# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-cv-1776-JRT-HB |
| This Document Relates To:<br><br>ALL ACTIONS | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' COMPLAINT AND THE FEDERAL LAW CLAIMS IN THE INDIRECT PURCHASER PLAINTIFFS' COMPLAINTS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED** |

## TABLE OF CONTENTS

                                                                                **Page**

INTRODUCTION AND SUMMARY ................................................................. 1

LEGAL STANDARD ................................................................................... 10

ARGUMENT ............................................................................................. 12

I.  PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE ANTITRUST
    CONSPIRACY ................................................................................. 12

    A.  The Complaints Lack Sufficient Factual Allegations of Agreements
        on Supply and Rest on Impermissible Group Pleading. ................ 13

        1.  There Are No Allegations of Agreement on Supply ............... 13

        2.  Allegations as to "Defendants" as a Group Are Not Enough. ...... 15

    B.  Nothing Alleged About Agri Stats Plausibly Establishes a
        Conspiracy. ............................................................................. 17

    C.  The Complaints' Allegations Contradict the Existence of the
        Purported Conspiracy. .............................................................. 20

        1.  Pork Production Increased Significantly and Defendants
            Expanded Capacity. .......................................................... 20

        2.  The Complaints Do Not Plausibly Allege Foreknowledge of
            Competitors' Future Supply Plans. ...................................... 25

        3.  The Absence of Vertical Integration Across Defendants
            Renders Plaintiffs' Theory Implausible. .............................. 26

        4.  The Complaints Allege No Unprecedented Increase in
            Industry Exports During the Alleged Conspiracy. ................. 29

        5.  The Complaints Acknowledge that the Only Production
            Decreases Occurred During Periods of Recession, Disease,
            and Higher Corn Prices. .................................................... 31

    D.  Plaintiffs' "Plus Factors" Do Not Save the Complaints from
        Dismissal. ............................................................................... 35

        1.  Alleged Signaling Through Public Statements. .................... 35

        2.  Opportunities to Collude. .................................................. 40

        3.  Industry Structure. ........................................................... 41

        4.  Increased Earnings. ........................................................... 42

        5.  Purportedly Abnormal Pricing. ........................................... 44

        6.  Market Share Stability. ...................................................... 45

E.  Plaintiffs' Misplaced Reliance on the *Broiler* Litigation Cannot Establish a Plausible Pork Conspiracy. ....................................... 46

　　1.  No Historically Unprecedented Decrease in Rate of Production. ...................................................................................... 47

　　2.  No Specific Production Cuts by All Producers. ............................... 48

　　3.  No Suspicious Timing of Meetings and Production Cuts. ............... 49

　　4.  No Unprecedented Methods to Effectuate Conspiracy. ................... 50

　　5.  Broiler Chickens and Hogs Are Different in Material Respects. ............................................................................................ 50

II.  PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS. .................................................................................... 51

A.  A Motion to Dismiss Should Be Granted When the Complaint Shows That a Claim Is Time-Barred. ............................................ 52

B.  Plaintiffs' Federal Antitrust Claims Are Time-Barred. ............................... 53

C.  Plaintiffs Have Not Sufficiently Pleaded Fraudulent Concealment. ........... 54

　　1.  Fraudulent Concealment Is Unavailable Because the Facts Supposedly Evincing a Conspiracy Have Been in the Public Record for Years. .............................................................................. 55

　　2.  Plaintiffs Fail to Allege Facts Showing that Defendants Took Affirmative Steps to Conceal Their Cause of Action. ..................... 58

　　3.  Plaintiffs Fail to Allege They Were Actually Misled by Any Affirmative Act of Concealment. ...................................................... 61

　　4.  Plaintiffs Are Silent on Due Diligence. ........................................... 61

D.  The Continuing-Conspiracy Doctrine Does Not Apply. ............................. 64

CONCLUSION ............................................................................................. 66

# TABLE OF AUTHORITIES

**Page**

## Cases

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
No. 13 CIV. 981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ................................. 43

*Affordable Cmtys. of Mo. v. Fed. Nat'l Mortg. Ass'n*,
714 F.3d 1069 (8th Cir. 2013) ............................................................................... 28

*Am. Channel, LLC v. Time Warner Cable, Inc.*,
No. 06-2175, 2007 WL 142173 (D. Minn. Jan 17, 2007) ........................................... 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................... 4, 11, 20, 43

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ............................................................................ 12, 42

*Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
94 F. Supp. 3d 1035 (D. Minn. 2015) ......................................................................... 36

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................. *passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
203 F.3d 1028 (8th Cir. 2000) ......................................................................... 7, 18, 40

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ....................................................................... *passim*

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ............................................................................................. 44-45

*Brown v. Medtronic, Inc.*,
628 F.3d 451 (8th Cir. 2010) ...................................................................................... 11

*Buetow v. A.L.S. Enters., Inc.*,
564 F. Supp. 2d 1038 (D. Minn. 2008) ....................................................................... 12

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011) ......................................................................... 11, 12, 42

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) ........................................................ 28

*Cascades Computer Innovation LLC v. RPX Corp.*,
  No. 12-CV-01143, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013) .................................. 20

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
  No. 11 Md. 02213, 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013) ............................ 15

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) ........................................................ 32

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ........................................................ 46

*Erie Cty., Ohio v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ................................................. 15, 46

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
  788 F. Supp. 1042 (D. Minn. 1992) ......................................... 17, 40

*In re Fla. Cement & Concrete Antitrust Litig.*,
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) ........................................ 42

*Granite Falls Bank v. Henrikson*,
  924 F.2d 150 (8th Cir. 1991) ........................................................ 53

*Great Plains Tr. Co. v. Union Pac. R.R. Co.*,
  492 F.3d 986 (8th Cir. 2007) ........................................................ 54

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
  647 F. Supp. 2d 1250 (W.D. Wash. 2009) .................................... 50

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009) ........................................ 18

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  797 F.3d 538 (8th Cir. 2015) ................................................. *passim*

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  No. 13-2664, 2014 WL 943224 (D. Minn. Mar. 11, 2014)
  *aff'd*, 797 F.3d 538 (8th Cir. 2015) ............................... 53, 54, 61

*Kansas City, Mo. v. Fed. Pac. Elec. Co.*,
  310 F.2d 271 (8th Cir. 1962) ........................................................ 61

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
   775 F. Supp. 2d 1071 (N.D. Ill. 2011) ......................................................... 48

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ..................................................................................... 64

*In re Late Fee & Over-Limit Fee Litig.*
   528 F. Supp. 2d 953 (N.D. Cal. 2007) .............................................. 32-33, 42

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
   705 F.3d 129 (2d Cir. 2013) ................................................................. 12, 19

*McDonough v. Anoka Cty.*,
   799 F.3d 931 (8th Cir. 2015) ........................................................... 4, 11, 20

*In re Milk Prod. Antitrust Litig.*,
   84 F. Supp. 2d 1016 (D. Minn. 1997),
   *aff'd*, 195 F.3d 430(8th Cir. 1999) ......................................................*passim*

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*,
   5 F. Supp. 2d 694 (D. Minn. 2000)............................................................. 37

*Montero v. Bank of Am., N.A.*,
   No. 13-cv-850, 2014 WL 562506 (D. Minn. Feb 13, 2014)......................... 25

*In re Monosodium Glutamate Antitrust Litig.*,
   No. CIV. 00MDL1328, 2003 WL 297287 (D. Minn. Feb. 6, 2003) ............. 58

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ............................................................. 33, 43

*name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*,
   795 F.3d 1124 (9th Cir. 2015) ................................................................... 18

*New Prime, Inc. v. Eaton Corp.*,
   No. 16-3407-CV-S-SRB, 2017 WL 5992466 (W.D. Mo. Mar. 16, 2017).............59, 61

*Nitro Distrib., Inc. v. Alticor, Inc.*,
   565 F.3d 417 (8th Cir. 2009) ..................................................................... 53

*Nunez v. Best Buy Co., Inc.*,
   315 F.R.D. 245 (D. Minn. 2016) ................................................................ 12

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   310 F. Supp. 3d 1002 (E.D. Mo. 2018) ...................................................... 35

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ...................................................... 36, 48

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
  828 F.2d 211 (4th Cir. 1987) ............................................................. 55, 60, 64

*Process Controls Int'l, Inc. v. Emerson Process Mgmt.*,
  753 F. Supp. 2d 912 (E.D. Mo. 2010) .................................................. 32, 40

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  860 F.3d 1059 (8th Cir. 2017)
  *cert. denied*, 138 S. Ct. 647 (2018) ................................................ 14-15, 64

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  893 F.3d 1047 (8th Cir. 2018) ............................................................. *passim*

*Prosterman v. Am. Airlines, Inc.*,
  No. 17-15468, 2018 WL 4018147 (9th Cir. Aug. 23, 2018) ..................... 6, 18

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,
  9 F. Supp. 3d 1032 (D. Minn. 2014) ...................................................... 12, 16

*Ripplinger v. Amoco Oil Co.*,
  916 F.2d 441 (8th Cir. 1990) ....................................................................... 58

*Rotella v. Wood*,
  528 U.S. 549 (2000) ..................................................................................... 53

*Shimota v. Wegner*,
  No. 15-1590, 2016 WL 1254240 (D. Minn. Mar. 29, 2016) ................... 19, 40

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ..................................................................... 24

*Summerhill v. Terminix, Inc.*,
  637 F.3d 877 (8th Cir. 2011) .................................................................. 52, 54

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
  738 F. Supp. 2d 505 (D. Del. 2010) ............................................................ 37

*Target Corp. v. LCH Pavement Consultants, LLC*,
  No. 12-1912, 2013 WL 2470148 (D. Minn. June 7, 2013) .......................... 19

*Tatone v. SunTrust Mortg., Inc.*,
  857 F. Supp. 2d 821 (D. Minn. 2012) .......................................................... 15

*United Magazine Co. v. Murdoch Magazines Distrib.*,
 146 F. Supp. 2d 385 (S.D.N.Y. 2001) ........................................................ 20

*United States v. Bestfoods*,
 524 U.S. 51 (1998) .................................................................................... 16

*United States v. U.S. Gypsum Co.*,
 438 U.S. 422 (1978) ............................................................................. 6, 17

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
 873 F.3d 185 (3d Cir. 2017) ................................................................ 7, 17

*Varner v. Peterson Farms*,
 371 F.3d 1011 (8th Cir. 2004) ................................................................. 52

*W. Coast Hotel Co. v. Parrish*,
 300 U.S. 379 (1937) .................................................................................. 32

*Washington Cty. Health Care Auth., Inc.*,
 No. 16 CV 10324, 2018 WL 3313010 (N.D. Ill. July 5, 2018) ................... 39

*In re Wholesale Grocery Prods. Antitrust Litig.*,
 722 F. Supp. 2d 1079 (D. Minn. 2010) ..................... 54, 55, 58, 60, 61, 64

*Williams v. First Nat'l Bank of St. Louis*,
 No. 4:14-CV-01458, 2014 WL 5800199 (E.D. Mo. Nov. 7, 2014) ........ 24, 25, 26

*Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*,
 520 F.2d 289 (8th Cir. 1975) ................................................................ 63-64

*Wood v. Carpenter*,
 101 U.S. 135 (1879) .................................................................................. 61

*Yellen v. Hake*,
 437 F. Supp. 2d 941 (S.D. Iowa 2006) ..................................................... 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 401 U.S. 321 (1971) .................................................................................. 53

## Statutory Authorities

15 U.S.C. § 15b ............................................................................... 51, 53

## Rules and Regulations

17 C.F.R. § 229.303(a)(3)(ii) (2018) ............................................................ 36

Fed. R. Civ. P. 10(c) ......................................................................................................... 11

## INTRODUCTION AND SUMMARY

Defendants respectfully submit that this case should never have been filed: it is the rare case that unambiguously fails to satisfy even the most basic pleading requirements. Notably, this litigation was commenced by the same group of plaintiffs' lawyers that are leading a pending antitrust suit (referenced throughout the Complaints) in the Northern District of Illinois, relating to the broiler chicken industry and against a number of the same defendants. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ("*Broiler*"). But glaringly absent here are any of the types of allegations that caused the *Broiler* court to let the plaintiffs there through the 12(b)(6) motion gate. The case here represents a misguided effort to place the "square peg" of the *Broiler* case into the "round hole" of a different industry—and the effort fails even when Plaintiffs' allegations are viewed in the most charitable light.

Federal courts must be "reasonably aggressive in weeding out meritless antitrust cases at the pleading stage," given the "unusually high cost of discovery[,] . . . the limited success of judicial supervision in checking discovery abuse, and the threat that discovery expense will push cost-conscious defendants to settle even anemic cases." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (citations omitted). This is just such a meritless case.

**The Complaints Fail to Allege Any Agreement.** Plaintiffs assert that "from at least 2009" to the present, Defendants conspired "to limit hog supply" and "coordinate[] production limits" in order to increase prices of pork products, including "smoked ham,

1

sausage and bacon." Compl. ¶¶ 2 & n.2, 60, 120.[1] But the Complaints allege no facts about any meetings or conversations—much less agreements—between Defendants about production. Instead, Plaintiffs lump Defendants together as a group and make the vague and conclusory assertion that at some undefined date or dates, sixteen different companies agreed to enter an undefined "scheme to limit hog supply" and also, at various other unspecified times over the course of a decade, "coordinated production limits." Compl. ¶¶ 60, 120. Such conclusory allegations cannot satisfy the requirement that the plaintiff in an antitrust case plead "factual content" by "list[ing] relevant individuals, acts, and conversations" to "support the reasonable inference that the defendant is liable for" the alleged conspiracy. *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (citations omitted).

**The Complaints Show That Supply and Capacity *Increased* During the Alleged Conspiracy.** Although the premise of the Complaints is that Defendants conspired to limit the supply of hogs in order to reduce the supply of pork on the market and thus raise pork prices, the Complaints include virtually no allegations about *any* hog or pork supply reductions. There are not even allegations about when or how individual Defendants implemented specific hog or pork supply reductions,[2] much less any specifics about the

---

[1] As the three operative complaints ("Complaints") contain many of the same allegations, as well as other substantively similar allegations, paragraph references are to the Direct Purchaser Plaintiffs' complaint in *Maplevale Farms Inc. v. Agri Stats, Inc.*, No. 18-cv-01803 (D. Minn.), Dkt. No. 83 ("Compl.") unless otherwise indicated.

[2] There are also no allegations that, during the alleged conspiracy, any pork processing facility was shut down or mothballed, any hog farms were shuttered, or that hog farmers' contracts were cancelled or adjusted downward in terms of supply.

alleged "coordinated production limits."   Compl. ¶ 60.   Instead, Plaintiffs rely on aggregated industry-wide data as support for their theory that Defendants conspired to restrict supply.   But the aggregated data show *that supply dramatically increased overall during the alleged conspiracy period*, as well as during most years throughout it (with significant increases occurring in 2011, 2012, and every year since 2014).  *Id*. ¶ 107, fig. 3.  Importantly, the overall increase in production aligns with the general trend before the alleged conspiracy period.  *Id*.[3]

The significant increase in pork production during the alleged conspiracy plainly required more hogs.   And given the Complaints' acknowledgement that it "takes nearly two years to substantially increase production," *id*. ¶ 52, hog production ramp ups had to occur throughout the purported conspiracy period to support the increased pork production during so many years of that period.  *Id*. ¶ 107, fig. 3.  The Complaints even explicitly acknowledge that such "ramping up" of supply is at odds with the alleged conspiracy.  *Id*. ¶ 66.  The Complaints also confirm that Defendants' pork production capacity increased— through both the costly expansion of existing plants and the building of new ones—during the alleged conspiracy.  *See, e.g.*, *id*. ¶¶ 84, 130.

Given this, Plaintiffs are left to allege that Defendants purportedly "acted in a concerted way to decrease supply" in *only three years*:  2009, 2010, and 2013.  *Id*. ¶ 107.

---

[3]  Similarly, some, but not all, Plaintiffs further allege that Defendants "reduced domestic supply by devoting more and more production exports to overseas markets."  Compl. ¶ 108. But, among other flaws with this alleged export conspiracy, the trend of increasing exports started well before the start of the alleged conspiracy, and exports increased at a higher rate before the alleged conspiracy than during it.  *Id*. ¶ 108, fig. 4.

3

But the Complaints themselves point to obvious alternative explanations for any temporary dips in production during these three particular years, including the major economic recession and pig disease (2009 and 2010), pig disease (2013 and 2014), or other market-wide pressures, including the rise in corn prices (2009, 2010, and 2013). These "obvious alternative explanation[s]" for the temporary dips in production, during an alleged conspiracy period in which supply *increased* overall, fundamentally undermine any inference of conspiracy. *McDonough v. Anoka Cty.*, 799 F.3d 931, 945-46 (8th Cir. 2015) (determining plausibility of an antitrust claim is a "context-specific" inquiry that "requires the reviewing court to draw on its judicial experience and common sense," and closely evaluate "whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 682 (2009)).

**The Alleged Conspiracy Is Implausible on Its Face: Defendants Are Mostly Hog *Purchasers*, Not Hog *Producers*.** Critical to Plaintiffs' theory is that "vertical integration"—Defendants' alleged control of both hog production (*i.e.*, breeding and raising pigs from birth until they are fully-grown hogs) and pork processing (*i.e.*, slaughtering hogs and producing pork products)—allows Defendants to limit hog supply to "directly control the supply and production of pork." *Id.* ¶ 69. The individual indirect purchaser Plaintiffs allege it was this vertical integration that "allowed the scheme to

succeed."  IIP Compl. at p. 32.[4]  Thus, *according to Plaintiffs*, absent such vertical integration, pork processors cannot control the supply of hogs and thus the supply of pork.

Although Plaintiffs lump sixteen different Defendants together as the "pork *integrator* Defendants," Compl. ¶ 1 (emphasis added), they do not actually allege that Defendants were vertically integrated throughout the alleged conspiracy or controlled the rearing and sale of hogs.  *Id*. ¶¶ 68-73.  In fact, the sixteen Defendants that Plaintiffs allege participated in this decade-long conspiracy are widely divergent.  The majority of the Defendants[5] are simply "pork processors" who do not raise hogs but primarily "buy hogs from independent farmers," *id*. ¶ 83, to produce pork products.  Only three pork-processing Defendants are alleged to have any "significant" hog production at all (which Plaintiffs define as merely having at least a five percent market share).  IIP Compl. ¶ 111.  Put simply, five of the eight pork-processing Defendants[6] primarily or exclusively *purchase* hogs from suppliers and do not control any meaningful hog supply.  These hog *purchasing* Defendants also have no economic incentive to *increase* hog prices.  And Plaintiffs have not explained anywhere in the Complaints why these hog *purchasers* would, contrary to their own

---

[4]  *Duryea v. Agri Stats, Inc.*, No. 18-cv-01776 (D. Minn.), Dkt. No. 74 ("IIP Compl.").  "IIPs" refers to the Individual Indirect Purchaser Plaintiffs.

[5]  A number of the Defendants—The Clemens Family Corporation, JBS USA Food Company Holdings, Mitsubishi Corporation (Americas), and Seaboard Corporation—are simply the parent or shareholder companies of pork-producing Defendants.  Beyond corporate ownership, there are no factual allegations at all about these non-pork producing entities.  *See infra* at 16.

[6]  Hormel Foods Corporation, Indiana Packers Corporation, JBS USA Food Company, Triumph Foods LLC, and Tyson Foods, Inc.

economic interests, conspire with hog *producers*.   These defects are fatal to the entire theory underlying the Complaints.

**The Allegations About Agri Stats Do Not Support a Plausible Inference of Conspiracy.**   Plaintiffs allege that Agri Stats—a data benchmarking service—was "key" to the formation and operation of the alleged scheme.   Compl. ¶ 48.   The Complaints conclusorily allege that Agri Stats "supplie[d] the data necessary" for Defendants to "coordinate production limitations," *id*. ¶ 66, and that this data "allowed [a Defendant] to know confidential supply information from its competitors" and "to know that supply would not increase in the future."   *Id.* ¶ 122.

Wholly absent from the Complaints, however, is *any* well-pleaded allegation of an agreement among Defendants to use Agri Stats as a means to reduce supply.   Nor do the Complaints allege that any Defendant took any action based on Agri Stats data, let alone any action in coordination with other Defendants.   The allegations here suggest only that each Defendant used a benchmarking service, which is insufficient to establish a plausible conspiracy.   *See, e.g.*, *Prosterman v. Am. Airlines, Inc.*, No. 17-15468, 2018 WL 4018147, at *2-3 (9th Cir. Aug. 23, 2018) (dismissing price-fixing claim notwithstanding allegations that airline defendants shared access to information through a non-airline defendant). Indeed, drawing an inference of unlawful conspiracy based on Agri Stats is inappropriate given that exchange of benchmarking information can "increase economic efficiency and render markets more, rather than less, competitive."   *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

The Complaints also allege that Agri Stats purportedly "allow[ed] each member of the cartel to police each other's production . . . for signs of cheating." Compl. ¶ 66. But the Complaints fail to allege any conspiracy for the Defendants to have policed, let alone how any Defendant could even use the information to police and enforce that undefined conspiracy. Assertions that Defendants "policed" an assumed conspiracy through "data sharing" cannot be used as an end-run around Plaintiffs' obligation to plausibly allege the underlying conspiracy itself. *See, e.g., Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 198 (3d Cir. 2017) (citing *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) ("a litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly")).

**The Complaints' Citations to Certain Public Statements Undermine Plaintiffs' Conclusory Assertion of Conspiracy.** The Complaints cite various public statements made by several executives in 2010 and 2011, alleging the Defendants purportedly knew that supply would not increase. But the Complaints confirm that after these statements were made, supply *actually increased*, while major producers also *increased capacity*. Compl. ¶¶ 84, 107, fig. 3, 130. In any event, the statements cited in the Complaints are, at most, generalized comments about the state of the industry that evince no coordination among any Defendants, or even parallel behavior. Nearly all of the statements were made during public "earnings calls" by publicly traded companies required to disclose information about the marketplace. And the Complaints allege four of the eight Defendants either made only a single such public statement or none at all.

7

**No Conspiratorial Acts Are Alleged to Have Occurred After 2013**.  Despite alleging a decade-long conspiracy, there are no allegations of any conspiratorial conduct *at all*—concerning coordinated supply reductions or otherwise—during the second half of the alleged conspiracy.

**No Significant Plus Factors Are Alleged Here.**  As detailed below, the Complaints point to several purported "plus factors"—such as Defendants' participation in trade associations, the structure of the pork industry, purported increases in earnings margins, and stability of market shares—all of which are factually and legally deficient, and offer no support for the existence of a conspiracy.

**Plaintiffs' Reliance on the *Broiler* Case Only Highlights the Deficiencies in the Complaints.**  Given the obvious flaws with their case about *hogs*, Plaintiffs are forced to try to seek refuge in the *Broiler* case.  But the Complaints lack any of the types of allegations on which the *Broiler* court relied in denying the motion to dismiss there:  the Complaints here do not (and could not) include allegations of specific production cuts by all producers; the Complaints do not (and could not) allege suspicious timing between meetings of Defendants and production cuts; the Complaints do not allege any unprecedented developments in the industry or historically unprecedented decreases in the methods or rate of production; and the Complaints cannot overcome material differences between the broiler chicken and pork industries.

**Plaintiffs' Claims Are Time-Barred.**  Even if Plaintiffs' factual allegations were sufficient to state a conspiracy claim (and they are not), dismissal would still be required because Plaintiffs' June 2018 complaints were filed long after the expiration of the four-

year statute of limitations.  Plaintiffs' factual allegations center around facts in the public record that pre-date the limitations period, such as (i) statements from public earnings calls in 2009 and 2010, through which Defendants allegedly "communicated the start" of their participation in a conspiracy and "communicated their planned supply restrictions;" (ii) supposedly "abnormal price movements" reflected in data published by the federal government "beginning in 2009;" (iii) publicly available data that allegedly show industry total production declines "[i]n 2009, 2010, and again in 2013" (but not since then); and (iv) publicly available information about pork industry trade association meetings.  The four-year limitations period under the Clayton Act (and many of the state laws under which the indirect purchasers assert claims) bars any claims that accrued before June 29, 2014.  Here, Plaintiffs' claims are based on publicly available facts and purported injuries that allegedly accrued beginning in 2009.  Accordingly, these claims are time-barred.

Plaintiffs try to salvage their time-barred claims through conclusory allegations aimed at invoking the doctrine of fraudulent concealment, but they do not allege any of the elements of that doctrine.  That failure is not surprising because Plaintiffs' factual allegations are sourced entirely from the public record.  Fraudulent concealment of public facts makes no sense.  Plaintiffs also offer the cursory assertion that an alleged conspiracy continued through the filing of the Complaints.  Even if Plaintiffs had plausibly alleged a continuing conspiracy, the statute of limitations would limit Plaintiffs' claims to transactions within the last four years.  But Plaintiffs allege no conspiratorial production cuts from 2014 to the present—the only production dip to which they can point during this time period is in 2014, which Plaintiffs acknowledge was the result of a widespread hog

disease.  Throughout the remainder of the time period, Plaintiffs' allegations show dramatically *increasing* pork production every year, which undermines their bald assertion of a continuing conspiracy.

* * *

At bottom, the length of a complaint says nothing about its timeliness or its sufficiency.  Stale claims premised entirely on information gleaned from publicly-available sources cannot avoid dismissal on statute of limitations grounds.  And the sufficiency of the Complaints cannot be fabricated through the assertion and repetition of wholly conclusory allegations, or the invocation of a readily distinguishable case in another Circuit involving another industry.  This case is not close to the line where a reasonable debate might be had about application of the *Twombly* plausibility standard.  Rather, this case falls squarely within the zone where Eighth Circuit precedent compels dismissal.

## LEGAL STANDARD

Plaintiffs must allege facts demonstrating with "plausibility" that "the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds" to restrain trade.  *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543-44 (8th Cir. 2015) (citations omitted).  This standard requires "more than labels and conclusions," and alleged conduct "merely consistent with [an] agreement" will not suffice. *Id*. at 543-44 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Determining whether a claim is plausible is a "context-specific" inquiry that "requires the reviewing court to draw on its judicial experience and common sense," and closely evaluate "whether there are lawful, 'obvious alternative explanation[s]' for the

10

alleged conduct." *McDonough v. Anoka Cty.*, 799 F.3d 931, 945-46 (8th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 682 (2009)).  Such evaluation is vital in antitrust cases, because allegedly parallel conduct may simply reflect the rational reactions of firms to "common perceptions of the market." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011) (quoting *Twombly*, 550 U.S. at 554).  Plaintiffs must therefore plead actual "factual content" by "list[ing] relevant individuals, acts, and conversations" in order to "support the reasonable inference that the defendant is liable for" the alleged conspiracy.  *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (citations omitted) ("*Propane II*").

Careful scrutiny is also required because of the massive discovery burdens such large antitrust cases typically entail.  As the Eighth Circuit has explained, courts must be "reasonably aggressive in weeding out meritless antitrust claims at the pleading stage," because of the "unusually high cost of discovery[,] . . . the limited success of judicial supervision in checking discovery abuse, and the threat that discovery expense will push cost-conscious defendants to settle even anemic cases." *Insulate*, 797 F.3d at 543 (citations omitted).

Relatedly, "documents attached to or incorporated within a complaint are considered part of the pleadings, and courts may look at such documents 'for all purposes,' FED. R. CIV. P. 10(c), including to determine whether a plaintiff has stated a plausible claim." *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459-60 (8th Cir. 2010); *see also Twombly*, 550 U.S. at 568 n.13 (holding that "the District Court was entitled to take notice of the full contents of the published articles, from which the truncated quotations [in the complaint]

11

were drawn"); *Nunez v. Best Buy Co., Inc.*, 315 F.R.D. 245, 248 n.1 (D. Minn. 2016) (holding that third-party study was "embraced by the" complaint where complaint "quotes directly from the" study and "draws conclusions from" it); *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1045 n.6 (D. Minn. 2014) (Tunheim, J.) (in deciding a Rule 12 motion, a court may consider documents "necessarily embraced by the complaint") (citation omitted).

## **ARGUMENT**

## I.  **PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE ANTITRUST CONSPIRACY.**

The "hallmark of [a] conspiracy is agreement." *Buetow v. A.L.S. Enters., Inc.*, 564 F. Supp. 2d 1038, 1041 (D. Minn. 2008) (citation omitted).  "[T]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (citations omitted).  Here, Plaintiffs fail to allege any direct evidence—that is, evidence that is explicit and requires no inferences to establish the conclusion being asserted—of any supply-reduction conspiracy.  *See Burtch*, 662 F.3d at 225 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)); *see also Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 705 F.3d 129, 136-40 (2d Cir. 2013).

Plaintiffs further fail to allege even circumstantial facts sufficient to support a plausible inference of a conspiracy.  They instead rely on purely conclusory allegations that Defendants entered an "agreed upon scheme to limit hog supply," imposed "coordinated production limits" to increase prices, and agreed to "use the exchanged

benchmarking information to coordinate supply and stabilize and increase prices of pork sold in the United States." Compl. ¶¶ 48, 60, 120. But these are just "naked assertions" of conspiracy. *Propane II*, 893 F.3d at 1057. Critically, the Complaints include no details regarding any purported "agreed-upon plans for coordinated production limits," such as how that agreement was reached, what limits were agreed upon, or how those limits were to be implemented by each Defendant. Compl. ¶ 60.

Rather than plausibly suggesting any supply-reduction conspiracy, what little the Plaintiffs do allege directly contradicts their theory. In fact, the Complaints show that during the alleged conspiracy period, pork supply significantly *increased* overall, that the majority of Defendants did not control hog supply, and that the few downturns in pork supply happened during periods of major economic recession, hog disease, or other market-wide pressures, providing obvious alternative explanations for these temporary supply reductions.

## A.    The Complaints Lack Sufficient Factual Allegations of Agreements on Supply and Rest on Impermissible Group Pleading.

### 1.    There Are No Allegations of Agreement on Supply.

The Complaints never actually describe the "agreed upon scheme to limit hog supply." Compl. ¶ 120. They say nothing about (i) what hog supply reductions and "coordinated production limits" were agreed upon and when; (ii) which Defendants implemented those limits and when; or (iii) the duration of the supposedly agreed-upon supply reductions, especially given the conceded increase in hog production in every year

after 2014. *Id.* ¶ 60. Defendants and this Court cannot be left to guess how a conspiracy might have transpired. *Twombly* and its progeny require far more.

Eighth Circuit case law distinguishes "naked assertions" that "do not 'raise a right to relief above the speculative level,'" from allegations that "list *relevant individuals, acts, and conversations*" and "provid[e] factual content to support the reasonable inference the defendant" is liable for conspiring in violation of antitrust law. *Propane II*, 893 F.3d at 1057 (emphasis added) (citations omitted). The latter are wholly absent here.

Likewise, the Complaints lack factual content about "acts" in furtherance of the alleged conspiracy—*i.e.*, supply reductions. Beyond conclusory assertions, there are no factual allegations indicating any parallel conduct to reduce supply or "coordinated production limits."[7]

In sum, the glaring absence of *any* alleged conspiratorial acts and inter-Defendant communications means that Plaintiffs offer no basis to even suggest Defendants entered into a decade-long conspiracy. *Cf. In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069-70 (8th Cir. 2017) (en banc) (alleged conspiracy plausible where plaintiffs alleged that (a) the executives of two competitors "exchanged seven phone calls on June 18 and 19, 2008," during which one of the executives "told [his counterpart] that '[his company] would follow closely behind [the competitor] if it successfully implemented its

---

[7] The only allegations that come close to indicating any actual supply reductions concern a single Defendant, Smithfield. Compl. ¶ 114 (referencing 3% reduction); *id.* ¶ 119 (referencing 8% reduction). But, Smithfield is also alleged to have begun significant supply reductions in February 2008, *id.* ¶ 112—well before the alleged conspiracy—such that the alleged subsequent reductions are no basis to infer any conspiracy.

14

fill reduction, and that it would not sell both 15-pound and 17-pound tanks,'" and (b) that the competing companies actually "reduced their fill levels from 17 pounds per tank to 15 pounds per tank while maintaining the same price per 'full' tank" by "no later than spring 2008" (citations omitted)), *cert. denied*, 138 S. Ct. 647 (2018).

## 2. Allegations as to "Defendants" as a Group Are Not Enough.

Instead of showing parallel supply reduction by each Defendant, Plaintiffs rely on aggregated, industry-wide annual production data that purportedly show "Defendants implemented capacity and supply restraints" during the alleged conspiracy.  Compl. at p. 39.  Those data, however, are aggregated and necessarily mask what each Defendant was doing; and do "not give rise to an inference of an unlawful agreement." *Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (aggregated market-wide data are "simply descriptions of the market, not allegations of anything that the defendants did"); *see also In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, No. 11 Md. 02213, 2013 WL 1100770, at *4 (S.D.N.Y. Mar. 18, 2013) (finding "generalized fluctuations" in data do not render a claim plausible without "sufficiently factual" allegations to "link these fluctuations to actions undertaken by" a defendant).

Plaintiffs' bid to lump all sixteen Defendants together through blunderbuss use of aggregated data and by referring generically to "Defendants" or the "pork integrators" throughout the Complaints falls well short of meeting pleading standards.  As this Court has explained, "[a] complaint which lumps all defendants together" does not satisfy Rule 8 because it "does not sufficiently allege who did what to whom." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831-32 (D. Minn. 2012) (collecting cases); *see also*

*Twombly*, 550 U.S. at 565 n.10 (2007) (a complaint fails when it "furnishes no clue" as to which defendants supposedly agreed or when and where the illicit agreement took place); *In re Milk Products Antitrust Litig*., 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997) (dismissal required where defendant was simply "lump[ed]" together with other defendants without any well-pleaded allegations), *aff'd*, 195 F.3d 430 (8th Cir. 1999).

Plaintiffs take this improper group pleading approach to the extreme by naming corporate parents or shareholders as Defendants based solely on their affiliation with their subsidiaries.[8]  But the mere allegation of corporate ownership is clearly deficient.  As this Court has recognized, "in order for antitrust allegations against a subsidiary to be fairly made against the parent company, there must be allegations that the parent company actually engaged in anti-competitive conduct and not merely that it served as parent to its wholly-owned subsidiary."  *Reg'l Multiple Listing Serv. of Minn., Inc.*, 9 F. Supp. 3d at 1044-45; *see also United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries.") (citation omitted).  Here, Plaintiffs do not claim that these Defendants engaged in any conduct apart from their subsidiaries, so they must be dismissed.

---

[8]  The parent/shareholder company Defendants are The Clemens Family Corporation, Mitsubishi Corporation (Americas), JBS USA Food Company Holdings, and Seaboard Corporation.

16

**B.      Nothing Alleged About Agri Stats Plausibly Establishes a Conspiracy.**

Agri Stats is a "benchmarking service" that provides data that allows a company to compare its "practices, methods or performance against those of other companies."  Compl. ¶ 43.  But using benchmarking information, including production and pricing information, is generally lawful, efficiency-maximizing, and pro-competitive.  *See U.S. Gypsum Co.*, 438 U.S. at 441 n.16 (finding information sharing can "increase economic efficiency and render markets more, rather than less, competitive"); *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1047 (D. Minn. 1992) (same).

Plaintiffs claim that Agri Stats' benchmarking service "was key to the formation, operation, and continuing stability of the Defendants' anticompetitive scheme."  Compl. ¶ 48.  But the Complaints include no allegation that Agri Stats ever suggested any "coordinated production limits" upon which Defendants then agreed.  Instead, Plaintiffs *assume* the existence of a conspiracy, and then attempt to portray Agri Stats as a mechanism for implementing and enforcing the assumed conspiracy.  For example, the Complaints claim that Agri Stats "supplie[d] the data necessary" for Defendants "to coordinate production limitations," data which purportedly "allow[ed] each member of the cartel to police each other's production . . . for signs of cheating."  *Id*. ¶ 66.

While these conclusory allegations are not entitled to any presumption of truth, even giving Plaintiffs that unwarranted benefit avails nothing.  That benchmarking data *could* conceivably be used to police an assumed conspiracy does not plausibly suggest a conspiracy.  *See, e.g.*, *Valspar Corp.*, 873 F.3d at 198 (defendants' participation in a "data sharing program" purportedly to monitor a conspiracy suffered from a "loaded

question fallacy," because rather than provide an answer as to whether "a conspiracy existed," the plaintiff only tried to show how the data sharing program "further[ed] the conspiracy" (citing *Blomkest Fertilizer, Inc.*, 203 F.3d at 1033 ("[A] litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly."))); *name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1131 (9th Cir. 2015) (a court "cannot infer a conspiracy based on speculation" that a "conspiracy is theoretically possible"); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 518 (S.D.N.Y. 2009) (allegations that "require the Court to assume the existence of the alleged conspiracy" do not establish a plausible inference of agreement).

Notably, the Complaints allege no facts about the production limits that were supposedly agreed upon, or the agreement Defendants were supposedly monitoring. *See Insulate*, 797 F.3d at 546 (dismissal is appropriate when "the complaint does not allege when the agreements occurred" or "provide any other specific factual allegation that would create an inference that an agreement was made").

Instead, Plaintiffs apparently hope the Court will join them in assuming a conspiracy, and then imagine that Agri Stats could have been used to facilitate that conspiracy. But the mere use of a purported "coordination facilitating device" (here Agri Stats) is insufficient to establish an anticompetitive agreement. *See, e.g.*, *Prosterman v. Am. Airlines, Inc.*, 2018 WL 4018147 (dismissing price-fixing claim despite allegations that airline defendants effectuated conspiracy using information obtained through a non-airline defendant engaged in the collection, processing, and dissemination of passenger fare data).

18

These deficiencies are not cured by the Complaints' allegations that Agri Stats provided "forward-looking" data that "allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans." Compl. ¶ 60. Again, Plaintiffs never explain what the "agreed-upon plans" were, or how Agri Stats allowed Defendants to "have confidence that each member was following through with" that undefined agreement. *Id.* ¶ 48. Certainly, the "mere knowledge that others are engaged in similar conduct is insufficient to allege concerted conduct." *Target Corp. v. LCH Pavement Consultants, LLC*, No. 12-1912, 2013 WL 2470148, at *5 (D. Minn. June 7, 2013); *see also Mayor & City Council of Balt., Md.*, 709 F.3d at 139 (an alleged "high level of interfirm *awareness*" does not plausibly suggest conspiracy) (emphasis in original). Equally meaningless is Plaintiffs' observation that "Agri Stats' reports are unlike those of lawful industry reports," and therefore could have allowed each Defendant to "police" their competitors' "future production." Compl. ¶¶ 3, 60, 66.[9] Plaintiffs fail to offer even a theory of how such enforcement would work, let alone set forth any factual allegations of such supposed "enforcement" involving Agri Stats or otherwise. While Plaintiffs assert that "information through the Agri Stats reports" allowed Defendants "to know that the supply of pork would not be increasing," *id*. ¶ 121, the Complaints show that *supply increased*. *See infra* at 20-25.

---

[9] Likewise, the single press article concerning the *poultry* industry, in which one law professor describes the Agri Stats data as "unusual," Compl. ¶ 67, cannot "push the 'claims across the line from conceivable to plausible.'" *Shimota v. Wegner*, No. 15-1590, 2016 WL 1254240, at *10 (D. Minn. Mar. 29, 2016) (Tunheim, J.) (quoting *Twombly*, 550 U.S. at 570).

**C.   The Complaints' Allegations Contradict the Existence of the Purported Conspiracy.**

In at least five core respects, the allegations in the Complaints (and the materials incorporated by reference) negate the claim of a nearly decade-long "coordinated antitrust conspiracy by competitors to reduce and restrict supply."  Compl. ¶ 109.  Viewed as a whole through the lens of "common sense" and in light of "'obvious alternative explanations,'" these materials reinforce the conclusion that there is no plausible claim.  *McDonough*, 799 F.3d at 945-46 (quoting *Iqbal*, 556 U.S. at 678, 682); *see, e.g.*, *Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-CV-01143, 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013) (when an "alleged conspiracy makes no economic sense, the claim must be dismissed"); *United Magazine Co. v. Murdoch Magazines Distrib.*, 146 F. Supp. 2d 385, 401 (S.D.N.Y. 2001) (dismissal required when alleged facts demonstrate the alleged conspiracy makes no economic sense).

**1.   Pork Production Increased Significantly and Defendants Expanded Capacity.**

The Complaints include a chart supposedly demonstrating that Defendants "acted in a concerted way to decrease supply."  Compl. ¶ 107.[10]  But, this chart actually shows that pork production *increased* to historically high levels during the alleged conspiracy period:

---

[10]  Both the DPP and IIPs use this same chart.  The Commercial and Institutional Indirect Purchaser Plaintiffs ("CIPs") set forth a similar-looking chart of USDA data covering not production by weight, but number of hogs slaughtered annually.  *Sandee's Bakery v. Agri Stats, Inc.*, No. 18-cv-01891, Dkt. No. 63 ("CIP Compl."), ¶ 115.



Figure 3: U.S. Annual Commercial Hog Production by Weight, 2000-2017

This chart contradicts Plaintiffs' central claim that Defendants conspired over ten years to "limit hog supply" and impose "coordinated production limits."  Compl. ¶¶ 60, 120.  In fact, the largest increase in pork production since 2000 occurred in 2015, within the alleged conspiracy period.  As the Complaints acknowledge, all of this "ramping up pork production" is fundamentally at odds with the conspiracy's alleged goals.  *Id*. ¶ 66. Although Plaintiffs' chart shows dips in production in certain years (which the Complaints themselves attribute to the Great Recession, pig disease, and other factors as discussed below), the overall increase in production aligns with the general trend before the period at issue:

21



Figure 3: U.S. Annual Commercial Hog Production by Weight, 2000-2017

Therefore, Plaintiffs' chart belies any assertion of a "drastic change" supposedly caused by the alleged conduct, *id*. ¶ 107, and does not display an "unprecedented" break from which a decade-long conspiracy can be inferred. *See Twombly*, 550 U.S. at 557 n.4.

The significant increase in pork production depicted in the Complaints plainly requires more hogs. *See* CIP Compl. ¶ 115, fig. 4 (showing overall increase in the *number* of hogs slaughtered commercially during alleged conspiracy). It takes *years* of investment to achieve the supply increase reflected in the Complaints, as Plaintiffs acknowledge. Compl. ¶ 52 ("Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, *it takes nearly two years to substantially increase production*.") (emphasis added); *see also id.* ¶ 122. This means that steps necessarily were taken to *increase* hog supply years in advance of the substantial gains in production reflected in the chart. That reality is fundamentally at odds with an alleged ongoing, long-term "scheme to limit hog supply." *Id.* ¶ 120.

22

It is also self-evident that any significant increase in pork production (as is reflected in the data alleged by Plaintiffs) would require operating at higher capacity or investing in more capacity. And, the Complaints confirm that major pork processors made significant investments to increase their capacity in the middle of the alleged conspiracy period. In 2012, for example, Plaintiffs allege that Cargill—then the third or fourth largest pork processor in the country—spent $25 million to increase capacity. *Id.* ¶ 84. (Cargill is not named as a defendant, presumably because Defendant JBS USA purchased its pork business in late 2015. *Id.* ¶¶ 78-79.) It defies common sense that costly expansion efforts would be undertaken in the throes of a supposed conspiracy to reduce production.

The DPPs and CIPs also acknowledge that Defendants "Seaboard and Triumph announced plans to expand" capacity through their joint venture during the alleged conspiracy. *Id.* ¶ 130. Plaintiffs seek to infer conspiracy from capacity expansion by alleging that the two Defendants only announced such plans in February 2017, but eventually postponed adding a second shift to the plant "in furtherance of the conspiracy." *Id.* However, the Complaints set forth nothing even remotely suggesting that this decision was made pursuant to an unlawful *agreement* between the two companies or with any other Defendants. Absent such allegations, the joint venture's supposed decision not to expand as quickly as planned lends no plausibility to Plaintiffs' claims.

Furthermore, Plaintiffs' assertion severely mischaracterizes the materials cited in the Complaints, which state that Seaboard and Triumph began to "construct a new pork facility" in *September 2015*, that the plant actually opened in 2017, and that only the planned *second* shift at this entirely new pork production facility was postponed in June

23

2018 because of the "really tight" labor market in the area.[11]  The conclusory assertion that

Seaboard and Triumph did not expand capacity due to a conspiracy bears no weight, as

courts are "not required to accept as true conclusory allegations which are contradicted by

documents referred to in the Complaint."  *Yellen v. Hake*, 437 F. Supp. 2d 941, 954 (S.D.

Iowa 2006) (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir.

1998)); *see also Williams v. First Nat'l Bank of St. Louis*, No. 4:14-CV-01458, 2014 WL

5800199, at *4 (E.D. Mo. Nov. 7, 2014) (holding that "courts need not accept 'factual

assertions that are contradicted by' . . . documents upon which the pleadings rely").

Notably, the DPP and CIP Complaints, when alleging that capacity utilization

generally declined from 2008-2013, cite a U.S.I.T.C. report.  *See* Compl. ¶ 107 n.37.  But

that report actually states that "in November 2013, the estimated daily slaughter capacity

in the United States was . . . up 10 percent from . . . November 2008."[12]  All of this

undermines Plaintiffs' vague and conclusory allegation that Defendants "refused to

increase their capacity."  *See* Compl. ¶ 129.[13]

---

[11]  *See* October 23, 2018 Declaration of John A. Kvinge in Support of Motion to Dismiss, Ex. A.; Jeff DeYoung, *Pork Packing Capacity Faces Delays to Growth*, Iowa Farmer Today (June 2, 2018), https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html (cited at Compl. ¶ 130).

[12]  *See* U.S. INTERNATIONAL TRADE COMMISSION, PORK AND SWINE INDUSTRY & TRADE SUMMARY 22 (2014) (cited at Compl. ¶ 107 n.37).

[13]  Plaintiffs further refute their own conclusory allegation by relying on sources documenting significant capacity increases by other Defendants during the alleged conspiracy.  *See* Clemens Br. at 6-7 (Clemens built a new processing facility in Coldwater, Michigan during the alleged conspiracy period, which *doubled* its processing capacity by an additional 2.5 million hogs per year); Indiana Packers Br. at 4 (Indiana Packers Corporation increased capacity by 20 percent during the alleged conspiracy period).

At bottom, the Complaints' own allegations that supply *increased* and capacity *expanded* are flatly inconsistent with an alleged supply-reduction conspiracy. The Court need not accept as true, even at the motion to dismiss stage, those allegations that are "contradicted by the complaint itself." *Williams,* 2014 WL 5800199, at *4; *see also Montero v. Bank of Am., N.A.*, No. 13-cv-850, 2014 WL 562506, at *11 (D. Minn. Feb 13, 2014) (dismissing complaint where plaintiffs relied on "conclusory allegations" and "the record directly contradicts Plaintiff's allegations").

### 2.     The Complaints Do Not Plausibly Allege Foreknowledge of Competitors' Future Supply Plans.

Another core feature of Plaintiffs' conspiracy claim is that Defendants "relied" on Agri Stats to "effectuate . . . their anticompetitive agreement." Compl. ¶ 37. Plaintiffs repeatedly tout that "access to competitively sensitive information . . . through the Agri Stats reports" "allowed [Defendants] to know that the *supply of pork would not be increasing.*" *Id.* ¶ 121 (emphasis added); *see also id.* ¶ 5 (Defendants "communicated to each other that no supply increases would happen"); *id.* ¶ 48 (Agri Stats data gave Defendants "confidence that each member was following through with the agreement by limiting their production"); *id.* ¶ 122 ("[s]upply level information regarding competitors allowed Defendants to know that supply would not increase in the future"); IIP Compl. ¶ 5 (Defendants "publicly signaled to each other that no supply increases would happen").

As examples of this purportedly conspiratorial foreknowledge about future supply reductions, Plaintiffs cite various statements made by Defendants' executives during

earnings calls in 2010 and 2011 that supply and capacity were not expected to increase.[14]

Yet, contradicting Plaintiffs' own allegations, the Complaints show that after these

statements supply *actually increased in 2011, 2012, and subsequent years*, while major

producers also *increased capacity*. *Id.* ¶ 107, fig. 3; *see supra* at 20-25. If anything, the

Complaints' allegations reflect an absence of foreknowledge or collaboration between

Defendants, as the executives' predictions of declining supply were wrong. Again, the

Court need not accept as true, even at the pleading stage, allegations "contradicted by the

complaint itself." *Williams*, 2014 WL 5800199, at *4.

### 3. The Absence of Vertical Integration Across Defendants Renders Plaintiffs' Theory Implausible.

Another central tenet of Plaintiffs' theory is that "vertical integration"—controlling

both hog production and pork processing—allows Defendants to limit hog supply to

effectuate the alleged supply-reduction conspiracy. According to the DPPs, "[v]ertical

integration *allows the integrator Defendants to directly control the production and supply

of pork* through their wholly owned and operated farms where the hogs are raised, fed, and

prepared for slaughter." *Id.* ¶ 69 (emphasis added). As the IIPs make clear, Plaintiffs'

theory is that the supposedly "nearly fully vertical" integrated nature of the industry

---

[14] *See*, *e.g.*, Compl. ¶ 119 (March 2010 statement on "fourth quarter and 2011 volumes for pork," "indicated that further cuts were still to come"); *id*. ¶ 122 (November 2010 statement that "she did not think the industry would see large scale expansion given profitability for the pork integrators"); *id*. ¶ 146 (describing CEO in December 2010 as "confident pork supplies would not be increasing in the market" based on "information [the public] may not quite have"); *id*. ¶ 123 (February 2011 statement that "production levels can't change much in 2011"); *id*. ¶ 124 (March 2011 statement that "I don't see [capacity expansion] on the horizon").

"allowed the scheme to succeed."  IIP Compl. at p. 32.  Absent such integration, pork processors obviously cannot control the supply of hogs and thus the supply of pork.

Yet Plaintiffs do not allege that all—or even most—Defendants were vertically integrated throughout the alleged conspiracy.  Compl. ¶¶ 68-73.  At most, the DPPs and CIPs attribute vertical integration to *only three of the eight pork-producing Defendants* (Smithfield, Seaboard, and Clemens).  *Id.* ¶¶ 71-73.  And with respect to one of these three Defendants (Clemens), Plaintiffs are careful to describe it as "vertically coordinated," not "vertically integrated," because it is not a significant hog producer.  Indeed, the IIP complaint alleges that *only one Defendant* (Smithfield) is fully integrated, and that *only three defendants (Smithfield, Triumph and Seaboard) have any "significant" hog production at all*—defining "significant" in underwhelming terms as ">=5% market share." IIP Compl. ¶¶ 109, 111.  The Complaints also show that these three Defendants account for only about one-third of the pork processing industry.  Compl. ¶ 80, fig. 2.[15]

With their factual allegations showing an *absence* of vertical integration (*i.e.*, control over hog production), the alleged conspiracy is implausible and economically irrational under Plaintiffs' own theory.  A conspiracy to restrict hog production would increase input costs for non-vertically integrated Defendants that purchase hogs for processing from independent farmers.  The claim that the pork processing Defendants conspired to reduce hog production even though it would have been against their own

---

[15]  Two of these Defendants, Seaboard and Triumph, are very small players, each with an alleged 5% share in pork processing (which is distinct from hog production).  *Id*. ¶¶ 79-80, fig. 2.

economic interests undermines any inference of conspiracy. *See, e.g.*, *Am. Channel, LLC v. Time Warner Cable, Inc.*, No. 06-2175, 2007 WL 142173, at *7 (D. Minn. Jan 17, 2007) (granting motion to dismiss an antitrust case because no plausible motive to conspire alleged); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) (holding that "it is inherently implausible . . . that Ford conspired to injure itself").

Plaintiffs attempt to salvage their claim by alleging all Defendants used "pork production contracts," under which pork processors "retain ownership of the hogs and set the terms of how they are raised" by contracted farmers to control hog production.  No factual allegations suggest that a majority of the pork-processing Defendants—including JBS USA, the second largest pork processor with an alleged share of 20%, *see* Compl. ¶¶ 79-80, fig. 2—are vertically integrated through such contracts or otherwise.[16]  Instead, Plaintiffs again turn to impermissible group pleading, by trying to lump all eight pork processors together using the nomenclature, "pork *integrator* Defendants."  *Id.* ¶ 1 (emphasis added).  But given the Complaints' actual fact allegations, this "pork integrator Defendant" label—whatever it may mean—is sorely insufficient to buttress this core underpinning of Plaintiffs' alleged conspiracy.  *See, e.g.*, *Affordable Cmtys. of Mo. v. Fed. Nat'l Mortg. Ass'n*, 714 F.3d 1069, 1074 (8th Cir. 2013) (finding unpersuasive the plaintiff's use of "labels and conclusions" to establish defendants' agent-principal relationship) (citing *Twombly*, 550 U.S. at 555); *see also Insulate*, 797 F.3d at 543.

---

[16]  As explained in their separate briefs, Hormel, IPC, JBS USA, Triumph, and Tyson were not vertically integrated at all or in any meaningful way during the alleged conspiracy.

Crucially, however, the Complaints not only acknowledge that there are "independent farmers" from which Defendants "buy hogs," Compl. ¶ 83, but also the very source the DPPs and IIPs quote for their allegations about such contracts goes on to state that, industry-wide, only "40 percent [of hogs] are produced under a production contract."[17]

### 4. The Complaints Allege No Unprecedented Increase in Industry Exports During the Alleged Conspiracy.

The DPP and CIP Complaints allege that Defendants "reduced domestic supply by devoting more and more production exports to overseas markets." Compl. ¶ 108. While the IIPs raise no export-related allegations, the other Plaintiffs cite no facts to support their bald assertion of a conspiracy to reduce domestic supply by selling abroad. No facts are alleged to suggest which Defendants agreed to (or actually did) increase exports, when any agreements were reached, whether those agreements covered specific pork products, or if the level of pork demand in foreign markets or other factors even render an increase in exports remotely suspicious. On this basis alone, the export allegations carry no weight.

---

[17] Allen Harper, *Hog Production Contracts: The Grower-Integrator Relationship*, VIRGINIA COOPERATIVE EXTENSION (2009), https://vtechworks.lib.vt.edu/bitstream/handle/10919/48173/414-039_pdf.pdf?sequence=1&isAllowed=y (cited at Compl. ¶ 70).

Rather, the sum total of the allegations on this supposed "export increase" conspiracy is a single chart. *Id.* ¶ 108, fig. 4. But that chart shows that the trend of increasing exports began well before 2009:



Figure 4: U.S. Pork Exports as a Percent of Total Production, 2000-2017

Indeed, the sharpest increase in exports took place between 2007 and 2008, at least a year before the start of the alleged conspiracy. The chart also shows that Defendants significantly *reduced* exports in 2009, when the conspiracy allegedly began.

Finally, the chart shows that exports grew from 7% to 20% of total production between 2000 and 2008 (pre-conspiracy), and only marginally (from 20% to 23% of total production) from 2008 to 2017. Thus, the Complaints show that there are no "complex and historically unprecedented changes" that could plausibly suggest collusion. *Twombly*, 550 U.S. at 557 n.4. The increase in exports is instead *lower* than pre-period trends, and consistent with the "increased global demand" during the relevant time period that the Complaints acknowledge. *See* Compl. ¶ 134; *see also id.* ¶ 120 (referencing "increase in consumption in emergent markets").

### 5. The Complaints Acknowledge that the Only Production Decreases Occurred During Periods of Recession, Disease, and Higher Corn Prices.

Given the foregoing, Plaintiffs have no claim.  Indeed, given the material increase in production overall during the alleged conspiracy, the Complaints try to squeak by on the conclusory allegation that Defendants' "concerted" efforts caused production decreases in 2009, 2010, and 2013.  Compl. ¶ 107.  Only three years of production decreases in an alleged nearly decade-long conspiracy is remarkable by itself.  Moreover, the allegations of the Complaints, the materials cited therein, and other public information of which the Court can take judicial notice all reflect "obvious alternative explanations" for the alleged reductions during those three years.

2009 and 2010:  The decreases in 2009 and 2010 coincided with a devastating economic recession, a widely-reported Swine (or H1N1) Flu, and record high prices for corn, the primary cost component for raising hogs.  A September 2009 earnings call by Defendant Smithfield (from which Plaintiffs partially quote to support their allegations about hog "liquidation" in the industry during this period) states:

> I sort of feel like the world has been against us for 12 months. . . .  I look and say *record high corn prices*. . . .  *A 75-year recession hits us in the fall*.  The financial crisis, which hit many, many companies, and we had a reactive export market. . . .  [A]nd *Smithfield got its own, got its own flu, the Swine Flu or the H1N1 as it was named, and it called Smithfield a Ground Zero*. . . .  I want to comment at some point and say, "God, do you got anything left?"  I mean *this company has taken on about every single challenge that could possibly occur in one year*. . . .

*See* October 23, 2018 Declaration of John A. Kvinge  in Support of Motion to Dismiss, Ex. B at 6 (emphases added) (cited at Compl. ¶ 117).[18]

The "deep national recession" alone independently explains the production declines in 2009 and 2010.  *See, e.g.*, *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998–99 (9th Cir. 2014) (taking judicial notice of "deep national recession" from 2007 to 2009 and dismissing claim because the harm alleged by plaintiffs was equally explainable by "this innocent alternative" explanation); s*ee also W. Coast Hotel Co. v. Parrish,* 300 U.S. 379, 399 (1937) ("We may take judicial notice of the unparalleled demands for relief which arose during the recent period of depression and still continue to an alarming extent despite the degree of economic recovery which has been achieved."). Combined with the effects of the Swine Flu and the high corn prices that the Complaints acknowledge,[19] there can be no reasonable inference of an alleged supply reduction conspiracy in 2009 and 2010.  *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 920 (E.D. Mo. 2010) (an alleged antitrust conspiracy must be assessed "through the lens of common economic experience").  Here, "as in *Twombly*, the complaint itself provides an alternative explanation for the" alleged output reductions.  *In re Late Fee*

---

[18]  *See also id.* at 2 ("I think you're aware that the hog market was sharply lower.  That is to some degree the result of the H1N1 virus that hit at the very end of the fourth quarter and that certainly immediately depressed the live hog market . . . .").

[19]  Plaintiffs' own allegations reflect that hog disease and rising corn prices serve as legitimate, non-conspiratorial reasons for curtailing production.  *See* Compl. ¶ 107 (the "production dip in 2014 reflected the adverse impacts from the deadly pig disease"); *id.* ¶ 125 ("all of the sudden the corn market is up . . . .  And what I would tell you is that keeps a lid on pork production"); *see also supra* at 31.

*& Over-Limit Fee Litig.* 528 F. Supp. 2d 953, 962-63 (N.D. Cal. 2007) (citing *Twombly*, 550 U.S. at 567).

The DPP and CIP Complaints even quote an article written in *Hog Farmer* magazine by the Vice President of Agstar, a *lender* not alleged to have conspired with Defendants, who recognized the pressures facing hog producers during this period and advised that such producers "must reduce sow numbers." Compl. ¶ 92. That is, the Complaints concede that a non-conspiring third-party believed sow reduction would be a rational response to market-wide events.[20] To the extent other hog producers subsequently implemented supply reductions in response to these same marketplace conditions, that does not suggest any conspiracy both because most Defendants are not actually alleged to have any control over hog production, *see supra* at 26-29, and also because any hog producers that reduced supply could rationally just be reacting to the "similar market pressures" observed by the Agstar lender. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

---

[20] Specifically, the relevant portions of the article that Plaintiffs carefully omitted, thereby distorting the comment state: "*The level of volatility we have seen in the markets over the past 18 months is unprecedented, which makes it difficult to establish any margin* . . . . The swine industry in the United States needs to reduce sow numbers by at least 300,000-500,000 sows *in order for supply to mesh with demand. The industry will not improve until the industry contracts.* If the larger production systems do not follow Smithfield's and Tyson's lead on reducing sow numbers, the industry will continue to struggle." *See* Mark Greenwood, *Costs Drop but Losses Continue*, NATIONAL HOG FARMER (Aug. 3, 2009), https://www.nationalhogfarmer.com/images/0903-costs-drop-losses-continue (emphases added) (quoted at Compl. ¶ 92).

2013:   The Complaints acknowledge that the porcine epidemic diarrhea virus ("PEDv") is a non-conspiratorial reason for a production decrease in 2014.  Compl. ¶ 107. While the Complaints allege that the virus severely impacted hog production "in the spring and summer of 2014," *id.*, the sole document that Plaintiffs cite concerning the "2014 PEDv epidemic," *id.* ¶ 129, actually states that the deadly virus hit the United States *in 2013*; and that by June 2013, "7 million pigs were lost to PEDv," which is "equivalent to about 11 percent of the country's pig population" according to U.S.D.A. data.[21]  Plaintiffs concede PEDv is an obvious alternative explanation for the drop in supply, and their own cited material makes plain that at least *11 percent* of the hog population was *lost* by mid-2013 to the disease.

Furthermore, the DPP and CIP Complaints acknowledge that corn prices again increased in 2013.  Plaintiffs quote an Indiana Packers executive's comments explaining how high corn prices impact hog production: "[t]his summer's heat waves and drought are likely to affect pork prices starting this fall and into the spring. . . .  *High corn prices make pig farming less profitable [by] . . . both reducing the supply of pork for processing plants come next spring* and making the pork that is on the market more expensive."  Compl. ¶ 126 (emphasis added).  Although Plaintiffs cite to this observation, and then cast it aside as an "excuse," *id.*, they do not allege that corn prices were not, in fact, rising, or that rising

---

[21]  *See* Kyle Bagenstose, *Pig Virus Has Ability to Affect Local Herds*, BUCKS COUNTY COURIER TIMES (May 4, 2014), http://www.buckscountycouriertimes.com/article/20140504/NEWS/305049832 (cited at Compl. ¶ 129).

34

corn prices do not tend to lead to lower hog production by hog farmers.  Thus, Plaintiffs again fail to confront the "obvious alternative" explanations for any supply decrease in 2013 that are described in the very material upon which their own Complaints rely.

### D.    Plaintiffs' "Plus Factors" Do Not Save the Complaints from Dismissal.

So-called "plus factors" are only potentially relevant to the extent they *add something* to allegations of parallel conduct.  *See, e.g.*, *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1013 (E.D. Mo. 2018) ("[I]t is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence—often referred to as the 'plus factors.'").  Here, Plaintiffs allege no facts showing any "acts" Defendants undertook in parallel.  *See supra* at 13-15.  Even so, standing alone or when considered together with Plaintiffs' other allegations, the alleged "plus factors" do not suggest an unlawful conspiracy.  They collectively say nothing about the nature, scope, duration, or participants in any agreement, and are consistent with independent actions by each Defendant.

### 1.    Alleged Signaling Through Public Statements.

Plaintiffs allege that Defendants "exploited" "public earnings calls and other sources" to "communicate their planned supply restrictions to their competitors in furtherance of the conspiracy."  Compl. ¶ 109.  There is nothing conspiratorial about company officials addressing economic conditions in the industry in which they operate during quarterly earnings calls.  Such calls are both routine and essential to the effective functioning of financial markets, and thus have legitimate business purposes.  In fact, many of the "earnings call" statements referenced in the Complaints were made by publicly

traded companies that are *required by law* to provide such information to investors.  *See*, *e.g.*, 17 C.F.R. § 229.303(a)(3)(ii) (2018) (requiring any company subject to the statute to indicate factors it "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income"); *see also Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1047 (D. Minn. 2015) (finding regulation "requires public companies to disclose 'trends or uncertainties . . . that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations'") (citing Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii)). Indeed, on the face of the Complaints, several alleged "signals" were actually *responses to questions posed by analysts* during quarterly earnings calls.  *See*, *e.g.*, Compl. ¶ 119 ("when asked about fourth quarter and 2011 volumes for pork"); *id*. ¶ 124 (responding to questioning about whether there will be a production and pricing "reversion to that norm over the near term").

Plaintiffs cannot breathe life into innocuous "public statements" by drawing implausible inferences from these remarks.  Here, the alleged "signaling" comprised "very general statements to investors or regulators about the trajectory" of the industry, which provide minimal, vague information insufficient to permit any plausible inference of conspiratorial behavior, and do not evince any conversations, coordination, or even parallel behavior.[22]  *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d

---

[22]  *See, e.g.*, Compl. ¶ 112 ("we saw overproduction and oversupplies in the hog market in" in 2008 and "we made the decision" to start reducing "our sow herds" in "February of '08"); *id*. ¶ 113 ("we see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated.  And I would expect that prices will be somewhat less

991, 1001 (N.D. Ill. 2011); *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 705-06 (D. Minn. 2000) (rejecting use of statement by defendant as a "plus factor" because it did "not refer to an agreement . . . . [or] evidence *concerted* action or an *agreement* of any kind") (emphasis in original).

And, while Plaintiffs complain that the CEO of one Defendant publicly stated during a quarterly earnings call in September 2009 that he had "had conversations with several sizable . . . producers" about "liquidation," that ambiguous statement does not suggest any signaling or improper subject matter of such conversations. Compl. ¶ 117. *See Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 513 (D. Del. 2010) ("ambiguous" statement was insufficient to plausibly allege conspiracy in light of plaintiffs' failure to allege "how, when, and where the illegal agreement took place"); *Insulate*, 797 F.3d at 545 (vague reference to agreement between defendant and unidentified "key distributors" is conclusory and insufficient to meet pleading standards). There is also no indication or allegation that the referenced "producers" are any of the Defendants in this litigation, as opposed to large, "independent [hog] farmers" referenced elsewhere in the Complaints. Compl. ¶ 83. Indeed, the materials cited in the Complaints explain that the company in question, Smithfield, purchases well over ten million hogs per year (roughly 50 percent of the hogs it processes) from external suppliers, which provides a rational non-conspiratorial reason for Smithfield to talk to those other producers about their hog

---

than last year"); *id*. ¶ 120 ("[A] combination of reduction in supply for cattle, for hogs, for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business").

supplies.[23]  In any event, the same CEO publicly stated at the end of 2009 that he had "*not seen* the significant Midwest reduction that would probably be needed to put this industry back into balance," Compl. ¶ 118 (emphasis added), suggesting, if anything, an absence of conspiracy.  The statements stand in stark contrast to the "factual content" from which a conspiracy can be inferred.  *See, e.g.*, *Propane II*, 893 F.3d at 1056.

Furthermore, the public statements cited in the Complaints directly contradict the assertions that the statements were a means of communicating Defendants' forward-looking plans to reduce hog numbers.  Indeed, the alleged statements were primarily made *before supply increases*, rendering implausible Plaintiffs' assertion that Defendants "exploited these public statements in order to communicate their planned supply restrictions to their competitors."  Compl. ¶¶ 107, fig. 3, 109; *see supra* at 23-26.  Even the few earlier statements from 2009 and 2010 demonstrate nothing because, as Plaintiffs acknowledge, the hog lifecycle requires "nearly two years to substantially increase production."  Compl. ¶ 52.  As such, if Defendants monitored each other's statements and took them into account in setting production goals, one would expect to see diminished hog numbers in about two years.  Yet, two years after the 2009 and 2010 statements were made, hog production *increased* in 2011 and 2012.  *Id.* ¶ 107.  Thus, the facts pleaded in the Complaints refute any suggestion that Defendants were "exploit[ing] these public

---

[23]  *See* WH Group Smithfield Foods 2014 Annual Report at 24 ("In the year ended December 31, 2014, Smithfield produced 14,724 thousand of the 27,890 thousand hogs that it slaughtered in the U.S., or 52.8%, and the remaining 13,166 thousand hogs were purchased from external suppliers.") (cited at Compl. ¶ 71 & n.22), http://file.irasia.com/listco/hk/whgroup/annual/2014/ar2014.pdf.

statements in order to communicate their planned supply restrictions to their competitors." *Id.* ¶ 109.

At the same time, for half of the eight pork-producing Defendants, the Complaints merely allege either a single public statement supposedly in furtherance of the putative conspiracy or none at all. Notably, those few that are asserted do not reference any agreement or remotely conspiratorial behavior.[24] Moreover, although Plaintiffs allege a purported ten-year conspiracy that supposedly continues today, the Complaints do not include a single public statement purportedly used as a "signal" by any Defendant after 2013.[25] *See, e.g.*, *Washington Cty. Health Care Auth., Inc.*, No. 16 CV 10324, 2018 WL 3313010, at *10 (N.D. Ill. July 5, 2018) (the "complaint alleges that the conspiracy continued unabated for years after the last shortage-letter-signal was sent, suggesting that the shortage letters were not, in fact, a signaling mechanism").

---

[24] *See* Compl. ¶ 126 (Indiana Packers (August 2012): identifying higher corn prices and heat as factors that could influence hog size and when *farmers* bring hogs to market, but noting no impact on IPC's production); *id.* ¶ 129 (Clemens (May 2014): explaining why company was relatively spared the effects of PEDv); *id.* ¶ 130 (alleging that Seaboard and Triumph Foods postponed the addition of a second shift in 2018 for a new plant constructed since 2015 and opened in 2017, but not alleging any statements in furtherance of the conspiracy).

[25] The DPP and IPP Complaints cite a purported statement from Smithfield in December 2013 that allegedly "emphasiz[ed] coordinated industry action was necessary to 'balance supply and demand.'" Compl. ¶ 127. The Complaints, however, acknowledge that PEDv caused a supply reduction in 2014, *id.* ¶ 107, and that no further decreases in pork production occurred thereafter. *Id.* ¶ 107, fig. 3.

2.      **Opportunities to Collude.**

Defendants allegedly used "several industry trade associations and other forums," including the U.S. Secretary of Agriculture-appointed National Pork Board, to "communicate with each other in person" and "facilitate their conspiratorial conduct." Compl. ¶¶ 86, 88.  No actual communications are described, simply a purported opportunity to communicate.  That is inadequate.  "[A]llegations that the parties had an opportunity to communicate . . . are insufficient alone to suggest a conspiracy." *Shimota*, 2016 WL 1254240, at *10.[26]  A court cannot draw a plausible inference of collusion simply "because [one] belong[s] to the same trade guild as one of his competitors." *Twombly*, 550 U.S. at 567 n.12.  This Court has likewise refused to treat a trade association as a "'walking conspiracy' of its members." *Five Smiths*, 788 F. Supp. at 1049 n.5 (citation omitted).  Any other result would "discourage all trade associations, industry gatherings, or joint ventures" and thereby "imperil reasonable and procompetitive collaborations."  VI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1417b at 116 (3d ed. 2010 & Supp. 2016).

The meager attempts by the DPPs and CIPs to portray two of these trade association meetings as nefarious fall flat.  Compl. ¶ 92.  Both meetings involved statements by independent third parties, not any Defendant.  One of these statements, discussed above, is by a third-party lender following a 2009 National Pork Industry Conference.  *See supra* at

---

[26] *See also Process Controls Int'l, Inc.*, 753 F. Supp. at 922 ("[I]t is well established that the mere opportunity to conspire, even in the context of parallel business activity, is insufficient to state a Section 1 claim.") (citing *Blomkest*, 203 F.3d at 1036).

33. The second is from an article on the National Pork Board website in advance of a July 2010 meeting.  The Complaint asserts that this article shows that "pork producers had responded to lower prices in 2009 'by reducing the size of the national herd' and '[a]s a result, prices have rebounded.'"  Compl. ¶ 92.  But, as the article reflects, the quoted statement came from the National Pork Board's president, *a veterinarian*; and his comment about industry trends cannot be reasonably read to suggest anything more than hog producers reacting rationally to lower prices due to recession and disease, as discussed *supra*.[27]

### 3.    Industry Structure.

The Complaints also allege that the pork processing industry exhibits certain characteristics that facilitate collusion:   the industry is "highly concentrated" (with Defendants "collectively control[ling] over 80 percent of the wholesale pork" marketplace) and has "high barriers to entry."  Compl. ¶¶ 1, 6, 76-85, 133.  Notably, Plaintiffs do not allege that the *hog* industry, in which the restraint allegedly took place, is highly concentrated or that Defendants control the rearing and sale of hogs.  In fact, as explained above, only three Defendants are alleged to have any "significant" (defined by Plaintiffs as greater than 5% market share) hog production.  IIP Compl. ¶¶ 109, 111; *see supra* at 27.

Plaintiffs' allegations about the structure of the pork processing industry do not render their claims plausible.  Courts have not hesitated to reject inferences of conspiracy

---

[27]  *See National Pork Board to meet during National Pork Industry Conference*, https://www.pork.org/news/national-pork-board-meet-national-pork-industry-conference/ (cited at Compl. ¶ 92).

based on allegations of industry concentration and high barriers to entry.  *See, e.g.*, *In re Late Fee & Over-Limit Fee Litig.* 528 F. Supp. at 964 ("[P]arallel behavior in a concentrated market is insufficient to suggest a conspiracy because it is a 'common reaction of firms in a concentrated market' to 'recogniz[e] their shared economic interests' and to reach similar 'price and output decisions' independently.  Thus, even if the alleged market were concentrated, this would not render the asserted conspiracy plausible.") (citing *Twombly*, 550 U.S. at 553-54 (citations omitted)); *see also In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1309 (S.D. Fla. 2010) ("Many courts have found in concentrated industries like the one Plaintiffs allege here . . . [o]ne does not need an agreement to bring about this kind of follow-the-leader effect") (citations omitted); *id.* at 1317 (market concentration and high barriers to entry do not make a claim plausible since they also "make the market susceptible to conscious parallelism").

### 4. Increased Earnings.

Plaintiffs' allegation that Defendants' earnings margins "increased significantly," IIP Compl. ¶ 128, adds nothing to the plausibility of their alleged conspiracy.  Increasing profits is *not* a plus factor.  *Burtch*, 662 F.3d at 229 ("'In a free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits' and without a 'scintilla of evidence of concerted, collusive conduct,' this motive does not on its own constitute evidence of a 'plus factor.'") (quoting *In re Baby Food*, 166 F.3d at 137).

And, while Plaintiffs try to make much of the supposed "widening" of profit margin spreads after the conspiracy allegedly began, the Complaints include no allegation accounting for how basic supply and demand factors might have affected prices and profits.

42

*In re Musical Instruments*, 798 F.3d at 1197 n.13 (affirming dismissal of antitrust claim when "[a]ny manner of economic variables may have contributed to these fluctuations in prices and sales").  Even more robust econometric analysis that tries to account for such factors and merely "'flags the possibility' of a conspiracy is not sufficient to meet the plausibility test."  *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13 CIV. 981, 2015 WL 1514539, at *12 (S.D.N.Y. Mar. 31, 2015) (citing *Iqbal*, 556 U.S. at 678).[28]

Here, however, the IIPs' charts provide no support for their claim that a supply reduction conspiracy began in 2009.  Even a cursory inspection of Figure 9 (IIP Compl. ¶ 128) reveals that the only sustained increase in profit margins occurred six years into the alleged conspiracy, and *during a period of increasing and record-high industry production*:



---

[28]   While Plaintiffs tout some pricing and market share charts as being "statistically significant" and showing a "standard deviation" change, IIP Compl. ¶¶ 119 fig. 6, 129, fig. 10, these charts are far from clear and fail to even remotely disclose their methodologies or inputs.

This trend severely undermines the plausibility of Plaintiffs' assertion that "Defendants' restriction of pork supply" was connected to "an increasing amount of the profits available in the pork industry."  IIP Compl. ¶ 7.

### 5. Purportedly Abnormal Pricing.

Plaintiffs also contend "abnormal pricing" movements support the plausibility of the alleged conspiracy.  *Id.* ¶ 125.  But they do not allege that Defendants agreed on prices, whether abnormal or not, for pork products.  *See, e.g.*, Compl. ¶ 2 (the conspiracy was to "limit[] production with the intent . . . of increasing pork prices").  Rather, Plaintiffs assert that "the increase of prices" "unexplained by increases in costs," and "the significant break between pricing prior to 2009 and pricing after 2009," are additional indicators of the plausibility of Defendants' conspiracy.  IIP Compl. ¶ 125.  But these conclusory statements do not mention pork demand (in the U.S. or foreign markets) or input costs for corn, feed, fuel, or labor, among many other factors that affect pork prices.  *Id.* ¶ 126-29.  As discussed above, *supra* at 29-31, 34-35, pricing analyses that fail to account for the effects of basic economic factors, such as demand and input costs, come nowhere close to alleging conduct so inexplicable that it supports an inference of conspiracy.  *See Propane II*, 893 F.3d at 1057 (allegation that conspiracy caused propane tank prices to remain at "high, non-competitive levels" despite decrease in propane gas prices is insufficient to sustain claim).

Nor is there anything inherently anticompetitive about similar prices or price increases in an allegedly "highly concentrated market."  Compl. ¶ 80.  In a "concentrated market, the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism or supracompetitive pricing."  *Brooke Grp. Ltd. v. Brown &*

*Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) ("rising prices do not themselves permit an inference of a collusive market dynamic").

Finally, the CIPs claim that pork prices "increas[ed] in 2009, spiked in 2014, and continuously remained at higher levels compared to the years prior to 2009." CIP Compl. ¶ 113, fig. 2; *see also* IIP Compl. at p. 40 (referencing "unprecedented increase" in prices from 2009). But their specific allegations draw a different picture. In fact, Figure 2 from the CIP Complaint sets forth Federal Reserve data showing just the opposite: that hog prices returned to historical, pre-recession/pre-Swine flu (2009-2010) and pre-PEDv virus (2013-2014) levels during the latter half of the alleged conspiracy period:



### 6. Market Share Stability.

Finally, the IIP Complaint alleges that enhanced market share stability suggests conspiracy. IIP Compl. ¶¶ 118-21. A chart cited in that complaint, however, actually shows significant volatility in Defendants' market shares during the alleged conspiracy. *Id.* ¶ 118, fig. 5. And a second chart, *id.* ¶ 119, fig. 6, sets forth an undefined analysis of

market shares.  Even accepting Plaintiffs' doubtful characterization of these two charts, however, both "are simply descriptions of the market, not allegations of anything that the defendants did . . . and do not give rise to an inference of an unlawful agreement."  *Erie Cty.*, 702 F.3d at 870.

### E.    Plaintiffs' Misplaced Reliance on the *Broiler* Litigation Cannot Establish a Plausible Pork Conspiracy.

Plaintiffs here (represented by essentially the same counsel who brought the *Broiler* case on behalf of some of the same named plaintiffs) invoke the *Broiler* opinion denying motions to dismiss in that case.  Compl. ¶¶ 38-42.  Courts, however, regularly reject such "if it happened there, it could have happened here" allegations.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).  Furthermore, nothing was found to even have "happened there" in the broiler industry.  The *Broiler* opinion was merely a preliminary determination that the conspiracy as alleged in the complaints (disputed by the defendants there) survived a motion to dismiss.  Pigs, of course, are not chickens; and examination of the allegations at issue here, individually or "as a whole," reveals stark contrasts with those brought in the *Broiler* case, rendering that ruling distinguishable in critical respects.

### 1.    No Historically Unprecedented Decrease in Rate of Production.

The *Broiler* court placed great weight on the allegation that although broiler production increased during the alleged conspiracy as an absolute matter, the plaintiffs there alleged that "there was a decrease relative to the historic annual rate of production increase." *Broiler*, 290 F. Supp. 3d at 793.   On this point, the *Broiler* court cited the following chart relied upon by those plaintiffs, *id.* at 795:



Here, in comparison, while the Complaints make the conclusory allegation that pork "production decreases marked a drastic change" during the alleged conspiracy, Compl. ¶ 107, drawing a comparable line through the charts in the Complaints reveals that the annual rate of production actually remained relatively consistent with the pre-"conspiracy" rate:



## 2. No Specific Production Cuts by All Producers.

In determining that the *Broiler* plaintiffs had alleged a plausible conspiracy, that court also relied on specific allegations that *each* defendant "either cut production or took action to restrain production" during the relevant time period, citing to "industry reports to support [plaintiffs'] allegation that *all* Defendants destroyed breeder flocks." *Broiler*, 290 F. Supp. at 796, 803 (emphasis in original).[29] By contrast here, as set forth *supra* at 15-16, Plaintiffs engage in impermissible group pleading, mention only a few actual output

---

[29]  Similarly, in other decisions denying motions to dismiss antitrust claims, courts based their decisions on concrete factual allegations about the "acts" at the heart of the claim. *See, e.g.*, *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1076 (N.D. Ill. 2011) (noting the "amount of detail provided" in plaintiffs' allegations on "the amount and timing" of the allegedly conspiratorial capacity reductions as well as numerous "allegations of parallel price increases"); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d at 996 (denying motion to dismiss when two producers each allegedly cut production by "approximately the same total amount" through coordinated facility closures over a period of less than two years).

reductions undertaken by a single Defendant, Compl. ¶¶ 114, 119, rely almost entirely on aggregate industry data and charts (which show that output *increased* during the alleged conspiracy period), *see, e.g.*, Compl. ¶ 107, fig. 3, and include allegations that a number of Defendants *increased* capacity during the alleged conspiracy.  *See supra* at 20-22.

### 3.    No Suspicious Timing of Meetings and Production Cuts.

The *Broiler* court noted that in "January 2008 [the first year of the alleged *Broiler* conspiracy], immediately after an industry convention, the large producers made public statements calling for industry-wide production cuts. . . .  And sure enough, soon thereafter, a number of other producers publicly announced that they would cut production."  *Broiler*, 290 F. Supp. 3d at 798; *see also id.* ("A similar scenario of industry meetings, followed by public statements and production cuts also took place in 2011, this time involving unprecedented slaughter or export of breeder flocks.").[30]

In contrast, the IIPs here do not even mention any such meetings; and while other Plaintiffs' note some specific industry meetings, almost all in 2011 and beyond, *see, e.g.*, Compl. ¶¶ 100-106, those hollow references are devoid of any allegations of "suspicious timing of important industry conferences . . . followed by unusual producer actions and market movements."  *Broiler*, 290 F. Supp. 3d at 800.  Quite the opposite, the meetings referenced occurred almost entirely during periods of significantly increased pork production (except for periods Plaintiffs concede were affected by the PEDv virus).  Compl.

---

[30]  *See also id*. at 799-800 (finding that "[t]he context within which those meetings take place is key to determining the significance of the occurrence of those meetings to the plausibility of a conspiracy claim").

¶ 107; *see also In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1257 (W.D. Wash. 2009) (dismissing complaint alleging an opportunity to conspire at industry gatherings but "mak[ing] no attempt to compare the timing of trade association meetings" to the conduct at issue).

### 4.    No Unprecedented Methods to Effectuate Conspiracy.

The *Broiler* court highlighted allegations "that between 2008 and 2014, the Broiler market experienced *unprecedented* movement, and the Broiler producers took *unprecedented* action." *Broiler*, 290 F. Supp. 3d at 797 (emphases added).  Likewise, the *Broiler* complaint specifically identified the "unprecedented methods" that defendants allegedly undertook to effectuate the purported conspiracy: (i) the "unprecedented slaughter or export of breeder flocks," which rendered the defendants "unable to increase production for at least eighteen months," *id.* at 798, 806; and (ii) the "shift[] to short-term contracts with variable pricing" at the start of the conspiracy period to capture higher pricing, *id.* at 800.  In contrast, here, the Complaints fail to identify any "unprecedented methods" employed during any portion of the alleged conspiracy period.

### 5.    Broiler Chickens and Hogs Are Different in Material Respects.

Plaintiffs cannot escape biological differences between broiler chickens and hogs that severely weaken the plausibility of the alleged pork conspiracy and undermine Plaintiffs' reliance on the *Broiler* decision.  Although it should be obvious, pigs are not chickens.  So while the *Broiler* court noted that a "momentary production increase" of broiler chickens was possible to take advantage of higher prices, 290 F. Supp. at 807, "[t]he typical hog production cycle lasts about four years . . . [and] it takes nearly two years to

substantially increase production."   Compl. ¶ 52.   And, as noted above, the material increases in production during the alleged conspiracy reflect that steps were being taken to increase hog supply *throughout* the alleged conspiracy period.   *See supra* at 20-25.   The extended, biologically-driven hog production cycle makes it implausible to suggest that, as was alleged of chickens in the *Broiler* case, a hog producer could have ramped up "production at a certain point to take advantage of the inflated price . . . achieved through production cuts."   290 F. Supp. 3d at 807.

Finally, not only did Defendants here have to cope with rising feed costs and the recession, but hog producers also had to contend with the Swine Flu and PEDv.   *See supra* at 31-35.   These epidemics unequivocally distinguish the economic conditions here from those in the *Broiler* case.

## II.   PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiffs allege that the supposed conspiracy was evinced in "public statements" on earnings calls and "abnormal price movements" in data published by the USDA, "[b]eginning in 2009."   *See* Compl. ¶¶ 111-128, 131.   But they did not file these lawsuits until June 2018, nearly a decade later.   Plaintiffs' antitrust claims are thus foreclosed by the Clayton Act's four-year statute of limitations.   *See* 15 U.S.C. § 15b.

Plaintiffs' invocation of fraudulent concealment does not excuse their untimely filing.   Plaintiffs allege none of the facts required to invoke that doctrine, and the few facts on which Plaintiffs rely were publicly available on the Internet and elsewhere well outside the four-year limitations period.   If those public facts plausibly show the existence of a

conspiracy (as Plaintiffs contend), then fraudulent concealment cannot possibly apply because those *public* facts, by definition, were not concealed. Nor do Plaintiffs plead any facts sufficient to meet the Eighth Circuit's exacting requirement that fraudulent concealment applies only where defendants have taken specific actions solely to conceal the conspiracy that are independent of the conspiratorial agreement itself. Plaintiffs' reliance on fraudulent concealment is therefore futile: regardless of whether Plaintiffs' federal antitrust claims survive *Twombly*, the statute of limitations bars them.

Moreover, to the extent Plaintiffs seek to recover for more recent events, they have failed to offer factual allegations plausibly showing a conspiracy extending past June 2014. Not only are the Complaints nearly silent about the years after 2014, but also the few allegations about those years actually *contradict* any claim of a continuing conspiracy. For example, while the alleged conspiracy supposedly sought to reduce pork supply, Plaintiffs' allegations show supply *increased* every year after 2013, other than a dip in 2014 that Plaintiffs acknowledge resulted from disease, not an unlawful agreement. *See supra* at 20-25, 31-35. Plaintiffs' federal antitrust claims should therefore be dismissed in their entirety.

### A. A Motion to Dismiss Should Be Granted When the Complaint Shows That a Claim Is Time-Barred.

Eighth Circuit law is clear that "when it appears from the face of the complaint itself that the limitation period has run, a limitations defense may properly be asserted through a Rule 12(b)(6) motion to dismiss." *Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004) (internal quote omitted); *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880-81 (8th Cir. 2011) (dismissing plaintiff's claims on limitations grounds). Courts in this

District have repeatedly dismissed, at the pleading stage, antitrust claims barred by the statute of limitations. *See, e.g.*, *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-2664, 2014 WL 943224, at *4-9 (D. Minn. Mar. 11, 2014), *aff'd*, 797 F.3d 538 (8th Cir. 2015); *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d at 1029 (dismissing antitrust claim because it accrued outside the limitations period).

## B.   Plaintiffs' Federal Antitrust Claims Are Time-Barred.

Plaintiffs' federal antitrust claims are subject to the Clayton Act's four-year statute of limitations, 15 U.S.C. § 15b, which requires the action to be brought no more than four years after the cause of action accrued.  An antitrust cause of action "accrues 'when a defendant commits an act that injures a plaintiff's business.'" *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 427 (8th Cir. 2009) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)); *see also Insulate*, 2014 WL 943224, at *5 (calculating accrual from the time of injury).  Thus, "accrual in antitrust actions depends on the commission of the defendant's injurious act rather than on the plaintiff's knowledge of that act or the resulting injury." *Granite Falls Bank v. Henrikson*, 924 F.2d 150, 153 (8th Cir. 1991), *overruled on other grounds*, *Rotella v. Wood*, 528 U.S. 549 (2000).

The first action in these proceedings was filed on June 28, 2018, and thus Plaintiffs are barred from asserting any antitrust claims that accrued before June 28, 2014.  But that is precisely what Plaintiffs are attempting to do here.  They allege that the conspiracy began no later than 2009 and that they were injured by having to pay artificially inflated prices for pork starting in 2009. *See* Compl. ¶¶ 2, 7, 37, 133-141, 153, 162-64.  It is simply far too late to bring that claim.

### C.     Plaintiffs Have Not Sufficiently Pleaded Fraudulent Concealment.

Plaintiffs try to salvage their time-barred claims by invoking the doctrine of fraudulent concealment.  But Plaintiffs source their factual allegations entirely from the public record.  Fraudulent concealment of public facts makes no sense, and the doctrine is not available here.

To invoke fraudulent concealment, Plaintiffs must allege facts showing: (1) affirmative acts by Defendants "taken solely to conceal" the alleged conspiracy; and (2) Plaintiffs' failure to discover the existence of the conspiracy; despite (3) due diligence by Plaintiffs in attempting to discover their claim.  *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d at 1022; *Insulate*, 2014 WL 943224 at *5; *In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1084 (D. Minn. 2010).  "Failure to properly allege any one of these elements is fatal to Plaintiffs' claim."  *In re Milk*, 84 F. Supp. 2d at 1022. Further, Plaintiffs' pleading must meet the particularity standard of Rule 9(b).  *Summerhill*, 637 F.3d at 880.  Thus, Plaintiffs must plead "the who, what, when, where, and how" of the allegedly fraudulent concealment.  *Id.* (quoting *Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007)).[31]

The Complaints fall well short of this standard on all elements.  As an initial matter, Plaintiffs' reliance on public sources is fatal to their claim of fraudulent concealment.  If the public facts Plaintiffs allege support a plausible inference of a conspiracy, then those

---

[31] *See also In re Milk*, 84 F. Supp. 2d at 1022 (plaintiffs must allege the "time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud").

same facts doom Plaintiffs' reliance on fraudulent concealment. *See, e.g.*, *In re Wholesale Grocery*, 722 F. Supp. 2d at 1084 (fraudulent concealment unavailable because "material information underlying the antitrust claims was available" on the public record); *In re Milk*, 84 F. Supp. 2d at 1024-25 (availability of facts underlying claim, including allegation that the effect of the conspiracy "was that milk prices were 'raised and stabilized,'" was enough to defeat claim of fraudulent concealment); *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987) (because facts underlying complaint were "necessarily discoverable upon simple inquiry of public records," plaintiff "could not validly claim more than ignorance, rather than fraudulent concealment of this particular information. That will not suffice."). Apart from this obvious deficiency, Plaintiffs also have failed to allege facts supporting *any* of the three elements of fraudulent concealment. The doctrine simply does not apply.

### 1. Fraudulent Concealment Is Unavailable Because the Facts Supposedly Evincing a Conspiracy Have Been in the Public Record for Years.

While Defendants dispute Plaintiffs' characterizations of the facts here, even assuming the truth of the Complaints' allegations for purposes of this motion, they show that the limitations period expired years ago.

Defendants supposedly orchestrated the putative conspiracy through public statements. Specifically, Plaintiffs assert that Defendants "disclosed certain of their supply restriction efforts" in public analyst conferences and "exploited these *public statements* in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy." Compl. ¶ 109 (emphasis added). While Plaintiffs offer conclusory

55

assertions of "secret" meetings, their factual allegations reference transcripts of concededly "public statements" in earnings calls that have been available on the Internet for years.  For example, Plaintiffs allege:

- During a June 2009 earnings call, a Defendant's CEO "stated that the current cuts were not enough and more were needed to 'fix' the hog industry and that '[s]omebody else has got to do something.'"  Compl. ¶ 114.

- In an August 2009 earnings call, another CEO "communicated the start of [its] participation in hog liquidation efforts."  *Id.* ¶ 116.

- In an earnings call in September 2009, a senior executive "stated that he had conversations with 'sizable large producers' and that they would be doing some liquidation."  *Id.* ¶ 117.

- In an earnings call in March 2010, the same executive "indicated that further cuts were still to come."  *Id.* ¶ 119.

- In a separate earnings call in March 2010, a CEO mentioned its "reduction in hog supply as a driver of profitability, and stated that these efforts were resulting in protein shortages."  *Id.* ¶ 120.

- Citing a December 2010 earnings call, that "[t]he Defendants also acknowledged access to information that allowed them to know that the supply of pork would not be increasing."  *Id.* ¶ 121.

Plaintiffs cannot simultaneously claim that these eight- and nine-year-old public statements evince a conspiracy—and indeed were themselves a key vehicle through which Defendants supposedly confirmed their joint participation—while also asserting that this supposed conspiracy could not have been discovered before June 2014.

Plaintiffs also rely heavily on allegations based on public information about Agri Stats.  According to Plaintiffs, the purported conspiracy catalyzed when "Agri Stats began to propose a series of benchmarks to the swine industry" that contained detailed production information.  *Id.* ¶¶ 43-54.  But the materials Plaintiffs identify were public well before the

limitations period.  For example, Plaintiffs cite a 2008 article in the "Advances in Pork Production Journal," which is publicly available on the Internet,[32] in which Agri Stats allegedly encouraged participants in the pork industry to participate in benchmarking efforts that "could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons."  Compl. ¶ 44.  Plaintiffs highlight passages from that same 2008 article stating that "the ultimate goal is increasing profitability" and that "[t]o gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program."  *Id.* ¶ 45.  Similarly, Plaintiffs cite a presentation at a 2009 conference, which is also publicly available on the Internet, for the proposition that each monthly Agri Stats report contains a range of detailed information "for analysis and comparison."  *Id.* ¶ 51.  Moreover, as evidence of the supposedly sinister "level of detail provided to competitors" by Agri Stats, Plaintiffs reproduce a chart from a 2011 Agri Stats presentation pulled from the Internet.  *Id.* ¶ 53. Far from being hidden, all of these materials are public—and long stale.

Finally, Plaintiffs purport to bolster their conspiracy allegations by asserting—based on publicly available data published by the United States Department of Agriculture—that "[b]eginning in 2009, the pork industry showed abnormal price movements," including prices that "increased beginning in 2009" and "spiked [in] 2014."  *Id.* ¶ 131; *see also id.* ¶¶ 137-140 (relying on alleged Bureau of Labor Statistics data to assert that higher retail pork prices were driven by higher wholesale pork prices).  Plaintiffs likewise point to

---

[32]  *See* www.prairieswine.com/pdf/36021.pdf.

publicly available data that allegedly show that "[i]n 2009, 2010, and again in 2013, the pork industry cut production." *Id.* ¶ 107. Plaintiffs cannot cite allegedly "abnormal price movements" from public data as evidence of a conspiracy and simultaneously claim that public data was somehow concealed. Courts in this Circuit reject fraudulent concealment when a complaint relies on public facts to state a conspiracy claim. *In re Wholesale Grocery*, 722 F. Supp. 2d at 1084; *In re Milk*, 84 F. Supp. 2d at 1024-25.

### 2. Plaintiffs Fail to Allege Facts Showing that Defendants Took Affirmative Steps to Conceal Their Cause of Action.

This Court adheres to the Eighth Circuit's strict rule that the doctrine of fraudulent concealment applies only where a plaintiff alleges facts suggesting that a defendant took actions specifically for the purpose of concealing the alleged conspiracy. Accordingly, a complaint must include "specific allegations of affirmative acts taken solely to conceal a price fixing conspiracy." *In re Milk*, 84 F. Supp. 2d at 1022; *see also Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990) (fraudulent concealment "requires an act of affirmative misrepresentation over and above the acts creating the alleged cause of action" and holding that "non-disclosure" of information is insufficient); *In re Monosodium Glutamate Antitrust Litig.*, No. CIV. 00MDL1328, 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003) ("Plaintiffs must show acts, other than the acts constituting the conspiracy, that demonstrate fraudulent concealment of that conspiracy.").

The Complaints confirm that nothing was "concealed" here. Plaintiffs cannot satisfy the first element of fraudulent concealment both because they rely on public information in their effort to show that there was a conspiracy and because the Complaints

contain no facts supporting the conclusory assertions of concealment.[33]  For example, Plaintiffs fail to allege any affirmative acts suggesting that any Defendant concealed its herd information, pricing, business plans, or, frankly, anything else.  And it is not just that the Complaints fail to allege that any Defendant took any affirmative steps to conceal the supposed agreement, a pleading failure that alone negates application of the doctrine.  Worse, the Complaints allege that Defendants openly executed the supposed conspiracy through public statements.  Plaintiffs' allegations about public "signaling" cannot be squared with fraudulent concealment.

With no facts suggesting concealment, Plaintiffs resort to buzzwords.  Compl. ¶¶ 142-143, 152.  They assert, for example, that Defendants used "secret" means of communications to hide their plans.  *Id.* ¶ 143.  Exactly what those means were, however, remains a total mystery.  Such labels (and nothing more) do not meet the plausibility standard in *Twombly*, much less the particularity requirement in Rule 9(b).  Then-Chief Judge Magnuson rejected nearly identical generic statements about unspecified "clandestine meetings" in the *Milk* case.  *In re Milk*, 84 F. Supp. 2d at 1024 ("Vaguely alleging that 'something' occurred at 'some time' fails to satisfy the particularity requirement.").  His reasoning applies here as well.

---

[33]  In one throw-away line that is devoid of any facts, Plaintiffs claim that the conspiracy "was self-concealing."  Compl. ¶ 151.  But, "[m]erely claiming that all conspiracies are self-concealing is simply insufficient."  *In re Milk*, 84 F. Supp. 2d at 1023; *see also New Prime, Inc. v. Eaton Corp.*, No. 16-3407-CV-S-SRB, 2017 WL 5992466, at *3 (W.D. Mo. Mar. 16, 2017) (finding the first prong of fraudulent concealment not satisfied when "Plaintiff's Complaint describes Defendant Eaton's actions as 'self-concealing'" and "identifies no affirmative misrepresentation").

Plaintiffs also cannot meet the pleading standard in the Eighth Circuit and Rule 9(b) with the mere allegation that one Defendant attributed price increases to non-conspiratorial factors, such as market forces and programs with retailers.  Compl. ¶ 147.  In the *Milk* case, plaintiffs alleged that, "instead of admitting to a conspiracy," defendants "publicly denied price fixing allegations" and instead attributed their high profits to other factors, such as "diversified operations, improved efficiency, drought, tight supplies, and state law."  *In re Milk*, 84 F. Supp. 2d at 1022-24.  Then-Chief Judge Magnuson held that plaintiffs' allegations were insufficient to toll the limitations period because "[s]imply denying the existence of an antitrust violation" or "attribut[ing] the change in prices to factors other than an illegal conspiracy" "does not constitute fraudulent concealment."  *Id.* at 1023-24. And to hold otherwise "would effectively nullify the statute of limitations."  *Id.* at 1023 (quoting *Pocahontas Supreme Coal Co.*, 828 F.2d at 218-19).[34]

It is true that no Defendant has confessed (or ever will confess) to Plaintiffs' conspiracy theory.  But Plaintiffs' pleading obligation is not to allege silence or a failure to confess but rather to allege with particularity facts showing affirmative acts of concealment, including "a specific time that Defendants affirmatively concealed the existence of a conspiracy."  *In re Milk*, 84 F. Supp. 2d at 1023 ("silence or passive conduct is not fraudulent unless parties' relationship imposes duty to disclose") (internal quotation

---

[34]  *See also Pocahontas*, 828 F.2d at 218-19 (rejecting a concealment claim based on a failure to confess to antitrust violations and statements attributing price increases to market forces); *In re Wholesale Grocery*, 722 F. Supp. 2d at 1085 (same).

marks omitted).[35]  Plaintiffs' failure to do so dooms their reliance on the fraudulent-concealment doctrine.

### 3. Plaintiffs Fail to Allege They Were Actually Misled by Any Affirmative Act of Concealment.

Plaintiffs also must allege facts showing "as a result of Defendants' concealment," they failed to discover the existence of the antitrust claim.  *In re Milk*, 84 F. Supp. 2d at 1024.  But Plaintiffs do not allege any facts remotely suggesting that they were actually misled by a Defendant (or anyone else) or that they somehow relied upon any subterfuge by any Defendant.  Instead, Plaintiffs merely assert that they could not have discovered the alleged conspiracy until shortly before filing the Complaint.  Compl. ¶ 142.  No facts, just an assertion.  Such conclusory statements are improperly "circular" when, as here, they are based on insufficient facts demonstrating actual concealment.  *In re Milk*, 84 F. Supp. 2d at 1024.

### 4. Plaintiffs Are Silent on Due Diligence.

Plaintiffs must also allege with particularity their diligence in attempting to uncover their claims and then explain why, despite their efforts, they could not have uncovered those claims within the limitations period.  *Kansas City, Mo. v. Fed. Pac. Elec. Co.*, 310 F.2d 271, 284 (8th Cir. 1962); *In re Milk*, 84 F. Supp. 2d at 1024; *Insulate*, 2014 WL 943224, at *5; *In re Wholesale Grocery*, 722 F. Supp. 2d at 1084-86.

---

[35] *See also, e.g.*, *Wood v. Carpenter*, 101 U.S. 135, 143 (1879) ("Concealment by mere silence is not enough."); *New Prime*, 2017 WL 5992466, at *3 ("Non-disclosure is not enough to qualify as fraudulent concealment.").

The Complaints are utterly silent as to what steps, if any, Plaintiffs took from 2009-2014 to investigate the allegedly "abnormal" prices that they paid for pork (which the USDA reported publicly), the public statements by Defendants, and the public statements of Agri Stats. *See supra* at 55-58. Moreover, the Plaintiffs point to no facts coming to light during the limitations period that were unknown and unknowable years before.

Instead, Plaintiffs simply declare that they "could not have discovered through the exercise of reasonable diligence[] the existence of the conspiracy" until *Bloomberg* published an article in 2017 about the chicken industry and their lawyers filed a 2018 amended complaint in the *Broiler* case. Compl. ¶¶ 142, 148-152. But the *Bloomberg* article hardly qualifies as a "eureka!" event. As its source for a conspiracy theory with respect to chicken, the *Bloomberg* article cites the 2016 complaint in the *Broilers* litigation, which was filed by Lockridge Grindal (*one of the Plaintiffs' counsel here*) on behalf of Maplevale Farms (*one of the named Plaintiffs here*).[36] The *Bloomberg* article presented no facts that were not already in the public record. Instead, that article relied (much like Plaintiffs) on statements from public analyst calls or other publications.[37]

In addition, the *Bloomberg* article is mostly about chicken, not pork. The article contains just two references to pork. Interestingly, it points out that data from Agri Stats

---

[36] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, BLOOMBERG BUSINESSWEEK, Feb. 15, 2017, *available at* www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged.

[37] For example, the *Bloomberg* article highlights a 2009 analyst conference call from the CEO of a chicken producer that supposedly "suggested another source for the shift [toward increased profitability in the chicken industry]: Agri Stats."

is far *less* useful in the pork and cattle business than in the chicken business, because "[t]he U.S. Department of Agriculture publishes reams of statistics on the hog and cattle business, which is of great value to farmers and commodities traders."  And the article states in passing that Agri Stats has been "branching out into the hog business," citing an Agri Stats presentation from 2011 that appears to be one of the same publicly available documents cited in the Complaint.  There is no startling revelation in either point.

Plaintiffs also cite the 2018 amended complaint in the *Broilers* litigation as a disclosure event.  Compl. ¶ 149.  But Plaintiffs do not explain how that complaint (filed by these same Plaintiffs' counsel) about the *chicken* business revealed any new or undisclosed facts about the *pork* industry.  When the same Plaintiffs' counsel turned their attention to pork in 2018, they relied upon facts that have been in the public record for years.

If the public statements and publicly available articles and data cited in the Complaints are sufficient to plead an unlawful agreement, they were certainly enough to "excite attention and thus put Plaintiffs on inquiry notice," foreclosing a claim of fraudulent concealment.  *See In re Milk*, 84 F. Supp. 2d at 1024-25 (plaintiffs failed to satisfy the diligence element of fraudulent concealment because they offered no explanation of the steps they took to discover their claims and did not "explain why the facts underlying their claim were not available to them at an earlier date"); *see also, e.g.*, *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*, 520 F.2d 289, 295 (8th Cir. 1975) (rejecting fraudulent concealment claim when "plaintiffs could have discovered" the cause of action "by reading the Tariff Commission's report" and "by reviewing the public testimony taken by the

63

Commission in connection with the preparation of this report").[38]  Plaintiffs' complete failure to allege due diligence also compels rejection of their reliance on fraudulent concealment.  *In re Milk*, 84 F. Supp. 2d at 1022.

### D.     The Continuing-Conspiracy Doctrine Does Not Apply.

Plaintiffs claim that the alleged conspiracy to reduce supply, however old it may be, is still ongoing.  But Plaintiffs allege no facts suggesting this is true.  The facts they do allege contradict, rather than support, any such claim.  And even if there were recent conspiratorial acts alleged, the continuing-conspiracy doctrine would limit Plaintiffs' claims *only* to transactions occurring within the limitations period.  Claims based on transactions before June 28, 2014 would still be barred.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997) (although "each [new] overt act that is part of the [original] violation and that injures the plaintiff . . . starts the statutory period running again[,] . . . the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period"); *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d at 1068 (same).

The Eighth Circuit's recent decision in *Propane Tank II* confirms that allegations of a continuing conspiracy must satisfy the *Twombly* plausibility standard.  In that case, a

---

[38]  *See also In re Wholesale Grocery*, 722 F. Supp. 2d at 1084-86 (rejecting fraudulent concealment claim when "material information underlying the antitrust claim was [publicly] available" to plaintiffs, and plaintiffs failed to sufficiently allege due diligence); *Insulate*, 2014 WL 943224, at *5 (same); *Pocahontas*, 828 F.2d at 218 (rejecting fraudulent concealment claim because material information was "necessarily discoverable upon simple inquiry and consultation of public records" and finding that plaintiffs "could not validly claim more than ignorance, rather than fraudulent concealment of this particular information").

group of indirect purchasers sought to enjoin an alleged conspiracy to reduce the amount of propane sold in tanks while maintaining the price. *Propane Tank II*, 893 F.3d at 1051-52. The court held that, although the complaint plausibly alleged a conspiracy from 2008 to 2010, the complaint was devoid of the facts necessary to state a claim for a continuing conspiracy in later periods. *Id.* at 1056-58. The court thus affirmed dismissal of the indirect purchasers' claims under *Twombly*. *Id.*

Here, Plaintiffs baldly assert that both the conspiracy and its effects "continu[e] to the present." Compl. ¶ 37. But that is a conclusion, not entitled to any presumption of truth. *See Propane II*, 893 F.3d at 1056-58. Even had Plaintiffs alleged an unlawful agreement before June 2014, the Complaints are devoid of factual allegations suggesting any conspiratorial actions within the limitations period. Plaintiffs simply recite a list of trade association meetings during the limitations period, but such allegations do not suggest any continuing conspiratorial activities. *See supra* at 40. Much more is required to do that.

Indeed, Plaintiffs concede that there were *no* conspiratorial production cuts during the limitations period. Plaintiffs allege that "[i]n 2009, 2010, and again in 2013, the pork industry cut production," and concede that the "production dip in 2014" was non-conspiratorial and stemmed from "the adverse impacts from the deadly" PEDv virus. Compl. ¶ 107. And Plaintiffs' own Figure 3 shows that annual commercial hog production by weight *increased* dramatically every year after 2014. *Id.* Thus, accepting Plaintiffs' pleading as true, the only factual allegations within the limitations period are wholly

65

*inconsistent* with an ongoing conspiracy to reduce supply that unlawfully raised prices.[39]
Likewise, Plaintiffs fail to invoke a single public statement purportedly used as a "signal" by any Defendant after 2013, and Plaintiffs' recitation of trade association meetings during the limitations period is not connected to any allegedly conspiratorial conduct.

The allegations here are far different from the *Broiler* case, upon which Plaintiffs rely in their Complaints.  The *Broiler* plaintiffs alleged conspiratorial communications, supply cuts, and irregular pricing patterns *within* the limitations period.  *Broiler*, 290 F. Supp. 3d at 783-84, 806.  In contrast, Plaintiffs here allege no such facts within the limitations period.  Instead, they allege facts showing Defendants *increased* supply every year during that period, other than a short dip in 2014 that Plaintiffs concede was due to disease.  Plaintiffs' factual allegations are plainly insufficient to support their conclusory assertion of a continuing conspiracy.  Accordingly, dismissal is required even with respect to transactions within the four-year limitations period.

## **CONCLUSION**

Plaintiffs' Complaints fail to state a claim at every level and should be dismissed in their entirety.  Defendants respectfully request that their motion to dismiss be granted with prejudice as to all three Consolidated Complaints.

---

[39] Unable to show any actual conspiratorial "acts" during the limitations period, Plaintiffs argue that Defendants "refused to increase their capacity" in 2014 and beyond.  Compl. ¶¶ 129-30.  But, as explained above, those assertions are contradicted by the Complaints' allegations and materials referenced therein, which show capacity increases during the alleged conspiracy period.  *See supra* at 23-25.

Date: October 23, 2018

*/s/ Mark L. Johnson*
Mark L. Johnson (#0345520)
Bethany Krueger (#0306368)
Virginia R. McCalmont (#0399496)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
bkrueger@greeneespel.com
vmccalmont@greeneespel.com
Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
Christina Briesacher (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
christina.briesacher@kirkland.com

*Counsel for Clemens Food Group, LLC
and The Clemens Family Corporation*

*/s/ Richard A. Duncan*
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
Bryan K. Washburn (#0397733)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegrebd.com
aaron.vanoort@faegrebd.com
craig.coleman@faegrebd.com
emily.chow@faegrebd.com
isaac.hall@faegrebd.com
bryan.washburn@faegrebd.com

*Counsel for Hormel Foods Corporation
and Hormel Foods, LLC*

/s/ Jaime Stilson
Jaime Stilson (#392913)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
(612) 492-6746
stilson.jaime@dorsey.com

Britt M. Miller (*pro hac vice*)
Robert E. Entwisle (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

William H. Stallings (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000
wstallings@mayerbrown.com

*Counsel for Indiana Packers Corporation and Mitsubishi Corporation (Americas)*

/s/ Donald G. Heeman
Donald G. Heeman (#286023)
Jessica J. Nelson (#347358)
Randi J. Winter (#391354)
Daniel R. Haller (#396497)
FELHABER LARSON
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402-4504
(612) 339-6321
dheeman@felhaber.com
jnelson@felhaber.com
rwinter@felhaber.com
dhaller@felhaber.com

Stephen R. Neuwirth (*pro hac vice*)
Michael B. Carlinsky *pro hac vice*)
Sami H. Rashid (*pro hac vice*)
Richard T. Vagas (*pro hac vice*)
Robert P. Vance, Jr. (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com
michaelcarlinsky@quinnemanuel.com
samirashid@quinnemanuel.com
richardvagas@quinnemanuel.com
bobbyvance@quinnemanuel.com

*Counsel for JBS USA Food Company and JBS USA Food Company Holdings*

/s/ William L. Greene
William L. Greene (#0198730)
Peter J. Schwingler (#0388909)
Jon M. Woodruff (#0399453)
STINSON LEONARD STREET LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
john.woodruff@stinson.com

J. Nicci Warr (pro hac vice)
STINSON LEONARD STREET LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

Counsel for Seaboard Foods, LLC and
Seaboard Corporation

/s/ John A. Cotter
John A. Cotter (134296)
John A. Kvinge (0392303)
LARKIN HOFFMAN DALY &
LINDGREN LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, MN 55427-1060
(952) 835-3800
jcotter@larkinhoffman.com
jkvinge@larkinhoffman.com

Richard Parker (pro hac vice)
Josh Lipton (pro hac vice)
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
rparker@gibsondunn.com
jlipton@gibsondunn.com

Brian Robison (pro hac vice)
GIBSON, DUNN & CRUTCHER, LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
(214) 698-3370
brobison@gibsondunn.com

Counsel for Smithfield Foods, Inc.

*/s/ Aaron Chapin*
Aaron Chapin (#6292540)
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
(312) 655-1500
aaron.chapin@huschblackwell.com

Gene Summerlin (*pro hac vice*)
Marnie Jensen (*pro hac vice*)
Ryann Glenn (*pro hac vice*)
Kamron Hasan (*pro hac vice*)
Quinn Eaton (*pro hac vice*)
Sierra Faler (*pro hac vice*)
HUSCH BLACKWELL LLP
13330 California St., Suite 200
Omaha, NE 68154
(402) 964-5000
gene.summerlin@huschblackwell.com
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com
kamron.hasan@huschblackwell.com
quinn.eaton@huschblackwell.com
sierra.faler@huschblackwell.com

*Counsel for Triumph Foods, LLC*

*/s/ David P. Graham*
David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

Rachel J. Adcox (*pro hac vice*)
Tiffany Rider Rohrbaugh (*pro hac vice*)
AXINN, VELTROP &
HARKRIDER LLP
950 F Street, N.W.
Washington, D.C. 20004
(202) 912-4700
radcox@axinn.com
trider@axinn.com

*Counsel for Tyson Foods, Inc., Tyson
Prepared Foods, Inc. and Tyson Fresh
Meats, Inc.*

70

<u>/s/ *Peter H. Walsh*</u>
Peter H. Walsh (# 388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
T. (612) 402-3000
F. (612) 402-3001
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
Jennifer A. Fleury (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com
jennifer.fleury@hoganlovells.com

*Counsel for Agri Stats, Inc.*