UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **In re Pork Antitrust Litigation**<br><br>This Document Relates To All Actions | Case No. 18-cv-01776-JRT-HB<br><br>**DEFENDANTS HORMEL FOODS CORPORATION AND HORMEL FOODS, LLC'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINTS** |

## INTRODUCTION

The consolidated class complaints are devoid of any allegation that Defendants Hormel Foods Corporation or its subsidiary Hormel Foods, LLC (collectively "Hormel" or "Company") agreed to participate in an antitrust conspiracy with the other Defendants.[1] The Court should dismiss the Complaint as to Hormel for failure to allege facts justifying its inclusion in this litigation.

Hormel's business emphasizes the sale of processed, branded, packaged consumer goods, including finished pork products such as Black Label® bacon, Natural Choice® deli meats, and, most famously, Spam® luncheon meat. Because Hormel purchases the vast majority of the hogs used to make these products from independent producers, higher hog prices undermine its profitability. The Complaint relies on investor earnings

---

[1] Throughout, Hormel cites the Direct Purchaser amended class complaint (Doc. 83), originally filed as *Maplevale Farms, Inc. v. Agri Stats, Inc.*, et al., Case No. 18-cv-01893-PJS-SER. The allegations against Hormel in the other complaints are materially identical, and they should be dismissed for the same reasons.

1

calls showing that Hormel's economic interest lies in low hog prices because the Company is a buyer of hogs, not a seller. Simply put, Hormel's participation in the alleged conspiracy would have been economically irrational. Indeed, Hormel would have been a *victim* of any such conspiracy if it existed.

## FACTUAL BACKGROUND

All references in the Complaint to Hormel are recounted below.

In paragraph 24, the Complaint alleges that Hormel sells "pork," which it defines to include everything from "fresh or frozen" pig meat to "smoked ham, sausage, and bacon." (Compl. ¶2 n.2.) It does not distinguish between live hogs, butchered pork cuts, and processed pork products. The Complaint notes that Hormel has "divisions or subsidiaries that sell pork under various name brands," (*id.* ¶74), but does not connect Hormel's finished and differentiated pork products to the alleged conspiracy.

Paragraph 49 alleges that Hormel subscribed and reported information to Defendant Agri Stats, Inc. It provides no dates or any details about Hormel's alleged subscription. It does not describe what information Hormel sent to or received from Agri Stats or how such information was used, or could have been used, *by Hormel* to further a conspiracy *benefitting Hormel*.

The Complaint includes Hormel in its allegations about market consolidation in the industry, before stating that Hormel has an 8% share of whatever market is being alleged. (*Id.* ¶80 Fig. 2.) Paragraph 77 alleges that Hormel is one of four "pork integrators" (an undefined term) that increased their collective market share from 34% in

2

1988 to "just under" 70% by 2015, but it then concedes that Hormel is half the size of Defendant JBS. (*Id.* ¶79.)

The Complaint alleges that Hormel participated in industry trade associations. (*See Id.* ¶¶89, 98-100, 196.) However, it makes no allegation that anyone from Hormel (or any other Defendant) took any inappropriate action at trade association events.

Finally, the Complaint references statements made by Hormel about hog prices and hog supplies during earnings calls in November 2008 (*id.* ¶110.), January 2009 (*id.* ¶111.), May 2009 (*id.* ¶113.), and November 2010 (*id.* ¶122.).

The Complaint does *not* allege: that Hormel did anything to restrict the supply or increase the prices of pork, that it produces hogs, that it could have profited from the alleged conspiracy, or that it said or did anything to agree to the supposed conspiracy.

No action attributed to Hormel post-dates 2013.

## ARGUMENT

The Court should dismiss claims against Hormel because:

1) The earnings calls cited in the Complaint demonstrate that Hormel could not have benefitted from the alleged conspiracy, and courts do not countenance antitrust allegations that defy economic rationality.

2) The Complaint fails to allege that Hormel agreed to participate in an antitrust conspiracy, had any reason to do so, or took any action furthering it.

I. **THE COMPLAINT RELIES ON DOCUMENTS THAT DEMONSTRATE THE IMPLAUSIBILITY OF HORMEL'S INVOLVEMENT IN THE ALLEGED CONSPIRACY**

The earnings calls cited in the Complaint, as well as the Company's public SEC filings, are subject to judicial notice on a motion to dismiss. (*See* Joint Federal Memorandum at 11-12 (citing cases taking judicial notice of materials referenced in pleadings).) *See also Shoemaker v. Cardiovascular Sys., Inc.*, Case No. 16-568, 2017 WL 1180444, at *7 (D. Minn. Mar. 29, 2017) (SEC filings and earnings calls).

All allegations about Hormel earnings calls relate to statements about hog prices, and the allegations assert that the statements somehow reflect a conspiracy to increase hog prices. Indeed, the Complaint's alleged conspiracy can only be understood as an agreement to restrict hog production. (*See, e.g.*, Compl. ¶¶51-52 (describing Agri Stats information related to production of hogs); ¶¶68-70 (alleging that vertical integration into hog production gave "Defendants" control over supply of hogs).) The Complaint alleges no facts consistent with a conspiracy to fix the price of processed pork products.

Hormel's earnings calls establish that hogs function as an input cost to Hormel, *so that increases in hog prices decrease Hormel's profitability*. This fundamental fact makes it irrational for Hormel to conspire to increase hog prices, and courts regularly reject antitrust conspiracy claims that defy economic logic. *See, e.g., Car Carriers, Inc. v. Ford*

4

*Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984) (affirming dismissal because it "is preposterous to assume that" a defendant would conspire against its own interests).[2]

During the cited earnings calls, Hormel consistently explained that it benefits from low hog prices, the opposite of the aim of the purported conspiracy. In the November 2008 call cited in the Complaint, Hormel's then-CEO explained that "[d]eclining hog prices" drove earnings growth for the Company. (Hormel Ex. 1 at 2.) He later identified "the prospect of increasing hog prices" as one of the "challenges we face." (*Id.* at 4.) And he explained that Hormel was in the position of monitoring hog supplies that it did not control and "guess[ing]" when reduced hog production would impact the marketplace. (*See* Compl. ¶110; Hormel Ex. 1 at 8.) Hormel's CFO then described hog prices as "hog costs" and observed that Hormel has a limited ability to forecast hog costs. (Hormel Ex. 1 at 8.) Thus, far from demonstrating Hormel's knowledge of a conspiracy, the November 2008 call establishes that hogs constitute an input cost for Hormel and that it does not control the supply of hogs.

In the February 2009 earnings call cited in the Complaint, Hormel explained that most of its hogs are purchased on contract from independent producers. (Hormel Ex. 2 at 13.) This business model challenged Hormel at the time because the Company was

---

[2] *See also Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 458 F.Supp.2d 474, 486 (E.D. Mich. 2006) (dismissing antitrust claims as "practically and economically implausible" because defendants had no incentive to conspire); *Brunson Commc'ns., Inc. v. Arbitron, Inc.*, 239 F.Supp.2d 550, 563 (E.D. Pa. 2002) ("[T]he Amended Complaint fails to sufficiently allege concerted activity for the simple reason that the supposed conspiracy makes no economic sense.").

contractually bound to purchase hogs at prices higher than it could obtain for slaughtered pork cuts. (*Id.* at 7, 12.) With high hog prices, Hormel was "upside down" on its pork packing business, resulting in negative margins for pork sales. (*Id.* at 7.) During that call, Hormel's CEO also explained that Hormel functions "more like a packaged food company" than a meat company because its business focuses on brands and value-added products. (*Id.* at 19.) Thus, the call confirmed that increased hog prices undermine Hormel's profitability.

During the May 2009 earnings call cited in the Complaint, Hormel reiterated that it views itself as a "packaged foods company" and therefore did not intend to make any additional investments in hog production. (Hormel Ex. 3 at 14.) Because Hormel would not vertically integrate further into hog production, its "goal would be to continue to maintain[] supplies [of hogs] through the family farm contract connections that we have for most of our business." (*Id.*) Hormel also repeated its concern that hog prices were higher than prices of pork cuts after packing, making its packing business unprofitable. (*Id.* at 11-12.) Again, these statements cannot be squared with Hormel's participation in a conspiracy to increase hog prices.

Finally, in the November 2010 earnings call cited in the Complaint, Hormel explained that it must manage its processed foods business to account for increasing "input costs." (Hormel Ex. 4 at 7.) And it attributed high hog costs to high grain prices, swine disease, and other abnormal production costs. (*Id.* at 16, 19.)

These statements are substantiated by Hormel's SEC filings. For example, Hormel's 2009 10-K states that its business "has emphasized the manufacturing and

...

distribution of branded, value-added consumer items rather than the commodity fresh meat business." (Hormel Ex. 5 at 3.) It describes pork as "the primary raw material" for Hormel's products, with hogs functioning as an input cost. (*Id.* at 3, 4.) It further explains that Hormel **purchased 93% of its hogs in fiscal 2009** from independent producers under supply contracts, with contract pricing driven by "market-based formulas." (*Id.* at 5.) And it explains that "higher hog costs resulting from a decreased supply" may act to "negatively impact margins" of Hormel's pork products. (*Id.* at 21.) Regarding industry reductions in hogs, the 10-K states that declines in hogs "may increase input costs" in the coming year. (*Id.* at 23.)

In sum, the documents on which the Complaint relies demonstrate that it would have been economically irrational for Hormel to participate in the alleged conspiracy.

## II. THE COMPLAINT FAILS TO ALLEGE FACTS SUFFICIENT TO STATE A CLAIM THAT HORMEL PARTICIPATED IN AN ANTITRUST CONSPIRACY

An agreement is an essential element of a Sherman Act Section 1 claim, and courts regularly dismiss claims for failing to include sufficient allegations that an individual defendant agreed to the alleged conspiracy. (*See* Seaboard Memorandum, Section I (collecting cases dismissing individual defendants from antitrust conspiracy claims).) The Complaint alleges nothing that can be construed as an agreement by Hormel to participate in a conspiracy.

<u>First</u>, allegations that Hormel participated in industry trade associations offer no basis to accuse it of participating in an unlawful conspiracy. (*See* Joint Federal Memorandum at Section I.D.3.)

Second, the Complaint's excerpts from four Hormel earnings calls do not support any inference that the Company joined a conspiracy. The Complaint takes general statements about the direction of hog prices out of context, and the full transcripts show that Hormel viewed increased hog prices as detrimental. Each statement cited in the Complaint refers to general predictions by Hormel executives about production controlled not by Hormel, but by independent producers of hogs:

- November 2008: Hormel's CEO stated that, "I mean the picture we are looking at is about a 3 to 4% decline in both the turkey side of the business and the pork side of the business." Hormel's CFO then declined to speculate about "hog costs," stating that Hormel has "quit being a hog cost forecaster." (*See* Compl. ¶110; Hormel Ex. 1 at 8.)

- January 2009: Faced with negative margins for its packing business caused by high hog prices, Hormel's CEO explained that it would continue to honor its contracts for hogs but might limit its spot market purchases. (Hormel Ex. 2 at 12-13.) Hormel's CFO added that, in this environment, it may make financial sense to reduce Hormel's pork production even though Hormel had to that point "harvest[ed] the same number of heads [as] last year." (*Id.*)

- May 2009: Asked about expectations for "hog prices" for the year, Hormel's CFO again declined to offer any meaningful forecast because "there's better forecasts that you can obtain publicly." She then noted that the supply of hogs had not contracted as much as anticipated so prices for

8

       the hogs that Hormel purchased were expected to be "somewhat less than last year, but higher than what we've seen in the first half of the year." (*See* Compl. ¶113; Hormel Ex. 3 at 7-8.)

- November 2010: A stock analyst noted that hog producers have "had two years of losses" leading him to question Hormel about financial pressures on hog producers. The full response of Hormel's CFO: "We haven't seen expansion in the hog industry. Anecdotally, I understand that some of the producers are finding it difficult to get the financing that they may need. And some of the larger producers are kind of waiting to see where these grain crops settle in and to see what their business model will look like before they put anything else in the ground. I am kind of going along with where the USDA sees hogs for 2011 at this point which is basically flat." (*See* Compl. ¶122; Hormel Ex. 4 at 19.)

In each case, Hormel consistently communicated that it has no control over hog production or prices, that it operates as a buyer of hogs produced by others, and that it has no better information about the direction of hog prices than public sources. Moreover, Hormel's responses to investors' questions about the general direction of hog prices, a key cost for the Company, is not evidence that it joined an antitrust conspiracy.

       <u>Third</u>, the allegation that Hormel subscribed to Agri Stats adds nothing. The Complaint makes no allegation about what information Hormel sent to or received from Agri Stats, when it did so, or for how long. Nor does the Complaint explain why subscribing to an industry benchmarking service should be interpreted as participation in

9

a conspiracy. (*See* Joint Federal Memorandum at Section I.B. (citing cases holding that benchmarking is generally pro-competitive).) Indeed, Hormel's earnings calls show that it primarily relies on external sources of information about the direction of hog prices to predict its costs, a perfectly legitimate reason to use Agri Stats. Additionally, since Hormel primarily purchases hogs from others, the Complaint does not explain how Hormel could have used Agri Stats information to take any action furthering a conspiracy to limit the supply of hogs. A simple subscription to a data service does not suggest that Hormel agreed to a conspiracy.

Finally, the Complaint provides no reason to connect Hormel to the alleged conspiracy and does not allege that Hormel agreed to join it. The Complaint never alleges that Hormel could have profited from increased hog prices, that it produces hogs, or that it could have done anything to further the conspiracy. Given Hormel's business model and lack of vertical integration, it is implausible to associate it with the alleged conspiracy absent explicit allegations establishing its agreement to participate.

Even when all of the allegations are added together, the Complaint alleges only the commonplace facts that Hormel is a public company that monitors information about hog prices, participates in trade groups, and provides information to its shareholders about its business environment. Without any economic rationale for Hormel to participate in a conspiracy that would have undermined its interests, these allegations cannot support an antitrust claim against Hormel.

## CONCLUSION

Hormel respectfully requests that the Court dismiss all claims against Hormel in these consolidated actions.

Date:  October 23, 2018

**FAEGRE BAKER DANIELS LLP**

<u>/s/ Richard A. Duncan</u>
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
Bryan K. Washburn (#0397733)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
richard.duncan@faegrebd.com
aaron.vanoort@faegrebd.com
craig.coleman@faegrebd.com
emily.chow@faegrebd.com
isaac.hall@faegrebd.com
bryan.washburn@faegrebd.com

*Counsel for Defendants Hormel Foods Corporation and Hormel Foods, LLC*