EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re Pork Antitrust Litigation | Case No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br>All Actions | **[EXHIBIT A: AGREED UPON PROVISIONS]**<br><br>**[PROPOSED] PROTECTIVE ORDER** |

The parties to this Protective Order (the "Order") have agreed to be bound by its terms; accordingly, it is ORDERED:

1.   **Scope.**   All documents, electronically stored information, items, and other information produced or adduced in the course of discovery, regardless of the medium or manner generated, stored, maintained or revealed (including, among other things, initial disclosures, responses to discovery requests, deposition testimony, and exhibits), and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Order concerning Confidential or Highly Confidential Information as defined below.  This Order shall apply to any named party to this action (including all of its officers, directors, employees, retained experts, outside counsel (and their support staff)).  This Order is subject to the Local Rules of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation of time periods.

2.    **Confidential Information.**   As used in this Order, "Confidential Information" means any document, or any portion thereof, which contains confidential or proprietary business, commercial, research, personnel, product or financial content belonging to the producing party, and which is designated as "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" for purposes of this litigation.   Confidential Information may fall within one or more of the following categories:  (a) information prohibited from disclosure by statute or contractual agreement; (b) information that reveals trade secrets; (c) research, technical, commercial or financial information that the party has maintained as confidential; (d) medical information concerning any individual; (e) personal identity information; (f) income tax returns (including attached schedules and forms), W-2 forms and 1099 forms; or (g) personnel or employment records of a person who is not a party to the case.  The parties will make reasonable efforts to ensure that information or documents that are available to the public are not designated as Confidential Information.

3.    **Highly Confidential Information.**   As used in this Order, "Highly Confidential Information" means any document, or any portion thereof, which a producing party or non-party believes to be so highly sensitive that: (i) it is the subject of reasonable efforts to maintain its secrecy; (ii) it is sufficiently valuable and secret to afford a potential or actual advantage over others; (iii) its disclosure to existing or potential competitors or customers would cause injury to the business, commercial, competitive, or financial interests of the producing party or non-party; and (iv) it is designated as "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" for

purposes of this litigation.  By way of example only, Highly Confidential Information may include but is not limited to:  (a) current or future business strategies and other strategic planning information; (b) projections or plans regarding performance, budgets, production, output, sales, marketing or distribution practices; (c) research and development information; (d) manufacturing know-how or technology; (e) board of directors materials and presentations; (f) customer lists or information; (g) negotiation strategies; (h) proprietary software, systems, or processes; (i) margin, cost, and pricing information; or (j) intellectual property.  If required by applicable privacy laws, Highly Confidential Information may also include personnel files that are designated as such for purposes of this litigation.

      4.    **Designation.**

      (a)    A party may designate a document as Confidential or Highly Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" on the document and on all copies in a manner that will not interfere with the legibility of the document.  To the extent a document is produced in a form in which placing or affixing the words "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" on the document is not practicable, the producing party may designate the document as confidential by cover letter, slip sheet, or by affixing a label to the production media containing the document. As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries

or descriptions that contain the Confidential or Highly Confidential Information. The marking "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" shall be applied prior to or at the time the documents are produced or disclosed. Applying such marking to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" shall also be so marked, except that indices, electronic databases or lists of documents that do not contain substantial portions or images of the text of documents designated as Confidential or Highly Confidential Information and do not otherwise disclose the substance of the Confidential or Highly Confidential Information are not required to be marked.

(b)     Though the parties understand that the designation of a document as Confidential or Highly Confidential Information is a certification by an attorney that the document contains Confidential or Highly Confidential Information as defined in this Order, the parties recognize that document review using technological means may result in the application of greater or lesser confidentiality designations than otherwise appropriate. The parties agree to work together on an as-needed (and per document) basis to address any potential over (or under) designation.

5.     **Depositions.**  Unless all parties agree otherwise on the record at the time the deposition testimony is taken, all deposition testimony taken in this case shall be treated

as Confidential Information for a period of thirty (30) days after the transcript is delivered to the party being deposed.  If counsel for any party states on the record that the deposition testimony should be treated as Highly Confidential Information, such testimony will be treated as Highly Confidential Information for the thirty (30)-day period following the delivery of the transcript to the party seeking to designate material as confidential.  No later than the thirtieth day after the transcript is delivered to the party being deposed or a party seeking to designate material as confidential, whichever is later, a party may serve a Notice of Designation to all parties of record and the court reporter for the deposition in question as to specific pages of the transcript that are designated Confidential or Highly Confidential Information, and thereafter only those portions identified in the Notice of Designation shall be protected by the terms of this Order.  The court reporter shall provide a final copy of the transcript that reflects any designations of pages of the transcript as Confidential or Highly Confidential Information in the lower left hand corner of each designated page.

6. **Protection of Confidential or Highly Confidential Material.**

(a) **General Protections.**  Except as set forth below, Confidential or Highly Confidential Information shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in subparagraph (b) for any purpose whatsoever other than the prosecution or defense of claims in, or the settlement of, this litigation, including any appeal thereof.  In this putative class action, Confidential or Highly Confidential Information may be disclosed only to the named plaintiffs and not to any other member of the putative class unless and until a class including the putative member

has been certified.  Nothing in this Order, however, shall prevent or prejudice any party designating materials Confidential or Highly Confidential Information from using its own such designated documents for any purpose, including privately disclosing its own Confidential or Highly Confidential Information to others not mentioned in this Paragraph 6, and such private disclosure shall not waive the protections of this Order.

(b)    **Limited Third-Party Disclosures.**  The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential or Highly Confidential Information to any third person or entity except as set forth below in subparagraphs (1)-(10) and (1)-(9), respectively. Subject to these requirements, the following categories of persons may be allowed to review Confidential Information:

(1)    Counsel.  Outside or in-house counsel for the parties (or in-house counsel for the parties' affiliates) and employees of such counsel who have responsibility for the preparation and trial of the action;

(2)    Parties.  Individual parties and employees or former employees of a party, but only to the extent counsel has a good-faith basis for believing such Confidential Information is relevant to events, transactions, discussions, communications or data about which the individual party, employee, or former employee has knowledge; disclosure to such individual party, employee, or former employee is limited to the portion of the document about such events, transactions, discussions, communications, or data; and such party, employee, or

6

former employee has completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound to this Order;

(3)    The Court and its personnel;

(4)    Court Reporters and Recorders.   Court reporters and recorders engaged for depositions;

(5)    Contractors. Those persons specifically engaged for the limited purpose of making copies of documents or organizing or processing documents, including outside vendors hired to process electronically stored documents;

(6)    Consultants and Experts. Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action but only after such persons have completed the certification contained in Attachment A to this Order;

(7)    Witnesses. During depositions or testimony at trial or any hearing, witnesses in this action to whom disclosure is reasonably necessary, provided that counsel for the party intending to disclose the information has a good-faith basis for believing such Confidential Information is relevant to events, transactions, discussions, communications or data about which the witness is expected to testify or about which the witness may have knowledge.  Witnesses shall not

7

retain a copy of documents containing Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts. Pages of transcribed testimony that are designated as Confidential Information pursuant to Paragraph 5 may not be disclosed to anyone except as permitted under this Order.

(8)   Author or recipient. The author or recipient of the document (not including a person who received the document solely in the course of litigation);

(9)   Identified Persons. Any person who is referenced in the document or whose conduct is purported to be identified in the document, provided that counsel for the party intending to disclose the information has a good-faith basis for believing such Confidential Information is relevant to events, transactions, discussions, communications or data about which the person has knowledge; disclosure to such person is limited to the portion of the document in which the person or person's conduct is identified or referenced; and such person has completed the certification contained in Attachment A to this Order; and

(10)   Others by Consent. Other persons only by written consent of the producing party or upon order of the Court and on such conditions as

may be agreed or ordered, but such consent shall not be unreasonably

withheld.

The following categories of persons may be allowed to review Highly Confidential

Information:

(1)     Counsel.  Outside counsel for the parties and employees of such

counsel who have responsibility for the action, provided that such

individuals do not regularly participate in the commercial business

activities of the party;

(2)     The Court and its personnel;

(3)     Court Reporters and Recorders.  Court reporters and recorders

engaged for depositions;

(4)     Contractors. Those persons specifically engaged for the limited

purpose of making copies of documents or organizing or processing

documents, including outside vendors hired to process electronically

stored documents;

(5)     Consultants and Experts. Consultants, investigators, or experts

employed by the parties or counsel for the parties to assist in the

preparation and trial of this action but only after such persons have

completed the certification contained in Attachment A to this Order;

(6)     Witnesses. During depositions or testimony at trial or any hearing, witnesses in this action to whom disclosure is reasonably necessary, provided that counsel for the party intending to disclose the information has a good-faith basis for believing such Highly Confidential Information is relevant to events, transactions, discussions, communications or data about which the witness is expected to testify or about which the witness may have knowledge. Before disclosing any document pursuant to this paragraph, counsel who intends to disclose the document must first notify counsel for the designating party of their intent to do so.  At depositions, trial or hearings, such notice may be accomplished by presenting a copy of the Highly Confidential Information to counsel for the designating party and permitting counsel an opportunity to object before the document is shown to the witness.  Until the designating party agrees to the disclosure, or the Court orders such disclosure, Highly Confidential Information shall not be disclosed to or discussed with any witness.  Witnesses shall not retain a copy of documents containing Highly Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts.  Pages of transcribed testimony or exhibits to depositions that are designated as Highly Confidential

Information must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

(7)     Author or recipient. The author or recipient of the document (not including a person who received the document solely in the course of litigation);

(8)     Identified Persons.  Any person who is referenced in the document or whose conduct is purported to be identified in the document, provided that counsel for the party intending to disclose the information has a good-faith basis for believing such Highly Confidential Information is relevant to events, transactions, discussions, communications or data about which the person has knowledge; disclosure to such person is limited to the portion of the document in which the person or person's conduct is identified or referenced; and such person has completed the certification contained in Attachment A to this Order; and

(9)     Others by Consent. Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered, but such consent shall not be unreasonably withheld.

To the extent any person is required to complete the certification contained in Attachment A to this Order, facsimile signatures or signatures transferred in electronic format (*e.g.,* PDF) shall be treated as original signatures purposes of this Order.

(c)     **High Level Summaries**.   Notwithstanding the provisions of paragraph 6(b), outside counsel for a party that is a corporation or other type of business entity may provide high level summaries or characterizations of the evidence in the case to individuals employed by the party who have responsibility to make decisions regarding the defense or settlement of the case.  Nothing in this Order is intended to bar or otherwise prevent any counsel from rendering advice to his or her client with respect to this litigation and, in the course of rendering such advice, from relying upon his or her examination or knowledge of Confidential or Highly Confidential Information.

(d)     **Control of Documents.**   Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential or Highly Confidential Information.  Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of three years after the termination of the case.

7.     **Absent Class Members.**  Confidential or Highly Confidential Information may not be disclosed to absent members of a certified class (each an "Absent Class Member") who have not intervened or otherwise appeared in this litigation, except under the circumstances described in Paragraph 6(a)-(b) of this Order.  If, however, Confidential or Highly Confidential Information is contained in a filing with the Court pursuant to

12

Paragraph 9 of this Order, such filing may be disclosed to counsel for the Absent Class Member (or the Absent Class Member if not represented) for purposes of evaluating any settlement affecting the Absent Class Member, provided that such counsel, if any, and the Absent Class Member have completed the certification contained in Attachment A to this Order.

8.   **Inadvertent Failure to Designate.**   An inadvertent failure to designate a document as Confidential or Highly Confidential Information does not, standing alone, waive the right to so designate the document.   If a party designates a document as Confidential or Highly Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to ensure that the document is treated in accordance with the provisions of this Order.   No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential or Highly Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential or Highly Confidential Information.

9.   **Filing of Confidential or Highly Confidential Information.**   This Order does not, by itself, authorize the filing of any document under seal.   Any party wishing to file a document designated as Confidential or Highly Confidential Information in connection with a motion, brief or other submission to the Court must comply with Local Rule 5.6.

10.   **No Greater Protection of Specific Documents.**   Except on privilege grounds not addressed by this Order, no party may withhold information from discovery

on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection. Nothing in this Order shall prevent a party from seeking greater or lesser protection with respect to the use of any Confidential or Highly Confidential Information.

11. **Challenges by a Party to Designation as Confidential or Highly Confidential Information.** The designation of any document as Confidential or Highly Confidential Information is subject to challenge by any party. The following procedure shall apply to any such challenge.

(a) **Meet and Confer.** A party challenging the designation of Confidential or Highly Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party. In conferring, the challenging party must explain the basis for its belief that the confidentiality designation was not proper and must give the designating party an opportunity to review the designated document, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation. The designating party must respond to the challenge within five (5) business days of the meet and confer.

(b) **Judicial Intervention.** A party that elects to challenge a confidentiality designation may (i) seek informal dispute resolution with the Court if such process can be mutually agreed upon with the designating party; or (ii) file and serve a motion that identifies the challenged document and sets forth in detail the basis for the challenge. Each such motion's supporting brief may not exceed five (5) pages and must be accompanied by a competent declaration that affirms that the movant has complied with

14

the meet and confer requirements of this procedure outlined above.   The burden of

persuasion in any such challenge proceeding shall be on the designating party, who shall

have the right to respond to any motion filed by a challenging party.   Until the Court rules

on the challenge, all parties shall continue to treat the document as Confidential or Highly

Confidential Information under the terms of this Order.   As such, any motion challenging

a confidentiality designation must not publicly file the documents with contested

designations nor describe them in a manner that would reveal Confidential or Highly

Confidential Information.

12.   **Action by the Court.**   Applications to the Court for an order relating to

documents designated Confidential or Highly Confidential Information shall be by motion.

Nothing in this Order or any action or agreement of a party under this Order limits the

Court's power to make orders concerning the disclosure of documents produced in

discovery or at trial.

13.   **Use of Confidential or Highly Confidential Documents or**

**Information at Trial.**   Nothing in this Order shall be construed to limit the use of any

document at any trial or hearing provided that the parties take necessary advance

precautions to avoid the public disclosure of Confidential or Highly Confidential

Information.   A party that intends to present or that anticipates that another party may

present Confidential or Highly Confidential Information at a hearing or trial shall bring

that issue to the Court's and parties' attention by motion or in a pretrial memorandum

sufficiently in advance of the proceeding without disclosing the Confidential or Highly

15

Confidential Information.  The Court may thereafter make such orders as are necessary to govern the use of such documents at hearing or trial.

14.     **Third Parties.**  In seeking discovery from third parties, the parties shall attach this Order to a copy of any subpoena or other discovery request.  Third parties from whom discovery is requested are parties to this Order and are entitled to the protections of this Order in responding to such requests.

15.     **Confidential or Highly Confidential Information Subpoenaed or Ordered Produced in Other Litigation.**

(a)     If a receiving party is served with a subpoena or an order issued in other litigation that would compel disclosure of any document designated in this action as Confidential or Highly Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than three court days after receiving the subpoena or order.  Such notification must include a copy of the subpoena or court order.

(b)     The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order.  In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c)     The purpose of imposing these duties is to alert the interested persons to the existence of this Order and to afford the designating party in this case an opportunity to try to protect its Confidential or Highly Confidential Information in the court from which

16

the subpoena or order issued.  The designating party shall bear the burden and the expense of seeking protection in that court of its Confidential or Highly Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court.  The obligations set forth in this paragraph remain in effect while the party has in its possession, custody or control Confidential or Highly Confidential Information by the other party to this case.

16.    **Challenges by Members of the Public to Sealing Orders.**  If a party or interested member of the public challenges the sealing of particular documents that have been filed under seal, the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

17.    **Unauthorized Disclosure or Use.**  If a party learns that it or its counsel, officers, directors, employees, consultants, experts or other agents have disclosed documents designated Confidential or Highly Confidential Information in any circumstance not authorized under this Order, that party must within two (2) business days of learning of such disclosure (a) notify the designating party of the disclosure and all pertinent facts relating thereto, (b) make every reasonable effort to prevent disclosure by each unauthorized person who received such information, (c) use reasonable best efforts to retrieve all copies of the protected documents disclosed to unauthorized persons, (d) inform the person or persons to whom unauthorized disclosures were made of the terms of this Order, and (e) request that each such person execute the certification contained in Exhibit

A to this Order.  Nothing contained herein shall limit the right of the designating party to seek relief against the party responsible for such disclosure.

18.    **Limitations on Waiver of Privilege.**

(a)    **Clawback of Inadvertent Disclosure.**  This Order is entered, *inter alia*, pursuant to Federal Rule of Evidence 502(d).  If a party or non-party that produces or otherwise discloses information in connection with this Litigation (the "Producing Party") thereafter claims that such information is protected by any privilege or attorney work product protection ("Disclosed Protected Information"), the disclosure of the Disclosed Protected Information shall not constitute or be deemed a waiver or forfeiture of any claim of privilege or work product protection that the Producing Party would otherwise be entitled to assert with respect to the Disclosed Protected Information and its subject matter in this proceeding or in any other federal or state proceeding.  The parties stipulate that by entering this Confidentiality Order, the Court shall provide the maximum protection allowed by Rule 502(d).

(1)    **Assertion of a Clawback.**  Any Producing Party may request, in writing, the return of any Disclosed Protected Information by identifying it and stating the basis for withholding such material or information from production.  The Producing Party must also provide a privilege log explaining the basis for the assertion of the privilege within 3 business days of asserting a clawback.

(2)    **Clawbacks before Deposition.** To the extent a party believes a clawback made prior to a scheduled deposition impacts that deposition, the parties will meet and

confer and a party may seek guidance from the Court if the meet and confer does not reach a successful resolution.

    (3) **Clawback Process.** Federal Rule of Civil Procedure 26(B)(5)(b) shall govern the clawback of Disclosed Protected Information.

      a. If a Producing Party requests the return of such Disclosed Protected Information then in the custody of one or more parties, the receiving parties shall—unless it contests the claim of attorney-client privilege or work product protection in accordance with sub-paragraph 18(b)(2)(b)—within ten (10) business days of receipt of written notice (i) destroy or return to the Producing Party the Disclosed Protected Information and all copies thereof, and (ii) provide a certification of counsel that all of the Disclosed Protected Information has been returned or destroyed.

      b. **Challenging a Clawback.** Notify the producing Party or non-Party that it wishes to challenge the claim of privilege or work product protection and has sequestered the material until the issue can be resolved.  The Parties agree to meet and confer regarding the claim of privilege.  If, at the conclusion of the meet and confer process, the Parties are still not in agreement, they may bring the issue to the Court.  A Party challenging a clawback request under this paragraph may use the clawed-back document and its contents for the purpose of filing a motion with the Court under seal that challenges whether or not the document is privileged or work product only in accordance with the provisions of Fed. R. Civ. P. 26(b)(5)(B).

      c. The parties may stipulate to extend the time periods set forth in sub-paragraph (a).

d.      Disclosed Protected Information that is sought to be reclaimed by the parties to this case pursuant to this Order shall not be used as grounds by any third party to argue that any waiver of privilege or protection has occurred by virtue of any production in this case.

e.      The Producing Party retains the burden of establishing the privileged or protected nature of the Disclosed Protected Information.  Nothing in this paragraph shall limit the right of any party to petition the Court for an *in camera* review of the Disclosed Protected Information.

(b)      Where a party agrees to or is ordered to destroy a clawed back document, the party must instruct their e-discovery vendor to delete the document entirely from their e-discovery database and delete other copies of the clawed back document.  To the extent that it is not technologically feasible for a receiving party to destroy a clawed back document (for example, if the clawed back document is part of a production provided on read-only production media such that the clawed back document cannot be destroyed without destroying the entire production media), the parties will meet and confer as to an acceptable alternative approach.

(c)      **Receiving Party's Obligation.** Without waiving the ability to challenge a clawback under ¶ 18(a)(3)(b) a party who discovers that it may have received an inadvertently disclosed or produced protected document must promptly notify the disclosing or producing party.  A party who is notified or discovers that it may have received a protected document must comply with Fed. R. Civ. P. 26(b)(5)(B).

19.    **Claims of Privilege and Redactions**

20

(a)     **Production of Privilege Logs:**  Except as provided otherwise below, for any document withheld in its entirety or produced but redacted, the producing Party will produce privilege/redaction logs in MS Excel format or any other format that permits electronic sorting and searching.  All privilege logs will served within 60 days after Substantial Completion of Document Productions.

(b)     **Exclusions from Logging Potentially Privileged Documents:**  The following categories of documents do not need to be contained on a producing Party's initial privilege log, unless good cause exists to require that a Party do so.

(1)     Information generated after June 30, 2018.  This provision does not apply to third parties to the Litigation.

(2)     Any communications exclusively between a producing Party and its outside counsel, an agent of outside counsel other than the Party, any non-testifying experts in connection with specific litigation, or with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts in connection with specific litigation.

(3)     Any privileged materials or work product created by or specifically at the direction of a Party's outside counsel, an agent of outside counsel other than the Party, any non-testifying experts in connection with specific litigation, or with respect to information protected by Fed. R. Civ. P.

26(b)(4), testifying experts in connection with specific litigation.

(4)    [**DISPUTED PROVISION: Excluding In-House Counsel Privilege Claims from Privilege Logs**]

(c)    **Privilege Log Requirements:**

(1)    **Metadata Log:**  To the extent applicable, each Party's privilege log only needs to provide objective metadata (to the extent it is reasonably available and does not reflect privileged or protected information) and an indication of the privilege or protection being asserted.

a.    Objective metadata includes the following (as applicable to the document types as shown in Appendix A to the ESI Protocol Order):

    i.    A unique privilege log identifier that makes clear the familial relationship of documents, i.e., parent/child.
    ii.    Custodian
    iii.    DuplicateCustodian, CustodianOther or CustodianAll (if applicable)
    iv.    File Name
    v.    Email Subject
    vi.    Author
    vii.    From
    viii.    To
    ix.    CC
    x.    BCC
    xi.    Date Sent
    xii.    Date Received
    xiii.    Date Created

b.     In addition to the objective metadata fields, a Party must also include a field on its privilege log entitled "Attorney/Description of Privileged Material" if the basis for the privilege asserted is not apparent from the objective metadata (e.g., the name of the attorney will be provided if not included in the objective metadata). Further, a Party must manually populate on its privilege log an author and date for any withheld document where that information is not provided by the objective metadata, unless such information is not reasonably discernable from the document or the information is not necessary to evaluate the claim of privilege in light of the metadata that is discernable and/or the information provided in the Attorney/Description of Privileged Material field.

c.     With respect to the "Email Subject" or "File Name" field, the producing Party may substitute a description of the document where the contents of these fields may reveal privileged information.  In the privilege log(s), the producing Party shall identify each instance in which it has modified the content of the "Email Subject" or "File Name" field (e.g., "[metadata redacted/altered to protect privilege]."

d.     Should a receiving Party, in good faith, have reason to believe a particular entry on a metadata-generated privilege log is responsive and does not reflect privileged discoverable information, the receiving Party may request, and the producing Party will not unreasonably refuse to provide, more information about the basis of the asserted privilege in compliance with Fed. R. Civ. P. 26(b)(5).

(2)     **Email Chains:**  If there is more than one branch of (i.e., more than one unique group of recipients of) an email thread, each branch will be individually logged; however, each individual email within the thread need not be logged if the recipients of the email chain are all identical.  A Party asserting privilege over a chain of emails may produce only a single redacted copy of such email chain consistent with the ESI Protocol to the extent some portions are only partially privileged, except that any unique branches of the email chain must also either be produced in redacted form or included on the metadata privilege log.

(3)     **Email Families:** Attachments to emails shall be logged as separate documents on the log, with family relationships identified.

(d)     **Documents Redacted for Privilege:**   Documents Redacted for Privilege:  As an initial production matter, redacted documents need not be logged as long as (a) for emails, the objective metadata (i.e., to, from, cc, bcc, recipients, date, and time, unless the privilege or protection is contained in these fields) is not redacted, and the reason for the redaction, including the nature of the privilege asserted, is noted on the face of the document, or, if noting the nature on the face of the document is not technologically feasible, is noted in the metadata field provided in section F below (for redacted documents where the subject matter is not decipherable as a result of redactions, a description of the contents of the document that is sufficient to understand the subject matter of the document may be requested); and (b) for non-email documents, the reason for the redaction is noted on the face of the document in the redacted area.  The producing Party will undertake

24

reasonable efforts to make limited, line-by-line redactions of privileged or work product information. After receipt of the production, the requesting Party may request in good faith that the producing Party create a privilege log for specific redacted documents. Electronic documents that are redacted shall be identified as such in a "redaction" field in the accompanying data load file.

(e)   **Challenges to Privilege Claims:**   Following the receipt of a privilege/redaction log, a requesting Party may identify, in writing (by Bates/unique identified number), the particular documents that it believes require further explanation. The producing Party shall endeavor to respond to such a request within 14 days. If a Party challenges a request for further information, the Parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the matter may be brought to the Court.

(f)   **Privilege Metadata Fields**:   Where a document is either withheld in full or redacted on the basis of a privilege, then that privilege shall be provided in a metadata field entitled "Privilege Asserted" and list a short description of the privilege asserted (e.g., "Attorney Client Privilege", "Attorney Work Product").

20.   **Obligations on Conclusion of Litigation.**

(a)   **Order Continues in Force.**   Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b)   **Obligations at Conclusion of Litigation.**   Within sixty (60) days after dismissal or entry of final judgment not subject to further appeal, all Confidential and Highly Confidential Information, including copies as defined in Paragraph 4(a), shall be

returned to the producing party unless:  (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction to the extent practicable in lieu of return;  or (3) as to documents bearing the notations, summations or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has done so.

(c)     **Retention of Work Product and Filed Documents.** Notwithstanding the above requirements to return or destroy documents, counsel may retain (1) email correspondence related to their representation, (2) attorney work product, including an index that refers or relates to designated Confidential or Highly Confidential Information so long as that work product does not duplicate verbatim substantial portions of Confidential or Highly Confidential Information; and (3) one complete set of (a) all documents filed with or by the Court, including those filed under seal; (b) all transcripts of depositions, including exhibits; and (c) all final expert witness reports and supporting materials disclosed pursuant to Rule 26 of the Federal Rules of Civil Procedure.  Any retained Confidential or Highly Confidential Information shall continue to be protected under this Order.  An attorney may use his or her work product in subsequent litigation, provided that its use does not disclose Confidential or Highly Confidential Information. Nothing in this Order shall be construed to require the destruction or return of Confidential or Highly Confidential Information stored in counsels' archives, back-up media, or disaster recovery media.

(d) **Deletion of Documents filed under Seal from Electronic Case Filing (ECF) System.** Filings under seal shall be deleted from the ECF system only upon order of the Court.

21. **Order Subject to Modification.** This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

22. **No Prior Judicial Determination.** This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document designated Confidential or Highly Confidential Information by counsel or the parties is entitled to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue.

23. **Persons Bound.** This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

24. **Future Parties.** The terms of this Order shall be binding upon all current and future parties to this litigation and their counsel; any party appearing in the litigation following entry of this Order shall be deemed to have joined the case subject to its provisions.

25. **Personal Jurisdiction.** Nothing herein shall be construed as a determination by the Court, or as a consent or waiver by any party, or parent or affiliate of any party, that such party, or parent or affiliate of a party, is subject to personal jurisdiction in this Court

or that discovery as to such party, or parent or affiliate of a party, shall proceed pursuant to the Federal Rules of Civil Procedure.

SO ORDERED.


Dated: _____          _____
                              HILDY BOWBEER
                              MAGISTRATE JUDGE
                              UNITED STATES DISTRICT COURT

## ATTACHMENT A TO PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re Pork Antitrust Litigation | Case No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br>All Actions | |

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

The undersigned hereby acknowledges that he/she has read the Protective Order in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States District Court for the District of Minnesota in matters relating to the Protective Order and understands that the terms of the Protective Order obligate him/her to use materials designated as Confidential or Highly Confidential Information in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential or Highly Confidential Information to any other person, firm, or concern.

The undersigned acknowledges that violation of the Protective Order may result in penalties for contempt of court.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

_____

Date: _____    _____
                              Signature

29

EXHIBIT B

# Exhibit B: Disputed Protective Order Provisions

| Disputed Provision | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| **¶ 19 (b)(4): Excluding In-House Counsel Privilege Claims from Privilege Logs** | None. [*Privilege claims relating to in-house counsel must be logged*] | [Adding the following to ¶ 19(b)'s categories of documents which do not need to be contained on a producing Party's initial privilege log, unless good cause exists to require the a Party do so]:<br><br>Any communication exclusively between a producing Party and its inside counsel (or their staff) to the extent that the attorney (or their staff) is acting in a legal capacity. |

EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re Pork Antitrust Litigation | Case No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br>All Actions | **[EXHIBIT C: *AGREED UPON PROVISIONS*]**<br><br>**[PROPOSED] ORDER REGARDING PRODUCTION OF ELECTRONICALLY STORED INFORMATION AND PAPER DOCUMENTS** |

This Order Regarding Production Of Electronically Stored Information And Paper Documents ("ESI Protocol Order") shall govern the Parties in the above-captioned case whether they currently are involved or become so in the future, and any related actions that may later be consolidated with this case (collectively, the "Litigation").

## I.   **GENERAL PROVISIONS**

A.   **Applicability:**  This ESI Protocol Order will govern the production of ESI and paper documents.  To the extent that a Party collected and processed documents prior to the entry of this ESI Protocol Order, and production of such documents cannot be made in accordance with the terms of this ESI Protocol Order, the Parties will meet and confer concerning the potential formats of the production of any such documents.

B.   **Limitations & Non-Waiver:**  Nothing in this ESI Protocol Order shall be construed to affect the admissibility of discoverable information.   All objections to the admissibility of any documents are preserved and may be asserted at any time.  Pursuant to the terms of this ESI Protocol Order, information regarding search process and electronically-stored information ("ESI") practices may be disclosed, but compliance with this ESI Protocol Order does not constitute a waiver, by any Party, of any objection to the production of particular ESI for any reason, including as irrelevant, undiscoverable, or otherwise inadmissible, unduly burdensome or not reasonably accessible, or privileged, nor does it constitute a waiver of any right to discovery by any Party.  For the avoidance of doubt, a Party's compliance with this ESI Protocol Order will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.  All parties preserve all such privileges and protections, and all parties reserve the right to object to any such privileges and protections.

C.   **ESI Liaisons:**

1.   **Designation:**  Each Party agrees to designate an ESI Liaison within 7 days after entry of this ESI Protocol Order.  Any Party is free to change its designated ESI Liaison by providing written notice to the other Parties.

2.   **Duties of ESI Liaison:**  Each ESI Liaison will be prepared to participate in the resolution of any e-discovery disputes or ESI issues that may arise (or designate another person as primarily responsible) and have access to personnel most knowledgeable about the Party's electronic systems and capabilities in order to, as appropriate, answer pertinent questions.

3. **Time Frame for ESI Issue Resolution:** Each ESI Liaison will acknowledge receipt of an ESI-related inquiry from another ESI Liaison within 3 business days after the initial inquiry and respond substantively no later than 10 business days after the initial inquiry. If the responding ESI Liaison believes the ESI issue in question is particularly complex and requires more than 10 business days to respond substantively, then within 10 business days the responding ESI Liaison will provide a general explanation of the process necessary to answer the question and provide an estimated response date.

D. **Deadlines:** References to schedules and deadlines in this ESI Protocol Order shall comply with Fed. R. Civ. P. 6 with respect to computing deadlines.

E. **Definitions:**

1. "Discovery Material" is defined as all information produced, given, or exchanged by and among all Parties, or received from non-Parties in the Litigation, including all deposition testimony, testimony given at hearings or other proceedings, interrogatory answers, documents and all other discovery materials, whether produced informally or in response to requests for discovery.

2. Plaintiffs and Defendants, as well as their officers, directors, employees, agents, and legal counsel, are referred to as the "Parties" solely for the purposes of this ESI Protocol Order. A single Plaintiff or Defendant, as well as, where applicable, its respective officers, directors, employees, agents, and legal counsel, may also be referred to as a "Party" solely for the purposes of this ESI Protocol Order.

3. "Plaintiffs" as used herein shall mean the putative Direct Purchaser Plaintiff class, Commercial and Institutional Indirect Purchaser Plaintiff class, and End-User Consumer Plaintiff class as set forth in the respective operative complaints.

4. "Defendants" as used herein shall mean Defendants named in the Direct Purchaser, Commercial and Institutional Indirect Purchaser, and End-User Consumer Complaints.

5. To avoid misunderstandings about terms, all Parties should consult the most current edition of The Sedona Conference Glossary.

F. **Authenticity and Admissibility:** Nothing in this ESI Protocol Order shall be construed to affect the authenticity or admissibility of any document or

data.  All objections to the authenticity or admissibility of any document or data are preserved and may be asserted at any time.

G.   **Confidential Information:**  For the avoidance of doubt, nothing herein shall contradict the Parties' rights and obligations with respect to any information designated as confidential under the Agreed Confidentiality Order (Dkt.[X]).

## II.   GENERAL PRODUCTION FORMAT PROTOCOLS

A.   **TIFFs:**  Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files.  Each image will have a file name that is the unique Bates number of that image, pursuant to ¶ II(E).  Original document orientation should be maintained to the extent reasonably practicable and technologically possible for a producing Party's vendor (i.e., portrait to portrait and landscape to landscape).  The imaged Data shall retain all attributes of the native or hard-copy file, such as document breaks.  Produced TIFF images will show all text and images that are visible in the form in which the electronic document was last saved, with the exception of redacted portions.  Hidden content, tracked changes or edits, comments, notes, and other similar information, to the extent viewable within a document in its native file format and visible in the form in which the electronic document was last saved, shall also be imaged so that such content is viewable on the image file.  Nothing in this subsection requires the modification or alteration of any document or data in order to make any hidden content, tracked changes or edits, comments, notes, and other similar information viewable if it is not already viewable in the form in which the electronic document was last saved.  Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively."  A producing Party retains the option to produce ESI in alternative formats if so agreed by the requesting Party, which may include native format, or a combination of native and TIFF formats.

B.   **Text Files:**  Each ESI item produced under this ESI Protocol Order shall be accompanied by a text file as set out below.  All text files shall be provided as a single document level text file for each item, not one text file per page.  Each text file shall be named to use the Bates number of the first page of the corresponding production item.

1.   **OCR:**  A producing Party may make paper documents available for inspection and copying/scanning in accordance with FED. R. CIV. P. 34 or, additionally or alternatively, scan and OCR paper documents.

4

Where OCR is used, the Parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR text files should indicate page breaks where possible. Even if OCR is used by a producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR.

2. **ESI:** Except for redacted documents, emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available. For redacted documents, Parties shall provide OCR text in accordance with the specifications in Section II.B(1).

C. **Production of Native Items:** The Parties agree that ESI shall be produced as TIFF images consistent with the format described in section II.A. with an accompanying load file, which will contain, among other data points, the ESI data points listed in Appendix 1 hereto. The exception to this rule shall be spreadsheet-application files (e.g., MS Excel), presentation files (e.g., MS PowerPoint), personal databases (e.g., MS Access), and multimedia audio/visual files such as voice and video recordings (e.g., .wav, .mpeg, and .avi), for which all ESI items shall be produced in native format upon reasonable request. In the case of personal database (e.g., MS Access) files containing confidential or privileged information, the Parties shall meet and confer to determine the appropriate form of production. When producing the above file types in native format, the producing Party shall produce a single-page TIFF slip sheet indicating that a native item was produced. The corresponding load file shall include NativeFileLink information for each native file that is produced. Further, the Parties agree to meet and confer prior to producing native file types other than spreadsheet application files, presentation files, and multimedia audio/visual file types such as .wav, .mpeg and .avi. Prior to processing non-standard native files for production, the producing Party shall disclose the file type to and meet and confer with the requesting Party on a reasonably useable production format. The Parties agree to meet and confer to the extent that there is data in database application files, such as SQL, to determine a reasonable form of production of usable data. Through the pendency of the Litigation, the producing Party shall exercise reasonable, good faith efforts to maintain all preserved and produced native files in a manner that does not materially alter or modify the file or the metadata.

D. **Requests for Other Native Files:** Other than as specifically set forth above, a producing Party need not produce documents in native format. If a Party would like a particular document produced in native format and this ESI Protocol Order does not require the production of that document in its native

format, the Party making such a request shall explain the reason for its request that the document be produced in its native format. The requesting Party will provide a specific Bates range for documents it wishes to be produced in native format. Any native files that are produced should be produced with a link in the NativeLink field, along with all extracted text and applicable metadata fields set forth in Appendix 1.

E.   **Bates Numbering:**

1.   All images must be assigned a Bates number that must always: (1) be unique across the entire document production; (2) maintain a constant prefix and length (ten-digits and 0-padded) across the entire production; (3) contain no special characters or embedded spaces, except hyphens or underscores; (4) be sequential within a given document; and (5) identify the producing Party. To the extent reasonably practicable, the Bates number must also maintain consistent numbering across a family of documents.

2.   If a Bates number or set of Bates numbers is skipped in a production, the producing Party will so note in a cover letter or production log accompanying the production.

3.   The producing Party will brand all TIFF images at a location that does not obliterate or obscure any part of the underlying images.

F.   **Parent-Child Relationships:**   Parent-child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business should be preserved to the extent reasonably practicable. For example, if a Party is producing a hard copy printout of an email with its attachments, the attachments should be processed in order behind the e-mail to the extent reasonably practicable.

G.   **[DISPUTED PROVISION: Entire Document Families]**

H.   **Load Files:**  All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (such as an Opticon file) as well as a metadata (.dat) file with the metadata fields identified below on the document level to the extent available. The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the Image Load files in the production.

I.   **Color:**  Documents or ESI containing color need not be produced initially in color.  However, if an original document or ESI item contains color markings and it is necessary to see those markings in their original color to understand the meaning or content of the document, then the requesting Party may, in good faith, request that the document or ESI item be produced in its original colors.  For such documents, the requesting Party shall provide a list of Bates numbers of the imaged documents sought to be produced in color.  The production of documents and/or ESI in color shall be made in single-page JPEG format (300 DPI).  All requirements for productions stated in this ESI Protocol Order regarding productions in TIFF format apply to any productions of documents and/or ESI in color made in such an alternative format.  Requests that a document be produced in color for the reasons set forth in this ¶ II(I) will not be unreasonably denied by the producing Party. If a producing Party wishes to object, it may do so by responding in writing and setting forth its objection(s) to the production of the requested document in color.

J.   **Confidentiality Designations:**  If a particular paper document or ESI item qualifies for confidential treatment pursuant to any applicable federal, state, or common law (e.g., Personally Identifiable Information or Protected Health Information), or to the terms of a Protective Order entered by the Court in the Litigation or a confidentiality stipulation entered into by the Parties, the designation shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying images.  This designation also should be included in the appropriate data field in the load file. For documents produced in native format with image placeholders, the placeholder image for the native file should be branded with the appropriate confidentiality designation to the extent possible.  Requesting parties shall ensure that the confidentiality claim follows the document regardless of whether the designation imprints on the file when viewed in printed form. Failure to comply with the procedures set forth in this ESI Protocol Order, any protective order or confidential order, or any confidential stipulation shall not waive any protection or confidential treatment.   The Parties recognize that document review using technological means may result in the application of greater or lesser confidentiality designations than otherwise appropriate.  The Parties agree to work together on an as-needed (and per document) basis to address any potential over (or under) designation.

K.   **Redactions**

1.   **Personal Data Redactions:** A producing Party may redact personal information to the extent that the information falls within one of the following categories: (1) the information relates to medical or health

issues of an individual; (2) social security numbers, bank account information, or personal passcodes; or (3) personal contact information of friends or family to the extent they do not work in in the Pork industry or work for a Party's competitors. Such redactions should be identified as "Redacted – Personal Data" on the document.

2.    [**DISPUTED PROVISION: Relevancy Redactions**]

L.    **Production Media & Protocol:** A producing Party may produce documents via email, readily accessible computer or electronic media, including CD-ROM, DVD, or external hard drive (with standard PC compatible interface) ("Production Media"), or via file-sharing service, including any network-based secure file transfer mechanism or SFTP.  Any requesting Party that is unable to resolve any technical issues with the electronic production method used for a particular production may request that a producing Party provide a copy of that production using Production Media.  The producing Party may encrypt Production Media, and will provide a decryption key to the requesting Party in a communication separate from the production itself.

## III.    PAPER DOCUMENT PRODUCTION PROTOCOLS

A.    **Scanning:**  A producing Party may make paper documents available for inspection and copying in accordance with FED. R. CIV. P. 34 or, additionally or alternatively, OCR paper documents.  Where OCR is used, the Parties agree that the following ¶¶ III(B)-(E) shall apply.

B.    **Coding Fields:**  The following information shall be produced in the load file accompanying production of paper documents:  (a) BegBates, (b) EndBates, (c) BegAttach,  (d) EndAttach,  (e) Custodian,  (f) Confidentiality,  and (g) Redacted (Y/N) or otherwise indicating that a redaction is present. Additionally, all paper documents will be produced with a coding field named "Paper Document" marked with a "Y" or otherwise indicate that the document originated in paper, and such indication shall be explained to the requesting party.

C.    **Unitization of Paper Documents:**  Paper documents should be logically unitized for production to the extent reasonably practicable.  Generally, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records.  The Parties will make reasonable efforts to unitize documents correctly.

1.    **Relationship:** The relationship among the documents in a folder or other grouping should be reflected in proper coding of the beginning

and ending document and attachment fields to the extent reasonably practicable.

2. **Identification:**  Where a document, or a document group – such as folder, clipped bundle, or binder – has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

## IV.   ESI METADATA FORMAT AND PROCESSING ISSUES

A.   **System Files:**  ESI productions may be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology as it exists at the time of de-NISTing.  Other file types may be added to the list of excluded files if they clearly do not have user-created content.

B.   **Metadata Fields and Processing:**

1. **Time Zone:**  To the extent reasonably practicable, ESI items shall be processed using a consistent time zone (e.g., GMT), and the time zone used shall be disclosed to the requesting Party.

2. **Auto Date/Time Stamps:**  To the extent reasonably practicable, ESI items shall be processed so as to preserve the date/time shown in the document as it was last saved, not the date of collection or processing.

3. Except as otherwise set forth in this ESI Protocol Order, ESI files shall be produced with at least each of the data fields set forth in Appendix 1 that can reasonably be extracted from a document.

4. The Parties are not obligated to manually populate any of the fields in Appendix 1 if such fields cannot reasonably be extracted from the document using an automated process, with the exception of the following  fields:   (a) BegBates,  (b) EndBates,  (c) BegAttach, (d) EndAttach, (e) Custodian, (f) Confidentiality, (g) Redacted (Y/N), and (h) NativeLink fields, which should be populated regardless of whether the fields can be populated pursuant to an automated process.

C.   **Redaction:**

1. The Parties agree that, where ESI items need to be redacted, they shall be produced solely in TIFF format with each redaction clearly indicated, except in the case of personal database files (e.g., MS Access), which shall be governed by ¶ II(C), *supra*.  Any metadata fields reasonably available and unnecessary to protect the privilege

9

protected by the redaction shall be provided.  The Parties understand that for certain MS Excel documents or other file types or files, TIFF redactions may be impracticable.  These documents may be redacted in native format.

2.   If the items redacted and partially withheld from production are audio/visual files, the producing Party shall, to the extent reasonably practicable, provide the unredacted portions of the content.  If the content is a voice recording, the Parties shall meet and confer to discuss the appropriate manner for the producing Party to produce the unredacted portion of the content.

D.   **Email Collection and Processing:**

1.   **Email Threading:**  The Parties may use email thread suppression to avoid review and production of information contained within an existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression eliminate (a) the ability of a requesting Party to identify every custodian who had a copy of a produced document or email, or (b) remove from a production any unique branches and/or attachments contained within an email thread.

2.   **Email Domains:**  Producing parties may utilize an ESI search process to identify categories of documents, such as emails from domains typically associated with junk email, such as fantasy football-related emails, retailer advertising, and newsletters or alerts from non-industry sources.

a.   [**DISPUTED PROVISION: Notice of Email Domains Culled**]

E.   **De-duplication:**  A producing Party may de-duplicate any file globally (i.e., across Document Custodians, *see infra* ¶ V(B)(1)) at the "family" level (i.e., families should not be broken due to de-duplication).  Each party may also de-duplicate emails in such a way as to eliminate earlier or incomplete chains of emails and therefore produce only the most complete iteration of an email chain.  The producing Party will make a reasonable effort to identify all custodians who were in possession of any de-duplicated documents through an appropriate load file such as DuplicateCustodian or CustodianAll/Other.  Additionally, all BCC recipients whose names would have been included in the BCC metadata field, to the extent such metadata exists, but are excluded because of horizontal/global de-duplication, must be identified in the BCC metadata field specified in Appendix 1 to the extent such metadata exists.  In

10

the event of rolling productions of documents or ESI items, the producing Party will, as needed, supplement the load files with updated duplicate custodian information, as well as BCC information to the extent such metadata exists. Duplicate custodian information may be provided by a metadata "overlay" and will be provided by a producing Party after the Party has substantially completed its production of ESI.

1.    Duplicate electronic documents shall be identified by a commercially accepted industry standard (e.g., MD5 or SHA-1 hash values) for binary file content. All electronic documents bearing an identical value are a duplicate group. The producing Party shall use reasonable efforts to produce only one document image or native file for duplicate ESI documents within the duplicate group to the extent practicable. The producing Party is not obligated to extract or produce entirely duplicate ESI documents. Any other methodology for identification of duplicates, including email field selection for hash value creation, must be discussed with the requesting Party and approved in writing before implementation.

2.    Duplicate messaging files shall be identified by a commercially accepted industry standard (e.g., MD5 hash values) for the email family, which includes the parent and email attachments. Duplicate messaging materials will be identified at a family level, including message and attachments. Email families bearing an identical value are considered a duplicate group. The producing Party shall use reasonable efforts to produce only one document image or native file for duplicate emails within the duplicate group to the extent practicable.

F.    **Zero-byte Files:** The Parties may, but are not required to, filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names. If the requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the requesting Party may request that the producing Party produce the zero-byte file. The requesting Party may provide a Bates number to the producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production.

G.    **Microsoft "Auto" Feature:** To the extent reasonably practicable and technologically possible for a producing Party's vendor, Microsoft Excel (.xls) and Microsoft PowerPoint (.ppt) documents should be analyzed for the "auto" features, where documents have an automatically updated date and time in the document, file names, file paths, or similar information that when

11

processed would be inaccurate for how the document was used in the ordinary course of business. If "auto date," "auto file name," "auto file path," or similar features are identified, the produced document shall be identified in a load file, metadata field, or otherwise as having these features.

H.   **Hidden Text:** ESI items shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments.

I.   **Embedded Objects:** Microsoft Excel (.xls) spreadsheets embedded in Microsoft Word documents will be extracted as separate documents and treated like attachments to the document. The Parties agree that other embedded objects, including, but not limited to, logos, icons, emoticons, and footers, may be culled from a document set and need not be produced as separate documents by a producing Party (e.g., such embedded objects will be produced within the document itself, rather than as separate attachments).

J.   **Compressed Files:** Compression file types (i.e., .CAB, .GZ, .TAR, .Z, and .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

K.   **Password-Protected, Encrypted, or Proprietary-Software Files:** With respect to any ESI items that are password-protected or encrypted within the scope of review, the producing Party will take reasonable steps based on industry standards to break the protection so that the documents can be reviewed and produced if appropriate. In the event that encrypted or password-protected documents, which are reasonably likely to be responsive to a document request, remain for a particular custodian after such reasonable efforts have been made, the producing Party shall advise the requesting Party. ESI that cannot be reviewed because proprietary software is necessary to view the ESI will be disclosed to a requesting Party, and the Parties shall meet and confer regarding the next steps, if any, with respect to such ESI.

V.   **[DISPUTED PROVISION: PARAMETERS FOR CULLING AND REVIEWING ESI AND PAPER DOCUMENTS]**

VI.   <u>**MISCELLANEOUS PROVISIONS**</u>

A.   **Inaccessible ESI:** If a producing Party asserts that certain categories of ESI that are reasonably likely to contain responsive information are inaccessible or otherwise unnecessary under the circumstances, or if the requesting Party asserts that, following production, certain ESI is not reasonably usable, the Parties shall meet and confer with their respective technology experts to

discuss resolving such assertions. If the Parties cannot resolve any such disputes after such a meet and confer has taken place, the issue shall be presented to the Court for resolution.

B.     **Variations or Modifications:** Variations from this ESI Protocol Order may be required. Any practice or procedure set forth herein may be varied by agreement of all affected Plaintiffs and all affected Defendants, which will be confirmed in writing. In the event a producing Party determines that a variation or modification is appropriate or necessary to facilitate the timely and economical production of documents or ESI, the producing Party will notify the requesting Party of the variation or modification. Upon request by the requesting Party, those Parties will meet and confer to address any issues in a reasonable and timely manner prior to seeking Court intervention.

SO ORDERED.

Dated: _____

_____
HILDY BOWBEER
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

13

## Appendix 1: ESI Metadata and Coding Fields

| Field Name[1] | Populated For (*Email, Edoc, Calendar, Contact, Cellphone, or All*) | Field Description |
|---|---|---|
| BegBates | All | Control Numbers. |
| EndBates | All | Control Numbers. |
| BegAttach | All | Control Numbers (First production Bates number of the first document of the family). |
| EndAttach | All | Control Numbers (Last production Bates number of the last document of the family). |
| Custodian | All | Custodian name (ex. John Doe). |
| DupCust, CustodianOther, or CustodianAll | All | All custodians who were in possession of a de-duplicated document besides the individual identified in the "Custodian" field. |
| LogicalPath | All ESI Items | The directory structure of the original file(s).  Any container name is included in the path. |
| Hash Value | All | The MD5 or SHA-1 hash value. |
| NativeFile | All | Native File Link. |
| Email Thread ID | Email | Unique identification number that permits threading of email conversations.  For instance, unique MS Outlook identification number ("PR_CONVERSATION_INDEX") is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, that facilitates use of email threading. |
| Thread Index | Email | Message header identifier, distinct from "PR_Conversation_Index", that permits threading of email chains in review software. |
| EmailSubject | Email | Subject line of email. |
| DateSent | Email | Date email was sent. |
| DateMod | Email, Edoc | Date the document was modified. |
| TimeSent | Email | Time email was sent. |
| TimeZoneUsed | All | Time zone used to process data during document collection and processing. |

---

[1] Field Names can vary from system to system and even between different versions of systems.  Thus, Parties are to be guided by these Field Names and Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI Protocol Order.

| Field Name[1] | Populated For (*Email, Edoc, Calendar, Contact, Cellphone, or All*) | Field Description |
|---|---|---|
| ReceiveTime | Email | Time email was received. |
| To | Email | All recipients that were included on the "To" line of the email. |
| From | Email | The name and email address of the sender of the email. |
| CC | Email | All recipients that were included on the "CC" line of the email. |
| BCC | Email | All recipients that were included on the "BCC" line of the email. |
| DateCreated | Edoc | Date the document was created. |
| FileName | Email, Edoc | File name of the edoc or email. |
| Title | Edoc | Any value populated in the Title field of the document properties. |
| Subject | Edoc | Any value populated in the Subject field of the document properties. |
| Author | Edoc | Any value populated in the Author field of the document properties. |
| DocExt | All | File extension of the document. |
| TextPath | All | Relative path to the document level text file. |
| Redacted | All | "X," "Y," "Yes," and "True" are all acceptable indicators that the document is redacted. Otherwise, blank. |
| Withheld Placeholder | All | To the extent a document is fully withheld (on the basis of privilege or otherwise), this field must be populated with a "Y" |
| Privilege Asserted | All | To the extent a document has been withheld on the basis of privilege or redacted on the basis of privilege, the text pertaining to such assertion of privilege shall be included as a metadata field (e.g., "Redacted – Attorney Client Privileged" or "Withheld – Attorney Client Privileged") |
| Paper | All | "Y" if document is scanned from hard copy in connection with the collection and production of documents in this matter. |
| Legend/Confidentiality | All | Indicates if document has been designated as "Confidential" or "Highly Confidential" under the Protective Order. |

EXHIBIT D

## Exhibit D: Disputed ESI Protocol Provisions

| Provision | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| ¶ II(G): Entire Document Families | Entire Document families must be produced, even if only the parent email or an attachment to an email is responsive. The only exception to this paragraph is when a document in an email family is withheld on the basis of privilege and in compliance with the parties' stipulation or Court's Order on such assertions of privilege. | As a general rule, entire document families should be produced, excepting junk files and non user created content excluded during processing and excepting attorney-client privileged documents. Parties will refrain from withholding documents from production on the basis of nonresponsiveness unless there is a good faith determination that the nonresponsive documents contain (1) specific highly confidential and proprietary nonresponsive business information relating to non-pork businesses or (2) personal information of the nature described in the paragraph regarding Personal Data Redactions below. The entry of an Agreed Confidentiality Order in this case does not prohibit a Party from taking the position that it is entitled to withhold a family member document for nonresponsiveness. Such breaks in families shall be noted with a placeholder document, and the receiving party will be able to dispute such withholding. |
| ¶ II(K)(2): Relevancy Redactions | **No "Relevancy" Redactions:** A Party may not redact information on the basis it believes it to be irrelevant and may only redact on the basis of privacy those items identified in Paragraph II(K)(1). | **Highly Confidential Data Redactions:** A producing Party may redact highly confidential business information to the extent that the information is specific highly confidential and proprietary nonresponsive business information relating to non-pork businesses. Such redactions should be identified as "Redacted – Personal Data" or "Redacted – Confidential Information" on the document. |
| ¶ IV(D)(2): Notice of Email Domains Culled | The Parties agree to disclose domain names excluded under this ¶ IV(D)(2) and to meet and confer on the timing for such disclosures. | Defendants propose that this be addressed in the separately negotiated agreement. Defendants propose that the parties negotiate this agreement and submit disputed provisions to the court for determination within 30 days following a ruling denying the pending motions to dismiss. |

| Provision | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| **¶ V: Parameters For Culling And Reviewing ESI And Paper Documents** | **V. PARAMETERS FOR CULLING AND REVIEWING ESI AND PAPER DOCUMENTS**<br><br>A. **General Provisions:**<br><br>1. **Time Period:**  Except as noted elsewhere in this ¶ V(A)(1), the Parties agree that they may limit the processing of discoverable information to that which was created, modified, sent, or received between January 1, 2007 and June 30, 2018 unless otherwise specified and agreed to by the Parties in writing.  However, this limitation shall not apply to structured data, which the Parties will meet and confer upon regarding a reasonable time period.  Plaintiffs and the Defendants agree to meet and confer on a processing end date for discoverable information responsive to discovery requests.  This paragraph does not prohibit a request for information before or after the period specified above, so long as it is narrow and does not require processing a large amount of data from outside this period.<br><br>2. **Iterative Process:**  The Parties and the Court plan to discuss search methodology and may amend this ESI Protocol Order or enter a separate Search Methodology Protocol in the future.<br><br>3. **Meet and Confer:**  A requesting or producing Party may, in good faith, seek to expand or contract the scope of the search.  Where such a request is made, the Parties will meet and confer and attempt in good faith to reach agreement as to the timing and conditions of such expansion or contraction.  If the Parties cannot reach agreement, any dispute may be presented to the Court.  All meet and confer sessions under this ¶ V(A)(3) will involve each Party's respective ESI Liaison and will give appropriate consideration to minimizing expense.<br><br>4. **Non-Waiver:**  The Parties' discussion of proposed search terms does not preclude a Party from requesting additional search terms pursuant to the terms of this ESI Protocol Order as | Defendants propose that this be addressed in the separately negotiated agreement. Defendants propose that the parties negotiate this agreement and submit disputed provisions to the court for determination within 30 days following a ruling denying the pending motions to dismiss. |

discovery and the Litigation progress nor does it preclude a Party from objecting to any such additional search terms requested.

**B. Document Custodians:**

1. **Document Custodians:**   Each Party will disclose an initial list of proposed document custodians reflecting those employees with information and/or documents responsive to the agreed-on scope of Rule 34 requests ("Document Custodian(s)").

2. **Additional Document Custodians:**   If, after the Parties identify initial Document Custodians, a requesting Party determines that an additional Document Custodian should be added, then the requesting Party shall advise the producing Party in writing of the proposed additional Document Custodian and the basis for the request.  If the Parties have not agreed whether to add the Document Custodian within 30 days of the requesting Party's request for an additional Document Custodian, the Parties shall bring the matter to the Court via a joint letter brief.

3. Except by agreement of the Parties or by order of the Court, a producing Party is not required to add custodians after completion of the above phases.

**C. Search Methodology**

1. **Subsequent Order**: The parties will meet and confer regarding a Search Methodology Order consistent with that entered in *In re Broiler Chicken Antitrust Litigation*.

2. **Use of Search Terms to Cull Unstructured ESI:**

   a. The Parties may use search terms and other limiters, including, by way of example only, date ranges and email domains in metadata fields, as a means of limiting the volumes of information to be reviewed for responsiveness.  To the extent that search terms are used to identify responsive ESI, a producing Party will notify the requesting Party of its intent to use search terms and disclose to the requesting Party (1) an initial list of search terms

the producing Party intends to use and (2) whether the producing Party intends to use different search terms with different custodians or data sets. The Parties will cooperate in good faith regarding the disclosure and formulation of appropriate search terms and protocols to cull unstructured ESI.

b. **Addition or Removal of Search Terms After Initial Search Term Negotiation:** If, after the completion of the initial search methodology disclosures, a requesting or producing Party determines that any search terms should be added to or removed from the initial search term list, then the requesting or producing Party shall advise the affected Parties in writing of the proposed change(s) to the search term(s) and of the reason(s) for the proposed change(s).

c. Except by agreement of the Parties or by order of the Court, a producing Party is not required to add custodians or search terms after completion of the above phases.

3. **Use of Technology Assisted Review or Other Advanced Technology-Based Analytics to Cull Unstructured ESI:**

a. **Use of TAR:** A Party may use Technology Assisted Review ("TAR") to sort documents for linear review without disclosure of that use. If a Party elects to use TAR to cull or otherwise limit the volume of unstructured ESI subject to linear review, the parameters set forth in ¶ V(D)(2) shall apply.

b. **Parameters for use of TAR:**

  i. **Paper Documents:** The Parties agree to meet and confer to determine whether paper documents may be included in a TAR process.

  ii. **The TAR Tool:** A producing Party shall describe to a requesting Party the vendor and the TAR technology or tool being used, including a description of the TAR tool's procedures.

c.  A producing Party need not conduct any additional review of information subjected to, but not retrieved by, a TAR tool as part of the identification of the subset of information that will be subject to review and production.

D. **Electronic Non-Custodial Documents:**

1. **Producing Party's Non-Custodial Document Disclosures:**  The producing Party will disclose a list of electronic "Non-Custodial" document sources (i.e., sources other than a Document Custodian's files) reasonably likely to contain responsive information sufficient to permit the requesting Party to determine (a) generally where and by whom the documents were maintained and (b) a general description of the types of documents in the particular Non-Custodial document storage location to the extent these categories of information are reasonably available.

2. **Non-Custodial Document Search Process:**  As a general matter, the means of and parameters for culling ESI set forth in this Paragraph V apply to Non-Custodial ESI as well as to Custodial ESI.  However, a producing Party may propose utilizing other culling technologies for Non-Custodial ESI by disclosing those no later than 14 days after a final decision to use these other culling technologies is made.  A requesting Party may raise issues or objections to the other culling technology within 14 days of the disclosure.  The Parties agree to meet and confer on any issues a requesting Party raises within this time period.  A producing Party may not moot the question of whether or not proposed culling technology should be used by proceeding with use of the technique and incurring substantial costs in doing so, or if it does, it may not argue that such costs justify adopting its approach as opposed to the actual merits of the proposed culling technique.  However, nothing in this ¶ V(E)(2) shall be construed to preclude substantial cost savings as relevant to the "merits" and justification of the proposed approach.

E. **Structured Data:**  To the extent a response to discovery requires production of discoverable ESI contained in a structured database, the Parties shall meet and confer in an attempt to agree upon a set of queries to be made for discoverable information and generate a report in a reasonably usable and exportable electronic file (e.g., Excel or CSV format) for review by the

requesting Party.  Upon review of the report, the requesting Party may make reasonable requests for additional information to explain the database schema, codes, abbreviations, and different report formats or to request specific data from identified fields.

F. **Custodial Cellphone & Personal Communications Data:**

1. **Cellphones:**  For Document Custodians agreed on by the Parties or ordered by the Court, a producing Party will take reasonable steps to identify whether any unique responsive communications are located on any cellphones in the possession, custody, or control of the producing Party.  Unless agreed otherwise, the following shall govern the review and production of unique, responsive, and non-privileged communications for cellphone-based data for the agreed or ordered Document Custodians with respect to cellphones in the possession, custody, or control of the producing Party.

   a. Prior to any culling of the cellphone data, a producing Party will disclose the following to the extent reasonably possible:  (1) to the extent not already provided, a list of cellphone number(s) used by the Document Custodian for work purposes, if any, (2) the name of the phone carrier that provided service for each identified phone number, (3) the type of phone, including brand and model number, if known, (4) a list of installed communications-related applications on the Document Custodian's cellphone, including ephemeral messaging applications (e.g., SnapChat, Confide, and Signal), Facebook Messenger, and other such applications if such applications are used for work purposes; and (5) whether or not the producing Party claims that a cellphone used by the Document Custodian for work purposes is not within its possession, custody, or control.

   b. A producing Party will review the following sources of information on a cellphone, to the extent reasonably available, to identify unique, responsive, and discoverable information:

      i. **Cellphone Call and Voicemail Logs:**  The logs of any calls made/received and voicemails left on a cellphone that the Document Custodian used for work purposes, if any, if the cellphone is in the possession, custody, or control of a producing Party.

ii.   **Text Messages:**  All text messages and/or iMessages on the cellphone device used for work purposes or contained in available backups/archives associated with the device, if any, if the cellphone is in the possession, custody, or control of a producing Party.

c.   **"Contacts":**  A Document Custodian's relevant contacts (e.g., MS Outlook Contacts or cellphone-based contacts) will be exported to MS Excel (or .csv) with all reasonably available metadata fields.  For mobile devices that are owned by the Document Custodian and used for personal purposes, if the device is in the possession, custody, or control of a producing Party, a producing Party is entitled to redact or withhold information from the contacts file that does not relate to the Document Custodian's work—including, but not limited to, the name and contact information for any family or friends not involved in the Pork industry.  If, after reviewing the redactions, the requesting Party believes that more information is needed about the redactions, then the Parties will meet and confer regarding the information redacted, and the producing Party shall provide explanations for information redacted or withheld.  Any document produced with redactions pursuant to this ¶ V(G)(1)(c) shall maintain the electronic search capabilities of the other data in the spreadsheet.

2. **Social Media Data:**  If a Document Custodian confirms that he or she (1) used Social Media for business purposes and (2) used that Social Media to communicate with an employee of another Defendant or otherwise regarding a subject relevant to the Litigation and included within a Request for Production, subject to objections to that Request, then the requested communication(s) must be produced if it is reasonably accessible, in the producing Party's possession, custody, or control, and not withheld as privileged and/or as illegal to produce under applicable privacy laws.  The Parties shall meet and confer to the extent there are any issues with respect to the format of such Social Media data.

EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION<br><br>This Document Relates To: ALL CASES | No. 1:16-cv-08637<br><br>**JOINT REPORT AND LETTER BRIEF REGARDING OCTOBER 24, 2018 STATUS CONFERENCE** |

Pursuant to the Court's Order on October 3, 2018 (ECF No. 1270), the parties submit this joint status report for the status conference scheduled for 9:30 a.m. October 24, 2018.  The agenda includes the following items, all of which are discussed in detail below:

     I.     Privilege Claims Relating to Defendants' Trade Associations: All Defendants Claims of Privilege Relating to Communications with Competitors Through the National Chicken Council, US Poultry, and USAPEEC.

     II.    Telephonic Participation in Depositions.

     III.   Koch's Withheld Email Attachments.

## I.     PRIVILEGE CLAIMS RELATING TO DEFENDANTS' TRADE ASSOCIATIONS.

### **Plaintiffs' Position**

The following Defendants have withheld or redacted communications for attorney/client privilege that involve a third party or employees from one or more other defendants that appear to be related to industry associations or councils.  These Defendants include Fieldale, Foster Farms, Peco, Perdue, Pilgrim's Pride, Sanderson, Simmons, and Tyson.  Of the redacted documents and entries reviewed thus far in this category, Defendants fail to meet the burden of asserting privilege in a number of ways: 1) the reason the content is privileged is not adequately described; 2) identification and parameters of the council or association members and participants are not defined so as to demonstrate the privilege was not waived; and 3) the attorney on whose behalf the privileged communication is being asserted is not properly identified.  This issue is ripe because the volume of documents affected by this issue is in the hundreds, and guidance on the burden to maintain privilege over these types of documents will streamline the issue and avoid discovery bottlenecks.

First, not only is the reason for withholding or redacting these documents with third party participants unclear, the individuals participating in the communication are not properly identified for the purpose of demonstrating that privilege can be maintained over the content.  *See Harper-*

*Wyman Co. v. Connecticut Gen. Life Ins. Co*., No. 86 C 9595, 1991 WL 62510, at *6 (N.D. Ill. Apr. 17, 1991) (common defense privilege did not apply and privilege waived as to association documents when group of documents includes many that were distributed to a group of unknown dimension). Voluntary disclosure of communications to third parties defeats a claim of attorney-client privilege; once a privileged communication is conveyed by the client to a third party, the privilege is generally waived. *See Bauer v. County of Saginaw*, 2015 WL 1439424 at *4 (E.D. Mich. Mar. 27, 2015); *see also In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996).

Some of these documents have the additional deficiency of not identifying an attorney associated with the attorney/client privilege assertion. Documents "that contain no request for legal advice, nor give legal advice, fall outside the scope of the [attorney-client] privilege." *Roth v. Aon Corp.*, 254 F.R.D. 538, 540 (N.D. Ill. 2009) (citation omitted). Because these emails contain no direct involvement by in-house counsel or communications with outside counsel and no individual attorney has been identified as being directly involved with the content, Defendants cannot meet their burden in claiming attorney-client privilege. *See RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 220 (N.D. Ill. 2013) (finding that documents without inclusion of an attorney or indication that they were intended to be confidential were not protected under the attorney-client privilege).

Certain Defendants produced lists of attorneys or legal staff associated with the redacted or withheld documents. Sanderson's list is the only one that identified certain individuals as counsel for associations or councils[1] despite numerous entries by a majority of the other defendants withholding or redacting documents involving third party participants presumably related to association or council communications. This deficiency is in direct violation of the ESI Protocol, which states that a privilege log must include "Attorney/Description of Privileged Material [when]

---

[1] Sanderson's list includes: Counsel for NCPF, Counsel for NPPC, Counsel for USA Poultry & Egg Export Council, and General Counsel North American Meat Institute.

the basis of the privilege asserted is not apparent from the objective metadata (e.g., the name of the attorney will be provided if not included in the objective metadata)). (Dkt. 459 at ¶ IV.C.1.b.).

This request should be addressed globally specifically because the privilege on these documents appears to be asserted on communication "between parties linked by a common interest." *United States v. Illinois Power Co.*, 2003 WL 25593221, at *3 (S.D. Ill. Apr. 24, 2003). Not all defendants have withheld or redacted trade association or council communication and documents. This suggests that the privilege as to these documents may have been waived. *See Harper-Wyman Co*, 1991 WL 62510, at *6 (N.D. Ill. Apr. 17, 1991). But Plaintiffs are unable to assess with the information currently received.

Plaintiffs have raised this issue to varying degrees with individual defendants in the course of reviewing the privilege logs and redacted documents in document productions.[2] The volume of Defendants' redacted documents and privilege logs varies by defendant, but collectively are quite voluminous.[3] Plaintiffs have been diligently reviewing the logs and redacted documents and have begun meeting and conferring with Defendants on deficiencies in the order that defendant deposition witnesses have been scheduled to ensure that to the extent possible privilege issues relating to documents of a particular deponent can be resolved prior to the deposition. In doing so, Plaintiffs have identified global issues such as this one that without guidance could jam discovery. The deficiency of asserting privilege over communication including defendants and/or third parties and not providing sufficient information for Plaintiffs to adequately assess the

---

[2] See e.g. Plaintiffs' Exhibit 1, Letter from E. Odette to P. Fitzgerald (Peco), July 23, 2018; Plaintiffs' Exhibit 2, Letter from E. Odette to D. Laytin (Sanderson), Aug. 7, 2018; Plaintiffs' Exhibit 3, Letter from E. Odette to L. Murray (Simmons), August 8, 2018; and Plaintiffs' Exhibit 4, Letter from E. Odette to R. Adcox (Tyson), Sept. 25, 2018.

[3] Privilege Log separate entry count (some include some redacted documents but most do not): Fieldale (46) Foster Farms (44), Peco (182), Perdue (2660), Pilgrim's Pride (7297), Sanderson (5906), Simmons (220) and Tyson (515).

privilege is an issue with the logs of the following defendants: Fieldale[4], Foster Farms[5], Peco[6], Perdue[7], Pilgrim's Pride[8], Sanderson[9], Simmons[10], and Tyson[11]. Because the log entries and redacted documents with this deficiency number in the hundreds, for these defendants we seek the following supplemental information:

- List of associations or councils whose communication or meeting minutes or notes is included in any defendant's privilege log or part of a redacted document;

- List of attorneys and their titles for whom the associations or councils had sought or received advice that is included in the withheld or redacted communication;

- Identification of Board Members and their titles for the relevant time period for each of the associations and councils identified in the withheld or redacted documents.

- Privilege log entries for all documents redacting information that have multi-defendant and/or third party participants on the communication;

We request the Court order Defendants who have withheld or redacted the above category of documents provide the lists and identification information no later than November 14, 2018 and subsequent logs for relevant redacted documents by November 30, 2018.

---

[4] See e.g. Plaintiffs' Exhibit 5, Fieldale Log No. 20, 24, 43, and 44.

[5] See e.g. Plaintiffs' Exhibit 6, Foster Farms Log Document IDs CTRL0000426179.

[6] See e.g. Plaintiffs' Exhibit 7, PECO0000634972; Plaintiffs' Exhibit 8, PECO0000637060; Plaintiffs' Exhibit 9, PECO0000637143; and Plaintiffs' Exhibit 10, PECO0000637989.

[7] See e.g. Plaintiffs' Exhibit 11, PERDUE0001801847 (currently sequestered as Perdue seeks to clawback this document and fully withhold it via a letter sent Monday, Oct. 8, 2018).

[8] See e.g. Plaintiffs' Exhibit 12, Pilgrims Privilege ID PRIVID_00125-1276 and Plaintiffs' Exhibit 13, PILGRIMS-0009887336 - PILGRIMS-0009887337.

[9] See e.g. Plaintiffs' Exhibit 14, Sanderson-0001955498; Plaintiffs' Exhibit 15, Sanderson-0002453634; Plaintiffs' Exhibit 16, Sanderson-0002655877; Plaintiffs' Exhibit 17, Sanderson-0003394603; Plaintiffs' Exhibit 18, Sanderson-0003049301; Plaintiffs' Exhibit 19, Sanderson-0003048653; Plaintiffs' Exhibit 20 Sanderson-0002681406; Plaintiffs' Exhibit 21, Sanderson-0002797400; and Plaintiffs' Exhibit 22, Sanderson-0002151684.

[10] Plaintiffs' Exhibit 23, SIMM0000223685; Plaintiffs' Exhibit 24, SIMM0000274306; Plaintiffs' Exhibit 25, SIMM0000276006; and Plaintiffs, Exhibit 26, SIMM0000283372.

[11] Plaintiffs' Exhibit 27, Tyson-PL0029; Plaintiffs' Exhibit 28, Tyson-PL0093; Plaintiffs' Exhibit 29, Tyson-PL0094; Plaintiffs' Exhibit 30, Tyson-PL0127; Plaintiffs' Exhibit 31, Tyson-PL0307; Plaintiffs' Exhibit 32, Tyson-PL0308.

**Defendants' Position**

As an initial matter, this issue is not ripe for resolution. Indeed, Defendants are surprised to see Plaintiffs raise this topic for the first time in this Joint Status Report. Most Defendants have heard **nothing** from Plaintiffs on the issue of their privilege logs, let alone the third party and common interest privilege concerns that Plaintiffs now assert.[12] And, for the few Defendants with whom Plaintiffs previewed this potential issue, Plaintiffs have not adequately attempted to reach a resolution without the Court's involvement. Defendants are happy to meet and confer with Plaintiffs, both as a group and individually where appropriate, on any specific concerns they have regarding particular documents. But raising concerns as Plaintiffs do here both unnecessarily burdens the Court and violates the ESI Protocol, which requires a written demand and meet and confer before any such disputes are raised with the Court. (Dkt. 459 at ¶ VI.E.)

Moreover, Plaintiffs' proposal is overly broad, unreasonable as to timing, and wrong on the law. **First**, Plaintiffs may not demand, as they do, "[p]rivilege log entries for **all documents** redacting information that have multi-defendant and/or third party participants on the communication." They are required by the ESI Protocol to identify **specific** documents for which they seek further information by Bates/unique identifier. (*See* Dkt. 459 at ¶¶ VI.D, E.) Rather than do so, they ask the Court to absolve them of their obligation under that order and demand a categorical re-review and logging of any document that lists a "third party," regardless of whether that party is outside counsel or an another agent or whether common interest privilege applies. Such a demand cannot be construed as reasonable or proportionate to the needs of this case.[13]

**Second**, Plaintiffs' proposed timing is unreasonable and burdensome in and of itself. Given

---

[12] For example, Fieldale, Foster Farms, Perdue, and Pilgrim's Pride Defendants have not heard from Plaintiffs regarding any alleged privilege issues. Yet, for the first time, Plaintiffs identify their privilege logs as deficient in this Report. *See supra* at nn.3, 4, 6.

[13] Defendants note that Plaintiffs' fourth request ("Identification of Board Members and their titles for the relevant time period for each of the associations and councils identified in the withheld or redacted documents") is properly addressed to trade associations themselves. (*See* Fed. R. Civ. P. 26(b)(2)(C)(i) (limiting discovery where information "can be obtained from some other source that is more convenient, less burdensome, or less expensive").)

the fact that Plaintiffs are raising these issues for the very first time for the majority of Defendants now, it is almost unthinkable that Defendants could reasonably complete these tasks less than one month after the hearing on this issue.[14]  Any productive discussions will necessarily require a timeline far less burdensome than this one.

*Third*, to the extent Plaintiffs are suggesting that the presence of a third party necessarily waives privilege, Plaintiffs are wrong on the law.  A privilege claim survives disclosure to a third party as long as the "disclosure is made between parties linked by a common interest," and that common interest may apply to trade associations.  *United States v. Illinois Power Co.*, 2003 WL 25593221, at *3 (S.D. Ill. Apr. 24, 2003) (upholding common interest privilege where association members "likely were all concerned with the same issue . . . and together as [the association] sought legal advice on these matters").[15]  Indeed, Plaintiffs' own authority undermines their argument.  In *Bauer v. County of Saginaw*, for example, the court upheld the privilege claim at issue despite disclosure to third parties.  2015 WL 1439424, at *4 (E.D. Mich. Mar. 27, 2015).  Similarly, in *Roth v. Aon Corp.*, the court upheld the privilege claim despite inclusion of non-lawyers on e-mail correspondence.  254 F.R.D. 538, 540 (N.D. Ill. 2009).[16]  Many of the documents Defendants have designated as privileged—including many of those identified by Plaintiffs in this Report—fall squarely within the protections recognized by Plaintiffs' own

---

[14]  Since Defendants received these demands only two days before the Joint Status Report was due, they continue to investigate the time and cost burdens that complying with these demands would impose.

[15]  *See also United States v. Ohio Edison Co.*, No. C2-99-1181, ECF No. 221 (S.D. Ohio Jan. 6, 2003) (communications from a trade association's lawyer to its members were privileged because they "would at least arguably reveal client confidences, including the types of subject about which the [trade association] members sought legal advice") (attached as Ex. D-1); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 07-mc-489, ECF No. 437 (D.D.C. Sept. 28, 2010) (communications between members of trade organization with the organization's counsel were privileged) (attached as Ex. D-2).

[16]  Notably, in *Harper-Wyman Co. v. Connecticut General Life Insurance Co.*, which Plaintiffs also cite, the court recognized that common interest privilege, like all privileges, must be assessed on a document-by-document basis to determine whether the "communications were made with an expectation of confidentiality."  1991 WL 62510, at *5 (N.D. Ill. Apr. 17, 1991).

authority.[17]  Further discussions between the parties with respect to the particular documents for which Plaintiffs seek additional information is the proper course.

In sum, this Court should decline to intervene at this early juncture, except to require that Plaintiffs comply with their obligations under the ESI Protocol.

## II.    TELEPHONIC PARTICIPATION IN DEPOSITIONS.

**Defendants' Position**

There could be 300 depositions taken in this case, or more.  With counsel and witnesses traveling all over the country, both the Court and the parties recognized that it would not be feasible for each party to be represented at each deposition in person.  The Deposition Protocol Order (the "Order") therefore permits counsel to appear and participate fully in each deposition by telephone. And it contemplates that counsel who participate by phone have access to exhibits in real time:

> To minimize travel and related costs, counsel may ***participate*** in any deposition by telephone.  Counsel noticing the deposition shall make arrangements so that a conference call line, and a real-time text feed are available during every deposition. Any party requesting a real-time text feed or equivalent electronic reporting shall be responsible for the cost of the additional services requested. Examining counsel and counsel intending to participate by phone shall cooperate in good faith to facilitate such participation.  ***When an exhibit is introduced at a deposition, counsel shall identify the exhibit by bates number in advance of questioning*** for clarity of the record and ***to facilitate participation by teleconference***.

(Dkt. 995 § VI (emphasis added).)

At the last two depositions held on October 2 (Tyson witness Todd Wilson) and October 3 (Wayne Farms witness Jay Moss), Plaintiffs' counsel questioned witnesses on documents that

---

[17]    *See, e.g.*, Sanderson-0002151684 (redacted email from Southern Hens counsel Walter Weems to Southern Hens members containing legal advice regarding a draft custom processing agreement) (attached as Ex. D-3).

could not be viewed remotely. For example, Plaintiffs' counsel, after providing Bates numbers for the upcoming exhibit, several times referred to a printout of metadata that had been attached to the document, which counsel on the phone could not see. At other times, Plaintiffs' counsel marked as exhibits multi-page printouts of Excel spreadsheets that had been produced in discovery only natively, so that counsel on the phone could not see what the witness saw and, therefore, had difficulty following when Plaintiffs' counsel referred to a page or section of the missing printout. One counsel even marked as an exhibit a document that he had prepared specifically for the deposition and bore no Bates number at all.

As permitted by the Order, counsel for Defendants raised these issues with Plaintiffs' counsel and asked for an agreement going forward:

> 2. Counsel on the phone have been unable to see documents introduced as exhibits that do not have Bates Numbers. We would like an agreement that it is the responsibility of deposing counsel to ensure that counsel attending by phone have copies of such exhibits before questioning on the exhibit begins. (There are a number of options available to achieve this result. We understand that Veritext has an "Exhibit Share" feature that can be used to display exhibits to remote attendees provided that deposing counsel (a) arranges for use of the feature and (b) provides the exhibits to Veritext in advance. Deposing counsel could also e-mail exhibits without Bates Numbers to a distribution list before the deposition begins. There may be other options as well.)

Plaintiffs' counsel rejected this request:

> Regarding the second request, for documents that do not have Bates numbers, plaintiffs' counsel are not willing to make a blanket agreement to provide copies of these exhibits in advance of the questioning. While there may be times when it is possible to do so, this will not always be the case. And, again, each deposition to date has been attended by a plethora of defense counsel whose only responsibilities have been to collect deposition exhibits. Perhaps you could request that one of your colleagues simply provide you with a copy of the deposition exhibit as it is received by the defense group.

(A copy of this e-mail exchange is attached as Ex. D-5.)

Plaintiffs' proposal is unworkable. Counsel appearing in person have no way to take a hardcopy exhibit and instantly scan and distribute it to counsel by e-mail, all while continuing to participate in the deposition and making objections as necessary. Counsel participating in person might *eventually* be able to distribute the exhibit to phone participants after the deposition. But counsel participating by phone are entitled to have the exhibit at the time that questioning on the exhibit takes place.

Also unworkable is Plaintiffs' subsequent proposed compromise described further below—*i.e.*, "to email any exhibits that do not have Bates numbers to a distribution list before or as questioning commences if the examiner has those exhibits scanned and available for emailing at the time of intended use." ***First***, the limitation "if the examiner has those exhibits scanned" gives the examiner the option not to scan exhibits, which would eliminate any obligation to distribute exhibits to telephone participants.

***Second***, the proposal only addresses exhibits *without* Bates numbers. Plaintiffs' counsel, however, recently questioned witnesses on printouts of Excel spreadsheets (which had been produced natively) and document metadata. A large spreadsheet might appear over many pages in a printout, formatted in any number of ways. Counsel participating by telephone must be able to follow the questioning as quickly as counsel participating in person. When a witness is directed to the top right side of page four of an Exhibit, for example, counsel on the phone should not have to scour the native Excel file to try to follow what is going on. Counsel are also entitled to see how a natively-produced document appears on paper after it has been formatted and be able to object to that formatting if appropriate. Also, while metadata can be found in each firm's document review software, it takes time to locate. In short, counsel participating by phone should be able to see what the witness sees as the witness sees it.

**Third**, emailing an exhibit "as questioning commences" does not allow phone participants to make contemporaneous objections. It takes time to forward exhibits by email, and by the time counsel receive those exhibits, the questioning could be well under way or even over. The exhibit must be e-mailed "before" questioning commences so as to ensure timely receipt by telephone participants.

Plaintiffs' objections below regarding burden and attorney work product are not well taken. Defendants are not requesting exhibits before the deposition, just before the questioning. If the document is emailed a minute or two before questioning, that will not give anyone time to script answers (which already assumes bad faith). Moreover, the problem here is with a small minority of exhibits—those that are not identical copies of the TIF/PDF images produced in discovery. The added burden would be minimal.

The Order permits the parties to be represented by counsel who may participate by telephone. "Participate" does not just mean "observe" or "listen to"; it means join in fully, as that is the only way (short of travelling to every deposition) that counsel can protect their clients' interests. To participate, as Section VI of the Order contemplates, counsel must have access to exhibits in real time.

### Plaintiffs' Position

Defendants are correct that the scope and number of depositions in this case is large. The corresponding burden on Plaintiffs' counsel to prepare for and conduct these depositions, where exhibits number in the dozens for each deposition, is extraordinary. For example, Plaintiffs introduced nearly forty exhibits at each of the recent Tyson and Wayne Farms depositions.

The deposition protocol already addresses the issue of exhibits raised by Defendants. Plaintiffs have scrupulously complied with this provision, either providing advance notice of the use of electronic exhibits (for depositions of telephone companies), and providing ten hardcopies of exhibits during the defense depositions of the Tyson and Wayne Farms' witnesses. Specifically, the deposition protocol (negotiated at length between the parties with the assistance of this Court) provides for the use of electronic exhibits with four days' notice, and the provision of a thumb drive to counsel for the deponent, or providing "sufficient" hard copies of exhibits – with sufficient copies meaning ten hardcopies. In full:

> A party may utilize electronic exhibits in connection with a deposition so long as the party provides notice to the deponent and its counsel not later than four business days before the deposition, arranges for the technology to permit presentment of the electronic exhibit at the deposition to the witness and counsel, and, at least five minutes prior to questioning the witness about the electronic exhibit, provides counsel for the deponent a thumb drive containing the electronic exhibit. With respect to any hard copy exhibit used in a deposition (i.e., an exhibit that has not been marked and used in a prior deposition in a related case), "sufficient copies" shall mean ten (10) hardcopies.

(Dkt. 995 § V.)  Plaintiffs' counsel have also complied with the provision requiring that they read the Bates number of documents into the record for the ease of those counsel participating by telephone.

Months after the entry of the deposition protocol, Defendants now seek to introduce additional burdens on examining counsel, requiring them to both provide hard copies at the deposition, but also provide electronic copies for those appearing telephonically.  Defendants' proposed revision of the deposition protocol is unworkable, and should be rejected.

*First*, the burden is not slight. In advance of any deposition, Plaintiffs' counsel already must select the exhibits to be used at the deposition, make the required 10 copies of each document,

and ship most or all of these documents in advance of the deposition.  At the deposition, Plaintiffs' counsel is questioning the witness, determining the order in which exhibits will be used to examine the witness (or omitted, possibly skipping planned exhibits as the deposition unfolds), introducing the exhibits and reading the Bates numbers into the record (as required by the protocol).  Defense counsel now seek to require examining counsel to also provide electronic copies of the deposition exhibits before or during the deposition itself.

*Second*, the proposal that Plaintiffs' counsel email copies of the deposition exhibits in advance of the deposition would require Plaintiffs' counsel to waive attorney-work-product protections.  This proposal would provide the witness with copies of the exhibits in advance of questioning, giving their counsel time to review and script answers.  Moreover, not all documents selected as possible deposition exhibits are introduced as actual deposition exhibits.  Requiring Plaintiffs' counsel to serve all exhibits in advance would provide defense counsel with improper insight into the minds of Plaintiffs' counsel as they select and discard exhibits for use with the witness.

*Third*, defense counsel are complaining about information and documents almost all of which is already in their possession.  Based on the depositions taken to date, Defendants complain about three types of documents: (i) documents where metadata has been attached; (ii) attachments that were produced as spreadsheets; and (iii) one document that was created by counsel for DAPs.  As to the first category – where metadata has been printed and attached to a document (to show the witness a document came from his files, for example), that information was produced by Defendants.  When they pull the document up in their review database, all of that metadata will be available to them. Requiring Plaintiffs to re-produce this information to them is an extraordinary request.  As to the second category, native spreadsheets that have been printed to hard copy for

use at deposition, again, all of the information is available to the defense counsel. They are simply saying that they need to see the exact form of the printed hardcopy, in exactly the same form it is being shown to the witness. But the deposition protocol, and the Federal Rules of Civil Procedure, do not guarantee counsel this right. As to the third type of document, that created by counsel and used at deposition, to resolve this issue, Plaintiffs' counsel made the following compromise proposal that they would make best efforts to provide the document in advance of questioning the witness:

> To that end, Plaintiffs would like to accommodate those counsel attending by telephone, but need to do so within the parameters of preserving flexibility during questioning. Plaintiffs' compromise proposal would be to email any exhibits that do not have Bates numbers to a distribution list before or as questioning commences if the examiner has those exhibits scanned and available for emailing at the time of intended use.

Defendants rejected this compromise proposal.

### III.   DEFENDANT KOCH'S WITHHOLDING OF EMAIL ATTACHMENTS.

**Plaintiffs' Position**

Defendants have worked cooperatively with Class Plaintiffs to substantially narrow the universe of withheld attachments to emails contained in initial productions, with one exception: Koch Foods. From the beginning, Koch has taken an expansive and unprincipled view of its authority to withhold attachments to emails. Koch has withheld 89,212 attachments to emails from document families constituting a total of 199,111 documents, out of a total of 877,917 total documents produced by Koch. Put another way, 10.2% of Koch's entire production are one-page documents stating an email attachment has been withheld, and 22.7% of all email families produced by Koch have one or more documents missing from the family. Plaintiffs are not aware of any precedent that would allow a defendant to withhold such tremendous volumes of email

attachments in antitrust litigation.  Nor are Plaintiffs aware of any precedent that would allow a defendant to withhold attachments when doing so would seriously compromise another party's ability to understand relevant document families, take effective depositions, and comply with Federal Rule of Evidence 106.

Plaintiffs first raised this issue in a motion to compel in June 2018 (Dkt. No. 976).  While the Court ultimately denied Plaintiffs' motion, it affirmed Plaintiffs' right under the ESI protocol "to challenge in good faith and with reasons why they think Defendants are withholding potentially responsive documents." Dkt. No. 1081 (the "July 18 Amended Order" or "Amended Order").  The Court also acknowledged that "it may be difficult" for Plaintiffs to raise such a challenge with "limited information they have about documents Defendants have withheld."  Thus, the Court concluded, "Plaintiffs' reasons for challenging a Defendant's withholding of a purportedly non-responsive document do not have to be precise as long as they are raised in good faith, and they can be based on context."  7/18/2018 Amended Order at 2.  For example, "Plaintiffs may have good reason to question the withholding of an attachment to an email when another attachment to the same email that was produced contains information Plaintiffs say is critical to their case.  In other words, whether or not the attachment was withheld properly as non-responsive, Plaintiffs may have good cause to flag the issue for discussion." *Id.*  Once Plaintiffs flag a potential issue with attachments, the Court emphasized, Defendants have an obligation to meet and confer in good faith.  *Id.* at 2-3.

Plaintiffs have taken to heart the Court's guidance to not take a "kitchen sink" approach to challenging withheld attachments.  Thus, over the past three months, Plaintiffs sent two letters to Koch challenging a handful of withheld attachments on a document-by-document basis, focusing on attachments necessary to complete document families that are likely to be at issue during

depositions.[18]  *See* Plaintiffs' Exhibit 34, (7/21/2018 letter) and Plaintiffs' Exhibit 35, (9/21/2018 letter).  To date, Plaintiffs have challenged roughly one percent of all email attachments withheld by Koch.

In their first letter, dated July 21, 2018, Plaintiffs requested that Koch review a small subset of the 60,138 attachments Koch had withheld. Plaintiffs' Exhibit 34, *supra.* Many of these withheld attachments consisted of unprocessable files which Koch had declined to identify, despite the prevailing custom in this litigation of producing such files or providing a placeholder identifying them.  *Id.*  Pursuant to ¶ II(G) of the ESI Protocol, Plaintiffs' first request provided a "list of Bates numbers of . . . documents suggesting that . . . responsive attachment[s] w[ere] withheld" and explained that the withheld attachments could be responsive based on their parent email or family group of documents.  *See* Plaintiffs' Exhibit 36, (7/21/2018 Challenged Email Attachments.)  Koch initially refused to review any of the documents Plaintiffs flagged, and even after the parties met and conferred, Koch agreed to review only a subset of the disputed attachments.  More specifically, Koch agreed to (1) identify the withheld attachments that Plaintiffs had already identified as junk files; and (2) review the withheld attachments Plaintiffs identified based on the responsiveness their document families.  However, Koch would not review the attachments Plaintiffs believed to be responsive based on their parent emails nor would it produce placeholders that clearly identified documents that could not be processed.

---

[18]  Having to identify such document families likely to be used at depositions is in itself concerning given that it forces Plaintiffs to identify for Koch work product information concerning their thought processes, especially given that nearly a quarter of all documents produced by Koch are affected by its withholding of email attachments.

Over the next two months, Koch withheld over 29,000 additional email attachments. Plaintiffs therefore sent a second letter to Koch on September 21, 2018, requesting that Koch produce an additional 650 withheld email attachments—less than 1% of the attachments Koch had withheld to date.  Plaintiffs' Exhibit 35, *supra*  Koch refused to review the attachments in Plaintiffs' requests, cursorily noting several documents it did not believe to be responsive. Plaintiffs' Exhibit 37, (10/5/2018 Koch Letter). For example, Plaintiffs requested that Koch produce the withheld attachment at Bates KOCH_0000271580. *See* Plaintiffs' Exhibit 38, (9/21/2018 Challenged Email Attachments).  Koch denied the request, stating that it "should have been obvious to Plaintiffs that the withheld attachment was non-responsive" based on the parent email. Plaintiffs' Exhibit 37, *supra*..  However, a document within the same email family addresses industry cutbacks and Koch's 2008 financial data, topics that are clearly responsive to Plaintiffs' discovery requests. *See* Plaintiffs' Exhibit 39, (KOCH_0000271582).  By withholding the attachment at Bates KOCH_0000271580 (and KOCH_0000271581), Koch prevented Plaintiffs from having a complete email family for this responsive document.  Instead, during a meet and confer on October 9, 2018, Koch only offered to review four substantive categories of attachments of its own choosing, approximately half of the attachments in Plaintiffs' list. Plaintiffs responded by explaining the inadequacy of Koch's proposal. Plaintiffs' Exhibit 40, (Clark's 10-10-2018 Response to Koch).

More generally, Koch's response to Plaintiffs' September 21 letter made clear that Koch did not properly analyze the attachments in Plaintiffs' request.  Had it done so, it would have realized that Plaintiffs' requested attachments needed to make complete document families.  Koch has apparently ignored the reality that incomplete document families impair Plaintiffs' ability to understand relevant documents, take effective depositions, and comply with Federal Rule of

Evidence 106, issues which this Court has recognized. *See* Amended Order, at 2 (citing Plaintiffs' Reply [ECF No. 1031], at 1). Instead, during a meet and confer on October 9, 2018, Koch offered to review only four substantive categories of attachments of its choosing, approximately half of the attachments in Plaintiffs' list. This type of compromise mirrors the result reached in August, which ultimately allowed Koch to continue its indiscriminate and prejudicial withholding of email attachments.

Koch has taken positions that make resolution of the issues nearly impossible without further guidance from the Court, including: (1) Plaintiffs are not entitled to see junk attachments, even if those attachments are necessary for Plaintiff to complete a relevant document family, as required by Federal Rule of Evidence 106; and (2) Plaintiffs cannot see attachments if they have not accurately described every nuance of those documents (which, as this Court recognized in its Amended Order, Plaintiffs cannot do in light of their "limited information . . . about documents Defendants have withheld").

Koch's position is troubling as much as it is an outlier—all other Defendants have worked with Plaintiffs to produce or describe with more particularity withheld attachments. For example, other defendants have agreed to mass-produce replacement placeholders describing (1) unprocessable files or (2) files without content to substantially narrow the issues faced by the parties in dealing with withheld email attachments. By contrast, Koch has refused, even though—based on Plaintiffs' extensive analysis of Koch's withheld documents—it appears that Koch mass-tagged (i.e., did not manually review) tens of thousands of email attachments of particular file types, rather than considering whether it actually needed to withhold such documents on a document-by-document basis. It is patently unfair in the face of such tactics to require Plaintiffs then to manually review each such email family and challenge such documents individually.

Accordingly, Plaintiffs respectfully request this Court order that: (1) Koch respond on a document-by-document basis to every attachment challenged by Plaintiffs' in their September 21, 2018, no later than October 30, 2018, (2) Koch must produce a descriptive placeholder identifying junk, unprocessable, or no-content documents that Plaintiffs' have challenged, and (3) going forward Koch must respond within 7 days to similarly narrow letters from Plaintiffs containing lists of challenged email attachments, and do so in accordance with the Court's guidance with respect to the September 21, 2018, list of challenged email attachments.

**Defendants' Position**

Plaintiffs demand that Koch re-review and produce over 650 attachments that Koch: (1) already reviewed; and (2) determined to be non-responsive. Plaintiffs refused to negotiate their demands and insist that all 650 attachments must be produced *regardless* of whether, on a second review, such attachments are once again determined to be non-responsive. Plaintiffs' positions defy the ESI Protocol Order (Dkt. No. 459) (the "ESI Protocol") and the Court's July 18, 2018 Amended Order (Dkt. No. 1082) (the "July 18 Order"), re-litigate issues that the Court has already resolved against Plaintiffs, and should be rejected.

Two months before making the instant demand, Plaintiffs requested that Koch re-review about 290 withheld attachments. In that instance, the parties negotiated and some, but not all, such attachments were re-reviewed. Ultimately, fewer than 10% of the attachments Plaintiffs had originally demanded were determined to be responsive and produced. On this second, substantially larger request, Plaintiffs have refused to negotiate and, as a result, this dispute must be decided by the Court. On September 21, 2018, Plaintiffs sent Koch a letter pursuant to paragraph II(G) of the ESI Protocol and an attached spreadsheet (the "Second Demand"). The

Second Demand lists over 650 attachments, each of which Koch previously reviewed individually and determined were not "responsive" within the terms of its production obligations.  The Second Demand asserts briefly why each attachment purportedly is responsive.

Koch responded in writing on October 5, 2018, raising a number of concerns and requesting a meet and confer.  The meet and confer took place on October 9, and Koch proposed a compromise by which it would re-review various categories of withheld attachments, and produce those that were responsive.  Plaintiffs refused to discuss any compromise.

Instead, Plaintiffs insisted that Koch was *required to both review and produce each and every* attachment listed in the Second Demand even if—on re-review—the attachment was still deemed not responsive.  (Oct. 9, 2008 email to Plaintiff's counsel, attached as Exhibit D-4.) Plaintiffs cited Federal Rule of Evidence 106 ("Evidence Rule 106") and concerns about introducing incomplete exhibits at depositions.

Given Plaintiffs' unyielding position, Koch was left to act unilaterally to narrow the issues before the Court by committing to re-review (and if responsive, produce) five categories of attachments listed in the Second Demand—those relating to pricing, sales, inventory, production, or AgriStats reports. Koch will also identify any withheld attachments that are "junk" files.

This leaves Plaintiffs seeking a Court order concerning about 350 items.  Remarkably, Plaintiffs have not—whether in the meet and confer or in this Joint Status Report—identified any other categories of attachments that should be re-reviewed.

The ESI Protocol Order and the July 18 Order permit:  (a) producing parties to *withhold* non-responsive attachments; and (b) correspondingly, receiving parties to *request*, in good faith and with reason, that withheld attachments be reviewed a second time for responsiveness. Plaintiffs' refusal to negotiate and insistence that all attachments they identify must be produced—

regardless of responsiveness—defeat both aspects of this carefully calibrated set of rights and obligations. What is more, Plaintiffs' latest demands threaten further and ongoing demands that likewise do not comply with the ESI Protocol and July 18 Order.

At a more granular level, the Second Demand fails to justify a re-review of the remaining 350 attachments, as Plaintiffs took the very "kitchen sink" approach that this Court rejected. (*See* July 18 Order at 3 n.1.) For example, the Second Demand seeks re-review of an attachment that Plaintiffs claim "may contain Agri Stats report data." But the parent email identifies the attachment as "image001.gif," a file type used for email signature blocks, and the ".gif" suffix stands for Graphics Interchange Format, which indicates that the file is an image, not likely to AgriStats data. Not surprisingly, the withheld attachment is non-responsive junk, which should have been obvious to Plaintiffs from the outset.

The Second Demand describes other attachments as likely "a report of the financial reserves of Koch done by a third party[.]" Under the parties' negotiated "responsiveness" terms, Koch is not obligated to produce documents about its financial reserves. Other entries seek attachments related to "financial data." But, the parties agreed that Koch would produce its audited financials, not every document related to "financial data."

Plaintiffs make much of Koch's withholding of KOCH_0000271580, but this only highlights that the Second Demand was hastily assembled and seeks to burden Koch with inquiries that Plaintiffs could readily perform. The parent email is a "Returned mail" sent by "Mail Delivery Subsystem MAILER-DAEMON@kochfoods.com." It shows two attachments: (a) "STATUS UPDATE AGENDA," which Koch already produced, and (b) "details.txt," which a quick internet search shows is a file type that "provides the details of the execution," including "the order in

which the actions were executed, and their dependencies."[19]  Plaintiffs do not know what they want—and instead ask Koch to figure it out.

Plaintiffs' purported Evidence Rule 106 concern is misplaced.   Under Plaintiffs' construction, this rule of evidence based on "fairness" at trial, would flatly deny litigants their right, recognized in the ESI Protocol and July 18 Order, to withhold irrelevant attachments in discovery.  Indeed, Plaintiffs previously made this argument (Motion to Compel, Dkt. No. 976 at 14)—and lost (July 18 Order, Dkt. No. 1082).  And contrary to Plaintiffs' contentions, the July 18 Order does not "recognize[]" that "evidentiary problems" are created by withholding non-responsive attachments.

Plaintiffs complain that Koch withheld thousands of attachments as non-responsive.  Yet, Koch's production was actually disproportionately large—including the third highest number of documents among 18 defendant families, though Koch's market share is not nearly as high.  Koch produced widely and also exercised its right to withhold irrelevancies.

Plaintiffs attempt to justify their Second Demand as only "challenging roughly one percent of Koch's withheld attachments."  Yet, Plaintiffs acknowledged in the meet and confer that -- two months after Koch completed its production -- Plaintiffs' review of Koch's production continues, and Plaintiffs provide no assurance that the Second Demand is their last or even their last "mass" demand for re-review.  Indeed, Plaintiffs' prayer for relief confirms that Plaintiffs will continue to demand that Koch re-review withheld non-responsive attachments and will do so in batches of 600 or more at a time.

---

[19]   *See*  https://docs.microsoft.com/en-us/sql/2014/database-engine/install-windows/  view-and-read-sql-server-setup-log-files?view=sql-server-2017.

The remainder of the Second Demand is not saved by the several mischaracterizations and speculations, including that:

- "Koch rejected" Plaintiffs' July 21 demand—in fact, the parties had a productive meet and confer and reached a *compromise*.  Here, Plaintiffs refused to negotiate.

- "[I]t appears that Koch mass-tagged (i.e., did not manually review) tens of thousands of email attachments of particular file types[.]"  In a word:  untrue.

Plaintiffs' persistence in their broad, scattershot demands for re-review and production of withheld attachments is improper and harassing, and should be rejected.

DATED: October 12, 2018

/s/ Brian D. Clark
W. Joseph Bruckner
Elizabeth R. Odette
Brian D. Clark
Simeon A. Morbey
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com

Clifford H. Pearson
Bobby Pouya
Michael H. Pearson
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
mpearson@pswlaw.com
bpouya@pswlaw.com

Bruce L. Simon
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Direct Purchaser Plaintiffs Interim Co-Lead
Class Counsel*

Respectfully submitted,

s/ Steven A. Hart
Steven A. Hart (#6211008)
Brian Eldridge (#6281336)
Kyle Pozan (#6306761)
HART MCLAUGHLIN & ELDRIDGE,
LLC
121 West Wacker Drive, Suite 1050
Chicago, IL 60601
Telephone: (312) 955-0545
Facsimile: (312) 971-9243
shart@hmelegal.com
beldridge@hmelegal.com
kpozan@hmelegal.com

*Direct Purchaser Plaintiffs Interim Liaison
Class Counsel*

/s/ Thomas A. Doyle
Kenneth A. Wexler
Edward A. Wallace
Thomas A. Doyle
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
eaw@wexlerwallace.com
tad@wexlerwallace.com

*Commercial and Institutional Indirect
Purchaser Plaintiffs Liaison Counsel*

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua R. Rissman
Brittany N. Resch
GUSTAFSON GLUEK PLLC
220 South Sixth Street, #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
bresch@gustafsongluek.com

Adam Zapala
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

*Commercial and Institutional Indirect
Purchaser Plaintiffs Interim Co-Lead
Counsel*

/s/ Steve W. Berman
Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO
LLP
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
steve@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO
LLP
455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611
(708) 628-4949
beth@hbsslaw.com

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO
LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
(510) 725-3000
shanas@hbsslaw.com

*End User and Consumer Plaintiffs Interim
Lead Counsel*

/s/ Scott E. Gant
Scott E. Gant
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727
sgant@bsfllp.com

*Counsel for Sysco and US Foods
Liaison Counsel for Direct Action Plaintiffs*

WEIL GOTSHAL & MANGES LLP

By: /s/ *Carrie C. Mahan*
Carrie C. Mahan (IL Bar No. 459802)
Christopher J. Abbott
Daniel E. Antalics
2001 M Street N.W., Ste 600
Washington, D.C. 20036
Telephone: 202-682-7000
Facsimile: 202-857-0940
carrie.mahan@weil.com
christopher.abbott@weil.com
daniel.antalics@weil.com

Kevin J. Arquit
767 Fifth Avenue
New York, NY 10153
Telephone: 212-310-0950
Facsimile: 212-310-8007
kevin.arquit@weil.com

BAILEY BRAUER PLLC

Clayton E. Bailey
8350 N. Central Expressway, Ste 206
Dallas, TX 75206
Telephone: 214-360-7433
Facsimile: 214-360-7424
cbailey@baileybrauer.com

EIMER STAHL LLP

Michael L. McCluggage (#01820966)
224 South Michigan Avenue, Ste 1100
Chicago, IL 60604
Telephone: 312-660-7665
Facsimile: 312-660-7665
mmccluggage@eimerstahl.com

*Attorneys for Defendant Pilgrim's Pride*
*Corporation and Liaison Counsel for*
*Defendants*

VENABLE LLP

By: /s/ *J. Douglas Baldridge*
J. Douglas Baldridge (#437678)
Lisa Jose Fales (admitted *pro hac vice*)
Danielle Foley (admitted *pro hac vice*)
Robert Davis (admitted *pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
jdbaldridge@venable.com
ljfales@venable.com
drfoley@venable.com
rpdavis@venable.com

Leonard L. Gordon (admitted *pro hac vice*)
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Telephone:  (212) 370-6252
Facsimile: (212) 307-5598
llgordon@venable.com

FALKENBERG IVES LLP

Kirstin B. Ives
30 N. LaSalle St., Ste 4020
Chicago, IL 60602
kbi@ffilaw.com
Telephone: (312) 566-4803
Facsimile: (312) 566-4810

*Attorneys for Defendants Perdue Farms, Inc.*
*and Perdue Foods LLC*

AXINN, VELTROP & HARKRIDER LLP

By: /s/ *Rachel J. Adcox*
Rachel J. Adcox
Daniel K. Oakes
Kenina J. Lee
950 F Street NW, Ste 700
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
radcox@axinn.com
doakes@axinn.com
klee@axinn.com

John M. Tanski
Jarod G. Taylor
90 State House Square
Hartford, CT 06103
Telephone: (860) 275-8100
Facsimile: (860) 275-8101
jtanski@axinn.com
jtaylor@axinn.com

Nicholas E.O. Gaglio
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Facsimile: (212) 261-5654
ngaglio@axinn.com

LIPE LYONS MURPHY NAHRSTADT &
PONTIKIS, LTD.

Bradley Charles Nahrstadt
230 West Monroe, Street, Ste 2260
Chicago, IL 60606
Telephone: (312) 448-6235
Facsimile: (312) 726-2273
bcn@lipelyons.com

*Attorneys for Defendants Tyson Foods, Inc.,*
*Tyson Chicken, Inc., Tyson Breeders, Inc.,*
*Tyson Poultry, Inc.*

PROSKAUER ROSE LLP

By: /s/ *Christopher E. Ondeck*
Christopher E. Ondeck
Adrian Fontecilla
Stephen R. Chuk
1001 Pennsylvania Ave., NW, Ste 600 South
Washington, DC 20004
Telephone: (202) 416-6800
Facsimile: (202) 416-6899
condeck@proskauer.com
afontecilla@proskauer.com
schuk@proskauer.com

*Attorneys for Wayne Farms LLC*

SHOOK HARDY & BACON LLP

By: /s/ *Lynn H. Murray*
Lynn H. Murray
111 S. Wacker Dr., Ste 5100
Chicago IL 60606
Telephone: (312) 704-7700
Facsimile: (312) 558-1195
lhmurray@shb.com

Laurie A. Novion
2555 Grand Novion
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
lnovion@shb.com

CONNORS & WINTERS

John R. Elrod
4375 N. Vantage Drive, Ste 405
Fayetteville, AR 72703
Telephone: (479) 582-5711
jelrod@cwlaw.com

*Attorneys for Defendant Simmons Foods, Inc.*
*and Simmons Prepared Foods Inc.*

NOVACK AND MACEY LLP

By: /s/ *Stephen Novack*
Stephen Novack
Stephen J. Siegel
Christopher S. Moore
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
Facsimile: (312) 419-6928
snovack@novackmacey.com
ssiegel@novackmacey.com
cmoore@novackmacey.com

*Attorneys for Defendants Koch Foods Incorporated, JCG Foods of Alabama LLC, JCG Foods of Georgia LLC and Koch Meat Co., Inc.*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: /s/ *Patrick Fitzgerald*
Patrick Fitzgerald (#6307561)
Lara Flath
Brooke Winterhalter
155 N. Wacker Drive
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
patrick.fitzgerald@skadden.com
lara.flath@skadden.com
brooke.winterhalter@skadden.com

Boris Bershteyn
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
boris.bershteyn@skadden.com

*Attorneys for Defendant Peco Foods, Inc.*

SIDLEY AUSTIN LLP

By: /s/ *John W. Treece*
John W. Treece, Bar No. 3122889
1 S. Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
jtreece@sidley.com

ROSE LAW FIRM

Amy Lee Stewart (admitted *pro hac vice*)
Amanda K. Wofford
120 East Fourth Street
Little Rock, Arkansas 72201
Telephone: (501) 377-0334
Facsimile: (501) 375-1309
astewart@roselawfirm.com
awofford@roselawfirm.com

*Attorneys for Defendants Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc.*

MAYER BROWN LLP

By: /s/ *Carmine R. Zarlenga*
Carmine R. Zarlenga, #90784529
William H. Stallings
Stephen M. Medlock
Oral D. Pottinger
1999 K Street N.W.
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
czarlenga@mayerbrown.com
wstallings@mayerbrown.com
smedlock@mayerbrown.com
opottinger@mayerbrown.com

*Attorneys for Defendant Foster Farms, LLC and Foster Poultry Farms, a California Corporation*

VEDDER PRICE P.C.

By: /s/ Gregory G. Wrobel
Gregory G. Wrobel (#3122900)
222 N. LaSalle Street
Chicago, IL 60601
Telephone: (312) 609-7722
Facsimile: (312) 609-5005
gwrobel@vedderprice.com


JORDAN PRICE WALL GRAY JONES &
CARLTON, PLLC

Henry W. Jones, Jr.
1951 Clark Avenue
Raleigh, NC 27605
Telephone: (919) 828-2501
Facsimile: (919) 834-8447
hjones@jordanprice.com

*Attorneys for Defendant House of Raeford
Farms, Inc.*

KIRKLAND & ELLIS LLP

By: /s/ Daniel E. Laytin, P.C.
Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
Martin L. Roth
Stacy Pepper
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Fax: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com
martin.roth@kirkland.com
stacy.pepper@kirkland.com

*Attorneys for Defendants Sanderson Farms,
Inc., Sanderson Farms, Inc. (Foods Division),
Sanderson Farms, Inc. (Processing Division),
and Sanderson Farms, Inc. (Production
Division)*

MANDELL MENKES LLC

By: /s/ Brendan J. Healey
Brendan J. Healey
One North Franklin, Ste 3600
Chicago, IL 60606
Telephone: (312) 251-1006
Facsimile: (312) 759-2189
bhealey@mandellmenkes.com


ALSTON & BIRD LLP

B. Parker Miller
Valarie C. Williams
Max Marks
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
parker.miller@alston.com
valarie.williams@alston.com
nowell.berreth@alston.com
max.marks@alston.com


SMITH, GILLIAM, WILLIAMS & MILES
PA

R. Brent Hatcher, Jr.
301 Green Street NW, Ste 200
Gainesville, GA 30501
Telephone: (770) 536-3381
Facsimile: (770) 535-9902
bhatcher@sgwmfirm.com
cfranklin@sgwmfirm.com

*Attorneys for Fieldale Farms Corporation*

STINSON LEONARD STREET LLP

By: /s/ *William L. Greene*
William L. Greene
50 South Sixth Street, Ste 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
william.greene@stinson.com


SUGAR FELSENTHAL GRAIS &
HELSINGER LLP

John C. Martin
30 N. LaSalle Street, Ste 3000
Chicago, IL 60602
Telephone: (312) 704-2172
Facsimile: (312) 372-7951
jmartin@sfgh.com


THE LAW GROUP OF NORTHWEST
ARKANSAS LLP

Gary V. Weeks
K.C. Dupps Tucker
Kristy E. Boehler
1830 Shelby Lane
Fayetteville, AR 72704
Telephone: (479) 316-3760
gary.weeks@lawgroupnwa.com
kc.tucker@lawgroupnwa.com
kristy.boehler@lawgroupnwa.com

*Attorneys for Defendants George's, Inc.*
*and George's Farms, Inc.*


VAUGHAN & MURPHY

By:  /s/ *Charles C. Murphy, Jr.*
Charles C. Murphy, Jr.
690 S Ponce Court NE
Atlanta, GA 30307
Telephone: (404) 667-0714
Facsimile: (404) 529-4193
cmurphy@vaughanandmurphy.com


WINSTON & STRAWN LLP

James F. Herbison
Michael P. Mayer
Brett A. Walker
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
jherbison@winston.com
mmayer@winston.com
bwalker@winston.com

*Attorneys for Defendant Norman W. Fries,*
*Inc. d/b/a Claxton Poultry Farms*

KUTAK ROCK LLP

By: /s/ *John P. Passarelli*
John P. Passarelli
James M. Sulentic
1650 Farnam Street
Omaha, NE 68102
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
john.passarelli@kutakrock.com
james.sulentic@kutakrock.com

J.R. Carroll
Jeffrey M. Fletcher
234 East Millsap Road, Ste 200
Fayetteville, AR 72703-4099
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
jr.caroll@kutakrock.com
Jeffrey.fletcher@kuakrock.com

Kimberly M. Hare (#6323326)
One South Wacker Drive, Ste 2050
Chicago, IL 60606-4614
Telephone: (312) 602-4100
Facsimile: (312) 602-4101
kimberly.hare@kutakrock.com

*Attorneys for Defendants O.K. Foods, Inc.,*
*O.K. Farms, Inc., and O.K. Industries, Inc.*

EVERSHEDS SUTHERLAND (US) LLP

By: /s/ *James R. McGibbon*
James R. McGibbon
Patricia A. Gorham
Nicholas R. Boyd
999 Peachtree Street, N.E., Ste 2300
Atlanta, Georgia 30309-3996
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
jimmcgibbon@eversheds-sutherland.com
patriciagorham@eversheds-sutherland.com
nickboyd@eversheds-sutherland.com

SMITHAMUNDSEN LLC

Clay H. Phillips
150 N. Michigan Avenue, Ste 3300
Chicago, Illinois 60601
Telephone: (312) 894-3200
Facsimile: (312) 997-1828
cphillips@salawus.com

*Attorneys for Defendants Harrison Poultry,*
*Inc.*

EDWARD C. KONIECZNY LLC

By: /s/ Edward C. Konieczny
Edward C. Konieczny
400 Colony Square, Ste 1501
1201 Peachtree Street, NE
Atlanta, GA 30361
T: (404) 380-1430
F: (404) 382-6011
ed@koniecznylaw.com


SMITH, GAMBRELL & RUSSELL, LLP

David C. Newman
W. Parker Sanders
1230 Peachtree Street, N.E.
Promenade, Ste 3100
Atlanta, GA  30309
T: (404) 815-3500
F: (404) 815-3509
dnewman@sgrlaw.com
psanders@sgrlaw.com


NEAL, GERBER & EISENBERG LLP

Jonathan S. Quinn
Andrew G. May
Two North LaSalle Street, Ste 1700
Chicago, Illinois 60602-3801
T: (312) 269-8000
F: (312) 269-1747
jquinn@nge.com
amay@nge.com

*Attorneys for Defendants Mar-Jac Poultry,*
*Inc., Mar-Jac Poultry MS, LLC, Mar-Jac*
*Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-*
*Jac Poultry, LLC, Mar-Jac Holdings, Inc.*

HOGAN LOVELLS US LLP

By:  /s/ William L. Monts III
William L. Monts III
Justin W. Bernick
Jennifer A. Fleury
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Telephone:  (202) 637-5910
Fax: (202) 637-5911
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com
jennifer.fleury@hoganlovells.com


MILLER, CANFIELD, PADDOCK, AND
STONE P.L.C.

Jacob D. Koering
225 West Washington Street, Ste 2600
Chicago, Illinois  60606
Telephone:  (312) 460-4272
Facsimile:  (312) 460-4201
koering@millercanfield.com

*Attorneys for Defendant Agri Stats, Inc.*