EXHIBIT A

```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3

 4   IN RE BROILER CHICKEN ANTITRUST    )  Docket No. 16 C 8637
     LITIGATION                         )
 5                                      )  Chicago, Illinois
     This Document Relates to:          )  February 24, 2017
 6   All Actions                        )  10:09 a.m.

 7
               TRANSCRIPT OF PROCEEDINGS - Telephonic Status
 8               BEFORE THE HONORABLE JEFFREY T. GILBERT

 9
     APPEARANCES:
10
     For Plaintiffs         HART McLAUGHLIN & ELDRIDGE LLC, by:
11   Maplevale Farms        MR. STEVEN A. HART
     and John Gross         MR. KYLE POZAN
12   and Company:           121 W. Wacker Drive, Suite 1050
                            Chicago, IL  60601
13

14   (Direct purchaser plaintiffs interim liaison class counsel)

15
                            LOCKRIDGE GRINDAL NAUEN PLLP, by:
16                          W. JOSEPH BRUCKNER
                            MR. BRIAN D. CLARK
17                          100 Washington Avenue South, Suite 2220
                            Minneapolis, MN  55401
18
     (Direct purchaser plaintiffs interim co-lead class counsel)
19

20                          PEARSON SIMON & WARSHAW LLP, by:
                            MR. BRUCE L. SIMON
21                          MR. AARON M. SHEANIN
                            MR. NEIL J. SWARTZBERG
22                          44 Montgomery Street, Suite 2420
                            San Francisco, CA  94104
23
     (Direct purchaser plaintiffs interim co-lead class counsel)
24

25
```

1   commercial and institutional indirect purchasers.

2          THE COURT:  Okay.  But we don't think we should wait

3   to begin doing some things that are done in -- in cases

4   generally while these motions are under advisement even with

5   the seriousness of the issues that are raised.  You know,

6   statistically in this district, I would say that only about

7   10 percent of our civil cases are completely disposed of on

8   what we call dispositive motions, motions to dismiss or

9   summary judgment, and 90 percent are not.  That's not to say

10   that this case fits within the statistics, but our culture in

11   this district because of that, as plaintiffs noted in their

12   filing last October, is not to stay discovery during the

13   pendency of dispositive motions.  And, you know, the federal

14   judicial center keeps statistics on cases terminated, for

15   example, by summary judgment, and their latest statistics show

16   that only 5 percent of the cases are totally completely

17   disposed of on summary judgment.  So even if good arguments

18   are being raised and they could change certain shape of the

19   case, the odds, at least early in the case like this, are, you

20   know, against the case completely being terminated.  And I

21   will say, those are odds.  That's not -- I'm not speaking for

22   Judge Durkin or myself on what would happen with these motions

23   at all.  You could very well be within the 10 percent or

24   5 percent of the cases that end at this stage.  But I'm just

25   saying statistically, that's what it is.

EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

*IN RE BROILER CHICKEN ANTITRUST LITIGATION*

This Document Relates To: All Actions

Case No. 1:16-cv-08637

**ORDER REGARDING DISCLOSURE OF INFORMATION**

In addition to disclosures that will be made pursuant to Rule 26(a)(1),[1] the parties will disclose the following documents and/or information for the period from January 1, 2007 to September 2, 2016, to the extent such information exists and is readily available. To the extent not already disclosed pursuant to the parties' previous agreement on December 2, 2016, the parties will disclose the documents and/or information provided below no later than January 31, 2017. As part of these initial, limited disclosures, the parties need not disclose each document falling within items (a)-(b) or (e)-(f), but will disclose one document for each year at issue to the extent such documents exist and are readily available. Such disclosures will be subject to the parties' ability to supplement or amend these disclosures once discovery commences, and further subject to modification by any party upon a showing that complying with such disclosure would be unduly burdensome. By providing information pursuant to these disclosures, the parties do

---

[1] In making the disclosures pursuant to this order, a disclosing party is not making any representations regarding whether it may use any documents, people, or information in support of its claims or defenses and is not agreeing that the persons disclosed possess information relevant to the claims or defenses. The parties will make required disclosures under Rule 26(a)(1) consistent with the deadline for such disclosures established under the federal and local rules and/or an order of this Court. Further, Defendants' position is that they do not intend to create or expand any preservation obligations to automatically include any person or documents that may be identified in any disclosure required by this order.

509450.7

not agree that any documents are discoverable or relevant and do not waive or limit their respective rights to object to, or oppose, any request for further disclosure or discovery.

a. **Organizational Charts:**

i. **Defendants:** Organizational charts sufficient to show the names and titles of individuals with the following positions or responsibilities relating to broiler chickens:

1. member of the board of directors;

2. all executives with the title of Director, Vice President, or higher (such as SVP, CEO, COO, CFO, etc.), as well as their assistants or secretaries;

3. investor and/or creditor relations;

4. the person or persons (if any, and excluding any clerical-level or administrative-level personnel) who:

   a. have primary responsibility for managing or overseeing the reporting and transmitting of data directly to and from Agri Stats, Express Markets, Inc., Urner Barry, or USDA relating to Broiler pricing, hatchery supply flock, slaughter, inventory, export, or production levels;

   b. report Broiler pricing information to the Georgia Department of Agriculture in connection with the Georgia Dock price survey;

    c.  regularly receive the Agri Stats report entitled the "Bottom Line Report"; and

    d.  have primary responsibility for analyzing data received from Agri Stats to identify data pertaining to specific competitors;[2]

5.  the person or persons who supervise the department responsible for Broiler sales to, purchases from, trades with, or co-packing transactions with other Defendants or with Mar-Jac Poultry, Harrison Poultry, or Claxton Poultry (the "Producer Co-Conspirators");

6.  all executives with the title of Director, Vice President, or higher, as well as certain limited executives with the title of Manager,[3] whose primary responsibilities include determining or setting Broiler pricing, hatchery supply flock, slaughter, inventory, export, or production levels, and who were an officer or board member of, or otherwise formally-designated participant (such as the member of a relevant committee) in any of the following:

    a.  National Chicken Council

    b.  United States Poultry & Egg Export Council

    c.  U.S. Poultry & Egg Association

---

[2] Defendants do not concede that the data described in this subparagraph is transmitted to or received from any of the identified entities, and Defendants do not concede that it is possible to analyze Agri Stats data to identify data pertaining to specific competitors.

[3] Such Managers include only individuals whose position makes them the highest level executive overseeing a specific Broiler complex, but not individuals with the position of manager who report to such individuals.

   d. Georgia Poultry Federation

   e. North Carolina Poultry Federation

   f. Poultry Federation

   g. International Poultry Expo

   h. International Producers and Processors Expo

   i. International Poultry Council

   j. Overseas Distribution Solutions

7. all executives with the title of Director, Vice President, or higher, as well as certain limited executives with the title of Manager,[4] whose primary responsibilities include determining or approving a Defendant's own Broiler pricing, hatchery supply flock, slaughter, inventory, export, or production levels. For example, with respect to the number of eggs laid per week by Broiler breeders at a hatchery, the person (if any) who determines the specific number of eggs to be laid or hatched each week and/or communicates that number to the relevant hatchery manager or employee.[5]

Defendants may create a list of individuals with the job responsibilities listed above in lieu of a formal organizational chart, so long as such a list provides the individual's name, title, the time period during which they held that title, and for item (a)(i)(6) above, the name of the trade association attended and any committee memberships held.

---

[4] See fn. 3 regarding an explanation of this limitation.

[5] Defendants do not agree that any determinations or approvals described in this subparagraph are ever made or provided.

With respect to (a)(i)(4) through (a)(i)(7), to the extent that a particular position (e.g., Hatchery Manager, Complex Manager, Live Production Manager, etc.) at a Defendant's Broiler complexes or other facilities typically fulfills the particular job responsibility at issue, a Defendant may simply identify that position and the estimated number of individuals who have held that position during the relevant period.

ii. **Direct Purchaser Plaintiffs:** Organizational charts sufficient to show the names and titles of individuals with the following positions or responsibilities relating to the purchase of Broiler chickens:

1. Plaintiffs' claims and allegations in the DPP Second Consolidated Amended Complaint; and

2. Plaintiffs' purchase of Broilers, including executives with the title of Director, Vice President, or higher.

Plaintiffs may create a list of individuals with the job responsibilities listed above in lieu of a formal organizational chart, so long as such a list provides the individual's name, title, the time period during which they held that title.

    iii.  **Indirect Purchaser Plaintiffs:**  Indirect Purchaser Plaintiffs that are businesses will disclose organizational charts (to the extent they exist) sufficient to show the names and titles of individuals with the following positions or responsibilities relating to the purchase of Broiler chickens:

        1.  have primary responsibility for analyzing the prices, supply levels, or availability of Broilers;

        2.  have primary responsibility for determining or approving the sale price of Broilers;

        3.  purchasing Broilers, including executives with the title of Director, Vice President, or higher; and

        4.  Plaintiffs' claims and allegations in the Commercial and Institutional Indirect Purchaser Plaintiffs' Third Amended Consolidated Class Action and End-User Consumer Plaintiffs' Consolidated Amended Class Action Complaints.

Plaintiffs may, but are not required to, create a list of individuals with the job responsibilities listed above in lieu of a formal organizational chart, so long as such a list provides the individual's name, title, the time period during which they held that title.

With respect to (a)(ii)(1) and (2), to the extent that a particular position at a Plaintiff typically fulfills the particular job responsibility at issue, a Plaintiff may, but is not required to, simply identify that position and the

estimated number of individuals who have held that position during the relevant period.

b. **Phone Directories:** Documents, such as phone directories, sufficient to show the office, fax, and cellphone number for the categories of individuals identified above in subparagraphs (a)(i)(1) through (a)(i)(5).[6]

c. **Email Systems:** Identification of the email system used, including the name of the email system, version number (including applicable dates for different versions, if readily available), and time period or number of days for which email is retained on the system.

d. **Non-custodial Data Sources:** A list of known non-custodial data sources (e.g. shared drives, servers, etc.), if any, likely to contain discoverable ESI. These lists will identify the databases that are likely to contain discoverable "structured data."

e. **Document Retention Policies:** Document retention and/or destruction policies in effect since January 1, 2007 to September 2, 2016.

f. **Employee Technology Use Policies:** Employee Technology Use Policies in effect since January 1, 2007 to September 2, 2016, including (if they exist) policies concerning use by employees of cellphones, notebook computers, and tablets for business purposes. Without intending to limit, such policies may go by the following names: bring-your-own device (BYOD) policies, choose-your-own-device (CYOD) policies, corporate-liable-employee-owned (CLEO) policies,

---

[6] Plaintiffs do not agree that their employees' phone numbers or phone records have any relevance to the antitrust price-fixing conspiracy alleged in this Action.

corporate-owned/personally enabled (COPE) policies, mobile-device-management (MDM) policies, and dual-use device policies. Plaintiffs and Defendants will disclose if they have no such policies.

g. **Phone Records**: Plaintiffs and Defendants will disclose if they have downloaded phone records from phone carriers and, if so, from which carriers they have downloaded such records, and the categories of phone records or specific phone numbers for which they have downloaded phone records.[7]

h. **Inaccessible Data**: A list of known data sources, if any, likely to contain discoverable ESI that a party asserts is not reasonably accessible under Rule 26(b)(B) or Rule 26(b)(2)(C)(i).

**SO ORDERED.**

Dated: 12/21/16

HON. JEFFREY T. GILBERT
U.S. Magistrate Judge

---

[7] Plaintiffs do not agree that their employees' phone numbers or phone records have any relevance to the antitrust price-fixing conspiracy alleged in this Action.

EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To: All Actions | Case No. 1:16-cv-08637<br><br>Magistrate Judge Jeffrey T. Gilbert |

## ORDER

Status hearing held on June 16, 2017. During the status hearing, the Court ruled on certain disputes reflected in the parties' Joint Status Report and Letter Brief for April 21, 2017 Status Conference [353] and Joint Status Report and Letter Brief for June 16, 2017 Status Conference and Pursuant to ECF No. 388 [415]. The parties are directed to the transcript for a complete record of the hearing.

This Order memorializes dates set by the Court during the status hearing and additional dates that were not specifically set during the status hearing.

1. On or before June 28, 2017, the parties shall submit a proposed agreed ESI Protocol to the Court's courtroom deputy.

2. On or before June 30, 2017, Plaintiffs and Defendants shall submit to the Court's courtroom deputy their respective proposals for an ESI expert possibly to be appointed by the Court to assist the Court and the parties regarding issues such as a protocol for technology assisted review of ESI and other issues relating to the discovery of ESI that may arise in the course of the litigation.

3. On or before July 7, 2017, Defendants shall file a response brief addressing the issue of Plaintiffs' request for immediate production of documents, if any, sent by Defendants to the Florida Attorney General in response to the Attorney General's Civil Investigative Demands discussed in the Joint Status Report and Letter Brief for June 16, 2017 Status Conference and Pursuant to ECF No. 388 [415 at 56–61].[1] On or before July 14, 2017, Plaintiffs shall file a reply brief.

---

[1] The parties also addressed the Florida Attorney General issue in the Joint Status Report and Letter Brief for April 21, 2017 Status Conference [353 at 8–9, 17–18].

4. On or before June 23, 2017, Commercial and Institutional Indirect Purchaser Plaintiffs ("CIIPP") shall file a response brief addressing the downstream discovery issue discussed in the Joint Status Report and Letter Brief for June 16, 2017 Status Conference and Pursuant to ECF No. 388 [415 at 33–52]. On or before June 30, 2017, Defendants shall file a reply brief. If Direct Purchaser Plaintiffs and/or End-User Consumer Plaintiffs want to file a brief addressing any matters discussed in CIIPP's response or Defendants' reply, the parties should meet and confer about a briefing schedule and then submit the proposed schedule to the Court on or before July 7, 2017.

5. On or before June 30, 2017, the parties shall exchange letters regarding their Rule 34 Requests for Production, including their respective responses and objections. On or before July 31, 2017, the parties shall meet and confer regarding their Requests for Production and their respective responses and objections thereto.

6. The Court will circulate to liaison counsel a proposed date or dates for a continued status hearing.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: June 20, 2017

2

EXHIBIT D

<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3

 4   IN RE BROILER CHICKEN        )  Docket No. 16 C 8637
     ANTITRUST LITIGATION         )
 5                                )  Chicago, Illinois
     This Document Relates to:    )  June 16, 2017
 6   All Actions                  )  10:57 a.m.

 7
                TRANSCRIPT OF PROCEEDINGS - Status
 8
            BEFORE THE HONORABLE JEFFREY T. GILBERT
 9

10   APPEARANCES:

11   For Plaintiffs        HART McLAUGHLIN & ELDRIDGE LLC
     Maplevale Farms       BY:  MR. STEVEN A. HART
12   and John Gross             MR. KYLE POZAN
     and Company:          121 West Wacker Drive, Suite 1050
13                         Chicago, Illinois  60601

14   (Direct purchaser plaintiffs interim liaison class counsel)

15

16                         LOCKRIDGE GRINDAL NAUEN PLLP
                           BY:  MR. BRIAN D. CLARK
17                         100 Washington Avenue South
                           Suite 2220
18                         Minneapolis, Minnesota  55401

19   (Direct purchaser plaintiffs interim co-lead class counsel)

20

21                         PEARSON SIMON & WARSHAW LLP
                           BY:  MR. BOBBY POUYA
22                              MR. MICHAEL H. PEARSON
                           15165 Ventura Boulevard, Suite 400
23                         Sherman Oaks, California  91403

24   (Direct purchaser plaintiffs interim co-lead class counsel)

25
</pre>

1       But like I said, it's a huge cost savings for our

2    clients, given -- given the issues privilege presents.

3       THE COURT:  Is there any creative way -- and what

4    you're proposing is that would be your privilege log, period?

5       MS. COTTRELL:  So what I would propose is that we

6    would do a metadata log.  We could work with plaintiffs if

7    there's some fields they want to guarantee are populated.

8       And if plaintiffs then come back to us and want to

9    challenge entries, we could then supplement with a more

10   traditional log or even more than a more traditional log, and

11   then, of course, address any privilege issues with the Court.

12      THE COURT:  But there would be no -- there would

13   be -- in your view of the world, there would be no traditional

14   privilege log produced in the first instance by any producing

15   party.  And there would be this log, and then the receiving

16   party would have to either raise an issue.  You've got to meet

17   and confer.  You'd have to talk about it.  You'd have to

18   provide additional information.

19      Hold on for a second.

20    (Discussion off the record.)

21      THE COURT:  Back on the record.

22      MS. COTTRELL:  But, Your Honor, I think this is

23   something we probably could work out with the plaintiffs.

24      THE COURT:  I'm not sure you could work it out -- the

25   flat thing.  But, I mean, I'm wondering whether there's some

1          MR. CASH:  Okay.  Thank you.

2          THE COURT:  Is there any defendant -- I mean, one of

3    the -- I mean, I got to determine big picture -- and, again,

4    I'm reluctant to do this in a flyby right now.  I really am.

5    But I -- you guys give me a lot of good information, and I

6    value the back-and-forth in the end.  As you've seen before, I

7    know I have to decide some stuff, and I will, but I'd like to

8    get information.

9          I do not buy the argument completely that because a

10   motion to dismiss is pending, no documents shall be produced.

11   I haven't through the whole case.  It will be a lot easier to

12   say that.  I just haven't said that yet.

13         I balance.  If balancing becomes too hard, then I'll

14   go one way or the other.  But at this point, I think

15   calibrating it is better.

16         So the question is, are there documents relevant?

17   Are they responsive?  What's the burden in producing them?  Am

18   I going down a slippery slope, because the next one is the

19   government investigation and the next government investigation

20   and the next government investigation?

21         So when I asked whether any of the defendants

22   produced these documents electronically or in hard copy, you

23   know, if it's in hard copy or electronically, what's the

24   volume?  That goes to burden.  Do you have to burn a disk, or

25   do you have to produce 75 boxes of documents?  Or do you make

1  in open court.  I'm not prepared to do it right this second

2  because I want to look at where the briefing schedules are,

3  what issues are being briefed.

4  And I do think we have made some progress here, not

5  insignificant progress.  And I'd like you to finish the ESI

6  Protocol and submit it so that I can sign it so at least we

7  have that.  If it has to be amended, so it's the first amended

8  ESI Protocol and the second amended ESI Protocol, I'm okay with

9  that.  But I'd like the first one.

10  I just think we're moving -- we're making some

11  progress.  You know, it's -- it may not be as much as

12  plaintiffs would like, but it's a lot more than a lot of cases

13  where you get a stay, and you don't do anything for years.  So

14  I get that.

15  And it's probably more than the defendants want to

16  do, but I actually think it's going to pay dividends at the end

17  if we have -- if we still have a case.  If we don't, you're

18  going to have a victory dinner, you know.  And so -- and I

19  don't think the victory dinner will be less just because your

20  clients had to pay for the ESI Protocol.

21  I'm just not sure what I want to order you to do

22  during this period of time at 4:00 in the afternoon after being

23  here for six hours.

24  MR. CLARK:  Can I make a 30-second proposal --

25  THE COURT:  Yes.

1       MR. CLARK:  -- just a couple of things?

2       THE COURT:  Yes, please.

3       MR. CLARK:  One, on the ESI Protocol, I think it

4  would be reasonable to get it in by a week from Monday, June

5  26th.  I think you've given us a lot of guidance.  That would

6  give us all of next week to talk about that.

7       THE COURT:  I would say the middle of that week, just

8  to give you more time.

9       MR. CLARK:  June 28th?

10       THE COURT:  Yeah.

11       MR. CLARK:  And then secondly, on Rule 34, it seems

12  like regardless of where things shake out on the search

13  discussions and loading, everybody's agreed we're to talk about

14  Rule 34 and not do it piecemeal.

15       THE COURT:  Yes.

16       MR. CLARK:  If we could commit to getting letters out

17  to defendants for all of the plaintiffs' RFPs and then the

18  defendants' objections within 14 days, and then if we allowed

19  our -- we gave our deadline 45 days out from now, that would

20  give us 30 days to meet and confer about those letters and have

21  these, frankly, pretty cooperative and frank discussions among

22  -- one on one with the defendants.

23       And we know we made a lot of progress on custodians

24  that way.  I think that framework with a deadline would let us

25  get things done in the next 45 days.

1      THE COURT:  The 45 days would be for somebody to file

2  something?

3      MR. CLARK:  Yeah.  If we did not reach agreement or

4  at least agree to defer particular issues on Rule 34, we would

5  file -- I suppose it would be a motion to compel or whatever

6  the Court said was appropriate format.

7      THE COURT:  I would want to have you in -- before I

8  get a huge motion to compel, I'd like you to come in to talk.

9  And I can set that 30 to 40 days after those letters go out

10  after you've had a chance to talk.  I want to know if the big

11  objections are:  "We've moved to dismiss this category of

12  claims; we're not going to produce these documents," that's a

13  different objection than "We shouldn't produce meetings or --

14  about X broiler chickens."

15      And I view those a little bit differently.  I don't

16  know that I want to be briefing a motion to compel on a time

17  period that Judge Durkin is going to have to decide.  So I'd

18  rather have these segmented a little bit.

19      MR. CLARK:  I think that makes sense.  The only thing

20  I would suggest is if we just -- it was very productive for the

21  custodian discussions to have a deadline by which we met and

22  conferred.  I mean, granted, we -- we're all procrastinators,

23  so we did it in the last week possible.  It was fine.  We got

24  it in.  If we could just put, you know, within, you know, 21

25  days, or whatever, of the letters, meet and confer --

1    THE COURT:  I'd say 30 days of the letters --

2    MR. CLARK:  Sure.

3    THE COURT:  -- you should have met and conferred.

4  Then I'll probably set a status.  And that helps me with -- I

5  also have four trials coming up, and so that's -- that affects

6  when I can have you come in.

7        Okay.  I'm glad I set some dates.  I just -- is there

8  a group -- what did you say last time?  If I want to have a

9  telephone conference with people about scheduling stuff, who do

10  I call on each side or who should Brenda call or contact?  Does

11  she know this already?  Has she -- who has she been -- has she

12  been contacting anybody?  Is there a liaison for one of you?

13    MR. HART:  Yes.  I think under the Court's order,

14  there -- the Court has appointed liaison counsel to wrangle our

15  constituents for any --

16    THE COURT:  Okay.  So we should use those from that

17  last management order.

18    MR. HART:  Yes, Your Honor.

19    THE COURT:  Okay.  Is there anything else of pressing

20  concern you want me -- Mr. Fontecilla, it is 4:09.

21    MR. FONTECILLA:  I was going to let you finish, Your

22  Honor.

23    THE COURT:  Is there anything else of a pressing

24  concern we need to deal with now, or should we call this a day,

25  say we did some good stuff, and move on?

EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

*IN RE PORK ANTITRUST LITIGATION*

This Document Relates To:
All Actions

Case No. 0:18-cv-01776-JRT-HB

**[PROPOSED] ORDER REGARDING DISCLOSURE OF INFORMATION**

In addition to disclosures that will be made pursuant to Rule 26(a)(1)[1] and the production of prior productions to government entities (see ¶ (i) below), the parties will disclose the following documents and/or information for the period from January 1, 2007 to June 30, 2018.  The parties will disclose the documents and/or information provided below no later than November 2, 2018.  As part of these initial, limited disclosures, the parties need not disclose each document falling within items (a)-(b) or (e)-(f), but will disclose one document for each year at issue to the extent such documents exist and are readily available.  Such disclosures will be subject to the parties' ability to supplement or amend these disclosures once discovery commences, and further subject to modification by any party upon a showing that complying with such disclosure would be unduly burdensome.  By providing information pursuant to these disclosures, the parties do not

---

[1] In making the disclosures pursuant to this order, a disclosing party is not making any representations regarding whether it may use any documents, people, or information in support of its claims or defenses and is not agreeing that the persons disclosed possess information relevant to the claims or defenses.  The parties will make required disclosures under Rule 26(a)(1) consistent with the deadline for such disclosures established under the federal and local rules and/or an order of this Court.

531387.1

agree that any documents are discoverable or relevant and do not waive or limit their respective rights to object to, or oppose, any request for further disclosure or discovery.

    a. **Organizational Charts:**

        i. **Defendants:** Organizational charts sufficient to show the names and titles of individuals with the following positions or responsibilities relating to pork:

        1. member of the board of directors;

        2. all executives with the title of Director, Vice President, or higher (such as SVP, CEO, COO, CFO, etc.), as well as their assistants or secretaries;

        3. investor and/or creditor relations;

        4. the person or persons (if any, and excluding any clerical-level or administrative-level personnel) who:

            a. have primary responsibility for managing or overseeing the reporting and transmitting of data directly to and from Agri Stats, Express Markets, Inc., Urner Barry, or USDA relating to pork pricing, supply, slaughter, inventory, export, or production levels;

            b. regularly receive the Agri Stats report entitled the "Bottom Line Report";

  c. have primary responsibility for analyzing data received from Agri Stats to identify data pertaining to specific competitors;[2] and

  d. or receive any other survey of pork producers that concerns the profitability, supply, or pricing of pork products.

5. the person or persons who supervise the department responsible for pork sales to, purchases from, trades with, or co-packing transactions with other pork producers;

6. all executives with the title of Director, Vice President, or higher, as well as certain limited executives with the title of Manager,[3] whose primary responsibilities include determining or setting pork pricing, supply, slaughter, inventory, export, or production levels, and who were an officer or board member of, or otherwise formally-designated participant (such as the member of a relevant committee) in any of the following:

  a. National Pork Board

---

[2] Defendants do not concede that the data described in this subparagraph is transmitted to or received from any of the identified entities, and Defendants do not concede that it is possible to analyze Agri Stats data to identify data pertaining to specific competitors.

[3] Such Managers include only individuals whose position makes them the highest level executive overseeing a specific pork complex, but not individuals with the position of manager who report to such individuals.

     b.  National Pork Producers Council

     c.  National Pork Industry Conference

     d.  North American Meat Institute

     e.  American Meat Institute

     f.  American Meat Institute Foundation

     g.  Minnesota Pork Producers Association

     h.  North Carolina Pork Council

     i.  South Carolina Pork Board

7. all executives with the title of Director, Vice President, or higher, as well as certain limited executives with the title of Manager,[4] whose primary responsibilities include determining or approving a Defendant's own pork pricing, supply, slaughter, inventory, export, or production levels.[5]

Defendants may create a list of individuals with the job responsibilities listed above in lieu of a formal organizational chart, so long as such a list provides the individual's name, title, the time period during which they held that title, and for item (a)(i)(6) above, the name of the trade association attended and any committee memberships held.

---

[4] See fn. 3 regarding an explanation of this limitation.

[5] Defendants do not agree that any determinations or approvals described in this subparagraph are ever made or provided.

          4

With respect to (a)(i)(4) through (a)(i)(7), to the extent that a particular position at a Defendant's pork facilities typically fulfill the particular job responsibility at issue, a Defendant may simply identify that position and the estimated number of individuals who have held that position during the relevant period.

ii. **Direct Purchaser Plaintiffs:**  Organizational charts sufficient to show the names and titles of individuals with the following positions or responsibilities relating to the purchase of pork:

1. Plaintiffs' claims and allegations in the August 17, 2018, Amended Complaints; and

2. Plaintiffs' purchase of pork, including executives with the title of Director, Vice President, or higher.

Plaintiffs may create a list of individuals with the job responsibilities listed above in lieu of a formal organizational chart, so long as such a list provides the individual's name, title, the time period during which they held that title.

iii. **Indirect Purchaser Plaintiffs:** Commercial Indirect Purchaser Plaintiffs that are businesses will disclose organizational charts (to the extent they exist) sufficient to show the names and titles of individuals

with the following positions or responsibilities relating to the purchase of pork:

1. have primary responsibility for analyzing the prices, supply levels, or availability of pork;

2. have primary responsibility for determining or approving the sale price of pork;

3. purchasing pork, including executives with the title of Director, Vice President, or higher; and

4. Plaintiffs' claims and allegations in the Commercial IPPs' Amended Complaint.

Plaintiffs may, but are not required to, create a list of individuals with the job responsibilities listed above in lieu of a formal organizational chart, so long as such a list provides the individual's name, title, the time period during which they held that title.

With respect to (a)(ii)(1) and (2), to the extent that a particular position at a Plaintiff typically fulfills the particular job responsibility at issue, a Plaintiff may, but is not required to, simply identify that position and the estimated number of individuals who have held that position during the relevant period.

b. **Phone Directories:** Documents, such as phone directories, sufficient to show the office, fax, and cellphone number for the categories of individuals identified above in subparagraphs (a)(i)(1) through (a)(i)(5).[6]

c. **Email Systems:** Identification of the email system used, including the name of the email system, version number (including applicable dates for different versions, if readily available), and time period or number of days for which email is retained on the system.

d. **Non-custodial Data Sources:** A list of known non-custodial data sources (e.g. shared drives, servers, etc.), if any, likely to contain discoverable ESI. These lists will identify the databases that are likely to contain discoverable "structured data."

e. **Document Retention Policies:** Document retention and/or destruction policies in effect since January 1, 2007 to June 30, 2018.

f. **Employee Technology Use Policies:** Employee Technology Use Policies in effect since January 1, 2007 to June 30, 2018, including (if they exist) policies concerning use by employees of cellphones, notebook computers, and tablets for business purposes. Without intending to limit, such policies may go by the following names: bring-your-own device (BYOD) policies, choose-your-own-device (CYOD) policies, corporate-liable-employee-

---

[6] Plaintiffs do not agree that their employees' phone numbers or phone records have any relevance to the antitrust price-fixing conspiracy alleged in this Action.

7

owned (CLEO) policies, corporate-owned/personally enabled (COPE) policies, mobile-device-management (MDM) policies, and dual-use device policies.   Plaintiffs and Defendants will disclose if they have no such policies.

g. **Phone Records**:  Defendants will disclose if they have downloaded phone records from phone carriers and, if so, from which carriers they have downloaded such records, and the categories of phone records or specific phone numbers for which they have downloaded phone records.

h. **Inaccessible Data**: A list of known data sources, if any, likely to contain discoverable ESI that a party asserts is not reasonably accessible under Rule 26(b)(B) or Rule 26(b)(2)(C)(i).

i. **Prior Government Investigation Document Productions**: To the extent a Defendant produced documents to the United States Department of Justice in connection with its 2010-2012 investigation into Agri Stats, a duplicate copy of that production will be produced to plaintiffs in this litigation.

SO ORDERED.

Dated: _____              _____
                                  HILDY BOWBEER
                                  United States Magistrate Judge

EXHIBIT F



**U.S. Department of Justice**

Antitrust Division

*Liberty Square Building*

*450 5th Street, NW*
*Washington, DC 20001*

September 17, 2010

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Jon A. Bragalone, Esq.
Carson Boxberger LLP
1400 One Summit Square
Fort Wayne, IN 46802

     Re:    Agri Stats, Inc. – Civil Investigative Demands 26184 & 26185

Dear Mr. Bragalone:

     Enclosed with this letter is a Civil Investigative Demand ("CID") issued pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14, requiring your client, Agri Stats, Inc., to produce certain documents and answer certain interrogatories, and provide oral testimony as specified in the annexed Schedules. The CID seeks these materials as part of an Antitrust Division investigation into possible agreements to exchange competitively sensitive price and cost information in the broiler, turkey, egg, swine, beef and dairy industries.

     As noted on the CIDs, the due date for production of documentary material and interrogatory answers (CID No. 26185) is October 7, 2010. The date specified for oral testimony (CID No. 26184) is October 19, 2010. I would also like to call your attention to the certificate of compliance form printed on the reverse side of the CIDs. This certificate must be completed by all persons responsible for producing the documentary material called for by the CID and must accompany the documents you submit.

     As you will note, I am the designated Deputy Custodian. To minimize any inconvenience in complying with the CIDs and to assist us, we propose that you submit copies of all documents by mail or messenger to me at the Antitrust Division, 450 5th Street, N.W., Washington D.C. 20530. If you elect not to follow this procedure, please contact me immediately.

     This CID covers documents in Agri Stats's possession, custody or control, wherever the documents are located. Unless and until we notify you otherwise in writing, we will not seek to enforce the CID to compel the production of documents that were located outside the United States at the time you received the CID. However, in order to expedite the conclusion of the present investigation, the Department requests your cooperation in producing any such

AGSTAT-09342759

documents on a voluntary basis by the date specified in the CID, or as otherwise agreed in writing.

     If you have any questions regarding the CIDs, please contact me at (202) 307-2931.

                    Sincerely yours,

                    Kathleen S. O'Neill

Enclosure

2

Civil Investigative Demand—Documentary Material and Written Interrogatories

# United States Department of Justice

**Antitrust Division**
**Washington, DC 20530**

To:  Agri Stats, Inc.
6510 Mutual Dr.
Fort Wayne, IN 46825

Civil Investigative
Demand Number: **-26185**

This civil investigative demand is issued pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-1314, in the course of an antitrust investigation to determine whether there is, has been, or may be a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 by conduct, activities, or proposed action of the following nature: agreements to exchange competitively sensitive price and cost information in the broiler, turkey, egg, swine, beef and dairy industries.

You are required by this demand to produce all documentary material described in the attached schedule that is in your possession, custody, or control, and to make it available at your address indicated above for inspection and copying or reproduction by a custodian named below. You are also required to answer the interrogatories on the attached schedule. Each interrogatory must be answered separately and fully in writing, unless it is objected to, in which event the reasons for the objection must be stated in lieu of an answer. Such production of documents and answers to interrogatories shall occur on the _7th_ day of _October_, 20_10_ at 5:00 p.m.

The production of documentary material and the interrogatory answers in response to this demand must be made under a sworn certificate, in the form printed on the reverse side of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances relating to such production and/or responsible for answering each interrogatory.

For the purposes of this investigation, the following are designated as the custodian and deputy custodian(s) to whom the documentary material shall be made available and the interrogatory answers shall be submitted: Donna N. Kooperstein (custodian) and Kathleen S. O'Neill (deputy custodian), U.S. Dept. of Justice, Antitrust Division, Transportation, Energy, and Agriculture Section, 450 Fifth Street NW, Suite 8000, Washington, DC 20530.

Inquiries concerning compliance should be directed to Kathleen S. O'Neill at 202-307-2931.

Your attention is directed to 18 U.S.C. § 1505, printed in full on the reverse side of this demand, which makes obstruction of this investigation a criminal offense.

Issued in Washington, D.C., this __16th__ day of _September_, 20_10_.

*Assistant Attorney General*

AGSTAT-09342764

**18 U.S.C. § 1505. Obstruction of proceedings before departments, agencies, and committees**

Whoever, with intent to avoid, evade, prevent, or obstruct compliance, in whole or in part, with any civil investigative demand duly and properly made under the Antitrust Civil Process Act, willfully withholds, misrepresents, removes from any place, conceals, covers up, destroys, mutilates, alters, or by other means falsifies any documentary material, answers to written interrogatories, or oral testimony, which is the subject of such demand; or attempts to do so or solicits another to do so; or

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress -

Shall be fined under this title or imprisoned not more than five years, or both.

### Form of Certificate of Compliance\*

I/We have read the provisions of 18 U.S.C. § 1505 and have knowledge of the facts and circumstances relating to the production of the documentary material and have responsibility for answering the interrogatories propounded in Civil Investigative Demand No. _____. I/We do hereby certify that all documentary material and all information required by Civil Investigative Demand No. _____ which is in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted to a custodian named therein.

If any documentary material otherwise responsive to this demand has been withheld or any interrogatory in the demand has not been fully answered, the objection to such demand and the reasons for the objection have been stated in lieu of production or an answer.

Signature _____

Title _____

Sworn to before me this _____ day of

_____, 20___.

_____
Notary Public

\*In the event that more than one person is responsible for producing the documents and answering the interrogatories, the certificate shall identify the documents and interrogatories for which each certifying individual was responsible. In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided by 28 U.S.C. § 1746.

AGSTAT-09342765

### CIVIL INVESTIGATIVE DEMAND FOR DOCUMENTS AND INFORMATION

Unless modified by agreement with the staff of the Department of Justice, each specification of this Demand requires a complete search of "the company" as defined in Paragraph "A" of the Definitions and Instructions which appear after the following specifications. If the company believes that the required search or any other part of the Demand can be narrowed in any way that is consistent with the Department's need for documents and information, you are encouraged to discuss such questions and possible modifications with the Department representatives identified on the last page of this Demand. All modifications to this Demand must be agreed to in writing by those representatives.

## SPECIFICATIONS

1.    Submit a copy of each organization chart and personnel directory in effect since January 1, 2008 for the company as a whole and for each of the company's facilities or divisions involved in any activity relating to the provision of industry benchmarking services.

2.    Submit a copy of each benchmarking report generated by the company, and state when each report was distributed to participants.

3.    Submit all documents relating to any request by a participant for a grouping of comparative data, or for additions to or modifications of any industry benchmarking report, including any changes to the types or categories of data reported.

4.    For each industry for which the company generates and distributes benchmarking reports, provide a copy of each type of data submission (*e.g.*, daily, weekly, monthly) provided by each participant to Agri Stats in the past year.

5.    Identify each participant in the industry benchmarking services provided by the company and, for each participant, state: (a) the name and business contact information of the person responsible for providing data to Agri Stats; (b) the date of initial participation; (c) the reports for which the participant provides data; (d) the reports received by the participant; and (e) the name of the person at Agri Stats who is responsible for day-to-day interactions with the participant.

6.    Submit a copy of each contract or agreement with each participant relating to the company's provision of industry benchmarking services, including, but not limited to, any document that sets forth the scope or pricing of industry benchmarking services provided to each participant.

7.    Submit a copy of each manual, guide, map, chart, instructions, definitions or any other document provided by Agri Stats to participants to facilitate the provision of data to Agri Stats, or the interpretation of the benchmarking reports generated and distributed by Agri Stats.

1

AGSTAT-09342751

8.  Submit a copy of each manual, guide, map, chart, instructions, definitions or any other document used internally by Agri Stats personnel in connection with the company's generation or provision of industry benchmarking services.

9.  Describe any criteria, policies, business practices, or guidelines used by the company to preserve the confidentiality of participants, or prevent the identification of an individual participant's data, including, but not limited to, any parameters relating to the aggregation of data or the timeliness of the data reported, and submit all documents relating to any such criteria, policies, business practices or guidelines.

10. Submit all documents relating to communications with participants that relate to: (a) the purpose, use, benefits or value of the company's benchmarking services; (b) other Agri Stats participants; (c) geographic markets, regions or sub-regions used in any benchmarking report; or (d) speculation or predictions regarding future prices or costs of any product or service referenced in any benchmarking report.

11. Submit all documents relating to the company's efforts to obtain new participants, including, but not limited to, any communications with prospective participants regarding the purpose, use, benefits or value of participating in the company's benchmarking services, or any marketing, sales or promotional materials used by Agri Stats to obtain new participants.

12. Identify each person involved in the formation of the company, and describe that person's: (a) role in the formation of Agri Stats; (b) prior professional background; and (c) current professional title; and submit all documents, regardless of the date, relating to the formation of the company.

13. Describe any financial relationship between the company, or any current or former director, officer, employee or agent of the company, and any participant in the company's benchmarking services (*e.g.*, ownership, employment or equity interest).

14. Identify each person responsible for preparing your response to this Demand, and submit a copy of each instruction prepared by or on behalf of your company relating to the steps taken to respond to this Demand. Where oral instructions were given, identify the person who gave the instructions and describe the content of the instructions and the person(s) to whom the instructions were given. For each specification, identify the individual(s) who assisted in the preparation of the response, with a listing of the persons (identified by name and corporate title or job description) whose files were searched by each.

2

AGSTAT-09342752

## DEFINITIONS AND INSTRUCTIONS

For the purposes of this Demand, the following definitions and instructions apply:

A.  The terms "you," "the company," or "Agri Stats" mean Agri Stats, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any person in which the company holds at least a 25 percent interest, regardless of how the company's interest is measured (*e.g.*, number of shares, degree of control, board seats or votes).

B.  The term "discussing" when used to refer to documents means analyzing, constituting, summarizing, reporting on, considering, recommending, setting forth, or describing a subject. Documents that contain reports, studies, forecasts, analyses, plans, proposals, evaluations, recommendations, directives, procedures, policies, or guidelines regarding a subject should be treated as documents that discuss the subject. However, documents that merely mention or refer to a subject without further elaboration should not be treated as documents that discuss that subject.

C.  The term "documents" means all written, recorded, and graphic materials and all electronic data of every kind in the possession, custody, or control of the company. The term "documents" includes electronic correspondence, drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, and all duplicates of documents (whether or not identical) in the files of or in the files maintained on behalf of all directors, officers, managers, or other supervisory employees, duplicates of documents in all other files that are not identical duplicates of the originals, and duplicates of documents the originals of which are not in the possession, custody, or control of the company. The term "documents" includes spreadsheets, as well as underlying cell formulae and other codes. The term "documents" also includes electronic mail messages and other documents and data stored in, or accessible through, computer or other information retrieval systems, such as personal computers, portable computers, workstations, minicomputers, personal data assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, portable or removable storage media, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of online or offline storage, whether on or off company premises. Unless otherwise specified, the term "documents" excludes bills of lading, invoices in non-electronic form, purchase orders, customs declarations, and other similar documents of a purely transactional nature and also excludes architectural plans and engineering blueprints.

D.  The terms "and" and "or" have both conjunctive and disjunctive meanings.

3

AGSTAT-09342753

E. The term "identify" means to state:

    (a)    in the case of a person other than a natural person, its name, principal address, telephone number, and the name of its chief executive officer; and

    (b)    in the case of a natural person, his or her name, current employer, business address, business telephone number, and title or position (and if he/she is a former employee of the company, the date that he/she ended employment with the company, and last known business address and telephone number).

F. The term "participant" means any person who provides data to or receives data from Agri Stats in connection with the company's provision of industry benchmarking services.

G. The term "person" includes the company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

H. The term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

I. All references to year refer to calendar year. Unless otherwise specified, each specification that calls for documents requires the company to submit all responsive documents that were created or received by the company after the date that is two (2) years prior to the date of the issuance of this Demand. Where information, rather than documents, is requested, provide it separately for each year. Where yearly data is not yet available, provide data for the calendar year to date. If calendar year information is not available, supply the company's fiscal year data indicating the twelve-month period covered, and provide the company's best estimate of calendar year data.

J. <u>The response to this Demand shall be submitted in the following manner:</u>

    (1)    Documents produced shall be complete and, unless privileged, unredacted, submitted as found in the company's files (*e.g.*, documents that in their original condition were stapled, clipped, or otherwise fastened together, or maintained in separate file folders, shall be produced in such form). Documents submitted shall be produced in the order in which they appear in the company's files and shall not be shuffled or otherwise rearranged.

    (2)    The company may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents.

    (3)    Unless otherwise requested by a Department representative, electronic documents (*e.g.*, e-mail) and data shall be produced in electronic form only. Electronic documents and data shall be produced in a format that allows the Department to access and use them, together with instructions and all other materials necessary to use or interpret the data, including record layouts and data dictionaries. For data submitted electronically, submit a description of the data's source. For

AGSTAT-09342754

documents and data submitted electronically, each electronic media device must be labeled so as to identify the contents of that media device. For electronic media containing electronic documents, the label must state which custodians' documents are contained on the device and the document control numbers of those documents.

(4) Mark each page of each document submitted – whether in hard-copy or electronic format – with corporate identification and consecutive document control numbers. Place all documents produced in hard-copy format in file folders. Mark each file folder with the company's corporate identification, the name of the person whose documents are in the folder and how the original file was labeled. If the company submits hard copies of electronic documents that have been printed from a common electronic source, such as a central e-mail or document server or a backup disk, such documents must be submitted in file folders that are marked with (a) a description of the enclosed documents' electronic source (*e.g.*, "Documents from Backup Tape No. 3 for E-mail Server XYZ, 3/1/06 - 3/31/06"); and (b) the name of each natural person whose electronic documents are contained in that file folder.

(5) In lieu of searching backup tapes or other media that are not reasonably accessible, but that may contain information responsive to this Demand, the company may elect to identify and preserve for the duration of the Department's investigation a select subset of such backup tapes and other media, such subset to be approved in writing by Department representatives. In the event that Department representatives determine in their sole discretion that a search of the select subset of backup tapes and other media is necessary, they shall so inform the company, which will be required to conduct a review of the subset and produce any responsive information contained therein.

(6) Hard-copy documents shall be submitted in sturdy boxes not larger than 1.5 cubic feet. Number each box and mark each box with corporate identification and the name(s) of the person(s) whose files are contained in that box.

(7) Provide any index of documents prepared by any person in connection with your response to this Demand. If the index is available in electronic form, provide it in that form.

(8) If you intend to utilize any de-duplication software or services when collecting or reviewing information that is stored in the company's computer systems or electronic storage media in response to this Demand, or if the company's computer systems contain or utilize such software, you must contact the attorneys for the government to determine, with the assistance of the appropriate government technical staff, whether and in what manner the company may use such software or services.

AGSTAT-09342755

K.      Before you prepare documents or information for production in electronic form (for example, before you attempt to copy, for your response to this Demand, documents or information from an electronically stored source onto a disk or other electronic storage medium), you must contact a Department representative to arrange a meeting or conference call with the company's personnel who are familiar with the electronic files in which the documents or information are stored, to explain to Department representatives the manner in which the documents or information are stored, and the types of information that are available on the electronic source. Department representatives must approve the format and production method for electronic data in advance of the submission by the company of its response to this Demand.

L.      If search terms were used to conduct all or any part of the search, provide a list of search terms used, along with a glossary of industry and company terminology. In addition, describe the search methodologies and the applications used to execute the search.

M.      Any documents that are withheld in whole or in part from production based on a claim of privilege shall be assigned document control numbers (with unique consecutive numbers for each page of each document); for purposes of this instruction, each attachment to a document shall be treated as a separate document and separately logged, if withheld, and cross referenced, if produced. The company shall also provide a statement of the claim of privilege and all facts relied upon in support of the decision to withhold each document, in the form of a log that conforms with the requirements set forth below. The company is encouraged to propose categorical limitations to exclude certain classes of privileged documents from its log.

(1)     For each document identified on the company's privilege log, state:

a.      the document's control numbers;

b.      all authors of the document;

c.      all addressees of the document;

d.      all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

e.      the date of the document;

f.      a description of the subject matter of the document;

g.      the nature or type of the privilege that the company is asserting for the document (*e.g.*, "attorney-client privilege");

h.      the specification(s) of this Demand to which the document is responsive;

6

AGSTAT-09342756

i.  the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

j.  whether the document has been produced in redacted form, and if so the range of the control numbers for the document.

(2) The company's privilege log shall also conform with all of the following requirements:

a.  Provide a separate legend containing the full name, title(s), and employer or company affiliation of each author, addressee, and recipient identified on the company's privilege log.

b.  All attorneys acting in a legal capacity with respect to the withheld document or communication, and only such attorneys, shall be identified on the privilege log with an asterisk.

c.  The description of the subject matter of each document shall describe the nature of the document in a manner that, though not revealing information that is itself privileged, provides sufficiently detailed information to enable the Department to assess the applicability of the privilege claimed.

d.  For each document withheld under a claim that it constitutes or contains attorney work product, also state whether the company asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based.

e.  Produce all nonprivileged portions of any responsive document (including nonprivileged or redactable attachments) for which a claim of privilege is asserted, except where the only nonprivileged information in the document has already been produced. Note where any redactions in the document have been made.

f.  The privilege log shall be produced in both hard-copy and electronic form, the electronic form of which shall be both searchable and sortable.

g.  Documents sent solely between counsel for the company, including in-house counsel acting solely in a legal capacity, and documents authored by the company's outside counsel that were not directly or indirectly furnished to any third party, such as internal law firm memoranda, may be omitted from the privilege log. However, any attachments to such documents must be included on the privilege log (if a privilege is applicable to such materials), unless such attachments are addressed and sent solely to counsel.

7

AGSTAT-09342757

N.    If the company is unable to answer any question fully, supply such information as is available. Explain why such answer is incomplete, the efforts made by the company to obtain the information, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the company to make an estimate, provide an explanation.

O.    If documents responsive to a particular specification no longer exist for reasons other than the ordinary course of business or the implementation of the company's document retention policy, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the specification(s) to which they are responsive, and identify persons having knowledge of the content of such documents.

P.    In order for the company's response to this Demand to be complete, the certification on the reverse of the Civil Investigative Demand form must be executed by the official supervising compliance with this Demand, notarized, and submitted along with the responsive materials.

Any questions you have relating to this Demand, including questions regarding its scope or meaning, or suggestions for possible modifications thereto should be directed to Kathleen S. O'Neill at (202) 307-2931. To submit documents to the Department of Justice in response to this Demand, address them to the attention of Kathleen S. O'Neill and deliver them to 450 Fifth Street N.W., Suite 8604, Washington, DC 20530 between 8:30 a.m. and 5:00 p.m. on any business day on or before the date of production specified on the Civil Investigative Demand form. To submit your response by United States mail, please call the staff listed above for mailing instructions.

AGSTAT-09342758