```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
      -----------------------------------------------------------
 3                                  )
      In Re: Pork Antitrust         )   File No. 18-cv-1776
 4    Litigation                    )           (JRT/HB)
                                    )
 5                                  )
                                    )   Saint Paul, Minnesota
 6                                  )   November 21, 2018
                                    )   9:30 a.m.
 7                                  )
                                    )
 8                                  )
      -----------------------------------------------------------
 9
                   BEFORE THE HONORABLE HILDY BOWBEER
10            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                 (MOTIONS HEARING and STATUS CONFERENCE)
11
      APPEARANCES
12    For Direct Purchaser      LOCKRIDGE GRINDAL NAUEN PLLP
      Plaintiffs:               BRIAN D. CLARK, ESQ.
13                              ELIZABETH R. ODETTE, ES.
                                ARIELLE WAGNER, ESQ.
14                              STEPHANIE A. CHEN, ESQ.
                                100 Washington Avenue South
15                              Suite 2200
                                Minneapolis, Minnesota
16                              55401-2179

17                              PEARSON, SIMON & WARSHAW
                                MELISSA S. WEINER, ESQ.
18                              800 LaSalle Avenue
                                Suite 2150
19                              Minneapolis, Minnesota 55402

20    On behalf of the          GUSTAFSON GLUEK PLLC
      Consumer Indirect         DANIEL E. GUSTAFSON, ESQ.
21    Plaintiffs:               BRITTANY N. RESCH, ESQ.
                                120 South Sixth Street
22                              Suite 2600
                                Minneapolis, Minnesota 55402
23
                                HAGENS BERMAN SOBOL SHAPIRO
24                              SHANA E.  SCARLETT, ESQ.
                                715 Hearst Avenue
25                              Suite 202
                                Berkeley, California 94710
```

```
 1    For Defendant Triumph    HUSCH BLACKWELL
      Foods:                   VOLLIS GENE SUMMERLIN, JR., ESQ.
 2                             13330 California Street
                               Suite 200
 3                             Omaha, Nebraska 68154

 4    For Defendant JBS USA:   FELHABER LARSON
                               DONALD G. HEEMAN, ESQ.
 5                             JESSICA J. NELSON, ESQ.
                               220 South Sixth Street
 6                             Suite 2200
                               Minneapolis, Minnesota 55402
 7
                               QUINN EMANUEL URQUHART &
 8                             SULLIVAN
                               SAMI H. RASHID, ESQ.
 9                             51 Madison Avenue
                               22nd Floor
10                             New York, New York 10010

11    For Defendant            GIBSON, DUNN & CRUTCHER
      Smithfield Foods:        RICHARD G. PARKER, ESQ.
12                             1050 Connecticut Avenue NW
                               Washington, DC 20036
13
                               GIBSON, DUNN & CRUTCHER
14                             BRIAN EDWARD ROBISON, ESQ.
                               2100 McKinney Avenue
15                             Suite 1100
                               Dallas, Texas 75201
16

17    For Defendant Tyson      DYKEMA GOSSETT, PLLC
      Foods:                   DAVID P. GRAHAM, ESQ.
18                             400 Wells Fargo Center
                               90 South Seventh Street
19                             Minneapolis, Minnesota 55402

20    (By Telephone)           AXINN VELTROP & HARKRIDER LLP
                               TIFFANY RIDER ROHRBAUGH, ESQ.
21                             RACHEL JOHANNA ADCOX, ESQ.
                               950 F Street NW
22                             Washington, DC 2000

23

24

25
```

```
 1        For Defendant Clemens      GREENE ESPEL PLLP
          Food Group:                MARK L. JOHNSON, ESQ.
 2                                   222 South 9th Street
                                     Suite 2200
 3                                   Minneapolis, Minnesota 55402

 4                                   KIRKLAND & ELLIS, LLP
                                     CHRISTINA HENK BRIESACHER, ESQ.
 5                                   300 North Lasalle Street
                                     Chicago, Illinois 60654
 6
          For Defendant Seaboard     STINSON LEONARD STREET, LLP
 7        Foods LLC:                 JON M. WOODRUFF, ESQ.
                                     WILLIAM L. GREENE, ESQ.
 8                                   50 South Sixth Street
                                     Suite 2600
 9                                   Minneapolis, Minnesota 55402

10        For Defendant Hormel       FAEGRE BAKER DANIELS, LLP
          Foods:                     ISAAC B. HALL, ESQ.
11                                   CRAIG S. COLEMAN, ESQ.
                                     90 South Seventh Street
12                                   Suite 2200
                                     Minneapolis, Minnesota 55402
13
          For Defendants Indiana     DORSEY & WHITNEY, LLP
14        Packers and Mitsubishi:    JAIME STILSON, ESQ.
                                     50 South Sixth Street
15                                   Suite 1500
                                     Minneapolis, Minnesota 55402
16
          (By Telephone)             MAYER BROWN, LLP
17                                   BRITT M. MILLER, ESQ.
                                     71 South Wacker Drive
18                                   Chicago, Illinois 60606

19        For Defendant              LARKIN HOFFMAN DALY & LINDGREN
          Smithfield:                JOHN A. COTTER, ESQ.
20                                   8300 Norman Center Drive
                                     Suite 1000
21                                   Minneapolis, Minnesota 55437

22        For Defendant Agri         HOGAN LOVELLS US, LLP
          Stats:                     JUSTIN BERNICK, ESQ.
23        (By Telephone)             WILLIAM LEITZSEY MONTS, III, ESQ
                                     555 13th Street NW
24                                   Washington, DC 20004

25
```

1     For Defendant JBS USA        QUINN EMANUEL URQUHART &
      (By Telephone)               SULLIVAN, LLP
2                                  STEPHEN R. NEUWIRTH, ESQ.
                                   123 Overlook Road
3                                  New Rochelle, New York 10804

4     Court Reporter:             CARLA R. BEBAULT, RMR, CRR, FCRR
                                   316 North Robert Street
5                                  Suite 146 U.S. Courthouse
                                   Saint Paul, Minnesota 55101

6

7

8

          Proceedings recorded by mechanical stenography;
9     transcript produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **P R O C E E D I N G S**

2              **IN OPEN COURT**

3

4           THE COURT:  Thank you for being patient this

5    morning.  I'll undertake to get these conferences going more

6    on time as we proceed in the future.  We've got quite a

7    gathering today and I understand we've got quite a few on

8    the phone as well.  What I'm going to do is I think we've

9    got a handheld mic available; is that right?  Yes, we do.

10   We're going to take appearances first.  So first let me call

11   the case.

12           This is In Re: Pork Antitrust Litigation.  The

13   proceedings are being docketed under the case number

14   18-cv-1776.  We're here for a status conference but also for

15   a hearing on Defendants' Motion to Stay Discovery which is

16   at Docket Number 193.  So let me get appearances first for

17   the Plaintiffs.

18           MR. GUSTAFSON:  Good morning, Your Honor.  Dan

19   Gustafson from Gustafson Gluek on behalf of Plaintiffs.

20           MS. RESCH:  Good morning, Your Honor.  Brittany

21   Resch from Gustafson and Gluek on behalf of the Consumer

22   Indirect Plaintiffs.

23           THE COURT:  And I ask everybody to speak slowly.

24   We've got a court reporter who doesn't recognize everybody

25   yet and is new to the case, and may not be the same court

1    reporter who is here in the future, so keep it slow and keep

2    your voice up.

3              MS. WEINER:  Good morning, Your Honor.  Melissa

4    Weiner, Pearson, Simon & Warshaw here in Minneapolis, for

5    the Plaintiffs as well.

6              MR. CLARK:  Brian Clark, Lockridge Grindal Nauen,

7    on behalf of the Direct Purchaser Plaintiff class.

8              MS. SCARLETT:  Shana Scarlett from Hagens Berman

9    on behalf of the Consumer Indirect Purchaser Plaintiffs.

10             THE COURT:  And is anyone in the audience here and

11   making an appearance on behalf of the Plaintiffs?  Okay.

12             MS. ODETTE:  Elizabeth Odette on Behalf of Direct

13   Purchaser Plaintiffs.

14             MS. WAGNER:  Arielle Wagner at Lockridge Grindal

15   Nauen on behalf of Direct Purchaser Plaintiffs.

16             MS. CHEN:  Stephanie Chen at Lockridge Grindal

17   Nauen on behalf of Direct Purchaser Plaintiffs.

18             THE COURT:  Is there anyone on the phone who

19   intends to make an appearance, and by that I mean who

20   intends to actually speak to any of the issues today on

21   behalf of any of the Plaintiffs' groups?

22             Apparently not.

23             All right.  Let's go on with the Defendants.

24             MR. SUMMERLIN:  Gene Summerlin with Husch

25   Blackwell on behalf of Triumph Foods.

 1              MR. HEEMAN:  Good morning, Your Honor.  Donald

 2      Heeman, Felhaber Larson, on behalf of the JBS Defendants.

 3              MR. PARKER:  Richard Parker on behalf of

 4      Smithfield.

 5              MR. RASHID:  Good morning, Your Honor.  Sami

 6      Rashid from Quinn Emanuel on behalf of the JBS Defendants.

 7              MR. JOHNSON:  Good morning, Your Honor.  Mark

 8      Johnson, Greene Espel, for the Clemens Defendants.

 9              MS. BRIESACHER:  Good morning, Your Honor.

10      Christina Briesacher on behalf of the Clemens Defendants.

11              THE COURT:  And to the audience.

12              MR. ROBISON:  Good morning, Your Honor.  Brian

13      Robison with Gibson Dunn for the Smithfield Defendant.

14              MR. WOODRUFF:  Good morning, Your Honor.  Jon

15      Woodruff on behalf of the Seaboard Defendants.

16              MR. GREENE:  Good morning, Your Honor.  William

17      Greene, Stinson Leonard Street, for Defendant Seaboard

18      Corporation and Seaboard Foods.

19              MR. COLEMAN:  Good morning.  Craig Coleman from

20      Faegre Baker Daniels on behalf of the Hormel Defendants.

21              MR. HALL:  Good morning.  Isaac Hall from Faegre

22      Baker Daniels on behalf of the Hormel Defendants.

23              MR. COTTER:  Good morning, Your Honor.  John

24      Cotter from Larkin Hoffman on behalf of Smithfield.

25              MR. GRAHAM:  David Graham from Dykema Gossett on

1      behalf of the Tyson Defendants.

2              MS. NELSON:  Good morning, Your Honor.  Jessica

3      Nelson from Felhaber Larson on behalf of the JBS Defendants.

4              MS. STILSON:  Good morning, Your Honor.  Jaime

5      Stilson on behalf of the Indiana Packers and Mitsubishi

6      Defendants.

7              THE COURT:  And let me ask whether there's anyone

8      on the phone who anticipates or who may want to reserve the

9      opportunity for a speaking role today?

10             MS. MILLER:  Good morning, Your Honor.  This is

11     Britt Miller of Mayer Brown on behalf of the Indiana Packers

12     Corporation and Mitsubishi Corporation America.

13             MR. NEUWIRTH:  Good morning, Your Honor.  This is

14     Stephen Neuwirth from Quinn Emanuel for the JBS Defendants.

15             MR. BERNICK:  Good morning.  This is Justin

16     Bernick from Hogan Lovells on behalf of Agri Stats.

17             MR. MONTS:  And William Monts, Your Honor, on

18     behalf of Agri Stats, also from Hogan Lovells.

19             MS. ROHRBAUGH:  Good morning, Your Honor.  This is

20     Tiffany Rider Rohrbaugh and Rachel Adcox from Axinn Veltrop

21     & Harkrider, on behalf of the Tyson Defendants.

22             THE COURT:  Anyone else who wants to make an

23     appearance today?

24             All right.  I'll just remind the folks on the

25     phone to keep your phones on mute when you aren't going to

1   be speaking and that will make sure we don't get any kind of

2   interference with our ability to hear what's going on here

3   in the courtroom.

4           We've got a couple of things on the docket this

5   morning.  One is the Defendants' Motion to Stay Discovery.

6   The other is a status conference that we had scheduled in

7   any event.

8           I've reviewed the papers submitted by the parties

9   as to both of those tasks, and my inclination is to start

10  with the Motion to Stay and then segue to the status

11  conference unless anybody suggests that that isn't quite the

12  logical way to proceed.  All right.  That looks like

13  everybody is in agreement.  So who is going to be arguing

14  Defendants' Motion to Stay?

15          MS. BRIESACHER:  I am, Your Honor, Christina

16  Briesacher.

17          THE COURT:  All right.  Please come forward.

18          MS. BRIESACHER:  May I begin?

19          THE COURT:  Yes.

20          MS. BRIESACHER:  The Supreme Court in *Twombly* has

21  cautioned that antitrust discovery is particularly

22  burdensome.  Costs can increase quickly and become extremely

23  high.  Even a cursory review of the requests for production

24  that Plaintiffs have served proves that this case will be no

25  exception.  Indeed, you know, this case involves three

1  putative classes, sixteen Defendants from nine corporate

2  families.  And the allegations span nearly twelve years.  As

3  a result, courts, including the Eighth Circuit and the

4  District Court here, have heeded the Supreme Court's words

5  of caution and declined to open the floodgates of discovery

6  prior to Plaintiff satisfying their initial pleading

7  burdens.

8        These and other cases recognize that a limited

9  stay in discovery is important to resolve gating issues

10  raised at the outset of litigation that will not only

11  prevent burdensome and potentially unnecessary discovery and

12  expenses, it will also serve judicial economy.

13        Now, the Defendants here are not seeking a full

14  stay of discovery.  In fact, there are certain items that we

15  have agreed to proceed with pending the Motions to Dismiss,

16  and these include the initial -- serving initial

17  disclosures, serving readily accessible org charts, which we

18  will do in I think less than two weeks now, and negotiating

19  the ESI protocol and protective order that we have done and

20  submitted a few discrete issues to the Court.  These actions

21  will help facilitate discovery if it becomes necessary

22  without opening kind of the floodgates of discovery, running

23  afoul of what *Twombly* cautioned against.

24        Plaintiffs' requests, on the other hand, although

25  styled as threshold tasks, will cause Defendants significant

1    undue burden and will create inefficiencies not only for the

2    parties but also for the Court.  Each of the factors that

3    courts have considered in determining whether to stay

4    discovery, including a quick peek at the merits, burden to

5    Defendants, potential prejudice to Plaintiffs and judicial

6    economy, all weigh in favor of a stay here.

7            Now, I'd like to turn now to the six items that

8    are in dispute today and discuss those in more detail.

9            THE COURT:  And in particular as you go through

10   those, I'd like to understand better, because I don't

11   have -- I don't have a lot in your brief about specifically

12   what the burden is.  I mean, I understand as a general

13   matter that if Judge Tunheim were to grant the motions in

14   their entirety then none of this would be necessary.

15           MS. BRIESACHER:  Right.

16           THE COURT:  But we are crossing that particular

17   bridge and saying yes, it makes sense to do certain

18   foundational things.  The question is how much of that.  So

19   I would like to understand better your argument about burden

20   with respect to some of these because if the cases or some

21   part of them do survive the Motions to Dismiss, I think it's

22   in everyone's interest to be poised and ready to get off the

23   mark, so...

24           MS. BRIESACHER:  Right, yes.  So the first item,

25   which is number one on Plaintiffs' list, is something that

1   they call ESI disclosures.  And really what these ESI

2   disclosures are are broad interrogatories and requests for

3   production seeking kind of discovery about discovery type

4   information spanning nearly 12 years.  So they include kind

5   of lists of individuals that worked in a variety of

6   positions, including in some instances their assistants and

7   secretaries over the past 11 years; office fax and cell

8   phone numbers for all these individuals that are identified;

9   non-custodial data sources and inaccessible data sources

10   that are likely to contain, quote, discoverable material all

11   over the last 11 years, and other types of requests for

12   documents.

13        Now, we assert that these ESI disclosures should

14   be stayed because they will be unduly burdensome for the

15   Defendants.  They would involve the digging through

16   information and historical systems that are a decade old to

17   locate the requested information.  To determine what may be

18   accessible versus inaccessible requires work by our clients,

19   by the attorneys, by vendors, all of which is expensive and

20   may ultimately be unnecessary.

21        The outcomes of the Motions to Dismiss further

22   could have a significant impact on the information that

23   needs to be identified here even if they are not granted in

24   their entirety.  For example, individual defendants may be

25   dismissed and the relevant time period may be significantly

1    reduced, which would obviate the need to disclose much of

2    what the Plaintiffs requested.  You know, trying to identify

3    systems over the past nearly 12 years and figure out what's

4    accessible and inaccessible is a vastly different exercise

5    than doing it over the last few years.

6         Finally, they have a last item in their ESI

7    disclosures that they call prior government investigation

8    document productions, and that is something that they have

9    asked for that appears in three of the six disputed items on

10   the list and I will address that shortly.

11        Plaintiffs kind of also are requesting

12   negotiations of Rule 34 requests for production and

13   negotiating documents and custodians, and this is number

14   five and number six on their list.  For each of these tasks,

15   in order to even begin negotiating responses to requests for

16   production you need to go kind of far down the road to

17   understanding what data exists, how it's stored, what's

18   available, what can be reasonably collected, and all within

19   taking into account the bounds of proportionality.

20        The Sedona Principles further recognized that

21   determining what is relevant and proportional under the

22   circumstances is a highly fact-specific question.  Even this

23   process to determine appropriate responses to discovery

24   requests will take a significant amount of time and our

25   client's time, especially for the types of requests that are

1    as broad as those that Plaintiffs have served.  And all of

2    this time and resources are even before you get to the stage

3    of meeting with the Plaintiffs, kind of meeting and

4    conferring, negotiating and taking disputes to the Court.

5          Kind of second, you know, all of this is a little

6    bit like putting the cart before the horse.  Forcing the

7    Defendants to respond now will create significant

8    inefficiencies for the parties and the Court.  So what the

9    Defendants will be left to do is caveat all of their

10   responses, trying to determine what might be relevant

11   following the Motions to Dismiss.

12         So the responses, for example, will say, We'll

13   produce X, you know, assuming this is relevant when the

14   Motions to Dismiss really come out; assuming that it's not

15   going to be too burdensome to collect once we actually go

16   and try and pull the requested information; assuming this is

17   all within the bounds of proportionality once we see what

18   the Court does on the rulings for the Motions to Dismiss.

19         And so what's going to end up happening is that

20   once we do get a ruling, even if the Motions to Dismiss are

21   denied, and in particular if some part of them are granted,

22   is the Defendants are going to have to go through and redo

23   all of their responses to say what they actually will

24   produce in light of the ruling.

25         Discovery, and especially discovery in antitrust

1    matters, is expensive enough without having to do things

2    twice.  In addition, identifying document custodians and

3    data system is further keyed off discovery requests and

4    responses, which in turn is keyed off what claims are

5    remaining, what defendants are remaining, and what the

6    relevant time period of the remaining case will be.

7          For example, you know, like I've stated,

8    negotiating custodians and databases that will be produced

9    in this case is going to be vastly different depending on

10   whether the case spans 12 years or it spans kind of less

11   than that, 4 years or fewer.  And in order to negotiate what

12   systems might be in play in this case, the devil is really

13   in the details.  It is a significant undertaking to

14   understand how data could be collected, what might be

15   exported, what's available, and what's been within the

16   bounds of proportionality.  Having to undertake ESI

17   disclosures, RFP responses, and identifying custodians and

18   systems now is really the exact type of burdensome discovery

19   that *Twombly* and other cases warn against.

20         The next two items on the Plaintiffs' list, kind

21   of one, which is number three on their list, is the Rule

22   26(f) report and the Rule 16 conference.  Now, this item

23   should be stayed because it's really just inefficient to set

24   out a schedule for the case before you know the scope of the

25   case.  Even if the case is dismissed in part, kind of the

1     relevant time period and the remaining Defendants will have

2     a significant impact on portions of the 26(f) report.  Kind

3     of even as just one example, the number of depositions in

4     the case could vary considerably depending on the number of

5     Defendants that remain in the case and the relevant time

6     period in the case.

7           Absent a stay here, we risk trying to negotiate in

8     a vacuum.  We risk taking disputes to the Court in a vacuum

9     without knowing kind of the most critical fact, which is the

10    scope of case.  These disputes further, you know,

11    essentially become unresolvable until we know kind of what

12    the path of the case will take following the Motions to

13    Dismiss rulings.  We also, again, we risk inefficiencies for

14    the parties and for the Court having to renegotiate key

15    parts of the Rule 26(f) report following the rulings on the

16    Motion to Dismiss.

17          Now, what the Defendants have done here is we have

18    already agreed to do the portions of the Rule 26(f) report

19    that kind of make sense at this stage.  So we're doing the

20    initial disclosures, which I think is I believe (c)(1) of

21    the template that is used in this district.  We're already

22    doing the protective order, the ESI protocol, we've talked

23    about privilege which is encompassed in the protective

24    order.  So those are the things that make sense to do that

25    are not going to be things we have to redo once we get a

1    Motion to Dismiss ruling, but really the rest of it is going

2    to be inefficient for the parties and the Court to set out

3    before the Motion to Dismiss ruling.

4         THE COURT:  Let me ask, one of the things -- and I

5    think it's primarily related to category one or task one of

6    the tasks that Plaintiffs have proposed ought to go forward.

7    And if I am reading the papers correctly, it looks like

8    they've proposed to you an order that's modeled to some

9    extent, to a fair extent on the order that the magistrate

10   judge entered in the *Broiler Chicken* case.  And I'm looking

11   particularly at Exhibit E to I think it is Mr. Clark's

12   affidavit, and the Docket Number is 205-2, and it goes

13   through and lists a number of things that I believe the

14   magistrate judge in the *Broiler Chicken* case had --

15   Magistrate Judge Gilbert, I believe, had also found

16   appropriate as -- and I'm not saying I'm mapping to that but

17   I'm interested in this particular proposed order and

18   understanding better why some or all of what's contemplated

19   here shouldn't happen sooner rather than later.

20        For example, item A on page 2 is org charts, and I

21   don't know whether your agreement to provide readily

22   available org charts essentially covers A or whether what

23   you're agreeing to do is somewhat more restricted than that.

24   So could you walk -- taking this as a template, could you

25   walk through for me and tell me what your -- what your

1   agreement encompasses and where it -- and where you're

2   departing from this, tell me a little more about why it

3   would be unduly burdensome to do it now rather than later.

4        MS. BRIESACHER:  Yes.  Your Honor, I think kind of

5   walking through the ESI disclosure, so the first part on org

6   charts, I mean what they call org charts, I mean is really

7   they've got specific titles and specific roles that they are

8   seeking information about over the last kind of 11 years.

9   Not only on a variety of different positions but also

10  information on phone numbers, cell phone, fax and business

11  phone that have been used over the last years.

12        What Defendants have agreed to provide is kind of

13  the relevant org charts that are readily accessible.  These

14  are going to require kind of a significant amount more

15  detail than what Defendants are going to produce here.  And

16  trying to kind of dig out who might have been in a variety

17  of the different positions over the last kind of 12 years is

18  really an exercise that is going to become burdensome for

19  the Defendants, particularly if, you know, some of this

20  might not be required, particularly if the relevant time

21  period shrinks.  You know, trying to go dig out who might

22  have been in a variety of different roles over the last 12

23  years is a different task than, for example, who might have

24  been in a variety of the roles for 4 years.

25        So I think the difference is we're kind of pulling

1    what's readily accessible, which it's going to be

2    defendant-by-defendant specific, but should cover, I would

3    say, a good portion of what Defendants [sic]  are seeking.

4    But they are requiring kind of an additional level of

5    specificity here that will escalate costs and become

6    burdensome for the Defendants.

7           On the kind of phone directories which I've hit

8    on, you know, I think it depends on the Defendants whether

9    their org charts include some sort of phone directory.  But

10   if they don't, you know, trying to go through and figure out

11   what those phone numbers are at this stage when it might not

12   be required down the road is going to be kind of, again,

13   something that is burdensome for the Defendants,

14   particularly, you know, with cell phone numbers, fax numbers

15   and office numbers that might have changed over the years.

16          For e-mail systems, you know, the identification

17   of e-mail systems and version numbers is, again, you know, I

18   think a lot of our clients probably have changed e-mail

19   systems over the years and trying to figure out what the

20   e-mail system is historically going back 12 years is another

21   task that we think is going to create some undue burden at

22   this stage of the case, and really I don't think it's going

23   to get us -- it's not going to get us very far.

24          And then really I think the non-custodial data

25   sources, which is D, I believe, and then inaccessible data

1    sources, I think are really where a lot of the burden is

2    going to come into play.  You know, although Defendants are

3    fully complying with all of our preservation obligations,

4    what Plaintiffs propose here is really kind of a different

5    animal.  Trying to figure out what exact data is on these

6    systems.

7         For the legacy systems, you know, it's a

8    relatively simple task to ensure that legacy systems and

9    back-up tapes are preserved, but it's different to try and

10   go in and figure out what data exists on those systems,

11   whether we think it's going to be discoverable, and then

12   determining whether we're going to be able to get any

13   information out of there so we know if it's going to be an

14   inaccessible system data source or something that we think

15   is going to be discoverable.

16        And, frankly, what is discoverable in this case is

17   going to turn on what happens to the Motions to Dismiss.  So

18   this is really an exercise that is kind of too soon to do

19   before we know the full scope of the case.  And then, again,

20   with kind of turning to the policies again, kind of pulling

21   the policies over the last 11 years may not be necessary if

22   this case is significantly reduced in time, and phone

23   records as well.

24        The last category is the prior government

25   investigation documents.  And this is something that wasn't

1       in the *Broiler's* order but appears in the order that

2       Plaintiffs are seeking here.  And here, as I mentioned, this

3       request really appears at three of the six disputed

4       categories.  It's included in the ESI disclosures.  It's a

5       standalone kind of request, it's number four on their list,

6       but they have also served requests for production asking for

7       these same documents.  And here --

8                   THE COURT:  But they are not maintaining that the

9       requests for production in and of themselves ought to be

10      responded to.  Their requests with respect to the requests

11      for production is to negotiate the scope of production.

12                  MS. BRIESACHER:  Correct.

13                  THE COURT:  And I realize you've got a separate

14      objection about that.  But my understanding is nobody is

15      here arguing that a part of -- that they are looking for a

16      decision from me that you will move forward with actually

17      producing, searching for and producing documents in

18      response.

19                  MS. BRIESACHER:  That's correct, yes.  I think

20      we're in agreement that that won't happen, but even kind of

21      this first step of beginning to negotiate, you're still

22      going to have to go kind of all the way down the path as if

23      you're responding.  You can't negotiate if you don't know

24      what data might exist, what data might be responsive, what

25      we think is going to be proportional to the needs of the

1    case, what we think is going to be relevant.  So even

2    negotiating requires Defendants to basically get all the way

3    there as if we were responding.

4          Okay.  So turning back to the requests for DOJ

5    documents, it's kind of inappropriate to just require a

6    wholesale production of those documents now.  First, as we

7    mentioned in our brief, the pork processor defendants have

8    no documents that are responsive to this request relating to

9    pork products.  For Agri Stats, you know, this is a long

10   dead investigation.  It was closed without action six years

11   ago.  The documents are preserved.  There's, you know,

12   Plaintiffs have shown no reason why they need these

13   documents now.

14         And kind of finally, and most significant, there

15   are going to be relevance issues with this set of documents

16   that were not present in *Broilers*.  Kind of a quick preview

17   is the document productions here have primarily focused on

18   the chicken industry so there are going to be relevance

19   considerations to whether, you know, some or all or a

20   portion of these documents are going to be relevant in this

21   case.  Kind of given the relevance concerns, it makes more

22   sense to have these go through normal course discovery

23   requests, you know, an opportunity to respond and object, to

24   bring any disputes to the Court about relevance rather than

25   just require kind of a wholesale production now where these

1    relevance concerns don't have an opportunity to be

2    addressed.

3               THE COURT:  Do we have a sense of the volume of

4    that production?

5               MS. BRIESACHER:  You know, I don't have a sense of

6    how voluminous it is, but I do know Agri Stats' counsel is

7    on the phone and they are kind of available, I'm sure, to

8    answer that question if you would like.

9               THE COURT:  Counsel for Agri Stats, and I will ask

10   you to identify yourself again on the phone, but are you

11   able to -- do you know approximately the size of the

12   production that was made to DOJ?

13              MR. BERNICK:  Your Honor, this is Justin Bernick

14   from Hogan Lovells on behalf of Agri Stats.  I don't have

15   the precise number of documents in front of me.  I can tell

16   you that it was a custodial-based production that spanned

17   multiple employees of the company.  And what my colleague

18   said is correct that the bulk -- the focus of the production

19   was on the broiler industry and that's why this is a very

20   different circumstance than the *Broilers* case.

21              At this point we cannot rule out that documents

22   related to pork may have been produced as part of that

23   production.  And so essentially what we have to do is go

24   through, as part of our normal negotiations with the

25   Plaintiffs over certain terms or custodians or other items,

1    to try to identify what part of that production may be

2    relevant to this matter and produce those consistent with

3    the way that we produced them -- produced other documents in

4    response to Plaintiffs' RFPs.

5              So it is a corpus of documents that exists that is

6    being preserved, but the burden associated with producing

7    pork-related materials from that is similar to the burden of

8    producing any other documents in the case.  The only

9    difference being that the materials have already been

10   collected, but all other burdens would be attendant to that.

11             I don't have an estimate on the number of

12   documents but it was a sizeable production and it involved

13   multiple employees of the company and producing e-mail and

14   other documents.

15             THE COURT:  All right.  Thank you.  Appreciate it.

16             MS. BRIESACHER:  The last item on their list, Your

17   Honor, is number seven, which is the search methodology

18   order.  And here, I mean, it's simply too early in the case

19   to lock Defendants into a search methodology order now.

20   Defendants will not decide what analytical tools they might

21   use, whether it be TAR or CAL or search terms and culling

22   until we know the volume, until we know the number of

23   custodians.  We won't know volume and custodians until there

24   are collections, which I think, you know, we're all in

25   agreement won't be necessary before the Motion to Dismiss

1    rulings.  Search terms and any culling that is used are

2    further tethered to RFP responses, and we can't fully

3    respond to RFPs until we know the scope of the case.

4         If the parties are required to do this now,

5    regardless of the Motion to Dismiss outcome, any order is

6    likely to be, need to be, renegotiated or revisited once the

7    parties are kind of getting into the nitty-gritty of

8    discovery.  And this, again, it's going to be inefficient to

9    try and do this twice.  Plaintiffs have said that they want

10   something akin to the search methodology order in *Broilers*.

11   But I think, you know, even in *Broilers* the search

12   methodology order was not entered until after the Motions to

13   Dismiss ruling, and these orders really are not a kind of

14   one size fits all.  Any order in this case will have to be

15   tailored to the scope of this case.

16        Your Honor, at the end of the day, all of these

17   discovery actions are going to require a lot of, you know,

18   the parties spinning their wheels, for not only parties but

19   also for the Court.  A lot of work which will have to be

20   redone once the Motion to Dismiss rulings come out.

21        And while Plaintiffs are correct that there is a

22   substantial cost and burden associated with the portion we

23   all agree is stayed, kind of the collecting, the reviewing,

24   the producing, there's also going to be a substantial cost

25   associated with these six discovery tasks that Plaintiffs

1    propose.  Client time, attorney time, vendor time, trying to

2    pull and understand information from the last 12 years,

3    assessing database sources over the last 12 years, many of

4    which will be legacy systems, negotiating RFP responses,

5    figuring out what can be done, what's accessible, what's

6    inaccessible, you add in the negotiations, the meet and

7    confers and trying to take disputes to the Court, all will

8    become kind of unduly burdensome and start to incur

9    significant costs for the Defendants.  You know, between now

10   and when the ruling comes out we will be doing these types

11   of discovery requests that before you know it end up

12   incurring the high discovery costs that *Twombly* cautions

13   against and costs that the Defendants are seeking to avoid

14   in the first place by filing this Motion to Stay.

15          For these reasons, Your Honor, we ask that the

16   Court grant a limited stay of discovery and order only those

17   tasks identified by the Defendants, that is the initial

18   disclosures, the org chart production, and the ESI and

19   protective order move forward pending the Motions to

20   Dismiss.

21          And I meant to ask at the outset, with your

22   permission I would like to reserve a few minutes for

23   rebuttal if I have time left.

24          THE COURT:  I'll give you a chance to reply.

25          MS. BRIESACHER:  Thank you, Your Honor.

1          THE COURT:  Mr. Clark.

2          MR. CLARK:  Your Honor, Brian Clark for the Direct

3     Purchases Plaintiffs, speaking on behalf of all Plaintiffs.

4     And just one note and change from what we submitted on

5     Friday, my colleague Shana Scarlett will address the issues

6     with the Department of Justice documents when we get to that

7     point.

8          THE COURT:  All right.

9          MR. CLARK:  I just have a couple of minutes of

10    preliminary things and then I'm happy to walk through the

11    seven categories we submitted and talk through those on kind

12    of how we see them fitting together.

13          I think it's clear neither party is proposing to

14    the Court we have a full stay or that we have full

15    discovery.  I think in essence what Plaintiffs are saying is

16    we need to prime the pump relatively fully so that when we

17    get to the point of being able to move forward with the full

18    discovery, which I think generally the burden would be a lot

19    more significant if we were saying load and process your

20    ESI, which is going to be terabytes, it is going to be big,

21    what we're doing is negotiating the scope of that.  Which

22    custodians are they.  Have you actually gone in and

23    preserved and ensured, you know, that their devices and

24    personal e-mail accounts are actually preserved, and that's

25    part of why we want to front load a lot of this.

1              And it's clear no matter what we do -- I mean, you

2      can look in the room today, there's over 30 attorneys --

3      there's going to be some burden.  The question is whether

4      that burden is reasonable or whether it's undue.  And we

5      think with what we're proposing here, stopping short of

6      fully opening the pumps and really going into the full

7      processing ESI, is a reasonable and a practical way to

8      balance the parties' interests in accomplishing something

9      during the pendency of the Motions to Dismiss.

10             And then, frankly, we have done this exact thing

11     in *Broilers* with some of the defense counsel sitting in this

12     room.  We had the same issues of, Well, it's hard to know

13     what the scope will be.  After the Motion to Dismiss there

14     might be various things that could happen.  We were able to

15     do that during the pendency of the Motion to Dismiss and

16     about a year during -- a little under a year during which

17     the Motion to Dismiss was pending, we were able to negotiate

18     the objections to Rule 34 requests, we were able to get

19     these ESI disclosures, inform the custodians discussions,

20     you're able to do that all of that during the pendency of

21     the Motion to Dismiss.

22             THE COURT:  And I'm taking this a little bit out

23     of order --

24             MR. CLARK:  Sure.

25             THE COURT:  -- but you mentioned it and the

1    question occurred to me.  What about defense counsel's

2    argument that, for example, with respect to the Rule 34

3    requests and trying to negotiate the scope, that it can only

4    be hypothetical until we know whether or to what extent

5    Judge Tunheim might decide to narrow the cases as opposed to

6    kind of all in or all out?  Tell me why that's not a

7    legitimate concern and raises the likelihood that you'd all

8    have to go back and sort of start from scratch to

9    renegotiate it again.

10          MR. CLARK:  First off, I mean, odds are, I mean,

11   we gave you the citation from the magistrate in *Broilers*, 90

12   percent of the cases in the Northern District of Illinois, I

13   think it's comparable in Minnesota, are not resolved on

14   Summary Judgment or Motion to Dismiss, so if you're gonna

15   play the odds, it's unlikely to happen.  But even if the

16   statute of limitations tolled the time period for damages,

17   that doesn't mean that's the exact time period with respect

18   to relevant liability information.  Even if the damages

19   period was the four years preceding when we filed in June

20   2018, the acts that took place back to 2008, 2009, those are

21   relevant to what then happens during the damages period.

22          So even if that were to happen, it's not the case

23   that while therefore ESI would only process four years back,

24   that's not how it's worked in prior cases where that has

25   happened and generally speaking, it -- that trimming doesn't

1    usually happen.  It's a hypothetical issue.  It came up

2    repeatedly in *Broilers*.  And in the end, the cases tend to

3    move forward in full and that's why, rather than kind of sit

4    on our hands after December 3rd when these Rule 23(a)

5    disclosures are made, we can spend the next six to nine

6    months moving these issues forward that we all know from

7    experience will take -- the tasks that we have listed in

8    pages 4 to 5 of our briefs, the seven tasks, those will take

9    six to nine months.

10           It's going to take time.  Some of them need to be

11   staggered.  I agree with defense counsel, certainly the

12   search methodology order makes some sense to do after we

13   have negotiated offers of productions, negotiated document

14   sources like custodians, it certainly makes sense to follow

15   that.  But in our view that's a case management discussion

16   with Your Honor on how to stagger that and ensure that

17   happens at the right point.  But we don't see any of those

18   issues on a potential different time period, meaning that we

19   need to sit on our hands for the next six to nine months.

20   We think these things can be accomplished productively.

21           And part of the reason is there is some real

22   prejudice to Plaintiffs if we don't do this.  And some of

23   the issues that come up is, in our experience over and over

24   again in cases, preservation to really be effective is about

25   specific people.  It's which person had this role.  And in

1     our ESI disclosures that's how we start that conversation.

2     We ask was there a person at your company that had a

3     responsibility for analyzing Agri Stats' reports, and was

4     there anyone who specifically had the task of identifying

5     the competitor's data in those reports.  By putting those in

6     the disclosures, it feeds into our discussions then about

7     the custodians and who should be designated and it ensures

8     that relatively early on, rather than waiting another six to

9     nine months, it's already been five, but rather than waiting

10    over a year, we do that now and ensure, okay, yeah, that

11    person left but we have a drive sitting in IT from when they

12    left.  Let's make sure we grab it and it doesn't get

13    reformatted.

14          So that's part of the benefit of doing these

15    discussions now is on the preservation side.  You also

16    identify things like e-mail accounts before an employee

17    leaves and becomes a former and it's a lot harder to grab

18    their personal e-mail account or cell phones.  And it

19    requires a custodian interview process which -- I mean, when

20    we're told, as a kind of a broad matter there's a litigation

21    hold, there's a lot of details that are under that and a lot

22    of variation between counsel on how they actually implement

23    that.

24          When we get into these specific discussions, it

25    avoids the possibility that somebody was just missed.  It

1    happens all the time, but it's a lot less likely to happen

2    if we have these disclosures and we discuss custodians.

3            And then just I guess going back to the fact that

4    in *Broilers* we did these tasks and we got an order about

5    almost exactly a year ago, November 20th, we had substantial

6    completion of document production from the 14 original

7    defendants in that case by July 18th.  So roughly 8 months

8    from the date of the order on the Motion to Dismiss to

9    substantial completion of production for the original 14

10   defendants.  There were some others that produced a little

11   bit later that were later-added defendants.  That's not

12   possible if we sit on our hands and don't accomplish the

13   tasks that we've laid out here because nobody would know

14   whose data to collect, what was being offered to produce,

15   and you can't hit the ground running in that way.  So it

16   really would just tack on an extra six to nine months if we

17   didn't do these things now.

18           And I'm happy to talk through each of the

19   categories however Your Honor would like.  I tried to hit

20   them, but in our view they fit together.  I mean, we've

21   tried to stage it here and really lay it out in an order

22   that makes sense to us, one through seven, that we obtain

23   information on e-mail auto delete in the ESI disclosures,

24   for instance.  That helps tell us how likely is it we're

25   going to get a full time period of e-mail from a particular

1    custodian.  If it's a 60-day auto delete, we might need to

2    designate a lot more custodians because there might only be

3    a few people who kept their e-mail for the full time period.

4            And then getting into the Rule 26(f) report,

5    discussing the time period for what will be produced,

6    discussing the number of interrogatories, that kind of then

7    feeds into the offers of production and actually kind of

8    dealing with the amended Rule 34(b)(2) of what is somebody

9    actually offering to produce.  In *Broilers* we did charts for

10   each party on what they were actually offering to produce.

11   Those discussions kind of all feed into each other and at

12   the end of the day when we have an order on the Motion to

13   Dismiss, we've identified the document sources, we've

14   identified the offers of production, and then we know what

15   people -- everybody knows what their task is when that order

16   comes in rather than starting all these tasks at day one

17   there.

18           THE COURT:  All right.  Thank you.

19           MR. CLARK:  Thank you, Your Honor.

20           THE COURT:  Yes, on the DOJ.

21           MS. SCARLETT:  Shana Scarlett from Hagens Berman,

22   Your Honor.

23           Just briefly, today I think that the Defendants

24   have acknowledged that the Department of Justice documents

25   from Agri Stats indeed do contain documents relating to the

1    pork industry.  On the face of the CID itself from the

2    Department of Justice it says that the documents are

3    relating to an investigation to exchange competitively

4    sensitive pricing cost information, including in the swine

5    industry.  There's been no articulated burden associated

6    with production of these documents.

7            We know from the letter closing the investigation

8    from the Department of Justice there's simply three hard

9    drives.  The only argument made against production of these

10   documents has been that there may be some broiler-related

11   documents intermixed with pork documents.  However, there's

12   a couple reasons why that shouldn't weigh against production

13   here.

14           First, there will be a protective order in effect

15   that governs what Plaintiffs do with these documents and how

16   they are used that gives Defendants the security that they

17   are confidential.  Withholding relevant documents within a

18   document family, for example, would deprive Plaintiffs of

19   relevant context to understand the documents if one relates

20   to broilers or one relates to pork.

21           THE COURT:  So are you characterizing the DOJ

22   production as a document family?

23           MS. SCARLETT:  No, I'm sorry, within the

24   production itself if there are, for example, an e-mail and

25   attached to that e-mail is a report that relates to pork and

1      a report that relates to *Broilers* --

2                 THE COURT:  And that, of course, is a separate --

3      I know there's a separate dispute on that.

4                 MS. SCARLETT:  There is, there is.  I'm just --

5      for the first time I think that today we've just heard the

6      suggestion that Agri Stats felt like it might do a relevance

7      review of these Department of Justice documents prior to

8      production.

9                 THE COURT:  And why -- if we go down that path,

10     why wouldn't they?  As long as we're not characterizing, and

11     I don't see how we could, the entire production as a

12     document family, it is essentially another source within

13     which there may be relevant documents.  So why wouldn't

14     there necessarily be, or at least appropriately be, a

15     relevance review within that collection?

16                MS. SCARLETT:  From our perspective, to the extent

17     Defendants are raising burden as a reason not to produce at

18     this stage, conducting a relevance review of these documents

19     would essentially be a self-imposed burden, not one

20     Plaintiffs are requiring and not one that we necessarily

21     agree with.

22                In the *Broilers* litigation, Agri Stats did produce

23     the entire set of documents that it had produced to the

24     Department of Justice.  It moved to -- it moved for a

25     protective order, in fact, only of searching additional

1    sources.  So these documents have already been produced in

2    related litigation in their entirety.  So to have them

3    produced here is an incremental burden and one that would be

4    of little cost or expense to Agri Stats, especially at this

5    point in the case when there's a lot of other things that

6    could happen, but we just wanted to make that point.

7            And as well, there is also a relevance here to the

8    *Broilers* litigation that can't be denied.  And while it's

9    true chicken is not a pig, many of these chickens and pigs

10   are owned by the same corporate family.  And so there is a

11   relevance to all of these broiler documents, reports, and

12   even, you know, as the complaints allege, the conspiracy in

13   the *Broilers* litigation under Plaintiffs' theory of the case

14   in some ways gave birth to the pork conspiracy.  And so

15   there is a relevance here separate and aside from just the

16   fact that there's a common investigation by the Department

17   of Justice into these two industries.

18            THE COURT:  Okay.  Anything else?

19            MS. SCARLETT:  No, Your Honor.  Thank you.

20            THE COURT:  All right.  Thank you.

21            All right.  I bet you want to reply.

22            MS. BRIESACHER:  Yes.  Just a few quick points,

23   Your Honor.

24            First, you know, on preservation, there's been

25   some discussion of preservation.  Defendants have fully

1    complied with all of their preservation obligations under

2    the rules.

3            Two, you know, we talk about the *Broilers*

4    experience and what happened in *Broilers*.  But first, you

5    know, there's actually two *Broilers* cases.  There's one that

6    the Plaintiffs like to talk about pending in Illinois.

7    There's actually a second one, a *Broilers* growers case, in

8    Oklahoma and there were Motions to Stay practices in both.

9    The Oklahoma case was a full stop stay of discovery and the

10   Illinois case is what the Plaintiffs have highlighted here.

11   So there have been two courts that have looked at this and

12   reached different conclusions, although they both agreed

13   that full discovery should not go forward.

14           Kind of second, even where tasks have moved

15   forward or were allowed to move forward, I mean, this is a

16   different case.  A pig is not a chicken.  They are not equal

17   just because something may --

18           THE COURT:  I think we're all in agreement.

19           MS. BRIESACHER:  Yes, yes.  But just because

20   something may have happened in the *Broilers* case does not

21   mean it should happen here.

22           And finally, for those of the defense group that

23   were involved in the *Broilers* case, we now know what a huge

24   burden that all of this pre-work resulted in.  And the

25   Plaintiffs refer to, you know, the six to nine months of

1   work that this is all going to entail, we have six to nine

2   months of work fully engaged on these threshold tasks.

3   There was a reference in the exhibits to kind of six-hour

4   hearings, there was briefings.  That is a substantial burden

5   to the Defendants that potentially will not be needed.  And

6   all of this pre-work is not going to be some breeze skate in

7   the park.  It's going to be a lot of work for the Defendants

8   to undertake.

9          And finally here, you know, there is no prejudice

10  or limited prejudice here.  This is not an indefinite stay

11  of discovery.  It's limited in scope, you know, and I want

12  to emphasize limited.  We're going to be in front of Judge

13  Tunheim in about six weeks arguing the Motions to Dismiss

14  and then, you know, the order will follow.  And, you know,

15  even a limited stay of discovery, any prejudice is going to

16  be offset by the benefits that are going to be achieved

17  following the Motion to Dismiss ruling.  It will help

18  streamline discovery and it will allow the parties to know

19  scope so they can focus on what is actually relevant

20  following the Motions to Dismiss.

21          THE COURT:  Well, what about Mr. Clark's argument

22  that -- and obviously if Judge Tunheim dismisses one or more

23  Defendants altogether, I get that then none of this would be

24  necessary.  But if what happens if what happens is that

25  Judge Tunheim limited the case in some way, for example,

1    through deciding that the recoverable damages are more

2    limited than what has been pleaded, what about Mr. Clark's

3    argument that, even so, the scope of relevant and

4    discoverable documents won't be affected all that much

5    because to the extent the documents reflect conduct, that

6    will still be relevant?

7            MS. BRIESACHER:  Well, you know, I think that's

8    probably going to result in some significant disputes, you

9    know, about what the relevant time period will be.  You

10   know, right now the allegations are spanning over the last

11   12 years from the requests for production that have been

12   served, the ESI disclosures, you know, the relevant time

13   period for the most part that they are putting forward is

14   tied to kind of the years of allegations.  There are a few

15   that they are seeking a look-back period of a few years and,

16   you know, we'll look at that and decide if that's

17   reasonable.  But I think it's a stretch to say that a 4-year

18   damages period means that you get documents back 12 years

19   and that all documents back 12 years are going to be

20   relevant.

21           So I think unquestionably if the statute of

22   limitations and the relevant time period is narrowed, there

23   unquestionably is going to be a narrowing of what is

24   relevant in the case, all right?

25           THE COURT:  Are there -- have you looked at the

1    requests for production to see whether there are requests

2    for which your position on discoverability, on what you

3    would be willing to concede or not to concede, can be

4    formulated regardless of whether the case is limited in some

5    fashion?  I mean, I understand what you're saying about if

6    the -- your position on relevance may be this if Judge

7    Tunheim limits the case, and it may be that if he doesn't.

8    But it isn't -- time period is not the only potential scope

9    issue or other objection issue to be negotiated here.  Have

10   you looked at whether you could even make progress on

11   negotiating these requests for production while saving

12   issues that are necessarily affected by time period?

13            MS. BRIESACHER:  Yeah.  So, you know, I haven't

14   kind of gone through them with a fine-tooth comb to see if

15   like, yes we can do this one, no we can't do this one.  But

16   really the scope of the case is going to be a major concern

17   regardless of what the request is.  So I think it's going to

18   be tough to kind of cherry pick one or two where we may be

19   able to make progress when kind of the full scope of the

20   case, who is left, time period, what claims are left, are

21   going to be really critical in understanding proportionality

22   and burden and what might be able to be done.

23            THE COURT:  What about on the DOJ?

24            MR. BERNICK:  Your Honor?

25            THE COURT:  Yes.

1              MR. BERNICK:  I'm sorry, this is Justin Bernick,

2     counsel for Agri Stats.  If I could have a moment to respond

3     to the DOJ-related argument?  I didn't mean to interject but

4     I wanted to make sure that I got some points in if we could.

5              THE COURT:  Agreed.

6              MR. BERNICK:  Thank you, Your Honor.  I think

7     first what I would say in response to your earlier question,

8     almost 400,000 pages of documents were produced in response

9     to the DOJ CID.  And this is a core relevance issue.  I

10    think, as the Plaintiffs indicated, this is mostly pork

11    documents with a few chicken documents thrown in, that's

12    absolutely not the case.  That's absolutely not the case.

13    This investigation was focused on chicken and at the end of

14    the day that's where the advocacy before the Department of

15    Justice took place and that's why the Department of Justice

16    closed the investigation.

17              As we said, we cannot rule out the possibility

18    that there are pork-related documents in the production, but

19    that's a very different situation and that's why a different

20    conclusion was reached in the *Broilers* litigation, why all

21    these materials were produced, because the investigation was

22    focused on chicken.  Here that's not the case and so there

23    would be a particularly high burden associated with

24    reviewing those materials.

25              And, Your Honor, I had the privilege of appearing

1    before you in the Mylan ERISA EpiPen Litigation not too long

2    ago addressing a very similar issue where there was a corpus

3    of documents that had already been collected and the

4    argument there was that, Well, because they are already

5    collected, they should all just be produced when they were

6    not all relevant to the case at hand.

7              And that's exactly what's going on here, Your

8    Honor.  The fact that there's a protective order in place

9    that could address confidentiality concerns doesn't mean

10   that my client Agri Stats is somehow obligated to produce

11   documents that have no bearing on the litigation pending

12   here at this time.  So that would be our position on that

13   issue, Your Honor.

14             THE COURT:  All right.  Thank you.

15             You're done?

16             MS. BRIESACHER:  Yep.  Thank you, Your Honor.

17             THE COURT:  Anything further?

18             MR. CLARK:  I just have one minor point to make on

19   the reference to the other *Broiler* litigation just for

20   context.  That case involved contract growers in the chicken

21   industry.  Our case is about the buying of the meat.

22   There's a second case that counsel referenced regarding

23   growers.  They have a Sherman Act claim, and I believe a

24   Packers and Stockyard Act claim.  There have been dozens of

25   such cases that have had, I guess, mixed results.  I think

1    there's a totally different history there versus a case like

2    the *Broilers* or like *Pork* where we're for the first time, I

3    believe in decades, addressing the issue of the price fixing

4    and the supply restrictions of the actual supply of meat.

5    That's what's, I think, so relevant of the *Broiler*

6    litigation in Chicago as opposed to the one in Oklahoma.

7              THE COURT:   Thank you.

8              Well, although certainly the parties agree here

9    that some stay of discovery is appropriate, that being said,

10   the Court still has to look at it independently because we

11   have an independent interest in making sure that cases move

12   forward in accordance with Rule 1.  And so I agree with the

13   parties that this is a case that does justify a limited,

14   although not an entire stay of discovery.  The -- in making

15   that decision, and really in connection with any of the

16   details of a stay, I'm not looking at the merits of the

17   Motions to Dismiss.

18             First, I'm not going to be deciding the Motions to

19   Dismiss.  Second, they haven't been fully briefed yet, and

20   so I think it would be inappropriate for me to try to, you

21   know, sneak a peek at them or purport to guess at how they

22   might come out.

23             But I think the other factors do justify a stay of

24   a good part of the discovery that would otherwise take place

25   in a case like this.  There's no doubt that discovery in an

1   antitrust litigation is burdensome, it is expensive, and I

2   think courts have regularly found that burden to justify a

3   stay of broad discovery while the Court considers pending

4   Motions to Dismiss.

5           I also believe that particularly given the parties

6   are taking active steps in negotiating disputes around

7   preservation, I think that prejudice associated with a delay

8   in actual production is ameliorated, and I don't think that

9   the public interest is going to be harmed by not allowing

10  full discovery to go forward at this time or that the

11  Court's ability to manage these cases efficiently is going

12  to be harmed by not allowing full discovery to go forward at

13  this time.

14          So it won't come as a surprise but I think it's

15  important to articulate for the record that I agree that a

16  stay of full discovery is appropriate here.

17          That being said, as I think at least one if not

18  both counsel mentioned, the devil is in the details of what

19  that stay is going to look like.  Some of that I think I can

20  tell you now.  I think some of it I'm going to need to mull

21  over for a bit, at least over the course of the Thanksgiving

22  weekend, although I'm not going to keep you waiting

23  indefinitely for this.  So let me give you a sense of at

24  least in broad strokes what my thinking is that I will do

25  and order with a more -- with a more detailed rendition of

1    what I think the parties -- or what I will require the

2    parties to move forward with and what I agree should be

3    deferred.

4            With respect to disclosures regarding ESI systems,

5    and I have -- to understand at least what the Plaintiffs are

6    looking for, I'm looking at their proposed order, which I

7    have already mentioned, which is document number 205-2.  I

8    am -- I know that the Defendants are willing to produce and

9    have committed to produce organizational charts to the

10   extent readily available.  I am -- I expect I will require

11   more than that, but I notice that the proposed order from

12   the Plaintiffs doesn't necessarily include some -- or at

13   least not at all parts includes some pretty important

14   qualifiers in Judge Gilbert's order, and that is -- that I

15   think are important here -- and that is to the extent the

16   information is readily available.  I think that's not quite

17   the same thing and maybe not at all the same thing as

18   readily accessible.

19           And my sense was that Judge Gilbert was trying to

20   recognize and to give some credence to the concerns of the

21   Defendants that they may not be required to go into every

22   file cabinet and search in every corner of the company now

23   for things that they may need to look more carefully for

24   later.

25           So I am going to require more of -- more than just

1     the organizational charts that have been -- that have

2     already been promised, but I am going to make sure that what

3     I do require is qualified by that readily available

4     qualifier.  And I do note that even in the Plaintiffs' order

5     there were some categories where you've proposed that at

6     least one document for each year at issue, to the extent

7     they exist and to the extent they are readily available, I

8     don't see any of this as requiring more than -- certainly

9     not more than what Judge Gilbert required.  And I think

10    there are some categories where I may reign it in a little

11    bit more.  That's why I need to think a bit over the course

12    of the weekend.

13          But as a -- kind of as a philosophical and a

14    practical matter, I am persuaded that more needs to happen

15    over the next several months than what Defendants are

16    prepared to agree to out of the blocks.  I understand that

17    it will be work, I understand it will take time, I

18    understand it wouldn't have needed to be done if you get

19    what you're hoping to get out of the Motions to Dismiss.

20    But the prospect of having to start from scratch on this

21    when Judge Tunheim issues his order on the Motions to

22    Dismiss is one that isn't compatible with my view about

23    moving these cases forward efficiently.  So I am going to

24    require more than what the Defendants are ready to agree to

25    out of the blocks.

1          And another part of my thinking here is also

2     preservation.  I hear you saying, and I credit that you've

3     taken meaningful steps towards preservation, but I also am

4     persuaded by the argument that Mr. Clark made that to be

5     confident in those steps, some of this same work has to be

6     done to identify custodians, to identify data sources.

7     Maybe not all of it, but a good part of it, so that everyone

8     can be confident that you know what you need to keep and

9     you've taken the effective steps to keep it.

10          So I am going to require more the dive into

11     custodians and data sources than I think the Defendants had

12     hoped for in the course of this -- in the course of this

13     hearing.  The details of that, though, I need to think about

14     a bit more.

15          The Defendants have already agreed they will do

16     26(a)(1) initial disclosures and the parties will, so we're

17     all in agreement that's going to move forward.

18          For now I'm going to defer requiring a 26(f)

19     report and setting a Rule 16 conference.  I'm going to

20     revisit that.  One of the things we'll get to when we get to

21     the status conference is scheduling more status conferences.

22     I'm going to plan to revisit that at what I expect will be a

23     late January status conference which will take place after

24     the hearing on the Motions to Dismiss.  We'll take another

25     look at whether we could make some meaningful progress even

1    if, hypothetically speaking, on a Rule 26(f) report and a

2    Rule 16 conference.  But I'm going to defer that for now.

3              With respect to the -- just working through these

4    tasks in order -- with respect to the documents produced by

5    or in connection with the DOJ investigation of Agri Stats,

6    I -- I don't agree that as a collection those documents are

7    automatically relevant; and I believe that Agri Stats, and I

8    don't know for sure whether any of the other Defendants

9    produced documents in connection with that investigation.

10   No one else has -- my sense is that no one else, at least

11   pork documents, but if the Plaintiffs are looking for more

12   than pork documents on the argument that they may be

13   relevant to this case as well, there is not nearly enough in

14   front of me now to make that call.

15             So absolutely if we were going to make -- move

16   forward on that at all at this juncture, it would require

17   first a meet and confer between counsel about relevance, and

18   if counsel couldn't agree to relevance, it would require

19   traditional Rule 34 briefing on relevance and

20   burdensomeness, the burdensomeness associated in this case

21   not with collecting the documents and probably not even with

22   a privilege review.  Presumably that was done, although it

23   might have been different in that context from this context,

24   but certainly the burden of reviewing those documents for

25   relevance.

1          Since there is a group of documents that has

2     already been collected, though, I am going to have the

3     parties move forward with that meet and confer process at

4     this time, and I will take up the issue sooner rather than

5     later of whether any of the documents that were produced to

6     the DOJ by Agri Stats are relevant and discoverable and

7     whether the burden of reviewing them at this point for

8     relevant documents suggests that that actual production

9     ought to be deferred.  But since we know we've got a group

10    of documents, I think we can make some progress forward on

11    that.

12          So I'm going to ask for -- well, let me ask this.

13    Is it Plaintiffs' position -- I'm thinking out loud, always

14    a bad idea -- is it Plaintiffs' position that everything

15    that any of the Defendants produced to the DOJ in connection

16    with the investigation of Agri Stats, regardless of what

17    kind of food material it referred to, is relevant and

18    discoverable here?

19          MS. SCARLETT:  So what I believe to be true,

20    taking Defendants at their word, is that none of the pork

21    Defendants sitting at this table have produced other than

22    Agri Stats.  So we're talking about Agri Stats alone and the

23    set of 400,000 documents that were referenced.  And I hear

24    Your Honor saying that you don't want the full corpus

25    produced to Plaintiffs.

1          THE COURT:  I'm certainly not persuaded that it

2      ought to be, that's true.

3          MS. SCARLETT:  So you'd like us to go back and

4      meet and confer with Agri Stats about what should be

5      produced from that and whether there's some agreement that

6      can be reached on a subset of the 400,000 documents?

7          THE COURT:  Let's start with that, and then based

8      on that, then Agri Stats will need to take a look at

9      what that -- the burden associated with that review would

10     be.  And that's something I'll take into account because,

11     again, if it appears that it would be a significant burden,

12     and I don't have any information about that, but if it

13     appears that it would be a significant burden, then

14     certainly one of the things I need to take account of is

15     whether the spirit of the stay of discovery at this juncture

16     suggests that that, too, ought to be deferred.  But at least

17     you might have resolved your -- perhaps resolved your issues

18     about relevance and discoverability so that we would be that

19     much farther down the road once the Motions to Dismiss get

20     resolved.  So meet and confer further on that.

21         Counsel for Agri Stats, do you have any questions?

22     Are you hearing what I'm proposing on this?

23         MR. BERNICK:  No, Your Honor, I don't believe we

24     have any questions and we'll meet and confer.

25         THE COURT:  All right.  So why don't you get me a

1    letter update on the result of that meet and confer.

2    Let's -- I know we've got the holidays coming up here.

3    What's the fair -- what gives you enough time that doesn't

4    just kind of let you -- everybody sort of drag it out at a

5    leisurely pace for having that meet and confer and reporting

6    back to me about it?

7               MS. SCARLETT:  We would be able to do that within

8    two weeks if counsel for Agri Stats is able to do that as

9    well.

10              MR. BERNICK:  That works for Agri Stats, Your

11   Honor.

12              THE COURT:  All right.  So why don't you meet and

13   confer and report back to me, let's see, it's the 21st

14   today?  Why don't you get me a report by December 10th.

15   That will give you two weeks to meet and confer and then

16   some time to put together the joint letter that

17   characterizes where you're at.  Based on that, let's look at

18   whether we want to proceed with motion practice at this

19   juncture or whether it makes sense to defer it while we wait

20   to see what happens with the Motions to Dismiss.  But at

21   least I'd like to progress that issue.

22              MS. SCARLETT:  Yes, Your Honor.

23              THE COURT:  Okay.

24              MR. BERNICK:  Your Honor, I'm sorry, did you say

25   December 10th?  I just want to make sure --

1          THE COURT:  Yes, December 10th for the letter to

2    me.

3          MR. BERNICK:  Thank you.

4          THE COURT:  And that letter can be -- well, you

5    can go ahead and e-file that letter.  I think that makes it

6    easier to kind of keep the docket straight and let everybody

7    know what's going on.  In general I'm going to require that

8    letters be e-filed unless we get to some point where we're

9    talking about one of two things I could see as an exception.

10   One would be if there's a letter that talks about the status

11   of settlement negotiations, we're a ways away from that but

12   obviously those would not be e-filed.

13         Also if there's a situation where a letter for

14   some reason addresses material that shouldn't be accessible

15   by everyone who currently has access to the combined file.

16   And I don't know what that would be, but I can't rule out

17   that possibility.  If that happens, then, you know, give me

18   the hi sign, let's talk about how best.  But let's assume

19   that when I require updates that I'm going to expect them to

20   be e-filed.

21         Counsel for Agri Stats, our court reporter needs

22   you to introduce yourself again on the phone.

23         MR. BERNICK:  I'm sorry.  This is Justin Bernick

24   B-e-r-n-i-c-k, at Hogan Lovells.

25         THE COURT:  And eventually I'll get these names

1     memorized as well, although I'm tempted as part of the order

2     to ask you to prepare a pictorial and voice identification

3     dictionary or a guide, but we'll defer that.

4            So that deals with four.  Five I want to think

5     about a bit more, which is the negotiating Rule 34 requests.

6     I have to believe that there's a way to make some progress

7     on that.  I just want to minimize the chances that we're

8     starting from a standing stop if these cases, in whole or in

9     part, move past the Motions to Dismiss.  I want to make as

10    much progress as we can but I don't want to set up a

11    situation where the parties are doing something in such a

12    vacuum that it has to be redone and then redone again.

13           So I want to think about that, but I think where

14    I'm headed is to at least send the parties back to meet and

15    confer about whether some number of the Rule 34 requests can

16    be negotiated without necessarily knowing exactly how Judge

17    Tunheim might slice and dice these cases.  Right now what

18    I've got is the Defendants telling me we would just as soon

19    not negotiate any of them and the Plaintiffs wanting to

20    negotiate all of them.  I'm not sure whether you've talked

21    about whether some progress could be made in a more nuanced

22    way.  So I do want you to have that conversation.  Is that

23    something you also can talk about over the next couple of

24    weeks and report back to me?

25           MR. CLARK:  Yes, Your Honor.

1          MS. BRIESACHER:  Yes, Your Honor.

2          THE COURT:  All right.  So why don't you get me a

3     letter on that by December 10th and based on what I see

4     there, if you can't come to some common understanding then

5     I'll call it one way or the other, because you obviously

6     need an answer; but I'd like you to try to see if there's a

7     more nuanced approach that's something short of the all or

8     nothing that you're currently -- that -- which is where your

9     parties are -- where the parties are currently.

10         With respect to document sources, I'm inclined --

11    I want to take another look at -- I want to think about this

12    a bit more, take another look at and see how it's precisely

13    been handled in other cases, but I can tell you that I'm

14    leaning toward having the parties negotiate document

15    sources.  Now, there can certainly be caveats built into

16    that negotiation, but I am concerned about making sure that

17    everything that needs to be done is being done with respect

18    to preservation and I think that a lot -- if that is being

19    done, I think that this discussion of document sources isn't

20    necessarily a huge step past that.  So let me -- I need to

21    think about that a bit, but I am inclined to require the

22    parties to make some progress on that.

23         And even if it's, well, if the case is limited in

24    this way, then we're not willing to agree to these document

25    sources; but if it's unlimited, then we agree; or if it

1    survives Motion to Dismiss as pleaded, then we agree that

2    those document sources need to be in the mix.

3              I'm not going to put you through a two-week drill

4    on that.  That's obviously a longer conversation, and I'm

5    going to get out an order that tells you more precisely what

6    I'm going to require here.  But I just wanted to let you

7    know where I was leaning so you can start to think about

8    where this might head.

9              On search methodology, again, there's a lot about

10   search methodology that I expect is not going to be -- well,

11   there's a lot about search methodology that will depend on

12   the scope of the case.  On the other hand, there's a lot

13   about search methodology that is about process that isn't

14   necessarily scope specific.  So just as with the Rule 34

15   requests, I am going to require the parties to take another

16   look at the -- and this really overlaps with the ESI

17   protocol discussion that we've got coming up in the status

18   conference -- but I'm going to require the parties to take a

19   look at that as well and see whether a good part of that can

20   be negotiated without having to qualify it by the eventual

21   time scope of the case.  I absolutely get that a good part

22   of it may have to wait, but I think some of it can be nailed

23   down and we'll talk about that a little more in detail when

24   we get to the status conference.

25              I think that covers, to the extent I'm going to

1    rule from the bench on this, I think that covers the Motion

2    to Stay.  Why don't we take a break, let the parties get up,

3    move around a little bit.  Let the court reporter take a

4    little bit of a break, and we will come back at 11:20 and

5    we'll pick up with the status conference.

6              MR. GUSTAFSON:  Thank you, Your Honor.

7         (Recess taken at 11:06 a.m.)

8                      *    *    *    *    *

9         (11:24 a.m.)

10                       **IN OPEN COURT**

11

12             THE COURT:  Please be seated.  We are on the

13    record once again in the matter of In Re: Pork Antitrust

14    Litigation, 18-cv-1776.  We're going to turn now to the

15    status conference in this matter.

16             One thing I did want -- I realized after I went

17    back into chambers, I wanted to clarify a bit with respect

18    to the discussion we had right at the end of the motion

19    hearing.

20             With respect to custodians, my thinking will

21    likely be different on the -- between the question of having

22    custodians identified for purposes of the ESI tasks, we'll

23    call them, the threshold ESI tasks that Plaintiffs have

24    identified, and negotiating custodians for purposes of

25    eventual, if we get to that point, eventual collection and

1    production.  I'm leaning -- for the reasons I described,

2    particularly with respect to preservation, I'm leaning

3    towards a more robust identification of custodians and

4    sources for purposes of the ESI threshold tasks, probably

5    less persuaded at this point that it makes sense to

6    negotiate the custodians from whom documents will be

7    collected for purposes of responding to the Rule 34

8    requests, particularly because the parties are still, at my

9    request, going to be doing some meeting and negotiating

10   about -- meeting and conferring about how much progress you

11   can make in the short term on negotiating those objections.

12   So I just wanted to -- I think my comments had appeared to

13   conflate the two and they are two very different things and

14   I just wanted to not mislead you about the status of my

15   thinking in that regard.

16          So let's turn to the status conference.  You've

17   submitted a joint status report at Docket Number 210 and you

18   also provided a letter and letter brief at Docket Number 203

19   and you provided me with some -- let me find them here --

20   you provided me -- and thank you very much for the way you

21   organized this information.  I'm in all of your debt.  You

22   provided me with some helpful materials in terms of

23   highlighting for me where your agreement was and where your

24   disputes are with respect to the ESI protocol and with

25   respect to the protective order, and the chart format I

1     found especially helpful.  So thank you for doing that for

2     me.  I appreciate it.

3              Other than the ESI protocol and the protective

4     order, it looked like the other thing on the agenda for this

5     status conference that you've identified is an update about

6     the parties' discussions on preservation of devices and

7     device archives of senior executives.  So those are the

8     three agenda items that you all identified for me.  The

9     fourth that I want to raise is the prospect of scheduling

10    additional status conferences and what the appropriate

11    timing for that ought to be.  So we'll get to that at the

12    end, but I just wanted to get that on your radar.

13             Let's start with the issue of the protective

14    order.  It appeared that there was largely agreement on that

15    but a single dispute which had to do with whether the

16    parties would be required to log communications involving

17    in-house counsel.  That looked like that was the only

18    dispute that was identified in terms of the draft.  Is that

19    correct?

20             MR. CLARK:  Yes, Your Honor.

21             THE COURT:  Who intends to address that for the

22    Plaintiffs?

23             MR. CLARK:  I will, Your Honor.

24             THE COURT:  All right.  Mr. Clark, will you come

25    forward.

1          MR. CLARK:  Your Honor, I don't have a lot more to

2     offer beyond what we submitted in the status brief.  I

3     think, in short, this is a -- we felt like we already kind

4     of met halfway on excluding from logging communications with

5     outside counsel.  I mean, any logging is excluded if it's

6     during the relevant time period if it's with outside

7     counsel.

8          Defendants want to take it a step further and move

9     to in-house counsel.  There are issues with dual roles from

10     any in-house counsel, there are issues with copying in-house

11     counsel, especially in these supply restriction cases.

12     There is very often, and we have cited some orders of our

13     own experience with this, that if we don't have the notice

14     that the communication exists and is being withheld, we

15     would have no way to challenge a wrongful withholding.  And

16     wrongful might be in good faith.  Somebody just has a

17     difference of opinion on whether or not a particular

18     communication is privileged.  All we're asking is that it be

19     logged so we have notice.  Defendants' proposal would give

20     us no notice and no opportunity to object to an area that we

21     have never had a case where we aren't engaging in

22     significant motion practice on withholding of communications

23     relating to in-house counsel.  So that's why we do not agree

24     to that exclusion category from logging.

25          THE COURT:  I understand.

1          Who would like to address this on behalf of the

2     Defendants?

3          MR. SUMMERLIN:  I will, Your Honor.

4          THE COURT:  All right.

5          MR. SUMMERLIN:  Again, my name is Gene Summerlin.

6          I understand the Plaintiffs' concern with close

7     calls, and we don't disagree that to the extent that there

8     may be in-house counsel that might be acting in a dual

9     capacity, there could well be a good-faith fight over

10    whether those items are subject to privilege or not.  But

11    our point was to the extent that we've got communications

12    including in-house counsel that are solely in their legal

13    capacity, so essentially no different than communications

14    that we've agreed not to log as outside counsel, in that

15    limited circumstance, we can avoid the need to do privilege

16    logs, or at least if we're looking for middle ground, do

17    more of a categorical type of log so that the burden here,

18    again, is all falling on the Defendants, not on the

19    Plaintiffs.  And we're trying to avoid having to go through

20    unnecessary work for documents that are clearly going to

21    fall within the privilege.

22          THE COURT:  What about Mr. Clark's concern about

23    the communications where in-house counsel is one of several

24    copy recipients?

25          MR. SUMMERLIN:  I would say that I think -- I

1    didn't bring the language up here --

2              THE COURT:  I've got it here.

3              MR. SUMMERLIN:  But I think that the language that

4    we've used is, you know, without good cause, you know, we

5    don't have to do the log, I think that's exactly what that

6    language is addressed towards is saying that in those

7    situations where it may be a close call or it's not

8    absolutely clear that the communication involving in-house

9    counsel is solely in their legal capacity, if one of the

10   Defendants wishes to assert a privilege there, that would

11   require a log.

12             THE COURT:  All right.  I understand.  Thank you.

13             On this one, although I have been there, I

14   sympathize with the concerns of -- and the burden of logging

15   communications involving in-house counsel, this is one where

16   I agree with the Plaintiffs that they will need to be

17   logged.  I think because in-house counsel are often copied

18   along with others, sometimes multiple others, where there

19   often are close calls about the capacity in which they were

20   acting, I think that it's best to require that they be

21   logged so that the opposing side is on notice that those

22   documents have been withheld and have the information they

23   need to take issue with it.

24             So I will enter the protective order in the form

25   it was proposed, but I will not be adopting the proposed

1    language to exclude in-house counsel from privilege logs.

2            Let's move to the issue of the ESI protocol, and

3    who wants to address that?

4            MR. CLARK:  Your Honor, Brian Clark for

5    Plaintiffs.

6            THE COURT:  Mr. Clark.

7            MR. CLARK:  I will just briefly hit on each of

8    these because I think we made our points we wanted to in the

9    letter brief.

10           The first disputed paragraph in Exhibit D of this

11   submission, that's Docket 203-1, page 50 of 89, the first

12   provision there, II(G), relates to the production of entire

13   document families.  That's the practice that our group of

14   Plaintiffs had always been familiar with up until the Court

15   agreed with Defendants to permit the withholding of e-mail

16   attachments in the *Broiler Chicken* case.  We provided what

17   we view as a little bit of a horror story of what happened

18   in that case when that provision is allowed to kind of run

19   amuck in a production where 22 percent of one Defendant's

20   entire document production was affected by this where

21   perhaps it was presented as kind of a pinhole that just a

22   few documents would go through it, it was a big -- it can

23   often become big enough that a truck can go through it.  And

24   it has significantly added to the costs and motion practice,

25   Plaintiffs' review burden.

1          And so what our proposal is, and we have already

2     agreed, Defendants may redact personal privacy information,

3     Social Security numbers, et cetera, but we do not agree that

4     there should be withholding of e-mail attachments.  And

5     that's both because Rule 34(b) requires production as kept

6     in the ordinary course.  An e-mail is maintained in one's

7     e-mail Outlook account with attachments as part of that

8     document, and Federal Rule of Evidence 106 also requires

9     that if a document in fairness may be reviewed in whole, it

10     should be produced in that way.

11          If that doesn't happen, the problem is you put a

12     document in front of a witness and it, on its face,

13     indicates it's not complete.  If it's an e-mail with one

14     attachment, you only have an e-mail.  You have a document

15     that says, Attachment withheld as irrelevant.  Now, you, on

16     its face, you have an incomplete document and you go to

17     trial with a witness who is not available at trial and you

18     can't litigate your case.  And so our proposal is not to

19     permit the withholding of documents in the document family.

20          THE COURT:  Just with respect to the personal

21     information piece -- all right.  I just wanted to make sure

22     that -- all right.  I didn't initially see that you had

23     incorporated that language in your proposal, but I see that.

24          MR. CLARK:  Exactly.  We've agreed on the

25     redaction of that personal information, not on the redaction

1     of information viewed as irrelevant.

2              THE COURT:  Right.

3              MR. CLARK:  But, yeah.  So that, in our view,

4     still allows one of the bases Defendants proposed for

5     withholding parts of e-mail families was, Well, what if it's

6     purely personal information, and I think redaction protects

7     that concern.

8              THE COURT:  Okay.  Thank you.

9              MR. CLARK:  And I can talk through -- I think the

10    relevancy redaction piece I've just spoken to.  In our view,

11    this is -- kind of, again, creates a lot of satellite

12    litigation.  If the document was relevant to the case, it's

13    relevant.  And redacting it, one, makes it an incomplete

14    document now; and, two, leads to a lot of satellite

15    litigation on whether or not it was, in fact, relevant.

16    Maybe it was a comment in the context of a relevant document

17    that somebody views as off color.  It ends up leading to a

18    lot of fights that don't need to happen if documents are

19    just produced in the first place.

20              And then I think, is my sense right, that on

21    notice of e-mail domains culled, the Court is intending for

22    us to meet and confer on that; and then the second disputed

23    provision that goes on to the next page on parameters for

24    culling?

25              THE COURT:  That's where I'm headed on those is to

1    require some further meet and confer to see whether some

2    others of those disputes can be narrowed even though we

3    don't know where the motion is going to come out.  I don't

4    think I need anything further on that, although I may check

5    in with the Defendants to see if there's some pushback and

6    would give you a chance to respond.

7              MR. CLARK:  Thank you, Your Honor.

8              THE COURT:  All right.  Yes, sir.

9              MR. SUMMERLIN:  I'm back.

10             THE COURT:  You are.

11             MR. SUMMERLIN:  With respect to categories II(G)

12   and II(K)(2), they are both dealing with kind of relevancy

13   redactions.

14             THE COURT:  Um-hum.

15             MR. SUMMERLIN:  What Defendants are proposing in

16   both of these paragraphs is that they be allowed to either

17   withhold documents or redact documents that only involve two

18   very limited categories of information; one highly -- if the

19   reference is to specific highly confidential and proprietary

20   nonresponsive business information relating to non-pork

21   business.  So we're -- again, in any discovery discussion,

22   right, we start with the idea of you're entitled to discover

23   what's relevant.  And we're saying, Okay, when we've got a

24   certain category of non-responsive, irrelevant data, we can

25   redact that or not produce it if it's highly confidential

1    and proprietary and it relates to a purely non-pork business

2    process.

3         Again, what we've got here is a group of

4    Defendants, essentially competitors, and so even with a

5    confidentiality order, there's concerns in providing that

6    kind of confidential proprietary information among your

7    competitors.

8         And then secondly, and I don't know that we really

9    have a disagreement here based on what we just heard, is

10   information of a personal nature as defined.

11        THE COURT:  And to that point, have you looked at

12   their proposal on personal information and are you -- and

13   does that do what you need to do?  In other words, I want to

14   make sure I know what the real dispute is here.  And I

15   understand it with respect to relevance redactions, but when

16   it comes to personal information, are you satisfied with

17   what they've proposed to address it?  Do you believe that

18   your proposal in that regard provides some additional

19   protection or where is the dispute?

20        MR. SUMMERLIN:  Well, I don't know that our two

21   proposals are very different.  I mean, what you may see is a

22   redaction that covers an entire document if it's personal

23   information.  Or I guess part of the issue is if we are

24   allowed to redact, just talking about the personal

25   information side, if we're allowed to redact personal

1    information that's nonresponsive -- otherwise nonresponsive,

2    I think that's sufficient.

3         To me, the question is, okay, if you've got, for

4    example, an attachment that is a payroll file or something

5    like that where, you know, essentially all of the relevant

6    data would be personal and would be redacted and it's not

7    otherwise relevant in the case, do you need to produce that

8    document fully redacted as opposed to our proposal saying,

9    Well, we would produce a placeholder saying that that

10   document has not been produced because it's personal

11   information.

12        I don't know that there's a -- that may be a

13   distinction without a difference in terms of the practical

14   effect.

15             THE COURT:  All right.

16             MR. SUMMERLIN:  So I don't know that that's where

17   our true dispute lies, but I do think we are teed up on the

18   confidential proprietary information.

19             THE COURT:  I understand.  Okay.

20             MR. SUMMERLIN:  Thank you, Your Honor.

21             THE COURT:  All right.  With respect to the issue

22   of personal information, I'll do a more careful review of

23   the parties' proposed alternate language but the parties are

24   in agreement, I think.  I think the thought bubbles over

25   your heads is essentially the same with respect to personal

```
 1        information.  So when I enter this order, I will adopt the

 2        language that I think best characterizes that agreement.

 3                I'm going to take the issue of relevancy

 4        redactions under advisement.  I share -- strongly share the

 5        antipathy of the courts to relevancy redactions, but I want

 6        to think about whether there's any part of what the

 7        Defendants are proposing here that may be appropriate

 8        because I am cognizant of the fact that we have a case that

 9        involves competitors and that there is, perhaps, a

10        heightened concern for access to highly-confidential

11        information.  So I want to make sure that I'm fully taking

12        that into account.  I will enter an order that reflects

13        where I come out on it, but I just want to let you know I'm

14        not yet ready to rule on that particular issue.

15                Moving on to the IV(d)(2), which is notice of

16        e-mail domains culled; and then V, which are the parameters

17        for culling and reviewing ESI and paper documents, both of

18        these are ones where I think Mr. Clark correctly anticipated

19        that I would like counsel to go back to the table and meet

20        and confer to see whether there are at least some of these

21        that can be resolved at this point in the litigation that

22        don't really need to wait for the Motions to Dismiss.

23                And again, I acknowledge that you can always make

24        the argument you wouldn't have to do it at all if the cases

25        are dismissed, but I'm -- that, in and of itself, is not
```

1    sufficient here.  What I want to know is are there some of

2    these that you can negotiate.  Because if the cases survive

3    the Motion to Dismiss, albeit in a more limited form, you

4    would still be taking the same position about how some of

5    these provisions ought to be negotiated.

6            So I want you to meet and confer on that to see

7    what you may be able to agree to at this stage of the

8    litigation, and then report back to me about whether there

9    are things that in good faith you believe simply can't be

10   negotiated until you know more about what -- how these cases

11   will be, if they are, delimited.  It doesn't mean I'll

12   accept that outright, but I at least would like you to have

13   that conversation first and report back.

14           Now, I realize this may take a bit more time than

15   some of the other things we have been talking about.  Is

16   that December 10th date still a valid one or do you need

17   more time for this conversation?

18           MR. CLARK:  Your Honor, from Plaintiffs'

19   perspective, that's enough time but certainly before

20   Christmas I think.

21           MR. SUMMERLIN:  Your Honor, I think from

22   Defendants' perspective --

23           THE COURT:  Why don't you come to the podium just

24   so we've got the --

25           MR. SUMMERLIN:  Yeah, let me come up here to the

1    mic.  You know, certainly with respect to IV(D)(2), I think

2    that's a fairly straightforward issue on whether we're going

3    to disclose e-mail domains that are culled.

4         The issues that are raised in paragraph V, though,

5    I think are much more complex in the sense that it's always

6    a little bit difficult to talk about how we're going to

7    handle some of the specifics of culling and reviewing ESI

8    when we haven't yet gathered that information.  Because at

9    least from my perspective, and I may be a little bit

10   simplistic on this, but the primary driver for me as we

11   start to make decisions on how we're going to handle ESI

12   really comes down to volume, right?  It's making a

13   determination is this a production that we can put ice on

14   everything, or do we have to start looking at other

15   technologies that will allow us to conduct a review to

16   determine relevance and all of that.

17        And so I think while in general it's possible for

18   us to meet and confer and maybe come to agreement on some of

19   the provisions of paragraph V in a fairly short amount of

20   time, there are other things like the search methodology and

21   the use of TAR or other advanced technologies that, again,

22   from my perspective are difficult to try and come up with a

23   rational decision at this point before we really know, well,

24   what is the volume of data we're talking about.

25        THE COURT:  At this point my requirement you meet

1    and confer acknowledges that that may be the case.

2              MR. SUMMERLIN:  Yeah.  So I think if it's going to

3    be acceptable for the parties to kind of say, Well, we met

4    about TAR and, you know, the Defendants' position is we

5    don't know yet because we don't know what volume we're

6    dealing with, then I think December 10th would be fine to do

7    that.

8              THE COURT:  All right.  Let's start with that.  If

9    it's -- yeah, let's start with that and see if you can chip

10   away at some of these, and then let me know where you think

11   you can and why.  And again, I'm not saying that I'll

12   automatically take that, but I want the parties to do as

13   much as even they acknowledge they could do at this point

14   and then let's see what's left and think about a rational

15   way to move the ball forward on anything else.

16             So by December 10th report back to me on further

17   meet and confer with respect to the IV(D)(2) and V issues in

18   the ESI protocol.

19             Since -- well, let me ask the question.  My

20   inclination would be to wait until I hear back from you on

21   that before I enter any of this because it isn't like you're

22   going to need it in two weeks.  Any reason why I ought to be

23   entering this piecemeal while this meeting and conferring is

24   still going on?

25             MR. CLARK:  No, Your Honor.  I think that makes

1    sense.  And just one other piece.  I think to the extent

2    there's a choice to be made based on volume, I think a lot

3    of what we've proposed is a little bit agnostic to the

4    volume.

5              THE COURT:  That's precisely the conversation I

6    want you to have.  If volume really doesn't matter to some

7    of this, then why not have the conversation about whether

8    there are -- whether you do or don't agree that it makes

9    sense.  And if it -- if there are reasons other than volume

10   that enter into it, we might still be able to get that

11   sorted out so that what we're left with potentially are the

12   things that are truly influenced by volume.

13             MR. CLARK:  And I think on search methodology, for

14   instance, in our view as long as we leave a path for key

15   words, leave a path for TAR, in our view that doesn't matter

16   what choice you make now as long as you know either choice

17   you can make --

18             THE COURT:  I'll give the Defendants a chance in

19   the meet and confer to talk about whether they think it's

20   still going to make a difference, but that's the

21   conversation that I don't think has happened yet and that I

22   would like to happen.

23             So I'll look for an update by December 10th.  If

24   your update is we worked hard at this but we're still

25   meeting and conferring, that's a perfectly okay response.  I

1    just want to keep noses to the grindstone to the extent we

2    can chip away at these issues.

3              Preservation.  Tell me where the parties are at

4    with their conversations about preservation of sources

5    relating to the senior executives.

6              MR. CLARK:  Your Honor, Plaintiffs and Defendants

7    have had productive conversations.  I think the only

8    potential issue I see is maybe with one Defendant, kind of a

9    possession, custody or control issue.  From our perspective,

10   we're not, you know, trying to obtain the data itself.  We

11   just want to make sure it's been imaged.

12             I think what might make sense is if we can't

13   resolve that in the next 7 to 14 days, we may request leave

14   to file or serve a subpoena for preservation purposes only

15   to kind of cut past the possession, custody or control issue

16   and just get the device in our case imaged.  If we have

17   that, I think it might make sense to do it -- I guess a

18   joint letter brief of some type because we have been having

19   productive discussions.  But that's how we anticipated

20   resolving the one issue we have with a particular executive.

21             THE COURT:  All right.  Anybody want to speak --

22   yes, on behalf of --

23             MR. RASHID:  Sami Rashid, Your Honor, JBS

24   Defendants.

25             THE COURT:  Good morning.

1           MR. RASHID:  Good morning.  I represent the one

2     Defendant with whom Plaintiffs are having this issue.  You

3     know, we don't just view it as a possession, custody or

4     control order.  We believe we've taken adequate preservation

5     measures, but we are in agreement -- Mr. Clark and I spoke

6     before we started this morning, we are in agreement with

7     talking about some more.  And then to the extent that we

8     cannot reach an agreement, submitting something to Your

9     Honor on a simultaneous basis.

10          THE COURT:  All right.  And he was talking --

11    Mr. Clark was talking about sometime in the next couple of

12    weeks or so.  Does that -- are you in agreement that that's

13    probably about the timetable that you will be raising the

14    issue with me if you can't work it out?

15          MR. RASHID:  Yes, Your Honor, that would be fine.

16          THE COURT:  All right.  That sounds fine.

17          MR. RASHID:  Thank you.

18          THE COURT:  All right.  So anything else other

19    than talking about when we schedule another status

20    conference and whether we ought to go ahead and schedule

21    status conferences on a recurring basis rather than one at a

22    time?  Yes, sir.

23          MR. PARKER:  Good morning, Your Honor.  Rich

24    Parker representing Smithfield.  I have two general points.

25    One, it doesn't apply to my Defendant, but I know there are

1    some folks on the phone who have holding companies who were

2    dragged into this litigation and they have nothing to do --

3    they own stock, not pigs.  And so I just want to put down a

4    marker in terms of meeting and conferring and moving ahead

5    with those folks, that's going to be a much different

6    proposition because they are really not in the business

7    we're talking about at all.  So I just wanted to raise that

8    marker.

9         THE COURT:  Well, I guess my question is is there

10   anything about what we've covered so far?  For example, the

11   protective order, I assume, has been negotiated among

12   everybody, right?

13        MR. PARKER:  Right.

14        THE COURT:  The ESI protocol, to the extent there

15   is agreement, has been agreed to by everybody.

16        MR. PARKER:  Yes.

17        THE COURT:  So are you proposing that some of the

18   Defendants be excluded from any of the meeting and

19   conferring that I've requested?

20        MR. PARKER:  Well, I'm also up here to suggest

21   that we meet for status conferences early and often for

22   several reasons.  I'm foreshadowing an issue here that if we

23   can't work it out with the other side, we'll bring that to

24   your attention.

25        I represent Smithfield, and I keep -- every time I

1      come here, I hear about chickens.  And we don't do chickens.

2      We were investigated by the DOJ.  We do have some rights

3      under *Twombly*.  We're going to read your order and comply

4      fully, but there is some issues in there, what we call an

5      antitrust or rule of reason, of what the right thing to do

6      is here, and so we may be back with some points here where

7      we don't agree with the Plaintiffs but I would like here to

8      get involved in that because we want to make sure that we're

9      living up to your order and living up to your expectations

10     as well.

11            But I do -- I understand enough about chickens to

12     know that it costs a lot of money, and I've got a client

13     that had nothing to do with that, nothing to do with the

14     DOJ, and so we may have some issues for you, Your Honor, as

15     we go forward, and I think early and often status

16     conferences is probably a good idea, I respectfully suggest.

17            THE COURT:  All right.  Well, I tend to be a fan

18     of status conferences as well.  I don't know exactly what

19     often means.  We should talk about that.

20            MR. PARKER:  Well, December 10, we have a letter.

21     Maybe we ought to have something after that.  I'm always

22     happy to come to Minnesota.

23            THE COURT:  I appreciate that.  Thank you.  Even

24     in December, in January?

25            MR. PARKER:  Your Honor, I'm a native actually.  I

```
 1    don't live here anymore, but I'm well aware.  Thank you.
 2              THE COURT:  I would say it would be difficult for
 3    me to do anything more frequently than monthly and keep all
 4    of my other cases going forward at the same time, and I'm
 5    not sure that more than monthly is necessary.
 6              You'd like to speak?  Yes.
 7              MS. SCARLETT:  Shana Scarlett representing the
 8    Plaintiffs.
 9              We agree early and often status conferences are
10    helpful.  We find them helpful in other cases, just to make
11    sure issues are being discussed thoroughly between the
12    parties and to get Your Honor's guidance as quickly as we
13    can.  Sixty days perhaps seems appropriate; thirty days
14    seems a little bit -- you know, we have a lot of issues in
15    this case and a lot of things that need to be dealt with,
16    but certainly from the Plaintiffs' perspective, sixty-day
17    status conferences would be helpful.
18              THE COURT:  Thank you.
19              Mr. Parker.
20              MR. PARKER:  Rich Parker again.  We have an
21    argument on the 10th.  Maybe we ought to have a conference
22    on the 11th.  Just a suggestion.
23              THE COURT:  You know, that sounds like that may be
24    worth doing.  Let me kind of get a sense.  Are there nodding
25    heads?  Anybody think we need to be getting together during
```

1    the week between Christmas and New Years, for example?  No,

2    no, not seeing a ground swell of enthusiasm for that idea.

3            Let me see what I can do.  I think that makes

4    sense.  I would certainly like to take advantage of the fact

5    that folks will be in town on the Motion to Dismiss.  I do

6    not have my calendar memorized for that date, but let me

7    take a look at it.  And ideally I think it would make some

8    sense to do it after the hearing on the Motion to Dismiss.

9    Judge Tunheim usually keeps his cards pretty close to the

10   vest, but if there were any strong signals sent during the

11   conference that you think I ought to be aware of, then I

12   think I would rather have the conference after that hearing

13   rather than before it.

14           I'm seeing somebody in the back of the courtroom.

15   Did you want to address this?

16           MS. STILSON:  Yes, Your Honor.  This is Jaime

17   Stilson.

18           THE COURT:  Actually, why don't you come -- just

19   so we've got everybody on the microphone and so the folks on

20   the phone can hear you.

21           MS. STILSON:  Yes, Your Honor.  I understand that

22   my colleague Britt Miller was trying to say something on the

23   telephone and she couldn't be heard, so I just wanted to

24   make sure that she had the opportunity to address Your

25   Honor.  Thanks.

1          THE COURT:  All right.  Ms. Miller.

2          MS. MILLER:  Your Honor, I wasn't sure if you

3     could hear me.  I spoke up but I wasn't clear about whether

4     or not my phone line was coming through.  Can you hear me

5     now?

6          THE COURT:  I can absolutely hear you now, and I

7     didn't hear you before, so thank you for being persistent.

8          MS. MILLER:  Not a problem.

9          I just wanted to address the issue that Mr. Parker

10    raised a moment ago as we are -- I represent one of the

11    corporate defendants who is impacted by the question of

12    being a holding company.  The question Your Honor asked was

13    whether or not any of the things that we have already talked

14    about could potentially impact those companies differently,

15    and my answer to that would be yes.  Literally I, and I

16    believe some of the other Defendants, represent a parent

17    company that has been named in the litigation, from what we

18    can tell, only by virtue of them being a partial owner of

19    the underlying pork producer, such that to the extent we are

20    dealing with preservation -- having to meet and confer on

21    preservation issues or custodians or document sources and

22    the like, depending on the breadth of those requests, that

23    could be quite an undertaking because we are talking about a

24    corporate parent -- a partial corporate parent who does

25    virtually nothing related to pork.

 1          So to the extent there can be some limitation on

 2     the requirement that those corporate defendants have to

 3     fully participate pending the Motion to Dismiss, we'd like

 4     Your Honor to consider it.

 5          On the status hearing, I certainly have no

 6     objection; and although I love Minnesota, I'm happy to limit

 7     the number of times we have to come up for hearing.  I

 8     personally have to be in court on the 11th in a different

 9     court, so if it would be possible to schedule something

10     perhaps the afternoon of the 10th, since we're seeing Judge

11     Tunheim in the morning, that would be appreciated, but I

12     understand if that's not possible with Your Honor's

13     schedule.

14          THE COURT:  Let me see what I can do.  It may

15     require moving some things around, but I absolutely hear

16     that that would make the most sense for you all and I do

17     want to try to minimize the burden on you if I can.

18          This issue of the defendants who have been

19     described as kind of the owners of the holding companies

20     kind of came up -- came up here where -- and didn't get a

21     chance to be fully addressed previously.  I'm starting to

22     run into some timing issues here.  I've got a conference

23     call starting in just a few minutes.

24          Let me ask -- let me ask this.  Let me get a -- it

25     wasn't even really discussed in the briefs in any way that

1    described a different concern, nor have I had a chance to

2    hear from the Plaintiffs on whether they'd see it

3    differently.  So I -- let me do this.  I want the -- two

4    things.  The meeting and conferring that I've required needs

5    to include, separately if necessary, the counsel who are

6    representing the Defendants who were characterized or

7    characterized themselves simply as holding companies.  So

8    you can talk about whether it might make sense to do

9    something differently or whether Plaintiffs' position --

10   Plaintiffs would take a different position or be willing to

11   take a different position with that.  Why don't you, when

12   you update me on December 10th, address that and include a

13   position letter on this issue.

14          So to the extent you haven't been able to work it

15   out, I need to know more about whether that's really a

16   separate issue that I ought to take different account of

17   than I have with respect to the Defendants generally, okay?

18          MS. MILLER:  Understood, Your Honor.

19          THE COURT:  So I don't want ten pages.  I want a

20   couple -- you know, a couple of pages of a letter that lays

21   out your position about why it does or doesn't have

22   anything, or should or shouldn't have anything to do with

23   the decisions I need to make about the scope of this stay.

24   Make sense?

25          MR. CLARK:  Yes, Your Honor.

1          THE COURT:  All right.  So that means since --

2    that you may not get a full stay order from me right after

3    the Thanksgiving weekend because I'd like to wrap as much up

4    as I can.  I think I'm inclined to wait until I've gotten

5    those meet and confer letters on December 10th and then wrap

6    as much up as I can after that point.  All right?  Make

7    sense?

8          Anything else we need to address for the good of

9    the order?

10          All right.  Well, thank you all.  I appreciate the

11   conversation.  I'll see what I can do about the 10th and I

12   wish you all a Happy Thanksgiving.

13          MR. GUSTAFSON:  You as well, Your Honor.

14          (Court adjourned at 12:02 p.m.)

15                         *      *      *

16

17

18          I, Carla R. Bebault, certify that the foregoing is

19   a correct transcript from the record of proceedings in the

20   above-entitled matter.

21

22

23          Certified by:  s/Carla R. Bebault
                            Carla Bebault, RMR, CRR, FCRR
24

25


                    Carla R. Bebault, RMR, CRR, FCRR
                           (651) 848-1220