## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | No. 0:18-cv-01776-JRT-HB |
| This Document Relates To: | |
| ALL ACTIONS | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO
DISMISS THE DIRECT PURCHASER PLAINTIFFS' COMPLAINT AND
THE FEDERAL LAW CLAIMS IN THE INDIRECT PURCHASER
PLAINTIFFS' COMPLAINTS FOR FAILURE TO STATE A CLAIM UPON
WHICH RELIEF MAY BE GRANTED**

# TABLE OF CONTENTS

I.    Introduction ................................................................................................ 1

II.   Legal Standards ........................................................................................ 3

      A.    Defendants' burden to prevail on a motion to dismiss is significant. ........... 3

      B.    The alleged horizontal price-fixing conspiracy constitutes a *per se* violation of the Sherman Act. .................................................................. 5

      C.    Defendants' motion to dismiss improperly relies upon external evidence. .. 7

            1.    Defendants' citation to documents outside of the Complaints violates the incorporation by reference doctrine. .............................. 8

            2.    Defendants' citation to documents outside of the Complaints violates the judicial notice doctrine. ................................................. 10

III.  Plaintiffs Adequately Plead Facts and Circumstances Establishing a Plausible Pork Price-Fixing Conspiracy Under *Twombly*. .................................................... 12

IV.   Defendants' Attacks Under *Twombly* Run Afoul of the Law and Ignore the Detailed Factual Allegations of the Complaints. .................................................. 20

      A.    Plaintiffs adequately plead an agreement to restrain pork supply .............. 20

            1.    Smithfield's CEO called the industry to joint action and acknowledged coordinated efforts to restrain supply—and its co-conspirators signaled their commitment. ...................................... 20

            2.    Each Defendant agreed to share competitively sensitive business information—as invited, facilitated, and monitored by Agri Stats— which supports the inference of agreement to stabilize supply and prices. ........................................................................................... 23

      B.    The unprecedented restraint of production relative to its long-term trajectory supports the plausibility of agreement, and Defendants' assertion of production increases is entirely misplaced. ............................. 29

      C.    Defendants' "alternative explanations" for their alleged conspiratorial acts do not undermine the plausibility of the Complaints. ........................... 33

      D.    Plaintiffs allege plus factors making the conspiracy plausible. ................. 36

      E.    The *Broilers* order denying motions to dismiss is instructive. ................... 45

010736-11 1081391 V1

V.    Plaintiffs' Claims Are Timely .................................................................. 48

    A.    Plaintiffs adequately allege a continuing violation. ..................................... 48

    B.    The statute of limitations is equitably tolled due to Defendants' fraudulent concealment. ............................................................................. 53

        1.    Defendants' wrongful concealment prevented Plaintiffs from discovering the conspiracy before 2018........................................... 55

            a.    Plaintiffs allege a self-concealing conspiracy....................... 55

            b.    Plaintiffs allege Defendants' affirmative concealment......... 57

        2.    Plaintiffs did not discover the operative facts until 2018................ 61

        3.    Plaintiffs have diligently pursued their claims in this litigation. ..... 61

        4.    The Court should defer its decision on fraudulent concealment...... 66

VI.    Conclusion............................................................................................ 68

010736-11 1081391 V1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abecassis v. Wyatt*,
902 F. Supp. 2d 881 (S.D. Tex. 2012) ..............................................................63, 64

*Am. Prairie Constr. Co. v. Hoich*,
560 F.3d 780 (8th Cir. 2009) ...............................................................................11

*In re Animation Workers Antitrust Litig.*,
123 F.Supp.3d 1175 .......................................................................................58, 67

*Arizona v. Maricopa Cty. Med. Soc'y*,
457 U.S. 332 (1982).........................................................................................6, 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................3

*In re Aspartame Antitrust Litig.*,
2007 WL 5215231 (E.D. Pa. Jan. 18, 2007)..........................................................55

*In re Auto. Parts Antitrust Litig.*,
50 F. Supp. 3d 869 (E.D. Mich. 2014)..................................................................41

*In re Automotive Parts Antitrust Litig.*,
2014 WL 4272772 (E.D. Mich. Aug. 29, 2014).......................................54, 62, 63

*Bailey v. Glover*,
88 U.S. 342 (1874).............................................................................................56

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................. *passim*

*BJC Health Sys. v. Columbia Cas. Co.*,
348 F.3d 685 (8th Cir. 2003) ................................................................................8

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa. 2010) ................................................30, 38, 39, 42

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ..............................................................................60

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) .......................................................... *passim*

*In re Bulk Popcorn Antitrust Litig.*,
  1990 WL 123753 (D. Minn. Jun. 19, 1990)..............................................7, 54, 59

*In re Bulk Popcorn Antitrust Litig.*,
  783 F. Supp. 1194 (D. Minn. 1991) ..........................................................................5

*Cafesjian v. Armenian Assembly of Am., Inc.*,
  2008 WL 906194 (D. Minn. Mar. 31, 2008) ......................................................8, 9

*Cantonis v. Stryker Corp.*,
  2011 WL 1084971 (D. Minn. Mar. 21, 2011) ........................................................60

*In re Capacitors Antitrust Litig.*,
  106 F. Supp. 3d 1051 (N.D. Cal. 2015) ................................................................50

*In re Cardizem CD Antitrust Litig.*,
  332 F.3d 896 (6th Cir. 2003) ..............................................................................7, 34

*Carrier Corp. v. Outokumpu Oyj*,
  673 F.3d 430 (6th Cir. 2012) ................................................................53, 61, 62

*In re Chicken Antitrust Litig.*,
  560 F. Supp. 963 (N.D. Ga. 1980) ........................................................................30

*Continental Ore Co. v. Union Carbide and Carbon Corp.*,
  370 U.S. 690 (1962)..........................................................................................5, 42

*In re Copper Antitrust Litig.*,
  436 F.3d 782 (7th Cir. 2006) ................................................................................63

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)..........................................................................................5, 6

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
  363 F.3d 761 (8th Cir. 2004) ................................................................................13

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  733 F. Supp. 2d 1348 (N.D. Ga. 2010) ................................................................42

*In re Domestic Airline Travel Antitrust Litig.*,
  221 F. Supp. 3d 46 (D.D.C. 2016) ................................................................ *passim*

*Edwards v. Nat'l Milk Producers Fed'n*,
  2012 WL 12951848 (N.D. Cal. Oct. 30, 2012)................................................58, 67

*ES Dev., Inc. v. RWM Enters., Inc.*,
  939 F.2d 547 (8th Cir. 1991) ................................................................................6

010736-11 1081391 V1

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013)...............................................................4, 36, 43, 44

*In re Fasteners Antitrust Litig.*,
   2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) .........................................54, 55, 56, 57

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
   788 F. Supp. 1042 (D. Minn. 1992)...............................................................29

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...........................................................22

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
   85 F. Supp. 3d 1007 (E.D. Wisc. 2015)...........................................................63

*In re Foreign Exchange Benchmark Rate Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015).................................................................4

*Forslund v. Stryker Corp.*,
   2010 WL 3905854 (D. Minn. Sept. 30, 2010) .....................................................68

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016)..........................................................................33

*In re Generic Pharm. Pricing Antitrust Litig.*,
   2018 WL 5003450 (E.D. Pa. Oct. 16, 2018) .......................................................34

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985).........................................................................9

*Graham v. Catamaran Health Sols. LLC*,
   2017 WL 3613328 (8th Cir. Aug. 23, 2017).......................................................11

*Grasso Enters., LLC v. Express Scripts, Inc.*,
   2017 WL 365434 (E.D. Mo. Jan. 25, 2017) .......................................................38

*Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*,
   120 F.3d 893 (8th Cir. 1997) ........................................................................65

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
   804 F. Supp. 2d 419 (D. Md. 2011)..................................................................38

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   797 F.3d 538 (8th Cir. 2015) .....................................................................12, 65

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   2014 WL 943224 (D. Minn. Mar. 11, 2014) .......................................................66

010736-11 1081391 V1

*Interstate Circuit, Inc. v. United States*,
   306 U.S. 208 (1939) .................................................................................24

*J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*,
   976 F. Supp. 2d 1051 (E.D. Ark. 2013) .....................................................3

*J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*,
   2015 WL 12696209 (E.D. Ar. Dec. 3, 2015) .............................................7

*Jenisio v. Ozark Airlines, Inc. Ret. Plan for Agent and Clerical Emps.*,
   187 F.3d 970 (8th Cir. 1999) .....................................................................9

*Kansas City, Mo. v. Fed. Pac. Elec. Co.*,
   310 F.2d 271 (8th Cir. 1962) ...................................................................53

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
   775 F. Supp. 2d 1071 (N.D. Ill. 2011) .............................................35, 38

*Kushner v. Beverly Enters.*,
   317 F.3d 820 (8th Cir. 2003) ...................................................................12

*Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ...................................................................................6

*In re Linerboard Antitrust Litig.*,
   497 F. Supp. 2d 666 (E.D. Pa. 2007) ......................................................32

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016) ............................................ *passim*

*McCleneghan v. Union Stock Yards of Omaha*,
   349 F.2d 53 (8th Cir. 1965) .....................................................................32

*In re Mercedes-Benz Anti-Trust Litig.*,
   157 F. Supp. 2d 355 (D.N.J. 2001) ................................................. *passim*

*In re Milk Prods. Antitrust Litig.*,
   84 F. Supp. 2d 1016 (D. Minn. 1997) ............................................ *passim*

*In re Monosodium Glutamate Antitrust Litig.*,
   2003 WL 297287 (D. Minn. Feb. 6, 2003) .............................................56

*Monsanto Co. v. Spray-Rite Ser. Corp.*,
   465 U.S. 752 (1984) .................................................................................13

*Morton v. Becker*,
   793 F.2d 185 (8th Cir. 1986) .....................................................................7

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
   198 F.3d 823 (11th Cir. 1999) ..................................................................62, 64

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ....................................................................4, 35

*N. Texas Specialty Physicians v. F.T.C.*,
   528 F.3d 346 (5th Cir. 2008) ......................................................................7, 34

*In re Optical Disk Drive Antitrust Litig.*,
   2017 WL 6503743 (N.D. Cal. Dec. 18, 2017)...................................................53

*Osborn v. Visa Inc.*,
   797 F.3d 1057 (D.C. Cir. 2015)........................................................................53

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010)............................................4, 41, 54, 59

*Palmer v. BRG of Georgia, Inc.*,
   498 U.S. 46 (1990) .............................................................................................6

*Phoenix Entm't Partners, LLC v. Star Music, Inc.*,
   2017 WL 5714021 (D. Minn. Nov. 28, 2017) ...................................................59

*In re Polyurethane Foam Antitrust Litig.*,
   799 F. Supp. 2d 777 (N.D. Ohio 2011)............................................................62

*In re Polyurethane Foam Antitrust Litig.*,
   86 F. Supp. 3d 769 (N.D. Ohio 2015)................................................................5

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995)........................................................................6

*In re Pre-Filled Propane Tank Antitrust Litig.*,
   860 F.3d 1059 (8th Cir. 2017) ................................................................ *passim*

*In re Pre-Filled Propane Antitrust Tank Litig.*,
   893 F.3d 1047 (8th Cir. 2018) ..............................................................49, 51, 52

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding), Ltd.*,
   2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).....................................................5

*In re Processed Egg Prods. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011)..................................................................9

*Prosterman v. Am. Airlines, Inc.*,
   2018 WL 4018147 (9th Cir. Aug. 23, 2018)......................................................27

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*
    960 F. Supp. 2d 958 (D. Minn. 2013) .............................................................. *passim*

*Ryan v. United States,*
    534 F.3d 828 (8th Cir. 2008) ...................................................................53

*Savig v. First Nat'l Bank of Omaha,*
    2009 WL 1955476 (D. Minn. July 6, 2009) ...........................................59

*Silver v. H&R Block, Inc.,*
    105 F.3d 394 (8th Cir. 1997) .....................................................................9

*Smith v. United States,*
    568 U.S. 106 (2013)................................................................................53

*Staehr v. The Hartford Fin. Servs. Grp., Inc.,*
    547 F.3d 406 (2d Cir. 2008)......................................................61, 63, 64

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010)......................................37, 40, 41, 44

*Steward v. Up North Plastics, Inc.,*
    177 F. Supp. 2d 953 (D. Minn. 2001).....................................................66

*TCF Nat'l Bank v. Market Intelligence, Inc.,*
    2013 WL 53837 (D. Minn. Jan. 3, 2013)................................................67

*In re Text Messaging Antitrust Litig.,*
    630 F.3d 622 (7th Cir. 2010) ...................................................................23

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    820 F. Supp. 2d 1055 (N.D. Cal. 2011) ...................................21, 29, 30, 53

*TMT Mgmt. Group, LLC v. U.S. Bank Nat'l Assoc.,*
    2016 WL 730254 (D. Minn. Jan. 4, 2016)..............................................10

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001)................................................................. *passim*

*Topchian v. JPMorgan Chase Bank, N.A.,*
    760 F.3d 843 (8th Cir. 2014) .....................................................................3

*In re Tyson Foods, Inc. Secs. Litig.,*
    275 F. Supp. 3d 970 (W.D. Ark. 2017)...................................................20

*U.S. v. U.S. Gypsum Co.,*
    438 U.S. 422 (1978)................................................................................29

010736-11 1081391 V1

*United Power Ass'n, Inc. v. L.K. Comstock & Co.*,
    1992 WL 402906 (D. Minn. Oct. 27, 1992) (Alsop, J.)........................................55

*United States v. Grimmett*,
    150 F.3d 958 (8th Cir. 1998) .......................................................................53

*United States v. Jones*,
    29 F.3d 1549 (11th Cir. 1994) .....................................................................11

*United States v. Linseed Oil Co.*,
    262 U.S. 371 (1923).......................................................................................25

*United States v. Patten*,
    226 U.S. 525 (1913).......................................................................................42

*United States v. Sinclair Broadcast Group, Inc.*,
    Case No. 1:18-cv-2609 ................................................................................25

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017)..........................................................................27

*In re Vitamins Antitrust Litig.*,
    2000 WL 1475705 (D.D.C. May 9, 2000)...................................................54

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    722 F. Supp. 2d 1079 (D. Minn. 2010) ......................................................65

*Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*,
    520 F.2d 289 (8th Cir. 1975) .......................................................................65

*Zean v. Fairview Health Servs.*,
    149 F.Supp. 1129 (D. Minn. 2016) ...............................................................7

## Statutes

15 U.S.C. § 1 (2004) ..................................................................... *passim*

## Other Authorities

Federal Rule of Civil Procedure 8 ......................................................................3

Federal Rule of Civil Procedure 9 ....................................................................54

Federal Rule of Civil Procedure 9(b)................................................................54

Federal Rule of Civil Procedure 12(b)(6) ....................................................7, 33

Federal Rule of Civil Procedure 10(c) ............................................................8

Federal Rule of Civil Procedure 12(d) ............................................................9

Federal Rule of Civil Procedure 15(a)(2) ......................................................68

Federal Rule of Civil Procedure 201(b) ........................................................11

Federal Rule of Evidence 201 ........................................................................12

010736-11 1081391 V1

## I.    INTRODUCTION

Plaintiffs[1] allege that Defendants,[2] the nation's largest pork integrators, conspired to restrain supply and thereby fix the price of pork in the United States. Prior to the start of the conspiracy, prices had been flat for years. Defendants acting independently lacked sufficient market power to restrain production and revive stagnating prices. Smithfield, for example, publicly acknowledged that it alone "can't solve the problem." Rather, it said that the "industry has got to solve it collectively."

The pork integrators were able to "solve it collectively," closely monitor each other, and so control supply and price, heeding the call of Agri Stats to collect and distribute competitively sensitive supply and pricing data—because the "ultimate goal is increasing profitability – not always increasing the level of production." The largest pork integrators signaled their commitment to capacity discipline, admitting in public calls that they had discussed production cuts.

The collusion achieved its intended result. After years of increasing production prior to the onset of the conspiracy, in 2009, 2010, and 2013 the pork industry cut production, with an unprecedented upswing in prices beginning in 2010. And there are

---

[1] Unless otherwise indicated, the term "Plaintiffs" refers collectively to Consumer Indirect Purchaser Plaintiffs ("IIPs"), Direct Purchaser Plaintiffs ("DPPs"), and Commercial and Institutional Indirect Purchaser Plaintiffs ("CIPs").

[2] The term "Defendants" refers collectively to Agri Stats, Inc.; Clemens Food Group, LLC, The Clemens Family Corporation (collectively, "Clemens"); Hormel Foods Corporation, Hormel Foods, LLC (collective, "Hormel"); Indiana Packers Corporation; JBS USA Food Company, JBS USA Food Company Holdings (collectively, "JBS"); Seaboard Foods LLC; Seaboard Corporation (collectively, "Seaboard"); Smithfield Foods, Inc.; Triumph Foods, LLC; Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. (collectively, "Tyson").

numerous other plus factors contributing to the plausibility of the conspiracy as well. These allegations—which must be taken as true and viewed in the light most favorable to the Plaintiffs—establish a plausible conspiracy to stabilize prices and supply for pork.

Instead of responding to the facts as alleged in the Complaints,[3] Defendants misconstrue and attempt to recast the conspiracy. Defendants ignore allegations, view them in isolation, and read them in the light most favorable to themselves. In doing so, Defendants cast aside the plausibility standard by positing possible alternative explanations for their collusive conduct. These arguments fail because *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), does not impose a probability standard, so a possible or even plausible alternative explanation for the conduct alleged does not render a conspiracy implausible.

Finally, Defendants' statute of limitations defense ignores Plaintiffs' allegations that Defendants took great pains to keep the conspiracy secret. Before Plaintiffs filed their Complaints, facts that would cause a reasonable person to suspect the existence of a conspiracy were not available to the market. As shown in their motion, to this day Defendants seek to cover up the conspiracy and provide pretexts for their misconduct. The Complaints establish that Plaintiffs' claims are timely because the statute of limitations was: (1) started anew by each act in furtherance of the conspiracy under the

---

[3] The term "Complaints" refers collectively to the operative complaints filed by Direct Purchaser Plaintiffs (DPPs) (No. 18-cv-1803, ECF No. 83), Consumer Indirect Purchaser Plaintiffs (IIPs) (No. 18-cv-1776, ECF No. 74), and Commercial and Institutional Indirect Purchaser Plaintiffs (CIPs) (No. 18-cv-1891, ECF No. 63).

continuing violation doctrine; and (2) equitably tolled due to Defendants' fraudulent concealment of the conspiracy.

Defendants' motion to dismiss should be denied in its entirety.

## II.   LEGAL STANDARDS

### A.   Defendants' burden to prevail on a motion to dismiss is significant.

On a motion to dismiss, courts must accept all of the plaintiffs' factual allegations as true and draw all reasonable inferences in their favor. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014). There is no heightened pleading standard in antitrust cases. *J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*, 976 F. Supp. 2d 1051, 1059 (E.D. Ark. 2013). "Moreover, in antitrust cases, where the proof is largely in the control of the defendant, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Id.* (quoting *Fusco v. Xerox Corp.*, 676 F.2d 332, 337 n.7 (8th Cir. 1982)).

"[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). In short, a complaint must contain sufficient facts, accepted as true, "to state a claim for relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570).

The plausibility standard does "not require heightened fact pleading of specifics." *Twombly*, 550 U.S. at 570; *see also In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane I*"), 860 F.3d 1059, 1070 (8th Cir. 2017) (en banc) ("Plaintiffs 'need not provide specific facts in support of their allegations.'"). Rather, a complaint need only

contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The facts must simply "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* This is true "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* While allegations of parallel conduct by itself is inadequate, an allegation of parallel conduct "gets the complaint close to stating a claim," and "some further factual enhancement" will render agreement plausible. *Id.* at 557.

At the pleading stage, courts cannot weigh "competing inferences" or "credit a defendant's counterallegations." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013). When based on allegations of parallel conduct (that is, without direct evidence of an agreement), "a complaint must at least allege the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible."[4] *Id.* at 46. Allegations of "plus factors" are one way to make a complaint more plausible, but they are not required, and "other, more general allegations informing the context of an agreement may be sufficient." *Id.* at 47.

A "'smoking gun' can be hard to come by, especially at the pleading stage." *In re Foreign Exchange Benchmark Rate Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015). Courts must consider the allegations in the complaint as a whole, and must reject any "attempt to parse and dismember the complaint[]." *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1006 (E.D. Mich. 2010); *see also Continental Ore Co. v.*

---

[4] Parallel conduct arises when "competitors adopt[] similar policies around the same time in response to similar market conditions." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

*Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts."). When analyzing an alleged conspiracy, the court must accept the allegations in the complaint as true, and the complaint must be construed "'liberally in the light most favorable to' Plaintiffs." *Propane I*, 860 F.3d at 1070.

"Once a conspiracy is established, even *slight evidence* connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement." *In re Bulk Popcorn Antitrust Litig.* (*Bulk Popcorn II*), 783 F. Supp. 1194, 1197 (D. Minn. 1991) (Magnuson, J.) (applying this rule at summary judgment); *see also In re Polyurethane Foam Antitrust Litig.*, 86 F. Supp. 3d 769, 786 (N.D. Ohio 2015) (citing *Bulk Popcorn II*). Courts also apply this rule at the pleading stage. *See, e.g.*, *Precision Assocs., Inc. v. Panalpina World Transp. (Holding), Ltd.*, No. 08-cv-00042, 2012 WL 3307486, at *2 (E.D.N.Y. Aug. 13, 2012).

      **B.**    **The alleged horizontal price-fixing conspiracy constitutes a *per se* violation of the Sherman Act.**

"Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984); *Propane I*, 860 F.3d at 1067 ("[H]orizontal restraint . . . is a *per se* antitrust violation."). By contrast, "[o]ther combinations, such as mergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." *Copperweld Corp.*, 467 U.S. at 768. Courts use

a "rule of reason" analysis to evaluate those combinations, inquiring into market power and market structure to assess the effect of the combination on competition. *Id.* A rule of reason analysis is not applicable here.

In this case, Plaintiffs allege "[a] horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price [which] is, and ought to be, *per se* unlawful." *See Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).[5] *Per se* violations of the Sherman Act are presumed to be unlawful, regardless of the motives behind the conspiracy. *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 557 (8th Cir. 1991) ("[W]here businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation of the underlying conduct.") (citing *U.S. v. Gen. Motors Corp.*, 384 U.S. 127, 146 (1966)). "The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 351 (1982).

Thus, the only thing that Plaintiffs need to allege to sustain their Sherman Act claims is that Defendants acted collectively in raising, fixing, or stabilizing the price of pork. *Id.*; *N. Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008) ("Procompetitive justifications will not be considered if a practice, such as price-fixing, is

---

[5] *See also In re Potash Antitrust Litig.*, 159 F.R.D. 682, 694 (D. Minn. 1995) ("Price-fixing is illegal per se under the Sherman Act."); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) ("[U]nder the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal *per se*.").

a *per se* violation."); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003) (holding that where a *per se* approach applies, "no consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual effect on competition."). Plaintiffs satisfy this standard.[6]

    **C.**    **Defendants' motion to dismiss improperly relies upon external evidence.**

In reviewing a motion to dismiss under Rule 12(b)(6), the Court's inquiry is limited and generally may not consider materials outside the complaint. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *Zean v. Fairview Health Servs.*, 149 F.Supp. 1129, 1133 (D. Minn. 2016) ("When considering a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials outside the pleadings."); *J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*, No. 12-cv-00754, 2015 WL 12696209, at \*2 (E.D. Ar. Dec. 3, 2015); *In re Bulk Popcorn Antitrust Litig.* (*Bulk Popcorn I*), No. 3-89-0710, 1990 WL 123753, at \*4 (D. Minn. Jun. 19, 1990) (Magnuson, J.). In addition, all of Plaintiffs' allegations must be accepted as true. *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1019 (D. Minn. 1997) (Magnuson, J.).

Defendants violate these fundamental principles by relying upon affirmative evidence outside the four corners of the Complaints and asking the Court to make factual determinations. The extrinsic materials include various articles and a transcript from a quarterly earnings call. As the court recognized in *In re Domestic Airline Travel Antitrust*

---

    [6] If the Court concludes that Plaintiffs' claims are subject to a rule of reason analysis, Plaintiffs reserve their rights to amend their claims, as necessary, to satisfy the appropriate standards.

*Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016), Defendants' attempted reliance upon external

evidence is improper:

> In essence, Defendants ask the Court to consider all the facts in the Complaint and the underlying documents provided as exhibits to their briefing and make factual determinations after weighing and considering the facts relied upon by each party. This is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true.

*Id.* at 71-72. Moreover, Defendants' reliance on this evidence cannot be saved by the

limited exceptions for incorporation by reference or judicial notice.

### 1. Defendants' citation to documents outside of the Complaints violates the incorporation by reference doctrine.

The incorporation-by-reference doctrine allows a defendant to rely upon

documents cited in a complaint only if: (1) the documents are "the sole basis" for the

plaintiff's claim; and (2) the documents provided by the defendant are undisputed. *See*

Fed. R. Civ. P. 10(c); *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687-89 (8th

Cir. 2003) (excluding documents on a motion to dismiss because the documents were

"neither undisputed nor the sole basis for [plaintiff's] complaint."). The typical

application of this limited exception is the incorporation of the contract at issue in a

breach of contract claim. *See, e.g.*, *BJC Health Sys.*, 348 F. 3d at 688; *Cafesjian v.*

*Armenian Assembly of Am., Inc.*, No. 07-2079 (JNE/JJG), 2008 WL 906194, at *7 n.7 (D.

Minn. Mar. 31, 2008). If the two elements are not satisfied, "the motion is . . . treated as

one for summary judgment." *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir.

1997); Fed. R. Civ. P. 12(d). Courts refuse to apply the doctrine when defendants attempt

010736-11 1081391 V1

to rely on documents to which plaintiffs make a "mere[] mentioning." *Cafesjian*, 2008 WL 906194, at *7 n.7; *see also Jenisio v. Ozark Airlines, Inc. Ret. Plan for Agent and Clerical Emps.*, 187 F.3d 970, 973 (8th Cir. 1999); *Domestic Airline Travel*, 221 F. Supp. 3d at 70-71.

This is exactly what Defendants attempt to do, improperly resting their motion upon external documents that receive a mere mention in the Complaints. *See, e.g.*, Mem. at 24 nn.11-12, 32, 33 & n.20, 34 & n.21.[7] These documents should not be incorporated by reference. *See Domestic Airline Travel*, 221 F. Supp. 3d at 70-71 (refusing to incorporate by reference articles, industry reports, transcripts from earning calls, and SEC filings cited within the complaint); *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) ("[L]imited quotation does not constitute incorporation by reference."); *see also In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 740 n.31 (E.D. Pa. 2011) (rejecting defendants' claim that *Twombly* broadened the incorporation by reference doctrine).

Defendants' motion to dismiss improperly includes matters outside the Complaints, and attaches affidavits with full reproductions of news articles, expansive quotes of industry publications, and information from earnings calls that do not appear in the Complaints. Defendants rely on these external materials in hope of substantiating their version of certain contested facts, and improperly invite the Court to draw

---

[7] All "Mem." references are to the Memorandum of Law In support of Defendants' Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Complaint and the Federal Law Claims in the Indirect Purchaser Plaintiffs' Complaints for Failure to State a Claim Upon Which Relief May Be Granted, ECF No. 162.

inferences in their favor. Courts, however, do not generally consider materials "submitted to challenge (and prove) the truth of the allegations alleged [in the complaint]," regardless of which party offers them in support of, or in opposition to, a motion to dismiss. *TMT Mgmt. Group, LLC v. U.S. Bank Nat'l Assoc.*, Civ. No. 14-4692 (MJD/JSM), 2016 WL 730254, at *13 (D. Minn. Jan. 4, 2016).

None of the external materials relied upon by Defendants should be considered. Specifically, the Declaration of John A. Kvinge attached to the joint motion to dismiss includes a full reproduction of an online news article mentioned briefly in the Complaints.[8] ECF No. 163, Ex. A. The passing reference in the Complaints did not allege anything about the other aspects of the article, nor does Defendants' citation to the news article reiterate what is said in the pleadings. Consequently, these documents are well outside of the pleadings and should be stricken as immaterial. *See Domestic Airline Travel*, 221 F. Supp. 3d at 71-72 (refusing defendants' request to "consider all the facts in the Complaint and the underlying documents provided as exhibits to their briefing and make factual determinations after weighing and considering the facts relied upon by each party").

### 2. Defendants' citation to documents outside of the Complaints violates the judicial notice doctrine.

Courts may judicially notice a fact only if it is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction, or can be accurately and readily determined from sources whose accuracy cannot reasonably be

---

[8] The Complaints reference the article attached as Exhibit A of the Joint Motion to Dismiss Declaration in Paragraph 130 of ECF No. 83 and Paragraph 136 in ECF No. 63.

questioned. Fed. R. Evid. 201(b); *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 798

(8th Cir. 2009). "Caution must . . . be taken to avoid admitting evidence, through the use

of judicial notice, in contravention of the relevancy, foundation, and hearsay rules." *Id.* at

797. And when a document is given judicial notice, it cannot be used to establish the truth

of the matters asserted therein. *Graham v. Catamaran Health Sols. LLC*, No. 16-1161,

2017 WL 3613328, at \*2 n.1 (8th Cir. Aug. 23, 2017); *In re Broiler Chicken Antitrust*

*Litig.*, 290 F. Supp. 3d 772, 794 (N.D. Ill. 2017) (*Broilers*) (refraining from taking

judicial notice of the "ultimate truth of [the Department of Agriculture's] production

numbers"). This is because the effect of judicially noticing a fact is to preclude the

opposing party from introducing contrary evidence and essentially directing a verdict

against him as to the fact noticed. *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.

1994).

Defendants request that this Court take judicial notice of transcripts of four

Hormel earnings calls from 2008, 2009, and 2010, and Smithfield's earnings call from

2009. ECF Nos. 163 and 171. While the earnings calls[9] are mentioned in the Complaints,

there is no reference to Hormel's 2009 annual report anywhere in the pleadings.

Regardless, none of this information satisfies the narrow requirements for proper judicial

notice. Defendants are not seeking judicial notice to establish the existence or publication

of documents. Rather, since the contents of the earnings calls—and the inferences to be

drawn from them—are directly in dispute, Defendants are improperly attempting to

---

[9] Hormel's earnings calls were referenced in Paragraphs 110, 111, 112, 113 of the DPP Complaint and Paragraphs 118, 119, and 121 of the CIP Complaint.

"present new factual allegations to counter the factual allegations underlying Plaintiffs' claims as set forth in the Complaint." *Domestic Airline Travel*, 221 F. Supp. 3d at 71, 72 (denying defendants' request to take judicial notice of the truth of the matter asserted in articles and industry reports that were cited or relied upon in the complaint); *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (refusing to take judicial notice of public documents in antitrust case for "the truth of the matters within them and inferences to be drawn from them"); *Kushner v. Beverly Enters.*, 317 F.3d 820, 831-32 (8th Cir. 2003) (refusing to take judicial notice of public records and SEC filings for the truth of the matter asserted). And Defendants' request for judicial notice should be denied for the additional and independently sufficient reason that "other than asserting that the Court should take notice of these facts, Defendants do not set forth how each document at issue satisfies the requirements of Federal Rule of Evidence 201." *Domestic Airline Travel*, 221 F. Supp. 3d at 72.

## III.   PLAINTIFFS ADEQUATELY PLEAD FACTS AND CIRCUMSTANCES ESTABLISHING A PLAUSIBLE PORK PRICE-FIXING CONSPIRACY UNDER *TWOMBLY*.

Contrary to Defendants' contention, Plaintiffs plausibly allege an antitrust conspiracy based on circumstantial allegations. As the case law firmly establishes, plaintiffs can (and almost always do) allege antitrust conspiracies without the smoking gun of direct evidence, because defendants "typically cannot be relied on to confess that they have entered into an unlawful agreement." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004); *see also Monsanto Co. v. Spray-Rite Ser. Corp.*, 465 U.S. 752, 764 (1984).

010736-11 1081391 V1

Plaintiffs' Complaints allege how Defendants adopted and implemented their price-fixing conspiracy. Rather than assert bare allegations of collusive conduct, the Complaints set forth specifics regarding Defendants' conspiracy to share competitively sensitive supply and pricing data in order to control the supply and thus fix the prices of pork. The Complaints identify the conspiratorial acts Defendants committed, who participated in the conspiracy, the time period, and how the conspiracy was monitored and enforced. These allegations provide sufficient facts to plausibly suggest the existence of the alleged conspiracy. Indeed, such allegations are similar to those in *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.* 960 F. Supp. 2d 958, 980 (D. Minn. 2013) (Tunheim, J.), where the Court denied a motion to dismiss because claimants identified an unreasonable restraint of trade, the individuals who restricted trade, and the actions taken to restrict trade.

The following is a summary of Plaintiffs' conspiracy allegations:

**The industry is conducive to collusion**. Defendants are the largest integrators of pork in the multi-billion dollar United States pork industry. IIP ¶ 74; DPP ¶ 135; CIP ¶ 51. The pork industry has significant market concentration: between 1988 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015. IIP ¶ 113; DPP ¶ 77; CIP ¶ 83. And the top eight integrators had market share exceeding 80 percent for the entire class period. IIP ¶¶ 113-116; DPP ¶¶ 77-82; CIP ¶¶ 83-85. Moreover, Defendants are vertically integrated, with broad control over all aspects of production and processing, either producing their own hogs or contracting out the production of hogs to growers. IIP ¶¶ 107-

109; DPP ¶¶ 68-71; CIP ¶¶ 73-77. And Defendants had many opportunities to collude, including at National Pork Producers Council meetings, the annual National Pork Industry Forum, the annual World Pork Expo, the annual National Pork Industry Conference, and at conferences held by the North American Meat Institute (and its predecessor, the American Meat Institute). DPP ¶¶ 86-106; CIP ¶¶ 92-112.

**Defendants enter into a supply-restraint agreement**. Prior to the start of the conspiracy, prices had been flat for years, with prices for pork products less than $1.40/lb. from 2000 to 2009, and at times substantially less. DPP ¶ 131. Defendants acting independently lacked sufficient market power to alter this. Smithfield, for example, publicly acknowledged that it "can't solve the problem" independently. IIP ¶ 101; DPP ¶ 117; CIP ¶ 125. Instead, "this industry has got to solve it collectively." *Id.*

The conspiracy began to unfold in 2008 when, following the success of increased and systematized information-sharing in the broiler market, Greg Bilbrey of Agri Stats invited "each and every commercial swine operation . . . to participate in some benchmarking effort." IIP ¶¶ 64-70; DPP ¶¶ 38-44; CIP ¶¶ 41-47. Agri Stats explained that the "ultimate goal is ***increasing profitability—not always increasing the level of production***." IIP ¶ 71; DPP ¶ 45; CIP ¶ 48. And it advised that "[t]o gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program." *Id*. In April 2009, Bilbrey repeated this invitation to collude to "all producers" and advised that "[p]roducer groups could design and operate their own benchmarking effort." IIP ¶ 72; DPP ¶ 46; CIP ¶ 49.

010736-11 1081391 V1

In 2009, the pork producers accepted this offer to exchange detailed cost, supply and sales information with their competitors in order to increase profitability by "not always increasing the level of production." IIP ¶¶ 71-73; DPP ¶¶ 45-47; CIP ¶¶ 48-50. Each member of the conspiracy subscribed to Agri Stats pursuant to this scheme, and collectively paid millions of dollars to Agri Stats over the course of the conspiracy. IIP ¶¶ 4, 77; DPP ¶¶ 4, 49; CIP ¶¶ 4, 54. Agri Stats' parent company confirmed that "over 90% of the poultry and pig market" subscribed to Agri Stats. IIP ¶ 77; DPP ¶ 49; CIP ¶ 54.

By subscribing to and participating in Agri Stats, producers shared confidential information concerning production levels, short and long-term production capacity, costs, profits, and sales. IIP ¶¶ 76, 79; DPP ¶¶ 48, 51; CIP ¶¶ 53, 56; *see also* IIP ¶ 142; DPP ¶ 148; CIP ¶ 144 (Agri Stats commenting on the "confidentiality" of the information that they "try to protect"). A former Department of Justice ("DOJ") antitrust lawyer commented that the level of plant-by-plant detail in the company's broiler reports— which no competitor would reasonably share with another—was "unusual" and conducive to collusion, because detailed information "creates stability for a cartel." IIP ¶ 96; DPP ¶ 67; CIP ¶ 72. For example, detailed information regarding the top 25 percent and the average of all companies allowed the co-conspirators to monitor each other's performance:

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 35,001,089 Pigs Finished | | | | | | | | | | | | |
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 30,785,319 Pigs finished | | | | | | | | | | | | |
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | | 8 | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | 3 | 5 | | 3 | |
| 22,306,500 Pigs finished | | | | | | | | | | | | |

IIP ¶ 81; DPP ¶ 53; CIP ¶ 58. And while the reports are purported to be anonymous, many are organized by company and facility with "such detailed figures covering every aspect of pork production and sales that producers can accurately identify the companies behind the metrics," using, for example "unique but recurring data points." IIP ¶ 90; DPP ¶ 61; CIP ¶ 66. In addition, Agri Stats required the participants to "agree on calculation and data collection procedures" and "*determine tolerance and outlier status and enforce.*" IIP ¶ 85; DPP ¶ 62; CIP ¶ 57. And it recognized that "each participant has to commit." *Id.* So Agri Stats was key to the formation, operation, and enforcement of Defendants' conspiracy to restrain supply and thereby fix prices.

**The conspiracy achieves supply reductions**. Once the conspiracy began, Defendants achieved three years of concerted decreases in supply, with an ongoing and intended impact on prices. IIP ¶ 97; DPP ¶ 107; CIP ¶ 115. After years of increasing production prior to the onset of the conspiracy, in 2009, 2010, and 2013 the pork industry actually experienced decreased production:

010736-11 1081391 V1



IIP ¶ 97; DPP ¶ 107.

    **The industry signals ongoing commitment to the conspiracy**. These industry-wide production cuts were accompanied by public signals from the largest producers regarding their ongoing commitment to capacity discipline. In May 2009, Smithfield's CEO and President, Larry Pope, stated that it had decided in 2008 "***to take a leadership position and start reducing our sow herds***." IIP ¶ 98; DPP ¶ 112; CIP ¶ 120. In May 2009, Hormel confirmed that it saw "a contraction in the overall supply of hogs for the year but not as much as we originally anticipated." IIP ¶ 99; DPP ¶ 113; CIP ¶ 121. And in June 2009, the CEO of Smithfield confirmed that its current cuts were not enough to "fix the hog industry." IIP ¶ 100; DPP ¶ 114; CIP ¶ 122. So, issuing a call to action, he stated that "[s]omebody else has got to do something." *Id.*

    Several months later, in September 2009, Smithfield's CEO reiterated that it "can't solve the problem." IIP ¶ 101; DPP ¶ 117; CIP ¶ 125. Instead, "***this industry has got to solve it collectively***." *Id.* So Smithfield's CEO "had conversations with several

sizable, more than sizeable large producers, in fact very large producers, and . . . they are doing some liquidation." *Id.* In fact, he said that he believed that "everyone is now looking" and "there are others cutting back." *Id.* He was right.

Tyson's COO James Lochner also confirmed that it "expect[ed] to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability." DPP ¶ 115; CIP ¶ 123. In March 2010, Smithfield indicated that "8% of the hogs will be down." IIP ¶ 102; DPP ¶ 119; CIP ¶ 126. That same month, JBS's CEO, Wesley Mendonca Batista, stated, "we are very optimistic about our business . . . and this reduction in supply, so we believe that we will see some shortage of protein going forward." DPP ¶ 120; CIP ¶ 127. In November 2010, Hormel's CFO, Jody Feragan, stated that she did not think the industry would see large scale expansion given profitability for the pork integrators. DPP ¶ 122. In 2012, Indiana Packers' president, Gary Johnson, commented that the pork company now "runs 'on a sold-out position.'" IIP ¶ 97; DPP ¶ 126; CIP ¶ 132. In 2013, JBS's CEO stated that "given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business." DPP ¶ 128; CIP ¶ 134. And in December 2013, Smithfield again reminded its co-conspirators that when it comes to the "overall industry balance of supply demand" it had "a limited ability to do it ourselves if the rest of the industry doesn't follow." DPP ¶ 127; CIP ¶ 133.

**Pork prices increase as Defendants intended**. Along with decreasing hog production came the intended result: an unprecedented increase in hog prices beginning in 2010, and staying elevated through 2018. IIP ¶ 126; DPP ¶ 113. According to

- 18 -

aggregate prices published by the USDA, the "hog market year average price" was at or below $50 every year between 1998 and 2009, before increasing to $76.30 in 2015. *Id.* And the following graph shows the drastic upswing in average wholesale hog prices in terms of cents per pound starting in 2010:



IIP ¶ 126.

Moreover, Defendants' revenues increased beginning in 2009, even taking into account defendant-specific costs. IIP ¶ 130. For two of the largest Defendants, Smithfield and Tyson, Plaintiffs' experts examined the spread between pork revenue and pork-related costs (costs of goods sold plus operating costs). IIP ¶¶ 131-132. And this analysis confirmed the beginning of abnormal pricing in 2009, when there was a divergence in revenue and costs. *Id.* So rising costs do not explain the dramatic and sustained price increases seen during the class period. IIP ¶ 133.

Finally, the pork industry has high barriers to entry and significant capital requirements to slaughter and process hogs on an industrial scale, rendering it unlikely that new entrants would enter the market to compete on price and take market share. IIP

¶ 122; DPP ¶ 84; CIP ¶ 87. And the pork market is characterized by inelastic demand, which means that higher prices do not result in a corresponding reduction of demand. IIP ¶ 123. Thus, the traditional hallmarks of successful conspiracies are all present here.

## IV. DEFENDANTS' ATTACKS UNDER *TWOMBLY* RUN AFOUL OF THE LAW AND IGNORE THE DETAILED FACTUAL ALLEGATIONS OF THE COMPLAINTS.

### A. Plaintiffs adequately plead an agreement to restrain pork supply.

Even in the absence of a "smoking gun," an antitrust conspiracy can be properly pled when plaintiffs allege parallel conduct supported by facts showing defendants "acted collusively, pursuant to a collective interest." *In re Tyson Foods, Inc. Secs. Litig.*, 275 F. Supp. 3d 970, 992 (W.D. Ark. 2017); *Propane I*, 860 F.3d at 1069. Here, Plaintiffs adequately plead facts showing that Defendants coordinated their efforts to restrain pork supply.

### 1. Smithfield's CEO called the industry to joint action and acknowledged coordinated efforts to restrain supply—and its co-conspirators signaled their commitment.

Defendants wrongfully assert that "there are no allegations of agreement on supply." Mem. at 13. But Smithfield's CEO ***admits*** that it coordinated with other producers to restrain supply. In May 2009, Smithfield's CEO Larry Pope stated that it had decided in 2008 "to take a leadership position and start reducing our sow herds." IIP ¶ 98; DPP ¶ 112; CIP ¶ 120. But in June 2009, he publicly lamented that its current cuts were not enough to "fix the hog industry," so "[s]omebody else has got to do something. We cut 13%." IIP ¶ 100; DPP ¶ 114; CIP ¶ 122. Several months later, in September 2009, Smithfield's CEO reiterated that it alone "can't solve the problem." IIP ¶ 101; DPP

- 20 -

¶ 117; CIP ¶ 125. Instead, "this industry has got to solve it collectively." *Id.* In

furtherance of the conspiracy, Smithfield's CEO admitted that it "had conversations with

several sizable, more than sizable large producers, in fact very large producers, and . . .

they are doing some liquidation." *Id.* In fact, he said that he believed that "everyone is

now looking" and "there are others cutting back." *Id.*

      Co-conspirators Tyson, JBS, Hormel, and Indiana Packers also signaled their

commitment to the conspiracy. *See, e.g.*, DPP ¶¶ 115, 120, 122, 126, 128; CIP ¶¶ 123,

127, 132, 134. In *In re TFT-LCD (Flat Panel) Antitrust Litig.*, the district court found that

allegations of a price-fixing conspiracy satisfied *Twombly* where "a number of public

statements by defendants" allegedly constituted "instances of invitations to agree and

subsequent agreements." 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008). For example, the

complaint quoted "a keynote address" given by the CEO of Samsung, which the

"plaintiffs characterize[d] as an effort to get other manufacturers in the industry to limit

production," as well as "statements by an executive from Samsung that the company

would raise prices and restrict production." *Id.*

      Likewise, in *Standard Iron Works v. Arcelormittal*, the plaintiffs "alleged the

specific content of statements made in public by Defendants' executives," periodically in

2005 through 2007, "which endorsed an industry strategy to reduce the output of steel."

639 F. Supp. 2d 877, 897 (N.D. Ill. 2009). And plaintiffs "alleged concerted and

unprecedented production curtailments that occurred on the heels of those statements at

specific intervals in 2005, 2006, and 2007." *Id.* The district court held that "a conspiracy

to fix prices can be inferred from an invitation followed by responsive assurances and

- 21 -

conduct." *Id.* at 895; *see also Broilers*, 290 F. Supp. 3d at 788 ("[P]ublic statements of intent to cut production are indicative of an agreement."). So too here.

Moreover, in *In re Flash Memory Antitrust Litig.*, the defendants argued that the plaintiffs' allegations concerning conspiratorial communications (while not public) were too "sporadic" to suggest an existence of an agreement to fix prices, with "only three discrete episodes" pleaded over a multi-year period. 643 F.Supp.2d 133, 1143 (N.D. Cal. 2009). But the court disagreed. Instead, the court inferred the defendants' ongoing exchange of information from the communications alleged in the complaint—and deemed it sufficient to "facilitate and monitor their alleged price fixing conspiracy." *Id.* at 1144.

Further, statements addressing the industry as a whole are particularly indicative of a plausible conspiracy. In *Domestic Airline Travel*, the district court found plausible "the inference that [d]efendants' conduct was the result of an agreement," because the defendants "made public statements about their own commitment to capacity discipline as well as the importance of maintaining the capacity discipline within the industry." 221 F. Supp. 3d at 62. The district court stated that the defendants' "discussion of the need for capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of Defendant's own planned course of conduct." *Id.* at 62-63. Plaintiffs make very similar allegations here. IIP ¶¶ 100-101; DPP ¶¶ 118, 122, 125-27; CIP ¶¶ 117, 119, 133.

- 22 -

      **2.**     **Each Defendant agreed to share competitively sensitive business information—as invited, facilitated, and monitored by Agri Stats—which supports the inference of agreement to stabilize supply and prices.**

In addition to their parallel supply restrictions as confirmed through public statements, the Defendants utilized Agri Stats to share with each other competitively sensitive and proprietary information in furtherance of the conspiracy. Defendants assert that "nothing alleged about Agri Stats plausibly establishes a conspiracy." Mem. at 17. But Defendants ignore the compelling inference of agreement that arises when each member of a conspiracy commits to the exchange of competitively sensitive information. Here, contemporaneously with Smithfield's calls to action, Agri Stats invited "each and every commercial swine operation . . . to participate in some benchmarking effort." IIP ¶¶ 70 (2008), 72 (2009); DPP ¶¶ 44, 46; CIP ¶¶ 47, 49. Agri Stats described the "ultimate goal" as "***increasing profitability—not always increasing the level of production***." IIP ¶ 71; DPP ¶ 45; CIP ¶ 48. And it advised that "[t]o gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program." *Id*. In response, *each* Defendant subscribed to Agri Stats, shared competitively sensitive information with Agri Stats (and each other), and paid millions of dollars collectively in order to receive the industry benchmarking data. IIP ¶¶ 4, 77, 79; DPP ¶¶ 4, 48, 51; CIP ¶¶ 4, 54, 56. This is a plausible basis from which to infer agreement. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (describing exchange of price information as "a practice, not illegal in itself, that facilitates price fixing");

- 23 -

*Broilers*, 290 F. Supp. 3d at 788 ("the extent of information sharing through Agri Stats is unusual, and plausibly amounts to a method of communication").

The Supreme Court has long condemned competitors' acceptance of invitations to collude as violative of the antitrust laws. In *Interstate Circuit, Inc. v. United States,* 306 U.S. 208 (1939), a distributors of motion picture films sent a letter to its competitors, jointly addressed, proposing certain terms of movie distribution. The terms of distribution were subsequently enacted by the competitors independently. The Supreme Court held this violated the Sherman Act because, given the joint dissemination of the letter, each movie distributor knew that the proposals were under consideration by others. *Id.* at 222. Each was aware that without substantially unanimous action, there was the risk of substantial loss of business but that with it there was the prospect of increased profits. *Id.* The Supreme Court held that the knowing concerted action was contemplated and adherence to the scheme was sufficient to demonstrate an agreement under the Sherman Act:

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, which, we will presently point out, was unreasonable within the meaning of the Sherman Act, and knowing it, all participated in the plan.

*Id.* at 226-27.

Similarly, in *United States v. Linseed Oil Co.*, 262 U.S. 371 (1923), the Supreme Court condemned a group of competitors' exchange of detailed information through a third-party "exchange" (similar to Agri Stats here). Through the exchange, the competitors were able to obtain comprehensive data on inventory, sales, and price in the linseed oil industry. *Id.* at 380, 384. The Supreme Court held such detailed sharing of information restrained competition because competitors "suddenly became parties to an agreement which took away their freedom of action by requiring each to reveal to all the intimate details of its affairs." *Id.* at 389.

These principles have been recently emphasized by the DOJ's complaint and proposed final judgments in *United States v. Sinclair Broadcast Group, Inc.*, Case No. 1:18-cv-2609. As outlined in the competitive impact statement, the DOJ alleged that the broadcaster/competitors reciprocally exchanged station-specific revenue information in addition to other competitively sensitive information.[10] The prohibited conduct includes competitors "direct or indirectly" communicating competitively sensitive information, including pricing or pricing strategies, revenues or market shares, among other things. *Id.*

Similarly, in *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001), an employee sued her employer and other oil and petrochemical companies for violating the Sherman Act by sharing compensation information and using it to set salaries at artificially low levels. 275 F.3d at 195. The district court dismissed and the Second Circuit reversed. *Id.* The plaintiff did "not allege an actual agreement among defendants to fix salaries," so the

---

[10] *See* Competitive Impact Statement, *United States v. Sinclair Broadcast Group, Inc.*, Case No. 1:18-cv-2609, ECF No. 3 (Nov. 13, 2018), *available at* https://www.justice.gov/opa/press-release/file/1110556/download.

court "analyze[d] plaintiff's complaint solely as to whether it allege[d] unlawful information exchange pursuant to this rule of reason." *Id.* at 199. But the court explained that "a closely related though analytically distinct" claim is one where "information exchange" is used "as evidence upon which to infer a price-fixing agreement." *Id.* at 198. And the court explained that there "are certain well-established criteria used to help ascertain the anticompetitive potential of information exchanges." *Id.* at 211.

The first factor in assessing the anticompetitive potential of information exchanges "is the time frame of the data." *Id.* (citing *U.S. v. U.S. Gypsum Co.,* 438 U.S. 422, 441 n.16 (1978)). As compared with exchanges of past price data, "exchanges of current price information . . . have the greatest potential for generating anti-competitive effects," because "current data have greater potential to affect future prices and facilitate price conspiracies." *Todd*, 275 F.3d at 211. By the same reasoning, "exchanges of future price information are considered especially anticompetitive." *Id.* In *Todd*, the court of appeals found the exchange of current and future compensation information problematic. *Id.* at 211-12.

A second factor "is the specificity of the information." *Id.* at 212. Price exchanges that "identify particular parties, transactions, and prices are seen as potentially anticompetitive because they may be used to police a secret or tacit conspiracy to stabilize prices." *Id.* (citing *Am. Column & Lumber Co. v. U.S.,* 257 U.S. 377, 410 (1921) (violation found where exchanged information provided specific details of transactions)). Of less concern is information "aggregated in the form of industry averages, thus avoiding transactional specificity." *Id.*; *cf. Valspar Corp. v. E.I. Du Pont De Nemours &*

- 26 -

*Co.*, 873 F.3d 185, 198 (3d Cir. 2017) (data was "aggregated, anonymized, and redistributed"). *See* Mem. at 17 (relying on *Valspar*). In *Todd*, the Court found this factor concerning because the data was specific enough that "deviations from previously announced salary levels [were] easily and quickly detectable." 275 F.3d at 212-13.

The third factor the *Todd* court considered in assessing the anticompetitive potential of information exchanges "is whether the data are made publicly available." *Id.* at 213. *Todd* explained that a court is "more likely to approve a data exchange where the information is made public." *Id.* But in *Todd*, the compensation information "was not disclosed to the public." *Id.*; *cf. Prosterman v. Am. Airlines, Inc*., No. 17-15468, 2018 WL 4018147, at *2 (9th Cir. Aug. 23, 2018) ("After that information has been made available to the public, ATPCO then publishes each airline's fares and rules to the other airline members . . . .."). *See* Mem. at 18. So the court found that the "characteristics of the data exchange in this case are precisely those that arouse suspicion of anticompetitive activity." 275 F.3d at 213. And it held that, all factors considered, the "nature of the information exchanged weigh[ed] against the motion to dismiss." *Id.*

The same can be said here. As in *Todd*, the information provided to competitors, facilitated by Agri Stats, involved current and future information, specific to each participant, and not available to the public. First, as alleged in the Complaints, the co-conspirators received monthly reports with data on the previous quarter and previous twelve-month periods—as well as the ***current*** month. IIP ¶ 79; DPP ¶ 51; CIP ¶ 56. And because a typical hog production cycle lasts about four years, "even current and historical

information regarding the production numbers of hogs provides *forward-looking* supply information to competitors." IIP ¶ 80; DPP ¶ 52; CIP ¶ 57.

Second, the data was organized by company and contained sufficient detail to permit the recipients to compare their performance and costs to other individual participants, as well as to the average of all companies, the top 25 percent, and the top five companies. IIP ¶ 79; DPP ¶ 51; CIP ¶ 56; *see also* IIP ¶¶ 90-94; DPP ¶¶ 61-65; CIP ¶¶ 66-70 (specific identities could even be reverse-engineered, though nominally anonymous). And each monthly report contained nine specific sections: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales. IIP ¶ 79; DPP ¶ 51; CIP ¶ 56. So by subscribing to Agri Stats, producers were able to share specific information concerning production levels, short and long-term production capacity, costs, profits, and sales. IIP ¶ 76; DPP ¶ 48; CIP ¶ 53.

Third, this information was not available to the public. Agri Stats itself has commented on the "confidentiality" of the information that it "[tries] to protect." IIP ¶ 142; DPP ¶ 144; CIP ¶ 148. The CEO of Smithfield confirmed that it compared itself to its competitors with information it knew "privately," including "how many they kill, what their processing levels are, and things like that." IIP ¶ 103; DPP ¶ 121; CIP ¶ 128. All the *Todd* factors point to the anticompetitive potential of these information exchanges, such that they provide a basis from which to plausibly infer a price-fixing agreement.

Moreover, Defendants do not dispute that *each* Defendant subscribed to Agri Stats and participated in this information exchange, which undercuts their assertion that

Plaintiffs engage in impermissible group pleading. Mem. at 15.[11] Indeed, Smithfield recognized that its early cuts were not enough to "fix the hog industry," such that "[s]omebody else has got to do something." IIP ¶ 100; DPP ¶ 114; CIP ¶ 122. And because it "can't solve the problem," it called for the "industry . . . to solve it collectively." IIP ¶ 101; DPP ¶ 117; CIP ¶ 125.

While the *Todd* factors establish that Defendants' participation in Agri Stats alone provides a plausible basis for the conspiracy Plaintiffs allege, Plaintiffs have alleged it as only one mechanism by which Defendants adopted and implemented their *per se* unlawful horizontal price fixing conspiracy. Thus, the allegations in this case are much stronger, and any procompetitive justifications for the use of Agri Stats are irrelevant in a *per se* claim. Nonetheless, the Complaints establish there was no procompetitive purpose for the information exchanges here, *see* IIP ¶ 82; DPP ¶ 54; CIP ¶ 59, which distinguishes Defendants' citation to *U.S. Gypsum Co.*, 438 U.S. at 441 n.16, and *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1047 (D. Minn. 1992). *See* Mem. at 17.

### B. The unprecedented restraint of production relative to its long-term trajectory supports the plausibility of agreement, and Defendants' assertion of production increases is entirely misplaced.

Under *Twombly*, "historically unprecedented change in pricing structure" can support an inference of agreement. 550 U.S. at 556 n.4. In *Flat Panel*, for example, the district court found that "the complaint meets the standard articulated in *Twombly*" by

---

[11] In addition, Plaintiffs make specific factual allegations as to particular Defendants as set forth herein and in the concurrently filed oppositions to the individual motions to dismiss.

alleging "unusual pricing practices" marking a departure from the past. 586 F. Supp. 2d at 1115-16. As the district court described it, the "complaint allege[d] that in the pre-conspiracy market, the industry faced declining TFT-LCD panel prices," but at the onset of the conspiracy the TFT-LCD product market became "characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices." *Id.* at 1115-16. And the plaintiffs alleged that the defendants controlled prices by "manipulating the capacity of various generations of fabrication plants, as well as the timing of bringing new capacity on line." *Id.* The court found that these allegations supported the plausibility of a price-fixing agreement. *Id.* at 1115-16; *see also In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 631-32 (E.D. Pa. 2010). So does the significant deviation from historical pork production and pricing here, even if based on aggregate data. *Broilers*, 290 F. Supp. 3d at 793, 795 (plausibility of conspiratorial agreement enhanced "when the industry as a whole slows production to a historically unprecedented rate" such that "prices experience an unusual increase"). *See* Mem. at 15.

Defendants' contention that the alleged conspiracy is implausible because production increased and capacity expanded during the class period, Mem. at 20-25, is wholly lacking in merit. First, Defendants do not—and cannot—dispute that after years of increasing production, there were multiple years during the conspiracy of decreased supply. Second, even in years when supply increased, Plaintiffs and their experts expect to prove that it may have been higher still but for the conspiracy. *See, e.g.*, *In re Chicken Antitrust Litig.*, 560 F. Supp. 963, 993 (N.D. Ga. 1980) (utilizing "multi-variable regression analysis to attempt to isolate the impact of the [National Broiler Marketing

Association's] activities"). Third, Defendants' purported support for their argument is a green line they misplace on one of the graphs from the Complaints:



Mem. at 22.

Remarkably, Defendants draw the line from the pre-conspiracy period through to the end of the conspiracy to assert that the chart "belies" any "drastic change" in production. *Id.* But to determine the trajectory of production *in the absence of collusion* the line properly should be drawn through the pre-conspiracy data points. And in doing so, the underproduction in the period of the conspiracy compared to the historic pattern is stark:



IIP ¶ 97 (line added); DPP ¶ 107 (same).

Thus, by focusing only on absolute pork supply during the class period, Defendants ignore the change in the rate of production increases prior to and during the conspiracy. *See McCleneghan v. Union Stock Yards of Omaha*, 349 F.2d 53, 59 (8th Cir. 1965) (determining damages based on periods before, during, and after conspiracy); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 683-84 (E.D. Pa. 2007) (approving expert damages calculation by analyzing pricing behavior before, during, and after conspiracy). Substantially slowed hog production growth during the class period supports the existence of a conspiracy. *Broilers*, 290 F. Supp. 3d at 792.

Finally, Defendants also argue that because fluctuations in aggregate production were not predicted with the clarity of a crystal ball, the whole conspiracy is implausible. Mem. at 25-26. But this argument ignores that there were three significant reductions in aggregate capacity—with the 2009, 2010, and 2013 reductions correctly predicted by Defendants. In addition to these reduction periods, from the start of the conspiracy production was artificially lower than the pre-conspiracy trajectory. As Defendants

- 32 -

acknowledged, these production reductions and restrictions coincided with the exchange

of "private information" at their disposal, so their knowledge was much more precise and

extensive than indicated by the public statements.

### C. Defendants' "alternative explanations" for their alleged conspiratorial acts do not undermine the plausibility of the Complaints.

Defendants' positing of alternative explanations for their coordinated conduct, as

well as their attempt to introduce contradictory facts outside the pleadings, do not

undermine the plausibility of the well-pled Complaints. Mem. at 13. Plausibility "does

not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556.

"Because plausibility is a standard lower than probability, a given set of actions may well

be subject to diverging interpretations, each of which is plausible." *Gelboim v. Bank of

Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016), *cert. denied,* 137 S.Ct. 814 (Jan. 17, 2017).

But the "choice between two plausible inferences that may be drawn from factual

allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.* "That

would be equivalent to impos[ing] a probability requirement at the pleading stage, which

*Twombly* expressly does not do." *Broilers*, 290 F. Supp. 3d at 801.

Defendants argue that the conspiracy is implausible because other Defendants

besides Smithfield, Triumph, and Seaboard are not vertically integrated. Mem. at 26-28.

However, the Complaints allege that the Defendant integrators have broad control over

all aspects of production (as well as processing), either producing their own hogs or

contracting out the production of hogs to independent growers. IIP ¶¶ 107-109; DPP

¶¶ 68-74; CIP ¶¶ 73-77. Moreover, because Defendants controlled the pork market, they

- 33 -

were able to dictate favorable terms to smaller pork farmers who would not have a market for their products without the integrator Defendants. *See id.* Indeed, this same contract-based production model has been used in the broiler industry. Despite Defendants' factual assertion that those contracting out production would face increased input costs due to a conspiracy, Defendants themselves have acknowledged that these can be passed through to consumers. In 2013, for example, JBS stated that "given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business," which it described as a "clear sign that we have been able to pass price increases." DPP ¶ 128; CIP ¶ 134.

Moreover, because the conspiracy is a *per se* antitrust violation, it does not matter that Defendants claim they acted in response to economic pressures such as the Great Recession or a period of rising input costs. *Maricopa Cty.*, 457 U.S. at 351; *Specialty Physicians*, 528 F.3d at 360; *Cardizem CD*, 332 F.3d at 906. *See* Mem. at 31-35. As the court recognized in *In re Sulfuric Acid Antitrust Litig.*, when analyzing a price fixing conspiracy, "an unforgiving market offers no excuse for violating antitrust laws." 743 F. Supp. 2d 827, 870 (N.D. Ill. 2010). When considering supply restraints, "[t]here is no requirement under the antitrust laws that plaintiffs prove only the most profitable capacity be eliminated." *Id.* at 869-70. Therefore, it is plausible that "producers could have colluded to reduce output and stabilize [product] prices precisely to salvage profit— indeed, stay in business—in a dire economic climate" such as the Great Recession or rising feed prices. *Id.*; *see also In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-2724, 2018 WL 5003450, at *27 (E.D. Pa. Oct. 16, 2018) ("Defendants may show they

- 34 -

had legitimate economic reasons for their pricing decisions" but "Plaintiffs are not required to rebut those reasons in order to withstand dismissal").

Further, Defendants' alternative explanations themselves are not even plausible. As to the Great Recession, Defendants improperly request the Court to take judicial notice that it occurred from "2007 to 2009" to justify mismatched production "decreases in 2009 and 2010." Mem. at 31-32. Additionally, the Great Recession does not explain why Defendants' production levels remained depressed below the historical trajectory, even when the U.S. economy was no longer in recession and consumer demand was rising. Nor does it explain why production fell in absolute terms in 2013. IIP ¶ 97; DPP ¶ 107; CIP ¶ 115. *See Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1079 (N.D. Ill. 2011) (finding a plausible conspiracy where plaintiffs alleged "capacity reductions, at least in large part, took place when the industry foresaw rising demand."); *Broilers*, 290 F. Supp. 3d at 802 (rejecting defendants' "alternative explanation" that production cuts were due to the Great Recession).[12]

As to swine diseases, Defendants improperly rely on extrinsic evidence to claim there was swine flu in 2009. Mem. at 31. But Defendants acknowledge it affected only one producer and make no attempt to quantify its effect. Defendants again improperly

---

[12] *Musical Instruments* is inapposite because "the complaint itself, perhaps maladroitly, provide[d] ample independent business reasons why each of the manufacturers adopted and enforced MAP policies even absent an agreement among the defendant manufacturers." 798 F.3d at 1195. The plaintiffs alleged that "each manufacturer was 'pressured by Guitar Center' to adopt MAP policies that were advantageous to Guitar Center, and the complaint concedes that each manufacturer responded to Guitar Center's pressure and coercion by adopting MAP policies in exchange for Guitar Center's agreement to purchase large volumes of the manufacturer's product stock." *Id.* The Complaints make no similar concession here.

rely on extrinsic evidence to factually dispute the timing of a porcine virus that the Complaints acknowledge affected production in 2014. IIP ¶ 97; DPP ¶ 107; CIP ¶ 115.

Finally, as to rising feed costs, Defendants' revenues increased beginning in 2009 ***even taking into account defendant-specific costs***. IIP ¶ 130. For two of the largest Defendants, Smithfield and Tyson, Plaintiffs' experts examined the spread between pork revenue and pork-related costs (costs of goods sold plus operating costs). IIP ¶¶ 131-32. This analysis confirmed the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the class period in 2009. *Id.* So as an empirical matter, the rising cost of corn feed does not explain the dramatic and sustained price increases seen during the class period. IIP ¶ 133.

### D.   Plaintiffs allege plus factors making the conspiracy plausible.

Defendants' parallel conduct and other "allegations informing the context of an agreement," *Evergreen*, 720 F.3d at 47, are discussed in detail above. Those allegations alone are sufficient to state a claim. *Id.* (holding that plus factors are helpful, but not required, at the pleading stage). But plus factors are another way to make a conspiracy "more plausible." *Id.*

Any context that "raises a suggestion of a preceding agreement" when coupled with parallel conduct can constitute a plus factor. *Twombly*, 550 U.S. at 557. Commonly recognized plus factors include but are not limited to "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm

- 36 -

communications." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 559 (S.D.N.Y. 2016).

In this case, Plaintiffs allege numerous plus factors. First, the market is both "horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production)." IIP ¶ 114; DPP ¶ 76; CIP ¶ 82. The levels of horizontal concentration are high and increasing: the top four pork integrators had nearly 70 percent market share by 2015, and the top eight had well over 80 percent for the entire class period. IIP ¶ 113; DPP ¶ 77; CIP ¶ 83.

The combined market share of the largest six Defendants translates to a Herfindahl-Hirschman Index ("HHI") value of 6,724, which is highly concentrated. DPP ¶¶ 80 & n.29; CIP ¶¶ 86 & n.30 (observing that DOJ uses HHI to measure market concentration). An HHI index measures the level of market power of an industry— approaching zero when the market is occupied by a large number of firms of relatively equal size, and reaching its maximum of 10,000 when a market is controlled by a single firm. The HHI value of 6,724 in the pork industry is optimal for collusion because no firm on its own has sufficient market power to manipulate prices, but together the largest Defendants possessed sufficient market power. IIP ¶ 112; DPP ¶ 82; CIP ¶ 89. This market concentration supports the inference of a conspiracy. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010) (finding defendants' combined 80% market share a persuasive plus factor); *Precision Rx*, 2016 WL 4446801, at *3 (E.D. Mo. Aug. 24, 2016) (finding 80% combined market share "supports a plausible inference of

- 37 -

conspiracy"); *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 804 F. Supp. 2d 419, 426 (D. Md. 2011) (finding high market concentration where defendants controlled 70% of the market); *Kleen*, 775 F. Supp. 2d at 1081 (inability of one firm to control the market supports the inference of a conspiracy).

Second, there are substantial barriers to entry. IIP ¶ 122; DPP ¶ 84; CIP ¶ 87. Entry is expensive and time consuming. For instance, it cost Cargill $25 million just to expand an existing facility in 2012, and it would cost many times more to build a new facility from scratch. *Id.* In addition to the financial outlay, most hogs are sold under a multi-year contract (typically to a Defendant), and in other situations, the processor owns the hog from farrow to finish. DPP ¶ 85; CIP ¶ 91. These industry characteristics would make it difficult for a new entrant to procure enough hogs to profitably operate a new facility, no matter how much money it had. *Id.* Barriers to entry are conducive to conspiratorial conduct. *Blood Reagents*, 756 F. Supp. 2d at 631.

Third, Defendants had numerous opportunities to collude through their involvement in industry trade associations. *See* DPP ¶¶ 86-106; CIP ¶¶ 92-112. Defendants' CEOs and high-level executives regularly attended trade association meetings. DPP ¶ 86; CIP ¶ 92. Indeed, Defendants discussed industry capacity, supply and demand, and prices at these meetings. DPP ¶¶ 701, 104; CIP ¶¶ 107, 110. "In combination with their alleged parallel conduct and other circumstantial elements, defendants' and their co-conspirators' joint involvement in a trade association supports an inference of a conspiracy." *Precision Rx*, 2016 WL 4446801, at *3; *Grasso Enters., LLC v. Express Scripts, Inc.*, No. 4:14CV1932 HEA, 2017 WL 365434, at *4 (E.D. Mo.

Jan. 25, 2017) ("'Membership and participation in a trade group facilitates collusion' and provides opportunities to conspire.").

Fourth, demand for pork is inelastic. IIP ¶ 6, 123; DPP ¶ 6; CIP ¶ 6. Smithfield publicly recognized this fact in a December 2013 earnings call. DPP ¶ 127; CIP ¶ 133. ("[T]he consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace."). In a May 2013 earnings call, JBS indicated the same thing. DPP ¶ 127; CIP ¶ 134 (noting "some restrictions in supply" had allowed JBS to pass on increased prices to consumers, which was similar to chicken and contrasted with beef). It is also a commodity product, which means "the pork sold by competitors has no meaningful difference and is thus interchangeable." DPP ¶ 133; CIP ¶ 138. The fact that pork is a commodity product and that demand is inelastic are market conditions conducive to anticompetitive coordination. *Blood Reagents*, 756 F. Supp. 2d at 631-32; *see also Broilers*, 290 F. Supp. 3d at 780 ("Commodity industries are particularly susceptible to agreements that violate antitrust laws.").

Fifth, Defendants took actions that were against their independent economic self-interest. For instance, in 2011 Smithfield stated that it would not build a new plant or take steps to increase capacity despite increasing margins. IIP ¶ 105; DPP ¶ 124; CIP ¶ 130. Similarly, Clemens was in position to take advantage of the PEDv epidemic by increasing its capacity and gaining market share in 2014 because its hogs in Pennsylvania were relatively unaffected—but it did not. DPP ¶ 129; CIP ¶ 135. In 2017, Seaboard and Triumph had a joint venture for which they had announced expansion to add a second

shift, but they canceled that expansion. DPP ¶ 130; CIP ¶ 136. Actions that "would plausibly contravene each defendant's self-interest 'in the absence of similar behavior of rivals'" are a plus factor that, coupled with allegations of parallel conduct, can render a conspiracy plausible. *Starr*, 592 F.3d at 327.

Sixth, Defendants engaged in public signaling. IIP ¶¶ 98-106; DPP ¶¶ 109-129; CIP ¶¶ 117-135. For example, Hormel's CEO stated in a January 2009 earnings call that Hormel would "look for opportunities . . . [to] reduce the numbers that we had going through." DPP ¶ 111; CIP ¶ 119. In June 2009, Smithfield's CEO stated that it had reduced supply by 13 percent, but that its reductions alone "will not fix the hog industry. . . . Somebody else has got to do something." IIP ¶ 100; DPP ¶ 114; CIP ¶ 122. Tyson and JBS's officers also stated that they expected to continue to see increases in hog liquidation and declining hog supplies. DPP ¶ 115; CIP ¶ 123-24. Defendants even confirmed that they did not anticipate substantial expansion and connected that fact to industry profitability. DPP ¶ 122. Public signaling, including "broadcasting of sensitive business information, plans or strategies is further circumstantial evidence of a conspiracy among competitors." *Precision Rx*, 2016 WL 4446801, at *4.

Seventh, Defendants engaged in unusual pricing behavior. IIP ¶¶ 125-26; DPP ¶ 131; CIP ¶ 113 (describing "abnormal price movements" and "dramatic[]" price increases). Pork wholesale prices began increasing in 2009 and spiked in 2014. *Id.* Additionally, they remained higher than pre-2009 levels throughout the class period. *Id.* Defendants' profits also increased steadily from 2009 to 2016. IIP ¶ 126; DPP ¶ 132; CIP ¶ 114. The "existence of unusual or 'dysfunctional' pricing behavior" is a plus factor that

can raise the inference of an agreement, particularly when there is a common motive.
*London Silver Fixing*, 213 F. Supp. 3d at 561.

Eighth, Defendants attempted to conceal their conduct to avoid antitrust scrutiny.
*See* section V.B.1.b below (discussing Defendants' affirmative conduct in seeking to
conceal their price-fixing conspiracy). This too is a recognized plus factor. *Starr*, 592
F.3d at 324.

Finally, some Defendants engaged in a similar supply reduction and price-fixing
conspiracy in the broiler market. IIP ¶¶ 64-68; DPP ¶¶ 38-42; CIP ¶¶ 41-45. Agri Stats
proposed a similar benchmarking scheme in the pork industry beginning by 2008. IIP
¶¶ 69-75; DPP ¶¶ 43-47; CIP ¶¶ 46-52. As in the broiler industry, in the pork industry
Defendants exchanged commercially sensitive information with Agri Stats, which gave
them the ability to monitor pricing and production, and to discipline their co-conspirators.
IIP ¶¶ 76-96; DPP ¶¶ 48-67; CIP ¶¶ 53-72. Defendants' anticompetitive conduct in
adjacent markets—that is, "markets not directly involved in the claims"—supports a
reasonable inference of anticompetitive conduct in *this* market. *Packaged Ice*, 723
F. Supp. 2d at 1009 (citing *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133
(N.D. Cal. 2009); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580
F.  Supp. 2d 896 (N.D. Cal. 2008)); *see also In re Auto. Parts Antitrust Litig.* (*Occupant
Safety Systems*), 50 F. Supp. 3d 869, 882 (E.D. Mich. 2014) ("Here, the component parts
in the MDL involve allegations of a similar scheme in each part, and thus, provide
context as to how the . . . conspiracy operated.").

Defendants' attack on each plus factor in isolation—asking whether that plus factor on its own gives rise to a plausible inference of a conspiracy—must be rejected. *See* Mem. at 35-46. "It hardly needs statement that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Patten*, 226 U.S. 525, 544 (1913); *see also Continental Ore Co.*, 370 U.S. at 699.

In addition to failing to consider Plaintiffs' allegations as a whole, Defendants' attempts to pick apart individual plus factors fail on their own terms. For example, Defendants contend high market concentration and barriers to entry "do not render [Plaintiffs'] claims plausible." Mem. at 41. But market concentration and barriers to entry are factors that can facilitate and make collusion more likely. *Blood Reagents*, 756 F. Supp. 2d at 631-32 (describing such market features as "conducive to transforming that motive into action").

Defendants' argument regarding opportunities to collude at trade association meetings suffers the same flaw and fails for the same reason. Mem. at 40-41. Defendants also ignore the fact that they discussed "industry capacity," "domestic availability and prices," and "analysis of supply and demand and price forecasts" at trade association meetings. DPP ¶¶ 101, 104; CIP ¶¶ 107, 110. These statements support an inference of a conspiracy and are more than evidence simply of opportunities to collude. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("[C]ollusive communications can be based upon circumstantial evidence and can occur

- 42 -

in speeches at industry conferences, announcements of future prices, statements on

earnings calls, and in other public ways.").

Defendants also claim that the public statements in the Complaint contradict

evidence outside the Complaint and other statements in the Complaint. Mem. at 35-39.

But as discussed above in section IV.A.2, Defendants' public statements about discipline,

limiting production, and resisting expansion must be judged on their own terms and help

to "inform[] the context of an agreement." *Evergreen*, 720 F.3d at 47.

Finally, Defendants argue that increased margins and abnormal pricing are

insufficient to support the plausibility of the conspiracy. Mem. at 42-45. This misses the

point that Defendants acted against their independent self-interest by failing to increase

capacity to take advantage of opportunities to capture market share. IIP ¶ 105;

DPP ¶¶ 124, 129-130; CIP ¶¶ 130, 135-136.

The decisions of other federal courts support the plausibility of Plaintiffs'

allegations in this case. For example, in *Precision Rx*, the plaintiffs alleged that the

country's four largest pharmacy benefit managers conspired to jointly boycott

compounding pharmacies and eliminate them from the market. 2016 WL 4446801, at *1.

The plaintiffs alleged parallel conduct by describing "a combination of techniques

defendants and their co-conspirators allegedly all used for the unified purpose of

eliminating plaintiffs and other independent compounding pharmacies from the market."

*Id.* at *3. The defendants had opportunities to conspire through their joint trade

association involvement, the market was highly concentrated, the defendants engaged in

public signaling, and they engaged in actions that would be against their self-interest in

- 43 -

the absence of a conspiracy. *Id.* at \*3-4. The court found those allegations of parallel conduct and those plus factors sufficient to support the inference of an agreement. *Id.* at \*5.

In *Evergreen*, another group boycott case, the court found the complaint plausibly alleged an agreement based on allegations that five defendants controlled 90 percent of the market and that participation of at least one defendant was necessary for the plaintiff to enter the market. 720 F.3d at 48. In *London Silver Fixing*, the court found plausible a conspiracy to artificially suppress prices based on allegations of unusual pricing behavior coupled with allegations that the co-conspirators "at times acted against their own interests." 213 F. Supp. 3d at 561-63. And in *Starr*, the court found a plausible conspiracy based on allegations that the defendants controlled 80 percent of the market, "some form of agreement among defendants would have been needed to render the enterprises profitable," a quote from one company's CEO suggested that the conduct occurred as an attempt to stop eroding profit margins, the defendants attempted to hide their conduct to avoid antitrust scrutiny, the defendants' pricing decisions would have been irrational in the absence of a conspiracy, and there was a DOJ investigation. 592 F.3d at 323-24. Those cases make clear Plaintiffs have met their pleading burden.

At bottom, the question is whether Plaintiffs have alleged the general outline of an agreement and circumstances making the agreement one (not the only) plausible inference. *Evergreen*, 720 F.3d at 46. Plaintiffs have alleged a clear outline of the agreement and circumstances here: Following the success of increased and systematized information-sharing in the broiler market, Defendants began discussing with Agri Stats

and each other ways to share confidential, forward-looking information that would enable them to reduce supply and raise the prices of pork, and monitor each Defendant's adherence to this agreement. Defendants also engaged in public signaling. Several market factors enabled their conspiracy: pork is a commodity product with inelastic demand, the market is highly concentrated, and there are high barriers to entry. In addition, Defendants' actions were economically irrational in the absence of a conspiracy. And, of course, the conspiracy worked—and pork prices went up. All of these factual allegations are sufficient to render Plaintiffs' allegations of an illegal agreement among Defendants plausible.

### E.   The *Broilers* order denying motions to dismiss is instructive.

Apart from the weight accorded to some Defendants' participation in a broiler price-fixing conspiracy as a plus factor (discussed above), the *Broilers* decision is relevant because the two actions are similar and the *Broilers* opinion denying the motion to dismiss is persuasive. As shown below, Defendants fail to meaningfully distinguish that case.

Apart from their truism that "[p]igs, of course, are not chickens," Mem. at 46, Defendants' arguments miss the mark. *See* Mem. at 46-51. The fact that there are differences between this case and *Broilers*, while true, is hardly noteworthy. Rather, what matters is how the two cases are similar. Just like any other district court order, the decision denying the *Broilers* motion to dismiss is relevant to the extent of its persuasive value, which comes from the fact that the court grappled with similar factual and legal issues. The *Broilers* decision is particularly relevant because there are substantial

- 45 -

similarities between the broiler and pork conspiracies, including overlapping Defendants, industry characteristics, and a similar price-fixing scheme.

The *Broilers* defendants are industrial broiler producers who controlled over 80 percent of broiler production in the United States. *Broilers*, 290 F. Supp. 3d at 779. They have integrated operations and own or control all aspects of producing broilers. *Id.* at 779-80. There are substantial barriers to entry. *Id.* at 780. The defendants purchased breeder flocks from companies that tightly controlled their availability and characteristics. *Id.* And broilers are a commodity product. *Id.*

The defendants conspired to restrain production and inflate prices of broilers (not all chickens), and communicated to each other through Agri Stats. *Id.* at 781. Agri Stats reports provided detailed information regarding production capacity, inventory, and financial information about each company. *Id.* The information in the reports, when combined with industry knowledge, allowed the defendants to identify each other's information. *Id.* An industry expert believed the extent of information shared through Agri Stats was "unusual" and raised antitrust concerns. *Id.* In addition to sharing information through Agri Stats, the defendants interacted regularly with each other at trade association meetings. *Id.*

During the conspiracy, the defendants' executives signaled that they expected production cuts and that "the rest of the market is going to have to pick-up a fair share." *Id.* at 782. The industry responded to those calls for cuts, including additional rounds of liquidation. *Id.* It would not have made sense for any one defendant to cut production in the absence of an illegal agreement because a single defendant would not have the market

- 46 -

power needed to raise prices, and the other defendants would simply increase production to capture market share. *Id.* at 783.

The court found those factual allegations gave rise to a plausible inference of concerted activity. *Id.* at 788. The court found it plausible that the defendants' conduct "was unusual in comparison to the industry's history of regular production increases." *Id.* The court also rejected the argument that the lack of details concerning the formation, operation, and communications constituting the conspiracy undermined its plausibility, noting that "when a conspiracy is secret such details will not be available without discovery, and thus cannot be required at the pleading stage." *Id.* Instead, the court credited the allegations that: (1) "public statements of intent to cut production are indicative of an agreement considering the commodity nature of Broilers"; (2) "the extent of information sharing through Agri Stats is unusual, and plausibly amounts to a method of communication"; (3) trade association meetings present opportunities for collusion; and (4) supply reduction and increased exports were "business strategies . . . indicative of a conspiracy." *Id.*

Here, the factual allegations and the factors the *Broilers* court found relevant are all present in this litigation. *See* section III above (summarizing relevant facts). Significantly, the *Broilers* court rejected the argument that Defendants make here: that overall increases in production preclude the existence of a conspiracy to decrease the rate of production increases, as is seen in the pork industry. *Compare* IIP ¶ 97; DPP ¶ 107; CIP ¶ 115 (showing decreases in the rate of pork production during the conspiracy), *with Broilers*, 290 F. Supp. 3d at 792. The *Broilers* court also rejected the defendants'

- 47 -

attempts to explain away the conduct alleged in the complaint with "alternative explanations," which would be the "equivalent to "impos[ing] a probability requirement at the pleading stage." *Id.* at 801. Given these substantial factual similarities concerning the relevant conspiratorial conduct and the industry and market characteristics, the *Broilers* opinion is persuasive and should guide this Court's analysis.

## V.   PLAINTIFFS' CLAIMS ARE TIMELY

### A.   Plaintiffs adequately allege a continuing violation.

Plaintiffs adequately plead a "continuing violation," which "restarts the statute of limitations each time the defendant commits an overt act." *Propane I*, 860 F.3d at 1063. In a case involving a horizontal conspiracy, "each sale to the plaintiff, starts the statutory period running again, *regardless of the plaintiffs' knowledge of the alleged illegality at much earlier times*." *Id.* at 1066-67 (quoting *Klehr v. AO Smith Corp.*, 521 U.S. 179, 189 (1997)). To meet this standard requires pleading: "(1) a price-fixing conspiracy; (2) that brings about a series of unlawfully high priced sales during the class period; and (3) sales to the plaintiffs during the class period." *Id.* at 1068.

All three elements are met in this case. First, as discussed in detail above, Plaintiffs have plausibly alleged Defendant's participation in a horizontal conspiracy to stabilize and increase pork prices by reducing supply or limiting increases in supply.

Second, Defendants' conspiracy brought about a series of unlawfully high priced sales during the class period. In *Propane I*, the court found sufficient the plaintiffs' allegations that the conspiracy continued into the class period. *Id.* at 1069. In doing so, the court made clear that allegations adequate to create the inference of a conspiracy in

the first instance help to buttress allegations that the conspiracy continued. *See id.* at 1069-71. The plaintiffs alleged that the conspiracy lasted from 2008 through 2015.[13] Their detailed allegations concerned certain communications in 2007 and 2008, including "calls and meetings . . . occurring at least as late as 2010." *Id.* at 1070; *see also id.* at 1071 (noting allegation that "Defendants continued to have regular communications regarding pricing, fill levels, and market allocation until at least late 2010."). Beyond that, however, the plaintiffs simply alleged that "the propane conspiracy succeeded" and that it continued during the class period. *Id.* at 1070-71. The court expressly rejected the defendants' argument that that "the maintenance of fill levels and prices [were] mere 'unabated inertial consequences' and not overt acts continuing the conspiracy." *Id.* at 1070. Instead, the plaintiffs needed only to allege that the conspiracy continued when the sales took place. *Id.*

Here, Plaintiffs meet the *Propane I* standard by alleging that Defendants entered into a conspiracy "from at least 2009 to the present to fix, raise, maintain, and stabilize the price of pork," which was effected by "coordinating output and limiting production." IIP ¶ 2; DPP ¶ 2; CIP ¶ 2. As discussed in more detail above, by 2009, Defendants began participating in the benchmarking scheme utilizing the Agri Stats reports. IIP ¶ 73; DPP ¶ 47; CIP ¶ 50. Pork production decreased in 2009, 2010, 2013, and 2014. IIP ¶ 97; DPP ¶ 107; CIP ¶ 115. Pork exports increased throughout the class period. DPP ¶ 108; CIP ¶ 116. Defendants made statements about limiting capacity in order to increase margins

---

[13] As noted below in the discussion of *Propane II*, this 2015 date is relevant because it corresponds to the date of the defendants' settlements and consent orders with the FTC.

on certain earnings calls at various times from 2008 through the end of 2013. IIP ¶¶ 98-106; DPP ¶¶ 110-128; CIP ¶¶ 118-134. And both Defendants' margins and the prices for pork products increased abnormally beginning in 2009. IIP ¶¶ 125-26, 136-139; DPP ¶¶ 131-32, 137-141; CIP ¶¶ 113-14, 142-45.

Defendants' parallel conduct continued throughout the class period; it did not stop at the end of 2013. *See* IIP ¶ 2; DPP ¶ 2; CIP ¶ 2 (alleging conspiracy continued "to the present"). Pork prices and Defendants' profits continued to rise throughout the class period. *See* IIP ¶¶ 125-26, 136-39; DPP ¶¶ 131-32, 137-141; CIP ¶¶ 113-14, 142-45. This would not have occurred had the conspiracy disbanded. Further, all of the plus factors identified by Plaintiffs remained the same. *See, e.g.*, IIP ¶¶ 113-120; DPP ¶¶ 77-80; CIP ¶¶ 83-86 (discussing high, and increasing, market concentration as recently as 2016), IIP ¶ 122; DPP ¶¶ 84-85; CIP ¶¶ 87, 91 (discussing barriers to entry), DPP ¶¶ 100-104; CIP ¶¶ 106-110 (discussing trade association meetings each year from 2014-2018).

Thus, to the extent Defendants argue that "Plaintiffs concede that there were no conspiratorial production cuts during the limitations period," Mem. at 65, they are mistaken. This fundamentally misunderstands the nature of the conspiracy, which involved both reductions in supply and *reduced increases* in supply in order to increase the price of pork. *See, e.g.*, IIP ¶ 2; DPP ¶ 2; CIP ¶ 2 (explaining Defendants' conspiracy was executed by "coordinating output and *limiting* production"), DPP ¶ 129; CIP ¶ 135 (Clemens did not attempt to take advantage of 2014 PEDv epidemic by *increasing* market share), DPP ¶ 130; CIP ¶ 136 (Seaboard and Triumph postponed *adding* second shift to joint venture in February 2017). *See also In re Capacitors Antitrust Litig.*, 106 F.

- 50 -

Supp. 3d 1051, 1062 (N.D. Cal. 2015) (upholding allegations that conspiracy allowed defendants "to slow . . . the market-driven decline in price for their products"); *Broilers*, 290 F. Supp. 3d at 792-95.

Third, Plaintiffs purchased pork during the class period. *See* IIP ¶¶ 12-46 (alleging that each plaintiff "[d]uring the Class Period . . . indirectly purchased pork and pork products for [his or her] own use and not for resale that was produced by one or more Defendants or their co-conspirators" and "suffered injury as a result"); DPP ¶¶ 14-20 (alleging that each plaintiff "purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result"); CIP ¶¶ 14-23 (alleging that each plaintiff "indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result").

Notably, Defendants do not even dispute that Plaintiffs' allegations satisfy the *Propane I* pleading standard. The question as it relates to plausibly alleging a continuing violation is whether Plaintiffs' allegations *concerning a continuing violation* are adequate, and Defendants' discussion of the issue confirms they are. On this point, Defendants argue only that "[e]ven had Plaintiffs alleged an unlawful agreement before 2014, the Complaints are devoid of factual allegations suggesting any conspiratorial actions within the limitations period." Mem. at 65. In support of this contention, Defendants cite *Propane II*—an opinion that has nothing to do with the statute of limitations or the continuing-violation doctrine—to try to establish that "[m]uch more is required." *See* Mem. at 64-65 (citing *In re Pre-Filled Propane Tank Litigation* (*Propane*

- 51 -

*II*), 893 F.3d 1047 (8th Cir. 2018)). In making this argument, Defendants badly

misconstrue *Propane II* and misrepresent what both *Propane* cases held.

   *Propane II* involved a different group of plaintiffs whose claims occurred

subsequent to an enforcement action brought against the defendants by the FTC, which

included 2015 settlements and consent orders. 893 F.3d at 1051. The court held that to

have standing to pursue injunctive relief claims under the Sherman Act, the indirect

purchaser plaintiffs were required to plead that the defendants conspired to charge supra-

competitive prices *after* January 2015 when the defendants entered the FTC consent

decrees. *Id.* at 1056. Instead, the plaintiffs only pled the same facts that were found

sufficient in *Propane I*—namely, that certain events occurred between 2008 and 2010,

and that "the conspiracy continued into the class period." *Id.* at 1057. But *Propane II*

presented a very different case because *Propane I* involved damages claims for purchases

*before* the 2015 FTC consent decrees, whereas *Propane II* involved injunctive claims for

purchases *after* the FTC consent decrees. *See id.* ("The issue here is different than that in

*Propane En Banc*.").

   Simply put, *Propane I* applies and is applicable to the facts of this case. To allege

a continuing violation, Plaintiffs need to plead facts that plausibly suggest a conspiracy,

and that the conspiracy continues into the class period. Because there is no intervening

act in this case—such as an FTC consent decree—Plaintiffs easily meet their burden to

plead the conspiracy's continuation.[14] *See Propane I*, 860 F.3d at 1064 n.2 ("Because

---

   [14] The standard for pleading a continuing violation is consistent with the settled rule
that withdrawal from a conspiracy is an affirmative defense presenting a question of fact,

continued sales at supracompetitive prices are overt acts under the continuing violations

theory, this court need not address Plaintiffs' allegations that Defendants' conspiratorial

communications about pricing and fill levels were additional overt acts sufficient to

invoke the theory.").

**B.    The statute of limitations is equitably tolled due to Defendants' fraudulent concealment.**

Fraudulent concealment is an equitable doctrine that seeks to ensure "that

sophisticated defrauders not be permitted to profit by their own misconduct and an

inflexible application of the statute of limitation." *In re Mercedes-Benz Anti-Trust Litig.*,

157 F. Supp. 2d 355, 368 (D.N.J. 2001); *see also Kansas City, Mo. v. Fed. Pac. Elec.

Co.*, 310 F.2d 271 (8th Cir. 1962). "[F]raudulent concealment of material facts prevents

the running of the statutory period . . . until the plaintiff discovers or by reasonable

diligence could discover the basis for the claim." *Ryan v. United States*, 534 F.3d 828,

832 (8th Cir. 2008). Courts employ a three-part test, which requires plaintiffs to plead:

"(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to

discover the operative facts that are the basis of his cause of action within the limitations

period; and (3) plaintiff's due diligence until discovery of the facts." *Carrier Corp. v.*

---

and the burden of proof is on the defendant. *Smith v. United States*, 568 U.S. 106, 111-12
(2013); *United States v. Grimmett*, 150 F.3d 958, 961 (8th Cir. 1998). Federal courts
routinely apply this rule in civil antitrust cases. *See, e.g.*, *Osborn v. Visa Inc.*, 797 F.3d
1057, 1067-68 (D.C. Cir. 2015); *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-
02143-RS, 2017 WL 6503743, at *6 (N.D. Cal. Dec. 18, 2017); *In re TFT-LCD (Flat
Panel) Antitrust Litig.*, 820 F. Supp. 2d 1055, 1059-61 (N.D. Cal. 2011). The
longstanding rule that withdrawal from an established conspiracy is an affirmative
defense helps to explain why a lesser showing is required to plead the continuation of a
conspiracy after it is established.

- 53 -

*Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012); *Bulk Popcorn I*, 1990 WL 123753, at *5 (citing *Bruno v. United States*, 547 F.2d 71, 74 (8th Cir. 1976)). When there is any question about fraudulent concealment, even if the plaintiff's "allegations of fraudulent concealment are not extensive," resolving the issue against the plaintiff on a motion to dismiss is improper because "the question is one for the jury." *Packaged Ice*, 723 F. Supp. 2d at 1018. Although the allegations must satisfy Rule 9(b), this requires only that the "circumstances of fraud be pled with enough particularity to put the party on notice of the nature of the claim." *In re Vitamins Antitrust Litig.*, No. 19-197, 2000 WL 1475705, at *2 (D.D.C. May 9, 2000).

As courts have repeatedly held, allegations need not be "extensive" to sufficiently plead wrongful concealment. *In re Automotive Parts Antitrust Litig.* (*Bearings*), No. 12-cv-501, 2014 WL 4272772, at *12 (E.D. Mich. Aug. 29, 2014). Although Rule 9(b) applies here, the standard is "relaxed . . . when factual information is peculiarly within the defendants' knowledge or control." *In re Fasteners Antitrust Litig.*, No. 08-md-1912, 2011 WL 3563989, at *3 (E.D. Pa. Aug. 12, 2011); *see also Mercedes-Benz*, 157 F. Supp. 2d at 368 ("Rule 9 does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control."). Acts of concealment are attributable to all co-conspirators, and concealment "is generally susceptible to industry-wide proof." *Vitamins*, 2000 WL 1475705, at *3.

Here, when Plaintiffs' allegations are viewed in their totality, it is clear that the Complaints allege sufficient facts to necessitate the denial of Defendants' motion to dismiss based on the statute of limitations because: (1) the conspiracy was self-

concealing, and in any event, Defendants' affirmative acts prevented discovery of the

conspiracy until 2018; (2) Plaintiffs did not discover the conspiracy until 2018; and

(3) Plaintiffs were not on inquiry notice and had no reason to investigate Defendants'

conduct in the pork industry prior to 2018.

### 1.   Defendants' wrongful concealment prevented Plaintiffs from discovering the conspiracy before 2018.

#### a.   Plaintiffs allege a self-concealing conspiracy.

Plaintiffs allege that Defendants' conspiracy was, by its nature, "self-concealing."

IIP ¶ 149; DPP ¶ 151; CIP ¶ 155. That alone suffices at the pleading stage. Indeed, courts

in this District have concluded that even at the *summary judgment* stage, "plaintiffs may

prove the 'fraudulent means' element by showing either that the defendants took

affirmative steps to prevent plaintiffs' discovery of their claims *or that the wrong itself

was of such a nature as to be self-concealing*." *United Power Ass'n, Inc. v. L.K.

Comstock & Co.*, No. 89-cv-766, 1992 WL 402906, at *6 (D. Minn. Oct. 27, 1992)

(Alsop, J.) (emphasis added). Defendants fail to mention this standard, but it is widely

accepted. *See, e.g.*, *London Silver Fixing*, 213 F. Supp. 3d at 572 (holding plaintiffs may

prove the first factor either by defendants' affirmative steps "or that the wrong itself was

of such a nature as to be self-concealing"); *Fasteners*, 2011 WL 3563989, at *5 ("Price-

fixing conspiracies are inherently self-concealing."); *In re Aspartame Antitrust Litig.*, No.

06-cv-1732, 2007 WL 5215231, at *5 (E.D. Pa. Jan. 18, 2007) ("[T]he fraudulent

concealment doctrine does not require affirmative acts of concealment when the

conspiracy is self-concealing."); *Mercedes-Benz*, 157 F. Supp. 2d at 371 (holding price-

fixing conspiracies are self-concealing when "concealment is so inter-twined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled").

The Eighth Circuit has not determined what standard applies. *In re Monosodium Glutamate Antitrust Litig.*, No. 00-md-1328-PAM, 2003 WL 297287, at *2 (D. Minn. Feb. 6, 2003). While courts in this District have reached different conclusions, this Court should apply the self-concealing standard because it comports with common sense, the equitable underpinnings of fraudulent concealment, and the reasoning of longstanding Supreme Court precedents. *See Bailey v. Glover*, 88 U.S. 342, 349 (1874) ("To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure.").

Defendants' price-fixing conspiracy would not have worked if they had not concealed it. They would have attracted government scrutiny, injured customer relations, and attracted competition from non-conspiring competitors or new entrants. *See Mercedes-Benz*, 157 F. Supp. 2d at 373. Because "Defendants' purported conspiracy would have been fruitless without a deliberate effort to conceal its substance," *Fasteners*, 2011 WL 3563989, at *5, the Court should find the first element of fraudulent concealment satisfied in this case.

b.      **Plaintiffs allege Defendants' affirmative concealment.**

Defendants further concealed their price-fixing agreement through various means of secrecy: (1) having secret meetings; (2) engaging in telephonic or in-person meetings to avoid the creation of written records; (3) limiting any explicit reference to competitor pricing or supply restraint communications on documents; (4) funneling the communication of competitively sensitive data to each other through non-publicly available Agri Stats reports; and (5) concealing from non-conspirators the existence and nature of their discussions with competitors about supply restraints and pricing. IIP ¶ 141; DPP ¶ 143; CIP ¶ 147. Indeed, Agri Stats itself is a self-described "quiet company" that does not advertise or even discuss what it does. IIP ¶ 142; DPP ¶ 144; CIP ¶ 148. It refused to share publicly the information it had collected privately. IIP ¶ 143; DPP ¶ 145; CIP ¶ 149. Smithfield's CEO even acknowledged that the information Defendants shared was not information known to investors or the public. IIP ¶ 144; DPP ¶ 146; CIP ¶ 128.

Defendants did not merely conceal their conspiracy. They also engaged in an affirmative misinformation campaign in which they publicly reported pretextual explanations for the effects of their conspiracy. *See id.* IIP ¶ 106; DPP ¶ 125; CIP ¶ 131 (discussing effect of China-based corn purchases), DPP ¶ 126; CIP ¶ 132 (citing heat waves and drought), IIP ¶ 145; DPP ¶ 147; CIP ¶ 150 (explaining high margins with reference to "good programs with our retailers, and lower grain cost"). This included taking advantage of numerous opportunities to collude at trade association meetings that

served as pretexts for their conspiratorial meetings with competitors. *See generally* DPP ¶¶ 86-106; CIP ¶¶ 92-112.

These allegations meet the standards established by the weight of antitrust authority in the federal courts. "Attributing the anti-competitive effects of a conspiracy to some cause other than the collusive conduct can be an affirmative act of fraudulent concealment." *In re Animation Workers Antitrust Litig.*, 123 F.Supp.3d 1175, 1200. Defendants did exactly that, by publicly stating that market-based and environmental factors explained rising pork prices, falling pork production, and their increasing margins. IIP ¶¶ 106, 145; DPP ¶¶ 125-26, 147; CIP ¶¶ 131-32, 150.

Other antitrust class actions provide helpful comparisons and demonstrate that Plaintiffs have met their burden. For example, in *Edwards*, the defendants had made "public announcements regarding the herd retirement program" that functioned as a supply reduction conspiracy. *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-cv-4766-JSW, 2012 WL 12951848, at *6 (N.D. Cal. Oct. 30, 2012). The plaintiffs alleged only that they would have had no reason to review the defendants' industry newsletters. *Id.* The court found those minimal allegations created a fact question such that fraudulent concealment could not be decided on a motion to dismiss. *Id.*

Similarly, in *Mercedes-Benz*, the plaintiffs alleged that they were not aware of the defendants' price-fixing conspiracy until the New York Times published an article outlining the details of the conspiracy. 157 F. Supp. 2d at 367. The plaintiffs alleged a single "affirmative act" of concealment: the defendants "were strenuously urged in the meetings not to reveal to anyone the substance of the discussions, lest the price-fixing

- 58 -

scheme be revealed." *Id.* at 371. The court inferred that these "adjurations to secrecy were implicitly backed with the threat of discipline." *Id.* at 372. As a result, the plaintiffs sufficiently pled with particularity that the defendants engaged in affirmative acts to conceal the conspiracy. *Id.* (holding that, in the alternative, the plaintiffs also sufficiently alleged a self-concealing conspiracy).

And in *Packaged Ice*, the plaintiffs' allegations of affirmative concealment were "not extensive." 723 F. Supp. 2d at 1018. The plaintiffs generally alleged that the defendants "represented publicly, both to customers and otherwise, that their pricing activities were unilateral, rather than collusive, and based upon legitimate business purposes, such as increased costs." *Id.* at 1018-19. That allegation was sufficient to satisfy the plaintiffs' burden at the pleading stage.

Lastly, in *Bulk Popcorn I*, the court found sufficient allegations that the defendants used secret means of communications, including using phone calls and in-person meetings; used rigged bids to give the appearance of competition; and used legitimate trade associations to mask their conspiracy. *Bulk Popcorn I*, 1990 WL 123753, at *4-5.

Conversely, the case Defendants primarily rely upon, *Milk*, is factually and legally distinguishable. Mem. at 58-61 (citing *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016 (D. Minn. 1997) (Magnuson, J.).[15] In particular, *Milk* involved a DOJ investigation

---

[15] *Milk* is also not binding precedent. *See Phoenix Entm't Partners, LLC v. Star Music, Inc.*, No. 16-cv-4078 (PJS/FLN), 2017 WL 5714021, at *2 (D. Minn. Nov. 28, 2017) ("To begin with, this Court's decisions are not binding precedent; this Court is free to disregard its own earlier opinions if it later concludes that it was mistaken, as it sometimes does."); *Savig v. First Nat'l Bank of Omaha*, No. 09-cv-132 (JNE/RLE), 2009 WL 1955476, at *3 (D. Minn. July 6, 2009) ("A district court judge is not required to

announced in July 1995. 84 F. Supp. 2d at 1024. Despite this public announcement, the plaintiffs argued that the defendants' "denials of wrongdoing *following this announcement* amounted to fraudulent concealment." *Id.* (emphasis added). The court rejected that argument and concluded that the DOJ investigation put the plaintiffs on inquiry notice. *Id.*

In this case, Plaintiffs rely on Defendants' affirmative misrepresentations that *predate* any publicly disclosed governmental investigation of Defendants' conduct. As this Court has previously ruled in non-antitrust cases, omissions can give rise to a fraudulent concealment claim when combined with other conduct, such as publicly providing misleading representations designed to obscure the truth, even when no affirmative representations were made to the plaintiff. *Cantonis v. Stryker Corp.*, No. 09-cv-3509 (JRT/JJK), 2011 WL 1084971, at *2-3 (D. Minn. Mar. 21, 2011). That standard is met in this case, because Defendants omitted and failed to disclose the truth of their supply reduction scheme and price-fixing conspiracy—and they made misleading public representations designed to provide pretexts for rising prices.

Further, because the statute of limitations is an affirmative defense, any suggestion by Defendants that Plaintiffs were required to plead more detailed facts is foreclosed by Eighth Circuit precedent. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 n.10 (8th Cir. 2009) ("[A] plaintiff need not plead facts to an affirmative defense before it is raised.").

---

follow the decision of another district court judge."). This is particularly true as it relates to an issue on which the Eighth Circuit has not yet spoken (the application of the fraudulent concealment-doctrine to an antitrust conspiracy).

010736-11 1081391 V1

### 2.    Plaintiffs did not discover the operative facts until 2018.

Until learning otherwise, Plaintiffs reasonably believed the pork industry to be a competitive industry. IIP ¶ 149; DPP ¶ 151; CIP ¶ 155. They did not actually discover the operative facts of the conspiracy until the facts became widely known or reported by the Bloomberg article published in February 2017 combined with the *Broilers* complaint disclosing the scope of the confidential services provided by Agri Stats in February 2018. IIP ¶¶ 146-48; DPP ¶¶ 148-150; CIP ¶¶ 151-153. Defendants do not challenge Plaintiffs' assertions that they did not discover the conspiracy before February 2018 when these events placed them on inquiry notice (discussed in more detail below). Nor could they, at the pleading stage. This suffices to meet the second element of fraudulent concealment at this stage. *See Carrier*, 673 F.3d at 446.

### 3.    Plaintiffs have diligently pursued their claims in this litigation.

The heart of Defendants' argument is that Plaintiffs were on inquiry notice of Defendants' price-fixing conspiracy because of Defendants' statements made in earnings calls. But as shown below, that argument is based on a fundamental misunderstanding of the law.

Due diligence is an objective test that does not require *any* investigation until the plaintiff has reason to investigate. *Carrier*, 673 F.3d at 447 (stating it is measured against the "reasonably diligent plaintiff"); *Staehr v. The Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (describing the "objective standard" for inquiry notice); *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 836 (11th Cir. 1999) ("The actual exercise of diligence is irrelevant because the standard is an objective

one."). The reasonableness of the plaintiff's investigation must be considered under the totality of the circumstances, factoring in the defendants' concealment. *Carrier*, 673 F.3d at 447. "Actions such as would deceive a reasonably diligent plaintiff toll the statute." *Bearings*, 2014 WL 4272772, at *13; *see also In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 802 (N.D. Ohio 2011) ("When facts exist that should excite the suspicions of a reasonably diligent person, a plaintiff that fails to make proper inquiries to discover his cause of action will not see the limitations period tolled. By contrast, when no information, actual or constructive, exists hinting at the fact of plaintiff's injury, the 'reasonable diligence' requirement seems limited to denying tolling for careless plaintiffs.").

Defendants rely exclusively on the fact that they made statements in their investor calls that Plaintiffs now cite to support the existence of the conspiracy. This argument fails because Plaintiffs were not and should not reasonably have been aware of this limited information in the public sphere. Plaintiffs could not have discovered facts giving rise to a claim against Defendants through reasonable diligence earlier than February 2018 because that is when the *Broilers* complaint disclosed the role of Agri Stats in the industry. IIP ¶ 147; DPP ¶ 149; CIP ¶ 152. That complaint, along with the information from the February 2017 Bloomberg article (which suggested that pork industry participants were using Agri Stats in a similar manner to broiler industry participants), was the first time the likelihood of Defendants' price-fixing conspiracy was sufficiently public and widespread to place Plaintiffs on inquiry notice and cause them to investigate.

- 62 -

IIP ¶¶ 147-48; DPP ¶¶ 149-150; CIP ¶¶ 152-53. Until then, Plaintiffs had no way of knowing Defendants were conspiring to limit pork supply or fixing pork prices.

Courts consistently hold that inquiry notice—that is, what a reasonably diligent plaintiff should know—cannot be established on the availability of such limited information in the public domain, particularly as a matter of law at the pleading stage.[16] The information with which Defendants seek to charge Plaintiffs may have been in the public domain, but it did not receive widespread publicity and was not generally known. As the Second Circuit has explained, "there is an inherent sliding scale in assessing whether inquiry notice is triggered by information in the public domain: the more widespread and prominent the public information disclosing the facts underlying the fraud, the more accessible this information is to plaintiffs, and the less company-specific the information must be." *Staehr*, 547 F.3d at 432. Because of the limited audience of

---

[16] *See, e.g.*, *Staehr*, 547 F.3d at 416-36 (publicly available information including Hartford's SEC filings, complaints filed in four lawsuits, and various articles from news sources and industry newsletters insufficient to grant *summary judgment* against plaintiff); *Bearings*, 2014 WL 4272772, at *13 (allegations that plaintiffs "received pricing information, but had no way of knowing that the prices imposed were higher because Defendants were conspiring . . . are sufficient to create an inference that [plaintiffs] lacked a reason to initiate an investigation"); *In re Copper Antitrust Litig.*, 436 F.3d 782, 789-90 (7th Cir. 2006) (statute of limitations did not start running as to claims against Morgan based on news reports of CFTC investigation, where Morgan was not charged with legal violations and lawsuits had not yet been filed against it); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 85 F. Supp. 3d 1007, 1011 (E.D. Wisc. 2015) (finding indirect purchasers' fraudulent concealment allegations survived motion to dismiss, even when direct purchasers had previously filed complaint, because "[i]nformation in the public domain . . . does not necessarily put a plaintiff on constructive notice of its injuries" but merely creates a fact question); *Abecassis v. Wyatt*, 902 F. Supp. 2d 881, 903 (S.D. Tex. 2012) (media reports and other publicly available documents containing "reports of the defendants' involvement in illegal payments under the OFP were sufficiently unclear and undeveloped as to make summary judgment inappropriate").

Defendants' investor calls and SEC filings, that information, although in the public domain, cannot place Plaintiffs on inquiry notice. *See also Morton's Market*, 198 F.3d at 833-34 (despite plaintiff's actual knowledge of news reports concerning attorney general suit accusing defendants of rigging bids for school milk contracts, plaintiff did not have constructive knowledge or duty to investigate defendants' fixing wholesale milk prices until defendant pleaded guilty); *Abecassis*, 902 F. Supp. 2d at 900 (questioning whether "media reports and other publicly available documents were sufficient to put the plaintiffs on inquiry notice that *the defendants* had made illegal oil payments to Iraq," even though the defendants were under investigation). Without any information about the pork conspiracy, there was no reason for Plaintiffs to investigate Defendants.

In support of their argument, Defendants again rely primarily on *Milk*. And again, it provides a poor comparison to the facts of this case. In *Milk*, the plaintiffs argued that "due diligence is not an element of fraudulent concealment" at all. 84 F. Supp. 2d at 1024. In finding a lack of due diligence, the court expressly relied on the DOJ's announced investigation as putting the plaintiffs on inquiry notice. *Id.*

Defendants' argument that Plaintiffs fail to plead what steps they took from 2009 to 2014 to investigate Defendants' conduct, Mem. at 62, fares no better. In order to be required to investigate Defendants' conduct, Plaintiffs must first have been placed on inquiry notice—that is to say, an objectively reasonable purchaser of pork would have investigated whether it had an antitrust claim. But because Plaintiffs were not placed on inquiry notice, they were not required to investigate. Questions about whether Plaintiffs' investigation was reasonable is beside the point, because there is no cause to investigate.

*See Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 897 (8th Cir. 1997) ("A victim must be aware of some suspicious circumstances, some 'storm warnings,' to trigger the duty to investigate.").

Defendants seek to have the Court conclude that because Plaintiffs' factual allegations of a conspiracy include limited public information from 2009 to 2014, fraudulent concealment cannot apply. Mem. at 61-64. But this argument is not only superficial, it is unsupported by law. *See Great Rivers*, 120 F.3d at 897 ("We simply note that we will not *automatically* impute public information to an injured party without a determination of some awareness of 'storm clouds' on the horizon."). *Milk* says nothing of the sort. Nor do the other cases cited by Defendants. *Willmar* was a summary judgment case, and it involved testimony to a public body conducting a government investigation. *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*, 520 F.2d 289, 294-96 (8th Cir. 1975). *Wholesale Grocery* involved asset transfers and withdrawals from regional markets, which in fact alerted the plaintiffs because they asked the defendants questions about the suspicious circumstances; that was not a case about inquiry notice, but rather a case about the adequacy of an investigation after the plaintiffs were on notice and had cause to investigate. *In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1084-86 (D. Minn. 2010) (Montgomery, J.). *Insulate* also involved a market allocation conspiracy; in addition, a substantially similar lawsuit was filed against the same defendants, which the court found sufficient to put the plaintiffs on inquiry notice. *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-cv-2664 (ADM/SER), 2014 WL 943224, at *5-6 (D. Minn. Mar. 11, 2014).

Notably, no court has held that purchasers of a product are under a duty of reasonable care to monitor its earnings calls or other information provided for the benefit of investors. Such a rule would require businesses and consumers to monitor the SEC filings and investor calls of every company in the world from which they directly or indirectly may have purchased a product. This would serve no public purpose, but rather would serve only to immunize price-fixing companies from claims of reasonably diligent plaintiffs. The Court should reject Defendants' attempt to craft a new legal standard. Under settled law, the question as it relates to this public information is whether that information was sufficient to have placed Plaintiffs on inquiry notice in 2009, or 2010, or at any other time prior to 2018.

### 4. The Court should defer its decision on fraudulent concealment.

As this Court has previously recognized, in some circumstances, it is most appropriate to defer decision on fraudulent concealment rather than decide the issue at the pleading stage, even if that means additional expense will be incurred. *See Steward v. Up North Plastics, Inc.*, 177 F. Supp. 2d 953, 960 (D. Minn. 2001) (Tunheim, J.) ("The Court declines to explore the merits of the tolling and fraudulent concealment arguments at this time because the Court would prefer to consider these arguments in connection with plaintiffs' motion for class certification. The Court understands that it will require some additional time and expense for defendants to oppose plaintiffs' motion, but the Court is simply unwilling to preemptively deny plaintiffs at least an opportunity to present a motion for class certification.").

Deferring a decision on fraudulent concealment until after discovery is sensible

and fair. First, because Plaintiffs have pled a continuing violation, at least some portion

of this case is timely. And because the statute of limitations will not bar Plaintiffs' claim

in their entirety, Plaintiffs are entitled to discovery concerning the whole conspiracy,

which began in approximately 2009. Plaintiffs' claims of a continuing conspiracy depend

on a conspiracy having begun at an earlier time. Dismissal of damages claims relating to

an earlier part of the conspiracy period, even if warranted, would not materially change

the scope of the litigation or its burden on the parties.

Second, fraudulent concealment presents a fact-intensive inquiry that is best suited

for resolution after the parties have conducted appropriate discovery. *TCF Nat'l Bank v.*

*Market Intelligence, Inc.*, No. 11-cv-2717 (JRT/ALB), 2013 WL 53837, *2 (D. Minn.

Jan. 3, 2013) ("When fraudulently concealed facts reasonably should have been

discovered … is a question of fact."); *see also London Silver Fixing*, 213 F. Supp. 3d

at 572 ("[B]ecause resolution of a claim of fraudulent concealment 'is intimately bound

up with the facts of the case,' it often cannot be decided at the motion to dismiss stage.");

*Animation Workers*, 123 F. Supp. 3d at 1194 ("[I]t is generally inappropriate to resolve

the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage,

particularly when the proof relating to the extent of the fraudulent concealment is alleged

to be largely in the hands of the alleged conspirators."); *Edwards*, 2012 WL 12951848,

at *6 ("The Court finds that the timing of when a reasonable plaintiff would have

discovered Defendants' conduct is a factual question which may not be resolved on a

motion to dismiss.").

## VI.   CONCLUSION

Plaintiffs have plausibly alleged that Defendants conspired to reduce—or limit increases in—the supply of pork, resulting in increased pork prices. Plaintiffs allege facts demonstrating Defendants' parallel conduct as well as numerous plus factors and other circumstantial evidence, which collectively make plausible the inference that Defendants illegally agreed to constrain supply and raise prices of pork. Additionally, Plaintiffs' claims are timely because of Defendants' continuing violations and their fraudulent concealment of their antitrust violations. For these reasons, and as explained in more detail above, the Court should deny Defendants' joint motion to dismiss in its entirety.

If, however, the Court grants Defendants' motion in any respect, Plaintiffs respectfully seek leave to amend their Complaints to attempt to plead additional facts and cure any deficiencies. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); *Forslund v. Stryker Corp.*, No. 09-cv-2134 (JRT/JJK), 2010 WL 3905854, at *9 (D. Minn. Sept. 30, 2010) (granting leave to amend to address pleading deficiencies identified in order granting motion to dismiss).

- 68 -

Respectfully submitted,

Dated: November 30, 2018

s/ Steve W. Berman
Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Elaine T. Byszewski
HAGENS BERMAN SOBOL SHAPIRO
301 North Lake Avenue, Ste. 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
elaine@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO
455 N. Cityfront Plaza Drive, Ste. 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
beth@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Britany N. Resch (#0397656)

s/ Shawn M. Raiter
Shawn M. Raiter (MN# 240424)
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6518
sraiter@larsonking.com

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
Yifei "Evelyn" Li
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com
evelyn@cunelolaw.com

*Co-Lead Counsel for Commercial and Institutional Indirect Purchaser Plaintiffs*

GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
bresch@gustafsongluek.com

*Co-Lead Counsel for Consumer Indirect*
*Purchaser Plaintiffs*

s/ W. Joseph Bruckner
W. Joseph Bruckner (MN #0147758)
Elizabeth R. Odette (MN #0340698)
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
Arielle S. Wagner (MN #0398332)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
aswagner@locklaw.com

Bruce L. Simon
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

Clifford H. Pearson
Daniel L. Warshaw
Bobby Pouya
Michael H. Pearson
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Melissa S. Weiner (MN #0387900)
Joseph C. Bourne (MN #0389922)
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pswlaw.com
jbourne@pswlaw.com

*Co-Lead Class Counsel for Direct Purchaser*
*Plaintiffs*

- 70 -