# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | No.  0:18-cv-01776-JRT-HB |
| This Document Relates To: | |
| ALL ACTIONS | |

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT.........................................1

II.    PLAINTIFFS HAVE ADEQUATELY PLED EACH DEFENDANT'S
       PARTICIPATION IN THE CONSPIRACY ...........................................................3

       A.     Plaintiffs Adequately Plead that Agri Stats Joined, Facilitated and
              Participated in the Conspiracy.......................................................................6

       B.     Plaintiffs' Complaints Contain Detailed Allegations Showing Each
              Integrator Defendant's Commitment to the Conspiracy ...........................10

              1.     Defendants' Reliance on External Evidence is Improper and
                     Should Be Disregarded....................................................................11

                     (a)    The Documents Offered by Hormel Violate the
                            Judicial Notice Doctrine.......................................................12

                     (b)    The Documents Offered by Indiana Packers and
                            Seaboard Violate the Incorporation by Reference
                            Doctrine.................................................................................14

              2.     Plaintiffs Have Adequately Established Each Integrator
                     Defendant's Participation in Agri Stats............................................15

              3.     Plaintiffs' Allegations Against the Clemens Defendants are
                     Sufficient .........................................................................................17

              4.     Plaintiffs' Allegations Against the Hormel Defendants are
                     Sufficient .........................................................................................19

              5.     Plaintiffs' Allegations Against the Indiana Packers
                     Defendants are Sufficient ................................................................22

                     (a)    Indiana Packers Improperly Mischaracterizes and
                            Disputes Plaintiffs' Allegations. .........................................22

                     (b)    MCA's Corporate Relationship with IPC. ...........................26

              6.     Plaintiffs' Allegations Against the JBS Defendants are
                     Sufficient .........................................................................................27

7.      Plaintiffs' Allegations Against the Seaboard Defendants are Sufficient ........................................................................ 29

8.      Plaintiffs' Allegations Against the Smithfield Defendants are Sufficient ........................................................................ 31

9.      Plaintiffs' Allegations Against the Triumph Defendants are Sufficient ........................................................................ 34

10.     Plaintiffs' Allegations Against the Tyson Defendants are Sufficient ........................................................................ 36

C.     Plaintiffs' Allegations, Including Those of Conduct by All Defendants, are Properly and Sufficiently Pled Against Each Defendant ........................................................................ 38

III.    CONCLUSION ........................................................................ 41

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Column & Lumber Co. v. United States*,
 257 U.S. 377 (1921) ............................................................................ 8, 9, 16

*Am. Prairie Constr. Co. v. Hoich*,
 560 F.3d 780 (8th Cir. 2009) ...................................................................... 12

*Atkins v. Hasan*,
 No. 15 CV 203, 2015 WL 3862724 (N.D. Ill. Jun. 22, 2015) ..................................... 38

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
 620 F.2d 1360 (9th Cir. 1980) ...................................................................... 4

*BJC Health Sys. v. Columbia Cas. Co.*,
 348 F.3d 685 (8th Cir. 2003) .............................................................. 13, 14

*In re Broiler Chicken Antitrust Litig.*,
 290 F. Supp. 3d 772 (N.D. Ill. 2017) ......................................... 12, 16, 17, 33

*Brooks v. Ross*,
 578 F.3d 574 (7th Cir. 2009) ...................................................................... 38

*In re Bulk Popcorn Antitrust Litig.*,
 783 F. Supp. 1194 (D. Minn. 1991) ............................................... 4, 11, 39

*Cafesjian v. Armenian Assembly of Am., Inc.*,
 No. 07-2079, 2008 WL 906194 (D. Minn. Mar. 31, 2008) ......................................... 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 738 F. Supp. 2d 1011 (N.D. Cal. 2010) ......................................................... 6

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 No. 07-5944, 2010 WL 9543295 (N.D. Cal. Feb. 5, 2010) ................................... 26, 39

*Cont'l Ore Co. v. Union Carbide and Carbon Corp.*,
 370 U.S. 690 (1962) .......................................................... 3, 26, 28, 37

*Coons v. Mineta*,
 410 F.3d 1036 (8th Cir. 2005) ...................................................................... 4

*In re Credit Default Swaps Antitrust Litig.*,
   No. 13-MD-2476, 2014 WL 4379112 (S.D.N.Y. Sep. 4, 2014)................................. 38

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   767 F. Supp. 2d 880 (N.D. Ill. 2011) ........................................................... 17

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   733 F. Supp. 2d 1348 (N.D. Ga. 2010) .................................................... 32, 33

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) .................................................... 14, 32, 33

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
   136 F.3d 554 (8th Cir. 1998) ............................................................ 26, 29

*Erickson v. Pardus*,
   551 U.S. 89 (2007).......................................................................... 4

*Five Smiths, Inc. v. National Football League Players Ass'n*,
   788 F. Supp. 1042 (D. Minn. 1992)........................................................ 4, 41

*Folger v. City of Minneapolis*,
   43 F. Supp. 3d 922 (D. Minn. 2014)......................................................... 13

*Graham v. Catamaran Health Sols. LLC*,
   No. 16-1161, 2017 WL 3613328 (8th Cir. Aug. 23, 2017) ......................................... 12

*Great Atl. & Pac. Tea Co. v. Amalgamated Meat Cutters & Butcher
   Workmen of N. Am.*,
   410 F.2d 650 (8th Cir. 1969) ................................................................ 5

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
   804 F. Supp. 2d 419 (D. Md. 2011) ..................................................... 23, 34

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ............................................................... 25

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
   425 U.S. 738 (1976).......................................................................... 5

*J. D. Fields & Co., Inc. v. Nucor-Yamato Steel Co.*,
   No. 4:12-cv-00754, 2015 WL 12969209 (E.D. Ark. Dec. 4, 2015) ............................... 3

*J.D. Fields & Co., Inc. v. Nucor-Yamato Steel Co.*,
   976 F. Supp. 2d 1051 (E.D. Ark. 2013)....................................................... 4

*Jenisio v. Ozark Airlines, Inc.*,
    187 F.3d 970 (8th Cir. 1999) ........................................................................ 14

*Kleen Prods., LLC v. Packaging Corp. of Amer.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ......................................................... 23

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) ........................................................................ 13

*United States ex rel. McGee v. IBM Corp.*,
    No. 11-C-3482, 2017 WL 4467458 (N.D. Ill. Oct. 6, 2017) ....................... 10

*In re Milk Prod. Antitrust Litig.*,
    84 F. Supp. 2d 1016 (D. Minn. 1997) ............................................ 4, 5, 39, 40

*Montero v. Bank of Am., N.A.*,
    No. 13-CV-850, 2014 WL 562506 (D. Minn. Feb. 13, 2014) ...................... 25

*Morton v. Becker*,
    793 F.2d 185 (8th Cir. 1986) ........................................................................ 11

*In re Nat'l Hockey League Players' Concussion Injury Litig.*,
    189 F. Supp. 3d 856 (D. Minn. 2016) ........................................................... 15

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
    764 F. Supp. 2d 991 (N.D. Ill. 2011) ............................................................. 9

*In re Polyurethane Foam Antitrust Litig.*,
    86 F. Supp. 3d 769 (N.D. Ohio 2015) ...................................................... 4, 39

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) ................................................................ 23, 25

*Precision Assocs., Inc. v. Panalpina World Transport (Holding), Ltd.*,
    No. 08-cv-00042, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) ................. 5

*Reg'l Multiple Listing Servs. of Minnesota, Inc. v. Am. Home Realty
    Network, Inc.*,
    9 F. Supp. 3d 1032 (D. Minn. 2014) .................................................. 14, 15, 26

*Rochling v. Dep't of Veteran Affairs*,
    725 F.3d 927 (8th Cir. 2013) .......................................................................... 4

*Stahl v. United States Dep't of Agric.*,
    327 F.3d 697 (8th Cir. 2003) ........................................................................ 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................ 5

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ............................................................. 7, 8

*Topchian v. JPMorgan Chase Bank, N.A.*,
   760 F.3d 843 (8th Cir. 2014) .............................................................. 3

*United States v. Jones*,
   29 F.3d 1549 (11th Cir. 1994) ........................................................... 12

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ........................................................................... 9

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017) ............................................................. 33

*Weinstein v. Saturn*,
   303 Fed. Appx. 424 (9th Cir. 2008) ................................................. 26

*Wong v. Wells Fargo Bank N.A.*,
   789 F.3d 889 (8th Cir. 2010) .............................................................. 4

*Zean v. Fairview Health Services*,
   149 F. Supp. 3d 1129 (D. Minn. 2016) ............................................ 11

## Other Authorities

Fed. R. Civ. P. 8(a) ................................................................................. 4

Fed. R. Civ. P. 10(c) ............................................................................. 14

Fed. R. Civ. P. 12(b)(6) .............................................................. 3, 11, 18

Fed. R. Civ. P. 12(f) ....................................................................... 11, 12

Fed. R. Evid. 201(b) ....................................................................... 12, 14

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Similar to Defendants'[1] Joint Motion to Dismiss,[2] their individual motions disregard and mischaracterize Plaintiffs' well-pled allegations and do not support their requests for dismissal.  Beginning in at least 2009, the pork integrator Defendants, who control over 80 percent of the pork sold in the United States, and Agri Stats, a data service who facilitated the conspiracy, exchanged sensitive proprietary information regarding output, supply and profits, and coordinated to reduce and stabilize the supply of pork in the United States.  DPP ¶¶ 1-2; IIP ¶¶ 1, 3-4; CIP ¶¶ 1, 3-4.[3]  The goal and result of the conspiracy was to fix, raise, maintain and stabilize pork prices.

Agri Stats played a central role in this conspiracy; it provided the invitation to this conspiracy and the means to carry it out.  Through Agri Stats, the pork integrator

---

[1] "Defendants" refers to Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation, Hormel Foods, LLC ("Hormel"), Indiana Packers Corporation, Mitsubishi Corporation (Americas) ("Indiana Packers"), JBS USA Food Company, JBS USA Food Company Holdings ("JBS"), Seaboard Foods LLC, Seaboard Corporation ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson").

[2] Defendants' Joint Motion To Dismiss The Direct Purchaser Plaintiffs' Complaint And The Federal Law Claims In The Indirect Purchaser Plaintiffs' Complaints For Failure To State A Claim Upon Which Relief May Be Granted (ECF No. 162) is hereinafter referred as the "Joint Motion to Dismiss."

[3] "Complaints" collectively refers to the Direct Purchaser Plaintiffs' First Amended and Consolidated Class Action Complaint (*Maplevale Farms Inc. v. Agri Stats, Inc.*, Case No. 18-cv-01803 (D. Minn.), ECF No. 83, hereinafter "DPP ¶ __"), the Consumer Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint (*Duryea, et al. v. Agri Stats, Inc., et al.*, Case No. 18-cv-01776 (D. Minn.), ECF No. 74, hereinafter "IIP ¶ __"), and the Commercial Institutional Indirect Purchaser Plaintiffs' First Amended and Consolidated Class Action Complaint (*Sandee's Bakery, et al. v. Agri Stats, Inc., et al.*, Case No. 18-cv-01891 (D. Minn.), ECF No. 63, hereinafter "CIP ¶ __").

Defendants received monthly detailed reports and graphs that allowed them to compare their performance and costs to other participants.  DPP ¶ 51; IIP ¶ 79; CIP ¶ 56.  The purpose of these reports was not to provide better prices to customers or to lower the costs of production by sharing competitor data.  Instead, it was to improve Defendants' profitability by allowing them to monitor, implement, and enforce the price-fixing scheme.  DPP ¶ 54; IIP ¶ 82; CIP ¶ 59.  Each Defendant not only participated in this anticompetitive behavior facilitated by Agri Stats, but also paid substantial amounts of money to do so.

Beyond the detailed Agri Stats reports, Defendants also publicly signaled their ongoing commitment to the conspiracy.  In public conference calls, Defendants' executives signaled their commitment to the conspiracy, their intent to reduce supply, and their knowledge that others in the industry would act consistently with the conspiracy.  DPP ¶¶ 112-27; IIP ¶¶ 97-102; CIP ¶¶ 120-134.  Defendants' unlawful conduct had the clear and intended result of decreasing supply and increasing the price of pork during the Class Period.  DPP ¶¶ 112-27; IIP ¶¶ 97-102; CIP ¶¶ 120-134.

Plaintiffs allege with sufficient specificity a single conspiracy within the pork industry and unlawful conduct as to each individual Defendant.  Defendants' arguments about "group pleading" miss the mark because in addition to the allegations describing and explaining "Defendants'" conduct collectively, Plaintiffs allege in detail the acts each Defendant took in furtherance of the conspiracy, including reporting to and de-anonymizing Agri Stats' industry benchmarking reports, individual attendance at trade association meetings, and coordinated supply restraints during the Class Period.

As such, Plaintiffs respectfully request that each of the Individual Motions to Dismiss[4] be denied in its entirety.

## II.   PLAINTIFFS HAVE ADEQUATELY PLED EACH DEFENDANT'S PARTICIPATION IN THE CONSPIRACY

Plaintiffs adequately allege specific conduct by each individual Defendant showing it joined and committed acts in furtherance of the conspiracy.  Each Defendant's individual challenge to the sufficiency of the allegations concerning it improperly minimizes, isolates, and ignores Plaintiffs' specific allegations.  Those allegations should be viewed as a whole and in context.  *See Cont'l Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.").

As set forth more fully in Plaintiffs' Opposition to the Joint Motion to Dismiss,[5] courts may grant a Rule 12(b)(6) motion only where a complaint's allegations, accepted as true and drawing all reasonable inferences in the plaintiff's favor, fails to state a claim upon which relief can be granted.  *See generally* Opp'n to Joint MTD; *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014); *J. D. Fields & Co., Inc. v. Nucor-Yamato Steel Co.*, No. 4:12-cv-00754, 2015 WL 12969209, at *2 (E.D. Ark.

---

[4] This Opposition focuses on the arguments raised in Defendants' individual motions to dismiss (Agri Stats, ECF No. 189; Clemens, ECF No. 168; Hormel, ECF No. 170; Indiana Packers, ECF No. 173; JBS, ECF No. 176; Seaboard, ECF No. 178; Smithfield, ECF No. 182; Triumph, ECF No. 184; and Tyson, ECF No. 187), hereinafter collectively referred to as "Individual Motions to Dismiss."

[5] Plaintiffs hereby incorporate the arguments and case law from their Opposition to the Joint Motion to Dismiss (filed concurrently herewith).

Dec. 4, 2015) (citing *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)); *see also Wong v. Wells Fargo Bank N.A.*, 789 F.3d 889 (8th Cir. 2010); *Rochling v. Dep't of Veteran Affairs*, 725 F.3d 927 (8th Cir. 2013).

Rule 8(a) applies to allegations regarding participation in a conspiracy. To satisfy Rule 8(a), "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation marks omitted; elision original); *see also In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999). There is no heightened pleading standard in antitrust cases. *J.D. Fields & Co., Inc. v. Nucor-Yamato Steel Co.*, 976 F. Supp. 2d 1051, 1059 (E.D. Ark. 2013). In the antitrust conspiracy context, the complaint must include a statement of "the facts constituting the conspiracy, its object and accomplishment." *Five Smiths, Inc. v. National Football League Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn. 1992) (quoting *Fusco v. Xerox Corp.*, 676 F.2d 332, 337 n.7 (8th Cir. 1982)).

"Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). "Once a conspiracy is established, even *slight evidence* connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement." *In re Bulk Popcorn Antitrust Litig.* (*Bulk Popcorn II*), 783 F. Supp. 1194, 1197 (D. Minn. 1991) (Magnuson, J.) (applying this rule at summary judgment); *see also In re Polyurethane Foam Antitrust Litig.*, 86 F. Supp. 3d 769, 786

(N.D. Ohio 2015) (citing *Bulk Popcorn II*).  Courts also apply this rule at the pleading

stage.  *See, e.g.*, *Precision Assocs., Inc. v. Panalpina World Transport (Holding), Ltd.*,

No. 08-cv-00042, 2012 WL 3307486, at *2 (E.D.N.Y. Aug. 13, 2012).

A complaint need not contain detailed defendant-by-defendant allegations.  *See In

re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).

Plaintiffs have alleged the contours and operation of this conspiracy in sufficient detail

and with as much specificity as possible.  Of course, Defendants themselves exclusively

possess materials that would permit more focused allegations, and Defendants are in no

position to claim they do not know what they are accused of doing.  It is for this reason

that courts are especially reluctant to grant dismissals for failure to state a claim in the

antitrust area.  *See In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d at 1020; *see also*

*Great Atl. & Pac. Tea Co. v. Amalgamated Meat Cutters & Butcher Workmen of N. Am.*,

410 F.2d 650, 653 (8th Cir. 1969); *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S.

738, 746 (1976) (stating that "in antitrust cases, where 'the proof is largely in the hands

of the alleged conspirators,' dismissals . . . should be granted very sparingly") (citations

omitted).

As set forth below, Plaintiffs have sufficiently pled that each Defendant joined and

participated in the conspiracy, which necessitates denial of their Individual Motions to

Dismiss.

/ / /

/ / /

/ / /

### A.    Plaintiffs Adequately Plead that Agri Stats Joined, Facilitated and Participated in the Conspiracy

Agri Stats was a central player to this conspiracy.  To survive a motion to dismiss, plaintiffs need only "make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185 (N.D. Cal. 2009)).

Plaintiffs allege that "Agri Stats knew that it played a central role in this conspiracy" (DPP ¶ 56; IIP ¶ 84; CIP ¶ 61) and "provided a means for defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of defendants' price-fixing scheme, resulting in a remarkably stable and successful anticompetitive cartel."  DPP ¶ 37; IIP ¶ 63; CIP ¶ 40.

Despite these allegations, Agri Stats argues – without citing to any case law or allegations in the complaint – that Plaintiffs failed to allege that (a) Agri Stats knew of any agreement or (b) Agri Stats agreed to support such a conspiracy.  Agri Stats MTD at 1-2.  This is contradicted by the Complaints, which detail how Agri Stats acted as a willing and informed participant in illicit collusion.  In 2008, Agri Stats issued its invitation to this conspiracy to the swine industry: participate (and assist in designing) in one of the most sophisticated electronic industry databases ever created to share competitively sensitive information to stabilize the supply and price of pork.  *See* DPP ¶ 44; IIP ¶ 70; CIP ¶ 47.  Benchmarking of the type undertaken by Agri Stats and its co-

conspirators here reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. *See* DPP ¶ 43; IIP ¶ 69; CIP ¶ 46. To encourage participation and to make the point clear, Agri Stats emphasized to its co-conspirators that the shared data could be used to restrict production and increase profits: "***the ultimate goal is increasing profitability – not always increasing the level of production***." DPP ¶ 45; IIP ¶ 71; CIP ¶ 48.

To help its co-defendants achieve that ultimate goal, Agri Stats collected and shared competitively sensitive pricing and supply-related data with its co-conspirators. *See* DPP ¶¶ 3, 48-60; IIP ¶¶ 3, 76-89; CIP ¶¶ 3, 53-65. In addition to facilitating cooperation among the pork producers, the data exchanged through Agri Stats bears all the hallmarks of the enforcement mechanism of a price-fixing scheme. *First*, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects." *See* DPP ¶ 4; IIP ¶ 4; CIP ¶ 4; *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)). *Second,* the information contained in Agri Stats' reports is specific to the pork producers, including information on profits, prices, costs, and production levels. *See* DPP ¶ 51; IIP ¶ 79; CIP ¶ 56; *Todd*, 275 F.3d at 212 ("Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity."). *Third*, none of the Agri Stats information was publicly available. *See* DPP ¶ 143; IIP ¶ 141; CIP ¶ 147. Agri Stats is a subscription service, and Agri Stats ensured that its detailed, sensitive business information was

available only to the co-conspirators and not to any buyers in the market. *See* DPP ¶ 4; IIP ¶ 4; CIP ¶ 4; *Todd*, 275 F.3d at 213 ("Public dissemination is a primary way for data exchange to realize its pro-competitive potential.").

On a weekly or monthly basis, Agri Stats would provide its co-defendants with current and forward-looking sensitive information (including profits, costs, and slaughter information) as well as keys to decipher which data belongs to which producers. *See* DPP ¶¶ 50-51; IIP ¶¶ 78-89; CIP ¶¶ 55-56. This highly sensitive, confidential data is not the type of information that competitors would share with each other in a normal, competitive market. *See* DPP ¶ 3; IIP ¶ 3; CIP ¶ 3. Agri Stats knew that the reports it shared with its co-defendants were not anonymous among the co-defendants. *See* DPP ¶¶ 61-65; IIP ¶¶ 90-94; CIP ¶¶ 66-70. Yet it continued to provide detailed data to the co-defendants. *Id.* By sharing this data, Agri Stats facilitated a "means for defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of defendants' price-fixing scheme." DPP ¶ 37; IIP ¶ 63; CIP ¶ 40.

Agri Stats' knowing preparation and dissemination of detailed, disaggregated data - where it was "common knowledge" competitors could de-anonymize the data – was itself, alone, an overt act in furtherance of the conspiracy sufficient to deny the motion to dismiss. As the Supreme Court said in *American Column & Lumber Co. v. United States*, "[g]enuine competitors do not make daily, weekly and monthly reports of the minutest details of their business to their rivals." 257 U.S. 377, 410 (1921). Hence, Agri Stats' conclusory arguments do not withstand scrutiny.

Agri Stats implies that Plaintiffs' claims should fail because "Agri Stats is neither a producer or supplier of pork." Agri Stats MTD at 1. Yet Plaintiffs have alleged that Agri Stats knowingly provided its co-defendants with an unparalleled ability to share critical, proprietary information concerning key business metrics, including production levels, short-term capacity, and long-term production – exactly the kind of data that has the greatest potential for anticompetitive effects. *See* DPP ¶ 48; IIP ¶ 76; CIP ¶ 53; *see, e.g.*, *United States v. U.S. Gypsum Co*., 438 U.S. at 443 ("[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects"); *Am. Column & Lumber Co.*, 257 U.S. at 398-99 (finding Section 1 violation where information exchange concerned future prices and production). In addition to collecting and disseminating this data, Agri Stats standardized and audited the data for accuracy. *See* DPP ¶¶ 50-51; IIP ¶¶ 78-79; CIP ¶¶ 55-56. And when co-conspirators needed help understanding the detailed data, Agri Stats would visit the co-defendants and explain the implications of the data. *See* DPP ¶ 58; IIP ¶ 86; CIP ¶ 63. Thus, Plaintiffs have pled sufficient facts to show that Agri Stats participated in the conspiracy even though Agri Stats was not a pork producer. *See In re Plasma-Derivative Protein Therapies Antitrust Litig*., 764 F. Supp. 2d 991, 1001, 1003 (N.D. Ill. 2011) (denying trade association's motion to dismiss where it argued it was "not a market participant" because the plaintiffs adequately alleged the association's involvement in the conspiracy).

By acting as a conduit and participating in the conspiracy, Agri Stats profited handsomely. As a subscription service, Agri Stats earned millions in revenue from its co-

defendants – far in excess of other pricing and production indices.  *See* DPP ¶ 4; IIP ¶ 4;

CIP ¶ 4.  Evidence of motive – such as the financial incentive present here – can be

relevant to the plausibility of a conspiracy.  *United States ex rel. McGee v. IBM Corp.*,

No. 11-C-3482, 2017 WL 4467458, at *1 (N.D. Ill. Oct. 6, 2017).  It is a fair inference

that Agri Stats could charge, and the conspirators were willing to pay, these above-

market rates because Agri Stats provided the vehicle necessary to police and implement

the conspiracy.  There would be no incentive for them to pay those fees if Agri Stats were

simply providing the same services that could be had for less from other providers.

In short, Plaintiffs have pled sufficient facts to show that Agri Stats was not an

unwitting tool for the conspirators; Agri Stats knew that its co-defendants used the

benchmarking reports to restrict supply, and knowingly facilitated their efforts.  In fact, it

told its co-defendants that they must "[d]etermine tolerance and ***outlier status and***

***enforce***," "and most importantly, ***"[e]ach participant has to commit***" to the conspiracy.

DPP ¶ 57; IIP ¶ 85; CIP ¶ 62 (emphasis added).

For these reasons, Agri Stats' Motion to Dismiss (ECF No. 189) should be denied.

### B.   Plaintiffs' Complaints Contain Detailed Allegations Showing Each Integrator Defendant's Commitment to the Conspiracy

Plaintiffs also adequately allege specific conduct by each individual pork

integrator Defendant showing it joined and committed acts in furtherance of the

conspiracy.  In an effort to escape this lawsuit, the integrator Defendants' Individual

Motions to Dismiss suffer from the same defects as their Joint Motion.  These motions all

attempt to minimize, reframe, and isolate Plaintiffs' allegations, and they rely on

inadmissible evidence beyond the scope of the pleadings.  When Plaintiffs' allegations are read in their proper context, in accordance with the applicable standard, Plaintiffs have more than satisfied their burden of presenting "*slight evidence* connecting a defendant to the conspiracy."  *See Bulk Popcorn II*, 783 F. Supp. at 1197 (emphasis in original).

       1.    <u>Defendants' Reliance on External Evidence is Improper and Should Be Disregarded</u>

"When considering a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials outside the pleadings."  *Zean v. Fairview Health Services*, 149 F. Supp. 3d 1129, 1133 (D. Minn. 2016); *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  The Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" under Federal Rule of Civil Procedure 12(f) and "has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion."  *Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003) (quotation omitted).

Despite this clear prohibition on the presentation of evidence beyond the pleadings, certain individual Defendants – Hormel, Indiana Packers and Seaboard[6] – have submitted documents and arguments in their motion which fall well outside the pleadings.  The documents are offered in an improper attempt to disprove allegations in the Complaints.  Courts have repeatedly refused to take judicial notice or otherwise

---

[6] All Defendants also submitted external evidence in support of the Joint Motion to Dismiss.  That evidence is also improper and should be stricken as argued in Plaintiffs' Opposition to the Joint Motion to Dismiss.  *See* Opp'n to Joint MTD.

consider such documents in support of a motion to dismiss, and this Court should do the same here.

These documents and references to them should not be part of the record and should be stricken pursuant to Rule 12(f).

> (a)     *The Documents Offered by Hormel Violate the Judicial Notice Doctrine.*

Courts may judicially notice a fact only if it is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  *See* Fed. R. Evid. 201(b); *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 798 (8th Cir. 2009).  "Caution must . . . be taken to avoid admitting evidence, through the use of judicial notice, in contravention of the relevancy, foundation, and hearsay rules." *Am. Prairie*, 560 F.3d at 797.  And when a document is given judicial notice, it cannot be used to establish the truth of the matters asserted therein.  *Graham v. Catamaran Health Sols. LLC*, No. 16-1161, 2017 WL 3613328, at *2 n.1 (8th Cir. Aug. 23, 2017); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 794 (N.D. Ill. 2017) (refraining from taking judicial notice of the "ultimate truth of [the Department of Agriculture's] production numbers").  This is because the effect of judicially noticing a fact is to preclude the opposing party from introducing contrary evidence and essentially directing a verdict against him as to the fact noticed.  *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

/ / /

Hormel requests that the Court take judicial notice transcripts of four Hormel earnings calls from 2008, 2009, and 2010 and Hormel's 2009 Annual Report.  ECF No. 171.  While the earnings calls are mentioned in the Complaints (*see* DPP ¶¶ 110-13; CIP ¶¶ 118-19, 121), there is no reference to Hormel's 2009 Annual Report anywhere in the pleadings.  Regardless, none of this information satisfies the narrow requirement for a request for judicial notice.

The documents Hormel relies upon are offered to prove the truth of the matters asserted in them and in hope that inferences will be drawn about matters that are directly disputed in the Complaints.  Courts have repeatedly refused to take judicial notice of such documents in support of a motion to dismiss.  *See BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 688 (8th Cir. 2003) (ruling that documents submitted in support of motion to dismiss, that "were provide in opposition to the pleading, and were not undisputed, constituted matters outside the pleading"); *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 832 (8th Cir. 2003) (district court did not abuse its discretion in declining to take judicial notice of documents "offered for the truth of the matter asserted in them" where opposing party "disputes the facts and inferences that the [offering party] attempt[s] to establish through" such documents); *Folger v. City of Minneapolis*, 43 F. Supp. 3d 922, 940 n.17 (D. Minn. 2014) (declining to take judicial notice of a newspaper article offered to "contradict the allegations of the complaint").

These documents are offered in an attempt to disprove allegations in the Complaints.  The contents of the earnings calls - and the inferences to be drawn from

them - are directly in dispute.  As such, the Court should not take judicial notice of their

contents under Federal Rule of Evidence 201(b).

> (b)  *The Documents Offered by Indiana Packers and Seaboard Violate the Incorporation by Reference Doctrine.*

The incorporation-by-reference doctrine allows a defendant to rely upon

documents cited in a complaint only if: (1) the documents are "the sole basis" for the

plaintiff's claim; and (2) the documents provided by the defendant are undisputed.  *See*

Fed. R. Civ. P. 10(c); *BJC Health Sys.*, 348 F.3d at 687-89 (excluding documents on a

motion to dismiss because the documents were "neither undisputed nor the sole basis for

[plaintiff's] complaint").  Courts refuse to apply the doctrine when defendants attempt to

rely on documents to which plaintiffs make a "mere[] mentioning."  *Cafesjian v.*

*Armenian Assembly of Am., Inc.*, No. 07-2079 (JNE/JJG), 2008 WL 906194, at *7 n.7 (D.

Minn. Mar. 31, 2008); *see also Jenisio v. Ozark Airlines, Inc.*, 187 F.3d 970, 973 (8th Cir.

1999); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 70-71 (D.D.C.

2016).

The Court should decline to consider the Declaration provided by Indiana Packers

in support of its motion to dismiss.  The Declaration (ECF No. 174) includes a full

reproduction of a news article mentioned in passing by the Complaints (*see* DPP ¶ 126;

CIP ¶ 63).  Indiana Packers asserts that the Court may consider this document based on

*Regional Multiple Listing Services of Minnesota, Inc. v. American Home Realty Network,*

*Inc.*, 9 F. Supp. 3d 1032, 1045 (D. Minn. 2014).  But in that case, the court considered a

letter sent by counterclaim defendants to the principal defendants where that letter was

*attached to the counterclaim.  See id.*  Unlike *Regional Multiple Listing*, the full news article is not attached to the Complaints.  This article, like those offered in support of the Joint Motion to Dismiss and Seaboard's motion, is an external document offered solely in hope of contradicting the allegations in the Complaints.  The article should be excluded as immaterial and outside the pleadings.

Similarly, the news articles offered by Seaboard in support of its separate motion are not embraced by the pleadings and are offered solely to contradict the allegations in the pleadings.  While the Complaints mention the articles included in the Seaboard Declaration (ECF No. 179), the Complaints do not refer to or encompass the entire contents of the articles (*see* DPP ¶ 130; CIP ¶ 136).  Seaboard instead provided the articles in hope of creating a more favorable record.  This sort of cherry-picked evidence is precisely the kind which courts exclude at the motion-to-dismiss stage.  *See In re Nat'l Hockey League Players' Concussion Injury Litig.*, 189 F. Supp. 3d 856, 869 (D. Minn. 2016) (refusing to consider "cherry-picked evidence" in the form of "meeting minutes, letters, memoranda, and reports" that failed to "merely reiterate what is said in the pleadings").

      2.    <u>Plaintiffs Have Adequately Established Each Integrator Defendant's Participation in Agri Stats</u>

As set forth above in Section II.A, Agri Stats facilitated and played a central role in the alleged conspiracy.  This conduct is sufficient to establish each integrator Defendant's participation in the conspiracy, especially at the pleading stage.  It is well established that "[g]enuine competitors do not make daily, weekly and monthly reports of

the minutest details of their business to their rivals." *Am. Column & Lumber Co.*, 257

U.S. at 410.  In competitive industries, it is not "the routine" for competitors to share real-

time information regarding supply, pricing, and profit.  *In re Broiler Chicken Antitrust*

*Litig.*, 290 F. Supp. 3d at 804 (holding that "[t]here is simply too much . . . unusual

information sharing through Agri Stats and a coincidence of business strategies that make

dismissal of Plaintiffs' claims at this point in the case inappropriate.").  Yet beginning in

2009, the integrator Defendants began to share exactly this kind of detailed sensitive

information through Agri Stats.  *See* DPP ¶ 47; IIP ¶ 73; CIP ¶ 50.  This detailed

information allowed each competitor to monitoring others' production and pricing.  *Id*.

Defendants' arguments that their specific conduct is not adequately pled falls

short.  *See infra* Section II.C.  This is especially the case as it relates to Defendants'

joining and participating in Agri Stats.  Each integrator Defendant subscribed and

reported to Agri Stats.  *See* DPP ¶¶ 3, 48-60; IIP ¶¶ 3, 76-89; CIP ¶¶ 3, 53-65.  Plaintiffs'

Complaints go above and beyond what is required and specifically name each of the

participating Defendant families:

> Each member of the conspiracy, Defendants Clemens,
> Hormel, Indiana Packers, JBS USA, Seaboard, Smithfield,
> Triumph, and Tyson, were all Agri Stats subscribers and
> reported their information to Agri Stats. Agri Stats' parent
> company, Eli Lilly, stated that "***over 90% of the poultry and***
> ***pig market***" uses Agri Stats in the United States.

DPP ¶ 49; IIP ¶ 77; CIP ¶ 54 (emphasis in original).

/ / /

/ / /

As such, Plaintiffs' specific allegations of each integrator Defendant joining and participating in Agri Stats are just some of many well-pled allegations that support the denial of the Individual Motions to Dismiss in their entirety.

3.       Plaintiffs' Allegations Against the Clemens Defendants are Sufficient

Clemens' arguments in their Motion to Dismiss (ECF No. 168) that they are not a proper defendant improperly attempt to challenge the truth, rather than legal sufficiency, of Plaintiffs' allegations and thus are not relevant to a determination of the sufficiency of the allegations in the Complaint.  *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 804.  Moreover, Clemens improperly attempts to minimize, isolate, and ignore the whole of Plaintiffs' Complaint and all of the allegations in context.  *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.* (*Dairy Farmers I*), 767 F. Supp. 2d 880, 898 (N.D. Ill. 2011) (denying defendants' motion to dismiss because "the individual defendants minimize the allegations against them in the complaint, completely omitting certain paragraphs from a list of quoted paragraphs that they suggest is exhaustive").

Clemens' individual motion fails because Plaintiffs have done far more than make vague allegations about "illegal pricing discussions."  Clemens MTD at 3.  Plaintiffs have set forth in detail the nature of the conspiracy and when and how it functioned through the extensive sharing of confidential, competitively sensitive information through Agri Stats, and that Clemens participated in that information exchange.  *See supra* Section II.B.2.

/ / /

Clemens' remaining arguments - that the opening of a plant in Coldwater, Michigan in 2017 cuts against a finding that Clemens participated in the conspiracy and that Clemens had no ability to control supply (*see* Clemens MTD at 6-9) - are factual arguments that have no place in a Rule 12 motion. *See supra* Section II.B.1. But even if these factual disputes were properly considered on a motion to dismiss (they are not), Clemens' allegations regarding the 2017 opening of the Coldwater plant ignore the facts that a small number of companies, including Clemens, control the vast majority of the pork industry, and that Clemens increasing *its* capacity does not detract from the purpose and effect of the whole of the conspiracy, of which it is a part. DPP ¶¶ 73, 80; IIP ¶ 118; CIP ¶¶ 79, 86.

Clemens' position that it lacked the ability or incentive to control supply or prices in the pork industry is also without merit. To accept Clemens' argument, one would have to assume that Plaintiffs have alleged that Clemens alone wrongfully established pork prices or supply, such that Clemens' ability acting alone to affect the market might be relevant. *See* Clemens MTD at 8-9. But Plaintiffs alleged that Clemens *conspired* with the other Defendants to fix pork prices, so whether Clemens alone can control supply levels is irrelevant. Indeed, Clemens' argument proves too much. If Clemens could not control supply independently, that establishes that the only way it could do so was through its participation in an anticompetitive cartel.

Moreover, Clemens' assertion that as a hog processor, it had no incentive to increase the price it paid to independent producers for the purchase of those hogs, is meritless. Clemens MTD at 9. Plaintiffs allege that the prices charged to purchasers of

pork at the end of the distribution chain were elevated by the conspiracy, not that the price paid by a processor such as Clemens to the hog farms was elevated.  As detailed in the Complaints, Clemens exercised substantial control throughout the distribution chain "from the farm all the way through our retail foodservice customers.  *See* DPP ¶ 73; CIP ¶ 79 (quoting Clemens Food Group, Vertically Integrated Purposefully Coordinated (available at http://www.clemensfoodgroup.com/our-company/vertically-coordinated)). Clemens is further alleged to control pork "supply through a number of means including capacity reductions, controlling slaughter rates, and exports" and its packaged pork division. *See* DPP ¶ 74; *See* IIP ¶¶ 6-7, 73, 97-102; CIP ¶ 80.  Clemens' attempt to ignore and dispute these allegations is premature and improper at the motion to dismiss stage.

Plaintiffs have sufficiently alleged Clemens' participation in the conspiracy and Clemens' arguments to the contrary are without merit.  As such, Clemens' Motion to Dismiss (ECF No. 168) should be denied.

4. Plaintiffs' Allegations Against the Hormel Defendants are Sufficient

Contrary to Hormel's contention in its Motion to Dismiss (ECF No. 170), Plaintiffs' Complaints have substantial direct and circumstantial allegations against them. As set forth below, the Complaints specifically allege involvement with Agri Stats (*see supra* Section II.B.2), supply restrictions (*see* DPP ¶¶ 110-11, 113; IIP ¶ 99; CIP ¶¶ 118-19, 121), vertical integration in furtherance of the conspiracy (*see* DPP ¶ 74; IIP ¶¶ 6-7, 111, 113; CIP ¶ 80), and rapid conspiratorial market concentration and control (*see* DPP ¶¶ 77, 79-80; IIP ¶¶ 113, 115-16; CIP ¶¶ 83, 85-86).

/ / /

898696.3                                   19

The Complaints further allege Hormel's public confirmation of supply reductions in 2008 and multiple times in 2009. *See* DPP ¶¶ 110-11, 113; IIP ¶ 99; CIP ¶¶ 118-19, 121. Specifically, Hormel CEO Jeffrey Ettinger confirmed during an October 2008 earnings call that he expected to see a 3% reduction in overall pork supply in 2009. Hormel's CEO stated in a January 2009 earnings call that Hormel would "look for opportunities . . . [to] reduce the numbers that we had going through." DPP ¶ 111; CIP ¶ 119. Hormel further confirmed the existence of such supply restrictions in May 2009. DPP ¶ 113; IIP ¶ 99; CIP ¶ 121. Such statements are evidence of public signaling. Naturally, profitability across the industry followed these anticompetitive supply reductions, as Hormel CFO Jody Feragan noted on the Q1 2010 earnings call. *See* DPP ¶ 122; CIP ¶ 119.

In addition to these allegations, the Complaints contain detailed allegations regarding Hormel's involvement in trade associations, including Cory Bollum serving on the National Pork Producers Council Board of Directors (DPP ¶ 89; CIP ¶ 95), Jim Snee, Stephen Binder and Jeffrey Ettinger serving on the Board of Directors of the NAMI and its predecessor the AMI (*see* DPP ¶ 98; CIP ¶ 104), and attending the International Production and Processing Expo in at least 2014 (DPP ¶ 106; CIP ¶ 112), which provided Hormel with opportunities to meet and collude with its co-defendants.

Hormel's argument that it "could not have benefitted from the alleged conspiracy," because it could not benefit from the increased price of pigs, fails for multiple reasons. Hormel MTD at 3-4. First, Hormel's implausibility argument is almost exclusively reliant on statements taken from proffered earnings calls transcripts and

annual reports which are not part of the Complaints. As discussed in Section II.B.1 above, such external evidence cannot be considered on a motion to dismiss and should be stricken.

Second, even if considered, these earnings calls do not merit dismissal of the Complaints. The Complaints allege that Defendants conspired to constrain the supply of pork and stabilize the price of pork sold at the other end of the distribution channel. *See, e.g.*, DPP ¶ 7; IIP ¶ 7; CIP ¶ 7 ("As a result of Defendants' unlawful conduct, Plaintiffs and the class members paid artificially inflated prices for pork during the Class Period."). Hormel was one of the largest pork integrators during the Class Period. DPP ¶ 77, 79-80; IIP ¶ 113, 116, 118; CIP ¶ 83, 85-86. Contrary to Hormel's claim "*that increases in hog prices decrease Hormel's profitability*" (Hormel MTD at 4), Hormel's own executives' statements confirm supply reductions in 2008 and 2009 led to increased profitability in 2010 (*see* DPP ¶ 122; CIP ¶ 119). Thus, Hormel's conveniently narrow focus on hog prices to defeat a pork conspiracy misses the mark.

The Complaint further alleges that Hormel was able to dictate pork prices through its vertical integration. *See* DPP ¶ 74; IIP ¶¶ 6-7, 111, 113; CIP ¶ 80. By creating and acquiring "divisions or subsidiaries that sell packaged pork under various name brands[,]" Hormel was able to further implement efforts to restrict supply. *Id.* The vertical integration of Hormel and other pork processor Defendants allowed them to control so-called "independent" pork farmers, and dictate the price of pork from the farm to the customer. *See* DPP ¶¶ 69-74; IIP ¶¶ 107-111; CIP ¶¶ 74-80. Hormel's argument

that, because it purchased "hogs" from farmers and then sold into the market, it is a "victim" of the conspiracy (Hormel MTD at 2) is not convincing.

With these allegations (and the many others) taken as true as per the standard on a motion to dismiss, Hormel's participation and the benefits derived therefrom are undeniable.  Therefore, Hormel's Motion to Dismiss (ECF No. 170) should be dismissed in its entirety.

5.    Plaintiffs' Allegations Against the Indiana Packers Defendants are Sufficient

The Complaints allege sufficient facts to establish that Indiana Packers Corporation ("IPC") and its U.S.-based parent Mitsubishi Corporation (Americas) ("MCA") (collectively, "Indiana Packers") joined and committed acts in furtherance of the conspiracy.  As set forth above, Indiana Packers is specifically alleged to have been an active participant in Agri Stats (*see* DPP ¶ 49; IIP ¶ 77; CIP ¶ 54).  Indiana Packers executives are identified as participants in trade associations, which are alleged to be an instrumentality of the conspiracy.  *See* DPP ¶ 49.  Indiana Packers' individual motion to dismiss (ECF No. 173) largely boils down to these Defendants' out-of-context characterizations of Plaintiffs' allegations.  Indiana Packers' argument fails both because it raises factual disputes ill-suited for disposition on the pleadings and because it mischaracterizes the Complaints' allegations.

(a)    *Indiana Packers Improperly Mischaracterizes and Disputes Plaintiffs' Allegations.*

Rather than attempt to show the insufficiency of the allegations in the Complaints, Indiana Packers' Motion to Dismiss attempts to reframe them in a manner that is

inconsistent with Plaintiffs' factual allegations.  By doing so, Indiana Packers

conveniently ignores multiple allegations of its participation in the conspiracy and

improperly relies upon external facts and evidence to adjudicate disputed facts at the

motion to dismiss stage.  *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d

1059, 1070 (8th Cir. 2017) (court must construe complaint liberally in light most

favorable to plaintiffs).

     Contrary to Indiana Packers' argument, Plaintiffs do not exclude Indiana Packers

from their allegations of collusion.  Indiana Packers misleadingly cites to Plaintiffs'

allegations regarding market concentration – which allege the market is largely in the

hands of six firms – to assert that Indiana Packers' exclusion from the list of the top six

suppliers somehow excises them from the collusion.  This is not so: such allegations

simply point to a highly concentrated industry susceptible to collusion.  *See, e.g.*, DPP ¶¶

75-85; IIP ¶¶ 112-21; CIP ¶¶ 81-91; *see also Haley Paint Co. v. E.I. Dupont De Nemours

& Co.*, 804 F. Supp. 2d 419, 426 (D. Md. 2011) (finding high market concentration where

defendants collectively controlled 70% of the market); *Kleen Prods., LLC v. Packaging

Corp. of Amer.*, 775 F. Supp. 2d 1071, 1077 (N.D. Ill. 2011).  Whether or not relatively

smaller firms like Indiana Packers conspired with the dominant six suppliers is a separate

inquiry; Indiana Packers' relatively smaller size does not inoculate it from liability if it

joined the conspiracy.

     As discussed above in Section II.B.2, Indiana Packers was an active and identified

participant in Agri Stats and committed acts in furtherance of the conspiracy as a result

thereof.  DPP ¶¶ 37-67; IIP ¶¶ 64-96; CIP ¶¶ 41-72.  Indiana Packers participated in the

same trade and industry organizations used to facilitate fixing pork supply, including an organization dedicated to sharing sensitive internal supply information, and offered pretextual justification for its own declining supply and increasing prices. *See, e.g.*, DPP ¶¶ 37-67; IIP ¶¶ 64-96, CIP ¶¶ 41-72.  Defendants simply omit this context.

Finally, the Complaint quotes IPC President, Gary Jacobson, as stating that IPC operated in a "sold-out position."  DPP ¶ 126; CIP ¶ 132.  While "sold-out position" is a quote from Mr. Jacobson, "at full capacity" is Indiana Packers' attorneys' after-the-fact characterization of the statement.  Indiana Packers MTD at 4.  But the two conditions are by no means synonymous or equivalent.  This is emblematic of how Indiana Packers' brief inverts the relevant standard by attempting to construe the facts in its favor.  Indeed, in a market with collusively restrained supply, one would fully expect suppliers to operate in "sold-out" positions or near sold-out positions to facilitate the very price increases that are the object of such collusion.

Mr. Jacobson went on to discuss how the hot weather and other input factors in 2012 could *constrict* input supply for Indiana Packers' processing plant, and lead to higher prices:

> "High corn prices make pig farming less profitable . . . both reducing the supply of pork for processing plants come next spring and making the pork that is on the market more expensive . . . high temperatures make pigs less hungry and they don't fatten for market as quickly as they would in a cooler year . . . it remains to be seen how the drought will change the plant's supply in the coming months."

DPP ¶ 126; CIP ¶ 132.  These are pretextual reasons for increasing prices because of decreasing supply, which demonstrates fraudulent concealment of the conspiracy.  Such

comments are a far cry from a substantial increase in production, which is how Indiana Packers attempts to characterize the facts.

In addition to improperly seeking to recast and misconstrue Plaintiffs' allegations, Indiana Packers' motion relies upon additional facts contained in a full production of the *Indiana Economic Digest* cited in the complaint. Indiana Packers MTD at 3-4. As set forth above (*see supra* Section II.B.1(b)) and in Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss, such reliance on external materials is not permissible in a motion to dismiss. Such evidence should be stricken and disregarded by the Court.[7]

Simply put, once Plaintiffs' allegations are placed back into context and the correct standard is applied, it is clear Plaintiffs plead sufficient factual content to support the reasonable inference that Indiana Packers is liable for the misconduct alleged. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d at 1070.

/ / /

---

[7] The authority cited by Indiana Packers is inapposite and does not support reliance on external evidence. In *Montero*, the court noted that the complaint's exhibits contradicted plaintiffs' assertions of title-transfer deficiencies, but then rested its holding predominately on its conclusion that plaintiff had no standing to challenge lender-to-lender assignments as a mortgagor. *Montero v. Bank of Am., N.A.*, No. 13-CV-850, 2014 WL 562506, at *13 (D. Minn. Feb. 13, 2014). In stark contrast, as discussed above and when construed in favor of Plaintiffs, the *Indiana Economic Digest* article *supports* Plaintiffs' allegations of Indiana Packers' conspiratorial conduct. And Defendants do not suggest that the *Digest* article somehow demonstrates Plaintiffs lack standing. Nor is this a situation where Plaintiffs' allegations evoke "an impenetrable [affirmative] defense," as was the case in *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009). *Hecker* involved a specific affirmative "safe-harbor" defense under ERISA anticipatorily raised by plaintiffs' complaint. *Id.* Here, Defendants raise no "impenetrable" affirmative defense evoked by Plaintiffs' allegation, and instead hang their entire argument on supposed inconsistencies among Plaintiffs' allegations.

(b)     *MCA's Corporate Relationship with IPC.*

In seeking to dismiss MCA, Defendants ignore that Plaintiffs defined Indiana Packers to include Indiana Packers Corporation *and* Mitsubishi Corporation (Americas) (*see* DPP ¶ 2; IIP ¶ 2; CIP ¶ 2), such that all allegations in the Complaints against Indiana Packers are also directed at MCA.  Therefore, Plaintiffs allege MCA "actually engaged in the anti-competitive conduct and not merely served as parents to its [] subsidiary [IPC]." *See Reg'l Multiple Listing Servs. of Minn., Inc.*, 9 F. Supp. 3d at 1044; *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944, 2010 WL 9543295, at *6 (N.D. Cal. Feb. 5, 2010); *see also Weinstein v. Saturn*, 303 Fed. Appx. 424 (9th Cir. 2008); *Cont'l Ore Co.*, 370 U.S. at 698-99.

Moreover, as Defendants correctly note, Plaintiffs further alleged that MCA exerted control over IPC.  *See* Indiana Packers MTD at 6.  While Plaintiffs' allegations of MCA's control over IPC may raise questions of fact - for instance, the extent of control exercised by MCA over IPC; MCA's awareness of IPC's collusive conduct; whether MCA directed IPC's unlawful activities; whether MCA directed IPC to collude; and whether MCA enjoyed ill-gained profits from the conspiracy - such questions of fact are not appropriately resolved on a motion to dismiss.  Put simply, the Court should defer the disposition of MCA, and allow Plaintiffs to explore these issues via discovery.  *See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("[C]ourts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators.").

6.    <u>Plaintiffs' Allegations Against the JBS Defendants are Sufficient</u>

JBS's Motion to Dismiss (ECF No. 176) fails to argue any legally significant points, especially at the pleading stage, not already presented in the Defendants' Joint Motion to Dismiss.  In its Motion to Dismiss, JBS completely ignores the numerous allegations specifically pled against it, as well as the countless others in which they are incorporated by reference (the two JBS entities are expressly included in the definition of "Defendants," *see* DPP ¶ 2; IIP ¶ 2; CIP ¶ 2).  *See infra* Section II.C.  The Complaints specifically allege that JBS USA Food Company and JBS USA Food Company Holdings "sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States."  DPP ¶¶ 28-29; IIP ¶¶ 53-54; CIP ¶¶ 31-32. JBS, like other co-conspirators, subscribed to and participated in the information exchange facilitated by Agri Stats.  *See supra* Section II.B.2; *see* DPP ¶ 49; IIP ¶ 77; CIP ¶ 54; *see generally* DPP ¶¶ 48-67; IIP ¶¶ 76-96; CIP ¶¶ 53-72.  JBS was also one of the leaders of a consolidation effort in the pork industry: "the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015."  DPP ¶ 77; IIP ¶ 113; CIP ¶ 83.  As alleged in the Complaints, "[i]n July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion."  DPP ¶ 78; IIP ¶ 115; CIP ¶ 84.  This billion-dollar consolidation effort increased JBS' control within the pork industry second only to Smithfield.  *Id.*; *see also* DPP ¶¶ 79-80; IIP ¶¶ 116, 118; CIP ¶¶ 85-86.

JBS did not stop with acquisitions.  JBS used its position as an industry juggernaut to secure influential positions for its executives in trade association and other forums.

JBS executives Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp each served on the AMI and NAMI Boards of Directors during the Class Period. DPP ¶ 98; CIP ¶ 104.  JBS executives also attended the 2014 International Production and Processing Expo.  DPP ¶ 106; CIP ¶ 112.  These trade associations and industry groups were some of the many opportunities that the Defendants, including JBS, exploited in furtherance of their conspiracy.  *See* DPP ¶ 86; CIP ¶ 92; *see also* DPP ¶¶ 87-90; CIP ¶¶ 93-96.

Finally, the Complaints detail a conspiracy rooted in supply restrictions.  "Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to limit hog supply."  DPP ¶ 120; CIP ¶ 127 (citing a March 8, 2010 statement made during an earnings call by JBS executive Wesley Mendonça Batista).  Mr. Batista further elaborated regarding the supply restrictions and confirmed the consequences thereof three years later on a May 15, 2013 earnings call: "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business. . . ." DPP ¶ 128; CIP ¶ 134.  At the motion to dismiss stage, when viewed as a whole and in context, Plaintiffs' allegations are well pled and plausible as they relate to JBS.  *See Cont'l Ore Co.*, 370 U.S. at 699.

As discussed in Section II.B.5(b) above, Plaintiffs allegations against JBS USA Food Company Holdings are sufficient.  As such, the Court should defer the disposition of JBS USA Food Company Holdings, and allow Plaintiffs to explore these issues via

discovery.  *See Double D Spotting Serv., Inc.*, 136 F.3d at 560.  Based on the foregoing,

JBS's Motion to Dismiss (ECF No. 176) should be denied in its entirety.

> 7.    Plaintiffs' Allegations Against the Seaboard Defendants are Sufficient

In its Motion to Dismiss (ECF No. 178), Seaboard purports to list the "limited"

allegations against it, but neglects to mention that even "limited" allegations are

sufficient to establish an individual defendant's participation in a well pled conspiracy.

*See* Seaboard MTD at 2.  Further, contrary to Seaboard's characterization, the allegations

of the Complaint are extensive and sufficient to put Seaboard on notice of Plaintiffs'

claims against them.

The Complaints allege that Seaboard Foods LLC and Seaboard Corporation "sold

pork in interstate commerce, directly or through its wholly owned or controlled affiliates,

to purchasers in the United States."  *See* DPP ¶¶ 30-31; IIP ¶¶ 56-57; CIP ¶¶ 33-34.

Further, as discussed in *supra* Section II.B.2, the Complaints allege Seaboard's

involvement and participation in Agri Stats (*see* DPP ¶ 49; IIP ¶ 77; CIP ¶ 54), a major

component of the alleged conspiracy related to the exchange of sensitive business secrets

and information with competitors.  *See generally* DPP ¶¶ 48-67; IIP ¶¶ 77-96; CIP ¶¶ 54-

72.

Seaboard's vertical integration (*see* DPP ¶ 72; CIP ¶ 78 (noting that Seaboard both

*owns facilities* and contracts the raising of "over five million hogs annually")) was a

factor in its participation in the conspiracy because it was able to control and restrict the

supply as per Defendants' anticompetitive agreement (*see* DPP ¶¶ 68-70; IIP ¶¶ 107, 109;

CIP ¶¶ 74-75).  Compliance with the supply restrictions was essential to Seaboard's survival in the pork industry, which was otherwise controlled by other integrators four times larger than it.  *See* DPP ¶¶ 79-80; IIP ¶ 116; CIP ¶¶ 85-86.

Seaboard executives were actively involved in trade associations and regularly attended conferences, providing opportunities to conspire and further the anticompetitive scheme.  The National Pork Industry Conference ("NPIC") "is the largest annual conference in the US that is held for the swine industry," and Seaboard's executives have been session presenters on numerous occasions.  *See* DPP ¶ 92; CIP ¶ 98.  As alleged in the Complaints, opportunities such as presenting at the NPIC (*id.*) and attending the International Production and Processing Expo in at least 2014 (DPP ¶ 106; CIP ¶ 112) provided Defendants, including Seaboard, opportunities to communicate and conspire with competitors.  *See generally* DPP ¶¶ 86-106; CIP ¶¶ 92-112.  In addition to actively participating at the NPIC, Seaboard executives Gary Louis, Rod Brenneman and Terry Holton each served on the AMI and NAMI Board of Directors during the Class Period.  *See* DPP ¶ 98; CIP ¶ 104.

The culmination of these efforts of exchanging information via Agri Stats and meeting with competitors was the ability to enter into joint agreements to reduce pork supply in order to artificially inflate prices.  Seaboard was specifically referenced in a call by the CEO of Smithfield, as a pork integrator that needed to cut production.  DPP ¶ 114; IIP ¶ 100; CIP ¶ 122.  In 2017, Seaboard and Defendant Triumph announced a joint facility and additional shift in response to "growing demand;" but that never happened.  DPP ¶ 130; CIP ¶ 136.  Against their individual best interests and in furtherance of the

conspiracy to restrict supply and artificially inflate prices, Seaboard and Triumph never implemented the announced plan and formally postponed it in 2018. *Id.*

These allegations, along with the others in Plaintiffs' well-pled Complaints, adequately tie Seaboard to the alleged conspiracy. The Complaints adequately allege Seaboard's participation in the conspiracy, including joining the conspiracy, restricting supply, and the relationship of the Seaboard entities.

Seaboard's attempt to dismiss the Complaints is without merit given the level of detail alleged by Plaintiffs. Furthermore, Seaboard's attempt to cherry pick external evidence in support of its motion and in an attempt to dispute the allegations in the Complaints is improper. As discussed in supra Section II.B.1(b), such external evidence should be stricken.

Finally, as discussed in Section II.B.5(b) above, Plaintiffs allegations against Seaboard Corporation are sufficient. For the reasons discussed, the Court should defer the disposition of Seaboard Corporation. As such, Seaboard's Motion to Dismiss (ECF No. 178) should be denied in its entirety.

8. <u>Plaintiffs' Allegations Against the Smithfield Defendants are Sufficient</u>

Plaintiffs have alleged a plausible conspiracy in which Smithfield participated. Plaintiffs' allegations concerning supply restrictions, price hikes, and enforcement implicate all Defendants, including Smithfield. Smithfield's argument that Plaintiffs' Complaints identify no conduct above and beyond routine business activities (*see* Smithfield MTD, ECF No. 182 at 1) is meritless.

Combined with its participation in Agri Stats (*see supra* Section II.B.2), in 2009, Smithfield also began reducing supply.  DPP ¶ 112; IIP ¶ 98; CIP ¶ 120.  The CEO of Smithfield signaled in June of that year that other competitors would have to step up and make production cuts: "Somebody else has got to do something.  We cut 13%.  The first 10% didn't fix it."  DPP ¶ 114; IIP ¶ 100; CIP ¶ 122.  That autumn, Smithfield's CEO admitted to discussing industry production cuts with other producers: "I'm talking to people who are financially extremely strong and they are cutting back, and that's got to be a statement about those people who are not financially strong.  But the answer is, yes, there are others cutting back.  We're not the only one."  DPP ¶ 117; IIP ¶ 101; CIP ¶ 125.

Smithfield attempts to minimize these statements by providing an alternative explanation as a defense.  But these are exactly the kinds of statements that support the plausibility of an antitrust claim: the "discussion of the need for capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of Defendant's own planned course of conduct."  *In re Domestic Airline Travel Antitrust Litig*., 221 F. Supp. 3d at 62-63; *see also In re Delta/AirTran Baggage Fee Antitrust Litig*., 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010) (discussing at the motion to dismiss stage that plaintiffs alleged more than mere price announcements because the executives' statements related to the allegation that "each Defendant signaled its willingness to cut capacity and increase prices if the other Defendant acted in concert").

Following these statements, the pork industry engaged in unprecedented production cuts.  DPP ¶ 107; IIP ¶ 97; CIP ¶ 115.  Prior to these production cuts, the

supply of pork increased <u>every year</u> between 2000 and 2009.  *Id.*  In short, these

unprecedented production cuts only occurred after the pork industry began sharing

detailed information with each other and only after Smithfield made public regarding its

commitment to cut capacity.  *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp.

at 63 (noting that "Defendants' statements concerning the focus on exercising capacity

discipline commenced in 2009 and were a deviation from past business practices."); *In re

Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d at 1360 ("Courts have . . .

found that unlawful conspiracies may be inferred when collusive communications among

competitors precede changed/responsive business practices, such as new pricing

practices.").

Although Smithfield disputes Plaintiffs' interpretation of Smithfield's public

statements regarding supply cuts, this is an inquiry better evaluated after discovery, and

not on a motion to dismiss.  *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 804

("[A]lthough Plaintiffs have not alleged details about the formation, operation, and

communications constituting the conspiracy, the facts included in the complaint are

sufficient to plausibly infer formation and communication.  Defendants criticize the lack

of details, but when a conspiracy is secret such details will not be available without

discovery, and thus cannot be required at the pleading stage.  Defendants' public

statements of intent to cut production are indicative of an agreement considering the

commodity nature of Broilers.").

Smithfield's reliance on the summary judgment decision in *Valspar Corp. v. E.I.

Du Pont De Nemours & Co.* is misplaced and inapplicable.  873 F.3d 185, 202-03 (3d

Cir. 2017) (affirming an order granting *summary judgment* because plaintiff "did not offer any single form of evidence that would have gotten it close to <u>showing that a conspiracy is more likely than not</u>.") (emphasis added).  But that is not the standard for a motion to dismiss.  To the contrary, the district court in *Valspar denied* the defendants' motion to dismiss – holding that the allegations of "parallel price increases announced and implemented by Defendants, details of the [] industry that facilitate collusion, market conditions favoring collusion, and opportunities to agree and collude in the form of trade association meetings and publications" together constituted a plausible case for liability. *Haley Paint Co.*, 804 F. Supp. 2d at 425.

As such, Plaintiffs' Complaints regarding Smithfield are sufficient at this stage of the litigation and Smithfield's Motion to Dismiss (ECF No. 182) should be denied.

9.   Plaintiffs' Allegations Against the Triumph Defendants are Sufficient

No matter how big or small, any entity that enters into a conspiracy and acts in furtherance of the conspiracy is equally liable for such violations.  Such is the case for Triumph.  As alleged in the Complaints, Triumph exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume, and demand through its co-conspirator, Defendant Agri Stats." *See supra* Section II.B.2; DPP ¶¶ 2, 49; IIP ¶¶ 2, 77; CIP ¶¶ 2, 54.  Triumph's business involved "[selling] pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States."  DPP ¶ 33; IIP ¶ 59; CIP ¶ 36.

As previously discussed in relation to co-Defendant and co-conspirator Seaboard, Triumph and Defendant Seaboard announced a joint facility and additional shifts in response to "growing demand," against their best interests and in furtherance of the conspiracy to restrict supply and artificially inflate prices.  DPP ¶ 130; CIP ¶ 136. Seaboard and Triumph never implemented the announced plan and formally postponed it the next year.  *Id.*

Triumph also attended industry forums and trade association meetings to stay abreast of the conspiracy's mandate and conspire with other Defendants.  The Complaints contain detailed allegations regarding Triumph's Mark Campbell and Rick Hoffman serving on the Board of Directors of the NAMI and its predecessor the AMI (*see* DPP ¶ 98; CIP ¶ 104), and attending the International Production and Processing Expo in at least 2014 (DPP ¶ 106; CIP ¶ 112).

Triumph's entire Motion to Dismiss focuses on what it claims are a lack of allegations against it; however, this ignores the numerous allegations concerning Triumph's involvement in the conspiracy.  In addition to detailed conspiracy allegations presented in the Complaints (in which Triumph is expressly included in the definition of "Defendants" (*see* DPP ¶ 2; IIP ¶ 2; CIP ¶ 2)), there are numerous allegations that meet the requisite pleading standard at this stage of litigation.  Even if Triumph was not a leader of the conspiracy, Triumph was involved in the price fixing scheme.

As such, Triumph's Motion to Dismiss (ECF No. 184) should be denied in its entirety.

/ / /

10.   <u>Plaintiffs' Allegations Against the Tyson Defendants are Sufficient</u>

Tyson's motion does not challenge the sufficiency and adequacy of Plaintiffs' well-pled allegations against them.  Instead, like certain other co-Defendants, Tyson argues (a) "that it would be impossible and irrational for the Tyson Defendants to join the alleged conspiracy[,]" and (b) Plaintiffs' Complaints contain improper group pleading allegations.  *See* Tyson MTD, ECF No. 187 at 1.  Regarding the plausibility of Tyson joining the conspiracy, Plaintiffs address this unsupportable argument below.  Regarding the sufficiency of Plaintiffs' allegations, Plaintiffs have already rebutted Defendants' group pleading arguments in *infra* Section II.C.

Tyson's contention - that in order for the alleged conspiracy "to work" each Defendant must be vertically integrated - simply does not make sense.  *See* Tyson MTD at 1.  Besides the fact that Tyson *is* vertically integrated (*see* DPP ¶ 74; IIP ¶ 60-62; CIP ¶ 80), vertical integration is not required for a defendant to join and participate in a price-fixing conspiracy.  Tyson bases its argument on the fact that they "do not produce hogs in any material way" (Tyson MTD at 2); however (as previously discussed in relation to similar arguments by Hormel, *supra* Section II.B.4), Plaintiffs' Complaints do not allege a conspiracy to restrain the prices of whole hogs or pigs.  The Complaints very clearly allege a conspiracy by pork integrators, in which Tyson was a top three market participant.  *See, e.g.*, DPP ¶ 7; IIP ¶ 7; CIP ¶ 7 ("As a result of Defendants' unlawful conduct, Plaintiffs and the class members paid artificially inflated prices for pork during the Class Period.").

/ / /

Tyson was a leader of the conspiracy.  As alleged in the Complaints, Tyson joined and participated in the conspiracy when it "publicly stated aggregate data" and subscribed to and provided competitive data to Agri Stats (*see supra* Section II.B.2).  *See* DPP ¶¶ 40, 49; IIP ¶¶ 66, 77; CIP ¶¶ 43, 54.  The Complaints also make specific references to supply restriction announcements by Tyson in 2009 and 2011.  *See* DPP ¶¶ 115, 123; IIP ¶ 104; CIP ¶¶ 123, 129.  In 2009 when it was announced that Tyson reduced sow numbers, the industry was encouraged to follow.  *See* DPP ¶ 92; CIP ¶ 98.  Of course, Tyson was well aware of the benefits of their actions and of those who follow: "In the words of Tyson Foods, Inc. COO, James Lochner, 'As you know decreased supply should be favorable to pricing.'"  DPP ¶ 133; CIP ¶ 138.  Defendants' common goal was to increase the price of pork and their margins.  Clearly, Defendants' actions yielded the intended and foreseeable results.  *Id.*

Further, Tyson and its executives actively participated in and often governed industry trade associations.  Todd Neff served on the Board of Directors of the National Pork Producers Council (DPP ¶ 89; CIP ¶ 95), Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren served on the AMI and NAMI Board of Directors during the Class Period (DPP ¶ 98; CIP ¶ 104), and had at least some representation at the 2014 International Production and Processing Expo (DPP ¶ 106; CIP ¶ 112).

When viewed as a whole and in context, there can be no doubt that Plaintiffs' allegations are well pled and plausible as they relate to and implicate Tyson.  *See Cont'l Ore Co.*, 370 U.S. at 699.  As such, Tyson's Motion (ECF No. 187) should be denied as to all entities.

### C.   Plaintiffs' Allegations, Including Those of Conduct by All Defendants, are Properly and Sufficiently Pled Against Each Defendant

As discussed herein, Plaintiffs' Complaints sufficiently allege the involvement of each of the Defendants.  A plaintiff may "adequately plead[] personal involvement . . . [where] he specifies that he is directing his allegation at all of the defendants."  *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009); *see also Atkins v. Hasan*, No. 15 CV 203, 2015 WL 3862724, at *3 (N.D. Ill. Jun. 22, 2015) ("It is true that, in certain cases, referring simply to 'the defendants' without further specification may adequately plead personal involvement.").

Plaintiffs satisfy the requirement of pleading each Defendant's individual involvement in the conspiracy as more fully set forth in Sections II.A and II.B, *supra*, as well as through numerous allegations that pertain to all Defendants.  Such allegations are not pled generally, but rather specifically when viewed in context.  Each of these allegations pertains to all Defendants and therefore adequately pleads personal involvement of each of them.  *See Brooks*, 578 F.3d at 582.  These allegations are sufficient at the pleading stage because they describe specific unlawful conduct by all Defendants, not merely in a formulaic recitation of the cause of action, but in sufficient detail to put all Defendants on notice of how they violated the antitrust laws.  *Id.*; *see also In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2014 WL 4379112, at *10 (S.D.N.Y. Sep. 4, 2014) (rejecting the argument that "references to 'Dealer-Defendants' as a group are insufficiently particular to render the allegations plausible" where complaint alleged "that 'senior-level employees of each [Dealer-Defendant]

participated'" in conspiratorial conduct and included lists of Dealer-Defendant representatives who were alleged to be present at different meetings).

In addition to the allegations that are applicable to the Defendants collectively, the Complaints further allege specific conduct by each individual Defendant showing it joined and committed acts in furtherance of the conspiracy. These allegations as to each of the individual Defendants are sufficient to establish each of their participation in the conspiracy. *See Bulk Popcorn II*, 783 F. Supp. at 1197; *In re Polyurethane Foam Antitrust Litig.*, 86 F. Supp. 3d at 786.

Defendants' attempt to escape culpability by arguing that Plaintiffs' Complaints employ improper "group pleading" falls short. While the Eighth Circuit has not adopted the well-established group pleading doctrine, there is *no per se* rule against grouping defendants for the purpose of asserting allegations. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2010 WL 9543295, at *6 (where a conspiracy is organized at the highest level of the defendant organization and carried out by subordinates, a complaint need not "not differentiate among related corporate entities") (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d at 1184).

Defendants cite *In re Milk Products Antitrust Litigation* for the proposition that lumping together defendants without sufficient individualized allegations ***may*** not be sufficient. *See* Clemens MTD at 1. For the same reasons set forth in Plaintiffs' Opposition to the Joint Motion to Dismiss, Defendants' reliance is not persuasive. In *Milk*, plaintiffs alleged an agreement between milk processors in violation of the Sherman Act to "discuss" and "agree" on the prices charged for milk products. *In re*

*Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d at 1020.  The court ruled the allegations

against defendant K&P were too "vague to place K & P on notice of the factual grounds

against it."  *Id*.  In part, the complaint alleged an agreement "[b]y engaging in illegal

pricing discussions in person and by telephone with other defendants."  *Id*.  The

complaint's allegations against K & P in *Milk* failed not due to group pleading, but

because of the lack of specific, individualized facts, either direct or circumstantial,

against it.  *Id*.  Significantly, none of the other five defendant families were dismissed

from the action.  *Id*. at 1020-21, 1029.  Stated differently, the allegedly "group"

allegations were sufficiently and specifically pled against the other defendants.  *Id*.  Such

is the case here.

Here, the Complaints contain significantly more detailed direct and circumstantial

allegations which support the existence of the conspiracy, and should be considered as to

each of the Defendants.  *See* DPP ¶¶ 110-30; IIP ¶¶ 98-106; CIP ¶¶ 118-36.  For example,

because the Complaints specifically identify each of the Defendants who subscribed to

and participated in Agri Stats (DPP ¶ 49; IIP ¶ 77; CIP ¶ 54), allegations regarding the

content of the reports and how they were utilized in this conspiracy, may be considered as

actions in furtherance of the conspiracy by each of these individual Defendants.  *See* DPP

¶¶ 48-67; IIP ¶¶ 77-96; CIP ¶¶ 54-72.

Similarly, Plaintiffs have identified all Defendants who were members of industry

trade associations, which provided ample opportunities to collude.  *See* DPP ¶ 86; CIP

¶ 92.  For instance, Defendants or close affiliates were members of the North American

Meat Institute ("NAMI") and its predecessor, the American Meat Institute ("AMI"), and

other organizations during the Class Period.  DPP ¶ 95; CIP ¶ 10.  The Complaints even

list the specific executives that served on the board of directors of each association or

group.  *See* DPP ¶ 98; CIP ¶ 104.  This is not merely a group pleading, but specific

pleading which satisfies the Rule 8 requirement of "a short, plain statement of facts

sufficient to give the defendant fair notice of the basis of the claim."  *Five Smiths, Inc.*,

788 F. Supp. at 1048 (quoting *Fusco*, 676 F.2d at 337 n.7).

     For these reasons, Plaintiffs' well-pled allegations are proper and are sufficient to

put each Defendant on notice of the misconduct alleged.

## III.   <u>CONCLUSION</u>

     Plaintiffs adequately allege a single conspiracy among all Defendants to fix, raise,

maintain and stabilize pork prices.  Plaintiffs have pled in their Complaints the unlawful

conduct in furtherance of the conspiracy as to each individual Defendant with sufficient

specificity.  For these reasons set forth herein, and those set forth in Plaintiffs' Opposition

to Defendants' Joint Motion to Dismiss, the Court should deny Defendants' Individual

Motions to Dismiss in their entirety.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Dated: November 30, 2018

*s/ Bobby Pouya*
_____
Bruce L. Simon
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

Clifford H. Pearson
Daniel L. Warshaw
Bobby Pouya
Michael H. Pearson
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Melissa S. Weiner (MN #0387900)
Joseph C. Bourne (MN #0389922)
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pswlaw.com
jbourne@pswlaw.com

W. Joseph Bruckner (MN #0147758)
Elizabeth R. Odette (MN #0340698)
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
Arielle S. Wagner (MN #0398332)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
aswagner@locklaw.com

*Co-Lead Class Counsel for Direct Purchaser Plaintiffs*

*s/ Shana E. Scarlett*
Steve. W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO
455 N. Cityfront Plaza Drive, Ste 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
beth@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Britany N. Resch (#0397656)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
bresch@gustafsongluek.com

*Co-Lead Counsel for Consumer Indirect Purchaser Plaintiffs*

*s/ Jonathon W. Cuneo*
Shawn M. Raiter (MN# 240424)
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6518
sraiter@larsonking.com

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
Yifei "Evelyn" Li
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com
evelyn@cunelolaw.com

*Co-Lead Counsel for Commercial and Institutional Indirect Purchaser Plaintiffs*