# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-1776 (JRT/HB) |
| This Document Relates To:<br><br>ALL ACTIONS | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' COMPLAINT AND THE FEDERAL LAW CLAIMS IN THE INDIRECT PURCHASER PLAINTIFFS' COMPLAINTS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

I. PLAINTIFFS MISSTATE THE APPLICABLE LEGAL STANDARDS. ............. 4

II. PLAINTIFFS' OPPOSITION CONFIRMS THEIR FAILURE TO ALLEGE A PLAUSIBLE SUPPLY-REDUCTION CONSPIRACY. ................... 7

    A. For Nearly Every Defendant, the Complaints Do Not Allege *Any* Supply-Reducing Acts. .................................................................... 7

    B. Purported "Concerted Decreases in Supply" Are Premised on Improper Group Pleading. .......................................................... 12

    C. Plaintiffs Allege No Conduct by the Parent/Shareholder Defendants. ....... 13

    D. Plaintiffs' Reliance on Isolated Statements by Smithfield Does Not Plausibly Establish a Supply-Reduction Conspiracy. ................................ 13

    E. Plaintiffs' Agri Stats-Related Allegations Undermine the Purported Conspiracy. ....................................................................................... 16

    F. Allegations Regarding Industry Structure and Trends Contradict the Plausibility of the Purported Conspiracy. .................................... 19

        1. Absence of Vertical Integration. ..................................... 19

        2. Significant Production Increases. ..................................... 21

        3. Plaintiffs' Allegations Include Obvious, Alternative Explanations for Any Alleged Anticompetitive Conduct. .............. 23

    G. No Alleged "Plus Factors" Save the Complaints from Dismissal. ............. 24

        1. Defendants Had No Common Motive to Conspire. ....................... 24

        2. Plaintiffs' Trade Association Allegations Are Wholly Disconnected From the Alleged Conspiracy. .................................... 25

        3. No Real Allegations of Actions against Self-Interest. ..................... 25

        4. The Industry Structure Undermines the Alleged Conspiracy. ......... 26

        5. Plaintiffs' Other Plus Factors Are Likewise Unavailing. ................ 26

    H. Plaintiffs Ignore Critical Differences with *Broiler*. ..................................... 27

III. THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIM.................. 28

    A. Plaintiffs' Claims Accrued in 2009 and Are Time-Barred. ........................ 29

    B. Plaintiffs Have Not Sufficiently Pleaded Fraudulent Concealment............ 29

    1.  Plaintiffs Fail to Allege Facts Showing Affirmative Acts of
      Concealment. ...................................................................................... 30

    2.  The Self-Concealing Conspiracy Doctrine Does Not Apply ........... 31

    3.  Plaintiffs Fail to Allege They Were Misled by Any
      Affirmative Act of Concealment. ...................................................... 34

    4.  Plaintiffs Admit They Conducted No Due Diligence. .................... 34

  C.  Plaintiffs' Allegations Contradict a Continuing Conspiracy. ..................... 35

IV.  FURTHER LEAVE TO AMEND WOULD BE FUTILE. .................................... 37

CONCLUSION ........................................................................................................... 38

## TABLE OF AUTHORITIES

**Page**

### Cases

*Abecassis v. Wyatt*,
   902 F. Supp. 2d 881 (S.D. Tex. 2012) ....................................................................... 35

*Ashanti v. City of Golden Valley*,
   666 F.3d 1148 (8th Cir. 2012) ..................................................................................... 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................... passim

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
   203 F.3d 1028 (8th Cir. 2000) ................................................................................... 16

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) ...................................................................................... 27

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ................................................................................... 29

*Conmar Corp. v. Mitsui & Co. (U.S.A.)*,
   858 F.2d 499 (9th Cir. 1988) ..................................................................................... 32

*Doe v. St. John's Univ.*,
   2017 WL 4863066 (D. Minn. Oct. 26, 2017) ............................................................ 22

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) ..................................................................................... 24

*Edwards v. Nat'l Milk Producers Fed'n*,
   2012 WL 12951848 (N.D. Cal. Oct. 30, 2012) ......................................................... 31

*Erie Cty., Ohio v. Morton Salt, Inc.*,
   702 F.3d 860 (6th Cir. 2012) ....................................................................................... 8

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013) ....................................................................................... 11

*Granite Falls Bank v. Henrikson*,
   924 F.2d 150 (8th Cir. 1991) ..................................................................................... 29

*Great Plains Tr. Co. v. Union Pac. R.R. Co.*,
    492 F.3d 986 (8th Cir. 2007) ................................................................. 30

*Hager v. Ark. Dep't of Health*,
    735 F.3d 1009 (8th Cir. 2013) ............................................................... 30

*In re Auto. Parts Antitrust Litig.*,
    50 F. Supp. 3d 869 (E.D. Mich. 2014) .................................................. 28

*In re Bulk Popcorn Antitrust Litig.*,
    1990 WL 123753 (D. Minn. June 19, 1990) .......................................... 31

*In re Bulk Popcorn Antitrust Litig.*,
    783 F. Supp. 1194 (D. Minn. 1991) ......................................................... 4

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) ................................................... 32

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016) ......................................................... 15

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) .................................................................... 28

*In re Fasteners Antitrust Litig.*,
    2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) .................................. 32, 33

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................................ 15-16, 28

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ................................................... 26

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ............................................ 5

*In re Magnesium Oxide Antitrust Litig.*,
    2011 WL 5008090 (D.N.J. Oct. 20, 2011) ............................................ 33

*In re Mercedes-Benz Antitrust Litig.*,
    157 F. Supp. 2d 355 (D.N.J. 2001) ....................................................... 31

*In re Milk Prods. Antitrust Litig.*,
    84 F. Supp. 2d 1016 (D. Minn. 1997) ........................................ 30, 31, 34

*In re Monosodium Glutamate Antitrust Litig.*,
  2003 WL 297287 (D. Minn. Feb. 6, 2003) ................................................................. 32

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ........................................................................... 8, 27

*In re Packaged Ice Antitrust Litig.*,
  723 F. Supp. 2d 987 (E.D. Mich. 2010) ............................................................ 28, 31

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ...................................................................... 9

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  860 F.3d 1059 (8th Cir. 2017) ........................................................ 8, 9, 12, 36, 37

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  893 F.3d 1047 (8th Cir. 2018) ........................................................................ 4, 36

*In re Publ'n Paper Antitrust Litig.*,
  2005 WL 2175139 (D. Conn. Sept. 7, 2005) ............................................................ 33

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ............................................................................. 32

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ................................................................... 28

*In re TFT-LCD (Flat Glass) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................................ 15, 16

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ............................................................................. 12

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  722 F. Supp. 2d 1079 (D. Minn. 2010) .................................................................. 31

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  2014 WL 943224 (D. Minn. Mar. 11, 2014) ............................................................. 34

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  797 F.3d 538 (8th Cir. 2015) ..................................................................... 3, 4, 7, 22

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017),
  *aff'd*, 2018 WL 6423941 (7th Cir. Dec. 7, 2018) .................................................... 26

v

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ....................................................................... 35, 36, 37

*Magee v. Trs. of the Hamline Univ.*,
  957 F. Supp. 2d 1047 (D. Minn. 2013) ................................................... 37

*McDonough v. Anoka Cty.*,
  799 F.3d 931 (8th Cir. 2015) ................................................... 5, 23-24, 30

*Montero v. Bank of Am., N.A.*,
  2014 WL 562506 (D. Minn. Feb 13, 2014) .............................................. 37

*New Prime, Inc. v. Eaton Corp.*,
  2017 WL 5992466 (W.D. Mo. Mar. 16, 2017) ......................................... 32

*OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*,
  503 F. Supp. 2d 490 (D. Conn. 2007) ..................................................... 33

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  310 F. Supp. 3d 1002 (E.D. Mo. 2018),
  *aff'd*, 2018 WL 6519654 (8th Cir. Dec. 12, 2018) ...................................... 7

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  2018 WL 6519654 (8th Cir. Dec. 12, 2018) .................................. 7, 10, 24, 37

*Precision Rx Compounding, LLC v. Express Scripts Holding Co.*,
  2016 U.S. Dist. LEXIS 112851 (E.D. Mo. Aug. 24, 2016) ......................... 11

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,
  960 F. Supp. 2d 958 (D. Minn. 2013) .................................................. 6, 11

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,
  9 F. Supp. 3d 1032 (D. Minn. 2014) ....................................................... 13

*Ripplinger v. Amoco Oil Co.*,
  916 F.2d 441 (8th Cir. 1990) ................................................................. 32

*Rotella v. Wood*,
  528 U.S. 549 (2000) ............................................................................ 29

*Rutledge v. Boston Woven Hose & Rubber Co.*,
  576 F.2d 248 (9th Cir. 1978) ................................................................. 34

*Sherr v. HealthEast Care Sys.*,
  262 F. Supp. 3d 869 (D. Minn. 2017) .............................................. 5, 7, 21

*Shimota v. Wegner*,
    2016 WL 1254240 (D. Minn. Mar. 29, 2016) ........................................... 25

*Silver v. H&R Block, Inc.*,
    105 F.3d 394 (8th Cir. 1997) ...................................................................... 6

*Standard Iron Works v. ArcelorMittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ....................................................... 15

*Summerhill v. Terminix, Inc.*,
    637 F.3d 877 (8th Cir. 2011) .................................................................... 30

*Supermarket of Marlinton, v. Meadow Gold Dairies, Inc.*,
    71 F.3d 119 (4th Cir. 1995) ...................................................................... 32

*Tatone v. SunTrust Mortg., Inc.*,
    857 F. Supp. 2d 821 (D. Minn. 2012) ...................................................... 12

*Texas v. Allan Constr. Co.*,
    851 F.2d 1526 (5th Cir. 1988) .................................................................. 32

*TMT Mgmt. Group, LLC v. U.S. Bank Nat'l Assoc.*,
    2016 WL 730254 (D. Minn. Jan 4, 2016) .................................................. 6

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................... 2, 17, 18

*United Power Ass'n v. L.K. Comstock & Co.*,
    1992 WL 402906 (D. Minn. Oct. 27, 1992) .............................................. 32

*United States v. Lopez*,
    443 F.3d 1026 (8th Cir. 2006) .................................................................... 4

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) .................................................................................. 17

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ..................................................................... 16

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004) .................................................................. 29

*Zean v. Fairview Health Servs.*,
    149 F. Supp. 3d. 1129 (D. Minn 2016) ...................................................... 6

vii

## INTRODUCTION

Plaintiffs' opposition briefs expose that the Complaints cannot satisfy even the most basic pleading requirements for an antitrust claim.[1]  Plaintiffs sidestep almost entirely Defendants' detailed showing that the Complaints have not plausibly alleged a conspiracy since 2009 to limit hog supply and thereby increase pork prices.  To the extent Plaintiffs do not simply ignore Defendants' points, they overstate the Complaints' actual allegations and invoke outdated and inapposite case law.

Plaintiffs never directly address numerous pleading deficiencies identified by Defendants, including:

(1) the Complaints do not identify *any coordinated supply cuts* by Defendants let alone, for nearly every Defendant, *any supply cuts at all*;

(2) the Complaints allege no facts about any meetings or conversations—much less agreements—between any Defendants about supply reduction;

(3) the Complaints contain not a single allegation about any specific instance where a Defendant used purportedly "private" information from Agri Stats as a basis to limit supply (Defendants instead made public statements indicating an utter lack of knowledge of their competitors' future supply plans);

(4) the Complaints expressly show that overall supply *increased* during the relevant time period and that, given the biological lifecycle of hogs (Plaintiffs allege it takes two years to substantially increase production), hog producers necessarily took steps to increase production throughout the alleged conspiracy;

(5) despite predicating the alleged conspiracy on vertical integration (*i.e.*, pork producers breeding their own hogs to produce pork), the Complaints do not (and could not) allege that most Defendants were vertically integrated, and thus could not (and would not want to) participate in a "scheme to limit hog supply"; and

---

[1]  Defendants' opening brief (Dkt. 162) is referred to as "Mem."  Plaintiffs' opposition brief (Dkt. 229) is referred to as "Opp."

(6) the Complaints make no allegation linking any communication at a trade association meeting to any supply cuts, or even setting forth a relationship between the timing of any such meeting and a supply cut.

Plaintiffs also continue their misplaced effort to force the "square peg" of the *Broiler* case into the "round hole" of the pork industry. Defendants explained in detail how the *Broiler* opinion was expressly predicated on types of allegations that are wholly absent here: (1) an unprecedented means of cutting production (unprecedented slaughter of breeding stock); (2) suspicious timing between trade association meetings and production cuts; (3) specific supply reductions by each defendant; and (4) a historically unprecedented decrease in production industry-wide. Instead of addressing (or even acknowledging) these stark differences, Plaintiffs and their counsel (many of whom are leading the *Broiler* litigation) simply assert that this case and *Broiler* have "substantial similarities." Opp. 45-46.

Plaintiffs also stunningly alter their theory by asserting Defendants' alleged "commit[ment] to the exchange" of information through Agri Stats alone "is a plausible basis from which to infer agreement." Opp. 23. But the mere *exchange of information* is a far cry from the *supply-reduction* conspiracy alleged in the Complaints. Moreover, the "information exchange" case that Plaintiffs spend pages discussing (*id.* 25-27) actually confirms the mere exchange of information is *not* a plausible basis from which to infer a *per se* unlawful agreement to raise prices or restrict output. *Todd v. Exxon Corp.*, 275 F.3d 191, 198-99 (2d Cir. 2001) (mere "exchange of information is not illegal *per se*" and is "analytically distinct" from allegations that defendants "actually formed an agreement" to fix prices).

2

Perhaps not surprisingly, Plaintiffs insist discovery, rather than dismissal, is the appropriate next step, contending "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Opp. 3. But this turns current law on its head. Whatever debate one might have about the ultimate limits of *Twombly*, it is well-established that conclusory and implausible antitrust conspiracy allegations cannot be the predicate for an inevitably burdensome discovery fishing expedition. *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (courts must be "reasonably aggressive in weeding out meritless antitrust cases at the pleading stage") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007)). Plaintiffs say discovery "may" help them "and their experts" prove their case. Opp. 30. But their plea only confirms why dismissal is appropriate.

Furthermore, Plaintiffs' opposition confirms that the statute of limitations bars their claims. Plaintiffs argue that the limitations period should be tolled by the doctrine of fraudulent concealment, but they point to no factual allegations establishing the elements of the doctrine. Instead, they rely on boilerplate conclusions, while ignoring their own allegations of public statements and publicly-available data on which their conspiracy claims are based. And Plaintiffs urge the Court to ignore controlling Eighth Circuit law that requires specific factual allegations demonstrating each element.

Plaintiffs also seek refuge in the continuing-conspiracy doctrine, even though this doctrine would not salvage any claims for damages outside the four-year limitations period (*i.e.*, prior to June 30, 2014). Moreover, Plaintiffs fail to point to factual allegations

plausibly showing that the alleged conspiracy continued into the limitations period. To the contrary, Plaintiffs allege no supposedly conspiratorial signaling or supply reductions within the last four years and instead affirmatively allege dramatically increasing production throughout this period. The statute of limitations thus clearly bars Plaintiffs' claims.

## I.   PLAINTIFFS MISSTATE THE APPLICABLE LEGAL STANDARDS.

Plaintiffs assert it is sufficient merely to allege "the *general contours* of when an agreement was made," supported by "*general allegations* informing the context of an agreement," and then to connect each Defendant to that general conspiracy via "*slight evidence*." Opp. 4-5 (emphases added). But the Eighth Circuit has repeatedly instructed that general antitrust conspiracy allegations do not suffice. Antitrust complaints instead must plead sufficient "factual content"—by "list[ing] relevant individuals, acts, and conversations"—to "support the reasonable inference that the defendant is liable for" the alleged conspiracy. *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (*"Propane II"*); *see also Insulate*, 797 F.3d at 546 (dismissing complaint alleging defendants "generally conspired to restrain trade," without alleging "when the agreements" or conspiratorial "communications occurred").

Plaintiffs invoke a decades-old case to suggest that "slight evidence" is sufficient to sweep a company into an antitrust conspiracy lawsuit. Opp. 5 (citing *In re Bulk Popcorn Antitrust Litig.*, 783 F. Supp. 1194, 1197 (D. Minn. 1991)). But the Eighth Circuit rejected that approach in *United States v. Lopez*, 443 F.3d 1026, 1030 (8th Cir. 2006), and since then, the "slight evidence" rule has been consistently rejected in civil cases as well. *E.g.*,

4

*In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *13 n.13 (N.D. Cal. Jan. 21, 2014) ("'slight evidence' rule has been disapproved as a standard for determining whether a defendant has joined a conspiracy" and "as a standard applicable in district courts at all").

Plaintiffs argue that on a 12(b)(6) motion, "courts cannot weigh competing inferences or credit defendant's counter-allegations." Opp. 4. But the Eighth Circuit has recognized that assessing whether a claim is plausible is a "context-specific" inquiry that "requires the reviewing court to draw on its judicial experience and common sense" and closely evaluate "whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct." *McDonough v. Anoka Cty.*, 799 F.3d 931, 945-46 (8th Cir. 2015) (quoting *Iqbal*); *see also Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 883-84 (D. Minn. 2017) (behavior "consistent with other, equally plausible explanations . . . does not give rise to an inference of conspiracy") (citation omitted).

In response to Defendants' showing that many documents cited in the Complaints expose the implausibility of the alleged conspiracy, Plaintiffs contend it is improper to consider the full text of those documents, asserting they are immaterial and only receive "passing reference" in the Complaints. Opp. 8-10. But the documents at issue are, in fact, essential: they often constitute the sole, albeit tenuous, purported links between particular Defendants and Plaintiffs' allegations.[2] And Plaintiffs do not dispute their authenticity.

---

[2] *E.g.*, Opp. 39, 50 (citing Compl. ¶ 129 n.57 (purportedly linking Clemens to the conspiracy)); Opp. 39-40, 50 (citing Compl. ¶ 130 n.58 (same for Seaboard and Triumph)); Opp. 18, 21, 40 (citing Compl. ¶ 115 n.43 (same for Tyson)).

*Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) ("[d]ocuments necessarily embraced by the pleadings include [those] whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.") (citation omitted).

In any event, Plaintiffs' narrow approach cannot be squared with *Twombly*'s holding that the district court, in assessing the plausibility of an alleged antitrust conspiracy, "was entitled to take notice of the *full contents* of the published articles referenced in the complaint, from which the truncated quotations were drawn." 550 U.S. at 568 n.13 (emphasis added); *see also Reg'l Multiple Listing*, 960 F. Supp. 2d at 972 n.11 ("[a]lthough the complaint did not include the text of the entire e-mail, the Court may consider the e-mail in its entirety because it may consider material necessarily embraced by the complaint on a motion to dismiss").

Plaintiffs' cited cases from this Circuit make clear that a court may evaluate the full text of documents referenced in the Complaints. *See Zean v. Fairview Health Servs.*, 149 F. Supp. 3d 1129, 1133-34 (D. Minn. 2016) (considering referenced consent form and questionnaire); *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) (plaintiff "cannot defeat a motion to dismiss by choosing not to attach the full statements to the complaint"); *TMT Mgmt. Group, LLC v. U.S. Bank Nat'l Assoc.*, 2016 WL 730254, at *7, 13-15, 21 (D. Minn. Jan 4, 2016) (evaluating email embraced by complaint). *Jenisio* and *Cafesjian* (Opp. 8-9) are inapposite, as those cases addressed whether documents were incorporated by reference into *agreements*, *not the pleadings*.

6

Finally, while Plaintiffs contend that dismissals before discovery "should be granted very sparingly" (Opp. 3), the Eighth Circuit requires that federal courts be "reasonably aggressive in weeding out meritless antitrust cases at the pleading stage." *Insulate*, 797 F.3d at 543 (citing *Twombly*).  Courts in this Circuit dismiss antitrust complaints for this very reason.  *E.g.*, *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1026 (E.D. Mo. 2018), *aff'd*, 2018 WL 6519654 (8th Cir. Dec. 12, 2018); *Sherr*, 262 F. Supp. 3d at 885.

## II.   PLAINTIFFS' OPPOSITION CONFIRMS THEIR FAILURE TO ALLEGE A PLAUSIBLE SUPPLY-REDUCTION CONSPIRACY.

### A.   For Nearly Every Defendant, the Complaints Do Not Allege *Any* Supply-Reducing Acts.

Plaintiffs concede they allege no direct evidence of their claim that, since 2009, Defendants conspired "to limit hog supply" and "coordinate[] production limits" to increase pork prices.  Compl. ¶¶ 2, 60, 120.  Instead, Plaintiffs try to rely on "circumstantial allegations," such as "parallel supply restrictions."   Opp. 12, 23; Dkt. 230 at 28 ("Complaints detail a conspiracy rooted in supply restrictions").

As the Eighth Circuit recognizes, parallel conduct alone is inadequate to establish a plausible antitrust conspiracy.  *Park Irmat*, 2018 WL 6519654, at *5.  Moreover, *some* factual allegation of parallel pricing or supply conduct is required.  *Id.* (affirming dismissal where plaintiff "fail[ed] to plausibly plead parallel conduct").  Here, Plaintiffs fail to plausibly plead any supply-reducing conduct that reflects each Defendant's commitment to the alleged supply-reduction conspiracy, let alone any remotely "parallel supply

7

restrictions." Mem. 2-3, 13-15, 48-50.[3]  Plaintiffs' failure to allege conspiratorial "acts"—hog supply reductions, exports, or capacity restraints—showing each Defendant "*acted collusively, pursuant to a collective interest to reduce* [supply]," renders the alleged conspiracy implausible.  *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069 (8th Cir. 2017) ("*Propane I*") (conspiracy plausible where plaintiffs alleged each competitor "reduced their fill levels from 17 pounds per tank to 15 pounds" and specific "conversations" between competitors) (emphasis added).

**Hog Supply Reductions.**  Although Plaintiffs maintain they have alleged "three years of concerted decreases in supply" in 2009, 2010, and 2013, that assertion is premised entirely on a chart of aggregated industry-wide data.  Opp. 16-17.  Plaintiffs do not (and cannot) dispute that aggregated data necessarily masks anything about particular Defendants and says nothing about parallel conduct.  *E.g.*, *Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (declining to infer conspiracy from mere "descriptions of the market, not allegations of anything that the defendants did"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 (9th Cir. 2015) (declining to infer conspiracy based on "an increase in the average retail price of *all* guitars" sold industry-wide without "any facts connecting" defendants' conduct to the increases).

---

[3]  The only allegations that come close to asserting actual supply reductions concern a single Defendant (Smithfield), which allegedly began such reductions *before* the alleged conspiracy, thus undermining any suggestion its continued reductions were conspiratorial. Mem. 14 n.7.

8

The best Plaintiffs can muster is the conclusory assertion that Defendants undertook unspecified "parallel supply restrictions as confirmed through public statements."  Opp. 23.  However, all of the purported "industry signals" (Opp. 17-18) are merely innocuous statements made during earnings calls by individual executives giving their *views* of the hog market, not supply-reducing *acts* Defendants undertook.[4]  Such "general statements to investors or regulators about the trajectory" of the industry do not "render the conspiracy allegation more plausible."  *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011).   Indeed, Plaintiffs offer no response to Defendants' showing that many of these statements were made by publicly-traded companies *required by law* to provide such information to investors.  Mem. 35-36.  These statements, even when taken at face value, thus fall far short of alleging facts "showing Defendants acted collusively, pursuant to a collective interest to reduce [supply]," *Propane I*, 860 F.3d at 1069—especially in light of Plaintiffs' own allegations that supply *increased* to record levels during the purported conspiracy.

**Exports.**   The DPP and CIP Complaints conclusorily allege unidentified Defendants reduced "domestic supply by devoting more and more production exports to overseas markets."  Compl. ¶ 108; CIP Compl. ¶ 116.  These Plaintiffs, however, make no effort to rebut Defendants' showing (Mem. 29-30) that the Complaints reveal exports

---

[4]  *E.g.*, Compl. ¶ 113 (Hormel:  "We *see* a contraction in the overall supply of hogs for the year not as much as we'd originally anticipated."); ¶ 115 (Tyson:  "Hog supplies will be down in Q4 . . . [w]e will continue to *watch* forward hog supplies"); ¶ 120 (JBS: discussing a "combination of reduction in supply for cattle, for hogs and for chicken . . . we will *see* some shortage in protein going forward") (emphases added).

9

increasing at a higher rate *before* the alleged conspiracy than during it, and that Plaintiffs failed to allege which Defendants (if any) agreed to (or did) increase exports.

**Capacity Reductions.**   While the Complaints conclusorily allege "capacity reductions" (Compl. ¶ 74), Defendants showed (Mem. 20-22) that the allegations actually confirm the major producers *increased* capacity during the purported conspiracy.   In response, Plaintiffs identify three discrete instances in which a few Defendants allegedly refrained from increasing capacity—but each in different ways and in different years (2011, 2014, 2017).   Opp. 39-40.   Such allegations, involving "dissimilar circumstances" and "lack[ing] temporal proximity," cannot establish plausibility.   *Park Irmat*, 2018 WL 6519654, at *5.

Indeed, one purported capacity "reduction" involved two joint venture participants that merely postponed the addition "of a second shift" after the "*expan*[*sion of*] their joint pork processing facility."   Compl. ¶ 130 (emphasis added); Mem. 23.   Another involved Clemens purportedly not "tak[ing] advantage of the PEDv epidemic by *increasing its capacity* and gaining market share in 2014."   Opp. 39 (emphasis added).   That is not a capacity "reduction" allegation, and the only factual content alleged is an explanation of why Clemens was spared, relatively, the effects of PEDv.   Compl. ¶ 129.   The third involved a 2011 earnings call in which Smithfield allegedly *stated* it was not planning to "build a new plant" to expand capacity in 2011.   Opp. 39.   But there is no allegation Smithfield actually "reduced" or failed to increase capacity (Compl. ¶ 124), and the

10

Complaints show production *increased* significantly in 2011 and 2012, and every year since 2014. *Id.* ¶ 107.

Furthermore, given Plaintiffs' acknowledgement that building a new facility "would take hundreds of millions of dollars" and "just to expand an existing facility" would cost tens of millions of dollars (*id.* ¶ 84), disparate allegations of uncoordinated decisions to not expand capacity fail to plausibly suggest conspiracy.

In summary, far from "identify[ing] the conspiratorial acts Defendants committed" (Opp. 13), the Complaints fail to allege *any* supply-*reducing* "acts" by any of the 16 Defendants other than Smithfield.

Nor are Plaintiffs' allegations "similar to those" (*id.*) in *Reg'l Multiple Listing*, where the Court sustained group-boycott counterclaims based on factual allegations outlining specific acts undertaken by the alleged conspirators. The counterclaimant alleged it received "thirty similar cease and desist letters" from co-conspirators following a trade association meeting where "there were discussions regarding the perceived threat that [counterclaimant] posed to the industry and what the industry could do to shut [it] down." 960 F. Supp. 2d at 980-81.[5] Nothing comparable is alleged here.

---

[5] Plaintiffs' heavy reliance on inapposite group-boycott cases is puzzling, especially since each case involved specific acts by defendants to exclude plaintiffs. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47-48 (1st Cir. 2013); *Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, 2016 U.S. Dist. LEXIS 112851, at *8 (E.D. Mo. Aug. 24, 2016).

**B.      Purported "Concerted Decreases in Supply" Are Premised on Improper Group Pleading.**

Plaintiffs suggest they have adequately alleged "three years of concerted decreases in supply" in 2009, 2010, and 2013.  Opp. 16.  But nowhere do Plaintiffs allege when any purported "agreed-upon plans for coordinated production limits" (Compl. ¶ 60) were reached, by which Defendants, or how any decreases were imposed.

Plaintiffs' assertion of "concerted decreases in supply" is exactly the type of "naked" allegation that fails to "support the reasonable inference that the defendant is liable for the" alleged conspiracy.  *Propane I*, 860 F.3d at 1070.  As noted above, these "concerted decreases" rest entirely on aggregated industry-wide data that, by definition, masks individual behavior.  The Complaints, thus, "lump[] all defendants together" and do not satisfy Plaintiffs' burden to "sufficiently allege who did what to whom."  *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831-32 (D. Minn. 2012); *supra* at 7-9.

This improper group pleading is not mitigated by Plaintiffs' allegation that each Defendant used Agri Stats.  Opp. 28-29.  The Complaints allege that Agri Stats allowed Defendants to "monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits."  Compl. ¶ 60.  Plaintiffs presuppose a conspiracy and say that Agri Stats could have been a monitoring mechanism.  Absent factual allegations that each Defendant actually limited supply, let alone pursuant to an unlawful agreement, there is no basis to infer that each Defendant participated in *any* "concerted decreases in supply" simply by purchasing benchmarking data from Agri Stats.  *E.g.*, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905-06 (6th Cir. 2009) (a complaint must "specify

12

how" each defendant was "involved in the alleged conspiracy," without relying on "indeterminate assertions" against all "defendants").

**C.    Plaintiffs Allege No Conduct by the Parent/Shareholder Defendants.**[6]

This Court recognizes that "for antitrust allegations against a subsidiary to be fairly made against the parent company, there must be allegations that the parent company actually engaged in anti-competitive conduct and not merely that it served as parent to its wholly-owned subsidiary." *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1044-45 (D. Minn. 2014). Plaintiffs ignore this black-letter law. There are no allegations about any conduct (conspiratorial or otherwise) by these Defendants. Plaintiffs now suggest it is sufficient simply to define these companies together with their pork-producing affiliates. Dkt. 230 at 26 ("Plaintiffs defined [Defendant] to include [a pork-producing subsidiary] and [its parent company] . . . such that all allegations . . . against [the subsidiary] are also directed at [the parent]"). Lumping companies together in this manner directly contravenes *Reg'l Multiple Listing* and constitutes impermissible group pleading in its purest form.

**D.    Plaintiffs' Reliance on Isolated Statements by Smithfield Does Not Plausibly Establish a Supply-Reduction Conspiracy.**

Plaintiffs contend that "Smithfield's CEO admit[ted] that it coordinated with other producers to restrain supply," and this constitutes "joint action" to which "its co-conspirators signaled their commitment." Opp. 20. But the content and timing of

---

[6]  The Clemens Family Corporation, JBS USA Food Company Holdings, Mitsubishi Corporation (Americas), and Seaboard Corporation.

Smithfield's statements, the purported "signals" by other Defendants in response, and subsequent production increases demonstrate that no call for "joint action" was issued or followed.

Plaintiffs allege that Smithfield's CEO stated during a September 2009 earnings call that he "had conversations with several sizable . . . producers" about hog "liquidation;" "this industry has got to solve it collectively;" and "there are others cutting back."  Compl. ¶ 117.  Defendants showed (Mem. 36-37) (a) this ambiguous statement does not suggest any improper subject matter of such conversations; (b) there is no indication that the referenced "producers" are any of the Defendants, as opposed to large, "independent [hog] farmers" referenced elsewhere in the Complaints;[7] and (c) Smithfield's CEO publicly stated at the end of 2009 that he had "*not seen* the significant Midwest reduction that would probably be needed to put this industry back into balance."  Compl. ¶ 118 (emphasis added).  These allegations suggest, if anything, an absence of conspiracy.  Plaintiffs do not respond to these arguments.

Nor are there any factual allegations supporting Plaintiffs' assertion that unidentified "co-conspirators signaled their commitment" in response to Smithfield's statement.  As demonstrated above, the only alleged "signaling" statements merely reflect Defendants' market perceptions.  *Supra* at 9; Mem. 35-39.

---

[7] As most Defendants are not hog producers, let alone "sizeable" ones, any conversations were not with those Defendants.  *Infra* at 19-20; Mem. 26-28.

Regardless, the alleged supply-reduction conspiracy is undermined by Plaintiffs' own allegations.  Given that the hog lifecycle requires "nearly two years to substantially increase production" (Compl. ¶ 52), one would not expect to see supply dramatically increase two years after the supposed call-to-arms.  But the Complaints show supply *increased* from 2011-2012, and in subsequent years, meaning steps were taken to increase hog supply during the period in which the purported call-to-arms was issued.  *Id.* ¶ 107, fig.3; Mem. 22, 38-39.  The math simply does not add up between the "signaling" allegations and Defendants' conduct.  Plaintiffs, again, provide no response.

The cases Plaintiffs cite actually support dismissal here.  *In re TFT-LCD (Flat Glass) Antitrust Litig.* found a conspiracy plausible where plaintiffs alleged "an invitation [to cut supply], followed by responsive assurances and conduct [to do so]."  586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008).  In *Standard Iron Works v. ArcelorMittal*, plaintiffs alleged "the *specific content of statements* made in public by Defendants' executives that endorsed an industry strategy to reduce the output of steel" and "*concerted and unprecedented production curtailments* that occurred on the heels of those statements at *specific intervals*."  639 F. Supp. 2d 877, 897 (N.D. Ill. 2009) (emphasis added).  *In re Domestic Airline Travel Antitrust Litig.* found the alleged conspiracy plausible because plaintiffs were able to "point to specific statements made by specific executives" at each defendant about their "commitment to capacity discipline" and, "in concert, with these statements a new trend of limited capacity growth occurred within the industry."  221 F. Supp. 3d 46, 66, 68-69 (D.D.C. 2016).  *In re Flash Memory Antitrust Litig.* likewise found

the alleged conspiracy plausible based on "specific instances where output was reduced following meetings by Defendants." 643 F. Supp. 2d 1133, 1142 (N.D. Cal. 2009).

In stark contrast, Plaintiffs merely allege an ambiguous statement by Smithfield, which was not followed by *any* supply curtailments by Defendants. Nor do Plaintiffs' vague argument (Opp. 14-15) that (1) Agri Stats "invited" "each and every commercial swine operation" in 2008 to use the benchmark data service to "increase profitability" and "not always increas[e] the levels production;" and (2) that "pork producers accepted" this offer at some undefined points, come close to an "invitation [to Defendants to cut supply]," that was "followed by *responsive assurances and conduct*" by any Defendants to do so. *TFT-LCD*, 586 F. Supp. 2d at 1116 (emphasis added).

### E.   Plaintiffs' Agri Stats-Related Allegations Undermine the Purported Conspiracy.

At most, Plaintiffs allege Agri Stats benchmarking data *could* conceivably be used to "police each [Defendant's] production . . . for signs of cheating" on the "agreed-upon plans for coordinated production limits." Compl. ¶¶ 60, 66; Mem. 17-19. Quite simply, such hypothetical use of benchmarking data as a monitoring mechanism does not plausibly establish the underlying supply-reduction conspiracy. *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 198 (3d Cir. 2017) (defendants' alleged participation in a "data sharing program" to monitor a conspiracy suffered from a "loaded question fallacy," because rather than demonstrating "a conspiracy existed," it merely explained how the program could have "further[ed] the conspiracy" (citing *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000)). Plaintiffs even fail to set

16

forth any factual allegations concerning Defendants' supposed use of Agri Stats to "enforce" the alleged conspiracy.

Plaintiffs do not respond to these arguments.  Instead, in a stunning shift, Plaintiffs now contend Defendants' alleged "commit[ment] to exchange" information through Agri Stats alone "is a plausible basis from which to infer agreement."  Opp. 23, 29.[8]  Plaintiffs' new theory appears to concede they lack sufficient allegations concerning a conspiracy "to limit hog supply" and "coordinate[] production limits," in which Agri Stats allegedly served as a mere monitoring mechanism.  Compl. ¶¶ 60, 120.[9]

Plaintiffs' new theory is also legally infirm.  The use of benchmarking information can "render markets more, rather than less, competitive."  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).  Although Plaintiffs spend pages discussing *Todd v. Exxon* to assert that information exchange "alone provides a plausible basis for the conspiracy" (Opp. 25-29), *Todd* made clear that the "exchange of price data and other information among competitors does not invariably have anticompetitive effects" and that a case merely premised on information exchange is *not* a plausible basis to infer a *per se* unlawful agreement among competitors.  275 F.3d at 198-99 (the mere "exchange of

---

[8]  In contrast, in *Broiler*, Plaintiffs characterized Agri Stats as a mere "plus factor" that was used as "a means of communication and monitoring."  290 F. Supp. 3d at 797, 800.

[9]  At points, Plaintiffs go so far as to re-frame their claim as a "conspiracy to share competitively sensitive supply and pricing data" (Opp. 13), while elsewhere they hew closer to the Complaint's theory (Compl. ¶ 60), that information-sharing allowed Defendants to "monitor" an agreement to reduce supply.

information is not illegal *per se*" and is "analytically distinct" from allegations that defendants "actually formed an agreement" to fix prices).[10]

Whatever standard the Court applies, the Agri Stats allegations—when assessed as a whole with Plaintiffs' other allegations—fundamentally undermine Plaintiffs' conclusory assertion of conspiracy.    Mem. 25-26.    Plaintiffs allege Defendants' "access to competitively sensitive information . . . through the Agri Stats reports" "allowed [Defendants] *to know that the supply of pork would not be increasing*."  Compl. ¶ 121 (emphasis added).   Plaintiffs argue that, armed with this knowledge from Agri Stats, Defendants made public statements demonstrating their "ongoing commitment to the conspiracy." Opp. 17.  Yet the Complaints show that following these statements, supply *increased dramatically*.  Compl. ¶ 107.  For example, Plaintiffs allege that "based on this knowledge" of "[s]upply level information regarding competitors" from Agri Stats, Hormel's CFO made statements in 2010 to the effect that "the industry" would not "see large scale expansion."  *Id.* ¶ 122.  But supply increased dramatically over the next two years.  *Id.* ¶ 107.

Plaintiffs now argue Agri Stats gave Defendants "much more precise and extensive [information] than indicated by public statements."   Opp. 33.   But if Defendants had "precise" information that "supply of pork would not be increasing," it makes no sense that the Complaints show a significant increase in pork supply thereafter.  Plaintiffs further

---

[10]  While Plaintiffs disclaim that they are proceeding under a rule-of-reason theory (Opp. 7 n.6), *Todd* is a rule-of-reason information-exchange case, and Plaintiffs make no effort to demonstrate they satisfy the prerequisites for such a case.

assert that "fluctuations in aggregate production were not predicted with the clarity of a crystal ball" (Opp. 32); but the supply increases during the alleged conspiracy were not "fluctuations," but rather significant *increases* in 2011, 2012, and every year since 2014. Compl. ¶ 107.

While Plaintiffs now disclaim any suggestion of "crystal ball"-like knowledge through Agri Stats, their conspiracy claim is premised on such knowledge. *Id.* ¶ 48 (Agri Stats provided Defendants with "unparalleled ability to share critical and proprietary information" and "have confidence that each member was following through with the agreement by limiting their production"); ¶ 60 ("Agri Stats provided forward-looking data that allowed the other Defendants to determine each other's future production"); ¶¶ 121-22. Plaintiffs' futile attempts to redefine the alleged conspiracy only confirm its implausibility.

### F.   Allegations Regarding Industry Structure and Trends Contradict the Plausibility of the Purported Conspiracy.

#### 1.   Absence of Vertical Integration.

The alleged conspiracy is expressly premised on the claim that Defendants' vertical integration (*i.e.*, not just processing pork but also owning/raising hogs) was "pervasive," "allow[ing] the integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter."  Compl. ¶ 69.  Plaintiffs allege vertical integration "allowed the scheme to succeed."  IIP Compl. at 32.

19

However, the Complaints themselves confirm that most Defendants were *not vertically integrated*. Mem. 26-29. DPPs and CIPs make *no* allegations that five of the eight pork-producing Defendants—Hormel, IPC, JBS, Triumph, and Tyson—were vertically integrated at all, or in any meaningful way, during the alleged conspiracy. Clemens is only alleged to have been "vertically coordinated," whatever that may mean. In fact, the IIPs' allegations show that five pork-producing Defendants had *no* "significant" hog production at all (with "significant" defined merely as ">=5% market share"). IIP Compl. ¶ 111.

In response, Plaintiffs effectively run from their Complaints and characterize vertical integration as merely one of "Defendants' 'alternative explanations.'" Opp. 33. That is false. *E.g.*, Compl. ¶ 69; IIP Compl. 32. They also make the cursory argument that "Defendant integrators have broad control over all aspects of production (as well as processing), either producing their own hogs or contracting out the production of hogs to independent growers." Opp. 33. But, as explained above, that is not what the Complaints allege, and Plaintiffs cannot lump all Defendants together with the undefined term "pork integrators."[11]

---

[11] Plaintiffs' contention that "because Defendants controlled the pork market, they were able to dictate favorable terms to smaller pork farmers who would not have a market for their products without the integrator Defendants," is similarly unavailing. Opp. 33-34. Assuming Plaintiffs mean independent hog farmers when they reference "pork farmers," Plaintiffs have not set forth any facts plausibly suggesting how any non-integrated Defendant could force such farmers to reduce their hog supply. Compl. ¶¶ 70-74.

Nor do Plaintiffs really address the fundamental economic reality that the non-integrated Defendants have no ability or incentive to *increase* the price of hogs they purchase to make pork. Mem. 27-28. Plaintiffs' primary response to the economic irrationality of the alleged conspiracy is to cite a single instance in 2013 when one non-integrated Defendant indicated that it had been able to pass on increased input costs to customers. Opp. 34.[12] But the ability to pass on cost increases does not explain *how* non-integrated, hog-*purchasing* Defendants (which own few, if any, hogs) would decrease hog supply. Nor does cost "pass through" explain *why* such Defendants would have any motivation to raise their input costs by reducing hog supply. On this basis alone, Plaintiffs' alleged conspiracy is implausible. *Sherr*, 262 F. Supp. 3d at 883-84 (dismissing conspiracy claim as implausible where allegations provide "no economic motive" for differently-situated defendants to conspire).

### 2.    Significant Production Increases.

Plaintiffs' allegations show significant overall increases in production throughout the alleged conspiracy. Opp. 30. And Defendants did far more in their moving papers than contend that "the alleged conspiracy is implausible because production increased." *Id.* Rather, Defendants demonstrated that, given Plaintiffs' allegations that it "takes nearly two years to substantially increase production" given the normal hog lifecycle (Compl. ¶ 52), steps were necessarily being undertaken *throughout* the purported conspiracy to increase

---

[12] Elsewhere, Plaintiffs bafflingly assert that they do "not [allege] that the price paid by a [pork] processor . . . to the hog farms was elevated" (Dkt. 230 at 19), despite clearly alleging "an unprecedented increase in hog prices" during the alleged conspiracy (Opp. 18).

hog supply (Mem. 22, 38).  Thus, the significant supply increases seen in 2011 and 2015 necessarily flowed from efforts beginning, respectively, in 2009 (when the alleged conspiracy began) and 2013 (the last purported "concerted supply decrease").  Compl. ¶¶ 52, 107.  Defendants also explained how this "ramping up" of production throughout the alleged conspiracy (*id.* ¶ 66) is fundamentally at odds with the conspiracy's purported goals. Mem. 21.

Rather than respond to these points, Plaintiffs try to hide from their own allegations by offering a revised theory asserting that Defendants purportedly acted in concert to effect a "change in the *rate* of production *increases*."  Opp. 32 (emphasis added).  Plaintiffs contend that, as a result of unspecified efforts at unspecified times by unspecified Defendants adhering to some unspecified agreement, "even in years when supply increased, Plaintiffs and their experts *expect* to prove that it *may* have been higher still but for the conspiracy."  *Id.* 30 (emphasis added).  But, there are no factual allegations to support this new "reduced increases" theory (*id.* 50), which, in any event, cannot be reconciled with the allegation showing the sharpest *increase* in production since 2000 occurred in 2015, during the supposed conspiracy.  Compl. ¶ 107; Mem. 21.  Plaintiffs' hope that costly discovery "may" eventually prove a conclusory "reduced increases" theory not alleged in the Complaints (Opp. 30)[13] is no basis for avoiding dismissal.  *E.g.*, *Insulate*, 797 F.3d at 543; *Doe v. St. John's Univ.*, 2017 WL 4863066, at *5 (D. Minn. Oct. 26, 2017) (dismissing

---

[13]  Plaintiffs actually alleged Defendants "acted in a concerted way to decrease supply." Compl. ¶ 107; IIP Compl. ¶ 97.

22

claim and denying request to "to proceed to discovery in the hopes of uncovering" supporting facts).

Nor does Plaintiffs' presentation of industry-wide data to support this "reduced increases" theory make sense. To illustrate expected production levels in the absence of the alleged conspiracy, Plaintiffs contend that in their annual hog production chart, "the line properly should be *drawn through the pre-conspiracy data points*." Opp. 31 (emphasis added). But Plaintiffs draw a trend line through *just two such data points* that, if accepted, leads to the absurd result that *underproduction occurred throughout the pre-conspiracy period* except in 2000 and 2008. In contrast, the trend line in Defendants' brief encompasses almost all of the pre-conspiracy data points. A side-by-side comparison makes this clear:

<u>Plaintiffs</u> (Opp. 32)            <u>Defendants</u> (Mem. 22)




### 3.   Plaintiffs' Allegations Include Obvious, Alternative Explanations for Any Alleged Anticompetitive Conduct.

When deciding a motion to dismiss, courts "should consider whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct, because '[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short

23

of the line between possibility and plausibility of entitlement to relief.'" *McDonough*, 799 F.3d at 946.   Although Plaintiffs only offer a conclusory assertion that "Defendants achieved three years of concerted decreases in supply" in 2009, 2010, and 2013 (Opp. 16), they ask the Court to ignore the "obvious alternative explanations" for the industry-wide supply decreases during those years—including the Great Recession, hog disease, and rising corn prices.   These alternative explanations are all referenced in the materials on which the Complaints rely.[14]   Opp. 16, 33.   And the Great Recession is a matter of public knowledge.   *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998-99 (9th Cir. 2014) (taking judicial notice of "deep national recession").

### G.    No Alleged "Plus Factors" Save the Complaints from Dismissal.

Where, as here, a plaintiff "fails to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary."   *Park Irmat*, 2018 WL 6519654, at *5.   Nevertheless, Plaintiffs' purported plus factors, whether considered as a whole or individually, undermine the plausibility of the alleged conspiracy.

#### 1.    Defendants Had No Common Motive to Conspire.

Although Plaintiffs acknowledge "a common motive to conspire" is one of the "commonly recognized plus factors" (Opp. 36), they tellingly never address it.   In fact, the

---

[14]   For example, the earnings call statements quoted in the Complaint as the basis for allegations about 2009-2010 conspiratorial hog liquidation discuss the recession, record-high corn prices, and hog disease as events impacting the hog market.   Mem. 31-32. Moreover, Plaintiffs' argument that the 2009 swine flu "affected only one producer" (Opp. 35) cannot be reconciled with the materials embraced by the Complaints showing the disease had widespread impact that "immediately depressed the *live hog market*."   Mem. 32 n.18 (emphasis added).

lack of a common motive among Defendants is a fatal weakness running throughout Plaintiffs' claims.  Most Defendants are not vertically integrated and, as hog *purchasers*, have no economic motivation to conspire with hog *producers* to reduce hog supply.  *Supra* at 19-21.

### 2.    Plaintiffs' Trade Association Allegations Are Wholly Disconnected from the Alleged Conspiracy.

Plaintiffs make no effort to tie any supply-reduction actions, or any other relevant conduct by Defendants, to trade association meetings.  Plaintiffs' only allegations concerning such meetings relate to statements by independent third parties (Mem. 40-41) and overviews of economic conditions in the "beef, pork, and poultry markets."  Compl. ¶¶ 101, 104.  Plaintiffs concede they are left with mere "opportunities to collude" (Opp. 38), but it is well-recognized that "allegations that the parties had an opportunity to communicate . . . are insufficient alone to suggest a conspiracy."  *Shimota v. Wegner*, 2016 WL 1254240, at *10 (D. Minn. Mar. 29, 2016) (Tunheim, J.); *see also Twombly*, 550 U.S. at 567 n.12 (no plausible inference of collusion simply "because [one] belong[s] to the same trade guild as one of his competitors").

### 3.    No Real Allegations of Actions Against Self-Interest.

Plaintiffs claim they allege "parallel acts [] against the apparent individual economic self-interest of the alleged conspirators."  Opp. 36, 39.  But the sum total of such alleged acts is the same three capacity-related allegations discussed above.  *Supra* at 10-11.  This is hardly "parallel" conduct, let alone a basis to assert "*Defendants* took actions" against their economic self-interest (Opp. 39)—especially when production and capacity were

*increasing*. Mem. 20-25. Moreover, even if a few Defendants did not expand their production capacity at disparate points, that would not suggest conspiracy. *E.g.*, *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 828 (N.D. Ill. 2017), *aff'd* 2018 WL 6423941 (7th Cir. Dec. 7, 2018) ("Defendants can act in their independent self-interest even when they turn away business . . . by reducing supply").

### 4.     The Industry Structure Undermines the Alleged Conspiracy.

While Plaintiffs attempt to show the industry is concentrated and has high barriers to entry, many courts recognize that such allegations do "not render the asserted conspiracy plausible." *In re Late Fee & Over-Limit Fee Litig.* 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007); Mem. 41-42. Plaintiffs' arguments about *concentration in the pork industry* also miss the mark. While Plaintiffs pleaded an output restraint in the *hog* market, they have not alleged *that* market is highly concentrated. They instead analyze pork processors, the majority of which Plaintiffs concede are not vertically integrated. Compl. ¶¶ 79-80, fig. 2.[15]

### 5.     Plaintiffs' Other Plus Factors Are Likewise Unavailing.

Plaintiffs' other generic plus factors add nothing. Plaintiffs contend, for example, that they have set forth charts showing "abnormal" price movements, "dramatic" price increases, and steady increases in Defendants' profits beginning in 2009. Opp. 40-41. But Plaintiffs do not respond to Defendants' showing that Plaintiffs' charts fail to account for

---

[15] The three allegedly vertically-integrated suppliers (Smithfield, Seaboard, and Triumph) are alleged to account for only 36% of pork production. *Id.*

even basic economic factors, such as demand and input costs.  Mem. 42, 44; *In re Musical Instruments*, 798 F.3d at 1197 n.13 (price increases not suggestive of collusion where "[a]ny manner of economic variables may have contributed to these fluctuations in prices and sales, from external market pressures to permissible conscious parallelism").

Furthermore, while increasing profits is *not* a plus factor, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011), Plaintiffs' profit-margin allegations are disconnected from the alleged supply-reduction conspiracy.  These allegations show the only sustained increase in profit margins *occurred six years after the alleged conspiracy began*, during a period of increasing and record-high levels of pork supply.  Mem. 43 (citing IIP Compl. ¶ 128).[16]

## H.  Plaintiffs Ignore Critical Differences with *Broiler*.

Plaintiffs cling to the *Broiler* decision, but never address the critical distinctions Defendants identified (Mem. 46-51), including that the *Broiler* complaint alleged:

- unprecedented means of cutting production (the slaughter of breeding stock);

- suspicious timing between trade association meetings and production cuts;

- specific production cuts by each broiler-producing defendant (here, Plaintiffs rely on only aggregated industry-wide data); and

- historically unprecedented decreases in production rates.

Nor do Plaintiffs explain how a conspiracy like the one alleged in *Broiler* could work in the pork industry, given the significant biological differences between chickens

---

[16]  Plaintiffs ignore this chart and instead point to charts about just two of the eight pork-producing Defendants.  Opp. 40.

and hogs:  as the Complaint recognizes, "[t]he typical hog production cycle lasts about four years . . . [and] it takes nearly two years to substantially increase production."  Compl. ¶ 52.

Certainly, the existence of a civil antitrust case involving broiler chickens provides no basis for sustaining the Complaints here.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting "if it happened there, it could have happened here" argument). The cases Plaintiffs cite, involving *criminal guilty pleas* concerning *the same type of conduct alleged in the civil antitrust case at issue*, are obviously irrelevant to Plaintiffs' invocation here of the hotly-disputed civil *Broiler* chicken case where there have been no such guilty pleas.[17]

## III.   THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIM.

After spending 48 pages arguing that public statements in earnings calls and public USDA price data plausibly state a supply-reduction conspiracy claim, Plaintiffs suddenly shift gears in response to the limitations motion, arguing those public facts were somehow secret and could not have been discovered until a 2017 *Bloomberg* article about the chicken industry.  But Plaintiffs must live with their own pleadings—if those public facts state a conspiracy claim, those same public facts confirm their claim is time-barred.

---

[17]  *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008-12 (E.D. Mich. 2010); (*guilty pleas* can lend plausibility to conspiracy claims); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1148-49 (same); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (same); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 882 (E.D. Mich. 2014) (same).

Plaintiffs' response confirms they have no facts supporting the fraudulent-concealment or continuing-conspiracy doctrines. Plaintiffs have only empty conclusions, which do not suffice to toll the limitations period.

### A.   Plaintiffs' Claims Accrued in 2009 and Are Time-Barred.

The Eighth Circuit is clear that an antitrust claim accrues at the time of injury. Mem. 53. Ignoring this controlling law, Plaintiffs improperly invoke the "discovery rule" (Opp. 53 (citing FTCA case)), even though the Eighth Circuit has rejected that rule: "accrual *in antitrust* actions depends on the commission of the defendant's injurious act rather than on the plaintiff's knowledge of that act or the resulting injury." *Granite Falls Bank v. Henrikson*, 924 F.2d 150, 153 (8th Cir. 1991) (emphasis added), *overruled on other grounds*, *Rotella v. Wood*, 528 U.S. 549 (2000).[18]

Plaintiffs allege their injuries first occurred in 2009. Mem. 53. Because Plaintiffs filed suit more than four years after 2009, their claims are time-barred unless they allege facts supporting a tolling doctrine. Plaintiffs fail to do so.

### B.   Plaintiffs Have Not Sufficiently Pleaded Fraudulent Concealment.

Under Eighth Circuit law, Plaintiffs must allege facts—with particularity under Rule 9(b)—showing: (1) defendants took affirmative steps to conceal plaintiffs' cause of action, (2) plaintiffs failed to discover the action, and (3) plaintiffs exercised due diligence in attempting to discover the claim. Mem. 54.[19] Plaintiffs ask this Court to relax Rule 9(b)

---

[18] *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1051 (8th Cir. 2000).

[19] Plaintiffs cite Sixth Circuit law. Opp. 53-54.

29

based on out-of-Circuit cases (Opp. 54), but the Eighth Circuit is clear that Rule 9(b)

applies with full force to fraudulent concealment.  Mem. 54; *In re Milk Prods. Antitrust*

*Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997); *see also Summerhill v. Terminix, Inc.*,

637 F.3d 877, 880 (8th Cir. 2011); *Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d

986, 995 (8th Cir. 2007).   A plaintiff claiming it was deceived by a defendant's acts

necessarily knows what those acts were and must allege them with particularity.

### 1.  Plaintiffs Fail to Allege Facts Showing Affirmative Acts of Concealment.

As supposed affirmative acts of concealment, *separate from the conspiracy itself*,

that were designed to conceal the scheme (Mem. 58), Plaintiffs cite from their Complaints

only two categories of assertions, neither of which satisfies this first requirement.

First, Plaintiffs repeat boilerplate conclusions about supposed secret meetings and

phone calls.  Opp. 57.  Such empty allegations—with no case-specific facts, which could

be pasted verbatim into any complaint—fail to satisfy Rule 9(b).  *Summerhill*, 637 F.3d at

880.  The Eighth Circuit does not credit such conclusory statements.  *Hager v. Ark. Dep't*

*of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) ("Courts must not presume the truth of legal

conclusions couched as factual allegations."); *see also McDonough*, 799 F.3d at 945.

Second, Plaintiffs cite public statements offering non-conspiratorial reasons for

pricing trends, which Plaintiffs assert were pretextual and prevented them from discovering

their claims (Opp. 57), even though Plaintiffs later concede they never heard or read the

statements.  *Id.* 62.   However, courts hold such market commentary is not active

30

concealment.  *E.g.*, *In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1085 (D. Minn. 2010); Mem. 60 & n.34.

The unpublished decision *In re Bulk Popcorn* does not salvage Plaintiffs' conclusory assertions.  This pre-*Twombly* case involved bid-rigging claims, detailed allegations about specific conversations on specific dates, and overt acts of concealment within the limitations period.  1990 WL 123753, at *4-5 (D. Minn. June 19, 1990); Cotter Dec., Exs. A-C (*Popcorn* complaints).  Here, Plaintiffs fail to allege any communications among Defendants or concealment of those conversations.  And Plaintiffs' attempt to sidestep *Milk*, which Judge Magnuson decided seven years after his *Bulk Popcorn* decision, is perplexing.  Judge Magnuson found plaintiffs' allegations were insufficient because they were conclusory and devoid of any specific facts, *not* because, as Plaintiffs here suggest, a government investigation put plaintiffs on inquiry notice.  *Milk*, 84 F. Supp. 2d at 1022-24; Cotter Dec., Ex. D (*Milk* complaint).  Plaintiffs' reliance on out-of-Circuit cases also does not advance their cause.  Opp. 58-59.[20]

### 2.    The Self-Concealing Conspiracy Doctrine Does Not Apply.

For at least three reasons, Plaintiffs' invocation of the self-concealing conspiracy doctrine does not excuse their failure to allege an affirmative act of concealment.

---

[20] *Edwards v. Nat'l Milk Producers Fed'n*, 2012 WL 12951848, at *6 (N.D. Cal. Oct. 30, 2012) ("[Plaintiffs] have not pled sufficient supporting allegations" to "rely on a theory of fraudulent concealment"); *Packaged Ice*, 723 F. Supp. 2d at 1018 (upholding concealment allegations because of guilty pleas); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 371-72 (D.N.J. 2001) (upholding concealment allegations that conspirators discussed the need for secrecy and threatened discipline to ensure it).

First, the Eighth Circuit has not recognized this doctrine.  To the contrary, the Eighth Circuit has held that a plaintiff must allege acts of concealment separate-and-apart from the conspiracy itself.  *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990). District courts in this Circuit have applied the *Ripplinger* standard in antitrust cases and explicitly rejected the self-concealing doctrine.  Mem. 58-59 & n.33.[21]

Plaintiffs are, thus, forced to rely on out-of-Circuit cases for the proposition the self-concealing doctrine "is widely accepted."  Opp. 55-56.  That is plainly untrue.  Every Circuit to address this issue other than the Second Circuit has explictly rejected the self-concealing doctrine.[22]

Second, even if this Circuit recognized the doctrine, it would not apply here.  As the term implies, the doctrine "is only even arguably proper" when the antitrust violation is "in its very nature deceptive," *Supermarket of Marlinton*, 71 F.3d at 123 & n.1, not when it is based upon public facts, such as signaling.  Mem. 55-58; *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 224 (E.D.N.Y. 2003) ("this case does

---

[21] *E.g.*, *New Prime, Inc. v. Eaton Corp.*, 2017 WL 5992466, at *3 (W.D. Mo. Mar. 16, 2017); *In re Monosodium Glutamate Antitrust Litig.*, 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003).  Plaintiffs cite only one district court from this Circuit that mentioned the self-concealing doctrine, *United Power Ass'n v. L.K. Comstock & Co.*, 1992 WL 402906, at *6 (D. Minn. Oct. 27, 1992), but the decision did not address *Ripplinger* and is contrary to Eighth Circuit law.

[22] *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008) (rejecting self-concealing doctrine); *Supermarket of Marlinton, v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) (same); *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1531 (5th Cir. 1988) (same); *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 505 (9th Cir. 1988) (same); *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at *3 (E.D. Pa. Aug. 12, 2011) (surveying Circuits and noting that "self-concealing" doctrine adopted only by Second Circuit).

not fit the rubric of the self-concealing doctrine" because the agreements "were immediately disclosed to the public" and the collusion "was not secret").[23]  Plaintiffs cannot claim public statements were critical to a conspiracy while simultaneously calling the conspiracy self-concealing.

Third, even if this Circuit recognized the doctrine, Plaintiffs cannot meet their pleading burden with one conclusory assertion that the conspiracy "was self-concealing." Mem. 59 n.33.  Plaintiffs allege no facts showing the conspiracy was self-concealing, but make the facile argument that merely "alleg[ing] that Defendants' conspiracy was, by its nature, 'self-concealing' . . . alone suffices at the pleading stage."  Opp. 55.  This is simply false.  Reciting the buzzword "self-concealing" falls well short of any pleading standard and cannot toll limitations.  *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *4 (D. Conn. Sept. 7, 2005) (rejecting self-concealing doctrine where plaintiffs "alleged nothing more than the conclusion that the conspiracy here was 'inherently self-concealing'").[24]  Any other rule would render the statute of limitations meaningless because it would allow any plaintiff to type the words "self-concealing" into a complaint and seek damages dating back several decades.

---

[23]  Tellingly, none of the out-of-Circuit cases Plaintiffs cite involved a conspiracy based on public facts.  Opp. 55-56 (citing *Aspartame*, *Mercedes*, *Fasteners*, and *London*).

[24]  *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *22 (D.N.J. Oct. 20, 2011); *OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 508 (D. Conn. 2007).

### 3.   Plaintiffs Fail to Allege They Were Misled by Any Affirmative Act of Concealment.

Plaintiffs do not allege any facts remotely suggesting they were misled by a Defendant or relied on any act of concealment.   Mem. 61.[25]   Instead, Plaintiffs state, without explanation, that they could not discover the public facts in the Complaints until the 2017 *Bloomberg* article and the 2018 *Broiler* complaint were available.   Opp. 61.   Such conclusory statements are improperly "circular" when, as here, they are not based on facts demonstrating actual concealment.   *Milk*, 84 F. Supp. 2d at 1024.

### 4.   Plaintiffs Admit They Conducted No Due Diligence.

Plaintiffs concede they did nothing to investigate their claims before 2018.   Opp. 64-66.   Without citing a case within this Circuit, Plaintiffs ask the Court to exempt them from the due-diligence requirement entirely, arguing they were not required to investigate their claims because they were not placed on inquiry notice until 2018.   *Id*. 61-66.

The Eighth Circuit's standard for inquiry notice is well-established:   "any activities which would create notice and 'excite attention' [] require[s] inquiry" by plaintiffs.   *Milk*, 84 F. Supp. 2d at 1024.[26]   "When prices are raised and competition is substantially eliminated, '[t]his fact *alone* . . . excite[s] attention and thus put [a] Plaintiff [] on inquiry notice.'"   *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 2014 WL 943224, at *5 (D. Minn. Mar. 11, 2014) (emphasis added).   Additionally, as one of Plaintiffs' cases noted,

---

[25]  Plaintiffs' admission that they did not see the allegedly pretextual public statements (Opp. 62) means they could not possibly have been "actively misled."   *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 249 (9th Cir. 1978).

[26]  Plaintiffs discuss the standard for inquiry notice in other Circuits.   Opp. 64-66.

"[t]he party invoking fraudulent concealment is generally considered to have constructive knowledge of publicly available information." *Abecassis v. Wyatt*, 902 F. Supp. 2d 881, 900 (S.D. Tex. 2012); *see also* Mem. 63-64 & n.38.

Tellingly, Plaintiffs never identify any facts in the *Bloomberg* article or the *Broiler* complaint (both involving chicken) that (i) were not public for years and (ii) provided an impetus to investigate and bring a case involving pork, an entirely separate market. Mem. 62-64. Instead, Plaintiffs cite public facts from 2008-2013 as support for their conspiracy claim, including public: statements by Agri Stats, statements in earnings calls, and USDA pricing data. *Id.* 55-58. Given that Plaintiffs claim this public information plus the allegedly "abnormal" pork prices Plaintiffs paid evidences a conspiracy, it was plainly enough to "excite attention" and put Plaintiffs on inquiry notice.

## C.   Plaintiffs' Allegations Contradict a Continuing Conspiracy.

Plaintiffs concede that the continuing-conspiracy doctrine, if successful, would allow them to recover damages only for the four years prior to filing suit. Opp. 67; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997). However, Plaintiffs' reliance on the continuing-conspiracy doctrine fails for three reasons.

First, Plaintiffs' facts about earnings calls, supposed signaling, and production cuts in 2009, 2010, and 2013 all pre-date the limitations period.[27] Because there are no facts suggesting any supposed conspiracy from 2008-2013 continued into 2014-2018, Plaintiffs

---

[27] Plaintiffs concede the 2014 production drop was due to disease, not a conspiracy. Compl. ¶ 107.

35

have failed to allege a continuing conspiracy. *E.g.*, *Propane II*, 893 F.3d at 1057 (no continuing conspiracy even though the "complaints contain allegations detailing events *in 2008 and through 2010* like those found sufficient in *Propane* [*I*]") (emphasis in original). The Complaints highlight massive production increases throughout the limitations period, Compl. ¶ 107, but lack countervailing "factual enhancement" that would make plausible the existence of a conspiracy continuing during that time. *Propane I*, 860 F.3d at 1070. By announcing that they "expect to prove that [production] may have been higher still but for the conspiracy," Opp. 30, Plaintiffs effectively concede the Complaints lack the requisite "factual enhancement."

Second, Plaintiffs cannot sustain a continuing-conspiracy claim by simply asserting the conspiracy continues "to the present." Opp. 50. Courts in this Circuit do not accept such generic conclusions after *Twombly*. *Propane I*, 860 F.3d at 1070 (pleading a continuing violation requires plaintiffs to "list relevant individuals, acts, and conversations, providing 'factual content'"). The statute of limitations would never bar any suit if plaintiffs could avoid it by typing the words "continues to the present" into a complaint.

Third, it is insufficient that Plaintiffs purchased pork from 2014-2018. Opp. 51. Plaintiffs must plead facts showing the conspiracy was in effect when those purchases took place: "the issue is whether the amended complaint alleges that the conspiracy continued when the sales took place. *If so*, under *Klehr*, 'each sale to the plaintiff,' is an overt act that restarts the statute of limitations." *Propane I*, 860 F.3d at 1070 (emphasis added) (quoting *Klehr*, 521 U.S. at 189). Plaintiffs ignore everything before "If so." But with no

36

facts showing a conspiracy from 2014-2018, Plaintiffs cannot use sales during that time to extend their damages period. *Id.* 1065 ("*so long as an illegal price-fixing conspiracy was alive*, each sale at the fixed price [started the four-year statute of limitation anew]") (emphasis added).

Fourth, Plaintiffs are wrong to suggest Defendants must show an intervening act or withdrawal from the conspiracy to stop the recovery of damages. Opp. 52 & n.14. *Klehr* and the two *Propane* cases mention neither intervention nor withdrawal. Plaintiffs bear the burden to plead that the alleged conspiracy continued into the limitations period. They cannot flip the pleading burden to require Defendants to prove an "intervening act" through a motion to dismiss.

Finally, as demonstrated above, the few post-2013 allegations about three Defendants involve "dissimilar circumstances" (in which these Defendants, at most, made unilateral decisions), "lack temporal proximity," and, therefore, do not suggest any conspiratorial conduct. *Park Irmat*, 2018 WL 6519654, at *5; *supra* at 10.

***

Courts in this District have repeatedly dismissed at the pleading stage antitrust claims barred by the statute of limitations. Mem. 52-53. This Court should do the same.

## IV.    FURTHER LEAVE TO AMEND WOULD BE FUTILE.

Leave to amend (Opp. 68) should be denied. Plaintiffs already amended their Complaints, and no further amendment could cure the fatal defects discussed above. *Montero v. Bank of Am., N.A.*, 2014 WL 562506, at *9 (D. Minn. Feb 13, 2014); *Magee v. Trs. of the Hamline Univ.*, 957 F. Supp. 2d 1047, 1065 (D. Minn. 2013) (Tunheim, J.).

37

## CONCLUSION

Defendants respectfully submit the Complaints should be dismissed with prejudice.

Date: December 21, 2018                           Respectfully submitted,

*/s/ Mark L. Johnson*                             */s/ Richard A. Duncan*
Mark L. Johnson (#0345520)                        Richard A. Duncan (#0192983)
Bethany Krueger (#0306368)                        Aaron D. Van Oort (#0315539)
Virginia R. McCalmont (#0399496)                  Craig S. Coleman (#0325491)
GREENE ESPEL PLLP                                 Emily E. Chow (#0388239)
222 South Ninth Street, Suite 2200                Isaac B. Hall (#0395398)
Minneapolis, MN 55402                             Bryan K. Washburn (#0397733)
(612) 373-0830                                    FAEGRE BAKER DANIELS LLP
mjohnson@greeneespel.com                          2200 Wells Fargo Center
bkrueger@greeneespel.com                          90 South Seventh Street
vmccalmont@greeneespel.com                        Minneapolis, MN 55402-3901
                                                  (612) 766-7000
Daniel Laytin, P.C. (*pro hac vice*)              richard.duncan@faegrebd.com
Christa Cottrell, P.C. (*pro hac vice*)           aaron.vanoort@faegrebd.com
Christina Briesacher (*pro hac vice*)             craig.coleman@faegrebd.com
KIRKLAND & ELLIS LLP                              emily.chow@faegrebd.com
300 North LaSalle                                 isaac.hall@faegrebd.com
Chicago, IL  60654                                bryan.washburn@faegrebd.com
(312) 861-2000
daniel.laytin@kirkland.com                        *Counsel for Hormel Foods Corporation*
christa.cottrell@kirkland.com                     *and Hormel Foods, LLC*
christina.briesacher@kirkland.com

*Counsel for Clemens Food Group, LLC*
*and The Clemens Family Corporation*

/s/ Jaime Stilson
Jaime Stilson (#0392913)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
(612) 492-6746
stilson.jaime@dorsey.com

Britt M. Miller (*pro hac vice*)
Robert E. Entwisle (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

William H. Stallings (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000
wstallings@mayerbrown.com

*Counsel for Indiana Packers Corporation
and Mitsubishi Corporation (Americas)*

/s/ Donald G. Heeman
Donald G. Heeman (#0286023)
Jessica J. Nelson (#0347358)
Randi J. Winter (#0391354)
Daniel R. Haller (#0396497)
FELHABER LARSON
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402-4504
(612) 339-6321
dheeman@felhaber.com
jnelson@felhaber.com
rwinter@felhaber.com
dhaller@felhaber.com

Stephen R. Neuwirth (*pro hac vice*)
Michael B. Carlinsky (*pro hac vice*)
Sami H. Rashid (*pro hac vice*)
Richard T. Vagas (*pro hac vice*)
Robert P. Vance, Jr. (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com
michaelcarlinsky@quinnemanuel.com
samirashid@quinnemanuel.com
richardvagas@quinnemanuel.com
bobbyvance@quinnemanuel.com

*Counsel for JBS USA Food Company and
JBS USA Food Company Holdings*

39

*/s/ William L. Greene*
William L. Greene (#0198730)
Peter J. Schwingler (#0388909)
Jon M. Woodruff (#0399453)
STINSON LEONARD STREET LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
john.woodruff@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LEONARD STREET LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

*Counsel for Seaboard Foods, LLC and*
*Seaboard Corporation*

*/s/ John A. Cotter*
John A. Cotter (#0134296)
John A. Kvinge (#0392303)
LARKIN HOFFMAN DALY &
LINDGREN LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, MN 55427-1060
(952) 835-3800
jcotter@larkinhoffman.com
jkvinge@larkinhoffman.com

Richard Parker (*pro hac vice*)
Josh Lipton (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
rparker@gibsondunn.com
jlipton@gibsondunn.com

Brian Robison (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
(214) 698-3370
brobison@gibsondunn.com

*Counsel for Smithfield Foods, Inc.*

/s/ Aaron Chapin
Aaron Chapin (#06292540)
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL  60606
(312) 655-1500
aaron.chapin@huschblackwell.com

Gene Summerlin (*pro hac vice*)
Marnie Jensen (*pro hac vice*)
Ryann Glenn (*pro hac vice*)
Kamron Hasan (*pro hac vice*)
Quinn Eaton (*pro hac vice*)
Sierra Faler (*pro hac vice*)
HUSCH BLACKWELL LLP
13330 California St., Suite 200
Omaha, NE 68154
(402) 964-5000
gene.summerlin@huschblackwell.com
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com
kamron.hasan@huschblackwell.com
quinn.eaton@huschblackwell.com
sierra.faler@huschblackwell.com

*Counsel for Triumph Foods, LLC*

/s/ David P. Graham
David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

Rachel J. Adcox (*pro hac vice*)
Tiffany Rider Rohrbaugh (*pro hac vice*)
AXINN, VELTROP &
HARKRIDER LLP
950 F Street, N.W.
Washington, D.C. 20004
(202) 912-4700
radcox@axinn.com
trider@axinn.com

*Counsel for Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc.*

41

/s/ *Peter H. Walsh*
Peter H. Walsh (#0388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
T. (612) 402-3000
F. (612) 402-3001
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
Jennifer A. Fleury (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com
jennifer.fleury@hoganlovells.com

*Counsel for Agri Stats, Inc.*