```
 1                   UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                  )
     In Re:  Pork Antitrust         )   File No. 18CV1776
 4   Litigation                     )         (JRT/HB)
                                    )
 5                                  )
                                    )   Minneapolis, Minnesota
 6                                  )   January 28, 2019
                                    )   10:05 A.M.
 7                                  )
                                    )
 8                                  )
     ------------------------------------------------------------
 9

10        BEFORE THE HONORABLE CHIEF JUDGE JOHN R. TUNHEIM
               UNITED STATES DISTRICT COURT JUDGE
11                      (MOTIONS HEARING)

12   APPEARANCES
     For Direct Purchaser       Lockridge Grindal Nauen PLLP
13   Plaintiffs:                BRIAN D. CLARK, ESQ.
                                JOSEPH BRUCKNER, ESQ.
14                              100 Washington Avenue South
                                Suite 2200
15                              Minneapolis, MN 55401

16                              Pearson Simon & Warshaw
                                BRUCE L. SIMON, ESQ.
17                              BOBBY POUYA, ESQ.
                                MELISSA S. WEINER, ESQ.
18                              MICHAEL H. PEARSON, ESQ. (PHONE)
                                800 LaSalle Avenue
19                              Suite 2150
                                Minneapolis, MN 55402
20
     On behalf of the           Gustafson Gluek PLLC
21   Consumer Indirect          DANIEL E. GUSTAFSON, ESQ.
     Plaintiffs:                DANIEL C. HEDLUND, ESQ.
22                              BRITTANY N. RESCH, ESQ.
                                120 South Sixth Street
23                              Suite 2600
                                Minneapolis, MN 55402
24

25
```

```
 1        On behalf of the        Hagens Berman Sobol Shapiro
          Consumer Indirect       SHANA E.  SCARLETT, ESQ.
 2        Plaintiffs:             715 Hearst Avenue
                                  Suite 202
 3                                Berkeley, CA 94710

 4                                Zimmerman Reed, LLP
                                  DAVID M. CIALKOWSKI, ESQ.
 5                                80 South Eighth Street
                                  Suite 1100
 6                                Minneapolis, MN 55402

 7
          For the Commercial      Cuneo Gilbert & LaDuca, LLP
 8        Indirect Purchaser      ALEC BLAIN FINLEY, ESQ.
          Plaintiffs:             JONATHAN WATSON CUNEO, ESQ.
 9                                (PHONE)
                                  4725 Wisconsin Avenue NW
10                                Suite 200
                                  Washington, DC 20016
11
                                  Larson King, LLP
12                                SHAWN M. RAITER, ESQ.
                                  30 East Seventh Street
13                                Suite 2800
                                  St. Paul, MN 55101
14
15        For Defendant Triumph   Husch Blackwell
          Foods:                  MEGAN SCHEIDERER, ESQ. (PHONE)
16                                13330 California Street
                                  Suite 200
17                                Omaha, NE 68154

18        For Defendant JBS USA:  Spencer Fane LLP
                                  DONALD G. HEEMAN, ESQ.
19                                JESSICA J. NELSON, ESQ. (PHONE)
                                  100 South Fifth Street
20                                Suite 1900
                                  Minneapolis, MN 55402
21
                                  Quinn Emanuel Urquhart &
22                                Sullivan
                                  STEPHEN R. NEUWIRTH, ESQ.
23                                SAMI H. RASHID, ESQ.
                                  51 Madison Avenue
24                                22nd Floor
                                  New York, NY 10010
25
```

```
 1      For Defendant               Larkin Hoffman Daly & Lindgren
        Smithfield Foods:           JOHN A. COTTER, ESQ.
 2                                  JOHN A. KVINGE, ESQ.
                                    8300 Norman Center Dr., Ste 1000
 3                                  Minneapolis, MN 55437

 4                                  Gibson Dunn & Crutcher
                                    RICHARD G. PARKER, ESQ.
 5                                  1050 Connecticut Avenue NW
                                    Washington, DC 20036
 6
                                    Gibson Dunn & Crutcher
 7                                  BRIAN EDWARD ROBISON, ESQ.
                                    2100 McKinney Avenue, Ste 1100
 8                                  Dallas, Texas 75201

 9      For Defendant Tyson         Axinn Veltrop & Harkrider LLP
        Foods:                      TIFFANY RIDER ROHRBAUGH, ESQ.
10                                  RACHEL JOHANNA ADCOX, ESQ.
                                    950 F Street NW, 7th Floor
11                                  Washington, DC 20004

12      For Defendant Clemens       Kirkland & Ellis, LLP
        Food Group:                 CHRISTA C. COTTRELL, ESQ.
13                                  300 North LaSalle
                                    Chicago, IL 60654
14
        For Defendant Hormel        Faegre Baker Daniels LLP
15      Foods:                      RICHARD A. DUNCAN, ESQ.
                                    90 South 7th Street, Ste 2200
16                                  Minneapolis, MN 55402

17      For Defendants Indiana      Dorsey & Whitney, LLP
        Packers and Mitsubishi:     JAIME STILSON, ESQ.
18                                  50 South Sixth Street, Ste 1500
                                    Minneapolis, MN 55402
19
                                    Mayer Brown LLP
20                                  BRITT M. MILLER, ESQ.
                                    71 South Wacker Drive
21                                  Chicago, IL 60606

22                                  Mayer Brown LLP
                                    WILLIAM STALLINGS, ESQ.
23                                  1999 K Street NW
                                    Washington, DC 20006
24

25
```

1                                            **10:05 A.M.**

2

3                          **(In open court.)**

4          THE COURT:  You may be seated.  Good morning.

5   Civil Case Number 18-1776, Wanda Duryea, et al, versus Agri

6   Stats, Inc., et al.

7          Let's have counsel note appearances, first those

8   who are here today for the plaintiffs.

9          MS. SCARLETT:  Shana Scarlett from Hagens Berman

10  appearing for the Consumer Indirect Purchaser Plaintiffs.

11         THE COURT:  All right.  Good morning.

12         MR. BRUCKNER:  Good morning, Your Honor.  Joe

13  Bruckner from Lockridge Grindal Nauen here for the Direct

14  Purchaser Plaintiffs.

15         THE COURT:  Good morning, Mr. Bruckner.

16         MR. GUSTAFSON:  Good morning, Your Honor.  Dan

17  Gustafson for the Consumer Plaintiffs.

18         THE COURT:  Mr. Gustafson.

19         MR. SIMON:  Good morning, Your Honor.  Bruce

20  Simon, Pearson Simon Warshaw, co-lead counsel with

21  Mr. Bruckner's office in the case.

22         THE COURT:  Good morning.

23         MR. POUYA:  Good morning, Your Honor.  Bobby

24  Pouya of Pearson, Simon & Warshaw for the Direct Purchaser

25  Plaintiffs.

         1               MS. WEINER:  Good morning, Your Honor.  Melissa

         2     Weiner, Pearson, Simon & Warshaw, for the Direct Purchaser

         3     Plaintiffs as well.

         4               THE COURT:  Good morning to you.

         5               MR. RAITER:  Good morning.  Shawn Raiter, Larson

         6     King, on behalf of the commercial indirects.

         7               THE COURT:  All right.

         8               MR. HEDLUND:  Good morning, Your Honor.  Dan

         9     Hedlund, Gustafson Gluek, for the Consumer Indirect

        10     Purchaser Plaintiffs.

        11               THE COURT:  Good morning.

        12               MR. CIALKOWSKI:  Good morning, Your Honor.  Dave

        13     Cialkowski with Zimmerman Reed for the commercial

        14     indirects.

        15               MR. CLARK:  Brian Clark, Lockridge Grindal Nauen,

        16     on behalf of the Direct Purchaser Plaintiffs.

        17               THE COURT:  All right.  For the defendants who

        18     are here in the courtroom?

        19               MR. NEUWIRTH:  Good morning, Your Honor.  Stephen

        20     Neuwirth from Quinn Emanuel for defendant JBS.

        21               THE COURT:  Good morning.

        22               MR. HEEMAN:  Good morning, Your Honor.  Don

        23     Heeman, Spencer Fane, for defendant JBS.

        24               MR. PARKER:  Good morning, Your Honor.  Richard

        25     Parker, Gibson Dunn, for Smithfield Foods.

 1              MS. MILLER:  Good morning, Your Honor.  Britt

 2     Miller, Mayer Brown, on behalf of Indiana Packers and

 3     Mitsubishi Corporation of America.

 4              THE COURT:  Good morning.

 5              MR. RASHID:  Good morning, Your Honor.  Sami

 6     Rashid from Quinn Emanuel for defendant JBS.

 7              THE COURT:  Good morning to you.

 8              MS. STILSON:  Good morning, Your Honor.  Jaime

 9     Stilson from Dorsey & Whitney also here for Indiana Packers

10     and Mitsubishi Corporation of America.

11              THE COURT:  Good morning.

12              MR. DUNCAN:  Good morning, Your Honor.  Richard

13     Duncan, Faegre Baker Daniels, for the Hormel defendants.

14              THE COURT:  Good morning.

15              MR. ROBISON:  Good morning, Your Honor.  Brian

16     Robison for Smithfield.

17              THE COURT:  Good morning.

18              MS. ADCOX:  Rachel Adcox from Axinn Veltrop &

19     Harkrider for the Tyson defendants.

20              MS. COTTRELL:  Good morning.  Christa Cottrell,

21     Kirkland & Ellis, for Clemens Food Group.

22              MR. STALLINGS:  And William Stallings also

23     for Indiana Packers and Mitsubishi Corporation of America.

24              THE COURT:  All right.  Good morning to all of

25     you.  Now, we have some counsel on the telephone; is that

1    correct?  Let's identify whoever is on the phone.

2              MR. PEARSON:  This is Michael Pearson from

3    Pearson, Simon & Warshaw on behalf of the Direct Purchaser

4    Plaintiffs.

5              THE COURT:  Okay.  Anybody else?

6              MR. CUNEO:  Jonathan Cuneo, Cuneo, Gilbert &

7    LaDuca, on behalf of the Commercial Indirect, with

8    Mr. Raiter.

9              THE COURT:  All right.  Anyone else?

10             MS. SCHEIDERER:  Megan Scheiderer from Husch

11    Blackwell for the defendant Triumph Foods.

12             THE COURT:  All right.  And do we have one more

13    on the phone?

14             MS. NELSON:  Good morning.  Jessica Nelson,

15    Spencer Fane, for JBS defendants.

16             THE COURT:  All right.  The Court has read the

17    briefs that have been filed in this case.  We have motions

18    to dismiss this morning.  Who is going to begin?

19             MR. NEUWIRTH:  Good morning, Your Honor.  If it

20    would please the Court, Stephen Neuwirth for the defendants

21    from Quinn Emanuel.  I am going to be addressing the

22    sufficiency of the federal claims.

23             THE COURT:  Okay.

24             MR. NEUWIRTH:  Mr. Parker from Gibson Dunn is

25    going to be addressing the statute of limitations

1    arguments, and Ms. Miller from Mayer Brown on behalf of the

2    defendants is going to be addressing the individual

3    defendant motions that were filed.

4              THE COURT:  All right.

5              MR. NEUWIRTH:  And also if it would please the

6    Court, for the argument on the sufficiency of the claims, I

7    put together a binder that has all materials that were in

8    the briefs just to facilitate the argument, and if I could

9    approach, I have copies for Your Honor and your clerks.

10             THE COURT:  That's fine.

11             MR. NEUWIRTH:  And we will also give it to the

12   plaintiffs.

13             THE COURT:  All right.  Mr. Neuwirth.

14             MR. NEUWIRTH:  Thank you very much, Your Honor.

15   Your Honor, the defendants respectfully submit that this is

16   the rare case that compels dismissal because it does not

17   come close to meeting even the minimal standards of

18   sufficiency and plausibility set forth by the Supreme Court

19   in *Twombly* and by the Eighth Circuit and courts in this

20   district since the *Twombly* decision.

21             And this perhaps should not be surprising because

22   this case was brought mainly by the same lawyers who are

23   prosecuting a case in federal court in Illinois related to

24   the broiler chicken industry, and it was only after that

25   *Broiler Chicken* case survived a motion to dismiss that this

1    case was filed here attempting to make similar allegations

2    related to the pork industry.

3            And the defendants respectfully submit that the

4    square peg of the *Broiler* case simply does not fit into the

5    round hole of the pork industry, and if we look behind tab

6    1 in the binder, *Twombly* and its progeny are particularly

7    relevant in an antitrust case like this one, and in fact,

8    as the Eighth Circuit noted in the *Insulate* case, the

9    courts have been reasonably aggressive in weeding out

10   meritless antitrust claims at the pleading stage given the

11   unusually high cost of discovery, the likelihood of

12   discovery abuse and the threat that discovery expense will

13   push cost conscious defendants to settle even an anemic

14   case.

15           This is something that the Court and this circuit

16   has recognized as well.  As we note behind tab 2 the key

17   issue at this stage is plausibility.  Have -- does the

18   complaint make allegations that push the case from

19   something that is merely possible across the line of

20   plausibility, and this is something that the Eighth Circuit

21   has noted in the *Insulate* case.

22           And it's noted as well that mere labels and

23   conclusions and conclusory allegations simply are not

24   sufficient to get across the plausibility line, and as the

25   *Cascades* case that we cite at the bottom of tab 2 notes,

1    When a conspiracy makes no economic sense, the claim must

2    be dismissed.

3            Now in antitrust conspiracy cases like this one,

4    the question is, Was there an agreement, and if we look

5    behind tab 11, we see that the Eighth Circuit has noted in

6    the *Pre-Filled Propane Tank* case that in an antitrust case,

7    the plaintiffs must plead factual content by listing

8    relevant individuals, acts and conversations to support the

9    reasonable inference that the defendant is liable for the

10   alleged conspiracy, and of course the hallmark of a

11   conspiracy is agreement.

12            So the question is in this case, Do the

13   complaints plausibly allege that there was an agreement

14   here?  Now, what is it that is alleged?  As we see behind

15   tab 12, the core allegation here is that the defendants had

16   an agreement to limit the supply of hogs used to make pork.

17            Pork, as we know, comes from hogs, and the

18   complaints allege repeatedly as we note at the top of tab

19   12 that the defendants agreed upon a scheme to limit hog

20   supply, that they had ongoing adherence to agreed upon

21   plans for coordinated production limits and that they

22   implemented their conspiracy by coordinating output and

23   limiting production.

24            The problem is that these conclusory assertions

25   are not backed up by any specific allegations.  The

1    complaint tells us nothing about what supply reductions and

2    coordinated production limits for hogs were agreed upon or

3    when.  It tells us nothing about which defendants

4    supposedly implemented those limits or when, and it tells

5    us nothing about the duration of this agreement, and this

6    case is nothing like the *Pre-Filled Propane Tank* case in

7    the Eighth Circuit from 2017 where there were a lot of

8    details about who spoke to whom, when the conversations

9    took place and what was agreed.

10           This is also nothing like the *Broiler* case that

11   the plaintiffs invoke.  That case had many details about

12   who in the industry was reducing supply, what was being

13   done to reduce supply and when.  The Court wrote a lengthy

14   opinion talking about all of those details.  None of that,

15   Your Honor, is present here.

16           And in fact, the law is very clear, as we see

17   behind tab 4, that just making general assertions, group

18   pleading against the defendants, is absolutely inadequate

19   to establish plausibility because as the Supreme Court

20   said, This gives us no clue about what defendant did what,

21   and as this Court noted in 2012, A complaint that just

22   lumps all the defendants together fails to state a claim

23   for relief.

24           And similarly in the *Milk Products* case in this

25   district, the Court said that you have to dismiss the case

1    when the defendants were simply lumped together.  Those

2    allegations we looked at, Your Honor, simply lumped the

3    defendants together.  They don't have any specific details,

4    and we know from the *Erie County* case in the Sixth Circuit

5    that just making aggregated assertions about what happens

6    does not give rise to an inference of an unlawful

7    agreement.

8         It's just descriptions of what happened in the

9    market, not allegations of anything that the defendants

10   did, and this is particularly true as we see behind tab 5

11   for parent companies.  There are four parent companies at

12   least that are identified in the complaint here:  The

13   Clemens Family Corporation, Mitsubishi Corporation, JBS USA

14   Food Holdings Company and Seaboard Corporation.

15        None of these companies are alleged to have done

16   anything other than be parents of other defendants, and

17   clearly the courts have repeatedly said that throwing

18   companies like that into a group pleading is also

19   insufficient.

20        This is also a case as we see behind tab 6 where

21   there is just no parallel conduct alleged.  There were

22   repeated conclusory assertions that the defendants were

23   trying to reduce supply.  Nowhere in the complaint can you

24   find a single allegation of what the defendants did

25   together to cause this to happen.

1          This is not like the *Broiler* case where there are

2     specific statements or meetings that the District Court

3     showed some connection to acts that the specific defendants

4     took to reduce supply.  None of that is here.  The District

5     Court in the *Broiler* case went out of its way to detail

6     those connections that it felt were in the complaint.

7          None of that is here in this case, and so perhaps

8     it's not surprising that the plaintiffs have now in their

9     opposition to this motion invoked the so-called slight

10     evidence rule where they say, well, it's enough to just

11     barely talk about any facts about the defendants, but as we

12     see behind tab 7 in the *Lithium Ion Batteries* case from

13     2014, the Court noted that the slight evidence rule has

14     been disapproved as a standard for determining whether a

15     defendant has joined a conspiracy in the first instance and

16     indeed is a standard applicable in district courts at all.

17          The plaintiffs were forced to cite a 1991 case as

18     their support for using this so-called slight evidence

19     rule, but that rule has since been rejected, and the Eighth

20     Circuit as well in the *United States versus Lopez* case

21     rejected that standard there in a criminal case.

22          Now, in addition to the problem of failing to

23     plead any factual details, there is another significant

24     problem with this case, Your Honor.  The conspiracy that is

25     alleged is simply implausible on its face, and just like in

1    *Twombly*, it's implausible based on what is in the complaint

2    itself.

3           As we see behind tab 13, this was supposed to be

4    a conspiracy that caused supply to be reduced, and if we

5    look, there is a chart in the complaint at paragraph 107,

6    figure 3.  It's also in the CIP complaint figure 4, this

7    exact same chart, and what it shows is that during the

8    conspiracy period supply went up, and there were

9    significant increases in a number of years during that

10   period.

11          Now, if we turn to tab 14, the way that the

12   plaintiffs have tried to respond to that in opposition to

13   this motion is to make the remarkable argument that there

14   is some trajectory line they can draw which somehow shows

15   that production didn't really go up.  Now, they say in

16   their opposition brief at page 31 that to determine the

17   trajectory of production in the absence of collusion, the

18   line properly should be drawn through the pre-conspiracy

19   data points.

20          Well, that's not what they do.  If we look on the

21   left here at the bottom, they don't draw a line through the

22   pre-conspiracy data points.  They draw a line just through

23   two of them, and the line they draw suggests that even in

24   the pre-conspiracy period, production was below the trend

25   that they say is the trend that should have been in place.

1      The chart that they draw is simply implausible,

2   and the way we know that is by looking behind tab 36

3   because in the *Broiler* case, they presented a similar chart

4   to support the claims, most of the plaintiff attorneys here

5   submitted a similar chart, and look what the judge did in

6   the *Broiler* case.

7      He looked at a trend line in the opinion that did

8   exactly what we are doing here, what the defendants are

9   doing.  He drew a line through all of the points in the

10  preperiod, and then he showed that after the conspiracy

11  started, the production numbers were below that trend line.

12  He drew it through all the points, not just through a low

13  point and a high point.

14      But if we turn back to tab 14, that's not what

15  the plaintiffs do at all, but it's the defendants who do

16  that, as we see on the right.  And if you do what the

17  plaintiffs say should be done, which is to draw a line

18  through the pre-conspiracy data points and then you look at

19  where that line goes, it shows that in fact the trend of

20  growth and production did not change at all.  This is all

21  in the complaint.  This is not a plausible conspiracy to

22  reduce supply as an absolute amount or even to reduce the

23  rate of supply growth.

24      But there is another reason, Your Honor, why this

25  conspiracy isn't plausible on its face, and that we see

1    behind tab 15.  As we noted, the core claim here is that

2    there was a conspiracy to reduce the supply of hogs used to

3    make pork.  That is the core claim in this case, and that's

4    why the complaints say over and over again that the

5    vertical integration of the defendants is critical.

6            What does that mean?  It means that the

7    defendants were not just producing pork, but they were also

8    raising the hogs that are used to make pork, and in the

9    *Broiler* case, that was a central finding by the District

10   Court there.

11           The Court there said that it understood from the

12   complaint that the defendants there controlled the supply

13   of broilers, I think the Court said, from the eggs to the

14   chickens to the broilers.  The problem, and look what the

15   defendants say -- look what the plaintiffs say.

16           They say that the vertical integration of the

17   defendants here allows the defendants to directly control

18   the production and supply of pork through their

19   wholly-owned and operated farms where the hogs are raised,

20   fed and prepared for slaughter, and the IIP plaintiffs

21   expressly say in their complaint that it was this vertical

22   integration that allowed the scheme to proceed.

23           The problem is, there are eight pork producers in

24   this case, and the plaintiffs in their complaints only

25   allege that three of them are vertically integrated.  So

1      this is a conspiracy purportedly to control the supply of

2      hogs involving companies that don't even control the supply

3      of hogs, and in fact, the complaint at paragraph 83 makes

4      express reference to the independent farmers from which

5      defendants buy hogs.

6             There is no allegation here that the defendants

7      or the three of them that are even alleged to have any hog

8      supply of their own control enough of the hog supply to

9      make any impact on prices for pork, and if we turn

10     behind tab -- I'm sorry, Your Honor.

11            THE COURT:  Are you going to address Agri Stats?

12            MR. NEUWIRTH:  Yes, Your Honor.

13            THE COURT:  It seems to me there is a significant

14     issue there with regard to essentially secret sharing of

15     production data that, as I understand, it wasn't made

16     public.

17            MR. NEUWIRTH:  I can turn to that immediately.

18     If it would please the Court, just one last very quick

19     point on the vertical integration and the defendants not

20     being hog producers.  As we see behind tab 16, another

21     reason the conspiracy isn't plausible is precisely because

22     it would make no sense for companies that purchase hogs to

23     conspire to reduce the supply of hogs and make the prices

24     of hogs higher.

25            That is the number one input into the price of

1    pork, and it makes no economic sense.  Common sense says

2    that this conspiracy doesn't make sense, and as we see in

3    the bottom of tab 16, again in their opposition brief the

4    defendants say it's the decreased hog production that

5    caused prices to go up.

6           So turning directly to Agri Stats, if we turn to

7    tab 21, we see that what is actually alleged about Agri

8    Stats in the complaints is that Agri Stats supposedly

9    allowed each member of the cartel to police each other's

10   production for signs of cheating.

11          And it's critical here, as the case law points

12   out, simply using information as an enforcement mechanism,

13   if that's what is alleged, is not a sufficient allegation

14   to show that there was an underlying conspiracy.  The fact

15   that they alleged Agri Stats was being used to enforce the

16   conspiracy tells us nothing about what the underlying

17   agreement was.  They still haven't pleaded the underlying

18   agreement.

19          And certainly the courts have also recognized as

20   the Supreme Court did in the *Gypsum* case and as the *Todd v.*

21   *Exxon* case pointed out, exchanging data can increase

22   sufficiency and doesn't in and of itself have

23   anti-competitive effects.  So to allege in the complaint,

24   as they do, that this is just a way to enforce the

25   conspiracy still begs the question of what is the agreement

1    that the defendants made that they are trying to enforce.

2              The fact that they say Agri Stats might allow

3    people to know whether somebody is conforming to the

4    conspiracy assumes something that hasn't been established,

5    and that may be why the plaintiffs in their opposition have

6    totally changed their theory about Agri Stats.  As we see

7    behind tab 23, the complaints, as I noted, repeatedly said

8    that Agri Stats was an enforcement mechanism for the

9    conspiracy.

10             That is what is actually alleged, but now in

11   opposition, as we see on the right, the defendants are now

12   arguing that the defendants -- the plaintiffs are now

13   arguing that the defendants merely committed to the

14   exchange of information through Agri Stats and that this

15   alone is a plausible basis from which to infer an

16   agreement.

17             So the new theory, which is not in the

18   complaints, is that the mere exchange of information

19   through Agri Stats was a vehicle for this conspiracy, and I

20   think that was what Your Honor's question had been directed

21   to.  So first point, that's not in the complaints.  What

22   was alleged was that it was an enforcement mechanism.

23             As we see behind tab 24, the very case on which

24   this new theory is premised, *Todd v. Exxon*, which is the

25   case that plaintiffs cite to support their new exchange of

1    information theory, actually expressly says that

2    allegations of exchanging information like we have here are

3    insufficient.

4           The Court there expressly said, Exchange of

5    information is not illegal per se and is analytically

6    distinct from allegations that defendants actually formed

7    an agreement to fix prices.  So we're left now with a

8    changed theory which says that the defendants were

9    exchanging information with each other.  That theory

10   doesn't work as a matter of law.

11          And as we see behind tab 25, the other thing that

12   the plaintiffs alleged in the complaint was that Agri Stats

13   supposedly gave the defendants unparalleled ability to

14   share critical and proprietary information and that Agri

15   Stats was key to the formation, operation and continuing

16   stability of the defendants' anti-competitive scheme and

17   that it supposedly allowed the defendants to know that the

18   supply of pork would not be increasing.

19          The problem with those allegations is, as we saw

20   earlier, that's not what happened.  The complaints

21   themselves show that supply did not in fact go down.  So

22   now what do the plaintiffs do?  What they argue now, as we

23   see on the right side here, is that, yes, this information

24   was exchanged but that fluctuations in aggregate production

25   were not predicted with the clarity of a crystal ball.

1          So the theory now is that Agri Stats, even though

2     the defendants didn't really reduce supply, it gave them

3     information that allowed them to know something about what

4     was happening in the market, and we would respectfully

5     submit, Your Honor, that Agri Stats allegations just don't

6     work.

7          They were sufficiently implausible in the

8     complaint that the plaintiffs changed them in their

9     opposition papers, and now what they allege in their

10    opposition papers doesn't work as a matter of fact or as a

11    matter of law.

12         Now, we would also very -- we think it's also

13    critical that in a case like this one where there is no

14    plausible explanation for what actually is alleged to have

15    happened here, it is appropriate for the Court to consider

16    the obvious alternative explanations for what happened, and

17    as we see behind tab 17, courts have repeatedly recognized

18    that common sense of the courts can be used to determine

19    whether there are reasonable alternative explanations.

20         The plaintiffs have been left to argue now that

21    there were three years within the alleged conspiracy period

22    when, when supply decreased, 2009, 2010 and 2013, but as we

23    see behind tab 18, the complaints themselves recognized

24    that in 2009 and 2010, there was the major recession which

25    the complaints recognize in the documents that they cite

1   had an impact on supply, and there were similarly record

2   high corn prices and pig disease.  This is all in the

3   complaint for those two years, all in the complaint.

4        And as we see behind tab 19, in 2013 and '14, the

5   other years when they say that supply supposedly went down,

6   really 2013, there was both pig disease and higher corn

7   prices that were alleged in the complaint and were said in

8   the complaint to have affected supply.  So we see supply is

9   going up.  The trend of supply is the same.

10        The plaintiffs say, oh, but within this long

11   conspiracy period there were three years when supply

12   dropped, but in each of those three years, the complaint

13   itself provides an explanation for what was happening in

14   the market, and if I could just briefly talk about the pig

15   disease that was relevant to 2013.

16        The complaints expressly say, quote, that the

17   PEDV virus in the spring and summer of 2014 caused a

18   production dip that was reflected -- that reflected the

19   adverse impacts from the deadly pig disease.  So the

20   complaint says, 2014, pig disease affected supply.

21        The problem is that the document that they cite,

22   as we point out on page 19, actually says that this pig

23   disease from the PED virus started early in 2013 and that

24   pig supply had been affected since 2013.  So within the

25   complaint itself, the document that the complaint cites

1    gives the alternative explanation for why supply went down

2    in 2013.

3            The plaintiffs don't point that out, but that's

4    what the document actually says, and so all of the

5    arguments that the plaintiffs make about 2014 actually

6    apply to 2013, and that leaves us with nothing to justify

7    this case going forward, and just very quickly, the

8    plaintiffs argue that there was no increase -- the

9    plaintiffs argue that export supposedly went up.

10           They probably did that because that was a factor

11   in the *Broiler* case, but if we look behind tab 26, we see

12   that again exports actually went up and that the biggest

13   increases in exports took place before the conspiracy

14   started and that there was only a small increase in exports

15   after the conspiracy had begun and that in fact the

16   complaint recognized that there was increased global demand

17   for pork during the conspiracy period.

18           So once again, the complaint gives us, the

19   complaint gives us the answer.  As we see behind tab 21, to

20   the extent that the plaintiffs -- I'm sorry -- behind tab

21   20, to the extent that the plaintiffs are alleging that

22   defendants purportedly refrained from increasing capacity,

23   those types of allegations are clearly insufficient because

24   the courts recognize that choosing not to increase capacity

25   without more doesn't prove anything, but perhaps more

1    importantly here is that the three instances alleged by

2    plaintiffs were not capacity reductions at all.

3          One involved a new joint venture that actually

4    added capacity where the defendant just didn't add a second

5    shift, and the others similarly were cases where capacity

6    increased.  There are also public statements that are here.

7    I will just say briefly that all of the public statements

8    that they cite are actually the type of statements that

9    public companies have to make to investors about what is

10   happening in the market.  That case law is detailed in our

11   papers.

12         And most importantly, unlike in the *Broiler* case,

13   there is no connection drawn between any of these

14   statements and any action that any particular defendant

15   took to actually affect supply, and in the *Broiler* case,

16   the Court drew connections that it felt existed in the

17   complaints there between public statements that were made

18   and actual actions to reduce supply.

19         There is nothing like that in this complaint,

20   Your Honor, and similarly, the allegations about trade

21   associations, concentration in the industry, earnings,

22   pricing, all of that is addressed here, and we believe that

23   at this point this case has nothing in it that would

24   justify moving the case to the next phase.

25         We think it's critical to note, Your Honor, that

1    the plaintiffs in the face of all that the defendants were

2    able to show about the insufficiency of the complaint made

3    it a key part of their opposition to argue that it would be

4    appropriate to let the case move on to discovery so that

5    these facts could be further developed.

6            But as we know from the *Insulate* case, just the

7    opposite is true.  If the complaint is insufficient, moving

8    on to discovery is the exact opposite of what federal

9    courts are supposed to do in these types of antitrust

10   cases, and finally, we would also submit that leave to

11   amend here would be futile because the problems with the

12   complaint here, Your Honor, are problems that can't be

13   fixed by amendment.

14           The reasons that the complaint is implausible,

15   the fact that the defendants are not producers of hogs in a

16   case that is about reducing the supply of hogs, the fact

17   that supply went up at a time when it was supposed to be

18   supposedly going down and that the rate of supply continued

19   throughout the period compared to what it had been before,

20   those problems can't be fixed with an amendment.

21           And we would express -- we would suggest that

22   this case is very much like *Magee v. Trustees of Hamline*

23   *University* where Your Honor held that it would be

24   inappropriate to have leave to amend precisely because the

25   complaint couldn't be changed in a way that would make it

1      adequate, and that's all the more so here where we're

2      dealing with an amended complaint, a consolidated amended

3      complaint.  This is not the first time that the case has

4      been pleaded.

5            So we would like to reserve roughly five to ten

6      minutes for rebuttal, but let me turn it over now to

7      Mr. Parker to address the statute of limitations.  Thank

8      you.

9            THE COURT:  All right.  Very well.  Thank you,

10     Mr. Neuwirth.

11           Go ahead, Mr. Parker.

12           MR. PARKER:  Thank you, Your Honor.  Rich Parker.

13     I'm one of the lawyers representing Smithfield, and I will

14     be talking for all defendants on the statute of

15     limitations.

16           Your Honor, what you see in the complaint and in

17     the plaintiffs' papers is an effort to put together an

18     argument that they have stated a claim under Section 1

19     based on old facts, based on very, very old facts, what we

20     call on our side of the room ancient history, and that

21     means that there is an independent --

22           Now, I don't think for one second -- as

23     Mr. Neuwirth said, they have not stated a claim, and that's

24     our position, but let's assume they did.  This case is

25     timed out.  This case should have happened five years ago,

1    and the argument we're now having with Mr. Neuwirth and the

2    other side should have occurred five or six years ago, and

3    let me take you through that.

4         What they're relying on is fraudulent

5    concealment, and so I'm going to make two points:  Number

6    one, in 2009 to 2013, the facts were all there and publicly

7    available.  That means they were on due diligence to figure

8    it out, and that means equally that we didn't fool them,

9    hide anything, bamboozle them or anything else.

10        Now, the law under *Wood v. Carpenter* and some of

11   the other cases, *Wholesale Groceries* and *Milk* decided in

12   this courtroom are that where something happens in the

13   marketplace that "excites interest" then you're on inquiry

14   notice.

15        And what they say -- Your Honor, I'm so into this

16   case I've memorized the chapters.  This is the Maplevale

17   complaint.  Paragraph 131 says, Oh, my goodness, in 2009,

18   there is dramatic drastic difference and change in pricing.

19   We used to price this way, and all of a sudden, well, they

20   are going up.  It's drastic.

21        Then in paragraph 107, they say the same thing

22   about production.  We have always had increasing

23   production.  Looks like a ruler going up.  All of a sudden

24   it didn't go up anymore.  That puts them on notice.  These

25   are great lawyers, and it sounds to me like they didn't get

1    these folks in until five years too late because had they

2    done their due diligence at that time, and Your Honor, I

3    have some, I have some binders I would like to show you

4    quickly here.

5              MR. ROBISON:  May I approach, Your Honor?

6              THE COURT:  Yeah.

7              MR. PARKER:  I'm going to use them briefly.  If

8    you would turn to page 3, I would most certainly appreciate

9    it.  Thank you.

10             Your Honor, what I'm saying is this:  Is that if

11   you started doing your due diligence in 2009, which they

12   were supposed to do, they would go to the USDA.  This is an

13   industry which the government is all over.  There is hot

14   and cold running data in this industry.  You can find

15   production data.  You can find hog data.  You can find

16   pricing data.  It's all there.

17             And when you look at this complaint, what are

18   they doing?  They're looking at the publicly available data

19   from when?  From back in 2009, '10 and '11.  It's all out

20   there.  You send a bright young person to the web, and they

21   would discover the earnings calls, and I'm referring to

22   paragraphs 110 to 130 of the Maplevale complaint.  They say

23   the earnings calls are overt acts.

24             We say this is just normal business from public

25   companies responding to earnings calls.  Let's assume

1    they're overt facts.  I'll assume that.  They are all out

2    there.  This complaint could have been written before 2014.

3    Now, one other point, and I think this is critical.  Agri

4    Stats, Your Honor, is not the secretive organization it's

5    made out to be.

6           If you look at paragraphs 44, start with

7    paragraph 44 of this complaint, they have a strong

8    description of Agri Stats.  Based on what?  Based on

9    publicly available speeches of an Agri Stats executive

10   named Mr. Bilbrey starting in 2008 and 2009, and I would

11   refer you specifically to paragraph 51 of the Maplevale

12   complaint, which takes you through an Agri Stats report.

13          It doesn't have numbers in there, but it says

14   what the line items are, and what's the conclusion from a

15   smart antitrust lawyer over here?  Oh, my goodness.  They

16   are exchanging data.  Now, I think that is okay.  We defend

17   that, but there is no doubt, no doubt, that before 2013 you

18   would have had the production, you would have had the

19   prices, and you would have had what Agri Stats was doing.

20   That's why this should have happened.

21          Now, let's talk about fraudulent concealment.

22   The fact, Your Honor, that all that stuff was out there

23   sure shows on its face that we didn't cover anything up.

24   We're sending information to the Department of Agriculture.

25   We're doing our earnings calls.  Agri Stats is making

1      speeches about what they do.  Nothing is covered up.

2               The *Cantonis* case, which was decided in this

3      courtroom, was where somebody was selling medical devices

4      and was frauding the FDA and was covering up an FDA report

5      that their product wasn't any good.  When that came out,

6      that's fraudulent concealment, and that put them on notice.

7      That's fair.  Where is the eureka moment here?

8               So I'm saying on the one hand, all the facts were

9      out there, but what is it that they've learned since that

10     time?  And so turn if you would to page 5, and you will see

11     they rely on two things, a Bloomberg article about

12     chickens.  Chickens are not hogs.  We all know that.

13     Chickens, that's what it's about.

14              The article, it is apparently sourced by the

15     plaintiffs' lawyers sitting at this table who were involved

16     in that case.  So they were tipped off by their own

17     article.  I don't understand that, but I'm just making that

18     point.  The other thing is is this article is 99.95 percent

19     about chickens, and all it says is that, guess what?  Agri

20     Stats is getting into the pork business.  That's really --

21     that's all it says.  That's their tip-off.

22              We knew that.  You go to page 44, paragraphs 44

23     and the following of this complaint, we all knew all that.

24     There was nothing to tip anybody off.  Then they say they

25     were tipped off by the Broiler's complaint, that is the

1    chicken case, and I don't see anything about pork in there,

2    either.  Your Honor, in the *Cantonis* case you're supposed

3    on -- in the *Broiler* case they said the defendants were

4    doing bad things and they covered it up, and it became

5    uncovered, and that's when the statute started running.

6    That's not what happened here.

7           THE COURT:  What about the continuing violation

8    allegation?

9           MR. PARKER:  Your Honor, I'm moving right to

10   that.  So let's just set the stage real quick here.  Okay.

11   So what I'm saying is, they are timed out from '09 to '13.

12   They start talking about stuff in '09.  This case needed to

13   be on file by the '13.

14          So now they're saying we can collect damages from

15   '14 until yesterday afternoon because it's continuing, and

16   so they say the conspiracy is continuing, but that's all

17   they say.  You've got to have some more facts than that,

18   and so I want to turn to something that Steve -- excuse

19   me -- Mr. Neuwirth was talking about that is very critical

20   here.

21          Turn if you would to page 7 of my booklet here,

22   and this is -- write down.  I should have put this down.

23   It's paragraph 107, my favorite paragraph from the

24   Maplevale complaint, and look what it says.  Here you go.

25   Okay.  And there is a reduction in '14, right?  But we're

1    not tagged with that.  That's when the pigs all got sick.

2    We're not tagged with that one.

3         Look where it is afterwards.  So how can you sit

4    there under *Twombly*, and that's a rhetorical question, Your

5    Honor.  I don't ask you questions.  I'm making a point

6    here.  How can you sit there and say there is a continuing

7    conspiracy when your own complaint says, I mean come on,

8    production is going up, and I want to compare this to some

9    very important Eighth Circuit opinion, and that's the

10   *Propane* case.

11        And there the Eighth Circuit said, correctly in

12   my humble opinion -- they can say anything they want, but

13   I'm just saying correctly.  They held that just pleading

14   continuing conspiracy was okay in that case, but here's

15   what was going on.  The complaint was that these guys had

16   canisters that were 17, some 17 volume.  They were about

17   this high, but they filled them up about that high and then

18   they kept the price the same (indicating).  It was cute.

19   That's why the FTC enjoined it.

20        But the complaint says that guess what?  The

21   canister is still this high and it's only filled this high

22   and the price is the same, therefore the conspiracy

23   continued.  Okay.  Okay.  Here they're saying the

24   conspiracy continued, but their complaint shows production

25   going up.  Their complaint contradicts that point, unlike

1        the *Propane* case.

2                And then in their opposition they say, well, I've

3        got to tell you something.  Had it not been for the bad

4        conduct by the people on this side of the room, it would

5        have gone up more.  Judge, there is nothing to support

6        that.  Nothing.  And if there is going to be a statute of

7        limitations in these kind of cases, we need -- you know,

8        Justice Briar in the *Clear* case said that private

9        enforcement is part of enforcement.

10               The antitrust laws in this country are enforced

11       by the FTC, the DOJ, the states and by folks like this, but

12       it is important that if they're going to be doing it, it

13       needs to be done on a timely basis.  That's why they

14       strictly enforce the statute of limitations, to create an

15       overwhelming incentive for people to get the work done on a

16       timely basis, and, sir, that did not happen here.

17               And on the continuing violation, if somebody can

18       just type, well, yeah, production is going up but the

19       conspiracy continues and that's good enough, I suggest that

20       we have undermined our statute of limitations.

21               THE COURT:  The information, the production

22       information provided through Agri Stats, how different was

23       that than the public information provided, or is that not

24       part of allegations or part of the record yet?

25               MR. PARKER:  I don't believe that's part of the

1   record.  My understanding is is that it overlaps, but there

2   is additional things that are not public.  I'm not saying

3   that everything in an Agri Stats report is publicly

4   available.

5          THE COURT:  All right.

6          MR. PARKER:  That's what I am saying.  I really

7   think we have, we really have them here.  I mean, this case

8   has timed out, and to simply say there is a continuing

9   violation just frankly doesn't cut it, to use the

10  colloquial.

11         Unless Your Honor has any more questions, I will

12  take my seat.

13         THE COURT:  That's fine.  Thank you, Mr. Parker.

14         MR. PARKER:  Thank you.

15         THE COURT:  Ms. Miller?

16         MS. MILLER:  Thank you, Your Honor.  I thought it

17  would go on the screen, but it would not.  I have hard

18  copies if Your Honor would allow me to disseminate them to

19  the Court.

20         THE COURT:  We will get it here.

21         MS. MILLER:  It's the same thing that is in hard

22  copies if the screens don't work.

23         THE COURT:  All right.  Go ahead.

24         MS. MILLER:  Your Honor, as I said, I represent

25  Indiana Packers and Mitsubishi Corporation, but for

1    purposes of this argument, I'm speaking on behalf of all

2    nine defendants who filed individual motions to dismiss.

3    Thank you, Your Honor.

4         Defendants recognize that we filed two

5    comprehensive joint briefs that explain the myriad reasons

6    that Mr. Neuwirth and Mr. Parker have already told you why

7    these complaints should be dismissed in their entirety.

8    The nine individual briefs, however, serve a very different

9    purpose.  They each show how plaintiffs have failed to meet

10   their required burden of alleging sufficient facts linking

11   each individual defendant to any conspiracy.

12        Plaintiffs concede at page 3 of their brief, as

13   they must, that they must allege specific conduct by each

14   individual defendant showing it joined and committed acts

15   in furtherance of the conspiracy, but plaintiffs have

16   failed to meet these elements with respect to each and

17   every individual defendant.

18        Instead, their complaint rests on group pleading

19   allegations that lump all of the defendants together.  Each

20   defendant, however, is uniquely situated.  For example, the

21   defendants are all different sizes, ranging from large

22   publicly-traded firms with multiple plants, such as JBS and

23   Tyson, to small single plant operators like IPC.

24        With respect to hog supplies, some defendants

25   raise hogs themselves, so-called vertically integrated

1    suppliers.  Others have contracts with hog producers.

2    Others buy hogs on the open market, and some employ many of

3    these different techniques.

4         With respect to sales of pork, each defendant

5    produces a range of products with some specializing in

6    commodity pork and value added brands.  Indeed for many of

7    these defendants there are only two or three factual

8    paragraphs to purport to address their conduct.  In short,

9    Your Honor, it's important for each of these defendants

10   that there are eight unique pork producing companies and

11   each has submitted a brief for the Court's consideration

12   and ruling.

13        Indeed, instead of showing facts that plausibly

14   link each defendant to the alleged conspiracy, plaintiffs

15   rely on large descriptions of the industry, but each

16   defendant's individual motion explains why the allegations

17   are insufficient as to each.  We want to highlight briefly

18   a few of the key arguments raised in these individual

19   briefs, some of which put a finer point on certain

20   arguments that were contained in the joint briefs, while

21   others addressed arguments that are applicable only to

22   certain defendants.

23        As a threshold matter, plaintiffs must show

24   parallel conduct by individual defendants in order to infer

25   that defendants actually agreed to reduce production, but

1     they fail to show any such coordinated cuts or other acts

2     by these individual defendants.  Indeed as we have already

3     discussed somewhat this morning, the allegations in the

4     complaint show the exact opposite.

5              The CACs cite to or rely on materials that

6     document substantial capacity increases by numerous

7     defendants.  For example, the CACs concede that Clemens

8     opened a brand new plant in Coldwater, Michigan, doubling

9     its capacity and allowing it to process an additional 2.5

10    million hogs annually.

11             Similarly, plaintiffs' only allegation of any

12    substance directed at my client Indiana Packers refers to

13    an article which says nothing about supply reduction.

14    Indeed it says quite the opposite.  It specifically states

15    that IPC increased production by 20 percent and increased

16    employment by 30 to 40 percent during the alleged

17    conspiracy.

18             Amazingly, although plaintiffs reference and cite

19    to this article and other documents in their complaint,

20    they then tell the Court not to pay attention to them for

21    purposes of this motion to dismiss, claiming now that they

22    are mere mentions and therefore can be disregarded, but

23    that is not the law.

24             And given that these articles for several of the

25    defendants are the only things that purportedly link them

1        to the alleged conspiracy, we submit that the Court should

2        reject plaintiffs' invitation to ignore them now.

3                Seaboard and Triumph opened a new processing

4        plant through a joint venture, thereby substantially

5        increasing capacity by six million hogs during the

6        purported conspiracy.  Of course, plaintiffs try to spin

7        this and claim that the JV's delay in adding even more

8        capacity through a second shift somehow supports their

9        capacity restriction claims.

10               But the materials again that the plaintiffs

11       specifically rely on reflect that it was a tight labor

12       market that prevented adding another shift, not a desire to

13       keep capacity from further expanding.  Plaintiffs further

14       allege that JBS USA acquired Cargill's pork related assets.

15       Yet there is not a single allegation that JBS reduced

16       supply after that acquisition.

17               Indeed, the CACs actually allege that the supply

18       of pork has substantially increased during this purported

19       conspiracy.  In short, the Court need not accept the

20       conclusions that are throughout plaintiffs' complaint that

21       are inconsistent with the very facts that they rely on.

22               Unlike in *Broilers*, plaintiffs here fail to

23       allege that "each defendant either cut production or took

24       action to restrain production."  This is a fatal flaw.

25       Indeed, when you strip the improper group pleading, several

1     defendants, Clemens, IPC, Seaboard, Triumph, Tyson, are

2     barely even mentioned in the complaint.

3            So instead, plaintiffs are left relying on

4     allegations that simply do not form the basis of a

5     plausible conspiracy.  They use selective and out of

6     context quotes from documents and earnings call

7     transcripts.  They make spurious claims about vertical

8     integration, which we have already discussed this morning.

9     They make allegations about participation and trade

10    associations, but ones that have absolutely no link to any

11    alleged conspiratorial conduct, and they simply say that

12    all of these companies subscribed to Agri Stats.

13           But plaintiffs' reference or partial quotes from

14    the articles and newspapers and earnings calls from these

15    several defendants, we encourage the Court to look at them.

16    We have submitted them to Your Honor because if you look at

17    them for their actual content and for their relevant

18    context, and each individual brief shows how the plaintiffs

19    have selectively quoted from each of those documents and

20    taken them out of context in order to fit their narrative,

21    but as we have already established in each of these briefs,

22    plaintiffs chose what to incorporate into their pleadings,

23    and they cannot run from them now in order to survive

24    dismissal.

25           As Mr. Neuwirth discussed at length plaintiffs'

40

1    reliance on the existence of vertical integration that

2    certain defendants raise hogs in addition to processing

3    hogs, I'm not going to rehash the conclusory allegations or

4    the implausibility of those allegations, but it is

5    important to recognize that plaintiffs' theory that

6    defendants wanted to reduce hog production as part of a

7    pork price fixing conspiracy is economically irrational

8    because hogs are an input cost for pork producers, and as

9    Mr. Neuwirth pointed out earlier, most of these defendants

10   don't raise hogs.

11          For example as Hormel and Tyson both note in

12   their individual briefs, it would be economically

13   irrational for nonintegrated defendants such as Clemens,

14   Hormel, ITC and Tyson to want to increase their costs.

15   Smithfield gets roughly 10 million hogs per year, about

16   half of their production, from independent growers.

17          Another point I want to make briefly, but first

18   as was mentioned this morning, plaintiffs' allegations

19   about reducing hog supply ignore that hog supply is a

20   different marketplace with its own set of firms, tons of

21   different numerous hog producers, not including many of the

22   defendants, and therefore that's a separate conspiracy that

23   they did not allege in this pork conspiracy that actually

24   is in their complaints.

25          Second, mere trade association membership is not

1    enough to suggest a conspiracy.  If so, firms in any number

2    of different industries that have trade association

3    meetings would simply stop having them.  Plaintiffs make no

4    effort to actually link the trade association meetings or

5    activities to any operative event that supports their

6    conspiracy claims, and as the individual briefs make clear,

7    there are no allegations at attendance at meetings by

8    specific defendants or allegations of any supply reductions

9    following those meetings.

10            Finally, as we have talked about a lot today,

11   each individual defendant cannot be pled into this lawsuit

12   and dragged into, quite frankly, years of expensive

13   litigation merely because of an Agri Stats subscription.

14   Plaintiffs assert that belonging to Agri Stats is

15   sufficient to establish each integrator defendant's

16   participation in the conspiracy, especially at the pleading

17   stage.

18            With all due respect, Your Honor, this is wishful

19   thinking on the part of the plaintiffs.  Benchmarking in

20   and of itself, which is done in industries across the

21   country, is in and of itself not anti-competitive.  For the

22   reasons we have already discussed this morning, plaintiffs

23   have not alleged that Agri Stats was the basis for any

24   agreement, and the per se price fixing conspiracy claim,

25   which is the one that plaintiffs actually pled here,

1    requires more than just allegations about information

2    sharing.

3              Indeed as Judge and now Justice Sotomayor made

4    clear in *Todd v. Exxon* that a pure information exchange

5    case is not a per se case, and that is not the complaint

6    that plaintiffs have pled.

7              Finally, Your Honor, as we have talked about

8    already, the need for these individual briefs in part stems

9    from plaintiffs' heavy reliance on improper group pleading

10   throughout the CACs.  Each defendant felt the need to

11   independently demonstrate that the generalized and

12   conclusory allegations that collectively directed at, quote

13   unquote, "defendants" did not apply to them.

14             Plaintiffs continue to assert, however, despite

15   clear authority to the contrary from this very court that

16   they can plead a conspiracy by resorting to made up

17   definitions and group pleading.  I won't reiterate or go

18   through the additional corporate affiliation arguments

19   which have already been made because the Court is very

20   familiar with those authorities, and quite frankly the law

21   is clear on this point.

22             In sum, although plaintiffs' complaints and their

23   briefing on these motions contain a lot of words and a lot

24   of industry allegations, they actually say very little.

25   Having failed to carry their burden to allege actual facts

1     and not mere conclusions to support their claims against

2     each individual defendant, their claims should be dismissed

3     as to each defendant, and each of the individual

4     defendants' brief ask the Court to do just that.

5               Whatever time we have left, Your Honor, we would

6     like to reserve for rebuttal.

7               THE COURT:  Thank you, Ms. Miller.

8               MS. MILLER:  Thank you.

9               THE COURT:  Let's take about a five-minute break.

10              THE CLERK:  All rise.

11                        **(Recess taken.)**

12

13                       **(In open court.)**

14              THE COURT:  All right.  You may be seated.  Go

15     ahead.

16              MS. SCARLETT:  Your Honor, Shana Scarlett for the

17     Consumer Indirect Purchaser Plaintiffs.  I will be

18     addressing the *Twombly* issues, and my colleague

19     Mr. Bruckner will be addressing statute of limitations and

20     the individual defendant motions.

21              THE COURT:  All right.

22              MS. SCARLETT:  *Twombly* requires only the

23     plausibility of a conspiracy, and plaintiffs have done that

24     here.  The agreement alleged is one to constrain supply and

25     stabilize the price of pork.  Not hogs, of pork.

1          Agri Stats was an information exchange, and it's

2     an example of a facilitating practice that can help support

3     the inference of a price fixing agreement.  That's

4     consistent with the Court's instruction in *Todd*, and it's

5     certainly consistent with the Supreme Court's decision in

6     *Linseed Oil* where it said, Furnishing sensitive business

7     information to competitors takes away freedom of action by

8     revealing intimate details of affairs to competitors, and

9     that was what happened here.

10          Agri Stats reduced the strategic uncertainty in

11     the marketplace by providing competitors with some of the

12     most sensitive production and supply information about

13     their competitors.

14          THE COURT:  Do you know, is there a significant

15     difference between what is available publicly and what was

16     shared through Agri Stats?

17          MS. SCARLETT:  Your Honor, I'm a little bit

18     constrained.  I am one of the counselors in the *Broiler*

19     case, and I do know a lot of information about Agri Stats

20     reports there that I am constrained from talking about

21     here.

22          THE COURT:  Right.

23          MS. SCARLETT:  But I will say this:  There is no

24     public Agri Stats report that we could find to put into

25     this complaint to demonstrate to Your Honor the detail that

1    is passed between competitors.  The public information that

2    we cite on production is from the USDA, and as you see from

3    the defendants' briefs, they attack it for being aggregated

4    and for masking individual differences.  I have to believe

5    they made this argument a little bit tongue in cheek

6    knowing of course only aggregate data is available

7    publicly, and what they have available through Agri Stats

8    is so much more detailed.

9         So when Agri Stats saw the success that it had in

10   the broilers industry using its reports and sharing

11   information between competitors, it issued its invitation

12   to the pork producers.  There is overlap in ownership

13   between broilers and pork companies, and so some of the

14   defendants, for example Tyson, knew the success it had in

15   the broilers industry using these Agri Stats reports.

16        In 2008 when Agri Stats made this offer, it

17   encouraged each and every commercial swine operation to

18   participate in this benchmarking operation, and the pork

19   producers, they took up that offer.  We see in 2009

20   statements starting to be made by Smithfield about its

21   reduction of 50,000 sow in 2008.  We saw Hormel talking

22   about a contraction in supply.

23        We see Smithfield talking about its 3 percent cut

24   on top of the 10 percent that it already made, and it says

25   to the market openly, Somebody else has got to do

1    something.  In September 2009, Smithfield CEO states

2    publicly that he had had conversations with large

3    producers, some of whom were doing liquidation.  He says

4    again to the industry, The industry has got to solve it

5    collectively.  There are others cutting back.  We're not

6    the only ones.

7          Smithfield says also publicly, and we believe

8    that the CEO must have been referencing Agri Stats.  The

9    only other possible interpretation is that he had had

10   private conversations, but in paragraph 103 of the consumer

11   complaint, we quote him as saying, We think we know

12   privately how many they kill, what their processing levels

13   are and things like this.  This is information you might

14   not have.

15         And he is saying this is information you might

16   not have to the public, to investors, to financial

17   analysts.  All right?  He is admitting that the information

18   they have through other means on production and supply is

19   something the public doesn't have.

20         Defendants have spent a lot of time talking about

21   that there is production increases during the class period.

22   Of course, there were three absolute decreases that the

23   complaint alleges in 2009, 2010, and 2013.  These decreases

24   in supply occurred after decreases in pork prices, making

25   for the type of abnormal pricing that courts look to when

1    looking to see the plausibility of a conspiracy.

2           Plaintiffs' theory is that the supply reduction

3    was over historical levels.  It's not an absolute

4    reduction.  We've had a couple charts that we have looked

5    at where there has been lines drawn through.  Defendants

6    once again criticize the plaintiffs' chart for only hitting

7    two pre-conspiracy lines and not fitting more tightly.

8           I would just like to hand up another version of

9    the chart where we took their criticism to heart and tried

10   to address it and added a third line.  This line is in

11   yellow which skews more tightly to pre-conspiracy but still

12   shows an underproduction compared to historical levels.

13          But I think the one thing that this multitude of

14   charts now really drives home, and it is where the *Broilers*

15   court landed, which is this is a question of fact.  This is

16   inappropriate for resolution at the motion to dismiss

17   stage.

18          Production numbers and the types of multi variate

19   regression analyses undertaken by economists, by economists

20   at the Rule 26 stage, are very factually intensive, and

21   this type of decision on whether or not production was

22   oversupply or undersupply is not appropriate for the

23   motions stage.

24          The other type of thing that courts look to when

25   looking at the plausibility of a conspiracy is pricing, and

1   here all of the complaints speak to the abnormal pricing

2   that took place.  The average pork wholesale price, the

3   price at which pork was sold downstream, was at or below

4   $50 every year between 1998 and 2009.  2009 it increased to

5   $76.30, and it remains elevated.  The plaintiffs didn't

6   stop at just looking at one type of pricing, however.  We

7   also looked at the pork cutout competent price also

8   published by the USDA.  It showed the same increase.  So

9   looking at pricing in multiple ways, we see a break between

10  what happened pre-class period and what happened during the

11  class period.

12          Defendants in their briefs and today have argued

13  several counter factual explanations that they think

14  explain away the pricing and the production numbers.  They

15  point to the great recession.  They point to hog disease,

16  and they point to raising corn prices.

17          Again, at the pleading stage, it's inappropriate

18  to consider this type of counter factual suggestion, and it

19  also is a question of fact that the economists look at in

20  multi variate regression analyses to control for these type

21  of complicated factors, but even then, the great recession

22  and the hog disease are two limited periods of time.

23          They are two very discrete events that happened

24  that can't possibly explain the entire class period and the

25  trends that are seen, and for corn prices, which would

1    underlie, if you look at paragraphs 128 and 129 of the

2    consumer complaint, we looked at the profit margin of the

3    producers.  So we took into account their costs and

4    compared that against prices.

5              And the rising costs did not explain the increase

6    in prices, and this is a statistically different --

7    statistically significant different result than the

8    pre-class period because input costs did explain prices to

9    a large extent in the pre-class period.  We did more than

10   just look at general industry data.

11             Two publicly-traded defendants, Tyson and

12   Smithfield, had sufficient information in their financial

13   reports that we also looked at those more individually, and

14   we came up with the same conclusion, paragraphs 131 and 132

15   of the consumer complaint.  Rising costs such as corn did

16   not explain the abnormal pricing in this industry.

17             Just a couple other things briefly.  Market

18   concentration here makes this somewhat different than the

19   broiler industry but in a way that makes the conspiracy

20   more plausible.  Here we have 8 defendants controlling 80

21   percent of the market.  In *Broilers*, there is somewhere

22   around 18 defendants in that case with a couple more

23   producers that are named as coconspirators, but that's a

24   significant difference.

25             And addressing the defendants' point on vertical

1    integration, there are a number of vertically integrated

2    defendants, but the conspiracy is not predicated on

3    vertical integration.  It is one of the pieces of market

4    structure which makes the existence of a conspiracy more

5    likely.  It has fewer firms that compete at all levels, and

6    it's easier to collude on price when you have a reduced

7    market like this.

8           The plaintiffs allege that the pork producers

9    control the hog farmers that are growing the hogs.

10   Paragraphs 109 and 114 of the consumer complaint discuss

11   how the integrators retain ownership of the hogs, they pay

12   service fees to the farmers who bear the investment costs

13   and the pork packers have control of the production numbers

14   through contractual relationships.

15          And just stepping back for a moment in utilizing

16   the common sense that defendants just evoked so frequently

17   in the last hour, it only makes common sense that companies

18   as large as JBS, Tyson, Smithfield exert power and control

19   over the individual hog farmers that do exist that are

20   raising those hogs.  It makes no sense the other way

21   around.

22          THE COURT:  Did the plaintiffs change their

23   theory about Agri Stats between the complaint and the

24   response?  Maybe you can talk about that for a moment, from

25   enforcement to exchange of information.

1          MS. SCARLETT:  Absolutely not, Your Honor.  There

2     was no change in the theory of the complaint.  I think the

3     confusion arises from the fact that Agri Stats permeates

4     almost every part of this conspiracy in the type of web

5     that is so rarely seen in other areas.  I, and many of my

6     co-counsel, have done a lot of conspiracy cases.  We have

7     seen a lot of trade associations that have information

8     provided.

9          I think it's fair to say none of us have ever

10    seen detail of the level provided in Agri Stats.  So, yes,

11    this information exchange under *Todd* is seen as one way to

12    facilitate a price fixing conspiracy.  That was always the

13    theory as pled in the complaint, but it is also an

14    enforcement mechanism.

15         Once you're five years into a conspiracy and

16    you're able to see the production trend lines, Agri Stats

17    absolutely is allowing the competitors to see whether

18    someone has stepped out of line, has someone increased its

19    market share, and there are the market share -- we have in

20    the complaint market share analyses that look at the

21    defendants' market share over the class period and how

22    stable it remained.

23         And not only do we have the graph in the

24    complaint, which shows just by looking at the stability of

25    these market shares, we also see that we did a standard

1    deviation analysis just to show that market shares were

2    more stable during the class period than before, and part

3    of this reason is Agri Stats.

4            There is no better way to enforce a conspiracy

5    than to receive the data weekly and monthly in your

6    offices.  Unlike other cartels, it's not necessary to go to

7    a room to exchange paper, to exchange the production

8    numbers, to have a Power Point up on the wall where

9    executives look at what is coming.  There is no need for

10   that in this technical world where Agri Stats provided it

11   to the defendants weekly and monthly.

12           If Your Honor doesn't have any more questions, I

13   think I will turn it over to my colleague, Mr. Bruckner.

14           THE COURT:  Just one issue.

15           MS. SCARLETT:  Sure.

16           THE COURT:  Maybe Mr. Bruckner can address it,

17   too.  The issue of the parent companies engaging in

18   anti-competitive activities, is that something you're going

19   to take?

20           MS. SCARLETT:  Mr. Bruckner is going to.

21           THE COURT:  All right.  Thank you, Ms. Scarlett.

22           MR. BRUCKNER:  Thank you, Your Honor.  First on

23   the statute of limitations issues, let me cut to the heart

24   of the defendants' arguments since I know we're running

25   short on time.  Mr. Parker talked about the information

1    that was publicly available back in the day or back during

2    the limitations period, but by no means does that

3    constitute the basis of our claim.

4         In any event, no court has ever held that the

5    purchasers of a product are under a duty of reasonable care

6    to monitor earnings calls or other information that is

7    provided for the benefit of investors, but more to the

8    point, as the Eighth Circuit pointed out in the *Great*

9    *Rivers* case, Public information is not automatically

10   imputed to an injured party without a determination of some

11   storm clouds on the horizon.

12        So this is, there is three elements of fraudulent

13   concealment, as Your Honor knows, and what we're really

14   talking about here is, were the plaintiffs, did they

15   exercise due diligence, so let's talk about that.  What

16   were the storm clouds?  What were the storm warnings that

17   put plaintiffs on notice and brought us and led us to bring

18   the claims that we brought here today?

19        It wasn't the defendants' public statements in

20   their earnings calls, especially not when you couple them

21   with their pretextual explanations for increases in pork

22   products, increases in their own profits.  They blame those

23   on China.  More grain was going to China.  They ascribe

24   their improved profits to better programs with dealers and

25   the like.

1          They were throwing us off the scent.  They were

2     affirmatively throwing us off the scent.  Given the time, I

3     don't want to spend a lot of time on their affirmative

4     acts, but we have covered those in our papers in addition

5     to the fact that we allege a self-concealing conspiracy, a

6     standard which is accepted and which Judge Alsop affirmed

7     in the *United Power* case.  He said, Alleging a

8     self-concealing conspiracy is an alternative to alleging

9     affirmative facts, but we have done both.

10          Let me get back to the storm clouds.  What put us

11     on notice?  It wasn't their public statements.  It wasn't

12     the fact that a benchmarking service became available in

13     the pork industry.  What put us on notice and what

14     constituted a storm cloud was the real story behind this

15     so-called benchmarking service.

16          Through Agri Stats, the defendants, who are

17     ostensible competitors, exchanged extremely confidential

18     and extremely sensitive information, detailed bottom line

19     information, with each other on a regular basis.  There was

20     profit information, prices, costs, production.  It was

21     current and forward-looking information, which courts

22     consistently hold has the greatest potential for

23     anti-competitive effects.

24          That information was not aggregated as

25     benchmarking services often are.  It was specific to

1    specific producers.  Now, nominally it was anonymous data,

2    but each of the defendants was able easily to de-anonymize

3    that data and identify their competitors' data in Agri

4    Stats reports, and as importantly, they knew that each of

5    their competitors could do the same thing, that is

6    de-anonymize their own data.

7            The defendants paid millions of dollars over the

8    class period for these Agri Stats reports, much, much more

9    than they paid for any other information that they got

10   through various indices.  And, Your Honor, if the

11   defendants suggested today that all of those facts were

12   publicly available, that's just not so.  Those facts were

13   all secret, confidential.  None of that was publicly

14   available.

15           Agri Stats itself as we allege in our complaint

16   in the direct purchaser complaint, it's paragraph 144, Agri

17   Stats itself bragged that it was a confidential company.

18   Agri Stats has always been kind of a quiet company.  There

19   is not a lot of people that know a lot about us, obviously

20   due to confidentiality that we try to protect.  We don't

21   talk about what we do.  That's absolutely true.  They did

22   not talk about what they did, and the defendants sure

23   didn't talk about what they did.

24           We also learned in February -- in 2018 that the

25   Department of Justice had issued a civil investigative

1    demand to Agri Stats which specifically referenced the pork

2    industry.  We also had the Bloomberg article in February of

3    2017 which said in essence that the aspect of the broiler

4    conspiracy that Agri Stats was a key part of had been

5    imported into the pork industry.  That's --

6              THE COURT:  Mr. Bruckner, does the fact that

7    public statements were made early on as alleged in the

8    complaint impact the self-concealing conspiracy claim?

9              MR. BRUCKNER:  Your Honor, I don't believe that

10   it does, especially given our position that we don't think

11   those public statements by themselves excited inquiry

12   notice.  So -- and especially if you balance them with the

13   pretextual explanations that they were giving at the same

14   time, we believe that if anyone had seen those public

15   statements alone in isolation, which I don't need to remind

16   the Court is not how you approach or address plaintiffs'

17   allegations on a motion to dismiss, but if you look at

18   those public statements, you look at at the same time with

19   the other hand the defendants are explaining them away with

20   seemingly innocuous explanations, no, I don't think it has

21   an impact on the self-concealing aspect that we have

22   alleged.

23              Very briefly, Your Honor, continuing violation?

24   We believe we have alleged fraudulent concealment

25   sufficiently, but even if the Court is of another belief,

1    we have alleged a continuing violation.  I don't want to go

2    through in great detail given the shortness of time, but

3    *Propane I*, the first *Propane* decision by the Eighth

4    Circuit, the en banc one, is quite clear that each sale to

5    a plaintiff in a price fixing conspiracy starts the

6    statutory period running again.  Courts consistently have

7    held that.  The en banc court in *Propane I* noted that every

8    circuit that has addressed that issue finds that in a price

9    fixing conspiracy, which this is, each subsequent sale

10   starts the statutory period running again.

11        Judge Montgomery found that in the *Wholesale*

12   *Grocers* case, and every other case has found the same

13   thing.

14        THE COURT:  The continued violation theory

15   depends heavily on the existence of Agri Stats, correct?

16        MR. BRUCKNER:  It depends in part on the

17   existence of Agri Stats and the information that they

18   exchanged.

19        THE COURT:  There were no public statements made

20   after 2013 or somewhere around there.

21        MR. BRUCKNER:  That's true.

22        THE COURT:  And production did start to steadily

23   increase at that point in time, so what else besides Agri

24   Stats supports the continuing violation theory?

25        MR. BRUCKNER:  Well, number one, the fact that we

1    allege that the conspiracy continued, none of the factors

2    that constituted the conspiracy, that is an agreement to

3    limit supply, and by the way, the fact that there were no

4    affirmative or absolute cuts is not contrary to our theory.

5    Our theory is that this conspiracy led them to restrain

6    supply and not increase it at the rate it otherwise would

7    have been.  We allege that that continued throughout the

8    period up until today.

9            All of the hallmarks of this industry that

10   facilitate collusion and make collusion more likely,

11   increasing concentration, high barriers to entry, none of

12   that stopped.  We certainly have not alleged that any of

13   that stopped.  So we say that all of the key factors that

14   we allege form this, not only form the conspiracy but

15   facilitated the conspiracy, continued throughout the

16   period.

17           And finally, Your Honor, I would, I would note

18   that all of these issues on the statute of limitations, be

19   it fraudulent concealment or continuing violation, are

20   uniquely fact based determinations that in order to resolve

21   them on a Rule 12 motion, the Court essentially would have

22   to do what the defendants are inviting it to do, and that

23   is look only at the allegations they like, like public

24   statements, ignore the allegations they don't like, like

25   our explicit allegation of affirmative facts, the

1  self-concealing nature of their conspiracy and all the

2  storm warnings that we talked about just a moment ago.

3          Unless the Court has more questions on that, I

4  want to turn very briefly to the individual motions, and

5  let me start with the point that Your Honor raised on the

6  parent companies because I think those are different than

7  the operating companies, I'll call them.  Your Honor, our

8  position is that by our definition, the defendants, we have

9  alleged that each one of them participated in the conduct

10 at issue.

11         We allege more than simply that the parent acted

12 as a parent company to each one's subsidiary, and frankly,

13 Your Honor, we think that the depth and the extent of that

14 control is as a matter of fact that ought to be explored on

15 discovery, but if the Court is of a different mind and is

16 not persuaded, we say that any dismissal of those parent

17 companies ought to be without prejudice so that we can

18 specifically pursue that question of the scope and extent

19 of control in discovery, and if appropriate we will

20 re-plead those allegations with more specificity.

21         But let me go back to the overall -- let me go

22 back to the rest of the individual motions to dismiss, and

23 I want to talk about a couple of overall legal principles

24 that apply here.  Number one, it's quite clear and

25 well-established that Rule 8(a) does not require us to

1    plead specific facts.

2           We only need to plead -- the statement need only

3    give the defendant a fair notice of what the claim is and

4    the grounds upon which it rests.  That's what the Supreme

5    Court held in *Erickson v. Pardus*, the same term that it

6    came out with the *Twombly* decision, and there is Eighth

7    Circuit Minnesota precedent to support that as well.

8           We need not allege defendant-by-defendant

9    allegations.  Judge Magnuson so held in the *Bulk Popcorn*

10   case, and Judge Illston has so held in the *LCD* case.  We

11   also are not required to allege participation by each and

12   every conspirator in each and every detail of the

13   conspiracy.

14          What we do allege, let me give just a summary of

15   allegations that are applicable to each and every one of

16   the eight producer defendants, not Agri Stats, but each and

17   every one of the eight producer defendants.  We allege that

18   each defendant, and we identify each one by name, entered

19   into a conspiracy to fix, raise, maintain and stabilize the

20   price of pork.

21          We allege that the principal method, not the

22   exclusive method but the principal method, by which each

23   defendant implemented it, each defendant identified by

24   name, was by coordinating their output and restricting

25   their production.  We allege that each defendant identified

1   by name exchanged this highly confidential and extremely

2   sensitive information with each other through Agri Stats.

3          I don't want to go back through the Agri Stats

4   litany, but it is important to note that we allege that

5   each defendant identified by name engaged in that behavior.

6   We allege that each defendant was able to identify their

7   conspirators' information and that each defendant knew that

8   their competitors were able to do the same thing.

9          And each of those allegations, as I say, are

10  defendant specific.  We go down the list, Clemens, Tyson,

11  all of the rest, and it applies to each of them.  We think

12  that's sufficient to keep defendants in the case, deny

13  their motions to dismiss.

14         Given the fact that we are now out of time,

15  unless the Court has more questions, I will step down.

16         THE COURT:  I think that's fine.  Rebuttal here,

17  a little?  How about, can we do it in ten minutes time for

18  each of you?

19         Okay.  Go ahead.

20         MR. NEUWIRTH:  Thank you.  Your Honor, litigation

21  is not supposed to be by slight of hand, and Your Honor

22  focused on Agri Stats in some of your questions, and we

23  submit that Agri Stats shows why this case must be

24  dismissed.  It is not legitimately disputable that what is

25  alleged in the complaint, and we showed you the paragraphs,

1     is that Agri Stats was an enforcement mechanism, and if

2     there is any doubt about what was alleged, the proof is in

3     the putting of the *broilers* decision itself.

4              In the *Broiler* case on which this case was

5     modeled, the District Court expressly noted at page 800 in

6     its opinion, "Here Agri Stats is not the mechanism

7     defendants are alleged to have used to effectuate the price

8     increases.  That would be the means of their production

9     cuts.  Rather, plaintiffs allege defendants used Agri Stats

10    as a means of communication and monitoring."

11             And that's what was alleged here originally.

12    Now, the problem with that theory in this case is that

13    unlike in the *Broiler* case where the District Court felt

14    the complaint showed in great detail what the defendants

15    specifically did with the information from Agri Stats to

16    affect supply and all the unprecedented conduct with

17    specificity that the particular defendants alleged or

18    alleged to have participated in there, none of that is

19    here, and you didn't hear any of that in the argument

20    today.

21             You heard no specific allegations of what the

22    defendants supposedly did to cut supply.  What you heard

23    was an allegation that is the shifted position that's not

24    in the complaint that exchanging information through Agri

25    Stats was the conspiratorial conduct and that this

1    supposedly had all these effects, none of which are alleged

2    in the complaint, and it is remarkable that my friend

3    Mr. Bruckner stood here and said that the *Bulk Popcorn* case

4    shows that their allegations are sufficient.

5          The *Bulk Popcorn* case is the 1991 case that used

6    the slight evidence rule, which we showed you has been

7    rejected by the Eighth Circuit and that the district courts

8    say is not good law in civil antitrust cases.  The slight

9    evidence rule is a rule that would say that absolute

10   absence of fact details about the particular defendants are

11   okay, and just listing the names of the defendants side by

12   side with conclusory allegations proves absolutely nothing.

13         Agri Stats is an exchange of information.  That's

14   their new theory, but the *Todd v. Exxon* case on which they

15   rely says the mere exchange of information is not enough.

16   Now, Your Honor asked the very legitimate question of,

17   well, is this secret information or public information.

18         However, whatever information it was, there is no

19   allegation that something was done with it to actually

20   affect supply, that any of the defendants did particular

21   things to reduce supply.  This is a case about the supply

22   of hogs.  We showed you in the complaint where it says it.

23   We showed that the complaint says that through cutting hog

24   supply the defendants were able to get their desired effect

25   of raising the price of pork.

1          It is a total misrepresentation of the complaint

2     for the plaintiffs to stand up here now and tell Your Honor

3     that this is not a case about reducing the supply of hogs,

4     and the problem is, even if all this information was

5     exchanged through Agri Stats exactly as the plaintiffs want

6     to describe it, they can't overcome the problem that we are

7     talking here about the supply of hogs.

8          And they have no answer to the fact that just

9     three of the pork producer defendants out of eight are

10    alleged to have any hog supply of their own, and it was an

11    overt misleading statement here to say to Your Honor that

12    the Smithfield CEO had talked about, with pork producers,

13    about destruction of pork.

14         Who are those producers?  The term "producers"

15    refers to the very independent pork, hog producers that are

16    referenced in the complaint.  We showed you earlier that

17    the complaint talks about them, and it is just a slight of

18    hand to come up here now and try to recharacterize the

19    complaint as something different from what it really is.

20         There is no way that they can solve the problems

21    in the complaint by invoking Agri Stats, and as we showed

22    you repeatedly and as we show in our briefs, when the Agri

23    Stats information was exchanged, supply kept going up at

24    the same rate.

25         Now, this chart which we were handed during the

1    argument, we will put aside the fact that this was not in

2    any of the papers.  It's something brand-new today.  This

3    yellow line is something brand-new, but look again what

4    they have done.  They have left out a chunk of the period

5    where there were dots that they want to exclude.

6         This is not the way the *broilers* court draws its

7    chart.  We showed you what the *broilers* court did, and this

8    yellow line relies on a point in the conspiracy, the

9    alleged conspiracy, to purportedly show the trend line

10   pre-conspiracy.  The much better line is the one that we

11   showed you, which runs through the dots in the

12   pre-conspiracy period and the post conspiracy period.  We

13   showed you what the *broilers* court did.

14        I would respectfully ask Your Honor to turn to

15   tab 35 in the book that I gave you originally.  We heard in

16   the plaintiffs' argument that supposedly profit margins or

17   abnormal pricing show that this conspiracy was effective.

18   Now putting aside that there is no relationship whatsoever

19   in the complaint alleged between any conduct and what

20   happened with the prices, if you look at the chart that we

21   show on tab 35, which comes from their complaint, it shows

22   that the only time prices went up in a way that was

23   different from what is the obvious trend before and during

24   the conspiracy was during years when we know from the

25   allegations of the complaint that there was a recession,

1    swine flu and the PED virus.

2             And it's remarkable.  There was no answer to what

3    we showed Your Honor.  The complaint does not say that this

4    was a period when supply was going down.  It points to

5    three years, 2009, 2010, and 2014, where the complaint says

6    supply went down.  It is just a misrepresentation of the

7    complaint to come now and tell Your Honor otherwise.

8             And the complaint itself contains the obvious

9    explanations for why supply went down in those years, and

10   we showed you, particularly, that the complaint says in

11   2014 the PED virus affected supplies, but the documents

12   underlying that show that that started in 2013.

13            So we are left with nothing, nothing that makes

14   this complaint plausible.  All of the general statements

15   that were made here today in the plaintiffs' argument are

16   trying to put a gloss over, to distract from what are the

17   detailed failures of the complaint to allege something

18   plausible.

19            Agri Stats shows what's wrong with the complaint.

20   It is not a reason to deny the motion to dismiss because

21   there is no way they can link the exchange of information

22   in Agri Stats to any ability or desire of these defendants

23   to reduce the supply of hogs as a way to raise prices.

24            The only thing they point to in their complaint

25   have obvious explanations that they themselves put in, and

1    in both our hearing binder and our briefs we speak in

2    detail about the public statements that they cite, but the

3    Smithfield CEO statement is perhaps the most glaring one in

4    terms of the abuse that the plaintiffs are making of what

5    these public statements said.  The Smithfield CEO said in

6    2009 that he had been in communication with producers of

7    hogs.

8             Those are not the defendants, and later that year

9    as we point out in our papers, the Smithfield CEO said that

10   supply had in fact gone up.  This is the opposite of what

11   happened in the *Broiler* opinion.  We believe if one puts

12   the *Broiler* opinion side by side with the allegations in

13   this complaint, there is no way that the plaintiffs can

14   legitimately defend it.

15            Thank you very much, Your Honor.  Mr. Parker had

16   a couple points to make on statute of limitations.

17            THE COURT:  Let's make it quick.  We have run out

18   of our ten minutes here.

19            MR. PARKER:  Thank you very much.  We are not

20   suggesting that the plaintiffs here have to monitor

21   earnings calls.  What I am suggesting is is that when there

22   is marketplace activities, pricing and production activity

23   that they know about that they describe as dramatic and

24   drastic and abnormal, they are put on notice.

25            Once you're on notice and you do your due

1    diligence, you would have found the earnings call.  That's

2    what I'm saying.  Maplevale is a big buyer.  They're a

3    broad line wholesale company.  They are buying pork every

4    day.  They know what is happening in the marketplace.

5    There is nothing unfair with saying that they're on notice

6    when the pricing becomes abnormal.

7           Second, the pretextual statements, I would refer

8    the Court to the *Wholesale Grocers* case and to the *Milk*

9    case which said that pretextual statements, when objective

10   reality, what those cases say, when objective reality, i.e.

11   pricing, shows there may be something to be interested in,

12   pretextual statements do not constitute hiding, do not

13   constitute concealment.

14          The third point -- and again, there is nothing

15   that we concealed.  They haven't, they haven't told us what

16   we concealed, but the third point I want to make is

17   something that they raise, and it's not in the, it's not in

18   the record, but I don't want you to think that somebody got

19   in trouble here.

20          Yes.  The DOJ did investigate during the time

21   period when they should have been doing their due

22   diligence.  Something excited their interest, and guess

23   what?  They shut it down.  They looked at Agri Stats.  They

24   subpoenaed documents.  They shut it down.  That's what I

25   had to say because I don't want you to think that there was

1    some DOJ thing out here.

2         The reality is -- and it makes the point I'm

3    making.  Something excited their interest, and they shut it

4    down.  They didn't find anything wrong.

5         Thank you.

6         THE COURT:  All right.  Thank you, Mr. Parker.

7         MS. MILLER:  Two very quick points, Your Honor,

8    which I will try to make not too quick for the court

9    reporter.  On the corporate defendants, Your Honor, if you

10   look at slide 6 in the presentation, in their brief, and

11   Mr. Bruckner made the point again today, they are defining

12   the two JBS entities similarly as defendants, and that

13   under the plaintiffs' theory brings them in.

14        They define Mitsubishi Corporation as Indiana

15   Packers, and on that theory that brings them in.  They do

16   it with respect to the Seaboard, Triumph, a number of these

17   defendants, but as Your Honor held in the *Hudock versus LG*

18   *Electronics* case, that is not enough where Your Honor

19   dismissed two Best Buy entities when those plaintiffs tried

20   to do the exact same thing.

21        With respect to the specific individual specific

22   pleading that Mr. Bruckner stood up there and said that

23   they have made specific allegations as to each and every

24   individual defendant, I respectfully disagree.  Yes, they

25   did say in their complaints that each defendant, they list

1    out the names of them, participated in the conspiracy, but

2    they don't say what that conspiracy was or what each of

3    those defendants did to participate in that conspiracy.

4         He said the principal method of effecting the

5    conspiracy was restricting supply.  We have talked about

6    supply ad nauseam this morning.  It's clear that a number

7    of these defendants don't control supply at all so had no

8    ability to increase it, decrease it or do anything as to

9    it.

10        Those that did, supply increased.  That each

11   defendant subscribed to Agri Stats, we have covered that.

12   Benchmarking in and of itself is not anti-competitive, and

13   each defendant could identify the other in Agri Stats, we

14   have plaintiffs' one or two paragraphs in the complaint

15   that say that.  Saying it doesn't make it a reality.

16        Thank you, Your Honor.

17        THE COURT:  All right.  Thank you.  Go ahead.

18   One comment.

19        MS. SCARLETT:  One comment.  There has now been

20   repeated discussion that somehow the plaintiffs have misled

21   the Court and wildly changed their theory from the original

22   complaint and the briefing.  Your Honor has all of the

23   papers, and the plaintiffs have absolutely done none of

24   those things.

25        Thank you for your time.

1          THE COURT:  All right.  Thank you for the

2    arguments this morning, Counsel.  The Court will take the

3    motions under advisement and will issue a written order as

4    quickly as possible.  Thank you.

5          We will be in recess.

6          THE CLERK:  All rise.

7                    **(Court was adjourned.)**

8                    *         *         *

9          I, Kristine Mousseau, certify that the foregoing

10   is a correct transcript from the record of proceedings in

11   the above-entitled matter.

12

13

14

15   Certified by:  s/  Kristine Mousseau, CRR-RPR
                    Kristine Mousseau, CRR-RPR
16

17

18

19

20

21

22

23

24

25