```
 1                     UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                   )
       In Re:  Pork Antitrust        )   File No. 18CV1776
 4     Litigation                    )        (JRT/HB)
                                     )
 5                                   )
                                     )   Courtroom 14W
 6                                   )   Minneapolis, Minnesota
                                     )   January 28, 2019
 7                                   )   2:03 P.M.
                                     )
 8                                   )
       ------------------------------------------------------------
 9

10               BEFORE THE HONORABLE HILDY BOWBEER
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11                     (STATUS CONFERENCE)

12     APPEARANCES
       For Direct Purchaser         Lockridge Grindal Nauen PLLP
13     Plaintiffs:                  BRIAN D. CLARK, ESQ.
                                    JOSEPH BRUCKNER, ESQ.
14                                  100 Washington Avenue South
                                    Suite 2200
15                                  Minneapolis, MN 55401

16                                  Pearson Simon & Warshaw
                                    BRUCE L. SIMON, ESQ.
17                                  BOBBY POUYA, ESQ.
                                    MELISSA S. WEINER, ESQ.
18                                  MICHAEL H. PEARSON, ESQ. (PHONE)
                                    800 LaSalle Avenue
19                                  Suite 2150
                                    Minneapolis, MN 55402
20
       For the Consumer             Gustafson Gluek PLLC
21     Indirect Purchaser          DANIEL C. HEDLUND, ESQ.
       Plaintiffs:                  120 South Sixth Street
22                                  Suite 2600
                                    Minneapolis, MN 55402
23
                                    Hagens Berman Sobol Shapiro
24                                  SHANA E. SCARLETT, ESQ.
                                    715 Hearst Avenue
25                                  Suite 202
                                    Berkeley, CA 94710
```

```
 1        For the Commercial      Cuneo Gilbert & LaDuca, LLP
          Indirect Purchaser      JONATHAN WATSON CUNEO, ESQ.
 2        Plaintiffs:             (PHONE)
                                  4725 Wisconsin Avenue NW
 3                                Suite 200
                                  Washington, DC 20016
 4
                                  Larson King, LLP
 5                                SHAWN M. RAITER, ESQ.
                                  30 East Seventh Street
 6                                Suite 2800
                                  St. Paul, MN 55101
 7
          For Defendant Triumph   Husch Blackwell
 8        Foods:                  GENE SUMMERLIN, ESQ.
                                  MEGAN SCHEIDERER, ESQ. (PHONE)
 9                                13330 California Street
                                  Suite 200
10                                Omaha, NE 68154

11        For Defendant JBS USA:  Spencer Fane LLP
                                  DONALD G. HEEMAN, ESQ.
12                                100 South Fifth Street
                                  Suite 1900
13                                Minneapolis, MN 55402

14                                Quinn Emanuel Urquhart &
                                  Sullivan
15                                STEPHEN R. NEUWIRTH, ESQ.
                                  SAMI H. RASHID, ESQ.
16                                51 Madison Avenue
                                  22nd Floor
17                                New York, NY 10010

18        For Defendant           Larkin Hoffman Daly & Lindgren
          Smithfield Foods:       JOHN A. COTTER, ESQ.
19                                JOHN A. KVINGE, ESQ.
                                  8300 Norman Center Dr., Ste 1000
20                                Minneapolis, MN 55437

21                                Gibson Dunn & Crutcher
                                  RICHARD G. PARKER, ESQ.
22                                1050 Connecticut Avenue NW
                                  Washington, DC 20036
23
                                  Gibson Dunn & Crutcher
24                                BRIAN EDWARD ROBISON, ESQ.
                                  2100 McKinney Avenue, Ste 1100
25                                Dallas, Texas 75201
```

```
 1      For Defendant Tyson            Axinn Veltrop & Harkrider LLP
        Foods:                         TIFFANY RIDER ROHRBAUGH, ESQ.
 2                                     RACHEL JOHANNA ADCOX, ESQ.
                                       LINDSEY STRANG, ESQ. (PHONE)
 3                                     950 F Street NW, 7th Floor
                                       Washington, DC 20004
 4
        For Defendant Clemens         Kirkland & Ellis, LLP
 5      Food Group:                    CHRISTA C. COTTRELL, ESQ.
                                       CHRISTINA BRIESACHER, ESQ.
 6                                     300 North LaSalle
                                       Chicago, IL 60654
 7
        For Defendant Hormel          Faegre Baker Daniels LLP
 8      Foods:                         RICHARD A. DUNCAN, ESQ.
                                       CRAIG S. COLEMAN, ESQ.
 9                                     ISAAC B. HALL, ESQ.
                                       90 South 7th Street, Ste 2200
10                                     Minneapolis, MN 55402

11      For Defendants Indiana        Dorsey & Whitney, LLP
        Packers and Mitsubishi:        JAIME STILSON, ESQ.
12                                     50 South Sixth Street, Ste 1500
                                       Minneapolis, MN 55402
13
                                       Mayer Brown LLP
14                                     BRITT M. MILLER, ESQ.
                                       71 South Wacker Drive
15                                     Chicago, IL 60606

16                                     Mayer Brown LLP
                                       WILLIAM STALLINGS, ESQ.
17                                     1999 K Street NW
                                       Washington, DC 20006
18
        For Defendants Seaboard       Stinson Leonard Street LLP
19      Foods, LLC, and                WILLIAM L. GREENE, ESQ.
        Seaboard Corporation:          PETER J. SCHWINGLER, ESQ.
20                                     50 South Sixth Street, Ste 2600
                                       Minneapolis, MN 55402
21
        For Defendant Agri            Hogan Lovells US LLP
22      Stats, Inc.:                   JUSTIN W. BERNICK, ESQ.
                                       Columbia Square
23                                     555 Thirteenth Street, NW
                                       Washington, D.C. 20004
24
            Proceedings recorded by mechanical stenography;
25      transcript produced by computer.
```

**P R O C E E D I N G S**

**IN OPEN COURT**

\*   \*   \*

1
2
3
4           THE COURT:  Good afternoon, everyone.  Please be
5     seated.
6           We are on the record for a case management
7     conference -- it's always interesting being in somebody
8     else's courtroom -- in In Re Pork Antitrust Litigation.
9     This is being managed under Matter No. 18-cv-1776.
10          Let me start by getting appearances.  And I think
11    we did arrange for sort of a traveling mic for that purpose.
12    I will ask first for appearances from everyone who is in the
13    courtroom, and then I will take roll of the folks that I
14    understand are appearing by telephone.
15          So shall we start with plaintiffs' counsel?
16          MR. CLARK:  Your Honor, Brian Clark, Lockridge
17    Grindal Nauen, for direct purchaser plaintiffs.
18          MR. POUYA:  Good afternoon, Your Honor.  Bobby
19    Pouya of Pearson Simon & Warshaw for direct purchaser
20    plaintiffs.
21          MS. SCARLETT:  Good afternoon, Your Honor.  Shana
22    Scarlett from Hagens Berman Sobol & Shapiro for the consumer
23    plaintiffs.
24          MR. HEDLUND:  Good afternoon.  Sorry.  Good
25    afternoon, Your Honor.  Dan Hedlund, Gustafson Gluek, also

1    for the consumer indirect purchaser plaintiffs.

2             MR. RAITER:  Good afternoon, Your Honor.  Shawn

3    Raiter, Larson King, on behalf of the commercial indirect

4    plaintiffs.

5             MS. WEINER:  Good afternoon, Your Honor.  Melissa

6    Weiner, Pearson Simon & Warshaw, for the direct purchaser

7    plaintiffs.

8             MR. BRUCKNER:  Good afternoon, Your Honor.  Joe

9    Bruckner from the Lockridge Grindal Nauen law firm for the

10   direct purchaser plaintiffs.

11            MR. SIMON:  Good afternoon, Your Honor.  Bruce

12   Simon, Pearson Simon & Warshaw, on behalf of direct

13   purchasers.

14            MR. ROBISON:  Good afternoon, Your Honor.

15   Opposing counsel broke this, Your Honor.  Good afternoon,

16   Your Honor.  Brian Robison with Gibson Dunn for Smithfield.

17            MR. HEEMAN:  Good afternoon, Your Honor.  Donald

18   Heeman, Spencer Fane, for the JBS entities.

19            MR. BERNICK:  Good afternoon.  Justin Bernick from

20   Hogan Lovells for Agri Stats.

21            MS. MILLER:  Good afternoon, Your Honor.  Britt

22   Miller from Mayer Brown on behalf of Indiana Packers and

23   Mitsubishi Corporation (Americas).

24            MR. PARKER:  Good afternoon.  Rich Parker from

25   Gibson Dunn on behalf of Smithfield.

```
 1              MR. DUNCAN:  Good afternoon, Your Honor.  Richard
 2    Duncan, Faegre Baker Daniels, for the Hormel defendants.
 3              MS. STILSON:  Good afternoon, Your Honor.  Jaime
 4    Stilson from Dorsey & Whitney on behalf of Indiana Packers
 5    and Mitsubishi Corporation (Americas).
 6              MR. RASHID:  Good afternoon, Your Honor.  Sami
 7    Rashid from Quinn Emanuel for the JBS defendants.
 8              MR. NEUWIRTH:  Good afternoon, Your Honor.  Steven
 9    Neuwirth from Quinn Emanuel for the JBS defendants.
10              MS. ADCOX:  Good afternoon.  Rachel Adcox from
11    Axinn Veltop & Harkrider for the Tyson defendants.
12              MR. STALLINGS:  William Stallings for Indiana
13    Packers and MCA.
14              MR. SCHWINGLER:  Good afternoon.  Peter Schwingler
15    from Stinson Leonard Street for the Seaboard defendants.
16              MR. GREENE:  Good afternoon, Your Honor.  William
17    Greene from Stinson Leonard Street for the Seaboard
18    defendants.
19              MR. SUMMERLIN:  Gene Summerlin from Husch
20    Blackwell for Triumph Foods.
21              MS. COTTRELL:  Hi there.  Christa Cottrell with
22    Kirkland & Ellis on behalf of Clemens.
23              MS. BRIESACHER:  Hi.  Christina Briesacher from
24    Kirkland & Ellis on behalf of Clemens defendants.
25              THE COURT:  Others in the back of the courtroom
```

1     who want to enter an appearance?

2              MR. KVINGE:  John Kvinge from Larkin Hoffman for

3     Smithfield.

4              MR. COTTER:  Good afternoon, Your Honor.  John

5     Cotter from Larkin Hoffman for the Smithfield Foods

6     defendants.

7              MS. RIDER ROHRBAUGH:  Good afternoon, Your Honor.

8     Tiffany Rider Rohrbaugh from Axinn Veltrop & Harkrider for

9     Tyson defendants.

10             MR. COLEMAN:  Craig Coleman from Faegre for

11    Hormel.

12             MR. HALL:  Isaac Hall from Faegre for Hormel.

13             THE COURT:  Okay.  And I believe we have perhaps

14    just two counsel -- because, Mr. Kvinge, I think you were

15    initially identified as somebody who might be appearing by

16    telephone, but you are right there.

17             I believe we have got someone on the phone on

18    behalf of Triumph; is that right?

19             MS. SCHEIDERER:  Yes.  Megan Scheiderer, Husch

20    Blackwell, for Triumph Foods is on the line.

21             THE COURT:  And then someone for Tyson?  Is

22    Lindsey Strang on the line?  Okay.  Is anyone else --

23             MS. STRANG:  Yes, I am on the line.

24             THE COURT:  Okay.

25             MS. STRANG:  Thank you.

1          THE COURT:  Is anyone else appearing by telephone

2     and want their appearance noted?

3          MR. PEARSON:  Good afternoon, Your Honor.  Michael

4     Pearson from Pearson Simon & Warshaw on behalf of the direct

5     purchaser plaintiffs.

6          THE COURT:  Anyone else?

7          MR. CUNEO:  Jonathan Cuneo, Cuneo Gilbert &

8     Laduca, for the indirect commercial plaintiffs.

9          THE COURT:  Anyone else?

10          All right.  I think we have got the full roll call

11     here.  And the record will reflect the hardiness of all of

12     you who actually braved the elements to be here, I

13     understand not only this afternoon, but at the hearing this

14     morning as well.

15          Let's talk a little bit about the way we are going

16     to proceed this afternoon.  I've got your status report from

17     December 12th.  I've got your agenda that was filed on

18     January 24th.  The status report was -- I am sorry -- was

19     filed on December 12th, Document 233.  Your January 24th

20     joint status report was Document 257.  So those are the

21     primary documents that I am working with.  And I will try to

22     note where I am referring to something else, and I would ask

23     that you do the same.

24          Also, even though you have all introduced

25     yourselves, since I haven't memorized everybody's names and

1    certainly our court reporter hasn't had a chance to do that,

2    I will ask that when you come to the podium to address a

3    particular issue, please again introduce yourself and state

4    the party that you are representing here this afternoon.

5           Moving on, my understanding from your January 24th

6    status report is essentially that you recommend using the

7    December 12th status report as sort of the topic outline.

8           What I am wondering is, Are there any topics not

9    addressed there that you all have agreed you would like to

10   raise today?  So no ambushing, no sandbagging, but have you

11   talked amongst yourselves and identified other topics that

12   weren't mentioned in that status report that you would like

13   to bring to my attention today?  I am seeing no nodding

14   heads on that subject.

15          All right.  With respect to the motion to stay, I

16   will be doing a written order on the motion to stay just to

17   close the loop on that.

18          I tried to signal at the previous case management

19   conference where I was headed at least conceptually.  And I

20   think everybody understands, and in fact I don't think

21   anybody argued to the contrary, that there won't be either a

22   complete stay of all activity or a full court press on all

23   fronts while the motions to dismiss are pending.  So, of

24   course, the question that you all have been working on is

25   where in that broad middle range of interim activity we

1    ought to land.  And I do appreciate the work you have done

2    to try to reach agreement on a number of those things.

3            Let me just ask a checking question on that

4    subject.  Have there been any other agreements reached since

5    your December 12th status report?  I know your January 24th

6    report said nope, that's it, but hope springs eternal.  Any

7    other disagreements or disputes that have been resolved

8    since then?

9            MS. SCARLETT:  No, Your Honor.

10           MS. MILLER:  No, Your Honor.

11           MR. ROBISON:  No, Your Honor.

12           THE COURT:  So I'll go through the remaining areas

13   of dispute then as we proceed through the status -- through

14   the status report and the status conference this afternoon.

15           With respect to the areas of agreement, I have got

16   a couple of checking questions.  I certainly don't want to

17   look any gift horses in the mouth, but a couple of things

18   just to make sure that I understand what it is you have

19   agreed to.

20           First, with respect to the agreement concerning

21   holding companies, are the holding companies involved and is

22   it the intent that the holding companies will be involved in

23   any of the discovery-related discussions that have been

24   described in the rest of the status report or that, with

25   respect to the holding companies, all of that work will

1   essentially be deferred until a decision on the motions to

2   dismiss?

3           MS. MILLER:  Your Honor, I can come to the podium

4   or I can stay here.  Your choice.

5           THE COURT:  The podium?

6           COURT REPORTER:  Yes.

7           THE COURT:  Okay.  Thank you.

8           MS. MILLER:  Good afternoon, Your Honor.  Britt

9   Miller on behalf of IPC and MCA.

10          It is our understanding that at least with respect

11  to those four companies they will not be participating in

12  discovery unless and until such time as their involvement

13  has been determined by the motions to dismiss, with the

14  understanding that in the event they are kept in the case we

15  will work promptly to catch up with the others.

16          THE COURT:  All right.  Any different

17  understanding from the plaintiffs?

18          MS. SCARLETT:  Shana Scarlett from Hagens Berman

19  for the consumer indirect purchaser plaintiffs.

20          That is the understanding, but also it is our

21  understanding that none of the preservation obligations go

22  away, that those will all still stay in effect.

23          THE COURT:  That's my understanding, and I see

24  counsel for the holding companies agree.

25          All right.  Second, with respect to the areas of

1   agreement on the ESI protocol -- and let me start just by

2   putting a couple of sign posts on the record about documents

3   that I am referring to.  The underlying, kind of, original

4   draft ESI protocol that we may be referring to over the

5   course of the afternoon, as I understand it, was Exhibit C

6   to the materials that you filed on October 30th in advance

7   of the previous case management conference.  I believe

8   that's ECF 203-1, beginning at page 34.  So I have got that.

9   Then there were some additional agreed terms that were

10  reflected in your December 12th status report that are

11  specified in ECF 233-1.  And then, of course, identification

12  of and discussion of the disputes and the parties'

13  respective proposed language with respect to those disputes,

14  and those are also in the December 12th status report at

15  233-1 and 233-2.  So those are the documents I have in front

16  of me to inform that part of our discussion.

17          Is there anything that you all may be referring to

18  that I didn't just mention on that issue?

19          MS. MILLER:  No, Your Honor.

20          MS. SCARLETT:  No.

21          THE COURT:  I don't think so.  Okay.

22          So with respect to, sticking with the areas of

23  agreement for just a moment, with respect to the term on

24  relevancy redactions, which was paragraph II(K)(2) of the

25  proposed ESI protocol, I took a look at the revised language

1    you sent back and compared it with the suggested language I

2    had come up with and it appeared that the difference was

3    that you all had agreed to strike my subpart or sub-subpart

4    (3).  That was the only language difference I saw.

5              Did I miss some other change?

6              MS. MILLER:  No, Your Honor.

7              THE COURT:  No.  All right.  We have got that

8    then.

9              I have reviewed and I've noted the other

10   provisions on which you reached agreement in the ESI

11   protocol.  We will talk about the disputed areas, but then

12   one of the deliverables following this conference that I am

13   going to ask for is a revised proposed ESI protocol that

14   incorporates your agreements and also incorporates language

15   based on the guidance that I will be giving you this

16   afternoon.  It seemed like an almost certainly more accurate

17   way to generate a final product for me to sign off on and

18   enter than if I am sitting there trying to cut and paste

19   agreements and other things into the draft that you had

20   previously sent.  So just this little head's up that that's

21   one of the things I am going to be asking for when we are

22   done.

23             Also on the subject of eventual deliverables and

24   proposed orders, the plaintiffs had proposed an order, I

25   think called Order Regarding Disclosure of Information.  It

1    was an attachment to your memorandum in opposition to the

2    motions to stay.  I believe it was at tab E, ECF 205-2,

3    beginning at page 24.  We talked through that in some detail

4    at the last conference.  I think I gave pretty clear

5    direction about where I wanted you to go with the subject

6    matter of that.  What I didn't know is and what wasn't

7    discussed here was whether anyone believes there is still a

8    need for a written order on that subject matter, or are you

9    on track and able to work that through without a separate

10   written order?

11          MS. SCARLETT:  For the clarity of record, Your

12   Honor, I think plaintiffs would appreciate an order.

13          MS. MILLER:  Your Honor, for defendants,

14   reasonable minds can disagree, but it's not entirely clear I

15   believe to the parties exactly what portions, if any,

16   defendants are intended -- don't believe that any of that

17   order is appropriate, as we have already discussed at the

18   last status hearing, but, yes, we would appreciate an order

19   directing what, if any, part of that needs to be done.

20          THE COURT:  Okay.  Well, I guess what I was

21   curious about is that there were a number of areas in that

22   order where the parties were already working together, such

23   as to provide organization charts and that kind of thing.

24   So I didn't know to what extent there had been continuing

25   efforts to narrow those differences or whether things just

1    stand where they stood at the time.

2         MS. MILLER:  Your Honor, they stand where they

3    stood.  The parties have exchanged disclosures, and the

4    defendants have produced organizational charts, but there

5    has been no further discussion on those topics.

6         THE COURT:  All right.  Thank you.  I appreciate

7    that clarification.

8         Okay.  Then returning to the status report and the

9    areas of dispute addressed in the status report, the first

10   item has to do with Rule 34 requests for production.  The

11   parties -- and let's assume, based on the clarification I

12   got with respect to the holding parties, that this

13   discussion does not apply to the holding parties unless you

14   tell me differently.  The parties have, based on the

15   discussions you have had since the last conference, you

16   agreed to specific RFPs that are described in your status

17   report that would be the subject of interim discussions, but

18   you disagree on what -- kind of how far those discussions

19   ought to go.  So I do have some follow-up questions to make

20   sure I understand your respective positions.

21        So let me get counsel for plaintiff, plaintiffs

22   up.

23        MS. SCARLETT:  Shana Scarlett for the consumer and

24   direct purchaser plaintiffs.

25        THE COURT:  One of the things I wanted to

1    understand better is what your proposal contemplates

2    regarding the finality and completeness of the written

3    objections and responses.

4           Now, it's my understanding that by responses you

5    don't mean like documents on the barrelhead, because

6    everybody has agreed that that's going to be deferred.  But

7    when you are asking for a deadline by which objections and

8    responses would be made, whether or not Judge Tunheim has

9    ruled by that time on the motions to dismiss, tell me a

10   little more about what your vision for that is.  What is it

11   you want to get?

12          MS. SCARLETT:  Absolutely, Your Honor.

13          So after serving the Rule 34 requests, in the

14   normal course of discovery what we would get back would be a

15   set of objections and responses by each particular defendant

16   outlining not only the contours of what they believe are off

17   limits for discovery, but also their commitment to produce,

18   if any.  And at times there is also a description of the

19   location where they would search.  For example, a defendant

20   may say that a particular request -- they have documents

21   responsive to that that can be found in a centralized

22   location.  Customer contracts, for example.  And they will

23   make the objection perhaps the time period they will

24   withhold privileged documents, and then they will say we

25   will produce documents from the centralized location of

1   these customer contracts.  That's the type of objection and

2   response that we can then meet and confer on and reach at

3   least the contours of the agreement, understanding they are

4   not going to produce them, but this is also the type of

5   investigation they would need to undertake in any event for

6   preservation.  When we ask for the customer contracts, they

7   need to talk to their clients and find out where those

8   customer contracts are.  And if the answer is we will

9   produce customer contracts, they are not in a centralized

10  location, they are going to be found in custodial files, and

11  we are not objecting to production, we understand they are

12  critical to the case and we will produce them, such as

13  custodial and search term agreements, and then that's the

14  response as well and we can have that discussion.  It is

15  clear in the objections and responses, and we are able to at

16  least move forward in discovery.

17          We understand that the set of responses are not

18  final and forever.  We understand that during the course of

19  discovery when the doors open up on discovery a defendant

20  may find out, well, it turns out that there was no

21  centralized file, it turns out whoever spoke spoke

22  incorrectly or there is only a small number.  So, of course,

23  we are used to getting supplements under the Rules of Civil

24  Procedure.  Of course, we are used to having further

25  discussions where what was thought to be true at the outset

1      of the case turns out not to be exactly right.

2              THE COURT:  Does that also then contemplate the

3      idea that if the objections are made on one premise and then

4      as a result of Judge Tunheim's order on the motions to

5      dismiss the premise is changed, that the objections and

6      agreements regarding scope could also change or at least

7      that the defendants' position on that could change as well?

8              MS. SCARLETT:  So I don't -- I think that's true.

9      There are global issues that I think could change.  So, for

10     example, there could be a class period that's narrowed on a

11     motion to dismiss.  Sometimes we see that.  So there could

12     be a placeholder of we agree to produce for the alleged

13     class period, but if the motion to dismiss order comes out

14     and your class period ends up being shorter, then the

15     agreement is we will produce for that period and, you know,

16     whatever, two years prior, whatever it ends out working out

17     to be.

18              In terms of the different, other types of scopes

19     of what a motion to dismiss order could look like, I am

20     hard-pressed to see how it really changes the core relevancy

21     of some of the documents, like customer contracts or things

22     like that.  I think that it could change the identity of the

23     defendants.  For example, if some of the parent shareholder

24     defendants are victorious on their motion to dismiss, that

25     might change things.  Class period.  But other than that, I

1   don't know exactly how it is the defendants think that the

2   shape of the motion to dismiss order would truly change the

3   core discovery that we are asking for in the agreed-upon

4   requests.

5          THE COURT:  Okay.  But at least at this point you

6   contemplate that there could be caveats, that even if they

7   went forward with these responses and objections, there

8   could be caveats, say, well, you know, if this -- we're

9   making this objection on this assumption, but if this

10  assumption changes, then we reserve the right to revisit

11  this.

12         MS. SCARLETT:  And that's certainly how it worked

13  in the broilers litigation.  For example, there was one

14  defendant that had a type of chicken that it was absolutely

15  certain was going to be dismissed from the case, and they

16  brought a separate motion on this grounds.  And so -- you

17  know, I was one of the counsel involved in those meet and

18  confers.  And so everything was carved out with the

19  understanding that if they were victorious on their

20  individual motion to -- the motion to dismiss on the type of

21  chicken, then they would not be responsible for producing

22  documents that related to that chicken.  They ended up

23  losing the motion to dismiss, so they did produce, but that

24  was absolutely an understanding that was placed during the

25  discovery conferences.

1           THE COURT:  Thank you.

2           MS. SCARLETT:  You are welcome.

3           THE COURT:  Who would like to address this for

4    defendant?

5           MR. ROBISON:  Thank you, Your Honor.  Brian

6    Robison with Gibson Dunn.  I am here on behalf of

7    Smithfield, but I am speaking for all the defendants, other

8    than the parent companies, on this particular issue.

9           Your Honor, the parties have made a lot of

10   progress since we were last before you in November.  In

11   November the parties had what you called sort of an

12   all-or-nothing approach on these Rule 34 requests.  The

13   parties on both sides read you loud and clear.  You were not

14   overly thrilled with the all-or-nothing approach and asked

15   us both to go back and look at the 46 document requests that

16   the plaintiffs had served on the defendants to see if there

17   were any that the parties agreed could fairly be discussed

18   at some level while the motions to dismiss were pending.  We

19   have reached agreement that 32 out of the 46 document

20   requests are things that we can discuss at some level while

21   the motions to dismiss are pending.

22          Now, the area of dispute is, as you framed it

23   exactly, what are we going to be talking about?  What level

24   of detail do we get into?  The defendants think for two

25   reasons giving written objections now makes no sense.

1    Number one, it is premature.  Number two, it is going to

2    lead to duplication of effort.  It is premature for us to be

3    serving formal written objections and responses now when we

4    don't know the scope of the case.  We don't know if exports

5    are going to remain in the case.  We don't know how many

6    years of damages will be available.  We don't know what

7    piece of the conspiracy, if any, Judge Tunheim is going to

8    find to be plausible.  So before we know the scope of the

9    case, what we will do, as Your Honor sort of previewed, is

10   serve incredibly lengthy responses to each of these 32

11   document requests where we put in all sorts of caveats.  One

12   particular defendant might agree to produce some category of

13   documents, if the motion to dismiss ruling says X.  They

14   might put in an objection if the ruling said Y.  But no one

15   knows right now.  We are all in a vacuum.  We are kind of in

16   the dark.

17           So instead of putting our clients to the

18   incredible expense of having to serve these contingent,

19   caveat-filled responses, what we propose is something

20   different.  What we propose is that we talk to the

21   plaintiffs.  We're not refusing to talk.  That's exactly why

22   we agreed to talk about the 32 document requests.  Talk to

23   them about the global issues that opposing counsel

24   mentioned.  There would be global issues.  There may be

25   requests, for example, where the plaintiffs have asked for

1    all documents in some category where we think for various

2    reasons we may be able to convince them that documents

3    sufficient to show a particular point would be sufficient

4    for their needs.  Those are the sorts of things.  We may be

5    able to talk about particular relevance issues.  There may

6    be proportionality issues.  But a lot of these are hard to

7    crystallize until we know what, if anything, remains in the

8    case after those rulings.

9        And the second point we would make does feed off

10   this Chicago -- there are actually two broiler cases.  They

11   talk about the one in Chicago.  There is another one in

12   Oklahoma where there was zero discovery, and the court there

13   granted a motion to stay all discovery.  And the briefing in

14   that Oklahoma case relates some of the horror story that had

15   come out of Chicago, the hundreds of pages of briefing on

16   discovery disputes, six-hour status conferences, a lot of

17   things throughout that docket sheet that show all of the

18   extra work that was generated about what happened in

19   Chicago.  But in Chicago what the defendants had to do was

20   then redo all of these objections.  After the ruling came

21   out -- there wasn't just one defendant -- multiple

22   defendants had to redo their objections to tailor them to

23   what the court ruled.

24       And so one thing we are trying to do here is be

25   reasonable, meet the court's desire to do something while

1     the motions are pending to get the case moving, but not

2     duplicate work, not force our clients to do this twice.

3              THE COURT:  Anything further?

4              MS. SCARLETT:  Just addressing that last point,

5     first of all.

6              In the broilers litigation there was no redo when

7     the motion to dismiss order came out.  What happened was

8     after a series of meet and confers between the plaintiffs

9     and the defendants, where after a little bit of motion

10    practice and a lot of discussion we finally reached

11    agreement on what the offers of production would be, the

12    defendants amended their responses to have them reflect

13    those offers of production or they provided them in a

14    separate document, but that was just to crystallize for the

15    parties what had been agreed upon.  There was very little

16    redo after the motion to dismiss order that I can recall at

17    all.

18             And just to address one specific other point

19    raised by opposing counsel, which is it's difficult for us

20    as plaintiffs to see how much progress we can make in a

21    group-wide meet and confer situation with the defendants,

22    unless there are particular issues like, for example, how

23    much pre-class period discovery they think we are entitled

24    to, how long data production should go for.  It is very

25    difficult to have the type of relevance and burden arguments

1  that we have in discovery conferences on a group-wide basis

2  with all eight defendants, all of whom have different

3  clients, different burdens, different methods of storing

4  documents, and all of whom are going to have to undergo

5  their own investigation for preservation issues separately.

6  So the proposal from the defendants that we have group-wide

7  meet and confers on these discovery requests, from the

8  plaintiffs' perspective, is little different than the

9  discovery stay they were asking for months ago.

10         THE COURT:  Okay.  I am going to let that issue

11  percolate.  I will give you an answer before the end of the

12  afternoon, but I am going to let that sort of bubble around

13  in the back of my head for a bit and maybe even take a break

14  at some point before we wrap up, but why don't we move on to

15  the issue of the ESI protocol.

16         The first area of dispute has to do with the time

17  period that would be for processing data or the scope of

18  data that would -- the temporal scope of data that would be

19  processed.  Now, that is paragraph Roman numeral V(A)(1).

20         And just so I understand the plaintiffs' proposal

21  here, my understanding is that the implication in this

22  context of the time period is that -- well, actually, rather

23  than tell you what I am assuming it is, let me ask the

24  question.  So who is going to be, okay, dealing with this

25  particular issue?

1          MR. POUYA:  Bobby Pouya for the direct purchaser

2     plaintiffs.

3          THE COURT:  What I want to understand is, is the

4     point of the proposal that the data would actually be

5     processed now; or are you trying to reach agreement about

6     once the switch gets flipped on discovery, if the motions to

7     dismiss are denied, the parties would already have reached

8     agreement about the temporal scope of what gets processed?

9          MR. POUYA:  The primary concern at this point is

10    preservation and ensuring that we have guideposts for what

11    needs to happen once the floodgates open.  And from our

12    perspective, it is important that we have a date that we are

13    talking about in terms of the nonstructural data, that we're

14    on the same page, so we're talking about -- the other things

15    that we're going to talk about potentially, which is what

16    data sources are being preserved, what custodians are

17    potentially at issue in the case.  All of those related-type

18    issues will not crystalize until we know what time period we

19    are talking about.

20          So all that we are asking here is that for the

21    purpose of the ESI protocol that there be a definite time

22    period, and we propose January 1st of 2007.  I believe it's

23    appropriate.  Defendants have not proposed any starting

24    period, and that's the problem, is we don't know where they

25    are going back to or what they are considering to be

1    potentially relevant.  So for the purpose of having

2    something in the ESI protocol, just like all the other

3    provisions that have been put in there, we believe the time

4    period should be January 1st, 2007.

5              THE COURT:  Yeah, I guess I see the question of

6    what gets preserved to be a bit different, though, from the

7    question of what gets processed.  And my understanding of

8    your proposed Roman numeral V(A)(1) was that it was a

9    commitment to processing data within a particular time

10   frame.  Maybe I am misunderstanding, but it did strike me

11   that that was somewhat different from reaching an

12   understanding with the defendants about the scope of data

13   that they would be preserving in the event it needs to be

14   collected, processed, et cetera.

15             MR. POUYA:  Sure.  And I think there's certainly

16   overlap between both of them in terms of the data that would

17   need to be not only preserved, but processed and collected.

18   I think there needs to be an understanding of what those

19   guideposts are as we're going through the meet and confer

20   process and while we're putting pen to paper on the ESI

21   protocol.

22             THE COURT:  Okay.  Are there -- I didn't believe

23   there are, but are there still outstanding disputes about

24   preservation?  My recollection from the November case

25   management conference was that there was just one issue

1       still in dispute that you were working on and that I think

2       the December -- I think the December 12th letter indicated

3       that you had resolved.  So are there still disputes about

4       preservation?  I am seeing shaking heads from the

5       defendants' table.

6               MR. POUYA:  Well, I don't know if you would call

7       them a dispute, but we believe that there's a discussion

8       that needs to be had.

9               As Your Honor indicated during the previous

10      hearing, the defendants will always say they're preserving

11      documents and they're aware of their obligations, but it's

12      important from plaintiffs' perspect to have a discussion

13      regarding the data sources that they are preserving, the

14      potential custodians that they are preserving, so we can

15      become -- we can have discreet understandings and get on the

16      same page of what those obligations are, whether it relates

17      to custodians, whether it relates to cell phones and devices

18      and whether it relates to data sources.  So not just

19      focusing on the time period issue, but I think the issues

20      that are being presented to you today are along those lines,

21      where we want to have those discussions and understand what

22      they are actually preserving and how they are preserving it.

23              THE COURT:  All right.  Let me hear from the

24      defendants.

25              MR. ROBISON:  Your Honor, Brian Robison again for

1    the defense group.

2            First up, in November the only question was about

3    whether devices of certain senior executives of each of the

4    defendants had been imaged or otherwise preserved, locked in

5    a drawer, et cetera.  And you are exactly right; at the

6    November conference counsel for both sides said there were

7    no other questions about that.  So the imaged devices of

8    these senior executives is an issue that's been taken off

9    the list.  Everything has been resolved.  That's done.

10           Now, getting down to this piece of the ESI

11   protocol, the defendants' position is that the court should

12   not prejudge what the relevant period of discovery is going

13   to be.  That is a hotly disputed issue.  All morning there

14   was discussion on these motions to dismiss.  The statute of

15   limitations period, the proper damages period, if any, was

16   hotly disputed.  It is going to continue to be disputed.

17   The defendants are not asking this court to pick a start

18   date.  We're not asking the court to pick our side in the

19   start date debate.  The plaintiffs are.  The plaintiffs are

20   asking this court to choose January 1, 2007, as the start

21   date of discovery, even though that's a disputed issue right

22   now.

23           If the concern is preservation, that is not a

24   concern, because I can represent to you that the defendants'

25   hold notices, the litigation hold notices, either are not

1    date restricted or they go back to January 1, 2007.  So this

2    court does not need to put its power behind an order that

3    endorses the plaintiffs' view or the start date of discovery

4    because of some preservation issue.  The defendants are not

5    taking the view that something from 2007 or 2008, if it's

6    otherwise relevant, otherwise being preserved, doesn't need

7    to be preserved anymore.

8            So, again, this is a disputed issue in the case.

9    It is going to be disputed for sometime.  And another reason

10   we think it's inappropriate to pick a January 1, '07, start

11   date is that, depending on how these motions to dismiss are

12   decided, there may not be a one-size-fits-all answer for a

13   discovery start date.  There may be some document requests

14   that later on, depending how Judge Tunheim rules, the court

15   decides should start with January 1, 2007.  There may be

16   other document requests based upon, again, proportionality,

17   the motion to dismiss rulings and other factors, burdens, et

18   cetera, the court decides there should be a different

19   discovery period.

20           So, again, at this time when we are still in the

21   dark, we don't know how the motions to dismiss will be

22   decided, when there's not a preservation risk because of the

23   way the defendants have agreed to preserve documents,

24   there's no need for the court to take sides on this start

25   date issue.  And it's something that should be decided, we

1     think, later on through meet and confers on a

2     request-by-request basis; and if the parties can't agree

3     later on, then obviously we bring it to the court and the

4     court calls the balls and strikes as it sees fit.

5                THE COURT:  Thank you.

6                On this one, as long as there's not a dispute, and

7     there doesn't appear to be a dispute about the idea that

8     data should be preserved going back at least to January 1,

9     2007 and forward, then I'll kind of go with defendants'

10    proposal on the issue of the time period.  I do think it

11    makes sense to defer that issue of what that beginning

12    bookend for processing data ought to be until after the

13    motions to dismiss are decided.  And I do also agree that it

14    could vary from defendant to defendant and potentially could

15    vary with data sources or custodians.  Hopefully, it won't

16    have to get quite that far into the nitty-gritty, but I

17    can't -- right now I don't think we do know enough to say

18    that all data beginning with January 1, 2007, through

19    June 18, 2018, must be processed.  So I am going to go with

20    defendants' proposal on this particular one.

21               Just to be clear, and then I think that

22    defendants' argument essentially underscored this, I am not

23    saying that I wouldn't ultimately agree with plaintiffs'

24    position on look-back, but I do think that Judge Tunheim's

25    decision on the motions to dismiss are going to be a valid

1    data point in this discussion and I think we need to wait

2    for that with respect to this particular issue.

3              Moving on to another area of dispute and that is

4    document custodian and noncustodial data sources, which is

5    paragraph Roman numeral V(A)(2)(a).  On this one, let me

6    tell you where I am going with it right now, and I will give

7    the parties a chance to let me know if they think I have

8    just totally misunderstood something as opposed to simply

9    disagreeing with me.

10             I am inclined to agree with the plaintiffs on this

11   particular issue.  I don't see why the parties can't and

12   shouldn't begin discussing in earnest custodians and

13   noncustodial data sources, even for the entire 11-year

14   period that the plaintiffs believe ought to be fair game and

15   in scope.  And I do believe that this will be an important

16   step to materially advancing your readiness to move forward

17   with discovery if and when one of these cases or more of

18   these cases moves past the motions to dismiss.

19             I totally get that there may be some effort and

20   probably some significant effort on defendants' part that in

21   the end could prove to have been unnecessary, but I am not

22   persuaded when it comes to this particular topic that that

23   risk outweighs the benefit of getting an early start on that

24   conversation.

25             I believe that a good point of what you need to

1    know you've had to figure out anyway to get your

2    preservation ducks in a row, and it wouldn't surprise me if

3    a good part of what you need to know might not have changed

4    materially over that period.  But to the -- let me provide a

5    qualifier here -- to the extent it has changed and if

6    defendants or particular defendants run into a specific

7    situation where it would in fact, to quote from your -- part

8    of the position letter, be extremely costly to canvas a

9    historic ESI system to identify custodians and sources from

10   11 years ago, then bring that concern to plaintiffs'

11   attention and it may be that you can reach agreement to

12   table that extremely costly part of the effort, but while

13   moving forward with discussions on the rest.

14          So qualified by that sort of -- I'm not sure what

15   to call it, but little caveat, I am going to accept

16   plaintiffs' proposal on this particular topic.  That's where

17   I am 95 percent sure I want to go with it.

18          Am I misunderstanding something that somebody

19   wants to make sure and get on the record beyond what you had

20   in your letters?

21          MR. ROBISON:  Your Honor, again, Brian Robison for

22   the defendants' group.

23          Just a point of clarification, I guess.  We are

24   obviously prepared to talk about custodians to some level

25   because we've served organizational charts and we've served

1    initial disclosures, and those list people with knowledge of

2    relevant facts, those list categories of documents that may

3    be relevant to the case.

4         I guess one point of clarification would be, and

5    this is something we put in our written paper, that there is

6    a -- that there is a difference between saying, for example,

7    there's a backup tape that's sitting on a shelf in the IT

8    department and it's being preserved versus having to spend

9    six figures with vendors and lawyers to attempt to load that

10   backup tape into a system, get it hosted, get it indexed and

11   try to figure out what exactly is still on that backup tape

12   and what's readily accessible for discovery.

13        And so, in our view, taking that first step and

14   identifying backup tapes that might be readily accessible,

15   depending on technology, what a vendor may be able to do

16   eventually, depending on Judge Tunheim's rulings, makes

17   sense.  I am asking for clarification on how far into backup

18   tapes and 11-year-old ESI structures the court exactly wants

19   us to go, because that is something that we discussed

20   briefly in November and I don't know that we've delved into

21   exactly what those burdens would be.

22        THE COURT:  Well, I understand that and I realize

23   we will -- we will have to cross that bridge at some point,

24   but the specific language proposed in, you know, in your

25   Exhibit B, ESI protocol disputed positions, which is

1  Document 233-2, page 1, the plaintiffs' proposal was the

2  parties -- and this is for inclusion in the ESI protocol --

3  the parties and the court will discuss the timing for

4  commencing with document custodian and source discussions

5  and address that issue in a separate search methodology

6  order or in an amended ESI protocol.  And the defendants'

7  counter was, The parties will not commence with the

8  identification of custodians or sources.  And all I am

9  saying is you will commence.

10      MR. ROBISON:  Okay.

11      THE COURT:  You will have that discussion.  If, as

12  you have that discussion, you get into some levels of detail

13  and you have a disagreement about whether it is feasible now

14  to get that -- to go down a particular road, try to work it

15  out.  If you can't, then we will have that conversation, but

16  I want you to start that conversation.  I want you to start

17  it, taking into account the 11-year period that the

18  plaintiffs believe is relevant, so I don't want you to cut

19  that off, and see how far you get with it.

20      MR. ROBISON:  Okay.  Thank you, Your Honor.

21      THE COURT:  Moving on to areas of dispute still in

22  the ESI protocol, document custodian cell phone data.  This

23  is paragraph Roman numeral V(E)(1)(a).

24      On this one I have got a question.  Actually, I

25  have got -- I have got -- my first question actually is for

1    defense counsel, and then I may have a follow-up question

2    for whichever plaintiffs' counsel is going to address it.

3              So who is on the hot seat for this particular one?

4              MS. MILLER:  I drew the short stick on that one,

5    Your Honor.  Britt Miller on behalf of defendants.

6              THE COURT:  All right.  I thought maybe you just

7    won the arm wrestling contest.

8              MS. MILLER:  I wouldn't even presuppose to try to

9    do that.

10             THE COURT:  So I guess what I want to understand

11   in this is a similar question to the one I had with respect

12   to the issue of the time frame for data, and that is the

13   information that plaintiffs have described in their proposed

14   subpart (a).  What I want to know from defendants is, Is all

15   of that information going to be preserved?  Now, I know that

16   they've asked that it not only be preserved before culling,

17   but that it be disclosed before culling.  But what I want to

18   know is, Is all of that information going to be preserved by

19   defendants so that if down the line there arose issues that

20   called for that information you would have it?

21             MS. MILLER:  It's my understanding, Your Honor, as

22   Mr. Robison said a moment ago, all of the defendants have

23   instituted legal holds that either are not limited in time

24   or go back at least to January 1st, 2007, and they are broad

25   enough to encompass data that would be encompassed on a cell

1   phone.  So we certainly believe that information is being

2   preserved.  Obviously, there are some questions, if there is

3   a former employee who no longer works with us or works for

4   any of the defendants, whether or not we have the ability to

5   say that that information is necessarily preserved.  Those

6   are independent questions.  If plaintiffs are particularly

7   concerned about cell phones and are concerned, as they said

8   in their papers, that independent employees might in fact

9   destroy something, if defendants need to issue a reminder

10   specifically calling out cell phones so that those that are

11   on legal hold will be reminded yet again to preserve that

12   data, we can certainly talk about something like that.  But

13   going to each potential document custodian's cell phone and

14   identifying the name of the phone carrier, the type of the

15   phone, the list of installed communications, the different

16   ephemeral messaging applications, that's an incredible

17   undertaking that goes to whether or not these types of

18   information would even be produced; but if the cell phone

19   data as a whole is covered by the legal hold, which we all

20   believe it is, then that information should be being

21   preserved during this period.

22            THE COURT:  One of the -- well, in the language

23   proposed by plaintiffs it was -- I mean, it seems to me that

24   one of the key clauses is prior to any culling of the cell

25   phone data.  Now, obviously, they want disclosure, but what

1    I want to make sure is this is not just about whether it's

2    being preserved now while you wait to see what's going to be

3    in scope and what you are going to be ultimately able to

4    produce.  This is also about whether at any point in

5    discovery, as discovery evolves, as issues arise, as

6    disputes arise, whether you would be able -- you know,

7    whether the necessary steps will be taken and whether the

8    ESI protocol ought to require that you would be -- that you

9    could, if necessary, generate a list of cell phone numbers

10   used by the document custodian for work purposes, the name

11   of the phone carrier that provided service, the type of

12   phone, the list of installed communications applications,

13   and whether or not the producing party claims that a cell

14   phone used for work purposes isn't within its possession,

15   custody and control.

16        So I guess I am probably -- but I want to hear

17   from the defendants -- probably persuaded that you don't

18   need to disclose that up front, but I do want to make sure

19   that, at least, that it's clear in the ESI protocol that

20   throughout the litigation the information requested in that

21   list of (a) through (e) will be preserved and would be

22   available to be produced if it became appropriate and

23   discoverable.

24        MS. MILLER:  Certainly, Your Honor.  And to be

25   sure, as we discussed at the November hearing, for the

1    identified executives that plaintiffs have already culled

2    out for each of the defendants, the parties have reached

3    agreement on the specific steps of preservation to make sure

4    that all of the information that is contained on those cell

5    phones or otherwise has been preserved, so at some point,

6    presumably, we could catalog if we went into the phone and

7    determine all of this information.  Presumably, as the

8    parties begin to discuss document custodians, we could then

9    address whether or not those could -- we similarly have that

10   information that could be catalogued.  There is no intention

11   on the part of defendants to say, okay, once, you know,

12   we've decided on these six custodians, everybody else's

13   stuff could be dumped.  I don't think that anyone is going

14   to take that position.  If there is preservation limits that

15   need to be discussed, they can be discussed as appropriate,

16   but the focus was going to be on document custodians and

17   making sure we can produce this information; and if there

18   are other potential custodians in question, we can discuss

19   how much information needs to be preserved; and if this is

20   one of the things that needs to be preserved, we can discuss

21   that as it goes forward.

22            THE COURT:  Okay.  All right.  Thank you.

23            Let me hear from plaintiffs on this.

24            MR. POUYA:  Bobby Pouya for direct purchaser

25   plaintiffs.

1          Your Honor, the point here is that on provision

2     (a) it obviously doesn't apply until there is culling of the

3     documents.  So we're talking about this -- this is something

4     that will be triggered once the production occurred.  It's

5     not something that needs to be disclosed now.

6          THE COURT:  Right.

7          MR. POUYA:  We believe that at that point having

8     it in the protocol and then having the disclosure is

9     important for two reasons:  One, having it in the protocol

10    ensures that defendants are aware of these obligations and

11    they will comply with them; and having it disclosed once the

12    production is made, it develops our understanding of what

13    was done and what was looked at it and what is being

14    produced.  It allows -- it provides transparency for us to

15    understand whether we received a complete production and to

16    understand what was produced.  So that's why the provision

17    is in here.  We don't need to do it later.  They are saying

18    these categories would fall within their preservation

19    obligations to the extent that they can do it.  So there's

20    no reason not to have it in the protocol now.

21         THE COURT:  All right.  Give me just a moment.  I

22    may have a follow-up question on that.  I want to check

23    something.  All right.  No.  I think I understand.  Thank

24    you.

25         MR. POUYA:  Thank you, Your Honor.

1          THE COURT:  Anything further?

2          MR. ROBISON:  Just briefly, Your Honor.  Brian

3   Robison again.

4          If what we are talking about is a disclosure of

5   information about cell phones to the plaintiffs, I think

6   that's a quite different question than whether that is being

7   preserved and whether the document holds are preserving it.

8   I don't understand the request for disclosure of this

9   information.  To me that just sounds like free discovery.

10   If they want to spend deposition time or if they want to

11   spend interrogatories asking about name, rank and serial

12   number of particular custodian cell phones, that's fine, but

13   I don't see anything in Rule 26(a) or any other rule of

14   procedure that requires us to take on the burden and expense

15   of getting all this detailed information about custodians'

16   cell phones and disclose it to the plaintiffs.

17          So our position is, as Ms. Miller talked about, we

18   agree that this is a potential source of discoverable

19   information for particular custodians and we have taken

20   reasonable steps to make sure it is preserved, but we do

21   object to the plaintiffs' request that we just disclose this

22   information to them outside the normal course of discovery.

23          THE COURT:  All right.  On this one I agree with

24   defendants' position in that I think that -- with one

25   exception that I will get to in a moment -- the disclosure

1    sought to be required by plaintiffs' proposal do go beyond

2    what is required.  The exception is subpart (5).  I do think

3    that it's important for purposes of transparency to be clear

4    with respect to any identified document custodian whether

5    the producing party is taking the position that a particular

6    cell phone that that custodian used for work purposes isn't

7    within its possession, custody and control.  So I think that

8    does need to be disclosed.

9            With respect to the others, I think it would be

10   appropriate and I think it would get to the concerns

11   expressed by plaintiffs' counsel if the ESI protocol clearly

12   states that this other information will be preserved and

13   that that is information that will be considered by the

14   defendants as part of their due diligence to assure that

15   those sources are evaluated and considered as a potential

16   source of data.  So to the extent that what you are looking

17   for is something explicit in the ESI protocol, it says, oh,

18   by the way, make sure you are checking these things, the

19   defendants are saying we will, we get it, but I don't think

20   -- I think it makes sense to include those explicitly as

21   information that ought to be preserved and considered.  But

22   I think it goes a step too far to say that it needs to be

23   disclosed out of the blocks, until and unless there is

24   reason to believe that something hasn't been done by

25   defendants that ought to be done and you are looking at

1    trying to understand whether there needs to be some

2    additional or alternative means of discovery or, heaven

3    forbid, sanctions.

4         Any questions about that particular piece, that

5    subparagraph (a)?  Okay.

6         Now, I wasn't clear on whether the parties had a

7    dispute about the remaining paragraphs (b) and (c).  Your

8    discussion just identified (a) as the dispute, but your

9    language for (b) and (c) is different as well, although I

10   wasn't sure if it was different in concept, you know,

11   whether the little thought bubbles over your respective

12   heads were different or whether it was just a difference in

13   the number of words you used to describe those concepts.

14        So can somebody tell me whether you've got a

15   dispute on (b) and (c) or not?

16        MS. MILLER:  Your Honor, Britt Miller on behalf of

17   IPC and on defendants.

18        From the defendants' perspective, again, this all

19   goes into the category of what has to be disclosed as

20   opposed to what needs to be preserved.  Certainly, the

21   defendants would consider, in looking at -- in determining

22   whether or not there is actually responsive or potentially

23   discoverable information, whether or not individual

24   applications were used for business purposes, whether they

25   contain unique and responsive nonprivileged communications,

1    the point being we are not going to withhold them as

2    privileged and/or illegal to produce under the privacy laws.

3    So ours go to, again, the question of what we will consider

4    and what will be withheld when it is ultimately decided that

5    we are going forward with discovery.  As I understand it,

6    it's the -- the plaintiffs' position is that we have to

7    affirmatively undertake all of this to identify each of

8    these -- each of these pieces of information and disclose

9    that information as part of the discovery process.  So we

10   read this provision as covering all of these things.  It's a

11   question of disclosure versus preservation.  And that to the

12   extent that there are -- any of these communications are

13   ultimately going to be produced, the parties will meet and

14   confer to the extent there are any issues in terms of

15   production or format.

16            THE COURT:  As I read plaintiffs' proposal, and I

17   will obviously give plaintiffs' counsel an opportunity to

18   tell me if I am misreading it, but looking, for example, at

19   their proposed paragraph (b) it says -- which is on page 2

20   of Document 233-2 -- it leads off with, A producing party

21   will review the following sources of information on a cell

22   phone to the extent reasonably available to identify unique,

23   responsive and discoverable information.  And then it

24   specifies the kind of information that the producing party

25   will review to identify unique, responsive and discoverable

1    information.  So that struck me as relatively

2    noncontroversial.  But what am I missing?

3             MS. MILLER:  I think the point, Your Honor, we

4    didn't take issue with the fact that as part of, ultimately,

5    as part of discovery, certainly, we will look at those

6    applications that were used for business purposes and that

7    do contain -- we use the same language on both sides --

8    contain unique, responsive and nonprivileged communications.

9    So I don't think that's the issue.  It's the -- from our

10   standpoint, we understand our obligations with respect to

11   the things that are on cell phones.  Not every cell phone

12   has call and voicemail logs and text messages, so we may not

13   be able to review some of this stuff or it may be in a

14   format that we can't access.

15            THE COURT:  Right.

16            MS. MILLER:  It's a question of we understand that

17   we have an obligation to look for documents where we

18   reasonably expect to find them, whatever that may look like

19   and whatever media they are stored on, but the level of

20   specificity puts an obligation on defendants which we don't

21   believe is called for, specifically with respect to cell

22   phones, or as set forth in the federal rules.  We will

23   undertake our obligations to identify that information that

24   is potentially relevant and those sources that are

25   reasonably accessible, but beyond that what plaintiffs are

1    asking for from defendants' perspective is overkill.

2           THE COURT:  All right.  Let me hear from

3    plaintiffs.

4           MR. POUYA:  So, Your Honor, our subsection (b)

5    under this provision is intended to provide clarity on

6    things that need to be reviewed in the context of reviewing

7    and producing cell phone information.  What I didn't hear

8    defense counsel just say was that any of the categories here

9    are controversial or something that should not be reviewed

10   and produced to the extent that it exists, and that's

11   exactly what the provision calls for and what we are asking

12   for here.  Cell phone call and voicemail logs should be

13   reviewed.  Text messages should be reviewed, and contacts

14   should be reviewed.  We believe that having it in the

15   protocol specifically is helpful to ensure that it happens

16   and the parties are on the same page.

17          THE COURT:  Just as a formatting question, on my

18   copy -- and I am assuming it is on everybody else's since it

19   was the version that was filed -- contacts is identified as

20   (c).  Should it instead have been romanette (i) -- or

21   romanette (iii)?

22          MR. POUYA:  I believe so, Your Honor.

23          THE COURT:  Okay.

24          MR. POUYA:  That's the way I read it.

25          THE COURT:  So the contacts is the third subpart

1   of your proposed paragraph (b)?

2           MR. POUYA:  Correct.

3           THE COURT:  Okay.  All right.

4           MS. MILLER:  And, Your Honor, if I may briefly?

5           THE COURT:  Yes.

6           Do you have anything further on that, Mr. Pouya?

7           MR. POUYA:  No, Your Honor.

8           THE COURT:  Okay.

9           MS. MILLER:  Your Honor, again, I think this is a

10  question of language, but we have -- defendants, as I said

11  before, understand that they have an obligation to look

12  where they reasonably believe information is going to be

13  found.  If they ultimately determine that after talking to

14  appropriate document custodians and determining, for

15  example, that they don't use text messages for work

16  purposes, it's the -- what this would require us to do is to

17  actually review all text messages and/or all iMessages on

18  the cell phone that is available -- that is used for work

19  purposes regardless of whether or not the custodian says,

20  for example, we actually -- I used text messages to

21  communicate.  Again, it's not a question of preservation.

22  If they want to ask during a deposition or the like did you

23  ever use text messages and the custodian says no, well, then

24  we would have undertaken a review that was unnecessary.  Our

25  point is we understand our obligations and we will undertake

1    that as part of a comprehensive discovery plan that requires

2    us to talk to custodians and interview them as to what sorts

3    of media and where their documents and other information are

4    stored, and we will undertake to look at those categories of

5    information, but to have it itemized when in fact it may --

6    the document custodians may say I never used text messages

7    at all, this would still require me to go look at them.

8         THE COURT:  With -- and I probably need to go back

9    to the original proposed ESI protocol, but maybe you can

10   answer me.  Is there anything in your proposed language with

11   respect to cell phone data that limits the application of

12   your proposed language to cell phones -- okay.  I see in

13   your, for example, in your sub (b) romanette (i) logs of

14   calls made and voicemails left on a cell phone that the

15   document custodian used for work purposes.  The same with

16   (ii), text messages and iMessages on the cell phone device

17   used for work purposes.  And then -- but contacts doesn't

18   appear to be limited in that way.  Or am I missing

19   something?

20        MR. POUYA:  I do not see it in here today, but to

21   the extent that that needs to be added, we can certainly add

22   it.

23        But part of what we are concerned about here, Your

24   Honor, is exactly what defense counsel said.  You know, it

25   doesn't -- wouldn't surprise you that in a conspiracy case

1    that a custodian's recollection of whether he used text

2    messages or not is not enough to ensure that those text

3    messages did not exist.  We actually want to make sure that

4    the cell phones are searched properly and that we don't get

5    into a situation where something comes out in deposition or

6    a text message that was produced by another defendant and

7    then we have to go back and do further discovery and get

8    into disputes.  So that's why this clarity is important.

9         THE COURT:  As I read your paragraph on contacts,

10   I am less convinced now that it was meant to be the third

11   subpart of (b).  It looks like it's a stand-alone -- it

12   looks like it's actually a stand-alone separate -- a

13   proposed stand-alone separate requirement to export all

14   relevant contacts on a cell phone for any document custodian

15   to MS Excel with all reasonably available data fields -- am

16   I correct -- and not just a review of contacts for unique,

17   responsive and discoverable information.

18        MR. POUYA:  I don't know standing here today.  I

19   believe it was the part -- subpart (iii) relating to cell

20   phone data, but I may be incorrect on that.

21        THE COURT:  Okay.  All right.  I think I'm going

22   to -- on this particular one, I think I'm going to send you

23   back to meet and confer a bit more on (b) and, you know, (b)

24   (i), (ii), (iii) or (b) (i), (ii) and (c).  I think you need

25   to double-check and see what it was meant to be.  I told you

1    where I come down on (a).

2            With respect to (b), I am inclined to agree that

3    those are pretty noncontroversial and probably also inclined

4    to agree that if a document custodian used a cell phone for

5    work purposes it may not be sufficient to just ask them

6    whether those work purposes, especially if we are talking

7    over a period of several years, ever included text messages

8    on any of the issues that may be involved in this

9    litigation.

10           So those to me seem fairly noncontroversial, and I

11   would encourage the defendants to go back and talk again

12   about that, figure out what you meant by what's either

13   romanette (iii) or subpart (c), and with a clarified

14   understanding see if you can reach agreement on that.

15           Since I don't know for sure what was intended and

16   since it looks like it may be broader than anything we have

17   been talking about and certainly broader than any of the

18   qualifiers that we have been talking about so far, you may

19   conclude that needs to be retooled and then see if you can

20   reach agreement with the defendants on that.  I don't know

21   where -- otherwise I am not sure where I come out on it

22   right now, but I would like you guys to take a shot instead.

23           MR. POUYA:  Yes, Your Honor.

24           THE COURT:  Okay?  Understand?

25           MS. MILLER:  Yes, Your Honor.

1          THE COURT:  All right.  Then we get to social

2     media data.  And let me get the defendants' counsel up on

3     that one.

4          MS. MILLER:  Yes, Your Honor.  Britt Miller.

5          THE COURT:  Okay.  In your counter -- and let me

6     give you a page cite.  All right.  So we are looking at

7     paragraph Roman numeral V(E)(2), and I am specifically

8     referring to Document 233-2, page 3.  We have got on the

9     left-hand side the plaintiffs' proposal on social media and

10    then the defendants' counter that social media data are

11    already addressed in V(E)(1)(a).  Now, V(E)(1)(a) is the

12    section dealing with cell phone data.  And, yes, it does

13    mention that to the extent social media data is on a cell

14    phone it has to be reviewed for discoverable data, but there

15    can be other sources of social media data beyond what's on a

16    cell phone.  So I don't see how the reference in --

17         MS. MILLER:  Your Honor, we are certainly happy to

18    try to clarify.  The point was the principle is the same,

19    that defendants -- the producing parties will use reasonable

20    due diligence to ensure that reasonably available sources of

21    data, whether that's social media data or on a cell phone

22    and any backups and archives, if those data sources are used

23    for work purposes, are evaluated as a potential source.  The

24    reality is social media here is not likely to be a huge

25    source of relevant information.  They don't -- the

1    complaints don't allege conspiracy communications through

2    Facebook Messenger.  If anything, they allege public -- the

3    opposite.  Public earnings calls are the source of a number

4    of the actual communications that plaintiffs complain of.

5         Defendants will, of course, look to and, as

6    appropriate, produce their company's own social media

7    content to the extent it is both relevant and responsive.

8    The devil in the details is with respect to individual

9    custodians and whether or not the defendants have control

10   over an individual defendant's Facebook account or their

11   Instagram account, and there could inevitably be

12   proportionality concerns depending on the situations.

13        Again, once the parties have discussed, as Your

14   Honor has already directed us to, to discuss document

15   custodians, we can then again evaluate for those custodians

16   whether or not this is an issue and whether or not they used

17   social media for business purposes.  Many will likely say

18   no.  But to the extent there are any that do, we can then

19   look to see whether or not there would be responsive

20   information.  But, again, it is the blanket requirement that

21   we affirmatively go and undertake a review of everybody's

22   Facebook account or everybody's, you know, Instagram account

23   in order to do this.  We will certainly look, but at least

24   as we understood plaintiffs' proposal it was if someone

25   determines -- if a document custodian confirms that he or

1    she used it for purposes and used that to communicate, then

2    it's the -- they have to go and -- it must be produced if

3    it's reasonably accessible.  Again, we --

4           THE COURT:  And --

5           MS. MILLER:  Yes.

6           THE COURT:  -- in the producing party's

7    possession, custody or control.  I mean, that qualifier is

8    there.  It is not committing you to gather individual social

9    media data if it's not in your possession, custody or

10   control, and we may have a fun exercise about whether it is

11   or not, but that's going to come regardless.  But I guess

12   what I am wondering is, What qualifier isn't here that

13   you're needing?

14          MS. MILLER:  Well, and, again, all of these were

15   interrelated from defendants' standpoint and it was -- we

16   shouldn't be required to undertake this until we get to

17   document custodians.  And it was simply an approach to say,

18   Your Honor, we are going to look at all reasonably available

19   sources, but, yes, we do have a possession, custody or

20   control question with respect to social media, which at

21   least the way it was drafted and as we understood it, this

22   was requiring something of us to do right now, to go out and

23   collect social media or determine whether or not, with

24   respect to any number of custodians, whether or not we had

25   this data, which, again, is beyond where we think we need to

1   do that.  Once the parties -- now that the parties have been

2   directed to talk about document custodians, this can be part

3   of the parties' conversation because then we have a better

4   understanding of who really is at issue here, but we can't

5   make essentially ironclad commitments on every single

6   custodian or every single employee at this particular point.

7            THE COURT:  I don't think this is requiring that

8   you actually go out and collect it, process it and produce

9   it right now.  I thought that this is just part of the ESI

10   protocol that puts some meat on the bones of what your

11   obligations and their obligations, for that matter, are

12   going to be as discovery unfolds.

13            MS. MILLER:  And again, Your Honor, I think that

14   from our standpoint it was, as defendants read the order and

15   as they read the proposal as a whole, the way -- the whole

16   thing, once you inject these into the remainder of the ESI

17   protocol, that this required some undertaking of us, of

18   defendants at this moment.  If Your Honor is simply saying

19   that as part of the discussion of document custodians if

20   defendants determine that in fact that they do have

21   possession, custody or control over a document custodian and

22   that they used social media for business purposes and/or

23   used and -- I am sorry -- and used that social media to

24   communicate with an employee, then we certainly can have

25   those discussions with plaintiffs as to what needs to be

1    produced.  That's not how defendants originally understood

2    in the entirety what plaintiffs were asking us to do.

3                THE COURT:  Okay.  Let me ask the plaintiffs then.

4                MR. POUYA:  Your Honor, you are correct on the

5    point that social media is not limited to cell phones, so

6    the cell phone provision doesn't cover this, and we believe

7    that we have already put forward all the qualifiers that are

8    necessary for this to address all of the defendants'

9    concerns.  It only applies if the document custodian

10   confirms that social media is used for business purposes and

11   used -- and the social media is used to communicate with an

12   employee of another defendant.  And the production

13   obligation only arises if it's reasonably accessible in the

14   producing party's possession, custody or control and not

15   withheld as privileged or as illegal to produce under

16   applicable privacy law.

17               So we believe it's appropriate to have it in here,

18   just like the other provisions that are already in the ESI

19   protocol, to provide clarity and there is enough qualifiers

20   in here to only apply to social media that would actually be

21   produced within the scope of this litigation.

22               THE COURT:  Okay.  And do I understand correctly

23   that this is, other than preservation obligations, which we

24   have talked about and appear to be well understood, that

25   nothing about this is intended to single out social media as

1    something that the defendants are supposed to go out and

2    immediately start collecting and processing and producing,

3    notwithstanding the pendency of the motions to dismiss?

4              MR. POUYA:  That's correct, Your Honor.

5              THE COURT:  Okay.  All right.  Well, with that

6    clarification of the proposal -- and that's certainly how I

7    read it -- I believe the necessary qualifiers are there.

8    And I don't see anything in the plaintiffs' proposal that

9    goes beyond what I believe conceptually defendants are

10   already saying they would be and understand they ought to be

11   doing, and I think it's appropriate to have the additional

12   detail to describe that.  In some ways I think that the

13   qualifiers are helpful to both sides to make it a little

14   more clear what the obligations are.  So I'm agreeing that

15   the -- with the clarification just described, I am agreeing

16   that this proposal can and ought to be included in the ESI

17   protocol.

18             So with the exception of the additional meeting

19   and conferring on the cell phone data issue, I think you've

20   got what you need to develop a revised joint proposed ESI

21   protocol and to get that me so that we can actually get

22   something on file.

23             How quickly do you think you would be able to

24   complete that meet and confer process on the cell phone

25   issue and then task someone with the responsibility of

1     folding it all together and then going back and forth to

2     make sure nothing has gotten accidentally slipped in that

3     shouldn't be?

4           MS. MILLER:  Your Honor, I haven't had an

5     opportunity to --

6           THE COURT:  Do you want to chat?  Talk amongst

7     yourselves.

8                         (Attorneys confer.)

9           MS. MILLER:  Your Honor, we're, not surprisingly,

10    not quite there.  Plaintiffs would like two weeks.  We think

11    given the number of defendants we have to deal with and the

12    possible going back and forth and back and forth it might

13    take an extra week to get it final and submit it to Your

14    Honor, so defendants have suggested three weeks.

15          THE COURT:  I am fine with three weeks.  So you

16    have got three weeks to not only complete the meeting and

17    conferring process, but to get me something that reflects

18    your, kind of, final word on what it ought to look like.

19          Hopefully, there won't be any competing proposals

20    in there; but if there are, I do appreciate the way you have

21    presented them, where you have got the draft proposed

22    protocol, you note where there's -- where there are disputed

23    provisions and then you show me either within the document

24    itself or in a separate chart clearly show me what your

25    respective language is.

1    Since I think we're kind of down to the short

2    strokes here, I don't think I need pages and pages of

3    discussion of your respective positions.  If there are

4    remaining disputes, keep it brief.  I think I understand

5    where we are going here.  All right?

6    MS. MILLER:  Understood, Your Honor.

7    THE COURT:  Okay.  So three weeks from today I

8    will look for that.

9    Why don't we take a break.  I want to think a bit

10    about the remaining issue on requests for production.

11    And in the meantime I would like you all, after

12    you take a little comfort break, to think about when we

13    should schedule a next conference and what, if anything,

14    ought to happen between now and then.

15    All right.  We will be in recess for 15 minutes.

16    (Recess taken from 3:27 p.m. till 3:43 p.m.)

17    THE COURT:  Please be seated.

18    On the issue of requests for production, I am

19    going to require that the process include preparing written

20    objections and responses, now understanding that responses

21    in this instance, we are all in agreement, does not include

22    producing documents, but I think -- I am persuaded that

23    conversations that don't lead towards some specific written

24    product are likely not to be of much use.

25    So let me talk a little bit about how I think

1    those responses could be accomplished.  I think -- well,

2    what I will require is that defendants take as an assumption

3    in their responses -- and this is by no means a prediction,

4    but you need an assumption to work with, so take as an

5    assumption in your written responses that the motions to

6    dismiss are denied and that Judge Tunheim does not in any

7    significant way limit or de-limit the scope of the

8    litigation.  So take that as your underlying assumption in

9    preparing objections and describing in your responses what

10   you will be searching for, reviewing and producing,

11   notwithstanding those objections.

12         In addition, identify in your responses what

13   issues are pending in the motions to dismiss, short of an

14   outright dismissal altogether, but what issues are pending

15   in the motion to dismiss that are pertinent to those

16   requests and that a ruling by Judge Tunheim could alter the

17   scope of your promise to produce.  Identify what those are.

18         Now, I am not going to require you, at least at

19   this juncture, to say, well, if he decides this, then our

20   position will be that and if he decides this other, then our

21   position will be the other, but at least identify if he

22   decides that exports are out of scope, then that could

23   affect our response to this request.  It might not affect

24   all of them.  So I don't want to see some boilerplate

25   general objection that identifies all the issues and says to

1    the extent this request or this response might be affected

2    by this issue, then thus and such.  Identify which issues

3    are pending in the motion to dismiss that could affect that

4    response, but I won't require you to go so far as to go down

5    the little decision tree and do the if this/then that, but

6    call out those issues.

7             Then after you have produced -- or after you have

8    provided those written responses, then it's fair game to

9    meet and confer about that.  If plaintiffs want to explore,

10   well, how -- would it affect your position on this if Judge

11   Tunheim did this, that or the other, I think that's fair

12   game for conversation, but I am not going to require you to

13   include it in your written responses at this point.

14            Any question about what I want to come out of this

15   issue with respect to requests for production?

16            Obviously, this doesn't include the holding

17   defendants, it does not include the holding defendants, and

18   it only applies to the 32 of the 46 requests that you have

19   said you would discuss.

20            Questions?  Okay.

21            With respect to timing, obviously, the plaintiffs

22   had proposed some timing back in mid December.  It is not

23   mid December anymore, so we probably need to tweak that

24   timing.  I am going to require the initial meeting and

25   conferring to be complete by March 8th and the objections

1    and responses to be provided by three weeks later, which

2    would be March 29th.

3           So when should we next convene this august group?

4           MR. ROBISON:  Your Honor, during the break counsel

5    for both sides discussed looking at dates the week of

6    April 8th, specifically later in the week.  We know there's

7    a particular basketball tournament in town on April 8th.  So

8    with certain other conflicts on April 10th, the parties were

9    tentatively looking at afternoon of April 11th or sometime

10   on April 12th.

11          THE COURT:  Okay.  Adrienne, are you able to tell?

12          Hold on a moment.  We actually have access to my

13   calendar all the way over in St. Paul.

14       (Off-record discussion between court and clerk.)

15          THE COURT:  All right.  It looks like the

16   afternoon of April 11th, pretty much any time after, say,

17   two, would work for me.  And I think April 12th is also open

18   as well.

19          Do you all have a preference?  Do you want to --

20          MR. ROBISON:  I'm getting a very strong vote for

21   the afternoon of April 11th.

22          THE COURT:  All right.  So let's say 2:00 central

23   time April 11th.

24          Let me see what I can do about making arrangements

25   to have it here.  I'm actually going to be speaking that

1    morning at a conference here in Minneapolis, so it may turn

2    out to be convenient for me to be here as well.  I'm not

3    making any promises, but we will -- but hold that thought.

4    We will get back to you on location, but on timing we will

5    make it 2:00 on April 12th.

6                MR. ROBISON:  11th.

7                THE COURT:  I am sorry.  April 11th, yes.  2:00,

8    April 11th, Thursday.

9                We have already talked about getting the, within

10   three weeks, an updated or a revised ESI protocol.  I have

11   got a couple of deliverables I need to get out for you.

12               As far as getting me a status report before the

13   conference, I would like to see an agenda -- I think I would

14   like to see an agenda a week before the conference.  If

15   there are any items on the agenda that describe disputes the

16   parties are having, then I would like to get your respective

17   position letters about those disputes at least three

18   business days before the conference.  So that would be --

19   that would be Monday.  So if you can get me the agenda by

20   the preceding Thursday and any position letters by Monday, I

21   think that will do it.

22               MR. CLARK:  Okay.

23               THE COURT:  Anything else that I should be asking

24   you for that you really want to get to me that I am not

25   mentioning?

```
 1            MR. ROBISON:  Nothing from the defense side, Your
 2   Honor.
 3            MR. CLARK:  Nothing further from plaintiffs, Your
 4   Honor.  Thank you.
 5            THE COURT:  All right.  Thank you very much.  We
 6   are adjourned.
 7            Yes?
 8            MS. SCARLETT:  We did have the matter of the Agri
 9   Stats' Department of Justice documents that we --
10            THE COURT:  Oh, goodness.  You are correct.  You
11   are correct.  I am sorry.  I noted that, and I blew right
12   past it.
13            We're not adjourned yet.  Give me one minute.
14            I hope we didn't lose anybody to whom that was
15   significant on the telephone.
16            All right.  Yeah, we do need to chat about this
17   just a little bit.  Hopefully, I won't be keeping you here
18   too much longer.
19            Who is going to be speaking on behalf of Agri
20   Stats?
21            MR. BERNICK:  I will, Your Honor.
22            THE COURT:  You will.  Okay.
23            MR. BERNICK:  This is Justin Bernick from Hogan
24   Lovells on behalf of Agri Stats.
25            THE COURT:  All right.  Just a moment.  All right.
```

1   As I read your position, you're basically saying you're

2   willing to hit the ground running as soon as Judge Tunheim

3   makes a decision, but not willing to do anything by way of

4   reviewing or producing any subset of these documents between

5   now and then.  Is that essentially correct?

6          MR. BERNICK:  That's correct, Your Honor.  As we

7   discussed in the paper -- it's all there -- the documents

8   that were produced to the Department of Justice related

9   primarily to the chicken industry.  And as I believe Your

10  Honor recognized at our last status conference, Agri Stats

11  has no obligation to produce documents that are not relevant

12  to pork in this lawsuit.

13          So our plan is sort of two prong.  There are four

14  custodians out of the approximately 30 DOJ custodians that

15  had some responsibilities related to pork.  And we'd review

16  all those documents for responsiveness and produce them if

17  they are responsive to plaintiffs' request.  And then the

18  second part would be if the remainder of the custodians --

19  we would apply whatever search methodology the parties

20  agreed to to those materials and then produce them and that

21  Agri Stats just shouldn't have an obligation that plaintiffs

22  insist on to literally produce every document produced to

23  DOJ in an investigation in a different industry.

24          THE COURT:  Okay.  I am inclined at this point to

25  have -- to kind of split the baby on this and have you at

1    least now, in what we are calling this interim period,

2    review the documents for the four custodians that had

3    responsibilities related to pork and produce the

4    nonprivileged responsive documents from those custodians.

5            Now, I don't know whether you -- I don't know

6    whether that would involve or whether you and plaintiffs

7    want to talk about the possibility that that involves a

8    conversation with them about a search methodology for those

9    documents, but in the interests of moving things forward in

10   a way that, you know, makes some progress in the case

11   without visiting undue burden that could turn out to be

12   unnecessary, that seems like an appropriate interim step.

13   And then if the case continues, then, yes, work with the

14   plaintiffs to develop a search methodology to search the

15   remaining documents for relevant materials.

16           With respect to plaintiffs' contention that the

17   entirety of the production to DOJ ought to be produced here,

18   I will simply say that right -- that right now I am not

19   persuaded that it should be and right now I am not saying,

20   you know, that -- right now my vision doesn't include that,

21   but the plaintiffs always have the right to bring a motion

22   to compel.  And if, with full briefing by either side, I am

23   persuaded, yes, there is reason to believe that it is

24   relevant and proportional and ought to be produced, we will

25   have that conversation.  That needs to be a conversation in

1    the course of formal motion practice after Judge Tunheim, if

2    at all, after Judge Tunheim has ruled on the motions to

3    dismiss.  So don't over-read what I -- what I said about

4    that.  I am just saying right now I am not feeling it, but

5    that doesn't preclude plaintiffs from making a motion and

6    changing my mind at the appropriate time.

7         So that's where I am -- that's where I am coming

8    out on this.  Anything I am not understanding that you want

9    to make sure I understand before I make that more

10   definitive?

11        MR. BERNICK:  No.  I think we made it clear in our

12   papers that the burden that that would impose on Agri Stats

13   is to review material now, and that's a burden that's not

14   being imposed on anyone else in this case right now.  It's

15   actually to review and produce documents.  And we haven't

16   heard anything from the plaintiffs to suggest that that's

17   necessary.  But we hear you loud and clear.  And I think

18   it's helpful, your comments previously, because our primary

19   concern is plaintiffs' requests for literally every single

20   one of these documents, when the thrust of the investigation

21   was in something very different than what the plaintiffs are

22   alleging here, and that's our number one concern coming into

23   this courtroom with our dispute.

24        THE COURT:  Understood.

25        All right.  Anything I ought to be hearing from

1    plaintiffs before I get more definitive on this subject?

2         MS. SCARLETT:  That proposal would be fine with

3    the plaintiffs, Your Honor.

4         THE COURT:  All right.  So why don't you proceed

5    along those lines then.  Look at those four custodians, work

6    to develop a search methodology and produce out of that, but

7    we will defer the rest until after the motions to dismiss

8    are decided.

9         MR. BERNICK:  Thank you, Your Honor.

10        THE COURT:  All right.  Now are we done?

11        Thank you for catching that.  I appreciate it.

12        We are again adjourned.

13        (Court adjourned at 4:00 p.m., 01-28-2019.)

14                         *   *   *

15        I, Renee A. Rogge, certify that the foregoing is a

16   correct transcript from the record of proceedings in the

17   above-entitled matter.

18               Certified by:  /s/Renee A. Rogge
                                Renee A. Rogge, RMR-CRR
19

20

21

22

23

24

25