```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                    )
       In Re:  Pork Antitrust         )   File No. 18-CV-1776
 4     Litigation                     )        (JRT/HB)
                                      )
 5                                    )
                                      )   Courtroom 13E
 6                                    )   Minneapolis, Minnesota
                                      )   April 11, 2019
 7                                    )   2:00 p.m.
                                      )
 8                                    )
       ------------------------------------------------------------
 9

10                 BEFORE THE HONORABLE HILDY BOWBEER
             UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11                (STATUS CONFERENCE - VIA TELEPHONE)


12     APPEARANCES
       For Direct Purchaser          LOCKRIDGE, GRINDAL, NAUEN, PLLP
13     Plaintiffs:                   BRIAN D. CLARK, ESQ.
                                     JOSEPH BRUCKNER, ESQ.
14                                   ELIZABETH ODETTE, ESQ.
                                     100 Washington Avenue South
15                                   Suite 2200
                                     Minneapolis, MN 55401
16
                                     PEARSON, SIMON & WARSHAW
17                                   BOBBY POUYA, ESQ.
                                     800 LaSalle Avenue
18                                   Suite 2150
                                     Minneapolis, MN 55402
19
       For the Consumer              GUSTAFSON GLUEK, PLLC
20     Indirect Purchaser            DANIEL C. HEDLUND, ESQ.
       Plaintiffs:                   120 South Sixth Street
21                                   Suite 2600
                                     Minneapolis, MN 55402
22
                                     HAGENS, BERMAN, SOBOL, SHAPIRO
23                                   SHANA E. SCARLETT, ESQ.
                                     715 Hearst Avenue
24                                   Suite 202
                                     Berkeley, CA 94710
25
```

```
 1
 2     For the Commercial      LARSON KING, LLP
       Indirect Purchaser      SHAWN M. RAITER, ESQ.
 3     Plaintiffs:             30 East Seventh Street
                               Suite 2800
 4                             St. Paul, MN 55101

 5
       For Defendant Triumph   HUSCH BLACKWELL
 6     Foods:                  GENE SUMMERLIN, ESQ.
                               13330 California Street
 7                             Suite 200
                               Omaha, NE 68154
 8

 9     For Defendant JBS USA:  SPENCER FANE, LLP
                               DONALD G. HEEMAN, ESQ.
10                             JESSICA NELSON, ESQ.
                               100 South Fifth Street
11                             Suite 1900
                               Minneapolis, MN 55402
12
                               QUINN EMANUEL URQUHART &
13                             SULLIVAN
                               STEPHEN R. NEUWIRTH, ESQ.
14                             SAMI H. RASHID, ESQ.
                               51 Madison Avenue
15                             22nd Floor
                               New York, NY 10010
16
       For Defendant           LARKIN, HOFFMAN, DALY & LINDGREN
17     Smithfield Foods:       JOHN A. COTTER, ESQ.
                               8300 Norman Center Dr.
18                             Suite 1000
                               Minneapolis, MN 55437
19
                               GIBSON, DUNN & CRUTCHER
20                             BRIAN EDWARD ROBISON, ESQ.
                               2100 McKinney Avenue,
21                             Suite 1100
                               Dallas, Texas 75201
22
       For Defendant Tyson     AXINN, VELTROP & HARKRIDER, LLP
23     Foods:                  TIFFANY RIDER ROHRBAUGH, ESQ.
                               950 F Street NW,
24                             7th Floor
                               Washington, DC 20004
25
```

```
 1                                   DYKEMA GOSSETT, PLLC
                                     DAVID GRAHAM, ESQ.
 2                                   90 S. 7th Street
                                     4000 Wells Fargo Center
 3                                   Minneapolis, MN 55402

 4        For Defendant Clemens      KIRKLAND & ELLIS, LLP
          Food Group:                CHRISTINA BRIESACHER, ESQ.
 5                                   300 North LaSalle
                                     Chicago, IL 60654
 6
          For Defendant Hormel       FAEGRE, BAKER, DANIELS, LLP
 7        Foods:                     CRAIG S. COLEMAN, ESQ.
                                     EMILY CHOW, ESQ.
 8                                   90 South 7th Street
                                     Suite 2200
 9                                   Minneapolis, MN 55402

10        For Defendants Indiana     DORSEY & WHITNEY, LLP
          Packers and Mitsubishi:    JAIME STILSON, ESQ.
11                                   50 South Sixth Street
                                     Suite 1500
12                                   Minneapolis, MN 55402

13                                   MAYER BROWN, LLP
                                     BRITT M. MILLER, ESQ.
14                                   71 South Wacker Drive
                                     Chicago, IL 60606
15
          For Defendants Seaboard    STINSON, LEONARD, STREET, LLP
16        Foods, LLC, and           PETER J. SCHWINGLER, ESQ.
          Seaboard Corporation:      50 South Sixth Street
17                                   Suite 2600
                                     Minneapolis, MN 55402
18
          For Defendant Agri         HOGAN LOVELLS US, LLP
19        Stats, Inc.:               JUSTIN W. BERNICK, ESQ.
                                     WILLIAM MONTS, III, ESQ.
20                                   Columbia Square
                                     555 Thirteenth Street NW
21                                   Washington, D.C. 20004

22          Proceedings recorded by mechanical stenography;
          transcript produced by computer.
23

24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

\*   \*   \*

1

2

3

4    THE COURT:  Good afternoon.  This is Judge

5 Bowbeer.  We are on the record in the matter of In Re Pork

6 Antitrust Litigation.  It sounds like we have a few more

7 people joining us.  This is Civil Matter No. 18-CV-1776.

8 And, for the record, we are holding this case management

9 conference by telephone; although, I am joined here at the

10 courthouse by our court reporter.  I'm going to wait just

11 another minute or two to see if we get any more people

12 calling in and then I'll call roll.

13    All right.  Let's see if that's our full

14 complement of participants here.  Let me start by asking

15 everyone at any point if you speak during this telephone

16 conference, even if you think we must recognize your voice

17 by now, please introduce yourself again every time you

18 speak.  That way we can be sure that we get a good, clear

19 record and we attribute the right statements to the right

20 people.

21    Let's start by getting appearances.  Since I've

22 got a list of the people I think are going to be on the

23 call, I'm going to go through those names, with apologies in

24 advance for any mispronunciations, and ask you to speak up

25 when you hear your name.  And when I get through for any

1    particular set of parties, then I'll ask if there's anyone

2    on the phone whose name I didn't call and whose appearance

3    should be noted.

4            So let's start with appearances for the

5    plaintiffs.  I have on behalf of the Consumer Indirect

6    Purchaser Plaintiffs first Daniel Hedlund.

7            MR. HEDLUND:  Good afternoon, Your Honor.  I'm

8    here.

9            THE COURT:  Shana Scarlett.

10           MS. SCARLETT:  Good afternoon, Your Honor.

11           THE COURT:  Shawn Raiter.

12           MR. RAITER:  For the Commercial Indirects, Your

13   Honor, yes.

14           THE COURT:  Correct, and I was just about to

15   switch.  So Shawn Raiter for the Commercial Indirect

16   Purchaser Plaintiffs.

17           And then on behalf of the Direct Purchaser

18   Plaintiffs I have Brian Clark.

19           MR. CLARK:  Yes, Your Honor.

20           THE COURT:  And Bobby -- is it Pouya?

21           MR. POUYA:  Yes.  It's Pouya.  Good afternoon,

22   Your Honor.

23           THE COURT:  Good afternoon.

24           Is there anyone else on the phone for any of the

25   plaintiff groups?

1          MR. BRUCKNER:  Yes, Your Honor.  Joe Bruckner,

2     also here for the Direct Purchaser Plaintiffs.

3          THE COURT:  Okay.

4          MS. ODETTE:  Elizabeth Odette for the Direct

5     Purchaser Plaintiffs.

6          THE COURT:  Anyone else for any of the plaintiff

7     groups who'd like to have their appearance noted?

8          All right.  Let's turn then to the defense

9     counsel.  First on behalf of Agri Stats I have William

10     Monts.

11          MR. MONTS:  Good afternoon, Your Honor.

12          THE COURT:  Justin Bernick.

13          MR. BERNICK:  Good afternoon, Your Honor.

14          THE COURT:  Anyone else for Agri Stats?

15          MR. MONTS:  No, Your Honor.  That's all of us.

16          THE COURT:  Okay.  For the Clemens Defendants, I'm

17     going to massacre this name, so I'm going to let you speak

18     it.

19          MS. BRIESACHER:  Your Honor, that's okay.  It's

20     Christina Briesacher.  Good afternoon, Your Honor.

21          THE COURT:  Good afternoon.  And, Ms. Briesacher,

22     are you expecting anyone on behalf of your clients?

23          MS. BRIESACHER:  Nope.

24          THE COURT:  Okay.  On behalf of the Hormel

25     Defendants I have Craig Coleman.

```
 1              MR. COLEMAN:  And I'm present, Your Honor.

 2              THE COURT:  And Emily Chow?

 3              MS. CHOW:  Yes.  Good afternoon, Your Honor.

 4              THE COURT:  Anyone else for Hormel?

 5              MR. COLEMAN:  No, Your Honor.

 6              THE COURT:  Indiana Packers Defendants, I have

 7      Britt Miller.

 8              MS. MILLER:  Present, Your Honor.  Good afternoon.

 9              THE COURT:  Jamie Stilson.

10              MS. STILSON:  I'm on as well, Your Honor.  Good

11      afternoon.

12              THE COURT:  And are you expecting anyone else on

13      behalf of Indiana Packers?

14              MS. STILSON:  We are not, Your Honor.

15              THE COURT:  Okay.  On behalf of JBS USA, Sami

16      Rashid.

17              MR. RASHID:  Yes, Your Honor.  Good afternoon.

18              THE COURT:  Good afternoon.

19              Steven Neuwirth.

20              MR. NEUWIRTH:  Good afternoon, Your Honor.

21              THE COURT:  Donald Heeman.

22              MR. HEEMAN:  Good afternoon, Your Honor.

23              THE COURT:  Jessica Nelson.

24              MS. NELSON:  Good afternoon, Your Honor.

25              THE COURT:  And are you all expecting anyone else
```

1     to appear for JBS?

2              MR. HEEMAN:  No, we're not, Your Honor.

3              THE COURT:  For the Seaboard Defendants I have

4     Peter Schwingler.

5              MR. SCHWINGLER:  Good afternoon, Your Honor.

6              THE COURT:  Good afternoon.  And are you expecting

7     anyone else to appear for your client?

8              MR. SCHWINGLER:  I am not.

9              THE COURT:  Smithfield Foods, Brian Robison.

10             MR. ROBISON:  Good afternoon, Your Honor.  Here.

11             THE COURT:  Richard Parker?

12             MR. ROBISON:  Your Honor, this is Brian Robison

13    again.  I don't think he's going to be able to join our

14    group.

15             THE COURT:  Okay.  John Cotter.

16             MR. COTTER:  Good afternoon, Your Honor.

17             THE COURT:  Anyone else for Smithfield?

18             MR. ROBISON:  No, Your Honor.

19             THE COURT:  Triumph Foods, Gene Summerlin.

20             MR. SUMMERLIN:  Yes, Your Honor.  And Megan

21    Scheiderer, I think, is identified as participating, but she

22    is traveling and doesn't have cell service right now.  So it

23    would just be me for Triumph.

24             THE COURT:  All right.  Very well.

25             And on behalf of the Tyson Defendants I have

```
 1    Tiffany Rohrbaugh.

 2              MS. ROHRBAUGH:  Yes, Your Honor.

 3              THE COURT:  And David Graham.  I'm not hearing --

 4              MS. ROHRBAUGH:  He couldn't attend, Your Honor --

 5              MR. GRAHAM:  I'm here, Your Honor.  I'm sorry.

 6              THE COURT:  Okay.  Very well.  We've got

 7    Mr. Graham.

 8              And are you expecting anyone else on behalf of the

 9    Tyson Defendants?

10              MS. ROHRBAUGH:  No, Your Honor.

11              THE COURT:  Is there anyone else on the phone who

12    wants their appearance noted and whose name I have not

13    called?  Apparently not.  All right.

14              So we've got an agenda.  And, again, just one more

15    reminder when you speak on a particular topic to make sure

16    you identify yourself first even though you have identified

17    yourself before.

18              So I've got the parties' status report for this

19    conference.  It's my understanding from the status report

20    and from the lack of anything else filed following the

21    status report that that is the only thing that is on file in

22    connection with this conference.  I'm referring to Docket

23    No. 314.

24              Is there anything that you all thought you filed

25    or brought to my attention beyond that status report?
```

 1          MR. CLARK:  Your Honor, Brian Clark speaking for

 2     plaintiffs.  No, I don't believe there is anything else.

 3          MR. ROBISON:  Your Honor, Brian Robison for the

 4     defense side.  We agree there's nothing else.

 5          THE COURT:  All right.  Very well.

 6          And just to address one thing regarding the format

 7     for these conferences.  In general -- and I know there was a

 8     bit of a difference of opinion on this particular

 9     conference -- in general, I do intend to make these

10     conferences in person although to make a call-in number

11     available for whoever would like to participate that way.

12     As you might imagine, the reason I decided to make it

13     exclusively a telephone conference this time was because of

14     the weather coming in, and it just seemed like the smartest

15     thing to do all the way around.  But for future planning,

16     although you're always welcome to suggest a telephone-only

17     conference, my default mode will be an in-person conference

18     with telephone availability.

19          I see a couple of issues that the parties want to

20     address in the course of the conference, but let me start

21     simply by asking, first on behalf of the plaintiffs and then

22     on behalf of the defendants, whether there's anything more

23     you'd like to report by way of fleshing out the status

24     report about the progress you've made since our last status

25     conference or progress that you've made since you submitted

1    your status update.  So let's start first with the

2    plaintiffs.  Unless you tell me otherwise, I will take you

3    in the order in which you identified yourselves in your

4    letters.  So that would be first on behalf of the Consumer

5    Indirect Purchaser Plaintiffs.  Anything you want to bring

6    to my attention by way of fleshing out the status report and

7    before we get to the disputes?

8              MR. HEDLUND:  Your Honor, Dan Hedlund.  I believe

9    Ms. Scarlett and I have designated Mr. Clark as our

10   spokesperson on behalf of all plaintiffs, so we'll turn it

11   over to him.

12             THE COURT:  All right.  Mr. Hedlund, it sounds

13   like you're going to cede the floor to Mr. Clark, but my

14   court reporter tells me she was having a little trouble

15   hearing you clearly, so if you do want to speak up again as

16   the call goes on, then make sure that you get a little

17   closer to the phone or speak up a little more or both.

18             Mr. Raiter.

19             MR. HEDLUND:  Will do.

20             THE COURT:  That's perfect.  That's much better.

21             Mr. Raiter, are you also ceding the floor to

22   Mr. Clark for purposes of any updates?

23             MR. RAITER:  Yes, Your Honor, we are.

24             THE COURT:  All right.  So, Mr. Clark, the podium,

25   so to speak, is yours.

1          MR. CLARK:  Hello, Your Honor.  The podium is

2     mine, but I actually don't have much more to report beyond

3     the status conference you said there.  And, just to be

4     clear, kind of the two issues we hoped to get some guidance

5     with so we had some guideposts to keep things moving over

6     the coming months were some guidelines and dates for us all

7     to shoot for on document custodians, and also kind of

8     flagging an issue that often comes up prior to identifying

9     document custodians, the phone records with the carriers,

10    just making sure there's specific identification of who

11    might have relevant phone records with the expected

12    custodians or I've been shooting to have those identified

13    within the next month or two, and then actual contact with

14    the carriers about those records because they each have a

15    seven-year rolling deletion policy is our experience.  So

16    each month that we wait to get those identified and

17    preserved they're deleted.  So that's just a concern we

18    have.  And we'd like to move as quickly as we can on that in

19    the next month or two.

20          THE COURT:  Okay.  Let me ask just so I understand

21    kind of what the status of this discussion is, and then

22    obviously we'll be interested in some further conversation

23    from both sides on this, but one of the things that the

24    defendants raised in their response in the status report,

25    particularly with respect to the guidelines and dates for

13

1    custodians, was a concern that there had not been a full

2    meet and confer on this subject before the letter was sent

3    in.

4         I still want to hear from both sides on this, but

5    let me just ask you, Mr. Clark, whether there's been any

6    kind of a meet and confer on this topic and any positions

7    exchanged on it since the letter was written?

8         MR. CLARK:  You know, we haven't had any

9    discussions since the letter was written.  We saw that

10   statement from the April 4th status letter, and we

11   understand -- we're willing if 60 days doesn't work and it

12   needs to be 90, we're happy to discuss that.  But with

13   respect to document custodians and also, of course, moving

14   along the individual discussions about objections and offers

15   of production for the Rule 34 requests, our position is it's

16   kind of just the natural flow of this process we're going

17   through here.  Prior to the word on the motion to dismiss is

18   to make some progress we have to continue with those tasks

19   and we ought to have some guidelines in doing so.

20        The specific answer to your question, no, there

21   has not been any further discussions since April 4th and

22   we're quite happy to have them.

23        THE COURT:  Okay.  Mr. Robison, let me ask you

24   first the more kind of overarching question:  Anything by

25   way of additional status report?  Before we get into the

1   specific areas of disagreement, anything else that the

2   defendants wanted to flesh out in terms of how the

3   conversations are going and what kind of progress has been

4   made since we last met in January or does the letter pretty

5   much sum it up?

6          MR. ROBISON:  Your Honor, Brian Robison for the

7   defense group.  Thanks for the chance to embellish a little

8   bit on what the parties submitted last week.  There are some

9   things that I think would be helpful to lay out here just to

10  give you, again, kind of a level set on where we are and the

11  progress the parties have made.  It didn't really fit in

12  that submission last week, but I think it would help you

13  maybe to understand exactly where things stand.

14          The parties have made substantial progress, we

15  believe, in preparing for discovery if we have to get into

16  discovery down the road.  The Court has set deadlines for

17  various tasks to be accomplished over the last few months

18  and the parties have hit every single one of those

19  deadlines.  If you had a list in front of you of the tasks

20  you had assigned us, Your Honor, you would be able to put a

21  red check mark next to each one of them.

22          Just by way of example, you had ordered the

23  parties to exchange organization charts and initial

24  disclosures on December 3rd, and the parties have done that.

25  You ordered the parties to submit a revised ESI protocol on

1   February 18th reflecting some of your rulings, as well as

2   some more results of the meet and confers that we've had on

3   that, and we did that.  And the Court has now entered an ESI

4   protocol.  You ordered the parties to exchange ESI

5   disclosures, and the parties did that on March 8th.  You

6   ordered the defendants to respond to 32 of the plaintiffs'

7   Rule 34 document requests with initial objections and

8   responses with some statements that are about how the

9   motions to dismiss might affect eventual productions, and

10  the defendants did that as well.  And those were served, I

11  believe, on March 29th.  We had a previous meet and confer

12  on those document requests on March 8th as well -- before

13  March 8th, I think it was March 6th.

14          So the parties have moved forward on the

15  disclosures, the organization charts, the ESI disclosures,

16  meeting and conferring for our first round of discussions on

17  the document requests.  The defendants have now served their

18  initial objections and responses to the document requests.

19  So all of this information we think sort of informs the

20  discussion today and reflects the progress the parties have

21  made, the deadlines the Court has set, the deadlines the

22  parties have met.  And we are certainly ready to discuss the

23  two issues -- I'm not sure they're even disputes yet, but

24  the two issues that are highlighted in the submission the

25  parties made last Thursday.

1          THE COURT:  Okay.  Good.  Thank you.  I appreciate

2    that additional detail.

3          Mr. Clark, anything relating to or responsive to

4    that that you want me to hear before we turn to the first of

5    the two topics that you wanted to discuss in a bit more

6    detail?

7          MR. CLARK:  No, Your Honor.

8          THE COURT:  Okay.  All right.  Well, let's then go

9    to the issue raised by the plaintiffs.  I guess it's in the

10   section called plaintiffs' further statement relating to the

11   custodians, defendants' custodians, and responses and

12   objections.

13         Mr. Clark, I've read the comments that the

14   plaintiffs made in that section.  I obviously have also read

15   the defendants' comments.  So anything more that you want to

16   discuss with me before I give Mr. Robison a further chance

17   to amplify on the defendants' remarks?

18         MR. CLARK:  Just a brief comment, Your Honor.  To

19   us a discussion about document custodians is really part of

20   their discussions about objections and offers of production

21   in response to Rule 34 requests, which we'll be doing

22   anyways.

23         In our experience in talking through each request,

24   it's most efficient and logical to discuss the document

25   sources for each.  For instance, the discussion is, well, do

1   you have a file about this topic that's in, you know, for

2   antitrust compliance policies it might be in the Legal

3   Department, et cetera.  So as you talk through each request,

4   it's usually most efficient to talk about the document

5   sources and whether you might be using a custodian search

6   for a specific request or a custodian search and centralized

7   sources like a network folder and to have that discussion

8   knowing the document custodians is often a pretty critical

9   piece of discussion to make those discussions fruitful.

10          So with respect to the discussions about Rule 34

11   requests and objections, we think it's fairly important to

12   have some schedule laid out for defendants in the first

13   instance to disclose their proposed document custodians, and

14   then plaintiffs to respond, and then if there's any dispute

15   about those some type of timetable to raise those disputes

16   with the Court.

17          THE COURT:  Okay.  And, obviously, I will give

18   Mr. Robison a chance to speak for himself on this, but was

19   there any discussion among you, either before or after this

20   letter was written, where an exchange of possible deadlines

21   or time frames was discussed or is this status conference

22   kind of the first discussion of that sort that you'll have

23   had?

24          MR. CLARK:  Your Honor, this is Brian Clark again.

25   The 60-day proposal is what we made to defendants.  I think

18

1   the -- probably I think it was April 1st or March 31st, a

2   few days before the deadline to submit the actual status

3   report.  We have not heard a counterproposal.  We're

4   certainly willing to entertain it, but certainly something

5   in the range of 60 days, maybe if an extra month is needed I

6   think we're amenable to it.  We're lawyers.  We need

7   deadlines.  So our view is we ought to have some type of

8   deadlines, and we're amenable to discussing something if 60

9   isn't workable for whatever reason.

10            THE COURT:  Okay.  All right.  Mr. Robison, I know

11   from your letter that there was some concern about not

12   having had as much meeting and conferring as you would've

13   liked to have had before it came to this, but the letter is

14   now about a week old, so tell me your response both to the

15   -- well, tell me your response to the proposal that the

16   plaintiffs are making and both about whether there ought to

17   be deadlines, which it strikes me that deadlines typically

18   are helpful in a situation like this, and also if there are

19   deadlines whether the ones that the plaintiffs have proposed

20   make sense or something else ought to be considered.

21            MR. ROBISON:  Thank you, Your Honor.

22            We, on the defense side, have had a chance to talk

23   now internally about what we saw last Thursday, and here's

24   how we are assessing what the plaintiffs were talking about

25   here.  The way we see their proposal, it really breaks down

1    into two pieces.  And we can wholeheartedly agree with the

2    first piece.  It's the second piece we object to.  The two

3    pieces as we see it are this:  number one, they want to set

4    up a schedule for exchanging custodian lists, and then

5    counterproposals, and then a time period to discuss who the

6    proper document custodians should be.  And that piece of

7    their proposal we are fully prepared to handle.  We're

8    prepared to talk about dates for exchanges today.  We have

9    no problem with that.

10         We are ready to talk about potential custodians.

11   We don't think we'll be able to reach final agreement while

12   we're still waiting for the rulings on the motions to

13   dismiss, but we can certainly make some progress and so we

14   are fully prepared to do that.

15         These negotiations on custodians have not yet

16   started.  As I said before, we had served our initial

17   disclosures in December.  We served organization charts in

18   December.  And the parties have not yet talked about those

19   productions in December.

20         And then in early March, we answered the ESI

21   interrogatories and produced still more information about

22   possible custodians and document sources, and the parties

23   have not yet had a chance to talk about those.

24         So, like I said at the outset, the parties have

25   made a lot of progress in getting ready for discovery.  The

1   defendants have cooperated at every step of the way and

2   we're willing to do so here as far as custodians as we're

3   talking to them about document requests.  We think it ought

4   to be mutual, by the way, reciprocal, so that we're talking

5   about plaintiff custodians at the same time.  We can talk

6   about that in a second.

7            The second piece, however, the part that we have a

8   problem with, and that is this idea that in 60 days parties

9   are going to reach an impasse and then we hurry up and file

10  motions to compel, I guess, on document requests and on

11  custodians.  It wasn't clear to us on the papers whether

12  they were envisioning motions to compel and document

13  requests and custodians both, but it sounds like today they

14  are.  But we think it's premature to be talking about filing

15  motions to compel and having discovery motions before

16  discovery even starts.  We think it's putting things

17  completely out of order to start discovery with motions to

18  compel.

19            So our thought would be we exchange dates today

20  for initial custodian lists, counterproposals, maybe

21  starting next week with initial lists, a week or two after

22  that for counters, and then we have 60 days after these

23  exchanges -- 60 or 90 days for negotiations.  And then at

24  that point, instead of hauling off with motions to compel,

25  at that point, 60 or 90 days out, we would have another

1    status conference and report to you on the progress we've

2    been able to make on custodians.  We think that, number one,

3    provides structure.  It does provide deadlines.  But it

4    doesn't have the prospect of all of us briefing motions to

5    compel when 60 or 90 days from now we may still not have

6    rulings on the motions to dismiss.

7           So we think it is premature for the Court to try

8    to prejudge those motions and figure out what the case is

9    about, what's relevant, which custodians are relevant,

10   proportionality, date range, all those sorts of things that

11   I would imagine would get teed up if we had to brief motions

12   to compel while we're still waiting on the rulings on the

13   motions to dismiss.  It requires a lot of guesswork on the

14   parties and some extended guesswork on the Court's part.

15          So our thought is let's go ahead and set dates for

16   exchanging custodian lists.  Let's set a 60- or 90-day time

17   period to negotiate, get as far as we can on custodians, and

18   then we report to you, Your Honor, on the progress we've

19   made, but we not have this idea of motions to compel hanging

20   out there while we've got motions to dismiss still pending

21   that may dismiss certain parties or certain pieces of the

22   case.

23          THE COURT:  All right.  I think I have that down

24   both in terms of the kind of time frame you're talking about

25   and -- just to make sure I heard you correctly, kind of

1    rewinding it just a bit, you were talking about being ready,

2    and your proposal would be on both sides, to exchange lists;

3    in other words, defendants propose their custodians,

4    plaintiffs propose their own custodians within a couple of

5    weeks.  And then had you proposed a deadline for a

6    responsive list following that?

7            MR. ROBISON:  Your Honor, our thought -- and,

8    again, this is just for defense side -- our thought was we

9    could be prepared to exchange the initial list going both

10   ways next Thursday, the 18th, if that works for the

11   plaintiffs, and then considering this is the start of

12   custodian negotiations maybe have two weeks for the parties

13   to respond.

14           So if we're playing that out, it would be May 2nd

15   would be the date for both sides to send their

16   counterproposals on custodians.  And then the clock for

17   negotiations would start from May 2nd and go until, I guess,

18   July 2nd or August 2nd for another status conference with

19   Your Honor.

20           THE COURT:  Okay.  Good.  I'm glad I asked.  I had

21   conflated the two things into that two-week period.  All

22   right.  Okay.

23           So, Mr. Clark, you've now heard a counterproposal,

24   so let me hear a little more from you.

25           MR. CLARK:  Sure.  I think, generally, the concept

1    with respect to the requests plaintiffs have made to

2    defendants for documents and the custodians that defendants

3    just laid out is amenable in coming back to the Court if you

4    are available in about a 60-day time period would be useful.

5            I think the two issues I heard was the first we

6    have heard about requests for production or interest in

7    document custodians from plaintiffs is right now.  Why

8    that's probably a little bit problematic is because

9    defendants haven't served any document request on any

10   plaintiff that I am aware of.  I certainly haven't seen

11   them.  That issue had not been raised.  We have just been

12   proceeding with requests for discovery to defendants.  We

13   are, of course, happy and we understand our obligations to

14   respond.

15           It might make a lot more sense to do a separate

16   track now that defendants are expressing an interest in

17   discovery from plaintiffs if we agree on a -- defendants can

18   serve the requests whenever they'd like, frankly.  We'll

19   respond to them in due course on kind of a similar schedule

20   defendants had to respond.  And then I think after that,

21   again, if we can certainly work out a schedule when

22   plaintiffs in the first instance would propose custodians

23   relevant to those document requests.  We can't really

24   identify the custodians until we know what specifically has

25   been requested.  We're happy to do that, and probably

1    something equivalent to the schedule we're working on here

2    for plaintiffs to request for defendants.  So that's the

3    first issue, is the issues are not at the same place because

4    there haven't actually been discovery requests to

5    plaintiffs.

6        The other issue on just kind of -- I don't think

7    -- I don't know and I need to look back whether we've

8    mentioned motions to compel.  Typically, actually, how we've

9    handled kind of document custodian disputes is more in the

10    nature of a joint letter brief so the parties can -- you

11    know, you do an initial exchange once they have teed up a

12    dispute on particular custodians and then do a final

13    exchange so they kind have had the back and forth, and often

14    that helps resolves the issues.

15        I think plaintiffs are perfectly happy to have a

16    status conference with the Court in about 60 days where we

17    raise perhaps if there's general categories of disputes

18    about particular custodians for instance, just sampling the

19    idea for a very low-level type of person.  Those kinds of

20    issues might be helpful to get some guidance from the Court

21    60 days out.  And then we might be able at that time to have

22    a conversation for disputes that we think are intractable

23    how you would like us to present those to you.

24        We don't think it's appropriate to wait until a

25    motion to dismiss order comes out, because otherwise there's

1    no real incentive for both parties to work through the

2    issues, find some common ground, and then resolve them.

3            THE COURT:  I'm just catching up with you in my

4    notes.  Just a second.

5            Mr. Robison, just to follow up on the point that

6    Mr. Clark made that written discovery directed to the

7    plaintiffs hasn't been served yet and therefore the table

8    hasn't yet been set in quite the same way for a discussion

9    about the plaintiffs' own custodians, that argument has some

10   allure to me.  Tell me why you would view that differently,

11   if you do.

12           MR. ROBISON:  Your Honor, it's certainly a good

13   question.  He's right, we have not sent document requests to

14   the plaintiffs.  They have served us with disclosures, and

15   org charts, and some subset of the ESI disclosures.  So it

16   seems like -- the defense group can talk about this some

17   more, but it seems like there is enough out there that we

18   could at least start the conversations.  The plaintiff

19   started this case, plaintiffs have made allegations, and I

20   would think the plaintiffs would be able to tell us proper

21   custodians who have documents that we can all imagine would

22   be relevant -- contracts for buying pork, communications

23   with pork suppliers, negotiations over pork pricing, those

24   sorts of things.

25           So I'm not sure that we literally can't make any

1    progress and can't do any talking until they see document

2    requests.  That's something maybe we on the defense side can

3    discuss among ourselves and then talk to them further.  But

4    I'm just not convinced that we're completely unable to start

5    these talks without them seeing document requests.

6         We may not -- again, I don't think we're going to

7    be able to reach final agreement on custodians for the

8    defendants or final agreement on objections for the

9    defendants while the motions are still outstanding.  So we

10   certainly wouldn't be able to do that with the plaintiffs

11   either, but I think we would be able to make progress.  If

12   we need to serve document requests -- if they just can't

13   talk to us at all without seeing document requests for

14   documents that I think they can imagine are coming, then we

15   on the defense side will figure out whether and when we want

16   to serve our requests.

17        THE COURT:  Okay.  All right.  Anything further on

18   this topic, Mr. Clark?

19        MR. CLARK:  No, Your Honor.  I think we're not

20   looking to hold things up, but just given the posture that

21   we don't have a document request, I mean, that's literally

22   how we frame where we're looking for information that's

23   requested, it's in response, because we're the responding

24   party.  It just seems to move everybody to actually know

25   what's being requested.  There are different types of things

1    pursued by various defendants in different cases that may or

2    may not be pursued here.  We can endeavor to on a more

3    accelerated schedule identify those document custodians once

4    we have the requests.  I think we'll have to have them in

5    order to know what we're responding to and where we have to

6    look for documents and who might have those documents.

7              THE COURT:  All right.  Okay.  Well, let's start

8    then with the issue of identifying defendants' custodians,

9    and then I'll turn to the issue of identifying plaintiffs'

10   custodians.  Well, let me ask -- well, no, I think we've

11   largely got agreement here.  The defendants have indicated

12   that they'd be in a position to serve initial lists by the

13   18th.

14             Mr. Robison, I assume that that proposal was based

15   on conversations you've had with the defense group generally

16   and wasn't speaking strictly for just your own clients.  Is

17   that correct?

18             MR. ROBISON:  Yes, that is correct.

19             THE COURT:  Okay.  And so let's go ahead and put

20   that date in place.

21             Mr. Clark, I didn't hear any opposition to the

22   idea that the plaintiffs would respond with a

23   counterproposal about defendants' custodians within a couple

24   of weeks after the 18th, which would bring us to May 2nd.

25             MR. CLARK:  No, Your Honor.  That schedule seemed

1    just fine to us.

2              THE COURT:  All right.  And then meeting and

3    conferring to commence promptly thereafter.  And I do think

4    it makes sense for us for a number of reasons, but also by

5    way of follow-up on this topic, to schedule another status

6    conference for about 60 days after May 2nd.  And then in

7    connection with your updates and position papers for the

8    status conference you can let me know where you are seeing

9    issues.  You can identify issues on which you'd like

10   guidance.

11             And I think, as Mr. Clark may have put it, if

12   there are issues that seem a bit more intractable where it

13   looks like at least one side or the other wants to urge me

14   to weigh in in a more definitive way, then we can talk at

15   that conference about whether and how to set that up.  I

16   think it will depend a bit on -- well, 60 days from May 2nd,

17   I wouldn't be surprised if you would have a decision from

18   Judge Tunheim by then.  I don't have any insider information

19   to that effect, but I wouldn't be surprised to see a

20   decision on the motion to dismiss by that point.  And,

21   obviously, that could reframe the timing conversation in any

22   event.

23             So let's just plan on a status conference.  So

24   we're looking at, oh, good, 4th of July.  How do you all

25   feel about a status conference right around the 4th of July?

1   Probably not so good.  We can shoot for either the week of

2   June 24th, which would be the full week prior to 4th of July

3   week, or probably the week of July 8th, which would be the

4   full week after 4th of July week.  I don't think I will make

5   you show your dedication to the cause by demanding that we

6   set a status conference for 4th of July week.

7          So, Mr. Clark, any strong feelings on the

8   plaintiffs' part about when we set that next status

9   conference vis-a-vis the 4th of July?

10          MR. CLARK:  Sure.  I think earlier in the week of

11   June 24th would probably help avoid a lot of the travel plan

12   type of issues, like June 24th or 25th, for anybody, you

13   know, taking off a little bit early before the July 4th week

14   would probably work well.

15          THE COURT:  Okay.  Mr. Robison.

16          MR. ROBISON:  Your Honor, I, frankly, do not know.

17   Our group has been talking about a July 2nd date.  So I do

18   not know.  I know the week of July 8th is bad for several of

19   us.  I don't know about the week of June 24th.  I know there

20   are certain days that week that are bad for me personally.

21          THE COURT:  You know, I can do -- I mean, I'm

22   trying to be thoughtful about all of your schedules.  I can

23   do a conference on July -- actually, on July 1st or July

24   2nd.

25          So why don't you all chat among yourselves after

30

1    we're done with this conference.  I could do June 24th.  It

2    would be tough for me without rearranging things.  If I

3    rearranged something, I could potentially do June 25th.  But

4    those are really the only two days that week, and the 24th

5    is a definite preference or I could do July 1st or July 2nd.

6    I would not want to get any closer to 4th of July just, as I

7    say, trying to be sensitive to everybody else's schedules.

8    And then the week of July 8th I could do the 8th, 10th -- it

9    looks like I could do pretty much any day the week of July

10   8th except for the 9th.

11          So why don't you all talk first among your

12   respective groups and then talk across the net to each other

13   and given those options see if you can agree on a date that

14   kind of meets the most people's needs.  If you can't, then

15   let me know where things fall apart and I'll just make a

16   decision.  But let's see if you can come up with one of

17   those dates that looks like it will work for the people who

18   need to be -- particularly the people who will want to be

19   here in person and would therefore need to travel to do

20   that.  Okay?

21          MR. ROBISON:  That works for the defense side,

22   Your Honor.  Thank you.

23          MR. CLARK:  Brian Clark, Your Honor.  Yes, that

24   works well.  Thank you.

25          THE COURT:  Okay.  With respect to the plaintiffs'

1    custodians, I do get Mr. Clark's point that there is a

2    distinction to be made because the defendants have not yet

3    served responses.  That being said, I do think that there's

4    been enough legwork done even with respect to identifying

5    the organization, and issues, and that kind of thing on the

6    plaintiff's side that I think you all ought to be in a

7    position to start considering custodians and pretty quickly

8    after service of actual written document requests ought to

9    be in a position to get those over to the defendants.

10             I know, Mr. Robison, you said you hadn't had a

11   chance really to talk to your group yet about how quickly

12   you wanted to get written requests out, but my inclination

13   would be to set a deadline of two weeks after you serve

14   written requests by which the plaintiffs would need to get

15   their proposed list to you and then a fairly comparable

16   schedule from there, which means we may or may not be in a

17   position to -- we'll at least be ready for a status

18   conference on the subject by that early July date, although

19   the meet and confer perhaps won't have progressed as far

20   along as for the defendants.  But just to get that process

21   started, Mr. Robison, any reason why you all couldn't get --

22   at least understanding you haven't had a chance to talk to

23   the rest of your group, how would you feel about just saying

24   that within two weeks after you get those written requests

25   served plaintiffs should get their own proposed custodians

1      over to you?

2                MR. ROBISON:  That sounds fine to us.

3                THE COURT:  Okay.  Mr. Clark, have I put you in

4      what you believe is a completely untenable position or given

5      what you already know does that sound like a deadline you

6      all could meet?

7                MR. CLARK:  Your Honor, we'll make it work, yeah,

8      as long as we have a couple weeks, as you've suggested, to

9      look at requests for production, we'll propose custodians.

10     And then, of course, I assume we'll have the typical 30 days

11     to get the objections and responses to the Rule 34 requests,

12     unless you're suggesting otherwise?

13               THE COURT:  No.  Otherwise the 30 days -- I don't

14     mean to accelerate anything else beyond what the rules would

15     ordinarily provide, but just set that two-week deadline

16     based on those written requests to get a list of proposed

17     custodians over, and then two weeks from that date then for

18     the defendants to counter with a meet and confer to follow.

19               MR. CLARK:  That won't be a problem.  We'll make

20     it work, Your Honor.

21               THE COURT:  Okay.  All right.  And then I will

22     want a status report on that process as well by that late

23     June/early July status conference.  But I do understand that

24     given that it will be starting a bit later, you may not be

25     quite as far along in your meet and confer process, but

1    obviously the more you can get done by that status

2    conference, the better my ability to weigh in and provide

3    some guidance that will keep you moving forward.  Does that

4    work?

5              MR. CLARK:  Yes, Your Honor.

6              THE COURT:  All right.  So let's turn next to the

7    issue of telephone records.  As I understand the concern

8    here -- and, Mr. Clark, you described it in your letter and

9    also previewed it a bit in your remarks a few minutes ago --

10   but it sounds like the driving concern here is that the

11   telephone providers have a seven-year -- typically have a

12   seven-year retention period for phone records, and the

13   concern is that if the phone numbers have not been disclosed

14   and sort of concomitantly some assurances provided that as

15   to each of those numbers the provider has been contacted and

16   told to hold the records your concern is that some of these

17   records may be destroyed by the providers pursuant to their

18   usual retention policy in the meantime.  Am I capturing your

19   concern accurately?

20             MR. CLARK:  Yes, Your Honor.  And typically the

21   way we've dealt with it in other cases is once there's a

22   better idea, which we'll have -- at least defendants will

23   have through their custodians by April 18th a sense of who

24   are the likely custodians -- typically a letter to the

25   carrier requesting specific phone numbers, have the records

1    retained or providing account numbers is sufficient.  It is

2    a case -- only in the case a carrier says, well, we need a

3    subpoena not for production but just requesting

4    preservation, occasionally with some smaller carriers that's

5    necessary, but for AT&T and Verizon typically a letter is

6    enough.

7              THE COURT:  Okay.  So, Mr. Robison, I know that

8    the defendants' section said, look, the defendants are

9    complying with document preservation obligations.  Of

10   course, the thought bubble over your head about what that

11   means with respect to phone records may be different from

12   the thought bubble over plaintiffs counsel's head in that

13   regard, so tell me what pieces of plaintiffs' request you

14   agree with and what pieces you don't agree with, and why

15   they shouldn't be concerned.

16             MR. ROBISON:  Thank you, Your Honor.  Yes, Brian

17   Robison for the defense side.

18             Last Thursday when we saw their section of the

19   joint report, that was the first time we had seen a

20   request -- kind of a broad-based request like this for

21   personal cell phone numbers.

22             Last July, the plaintiffs sent each defendant a

23   letter listing certain identified executives and asked us to

24   take steps to preserve the executives' devices, either

25   imaging them or doing something else to preserve them, and

1    we did that.  We didn't think we were required to do it, but

2    to avoid a fight, we went ahead and took pretty expensive

3    steps to make sure those executives' devices were preserved.

4         This request, though, is a little different.

5    We're learning more on this call about exactly what they

6    have in mind and when.  But to us, in our view, it's hard to

7    get our hands around exactly what's involved, exactly how

8    many devices we're talking about, how many phone numbers

9    we're talking about before we get further down the road in

10   negotiating who the actual custodians are.

11        Mr. Clark is right, in other cases there are

12   letters like this sent to cell carriers for personal phone

13   numbers, but they're not done now.  They're not done when

14   there hasn't been discussion over who the custodians are

15   even likely to be.

16        So I guess our concern is, number one, we haven't

17   talked to them about exactly what they have in mind, and

18   exactly for how many people, and exactly when they want

19   these letters sent, so to us it kind of came out of the blue

20   and we hadn't had a chance to react to it.  But now that

21   we're hearing more, it sounds like it's not something that

22   the plaintiffs are asking us to do today for all the people

23   listed on any org chart.  It's more something that would be

24   done later once we've made some more progress on these

25   custodian negotiations.  And if that's the case, then I

1     think our objections are starting to fade away, because then

2     we're not talking about doing it for literally thousands of

3     people's phone numbers when we know we're not going to have

4     thousands of document custodians.

5              THE COURT:  Mr. Clark.

6              MR. CLARK:  Yeah.  I mean, just to be clear, we're

7     not agreeing that defendants ought not -- if they know that

8     certain employees were likely to be document custodians and

9     had communications with competitors they ought not to have

10    done this last June or July.

11             What we are saying now is that as we're --

12    especially, I guess, in the next week defendants are going

13    to have identified document custodians, we're saying

14    certainly by now there should be an effort to preserve those

15    people's relevant information, including their phone logs

16    that are held by phone carriers.  So that's, I think, really

17    getting to the heart of what we're asking for here.

18             MR. ROBISON:  Yeah, Your Honor.  Brian Robison.

19             Just to react to that, I think there really has

20    been a disconnect here because previously when we received

21    the ESI protocols from the plaintiffs, there wasn't anything

22    in there about taking steps vis-a-vis third parties

23    vis-a-vis phone carriers.  The requests in the E SI protocol

24    for cell phones was to gather up and disclose to them phone

25    numbers, cell carriers, communications apps, messaging apps,

1    that sort of thing, information that is unique to the person

2    and the phone.  And we discussed that with you, Your Honor,

3    in November.  We objected to disclosing that wholesale

4    because it's basically free discovery.  The Court agreed

5    that we did not need to disclose that sort of detailed

6    information.  We need to preserve it, and we've instructed

7    people to preserve things like this information that's on

8    their device -- messaging apps, phone numbers, cell carrier

9    information, all that -- so when people are deposed later,

10   the plaintiffs can ask about it again in a deposition.

11            This is the first time we're hearing that they

12   think we have an obligation to be notifying cell carriers to

13   preserve an unknown number of people's call logs.  So I

14   really do think this is something that has not been fleshed

15   out in a meet and confer.  It's something that is new.  And,

16   like I said, to us we're willing to do this.  It's just to

17   us a timing and a scope question.  It's when do we do it and

18   for how many cell numbers.

19            THE COURT:  All right.  This does sound like an

20   issue where the parties need to talk further between

21   themselves, certainly until you all have kind of fully

22   engaged on what precisely the plaintiffs are seeking and

23   what precisely the defendants would be willing to agree to

24   and whatnot.  I don't have enough information here, I think,

25   to provide any particularly intelligent guidance.

1              So I do think you ought to meet and confer on

2     this.  I'm not sure I want to wait until the status

3     conference in July if there is a significant disconnect

4     between you on this, though.

5              So I think what I'd like to have you do is meet

6     and confer further on this.  You're going to be talking

7     about custodians anyway over the next couple of weeks.  Why

8     don't you get me a status update on this particular issue

9     let's say in 30 days.  So if you could do a joint status

10    update to me in 30 days that tells me where you're at in

11    your conversation about this.  Ideally you'll have come to

12    some agreement, either a concrete agreement or an agreement

13    about how you're going to get to an agreement.  But give me

14    a status update, let me know where you stand, and based on

15    that I'll decide whether it would make some sense to try to

16    schedule an interim conference call for the purpose of

17    talking further about this or whether it looks like you're

18    on track and we don't need to talk before our early July

19    status conference.  Does that make sense?

20             MR. CLARK:  Brian Clark, Your Honor.  Yes, that

21    does make sense.

22             MR. ROBISON:  Brian Robison for the defense side.

23    Yes, that works just fine.

24             THE COURT:  Okay.  I think that covers the two

25    items on which plaintiffs had requested further discussion.

1     Is there anything that I've missed or anything that you

2     decided between yourselves after you wrote the letter that

3     you wanted to get on my radar?

4            MR. CLARK:  Your Honor, for plaintiffs this is

5     Brian Clark.  No, there is nothing else.

6            MR. ROBISON:  Brian Robison for the defense side.

7     No, Your Honor, nothing else.

8            THE COURT:  Okay.  So we have a plan for getting a

9     date for the next status conference, we've got a plan for

10    moving forward on document custodians, and a plan for moving

11    forward on phone records.  I will make sure that those items

12    are reflected in the minutes for this call.  But if there's

13    nothing further, I think we can adjourn.

14           Thank you very much for your participation, and I

15    will look forward to talking with you in about

16    two-and-a-half months, if not before.

17           We're in recess.

18           (Court adjourned at 2:55 p.m.)

19                          *     *     *

20           I, Debra Beauvais, certify that the foregoing is a

21    correct transcript from the record of proceedings in the

22    above-entitled matter.

23           Certified by:   *s/Debra Beauvais*
                             Debra Beauvais, RPR-CRR

24

25