# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE PORK ANTITRUST LITIGATION* | Civil No. 18-1776 (JRT/LIB) |
| This Document Relates To: | **AMENDED MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' COMPLAINTS** |
| *All Actions.* | |

Brian D. Clark and W. Joseph Bruckner, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; Bruce L. Simon, **PEARSON SIMON & WARSHAW LLP**, 44 Montgomery Street, Suite 2450, San Francisco, CA 94104; Bobby Pouya and Michael H. Pearson, **PEARSON SIMON & WARSHAW LLP**, 15165 Ventura Boulevard, Suite 400, Sherman Oaks, CA 91403; Melissa S. Weiner and Joseph C. Bourne, **PEARSON SIMON & WARSHAW LLP**, 800 LaSalle Avenue, Suite 2150, Minneapolis, MN 55402, for the Direct Purchaser Plaintiffs.

Daniel E. Gustafson, Daniel C. Hedlund, and Brittany N. Resch, **GUSTAFSON GLUEK PLLC**, 120 South 6th Street, Suite 2600, Minneapolis, MN 55402; Shana E. Scarlett, **HAGENS BERMAN SOBOL SHAPIRO LLP**, 715 Hearst Ave., Suite 202, Berkeley, CA 94710; David M. Cialkowski, **ZIMMERMAN REED, PLLP**, 1100 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402; Breanna Van Engelen, **HAGENS BERMAN SOBOL SHAPIRO LLP**, 1301 Second Avenue, Suite 2000, Seattle, WA 98101, for the Consumer Indirect Purchaser Plaintiffs.

Alec Blain Finley and Jonathan Watson Cuneo, **CUNEO GILBERT & LADUCA, LLP**, 4725 Wisconsin Avenue NW, Suite 200, Washington, DC 20016; Shawn M. Raiter, **LARSON KING, LLP**, 30 East Seventh Street Suite 2800, St Paul, MN 55101, for the Commercial Indirect Purchaser Plaintiffs.

Megan A. Scheiderer, **HUSCH BLACKWELL, LLP**, 4801 Main Street, Suite 1000, Kansas City, MO 64112, for Defendant Triumph Foods, LLC.

Donald G. Heeman and Jessica J. Nelson, **SPENCER FANE**, 150 South Fifth Street, Suite 1900, Minneapolis, MN 55402; Stephen R Neuwirth and Sami H Rashid, **QUINN EMANUEL URQUHART & SULLIVAN, LLP**, 51 Madison Avenue, 22nd Floor, New York, NY 10010, for Defendant JBS USA.

John A Cotter and John Anders Kvinge, **LARKIN HOFFMAN DALY & LINDGREN, LTD**, 8300 Norman Center Drive, Suite 1000, Minneapolis, MN 55437; Richard G. Parker, **GIBSON, DUNN & CRUTCHER**, 1050 Connecticut Avenue, N.W., Washington, DC 20036; Brian Edward Robison, **GIBSON, DUNN & CRUTCHER, LLP**, 2100 McKinney Avenue, Suite 1100, Dallas, TX 75201, for Defendant Smithfield Foods, Inc.

Tiffany Rider Rohrbaugh and Rachel Johanna Adcox, **AXINN, VELTROP & HARKRIDER LLP**, 950 F. Street NW, Washington, DC 20004, for Defendant Tyson Foods.

Christa C. Cottrell, **KIRKLAND & ELLIS LLP**, 300 North LaSalle, Chicago, IL 60654, for Defendant Clemens Food Group, LLC.

Richard A Duncan, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street Suite 2200, Minneapolis, MN 55402, for Defendant Hormel Foods.

Jaime Stilson, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402; Britt M. Miller, **MAYER BROWN LLP**, 71 South Wacker Drive, Chicago, IL 60606; William Stallings, **MAYER BROWN LLP**, 1999 K Street NW, Washington, DC 20006, for Defendant Indiana Packers and Mitsubishi Corporation of America.

Plaintiffs (separated into three putative classes) allege that Defendants, some of the nation's leading pork producers and integrators, conspired to limit the supply of pork in order to fix prices in violation of state and federal antitrust laws. Defendants now move to

dismiss the claims against them.  Because Plaintiffs have not adequately pleaded parallel conduct sufficient to support an inference of conspiracy, the Court will grant Defendants' Motions and dismiss Plaintiffs' Complaints without prejudice.  The Court will, however, grant Plaintiffs leave to amend their Complaints.

## BACKGROUND

This class action embodies the consolidation of thirteen separately filed actions. The Plaintiffs are grouped into three different classes of pork purchasers: Direct Purchaser Plaintiffs ("DPPs"), Consumer Indirect Purchaser Plaintiffs ("IPPs"), and Commercial and Institutional Indirect Purchaser Plaintiffs (CIPs").  Each group consists of individuals or companies who have either directly or indirectly purchased pork products from one of the Defendants.[1]  Each class has filed a separate, consolidated complaint, alleging that the Defendants conspired with one another to increase the price of pork products.[2]  Because the factual allegations in each of the three complaints are nearly identical, the Court will consider them interchangeably.

---

[1] Defendants are:  Agri Stats, Inc. ("Agri Stats"); Clemens Food Group, LLC, and The Clemens Family Corporation (together and separately, "Clemens"); Hormel Foods Corporation and Hormel Foods, LLC (together and separately, "Hormel"); Indiana Packers Corporation and Mitsubishi Corporation (Americas) (together and separately, "Indiana Packers"); JBS USA Food Company and JBS USA Food Company Holdings (together and separately, "JBS USA"); Seaboard Foods LLC and Seaboard Corporation (together and separately, "Seaboard"); Smithfield Foods, Inc. ("Smithfield"); Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. (together and separately, "Tyson").

[2] The DPP's consolidated complaint can be found at Civ. No. 18-1803, Docket No. 83 ("DPP Compl.").  The IPP's consolidated complaint can be found at Civ. No. 18-1776, Docket No. 74 ("IPP Compl.").  The CIP's complaint can be found at Civ No. 18-1891, Docket No. 63 ("CIP Compl.").

## I.     FACTUAL BACKGROUND

### A.     Ability and Motivation to Collude

The pork industry is "horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated." (Civ. No. 18-1803, DPP Compl. ¶ 76, Aug. 17, 2018, Docket No. 83.) The top four participants—Defendants Smithfield, Tyson, JBS USA, and Hormel—control an almost 70 percent market share. (*Id.* ¶ 77.) Smithfield and JBS USA each control over 20 percent of the market, and Tyson controls 18 percent. (*Id.* ¶ 80.) Taken together, the top eight participants, all of whom are Defendants in this case, control over 80 percent of the market. (Civ. No. 18-1776, IPP Compl. ¶ 113, Aug. 17, 2018, Docket No. 74.) The top eight participants have maintained their dominant position in the market for most of the last twenty years. (*Id.* ¶ 118.)

The sustained market concentration inherent in the pork industry is due in part to the significant barriers to entry placed on new competitors. For example, building a new facility can cost hundreds of millions of dollars. (DPP Compl. ¶ 84.) Accruing such capital can be difficult, which works to dissuade potential competitors. (IPP Compl. ¶ 122.) Another barrier to competitor entry is the unique nature of the industry itself. Most of the largest pork integrators do not produce their own pigs but instead enter into contracts with independent farmers who raise the pigs until they are ready to be slaughtered. (DPP Compl. ¶ 70.) Because "[m]ost of the hogs produced in the U.S. are sold under a multi-year contract," it is difficult for any potential competitor to find pigs to purchase. (*Id.* ¶ 85.)

Plaintiffs allege that this market concentration put the pork industry in "an ideal zone for collusion," as Defendants–through market domination and contractual

arrangements–were in a position to "manipulate price through an agreement among the relatively few dominant players." (*Id.* ¶ 82).

In addition to being highly concentrated, the pork industry is also relatively unique because pork is considered a "commodity product." (*Id.* ¶ 133.) This means that the pork products produced by the various industry participants are largely indistinguishable from one another. (*Id.*) Thus, price is the only means by which most consumers distinguish the companies. (IPP Compl. ¶ 124.) Defendants are therefore discouraged from raising their prices individually, because each of their products are largely interchangeable. Pork is also subject to a "highly inelastic" demand, meaning that demand does not typically decrease when pork prices increase. (*Id.* ¶ 123.)

Accordingly, Plaintiffs allege that not only were Defendants in a position to collude, but also that this unique industry set-up, wherein one company suffers if it unilaterally raises its prices but no companies suffer if they all raise their prices, made such an agreement possible–and necessary–if Defendants wanted to increase prices.

Finally, Plaintiffs allege that Defendants were motivated to enter into such an agreement, because pork product prices were flat between 2000 and 2009, holding at less than $1.40 per pound. (DPP Compl. ¶ 131.) Therefore, Plaintiffs claim that Defendants had the ability to collude, the need to collude, and the motivation to collude.

**B.    The Conspiracy**

Plaintiffs allege that, starting in 2009, Defendants began to discretely conspire with one another to decrease pork production and/or to limit production increases in an effort to raise the price of pork. (*Id.* ¶ 2.) According to Plaintiffs, Defendants carried out this

alleged conspiracy in two synchronized ways.  First, Defendants aimed public statements

at one another emphasizing the need to cut production, which also served to signal each

Defendants' continued adherence to the overall conspiracy.  (Civ. No. 18-1891, CIP

Compl. ¶ 5, Aug. 17, 2018, Docket No. 63.)  Second, as a means of enforcement and

oversight, "Defendants exchanged detailed, competitively sensitive, and closely guarded

non-public information about prices, capacity, sales volume, and demand through their co-

conspirator, Defendant Agri Stats."  (*Id.* ¶ 2.)

### 1.    Public Statements

Beginning in 2009, several of the Defendants openly acknowledged that price-

stagnation inherent in the pork industry was an issue that required an industry wide

solution–i.e. a reduction in production.   For example, Smithfield's CEO noted that

"overproduction and the oversuppl[y] of hogs . . . [were] driving our hog market down."

(DPP Compl. ¶ 112.)  He acknowledged that Smithfield, in response to that overproduction,

had started cutting back on its pig operation, but noted that its production cuts were not

enough to "fix" the hog industry and stressed that "somebody else has got to do something."

(*Id.* ¶ 114.)  He also stated that Smithfield "had done its 'fair share'" to cut supply, that it

had taken a leadership role in doing so, and that further cuts "would probably be needed to

'put this industry back in balance,'" specifically calling for cuts in the Midwest.  (*Id.* ¶

118.)

Smithfield's CEO also acknowledged that, by September 2009, it had already "had

conversations with several sizable, more than sizable large producers, in fact very large

producers" and that he was aware that they would be "doing some liquidation." (*Id.* ¶ 117.)

This statement was corroborated by several industry participants within the following year, as many Defendants made similar public acknowledgments. Hormel stated that it was looking at cutting pork supply and that it had noticed a contraction in the market, (*id.* ¶¶ 111, 113), Tyson acknowledged that it "expected to see . . . pork production decrease into 2010 and beyond to improve producer profitability," (*id.* ¶ 115), and JBS confirmed that it expected to see some shortage in the industry, (*id.* ¶ 116).

Statements of this nature continued into the following years. In 2010 Smithfield once again publicly acknowledged that it would continue cutting production. (*Id.* ¶ 119.) Hormel stated that it believed industry production would not increase. (*Id.* ¶ 122.) In 2012, Smithfield argued that no one would be "real excited about adding capacity," (*id.* ¶ 125), and JBS stated that it was running on a sold-out position, (*id.* ¶ 126), and that "restrictions in supply" contributed to "good margins," (*id.* ¶ 128). In 2013, Smithfield noted that it had a limited ability to move prices up on its own through supply and demand but that "the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace." (*Id.* ¶ 127.)

Through these public statements, Plaintiffs allege, Defendants were able to "communicate their planned supply restrictions to their competitors in furtherance of the conspiracy" throughout the conspiracy's existence. (*Id.* ¶ 109.)

### 2.     Agri Stats

Equally if not more important to the alleged conspiracy was Defendants' use of Agri Stats, Inc. Agri Stats is a company that "collects participant financial and production data[,] . . . convert[s] the data, [and] prepare[s] it for comparison." (*Id.* ¶ 50.) Plaintiffs

refer to this practice as "benchmarking," and describe it as "the act of comparing one company's practices, methods or performance against those of other companies." (*Id.* ¶ 43.) Benchmarking is useful for industry participants because it can "reduce[] strategic uncertainty in the market and change[] the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition." (*Id.*)

Agri Stats' benchmarking reports are available only to those who participate in the data-sharing, and therefore the reports are never released to the public. (*See id.* ¶ 2.) Partially for this reason, Agri Stats has described itself as "kind of a quiet company . . . [t]here's not a whole lot of people that know a lot about us." (*Id.* ¶ 144.)

Beginning in 2008, Agri Stats publicly encouraged "[e]ach and every commercial swine operation . . . to participate in some benchmarking effort" by sharing sensitive information with it. (*Id.* ¶ 44.) Agri Stats encouraged every market participant to join its efforts because full participation would lead to the "maximum benefit, production, cost and financial performance." (IPP Compl. ¶ 71) Agri Stats further stated that participants "could design and operate their own benchmarking effort," ranging from "simple production comparisons to elaborate and sophisticated total production and financial comparisons." (DPP Compl. ¶¶ 44, 46.) Agri Stats was also clear about its purpose, informing potential participants that "the ultimate goal" of its benchmarking process was "increasing profitability – not always increasing the level of production." (*Id.* ¶ 45.)

Plaintiffs allege that, in 2009, each Defendant accepted Agri Stats' offer to engage in benchmarking. [3] (*Id.* ¶ 47.) Accordingly, Agri Stats began collecting data from the Defendants. (IPP Compl. ¶¶ 78-79.) This data generally consists of sensitive and proprietary business information, including information on a given Defendant's "production levels and short and long-term production capacity," (DPP Compl. ¶ 48), as well as "profits, prices, and costs," (*id.* ¶ 4). In exchange for sharing this information, Defendants receive monthly reports that "compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies." (*Id.* ¶ 51.)

While Agri Stats technically anonymizes the monthly reports by giving each Defendant a unique identity number, the monthly reports "contain such detailed figures covering every aspect of pork production and sales that participants can accurately identify the companies behind the metrics." (*Id.* ¶ 61.) The ability for one Defendant to identify another Defendant's metrics is aided not only by the level of detail provided within the reports, but also by the fact that Agri Stats never changes the identity numbers of the Defendants. (*Id.* ¶ 62.) This is true even though Agri Stats knows that the Defendants are able to decipher the identities of the other producers. (*Id.* ¶ 65). Thus, while nominally anonymous, Agri Stats' monthly reports allow each Defendant to see critical commercial information from each of the other Agri Stats users. Accordingly, not only can the market

---

[3] Agri Stats was so ubiquitous in the industry that at one point, "over 90% of the poultry and pig market use[d] Agri Stats." (DPP Compl. ¶ 49).

participants see "the data necessary to coordinate production limitations and manipulate prices," they also have a mechanism by which to enforce compliance with the overall conspiracy. (*Id.* ¶ 66.) In this way, Agri Stats is critical to the alleged conspiracy because its reports "serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures . . . for signs of cheating." (*Id.* ¶ 66.)

## C.    The Conspiracy in Motion

Prior to 2009, total pork production increased steadily year to year, spiking in 2008. However, in the years following, and in concert with the beginning of the alleged conspiracy, production rates departed from their historic trends. In the years 2009, 2010, and 2013, net production actually decreased.[4]

---

[4] Production levels also decreased in 2014, but Plaintiffs acknowledge that this dip was due to a deadly pig disease. (DPP Compl. ¶ 107.)



(CIP Compl. ¶ 115.)

At the same time as the industry decreased overall production, the industry also dramatically increased the percentage of pork that was exported. (DPP Compl. ¶ 108.) Prior to 2010, the percentage of total pork that was exported was consistently below 15%, spiking abnormally in 2008 at 20%. (*Id.*) However, between 2010–2015, that number remained steadily above 20%, at times nearly reaching 25%. (*Id.*) Plaintiffs allege that "[s]ending production overseas is another way in which Defendants can reduce the supply available to U.S. markets." (*Id.*)

Ultimately, Plaintiffs claim that the conspiracy and practice of limiting pork production was successful. Starting in 2009, as pork production decreased, prices increased. As noted earlier, from 2000 to 2009 pork product prices remained below $1.40

per pound.  (*Id*. ¶ 131.)  After 2009, prices rose to as high as $1.80 per pound and have not dropped below $1.40 per pound.  (*Id*.)  The same is true for the wholesale market price. Between 1998 and 2009, the hog market year average was at or below $50 every year.  (IPP Compl. ¶ 126.)  That price jumped to $76.30 by 2015.  (*Id*.)  Further, the average wholesale price per pound increased dramatically:



(IPP Compl. ¶ 126.)  This same trend is seen across a variety of pork products, indicating that the inflated pork prices were passed on to consumers.  (*See* CIP Compl. ¶¶ 142–45.)

Finally, Plaintiffs allege that the conspiracy was able to succeed for a sustained period because Defendants actively concealed its very existence.  Defendants did this through:

> [V]arious means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint

communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

(IPP Compl. ¶ 141; DPP Compl. ¶ 143; CIP Compl. ¶ 147).

## II.    PROCEDURAL BACKGROUND

In 2018, thirteen putative classes brought various antitrust actions against Defendants. As noted above, the thirteen classes were subsequently organized into three combined classes. The DPPs are a class "consisting of all persons and entities who purchased pork directly from a Defendant or co-conspirator." (DPP Compl. at 7.) The IPPs are a class of individuals and consist "of all persons and entities who purchased pork indirectly from a defendant or co-conspirator for personal use." (IPP Compl. at 4.) Finally, the CIPs are a class of businesses who "purchased pork indirectly from a Defendant or co-conspirator . . . for their own business use in commercial food preparation." (CIP Compl. at 2.)

Once categorized into these three classes, each class filed an amended complaint on August 17, 2018. (*See* DPP Compl., IPP Compl., CIP Compl.) Each class alleges that Defendants violated Section 1 of the Sherman Act by conspiring to fix the price of pork. The IPPs and CIPs further allege that Defendants violated a number of state antitrust and consumer protection laws for the same reason.

Defendants subsequently brought the present consolidated and individual motions to dismiss. First, Defendants brought a consolidated motion to dismiss the Sherman Act claims in each of the three complaints, arguing that each class of Plaintiffs has failed to state a claim upon which relief can be granted. (Civ. No. 18-1776, 1st Joint Mot. to Dismiss, Oct. 23, 2018, Docket No. 161.) Defendants also brought a joint motion to dismiss the IPP and CIP state law claims. (2d Joint Mot. to Dismiss, Oct. 23, 2018, Docket No. 164.) Additionally, each individual Defendant brought a motion to dismiss all the above claims, arguing that each class of Plaintiffs had failed to adequately state a claim as to it.[5]

## DISCUSSION

### I. STANDARD OF REVIEW

Reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true and construes the pleadings in a light most favorable to the non-moving party. *See, e.g., Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.,* 270 F.3d 637, 638 (8th Cir. 2001) (per curiam). To survive a motion to dismiss, however, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[5] Each of the individual motions to dismiss are found in Case Number 18-1776 and were brought on October 23, 2018. (*See* Clemens Mot. to Dismiss, Docket No. 167; Hormel Mot. to Dismiss, Docket No 169; Americas Mot. to Dismiss, Docket No. 172; JBS Mot. to Dismiss, Docket No. 175; Seaboard Mot. to Dismiss, Docket No. 177; Smithfield Mot. to Dismiss, Docket No. 181; Triumph Mot. to Dismiss, Docket No. 183; Tyson Mot. to Dismiss, Docket No. 186; and Agri Stats Mot. to Dismiss, Docket No. 188.)

-14-

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, to avoid dismissal, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quotations omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility" and, therefore, must be dismissed. *Id.* (quotations omitted). At the motion to dismiss stage, the record for review before the Court is generally limited to the complaint and any documents attached as exhibits that are necessarily embraced by the complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

## II.    THE FEDERAL SHERMAN ACT CLAIMS

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a claim under Section 1 of the Sherman Act "a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Insignia Sys., Inc. v. News Am. Mktg. In–Store, Inc*., 661 F .Supp. 2d 1039, 1062 (D. Minn. 2009) (quotations omitted).

Because Section 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984),

"'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (alterations in original) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

"Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp.*, 467 U.S. at 768. Thus, where—as here—a plaintiff alleges horizontal price fixing or that a defendant entered into an agreement with competing retailers to limit output in order to increase price, the only thing that must be alleged at the motion to dismiss stage is that defendants acted collectively. To adequately plead this requirement, "the plaintiff must demonstrate that the defendants shared a 'unity of purpose or a common design and understanding, or a meeting of the minds.'" *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1273 (8th Cir. 1983)).

Defendants argue that Plaintiffs have failed to adequately allege an agreement. Plaintiffs do not dispute that they have not alleged a direct and explicit agreement at this stage. However, Plaintiffs point out that courts have long recognized that such direct evidence is rare, particularly at the pleading stage. *See ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553 (8th Cir. 1991). Courts must often consider whether complaints which fall short of alleging the "smoking gun" nevertheless allege sufficient circumstantial facts to plausibly establish that defendants agreed to engage in the given anticompetitive

conduct. Instead of direct evidence, therefore, agreements may "be proved by inferences that may be drawn from the behavior of the alleged conspirators." *Id.* (quotations omitted).

Plaintiffs that lack smoking gun evidence often highlight "parallel conduct" between defendants—such as when several defendants raise or lower prices together—to demonstrate that an agreement is plausible.[6] The Eighth Circuit has repeatedly recognized that a plaintiff can survive a motion to dismiss by alleging parallel conduct, but has specified that "[p]leading only 'parallel conduct' or other conduct 'merely consistent with [an] agreement' is not sufficient to show a conspiracy." *Insulate*, 797 F.3d at 544 (quoting *Twombly*, 550 U.S. at 557) (emphasis removed). *See also In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane I*"), 860 F.3d 1059, 1069 (8th Cir. 2017) (quoting *Twombly*, 550 U.S at 557) ("[A]n allegation of parallel conduct . . . gets the complaint close to stating a claim.") Instead, "it is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence— often referred to as 'plus factors.'" *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 991 (W.D. Ark. 2017) (quotations omitted). "Such 'plus factors' may include: (1) a shared motive to conspire; (2) action against self-interest; (3) market concentration; and (4) a high-level of interfirm communication exist[ing] in conjunction with the parallel

---

[6] Parallel conduct sufficient to be interpreted as collusive can be defined as "behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" or as "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Twombly*, 550 U.S at 557, n. 4 (citations and quotations omitted).

actions," amongst others. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1013 (E.D. Mo. 2018) (quotations omitted).

Plaintiffs argue that their complaints allege parallel conduct and plus factors sufficient to support a plausible inference of an agreement. For plus factors, Plaintiffs point to the collusive and constricted nature of the industry, the inelasticity of pork demand, trade associations attended by the Defendants, actions taken by some of the Defendants' against their own self-interests, pricing practices, and the fact that some of these Defendants engaged in similar practices in the chicken industry. (*See generally* Pls.' Mem. Opp. at 47-56, Nov. 30, 2018, Docket No. 229.) Additional plus factors include the central role that Agri Stats played in the alleged conspiracy and the frequent public statements made by Defendants regarding the state of the pork market.[7]

The plus factors identified and discussed by Plaintiff are undoubtedly strong and are of the type often used to support an inference of an agreement. However, in the same way that parallel conduct on its own is insufficient to establish an agreement, plus factors without plausible allegations of parallel conduct are insufficient to establish an inference

---

[7] Plaintiffs also claim that "Defendants' participation in Agri Stats alone provides a plausible basis for the conspiracy." (Mem. Opp. at 29.) It is unclear to the Court whether Plaintiffs are arguing that Defendants' use of Agri Stats would by itself constitute a plausible allegation of a conspiracy, or if the use of Agri Stats supports their allegations of parallel conduct. Plaintiffs cite *Todd v. Exxon Corp.*, 275 F. 3d 191 (2d Cir. 2001), and its discussion of how information sharing services interact with antitrust allegations. To the extent that Plaintiffs are asserting that the use of Agri Stats alone is sufficient to allege a conspiracy, the Court disagrees. *Todd* itself explained that information sharing "is not illegal *per se*, but can be found unlawful under a rule of reason analysis." *Id.* at 198. However, the antitrust violations here are centered on a per se violation. Accordingly, the Court believes that the Agri Stats allegations are correctly viewed as a "plus factor," as they were in *In re Broiler Chicken Antitrust Litigation*. 290 F. Supp. at 800.

of an agreement.  *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) ("Because Irmat fails to plausibly plead parallel conduct, no discussion of any "plus factors" is necessary."); *see also In re Beef Indus. Antitrust Litig. MDL Docket No. 248*, 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel."); *In re Travel Agent Comm'n Antitrust Litig.*, No. 1:03 CV 30000, 2007 WL 3171675, at *4 (N.D. Ohio Oct. 29, 2007) (dismissing some defendants because the complaint provided insufficient facts to conclude that they engaged in the alleged parallel conduct).

While Plaintiffs' cited plus factors are strong, the allegations at this point regarding parallel conduct are sparse and conclusory.  Plaintiffs assert that the Defendants conspired together to limit the supply of pork, and that their actions in furtherance of that agreement— actually limiting pork supply—constituted parallel conduct.  Plaintiffs allege, at most, two types of actions:  (1) that Defendants intentionally decreased the production of pork, and (2) that Defendants intentionally exported a greater percentage of their pork.[8]

To attempt to show that Defendants engaged in parallel conduct by decreasing the total production of pork, Plaintiffs rely on industry-wide data and public statements made by some of the individual Defendants.  While the industry-wide data certainly shows that

---

[8] Of course, such actions may constitute parallel conduct in antitrust cases.  *See Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877 (N.D. Ill. 2009) (restriction of steel output); *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) (supply restriction of eggs); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) (supply restriction of chickens).

pork production decreased in various years after 2009, it does nothing to indicate how any of the individual Defendants acted. Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork. And that type of information is vital to pleading parallel conduct.

For instance, the complaint in *In re Broiler Chicken Antitrust Litig.*, a case on which Plaintiffs rely, alleges specific production cuts from specific individual defendants. 290 F. Supp. 3d at 782 ("defendants Tyson, Pilgrim's, Foster Farms, Peco Foods, and Perdue cut back their Broiler production . . . Five more defendants—Fieldale Farms, 5 Simmons, Wayne Farms, O.K. Foods, and Koch Foods . . . —followed suit with their own production cuts in April 2008."); *see also id.* at 795 ("Plaintiffs allege a range of percentage reductions of between 1.25% and 10%."). Likewise, the allegations in *Standard Iron Works,* another case relied on by Plaintiffs, were similarly specific and individualized. 639 F. Supp. 2d at 886 (noting that "all Defendants are alleged to have implemented massive and unprecedented production cuts" before detailing the actions taken by the various defendants). In the present case, however, Plaintiffs rely almost exclusively on industry-wide data and ask the Court to infer that the individual Defendants all contributed to the decreased production, seemingly simply because they make up the majority of the industry.[9] The Court will not engage in such speculation. While it is entirely possible that each of the accused Defendants engaged in production cuts as alleged, "[t]he plausibility

_____

[9] Plaintiffs do adequately plead that Smithfield engaged in production cuts.

-20-

standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  Without more specific facts, Plaintiffs' allegations that the Defendants engaged in production cuts are nothing more than bare assertions.

Nor do Plaintiffs adequately plead when each Defendant undertook production cuts. In *Park Irmat Drug Corp.*, the Eighth Circuit found that plaintiffs had failed to plead parallel conduct in part because the alleged parallel conduct "lack[ed] temporal proximity." 911 F.3d at 516.  *See also In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441 (E.D. Pa. 2018) (plaintiffs must allege conduct that is "reasonably proximate in time and value") (citations omitted).  Here, Plaintiffs do not plead with any specificity which Defendants reduced production during which years.  Instead, they simply point to industry-wide decreases over more than a five-year period.  The Court is therefore unable to analyze whether Defendants' production cuts were temporally proximate.

Perhaps acknowledging the dearth of specific allegations, Plaintiffs cite public statements made by some of the Defendants.  Plaintiffs are correct that public statements are often considered relevant in determining whether a conspiracy was adequately alleged. *See, e.g.*, *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d at 797-98.  However, these statements are nearly always analyzed as "plus factors."  *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011); *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1374 (N.D. Ga. 2017). Rarely are statements used as evidence of the parallel conduct itself.

Nevertheless, Plaintiffs here highlight public statements as direct evidence of production cuts. For example, in 2009 Smithfield's CEO (1) admitted that it had spoken with other industry actors; (2) publicly stated that Smithfield was taking a leadership position by reducing its herds; and (3) lamented that its cuts alone would not be enough to fix the industry and stated that other companies needed to begin making cuts. Smithfield later again admitted that it had made significant cuts and confirmed that it was unlikely to reverse those cuts.

Plaintiffs assert that Smithfield's sentiment was echoed by, at a minimum, Tyson, JBS, Hormel, and Indiana Packers, and that the collective statements amount to an admission of parallel conduct. But besides Smithfield's clear acknowledgment that it made cuts, the public statements referenced by Plaintiffs do not read as admissions that any other individual Defendant made cuts. Instead, the statements cited generally refer to the industry as a whole, and are largely vague. For example, Hormel stated that it saw "a contraction in the overall supply of hogs for the year but not as much as [it had] originally anticipated," and that it would "look for opportunities" to cut supply. (DPP Compl. ¶¶ 111, 113). Tyson's COO acknowledged that "[w]e do expect to see liquidation accelerate and pork production decrease." (DPP Compl. ¶ 115.) JBS stated that "we are seeing the start . . . we are seeing some more [hog] liquidation." (DPP Compl. ¶ 116.) None of these statements indicate that any individual Defendant was making cuts; but rather that each Defendant simply noticed that the industry's production as a whole was declining. At a minimum, the statements are too indefinite to plausibly establish that any Defendant other than Smithfield actually made cuts. Although it is true that Smithfield claimed that it

discussed cuts with other industry producers and publicly stated that other producers would start making cuts, such statements form no basis on which to conclude that the specific Defendants alleged here actually undertook production cuts. Plaintiffs attempt to implicate the non-Smithfield Defendants through Smithfield's public statements is weak and does not suffice to plausibly establish parallel conduct.

This same analysis applies to the export theory of parallel conduct.[10] Plaintiffs give no individualized examples of any one Defendant increasing its rate of export, but simply provide the Court with the industry-wide data. As discussed above, this does not suffice to plausibly plead parallel conduct.

Except for Smithfield, the Court finds no **specific** allegations in the complaints that plausibly establish that the individual Defendants decreased their own production of pork. It is clear that the pork industry as a whole saw a decrease in production in various years following 2009. But Plaintiffs have not adequately pleaded that this decrease was the result of consciously parallel conduct undertaken by the specific Defendants they accuse. Instead, Plaintiffs rely on industry-wide data and vague public statements and ask the Court to infer that each Defendant engaged in similar parallel conduct simply because they make up the majority of the industry. It may be true that some of these Defendants cut production in the years following 2009. It may also be true that all of these Defendants cut production. The fact that the complaints contain this ambiguity is exactly the problem, and the Court

---

[10] It is unclear whether Plaintiffs allege that the export increase is a separate example of parallel conduct or merely wrapped into the larger pork output decrease.

is unwilling to force Defendants into significant and costly discovery without plausible allegations that they engaged in the conduct alleged.[11]   Therefore, the Court finds that Plaintiffs have not adequately pleaded parallel conduct, an essential element in showing that Defendants engaged in an agreement to limit the supply of pork.  For that reason, the Court finds that Plaintiffs have not sufficiently stated a claim upon which relief may be granted.

## III.    STATE ANTITRUST CLAIMS

In addition to the federal Sherman Act claims brought by each class of Plaintiffs, the CIP and the IPP plaintiffs also brought a variety of consumer protection and antitrust state law claims.  Defendants move to dismiss these claims on a variety of grounds.  Their primary argument is that each of the state law claims requires Plaintiffs to allege a conspiracy to limit the supply of pork and that, because Plaintiffs fail to do so, all of the state law claims fail.  Plaintiffs do not disagree.  Because the Court finds that Plaintiffs have failed to adequately plead a conspiracy, the Court will grant Defendants' motions to dismiss the state law claims.

---

[11] This concern is particularly true here, where Plaintiffs name both subsidiaries and parents as Defendants yet make no attempt to distinguish the actions of the two, instead grouping them together.  As Defendants point out, "[c]ourts have generally held that, in order for antitrust allegations against a subsidiary to be fairly made against the parent company, there must be allegations that the parent company actually engaged in anti-competitive conduct and not merely that it served as parent to its wholly-owned subsidiary."  *Reg'l Multiple Listing Serv. of Minnesota, Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1044 (D. Minn. 2014).

## IV.  LEAVE TO AMEND

Plaintiffs seek leave to amend their complaints.  Under Federal Rule of Civil Procedure 15(a)(2), leave to amend "shall be freely given where justice so requires."  "A district court may appropriately deny leave to amend where there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment."  *Moses.com Secs., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005) (quotations omitted).

Defendants argue that the Court should deny leave to amend because Plaintiffs already amended their Complaints and "no further amendment could cure the fatal defects." (Defs.' Reply at 37, Dec. 21, 2018, Docket No. 234.)  Defendants do not, however, argue that Plaintiffs have unduly delayed this case, acted in bad faith, or repeatedly failed to cure deficiencies in their complaints.  While it is true that Plaintiffs have amended their complaints before, this is the first time the Court has identified any deficiencies, and the Court does not believe that those deficiencies cannot be cured.  The Court will therefore give Plaintiffs the opportunity to amend their complaint.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Complaint and the Federal Law Claims in the Indirect Purchaser Plaintiffs' Complaints

[Docket No. 161] is **GRANTED**;

2.      Defendants' Joint Motion to Dismiss the State Law Claims in the Indirect

Purchaser Plaintiffs' Complaints [Docket No. 164] is **GRANTED**;

3.      The Direct Purchaser Plaintiffs' First Amended Complaint [Civ. No. 18-

1803, Docket No. 83] is **DISMISSED** without prejudice.

4.      The Consumer Indirect Purchaser Plaintiffs' First Amended Complaint [Civ.

No. 18-1776, Docket No. 74] is **DISMISSED** without prejudice.

5.      The Commercial and Institutional Indirect Purchaser Plaintiffs' First

Amended Complaint [Civ No. 18-1891, Docket No. 63] is **DISMISSED** without prejudice;

6.      All individual Motions to Dismiss [Docket Nos. 167, 169, 172, 175, 177,

181, 183, 186, and 188] are **DENIED** as moot;

7.      Each class of consolidated Plaintiffs shall have ninety [90] days from the date

of this order to file an amended complaint.


DATED:  August 8, 2019                    _____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                              Chief Judge
                                                  United States District Court