UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

```
------------------------------------------------------------
                                  )
In Re Pork Antitrust Litigation   )  COURT FILE
                                  )  NO. 18-CV-1776 (JRT/HB)
--------------------------------- )
                                  )
Wanda Duryea, et al.,             )
                                  )
                   Plaintiffs,    )
                                  )
         vs.                      )
                                  )
Agri Stats, Inc., et al.,         )  Devitt Courtroom
                                  )  Tuesday, July 2, 2019
                   Defendants.    )  St. Paul, Minnesota
                                  )  2:00 P.M.
------------------------------------------------------------
```

**<u>CASE MANAGEMENT CONFERENCE</u>**


BEFORE THE HONORABLE HILDY BOWBEER
UNITED STATES MAGISTRATE JUDGE


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**A P P E A R A N C E S :**


**For the Direct Purchaser Plaintiffs:**

**LOCKRIDGE GRINDAL NAUEN, PLLP**
By:   BRIAN D. CLARK, ESQUIRE
STEPHANIE CHEN, ESQUIRE
SIMEON A. MORBEY, ESQUIRE
100 Washington Ave. So. - Suite 2200
Minneapolis, Minnesota  55401

**PEARSON, SIMON & WARSHAW, LLP**
**(California)**   By:   CLIFFORD H. PEARSON, ESQUIRE
JOSEPH C. BOURNE, ESQUIRE
800 LaSalle Avenue - Suite 2150
Minneapolis, Minnesota  55402


**For the Commercial Indirect Purchaser Plaintiffs:**

**LARSON KING, LLP**
By:   SHAWN M. RAITER, ESQUIRE
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, Minnesota  55101

**CUNEO GILBERT & LaDUCA, LLP**
By:   A. BLAINE FINLEY, ESQUIRE
4725 Wisconsin Avenue, NW  Suite 200
Washington, D.C.  20016


**For the Consumer Indirect Purchaser Plaintiffs:**

**GUSTAFSON GLUEK, PLLC**
By:   BRITTANY N. RESCH, ESQUIRE
120 South Sixth Street - Suite 2600
Minneapolis, Minnesota  55402

**HAGENS BERMAN SOBOL SHAPIRO, LLP**
By:   SHANA E. SCARLETT, ESQUIRE
RIO S. PIERCE, ESQUIRE
BREANNA VAN ENGELEN, ESQUIRE
715 Hearst Avenue - Suite 202
Berkeley, California  94710

**A P P E A R A N C E S :   (Continued)**


For defendant Agri Stats, Inc.:

                        **HOGAN LOVELLS US, LLP**
                        By:  WILLIAM L. MONTS, ESQUIRE
                             JUSTIN W. BERNICK, ESQUIRE
                        Columbia Square
                        555 Thirteenth Street, NW
                        Washington, D.C.  20004


For Winn-Dixie Stores, Inc. and BI-LO Holdings, LLC:

                        **THOMPSON TARASEK LEE-O'HALLORAN**
                        By:   JAMES W. ANDERSON, ESQUIRE
                        7101 York Avenue South - Suite 255
                        Edina, Minnesota  55435

                        **AHERN and ASSOCIATES, P.C.**
                        By:  THEODORE B. BELL, ESQUIRE
                        590 North Sheridan Road
                        Lake Forest, Illinois  60045


For defendant Clemens Food Group:

                        **KIRKLAND & ELLIS, LLP**
                        By:  CHRISTINA BRIESACHER, ESQUIRE
                        300 North LaSalle
                        Chicago, Illinois  60654

                        **GREENE ESPEL, PLLP**
                        By:  VIRGINIA R. McCALMONT, ESQUIRE
                        222 South Ninth Street - Suite 2200
                        Minneapolis, Minnesota  55402


For defendant Hormel Foods Corporation:

                        **FAEGRE BAKER DANIELS, LLP**
                        By:  EMILY E. CHOW, ESQUIRE
                             CRAIG S. COLEMAN, ESQUIRE
                             ISAAC B. HALL, ESQUIRE
                        2200 Wells Fargo Center
                        90 South Seventh Street
                        Minneapolis, Minnesota  55402-3901

**A P P E A R A N C E S :**   (Continued)


**For defendants Indiana Packers Corporation**
     **and Mitsubishi Corporation (Americas):**


                         **MAYER BROWN, LLP**
                         By:  BRITT M. MILLER, ESQUIRE
                              ROBERT E. ENTWISLE, ESQUIRE
                         71 South Wacker Drive
                         Chicago, Illinois  60606

                         **DORSEY & WHITNEY, LLP**
                         By:  JAIME STILSON, ESQUIRE
                         50 South Sixth Street - Suite 1500
                         Minneapolis, Minnesota  55402-1498



**For defendant Seaboard Foods, LLC, and**
     **Seaboard Corporation:**


                         **STINSON LEONARD STREET, LLP**
                         By:  PETER J. SCHWINGLER, ESQUIRE
                         50 South Sixth Street - Suite 2600
                         Minneapolis, Minnesota  55402



**For defendant Smithfield Foods, Inc.:**


                         **GIBSON, DUNN & CRUTCHER, LLP**
                         By:  BRIAN ROBISON, ESQUIRE
                              RACHEL W. ROBERTSON, ESQUIRE
          **(Washington, D.C.)**      STEPHANIE E. PEARL, ESQUIRE
                         2100 McKinney Avenue - Suite 1100
                         Dallas, Texas  75201-6912

                         **LARKIN HOFFMAN**
                         By:  JOHN A. COTTER, ESQUIRE
                         8300 Norman Center Drive
                         Suite 1000
                         Minneapolis, Minnesota  55437

**A P P E A R A N C E S :   (Continued)**

**For defendant Triumph Foods:**

        **HUSCH BLACKWELL, LLP**
        By:  GENE SUMMERLIN, ESQUIRE
**(Kansas City)**     MEGAN A. SCHEIDERER, ESQUIRE
        13330 California Street - Suite 200
        Omaha, Nebraska  68154

**For defendant Tyson Foods:**

        **AXINN VELTROP & HARKRIDER, LLP**
        By:  TIFFANY RIDER ROHRBAUGH, ESQ.
        950 F Street, NW - 7th Floor
        Washington, D.C.  20004

        **DYKEMA GOSSETT, PLLC**
        By:  DAVID P. GRAHAM, ESQUIRE
        4000 Wells Fargo Center
        90 South Seventh Street
        Minneapolis, Minnesota  55402

**For defendant JBS USA Food Company:**

        **SPENCER FANE, LLP**
        By:  DONALD G. HEEMAN, ESQUIRE
        JESSICA J. NELSON, ESQUIRE
        100 South Fifth Street - Suite 1900
        Minneapolis, Minnesota  55402

        **QUINN EMANUEL URQUHART**
        **& SULLIVAN, LLP**
        By:  SAMI H. RASHID, ESQUIRE
        STEPHEN R. NEUWIRTH, ESQUIRE
        1300 I Street NW - Suite 900
        Washington, D.C.  20005

*     *     *     *

1          (2:00 p.m.)

2                         **P R O C E E D I N G S**

3                          **IN OPEN COURT**

4          THE COURT:  Good afternoon, everyone.  Please be

5    seated.  It seems like every time we get together it's a

6    different courtroom.

7          All right.  We are in court this afternoon for a

8    case management conference in the matter of In Re Pork

9    Antitrust Litigation.  This is a proceeding under Matter

10   Number 18-CV-1776.

11         So let me start by getting some appearances, first

12   on behalf of the Direct Purchaser Plaintiffs.

13         MR. CLARK:  Your Honor, Brian Clark on behalf of

14   the Direct Purchaser Plaintiffs.

15         MS. CHEN:  Your Honor, Stephanie Chen on behalf of

16   the Direct Purchaser Plaintiffs.

17         MR. BOURNE:  Good afternoon, Your Honor.  Joe

18   Bourne from Pearson, Simon & Warshaw for the Direct

19   Purchaser Plaintiffs.

20         THE COURT:  Okay.  And next on behalf of -- is

21   that it for the Direct Purchaser Plaintiffs, first?

22         MR. CLARK:  Yes, Your Honor.

23         THE COURT:  So next on behalf of the Commercial

24   Indirect Purchaser Plaintiffs.

25         MR. RAITER:  Good afternoon, Your Honor.  Shawn

 1    Raiter on behalf of the Commercial Indirects.

 2              THE COURT:  Anyone else for the Commercial

 3    Indirect group?

 4              All right.  And next on behalf of the Consumer

 5    Indirect Purchaser Plaintiffs.

 6              MS. RESCH:  Good afternoon, Your Honor.  Brittany

 7    Resch from Gustafson Gluek on behalf of the Consumer

 8    Indirect Purchaser Plaintiffs.

 9              THE COURT:  And anybody else appearing for that

10    group?

11              All right.  Let's turn then to appearances for the

12    defendants, first on behalf of Agri Stats.

13              MR. MONTS:  Good afternoon, Your Honor.  It's

14    William Monts and Justin Bernick from Hogan Lovells on

15    behalf of Agri Stats.  We're on the telephone, obviously.

16              THE COURT:  All right.  I heard Justin Bernick,

17    but -- oh, William Monts.  Okay.

18              I should ask, is there anybody on the phone

19    appearing for Plaintiffs?

20              MR. PEARSON:  Yes, Your Honor, Clifford Pearson,

21    Pearson, Simon & Warshaw, for the Direct Purchaser

22    Plaintiffs.

23              THE COURT:  Go ahead.  Anybody else for

24    Plaintiffs?

25              MR. MORBEY:  Simeon Morbey from Lockridge Grindal

1    Nauen for Direct Purchaser Plaintiffs.

2            THE COURT:  All right.  I think that's it for

3    Plaintiffs.  We've got appearances -- I'm sorry.  Go ahead.

4            MR. FINLEY:  Blaine Finley of Cuneo Gilbert &

5    LaDuca for the Commercial Indirects.

6            MR. ANDERSON:  Also, Your Honor, James Anderson of

7    the law firm Thompson Tarasek Lee-O'Halloran.  I'm here on

8    behalf of Winn-Dixie Stores, Inc. and BI-LO Holdings, LLC.

9    That's related Case Number 19-CV-1578.

10            THE COURT:  Thank you.  I was going to ask whether

11    anyone was here on behalf of Winn-Dixie.  Thank you and

12    welcome to the party.

13            MR. ANDERSON:  Thank you very much.

14            MR. BELL:  Theodore Bell, also here on behalf of

15    Winn-Dixie and BI-LO Holdings from Ahern and Associates in

16    Chicago.

17            MS. SCARLETT:  THE COURT:  Shana Scarlett, Rio

18    Pierce, and Breanna Van Engelen from Hagens Berman Sobol

19    Shapiro on behalf of the Consumer Plaintiffs.

20            THE COURT:  Anyone else want to note appearances

21    for the plaintiffs?  Going once . . .

22            All right.  So we've got Mr. Bernick and Mr. Monts

23    on the phone for Agri Stats.  Anyone else for Agri Stats?

24            All right.  Moving on to the Clemens Food Group.

25    Who's appearing on behalf of Clemens?

```
 1              MS. BRIESACHER:  Good afternoon, Your Honor.
 2    Christina Briesacher from Kirkland & Ellis.
 3              MS. McCALMONT:  And Virginia McCalmont of Greene
 4    Espel.
 5              THE COURT:  Anyone on the phone for Clemens?
 6              All right.  Turning to Hormel.
 7              MS. CHOW:  Good afternoon, Your Honor.  Emily
 8    Chow, Craig Coleman, and Isaac Hall from Faegre Baker
 9    Daniels on behalf of Hormel Foods Corporation.
10              THE COURT:  And is anyone on the phone for Hormel?
11              Indiana Packers.
12              MS. MILLER:  Good afternoon, Your Honor.  Britt
13    Miller, Mayer Brown, on behalf of Indiana Packers.
14              MS. STILSON:  And Jaime Stilson of Dorsey &
15    Whitney on behalf of Indiana Packers.
16              THE COURT:  Anyone on the phone for Indiana
17    Packers?
18              MR. ENTWISLE:  Yes, Your Honor, Bob Entwisle.
19              THE COURT:  Seaboard Foods.
20              MR. SCHWINGLER:  Good afternoon, Your Honor.
21    Peter Schwingler from Stinson on behalf of Seaboard.
22              THE COURT:  Anyone on the phone for Seaboard?
23              Smithfield Foods.
24              MR. ROBISON:  Good afternoon, Your Honor.  Brian
25    Robison here for Smithfield Foods.
```

```
 1                    MR. COTTER:  Your Honor, John Cotter for

 2      Smithfield.

 3                    THE COURT:  Is anyone on the phone for Smithfield?

 4                    MS. PEARL:  Yes, you have Stephanie Pearl and

 5      Rachel Robertson.

 6                    THE COURT:  Anyone else?

 7                    All right.  Triumph Foods.

 8                    MR. SUMMERLIN:  Gene Summerlin and Megan

 9      Scheiderer.

10                    THE COURT:  And is anyone in the courtroom on

11      behalf of Triumph Foods?

12                    No.  All right.  Moving on to Tyson, the Tyson

13      defendants.

14                    MS. ROHRBAUGH:  Yes, Your Honor.  Tiffany Rider

15      Rohrbaugh from Axinn Veltrop & Harkrider.

16                    MR. GRAHAM:  David Graham on behalf of the Tyson

17      defendants.

18                    THE COURT:  Anyone on the phone for Tyson?

19                    JBS USA Food Company.

20                    MR. HEEMAN:  Good afternoon, Your Honor.  Don

21      Heeman from Spencer Fane.

22                    MR. RASHID:  Good afternoon, Your Honor.  Sami

23      Rashid from Quinn Emanuel, and I'm joined on the phone by my

24      colleague Stephen Neuwirth from Quinn Emanuel.

25                    MS. NELSON:  And Jessica Nelson, Spencer Fane, for
```

1    JBS.

2              THE COURT:  And is there anyone else -- I got

3    Mr. Rashid.  Anyone else on the phone for JBS?

4              MR. NEUWIRTH:  Yes.  This is Stephen Neuwirth,

5    Your Honor, Quinn Emanuel.  Thank you.

6              THE COURT:  And then finally, I think, Mitsubishi.

7              MS. MILLER:  Your Honor, Britt Miller, Mayer

8    Brown, on behalf of Mitsubishi Corporation (Americas).

9              MS. STILSON:  And Jaime Stilson as well, Your

10   Honor.

11             THE COURT:  All right.  Anyone who wants their

12   appearance noted who hasn't otherwise introduced themselves?

13             Apparently not.  All right.  So, moving on, I got

14   what was described as a Joint Agenda and Joint Update Letter

15   for the status conference.  I saw "update."  I'm not sure I

16   saw a really structured agenda, and so I was a little -- at

17   least left a little uncertain about whether you all had

18   talked about how you wanted to organize the conversation

19   this afternoon and what specific topics you wanted to make

20   sure we discussed.

21             Have you had any further conversation along those

22   lines and do you have a proposed order of events?

23   Otherwise, I'll just plow through the update, but I'm open

24   to suggestions.

25             MR. CLARK:  I think we're fine proceeding however

1    you'd like, Your Honor.  We've not had a chance to discuss.

2            THE COURT:  All right.  Well, then -- actually, I

3    think it would be helpful to me to begin with -- just for a

4    quick update on the status of the Winn-Dixie case and

5    whether you've had any conversations, at least any

6    conversations you're prepared to share, about how and to

7    what extent that case will be either consolidated or

8    coordinated with this one.

9            MR. ANDERSON:  Yes, Your Honor.  James Anderson

10   again on behalf --

11           THE COURT:  Why don't you come up to the podium.

12   That's fine.  We just find we get a better, more consistent

13   record if folks are at the podium.

14           MR. ANDERSON:  James Anderson again, Your Honor,

15   on behalf of plaintiffs Winn-Dixie and BI-LO.

16           We haven't had conversations thus far.  Obviously,

17   we hope to kind of operate in a parallel fashion with the

18   plaintiffs in the existing and underlying action.  My hope

19   is -- Defendants have not been served in this matter yet.

20   My hope is that counsel would agree to accept service of our

21   complaint in a manner consistent with what's happened in

22   this case thus far, and of course we'll be happy to meet and

23   confer with Defendants regarding an approach, a reasonable

24   approach, to their answering or otherwise responding to

25   those complaints.

1          THE COURT:  All right.  My assumption -- and

2     please let me know if you all see it differently.  Since the

3     Winn-Dixie complaint is not a class complaint, then my

4     understanding is that the terms of the initial case

5     management order in this case which provide for automatic

6     consolidation don't apply to Winn-Dixie.  Am I correct in

7     that understanding?

8          MR. ANDERSON:  I think that's correct, Your Honor,

9     so I think we need to get ourselves consolidated in this

10    action and move forward accordingly if that's --

11         THE COURT:  But it would require a motion and

12    before a motion it will require some meeting and conferring.

13         MR. ANDERSON:  Yes, Your Honor.

14         THE COURT:  Understood.  Okay.

15         Anything else about the Winn-Dixie matter

16    specifically that needs to get on my radar at this point or

17    wait for the defendants to be served and you'll have that

18    conversation with them?

19         MR. ANDERSON:  I think that's exactly right, Your

20    Honor.  Thank you.

21         THE COURT:  All right.  Thank you.

22         MR. ANDERSON:  Thank you.

23         THE COURT:  I got in the update kind of a general

24    description of what you all have been up to since we last

25    got together, not a detailed description.  And I don't

1    necessarily need chapter and verse, but I was interested in

2    hearing perhaps a little more about what you all feel you've

3    been able to accomplish since the last time we got together

4    and I'd be interested in a reprise of that from both sides.

5              Is that something that you'd be in a position to

6    address?

7              MR. ROBISON:  Yes, Your Honor.

8              THE COURT:  All right.  Why don't you come on

9    forward and then give you all a chance to do likewise.

10             Yes.

11             MR. ROBISON:  Your Honor, this is Brian Robison

12   with Gibson Dunn for Smithfield.

13             And I had thought maybe it would be helpful for

14   the Court to understand what had happened since the April 11

15   status conference, all the activity the parties have been

16   engaged in, give you a little context for what we might talk

17   about today.  And I have a couple of graphics that I thought

18   I would hand up that sort of illustrate the timeline of

19   events that have happened, and I thought I'd hand those out

20   if --

21             THE COURT:  Have you shared those with Plaintiffs'

22   counsel?

23             MR. ROBISON:  I've got them right here.

24             THE COURT:  All right.  Why don't you give them --

25   hand them up to my law clerk and why don't you give them a

1    chance to at least review them for a moment and then we can

2    chat.

3              (Documents distributed to counsel)

4              (Discussion off the record between the Court and

5               the court reporter)

6         (Mr. Robison approaches podium)

7              THE COURT:  Yes.  Mr. Willette just made the same

8    comment to me.  Make sure you're speaking directly into at

9    least one of the microphones.  Your voice is fairly soft and

10   I'm concerned the folks on the phone may not be able to hear

11   you.

12             MR. ROBISON:  Sure.

13             THE COURT:  That's better.

14             MR. ROBISON:  Your Honor, if you flip past the

15   cover slide to the first substantive slide, you'll see a few

16   of the milestones that the parties had accomplished prior to

17   that April 11 status conference.

18             The parties had exchanged their Rule 26

19   disclosures on December 3rd.  The parties that had readily

20   available org charts had also exchanged those as well.

21             Then in February, after several weeks, probably

22   months, of negotiations and meet-and-confers, the parties

23   submitted to the Court a revised ESI protocol.  The Court

24   eventually entered that protocol.  Part of that protocol

25   included a section on search methodology that encapsulated

1     the parties' agreement on how they would move forward on a

2     search methodology, or TAR, or some other method of

3     reviewing documents.

4          On March 6th the parties held their initial

5     meet-and-confer on 32 of the plaintiffs' document requests.

6     The plaintiffs had served more than 32, but the parties had

7     agreed that there were 32 of those requests that we could

8     have meaningful discussions about while we're all in the

9     dark here without rulings on the motions to dismiss.  So the

10    Court had ordered to have this initial meet-and-confer to go

11    through issues on these 32 document requests and their

12    definitions that we thought we could meaningfully discuss

13    now before we get rulings on the motions to dismiss, and the

14    parties did that.

15         On March 8th the parties exchanged what we call

16    the ESI disclosures, or the answers to the ESI

17    interrogatories.  We'll talk about these more today, but

18    these were incredibly detailed, Your Honor.  I think you

19    remember we went through these with you a few times.  But

20    these were questions that required corporate parties, mainly

21    the defendants, to go through and provide information on

22    email systems, transaction data systems, and certain

23    employees and executives and officers going back 12 years,

24    and so those disclosures going both ways were exchanged on

25    March 8th.

1          Then on March 29th, as the Court had ordered, the

2     defendants served their written objections and responses to

3     those 32 of the plaintiffs' document requests, and those

4     were necessarily conditional.  They had caveats built in

5     based upon the rulings on the motions to dismiss that will

6     come later, but those were served and set up the

7     meet-and-confers that we'll talk about in a minute over

8     those document responses.

9          The parties then had the April 11th status

10     conference and during that status conference we discussed a

11     few points.  One was the preservation of telephone records

12     that we'll talk about in more detail here.

13          But then if you go to slide 3, you'll see a

14     summary of some of the discovery tasks that have taken place

15     since that April 11 conference, and they're broken up into

16     three buckets here that I can explain that make more sense.

17     The challenge was to try to keep these slides brief and

18     cover a lot of material.  There was a lot happening.

19          And so the way I've organized this, the first two

20     dates you see here relate to discovery going toward the

21     defendants.  So on the prior slide we talked about how the

22     defendants had already answered 32 of the document requests,

23     so meeting and conferring on those was set up.

24          Here we have the date the Court gave us to serve

25     our initial proposed custodian list, so on April 18th we

1    gave the plaintiffs what we thought were the proper list of

2    custodians for eventual document discovery.

3              They asked for more time to respond to that and

4    give us their counter-proposals.  We gave it to them.  So

5    you see here May 15 was actually the date when they sent

6    their counter-proposals.  So at this point the parties were

7    poised to have meet-and-confers over who the document

8    custodians should be for the defense side and we'll talk

9    about that again in a minute.

10             Then the next four dates you see sort of in the

11   middle of the slide relate to discovery going over toward

12   the plaintiffs.

13             On April 19th we served our first set of document

14   requests.  Two weeks later the plaintiffs served us with

15   their initial list of plaintiff document custodians, and

16   May 17 we responded with our counter-proposals.  We raised

17   questions about some people who were on the list and who

18   were left off the list, so that was setting up

19   meet-and-confers for later.  And then on May 20th you see

20   the plaintiffs served their written objections and responses

21   to our document requests.

22             So, again, a lot of activity going both ways with

23   discovery, meeting and conferring on document requests,

24   meeting and conferring on custodians.

25             While all of that was happening, a third bucket of

1    activity you see at the very bottom.  On May 13 the parties

2    addressed the concern the plaintiffs had over telephone

3    records.

4           On April 11th when we had our last conference with

5    you, Your Honor, they mentioned that they were concerned

6    that telephone records not in our possession, but in the

7    possession of cellular phone company, like Verizon or AT&T,

8    might not be preserved for certain phone numbers, and so

9    they requested that we work on a protocol for how the

10   defendants would notify nonparties that might have cell

11   phone records, and after a lot of meeting and conferring and

12   exchanging of drafts we were able to reach agreement on

13   that, so the parties now have rules for how to handle

14   company-issued phones and personal phones used for work

15   purposes.

16          THE COURT:  And I assume that whatever action

17   items were called for in that protocol, those have moved

18   forward since then.

19          MR. ROBISON:  Yes, they should -- yeah, I would

20   think they have.  We haven't heard any news to the contrary,

21   so as far as I know, whatever protocol was required to be

22   followed has been followed.

23          Okay.  Last slide.  This is kind of the meat of

24   our presentation on the summary here.

25          This shows from about mid-May -- there may have

1       been a few meet-and-confer calls before that, but from about

2       mid-May through last week, the parties have had a series of

3       meet-and-confer calls, and it's got to be over 20 by now

4       with all the different parties on both sides of the case.

5       But the parties have had meet-and-confers over our custodian

6       list, the defense side custodians, over our responses to

7       their document requests, also over their custodian lists,

8       and over their responses to our document requests.

9               And then as the Court knows how this process plays

10      out, there'll be a two-hour call.  One side will send a

11      summary letter later.  Sometimes it's soon after, sometimes

12      it's weeks after, but there'll be a summary letter.  The

13      recipient of that summary letter will review it and send a

14      response that agrees with some and disagrees with some, and

15      the end result of these calls and these letters has been

16      that the parties have been able to make a lot of progress.

17      We're narrowing any disputes that existed in mid-May when

18      this whole process started.  We're working through the

19      custodian lists.  We're checking some people off, we're

20      adding some people to the list conditionally based upon

21      dropping some other people on the custodian list, for

22      example.

23              You see here I've got one to give you a flavor for

24      some of the numbers that have been involved.  If we look

25      just at the defendants' custodian side, the defendants

1    proposed a collective total of 72 custodians in that initial

2    proposal.  The plaintiffs came back about a month later in

3    mid-May proposing a total of another 370 custodians.  During

4    the meet-and-confer process, the defendants have offered to

5    add some custodians if the plaintiffs will drop the rest.

6    The plaintiffs have not agreed to that.  There's still more

7    and back-and-forth with a lot of the defendants on who the

8    proper document custodian would be.  I think one defendant's

9    having its first call tomorrow.

10            So the status of custodian negotiations for each

11   defendant's a little bit different.  They're obviously not

12   working in lockstep on exactly the same schedule.

13            But this shows you the amount of work that has

14   gone into these meet-and-confer sessions.  Anytime a

15   plaintiff comes back and proposes a new set of custodians,

16   that requires work on our end to go investigate who these

17   people are, how long they've been at the company, whether we

18   still have documents for them, what their job

19   responsibilities are, whether their documents would likely

20   be subsumed within somebody else's documents and

21   duplicative, that sort of thing.

22            The same sort of thing has happened on

23   non-custodial sources.  The plaintiffs you see here have

24   asked us for information on what non-custodial sources might

25   exist, where they might be, how they're preserved.  And

1     again, each time we get a question like that, it requires us

2     to go back and do investigations with our client and we've

3     been doing that.  The defendants have been, I think, very

4     diligent, and again, the parties have made a lot of

5     progress.  There's been similar, although not quite as

6     developed, talks on the plaintiffs' side and as we ask

7     questions about custodians and document sources there as

8     well, and those meet-and-confers are still ongoing as well.

9             But as far as we know, even though there's been a

10    lot of work here, I don't think anybody's reached final

11    agreement on custodian lists or document responses, but I'm

12    also not aware of a total impasse.  So in our view, the

13    meet-and-confer process has worked well, we've been able to

14    narrow any disputes that might have existed, but I don't

15    think we've reached an impasse that would require Court

16    involvement.

17            THE COURT:  All right.  Thank you.  That's

18    helpful.

19            Who's going to address the plaintiffs' perspective

20    on this?

21            MS. RESCH:  That'll be me, Your Honor, Brittany

22    Resch from Gustafson Gluek on behalf of the Consumer

23    Plaintiffs.

24            While I think Mr. Robison's summary here is pretty

25    thorough and accurate -- I mean, we just got these dates

1      today, so we have no way of knowing if they're fully

2      accurate or not.  I have no reason to doubt they are, but on

3      the last page I just have some points I want to talk about

4      quickly here.

5              So Mr. Robison made some points about how the

6      talks are continuing and they're continuing and they're

7      going on and on.  They are and we are making progress, but

8      we can't keep doing this dance forever, which is why

9      Plaintiffs put in the status report a proposed schedule that

10     is teed off of not only the motion-to-dismiss order, but

11     also reaching some kind of final resolution on custodians

12     and document sources and the Rule 34 requests.

13             At some point we are going to reach final impasse

14     on some of these issues.  You know, some might be close to

15     final impasse right now, but eventually we will reach

16     impasse on some, it's inevitable, and we would like a date

17     to come to to you and present those issues so we can keep

18     moving the ball forward.

19             In the lighter tan boxes where it says:

20     "Defendants initially proposed a total of 72 document

21     custodians," you know, I just want to reiterate that all the

22     numbers in that box are reflecting individual defendant

23     meet-and-confers, so, you know, 72 includes all the

24     defendants.  So when they say here that Plaintiffs rejected

25     that offer, it's not exactly clear what offer Plaintiffs

1      rejected.  You know, I'm not sure what that means, but we

2      have been meeting and conferring and negotiating back and

3      forth, we've been adding some, we've been dropping others,

4      and Defendants have been doing the same and they've been

5      going back and bringing us more information.

6               I think all of these discussions have been in good

7      faith.  You know, we're going off of organization charts and

8      titles alone, so it's kind of in Defendants' hands to tell

9      us why that person is or isn't actually relevant, and I

10     think those have made good progress.  But again, you know,

11     we can only do this dance for so long before we just keep

12     going in circles, so a deadline to actually come to some

13     final resolution on these would be really helpful, and

14     that's why we included that date in our proposed schedule.

15               Just some other -- do you have any questions on

16     any of that, Your Honor?

17               THE COURT:  I will, but why don't you go ahead and

18     I'll circle back.

19               MS. RESCH:  Okay.  So just one other thing on the

20     schedule.

21               While we understand that, you know, this is

22     reflecting the chicken -- the order that was entered in the

23     *Broiler* case in Chicago, you know, we're flexible on these

24     dates.  We just need some firm deadlines to go off of.  If

25     and when the motion-to-dismiss order comes out -- and

1    hopefully that's soon --

2            THE COURT:  Yes.  That's not an "if," it's a

3    "when."

4            MS. RESCH:  Yes, it's just when.  You know, we

5    don't want to sit there and stare at each other once the

6    order comes out and we've all read it and some part of the

7    case goes forward.  We want to be able to spring into action

8    and go right into continuing to work to move this case

9    forward.  So that's why we believe that this order or

10   something like these deadlines would be really helpful.

11   We're happy to, you know, keep talking with Defendants about

12   specific amounts of days that are triggered after the

13   motion-to-dismiss order comes out, but we think it's

14   important to be efficient.

15           THE COURT:  Let me ask this, then:  The schedule

16   that you threw out for consideration in your part of the

17   joint update letter, it appears that specific schedule at

18   least as of the date this letter went in had not yet been

19   the subject of a thorough-going meet-and-confer.  Have there

20   been any discussions about any part of this proposed

21   schedule since then, and if so, has any progress been made?

22           MS. RESCH:  I don't believe so, no, Your Honor,

23   there haven't.

24           THE COURT:  And I guess I asked a compound

25   question.  Have there been -- which was:  Have there been

1    any discussions, and if so, has there been progress.  Let me

2    break it up.  Have there been any discussions since this

3    letter?

4              MS. RESCH:  No, Your Honor.  We are happy to

5    continue meeting and conferring.  Just wanted to throw out

6    our proposal to get the ball rolling.

7              THE COURT:  Okay.  Because certainly I do think

8    that this is something that makes sense for the parties to

9    meet and confer about.  I think it ought to be very doable.

10   You know, without necessarily adopting line by line

11   everything that's in here, I think it ought to be very

12   doable to talk now first through meet-and-confer between the

13   parties about deadlines in a sort of, you know,

14   T-plus-30-and-counting type format so that you know what

15   kind of a schedule you'll be establishing for yourselves at

16   least on some items when that order comes out on the motions

17   to dismiss.

18             So I would be interested in hearing from

19   Defendants whether you were opposed across the board to

20   having this conversation at this juncture or whether you

21   were just saying we haven't had time to look at the schedule

22   and therefore asking the Court not to just adopt it

23   wholesale until we've had a chance to talk about it.

24             MR. ROBISON:  Sure, Your Honor.  Brian Robison

25   again for Smithfield.

1           As far as this proposed schedule that we saw for

2     the first time last week, I guess here's our reaction to the

3     idea that the parties would reach an impasse on some sort of

4     discovery issue and then immediately come to the Court now

5     while we're still waiting on motions to dismiss to be

6     decided and ask for a ruling.

7           The way we think about this whole proposal, we

8     draw a distinction between two possible dates.  One would be

9     setting a deadline for the parties to meet and confer and

10    come to either an agreement or an impasse.  That could be

11    one deadline, that the Court says, just throwing out a

12    number, 60 days from today the parties either have to reach

13    agreement on a various list of discovery disputes or they

14    have to reach an impasse.  That's one thing.

15          It's quite a different thing to say 60 days from

16    now if the parties reach agreement, great.  If the parties

17    reach an impasse, then we're going to have joint submissions

18    on a motion to compel and this Court is going to have to

19    decide a motion to compel the defendants, for example, to

20    add more document custodians, or the Court's going to have

21    to decide whether to sustain or overrule a document

22    objection while we're all still waiting on the motions to

23    dismiss to be decided.

24          This first kind of deadline, setting a deadline

25    for meet-and-confers to come to an end and reach an

1   agreement or impasse, that's one thing.  That's not

2   something we oppose.  The second kind of deadline where we

3   say if there is impasse, the parties immediately come to

4   court with a motion to compel or a motion to overrule a

5   discovery objection, that's the part we had a problem with.

6        So if we get into a meet-and-confer with the

7   plaintiffs on a schedule for resolving discovery disputes,

8   something like that, what we would prefer to see would be a

9   deadline for these meet-and-confers to come to conclusion,

10  we get as far as we can, we make as much progress as we can,

11  but we not set a deadline for motion practice, and there are

12  a few reasons for that.

13       First, for example, the plaintiffs filed a motion

14  to compel the defendants to add another 28 custodians, we

15  would have to respond to that.  There would be a lot of

16  briefing back and forth.  For the Court to understand

17  whether these 28 people need to be added as document

18  custodians, the Court would have to understand each company

19  involved, how those companies are structured, who these 28

20  custodians are.  The Court could not just look at the org

21  chart and look at the job title and make a decision, proper

22  or improper custodian.  The Court would have to understand

23  each company's structure, each employee's job

24  responsibility, whether this employee is duplicative of

25  somebody who's already on the custodian list.  There's a

1    whole host of fact issues that the parties would have to

2    brief.

3              Then the Court would have to make a decision,

4    possibly before we have rulings on the motions to dismiss,

5    as to what's in the case, what the scope of the case is,

6    which parties are in the case, which years are in the case.

7              The plaintiffs in the complaints allege Agri

8    Stats, for example, is the key to the conspiracy.  This is

9    the way the defendants supposedly communicated and shared

10   information.  Their document requests ask for benchmarking

11   services other than Agri Stats.  It's possible that Judge

12   Tunheim's ruling, even if he denied the motions to dismiss,

13   in whole or in part, might say something in his ruling that

14   informs us on whether he thinks any other benchmarking

15   service could possibly be relevant.

16             It's possible his ruling would shave time off the

17   damages period.  It's possible his ruling is going to

18   exclude certain defendants.  There are all kinds of ways

19   that a ruling on these motions to dismiss would change the

20   scope of the case and, most important, change what's

21   proportional.  I think it would be very difficult for any

22   judge to decide what's proportional to the needs of the

23   case, whether 150 custodians is proportional or it needs to

24   be 185, without knowing the scope of the case, the

25   parameters of the case, what parties, what claims are

1    involved, what years of damages are involved.

2          So to us it seems like the Court -- when Your

3    Honor was reviewing our motion to stay discovery, Your Honor

4    went through the various factors that are relevant in

5    deciding whether to stay, and one of those is the strength

6    of the motions to dismiss.  And Your Honor had decided not

7    to look at that factor because, I think in your words, you

8    didn't even want to take a peek at those motions, you didn't

9    want to prejudge them.  In our view, if we get into motion

10   practice over custodians or document objections or any other

11   issue while these motions to dismiss are still pending, in

12   our view I think it would require the Court to do even more

13   than take a peek at those motions.  I think there'd be some

14   requirement to look at those issues and maybe prejudge what

15   Judge Tunheim might do with them.

16         So to us it's a lot of wasted effort to brief

17   things when we're still in the dark and when those rulings

18   might moot a dispute.  If we have a dispute over a category

19   of custodians or a document objection, those rulings might

20   moot any disagreement the parties have.  One side or the

21   other may change its position.  So again, there would be a

22   lot of wasted effort by the parties and the Court if we were

23   briefing things while we're still sort of in this limbo

24   period.

25         THE COURT:  A couple of follow-up questions.

1    Looking at the specific deadlines that are

2    described in Plaintiffs' further statement in the joint

3    update, which just for the record is document number 341 --

4    and I'm looking at page -- well, by CM/ECF pagination it's

5    page 3.  It's actually marked as page 2 of the update.

6    But in any event, there's a chart there of

7    proposed dates, and at least on that chart I'm not seeing a

8    proposed deadline here by which the parties would

9    necessarily bring to the Court specific disputes that have

10   not been resolved through the meet-and-confer process.

11   Am I missing something?  I'm seeing nods and

12   shakes that suggest I'm missing something.  Oops, you know

13   what I'm seeing here?  Never mind.  Date by which parties

14   submit joint letter brief to the Court regarding areas of

15   dispute.  Okay.  Pretend I didn't say that.

16   MR. ROBISON:  Yes.  We're calling it a motion to

17   compel.  I don't know if there's going to be a joint letter

18   brief.  The point is that they would ask the Court to take

19   action on one of our objections, or one of our custodians,

20   or I guess they would expect us to be moving to compel them

21   to add custodians.  To us, all of that needs to wait.  We

22   can make a ton of progress and we already have.  We can get

23   to the point where we know:  Here are the disputes the

24   parties have.  Once the motions to dismiss are decided,

25   within ten or 14 days the parties can either agree that

1       those disputes have been resolved by the motions, one party

2       or the other makes a compromise, and we're done and there's

3       nothing to present to the Court.  Or ten or 14 days after

4       the motions to dismiss are decided, the parties then bring a

5       motion to compel.

6              So it doesn't have to be -- we're not going to be

7       sitting around on our hands, we're not just going to look at

8       each other when these motions get decided.  This could be

9       something that could be teed up pretty fast.  All we're

10      saying is that there's a difference between have a date to

11      reach an impasse versus a date to bring disputes to the

12      Court, because those disputes to the Court could be mooted,

13      reduced, somehow affected by these rulings on the motions to

14      dismiss.

15             THE COURT:  All right.  I understand the point.

16      Let me hear a response from Plaintiffs on that.

17             MS. RESCH:  Thank you, Your Honor.  Just really

18      quick.

19             So even if we do ultimately reach an impasse on

20      some issues, you know, I understand that some might revolve

21      around some different scope after the motion-to-dismiss

22      order comes out.  That's certainly possible.  We're not

23      saying that that's not possible.

24             But the categories of issues in our status letter

25      to the Court on the top of page 3, ECF page 4, you know,

1   we're talking like impermissible general objections, whether

2   or not complete copies of work calendars will be produced,

3   categories of document custodians.  Those aren't things that

4   are necessarily -- maybe the latter more so, but those

5   aren't necessarily things that revolve around what the

6   motion-to-dismiss order says.  There are some others perhaps

7   that could fall into that category that don't revolve around

8   the motion-to-dismiss order, and those are the types of

9   things that we want to keep moving on.  We don't want to

10  just, you know, get all this momentum going and then come to

11  an impasse and then just sit on it.  I mean, it could be a

12  couple months, it could be a little bit longer before the

13  motion-to-dismiss order comes out, and to have all that

14  momentum and then just -- the dispute goes cold until the

15  order comes out seems inefficient.

16          THE COURT:  Now, I am inclined to agree that there

17  are probably some disputes out there that aren't going to be

18  affected by Judge Tunheim's order except in the largest

19  sense that if Judge Tunheim were to dismiss any particular

20  defendant altogether, then it's all moot.

21          But setting that aside, that the specific kinds of

22  rulings that might determine the scope of the case, I think

23  there are probably some disputes that are not going to be

24  affected by that one way or the other.  I've got some

25  concern about whether taking some of these in a piecemeal

1    way with a number of smaller hearings would be an efficient

2    way of doing that, but of course not knowing what the

3    disputes are it's a little hard to tell.

4          I do think that it makes sense for you all to

5    confer about a deadline by which you will have wrapped up

6    your meet-and-confer process.  And if you want to define a

7    couple of different kinds of buckets of disputes -- it's

8    going to take a little longer on custodians, maybe a little

9    less on something else, I'm not saying there has to be a

10   one-size-fits-all deadline, but I do think that setting an

11   end date and making it a fairly aggressive end date by which

12   you will have gotten to kind of a fish-or-cut-bait place

13   with your willingness to further compromise I think does

14   make sense.  Otherwise, these things just do tend to keep

15   going on.

16         I am sensitive to the point that Mr. Robison

17   made -- and it's probably true on the plaintiffs' side as

18   well -- that certain kinds of disputes require one side or

19   the other to go off and do a bunch of research before being

20   able to respond, and I think the deadline needs to take that

21   into account, because it's important that the process be an

22   informed process and I don't think anybody wants to just put

23   on a blindfold and throw darts at the dartboard.  But I do

24   want you to meet and confer on a couple of things.

25         One is a deadline or combination of deadlines by

1        which you will wrap up the meet-and-confer process on the

2        matters on which you are currently meeting and conferring,

3        as well as whether there are some of those disputes that in

4        good faith everybody would have to acknowledge really

5        aren't -- the answer isn't going to be driven by what Judge

6        Tunheim's decision or decisions are short of a complete

7        dismissal, so are there some that really could be teed up

8        sooner, and if so, what are those.  Ultimately I'll need to

9        decide whether I think it's a good use of my time and your

10       time and resources to do those sooner rather than later, but

11       I'd at least like to see if you could identify which they

12       are and then tell me what you think you've got.

13              I'm setting aside the search methodology order

14       piece for a minute, because I want to hear some further

15       discussion about all of that.

16              But specific to these discovery disputes, I do --

17       and I guess what I would suggest further is, with respect to

18       the disputes where you probably have to acknowledge that the

19       metes and bounds of Judge Tunheim's order could make a

20       difference in how those disputes are resolved and may even

21       require a bit of supplemental meeting and conferring in the

22       immediate wake of the order, set yourself a deadline for

23       that as soon as the order has been issued so that maybe

24       another -- within ten days after the order or whatever, you

25       will have done a supplemental meet-and-confer about these

1    disputes and then within so many days after that they would

2    be presented.

3              I'm just throwing out ideas, but that's the kind

4    of thing I'd like to see you meet and confer about.  And I

5    am interested in whether there is some body of the disputes

6    where if you can't work it out on your own could be brought

7    up sooner so we've got at least that much more behind us

8    when Judge Tunheim issues his orders.

9              Also, with respect to some of these other

10   deadlines -- and I'm looking at the deadlines for amended

11   objections and responses to the first set of requests for

12   production.  And I assume that would probably -- I don't

13   know whether there would also be some amended objections and

14   responses by plaintiffs, but at least the additional

15   deadlines you've described here that you did key to the

16   orders on the motion to dismiss, I think it does make sense

17   to negotiate and to see if you can reach some agreements on

18   deadlines that would be keyed from Judge Tunheim's order or

19   orders.

20             Defendants, I didn't hear any -- Mr. Robison, I

21   didn't hear any particular opposition to looking at those.

22   Is there something I didn't listen to or that you hadn't

23   gotten around to saying in your comments on that?

24             MR. ROBISON:  Your Honor, are you referring to the

25   proposed dates in there for things like completing document

1     production?

2              THE COURT:  Yes, starting with the fourth item

3     down -- just by way of example, but starting with the fourth

4     item down where it begins -- where we see a set of suggested

5     deadlines that are calculated by a period of time after

6     Judge Tunheim's order.

7              MR. ROBISON:  In our view, setting dates for

8     something like completion of document production now is just

9     kind of an exercise in futility.  If we need to talk to them

10    about it, we can do our best to take a wild guess, but at

11    this point, standing here on July 2nd, where we don't have

12    agreement on who the document custodians are going to be and

13    we haven't done collection of emails, we don't know volumes

14    we're talking about, it's hard for us to imagine what that

15    date might look like.  It seems like that's a date that we

16    may be able to set after we start collecting documents and

17    we figure out what the volume we have to review would be.  I

18    note that in the proposal for the *Pork* case they proposed a

19    completion of document production I think after --

20             THE COURT:  You mean *Broiler?*

21             MR. ROBISON:  No, no, for this case.

22             THE COURT:  Oh, okay.  You're saying in this

23    proposal right here.

24             MR. ROBISON:  Yes.  In this proposal for the *Pork*

25    case, I think the plaintiffs have proposed everybody finish

1    all their document productions 180 days, whereas in the

2    *Broiler* case, which is the case they always use as their

3    calling card, it was longer than 180 days and then I think

4    it had to be extended even beyond that.  So to us right now,

5    everybody truly would just be engaging in guesswork, and I

6    guess if we all just need to guess we can guess.  They're

7    guessing, we're guessing.  I don't think they've started

8    collecting documents.  I know we haven't started collecting

9    documents.  So before we have some idea of number of

10   custodians, volume of emails we need to collect and review

11   and produce, how we're going to do it, whether it's through

12   search terms or TAR or something else, it seems like to us

13   it's really difficult even to come up with a guess for how

14   long it's going to take to complete document productions.

15            THE COURT:  And would that be your response across

16   the board here?  Because I'm not sure -- obviously what I'm

17   proposing here is a meet-and-confer and the result of the

18   meet-and-confer could be:  We think we can make some truly

19   informed assessments on this, this and this, and not on

20   that, that, and that.  Are you saying that just across the

21   board there's no point to having a conversation about how

22   long it will take to get certain things done after an order

23   is entered and so we should not really look at that at all

24   until after we see Judge Tunheim's order?  Is that

25   essentially what you're saying?

1          MR. ROBISON:  Not quite.  I don't think the

2     defendants would ever say we are not going to talk.  We

3     would never tell the Court we do not want to meet and confer

4     or we will refuse even to talk about it.  I think our

5     position's a little more nuanced than that in that we're

6     willing to talk, we're willing to meet and confer.  We're

7     already meeting and conferring with them on a weekly basis

8     on custodians and sources and objections and that sort of

9     thing and we can add this to the list.

10          It seems like it's going to be awfully difficult

11     for anybody to guess how long it's going to take the

12     plaintiffs to get their documents out the door and how long

13     it's going to take us to get our documents out the door.  So

14     any date anybody proposed on their side or on our side

15     really is just kind of a shot in the dark and it's awfully

16     conditional on a whole lot of things falling into place.  So

17     even if the parties proposed dueling dates, I'm not sure how

18     the Court would pick between the dueling dates, whether it's

19     eight months or 12 months.  Right now we're all just so

20     uncertain as to what the scope of discovery is going to be.

21     It's really hard to come up with proposed dates, but I would

22     certainly not say we're not willing to talk.

23          THE COURT:  And I didn't hear you suggesting that

24     regardless of what I said you weren't going to talk on the

25     subject.

1           But one of the things that Ms. Resch said was --

2     that resonated with me is the idea that when Judge Tunheim

3     issues that order, that's going to kick some things quickly

4     into gear, and I think to do that -- and maybe it's not

5     right now coming up with a wild guess on substantial

6     completion of document production.  I get why that may not

7     make sense.  On the other hand, I think it's worth talking

8     about.  But there could be some much more specific deadlines

9     even that aren't proposed here for within "X" days after

10    that order we are going to have this conversation.  Within

11    "Y" days we know that we will be able to produce this.

12          For example, there's a line item entry here on

13    readily available responsive phone records.  Maybe that's

14    something that regardless of what the order says, unless it

15    says you're out of it altogether, you know that within 30

16    days or some number of days, yes, you can get those and get

17    them out the door.  Within "X" days you will assess the

18    volume of documents at stake and you will then have the

19    conversation about how long document production would be.

20          So what I want you to meet and confer about is how

21    much structure can you come up with with some definitive

22    deadlines about what will start happening and how quickly it

23    will happen after Judge Tunheim issues his order.

24          MR. ROBISON:  That's perfect, Your Honor.  That's

25    exactly what we had in mind and just take this more in baby

1    steps rather than shoot for the fences and try to figure out

2    when substantial completion of document production could

3    happen.  There may be things that could happen in the more

4    near term.  There may be low-hanging fruit that we could

5    produce quickly and that the plaintiffs could produce

6    quickly.  There may be discovery disputes, like I was saying

7    earlier, that get mooted and then are no longer disputes.

8    If there are some disputes that really do turn on the

9    motion-to-dismiss ruling, they could be presented to Your

10   Honor in short order right after that ruling comes out.

11        So I think if we have to go down the depressing

12   road of thinking these motions get denied and the case

13   continues, I think there are things the defendants are going

14   to be prepared to do in short order after that ruling hits,

15   but the idea of here in July trying to guess when both sides

16   are going to be substantially completed with document

17   production, that's the part that seems like it's a bridge

18   too far.

19        THE COURT:  I understand why it might be, but I do

20   want you to talk about -- I want that conversation to be an

21   open-minded one on both sides about these other kinds of

22   deadlines as well.  It might be they could persuade you that

23   you know enough now to be able to make an informed and

24   educated proposal about how long some of these things would

25   take, but at the minimum I'd want to see some deadlines that

1    set some near-term targets for shortly after the order comes

2    out.  And as I indicated to Ms. Resch when she was up here,

3    I also -- particular to disputes, I do want you meeting and

4    conferring with an open mind about whether there are any of

5    the disputes you're dealing with now that really could be

6    teed up before that order comes out.

7              MR. ROBISON:  Yes, Your Honor.  We're certainly

8    prepared to do that for sure.

9              THE COURT:  Okay.  Let me let Ms. Resch respond to

10   anything we've just been talking about and then I've got a

11   couple of follow-up things on this.

12             Yes.

13             MS. RESCH:  Just really quickly.  The substantial

14   completion of document production date that was set in the

15   *Broiler* case of 240 days, I think Mr. Robison said that that

16   was changed or amended later on.  It actually wasn't.  It

17   was just the discovery closing date that was changed.  The

18   240-day substantial completion of document production was

19   hit and it was kept.  So the defendants just hired more

20   people to review the documents or somehow they made it work

21   in *Broilers*.  Here in *Pork* there are half the number of

22   defendants.  A hundred and eighty days should be enough time

23   for them to --

24             THE COURT:  I'm not sure how having half the

25   number of defendants makes a difference in how long it might

1    take any one defendant with a whole boatload of documents to

2    get through them.

3              MS. RESCH:  Right.  It's more the size of each

4    defendant, I guess.  So in *Chicken* there's a lot of really

5    big defendants and here there's more of a mix of big and

6    small.  I guess that was more my point there.  I mean, the

7    point is that they made it work in *Broilers*.  Two hundred

8    forty days was hit and then they did their validation

9    protocol after that, so it worked.  The date didn't have to

10   be changed.

11             THE COURT:  Let me think.  There was something

12   else I wanted to follow up on and then I got so interested

13   in that point it just completely escaped my mind.

14             Oh, I know.  For the meet-and-confer that we're

15   talking about -- actually a couple of topics on which I've

16   told you I'd like you to meet and confer, namely on

17   deadlines for completing the meet-and-confer on the pending

18   discovery disputes and identifying which topics could be

19   fair game for pre-order and which topics are probably not

20   well taken up until post-order.  That's one set of

21   meet-and-confers.  And then the other meet-and-confers

22   around some of the prospective deadline setting that we're

23   talking about.

24             From your perspective, how long -- and I'll hear

25   from Mr. Robison or someone else from the defendants -- how

1   long would you propose before you can get back to me with a

2   joint update about the state of this group of

3   meet-and-confers?

4          MS. RESCH:  About two weeks or so.  I think we --

5   I mean, given the holiday, maybe two and a half weeks.

6          THE COURT:  Mr. Robison?  I will tell you I'm

7   going to be out of town at a magistrate judges conference

8   the week that ends -- let me see -- find my calendar here so

9   I can talk intelligently.

10          I will be at a magistrate judges conference from

11   July 15th through 19th, so could you get back to me with a

12   joint update by either the 19th or the 22nd of July?

13          MR. ROBISON:  Your Honor, I just -- I want to call

14   a timeout here and make sure I understand exactly what we're

15   talking about.

16          THE COURT:  Okay.

17          MR. ROBISON:  Are we talking about a date by which

18   the parties on both sides would finish all meeting and

19   conferring on all custodian issues and all document --

20          THE COURT:  No.

21          MR. ROBISON:  Okay.

22          THE COURT:  What we're talking about is two --

23   meeting and conferring about a deadline for -- we're getting

24   to several levels of meeting and conferring here -- meeting

25   and conferring about a deadline by which you would agree to

1    have completed your meeting and conferring on these open

2    discovery issues, right, and it might be more than one

3    deadline.  It might be a deadline for these kinds of issues

4    and a different deadline for those kinds of issues, but

5    getting back to me about your joint proposal on a -- or your

6    positions on a deadline for those -- along with telling me

7    the results of your conversation about which discovery

8    disputes you believe could be teed up before and resolved

9    before the order comes down from Judge Tunheim and which

10   would need to be deferred until after that, so deadline or

11   deadlines by which you would have completed that process and

12   which disputes fit into which bucket.  That's one thing I'd

13   like to hear back from you about by the 19th or potentially

14   the 22nd.

15            The second thing which I would also like to hear

16   from you about by that date would be the results of your

17   meeting and conferring about deadlines on the various

18   matters described on page 2 of document number 341, the ones

19   we were talking about a few minutes ago, what's going to

20   happen the moment that order comes out, how quickly will you

21   move forward with certain tasks.  Are you in a position now

22   to set deadlines for a certain number of days after that

23   order or are there other things for which you can't or it's

24   your position that you can't set deadlines thoughtfully

25   until after the order comes out, and if so, how quickly

 1     would you be ready to.

 2              That may not be the most articulate exposition,

 3     but that's what I'm looking for an update on by, say,

 4     July 19th.

 5              MR. ROBISON:  If we could have -- I just know

 6     about some conflicts on our side.  If we could have until

 7     July 22nd to talk to the plaintiffs about the list of --

 8              THE COURT:  Those things.

 9              MR. ROBISON:  -- future deadlines that we would

10     agree to or propose to the Court, I think that would be -- I

11     think that's something the defense group could meet.

12              THE COURT:  Do you want to chat for a moment

13     and --

14              MR. ROBISON:  I think that might be an excellent

15     idea.

16              THE COURT:  Of course.  Why don't you do that.

17     They're all here for a good reason.

18          (Defense counsel confer)

19              MR. ROBISON:  Your Honor, thanks for the extra

20     time.

21              The defendants have more scheduling conflicts and

22     vacation conflicts than I realized.  A couple of our lawyers

23     apparently have multiple hearings the week prior to the

24     22nd, so if we could have an extra three days or so and have

25     the deadline for submitting something be July 25th or 26th,

1    that would be immensely helpful on our side

2            THE COURT:  So what you're proposing is that by

3    July 25th you would have completed your meet-and-confer with

4    the plaintiffs about the various deadline-setting issues

5    that we've been discussing.

6            MR. ROBISON:  Yes.

7            THE COURT:  Both on the discovery dispute side and

8    on the question of what deadlines can be set now to be

9    triggered by the order, and that by the 25th you and the

10   plaintiffs will have provided to me a joint letter where you

11   describe what agreements you've been able to reach and where

12   you disagree, your respective positions on that.

13           MR. ROBISON:  Yes.

14           THE COURT:  Ms. Resch?

15           MS. RESCH:  That sounds great to us.

16           THE COURT:  All right.  Then that's what will

17   happen by the 25th.  I want to come back to search

18   methodology in a moment or search methodology order in a

19   moment, but while we're on this topic, let's -- and

20   particularly while we're looking at calendars, I would like

21   to set another case management conference and am interested

22   in what conversation, if any, the parties have had about the

23   timing for something like that.  We've been going about

24   every six weeks.

25           I'm on criminal duty the week of August 12th,

1    which makes that not a great week, so probably the -- well,

2    I'm actually on both of those, the week preceding that as

3    well.

4         So the week of the 19th would work pretty well for

5    me, and specifically -- and I'll give you a chance to all

6    pull out your iPhones, you have permission to pull out your

7    smartphones, and let me look specifically at the dates that

8    would work for me that week.

9         (Pause)

10        THE COURT:  Okay.  So I'm wide open the 21st and

11   wide open the 23rd of August.

12        Yes, Ms. Resch.

13        MS. RESCH:  Both days work for Plaintiffs, Your

14   Honor.

15        THE COURT:  Okay.

16        MS. MILLER:  Good afternoon, Your Honor.  Britt

17   Miller on behalf of Defendants.

18        Unfortunately, everybody's frantically looking at

19   their calendars, and we have one quick point of

20   clarification.

21        A moment ago we had understood that the deadline

22   you were looking for was a deadline by which we had to meet

23   and confer on the two buckets of information that you wanted

24   the parties to meet and confer on, the issues bucket and the

25   scheduling bucket, for lack of better terminology, and we

1    understood that to be July 25th.  I wasn't sure that we

2    were -- we were understanding that the meet-and-confer not

3    only had to happen by that date, but we also had to submit

4    something in writing as of that date.

5              THE COURT:  I'd like an update by that point.

6              MS. MILLER:  Okay.  I didn't know if we would be

7    given a few extra days to complete something written

8    assuming that we are ending up doing some of our further

9    meeting and conferring that week.  I'm one of the ones with

10   the scheduling conflict the week before that takes me

11   completely out.

12             THE COURT:  Take your best shot at getting me

13   something by the 25th.  If by that point you've done

14   everything you can and you're still putting finishing

15   touches on a joint letter that accurately describes where

16   you each are, and you get in touch with chambers and say,

17   "We're going to need another day," I'm open to that.  It

18   isn't magic in that sense, but I do want to kind of keep

19   the pedal to the metal, including coming back to me to tell

20   me where you're at.

21             MS. MILLER:  I appreciate that, Your Honor.

22             On the other question of availability, do you have

23   any availability the following week?  We have a couple of

24   people that are affirmatively out --

25             THE COURT:  On the 21st and the 23rd?

1          MS. MILLER:  -- for that week on vacations and

2     otherwise.  August is a big vacation month --

3          THE COURT:  It is.

4          MS. MILLER:  -- before the kids go back to school.

5     And it doesn't work for JBS.  How is right after Labor Day?

6          THE COURT:  Oh.  Why don't you -- let's do this:

7          I want to give Plaintiffs some input into this as

8     well and maybe it should be the topic for a conversation

9     that we don't necessarily need to have on the record.

10          MS. MILLER:  Your Honor, we could as part of our

11     meet-and-confer efforts that we owe you a response on or

12     about the 25th of July, we could suggest a date for a

13     possible next status hearing based on everybody's calendars

14     at that point.

15          THE COURT:  I need you to meet and confer more

16     quickly about that.

17          MS. MILLER:  Okay.

18          THE COURT:  Because by the time we get to the end

19     of July --

20          MS. MILLER:  Your dates will be gone.

21          THE COURT:  -- August may be toast.

22          MS. MILLER:  Fair enough.

23          THE COURT:  So if you could get back to me -- let

24     me -- tell you what.  I will give you my available dates

25     from the week of August 19th -- I know that's a problem, but

1    I'm just going to get them out there for the record.  I'll

2    have Judy send you all my available dates for a status

3    conference starting the week of August 19th and going to

4    mid-September.

5              MS. MILLER:  That would be great, Your Honor.

6              THE COURT:  And then you all meet and confer on --

7    once you've got those dates -- and I'll get them out to you

8    by tomorrow morning.  If you could get back to me -- let's

9    see here.  Could you all get back to me by the 10th with the

10   dates that work best for you all?

11             MS. MILLER:  I'm getting nods from both sides, so

12   I'll take that as a yes, Your Honor.

13             THE COURT:  Great.  The sooner the better just

14   because it gives me more certainty, but no later than the

15   10th or else I'll just throw a dart at the calendar and --

16             MS. MILLER:  Fair enough.

17             THE COURT:  -- that's never good.

18             MS. MILLER:  We appreciate it, Your Honor.

19             THE COURT:  Okay.  Thank you.

20             Let me see where we're at on this.  I think the

21   only other topic that -- sort of discrete topic that I saw

22   in the update that I wanted to hear a bit more about was the

23   topic of a search methodology order.  I read the letter.  I

24   certainly know the search methodology order that was entered

25   in the *Broiler* case.  I also know that we have some language

1    around search methodology in the ESI protocol that was

2    negotiated between the parties, so I wasn't exactly sure

3    what Plaintiffs were proposing and so I wasn't sure how that

4    fits into what kind of a meet-and-confer the parties ought

5    to and want to have, so are you in a position to tell us

6    about that?

7              MR. CLARK:  Absolutely, Your Honor.

8              THE COURT:  Thank you.

9              MR. CLARK:  Brian Clark for Direct Purchaser

10   Plaintiffs.

11             I looked back at the language too, because my

12   recollection was a lot of conversations with Defendants that

13   we would deal with the details of search methodology at some

14   point in the future, so I was a little surprised to see on

15   the agenda that there was some suggestion that had been

16   agreed to.

17             What we did is we deferred meet-and-confers about

18   the details of search methodology until later.  This

19   wouldn't get one very far in a -- doesn't have validation.

20   What we have in the ESI protocol doesn't have a lot of

21   things that we would expect to have if TAR is being used and

22   even with search terms disclosure about terms and other

23   things like that.

24             So we had always anticipated there'd be a further

25   discussion -- and that's what's referenced here in our

1    reading -- of a meet-and-confer regarding the details of

2    search methodology order.  We've put forward from the

3    beginning we think it ought to be along the lines what

4    Professor Grossman assisted the parties with entering in the

5    *Broiler Chicken* litigation.  We're open to discussion, every

6    case is different, but that's what we put forward and that's

7    what we're prepared to do.  And we don't think that's really

8    dependent in any way on an order on the motion to dismiss.

9    It's one of these discrete topics that if we can knock out

10   that issue now, it's one less thing to do on, you know,

11   T-minus zero when we have an order on the motion to dismiss.

12                  THE COURT:  Yes.  I'm certainly not absolutely --

13   I'm absolutely not averse to the parties having a

14   conversation about what more they would propose, ideally a

15   negotiated proposal, but maybe not.  But I certainly don't

16   have any objection at all and I like the idea of the parties

17   starting a conversation now about what additional structure

18   they believe would be helpful at a Court-Imposed level with

19   regard to search methodology.

20                  I am not by any stretch of the imagination

21   assuming that the *Broiler* order or anything that gets to

22   that level of granularity is what's needed here.  I'm

23   familiar with it, I've got tremendous respect for Professor

24   Grossman, I know Professor Grossman, it was a remarkable

25   piece of work.  I don't know whether that's what we need

1    here.

2            So I think it makes sense for the parties to at

3    least start a conversation about what is needed, whether it

4    ought to be an order, how deep a dive and how granular it

5    makes sense for it to be.  There are some advantages to both

6    sides to having a common understanding about that.  It can

7    reduce post-production conflicts, but sometimes it's at the

8    cost of a bunch of pre-production conflicts, so I'm not

9    jumping to the conclusion that it would -- that something

10   along those lines would necessarily be value-added in this

11   case.

12           But let me hear from the defendants about when

13   would be the time to at least have that conversation and

14   I'll be back to you, Mr. Clark.

15           MR. CLARK:  Thank you, Your Honor.

16           MS. MILLER:  Good afternoon, Your Honor.  Britt

17   Miller again.

18           Your Honor has just articulated a number of the

19   concerns that we articulated in our submission to the Court.

20   We agree that it's not a foregone conclusion or should it be

21   that the *Broilers* order as detailed as it was is necessary

22   for this case.  This case is not *Broilers*.

23           We also note that the search methodology order in

24   that case was entered some 45 days after the motions to

25   dismiss were decided and inevitably were influenced by all

1    sorts of information which we currently don't have which

2    Mr. Robison already told you about in terms of we don't know

3    if we're going to use TAR, whether we're going to use search

4    terms, we don't know the volume of documents we're going to

5    be looking at.

6              So all of these things are going to inform whether

7    or not a search methodology might be appropriate, whether

8    it's not.  Obviously the parties have different opinions as

9    to whether or not something like what was done in *Broilers*

10   is necessary.  We obviously don't believe it is.  We're

11   happy to have some initial discussions as to, you know,

12   whether or not such a thing we think would be appropriate if

13   they have reasons that they think it might be necessary to

14   have a search methodology like *Broilers*.  We can certainly

15   have that discussion.  We haven't heard anything other than

16   it's what was done in *Broilers* and that's why it should be

17   done here.  We're not seeing the parallels as to why it

18   wouldn't in light of what is already in and, as Your Honor

19   noted, is negotiated in the ESI protocol.  I went through

20   the *Broilers* order and there are a number of provisions that

21   the parties already negotiated and are in the ESI protocol.

22             THE COURT:  That's true, but there are also a lot

23   of things that aren't already in the ESI protocol and that

24   it's at least worth -- I think it's at least worth a

25   conversation between the parties.  Do we want to and do we

1    think it makes good sense to have an established approach to

2    validation.  Do we think it makes good sense to have a very

3    structured approach to when search terms will be proposed

4    and within how many days they'll be responded to and how

5    those terms will be tested and validated.

6         It may not be the *Broilers* order.  It could be a

7    different order.  It could be a different process.  It could

8    be a higher level order.  It might be no order at all.  But

9    I think that the parties ought to have the conversation,

10   because there are -- I think there are things that can be

11   gained in the way of efficiency and certainty and dispute

12   minimization on both sides.

13        MS. MILLER:  And I think that conversation that

14   you just described of whether there should be something like

15   this or whether there should be an order at all, whether it

16   should be something less than *Broilers*, whether it should be

17   something like *Broilers*, we're certainly happy to engage in

18   that conversation.  I think the concern that we have,

19   engaging at the level at which *Broilers* exists, to your

20   point, is inevitably going to create more pre-collection

21   concerns.

22        I can give Your Honor any number of examples where

23   we had evidentiary hearings on a validation protocol and

24   whether or not it was acceptable, and this could all be for

25   naught, again, depending on the motions to dismiss,

1    especially for those -- there may be defendants that are

2    ultimately dismissed out and so it's a complete waste of

3    time.

4          And so we are happy to continue to have the

5    conversations, as I think we have been successfully doing up

6    to this point, but we don't want to get in a situation where

7    we're negotiating the detailed levels of a validation

8    protocol, because obviously Defendants don't believe one is

9    necessary and haven't heard yet -- we may -- an explanation

10   of why one might be warranted here.

11         So if Your Honor is suggesting that we have that

12   conversation, is such an order warranted and why or why not,

13   I think we're happy to have that conversation.  It's the

14   concept that we would be required to start engaging in these

15   very specific and detailed undertakings when I don't think a

16   single defendant, or quite frankly -- I don't know if the

17   plaintiffs have gotten this far -- but not a single

18   defendant knows whether or not they're going to use search

19   terms, or whether they're going to use TAR, and that might

20   change depending on the volume of documents that are

21   ultimately collected and required to look at.  So all of

22   those things are influenced by a number of factors we don't

23   have in front of us as we sit here.

24         THE COURT:  Now, just so I understand, in the

25   *Broilers* order, I don't know that the *Broilers* order either

1    knew at that point which party was going to use which

2    methodology.  My understanding of the order was that it said

3    if you go this route, here's the process that's going to

4    govern that interaction with the plaintiffs.  If you go this

5    route, here's the process that's going to govern it.

6              MS. MILLER:  I understand.  My reading of the

7    order is the same, Your Honor.  But my point was, as I

8    understand it, those discussions were informed by knowledge

9    of what the scope of the case was going to be looking like

10   as the result of the fact that it wasn't entered until well

11   after the motion to dismiss was decided, and so it wasn't

12   simply done in a vacuum.  Certainly there were some initial

13   discussions of, you know, whether or not such a protocol

14   would be warranted and whether or not there were some

15   general guidelines that might guide the parties in terms of

16   deadlines by which to exchange search terms or the like.

17   It's the concern we have of getting into literally the weeds

18   where we don't know whether or not getting into the weeds is

19   sufficient here.  A lot of the topics that are in the

20   *Broiler*s orders are ones that have been traditionally left

21   to -- with no problems -- to the parties in exercising their

22   obligations and their responsibilities under the federal

23   rules.  We haven't heard an explanation yet for why those

24   traditional obligations and those traditional requirements

25   that are imposed on the parties in every case are not

1   sufficient here under this Court's orders and this Court's

2   rules.

3           *Broilers*, with all due respect to Professor

4   Grossman, is an outlier and we're unaware of any such order

5   of that level of management of the process being entered in

6   this court, and we're not sure that we have heard yet an

7   explanation as for why it's necessary here.

8           THE COURT:  All right.  Mr. Clark, anything

9   further on this?

10          MR. CLARK:  No.  I won't get into the substance of

11  the order, but I just think having a conversation is useful

12  now as far as where we end up and when we end up there.  We

13  can talk about that, but I agree having a meet-and-confer on

14  this topic and discussing the ways in which the order can

15  help avoid disputes later on would be a good idea now.

16          THE COURT:  I agree.  I think what I'll do so as

17  not to overwhelm the other meeting and conferring that I

18  think has some more urgency right now, I'm going to ask you

19  to meet and confer on this between now and the next case

20  management conference and then in your joint update letter

21  and any additional letters you may provide, educate me at

22  that point about the status of your meet-and-confer and we

23  can talk further about it at the next case management

24  conference.  Make sense?  Okay.

25          Anything else that I failed to glean from the

1    joint update that you had wanted to make a topic of our

2    conversation here?  From Plaintiffs?

3              MS. RESCH:  Nothing.

4              THE COURT:  Okay.  From Defendants.

5              MS. MILLER:  Nothing, Your Honor.

6              THE COURT:  All right.  Well, thank you very much

7    and I wish you all a very enjoyable 4th of July holiday.

8    We're adjourned.

9              (Proceedings concluded at 3:30 p.m.)

10                   *     *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224