```
1                      UNITED STATES DISTRICT COURT
                           DISTRICT OF MINNESOTA
2
3      -----------------------------------------------------------
                                   )
       In Re:  Pork Antitrust      )   File No. 18-CV-1776
4      Litigation                  )        (JRT/HB)
                                   )
5                                   )
                                   )   St. Paul, Minnesota
6                                   )   November 19, 2019
                                   )   9:30 a.m.
7      -----------------------------------------------------------

8                   BEFORE THE HONORABLE HILDY BOWBEER
             UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
9                          (MOTION HEARING)

10     APPEARANCES
       For Direct Purchaser        LOCKRIDGE, GRINDAL, NAUEN, PLLP
11     Plaintiffs:                 BRIAN D. CLARK, ESQ.
                                   100 Washington Ave. S., #2200
12                                 Minneapolis, MN 55401

13                                 PEARSON, SIMON & WARSHAW, LLP
                                   CLIFFORD PEARSON, ESQ.
14                                 (via telephone)
                                   15165 Ventura Blvd., #400
15                                 Sherman Oaks, CA 91403

16                                 PEARSON, SIMON & WARSHAW, LLP
                                   JOSEPH BOURNE, ESQ.
17                                 800 LaSalle Ave., #2150
                                   Minneapolis, MN 55402
18
       For the Consumer            GUSTAFSON GLUEK, PLLC
19     Indirect Purchaser          BRITTANY RESCH, ESQ.
       Plaintiffs:                 DANIEL GUSTAFSON, ESQ.
20                                 (via telephone)
                                   120 S. 6th St., #2600
21                                 Minneapolis, MN 55402

22                                 HAGENS, BERMAN, SOBOL, SHAPIRO
                                   SHANA E. SCARLETT, ESQ.
23                                 715 Hearst Ave., #202
                                   Berkeley, CA 94710
24

25
```

```
 1      For the Commercial        LARSON KING, LLP
        Direct Purchaser          SHAWN M. RAITER, ESQ.
 2      Plaintiffs:               30 E. 7th St., #2800
                                  St. Paul, MN 55101
 3
                                  CUNEO, GILBERT & LaDUCA, LLP
 4                                ALEC BLAINE FINLEY, ESQ.
                                  (via telephone)
 5                                4725 Wisconsin Ave. NW, #200
                                  Washington, DC 20016
 6
        For Defendant Triumph     HUSCH BLACKWELL
 7      Foods:                    GENE SUMMERLIN, ESQ.
                                  (via telephone)
 8                                13330 California St., #200
                                  Omaha, NE 68154
 9

10      For Defendant JBS USA:    SPENCER FANE, LLP
                                  DONALD G. HEEMAN, ESQ.
11                                100 S. 5th St., #1900
                                  Minneapolis, MN 55402
12
                                  QUINN EMANUEL URQUHART &
13                                SULLIVAN
                                  SAMI H. RASHID, ESQ.
14                                (via telephone)
                                  51 Madison Avenue
15                                22nd Floor
                                  New York, NY 10010
16
        For Defendant            LARKIN, HOFFMAN, DALY & LINDGREN
17      Smithfield Foods:        JOHN A. COTTER, ESQ.
                                  8300 Norman Center Dr., #1000
18                                Minneapolis, MN 55437

19
        For Defendant Tyson      AXINN, VELTROP & HARKRIDER, LLP
20      Foods:                   TIFFANY RIDER ROHRBAUGH, ESQ.
                                  (via telephone)
21                                950 F Street NW,
                                  7th Floor
22                                Washington, DC 20004

23                                DYKEMA GOSSETT, PLLC
                                  DAVID GRAHAM, ESQ.
24                                90 S. 7th Street
                                  4000 Wells Fargo Center
25                                Minneapolis, MN 55402
```

1

2

3    For Defendant Seaboard
     Foods:                      **STINSON, LLP**
4                                **WILLIAM GREENE, ESQ.**
                                 50 S. 6th St., #2600
                                 Minneapolis, MN 55402
5    For Defendant Clemens
     Food Group:                 **KIRKLAND & ELLIS, LLP**
6                                **CHRISTINA BRIESACHER, ESQ.**
                                 **CHRISTINA SHARKEY, ESQ.**
7                                300 North LaSalle
                                 Chicago, IL 60654
8
                                 **GREENE ESPEL, PLLP**
9                                **MARK JOHNSON, ESQ.**
                                 222 S. 9th St., #2200
10                               Minneapolis, MN 55402
     For Defendant Hormel
11   Foods:                      **FAEGRE, BAKER, DANIELS, LLP**
                                 **RICHARD DUNCAN, ESQ.**
12                               **EMILY CHOW, ESQ.**
                                 90 S. 7th St., #2200
13                               Minneapolis, MN 55402
     For Defendants Indiana
14   Packers and Mitsubishi:     **DORSEY & WHITNEY, LLP**
                                 **JAIME STILSON, ESQ.**
15                               50 S. 6th St., #1500
                                 Minneapolis, MN 55402
16   For Defendant Agri
     Stats, Inc.:                **HOGAN LOVELLS US, LLP**
17                               **JUSTIN W. BERNICK, ESQ.**
                                 Columbia Square
18                               555 Thirteenth Street NW
                                 Washington, DC 20004
19
         Proceedings recorded by mechanical stenography;
20   transcript produced by computer.

21

22

23

24

25

1          **P R O C E E D I N G S**

2                **IN OPEN COURT**

3          THE LAW CLERK:  All rise.  Court is now in

4     session, the Honorable Magistrate Judge Hildy Bowbeer

5     presiding.

6          THE COURT:  Good morning, everyone.  Please be

7     seated.

8          We are on the record in the In Re Pork Antitrust

9     Litigation, Matter No. 18-CV-1776.  And specifically we are

10    here on defendant's motion for a protective order concerning

11    ex parte lawyer communications, which is Docket No. 374.

12          I know that my law clerk has gone through and

13    figured out who's here, but we should probably make a record

14    of that for the transcript as well.  So let me go through

15    each of the groups and get on the record who is here, and if

16    you could also indicate for me as you introduce yourself

17    whether you intend to be heard today or whether you're just

18    going to be listening intelligently and attentively to the

19    proceedings.

20          So let's start with counsel for the Direct

21    Purchaser Plaintiffs.

22          MR. CLARK:  Your Honor, Brian Clark, Lockridge,

23    Grindal, Nauen for Direct Purchaser Plaintiffs.  I intend to

24    only listen.

25          THE COURT:  How about -- well, anybody else here

1    for the Direct Purchaser Plaintiffs?

2             MR. BOURNE:  Yes.  Good morning, Your Honor --

3             MR. PEARSON:  Yes, Your Honor.  Clifford Pearson,

4    Pearson, Simon & Warshaw.

5             THE COURT:  All right.  Good morning.

6             MR. PEARSON:  I don't intend to speak, Your Honor.

7             THE COURT:  All right.  Thank you.

8             MR. PEARSON:  I will listen intently.

9             THE COURT:  Okay.  Sounds good.

10            MR. BOURNE:  And Joe Bourne from Pearson, Simon &

11   Warshaw.

12            THE COURT:  Very well.  And you are not intending

13   to argue either?

14            MR. BOURNE:  No, Your Honor.

15            THE COURT:  Okay.  Anybody else here, whether in

16   person or on the phone, for the Direct Purchaser Plaintiffs?

17   All right.

18            Let's turn then to the Commercial Institutional

19   Indirect Purchaser Plaintiffs.  Who's here on behalf of that

20   group?

21            MR. RAITER:  Shawn Raiter, Your Honor.  I do not

22   intend to speak.

23            THE COURT:  Okay.  Who else?

24            MR. FINLEY:  Blain Finley on the phone, and I do

25   not intend to speak.

1          THE COURT:  And how about on behalf of the

2     Consumer Indirect Purchaser Plaintiffs?

3          MS. SCARLETT:  Shana Scarlett from Hagens, Berman.

4     And I will be speaking on behalf of the Consumer Indirect

5     Purchaser Plaintiffs.

6          MS. RESCH:  And Brittany Resch from Gustafson

7     Gluek, and I do not intend to speak.

8          MR. GUSTAFSON:  Good morning, Your Honor.  Dan

9     Gustafson on behalf of Consumer Indirect Purchaser

10    Plaintiffs, and I will not be speaking.

11         THE COURT:  Then anybody else on behalf of any of

12    the groups of plaintiffs that I haven't heard from?  All

13    right.

14         Then let's turn to the defendants.  Is anyone here

15    on behalf of Agri Stats?  Anyone here?

16         MR. BERNICK:  Yes, Your Honor.  This is Justin --

17         THE COURT:  Go ahead.

18         MR. BERNICK:  Sorry.  Yes, Your Honor.  This is

19    Justin Bernick from Hogan Lovells on behalf of Agri Stats.

20         THE COURT:  All right.  Thank you.

21         Anyone else?

22         How about on behalf of Clemens Food Group?

23         MS. BRIESACHER:  Good morning, Your Honor.

24    Christina Briesacher from Kirkland & Ellis, and I will be

25    presenting our motion today.

1          MS. SHARKEY:  Good morning, Your Honor.  Christina

2     Sharkey, also from Kirkland Ellis.  I do not intend to speak

3     today.

4          MR. JOHNSON:  Mark Johnson from Greene Espel, Your

5     Honor.  I won't be speaking.

6          THE COURT:  Anyone on the phone for the Clemens

7     Food Group?

8          Turning to Hormel.

9          MR. DUNCAN:  Richard Duncan and Emily Chow from

10    Faegre, Baker, Daniels, and we will not argue.

11         THE COURT:  Anyone on the phone for Hormel?

12         Turning to Indiana Packers.

13         MS. STILSON:  Good morning, Honor.  Jamie Stilson

14    from Dorsey on behalf of Indiana Packers.  I will not be

15    speaking today, Your Honor.

16         THE COURT:  And anyone on the phone for Indiana

17    Packers?

18         How about Seaboard Foods?

19         MR. GREENE:  Your Honor, William Greene of Stinson

20    for the Seaboard Defendants.  I will not be speaking today.

21         THE COURT:  Anyone on the phone for Seaboard?

22         Smithfield Foods.

23         MR. COTTER:  Good morning, Your Honor.  John

24    Cotter from Larkin Hoffman for Smithfield Foods.  I will not

25    be speaking.

1            THE COURT:  Anyone on the phone for Smithfield

2     Foods?

3            Triumph Foods?

4            MR. SUMMERLIN:  Good morning, Your Honor.  This is

5     Gene Summerlin from Husch Blackwell on behalf of Triumph,

6     and I don't intend to speak today.

7            THE COURT:  Anyone else for Triumph?

8            Tyson Foods.

9            MR. GRAHAM:  David Graham from Dykema Gossett.  I

10     don't intend to speak today.

11            THE COURT:  Anyone else for Tyson?

12            MS. ROHRBAUGH:  And Tiffany Rider Rohrbaugh from

13     Axinn on behalf of Tyson.

14            THE COURT:  Okay.  JBS.

15            MR. HEEMAN:  Good morning, Your Honor.  Don Heeman

16     from Spencer Fane on behalf of JBS Defendants.  I will just

17     be listening.

18            THE COURT:  And is anyone else either in the

19     courtroom or on the phone for JBS?

20            MR. RASHID:  Good morning, Your Honor.  This is

21     Sami Rashid from Quinn Emanuel on behalf of JBS USA.  I

22     don't intend to speak today.

23            THE COURT:  Anyone from Mitsubishi?

24            Is there any counsel for any defendant -- oh, I'm

25     sorry.  Go ahead.

1          MS. STILSON:  Well, Your Honor, I believe they are

2     not in any of the operative complaints, but obviously they

3     are a parent of Indiana Packers.

4          THE COURT:  All right.

5          Anyone for any of the defendants, either in the

6     courtroom or on the phone, that I've not yet called on or

7     has not brought themselves to my attention?

8          Okay.  Then let's proceed with the motion.  And,

9     Ms. Briesacher, I believe you said you'd be arguing for the

10    Defendants.

11         MS. BRIESACHER:  Yes, Your Honor.

12         THE COURT:  Please go ahead.

13         MS. BRIESACHER:  May I proceed, Your Honor?

14         THE COURT:  Yes.

15         MS. BRIESACHER:  Your Honor, we're here today

16    because, frankly, we have concerns about the tactics that

17    plaintiffs are using when contacting potential witnesses in

18    this case.  And while plaintiffs are certainly entitled to

19    conduct an investigation, they must do so within the bounds

20    of the ethical rules, rules that were put in place to impose

21    safeguards on when and how to communicate with represented

22    and unrepresented parties.

23         We're here today --

24         THE COURT:  Now, by "parties," though, you're

25    using "parties" sort of in the broadest sense, in other

 1    words, represented and unrepresented?

 2            MS. BRIESACHER:  Individuals, correct, Your Honor.

 3            And today we're here to propose guidelines

 4    outlining what the law requires in this area.  And we

 5    believe that these guidelines will benefit all parties, but

 6    will really force some rigor into this process as the

 7    ethical rules require.

 8            Now I'd like to take a minute and just level set

 9    how we got here.  Mr. John Reininger is a long-time employee

10    of Clemens.  He has been employed at the company for nearly

11    30 years.  He is a senior executive.  His title currently is

12    the Chief Relationship Officer.

13            Mr. Reininger has been known to the plaintiffs

14    since very early in the case.  He was on over a dozen

15    organizational charts that we produced, including the most

16    recent.  And we also specifically discussed Mr. Reininger

17    with the plaintiffs.  They demanded that he be added as a

18    document custodian during the meet and confer process.  And

19    in July, we discussed Mr. Reininger on one of our meet and

20    confer calls.  And to put this in context, it was a month

21    essentially before they called him -- their investigator

22    called him.

23            You know, what's more, even setting aside what we

24    told them or what was in our documents, really just a simple

25    Google search would have revealed his affiliation with

1   Clemens.  This is something that I did on my own, Your

2   Honor.  If you just Google "John Reininger," his name

3   appears within the first few hit results.  It actually links

4   to his LinkedIn page showing he is a current employee.  Or

5   if you Google "John Reininger hog" or "John Reininger pork,"

6   it actually links to the Clemens website and is the first

7   search result.  And it links to the current senior

8   leadership of Clemens.  It has John Reininger's name, his

9   picture, his title.  And that, actually, is the web page we

10   attached at Exhibit 3 to our motion.

11        So plaintiffs cannot say that they did not know he

12   was a current employee.  We discussed it with them, and

13   really a simple internet search would have advertised it.

14   Despite knowing that he was a current employee, they called

15   him.

16        THE COURT:  Well, and my understanding is

17   plaintiffs' counsel acknowledge that they did know that he

18   was an employee but have said that somehow -- I want to

19   understand better -- but that somehow that word didn't get

20   to the investigator.

21        MS. BRIESACHER:  Yes.  Correct.  Correct.

22        So despite knowing this, their investigator

23   reached out to him.  On August 28th, 2019, Mr. Reininger

24   received a voicemail.  When he listened to the voicemail,

25   the caller identified himself as a "researcher looking into

1    the pork industry."  He didn't mention the lawsuit, his firm

2    or anything about this case.

3           Kind of believing he was just an academic

4    researcher, Mr. Reininger called him back.  During the

5    two-minute discussion that followed -- and we know it's two

6    minutes, Your Honor, because we have a record of the call

7    log showing the length of the time, and I have a screenshot

8    here if you're interested in seeing it -- the plaintiffs

9    asked Mr. Reininger questions related to his experience hog

10   farming.

11          Mr. Reininger asked the investigator, you know,

12   what are you looking for?  And the investigator only

13   provided some vague responses about looking into information

14   generally.

15          During this two-minute phone call, plaintiffs'

16   investigator did not disclose his affiliation with the firm,

17   disclose his involvement with the case, ask Mr. Reininger

18   where he worked or whether he worked for a defendant, or

19   asked if he was represented.

20          It was only after they hung up that Mr. Reininger

21   thought, you know, there was something off about the call,

22   that it was odd.  So he actually looked up the name of the

23   caller and then saw, you know, this wasn't an academic

24   researcher.  This was the plaintiffs.

25          When we first put plaintiffs on notice that they

1    spoke with a current employee, they initially denied it.

2    And then we told them no, your assertion is incorrect.  You

3    reached out to a current officer and executive of the

4    company that was on our organizational charts and that we

5    spoke about during meet and confers.  And then they said

6    that it was an inadvertent error.

7              THE COURT:  Is there any information indicating

8    that Mr. Reininger told the investigator anything that --

9    and I know this isn't your only concern -- but that he

10   actually said anything to the investigator that disclosed

11   confidential or privileged or prejudicial information in any

12   way?

13             MS. BRIESACHER:  No, Your Honor.  We do not

14   believe that there was any privileged communications that

15   Mr. Reininger told the investigator.

16             You know, he'd asked about his experience with hog

17   farming.  They talked about that.  He actually asked the

18   investigator what he was looking for.  And, you know, there

19   were some vague responses and then the call ended.

20             So we agree that there was no privileged

21   communications revealed on that phone call, but that doesn't

22   address our concern that it shouldn't have happened in the

23   first place.

24             THE COURT:  About why.

25             MS. BRIESACHER:  We found this extremely

1     troubling, particularly that a seemingly experienced

2     investigator who admits that he knew enough about

3     Mr. Reininger to know that he worked with pork companies for

4     awhile, but apparently never connected with his team to know

5     that, yes, this is a current employee or never did even a

6     simple internet search which would have revealed that he is

7     the current Chief Relationship Officer.

8               So this concern is what lead to our request that

9     plaintiffs agree to provide certain disclosures in future

10    interviews to avoid any future mistakes, inadvertent or

11    otherwise.

12              THE COURT:  So tell me about your meet and confer

13    process, because it's not feeling like it was really robust

14    here.  Now, I understand, and I want to understand this

15    better from plaintiffs' counsel as well that initially said

16    no, it didn't happen, and I realize that could've been

17    off-putting, but still tell me what efforts you made to have

18    a really interactive conversation with plaintiffs' counsel

19    about whether there was harm done on this occasion and what

20    you might be able to agree upon to make sure that it didn't

21    happen again.

22              MS. BRIESACHER:  Yes.  Your Honor, you know, we

23    engaged in over a month and a half of correspondence with

24    the plaintiffs.  It's true --

25              THE COURT:  Calling?  Was there any calling?

1           MS. BRIESACHER:  Your Honor is correct that there

2    were no calls.  We engaged in a month and a half of email

3    correspondence with the plaintiffs.

4           It is correct that their final correspondence did

5    offer to meet and confer to the extent we had questions

6    about their proposal.  Your Honor, we just didn't have any

7    questions about their proposal.  We just didn't agree with

8    it.

9           It's clear that we have a fundamental disagreement

10   on certain aspects of required disclosures, including the

11   timing of disclosures, what disclosures should be provided,

12   and to whom they should be provided.  So we believed, Your

13   Honor, that the time was ripe to bring these issues to the

14   Court for some guidance.  So that's what we did, Your Honor.

15           THE COURT:  So tell me about where -- map out for

16   me where you believe you and plaintiffs agree, presumably

17   there are some areas of overlap, and where you see

18   divergence, where you're asking for this and they're saying

19   no or you're asking for this and they're saying, well, no,

20   not like that, like something else.

21           MS. BRIESACHER:  Sure.  So I will take this in

22   three bundles.  So I'll start with when must disclosures be

23   made.  And there, Your Honor, we have a fundamental

24   disagreement on when disclosures must be made.

25           We assert that disclosures, including that you

1     work for plaintiffs, should be made at the outset of any

2     call or interview.  Plaintiffs' proposal in contrast says

3     that disclosures will be made only before any kind of

4     "substantive communication."  They argued in their

5     opposition that they would be made after some kind of

6     verification of the witness's identity.  But really either

7     proposal is unworkable and here's why.

8              If plaintiffs do not need to provide disclosures

9     until a conversation turns "substantive" and if we took

10    Mr. Reininger for example, when would that be?  After he

11    talked about his work as a hog farmer?  At no point, leaving

12    him with a misimpression entirely because they didn't view

13    the information he provided as substantive?  Or kind of

14    taking their proposal on verifying a witness's identity,

15    when do they decide it has been verified, how many minutes

16    into the discussion?

17             Here the investigator spoke with Mr. Reininger for

18    two minutes without ever identifying himself.  Two minutes

19    is a really long time to be on the phone with somebody

20    without telling them who you are, your affiliation with the

21    case, or what the purpose of the call is, or asking if

22    they're represented.

23             There's really no benefit to this gray area line

24    drawing that plaintiffs are proposing.  The timing here

25    should be simple -- when the call starts -- so everyone

1    knows who is who and what the purpose is.  And this will

2    bring to the forefront immediately whether the individual is

3    represented.

4         This simple approach is consistent with the case

5    law we've attached.  We've cited to *Eldredge v. City of St.*

6    *Paul*.  And there the court required disclosures and said

7    that they should occur "prior to any interview."

8         THE COURT:  But is that necessarily across the

9    board?  In other words, doesn't it make a difference -- and

10   I realize what didn't happen here that should've happened

11   here was either the investigator being better informed about

12   who he was or wasn't calling in the first place -- but

13   wouldn't the natural place to start be confirming the

14   identity of the individual and finding out right away

15   whether he or she is or isn't a current or former employee

16   of a party?

17        MS. BRIESACHER:  Yes.  That's what they say, but

18   that's not happening here, because if you get two minutes

19   into a discussion without ever saying, oh, by the way, I'm

20   working for the plaintiffs, are you represented in this

21   case, then whatever method they're doing to verify identity

22   doesn't work.  I mean, it takes two seconds to say is this

23   John Reininger?  Yes.  Okay.  Mr. Reininger, I am Matt

24   Isaacs.  I work for the plaintiffs' law firm in this case.

25        I mean, if those disclosures would've been made at

1    the outset, this motion could've been avoided.  And that's

2    something simple that can be done right at the outset.  It

3    takes 15 seconds to do, but it's a check.  It's to make sure

4    whatever assumptions you have about whether the plaintiff is

5    a party, whether they're a third party, whether they're

6    adverse or neutral, it's a check on those assumptions if you

7    just simply ask somebody -- tell them about the case and ask

8    if they are represented in the case.

9            So we do have a dispute about when disclosures

10   must be made, and then I have a quick point I want to make

11   about voicemails.

12           So the plaintiffs argue that they should not have

13   to make any disclosures in a voicemail.  They claim that

14   making disclosures in a voicemail could lead to "confusion

15   or misunderstandings."  However, their current approach of

16   identifying themselves as mere researchers is absolutely

17   causing confusion and is leading to misunderstandings as

18   evidenced by what happened with Mr. Reininger.  I mean, he

19   thought they were academic researchers until he himself

20   Googled them after this confusing two-minute call and he saw

21   no, these are the people that are suing us.

22           THE COURT:  If the person on the other end of the

23   phone -- if Mr. Reininger had not been an employee or even a

24   former employee but really was somebody working in the hog

25   industry, do you maintain that it would have been improper

1    or against any of the case law or the ethical rules for

2    Mr. Isaacs to say what he said?  I'm a researcher.  I'm

3    looking into the hog industry.  I'd like to talk to you.  Is

4    there something more or different that you believe the

5    ethical rules or the case law required if we hypothesize

6    that the person on the other end of the phone was of the ilk

7    that the researcher says he thought they were?

8         MS. BRIESACHER:  Yes, and really what you are

9    asking is to whom these disclosures should be made.  Should

10   they only be made to current and former?  Should they be

11   made to everyone?  Really we see for at least kind of

12   certain of the disclosures no difference between the two.

13        Rule 4.3 -- you know, the comments of Rule 4.3

14   state -- and this is dealing with unrepresented parties,

15   third parties in the case, adverse or neutral -- that in

16   order to avoid misunderstandings, a lawyer will typically

17   need to identify the lawyer's client.

18        That rule also contains an obligation to correct

19   any misunderstanding if you reasonably know that the person

20   doesn't kind of understand the lawyer's role in the case.

21        4.4 says a lawyer cannot use methods of obtaining

22   evidence that violate the rights of the third parties.

23        So, at a minimum, with individuals that you

24   believe are true third party, non-adverse witnesses you at

25   least should be identifying yourself, your affiliation with

1    the law firm, and asking if they're represented, again, just

2    as a check.

3           If plaintiffs are able to proceed as they have and

4    not provide any disclosures to individuals that they believe

5    are non-adverse, kind of neutral third parties, then that

6    won't kind of solve the issue that brought us here in the

7    first place, because with Mr. Reininger they didn't believe

8    that.

9           So if they're able to just continue to tell these

10   people that they are researchers in the industry and not

11   provide any of these basic, routine disclosures about who

12   they are and the purpose, it could allow conversations --

13   prohibited conversations like the one that occurred with

14   Mr. Reininger to continue.

15          Now, Your Honor, I'd like to turn next to our kind

16   of next bucket of cases, which is what disclosures must be

17   made.  And here we proposed six routine disclosures.  As

18   part of our exchange prior to this motion, the plaintiffs

19   kind of appear to agree that their disclosures will now

20   include that the lawyer investigator states their

21   affiliation with the law firm they work for and, two, that

22   they'll inquire and confirm whether the witness is a current

23   employee.  Now, they have agreed to do this, again, for

24   certain individuals, the current and formers, but are

25   objecting to anyone else.

1              The parties do have a dispute about some of the

2       remaining disclosures, including inquiring whether the

3       individual is represented, informing the individual they

4       should not divulge privileged communications, and their

5       rights to be interviewed and have counsel present.  These

6       disclosures are routine.  They have been ordered in other

7       cases.

8              THE COURT:  But not for truly unaffiliated

9       parties, right?

10             MS. BRIESACHER:  It is correct that there has been

11      the case law --

12             THE COURT:  Nonparties.

13             MS. BRIESACHER:  The case law that we found --

14      this issue doesn't come up very much, probably because these

15      things are generally routine and most times they're used as

16      a default, but the cases that we work under are a little

17      unique because it is plaintiffs bringing most of these

18      motions in order to seek the court's permission to contact

19      certain current or former employees.

20             THE COURT:  And I agree it makes perfect sense for

21      those.  I'm just trying to understand where in the case law

22      or in the rules I would find support for the idea that

23      someone who is not a current or former employee should be

24      told that they've got a right to have counsel present for an

25      interview.

1          MS. BRIESACHER:  Well, Your Honor, I think it

2     again goes back to 4.3 and 4.4.  And, you know, for those

3     individuals that plaintiffs believe are truly third party

4     and neutral, non-adverse, I think it kind of goes back to

5     the rules of avoiding misunderstanding and ensuring that

6     your methods of obtaining evidence aren't violating anyone's

7     legal rights.

8          So it's certainly true that nobody has an

9     obligation to talk to them and that they can have a lawyer

10    of their choosing present.  But, at a minimum, Your Honor,

11    for these individuals that plaintiffs believe to be

12    non-adverse third parties, we would request that there be

13    some basic disclosures.  The first three that we would

14    propose:  You identify yourself and your affiliation; you

15    identify the purpose of the call, seeking information about

16    the lawsuit; and you ask the person if they're represented.

17         If third parties are provided those three basic

18    disclosures, it would address what brought our motion, the

19    concerns that brought our motion today, and that's to check

20    that plaintiffs' assumptions are in fact accurate as to

21    whether the person is adverse or neutral.

22         Your Honor, plaintiffs essentially here are trying

23    to argue no harm no foul.  They assert this motion is

24    unnecessary because there was no substantive discussion with

25    Mr. Reininger, and they allege they have not contacted any

1    other represented parties.

2           Now, frankly, we can only take them at their word

3    that they haven't contacted anyone else; although, their

4    investigator did say, you know, that he had no substantive

5    communications with any other represented parties.  I'm not

6    really sure what that means.  But even if we take them at

7    their word that no one else has been contacted, you know,

8    this motion and an order like this may not have been

9    necessary kind of before this became an issue and before we

10   learned of what happened and they initially denied it and

11   then called it an inadvertent error, but now we live in a

12   world where they have contacted a senior executive and

13   contacted a senior executive who had no idea who they were.

14          So the reality is really there is no harm in

15   setting clear guidelines, Your Honor, on what is expected

16   when either side contacts a witness, particularly given the

17   massive gray area that exists, and that we know of at least

18   one senior investigator had no idea this happened.

19          So that's really what we're asking here today,

20   guidance to avoid ambiguity, to ensure the parties are on

21   the same page, and to ensure this doesn't happen again.

22          THE COURT:  All right.  Thank you.

23          Ms. Scarlett.

24          MS. SCARLETT:  Shana Scarlett from Hagens on

25   behalf of the Consumer Indirect Purchaser Plaintiffs.

1          THE COURT:  I'm going to have you raise the

2     podium, or at least the microphone, to make sure we can all

3     hear.

4          MS. SCARLETT:  So Mr. Isaacs is a case

5     investigator that is employed full-time by my firm, Hagens

6     Berman.  He works in the office that I work in, the Berkeley

7     office, of which I'm a managing partner.  Mr. Isaacs has

8     worked extensively with my firm doing this type of case

9     investigation.

10          In a world where *Twombly* came down from the

11     Supreme Court and it became much more difficult to have

12     antitrust cases being brought, especially where conspiracies

13     oftentimes operate in secret, my firm performs extensive

14     case investigations before bringing cases like this one, the

15     pork antitrust case.

16          This case was brought in June 2018.  We conducted

17     over six months of investigation prior to bringing the case.

18     We had case investigators discussing the industry with

19     witnesses.  We spoke to former employees of the companies.

20     We engaged economists.  We used trained investigators to

21     talk to these witnesses outside of the firm.  We reviewed

22     extensive public records.

23          These types of cases are extraordinarily

24     difficult, and we want to get them right, and we want to

25     make sure that we are bringing cases that have merit.  We're

1    very cautious.  It is our firm policy to only contact former

2    employees, even though there are circumstances where it

3    would be fine to contact current employees.  We have just

4    made it a firm policy, as Mr. Berman, our managing partner,

5    made clear in his declaration, that our investigators are

6    instructed only to avoid current employees.

7         What happened here was a simple mistake.  Our case

8    investigator is an extraordinary gentleman.  He has an

9    incredible history as an investigative journalist in an

10   industry that, as some of us know, is not doing well.  He

11   was a professor, so he taught at U.C. Berkeley.  He taught

12   Investigative Journalism.  He conducted in-depth

13   investigations into criminal ongoings in casinos.  He's just

14   an extraordinary man who operates to the highest

15   professional standard.

16        THE COURT:  So how did this happen?

17        MS. SCARLETT:  So let me explain how this

18   happened.  There are 12 defendants in this case.  At one

19   point in time, we were discussing 391 custodians.  The teams

20   discussing custodians were split across firms and even split

21   across groups within my firm.

22        Mr. Isaacs, our case investigator, was conducting

23   interviews at the time and did have lists of the current

24   employees, but these org charts are very opaque.  They're

25   not initially very easy to understand.  This was just a

1    simple mistake.

2           Mr. Isaacs' practice, our practice as a firm, is

3    to make contact with someone and then first verify their

4    identity and that they are the person that we're looking

5    for.  When Mr. Isaacs tried to identify the identity of

6    Mr. Reininger -- and I might not be saying that right -- the

7    witness misrepresented that he was not affiliated with the

8    pork industry.  Had he have said he was affiliated with the

9    pork industry, then the series of disclosures that normally

10   happens would've happened here and it would've been

11   confirmed that he was a current employee and the call would

12   have ended.  So but for that misrepresentation by the

13   defendant's employee, we would not be in this situation.

14          We all agree this was just a two-minute call.  We

15   didn't go back to the phone records, but we're just assuming

16   the defendants are correct in asserting it was a two-minute

17   call.  That's a very short period of time.

18          Mr. Isaacs told Mr. Reininger that he was

19   interested in speaking with hog farmers.  I think that

20   clearly indicates he did not have any understanding that

21   this was an employee from one of the defendants when he said

22   he was particularly interested in speaking with people who

23   had worked on a farm.

24          At the time of these phone calls, we were

25   investigating the structure of the industry.  We were not

1    trying to contact the current or former employees of the

2    pork defendants.  We were looking much more strictly at the

3    industry itself in trying to determine how that is the same

4    or different from other industries.  When Mr. Reininger said

5    he was not affiliated with the industry, the call ended.

6           The guidelines proposed by the defendants are

7    vastly overbroad.  First of all, they would impede our

8    ability to talk to others unaffiliated with the defendants.

9    We are the Indirect Purchaser Plaintiffs.  We need to show

10   pass-through.  We need to show an overcharge due to

11   conspiracy and that that was passed through down to the

12   class, the consumers that ended up buying this pork.

13          We conduct many interviews.  We issue subpoenas.

14   We negotiate data.  We talk to a lot of people about that

15   very issue, the issue of pass-through.  Defendants' proposed

16   guidelines would impact all of those interviews.  When we

17   call to ask someone for essentially how does pricing at a

18   grocery store work, under defendants' guidelines we would

19   then have to say to them -- ask whether or not they are

20   currently represented, tell them they have the right to

21   refuse to be interviewed, tell them they have the right to

22   counsel of their choosing.  These type of disclosures in

23   that context would be almost, you know, deafening for

24   plaintiffs' investigation and stop us from being able to

25   talk to industry participants that we need to talk to to

1    fully understand this case.

2            The defendants say we have a dispute over timing

3    where they are asking for this to be made at the outset of

4    the interview.  From our perspective, this is something we

5    already do.  Had in this instance Mr. Reininger accurately

6    said that he was affiliated with the industry and our case

7    investigator been able to confirm that this was the man that

8    he was intending to talk to and he said he was affiliated,

9    the next series of questions would have been confirming

10   whether or not he was employed by a defendant and the call

11   would've terminated.

12           THE COURT:  So who did he think he was talking to?

13           MS. SCARLETT:  So we spent a lot of time trying to

14   backtrack how this happened and we can't precisely.  All I

15   can say to you is that from what I know working with case

16   investigators, which I have been doing 20 years, oftentimes

17   we get names through someone else.  So we'll speak to

18   someone.  We'll get that information.  They're helpful to

19   us.  And we'll say to them:  Do you know anyone else who

20   would be willing to speak to us?  It's my best guess that

21   that's how this happened and how we got his name.  And it

22   was divorced from any Google search that would have, as

23   defense counsel had said, turned up immediately that he was

24   an employee of one of the defendants.

25           THE COURT:  Even though he told -- as I understand

1    it, Mr. Isaacs told Mr. Reininger that he understood he had

2    worked for companies in the pork industry?

3            MS. SCARLETT:  But Mr. Isaacs believed that he was

4    one of the farmers, which is what our investigation was

5    looking at.

6            THE COURT:  So what does industry mean?

7            MS. SCARLETT:  I think industry is very overbroad,

8    and there's a big difference between wanting to talk to one

9    of the pork farmers that are selling the hogs versus one of

10   the pork processors that are further up the chain that are

11   the defendants in this case.  So that's where the disconnect

12   was.

13           So at the outset, the interview on a call that was

14   very short, two minutes, when these types of disclosures

15   oftentimes take up to ten minutes.  Many times witnesses

16   have a lot of questions about who we are.  Hagens Berman.

17   We often refer them to our website.  We have this case

18   listed on our website.  There are oftentimes the list of the

19   counsel and our attorneys on the case.  We go over who those

20   are.  We go over who we are before we ever get into what is

21   the substance of the back and forth of the questions that

22   our case investigator would have about this.

23           So when the defendants are asking for disclosures

24   to be made at the outset -- and what I think I heard my

25   opposing counsel say even in a voicemail -- that type of

1      thing simply is not feasible conducting these types of case

2      investigations.

3                For example, even leaving it in a voicemail were

4      this to be required for us in conducting interviews of any

5      non-party in this industry, would we need to leave all of

6      this information in a voicemail, for example, for a

7      non-testifying expert that I'm trying to retain from a

8      university?  How much is it that we need to leave in that

9      initial voicemail?  There is a certain unworkability about

10     the defendants' proposal.

11               The second part of their guidelines are that we

12     inquire whether or not the employee is current.  Of course,

13     that's something that we do as soon as we can verify.  But

14     there is that first step of verifying identity that needs to

15     happen.

16               Defendants have also requested that we inquire

17     whether the individual contacted is currently represented,

18     but that's not the test.  The test is whether or not they're

19     currently represented and it has to be the subject of the

20     representation.  And *McCormick,* cited by defendants, makes

21     this clear.  It's not simply where someone is represented

22     and, say, for example, has a family attorney, has a personal

23     injury attorney because of a car accident.  There are many

24     instances where people are represented that are completely

25     unrelated to the subject matter, which is another part of

1     their guidelines that they are requesting that's

2     extraordinarily overbroad.

3              Whether or not the witness has the right to have

4     the counsel of their choosing is another perplexing one.

5     And I think Your Honor picked up on this.  This is something

6     that has been ordered in other cases, but not to the breadth

7     here.  And for witnesses that are being contacted and

8     interviewed that makes it sound as if there are criminal

9     proceedings that are being engaged, that they have the right

10    to the counsel of their choosing.  Of course, they could

11    have any counsel they choose, but then they'd have to pay

12    for it.  And it becomes a very burdensome and onerous task

13    to have industry participants have to retain individual

14    counsel and then pay an hourly rate of $200 an hour to

15    simply have an interview with us where we're only seeking

16    background information, for example, about hog farming and

17    what does the practice of hog farming look like, and who

18    owns the hogs, how are they sold, are there are auctions,

19    basic questions like this that in truth there is no real

20    need for that person to have counsel of their choosing as

21    would be suggested in a criminal investigation.

22              THE COURT:  Let me back up a moment to verifying

23    identity.

24              MS. SCARLETT:  Absolutely.

25              THE COURT:  What exactly does that mean to you or,

1   more precisely, what exactly does that mean to your

2   investigators?  Because, I mean, presumably he ascertained

3   that John Reininger was John Reininger.  Was that verifying

4   identity or -- because it didn't verify what needed to be

5   verified to ascertain more quickly that the call needed to

6   conclude.

7         MS. SCARLETT:  So I can speak more generally about

8   what I know when we verify the identity.  Oftentimes we'll

9   have a name and a city and that's it.  And it's very

10  difficult to know whether or not the name of the person that

11  you have -- there may be, let's say, Joe Scott in Blaine,

12  Washington.  There might be seven Joe Scotts in Blaine,

13  Washington.  We need to make sure that we have the right Joe

14  Scott, the one that worked in the industry.  So there is a

15  series of questions.

16        And at the same time I think you are trying to

17  build a rapport with the witness to see if they are

18  comfortable talking to you or not; some people are not.

19  Some people hang up the phone right away.  To build that

20  rapport is part of it.

21        So when verifying the identity, it is to make sure

22  (1) that they are the person that you thought they were; (2)

23  that they are in the geographical location that you thought

24  they were; and then whether or not they are participating in

25  the industry that we are investigating.  And so verifying

1      identity have kind of those three steps to it.

2                  And, again, when Mr. Isaacs had asked the question

3      of whether or not he was affiliated with the pork industry,

4      the answer was no, and that's when the call was terminated.

5      So it's a critical part to know that the person Joe Scott

6      that we're trying to call is actually affiliated with the

7      pork industry and we're not just broadly announcing to

8      people who have no interest in it that, you know, we're

9      investigating the pork industry for certain parts of

10     collusion.  That's not something that we would speak broadly

11     about during any phase of the case, other than being in

12     court with Your Honor.

13                 THE COURT:  So what then stopped Mr. Isaacs or

14     what inhibited Mr. Isaacs from asking the question -- and

15     I'm going to set aside the emails.  I understand your points

16     on that.  But once there was a live conversation going on,

17     what stopped Mr. Isaacs from asking him at an earlier point

18     in this conversation?

19                 I guess two minutes on the phone is in the eye of

20     the beholder.  There are some calls where two minutes is way

21     too long as far as I'm concerned, but that's another

22     subject.  But what stopped Mr. Isaacs from asking the

23     question much earlier in the conversation are you affiliated

24     in any way with the pork industry?  It sounds like if

25     Mr. Reininger had said no, the call would have ended then.

1    If he would have said yes, of course, the next questions

2    would have needed to be with whom or in what capacity so

3    that then he could figure out whether he needed to shut down

4    the call.

5            MS. SCARLETT:  Again, this is hearsay.  And I want

6    to emphasize again that I trust Mr. Isaacs implicitly.  I

7    believe he comports himself according to the highest

8    professional standards.

9            It's my understanding that he was trying to get at

10   whether or not this witness has an affiliation with the pork

11   industry.  That is why he was saying that he was interested

12   in speaking with hog farmers, particularly interested in

13   speaking with people who worked on a farm.

14           It's our belief at Hagens Berman that he did get

15   to the identity verification as quickly as he could.  It

16   took two minutes or less than two minutes.  From our

17   perspective, that's a short period of time after you start

18   going through introductions and asking the name and pauses

19   and how fast people speak.  Two minutes to us seems like a

20   very short period of time for Hagens Berman to have gotten

21   to the point where there was a lack of verification working

22   on this person in the industry and the call was terminated.

23           So from my perspective, I, again, trust Mr. Isaacs

24   and trust him to have done everything properly.  When he

25   says it took a minute and a half, a minute and 45 seconds to

1    get to that point, I trust that that was true and that he

2    was trying to explain to the witness that he was interested

3    in hog farmers.

4          THE COURT:  Have you made changes to your protocol

5    or are you proposing to make changes to your protocol either

6    in the preparation for the calls or on the calls themselves

7    to assure that something like this doesn't happen again?

8          MS. SCARLETT:  So we have made one change to our

9    protocol.  So, again, I've been doing these type of witness

10   interviews for 20 years, and we only give a privilege

11   instruction to not divulge privileged information if after

12   talking with the witness and verifying that they are a

13   former employee and they worked for the company during the

14   time period we're interested in.

15         If we believe because of their position they might

16   be in a place to have access to privileged information, we

17   give them a very strong instruction that they are never to

18   divulge privileged information to us.

19         We don't give that instruction usually if it's

20   just a person involved in an industry or if it's a former

21   employee that was not in a position that we would believe

22   they would ever have access to in-house counsel or outside

23   counsel.  So we've changed that instruction.

24         At this point, before the interview is to be

25   conducted, we will in this case give an instruction that

1    they should not divulge privileged communications during the

2    interview, regardless of whether or not we believe they

3    would be in a position to have those communications.

4         THE COURT:  If we were to think about the

5    disclosures that your investigator makes to someone that

6    they come to believe is not a current or former employee

7    versus the disclosures that they make if they determine

8    someone is a former employee -- because my understanding is

9    once they conclude someone is a current employee, boom, call

10   is over.

11        MS. SCARLETT:  Correct.

12        THE COURT:  So if we would look at the difference

13   between your protocol or in what you would be willing to

14   agree that your protocol ought to include between the person

15   that I now understand -- I'm making the call.  I now

16   understand this person, as far as I can tell, wasn't ever

17   employed versus this person -- it appears this person seems

18   to have been a former employee of Clemens, what's the

19   difference between the disclosures you agree should be made?

20        MS. SCARLETT:  So I think that would be the big

21   difference in the two disclosures.  For anyone that has ever

22   worked at a company we now give them a privilege

23   instruction.

24         For someone who is never affiliated with a company

25   and we're simply talking to them about more neutral topics

1    like pass-through or a professor that we want to interview

2    or a non-testifying consultant -- there's honestly a list

3    too long for me to go through; I'm just giving you the three

4    examples off the top of my head -- but for those we make

5    sure that it's clear who we are, what firm we are, what case

6    this is regarding.  And usually there is a conflicts check

7    run by phone, whatever it is, and then the interview would

8    proceed.

9            So I think the big difference between those two

10   buckets is really that now our protocol includes the

11   instruction of privilege.

12           THE COURT:  When you say the "instruction of

13   privilege," regardless of what that person's role was with

14   the company, whether or not there is reason to believe that

15   they were at a position where they might have had access to

16   privileged information?

17           MS. SCARLETT:  That's correct, Your Honor.  But we

18   think that's well beyond what the case law requires.

19           THE COURT:  I understand the distinction you're

20   drawing, but I just want to make sure I understand what that

21   protocol now is.

22           Okay.  Anything else?

23           MS. SCARLETT:  No, Your Honor.

24           THE COURT:  All right.  Thank you.

25           Yes.

1          MR. CLARK:  Your Honor, I told you I wouldn't

2     speak and here I am.

3          THE COURT:  Here you are.

4          MR. CLARK:  Brian Clark, Direct Purchaser

5     Plaintiffs.

6          You asked counsel for Clemens regarding the meet

7     and confer process under Local Rule 7.1(a) and whether it

8     was adequate.  The answer is no.  As we submitted in our

9     Docket No. 381, there was no meet and confer whatsoever with

10    the Direct Purchaser Plaintiffs.  Our notice of this issue

11    at all was from the filing by defendants.

12         I heard the word repeated again and again today of

13    "plaintiffs" broadly, including all three classes.  We filed

14    our papers assuming that defense counsel would correct their

15    incorrect statement in their meet and confer statement and

16    also in their brief lumping all plaintiffs together.

17         We stated clearly we were not involved with this

18    conduct.  It makes me question why there hasn't been a

19    corrected filing or correction to the meet and confer

20    statement since the time we filed this on October 15th.

21    It's over a month later now.  I just would like to make that

22    clear.

23         I have continued to hear the word "plaintiffs"

24    used throughout the proceedings today and, as far as I know,

25    this is a motion regarding the Consumer Indirect Purchaser

1    Plaintiffs, not Direct Purchaser Plaintiffs or my colleagues

2    with the Commercial and Institutional Indirect Purchaser

3    Plaintiffs.

4              THE COURT:  All right.  Thank you.

5              MR. CLARK:  Thanks.

6              THE COURT:  Mr. Raiter.

7              MR. BERNICK:  Your Honor, this is Justin Bernick,

8    counsel for Agri Stats.  I have one thing I would like to

9    raise.  I also did not anticipate speaking.  If now is the

10   appropriate time, I'd be happy to do that.

11             THE COURT:  Now would be fine, and then I'll get

12   to Mr. Raiter.  Go ahead, Mr. Bernick.

13             MR. BERNICK:  Thank you, Your Honor.

14             So there's been a suggestion here that this was an

15   isolated incident, that the plaintiffs' focus here is on

16   contacting non-parties and other individuals.  We had a

17   similar situation with Agri Stats that we alerted plaintiffs

18   to where Mr. Isaacs contacted a current Agri Stats employee.

19             Again, this employee, their profile makes it clear

20   they are a current employee.  He left a voicemail saying he

21   was a researcher calling Agri Stats employees and asked her

22   to call back.  And, thankfully, this woman had the presence

23   of mind to reach out to the Human Resources person in Agri

24   Stats to try to confirm what was going on.  We chased it

25   down.  But she was very confused.

1    She didn't know who was calling her, didn't know

2  if it was us -- the attorneys for Agri Stats -- reaching out

3  to her asking questions, which we obviously have been doing

4  in the course of representing the company or --

5    THE COURT:  Hold on.  Hold on.  Mr. Bernick, you

6  are speaking way too fast.

7    MR. BERNICK:  Oh, I'm sorry.

8    THE COURT:  Go ahead.  Why don't you back up a few

9  sentences and take it a little slower.

10    MR. BERNICK:  Absolutely.  I apologize, Your

11  Honor.

12    So I was just relaying the details of a particular

13  incident related to Mr. Isaacs and Agri Stats.  He left a

14  voicemail for a current Agri Stats employee, Ms. McGettigan,

15  who her LinkedIn profile also discloses that she is a

16  current employee of Agri Stats.  The voicemail that

17  Mr. Isaacs left for her said that he was a researcher

18  calling Agri Stats employees, please give him a call back.

19    And thankfully this individual had the presence of

20  mind to reach out to the internal HR person at Agri Stats --

21  there is no in-house counsel at Agri Stats; they're a small

22  company -- to try to confirm what this was.

23    She didn't know if it was us, Agri Stats' outside

24  counsel, contacting her, as we have done from time to time

25  to ask questions about the case, or if this was somebody

1   else.  Thankfully, she raised it up the flagpole and did not

2   call him back.

3           The only reason I raise that is because I think

4   there's been a suggestion here that this only relates to

5   non-parties and that this was an outlier.  It sounded from

6   the voicemail that this was a deliberate strategy to reach

7   out to employees, or at least former employees, but

8   certainly employees and parties.  And the voicemail did not

9   provide sufficient disclosure for this individual to know

10  who the individual was.

11          We raised the issue with plaintiffs and they

12  responded and said that from their vantage point, everything

13  was above board.  We disagree with that position.  But I

14  wanted to make sure that I made that point because I wasn't

15  aware that the plaintiffs would be taking the position that

16  this was somehow an outlier or some sort of anomaly.  From

17  our vantage point, this seemed from the voicemail to be a

18  deliberate strategy of reaching out to the employees of the

19  parties.

20          THE COURT:  All right.  Thank you, Mr. Bernick.

21          Mr. Raiter.

22          MR. RAITER:  Thank you, Your Honor.

23          I echo the comments from Mr. Clark.  On behalf of

24  the Commercial Indirects, there was no attempt to meet and

25  confer by the defendants.  There was no notice of this issue

1    to us.  And the suggestion that it is plaintiffs, which is

2    intentional, is misleading.  They keep doing it.  We just

3    heard it on the phone.  It wasn't the plaintiffs.  It wasn't

4    the Commercial Indirects.  It wasn't the Directs.

5          That is not to say that this contact was

6    inappropriate in any sense, but the suggestion that we're

7    all lumped together here as plaintiffs is simply wrong and

8    it's misleading.  It was pointed out to defense counsel and

9    they have not corrected it and they should.  They have no

10   motion before us this morning or directed to the Commercial

11   Indirects.  They haven't made such a motion.  They didn't

12   meet and confer about such a motion.  And to suggest that we

13   should all be lumped in together, again, is inappropriate.

14         MS. SCARLETT:  May I respond briefly to

15   Mr. Bernick?

16         THE COURT:  Okay, but then I want to give

17   Ms. Briesacher an opportunity to respond as well.  Yes.  Go

18   ahead.

19         MS. SCARLETT:  I just want to respond to

20   Mr. Bernick from Agri Stat's suggestion that this is a

21   deliberate strategy by the plaintiffs.  I would just point

22   out, Your Honor, that was a voicemail.  Our case

23   investigator never spoke with the employee; had he, the

24   first steps would have been to verify identity and then to

25   discover whether or not she was a current employee of one of

1     the defendants and then the call would have terminated.

2              To suggest --

3              THE COURT:  So are you saying it's incorrect that

4     the voicemail from Mr. Isaacs said I'm trying to reach

5     employees of Agri Stats?  I'm trying to talk to employees of

6     Agri Stats?

7              MS. SCARLETT:  As I'm standing here today, I just

8     don't know whether or not that's what Mr. Isaacs would say

9     and that the voicemail said or not.  I just don't have any

10    information on that.  But I can just tell you it is our

11    policy to not speak with current employees.

12             And so to suggest there is a deliberate strategy

13    here is incorrect versus what we see the state of affairs,

14    which is a very large case with 12 defendants, many of whom

15    have hundreds of employees, that there are now arguably two

16    incidents where a current employee was conducted.  But had

17    our investigator gone through the steps, the call would have

18    terminated.  We have no intention of speaking with current

19    employees.

20             THE COURT:  Let me just ask one other question.

21    With respect to the practicalities of what can or can't be

22    said on a voicemail, what if, for example, the protocol

23    called for the investigator on the voicemail to disclose who

24    he was and who he was calling on behalf of?

25             MS. SCARLETT:  If a protocol were in place that

1    required, for example, a case investigator to say I'm so and

2    so and I work for this law firm, I think the practicality of

3    that would be very few people would call us back.  When

4    people hear that there is a law firm, they are generally

5    fearful that they're in trouble and that they have done

6    something wrong.

7         I think that having that kind of protocol, which

8    we don't see in the case law, we've never seen required by

9    any other court, is the type of thing that has a real

10   chilling effect on case investigations, which brings you

11   back to my opening statement and why I told you this is

12   necessary.  These cases are very difficult.  Conspiracies

13   conduct themselves in secret.  And without the ability to

14   have a factual investigation take place, many of these types

15   of cases would not be brought.

16            THE COURT:  Okay.  Thank you.

17            Ms. Briesacher.

18            MS. BRIESACHER:  Your Honor, I'd first like to

19   address the comments made by the other two groups of

20   plaintiffs.

21         So when we -- as we kind of were preparing for

22   this motion, you know, we did direct our meet and confer

23   efforts at the party whose conduct we had concerns about,

24   and that was the Consumer Indirect Plaintiffs.

25         It is fair to say that we did not meet and confer

1    with the other two groups of plaintiffs because we had no

2    reason to believe they were engaging in similar conduct.

3            We raised and filed this motion again focusing on

4    the party whose tactics we were concerned about.  Again,

5    that's the Consumer Indirect Plaintiffs.  I think our motion

6    makes clear kind of whose conduct we're troubled by.

7            But in this instance, you know, we're not asking

8    for sanctions.  We're not asking for anyone to be

9    disqualified.  We're here really asking for the Court's

10   guidance.

11           THE COURT:  But you are asking for an order that

12   would apply across the board, including to all plaintiff

13   groups, presumably to all defendants as well.

14           MS. BRIESACHER:  Correct, Your Honor.  We're just

15   asking everyone to follow the ethical rules.  And I would

16   anticipate that any guidance or orders that the Court issued

17   would be applicable to everyone, not just one group of

18   plaintiffs.

19           Second, I wanted to address the voicemail point.

20   We do not assert that all six disclosures need to be made on

21   a voicemail.  But, at a minimum, the plaintiffs should be

22   indicating who they are and who they're representing and the

23   purpose of the case.  I know plaintiffs have concern that

24   they think it's going to lead to some confusion or

25   misunderstandings about what the call is about, but the

1    reality is right now they're being misleading in a voicemail

2    saying they're researchers and then they're on a call and

3    not immediately correcting that misunderstanding that they

4    have created.

5              THE COURT:  But as long as -- I guess isn't it

6    what matters is that the necessary disclosures are made

7    before substantive information is gathered, information that

8    would go to the merits of claims or defenses in the case?

9              MS. BRIESACHER:  Your Honor, I think that this

10   case, kind of what happened here, shows that just saying it

11   needs to happen before substantive communications is too big

12   of a gray area.

13             THE COURT:  Well, what substantive communications

14   happened here?

15             MS. BRIESACHER:  Your Honor, here -- I mean, the

16   call -- well, the call did stop after two minutes, but there

17   were significant -- I mean, two minutes is a long time.

18   They asked about his experience hog farming.  They were able

19   to ask him if he worked on a hog farm between certain years.

20   I know that there seems to be a fact dispute about what was

21   discussed.  If what the plaintiffs say is true, that they

22   asked are you John Reininger, do you work for the pork

23   industry and he said no.  That's a 10-second conversation.

24   So clearly there were more discussions here.

25             During the course of these discussions,

1    Mr. Reininger was still under the false -- kind of the false

2    belief that this was an academic researcher.  He didn't know

3    that they were the plaintiffs.

4           So if you don't say it immediately -- hi, I'm so

5    and so, I work for the plaintiffs, I'm here to talk about

6    this case -- you run the risk of substantive communications

7    happening then before these disclosures be made.

8           So, Your Honor, we're here just asking for a

9    simple rule at the outset of the call and not to have

10   several minutes go by before these disclosures be made,

11   because then you risk what we are concerned about and that

12   these substantive discussions and privileged communications

13   could be revealed because the person doesn't understand who

14   they are on the phone with.

15          Thank you.

16          THE COURT:  I am concerned that there was not, as

17   my practice pointers require, an actual interactive

18   conversational meet and confer.  I can't tell from this

19   conversation whether that would be a waste of time or not.

20   It sounds like there are some areas where the parties are in

21   agreement.  It sounds like there are some others where

22   probably they wouldn't be.  But I'd still like you to have

23   gone through that step of giving it a try, of sitting down

24   and thinking about what things you can agree you want to

25   avoid, what things you can agree ought to be part of a

1    protocol, and if you still depart/diverge where those

2    limited areas are.

3            I am concerned about what happened here.  And I

4    have no reason to doubt your representations about

5    Mr. Isaacs, but I am concerned that, given Mr. Reininger's

6    position in Clemens and how easily discernible it would have

7    been from a number of sources, I am concerned that that call

8    was made.

9            On the other hand, I don't have anything on the

10   record, or otherwise, to tell me that there was some

11   substantive information passed along.

12           I'm hearing Mr. Bernick saying that there was a

13   contact with another current employee, but I don't have

14   anything in the record to that effect.  Not that I doubt

15   Mr. Bernick, but I don't have anything from anybody who was

16   directly involved in that call about what happened.

17           I do believe that what defendants are asking for

18   goes beyond what you're entitled to get, and I don't think

19   anything that happened here justifies going that far.  But I

20   don't want to have you back here every month or six weeks

21   either arguing about, well, did this one cross the line or

22   did that one cross the line.

23           So I do think it would make sense for you all to

24   take a good-faith run at sitting down together, including

25   the plaintiffs who weren't a part of this, because I'm not

1    sure -- I mean, I could enter a limited order, if I were so

2    inclined, directed to one set of plaintiffs, but it would be

3    much better if there was a set of basic working rules of the

4    road that applied across the board and not on a

5    party-by-party basis.

6              So I am going to require you to take a shot at

7    seeing whether you could agree to some kind of stipulation

8    for this is how we're going to approach these contacts going

9    forward.  And I'm going to have you -- you're welcome to use

10   one of the lovely conference rooms that are here; or if

11   you've got flights to catch and that's not going to work, to

12   set up a time to talk on the phone.  But I'm going to

13   require that you get back to me -- what day is today?  Oh,

14   my calendar says it's January 2020 already.  That's not

15   right.  Okay.  So today is the 19th.  I would like -- and

16   we've got Thanksgiving in the middle of things.  I want you

17   to get back to me with a joint report by December 2nd and

18   let me know whether you've been able to agree to all of or

19   most of, let's say, some rules of the road, whether they're

20   by stipulation or by -- however you want to express it, but

21   something that leaves everybody comfortable that you're all

22   on the same page; or, if not, how far you did get by way of

23   agreement and where you part company.

24             And then based on that, I'm going to hold this

25   motion in abeyance for the time-being.  Let me see what you

1    report back to me.  I think you can tell by the questions

2    I'm asking where I've got concerns and on both sides.

3          By way of one more piece of guidance, I am

4    inclined to agree that as long as a voicemail doesn't

5    affirmatively misrepresent who somebody is calling from, I'm

6    not inclined to think that a voicemail is a really workable,

7    practical place to leave this information.  But once you're

8    on the phone live, it seems to me you all ought to be able

9    to agree to some understandings about how the call will

10   proceed from there.  I would at least like to give you that

11   opportunity.

12         So let me hear back from you by joint letter on

13   December 2nd.  The letter probably ought to be e-filed,

14   rather than emailed, because I think it's important we have

15   a record of what you could or couldn't agree on.  And then

16   once I get that, I'll see what's left of this motion, and I

17   will either bless the stipulation or I will take the motion

18   under advisement and get an order out as soon as I can.

19         Any questions about that direction?

20         MS. BRIESACHER:  No, Your Honor.

21         THE COURT:  All right.  Thank you all.

22         Did I hang up on you all on the phone?

23         UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

24         THE COURT:  Thank you.  If I don't see you before

25   Thanksgiving, have a good one.

1              (Court adjourned at 11:00 a.m.)

2                          *      *      *

3              I, Debra Beauvais, certify that the foregoing is a

4      correct transcript from the record of proceedings in the

5      above-entitled matter.

6                    Certified by:   *s/Debra Beauvais*
                                     Debra Beauvais, RPR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25