# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-cv-1776-JRT-HB |
| This Document Relates To: ALL ACTIONS | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE FEDERAL LAW CLAIMS IN PLAINTIFFS' AMENDED COMPLAINTS** |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................... 1

STANDARD OF REVIEW.................................................................................. 5

ARGUMENT........................................................................................................ 7

I.      THE AMENDED COMPLAINTS FAIL TO ALLEGE PARALLEL
        CONDUCT................................................................................................ 7

        A.      The Vast Majority of Plaintiffs' New Allegations Do Not Establish
                Whether, When, or How Any Individual Defendant Acted to Reduce
                Supply.......................................................................................... 10

        B.      The Remaining Supply-Reduction Allegations Are Not Remotely
                Parallel........................................................................................ 15

        C.      Year-by-Year Examination Further Demonstrates the Lack of
                Parallel Conduct. ....................................................................... 19

        D.      Materials Embraced by the Complaints Demonstrate that Defendants
                Did Not Engage in Any Parallel Supply Cuts. ........................... 25

II.     OTHER INDEPENDENT GROUNDS FOR DISMISSAL ALSO EXIST.......... 26

        A.      Plaintiffs' Allegations Continue to Contradict the Existence of the
                Purported Conspiracy. ................................................................ 26

                1.      Lack of Vertical Integration Across Defendants............................. 26

                2.      Hog Production Increased Significantly. .......................................... 29

                3.      The Agri Stats Allegations Undermine the Purported
                        Conspiracy........................................................................................ 31

                4.      The Complaints Themselves Identify Obvious Alternative
                        Explanations for Supply Reductions. ............................................... 32

III.    "PLUS FACTORS" CANNOT SAVE PLAINTIFFS' CLAIMS.......................... 34

        A.      No Common Motive to Conspire. ......................................................... 36

        B.      No Actions Against Self-Interest. ......................................................... 36

        C.      Industry Structure. ............................................................................... 36

        D.      Alleged Public Signaling and Opportunities to Collude. ..................... 37

        E.      Agri Stats. .............................................................................................. 39

        F.      Increased Earnings and Supposed "Break" in Pricing. .....**Error! Bookmark
                not defined.**

        G.      Market Share. ........................................................................................ 41

IV.    THE IPPS' NEW "INFORMATION EXCHANGE" THEORY DOES NOT SAVE THEIR COMPLAINT FROM DISMISSAL. ................................................ 41

    A.    Legal Standard. ........................................................................................ 43

    B.    No Current or Forward-Looking Information Exchanged Through Agri Stats. ............................................................................................... 44

    C.    No Factual Allegations That Defendants Actually Used Agri Stats Data to Match or Inflate Prices. ................................................................ 45

    D.    No Factual Allegations Plausibly Suggesting *How* Defendants Could Use Historical Agri Stats Data to Match or Inflate Prices. .......................... 50

    E.    No Plausible Allegations of Anticompetitive Harm. .................................. 51

V.    THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIMS. ............... 53

    A.    Plaintiffs' Federal Antitrust Claims Are Time-Barred. ............................... 55

    B.    Plaintiffs Have Not Sufficiently Pleaded Fraudulent Concealment. ........... 55

        1.    Fraudulent Concealment Is Unavailable Because the Facts Supposedly Showing a Conspiracy Have Been in the Public Record for Years. ............................................................................ 57

        2.    Plaintiffs Fail to Allege Facts Showing that Defendants Took Affirmative Steps to Conceal Their Actions. ................................... 60

        3.    Plaintiffs Fail to Allege They Were Actually Misled by Any Affirmative Act of Concealment. ...................................................... 62

        4.    Plaintiffs Are Silent on Due Diligence. ............................................ 62

        5.    The Self-Concealing Conspiracy Doctrine Does Not Apply. .......... 64

    C.    The Continuing Conspiracy Doctrine Does Not Apply. ............................. 65

VI.    LEAVE TO AMEND SHOULD BE DENIED. ..................................................... 67

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
  2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015),
  *aff'd*, 771 F. App'x 498 (2d Cir. 2019) ....................................................... 41

*Am. Channel, LLC v. Time Warner Cable, Inc.*,
  2007 WL 142173 (D. Minn. Jan. 17, 2007) ................................................. 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................. *passim*

*Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035 (D. Minn. 2015) ........................................................ 38

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................. *passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
  203 F.3d 1028 (8th Cir. 2000) ............................................................. 14, 40

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ................................................................... 6, 40

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) .................................................................. 29

*Conmar Corp. v. Mitsui & Co. (U.S.A.)*,
  858 F.2d 499 (9th Cir. 1988) .................................................................... 64

*ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*,
  355 F. Supp. 3d 785 (D. Minn. 2019) ......................................................... 8

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) .................................................................... 32

*Erie Cty., Ohio v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ............................................................... 13, 41

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
  368 F. Supp. 3d 681 (S.D.N.Y. 2019) ....................................................... 59

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
  788 F Supp. 1042 (D. Minn. 1992) ........................................ 43, 44, 49, 51, 52

*Granite Falls Bank v. Henrikson*,
  924 F.2d 150 (8th Cir. 1991) .................................................................... 55

*Great Plains Tr. Co. v. Union Pac. R.R. Co.*,
   492 F.3d 986 (8th Cir. 2007) ................................................................ 56

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ............................................... 10, 38

*In re Fasteners Antitrust Litig.*,
   2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ....................................... 65

*In re Fla. Cement & Concrete Antitrust Litig.*,
   746 F. Supp. 2d 1291 (S.D. Fla. 2010) ................................................ 37

*In re Generic Pharm. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ............................................. 5, 6, 7

*In re Hawaiian & Gumanian Cabotage Antitrust Litig.*,
   647 F. Supp. 2d 1250 (W.D. Wash. 2009) ........................................... 39

*In re Late Fee & Over-Limit Fee Litig.*,
   528 F. Supp. 2d 953 (N.D. Cal. 2007) ................................................. 37

*In re Milk Prod. Antitrust Litig.*,
   84 F. Supp. 2d 1016 (D. Minn. 1997) ........................................... *passim*

*In re Monosodium Glutamate Antitrust Litig.*,
   2003 WL 297287 (D. Minn. Feb. 6, 2003) ...................................... 60, 64

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ........................................................ 15, 40

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) ................................................... 37

*In re Pork Antitrust Litig.*,
   2019 WL 3752497 (D. Minn. Aug. 8, 2019) ................................... *passim*

*In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane I*") (en banc),
   860 F.3d 1059 (8th Cir. 2017) ...................................................... 65, 66

*In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane II*"),
   893 F.3d 1047 (8th Cir. 2018) ................................................... 5, 40, 66

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ............................................................. 64

*In re Travel Agent Comm'n Antitrust Litig.*,
   2007 WL 3171675 (N.D. Ohio Oct. 29, 2007),
   *aff'd*, 583 F.3d 896(6th Cir. 2009) .................................................. 10

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   722 F. Supp. 2d 1079 (D. Minn. 2010) ......................................... *passim*

*Insignia Sys., Inc. v. News Corp.*,
   2005 WL 2063890 (D. Minn. Aug. 25, 2005) ....................................................... 52, 55

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   2014 WL 943224 (D. Minn. Mar. 11, 2014),
   *aff'd*, 797 F.3d 538 (8th Cir. 2015) ................................... 53, 55, 59, 62, 64

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   797 F.3d 538 (8th Cir. 2015) ............................................................................... 5, 6

*Jones v. Micron Tech. Inc.*,
   400 F. Supp. 3d 897 (N.D. Cal. 2019) ........................................................................ 38

*Kansas City, Mo. v. Fed. Pac. Elec. Co.*,
   310 F.2d 271 (8th Cir. 1962) ....................................................................................... 62

*Kent v. Bank of Am., N.A.*,
   2012 WL 3582717 (D. Minn. Aug. 17, 2012) ............................................................. 67

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ............................................................................................... 65, 66

*Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ...................................................................................................... 17

*McDonough v. Anoka Cty.*,
   799 F.3d 931 (8th Cir. 2015) ........................................................................... 6, 32, 51

*New Prime, Inc. v. Eaton Corp.*,
   2017 WL 5992466 (W.D. Mo. Mar. 16, 2017) ............................................................ 64

*Nitro Distrib., Inc. v. Alticor, Inc.*,
   565 F.3d 417 (8th Cir. 2009) ....................................................................................... 55

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   310 F. Supp. 3d 1002 (E.D. Mo. 2018),
   *aff'd*, 911 F.3d 505 (8th Cir. 2018) ....................................................................... 34, 35

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) ..................................................................................... 7, 9

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
   828 F.2d 211 (4th Cir. 1987) ............................................................................. 56, 61, 64

*Prosterman v. Am. Airlines, Inc.*,
   2018 WL 4018147 (9th Cir. Aug. 23, 2018) ............................................................... 35

*Razorback Ready Mix Concrete Co., v. Weaver*,
   761 F.2d 484 (8th Cir. 1985) ....................................................................................... 44

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,
   960 F. Supp. 2d 958 (D. Minn. 2013) ........................................................................... 7

*Ripplinger v. Amoco Oil Co.*,
    916 F.2d 441 (8th Cir. 1990) ................................................................ 60, 64

*Rotella v. Wood*,
    528 U.S. 549 (2000) ................................................................................. 55

*Sherr v. HealthEast Care Sys.*,
    262 F. Supp. 3d 869 (D. Minn. 2017) ....................................................... 29

*Shimota v. Wegner*,
    2016 WL 1254240 (D. Minn. Mar. 29, 2016) ......................................... 38, 52

*Standard Iron Works v. ArcelorMittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ........................................................ 10

*Sugar Inst. v. United States*,
    297 U.S. 553 (1936) ................................................................................. 49

*Summerhill v. Terminix, Inc.*,
    637 F.3d 877 (8th Cir. 2011) .............................................................. 53, 56

*Supermarket of Marlinton Inc., v. Meadow Gold Dairies, Inc.*,
    71 F.3d 119 (4th Cir. 1995) ................................................................. 64, 65

*Tatone v. SunTrust Mortg. Inc.*,
    857 F. Supp. 2d 821 (D. Minn. 2012) ....................................................... 13

*Texas v. Allan Constr. Co.*,
    851 F.2d 1526 (5th Cir. 1988) ................................................................. 64

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................. 42, 43, 44, 45, 49, 50

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ..................................................................... 39

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004) ................................................................. 53

*Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ............................................... 10, 35, 37

*Wholesale All., LLC v. Express Scripts, Inc.*,
    366 F. Supp. 3d 1069 (E.D. Mo. 2019) ...................................................... 44

*Williams v. First Nat'l Bank of St. Louis*,
    2014 WL 5800199 (E.D. Mo. Nov. 7, 2014) ............................................... 14

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ................................................................ 37

*Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*,
    520 F.2d 289 (8th Cir. 1975) ................................................................... 63

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
   401 U.S. 321 (1971)................................................................................................54, 55

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the third amended complaints filed by the Direct Purchaser Plaintiffs ("DPPs") (Dkt. 431) and the Commercial and Institutional Indirect Purchaser Plaintiffs ("CIPs") (Dkt. 432), as well as the second amended complaints filed by the Consumer Indirect Purchaser Plaintiffs ("IPPs") (Dkt. 392), Puerto Rico ("PRAC") (No. 19-cv-2723, Dkt. 47) and Winn-Dixie ("WDAC") (No. 19-cv-1578, Dkt. 94) (together, the "Amended Complaints").[1]

## PRELIMINARY STATEMENT

This Court granted Defendants' motions to dismiss the original complaints, holding that "Plaintiffs have not adequately pleaded parallel conduct." *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *9 (D. Minn. Aug. 8, 2019) ("Order"). The Court found Plaintiffs had not "adequately plead[ed] when each Defendant undertook production cuts," *id*. at *8, and failed to make "**specific** allegations in the complaints that plausibly establish that the individual Defendants decreased their own production of pork," *id.* at *9. Recognizing that such "information is vital to pleading parallel conduct," the Court gave Plaintiffs leave to replead, directing that they include "specific information" that would permit the Court to "analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork." *Id.* at *8.

---

[1]  Unless otherwise indicated, all paragraph references are to the DPP third amended complaint (DPP ¶__). All of the Amended Complaints contain substantively similar allegations of the same purported supply-reduction conspiracy alleged in the original complaints that this Court dismissed. The IPP complaint alone now also includes additional allegations of a purported conspiracy to exchange information for the purpose of matching or inflating prices. *Infra* Section IV.

Although this Court gave Plaintiffs ample time to amend, the Amended Complaints glaringly still lack any of the specific factual allegations of parallel conduct that this Court deemed "essential." *Id.* at \*9. The Amended Complaints largely repeat the same general theories of liability alleged in the dismissed complaints: Plaintiffs continue to allege that (1) Defendants purportedly "entered into a conspiracy from at least 2009 to the present to fix, raise, maintain, and stabilize the price of pork," DPP ¶2; (2) "Defendants' agreed upon scheme" was "to limit *hog* supply," "by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States," *id.* ¶¶2, 149 (emphasis added); and (3) Agri Stats was a "central and critical part" of the alleged conspiracy by "provid[ing] a means for Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics," *id.* ¶34; *see also* IPP ¶6. The Amended Complaints also repeat that "Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices." DPP ¶7; *see also* IPP ¶12.

The Amended Complaints continue to rely heavily on the type of conclusory allegations this Court deemed insufficient. For example, a good chunk of Plaintiffs' new allegations are "largely vague" statements by Defendants or third parties that "refer to the industry as a whole" – allegations that do not "indicate that any individual Defendant was making cuts." Order at \*9. Beyond such generalities, Plaintiffs allege only a few sporadic, disconnected and largely vague allegations about different supply-related behavior by different Defendants, at mostly unspecified times in different years.

None of the allegations plead supply-reducing acts that are sufficiently "proximate in time and value" to support a plausible inference of conspiracy. *Id*. at *8 (citation omitted). While the Amended Complaints, like the originals, allege that Smithfield reduced its hog herd, Plaintiffs fail to allege that other Defendants reduced hog herds in parallel with Smithfield in timing, amount, proportion, or any other manner – the same failing that prompted the Court to dismiss the original Complaints. In the case of two Defendants (IPC and Seaboard), Plaintiffs do not allege any production cuts. In the case of three others (Clemens, JBS USA and Triumph), each only undertook a *single* alleged production cut during the entire alleged conspiracy. Put simply, the Amended Complaints are notable for what they do not show: that Defendants acted in parallel.[2]

In addition, other defects (that this Court did not reach in dismissing the original complaints) continue to plague the Amended Complaints and undermine the plausibility of the alleged conspiracy:

(1)     the Amended Complaints show that overall hog supply *increased* to record levels during the alleged conspiracy period; furthermore, the Amended Complaints themselves provide obvious, alternative explanations – including, for example, the Great Recession and pig disease – for the few incidental downturns in supply that did occur;

(2)     the Amended Complaints do not allege any specific instance when a Defendant used purportedly "private" information from Agri Stats to limit supply (the Amended Complaints instead identify public statements by Defendants that indicate an utter lack of knowledge of their competitors' future supply plans); and

---

[2] At the same time, as discussed at pages 32-33, *infra*, the materials cited in the Complaints show that Smithfield cut hog production during a period in which it was losing money on every hog it raised, thus providing an obvious independent rationale for its actions.

(3)     although the purported conspiracy involved reduction in the supply of *hogs* used to produce pork, the Amended Complaints do not (and could not) allege that most of the Defendant pork processors even had their own supply of hogs to reduce.

Apparently recognizing the weakness of their supply-reduction allegations, IPPs have now amended their complaint to allege "in the alternative" a claim that the information disseminated by Agri Stats enabled Defendants to " inflate" and "match each other's pricing."  IPP ¶¶13, 68, 276, 281; *see, e.g.*, *id*. ¶¶19, 36.  But there are no facts alleged regarding *any* pricing decision made by any Defendant.  And despite having access to discovery from Agri Stats, the facts that are alleged – in the form of Agri Stats reports showing a wide divergence in the prices charged by different producers – undermine any notion that Defendants used Agri Stats to match prices or engage in any anticompetitive behavior.

Finally, Plaintiffs' claims are barred by the Clayton Act's four-year statute of limitations.  While Plaintiffs allege a conspiracy *starting in 2009*, and base those claims on publicly-available information, the first action in these proceedings was not filed until June 28, 2018.  Plaintiffs' allegations that Defendants fraudulently concealed their conduct are not only wholly conclusory, but also fail to satisfy any of the predicate elements for pleading fraudulent concealment.  And this failure is not surprising, given that Plaintiffs' allegations are based almost entirely on publicly-available documents and information.  The Amended Complaints also lack any factual allegations plausibly suggesting that a conspiracy continued into the four-year limitations period.

Plaintiffs have now tried and failed more than once to allege facts plausibly establishing an antitrust claim. Defendants thus respectfully submit that the claims should be dismissed with prejudice.

## STANDARD OF REVIEW

To state a claim for violating Section 1 of the Sherman Act on the theory that Defendants "limit[ed] output in order to increase price," Plaintiffs must allege direct or circumstantial facts that plausibly suggest that Defendants reached a "'meeting of the minds'" and "*acted collectively*." Order at *6 (quoting *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015)) (emphasis added).

Plausibility requires "more than labels and conclusions" or alleged conduct "merely *consistent with* [an] agreement." *Insulate*, at 543-44 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)) (alteration in original); *see also In re Pre-Filled Propane Tank Antitrust Litig. ("Propane II")*, 893 F.3d 1047, 1056 (8th Cir. 2018) (complaint must establish more than "sheer possibility that a defendant has acted unlawfully") (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). Rather, a complaint must include "factual content" such as "relevant individuals, acts, and conversations" that "raise a right to relief above the speculative level." *Propane II*, 893 F.3d at 1056-57 (citations omitted).

Factual allegations that defendants engaged in parallel conduct are "an essential element" of Plaintiffs' conspiracy claim. Order at *9. Such allegations must be specific to particular defendants, and the conduct, to be deemed parallel, must be "reasonably proximate in time and value." *Id.* at *8 (quoting *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441 (E.D. Pa. 2018)). It is insufficient to plead industry-wide

trends while failing to identify specifically which defendants contributed to those trends, and when and how. *Id.* This Court dismissed the original complaints because they failed to include such factual, defendant-specific allegations. *Id*. at *9. The Court therefore was "unwilling to force Defendants into significant and costly discovery." *Id.*; *see also Insulate*, 797 F.3d at 543 (federal courts must be "'reasonably aggressive in weeding out meritless antitrust claims at the pleading stage,'" given "'the unusually high cost of discovery in antitrust cases'") (citations omitted).

Even where a complaint alleges parallel conduct, such allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; Order at *6. These criteria are essential, because allegedly parallel conduct may simply reflect the rational reactions of firms to "common perceptions of the market." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011) (quoting *Twombly*, 550 U.S. at 554). "Even 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions,' is 'not in itself unlawful.'" *Twombly*, 550 U.S. at 553-54 (citation omitted).

Finally, in assessing the plausibility of an alleged antitrust conspiracy, the Court must also consider "whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct." *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 682) (alteration in original). And as this Court recognized, *see* Order at *5, a court at the motion to dismiss stage is "entitled to take notice of the full contents of"

materials cited or referenced in the Amended Complaints.  *See also Twombly*, 550 U.S. at

568 n.13; *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,

960 F. Supp. 2d 958, 972 n.11 (D. Minn. 2013).

## ARGUMENT

### I.   THE AMENDED COMPLAINTS FAIL TO ALLEGE PARALLEL CONDUCT.

Like the original complaints, Plaintiffs' Amended Complaints contain no "smoking

gun" allegations of a "direct and explicit agreement" among Defendants to reduce supply.

Order at *6.  In fact, the Amended Complaints include few new allegations at all.  *See* Decl.

of John A. Kvinge in Supp. of Defs.' Mot. to Dismiss ("Kvinge Decl."), Ex. 1 (redline

comparison of DPP first and third amended complaints).

Thus, the Court must again assess whether Plaintiffs have alleged "sufficient

circumstantial facts to plausibly establish" that "Defendants conspired together to limit the

supply of pork."   Order at *6-7.   But "[w]ithout specific information regarding each

Defendant, the Court has no basis to analyze which, how many, or when any of the

individual Defendants may have affirmatively acted to reduce the supply of pork.  And that

type of information is vital to pleading parallel conduct."  *Id.* at *8.

"Without more specific facts, Plaintiffs' allegations that the Defendants engaged in

production cuts [remain] nothing more than bare assertions."  *Id.*  "Specific" allegations of

"production cuts" must be "'reasonably proximate in time and value'" in order to be

considered parallel conduct.  *Id.* (quoting *In re Generic Pharm. Pricing Antitrust Litig.*,

338 F. Supp. 3d at 441); *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*,

911 F.3d 505, 516-17 (8th Cir. 2018) (plaintiffs failed to plausibly allege parallel conduct where the conduct by competitors occurred six months apart and therefore lacked "temporal proximity").

The Court granted Plaintiffs leave to amend to add "**specific** allegations . . . that plausibly establish that the individual Defendants decreased their own production of pork" in parallel with their competitors.  Order at *9.  The Amended Complaints, however, lack any such specific allegations of parallel conduct and on this ground alone must again be dismissed.

Indeed, the majority of Plaintiffs' new allegations exhibit the same flaws as those previously rejected by this Court – namely, they "generally refer to the industry as a whole, [] are largely vague," and "are too indefinite to plausibly establish that any Defendant other than Smithfield actually made cuts."  *Id*.  For example, the new allegations in the Amended Complaints:

- do not allege *any* purported production cuts during 2012, 2015, 2017 or 2018, and "acknowledge that [the 2014 production] dip was due to a deadly pig disease."  *Id*. at *4 n.4; *see also* DPP ¶¶120, 160;[3]

- during the last seven years of the alleged conspiracy (*i.e.*, post-2011), only allege a single production cut by one Defendant in 2016;

---

[3]  While the IPPs' original complaint acknowledged the pig disease in 2014, *see* IPP FAC (Dkt. 74) ¶97, the IPP's omitted this fact from their amended complaint.  Incredibly, IPPs now even highlight the higher pork prices in 2014 as somehow suggesting conspiracy.  IPP ¶9.  This is improper.  *See ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 795 (D. Minn. 2019) (denying leave to amend where proposed allegations "flatly contradict the original complaint," and "are a transparent attempt to remove dispositive admissions and replace them with different allegations that would survive a Rule 12 motion to dismiss").

- even during the few instances when two or more Defendants allegedly cut production in *some* way at *some* point during a given year, do not allege any cuts that are "proximate in time and value," Order at *8; and

The Amended Complaints also:

- do not allege that Defendants IPC or Seaboard engaged in *even a single* production cut during the entire decade-long conspiracy.

- allege that Defendants JBS, Clemens and Triumph each only undertook a *single* production cut during the entire alleged conspiracy – and only one of those cuts allegedly occurred after 2011 (in 2016); and

- do not allege that Seaboard and Triumph (the only two Defendants other than Smithfield said to have any "significant" hog production, IPP ¶144), engaged in *any* production cuts *after 2009* (and, as noted, do not specifically allege any production cut by Seaboard at any time).

The Amended Complaints thus reveal a *complete absence* of parallel conduct.

To the extent that the Amended Complaints also allege that certain Defendants increased the rate of exports, again no parallel conduct whatsoever is alleged. Only four Defendants – JBS, Seaboard, Smithfield and Tyson – are alleged to have increased exports at any time. JBS is alleged to have done so at some undefined points between 2009 and 2011; Seaboard is alleged to have done so in 2010; Smithfield is alleged to have done so in 2015; and Tyson is alleged to have done so in 2010. Even where two Defendants may have increased exports in the same year, there is no allegation showing the exports were "proximate in time and value." Order at *8. And as discussed in more detail below (pp. 17-19, *infra*), this was all in a context where the Amended Complaints expressly show that exports increased at a higher rate *before* the alleged conspiracy than during it.

The lack of parallelism compels dismissal of the Amended Complaints. Order at *9; *see also Park Irmat*, 911 F.3d at 516-17 (dismissing complaint where conduct occurred

"under dissimilar circumstances and separated by six months"); *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at \*4 (N.D. Ohio Oct. 29, 2007) (dismissing defendants that "followed the commission moves only after periods ranging from several weeks to six months; or . . . only implemented the caps or cuts partially"), *aff'd*, 583 F.3d 896 (6th Cir. 2009); *Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 836 (N.D. Ill. 2018) (defendants' product recalls that "were not remotely parallel in magnitude" "warrant no inference of collusion").[4]

## A.   The Vast Majority of Plaintiffs' New Allegations Do Not Establish Whether, When, or How Any Individual Defendant Acted to Reduce Supply.

Most of Plaintiffs' new allegations do not even speak to the conduct of any particular Defendant, much less that any Defendants acted in parallel.  As reflected in the attached comparison (Kvinge Decl., Ex. 1), Plaintiffs primarily advance five types of obviously insufficient allegations.

**Generalized Public Statements**.  The new Complaints continue to rely principally on alleged public statements by certain Defendants' executives, even though this Court already found that these statements "generally refer to the industry as a whole, and are

---

[4]   Complaints premised on parallel conduct survive motions to dismiss only when those complaints include specific factual allegations of parallel conduct.  Order at \*7; *see also Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 897 (N.D. Ill. 2009) (plaintiffs "alleged the specific content of statements made in public by Defendants' executives which endorsed an industry strategy to reduce the output of steel" and "concerted and unprecedented production curtailments that occurred on the heels of those statements at specific intervals"); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 792 (N.D. Ill. 2017) ("Plaintiffs have alleged that all of the defendants engaged in production cuts at the same time"); *id.* at 798 ("[a] similar scenario of industry meetings, followed by public statements and ["unprecedented"] production cuts also took place in 2011").

largely vague." Order at *9. As this Court explained, such statements "do not read as admissions" and "are too indefinite to plausibly establish that any Defendant other than Smithfield actually made cuts." *Id*. (citing DPP FAC (Dkt. 83) ¶¶111, 113, 115-16); *see also* DPP ¶¶128, 136, 139, 142, 144 (relying on same allegations). Allegations that merely describe what an executive "saw" or perceived to be happening in the industry do not "indicate that any individual Defendant was making cuts; but rather that each Defendant simply noticed that the industry's production as a whole was declining." Order at *9.

Plaintiffs now have doubled down on their original failed pleadings by alleging more general public statements. For example, Plaintiffs allege that a 2009 Tyson 10-K stated that the company "expect[s] to see a gradual decline in hog supplies . . . resulting in *industry* slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)." DPP ¶143 (emphasis added); IPP ¶113 (same). But such statements refer to the industry generally and "do not read as admissions" and are "too indefinite to plausibly establish" any supply cuts taken by Defendants. Order a *9.[5] At bottom, any executive statements referenced in the Amended Complaints, as in the original complaints, provide "no basis to

---

[5] Other similarly insufficient allegations of statements by Defendants' executives concerning general market conditions and developments include: DPP ¶127 (according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions"); IPP ¶105 ("Tyson described pork 'supplies coming down' and that 'the worldwide supplies of pork are still down.'"); *id*. ¶114 ("Hormel stated that 'we've seen about a 2% liquidation' in hogs."); WDAC ¶135 (Tyson executive "stated that there were likely to be fewer hogs in 2009"); *id*. ¶164 (Tyson stated "'[w]orldwide protein supplies and US domestic availability are expected to remain below '08 and '09 levels,'" and that "'[p]ork supplies in 2011 are anticipated to be below their peak supplies in calendar 2008 and 2009, and most projections show no material changes compared to 2010'").

11

analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork." *Id*. at *8.

**Third-Party Industry Observations**. Plaintiffs also continue to cite statements by third parties. For example, Plaintiffs again quote a *Hog Farmer* magazine article by the Vice President of AgStar, a *lender* not alleged to have conspired with Defendants, who recognized the economic pressures hog producers faced during this period and advised that such producers "must reduce sow numbers." DPP ¶¶104, 137; IPP ¶100.[6] As in the original complaints, these third party statements concern the "industry as a whole" and are even more "vague" regarding individual Defendant conduct than the generalized public statements from Defendants or their executives. Order at *9; *see, e.g.*, DPP ¶156 (alleging that "industry observers" noted that "Defendants were holding their slaughter levels constant"); *id.* ¶162 (alleging that *Pig International* "noted the continuing problem of daily slaughter capacity").

**Group Pleading**. Plaintiffs also again resort to group pleading and aggregated, industry-wide data and charts, which are insufficient to establish conduct by particular Defendants. For example, Plaintiffs allege that "[a]s of March 2010, *US pork production* was noted to be down . . . *Defendants* also were reported to have increased exports 8% . . . ." *Id*. ¶150 (emphasis added); *see also id*. ¶133 (alleging "integrator *Defendants'* market

---

[6] If anything, this allegation weakens the plausibility of Plaintiffs' claim, because it shows that a non-conspiring third-party believed sow reduction would be a rational, "independent response[] to common stimuli" caused by market-wide events. Order at *6 n.6; *see also* DPP ¶147 ("an industry insider noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability"); IPP ¶110 (similar); WDAC ¶176 (similar).

behavior," "*Defendants'* annual production," and "*Defendants'* individual economic self-interest," without any differentiation among individual Defendants) (emphasis added); IPP ¶99 ("*Defendants* engaged in a parallel round of production cuts in 2009 through 2010.") (emphasis added); WDAC ¶161 ("[m]odest contractions in the U.S. sow herd have contributed to tightening supplies."); *id*. ¶166 ("Smithfield further stated that 'Industry-wide, slaughter volumes were down 3.5%' and 'Lower industry slaughter levels are expected to persist well into the company's second quarter.'").

This Court previously held such allegations to be insufficient.  Order at *8; *see also Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (aggregated market-wide data are "simply descriptions of the market, not allegations of anything that the defendants did"); *Tatone v. SunTrust Mortg. Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012) ("complaint which lumps all defendants together and does not sufficiently allege who did what to whom" warrants dismissal).

**Supply-Related Conduct in Irrelevant Years**.   Plaintiffs have consistently claimed the purported conspiracy began in 2009.  *See, e.g.*, Order at *2 ("Plaintiffs allege that, starting in 2009, Defendants began to discretely conspire with one another"); DPP ¶2 (Defendants "entered into a conspiracy from at least 2009 to the present"); IPP ¶20 ("In early 2009, at the beginning of the conspiracy period . . . ").

Yet, certain Plaintiffs have now added allegations concerning conduct in 2008, *pre-*

*dating* the alleged conspiracy. *E.g.,* DPP ¶¶124, 134.[7] Of course, acts occurring "before the class contends the conspiracy ever began" are "of little relevance to this case." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1037 n.7 (8th Cir. 2000) (en banc). Notably, some Plaintiffs now assert that the conspiracy began sometime "in the last part of 2008." DPP ¶134; WDAC ¶134; PRAC ¶122. That allegation, however, is purely conclusory and also at odds with numerous other allegations explaining that the alleged conspiracy began in 2009. *E.g.,* DPP ¶120 (in 2009, "the pork integrators changed their behavior and acted in a concerted way to decrease supply," and the production decrease in 2009 "marked a drastic change from the period prior to the conspiracy"); DPP ¶43 ("In April 2009, Greg Bilbrey of Agri Stats again invited swine integrators to design and operate their own benchmarking effort."). The Amended Complaints also allege that "[p]rior to 2009, total pork production increased steadily year to year, *spiking in 2008*." Order at *4; DPP ¶120, fig.7. The effort to push the start of the alleged conspiracy back to 2008 thus cannot be taken seriously. *See Williams v. First Nat'l Bank of St. Louis*, 2014 WL 5800199, at *4 (E.D. Mo. Nov. 7, 2014) (finding even at the pleading stage, courts need not accept as true allegations "contradicted by the complaint itself") (citation omitted).

Furthermore, any supply reductions *before* 2009 would only show that reductions *during* the alleged conspiracy period were not the type of "complex and historically

---

[7] *See also* DPP ¶128 ("Hormel's production statistics show that it cut its number of sows in 2008"); *id.* ¶130 ("In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.").

unprecedented changes" that could plausibly suggest collusion.  *Twombly*, 550 U.S. at 556 n.4.

**Lower Sales**.  Plaintiffs now allege that some Defendants reported lower sales of pork products at various times during the conspiracy.[8]  But allegations of *sales* fluctuations offer no factual support that any particular Defendant actually undertook *production* cuts, let alone that any Defendant coordinated with another Defendant to do so.  Indeed, a Defendant might have lower *sales* because a competitor is winning more of its business or simply because of a dip in demand.  *E.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 n.13 (9th Cir. 2015) (affirming dismissal of antitrust claim when "[a]ny manner of economic variables may have contributed to these fluctuations in prices and sales").

## B.    The Remaining Supply-Reduction Allegations Are Not Remotely Parallel.

The remaining allegations, which concern a mish-mash of alleged hog supply reductions, pork processing or capacity restraints, or pork exports at a range of different times, do not come close to establishing parallel conduct, including "which, how many, or when any of the Defendants may have affirmatively acted" to reduce supply, Order at *8.

**Hog Supply Reductions**.  The lynchpin of the alleged conspiracy is a purported "agreed upon scheme to limit hog supply."  DPP ¶149; *see also id.* ¶70 ("Due to the nature

---

[8]   *See* DPP ¶128 (alleging "Hormel also reported lower *sales* of pork products in 2013") (emphasis added); *id*. ¶126 (alleging "Tyson reported a 3.3% decrease in its Pork *sales* volume") (emphasis added); *id*.¶129 (alleging Seaboard reported in 2013 that it had "lower *sales* volume of pork products in the domestic market") (emphasis added).

of the pork production cycle, the reduction of sows—i.e. farrowing hogs—has a significant impact on the supply of pork."); IPP ¶120 ("[s]upply level information regarding competitors allowed them to know that supply would not increase in the future, given the lifecycles of" hogs).  Yet the Amended Complaints lack *any* allegations of parallel hog supply reductions.  In fact, Plaintiffs only allege that a single Defendant affirmatively acted to reduce the supply of hogs *at any time after 2011*.  This is unsurprising: the vast majority of Defendants are hog *purchasers* that have few or no hogs of their own.  *Infra* Section III.A.  Even among the three Defendants (Smithfield, Seaboard, and Triumph) alleged to have any "significant" hog production, IPP ¶144, Plaintiffs do not allege parallel supply reductions.  Plaintiffs rely heavily on Smithfield's decision to reduce its hog production, *but those reductions are alleged to have begun in February 2008*, well before the start of the alleged conspiracy.  DPP ¶138; IPP ¶99.  Plaintiffs allege that Triumph only engaged in a single sow reduction in 2009 — but this was well after Smithfield allegedly began its production cuts — and Plaintiffs do not even attempt to show that Triumph's reduction was in parallel amounts to Smithfield's.  DPP ¶130.  And Plaintiffs do not allege that Seaboard engaged in *any* sow reductions throughout the entire conspiracy period.  DPP ¶129.

**Pork Processing/Capacity Restrictions**.  The Amended Complaints do not allege that even half the Defendants engaged in *any* reductions of pork processing or capacity utilization.  Nor do Plaintiffs provide any basis for the Court to determine whether even the scant pork-restriction allegations are proximate in time or value, because they are conclusory and impenetrably vague.  *E.g.,* DPP ¶128 ("Hormel further reported tonnage

16

reductions for its pork operations" in 2009); IPP ¶103 (Hormel replied to an industry analyst, "if there were free market hogs that normally we would be bidding on, we're not looking to take them in"); IPP ¶106 (Hormel "reduced production in our basic processing for . . . pork.").

Similarly, a number of the capacity reduction allegations are so vague as to be meaningless. *See* DPP ¶126 (alleging "a decrease in [Tyson's] capacity utilization rate" in 2010 and a "decrease [sic] its capacity utilization" in 2013); *see also* DPP ¶154 (referencing Smithfield earnings call statement that it was not planning "to build a new plant to expand capacity") (emphasis omitted). The remaining capacity reduction allegations occur across different years. *See* IPP ¶105 ("In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87%, down from the previous year's rate of 90%."); WDAC ¶¶141, 160-61, 166 (discussing Smithfield plant closures that began sometime in 2009 and concluded in mid-2010); DPP ¶128 (Hormel "reduced its capacity at its Los Angeles plant by 500 head per day" in 2014). Further underscoring the lack of parallelism are other allegations that major pork processors, including Defendants, *increased capacity* during the alleged conspiracy. *See infra* Section II.A.2.

**Exports**. Some Plaintiffs allege that increased pork exports purportedly suggest a conspiracy. (The IPP amended complaint does not include *any* export-related allegations.) As an initial matter, however, there is nothing inherently anticompetitive about exporting. *See, e.g., Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n.6 (1986) (even in perfectly competitive markets, individual sellers "still have to choose whether to sell goods overseas"). Moreover, the Amended Complaints include no factual allegations

17

that any Defendant communicated about (much less agreed on) export levels, coordinated its exports, agreed on export prices, or made any sales to foreign purchasers that were contrary to its unilateral self-interest. Nor do the Amended Complaints include any specific, factual allegations that "Defendants intentionally exported a greater percentage of their pork" in order "to limit the supply of pork" in the United States. *See* Order at *7. Instead, Plaintiffs allege, for example, that "Defendants also were reported to have increased exports 8%", DPP ¶150 – precisely the type of industry-wide data and group pleading that this Court previously found "does not suffice to plausibly plead parallel conduct." Order at *9.

Furthermore, many of Plaintiffs' new allegations say nothing about whether any Defendant increased the proportion of its pork sold outside the United States, let alone that any Defendant did so intentionally for nefarious reasons or in parallel with any other Defendant.[9] The scant allegations that reference exports in relation to domestic production are so vague in terms of timing and magnitude as to be facially insufficient.[10]

---

[9]  *See, e.g.*, DPP ¶128 ("Hormel reported strong earnings from its pork exports"); *id.* ¶129 ("Seaboard placed an increasing emphasis on exports and increased its volume of export sales").

[10]  *See, e.g.*, DPP ¶130 (alleging that at some unspecified time "Triumph, focused its production on exports . . . . These exports constituted a significant portion of its production throughout the class period, and reduced or otherwise limited Triumph's production in the United States."); *id.* ¶126 (alleging that at some point in 2010 Tyson reported "increased export sales" by unidentified amount); *id.* ¶129 n.49 (alleging Seaboard's "export volumes increased" by unidentified amount sometime in 2010).

Finally, the industry-wide export data included in the Amended Complaints actually undermines the alleged conspiracy.  Most notably, Plaintiffs' chart shows that exports *increased* at a higher rate *before the alleged conspiracy* than during it:

**Figure 8: U.S. Pork Exports as a Percent of Total Production, 2000-2017**



DPP ¶122, fig.8.  Specifically, while exports rose from 7% of pork production to 20% from 2000 to 2009, they only rose from 20% to 23% during the alleged conspiracy.  The chart also shows a significant *reduction* in exports in 2009, the year the conspiracy allegedly began.

### C.    Year-by-Year Examination Further Demonstrates the Lack of Parallel Conduct.

An assessment of Plaintiffs' remaining supply reduction allegations on an annual basis further underscores the lack of parallel conduct.

**2009**:  2009 is one of just three years during the alleged decade-long conspiracy for which Plaintiffs allege "pork integrators . . . acted in a concerted way to decrease supply."

19

DPP ¶120.  Yet, only three of the seven pork-producing Defendants (Smithfield, Tyson, and Triumph) are alleged to have reduced their hog inventory in 2009.  *See* DPP ¶¶124, 126, 130; WDAC ¶148.  And Smithfield is alleged to have commenced making substantial cuts *in February 2008*, well *before* the alleged conspiracy.  *See* DPP ¶138 (quoting Smithfield CEO as stating that in February 2008, "[w]e started a reduction of 50,000 sows and 1 million of our 18 million pigs"); *see also id.* ¶¶124, 134.  No conspiracy starting in 2009 can be inferred from Smithfield's having continued production cuts it started in 2008. *See* Order at *6 n.6.

Moreover, the alleged hog supply reductions in 2009 are not "reasonably proximate in time and value."  Order at *8.  Plaintiffs seemingly allege that Smithfield made a 10% sow herd reduction at an unspecified point before June 2009 and a 3% sow herd reduction at some point later, while Tyson cut its marginal sow herd[11] "by over 25%" at an unspecified time either "between 2008 and 2009" or "during 2009."  *Compare* DPP ¶126 *with* IPP ¶113.  Winn-Dixie alone alleges that Smithfield and Tyson "would concurrently be engaging in sow reductions . . . in the near future," WDAC ¶148, but that allegation lacks any temporal connection to Triumph, which allegedly cut 24,500 sows at some unspecified time in 2009.  DPP ¶130; WDAC ¶130.  Without more, these allegations do not suggest parallel conduct among these three Defendants, let alone the remaining Defendants.

---

[11]   Tyson owned only approximately 52,000 sows in 2009, accounting for less than 1.8% of total sows owned by the top 25 hog producers.  *See* Kvinge Decl., Ex. 2 (*Top 25 U.S. Pork Powerhouses 2009*, Successful Farming (Sept. 14, 2009)) (cited at DPP ¶121).

Other allegations about 2009 do nothing to shore up the allegations of purported parallel conduct in that year.  With respect to Hormel, the Amended Complaints only make temporally vague allegations regarding *hog purchases* and unspecified "tonnage reductions" for pork, not reduction of hog supply.[12]  *E.g.,* IPP ¶103 (Hormel replied to an industry analyst that it would not be "looking to take" in "free market hogs that normally we would be bidding on"); *id.* ¶106 (Hormel stated at an investor conference it "reduced production in our basic processing for . . . pork"); DPP ¶128 (Hormel "reported tonnage reductions for its pork operations in its 2009 Annual Report").[13]

**2010**: 2010 is the second of the three years during which Defendants allegedly "acted in a concerted way to decrease supply."  DPP ¶120.  But, again, no allegations show parallel conduct.  Plaintiffs allege that Smithfield, at an unspecified time, continued hog supply reductions that commenced as early as February 2008.  DPP ¶¶124, 148.  But, as noted, continuing hog supply reductions that started before the alleged conspiracy does not permit a reasonable inference of collusion.  Triumph and Seaboard – the only other allegedly "significant" hog producers, IPP ¶144 – are not alleged to have engaged in *any* hog supply reduction at all in 2010.  The only other, non-Smithfield 2010 hog-related

---

[12]   Hormel only owned a marginal sow herd of approximately 54,000 sows in 2009.  *See* Kvinge Decl., Ex. 2.

[13]   As to the allegation that "[i]n 2011 JBS USA reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS USA," DPP ¶127, the Amended Complaints do not even attempt to identify whether the phrase, "prior two years," refers to 2009 and 2010, or 2010 and 2011.  (For example, the exports could have increased by 1% in 2009 and 4% in 2010; or 4% in 2010 and 1% in 2011.)  Nor do the Amended Complaints identify any parallel relationship between such exports and the conduct of any other Defendants.

allegation is that "[in] August 2010, Hormel stated that 'our hog supply is down 3 to 4%.'" IPP ¶118. But this vague allegation certainly does not indicate that Hormel "affirmatively *acted* to reduce the supply," Order at *8 (emphasis added), as opposed to identifying more limited availability of hogs in the market.[14] Nor, in any event, do the Amended Complaints establish any proximity in time or value between Hormel's conduct and the conduct of Smithfield, the only other Defendant alleged to have engaged in hog supply reductions in 2010.

The *pork*-related allegations about 2010 also do not evidence conspiracy. Plaintiffs allege that "[i]n 2010 Tyson reported a 3.3% decrease in its Pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate." DPP ¶126. As noted above, a mere decrease in "sales volume" says nothing about whether supply was restricted. Nor is it remotely comparable to the alleged 11% decrease in Smithfield's processing rate in 2010 from the closure of one of its plants. WDAC ¶166. The remaining vague allegations about Tyson's "increased export sales" and "a decrease in its capacity utilization rate," DPP ¶126, say nothing about when such acts occurred, or how they impacted supply, if at all. Nor is there any way to connect those fuzzily alleged acts with Plaintiffs' equally vague allegations that "in the prior two years" JBS USA's "pork export volume had grown," *id*. ¶127, and that Seaboard's "export volumes increased . . . while domestic volumes *nearly kept pace* with 2009," *id*. ¶129 n.49 (emphasis

---

[14]   Indeed, Plaintiffs recognize that Hormel purchases hogs from third parties. *See* DPP ¶80.

added).  Indeed, it is noteworthy that the only allegation Plaintiffs could muster regarding Seaboard is that its domestic supply *remained steady*.  *Id.*

**2011**:  Plaintiffs allege that at unknown times during 2011, Smithfield "continued to downsize its sow herd" by an unknown amount and "vowed publicly that it did not intend to increase capacity." DPP ¶124; *see id*. ¶154; IPP ¶121.  With respect to other Defendants, Plaintiffs allege only that Clemens "reported production of 1,000 fewer sows through its subsidiary."  DPP ¶131.[15]  The allegations that two Defendants – one of which had been cutting hog production continuously since 2008 – cut production by unknown amounts at unknown times during 2011 falls well short of constituting parallel conduct that is "reasonably proximate in time and value."  Order at *8.

**2012**:  Plaintiffs do not allege that *any* Defendant acted to reduce supply in 2012.

**2013**:  2013 is the last year during which Plaintiffs allege that Defendants "acted in a concerted way to decrease supply."  DPP ¶120.  But materials embraced by the Amended Complaints demonstrate that the deadly PED virus, which Plaintiffs acknowledge as a non-conspiratorial reason for production declines in 2014, *actually began* to impact the United States *as early as mid-2013*.[16]  Moreover, Plaintiffs make allegations about the conduct of

---

[15]   Even this allegation is directly contradicted by the *Pork Powerhouses* rankings, which Plaintiffs cite throughout their Amended Complaints.  *See* Clemens Mem. at 6.

[16]   *See* DPP ¶160 n.72 (citing Kyle Bagenstose, *Pig Virus Has Ability to Affect Local Herds*, Bucks County Courier Times (May 4, 2014), http://www.buckscountycouriertimes.com/article/20140504/NEWS/305049832); *see also* WDAC ¶175 n.72 (citing Betsy Freese, *Pork Powerhouses 2013: Disease Hits, Growth Continues,* Successful Farming (September 29, 2013), https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-growth_283-ar34203).

only a single Defendant (Tyson) in 2013, and that conduct related to pork sales – not hog supply. Specifically, DPPs allege that "Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to 'balance[] our supply with customer demand.'" DPP ¶126 (alteration in original). And there is nothing collective about Tyson acting alone.[17]

**2014**: As noted, Plaintiffs "acknowledge" that any dip in hog production in 2014 "was due to a deadly pig disease." Order at *4 n.4. And the allegation that a single Defendant (Hormel) "reduced its capacity at its Los Angeles plant" that year, DPP ¶128, obviously does not reflect parallel conduct.

**2015**: The allegation that a single Defendant (Smithfield) "focused an increasing portion of its production on exports" by some unknown amount at some unknown time during 2015, DPP ¶125, cannot reflect parallel conduct with anyone else.

**2016**: Similarly, the allegation that a single Defendant (JBS) "reduced the number of sows it produced" cannot reflect parallel conduct. DPP ¶127.[18]

**2017 and 2018**: The Amended Complaints do not include any specific allegations that even a single Defendant acted to reduce supply during these years.

---

[17]  Indeed, balancing supply with demand is a prudent business strategy that is the *opposite* of Plaintiffs' assertion that Defendants collectively undertook "efforts to constrain supply short of demand." DPP ¶166.

[18]  This allegation is also false. As explained in the JBS-specific motion to dismiss, the sow inventory reports cited in the Amended Complaints unambiguously reveal that JBS *increased* its sow inventory from 2015 to 2016. JBS USA Mem. at 4.

**D.      Materials Embraced by the Complaints Demonstrate that Defendants Did Not Engage in Any Parallel Supply Cuts.**

Materials cited in the Amended Complaints further show that Defendants *did not* engage in parallel supply reductions in 2009, 2010 and 2013 (the only years when the Amended Complaints state that supply dropped), or any other years.  Specifically, *Pork Powerhouses* reports cited throughout the Amended Complaints identify the total annual sow inventories for the largest sow producers.  *E.g.,* DPP ¶¶119 & n.44, 121 & n.46, 124 & n.47, 134 & n.51, 161.  (*Pork Powerhouses* reports from 2008 to 2018 are included as Exhibit 2 to the Kvinge Declaration).  Given the Amended Complaints' reliance on these reports, the Court may consider them on a motion to dismiss.  *See supra* at 6-7.

The *Pork Powerhouses* reports show that Smithfield was the only Defendant that significantly reduced hog supply at any point during the alleged conspiracy.  The annual figures for Defendants' inventory levels set forth in those reports are summarized in the following chart.  These data, exhibit distinctly non-parallel conduct.  Indeed, even when Smithfield was cutting its herd from 2008 to 2011, the remaining' hog producers' herds were largely flat or even increasing.



## II.    OTHER INDEPENDENT GROUNDS FOR DISMISSAL ALSO EXIST.

The Amended Complaints also should be dismissed for other independent reasons that this Court did not reach in addressing the original complaints.

### A.    Plaintiffs' Allegations Continue to Contradict the Existence of the Purported Conspiracy.

#### 1.    Lack of Vertical Integration Across Defendants.

Plaintiffs repeat their central allegation that Defendants were vertically integrated – specifically, that Defendants not only processed pork but also *owned hogs*, and thus were able to effectuate an "agreed upon scheme to limit hog supply," DPP ¶149, as a means to raise pork prices.   According to Plaintiffs, this vertical integration allowed what the

Plaintiffs label "integrator Defendants" to "*directly control the production and supply of pork through their wholly owned and operated farms* where the hogs are raised, fed, and prepared for slaughter," DPP ¶68, which "*allowed the scheme to succeed*."  IPP at p. 70 (emphases added).

This core theory collapses, however, because the Amended Complaints (like the original complaints) confirm that most Defendants were *not* vertically integrated.  Indeed, the IPP amended complaint expressly recognizes that only one Defendant (Smithfield) is fully integrated, and that only two other Defendants (Triumph and Seaboard) have any "significant" hog production at all, which IPPs define as merely ">=5% market share" of hog production.  IPP ¶144.

Setting aside various conclusory allegations that "Defendants" are "vertically integrated," the non-IPPs make no specific allegations that any of the remaining Defendants are vertically integrated.  First, Plaintiffs make no allegation (and could not) that JBS USA was vertically integrated at all prior to its acquisition of Cargill in 2015.  DPP ¶76.  Second, as to Clemens, these Plaintiffs actually allege only that the company is "vertically *coordinated*," not vertically integrated, because it produces only a negligible number of hogs.  DPP ¶75.  Third, as to Tyson, these Plaintiffs concede that the "majority of [Tyson's] live hog supply is obtained through various procurement relationships with independent producers," not from wholly-owned and operated hog farms.  DPP ¶78.  Fourth, these Plaintiffs allege that IPC obtains its hogs from its "surrounding farm neighbors" and relies on "family-farm sourcing," again not wholly-owned and operated farms.  DPP ¶79.  Finally, while these Plaintiffs conclusorily allege that "Hormel is a

vertically integrated company," the Amended Complaints actually refer to Hormel annual report statements that "*the live hog industry*" has "evolved" to be "vertically integrated" but that Hormel *purchases hogs owned and produced by others* using "long-term supply contracts." DPP ¶80 (emphasis added).

All Plaintiffs also allege generally that "Defendants" have "pork production contracts" with farmers under which Defendants "*typically retain ownership of the hogs* and set the terms for how they are raised, allowing them to further control the supply of the pork on the market." DPP ¶69 (emphasis added); *see also* IPP ¶142 (under such contracts, "[f]ully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when."). But such allegations do nothing to advance Plaintiffs' core theory, since the Amended Complaints themselves recognize that JBS, Clemens, Tyson, IPC, and Hormel have little or no hog ownership at all. Nor have Plaintiffs set forth any non-conclusory allegations plausibly suggesting how any non-integrated Defendant could force independent hog farmers to reduce their hog supply.

That the majority of Defendants are not vertically integrated undermines Plaintiffs' core premise that Defendants had an incentive to reduce hog supply. Restricting hog production and thereby raising hog prices actually would only *increase* the input costs (and likewise decrease the profits) for the majority of Defendants that must *purchase* most or all of the hogs they process. The Amended Complaints allege that "all further processors look to purchase commodity items at the lowest price possible," IPP ¶187, and the same would obviously be true for the majority of Defendants that purchase hogs.

It is simply implausible that the majority of Defendants that had to purchase hogs would have conspired to reduce hog supply and thereby raise the prices they had to pay for hogs.  *E.g.*, *Am. Channel, LLC v. Time Warner Cable, Inc.*, 2007 WL 142173, at *7 (D. Minn. Jan. 17, 2007) (granting motion to dismiss antitrust case where no plausible motive to conspire alleged); *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 883-84 (D. Minn. 2017) (dismissing Sherman Act conspiracy claim where allegations provide "no economic motive" for differently-situated defendants to conspire); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) ("it is inherently implausible . . . that Ford conspired to injure itself").

### 2.    Hog Production Increased Significantly.

The Complaints include a chart supposedly demonstrating that Defendants "acted in a concerted way to decrease supply."   DPP ¶120.   But the chart shows that hog production *increased* to historically high levels during the alleged conspiracy:



Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000-2017

The largest increase in hog production took place in 2015, right in the middle of the alleged conspiracy period, and production increased in the majority of years during that period. The steady increase in production since 2000 directly contradicts Plaintiffs' assertion of a "drastic change" caused by the alleged conspiracy, DPP ¶120, and precludes any plausible inference that beginning in 2009 there was some "unprecedented" break, *Twombly*, 550 U.S. at 556 n.4, from which a decade-long conspiracy might be inferred.

Furthermore, the Amended Complaints acknowledge that "given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, *it takes nearly two years to substantially increase production*." DPP ¶50 (emphasis added); *see also id.* ¶70. Thus, given the increased production during the alleged conspiracy period, steps must have been taken to increase hog production *throughout the entire conspiracy period*, including during years when Plaintiffs allege hog supply decreased, and even at the purported conspiracy's start.

Finally, contradicting the mere assertion that "Defendants implemented *capacity* and supply restraints," *see* DPP at p. 50, and "were holding their slaughter levels constant," DPP ¶156, the Amended Complaints also confirm that major pork processors, including Defendants, increased processing *capacity* during the conspiracy period. For example, Plaintiffs allege that Cargill – then the third or fourth largest pork processor and a purported "co-conspirator" – spent $25 million to expand capacity in 2012. DPP ¶94; IPP ¶¶52, 155. Plaintiffs also allege that Seaboard and Triumph entered a joint venture to construct a new pork processing facility, which was completed in 2017. DPP ¶163. Although Plaintiffs continue to misrepresent that this expansion was announced in 2017, an article cited in the

Amended Complaints explains that construction on the new facility began in September 2015 and the facility opened in 2017.[19]

### 3. The Agri Stats Allegations Undermine the Purported Conspiracy.

Plaintiffs allege Defendants obtained "access to competitively sensitive information . . . through the Agri Stats reports" that purportedly "allowed [Defendants] to know that the supply of pork would not be increasing."  DPP ¶151; *see also* IPP ¶119-20. Plaintiffs further allege that this purported foreknowledge "that supply would not increase in the future," DPP ¶152, was acknowledged in public statements by various Defendant executives in 2010 and 2011, *see* DPP ¶¶151-54.  Yet as shown in Plaintiffs' own chart, industry-wide production *increased dramatically* after such statements were made. DPP ¶120, fig.7.

As discussed below, *infra* Section IV, IPPs' new rule of reason theory further undermines the central premise that Agri Stats was "critical" to the alleged supply reduction conspiracy.  Order at *4.  IPPs, who make no factual allegations that Agri Stats reports allowed Defendants to "know" their competitors' forward-looking production levels, instead now focus on price, not output.  *E.g.*, IPP ¶20 ("The new sales reports were

---

[19]   *See* Jeff DeYoung, *Pork Packing Capacity Faces Delays to Growth*, Iowa Farmer Today (June 2, 2018), https://www.agupdate.com/iowafarmertoday/news/livestock/porkpacking-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html (cited at DPP ¶163).  Plaintiffs further refute their own conclusory assertions by relying on sources that Clemens doubled its pork processing capacity when it opened a new facility in Coldwater, Michigan, in 2017.  *See* Clemens Mem. at 4-5.

designed to specifically allow a defendant to compare its prices with that of its competitors.").

### 4. The Complaints Themselves Identify Obvious Alternative Explanations for Supply Reductions.

The Amended Complaints include "'obvious alternative explanation[s],'" *McDonough*, 799 F.3d at 946 (quoting *Iqbal*, 556 U.S. at 682) for (a) the alleged reductions during the mere three years (2009, 2010, and 2013) when the Amended Complaints allege that supply decreased, and (b) the alleged increases in exports.

#### (a) Alleged Production Decreases.

<u>2009 and 2010</u>: The alleged production decreases in 2009 and 2010 obviously coincide with the Great Recession, which standing alone is a sufficient independent explanation for those decreases. *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998-99 (9th Cir. 2014) (taking judicial notice of "deep national recession" and dismissing claim because the harm alleged by plaintiffs was equally explainable by "this innocent alternative" explanation). The decreases in 2009 and 2010 also coincided with a widely-reported H1N1 swine flu epidemic, as well as record-high prices for corn – the primary cost component for raising hogs.

Each of these factors is identified in a 2009 Smithfield earnings call transcript that the Amended Complaints partially quote:

> "I sort of feel like the world has been against us for 12 months. . . . I look and [see] *record high corn prices*. . . . *A 75-year recession hits us in the fall*. The financial crisis, which hit many, many companies, and we had a reactive export market. . . . [A]nd *Smithfield got its own, got its own flu, the Swine Flu or the H1N1 as it was named, and it called*

> *Smithfield a Ground Zero.* . . . I want to comment at some point
> and say, "God, do you got anything left?"  I mean *this company
> has taken on about every single challenge that could possibly
> occur in one year.* . . ."

Kvinge. Decl., Ex. 3 at 6 (emphases added) (cited at DPP ¶145).  Materials cited in the

Amended Complaints show that, as a result of these devastating marketplace conditions,

Smithfield was *losing money on every hog it raised* during this period, making its unilateral

business decision to reduce its herd perfectly rational.  *See* Smithfield Mem. at 4-6.

2013:  As noted above, materials embraced by the Amended Complaints also reveal

that the PED virus, which Plaintiffs acknowledge caused production declines in 2014, DPP

¶160-61, actually began impacting the United States as early as mid-2013.  Indeed, the sole

document that DPPs cite concerning the deadly "PEDv epidemic" states that *since June

2013*, "7 million pigs were lost to PEDv," which is "equivalent to about 11 percent of the

country's pig population" according to U.S.D.A. data.[20]  And the September 2013 *Pork

Powerhouses* article cited by Winn-Dixie explains that PEDv struck in *May 2013*, was

"causing up to 100% mortality in newborn pigs," and was "the top-of-mind topic for the

nation's largest producers this fall."[21]

The Amended Complaints also acknowledge that corn prices, a key cost input, were

rising in 2013, citing an IPC executive who explained: "[h]igh corn prices make pig

---

[20]   *See supra* Note 15.

[21]   Betsy Freese, *Pork Powerhouses 2013: Disease Hits, Growth Continues*, Successful
Farming,           (September         29,         2013),         available         at
https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-
growth_283-ar34203 (cited at WD FAC (Dkt. 81) ¶175 n.72).

farming less profitable [by] . . . both reducing the supply of pork for processing plants come next spring and making the pork that is on the market more expensive."  DPP ¶157. Although Plaintiffs characterize this explanation as an "excuse," *id*., they do not dispute either that corn prices were rising or that those rising corn prices would lead to lower hog production.

(b)     <strong>Alleged Export Increases.</strong>

The Amended Complaints provide an "obvious alternative explanation" for any export increases during the alleged conspiracy period: the "increased global demand" for pork during the alleged conspiracy period, DPP ¶173; *see also id*. ¶149 (alleging an "improvement and increase in consumption in emergent markets"); WDAC ¶164 ("Tyson stated in its Q2 2010 earnings conference call that . . . 'We have seen good interest in Beef and Pork exports to a variety of global destinations.'").

The Amended Complaints also allege Smithfield "focused" more of its production on China sometime around 2015 in conjunction with a Chinese "sister company."  DPP ¶125.  The cited materials reveal that Smithfield itself had been acquired by a Hong Kong-based parent company in late 2013, thus rendering any increased post-acquisition "focus" by Smithfield on production to end markets in China wholly expected, and certainly not conspiratorial.  *See* Smithfield Mem. at 10.

## III.    "PLUS FACTORS" CANNOT SAVE PLAINTIFFS' CLAIMS.

A plaintiff seeking to rely on circumstantial allegations of a conspiracy must couple parallel conduct allegations with "substantial additional evidence—often referred to as 'plus factors.'"  *Park Irmat Drug Corp. v. Express Scripts Holding Co*., 310 F. Supp. 3d

1002, 1013 (E.D. Mo. 2018), *aff'd*, 911 F.3d 505 (8th Cir. 2018) (citations omitted). "However, in the same way that parallel conduct on its own is insufficient to establish an agreement, plus factors without plausible allegations of parallel conduct are insufficient to establish an inference of an agreement." Order at *7. As before, because Plaintiffs "fail[] to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary." *Park Irmat*, 911 F.3d at 517. Thus, plus factors should be beside the point now.

To the extent that this Court previously indicated, without reaching the issue, that the "plus factors identified and discussed by Plaintiff[s] are undoubtedly strong and are of the type often used to support an inference of an agreement," Order at *7, Defendants respectfully submit that the Amended Complaints compel a further review of the plus factors actually alleged. The purported "plus factors" here are largely consistent "with unilateral conduct," *Park Irmat*, 310 F. Supp. 3d at 1013 (citation omitted), in the type of "highly concentrated" industry Plaintiffs allege, DPP ¶1; and, therefore, do not suggest an unlawful conspiracy. Were it otherwise, "an antitrust complaint targeting any industry with those features would survive a motion to dismiss regardless of whether there were any additional facts suggesting an agreement." *Washington Cty.*, 328 F.3d at 841; *Prosterman v. Am. Airlines, Inc.*, 2018 WL 4018147, at *3 (9th Cir. Aug. 23, 2018) ("even viewed collectively, Plaintiffs' plus factors suggest only conscious parallelism in an interdependent oligopoly"). Moreover, many of the purported plus factors actually undermine the plausibility of the alleged conspiracy.

### A.   No Common Motive to Conspire.

One "plus factor" can be "a shared motive to conspire." Order at *6. Here, however, Defendants had no common motive to conspire. The Amended Complaints depend heavily on the supposed vertical integration of the Defendants. But the Amended Complaints lack specific allegations that the majority of Defendants are vertically integrated. The non-integrated Defendants, as hog *purchasers*, had no economic incentive to conspire to reduce the supply of hogs and thereby raise the prices they pay for hogs. *See supra* at 16.

### B.   No Actions Against Self-Interest.

Relying again on group pleading, Plaintiffs conclusorily assert that alleged supply restrictions were "in contravention of Defendants' individual economic self-interest." DPP ¶133. But as demonstrated above, the Amended Complaints remain essentially devoid of specifics of how and when the Defendants "affirmatively acted to reduce the supply of pork" during the purported decade-long conspiracy, let alone that any actions were against their individual self-interests. Order at *8; *see also supra* at 10-12. Even during the few years when there was a decrease in supply *industry-wide*, there are obvious alternative explanations – including economic recession and disease. *See supra* at 32-34. This is also true with respect to Smithfield, the one Defendant alleged to have reduced hog production significantly. *See supra* at 32-33.

### C.   Industry Structure.

Plaintiffs allege that the pork industry is "highly concentrated" (with Defendants "collectively control[ling] over 80 percent of the wholesale pork" marketplace) and has "high barriers to entry." DPP ¶¶1, 6, 88-90. As an initial matter, Plaintiffs make no

allegation that the *hog producing* industry (where the alleged "scheme to limit hog supply" took place) is highly concentrated.  DPP ¶149.  In any event, such market features "do not constitute a "plus factor" but are simply "market characteristics" that reflect the "industry is an oligopoly, which is perfectly legal."  *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003); *see also In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (allegations about market concentration do "not render the asserted conspiracy plausible."); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1317 (S.D. Fla. 2010) (market concentration and high barriers to entry do not make a claim plausible since they also "make the market susceptible to conscious parallelism"); *Washington Cty.*, 328 F. Supp. 3d at 841 ("it cannot be the case that allegations that a market is oligopolistic and a product is homogeneous are sufficient to survive a motion to dismiss").

### D.     Alleged Public Signaling and Opportunities to Collude.

Plaintiffs claim Defendants "exploited" "public earnings calls and other sources" to "communicate their planned supply restrictions to their competitors in furtherance of the conspiracy."  DPP ¶133.  But as before, there is no "basis on which to conclude that the specific Defendants here actually undertook production cuts."  Order at *9; *supra* at 7, 11-12.  Nor is there anything conspiratorial about company officials at largely publicly-traded companies addressing the observed economic conditions in the industry in which all operate.  *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011) ("general statements to investors or regulators about the trajectory" of the industry do not "render the conspiracy allegation more plausible"); *see*

*also* Order at \*9 ("the statements cited generally refer to the industry as a whole"). Indeed, federal regulations *require* publicly-traded companies to disclose their industry outlooks.[22] Courts have been "properly reluctant" to view such statements, when made during public earnings calls, as plus factors evidencing an antitrust conspiracy. *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 920 (N.D. Cal. 2019) (citation omitted); *see also id.* at 919 (observing that the court is "not at all surprised that competitors in such [an allegedly oligopolistic] market would be poised to make observations about the behavior of other competitors").

Plaintiffs also conclusorily allege that Defendants used "several industry trade associations and other forums . . . to facilitate their conspiratorial conduct." DPP ¶98. Yet Plaintiffs still make no effort to tie any supply reductions to trade-association meetings. This stands in sharp contrast to the *Broiler* case, where the court specifically relied upon the "suspicious timing of important industry conferences . . . followed by unusual producer actions and market movements." *Broiler*, 290 F. Supp. 3d at 800. Here, the Amended Complaints also allege that any referenced trade association meetings were merely "opportunities to discuss pricing and production." DPP ¶105. But such "[a]llegations that the parties had an opportunity to communicate . . . are insufficient alone to suggest a conspiracy." *Shimota v. Wegner*, 2016 WL 1254240, at \*10 (D. Minn. Mar. 29, 2016)

---

[22] *See, e.g.*, *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1047 (D. Minn. 2015) (noting that federal regulations "require[] public companies to disclose 'trends or uncertainties . . . that [they] reasonably expect[] will have a material favorable or unfavorable impact on net sales or revenues'" (quoting Reg. S–K, 17 C.F.R. § 229.303(a)(3)(ii)).

(Tunheim, J.) (citation omitted); *see also In re Hawaiian & Gumanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1257 (W.D. Wash. 2009) ("Attendance at industry trade shows and events . . . is presumed legitimate and is not a basis from which to infer a conspiracy, without more.") (citations omitted).

E.    **Agri Stats.**

Plaintiffs continue to claim that Agri Stats' benchmarking service "was key to the formation, operation, and continuing stability of the Defendants' anticompetitive scheme." DPP ¶45.  But there are *no* well-pleaded allegations that Defendants agreed to use Agri Stats as a means to reduce supply.  This Court thus recognized that Agri Stats should, at most, be analyzed as a potential "plus factor."  Order at *7 n.7.  But even as a potential plus factor, the conclusory assertion that Agri Stats was used by Defendants to "coordinate supply" and "police each other's production . . . for signs of cheating" cannot be credited. DPP ¶¶44, 65; *see also* IPP ¶50.  While Plaintiffs allege that "even current and historical information [from Agri Stats] regarding the production numbers of hogs provides forward-looking supply information to competitors" given the lifecycle of hogs, DPP ¶50, the Amended Complaints demonstrate the opposite:  that industry-wide supply dramatically *increased* after Defendants allegedly proclaimed (in alleged reliance on such "forward-looking" Agri Stats information) that it would not.  *Supra* at 29-31.

Moreover, the conclusory allegation that Defendants "policed" an assumed conspiracy through "data sharing" cannot be used to bypass Plaintiffs' failure to plausibly allege specific acts of parallel supply cuts or anything else suggestive of conspiracy.  *See Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 198 (3d Cir. 2017) ("[A]

litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly." (quoting *Blomkest Fertilizer, Inc.*, 203 F.3d at 1033) (alteration in original)).

**F.     Increased Earnings and Supposed "Break" in Pricing.**

Increased profits are *not* a recognized plus factor.  *Burtch*, 662 F.3d at 229 ("'In a free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits' and without a 'scintilla of evidence of concerted, collusive conduct,' this motive does not on its own constitute evidence of a 'plus factor.'") (citation omitted). Plaintiffs' allegations that Defendants obtained "substantial profit increases," DPP ¶166, and that Defendants' earnings margins "increased significantly," IPP ¶127, add nothing to the plausibility of the alleged conspiracy.

Nor does the alleged "widening" of *industry-wide* profit margin spreads, IPP ¶127 fig. 4, or the alleged "break" in pricing in 2009, DPP ¶164, constitute a genuine plus factor, because the Amended Complaints make no effort to account for how basic supply and demand factors might have affected prices and profits.  *See Propane II*, 893 F.3d at 1057 (allegation that conspiracy caused propane tank prices to remain at "high, noncompetitive levels" despite decrease in propane gas prices is insufficient to sustain claim); *see also In re Musical Instruments*, 798 F.3d at 1197 n.13 (affirming dismissal of antitrust claim when "[a]ny manner of economic variables may have contributed to these fluctuations in prices and sales").   Moreover, IPP Figure 4 unambiguously reveals that the only apparent widening of profit margins here commenced in 2015, almost six years after the alleged start of the conspiracy in 2009.  This and the other industry-wide studies cited do "nothing to indicate how any of the individual Defendants acted."  Order at *8.

Finally, the two studies about Tyson and Smithfield likewise are insufficient, not only because they fail to account for basic factors like demand, but also because they say nothing about the vast majority of the Defendants.  Indeed, econometric analysis that merely "'flags the possibility' of a conspiracy is not sufficient to meet the plausibility test." *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539, at *12 (S.D.N.Y. Mar. 31, 2015) (citing *Iqbal*, 556 U.S. at 678), *aff'd*, 771 F. App'x 498 (2d Cir. 2019).

## G.    Market Share.

Finally, Plaintiffs allege that purported enhanced market share stability suggests a conspiracy.  DPP ¶¶92-93; IPP ¶¶145-52.  The cited charts, however (DPP ¶92, fig.5; IPP ¶151, fig.14, actually show significant volatility in Defendants' market shares during the alleged conspiracy period.  And a second chart (DPP ¶93, fig.6; IPP ¶152, fig.15) sets forth an unexplained and unclear analysis of market shares that improperly lumps all Defendants' market shares together.  In any event, the charts at best "are simply descriptions of the market, not allegations of anything that the defendants did . . . and do not give rise to an inference of an unlawful agreement."  *Erie Cty.*, 702 F.3d at 870.

## IV.   THE IPPS' NEW "INFORMATION EXCHANGE" THEORY DOES NOT SAVE THEIR COMPLAINT FROM DISMISSAL.

Until the filing of the IPPs' recent complaint, all Plaintiffs alleged that "Agri Stats was key to the formation, operation, and enforcement of Defendants' conspiracy *to restrain supply* and thereby fix prices."  *See* Dkt. 229 (Pls. Opp.) at 16 (emphasis added).  The alleged conspiracy to reduce supply was framed as a *per se* Sherman Act violation.  Indeed, at the hearing on the motion to dismiss the original complaints, IPP counsel represented

that there "was no change in the theory of the complaint," *see* Jan. 28, 2019 Hr'g Tr., Dkt.

284, at 50:22-51:2, notwithstanding their citation to *Todd v. Exxon Corp.,* 275 F.3d 191

(2d Cir. 2001), a case applying the rule of reason.  In granting the motion to dismiss the

original complaints, the Court noted that "the antitrust violations here are centered on a per

se violation."  Order at *7 n.7.

IPPs now, however, have pleaded in the alternative a new rule of reason claim that

Agri Stats served as an information exchange that allowed Defendants "to readily . . .

*compare and match each other's pricing*."  IPP ¶277 (emphasis added); *see also id.* ¶19

(Agri Stats "identif[ied] for its co-conspirators the *price-raising opportunities* that they can

cash in on at the expense of the consumers"); ¶36 (Agri Stats provided data "all with the

*understanding that the defendants were using the data to make decisions regarding their*

*prices*") (emphasis added); ¶44 ("These types of reports had the effect of *allowing co-*

*conspirators to know exactly how far they could raise their prices to conform to their*

*competitors' prices*") (emphasis added); ¶281 (Agri Stats information was "a *material*

*factor* in Defendant Processors' decisions to *inflate the prices* that Plaintiffs paid for pork

during the class period.") (emphasis added).

IPPs do not – and could not – sidestep the deficiencies in their *per se supply*

*reduction* conspiracy claim by repackaging it as a *rule of reason pricing* claim.  Despite

adding numerous pages to their Amended Complaint and including pictures of various Agri

Stats documents, the claim boils down to a conclusory assertion that the Agri Stats

information was a "material factor" in Defendants' efforts to "match" and "inflate" prices.

But dooming this theory is the lack of any factual allegations plausibly suggesting that Agri

Stats data was actually used by any Defendant to set prices, let alone to anticompetitively match prices.  To the contrary, the very Agri Stats reports referenced in and attached to the IPP Amended Complaint show a wide divergence in the prices charged by different producers.  Indeed, despite repeatedly deploying buzzwords about the exchange of "current and forward-looking" data, IPPs' factual allegations actually demonstrate, at most, that Agri Stats benchmarked and distributed the type of *historic* data that has the *least* "potential to affect future prices and facilitate price conspiracies."  *Todd*, 275 F.3d at 211.

The Court should therefore reject Plaintiffs' invitation to "engage in such speculation" that Defendants used Agri Stats information in an allegedly anticompetitive manner to inflate and match prices.  Order at * 8.  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  Claims like those here suggesting anticompetitive conduct through an information exchange require careful scrutiny, given that benchmarking data "can enhance competition by making competitors more sensitive to each other's price changes, enhancing rivalry among them."  *Todd*, 275 F.3d at 214.

### A.     Legal Standard.

"In order to state a rule of reason claim under Section 1 of the Sherman Act, a plaintiff must allege concerted action that is intended to harm or unreasonably restrain competition and that actually causes such injury to competition."  *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F Supp. 1042, 1051 (D. Minn. 1992).  As with *per se* claims, courts assessing rule of reason claims must be "reasonably aggressive in weeding

out meritless antitrust claims at the pleading stage." *Wholesale All., LLC v. Express Scripts, Inc.*, 366 F. Supp. 3d 1069, 1076 (E.D. Mo. 2019).

The "Supreme Court has recognized that, absent some agreement between competitors to restrain price, the exchange of price and other market information is generally benign conduct that facilitates efficient economic activity." *Five Smiths,* 788 F. Supp. at 1052-53 (citations omitted). Accordingly, courts assessing rule of reason claims focus on factors such as the recency of the information exchanged to determine whether the claimed antitrust violation is plausible. While "exchanges of *future* price information are considered especially anticompetitive," by contrast "the exchange of *past* price data is greatly preferred" because past data has the least "potential to affect future prices and facilitate price conspiracies." *Todd*, 275 F.3d at 211 (emphases added). There also must be plausible factual allegations that the defendants actually *used* the information exchange to harm competition. *E.g.*, *Razorback Ready Mix Concrete Co., v. Weaver*, 761 F.2d 484, 488 (8th Cir. 1985) (affirming dismissal for failure to adequately allege "defendants' conduct had any adverse effect on competition").

**B.    No Current or Forward-Looking Information Exchanged Through Agri Stats.**

In *Todd v. Exxon Corp.*, the court upheld an information exchange claim that was based primarily on allegations that the defendants had exchanged "*current and future increases* in Defendants' salary budgets," 275 F.3d at 212 (emphasis added). Here, by contrast, IPPs do not identify any forward-looking pricing information that was exchanged among Defendants. In fact, while IPPs make generalized assertions about purportedly

44

"current" pricing data in the Agri Stats reports, IPPs are forced to concede, when talking about specific reports, that the information in those reports actually was "weeks" or even "months old." IPP ¶¶19, 47. IPPs, for example, conclusorily assert that Agri Stats provided "reports for other defendants that contain detailed pricing data" and that "this pricing information was *current*," only to then concede that these reports actually consisted of "pricing information that was less than *six weeks old*." *Id.* ¶43 (emphases added). The IPP Amended Complaint also concedes that the Agri Stats' Weekly Sales Report, attached to that Amended Complaint as Exhibit A, "included sales data that was only *weeks old*." *Id.* ¶¶19, 20, 28, 38. Similarly, the IPP Amended Complaint acknowledges that the Agri Stats Operations Profit Report (attached thereto as Exhibit F) and the Agri Stats Swine Processing Report (attached thereto as Exhibit G) included data that was "less than *three months*" old. *Id.* ¶47 (emphasis added).

Thus, the IPP Amended Complaint shows nothing more than that Agri Stats reports included backward-looking, not forward-looking, data – precisely the type of historical information that *Todd* itself characterized as "greatly preferred," because it does not have the same "potential to affect future prices and facilitate price conspiracies" as does current or forward-looking information. 275 F.3d at 211.

### C.   No Factual Allegations That Defendants Actually Used Agri Stats Data to Match or Inflate Prices.

IPPs conclusorily assert that the information provided by Agri Stats was used by Defendants to "match" the price of competitors or to "inflate" pricing. IPP ¶¶19, 281. But their Amended Complaint does not include a single specific factual allegation of any

Defendant using Agri Stats to "match" or "inflate" prices, let alone to set pricing.[23]  IPPs do not even purport to relate the timing of alleged information exchanges with any price increases by individual Defendants.  The conclusory assertions that "Defendants used the pricing information provided by Agri Stats (and indirectly, their competitors) to set their own prices of pork," and "inflate" those prices, IPP ¶¶38, 281, are "'naked assertion[s]' devoid of 'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (citation omitted), that do not "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

The IPPs' quotations from emails between Agri Stats and Tyson, IPP ¶¶35-38, 40, 67, simply demonstrate that Tyson used the *benchmarking* service to *benchmark* – comparing its own performance to the *average* performance of its various, unidentified competitors, *see, e.g.,* IPP ¶36 (discussing need to use data to compare Tyson's yield against "avg yld"), or to identify opportunities to improve profitability by, for example, shifting product mix, *see, e.g.*, IPP ¶37 (excerpt from spreadsheet showing, for example, that Tyson considered increasing the percentage of certain ribs in its product mix).  Nor do the referenced documents support the allegation that Agri Stats "helped defendants determine the identity of their competitors."  IPP ¶38.  The referenced email on this point merely shows that Agri Stats responded to a query by providing a complete list of the six other participants in its service.  *Id.*

---

[23]   Hormel is not even alleged to have received the Agri Stats' Sales Reports or to have exchanged pork-product pricing information with Agri Stats. *See, e.g.*, IPP ¶78 (not listing Hormel as a recipient of "pork sales reports"); ¶85 (similar).

Moreover, the Agri Stats reports IPPs cite actually show price *divergences* rather than any price "*matching.*"   For example, a cited Agri Stats report from October 2009, which the IPPs claim "lists the pricing variance against the national average for the thirteen plants in the reports," IPP ¶28, shows a dramatic divergence in net pricing among thirteen different pork producers:[24]



```
Oct 13, 2009 - 09:58
         Weeks: 31/09 - 35/09 Ending: 08/01/09 - 08/29/09

                              (a)    (a.1)   (a.2)
                             NET PRICE W/CO MIX
                             ----------------------
                       PLT.                  CO    NAT'L
      LIN  FLAGS  RE   NUM.   VAR           NET     NET

        1                     2.93         73.14   70.21
        2                     0.80         72.71   71.91
        3                     0.74        105.09  104.35
        4                     0.60         75.38   74.78
        5                     0.17         72.08   71.91
        6                    -0.01         64.98   64.99
        7                    -0.02         71.12   71.14
        8                    -0.02         74.91   74.93
        9                    -0.06         67.04   67.10
       10                    -0.26         67.25   67.51
       11                    -0.28         66.80   67.08
       12                    -0.61         71.49   72.10
       13               STORM -1.97         65.63   67.59

       14    13      Wt Co    0.00         71.36   71.36
       15     3      Wt 25%   1.49         83.65   82.16
       16     5      Wt 5     1.05         79.68   78.63
```

Significant price divergences are also seen on a product-by-product basis, as reflected in the corresponding Agri Stats report filed as Exhibit C:[25]

---

[24]   As reflected in the cited chart, the company's aggregate net price for the "mix" of products sold from that particular plant (CO NET) falls both above and below the aggregate national average price for a similar "mix" of pork products sold by the other 13 companies/plants listed in the report (NAT'L NET).  Significant price divergences are also seen on a product-by-product basis, as reflected in the corresponding Agri Stats report filed as Exhibit C.

[25]   In numerous instances, a product sold by the company (COMPANY NET PRICE) is well below the national average price (NAT'L NET) for that product, and in numerous

47

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Filed 11/06/19   Page 9 of 42 | | | | | | |
| | Y/COMPLEX | | | | | | | |
| .3) | (d) | (d.1) | (d.2) | | (e) | (e.1) | (e.2) | ( |
| | | | | | VARIANCE TO NAT'L | | | ECONO |
| ONAL | COMPANY | NAT'L | NAT'L | | | | | |
| MIX | NET | NET | TOP | | NAT'L | NAT'L | TOP 25 | V |
| | PRICE | PRICE | 25% | | RANK | VAR | VAR | NA |
| 0.14 | 58.28 | 57.17 | 58.25 | | 1-6 | 1.11 | 0.03 | |
| 0.01 | 69.12 | 67.51 | 69.12 | | 1-2 | 1.61 | - | |
| 0.36 | 109.72 | 96.91 | 101.22 | | 2-8 | 12.81 | 8.50 | |
| 0.12 | 20.21 | 18.77 | 20.22 | | 2-9 | 1.44 | -0.01 | |
| 0.77 | 83.96 | 82.93 | 85.11 | | 6-13 | 1.04 | -1.15 | |
| 0.06 | 70.88 | 67.96 | 72.82 | | 4-7 | 2.92 | -1.93 | |
| 0.33 | 104.01 | 100.46 | 107.98 | | 4-10 | 3.54 | -3.98 | |
| 0.15 | 76.09 | 63.36 | 68.26 | | 3-11 | 12.72 | 7.82 | |
| 0.03 | 75.09 | 70.27 | 75.96 | | 3-5 | 4.81 | -0.88 | |
| 1.10 | 93.54 | 91.71 | 95.13 | | 4-11 | 1.83 | -1.59 | |
| 0.01 | 76.83 | 60.63 | 72.85 | | 1-3 | 16.20 | 3.98 | |
| 0.27 | 91.51 | 84.19 | 90.47 | | 5-12 | 7.32 | 1.03 | |
| 0.07 | 74.63 | 70.42 | 72.60 | | 1-2 | 4.21 | 2.03 | |
| 0.80 | 103.69 | 103.14 | 105.97 | | 5-9 | 0.55 | -2.28 | |
| 0.03 | 163.88 | 100.94 | 119.21 | | 1-10 | 62.94 | 44.66 | |
| 1.87 | 57.70 | 57.46 | 58.72 | | 6-12 | 0.24 | -1.02 | |
| 0.21 | 136.32 | 126.56 | 134.52 | | 3-10 | 8.76 | 0.80 | |
| 2.49 | 53.47 | 51.99 | 53.00 | | 4-13 | 1.48 | 0.48 | |
| 0.27 | 99.80 | 97.55 | 98.91 | | 2-9 | 2.25 | 0.89 | |
| 0.07 | 309.97 | 285.56 | 290.62 | | 1-10 | 24.41 | 19.35 | |
| 0.43 | 46.25 | 44.96 | 48.88 | | 6-12 | 1.30 | -2.62 | |

And in connection with this or any other Agri Stats report, Plaintiffs do not allege a single instance when any Defendant's price moved to "match" any other Defendant's price.

IPPs also allege that in October 2009, Agri Stats purportedly received questions from an unidentified "J.B.S." employee seeking to learn "why is the #1 guy in sales book so far ahead of competition *every week*." *Id.* ¶39 (emphasis added). But this quote at most confirms that the anonymous Agri Stats data showed continuing pricing variation during the alleged conspiracy.

Having failed to allege any specific facts concerning even a single instance of actual price "matching" or price "inflation," the rule of reason claim suffers from the same

---

other instances a product's price is well above the national average price. *See* Ex. C, at pp. 1.2-2 to 1.2-3.

fundamental defect as the alleged *per se* supply reduction claim:  it includes "nothing to indicate how any of the individual Defendants acted."  Order at *8.  And this deficit of factual allegations is more problematic in the context of a rule of reason information exchange claim, given that the use of benchmarking to understand a marketplace's cost and pricing structure can be procompetitive, efficiency-enhancing, and consistent with a company's unilateral self-interest.  *E.g.*, *Sugar Inst. v. United States*, 297 U.S. 553, 598 (1936) ("the dissemination of information is normally an aid to commerce"); *Five Smiths*, 788 F. Supp. at 1052-53 ("Supreme Court has determined that, absent some agreement between competitors to restrain price, the exchange of price and other market information is generally benign conduct that facilitates efficient economic activity.") (citation omitted).

IPPs' allegations here thus are a far cry from those in *Todd v. Exxon Corp.*, where the complaint included specific allegations that each defendant *used* the exchanged salary information to align its salaries at or near those of its competitors, and included detailed factual allegations about how Exxon "capitalized on the shared data":

> to decrease its 'competitive factor' – the percentage by which Exxon would have to adjust its salary levels in order to maintain alignment with the salaries offered by its competitors. [] Exxon's competitive factor dropped from 6.5% in 1991 to 0% in 1995, [] and its salaries decreased 4.1% between 1987 and 1994 in comparison to the Six Majors[].  The various information exchanges also allowed Exxon to reduce its overall salary index versus the competition from 110.7% in 1987 to 107.0% in 1993."

275 F.3d at 196-97.

The *Todd* plaintiffs further alleged that the "defendants also *attended meetings at least three times per year* at which various types of salary information were discussed," including "current and future increases in Defendants' salary budgets;" and where they

49

gave each other "*assurances that the information would be used* in setting the salaries of MPT employees." *Id.* at 196, 212 (emphases added). The court found these assurances and meetings to be a "troubling aspect of the arrangement at issue." *Id.* at 213.

In contrast, IPPs here allege only that Agri Stats' reports "identified for Defendants '*opportunities*' where their pricing was lower than other Defendants and where they *could* raise their prices to match," IPP ¶280 (emphases added). The IPP Amended Complaint utterly lacks any specific allegations about (1) any price matching or inflation by any Defendant based on Agri Stats data, (2) any other use by any Defendant of the Agri Stats data for any anticompetitive purpose, (3) any assurances during meetings or otherwise that prices would be matched, or (4) any communications at meetings or otherwise where there were agreements or assurances to use the Agri Stats data to coordinate pricing.

> **D.    No Factual Allegations Plausibly Suggesting *How* Defendants Could Use Historical Agri Stats Data to Match or Inflate Prices.**

Figure 4 in the IPP Amended Complaint reflects that the price of pork, unlike the salaries in *Todd*, oscillated significantly and changed frequently.



**Figure 4: Hog-Composite Spread Widening During the Class Period**

Given the significant and frequent fluctuations in commodity pork pricing, IPPs' mere assertion that Defendants could use data that is weeks or months old, *supra* at 42, to "*know exactly how far they could raise their prices to conform to their competitors' prices,*" *id.* ¶44 (emphasis added), defies common sense and is simply implausible. *E.g.*, *McDonough*, 799 F.3d at 945-46 (the plausibility of a claim must be assessed through the lens of "common sense") (quoting *Iqbal*, 556 U.S. at 679).

### E.    No Plausible Allegations of Anticompetitive Harm.

Because information exchanges are often pro-competitive, IPPs must plausibly allege "how competition has been injured by the exchange of [] information." *Five Smiths*, 788 F. Supp. at 1051 n.10.   The IPPs' conclusory assertion that "[t]he information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the market for pork in the United States and (2) inflating the prices for pork during the Class Period," falls well short of plausibility.  IPP ¶283.

At most, IPPs assert the theoretical possibility that Agri Stats data could be used to "compare and match each other's pricing . . . and raise prices," IPP ¶¶276-77.  But IPPs have alleged nothing to carry their theory "across the line from conceivable to plausible.'" *Shimota v. Wegner*, 2016 WL 1254240, at *10 (D. Minn. Mar. 29, 2016) (Tunheim, J.) (quoting *Twombly*, 550 U.S. at 570).  IPPs fail to allege how Agri Stats data was  causally connected to any pricing decisions, or used by any Defendant to set the price of pork – let alone *how* the backward-looking data could be used to "match" or "inflate" future prices. *Supra* at 42-43; *see also Five Smiths,* 788 F. Supp. at 1054 (finding alleged information "exchange fails to state a rule of reason violation" because there was no plausible allegation that the exchange could cause an "anticompetitive effect").

Moreover, contrary to the claim that Agri Stats data on *pork* led to higher *pork* prices, IPPs continue to allege that increases in pork prices were caused by increases in *hog* prices. IPP ¶¶124-26.  This, of course, is the *opposite* of what one would expect if Agri Stats *pork* pricing data were driving pork prices higher.  Thus, IPPs' allegation that "average *hog* wholesale price experienced an unprecedented increase beginning in 2009" and pork prices increased as a result, IPP ¶124; *see also id.* ¶¶125-26, undermines the conclusory assertion that Agri Stats data caused an increase in pork prices.  IPPs' "broad, unsupported allegations" of harm to competition through increased prices are "inadequate to withstand a motion to dismiss."  *Insignia Sys., Inc. v. News Corp.*, 2005 WL 2063890, at *4 (D. Minn. Aug. 25, 2005) (Tunheim, J.).

## V.      THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIMS.

Plaintiffs' claims again fall outside the Clayton Act's four-year statute of limitations. *See* 15 U.S.C. § 15b (actions under the Clayton Act "shall be forever barred unless commenced within four years after the cause of action accrued"). Plaintiffs allege that the Defendants "communicated the start of [their] participation" in a conspiracy and "communicate[d] their planned supply restrictions" through public statements on earnings calls beginning as early as 2009. DPP ¶133, 144; IPP ¶8 ("The pork processors admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen."). They allege that the supposed conspiracy led to "historic and unprecedented" supply cuts that were reflected in publicly available reports in 2009. DPP ¶121. And they allege that "[b]eginning in 2009, the pork industry showed abnormal price movements" in data published by the USDA, including a "significant break between pricing prior to 2009 and after 2009, supporting the plausibility of a conspiracy to restrain prices of pork." DPP ¶164; IPP ¶¶124, 125 & Fig. 2. And yet Plaintiffs did not file these lawsuits until June 2018, nearly a decade later. Plaintiffs' claims are thus barred by the four-year statute of limitations.

"[W]hen it appears from the face of the complaint itself that the limitation period has run, a limitations defense may properly be asserted through a Rule 12(b)(6) motion to dismiss." *Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004) (citation and quotation marks omitted); *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880-81 (8th Cir. 2011) (dismissing plaintiff's claims on limitations grounds). Courts in this District have repeatedly dismissed antitrust claims barred by the statute of limitations. *E.g.*, *Insulate SB,*

*Inc. v. Advanced Finishing Sys., Inc.*, 2014 WL 943224, at *4-9 (D. Minn. Mar. 11, 2014),

*aff'd*, 797 F.3d 538 (8th Cir. 2015); *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016,

1029 (D. Minn. 1997).

Plaintiffs cannot evade the statute of limitations here.  They claim they did not

realize there was a cause of action until reading materials about the chicken (not pork)

industry in 2017 or 2018.  But the limitations period runs from "when a defendant commits

an act that injures a plaintiff's business," not when these Plaintiffs belatedly claim that they

*discovered* their cause of action.  *See Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S.

321, 338 (1971).   Plaintiffs make conclusory references to purported fraudulent

concealment, but allege none of the facts required to invoke that doctrine.  And this is not

surprising, because Plaintiffs allege that the conspiracy was publicly communicated in

earnings calls and evidenced by data publicly released by the USDA starting in 2009.  If

those public facts—which were obviously not concealed—plausibly show the existence of

a conspiracy, then fraudulent concealment cannot possibly apply.  Nor do Plaintiffs plead

any of the elements required to show fraudulent concealment, and certainly not with the

particularity required to meet the applicable Rule 9(b) pleading standard.

Plaintiffs also fail to plead that the conspiracy continued to June 2014 or beyond.

In fact, Plaintiffs' allegations *contradict* any claim of a continuing conspiracy, as their data

shows *increases* in supply every year after 2013, save only a dip in 2014 that Plaintiffs

acknowledge resulted from hog disease.

Plaintiffs' federal antitrust claims thus are time-barred and should be dismissed in

their entirety.

### A.    Plaintiffs' Federal Antitrust Claims Are Time-Barred.

The Clayton Act's four-year statute of limitations "accrues 'when a defendant commits an act that injures a plaintiff's business.'"  *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 427 (8th Cir. 2009) (quoting *Zenith*, 401 U.S. at 338); *see also Insulate*, 2014 WL 943224, at *5 (calculating accrual from time of injury).  Thus, "accrual in antitrust actions depends on the commission of the defendant's injurious act rather than on the plaintiff's knowledge of that act or the resulting injury."  *Granite Falls Bank v. Henrikson*, 924 F.2d 150, 153 (8th Cir. 1991), *abrogated on other grounds*, *Rotella v. Wood*, 528 U.S. 549 (2000).

The first action in these proceedings was filed on June 28, 2018, meaning Plaintiffs are barred from asserting antitrust claims that accrued before June 28, 2014.  But that is precisely what Plaintiffs are attempting to do here.  They allege that the conspiracy began no later than 2009 and that they were injured by having to pay artificially inflated prices for pork starting in 2009.  *See* DPP ¶¶2, 7, 121; IPP ¶¶124, 125 & Fig. 2.  These claims were filed too late.

### B.    Plaintiffs Have Not Sufficiently Pleaded Fraudulent Concealment.

Fraudulent concealment applies only where Plaintiffs allege facts showing: "(1) Defendants' concealment of Plaintiffs' cause of action, (2) failure by Plaintiffs to discover their cause of action, and (3) due diligence by Plaintiffs in attempting to discover the claim."  *In re Milk*, 84 F. Supp. 2d at 1022; *see also Insulate*, 2014 WL 943224, at *5; *In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1084 (D. Minn. 2010).  "Failure to properly allege any one of these elements is fatal to Plaintiffs' claim."  *In re*

*Milk*, 84 F. Supp. 2d at 1022.  Moreover, Plaintiffs' pleading must meet the particularity standard of Rule 9(b).  *Summerhill*, 637 F.3d at 880.  This means Plaintiffs must plead "the who, what, when, where, and how" of the alleged fraudulent concealment.  *Id.* (quoting *Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007)).[26]

If the public facts Plaintiffs allege support a plausible inference of conspiracy, then they necessarily doom Plaintiffs' reliance on fraudulent concealment.  *E.g.*, *In re Wholesale Grocery*, 722 F. Supp. 2d at 1084 (fraudulent concealment unavailable because "material information underlying the antitrust claims was available" on the public record); *In re Milk*, 84 F. Supp. 2d at 1024-25 (no fraudulent concealment given availability of facts underlying claim, including allegation that the effect of the conspiracy "was that milk prices were 'raised and stabilized'"); *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987) (because facts underlying complaint were "necessarily discoverable upon simple inquiry and consultation of public records," plaintiff  "could not validly claim more than ignorance, rather than fraudulent concealment of this particular information. That will not suffice.").  At the same time, Plaintiffs also have failed to allege facts supporting any of the three necessary elements of fraudulent concealment.

---

[26]   *See also In re Milk*, 84 F. Supp. 2d at 1022 (Plaintiffs must allege the "time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud").

1.    **Fraudulent Concealment Is Unavailable Because the Facts Supposedly Showing a Conspiracy Have Been in the Public Record for Years.**

While Plaintiffs make conclusory assertions about "secret" meetings, their factual allegations concern nothing that is secret.  Indeed, Plaintiffs principally rely on public statements in earnings calls and annual reports from 2008 to 2010 that have been broadly available on the Internet for nearly a decade.  *E.g.*, DPP ¶¶134-63.  For example, Plaintiffs allege that Defendants orchestrated a conspiracy through public statements and purportedly "communicated the start of [their] participation" in the alleged conspiracy in public earnings calls.  DPP ¶144; IPP ¶109.  They assert that Defendants "disclosed certain of their supply restriction efforts in public earnings calls" and "exploited these public statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy."  DPP ¶133.  Similarly, Plaintiffs allege that "[t]he pork processors admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen."  IPP ¶8; *see also id.* ¶121 (one Defendant "publicly signaled to its competitors that it would not increase capacity").

Plaintiffs cannot legitimately claim that these decade-old public statements show a conspiracy while simultaneously asserting that this supposed conspiracy could not have been discovered before June 2014.  For example, Plaintiffs allege that publicly available production data show the effects of the alleged conspiracy—reductions in hog production.  Plaintiffs also point to publicly available data from 2009 supposedly showing "historic and unprecedented" supply cuts.  DPP ¶¶120-21; *see also* IPP ¶98.

Nor can Plaintiffs claim that their supposed injuries – paying allegedly higher prices for pork – were hidden.  The complaints rely on data published by the USDA to argue that "[b]eginning in 2009, the pork industry showed abnormal price movements."  DPP ¶164; *see also id.* ¶¶176-80 (relying on alleged Bureau of Labor Statistics data to assert that higher retail pork prices were driven by higher wholesale pork prices).  Similarly, Plaintiffs rely on publicly available data to argue that "[a]n economic analysis of the prices of pork during the class period show an abnormal shift, supporting the inference of collusion. Beginning in 2009, pork wholesale prices increased and remained at a higher level compared to the years prior to 2009."  IPP ¶9.  Courts in this Circuit reject fraudulent concealment where, as here, a complaint relies on public facts to support a conspiracy claim.  *In re Wholesale Grocery*, 722 F. Supp. 2d at 1084; *In re Milk*, 84 F. Supp. 2d at 1024-25.[27]

The IPP Complaint attempts to sidestep this fatal flaw by claiming that the details of Agri Stats reports "were not publicly available," IPP ¶17, and that it was only through discovery that Plaintiffs have learned that "Agri Stats bears all the hallmarks of the enforcement mechanism of a price-fixing scheme."  *Id.* ¶7.  But Plaintiffs' own allegations contradict that contention.  Indeed, the original complaints – filed before Plaintiffs obtained the discovery they now claim revealed Agri Stats' role – relied on public sources to

---

[27]  Plaintiffs also rely on public information to support their supposed "plus factors."  *E.g.*, DPP ¶¶67-81 (citing public documents for alleged vertical integration), 82 (citing 2001 USDA publication for allegedly "high levels of market concentration"), 94-95 (citing public documents for alleged barriers to entry), 97 (observations about alleged homogeneity of pork products), 98-118 (citing websites and other public documents to identify trade group meetings).

describe the supposed facilitating role of Agri Stats. *E.g.*, DPP FAC ¶43-54 (citing publicly available sources for the claim that Defendants used "detailed sensitive information" in Agri Stats reports "to coordinate supply and stabilize and increase prices of pork" and "monitor[] each other's production and pricing").

Moreover, the statute of limitations is not tolled simply because a plaintiff might not have known every detail about a conspiracy. *See In re Milk*, 84 F. Supp. 2d at 1024 ("any activities which would create notice and 'excite attention' will require inquiry" and begin the limitations period); *see also Insulate*, 2014 WL 943224, at *5 (even though the agreements were supposedly secret, "[w]hen prices are raised and competition is substantially eliminated, this fact alone would seem to excite attention and thus put a Plaintiff on inquiry notice") (citation and alterations omitted); *In re Wholesale Grocery*, 722 F. Supp. 2d at 1085, 1090 (despite allegations of a "secret market allocation," the "publicly available information coupled with the events that had transpired should have . . . excite[d] attention") (citations and quotation marks omitted); *see also, e.g.*, *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 708 (S.D.N.Y. 2019) ("[O]nce there are sufficient 'storm warnings' to trigger the duty to inquire, the duty arises" and "[s]uch storm warnings . . . need not detail every aspect of the alleged fraudulent scheme.") (citation omitted).

Here, of course, this Court has already recognized that AgriStats is not the core of the conspiracy alleged, but at best a mere plus factor. The core of the alleged conspiracy is a purported agreement to reduce hog supply and thereby raise pork prices. And as detailed herein, Plaintiffs' allegations (albeit wholly conclusory ones) about purported

reduced supply are based on citations to information that was publicly available at the time. Discovery providing additional details about a putative conspiracy's operation cannot restart the limitations period. Otherwise fact discovery in every conspiracy case would eliminate the limitations period prescribed in the statute.

> **2.     Plaintiffs Fail to Allege Facts Showing that Defendants Took Affirmative Steps to Conceal Their Actions.**

An antitrust complaint adequately alleges fraudulent concealment only where the complaint sets forth "specific allegations of affirmative acts taken solely to conceal a price fixing conspiracy." *In re Milk*, 84 F. Supp. 2d at 1022 (citation omitted); *see also Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990) (fraudulent concealment "requires an act of affirmative misrepresentation over and above the acts creating the alleged cause of action" and holding that "non-disclosure" of information is insufficient); *In re Monosodium Glutamate Antitrust Litig.*, 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003) ("Plaintiffs must show acts, other than the acts constituting the conspiracy, that demonstrate fraudulent concealment of that conspiracy.").

Plaintiffs utterly fail to allege this essential element. Indeed, they fail to allege any affirmative acts suggesting that any Defendant concealed its herd information, pricing, business plans, or, frankly, anything else.

Instead, Plaintiffs resort to buzzwords. DPP ¶¶181-82, 191. They assert, for example, that Defendants used "secret" means of communications, along with a generic reference to "the use of the telephone or in-person meetings." *Id.* ¶182. Plaintiffs, however, offer no particular facts to support these boilerplate assertions. And merely

listing some potential means through which people might communicate comes nowhere close to alleging the details required by the Rule 9(b) standard.  Judge Magnuson rejected nearly identical generic statements about unspecified "clandestine meetings" in *Milk*.  84 F. Supp. 2d at 1024 ("Vaguely alleging that 'something' occurred at 'some time' fails to satisfy the particularity requirement.").

Nor do Plaintiffs meet the Rule 9(b) standard by alleging that a defendant attributed price increases to non-conspiratorial factors, such as market forces and programs with retailers.  DPP ¶186.  In *Milk*, plaintiffs alleged that "instead of admitting to a conspiracy," defendants "publicly denied price fixing allegations" and attributed their high profits to other factors, such as "diversified operations, improved efficiency, drought, tight supplies, and state law."  *In re Milk*, 84 F. Supp. 2d at 1022-23.  The court held that plaintiffs' allegations were insufficient to toll the limitations period because "[s]imply denying the existence of an antitrust violation" or "attribut[ing] the change in prices to factors other than an illegal conspiracy" "does not constitute fraudulent concealment."  *Id.* at 1023-24. To hold otherwise "would effectively nullify the statute of limitations."  *Id.* at 1023 (quoting *Pocahontas*, 828 F.2d at 218-19).

While no Defendant has "confessed" to the alleged conspiracy, Plaintiffs must plead something more than silence or a failure to confess.  Rather, they must allege with particularity facts showing affirmative acts of concealment, including "a specific time that Defendants affirmatively concealed the existence of a conspiracy."  *Id.* ("silence or passive conduct is not fraudulent unless parties' relationship imposes duty to disclose") (citation omitted).  Plaintiffs' failure to do so dooms their reliance on fraudulent concealment.

61

### 3.    Plaintiffs Fail to Allege They Were Actually Misled by Any Affirmative Act of Concealment.

Plaintiffs also must allege with particularity facts showing that "as a result of Defendants' concealment," they failed to discover the existence of the antitrust claim. *Id*. at 1024. But Plaintiffs here do not allege any facts remotely suggesting that they were actually misled by a Defendant, saw or heard any statement that supposedly hid the conspiracy, or somehow relied upon any subterfuge by any Defendant.

### 4.    Plaintiffs Are Silent on Due Diligence.

Plaintiffs must also allege with particularity their diligence in attempting to uncover their claims and then explain why, despite their efforts, they could not have uncovered those claims within the limitations period. *Kansas City, Mo. v. Fed. Pac. Elec. Co.*, 310 F.2d 271, 284 (8th Cir. 1962); *In re Milk*, 84 F. Supp. 2d at 1024; *Insulate*, 2014 WL 943224, at *5; *In re Wholesale Grocery*, 722 F. Supp. 2d at 1084-86. The Complaints are silent as to what steps, if any, Plaintiffs took from 2009-2014 to investigate the allegedly "abnormal" prices they paid (as reflected in data published by the USDA) and the public statements and other information on which they now rely. Moreover, Plaintiffs point to no facts that became known during the limitations period that were unknowable years before.

Instead, Plaintiffs simply declare that they "could not have discovered through the exercise of reasonable diligence[] the existence of the conspiracy" until *Bloomberg* published an article in 2017 about the chicken industry and their lawyers filed a 2018 amended complaint in the *Broiler* case. DPP ¶¶181, 187-91. But the *Bloomberg* article hardly qualifies as a "eureka!" event. The article is primarily about chicken, not pork. And

as its source for a conspiracy theory with respect to chicken, the *Bloomberg* article cites the 2016 complaint in the *Broilers* litigation, which was filed by Lockridge Grindal (one of Plaintiffs' counsel here) on behalf of Maplevale Farms (one of the Plaintiffs here).[28] The *Bloomberg* article presented no facts not already in the public record. Instead, that article relied (much like Plaintiffs) on statements from public analyst calls or other publications.

Plaintiffs also cite the 2018 amended complaint in the *Broilers* litigation as a disclosure event. DPP ¶188. But Plaintiffs do not explain how that complaint (filed by these same Plaintiffs' counsel) about the *chicken* business revealed any new or undisclosed facts about the *pork* industry. And when the same Plaintiffs' counsel turned their attention to pork in 2018, they relied upon facts that have been in the public record for years.

If the public information cited in the Complaints purportedly is sufficient to plead an unlawful agreement, it certainly should have been enough to "excite attention and thus put Plaintiffs on inquiry notice." *See In re Milk*, 84 F. Supp. 2d at 1024-25 (plaintiffs failed to satisfy the diligence element because they offered no explanation of the steps they took to discover their claims and did not "explain why the facts underlying their claim were not available to them at an earlier date"); *see also, e.g.*, *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*, 520 F.2d 289, 295 (8th Cir. 1975) (rejecting fraudulent concealment when "plaintiffs could have discovered" the cause of action "by reading the Tariff

---

[28]   *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek, (Feb. 15, 2017), https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged.

Commission's report" and "by reviewing the public testimony taken by the Commission in connection with the preparation of this report").[29]   Plaintiffs' complete failure to allege due diligence also compels rejection of their reliance on fraudulent concealment.  *In re Milk*, 84 F. Supp. 2d at 1022.

### 5.      The Self-Concealing Conspiracy Doctrine Does Not Apply.

Plaintiffs try to salvage their insufficient fraudulent concealment claim by calling the alleged conduct "self-concealing."  DPP ¶¶123, 190.  But Plaintiffs' conclusory label is unavailing.

First, the self-concealing conspiracy doctrine does not exist in this jurisdiction.  To the contrary, a plaintiff must allege acts of concealment separate and apart from the conspiracy itself.  *Ripplinger*, 916 F.2d at 442.  The *Ripplinger* standard applies in antitrust cases.  *E.g.*, *New Prime, Inc. v. Eaton Corp.*, 2017 WL 5992466, at *3 (W.D. Mo. Mar. 16, 2017); *In re Monosodium Glutamate*, 2003 WL 297287, at *3 (noting that "this Court has adopted the 'separate and apart' standard").[30]

---

[29]   *See also In re Wholesale Grocery*, 722 F. Supp. 2d at 1084-86 (rejecting fraudulent concealment claim when "material information underlying the antitrust claim was [publicly] available," and plaintiffs failed to sufficiently allege due diligence); *Insulate*, 2014 WL 943224, at *5 (same); *Pocahontas*, 828 F.2d at 218 (rejecting fraudulent concealment claim because material information was "necessarily discoverable upon simple inquiry and consultation of public records" and finding that plaintiffs "could not validly claim more than ignorance, rather than fraudulent concealment of this particular information").

[30]   Plaintiffs relied in their previous briefing on out-of-Circuit cases for the proposition that the self-concealing doctrine "is widely accepted."  *See* Dkt. 229 (Pls. Opp.) at 55-56.  That is plainly untrue.  Every Circuit to address this issue other than the Second has explicitly rejected the self-concealing doctrine.  *E.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008) (rejecting self-concealing doctrine); *Supermarket of Marlinton Inc., v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122-23 (4th Cir. 1995) (same); *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1531 (5th Cir. 1988) (same); *Conmar Corp. v.*

Second, the doctrine would not apply here even if it existed.  As the term implies, the doctrine "is only even arguably proper" when the antitrust violation is "in its very nature deceptive," and not when it is based upon public facts, such as signaling.  *Supermarket of Marlinton*, 71 F.3d 119, 123 & n.1 (4th Cir. 1995).  Quite simply, Plaintiffs cannot claim public statements were critical to a conspiracy while simultaneously calling the conspiracy self-concealing.

## C.    The Continuing Conspiracy Doctrine Does Not Apply.

Plaintiffs allege no *facts* plausibly suggesting that an alleged supply-reduction conspiracy continued into 2018.  The facts they allege contradict, rather than support, any such claim.  And in any event, the continuing-conspiracy doctrine would limit Plaintiffs' claims *only* to transactions occurring within the four-year limitations period.  Any claims based on transactions before June 28, 2014 would still be barred.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997) (although "each [new] overt act that is part of the [original] violation and that injures the plaintiff . . . starts the statutory period running again, . . . the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period") (citation omitted); *In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane I*") (en banc), 860 F.3d 1059, 1068 (8th Cir. 2017) (same).

---

*Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 505 (9th Cir. 1988) (same); *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at *3 (E.D. Pa. Aug. 12, 2011) (surveying Circuits and noting that "self-concealing" doctrine adopted only by Second Circuit).

Plaintiffs' opposition to Defendants' motions to dismiss the original complaints relied heavily on *Propane I* for their continuing-conspiracy argument. In *Propane I*, however, the Eighth Circuit explained that "*the issue is whether the amended complaint alleges that the conspiracy continued when the sales took place. If so*, under *Klehr*, 'each sale to the plaintiff,' is an overt act that restarts the statute of limitations." *Propane I*, 860 F.3d at 1070 (emphasis added) (quoting *Klehr*, 521 U.S. at 189). And, critically, as the Eighth Circuit confirmed in *Propane II*, allegations of a continuing conspiracy must satisfy the *Twombly* plausibility standard. 893 F.3d at 1056. In *Propane II*, the court held that although the complaint plausibly alleged a conspiracy from 2008 to 2010, the complaint was devoid of the facts necessary to state a claim for a continuing conspiracy in later periods. *Id.* at 1056-58. The court thus affirmed dismissal of the claims under *Twombly*. *Id.*

Here, Plaintiffs baldly assert that both the conspiracy and its effects "continu[e] to the present." DPP ¶34. But that conclusory assertion is not entitled to any presumption of truth. *See Propone II*, 893 F.3d at 1056. Even had Plaintiffs alleged an unlawful agreement before June 2014, the Complaints contradict any claim that a purported supply-restraint conspiracy continued within the limitations period. Indeed, Plaintiffs concede that there were no production cuts during the limitations period. Plaintiffs allege that "[i]n 2009, 2010, and again in 2013, the pork industry cut production," and concede that the "production dip in 2014" was non-conspiratorial and stemmed from "the adverse impacts from the deadly" PEDv virus. DPP ¶120. And Plaintiffs' own Figure 7 shows that annual commercial hog production by weight *increased* dramatically every year after 2014. *Id.*

Moreover, as demonstrated above, the Complaints allege there was only a *single* supply-reducing act by one Defendant in both 2015 and 2016, reflecting an utter absence of any coordinated, or even remotely parallel, behavior.   And the Complaints set forth *no* allegations of supply-reducing acts by *any* Defendants in 2017 and 2018.  *Supra* at 24.

Thus, accepting Plaintiffs' pleading as true, the only factual allegations within the limitations period are wholly inconsistent with an ongoing conspiracy to reduce supply that unlawfully raised prices.  Likewise, Plaintiffs fail to invoke a single public statement purportedly used as a "signal" by any Defendant after 2013, and Plaintiffs' recitation of trade association meetings during the limitations period is not connected to any allegedly conspiratorial conduct.

## VI.    LEAVE TO AMEND SHOULD BE DENIED.

In dismissing the original complaints, this Court identified the types of allegations that would be necessary to sustain a claim and gave Plaintiffs ninety additional days to amend.  Yet the Amended Complaints have the same core deficiencies that caused this Court to dismiss the original complaints.  Under these circumstances, further leave to amend would be futile and only waste the resources of the parties and the Court.  *See Kent v. Bank of Am., N.A.*, 2012 WL 3582717, at *3 n.5 (D. Minn. Aug. 17, 2012) (Tunheim, J.) (amendment was futile where "[p]laintiffs have already amended their complaint once, have not suggested how they would cure the deficiencies of this pleading, and have not pled facts that would support this claim.").

67

Date:  January 15, 2020

Respectfully submitted,

*/s/ Mark L. Johnson*
Mark L. Johnson (#0345520)
Virginia R. McCalmont (#0399496)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
bkrueger@greeneespel.com
vmccalmont@greeneespel.com
Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
Christina Briesacher (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
christina.briesacher@kirkland.com

*Counsel for Clemens Food Group, LLC
and The Clemens Family Corporation*

*/s/ Richard A. Duncan*
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
Bryan K. Washburn (#0397733)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegrebd.com
aaron.vanoort@faegrebd.com
craig.coleman@faegrebd.com
emily.chow@faegrebd.com
isaac.hall@faegrebd.com
bryan.washburn@faegrebd.com

*Counsel for Hormel Foods Corporation
and Hormel Foods, LLC*

/s/ Jaime Stilson
Jaime Stilson (#392913)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
(612) 492-6746
stilson.jaime@dorsey.com

Britt M. Miller (*pro hac vice*)
Robert E. Entwisle (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

William H. Stallings (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000
wstallings@mayerbrown.com

*Counsel for Indiana Packers Corporation*

/s/ Donald G. Heeman
Donald G. Heeman (#286023)
Jessica J. Nelson (#347358)
Randi J. Winter (#391354)
SPENCER FANE LLP
150 South Fifth Street, Suite 1900
Minneapolis, MN 55402-4206
(612) 268-7000
dheeman@spencerfane.com
jnelson@spencerfane.com
rwinter@spencerfane.com

Stephen R. Neuwirth (*pro hac vice*)
Michael B. Carlinsky (*pro hac vice*)
Sami H. Rashid (*pro hac vice*)
Richard T. Vagas (*pro hac vice*)
David B. Adler (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com
michaelcarlinsky@quinnemanuel.com
samirashid@quinnemanuel.com
richardvagas@quinnemanuel.com
davidadler@quinnemanuel.com

*Counsel for JBS USA Food Company*

/s/ William L. Greene
William L. Greene (#0198730)
Peter J. Schwingler (#0388909)
Jon M. Woodruff (#0399453)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
john.woodruff@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

*Counsel for Seaboard Foods, LLC and
Seaboard Corporation*

/s/ John A. Cotter
John A. Cotter (134296)
John A. Kvinge (0392303)
LARKIN HOFFMAN DALY &
LINDGREN LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, MN 55427-1060
(952) 835-3800
jcotter@larkinhoffman.com
jkvinge@larkinhoffman.com

Richard Parker (*pro hac vice*)
Josh Lipton (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
rparker@gibsondunn.com
jlipton@gibsondunn.com

Brian Robison (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3370
brobison@gibsondunn.com

*Counsel for Smithfield Foods, Inc.*

<u>/s/ Aaron Chapin</u>
Aaron Chapin (#6292540)
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
(312) 655-1500
aaron.chapin@huschblackwell.com

Gene Summerlin (*pro hac vice*)
Marnie Jensen (*pro hac vice*)
Ryann Glenn (*pro hac vice*)
Kamron Hasan (*pro hac vice*)
Quinn Eaton (*pro hac vice*)
Sierra Faler (*pro hac vice*)
HUSCH BLACKWELL LLP
13330 California St., Suite 200
Omaha, NE 68154
(402) 964-5000
gene.summerlin@huschblackwell.com
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com
kamron.hasan@huschblackwell.com
quinn.eaton@huschblackwell.com
sierra.faler@huschblackwell.com

*Counsel for Triumph Foods, LLC*

<u>/s/ David P. Graham</u>
David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

Rachel J. Adcox (*pro hac vice*)
Tiffany Rider Rohrbaugh (*pro hac vice*)
Jetta C. Sandin (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
AXINN, VELTROP &
HARKRIDER LLP
950 F Street, N.W.
Washington, D.C. 20004
(202) 912-4700
radcox@axinn.com
trider@axinn.com
jsandin@axinn.com
lstrang@axinn.com

*Counsel for Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc.*

71

/s/ *Peter H. Walsh*
Peter H. Walsh (# 388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
T. (612) 402-3000
F. (612) 402-3001
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
Jennifer A. Fleury (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com
jennifer.fleury@hoganlovells.com

*Counsel for Agri Stats, Inc.*