# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **In re Pork Antitrust Litigation**<br><br>This Document Relates To All Actions | Case No. 18-cv-1776 (JRT-HB)<br><br>**DEFENDANTS HORMEL FOODS CORPORATION AND HORMEL FOODS, LLC'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINTS** |

US.125373491.10

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I. THE TACS CONFIRM THAT THE ALLEGED CONSPIRACY WOULD HAVE UNDERMINED HFC'S INTERESTS ........................................ 3

II. THE TACS SHOW THAT HFC DID NOT RESTRICT HOG OR PORK SUPPLY .......................................................................................... 6

    A. No Conspiracy Can Be Inferred from Allegations Regarding HFC's Pork Processing Volumes .................................................. 6

    B. HFC Maintained Its Sow Herd During The Relevant Time Period ........................................................................................ 9

III. THE TACS SHOW THAT HFC DID NOT SHARE SALES OR PRICING DATA WITH AGRI STATS ................................................ 11

CONCLUSION ................................................................................................................ 13

i

# **INTRODUCTION**

As detailed in Hormel Foods Corporation's ("HFC" or "Company") original motion to dismiss, participation in the alleged conspiracy would have undermined HFC's economic interests. (*See generally* Docket 170) HFC earnings calls quoted in Plaintiffs' original complaints made clear that the Company is not vertically integrated, purchases the vast majority of the hogs it processes from independent producers, and suffers diminished margins when hog prices increase. (*See id.* at 4-7) Throughout the supposed conspiracy period, HFC has instead consistently emphasized its value-added processed pork products and regards itself as a "packaged food company" that is "very branded oriented." (*Compare, e.g.*, Docket 431, DPP ¶172 (alleging that pork is a "commodity product"), *with* Ex. 1, at 1-08 (cited in DPP ¶128))

After learning that the alleged conspiracy would harm HFC's economic interests and being given both ninety days and a roadmap of the "specific information" required to state a claim against each Defendant (*see* Docket 361, Order 20, 26 (hereinafter "Order")), Plaintiffs should have revisited their unfounded decision to sue HFC. Instead, Plaintiffs' second and third amended complaints (collectively "TACs" or "Complaints")[1] fail to address the deficiencies identified by the Court and inexplicably continue to rely on the same earnings calls while making allegations against HFC directly contrary to their contents.

---

[1] Allegations related to HFC in the direct-action complaints filed by the Commonwealth of Puerto Rico and by Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC are identical to those in the class complaints in all material respects. Accordingly, those complaints should be dismissed for the reasons set forth herein.

1

The TACs and "materials embraced by the pleadings"[2] confirm that there is no plausible basis to sue HFC as a participant in the conspiracy alleged:

1. Because HFC purchased the vast majority of the hogs it processes from independent producers throughout the supposed conspiracy, it suffered decreased profitability when hog prices increased.

2. HFC did <u>not</u> cut its very limited hog production during the alleged relevant period.

3. HFC had a limited Agri Stats subscription and <u>never</u> exchanged information related to pork sales or pricing.

Thus, the TACs have only made claims against HFC more baseless. Rather than pleading "specific information" showing how HFC "affirmatively acted to reduce the supply of pork" (*see* Order 20), Plaintiffs have instead pleaded facts rendering HFC's participation in the alleged conspiracy wildly implausible. Indeed, if the supposed conspiracy existed, HFC would have been a significant victim of it.

All claims against HFC should be dismissed with prejudice.[3]

---

[2] *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (taking notice of "materials embraced by the pleadings"); *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148, 1152 (D. Minn. 1997) (considering all documents referenced in complaints). This memorandum relies solely on materials expressly cited by the TACs—including HFC earnings calls, its 2009 Annual Report, and third-party data regarding hog production.

[3] Defendant Hormel Foods, LLC, a non-operating entity, must be dismissed for the independent and additional reason that none of the Complaints alleges that it took any action related to the supposed conspiracy. The only allegation as to Hormel Foods, LLC in any of the TACs is that it is a subsidiary of HFC (*see, e.g.*, DPP ¶¶22-23), but no complaint has ever explained what it does or its connection to the allegations. The

(footnote continued)

# ARGUMENT

## I. THE TACS CONFIRM THAT THE ALLEGED CONSPIRACY WOULD HAVE UNDERMINED HFC'S INTERESTS

The TACs allege that vertical integration was critical to the alleged conspiracy by giving "pork integrators" control over hog production: "Vertical integration allows the integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms where hogs are raised, fed, and prepared for slaughter." (DPP ¶68; *see also id.* ¶¶67-72) Yet <u>every</u> HFC investor document referenced by the TACs shows that the Company was not vertically integrated during the supposed conspiracy period to any meaningful extent. And Plaintiffs know this: their chart in the IPP Complaint expressly concedes that HFC is not vertically integrated into "Hog Production":

| Defendant | Hog Production | Hog processing and intermediate pork processing/packing | Further Pork Processing |
|---|---|---|---|
| Smithfield | ✓ | ✓ | ✓ |
| Tyson | | ✓ | ✓ |
| Triumph | ✓ | ✓ | |
| Seaboard | ✓ | ✓ | |
| Hormel | | ✓ | ✓ |

(Docket 392, IPP ¶144 (arrow added))

_____
(footnote continued from previous page)

rationale of *Regional Multiple Listing Service of Minnesota, Inc. v. American Home Realty Network, Inc.*, 9 F.Supp.3d 1032, 1044 (D. Minn. 2014)—cited in the Order at 24 n.11—fully applies to a subsidiary that has not been accused of any misconduct.

3

The TACs contain internal inconsistencies due to Plaintiffs' inability to reconcile HFC's lack of vertical integration with their alleged conspiracy. The same paragraph alleging that "Hormel is a vertically integrated company with control over live hog operations" also concedes that HFC purchases its hogs under contracts with producers, directly contrary to Plaintiffs' allegation that Defendants control production with "wholly owned and operated farms." (*Compare* DPP ¶80; Docket 432, CIP ¶84, *with* DPP ¶68) And that same paragraph cites HFC's 2009 Annual Report, which warns investors that "higher hog costs resulting from a decreased supply may begin to negatively impact margins for Refrigerated Foods." (*See* Ex. 2, at 2-23 (emphasis added)) Because HFC's business is the sale of "branded and unbranded food products" and the Company relies on contracts with independent producers to procure hogs as raw material to process those products, hogs are a source of cost—not revenue—to the Company. (*Id.* at 2-22, 2-32, 2-36, 2-55) Higher hog costs therefore hurt HFC's business.

In addition to demonstrating that the alleged conspiracy would have undermined HFC's profitability, the 2009 Annual Report repudiates the TACs' general assertion against all Defendants that hog contracts rely on "fixed service fees" for hogs placed at producer farms. (*See* DPP ¶69; CIP ¶73) Instead, in contrast to "grow-out contracts" where farmers are paid solely for the labor and facilities required to raise livestock owned by the processor, HFC contractually commits to purchase hogs from producers "based on market prices at the time of delivery." (Ex. 2, at 2-32) Specifically, HFC's contracts with producers "use market-based formulas based on hog futures, hog primal values, or industry report hog markets." (*Id.* at 2-36) HFC's business is nothing like Plaintiffs'

4

alleged vertically integrated operation that controls hog production, and the Company instead engages in careful hedging to manage risks associated with high hog prices. (*See id.*)

All earnings calls and investor presentations cited by the Complaints also affirm HFC's lack of vertical integration and vulnerability to higher hog prices:

- **Q4 2008.** HFC explained that declining hog prices boosted its profitability that year but predicted that higher hog prices would create challenges going forward. (*See* Ex. 3, at 3-02, 3-03) "The challenges we face include . . . the prospect of increasing hog prices as supplies gradually decline." (*Id.* at 3-03)

- **Q1 2009.** HFC explained that its pork-processing operation was losing money because it was contractually obligated to pay higher prices for hogs produced by independent farms than it could obtain for slaughtered pork. (*See* Ex. 1, at 1-01, 1-03, 1-05)

- **Q2 2009.** HFC stated that it would not invest in hog production because it views itself as a "packaged foods company." (Ex. 4, at 4-06) Rather than vertically integrating, HFC told investors that it would continue purchasing hogs from "family farm contract connections." (*Id.*)

- **June 2, 2009 Stephens Spring Investment Conference.** While the IPP Complaint references HFC comments about reduced pork processing (*see* IPP ¶106), HFC also stated that its pork-processing business was "negatively impacted by the unfavorable spreads between the hog costs and primal values," meaning that HFC lost money on hogs it processed because the prices it paid for hogs exceeded the value of processed pork cuts. (Ex. 5, at 5-01; *see also* Ex. 1, at 1-03 ("[W]e're still upside down right now in terms of the value of the meat versus what we're paying for hogs is negative."); Ex. 4, at 4-01 (referencing "negative cutout margins"))

- **Q4 2009.** HFC acknowledged the liquidation of hogs in the industry, and stated its expectation that "we'll see the prices [of hogs] increase" but "hope[d]" that the price increases would only be "at a modest level going forward." (Ex. 6, at 6-06)

5

- **Q3 2010.** HFC warned investors that it "expect[s] higher hog costs to continue in the fourth quarter, negatively impacting margins in our value-added Refrigerated Foods businesses and in our pork-based Grocery Products items." (Ex. 7, at 7-02)

- **Q4 2010.** HFC expected "about the same level of [hog] production in 2011" by independent producers despite challenges producers faced due to high grain costs. (Ex. 8, at 8-07)

In short, all HFC investors-relations materials cited by the TACs show that the alleged conspiracy would have been directly contrary to HFC's interests. HFC's participation in the alleged conspiracy is implausible, and Plaintiffs' claims against it should be dismissed.

## II. THE TACS SHOW THAT HFC DID NOT RESTRICT HOG OR PORK SUPPLY

### A. No Conspiracy Can Be Inferred from Allegations Regarding HFC's Pork Processing Volumes

Plaintiffs grossly misconstrue HFC's statements about reduced processing volumes in 2009. Plaintiffs selectively and misleadingly quote from HFC's Q1 2009 earnings call, in which its CFO stated that the Company would look for opportunities to decrease the number of hogs it processed. (DPP ¶128; CIP ¶132) In fact, HFC's CFO contemporaneously observed that it had been "many years" since the Company was last "upside down" on packing margins but that, despite this reality, HFC "harvested the same number of heads last year." (Ex. 1, at 1-05) And HFC's CEO then noted that it is contractually bound to purchase most of the hogs it processes, so it could only reduce processing volumes by declining to purchase hogs on the spot market so as not to "cut red on them." (*Id.*) Thus, the quoted document shows that HFC could not and had not

6

significantly limited its processing operations. To the extent HFC sought to do so, that was a rational reaction to high hog prices created by adverse market conditions beyond the Company's control.

Moreover, Plaintiffs cannot infer conspiratorial participation from conduct having a legitimate economic explanation. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007) (rejecting as insufficient allegations that "could equally have been prompted by lawful, independent goals"). It would have been economically irrational for HFC not to consider reductions in processing volumes given negative processing margins caused by high hog prices—the supposed aim of the conspiracy. Thus, Plaintiffs plead facts showing that HFC would have been hurt by the purported conspiracy, not that it took any actions to further it.

In any event, the Complaints show no plausible effort by HFC to impact overall pork supply. HFC is alleged to process only 8% of U.S. pork (DPP ¶88, fig. 4; CIP ¶92, fig. 4), so even dramatic reductions in its operations would have had minimal impact on supply. But Plaintiffs point to a mere 1.1% decrease in HFC's slaughtered hogs as reflected in its 2009 Annual Report, reducing HFC's slaughter by about 100,000 hogs to 9.44 million from 9.55 million. (*Compare* DPP ¶128; CIP ¶132, *with* Ex. 2, at 2-25) Against the 2009 backdrop of historically bad processing margins, impacts from H1N1 swine flu, exorbitant input costs for hogs, and economic recession—facts repeatedly referenced throughout the documents cited by the TACs—HFC delivered a remarkably robust performance inconsistent with participation in a conspiracy to cut pork supply.

The DPP and CIP Complaints also refer to a *National Hog Farmer* article titled "Will PEDV Cost Our Industry a Plant?" reporting that a single HFC plant reduced slaughter by 500 head per day in 2014. (*See* Ex. 9, at 9-02, 9-04) But the article shows that this plant was the smallest of the Company's three processing plants, and the other plants reported no changes, so HFC's daily processing capacity reduced by only about 1% from 37,300 to 36,800 head overall. (*Id.* at 9-04) This *de minimus* reduction at a single plant occurred in the midst of "the adverse impacts from the deadly pig disease" during 2014. (DPP ¶¶120, 128; CIP ¶¶124, 132) And the article shows that industry's overall processing capacity increased that year notwithstanding the challenges posed by PEDV, making any inference of a conspiracy to restrict supply using Plaintiffs' cherrypicked figures even less plausible. (Ex. 9, at 9-02, 9-04.)

Plaintiffs fail to allege any other reductions in processing volumes by HFC at any point from 2008 until commencement of this litigation in 2018. Despite reviewing the Company's financial statements and searching for evidence of actions to reduce pork supply, all that Plaintiffs allege is that HFC reduced its overall processing by immaterial amounts in two discrete years. These allegations are made without showing what occurred in other years or year-to-year. None of this supports even an inference that HFC conspired to reduce pork supply.

The TACs' remaining allegations regarding HFC do nothing to suggest it took actions to reduce supply. As to exports, the Court found that Plaintiffs' original complaints provided "no individualized examples of any Defendant increasing its rate of export." (Order 23) Regarding Hormel, the TACs' only response to that deficiency is to

8

allege that "Hormel reported strong earnings from its pork exports in 2011." (DPP ¶128; CIP ¶132) This plainly inadequate allegation says nothing about how much HFC exported, whether it increased or decreased exports during this or any other relevant year, what it exported, or why. It does not even allege that HFC exported products that it could have sold domestically. (*See* Ex. 1, at 1-06 (describing HFC's pork exports as "niched" products))

Finally, Plaintiffs' continued allusions to HFC's statements about third parties, such as firms engaged in the "live hog industry" (DPP ¶80; CIP ¶84), are insufficient to state a claim against the Company. Using HFC's statements quoted in the original complaints as an example, the Court squarely rejected as insufficient a Defendant's statements about general supply conditions because such statements "generally refer to the industry as a whole, and are largely vague." (Order 22) Nothing has changed.

**B.      HFC Maintained Its Sow Herd During The Relevant Time Period**

Plaintiffs rely on "Pork Powerhouse" hog-production numbers compiled by Successful Farming, but that data preclude HFC's participation in the alleged conspiracy. All TACs reference reports from 2007 to 2009, and each report contains numbers from the prior year. (*See, e.g.*, DPP ¶¶119, 121) This table summarizes the information presented in the 2007, 2008, and 2009 reports:

|  | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| **Hormel Sows** | 51,000 | 63,000 | 54,000 | 54,000 |
| **U.S. Industry Sows** | 2,996,315 | 3,124,700 | 2,947,800 | 2,934,251 |

(*See* Exs. 10, 11) In addition to showing the extremely limited scope of HFC's hog production, the proffered data show that HFC did not cut its production in any

9

meaningful way. HFC's reduction of 9,000 sows from 2007 to 2008—<u>before</u> the alleged conspiracy—amounted to just 0.3% of the industry's total sows that year, raising no possible inference that this reduction furthered a conspiracy to restrict hog supply. And this slight reduction still kept HFC's sow numbers above 2006 levels.

Moreover, while the industry was contracting in 2009 due to high feed costs and H1N1, HFC kept its numbers constant. (Ex. 12, at 12-02, 12-05) Notwithstanding Plaintiffs' allegation that "pork integrators commenced participation in the detailed benchmarking scheme" in 2009 (DPP ¶44; CIP ¶48), HFC maintained the same number of sows that year. (Ex. 12, at 12-05) Plaintiffs further admit that, after "cut[ting] its number of sows in 2008," HFC "<u>maintained such reduced production throughout the class period</u>." (DPP ¶128 (emphasis added); CIP ¶132 (same)) Indeed, the DPP and CIIP Complaints quote from the 2014 "Pork Powerhouse" report confirming that HFC maintained its sow herd at 54,000 from 2009 through 2014. (*See* DPP ¶161; CIP ¶ 165; Ex. 13, at 13-11) Plaintiffs cannot both concede that HFC "maintained" its sow herd "throughout the class period" and plausibly allege that HFC conspired to reduce hog production. (*See* Order 20)

While the Order held that Plaintiffs must allege "specific information" showing "when any of the individual Defendants may have affirmatively acted to reduce the supply of pork" (Order 20), the "Pork Powerhouse" figures cited by Plaintiffs definitively show that Plaintiffs failed to meet this burden as to HFC.

10

### III. THE TACS SHOW THAT HFC DID NOT SHARE SALES OR PRICING DATA WITH AGRI STATS

Given the "central and critical" role Agri Stats supposedly played in the pleaded conspiracy (*see, e.g.*, DPP ¶34; CIP ¶38), HFC's limited interaction with Agri Stats is striking. While Plaintiffs describe Agri Stats' sales reports as its "most egregious service" because of the inclusion of pricing information (IPP ¶19), the TACs also reveal that HFC did not subscribe to those reports. Lacking access to other pork-product manufacturers' sales and pricing information precludes HFC from participating in the *raison d'être* of the alleged conspiracy: to "identify for [the] co-conspirators the price-raising opportunities that they can cash in on at the expense of the consumers." (*Id.*)[4]

The DPP and CIP Complaints simply lump HFC together with all other Defendants in vague and unsubstantiated allegations that Defendants collectively shared information through Agri Stats. (*See, e.g.*, DPP ¶¶2, 46; CIP ¶¶ 2, 50) These complaints make no HFC-specific allegations about what the Company shared with Agri Stats.

The IPP Complaint shows why these generic group allegations are insufficient as to HFC. While the TACs assert that the Pork Sales Reports contain pricing information related to bacon, ham, and pork products, the IPP Complaint shows that <u>HFC did not exchange this information</u> with Agri Stats. (*See, e.g.*, IPP ¶¶33-38) The Company's name does not appear on <u>any</u> lists of participants exchanging sales or pricing information referenced by the TACs. (*See id.* ¶23, Ex. B at AGSTAT-P-0000017377 (HFC is not

---

[4] The failure to allege that HFC provided confidential or sensitive information to Agri Stats, as well as any details about HFC's participation, also requires dismissal of the rule-of-reason claim that the IPP Complaint pleads as an afterthought.

11

listed as an "Economic Impact Section Participant"); *id.* ¶¶31, 78, Ex. E (HFC is not listed as a "Pork Kill/Cut Participant" or a "Pork Sales" Participant); *id.* ¶79 (HFC is not listed as a company "currently providing Agri Stats with sales data"); *id.* at Ex. F, at AGSTAT-P-0000019234 (HFC is not listed as a "Pork Processing Participant"))

In fact, the IPP Complaint repeatedly references an Agri Stats sales pitch to "noncustomer" HFC. (IPP ¶¶27 n.6, 31, Ex. E) Presented to HFC on June 25, 2010 during the formative years of the supposed conspiracy, the pitch confirms that HFC was not participating in Agri Stats' processing or sales reports. (IPP Ex. E, at 17, 25) Thus, HFC was not exchanging the information that the TACs allege was "the key to the formation, operation, and continuing stability" of the conspiracy. (DPP ¶45; CIP ¶49) Because HFC did not exchange pricing or sales information for the products it sells, the TACs offer no basis to link it to the alleged conspiracy.

Finally, the IPP complaint relies on HFC's Initial Disclosures that identify an HFC employee responsible for exchanging data with Agri Stats. (IPP ¶174 (citing HFC's Rule 26(a)(1)(A) Initial Disclosures) But those same disclosures reveal that HFC provided only limited data to Agri Stats, declined to participate in Agri Stats services "regarding sales of pork products," and terminated Agri Stats altogether well before this litigation. (Ex. 14, at 14-03)

The Court described Plaintiffs' characterizations of Agri Stats as "critical to the alleged conspiracy." (Order 10) The TACs underscore that point by alleging that Agri Stats had "critical importance for a collusive scheme in the pork industry" and that Agri Stats amounted to "the proverbial smoke-filled room." (*See, e.g.*, DPP ¶¶3, 65) But HFC

12

was not in that room. The documents cited in the TACs directly refute that HFC ever exchanged the pricing or sales data that Plaintiffs allege was critical to the supposed conspiracy.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims against HFC and Hormel Foods, LLC should be dismissed with prejudice.

Date:  January 15, 2020

**FAEGRE BAKER DANIELS LLP**

*/s/ Richard A. Duncan*
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
Bryan K. Washburn (#0397733)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
richard.duncan@faegrebd.com
aaron.vanoort@faegrebd.com
craig.coleman@faegrebd.com
emily.chow@faegrebd.com
isaac.hall@faegrebd.com
bryan.washburn@faegrebd.com

*Counsel for Defendants Hormel Foods Corporation and Hormel Foods, LLC*

US.125373491.08

13

US.125373491.10