UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION<br><br>This Document Relates To: All Actions | No. 18-cv-1776 (JRT/HB)<br><br>**SMITHFIELD'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS** |

**INTRODUCTION**

Smithfield Foods, Inc. ("Smithfield") joins Defendants' Joint Memoranda of Law to dismiss the Plaintiffs' Complaints. This Memorandum addresses Plaintiffs' allegations as they specifically relate to Smithfield.[1]

Plaintiffs offer no direct evidence that Smithfield joined any unlawful agreement with any competitor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) ("the crucial question is whether the challenged anticompetitive conduct stems from . . . an agreement") (alterations and citation omitted). Instead, Plaintiffs ask this Court to infer an agreement to restrict hog production based on very attenuated circumstantial evidence. None of the conduct on which Plaintiffs rely suggests an agreement with competitors on anything. To the contrary, Plaintiffs' allegations reflect normal and common-sense business conduct that was in Smithfield's unilateral interest. This precludes any inference of conspiracy. *See Blomkast Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (antitrust allegation based on circumstantial evidence "require[s] evidence that [the]

---

[1] Because all of the operative class complaints contain substantively similar allegations in relation to Smithfield, for the sake of brevity this Memorandum will cite to the Direct Purchaser Plaintiffs' Third Amended Complaint ("DPP") unless noted otherwise.

defendant acted contrary to self-interest") (summarizing *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 884 (8th Cir. 1978)); *Valspar Corp. v. E.I. Du Pont de Newmours & Co.*, 873 F.3d 185, 195 (3d Cir. 2017) (antitrust claim based on circumstantial evidence requires evidence of conduct "so unusual that in the absence of advance agreement, no reasonable firm would have engaged in it") (quotation omitted).

Defendants' Joint Brief explains why Plaintiffs' allegations about Agri Stats and the other group-pleading allegations are insufficient to support an inference of conspiracy. Smithfield incorporates those points by reference. With respect to Smithfield in particular, Plaintiffs rely principally on three types of allegations:

(1) Smithfield decreased its hog production from 2008 to 2011. As shown in the Complaints, however, (and as discussed in detail below) this was during a period in which Smithfield was losing money on every hog that it raised, with more than $1 billion in losses directly attributable to hog production in 2008 and 2009.

(2) Smithfield executives made public statements regarding hog production during quarterly earnings calls. As shown in the Complaints, however, the company was explaining to investors (as required by U.S. securities laws) the industry conditions actuating Smithfield's decision to reduce its hog production in response to its massive losses on hogs.

(3) Smithfield increased its "focus" on exporting pork to China in 2015. The Complaints, however, show that this was after the company was acquired by a Hong Kong-based firm in late 2013. And they show that China is the

largest pork consuming market in the world, with prices at the time that substantially exceeded prices in the United States.

The Complaints and the materials they cite thus provide obvious and plausible alternative explanations for the actions allegedly taken by Smithfield, which are consistent with Smithfield's natural and independent business interests. This forecloses Plaintiffs' proposed inference of conspiracy. *See Twombly*, 550 U.S. at 567–68 (rejecting plausibility of antitrust conspiracy because "here we have an obvious alternative explanation"); *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (circumstantial evidence in *Twombly* "did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior"). While Plaintiffs attempt to paint a nefarious picture of Smithfield with their rhetoric and conclusory assertions, the *facts* that they allege about Smithfield's conduct and the context for those actions show that it was a natural and rational, indeed obvious, business decision for Smithfield to scale back production during a period in which the company was *losing money on every hog it raised*. In these circumstances, and of course assuming every factual allegation as true, Smithfield's production decisions and public responses to investor inquiries do not evidence a conspiracy.

# ARGUMENT

## I. SMITHFIELD'S ALLEGED DECREASE IN HOG PRODUCTION FROM 2008 TO 2011 WAS A REASONABLE UNILATERAL REACTION TO MARKETPLACE CONDITIONS.

Plaintiffs allege that Smithfield decreased its hog production, starting in February 2008 and continuing into 2011. DPP ¶¶124, 138. The Complaints and the materials they cite, however, identify obvious and independent business reasons for this alleged conduct.

For example, the Complaints show that the years during and following the Great Recession presented unprecedented challenges to Smithfield's hog production business. In a September 2009 earnings call that the Complaints partially quote (DPP ¶145), Smithfield's CEO remarked:

> I sort of feel like the world has been against us for 12 months[.] . . . [R]ecord high corn prices . . . an oversupply of live hogs[,] and historically low live hog prices[.] . . . A 75-year recession[] hit us in the fall. The financial crisis, which hit many . . . companies, and . . . a reactive export market[.] . . . Smithfield got its own . . . flu, the Swine Flu . . . and Smithfield [was called] Ground Zero. We ha[d] a devastating fire. And . . . the government working against us trying to create incentives for more ethanol to raise corn prices. . . . [T]his company has taken on about every single challenge that could possibly occur in one year[.][2]

---

[2] Q1 2010 Smithfield Foods Earnings Call, at 6 (Sept. 8, 2009) (cited at DPP ¶145), Declaration of John A. Kvinge in Support of Smithfield's Motion to Dismiss ("Kvinge Decl.") Ex. B. Because Plaintiffs cite this document in their Complaints, the Court may properly consider it in its entirety and in context on this Motion to Dismiss. *See, e.g., Twombly,* 550 U.S. at 568 n.13 ("the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn"); *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459–60 (8th Cir. 2010) ("documents . . . incorporated within a complaint are considered part of the pleadings, and courts may look at such documents for all purposes, . . . including to determine whether a plaintiff has stated a plausible claim") (quotation omitted). *See also Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998 & n.6 (9th Cir. 2014) (taking judicial

In fact, as the materials cited in the Complaints show, Smithfield was *losing money on every hog it raised* during this period.  For example, the Complaints quote excerpts from a June 2009 earnings call in which Smithfield's CEO stated:  "I can summarize the year very, very succinctly in saying that we have a hog production issue."[3]  As he explained, Smithfield was "under water" on each hog—the company's raising costs for each hog were greater than the sales price—and the situation was getting worse, with "losses . . . $20 a head worse than they were this time last year."[4]

Smithfield's hog production losses during those years were staggering.  By the end of 2009, Smithfield had "hog production losses" of "**about $1 billion**" over "the last eight quarters."[5]  As Smithfield's CFO explained in mid-2009, "Hog Production remains the company's [A]chilles heel," resulting in the company experiencing "an unprecedented $521 million loss in 2009."[6]  And those losses on each hog continued beyond 2009, with Smithfield's CEO remarking in March 2010 (in another earnings call partially quoted by

---

notice of the "deep national recession" that affected the U.S. economy from 2007 to 2009 (citing *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 399 (1937)).

[3]   Q4 2009 Smithfield Foods Earnings Call, at 2 (June 16, 2009) (cited at DPP ¶140), Kvinge Decl. Ex. A.

[4]   *Id*.

[5]   Q2 2010 Smithfield Foods Earnings Call, at 10 (Dec. 10, 2009) (cited at DPP ¶146), Kvinge Decl. Ex. C (emphasis added).

[6]   Q4 2009 Smithfield Foods Earning Call, at 6 (June 16, 2009) (cited at DPP ¶140), Kvinge Decl. Ex. A.

the Complaints (DPP ¶148)) that "[w]e're still under water . . . in terms of raising costs being above sales price."[7]

The Court already has held that the Complaints must plausibly allege "behavior that would probably not result from . . . independent responses to common stimuli[.]" Amended Opinion and Order Granting Defs.' Motion to Dismiss, Dkt. No. 361, at 17 n.6 (quoting *Twombly*, 550 U.S. at 557 n.4). When a company is losing money on every unit it produces—and when those losses are widening—the obvious business decision is to cut back on money-losing production. This is common business sense—there is no such thing as "what we lose on every sale, we make up on volume." This obvious independent explanation for Smithfield's alleged production reductions forecloses Plaintiffs' proposed inference of conspiracy. *See Iqbal*, 556 U.S. at 680 (conspiracy may not be inferred from conduct that is "not only compatible with, but indeed . . . more likely explained by, lawful, unchoreographed free-market behavior"); *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015) (courts must engage in a "context-specific" inquiry that "requires the reviewing court to draw on its judicial experience and common sense") (quoting *Iqbal,* 556 U.S. at 679); *see also Mayor and City Council of Baltimore v. Citigroup, Inc*., 709 F.3d 129, 138 (2d Cir. 2013) (antitrust allegation implausible because the "[d]efendants' alleged actions . . . made perfect business sense . . . [based on] the allegations in the[] complaints";

---

[7] Q3 2010 Smithfield Foods Earnings Call, at 2 (Mar. 11, 2010) (cited at DPP ¶148), Kvinge Decl. Ex. D.

"at that point [defendants' alleged actions were] not just *a* rational business decision, but the *only* rational business decision").

Moreover, the materials cited in the Complaints indicate that Smithfield ceased production cuts when it was no longer losing money on its hog production business. The last "downsiz[ing]" of Smithfield's "sow herd" that is identified in the Complaints is alleged to have occurred sometime in 2011. DPP ¶124. The Complaints excerpt from Smithfield's March 2011 earnings call, in which Smithfield reported that while its hog production business had shown "a significant improvement over the prior year," it still experienced "a slight loss of $2 million."[8] Notably, Plaintiffs do not identify any subsequent period in which Smithfield allegedly reduced its sow herd. And they do not identify *any* period in which Smithfield allegedly reduced its herd other than when it was losing money on hog production. Smithfield's hog production decisions were thus fully consistent with independent decision-making. As a matter of law, no conspiracy may be inferred from this conduct. *Iqbal*, 556 U.S. at 680.

## II. SMITHFIELD'S ALLEGED STATEMENTS IN PUBLIC EARNINGS CALLS DO NOT SUPPORT A PLAUSIBLE INFERENCE OF CONSPIRACY.

Plaintiffs attempt to bolster their antitrust conspiracy theory by pointing to statements made by Smithfield's executives in quarterly public earnings calls, in which they discussed Smithfield's decisions to cut hog production in response to increasing costs

---

[8] Q3 2011 Smithfield Foods Earnings Call, at 2, 4 (Mar. 10, 2011) (cited at DPP ¶154), Kvinge Decl. Ex. E.

of raising hogs, marketplace conditions of oversupply, and plummeting prices. *E.g.*, DPP ¶¶124, 134, 138, 140, 141, 146, 148, 154. Smithfield at the time was a publicly-traded company. It was therefore subject to federal regulations that "require[d]" it to "disclose 'trends or uncertainties . . . that [it] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'" *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1047 (D. Minn. 2015) (quoting Reg. S–K, 17 C.F.R. § 229.303(a)(3)(ii)).

With losses of a billion dollars in its hog production business over a two-year period, it was obviously incumbent on Smithfield's executives to explain to investors the source of those losses, the marketplace conditions facing the company, the steps being taken to mitigate its losses, and the outlook the company had for the future. For that very reason, courts have been "properly reluctant" to view statements made during public earnings calls as evidence of an antitrust conspiracy. *See Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 920 (N.D. Cal. 2019); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1373–74 (N.D. Ga. 2017), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018); *see also* Richard M. Steuer et al., *The Application of Antitrust to Public Companies' Disclosures*, 63 Admin. L. Rev. 159 (2011) (in light of federal disclosure requirements, statements made during public earnings calls should not be viewed as evidence of an antitrust conspiracy unless "unambiguously anticompetitive").

It is also notable that Plaintiffs quote statements by Smithfield executives demonstrating that other companies in the industry were *not* cutting production in parallel with Smithfield, thus underscoring the *absence* of conspiracy. *See, e.g.*, DPP ¶146

(December 2009: "I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance"). This, of course, is consistent with industry data showing an *absence* of parallel cuts by other hog producers. *See* Mem. L. in Support of Defendants' Joint Motion to Dismiss the Federal Claims in Plaintiff's Amended Complaint at Section I.D. And it underscores Plaintiffs' ongoing failure to allege parallel conduct of any sort by the Defendants.

It is true that Plaintiffs cite a September 2009 earnings call in which Smithfield's CEO allegedly stated that he "had conversations with several . . . very large producers, and . . . they are doing some liquidation." DPP ¶145. But Plaintiffs do not allege any facts showing that the "producers" referenced in that statement were any of these Defendants, or that there was anything nefarious about such alleged conversations. To the contrary, the materials cited in the Complaints show that Smithfield buys nearly half the hogs that it processes each year from other hog producers.[9] It would be expected, absent any alleged conspiracy, that Smithfield would discuss hog supplies and marketplace conditions with the producers that sell Smithfield millions of hogs per year. Thus, in context, the cited quotation says nothing about Smithfield entering into any agreement with its competitors to restrict production.

---

[9]  *See* WH Group 2014 Annual Report, at 24 (2015) (cited DPP ¶73), http://media-whgroup.todayir.com/2015041617050173_en.pdf ("In the year ended December 31, 2014, Smithfield produced 14,724 thousand [14,724,000] of the 27,890 thousand [27,890,000] hogs that it slaughtered in the U.S., or 52.8%, and the remaining 13,166 thousand [13,166,000] hogs were purchased from external suppliers."). Plaintiffs erroneously cite this document as "Smithfield Foods Annual Report." It is the annual report of Smithfield's parent company, WH Group.

### III. PLAINTIFFS' ALLEGATION THAT SMITHFIELD INCREASED ITS "FOCUS" ON EXPORTING PORK TO CHINA DOES NOT EVIDENCE A CONSPIRACY.

Plaintiffs allege that Smithfield "focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015." DPP ¶125. The materials cited in the Complaints, however, explain that Smithfield was acquired by a Hong Kong-based parent company in late 2013.[10] That Smithfield might allegedly send more exports to China after being acquired by a Hong Kong-based parent company (which owns a "sister company" in China) is neither remarkable nor suggestive of conspiracy. Notably, Plaintiffs do not allege that any other Defendant increased exports to China in parallel with Smithfield.

Moreover, even if other Defendants did increase exports to China at the same time as Smithfield, such actions still would not suggest anticompetitive behavior because growing a customer base and selling products at higher margins is common sense and in any company's unilateral interest. Indeed, as shown in the materials cited in the Complaints, China is the world's largest consumption market for pork, and hog prices in China were considerably higher than they were in the United States during the period in which Smithfield allegedly "focused" more on exports to China. For example, the WH Group 2014 Annual Report (cited at DPP ¶73) indicates that hog prices in China were

---

[10] *See id.* at 3, 6 n.4.

substantially higher than the prices in the United States during the relevant period.[11] That Report includes a chart depicting that difference in hog prices:



Selling more pork to purchasers in China to take advantage of significantly higher prices is entirely consistent with the natural, independent decision-making of any profit-maximizing company. And such sales are particularly sensible when made in connection with a "sister company" operating in the largest pork-consuming market in the world and which has just opened a new plant. This alleged fact is not remotely indicative of a conspiracy.

## **CONCLUSION**

For the reasons stated herein and in Defendants' Joint Briefs, Smithfield respectfully requests that all claims against it be dismissed.

---

[11]  *Id*. at 13–14; *see also* WH Group 2017 Interim Report, at 5 (2017) (noting the average hog price in China ($2.4/kg) was approximately double the price in the U.S. ($1.2/kg)) (cited at DPP ¶89), http://media-whgroup.todayir.com/2017090616310052_en.pdf.

Date: January 15, 2020

*/s/ John A. Cotter*
John A. Cotter (134296)
John A. Kvinge (0392303)
LARKIN HOFFMAN DALY & LINDGREN LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, MN 55427-1060
(952) 896-3340
jcotter@larkinhoffman.com
jkvinge@larkinhoffman.com

Richard Parker (*pro hac vice*)
Josh Lipton (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
rparker@gibsondunn.com
jlipton@gibsondunn.com

Brian Robison (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
(214) 698-3370
brobison@gibsondunn.com

*Counsel for Smithfield Foods, Inc.*