# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-1776 (JRT/HB) |
| This Document Relates to: | |
| ALL ACTIONS | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' COMPLAINT AND THE FEDERAL LAW CLAIMS IN THE INDIRECT PURCHASER PLAINTIFFS' COMPLAINTS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.   LEGAL STANDARDS ............................................................................. 5

    A.   Defendants' burden to prevail on a motion to dismiss is
        significant. ......................................................................................... 5

III.   PLAINTIFFS HAVE SUFFICIENTLY ALLEGED PARALLEL
     CONDUCT ................................................................................................ 7

    A.   Plaintiffs' allegations of parallel conduct comport with
        precedent and sufficiently establish Defendants' participation
        in the conspiracy. ............................................................................... 7

    B.   Defendants' challenges to Plaintiffs' parallel conduct
        allegations are devoid of legal and factual precedent. ............................ 15

        1.   Defendants' attempt to ignore Plaintiffs' specific and
            detailed allegations is unavailing. .................................................. 16

        2.   Defendants' attempt to reinterpret the alleged Pork
            conspiracy is not permitted and contradicts the law. .................... 17

        3.   Defendants' "year-by-year" recharacterization of their
            parallel conduct is improper and unconvincing. .......................... 21

        4.   Defendants' attempt to explain away the supply cuts
            reported in the Pork Powerhouses survey is without
            merit. ............................................................................................ 22

IV.   DEFENDANTS' "OTHER INDEPENDENT GROUNDS" DO NOT
     SUPPORT DISMISSAL ......................................................................... 24

    A.   Defendants' arguments regarding vertical integration
        misrepresent the law and Plaintiffs' allegations....................................... 24

    B.   Supply increases during certain years do not establish that an
        antitrust conspiracy is implausible. ........................................................ 26

    C.   Defendants' participation in Agri Stats supports Plaintiffs'
        allegations that they participated in the conspiracy. ................................ 28

D.      Defendants' alternative explanations do not establish the conspiracy is implausible. ........................................................ 29

V.      DEFENDANTS' ATTEMPT TO UNDERMINE THE EXISTENCE OF PLUS FACTORS IS UNPERSUASIVE ........................................ 33

     A.      The pork market is exactly the type of highly concentrated, commodity market that courts recognize as conducive to collusion. ............................................................................... 34

     B.      Defendants' unprecedented information exchanges through Agri Stats that allowed them to closely monitor each other's production and sales supports the plausibility of Plaintiffs' claims ................................................................................... 37

     C.      Defendants publicly encouraged each other to cut production. ............... 40

     D.      Plaintiffs allege other recognized plus factors. ......................... 42

VI.      THE RULE OF REASON CLAIMS ALLEGED BY THE IPPS ARE SUFFICIENT ....................................................................... 44

     A.      Plaintiffs sufficiently allege that Defendants entered into an anticompetitive information exchange agreement. ................... 44

     B.      The market structure of the pork industry strongly supports the plausibility of anticompetitive effects from the alleged information exchange agreement. .......................................... 45

     C.      The nature of the information exchanged supports the plausibility of anticompetitive effects from the agreement ..................... 48

         1.      The Agri Stats Reports constitute an exchange of current pricing information that courts consistently hold violates the Sherman Act. .................................... 49

         2.      Other characteristics of the Agri Stats reports are also hallmarks of anticompetitive information exchange agreements ..................................................................... 53

     D.      Defendants' factual arguments against the rule of reason claim fail. ............................................................................. 55

         1.      Plaintiffs have made plausible allegations that Defendants used Agri Stats reports to set prices. ...................... 55

2. Plaintiffs have made substantial factual allegations that Defendants' information exchange agreements produced anticompetitive effects. ................................... 59

VII. PLAINTIFFS' CLAIMS ARE TIMELY ............................................. 63

A. The statute of limitations is equitably tolled due to Defendants' fraudulent concealment........................................ 64

1. Defendants' wrongful concealment prevented Plaintiffs from discovering the conspiracy before 2018. ............. 65

   a. Plaintiffs allege a self-concealing conspiracy. ................... 66

   b. In the alternative, Plaintiffs have adequately alleged Defendants' affirmative concealment.................. 68

2. Plaintiffs did not discover the conspiracy until 2018................... 73

3. Plaintiffs exercised due diligence and had no reason to investigate Defendants' conduct in the pork industry prior to 2018. ................................................................. 73

B. The Court should defer its decision on fraudulent concealment.......................................................................... 78

C. Plaintiffs adequately allege a continuing violation. ............................... 80

VIII. CONCLUSION ........................................................................... 85

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Abecassis v. Wyatt,*
  902 F. Supp. 2d 881 (S.D. Tex. 2012) .......................................................................75

*Am. Column & Lumber Co. v. United States,*
  257 U.S. 377 (1921)..............................................................................48, 52, 62, 63

*Am. Prairie Constr. Co. v. Hoich,*
  560 F.3d 780 (8th Cir. 2009) ................................................................................23

*Anderson v. Dairy Farmers of Am., Inc.,*
  2010 WL 1286181 (D. Minn. Mar. 29, 2010) ....................................................69, 70

*In re Animation Workers Antitrust Litig.,*
  123 F.Supp.3d 1175 (N.D. Cal. 2015) ................................................................69, 79

*Arizona v. Maricopa Cty. Med. Soc'y,*
  457 U.S. 332 (1982)............................................................................................29, 31

*In re Aspartame Antitrust Litig.,*
  2007 WL 5215231 (E.D. Pa. Jan. 18, 2007)..............................................................68

*In re Auto. Parts Antitrust Litig.* (*Bearings*),
  2014 WL 4272772 (E.D. Mich. Aug. 29, 2014)..................................................65, 74

*In re Auto. Parts Antitrust Litig.* (*Occupant Safety Sys.*),
  50 F. Supp. 3d 869 (E.D. Mich. 2014)......................................................................43

*Bailey v. Glover,*
  88 U.S. 342 (1874)....................................................................................................67

*Baker v. F & F Inv.,*
  420 F.2d 1191 (7th Cir. 1970) .................................................................................67

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)........................................................................................6, 8, 30, 33

*BJC Health Sys. v. Columbia Cas. Co.,*
  348 F.3d 685 (8th Cir. 2003) ..................................................................................23

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ...................................................................72

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................................*passim*

*In re Bulk Popcorn Antitrust Litig.*,
   1990 WL 123753, (D. Minn. Jun. 19, 1990)......................................64, 71

*Cantonis v. Stryker Corp.*,
   2011 WL 1084971 (D. Minn. Mar. 21, 2011) ..........................................72

*In re Capacitors Antitrust Litig.*,
   106 F. Supp. 3d 1051 (N.D. Cal. 2015) ....................................................82

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) ..............................................................30, 31

*Carrier Corp. v. Outokumpu Oyj*,
   673 F.3d 430 (6th Cir. 2012) ......................................................64, 73, 74

*In re Chocolate Confectionary Antitrust Litig.*,
   602 F.Supp.2d 538 (M.D. Pa. 2009) ........................................................35

*City of Moundridge v. Exxon Mobil Corp.*,
   2009 WL 5385975 (D.D.C. Sept. 30, 2009) ............................................19

*Cole v. Homier Distrib. Co., Inc.*,
   599 F.3d 856 (8th Cir. 2010) ...................................................................58

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)....................................................................................7

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)..................................................................................29

*In re Currency Conversion Fee Antitrust Litig.*,
   264 F.R.D. 100 (S.D.N.Y. 2010) ........................................................18, 19

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
   245 F. Supp. 3d 1343 (N.D. Ga. 2017) ...................................................40

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016).....................................................*passim*

*Edwards v. Nat'l Milk Producers Fed'n*,
  2012 WL 12951848 (N.D. Cal. Oct. 30, 2012) ...................................................*passim*

*ES Dev., Inc. v. RWM Enters., Inc.*,
  939 F.2d 547 (8th Cir. 1991) ..................................................................................29

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013) ................................................................................6, 7

*In re Fasteners Antitrust Litig.*,
  2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ....................................................65, 68

*First, Williamson Oil Co., Inc. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ...........................................................................*passim*

*Five Smiths Inc. v. Nat'l Football League Players Ass'n*,
  788 F.Supp. 1042 (D. Minn. 1992).........................................................47, 48, 53, 59

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) ....................................................................36

*In re Foreign Exch. Benchmark Rate Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015)...........................................................................7

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016)......................................................................................30

*In re Generic Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ......................................................................15

*In re Generic Pharms. Pricing Antitrust Litig.*,
  2018 WL 5003450 (E.D. Pa. Oct. 16, 2018)............................................................31

*Goldman v. Belden*,
  754 F.2d 1059 (2d Cir. 1985)...................................................................................23

*Grasso Enters., LLC v. Express Scripts, Inc.*,
  2017 WL 365434 (E.D. Mo. Jan. 25, 2017) ............................................................43

*Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*,
  120 F.3d 893 (8th Cir. 1997) ...................................................................................77

*Hill v. Texaco, Inc.*,
  825 F.2d 333 (11th Cir. 1987) ..................................................................................67

*Holmberg v. Armbrecht*,
  327 U.S. 392 (1946) ..................................................................................63

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  2014 WL 943224 (D. Minn. Mar. 11, 2014) ............................................78

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017).................................................8, 19

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939) ..................................................................................21

*J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*,
  976 F. Supp. 2d 1051 (E.D. Ark. 2013) .................................................5, 6

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) ......................................................41

*Kansas City, Mo. v. Fed. Pac. Elec. Co.*,
  310 F.2d 271 (8th Cir. 1962) ..............................................................63, 64

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017) ........................................................41

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
  775 F.Supp.2d 1071 (N.D. Ill. 2011) ....................................8, 19, 31, 35

*In re Late Fee & Over-Limit Fee Litigation*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007) ......................................................36

*Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)...................................................................................29

*In re London Silver Fixing, Ltd.*,
  213 F. Supp. 3d 530 (S.D.N.Y. 2016)..................................................68, 79

*McCleneghan v. Union Stock Yards of Omaha*,
  349 F.2d 53 (8th Cir. 1965) ......................................................................27

*In re Mercedes-Benz Anti-Trust Litig.*,
  157 F. Supp. 2d 355 (D.N.J. 2001) ....................................................*passim*

*In re Milk Prods. Antitrust Litig.*,
  84 F. Supp. 2d 1016 (D. Minn. 1997) (Magnuson, J.)....................71, 72, 76

*In re Monosodium Glutamate Antitrust Litig.*,
 2003 WL 297287 (D. Minn. Feb. 6, 2003) .........................................................66, 70

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.*,
 198 F.3d 823 (11th Cir. 1999) .............................................................................73, 75

*In re Musical Instruments & Equip. Antitrust Litig.*,
 798 F.3d 1186 (9th Cir. 2015) ...............................................................................7, 20

*N. Texas Specialty Physicians v. Fed. Trade Comm'n*,
 528 F.3d 346 (5th Cir. 2008) ................................................................................30, 31

*New Prime, Inc. v. Eaton Corp.*,
 2017 WL 5992466 (W.D. Mo. Mar. 16, 2017).........................................................66

*New York v. Hendrickson Bros., Inc.*,
 840 F.2d 1065 (2d Cir.1988).....................................................................................68

*In re Optical Disk Drive Antitrust Litig.*,
 2017 WL 6503743 (N.D. Cal. Dec. 18, 2017).........................................................84

*Osborn v. Visa Inc.*,
 797 F.3d 1057 (D.C. Cir. 2015).................................................................................84

*In re Packaged Ice Antitrust Litig.*,
 723 F. Supp. 2d 987 (E.D. Mich. 2010)....................................................7, 43, 64, 71

*Palmer v. BRG of Georgia, Inc.*,
 498 U.S. 46 (1990)....................................................................................................29

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
 911 F.3d 505 (8th Cir. 2018) ....................................................................................15

*Penne v. Greater Minneapolis Area Bd. of Realtors*,
 604 F.2d 1143 (8th Cir. 1979) ..................................................................................48

*Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*,
 998 F.2d 1224 (3rd Cir. 1993) ..................................................................................40

*Phoenix Entm't Partners, LLC v. Star Music, Inc.*,
 2017 WL 5714021 (D. Minn. Nov. 28, 2017) ..........................................................71

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
 764 F.Supp.2d 991 (N.D. Ill. 2011) ...........................................................................8

*In re Polyurethane Foam Antitrust Litig.*,
    799 F. Supp. 2d 777 (N.D. Ohio 2011) ........................................................74

*In re Potash Antitrust Litig.*,
    159 F.R.D. 682 (D. Minn. 1995) ..................................................................29

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) (*en banc*) ............................................*passim*

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    893 F.3d 1047 (8th Cir. 2018) ...............................................................83, 84

*Precision Rx Compounding, LLC v. Express Scripts Holding Co.*,
    2016 WL 4446801 (E.D. Mo. Aug. 24, 2016) .............................................40

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F.Supp.2d 709 (E.D. Penn. 2011) ...........................................................8

*Ripplinger v. Amoco Oil Co.*,
    916 F.2d 441 (8th Cir. 1990) .......................................................................66

*Ryan v. United States*,
    534 F.3d 828 (8th Cir. 2008) .......................................................................64

*Savig v. First Nat'l Bank of Omaha*,
    2009 WL 1955476 (D. Minn. July 6, 2009) ................................................71

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ..............................................................9, 21, 33

*Second, Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ...................................................*passim*

*Smith v. United States*,
    568 U.S. 106 (2013) .....................................................................................84

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ...................................................................73, 75

*Standard Iron Works v. Arcelormittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ..........................................................42

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ...................................................................35, 44

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    580 F. Supp. 2d 896 (N.D. Cal. 2008) .........................................................34

*Steward v. Up N. Plastics, Inc.*,
    177 F. Supp. 2d 953 (D. Minn. 2001) (Tunheim, J.) ..................................78

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ..........................................................31

*TCF Nat'l Bank v. Mkt. Intelligence, Inc.*,
    2013 WL 53837 (D. Minn. Jan. 3, 2013)......................................................79

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ................................................................28, 34

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    820 F. Supp. 2d 1055 (N.D. Cal. 2011) ......................................................84

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    586 F. Supp. 2d 1109 (N.D. Cal. Aug. 25, 2008) ......................................41

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)................................................................*passim*

*Topchian v. JPMorgan Chase Bank, N.A.*,
    760 F.3d 843 (8th Cir. 2014) .........................................................................5

*United Power Ass'n, Inc. v. L.K. Comstock & Co.*,
    1992 WL 402906 (D. Minn. Oct. 27, 1992) ..........................................66, 67

*United States v. Alcoa, Inc.*,
    2001 WL 1335698 (D.D.C. June 21, 2001).................................................35

*United States v. Container Corp. of Am.*,
    393 U.S. 333 (1969)...........................................................................*passim*

*United States v. Grimmett*,
    150 F.3d 958 (8th Cir. 1998) .......................................................................84

*United States v. Jones*,
    29 F.3d 1549 (11th Cir. 1994) .....................................................................23

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)...................................................................44, 48, 57

*In re Vitamins Antitrust Litig.*,
   2000 WL 1475705 (D.D.C. May 9, 2000) ........................................................64, 65

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   722 F. Supp. 2d 1079 (D. Minn. 2010) (Montgomery, J.)....................................77, 78

*Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*,
   520 F.2d 289 (8th Cir. 1975) .........................................................................................77

*Zean v. Fairview Health Servs.*,
   149 F.Supp.3d 1129 (D. Minn. 2016).........................................................................22

## FEDERAL RULES

Federal Rule of Civil Procedure 10(c)...............................................................................23

Federal Rule of Civil Procedure 9 .....................................................................................65

Federal Rule of Civil Procedure Rule 9(b)..................................................................64, 65

Federal Rule of Civil Procedure 12(b)(6)...................................................................22, 30

Federal Rule of Evidence 201(b).......................................................................................23

## SECONDARY AUTHORITIES

ABA Model Jury Instructions in Antitrust Cases, § 2(C)(4) (2016 Ed.) ............12, 14, 27

# I.     INTRODUCTION

In its order granting Defendants'[1] previous motion to dismiss, this Court

recognized that a price fixing conspiracy can be adequately alleged through "consciously

parallel conduct if the parallelism is accompanied by substantial additional evidence—

often referred to as 'plus factors.'" *See* Order at 17.[2] The Court held that "[t]he plus

factors identified and discussed by Plaintiff[s] are undoubtedly strong and are of the type

often used to support an inference of an agreement." *Id.* at 18. Furthermore, Plaintiffs[3]

sufficiently pled that the Pork[4] industry experienced significant supply reductions during

the conspiracy period. *Id.* at 19. However, the Court granted Defendants' motion to

dismiss because Plaintiffs did not sufficiently allege how the individual Defendants

(except Smithfield) participated in the conspiracy. *Id.* at 20. In response to the Court's

order of dismissal without prejudice, Plaintiffs have amended their complaints with the

---

[1] The term "Defendants" refers collectively to Agri Stats, Inc.; Clemens Food Group, LLC and The Clemens Family Corporation (collectively, "Clemens"); Hormel Foods Corporation and Hormel Foods, LLC (collectively, "Hormel"); Indiana Packers Corporation; JBS USA Food Company ("JBS"); Seaboard Foods LLC and Seaboard Corporation (collectively, "Seaboard"); Smithfield Foods, Inc.; Triumph Foods, LLC; Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. (collectively, "Tyson").

[2] "Order" refers to the Amended Memorandum Opinion and Order Granting Defendants' Motions to Dismiss Plaintiffs' Complaints, Aug. 8, 2019, ECF No. 361.

[3] Unless otherwise indicated, the term "Plaintiffs" refers collectively to Consumer Indirect Purchaser Plaintiffs ("IPPs"), Direct Purchaser Plaintiffs ("DPPs"), and Commercial and Institutional Indirect Purchaser Plaintiffs ("CIPs").

[4] The term Pork is defined in the Amended Complaints as including "pig meat purchased fresh or frozen, smoked ham, sausage, and bacon." *See, e.g.*, DPPs' Amended Complaint at 4, Jan. 15, 2020, ECF No. 431.

following new factual allegations that (1) show parallel conduct by Defendants during the class period sufficient to support Plaintiffs' *per se* claim and (2) support the Indirect Purchaser Plaintiffs' newly pled rule of reason claim:

- Adding allegations setting forth parallel conduct by each of the processing Defendant during the conspiracy period that furthered their goal of fixing the price of pork, including:

  - Smithfield made production cuts in 2009, 2010, and 2011 while repeatedly engaging in public signaling to its competitors about the need for industry-wide cuts;

  - Tyson cut both its sow production and its capacity utilization rates in 2009, and then reported decreased pork sales and capacity utilization rates later in the class period;

  - JBS increased its export volumes near the start of the class period and then near the end of the conspiracy period reduced its sow production while subsequently touting that pork prices were higher because of increased demand and output restrictions;

  - Hormel cuts its sow production in 2008, at the start of the conspiracy, and then in 2009 publicly stated that it had reduced pork production;

  - Triumph substantially cut production in 2009, representing over 6% of its herd;

- ▪ Seaboard increased its exports near the start of the alleged conspiracy period, thus reducing available domestic supply;

- ▪ Clemens reduced its pork production near the start of the conspiracy period and subsequently refused to increase its market share later in the conspiracy period;

- ▪ Indiana Packers reduced its pork processing in 2012.

- Adding allegations that the pork production reductions in 2009 were historically unprecedented, with a trade publication reporting that the 6.4% reduction in sows was the first time that the nation's top 25 pork producers had cut sow numbers since it had begun compiling sow numbers;

- Adding allegations in support of IPPs' rule of reason claim that document the specific contents of Agri Stats regularly prepared weekly and monthly reports containing competitively sensitive information on Defendants' costs, prices, and profits, including weekly sales reports distributed to Defendants that specifically calculated the profits they could gain from raising their prices;

- Adding allegations in support of IPPs' rule of reason claim that Defendants specifically communicated with Agri Stats regarding pricing opportunities that were indicated in the Agri Stats data;

- Adding allegations in support of IPPs' rule of reason claim that pork is a commodity market with inelastic demand, price-based competition, and a fungible product – market characteristics the Supreme Court has recognized

- 3 -

where information exchange is most likely to produce anticompetitive effects.

The Amended Complaints[5] thus address the Court's concerns, and establish that the "historic and unprecedented" supply cuts experienced in the Pork industry during the Class Period were the product of coordinated action by the Defendants, which were not in their independent economic best interest. *See, e.g.*, DPP ¶ 119-132; IPP ¶¶ 98-123; CIP ¶¶ 123-126. Moreover, the Amended Complaints detail the method, manner, means, and timing of each of the Defendant's supply cuts in furtherance of the conspiracy. *See, e.g.*, DPP ¶¶ 119-163; IPP ¶¶ 98-123; CIP ¶¶ 123-167. These additional allegations or parallel conduct, when coupled with the plus factors the Court has already deemed sufficient, necessitate denial of Defendants' newly filed Motion to Dismiss.[6]

The IPPs also allege an additional claim that Defendants' detailed and unprecedented exchanges of proprietary production, supply, and pricing information utilizing Agri Stats were anticompetitive and illegal under a rule of reason analysis. As

---

[5] "Amended Complaints" collectively refers to: the Direct Purchaser Plaintiffs' Third Amended and Consolidated Class Action Complaint (*Maplevale Farms Inc. v. Agri Stats, Inc.*, No. 18-cv-01803 (D. Minn.), Jan. 15, 2020, ECF No. 431, hereinafter "DPP ¶ __"); the Consumer Indirect Purchaser Plaintiffs' Second Amended Consolidated Class Action Complaint (*Duryea, et al. v. Agri Stats, Inc., et al.*, No. 18-cv-01776 (D. Minn.), Nov. 6, 2019, ECF No. 393, hereinafter "IPP ¶ __"); and the Commercial Institutional Indirect Purchaser Plaintiffs' Third Amended and Consolidated Class Action Complaint (*Sandee's Bakery, et al. v. Agri Stats, Inc., et al.*, No. 18-cv-01891 (D. Minn.), Jan. 15, 2020, ECF No. 432, hereinafter "CIP ¶ __").

[6] *See* Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Federal Law Claims in Plaintiffs' Amended Complaints ("MTD"), Jan. 15, 2020, ECF No. 439.

the Court recognized in its Order, such information exchanges can independently constitute an antitrust violation pursuant to the rule of reason. Order at 18 n.7.

In an effort to dismiss these actions, Defendants do what is not permitted at the pleading stage, by attempting to reframe, ignore, minimize, and explain away Plaintiffs' factual allegations. Defendants wrongly attempt to misrepresent and elevate the standard for pleading parallel conduct. Defendants attempt to reframe the scope of the conspiracy, to ignore evidence of their supply cuts. Defendants disregard the specific allegations of their supply cuts and offer alternative explanations which do not overcome the plausibility of Plaintiffs' allegations. Defendants also attempt to minimize the import and impact of the highly confidential information they exchanged through Agri Stats. And they attempt to explain away the numerous plus factors, which the Court already found were sufficiently pled. Defendants' arguments are without merit, and their Motion to Dismiss should be denied.

## II.    LEGAL STANDARDS

### A.    Defendants' burden to prevail on a motion to dismiss is significant.

On a motion to dismiss, courts must accept plaintiffs' factual allegations as true and draw all reasonable inferences in their favor. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014). In antitrust cases, there is no heightened pleading standard. *See, e.g.*, *J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*, 976 F. Supp. 2d 1051, 1059 (E.D. Ark. 2013). "Moreover, in antitrust cases, where the proof is largely in the control of the defendant, 'dismissals prior to giving the plaintiff ample opportunity

for discovery should be granted very sparingly.'" *Id.* (quoting *Fusco v. Xerox Corp.*, 676 F.2d 332, 337 n.7 (8th Cir. 1982)).

Under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), plausibility does "not require heightened fact pleading of specifics"; *see also In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane I*"), 860 F.3d 1059, 1070 (8th Cir. 2017) (*en banc*) ("Plaintiffs 'need not provide specific facts in support of their allegations.'"). Rather, a complaint need only contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The facts must simply "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* This is true "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.*[7] While allegations of parallel conduct by themselves are inadequate, an allegation of parallel conduct "gets the complaint close to stating a claim," and "some further factual enhancement" will render agreement plausible. *Id.* at 557.

At the pleading stage, courts cannot weigh "competing inferences" or "credit a defendant's counterallegations." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013). When based on allegations of parallel conduct (that is, without direct evidence of an agreement), "a complaint must at least allege the general contours of when an agreement was made, supporting those allegations with a context

---

[7] Here, as elsewhere in the brief, all internal quotation marks and citations are omitted, and emphasis added, unless otherwise noted.

that tends to make said agreement plausible."[8] *Id.* at 46. Allegations of "plus factors" are one way to make a complaint more plausible, but they are not required, and "other, more general allegations informing the context of an agreement may be sufficient." *Id.* at 47.

A "'smoking gun' can be hard to come by, especially at the pleading stage." *In re Foreign Exch. Benchmark Rate Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015). Courts must consider the allegations in the complaint as a whole, and must reject any "attempt to parse and dismember the complaint[]." *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1006 (E.D. Mich. 2010); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.").

## III.   PLAINTIFFS HAVE SUFFICIENTLY ALLEGED PARALLEL CONDUCT

### A.   Plaintiffs' allegations of parallel conduct comport with precedent and sufficiently establish Defendants' participation in the conspiracy.

This Court granted Plaintiffs' leave to amend their complaints in order to permit Plaintiffs to plead parallel conduct evidencing Defendants' supply restriction efforts. In evaluating the sufficiency of Plaintiffs' allegations it is essential to understand what courts consider sufficient to allege parallel conduct in the context of a supply reduction conspiracy. Contrary to Defendants' arguments, parallel conduct does not require that participants engage in identical and simultaneous supply restrictions that mirror each other in manner, scope, and timing. Rather, "the Supreme Court has long held that

---

[8] Parallel conduct arises when "competitors adopt[] similar policies around the same time in response to similar market conditions." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

simultaneous action is not a requirement to demonstrate parallel conduct." *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (citing *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939); *see also Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F.Supp.2d 1071, 1077 n.9 (N.D. Ill. 2011) ("capacity reductions need not be simultaneous to demonstrate conscious parallelism," rather, allegation of sequential conduct "is common" in such cases). Accordingly, parallel conduct exists even when Defendants' supply restrictions took place "gradually" because "*Twombly* does not require that a complaint include allegations of such an unnatural coincidence in the management of competitors' businesses." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F.Supp.2d. 991, 1000 (N.D. Ill. 2011); *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017) ("Unanimity of action . . . is not required.").

Moreover, courts have rejected the precise arguments propounded by Defendants that parallel conduct is not established when the "alleged production cuts are too varied in methods and amounts." *Broiler Chicken*, 290 F. Supp. 3d at 791; *In re Processed Egg Prods. Antitrust Litig.*, 821 F.Supp.2d 709, 714-15 (E.D. Penn. 2011) (Defendants' "supply adjustment" conspiracy utilized a series of egg supply reduction events including flock reductions, hatch reductions, cage species density guidelines, and exporting eggs); *Plasma-Derivative*, 764 F.Supp.2d. at 996 (Defendants conspired to limit the supply of plasma therapies using "a series of production cuts, strategic acquisitions, and plant closures."). Indeed, Defendants' use of multiple methods to reduce supply is not only plausible, but "not surprising [because] [c]ommercially sophisticated parties like the

defendants could well understand the red flags that would be raised" by simultaneous and identical conspiratorial acts. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427-28 (4th Cir. 2015); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."). As the court recognized in *Broiler Chicken*, 290 F. Supp. 3d at 792:

> It is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator, where multiple options would accomplish the intended goal. Permitting flexibility, where possible, in the means of effectuating price increases, would enable a greater number of producers to participate in the conspiracy, and might help to conceal the collusive nature of their conduct.

Plaintiffs have satisfied this standard by alleging and providing specific examples regarding how each Defendant reduced or otherwise limited its Pork production. Despite the fact that Defendants protect the disclosure of their proprietary production statistics from the public (while willingly sharing it with their direct competitors through Agri Stats), Plaintiffs have pled specific facts demonstrating Defendants' parallel conduct in furtherance of the conspiracy. These allegations regarding Defendants' participation in the conspiracy reveal that their supply reductions were sufficiently close in time and in furtherance of their common and agreed-upon goal of achieving supra-competitive prices. As in other supply restriction antitrust actions, Plaintiffs allege that the Defendants reduced the supply of Pork through various available means, including: (1) the slaughter and elimination of sows and hogs; and (2) the reduction in Pork production by limiting capacity and reducing sales volume. The Amended Complaints further establish that

these supply cuts did not occur in isolation, but took place in conjunction with and in relation to numerous plus factors supporting the existence of the conspiracy. *See* Section V, *infra*; *see also* Order at 18-19.

**2008 Through 2010:** Prior to the alleged conspiracy period, the Pork market was marked by consistent and steady supply increases. *See* DPP ¶119; CIP ¶ 123 ("As one industry commentator reported in 2007, 'Some things you can just take to the bank. Sow herd expansion among the Pork Powerhouses would fall into that category – even in the face of the biggest run-up in feed prices in history.'"); *see also* DPP ¶ 120; CIP ¶ 124, Figure 7 (demonstrating steady supply expansion prior to the conspiracy period).

This changed during the conspiracy. Starting in 2008 and continuing through 2010, numerous Defendants engaged in supply reductions. These supply cuts were not the result of unbelievably coincidental unilateral conduct, but rather were coordinated: "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers. These companies report 200,000 fewer sows than one year ago, a drop of 6.4%." *See* DPP ¶ 121; CIP ¶ 125 (citing Freese, Betsy, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009)). "[S]uch 'historically unprecedented changes,' [ ] suggest a conspiratorial agreement, not mere parallel conduct." *See Broiler Chicken,* 290 F. Supp. 3d at 793.

The Amended Complaints provide specific facts regarding Defendants' participation in these supply restrictions including the following:

Smithfield: Smithfield commenced its conspiratorial supply restrictions in 2008. DPP ¶ 124; CIP ¶ 128. In 2009, Smithfield signaled publicly that it had already reduced

the size of its U.S. herd by two million market hogs annually, and it was initiating a further 3% reduction of its U.S. sow herd, effective immediately. DPP ¶ 124; IPP ¶ 107; CIP ¶ 128. Smithfield made additional production cuts in 2010. DPP ¶ 124; IPP ¶ 116; CIP ¶ 128.

Tyson: In 2009, Tyson cut its sows (used in the breeding of hogs)[9] by over 25%, marking a significant reduction. *See* DPP ¶ 126; IPP ¶ 113; CIP ¶ 130. Tyson also reduced its capacity utilization rates during the first half of 2009. IPP, ¶¶ 102, 105. Tyson further reported a 3.3% decrease in its Pork sales volume and decrease in its capacity utilization in 2010. *Id.*

Hormel: In 2008, Hormel cut its number of sows in 2008 and maintained such reduced production throughout the class period despite having ample opportunities to make increases. *See* DPP ¶ 128; IPP ¶ 101; CIP ¶ 132. Hormel also stated in February 2009 that it would look for opportunities to reduce its production numbers. IPP ¶ 103. In June 2009, Hormel confirmed that it had reduced its production in basic processing for pork. IPP ¶ 106. Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. DPP ¶ 128; CIP ¶ 132.

Triumph: In 2008, Triumph Foods reported that it had cut 11,000 sows. DPP ¶ 130; CIP ¶ 134. In 2009 Triumph reported another substantial cutback of approximately 24,500 sows, representing over 6% of its sow herd. *Id.*; IPP ¶ 112.

---

[9]  *See* DPP ¶ 70; CIP ¶ 74 ("Due to the nature of the pork production cycle, the reduction of sows—i.e. farrowing hogs—has a significant impact on the supply of pork.").

**2011 and 2012:** In 2011 and 2012, pork prices significantly increased, which in turn significantly increased Defendants' profits. These allegations are based on evidence including: (1) Defendants' own statements and admissions (DPP ¶¶ 153-156; IPP ¶¶ 120-122; CIP ¶¶ 157-160); (2) Plaintiffs' analysis of hog wholesale prices and lean hog composite prices which substantially increased during the class period (DPP ¶¶ 165, 167; IPP ¶¶ 125-126; CIP ¶¶ 169, 171); (3) Plaintiffs' analysis of Defendants' elevated earnings and profits during the class period (DPP ¶¶ 164-171; IPP ¶¶ 127-132; CIP ¶¶ 168-175). But despite increasing pork prices and Defendants' profits during the conspiracy period, and recognizing that they profited more from working collusively than independently, the Defendants continued to restrict production. In fact, Defendants repeatedly emphasized that they would not increase production, despite their rising profits. *See* DPP ¶¶ 153-156; IPP ¶¶ 120-122; CIP ¶¶ 157-160. The fact that Defendants did not increase production is further evidence of Defendants' collusive agreement to artificially restrict pork below demand. *See Broiler Chicken*, 290 F. Supp. 3d at 792 (rejecting Defendants' claim that increases in overall production render the conspiracy implausible because "Plaintiffs . . . base their claims on allegations that overall production increases were not in line with what had been the Broiler industry's historic annual 3% production increase"); *see also* ABA Model Jury Instructions in Antitrust Cases, § 2(C)(4) (2016 Ed.) ("The Sherman Act prohibits agreements between competitors or potential competitors that ***limit*** how much of a product one or more of them will produce.") (Emphasis added.).

- 12 -

Rather than increase supply, Defendant Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats in 2011. DPP ¶ 131; CIP ¶ 135. That same year, Defendant JBS reported increasing its export volume by 15% to 20%, which had the effect of decreasing domestic sales. DPP ¶ 127; CIP ¶ 131. Other Defendants refused to increase production, and ensured that production did not increase as expected. This was no coincidence, as Defendants were closely monitoring each other by exchanging competitive information privately through Agri Stats, and signaling their intention to limit production increases in public statements. *See, e.g.*, DPP ¶ 151; CIP ¶ 155 (Smithfield CEO Larry Pope stating, "Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are . . . [t]his is information you may not quite have. And we have been certainly impressed with how our competitors have been able to achieve margins."); DPP ¶ 153; CIP ¶ 157 (Tyson COO stating, "If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.").

**2013:** Defendants made further Pork production cuts in 2013. Again, the Amended Complaints include specific allegations establishing multiple Defendants participated in these cuts including:

Tyson: In 2013, Tyson reported a 3.6% decrease in sales volume and decrease in capacity utilization in an effort to "balance[ ] our supply with customer demand." DPP ¶ 126; CIP ¶ 130.

Seaboard: Despite having an almost identical capacity as in 2012, Seaboard reported in 2013 that it had "lower sales volume of pork products in the domestic market"

- 13 -

which resulted in "higher prices for pork products sold in the domestic market." DPP ¶ 129; CIP ¶ 133.

Hormel: Hormel also reported lower sales volume of pork products in 2013. DPP ¶ 128; CIP ¶ 132.

**2014:** In 2014, while hog supply was impacted by the PEDv virus which infected pigs, Defendants who were not affected by the disease did not increase their production, contrary to what would be expected in a competitive market. *See* DPP ¶ 131; CIP ¶ 135 (In 2014, "Clemens did not utilize its advantage and refused to increase its market share when it clearly had substantial market incentives to do so."); *see Broiler Chicken*, 290 F. Supp. 3d at 792; ABA Model Jury Instructions in Antitrust Cases, § 2(C)(4).

**2015 and 2016:** While overall Pork supply increased in 2015 and 2016, Plaintiffs allege that these increases were less than pre-conspiracy supply trends and less than they would have been in a competitive market. DPP ¶ 162; CIP ¶ 166. In 2016, Defendant JBS reduced the supply of hogs it acquired from Cargill. DPP ¶ 127; CIP ¶131.

These facts, when viewed pursuant to the proper legal standard, and read in the light most favorable to the Plaintiffs, demonstrate that the Defendants acted in parallel in furtherance of the supply reduction and suppression conspiracy alleged by the Plaintiffs. *See supra* (establishing the standard for pleading parallel conduct).

These facts further distinguish this case from the authorities that were relied upon by the Court in ruling that the Plaintiffs did not sufficiently allege parallel conduct in their previous complaints. *See* Order at 21 (citing *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir. 2018); *In re Generic Pharms. Pricing*

*Antitrust Litig.*, 338 F. Supp. 3d 404, 443 (E.D. Pa. 2018)). In *Park Irmat*, 911 F.3d at 516, the court found that plaintiffs' bare bones allegations did not establish parallel conduct because "[t]he only allegation that hints at parallel conduct is that both CVS and Express Scripts terminated Irmat from their networks." Nonetheless, the court emphasized that "[w]e do not hold that actions taken within six months of each other can never constitute parallel conduct, but only that the terminations here . . . did not constitute parallel conduct." *Id.* at 517. The court in *Generic Pharms.*, 338 F. Supp. 3d at 443, actually found that plaintiffs sufficiently alleged parallel conduct despite the fact that defendants' price increases occurred "weeks or months" apart and did not always match the conduct of other defendants. In reaching this conclusion, the court recognized, "'Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct.'" *Id.* at 441 (quoting *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010)). Moreover, "a showing of parallel pricing requires only evidence that defendants 'acted similarly,' and not evidence that they charged the same prices or engaged in identical conduct." *Generic Pharms.*, 338 F. Supp. 3d at 441-42 (citing *In re Chocolate Confectionary Antitrust Litig.*, 999 F.Supp.2d 777, 787 (M.D. Pa. 2014)).

**B.    Defendants' challenges to Plaintiffs' parallel conduct allegations are devoid of legal and factual precedent.**

Ignoring the relevant authority and the allegations in Plaintiffs' Complaints, the Defendants nevertheless argue that Plaintiffs have not sufficiently alleged parallel

conduct. These arguments are without factual and legal merit, and fail for the reasons below.

**1.     Defendants' attempt to ignore Plaintiffs' specific and detailed allegations is unavailing.**

As set forth above, and detailed in the Amended Complaints, the Plaintiffs have alleged specific facts relating to the supply reduction and stabilization efforts that were engaged in by the individual Defendants. *See, e.g.,* DPP ¶¶ 124-32; IPP ¶¶ 98-123; CIP ¶¶ 128-36. Nevertheless, Defendants seek to ignore these allegations by asserting that the "majority" of the new allegations in Plaintiffs' Amended Complaints do not relate directly to parallel conduct. *See* MTD at 10. This is a straw man argument. The Court's Order obviously did not forbid Plaintiffs from pleading additional facts to support the existence of the agreement, or otherwise strengthen the plus factors which the Court recognized "are undoubtedly strong and are of the type often used to support an inference of an agreement." Order at 18. Thus, these allegations do not support *dismissal* even if they do not directly relate to Plaintiffs' parallel conduct allegations.

Defendants' argument also fails because it selectively ignores relevant allegations of parallel conduct which support denial of their Motion to Dismiss. For example, Defendants wrongly suggest that supply cuts that took place in 2008 are not probative of the conspiracy. *See* MTD at 13-14. But as courts have recognized in similar circumstances, evidence that some Defendants commenced their supply cuts in 2008 is consistent with and supports Plaintiffs' allegations that the conspiracy began in *at least 2009. Compare* DPP ¶¶ 124, 128, 130; CIP ¶¶ 128, 132, 134; *with Broiler Chicken*, 290

- 16 -

F. Supp. 3d at 782 (recognizing production cuts that began in 2007 are probative of a conspiracy that was alleged to have commenced in *at least 2008*). Thus, there is nothing contradictory between the initiation of supply cuts by some Defendants in 2008 and a conspiracy period that begins in *at least* 2009. In light of the directly relevant timing of the 2008 supply cuts to the alleged start of the class period, they are probative of conspiratorial conduct.

> ### 2.    Defendants' attempt to reinterpret the alleged Pork conspiracy is not permitted and contradicts the law.

As Plaintiffs' Complaints make clear and the Court has recognized, the Defendants are comprised of Pork integrators, who are the largest producers of Pork products in the United States. *See, e.g.*, DPP ¶¶ 1-7, 67-95; CIP ¶¶ 1-7, 71-99; *see also* Order at 4-5, 18-19 (discussing market conditions in the *Pork industry* as a plus factor which supports the plausibility of the alleged conspiracy). The Defendants have achieved a level of concentration and control over the production of Pork which made the market susceptible to collusion, and allowed them to implement their anticompetitive scheme. *See* DPP ¶¶ 82-95; IPP ¶¶175-190; CIP ¶¶ 86-99 (detailing market concentration, barriers to entry, market stability and other economic factors making the Pork market susceptible to collusion); *see also* Order at 4-5, 18-19.

Based on their control over the production of Pork, the Defendants had multiple means at their disposal to reduce Pork supply, including reductions in the production of sows and hogs, capacity reductions and minimization, sales volume reductions, and exports out of the United States. *See* DPP ¶¶ 67-80; CIP ¶¶ 71-84; *see also* DPP ¶ 81;

CIP ¶ 85 ("Each of the Defendants further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports.").

In light of these allegations, Defendants' arguments that parallel conduct does not exist do not withstand scrutiny. *First*, Defendants attempt to recharacterize the alleged conspiracy to one that is exclusively related to the supply of hogs. *See* MTD at 15. Defendants' attempt to recast and recharacterize the conspiracy is impermissible and should once against be rejected by the Court. *See* DPP ¶¶ 1-7; IPP ¶ 6; CIP ¶¶ 1-7 (alleging a conspiracy to fix the supply of Pork among Agri-Stats and Pork integrator defendants); Order at. 3 ("Each class has filed a separate, consolidated complaint alleging that the Defendants conspired with one another to increase the price of *pork products*.") (Emphasis added.); Order at 19 (recognizing that Plaintiffs' conspiracy allegations relate to restrictions on the "production of pork").

*Second*, Defendants' argument that Plaintiffs have not sufficiently alleged parallel conduct because Defendants did not utilize identical means to reduce pork supply is without merit and has been expressly rejected by multiple courts. *Compare* MTD at 16, *with Broiler Chicken*, 290 F. Supp. 3d at 792 ("It is more than plausible that conspirators would leave the precise means of cutting production up to each conspirator."); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010) ("[I]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period.") (ellipsis in original); *Domestic Airline*, 221 F.Supp.3d at 69 ("Plaintiffs do not need to demonstrate that

Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct.").

*Third*, Defendants' argument that Plaintiffs have not sufficiently alleged parallel conduct because Defendants did not all make the same volume of cuts is without merit. *Compare* MTD at 16, *with Kleen*, 775 F.Supp.2d at 1077, n.8 ("Variations in the size of capacity reductions do not disprove the existence of a conspiracy[.]"); *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940 (RWR), 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms."); *see also* Section III.B, *supra* (listing additional authority). In this case it is perfectly plausible that the largest pork producer, Smithfield, made the largest supply cuts, which were pursuant to Defendants' anticompetitive agreement, and that those cuts then were followed and supported by the rest of the industry through their own respective supply restraints.

*Fourth*, Defendants' claim that Plaintiffs have not alleged parallel conduct because not all Defendants participated in each instance of parallel supply reductions is a misstatement and misapplication of the law. *Currency Conversion*, 264 F.R.D. at 114 ("[I]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period.") (ellipsis in original); *Interest Rate Swaps*, 261 F. Supp. 3d at 479 ("Unanimity of action . . . is not required. . . . And at the pleading stage, before discovery, the failure to allege that a given defendant engaged in a given practice may simply reflect that plaintiffs' information is as-yet incomplete."). As set forth above, the Amended Complaints sufficiently allege each

Defendant's involvement in the conspiracy. *See generally* Plaintiffs' Omnibus Opposition to Defendants' Individual Motions to Dismiss, concurrently filed herewith. The law does not require identical engagement of each defendant to plead parallel conduct.

*Fifth*, Defendants' claims that sales volume reductions and increased exports are not probative of supply cuts are unsupported by the law and the facts. The term "sales volume" relates to "the quantity or number of products sold or services provided by a company in a particular period of time." *See* Cambridge Business English Dictionary, Cambridge University Press (2020). This is of course distinguishable from sales revenue or margins, which increased during the class period as a result of production decreases. Thus, a reduction in the *volume* of Pork products is probative and indicative of a reduction of *supply* of Pork. *See* DPP ¶¶ 126, 128, 129; CIP ¶¶ 130, 132, 133. Similarly, courts have recognized that increased exports have the effect of reducing the supply of products available in the United States. *Broiler Chicken*, 290 F.Supp. 3d at 804 (citing export increases as a prong supporting parallel conduct); *see also* Order at 19 n.8 (recognizing that decreases in the production of pork and export increases may establish parallel conduct).[10]

---

[10]  Defendants' reliance on *Musical Instruments*, 798 F.3d at 1193-94, in support of their attack on parallel conduct, is unconvincing given that the court in *Musical Instruments* found parallel conduct was sufficiently pled but not supported by sufficient plus factors. In this case, the Court has already held that plus factors were sufficiently pled.

**3.    Defendants' "year-by-year" recharacterization of their parallel conduct is improper and unconvincing.**

The Supreme Court has long held that "it is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227. Nevertheless, in support of their motion to dismiss, the Defendants include their own year by year dismemberment of the conspiracy, which they claim demonstrates a lack of parallel conduct. *See* MTD at 19-24. Defendants ask the Court to completely ignore evidence of production cuts simply because they are not identical. *See id.* at 20-23 Defendants ignore evidence of pork production cuts, because they improperly re-characterize Plaintiffs' Complaints as alleging a hog conspiracy, instead of the pork conspiracy that was actually alleged. *See id.* at 20-22. Defendants demand that the Court accept their explanations for supply restrictions that did occur, rather than draw plausible inferences for Plaintiffs – as the Court must at the pleading stage. *Id.* at 23.

In essence, Defendants insist that parallel conduct can only exist if they acted at the same exact time; reduced supply in the same exact amounts; and utilized the same exact methods. *See* MTD at 20-23. Unsurprisingly, Defendants cite to no legal authority in support of their self-created heightened pleading standard because there is none. *See SD3,* 801 F.3d at 429 (Rejecting the argument that parallel conduct requires that, "defendants move in relative lockstep, achieving their common anticompetitive ends (exclusion) only by substantially identical means. [Because] [s]o far as we can tell, this

- 21 -

standard finds no support in any existing authority."); *see also* Section III.A, *supra* (articulating the proper standard for parallel conduct).

### 4.    Defendants' attempt to explain away the supply cuts reported in the Pork Powerhouses survey is without merit.

Defendants also claim that the conspiracy can be disproven based on their own analysis of the *Pork Powerhouses* survey which is cited in the Plaintiffs' Complaints. Defendants' arguments fail for numerous reasons. First, while the *Pork Powerhouses* survey is cited in the Complaints, it is not "embraced by the pleadings" and thus Defendants' argument constitutes an improper reliance on outside materials. *See Zean v. Fairview Health Servs.*, 149 F.Supp.3d 1129, 1133 (D. Minn. 2016) ("When considering a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials outside the pleadings."). As the court recognized in *Domestic Airline*, 221 F. Supp. 3d at 71-72, Defendants' attempted reliance upon external evidence is improper:

> In essence, Defendants ask the Court to consider all the facts in the Complaint and the underlying documents provided as exhibits to their briefing and make factual determinations after weighing and considering the facts relied upon by each party. This is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true.

While courts recognize certain limited exceptions to the general rule via the incorporation by reference and judicial notice doctrine, Defendants have not and cannot satisfy their criteria. The incorporation-by-reference doctrine allows a defendant to rely upon documents cited in a complaint only if: (1) the documents are "the sole basis" for the plaintiff's claim; and (2) the documents provided by the defendant are undisputed.

- 22 -

*See* Fed. R. Civ. P. 10(c); *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687-89

(8th Cir. 2003) (excluding documents on a motion to dismiss because the documents

were "neither undisputed nor the sole basis for [plaintiff's] complaint"). By no means is

the *Pork Powerhouses* survey the sole basis for Plaintiffs' claims; it is cited only a

handful of times, and is just one of the dozens of sources relied upon in the Amended

Complaints. *See Domestic Airline*, 221 F. Supp. 3d at 70-71 (refusing to incorporate by

reference articles, industry reports, transcripts from earning calls, and SEC filings cited

within the complaint); *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985)

("[L]imited quotation does not constitute incorporation by reference.").

      The doctrine of judicial notice is limited to facts that are not subject to reasonable

dispute because it is generally known within the trial court's territorial jurisdiction, or can

be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned. Fed. R. Evid. 201(b); *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 797

(8th Cir. 2009) ("Caution must . . . be taken to avoid admitting evidence, through the use

of judicial notice, in contravention of the relevancy, foundation, and hearsay rules.").

This is because the effect of judicially noticing a fact is to preclude the opposing party

from introducing contrary evidence and essentially directing a verdict against him as to

the fact noticed. *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994). In this case,

since the *Pork Powerhouse* survey is based on unaudited information provided by the

Defendants and their affiliates, it cannot be subjected to judicial notice. Moreover, it is

plausible that it does not reflect all sow reductions by Defendants during the class period.

Moreover, the *Pork Powerhouses* survey demonstrates that Defendants engaged in parallel sow reductions. For example, in 2009 the survey states that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers." DPP ¶ 121; CIP ¶ 125 (citing Freese, Betsy, Pork Powerhouses 2009: *Big Boys Cut Back* (Sep. 14, 2009)). Thus, Defendants' attempt to ignore these cuts by claiming that the only "significant" cuts were by Smithfield, is simply a variation of the impermissible argument that parallel cuts must be uniform and identical.

In any case, the *Pork Powerhouses* survey is just one publicly available source which attempts to measure the number of sows produced, which is just one estimate of Pork production. As set forth above, the Defendants had multiple methods to reduce Pork supply at their disposal and were not limited to sow reductions. Moreover, since the *Pork Powerhouse* survey is based on unaudited information provided by the Defendants and their affiliates, it is plausible that it does not reflect all sow reductions by Defendants during the class period.

## IV.   DEFENDANTS' "OTHER INDEPENDENT GROUNDS" DO NOT SUPPORT DISMISSAL

Defendants' other grounds for dismissal fail for the reasons set forth below.

### A.   Defendants' arguments regarding vertical integration misrepresent the law and Plaintiffs' allegations.

Defendants' claims that the Amended Complaints are not plausible because the Pork integrator Defendants are not vertically integrated misrepresent the law and the facts. Defendants' vertical integration argument is based on a false premise and

- 24 -

misrepresentation, that Plaintiffs have alleged a conspiracy to "reduce hog supply" and thus it is vital that Defendants "owned hogs" in order to effectuate the conspiracy. MTD at 26-28. But the ownership of one's own hogs is not required in order to allege a horizontal conspiracy to fix Pork prices or Defendants' participation therein.

As set forth in Section III.A above, Plaintiffs have alleged a conspiracy by the leading producers of Pork in the United States to fix the prices of Pork, which was executed via numerous means. *See also* Order at 3, 19.

As detailed in the Amended Complaints, controlling Pork supply can be implemented through multiple means including hog production, pork production contracts, and pork integration. DPP ¶ 81; CIP ¶ 85 ("Each of the Defendants further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports. Defendants including Smithfield, Clemens, Tyson, Hormel, Indiana Packers, Seaboard, Triumph, and JBS sell packaged pork under various name brands."). None of the Defendants dispute that they had the ability to reduce or constrain the supply of Pork. Nor could they do so since it is clear that they dominated the sale of pork products in the United States, controlling over 80% of the market. *See* DPP ¶¶ 82-95; IPP ¶¶ 145-154; CIP ¶¶ 86-99. Thus, the ownership of one's own hogs is not required in order to allege a horizontal conspiracy to fix Pork prices or Defendants' participation therein.

Second, the Amended Complaints contain sufficient allegations demonstrating that Defendants were vertically integrated. As Defendants concede, Smithfield, Seaboard and Triumph are vertically integrated and have direct substantial control over their hog

- 25 -

production. *See* MTD at 27. Plaintiffs' allegations that Clemens and Indiana Packers are

vertically integrated are based on direct quotations and representations on their

websites.[11] Clemens's and Indiana Packers' attempt now to walk back their own

representations in an attempt to dismiss this lawsuit is thoroughly unconvincing.

Defendants further concede that JBS gained direct control over hog production through

the acquisition of its predecessor in interest Cargill in 2015. Tyson also concedes that it

raises hogs, but weakly asserts that this production is not "significant." Finally, Hormel

has the ability to exert control over its suppliers using long-term contracts. These

allegations are all consistent with and support the plausibility of the alleged conspiracy.

**B.      Supply increases during certain years do not establish that an antitrust
         conspiracy is implausible.**

Defendants' argument that a conspiracy is implausible because overall production

increased during the class period is a red herring. As this Court has recognized, "the

industry-wide data certainly shows that pork production decreased in various years after

---

[11] *See* DPP ¶ 75; CIP ¶ 79 (Clemens stated that "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers." A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.'") (quoting Clemens Food Group website at http://www.clemensfoodgroup.com/our-company/vertically-coordinated) (emphasis added) (last viewed on Feb. 21, 2020); DPP ¶ 79; CIP ¶ 83 ("Indiana Packers states on its website, 'We're a fully integrated pork company operating entirely within the heart of the Midwest, so our team members can better partner with our surrounding farm neighbors to produce the freshest, highest-quality products.' 'With our Midwest family-farm sourcing, pork-exclusive expertise and vertically integrated operation, it's no wonder customers from all sectors of the food industry trust Indiana Packers to be their primary pork supplier.'") (quoting Indiana Packers Corporation website at https://indianapackerscorp.com/ (last viewed on Feb. 21, 2020).

- 26 -

2009." *See* Order at 19-20. The Complaints further establish that these production restraints were historic and unprecedented, which supports the plausibility of the conspiracy. *See* DPP ¶ 121; CIP ¶ 125 ("[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers"); IPP ¶ 98 (showing production increases from 2000-2008, with production decreases in 2009, 2010, and 2013).

The *Broiler Chicken* court rejected precisely this argument, *i.e.*, that overall production increases establish implausibility:

> This argument might carry weight if Plaintiffs had alleged that Defendants conspired to decrease overall production in absolute numbers. Plaintiffs, however, base their claims on allegations that overall production increases were not in line with what had been the Broiler industry's historic annual 3% production increase.

*Broiler Chicken*, 290 F. Supp. 3d at 792.

The same is true in this case. Plaintiffs' theory of liability and factual allegations are thus consistent with the applicable case law which holds that supply restrictions can be achieved by reducing the pace of supply increases or otherwise keeping supply less than demand. *Id.*; *see also* ABA Model Jury Instructions in Antitrust Cases, § 2(C)(4) (2016 Ed.) ("The Sherman Act prohibits agreements between competitors or potential competitors that limit how much of a product one or more of them will produce."). Plaintiffs' theory of liability is also in accord with accepted methods of calculating damages in antitrust litigation. *McCleneghan v. Union Stock Yards of Omaha*, 349 F.2d

53, 59 (8th Cir. 1965) (determining damages based on periods before, during, and after conspiracy).

**C.     Defendants' participation in Agri Stats supports Plaintiffs' allegations that they participated in the conspiracy.**

Simply put, there is nothing about Defendants' participation and exchange of competitively sensitive information through Agri Stats which undermines the existence or plausibility of the conspiracy. As more fully set forth in Section V.B *infra*, Defendants' participation in Agri-Stats allowed them to exchange highly sensitive proprietary information regarding competitors, including their production, profits and sales of Pork. Agri Stats described the "ultimate goal" of this participation as "***increasing profitability—not always increasing the level of production***." DPP ¶ 42; IIP ¶ 72; CIP ¶ 46 (emphasis added). Through their participation in Agri Stats, Defendants shared competitively sensitive information with each other, their direct competitors, and paid millions of dollars collectively in order to receive their competitors' proprietary information in return. DPP ¶ 4; IIP ¶¶ 2-6; CIP ¶ 4. As the Court has already recognized, the central role that Agri Stats is alleged to have played is a plus factor which supports the existence of the conspiracy. *See* Order at 18; *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (describing exchange of price information as "a practice, not illegal in itself, that facilitates price fixing"); *Broiler Chicken*, 290 F. Supp. 3d at 788 ("the extent of information sharing through Agri Stats is unusual, and plausibly amounts to a method of communication").

**D.      Defendants' alternative explanations do not establish the conspiracy is implausible.**

"Certain agreements, such as horizontal price fixing . . . are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984); *Propane I*, 860 F.3d at 1067 ("[H]orizontal restraint . . . is a *per se* antitrust violation."). In this case, Plaintiffs allege "[a] horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price [which] is, and ought to be, *per se* unlawful." *See Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007).[12] *Per se* violations of the Sherman Act are presumed to be unlawful, regardless of the motives behind the conspiracy. *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 557 (8th Cir. 1991) ("'[W]here businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation of the underlying conduct.'") (quoting *U.S. v. Gen. Motors Corp.*, 384 U.S. 127, 146 (1966)). "The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 351 (1982).

---

[12] *See also In re Potash Antitrust Litig.*, 159 F.R.D. 682, 694 (D. Minn. 1995) ("Price-fixing is illegal *per se* under the Sherman Act."); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal *per se*.").

Thus, the only thing that Plaintiffs need to allege to sustain their *per se* price fixing claims is that Defendants acted collectively in raising, fixing, or stabilizing the price of pork. "[N]o consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual effect on competition." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003); *see also N. Texas Specialty Physicians v. Fed. Trade Comm'n*, 528 F.3d 346, 360 (5th Cir. 2008) ("Procompetitive justifications will not be considered if a practice, such as price-fixing, is a *per se* violation.").

Moreover, plausibility "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016), *cert. denied*, 137 S.Ct. 814 (Jan. 17, 2017). But the "choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.* at 781. "That would be equivalent to impos[ing] a probability requirement at the pleading stage, which *Twombly* expressly does not do." *Broiler Chicken*, 290 F. Supp. 3d at 801 (alteration in original).

Viewed in light of these standards, it is clear that Defendants' alternative explanations do not render the Amended Complaints implausible and do not support dismissal.

<u>Economic Pressures</u>: Defendants' claim that they acted in response to economic pressures such as the Great Recession or a period of rising input costs is no defense to a

*per se* antitrust violation. *Maricopa Cty.*, 457 U.S. at 351; *Specialty Physicians*, 528 F.3d at 360; *Cardizem*, 332 F.3d at 906. As the court recognized in *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 869-70 (N.D. Ill. 2010), it is plausible that "producers could have colluded to reduce output and stabilize [product] prices precisely to salvage profit—indeed, stay in business—in a dire economic climate" such as the Great Recession or rising feed prices. *Id.* However, because horizontal conspiracies are *per se* violations of the Sherman Act, "an unforgiving market offers no excuse for violating antitrust laws." *Id.* at 870; *see also In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2018 WL 5003450, at *27 (E.D. Pa. Oct. 16, 2018) ("Defendants may show they had legitimate economic reasons for their pricing decisions" but "Plaintiffs are not required to rebut those reasons in order to withstand dismissal.").

Defendants' claim does not hold water in any event. The Great Recession does not explain why Defendants' production levels remained depressed below the historical trajectory, even when the U.S. economy was no longer in recession and consumer demand was rising. DPP ¶¶ 153-156, 164-171; CIP ¶¶ 157-160, 168-175. Nor does it explain why production fell in absolute terms in 2013. *See Kleen*, 775 F. Supp. 2d at 1079 (finding a plausible conspiracy where plaintiffs alleged "capacity reductions, at least in large part, took place when the industry foresaw rising demand"); *Broiler Chicken*, 290 F. Supp. 3d at 802 (rejecting defendants' "alternative explanation" that production cuts were due to the Great Recession).

Finally, as to rising feed costs, Defendants' revenues increased beginning in 2009 ***even taking into account Defendant-specific costs***. DPP ¶¶ 168-170; IPP ¶¶ 129-130;

CIP ¶¶ 172-174. For two of the largest Defendants, Smithfield and Tyson, Plaintiffs' experts examined the spread between pork revenue and pork-related costs (costs of goods sold plus operating costs). *Id.* This analysis confirmed the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the class period in 2009. *Id.* So as an empirical matter, the rising cost of corn feed does not explain the dramatic and sustained price increases seen during the class period.

Swine Diseases: As to swine diseases, Plaintiffs have already taken them into account with regard to their analysis of production decreases in 2014. *See* DPP ¶ 164; CIP ¶ 168. Defendants improperly rely on extrinsic evidence to claim there was swine flu in 2009, which should not be considered at the pleading stage. *See* MTD at 32. But Defendants acknowledge it affected only one producer and make no attempt to quantify its effect. Defendants also improperly rely on extrinsic evidence to factually dispute the timing of a porcine virus that the Amended Complaints acknowledge affected production in 2013. In truth, swine diseases do not explain the supply restraints alleged in this case and cannot be relied upon to dismiss the Amended Complaints.

Export Increases: Finally, Defendants' argument that export increases can be explained by "increased global demand" completely misses the point and actually supports the existence of the conspiracy. Plaintiffs do not dispute that demand increased during the class period. In fact, this rise in demand supports Plaintiffs' allegation that Defendants restricted and restrained supply, even if there were increases in total production during the class period. *See* Section III.A, *supra*. Moreover, Defendants do not dispute that their increased focus on exports had the effect of reducing the supply of

- 32 -

pork in the United States, which allowed them to achieve conspiratorial objectives while overall demand and production increased.

## V. DEFENDANTS' ATTEMPT TO UNDERMINE THE EXISTENCE OF PLUS FACTORS IS UNPERSUASIVE

Plus factors are factual context that raise a "suggestion of a preceding agreement" *Twombly*, 550 U.S. at 557. This Court already recognized that the "plus factors identified and discussed by Plaintiff[s] are undoubtedly strong and are of the type often used to support an inference of an agreement." *See* Order at 18. Plaintiffs' Amended Complaints set forth in even greater detail numerous plus factors that courts recognize as supporting an inference of an agreement, including most significantly: (1) numerous characteristics of the market for Pork processing, which is exactly the type of highly concentrated, commodity market with inelastic demand and high barriers to entry that courts recognize as particularly likely to produce collusion; (2) information exchanges through Agri Stats and trade associations; (3) public signaling between competitors regarding future production plans; and (4) other plus factors already recognized by this court including actions against self-interest, membership in trade associations, and similar practices in the chicken industry. Taken together, these plus factors strongly support the plausibility of the alleged conspiracy. *Twombly*, 550 U.S. at 557; *SD3*, 801 F.3d at 424 (plus factors "must be evaluated holistically").

In its Order, this Court recognized that Plaintiffs demonstrated that the Pork industry features a number of the hallmarks of industries that are ripe for collusion, including:

- 33 -

> constricted nature of the industry, the inelasticity of pork
> demand, trade associations attended by the Defendants,
> actions taken by some of the Defendants' against their own
> self-interests, pricing practices, and the fact that some of these
> Defendants engaged in similar practices in the chicken
> industry.

Order at 18.

Defendants' attempts to overcome these plus factors should once again be denied

by the Court.

## A.   The pork market is exactly the type of highly concentrated, commodity market that courts recognize as conducive to collusion.

As Judge Posner explained, industry market structure is a plus factor when an

"industry structure that facilitates collusion constitutes supporting evidence of collusion."

*Text Messaging*, 630 F.3d at 629. "Generally speaking, the possibility of anticompetitive

collusive practices is the most realistic in concentrated industries." *See Todd v. Exxon

Corp.*, 275 F.3d 191, 208 (2d Cir. 2001). Numerous courts have recognized that a market

structure that facilitates collusion constitutes a plus factor. *Domestic Airline*, 221 F. Supp.

3d at 61 (collecting cases that partially relied on market structure as a factor in evaluating

plausibility of conspiracy and stating that "this information is pertinent"); *In re Static

Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902-03 (N.D. Cal.

2008) ("homogenous product" and "high manufacturing and technological barriers" were

"sufficient to support an inference" that the market is "one in which exchanging price

information can lead to 'interference with the setting of price by free market forces'").

Here, the Pork industry is highly concentrated. DPP ¶¶ 82-92; IPP ¶¶ 145-154;

CIP ¶¶ 86-96. Moreover, throughout the entire class period, Defendants collectively held

- 34 -

over an 80% market share. DPP ¶ 92; IPP ¶ 146; CIP ¶ 96. Courts recognize that high levels of market concentration, featuring comparable levels of market share, constitute a plus factor. *See, e.g., Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010) (finding defendants' combined 80% market share a persuasive plus factor).

Courts further recognize that industry features like "barriers to entry, . . . inelastic demand and commodity-like products" provide "some additional contextual support for the plausibility of a conspiracy." *Kleen*, 775 F. Supp. 2d at 1081. Here, Plaintiffs have provided detailed factual allegations, supported by economic analysis, that the Pork market features numerous characteristics that courts recognize as conducive to collusion. *First*, "[c]ommodity industries are particularly susceptible to agreements that violate antitrust laws." *Broiler Chicken*, 290 F. Supp. 3d at 780. Pork is a commodity product. DPP ¶ 172; CIP ¶ 176. *Second*, product homogeneity and inelastic demand are characteristics conductive to anticompetitive coordination. *United States v. Alcoa, Inc.*, No. CIV. A.2000-954 RMU, 2001 WL 1335698, at *12 (D.D.C. June 21, 2001). Pork is a homogenous product, as pork from one producer is readily substitutable for pork from another producer. DPP ¶¶ 96-97; IPP ¶¶ 184-89; CIP ¶¶ 100-101. Conversely, demand for pork is relatively inelastic; as Smithfield recognized in a December 2013 earnings call, "the consumer tends to be willing to pay proportionately higher values for their pork meat when *small* increments of supply are withdrawn from the marketplace." DPP ¶ 158; CIP ¶ 162. *Third*, markets with high barriers to entry further support the plausibility of a conspiracy. *See In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538, 551 (M.D. Pa. 2009) (describing as "material" the allegation of high barriers to entry). The

pork market features significant barriers to entry. The construction of a new pork processing plant costs tens of millions of dollars. DPP ¶ 94; IPP ¶ 155; CIP ¶ 98.

In response, Defendants rely on a handful of distinguishable cases. MTD at 37. *First*, *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir. 2003), is a case decided at summary judgment, not on a motion to dismiss, and thus it applies a different standard. *Second*, *Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.* 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018), states that "industry structure alone cannot get the complaint across the finish line." But, of course, plus factors are not weighed in isolation and the plausibility of Plaintiffs' case is not based on industry structure alone. Here, Plaintiffs have alleged numerous other plus factors including information exchanges and public statements that were not present in that case. *Third*, the same judge that held in *In re Late Fee & Over-Limit Fee Litigation*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) that allegations about market concentration do "not render the asserted conspiracy plausible" subsequently held in *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1145 (N.D. Cal. 2009) that allegations of "high market concentration can appropriately be relied upon as a factor to suggest price collusion" when plaintiffs have also alleged "the existence of multiple and on-going business relationships, cross-licensing and joint venture agreements, high barriers to entry, and homogeneity in products." *Id*. Plaintiffs have alleged many of the same factors here, and thus the pork processing market structure is further supporting evidence of collusion.

**B.    Defendants' unprecedented information exchanges through Agri Stats that allowed them to closely monitor each other's production and sales supports the plausibility of Plaintiffs' claims.**

"Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd*, 275 F.3d at 198 (discussing how information exchange can constitute either a plus factor, or an agreement to exchange information can be anticompetitive under a rule of reason analysis). In its Order, the Court recognized that Plaintiffs' allegations regarding Agri Stats constitute a "plus factor" supporting the existence of a per se price fixing conspiracy just as it did in *Broiler Chicken*, 290 F. Supp. 3d at 772.[13]

In *Broiler Chicken*, the court specifically recognized that the largely identical forms of information exchange through Agri Stats (there for chickens, here for pork) constituted a plus factor that supported an inference of a price-fixing agreement. *Broiler Chicken*, 290 F. Supp. 3d at 781. The court held that "the extent of information sharing through Agri Stats is unusual, and plausibly amounts to a method of communication." *Id.* at 788. The court emphasized that plaintiffs had plausibly alleged that "the information provided by Agri Stats . . . facilitated the conspiracy." *Id.* at 800. In *Haff Poultry v. Tyson*, a second court also held that information exchange through Agri Stats was a "facilitating practice" that was sufficient for plaintiffs allegations of a scheme to suppress

---

[13] The Court further indicated that Defendants' participation in Agri Stats could constitute an independent antitrust violation to be analyzed pursuant to the rule of reason. Order at 18 n.7. As set forth in Section VI below, the IPPs have asserted such a violation pursuant to the rule of reason.

- 37 -

broiler grower compensation to survive the motion to dismiss. Scarlett Decl.,[14] Ex. A at 32.[15]

In response, Defendants assert that Plaintiffs have made conclusory allegations regarding Defendants' use of Agri Stats. MTD at 39. But Plaintiffs have provided substantial, detailed allegations that set forth in significant detail exactly how the unusual information exchange through Agri Stats facilitated the conspiracy. *See, e.g.*, IPP ¶¶ 17-90. *First*, Agri Stats reports were only available to Defendants, not other market participants, and access to the reports was conditioned on reciprocity – Defendants had to give data to get data. IPP ¶¶ 81-82, DPP ¶ 4, CIP ¶ 4; *cf. Todd*, 275 F.3d at 213 (a court is "more likely to approve a data exchange where the information is made public"). *Second*, Agri Stats reports contained current data, often only two weeks old, that was reported on a granular level, breaking out Defendants' costs and profits on a cut-by-cut of meat basis. IPP ¶¶ 19-57; *see Todd*, 275 F.3d at 212 (information exchanges that "identify particular parties, transactions, and prices are seen as potentially anticompetitive because they may be used to police a secret or tacit conspiracy to stabilize prices"). The Amended Complaints now set forth even more detail from the Agri Stats reports that show how the reports provided detailed, granular information regarding Defendants' production and prices. IPP ¶¶ 17-90. For example, Agri Stats provided Defendants with a sales data

---

[14] "Scarlett Decl." refers to the Declaration of Shana E. Scarlett in Support of Plaintiffs' Opposition to Motion to Dismiss, concurrently filed herewith. All "Ex.__" references are to the Scarlett Decl., unless otherwise noted.

[15] Transcript of Proceedings, *Haff Poultry, Inc., et al. v. Tyson Foods, Inc.*, No. Civ-17-33-RJNS (E.D. Okla. Jan. 6, 2020).

miner tool that allowed them access to near-contemporaneous data on the national net

price of particular products, the variance between the national net price and their price,

and the economic impact of that variation. IPP ¶¶ 33-35. Agri Stats provided a monthly

operations profit report that provided very detailed data on each Defendant's costs,

profits, margins, and yields. IPP ¶¶ 45-48. Agri Stats provided a processing report that

provided monthly data on each Defendant's costs, including key items like labor,

material, and supplies. IPP ¶¶ 54-57.

Defendants' primary response is to argue that Agri Stats reports did not provide

forward-looking information on hog production because hog supply increased over the

class period. MTD at 39. This is a complete *non sequitur* for two reasons. *First*, that pork

production increased over the entire class period says nothing about how much pork

production would have increased absent Defendants' anticompetitive conduct, including

the use of Agri Stats as a facilitating practice. *Second*, hog production increases reveal

nothing about whether Agri Stats reports contributed to an anticompetitive effect. *See*

*United States v. Container Corp. of Am.*, 393 U.S. 333, 336-37 (1969) (information

exchanges anticompetitive even during period of falling prices because they contributed

to stabilized prices). Instead, the anticompetitive content of Agri Stats reports is shown

by the excerpts from Agri Stats reports that Plaintiffs have included in their Amended

Complaints that contain current, private information about the Defendants' prices, costs,

and profits. IPP ¶¶ 33-35, 45-48, 54-57.

Defendants also make the bald-faced assertion that the plus factors are largely

consistent with unilateral conduct. MTD at 35. But of course, Defendants' use of Agri

- 39 -

Stats is completely inconsistent with unilateral conduct because it is a coordinated exchange of information between each and every one of the processing Defendants. Agri Stats reports, on their first page, clearly identify which companies are providing information to Agri Stats, meaning that each Defendant knew that it was engaging in a multilateral information exchange through Agri Stats with their direct competitors. IPP ¶¶ 23, 53.

**C.      Defendants publicly encouraged each other to cut production.**

Public signaling, such as the "broadcasting of sensitive business information, plans or strategies," is a widely recognized plus factor. *Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, No. 16-cv-0069 (CEJ), 2016 WL 4446801, at *4 (E.D. Mo. Aug. 24, 2016). In particular, "discussion of the need for capacity discipline within the industry as a whole is notable because it involves more than a mere announcement of Defendant's own planned course of conduct." *Domestic Airline*, 221 F. Supp. 3d at 62-63. Therefore, "one participant expressly invit[ing] common action by the other" can show collusion. *See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224 (3rd Cir. 1993); *see also* Order at 21 (recognizing that such public statements are often considered as plus factors) (citing *Plasma-Derivative*, 764 F. Supp. 2d at 1001; *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1374 (N.D. Ga. 2017).

Defendants engaged in exactly this kind of signaling to each other during the conspiracy. Most notably, Smithfield's CEO publicly signaled in June 2009 after Smithfield cut its hog supply by 3% that those cuts were "not enough to fix the industry"

- 40 -

and that "somebody else has got to do something." DPP ¶ 140; IPP ¶ 107; CIP ¶ 144. Here, the specific comments by Smithfield's CEO represented a direct encouragement to Smithfield's competitors to engage in future action to cut production, and go far further than simply addressing observed economic conditions. *See, e.g.*, *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 840 (N.D. Ill. 2017) ("Of course, if Defendants had crossed the line into encouraging their competitors to exercise discipline, then their talk would become actionable conduct (or at least indicate that a conspiracy was afoot."). Even Defendants' own cited authority recognizes that this exact kind of public signaling statement that encourages competitors to behave in a specific, coordinated fashion is a plus factor. *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 919 (N.D. Cal. 2019) (there is a "meaningful" difference between a company's simple *observation* of competitors' current behavior and "circumstances where defendants have called upon their competitors to 'exercise' discipline and therefore invited them to behave in a certain way").

Moreover, Smithfield's invitation to the industry to cut production was followed by the "responsive assurances and conduct" that courts recognize supports an inference of a "conspiracy to fix prices." *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. Aug. 25, 2008). These acts by the other co-conspirators came in the form of action, as well as reciprocal public statements which reinforced the conspiracy. Namely, as set forth above in Section III.A, numerous co-conspirators cut their production in 2009 including Tyson, Triumph, and Hormel. *See* DPP ¶¶ 134-146; CIP ¶¶ 138-150. In 2009, Tyson also made public comments confirming the expectation that the industry would see supply cuts in 2009 and 2010. DPP ¶¶ 142-43; CIP ¶¶ 146-47.

The signals of reciprocal conduct were received by Smithfield's CEO, who confirmed in December of 2009 that Smithfield had engaged in its fair share of supply cuts and was aware of other producers "cutting back besides ourselves." DPP ¶¶ 146, 151; CIP ¶¶ 150, 155.

Defendants continued to publicly signal each other in 2011 and 2012 that they did not intend to increase production levels as the pork market demonstrated healthy returns. *See* DPP ¶ 153; CIP ¶ 157 (Tyson); ¶¶ 154, 155; CIP ¶¶ 158, 159 (Smithfield). In 2013, Smithfield implicitly encouraged industry wide reductions in supply, stating that "the industry move prices up and collectively as a group. We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace." DPP ¶ 158; CIP ¶ 162.

These statements reveal a pattern and practice of publicly encouraging supply restrictions—whether it be outright supply cuts or limitations on the pace of supply increases. Collectively, the "specific content of statements made in public by Defendants' executives which endorsed an industry strategy to reduce the output" of pork supports an inference of conspiracy. *Standard Iron Works v. Arcelormittal*, 639 F. Supp. 2d 877, 897 (N.D. Ill. 2009).

## D.   Plaintiffs allege other recognized plus factors.

First, Plaintiffs have provided numerous factual allegations documenting that Defendants' high-level executives regularly attended trade association meetings where they discussed pricing and industry capacity. DPP ¶¶ 98-118; CIP ¶¶ 102-122. Taken

together with Plaintiffs' other plus factors, these opportunities to communicate through trade associations further support an inference of conspiracy. *Grasso Enters., LLC v. Express Scripts, Inc.*, No. 4:14-CV-1932 HEA, 2017 WL 365434, at *4 (E.D. Mo. Jan. 25, 2017) ("'Membership and participation in a trade group facilitates collusion' and provides opportunities to conspire.").

Second, some Defendants engaged in a similar supply reduction and price-fixing conspiracy in the broiler market facilitated by the use of Agri Stats. IPP, ¶¶ 163-164. Defendants' anticompetitive conduct in adjacent markets—that is, "markets not directly involved in the claims"—supports a reasonable inference of anticompetitive conduct in *this* market.[16]

Third, Defendants took actions that were against their independent economic self-interest including: (1) Smithfield choosing not to build a new plant or take steps to increase capacity in 2011 despite increasing margins;[17] (2) Clemens refusing to take advantage of the impact of the PEDv epidemic on other producers by increasing its own capacity and gaining market share;[18] and (3) Seaboard and Triumph canceling their previously announced second-shift expansion of their joint venture.[19] Actions that "would

---

[16] *Packaged Ice*, 723 F. Supp. 2d at 1009 (citing *Flash Memory*, 643 F. Supp. 2d at 1133; *SRAM*, 580 F. Supp. 2d at 896); *see also In re Auto. Parts Antitrust Litig.* (*Occupant Safety Sys.*), 50 F. Supp. 3d 869, 882 (E.D. Mich. 2014) ("Here, the component parts in the MDL involve allegations of a similar scheme in each part, and thus, provide context as to how the . . . conspiracy operated.").

[17] IPP ¶ 121; DPP ¶ 124; CIP ¶ 128.

[18] DPP ¶ 131; CIP ¶ 135.

[19] DPP ¶ 129; CIP ¶ 133.

- 43 -

plausibly contravene each defendant's self-interest 'in the absence of similar behavior of rivals'" are a plus factor that, coupled with allegations of parallel conduct, can render a conspiracy plausible. *Starr*, 592 F.3d at 327.

## VI.   THE RULE OF REASON CLAIMS ALLEGED BY THE IPPS ARE SUFFICIENT

### A.   Plaintiffs sufficiently allege that Defendants entered into an anticompetitive information exchange agreement.

Under Supreme Court precedent, the "most prominent . . . factors" in "divining the procompetitive or anticompetitive effects of" information exchange are "the structure of the industry involved and the nature of the information exchanged." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

Here, both factors strongly support the anticompetitive nature of the information exchange. First, the pork market features a fungible product, inelastic demand, price-based competition, and relatively few sellers. These are exactly the market structure features that the Supreme Court recognized are particularly likely to make information exchanges anticompetitive. *Container Corp.*, 393 U.S. at 337.

Second, the Agri Stats reports include the regular private exchange of current pricing information among competitors. As the Supreme Court emphasized, "exchanges of current price information, ***of course***, have the greatest potential for generating anticompetitive effects and although not per se unlawful have consistently been held to violate the Sherman Act." *Gypsum*, 438 U.S. at 441 n.16. Based on this existing precedent, a court recently held that plaintiff chicken growers had plausibly alleged that

information exchange agreements between Agri Stats and chicken processors were anticompetitive under a rule of reason analysis. Ex. A at 48.

Revealingly, Defendants' brief never discusses – or even mentions – these two controlling Supreme Court cases. Defendants instead proffer their own factual findings, claiming that there is no evidence that Defendants used Agri Stats data to set prices or that the information exchange produced anticompetitive effects. These factual challenges fail. Plaintiffs have provided both extensive factual allegations to support a reasonable inference that Defendants used Agri Stats reports for price-setting and detailed econometric analysis that shows anticompetitive effects in the relevant market.

**B.    The market structure of the pork industry strongly supports the plausibility of anticompetitive effects from the alleged information exchange agreement.**

In *Container Corp.*, the Supreme Court held that the following market structure characteristics made exchange of pricing information likely to produce anticompetitive effects: (1) "the industry is dominated by relatively few sellers"; (2) "the product is fungible"; (3) "the competition for sales is price"; (4) "demand is inelastic"; and (5) "the exchange of price data tends toward price uniformity." *Container Corp.*, 393 U.S. at 337. Plaintiffs have provided substantial factual allegations showing that the pork market possesses each and every one of these characteristics.

First, the pork market is dominated by relatively few sellers. The eight Defendants who participated in Agri Stats reports compose approximately 80% of the total pork processing market. IPP ¶ 183. In *Container Corp*, the Supreme Court held that a market featured relatively few sellers when the 18 defendants composed 90% of the total

- 45 -

relevant market. *See Container Corp.*, 393 U.S. at 342. Indeed, while on the Second Circuit, then-Judge Sotomayor found "it unsurprising that data exchange cases may involve a number of participants that begins to push the boundaries of oligopoly. These players are most in need of such data exchange arrangements in order to facilitate price coordination; a very small handful of firms in a more highly concentrated market may be less likely to require the kind of sophisticated data dissemination alleged in this case." *See Todd*, at 275 F.3d at 209 (market structure supported rule of reason claim in case where 14 defendants controlled 80-90% of the defined market).

Second, pork is fungible, with pork from one manufacturer substitutable for pork from other manufacturers. IPP ¶¶ 184-185. The International Trade Commission specifically described pork as a fungible market. IPP ¶ 184. This aspect of the pork market is illustrated by the very structure of Agri Stats reports, which compare the prices, costs, and profits for particular types of pork products across manufacturers. *See, e.g.,* IPP ¶¶ 34, 186 (excerpt from economic impact sales report broken down by particular types of pork product). If pork products were not fungible, then there would be no reason for Agri Stats to collect and analyze Defendants' data on such a basis.. Indeed, Plaintiffs have provided substantial factual allegations showing Defendants closely analyzing the differences between their prices and that of their competitors based on the Agri Stats reports, a reflection of the fungible nature of pork. *See* IPP ¶¶ 35-40.

Third, the pork market features price-based competition. Internal documents from Agri Stats specifically discuss that purchasers in the pork market "look to purchase commodity items for the lowest price possible." IPP ¶ 187.

- 46 -

Fourth, demand for pork is inelastic. Plaintiffs included econometric analysis that calculated an inelastic price demand for pork. IPP ¶ 188. Furthermore, the Supreme Court emphasized that inelastic demand occurs in markets where, "buyers place orders only for immediate, short-run needs." *Container Corp.*, 393 U.S. at 337. Here, the perishable nature of pork ensures that buyers will only place orders for immediate, short-term needs, thus further establishing the inelastic demand of pork.

Fifth, the pork market features a trend toward price uniformity. The congressionally-established National Pork Board states that "U.S. pork production and pig prices vary in a predictable manner during the calendar year." IPP ¶ 189. Indeed, the very structure of the Agri Stats sales reports encourages this trend towards price uniformity as they calculate the additional profits Defendants could gain by raising their prices to match the national average or the top 25% highest prices. IPP ¶ 29.

Defendants' brief simply ignores the aspects of industry structure alleged in the IPP Complaint that make the information exchange through Agri Stats particularly likely to produce significant anticompetitive effects. But these features of the pork market must be considered at the motion to dismiss stage when evaluating the plausibility of the rule of reason claim. *See Todd*, 275 F.3d at 211 (finding market structure supported plausibility of rule of reason claim).

Indeed, these market characteristics were entirely missing in *Five Smiths*, a case that Defendants heavily rely upon, where the court dismissed plaintiffs' rule of reason claim because "the market structure of the National Football League does not have the characteristics required by *Container Corp.* and thus plaintiffs cannot allege the requisite

factors to establish a rule of reason violation based solely on the exchange of salary information." *Five Smiths Inc. v. Nat'l Football League Players Ass'n*, 788 F.Supp. 1042, 1054 (D. Minn. 1992).[20] Conversely, the market structure here strongly supports the plausibility of Plaintiffs' rule of reason claim.

## C.     The nature of the information exchanged supports the plausibility of anticompetitive effects from the agreement.

As the Supreme Court has repeatedly recognized, exchanges of current price information "have the greatest potential for generating anticompetitive effects and although not per se unlawful have consistently been held to violate the Sherman Act." *Gypsum*, 438 U.S. at 441 n.16 (collecting cases). The Supreme Court has long recognized the anticompetitive effects of price information exchange naturally stem from "the disposition of men 'to follow their most intelligent competitors,' especially when powerful" and "the inherent disposition to make all the money possible." *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 399 (1921). The Eight Circuit has also specifically recognized the potential anticompetitive effects of information exchanges regarding prices. *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1148 (8th Cir. 1979) (reversing grant of summary judgment for defendant who supervised price information exchange between defendants because it "remains an open question whether the price information exchange" had an anti-competitive effect).

---

[20] *Five Smiths* is further distinguished by the fact that plaintiffs in that case did not allege a relevant market, which is a necessary predicate for a rule of reason claim. *Five Smiths*, 788 F. Supp. at 1052. Here, Defendants do not dispute that Plaintiffs alleged a relevant market in which Defendants possess market power. IPP ¶¶ 175-177.

Agri Stats reports include the kinds of price information exchange that the Supreme Court recognizes as having the greatest potential for generating anticompetitive effects. Furthermore, the information exchange also contain numerous other characteristics that courts recognize as strengthening the likelihood of anticompetitive effects: the reports were never publicly disseminated, access was conditioned on reciprocity, and the reports contained disaggregated, easily deanonymized data.

1.     **The Agri Stats Reports constitute an exchange of current pricing information that courts consistently hold violates the Sherman Act.**

Plaintiffs have set forth detailed factual allegations that show Agri Stats sales reports contain current pricing information. Agri Stats introduced new weekly and monthly sales reports in early 2009 that allowed Defendants to more easily compare their prices. IPP ¶ 20. The new sales reporting function included a strengthened auditing function that would allow Agri Stats to improve the accuracy of the reports. *Id.* Agri Stats weekly sales reports contained data that was less than two weeks old. *Id.* The reports included pricing information on specific cuts of pork meat that compared Defendants' prices with that of the national average price and the average highest 25%. IPP ¶¶ 20-21. The Agri Stats reports specifically calculated for Defendants the additional revenues they could gain from raising their prices. IPP ¶¶ 22, 26. Agri Stats sales reports identified the exact Defendants participating in the report; the reports contained only a limited number of companies, thus making it easier for Defendants to deanonymize the reports. IPP ¶¶ 23-25. Agri Stats responded to inquiries from Defendants about which Defendants were participating in the Agri Stats sales reports. IPP ¶ 38. Agri Stats provided Defendant

processors with a sales data miner tool that provided granular sales data broken down by "category, group, product type, preparation, additive, size, and inner packaging." IPP ¶ 33. Defendants asked Agri Stats to structure the reports so that they easily identified pricing opportunities for Defendants. IPP ¶ 36. Defendants also asked Agri Stats for help in identifying opportunities to raise prices based off the reports. IPP ¶¶ 36-40.

In response, Defendants claim the pricing information was not useable and not current. Both arguments fail. First, Defendants claim that the fluctuations in commodity pork pricing mean that it "defies common sense and is simply implausible" that Defendants could use the pricing information in Agri Stats reports to raise prices. MTD at 50-51. But the weekly Agri Stats sales reports themselves specifically identified for Defendants exactly how much more revenue they could earn on specific products by raising their prices to match either the national average or the highest 25% average price. *E.g.,* IPP ¶¶ 29-30. Defendants never even try to explain why Agri Stats would repeatedly provide hundreds of such calculations on a weekly basis if it was simply implausible that Defendants could gain those profits by raising prices. Nor do Defendants explain why it defies common sense that Defendants could use Agri Stats pricing information because of commodity price fluctuations when Noel White, who subsequently became Tyson's CEO, specifically requested that Agri Stats clearly "indicate [pricing opportunities] with ease" in its reports. IPP ¶ 40. Thus, even though Defendants now retroactively claim otherwise, Defendants' actual business executives sensibly thought during the conspiracy that Agri Stats sales reports identified price-raising opportunities.

Defendants even take one page from a single Agri Stats report and claim that the fact that prices were not entirely uniform between Defendants on that single page shows that the Agri Stats information exchange did not create price uniformity. MTD at 47-48. Defendants' proffered unreasonable inferences are irrelevant at this stage of the litigation. And, in any case, as the Supreme Court made clear, the relevant question is not whether information exchanges lead to complete and utter price uniformity, but whether they lead to prices higher than what they would have been absent the conspiracy. *Container Corp.*, 393 U.S. at 336. Thus, the Supreme Court has held that regular exchanges of pricing information between competitors was anticompetitive, even in a market where prices steadily fell throughout the period of information exchange, because the exchanges promoted price stabilization. *See Container Corp.*, 393 U.S. at 336-337.

Second, Defendants make the creative claim that two week-old Agri Stats sales data does not qualify as current for purposes of a rule of reason information exchange claim. MTD at 44-45. But Defendants' own case law shows the speciousness of their novel argument. Defendants' only citation in support of their proffered definition of current is *Todd*, but in that very case, the "most prominent" type of information exchange was a survey of salary data that was distributed several times a year. *Todd*, 275 F.3d at 212. Here, by contrast, the massive reams of data that Agri Stats collected was distributed on a weekly and monthly basis, and thus contained significantly more current information than the data in *Todd* that supported an information exchange claim. *See, e.g.*, IPP ¶ 21 (weekly sales report distributed on March 5th contained sales data for week ending February 21st). Indeed, in *Haff Poultry* the court held that the regular exchange of data

through Agri Stats constituted the exchange of "detailed, confidential, nearly contemporaneous information" sufficient to sustain a rule of reason information exchange claim brought by chicken growers against broiler chicken processors who participated in Agri Stats. Ex. A at 44-45. Supreme Court decisions further support that the exchange of nearly contemporaneous information constitutes the kind of current information that produces significant anticompetitive effects. *See Am. Column*, 257 U.S. at 410 (information exchange agreement anticompetitive that included monthly, weekly, and daily reports); *Container Corp.*, 393 U.S. at 336 (information exchange constituted price quotes of most recently charged prices). And the FTC has stated that information exchanges might qualify for safe harbor only if the information is more than three months old.[21] Thus, the case law is clear that current means timely, not instantly simultaneous. Agri Stats' weekly and monthly reports qualify as current because they contain data that is generally two to six weeks old. *See, e.g.*, IPP ¶ 35 (Agri Stats publishes four different weekly sales reports, a "data miner," a weekly sales report, a weekly pricing report, a weekly pricing exception report, and a weekly mix exception report), IPP ¶21 (sales report with data that is two weeks old); IPP ¶ 26 (economic impact sales report with data that is six weeks old).

---

[21] Michael Bloom, *Information Exchange: Be Reasonable*, Federal Trade Commission (Dec. 11, 2014), https://www.ftc.gov/news-events/blogs/competition-matters/2014/12/information-exchange-be-reasonable.

### 2.     Other characteristics of the Agri Stats reports are also hallmarks of anticompetitive information exchange agreements.

Other significant characteristics of the Agri Stats reports strengthen the plausible inference that they produced anticompetitive effects. First, the information exchange through Agri Stats is private and only available to Defendants. IPP ¶ 7. Agri Stats worked hard to avoid revealing information even in response to government inquiries. IPP ¶ 80. Courts have long recognized that "[p]ublic dissemination is a primary way for data exchange to realize its procompetitive potential." *Todd*, 275 U.S. at 213. Thus, it is not surprising that Defendants proffer no explanation for how the secret pricing reports helped competition in the market as a whole. *See id.* at 213 ("in the traditional oligopoly (seller-side) context, access to information may better equip buyers to compare products, rendering the market more efficient while diminishing the anticompetitive effects of the exchange").

The private nature of the information exchange agreement here clearly distinguishes this case from *Five Smiths*, where the information exchange was not anticompetitive because it simply provided defendants with access to the same salary information that plaintiffs already possessed. *See Five Smiths*, 788 F. Supp. at 1055. But here, purchasers of pork could not use information in Agri Stats sales reports to negotiate lower prices because they were completely denied access to the reports. *See* Ex. A at 49-50 ("Defendants contend that information exchanges help companies compete. But this does not suggest how the information exchange [through Agri Stats] helped these

- 53 -

defendants compete against each other rather than unreasonably restrain grower compensation.").

Second, the information exchange in Agri Stats was conditioned upon reciprocity. Defendants had to provide information in order to get access to the information of their competitors. IPP ¶ 76. As the *Haff Poultry* court emphasized regarding Agri Stats reports, "defendants contend that all they did was independently decide to participate in benchmarking, this ignores the reality of what the plaintiffs allege . . . the reciprocal horizontal agreement to exchange sensitive, detailed, current nonpublic information." Ex. A at 47.

Third, the Agri Stats reports provided granular information on a disaggregated level that was easily deanonymized. Agri Stats' reports included data on a competitor-by-competitor level, and Defendants in response asked questions to Agri Stats about the results of specific competitors. IPP ¶ 39 (Agri Stats employee relaying question from JBS employee about "Why is #1 guy in sales book so far ahead of the competition every week?"). The Agri Stats reports also contained data from only nine Defendants, and thus the top 25% average that Agri Stats prepared gave the pricing of the approximately top two competitors. IPP ¶ 25. Agri Stats reports were also easily deanonymized. IPP ¶¶84-90. In *Todd*, the court specifically identified comparable levels of disaggregation as indicating the information exchange was potentially anticompetitive. *Todd*, 275 F.3d at 212 (information exchange was "problematic" when participants received "data broken down to subsets consisting of as few as three competitors"). In *Haff Poultry*, the court emphasized that plaintiffs' allegations that Agri Stats reports were easily deanonymized

- 54 -

meant that it was immaterial whether Agri Stats "acted merely as a middle-man" or if "defendants met in person and handed identical information to one another in a meeting." Ex. A at 49. The same features of disaggregated, easily deanonymized data present in *Todd* and *Haff Poultry* are also present here, thus further supporting the rule of reason claim.

Defendants ignore each of these aspects of the Agri Stats reports, presumably for the very reason that they further strengthen the reasonable inference that the information exchange agreement produced significant anticompetitive effects.

**D.     Defendants' factual arguments against the rule of reason claim fail.**

Rather than squarely address binding Supreme Court precedent, Defendants instead rely primarily on two factual arguments: 1) Defendants never used Agri Stats data to set or raise prices; and 2) the Agri Stats information exchange agreement did not produce anticompetitive effects. Both arguments fail. Plaintiffs have made abundant factual allegations that amply support a plausible inference that Defendants used Agri Stats reports for setting prices. Plaintiffs have also provided extensive econometric analysis showing anticompetitive effects on the market for pork prices during the relevant period.

**1.     Plaintiffs have made plausible allegations that Defendants used Agri Stats reports to set prices.**

Defendants' factual argument about the extent to which they relied on Agri Stats reports is merely a predictable attempt to take advantage of the fact that Plaintiffs have not yet had the full benefit of discovery that would reveal exactly how Defendants used

Agri Stats data. *See, e.g.,* MTD at 48 (stating that IPP complaint has "failed to allege any specific facts concerning even a single instance of actual price "matching""). But Defendants' argument that there is no evidence Defendants used Agri Stats data to set prices borders on the frivolous. Agri Stats' own words, communications between the Defendants, Defendants' own initial disclosures, and basic common sense all support the entirely reasonable inference that Defendants used Agri Stats reports to set prices.

First, Agri Stats itself explained in an email to Seaboard introducing a new version of the weekly sales report that the new report is a "dramatic improvement to the legacy platform in evaluating sales. It compares a company's price and sales mix versus the national price." IPP ¶ 20. Agri Stats also touted new auditing features that would help ensure the accuracy of the sales data that Agri Stats distributed. *Id.* Agri Stats' own explanation to Defendants of the sales report as a tool for **evaluating sales** of Defendants by comparing their prices against the data compiled by Agri Stats supports a reasonable inference that Defendants used Agri Stats data for the purpose of setting prices.

Second, the limited set of available Agri Stats documents shows that Defendants themselves carefully analyzed the data provided by Agri Stats for the purpose of setting prices. Deb McConnell, a Tyson employee, told Agri Stats that Tyson was using the Agri Stats data in the sales data miner tool for "revenue/return analysis." In a follow-up e-mail, McConnell stated that the "sales group has already responded with some items." IPP ¶ 38. Defendants provide no explanation at all for why Tyson's sales employees would be providing follow up items to Agri Stats if Tyson's sales employees were not using Agri Stats data in their sales-related responsibilities. Similarly, Stacey Edwards, an Agri Stats

employee, documented a list of questions from JBS employees, including "what are some of the opportunities in injected boneless loins?" and "why is #1 guy in sales book so far ahead of the competition every week?" IPP ¶ 39. Again, Defendants make no attempt to explain why JBS was closely analyzing Agri Stats sales data and asking follow-up questions regarding pricing opportunities if JBS was never using the Agri Stats data to set prices.

Third, Defendants' own initial disclosures identified executives like Clemens's treasurer, Indiana Packers' director of global sales, JBS's head of business analysis, Seaboard's senior director of business data & analytics, and Triumph's chief integrated business strategy officer, as executives that were responsible for transmitting data to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export, or production levels. IPP ¶ 174. Thus, Defendants' own disclosures support the reasonable inference that Defendant executives who transmitted data to and from Agri Stats then used that data as part of their apparent responsibilities for setting prices.

Fourth, it defies common sense that Agri Stats and Defendants would laboriously collect incredibly voluminous data on a weekly basis regarding Defendants' sales, distribute reports that specifically identified opportunities for Defendants to gain profits by raising prices on specific products, but then never actually use the data for the purpose of setting prices. *See* IPP Amended Complaint, Ex. E (example of a 99 page weekly sales report). To the contrary, the Supreme Court has specifically recognized that the "most likely consequence of any such agreement to exchange price information would be the stabilization of industry prices." *Gypsum*, 438 U.S. at 457. Indeed, Defendants make no

- 57 -

attempt to explain why Defendants would pay millions of dollars for Agri Stats services

if they weren't able to profitably use Agri Stats reports. IPP ¶7.

Thus, in order to succeed, Defendants' argument would require the Court to hold

that (1) Agri Stats introduced a new weekly sales data tool in 2009 at the start of the

conspiracy specifically designed to allow Defendants to easily compare their prices with

each other, but that Defendants never used the tool for the setting of prices; (2) sales

employees from Defendants closely analyzed the Agri Stats data, asked Agri Stats

follow-up questions regarding the data, but then never used that data to set prices; (3)

senior executives from Defendants with sales-related responsibilities directly participated

in the transmission of data to and from Agri Stats, but never considered using that data in

the setting of prices; and (4) Defendants and Agri Stats engaged in the complicated, time-

intensive and very expensive process of preparing hundred-page reports of sales data on a

weekly basis purely as an eccentric, recreational hobby unconnected to the process by

which they set prices on pork.

But at the motion to dismiss stage, the Court draws reasonable inferences for

Plaintiffs, not unreasonable inferences for Defendants. *See Cole v. Homier Distrib. Co.,*

*Inc*., 599 F.3d 856, 861 (8th Cir. 2010) ("When determining whether a claim is facially

plausible, we accept the allegations contained in the complaint as true and draw all

reasonable inferences in favor of the nonmoving party."). Here, the substantial factual

allegations Plaintiffs have provided collectively support the "irresistible inference" that

Defendants used Agri Stats reports to set prices above the competitive level that would

have occurred absent the reports. *See Container Corp.*, 393 U.S. at 337 ("The inferences

are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition.").

2. **Plaintiffs have made substantial factual allegations that Defendants' information exchange agreements produced anticompetitive effects.**

Defendants also claim that Plaintiffs have not alleged the information exchange agreements had anticompetitive effects on pork prices. MTD at 51-52. Defendants again rely on *Five Smiths,* but the logic of that case explains exactly why the Agri Stats information exchange would likely produce anticompetitive effects. In *Five Smiths*, the information exchange ensured that both sides in a negotiation (there, plaintiffs NFL clubs and defendants NFL player agents) had equal access to salary information. *Five Smiths*, 788 F. Supp. at 1055. Thus "the dissemination of salary information has no anticompetitive effect and may actually benefit competition because it provides players with the same type of information concerning other players' salaries that plaintiffs already possess." *Id.* But here, the information exchange exclusively between Defendants ensures that Defendants have access to pricing information that purchasers of pork, including Plaintiffs, are forbidden from accessing. Therefore, the availability of information to only one side in a negotiation makes the negotiation process *more* unfair, and more likely to produce anticompetitive effects. *See id.* (giving "independent access to [the] same negotiating information . . . make[s] the negotiation process fairer").

Furthermore, the *Haff Poultry* court specifically rejected defendants' argument that plaintiffs had not pled anticompetitive effects from Agri Stats information exchange agreements because of a lack of factual allegations regarding the use of Agri Stats reports

where plaintiffs had provided econometric analysis on the anticompetitive effect of the

information exchange agreements. Ex. A at 55. Here, Plaintiffs have specifically

provided detailed econometric analyses that show significant increases in pork prices

during the conspiracy period that are unexplained by underlying movements in hog prices

after the introduction of new Agri Stats sales reports in early 2009. First, there was a

statistically significant increase in the spread between hog prices and pork prices during

the class period as compared to the prior period. IPP ¶¶ 127-128. The increased margins,

and thus higher profits, for the Defendants is shown in the following Figure 5 from the

IPP Amended Complaint that demonstrates a statistically significant increase in the

spread between hog costs and pork prices during the class period:

**Figure 5: Statistically Significant Break in Hog-Composite Spread Comparing
Before and During Class Period**



Second, Plaintiffs have analyzed the margins of Smithfield and Tyson to

determine the spread between their pork revenues and their underlying costs, which

include the cost of acquiring hogs. IPP ¶¶ 129-132. For both Defendants, Plaintiffs have found that there was a divergence between revenues and costs beginning in 2009. IPP ¶¶ 130-31.

These are exactly the kind of anticompetitive effects – increased pork prices, not driven by changes in underlying costs – that would be expected from Agri Stats sales reports that focus on pork prices. Indeed, Defendants' argument that Plaintiffs allege "increases in pork prices were caused by increases in hog prices" (MTD at 52), simply ignores Plaintiffs' detailed econometric analysis that shows increases in pork prices during the class period were not explained by changes in hog prices. Plaintiffs have made further factual allegations showing that prices for pork products such as ham and bacon increased significantly during the class period. IPP ¶¶ 135-138. Plaintiffs have also specifically alleged that the information exchange agreements led to increases in pork prices. IPP ¶¶ 280-283. Plaintiffs' econometric evidence thus matches the kind of analyses that courts have accepted as sufficient at the motion to dismiss stage. *See Todd*, 275 F.3d at 214 (anticompetitive effects from information exchange sufficiently alleged based on allegations that they produced anticompetitive effects and econometric analysis of depressed salaries).

Defendants also reiterate their argument that the Agri Stats information exchange agreements were not used to set prices. MTD at 51-52. For the reasons discussed above, Defendants are demanding that this Court suspend its common sense and defy the irresistible inference, supported by substantial factual allegations, that Defendants'

information exchange had the anticompetitive effect of artificially restraining price competition. *See Container Corp.*, 393 U.S. at 337.

Indeed, the Agri Stats information exchange agreement reveals that the history of collusion rhymes. In *American Column*, the Supreme Court held an information exchange agreement through an association was anticompetitive when it was marketed to participants as follows: 'The keynote to modern business success is mutual confidence and co-operation. Co-operative competition, not cutthroat competition . . . Co-operation will only replace undesirable competition as you develop a co-operative spirit. . . . More members mean more power to do more good for the industry. With co-operation of this kind we will very soon have enlisted in our efforts practically every producing interest, and you know what that means." *Am. Column*, 257 U.S. at 394. Here, Agri Stats similarly marketed its services as a way of increasing the industry's collective profits by restraining competition, emphasizing that "the ultimate goal is increasing profitability" – not simply increasing level of production. IPP ¶ 192. And just like in *American Column*, Agri Stats emphasized the critical importance of industry-wide participation, stating that for its program to be successful "industry participation must be high," and "each participant has to commit." IPP ¶¶ 75, 77. Thus, the ultimate reasoning of *American Column* still rings true one hundred years later:

> Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals, as the defendants did; they do not contract, as was done here, to submit their books to the discretionary audit, and their stocks to the discretionary inspection, of their rivals, for the purpose of successfully competing with them; and they do not submit the details of their business to the analysis of an

> expert, jointly employed, and obtain from him a 'harmonized' estimate of the market as it is, and as, in his specially and confidentially informed judgment, it promises to be. . . . To pronounce such abnormal conduct on the part of 365 natural competitors . . . a 'new form of competition,' and not an old form of combination in restraint of trade, as it so plainly is, would be for this court to confess itself blinded by words and forms to realities which men in general very plainly see, and understand and condemn, as an old evil in a new dress and with a new name.

*Am. Column*, 257 U.S. at 410.

Plaintiffs have plausibly alleged that the Agri Stats information exchange agreement is "an old evil in a new dress and with a new name" and, as such, have stated a rule of reason claim against the Defendants.

## VII.   PLAINTIFFS' CLAIMS ARE TIMELY

Plaintiffs' claims are timely because Plaintiffs have alleged a continuing violation, which restarts the statute of limitations with each sale. And Plaintiffs sufficiently allege that Defendants fraudulently concealed the conspiracy, which tolls the statute of limitations. Tolling is proper when the party injured by fraud "remains in ignorance of it without any fault or want of diligence or care on his part." *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946).[22] Here, Defendants acted to conceal the conspiracy from members of the classes.

---

[22] *See also Kansas City, Mo. v. Fed. Pac. Elec. Co.*, 310 F.2d 271, 284 (8th Cir. 1962) (participants in secret cartels "should not, when their machinations are discovered, be permitted to use the shield of the statute of limitations to bar redress by those whom they have victimized").

- 63 -

**A.**     **The statute of limitations is equitably tolled due to Defendants' fraudulent concealment.**

The statute of limitations applicable to Plaintiffs' claims is tolled due to Defendants' fraudulent concealment of the conspiracy. Fraudulent concealment is an equitable doctrine that seeks to ensure "that sophisticated defrauders not be permitted to profit by their own misconduct and an inflexible application of the statute of limitation." *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 368 (D.N.J. 2001).[23] Courts employ a three-part test, which requires plaintiffs to plead: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012).[24] When there is any question about fraudulent concealment, even if the plaintiff's "allegations of fraudulent concealment are not extensive," resolving the issue against the plaintiff on a motion to dismiss is improper because "the question is one for the jury." *Packaged Ice*, 723 F. Supp. 2d at 1018. Although the allegations must satisfy Rule 9(b), this requires only that the "circumstances of fraud be pled with enough particularity to put the party on notice as to the nature of the claim." *In re Vitamins*

---

[23] *See also Kansas City*, 310 F.2d at 271. "[F]raudulent concealment of material facts prevents the running of the statutory period . . . until the plaintiff discovers or by reasonable diligence could discover the basis for the claim." *Ryan v. United States*, 534 F.3d 828, 832 (8th Cir. 2008).

[24] *See also In re Bulk Popcorn Antitrust Litig.*, No. 3-89-0710,1990 WL 123753, at *5 (D. Minn. Jun. 19, 1990) (citing *Bruno v. United States*, 547 F.2d 71, 74 (8th Cir. 1976)).

*Antitrust Litig.*, No. 99-197 (TFH), 2000 WL 1475705, at *2 (D.D.C. May 9, 2000).

As courts have repeatedly held, allegations need not be "extensive" to sufficiently plead wrongful concealment. *In re Auto. Parts Antitrust Litig.* (*Bearings*), No. 12-cv-00501, 2014 WL 4272772, at *12 (E.D. Mich. Aug. 29, 2014). Although Rule 9(b) applies here, the standard is "relaxed . . . when factual information is peculiarly within the defendants' knowledge or control." *In re Fasteners Antitrust Litig.*, No. 08-md-1912, 2011 WL 3563989, at *3 (E.D. Pa. Aug. 12, 2011).[25] Acts of concealment are attributable to all co-conspirators, and concealment "is generally susceptible to industry-wide proof." *Vitamins*, 2000 WL 1475705, at *3.

Here, when Plaintiffs' allegations are viewed in their totality, it is clear that the Amended Complaints allege sufficient facts to necessitate the denial of Defendants' motion to dismiss based on the statute of limitations because: (1) the conspiracy was self-concealing, and in any event, Defendants' affirmative acts prevented discovery of the conspiracy until 2018; (2) Plaintiffs did not discover the conspiracy until 2018; and (3) Plaintiffs were not on inquiry notice and had no reason to investigate Defendants' conduct in the pork industry prior to 2018.

### 1.    Defendants' wrongful concealment prevented Plaintiffs from discovering the conspiracy before 2018.

Plaintiffs sufficiently allege both that Defendants fraudulently concealed the conspiracy for two reasons. First, Plaintiffs have demonstrated all the elements that this

---

[25] *See also Mercedes-Benz*, 157 F. Supp. 2d at 368 ("Rule 9 does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control.").

was a self-concealing conspiracy. Second, in the alternative, Plaintiffs have adequately alleged affirmative concealment.

### a. Plaintiffs allege a self-concealing conspiracy.

Plaintiffs allege that Defendants' conspiracy was, by its nature, "self-concealing." IPP ¶ 166; DPP ¶ 190; CIP ¶ 194. That alone suffices at the pleading stage. Indeed, courts in this District have concluded that even at the *summary judgment* stage, "plaintiffs may prove the 'fraudulent means' element by showing either that the defendants took affirmative steps to prevent plaintiffs' discovery of their claims *or that the wrong itself was of such a nature as to be self-concealing*." *United Power Ass'n, Inc. v. L.K. Comstock & Co.*, No. 89-cv-766, 1992 WL 402906, at *6 (D. Minn. Oct. 27, 1992) (Alsop, J.) (emphasis added).

Defendants ask the Court to apply a different standard, the "separate and apart" standard. MTD at 64. But the Eighth Circuit has not determined that this standard applies to antitrust conduct. *See In re Monosodium Glutamate Antitrust Litig.*, No. 00-md-1328-PAM, 2003 WL 297287, at *2 (D. Minn. Feb. 6, 2003).[26] Courts in this district –

---

[26] Defendants rely upon *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441 (8th Cir. 1990) to argue that the "separate and apart" standard applies here. But *Ripplinger* did not involve conduct that was inherently self-concealing, such as an antitrust conspiracy. Likewise, Defendants' reliance on *New Prime, Inc. v. Eaton Corp.*, No. 16-3407-CV-S-SRB, 2017 WL 5992466 (W.D. Mo. Mar. 16, 2017) is inapposite. In *New Prime*, the plaintiffs asserted that the alleged improper conduct occurred between 1999 and 2006. In 2006, a publicly filed lawsuit was brought against the defendants for this improper conduct. Yet the plaintiffs in *Ripplinger* waited ten years after the publicly filed lawsuit to bring their claims based on the same conduct. *Id.* Because the plaintiffs admitted the conduct "was described in a publicly-filed lawsuit a decade ago" the claims were properly time-barred. *Id.*

including Judge Alsop – have applied the self-concealing standard when applicable. *See United Power*, 1992 WL 402906.

Defendants incorrectly state that "the self-concealing conspiracy doctrine does not exist in this jurisdiction" and suggest that the only circuit that applies the self-concealing standard is the Second Circuit. MTD at 64. This is plainly wrong: in *United Power*, Judge Alsop held that plaintiffs could prove fraudulent concealment at trial by showing "either that the defendants took affirmative steps to prevent plaintiffs' discovery of their claims or that the wrong itself was of such a nature as to be self-concealing." *United Power*, 1992 WL 402906, at *6 (citing cases). Hence, while some courts in this District have reached different conclusions, this Circuit should apply the self-concealing standard, consistent with *United Power*.

The self-concealing standard also comports with common sense, the equitable underpinnings of fraudulent concealment, and the reasoning of longstanding Supreme Court precedents. *See Bailey v. Glover*, 88 U.S. 342, 349 (1874) ("To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure."). And contrary to Defendants' arguments, the self-concealing standard is widely accepted.[27]

---

[27] *See Hill v. Texaco, Inc.*, 825 F.2d 333 n.2 (11th Cir. 1987) (holding that fraudulent concealment may be shown if the "wrong is of such a character as to be self-concealing"); *Baker v. F & F Inv.*, 420 F.2d 1191, 1199 (7th Cir. 1970) ("Where, as in the case of many conspiracies in violation of federal antitrust laws, the wrong is self-

Here, Defendants' price-fixing conspiracy would not have worked if they had not concealed it. They would have attracted government scrutiny, injured customer relations, and attracted competition from non-conspiring competitors or new entrants. *See Mercedes-Benz*, 157 F. Supp. 2d at 373. Because "Defendants' purported conspiracy would have been fruitless without a deliberate effort to conceal its substance" (*Fasteners*, 2011 WL 3563989, at *5), the Court should find the first element of fraudulent concealment satisfied in this case.

> ### b.   In the alternative, Plaintiffs have adequately alleged Defendants' affirmative concealment.

Even if the Court applies the "separate and apart standard" as Defendants request, Plaintiffs have sufficiently alleged that Defendants took affirmative steps to conceal their conduct, including:

- Engaging in secret in-person and telephonic meetings in order to prevent the existence of written records. IPP ¶ 157; DPP ¶ 182; CIP ¶ 186.

---

concealing, little need by added in order to justify tolling the statute."); *New York v. Hendrickson Bros., Inc*., 840 F.2d 1065, 1084-85 (2d Cir.1988) ("[T]he State sufficiently proved the concealment by the defendants of the conspiracies . . . both because the bid-rigging was self-concealing and because the . . . [] defendants' affirmative acts of concealment were properly admissible against all of the defendants."); *In re London Silver Fixing, Ltd.*, 213 F. Supp. 3d 530, 572 (S.D.N.Y. 2016) (holding plaintiffs may prove the first factor either by defendants' affirmative steps "or that the wrong itself was of such a nature as to be self-concealing"); *Fasteners*, 2011 WL 3563989, at *5 ("Price-fixing conspiracies are inherently self-concealing."); *In re Aspartame Antitrust Litig*., No. 06-cv-1732, 2007 WL 5215231, at *5 (E.D. Pa. Jan. 18, 2007) ("[T]he fraudulent concealment doctrine does not require affirmative acts of concealment when the conspiracy is self-concealing."); *Mercedes-Benz*, 157 F. Supp. 2d at 371 (holding price-fixing conspiracies are self-concealing when "concealment is so inter-twined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled").

- Limiting any explicit reference to competitor pricing or supply restraint communications on documents. IPP ¶ 157; DPP ¶ 182; CIP ¶ 186.

- Communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers). IPP ¶¶ 157-59; DPP ¶¶ 182-183; CIP ¶¶ 186-187.

- Falsely attributing the rising pork prices and the stability in the pork market to "good programs with our retailers, and lower grain cost" IPP ¶ 162; DPP ¶ 186; CIP ¶ 190.

- Attributing the stabilization in capacity to "rumors" that China was going to purchase more corn. IPP ¶ 122; DPP ¶ 155; CIP ¶ 159.

- Claiming that heat waves, drought, and feed prices were the reason behind rising pork prices. DPP ¶ 157; CIP ¶ 161.

- Taking advantage of numerous opportunities to collude at trade association meetings that served as pretexts for their conspiratorial meetings with competitors. DPP ¶¶ 98-118; CIP ¶¶ 102-122.

These factual allegations meet the standards established by the weight of antitrust authority in the federal courts. "Attributing the anti-competitive effects of a conspiracy to some cause other than the collusive conduct can be an affirmative act of fraudulent concealment." *In re Animation Workers Antitrust Litig*., 123 F.Supp.3d 1175, 1200 (N.D. Cal. 2015). Defendants did exactly that, by publicly stating that market-based and environmental factors explained rising pork prices, falling pork production, and their increasing margins.

In *Anderson v. Dairy Farmers of Am., Inc.*, No. 08–4726 (JRT/FLN), 2010 WL 1286181 (D. Minn. Mar. 29, 2010), this Court held that even when "the evidence of fraudulent concealment is somewhat weak" – which is far from the case here – "the

- 69 -

question is for the finder of fact." *Id*., at *9. This Court in *Anderson* concluded that plaintiffs sufficiently pled a CEO's public statements concealed motive. *Id.* Likewise, in *Monosodium Glutamate*, 2003 WL 297287, at *3, Judge Magnuson determined that defendants were not entitled to summary judgment on the issue of fraudulent concealment where plaintiffs presented evidence that the defendants had "communicated by phone so as not to leave a 'paper trail,' and gave false reasons for price increases." Here, Plaintiffs have sufficiently alleged that the conspiracy was fraudulently concealed.

Other antitrust class actions provide helpful comparisons and demonstrate that Plaintiffs have met their burden. For example, in *Edwards*, the defendants had made "public announcements regarding the herd retirement program" that functioned as a supply reduction conspiracy. *Edwards v. Nat'l Milk Producers Fed'n*, No. 11-cv-4766-JSW, 2012 WL 12951848, at *6 (N.D. Cal. Oct. 30, 2012). The plaintiffs alleged only that they would have had no reason to review the defendants' industry newsletters. *Id.* The court found those minimal allegations created a fact question such that fraudulent concealment could not be decided on a motion to dismiss. *Id.*

Similarly, in *Mercedes-Benz*, 157 F. Supp. 2d at 367, the plaintiffs alleged that they were not aware of the defendants' price-fixing conspiracy until the New York Times published an article outlining the details of the conspiracy. The plaintiffs alleged a single "affirmative act" of concealment: the defendants "were strenuously urged in the meetings not to reveal to anyone the substance of the discussions, lest the price-fixing scheme be revealed." *Id.* at 371. The court inferred that these "adjurations to secrecy were implicitly backed with the threat of discipline." *Id.* at 372. As a result, the plaintiffs sufficiently pled

with particularity that the defendants engaged in affirmative acts to conceal the conspiracy. *Id.* (holding that, in the alternative, the plaintiffs also sufficiently alleged a self-concealing conspiracy).

And in *Packaged Ice*, 723 F. Supp. 2d at 1018, the plaintiffs' allegations of affirmative concealment were "not extensive." The plaintiffs generally alleged that the defendants "represented publicly, both to customers and otherwise, that their pricing activities were unilateral, rather than collusive, and based upon legitimate business purposes, such as increased costs." *Id.* at 1018-19. That allegation was sufficient to satisfy the plaintiffs' burden at the pleading stage.

Lastly, in *Bulk Popcorn*, the court found sufficient allegations that the defendants used secret means of communications, including using phone calls and in-person meetings; used rigged bids to give the appearance of competition; and used legitimate trade associations to mask their conspiracy. *Bulk Popcorn*, 1990 WL 123753, at *4-*5.

Conversely, the case Defendants primarily rely upon, *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016 (D. Minn. 1997) (Magnuson, J.),[28] is factually and legally distinguishable. MTD at 58-61 (citing *Milk*, 84 F. Supp. 2d at 1016). In particular, *Milk*

---

[28] *Milk* is also not binding precedent. *See Phoenix Entm't Partners, LLC v. Star Music, Inc.*, No. 16-cv-4078 (PJS/FLN), 2017 WL 5714021, at *2 (D. Minn. Nov. 28, 2017) ("To begin with, this Court's decisions are not binding precedent; this Court is free to disregard its own earlier opinions if it later concludes that it was mistaken, as it sometimes does."); *Savig v. First Nat'l Bank of Omaha*, No. 09-cv-132 (JNE/RLE), 2009 WL 1955476, at *3 (D. Minn. July 6, 2009) ("A district court judge is not required to follow the decision of another district court judge."). This is particularly true as it relates to an issue on which the Eighth Circuit has not yet spoken (the application of the fraudulent concealment-doctrine to an antitrust conspiracy).

involved a DOJ investigation announced in July 1995, but plaintiffs claimed that no facts

had put them on notice until May 1996. Despite this public announcement, the plaintiffs

argued that the defendants' "denials of wrongdoing *following this announcement*

amounted to fraudulent concealment." *Id.* at 1024 (emphasis added). The court rejected

that argument and concluded that the DOJ investigation put the plaintiffs on inquiry

notice. *Id.*

In this case, Plaintiffs reasonably relied on Defendants' affirmative

misrepresentations. Unlike in *Milk*, there was no DOJ investigation of Defendants'

conduct in the Pork industry that put Plaintiffs on inquiry notice. As this Court has

previously ruled in non-antitrust cases, omissions can give rise to a fraudulent

concealment claim when combined with other conduct, such as publicly providing

misleading representations designed to obscure the truth, even when no affirmative

representations were made to the plaintiff. *Cantonis v. Stryker Corp.*, No. 09-cv-3509

(JRT/JJK), 2011 WL 1084971, at \*2-\*3 (D. Minn. Mar. 21, 2011). That standard is met

in this case, because Defendants omitted and failed to disclose the truth of their supply

reduction scheme and price-fixing conspiracy – and they made misleading public

representations designed to provide pretexts for rising prices.

Further, because the statute of limitations is an affirmative defense, any suggestion

by Defendants that Plaintiffs were required to plead more detailed facts is foreclosed by

Eighth Circuit precedent. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 n.10

(8th Cir. 2009) ("[A] plaintiff need not plead facts responsive to an affirmative defense

before it is raised.").

- 72 -

**2.      Plaintiffs did not discover the conspiracy until 2018.**

Until learning otherwise, Plaintiffs reasonably believed the pork industry to be a competitive industry. IPP ¶ 166; DPP ¶ 190; CIP ¶ 194. They did not actually discover the operative facts of the conspiracy until the facts became widely known or reported by the Bloomberg article published in February 2017 combined with the *Broiler Chicken* complaint disclosing the scope of the confidential services provided by Agri Stats in February 2018. IPP ¶¶ 163-165; DPP ¶¶ 187-188; CIP ¶¶ 191-192. Defendants do not challenge Plaintiffs' assertions that they did not discover the conspiracy before February 2018 when these events placed them on inquiry notice (discussed in more detail below). Nor could they, at the pleading stage. This suffices to meet the second element of fraudulent concealment at this stage. *See Carrier*, 673 F.3d at 446.

**3.      Plaintiffs exercised due diligence and had no reason to investigate Defendants' conduct in the pork industry prior to 2018.**

The heart of Defendants' argument is that Plaintiffs were on inquiry notice of Defendants' price-fixing conspiracy because of Defendants' statements made in earnings calls. But as shown below, that argument is based on a fundamental misunderstanding of the law.

Due diligence is an objective test that does not require any investigation until the plaintiff has reason to investigate.[29] *Carrier,* 673 F.3d at 447 (stating it is measured

---

[29] *See also Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 427 (2d Cir. 2008) (describing the "objective standard" for inquiry notice); *Morton's Market, Inc. v. Gustafson's Dairy, Inc*., 198 F.3d 823, 836 (11th Cir. 1999) ("The actual exercise of diligence is irrelevant because the standard is an objective one.").

against the "reasonably diligent plaintiff"). The reasonableness of the plaintiff's investigation must be considered under the totality of the circumstances, factoring in the defendants' concealment. *Id.* "Actions that would deceive a reasonably diligent plaintiff toll the statute." *Bearings*, 2014 WL 4272772, at *13.[30]

Defendants rely exclusively on the fact that they made statements in their investor calls that Plaintiffs now cite to support the existence of the conspiracy. MTD at 57. This argument fails because Plaintiffs were not and should not reasonably have been aware of this limited information in the public sphere, nor is it reasonable to argue that without the further context provided by the 2017 article coupled with the February 2018 *Broiler Chicken* complaint, that Plaintiffs could have or should have understood the potential significance of these statements when looked at in isolation. Plaintiffs could not have discovered facts giving rise to a claim against Defendants through reasonable diligence earlier than February 2018 because that is when the *Broiler Chicken* complaint disclosed the role of Agri Stats in the industry – which is the core mechanism that Defendants used to set pork production levels and fix pork prices. IPP ¶ 164; DPP ¶ 187; CIP ¶ 191. That complaint, along with the information from the February 2017 Bloomberg article (which suggested that pork industry participants were using Agri

---

[30] *See also In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 802 (N.D. Ohio 2011) ("When facts exist that should excite the suspicions of a reasonably diligent person, a plaintiff that fails to make proper inquiries to discover his cause of action will not see the limitations period tolled. By contrast, when no information, actual or constructive, exists hinting at the fact of plaintiff's injury, the 'reasonable diligence' requirement seems limited to denying tolling for careless plaintiffs.").

Stats in a similar manner to broiler industry participants), was the first time the likelihood of Defendants' price-fixing conspiracy was sufficiently public and widespread to place Plaintiffs on inquiry notice and cause them to investigate. IPP ¶¶ 163-64; DPP ¶¶ 187-188; CIP ¶¶ 191-192. Until then, Plaintiffs had no way of knowing Defendants were conspiring to limit pork supply or fixing pork prices.

Courts consistently hold that inquiry notice – that is, what a reasonably diligent plaintiff should know – cannot be established on the availability of such limited information in the public domain, particularly as a matter of law at the pleading stage. The information with which Defendants seek to charge Plaintiffs may have been in the public domain, but it did not receive widespread publicity and was not generally known. As the Second Circuit has explained, "there is an inherent sliding scale in assessing whether inquiry notice was triggered by information in the public domain: the more widespread and prominent the public information disclosing the facts underlying the fraud, the more accessible this information is to plaintiffs, and the less company-specific the information must be." *Staehr*, 547 F.3d at 432. Because of the limited audience of Defendants' investor calls and SEC filings, that information, although in the public domain, cannot place Plaintiffs on inquiry notice.[31] Without any information about the pork conspiracy, there was no reason for Plaintiffs to investigate Defendants' conduct.

---

[31] *See also Morton's Market*, 198 F.3d at 833-34 (despite plaintiff's actual knowledge of news reports concerning attorney general suit accusing defendants of rigging bids for school milk contracts, plaintiff did not have constructive knowledge or duty to investigate defendants' fixing wholesale milk prices until defendant pleaded guilty); *Abecassis v. Wyatt*, 902 F. Supp. 2d 881, 900 (S.D. Tex. 2012) (questioning whether "media reports and other publicly available documents were sufficient to put the plaintiffs on inquiry

Defendants argue that Plaintiffs should have been aware of Agri Stats prior to the Bloomberg investigative report because "the Bloomberg article presented no facts not already in the public record". MTD at 63. Yet this ignores the allegations in Plaintiffs' complaints: Agri Stats is a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret (IPP ¶ 157; DPP ¶ 182; CIP ¶ 186); Agri Stats does not advertise or talk about what it does (IPP ¶ 159; DPP ¶ 183; CIP ¶ 187); and when Agri Stats made statements, it concealed the true detail and nature of the reports (IPP ¶ 160; DPP ¶ 184; CIP ¶ 188). Prior to this article, Plaintiffs had no knowledge that Agri Stats – a company that strives to keep itself unknown – was participating in the pork industry. IPP ¶ 163; DPP ¶ 187; CIP ¶ 191. Likewise, before the *Broiler Chicken* lawsuit was filed, there was no publicly available information that presented the full scope of the confidential services that Agri Stats provides to its clients. IPP ¶ 188; DPP ¶ 188; CIP ¶ 192.

In support of their argument, Defendants again rely primarily on *Milk*. And again, it provides a poor comparison to the facts of this case. In *Milk*, 84 F. Supp. 2d at 1024, the plaintiffs argued that "due diligence is not an element of fraudulent concealment" at all. In finding a lack of due diligence, the court expressly relied on the DOJ's announced investigation as putting the plaintiffs on inquiry notice. *Id*.

---

notice that the defendants had made illegal oil payments to Iraq," even though the defendants were under investigation).

Defendants' argument that Plaintiffs fail to plead what steps they took from 2009 to 2014 to investigate Defendants' conduct (MTD at 62), fares no better. In order to be required to investigate Defendants' conduct, Plaintiffs must first have been placed on inquiry notice—that is to say, an objectively reasonable purchaser of pork would have investigated whether it had an antitrust claim. But because Plaintiffs were not placed on inquiry notice, they were not required to investigate. Questions about whether Plaintiffs' investigation was reasonable is beside the point, because there is no cause to investigate. *See Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 897 (8th Cir. 1997) ("A victim must be aware of some suspicious circumstances, some 'storm warnings,' to trigger the duty to investigate.").

Defendants seek to have the Court conclude that because Plaintiffs' factual allegations of a conspiracy include limited public information from 2009 to 2014, fraudulent concealment cannot apply. MTD at 60-64. But this argument is not only superficial, it is unsupported by law. *See Great Rivers*, 120 F.3d at 897 ("We simply note that we will not automatically impute public information to an injured party without a determination of some awareness of 'storm clouds' on the horizon."). *Milk* says nothing of the sort. Nor do the other cases cited by Defendants. *Willmar* was a summary judgment case, and it involved testimony to a public body conducting a government investigation. *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*, 520 F.2d 289, 294-96 (8th Cir. 1975). *Wholesale Grocery* involved asset transfers and withdrawals from regional markets, which in fact alerted the plaintiffs because they asked the defendants questions about the suspicious circumstances; that was not a case

about inquiry notice, but rather a case about the adequacy of an investigation after the plaintiffs were on notice and had cause to investigate. *In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1084-86 (D. Minn. 2010) (Montgomery, J.). *Insulate* also involved a market allocation conspiracy; in addition, a substantially similar lawsuit was filed against the same defendants, which the court found sufficient to put the plaintiffs on inquiry notice. *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-cv-2664 (ADM/SER), 2014 WL 943224, at *5-*6 (D. Minn. Mar. 11, 2014).

Notably, no court has held that purchasers of a product are under a duty of reasonable care to monitor sellers' earnings calls or other information provided for the benefit of investors. Such a rule would require businesses and consumers to monitor the SEC filings and investor calls of every company in the world from which they directly or indirectly may have purchased a product. This would serve no public purpose, but rather would serve only to immunize price-fixing companies from claims of reasonably diligent plaintiffs. The Court should reject Defendants' attempt to craft a new legal standard. Under settled law, the question as it relates to this public information is whether that information was sufficient to have placed Plaintiffs on inquiry notice in 2009, or 2010, or at any other time prior to 2018. The answer is no.

**B.     The Court should defer its decision on fraudulent concealment.**

As this Court has previously recognized, in some circumstances, it is most appropriate to defer decision on fraudulent concealment rather than decide the issue at the pleading stage, even if that means additional expense will be incurred. *See Steward v. Up N. Plastics, Inc.*, 177 F. Supp. 2d 953, 960 (D. Minn. 2001) (Tunheim, J.) ("The Court

declines to explore the merits of the tolling and fraudulent concealment arguments at this time because the Court would prefer to consider these arguments in connection with plaintiffs' motion for class certification. The Court understands that it will require some additional time and expense for defendants to oppose plaintiffs' motion, but the Court is simply unwilling to preemptively deny plaintiffs at least an opportunity to present a motion for class certification.").

Deferring a decision on fraudulent concealment until after discovery is sensible and fair.

First, fraudulent concealment presents a fact-intensive inquiry that is best suited for resolution after the parties have conducted appropriate discovery. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, No. 11-cv-2717 (JRT/ALB), 2013 WL 53837, *2 (D. Minn. Jan. 3, 2013) ("When fraudulently concealed facts reasonably should have been discovered . . . is a question of fact.") (ellipsis in original); *see also London Silver Fixing*, 213 F. Supp. 3d at 572 ("[B]ecause resolution of a claim of fraudulent concealment is 'intimately bound up with the facts of the case,' it often cannot be decided at the motion to dismiss stage."); *Animation Workers*, 123 F. Supp. 3d at 1194 ("[I]t is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators."); *Edwards*, 2012 WL 12951848, at *6 ("The Court finds that the timing of when a reasonable plaintiff would have discovered Defendants' conduct is a factual question which may not be resolved on a motion to dismiss.").

Second, because Plaintiffs have pled a continuing violation, as discussed below, at least some portion of this case is timely. And because the statute of limitations will not bar Plaintiffs' claims in their entirety, Plaintiffs are entitled to discovery concerning the whole conspiracy, which began in approximately 2009. Plaintiffs' claims of a continuing violation depend on a conspiracy having begun at an earlier time. Dismissal of damages claims relating to an earlier part of the conspiracy period, even if warranted, would not materially change the scope of the litigation or its burden on the parties.

**C.     Plaintiffs adequately allege a continuing violation.**

Plaintiffs adequately plead a "continuing violation," which "restarts the statute of limitations period each time the defendant commits an overt act." *Propane I*, 860 F.3d at 1063. In a case involving a horizontal conspiracy, "'each sale to the plaintiff, starts the statutory period running again, ***regardless of the plaintiff's knowledge of the alleged illegality at much earlier times***.'" *Id.* at 1066-67 (quoting *Klehr v. AO Smith Corp.*, 521 U.S. 179, 189 (1997) (emphasis added)). To meet this standard requires pleading: "(1) a price-fixing conspiracy; (2) that brings about a series of unlawfully high priced sales during the class period; and (3) sales to the plaintiffs during the class period." *Id.* at 1068.

As with their original motion to dismiss, Defendants again misstate the standard of *Propane I*. In *Propane I*, 860 F.3d at 1064 n. 2, the Eighth Circuit held that "continued sales at supracompetitive prices are overt acts under the continuing violations theory." Like Defendants do here, the defendants in *Propane I* attempted to argue that the plaintiffs needed to include more factual allegations indicating continued conduct within the limitations period. *Id.* at 1069. The *Propane I* plaintiffs described certain

communications in 2007 and 2008, including "calls and meetings . . . occurring at least as late as 2010." *Id.* at 1070; *see also id.* at 1071 (noting allegation that "Defendants continued to have regular communications regarding pricing, fill levels, and market allocation until at least late 2010"). Beyond that, however, the plaintiffs simply alleged that "the propane conspiracy succeeded" and that it continued during the class period. *Id.* at 1070-71. Disagreeing with the defendants, the Eighth Circuit held that "[t]he allegations that the conspiracy continued into the class period are sufficient." *Id.* at 1069. Hence, to maintain a continuing violation at the pleadings stage, Plaintiffs need only to allege that the conspiracy continued when the sales took place. *Id.*

Plaintiffs' allegations are sufficient here. As was the case in *Propane I*, Defendants here argue that Plaintiffs have failed to demonstrate that the "alleged supply-reduction conspiracy continued into 2018," and thus suggest that the continuing violation doctrine should not apply. MTD at 65. Nonsense. Plaintiffs meet the *Propane I* standard by alleging that Defendants entered into a conspiracy "from at least 2009 to the present to fix, raise, maintain, and stabilize the price of pork." IPP ¶ 6; DPP ¶ 2; CIP ¶ 2. As discussed in more detail above, by 2009, Defendants began participating in the benchmarking scheme utilizing the Agri Stats reports. IPP ¶ 6-7. Plaintiffs allege that Defendants shared extensive information through Agri Stats – including current and forward-looking sensitive information (such as profits, costs, sale prices and slaughter information) – so that Defendants could stabilize production and to fix prices and that this information exchange continued throughout the conspiracy. IPP ¶¶ 4, 6, 7, 11, 12, 19, 22, 61, 62, 169, 170. Pork exports increased throughout the class period. DPP ¶¶ 120-22; CIP

¶ 124-126. Defendants' margins and the prices for pork products increased abnormally beginning in 2009 and stayed elevated throughout the class period. IPP ¶¶ 127-28, 130-132; DPP ¶¶ 164-71; CIP ¶¶ 168-175.

Thus, Defendants' parallel conduct continued throughout the class period; it did not stop at the end of 2013. *See* IPP ¶ 6; DPP ¶ 2; CIP ¶ 2 (alleging conspiracy continued "to the present"). Pork prices and Defendants' profits continued to rise throughout the class period. *See* IPP ¶¶ 126-132, DPP ¶¶ 167-171; CIP ¶¶ 171-175. This would not have occurred had the conspiracy disbanded. Further, all of the plus factors identified by Plaintiffs remained the same.[32] Under Eight Circuit law, these allegations are more than sufficient to find a continuing violation.

To the extent Defendants argue that "the Complaints contradict any claim that a purported supply-restraint conspiracy continued within the limitations period" (MTD at 66), they are mistaken. This fundamentally misrepresents the nature of the conspiracy that Plaintiffs allege, which involved both reductions in supply and *reduced increases* in supply in order to increase the price of pork.[33] *See In re Capacitors Antitrust Litig.*, 106

---

[32] *See, e.g.*, IPP ¶¶ 133-134, 150-154; DPP ¶¶ 87-90; CIP ¶¶ 91-94 (discussing high, and increasing, market concentration as recently as 2016); IPP ¶ 178; DPP ¶¶ 94-95; CIP ¶¶ 98-99 (discussing barriers to entry), DPP ¶¶ 98-118; CIP ¶¶ 102-122 (discussing trade association meetings each year from 2014-2018).

[33] *See, e.g.*, IPP ¶ 6; DPP ¶ 2; CIP ¶ 2 (explaining Defendants' conspiracy was executed by "coordinating output and *limiting* production"); DPP ¶ 131; CIP ¶ 135 (Clemens did not attempt to take advantage of 2014 PEDv epidemic by *increasing* market share); DPP ¶ 162; CIP ¶ 166 (explaining that in 2015, the industry noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production); DPP ¶ 163; CIP ¶ 167 (Seaboard and Triumph postponed *adding* second shift to joint venture in February 2017).

F. Supp. 3d 1051, 1062 (N.D. Cal. 2015) (upholding allegations that conspiracy allowed defendants "to slow . . . the market-driven decline in price for their products"); *Broiler Chicken*, 290 F. Supp. 3d at 792-95.

Finally, Defendants simply ignore the fact that they continue to use Agri Stats to this day. Plaintiffs allege that Defendants used Agri Stats beginning in 2009 and continuing through the present to share information on a weekly and monthly basis. IPP ¶ 266. Plaintiffs have established that the purpose and effect of exchanging this competitive information through Agri Stats was "increasing pork prices to plaintiffs and class members." IPP ¶ 12. The conspiracy succeeded and that the classes and consumers continue to pay supra-competitive prices for pork as a result of this information exchange. IPP ¶ 6. And to support these allegations, Plaintiffs have provided economic data showing the unprecedented price increases that occurred after Defendants began exchanging information. *See* IPP ¶¶ 126, 128, 130-131, 135-138. Defendants ignore all of Plaintiffs' allegations regarding their continued use of Agri Stats. *See* MTD at 65-67.

Instead of disputing that Plaintiffs' allegations satisfy the *Propane I* pleading standard, Defendants misconstrue *In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane II*"), 893 F.3d 1047 (8th Cir. 2018)  – an opinion that has nothing to do with the statute of limitations or the continuing-violation doctrine – to suggest that the standard articulated in *Propane I* has changed. MTD at 66. *Propane II* involved a different group of plaintiffs whose claims occurred subsequent to an enforcement action brought against the defendants by the FTC, which included 2015 settlements and consent orders. *Propane II*, 893 F.3d at 1051. The court held that to have standing to pursue

injunctive relief claims under the Sherman Act, the indirect purchaser plaintiffs were required to plead that the defendants conspired to charge supra-competitive prices *after* January 2015 when the defendants entered the FTC consent decrees. *Id.* at 1056. Instead, the plaintiffs only pled the same facts that were found sufficient in *Propane I*—namely, that certain events occurred between 2008 and 2010, and that "the conspiracy continued into the class period." *Propane I*, 860 F.3d at 1069. But *Propane II* presented a very different case because *Propane I* involved damages claims for purchases *before* the 2015 FTC consent decrees, whereas *Propane II* involved injunctive claims for purchases *after* the FTC consent decrees. *See Propane* II, 893 F.3d at 1057 ("The issue here is different than that in *Propane En Banc*.").

Simply put, *Propane I* applies and is applicable to the facts of this case. To allege a continuing violation, Plaintiffs need to plead facts that plausibly suggest a conspiracy, and that the conspiracy continues into the class period. Because there is no intervening act in this case – such as an FTC consent decree – Plaintiffs easily meet their burden to plead the conspiracy's continuation.[34] *See Propane I*, 860 F.3d at 1064 n.2 ("Because

---

[34] The standard for pleading a continuing violation is consistent with the settled rule that withdrawal from a conspiracy is an affirmative defense presenting a question of fact, and the burden of proof is on the defendant. *Smith v. United States*, 568 U.S. 106, 111-12 (2013); *United States v. Grimmett*, 150 F.3d 958, 961 (8th Cir. 1998). Federal courts routinely apply this rule in civil antitrust cases. *See, e.g.*, *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067-68 (D.C. Cir. 2015); *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-02143-RS, 2017 WL 6503743, at *6 (N.D. Cal. Dec. 18, 2017); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 820 F. Supp. 2d 1055, 1059-61 (N.D. Cal. 2011). The longstanding rule that withdrawal from an established conspiracy is an affirmative defense helps to explain why a lesser showing is required to plead the continuation of a conspiracy after it is established.

continued sales at supra-competitive prices are overt acts under the continuing violations theory, this court need not address Plaintiffs' allegations that Defendants' conspiratorial communications about pricing and fill levels were additional overt acts sufficient to invoke the theory.").

## VIII.  CONCLUSION

For these reasons, the Court should deny Defendants' motion to dismiss.

DATED: February 21, 2020                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP        LARSON • KING, LLP

By:___s/ Steve W. Berman_____       By:___s/ Shawn M. Raiter_____
    STEVE W. BERMAN                        SHAWN M. RAITER (MN# 240424)

Breanna Van Engelen                    2800 Wells Fargo Place
1301 2nd Avenue, Suite 2000            30 East Seventh Street
Seattle, WA 98101                      St. Paul, MN 55101
Telephone: (206) 623-7292              Telephone: (651) 312-6518
Facsimile: (206) 623-0594              sraiter@larsonking.com
steve@hbsslaw.com
breannav@hbsslaw.com                   Jonathan W. Cuneo
                                       Joel Davidow
Shana E. Scarlett                      Blaine Finley
HAGENS BERMAN SOBOL SHAPIRO LLP        Yifei "Evelyn" Li
715 Hearst Avenue, Suite 202           CUNEO GILBERT & LADUCA, LLP
Berkeley, CA 94710                     4725 Wisconsin Ave. NW, Suite 200
Telephone: (510) 725-3000              Washington, DC 20016
Facsimile: (510) 725-3001              Telephone: (202) 789-3960
shanas@hbsslaw.com                     jonc@cuneolaw.com
                                       joel@cuneolaw.com
GUSTAFSON GLUEK PLLC                    bfinley@cuneolaw.com
                                       evelyn@cunelolaw.com
By:___s/ Daniel C. Hedlund_____
    DANIEL C. HEDLUND (#258337)        *Co-Lead Counsel for Commercial and*
                                       *Institutional Indirect Purchaser Plaintiffs*
Daniel E. Gustafson (#202241)
Michelle J. Looby (#388166)
Brittany N. Resch (#0397656)

- 85 -

120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
bresch@gustafsongluek.com

*Co-Lead Counsel for Consumer Indirect*
*Purchaser Plaintiffs*
LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By:  s/ W. Joseph Bruckner
    W. JOSEPH BRUCKNER (MN #0147758)

Elizabeth R. Odette (MN #0340698)
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
Arielle S. Wagner (MN #0398332)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
aswagner@locklaw.com

Bruce L. Simon
PEARSON, SIMON & WARSHAW, LLP
350 Sansome St., Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com

*Co-Lead Class Counsel for Direct Purchaser*
*Plaintiffs*

PEARSON SIMON & WARSHAW, LLP

By:   s/ Bobby Pouya
    BOBBY POUYA

Clifford H. Pearson
Bobby Pouya
Michael H. Pearson
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Melissa S. Weiner (MN #0387900)
Joseph C. Bourne (MN #0389922)
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pswlaw.com
jbourne@pswlaw.com

*Co-Lead Class Counsel for Direct Purchaser*
*Plaintiffs*

- 86 -