# EXHIBIT A

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   EASTERN DISTRICT OF OKLAHOMA
2

3

HAFF POULTRY, INC., JOHNNY UPCHURCH,   )
4   JOHNATHAN WALTERS, MYLES B. WEAVER,     )
MELISSA WEAVER and NANCY BUTLER,       )
5                                          )
                      Plaintiffs,          )
6                                          )
        vs.                                )   No. CIV-17-33-RJS
7                                          )
TYSON FOODS, INC., TYSON CHICKEN,          )
8   INC., TYSON BREEDERS, INC., TYSON       )
POULTRY, INC.,PILGRIM PRIDE             )
9   CORPORATION and PERDUE FARMS,INC.,      )
                                           )
10                     Defendants.          )

11

12              TRANSCRIPT OF MOTION HEARING
          **BEFORE THE HONORABLE ROBERT J. SHELBY**
13              UNITED STATES DISTRICT JUDGE

14                   JANUARY 6, 2020

15                    *  *  *  *  *

16

17

18

19

20

21

22

REPORTED BY:            KEN SIDWELL, CSR-RPR
23                          United States Court Reporter
                        P.O. Box 607
24                          Muskogee, Oklahoma  74402

25

2

<pre>
 1                        APPEARANCES

 2    FOR THE PLAINTIFFS:

 3         MR. ERIC L. CRAMER, Berger & Montague, PC,
      1622 Locust Street, Philadelphia, Pennsylvania, 19103,
 4
           MR. GARY I. SMITH, JR., Hausfeld, LLP, 325 Chestnut
 5    Street, Suite 900, Philadelphia, Pennsylvania, 19106,

 6         MR. DANIEL J. WALKER, Berger Montague, PC, 2001
      Pennsylvania Avenue NW, Suite 300, Washington, D.C. 20006,
 7
           MR. GARY E. MASON, Whitfield Bryson & Mason, LLP, 5101
 8    Wisconsin Avenue, NW, Suite 305, Washington, D.C. 20036.

 9    FOR THE DEFENDANTS:

10         MS. RACHEL J. ADCOX, Axinn Veltrop & Harkrider, LLP,
      950 F Street, NW, Washington, D.C. 20004, for Tyson,
11
           MR. CLAYTON E. BAILEY, Bailey, Brauer, PLLC, 8350 North
12    Central Expressway, Suite 206, Dallas, Texas, 75206, for
      Pilgrim Pride,
13
           MS. PATRICIA A. SAWYER, Whitten Burrage, 512 North
14    Broadway, Suite 300, Oklahoma City, Oklahoma, 73102, for
      Tyson,
15
           MR. LEONARD L. GORDON, Venable, LLP, 1270 Avenue of the
16    Americas, 24th Floor, New York, New York, 10020, for Perdue.

17

18

19

20

21

22

23

24

25
</pre>

3

1                    JANUARY 6, 2020 PROCEEDINGS

2                   (On the record at 9:48 a.m.)

3            THE COURT:  Are there fewer of you than there were

4     last time?  Are some of you dying in the interim?  Good

5     morning.  We'll go on the record in our consolidated case,

6     Number 6:17-CV-33.  Counsel, you are familiar to me, though

7     it's been a while since I've had the pleasure of seeing your

8     faces and I have your names here, but take a moment, would

9     you, please, and make your appearances.

10           MR. CRAMER:  Good morning, Your Honor.  Eric

11    Cramer from Berger & Montague for the plaintiffs.  And we

12    also have in the audience Stephen Haff from Haff Poultry.

13           THE COURT:  Great.  Thank you.

14           MR. CRAMER:  Thank you, Your Honor.

15           MR. SMITH:  Good morning, Your Honor.  Gary Smith

16    from Hausfeld on behalf of the plaintiff.

17           THE COURT:  Welcome.

18           MR. WALKER:  Good morning, Your Honor.  Dan Walker

19    from Berger & Montague on behalf of the plaintiffs.

20           THE COURT:  Thank you.

21           MR. MASON:  And good morning, Your Honor.  Gary

22    Mason with Whitfield Bryson & Mason.

23           THE COURT:  Terrific.

24           MS. ADCOX:  Good morning, Your Honor.  Rachel

25    Adcox from Axinn Veltrop & Harkrider on behalf of Tyson

4

1   Foods.

2         THE COURT:  Thank you.

3         MR. GORDON:  Good morning, Your Honor.  Leonard

4   Gordon from Venable Firm on behalf of Perdue.

5         MS. SAWYER:  Good morning.  Patricia Sawyer,

6   Whitten Burrage on behalf of Tyson Foods.

7         THE COURT:  Thank you.

8         MR. BAILEY:  Good morning, Your Honor.  Clayton

9   Bailey from Bailey Brauer in Dallas on behalf of Pilgrims

10  Pride.

11        THE COURT:  Good morning.  Sorry to keep you all

12  for a few minutes this morning.  We were having an IT issue.

13        So as we discussed during our telephonic status

14  conference in November what I anticipate accomplishing today

15  is providing you with rulings on the outstanding motions,

16  and then I think we have some case management work to do.

17  And I'll be asking all of you for some guidance and feedback

18  when we get to that point.

19             You'll want to take a moment before we begin

20  and look at your workspace and make sure there's nothing

21  sharp lest one of your colleagues be reaching for something

22  sharp to stab yourself while I give this oral ruling because

23  it is long.  So if you have other work that you need to do

24  or whatever, take a nap, if you'd just keep your snoring

25  down a little bit, please, so the court reporter can hear.

1    We've attempted to be thorough and complete in the rulings

2    that we'll provide today.  And the upside of that is that

3    you'll have the benefit, I hope, of a relatively complete

4    record in the event that you need it for some reason.  The

5    downside is you'll just have to bear with us.  There'll be a

6    long time before any of you speak again.

7                The punch line is that I'm denying the

8    defendants' joint motion to dismiss under Rules 12(b)(2),

9    12(b)(3) and 12(b)(6).  That joint motion is Docket 193.

10   And then I'm also denying Perdue's motion to compel

11   arbitration with Plaintiff Butler.  That's Docket 192.

12                I have in my mind that we have some work that

13   we need to do with the complaint to ensure our compliance

14   with the bankruptcy court order respecting Pilgrims Pride

15   was it?  Right.

16                One of the things that I'll be asking counsel

17   for the plaintiffs after we complete giving the ruling is

18   anticipating a likelihood that there will be a second

19   amended complaint to deal with the bankruptcy issues.  There

20   isn't a motion pending for leave to file a further amended

21   complaint, and I think we ought to talk about what it is

22   that the plaintiffs would anticipate, or wish to achieve

23   through an amendment and the scope of that amendment, or

24   whether it's something that you all need time to consult

25   with your clients and then perhaps file a motion describing

1    in greater detail.  The nuance or the complexity I see to

2    that is that my hope and desire, given the time that has

3    elapsed, is that we leave here today with sort of a time

4    line for moving forward and some clear guidance about how

5    and when the next steps will be achieved so that we can get

6    the train moving again.

7              I think, in the interest of completeness, it

8    may be helpful for us to begin by reminding ourselves where

9    we've been, and so I'll take a moment at the outset here and

10   provide I think a summary of our procedural history, and

11   then we'll move into the motions.  And we'll take them up in

12   turn.  First, the motion to dismiss and then the arbitration

13   motion.

14             So in January of 2018, we were together here

15   and received argument on, and the Court issued a ruling

16   effectively granting the motion or motions of the Koch

17   parties and Sanderson defendants' motion to dismiss for

18   personal jurisdiction and improper venue.  And then when

19   last we were together, we received argument on the two

20   motions that the Court will be addressing today.  The

21   transcript of that hearing is our Docket Number 229.  That

22   hearing was in April, April 26 of 2018.  And I think

23   prompted in part by some of the argument that we had during

24   that hearing, the defendant sought and received leave to

25   file supplemental briefing concerning allegations of a

1    relevant market, and the defendants filed that supplemental

2    briefing in May of 2018.  That's Docket 234.  That prompted

3    the plaintiffs to respond in June of 2018, Docket 239.

4           The Court then received additional briefing,

5    further briefing both in June and in July.  First, the

6    defendants, through a motion, provided supplemental

7    authority, Docket 242.  And the plaintiffs responded in turn

8    with -- well, responded to that supplemental authority in a

9    response that's Docket 243.  And I'm going to take a short

10   detour here and discuss briefly the supplemental authority,

11   again in the interest of a complete and thorough record.

12          So I'll just be to the point here.  The

13   supplemental authority submitted by the parties plays no

14   role in the Court's analysis today, other than, in some

15   instances, citations to some of the new cases for basic

16   Sherman Act principles.  And the reason that the

17   supplemental authority is not significantly affecting the

18   Court's ruling is that, well, really, the reasons set forth

19   in the plaintiffs' response to that authority.

20          Briefly, the defendants submitted to the

21   Court the Supreme Court decision of *Ohio vs. American*

22   *Express Company*, a 2018 decision in which the Supreme Court

23   found vertical antisteering agreements in American Express's

24   contracts with its merchants not to be Sherman Act

25   violations under the rule of reason.  The defendants contend

1    that that case is important here because, they argue, the

2    court clarified that a Sherman Act plaintiff must show a

3    relevant market when the alleged restraints at issue are

4    vertical.

5          In vertical cases we need a showing of a

6    relevant market because the entity imposing restraints must

7    have market power.  Defendants analogized the American

8    Express merchant relationship there to the relationship here

9    among the poultry integrator companies and their

10   relationship to Agri-Stats and, for that reason, they

11   characterize the plaintiffs' claims in this case as being

12   vertical in nature.  But in my judgment, accepting that

13   characterization ignores how the plaintiffs themselves have

14   chosen to plead their claim and how it has been alleged to

15   operate in the consolidated amended complaint, including the

16   horizontal nature of the reciprocity between the

17   integrators, which is merely facilitated by Agri-Stats and

18   is the real target of the plaintiffs' claims.

19         Agri-Stats, as we'll discuss at great length

20   today, takes the information from the integrators and then

21   shares it with the horizontal actors who further use it for

22   their own benefit.  The conduct the plaintiffs challenge is

23   not vertical, and does not involve a vertical restraint in

24   the defendants' relationship with Agri-Stats.  And so I

25   wholly agree, at this stage at least, with the reasoning in

9

1    the plaintiffs' response to the authority, Docket 243.

2              And let me say, I just commented on some of

3    the allegations.  And I'll be referring today to facts

4    extensively in our discussion.  And just by way of

5    background and a reminder, we're here at Rule 12.  So the

6    facts that I'm relying on are largely drawn, but not

7    exclusively drawn here from the amended consolidated

8    complaint.  And those facts in that complaint of course are

9    presumed to be true, though while pleaded allegations in

10   that complaint, presumed to be true.

11             I think it is appropriate, given the nature

12   of the claims, for the defendants to have provided

13   additional factual information, and I've considered that at

14   times as it's appropriate.  And I failed to mention this at

15   the beginning because I haven't yet started into the

16   discussion about the motions on their merits.  But you don't

17   need to -- you can set down your pens.  Take whatever notes

18   you want.  But I'm not going to be asking any of you to

19   prepare a ruling to submit an order for the Court's review.

20   Instead, we'll be placing on the docket in the next few days

21   an entry referring to the transcript of this hearing and

22   this portion of the hearing as the Court's ruling and the

23   basis for the Court's ruling.  So you don't need to worry

24   about cramps in your hands.

25             All right.  Returning to our procedural

1    history.  In the first quarter of 2019, the plaintiff -- or,

2    excuse me -- the plaintiffs, yes, corresponded with the

3    Court specifically concerning Pilgrims Pride, and the

4    plaintiffs requested a hearing to take up those issues.

5    That was Docket 250.  Pilgrims Pride responded and

6    questioned whether a hearing was necessary.  And then, as I

7    said, in November when we spoke, I was slow to get a status

8    conference set in November.  And my apologies again to all

9    of you and your clients for that delay.  And while I

10   can't -- I can't go back and make up for that time, I can

11   assure you and I do assure you that you have my undivided

12   attention, and you will moving forward.  We'll be fully

13   engaged to ensure that there are not any additional

14   unnecessary delays.

15              In any event, in the weeks leading up to the

16   status conference that we had in November, the plaintiffs

17   filed a motion to lift discovery -- or, excuse me -- the

18   discovery stay in this case.  That submission was Docket

19   253.  And of course, the defendants opposed that motion in

20   Docket 261.

21              During that November status conference, we

22   discussed the Pilgrims Pride issues, the need for this

23   hearing to provide an oral ruling rather than having

24   additional delay for the benefit of a written decision.  And

25   during that hearing, I denied without prejudice the

1    plaintiffs' motion to lift the discovery stay.

2              So we'll proceed now, as I said, with oral

3    rulings on the outstanding motion to dismiss and the

4    arbitration, and then we'll take up some housekeeping

5    matters.

6              Throughout the hearing and throughout this

7    ruling, I will at times refer to page numbers in some of the

8    filings, especially with respect to the briefings.  And just

9    so it's clear, I'll be referring to the pagination that the

10   court's docketing system places on the papers at the top of

11   the page, which does not usually align with the pagination

12   that the parties use when you prepare the documents

13   initially.

14             So we'll turn now to defendants' joint motion

15   to dismiss.  And let me just say, because at some point

16   you'll become desperate for a break, we will take a break

17   after we get through the ruling on the motion to dismiss,

18   and we'll break before we come back to take up the

19   arbitration motion.

20             Turning then to the motion to dismiss, Docket

21   193.  As I've said a moment ago, in consideration -- or the

22   ruling I'm about to provide is in consideration of the

23   defendants' opening brief, Docket 193; the plaintiffs'

24   opposition, Docket 200; the plaintiffs' reply, Docket 208;

25   the defendants' corrected supplemental brief, Docket 234;

1    the plaintiffs' response in opposition to the corrected

2    supplemental brief, Docket 239; defendants' additional

3    supplemental authority, 242; the response to that authority,

4    Docket 243; and then a careful review of our hearing

5    transcript.  And I thank counsel again for your excellent

6    oral argument on the motions.

7               In this putative class action antitrust case,

8    six broiler chicken growers assert, in a consolidated

9    amended complaint, two causes of action against the

10   defendants who are broiler chicken integrators, companies

11   that purchase the broiler chicken grower services.

12              In their first cause of action, the plaintiff

13   growers assert a claim arising under Section 1 of the

14   Sherman Act, 15 United States Code, Section 1.  I'm

15   referring now to the amended complaint, Docket 137 and

16   Paragraphs 165 to 169.  In that claim, plaintiffs contend

17   the integrator defendants, together with other integrators,

18   formed a scheme not to compete amongst each other for grower

19   services in order to suppress grower compensation.

20   Plaintiffs allege this scheme is per se illegal under the

21   Sherman Act, and that it was effectuated through certain

22   facilitating agreements or practices, including, among other

23   things, first, the exchange of detailed current disagregated

24   grower compensation data; and, second, by entering into

25   agreements not to solicit or poach each other's growers.

1          In their second cause of action, the growers

2  assert a claim for unfair practice in violation of Section

3  202 of the Packers and Stockyards Act, 7 United States Code,

4  Section 192(a).  This is Paragraphs 170 through 178.  The

5  defendant integrators jointly moved to dismiss the plaintiff

6  growers' consolidated amended complaint with prejudice

7  pursuant to Rule 12(b)(2), 12(b)(3) and 12(b)(6) of the

8  Federal Rules of Civil Procedure.  And respectively, of

9  course, these rule provisions concern dismissal for lack of

10  personal jurisdiction, improper venue, and failure to state

11  a claim upon which relief can be granted.

12          The defendant integrators contend the growers

13  have not plausibly alleged a Sherman Act claim, nor a PSA

14  claim.  Further, the integrators argue that the growers have

15  not shown that venue is proper in this district for the PSA

16  claim.  And the defendants further argue that, if the

17  Sherman Act claim is dismissed, then any PSA claim brought

18  on behalf of non-Oklahoma plaintiffs must also be dismissed

19  for lack of personal jurisdiction.

20          We'll take a moment I think at the outset and

21  survey the plaintiffs' consolidated complaint that is the

22  basis for the motion to dismiss.  The factual background, as

23  I said, is drawn from the allegations in that complaint, and

24  they are assumed at this stage to be true.  And I cite *Abdi*

25  *vs. Wray*, a Tenth Circuit decision from 2019.  Its factual

1    background will be familiar to all of you, though I

2    understand that some of it will be -- much of it will be

3    disputed by the defendants later in the case.

4              Broiler chickens account for nearly all

5    domestic chicken consumption.  Their production is

6    concentrated in localized networks controlled by vertically

7    integrated companies like the defendants, who control nearly

8    every aspect of production under agreements known as

9    Contract Farming Arrangements, or CFAs, with thousands of

10   domestic poultry growers.  Citing Paragraph 45.

11             The CFAs are substantially similar across the

12   integrators with nearly identical compensation terms.

13   Paragraph 57.  The integrator defendants do not permit their

14   growers to provide grow-out services to any other

15   integrators.  Paragraph 58.  Growers are also barred under

16   their CFAs from sharing confidential compensation

17   information.  Paragraph 64.

18             And now I'm going to refer at times today to

19   the defendants, and of course the original consolidated

20   amended complaint named five defendant families as I think

21   of them.  And several of them have been dismissed, as we

22   said, the Sanderson and Koch parties most notably.  But I'll

23   be referring to the defendants collectively as they were

24   named in the consolidated amended complaint for at least two

25   reasons.  One, those are the allegations before us.  And,

1    second, while they are no longer here, at least the Koch and

2    Sanderson related parties are still alleged to be defendants

3    that engaged in this conspiring agreement in restraint of

4    trade.

5         The defendants are the five largest U.S.

6    poultry integrators accounting for 60 percent of the grower

7    services.  Paragraph 46.  And as a result of a market shift

8    toward integration, there are only about 25 integrators in

9    the nation, and they collectively contract with about 97

10   percent of the domestic poultry growers, and that total is

11   around 30,000.  I'm citing Paragraph 50.  Growers provide

12   the land and specified facilities or so-called grow-out

13   houses, which can cost as much as $300,000 or more to build,

14   and those facilities are designed to care for chickens until

15   the integrators take them.  Growers often go into

16   substantial debt to begin providing grow-out services.  And

17   even a well-performing grower may spend decades recouping

18   his or her initial investments.  The integrators provide

19   birds, veterinary services, and supervision to the growers.

20   I'm citing Paragraphs 53 and 54, 59 and 61.

21        Since 2008, the defendants and other

22   integrators who control 120 broiler chicken complexes, about

23   98 percent of domestic broiler production, have shared

24   detailed non-public contemporaneous grower compensation

25   information, which is not shared with the growers

1   themselves.  Paragraphs 66, 69 and 75.  The integrators

2   share data on a weekly basis by disseminating to and

3   receiving from a third party company, Agri-Stats, the data.

4   Agri-Stats is a research firm whose mission is to "improve

5   the profitability" of its clients.  And I've omitted some of

6   the language in the middle there that was not material.

7   Paragraphs 68 through 69, 72 and 75.

8          The information defendants and other

9   integrators share through Agri-Stats includes information on

10  complexes both regionally and based on individual farms.

11  Paragraphs 69 and 71.  Defendants and other integrators

12  share granular data on grower compensation, as well as

13  numerous other categories of information concerning their

14  complexes, including general locations, monthly profits per

15  live pound, anticipated capacity, future output, equipment,

16  breeder stock characteristics, the number of chicks

17  delivered, broiler weights and mortality rates, production

18  rates per square foot, feed and medicine use, and

19  transportation costs.  Paragraph 70.

20         The information is purportedly anonymous, but

21  lacks the safeguards necessary to prevent one with knowledge

22  in the industry from identifying which data belongs to which

23  defendants or other integrators, or which would prevent

24  people with knowledge in the industry from using that data

25  to determine grower compensation.  Paragraphs 73 and 74.

1            In addition to the information shared through

2   Agri-Stats, the defendants and other integrators also share

3   chicken feed samples, Paragraph 76; permit access to each

4   other's complexes, including to Sanderson and Perdue

5   complexes in North Carolina, Paragraph 77; and high level

6   employees among integrators move freely amongst the

7   competing companies, unbounded by non-compete and

8   confidentiality agreements, Paragraph 78.

9            Plaintiffs allege defendants and other

10  integrators have an agreement not to solicit or to recruit

11  one another's growers.  Paragraph 79.  And evidence of this

12  includes the following:  According to a letter written to

13  the federal Grain, Packers and Stockyards Administration,

14  one Tyson grower complained that he had inquired about a job

15  posting by non-defendant integrator Peco Foods, but when he

16  called Peco Foods, he was told that "the companies had an

17  agreement among each other not to take each other's

18  growers."  Paragraph 80.

19           Quotes from articles and workshops suggesting

20  growers have experienced challenges in being hired by other

21  integrators are also included as well as -- well, and that

22  that information from the workshops and articles cause some

23  in the industry to believe that the companies have entered

24  into no-poach agreements.  That information is set out in

25  Paragraphs 81 and 82.  And the plaintiffs further point to

1    data, including the fact that only a small percentage of

2    growers switch integrators each year.  For example, in 2014,

3    only 2.88 percent to five percent of integrators changed --

4    excuse me -- of growers changed integrators.  That's set out

5    in Paragraphs 85 through 87.  And the plaintiffs say that's

6    telling in view of the fact that 75 percent of growers have

7    more than one integrator in their geographic area and could,

8    therefore, theoretically switch integrators but for the

9    alleged no-poach agreement.  Paragraph 89.

10              Plaintiffs allege that when growers do switch

11   integrators, the switch is accompanied by, if not driven by

12   a benefit to the integrator.  And citing what appears to be

13   a hypothetical example in the complaint, the plaintiffs

14   describe a scenario under which one integrator may have

15   excess processing capacity and may, therefore, hire another

16   integrator's growers if the second has too many growers at

17   the time.  That's set out in Paragraph 88.

18              The complaint identifies industry factors,

19   so-called plus factors, that the plaintiffs contend render

20   the industry susceptible to collusion and bolster the

21   plausibility of the overarching scheme that's alleged in the

22   complaint.  And according to plaintiffs, these factors

23   include:  High barriers to entry for integrators; two, high

24   exit barriers for growers, including requisite upgrades and

25   debt burdens; number three, inelastic demand; number four,

1   industry concentration; number five, fungibility of grow-out

2   services; number six, opportunities to collude, including

3   regular meetings of the National Chicken Counsel, three

4   annual board meetings at least, and industry leadership

5   involvement among representatives of the various defendants.

6          More, plaintiffs point to the fact that the

7   industry has been subject to antitrust scrutiny in the past,

8   and they point to the fact that the Department of Justice in

9   the 1970s shut down regular industry conference calls during

10  which broiler production and prices were discussed.  That's

11  in Paragraph 125.  Plaintiffs maintain that Agri-Stats has

12  effectively replaced those weekly conference calls.

13          The complaint provides information and

14  allegations concerning a relevant market and monopsony

15  power.  In this respect, the plaintiffs allege the

16  defendants "collectively possessed market and monopsony

17  power" in the relevant market, which the plaintiffs define

18  as -- which the plaintiffs define as the purchase of

19  grower -- excuse me -- broiler grow-out services in the

20  United States.  Paragraphs 129 and 136.  Defendants buy more

21  than 60 percent of those services.  Paragraph 132.

22  Plaintiffs allege that the uniform CFAs that integrators

23  impose with identical or nearly identical compensation

24  levels necessarily suppress grower compensation "in all

25  geographic regions in the United States."  Paragraph 134.

20

1    And plaintiffs maintain that, absent this, the integrators

2    would compete and might open plants where other integrator

3    companies already exist.  Paragraph 135.

4              The complaint goes on to identify alleged

5    anticompetitive effects of this scheme and injury suffered

6    by the class, or the putative class.  Plaintiffs allege

7    grower compensation levels have been suppressed below

8    competitive levels due to the information sharing scheme,

9    Paragraphs 137 to 140, and the no-poach agreement,

10   Paragraphs 141 and 142.  And due to suppression and the law

11   of supply and demand, this necessarily results, the

12   plaintiffs maintain, in fewer broilers being produced than

13   would otherwise be produced if the growers were paid

14   competitively, further resulting in reduced broilers on the

15   market and a higher market price to consumers.  Paragraph

16   145.

17             And in this section of the complaint, the

18   plaintiffs discuss the tournament system, which fixes grower

19   compensation based on how growers rank against one another

20   on feed conversion rates and then apply formulaic

21   guidelines.  The shared compensation information, plaintiffs

22   maintain, is used to set tournament system levels wherein

23   top growers receive base pay plus an incentive, while bottom

24   performing growers receive base pay less a disincentive.

25   Plaintiffs allege this system is one means by which the

1    scheme artificially reduces grower compensation.  Paragraph

2    146.

3                 So against that factual background, these are

4    the legal standards that the Court thinks are governing and

5    that I'm required to apply to the motion.

6                 The defendants maintain in the Rule 12(b)(6)

7    challenge to the plaintiffs' Sherman Act claim that the

8    claim is subject to dismissal because the plaintiffs have

9    not plausibly alleged agreements amongst the defendants

10   either to poach each other's growers, or to exchange illicit

11   information.

12                The pleading standards are familiar to all of

13   you.  Dismissal under Rule 12(b)(6) is appropriate only if

14   the complaint, viewed in the light most favorable to the

15   plaintiff, lacks enough facts to state a claim to relief

16   that is plausible on its face.  And I'm citing again the

17   *Abdi* decision from the Tenth Circuit.

18                In deciding whether the plaintiff has

19   adequately stated a claim for relief, I'm required to view

20   the allegations in the consolidated amended complaint in the

21   light most favorable to the plaintiffs, accepting the

22   well-pled facts as true, and drawing all reasonable

23   inferences in the plaintiffs' favor.  More language from

24   *Abdi* at Page 1025.

25                To avoid dismissal, plaintiffs' consolidated

1    amended complaint must comport with Rule 8(a)(2) of the

2    Federal Rules of Civil Procedure which requires a short and

3    plain statement of the claim showing that the plaintiffs are

4    entitled to relief.  The Rule 8 pleading standard, the

5    Supreme Court has told us, does not require detailed factual

6    allegations, but it demands more than an unadorned

7    accusation.  That's language from *Iqbal*, the 2009 decision

8    from the Supreme Court.  A claim offering labels and

9    conclusions, or a mere formulaic recitation of the elements

10   of a cause of action are insufficient.  The court explained

11   that in greater detail in *Iqbal*.  Also insufficient are

12   claims tendering naked assertions devoid of further factual

13   enhancement.

14           Rather, to survive defendants' Rule 12(b)(6)

15   challenge, the plaintiffs must allege sufficient factual

16   matter accepted as true to state a claim to relief that is

17   plausible on its face allowing the court to draw the

18   reasonable inference that the defendants are liable for the

19   misconduct alleged.  More language from *Iqbal*.  And while

20   the court generally must accept factual allegations in a

21   proposed claim as true, it is not bound to accept as true

22   legal conclusions couched as factual allegations.  That was

23   explained in *Twombly* at Page 555.  *Twombly*, of course the

24   2007 Supreme Court decision, and we'll be talking more about

25   that in a moment.  Rather, the factual allegations must be

1    enough to raise a right to relief above the speculative

2    level.  More language from *Twombly*.

3                    And when considering plausibility and fair

4    notice to the defendants, the degree of specificity

5    necessary in the plaintiffs' complaint necessarily depends

6    on the context.  So said the Tenth Circuit in *Robbins vs.*

7    *Oklahoma*, a 2008 decision.

8                    So I'll discuss the contours of the

9    plaintiffs' Sherman Act claim more in a moment.  But as the

10   Supreme Court stated in *Twombly*, such a claim, at the least,

11   requires allegations containing enough factual matter taken

12   as true to suggest that an agreement was made.  That's at

13   Page 556 of Justice Souter's decision.  Such an agreement

14   must be plausible, though not necessarily probable.  There

15   simply must be enough facts "to raise a reasonable

16   expectation that discovery will reveal evidence of an

17   illegal agreement."  That quote drawn also from Page 556.

18   And the court continued, "Thus, a well-pleaded complaint may

19   proceed even if it strikes a savvy judge that actual proof

20   of those facts is improbable and that a recovery is very

21   remote and unlikely."  And as then-Second Circuit Judge

22   Sotomayor reminded us in *Todd vs. Exxon Corp.* cited and

23   relied upon by both sides in the context of this Rule 12

24   motion, "No heightened pleading standard" -- excuse me --

25   "No heightened pleading requirements apply in antitrust

24

1    cases.  A short plain statement of a claim for relief which

2    gives notice to the opposing party is all that is necessary

3    in antitrust cases as in other cases under the federal

4    rules."  Of course, that's a 2001 decision and I'm omitting

5    the internal citations.  As then-Judge Sotomayor continued,

6    "Furthermore, in antitrust cases in particular, the Supreme

7    Court has stated that dismissals prior to giving the

8    plaintiffs ample opportunity for discovery should be granted

9    very sparingly."

10             So turning now more specifically to the

11   Sherman Act claim, the Sherman Act, 15 United States Code,

12   Section 1 provides that every contract, combination in the

13   form of trust or otherwise, or conspiracy, in restraint of

14   trade or commerce among the several states, or with foreign

15   nations, is declared to be illegal.  A plaintiff asserting a

16   claim under Section 1 must prove not only the existence of

17   an agreement or conspiracy between two or more competitors

18   to restrain trade, but also that the restraint is

19   unreasonable.  That's a quote from the Tenth Circuit in

20   2017, the case, *Buccaneer Energy vs. Gunnison Energy*

21   *Corporation*.

22             Restraints are found to be unreasonable in

23   two ways.  First, a small group of restraints are

24   unreasonable per se because they always, or almost always

25   tend to restrict competition and decrease output.  That's a

1    quote from the Supreme Court in *Ohio vs. American Express*.

2    Put another way, agreements or practices are per se

3    unreasonable where, because of their pernicious effect on

4    competition and lack of any redeeming virtue are

5    conclusively presumed to be unreasonable and, therefore,

6    illegal without elaborate inquiry as to the precise harm

7    that they have caused or the business excuse for their use.

8    That's a quote from the *Buccaneer* decision from the Tenth

9    Circuit.

10            For example, under the Sherman Act, a

11   combination formed for the purpose and with the effect of

12   raising, depressing, fixing, pegging, or stabilizing the

13   price of a commodity in interstate or foreign commerce is

14   illegal per se.  That's a quote from *United States vs.*

15   *Socony-Vacuum Oil Company*, a 1940 decision from the Supreme

16   Court.  And, likewise, more recently, the Tenth Circuit has

17   stated that "horizontal price fixing and group boycott are

18   per se violations, so a plaintiff's failure to allege a

19   relevant market is not fatal to such a claim."  That

20   discussion is in *Campfield vs. State Farm Mutual*, a 2008

21   decision.

22            In contrast, restraints that are not per se

23   unreasonable are evaluated under the rule of reason, which

24   requires a fact-specific assessment of market power and

25   market structure to assess the restraint's actual effect on

1   competition.  Language again from the 2018 *American Express*

2   decision by the Supreme Court.  And as the Tenth Circuit

3   said in *Buccaneer*, the rule of reason is the default

4   approach, and there is a presumption in favor of its

5   application.  Under the rule of reason, the court seeks to

6   ascertain the extent to which challenged conduct harms

7   competition, and then to determine whether any such harm is

8   nonetheless justified by countervailing procompetitive

9   benefits.

10              So with those principles in mind, I'll now

11  turn to the defendants' specific challenges to the

12  plaintiffs' Sherman Act claim.

13              Defendants contend that the plaintiffs have

14  failed to plead adequately their Sherman Act claim.  In

15  their opening brief, the defendants insist that the Court

16  should look past how the plaintiffs chose to plead their

17  claim, that is as an overarching scheme, illegal per se, not

18  to compete for grow-out services with facilitating

19  information sharing and no-poaching agreements.  Instead,

20  the defendants ask us to evaluate those facilitating

21  practices distinctly as two separate agreements or claims

22  independently themselves.  This argument is set out at Page

23  8 of Docket 193.

24              And at least in my judgment, in essence, I

25  construe the defendants' argument to be that the plaintiffs'

1    Sherman Act claim fails because it inadequately pleads two

2    Sherman Act claims that the plaintiffs are not independently

3    asserting.  It seems to me, at its core, the defendants are

4    trying to redraft the plaintiffs' complaint.  And, of

5    course, this they may not do.

6              Defendants urge that, when considered

7    separately, the defendants' pleading falls short.

8    Defendants argue that the no-poach agreement fails because

9    plaintiffs do not offer sufficient factual support for it,

10   and because there are obvious alternative reasons why

11   growers do not switch amongst integrators.  And defendants

12   urge that, when considered distinctly, any information

13   sharing agreement must be analyzed under the rule of reason,

14   and that, under that rule, that claim fails.  Defendants

15   only very briefly addressed the plaintiffs' overarching per

16   se scheme allegation in a few paragraphs only in their

17   opening brief and in reply.  Defendants fleetingly argue

18   that the claim is factually unsupported, and that the Court

19   must analyze each agreement separately, and that the

20   information sharing claim, as I said, must be evaluated at

21   this stage under the rule of reason.  The treatment of this

22   issue and the overarching claim is addressed in Docket 193

23   at Pages 18 and 20, and Docket 208 at Pages 3 and 4.

24              The plaintiffs respond that the consolidated

25   amended complaint plausibly sets forth a single overarching

1   conspiracy or scheme among the defendants not to compete for

2   broiler chicken grow-out services which had the effect of

3   keeping grower compensation artificially low.  This

4   discussion in paragraph -- excuse me -- in Docket 200 at

5   Page 15, and Docket 137, Paragraphs 1 through 4.  That's the

6   consolidated amended complaint.

7           In their briefing and in the consolidated

8   amended complaint, plaintiffs allege that the scheme is

9   illegal per se under the Sherman Act.  Docket 200 at Page

10  10, the amended complaint at Paragraph 169.  Plaintiffs

11  allege the overarching scheme had at least two complimentary

12  and mutually reinforcing elements.  As we've said, first,

13  the agreement to share current, detailed, sensitive and

14  confidential business information, including grower

15  compensation.  And that this agreement enables compensation

16  suppression, and allows conspiring integrators to monitor

17  input prices resulting in coordinated compensation levels

18  which disincentivises growers from switching amongst those

19  integrators.  And then, second, a complementary no-poach

20  agreement not to solicit or hire growers from other

21  conspiring integrators, resulting in the growers' complete

22  inability to switch amongst at least those participating

23  integrators.

24          As I've said, while the plaintiffs urge the

25  Court to evaluate the two mutually reinforcing elements of

1   their alleged scheme together and to evaluate them in their

2   full context, they also argue that, if analyzed separately,

3   each component of the scheme is sufficiently alleged as an

4   independent violation of the section act -- or, excuse me --

5   Section 1 of the Sherman Act, and that the defendants'

6   arguments at this early stage, Rule 12, essentially amount

7   to affirmative defenses.  That argument is on Page 10 of

8   Docket 200.

9               I decline for the reasons I'm going to now

10  explain -- at this stage of the proceeding at least, I

11  decline the defendants' invitation to recast the plaintiffs'

12  per se Section 1 Sherman Act claim plaintiffs clearly set

13  forth in their consolidated amended complaint as two

14  separate claims which must be separately analyzed.

15              Though the defendants offered separate

16  analyses of the information sharing and no-poach agreements

17  in their opening brief, their explanation concerning why the

18  Court -- they maintain -- the Court was required to analyze

19  them separately at the motion to dismiss stage was less than

20  compelling in both their opening brief and the reply brief.

21  And it leaves me, in my judgment, without a firm basis on

22  which to reach such a legal conclusion at this time.  And I

23  feel like that might have been dense and not very clear.

24  What I mean is, the defendants have not persuaded me that

25  I'm required to disassemble the plaintiffs' single alleged

1    Sherman Act claim, and, instead, evaluate the component

2    constituent parts independently as if they were asserted as

3    independent claims under the Sherman Act.

4              And the cases cited by the defendants'

5    briefing leave me unpersuaded, as I've said, at this early

6    stage that the plaintiffs' overarching scheme must be

7    evaluated as two separate agreements.  First, both sides

8    discuss in their papers *Todd vs. Exxon*, that 2001 decision

9    from the Second Circuit authored by now-Justice Sotomayor.

10   Defendants cite it for the proposition that, that while

11   plaintiffs -- "while plaintiffs allege a per se violation of

12   the antitrust laws, they cannot show this allegation with an

13   information exchange agreement, because it is well-settled

14   that information exchanges are addressed under the rule of

15   reason."  That's set out in Docket 193 at Page 18.  But *Todd*

16   only expressly provides that information exchange claims

17   asserted independent of an alleged unlawful agreement --

18   excuse me -- independent of an alleged unlawful agreement,

19   in that case, of course, to fix salaries for certain

20   employees.  Only independent claims of that nature are

21   analyzed under the rule of reason.  In that decision,

22   then-Judge Sotomayor explained that horizontal price-fixing

23   agreements, illegal per se under the Sherman Act, may be

24   shown with evidence of "facilitating practices" such as

25   information exchange.  A quote from Page 198 of that

1    decision.  "Even in the absence of direct smoking gun

2    evidence, a horizontal price-fixing agreement may be

3    inferred on the basis of conscious parallelism where such

4    interdependent conduct is accompanied by circumstantial

5    evidence and plus factors such as defendant's use of

6    facilitating practices.  Information exchange is an example

7    of a facilitating practice that can help support an

8    inference of a price-fixing agreement."

9              The court of appeals there distinguished the

10   use of information sharing as a facilitating practice

11   showing a per se illegal price-fixing agreement with the

12   "closely related but analytically distinct type of Section 1

13   claim where the violation lies in the information exchange

14   itself, as opposed to merely using the information exchange

15   as evidence upon which to infer a price-fixing agreement."

16   This distinct information sharing claim, recognized in many

17   cases cited in the papers from *Maple Flooring* on, is

18   analyzed under the rule of reason.  But in *Todd*, the court

19   of appeals analyzed the information sharing at issue under

20   the rule of reason because the plaintiffs had not alleged an

21   actual agreement among defendants to fix salaries.

22             In contrast to the *Todd* case, the plaintiff

23   growers here have alleged an overarching horizontal

24   agreement amongst the integrators to refrain from competing

25   for grower services for the purpose of depressing grower

1    compensation.  Defendants do not contest that this would be

2    a per se -- excuse me -- do not contest that this would be a

3    per se violation of the Sherman Act.  And I conclude that

4    plaintiffs may, at this early stage, support their

5    allegations of that scheme in violation of the Sherman Act

6    per se with allegations of facilitating practices such as

7    sharing detailed non-public information, as well as other

8    plus factors plaintiffs identify from Paragraphs 90 through

9    128 in the consolidated amended complaint which "render the

10   industry susceptible to collusion and bolster the

11   plausibilty of the scheme."  And those include, as I've

12   said, the high entry barriers for integrators, the high exit

13   barriers for growers, inelastic demand for both broilers and

14   grower services, industry concentration, fungibility of

15   grow-out services, and numerous opportunities to collude.

16            Defendants also cite and rely on *In Re*

17   *Processed Egg Products Antitrust Litigation*.  It was a 2016

18   decision from the Eastern District of Pennsylvania.  And,

19   specifically, defendants rely on it for the proposition that

20   the facilitating practices described in the plaintiffs'

21   Sherman Act claim must be evaluated separately before the

22   plaintiff can proceed at the motion to dismiss stage.

23            I don't read that case, as I've said, from

24   another district court in Pennsylvania to so require that

25   result.  First, that case, like many of the cases relied on

1    and cited by the defendants, that case was decided at

2    summary judgment.  The plaintiffs there had alleged the

3    defendant egg producers had conspired in violation of

4    Section 1 to reduce the domestic egg supply in an effort to

5    raise prices, and it's set out at Page 1036 of the district

6    court decision.  The conspiracy was allegedly facilitated by

7    three programs, including a producer certification program

8    which increased minimum cage space per bird.  And in the

9    summary judgment motions before the court, the defendants

10   focused solely on the certification program, arguing it

11   could not amend to a per se violation, but, instead, had to

12   be analyzed under the rule of reason.  The court found that

13   issue a proper mode of legal analysis, as the court

14   described it, and presenting a legal question in the court's

15   view that was appropriate for summary judgment.  This is

16   explained at Page 1039 of that decision.  And the trial

17   court went on to explain that it concluded it would evaluate

18   the certification program separately and under the rule of

19   reason, despite the plaintiffs' arguments that the

20   defendants' collective actions in furtherance of the

21   conspiracy must be viewed as a singular attempt by the

22   defendants to artificially reduce egg supply, and that the

23   conspiracies to reduce egg supply were per se unlawful.

24   That's all explained at Page 1040 of the decision.

25                   The court, nevertheless, did evaluate the

34

1    claims separately -- the arguments separately and under the

2    rule of reason without clear precedent supporting that

3    specific determination, but, instead, simply stating that

4    the plaintiffs' position "cannot possibly be correct"

5    because it would subsume the rule of reason in most, if not

6    all, circumstances.  That discussion, the relevant

7    discussion again at Page 1040 of the decision.

8              I am not so confident as the district court

9    in Pennsylvania that that is correct, or that this is a

10   reason to reject a plaintiffs' view of their own claim at

11   the Rule 12 stage.  Indeed, doing what the *Egg Products*

12   court did arguably undermines the plaintiffs' ability to do

13   something numerous courts have said plaintiffs may do; prove

14   a per se illegal price-fixing agreement with circumstantial

15   evidence and plus factors.  It strikes me as strange that we

16   would break down each piece of a component of the component

17   evidence tending to show the agreement, and determine

18   whether, on its own, each piece satisfies the rule of

19   reason.

20             Nonetheless, for reasons that I will explain

21   in just a moment, my preliminary view of this issue is not

22   dispositive to my ruling on the Rule 12 motion, or whether

23   the case continues because, as I'll explain, I conclude that

24   at least the information sharing agreement is sufficiently

25   alleged under the rule of reason.

1              And the Court's decision at this stage and on

2    the limited briefing on this particular issue does not

3    foreclose the parties from raising this issue again at

4    summary judgment with more fully developed arguments and

5    with the benefit of a factual record.  Indeed, summary

6    judgment, or appeal therefrom, is the posture of most of the

7    relevant cases cited by the defendants.  But I just don't

8    find those cases conclusive at this stage of the litigation,

9    and on the sparse analysis that the defendants offer in

10   support of some of their arguments.

11             And I acknowledge that the less than entirely

12   clear language from Justice Kennedy in the *Leegin Creative*

13   *Leather Products* case to the effect that, if a vertical

14   agreement setting resale prices is made to support a clearly

15   per se illegal horizontal cartel, then the unlawfulness of

16   the resale agreement would need to be proven by the rule of

17   reason.  I acknowledge that language.  It's the 2007

18   decision.  That language is found on Page 893 of the

19   decision.

20             And he continued, Justice Kennedy did, to

21   state that this type of agreement may also be useful

22   evidence for a plaintiff attempting to prove the existence

23   of a horizontal cartel.  It's unclear to me at least, even

24   under that language, that these agreements supporting the

25   finding of a horizontal agreement that is per se illegal

1  must be independently proven under the rule of reason.  But

2  I concede that conclusion could change if the argument were

3  further developed, and we'll have to -- my guess is we'll

4  have to evaluate it again at summary judgment.

5          Briefly, in their discussion of this issue,

6  the defendants also cite in their papers *In Re Citric Acid*

7  *Litigation*, the 1999 decision from the Ninth Circuit for the

8  I think fairly unremarkable proposition that courts have

9  rejected evidence of an information exchange alone as

10  sufficient to support a finding that there is a conspiracy.

11  But the posture and facts of that case are quite distinct

12  from those here where we are simply setting the pleadings at

13  a Rule 12 stage.  In the *In Re Citric Acid Litigation* case,

14  there was an admitted conspiracy in the citric acid market,

15  but Defendant Cargill denied participating with other

16  conspirators.  After class certification and after

17  discovery, Cargill obtained summary judgment on the

18  plaintiffs' claim it had used trade organization meetings as

19  a vehicle for engaging in a conspiracy.

20          Conducting an independent review of the

21  evidentiary record on appeal, the court of appeals there

22  found there was no evidence to support the plaintiffs'

23  claim.  After disposing of plaintiff's argument that Cargill

24  participated in meetings where price fixing was admittedly

25  discussed by others, the court rejected plaintiffs' claims

1     that studying and meeting to discuss information about

2     Chinese citric acid producers was enough to support an

3     inference of a conspiracy involving Cargill, particularly

4     where minutes from the meeting indicated those in attendance

5     had rejected a suggestion to contact Chinese producers in an

6     effort to stabilize prices.  That discussion is on Page 1098

7     of that decision.

8               For all of those reasons, I am unconvinced at

9     this stage that plaintiffs' overarching per se scheme claim

10    must be broken down and analyzed agreement by agreement,

11    including through the application of a rule of reason

12    analysis for the information sharing practices that are

13    alleged.  Rather, as the plaintiffs state in their briefing,

14    together plaintiffs' allegations state a Section 1 claim.

15    Defendants' motion does not assert otherwise.  That's

16    language from Docket 200 at Page 10.

17              And in the language of the *Twombly* decision,

18    beginning at Page 1966, the court said, "It makes sense,

19    therefore, to say that an allegation of parallel conduct and

20    a bare assertion of conspiracy will not suffice.  Without

21    more, parallel conduct does not suggest conspiracy and a

22    conclusory allegation of agreement at some unidentified

23    point does not supply facts adequate to show illegality.

24    Hence, when allegations of parallel conduct are set out in

25    order to make a Section 1 claim, they must be placed in a

1    context that raises a suggestion of a preceding agreement,

2    not merely parallel conduct that could just as well be

3    independent action."  And that is exactly what I think the

4    plaintiffs have alleged here.

5              And for that reason the defendants' Rule 12

6    motion will be denied.  But even if I were required at this

7    stage, as the defendants urge, to analyze the overarching

8    schemes two primary facilitating practices or agreements

9    separately, as I've already said, I conclude the information

10   sharing agreement is adequately alleged under the rule of

11   reason.  And though it's a close -- I think a close

12   decision, I also conclude that, if it was analyzed

13   separately and required to be adequately pled separately,

14   the no-poach agreements -- excuse me -- the no-poach

15   allegations at least fall short of plausibly alleging an

16   agreement amongst the integrators not to hire one another's

17   growers.

18             So in the interest of completeness, and

19   transparency in my ruling, and to the extent that it helps

20   inform the decisions all of you are going to make going

21   forward, even though I've already said that I think the

22   motion fails and that I'm not required to engage in this

23   analysis, I am, in this instance at least, nevertheless,

24   going to provide it.  I think it may be helpful and

25   beneficial to all of you, and especially if we end up

1    revisiting this at Rule 56.  I'll first take up the alleged

2    no-poach agreement.

3              Plaintiffs allege that, as part of the scheme

4    to suppress grower compensation, defendants and other

5    integrators agreed not to solicit or recruit one another's

6    growers.  That allegation is set out in the consolidated

7    amended complaint at Paragraph 79.  Plaintiffs assert they

8    have alleged facts proving both directly and

9    circumstantially this unwritten pact or agreement.  And as I

10   said, though it's close, I conclude the plaintiffs have not

11   plausibly shown the existence of a no-poach agreement, at

12   least on the basis of the allegations contained in the

13   consolidated amended complaint.

14             First, plaintiffs discuss a letter written to

15   the federal Grain, Packers and Stockyard Administration in

16   which one Tyson grower complained that he had inquired about

17   a job posting by non-defendant integrator Peco Foods, but

18   that when he called Peco Foods he was told by an assistant

19   that "the companies had an agreement among each other not to

20   take each other's growers."  That's in Paragraph 80 of the

21   complaint.  Plaintiffs are unable to, or fail at least, to

22   identify who wrote the letter, when it was written, what

23   area of the country the grower was in, or any other

24   information surrounding the letter and the circumstances it

25   describes concerning the call that was made.  If more detail

1    had been included, such as dates as perhaps the identity of

2    the grower, it may well be evidence of an agreement.  But as

3    it is alleged, in my view, it falls short.

4              I may have said this at oral argument, and I

5    continue to study the allegations in the complaint.  I

6    think, mindful of the legal standard that applies and

7    drawing the reasonable inferences from the facts alleged in

8    the complaint in the plaintiffs' favor, still, at most, in

9    my view, that allegation provides a reasonable inference

10   that Peco may have had an agreement with Tyson.  Not that

11   the named defendants in this case had an agreement amongst

12   themselves.  And it tells us nothing about when that

13   agreement may have existed.  That's especially important I

14   think in the view of the nature in the view of the

15   overarching conspiracy alleged by the plaintiffs.

16             Next, plaintiffs allege unattributed grower

17   statements from articles and workshops suggest growers have

18   experienced challenges being hired by other integrators and,

19   for that reason, that they believe the companies have a

20   no-poach agreement.  These allegations are found primarily

21   in Paragraphs 81 and 82.  One quote is from a grower who

22   started working in the industry in 1995.  That is the only

23   date alleged in the discussion of the articles and

24   workshops.  Not even the dates of the articles or workshops

25   is alleged in the complaint.  The nature of these

41

1    allegations, without strong corroborating evidence, is

2    simply a perception of unidentified growers and unidentified

3    integrators at unidentified times.  And in my judgment, even

4    drawing the reasonable inferences in favor of the plaintiff,

5    that's insufficient.

6              As indirect evidence, plaintiffs allege that

7    only a small percentage of growers switch integrators each

8    year.  And they point, as I've said, to 2014 as an example

9    where somewhere between just under three percent to five

10   percent of growers changed integrators.  These allegations

11   are in Paragraphs 57 -- excuse me -- 85 and 87.  This, they

12   complain, is despite the fact that 75 percent of growers

13   have more than one integrator in their geographic area and

14   could, therefore, theoretically switch but for the alleged

15   no-poach agreement.  This is explained in Paragraph 89.

16             But in view of the lack of direct evidence,

17   and for the reasons the defendants discuss in their

18   briefing, the Court cannot conclude that those facts

19   plausibly suggest the existence of a no-poach agreement.

20   Low switching numbers could be due to a number of other

21   factors such as the initial investments a grower might make

22   in their facilities to comport with specific integrator

23   requirements.  And let me say, I considered the fact that

24   one might reasonably infer -- I think -- I think this gets

25   tricky at Rule 12, drawing a line between those inferences

1    the Court concludes are reasonable inferences to draw from

2    the allegations, and then, when you've crossed that line and

3    you've essentially written new allegations for the

4    plaintiffs, which I'm not permitted to do.  I don't read the

5    plaintiffs to allege that those threshold build-out

6    requirements are part and parcel with the alleged conspiracy

7    because they act to prevent the growers from moving from one

8    integrator to another.  I don't see that allegation in the

9    complaint.  I don't understand it to be part of the theory.

10   And for that reason, I don't think it's fair for me to draw

11   that inference, even though I think it is an inference that

12   could be drawn from the facts that are set out in the

13   complaint.  And I'm not drawing that inference for purposes

14   of my analysis today.

15              On this point of the low number of growers

16   who switch integrators, the plaintiffs allege that when the

17   growers do switch, it's to benefit the integrator, not the

18   grower, and that the change is accompanied by a benefit to

19   the integrator.  But in support of this contention, the

20   plaintiffs merely theorize, and what I -- it just strikes me

21   as a hypothetical example describing a scenario in which one

22   integrator may have excess processing capacity and may,

23   therefore, hire another integrator's growers if the second

24   has too many growers at the time.  But that alone, again,

25   even drawing the reasonable inferences in favor of the

1   plaintiff, fails to carry the no-poach claim across the line

2   of plausibility.

3             And absent plaintiffs' allegations are facts

4   suggesting how much growers tried to switch in any given

5   year but were unable to do so.  Indeed, there's not --

6   there's not a single allegation that I could see in the

7   complaint concerning any identifiable grower, including any

8   plaintiff who attempted to change integrators but was

9   unsuccessful or was denied that opportunity.  Of course

10  that's not required to be stated, but when required to

11  consider the allegations in the complaint as a whole.

12            For all of those reasons, I conclude that if

13  the plaintiffs had pled as an independent Sherman Act

14  violation on its own the no-poach agreement, which

15  plaintiffs did not do, that the allegations in the complaint

16  do not plausibly state a distinct Sherman Act violation.

17            Next I'll take up the information sharing

18  agreement.  Certain exchanges of information can give rise

19  to distinct Sherman Act violations that would be evaluated

20  under the rule of reason.  And I'm citing here *Todd* at Page

21  198.  When evaluating such an exchange under the rule of

22  reason, of course the court is required to consider a number

23  of factors, including most prominently the structure of the

24  industry involved and the nature of the information

25  exchanged.  That discussion is also in *Todd* where Justice

1    Sotomayor, then-Judge Sotomayor was quoting the *Gypsum*

2    decision.

3              Concerning the nature of the information,

4    courts have found it less troubling when the information

5    exchanged was public and historical rather than confidential

6    and current.  For example, in the *Maple Flooring* decision

7    that the parties cite throughout the papers, the Supreme

8    Court sought to determine whether information shared by

9    numbers of a wood flooring trade association "will

10   necessarily have that effect so as to produce that

11   unreasonable restraint of interstate commerce which is

12   condemned by the Sherman Act."  That's from Page 572.  And

13   of course the court went on to answer that question, no,

14   under the circumstances of that case, where there was no

15   indication the defendants had entered into an agreement, and

16   the sales and pricing information shared was both public,

17   published in trade journals, and based on historical

18   transactions rather than current data.

19             In contrast, the plaintiffs here contend that

20   they have included sufficient allegations in the

21   consolidated amended complaint to state a cognizable

22   information sharing claim under the rule of reason.  They

23   allege that, at least since 2008, the defendants and other

24   integrator companies who control 98 percent of domestic

25   broiler production have shared detailed, confidential,

1    nearly contemporaneous information on complexes, profits,

2    capacity and output, a variety of costs and compensation.

3    And that that data is neither shared with the public, nor

4    even with the growers themselves.  And I'm citing Paragraphs

5    66, 69 and 75 of the complaint.  Plaintiffs further allege

6    that the integrators and other -- excuse me -- the

7    integrator defendants and other integrators share that data

8    on a weekly basis by disseminating their information to and

9    then receiving back information from other integrators,

10   including the other integrator defendants through the

11   Agri-Stats research firm.  Paragraphs 67 through 69, 72 and

12   75.

13            Though the information is purportedly

14   anonymous, the plaintiffs maintain it lacks safeguards to

15   prevent anyone knowledgeable in the industry from

16   identifying which data belongs to which integrator, and then

17   using that to determine grower compensation.  Paragraphs 73

18   and 74.  In addition to the information shared via

19   Agri-Stats, the defendants and other integrators also shared

20   chicken feed samples, permit access to each other's

21   complexes, including to now-dismissed Sanderson and Perdue

22   complexes in North Carolina.  Paragraph 77.  And that the

23   defendants have numerous opportunities to share information

24   in person.  Plaintiffs further allege that high level

25   employees move freely amongst companies unbounded by

1       uncompete -- non-compete, rather, and confidentiality

2       agreements, and that the integrators through executives

3       attend numerous industry meetings each year.

4                   Defendants contend that these allegations

5       don't help -- do not help plaintiffs establish an

6       information sharing claim under the rule of reason for three

7       primary reasons:  First, that the plaintiffs are unable to

8       show an agreement amongst one another to share the

9       information; second, that there are competitive explanations

10      for sharing the information; and, third, that the plaintiffs

11      failed to plead plus factors that would make the agreement

12      more plausible.

13                  And, additionally in briefing that developed

14      after our last hearing really -- I think this argument was

15      made initially in a footnote, and then developed further in

16      reply, and then a great deal more after hearing the

17      defendants contend the plaintiffs have failed to plead a

18      plausible relevant market or an anticompetitive effect on

19      that market, and for those reasons, the defendants contend

20      any information sharing claim fails.  I disagree.

21                  First, I find the plaintiffs have

22      sufficiently alleged an agreement to share information of

23      the very kind and quality that troubles courts considering

24      these claims, and that that happened since at least 2008

25      when the defendant integrators and other integrators have

1    provided information to Agri-Stats knowing it would be

2    disseminated and that, in return, they would receive similar

3    information.  And while defendants contend that all they did

4    was independently decide to participate in benchmarking,

5    this ignores the reality of what the plaintiffs allege, at

6    least in my view.  That is, the reciprocal horizontal

7    agreement to exchange sensitive, detailed, current nonpublic

8    information.  Plaintiffs contend that defendants did not

9    provide the highly sensitive, detailed, current nonpublic

10   information in a vacuum or as an act of public service.

11   They contend that they provided it because it would be their

12   ticket to receive the same sensitive, detailed, current

13   nonpublic information from all the other participating

14   companies.  And that, in fact, that is -- and that they, in

15   fact, do share that information and they, in fact, do

16   receive that information in return.

17            Plaintiffs allege the who; the defendants and

18   other conspiring companies identified in the consolidated

19   amended complaint.  They identify the what; the exchange of

20   sensitive, detailed, current nonpublic information with the

21   expectation that they would receive and they do receive the

22   same in return.  They describe the when; since at least

23   2008.  And the why; to reduce their costs, including grower

24   compensation.

25            Defendants, at least in my view, do not

1    squarely grapple with the reciprocal nature of the exchange

2    alleged, or the nature of the information exchanged, which

3    is in material contrast to the kind and type and quality of

4    information at issue in *Maple Flooring* and other related

5    cases.  In the *Maple Flooring* case, as I've said, the

6    information was not current, and it was disseminated

7    publicly in trade publications.

8              I find that the plaintiffs have sufficiently

9    alleged an agreement to disseminate the sort of information

10   that causes heartburn for courts considering Sherman Act

11   information exchange claims.

12             And though defendants make much of the fact

13   they are not alleged to have met in person to exchange

14   information or develop benchmarks, as was true in some of

15   the other cases they cite and rely on, I fail to see how

16   it's material whether they meet in person, email the

17   information, post it on a confidential Google doc, or

18   provide it to one another through a third party conduit,

19   like Agri-Stats, who then disseminates the information among

20   the participating integrator defendants and others.

21             Viewing the facts favorably to the

22   plaintiffs, as I must at this stage, the defendants would

23   have been aware of the sensitive and current nature of their

24   own business information they were willing to share, and

25   they knew they would receive, and in fact did receive the

1    same information in return.  Plaintiffs allege it is

2    possible, due to the granular nature of the data and

3    information, to ascertain which company provided the

4    information.  Defendants do not explain adequately, in view

5    of these allegations -- how, in view of these allegations,

6    rather, it's material that Agri-Stats acted merely as a

7    middle-man or a clearinghouse or a data refiner, instead of

8    requiring the defendants to directly meet in person and

9    exchange the same information in person.  Defendants do not

10   explain what difference it would make, if any, if the

11   defendants met in person and handed identical information to

12   one another in a meeting, or handed it to an assistant who

13   compiled it into tables and binders.

14              The allegation and the theory, again which I

15   am required to assume to be true at this stage of the

16   proceedings, is that the defendants knew that providing

17   Agri-Stats their sensitive information would provide them

18   reciprocal access to the same information from the others.

19              Next I consider the defendants' proffered

20   explanations for their reciprocal exchange of the sensitive,

21   detailed, current nonpublic information with one another.

22   Defendants contend that information exchanges help companies

23   compete.  This is set out in Page 22 of Docket 193.  But

24   this does not suggest how the information exchange helped

25   these defendants compete against each other rather than

1    unreasonably restrain grower compensation.  Continuing,

2    defendants argue that monitoring one another's compensation

3    paid to growers makes sense and is consistent with

4    independent business decision making.

5              Setting aside that the information shared was

6    the sort that courts are routinely concerned about, as I've

7    already said, I simply do not read the plaintiffs to have

8    alleged defendants are independently acting, that is

9    monitoring one another in some kind of conscious parallelism

10   in their own independent but similar business interest as

11   was the case in *Twombly*.  Rather, the plaintiffs have

12   alleged the defendants agreed to regularly hand over

13   sensitive, nonpublic information.

14             At this stage, I find plaintiffs' allegations

15   much more compelling than the insufficiently pled

16   independent actions in *Twombly*, particularly in light of the

17   plus factors that plaintiffs have alleged concerning the

18   movement of executives between companies without

19   confidentiality agreements, the opportunities to meet, the

20   complex tours -- the facility complex tours competing

21   integrators took, and the structure of the market which

22   renders it particularly susceptible to anticompetitive

23   information sharing.  That is, it's highly concentrated,

24   involves fungible products, and is subject to inelastic

25   demand.

1          Finally, a rule of reason analysis will often

2    require a showing of anticompetitive effects in a relevant

3    market.  And the parties here spend at least some of the

4    real estate in their papers arguing about whether plaintiffs

5    must necessarily plead a market if they have pled

6    anticompetitive effects.  For instance, the Supreme Court in

7    the *Federal Trade Commission vs. Indiana Federation of*

8    *Dentists* in 1986 observed that a naked restriction on price

9    or output is not justified even in the absence of market

10   power evidence.  That discussion is on Page 460 of that

11   decision.  But even if the defendant had not engaged in such

12   a naked restriction, the court suggested that sufficient

13   evidence of anticompetitive effects obviated the need for an

14   inquiry into market power which is but a surrogate for

15   detrimental effects.

16         Either way, the Court need not resolve that

17   issue at this stage because it finds that the plaintiffs

18   have adequately pled a product and geographic market for the

19   reasons that I'll now explain, beginning with the market

20   allegations.

21         An alleged product market must bear a

22   rational relation to the methodology courts prescribe to

23   define a market for antitrust purposes, analysis of the

24   interchangeability of use, or the cross-elasticity of

25   demand.  That's a quote from the *Todd* decision at Page 200.

1           At Page 129 of the consolidated amended

2   complaint, paragraphs -- I said page -- Paragraph 129,

3   plaintiffs allege the relevant market is the purchase of

4   broiler grow-out services, and the relevant geographic

5   market is the United States.

6           The Court evaluates these market allegations

7   bearing in mind that the deeply fact-intensive inquiry

8   required in market definitions leads many courts, it seems

9   to me most courts, to hesitate to grant motions to dismiss

10  for failure to plead a relevant product market.  And I cite

11  for example the *Todd* decision and the discussion at Pages

12  199 and 200.

13          Indeed, many of the cases the defendants

14  themselves rely on do not provide an evaluation of market

15  definitions at the motion to dismiss stage.  And I cite the

16  *Tarabashi* decision from the Tenth Circuit in 1991.  That was

17  an appeal of findings following a bench trial on relevant

18  market.  And the *Buccaneer* decision from 2017, a Tenth

19  Circuit decision that was an appeal from a ruling on summary

20  judgment.

21          Defendants take issue with plaintiffs'

22  allegations concerning a nationwide geographic market,

23  arguing it is fatally overbroad without any factual support,

24  and lacking in common sense.  And these arguments are set

25  out in Pages 3 through 5 of Docket 234.  The defendants

1    argue that it's implausible that growers would sell or

2    integrators would compete with grower services on a national

3    scale.  Rather, defendants contend growers cannot plausibly

4    see integrators with a complex across the country as a good

5    substitute.

6              Even if the court could reach that factual

7    conclusion, it ignores that, absent the challenged conduct,

8    an integrator might compete for grow-out services in a given

9    area by moving into the area, or incentivizing growers to

10   move.  And plaintiffs allege this in Paragraph 135 of their

11   complaint.  Neither does the defendants' theory account for

12   the fact that a new grower might seek out, or an existing

13   grower might expand business in a different geographic area.

14   And integrators who feared losing new or expanding growers

15   to higher paying areas would presumably compete to retain or

16   retract growers in their geographic area.

17             In an attempt to meet that reasoning, the

18   defendants cite *Heerwagen vs. Clear Channel Communications*,

19   the Second Circuit decision from 2006, and specifically for

20   the proposition that the grower services market should not

21   be broadened simply because the integrators could buy

22   services nationwide.  *Heerwagen* dealt with concert ticket

23   sales of course, as you all know.  There, the court rejected

24   the notion that the market for attending live concerts was

25   nationwide where, importantly, after a lengthy evidentiary

1    hearing, no proof was adduced that a consumer in one city

2    would view a concert in another as a reasonable substitute.

3             I find that case unpersuasive at this stage.

4    It is logical that individual consumers, in that case

5    concert attendees, investing in one event in one city would

6    not view a concert in a far away place as a reasonable

7    substitute.  But it is unclear why it would be simply

8    implausible to think, at this early stage and before we

9    evaluate the evidence, why the integrator companies would

10   not view growers in different areas as possible substitutes.

11            In any event, the posture of that case

12   underscores the concern that the *Todd* court expressed.  That

13   except in situations of apparent implausibility, the court

14   should exercise caution in considering the dismissal of an

15   otherwise plausible, well-pled Sherman Act claim merely on

16   the basis of insufficient market allegations.

17            I conclude the plaintiffs have adequately

18   alleged, at this early stage, a grow-out services market,

19   and national geographic market, even if some aspects of the

20   market are in a sense local, in the language of the *Grinnell*

21   *Corporation* case from 1966.

22            We'll take up the plaintiffs' allegations of

23   the anticompetitive effect of the defendants' conduct, and

24   then we'll break.  I think that will be a good time for a

25   break.

1                  Turning to that issue, the defendants contend

2    that plaintiffs fatally failed to plead actual direct

3    anticompetitive effects, where there are no allegations in

4    the consolidated amended complaint that compensation

5    actually changed and by how much after any information

6    exchange.  And this argument is I think best presented on

7    Page 5 of Docket 234.  And though plaintiffs plead only that

8    the conspiracy began, I think the language of the complaint

9    is in or before 2008, they plead that compensation has been

10   declining since the 1980s, thus making it implausible to

11   blame a decline on a more recent illicit information sharing

12   agreement.  But the plaintiffs allege that, since the 1980s,

13   the price of broilers has risen, while the grower's share of

14   the market price has declined.  That's Paragraph 151.  Even

15   if compensation had also been declining since the 1980s,

16   plaintiffs allege in their consolidated amended complaint

17   that the defendants' scheme caused it to be suppressed below

18   what would otherwise be competitive.  And this is found in

19   Paragraphs 137 through 154.  Plaintiffs support their

20   allegations with reference to economic theory, guidance from

21   the Department of Justice, and specific facts concerning

22   this industry in particular.  And they allege that,

23   specifically since 2007 and 2008, grower pay has declined

24   while there have been increases in broiler wholesale prices.

25   Paragraph 151.

1            I find the allegations of anticompetitive

2    effect sufficient at this stage of the proceedings.

3            For all of these reasons then, I find that,

4    even if I am required to consider separately and distinctly

5    from the overarching scheme pled and alleged in the

6    complaint, the constituent agreements, the no-poach and the

7    information sharing agreement, I conclude that the

8    plaintiffs have included sufficient allegations in the

9    complaint to state a cognizable claim under the rule of

10   reason for information sharing in violation of Sherman Act,

11   Section 1.  For these reasons, the Sherman Act claim will

12   survive the plaintiffs' (sic) joint motion to dismiss.  The

13   overarching scheme, which was not directly attacked, is

14   supported by facilitating practice -- practices, and

15   other -- other allegations and practices that support the

16   inference of the existence of that agreement.  Though, as

17   I've said, the no-poach agreement, while close, in my

18   judgment lacks the sufficient factual detail necessary to

19   nudge it over the line of plausibility.

20           So we'll take a brief break and we'll come

21   back to the Packers and Stockyards Act claim, and then the

22   Arbitration Act.  And it occurs to me, I meant to say this

23   at the beginning of the discussion, instead I'm giving it to

24   you at the halftime break, but I could have provided this

25   oral ruling to you over the phone in a conference call.  But

1    what's important, and I thought was important is the

2    business that we have to do following this.  And so I still

3    think it was essential that we get together face-to-face,

4    and have a chance to visit about those things.  Stretch your

5    legs, get some air, take an aspirin, we'll be back in a bit.

6    Thank you.

7                    *(Off the record at 11:22 a.m.)*

8                   *(Back on the record at 11:37 a.m.)*

9                THE COURT:  Welcome back, everyone.  We'll go back

10   on the record.  We'll continue with the Court's oral ruling.

11                    There was another component to the rule -- a

12   few additional components to the Rule 12 motion to dismiss.

13   So we'll turn now to that portion of the motion relating to

14   the Packers and Stockyards Act.

15                    The defendants argue that plaintiffs' claim

16   for unfair practices in violation of Section 202 of the PSA

17   fails because defendants maintain plaintiffs did not

18   adequately plead any anticompetitive agreement or requisite

19   anticompetitive effects.  Docket 193 at Page 25.  Of course

20   the PSA was enacted in 1921 with the primary purpose to

21   ensure fair competition and fair trade practices in

22   livestock marketing and in the meat packing industry, and to

23   safeguard farmers against receiving less than the true value

24   of their livestock.  At least that's how the Tenth Circuit

25   described it in 2007 in *Been vs. Oklahoma Industries.*

1          PSA Section 202(a) makes it unlawful for a

2   live poultry dealer to engage in or use any unfair

3   discriminatory or deceptive practice or device.  While it

4   was meant to be broader than antecedent antitrust

5   litigation, the Tenth Circuit has recognized that Section

6   202, nonetheless, incorporates the basic antitrust blueprint

7   of the Sherman Act and other preexisting antitrust

8   legislation.  That explains in -- that is explained, rather,

9   in *Been* at 1228.  Thus, the Tenth Circuit has held that

10  plaintiffs asserting a Section 202(a) claim must show that

11  the practice injures, or is likely to injure competition.

12  *Been* at 1230.  This showing need not include any proof of an

13  intent to cause injury or any other unlawful effect.  Thus,

14  in *Been* it was sufficient to create a genuine issue of

15  material fact to defeat summary judgment for the grower

16  plaintiff to show that the defendant was a monopsony in the

17  relevant market, and that economic theory supported the

18  conclusion that, without competition from other buyers, a

19  monopsonist will lower prices paid to sellers, which, over

20  time, results in higher consumer prices.

21          Under these principles, I conclude, for the

22  reasons I've already explained in denying dismissal of the

23  plaintiff's Sherman Act claim, that the plaintiffs have

24  adequately alleged both an information sharing practice or

25  agreement, potentially illicit on its own, or as a

1      facilitating practice furthering an agreement -- an

2      overarching agreement amongst the defendants not to compete

3      for grower services, and that anticompetitive effects

4      resulting from the defendants' conduct have been adequately

5      alleged.  This suffices for the PSA claim under my reading

6      of the PSA and the *Been* decision, including the "likely to

7      injure" standard it approved, and the nature of the economic

8      evidence the Tenth Circuit found helpful to the plaintiffs

9      in reversing the district court's grant of summary judgment.

10                  Defendants next contend that the plaintiffs'

11     PSA claim must be dismissed because a mandatory venue

12     provision in the PSA renders venue in this district

13     improper.  Defendants, in their opening memorandum,

14     selectively cite from the PSA venue statute arguing that the

15     statute "mandates that venue shall be located in the federal

16     judicial district in which the principal part of the

17     performance of a poultry growing arrangement or contract

18     takes place."  Citing 7 United States Code, Section 197b(a).

19     Because no defendant performed under its grower contracts in

20     this district, defendants argue venue is thus improper.

21     This argument is set out on Page 27 of Docket 193.

22                  But defendants' opening argument omits, and

23     does not analyze an important part of the venue provision,

24     that it applies only to any dispute among the parties to a

25     poultry growing arrangement that arises out of the

1    arrangement or contract, in the language of 7 United States

2    Code, Section 197b(a).

3                     After failing to include this provision in

4    it's opening brief, the defendants argue in reply that

5    because all plaintiffs are poultry growers under another

6    part of the PSA, meaning they raise live poultry under a

7    poultry growing agreement, they somehow must be subject to

8    the venue provision because, but for the poultry growing

9    arrangements, plaintiffs would not have standing to bring

10   their claims.  This is the argument that develops in Docket

11   208 at Page 11.  I disagree.

12                    The defendants provide no analysis or legal

13   authority upon which I can conclude that plaintiffs' PSA

14   claim is governed by the mandatory venue provision, that the

15   claim amounts to a dispute between parties to a poultry

16   growing arrangement and arising out of the poultry growing

17   arrangement or contract.

18                    As plaintiffs point out, and defendants do

19   not contest in their reply, the PSA claim in this case does

20   not involve only a dispute between parties to a poultry

21   growing arrangement.  Rather, each plaintiff was a party

22   under such an arrangement with only one integrator, not all

23   defendants; and, second, therefore a dispute arising out of

24   the arrangement or contract.  No plaintiff is seeking to

25   enforce any contractual provision.  The mandatory venue

1   provision in the PSA, at least in my judgment, does not

2   apply in this case.

3          Finally, the defendants argue that, if the

4   Court had dismissed the plaintiffs' Sherman Act claim, it

5   must dismiss the PSA claims asserted by the non-Oklahoma

6   plaintiffs, all but Haff Poultry, for lack of personal

7   jurisdiction.

8          Without the Sherman Act's nationwide service

9   of process provision, these plaintiffs would have to rely on

10  Oklahoma's long arm statute to establish personal

11  jurisdiction over the defendants, and defendants claim they

12  are not subject to personal jurisdiction in Oklahoma under

13  the long arm statute.  But because the Court has not

14  dismissed the Sherman Act claim, I decline to find the

15  plaintiffs are incapable of establishing personal

16  jurisdiction on that basis.

17         That leaves us I think just with Perdue's

18  motion to compel arbitration and to dismiss, or, in the

19  alternative, to stay.  I guess I should have summarized a

20  moment ago.  I think I've now addressed all the arguments in

21  the Rule 12 motion.  And for those reasons stated, that

22  motion is denied.

23         So turning to the motion to compel, Docket

24  192, in addition to joining defendants' motion to dismiss at

25  the joint motion, defendant Perdue Farms separately moves to

1    dismiss or stay pending arbitration the claims of one

2    plaintiff, Nancy Butler.

3            Once again, some relevant factual background.

4    Butler is the only named plaintiff here who is alleged to

5    have been in a grower-integrator relationship with Perdue.

6    On May 28, 2015, she signed a poultry producer agreement

7    with Perdue Foods LLC, a subsidiary of named defendant

8    Perdue.  That agreement contained an arbitration clause

9    requiring any disputes between Butler and Perdue be resolved

10   via the complaint and arbitration procedures outlined in the

11   agreement.  I'm reading now from Docket 192-2 at Page 13.

12           The complaint procedures required Butler to

13   instigate a complaint by presenting her concerns, first to a

14   local flock advisor within three working days from the date

15   of the problem, or three days from the date when Butler

16   became aware of the problem, whichever occurred first.  The

17   complaint procedures, if several interim steps failed,

18   culminated in a recommendation from a peer review committee

19   if they involve payment or settlement issues.  If either

20   party rejected the committee's recommendation, or if the

21   issue never went to the peer review committee in the first

22   place, then a party is permitted to instigate arbitration.

23           The procedures outlined in Butler's agreement

24   with Perdue require any party instigating arbitration to do

25   so within 120 days after the complaint or issue arose.

1    Citing Docket 192-2 at Page 11, Paragraph 3.  Each party

2    bears its own cost in arbitration and they share equally the

3    cost of paying for an arbitrator who has expertise in the

4    poultry industry.  Paragraphs 5 and 6.  Discovery is

5    permitted, but only, if at all, after the arbitrator

6    authorizes it upon a showing of substantial need.  I'm

7    citing Paragraph 8.  And the arbitrator has no power to

8    award, and the parties are barred from seeking in any other

9    forum, non-monetary or equitable relief, damages

10   inconsistent with the parties' agreement, or punitive

11   damages not measured by the prevailing parties' actual

12   damages.  Paragraph 9.

13                   In the 2015 agreement, Butler and Perdue also

14   waive any right to assert class action claims against one

15   another, and they agree they will not lead, join, or serve

16   as a member or a class bringing such a claim.  Paragraph --

17   let's see.  I think that's -- now I'm missing the cite to

18   that.  I apologize.  When Butler signed the agreement in

19   2015, she additionally signed an opt-in provision relating

20   specifically to the arbitration agreement agreeing that she

21   "accepted the arbitration provisions as set forth in this

22   agreement."  Such a conspicuously disclosed opt-in provision

23   is required for arbitrating clauses to be minimally valid

24   and enforceable under the PSA.  And I'm citing here 7 United

25   States Code, Section 197c(a)(b).

1          In 2017, Butler signed a modification to the

2    2015 agreement.  It was an updated fee schedule.  Docket 205

3    at Page 3.  She did not sign a new opt-in agreement relating

4    to arbitration.  Plaintiffs fault Perdue for not including

5    an opt-in agreement in the 2017 fee modification.

6          Let me just quickly dispose here of an

7    argument the plaintiffs advance in their papers, that Perdue

8    was required to include a new opt-in provision along with

9    the 2017 modification.  At least on the arguments before me,

10   I cannot reach that conclusion.  Perdue persuasively points

11   out that the 2017 modification makes clear on its face that

12   it is simply an updated fee schedule applicable to the

13   earlier entered 2015 agreement.  And that Butler, in signing

14   the 2017 updated schedule, agreed to be continued -- agreed

15   to be bound by the terms -- the other terms of the 2015

16   agreement.

17          Turning to the motion, Perdue argues that,

18   pursuant to the arbitration provision in the 2015 agreement,

19   Butler has contracted with Perdue to arbitrate her Sherman

20   Act and PSA claims that she now brings, and that this

21   arbitration clause requires that I dismiss those claims.

22   But Perdue argues that if Butler's claims are not dismissed

23   pursuant to the arbitration clause, then all claims against

24   Perdue in this action should be stayed pending Butler's

25   arbitration because none of the other plaintiffs were Perdue

1    growers, and none have alleged they were denied the

2    opportunity to be a Perdue grower pursuant to the

3    overarching conspiracy alleged.

4            Perdue finally argues that Butler also waived

5    certain rights relating to this litigation.  They include

6    the ability to seek treble damages, the ability to lead,

7    join, or serve as a member of a class in a class action, and

8    also the right to trial by jury.

9            Plaintiffs advance four primary arguments in

10   opposition to Perdue's motion.  This begins in Docket 201.

11   First, plaintiffs maintain that Perdue's motion is futile.

12   I think that they mean that it won't have meaningful impact

13   on the litigation because Butler would still have conspiracy

14   claims against the other defendants, and the other

15   plaintiffs would still have such claims against Perdue.  I

16   agree.

17           Plaintiffs assert claims alleging

18   anticompetitive agreements amongst all the defendants

19   demonstrated or supported by the no-poach agreement and the

20   illicit information sharing agreement that had the effect of

21   lowering compensation to all growers, regardless of their

22   specific contracting integrator.  And Perdue's argument in

23   its reply on this point I thought was quite unhelpful,

24   pointing simply to the fact that there's a contractual

25   relationship between distinct growers and defendants.  But

1    of course this does not mean that the contractual

2    relationship is necessary to pursue claims.

3              Second, the plaintiffs argue that Butler's

4    Sherman Act and PSA claims are simply not covered by the

5    arbitration agreement.  Third, the plaintiffs argue the

6    arbitration provision is unenforceable under the effective

7    vindication doctrine.  Of course, Justice Scalia articulated

8    that doctrine in *American Express vs. Italian Colors*

9    *Restaurant* and described the doctrine as a judicial

10   willingness to invalidate on public policy grounds

11   arbitration agreements that operate as a prospective waiver

12   of a party's right to pursue statutory remedies.  That case

13   of course was a 2017 Supreme Court decision, and that

14   language I just quoted, with a part in the middle not

15   material or relevant omitted, is on Page 235.

16             Fourth, and finally in their opposition, the

17   plaintiffs argue that the arbitration provision is

18   unenforceable under the PSA because Perdue provided Butler

19   with a 2017 modification to the 2015 agreement, but that the

20   2017 agreement failed, as I said, to provide an opt-in or

21   opt-out arbitration provision.  And as I've already

22   indicated, I find that argument unpersuasive.

23             So I will now discuss whether Butler's claims

24   are covered by that the arbitration agreement, and, if so,

25   whether Butler, nevertheless, escapes its application

1    through the effective vindication doctrine.

2              Once again, we have to first understand the

3    law that I'm required to apply.  Perdue, as the party

4    seeking to enforce the arbitration provision, bears the

5    burden to show that it's applicable.  I'm citing *Hancock vs.*

6    *AT&T*, a Tenth Circuit decision from 2012.  The PSA

7    contemplates arbitration of PSA claims, subject to

8    disclosure requirements.  Mandatory arbitration of PSA

9    claims is permitted if a contract conspicuously discloses

10   that it allows a producer or grower, prior to entering the

11   contract, to decline to be bound by the arbitration

12   provision.  That's the provision of 7 United States Code,

13   Section 197c(a)(b) that we previously mentioned.  And the

14   Federal Arbitration Act provides that a written provision in

15   any contract to settle by arbitration a controversy

16   thereafter arising out of such contract or transaction shall

17   be valid, irrevocable and enforceable save upon such grounds

18   that exist at law or in equity for the revocation of any

19   contract.  That language from 9 United States Code, Section

20   2.

21             The Supreme Court commenting on this language

22   has explained that it reflects a liberal federal policy

23   favoring arbitration.  And that was explained further in the

24   *Conception* case from 2011.  And in *Italian Colors*, the

25   Supreme Court said the overarching principle is that

1   arbitration is a matter of contract.  And more recently, the

2   Tenth Circuit in *Jacks vs. CMH Homes* explained that

3   arbitration is a matter of contract.  And in order to

4   determine whether a party has agreed to arbitrate a dispute,

5   courts in this circuit are instructed to apply ordinary

6   state law principles that govern the formation of contracts.

7           I'm instructed that a party cannot be

8   required to submit to arbitration any dispute which he or

9   she has not agreed to submit to arbitration.  And while

10  doubts concerning the scope of arbitrable issues are

11  resolved in favor of arbitration, the presumption of

12  arbitrability falls away when parties dispute the existence

13  of a valid and enforceable arbitration agreement in the

14  first instance.  All of that is language from that Tenth

15  Circuit decision, *Jacks*.

16          I'll first take up whether Perdue has shown

17  that Butler's Sherman Act and PSA claims are covered by the

18  2015 arbitration agreement.

19          While antitrust and PSA claims are not

20  categorically shielded from arbitration, an issue clearly

21  answered in the PSA itself and *Italian Colors* and other

22  cases, that does not mean that they are necessarily covered

23  by this agreement.  Here, the broad arbitration agreement

24  found at Section VII(B) does appear to cover the claims

25  asserted by Butler in this case.  That provision provides

1    that "all complaints and disputes by and between" Butler and

2    Perdue, irrespective of whether those complaints or disputes

3    relate to the 2015 agreement, shall be resolved by Perdue's

4    complaint resolution procedure and/or arbitration, as the

5    case may be.  While it seems strange to require a grower

6    like Butler to take antitrust claims to a flock advisor,

7    plaintiffs haven't persuasively argued why this oddity

8    requires the Court to ignore the plain language of the

9    agreement.  And once a grower goes through the admittedly

10   odd complaint procedure, they are then able to instigate

11   arbitration.  And this broad provision requires more claims

12   than other parts of the 2015 agreement's complaint and

13   arbitration procedures.  For instance, in another part,

14   Section VI more narrowly states that the complaint

15   resolution and arbitration procedures apply to complaints or

16   disputes arising from the agreement.  That was -- that's

17   explained at Page 9 of 192-2.

18              But plaintiffs complain that, even if the

19   claims are covered, that I should decline to enforce the

20   provision because the effective vindication doctrine

21   requires that result.

22              As I've said, the Supreme Court explained in

23   *Italian Colors* that, under the effective vindication

24   doctrine, a court may invalidate on public policy grounds

25   arbitration agreements requiring a signatory to

1   prospectively waive their right to pursue statutory

2   remedies.  That discussion at Page 235 of the decision

3   quoting, in part, the *Mitsubishi Motors Corp.* case from

4   1985.  In addition to invalidating a provision in an

5   arbitration forbidding the assertion of certain statutory

6   rights, the doctrine might also invalidate, or be available

7   invalidate provisions imposing fees attached to arbitration

8   that are so high as to make access to the forum

9   impracticable.  But the expense involved in proving a

10  statutory remedy is not the same as eliminating the right to

11  pursue that remedy.  And the fact that an arbitration

12  agreement increases some costs will not necessarily

13  invalidate the arbitration agreement.

14          Under these principles, the *Italian Colors*

15  court upheld an arbitration agreement that the Sherman Act

16  class action plaintiffs were seeking to avoid, which

17  required them to arbitrate their claims individually rather

18  than on a class basis.

19          Plaintiffs argue that multiple provisions in

20  Butler's agreement run afoul of the effective vindication

21  doctrine.  And before I discuss them, let me first note that

22  I am unpersuaded by Perdue's initial response to the

23  plaintiffs' argument on this issue.  That is that the

24  plaintiffs have, as a threshold matter, ignored the fact

25  that Butler voluntarily entered into the arbitration

1    agreement, indeed opted into it, and that she cannot now

2    express what Perdue terms buyer's remorse.  That argument is

3    in Docket 205 at Page 7.

4              That argument was soundly rejected by the

5    Tenth Circuit in *Nesbitt vs. FCNH*, a 2016 decision.  Indeed,

6    plaintiffs made this point in their briefing at Footnote 9.

7    In *Nesbitt*, the court explained that the fact that the

8    arbitration agreement the plaintiff had entered into

9    contained an opt-out provision could not preclude the

10   doctrine's application, because in the cases the doctrine is

11   applied, the courts must necessarily have found that binding

12   arbitration agreement under which the parties agreed to

13   submit claims to arbitration.  The opt-out option, or, in

14   this case, the opt-in provision is irrelevant once the

15   parties have the agreement in place.  And that discussion

16   was on Page 378 of that Tenth Circuit decision.

17             Further, at least in my judgment, Perdue's

18   attempt to distinguish *Nesbitt* appears wholly unavailing

19   when Perdue argues that, because their opt-in complied with

20   the PSA regulations to create a valid arbitration clause,

21   the agreement should somehow escape evaluation under the

22   effective vindication doctrine.  That argument is on Page 6.

23   Every agreement evaluated under effective arbitration is,

24   initially, procedurally enforceable or else we wouldn't

25   reach the doctrine.  And the PSA, just as a matter of

1   statute, puts in place extra protections to make sure those

2   agreements don't improperly bind growers.  But once there is

3   a binding agreement, and that's just the first step, the

4   next step necessarily follows.  And that's the question

5   here.  Does it impermissibly trample certain statutory

6   rights?  Not every binding agreement does.

7           Turning to plaintiffs' specific arguments for

8   application of the effective vindication doctrine, I have

9   differing views on the six issues the plaintiffs identify,

10  which I have generally placed into four categories and will

11  take up in ascending order of my concern.  And in the end, I

12  conclude the doctrine applies to permit Butler to escape

13  application of the arbitration agreement.

14          First, discovery.  Discovery is available

15  under the agreement only upon showing substantial need.

16  This does not clearly trigger the application of the

17  doctrine.  It sets forth a slightly different standard, the

18  arbitration clause does, but does not preclude discovery,

19  nor does it clearly hinder vindication of any rights.

20  Speculating that somehow, some day Butler might not get the

21  discovery she sought or needed or could not use discovery

22  gained in this case is not enough in my judgment.

23          Second, requiring Butler to pay arbitration

24  fees.  There are plenty of cases suggesting that fees might

25  trigger application of the doctrine if a plaintiff meets an

1    initial burden to show that they would be somehow

2    cost-prohibitive.  And here *Nesbitt*, I think, is

3    illuminating.  In *Nesbitt*, the plaintiff had submitted

4    evidence of the likely cost of arbitration, and evidence

5    demonstrating why it would be prohibitive.  The problem

6    here, of course, is that we don't have any such evidence.

7    So while it might have been an avenue to trigger application

8    of the doctrine, the plaintiffs' showing here, at least in

9    my judgment, is insufficient.

10           Third, we have the question of the statute of

11   limitations.  Under the arbitration agreement, a plaintiff

12   is required to assert a claim within 120 days as opposed to

13   four years, which is the statute under the Sherman Act, or

14   that a claimant would normally have under the PSA.  The

15   Fourth Circuit court of appeals in *Cotton Yarn* allowed a

16   one-year statute of limitations to apply in an arbitrable

17   Sherman Act claim.  And in so doing, that court noted the

18   statutes of limitations may be shortened by agreement,

19   unless they are unreasonably short.  And of course that

20   decision, the *Cotton Yarn* case is a 2007 decision.

21           I find that 120 days is an unreasonably short

22   time frame within which to require a prospective plaintiff

23   to assert a Sherman Act claim, or the type of PSA claim

24   asserted here.  And that determination hinges on the nature

25   of the claims, complex antitrust claims, one that defendants

**United States District Court**

1   here rightfully point out in their joint motion to dismiss

2   demands highly detailed factual allegations and complex

3   legal justification.

4              Fourth, of most concern to me in view of the

5   case law, is the fact that the remedy -- there is the nature

6   of the remedies barred under the arbitration agreement.

7   This agreement eliminates the right to recover attorneys'

8   fees and treble damages, which the *Italian Colors* court

9   specifically recognized in dicta as important to vindicating

10  Sherman Act rights.  It also prevents recovery of any

11  injunctive relief.  And in my view, these present

12  insurmountable problems for Perdue in this case.

13             And Perdue's response to these concerns about

14  the barred remedies in its reply falls far short in my

15  judgment.  Though Perdue offers at least some discussion in

16  its reply concerning costs, discovery, and the statute of

17  limitations, there really is no direct engagement on the

18  issue of barred remedies.  At best, Perdue cites the *Cotton*

19  *Yarn* case and argues the Fourth Circuit there rejected the

20  plaintiff's urged application of the effective vindication

21  doctrine.  And I quote Perdue's description, "Even where the

22  arbitration provisions limited the statute of limitations

23  period, the scope of discovery, and plaintiffs' potential

24  damages recovery under the Clayton Act."  That was Page 9 of

25  Perdue's brief.  But in that case, I could not find an

1    explicit reference to any contract term limiting damages.

2    At most, in that case, the plaintiff had argued that a

3    shorter statute of limitations might have a practical effect

4    of reducing the amount of damages they could recover

5    because, they contended there, that the period of harm would

6    be reduced.

7              But the court of appeals rejected that

8    argument, noting it amounts to little more than an operation

9    that the limitations period under the arbitration agreements

10   is shorter, and the unremarkable recognition that

11   limitations provisions affect the amount of damages that may

12   be recovered.  The discussion was at Page 288 of the

13   decision.  There is no arbitration provision I could find

14   discussed in *Cotton Yarn* that expressly affected the

15   remedies the plaintiff could seek as the Perdue arbitration

16   agreement does in multiple ways.  Thus, Perdue has

17   essentially not addressed this argument in its reply.

18             The Court concludes the arbitration

19   agreement's limitation of the statute of limitations for

20   complex antitrust claims and the barring of remedies

21   otherwise available to Butler, and critical to vindicating

22   rights under the applicable federal statute, warrants

23   application of the effective vindication doctrine under

24   which I conclude Butler is not bound by the arbitration

25   agreement with regards to the claims she seeks to pursue in

1    this case.

2              And I'll note that, at oral argument, Perdue

3    offered some allusion to possibly severing certain clauses

4    from the arbitration agreement in order to save it.  But

5    Perdue had offered not a word in response to plaintiff's

6    contention in their opposition that the problematic

7    provisions could not effectively be severed.  Perdue waived

8    its response in argument, in the Court's view, and otherwise

9    inadequately briefed it, and I will not undertake a

10   rewriting of the arbitration provision.

11             As a final matter, Perdue argues, pursuant to

12   another provision in the 2015 agreement, that Butler has

13   waived certain rights related to class actions.  And I

14   decline at this time to evaluate and apply that provision so

15   far in advance of the class certification stage.  And to the

16   extent that Perdue argues here that Butler -- that without

17   Butler as a class plaintiff, claims against Perdue cannot

18   continue, I disagree given the nature of the allegations in

19   this antitrust case.  The other plaintiffs allege Perdue

20   conspired to violate antitrust laws, and that they were

21   harmed as a result.  There is no reason, at least in face of

22   the argument and briefing submitted by Perdue at this point,

23   why those claims cannot proceed.  Of course, we may have to

24   take up the class issues later.

25             I greatly appreciate your patience as we got

1    through all of that.  The effect of that is to deny Perdue's

2    motion to compel arbitration.

3              And that naturally leaves me wondering where

4    we are and where we're headed.  The plaintiffs --

5    Mr. Cramer, the plaintiffs still maintain that some

6    modification to the allegations in the consolidated

7    complaint are necessary to bring it in compliance with the

8    bankruptcy court's order?

9              MR. CRAMER:  Your Honor, we believe that's true,

10   some minor modifications.  Mr. Smith is going to handle it,

11   so I will have him --

12             MR. SMITH:  It will be brief, Your Honor.

13             THE COURT:  Would you kindly come to the podium to

14   aid the court reporter?  Thank you.

15             MR. SMITH:  Yes, Your Honor.  We think the

16   bankruptcy issue is relatively easy to resolve.  Our

17   amendment would clarify three things.  It would clarify that

18   we are not seeking any damages flowing from conduct that

19   predated Pilgrim's bankruptcy discharge.

20             THE COURT:  Against Pilgrim or any defendant?

21             MR. SMITH:  Against Pilgrim.  Pilgrim is the only

22   one entitled to the benefit of the discharge.  We are going

23   to then clarify -- this is in our complaint, but we will

24   just emphasize that we are only seeking damages from 2013

25   onwards.  And of course the bankruptcy discharge was several

78

1    years before that.  And that, finally, we will clarify that

2    Pilgrim committed overt acts in furtherance of the

3    conspiracy after the date of its discharge, which brings it

4    back into the fold for liability purposes for the

5    conspiracy.

6                We would propose that we would bring a motion

7    to amend before Your Honor on a timetable to be discussed

8    among the parties and Your Honor, and then Your Honor could

9    rule upon that motion to amend.

10               THE COURT:  Do you know today as you're here,

11   speaking on behalf of the plaintiffs collectively, whether

12   the plaintiffs are contemplating any additional

13   modifications to the complaint beyond those you've just

14   outlined?

15               MR. SMITH:  Yes, Your Honor.  There is one sort of

16   clerical issue.  At the outset of the case, Perdue had told

17   us that we had named the incorrect legal entity, and we had

18   reserved the amendment to bring in the correct legal entity

19   so as not to disrupt the briefing schedule.  And so we would

20   make that sort of clerical amendment in the complaint.  But

21   other than that, I don't see any other amendment that would

22   be necessary.

23               THE COURT:  Okay.  Thank you.  Defendants, let me

24   just say in response to what I just heard, what makes the

25   most sense to me I think is to construe that as an oral

1    motion to make those modifications to the complaint, and I

2    don't think they are substantive with respect to any of the

3    legal issues that have been addressed, and I'm inclined to

4    grant that motion today so we can get the complaint on file

5    and get moving.  But let's hear from all of you, or those of

6    you who care to be heard.  Mr. Bailey.

7              MR. BAILEY:  Good afternoon, Your Honor.

8              THE COURT:  Hi.  Welcome.

9              MR. BAILEY:  Well, I appreciate what the

10   plaintiffs are saying about seeking leave, but we need some

11   specifics as to when these overt acts that my client engaged

12   in occurred.  We heard that they may be seeking damages from

13   2013 forward, but when are the acts and what were the acts?

14   We need to see that amended complaint before we should go

15   forward.

16             THE COURT:  Before I --

17             MR. BAILEY:  I think there needs to be some more

18   meat on that bone.

19             THE COURT:  But before I decide whether we should

20   receive it?  We're just talking procedure right now.  Like

21   whether we should require the filing of a motion seeking

22   leave to amend the complaint, attaching a copy of the

23   amended complaint and inviting a brief, doesn't that just

24   add one additional step to getting to the core issue?  Your

25   concern may be present, which is --

1          MR. BAILEY:  We've got a bankruptcy issue here,

2     Your Honor, and I need to see what the complaint is, because

3     what they're alleging may not satisfy what the bankruptcy

4     court has ordered them to do.  We have an injunction in

5     place.  I would just say this:  The bankruptcy court ruling

6     was in March of 2018.  The plaintiffs know what the issues

7     are.  I would think if they had -- I don't know, I'd leave

8     it up to them -- 15, 30 days, if even that long, to file a

9     formal motion for leave with the amended complaint attached,

10    and give -- you know, Pilgrims will agree to a ten-day time

11    frame to respond.  That should be plenty enough.

12          THE COURT:  That's seems --

13          MR. BAILEY:  Does that seem fair to the Court?

14          THE COURT:  Thanks for asking.  It does.  I mean,

15    I don't want to receive a complaint that runs afoul of the

16    injunction in the bankruptcy case.  And, Mr. Smith, I hear

17    from you?  Sure.  But I think I understand your position,

18    Mr. Bailey, on behalf of Pilgrims Pride.  Thank you.

19          MR. BAILEY:  Thank you, Your Honor.

20          THE COURT:  Mr. Smith.

21          MR. SMITH:  Yes.  Just to clarify what the

22    bankruptcy court injunction said, was it said that we cannot

23    proceed against Pilgrims until we have amended the

24    complaint.  That's what we're trying to do.  That's what

25    your order or granting the oral motion would accomplish.

1    There's no bar to us proceeding in that way if that's how

2    Your Honor would like to proceed.

3              THE COURT:  I appreciate that.  My --

4              MR. SMITH:  And as to overt acts, Pilgrims, every

5    day from 2013 -- every week from 2013 to the present,

6    committed an overt act by exchanging information with its

7    co-conspirators.  So we don't think the overt act issue is

8    particularly hard to flesh out in this case.

9              THE COURT:  I think I understood Mr. Bailey to --

10   he didn't say this, but I think I understood him to raise

11   two different concerns.  One is one related to the substance

12   of the allegations, and the other, allegations that may

13   implicate the injunction.  And it's the latter, not the

14   former that has me most concerned about the procedure that

15   we're going to employ.  I don't think it will be

16   unreasonable to require you to submit a motion with an

17   attached proposed second amended consolidated complaint I

18   suppose.  When would you -- when would you contemplate doing

19   that?

20             MR. SMITH:  We could have that on file in four

21   weeks if that would please the Court.

22             THE COURT:  It's your --

23             MR. SMITH:  Or three weeks.

24             THE COURT:  It's your -- you tell me.  It's your

25   complaint.  Three weeks -- three weeks from today?  I don't

1    have a calendar.

2            MR. CRAMER:  January 27th.

3            MR. SMITH:  January 27th, Your Honor.

4            THE COURT:  Thank you.  January 27th.  We'll look

5    for a motion for leave to amend on or before January 27th.

6    And a response, if any, from Pilgrims Pride within three

7    weeks of that date, Mr. Bailey?

8            MR. BAILEY:  That will be fine, Your Honor.  Thank

9    you.

10           THE COURT:  Thank you.  I think that's February

11   17th.  All right.

12           MR. CRAMER:  February 17th is President's Day just

13   in case --

14           THE COURT:  Well, we'll honor our presidents.  No,

15   we'll -- thank you.  The 18th.  February 18th for -- on or

16   before February 18th.

17               Plaintiffs, you have told us today -- well,

18   this is going to be crucial I think.  The answers need to be

19   drawn to the operative complaint, and it won't make any

20   sense to anybody to respond to this complaint because it's

21   going to change.  So we will stay the time for answering the

22   complaint until after the Court decides the motion for leave

23   to amend.  And that ruling will include -- well, if there's

24   going to be -- if the Court is going to be ordering answers

25   from parties, I'll include a time line for that in the

1    ruling that we provide on the order deciding the motion for

2    leave to amend.  I think that's the best way to go forward.

3              And then the next thought that I have, we

4    have -- I stayed -- at the defendants' request, I stayed

5    discovery in this case at the outset, in contravention of my

6    own practices and I think the practices that are the

7    preferred practices in the Tenth Circuit generally.  And it

8    seems to me that it's time now to begin discovery.  But

9    let's -- I assume the plaintiffs wish to proceed with

10   discovery.

11             MR. CRAMER:  Yes, Your Honor, we do.

12             THE COURT:  So let's hear from the defendants.

13   Thank you.  Ms. Adcox.

14             MS. ADCOX:  Thank you, Your Honor.  And we do

15   appreciate your inclination to move this case forward in a

16   relatively expedient manner going forth.  We think the

17   quickest way to do that is, as Your Honor suggests, to get a

18   new consolidated amended complaint on file.  To allow the

19   parties to look at that.  To allow the parties, including

20   Perdue and Tyson, to respond to that complaint, if such a

21   response is necessary.  Obviously we don't know exactly what

22   amendments the plaintiffs will make until we actually see

23   the complaint.

24             The concern that we have, and the reason that

25   we believe the stay should remain in place, until the

1    complaint is resolved upon and any motions to dismiss are

2    decided is that we are greatly burdened by piecemeal

3    discovery.  We know, for example, that the plaintiffs will

4    want to bring Pilgrims back if Tyson and Perdue, for

5    example, are off and running in discovery negotiations.  Any

6    sort of a late entry by Pilgrims can cause quite a bit of

7    inefficiency and confusion.  Pilgrims will want their

8    opportunity to challenge the new allegations in the

9    complaint, if that's appropriate, and will end up having to

10   play catch-up or otherwise stall the rest of discovery in

11   the case.  Pilgrims, in the meantime, would also be unable

12   to weigh in on any procedural issues that need to get

13   discussed in the interim, which will prejudice them, and I'm

14   sure Mr. Bailey can address that if he feels the need.

15              Piecemeal discovery in this case would also

16   be burdensome and costly because of the geographic scope of

17   the case that Your Honor has now ruled upon.  Documents and

18   personnel are likely to not be centrally located.  There are

19   grower complexes all over the United States.  There are also

20   issues with the fact that search parameters that plaintiffs

21   will most likely want to start negotiating will be affected

22   by any sort of disparity or later addition of claims or

23   facts, and particularly with respect to the use of

24   technology-assisted review which requires some certain scope

25   of the case.

1        THE COURT:  I'm sorry, I want to make sure I

2   understood the last thing you said.

3        MS. ADCOX:  Sure.

4        THE COURT:  I think what you were suggesting was

5   that our uncertainty about what claims might be asserted in

6   the complaint and be answered by the defendants creates a

7   specific burden in here because of the ESI inquiries that

8   will have to be -- those will be tailored to the claims.

9   And until we know the claims, we can't know the inquiries,

10  and let's just do it once and not twice.  Is that what you

11  were saying?

12       MS. ADCOX:  That's effectively what I'm saying.

13  And, Your Honor, I think that, in this case particularly, if

14  plaintiffs are true to their word --

15       THE COURT:  I can't tell for sure, but it looks

16  like our court reporter might be having trouble, A, hearing

17  you, and, B, you might be speaking really quickly.

18       MS. ADCOX:  Thank you, Your Honor.  I will correct

19  both.  I also think, Your Honor, that if plaintiffs are true

20  to their word here, and that the scope of their amendments

21  will be somewhat limited, the effect of the stay will not

22  prejudice them.  All it will do is serve to move the case

23  forward in the most efficient manner by making sure that all

24  of the parties are on the same page.

25       THE COURT:  Okay.  Rather than just rule against

86

1    you, I want to credit your argument and make sure I'm giving

2    it full weight.  I am certain -- I'm nearly certain that

3    discovery, as you said, will be complicated and expensive in

4    this case.  Courts ordinarily proceed in cases without

5    waiting for resolving motions to dismiss and narrowing

6    claims and whatever else happens.  Moreover, that discovery

7    is going to happen in this case.  I've now overruled the

8    substantive objections to the Sherman Act claim and PSA

9    claim.  And Pilgrims may raise specific objections about the

10   sufficiency of certain allegations as to Pilgrims.  They may

11   raise issues relating to the scope of the new allegations

12   vis-a-vis the bankruptcy injunction order.  I don't

13   understand that anything Pilgrims is going to say -- and I

14   accept the plaintiffs' representations today about the

15   nature and scope of the proposed amendments.  Nothing

16   Pilgrims is going to say is going to prevent that discovery

17   from going forward.  Isn't it just time to start, in

18   fairness to the plaintiffs who have been waiting two years,

19   to just begin, to have a Rule 26(f) conference and serve

20   some discovery?

21          MS. ADCOX:  Well, I appreciate, again, Your

22   Honor's view on this.  I think our concern simply is with

23   the piecemeal nature of the discovery that might result if

24   we have Pilgrims on one track and the two defendants on the

25   other track.  And so anything we can do to avoid that, Your

1    Honor, would obviously be appreciated.

2            THE COURT:  So there's no reason, is there, that

3    Pilgrims couldn't participate in a Rule 26(f) conference

4    like defendants do all the time in cases where they're named

5    but haven't yet answered?  Do you want to --

6            MS. ADCOX:  I would like -- no, I'd like to defer

7    to Pilgrim's counsel for obviously his opinion.

8            THE COURT:  Sure.  Do you see any reason why they

9    couldn't participate?  Would you object to their

10   participating in a Rule 26(f) conference?

11           MS. ADCOX:  We would not object.  But, again, I

12   cannot speak for Pilgrims as to whether they would object

13   with no operative complaint on file.

14           THE COURT:  Okay.  Thank you.  Before we hear from

15   Pilgrims, Mr. Smith or Mr. Cramer, do you object to Pilgrims

16   participating in an attorney planning conference before --

17           MR. CRAMER:  We do not object.

18           THE COURT:  -- they answer it or move to dismiss

19   your complaint?

20           MR. CRAMER:  No, we do not object, Your Honor.

21   And the discovery can proceed before -- there's going to --

22   it's going to take time to negotiate a Rule 26(f) report to

23   Your Honor.  That can proceed.  By the time we have a Rule

24   16 conference, I think the operative complaint will be clear

25   and the allegations will be clear.  There's nothing

1    mysterious.  And we think it's time to begin moving forward.

2    There are a number of documents that these parties have

3    already produced to the Department of Justice relating to

4    some of these underlying claims in the consumer case related

5    to these underlying claims.  We have to negotiate a

6    confidentiality agreement.  There's going to be -- we have

7    to negotiate search terms, and those are going to be similar

8    whether Pilgrims is there or not.  We -- there are a lot of

9    preliminary things that can and should be accomplished over

10   the next few weeks, and that can happen while we're working

11   on the very minor amendments to the complaint.

12           THE COURT:  The plaintiffs -- let me -- Mr. Smith

13   I think answered this question, but let me just ask directly

14   and to the point.  The plaintiffs have no intention of

15   articulating a new theory of the case as to Pilgrims?

16           MR. CRAMER:  We do not.

17           THE COURT:  No new claims as to Pilgrims?

18           MR. CRAMER:  We do not.

19           THE COURT:  Your intent in the further amendment

20   is to narrow the scope of the claims that are already

21   asserted against Pilgrims.  Is that true?

22           MR. CRAMER:  Correct, Your Honor.

23           THE COURT:  Thank you.  Mr. Bailey.

24           MR. BAILEY:  Your Honor, Pilgrims doesn't have a

25   problem discussing or having a conference about scheduling,

1    or even a protective order in this case.  I think the only

2    problem I have, again, is if we get into some type of ESI

3    protocol or who my custodians are going to be, that type of

4    thing.  Until I see the complaint that's alleged, what date

5    is it going to be that we supposedly, you know, entered into

6    this conspiracy after December 20, 2000 -- I hear 2013.

7    Just when is it?  That does have an impact.  People come and

8    go in corporations.  If they say it started June 1 of 2013,

9    that may impact the custodians who left before then on the

10   live production side.

11            So that's the issue I have, is it really

12   causes me to speculate in trying to negotiate things.  As it

13   relates to dates and things like that for scheduling, we can

14   engage in those discussions.

15          THE COURT:  I appreciate that, Mr. Bailey.  We're

16   talking about the proposed second amended class action

17   complaint being on file on or before January 27th.  And you

18   strike me as a really bright lawyer.  And while I'm

19   confident that you may be partially handicapped in your

20   ability to provide some information prior to the 27th, I'm

21   sure that -- I'm sure we can work our way around it.

22            It's time to begin.  I'm going to lift -- I'm

23   ordering lifted the stay on discovery that I previously

24   imposed in the case.  And I don't know that it will be

25   helpful for me to start doing anything more with respect to

1    discovery now.  You all begin.  It's time to have a Rule 16

2    conference, I think a Rule 26(f) conference.

3              I'm just now thinking about -- now I'm

4    wandering into space where I think I'd like your feedback

5    about something.  I've said now at least twice and probably

6    three times -- I'm sorry if I'm being repetitive -- I think

7    you would all benefit from an A referral to a magistrate

8    judge in this district for the non-dispositive matters,

9    specifically for two reasons.  One is that the plaintiffs

10   chose this forum.  And one of the calculations in choosing a

11   forum I think, and appropriate consideration, are the rules

12   that will govern the proceedings.  And I think you're

13   entitled to the application of the local rules.  And that

14   would be more efficiently done by a magistrate judge who

15   implements those rules on a day-to-day basis consistent with

16   the standing custom and practice.  That may also have been

17   an appropriate consideration by the plaintiffs choosing this

18   forum.  Second, and while I can -- we'll talk a little bit

19   more about case management and the District Court's

20   involvement.  Having a local magistrate judge will make it

21   much, much easier to have hearings if they are necessary on

22   any of the case management issues that the magistrate judge

23   will oversee, at least in the first instance.  So I propose

24   to enter an A referral and have one of the local magistrate

25   judges assigned for that reason.  But I'm open to some

1    discussion about that if anybody cares to weigh in.

2    Mr. Cramer.

3              MR. CRAMER:  Your Honor, we think that is a good

4    idea as long as the magistrate judge is limited to

5    discovery-related matters.  We would like Your Honor,

6    obviously, to consider the summary judgment motion, the

7    class certification motion, and the entire scheduling of the

8    case.  We think Your Honor should consider the case as a

9    whole and how that's going to proceed, and then allow the

10   magistrate judge to deal with the discovery disputes as they

11   arise.  Because the case -- the case schedule, that is how

12   we're -- how long discovery is going to last, when summary

13   judgment will be briefed, how class certification is going

14   to happen, when the expert reports will be due, whether

15   they'll be -- class and merits reports will be separate or

16   whether they'll be combined, there will be a number of

17   issues that will, I think, given that Your Honor will be

18   considering the class motion and the summary judgment motion

19   and, ultimately, as we head towards trial, we think that it

20   would be best if Your Honor considered the overarching

21   schedule, and then allow the magistrate to work within that

22   schedule.

23             THE COURT:  Okay.  Defendants.  Ms. Adcox.

24             MS. ADCOX:  Thank you, Your Honor.  We do not have

25   any issue with the appointment of the magistrate judge.  But

1    we do think it sufficient if the magistrate judge does make

2    scheduling rulings in consultation with Your Honor as

3    opposed to Your Honor being somebody that we're back to when

4    and if schedule changes are necessary midstream in the

5    case.

6         THE COURT:  Okay.  Well, I'm going to think about

7    that and consider that.  Look, this is not a routine case,

8    at least not in my judgment.  And I anticipate, given the

9    complexity of the issues, the nature of the issues, the

10   nature of the claims, the number of the parties, the

11   sophistication of counsel and the like, and also whatever --

12   whatever months of delay I'm accountable for in this case.

13   I'm going to be actively involved in the management of the

14   case, more so than I ordinarily am in a case has an A

15   referral.  And my instinct is, but I'm going to think more

16   about what you've all said -- and I wonder, when I say an A

17   referral, you all -- yes.  Okay.  Under the Magistrate Act,

18   right?  So non-dispositive motions subject to an appeal, or

19   objections and things of that nature.  Ordinarily that is

20   all non-dispositive motions.

21        But that is not what I had in mind in this

22   case.  Mr. Cramer, you brought up the class motions.  I'll

23   decide the class certification issues in the case.  And I do

24   think that this is an appropriate case for active

25   involvement in the scheduling, at least in the first

1    instance.  But I think the practice I'll employ is we'll

2    actively manage -- monitor the docket and if there -- we'll

3    be active in regular communication with the assigned

4    magistrate judge.  And I may unrefer specific motions that

5    get filed so that we can address them directly.  And I'll

6    just -- I don't -- we'll do it on a case-by-case basis I

7    think.

8                    Related to that point, though, now I'm just

9    asking you how I can help best serve all of you.  I've had

10   cases where it's been helpful to have monthly status calls.

11   I've had cases in MDL that we manage where I require the

12   parties to submit 60-day reports and raise issues that the

13   parties are having trouble resolving so that I can be

14   involved.  I'm just trying to think about the most effective

15   way for me to help all of you get answers to the questions

16   you're going to need answered.  Maybe it's just through the

17   traditional motion practice.  I don't want to impose

18   additional time and expense on the parties by requiring you

19   to come here for hearings quarterly or more often just to

20   have a hearing.  So I don't know.  I think what might be

21   most helpful is to receive periodic reports from counsel

22   concerning the issues that you're working on, the success

23   you're finding, and those issues that are arising where you

24   need the Court's involvement.  And it could be done in an

25   informal way through this, it could be a joint submission by

1    the parties on whatever schedule we agree to.  And insofar

2    as you agree about things in the joint submission, that

3    would be set out.  And insofar as anybody wanted to say

4    something else that others didn't agree with, you can

5    include that.  We could review those reports, and then we

6    could either have calls or meetings as necessary to address

7    whatever issues have arisen.  I'm sort of thinking out loud

8    while I'm talking now, but I'm finding that I like my idea,

9    which is not surprising maybe.  But let me ask for your

10   thoughts about that.

11        MR. CRAMER:  Your Honor, Eric Cramer for the

12   plaintiffs.  Yeah, we agree.  We think that periodic joint

13   submissions with the opportunity for each party, if there is

14   disagreement, to weigh in on what their disagreement is and

15   their respective positions are would be a good idea.  So I

16   think that is a good idea.  And then, as result of those

17   regular joint submissions, there may be a point at which

18   enough disputes have arisen where a hearing, telephonic or

19   in person is necessary.  So we think that's a good idea.

20        THE COURT:  Defendants, I don't know if you have a

21   response you care to share.

22        MS. ADCOX:  Your Honor, I think we would need to

23   take care to make sure that the regular submission of these

24   reports doesn't actually precipitate disputes rather than

25   resolve them, and that may be solved by having them on a

1    less frequent basis perhaps.

2          MR. CRAMER:  Your Honor, in my experience, the

3    practice of doing a joint report to a court often helps

4    resolve disputes because parties have an interest in not

5    being obstreperous and showing that they're trying to work

6    things out in a reasonable fashion.  But that's just been my

7    experience.  Others might have a different experience with

8    that.

9          THE COURT:  We're going to -- I do need to take a

10   very short recess for a moment.  I think we'll be like five

11   minutes.  But why don't we take a very short break and come

12   back and continue this discussion.  It will be less than ten

13   minutes.  Thank you.

14                *(Off the record at 12:37 p.m.)*

15                *(Back on the record at 12:50 p.m.)*

16         THE COURT:  My apologies for that interruption.

17   I'm informed that I misspoke in announcing the conclusion of

18   our ruling on the earlier motions, though all of you knew

19   what I meant, which is why you weren't alarmed.  I think I

20   said -- I must have said that the plaintiffs' joint motion

21   to dismiss was denied.  And of course it was the defendants'

22   joint motion.

23              All right.  Well, I think -- I appreciated

24   hearing from -- though I guess we didn't hear from all the

25   defendants.  I think Ms. Adcox had a moment and was

1    consulting with her colleagues before she spoke about status

2    reports.  I think that makes sense to me is a good way for

3    us to begin this case.  It's worked for us in MDL

4    proceedings.  And when I was a lawyer in class action

5    litigation, I thought it was helpful to avoiding disputes

6    percolating to the motion stage and requiring more --

7    required fewer motions I think than not requiring that

8    process.  I do know they can be burdensome, though, and time

9    consuming, and so I don't want it to overwhelm what you

10   actually need to do.

11               I'm going to propose, at least initially,

12   that we start with 90-day status reports and let's go from

13   there and see how it works.  And I'll read whatever you

14   submit, and so make them as brief or as lengthy as you need.

15   You can take advantage of those reports as an opportunity to

16   inform me and educate me about things.  It won't be super

17   helpful to you to be arguing the merits of a lot or

18   pre-arguing the merits of things.  We'll get to those.  But

19   let's just get a sense for it, a measure of it.  The first,

20   if we start on a 90-day schedule, this is the beginning of

21   January, about a 90-day report -- actually, let's do this.

22               I'm going to propose -- and we'll talk in a

23   moment about whether this makes sense to any of you.  I'm

24   going to propose that we hold a date for a potential

25   hearing, if we need one, in early April before Easter.  And

1    so maybe your first report, it would be helpful if it came a

2    week earlier.  Let's just think about the first report being

3    due on -- submitted by March 30th.  And I don't know, I hope

4    it's not horribly burdensome for all of you for us to have

5    Monday hearings.  It's just a good day for me to do it.  It

6    requires you to travel on Sunday.  I don't know that we need

7    to meet in person in early April to decide any issues to fix

8    the pleadings finally.  But I'm going to propose that we

9    hold Monday, April 6th as a hearing date, if we need it, to

10   get together and resolve any outstanding motions.  April 5th

11   I think is Palm Sunday, but we're far enough out from Easter

12   I hope it wouldn't interfere with any of your schedules.

13   Can you be available -- Mr. Cramer, can the plaintiffs be

14   available on the 6th?

15            MR. CRAMER:  Yes, we can, Your Honor.

16            THE COURT:  And are there defendants who are

17   unable to be present on the 6th?

18            MS. ADCOX:  No, Your Honor.

19            THE COURT:  Okay.  I don't know that we'll have

20   that hearing or we won't.  Let's see what unfolds in the

21   briefing in the next little bit.  I picked that time period

22   just sort of working backwards from what I think the

23   briefing schedules may be on the motions, and so we'll have

24   your report the week before.  And if it becomes clear that

25   we don't need to have a hearing, I'll vacate that hearing as

1    early as I can so you can -- you don't -- so you have

2    control over your schedules.

3              What else should we take up while we're here,

4    if anything, from the defendants' perspective?

5              MS. ADCOX:  No, Your Honor.

6              THE COURT:  From the plaintiffs?

7              MR. CRAMER:  Your Honor, think it would be helpful

8    for you to schedule a date for the Rule 16 conference

9    because that date -- from that date flows the 26(f) report

10   and the other things the parties need to do.  And that could

11   be either by telephone or in person.  But we suggest at some

12   point in the first two weeks of March would be a good day

13   for a Rule 16 conference.

14             THE COURT:  I wonder if -- so the practice in our

15   court in Utah, the Rule 16 conferences are handled by the

16   magistrate judges, though I am happy to handle -- I think it

17   would be helpful for me to be involved in the Rule 16

18   conference here.  Why don't we plan to do that on April 6th,

19   and any motions we'll need to take up.  And that may be a

20   few weeks later than you had in mind.  But maybe we'll also

21   then have the benefit of your report on the 30th.  So we'll

22   set that date as a Rule 16 conference and a motion hearing.

23   That's a good suggestion.  Thank you.

24                            (Pause)

25             THE COURT:  Given that we are going to have a

1    90-day status report on or before March 30th, let me ask

2    counsel if any of you think it would be helpful -- I'll

3    defer to you -- to have a status report on the Rule 16

4    conference separate and apart from that 90-day conference?

5    That doesn't necessarily make any sense to me, and I don't

6    want to create work for everybody.  Surely a week before is

7    enough.  It's ordinarily submitted two weeks before a Rule

8    16 conference in this district, but I think a week is

9    sufficient unless you have concerns.

10            MR. CRAMER:  That's fine with us, Your Honor.

11            MS. ADCOX:  No concern, Your Honor.

12            THE COURT:  Terrific.  Mr. Cramer, anything more

13   from the plaintiffs?

14            MR. CRAMER:  No, Your Honor.  Thank you.

15            THE COURT:  All right.  I appreciate your patience

16   today, counsel.  Thank you.  We'll be in recess.  I look

17   forward to seeing you soon.

18            *(Off the record at 12:57 p.m.)*

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2          I, Ken Sidwell, Certified Shorthand Reporter for

3     the Eastern District of Oklahoma, do hereby certify that the

4     foregoing is a true and accurate transcription of my

5     stenographic notes and is a true record of the proceedings

6     held in the above-captioned case.

7          I further certify that I am not employed by nor

8     related to any party to this action, and that I am in no way

9     interested in the outcome of this matter.

10          In witness whereof, I have hereunto set my hand

11     this 8th day of January, 2020.

12

13                                   s/Ken Sidwell
                                     Ken Sidwell, CSR-RPR
14                                   United States Court Reporter

15

16

17

18

19

20

21

22

23

24

25