# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil Case No. 18-1776 (JRT/HB) |
| This Document Relates to: | |
| ALL ACTIONS | |

# PLAINTIFFS' OMNIBUS OPPOSITION
# <u>TO DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 1

II.   PLAINTIFFS' ALLEGATIONS, INCLUDING THOSE OF
      CONDUCT BY ALL DEFENDANTS, ARE PROPERLY AND
      SUFFICIENTLY PLED AGAINST EACH DEFENDANT ................................. 3

III.  PLAINTIFFS HAVE ADEQUATELY PLED EACH DEFENDANT'S
      PARTICIPATION IN THE ALLEGED CONSPIRACY ........................................ 6

      A.   Plaintiffs' Amended Complaints plead specific conduct by
           Defendant Smithfield in furtherance of the alleged conspiracy. ................... 8

      B.   Plaintiffs' Amended Complaints plead specific conduct by
           Defendant Tyson in furtherance of the alleged conspiracy. ........................ 10

      C.   Plaintiffs' Amended Complaints plead specific conduct by
           Defendant JBS in furtherance of the alleged conspiracy. ........................... 12

      D.   Plaintiffs' Amended Complaints Plead Specific Conduct by
           Defendant Hormel in Furtherance of the Alleged Conspiracy ................... 15

      E.   Plaintiffs' Amended Complaints plead specific conduct by
           Defendant Seaboard in furtherance of the alleged conspiracy. ................... 18

      F.   Plaintiffs' Amended Complaints plead specific conduct by
           Defendant Triumph in furtherance of the alleged conspiracy. ................... 20

      G.   Plaintiffs' Amended Complaints plead specific conduct by
           Defendant Clemens in furtherance of the alleged conspiracy. ................... 21

      H.   Plaintiffs' Amended Complaints plead specific conduct by
           Defendant Indiana Packers in furtherance of the alleged
           conspiracy. ............................................................................................... 24

      I.   Plaintiffs' Amended Complaints plead specific conduct by
           Defendant Agri Stats in furtherance of the alleged conspiracy ................... 26

      J.   IPP's Amended Complaint sufficiently pleads each individual
           Defendant's participation in an anticompetitive information
           exchange agreement. ................................................................................ 31

010736-11/1240735 V3

1.    IPPs sufficiently plead Hormel's participation in the information exchange agreement. ...................................................... 31

2.    IPPs sufficiently plead Clemens's participation in the information exchange agreement. ...................................................... 33

3.    IPPs sufficiently plead Indiana Packers' participation in the information exchange agreement. ............................................... 36

IV.    CONCLUSION .................................................................................. 37

010736-11/1240735 V3

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Admiral Theatre Corp. v. Douglas Theatre Co.*,
585 F.2d 877 (8th Cir. 1978) ..................................................................................... 10

*Atkins v. Hasan*,
2015 WL 3862724 (N.D. Ill. Jun. 22, 2015) ............................................................... 3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................... 9, 22, 36

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
620 F.2d 1360 (9th Cir. 1980) .............................................................................. 6, 23

*BJC Health Sys. v. Columbia Cas. Co.*,
348 F.3d 685 (8th Cir. 2003) ......................................................................... 16, 22, 31

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................................................. *passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*
203 F.3d 1028, 1032 (8th Cir. 2000) .......................................................................... 9

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) ................................................................................. 3, 4

*In re Bulk Popcorn Antitrust Litig.*,
783 F. Supp. 1194 (D. Minn. 1991) ........................................................................ 4, 33

*Cafesjian v. Armenian Assembly of Am., Inc.*,
2008 WL 906194 (D. Minn. Mar. 31, 2008) ............................................................. 17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2010 WL 9543295 (N.D. Cal. Feb. 5, 2010) .............................................................. 5

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ................................................................................. 2, 11, 14, 18

*Coons v. Mineta*,
410 F.3d 1036 (8th Cir. 2005) ................................................................................... 6

010736-11/1240735 V3

*In re Credit Default Swaps Antitrust Litig.*,
   2014 WL 4379112 (S.D.N.Y. Sep. 4, 2014)............................................................ 4, 5

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ...................................................................... 12, 31

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
   788 F. Supp. 1042 (D. Minn. 1992) ............................................................................ 6

*Great Atl. & Pac. Tea Co. v. Amalgamated Meat Cutters & Butcher*
   *Workmen of N. Am.*,
   410 F.2d 650 (8th Cir. 1969) ...................................................................................... 7

*Hosp. Bldg. Co. v. Trustees of the Rex Hosp.*,
   425 U.S. 738 (1976) ............................................................................................... 7, 10

*Jung v. Ass'n of Am. Med. Colls.*,
   300 F. Supp. 2d 119 (2004) ................................................................................. 27, 28

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) .................................................................................... 22

*Kleen Prods. LLC v Packaging Corp. of Am.*,
   775 F. Supp. 2d 1071 (N.D. Ill. 2011) ................................................................. 22, 23

*United States ex rel. McGee v. IBM Corp.*,
   2017 WL 4467458 (N.D. Ill. Oct. 6, 2017)............................................................... 28

*In re Milk Prods. Antitrust Litig.*,
   84 F. Supp. 2d 1016 (D. Minn. 1997).......................................................................... 7

*Morton v. Becker*,
   793 F.2d 185 (8th Cir. 1986) .................................................................................... 12

*In re Nat'l Hockey League Players' Concussion Injury Litig.*,
   189 F. Supp. 3d 856 (D. Minn. 2016)........................................................................ 17

*Penne v. Greater Minneapolis Area Bd. of Realtors*,
   604 F.2d 1143 (8th Cir. 1979) ............................................................................. 28, 33

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) ........................................................................ 28

*In re Polyurethane Foam Antitrust Litig.*,
   86 F. Supp. 3d 769 (N.D. Ohio 2015)............................................................... 4, 7, 33

010736-11/1240735 V3

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) ............................................................... 13, 25

*In re Propranolol Antitrust Litig.*,
    249 F. Supp. 3d 712 (S.D.N.Y. 2017) ........................................................ 16

*Rochling v. Dep't of Veteran Affairs*,
    725 F.3d 927 (8th Cir. 2013) ...................................................................... 6

*Sitzer v. Nat'l Ass'n of Realtors*,
    2019 WL 5381984 (W.D. Mo. Oct. 16, 2019) ...................................... 2, 7, 36

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................................................ 7

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ....................................................................... 35

*Topchian v. JPMorgan Chase Bank, N.A.*,
    760 F.3d 843 (8th Cir. 2014) ........................................................... 6, 18, 25

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ....................................................................... 34

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942) ................................................................................... 34

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ....................................................................... 10

*Wong v. Wells Fargo Bank N.A.*,
    789 F.3d 889 (8th Cir. 2015) ....................................................................... 6

*Zean v. Fairview Health Servs.*,
    149 F. Supp. 3d 1129 (D. Minn. 2016) ......................................................... 12

## FEDERAL RULES

Federal Rule of Civil Procedure 8 ....................................................................... 6

Federal Rule of Civil Procedure 10(c) ................................................................. 16

Federal Rule of Civil Procedure 12(b)(6) ......................................................... 6, 12

## I.       INTRODUCTION AND SUMMARY OF ARGUMENT

In response to the Court's Order[1] on Defendants' initial motions to dismiss, Plaintiffs have alleged significant facts as to each Defendant[2] in the Amended Complaints[3] that, along with the totality of allegations therein, adequately plead an antitrust conspiracy to fix the price of pork sold in the United States in order to charge supra-competitive prices.

Plaintiffs' Amended Complaints contain significant and specific allegations of the parallel conduct by each Defendant in furtherance of the alleged conspiracy. In addition to allegations of parallel conduct, Plaintiffs have alleged numerous plus factors. Most critically, Plaintiffs allege that Defendants agreed to exchange detailed, competitively sensitive information in furtherance of their conspiracy to increase the price of pork in the

---

[1] "Order" refers to the Amended Memorandum Opinion and Order Granting Defendants' Motions to Dismiss Plaintiffs' Complaints, Aug. 8, 2019, ECF No. 361.

[2] "Defendants" refers to Agri Stats, Inc. ("Agri Stats"); Clemens Food Group, LLC and The Clemens Family Corporation (collectively, "Clemens"); Hormel Foods Corporation and Hormel Foods, LLC (collectively, "Hormel"); Indiana Packers Corporation ("Indiana Packers"), JBS USA Food Company ("JBS"); Seaboard Foods LLC and Seaboard Corporation (collectively, "Seaboard"); Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. (collectively, "Tyson").

[3] "Amended Complaints" collectively refers to: the Direct Purchaser Plaintiffs' Third Amended and Consolidated Class Action Complaint (*Maplevale Farms Inc. v. Agri Stats, Inc.*, No. 18-cv-01803 (D. Minn.), Jan. 15, 2020, ECF No. 431, hereinafter "DPP ¶ __"); the Consumer Indirect Purchaser Plaintiffs' Second Amended Consolidated Class Action Complaint (*Duryea, et al. v. Agri Stats, Inc., et al.*, No. 18-cv-01776 (D. Minn.), Nov. 6, 2019, ECF No. 393, hereinafter "IPP ¶ __"); and the Commercial Institutional Indirect Purchaser Plaintiffs' Third Amended and Consolidated Class Action Complaint (*Sandee's Bakery, et al. v. Agri Stats, Inc., et al.*, No. 18-cv-01891 (D. Minn.), Jan. 15, 2020, ECF No. 432, hereinafter "CIP ¶ __").

United States. *See* IPP ¶ 6; DPP ¶ 2; CIP ¶ 2. During the conspiracy, Agri Stats provided highly sensitive "benchmarking" reports to all of the Defendants. IPP ¶ 173; DPP ¶ 3; CIP ¶ 3. The effect of this information exchange was to allow the pork integrators to monitor each other's production and control supply and price in furtherance of their anticompetitive scheme. *See* IPP ¶ 6; DPP ¶ 3; CIP ¶ 3. These allegations regarding Defendants' information exchange through Agri Stats: (1) support Plaintiffs' *per se* conspiracy claims and (2) independently satisfy the individual participation requirement for the information exchange claims asserted by the Consumer Indirect Purchaser Plaintiffs.

Beyond Agri Stats, Defendants also publicly signaled their ongoing commitment to the conspiracy. In public conference calls, Defendants' executives emphasized their intent to reduce supply and their knowledge that others in the industry would act consistently with the conspiracy. *See* IPP ¶ 99-123; DPP ¶¶ 133-163; CIP ¶¶ 137-167.

These allegations, when viewed as a whole and in context of the other allegations, clearly provide the framework of Defendants' conspiracy. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts[.]"). When Plaintiffs' allegations are read in accordance with the applicable standard, Plaintiffs have more than satisfied their burden of presenting allegations that "raises ***a suggestion*** of a preceding agreement" between Defendants. *Sitzer v. Nat'l Ass'n of Realtors*, No. 4:19-CV-00332-SRB, 2019 WL 5381984, at *4 (W.D. Mo. Oct. 16, 2019) (emphasis added) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

010736-11/1240735 V3

Defendants' Individual Motions to Dismiss[4] should be denied in their entirety for the reasons discussed herein, along with the reasons articulated in Plaintiffs' Opposition to the Joint Motion to Dismiss.[5] Because the Individual Motions to Dismiss fail to raise any new arguments not already presented in the Joint Motion to Dismiss,[6] the Individual Motions to Dismiss rise or fall with the Joint Motion to Dismiss. Additionally, each Individual Motion to Dismiss impermissibly attempts to offer factual, pretextual alternative explanations to refute Plaintiffs' allegations. This is impermissible at the pleadings stage.

## II.   PLAINTIFFS' ALLEGATIONS, INCLUDING THOSE OF CONDUCT BY ALL DEFENDANTS, ARE PROPERLY AND SUFFICIENTLY PLED AGAINST EACH DEFENDANT

Plaintiffs' Amended Complaints sufficiently allege the involvement of each of the Defendants. A plaintiff may "adequately plead[] personal involvement . . . [where] he specifies that he is directing [his] allegation at all of the defendants." *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009); *see also Atkins v. Hasan*, No. 15 CV 203, 2015 WL

---

[4] "Individual Motions to Dismiss" collectively refers to the motions filed by Clemens (ECF No. 441), Hormel (ECF No. 443), Indiana Packers (ECF No. 446), JBS (ECF No. 449), Seaboard (ECF No. 451), Smithfield (ECF No. 454), Triumph (ECF No. 457), Tyson (ECF No. 459), and Agri Stats (ECF No. 461). Individually, the motions shall be referred to as "[Defendant Name] Motion" (*i.e.*, Smithfield Motion).

[5] Plaintiffs hereby incorporate the arguments and case law from Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Complaint and the Federal Law Claims in the Indirect Purchaser Plaintiffs' Complaints for Failure to State a Claim Upon Which Relief May Be Granted ("Opposition to the Joint Motion to Dismiss" or "Joint MTD Opp'n"), filed concurrently herewith.

[6] "Joint Motion to Dismiss" refers to the Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Federal Law Claims in Plaintiffs' Amended Complaints, Jan. 15, 2020, ECF No. 439.

3862724, at *3 (N.D. Ill. Jun. 22, 2015) ("It is true that, in certain cases, referring simply to 'the defendants' without further specification may adequately plead personal involvement.").

Plaintiffs satisfy the requirement of pleading each Defendant's individual involvement in the conspiracy. As more fully set forth in Section III, *infra*, these allegations as to each of the individual Defendants are sufficient to establish each of their participation in the conspiracy. *See In re Bulk Popcorn Antitrust Litig.*, 783 F. Supp. 1194, 1197 (D. Minn. 1991); *In re Polyurethane Foam Antitrust Litig.*, 86 F. Supp. 3d 769, 786 (N.D. Ohio 2015).

The Defendants' involvement in the conspiracy is further supported through numerous allegations that pertain to all Defendants. Such allegations are not pled generally, but rather specifically when viewed in context. Each of these allegations pertains to all Defendants and therefore adequately pleads personal involvement of each of them. *See Brooks*, 578 F.3d at 582. These allegations are sufficient at the pleading stage because they describe specific unlawful conduct by all Defendants, not merely in a formulaic recitation of the cause of action, but in sufficient detail to put all Defendants on notice of how they violated the antitrust laws. *Id.*; *see also In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2014 WL 4379112, at *10 (S.D.N.Y. Sep. 4, 2014) (rejecting the argument that "references to 'Dealer-Defendants' as a group are insufficiently particular to render the allegations plausible" where complaint alleged "that 'senior-level employees of each [Dealer-Defendant] participated'" in conspiratorial

conduct and included lists of Dealer-Defendant representatives who were alleged to be present at different meetings). *Id*. (Alteration in the original.)

Defendants' attempt to escape culpability by arguing that Plaintiffs employ improper "group pleading" falls short. While the Eighth Circuit has not yet adopted the well-established group pleading doctrine, there is *no per se* rule against grouping defendants for the purpose of asserting allegations. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944 SC, 2010 WL 9543295, at *6 (N.D. Cal. Feb. 5, 2010) (where a conspiracy is organized at the highest level of the defendant organization and carried out by subordinates, a complaint need not "differentiate among related corporate entities").

Here, the Amended Complaints contain detailed direct and circumstantial allegations which support each of the Defendant's participation in conduct and allegations relating to all Defendants. For example, because the Complaints specifically identify each of the Defendant who subscribed to and participated in Agri Stats (IPP ¶¶ 31-32, 78-79, 85; DPP ¶ 46; CIP ¶ 50), allegations regarding the content of the reports and how they were utilized in this conspiracy may be considered as actions in furtherance of the conspiracy by each of the individual Defendant. *See* IPP ¶ 17-90; DPP ¶¶ 45-66; CIP ¶¶ 49-70.

Similarly, Plaintiffs have identified all Defendants who were members of industry trade associations, which provided ample opportunities to collude. *See* DPP ¶ 98; CIP ¶ 102. For instance, Defendants or close affiliates were members of the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute ("AMI"), and

- 5 -

other organizations during the Class Period. DPP ¶ 110; CIP ¶ 114. The Complaints even

list the specific executives that served on the board of directors of each association or

group. *See* DPP ¶ 110; CIP ¶ 114. This is not merely a group pleading, but specific

pleading which satisfies the Rule 8 requirement of "'a short, plain statement of facts

sufficient to give the defendant fair notice of the basis of the claim.'" *Five Smiths, Inc. v.

Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn. 1992) (quoting

*Fusco v. Xerox Corp.*, 676 F.2d 332, 337 n.7 (8th Cir. 1982)).

## III.   PLAINTIFFS HAVE ADEQUATELY PLED EACH DEFENDANT'S PARTICIPATION IN THE ALLEGED CONSPIRACY

As set forth more fully in Plaintiffs' Opposition to Joint Motion to Dismiss filed

concurrently herewith, it is the most black letter of law that courts may grant a Rule

12(b)(6) motion only where a complaint's allegations, accepted as true and drawing all

reasonable inferences in the plaintiff's favor, fails to state a claim upon which relief can

be granted. *See generally* Joint MTD Opp'n; *Topchian v. JPMorgan Chase Bank, N.A.*,

760 F.3d 843, 848 (8th Cir. 2014); *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005);

*Wong v. Wells Fargo Bank N.A.*, 789 F.3d 889 (8th Cir. 2015); *Rochling v. Dep't of

Veteran Affairs*, 725 F.3d 927 (8th Cir. 2013).

"Participation by each conspirator in every detail in the execution of the

conspiracy is unnecessary to establish liability, for each conspirator may be performing

different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air

Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). To satisfy the pleading requirements

necessary to survive a motion to dismiss against individual Defendants, plaintiffs need

only provide allegations that "in a context raises *a suggestion* of a preceding agreement." *Sitzer*, 2019 WL 5381984, at *4 (W.D. Mo. Oct. 16, 2019) (emphasis added) (citing *Twombly*, 550 U.S. at 557); *see also Polyurethane*, 86 F. Supp. 3d at 786 ("only 'slight' evidence is needed to connect a defendant to a conspiracy").

A complaint need not contain detailed defendant-by-defendant allegations. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008). Of course, prior to the commencement of discovery, Defendants alone possess materials that would permit more focused allegations, and Defendants are in no position to claim they do not know what they are accused of doing. It is for this reason that courts are especially reluctant to grant dismissals for failure to state a claim in the antitrust area. *See In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997); *see also Great Atl. & Pac. Tea Co. v. Amalgamated Meat Cutters & Butcher Workmen of N. Am.*, 410 F.2d 650, 653 (8th Cir. 1969); *Hosp. Bldg. Co. v. Trustees of the Rex Hosp.*, 425 U.S. 738, 746 (1976) (stating that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' . . . dismissals . . . should be granted very sparingly") (internal citation omitted).

As set forth below, Plaintiffs have sufficiently pled that each Defendant joined and participated in the conspiracy, which necessitates denial of their Individual Motions to Dismiss.

A.     **Plaintiffs' Amended Complaints plead specific conduct by Defendant Smithfield in furtherance of the alleged conspiracy.**

Plaintiffs have further bolstered the allegations in the Amended Complaints against Smithfield. Of course, the Court has already held that Smithfield made production cuts that suggest parallel conduct: "Plaintiffs do adequately plead that Smithfield engaged in production cuts." Order at 20 n.9. Smithfield is the largest producer and processor of pork in the United States, and Plaintiffs have alleged that Smithfield participated in the conspiracy in explicit detail. These allegations include evidence of supply cuts in multiple years during the conspiracy.

Plaintiffs allege that in 2008, Smithfield reduced its U.S. herd by two million hogs annually. IPP ¶¶ 99, 107; DPP ¶ 124; CIP ¶ 128. Then, in 2009, Smithfield initiated an additional three percent reduction in the sow herd. *Id*. In addition to these supply reductions, Smithfield then signaled to its competitors that another competitor would have to initiate the next set of cuts, with the CEO stating, "our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something." IPP ¶ 107; DPP ¶ 140; CIP ¶ 144. Smithfield's statement signaled further to competitors that the rest of the industry needed to make its fair share of cuts in order to pass price increases onto the consumer, because "the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace." DPP ¶ 158; CIP ¶ 162.

While Smithfield was cutting production, it was also privately exchanging information with its competitors through Agri Stats about its production operations. DPP

¶ 151, IPP ¶ 99, 107-108, 111; CIP ¶ 155. Smithfield also exchanged detailed sales data, including pork prices with their competitors. DPP ¶ 151, IPP ¶ 119; CIP ¶ 155. Smithfield's key executives also attended trade association events to discuss pricing, production and other non-public proprietary information to ensure that Smithfield's competitors remained committed to a plan of artificially restricting pork production. DPP ¶¶ 104-118; CIP ¶¶ 108-122. This conduct, in conjunction with Smithfield's participation in Agri Stats, constitutes more than the "slight evidence" of Smithfield's participation in the alleged conspiracy. *Polyurethane*, 86 F. Supp. 3d at 786.

Smithfield argues that the Court should disregard these allegations and instead find that Smithfield's supply reductions and public statements occurred for "independent business reasons." Smithfield Motion at 4. This constitutes an improper attempt to shift the motion to dismiss standard from plausibility to probability. *See Twombly*, 550 U.S. at 556 (plausibility "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"). To support this contention, Smithfield improperly relies upon a summary judgment decision, *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, where the Eighth Circuit held that "if it is as reasonable to infer from the evidence a price-fixing conspiracy as it is to infer permissible activity, then the plaintiffs'[] claim, without more, *fails on summary judgment*." 203 F.3d 1028, 1032 (8th Cir. 2000) (emphasis added). Smithfield would like the Court to re-write the Eighth

- 9 -

Circuit decision so that this weighing of evidence occurs at the motion to dismiss stage.[7]

There are no cases in this District (and Smithfield cites to none) where a court weighed

evidence and applied the summary judgment standard at the pleadings stage. Indeed, to

do so would be improper; because "in antitrust cases, where 'the proof is largely in the

hands of the alleged conspirators,'. . . dismissals . . . should be granted very sparingly."

*Hosp. Bldg.*, 425 U.S. at 746.

**B.     Plaintiffs' Amended Complaints plead specific conduct by Defendant Tyson
       in furtherance of the alleged conspiracy.**

Tyson's Motion does not challenge the sufficiency and adequacy of Plaintiffs'

well-pled allegations against it, but rather relies upon arguments raised by Defendants in

their Joint Motion to Dismiss. First, Tyson argues Plaintiffs' conspiracy is implausible. In

order to explain away and minimize Plaintiffs' conspiracy allegations, Tyson has

attempted to reinvent and recharacterize the alleged conspiracy, from one to fix the price

of *pork*, to one that is exclusively related to the supply of *hogs*. *See* Tyson Motion at 2-6.

Tyson bases its argument on the fact that it "is not a producer of hogs, but almost

exclusively a purchaser." Tyson Motion at 2.

Yet Plaintiffs' Amended Complaints do not allege a conspiracy to restrain the

prices of whole hogs or pigs. The Complaints very clearly allege a conspiracy by pork

---

[7] Smithfield relies upon two other cases that weigh the evidence either at trial or on summary judgment. In *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877 (8th Cir. 1978) the Eighth Circuit upheld a directed verdict after trial – well beyond the pleadings stage. Likewise, in *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185 (3d Cir. 2017), the Third Circuit examined the circumstantial evidence at summary judgment. In all three of these cases, the plaintiffs survived the motion to dismiss. Smithfield fails to explain why the same conclusion is not appropriate here.

integrators, in which Tyson was a top three market participant, to fix the price of pork. *See, e.g.*, IPP ¶ 12; DPP ¶¶ 1-7; CIP ¶¶ 1-7 ("As a result of Defendants' unlawful conduct, Plaintiffs and the class members paid artificially inflated prices for pork during the Class Period."). Tyson's attempt to recast and recharacterize the conspiracy is impermissible and should once against be rejected by the Court. *See* IPP ¶¶ 6-13; DPP ¶¶ 1-7; CIP ¶¶ 1-7 (alleging a conspiracy to fix the supply or pork among Agri-Stats and Pork integrator Defendants; Order at 3 ("Each class has filed a separate, consolidated complaint alleging that the Defendants conspired with one another to increase the price of *pork products*.") (Emphasis added.).

The fact is that Tyson was a leader of the conspiracy. Plaintiffs' allegations are specific to Tyson and adequately tie it to the conspiracy. Tyson was well aware of the benefits of its actions and of those who follow: "In the words of Tyson Foods, Inc. COO, James Lochner, 'As you know decreased supply should be favorable to pricing.'" DPP ¶ 172; CIP ¶ 176. Defendants' common goal was to increase the price of pork and their margins. Clearly, Defendants' actions yielded the intended and foreseeable results. *Id.*

The Amended Complaints also make specific references to supply restriction efforts by Tyson in 2009 and 2011 and reduced sow numbers. *See* IPP ¶¶ 102, 105, 113, 120; DPP ¶¶ 142, 153; CIP ¶¶ 146, 157. When viewed as a whole and in context, there can be no doubt that Plaintiffs' allegations are well pled and plausible as they relate to and implicate Tyson. *See Cont'l Ore*, 370 U.S. at 699. Of course, each of these specific allegations is in addition to Tyson's involvement in Agri Stats (*see* IPP ¶¶ 40, 52, 60, 67,

79, 174; DPP ¶ 46; CIP ¶ 50) and various industry trade associations (*see* DPP ¶¶ 101, 110-12, 118; CIP ¶¶ 105, 114-16, 122). Tyson's implausibility argument must fail.

Second, Tyson argues that Plaintiffs' Amended Complaints impermissibly plead allegations against the three Tyson entities. As more fully discussed in the Plaintiffs' Opposition to Joint Motion to Dismiss and Section II, *supra*, this argument too must fail. As the Amended Complaints make clear, each of the Tyson entities sued was directly involved in the sale of and distribution of Pork in the United States. *See* IPP ¶¶ 243-245; DPP ¶¶ 31-33; CIP ¶¶ 35-37. As such, Tyson's Motion should be denied.

## C.   Plaintiffs' Amended Complaints plead specific conduct by Defendant JBS in furtherance of the alleged conspiracy.

JBS's Motion fails to argue any legally significant points, especially at the pleading stage, not already presented in the Defendants' Joint Motion to Dismiss. This time, however, JBS attempts to explain away Plaintiffs' allegations against it by disputing ***facts*** and impermissibly presenting extrinsic evidence to support the arguments. This, of course, is improper at the pleading stage.

"When considering a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials outside the pleadings." *Zean v. Fairview Health Servs.*, 149 F. Supp. 3d 1129, 1133 (D. Minn. 2016); *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). Consideration of evidence beyond the pleadings "is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71-72 (D.D.C. 2016)

(denying defendants' reliance on external evidence at the motion to dismiss stage).

JBS's attempt to prematurely litigate facts on a motion to dismiss demonstrates the reason that courts have refused to look beyond the pleadings at the motion to dismiss stage.

JBS relies upon the extrinsic Pork Powerhouse survey for the proposition that its production of sows increased from 2015 through 2016. Of course, such external evidence should not be admitted and litigated at the pleading stage; where Plaintiffs' allegations are viewed in a light most favorable to the Plaintiffs. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017). Furthermore, JBS cites its own 2016 annual report (JBS Motion at 4), but that very report states that JBS produced 170,000 sows in 2016. *See* JBS Annual and Sustainability Report 2016 at 63 (*available at* https://jbss.infoinvest.com.br/enu/4070/JBS%20RAS%202016%20EN%20170502%20Final.pdf (last visited Feb. 21, 2020). This is less than the 177,000 sows reported in Pork Powerhouses that same year and less than the 175,000 sows reported in 2015 and supports Plaintiffs' supply cut allegations.  Any dispute regarding inferences to be drawn from the Pork Powerhouse survey results and JBS' own annual report demonstrates the dangers of JBS's attempt to litigate factual disputes at the motion to dismiss stage.

As JBS itself states, Plaintiffs **did allege a production cut and specific allegations regarding conspiratorial conduct**. JBS Motion at 1-3 (regarding supply and exports). The Amended Complaints detail a conspiracy rooted in supply restrictions in which JBS participated. "Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to

- 13 -

limit hog supply." DPP ¶ 149; CIP ¶ 153 (citing a March 8, 2010 statement made during an earnings call by JBS executive Wesley Mendonça Batista). Mr. Batista further elaborated regarding the supply restrictions and confirmed the consequences thereof three years later on a May 15, 2013 earnings call: "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business[.]" DPP ¶ 159; CIP ¶ 163; *see also* IPP ¶ 123. At the motion to dismiss stage, when viewed as a whole and in context, Plaintiffs' allegations are well pled and plausible as they relate to JBS. *See Cont'l Ore*, 370 U.S. at 699.

Furthermore, JBS was one of the leaders of a consolidation effort in the pork industry: "the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015." DPP ¶ 84; CIP ¶ 88; *see also* IPP ¶ 146. As alleged in the Complaints, "[i]n July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion." DPP ¶ 85; CIP ¶ 89; *see also* IPP ¶ 148. This billion-dollar consolidation effort increased JBS' control within the pork industry second only to Smithfield. DPP ¶ 85, IPP ¶ 148; CIP ¶ 89.

JBS did not stop with acquisitions. JBS used its position as an industry juggernaut to secure influential positions for its executives in trade association and other forums. JBS executives Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp each served on the AMI and NAMI Boards of Directors during the Class Period. DPP ¶ 110; CIP ¶ 114. JBS executives also attended the 2014 International Production and Processing Expo. DPP ¶ 112; CIP ¶ 116. These trade associations and industry

groups were some of the many opportunities that Defendants, including JBS, exploited in furtherance of their conspiracy.

Of course, each of these specific allegations are in addition to many other allegations where JBS is expressly included in the definition of "Defendants." *See* IPP ¶ 15; DPP ¶ 2; CIP ¶ 2. Finally, JBS, like other co-conspirators, subscribed to and participated in the information exchange facilitated by Agri Stats. *See* IPP ¶¶ 39, 52, 72, 174; DPP ¶ 46; CIP ¶ 50; *see also* DPP ¶¶ 45-66; CIP ¶¶ 49-70.

For these reasons, JBS's Motion should be denied.

## D.     Plaintiffs' Amended Complaints Plead Specific Conduct by Defendant Hormel in Furtherance of the Alleged Conspiracy

Plaintiffs' specific allegations against Hormel are sufficient because Plaintiffs have alleged (1) Hormel's participation in production cuts in 2009, at the start of the conspiracy (*see* IPP ¶¶ 101, 103-104, 106; DPP ¶ 128; CIP ¶ 132); (2) Hormel's participation in Agri Stats (*see* IPP ¶¶ 86, 174); and (3) Hormel's participation in various trade associations that provided opportunities to collude (DPP ¶¶ 98-118; CIP ¶¶ 102-122).

Hormel's primary response is that it did not participate in the alleged conspiracy because it was harmed by higher hog prices. *See* Hormel Motion at 4. ("Higher hog costs therefore hurt HFC's business."). Like Tyson, Hormel's attempt to recast and recharacterize the pork conspiracy as a hog conspiracy is impermissible and should once against be rejected by the Court. *See* DPP ¶¶ 1-7; CIP ¶¶ 1-7 (alleging a conspiracy to fix the price of Pork among Agri-Stats and Pork integrator Defendants); Order at 3 ("Each

class has filed a separate, consolidated complaint alleging that the Defendants conspired with one another to increase the price of ***pork products***.") (Emphasis added.). Indeed, Hormel acknowledges that it was in Hormel's interest to raise the price of pork, because its profits were based on the margin between the price that it paid for hogs and the price at which it sold pork. *See* Hormel Motion at 7 ("it would have been . . . irrational for HFC not to consider reductions in processing volumes given negative processing margins caused by high hog prices."). Hormel's argument that its margins were negative in 2009 simply provides a motive for Hormel to engage in actions that would increase the price of pork. *See In re Propranolol Antitrust Litig*., 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017). It is a matter of basic economics that lower pork supply through processing reductions will lead to increases in prices and Plaintiffs have alleged that "limiting production" of pork was a "principal means" of "increasing pork prices." DPP ¶ 2; CIP ¶ 2.

Hormel's argument is also based almost entirely on external evidence that Hormel has introduced in the form of fourteen separate exhibits, including numerous statements taken from Hormel's earnings calls and annual reports. This external evidence cannot be considered on a motion to dismiss and should be stricken because they are not materials incorporated by reference. That doctrine only applies if (1) the documents are "the sole basis" for the plaintiff's claim; and (2) the documents provided by the defendant are undisputed. *See* Fed. R. Civ. P. 10(c); *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687-89 (8th Cir. 2003) (excluding documents on a motion to dismiss because the documents were "neither undisputed nor the sole basis for [plaintiff's] complaint"). Courts refuse to apply the doctrine when defendants attempt to rely on documents to

which plaintiffs make a "mere[] mentioning." *Cafesjian v. Armenian Assembly of Am., Inc.*, No. 07-2079 (JNE/JJG), 2008 WL 906194, at *7 n.7 (D. Minn. Mar. 31, 2008). Here, the Amended Complaints mention materials from Hormel's earnings statements but do not refer to or encompass the entire content of those documents. Hormel's subsequent attempt to cherry-pick those documents in search of an early directed verdict in its favor should be rejected by this Court. *See In re Nat'l Hockey League Players' Concussion Injury Litig.*, 189 F. Supp. 3d 856, 869 (D. Minn. 2016) (refusing to consider "cherry-picked evidence" in the form of "meeting minutes, letters, memoranda, and reports" that failed to "merely reiterate what is said in the pleadings").

Plaintiffs have alleged specific actions by Hormel of limiting production that helped further the conspiracy's goal of raising pork prices. Over the course of 2008, Hormel reduced the number of pig sows that it had from 63,000 to 54,000. IPP ¶ 101. Concurrently, in February 2009, Hormel stated about its pork processing operations that "we've certainly look[ed] for opportunities . . . where we could reduce the numbers that we had going through." IPP ¶ 103. Hormel also emphasized that it was limiting its bidding on free market hogs, thus decreasing the overall supply of hogs that it processed into pork. *Id.* In June 2009, Hormel again confirmed a reduction in its pork processing, stating that "we reduced production in our basic processing for . . . pork." IPP ¶ 106. Overall, Hormel reduced the amount of pork that it processed by 100,000 hogs in 2009. DPP ¶ 128; CIP ¶ 132. In 2010, Hormel confirmed that there was now increased profitability among pork integrators and that the industry would not engage in large scale expansion, indicating the success that supply restrictions on both hog supply and pork

processing output had on raising the price of pork in 2009-2010. DPP ¶ 152; CIP ¶ 156.

Thus, Plaintiffs have sufficiently alleged Hormel's participation in a conspiracy to

increase the prices of pork through production restrictions.

**E.    Plaintiffs' Amended Complaints plead specific conduct by Defendant Seaboard in furtherance of the alleged conspiracy.**

Seaboard's consolidation of Plaintiffs' allegations (although it fails to account for

the balance of the Amended Complaints), as well as its six-point list outlining its actual

and specific involvement in the alleged conspiracy, prove why its Motion must fail. *See*

Seaboard Motion at 3-4, 5. To argue that these well-pled allegations fail to meet the

pleading standard at this stage demonstrates a fundamental misunderstanding of the law.

*See Cont'l Ore*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be

judged by dismembering it and viewing its separate parts."); *see also Topchian*, 760 F.3d

at 848.

Nonetheless, Seaboard argues in its Motion that Plaintiffs have failed to allege a

claim against it (1) because the two Seaboard entities are "grouped" together (*see*

Section II, *supra*), and (2) that the allegations do not prove that Seaboard joined the

conspiracy by participating in supply restraints.

As discussed in Section III.H (Indiana Packers), *infra*, in booming industries

supply restrictions may also present themselves in the form of lesser supply increases.

*See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 792 (N.D. Ill. 2017)

("This argument might carry weight if Plaintiffs had alleged that Defendants conspired to

decrease overall production in absolute numbers."). Here, Plaintiffs have alleged that

prior to the conspiracy, supply increases in the pork industry were consistent and "virtually a given." *See* DPP ¶ 119; CIP ¶ 123. As such, Seaboard's statements in its Motion that Seaboard did not agree with anyone to reduce the supply of pork and did not participate in supply restraints fails to consider the allegation restraining and stabilizing identical capacity in 2012 and 2013 (*see* DPP ¶ 129; CIP ¶ 133) in itself is a restraint. This fact, in addition to the many others in the Amended Complaints and identified by Seaboard in its Motion, show Seaboard's participation and actions taken in furtherance of the alleged conspiracy. This point is just one of many that Seaboard attempts to explain away and improperly recast in its Motion. Each of them similarly fails.

Seaboard not only participated in supply restrictions, but also signaled its conduct to competitors. Seaboard was specifically referenced in a call by the CEO of Smithfield in its discussion of the industry's need to cut production. DPP ¶ 140; IPP ¶ 107; CIP ¶ 144. In 2017, Seaboard and Defendant Triumph announced a joint facility and additional shift in response to a "growing demand" but that never happened. DPP ¶ 163; CIP ¶ 167. Against their individual best interests and in furtherance of the conspiracy to restrict supply and artificially inflate prices, Seaboard and Triumph did not implement the announced plan and formally postponed it in 2018. *Id.*

But Seaboard did not need to partner with a co-conspirator – Seaboard's vertical integration (*see* DPP ¶ 74; CIP ¶ 78 (noting that Seaboard both *owns facilities* and contracts the raising of "over five million hogs annually")) was a factor in its participation in the conspiracy because it was able to control and restrict the supply as per Defendants' anticompetitive agreement (*see* DPP ¶¶ 67-70; CIP ¶¶ 71-74).

When read in context rather than isolated in a vacuum as Seaboard insists, Seaboard's participation in trade associations (*see* DPP ¶¶ 110, 111, 118; CIP ¶¶ 114, 115, 122) and Agri Stats (*see* IPP ¶¶ 20, 38, 43, 52, 174; DPP ¶ 46; CIP ¶ 50) further supports the inference that it agreed to restrict supply. These allegations, along with the others in Plaintiffs' well-pled Amended Complaints, adequately tie Seaboard to the alleged conspiracy.

The Amended Complaints adequately allege Seaboard's participation in the conspiracy, including joining the conspiracy, restricting supply, and the relationship of the Seaboard entities. As such, Seaboard's Motion should be denied in its entirety.

**F.**   **Plaintiffs' Amended Complaints plead specific conduct by Defendant Triumph in furtherance of the alleged conspiracy.**

Triumph's entire Motion focuses on what it claims is a lack of allegations against it yet then ignores the specific allegations concerning Triumph's involvement in the conspiracy. In addition to detailed conspiracy allegations presented in the Amended Complaints (in which Triumph is expressly included in the definition of "Defendants" (*see* DPP ¶ 2; CIP ¶ 2)), there are numerous allegations specific to Triumph that meet the requisite pleading standard at this stage of litigation.

Specifically, Plaintiffs allege, "In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry." DPP ¶ 130; CIP ¶ 134; *see also* IPP ¶ 112. This cutback is particularly probative of Triumph's participation because it parallels production cuts made by other Defendants in 2009, including Smithfield, Tyson, and

Hormel. This is direct evidence of Triumph's involvement in the alleged conspiracy to limit the supply of pork. Furthermore, Triumph and Seaboard considered but then chose not to expand production at a shared facility, despite their own acknowledgment of "growing demand." DPP ¶ 129; CIP ¶ 133.

Additionally, as with all pork integrators included in this lawsuit, Triumph subscribed and reported to Agri Stats. IPP ¶¶ 38, 52, 174; DPP ¶ 44; CIP ¶ 48. Further, also with the other pork integrators, Triumph's executives were active participants in trade associations and industry groups that provided ample opportunities to meet and conspire. DPP ¶¶ 110, 118; CIP ¶¶ 114, 122. No matter how big or small, any entity that enters into a conspiracy and acts in furtherance of the conspiracy is equally liable for such violations. As such, Triumph's Motion should be denied in its entirety.

## G.   Plaintiffs' Amended Complaints plead specific conduct by Defendant Clemens in furtherance of the alleged conspiracy.

Plaintiffs' allegations against Clemens are sufficient to show that Clemens participated in the conspiracy. Clemens argues that the allegations are insufficient for two reasons: (1) the allegations regarding Clemens's supply cuts are not sufficient; and (2) it does not have a motive to participate in the conspiracy. For the reasons set forth below, these arguments are unpersuasive.

Plaintiffs allege supply restrictions during the conspiracy and also demonstrate how, contrary to what one would expect to see in a competitive market, Clemens failed to increase its market share despite having clear market incentives to do so. DPP ¶¶ 131, 160; CIP ¶¶ 135, 164; *see also Broiler Chicken*, 290 F. Supp. 3d at 792 (recognizing a

reduction or stabilization in growth as a basis for establishing a restriction in furtherance of a price fixing conspiracy).

Plaintiffs further allege Clemens reduced production in 2011. DPP ¶ 131; CIP ¶ 135. Clemens argues that the Court should disregard these allegations and instead find that Clemens could not have participated in a conspiracy because its supply increased in other years. *See* Clemens Motion at 2-5. But to accept Clemens's counterfactual allegations would impermissibly fail to draw all plausible inferences in favor of the Plaintiffs. *Twombly*, 550 U.S. at 556; *see also BJC Health Sys.*, 348 F.3d at 687-89.

Clemens's reliance on *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) illustrates the problem with making factual determinations at the motion to dismiss stage. In *Kleen*, the Seventh Circuit upheld *summary judgment* in favor of two defendants because, after all the evidence was gathered and examined, the plaintiffs were unable to show that the remaining two defendants in the litigation engaged in a conspiracy. Clemens would like the Court to apply the same logic here – but at the motion to dismiss stage. *See* Clemens Motion at 5. Yet at this motion to dismiss stage in *Kleen*, the district court allowed the plaintiffs to proceed, holding that the plaintiffs had plausibly stated enough facts to state a claim, and discovery would reveal "whether the mill closures actually furthered a conspiracy or may perhaps tend to make its existence less likely." *Kleen Prods. LLC v Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1078 n.11 (N.D. Ill. 2011). As was the case in *Kleen*, it would be inappropriate to dismiss Plaintiffs' claims here.

Relatedly, Clemens suggests that its 2011 supply cut was "negligible" and cannot be evidence of parallel conduct because its 2011 production cut took place after the other Defendants made their production cuts in 2009 and 2010.[8] Clemens Motion at 2. Contrary to Clemens's argument, "the Supreme Court has long held that simultaneous action is not a requirement to demonstrate parallel conduct." *Broiler Chicken*, 290 F. Supp. 3d at 791-92, 795-96. And although Clemens argues that its production in other years increased, Plaintiffs have demonstrated that Clemens's market share remained remarkably stable throughout the conspiracy period. IPP ¶ 151; DPP ¶ 92; CIP ¶ 96. Even when Clemens had a competitive advantage over other pork producers, Clemens kept its market share the same – staying the course with other competitors. DPP ¶ 160; CIP ¶ 164. Hence, by focusing only on the 2011 supply cut, Clemens fails to address these allegations.[9] This is critical, because it ignores the possibility that Clemens participated in the conspiracy by agreeing to not intrude on other Defendants' market share while they engaged in more vigorous supply cuts – even though it would have been in Clemens's interest to increase market share.

Finally, Clemens argues that it could not have participated in the conspiracy because it has no motive to drive up hog prices. Clemens Motion at 8-9. This argument

---

[8] And although Clemens characterizes its supply cut as negligible, courts have held that "[v]ariations in the size of capacity reductions do not disprove the existence of a conspiracy" and "reductions need not be simultaneous to demonstrate conscious parallelism." *Packaging Corp.*, 775 F. Supp. 2d at 1071 n.8 & n.9.

[9] Courts recognize that "each conspirator may be performing different tasks to bring about the desired result" of a conspiracy. *Beltz Travel*, 620 F.2d at 1367.

fails because Plaintiffs are alleging a conspiracy to increase *pork* prices, not *hog* prices. *See, e.g.*, IPP ¶ 262 ("The purpose of the conspiratorial conduct of defendants and their co-conspirator was to raise, fix, or maintain the price of pork and, as a direct and foreseeable result, Plaintiffs and the classes paid supra-competitive prices for pork during the Class Period."); *also* DPP ¶¶ 1-7; CIP ¶¶ 1-7 (alleging a conspiracy to fix the supply of pork).

Furthermore, Plaintiffs allege that Clemens participated in Agri Stats – which allowed Clemens to exchange highly granular and current data on pricing, costs and supply with its competitors. Agri Stats let Clemens know exactly how far it could raise its prices to conform to its competitors' prices. IPP ¶¶ 11, 43-44. Clemens used the pricing information provided by Agri Stats (and indirectly, its competitors) to raise prices; Agri Stats never attempted to identify products where Clemens should cut prices to gain additional sales. IPP ¶ 22. Finally, Plaintiffs allege Clemens participated in various trade associations that provided opportunities to collude. DPP ¶¶ 110, 114, 118; CIP ¶¶ 114, 118, 122.

With these allegations, Plaintiffs have sufficiently pled specific conduct by Clemens.

## H.   Plaintiffs' Amended Complaints plead specific conduct by Defendant Indiana Packers in furtherance of the alleged conspiracy.

Despite Indiana Packers' argument to the contrary, Plaintiffs' Amended Complaints *do* allege specific conduct in furtherance of the alleged conspiracy, and that Indiana Packers participated in the scheme to reduce and constrain the supply of pork. In

addition to the well-pled allegations in the Amended Complaints that expressly include Indiana Packers, specific allegations regarding this *private* company, including but not limited to paragraph 157 of the DPP Amended Complaint and Paragraph 161 of the CIP Amended Complaint, tie it to the alleged conspiracy. DPP ¶ 157; CIP ¶ 161. This allegation provides two important points in regards to Indiana Packers' participation in the alleged conspiracy: (1) Indiana Packers discussed potential production cuts; and (2) there is no pro-competitive justification for such an announcement; thus it is reasonable, in light of the evidence set forth in the Amended Complaints, to infer such an announcement was signaling. Public companies, at times, need to announce certain material facts to their shareholders. Yet privately held companies are never required to make such announcements.

Indiana Packers' Motion improperly attempts to explain away the facts and circumstances surrounding the pretextual statement by its president Gary Jacobson regarding the company's supply and production. Of course, such fact-based arguments are improper at the pleading stage. *See Topchian*, 760 F.3d at 848. When viewed in a light most favorable to Plaintiffs, it is clear that Indiana Packers participated in the alleged conspiracy by signaling its competitors. *See* DPP ¶ 157; CIP ¶ 161. There is no reason for a private company to make such a statement publicly, no matter the form of media.[10]

---

[10] Indiana Packers attempted to explain away the significance of the announcement because it was made to a low circulation, local media. *But see Propane,* 860 F.3d at 1070 (court must construe complaint liberally in light most favorable to plaintiffs).

In booming industries, supply restrictions may also present themselves in the form of lesser supply increases. *See Broiler Chicken*, 290 F. Supp. 3d at 792. Here, Plaintiffs have alleged that in the years leading up to the conspiracy, supply increases in the pork industry were consistent and "virtually a given." DPP ¶ 119; CIP ¶ 123. As such, Indiana Packers' statement in its Motion that "[Plaintiffs] do not allege any actual supply cut" (Indiana Packers Motion at 3), is misleading.

In addition to each of the specific allegations of Indiana Packers' participation in the alleged conspiracy, Indiana Packers simply ignores all of the allegations that provide important context. Indiana Packers was an active and identified participant in Agri Stats and committed acts in furtherance of the conspiracy as a result. IPP ¶¶ 38, 52, 174; DPP ¶¶ 40-66; CIP ¶¶ 44-70. Indiana Packers participated in the same trade and industry organizations used to facilitate fixing pork supply, including an organization dedicated to sharing sensitive internal supply information, and offered pretextual justification for its own declining supply and increasing prices. *See, e.g.*, DPP ¶¶ 40-66; CIP ¶¶ 44-70.

For these reasons, Indiana Packers' Motion should be denied.

## I.     Plaintiffs' Amended Complaints plead specific conduct by Defendant Agri Stats in furtherance of the alleged conspiracy.

Plaintiffs have alleged a conspiracy to inflate the prices of pork. Agri Stats was a central player in this conspiracy. Agri Stats argues that it lacked any knowledge of the conspiracy. But this ignores Plaintiffs' specific factual allegations that detail how Agri Stats acted as a willing and informed participant in the illegal agreement. IPP ¶ 5, 11, 20, 60, 81-83, 170-173.

Benchmarking of the type undertaken by Agri Stats and its co-conspirators here reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. *See* IPP ¶ 69; DPP ¶ 43; CIP ¶ 47. Agri Stats specifically emphasized to its co-conspirators that the shared data could be used to restrict production and increase profits: "***the ultimate goal is increasing profitability – not always increasing the level of production***." IPP ¶ 192 (emphasis in original). And, as discussed in detail elsewhere, the information exchange through Agri Stats is the type that supports an anticompetitive agreement between Defendants. *See generally* Joint MTD Opp'n Section V.B. *First*, the data was current and forward looking, including sales data that was less than two weeks old. IPP ¶¶ 19-57. *Second*, the data included firm-specific information about Defendants' costs, sales, and profits. IPP ¶¶ 33-35, 45-48, 54-57. *Third*, the data was only available to Defendants and was never publicly disseminated. IPP ¶¶ 81-82, DPP ¶ 4, CIP ¶ 4. *Fourth*, Agri Stats knew that Defendants were able to deanonymize the data and yet continued to provide its detailed reports. IPP ¶¶ 84-90.

In short, Agri Stats knew that it was providing a highly detailed information exchange service that was strictly limited only to the participating Defendants and that it marketed to those same Defendants as a way of increasing their profitability, rather than their production. This is sufficient to allege Agri Stats knowingly participated in the conspiracy. Indeed, courts have routinely held that defendants who facilitate information exchange between other defendants in an antitrust conspiracy are potentially liable. For example, the court in *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 167 (2004),

- 27 -

held that a defendant who administered a very detailed, yearly survey on medical residents was properly named because, "it is reasonable to infer that the annual nature of the survey provides the institutional defendant coconspirators the information they need to keep compensation levels depressed." *See id*. Similarly, the court in *In re Plasma-Derivative Protein Therapies Antitrust Litig*., 764 F. Supp. 2d 991, 1001, 1003 (N.D. Ill. 2011), denied a trade association's motion to dismiss where it argued it was "not a market participant" because the plaintiffs adequately alleged the association's involvement in the conspiracy. *Id.* The Eighth Circuit reversed the grant of summary judgment for a local realtor board that had supervised an information exchange because questions remained about the "role in this alleged conspiracy of the price information exchange fostered by the" defendant. *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1148 (8th Cir. 1979).

The same result holds here. Plaintiffs have provided plausible factual allegations that Agri Stats knowingly provided an information exchange service to the Defendants that allowed them to enter into an illegal agreement to fix the price of pork.

Agri Stats further claims that there is nothing that shows it could benefit from the conspiracy. But, by acting as a conduit and participating in the conspiracy, Agri Stats profited handsomely. As a subscription service, Agri Stats earned millions in revenue from its co-Defendants – far in excess of other pricing and production indices. *See* DPP ¶ 4; IPP ¶ 7; CIP ¶ 4. Evidence of motive – such as the financial incentive present here – is relevant to the plausibility of a conspiracy. *United States ex rel. McGee v. IBM Corp*., No. 11-C-3482, 2017 WL 4467458, at *1 (N.D. Ill. Oct. 6, 2017). The logical inference is

that Agri Stats received far more than market rates for its benchmarking services because Agri Stats provided the vehicle necessary to police and implement the conspiracy. There would be no incentive for Defendants to pay those fees if Agri Stats were simply providing the same services that could be had for less from other providers.

Agri Stats also spends much of its motion emphasizing that Plaintiffs have not identified specific Agri Stats reports that contain data on future hog production levels. Agri Stats Motion at 5-9. But Plaintiffs have specifically alleged a conspiracy among Defendants to "fix, raise, maintain, and stabilize pork prices." IPP ¶ 6. Plaintiffs have provided numerous, specific examples of the kind of detailed information exchange through Agri Stats that would facilitate exactly such a conspiracy. Most directly, Agri Stats prepared and distributed to Defendants detailed weekly and monthly reports on pork prices that specifically calculated the additional profits Defendants could gain by raising their prices on specific cuts of pork. IPP ¶¶ 21-30. Agri Stats also held communications with Defendants regarding the contents of the reports in which Defendants asked for the assistance of Agri Stats in identifying price-raising opportunities. IPP ¶¶ 35-40.

Agri Stats also prepared and distributed numerous reports containing Defendants' sensitive business data regarding their production operations. The Agri Stats Operations Profit Report includes detailed, plant-specific information on Defendants' profits, including categories for operations profit and margin. IPP ¶ 45. The Agri Stats Key Performance Indicator Report identified key metrics for Defendants' operations, including their operations profit per pound and their hogs purchased expense per pound. IPP ¶ 48. For each of these metrics, Agri Stats calculated the economic impact of the

variance between the Defendant receiving the report and the national average or the top 25% highest performers. IPP ¶ 48. Furthermore, Agri Stats prepared and distributed regular processing reports to the Defendants that provided sensitive, confidential information on Defendants' operations, such as granular cost data on Defendants' labor, material, and supplies. IPP ¶ 54. The report also contained data on each Defendant's efficiency in processing pork. IPP ¶ 57.

As authorities in the field recognize, "exchanging sensitive business data is not usually consistent with independent business conduct; in fact, it suggests a commitment to an anticompetitive scheme. Production data can be used to directly police production quotas or can facilitate interdependent action in reducing output." BENCHMARKING AND ANTITRUST, 62 Antitrust L.J. 483, 499. Agri Stats' exchange of production, sales, and profit data constitutes exactly the kinds of sensitive exchange of business data that suggest commitment to an anticompetitive scheme. Plaintiffs have thus provided detailed factual allegations that support an inference that Agri Stats participated in a conspiracy to fix the price of pork. These factual allegations demonstrate that Agri Stats was not an unwitting tool for the conspirators; Agri Stats instead knowingly provided Defendants reports that they used for their conspiracy of fixing the price of pork. Indeed, Agri Stats strongly emphasized to Defendants the importance of each sharing their data through Agri Stats, stating that each Defendant must "[d]etermine tolerance and ***outlier status and enforce***," "and most importantly, ***"[e]ach participant has to commit"*** to the conspiracy. IPP ¶ 75 (emphasis in original).

- 30 -

Agri Stats' motion to dismiss should be denied because it was a knowing participant in the conspiracy.

**J.      IPP's Amended Complaint sufficiently pleads each individual Defendant's participation in an anticompetitive information exchange agreement.**

Smithfield, Tyson, JBS, Agri Stats, Seaboard, and Triumph do not address IPPs' claim that they engaged in an unlawful information exchange under a rule of reason analysis. Each of the Defendant thus concedes that if the Court finds that these allegations are sufficient to support a rule of reason claim against all Defendants, then they are sufficient as to these individual Defendants. The three remaining Defendants (Hormel, Clemens, and Indiana Packers) each makes brief arguments against their individual participation in Agri Stats. Notably, none of these Defendants dispute that they participated in Agri Stats. Instead, they raise factual challenges that are largely inaccurate and inappropriate for resolution at the motion to dismiss. Each of the Individual Motion should be denied.

**1.      IPPs sufficiently plead Hormel's participation in the information exchange agreement.**

Hormel's primary defense to IPPs' rule of reason claim is to engage in premature factual disputes about the reports to which Hormel did or did not subscribe. Hormel Motion at 11-12; *Domestic Airline*, 221 F. Supp. 3d at 71-72 (rejecting defendants' improper reliance on external evidence); *BJC Health Sys.*, 348 F.3d at 687-89 (same). In doing so, Hormel engages in glaring misrepresentations to the Court. Notably, Hormel's brief states that Hormel "was not participating in Agri Stats processing or sales reports." Hormel Motion at 12. But Hormel's own initial disclosures, which it attached as an

- 31 -

exhibit, states that Hormel "subscribed to Agri Stats reports for Swine Processing from January 1, 2007 to October 2010, and from December 2014 to November 2017." Hormel Motion, Ex. 14 at 14-04. Notably, Hormel itself describes 2010 as part of the "formative years of the . . . conspiracy." Hormel Motion at 12. And that is exactly when Hormel was receiving processing reports according to its own initial disclosures. Hormel's disclosures also confirm that Hormel and Hormel subsidiaries subscribed to Agri Stats Swine Production reports. Hormel Motion, Ex. 14 at 14-04. Thus, despite Hormel's attempts to cloud the issue, Hormel obviously participated in the exchange of competitively sensitive information through Agri Stats. In short, Hormel is blowing smoke about the extent to which it was in the "proverbial smoke-filled room" administered by Agri Stats. *See* Hormel Motion at 12.

Hormel also heavily emphasizes that Plaintiffs have not alleged that Hormel received the Agri Stats Sales Reports. *See* Hormel Motion at 11. But the DOJ and FTC have specifically stated that the sharing of current information relating to "price, output, costs or strategic planning is more likely to raise competitive concern." *See* DOJ/FTC Antitrust Guidelines for Collaborations Among Competitors at 15 (*available at* https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf). Hormel did share such current information relating to cost and output because it participated in the processing reports that did include cost data. *See* IPP ¶¶ 51-60. Indeed, Hormel's own initial disclosures specifically identify Hormel's Director of Cost Accounting as

supervising the transmission of data to and from Agri Stats. Hormel's Motion, Ex. 14 at 14-04.

Thus the fact that Hormel's level of participation in the information exchange agreement may have varied from that of the other Defendants does not alter the fact that Hormel did participate in the information exchange agreement by sending and receiving information, such as current data on costs, that have the potential to produce significant anticompetitive effects. These are sufficient allegations to plead Hormel's involvement in the information exchange agreements. *See Bulk Popcorn*, 783 F. Supp. at 1197 ("Once a conspiracy is established even *slight evidence* connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement."); *see also Polyurethane*, 86 F. Supp. 3d at 786. Hormel's factual arguments about the extent or effect of the information exchange are not appropriate for resolution at summary judgment, much less the motion to dismiss stage. *See Penne*, 604 F.2d at 1147-48 (reversing district court grant of summary judgment and noting that "it remains an open question" whether the information exchange agreement in that case had an anticompetitive effect). Thus, Plaintiffs have sufficiently pled Hormel's involvement in the information exchange agreement.

### 2. IPPs sufficiently plead Clemens's participation in the information exchange agreement.

Clemens argues that it did not enter into an agreement to exchange information because it never communicated with the other Defendant processors about its decision to use Agri Stats. But Plaintiffs have sufficiently pled Clemens's participation in the

information exchange agreement as both a vertical agreement between Clemens and Agri

Stats and as a hub-and-spoke agreement of the kind long recognized under antitrust law.

*First*, Clemens does not dispute that it entered into an agreement with Agri Stats to

exchange information. Clemens Motion at 12. But it then simply jumps to the assertion

that the agreement is non-actionable. To the contrary, the agreement is actionable as

anticompetitive under a rule of reason analysis, for the reasons set forth in detail in

Section VI of the Plaintiffs' Opposition to Joint Motion to Dismiss. Clemens's attempt to

assume away this argument fails.

*Second*, "courts have long recognized the existence of "hub-and-spoke"

conspiracies in which an entity at one level of the market structure, the "hub,"

coordinates an agreement among competitors at a different level, the "spokes." *United

States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015). These agreements consist of

"both vertical agreements between the hub and each spoke and a horizontal agreement

among the spokes 'to adhere to the [hub's] terms,' often because the spokes 'would not

have gone along with [the vertical agreements] except on the understanding that the other

[spokes] were agreeing to the same thing.'" *Id.* (quoting VI Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law*, ¶ 1402c (3d ed. 2010); alteration in original). The Supreme

Court has long held that agreement among the spokes can be inferred by knowledge that

"its contract was not an isolated transaction but part of a larger arrangement." *United

States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (holding Defendants liable even

though they only had direct negotiations with the hub of the conspiracy and did not have

communications with each other). Clemens, along with each of the other Defendant knew

- 34 -

that it was participating in an information exchange agreement that was part of a larger arrangement because the Agri Stats reports specifically identified which Defendants were participating in the reports. *See, e.g.*, IPP ¶ 52. Indeed, Agri Stats specifically identified which Defendants were participating in the Agri Stats reports in the presentations they gave that solicited new business. IPP ¶ 31. These are sufficient factual allegations that Clemens participated in the information exchange agreement.

Clemens also argues that Plaintiffs have not specifically alleged any particular Clemens pork reduction or price increase from the information sharing. Clemens Motion at 10. Clemens cites no case authority for their novel argument that Plaintiffs must plead specific anticompetitive effects by Clemens as a result of the information exchange agreement, rather than anticompetitive effects to the market as a whole from the information exchange agreement in which Clemens participated. *See*, *e.g., Todd v. Exxon Corp.*, 275 F.3d 191, 214 (2d Cir. 2001) (anticompetitive effect from information exchange agreement sufficiently pled by allegations regarding anticompetitive effect to market as a whole). Plaintiffs have more than sufficiently pled Clemens's participation in the information exchange agreement and anticompetitive effects from that agreement with specific allegations that Clemens received Agri Stats reports, including customized presentations that Agri Stats prepared for Clemens, that Clemens's treasurer directly participated in the transmission of data to and from Agri Stats, and that pork prices rose during the conspiracy period. IPP ¶¶ 40-44, 126-138, 174. Thus, Plaintiffs have sufficiently alleged Clemens's actual participation in an information exchange agreement.

**3.     IPPs sufficiently plead Indiana Packers' participation in the information exchange agreement.**

Indiana Packers, like Clemens, argues that Plaintiffs have not specifically alleged any particular Indiana Packers' pork reduction or price increase from the information sharing. Indiana Packers Motion at 7. But Plaintiffs have provided specific allegations that Indiana Packers participated in the information exchange agreement. In particular, Plaintiffs have alleged, based on Indiana Packers' own disclosures, that Indiana Packers' director of global sales, vice president of procurement, and controller each participated in the transmission of data to and from Agri Stats. IPP ¶ 174. At the motion to dismiss stage, Plaintiffs are entitled to the plausible inference that Indiana Packers' director of global sales, who personally participated in the information exchange, used Agri Stats data for the setting of prices. But even that inference is not necessary, because Indiana Packers' own disclosures establish that Indiana Packers participated in the agreement. *See Twombly*, 550 U.S. at 557; *Sitzer* 2019 WL 5381984, at *4.

Indiana Packers provides no case law to support its final, bare assertion that Plaintiffs must plead the specific anticompetitive conduct from Indiana Packers that injured competition. Indiana Packers Motion at 7. But in any case, the anticompetitive conduct by Indiana Packers was, at the very least, its undisputed decision to participate in the information exchange and Plaintiffs have pleaded extensive evidence of anticompetitive effect to the market as a whole from the information exchange agreement. *See* Joint MTD Opp'n, Section VI.D.2.

- 36 -

Plaintiffs have thus pled the individual participation of Hormel, Clemens, and

Indiana Packers in an anticompetitive information exchange agreement.

## IV.    CONCLUSION

For these reasons, and well as for the reasons articulated in Plaintiffs' Opposition

to Defendants' Joint Motion to Dismiss, the Court should deny all Defendants' Individual

Motions to Dismiss.

DATED: February 21, 2020

HAGENS BERMAN SOBOL SHAPIRO LLP

By:___/s/ Steve W. Berman_____
     STEVE W. BERMAN

Breanna Van Engelen
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com


GUSTAFSON GLUEK PLLC

By:___/s/ Daniel C. Hedlund_____
     DANIEL C. HEDLUND (#258337)

Daniel E. Gustafson (#202241)
Michelle J. Looby (#388166)
Brittany N. Resch (#0397656)
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

LARSON • KING, LLP

By:___/s/ Shawn M. Raiter_____
     SHAWN M. RAITER (MN# 240424)

2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6518
sraiter@larsonking.com

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
Yifei "Evelyn" Li
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com
evelyn@cunelolaw.com

*Co-Lead Counsel for Commercial and
Institutional Indirect Purchaser Plaintiffs*


PEARSON SIMON & WARSHAW, LLP

By:___/s/ Bobby Pouya_____
     BOBBY POUYA

- 37 -

Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
bresch@gustafsongluek.com

*Co-Lead Counsel for Consumer Indirect
Purchaser Plaintiffs*

Clifford H. Pearson
Thomas J. Nolan
Bobby Pouya
Michael H. Pearson
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104
cpearson@pswlaw.com
tnolan@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By:    W. Joseph Bruckner
     W. JOSEPH BRUCKNER (MN #0147758)

Elizabeth R. Odette (MN #0340698)
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
Arielle S. Wagner (MN #0398332)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
samorbey@locklaw.com
aswagner@locklaw.com

Bruce L. Simon
PEARSON, SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008
bsimon@pswlaw.com

*Co-Lead Class Counsel for Direct Purchaser
Plaintiffs*

Melissa S. Weiner (MN #0387900)
Joseph C. Bourne (MN #0389922)
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile:  (612) 389-0610
mweiner@pswlaw.com
jbourne@pswlaw.com

*Co-Lead Class Counsel for Direct Purchaser
Plaintiffs*

- 38 -