# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-cv-1776-JRT-HB |
| This Document Relates To:<br><br>ALL ACTIONS | **REPLY IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE FEDERAL LAW CLAIMS IN PLAINTIFFS' AMENDED COMPLAINTS** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT....................................................................................................... 4

I.    PLAINTIFFS MISSTATE THEIR PLEADING BURDEN UNDER
      RULE 8................................................................................................... 4

II.   PLAINTIFFS' OPPOSITION CONFIRMS THEY FAIL TO ALLEGE
      PARALLEL CONDUCT. ......................................................................... 5

      A.   Plaintiffs Misstate the Legal Standards Applicable to Parallel
           Conduct. ...................................................................................... 5

      B.   The Allegations of Supply-Reducing Acts Are Not Remotely
           Parallel......................................................................................... 8

      C.   Materials Embraced by the Amended Complaints Confirm the Lack
           of Parallel Supply Reductions. .................................................. 13

III.  PLAINTIFFS FAIL TO REBUT OTHER GROUNDS FOR DISMISSAL.......... 14

      A.   Lack of Vertical Integration Undermines the Alleged Conspiracy............. 14

      B.   Hog Production Increased Significantly. .................................... 15

      C.   The Agri Stats Allegations Undermine the Purported Conspiracy. ........... 16

      D.   The Amended Complaints Identify Obvious Alternate Explanations
           for Supply Reductions. ............................................................... 16

      E.   Plaintiffs' Export Allegations Undermine the Plausibility of the
           Alleged Conspiracy. ................................................................... 17

IV.   THE PURPORTED "PLUS FACTORS" DO NOT SAVE THE
      AMENDED COMPLAINTS. .................................................................. 18

      A.   No Common Motive to Conspire or Actions Against Self-Interest............ 18

      B.   Industry Structure. ..................................................................... 19

      C.   Alleged Public Signaling and Opportunities to Collude. ............. 19

      D.   Agri Stats..................................................................................... 20

      E.   Plaintiffs' Other Purported Plus Factors. .................................. 20

V.    IPPS' NEW "INFORMATION EXCHANGE" THEORY DOES NOT
      SALVAGE THEIR CASE. ...................................................................... 20

      A.   No Exchange of Current or Forward-Looking Pricing Information. .......... 21

      B.   No Plausible Allegation That Defendants Actually Used Agri Stats
           Data to *Match* and *Inflate* Prices. ........................................... 24

ii

C.      No Plausible Allegation of Anticompetitive Harm. ..................................... 26

VI.    THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIM.................. 28

A.      Plaintiffs' Claims Accrued in 2009. ......................................................... 28

B.      Plaintiffs Have Not Pleaded Fraudulent Concealment.............................. 29

1.    There Are No Affirmative Acts of Concealment. ........................... 29

2.    The Self-Concealing Conspiracy Doctrine Does Not Apply. .......... 31

3.    Plaintiffs Were Not Misled. ........................................................... 32

4.    Plaintiffs Did Not Exercise Due Diligence. .................................... 33

C.      Plaintiffs' Allegations Contradict a Continuing Conspiracy. .................... 34

CONCLUSION ........................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*Abecassis v. Wyatt*,
  902 F. Supp. 2d 881 (S.D. Tex. 2012) ...................................................................... 34

*Am. Column & Lumber Co. v. United States*,
  257 U.S. 377 (1921) ................................................................................................ 24

*Anderson v. Dairy Farmers of Am., Inc.*,
  2010 WL 1286181 (D. Minn. Mar. 29, 2010) ......................................................... 31

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................... 13, 16

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
  203 F.3d 1028 (8th Cir. 2000) ................................................................................... 9

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ................................................................................. 28

*Granite Falls Bank v. Henrikson*,
  924 F.2d 150 (8th Cir. 1991) ................................................................................... 28

*Grasso Enters., LLC v. Express Scripts, Inc.*,
  2017 WL 365434 (E.D. Mo. Jan. 25, 2017) ............................................................ 19

*In re Blood Reagents Antitrust Litig.*,
  756 F. Supp. 2d 623 (E.D. Pa. 2010) ........................................................................ 6

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................................................... 2, 6

*In re Bulk Popcorn Antitrust Litig.*,
  1990 WL 123753 (D. Minn. June 19, 1990) ............................................................ 30

*In re Chocolate Confectionary Antitrust Litig.*,
  999 F. Supp. 2d 777 (M.D. Pa. 2014) ....................................................................... 7

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  245 F. Supp. 3d 1343 (N.D. Ga. 2017)
  *aff'd sub nom Siegel v. Delta Air Lines, Inc.*,
  714 F. App'x 986 (11th Cir. 2018) .......................................................................... 19

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ...................................................................................... 20

*In re Generic Pharm. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ......................................................................... 7

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017) ...................................................... 6

*In re Milk Prods. Antitrust Litig.*,
    84 F. Supp. 2d 1016 (D. Minn. 1997) ................................... 29, 30, 33, 34

*In re Monosodium Glutamate Antitrust Litig.*,
    2003 WL 297287 (D. Minn. Feb. 6, 2003) ...................................... 30, 31

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .............................................................. 19

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
    764 F. Supp. 2d 991 (N.D. Ill. 2011) ..................................................... 6

*In re Pork Antitrust Litig.*,
    2019 WL 3752497 (D. Minn. Aug. 8, 2019) ................................... passim

*In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane I*") (en banc),
    860 F.3d 1059 (8th Cir. 2017) ....................................................... 35, 36

*In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane II*"),
    893 F.3d 1047 (8th Cir. 2018) ......................................................... 4, 35

*In re Publ'n Paper Antitrust Litig.*,
    2005 WL 2175139 (D. Conn. Sept. 7, 2005) ....................................... 32

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    722 F. Supp. 2d 1079 (D. Minn. 2010) ............................................... 30

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
    797 F.3d 538 (8th Cir. 2015) ................................................................ 5

*Jones v. Micron Tech. Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................ 19

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ................................................. 6

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) .......................................................................... 34

*Maple Flooring Mfrs.' Ass'n v. United States*,
    268 U.S. 563 (1925) .......................................................................... 23

*McDonough v. Anoka Cty.*,
    799 F.3d 931 (8th Cir. 2015) ................................................... 5, 16, 22

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ..................................................... 2, 7, 18

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,
    960 F. Supp. 2d 958 (D. Minn. 2013) ................................................ 13

*Ripplinger v. Amoco Oil Co.*,
    916 F.2d 441 (8th Cir. 1990) ............................................................. 31

*Rotella v. Wood*,
    528 U.S. 549 (2000) ....................................................................... 28

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ............................................................. 6

*Sherr v. HealthEast Care Sys.*,
    262 F. Supp. 3d 869 (D. Minn. 2017) ............................................... 15

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    2011 U.S. Dist. LEXIS 72764 (E.D. Cal. July 7, 2011)....................... 27

*Summerhill v. Terminix, Inc.*,
    637 F.3d 877 (8th Cir. 2011) ............................................................ 29

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010) .................................................. 26

*Tatone v. SunTrust Mortg. Inc.*,
    857 F. Supp. 2d 821 (D. Minn. 2012) .................................................. 4

*Tera Grp., Inc. v. Citigroup, Inc.*,
    2019 WL 3457242 (S.D.N.Y. July 30, 2019)......................................... 4

*Todd v. Exxon Corp.*.
    275 F.3d 191 (2d Cir. 2001) ..........................................21, 22, 23, 25

*United States v. Container Corp. of Am.*,
    393 U.S. 333 (1969) ................................................................24, 25

*United States v. Lopez*,
    443 F.3d 1026 (8th Cir. 2006) ............................................................ 4

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ..........................................................21, 24, 26

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ............................................................. 20

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004)........................................................... 28

## CITATION FORMAT

"**Order**":  the Court's order and opinion dismissing the prior complaints (*In re Pork Antitrust Litig.*, 2019 WL 3752497 (D. Minn. Aug. 8, 2019)).

"**DPP**":  the Direct Purchaser Plaintiffs' Third Amended Complaint (Dkt. 431).

"**IPP**":  the Individual Indirect Purchaser Plaintiffs' Second Amended Complaint (Dkt. 392).

"**Amended Complaints**":  the DPP Third Amended Complaint (Dkt. 431), IPP Second Amended Complaint (Dkt. 392), and the Commercial and Institutional Indirect Purchaser Plaintiffs Third Amended Complaint (Dkt. 432), as well as the Third Amended Complaint filed by Puerto Rico (No. 19-cv-2723, Dkt. 103) and the Second Amended Complaint filed by Winn-Dixie (No. 19-cv-1578, Dkt. 94).

"**Mem.**":  Defendants' opening joint brief in support of the motions to dismiss (Dkt. 439).

"**Opp.**":  Plaintiffs' main opposition brief (Dkt. 476).

"**Omnibus Opp.**":  Plaintiffs' "omnibus" opposition brief (Dkt. 479).

## INTRODUCTION

The Court dismissed the prior complaints because "Plaintiffs have not adequately pleaded parallel conduct sufficient to support an inference of conspiracy." Order *1. That is, Plaintiffs failed to allege with "specificity which Defendants reduced production during which years." *Id.* *8. The Court recognized that such factual allegations are "vital to pleading parallel conduct," and that without them, the Court is "unable to analyze whether Defendants' production cuts were temporally proximate." *Id.*; *see also id.* ("plaintiffs must allege conduct that is 'reasonably proximate in time and value'") (citation omitted).

In Opposition, Plaintiffs raise a straw man argument claiming Defendants contend only "identical and simultaneous supply restrictions" can constitute parallel conduct, Opp. 7. This tactic seems designed to distract from the fact that the Amended Complaints:

- do not allege IPC[1] or Seaboard engaged in *even a single* production cut (*i.e.*, slaughtering of sows or pork processing reduction) during the alleged conspiracy;

- allege JBS, Clemens and Triumph each only undertook a *single* production cut during the entire alleged conspiracy – and each in different years;

- do not allege that Defendants took similar actions within *months* of each other – instead, Plaintiffs point to actions that were within *multi-year* periods;

- do not allege *any* purported production cuts by *any* Defendant during 2012, 2015, 2017 or 2018, and "acknowledge that [the 2014 production] dip was due to a deadly pig disease." Order *4 n.4.

Plaintiffs vaguely claim that Defendants "ignore[] relevant allegations of parallel conduct" and that Defendants' year-by-year categorization of the alleged supply reductions

---

[1]   While Plaintiffs asserted that IPC "reduced its pork processing in 2012," Opp. 3, they have since confirmed that "this statement was included in error."  *See* IPC Reply 1.

is somehow "improper."  Opp. 16, 21.  But they never identify what supply-reduction allegations Defendants supposedly ignored.  Moreover, Plaintiffs' *own analysis* confirms the lack of supply-reducing acts "proximate in time and value" to support a plausible inference of conspiracy.  Order *8.

For example, Plaintiffs lump together a *three-year period* encompassing *the year before the alleged conspiracy* (2008) as well as the first two years of the alleged conspiracy (2009 and 2010).  Opp. 10-11.  But even under this expansive time period (plainly designed to obscure the lack of temporally-proximate parallel conduct), Plaintiffs have, at best, set forth supply-related allegations pertaining to only four of the eight pork-producing Defendants (Hormel, Smithfield, Triumph and Tyson).  *Id.*  Plaintiffs then lump together a *two-year period* (2011-2012), but can point to alleged supply-reducing conduct by only two other Defendants (JBS and Clemens).  *Id.* 13.  Seaboard is not mentioned at all until 2013, and IPC is never mentioned.  *Id.*  Thus, in Plaintiffs' view, parallel conduct is established by listing Smithfield's alleged reduction of millions of hogs in 2008 and 2009, *id.* 10, with allegations that JBS and Seaboard did nothing until 2011 and 2013, respectively, when they either reported an increase in exports or "lower sales volume," *id.* 13.

Plaintiffs cite no authority for their assertion that this random assemblage of acts across different years constitutes parallel conduct.  The Eighth Circuit has explained that conduct "executed under dissimilar circumstances and separated by" significant time periods *does not* "constitute parallel conduct."  *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir. 2018).  Indeed, Plaintiffs' cases reflect precisely the type of proximate conduct lacking here.  *E.g.*, *In re Broiler Chicken Antitrust Litig.*,

290 F. Supp. 3d 772, 792 (N.D. Ill. 2017) ("Plaintiffs have alleged that *all of the defendants* engaged in production cuts *at the same time*") (emphases added).

Beyond this threshold pleading defect, other defects continue to undermine the plausibility of the alleged conspiracy.  For example:

- the Amended Complaints confirm overall hog supply actually *increased* to record levels during the alleged conspiracy period; and

- most Defendants *purchased* hogs and therefore would not participate in a "scheme to limit hog supply," DPP ¶149, that would cause hog prices to rise.

As for IPPs' new Rule of Reason claim that the information disseminated by Agri Stats enabled Defendants to "raise prices to match their competitors," IPP ¶19, IPPs concede that the information exchanged is "generally two to six weeks old," Opp. 52.  Such historical information is not "current" in an industry in which prices change daily as evident from the case law IPPs invoke.  IPPs also do not explain how such historical information could be used to match commodity pork prices.  Nor can IPPs plausibly connect the use of Agri Stats to any harm as the alleged "increase in the spread between hog costs and pork prices," Opp. 60, did not begin *until several years after* Defendants allegedly started using Agri Stats.  The theoretical *possibility* that Agri Stats might have been used to increase prices cannot carry the claim across the *plausibility* threshold especially when, as courts have recognized, benchmarking information serves many procompetitive purposes.

Finally, Plaintiffs' Opposition only confirms that the statute of limitations bars their claims.

### ARGUMENT

**I.    PLAINTIFFS MISSTATE THEIR PLEADING BURDEN UNDER RULE 8.**

Plaintiffs incorrectly assert that they need only allege "the *general contours* of when an agreement was made," supported by "*general allegations* informing the context of an agreement."  Opp. 6-7 (citations omitted) (emphases added).  But this Court already rejected that assertion, holding instead that "[w]ithout more specific facts, Plaintiffs' allegations that the Defendants engaged in production cuts are nothing more than bare assertions."  Order *8; *see In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane II*"), 893 F.3d 1047, 1057 (8th Cir. 2018) (requiring "factual content" – by "list[ing] relevant individuals, acts, and conversations").

Plaintiffs further assert that "referring simply to the defendants . . . may adequately plead personal involvement" of each Defendant.  Omnibus Opp. 3-4 (citations omitted).  Again, the Court previously rejected such group pleading.  Order *8-9 ("Plaintiffs do not plead with any specificity which Defendants reduced production during which years."); *accord Tatone v. SunTrust Mortg. Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012).  Plaintiffs also contend that "slight evidence" is sufficient to sweep a company into an antitrust conspiracy lawsuit.  Omnibus Opp. 33.  But the Eighth Circuit "rejected" that approach in *United States v. Lopez*, 443 F.3d 1026, 1030 (8th Cir. 2006), and courts have rejected it in civil cases as well.  *E.g.*, *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *13 (S.D.N.Y. July 30, 2019).

Plaintiffs also argue that on a Rule 12(b)(6) motion, "courts cannot weigh competing inferences or credit a defendant's counter-allegations."  Opp. 6. (citation omitted).  But

assessing a claim's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense" and closely evaluate "whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct." *McDonough v. Anoka Cty.*, 799 F.3d 931, 945-46 (8th Cir. 2015) (quoting *Iqbal*).

Finally, while Plaintiffs cite pre-*Twombly* case law to contend that dismissals before discovery "should be granted very sparingly," Opp. 5, this Court already dismissed the prior complaints after determining that it would not "force Defendants into significant and costly discovery without plausible allegations that they engaged in the conduct alleged." Order *9; *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015).

## II.   PLAINTIFFS' OPPOSITION CONFIRMS THEY FAIL TO ALLEGE PARALLEL CONDUCT.

### A.   Plaintiffs Misstate the Legal Standards Applicable to Parallel Conduct.

Instead of following the Court's guidance to set forth "specific information regarding each Defendant" of "conduct that is 'reasonably proximate in time and value,'" Order *8, Plaintiffs misleadingly assert that Defendants' motion rests on the proposition that "only identical and simultaneous supply restrictions" can constitute parallel conduct, Opp. 7; *see also id.* 21.  Rather, Defendants consistently argue that the alleged supply reductions here are too few, scattered, and different to be "'reasonably proximate in time and value.'"  Order *8.

Plaintiffs also suggest that general assertions that supply cuts took place "gradually" and were "sufficiently close in time" constitute parallel conduct. Opp. 8-9.[2] But the cases Plaintiffs cite confirm that the sporadic mishmash of supply reductions alleged here falls well short of the required proximity:

- *Broiler*, 290 F. Supp. 3d at 792 ("Plaintiffs have alleged that all of the defendants engaged in production cuts at the same time");

- *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 (N.D. Ill. 2011) ("Plaintiffs allege [] Defendants' uniformly contemporaneous supply restrictions and price increases . . . Defendants raised prices simultaneously");

- *SD3, LLC v. Black & Decker (U.S.) Inc*., 801 F.3d 412, 440 (4th Cir. 2015) ("'[a]t, or within a period of months following the October 2001 meeting, each of Defendants . . . had agreed to enter into a boycott'") (emphasis removed);

- *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 626, 629-30 (E.D. Pa. 2010) (defendants "harmonized prize [sic] increases" and "near-parallel price movements" "in close proximity to one another");

- *In re Interest Rate Swaps Antitrust Litig*., 261 F. Supp. 3d 430, 475 (S.D.N.Y. 2017) (four defendants "made the identical demand" of boycotted entity on the same day);

---

[2] Plaintiffs cite *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991 (N.D. Ill. 2011) for their "gradually" standard, but the alleged supply cuts by the only two defendants in the market there were identical and temporally proximate. *Id*. at 996, 999 (noting supply-reduction announcements "[a]round the same time" and that each of the two defendants were "alleged to have cut production by 1 million liters").

- *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014) ("defendants followed immediately with similar price increases" either "within two days" or "within two weeks").

The Eighth Circuit has similarly found that conduct "executed under dissimilar circumstances and separated by six months" did *not* constitute parallel conduct. *See Park Irmat*, 911 F.3d at 517; *accord* Order *8 (citing *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 446-47 (E.D. Pa. 2018) (dismissing defendant whose prices "peaked several months after" other defendants' increases)).

Plaintiffs also argue that the Court may not focus on the hog supply cut allegations separately.  Opp. 18.  But their antitrust claim has always been centered on a purported "agreed upon scheme to limit hog supply."  DPP ¶149.  Indeed, Plaintiffs allege that slaughtering sows is a severe and long-lasting means of reducing pork production.  *See* Opp. 11 n.9 (citing DPP ¶70 ("Due to the nature of the pork production cycle, the reduction of sows—i.e. farrowing hogs—has a significant impact on the supply of pork.")); DPP ¶50 ("The typical hog production cycle lasts about four years . . . it takes nearly two years to substantially increase production.").  Plaintiffs allege no facts suggesting that any other purported supply reduction mechanisms have similar effects.  Focusing on the hog-reduction allegations thus makes sense, and shows that the *majority* of Defendants have little or no hog production, and not all Defendants are alleged to have slaughtered *any* sows. *Infra* Sections III.A, II.B; Mem. 26-29.

Plaintiffs' related mischaracterization of Defendants' motion as requiring "utiliz[ation of] identical means to reduce pork supply" to establish parallel conduct, Opp.

7

18, is flatly wrong.  Defendants' year-by-year analysis includes *all* of the alleged means of supply reduction (sow, pork processing, and exports) and demonstrates that none were "reasonably proximate in time and value."  Order *8; Mem. 9-10, 19-24.

### B.     The Allegations of Supply-Reducing Acts Are Not Remotely Parallel.

Contrary to Plaintiffs' claim that Defendants' purported "year by year" analysis of the conspiracy is "improper," Opp. 21, such analysis directly complies with the Court's ruling.  Order *8 (identifying need to understand "which Defendants reduced production during which years").  But whether Plaintiffs' scant allegations of supply-reducing conduct are analyzed comprehensively, year-by-year, or grouped by type, the Amended Complaints still fail to allege conduct "reasonably proximate in time and value."  *Id*. *8.

A comprehensive review of the Amended Complaints demonstrates that Plaintiffs:

- do not allege *any* purported production cuts during *half* the years of the alleged conspiracy (2012, 2014 (pig disease), 2015, 2017 or 2018);

- allege only a *single* production cut by one Defendant *during the last seven years* of the alleged conspiracy (in 2016);

- do not allege IPC or Seaboard engaged in *a single* production cut during the decade-long conspiracy;

- allege JBS, Clemens, and Triumph each undertook only a *single* production cut during the entire conspiracy, only one of which occurred after 2011; and

- do not allege Seaboard and Triumph (the only two Defendants other than Smithfield alleged to have any "significant" hog production, IPP ¶144), engaged in *any* production cuts *after the first year* of the purported decade-long conspiracy (or that Seaboard undertook *any* production cut whatsoever).

Mem. 8-9, 19-24.

Unable to refute these points and in contravention of the Order (*9), Plaintiffs try again to shoehorn allegations of vague industry-wide statements – many of which the Court already deemed insufficient – into the analysis of whether each Defendant engaged in supply reductions.  *E.g.*, Opp. 10 (referencing trade publication's report that "the nation's largest 25 producers have cut sow numbers"); *id.* 12 (referencing third-party and industry statements to conclude "Defendants repeatedly emphasized that they would not increase production"); *id.* 13 (alleging "Defendants refused to increase production"); *id.* 14 (citing third-party publication on industry capacity); *see also* Mem. 11 & n.5, 12.

Plaintiffs also insist innocuous statements about "lower sales" of pork products are sufficient allegations that Defendants affirmatively reduced supply.  Opp. 20.  But such statements do not "indicate that any individual Defendant was making cuts," as required.  Order *9.  Indeed, Plaintiffs do not dispute that a Defendant might report lower *sales* simply because demand softened or a competitor won more of its business.  Mem. 15.

Yet, even when Plaintiffs group the alleged supply reductions in the multi-year sets they suggest are most persuasive, *see* Opp. 10-14, their own summary confirms those reductions were not remotely parallel.

As an initial matter, Plaintiffs identify no authority supporting their argument that alleged supply reductions can be temporally proximate across multi-year periods.  *Supra* Section II.A.  Plaintiffs also do not explain why they include numerous allegations about actions in 2008, when they claim that the conspiracy "began in approximately 2009."  Opp. 80.  Instead, Plaintiffs vaguely assert that the 2008 allegations are "directly relevant."  Opp. 17.  But pre-conspiracy acts are "of little relevance," *Blomkest Fertilizer, Inc. v. Potash*

*Corp. of Saskatchewan*, 203 F.3d 1028, 1037 n.7 (8th Cir. 2000) (en banc), and, if anything, detract from plausibility here.

**2008 – 2010**:  Plaintiffs' analysis shows that only half of the eight pork processing Defendants (Hormel, Smithfield, Triumph and Tyson) undertook *any* alleged supply-reducing acts during the initial years (2009-2010) of the purported conspiracy.  Opp. 10-11.  This directly contradicts Plaintiffs' conclusory allegation that "the pork integrators changed their behavior and *acted in a concerted way to decrease supply*" beginning in 2009. DPP ¶120 (emphasis added).

Nor do the supply-reduction allegations during the broad 2008-2010 period reflect parallel conduct.  Plaintiffs just list a series of disparate alleged acts but never explain how that conduct is reasonably proximate in time and value.

Critically, Plaintiffs allege Smithfield began significant hog supply cuts in *February 2008*.  DPP ¶138; IPP ¶99 (alleging Smithfield "started a reduction of 50,000 sows and 1 million of [its] 18 million pigs").[3]  This unilateral cut *eleven months before the start of the purported conspiracy* only underscores that Smithfield's alleged supply reductions – far from being "historic and unprecedented," DPP ¶121 – were consistent with independent behavior.  *See* Order *6 n.6.  The allegations about Triumph reveal a similar flaw: it allegedly began hog reductions in 2008, rendering its 2009 cuts anything but unprecedented. Opp. 11-12.  Plaintiffs' analysis also confirms that Seaboard, the only Defendant other than

---

[3]   Smithfield was losing money on every hog it raised, thus providing an obvious independent rationale for its actions.  Smithfield Mem. (Dkt. 454) at 4-6.

Smithfield and Triumph to have any "significant" hog production, IPP ¶144, is not alleged to have cut hog production *at all* during the entire conspiracy. Opp. 13.

Hormel's *only* alleged hog reduction occurred in 2008 – before the alleged conspiracy. Opp. 11. Thus, Hormel *did not* participate in the "unprecedented" hog reductions that allegedly began in 2009, DPP ¶121, or any "agreed upon scheme to limit hog supply," *id*. ¶149. Furthermore, the vague allegations that Hormel reduced pork processing and reported tonnage reductions at unknown times and in unknown quantities in 2009, Opp. 11, does not show the requisite proximity with acts of any Defendant. *See* Order *8. Finally, Plaintiffs' remaining opaque allegations that Tyson, an insignificant hog producer, IPP ¶144, cut its sow levels at some point "[b]etween 2008 and 2009," DPP ¶126, or "[d]uring 2009," IPP ¶113, and "reduced its capacity utilization rates during the first half of 2009" and in 2010 by small amounts do not reflect parallel conduct with other Defendants or suffice to implicate Tyson in the alleged decade-long conspiracy.

**2011 – 2012**: Plaintiffs present 2011-2012 as a combined two-year period, but do not identify any alleged supply reductions in 2012. As for 2011, Plaintiffs only muster a single alleged reduction by Clemens' predecessor of a mere 1,000 sows – a reduction (even if true, *see* Dkt. 441 at 6-7) made in parallel with no other supplier and in the midst of an industry-wide two-year increase. Opp. 13; DPP ¶120. Plaintiffs pair that miniscule *hog* reduction with JBS's reported 5% increase in its export volume of *pork*. Opp. 13; DPP ¶127. Plaintiffs never explain how these alleged reductions are reasonably proximate in time or value to each other; to the reductions allegedly undertaken *years earlier* by other Defendants, or to the conduct of Seaboard or IPC, which are never mentioned in Plaintiffs'

analysis through the alleged conspiracy's first four years.  Opp. 10-13 (in fact, there is no allegation IPC reduced supply in *any* year).

**2013**:  Plaintiffs allege that "Tyson reported a 3.6% decrease in sales volume" and decreased capacity utilization; Seaboard reported "lower sales volume"; and Hormel reported "lower sales" (without specifying volume or revenue) – all by unidentified amounts and at unidentified times in 2013.  *Id*. 13-14; DPP ¶128.  Plaintiffs never allege any of these sales drops resulted from any Defendant's affirmative act to reduce supply, *supra* 9, nor do they explain how such alleged conduct could be deemed reasonably proximate in time and value with other alleged supply reductions.

**2014**:  Plaintiffs have "acknowledge[d]" that any dip in hog production in 2014 "was due to a deadly pig disease."  Order *4 n.4.  Plaintiffs only rehash the allegation that one Defendant, Clemens, allegedly "refused to increase its market share" to capitalize on being spared by the disease.  Opp. 14.  But this ignores Plaintiffs' own allegations that Clemens *increased* its market share by opening up a new processing plant.  *See* Dkt. 441, at 1-5.  Nor is this a supply-reduction allegation or conduct in parallel with any other Defendant.

**2015 – 2016**:  Plaintiffs only allege a *single* specific supply reduction (itself disputed, *see* JBS Mem. (Dkt. 449) at 3) by one Defendant by an unidentified amount in 2016.  Opp. 14.  Obviously, this isolated supply cut allegation – during a period of increasing supply industry-wide, *see* DPP ¶120, fig.7 – does not reflect parallel conduct with other Defendants.  Notably, Plaintiffs identify no relevant allegations in 2015 or in 2017 and beyond, making the alleged 2016 cut the sole supply reduction during the *entire second half* of the alleged conspiracy.

C. **Materials Embraced by the Amended Complaints Confirm the Lack of Parallel Supply Reductions.**

Plaintiffs do not dispute the accuracy of Defendants' chart demonstrating the complete lack of parallel conduct throughout the alleged conspiracy. Mem. 25-26. Rather, they assert Defendants have improperly referenced the *Pork Powerhouses* reports cited repeatedly throughout the Amended Complaints, and upon which the chart is based. Opp. 22. But this Court is "entitled to take notice of the *full contents* of the published articles referenced in the complaint, from which the truncated quotations were drawn." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (emphasis added); *see also Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 960 F. Supp. 2d 958, 972 n.11 (D. Minn. 2013).

Here, citations and uncited references to the *Pork Powerhouses* reports and accompanying articles are littered throughout the Amended Complaints, often as the sole source for Plaintiffs' alleged supply cuts. *E.g.*, DPP ¶¶119, 121, 124, 134, 161 (citing articles accompanying and reflecting specific reports); *id.* ¶¶124, 126, 128, 130, 134 (alleging exact sow inventory figures reflected in the reports).

Plaintiffs repeatedly assert that the 2009 "*Pork Powerhouses* survey demonstrates that Defendants engaged in parallel sow reductions." Opp. 24; *see also id.* 3, 10, 27. Given the weight Plaintiffs place on the report, the Court should consider that it confirms the lack of parallel conduct by Defendants. Of the Defendants covered in the report, only three (Smithfield, Triumph and Tyson) are shown to have reduced – in non-parallel amounts – sow inventories from 2008 levels, while one Defendant (Clemens, referred to as its affiliate

13

Country View Family Farms) *increased* its inventory, and two Defendants (Seaboard and Hormel) as well as one alleged co-conspirator (Cargill, IPP ¶52) did *not* reduce their sow herds at all.  Decl. of Jessica J. Nelson ("Nelson Decl."), Ex. 1.[4]

## III.   PLAINTIFFS FAIL TO REBUT OTHER GROUNDS FOR DISMISSAL.

### A.   Lack of Vertical Integration Undermines the Alleged Conspiracy.

Plaintiffs contend "the ownership of one's own hogs is not required to allege a horizontal conspiracy."  Opp. 25.  But that position directly contradicts the Amended Complaints, which state that vertical integration "allowed the scheme to succeed."  IPP p. 70; *see also* DPP ¶149 (alleging "Defendants' agreed upon scheme to limit hog supply").

The Amended Complaints confirm that only Smithfield was significantly integrated, and only two other Defendants had any "significant" hog production.  IPP ¶144.  As to the remaining five Defendants, Plaintiffs do not dispute that JBS was not vertically integrated until late 2015, or that Tyson's hog production "is not 'significant.'"  Opp. 26.  Plaintiffs' assertion that Hormel "ha[d] the ability to exert control over its suppliers," *id.*, is a concession that it purchased its hogs from third parties.  Finally, Plaintiffs' allegations establish that Clemens and IPC, like Hormel, obtained hogs through contracts with hog farmers, not ownership via vertical integration.  Mem. 27-28.

---

[4]  JBS and IPC are not listed because they did not engage in hog production.  And, notably, after the sentence quoted by Plaintiffs, the article states, "[o]nly two firms increased sows from last year, Country View Family Farms (Hatfield) [*i.e.*, Clemens] and Texas Farm.  *Fifteen firms reduced sow numbers*, including the largest two, Smithfield Foods and Triumph Foods."  *Id*. (emphasis added).  That *12 non-Defendants reduced their inventories* in 2009 – while only two hog producers increased – demonstrates that there was nothing unusual about the reported reductions by Smithfield, Triumph and Tyson.

These concessions are significant as it is economically irrational for any primarily hog-purchasing Defendant to conspire to reduce hog supply, thereby raising hog prices and increasing input costs. *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 883-84 (D. Minn. 2017) (dismissing conspiracy where there was "no economic motive" for differently-situated defendants to conspire).

### B.    Hog Production Increased Significantly.

Plaintiffs assert the historic rise in hog production during the alleged conspiracy is immaterial because the *rate* of that increase was "not in line" with the pre-conspiracy rate. Opp. 26-27. However, the very data Plaintiffs cite shows exactly the opposite: hog production increased at roughly the *same rate* before and during the alleged conspiracy period. DPP ¶120, fig.7:



Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000-2017

Plaintiffs also ignore two key facts included in the Amended Complaints that further demonstrate the alleged conspiracy's implausibility: (1) major alleged conspirators (Cargill, Triumph and Seaboard) significantly *increased* slaughter capacity during the conspiracy period; and (2) because of the two-year period needed to increase hog

production substantially, Defendants would have had to begin expanding hog production at the very time the conspiracy allegedly began (*e.g.*, the increase in production in 2011 required planning beginning in 2009).  Mem. 30-31.

### C.     The Agri Stats Allegations Undermine the Purported Conspiracy.

Plaintiffs allege Agri Stats enabled "Defendants to know that supply would not increase in the future," and that such foreknowledge was reflected in public statements by Defendants' executives in 2010 and 2011.  DPP ¶¶151-54.  Plaintiffs make no attempt to explain, however, why their own pleadings show such foreknowledge was repeatedly wrong, as production actually *increased dramatically* after those statements were made.  Mem. 31-32.  These factual allegations severely undermine Plaintiffs' theory that Agri Stats enabled Defendants "to have confidence that each member was following through with the agreement" to limit supply.  DPP ¶45.

### D.     The Amended Complaints Identify Obvious Alternate Explanations for Supply Reductions.

Courts consider "obvious alternative explanation[s]" when assessing the plausibility of an antitrust conspiracy claim.  *Twombly*, 550 U.S. at 567; *McDonough*, 799 F.3d at 946.

**2009 and 2010**:  Plaintiffs' puzzling claim that "Defendants acknowledge [H1N1] affected only one producer," Opp. 32, is belied by the 2009 *Pork Powerhouses* article Plaintiffs repeatedly cite:  "[T]he *H1N1 'swine flu' virus is a big problem for the industry*." Nelson Decl., Ex. 1 (emphasis added).  Furthermore, while Plaintiffs argue "the rising cost of corn feed does not explain . . . price increases," Opp. 32, it is *production* decreases, not *price* increases, that constitute the purported parallel conduct.  Plaintiffs also do not dispute

that production decreases in 2009 and 2010 coincided with the Great Recession, a recognized "innocent alternative" explanation.  Mem. 32-33.

**2013**:  Plaintiffs finally concede that disease affected production in 2013.  Opp. 32 ("the Amended Complaints acknowledge [the PEDv] affected production in 2013").  This belated concession undermines the significance of any alleged supply cuts in 2013.  That Defendants allegedly reported "lower sales volume" during a period of pig disease is unsurprising.  *Supra* 12.

### E. Plaintiffs' Export Allegations Undermine the Plausibility of the Alleged Conspiracy.[5]

The Amended Complaints contain no allegations suggesting parallel export conduct. Critically, Plaintiffs do not dispute that exports increased at a higher rate *before* the alleged conspiracy than *after*, or that exports fell sharply in 2009 when the conspiracy allegedly began, as DPP ¶122, fig.8, shows:



Figure 8: U.S. Pork Exports as a Percent of Total Production, 2000-2017

---

[5]   IPPs make no export-related allegations.

Plaintiffs also do not dispute that there are *no* allegations that Defendants ever coordinated about or agreed upon export levels or prices; or made any export sales contrary to each company's own self-interest.  Mem. 17-19.

Plaintiffs also concede that global demand for pork *increased* during the alleged conspiracy period.  Opp. 32.  That alone explains overseas sales, which are a perfectly normal and procompetitive activity.  Mem. 17-18.  Plaintiffs' assertion that increased global demand somehow demonstrates Defendants restricted supply through exports is nonsensical.  Opp. 32-33.

## IV.   THE PURPORTED "PLUS FACTORS" DO NOT SAVE THE AMENDED COMPLAINTS.

As Plaintiffs "fail[] to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary."  *Park Irmat*, 911 F.3d at 517.  Even so, Plaintiffs' purported plus factors are consistent with unilateral conduct and otherwise insufficient "to support a plausible inference of an agreement."  Order *7; *see* Mem. 34-35.

### A.   No Common Motive to Conspire or Actions Against Self-Interest.

Plaintiffs now notably omit any reference to "a shared motive to conspire," Order *6, what they contended is a "commonly recognized" plus factor, *see* Pls.' 2018 Opp. (Dkt. 229) 36.  Plaintiffs also effectively concede that most Defendants were not vertically integrated, meaning they had no economic incentive to conspire, *supra* Section III.A; and allege no facts plausibly suggesting any Defendant acted against its self-interest, *supra* Section II.B; Mem. 30-31, 36.

## B.     Industry Structure.

Ignoring the *hog* industry, Plaintiffs highlight the allegedly "highly concentrated" nature of the *pork* industry.  Opp. 34.  But such allegations routinely are recognized as "neutral facts" "just as likely to be consistent with innocent as unlawful behavior." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195-96 (9th Cir. 2015).

## C.     Alleged Public Signaling and Opportunities to Collude.

The Court previously found that the bulk of the public statements cited by Plaintiffs merely indicated "that each Defendant simply noticed that the industry's production as a whole was declining."   Order *9.   Consistent with federal regulations, Plaintiffs acknowledge that "[p]ublic companies, at times, need to announce certain material facts to their shareholders," Omnibus Opp. 25; *see also* Mem. 38 & n.22.   The only three "reciprocal public statements" cited by Plaintiffs, Opp. 41-42 (citing DPP ¶¶142-43, 153) – including one previously cited by this Court, Order *9 – all denote "information companies legitimately convey to their shareholders and courts are properly reluctant to characterize them as evidence of unlawful conspiracies."  *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1373 (N.D. Ga. 2017) (citations omitted).

Plaintiffs also do not dispute that mere "opportunities to communicate through trade associations," Opp. 43, are irrelevant when not tied to any subsequent supply-reducing *acts*, Mem. 38; *cf. Grasso Enters., LLC v. Express Scripts, Inc.*, 2017 WL 365434, at *4 (E.D. Mo. Jan. 25, 2017) ("alleged parallel conduct directly followed the . . . meetings, providing a correlation to support an inference") (cited Opp. 43).

### D.  Agri Stats.

Beyond the other flaws discussed above, the conclusory allegation that Defendants "policed" an assumed conspiracy through Agri Stats cannot be used to bypass Plaintiffs' failure to allege parallel supply cuts or anything else indicative of the supposedly underlying conspiracy.  *See Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 198 (3d Cir. 2017).

### E.  Plaintiffs' Other Purported Plus Factors.

Plaintiffs do not dispute that allegations regarding profits and market share are not valid plus factors.  Mem. 40-41.  Nor does the existence of a civil antitrust case *in a different industry* involving just a few of the Defendants here provide any basis for sustaining these claims.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting "if it happened there, it could have happened here" argument).

## V.  IPPS' NEW "INFORMATION EXCHANGE" THEORY DOES NOT SALVAGE THEIR CASE.

Plaintiffs' Opposition confirms there is nothing plausible about IPPs' new theory that Agri Stats served as an information exchange that allowed Defendants to "raise prices to *match* their competitors."  IPP ¶19 (emphasis added); *id.* ¶276.  IPPs expressly concede that the Agri Stats information is "generally two to six weeks old."  Opp. 52.  Neither in the context of the pork industry in which prices change daily nor under the cases IPPs cite is such information "current" for price-matching purposes.

IPPs are thus largely left to assert that because Defendants allegedly operated in a concentrated industry and subscribed to Agri Stats, they necessarily used the information

in an anticompetitive manner.  But that assertion is at odds with the case law.  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (the use of benchmarking information can "render markets more, rather than less, competitive"); Mem. 49.  The Court should therefore reject IPPs' invitation to "engage in such speculation" that Defendants necessarily used Agri Stats information to inflate and match prices.  Order *8.  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

### A.  No Exchange of Current or Forward-Looking Pricing Information.

IPPs do not dispute that courts assessing similar claims place great weight on the recency of the information exchanged to determine whether the claim is plausible.  In doing so, courts have repeatedly recognized that "the exchange of past price data is greatly preferred" because it has the least "potential to affect future prices and facilitate price conspiracies."  *Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001); *see also Gypsum*, 438 U.S. at 441 n.16.

Here, IPPs concede that the pricing information exchanged via Agri Stats was "*generally two to six weeks old*."  Opp. 52 (emphasis added); *see also* IPP ¶47 (pointing to "months old" information).  IPPs then characterize such historical data as "nearly contemporaneous" and "current."  Opp. 51-52.  But IPPs also maintain that pork is a commodity, and do not dispute that pork is subject to significant, frequent fluctuations in pricing.  IPP ¶187; Mem. 51; Opp. 50.  IPPs' Figure 4 reflects such fluctuations.

Indeed, pork prices fluctuate so frequently that the USDA *requires* pork processors to report detailed price information *once* or *twice daily*, including "[t]he price for each

wholesale pork sale." 7 C.F.R. § 59.205. The USDA then aggregates and publishes such data *the same day*. *Id*.[6] In the context of the pork industry, weeks- and months-old data cannot plausibly be deemed "nearly contemporaneous" enough to match prices. *See McDonough*, 799 F.3d at 945 (plausibility is a "context-specific" inquiry that "requires the reviewing court to draw on its judicial experience and common sense").

Nor do any of the cases that IPPs invoke suggest that such historical pricing data of a commodity product is sufficiently "current" to raise anticompetitive concerns. The Second Circuit in *Todd* denied a motion to dismiss a claim concerning the "exchange[]" of "salary information" about "*current* and *future* increases in Defendants' salary budgets." *Todd*, 275 F.3d at 212 (emphases added). IPPs argue that since the "survey of salary data . . . was distributed several times a year," Opp. 51, and not more regularly, even historical data can be "current." But *salaries are not a commodity* and do not typically fluctuate even weekly or monthly, thus enabling even periodic updates of salary information to reflect current salaries and potentially facilitate salary-coordination. *See, e.g.*, *Todd*, 275 F.3d at 212 (the "periodically updated data sets were used by each defendant to determine whether the announced budgets of its competitors had in fact been implemented so that each could consider what adjustments should be made to coordinate salaries"). Pork is different: prices typically fluctuate daily; and weeks-old information cannot serve that purpose. And that is presumably why IPPs make no attempt to explain *how* in such a fluctuating price

---

[6] The daily reports are available at: *Daily Pork Reports,* UNITED STATES DEPARTMENT OF AGRICULTURE, https://www.ams.usda.gov/market-news/daily-pork-reports.

environment Defendants could use *weeks-old* price data to "know exactly how far they could raise their prices to conform to their competitors' prices." IPP ¶44; Mem. 50-51.

IPPs rely most heavily on *Haff*, a case in which the plaintiffs alleged an "exchange of *current* and sometimes *future* information" including the compensation levels competitors paid to growers of broiler chickens that suppressed such compensation. Nelson Decl., Ex. 2 (*Haff* Pls.' Opp.) at 11 (emphases added); *see also id*., Ex. 3 (*Haff* Compl.) ¶¶66-75. In denying the motion to dismiss, the court treated the complaint there – which did not define the recency of the data at issue at all, including whether it was weeks or months old, *id*., Ex. 3 ¶¶66-75 – as alleging that defendants had exchanged "contemporaneous grower compensation information." Opp., Ex. A 15. And the *Haff* court emphasized the "material contrast to the kind and type and quality of" the "contemporaneous" information allegedly exchanged [in *Haff*] versus information "based on historical transactions rather than current data" in cases like *Maple Flooring Mfrs.' Ass'n v. United States*, where the Supreme Court found the exchange of information not anticompetitive. 268 U.S. 563 (1925); Opp., Ex. A 44-45, 48.[7]

IPPs also cite what they claim to be the "controlling Supreme Court cases" that offer guideposts for the "kind of current information that produces significant anticompetitive effects." Opp. 45-46, 52. Those "controlling" cases do not help IPPs. In *Container*, the Supreme Court found problematic the exchange among competitors of "the most recent

---

[7]    Unlike here, the *Todd* and *Haff* complaints included specific allegations about regular inter-defendant meetings during which the exchanged information was discussed. *Todd*, 275 F.3d at 196, 212; Nelson Decl., Ex. 2 at 19 (alleging "numerous specific meetings . . . which facilitated the [information sharing agreement]"); *see also* Mem. 49-50.

price charged or quoted" for corrugated containers "whenever [a competitor] needed such information."   *United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969).   In *American Column*, the Supreme Court did not question the reasonableness of the reporting of week-old data on "the amount of stock held, the sales made and the prices received." *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 398 (1921).   Instead, it was the forward-looking reports on "what the production of each [member] will be for the next 'two months'" and the "significant suggestions as to both future prices and production" that raised anticompetitive concerns.   *Id.* at 399.   And in *Gypsum*, the Supreme Court assessed the practice of "*telephoning a competing producer* to determine the *price currently being offered* on gypsum board to a specific customer.*"*   438 U.S. at 429 (emphasis added).

In summary, none of the cases the IPPs invoke support their contention that "generally two to six weeks old" information is "current" in the context of the pork industry.[8]

**B.    No Plausible Allegation That Defendants Actually Used Agri Stats Data to *Match* and *Inflate* Prices.**

IPPs' theory is that Agri Stats allowed Defendants to "compare and match each other's pricing" in order to "raise prices that were lower."   IPP ¶¶276-77.   IPPs acknowledge that an allegedly anticompetitive exchange of pricing information must

---

[8]   That the FTC (Opp. 52 n.21) provides a full safe harbor for data more than three months old does not render the exchange of "two to six weeks old" data anticompetitive, and that is all the more true in an industry in which prices fluctuate far more frequently.   Moreover, no court has applied the "three month" limitation in assessing claims.

"tend[] toward *price uniformity*."  Opp. 45 (quoting *Container*) (emphasis added); *id.* 47 (the "Agri Stats reports encourage[] this trend towards price uniformity"); *Container*, 393 U.S. at 336 (data exchange had "the effect of keeping prices within a fairly narrow ambit").

Yet, IPPs then claim that such "price uniformity" is not required.  Opp. 51 ("the relevant question is not whether information exchanges lead to . . . price uniformity").  IPPs are forced to take these contradictory positions because the very Agri Stats reports appended to their Amended Complaint show wide price divergences among pork producers *several months after* Defendants allegedly started using the weekly sales reports.  Mem. 47-48.  IPPs neither dispute this, Opp. 51, nor explain why such wide price divergences would persist after months and months of Defendants' price "matching."

IPPs also wrongly assert that only a "single page" in an Agri Stats report shows that prices were not uniform.  *Id*.  But the portions of the reports Defendants cited are just examples.  Within the underlying Exhibit C to IPPs' complaint (an August 2009 weekly sales report), page after page shows price divergences across multiple pork products.  *See, e.g.*, IPP Ex. C at pp. 1.2-1 to 1.3-12; *see also* IPP Ex. A (March 2009 sales report) at W.4-1 to W.6-15.

The wide pricing divergence starkly contrasts with the pricing in the cases IPPs invoke.  In *Container*, it was shown that "once a defendant had this information he quoted *substantially the same price* as the competitor," "the knowledge of a competitor's price usually meant *matching* that price," and the effect of this "reciprocal exchange of prices was to *stabilize* prices."  393 U.S. at 336-37, 339.  And in *Todd*, plaintiffs plausibly alleged that "the difference [in salaries] grows gradually smaller -- a portrait of market

stabilization." 275 F.3d at 214. By contrast, IPPs fail to offer any factual allegations that Defendants' pork prices became more uniform. Rather, the Agri Stats' reports that IPPs attach to their complaint indisputably contradict that theory.

IPPs are left to argue that because Defendants subscribed to Agri Stats, they *must* have used it to match or inflate prices. Opp. 50. But that conjecture cannot sustain their claim. *See, e.g.*, *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 516 (D. Del. 2010) (granting dismissal because "[p]laintiff alleges only non-actionable exchanges of information, setting forth no facts permitting an inference that the data shared had any impact on pricing decisions"); *see also* Mem. 49-50. IPPs' complaint is not only devoid of a single price-matching example but instead shows that Defendants used the *benchmarking* service to compare their respective performances to rivals. *See, e.g.*, IPP ¶36 (assessing average "yield" not prices); IPP ¶38 (using data to conduct a "revenue/return analysis" not match prices).

### C.    No Plausible Allegation of Anticompetitive Harm.

Courts recognize that "the exchange of price data and other information among competitors *does not* invariably have anticompetitive effects." *Gypsum*, 438 U.S. at 441 n.16 (emphasis added). IPPs claim they have provided "econometric analyses that show significant increases in pork prices . . . that are unexplained by underlying movements in hog prices after the introduction of new Agri Stats sales reports in early 2009." Opp. 60. In support, IPPs present their Figure 5, which purports to analyze this "Hog-Composite Spread" across two broad periods (2000-2008 and 2009-2017):



Figure 5: Statistically Significant Break in Hog-Composite Spread Comparing Before and During Class Period

Opp. 60.  But what this highly-aggregated chart obscures is that – as reflected in IPPs'

Figure 4, which is alleged (IPP ¶¶127-28) to contain the same data underlying Figure 5 –

any alleged "spread" between pork and hog prices did not occur until 2015, *six years* "*after*

*the introduction of new Agri Stats sales reports in early 2009,*" Opp. 60 (emphasis added):



Figure 4: Hog-Composite Spread Widening During the Class Period

IPPs thus have no plausible basis to ascribe any purportedly anticompetitive effects to the

use of Agri Stats beginning in 2009.  *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,

2011 U.S. Dist. LEXIS 72764, at *41 (E.D. Cal. July 7, 2011) (dismissing a conspiracy

claim "because of remoteness in time between the acts and . . . anticompetitive effects"; there was "no 'link' between acts and anticompetitive effect" because "prices were not increased until three years later").

## VI.    THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' CLAIM.

Plaintiffs consume 63 pages arguing that public statements in earnings calls, public facts about market structure, and public USDA price data plausibly state a supply-reduction conspiracy claim.  They then shift gears in response to the limitations motion, arguing those same facts were hidden and could not have been discovered until a 2017 Bloomberg article about the chicken industry.  That does not work.  The same public facts Plaintiffs allege in support of their putative conspiracy claim confirm that the claim is time-barred.  Plaintiffs' response also confirms that they can plead no facts supporting the fraudulent-concealment or continuing-conspiracy doctrines.  Buzzwords and empty conclusions do not toll the limitations period.

### A.    Plaintiffs' Claims Accrued in 2009.

Antitrust claims accrue at the time of injury.  Mem. 55.  Plaintiffs attempt to hide behind the "discovery rule," Opp. 64 n.23, but "accrual in antitrust actions depends on the commission of the defendant's injurious act rather than on the plaintiff's knowledge of that act or the resulting injury."  *Granite Falls Bank v. Henrikson*, 924 F.2d 150, 153 (8th Cir. 1991), *overruled on other grounds*, *Rotella v. Wood*, 528 U.S. 549 (2000).[9]

---

[9]  *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1051 (8th Cir. 2000).

The Clayton Act limitations period is four years.  Plaintiffs allege their injuries first occurred in 2009.  Opp. 17.  Because they sued more than four years after 2009, this case should be dismissed absent facts alleging a tolling doctrine.  As explained below, Plaintiffs fail to allege those facts.

### B.    Plaintiffs Have Not Pleaded Fraudulent Concealment.

Plaintiffs must allege, with particularity under Rule 9(b): (1) affirmative steps to conceal Plaintiffs' cause of action; (2) failure to discover the action; and (3) due diligence in attempting to discover the claim.  Mem. 55.  Plaintiffs ask this Court to relax Rule 9(b) based on out-of-Circuit cases, Opp. 65, but the Eighth Circuit is clear that Rule 9(b) applies with full force to fraudulent concealment.  Mem. 56; *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011); *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997).

### 1.    There Are No Affirmative Acts of Concealment.

Plaintiffs must allege affirmative acts of concealment, separate from the putative conspiracy, designed to conceal the scheme.  Mem. 60.  On this element, Plaintiffs cite two categories of assertions from their Complaints, neither of which suffices.

*First*, Plaintiffs repeat boilerplate conclusions about supposed secret meetings, coded messages, and phone calls.  Opp. 68-69.  No details whatsoever.  These empty, generalized assertions are bereft of facts and could be pasted verbatim into any complaint. They do not plausibly suggest that any misrepresentation or concealment actually occurred and fail to satisfy Rule 9(b).  *Summerhill*, 637 F.3d at 880.

*Second*, Plaintiffs cite Defendants' public statements offering market-based reasons for pricing trends, asserting they were a cover-up preventing Plaintiffs from discovering collusion.  Opp. 69.  But market commentary is not active concealment.  *E.g., In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1085 (D. Minn. 2010); Mem. 61; *supra* 19 (noting legal duty to discuss market trends with investors).  And in any event, Plaintiffs concede they never heard or read the statements, and thus could not possibly have been misled or confused by them.  Opp. 74.

Plaintiffs' reliance on cases involving far more specific factual allegations underscores the deficiency of their claims of fraudulent concealment.  *Bulk Popcorn*, for example, involved rigged bids designed "to give the illusion of competition," along with detailed allegations about specific collusive conversations on specific dates.  *In re Bulk Popcorn Antitrust Litig.*, 1990 WL 123753, at *4-5 (D. Minn. June 19, 1990); Nelson Decl., Exs. 4-6 (*Popcorn* Complaints).  Similarly, Plaintiffs rely on *Monosodium*, with its allegations that "Defendants falsified travel and expense reports, used secret codes, orchestrated price increases to avoid arousing customers' suspicions, allocated customers." 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003).  That is concealment.  Plaintiffs' threadbare, boilerplate statements pale in comparison.

Plaintiffs' attempt to sidestep *Milk*, which Judge Magnuson decided seven years after *Popcorn*, is perplexing at best.  *Milk* rejected conclusory concealment assertions because (as here) they lacked specific facts, not because, as Plaintiffs suggest, a government investigation triggered inquiry notice.  *Milk*, 84 F. Supp. 2d at 1022-24; Nelson Decl., Ex. 7.  Similarly, Plaintiffs' reliance on *Anderson* does not advance their cause.  Opp.

69-70. That case involved a different statute with a limitations period triggered by the discovery rule – i.e., when a plaintiff knows or should know of a claim. *Anderson v. Dairy Farmers of Am., Inc.*, 2010 WL 1286181, at *5 (D. Minn. Mar. 29, 2010). In antitrust cases, the limitations period runs from the time of injury. Mem. 54.

## 2.   The Self-Concealing Conspiracy Doctrine Does Not Apply.

The self-concealing conspiracy doctrine does not apply for at least three reasons.

*First*, it is not the law. In the Eighth Circuit, a plaintiff must allege acts of concealment separate-and-apart from the conspiracy itself. *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990). District courts in this Circuit apply *Ripplinger* in antitrust cases and reject the self-concealing doctrine. Mem. 64. Plaintiffs ignore these cases and instead cite *United Power*, which predates *Milk* and *Monosodium* and ignores *Ripplinger*. Opp. 66-67. *United Power* is unreliable – as Judge Magnuson stated in *Monosodium*, "this Court has adopted the 'separate and apart' standard." 2003 WL 297287 at *3.[10]

*Second*, Plaintiffs compound that problem by arguing that antitrust conspiracies are "inherently self-concealing." Opp. 66 n.26. Some may well be, but not the one Plaintiffs purport to plead, which rests heavily upon purported public signaling. The blanket rule for which Plaintiffs advocate would eliminate the statute of limitations in *every* case alleging an antitrust conspiracy. No Circuit has ever adopted such a rule.

---

[10]   Plaintiffs rely on out-of-Circuit cases to argue that the self-concealing doctrine "is widely accepted." Opp. 67-68 n.27. That is untrue. Mem. 64 n.30.

*Third*, Plaintiffs cannot meet their Rule 9(b) pleading burden by asserting that the conspiracy "would not have worked if [Defendants] had not concealed it." Opp. 68. Again, that may be true in some cases, but not here where Plaintiffs purport to plead a conspiracy but allege no facts showing secret meetings, cover-ups, deceptive conduct, or any other fact reflecting concealment. Instead, Plaintiffs assert that merely "alleg[ing] that Defendants' conspiracy was, by its nature, 'self-concealing' . . . alone suffices at the pleading stage." Opp. 66. But reciting the buzzword "self-concealing" falls well short of any pleading standard. *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *4 (D. Conn. Sept. 7, 2005) (rejecting self-concealing doctrine when plaintiffs "alleged nothing more than the conclusion that the conspiracy here was 'inherently self-concealing'"). Any other rule would render the statute of limitations meaningless by allowing any plaintiff to type the words "self-concealing" into a complaint and sidestep the limitations period.

### 3. Plaintiffs Were Not Misled.

If Plaintiffs heard and were misled by Defendants' statements about market conditions and activities, their complaints would have said so. Mem. 62. Because the supposedly conspiratorial statements from Defendants' public earnings calls doom any claim of actual concealment, Plaintiffs argue that they were not aware of the earnings calls. Opp. 74. But Plaintiffs' head-in-the-sand approach means they cannot have been misled by the allegedly false statements from the very same earnings calls. In short, Plaintiffs allege that they missed the supposed cover-up and therefore could not have been misled, so they cannot now claim Defendants concealed anything from them.

32

Plaintiffs are left with an unexplained assertion that they could not discover the public facts in the Complaints until the 2017 Bloomberg article and the amended 2018 *Broiler* complaint.  Mem. 62-63.  This comes nowhere close to alleging that they were misled by Defendants in any way – particularly when the facts they rely upon were widely available from public sources.  Opp. 73; *Milk*, 84 F. Supp. 2d at 1024.

### 4.     Plaintiffs Did Not Exercise Due Diligence.

Plaintiffs did not investigate their claims before 2018.  Opp. 73-78.  Instead, they ask the Court to exempt them from any such obligation before 2017 or 2018, when the Bloomberg article and *Broiler* complaint were circulated.  *Id.*

The standard for inquiry notice, however, is well-established: "any activities which would create notice and 'excite attention' will require inquiry."  *Milk*, 84 F. Supp. 2d at 1024.[11]  And, specifically, where a plaintiff alleges that "prices were 'raised and stabilized . . . and price competition was substantially eliminated,'" "[that] fact alone would seem to excite attention and thus put Plaintiffs on inquiry notice."  *Id.*  Here, that starts in 2009. DPP ¶164 ("abnormal price movements" "[b]eginning in 2009"), 165 ("unprecedented increase in swine prices beginning in 2009").  Plaintiffs wrote the checks and thus knew they were paying prices they allege were "abnormal."  And the price and supply data cited in the Complaints, along with the statements from earnings calls, were publicly available. As one of Plaintiffs' cases notes, "[t]he party invoking fraudulent concealment is generally

---

[11]   Plaintiffs discuss the standard for inquiry notice in other Circuits.  Opp. 74-75.

considered to have constructive knowledge of publicly available information." *Abecassis v. Wyatt*, 902 F. Supp. 2d 881, 900 (S.D. Tex. 2012); Opp. 75 n.31. *See* Mem. 63-64.

Plaintiffs claim that the Bloomberg article and the *Broiler* complaint somehow tipped them off and caused them finally to inquire. But they have not identified any facts in those chicken-related documents that were not public for years or explained how they provided an impetus to investigate a case involving pork.[12]  Mem. 62-64. Nor do Plaintiffs rely on those documents to plead their case. Rather, they cite public facts from 2008-2013, including public statements by Agri Stats, statements in earnings calls, "Pork Powerhouses" sow herd reports in farm journals, and USDA pricing and production data. *Id.* 55-58. This wealth of public information, plus the purportedly "abnormal" pork prices Plaintiffs claim to have paid, was enough to "excite attention" and thus put Plaintiffs on inquiry notice in 2009. *Milk*, 84 F. Supp. 2d at 1024.

## C.    Plaintiffs' Allegations Contradict a Continuing Conspiracy.

All parties agree that the continuing-conspiracy doctrine would at most allow Plaintiffs to recover damages only for the four years before filing suit. Opp. 80; *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997). But Plaintiffs are not entitled even to seek

---

[12]  Plaintiffs claim no duty to investigate because they "had no knowledge that Agri Stats . . . was participating in the pork industry" before the 2018 complaint. This Court, however, has already recognized that Agri Stats is not the core of the conspiracy asserted, but merely, at best, a plus factor, and Plaintiffs repeatedly cite Agri Stats' public statements before 2018. *E.g.*, DPP ¶¶41-59. Finally, a plaintiff's lack of knowledge of every detail about a putative conspiracy does not obviate the duty to investigate. *Milk*, 84 F. Supp. 2d at 1024; Mem. 59.

damages for the last four years because they have not properly alleged a continuing conspiracy.

Plaintiffs allege no facts that evince anything untoward actually continuing. They allege no facts about supposed signaling on earnings calls or production cuts during the 2014-18 limitations period; all of those allegations are from 2009, 2010, and 2013.[13] Instead, the Complaints demonstrate massive production *increases* throughout the limitations period, DPP ¶¶119-132, and lack the "factual enhancement" to make plausible any supply-reduction conspiracy in 2014-18. *In re Pre-Filled Propane Tank Antitrust Litig.* ("*Propane I*"), 860 F.3d 1059, 1070 (8th Cir. 2017) (en banc). Without that factual support, Plaintiffs do not plead a continuing conspiracy. *Propane II*, 893 F.3d 1047, 1057 (8th Cir. 2018) (finding no continuing conspiracy even though the "complaints contain allegations detailing events in 2008 and through 2010 like those found sufficient in *Propane* [*I*]").

Plaintiffs' bald statement that the putative agreement continues "to the present," Opp. 81-82, does not suffice. Plaintiffs plead no supporting facts, and their generic conclusion is defective under *Twombly*. *Propane I*, 860 F.3d at 1070 (holding that plaintiffs must "list relevant individuals, acts, and conversations, providing 'factual content'" to plead a continuing violation). The statute of limitations would be meaningless if antitrust plaintiffs could avoid it by the expedient of baldly asserting that a putative conspiracy "continues to the present."

---

[13]   Plaintiffs concede the 2014 production drop was due to disease, not conspiracy. Order *10 n.4.

Plaintiffs also claim profits, margins, prices, and pork exports increased from 2014-18, Opp. 81-82. But as shown above, the Complaints concede that pork exports rose at an *equal or faster* rate before 2009 than after, thus negating any inference of a continuing conspiracy. Moreover, generic market statistics, untethered to the factors that affect them, do not support a claim of continuing conspiracy. *Supra* 35.

Plaintiffs also point to pork sales from 2014-2018, but those numbers do not indicate unlawful or continuing conduct. Plaintiffs must plead facts showing the putative conspiracy was operative when those sales occurred: "the issue is whether the amended complaint alleges that the conspiracy continued when the sales took place. If so, under *Klehr*, 'each sale to the plaintiff,' is an overt act that restarts the statute of limitations." *Propane I*, 860 F.3d at 1070. Without conspiracy facts from 2014-18, Plaintiffs cannot use sales during that time to extend their damages period.

The IPPs' information-sharing claim also does not trigger the continuing-conspiracy doctrine. Opp. 81, 83. The Court has recognized that subscribing to Agri Stats is not tantamount to joining a supply-reduction conspiracy; it is at most a plus factor. Order 18 n.7. Moreover, as shown above, no plaintiff group alleged facts showing an exchange of future projections, use of data to decide on output or price, or competitive harm. *Supra* Section V. The only alleged conduct within the limitations period is subscribing to benchmarking data. And as discussed in detail above, that is not enough to state an antitrust claim.

Finally, Plaintiffs attempt to circumvent their pleading obligation by suggesting Defendants must show an intervening act or withdrawal from the putative conspiracy to

avoid the continuing conspiracy doctrine.  Opp. 84 n.34.  Neither *Klehr* nor the *Propane* cases mention intervening acts or withdrawal.  Rather, Plaintiffs must allege facts suggesting the alleged conspiracy continued into the limitations period.  That they have failed to do.

***

Courts in this District have repeatedly dismissed antitrust claims barred by the statute of limitations at the pleading stage.  Mem. 53-54.  This Court should as well.

### **<u>CONCLUSION</u>**

Defendants respectfully submit that the Amended Complaints should be dismissed with prejudice.

37

Date:  March 13, 2020

Respectfully submitted,

*s/ Mark L. Johnson*
Mark L. Johnson (#0345520)
Virginia R. McCalmont (#0399496)
Davida S. McGhee (#0400175)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
vmccalmont@greeneespel.com
dwilliams@greeneespel.com

Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
Christina Briesacher (*pro hac vice*)
Christina Sharkey (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
christina.briesacher@kirkland.com
christina.sharkey@kirkland.com

**Counsel for Clemens Food Group, LLC**
**(formerly Hatfield Quality Meats, Inc.)**
**and The Clemens Family Corporation**

*s/ Richard A. Duncan*
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
Bryan K. Washburn (#0397733)
FAEGRE DRINKER BIDDLE & REATH
LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com
bryan.washburn@faegredrinker.com

**Counsel for Hormel Foods Corporation**
**and Hormel Foods, LLC**

s/ Jaime Stilson
Jaime Stilson (#392913)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
(612) 492-6746
stilson.jaime@dorsey.com

Britt M. Miller (*pro hac vice*)
Robert E. Entwisle (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

William H. Stallings (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000
wstallings@mayerbrown.com

**Counsel for Indiana Packers
Corporation**

s/ Donald G. Heeman
Donald G. Heeman (#286023)
Jessica J. Nelson (#347358)
Randi J. Winter (#391354)
SPENCER FANE LLP
150 South Fifth Street, Suite 1900
Minneapolis, MN 55402-4206
(612) 268-7000
dheeman@spencerfane.com
jnelson@spencerfane.com
rwinter@spencerfane.com

Stephen R. Neuwirth (*pro hac vice*)
Michael B. Carlinsky (*pro hac vice*)
Sami H. Rashid (*pro hac vice*)
Richard T. Vagas (*pro hac vice*)
David B. Adler (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com
michaelcarlinsky@quinnemanuel.com
samirashid@quinnemanuel.com
richardvagas@quinnemanuel.com
davidadler@quinnemanuel.com

**Counsel for JBS USA Food Company**

*s/ William L. Greene*
William L. Greene (#0198730)
Peter J. Schwingler (#0388909)
Jon M. Woodruff (#0399453)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
jon.woodruff@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

**Counsel for Seaboard Foods, LLC and
Seaboard Corporation**

*s/ John A. Cotter*
John A. Cotter (#134296)
John A. Kvinge (#0392303)
LARKIN HOFFMAN DALY &
LINDGREN LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, MN 55427-1060
(952) 835-3800
jcotter@larkinhoffman.com
jkvinge@larkinhoffman.com

Richard Parker (*pro hac vice*)
Josh Lipton (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
rparker@gibsondunn.com
jlipton@gibsondunn.com

Brian Robison (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3370
brobison@gibsondunn.com

**Counsel for Smithfield Foods, Inc.**

*s/ Aaron Chapin*
Aaron Chapin (#6292540)
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL  60606
(312) 655-1500
aaron.chapin@huschblackwell.com

Gene Summerlin (*pro hac vice*)
Marnie Jensen (*pro hac vice*)
Ryann Glenn (*pro hac vice*)
Kamron Hasan (*pro hac vice*)
Quinn Eaton (*pro hac vice*)
Sierra Faler (*pro hac vice*)
HUSCH BLACKWELL LLP
13330 California St., Suite 200
Omaha, NE 68154
(402) 964-5000
gene.summerlin@huschblackwell.com
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com
kamron.hasan@huschblackwell.com
quinn.eaton@huschblackwell.com
sierra.faler@huschblackwell.com

**Counsel for Triumph Foods, LLC**

*s/ David P. Graham*
David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

Rachel J. Adcox (*pro hac vice*)
Tiffany Rider Rohrbaugh (*pro hac vice*)
Jetta C. Sandin (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
AXINN, VELTROP &
HARKRIDER LLP
950 F Street, N.W.
Washington, D.C. 20004
(202) 912-4700
radcox@axinn.com
trider@axinn.com
jsandin@axinn.com
lstrang@axinn.com

**Counsel for Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc.**

_s/ Peter H. Walsh_
Peter H. Walsh (#388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
T. (612) 402-3000
F. (612) 402-3001
peter.walsh@hoganlovells.com

William L. Monts III (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

**Counsel for Agri Stats, Inc.**