# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN RE: BROILER CHICKEN GROWER LITIGATION<br><br>This Document Relates To All Cases | Case No. 6:17-cv-00033-RJS<br>The Honorable Robert J. Shelby |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' JOINT MOTION TO DISMISS UNDER**
**FEDERAL RULES OF CIVIL PROCEDURE 12(B)(2), (3), AND (6)**

# Table of Contents

I.    INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 3

    A.    The Structure of the Grower-Integrator Relationship ....................................... 3

    B.    The Grower Compensation System ................................................................. 3

    C.    Defendants' Anticompetitive Conspiracy ....................................................... 4

    D.    Additional Factors Rendering the Broiler Industry Conducive to Collusion ................. 5

III.    LEGAL STANDARD ......................................................................................... 6

IV.    ARGUMENT ...................................................................................................... 7

    A.    Plaintiffs Adequately Plead an Anticompetitive Conspiracy in Violation of Section 1 of the Sherman Act .......................................................................... 7

        1.    Plaintiffs plead a single, overarching anticompetitive Conspiracy consisting of two complementary and mutually reinforcing elements. ................................... 7

        2.    Plaintiffs sufficiently plead a Section 1 violation arising from the ISA ...................... 8

            a) The ISA allegations alone state a claim under the rule of reason ........................... 9

                i.    Defendants' agreement to participate in the Agri Stats program is an unlawful horizontal agreement under Section 1. ........................................ 9

                ii.    The information exchanged through the ISA is of the type that has traditionally raised concern of anticompetitive effects. ........................... 10

                iii.    The structure of the market for Grow-Out Services renders it susceptible to harm through information sharing by would be competitors. .............. 12

b) Defendants' arguments should be rejected. ............................................ 13

3.   Plaintiffs sufficiently plead a Section 1 violation arising out of the NPA. ............... 16

4.   Plaintiffs allege relevant plus factors. ......................................................... 19

5.   Defendants seek the application of an improper pleading standard for Plaintiffs' Section 1 claim. .................................................................................... 20

B.   Plaintiffs Adequately Plead Their PSA Claim .............................................. 21

1.   Plaintiffs Adequately Plead Their PSA Claim. .......................................... 21

2.   Plaintiffs' PSA claims are well-pleaded and consistent with Tenth Circuit precedent and the purpose of the PSA. ..................................................... 21

3.   The PSA's venue provision does not apply here. ....................................... 23

4.   PSA claims of non-resident Plaintiffs should not be dismissed under *Bristol-Myers*. 24

V.   CONCLUSION .................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Am. Column & Lumber Co. v. United States*,
    257 U.S. 377 (1921) ............................................................................... 11, 12

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ...................................................................... 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 6

*Been v. O.K. Industries, Inc.*,
    495 F.3d 1217 (10th Cir. 2007) .......................................................... 21, 22, 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................. 6, 7, 21

*B&R Supermarket, Inc. v. Visa, Inc.*,
    No. 16-cv-1150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) ........................... 19

*Bishop v. Oklahoma ex rel. Edmondson*,
    447 F. Supp. 2d 1239 (N.D. Okla. 2006) ......................................................... 24

*Bishop v. Oklahoma*,
    333 F. App'x 361 (10th Cir. 2009) ................................................................. 24

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*,
    137 S. Ct. 1773 (2017) ................................................................................. 25

*Bristow Endeavor Healthcare, LLC v. Blue Cross and Blue Shield Ass'n*,
    691 F. App'x 515 (10th Cir. 2017) ................................................................. 20

*Bruhn's Freezer Meats of Chicago, Inc. v. USDA*,
    438 F.2d 1332 (8th Cir. 1971) ...................................................................... 21

*Burda v. Wendy's Int'l, Inc.*,
    659 F. Supp. 2d 928 (S.D. Ohio 2009) ............................................................ 23

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) ......................................................................... 15

*Consolidated Metal Products, Inc. v. Am. Petroleum Inst.*,
    846 F.2d 284 (5th Cir. 1988) ........................................................................ 19

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ...................................................................................... 8

*De Jong Packing Co. v. USDA*,
    618 F.2d 1329 (9th Cir. 1980) ...................................................................... 21

*Erickson v. Pardus*,
   551 U.S. 89 (2007) .................................................................................................. 6

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013) ................................................................................... 6

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*,
   527 F. Supp. 2d 1257 (D. Kan. 2007) ................................................................... 7

*In re Animation Workers Antitrust Litig.*,
   123 F. Supp. 3d 1175 (N.D. Cal. 2015) ........................................................... 8, 16

*In re Automotive Parts Antitrust Litig.*,
   29 F. Supp. 3d 982 (E.D. Mich. 2014) ................................................................ 17

*In re Cathode Ray Tube*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) .............................................................. 18

*In re Dental Supplies Antitrust Litig.*,
   No. 16-cv-696, 2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) ........................... 18

*In re eBay Seller Antitrust Litig.*,
   545 F. Supp. 2d 1027 (N.D. Cal. 2008) .............................................................. 14

*In re Flat Glass Antitrust Litig. (II)*,
   Nos. 8-180, 11-658, 2012 WL 5383346 (W.D. Pa. Nov. 1, 2012) ......................... 8

*In re Fresh & Process Potatoes Antitrust Litig.*,
   834 F. Supp. 2d 1141 (D. Idaho 2011) ................................................................. 6

*In re High Tech Emp. Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................................................... *passim*

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) .............................................................. 16

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ............................................................................. 19

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010) ............................................................... 6

*In re Petroleum Prods. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ..................................................................... 8, 10, 11

*In re Processed Egg Prods. Antitrust Litig.*,
   206 F. Supp. 3d 1033 (E.D. Pa. 2016) ................................................................ 13

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008) .......................................................... 10, 18

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ........................................... 19

*Jackson v. MCI Telecomms., Corp.*,
   No. 92-2503-GTV, 1993 WL 408332 (D. Kan. Sept. 29, 1993) ........................................... 24

*Jicarella Apache Tribe v. Supron Energy Corp.*,
   728 F.2d 1555 (10th Cir. 1984) ........................................... 19

*Jojola v. Chavez*,
   55 F.3d 488 (10th Cir. 1995) ........................................... 14

*Khalik v. United Air Lines*,
   671 F.3d 1188 (10th Cir. 2012) ........................................... 6

*LaFlamme v. Societe Air France*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) ........................................... 18

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ........................................... 13

*Maple Flooring Mfrs. v. United States*,
   268 U.S. 563 (1925) ........................................... 14, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................... 20, 21

*Mitchael v. Intracorp., Inc.*,
   179 F.3d 847 (10th Cir. 1999) ........................................... 16

*Moya v. Shollenbarger*,
   465 F.3d 444 (10th Cir. 2006) ........................................... 14

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016) ........................................... 16

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
   524 F. Supp. 2d 1031 (N.D. Ill. 2007) ........................................... 22

*Peralta v. Church Mut. Ins. Co.*,
   No. CIV.10-414-C, 2010 WL 2471675 (W.D. Okla. June 16, 2010) ........................................... 23

*Premier Grp., Inc v. Bolingbroke*,
   No. 15-CV-01469-PAB-CBS, 2015 WL 4512313 (D. Colo. July 27, 2015) ........................................... 24

*Retrophin, Inc. v. Questcor Pharmaceuticals, Inc.*,
   41 F. Supp. 3d 906 (C.D. Cal. 2014) ........................................... 14

*Ridge at Red Hawk, L.L.C. v. Schneider*,
   493 F.3d 1174 (10th Cir. 2007) ........................................... 6

*Robbins v. Oklahoma*,
 519 F.3d 1242 (10th Cir. 2008) ............................................................ 6

*Schlottman v. Unit Drilling Co., LLC*,
 No. CIV-08-1275-C, 2009 WL 414054 (W.D. Okla. Feb. 18, 2009) .................... 24

*Superior Offshore Int'l, Inc. v. Bristow Group*,
 738 F. Supp. 2d 505 (D. Del. 2010) ................................................. 15, 16

*Swift & Co. v. United States*,
 393 F.2d 247 (7th Cir. 1968) ............................................................ 21

*Tarver v. Ford Motor Co.*,
 No. CIV-16-548-D, 2017 WL 3527710 (W.D. Okla. Aug. 16, 2017) ................... 25

*Telecor v. Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
 305 F.3d 1124 (10th Cir. 2002) ....................................................... 22

*Todd v. Exxon Corp.*,
 275 F.3d 191 (2d Cir. 2001) ...................................................... *passim*

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
 964 F.2d 1022 (10th Cir. 1992) .......................................................... 7

*United States v. Am. Linseed Oil Co.*,
 262 U.S. 371 (1923) ............................................................ 11, 14, 15

*United States v. Beachner Const. Co.*,
 555 F. Supp. 1273 (D. Kan. 1983) ........................................................ 7

*United States v. Container Corp.*,
 393 U.S. 333 (1969) .............................................................. *passim*

*United States v. U.S. Gypsum Co.*,
 438 U.S. 422 (1978) ............................................................. 9, 10, 11

*Vogel v. Am. Soc. of Appraisers*,
 744 F.2d 598 (7th Cir. 1984) ........................................................... 22

*Volentine v. Raeford Farms of Louisiana, LLC*,
 No. 09-CV-1865, 2010 WL 743557 (W.D. La. Feb. 24, 2010) ......................... 24

*W. Penn Allegheny Health Sys. v. UPMC*,
 627 F.3d 85 (3d Cir. 2010) .............................................................. 6

*Wilcox v. First Interstate Bank of Or., N.A.*,
 815 F.2d 522 (9th Cir. 1987) ....................................................... 11, 12

**Statutes**

7 U.S.C. § 182 ........................................................................... 2

7 U.S.C. § 192 ........................................................................................................ 21

7 U.S.C. § 197b ...................................................................................................... 23

7 U.S.C. § 202 .......................................................................................................... 1

15 U.S.C. § 1 .................................................................................................... 1, 7, 8

**Other Authorities**

81 Fed. Reg. 244 (proposed Dec. 20, 2016) (to be codified at 9 C.F.R. pt. 201) ....................... 24

Fed. R. Civ. P. 8 ...................................................................................................... 6

Fed. R. Civ. P. 9 .................................................................................................... 19

Fed. R. Civ. P. 12 .................................................................................................... 6

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles and Their Application, 4th Ed. (Aspen Pub. 2016) .................................... 8, 11, 17

Herbert Hovenkamp, The Antitrust Enterprise: Principle and Execution (Harvard Univ.
    2005) .................................................................................................................... 8

Delegation of the U.S., Org. for Economic Co-operation and Development, Note on
    Roundtable on Information Exchange Between Competitors Under Competition Law
    (October 21, 2010) ................................................................................................. 8, 9

Federal Trade Commission and Department of Justice Antitrust Division,
    Antitrust Guidance for Human Resources Professionals (October 2016) .......................... 5, 16

## I.     **INTRODUCTION**

Plaintiffs'[1] Consolidated Amended Class Action Complaint ("CAC") alleges that Defendants[2] engaged in a nationwide conspiracy (the "Conspiracy") that suppressed compensation to a proposed class of similarly situated growers of broiler chickens ("Growers" or the "Class") in violation of (a) Section 1 of the Sherman Act ("Section 1"), and (b) Section 202 of the Packers and Stockyards Act ("PSA"). Defendants are vertically integrated poultry companies ("Integrators").[3] They are by far the five largest Integrators, collectively contracting for over 60% of Grower services ("Grow-Out Services") in the United States. Plaintiffs are five Growers—one providing Grow-Out Services to each Defendant Family.

Defendants and their Co-Conspirators (the "Cartel") engaged in an overarching Conspiracy with the purpose and effect of limiting competition among Integrators for Grow-Out Services nationwide. As a result of this Conspiracy, the Cartel paid Growers less for Grow-Out Services. The Conspiracy was effectuated through two primary means. First, the "Conspiring Integrators," *i.e.*, Defendants and the Co-Conspirator Integrators, agreed to exchange current, non-public, confidential business information at a granular level, including data from which the Conspiring Integrators can ascertain each other's costs of operation as well as the base compensation paid to Growers at each individual Complex[4] (the "Information Sharing Agreement" or the "ISA"). The Conspiring Integrators use Agri Stats, Inc. ("Agri Stats"), a purported third-party data aggregation service, to collect, distribute, and effectuate the ISA. Second, the Conspiring Integrators agreed not to hire, recruit, or solicit each other's Growers (the "No Poach Agreement" or "NPA").

---

[1] "Plaintiffs" refers to all Plaintiffs named in the CAC. CAC ¶¶ 5-9.

[2] "Defendants" refers to all defendants named in the CAC. CAC ¶¶ 10-24. "Defendant Family" refers to all Defendants within each corporate group. The Defendant Families are "Tyson" (consisting of Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc.), "Pilgrim's Pride" (consisting of Pilgrim's Pride Corporation), "Perdue" (consisting of Perdue Farms, Inc.), "Koch" (consisting of Koch Foods, Inc. and Koch Meat Co., Inc.), and "Sanderson" (consisting of Sanderson Farms, Inc., Sanderson Farms, Inc., Sanderson Farms, Inc. (Food Division), Sanderson Farms, Inc. (Processing Division), and Sanderson Farms, Inc. (Production Division)).

[3] Vertically-integrated poultry companies are the principal entities in the poultry industry. These "Integrators" control virtually every aspect of poultry production, including breeding and hatching, producing feed, providing medicine and veterinary care for their birds, and then slaughtering and processing the birds. *See* CAC ¶ 45.

[4] As defined in the CAC, a "Complex" is a broiler processing plant operated by a vertically-integrated poultry company such as Defendants or the Co-Conspirators. CAC ¶ 50.

Through these independent but mutually reinforcing components, the Cartel limited Grower mobility and artificially suppressed compensation paid to all Growers.

This Conspiracy violates Section 1 and the PSA. As to Section 1, Defendants' motion to dismiss (the "Motion" or "Joint Mot.") challenges only whether the ISA and NPA are adequately pleaded when considered separately. But Plaintiffs allege a single Section 1 claim, and courts must examine the pieces of an anticompetitive course of conduct together, not broken into its component parts. Together, Plaintiffs' allegations state a Section 1 claim. Defendants' Motion does not assert otherwise.

But even analyzed separately, the CAC's allegations are more than sufficient as to each component. As to the ISA, Defendants assert that the CAC alleges only that the ISA is illegal *per se*. Not so. The CAC pleads an *overarching* horizontal Conspiracy under the *per se* standard, while alternatively setting forth all the facts necessary to state a standalone ISA claim under the "rule of reason" mode of analysis. As to the NPA, the Motion asserts that (a) Plaintiffs' allegations do not support an inference of agreement, and that, (b) contrary to the CAC, the low rate of Growers' switching Integrators is *exclusively* the result of high exit barriers for Growers. But, as shown below, the CAC alleges sufficient facts showing (a) an illegal agreement between Defendants not to poach each other's Growers, (b) that such agreement raised barriers to mobility among Growers above and beyond any naturally existing ones, and (c) that such artificial barriers had anticompetitive effects. Multiple courts have found NPAs to be antitrust violations where they restrict worker mobility and thereby suppress compensation, as the CAC alleges. Indeed, under well accepted antitrust law and economics, the existence of high natural barriers to Grower mobility makes the NPA *more plausible* because, under such circumstances, an NPA is more likely to be effective in shutting down competition.

Further, this Conspiracy violates the PSA. Under the PSA, Plaintiffs need only show that a poultry dealer[5] either (1) engaged in a practice that injured, or was likely to injure, competition, or (2) conspired, combined, agreed, or arranged with any other person to manipulate or control prices. The Conspiracy meets both criteria: the CAC alleges that (a) Defendants engaged in an

---

[5] A "live poultry dealer" is defined as "any person engaged in the business of obtaining live poultry by purchase under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another." 7 U.S.C. § 182(10). Defendants do not dispute that they are live poultry dealers under the PSA. As alleged in the CAC, the Conspiring Integrators are all live poultry dealers under the PSA.

overarching Conspiracy—including the NPA and ISA—to suppress Grower compensation, and that (b) this conduct injured (or, at the very least, is likely to injure) competition in the market for Grow-Out Services. These practices violate the PSA, individually and cumulatively.

In short, none of Defendants' arguments supports dismissal. At most, they suggest possible defenses—including alleged procompetitive justifications—that Defendants may pursue, if applicable, at summary judgment or trial. The Motion should be denied.

## II.   BACKGROUND

### A.   The Structure of the Grower-Integrator Relationship

Integrators enter into so-called contract farming arrangements ("CFAs") with Growers to care for broilers[6] prior to slaughter at the Integrators' Complexes. CAC ¶ 45. Growers provide land, labor, and utilities for the operation, and make substantial investments in grow-out facilities to meet the Integrators' specifications. *Id.* ¶¶ 53-55, 59, 91. Growers do not own the broilers, yet they bear the risk of loss while caring for broilers. Integrators control virtually every aspect of the broiler growing process including, *inter alia*: genetics of the broilers; amount, type and timing of broilers delivered to Growers; composition, amount and delivery schedule of the feed; distribution of medical services and medication; structure, temperature, ventilation, lighting duration, and other environmental aspects of grow-out facilities on the Growers' properties; and the time, method, and manner that broilers will be picked up for processing. *Id.* ¶¶ 52-53.

### B.   The Grower Compensation System

Each Integrator, including each Defendant, uses the same compensation system known as the "Tournament System." *See id.* ¶ 146. Under this system, Integrators begin with a common base compensation rate, and then compare Growers based on certain factors. *Id.* ¶ 147. Integrators pay the top-scoring Growers in each tournament pool a certain percentage above base compensation as an "incentive," and pay the low-scoring Growers a certain percentage below base compensation as a "disincentive." *Id.* ¶¶ 147-49. This is not a "profit sharing" system, however, because the total amount paid by Integrators to Growers does not increase based on overall Grower profitability or efficiency. Instead, each tournament pool's compensation is pegged to the base pay. *Id.* ¶¶ 143-50. Thus, when base pay changes, *all* Growers' compensation is affected. *See id.* ¶ 150.

---

[6] Broilers are young chickens bred for meat. CAC ¶ 45.

## C.  **Defendants' Anticompetitive Conspiracy**

To increase their profits, Defendants and the other Conspiring Integrators agreed to limit competition for Grow-Out Services through a Conspiracy involving two agreements. ***First***, Defendants agreed to share current, detailed, confidential competitive information with each other through Agri Stats, a private company whose "mission is '[t]o improve the bottom line profitability of [its] participants by providing accurate and timely comparative data.'" *Id.* ¶¶ 66-67. Conspiring Integrators agreed to share data on everything from costs and capacity for production to detailed Grower compensation information. *Id.* ¶¶ 69-70. As part of the ISA, Agri Stats compiles and then disseminates the data in such granular and disaggregated detail that any Cartel member can easily determine, for instance, what other Conspiring Integrators pay to each Grower. *Id.* ¶ 73.[7] Thus, "[t]he Cartel members are . . . able to constantly monitor each other's compensation levels to Growers and ensure that no Integrator is offering materially more in compensation than another." *Id.* ¶ 74. The ISA limits competition for Grow-Out Services, thereby limiting the incentive for Grower mobility because, armed with the shared data, the Conspiring Integrators do not compete for Grow-Out Services on compensation levels.[8] ***Second***, the Conspiring Integrators agreed not to hire, recruit, or solicit Growers from each other through the NPA. *Id.* ¶¶ 79-89. The NPA reduces competition for Grow-Out Services and, combined with the ISA, limits Growers' ability to switch to different Integrators. *Id.* ¶¶ 85, 93, 133, 141. The CAC recounts statements from Growers who were denied the opportunity to switch Integrators due to the "unwritten pact" among Integrators not to hire each other's Growers. *Id.* ¶¶ 80-84. The CAC also pleads data showing Growers' switching between Integrators is rarer than would be expected in a competitive market. *Id.* ¶¶ 87-88.

Overall, the Conspiracy suppresses competition for Grow-Out Services and limits Grower

---

[7] Defendants argue that Plaintiffs acknowledge that the data is anonymous and that "no specific factual allegations . . . support th[e] conclusion" that Integrators can disaggregate the data. Joint Mot. at 4. That is false. Although Agri Stats *purports* to anonymize this data, it is provided on such a granular basis that the Integrators ascertain the identity of the Integrator, Complex, and transactions with Growers. *Id.* ¶¶ 73-74.

[8] Notably, while Integrators agreed to share this compensation information among themselves, they do not share it with the Growers, who are subject to strict confidentiality provisions that prohibit them from sharing their own compensation information. *Id.* ¶ 64. This asymmetrical information sharing hinders Growers' ability to negotiate compensation or ascertain the market value for Grow-Out Services, while Conspiring Integrators use the information to eliminate competition for Grow-Out Services. *Id.* ¶¶ 63-64, 139-40.

mobility between Integrators, which, in turn, suppresses Grower compensation below competitive levels because it suppresses the Conspiring Integrators' willingness or need to outbid other Integrators for Grow-Out Services. In a competitive market, free from the effects of the Conspiracy, Integrators would compete for Grow-Out Services to retain and attract Growers. Absent the Conspiracy, such competition would inure to the benefit of all Growers because (1) each Integrator's base pay is virtually the same (or at a minimum, linked) regardless of geography, and (2) the Tournament System directly ties net compensation to base compensation. *See id.* ¶¶ 137-44. Thus, an increase in the base Grower compensation, as would happen in a competitive market absent the Conspiracy, would increase Growers' compensation universally.[9]

### D. Additional Factors Rendering the Broiler Industry Conducive to Collusion

The Conspiracy operates against the backdrop of a broiler industry characterized by numerous "plus factors" that render it susceptible to collusion, thus making the allegations in the CAC more plausible. Such factors include, *inter alia*: (1) high fixed costs of entry for potential new Integrators (CAC ¶¶ 91-92); (2) high industry concentration levels, specifically based on the market share of the Conspiring Integrators which purchase 98% of Grow-Out Services—with Defendants accounting for 60% of the market by themselves (*Id.* ¶¶ 69, 132); (3) high exit barriers for Growers, due to high debt levels (*Id.* ¶ 133); and (4) many opportunities to collude (*Id.* ¶¶ 102-23). The high fixed costs of entry for Integrators, high level of concentration, high exit barriers, and high debt levels of Growers combine to give the Conspiring Integrators a great deal of market power vis-à-vis Growers, and create the motive and ability to collude successfully. As a result, Growers cannot readily exit the industry because of high debt-financed investments, are forced to care for broilers within the confines of a CFA with a Conspiring Integrator, *id.* ¶ 100, and thus are highly susceptible to an Integrator Cartel.

---

[9] Absent collusion, certain Growers would have the ability to switch to different Integrators offering better compensation. *See id.* ¶ 140 ("'Sharing information with competitors about terms and conditions of employment' can be anticompetitive in that it decreases competition below competitive levels by allowing firms to match each other's compensation rather than compete for services by offering additional compensation.") (citing *Antitrust Guidance for Human Resources Professionals*, issued by DOJ's Antitrust Division and Federal Trade Commission ("DOJ Guidance") (Oct. 2016), available at https://www.justice.gov/atr/file/903511/download). Through the Tournament System, which pegs net Grower compensation to a universal base rate, if Integrators raise Grower compensation to attract those Growers willing or able to switch, compensation would necessarily increase for *all* Growers. CAC ¶¶ 141-50.

## III.   <u>LEGAL STANDARD</u>

Defendants fail to meet the high burden required by Fed. R. Civ. P. 12(b)(6),[10] under which a court "assume[s] the truth of the plaintiff's well-pleaded factual allegations and view[s] them in the light most favorable to the plaintiff." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). The proper inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not contain "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A judge must still "accept all allegations as true" and "may not dismiss on the ground that it appears unlikely the allegations can be proven." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "Thus, 'plausible' cannot mean 'likely to be true.' Rather, 'plausibility' in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claim across the line from conceivable to plausible.'" *Id.* (citing *Twombly*, 550 U.S. at 547).

Under *Twombly* (and its successor, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)), "Rule 8(a)(2) still lives," and "[s]pecific facts are not necessary; the [complaint] need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (citing *Erickson v. Pardus*, 551 U.S. 89 (2007)). Courts throughout the country have reject a heightened pleading requirement in anticompetitive conspiracy cases, instead applying Fed. R. Civ. P. 8. *Twombly*, 550 U.S. at 569 n.14; *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 n.3 (1st Cir. 2013) (*Twombly* "explicitly rejected a heightened pleading standard in antitrust cases"); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1163 (D. Idaho 2011) ("[*Twombly* and *Kendall*] do not impose the elaborate 'who-what-where-when' pleading requirement defendants insist upon.").[11]

---

[10] The Motion also references Rule 12(b)(2) (lack of personal jurisdiction) and Rule 12(b)(3) (improper venue) but those arguments are addressed solely to the Packers and Stockyards Act claim, discussed in Section IV.B.3 & IV.B.4, *infra*.

[11] *See also In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1008 (E.D. Mich. 2010) (denying motion to dismiss, even as "Defendants continue to sound the who, what, when and where refrain throughout their briefs"); *see also W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (rejecting that "judges presiding over antitrust and other complex cases must act as 'gate keepers,' and must subject pleadings in such cases to heightened scrutiny" as "squarely at odds with Supreme Court precedent").

IV.   **ARGUMENT**

   A. **Plaintiffs Adequately Plead an Anticompetitive Conspiracy in Violation of Section 1 of the Sherman Act.**

   Plaintiffs satisfy all elements of their Section 1 claim, which requires a plaintiff to show that the Defendants entered into any "contract, combination . . . , or conspiracy" that unreasonably restrains competition in the relevant market. *See* 15 U.S.C. § 1; *see also TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992). "The challenged agreement giving rise to a conspiracy need not be in writing or be explicit." *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1296-97, 1301 (D. Kan. 2007); *Twombly*, 550 U.S. at 553 (conspiratorial agreement may be "tacit or express"). Indeed, "[i]t is well settled that '[n]o formal agreement is necessary to constitute an unlawful conspiracy . . . . Clearly a tacit understanding created and executed by a long course of conduct is enough to constitute agreement, even without personal communication." *United States v. Beachner Const. Co.*, 555 F. Supp. 1273, 1281 (D. Kan. 1983), *aff'd,* 729 F.2d 1278 (10th Cir. 1984).

   1. **Plaintiffs plead a single, overarching anticompetitive Conspiracy consisting of two complementary and mutually reinforcing elements.**

   Plaintiffs allege that Defendants participated in an overarching Conspiracy not to compete for Grow-Out Services. The Conspiracy has two principal elements: (1) an agreement to share their sensitive business data including the compensation paid to Growers (the "ISA"), *see, e.g.*, CAC ¶¶ 66-78; and (2) an agreement not to hire Growers from other Conspiring Integrators (the "NPA"), *see, e.g., id.* ¶¶ 79-89, 138. These independent components bolster one another: the ISA permits Conspiring Integrators to coordinate Grower compensation levels to limit Growers' *incentive* to switch to different Integrators, while the NPA limits Growers' *ability* to switch. These agreements are coupled with certain "plus factors" increasing the plausibility of the Conspiracy. Together, this scheme suppresses Grower compensation and violates Section 1.

   Here, the information sharing has facilitated an overarching agreement not to compete for, and thereby suppress the price of, an input (Grow-Out Services) by enabling Cartel members to control and monitor the input prices. As in *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001), the overarching non-compete agreement is illegal *per se*, and the information sharing program is "an example of a facilitating practice that can help support an inference of a price-fixing

agreement."[12]

Defendants, however, mischaracterize Plaintiffs' allegations as two discrete agreements and compartmentalize the allegations, attacking them separately.[13] Although, as demonstrated below, each agreement states a Section 1 claim by itself, Supreme Court precedent mandates that the components of the Conspiracy be analyzed together in their full context. *See, e.g.*, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *In re High Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) ("In antirust conspiracy cases, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" (internal quotations omitted)).[14]

## 2. Plaintiffs sufficiently plead a Section 1 violation arising from the ISA.

In addition to the ISA being a facilitating practice for the Conspiracy, there is "a closely related but analytically distinct type of claim, also based on [Section 1], where the violation lies in the information exchange itself—as opposed to merely using the information exchange as evidence upon which to infer a price-fixing agreement." *Todd*, 275 F.3d at 198; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1436b2 (4th ed. 2017) ("Areeda") ("The information exchange itself embodies a conspiracy to

---

[12] *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 448 (9th Cir. 1990) (discussing condemnation of "practices which unjustifiably facilitate interdependent pricing and which can be readily identified and enjoined" (internal quotation marks omitted)); *In re Flat Glass Antitrust Litig. (II)*, Nos. 8-180, 11-658, 2012 WL 5383346, *3 (W.D. Pa. Nov. 1, 2012); *see also* Herbert Hovenkamp, *The Antitrust Enterprise* 131 (2005) ("[A]n agreement may be inferred from additional actions that firms take in order to make an oligopoly market more stable."); Note by Delegation of the U.S., Org. for Economic Co-operation and Development, *Roundtable on Information Exchange Between Competitors Under Competition Law* ¶¶ 3, 8-9 *available at* https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf.

[13] Defendants only analyze the components of the Conspiracy together when Defendants argue that "[if] Plaintiffs' [NPA] were true . . . then Defendants had no motive to enter Plaintiffs' [ISA] so they may 'constantly monitor' what other integrators are paying." Joint Mot. at 17. Not so. The two elements of the Conspiracy are both designed to prevent competition between Conspiring Integrators over Growers, and are thus consistent and mutually reinforcing.

[14] *See also In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1208 (N.D. Cal. 2015) ("Defendants' disagreements with Plaintiffs' characterizations or interpretations of certain factual allegations do not go to the sufficiency of Plaintiffs' allegations on a motion to dismiss.") (citation omitted); *id.* at 1212 (noting that "courts have generally rejected attempts by defendants to recharacterize a plaintiff's theory of an overarching conspiracy" and collecting cases).

meet or exchange, and that conspiracy may be illegal if unreasonable because it is likely to contribute to anticompetitive results without adequate justification."). In such cases, the "exchange of information is not illegal *per se*, but can be found unlawful under a rule of reason analysis." *Todd*, 275 F.3d at 198.[15] Here, even if the Court considers the ISA in isolation from the alleged Conspiracy, Defendants' program for sharing highly-detailed, regularly-updated, confidential business information enabled Integrators to suppress competition in the market for Grow-Out Services, and thus, violates Section 1 under the rule of reason.

### a)   The ISA allegations alone state a claim under the rule of reason.

The CAC sufficiently pleads a standalone Section 1 claim based on the ISA. First, the information exchanged through Agri Stats is, as set forth below, of the type that typically concerns courts because it is (1) current (or future), (2) specific and detailed, and (3) maintained confidentially. Second, the structure of the Broiler industry—*e.g.*, high concentration, fungible products, inelastic demand—is such that the exchange of such information was likely to, and did, reduce competition for Grow-Out Services and have anticompetitive effects. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (courts look to industry structure and nature of information exchanged "in divining the procompetitive or anticompetitive effects of this type of interseller communication").

### i.   Defendants' agreement to participate in the Agri Stats program is an unlawful horizontal agreement under Section 1.

The CAC pleads directly an agreement among would-be horizontal competitors to share detailed compensation and other information. CAC ¶ 2 ("[T]he Cartel members illegally agreed to share detailed data on Grower compensation with one another, with the purpose and effect of artificially depressing Grower compensation below competitive levels."); *see also id.* ¶ 66 ("Defendants and their Co-Conspirators have agreed to and have shared with themselves (but not with Growers) detailed Grower compensation information."). By agreeing to provide confidential business information to Agri Stats in exchange for receiving Conspiring Integrators' confidential business information, each Defendant engaged in illicit concerted action. In the context of agreements to exchange information, horizontal competitors engage in concerted action through the simple reciprocal act of sharing material information. In *United States v. Container Corp.*, 393

---

[15] *See* OECD Note, *supra* n.12, ¶ 9 ("[I]nformation exchanges likely to affect prices may, under certain circumstances, be illegal in and of themselves.").

U.S. 333 (1969), for example, the Supreme Court condemned an "informal" agreement characterized by "an infrequency and irregularity of price exchanges" between competitors. *Id.* at 335-38. "[A]ll that was present was a request by each defendant of its competitor" for recent price information and that the competitor "usually furnished the data with the expectation that it would be furnished reciprocal information when it wanted it." *Id.* at 335. The Court emphasized that sharing information creates an expectation of reciprocity: "when a defendant requested and received price information it was affirming its willingness to furnish such information." *Id.*; *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) ("[T]he exchange of price information alone can be 'sufficient to establish the combination or conspiracy, the initial ingredient of a violation of [Section 1].").

Here, each Co-Conspirator agreed to share its information through Agri Stats *because* the others had also agreed. Absent mutual agreement—especially of the Defendant Families who comprised 60% of the market—the program would have been worthless. *The point of the Agri Stats program was reciprocity*: No mutual commitment to exchange information, no program. Thus, by agreeing to provide information with the expectation of receiving the same, the Conspiring Integrators entered into an agreement in violation of Section 1. *See, e.g.*, CAC ¶¶ 66-78. The anticompetitive *purpose* of this mutual commitment is conceded in Defendants' moving papers: they exchange this information, which *includes Grower compensation* data, to "control their own costs," *which include Grower compensation*. Joint Mot. at 1.

## ii. The information exchanged through the ISA is of the type that has traditionally raised concern of anticompetitive effects.

The information exchanged among would-be horizontal competitors through Agri Stats is of the type that typically raises antitrust concern because the information is (1) current (or future), (2) specific and detailed, and (3) confidential or otherwise non-public. *See Todd*, 275 F.3d at 211-13. Such information is particularly likely to cause effective coordination and limit competition.

First, "[e]xchanges of current price information . . . have the greatest potential for generating anticompetitive effects." *U.S. Gypsum*, 438 U.S. at 441 n.16. Unlike historical business information, the exchange of current price information helps would-be competitors tacitly coordinate their pricing (or, as here, compensation) decisions. *See In re Petroleum Prods.*, 906 F.2d at 448 (discussing condemnation of "practices which unjustifiably facilitate interdependent

pricing and which can be readily identified and enjoined" (internal quotation marks omitted)).[16] This disruption of the ordinary competitive mechanism harms those, like Growers and consumers, who would stand to benefit from real competition. The CAC alleges an exchange of current and sometimes future information, including Grower compensation as well as cost, output and capacity information for all members of the Cartel on an individual basis. *See, e.g.*, CAC ¶¶ 69-71. This enabled the Conspiring Integrators to disrupt competition for Grow-Out Services, thereby suppressing compensation to Growers and reducing Broiler output. *Id.*; *see also U.S. Gypsum*, 438 U.S. at 441 n.16; *Todd*, 275 F.3d at 211.

Second, "[i]n addition to time frame, another factor courts look to [in evaluating the legality of information exchanges] is the specificity of the information." *Todd*, 275 F.3d at 212. Courts have repeatedly condemned as a Section 1 violation the sharing of granular, comprehensive, confidential business information, such as prices charged (current or in the past), costs of production and selling, production capacity, production volume and salary information. *See, e.g.*, *Container Corp.*, 393 U.S. at 336-37; *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 380-81 (1923); *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 394 (1921); *Todd*, 275 F.3d at 212. This, again, is because the more specific and the less anonymized the information, the easier it is for the would-be competitors to tacitly coordinate and avoid competing. Here, the information exchanged is precisely the type often condemned: the Cartel exchanged on a weekly basis current cost and price information, including data on the Integrators' flocks (including mortality and weight gain), feed and equipment used in grow-out facilities, transportation costs, operating profits, future capacity, facility locations, and—importantly—Grower compensation. CAC ¶¶ 69-72. Although Agri Stats purports to anonymize this data, it is provided on such a granular basis that the Integrators ascertain the identity of the Integrator, Complex, and transactions with Growers. *Id.* ¶¶ 73-74.

Third, courts are concerned when competitors exchange non-public information because it creates an information asymmetry that gives a buyers' cartel unfair bargaining power over its suppliers, allowing them to disrupt competition and suppress compensation. *Todd*, 275 F.3d at 213; *see also Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522, 526 (9th Cir. 1987) (distinguishing the exchange of private/confidential information (which *Container Corp.*

---

[16] *See also* Areeda, ¶ 2113e ("[W]e would consider direct interseller communications of current prices on specific transactions to be 'nearly naked' restraints.").

determined had an anticompetitive effect on the industry) from the exchange of public information (which does not raise similar concerns)). Here, Agri Stats and the Conspiring Integrators treat the information as highly confidential. It is not publicly available and not made available to Growers. CAC ¶ 75. Conspiring Integrators have insuperable leverage over the Growers with whom they deal because of the information asymmetry caused by the ISA, which enables them to suppress compensation below the levels obtainable in a competitive market. *Id.*

### iii. The structure of the market for Grow-Out Services renders it susceptible to harm through information sharing by would be competitors.

The market for Grow-Out Services is particularly susceptible to an anticompetitive ISA because it is (1) highly concentrated, (2) involves fungible products, and (3) is subject to inelastic demand. *See Todd*, 275 F.3d at 208.

First, with respect to market concentration, courts focus on the percentage of the market that is subject to the information sharing program; the higher the participating market share, the more susceptible the market is to anticompetitive harm through information sharing. Concentration matters because it makes tacit coordination among participants easier and renders the effects of the interdependent horizontal coordination more widespread. *See, e.g.*, *Container Corp.*, 393 U.S. at 342 (18 firms with 90% of market); *Am. Column*, 257 U.S. at 410 (365 firms with 33% of market); *Todd*, 275 F.3d at 208-09 (14 firms comprising 80%-90% of market). As alleged in the CAC, the market for Grow-Out Services is highly concentrated. The Conspiring Integrators account for 98% of Broiler production within the U.S., CAC ¶ 69, with Defendant Families comprising over 60%. *Id.* ¶ 46. This high-degree of concentration makes the ISA more likely to cause anticompetitive harm by (1) making it easier for Conspiring Integrators to tacitly coordinate compensation to Growers (among other costs and prices), (2) limiting Growers' ability to avoid the competitive harm by switching Integrators (which is further limited by the NPA), and (3) magnifying the output reduction due to the high market share subject to the ISA.

Second, information sharing among buyers of fungible products or services is more likely to cause anticompetitive harm because it is easier for co-conspirators to tacitly coordinate the prices they offer when price (and not other qualitative factors) is the primary basis of competition. *Todd*, 275 F.3d at 209. In a case relating to compensation, such as this, the relevant inquiry is "whether jobs at the various [Defendants] were comparable, or fungible enough so that the defendants could have used the exchanged information as part of a tacit conspiracy to depress salaries." *Todd*, 275 F.3d at 209. As alleged in the CAC, "Grow-Out Services are fungible.

Growers care for Broilers using Integrators' own birds, feed, and medicine. Growers bring to the table labor, investment capital, and land that are largely homogenous." CAC ¶ 101. In other words, Defendants have used the fungibility of Grow-Out Services, in the context of the ISA, to avoid competing for Growers, which depressed compensation and reduced output.

Third, information sharing is more likely to cause anticompetitive harm where demand for the product or service is inelastic because inelastic demand reduces the bargaining power of sellers (here Growers). Demand is inelastic when a seller (*e.g.*, a Grower) cannot hold out for some period of time for a better price from the buyer (*e.g.*, an Integrator). *See Todd*, 275 F.3d at 210. Where "the supply at issue is the labor of the [plaintiff] employees," the demand is often inelastic because "[l]abor is an extremely perishable commodity—an hour not worked today can never be recovered." *Id.* at 209 (internal citation and quotation marks omitted). Here, the demand for Grow-Out Services is inelastic. *See* CAC ¶¶ 90, 93-100. Growers typically have enormous overhead, often financed by debt, which renders them particularly ill-suited to hold out against well-capitalized Integrators when negotiating compensation. *Id.*

In sum, due to the nature of the information exchanged through Agri Stats and the structure of the broiler industry, the ISA caused anticompetitive harm in three ways. First, it facilitated tacit compensation coordination and thereby suppressed Grower compensation to levels lower than they would have been absent the information sharing. *Id.* ¶¶ 137, 139-40, 144. Second, the conduct reduced output of broilers. *Id.* ¶ 145. Third, the conduct raised prices of broilers to consumers. *Id.* These allegations are sufficient to state a standalone Section 1 claim under the rule of reason.

### b)  Defendants' arguments should be rejected.

Defendants ignore the long-standing legal precedent and the many allegations demonstrating that the ISA enabled Co-Conspirators to suppress Grower compensation. Instead, Defendants focus on two arguments that should be rejected.

First, Defendants contend that the CAC alleges only a *per se* illegal Section 1 information sharing claim. Joint Mot. at 12-13. But as explained above, while Plaintiffs allege that the Conspiracy as a whole—*i.e.*, including the NPA—is illegal *per se*, Plaintiffs' allegations as to the ISA state a claim under the rule of reason.[17]

---

[17] Defendants erroneously rely on *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007), and *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033 (E.D. Pa. 2016), for the proposition that the ISA should not be treated as *per se* illegal simply because it is part of a

Defendants then try to back-door purported procompetitive justifications for their anticompetitive conduct (*i.e.*, that the ISA is mere "benchmarking" that enables Defendants "to produce chickens as efficiently as possible").[18] Joint Mot. at 1, 2, 4, 12. But adjudicating whether the challenged conduct is, on balance, procompetitive or anticompetitive is a fact intensive inquiry not appropriate now. *See, e.g.*, *Retrophin, Inc. v. Questcor Pharmaceuticals, Inc*., 41 F. Supp. 3d 906, 918 (C.D. Cal. 2014) (existence of valid business justification ordinarily a fact question); *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal.) ("A procompetitive benefit may rebut a prima facie case. However, to survive dismissal Plaintiffs are required only to establish a prima facie case.").[19] Moreover, "benchmarking" can be illegal under the Sherman Act—even where it may allow producers to lower costs—if the industry structure and the nature of the information exchanged are such that competition is harmed. *See, e.g.*, *Am. Linseed*, 262 U.S. at 380-81. In short, the CAC more than sufficiently alleges a claim under the rule of reason.[20]

---

larger *per se* illegal conspiracy. But as discussed herein, the ISA should be considered as both a facilitating practice for an illegal horizontal agreement not to compete, which is illegal *per se*, and as an anticompetitive agreement standing on its own, which is illegal under the rule of reason.

[18] Incongruously, while Defendants argue that Plaintiffs fail even to *allege* a claim under the rule of reason, Defendants also challenge Plaintiffs' rule of reason allegations. For example, in a footnote, Defendants assert without support or explanation, that the CAC "alleges a highly-implausible nationwide market for Grower services." Joint Mot. at 11 n.6. Not so. Plaintiffs' allegations amply support nationwide anticompetitive impact in a nationwide market, CAC ¶¶ 2, 129, 134-38, 141-43, and Defendants provide no contrary rationale. Even if Defendants had attacked Plaintiffs' relevant market allegations, that argument would fail because Rule 12(b)(6) is an inappropriate means of adjudicating fact-based issues like relevant market. *See, e.g.*, *Todd*, 275 F.3d at 199 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

[19] Although it is Defendants' burden to prove any procompetitive justifications, Plaintiffs allege there were no "countervailing procompetitive benefits" to the information sharing. *Id.* ¶ 138. Any legitimate procompetitive justifications—if there are any—must await summary judgment because they are outside the four corners of the CAC. *See, e.g.*, *Moya v. Shollenbarger*, 465 F.3d 444, n.16 (10th Cir. 2006) ("It is well-established . . . that in determining whether to grant a motion to dismiss, [courts] are limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint." (quoting *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995))).

[20] Defendants cite *Maple Flooring Mfrs. v. United States*, 268 U.S. 563 (1925), an appeal from a district court injunction, as purportedly blessing their information sharing as procompetitive. Joint Mot. at 12-13. But, in *Maple Flooring*, the information exchanged had none of the tell-tale signs of an illegal agreement. Unlike here, the information was summarized by the trade group and shared so that it could not be disaggregated by manufacturer, and it was disseminated to the public, including to buyers of the manufacturers' products. *Id.* at 566. Additionally, there was no evidence

Second, Defendants contend that Plaintiffs' Section 1 claim should be dismissed for failure to plead either direct or circumstantial evidence of an illegal agreement. Joint Mot. at 14-17. This is wrong legally and factually. As set forth above, Plaintiffs allege that (1) each Defendant and Conspiring Integrator agreed to provide confidential, current, granular cost information to Agri Stats with the expectation that other Conspiring Integrators will do the same and for the purpose of controlling Grower compensation, (2) the nature of the shared information made it likely that the exchange would (and did) cause effective coordination, and limit competition, among potential competitors, and (3) the broiler industry conditions are conducive to effective collusion, which increases the plausibility of the other allegations. *See* Discussion, *supra* Part IV.A.2.a.i-iii. *See also* CAC ¶¶ 2, 66-78, 148.

Defendants further argue that the ISA's operation through third party Agri Stats negates the conspiracy. Joint Mot. at 14. Not so. The use of a third party to gather and disseminate information is a hallmark of illegal information sharing programs. For example, in *American Linseed*, the defendants—all competitors in linseed processing—sent confidential business information to a third-party, "Armstrong Bureau of Related Industries," which operated "a so-called 'exchange' through which one subscribing manufacturer may obtain detailed information concerning the affairs of others doing like business." 262 U.S. at 380. The Bureau provided this service for other industries, and while all linseed processors agreed with the Bureau to be part of the program, there was no evidence that they had agreed *with each other* to use the Bureau. Nevertheless, the Court found that the information exchange violated Section 1. *Id.* at 389. That is, regardless of the formal structure, the defendants exchanging information via the Bureau "[o]bviously . . . were not bona fide competitors." *Id.* Here, each Conspiring Integrator provided information to Agri Stats so as to receive its would-be competitors' confidential sales information, thereby restricting competition rather than engaging as "bona fide competitors."[21]

_____

that the information sharing had any effect on "prices, production, and competition in the flooring industry." *Id.* at 567-68, 575-76.

[21] Defendants cite *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011), for the irrelevant proposition that "mere exchange of information through benchmarking is not unlawful." Joint Mot. at 14. *Burtch* involved sporadic exchanges involving a single insolvent customer, that were not part of any formal program, and which did not support an anticompetitive purpose that harmed competition in the relevant market. Defendants also rely on *Superior Offshore Int'l, Inc. v. Bristow Group*, 738 F. Supp. 2d 505 (D. Del. 2010), Joint Mot. at 16, for a similar proposition—namely, that in the absence of "any specific concerted exchange" of price information, the mere sharing of

### 3. Plaintiffs sufficiently plead a Section 1 violation arising out of the NPA.

Plaintiffs also plead the NPA pursuant to which the Conspiring Integrators agreed not to hire each other's Growers. Such agreements are anticompetitive where, as here, they reduce competition for labor thereby suppressing wages. *See, e.g.*, *Animation Workers*, 123 F. Supp. 3d at 1214; *High-Tech*, 856 F. Supp. 2d at 1122-23; *see also* DOJ Guidance, *supra* n.9 ("Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws.").

The CAC alleges that all Defendants subscribed to an "unwritten pact" not to (1) solicit or recruit Growers from one another, or (2) hire Growers from each other. *See, e.g.*, CAC ¶¶ 79-89.[22] Specifically, the CAC pleads the NPA with four types of allegations: First, the CAC alleges direct evidence of the NPA through several statements of Growers, each of whom was apprised of the agreement or became aware of it when he or she was denied the opportunity to switch. *See, e.g.*, *id.* ¶ 80 (citing letter to USDA from Tyson Grower regarding statement from Peco Foods employee that Tyson and Peco had an NPA); *id.* ¶¶ 82-84 (quoting DOJ workshop testimony by Growers regarding the NPA). Second, the CAC alleges circumstantial evidence, including that Growers rarely switch between Integrators and that such switches only occur when the Integrator losing the

---

information is not actionable. Joint Mot. at 16. *Superior Offshore* is inapposite because the court found that plaintiff had "set[] forth no facts permitting an inference that the data shared *had any impact on pricing decisions*." 738 F. Supp. 2d at 516. Here, by contrast, the essence of the information-sharing Section 1 claim is that, given the structure of the industry and the nature of the information exchanged, the information sharing itself had a direct effect on Grower compensation. *See* CAC ¶¶ 139-40. Defendants also cite *Mitchael v. Intracorp., Inc.*, 179 F.3d 847 (10th Cir. 1999), Joint Mot. at n.7, which reviewed a *summary judgment* decision concerning the sharing of the amount of fees chiropractors charged. Importantly, the alleged conspiracy was that insurance companies used those fee thresholds to fix compensation to chiropractors, but chiropractors as a group got to determine the fees they charged. Thus, the insurers were sharing information on other entities' prices, over which the insurers lacked price-setting authority.

[22] Defendants argue that the NPA allegations fail because no Plaintiff alleges that it attempted to switch and was denied. Joint Mot. at 8-9. This argument is a *non sequitur*. Plaintiffs do not allege they were harmed because they were unable to switch. Instead, Plaintiffs allege that by reducing the mobility of the Growers, the NPA broadly suppresses compensation across the market. *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1206-10 (N.D. Cal. 2013) (crediting expert analysis showing that no-poach agreements suppressed the compensation of an entire class of technology workers even though very few of them even sought to move between companies); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 303-04 (N.D. Cal. 2016)(crediting documentary evidence and expert report demonstrating that "anti-solicitation agreements and collusive communications resulted in suppressed compensation that affected all class members.").

Grower stands to benefit (such as when an Integrator has too many Growers or is closing a Complex). *See, e.g.*, CAC ¶¶ 85-88. Third, the CAC alleges that, *e.g.*, industry structure and conditions render the market susceptible to effective collusion. *See supra*, Part II.D. Fourth, Plaintiffs allege the ISA, which is, in part, a facilitating practice to the NPA, demonstrating that Defendants had a cooperative relationship instead of one characterized by competition. Taken together, these allegations are more than sufficient to plead the NPA.

Defendants assert that the high barriers for Growers seeking to move between Integrators (due to, *e.g.*, certain Integrator-specific requirements imposed by Cartel members) is an "obvious, alternative explanation" to the allegations of the NPA, making the NPA unnecessary and thus implausible. Joint Mot. at 7, 8. Defendants effectively ask: "If switching was already difficult, why would Defendants need to make it even more difficult?" The answer is that the more competition is restricted, the less Growers get paid (and the more money the Integrators keep as profits). And, indeed, antitrust law makes clear that high natural exit (or entry) barriers makes an illicit agreement more plausible, *not less*, because such barriers make it more likely that an illicit agreement to suppress competition would be successful. *See In re Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 996 (E.D. Mich. 2014) (finding the pleaded highly concentrated market with "high barriers to entry 'facilitate the formation and maintenance of a cartel'"); *see also* Areeda, ¶ 941a ("The effect of significant entry [or exit] barriers is to enable a . . . cartel or oligopoly persistently to maintain higher than competitive prices while yet deterring immediate entry that would drive prices back to the competitive level."). In any event, determining whether the low observed rate of switching is solely because of the high exit barriers, or whether, as alleged, the NPA contributed to that low rate is inappropriate on a Rule 12 motion.

After arguing that the relative *absence* of switching makes the NPA implausible, Defendants next assert that the *existence* of switching makes the NPA implausible. Joint Mot. at 8. Defendants assert that, "Plaintiffs . . . admit that Growers do switch Integrators, usually when doing so is 'accompanied by a benefit to an Integrator'—*e.g.*, solving the problem of 'too many Growers under contract.'" Joint Mot. at 8 (misquoting the CAC) (emphasis omitted). Defendants omit the crux of the allegation. The CAC alleges that, under the NPA, Growers are only permitted to switch Integrators when doing so "is accompanied by a benefit ***to the Integrator the Grower is leaving***," not just "***an Integrator***" as Defendants assert. *Compare* CAC ¶ 88 *with* Joint Mot. at 8. In a competitive market, without the NPA, Integrators would hire one another's Growers

17

regardless of whether the competitor Integrator losing the Grower stood to benefit; indeed, in a world where Integrators were not coordinating, depriving a rival of an important resource would be a benefit to the acquiring Integrator. That supposedly rival Integrators appear to be protecting each other is precisely the sort of "anomalous behavior" that supports a claim's plausibility. *See* Joint Mot. at 8 ("*Twombly* contemplates a 'factually suggestive' context involving **some sort of anomalous behavior** on the part of defendants.") (quoting *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010)) (emphasis in original).

Defendants further argue that Plaintiffs have not adequately alleged which Defendants were involved in the NPA. Joint Mot. at 7. Defendants are wrong: Plaintiffs allege that *all Defendants* (and the alleged Co-Conspirators) participated in a multilateral NPA as part of the overarching Conspiracy. *See* CAC ¶¶ 3, 79, 138. But courts "do not require plaintiffs in complex . . . antitrust cases to plead detailed, defendant-by-defendant allegations; instead they require plaintiffs to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *In re Cathode Ray Tube*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010); *see also SRAM*, 580 F. Supp. 2d at 904 (argument that "Plaintiffs have failed to allege how each individual Defendant participated in the alleged conspiracy" failed because it "rel[ied] upon the standard for a motion for summary judgment").

Further, Plaintiffs allege that a Tyson Grower was denied the opportunity to switch to a Conspiring Integrator due to the Grower's relationship with Tyson. *Id.* ¶ 80. Plaintiffs also allege that other Growers who operated in areas serving multiple Integrators were unable to switch Integrators due to the "unwritten pact" between the Integrators. *See id.* ¶¶ 81-84 (Growers' statements concerning Integrators' "unwritten pact," "written [sic] rule," and refusal to "cross the lines to [recruit a Grower]"). These allegations are more than sufficient. *See In re Dental Supplies Antitrust Litig.*, No. 16-cv-696, 2016 WL 5415681, at *4 (E.D.N.Y. Sept. 28, 2016) ("Defendants are correct that [the anti-poaching agreement allegations] are less developed at this stage than others[, and although, t]his particular allegation has minimal detail, and that detail only involves [two of the three defendants,] the allegations in the [complaint] in its entirety are enough to merit further exploration through discovery."); *see also High Tech*, 856 F. Sup. 2d at 1121 (denying motion to dismiss because, "[i]n light of Plaintiffs' specific allegations concerning the industry-wide procompetitive effects of cold calling recruiting practices, it is plausible to infer that even a single bilateral agreement would have the ripple effect of depressing the mobility and

compensation of employees of companies that are not direct parties to the agreement").

**4. Plaintiffs allege relevant plus factors.**

Contrary to Defendants' assertion, Joint Mot. at 9-11, Plaintiffs plead numerous "plus factors," which, considered together with the other allegations, make Plaintiffs' Conspiracy claims more plausible. First, Defendants dispute the probity of "opportunity evidence," such as, *e.g.*, that Cartel members had multiple opportunities to collude at trade association meetings, or that the movement of top executives created such opportunities. Joint Mot. at 9-11. But courts have repeatedly held that meetings between rivals creating the opportunity for collusion, make a conspiracy more plausible, particularly where other plus factors are well-pleaded. *See B&R Supermarket, Inc. v. Visa, Inc.*, No. 16-cv-1150, 2016 WL 5725010, at *8 (N.D. Cal. Sept. 30, 2016) (concluding that allegations regarding the opportunity to collude, while not sufficient alone, support the plausibility of an impermissible conspiracy); *High Tech*, 856 F. Supp. 2d at 1118 (quoting *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1561 (10th Cir. 1984) (observing that overlapping board membership "may indicate an opportunity to conspire")).[23] And Plaintiffs go beyond naked allegations of trade association meetings, alleging numerous specific meetings, including those organized by Agri Stats, which facilitated the ISA.

Plaintiffs also allege that the Conspirators "permit high level employees to regularly move between companies *without non-compete limitations or confidentiality agreements* that would

---

[23] Defendants rely on *American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1285-86 (11th Cir. 2010), for the proposition that opportunity evidence related to trade association participation "provides no indications of conspiracy." Joint Mot. at 9. *American Dental*, however, was a RICO case subject to the heightened Fed. R. Civ. P. 9(b) pleading standard. Defendants' related citation to *Consolidated Metal Products, Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988), Joint Mot. at 9, is also inapposite because it was a summary judgment decision in which the plaintiff, after two years of fact discovery, "offer[ed] no evidence tending to show a conspiracy[,]" instead just claiming that the defendant-trade association was a "walking conspiracy." *See id.* Finally, Defendants suggest that Plaintiffs' allegations amount to "participation in a trade association" being anticompetitive. *See* Joint Mot. at 9-10 (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010). But Plaintiffs do not allege that merely participating in trade association meetings is illegal. Rather Plaintiffs' point is that the Conspiring Integrators had the opportunity to reach and discuss the NPA (and ISA) at those meetings, which makes Plaintiffs' allegations as to the overarching Conspiracy, the NPA, and the ISA more plausible under well-established law. If hypothetically the Co-Conspirators had never met or spoken with each other, Defendants would use that as evidence that the Conspiracy is implausible. Conversely, the fact that they interact repeatedly makes Conspiracy more likely.

protect a company's (seemingly) proprietary business knowledge and customer base." CAC ¶ 78 (emphasis added). Thus, the CAC pleads more than mere movement of executives, but instead that such movement occurs in anomalous fashion in which supposed competitors appear unconcerned about their competitors' confidential business information. Second, Defendants argue that the remaining allegations concerning "plus factors" are insufficient because each, without more, cannot make a conspiracy plausible. *See, e.g.*, Joint Mot. at 11. But there *is* "more." Indeed, all the other "plus factors" *and* the other well-pled allegations in the CAC (including the ISA) are the "more" required to infer an agreement.

### 5. Defendants seek the application of an improper pleading standard for Plaintiffs' Section 1 claim.

Defendants argue that the CAC fails to answer purportedly essential questions—who, did what, to whom (or with whom), where and when—necessary to meet Plaintiffs' pleading burden for both the alleged NPA and the alleged ISA. *See, e.g.*, Joint Mot. at 2, 5. But Plaintiffs do plead the Conspiracy and its elements with specificity. Regarding the ISA, the CAC alleges who (each of them), did what (agreed to share confidential information), where (through Agri Stats), when (from at least 2008 through the present), and why (to limit Growers' incentives to switch Integrators and thereby suppress wages). CAC ¶¶ 66-78. Indeed, Defendants do not even deny that each of them shared information with each other through Agri Stats with the expectation of reciprocity that was built into the very nature of the Agri Stats exchange. That is sufficient by itself to infer an agreement. As to the NPA, Plaintiffs plead who (the Defendants and Conspiring Integrators), what (agreed not to recruit, solicit, or hire each other's Growers), where (nationwide) and when (since at least 2008), and why (to limit Growers' ability to switch Integrators and thereby suppress Grower compensation). CAC ¶¶ 79-89. Plaintiffs need only plead facts from which an agreement may plausibly be inferred. *See* Discussion, *supra* Section VI.A.1.[24] Plaintiffs plead non-

---

[24] Defendants' reliance on *Bristow Endeavor Healthcare, LLC v. Blue Cross and Blue Shield Ass'n*, 691 F. App'x 515 (10th Cir. 2017), Joint Mot. at 5, is misplaced. Unlike here, the *Bristow* plaintiffs alleged a vertical non-price restraint between their direct competitor health system and an insurance carrier that resulted in the carrier declining to make a plaintiff an in-network provider. Such non-price vertical restraints are examined to determine whether the agreement has or is likely to create, increase, or facilitate the exercise of market power. The Tenth Circuit observed that the insurance carrier defendants "had no rational economic motive to conspire." *Bristow*, 691 F. App'x at 519 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986)). Absent any economically rational allegations for why the insurance carrier defendants would have engaged in the alleged anticompetitive agreement, the Tenth Circuit required additional allegations

conclusory allegations that raise "enough facts to raise a reasonable expectation that discovery will reveal evidence' to support the allegation." *Twombly*, 550 U.S. at 556.

## B. Plaintiffs Adequately Plead Their PSA Claim

### 1. Plaintiffs Adequately Plead Their PSA Claim.

Plaintiffs satisfy each element of the PSA. "Although intended to be broader than antecedent antitrust legislation, [the PSA] 'nonetheless incorporates the basic antitrust blueprint of the Sherman Act and other pre-existing antitrust legislation.'" *Been v. O.K. Industries, Inc.*, 495 F.3d 1217, 1228 (10th Cir. 2007) (quoting *De Jong Packing Co. v. USDA*, 618 F.2d 1329, 1335 n.7 (9th Cir. 1980)). The PSA makes it unlawful for "any live poultry dealer with respect to live poultry, to . . . (e)ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device," 7 U.S.C. § 192(a), or "conspire, combine, agree, or arrange with any other person . . . to manipulate or control prices," *id.* § (f)(3). Thus, to state a claim under these provisions of the PSA, a plaintiff must show that a poultry dealer (such as one of the Defendants) either (1) engaged in a practice that injured competition or was likely to injure competition in violation of Section 192(a), or (2) conspired, combined, agreed, or arranged with any other person to manipulate or control prices in violation of Section 192(f)(3). *Been*, 495 F.3d at 1230.[25]

### 2. Plaintiffs' PSA claims are well-pleaded and consistent with Tenth Circuit precedent and the purpose of the PSA.

The CAC pleads with specificity that (a) the Conspiracy was likely to and did injure competition in the market for Grow-Out Services, and (b) that Defendants conspired to manipulate and/or control prices in that market, thus stating a claim for violation of the PSA. "The lack of competition between buyers, with the attendant possible depression of producers' [*i.e.*, Growers'] prices, was one of the evils at which the Packers and Stockyards Act was directed." *Swift & Co. v. United States*, 393 F.2d 247, 154 (7th Cir. 1968); *see also Bruhn's Freezer Meats of Chicago, Inc. v. USDA*, 438 F.2d 1332, 1337 (8th Cir. 1971). Here, Plaintiffs allege that Defendants engaged in

---

to demonstrate plausibility; namely who at the insurance carrier made the agreement, what was agreed to, or why the insurance carrier agreed to harm itself. *Id.* at 520. Here, by contrast, Plaintiffs set forth the rational economic motives of all Defendants, namely, that each was able to suppress compensation to their Growers and thereby reduce their expenses and increase profits. Neither *Bristow* nor antitrust jurisprudence requires a plaintiff pleading conduct in the defendants' economic interests to plead these "who, what, when, and why" facts.

[25] The PSA standard is more lenient than Section 1 because the PSA does not require injury to competition, only conduct that "is *likely to* injure competition." *See Been*, 495 F.3d at 1230.

an overarching Conspiracy not to compete for Grow-Out Services, which carries "the attendant possible depression of [Growers'] prices" in violation of the PSA.

*Been v. O.K. Industries* compels denial of Defendants' Motion. In *Been*, the Tenth Circuit found that an Integrator with market power is a threat to competition. 495 F.3d at 1231. Here, the CAC alleges that Defendant Integrators (through the Conspiracy) collectively possessed monopsony power in the market for Grow-Out Services, and that this Conspiracy enabled Defendants to manipulate the price of Grow-Out Services. CAC ¶¶ 136; *see also Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("Just as a sellers' cartel enables the charging of monopoly prices, a buyers' cartel enables the charging of monopsony prices."); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1040 (N.D. Ill. 2007) ("This is because a buyers' cartel is the mirror image of a sellers' cartel; the harm caused is not artificially raised prices for consumers, but rather artificially lowered prices for sellers.").

*Been* recognizes that an Integrator with monopsony power—like the Cartel has collectively acquired here through the Conspiracy—will lower compensation to Growers and raise broiler prices: "According to economists, without competition from other buyers, a monopsonist will lower prices paid to sellers, which over time results in higher consumer prices." 495 F.3d at 1231. In other words, a group of poultry processors that collude to enhance monopsony power "will lower prices paid to sellers," thereby injuring both poultry producers (*i.e.*, Growers) and end-users (*i.e.*, consumers). *Id.*; *see also Telecor v. Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1136 (10th Cir. 2002) (explaining that depression of prices can injure both producers and consumers because "[s]ome producers will either produce less or cease production altogether, resulting in less-than optimal output of the product or service, and over the long run higher consumer prices, reduced product quality, or substitution of less efficient alternative products").

*Been* explains that Integrators with monopsony power—or, as here, a group of Integrators collectively exercising monopsony power—utilize that market power to affect prices:

> [I]n the vertically integrated poultry market, a processor with a monopsony need not wait for poultry growers to produce less to increase prices on the wholesale market because the processor also controls the growers' supply. It may simply deliver fewer chicks to the growers, pay them the same low prices, and resell at the same or higher price. When this happens, both the growers and the end-users are adversely affected. That is, by manipulating prices to suppliers, a monopsonist threatens to injure the end-users.

*Been*, 495 F.3d at 1232. As alleged in the CAC, Defendants' Conspiracy not to compete for Grow-

Out Services, which was effectuated through the ISA and the NPA, enhanced the Cartel's monopsony power. The lower prices paid to Growers for their services ultimately reduces the output of broilers, which in turn, increases prices consumers pay for broilers. *Been* found the mere likelihood of these effects violates the PSA. The same reasoning applies here.[26]

### 3. The PSA's venue provision does not apply here.

Defendants argue that because Plaintiffs do not allege that *their* CFAs were performed in this District, venue is not proper for Plaintiffs' PSA claims pursuant to the PSA's venue provision. Joint Mot. at 20 (citing 7 U.S.C. § 197b(a)). Defendants are wrong.

The PSA's venue provision is not applicable. The statute states, "[t]he forum for resolving any dispute among the parties to a poultry growing arrangement . . . that arises out of the arrangement or contract shall be located in the Federal judicial district in which the principle part of the performance takes place under the arrangement or contract." 7 U.S.C.A. § 197b(a). Thus, to apply, the dispute must (1) be among the parties to a CFA, and (2) arise out of the CFA. Neither element is present here. First, the dispute here goes beyond "the parties to a CFA" because each Plaintiff (and Class member) is (or was) a party to a CFA with *one* Integrator, but all Plaintiffs and Class members assert the PSA claim against *all* Defendants for the anticompetitive Conspiracy. Thus, this is not simply a "dispute among the parties to a CFA." Second, Plaintiffs' PSA claims do not arise out of the CFA. Plaintiffs do not allege that the contracts form the basis of the Conspiracy, nor do Plaintiffs seek to enforce any provision of a CFA. Rather, the CAC alleges an anticompetitive conspiracy that exists irrespective of the terms of any CFA. *See Burda v. Wendy's Int'l, Inc.*, 659 F. Supp. 2d 928, 938 (S.D. Ohio 2009) (finding that the contract did not confer the power on defendants to take the actions that form the basis of the plaintiffs' antitrust claims).

But even if the PSA's venue provision did apply—and it does not—the PSA claims would still be properly brought in this District. First, venue would be proper here under the doctrine of

---

[26] Defendants' attack on Plaintiffs' PSA claims mischaracterizes the allegations. Specifically, Defendants posit that "the [CAC] offers only conclusory statements that Defendants' information exchange has 'artificially reduced the compensation of all Growers below levels that would have prevailed in its absence.'" Joint Mot. at 18 (citing CAC ¶ 144). Defendants are wrong. Here, as set forth above, *supra* Part IV.A., the Conspiracy, NPA, and ISA, each injure (or at the very least are likely to injure) competition by inhibiting Grower mobility, suppressing compensation to Growers, and reducing output (and thereby raising prices) to consumers. Defendants challenge these facts and others in the CAC, but such efforts are more properly reserved for trial. *See Peralta v. Church Mut. Ins. Co.*, No. CIV.10-414-C, 2010 WL 2471675, at *1 (W.D. Okla. June 16, 2010) ("A motion to dismiss is not the proper vehicle for a factual challenge.").

pendent venue, which provides that "when two or more federal claims are brought and venue is properly laid as to one claim, [] venue will support the adjudication of the other related claim." *Jackson v. MCI Telecomms., Corp.*, No. 92-2503-GTV, 1993 WL 408332, at *2 (D. Kan. Sept. 29, 1993).[27] The exercise of pendent venue is based on judicial discretion considering the relatedness of the claims, judicial economy, convenience and fairness. *Id.* As set forth in Plaintiffs' Opposition to Defendants Koch and Sanderson's Motion to Dismiss for Lack of Personal Jurisdiction and Venue ("Jurisdiction and Venue Opposition"), filed contemporaneously herewith, venue is proper in this district for Plaintiffs' Section 1 claims. Thus, the pendent venue doctrine makes venue proper for Plaintiffs' PSA claims based on the relatedness of the claims (they are based on the same nucleus of operative facts), and recognition that in such circumstances requiring the PSA claims to be brought elsewhere defeats concepts of judicial economy, convenience, and fairness.

Second, the venue restriction was intended to benefit Growers, not Integrators, and cannot be invoked by Defendants against the wishes and interests of Plaintiffs. According to the division of the Department of Agriculture responsible for administering the PSA, the venue provision was enacted to protect the Grower/producers, not the Defendant Integrators:

> The 2008 Farm Bill added section 209, *Choice of Law and Venue*, to the P&S Act… **Due to the differences in resources between the live poultry dealer, swine contractor or packer and the poultry grower, swine production contract grower or livestock producer, the growers and producers are at a disadvantage if required to travel great distances to resolve disputes**.[28]

Therefore, regardless whether the PSA's venue provision applies, venue is proper in this district.

**4.   PSA claims of non-resident Plaintiffs should not be dismissed under *Bristol-Myers*.**

Finally, Defendants argue that if the Court dismisses Plaintiffs' Section 1 claim, the PSA claims brought by non-Oklahoma residents must also be dismissed for lack of personal jurisdiction. Joint Mot. at 20-21. In particular, Defendants argue that in the absence of a Section 1 claim, the Court cannot exercise general jurisdiction over Defendants, as none is incorporated in

---

[27] *See also Premier Grp., Inc v. Bolingbroke*, No. 15-CV-01469-PAB-CBS, 2015 WL 4512313, at *9 (D. Colo. July 27, 2015); *Schlottman v. Unit Drilling Co., LLC*, No. CIV-08-1275-C, 2009 WL 414054, at *2 (W.D. Okla. Feb. 18, 2009); *Bishop v. Oklahoma ex rel. Edmondson*, 447 F. Supp. 2d 1239, 1254-55 (N.D. Okla. 2006), *rev'd in part on other grounds sub nom. Bishop v. Oklahoma*, 333 F. App'x 361 (10th Cir. 2009).

[28] Unfair Practices and Undue Preferences in Violation of the Packers and Stockyards Act, 81 Fed. Reg. 244 (proposed Dec. 20, 2016) (to be codified at 9 C.F.R. pt. 201) (emphasis added); *see also Volentine v. Raeford Farms of Louisiana, LLC*, No. CIV.A.09-CV-1865, 2010 WL 743557, at *3 (W.D. La. Feb. 24, 2010) ("The provision . . . favors the farmer or producer.").

Oklahoma, and none operates in Oklahoma as its principal place of business. Joint Mot. at 21. Further, Defendants argue that the Court cannot exercise specific jurisdiction over the Defendants, as the non-Oklahoma resident claims have no connection to Oklahoma. *Id.* This argument is based on a misapplication of the recent decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017). It should be rejected.

As discussed in Plaintiffs' Jurisdiction and Venue Opposition (at 3-10), this Court has specific jurisdiction over each Defendant based on the Oklahoma long-arm statute, and the fact that each Defendant participated in a Conspiracy that affected Growers nationwide, including in Oklahoma. Defendants' suggestion that *Bristol-Myers* held that "a court cannot exercise specific jurisdiction over defendants where plaintiffs' claims do not arise out of defendants' conduct in the forum state," Joint Mot. at 21, mischaracterizes the holding. Indeed, *Bristol-Myers* is a "straightforward application . . . of settled principles of personal jurisdiction," *Bristol-Myers*, 137 S. Ct. at 1783, which support jurisdiction in this District. *See* Jurisdiction and Venue Opposition at 3-10. Moreover, *Bristol-Myers* expressly does not apply to personal jurisdiction asserted by federal courts in federal question cases. 137 S. Ct. at 1777.[29]

In short, there is jurisdiction over all Defendants under the basic principles of due process, and *Bristol-Myers* does not change that analysis here.

## V.   CONCLUSION

Plaintiffs sufficiently allege claims under the Sherman Act and the PSA, and thus, Defendants' Motion should be denied.

---

[29] As one court in this Circuit has already noted, "the Court's decision in *Bristol-Myers* 'concern[ed] the due process limits on the exercise of personal jurisdiction by a State,' and 'le[ft] open the question of whether the Fifth Amendment imposes the same restrictions on . . . a federal court.'" *Tarver v. Ford Motor Co.*, No. CIV-16-548-D, 2017 WL 3527710, at *3 n. 3 (W.D. Okla. Aug. 16, 2017) (citing *Bristol-Myers*, 137 S. Ct. at 1784).

Dated: October 23, 2017

/s/ Larry D. Lahman
Larry D. Lahman, OBA #5166
Roger L. Ediger, OBA #19449
Carol Hambrick Lahman, OBA # 11330
Scott E. Cordell, OBA #31522
MITCHELL DECLERK
202 West Broadway Avenue
Enid, OK 73701
Telephone: (580) 234-5144
Facsimile: (580) 234-8890
Email: ldl@mdpllc.com
Email: carollahman@gmail.com
Email: rle@mdpllc.com
Email: sec@mdpllc.com

*Additional Class Counsel for Plaintiffs and the Proposed Class*

Michael D. Hausfeld*
James J. Pizzirusso*
Melinda R. Coolidge*
HAUSFELD, LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: jpizzirusso@hausfeld.com
Email: mcoolidge@hausfeld.com

Gary I. Smith, Jr.*
HAUSFELD, LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270
Facsimile: (215) 985-3271
Email: gsmith@hausfeld.com

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

Eric L. Cramer*
Patrick F. Madden*
Christina Black*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: ecramer@bm.net
Email: pmadden@bm.net
Email: cblack@bm.net

Daniel J. Walker*
BERGER & MONTAGUE, P.C.
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
Email: dwalker@bm.net

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

M. David Riggs
Donald M. Bingham
Kristopher Koepsel
RIGGS ABNEY NEAL TURPEN ORBISON & LEWIS
502 West Sixth Street
Tulsa, OK 74119
Telephone: (918) 699-8914
Facsimile: (918) 587-9708
Email: driggs@riggsabney.com
Email: don_bingham@riggsabney.com
Email: kkoepsel@riggsabney.com

William A. Edmondson, OBA #2628
RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS
528 N.W. 12th Street
Oklahoma City, OK 73103
Telephone: (405) 843-9909
Facsimile: (405) 842-2913
Email: dedmondson@riggsabney.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

27

Vincent J. Esades*
HEINS MILLS & OLSON, PLC
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
Email: vesades@heinsmills.com

Warren T. Burns*
BURNS CHAREST, LLP
900 Jackson Street, Suite 500
Dallas, TX 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
Email: wburns@burnscharest.com

Gregory Davis*
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Telephone: (334) 832-9080
Facsimile: (334) 409-7001
Email: gldavis@knology.net

Charles D. Gabriel*
CHALMERS, BURCH & ADAMS, LLC
North Fulton Satellite Office
5755 North Point Parkway, Suite 96
Alpharetta, GA 30097
Telephone: (678) 735-5903
Facsimile: (678) 735-5905
Email: cdgabriel@cpblawgroup.com

Larry S. McDevitt*
David M. Wilkerson*
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Telephone: (828) 258-2991
Facsimile: (828) 257-2767
Email: lmcdevitt@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com

Harlan Hentges (OBA #17911)
HENTGES & ASSOCIATES, PLLC
102 East Thatcher Street

Edmond, OK 73034
Telephone: (405) 340-6554
Facsimile: (405) 340-6562
Email: harlan@organiclawyers.com

John C. Whitfield*
Caroline Taylor*
WHITFIELD BRYSON & MASON, LLP
19 North Main Street
Madisonville, KY 42431
Telephone: (270) 821-0656
Email: john@wbmllp.com
Email: caroline@wbmllp.com

Gary E. Mason*
WHITFIELD BRYSON & MASON, LLP
5101 Wisconsin Avenue, NW
Suite 305
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
Email: gmason@wbmllp.com

J. Dudley Butler*
BUTLER FARM & RANCH LAW GROUP, PLLC
499-A Breakwater Drive
Benton, MS 39039
Telephone: (662) 673-0091
Facsimile: (662) 673-0091
Email: jdb@farmandranchlaw.com

Daniel M. Cohen*
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC 20016
Telephone: (202)789-3960
Facsimile: (202)789-1813
Email: Danielc@cuneolaw.com

David S. Muraskin*
PUBLIC JUSTICE, PC
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 861-5245
Facsimile: (202) 232-7203

29

Email: dmuraskin@publicjustice.net

Hollis Salzman *
Kellie Lerner*
ROBINS KAPLAN, LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
Email: HSalzman@RobinsKaplan.com
Email: KLerner@RobinsKaplan.com

Aaron Sheanin*
ROBINS KAPLAN, LLP
2440 West El Camino Real
Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
Email: ASheanin@RobinsKaplan.com

M. Stephen Dampier*
LAW OFFICES OF M. STEPHEN DAMPIER, P.C.
55 North Section Street
P.O. Box 161
Fairhope, AL 36532
Telephone: (251) 929-0900
Facsimile: (251) 929-0800
Email: dampier.steve@gmail.com


*Additional Class Counsel for Plaintiffs and the Proposed Class*


*\* Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2017, I electronically submitted the attached document to the Clerk of the Court for filing using the ECF system for filing.

/s/ *Larry D. Lahman*
Larry D. Lahman