UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

In Re:  Pork Antitrust        )    File No. 18CV1776
Litigation                    )    19CV1578 & 19CV2723
                              )         (JRT/HB)
                              )
                              )
                              )    Minneapolis, Minnesota
                              )    May 13, 2020
                              )    2:08 P.M.
                              )
                              )
------------------------------------------------------------


BEFORE THE HONORABLE CHIEF JUDGE JOHN R. TUNHEIM
UNITED STATES DISTRICT COURT JUDGE
**(MOTIONS HEARING VIA VIDEO CONFERENCE)**

<u>APPEARANCES</u>

| | |
|---|---|
| For Plaintiffs in Wanda Duryea, et al.: | Lockridge Grindal Nauen PLLP<br>BRIAN D. CLARK, ESQ.<br>JOSEPH BRUCKNER, ESQ.<br>100 Washington Avenue South<br>Suite 2200<br>Minneapolis, MN 55401 |
| | Pearson Simon & Warshaw<br>BOBBY POUYA, ESQ.<br>800 LaSalle Avenue<br>Suite 2150<br>Minneapolis, MN 55402 |
| | Gustafson Gluek PLLC<br>DANIEL C. HEDLUND, ESQ.<br>120 South Sixth Street<br>Suite 2600<br>Minneapolis, MN 55402 |
| | Hagens Berman Sobol Shapiro<br>STEVE BERMAN, ESQ.<br>SHANA E. SCARLETT, ESQ.<br>715 Hearst Avenue<br>Suite 202<br>Berkeley, CA 94710 |
| | Cuneo Gilbert & LaDuca, LLP<br>ALEC BLAIN FINLEY, ESQ.<br>4725 Wisconsin Avenue NW<br>Suite 200<br>Washington, DC 20016 |
| For Plaintiffs in Winn-Dixie Stores, Inc., et al.: | Ahern and Associates, P.C.<br>PATRICK AHERN, ESQ.<br>590 North Sheridan Road<br>Lake Forest, IL 60045 |
| For Plaintiffs in Commonwealth of Puerto Rico: | Schneider Wallace Cottrell Konecky Wotkns<br>KYLE G. BATES, ESQ.<br>2000 Powell Street<br>Suite 1400<br>Emeryville, CA 94608 |

```
 1      For Defendant Triumph      Husch Blackwell
        Foods:                     VOLLIS GENE SUMMERLIN, ESQ.
 2                                 13330 California Street
                                   Suite 200
 3                                 Omaha, NE 68154

 4
        For Defendant JBS USA:     Spencer Fane LLP
 5                                 DONALD G. HEEMAN, ESQ.
                                   100 South Fifth Street
 6                                 Suite 1900
                                   Minneapolis, MN 55402
 7
                                   Quinn Emanuel Urquhart &
 8                                 Sullivan
                                   STEPHEN R. NEUWIRTH, ESQ.
 9                                 SAMI H. RASHID, ESQ.
                                   51 Madison Avenue
10                                 22nd Floor
                                   New York, NY 10010
11

12      For Defendant             Gibson Dunn & Crutcher
        Smithfield Foods:          RICHARD G. PARKER, ESQ.
13                                 1050 Connecticut Avenue NW
                                   Washington, DC 20036
14
                                   Gibson Dunn & Crutcher
15                                 BRIAN EDWARD ROBISON, ESQ.
                                   2100 McKinney Avenue, Ste 1100
16                                 Dallas, Texas 75201

17
        For Defendant Agri        Hogan Lovells US, LLP
18      Stats:                     JUSTIN BERNICK, ESQ.
                                   WILLIAM LEITZSEY MONTS, III, ESQ
19                                 555 13th Street NW
                                   Washington, DC 20004
20

21      For Defendant Tyson       Axinn Veltrop & Harkrider LLP
        Foods:                     TIFFANY RIDER ROHRBAUGH, ESQ.
22                                 950 F Street NW, 7th Floor
                                   Washington, DC 20004
23

24

25
```

```
 1     For Defendant Clemens      Kirkland & Ellis, LLP
       Food Group:                CHRISTA C. COTTRELL, ESQ.
 2                                CHRISTINA HENK BRIESACHER, ESQ.
                                  300 North LaSalle
 3                                Chicago, IL 60654

 4
       For Defendant Seaboard     Stinson Leonard Street, LLP
 5     Foods LLC:                 PETER J. SCHWINGLER, ESQ.
                                  WILLIAM L. GREENE, ESQ.
 6                                50 South Sixth Street
                                  Suite 2600
 7                                Minneapolis, Minnesota 55402

 8
       For Defendant Hormel       Faegre Baker Daniels LLP
 9     Foods:                     RICHARD A. DUNCAN, ESQ.
                                  90 South 7th Street, Ste 2200
10                                Minneapolis, MN 55402

11
       For Defendants Indiana     Dorsey & Whitney, LLP
12     Packers and Mitsubishi:    JAIME STILSON, ESQ.
                                  50 South Sixth Street, Ste 1500
13                                Minneapolis, MN 55402

14                                Mayer Brown LLP
                                  BRITT M. MILLER, ESQ.
15                                71 South Wacker Drive
                                  Chicago, IL 60606
16

17

18

19

20

21

22

23

24

25
```

1                              **2:08 P.M.**

2

3                    **(In open court via video conference.)**

4              THE COURT:  All right.  I believe we're ready to

5     begin.  Good afternoon, everyone.  This is Civil Case

6     Number 18-1776, Wanda Duryea, et al, versus Agri Stats,

7     Inc., et al; Civil Case Number 19-1578, Winn-Dixie Stores

8     versus Agri Stats, Inc.; and Civil Case 19-2723, the

9     Commonwealth of Puerto Rico versus Agri Stats, Inc., et al.

10             We're going to go through and have counsel note

11    appearances by Ms. Arent-Zachary.  Go ahead.

12             THE CLERK:  Okay.  Starting with plaintiffs, I

13    will read your name, and just say present or here or some

14    variation.  In the lead case, we have Alec Finley.  Not

15    hearing you.  You may be muted.

16             UNKNOWN SPEAKER:  Ma'am, may I break in?  I'm not

17    hearing Judge Tunheim.  I don't know if any of us on the

18    bridge are.

19             THE CLERK:  That's unfortunate, but you can hear

20    me fine?  Oh, they can't hear us.  Why can't they hear us?

21    Oh, wait.

22             MR. HEDLUND:  I wasn't hearing, either.  It looks

23    like it's maybe on mute.

24             THE CLERK:  We are -- you're muted?  We're going

25    to go off the record.

1              **(Off-the-record discussion.)**

2

3              **(In open court via video conference.)**

4              THE COURT:  All right.  I believe we're now on.

5     Again, let me apologize for looking like I'm looking off

6     into the distance.  It's the camera angle in the courtroom

7     for video conference that is causing this.  I actually am

8     looking directly at you with the big screen here in front

9     of me.

10             So can you hear me okay?

11             MS. MILLER:  Yes, Your Honor.

12             THE COURT:  Okay.  All right.  We'll start again

13    here.  This is Civil Case Number 18-1776, Wanda Duryea, et

14    al, versus Agri Stats, Inc., et al; and we also have Civil

15    Case Number 19-1578, Winn-Dixie Stores, Inc., versus Agri

16    Stats, Inc.; and we have Civil Case Number 19-2723, the

17    Commonwealth of Puerto Rico versus Agri Stats, Inc., and

18    there are, of course, are other plaintiffs and defendants

19    other than the initial ones listed in each case.

20             We're going to go through and have each counsel

21    note their appearances.  Rather than have you do it

22    individually, I am going to have Ms. Arent-Zachary say your

23    name, and if you would quickly unmute and say present, then

24    we will get everyone's name down for the record.

25             THE CLERK:  Okay.  I'll start again.  On the

1    plaintiffs' side, Alec Finley?

2              MR. FINLEY:  Alec Finley [indiscernible due to

3    audio interruption] for plaintiffs.

4              THE COURT:  Mr. Finley, the ear buds do not work

5    well with this media.

6              MR. FINLEY:  Understood.  I will switch to

7    headphones or earphones.

8              THE COURT:  Thank you.  Daniel Hedlund?

9              MR. HEDLUND:  Here.  Good afternoon.

10             THE CLERK:  Steve Berman?  I believe Mr. Berman

11   is with us.  If you are speaking, you may be muted.

12             THE COURT:  He's muted.

13             THE CLERK:  Mr. Berman, I see that you are muted

14   but you --

15             MR. BERMAN:  Yes, I'm here.  Sorry.

16             THE CLERK:  It's hard to get used to this.  Shana

17   Scarlett?

18             THE COURT:  She is there.

19             THE CLERK:  Yeah, you are also muted.

20             MS. SCARLETT:  Here.  Can you hear me now?

21             THE CLERK:  Yes.  Barely.

22             Okay.  Brian Clark?

23             MR. CLARK:  Yes.  Good afternoon.

24             THE CLERK:  W. J. Bruckner?

25             MR. BRUCKNER:  Yes.  Joe Bruckner, good

```
 1    afternoon, everybody.
 2              THE CLERK:  Bobby Pouya.
 3              MR. POUYA:  Present.
 4              THE CLERK:  And I think that's -- wait for
 5    plaintiffs, Patrick Ahern?
 6              MR. AHERN:  Present.
 7              THE CLERK:  And Kyle Bates.
 8              MR. BATES:  Here.  Good afternoon, Your Honor.
 9              THE CLERK:  And I believe that's everyone for
10    plaintiffs.  Is there anyone I missed?
11              Okay.  For defendants, this is in order by firm.
12    Tiffany Rider Rohrbaugh?
13              MS. ROHRBAUGH:  Present.
14              THE CLERK:  Jaime Stilson.
15              MS. STILSON:  Jaime Stilson, and I'm here.
16              THE CLERK:  It's Jaime.
17              MR. STILSON:  Yeah.
18              THE CLERK:  Richard Duncan?
19              MR. DUNCAN:  Yes.  Present.  Good afternoon.
20              THE CLERK:  Thank you.  Richard Parker?
21              MR. PARKER:  Present.  Good afternoon.
22              THE CLERK:  Brian Robison?
23              MR. ROBISON:  Present.  Good afternoon.
24              THE CLERK:  Justin Bernick?
25              MR. BERNICK:  Here.
```

```
 1                    THE CLERK:  William Monts?

 2                    MR. MONTS:  Good afternoon.  Here.

 3                    THE CLERK:  Gene Summerlin?

 4                    MR. SUMMERLIN:  Here.

 5                    THE CLERK:  Christa Cottrell.

 6                    MS. COTTRELL:  Yep.  I'm here.

 7                    THE CLERK:  Christina Briesacher?

 8                    MS. BRIESACHER:  Yes.  Briesacher.  I'm present.

 9                    THE CLERK:  Oh, that wasn't too bad.

10               Sami Rashid?

11                    MR. RASHID:  Present.

12                    THE CLERK:  Stephen Neuwirth?

13                    MR. NEUWIRTH:  Present.  Thank you.

14                    THE CLERK:  Donald Heeman?

15                    MR. HEEMAN:  Yes.  Good afternoon.

16                    THE CLERK:  Peter Schwingler?

17                    MR. SCHWINGLER:  Present.

18                    THE CLERK:  And William Greene?

19                    MR. GREENE:  Present.  Good afternoon.

20                    THE CLERK:  Did I miss anyone for defendants?

21                    MS. MILLER:  Yes.  Your Honor, Britt Miller,

22          Mayer Brown, on behalf of IPC, and on the audio line is my

23          colleague William Stallings.

24                    THE CLERK:  I see.  I did miss you, Ms. Miller.

25          Thank you.
```

1           MS. MILLER:  No problem.

2           THE COURT:  All right.  Did we get everybody?

3           All right.  The Court has read through the briefs

4    that have been filed in this matter in preparation for this

5    hearing.  Thank you all for agreeing to participate by Zoom

6    today so that we can get this motion heard or these motions

7    heard while we are in this slowdown caused by the pandemic.

8           So I imagine you have a view as to who is going

9    first and an order here, and I will accede to how you wish

10   to proceed with argument on the motions.

11          MR. NEUWIRTH:  Good afternoon, Your Honor.  This

12   is Stephen Neuwirth from Quinn Emanuel, and I have been

13   designated by the defendants to speak concerning the

14   sufficiency of the federal Sherman Act claims, and I will

15   be followed by Mr. Parker who will be addressing the

16   federal statute of limitations issue.

17          And then he will be followed by Mr. Duncan who

18   will be addressing the other items that Your Honor had

19   identified that you wanted the parties to address today,

20   and if it is still Your Honor's intention to have

21   approximately a three-hour hearing, it would be our

22   intention to reserve approximately half an hour for

23   rebuttal after the plaintiffs speak, if that would please

24   the Court.

25          THE COURT:  That's fine.

1          MR. NEUWIRTH:  Thank you very much, Your Honor.

2          So turning to the sufficiency of the claims, I

3     believe we delivered to the Court for Your Honor a binder

4     with certain demonstratives that we were planning to use in

5     today's hearing, and it's a binder that has the cover

6     Defendants' Hearing Binder Regarding Sufficiency of the

7     Federal Sherman Act Claims.

8          THE COURT:  Yes.

9          MR. NEUWIRTH:  And I will be referring to that

10    during the argument.  In fact we begin at the very

11    beginning of tab 1 in that binder, because as Your Honor

12    knows, you dismissed the complaint that had originally been

13    filed in this case, and as highlighted behind tab 1 when

14    you did so, you did so principally on the ground that the

15    plaintiffs have not adequately pleaded parallel conduct

16    sufficient to support an inference of conspiracy.

17         And you highlighted in your opinion that what the

18    original complaints lacked was specific information

19    regarding each defendant concerning -- and you said that

20    you had no basis to analyze which, how many or when any of

21    the individual defendants may have affirmatively acted to

22    reduce the supply of pork, and you noted that that

23    information is vital to pleading parallel conduct.

24         And you also noted that the complaints lacked any

25    of the type of specific allegations that would enable the

1     Court to determine whether defendants' alleged production

2     cuts were temporally proximate, and you then gave the

3     plaintiffs 90 days plus to submit amended complaints that

4     were meant to address this deficiency.  Unfortunately, the

5     new complaints that the plaintiffs have filed do not solve

6     this fatal flaw whatsoever.

7              In fact, as we see behind tab 5, when you granted

8     plaintiffs leave to amend, you expressly said it was so

9     that they could put in specific allegations that plausibly

10    establish that the individual defendants decreased their

11    own production of pork in parallel with their competitors,

12    but that did not happen at all.

13             As we see behind tab 6, the new complaints, like

14    the old complaints, don't allege any purported production

15    cuts during half of the years of this alleged conspiracy.

16    They don't allege that two of the defendants, IPC and

17    Seaboard, ever engaged in any production cut during the

18    entire ten years of the conspiracy.

19             As three of the other defendants, JBS, Clemens

20    and Triumph, they allege that each undertook only a single

21    production cut during the entire period of the conspiracy,

22    and they don't allege that Seaboard and Triumph engaged in

23    any production cuts after the first year of the purported

24    conspiracy that supposedly lasted ten years.

25             The new complaints in this respect are exactly

1    like the ones that you dismissed, and if we look behind tab

2    9, what we see is that the steps that the plaintiffs claim

3    to have taken to fix the problem really are just a

4    repetition of exactly what you found insufficient the first

5    time around.

6           The prior complaints relied on generalized public

7    statements by the defendants talking about the marketplace.

8    You said those were insufficient, and those same statements

9    and others just like them are in the new complaints.  The

10   plaintiffs in their original complaints had quotes from

11   third parties who weren't even working at the defendants'

12   making observations about the market.  Those were

13   insufficient.

14          Those same observations appear in the amended

15   complaint.  We have the problem of group pleading where the

16   plaintiffs speak in generalities about all of the

17   defendants or the market as a whole.  No way to know what

18   any defendant did.  The same thing appears in the new

19   complaint, and once again, the plaintiffs when they put

20   forth data rely on aggregated industry data which again

21   gives you no way to know what any defendant did.

22          And this was after being told they needed

23   specificity and being given over 90 days to provide it, and

24   I would respectfully submit that when the plaintiffs get up

25   today and show you the time line that is in their

1     demonstratives, you will see that every category of

2     problematic allegation that I just went over is in that

3     time line.  This is what the plaintiffs are relying on.

4              Now, what the plaintiffs have also tried to do in

5     their opposition papers to address this problem, Your

6     Honor, is instead of looking at the conspiracy as a whole,

7     they have asked Your Honor to consider subgroups of years,

8     to look at just two- or three-year periods at a time where

9     they claim there are clusters of activity.

10             Well, just by way of background, there are a

11    couple of problems with this.  First, as we see behind tab

12    13 is that in an effort to put together one of these

13    smaller periods of time, instead of starting the conspiracy

14    period in 2009, the plaintiffs now want you to look at the

15    period 2008 to 2010, and they want to include what they

16    allege are cuts in supply during 2008.

17             The reason that doesn't work in this case, Your

18    Honor, is because the complaints from the outset, the

19    original complaints and the new complaints, are so heavily

20    invested in saying that this conspiracy started in 2009.

21             In your original opinion at page two as we note

22    here, Your Honor recognized that the original complaints

23    had repeatedly alleged that starting in 2009 defendants

24    began to discretely conspire with one another.

25             THE COURT:  Mr. Neuwirth, doesn't the complaint

1    indicate the conspiracy may have begun earlier?  I think

2    there is an allegation in there, and so why wouldn't that

3    evidence be possibly relevant?

4             MR. NEUWIRTH:  Well, Your Honor, to the extent

5    that there are lines like that in the amended complaint, we

6    would submit that they cannot be reconciled with the other

7    allegations of the complaint that are meant to explain how

8    this [indiscernible due to audio malfunction] --

9             THE CLERK:  You are cutting out, Mr. Neuwirth.

10            COURT REPORTER:  Mr. Neuwirth, this is the court

11   reporter.  I am going to repeat up to when you cut out,

12   what I have up to that point, and then you can continue

13   from there.  Okay?

14            MR. NEUWIRTH:  Thank you.

15            COURT REPORTER:  What I have is, "Submit that

16   they cannot be reconciled with the other allegations of the

17   complaint that are meant to explain how this" --

18            MR. NEUWIRTH:  Thank you.

19            How this conspiracy worked.

20            Can you hear me now, madam court reporter?

21            COURT REPORTER:  Yes, sir.  Thank you.

22            MR. NEUWIRTH:  Thank you very much.

23            And, Your Honor, as we see here what the

24   complaints say is that in 2009 the defendants changed their

25   behavior, that 2009 marked a drastic change from the period

1    prior to the conspiracy.  In fact, these complaints

2    expressly allege that prior to 2009, total pork production

3    increased steadily year to year spiking in 2008, and they

4    also allege that it was only in April of 2009 that the

5    exchange of information using Agri Stats that they complain

6    about began.

7             It says right here, in April of 2009 Greg Bilbrey

8    of Agri Stats invited swine integrators to design and

9    operate their own benchmarking effort.  So while Your Honor

10   is correct [indiscernible due to audio malfunction].

11            THE CLERK:  Mr. Neuwirth, your audio is breaking

12   up again.

13            MR. NEUWIRTH:  Okay.  I apologize.  I have not

14   had this problem before.

15            THE CLERK:  It's fine now.  It was momentary, I

16   think.

17            THE COURT:  I think the issue is, when you speed

18   up talking sometimes the words get mixed up together.  So

19   just speak slowly.  It will be just fine.

20            MR. NEUWIRTH:  Thank you very much.  I will do

21   that.

22            And as I was just noting, I hope it came through,

23   the complaint expressed that it was in April 2009 that the

24   complaints say the defendants were invited to start using

25   Agri Stats for the purposes that the plaintiffs allege were

1    inappropriate.

2         And so, Your Honor, while it is true that the

3    complaints have some lines interspersed within them

4    suggesting that maybe this started in 2008, that is not

5    plausible relative to these other allegations saying that

6    pork production increased steadily [indiscernible due to

7    audio malfunction] in 2008, but it wasn't until 2009 that

8    the defendants changed their behavior.

9         But even assuming that you could include the 2008

10   data, there is another problem, which is highlighted behind

11   tab 14, which is that these conspiracies that Your Honor

12   also noted in [indiscernible due to audio malfunction].

13        THE CLERK:  You're breaking up Mr. Neuwirth.  I

14   think part of it is while you're speaking, you seem to be

15   kind of moving back and forth a little bit when you're

16   looking down.  I'm sorry to be so nitpicky, but that seems

17   to be when you're cutting out.

18        MR. NEUWIRTH:  Okay.  I appreciate that.  If this

19   happens again, I can switch to a different device, but I

20   hope this will work, and please thank you for graciously

21   letting me know about this.

22        Another problem, Your Honor, is that, as we see

23   behind tab 14, the plaintiffs' allegation here is that

24   there was a scheme to limit the supply of hogs.  However,

25   the plaintiffs themselves now have to acknowledge, as you

1    see behind tab 15, that of all the defendants only three of

2    them were alleged to have any significant hog production at

3    all, and what the plaintiffs say in their complaint is

4    significant is just getting 5 percent of their hog supply

5    from their own production.

6         So the notion that these defendants, almost the

7    majority of whom didn't even produce their own hogs, would

8    have wanted to raise the price of hogs by limiting supply

9    is completely implausible because why would these

10   defendants have wanted to raise their number one cost

11   input.  There is no explanation of that in the complaints

12   even though we have been raising this from the outset.

13        But turning to the specific clusters that

14   supposedly show parallel conduct, as we see behind tab 16,

15   for the years 2008 to 2010, four of the eight pork

16   processing defendants, that is Clemens, IPC, JBS and

17   Seaboard, are not alleged to have done anything during the

18   years 2008 to 2010.

19        Smithfield is alleged to have cut supply, but the

20   complaints acknowledge that that started in February 2008,

21   eleven months before the complaints as we saw said that

22   everything changed and during a year that the complaints

23   say was a year when supply spiked.

24        Triumph is only alleged to have cut some hog

25   supply once during this period, and plaintiffs only allege

1    that Hormel cut sows by an unknown amount at some

2    unspecified time in 2008 and had tonnage reductions of some

3    unspecified time in 2009 and similar allegations about

4    Tyson.  So during this period 2008 to 2010, we have nothing

5    that could remotely constitute parallel conduct.

6              As we see behind tab 18, looking at the years

7    2011 to 2012, which is the next period that the plaintiffs

8    ask us to look at, the plaintiffs don't even allege that

9    anybody did anything to reduce supply during 2012, and in

10   2011, the -- in 2011, it's only alleged a few suppliers

11   made cuts.

12             Now in looking at the years 2008 to 2010, it's

13   critical that on top of the absence of allegations, the

14   plaintiffs also disregard the compelling alternative

15   explanation that their own complaints identify for why

16   there might have been some reductions in supply.  As we see

17   behind tab 33, the complaints themselves recognize that

18   this was the period of the Great Recession, which had a

19   huge impact on the economy and demand for goods.

20             It was also a period when there was a swine flu

21   epidemic, and it was also a period of higher corn prices.

22   All of this is reflected in the complaint itself, and we

23   have all the citations here for where that occurred.  So

24   2008 to 2010 is a period when not only do they have only

25   the sparsest allegations among all the defendants of any

1    supply cuts, but there are major events like the Great

2    Recession and swine flu epidemic that clearly have to be

3    accounted for and even greater weight to the absence of

4    parallel conduct allegations.

5            We saw how little there is for 2011 and 2012, and

6    I think it's critical as well that if you look behind tab

7    19, what we see is what a tremendous absence of evidence

8    there was that the plaintiffs felt compelled in their

9    opposition brief to assert that Indiana Packers would

10   reduce pork processing in 2012.

11           After a letter was written to the plaintiffs

12   pointing out that that allegation doesn't even appear in

13   the complaint, the plaintiffs conceded in an e-mail they

14   sent that there were no supply cuts by IPC in 2012, meaning

15   there were no cuts by any supplier that year.

16           Turning [indiscernible due to audio malfunction]

17   the period when the plaintiffs say that there was any

18   concerted effort to decrease supply, if we look behind tab

19   20, the plaintiffs now concede that 2013 was a year when

20   there was a major pig virus that affected production, and

21   they only have limited allegations in that year in any

22   event about three of the defendants, none of which

23   indicates any parallel conduct at all.

24           For 2014 as we see behind tab 21, that was a year

25   when there was deadly pig disease.  Your Honor recognized

1   that in your first order and said that the plaintiffs

2   acknowledge that that was what caused the dip in production

3   that year, and as we see behind tab 22 for the years 2015

4   and 2016, plaintiffs cite only a single alleged supply

5   reduction during that period.

6          And it's just an allegation that JBS, one of the

7   companies that isn't even alleged to be a significant sow

8   producer, reduced the number of sows that it produced that

9   year.  So looking over the course of the conspiracy and

10  even looking at the clusters of time that the plaintiffs

11  have identified, the very problem that Your Honor

12  recognized with the original complaints still exist.

13         Now, the complaint also has other information

14  which highlights the lack of plausibility.  As we see

15  behind tab 23, Your Honor can and should consider the full

16  text of documents that are embraced by the amended

17  complaints.  The Supreme Court said that in *Twombly*, and

18  many other courts have said that since then, including Your

19  Honor in the *Region Multiple Listing Service of Minnesota*

20  case from 2013.

21         And as we see behind tab 24, one of the documents

22  that the complaints now rely on heavily are Pork

23  Powerhouses report including a report from 2009, but that

24  report shows that only three of the eight defendants

25  reduced sow levels from 2008 levels, and they did so in

1     nonparallel amount.

2           It shows that one of the defendants, Clemens,

3     actually increased its sow inventory, its sow inventory

4     from 2008 levels, that two of the defendants, Seaboard and

5     Hormel, didn't reduce their sow inventories at all, and two

6     of the remaining defendants are not even listed.  So the

7     document that they include undermines the allegations in

8     their complaint.

9           Critically as we see behind tab 25, what these

10    Pork Powerhouse reports also show is a total lack of

11    parallel conduct.  These are data points from those

12    reports.  We put it into our opposition papers, and the

13    plaintiffs did not dispute its accuracy.  This shows what

14    happened for each of the defendants, and it's true, as we

15    can see on the top line, that Smithfield did have a drop in

16    output during the years 2008 to 2010, as Your Honor noted

17    in your original opinion.

18          But these Pork Powerhouse reports only confirm

19    what Your Honor also found, which was that there was no

20    evidence that what Smithfield did was in coordination with

21    any other defendant.  There is no other defendant in this

22    chart which had a reduction in output during this period,

23    and if we look at the entire period from 2009 forward, most

24    of the defendants are higher at the end of that period than

25    they were at the beginning.

1          So the very thing that Your Honor found in your

2     original decision is highlighted in the documents that have

3     now been put and cited in the amended complaint.  We also

4     note that behind tab 26, it is clear from the new

5     complaints and the charts that are in them that only three

6     of the defendants as noted earlier have any significant hog

7     production of their own.

8          And again as we noted, it's implausible that

9     there would have been any sort of conspiracy among these

10    defendants to reduce the supply of hogs given that fact,

11    and then finally, if we look behind tab 28, and this is

12    also figure 7 of the direct purchaser complaint paragraph

13    120, it shows that hog production increased significantly

14    during the alleged conspiracy.

15         It shows that from the period 2009 through 2017,

16    which is the period that the complaints cover, hog supply

17    actually went up, and in the absence of any allegations of

18    parallel conduct, this chart in the complaint only

19    highlights why there are no allegations of parallel conduct

20    because had there been parallel conduct to reduce supply,

21    this increase in supply wouldn't have been possible.

22         Now, perhaps to, perhaps to find another way to

23    salvage this case, the indirect purchasers have come up

24    with a new allegation.  They have now added in the IPP

25    complaint only an information exchange theory of liability

1    which they say should be governed by the rule of reason,

2    Your Honor, and as we see behind tab 41, essentially what

3    they said is that Agri Stats served as an information

4    exchange that allowed the defendants to compare and match

5    each other's pricing.  That is the allegation.

6           Unfortunately, the complaints show that this

7    cannot work.  If we look behind tab 42, what we see is that

8    the cases that have found this type of information exchange

9    claim to even be possible have always highlighted that it

10   had to be focused on the exchange of current or future

11   price information, which makes sense because only current

12   or future price information could be used as a means to set

13   prices for the present time or the future.

14          However, as we see behind tab 43, the complaints

15   themselves recognize that the data exchange here was weeks

16   or months old.  The quotes from the complaints talk about

17   the data being six weeks old or three months old or even

18   two to six weeks old.

19          Now the plaintiffs may try to argue that there is

20   no reason why that type of data wouldn't be relevant in

21   general.  However, in this industry as we see behind tab

22   44, the complaints themselves show that prices vary

23   constantly.  Not only do they vary constantly, they vary

24   daily, and the USDA regulations that are published at 7

25   C.F.R. Section 59 as we quote on tab 44 show that pork

1    processors are required to report their prices twice a day

2    to the USDA, and the USDA then aggregates and publishes

3    those prices on the same day.

4            So in this industry, pricing information which is

5    weeks or months old cannot satisfy the criteria for current

6    pricing, and as we highlight on tabs 45 and 46 and 47, I

7    won't go through it now, but every single one of the cases

8    that the plaintiffs cite, including *Todd v. Exxon* and the

9    very recent *Haff Poultry versus Tyson* decision, a decision

10   that a judge read into the record that they included with

11   their papers, those cases all expressly dealt with current

12   and sometimes future information.

13           That is a quote from the *Haff Poultry* case, which

14   wasn't even a case concerning supply.  It had to do with

15   payments to growers of broiler chickens, and so what all of

16   these cases show is that an information exchange theory can

17   only work if what is being exchanged has the possibility of

18   affecting prices, and in this industry, the complaints

19   themselves show that that cannot work.

20           The complaints also have no allegations

21   whatsoever that would enable the Court to determine how any

22   of this pricing information was used to affect any

23   particular price.  You can read these complaints cover to

24   cover.  There is not one allegation connecting any

25   particular exchange of information to any change in a price

1    by any defendant.

2            And I would respectfully ask Your Honor to turn

3    behind tab 51 because the plaintiffs' demonstratives now

4    point to a chart, which I should note is also in the

5    original complaint, which they say highlights how you can

6    see that there was an effect on pricing.

7            However, this is completely aggregated data that

8    Your Honor said was not sufficient to show any defendant

9    did anything.  It's average spreads for, for hogs and --

10   for hog composites and during the class period and before,

11   and there is no information about any defendant there, no

12   information about any pricing decision.

13           So the plaintiffs can talk all they want about

14   econometric analysis, but there is nothing here that

15   relates to any particular defendant knew anything about

16   pricing based on the information that was supposedly

17   exchanged.  So in sum, these new complaints have the exact

18   same problem that the original complaints did, and the time

19   that you gave plaintiffs to fix the complaints does not

20   change the outcome at all.

21           Let me just say very quickly in closing, Your

22   Honor, that the plaintiffs submitted to you this week a

23   supplemental filing referring to an executive order of the

24   President related to production in the current period at

25   different meat packing facilities, and they have

1    highlighted that in their demonstratives for today.

2          It is, we think, shocking and virtually

3    outrageous that the plaintiffs would try to connect a

4    situation concerning the health and safety of the workers

5    in this facility hundreds and maybe thousands of whom come

6    up with the COVID-19 virus and that the companies and the

7    government are trying to address that situation.

8          To suggest that that has anything to do with the

9    allegations in this case or that it in any way solves the

10   problem of the absence of parallel conduct in this

11   complaint, it's really beyond the pale to try to draw that

12   connection and try to exploit the terrible pandemic that

13   our country [indiscernible due to audio malfunction].

14         Thank you very much, Your Honor.

15         THE COURT:  Thank you, Mr. Neuwirth.

16         Let's see.  Mr. Parker, are you next?

17         MR. PARKER:  Yes, Your Honor.  Richard Parker

18   from Gibson Dunn, and I will be addressing the statute of

19   limitations issues on behalf of all of the defendants.

20         May it please the Court.  Your Honor, what you

21   just heard from Steve Neuwirth was a presentation of all

22   the reasons, all the many reasons, that plaintiffs showed

23   up in this courtroom with too little, too little to state a

24   claim under the Sherman Act.  What I'm going to say is that

25   their problem is not just too little, it's too late.  Too

1    little too late, both result in dismissal with prejudice we

2    respectfully submit.

3            And let's just start with the basic facts.  I

4    submitted a binder for Your Honor with a few slides in

5    there.  I'm going to sort of use them generally.  If you

6    look at slide one, you will see an outline of my remarks

7    today, subject of course to your questions, but the point

8    I'm making right now is the first point, and that is as

9    Your Honor found last August, the first act that allegedly

10   caused injury to these folks occurred in '09.

11           This case was not filed until '18.  That's nine

12   years.  The statute, as we all know, is four years, and

13   that is a big problem and we suggest a fatal problem for

14   these plaintiffs.  They try to plead their way out of their

15   -- or off the hook of their own tardiness by invoking the

16   fraudulent concealment doctrine, and the problem with their

17   pleading is that there is no fraud, and there is no

18   concealment.

19           That's, that's, that's the threshold problem.

20   There are three elements, of course, to fraudulent

21   concealment.  First of all, the fraudulent concealment, and

22   the second one, they were mislead, and third is of course

23   diligence, and the last two I'm leaving to the papers.

24   That's what I'm saying.

25           I just want to look at the threshold issue, which

1   is did we conceal anything, and I suggest, Your Honor, on

2   the state of this record the answer to that question is a

3   resounding no.

4        Your Honor, if you would turn to slide 2, you

5   will see a summary of their claim, and I just want to start

6   with your August order in which you stated aptly that the

7   complaint -- withdrawn -- this alleged conspiracy has two

8   main elements:

9        Number one, of course, are public statements,

10  earnings call statements, suggesting that my client and

11  others were very concerned about losing a lot of money on

12  hogs, very concerned about overproduction of hogs.  There

13  is no question, and what the plaintiffs are saying is that

14  those statements are not legitimate responses to investor

15  inquiries, which is what we say.

16       They say we were signaling each other.  The

17  problem with that is that in a public signaling case what

18  role can fraudulent concealment have because public

19  signaling is, well, public.  It's public.  It's not

20  concealed.

21       The other principal aspect of this conspiracy

22  that the other side is claiming here is of course Agri

23  Stats, which they say is a very secretive organization, and

24  Your Honor, I'm not here to say that every Agri Stats

25  report or any of them are publicly available, but what was

1    publicly available indicates that the defendants and Agri

2    Stats were concealing nothing.

3            If you look at the bottom of slide 2, you will

4    see citations to the complaint in which the other side

5    talks about the facts that were out there in 2008, '09,

6    back in the day, as they say, about Agri Stats, and Your

7    Honor summarized those points on page 8 of your August

8    opinion.

9            And so it was not concealed that Agri Stats was

10   out selling benchmarking services to as many pork producers

11   as they possibly could.  It was not concealed that

12   benchmarking, of course, involves the exchange of data, and

13   it was not concealed that Agri Stats was telling everybody

14   who would listen that, well, this is about increasing

15   profitability if you use our service.  They're marketing

16   their service, and, Your Honor, they're doing it openly

17   which suggests there was no concealment.

18           Now, if you look at sort of the paradigm for

19   fraudulent concealment, you will see as in the *Monosodium*

20   *Glutamate* case -- I hope I am pronouncing that correctly --

21   that there was people who were fixing prices, but they had

22   some elaborate scheme to make it look like business as

23   usual and to cover up the fact that prices were not

24   competition on the merits but were fixed.  Then that was

25   exposed, and then the statute started running.

1            Well, here, Your Honor, what is exactly exposed

2    between, you know, the operative events, '10, '11, '12, '13

3    and now.  Well, they say it has to do with the Bloomberg

4    chicken article, an article about chickens and about a

5    chicken case, and all it says about pork in there is that

6    guess what, Agri Stats is selling benchmarking services to

7    pork.

8            That's not a revelation, Your Honor.  It's not a

9    revelation because it wasn't concealed.  It was known.  We

10   didn't -- Agri Stats and none of these other defendants

11   covered that up back in the day, back in '09 or '10 or '13,

12   and so the paradigm of fraudulent concealment just doesn't

13   apply here.  You can't fraudulently conceal a public

14   signaling case, and you can't fraudulently conceal somebody

15   who is openly selling benchmarking service, and we did not

16   do that, and that complaint is inadequate.  Fraudulent

17   concealment does not get these folks off of the tardiness

18   hook.

19           Now, I will move on to the second theory, and

20   that's continuing conspiracy, and just to give context,

21   what that means is is that you have to have a conspiracy.

22   I'm sorry.  Go ahead.

23           THE COURT:  Let me ask you a question.  On the

24   fraudulent concealment, do I have to make a factual finding

25   here in order to determine conclusively that there was no

1     fraudulent concealment?  Explain how this is a question of

2     law for me.  Okay?

3              MR. PARKER:  It's a question on the face of the

4     complaint.  It's very clear in the Eighth Circuit that if

5     the face of the complaint shows the statute is not complied

6     with and there is no out, then the complaint could be

7     dismissed under 12(b)(6).

8              What I am suggesting is is that the complaint on

9     its face pleads the use of public statements.  That's not

10    concealment, and I have the citations on page 2 of my Power

11    Point or my dec says there was all kinds of information out

12    there about Agri Stats, which means it wasn't concealed

13    because it's out there, and so on the face of this

14    complaint, that's what I'm saying.  And I can understand

15    what you're saying about a fact, and that sounds like a

16    trial issue.  Absolutely.

17             But here it's in the complaint, and I'm

18    suggesting, Your Honor, a review of the complaint shows a

19    clear violation of the statute and shows that equity in the

20    form of fraudulent concealment can't bail them out because

21    nothing was fraudulent and nothing was concealed.  That's

22    what I'm saying.  It's a determination on the face of the

23    complaint.

24             THE COURT:  I understand.  Thank you.

25             MR. PARKER:  Okay.  Thank you, Your Honor.

1           Moving on to continuing conspiracy, you have to

2     have a conspiracy which -- excuse me -- Mr. Neuwirth just

3     said there wasn't any conspiracy, and then you have to have

4     it continuing, and I'm going to address that issue.

5           Now, if that doctrine applies, that does not mean

6     that these folks can collect damages back to '09 or

7     whenever they're going to start or they're going to try to

8     start.  It only means that they get the last four years

9     before the statute -- before the filing and that was four

10    years previous to June of '18, if it applied.

11          THE COURT:  So, Mr. Parker, does the four-year

12    time bar apply to a claim for injunctive relief?

13          MR. PARKER:  I believe it does, yes.

14          THE COURT:  Okay.

15          MR. PARKER:  I believe it applies to both, and I

16    would also add on this complaint, there isn't a basis for

17    injunctive relief because of inadequate pleadings of

18    ongoing conduct, and that's about what I'm going to talk

19    about here.

20          To have a conspiracy that, a continuing

21    conspiracy, you have to have a complaint, overt acts plus

22    sales.  They make it sound like, well, since we're still

23    selling pork, and I bet you we have sold a lot of pork in

24    the last 45 minutes.  Of course we're selling pork, but

25    they are making it sound like that's all you need.

1          What I'm saying is, you need sales plus some kind

2     of an overt act, and they're going to show you a time line

3     in their papers today that talks about the key events, and

4     it's on page 9, 10 and 11 of their dec and the last key

5     event was in '13, which is exactly what I'm saying, that

6     there is nothing bad in this complaint happening after '13;

7     therefore, no overt act; therefore, no continuing

8     conspiracy.

9          And so I would refer the Court, for example, to

10    the -- the plaintiffs love the *Propane I* case, and I think

11    it's very helpful here, but it's helpful for us.   In

12    *Propane I*, there was a conspiracy where people were selling

13    cans of propane, but they decided in a conspiratorial

14    fashion not to fill them up, to kind of shave off the top a

15    little bit and then change the same price.

16          That's a conspiracy.  That's a conspiracy, and

17    because they were fixing prices and reducing the

18    quantities, and they all agreed on it.  So the question

19    was, did it continue?  Well, the Court said, look, the can

20    is still not filled, and they're still charging the same

21    price.  Looks like it's continuing.

22          So their problem here is our alleged production

23    cut, and I would refer Your Honor to 6, page 6 of my dec

24    here, which refers to a DPP paragraph 51, and, you know, it

25    looks to me like production is going to an all time high.

1    This is not a situation in which the can is not filled and

2    the price is still the same.  This is not a situation which

3    anybody is cutting production.

4         They're going to an all time high.  They're not

5    just going up.  They're really going up.  This is like a

6    record.  Now, they say, well, look, had it not been for

7    some unspecified conduct going on, you would have had a

8    record and a half or something.  That's an astounding

9    statement, and there ought to be some kind of an overt act

10   connected with it, and I suggest, Your Honor, it's just not

11   there.

12        And so going to 10,000 feet, let's just look

13   down.  I just want to conclude.  You look down on this and

14   you realize that they are late.  They are way late because

15   the key events on their own time line took place between

16   '09 and '13, and they're going to get to their time line,

17   but I'll embrace that.

18        I'll take that as an allegation in the complaint,

19   but that means the statutes run, and as I said, Your Honor,

20   the fraudulent concealment paradigm does not apply here,

21   nor is the allegation sufficient to support a continuing

22   conspiracy.

23        So those are the points that I wanted to make,

24   Your Honor, and if -- unless you have questions, I will

25   take my seat or I guess since I'm already sitting, I will

1    just turn the mic over to Mr. Duncan.  You know, I have

2    never done this before, Your Honor.  This is new for me, so

3    I hope I didn't foul it up too bad.

4              THE COURT:  You did just fine, Mr. Parker.

5              Mr. Duncan, your turn.

6              MR. DUNCAN:  Thank you, Your Honor.  Richard

7    Duncan representing the Hormel Foods defendants.

8              I'm going to address the four state law and

9    Puerto Rico issues that you raised with the parties last

10   Thursday.  I am going to try here to project my slides

11   because I think that will make it easier for everyone to

12   follow along through these topics.  Okay.  Hopefully

13   everyone can see that.

14             So the first question Your Honor raised, we

15   address it in slide 2, is the lack of standing of the

16   commercial indirect plaintiffs to bring claims outside of

17   their state of residence.  So there are two pillars

18   supporting our argument that the commercial indirect

19   purchasers lack standing to bring claims based on the law

20   of 20 states, 20 in which they neither reside nor did they

21   purchase any pork product.

22             First, Article III standing is a threshold issue,

23   and it must be present at all stages of federal litigation,

24   and second, standing requires the invasion of a legally

25   protected right, and to invoke federal jurisdiction, a

1  party must state a claim under a statute which affords it

2  protection.

3         Now in this district in the past few years, there

4  have been several class action case decisions that have

5  adhered to the analysis we're providing and have dismissed

6  at the outset --

7         COURT REPORTER:  Excuse me, Mr. Duncan.  This is

8  the court reporter.

9         Someone has background noise, and you are not

10  muted, and you are bumping out Mr. Duncan when he speaks.

11         THE CLERK:  It was someone on the audio.  I just

12  muted them.

13         COURT REPORTER:  Okay.  Thank you.

14         Mr. Duncan, I am going to tell you where I left

15  off.  "Now in this district in the past few years, there

16  have been several class action case decisions that have

17  adhered to the analysis we're providing and have dismissed

18  at the outset" --

19         MR. DUNCAN:  -- state law claims under the laws

20  of states in which no named plaintiff resides.

21         We have briefed Judge Montgomery's 2014 decision

22  in *Insulate* extensively, but I want to draw the Court's

23  attention today to a couple of other decisions.

24         First, Judge Frank's 2018 decision in McAteer

25  against Target, a personal injury class action, where he

1     hits the issue right on the head.  He says, Without a named

2     plaintiff who purchases a product within a given state,

3     there is no one who is harmed, who is legally protected

4     under that state's laws.

5            In our briefing, we also mention a 2015 decision

6     by then Chief Judge Davis called Ferrari against Best Buy,

7     and he goes through not just the decisions in our district,

8     but he goes through a number of them and again comes to the

9     conclusion that a plaintiff cannot state a class claim

10    under the law of a state in which they do not reside.

11           Now, we'll talk about the response here.  The

12    commercial indirect purchasers argue that they can avoid

13    addressing this Article III issue now -- excuse me -- the

14    Court can avoid it and Your Honor can look at it down the

15    road at class certification time.  That analysis is

16    incorrect under the cases that I have just been discussing,

17    and the plaintiffs really offer no persuasive reason for

18    the Court frankly to avoid doing what it should do, which

19    is address the Article III questions at the outset.

20           The fact that under Eighth Circuit law, the fact

21    that this is a class action does not change the basic

22    standing analysis.  In a footnote in the *McAteer* decision,

23    Judge Frank explains I think well why his analysis holds

24    true in the class setting, and he says, To the extent

25    plaintiff posits that putative class members suffered a

1  particular injury in Minnesota, those members are not

2  currently before the Court and any allegation of such

3  injury is mere conjecture, and the same is true here.

4       Unnamed and unknown persons in other states have

5  suffered no cognizable injury, and these plaintiffs can't

6  state a claim for them.  In our briefs, we discuss *Amchem*

7  and *Ortiz*.  For me the key point there is the massive

8  asbestos settlement context in which those cases arose, and

9  the Supreme Court holds that because class certification

10  was dispositive and plainly erroneous that it wasn't going

11  to reach the Article III issue.

12       But we do note in our reply brief that in *Ortiz*

13  the Supreme Court confirmed, Ordinarily any Article III

14  court must be sure of its own jurisdiction before getting

15  to the merits, and so we're asking the Court to follow that

16  guidance and dismiss the claims for which there is no named

17  plaintiff resident in the particular state.

18       Now absent questions, I'm going to move to the

19  9(b) issue Your Honor raised.

20       THE COURT:  That's fine.

21       MR. DUNCAN:  Whether 9(b) applies to state law

22  consumer protection claims.  So to allege their consumer

23  protection claims, both groups of indirect purchaser

24  plaintiffs make broad allegations of fraud and deception

25  and failure to disclose by defendants, and we have gathered

1      those together in our brief.  I think the best Eighth

2      Circuit precedent supporting our argument that such

3      allegations trigger Rule 9(b) is Olin against Dakota

4      access.  *Olin* came down in December 2018 after this case

5      was first filed, and I'll note after the Southern District

6      of California's 2017 decision, the *Packaged Seafoods* case,

7      that plaintiffs are going to cite to you in their slide

8      dec.

9              So in *Olin* the Eighth Circuit reiterates the

10     direction from the *Streambend* case that whether 9(b)

11     applies is a pleading specific inquiry, and then it follows

12     that direction in *Olin* to note that Rule 9(b) applies to a

13     claim under North Dakota's Consumer Protection Act which

14     requires pleading of fraudulent or deceptive conduct.

15             Here the commercial indirect purchaser plaintiffs

16     plead a claim under the same North Dakota statute at issue

17     in *Olin* that the Court said required application of

18     Rule 9(b).  Now, the plaintiffs essentially concede that

19     they don't plead fraud with Rule 9(b) particularity.  They

20     assert they don't have to because this is a price fixing

21     case, but again, I would argue *Olin* dispensed with that

22     argument.

23             *Olin* holds that, quote, "A claim may sound in

24     fraud even though it is brought under a statute that also

25     prohibits non-fraudulent conduct."  So if you allege fraud,

1    which the plaintiffs do here in spades, or if the statute

2    requires it, either or -- and we cite nine states' laws

3    that require pleading of fraud -- you have to plead the

4    who, what, when, where and how of the supposedly deceptive

5    communication.

6            The plaintiffs don't do that.  They simply mouth

7    those words.  There is no conduct pled, and for that

8    reason, they don't comply with Rule 9(b), and then finally

9    while we're on this topic, an important point is, that we

10   make in the briefs, but the plaintiffs don't plead any

11   conduct violating the consumer protection statutes other

12   than the conduct that they plead as price fixing.

13           So the consumer protection claims have to be

14   dismissed with prejudice if the antitrust claims fail

15   because there is no further conduct to state a claim with,

16   and that's my conclusion on that subject, and I'll turn to

17   Puerto Rico next.

18           THE COURT:  That's fine.

19           MR. DUNCAN:  First, whether Puerto Rico has

20   *parens patriae* standing.  Pausing for a second, when we

21   received the Court's questions, we understood that this one

22   related to Puerto Rico law, and that is what I will be

23   talking about mostly.

24           There is a federal *parens patriae* provision in

25   the Clayton Act.  The Commonwealth doesn't plead it, and I

1       just want to note that the Supreme Court in *Illinois Brick*

2       expressly held that that provision does not permit a *parens*

3       *patriae* action on behalf of indirect purchasers, which is

4       what the Commonwealth of Puerto Rico, those are the people

5       that they are alleging are harmed are indirect purchasers.

6               So I'm going to set that federal issue aside and

7       now just talk about Puerto Rico.  So there are two ways in

8       which an attorney general can get standing to sue *parens*

9       *patriae,* either by express statutory authorization or under

10      common law by asserting a quasi sovereign interest.

11              Judge Gelpi in the *Carpenter Company* case that

12      the Commonwealth submitted to the Court as supplemental

13      authority summarizes the law in the first point in that

14      case.  He says there is no Commonwealth *parens patriae*

15      statute for antitrust claims.

16              This action by the Commonwealth is not a class

17      action, so there are two other statutes that they mention

18      in their brief that are not relevant to the *parens patriae*

19      analysis in a nonclass action.  So under the *Snapp* test,

20      there is no quasi sovereign interest at stake here.

21              So there is an antitrust injury section of the

22      Commonwealth's third amended complaint, and the injury they

23      identify in paragraph 174D is, End user consumers of pork

24      who indirectly purchased pork for personal use paid

25      artificially high prices, and I submit this is an

1    individual injury.

2            It's not a quasi sovereign interest, and in fact

3    I know it's an individual injury because it's exactly the

4    same injury alleged by the individual indirect purchasers

5    in paragraph 257B of their current complaint.  The people

6    they say are injured are, End user consumers of pork who

7    indirectly purchase pork for personal use, including

8    plaintiffs, paid artificially inflated prices.  It's

9    virtually word for word, the same injury.

10           Finally, Puerto Rico consumers of pork are not

11   being uniquely disadvantaged like the Puerto Rican laborers

12   were in the *Snapp* case.  This is not a case about anyone in

13   Puerto Rico suffering some unique injury because of being

14   in Puerto Rico.  So our conclusion is, Puerto Rico does not

15   have *parens patriae* standing to bring claims in this

16   lawsuit.

17           Then finally, Your Honor asked whether Puerto

18   Rico has plausibly alleged violations of Sections 259 and

19   260 of the Puerto Rico antitrust act.  So turning first to

20   Section 259, which is the unfair and deceptive trade

21   practices provision of Puerto Rico's antitrust act, the

22   first point to bear in mind is that the statute permits

23   only injunctive relief to the attorney general.

24           My next point is that the third amended complaint

25   of the Commonwealth doesn't specify any conduct violating

1    Section 259.  In fact, paragraph 190 of that complaint,

2    which is where all of these allegations are, it doesn't

3    even make a conclusory allegation of unfair or deceptive

4    conduct.

5           It recites only the elements for the Sherman Act

6    Section 1 and Section 2 analogues under the Puerto Rico

7    antitrust act and that's Section 258 and 260.  So the

8    pleading is deficient on its face, and the claim should be

9    dismissed.  At best the Section 259 claim would necessarily

10   fail if the 258 price fixing claim fails.

11          If the Commonwealth hasn't pleaded a price fixing

12   conspiracy, again like the other consumer protection

13   claims, there is no independent conduct alleged that

14   support a Section 259 claim.  And then finally under

15   Section 260, the analogue to Sherman Act Section 2, there

16   is no claim stated.

17          First, the complaint pleads the defendants, again

18   in this paragraph 290, excuse me, 190, they plead that

19   defendants, quote, "Monopolized or attempted to monopolize

20   trade or commerce of pork," but that's all it says.  It

21   doesn't plead the essential elements of either a

22   monopolization claim or an attempted monopolization claim.

23          Normally there is no pleading that any defendant

24   has anything near the 50 percent market share that the

25   Eighth Circuit in cases going back to *U. S. versus Empire*

1    *Gas* has required for even an attempted monopolization, much

2    less full monopolization.

3          I think the real reason this is not a

4    monopolization case is because Puerto Rico's complaint does

5    not plead any act of exclusion of competition.  Excluding

6    competition to gain a monopoly is the crux of an unlawful

7    monopoly claim, but there are no allegations that any

8    defendant has taken any action to exclude any of its rival

9    pork producers from the market.  This is just not a

10   monopolization case.

11         Finally, the Commonwealth's brief in opposition

12   attempts to add what they call a conspiracy to monopolize

13   claim.  That isn't procedurally permissible, but if it

14   were, the claim fails for the reason that no conspiracy is

15   alleged, and I like this Virginia court's phrasing of it,

16   Because there can't be a conspiracy to monopolize unless

17   the conspiracy is somehow rationally directed toward the

18   exclusion of competitors.

19         Of course that type of conduct is notably absent

20   from any of these complaints.

21         THE COURT:  Mr. Duncan, would it be true that

22   competitors would benefit also from the alleged conspiracy?

23         MR. DUNCAN:  Your Honor, yes.  I think yes.  I

24   think it's the *Matsushita* case which says that in a price

25   fixing conspiracy, the conspirators are taking actions to

1    benefit, that benefit themselves collectively, but that's a

2    Section 1 question.  That's the conspiracy question.

3            In Section 2, again the requirement -- and it's

4    in the *American Tobacco* case there -- the requirement is

5    that one competitor is doing something to exclude its rival

6    manufacturers in order to expand its own market power.

7    That is not the same as cartelists getting together to fix

8    price benefits them all.

9            The essence of monopoly is that unilateral

10   expansion of one's business at the expense of one's rivals,

11   and that's not what is pled here.  I hope that's, I hope

12   that's clear.

13           THE COURT:  Yes.  I understand.  Thank you.

14           MR. DUNCAN:  Thank you, Your Honor.  That

15   concludes my portion of the argument [indiscernible due to

16   audio interruption].

17           THE COURT:  I'm sorry.  We didn't catch the last

18   statement you made, Mr. Duncan.

19           MR. DUNCAN:  The last statement?  I just said I

20   think that it concludes my portion of the argument and

21   concludes the defense side of the argument at this time.

22           THE COURT:  All right.  Before we turn to the

23   plaintiffs, we're going to take just a short break, about

24   five minutes or so.  So stay connected, and we will be

25   right back.

1          **(Recess taken.)**

2

3          **(In open court via video conference.)**

4          THE COURT:  All right.  Let's proceed with the

5     response.

6          For the plaintiffs, what's the response here for

7     us?

8          THE CLERK:  If someone is speaking -- wait.

9     Counsel, we're going to resume.  Just a reminder to speak

10    slowly and clearly, and we will interrupt if we have a hard

11    time hearing you.

12         THE COURT:  All right.  How are we going to

13    proceed for the plaintiffs?  What's the plan?

14         MS. SCARLETT:  Your Honor, Shana Scarlett from

15    Hagens Berman.  I will be speaking to the Sherman Act

16    claims and the 9(b) issue.  After that I will be turning it

17    over to Mr. Pouya from the direct purchasers to address the

18    statute of limitations issue.

19         The commercials will then address their standing

20    issues, and lastly, Puerto Rico's counsel will address

21    those issues specific to Puerto Rico.

22         THE COURT:  All right.  Go ahead, Ms. Scarlett.

23         MS. SCARLETT:  Good afternoon, Your Honor.  I

24    just want to address two prefatory issues.  First,

25    plaintiffs do object to defendants' heavy reliance on

1   documents outside of the pleadings.  The chart that they

2   showed you on page 25 of their slide presentation with the

3   sow inventory levels from Pork Powerhouse, essentially what

4   they're doing is converting a motion to dismiss to a motion

5   for summary judgment.

6        These issues are ones that are usually vetted

7   heavily between experts, looking at supply issues, looking

8   at reasons for supply issues and identifying specific

9   amounts related to an overcharge, something inappropriately

10  done on a motion to dismiss.

11       Their chart and many of their suggested alternate

12  explanations do directly contradict the allegations of the

13  complaint.

14       COURT REPORTER:  Ms. Scarlett, this is the court

15  reporter.  Could you please slow down?

16       MS. SCARLETT:  Yes.

17       COURT REPORTER:  I left off with, "Their chart

18  and many of their suggested alternate explanations do

19  directly contradict the allegations of the complaint."

20       MS. SCARLETT:  The plaintiffs here, however, have

21  requested judicial notice of one very discrete document,

22  the executive order that was recently issued.  Plaintiffs

23  believe that that supports the plausibility of the

24  allegations of the complaint, but should this Court choose

25  not to take judicial notice of it, plaintiffs do request

1     leave to amend.

2              We believe that many of the recent events,

3     extreme in their measure, do provide plausibility for the

4     allegations in the complaint, demonstrating that even a

5     small amount of constraint in the supply chain does

6     drastically impact price and supply of pork.

7              Defendants argue to Your Honor that this

8     complaint, that these complaints are the same as the last

9     complaint.  Looking at slide 2 of the plaintiffs'

10    presentation, this is not the case.  We received your

11    order.  We took it to heart.  We added allegations best we

12    could at the outset of the case with very limited access to

13    discovery to address the Court's concerns.

14             What did we do?  We added additional allegations

15    of parallel conduct, keeping in mind not all these

16    defendants are publicly-traded.  Not all of them make

17    public statements.  They don't have publicly available data

18    for us to use, but we found what we could, and we have

19    added those allegations to the complaint.

20             The indirect purchaser case has added a rule of

21    reason claim.  We did get some amount of limited discovery

22    from Agri Stats in this litigation.  It included a small

23    number of Agri Stats reports and a small amount of

24    communications.  We added those to the complaint and added

25    a rule of reason claim.

1          We have also added additional economic analysis

2     on the pork market that further supports the allegations of

3     both the per se and the rule of reason claim, and turning

4     to slide 3 of the presentation, these two claims are

5     distinct.  There are two distinct claims, although the

6     facts underlying both of them are very strikingly similar.

7          The first claim is a per se allegation of an

8     agreement to destabilize the price of pork, and this claim

9     is shared across all of the plaintiffs' complaints.  The

10    second claim is one for rule of reason, that the defendants

11    engaged in an information sharing agreement of information

12    on a highly, highly granular level of the type not normally

13    passed between competitors to impact the supply and price

14    of pork, and that's one that is brought in the indirect

15    purchaser complaint alone.

16         Turning to slide 4, the defendants have, as they

17    have since the beginning of this case and even as recently

18    as their parts of the argument in their slide declaration,

19    attempt to reframe and re-cast this conspiracy.  This is

20    not a conspiracy to constrain the supply of pigs.  This

21    conspiracy is one to constrain the supply and price of pork

22    being sold into the U. S. market.

23         The vertical integration of some of the

24    defendants, that facilitates this conspiracy, and that's

25    because it removes other players from the market.  A

1    limited number of participants means that there are fewer

2    that could come in as new entrants, and it means the

3    coordination amongst conspirators is much easier the fewer

4    that are involved.

5          But the allegation is not that vertical

6    integration is necessary for every defendant, and that's

7    not required to make this conspiracy plausible.  Turning to

8    slide 5, Your Honor.  Here we have just a small part of the

9    President's recent executive order.  In recent days we have

10   seen some extraordinary events.

11         And this executive order was issued in April, and

12   it states, "The closure of a single meat or poultry

13   processing facility can severely disrupt the supply of

14   protein to an entire grocery chain."

15         We're not asking or suggesting that the recent

16   events should be wholly integrated into the complaint.

17   We're just asking this Court to look at whether or not that

18   statement supports the plausibility of the conspiracy here.

19   Defendants have argued that it's implausible, that the

20   supply chain is such that none of the actions that we have

21   alleged could possibly impact the price or supply of pork.

22   We believe the statement in the executive order says

23   otherwise.  These small number of defendants wield

24   incredible control over the supply of pork in this country.

25         Turning to slide 6, this is one of the

1      econometric measurements the plaintiffs have made to

2      demonstrate the plausibility of the conspiracy here.  We

3      measured the margin between the cost of the hogs being

4      purchased and pork prices, and this analysis shows a

5      divergence prior to the class period and during the class

6      period.

7              It shows that there is a statistical significance

8      at the 0.01 level.  There is a divergence here between what

9      it was costing these defendants to either raise or purchase

10     the hogs and what it costs to sell them, and it also

11     demonstrates that costs alone, despite what the defendants

12     have put forward as alternate explanations here, costs

13     alone do not explain the increase in prices of pork during

14     the class period.

15             Slide 7, Your Honor, is a very similar set of

16     measurements.  This is for two of the defendants, Tyson and

17     Smithfield.  Tyson and Smithfield are both publicly-traded

18     companies.  They have an obligation to disclose certain

19     information to their shareholders, and using the

20     information that was disclosed in their Securities and

21     Exchange Commission filings, we perform the same analysis

22     here, and it shows again that the hog cost increase does

23     not explain the increase in price of pork.

24             Turning to slide 8 and just briefly addressing

25     the legal framework required for parallel conduct.  What is

1     legally required?  You asked the plaintiffs to identify

2     supply cuts with more specificity, to allege cuts that were

3     reasonably proximate in time and value.

4          The law requires, however, that these cuts need

5     not be simultaneous and they need not be lockstep because

6     how could that be?  If the law required nearly identical

7     behavior by the defendants, then any defendant would be

8     able to escape liability by merely planning their cuts to

9     have some spacing in time.

10         You could defeat liability by simply saying, you

11    cut now and I will cut two months from now.  That simply

12    cannot be that the law is so rigid.  What the requirement

13    would be for us to plead every individual supply cut or

14    reduce in capacity of the slaughter facilities would

15    require an enormous amount of access to data.

16         This is data that we can only have access to

17    during discovery.  The defendants are not all publicly

18    reported companies, and not all of them are required to

19    disclose this information, but given the public information

20    available, we have put together a time line of events.

21    Turning to --

22         THE COURT:  Let me ask you a question.  Other

23    than allegations against JBS, were there supply reductions,

24    are there supply reductions alleged after 2011?

25         MS. SCARLETT:  Your Honor, turning to slide 11,

1    which has the 2013 time line of events, there is a 3.6

2    percent decrease in sales volume and capacity utilization

3    by Tyson in 2013, Hormel reporting lower sales of its pork

4    products in 2013, and then Seaboard reporting it had lower

5    sales volumes of pork products.

6            And to that end, there is of course slide 12

7    which is on the aggregate showing that the supply in the

8    industry was stabilized at a reduced level than what it

9    would have been but for the complaint, and yes, this is an

10   aggregate slide, but it is based on the information

11   available to the plaintiffs at this time.

12           And the law itself does not require that each

13   defendant cut supply to participant in a conspiracy to

14   stabilize the price and supply of pork.  Turning to slide

15   13, it's fundamental to the Sherman Act and the various

16   state acts that were following the Sherman Act that

17   stabilizing itself is prohibited.

18           The defendants need not make an actual cut if the

19   agreement is to stabilize the supply, and there is legions

20   of case law that say this, Your Honor.  If we did see, for

21   example, one defendant, let's say Smithfield, cutting

22   supply early in the class period in 2009, what one would

23   expect to see in a competitive market is that the other

24   defendants would then increase their supply to eat up that

25   market share.

1          Turning to slide 14, that's not what we see.

2     Slide 14 shows, and again this is another economic

3     measurement, you know, made by the plaintiffs here in

4     support of the pleading which leads to the inference of the

5     plausibility of the conspiracy.  What we see on slide 14 is

6     stabilized market share during the class period.

7          And this is measured against prior to the class

8     period where we see much larger fluctuations in market

9     share.  So when Smithfield cut in 2009, you would expect in

10    a competitive market to see other defendants increase their

11    supply to gain market share, and that in fact is not what

12    we see, which supports the inference of a conspiracy here

13    to stabilize supply.

14         The conspiracy is also made more plausible by the

15    various foundational plus factors that this Court has

16    already recognized, but I will just review briefly.  Slide

17    15 shows a very heavily consolidated market.  There are

18    very few players.  We see a simplified structure which

19    facilitates collusion.  When you have a small number of

20    players it's much easier to communicate.  It's much easier

21    to coordinate.  It's much easier to reach an agreement.

22         Four packers controlled roughly 70 percent of the

23    market by 2015.  Eight packers exceed 80 percent of the

24    market.  This type of heavily consolidated industry almost

25    lends itself to collusion as this Court has recognized.  In

1    slide 16, another factor that heavily supports collusion

2    and the inference of plausibility here is that this is a

3    commodity product.  Pork is fungible.  Bacon is bacon.

4    Pork chops are pork chops.

5            One defendant doesn't sell a branded item that

6    isn't easily interchangeable by another.  These defendants

7    compete on price, and when there is an interchangeable

8    product where you compete on price, it is much easier to

9    form a conspiracy to constrain the supply and price of that

10   item.

11           Looking at slide 17, we see public signaling.  We

12   see in 2009 Smithfield's CEO saying its cuts were not

13   enough to fix the industry and somebody else has got to do

14   something.  We see other producers, Tyson, Hormel and

15   Triumph, each cut production in 2009, and in 2009 we see

16   Smithfield's CEO confirming that he was aware other

17   producers were cutting back.

18           There is other instances of public signaling

19   throughout the complaints.  In December 2010, Smithfield's

20   CEO said, Given the information we think we have publicly,

21   plus what we think we know privately, how many they kill,

22   what their processing levels and things like that, they

23   didn't think supply would increase.

24           The defendants had inside information, Your

25   Honor.  This case is not limited alone to public signaling

1     because of the existence of the Agri Stats reports which

2     did give the defendants unparalleled access to each other's

3     sensitive business information.

4          Looking at slide 18, we see another plus factor,

5     which is abnormal price movements.  This is the pork cutout

6     price.  A cutout is the cost paid for the pig versus the

7     price received when you sell that pig.  The vertical line

8     in the middle of this table is the beginning of the class

9     period.  At one point in time during the class period we

10     have measured a 56 percent increase in price, an incredible

11     abnormal price movement indeed.

12          On average, there was an 18 percent increase in

13     price.  The plausibility of the conspiracy is supported by

14     this inference that something happened in 2009, that the

15     defendants entered into an agreement, either a per se

16     horizontal conspiracy to constrain supply or an agreement

17     to exchange information under the rule of reason, which

18     made a break from what had happened previously and that

19     dramatically -- and that dramatically impacted the price of

20     pork in the market.

21          Slide 19 gives you in general the framework for

22     the rule of reason case which I will not belabor here.  I'm

23     sure Your Honor is very familiar with it, but in general

24     courts have found that the exchange of current pricing

25     information in a market is anti-competitive, particularly

1     where you have the market structure present that we have

2     here.

3              Slide 20 shows you that each of these defendants

4     knowingly entered into this agreement.  Agri Stats reports

5     are very unusual.  On the first or second page of it, it

6     gives each defendant a list of the participants in that

7     report.  It tells you that your other coconspirators have

8     provided the same sensitive business information that you

9     are providing.

10             Agri Stats in marketing its services also

11    disclosed to the participants who was participating, and

12    you can see that on the slide 20.  It would tell each of

13    the defendants who else was participating in giving data,

14    ensuring that those defendants knew their coconspirators

15    were participating.

16             On slide 21, we outline that the plus factors

17    which support the per se conspiracy here also dramatically

18    support the plausibility of a rule of reason claim.  The

19    pork market features all of the market structures that the

20    Supreme Court stated in *Container Corp* were likely to make

21    an information exchange anti-competitive.

22             Again, roughly eight players control 80 percent

23    of the market.  Pork is fungible.  There is inelastic

24    demand.  There is price based competition, and there is a

25    trend towards priced based uniformity.  Collusion is easier

1    when prices are the only way that product can be

2    differentiated.

3           Defendants have raised questions regarding

4    whether or not the information contained in these Agri

5    Stats reports is current, but of course it's crystal clear

6    that the Department of Justice handbook only allows a safe

7    harbor for pricing information that is older than three

8    months, and that is not the case here.

9           The Agri Stats data is two to six weeks old at

10   best.  This information is highly confidential.  It is

11   available only to the defendants.  It is very one-sided in

12   a marketplace where only the defendants have the access to

13   this pricing and supply information, where other big market

14   players wouldn't, distributors, grocery stores, retail

15   chains, any of those other market participants that are

16   looking to purchase themself or have no access to this Agri

17   Stats data.

18          And because of its heavily detailed nature,

19   market participants who have seen it, employees of

20   companies, employees of Agri Stats, know how to

21   de-anonymize these reports and are able to discern which

22   competitor places at what place in the report.  Of course

23   this is facilitated by the index that appears at the

24   beginning of the report telling each defendant who is

25   participating in that particular sales report or cost

1    report or processing report.

2         We have given the Court examples of the Agri

3    Stats sales reports.  Some of them were attached to the

4    complaint.  They are very large.  We also put screen shots

5    in our complaint of what they might look like.  On slide

6    23, there is a brief, just a brief screen shot of an Agri

7    Stats sales report and a column because we just wanted to

8    point out to Your Honor.

9         In that top right-hand column where it says

10   Economic Impact Dollars, what that is telling each

11   coconspirator is the amounts of money that they would make

12   if they raised the price of that particular skew or

13   product -- and it's a very detailed list -- if they raised

14   their price to either the national average or the top 25

15   percent, how much additional money they would make.

16        This is a Tyson report published in October 2009,

17   and it has information through August 2009.  This makes

18   this pricing information only six weeks old.  It's

19   incredibly detailed.  It breaks out for the coconspirators

20   how much more money they could make if they did raise their

21   prices.

22        It's not the type of information that normal

23   competitors would provide to each other.  These reports are

24   the only thing that Agri Stats provides.  If you look at

25   slide 24, we have here the Agri Stats sales data miner,

1    which also includes detailed pricing information.

2              This, the Agri Stats sales data miner has

3    information by category, by group, by product type and by

4    preparation and gives in this case Tyson –– this document

5    was a Tyson interaction with Agri Stats –– the impact again

6    of the dollar value that that company would make if it

7    raised its prices to the national average, and this

8    information we believe is available to the coconspirators

9    online kind of as you query.  This is not something they

10   needed to wait for the report to be disseminated.

11             Turning to slide 25, again emphasizing, this is

12   as current information as one can have when it's only two

13   to six weeks old, when it is as sufficiently detailed as it

14   is and when it calls out for all of the coconspirators the

15   amounts of money that they could make were they to raise

16   their price.

17             It suspends disbelief that the defendant would

18   pay the amounts of money that they do to this private

19   service Agri Stats, provide the detailed data that they do

20   to this company and knowing that it goes to their

21   competitors if they were not using this information to

22   raise their prices and to stabilize supply.

23             And we can take a look at what the defendants

24   actually did, again realizing that the plaintiffs have had

25   only limited discovery, a very small number of documents

1    produced, but even that very small number produced shows us

2    that defendants did use Agri Stats to identify pricing

3    opportunities.

4          One of the bullet points on slide 26 points out

5    for you that Noel White, the future Tyson CEO, in an e-mail

6    that was reported to Agri Stats is insistent that the info

7    be very clear, concise and indicate opps with ease, and the

8    opportunities that he wanted indicated with ease were the

9    opportunities for Tyson to increase the price of its

10   products, and that's the economic impact column that Agri

11   Stats has in all of its economic impact reports.

12         Agri Stats also had regular meetings with the

13   defendants, slide 27.  It would travel from defendant to

14   defendant and meet with the executives.  This example on

15   slide 27 is between Tyson and Agri Stats, and some of the

16   key take-aways from the meetings were that if they

17   increased the price of certain products there was an

18   opportunity to price up into the top eight.

19         This is exactly the type of impact document one

20   would expect to see if Agri Stats were being used for

21   pricing opportunities, and that is indeed what we see from

22   the small number of documents that were produced.

23         On slide 28 we have outlined just a small number

24   of things from the initial disclosures which shows that

25   high level executives were designated to oversee the

1    relationship with Agri Stats and to oversee the

2    transmission of data to and from Agri Stats.

3              That is the level of importance that these

4    defendants ascribed to the Agri Stats reports, that they

5    would put such high level directors, treasurers, division

6    controllers in control of this relationship.

7              Your Honor, just briefly on the -- I'm finished,

8    unless Your Honor has any questions further on the rule of

9    reason or the per se?

10             THE COURT:  I just had one question.  Other than

11   participating in providing information to Agri Stats, are

12   there any other allegations against Indiana Packers?

13             MS. SCARLETT:  Your Honor, I would have to go

14   back through the complaints in detail, but I believe in

15   large part, the allegations against Indiana Packers rest

16   with their participation in Agri Stats.

17             THE COURT:  All right.  That's what I thought.

18   Thank you.

19             MS. SCARLETT:  Just briefly addressing Rule 9(b),

20   it's a very fact specific inquiry.  Your Honor is more than

21   capable of addressing it, but it's whether or not these

22   claims sound in fraud.  These are price fixing and supply

23   constraints antitrust claims.  These are not consumer

24   allegations of deception of packaging or labeling.  These

25   are the core critical antitrust claims.

1           Other cases have certainly found they do not

2     sound in fraud and have applied the same level of scrutiny

3     that Sherman Act claims have at the motion to dismiss

4     stage, but even if, Your Honor, even if you wanted to apply

5     the 9(b) standard, the plaintiffs here, the indirect

6     purchaser complaint alone is 177 pages.

7           It details timing of statements.  It details who

8     said them.  It details a large number of the Agri Stats

9     reports.  There is sufficient allegations here to support a

10    9(b) complaint, even though the indirect purchasers and

11    other plaintiffs do not believe that it is appropriate at

12    this time.

13          Unless Your Honor has further questions on that,

14    I will cede the rest of my time to Mr. Pouya for the direct

15    purchasers.

16          THE COURT:  Thank you, Ms. Scarlett.

17          Mr. Pouya?

18          MR. POUYA:  Good afternoon, Your Honor, Bobby

19    Pouya for the direct purchaser plaintiffs.  I will be

20    addressing defendants' statutes of limitations arguments.

21          Your Honor, defendants' statute of limitations

22    attacks on plaintiffs' complaints failed because plaintiffs

23    sufficiently alleged fraudulent concealment and the

24    continuing violation doctrine.

25          First, with respect to fraudulent concealment,

1    defendants' conspiracy did not take place in the light of

2    day.  Rather, it was conducted in secret in order to

3    prevent discovery by the plaintiffs and class members, and

4    while this district has recognized that antitrust

5    conspiracies are inherently self-concealing in the *United*

6    *Power Association* case, we pled affirmative acts of

7    concealment in this case which would plead fraudulent

8    concealment under any standard, even the most stringent

9    standard that is applied in this district.

10            There is at least three acts of concealment here,

11   Your Honor.  The first is the exploitation and exchange of

12   information through Agri Stats.  As Ms. Scarlett went

13   through in her presentation, Agri Stats is a company that

14   exchanges information by the defendants for the defendants.

15            The plaintiffs and the class members did not have

16   any access to those reports or the information that is

17   exchanged therein, and in fact, the principles of Agri

18   Stats is predicated on confidentiality for persons outside

19   of the defendants while sharing that information, that

20   sensitive information, amongst the defendants themselves.

21            The reports that have been received from Agri

22   Stats in this case have been marked highly confidential by

23   the defendants, and the ones that are attached to the U P

24   complaint are still sealed, and defendants in their

25   presentation, Mr. Parker said that public -- Agri Stats was

1    public.  Yes, they had a public website that made them look

2    like a farm and they, the fact that they are -- they exist

3    as an entity was disclosed.

4         But nowhere was it obvious that the information

5    that they were exchanging were to the level of degree that

6    has resulted in the actions here until at least 2017, and

7    simply calling Agri Stats a benchmarking service provides

8    nothing to the public to provide them with that information

9    and put them on notice that the information exchange list

10   was occurring here.

11        The other thing that defendants did was provide

12   pretext and justifications intended to prevent discovery of

13   the conspiracy, and again, this is not a conclusory

14   allegation.  We alleged in the complaint that defendants

15   falsely attributed the rising pork prices and the stability

16   in the pork market to things such as good programs with our

17   retailers and lower grain costs, rather than the

18   conspiratorial acts.

19        They attributed the stabilization in capacity to

20   rumors that China was going to purchase more corn rather

21   than the conspiracy.  They claimed that heat waves and

22   drought and feed prices were the reason behind pork prices

23   increasing rather than the conspiracy, and we further

24   allege that defendants took advantage of industry meetings

25   as opportunities to collude in order to avoid detection.

1           And again, this is not a summary allegation.  We

2    allege in detail the industry associations that were

3    involved, the meetings that took place, the persons from

4    defendants that participated in those meetings and our

5    allegation that they were exploited in furtherance of the

6    conspiracy.

7           So in viewing whether these affirmative acts are

8    sufficient to establish fraudulent concealment, I believe

9    that two summary judgment decisions are appropriate to look

10   at and enlightening, and one was the *In Re:  Monosodium*

11   *Glutamate* case which Mr. Parker decided.

12          If you look at that case, that was a summary

13   judgment decision by Judge Magnuson who also decided *In Re:*

14   *Milk*, and if you look at the allegations in that case that

15   went past summary judgment in terms of fraudulent

16   concealment, it was communicating by phone so as not to

17   leave a paper trail, falsifying travel and expense reports,

18   using secret codes, orchestrating price increases to avoid

19   arousing customer suspicions and giving false reasons for

20   price increases.

21          The allegations of fraudulent concealment that

22   got the plaintiffs past summary judgment in *Anderson versus*

23   *Dairy Farmers of America* which this court decided in 2010

24   were even more scant.  The Court said, The evidence of

25   fraudulent concealment is someone weak, and all that got

1    the plaintiffs past summary judgment was an allegation that

2    the defendant attributed the purchase of cheese that they

3    were using to manipulate milk prices to legitimate

4    purchases that they needed.

5              So in this case, even though we're only at the

6    motion to dismiss stage, we believe we have more than that,

7    and we have alleged affirmative acts to establish

8    fraudulent concealment by the defendants.  The other issue

9    here is inquiry notice, whether plaintiffs were on inquiry

10   notice to discover and take affirmative acts to discover

11   defendants' conduct.

12             The defendants claim that plaintiffs were on

13   inquiry notice regarding defendants' unlawful acts because

14   the alleged conspiracy -- conspiratorial acts were public.

15   If this was the law, it would be impossible to establish

16   fraudulent concealment because all complaints are

17   inherently derived from publicly available information.

18             The Eighth Circuit expressly rejected this

19   standard in the *Great Rivers Cooperative* case.  It states

20   that courts in this district cannot automatically impute

21   plaintiffs' constructive knowledge of any information

22   available to the public, including all articles published

23   on and the publicly available records to the plaintiffs.

24             Instead, *Great Rivers Co-Op* states that inquiry

25   notice is an objective standard which requires some storm

1    warnings that would alert a reasonable person of the

2    possibility of misleading information.  So the question is,

3    What were the storm warnings here?

4         I believe the defendants said it best in their

5    presentation on slide 4.  There is no eureka moment here.

6    We agree.  There is no one public source of information

7    which placed plaintiffs on notice regarding the existence

8    of an antitrust conspiracy.  There was no publicly

9    disclosed DOJ, FTC or enforcement action.  There is no

10   other lawsuit on file alleging similar allegations in the

11   pork industry.

12        The defendants' production statistics were not

13   easily accessible, and the complaints as well pled as they

14   are, they are derived from numerous different sources, not

15   one source, not one thing that would excite the reasonable

16   consumer, the reasonable purchaser of pork, and absent

17   that, the plaintiffs aren't required to do what defendants

18   ask them to do, which is compile pricing data and analyze

19   it using expert witnesses or listen in on earnings calls

20   and review SEC filings just because they happen to be

21   publicly available.

22        And with respect to Agri Stats, plaintiffs didn't

23   even have access or know what kind of information was being

24   exchanged until at least 2017.  The other thing that

25   defendants have done is, they have attacked the two

1    articles, the Bloomberg article from February 2017 and the

2    UP second amended complaint in *Broilers*, which we allege

3    would be the first indication that something was awry, at

4    least as it relates to Agri Stats.

5          Even those documents, they relate primarily to

6    chicken.  We agree.  They do relate primarily to chicken,

7    and the fact that that is the closest thing we have to an

8    eureka moment here indicates how little there was in the

9    public record.  So that fact, the fact that they did relate

10   to chicken, would not support defendants' argument.  It

11   would just mean there was nothing before we filed our

12   lawsuit to put us on inquiry notice.

13         Turning to the continuing violation doctrine,

14   which the defendants are not -- now attempting to call the

15   continuing conspiracy doctrine, the continuing violation

16   doctrine as this court held in *Propane I* in 2017 does not

17   require conspiratorial acts during the statute of

18   limitations period.

19         All that it requires is that product that was the

20   subject of the conspiracy be sold at inflated prices.

21   *Propane I* held at footnote 2, "Because continued sales at

22   super competitive prices are overt acts under the

23   continuing violations doctrine, this court need not address

24   plaintiffs' allegations that defendants' conspiratorial

25   communications about pricing and full levels were

1      additional overt acts sufficient to invoke the theory."

2              So even if you take defendants' perspective as

3      true and they say, this is, this conspiracy is limited to

4      supply restrictions, and those ended in 2013, we don't

5      agree with that, but even taking it as true, the continuing

6      violations doctrine would apply because there was products

7      sold at artificially inflated prices thereafter as a result

8      of that conduct.

9              THE COURT:  So --

10             MR. POUYA:  This is again [indiscernible due to

11     audio interruption] allegation.

12             THE COURT:  Mr. Pouya, I have a question.  So

13     assuming that affirmative acts to reduce supply stopped at

14     some point in time because of the increase in supply that

15     is shown in the data, are there cases that support the

16     argument that a continuing violation can be adequately

17     pleaded by simply sharing information?

18             MR. POUYA:  Well, the case law that would

19     interpret it, I believe you're talking about Agri Stats

20     which is the foundation --

21             THE COURT:  Yes.

22             MR. POUYA:  Yes.  Not only the rule of reason

23     claims but the per se claims.  So to the extent that those

24     were acts in furtherance of the conspiracy, those are

25     overt, additional overt acts in furtherance of the

1    conspiracy, the conspiracy would therefore still be in

2    effect, and everything sold during that period would be

3    subject to, would be part of the conspiracy.

4            But I don't even think the Court needs to get

5    there because even if you take defendants' perspective that

6    the overt conspiratorial acts ended in 2013, which we don't

7    agree with, the impact on prices continued thereafter, and

8    again, this is not a conclusory allegation.

9            It's reflected in the fact that we have alleged

10   specific facts regarding the pork production cycle and the

11   effect that cuts have over a long period of time on prices,

12   and that's at paragraphs 50, 70 and 71 of the DPP

13   complaint.

14           As Ms. Scarlett showed in her presentation

15   earlier today, we have also analyzed prices before and

16   after the conspiracy, and that analysis shows that the

17   pricing impact of the conspiracy continued through the

18   present, and those allegations, again, are specific in the

19   complaints.

20           With regard, turning back to your question again,

21   Your Honor, with regard to acts that continued after 2013,

22   it's undisputed that defendants continued to exchange

23   information through Agri Stats through the present.  That

24   conduct has not stopped, and that conduct is central to our

25   claims.

1           Also as Ms. Scarlett pointed out, we do not

2     simply allege that the conspiracy is one to decrease

3     supply.  It's one to stabilize supply, and we have also, we

4     believe, established that the supply was restrained and did

5     not recover in a manner that it would have but for the

6     conspiracy due to the defendants' conspiratorial conduct.

7           That's all I have for my presentation, Your

8     Honor, unless you have any further questions.

9           THE COURT:  No.  That is fine.

10          Who is next?

11          MR. FINLEY:  Good afternoon, Your Honor.  This is

12    Blaine Finley for the commercial and institutional indirect

13    purchaser plaintiffs, and I will be addressing the issue

14    regarding Article III standing and class certification.

15          THE COURT:  All right.  Thank you.  Go ahead,

16    Mr. Finley.

17          MR. FINLEY:  And so this issue is fundamentally

18    an issue of representative litigation, which is to say,

19    with these named plaintiffs that have brought claims, can

20    they also bring claims on behalf of absent class members,

21    and this question is present both with regard to absent

22    class members in the same state and in other states.

23          In other words, this distinction that defendants

24    draw is ultimately a distinction without a difference in a

25    situation like this one, and this question because it

1   relates to representative litigation is most appropriately

2   addressed first and foremost under Rule 23 and the

3   standards that it sets forth at the class certification

4   stage of their case.

5          And so if you go to the presentation, the Power

6   Point presentation of the defendants on this issue, they

7   essentially ignore *Amchem* and *Ortiz*, and I suggest that the

8   holding in those cases that class cert can be logically

9   antecedent to standing doesn't apply in a situation like

10  this.

11         However, in my group's briefing on this subject,

12  there are numerous District Court opinions that have

13  interpreted those two Supreme Court opinions to allow

14  courts to defer a decision on standing until class

15  certification, and in fact, one of those opinions *Roth v.*

16  *Time Life Fitness* was written by Your Honor.

17         And in general, there has, I would say, there has

18  been a movement toward deferring standing determinations

19  until class certification in circuits across the nation.

20  There is an opinion cited in my group's briefing *In Re:*

21  *Carrier IQ, Inc.*, and it collects District Court opinions

22  under the circuits, the Second and Ninth, that reach

23  similar results to what plaintiffs advocate here.

24         In addition, commercial indirect's briefing cites

25  to *In Re:  Asacol*, which is a First Circuit opinion that

1    suggests that it is appropriate in the antitrust class

2    action context to defer a determination on standing until

3    class certification, and so then why is deferring a

4    determination on standing appropriate in this particular

5    case?

6           And a major answer to that is that the

7    allegations in this case are with respect to a nationwide

8    conspiracy.  The scope and effect of the alleged conduct

9    are alleged to be nationwide.  The effect is alleged to be

10   uniform as well.

11          And another point to consider is that it would be

12   an odd result to determine standing now and say we're

13   taking these claims out of the case because the commercial

14   indirect named plaintiffs in this case are already bringing

15   nationwide federal injunctive claims under the Sherman Act

16   on behalf of absent class members from states where there

17   isn't currently a named plaintiff in this litigation.

18          So the situation would be, the current named

19   plaintiffs would be representing some of the claims but not

20   the damages claims, and it's arguably an absurd result or

21   it would be.  As far as some of the cases the defendants

22   have cited, I would like to take a brief minute or two

23   treating those.

24          In *Insulate*, the entire matter was going away

25   anyways on the basis of *Twombly*, and so language in that

1    case about not deferring standing is dicta in the view of

2    the plaintiffs.  In *McAteer v. Target Corp*, all of the

3    claims were ultimately dismissed for a number of reasons,

4    for reasons that did not necessarily have to do with

5    standing.

6            Among others the Court mentions, indicated, that

7    some of the claims were, constituted nonactionable puffery,

8    and *Ferrari v. Best Buy Co.* is a consumer products case

9    where the named plaintiff bought one type of television,

10   and there might have been issues about whether the named

11   plaintiff only relied on a subset of the advertising that

12   was put out into the market by defendants.

13           And so factually or as far as the ultimate

14   outcome, these cases don't necessarily speak directly to

15   this issue of whether and when it is appropriate to defer

16   the decision on standing, and then as my second defined

17   matter, commercial indirects would pose the question, what

18   is gained by deciding standing now before the class

19   certification stage at which it is appropriate to decide

20   standing?

21           A likely outcome would be a number of new named

22   plaintiffs in a random motion to dismiss briefing.  That

23   would be the cost, but what is gained is unclear,

24   especially in a case like this where what is at stake is a

25   nationwide antitrust conspiracy.

1          And as a final matter I will note that in

2     defendants' presentation there is a bullet point about

3     *Illinois Brick*, and as I recall, *Illinois Brick* was not in

4     their briefing with respect to this Article III standing

5     class certification issue, and in addition, counsel did not

6     elaborate on this issue, and I'm not sure it's properly

7     before the Court for that reason.

8          That's all I have, unless Your Honor has

9     questions.

10          THE COURT:  No.  That's fine, Mr. Finley.  Thank

11     you.

12          Who is next?

13          MR. BATES:  Good afternoon, Your Honor.  Kyle

14     Bates for the Commonwealth of Puerto Rico, and I will be

15     addressing defendants' Puerto Rico specific arguments.

16          THE COURT:  All right.  Thank you.

17          MR. BATES:  Your Honor, turning to *parens patriae*

18     standing, I want to raise the background presumption from

19     the Supreme Court which the defendants did not address in

20     their presentation today, and the *Snapp versus Puerto Rico*

21     decision which is cited on page 18 of our brief quotes

22     that, "The prerogative of *parens patriae* is inherent in the

23     supreme power of every state."

24          So that's the background presumption about

25     actions by states in their capacity as *parens patriae*, and

1    there are two avenues to pursuing claims in the capacity of

2    *parens patriae*.  One is by express statutory authority, and

3    the other is by satisfying the multi factor test in the

4    *Snapp* case.

5           And here there are -- the language of the statute

6    that confers *parens patriae* authority to Puerto Rico in

7    this case, which is cited on page 19 of our opposition, is

8    32 LPRA 3341 which says that the Commonwealth

9    of Puerto Rico through its agencies, dependencies and

10   instrumentalities in their capacity of *parens patriae* may

11   file a class suit on behalf of consumers for damages.

12   That's what the statute says.

13          THE COURT:  Why does the statute say class suit

14   there?  I'm not sure whether a Commonwealth or a state can

15   file a class suit.  What do you think that means?

16          MR. BATES:  Your Honor, we think it means a

17   representative suit as opposed to a class action, which is

18   a term of art in federal jurisprudence under Rule 23.  The

19   *LG Display versus Madigan* case, which is cited on page 20

20   of our brief which is a Seventh Circuit decision from 2011,

21   it goes into detail about the difference between a *parens*

22   *patriae* case and a class action.

23          And on page 772 of that decision, the court said,

24   The class action must be brought by a representative

25   person, a class representative, as opposed to an attorney

1    general which is who brings this case, and there are other

2    Rule 23 procedural requirements like adequacy, typicality

3    and commonality that are required to be met in a class

4    action that are not required to be met in a *parens patriae*

5    action like this one.

6            And that's what the Seventh Circuit held in *LG*

7    *Display*.  It's what the Fourth Circuit held in *CVS*

8    *Pharmacy*.  It's what the Ninth Circuit held in *Chu Mei*

9    *Intellects Corporation* [phonetic].  Defendants don't

10   address any of those instances.  They simply substitute the

11   phrase "class action" for "class suit."

12           In fact, Your Honor, the *Cardizem* case which is

13   cited on page 19 of our brief, it is 218 F.R.D. 508,

14   interpreted this exact statute, Section 3341, and held that

15   Puerto Rico, along with 13 other attorneys general were,

16   "Expressly conferred *parens patriae* authority."

17           So for those reasons, Your Honor, we respectfully

18   submit that Puerto Rico does have express statutory

19   authority to proceed as *parens patriae*.  Even so, Your

20   Honor, Puerto Rico satisfies the *Snapp* factors.  *Snapp* only

21   requires that Puerto Rico show that it has a quasi

22   sovereign interest in the claims at issue.

23           And by that, Puerto Rico needs to show that it is

24   not, "Only a nominal party without a real interest," and

25   Puerto Rico clearly has its own interest in this case which

1    were evident by the damages it seeks for its other counts.

2          And furthermore, courts, including this district,

3    have repeatedly held that a state maintains a quasi

4    sovereign interest either where the health and well-being

5    of its citizens are affected or where the state works to

6    ensure that its residents enjoy the full benefit of federal

7    laws, and that's *Minnesota by Humphrey versus Standard Oil*,

8    568 Federal Supplement 556, this court's decision of 1983.

9          In the *Standard Oil* case this district assessed

10   Georgia's antitrust case that it brought about price fixing

11   in the rail freight market, and this court concluded that

12   if Georgia properly brought a claim under *parens patriae*

13   because it had a quasi sovereign interest in ensuring that

14   its residents had access to properly priced rail freight.

15         And defendants' only argument that Puerto Rico

16   doesn't satisfy the *Snapp* factors are that pork is not an

17   appropriately important aspect of Puerto Rico's culture,

18   and we submit that rail freight is probably not a

19   significant feature of Georgia's culture, but nevertheless

20   ensuring, it is clearly a quasi sovereign interest in

21   ensuring that Puerto Rico's citizens are protected and that

22   they enjoy the full protection of federal law.

23         So for those reasons we contend that Puerto Rico

24   satisfies the *Snapp* factors.  Unless Your Honor has other

25   questions, I will move on to Section 259.

1            THE COURT:  That's fine.  Go ahead.

2            MR. BATES:  As defendants noted during their

3    presentation, Puerto Rico is seeking injunctive relief, and

4    there is not a dispute about that.  At this point, as you

5    can see from the parties' papers, defendants' argument

6    about the deficiencies of Puerto Rico's claim under Section

7    259, to the extent that they are not subsumed within

8    defendants' larger *Twombly* arguments, are that Puerto Rico

9    hasn't complained of an unfair practice, and that's just

10   not true.

11           Your Honor, you heard from Ms. Scarlett earlier

12   today.  There was coordination among vertically integrated

13   coconspirators, and you heard from Mr. Pouya that the Agri

14   Stats conspiracy was created for defendants by defendants

15   literally to share price sensitive information with each

16   other that wasn't to be shared by anybody who wasn't in the

17   club, and that's the definition of an unfair or deceptive

18   act and practice.  Those are alleged all throughout

19   plaintiffs' complaint, as you heard from my colleagues

20   earlier today.

21           Moving on to Puerto Rico's claim under Section

22   260, Your Honor, the inquiry that is before the Court today

23   concerns Puerto Rico, the sufficiency of Puerto Rico's

24   allegations regarding defendants' intent to monopolize.  A

25   claim for conspiracy to monopolize has three elements,

1    which are set out on page 7 of our brief, and the first two

2    of those elements are subsumed in a Section 1 claim, which

3    defendants don't dispute.

4           They admit that on page 5 of their reply, which

5    is at ECF 116, and so assuming that the sufficiency of

6    plaintiffs' Section 1 claim proceeds, all that is left for

7    the Court to consider in considering Section 260 are the

8    specific intent to monopolize, and defendants argue that

9    Puerto Rico hasn't made any allegations about market power

10   or the intent for defendants to monopolize.

11          Again, that's just not what the complaints say.

12   Paragraph 35 of Puerto Rico's complaint says that beginning

13   in at least 2008, Agri Stats began to propose a series of

14   benchmarks to the swine industry along the lines of the

15   benchmarks use to restrain competition in the broiler

16   industry.

17          Paragraphs 35 and 36 talk about how Agri Stats

18   marketed this benchmarking club to everyone in the

19   industry, and in 2008, Greg Bilbrey of Agri Stats said that

20   each and every commercial swine operation is encouraged to

21   participate in some benchmarking effort, and that's

22   plaintiffs' complaint at paragraph 36.

23          The market power of defendants is addressed

24   throughout all of the plaintiffs' complaint.  In this case,

25   specifically in Puerto Rico's complaint, it's discussed at

1   paragraph 78 where it talks about the top four pork

2   integrators, Smithfield, Tyson, JBS and Hormel, increasing

3   their market share by almost double by 2015 and that the

4   top eight pork integrators had a market share exceeding 80

5   percent during the relevant time period, and Ms. Scarlett

6   mentioned that as well, but it is in paragraph 82.

7          THE COURT:  The same question I asked earlier.

8   How are competitors impacted?  Wouldn't their prices or the

9   amount of money they got for their product have increased

10  as well?  So how is there a monopolization?

11         MR. BATES:  Your Honor, defendants claim that

12  exclusionary conduct is somehow an additional element of a

13  Section 2 claim, and while monopolization can exclude

14  rivals, it certainly doesn't have to exclude rivals.

15  Competitors can be incidental beneficiaries of a

16  conspiracy.

17         What matters for the antitrust laws is harm to

18  competition, not harm to competitors, and that's the

19  Supreme Court in *Brunswick Corporation versus Pueblo*

20  *Bowol-O-Mat*, 429 U.S. 477.  So the fact that competitors

21  may have incidentally benefitted from a conspiracy they

22  weren't a part of doesn't mean there wasn't a conspiracy to

23  monopolize under Section 2 or Section 260.

24         And with that, Your Honor, I will sit down unless

25  you have additional questions.

1          THE COURT:  I don't.  Is there any other argument

2     for the plaintiffs?

3          MR. AHERN:  Your Honor, this is Patrick Ahern for

4     the Winn-Dixie plaintiffs.  I don't know if -- I'm being

5     heard.  I don't know if I'm being seen.  I don't need to be

6     seen.

7          THE COURT:  You're both being heard and seen,

8     Mr. Ahern.

9          MR. AHERN:  All right.  Just about four points,

10    Your Honor.  The first one is just calling Your Honor's

11    attention to two different parts of our complaint, and I

12    think these are mirrored in the complaints of the other

13    plaintiffs.

14          In paragraph 148 there is an allegation that

15    Tyson and Smithfield announced cuts on the very same day,

16    July 25th, 2009, and I just wanted to make sure that the

17    Court had that in mind.  In paragraph 128, there is an

18    allegation that in June of 2014 that Hormel announced that

19    it was reducing capacity at its Los Angeles plant.

20          The second point, Your Honor, relates to the

21    statute of limitations.  I think there are two things

22    important here.  A continuing violation can be a continuing

23    harm.  It doesn't have to be an overt act, and this is

24    exactly what *Hanover Shoe* says at page 502.  *Hanover Shoe*

25    is 392 U.S. 481.

1          At 502, footnote 15, the Supreme Court says, A

2     continuing violation of the Sherman Act which inflicted

3     continuing and accumulating harm, and the distinction

4     between the continuing and accumulating harm and the overt

5     act was picked up by the Eleventh Circuit in the *Morgan's*

6     *Market* case, 198 F.3d at 828.

7          We think that this is an important issue when it

8     comes to what Mr. Pouya mentioned in terms of reductions in

9     supply in this type of a setting.  I just litigated this

10    issue in *Winn-Dixie versus Southeast Milk* in connection

11    with a program that was challenged reducing the herds of

12    dairy cows, and there is a lasting effect of these types of

13    reductions in supply.

14         And that's just something we wanted the Court to

15    be aware of, and as Mr. Pouya said, there are allegations

16    in the complaints that relate to this.

17         The second point about continuing violation is,

18    it is often analyzed in the context or with, along with the

19    issue of withdrawal of the conspiracy.  If Your Honor

20    believes or finds that there are adequate allegations for a

21    production, a conspiracy to reduce production and supply

22    through 2013, then the defendants must affirmatively show

23    that they withdrew from the conspiracy, and this is

24    important.  This adds added importance to the use of Agri

25    Stats.

1          Obviously the defendants have not shown that

2     here.  Probably on a motion to dismiss that's not

3     surprising because this is an intensely factual issue, but

4     in, once again, in the *Winn-Dixie versus Southeast Milk*

5     case, the Court dealt with both the issue of continuing and

6     accumulating harm, along with the issue of withdrawal, and

7     found that on summary judgment that was a factual issue.

8          The third point, Your Honor, is that -- the third

9     point was relating to the impact of a reduction in supply

10    that has a lasting effect, and I think I covered that.  The

11    fourth point, Your Honor, is that we allege that Agri Stats

12    was used to carry out the conspiracy.

13         Included in that is policing and monitoring the

14    conspiracy, and in the absence of the defendants indicating

15    that they withdrew from the conspiracy, Agri Stats

16    continued to be used and continued to be used to monitor

17    and police the conspiracy, both with respect to prices and

18    with respect to the reduction in production or to hold

19    production stable when prices increased.

20         If Your Honor doesn't have any questions, that's

21    all I have.

22         THE COURT:  That's all.  Thank you, Mr. Ahern.

23    Anyone else from the plaintiffs?

24         Okay.  If not, we will switch to any reply by the

25    defense, but I'm going to take a short break here.  This is

1    the time of our weekly call for all of our staff to call in

2    to bring them up-to-date on what is going on with our

3    response to the virus.  That only takes about five to seven

4    minutes or so, so I will be right back.  So stay on.

5              MR. NEUWIRTH:  Thank you, Your Honor.

6                      **(Recess taken.)**

7

8              **(In open court via video conference.)**

9              THE COURT:  All right.  Who is going to be first?

10             MR. NEUWIRTH:  Thank you, Your Honor.  Stephen

11   Neuwirth.  I will be speaking first, and I'm going to be

12   responding on the federal Sherman Act claims.

13             THE COURT:  All right.

14             MR. NEUWIRTH:  Thank you.  Your Honor,

15   Ms. Scarlett started with two overarching points.  The

16   first was her concern that defendants were purportedly

17   relying on documents outside of the complaint.  Nothing

18   could be further from the truth.  Every single document I

19   spoke about today was a document that was quoted from,

20   cited or attached to the complaint.

21             As you will see in our argument binder, every

22   single document referenced had a citation to the complaint,

23   the paragraph where it appears.  The charts that we showed

24   you are charts obtained from plaintiffs' own complaints.

25             We gave you the paragraph numbers, and we showed

1     you the case law, including your own opinion from 2013,

2     that documents cited and embraced in the complaint are

3     appropriate to consider on a motion to dismiss, and once

4     they are in the complaint, the plaintiffs can't cherry-pick

5     from those documents and try to characterize them in ways

6     that are inconsistent with what the documents actually say.

7               COURT REPORTER:  Mr. Neuwirth, I am sorry.  This

8     is the court reporter.  For some reason you are very

9     distorted.  I think it is because you are actually kind of

10    animated and you are moving around a little bit.  If you

11    could maybe try to sit still.  Let's see if that will work.

12    Okay?

13              MR. NEUWIRTH:  Thank you, Madam Court Reporter.

14              COURT REPORTER:  And I ended with, "Inconsistent

15    with what the documents actually say."

16              MR. NEUWIRTH:  Thank you for your guidance on

17    this.

18              The second point that Ms. Scarlett made was to

19    focus even more heavily on the President's executive order

20    from April 28th, 2020.  It's critical that the text from

21    that order that the plaintiffs seek to highlight from page

22    5, even accepting everything it says as true, says nothing

23    more than the [indiscernible due to audio malfunction] can

24    have an impact on supply.

25              That's it, and in fact, the language that is in

1    quotes there, the only example has to do with meat

2    processing facilities.  The word "pork" does not appear in

3    any of this text.  This document says absolutely nothing

4    about whether [indiscernible due to audio malfunction] is

5    the critical issue at this stage, whether the plaintiffs

6    can show parallel conduct.

7            This document has nothing to do with parallel

8    conduct.  Absolutely nothing.  It's not even suggested

9    here, and it's well understood that the actual emergency

10   the document refers to is the health crisis in these meat

11   facilities that the company and the government are both

12   trying to address.  This is beside the point completely.

13           Now, turning to the substance of the argument,

14   there is a great sense of déjà vu today not only because

15   the new complaints are so similar to the original

16   complaints in their deficiencies, but so much of the

17   plaintiffs' argument is literally a repetition of what was

18   said the last time around, reintroducing materials that

19   this Court already considered and found insufficient to

20   solve the problem of the lack of parallel conduct.

21           In the plaintiffs' book, tab 6 has a chart

22   showing average spreads, two columns, average spreads.

23   This chart was in the original complaints.  This chart was

24   discussed at the last hearing, and it was not deemed

25   sufficient to prove anything.

1          Your Honor pointed out in your opinion that this

2    type of [indiscernible due to audio malfunction]

3    information sheds no light on whether there is any parallel

4    conduct in this case.  The charts at tab 7 are also not

5    new.  These two charts related to Tyson and Smithfield's

6    revenues and costs were both in the original complaints.

7          They were specifically talked about at the last

8    hearing on page 49 of that transcript, and these charts not

9    only say nothing about the vast majority of the defendants,

10   but they also prove nothing.  All that they prove is what

11   was the relationship between revenues and costs.

12         That tells us nothing about what was happening to

13   prices as a relative matter, and it certainly tells us

14   nothing about whether these two defendants were doing

15   anything in parallel with anyone else.

16         Now, plaintiffs spend some substantial time

17   trying to assert that parallel conduct does not have to be

18   in lockstep.  The problem is, they're not even close to

19   being parallel by any measure.  Even their time line, which

20   we will look at in a minute, just has sporadic instances of

21   what they try to characterize as supply cutting activity.

22         And a lot of what's on that chart are literally

23   the public statements that Your Honor's last opinion said

24   were insufficient to establish anything sufficient for this

25   complaint to survive on a motion to dismiss.

1          But if you look at tab 8 in our binder, the cases

2     that the plaintiffs themselves cite show that the type of

3     parallel conduct that's necessary is not absent here.  In

4     the *Broiler Chicken* case, it was alleged that all the

5     defendants had production cuts at the same time.  In the

6     *Kleen Products* case, there is uniform and simultaneous

7     supply restrictions and price increases.

8          In the *SD3* case, the changes occur within a

9     period of months, and it was done by each of the

10    defendants.  The *Blood Reagents* case, near pattern of price

11    reducing in close proximity.  The *Interest Rates Swaps*

12    case, identical demands on the same day.  The *Chocolate*

13    case, immediate price increases within two days or within

14    two weeks of each other.

15         Your Honor, there is nothing remotely close to

16    that here, and the timetable of events that the plaintiffs

17    have given you on pages, on the pages of their book are

18    shocking in the extent that they are just repeating what

19    they did last time.  The chart of 2008 to 2009 includes an

20    allegation which says that in February 2009 Hormel stated

21    that it looked for opportunities to reduce production.

22         You at page 9 of your order [indiscernible due to

23    audio malfunction] specifically addressed that statement

24    and said it is not sufficient to count to establish

25    parallel conduct.  That is just one example.

1          On the chart for 2009 and 2010, a statement in

2     August 2009 by JBS, a statement in August 2009 by

3     third-party Steven Meyer, September 2009 statement by the

4     CEO of Smithfield were all addressed in your last opinion,

5     and you said in all of those that they were not sufficient,

6     that they were just general statements about what was

7     happening in the marketplace.

8          None of these allegations are new.  The March

9     2009 statement by JBS was in the original complaint.  All

10    they have done here is put together on a chart materials

11    that this Court has already rejected, and the chart for

12    2013, you asked what could you show besides -- what you

13    asked the plaintiffs, what allegation did they have post

14    2011 besides a single allegation about JBS in 2013.

15         And all they could point you to was a single

16    reported sales price decrease for Tyson in 2013 and an

17    allegation that it decreased its capacity in response.

18    That's it.  The entire period after 2011, that's it.  That

19    is not parallel conduct by any measure, and the only other

20    things on that chart are statements by Hormel and Seaboard

21    in that year that they had lower sales volume, but lower

22    sales volume doesn't mean lower output.

23         It doesn't mean anything other than that you sold

24    less, and remember as we showed you and Ms. Scarlett did

25    not address, the plaintiffs admit that in 2013 there was a

1    PEDv virus that was affecting pigs.  It was affecting that

2    whole industry, and so the fact that certain defendants may

3    have reported lower sales during that period is completely

4    consistent with that statement in the complaint.

5          Now, slide 12 starts with a line that had dots

6    and a line.  This is the chart we showed you which shows

7    that output actually increased over the conspiracy period,

8    and defendants' response is to draw a line through it and

9    say, well, output could have been even higher.

10          The problem is, they showed you this exact same

11   chart at the last hearing, and we made the exact same

12   complaint about it that we would make now, that this

13   drawing of a line with what sales could have done is

14   totally arbitrary.  There is no reason why they don't

15   connect the first dot and the last dot.

16          They could have covered a lot more dots on this

17   chart had they made the line more [indiscernible due to

18   audio malfunction].  They chose not to do that, but again,

19   it's exactly what we looked at in the last hearing.  At tab

20   14, once again, more aggregated data, exactly what Your

21   Honor said in your opinion was insufficient to show

22   parallel conduct.

23          Now, the plaintiffs also spent much more time

24   talking about plus factors than talking about parallel

25   conduct.  I believe that other than answering your question

1          about post 2011 conduct, the plaintiffs spent no time

2          demonstrating that there was parallel conduct whatsoever.

3          They spent much more time talking about plus factors.

4                    But as Your Honor noted in your last opinion,

5          Your Honor spent a portion of that opinion talking about

6          the plus factors that Your Honor found compelling, but Your

7          Honor said in the absence of a threshold showing of

8          parallel conduct, those plus factors are not enough to

9          allow a case to survive a motion to dismiss.

10                   You can't have plus factors when there is no

11         underlying parallel conduct, and that holding was

12         completely consistent, as we show behind tab 35, with the

13         Eighth Circuit's 2018 holding in the *Posterman* case, and

14         you discussed this issue on page 7 of your last order.

15                   Our book from page 35 to 40 talks about the

16         different plus factors, but the plus factor that was

17         focused on here were public statements, and these public

18         statements are the same type of public statements that Your

19         Honor felt last time were insufficient to prove anything.

20         What is truly remarkable as well is the chart that the

21         plaintiffs showed at tab 18 of their book, which they say

22         demonstrates abnormal pricing.

23                   This chart is remarkable for several reasons.

24         First, we told you in our opening statement, our opening

25         presentation today, that the plaintiffs [indiscernible due

1    to audio malfunction] 2009 as the start of the class period

2    and that to the extent they want to bring in examples from

3    2008, it contradicts their complaint.  This chart that you

4    were shown by Ms. Scarlett has a bright line saying that

5    the start of the class period is January 2009.

6              This chart purports to compare what happened to

7    pricing after 2009 with what happened before.  For the

8    plaintiffs to now say we should also look at conduct in

9    2008 to show parallel conduct doesn't reconcile with that.

10   What this chart on pricing actually shows is that the two

11   spikes that occur are spikes in 2010 and spikes in 2013 and

12   '14.

13             And the complaints themselves show Your Honor

14   that that was during the Great Recession, during pig

15   disease in 2010 and during terrible pig disease in 2013 and

16   2014, which had a devastating impact on supply.  That is

17   not outside the complaint.  It's in the complaint, and Your

18   Honor spoke expressly about the pig disease in 2014 in your

19   last opinion quoting the original complaints.

20             All of those are repeated, and that's at our

21   slide 33 and 34.  We include all of the places in the

22   complaint, paragraph 145, the DPP complaint; paragraph 147

23   of the DPP complaint; paragraphs 173, 149 and 164 of other

24   complaints.  That is where all that information about the

25   Great Recession, the swine flu and then the PEDv virus are

1    all included here.

2              We are all living through a virus now, and we see

3    what it can do.  When it runs rampant in the pig

4    population, it has a devastating impact on supply.

5              Now, on the data arguments -- I'm sorry.  Before

6    I turn to the exchange of data, I just want to make one

7    other point.  What the complaints also show us against the

8    sparse allegations of parallel conduct is that the

9    defendants actually increased capacity during this period,

10   which is consistent with the chart showing that the amount

11   of output actually went up.

12             As we show on tab 29, the complaints, the DPP

13   complaint and the IPP complaint, both allege that in 2012

14   Cargill, a purported coconspirator, spent 25 million

15   dollars to expand capacity.  The DPP complaint at paragraph

16   163 says that in 2015, Seaboard and Triumph entered a joint

17   venture to construct a new pork processing facility, and

18   the facility opened in 2017.

19             And the DPP complaint at paragraph 92, the

20   Winn-Dixie complaint at paragraph 91, and the DPP complaint

21   again in paragraph 113 referencing pork show that Clemens

22   opened a new pork processing facility in 2017 and doubled

23   the processing capacity and doubled its market share.

24             So those allegations in the complaint render even

25   more devastating the absence of parallel conduct

1    allegations.

2            Now perhaps with -- I'm sorry, Your Honor?

3            Perhaps for this reason, Ms. Scarlett in her

4    argument and the plaintiffs in their papers are now

5    investing so much in this new claim of information

6    exchange, but listening to Ms. Scarlett's arguments

7    highlights what is wrong with this allegation.

8            There is no allegation anywhere in the IPP

9    complaint that the information that was exchanged ever

10   affected a price that any defendant set.  You heard what

11   she said.  She said phrases like, this information meant

12   that defendants could have raised prices.

13           She showed you that people at the companies paid

14   careful attention to the data that would have enabled them

15   to raise their prices, but that's not an allegation, that

16   the information was exchanged ever did raise their price.

17           In fact, what she showed you in her dec at page

18   23 was a chart that showed prices that were below the

19   average price, and she said this would allow someone to

20   figure out how they could have raised their price to the

21   average, but there is no evidence that ever happened.

22           The only evidence we have is that companies were

23   charging prices below the average price, and the very chart

24   she shows you shows great variation in price.  She shows

25   you three prices that are $10, $9 and $2 off the average.

1    This is the opposite of parallel conduct and the opposite

2    of what we need to be able to establish that information

3    exchanges had an effect.

4           In fact, as we show you at tab 50 of our book,

5    price uniformity is the key to these information exchange

6    cases.  In the *Container Corp.* case from 1969 that the

7    plaintiffs cite, the court said that once a defendant had

8    this information, he quoted substantially the same price,

9    which meant matching that price.

10          In the *Todd versus Exxon* case by Justice

11   Sotomayor, the court expressly said that the information

12   that was exchanged allowed Exxon to adjust its salary

13   levels to maintain alignment and that each defendant used

14   the information to align its salary, not that they could

15   have, but there were specific allegations that they did,

16   and that is clear that that is exactly what is missing

17   here.

18          None of the quotes that you were shown showed

19   anything about what they actually did to affect prices.

20   Now, Ms. Scarlett and the plaintiffs in their papers try to

21   argue that the fact that the justice department has a

22   so-called safe harbor for information that is more than

23   three months old somehow solves their problem, but that's

24   not true at all, Your Honor.

25          As Your Honor knows, a safe harbor just means

1    that if information that is exchanged is more than three

2    months old, the justice department automatically will not

3    be concerned about it.  That doesn't mean that in every

4    industry information that is less than three months old is

5    considered current.  Nothing like that can be implied from

6    the justice department safe harbor.

7           The cases that the plaintiffs rely on make clear

8    that the information that is exchanged has to be the type

9    of information that can be currently used or used in the

10   future.  *Todd v. Exxon* talked about current and future

11   prices and expressly distinguished pricing information that

12   was backward looking and said that that type of information

13   is the best type of information to exchange.  It literally

14   said that.

15          Now, the *Haff* case also spoke about

16   contemporaneous information, and the judge there expressly

17   distinguished cases like *Maple Flooring* where these type of

18   information claims were rejected because what was exchanged

19   was historical transactions rather than current data, and

20   case law that we have cited makes clear that there is no

21   problem with exchanging the type of data that is exchanged

22   by Agri Stats in the abstract, that there can be many

23   competitive benefits to exchanging aggregated data on the

24   industry.

25          What's missing here is that there is nothing in

1    the complaint to show that the Agri Stats data was ever

2    used for any purpose that would have been improper, and in

3    fact, this is so highlighted in the plaintiffs' complaint,

4    tab 52 in our book.  The IPPs have a figure 4 in their

5    complaint at paragraph 127.  It's a chart showing spread

6    between what they call the high composite spread, which is

7    a change in two factors.

8            The spread that they show, as we highlight in our

9    brief and in their brief, only begins to separate in 2015,

10   but the allegation here is that the defendants started

11   using Agri Stats in 2009.  There is no evidence even from

12   their composite charts that this information exchange was

13   making any difference whatsoever.

14           It's also troubling that on page 27 of their book

15   the plaintiffs have a chart which Ms. Scarlett showed you

16   which says, Defendants had regular meetings to identify

17   opportunities to raise price using Agri Stats reports, and

18   they cite paragraph 37 of their complaint.

19           What is troubling about this is that this is

20   written in a way to imply that the defendants were talking

21   to each other, that these were inter-defendant discussions.

22   Paragraph 37 doesn't say that at all, and the entire IPP

23   complaint doesn't say that at all.  There is not a word in

24   that complaint about any sort of inter-defendant discussion

25   relating to the Agri Stats data.

1           This case, to the extent it's just not old wine

2      being poured out of new bottles, has nothing to meet the

3      criteria that Agri Stats [indiscernible due to audio

4      malfunction] for this case to survive a motion to dismiss.

5      Everything that you wrote in your original opinion on the

6      original complaint can be written about the new complaints,

7      not just because so much of the new complaints copy what is

8      in the old complaints, but anything that is new has the

9      same flaws as what Your Honor found last time.

10          Ms. Scarlett asked you for leave to amend if the

11     Court was not prepared to take judicial notice of the

12     executive order that was referenced earlier.  There is

13     nothing in that executive order which is a basis to amend

14     the complaint.

15          The plaintiffs here have had two chances now to

16     give you a complaint to cure the deficiencies you

17     identified.  We're at the point now where any further

18     amendments would be futile.

19          In the *Kent versus Bank of America* case in 2012,

20     Your Honor granted dismissal with prejudice because you

21     said, quote, "Plaintiffs have already amended their

22     complaint once, have not suggested how they would cure the

23     deficiencies of this pleading and have not pled facts that

24     would support the complaint."

25          Certainly there is nothing in the President's

1    executive order that remotely can solve the flaws in this

2    complaint.  We've already expressed our concern about that

3    order even having been mentioned, but what it really

4    highlights is the absence of sufficient allegations here.

5              Thank you very much, Your Honor.

6              THE COURT:  Thank you, Mr. Neuwirth.  Let's see.

7              Mr. Parker, anything you would like to say?  I

8    think we're on mute.

9              THE CLERK:  It was me, Counsel.  I've unmuted

10   you.

11             MR. PARKER:  Okay.  I'm good.

12             Your Honor, number one, I want to respectfully

13   request that you take pages 9, 10 and 11 of their dec and

14   add it to our dec because we will adopt that because what

15   that shows is that if you give them every benefit of the

16   doubt, there aren't any parallel activities after '13, even

17   if you give them every benefit of the doubt.

18             That means the statute ran in '17, and they were

19   approximately one year late, and if there isn't any

20   parallel activity after '13 from which to infer a

21   conspiracy, my client had nothing to withdraw from, with

22   all due respect.

23             Point number two is that there wasn't any eureka.

24   I was giving them the benefit of the doubt that they

25   actually learned something between, you know, '13 and '18

1    that they needed to know to file this complaint.  They said

2    no, there isn't any eureka moment.  I agree with that, and

3    the reason for that is that Agri Stats was not concealed

4    and that you can't conceal public statements.

5         You can't conceal them, and so if there was some

6    problem, when in their opinion does -- I'm asking this

7    rhetorically.  I don't ask you questions, Your Honor.  When

8    in their opinion does the statute start?  I guess they say

9    it starts in '17 when they read the chicken article from

10   Bloomberg, but then they say they didn't learn anything,

11   and I agree they didn't learn anything because nothing was

12   concealed.

13        Final point, I want Your Honor, I refer you again

14   to our slide 6 and to page 51 of the direct purchaser

15   complaint that shows production going sky high, sky high,

16   and if there was an overt act that somehow kept it from

17   going double sky high, they probably ought to say what it

18   is, and it can't be Agri Stats passing out information that

19   doesn't even help on production.

20        They don't contend it helps on production, and

21   Agri Stats passing out six-week old pricing data, I think

22   you could lose a lot of money relying on six-week old data

23   in a commodity market.

24        Thank you, Your Honor.  Unless you have any

25   questions, that will be all I have in rebuttal.

1          THE COURT:  Thank you, Mr. Parker.

2          Mr. Duncan, did you have anything?

3          MR. DUNCAN:  Very briefly, sir, checking through

4     the four points.  I'm going to rest on the Article III

5     issue, the, on the decisions that we have cited and talked

6     about this morning about whether you can have standing to

7     bring claims under the law of a state you don't reside in

8     or purchase the product in.

9          We did not ignore *Amchem* and *Ortiz*.  I read those

10    cases this morning.  When I read them, I was struck by the

11    fact that the Supreme Court was dealing with an intractable

12    problem, which is massive asbestos class settlements, and

13    that's why the Court said we're going to address that issue

14    because the settlements are so obviously not certifiable.

15    We're going to put that in front of Article III, but the

16    courts clearly say this is not for everybody else to start

17    doing.

18         Mr. Finley says, well, what is gained by deciding

19    standing now?  I'm trying to figure out a polite way to

20    tell this to the Court, so maybe I will just read a

21    sentence from Judge Frank, *McAteer versus Target* case.  He

22    says, "Article III standing is an absolute requirement to

23    litigate in federal court."

24         So I don't think there is an ability to simply

25    decide to defer it, and honestly, why would we litigate

1    claims under the laws of 20 states when there is no one who

2    is even identified as being possibly injured under that

3    law?  I mean, that's the essential issue that I don't think

4    plaintiffs can resolve.

5           Moving to Rule 9(b), I think I heard plaintiffs'

6    counsel state that they meet 9(b) standards because they

7    plead, for instance, the exchange of information through

8    Agri Stats with sufficient detail, but exchange of

9    information through Agri Stats is not fraud or deception.

10          So what's missing here in their complaint is,

11   there is no pleading of a statement by anyone to anyone

12   that is false and why it's false, and that's why their

13   consumer protection claims don't meet Rule 9(b).

14          Turning quickly to Puerto Rico *parens patriae*

15   standing, I think the whole thing can be answered by

16   looking at page 22 of Judge Gelpi's decision in the

17   *Carpentry Company* case that Puerto Rico presented to Your

18   Honor, and that's document 137 in the case.  If you look at

19   the third amended complaint, there are two state law

20   claims.

21          There is the antitrust claim, which alleges

22   claims under Sections 258, 259 and 260 of the antitrust

23   act, and there is an unjust enrichment claim.  The statute

24   that counsel says provides *parens patriae* jurisdiction or

25   claim, LPRA 3341, is not pled in the complaint.

1      It is not, so let's look at what Judge Gelpi says

2   about the claims that are pled in the complaint.  "No

3   Commonwealth statute, nor Puerto Rico Supreme Court

4   precedent, explicitly provides for *parens patriae* standing

5   to present unjust enrichment claims," so that takes care of

6   that.

7      He then says, "No Commonwealth statutes directly

8   allow *parens patriae* standing for antitrust claims, as it

9   does for other civil claims."  The statute that he

10  distinguishes from the antitrust claims that has no *parens*

11  *patriae* authority, I guess it's a consumer protection

12  statute of some kind, but Judge Gelpi says LP or PRLA Title

13  3341, that's what he cites in contradistinction to the

14  antitrust act to say there are some other statutes that do

15  have *parens patriae* authority, but there is no claim in

16  this case under that statute.

17      Finally Georgia against Pennsylvania Railroad,

18  that's an interesting case.  I think it supports our view,

19  though, because the claim there was that shippers were

20  discriminating against Georgia specifically, making it more

21  expensive for Georgia shippers to get their goods to port.

22      That's like *Snapp* where the Puerto Rican workers

23  were being discriminated against because they were Puerto

24  Rican.  All we have here from the Puerto Rico complaint is

25  that indirect purchasers are paying more for pork, which is

1      exactly the individual injury that has been alleged

2      elsewhere.

3              Finally on Section 259, I will rest on that.  On

4      Section 260, it's absolutely true that exclusionary conduct

5      is an essential element of a claim of monopolization, an

6      attempt to monopolization, conspiracy to monopolize.

7      Spectrum Sports against McQuillan puts exclusionary conduct

8      as the key point in attempted monopolization.

9              *American Tobacco* has it in monopolization and

10     conspiracy, and again, I point Your Honor to the cases we

11     discussed there on slide 8.  That's my argument.  Thank

12     you.

13             THE COURT:  All right.  Thank you, Mr. Duncan.

14             I think we're ready to wrap up.  Anything that

15     the plaintiffs need to say before we wrap up the hearing

16     today?

17             MS. SCARLETT:  30 seconds, Your Honor.

18             THE COURT:  That's fine.

19             MS. SCARLETT:  My learned colleague Mr. Neuwirth

20     argued that plaintiffs have not come forward with evidence

21     demonstrating the impact on prices from the Agri Stats

22     reports, and I think that one issue really tethers a lot of

23     the arguments here today, which is plaintiffs are not

24     required to have evidence.

25             We're at the pleading stage.  What is to be done

1    is to look at the allegations of the complaint.  Evidence

2    comes later after discovery and motions for summary

3    judgment and a trial.

4            The complaints clearly state, the indirect

5    purchaser complaint at paragraph 12, that Agri Stats had

6    the intended purpose and effect of increasing pork prices

7    to plaintiffs and class members.  The direct purchaser

8    complaint at paragraph 52 says, The purpose of the Agri

9    Stats reports was profitability of the defendant companies,

10   and the impact was higher prices of pork for customers.

11           This is a motion to dismiss.  The plaintiffs have

12   pled a plausible conspiracy, and we thank Your Honor for

13   your time.

14           THE COURT:  All right.  Anything else,

15   plaintiffs' lawyers?

16           MR. BATES:  Your Honor, very briefly for Puerto

17   Rico, if I may?

18           THE COURT:  Yes.

19           MR. BATES:  Your Honor, Mr. Duncan in rebuttal

20   read you two sentences from Judge Gelpi's decision in the

21   *Carpenter* case.  He didn't read you the sentence between

22   them which says, "Had the government timely filed this suit

23   and would have sought damages under the Puerto Rico

24   Antitrust Act, then it may have had *parens patriae*

25   standing."

1          THE COURT:  All right.  Thank you, Mr. Bates.

2          Thank you, Counsel, for your arguments this

3     afternoon.  I appreciate it very much.  Excellent.  The

4     Court is going to take the motions under advisement and

5     will issue a written order as quickly as possible.

6          Again, my thanks for participating by video

7     today, and I appreciate the arguments.  We'll be in recess.

8     Thank you.

9                    **(Court was adjourned.)**

10                   *          *          *

11          I, Kristine Mousseau, certify that the foregoing

12     is a correct transcript from the record of proceedings in

13     the above-entitled matter.

14

15

16

17     Certified by:  s/  Kristine Mousseau, CRR-RPR
                          Kristine Mousseau, CRR-RPR
18

19

20

21

22

23

24

25