# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JUDY JIEN, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Case No. 1:19-CV-2521-SAG |
| | * | |
| PERDUE FARMS, INC., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

*************

## MEMORANDUM OPINION

Plaintiffs Judy Jien, Kieo Jibidi, Elaisa Clement, Glenda Robinson, and Emily Earnest (collectively "Plaintiffs"), on behalf of themselves individually and on behalf of a class of former and current employees, filed suit against fourteen poultry processors and their subsidiaries,[1] plus two data consulting companies,[2] (collectively "Defendants"). The Amended Complaint alleges two violations of Section 1 of the Sherman Antitrust Act. ECF 258. Specifically, Plaintiffs allege

---

[1] Perdue Farms, Inc.; Perdue Foods LLC; Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; The Hillshire Brands Company; Tyson Fresh Meats, Inc.; Tyson Processing Services, Inc.; Tyson Refrigerated Processed Meats, Inc.; Keystone Foods, LLC; Equity Group Eufaula Division, LLC; Equity Group—Georgia Division, LLC; Equity Group Kentucky Division, LLC; Pilgrim's Pride Corporation; Pilgrim's Pride Corporation of West Virginia, Inc.; JFC LLC (d/b/a GNP Company); Sanderson Farms, Inc.; Sanderson Farms, Inc. (Foods Division); Sanderson Farms, Inc. (Processing Division); Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of Georgia, LLC; JCG Industries, Inc.; Koch Foods LLC; Koch Foods of Alabama, LLC; Koch Foods of Ashland, LLC; Koch Foods of Gadsden LLC; Koch Foods of Cumming LLC; Koch Foods of Gainesville LLC; Koch Foods of Mississippi LLC; Wayne Farms, LLC; WFSP Foods, LLC; Mountaire Farms, Inc.; Mountaire Farms of Delaware, Inc.; Peco Foods, Inc.; Simmons Foods, Inc.; Simmons Prepared Foods, Inc.; Fieldale Farms Corporation; George's, Inc.; Ozark Mountain Poultry, Inc.; George's Chicken, LLC; George's Foods, LLC; George's Processing, Inc.; Butterball, LLC; Hormel Foods Corporation; Jennie-O Turkey Store, Inc.; Jennie-O Turkey Store, LLC; Jennie-O Turkey Store Sales, LLC; Cargill, Inc.; and Cargill Meat Solutions Corporation (collectively, "Defendant Processors")

[2] Agri Stats, Inc. ("Agri Stats") and Webber, Meng, Sahl and Company, Inc. d/b/a WMS and Company, Inc. ("WMS").

1) a conspiracy among Defendants to fix and depress poultry workers' compensation, and 2) an unlawful exchange of compensation data. *Id.* Presently pending are Defendants' Motions to Dismiss the Amended Complaint ("the Motions"). ECF 341, 342, 343, 344, 349, 350, 351, 353. Plaintiffs filed an Omnibus Opposition, ECF 359, and Defendants filed a number of Replies, ECF 362, 363, 364, 365, 366, 367, 368, 369, 370. For the reasons stated below, I shall grant in part and deny in part the Motions.

## I.   FACTUAL BACKGROUND

### a.  The Poultry Industry

The following facts are derived from the Amended Complaint, and are taken as true for purposes of adjudicating the Motions. "Poultry" is defined as "any domesticated bird used for food." ECF 258 at 26. Defendants consist of industrial poultry processors, along with two data consulting companies that assist these processors. Collectively, the Defendant Processors control approximately 80% of poultry processing production in the United States, and earn more than $30 billion in annual revenue from sales of processed poultry. *Id.* The Defendant Processors are vertically integrated companies that control or own their own hatcheries, feed mills, growers, and—most central to this case—processing plants. *Id.* at 26–27. In total, the Defendant Processors own approximately 200 processing plants in the United States, with the locations of these plants often clustered in groups in rural areas, so as to be closer to the poultry growers with whom they contract. *Id.* Each Defendant Processor has a plant that is within 32 miles of another Defendant Processor's plant. *Id.* There is a high barrier to entry in the poultry industry, with the cost of constructing a processing complex often exceeding $100 million. *Id.* at 58. This has resulted in the industry becoming highly concentrated. *Id.*

The alleged Class is comprised of workers in the Defendant Processors' processing plants, from 2009 to the present. *Id.* at 27. There are approximately 220,000 workers employed by poultry processing plants each year. *Id.* at 28. Because the Defendant Processors produce commodity poultry products in a similarly efficient and vertically integrated manner, their poultry processing facilities were and are characterized by highly similar operations, and thus highly similar labor requirements. *Id.* Employees at the Defendant Processors' plants are paid either hourly wages or annual salaries, depending on their position. *Id.* at 29. Approximately 90% of the employees are production or maintenance workers paid hourly wages, while the remaining 10% are supervisory workers paid annual salaries. *Id.* Employment benefits are also included in these compensation packages. *Id.* at 30. Some hourly and salaried roles are paid more than others, due to the greater skill and experience required. *Id.* Decisions on poultry processing compensation are made in a systematic and centralized fashion at each Defendant Processor's corporate headquarters. *Id.* at 31–32. Hourly wages for poultry processors are low, and the work is grueling and often dangerous. *Id.* at 33–34. The poultry processing industry relies upon entry-level employees from vulnerable populations, including migrant workers, refugees, asylum-seekers, and prison laborers. *Id.* at 34.

### b.    Defendants' Alleged Conspiracy

#### i.  Secret Compensation Meetings to Fix Wages

Plaintiffs allege that, beginning in January 2009 and continuing to the present, Defendants have conspired to fix and depress the compensation paid to employees at poultry processing plants. Beginning on or before 2009, senior executives responsible for setting compensation levels at the Defendant Processors' plants began engaging in secret annual meetings at the Hilton Sandestin

Resort Hotel & Spa in Destin, Florida.[3]  *Id.* at 38–39.  Though these meetings often occur at the same time as poultry industry conferences, they are kept "off the books."  *Id.*  Plaintiffs allege two main components of the secret meetings.  First, the executives exchange timely data regarding wages, salaries, and benefits paid to Class Members, through a comprehensive and detailed survey. *Id.* at 39.  Second, the executives hold roundtable discussions to agree on and fix compensation paid to Class Members.  *Id.*  The survey is conducted by WMS, a compensation consulting firm. *Id.*  In the survey, the Defendant Processors provide WMS with comprehensive and highly detailed current wage data, which WMS anonymizes and then shares at the secret meetings.  *Id.* at 40. Defendants are forbidden from remotely exchanging their compensation data—any Defendant Processor who fails to attend the annual secret in-person meeting two years in a row is expelled from the group.  *Id.* at 45.

At the secret meetings, WMS also gives a presentation highlighting average and median compensation data, among other detailed metrics, for hourly and salaried workers.  *Id.*  Plaintiffs allege that WMS's anonymization techniques are "superficial," and that attendees at the secret meetings can easily tell which data came from which Defendant Processor.  *Id.* at 43.  Defendant Processors use this data to inform their compensation decisions, with some seeking to align their wages with the data provided by the WMS surveys.  *Id.*  Plaintiffs allege that, with the WMS data in hand, Defendants' executives in attendance at the secret meetings discuss and agree on salary raises and bonus budgets for the coming year, and scold any Defendant Processors that deviated from the prior year's agreed-upon fixed wages.  *Id.* at 44.  One Defendant Processor executive, in

---

[3] Defendant Processors Butterball, Jennie-O, and Cargill are alleged to have joined the secret meetings for the first time in 2015.  *Id.* at 45.

or around 2018, described the secret meetings as so "inappropriate and improper that the company would no longer attend them." *Id.* at 45.

### ii. Agri Stats's Highly Detailed Information Exchange

Each month, the Defendant Processors also provide detailed compensation data to Agri Stats, a data consulting company. *Id.* at 46. Agri Stats gathers information from, and exchange information among, more than 95% of U.S. poultry producers, providing its subscribers with a comprehensive, real-time view of compensation in the poultry industry. *Id.* at 48. In order to gain access to Agri Stats's data, Defendant Processors must pay millions of dollars, and also must agree to provide their own detailed compensation data for inclusion. *Id.* at 53. The data distributed by Agri Stats includes current wage and salary data, along with national and regional averages and worker productivity data. *Id.* at 48–49. Agri Stats works hard to ensure the accuracy of its reports, spending a large amount of time and effort to set up data input systems that transmit extensive, detailed data, and the company audits its subscribers too. *Id.* at 52. Agri Stats claims to be anonymous, but Plaintiffs allege that the Defendant Processors can easily match compensation data with specific plants owned by specific processors. *Id.* at 49–50. Agri Stats also provides personnel to teach processors how to extract information from the data, and holds industry-wide conferences to address the data and its implications. *Id.* Plaintiffs allege that Defendant Processors use Agri Stats to harmonize the compensation paid to workers, and to confirm that no processors deviate from the price-fixing agreements reached at the annual secret meetings. *Id.* at 50–51. Agri Stats plays a significant role in how Defendant Processors make their compensation decisions, with several aiming to align their wage levels with the reported Agri Stats data. *Id.* at 51–52. Since use of Agri Stats began, profit margins at several Defendant Processors have increased dramatically. *Id.* at 54.

### iii.   Plant-to-Plant Communication Regarding Wage Levels

According to the Amended Complaint, the final prong of the alleged conspiracy involves regional data exchanges between Defendant Processors, to further enable the depression of employee compensation.  Unlike the secret meetings and the shared use of Agri Stats, this portion of the alleged conspiracy is largely informal and regional.  Human resource managers at some plants, for example, call their closest competitors to share information about pay rates, planned increases, and benefits.  *Id.* at 55.  One Defendant Processor created a survey regarding wage data, and distributed it to its competitor processors in the region, using the results to inform pay bands for its workers.  *Id.* at 56.  Unlike Agri Stats, this informally exchanged information also sometimes includes future wages, such as when one Defendant Processor expanded its operations, and a competitor reached out for information regarding future wages for anticipated positions at the newly expanded plant.  *Id.* at 55–56.  Some of these exchanges are regular occurrences, allowing competitors to compare their wage data and inform their corporate headquarters of the compensation offered in the region.  *Id.*  One human resource manager said that they "collaborate[d]" with rival plants with regard to both current and future wage data. *Id.* at 57.  Some Defendant Processors have toured each other's poultry processing plants, using these tours as an opportunity to discuss wages and labor practices.  *Id.*  at 57.

## II.   LEGAL STANDARD

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss.  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by

a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

## III.   ANALYSIS

### A.  Group Pleadings and Defendants' Subsidiaries

Before reaching the plausibility of the specific allegations in the Amended Complaint, this Court must first address a problem common to both Counts. Plaintiffs have lumped the various subsidiaries of many of the Defendant Processors together, without alleging any facts specific to each entity or each corporate family. Fourth Circuit case law holds that a complaint cannot rely on "indeterminate assertions against all defendants," a fact that holds true even when some of those defendants are corporate subsidiaries or affiliates of one another. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423 (4th Cir. 2015) ("'The fact that two separate legal entities may have a corporate affiliation does not alter [the] pleading requirement' to separately identify each defendant's involvement in the conspiracy."). Here, using largely generic language, and without

any explanation beyond baldly alleging a corporate relationship, Plaintiffs group numerous Defendants together, and refer to each collective set of corporate subsidiaries by a group label for the remainder of the Amended Complaint.   ECF 258 at 7–19.   That sort of "lump[ing] together without sufficient detail" is precisely the type of corporate entity group pleading *SD3* forbids. *SD3*, 801 F.3d at 423.

Plaintiffs cannot be expected, at this early stage of the case without having the benefit of discovery, to provide detailed specifics as to the nuances of the relationships among the corporate entities.   But something more than what has been provided here is required.   The Amended Complaint fails to offer factual allegations sufficiently outlining the relationship between the corporate subsidiaries, such that treating them as a unified whole would be plausible based on their intertwined nature.   Indeed, the case caption suggests that some of these entities might not be as unified as Plaintiffs assume, given the differing addresses listed for certain Defendant Processor subsidiaries, despite their common corporate affiliations.   Alternatively, there are no factual allegations specific enough to each individual corporate subsidiary to plausibly tie each entity to the alleged conspiracy.   Without such basics, the Court and Defendants are left to guess at which entities were involved in what parts of the conspiracy.[4]   For example, Plaintiffs allege that "Tyson's" wages were set at "corporate headquarters," without specifying which, if any, of the

---

[4] In their Opposition, Plaintiffs suggest that the allegations referring to groupings of Defendants are meant to specifically apply to *all* the subsidiaries included in that grouping, ECF 359 at 82–83, but that sort of pleading is specifically rejected in *SD3*.   801 F.3d at 422 (holding plaintiffs cannot rely on "indeterminate assertions against *all* defendants") (emphasis added).   Moreover, the Amended Complaint already takes great liberties with the general use of the term "Defendants," barely mentioning certain defendants in connection with specific facts.   To allow indeterminate group pleading as to corporate subsidiaries would be to inappropriately layer generality upon generality, and would deprive the individual corporate entities of the requisite notice of the facts on which Plaintiffs' claims are based.

entities included under the heading "Tyson" share headquarters or management structures. Given the ten different subsidiaries grouped by Plaintiffs under the name "Tyson," Defendants can only guess as to which specific Tyson entities are alleged to be involved in wage decisions. Indeed, it is possible that, if Tyson's wages are set in a centralized fashion, some Tyson subsidiaries named as defendants might have played no role in fixing compensation, even if their employees' wages were affected.

The same holds true for the alleged secret compensation meetings—unspecified "Tyson executives" are alleged to have attended, without specifying which of the ten Tyson entities employed them. Did every Tyson subsidiary send a representative, or were only some represented? Or if one Tyson executive attended, did that executive represent all, or just one, of the Defendant entities? Without any allegations as to the nature of these grouped Defendants' corporate relationships vis-à-vis their operational and wage decisions, or, alternatively, any factual allegations linking each distinct subsidiary to the conspiracy, the Amended Complaint fails to sufficiently state a claim against those entities.[5] As such, Counts I and II will be dismissed without prejudice as to those Defendants who are pled in conjunction with one or more subsidiaries.[6]

---

[5] In *SD3,* only some of the grouped defendants were dismissed, while subsidiaries for whom particularized factual allegations were made were not. 801 F.3d at 423. Here, however, the nature of the group pleadings makes it impossible to tell which facts in the Amended Complaint apply to which specific entities within the various groups. For example, in Section III(B)(a), this Court concludes that the secret compensation meetings plausibly constitute direct evidence of conspiracy, but, because of the grouped reference to attendees from certain Defendants (such as "a Tyson executive"), it is impossible to ascertain which corporate entities actually participated. Thus, unlike in *SD3*, all of the grouped Defendants must be dismissed, though Plaintiffs will be permitted to seek leave to amend to plead their allegations with more precision.

[6] Among the Defendants, only Tyson makes the argument about the imprecise pleading of subsidiaries in its Motion to Dismiss. However, *sua sponte* dismissal on this basis is appropriate as to the rest of the "corporate family" Defendants as well. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 (4th Cir. 2006) ("Where the face of a complaint plainly fails to state a claim for relief, the district court has 'no discretion' but to dismiss it."). To the extent that some Defendant Processors declined to raise the issue because they maintain intertwined corporate structures with

However, five Defendants—Fieldale, Butterball, Peco Foods, Agri Stats, and WMS—are named individually, with no subsidiaries or related corporate entities, and are not subject to dismissal on this basis. Thus, substantive examination of the two Counts is required.

## B. Conspiracy to Depress Compensation in Violation of Section 1 of the Sherman Antitrust Act

Plaintiffs' allegation that Defendants entered into an agreement to fix the compensation of poultry workers constitutes "a per se violation of the Sherman Act." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). A *per se* claim can be proven via either "direct" or "circumstantial" evidence that an unlawful agreement existed. *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012). Plaintiffs suggest that they have presented both types of evidence to support their wage fixing conspiracy claim, while Defendants counter that the Amended Complaint contains only conclusory allegations and inappropriate group pleadings. Ultimately, Plaintiffs have alleged a handful of key factual allegations sufficient to support a plausible *per se* wage fixing conspiracy claim as to some of the five remaining Defendants, but not others.

### a. Direct Evidence of *Per Se* Conspiracy

Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). Examples of direct evidence include "eyewitness accounts," *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996), "admissions by employees. . . of the conspirators," *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 998 (N.D. Ill. 2011), "a document or conversation explicitly manifesting the existence of the agreement in question," *In re*

---

their subsidiaries, Plaintiffs should be able to address those facts specifically within an amended pleading.

11

*Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 439 (E.D. Pa. 2018), or "a recorded phone call in which two competitors agreed to fix prices at a certain level," *Am. Chiropractic Ass'n*, 367 F.3d at 226.

Though Defendants rightly point out that "[d]irect evidence is extremely rare in antitrust cases," *id.*, Plaintiffs have managed to present some such evidence here. The most important direct evidence is a statement by a senior Tyson executive, fretting about the propriety of wage discussions at the secret meetings. Specifically, the Amended Complaint alleges:

> A senior executive from Tyson noted during a private conversation in or around 2018 that the discussions about wages, salaries and benefits at the "off the books" meetings held at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida were so inappropriate and improper that that the company would no longer attend them.

ECF 258 at 44–45.

This statement is precisely the sort of "smoking gun" that makes Plaintiffs' *per se* antitrust claim plausible. For starters, it involves an executive of an alleged conspirator admitting to the inappropriateness of its conduct (specifically, its participation in the secret meetings). Moreover, it demonstrates that the level of inappropriateness of the conduct was so high that the conspirator planned to withdraw from the meetings entirely. When such extreme fears of impropriety are expressed in the context of secret, detailed, and comprehensive compensation discussions attended by a large swath of the poultry industry's top executives, there is no inferential leap required to find a wage fixing conspiracy plausible.

Plaintiffs provide additional direct evidence in the form of a statement by a former human resource manager who had worked for both Perdue and George's. That executive described the nature of wage data sharing with several competitors:

> The former human resources manager explained that managers of the Perdue plant and the George's plant contacted managers of rival poultry processing plants operated by Pilgrim's, Cargill and Virginia Poultry Growers Cooperative and

> requested the current hourly wage rates for plant workers as well as any planned
> future increases to those hourly wage rates. The former human resources manager
> said, "We would collaborate. We would talk among each other to see what they
> were doing for pay." The former human resources manager provided the
> compensation data obtained from rival poultry plants to the corporate headquarters
> of Perdue or George's.

ECF 258 at 57.   This specific factual allegation makes plausible the "plant-to-plant

communications" portion of the conspiracy.   The word "collaborate" is particularly damning,

connoting a cozy relationship in which the ostensible competitors worked together to share wage

levels at their respective plants, and to provide that information to corporate headquarters.   Many

of Plaintiffs' other allegations merely outline how information was transferred amongst the

competitive businesses, but "collaborate" goes a step further, and suggests that the exchanged

information was being used in an intentional way.   No inference is required to reach this

conclusion—collaboration between supposed competitors with regard to wages makes it plausible

that those collaborators were conspiring to depress wages.

Defendants rightly point out that Plaintiffs' direct evidence is light on specifics, in terms

of what precisely was "inappropriate" about the secret meetings, or what "collaboration"

specifically occurred.   Plaintiffs do not pinpoint the date of the supposed agreement to fix wages,

the participants in the original agreement, or many of the mechanics of how the agreement worked.

Yet such details are not required at this early stage in proceedings.   *Twombly*, 550 U.S. at 555

(noting that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations").   The direct evidence offered need only make *plausible* a conclusion that the

pre-2018 secret meetings involved an agreement to fix wages, and/or that plant-to-plant

communications furthered the wage fixing conspiracy.   It is not Plaintiffs' burden at this stage to

articulate the finer points of the alleged scheme, *id.* at 545 (a complaint need only "raise a right to

relief above the speculative level"), or to disprove alternative explanations for the direct evidence

they provide, *Houck*, 791 F.3d at 484 (finding a district court improperly "undertook to determine whether a lawful alternative explanation appeared more likely").  The discomfort at impropriety articulated in the Tyson executive's statement, culminating in a suggestion that the company would no longer even attend the secret wage meetings, is sufficient to allow Plaintiffs' claims of a *per se* wage fixing conspiracy to clear the low "plausibility" bar.  The same holds true for the statement regarding collaboration between poultry competitors with regards to wages.

What Plaintiffs fail to do, however, is to link their direct evidence to *each* of the remaining five Defendants.  It is not sufficient for a claim to be merely plausible in the abstract, but it must be linked to each Defendant to place it on notice as to what it is alleged to have done.  *Twombly*, 550 U.S. at 565 (stating that where "complaint [ ] furnishes no clue" as to which defendants supposedly agreed to conspire, the complaint fails to give adequate notice).  Though the Tyson executive's statement plausibly suggests that the secret compensation meetings involved a wage fixing conspiracy, Plaintiffs must next link each specific Defendant to the secret meetings in order to state a claim.  Plaintiffs do so, but only with respect to eleven out of the fourteen "corporate families" in question:

> [T]he following Defendants and co-conspirators attended the particular "off-the-books" in-person meeting in April 2017 at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida: Tyson, Pilgrim's, Perdue, Koch Foods, Wayne Farms, George's, Keystone, Fieldale Farms, Simmons, Butterball, Cargill, Cooper Farms, Foster Farms, Amick Farms, Case Foods, OK Foods, and Allen Harim. Other Defendants and co-conspirators attended other "off-the-books" annual meetings of the Compensation Committee during the Class Period.

ECF 258 at 45.  Jennie-O, meanwhile, is specifically alleged to have first started attending the "off the books" meetings in or around 2015 (though apparently not in April 2017).  *Id.*  The human resource manager's statement regarding "collaborat[ion]" between poultry processors, meanwhile, only mentions the Perdue, George's, Pilgrim's, and Cargill Defendants.  *Id.* at 57.  Of the three

Defendant Processors remaining following the dismissals above, only Fieldale and Butterball are mentioned explicitly in connection with the direct evidence.  Peco Foods is not.[7]

A similar dichotomy exists with regards to the two data processing Defendants.  Only WMS is alleged to have attended and presented at the secret meetings.  *Id.* at 141.  Agri Stats is not alleged to have attended the secret meetings, and is not mentioned by the former human resource manager as part of the plant-to-plant wage collaboration either.  That the data Agri Stats provided was comprehensive, that some Defendants allegedly used the data to make compensation decisions in a collective fashion, or even that some of the Defendants were allegedly able to de-anonymize the data, is not direct evidence of Agri Stat's knowing participation in a conspiracy to fix compensation.  There is thus nothing specific in the Amended Complaint linking Agri Stats to the direct evidence that makes a *per se* conspiracy plausible.

The group allegations dotting the Amended Complaint are not enough to tie the otherwise unmentioned Defendants to the direct evidence of conspiracy.  First, many of the allegations are vague and conclusory.  *See, e.g.*, ECF 258 at 111–12 (broadly alleging that compensation at each processors' plant was determined "in a systematic way" and was "aligned with compensation. . . at other Defendant Processors," without providing any specifics as to what that systematic process was or what the alignment looked like); *id.* at 53 (alleging "Defendant Processors' monthly exchange of . . . compensation data [via Agri Stats] was anticompetitive," and "resulted in lower compensation for all Class Members" without providing any specific facts in support); *id.* at 54 (alleging that information shared between regional plants was used at corporate headquarters "to facilitate the setting of artificially depressed compensation" without providing examples of how

---

[7] The Court notes that the Sanderson and Mountaire Defendants are not mentioned in or linked to the direct evidence, either, although the claims against both were dismissed in Section III(A).

15

corporate headquarters used that information).  Indeed, the specificity of certain claims in the Amended Complaint, such as the Tyson executive's comments and the detailed list of attendees at the April 2017 meeting, show by contrast just how threadbare the rest of Plaintiffs' allegations are.

As previously noted, many of Plaintiffs' other allegations constitute impermissible group pleadings.  "A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group."  *SD3*, 801 F.3d at 422–23.  Here, Plaintiffs broadly lump unidentified Defendants together to, for example, allege attendance at the "off the books" compensation meetings, ECF 258 at 38, or participation in plant-to-plant communications about wages, *id.* at 30.  Adding the word "each" before "Defendant"—as Plaintiffs inconsistently do in their Amended Complaint—does not change this calculus.  "Each" does suggest that Plaintiffs intend the allegation to apply to *all* Defendants, but that is merely another inappropriate way to lump the Defendants together, without identifying specific facts to tie them individually to the conspiracy.  *SD3*, 801 F.3d at 422 (noting that it is not enough to rely on "indeterminate assertions against all defendants").

Ultimately, Plaintiffs have provided sufficient direct evidence for a *per se* conspiracy claim plausible with regards to some, but not all, of the five remaining Defendants.  The Motions to Dismiss Count I will be denied as to Fieldale, Butterball, and WMS.  However, this Court is unable to conclude that direct evidence supporting the plausibility of the wage fixing conspiracy exists as to Peco Foods or Agri Stats, and must analyze the existence of sufficient circumstantial evidence to tie those two entities to the alleged conspiracy.

### b.  Circumstantial Evidence of *Per Se* Conspiracy

The Amended Complaint fails to offer circumstantial evidence of collusion *per se* for either Agri Stats or Peco Foods.  In order to support a circumstantial inference of conspiracy, Plaintiffs

must allege both 1) parallel conduct by the Defendants, and 2) "plus factors" suggesting that the parallel conduct resulted from concerted action.[8]  *Twombly*, 550 U.S. at 567; *SD3*, 801 F.3d at 424.

"A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly,'" or that their actions were uniform.  *SD3*, 801 F.3d at 427.  Parallel conduct "need not be exactly simultaneous and identical in order to give rise to an inference of agreement." *Id.* at 429 (quoting *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010)). Here, Plaintiffs allege parallel alignment of compensation, but cite no facts beyond their conclusory group pleadings.  ECF 258 at 30 (stating that the compensation for each Defendant Processor's hourly and salary workers "was determined in a systematic way using compensation schedules. . . that were aligned with the compensation for the same positions at other Defendant Processors").  The Amended Complaint cites no facts regarding comparative wage levels, or any other specific compensation data, to support a conclusion that Peco Foods set similar or uniform wages to those of other Defendant Processors.[9]  In fact, Plaintiffs do not compare the compensation offered by any of the parties at any point, nor do they examine how wages changed before and after the Defendants' alleged 2009 agreement to fix employee pay.

---

[8] The rule in the Fourth Circuit is clear: parallel conduct is required for a Sherman Act, 15 U.S.C. § 1 claim resting on circumstantial evidence.  *SD3*, 801 F.3d at 424 (interpreting *Twombly* to mean that "[f]or a § 1 claim to survive, then, a plaintiff *must* plead parallel conduct and something 'more'") (emphasis added).  Plaintiffs' arguments to the contrary cite non-controlling case law, and urge this Court to interpret *Twombly* in a manner at odds with *SD3*.  *See* ECF 359 at 23–24 ("*Twombly* held that allegations of parallel conduct alone are *insufficient* to plead a conspiracy claim, *not* that parallel conduct is *required* to plead a claim.") (emphasis in original).

[9] Reference to average wage levels across the poultry industry is similarly insufficient, as it fails to provide any insight into how Defendants acted with regards to one another.  Averages are more or less another form of inappropriate group pleading, lumping the various parties together without any insight into any specific Defendant's behavior.  Moreover, the average earnings data in the Amended Complaint appears to cover the entire poultry processing industry, not just the Defendant Processors, further diminishing its specificity and utility in determining how the Defendant Processors acted in relation to one another.

While Plaintiffs do allege some specified facts pertaining to Defendants' use of WMS and Agri Stats services to set their compensation numbers, the fact that companies all used the same benchmarking companies' data to inform their wages is insufficient to permit a circumstantial inference of collusion. That employers might set their wages within a general range—a range the Amended Complaint does not provide any particularized information about—based off available benchmarking data is not surprising, nor illegal, nor evidence of companies acting in parallel to comport with a conspiratorial agreement. *Twombly*, 550 U.S. at 557 (requiring parallel conduct to "be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action"). Without information regarding how wages actually moved during the relevant period for specific Defendants, or how Defendants actually acted in concert together to set wages, parallel alignment of compensation has not been plausibly alleged.

Plaintiffs' second theory of parallel conduct, centering on information exchanges, similarly falls short. The mere existence of available competitor information, without more, does not plausibly support an inference of collusion. *See U.S. v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) ("[T]he dissemination of price information is not itself a per se violation of the Sherman Act."). It is clear that at least some of the Defendants acted in parallel, insofar as they gathered data about their competitors and shared their own data as well. However, such conduct is neither illegal nor inherently collusive, particularly given the lack of facts alleging that the information sharing resulted in largely uniform or otherwise coordinated wages amongst the alleged

conspirators.[10]   To find "parallel conduct," it is not enough to simply show that companies were acting similarly in *any* limited way.

Given Plaintiffs' failure to plausibly allege the requisite parallel conduct, their collusion *per se* claims based on circumstantial evidence fail, and no discussion of "plus factors" is required. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018).   In the absence of either direct or circumstantial evidence showing plausible collusion *per se*, Peco Foods's and Agri Stats's Motions to Dismiss will be granted as to Count I.

## C. Conspiracy to Exchange Compensation Information in Violation of Section 1 of the Sherman Antitrust Act

Plaintiffs' theory of liability in Count II is that Defendants unlawfully exchanged information concerning poultry plant employee compensation through third-party benchmarking services, industry meetings, and plant-to-plant communications.   As described above, information exchanges are not *per se* unlawful.   *See U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.   For this reason, we have held that such exchanges of information do not constitute a per se violation of the Sherman Act.").   Thus, Plaintiffs must establish that the putative information exchange has an overall anticompetitive effect on the relevant labor market, an analysis known as the "rule of reason." *Todd v. Exxon Corp.*, 275 F.3d 191, 198–99 (2d Cir. 2001).   To survive a motion to dismiss on

---

[10] The Court notes that the statement by the former human resource manager who described "collaborat[ion]" on compensation among several Defendant Processors, ECF 258 at 57, would qualify as evidence of parallel conduct for the specific entities named.   This statement describes not merely an exchange of information, but how the relevant Defendant Processors were *using* the information (to "collaborate" on wage matters).   However, this statement was not made in connection with Peco Foods or Agri Stats, the sole remaining Defendants at issue.

this theory, Plaintiffs must plausibly allege (1) an agreement to exchange information; and (2) "anticompetitive effect[s]" flowing from that agreement. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002); *accord Robertson*, 679 F.3d at 290. There is little debate that Plaintiffs have satisfied the first prong of the analysis. They have amply pled an agreement to share information among Defendants, given the plethora of alleged facts in the Amended Complaint pertaining to secret meetings, WMS, Agri Stats, and plant-to-plant communications. The "anticompetitive effects" prong, however, requires more scrutiny.

The parties dispute whether an analysis of the relevant product and geographic markets is required to show anticompetitive effects. Plaintiffs draw a distinction between direct and indirect evidence of anticompetitive effects, with the former *not* requiring a market analysis while the latter does. ECF 359 at 45, 47–48. The Fourth Circuit, however, has instead stated simply that "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Robertson*, 679 F.3d at 290. The primary case Plaintiffs cite for the proposition that they need not specify a relevant market, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986), involves the application of a different test, not the full "rule of reason" analysis at issue here. *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999) (noting that *Ind. Fed'n of Dentists* was a case that "formed the basis for what has come to be called . . . 'quick-look' analysis under the rule of reason"). Using a "quick look" analysis is only appropriate where the anticompetitive effect of information sharing is so obvious that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect," *id.*, which is not the case here, given that sharing price information is presumptively lawful. Instead, the full rule of reason analysis, including definition of the relevant market, is required. *See Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499,

508–09 (4th Cir. 2002) (stating the full rule of reason should be used "for restraints whose net impact on competition is particularly difficult to determine").

### a.   Market Power and the Relevant Market

"A threshold inquiry in any Rule of Reason case is whether the defendant had market power" and "to prove market power the plaintiff must first establish the relevant product and geographic markets." *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989).  Plaintiff has defined the relevant product market as the market for poultry processing labor, and the relevant geographic market as the continental United States. ECF 258 at 80. "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market" or geographic market.  *Kolon Indus.*, 637 F.3d at 443 & n.3 (citations omitted).

### i.   The Relevant Geographic Market

"The relevant geographic market in antitrust cases is defined by the 'area within which the defendant's [employees] . . . can practicably turn to alternative [jobs] if the defendant were to raise its prices.'" *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) (quoting *Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2011)).  When it comes to motions to dismiss, the Fourth Circuit has embraced the notion that dismissals of alleged geographic markets "are generally limited to instances in which the complaint either: (1) fails to allege a geographic market or the boundaries of a relevant geographic market; (2) defines a geographic market in an unreasonably and implausibly narrow manner; or (3) alleges a contradictory and vague delineation of the relevant geographic market." *Kolon Indus.*, 637 F.3d at 444 (quoting *Allen v. Dairy Farmers of Am., Inc.*, 748 F.Supp.2d 323, 339 (D. Vt. 2010)).

The above three reasons for dismissal are not applicable here. Plaintiffs do allege a geographic market, the continental United States, which is neither vague nor contradictory. ECF 258 at 64. Defendants allege this market is implausibly broad, not too narrow. ECF 344-1 at 26. While overbreadth is not one of the categories contemplated by the Fourth Circuit in *Kolon Indus.*, it is a theory worth examining. It is facially true that employees at a poultry processing plant in Alabama, earning less than $25,000 annually, likely would not view a job at a plant in California as a viable alternative, given the cost of relocation. The employees' relative immobility means that those jobs are not interchangeable in the manner contemplated by *It's My Party, Inc.*, a fact that Defendants suggest means the geographic market should be dismissed as implausible.

To end the analysis there, however, would be to overlook the very purpose of the geographic market. Plaintiffs must outline a relevant market so that they can then allege that Defendants have sufficient market power within the market for their information sharing to restrain competition. *Dickson*, 309 F.3d at 207. It is therefore problematic to allege too *narrow* a geographic market, because it could create the illusion of market power where no market power exists, via the exclusion of nearby alternative employment opportunities (what the Fourth Circuit called the "gerrymandering" of the geographic market). *It's My Party, Inc.*, 811 F.3d at 683. The same concern does not exist for a broad geographic market, because many alternative employment opportunities are included in the allegedly overbroad market, so there is no risk of creating an illusion of market power. In fact, by alleging a broad geographic market spanning the entire country, Plaintiffs are making it *harder* to prove their case, because the level of market power necessary to control wages across the entire country is much greater. *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *19 (E.D. Pa. July 29, 2015) ("[T]o the extent that [Plaintiff expert's] geographic Market definition is too large, that would only understate

market power in the relevant market.").  In sum, the geographic market must be broad enough to encompass all of the jobs that a processing employee could practicably turn to as an alternative. For it to be broader than that, and to encompass additional jobs that are *not* necessarily viable alternatives due to their distance, is not a defect warranting dismissal at this early stage of the proceedings.

It is essential, too, that Plaintiffs have alleged specific facts to support finding a national market plausible—namely that Defendant Processors saw themselves operating on a national scale when it came to employees' compensation.  *See Kolon Indus.*, 637 F.3d at 442–43 (noting that an attempt to define the relevant geographic market may include "the area within which the [defendants] view themselves as competing").  The Defendant Processors are alleged to have made compensation decisions in a centralized fashion, and to have set compensation at largely the same levels across the country regardless of region.  ECF 258 at 68, 71.  The Amended Complaint also alleges that Defendant Processors collected and analyzed national wage data via Agri Stats and WMS, using that nationwide data to set the compensation of their plant workers.  ECF 258 at 42, 48–49.  Thus, at this early stage in the proceeding where the bar to avoid dismissal is low, the geographic market has been plausibly alleged, despite its breadth.[11]

### ii.   The Relevant Product Market

A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced . . . ."  *Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 582 (4th Cir. 2003).  In the context of employment, "the relevant market is one where employment positions are reasonably interchangeable with those

---

[11] This decision, of course, is limited to finding a national geographic market *plausible*.  Defendants may in fact succeed on their overbreadth argument at a later stage of the case, depending on what facts are brought to light in discovery.

offered by defendant[s]." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005). Plaintiffs have defined the relevant product market as the market for employment at poultry processing plants. ECF 258 at 64.

The poultry processing labor market is plausible, because Plaintiffs have sufficiently pled facts suggesting the Defendant Processors' employees are reasonably limited to poultry jobs. Specifically, Plaintiffs claim that at least some of poultry workers have developed industry-specific skills—including hanging live birds, carving bird meat, cleaning and repairing poultry-specific equipment, and supervising poultry-specific plant operations—that would make transitioning to other jobs an imperfect substitute. *Id.* at 29–30, 65–66; *see also Todd*, 275 F.3d at 203 (noting that both technical and non-technical workers "develop industry-specific expertise that affects their value in [a] labor market"). Plaintiffs also claim that limited education and language skills make it difficult for poultry processing workers to transition to other jobs, providing several statements by poultry employees alleging that Defendant Processors specifically targeted people with limited education and English skills because they would be less easily able to leave the poultry industry. ECF 258 at 64–65. Lastly, Plaintiffs point out that their detailed allegations regarding Defendant Processors' extensive collection of poultry wage compensation data, including information from Agri Stats, WMS, and the poultry-only annual secret meeting regarding compensation, plausibly suggest that Defendants themselves see poultry labor as a distinct, nationwide unit. *Todd*, 275 F.3d at 205 (noting that "[d]efendants have gone to considerable lengths to compile the data" about a particular labor market, which suggests that the market is distinct because "economic actors usually have accurate perceptions of economic realities").

Defendants' primary argument to the contrary is to urge the Court to consider the many alternative jobs that poultry workers could theoretically pursue, such as work in another section of

the food processing industry.  ECF 370 at 15–16.  They also highlight certain jobs, like janitorial

positions, where significant questions loom as to how Plaintiffs' arguments about industry-specific

skills or English language abilities apply.  *Id.*  It is undoubtedly true that the Amended Complaint

lumps together a broad range of poultry processing jobs at different pay levels, requiring different

skills, and with different job descriptions, and then offers only a handful of details regarding how

this diverse array of jobs can be treated together as one single product market separate from other

facially similar industries.  Nevertheless, only a bare minimum level of specificity is required at

this early stage of the proceedings.  Plaintiffs need not disprove alternative relevant markets

proposed by the Defendant, *Houck*, 791 F.3d at 484, or explain with fine detail how each poultry

processing job is different to similar jobs in other industries, *Twombly*, 550 U.S. at 555.  By

alleging a unique poultry skillset, language barriers, and Defendants' own conception of the labor

market, Plaintiffs have satisfied notice pleading requirements.  While the Amended Complaint's

allegations to this end are thin and will require significant fleshing out to survive challenge at later

stages of this litigation, they clear the low bar of plausibility here.

###### iii.  Market Power

The last prong of the "relevant market" analysis assesses whether Plaintiffs have

sufficiently alleged that Defendant Processors had enough market power in the poultry processing

labor market, spanning the continental United States, to implement an anticompetitive information

exchange.  *Todd*, 275 F.3d at 206–08.  The Complaint alleges that Defendant Processors and their

co-conspirators control more than 90% of the poultry processing jobs in the United States, ECF

258 at 69, which is on its face a large enough market share to plausibly suggest that they could

have suppressed compensation in the relevant market.  Defendants do not contest this point.

### b. Anticompetitive Effects in the Relevant Market

Having found that the Amended Complaint plausibly alleged market power within the relevant market, the Court must determine whether Plaintiffs pled that the information sharing has had an anticompetitive effect. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (holding that direct evidence of anticompetitive effects would be "proof of actual detrimental effects [on competition]" and that indirect proof of anticompetitive effects would require "some evidence that the challenged restrain harms competition"). While the Amended Complaint alleges few specific datapoints regarding how Defendant Processors' information sharing actually impacted worker compensation, the Fourth Circuit has explicitly held that a plaintiff need not show specific wages, or forecast evidence sufficient to prove an unlawful information exchange claim, to defeat a motion to dismiss. *Robertson*, 679 F.3d at 290–91.

Here, as in *Robertson*, Plaintiffs have alleged key mechanics of the conspiratorial information sharing scheme as well as the specific way the scheme was designed to restrain competition in the market. In particular, Plaintiffs have alleged specific, secret meetings between poultry executives in which extensive poultry processing wage data was exchanged via WMS, and in which industry compensation was agreed upon and artificially suppressed. ECF 258 at 38–46. Moreover, Defendant Processors are alleged to have used Agri Stats to monitor competitors' adherence to this plan, *Id.* at 46, and to have chastised processors who deviated from this set compensation level, *Id.* at 44, further "eliminat[ing] a major incentive for Defendant Processors to increase compensation," *Id.* at 83. This, taken in conjunction with the plethora of specific allegations regarding detailed and highly sensitive present and future wage data exchanged among ostensible competitor Defendant Processors, is enough to make the alleged anticompetitive effects economically plausible in the relevant market.

26

It is worth briefly addressing Agri Stats's unique place within this information sharing analysis.  Unlike WMS, Agri Stats is not alleged to have knowledge of Defendant Processors' wage fixing conspiracy, to have attended any of the "off the books" meetings, or to otherwise have engaged in any conduct beyond simply being in the business of data sharing.  Indeed, its conduct has already been deemed to fall short of the *per se* conspiracy bar in Section III(B).  The "rule of reason" analysis, however, is distinct in that it is specifically designed to analyze the anticompetitive impact of otherwise lawful activity.  Agri Stats's conduct, while not sufficient to constitute direct or indirect evidence of *per se* conspiracy, still plausibly constitutes unlawful information sharing because of the breadth of its market coverage and the nature of the data it provided.  Plaintiffs allege that Agri Stats's client base constituted "more than 95 percent of U.S. poultry processors."  *Id.* at 48.  In addition, its business model revolves around sharing *current* wage data, which both the Supreme Court and Department of Justice have noted is particularly sensitive and has "the greatest potential for generating anticompetitive effects."  *Gypsum*, 438 U.S. at 441 n.16; *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines For Collaborations    Among    Competitors,    15    (2000),    available    at http://www.ftc.gov/os/2000/04/ftcdojguidelines.pdf (noting  the  sensitive  nature  of  price information and specifically identifying "current operating . . . plans" as especially likely to raise antitrust concerns).  By providing comprehensive, real-time, and current wage data to nearly the entire  poultry  processing  industry,  Agri Stats's  conduct  can  plausibly  be  alleged  to  constitute unlawful information sharing per Count II.

In sum, Plaintiffs have sufficiently alleged Defendant Processors' market power within the continental United States poultry processing labor market, as well as plausible anticompetitive effects resulting  from the compensation-depressing  information exchange in which Defendants

engaged. As a result, the Count II claims against the five remaining Defendants—Fieldale, Butterball, Peco Foods,[12] Agri Stats, and WMS—will survive dismissal.

### D. Plaintiffs' Surviving Claims Are Not Time Barred

#### a. Count I

Since Count I survives dismissal with regard to Fieldale, Butterball, and WMS, this Court must address Defendants' claims that the Amended Complaint is time barred. In general, antitrust claims must be brought within four years of the defendants' illegal conduct. *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 287 (4th Cir. 2007) ("The Clayton Act. . . establishes a four-year limitations period in which to bring a claim for a violation of the Sherman Act, 15 U.S.C.A. § 1."). Where there is fraudulent concealment, however, the statute of limitations does not begin until discovery of the alleged anticompetitive conduct. *See Supermarket of Marlinton v. Meadow Gold Dairies*, 71 F.3d 119, 122 (4th Cir. 1995), citing *Bailey v. Glover*, 88 U.S. 342, 349 (1874) ("[W]hen the fraud has been concealed . . . the limitations period does not begin to run until the plaintiff discovers the fraud."). Plaintiffs here have adequately pled fraudulent concealment, and thus their surviving Count I claims are not time barred.

To successfully plead fraudulent concealment, Plaintiffs must allege that Defendants "fraudulently concealed facts that are the basis" of the claims, that Defendants undertook "affirmative acts" to conceal their conspiracy, and that Plaintiffs "failed to discover those facts within the statutory period, despite the exercise of due diligence." *Marlinton*, 71 F.3d at 122. These allegations also must be pled with particularity to satisfy Rule 9(b), which requires that the

---

[12] Although Peco Foods was not linked to the secret meetings, the Amended Complaint does specifically allege that it engaged in information sharing, which is sufficient to state a claim as to Count II. ECF 258 at 55.

complaint name the "who, what, when, where and how of the alleged fraud." *U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 280 (4th Cir. 2014).

Here, Plaintiffs satisfy this standard as to the secret compensation committee meetings, which constitute the critical direct evidence upon which their Count I claims rest. The "who" are the twelve Defendant Processors, plus WMS, who are alleged to have attended the meetings. ECF 258 at 45. The "what" are the secret meetings themselves, which are alleged to have included highly detailed sharing and discussion of industry wage information and were deemed extremely inappropriate by one Tyson executive. *Id.* at 40. The "when" is at the annual meetings of major poultry producers, and the "where" is the Hilton Sandestin Resort Hotel & Spa in Destin, Florida. *Id.* at 38–39. The "why" is to implement and conceal an alleged wage-fixing scheme. Plaintiffs particularly allege Defendants' affirmative efforts to conceal the meetings, including keeping the meetings "off the books," despite their close proximity to well-publicized industry conferences with public schedules. *Id.* at 38. Additionally, Plaintiffs specifically allege that Defendants required in-person attendance at the secret meetings to avoid leaving a paper trail, with expulsion from the group as the penalty for non-compliance with this clandestine practice. *Id.* at 45. Moreover, the wage data discussed at the meetings was allegedly manipulated to give the illusion of anonymity, despite Defendants' ability to ascertain which processor had reported which wages. *Id.* at 43. All of these alleged techniques plausibly constitute affirmative acts of concealment, hiding the wage compensation discussions at the core of Plaintiffs' collusion claims.

Plaintiffs also successfully allege due diligence with particularity. The Fourth Circuit rule is that plaintiffs may "satisfy [the due diligence requirement] without demonstrating that [they] engaged in any specific inquiry." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 554 (4th Cir. 2019) (brackets in original) (quoting *Marlinton*, 71 F.3d at 128). "'If the plaintiff establishes that

it was not (and should not have been) aware of facts that should have excited further inquiry on its part'—if the plaintiff was not on inquiry notice—'then there is nothing to provoke inquiry.'" *Id.* While Plaintiffs do cite some public information, the backbone of their surviving Count I claims is the series of secret meetings that were not publicized, and that Plaintiffs have sufficiently alleged were affirmatively concealed.  Plaintiffs were not on inquiry notice of these meetings.  Their awareness of the poultry industry's hiring of the "economically desperate," or of the industry's use of Agri Stats, for example, do nothing to suggest the existence of annual secret meetings to set compensation for the vast majority of the poultry industry.  Moreover, the Amended Complaint's contents suggest that counsel undertook an extensive investigation to uncover these meetings, which involved interviews with numerous confidential witnesses.  The secretive nature of the meetings, the lack of publicly available information, and the apparent investigation Plaintiffs' counsel undertook to uncover the existence of the meetings suggests that they exercised due diligence to investigate the alleged collusion.  Thus, the surviving Count I claims against Fieldale, Butterball, and WMS are not time barred.

> ### a.  Count II

Plaintiffs' surviving Count II claims against Fieldale, Butterball, Peco Foods, Agri Stats, and WMS must be examined separately, because the alleged anticompetitive conduct is different. While the secret compensation fixing meetings—central to Count I, and relevant as to Count II with regards to the Defendants (Fieldale, Butterball, and WMS) alleged to have participated in those meetings—are appropriately alleged to have been fraudulently concealed, the same is not true for Defendants' other information sharing conduct.  With regard to Agri Stats, Plaintiffs' own allegations suggest that as early as 2009, unions representing putative class members knew that certain Defendant Processors "insist[ed] during negotiations that wages 'would have to be within the parameters' contained in Agri Stats." ECF 258 at 52.  This should have been sufficient to

"provoke Plaintiffs' inquiry." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007). Plaintiffs' allegations of direct plant-to-plant information sharing, meanwhile, lack any facts suggesting the Defendant Processors concealed these communications. Thus, Plaintiffs' fraudulent concealment claims fall short insofar as they relate to Count II claims against surviving Defendants who are not specifically alleged to have participated in the secret meetings, namely Agri Stats and Peco Foods.

Although Plaintiffs have not sufficiently pled fraudulent concealment for Count II with regard to these two Defendants, they do successfully allege a continuing violation of the Sherman Act, 15 U.S.C.A. § 1, which refreshes the four-year statute of limitations and allows their claims to proceed. A continuing violation occurs when an "overt act that is part of the [original] violation and that injures the plaintiff" continues into the original statutory period and thus "starts the statutory period running again" regardless of the plaintiff's knowledge of the alleged illegality at an earlier time. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal citations omitted). In other words, where an antitrust violation is continuing in nature, suit may be brought more than four years after the events that initially created the cause of action, so long as the action is commenced within four years after the defendant commits an overt act in furtherance of the violation. Here, for Count II, the original cause of action was created when Agri Stats and Peco Foods are alleged to have begun their anticompetitive information sharing at the beginning of the Class Period over a decade ago. Since then, both Defendants are alleged to have continuously committed overt acts in furtherance of this information sharing scheme all the way up until the filing of the Complaint, such that every overt act "starts the [four-year] statutory period running again," *id.* Specifically, Agri Stats is alleged to have facilitated the exchange of current and disaggregated compensation data "on a monthly basis during the Class Period." ECF 258 at

31

50.  Peco Foods, meanwhile, is alleged to have shared compensation information "all the time," and a former Peco Foods employee described in present tense the fact that "local plants talk." *Id.* at 55.[13]  Since Agri Stats and Peco Foods are alleged to have constantly been refreshing the statute of limitations via their ongoing information sharing activities, Plaintiffs have adequately stated a claim for alleged damages from both Defendants that fall within the four-year period prior to the filing of their first Complaint.

**E.  Plaintiffs' Dismissed Claims Shall Be Dismissed Without Prejudice**

Where the Court has concluded that dismissal of Plaintiffs' claims is appropriate, Defendants urge the dismissal to be with prejudice.  Defendants contend that Plaintiffs have already amended once in response to Defendants' prior motions to dismiss, and thus have now failed to state a claim despite two separate opportunities. ECF 344 at 33.  Any further amendments, Defendants argue, would constitute prejudice. *Id.*  This view, however, runs contrary to the Federal Rules' and the Fourth Circuit's liberal allowance of amendments. *See* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given"); *see e.g.*, *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (emphasizing Rule 15 is a "liberal rule" which "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities").  There has been no showing of bad faith, nor has there been a showing of actual prejudice, beyond the time that might be spent replying to a prospective future amended complaint. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509–10 (4th Cir. 1986) (noting that in the Fourth Circuit, "leave to amend a pleading should be denied only" with a showing of prejudice, bad faith, or futility).  Perhaps most importantly, this is the first time Plaintiffs have had the opportunity to understand the Court's view

---

[13] To the extent these facts are not borne out in discovery, Peco Foods will be free to re-raise its limitations argument on summary judgment.

of the Amended Complaint's deficiencies.  As described above, this Court "does not believe that those deficiencies cannot be cured."  *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *10 (D. Minn. Aug. 8, 2019).  Accordingly, Plaintiffs' claims will be dismissed without prejudice, and Plaintiffs will be afforded thirty days in which to seek leave to file a second Amended Complaint.[14]

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss, ECF 341, 342, 343, 344, 349, 350, 351, 353, are GRANTED in part and DENIED in part.  The Motions to Dismiss Count I will be granted as to all Defendants, except Fieldale, Butterball, and WMS.  The Motions to Dismiss Count II will be granted as to all Defendants except Fieldale, Butterball, Peco Foods, WMS, and Agri Stats.  All of the dismissed claims will be dismissed without prejudice.

A separate Order is filed herewith.

Dated:  September 16, 2020

                                                              /s/
                                          Stephanie A. Gallagher
                                          United States District Judge

---

[14] As a matter of efficiency, Plaintiffs should confer with counsel for the five remaining Defendants, and should advise if they intend to seek leave to file a second Amended Complaint, to avoid those Defendants having to file an Answer to this Amended Complaint only to have to respond again to an amended version.