# EXHIBIT A



FILED

FEB 1 0 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

Case No. 2:19-cv-00463

IN RE PEANUT FARMERS
ANTITRUST LITIGATION

**ORDER REGARDING SEARCH AND
PRODUCTION OF
ELECTRONICALLY STORED
INFORMATION AND PAPER
DOCUMENTS**

This Order Regarding Search And Production Of Electronically Stored Information And Paper Documents ("ESI Protocol & Search Methodology Order") shall govern the Parties in the above-captioned case whether they currently are involved or become so in the future, and any related actions that may later be consolidated with this case (collectively, the "Litigation").

## I. GENERAL PROVISIONS

A. **Applicability:** This ESI Protocol & Search Methodology Order will govern the production of electronically-stored information ("ESI") and paper documents.

B. **Limitations & Non-Waiver:** Pursuant to the terms of this ESI Protocol & Search Methodology Order, information regarding search process and ESI practices may be disclosed, but compliance with this ESI Protocol & Search Methodology Order does not constitute a waiver, by any Party, of any objection to the production of particular ESI for any reason, including that it is irrelevant, undiscoverable, or otherwise inadmissible, unduly burdensome or not reasonably accessible, or privileged, nor does it constitute a waiver of any right to discovery by any Party. Nothing in this ESI Protocol & Search Methodology Order shall be construed to affect the discoverability of information or the admissibility of discoverable information. Nor shall anything in this ESI Protocol & Search Methodology Order be construed to affect the authenticity of any document or data. All objections to the discoverability, admissibility, authenticity, confidentiality, or production of any documents and ESI are preserved and may be asserted at any time. For the avoidance of doubt, a Party's compliance with this ESI Protocol & Search Methodology Order will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. All Parties preserve all such privileges and protections, and all Parties reserve the right to object to any such privileges and protections.

C. **Cooperation:** The Parties agree that they will adhere to the principles of cooperation, transparency, reasonableness, and proportionality, as set forth in the Federal Rules of

Civil Procedure and as interpreted by federal case law as they conduct discovery in the Litigation.

D. **ESI Liaisons:**

    1.    **Designation:** Each Party agrees to designate an ESI Liaison within 7 days after entry of this ESI Protocol & Search Methodology Order. Any Party is free to change its designated ESI Liaison by providing written notice to the other Parties.

    2.    **Duties of ESI Liaison:** Each ESI Liaison will be prepared to participate in the resolution of any e-discovery disputes or ESI issues that may arise (or designate another person as primarily responsible) and have access to personnel most knowledgeable about the Party's electronic systems and capabilities in order to, as appropriate, answer pertinent questions.

    3.    **Time Frame for ESI Issue Resolution:** Each ESI Liaison will acknowledge receipt of an ESI-related inquiry from another ESI Liaison within 3 business days after the initial inquiry and respond substantively no later than 10 business days after the initial inquiry. If the responding ESI Liaison believes the ESI issue in question is particularly complex and requires more than 10 business days to respond substantively, then within 10 business days the responding ESI Liaison will provide a general explanation of the process necessary to answer the question and provide an estimated response date.

E. **Deadlines:** References to schedules and deadlines in this ESI Protocol & Search Methodology Order shall comply with Federal Rule of Civil Procedure 6 with respect to computing deadlines.

F. **Definitions:**

    1.    Plaintiffs and Defendants, as well as their officers, directors, employees, agents, and legal counsel, are referred to as the "Parties" solely for the purposes of this ESI Protocol & Search Methodology Order. A single Plaintiff or Defendant, as well as, where applicable, its respective officers, directors, employees, agents, and legal counsel, may also be referred to as a "Party" solely for the purposes of this ESI Protocol & Search Methodology Order.

    2.    "Plaintiffs" as used herein shall mean the putative class of peanut farmers as set forth in the operative complaint, and any other plaintiff who, in the future, brings an action that is deemed related to or consolidated with the above-captioned matter.

    3.    "Defendants" as used herein shall mean Defendants named in the operative complaint, and any other defendant who, in the future, is named as a defendant in an action that is deemed related to or consolidated with the above-captioned matter.

2

4. To avoid misunderstandings about terms, all Parties should consult the most current edition of The Sedona Conference Glossary.

G. **Confidential Information:** For the avoidance of doubt, nothing herein shall contradict the Parties' rights and obligations with respect to any information designated as confidential under the forthcoming Protective Order.

H. **Preservation:** The Parties agree that they shall continue to take reasonable steps to preserve relevant documents and ESI in accordance with their obligations under applicable law. The Parties will meet and confer regarding the scope of preservation, including custodians, data sources, date ranges, and categories of information that have been or should be preserved in connection with this Litigation. By preserving or producing information for the purpose of this Litigation, the Parties are not conceding that such material is discoverable or admissible.

## II. GENERAL PRODUCTION FORMAT PROTOCOLS

A. **TIFFs:** Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files. Each image will have a file name that is the unique Bates number of that image, pursuant to Paragraph II(E). Original document orientation should be maintained to the extent reasonably practicable and technologically possible for a producing Party's vendor (i.e., portrait to portrait and landscape to landscape). The imaged data shall retain all attributes of the native or hard-copy file, such as document breaks, to the extent reasonably practicable. To the extent reasonably practicable, produced TIFF images will show all text and images that are visible in the form in which the electronic document was last saved, with the exception of redacted portions. Hidden content, tracked changes or edits, comments, notes, and other similar information, to the extent viewable within a document in its native file format and visible in the form in which the electronic document was last saved, shall, to the extent reasonably practicable, also be imaged so that such content is viewable on the image file. Nothing in this subsection requires the modification or alteration of any document or data in order to make any hidden content, tracked changes or edits, comments, notes, and other similar information viewable if it is not already viewable in the form in which the electronic document was last saved. Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively." A producing Party retains the option to produce ESI in alternative formats if so agreed by the requesting Party, which may include native format, or a combination of native and TIFF formats.

B. **Text Files:** Each ESI item produced under this ESI Protocol & Search Methodology Order shall be accompanied by a text file as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page. Each text file shall be named to use the Bates number of the first page of the corresponding production item.

3

1. **OCR:** A producing Party may make paper documents available for inspection and copying/scanning in accordance with Federal Rule of Civil Procedure 34 or, additionally or alternatively, scan and OCR paper documents. Where OCR is used, the Parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR text files should indicate page breaks where possible. Even if OCR is used by a producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR.

2. **ESI:** Except for redacted documents, emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available. For redacted documents, Parties shall provide OCR text in accordance with the specifications in Paragraph II(B)(1).

C. **Production of Native Items:** The Parties agree that ESI shall be produced as TIFF images consistent with the format described in Paragraph II(A) with an accompanying load file, which will contain, among other data points, the ESI data points listed in Appendix 1 hereto. The exception to this rule shall be spreadsheet-application files (e.g., MS Excel), presentation files (e.g., MS PowerPoint), personal databases (e.g., MS Access), and multimedia audio/visual files such as voice and video recordings (e.g., .wav, .mpeg, and .avi), for which all ESI items shall be produced in native format upon reasonable request. In the case of personal database (e.g., MS Access) files containing confidential or privileged information, the Parties shall meet and confer to determine the appropriate form of production. When producing the above file types in native format, the producing Party shall produce a single-page TIFF slip sheet indicating that a native item was produced. The corresponding load file shall include NativeFileLink information for each native file that is produced. Further, the Parties agree to meet and confer prior to producing native file types other than spreadsheet application files, presentation files, and multimedia audio/visual file types such as .wav, .mpeg, and .avi. Prior to processing non-standard native files for production, the producing Party shall disclose the file type to and meet and confer with the requesting Party on a reasonably useable production format. The Parties agree to meet and confer to the extent that there is data in database application files, such as SQL, to determine a reasonable form of production of usable data. Through the pendency of the Litigation, the producing Party shall exercise reasonable, good faith efforts to maintain all preserved and produced native files in a manner that does not materially alter or modify the file or the metadata.

D. **Requests for Other Native Files:** Other than as specifically set forth above, a producing Party need not produce documents in native format. If a Party would like a particular document produced in native format and this ESI Protocol & Search Methodology Order does not require the production of that document in its native format, the Party making such a request shall explain the reason for its request that the document be produced in its native format. The requesting Party will provide a specific Bates range for documents it wishes to be produced in native format. Any native files that are produced should be produced with a link in the NativeLink field, along with all extracted text and applicable metadata fields set forth in Appendix 1.

4

E.   **Bates Numbering:**

1.   All images must be assigned a Bates number that must always: (1) be unique across the entire document production; (2) maintain a constant prefix and length (ten-digits and 0-padded) across the entire production; (3) contain no special characters, embedded spaces, hyphens, or underscores; (4) be sequential within a given document; and (5) identify the producing Party. To the extent reasonably practicable, the Bates number must also maintain consistent numbering across a family of documents.

2.   If a Bates number or set of Bates numbers is skipped in a production, the producing Party will so note in a cover letter or production log accompanying the production.

3.   The producing Party will brand all TIFF images at a location that does not obliterate or obscure any part of the underlying images.

F.   **Parent-Child Relationships:** Parent-child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business should be preserved to the extent reasonably practicable. For example, if a Party is producing a hard copy printout of an email with its attachments, the attachments should be processed in order behind the e-mail to the extent reasonably practicable.

G.   **Entire Document Families:** Subject to Paragraphs II(K)(1), II(K)(2), and VI(D)(2) below, entire document families must be produced, even if only the parent email or an attachment to an email is responsive, except (1) junk files and non-user-created content routinely excluded during processing, and (2) documents that are withheld on the basis of attorney-client privilege or work product protection.

H.   **Load Files:** All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (such as an Opticon file) and a metadata (.dat) file with the metadata fields identified below on the document level to the extent available. The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the image load files in the production.

I.   **Color:** Documents or ESI containing color need not be produced initially in color. However, if an original document or ESI item contains color markings and it is necessary to see those markings in their original color to understand the meaning or content of the document, then the requesting Party may, in good faith, request that the document or ESI item be produced in its original colors. For such documents, the requesting Party shall provide a list of Bates numbers of the imaged documents sought to be produced in color. The production of documents and/or ESI in color shall be made in single-page JPEG format (300 DPI). All requirements for productions stated in this ESI Protocol & Search Methodology Order regarding productions in TIFF format apply to any productions of documents and/or ESI in color made in such an alternative format. Requests that a

document be produced in color for the reasons set forth in this Paragraph II(I) will not be unreasonably denied by the producing Party. If a producing Party wishes to object, it may do so by responding in writing and setting forth its objection(s) to the production of the requested document in color.

J.    **Confidentiality Designations:** If a particular paper document or ESI item qualifies for confidential treatment pursuant to the terms of the Protective Order entered by the Court in the Litigation, or to any applicable federal, state, or common law (e.g., Personally Identifiable Information or Protected Health Information), the designation shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying images. To the extent reasonably practicable, this designation also should be included in the appropriate data field in the load file. For documents produced in native format with image placeholders, the placeholder image for the native file should be branded with the appropriate confidentiality designation to the extent possible. Requesting Parties shall take reasonable steps to ensure that the confidentiality claim follows the document regardless of whether the designation imprints on the file when viewed in printed form. Failure to comply with the procedures set forth in this ESI Protocol & Search Methodology Order, any protective order or confidentiality order, or any confidential stipulation shall not waive any protection or confidential treatment.

K.    **Redactions**

   1.    **Personal Data Redactions:** In addition to the redactions permitted as set forth in Paragraph VI(D)(2) below, a producing Party may redact personal information to the extent that the information falls within one of the following categories:

      a.    the information relates to medical or health issues of an individual; or

      b.    social security numbers, taxpayer-identification numbers, driver's license numbers, passport numbers, financial-account numbers or other bank account information, or personal passcodes. Such redactions should be identified as "Redacted – Personal Data" on the document.

   2.    **No "Relevancy" Redactions:** A party may not make redactions based on an assertion that the data is not relevant. The only redactions permitted are on the basis of privilege, the two specific categories of Personal Data Redactions listed in Paragraph II(K)(1)(a) and II(K)(1)(b) above, or those permitted as set forth in Paragraph VI(D)(2) below.

L.    **Production Media & Protocol:** A producing Party may produce documents via readily accessible computer or electronic media, including CD-ROM, DVD, or external hard drive (with standard PC compatible interface) ("Production Media"), or via file-sharing service, including any network-based secure file transfer mechanism or Secure File Transfer Protocol. Any requesting Party that is unable to resolve any technical issues

with the electronic production method used for a particular production may request that a producing Party provide a copy of that production using Production Media.

The producing Party may encrypt Production Media, and will provide a decryption key to the requesting Party in a communication separate from the production itself. If used, each piece of Production Media must be assigned a production number or other unique identifying label corresponding to the date of the production of documents on the Production Media, as well as the sequence of material in that production. For example, if the production comprises document images on three DVDs, the producing Party may label each DVD in the following manner: "[Party] Production January 1, 2020-001," "[Party] Production January 1, 2020-002," and "[Party] Production January 1, 2020-003."

Each production should include a transmittal letter that includes (1) the production date, (2) the Bates range of the materials included in the production, and (3) a brief description of the production.

## III.   PAPER DOCUMENT PRODUCTION PROTOCOLS

A.   **Scanning:** A producing Party may make paper documents available for inspection and copying in accordance with Federal Rule of Civil Procedure 34 or, additionally or alternatively, scan and OCR paper documents. Where OCR is used, the Parties agree that Paragraph II(B)(1) and the following Paragraphs III(B)-(C) shall apply.

B.   **Coding Fields:** The following information shall be produced in the load file accompanying production of paper documents produced by scan and OCR to the extent reasonably practicable: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian, (f) Confidentiality, and (g) Redacted (Y/N). Additionally, all paper documents will be produced with a coding field named "Paper Document" marked with a "Y."

C.   **Unitization of Paper Documents:** Paper documents should be logically unitized for production to the extent reasonably practicable. Generally, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records. The Parties will make reasonable efforts to unitize documents correctly.

   1.   **Relationship:** The relationship among the documents in a folder or other grouping should be reflected in the coding of the beginning and ending document and attachment fields to the extent reasonably practicable.

   2.   **Identification:** Where a document, or a document group – such as folder, clipped bundle, or binder – has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping to the extent reasonably practicable.

7

## IV. ESI METADATA FORMAT AND PROCESSING ISSUES

A. **System Files:** ESI productions may be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology as it exists at the time of de-NISTing. Other file types may be added to the list of excluded files if they clearly do not have user-created content and by agreement of the Parties.

B. **Metadata Fields and Processing:**

1. **Date and Time:** No party shall modify the date or time as contained in any original ESI.

2. **Time Zone:** To the extent reasonably practicable, ESI items shall be processed using a consistent time zone (e.g., Eastern Standard Time), and the time zone used shall be disclosed to the requesting Party.

3. **Auto Date/Time Stamps:** To the extent reasonably practicable, ESI items shall be processed so as to preserve the date/time shown in the document as it was last saved, not the date of collection or processing.

4. **Metadata Fields:** Except as otherwise set forth in this ESI Protocol & Search Methodology Order, ESI files shall be produced with at least each of the data fields set forth in Appendix 1 that can reasonably be extracted from a document.

   The Parties are not obligated to manually populate any of the fields in Appendix 1 if such fields cannot reasonably be extracted from the document using an automated process, with the exception of the following fields to the extent reasonably practicable: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian, (f) Confidentiality, (g) Redacted (Y/N), (h) NativeLink fields, and (i) Paper Document (Y) (where applicable), which should be populated regardless of whether the fields can be populated pursuant to an automated process.

C. **Redaction:**

1. The Parties agree that, where ESI items need to be redacted, they shall be produced solely in TIFF format with each redaction clearly indicated, except in the case of personal database files (e.g., MS Access). Personal database files shall be governed by Paragraph II(C), *supra*. Any non-privileged metadata fields reasonably available shall be provided. The Parties understand that for certain MS Excel documents or other file types or files, TIFF redactions may be impracticable. These documents may be redacted in native format by deleting the data from the document before production.

2. If the items redacted and partially withheld from production are audio/visual files, the producing Party shall, to the extent reasonably practicable, provide the unredacted portions of the content. If the content is a voice recording, the Parties

8

shall meet and confer to discuss the appropriate manner for the producing Party to produce the unredacted portion of the content.

D. **Email Collection and Processing:**

1. **Email Threading:** The Parties may use email thread suppression to avoid review and production of information contained within an existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression eliminate (a) the ability of a requesting Party to identify every custodian who had a copy of the produced document or email, or (b) remove from production any unique branches and/or attachments contained within an email thread.

2. **Email Domains:** Producing Parties may utilize an ESI search process to identify categories of documents, such as emails from domains typically associated with junk email, such as fantasy football-related emails, retailer advertising, and newsletters or alerts from non-industry sources. To the extent a Party opts to exclude uniquely identifiable email domain names (e.g., emails from domains typically associated with junk or irrelevant topics like sports, fantasy team competitions, retailer advertising, and newsletters or alerts from non-industry sources) as part of its initial filter of potentially responsive documents, the Parties agree to disclose domain names excluded under this paragraph and to meet and confer on the timing for such disclosures.

E. **De-duplication:** A producing Party may de-duplicate any file globally (i.e., across document custodians) or horizontally at the "family" level (i.e., families should not be broken due to de-duplication). Each party may also de-duplicate emails in such a way as to eliminate earlier or incomplete chains of emails and therefore produce only the most complete iteration of an email chain. To the extent consistent with Paragraph IV(B)(4) above, a producing Party will make a reasonable effort to identify all custodians who were in possession of any de-duplicated documents through an appropriate load field such as DuplicateCustodian or CustodianAll/Other. Additionally, to the extent consistent with Paragraph IV(B)(4) above, all BCC recipients whose names would have been included in the BCC metadata field, to the extent such metadata exists, but are excluded because of horizontal/global de-duplication, must be identified in the BCC metadata field specified in Appendix 1 to the extent such metadata exists. In the event of rolling productions of documents or ESI items, the producing Party will, as needed, supplement the load files with updated CustodianAll or CustodianOther information, as well as BCC information to the extent such metadata exists. Duplicate custodian information may be provided by a metadata "overlay" and will be provided by a producing Party after the Party has substantially completed its production of ESI.

1. Duplicate electronic documents shall be identified by a commercially accepted industry standard (e.g., MD5 or SHA-1 hash values) for binary file content. All electronic documents bearing an identical value are a duplicate group. The producing Party shall use reasonable efforts to produce only one document image or native file for duplicate ESI documents within the duplicate group to the extent

practicable. The producing Party is not obligated to extract or produce entirely duplicate ESI documents. Any other methodology for identification of duplicates, including email field selection for hash value creation, must be discussed with the requesting Party and approved in writing before implementation. The requesting Party will not unreasonably withhold approval.

F. **Zero-byte Files:** The Parties may, but are not required to, filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names. If the requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the requesting Party may request that the producing Party produce the zero-byte file. The requesting Party may provide a Bates number to the producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production.

G. **Microsoft "Auto" Feature:** To the extent reasonably practicable and reasonably technologically possible for a producing Party's vendor, Microsoft Excel (.xls) and Microsoft PowerPoint (.ppt) documents should be analyzed for the "auto" features, where documents have an automatically updated date and time in the document, file names, file paths, or similar information that when processed would be inaccurate for how the document was used in the ordinary course of business. If "auto date," "auto file name," "auto file path," or similar features are identified, the produced document shall be identified in a load file, metadata field, or otherwise as having these features (e.g., branded with the words "Auto Date," "Auto File Name," or "Auto File Path").

H. **Hidden Text:** ESI items shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments.

I. **Embedded Objects:** Embedded objects will not be processed in such a way that they are extracted, except as to standalone Microsoft Excel, Microsoft Word, or similar documents. The Parties agree that other embedded objects, including, but not limited to, logos, icons, emoticons, and footers, may be culled from a document set and need not be produced as separate documents by a producing Party (e.g., such embedded objects will be produced within the document itself, rather than as separate attachments).

J. **Compressed Files:** Compression file types (i.e., .CAB, .GZ, .TAR, .Z, and .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

K. **Password-Protected, Encrypted, or Proprietary-Software Files:** With respect to any ESI items that are password-protected or encrypted within the scope of review, the producing Party will take reasonable steps based on industry standards to break the protection so that the documents can be reviewed and produced if appropriate. In the event that encrypted or password-protected documents, which are reasonably likely to be responsive to a document request, remain for a particular custodian after such reasonable efforts have been made, the producing Party shall advise the requesting Party. ESI that

cannot be reviewed because proprietary software is necessary to view the ESI will be disclosed to a requesting Party, and the Parties shall meet and confer regarding the next steps, if any, with respect to such ESI.

## V.   DOCUMENT SOURCE SCOPE AND DISCLOSURE PARAMETERS

A.   **Time Period:** The Parties agree that ultimately they will be able to limit the processing of discoverable information to that which was created, modified, sent, or received during a particular time period. However, the parties do not presently agree on what that time period will be and consequently will raise that issue with the Court.

B.   **Document Source Negotiations**

1.   **Initial Document Custodians and Sources:** Each party will provide a list of proposed document custodians and non-custodial document sources (e.g., centralized document sources other than an individual document custodian's files) reflecting those employees or sources with information and/or documents responsive to an agreed-on or Court-ordered scope of Rule 34 Requests.

2.   **Additional Document Custodians or Sources:** If, after the Parties identify initial document custodians, a requesting Party believes that additional document custodians or sources should be added, then the requesting Party shall advise the producing Party in writing of the proposed additional document custodians or sources and the basis for the request. If the Parties have not agreed whether to add the document custodian or source within 30 days of the requesting Party's request, then the matter may be brought to the Court.

3.   Except by agreement of the Parties or by order of the Court, a producing Party is not required to add document custodians or sources after completion of the above steps in Paragraphs V(B)(1) and V(B)(2).

## VI.   PARAMETERS FOR CULLING OF PAPER AND ESI DOCUMENTS

A.   **Transparency:** With the goal of permitting requesting Parties an appropriate level of transparency into a producing Party's electronic search process, without micromanaging how the producing Party meets its discovery obligations and without requiring the disclosure of attorney work product or other privileged information, the Parties will endeavor to be reasonably transparent regarding the universe of documents subject to targeted collections or culling via search terms and other limiters (e.g., date ranges and email domains in metadata fields) and/or TAR/CAL.

B.   **Pre-Search Deduplication & Culling of Collected Data:**

1.   **De-Duplication:** Before running either of the Search Processes below in Paragraph VI(C), data should be de-duplicated by hash value across all agreed or Court-ordered document custodians.

2. **Email Threading:** If the producing Party's search software has the capability, then the producing Party may choose to include inclusive emails only in the data set subject to the Keyword and/or TAR/CAL Search Process, including the data set against which keyword searches are tested. A producing Party will disclose whether or not they are testing search terms in a set of data that excludes non-inclusive emails. Non-inclusive emails do not need to be searched, reviewed, or produced in this matter.

3. **Email Domains:** Should the requesting Party want certain email domains excluded from the data set against which search terms are tested, the requesting Party must provide a list of such domain names to the producing Party ahead of the producing Party's testing of search terms. Likewise, if the producing Party identifies domains that it believes should be eliminated, it will produce a list of those domain names to the requesting Party.

4. **Paper Documents:** The Parties agree to meet and confer to determine whether paper documents scanned to electronic form for litigation may be included in any keyword or TAR process.

5. **Targeted Collections:** Only documents a producing Party intends to subject to electronic searching parameters should be included in the data set against which search terms are tested. As a hypothetical example, a centralized, non-custodial folder of responsive submissions of peanut inventory or pricing data to the USDA that a Defendant intends to produce in its entirety should not be included in the data set against which search terms are tested.

6. **Exception Reporting:** For any documents not otherwise identified as system or operating files, the producing Party must disclose processing exceptions that are unresolved at the end of the discovery period, such as documents that cannot be opened due to encryption or other issues.

7. **Disclosure of Other Culling Parameters Required:** A producing Party is permitted to cull data using the agreed-upon custodial and non-custodial sources, agreed-upon date parameters, and agreed-upon search terms (if applicable), and a producing Party is permitted to remove known system or operating files, such as those that appear on the National Software Reference Library hash list. As such, the Parties may cull entire file directories from computer hard drives that contain Program Files, Program Data, SWTOOLs, Windows Operating System files, etc. For those excluded directories, the Parties will only conduct searches on user-created content that is reviewable and likely to yield relevant content. To the extent a producing Party elects to use additional culling parameters, those parameters will be disclosed.

C.  **Search Methodology Parameters:**  The following TAR/CAL and Keyword Search Processes govern how collected data may be electronically culled in this matter.

1.  **TAR/CAL Search Process:**

a.  **Use of Search Terms with TAR/CAL:**

i.  No later than 7 days after agreement between the Parties or an order by the Court on document custodians, the requesting Party will propose to a producing Party a limited number of document custodians, not to exceed three individuals, for whom, across their email only, it requests that no search term pre-culling be used prior to applying TAR/CAL during the review process.  However, the other data culling parameters described in ESI Protocol & Search Methodology Order may be applied to these document custodians, including to their email.

ii.  After disclosure of a party's proposed search process, the Parties will meet and confer on any issues or disputes regarding the requesting Party's proposals.

b.  **Producing Party TAR/CAL Disclosures:**

i.  On a date as agreed by the Parties or ordered by the Court, a producing Party that elects to use TAR/CAL will disclose the following information regarding its use of a TAR/CAL process:  (a) the name of the TAR/CAL software and vendor, (b) a general description of how the producing Party's TAR/CAL process will work, including how it will train the algorithm, such as using exemplars, keyword search strings, or some other method, (c) a general description of the categories or sources of the documents included or excluded from the TAR/CAL process, and (d) what quality control measures will be taken.

c.  **Requesting Party Response:**

i.  After receiving a producing Party's TAR/CAL Disclosures, the requesting Party may raise with the producing Party any concerns with the proposed TAR/CAL process or categories of documents that it proposes should be excluded from the TAR/CAL process.  A requesting Party may also propose any exemplars it proposes be used to train a TAR/CAL tool or narrow keyword search strings it proposes be used to generate exemplars to train a TAR/CAL tool.  A producing Party retains the right to

13

reject and oppose any such requests, subject to resolution by the Court.

d. **Cooperation:** The Parties agree to work together in good faith to resolve any differences that they may have over the producing Party's use of TAR/CAL and its processes, recall, and validation proposals. If an agreement cannot be timely reached, then the Parties agree to raise this issue with the Court.

2. **Keyword Search Process:**

a. **Iterative Process:** Developing efficient keyword search terms is an iterative process and will require transparent and cooperative efforts by both the producing and requesting Party; however, it is important to set certain limits in order to effectively and efficiently manage time and expense.

b. **Search Software Disclosures:** On a date as agreed by the Parties or ordered by the Court, the producing Party will disclose any search software they have decided to use (including version number) and that software's default stop/noise words and search language syntax.

c. **First Phase Search Term Proposals:**

i. *Producing Party Proposes an Initial Set of Search Terms*: After disclosing its search process to the requesting party, the producing Party will propose a set of search terms. The producing Party's proposal will include, to the extent known, semantic synonyms and common spellings of the keywords proposed. Where a producing Party seeks to exclude false positives (aka, "noise hits") by modifying or excluding certain keywords, then it will supply contextual examples of such false positives to explain why they must be excluded.

ii. *Requesting Party's Proposed Revisions*: After receiving the initial proposed search terms, the requesting Party will provide any proposed revisions to the producing Party's search terms.

iii. *Producing Party Provides Information Sufficient to Support Its Objections:* After receipt of the requesting Party's proposed revisions, the producing Party will provide information sufficient to support its objections to specific search terms.

14

iv. *Cooperation*: The producing Party and the requesting Party will work together in good faith to reasonably narrow the number of documents returned via search term hits and narrow the number of irrelevant documents captured as a result of the search terms. To the extent any disputes remain concerning the sufficiency of the producing Party's information in support of its objections and/or the use of specific search terms after good faith negotiations have occurred, either Party may request the assistance of the Court in resolving such disputes.

d. **Second Phase Search Term Proposals:**

i. *Requesting Party Proposes an Additional Set of Search Terms*: The Parties agree that Plaintiffs collectively and Defendants collectively may propose additional search terms to a producing Party one time. On a date as agreed by the Parties or ordered by the Court, the requesting Party may propose a set of additional search terms. The requesting Party will explain generally the basis for the additional requested terms, which could include, for example, identifying by Bates number exemplar documents that support the request.

ii. *Producing Party Provides Information Sufficient to Support Its Objections*: After the requesting Party provides an additional set of proposed search terms, the producing Party will provide information sufficient to support its objections to specific additional search terms.

iii. *Requesting Party and Producing Party Will Meet and Confer Regarding Requesting Party's Proposed Additional Search Terms*: After the requesting Party proposes an additional set of search terms, the Parties will meet and confer regarding any disputes or counter-proposals regarding the additional search terms. To the extent any disputes remain concerning the sufficiency of the producing Party's information in support of its objections and/or the use of specific additional search terms after good faith negotiations have occurred, either Party may request the assistance of the Court in resolving such disputes.

3. *Good Cause Inability of a Party to Meet the Deadlines Imposed in this Order*: It is expected that the Parties shall make their best efforts to complete the above steps in a reasonable and efficient manner. The Parties understand that technical (or other) issues or unanticipated volumes may interfere with a Party's best efforts to comply. Should a

15

Party anticipate that for good cause it may be unable to meet a deadline ultimately agreed between the Parties or ordered by the Court, that Party shall promptly raise the issue with the other Parties, explain the reason for the inability to timely comply, and negotiate a reasonable extension for compliance. If the Parties are unable to immediately agree upon a revised deadline for compliance, they shall promptly raise the issue with the Court for resolution. This provision shall not be construed as blanket permission for a Party to modify or extend the ultimate deadlines agreed to by the Parties or ordered by the Court without good cause, but rather, to recognize that when dealing with search and review of large volumes of ESI, there are sometimes legitimate, unanticipated challenges that may interfere with a Party's best efforts to fulfill its obligations and therefore, to afford the Parties reasonable flexibility and mutual accommodation should that eventuality occur.

4. **Additional Searching**: Except by agreement of the Parties or by order of the Court, a producing Party is not required to add search terms after completion of the above phases. A producing Party also need not conduct any additional review of information subjected to, but not retrieved by, a TAR/CAL tool as part of the identification of the subset of information that will be subject to review and production.

5. **Validation Procedures**: The review process should incorporate quality-control and quality-assurance procedures to ensure a reasonable production consistent with the requirements of Federal Rule of Civil Procedure 26(g). The Parties agree to meet and confer at an appropriate time regarding what, if any, validation procedures may be required once a producing Party reasonably believes that it has produced or identified for production substantially all responsive non-privileged documents.[1]

C. **Structured Data:** To the extent a response to discovery requires production of discoverable ESI contained in a structured database, the Parties shall meet and confer in an attempt to agree upon a set of queries to be made for discoverable information and generate a report in a reasonably usable and exportable electronic file for review by the requesting Party. Upon review of the report, the requesting Party may make reasonable requests for additional information to explain the database schema, codes, abbreviations, and different report formats or to request specific data from identified fields.

D. **Custodial Cellphone & Personal Communications Data:**

1. **Cellphones:** For document custodians agreed on by the Parties or ordered by the Court, a producing Party will take reasonable steps to identify

---

[1] For the avoidance of doubt, Plaintiffs believe validation should be required and reserve their right to raise this issue with the Court should the parties be unable to agree on a specific protocol for such validation.

whether any unique responsive communications are located on any cellphones in the possession, custody, or control of the producing Party. Unless agreed otherwise, the following shall govern the review and production of unique, responsive, and non-privileged communications for cellphone-based data for the agreed or ordered document custodians with respect to cellphones in the possession, custody, or control of the producing Party.

    a. Prior to any culling of the cellphone data, a producing Party will disclose the following to the extent reasonably possible: (1) to the extent not already provided, a list of cellphone number(s) used by the document custodian for work purposes, if any, (2) the name of the phone carrier that provided service for each identified phone number, (3) the type of phone, including brand and model number, if known, (4) a list of installed communications-related applications used for work purposes on the document custodian's cellphone, including ephemeral messaging applications (e.g., SnapChat, Confide, and Signal), Facebook Messenger, and other such applications if such applications are used for work purposes, and (5) whether or not the producing Party claims that a cellphone used by the document custodian for work purposes is not within its possession, custody, or control.

    b. A producing Party will review the following sources of information on a cellphone used for work purposes, to the extent reasonably available, to identify unique, responsive, and discoverable information; the Parties will discuss and will not unreasonably oppose methods of culling the below sources for responsive information:

        i. **Cellphone Call and Voicemail Logs:** The logs of any calls made/received and voicemails left on a cellphone that the document custodian used for work purposes, if any, if the cellphone is in the possession, custody, or control of a producing Party.

        ii. **Text Messages:** All text messages and/or iMessages on the cellphone device used for work purposes or contained in available backups/archives associated with the device, if any, if the cellphone is in the possession, custody, or control of a producing Party.

2.    **"Contacts":** The Parties will review a document custodian's relevant contacts (e.g., MS Outlook Contacts or cellphone-based contacts) in the possession, custody or control of a producing Party. The Parties will discuss and will not unreasonably oppose methods of culling a document custodian's contacts for responsive information. A producing Party is

17

entitled to redact or withhold information from the contacts file that does not relate to the document custodian's work—including, but not limited to, the name and contact information for any family or friends not involved in the peanut industry. If, after reviewing the redactions, the requesting Party believes that more information is needed about the redactions, then the Parties will meet and confer regarding the information redacted.

3. **Social Media Data:** If a document custodian confirms that he or she (1) used Social Media for business purposes and (2) used that Social Media to communicate with an employee of another Defendant or otherwise regarding a subject relevant to the Litigation and included within a Request for Production, subject to objections to that Request, then the requested communication(s) must be produced if it is reasonably accessible, in the producing Party's possession, custody, or control, and not withheld as privileged and/or as illegal to produce under applicable privacy laws. The Parties shall meet and confer to the extent there are any issues with respect to the format of such Social Media data.

## VII.  CLAIMS OF PRIVILEGE AND REDACTIONS

A. **Production of Privilege Logs:** Except as provided otherwise below, for any document withheld in its entirety or produced but redacted, the producing Party will produce privilege/redaction logs in MS Excel format or any other format that permits electronic sorting and searching.

B. **Exclusions from Logging Potentially Privileged Documents:** The following categories of documents do not need to be contained on a producing Party's privilege log, unless good cause exists to require that a Party do so.

1. Information generated before the beginning of the relevant discovery period agreed to by the Parties or ordered by the Court. While reserving all rights with respect to the relevant time period for discovery, the Parties agree that information generated after September 5, 2019 also need not be logged. This provision does not apply to non-Parties to the Litigation.

2. Any communications exclusively between a producing Party and its outside counsel, an agent of outside counsel other than the Party, any non-testifying experts in connection with specific litigation, or, with respect to information protected by Federal Rule of Civil Procedure 26(b)(4), testifying experts in connection with specific litigation.

3. Any privileged materials or work product created by or specifically at the direction of a Party's outside counsel, an agent of outside counsel other than the Party, any non-testifying experts in connection with specific litigation, or, with respect to information protected by Federal Rule of Civil Procedure 26(b)(4), testifying experts in connection with specific litigation.

## C. Privilege Log Requirements:

1. **Metadata Log:** To the extent applicable, each Party's privilege log only needs to provide objective metadata (to the extent it is reasonably available and does not reflect privileged or protected information) and an indication of the privilege or protection being asserted.

    a. Objective metadata includes the following (as applicable to the document types as shown in Appendix 1):

        i. A unique privilege log identifier
        ii. Custodian
        iii. CustodianOther or CustodianAll (if applicable)
        iv. File Name
        v. Email Subject
        vi. Author
        vii. From
        viii. To
        ix. CC
        x. BCC
        xi. Date Sent
        xii. Date Received
        xiii. Date Created

    b. In addition to the objective metadata fields, a Party must also include a field on its privilege log entitled "Attorney/Description of Privileged Material" if the basis for the privilege asserted is not apparent from the objective metadata (e.g., the name of the attorney will be provided if not included in the objective metadata). Further, a Party must manually populate on its privilege log an author and date for any withheld document where that information is not provided by the objective metadata, unless such information is not reasonably discernable from the document or the information is not necessary to evaluate the claim of privilege in light of the metadata that is discernable and/or the information provided in the Attorney/Description of Privileged Material field.

    c. With respect to the "Email Subject" or "File Name" field, the producing Party may substitute a description of the document where the contents of these fields may reveal privileged information. In the privilege log(s), the producing Party shall identify each instance in which it has modified the content of the "Email Subject" or "File Name" field.

19

        d.    Should a receiving Party, in good faith, have reason to believe a particular entry on a metadata-generated privilege log is responsive and does not reflect privileged discoverable information, the receiving Party may request, and the producing Party will not unreasonably refuse to create, a privilege log for that entry in compliance with Federal Rule of Civil Procedure 26(b)(5).

    2.    **Email Chains:** If there is more than one branch of (i.e., more than one unique group of recipients of) an email thread, each branch will be individually logged; however, each individual email within the thread need not be logged if the recipients of the email chain are all identical. A Party asserting privilege over a chain of emails may produce only a single redacted copy of such email chain consistent with Paragraph VII(D) below to the extent some portions are only partially privileged, except that any unique branches of the email chain must also either be produced in redacted form or included on the metadata privilege log.

D.    **Documents Redacted for Privilege:** Redacted documents need not be logged as long as (a) for emails, the objective metadata (i.e., to, from, cc, bcc, recipients, date, and time, unless the privilege or protection is contained in these fields) is not redacted, and the reason for the redaction, including the nature of the privilege asserted, is noted on the face of the document (for redacted documents where the subject matter is not decipherable as a result of redactions, a description of the contents of the document that is sufficient to understand the subject matter of the document may be requested); and (b) for non-email documents, the reason for the redaction is noted on the face of the document in the redacted area. In accordance with this Paragraph VII(D), the producing Party will undertake reasonable efforts to make limited, line-by-line redactions of privileged or work product information. After receipt of the production, the requesting Party may request in good faith that the producing Party create a privilege log for specific redacted documents, by Bates number. Electronic documents that are redacted shall be identified as such in a "redaction" field in the accompanying data load file.

E.    **Challenges to Privilege Claims:** Following the receipt of a privilege/redaction log, a requesting Party may identify, in writing (by Bates/unique identification number), the particular documents that it believes require further explanation. The producing Party shall endeavor to respond to such a request within 14 days. If a Party challenges a request for further information, the Parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the matter may be brought to the Court.

# VIII.    CLAWBACK ORDER

A.    **Non-Waiver:** Pursuant to Federal Rule of Evidence 502(d), the production of any material or information shall not be deemed to waive any privilege or work product protection in the Litigation or in any other federal or state proceeding. Nothing in this Paragraph VIII is intended to or shall serve to limit a Party's right to conduct a review of any material or information for relevance, responsiveness, and/or segregation of privileged and/or protected information before production,

subject to Paragraph VIII(B)(1) below. The Parties stipulate that the Court should enter a Rule 502(d) Order to this end, which shall be interpreted to provide the maximum protection allowed by Rule 502(d).

B.   **Assertion of a Clawback:**  Any Party or non-Party may request the return of any produced material or information on the grounds of privilege or work product protection by identifying it, stating the basis for withholding such material or information from production, and providing any other information that would be listed on a supplemental privilege log, subject to Paragraph VIII(B)(1) below.

1.   **Clawbacks Before Depositions:**  If a Party attempts to clawback a document authored or received by an individual who is scheduled for a deposition within 30 days of the date of the deposition, and the propriety of the clawback is not resolved pursuant to Paragraph VIII(C)(2) below prior to the date of the deposition, then the Parties will meet and confer on the appropriate course of action, which may, but need not necessarily, include:

a.   rescheduling the deposition until the issue is resolved by the Court;

b.   conferring prior to the deposition to determine if the document may be used in the deposition subject to agreed-upon limitations;

c.   calling the Court if the clawback is made during the deposition to determine if immediate resolution is possible; and/or

d.   allowing the Party resisting the clawback to recall the deponent for the sole and exclusive purpose of questioning the deponent on the document at issue if the Court subsequently determines the clawback was improper (if exercised, recalling the deponent for this purpose will not count against the total number of depositions or deposition hours to which the Party resisting the clawback is entitled).

2.   **Document Used in Proceedings:**  Notwithstanding the foregoing, the Parties agree that any document used by any Party in a deposition, expert report, or court filing in this action (with the exception of a motion to determine the existence of any privilege) shall not be eligible for protection under Rule 502(d) as a clawed-back document if the producing Party does not clawback that document pursuant to this ESI Protocol & Search Methodology Order within 21 calendar days of its use.  For a document used by a Party in a deposition, expert report, or court filing in this action that is clawed back after 21 calendar days of its use, Rule 502(b) shall govern any dispute with respect to the producing Party's potential waiver of attorney-client privilege or work product protection with respect to the document.

C. **Clawback Process:** Federal Rule of Civil Procedure 26(b)(5)(B) shall govern the clawback of produced documents or information on the grounds of privilege or work product protection. If a Party or non-Party requests the return of such produced material or information then in the custody of one or more Parties, the possessing Parties shall within 7 business days:

    1. Destroy or return to the requesting Party or non-Party the produced material or information and all copies thereof, and expunge from any other document or material information derived solely from the produced material or information; or

    2. Notify the producing Party or non-Party that it wishes to challenge the claim of privilege or work product protection and has sequestered the material until the issue can be resolved. The Parties agree to meet and confer regarding the claim of privilege. If, at the conclusion of the meet and confer process, the Parties are still not in agreement, they may bring the issue to the Court. A Party challenging a clawback request under this Paragraph VIII(C)(2) may use the content of the clawed-back document for the sole purpose of filing a motion with the Court under seal, consistent with Local Rule 5, that challenges whether or not the document is privileged or work product.

D. **Implementation of a ClawBack:** Where a Party agrees to or is ordered to destroy a clawed back document, the Party must instruct their e-discovery vendor to delete the document entirely from their e-discovery database and delete other copies of the clawed back document. To the extent that it is not technologically feasible for a receiving Party to destroy a clawed back document (for example, if the clawed back document is part of a production provided on read-only Production Media such that the clawed back document cannot be destroyed without destroying the entire Production Media), the Parties will meet and confer as to an acceptable alternative approach.

## IX. <u>MISCELLANEOUS PROVISIONS</u>

A. **Inaccessible ESI:** If a producing Party asserts that certain categories of ESI that are reasonably likely to contain responsive information are inaccessible or otherwise unnecessary under the circumstances, or if the requesting Party asserts that, following production, certain ESI is not reasonably usable, the Parties shall meet and confer with their respective technology experts to discuss resolving such assertions. If the Parties cannot resolve any such disputes after such a meet and confer has taken place, the issue shall be presented to the Court for resolution.

B. **Variations or Modifications:** Variations from this ESI Protocol & Search Methodology Order may be required. Any practice or procedure set forth herein may be varied by agreement of all affected Plaintiffs and all affected Defendants, with reasonable notice to and consultation of any other Party to this Litigation, which will be confirmed in writing. In the event a producing Party determines that a variation or modification is appropriate

or necessary to facilitate the timely and economical production of documents or ESI, the producing Party will notify the requesting Party of the variation or modification. Upon request by the requesting Party, those Parties will meet and confer to address any issues in a reasonable and timely manner prior to seeking Court intervention.

C.     **Waiver.**  Nothing herein shall be construed as a waiver of any pending motion to dismiss or regarding discovery, or the right of any party to seek further relief regarding discovery.

SO ORDERED.

Dated: 2/10/20

_____/s/_____
Henry Coke Morgan, Jr.
Senior United States District Judge
HENRY COKE MORGAN, JR.
Senior United States Judge

**WE ASK FOR THIS:**

/s/ *Kristan B. Burch*
Stephen E. Noona (VSB No. 25367)
Patrick H. O'Donnell (VSB No. 29637)
Kristan B. Burch (VSB No. 42640)
Clark J. Belote (VSB No. 87310)
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Telephone: (757) 624-3000
Facsimile: (888) 360-9092
senoona@kaufcan.com
phodonnell@kaufcan.com
kbburch@kaufcan.com
cjbelote@kaufcan.com
*Counsel for Birdsong Corporation*

*/s/ K. Ross Powell*
K. Ross Powell (VSB No. 89495)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: +1 202 389 5000
Facsimile: +1 202 389 5200
ross.powell@kirkland.com

Daniel E. Laytin, P.C. (admitted *pro hac vice*)
Stacy Pepper (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
dlaytin@kirkland.com
stacy.pepper@kirkland.com

Robert Allen (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
bob.allen@kirkland.com

*Counsel for Defendant Golden Peanut Company, LLC*

*/s/ Kevin J. Funk*
Wyatt B. Durrette , Jr. (VSB No. 04719)
Kevin Jerome Funk (VSB No. 65465)
DURRETTE ARKEMA GERSON & GILL PC
1111 East Main Street, 16th Floor
Richmond, VA 23219
(804) 775-6900
Email: kfunk@dagglaw.com
Email: wdurrette@dagglaw.com
*Counsel for the Plaintiffs*

## <u>Appendix 1: ESI Metadata and Coding Fields</u>

| Field Name[2] | Populated For (*Email, Edoc, Calendar, Contact, Cellphone, or All*) | Field Description |
|---|---|---|
| BegBates | All | Control Numbers. |
| EndBates | All | Control Numbers. |

---

[2] Field Names can vary from system to system and even between different versions of systems. Thus, Parties are to be guided by these Field Names and Field Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI Protocol & Search Methodology Order.

| Field Name[2] | Populated For (*Email, Edoc, Calendar, Contact, Cellphone, or All*) | Field Description |
|---|---|---|
| BegAttach | All | Control Numbers (First production Bates number of the first document of the family). |
| EndAttach | All | Control Numbers (Last production Bates number of the last document of the family). |
| Custodian | All | Custodian name (ex. John Doe). |
| DupCust, CustodianOther, or CustodianAll | All | All custodians who were in possession of a de-duplicated document besides the individual identified in the "Custodian" field. |
| LogicalPath | All ESI Items | The directory structure of the original file(s). Any container name is included in the path. |
| Hash Value | All | The MD5 or SHA-1 hash value. |
| NativeFile | All | Native File Link. |
| Email Thread ID | Email | Unique identification number that permits threading of email conversations. For instance, unique MS Outlook identification number ("PR_CONVERSATION_INDEX") is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, that facilitates use of email threading. |
| Thread Index | Email | Message header identifier, distinct from "PR_Conversation_Index", that permits threading of email chains in review software. |
| EmailSubject | Email | Subject line of email. |
| DateSent | Email | Date email was sent. |
| DateMod | Email, Edoc | Date the document was modified. |
| TimeSent | Email | Time email was sent. |
| TimeZoneUsed | All | Time zone used to process data during document collection and processing. |
| ReceiveTime | Email | Time email was received. |
| To | Email | All recipients that were included on the "To" line of the email. |
| From | Email | The name and email address of the sender of the email. |
| CC | Email | All recipients that were included on the "CC" line of the email. |
| BCC | Email | All recipients that were included on the "BCC" line of the email. |
| DateCreated | Edoc | Date the document was created. |
| FileName | Email, Edoc | File name of the edoc or email. |
| Title | Edoc | Any value populated in the Title field of the document properties. |
| Subject | Edoc | Any value populated in the Subject field of the document properties. |
| Author | Edoc | Any value populated in the Author field of the document |

| Field Name[2] | Populated For (*Email, Edoc, Calendar, Contact, Cellphone, or All*) | Field Description |
|---|---|---|
| | | properties. |
| DocExt | All | File extension of the document. |
| TextPath | All | Relative path to the document level text file. |
| Redacted | All | "X," "Y," "Yes," and "True" are all acceptable indicators that the document is redacted. Otherwise, blank. |
| Withheld Placeholder | All | To the extent a document is fully withheld (on the basis of privilege or otherwise), this field must be populated with a "Y." |
| Privilege Asserted | All | To the extent a document has been withheld on the basis of privilege or redacted on the basis of privilege, the text pertaining to such assertion of privilege shall be included as a metadata field (e.g., "Redacted – Attorney Client Privileged" or "Withheld – Attorney Client Privileged"). |
| Paper | All | "Y" if document is scanned from hard copy in connection with the collection and production of documents in this matter. |
| Confidentiality | All | Indicates if document has been designated as "Confidential" or "Highly Confidential" under the Protective Order. |

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

Civil Action No. 2:19-cv-00463

*IN RE PEANUT FARMERS*
*ANTITRUST LITIGATION*

**Honorable Raymond A. Jackson**
**Honorable Lawrence R. Leonard**

## VALIDATION PROTOCOL ORDER

This Validation Protocol Order provides the validation procedures referred to in ¶ VI(C)(5) of the Court's ESI Protocol (ECF No. 92). This Validation Protocol Order shall govern the parties in the above-captioned case whether they currently are involved or become so in the future, and any actions that may later be deemed related to or consolidated with this case.

A producing party's review process should incorporate quality-control and quality-assurance procedures to ensure a reasonable production consistent with the requirements of Federal Rule of Civil Procedure 26(g). Once a producing party reasonably believes that it has produced or identified for production substantially all responsive non-privileged documents, it shall conduct validation according to the sampling protocol described below and in Paragraph I (hereinafter collectively referred to as "Validation Protocol").

This Validation Protocol shall apply to the review process regardless of whether technology-assisted review or exhaustive manual review was used by the producing party.

A.     The Document Collection ("Collection") is defined as including all documents identified for review for responsiveness and/or privilege following the application of keywords or other culling criteria. This Validation Protocol assumes that the completeness or adequacy of the Collection has already been established. For the purposes of Plaintiffs' validation requirements

under this Validation Protocol, the Collection refers to the combined set of documents from all named representatives rather than to each individual named representative.

B.    The Collection shall be partitioned into the following two Subcollections:

1.    Documents designated by the review as responsive to at least one Request for Production, including any privileged documents, but not including family members of responsive documents, unless those family members are deemed to be responsive in their own right ("Subcollection B(1)");

2.    Documents designated by the review as non-responsive to any of the Requests for Production ("Subcollection B(2)").

C.    A sample shall be drawn consisting of the following:

1.    300 documents selected at random from Subcollection B(1) ("Subsample C(1)");

2.    A sample of documents selected at random from Subcollection B(2) ("Subsample C(2)"); the size of Subsample C(2) will be determined after completing the review of Subsample C(1) and will be chosen so as to ensure that the margin of error associated with the recall estimate (*see* Paragraph I) does not exceed +/- 3% (calculated at a level of 95% statistical confidence); if the specified margin of error cannot be guaranteed with a sample of 2,500 documents or fewer, the size of Subsample C(2) will be 2,500 documents.

D.    Should a producing party believe that the sample sizes specified in Paragraph C would be disproportionate or unduly burdensome under the circumstances, that party shall promptly raise the issue with the requesting party. To the extent a dispute remains concerning the

2

sample sizes to be used after good faith negotiations have occurred, either party may request the assistance of the Court in resolving such dispute.

E.     The Subsamples C(1) and C(2) shall be combined into a single "Validation Sample," with no indication of the Subcollection from which the documents were derived or how they were previously coded. The Validation Sample shall be reviewed and coded by a subject matter expert ("SME") who is knowledgeable about the subject matter of the litigation. This should be an attorney who is familiar with the RFPs and the issues in the case. During the course of the review of the Validation Sample, the SME shall not be provided with information on the Subcollection or Subsample from which any document was derived or the prior coding of any document. The intent of this requirement is to ensure that the review of the Validation Sample is blind; it does not preclude a party from selecting as SMEs attorneys who may have had prior involvement in the original review process.

F.     Once the coding in Paragraph E has been completed, the producing party shall prepare a table listing each of the documents in Subsamples C(1) and C(2). For each document, the table shall include:

1.     the Bates number of the document (for documents produced), or a control/identification number (for non-produced documents);

2.     the Subsample from which the document came (*i.e.*, C(1) or C(2));

3.     the SME's responsiveness coding for the document (*i.e.*, responsive or non-responsive);

4.     the SME's privilege coding for the document (*i.e.*, privileged or not privileged). If the document is coded as non-responsive, a privilege determination need

3

not be made. All documents in the samples coded as privileged shall be included on the producing party's privilege log.

   5.  for Plaintiffs, the name of the named representative associated with the document.

G.  The following items shall be provided to the requesting party:

   1.  the table described in Paragraph F;

   2.  a copy of any responsive, non-privileged document in Subsamples C(1) and C(2) that was not previously produced or identified for production to the requesting party;

   3.  the statistics and recall estimate detailed in Paragraph I to this Validation Protocol.

H.  Once the requesting party has received and has had an opportunity to review the items described in Paragraph G and Paragraph I, the parties shall meet and confer to determine whether or not the parties agree that the recall estimate, and the quantity and nature of the responsive documents identified through the sampling process, indicate that the review is substantially complete. If the recall estimate and the samples indicate that Subcollection B(2) still contains a substantial number of non-marginal, non-duplicative responsive documents as compared to Subcollection B(1), the review and quality assurance process shall continue, and the validation process shall be repeated, as warranted. If the parties are unable to agree on whether the review is substantially complete, or on whether the validation process must be repeated, the parties may request the assistance of the Court in resolving the dispute.

I.  An estimate of recall shall be computed to inform the decision-making process described in Paragraph G of the Validation Protocol; however, the absolute number in its own right shall not be dispositive of whether or not a review is substantially complete. Also of

concern is the novelty and materiality (or conversely, the duplicative or marginal nature) of any responsive documents identified in Subsample C(2). The estimate of recall shall be derived as described below. It should be noted that, when conducted by an SME pursuant to Paragraph E of the Validation Protocol, a recall estimate on the order of 70% to 80% is consistent with, but not the sole indicator of, an adequate (*i.e.*, high-quality) review. A recall estimate somewhat lower than this does not necessarily indicate that a review is inadequate, nor does a recall in this range or higher necessarily indicate that a review is adequate; the final determination also will depend on the quantity and nature of the documents that were missed by the review process.

**Recall Estimation Method:**[1]

The number of responsive documents found $\approx$ the size of Subcollection B(1) $\times$ the number of responsive docs in Subsample C(1) $\div$ 300.

The number of responsive documents coded incorrectly $\approx$ the size of Subcollection B(2) $\times$ the number of responsive documents in Subsample C(2) $\div$ the size of Subsample C(2).

Estimated recall $\approx$ the number of responsive documents found $\div$ (the number of responsive documents found + the number of responsive documents coded incorrectly).

The Clerk is **REQUESTED** to deliver a copy of this Order to all counsel of record.

It is so **ORDERED**.

**LAWRENCE R. LEONARD**
UNITED STATES DISTRICT MAGISTRATE JUDGE

---

[1] The margins of error (or confidence intervals) associated with the recall estimate can be calculated according to methods discussed in the relevant academic literature (*e.g.*, Webber, W. (2013), Approximate recall confidence intervals. *ACM Transactions on Information Systems (TOIS)*, 31(1), 1-33).

# EXHIBIT C

CASE 0:18-cv-01776-JRT-JFD Doc. 584-1 Filed 11/20/20 Page 36 of 56

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION*<br><br>This Document Relates To: All Actions | Case No. 1:16-cv-08637<br><br>**ORDER REGARDING SEARCH METHODOLOGY FOR ELECTRONICALLY STORED INFORMATION** |

      This Order Regarding Search Methodology for Electronically Stored Information ("Search Methodology Order") shall govern the Parties in the above-captioned case whether they currently are involved or become so in the future, and any related actions that may later be consolidated with this case (collectively, the "Litigation").

## I.    DOCUMENT SOURCE DISCLOSURES

    A.    **Transparency:**  With the goal of permitting requesting Parties an appropriate level of transparency into a producing Party's electronic search process, without micromanaging how the producing Party meets its discovery obligations and without requiring the disclosure of attorney work product or other privileged information, the Parties will endeavor to be reasonably transparent regarding the universe of documents subject to targeted collections or culling via search terms and/or TAR/CAL.

    B.    **Pre-Search Deduplication & Culling of Collected Data:**

        1.    **De-Duplication:**  Before running either of the Search Processes below in ¶ II, data should be de-duplicated by hash value across all agreed or Court-ordered document custodians.

        2.    **Email Threading:**  If the producing Party's search software has the capability, then the producing Party may choose to only include inclusive emails in the data set subject to the Keyword and/or TAR/CAL Search Process, including the data set against which keyword searches are tested. A producing Party will disclose whether or not they are testing search terms in a set of data that excludes non-inclusive emails.  Non-inclusive emails do not need to be searched, reviewed, or produced in this matter. *See* ESI Protocol, Dkt. 459, ¶ IV(D)(1).

        3.    **Email Domains:**  Should the requesting Party want certain email domains excluded from the data set against which search terms are tested, the

requesting Party must provide a list of such domain names to the producing Party ahead of the producing Party's testing of search terms. Likewise, if the producing Party identifies domains that it believes should be eliminated, it will produce a list of those domain names to the requesting Party. *See* ESI Protocol, ¶ IV(D)(2). Plaintiffs' analysis to date of the Florida AG productions made by certain Defendants indicates there are a large variety of industry email newsletters that can be culled (*i.e.*, excluded from a Defendant's review and production of documents) where there are no internal forwards of such documents after their receipt. Plaintiffs agree to provide a list of these domain names prior to Defendants undertaking a search of their data.

4. **Targeted Collections:** Only documents a producing Party intends to subject to electronic searching parameters should be included in the data set against which search terms are tested. As an example, a centralized, non-custodial folder of responsive Agri Stats reports that a party intends to produce in its entirety (to the extent not privileged) should not be included in the data set against which search terms are tested.

5. **Exception Reporting:** For any documents not otherwise identified as system or operating files, the producing Party must disclose processing exceptions that are unresolved at the end of the discovery period, such as documents that cannot be opened due to encryption or other issues.

6. **Disclosure of Other Culling Parameters Required:** A producing Party is permitted to cull data using the agreed-upon custodial and non-custodial sources, agreed-upon date parameters, and agreed-upon search terms (if applicable), and a producing Party is permitted to remove known system or operating files, such as those that appear on the National Software Reference Library (NSRL) hash list. As such, the Parties may cull entire file directories from computer hard drives that contain Program Files, Program Data, SWTOOLs, Windows Operating System files, etc. For those excluded directories, the Parties will only conduct searches on user-created content that is reviewable and likely to yield relevant content. To the extent a producing Party elects to use additional culling parameters, those parameters will be disclosed.

## II.   **SEARCH METHODS**

The following TAR/CAL and Keyword Search Processes govern how collected data may be electronically culled in this matter.

A.   **TAR/CAL Search Process:**

1.   **Use of Search Terms with TAR/CAL:**

a.   No later than December 22, 2017, the requesting Party will propose to a producing Party a limited number of Document

Custodians for whom, across their email only, it requests that no search term pre-culling be used prior to applying TAR/CAL during the review process. However, the other data culling parameters described in ¶ I(B) may be applied to these Document Custodians, including to their email.

b.      No later than January 12, 2018, the Parties will meet and confer on any issues or disputes regarding the requesting Party's proposals.

2.      **Producing Party TAR/CAL Disclosures:**

a.      No later than January 19, 2018, a producing Party that elects to use TAR/CAL will disclose the following information regarding its use of a TAR/CAL process: (a) the name of the TAR/CAL software and vendor, (b) a general description of how the producing Party's TAR/CAL process will work, including how it will train the algorithm, such as using exemplars, keyword search strings, or some other method, (c) a general description of the categories or sources of the documents included or excluded from the TAR/CAL process, and (d) what quality control measures will be taken.

3.      **Requesting Party Response:**

a.      Within 7 days of receiving a producing Party's TAR/CAL Disclosures, the requesting Party may raise with the producing Party any concerns with the proposed TAR/CAL process or categories of documents that it proposes should be excluded from the TAR/CAL process. A requesting Party may also propose any exemplars it proposes be used to train a TAR/CAL tool or narrow keyword search strings it proposes be used to generate exemplars to train a TAR/CAL tool. A producing Party retains the right to reject and oppose any such requests, subject to resolution by the Special Master and/or the Court.

4.      **Cooperation:**  The Parties agree to work together in good faith to resolve any differences that they may have over the producing Party's use of TAR/CAL and its processes, recall, and validation proposals. If an agreement cannot be timely reached, then the Parties agree to raise this issue with the Special Master and to follow her direction absent the showing of good cause to the contrary, and subject to the Parties' rights to petition the Court for review of or relief from any decision or guidance provided by the Special Master.

B.      **Keyword Search Process:**

1.      **Iterative Process:**  Developing efficient keyword search terms is an iterative process and will require transparent and cooperative efforts by both the producing and requesting Party; however, it is important to set

3

certain limits in order to effectively and efficiently manage time and expense.

2. **Search Software Disclosures:** No later than January 12, 2018, the producing Parties will disclose any search software they have decided to use (including version number) and that software's default stop/noise words and search language syntax. Additionally, the Parties should use best efforts to disclose information that answers these questions regarding their search tool:

    a. What stop words have been excluded from the index (if different than the default stop words for the tool)?

    b. Can searches be constrained by upper- and lowercase?

    c. Can numbers and single letters be searched?

    d. Are there characters that cannot be searched or are treated as spaces or ignored?

    e. How are diacritics resolved?

    f. Can searches be run on metadata fields?

    g. Are proximity-limited search terms subject to an evaluation order, e.g., will terms structured X w/5 Y yield hits if the text reads Y w/5 X?

    h. Does the tool offer synonym searching?

    i. How does the tool account for common misspellings?

3. **First Phase Search Term Proposals:**

    a. *Producing Party Proposes an Initial Set of Search Terms*: No later than January 19, 2018, the producing Party will propose a set of search terms. The producing Party's proposal will include, to the extent known, semantic synonyms and common spellings of the keywords proposed. Where a producing Party seeks to exclude false positives (aka, "noise hits") by modifying or excluding certain keywords, then it will supply contextual examples of such false positives to explain why they must be excluded.

    b. *Requesting Party's Proposed Revisions*: Within 12 days of receiving the initial proposed search terms, the requesting Party will provide any proposed revisions to the producing Party's search terms.

c. *Producing Party Provides Information Sufficient to Support Its Objections:* Within 8 days of receipt of the requesting Party's proposed revisions, the producing Party will provide information sufficient to support its objections to specific search terms, which could include, for example, estimates of the incremental number of false positive hits and the incremental number of true positive hits introduced by the disputed search terms, as well as examples of the false positive hits.

d. *Cooperation*: The producing Party and the requesting Party will work together in good faith to reasonably narrow the number of documents returned via search term hits and narrow the number of irrelevant documents captured as a result of the search terms. To the extent any disputes remain concerning the sufficiency of the producing Party's information in support of its objections and/or the use of specific search terms after good faith negotiations have occurred, either Party may request the assistance of the Special Master in resolving such disputes.

4. **Second Phase Search Term Proposals:**

a. *Requesting Party Proposes an Additional Set of Search Terms*: The Parties agree that Plaintiffs collectively and Defendants collectively may propose additional search terms to a producing Party one time. No later than May 14, 2018 (60 days after the Court-ordered March 15, 2018 deadline for "Rolling Production of Documents, Prioritizing Custodians as Agreed by the Parties or Ordered by the Court" (Dkt. 574)), the requesting Party may propose a set of additional search terms. The requesting Party will explain generally the basis for the additional requested terms, which could include, for example, identifying by Bates number exemplar documents that support the request.

b. *Producing Party Provides Information Sufficient to Support Its Objections*: No later than 10 days after the requesting Party provides an additional set of proposed search terms, the producing Party will provide information sufficient to support its objections to specific additional search terms, which could include, for example, estimates of the incremental number of false positive hits and the incremental number of true positive hits introduced by the disputed additional search terms, as well as examples of the false positive hits.

c. *Requesting Party and Producing Party Will Meet and Confer Regarding Requesting Party's Proposed Additional Search Terms*: No later than 15 days after the requesting Party proposes an additional set of search terms, the Parties will meet and confer

regarding any disputes or counter-proposals regarding the additional search terms. To the extent any disputes remain concerning the sufficiency of the producing Party's information in support of its objections and/or the use of specific additional search terms after good faith negotiations have occurred, either Party may request the assistance of the Special Master in resolving such disputes.

d.    *Good Cause Inability of a Party to Meet the Deadlines Imposed in this Order*: While it is expected that the Parties shall make their best efforts to comply with the deadlines set forth in this Order, it is conceivable that technical (or other) issues or unanticipated volumes may interfere with a Parties' best efforts to comply. Should a Party anticipate that for good cause it may be unable to meet a deadline set forth in this Order, the Party shall promptly raise the issue with the other Parties, explain the reason for the inability to timely comply, and negotiate a reasonable extension for compliance. If the Parties are unable to immediately agree upon a revised deadline for compliance, they shall promptly raise the issue with the Special Master or the Court for resolution. This provision shall not be construed as blanket permission for a Party to modify or extend the deadlines agreed to by the Parties and set forth in this Order without good cause, but rather, to recognize that when dealing with search and review of large volumes of electronically stored information, there are sometimes legitimate, unanticipated challenges that may interfere with a Party's best efforts to fulfill its obligations and therefore, to afford the Parties reasonable flexibility and mutual accommodation should such eventuality occur.

## III.   <u>VALIDATION PROTOCOL</u>

A.    The review process should incorporate quality-control and quality-assurance procedures to ensure a reasonable production consistent with the requirements of Federal Rule of Civil Procedure 26(g). Once a producing Party reasonably believes that it has produced or identified for production substantially all responsive non-privileged documents, it shall conduct validation according to the sampling protocol described below and in Appendix A. This Validation Protocol shall apply to the review process regardless of whether technology-assisted review ("TAR") or exhaustive manual review ("manual review") was used by the producing Party.

B.    The Document Collection ("Collection") is defined as including all documents identified for review for responsiveness and/or privilege following the application of keywords or other culling criteria. This Validation Protocol assumes that the completeness or adequacy of the Collection has already been established. For purposes of the three putative plaintiff classes' validation requirements under this

Validation Protocol, the Collection refers to the combined set of documents of a particular proposed class of plaintiffs, rather than to each individual named representative of a particular class of plaintiffs.

C.   The Collection shall be partitioned into the following two or three Subcollections, for manual review or for TAR processes, respectively:

   1.   Documents identified by the review as responsive to at least one Request for Production, including any privileged documents, but not including family members of responsive documents, unless those family members are deemed to be responsive in their own right ("Subcollection C(1)");

   2.   Documents coded as non-responsive by a human reviewer, regardless of how the documents were selected for review (e.g., by TAR, manual review, or otherwise) ("Subcollection C(2)");

   3.   Documents excluded from manual review as the result of a TAR process ("Subcollection C(3)"). If the review process involved only manual review and no TAR, the Collection will not include Subcollection C(3).

D.   A sample shall be drawn consisting of the following:

   1.   500 documents selected at random from Subcollection C(1) ("Subsample D(1)");

   2.   500 documents selected at random from Subcollection C(2), if TAR was used, otherwise 2,500 documents selected at random from Subcollection C(2), if manual review was used ("Subsample D(2)");

   3.   2,000 documents selected at random from Subcollection 1(c) if TAR was used ("Sample D(3)"). If TAR was not used, there will be no Subsample D(3).

E.   Should a producing Party believe that the sample sizes specified in Paragraph III(D) would be disproportionate or unduly burdensome under the circumstances, that Party shall promptly raise the issue with the requesting Party. To the extent a dispute remains concerning the sample sizes to be used after good faith negotiations have occurred, either Party may request the assistance of the Special Master in resolving such dispute.

F.   The sample of 3,000 documents comprised of the documents from Subsamples D(1), D(2), and, if TAR was used, D(3), shall be combined into a single Validation Sample, with no indication of the Subcollection from which the documents were derived or how they were previously coded. The Validation Sample shall be reviewed and coded by a subject matter expert ("SME") who is knowledgeable about the subject matter of the litigation. This should be an attorney who is familiar with the RFPs and the issues in the case. During the course of the review of the Validation Sample, the SME shall not be provided

7

with any information concerning the Subcollection or Subsample from which any document was derived or the prior coding of any document. The intent of this requirement is to ensure that the review of the Validation Sample is blind; it does not preclude a Party from selecting as SMEs attorneys who may have had prior involvement in the original review process.

G.   Once the coding in Paragraph III(F) has been completed, the producing Party shall prepare a table listing each of the 3,000 documents in the Validation Sample. For each document, the table shall include:

1.   the Bates number of the document (for documents produced), or a control/identification number (for non-produced documents);

2.   the Subsample from which the document came (i.e., D(1), D(2), or, if TAR was used, D(3));

3.   the SME's responsiveness coding for the document (i.e., responsive or non-responsive);

4.   the SME's privilege coding for the document (i.e., privileged or not privileged). If the document is coded as non-responsive, a privilege determination need not be made. All documents in the Validation Sample coded as privileged shall be included on the producing Party's Privilege Log, as per the requirements set forth in ¶ VI of ESI Protocol (Dkt. 459).

5.   for putative class plaintiffs, the named class representative associated with the document.

H.   The following items shall be provided to the requesting Party and to the Special Master:

1.   the table described in Paragraph III(G);

2.   a copy of each responsive, non-privileged document in the Validation Sample that was not previously produced or identified for production to the requesting Party;

3.   the statistics and recall estimate detailed in Appendix A to this Order.

I.   Once the requesting Party has received and has had an opportunity to review the items described in Paragraph III(H) and Appendix A, the Parties shall meet and confer to determine whether or not the Parties agree that the recall estimate, <u>and the quantity and nature of the responsive documents identified through the sampling process</u>, indicate that the review is substantially complete. If the recall estimate and the samples indicate that Subcollections C(2) and/or C(3) still contain a substantial number of non-marginal, non-duplicative responsive documents as compared to Subcollection C(1), the review and quality assurance process shall continue, and the validation process shall be repeated, as warranted.

If the parties are unable to agree on whether the review is substantially complete, or whether the validation process must be repeated, the Special Master shall render a decision, subject to the Parties' rights to petition the Court for review of or relief from any decision or guidance provided by the Special Master.

SO ORDERED.

Dated: <u>January 3, 2018</u>                    /s/ Maura R. Grossman
                                               MAURA R. GROSSMAN
                                               SPECIAL MASTER

Dated: <u>January 3, 2018</u>                    _____
                                               HON. JEFFREY T. GILBERT
                                               U.S. MAGISTRATE JUDGE

9

# APPENDIX A

## Method of Recall Estimation

An estimate of recall shall be computed to inform the decision-making process described in III(H) of the Validation Protocol; however, the absolute number in its own right shall not be dispositive of whether or not a review is substantially complete. Also of concern is the novelty and materiality (or conversely, the duplicative or marginal nature) of any responsive documents identified in Subsamples D(2) and/or D(3). The estimate of recall shall be derived as described below, depending on whether or not the review process involved the use of TAR. It should be noted that, when conducted by an SME pursuant to Paragraph III(F) of the Validation Protocol, a recall estimate on the order of 70% to 80% is consistent with, but not the sole indicator of, an adequate (i.e., high-quality) review. A recall estimate somewhat lower than this does not necessarily indicate that a review is inadequate, nor does a recall in this range or higher necessarily indicate that a review is adequate; the final determination also will depend on the quantity and nature of the documents that were missed by the review process.

**Recall Estimation Method for a Review Process Involving TAR:**

The number of responsive documents found ≈ the size of Subcollection C(1) × the number of responsive docs in Subsample D(1) ÷ 500.

The number of responsive documents coded incorrectly ≈ the size of Subcollection C(2) × the number of responsive documents in Subsample D(2) ÷ 500.

The number of responsive documents not reviewed ≈ size of Subcollection C(3) × the number of responsive documents in Subsample D(3) ÷ 2,000.

Estimated recall ≈ the number of responsive documents found ÷ (the number of responsive documents found + the number of responsive documents coded incorrectly + the number of responsive documents not reviewed).

**Recall Estimation Method for a Review Process Involving Manual Review:**

The number of responsive documents found ≈ the size of Subcollection C(1) × the number of responsive documents in Subsample D(1) ÷ 500.

The number responsive documents coded incorrectly ≈ the size of Subcollection C(2) × the number of responsive documents in Subsample D(2) ÷ 2,500.

Estimated recall ≈ the number of responsive documents found ÷ (the number of responsive documents found + the number of responsive documents coded incorrectly).

# EXHIBIT D

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

IN RE PORK ANTITRUST
LITIGATION

This Document Relates To:

All Actions

Case No. 0:18-cv-01776-JRT-HB

**[PROPOSED] ORDER REGARDING
SEARCH METHODOLOGY FOR
ELECTRONICALLY STORED
INFORMATION**

This Order Regarding Search Methodology for Electronically Stored Information ("Search Methodology Order") shall govern the Parties in the above-captioned case whether they currently are involved or become so in the future, and any related actions that may later be consolidated with this case (collectively, the "Litigation").

## I.   DOCUMENT SOURCE DISCLOSURES

A.   **Transparency:**  With the goal of permitting requesting Parties an appropriate level of transparency into a producing Party's electronic search process, without micromanaging how the producing Party meets its discovery obligations and without requiring the disclosure of attorney work product or other privileged information, the Parties will endeavor to be reasonably transparent regarding the universe of documents subject to targeted collections or culling via search terms and/or TAR/CAL.

B.   **Pre-Search Deduplication & Culling of Collected Data:**

1.   **De-Duplication:**  Before running either of the Search Processes below in Paragraph II, data should be de-duplicated by hash value across all agreed or Court-ordered document custodians using the deduplication procedures provided for in Paragraph IV(E) of the ESI Protocol (Dkt. 292).

2.   **Email Threading:**   If the producing Party's search software has the capability, then the producing Party may choose to only include inclusive emails in the data set subject to the Keyword and/or TAR/CAL Search Process, including the data set against which keyword searches are tested. A producing Party will disclose whether or not they are testing search terms in a set of data that excludes non-inclusive emails.  Non-inclusive emails do not need to be searched, reviewed, or produced in this matter.  *See* ESI Protocol, ¶ IV(D)(1).

3.   **Email Domains:**  Should the requesting Party want certain email domains excluded from the data set against which search terms are tested, the

requesting Party must provide a list of such domain names to the producing Party ahead of the producing Party's testing of search terms. Likewise, if the producing Party identifies domains that it believes should be eliminated, it will produce a list of those domain names to the requesting Party. *See* ESI Protocol, ¶ IV(D)(2). Plaintiffs' analysis to date of the Florida AG productions made by certain Defendants indicates there are a large variety of industry email newsletters that can be culled (*i.e.*, excluded from a Defendant's review and production of documents) where there are no internal forwards of such documents after their receipt. Plaintiffs agree to provide a list of these domain names prior to Defendants undertaking a search of their data.

4. **Targeted Collections:** Only documents a producing Party intends to subject to electronic searching parameters should be included in the data set against which search terms are tested. As an example, a centralized, non-custodial folder of responsive Agri Stats reports that a party intends to produce in its entirety (to the extent not privileged) should not be included in the data set against which search terms are tested.

5. **Exception Reporting:** For any documents not otherwise identified as system or operating files (e.g., system files or program executables), the producing Party must disclose processing exceptions that are unresolved at the end of the discovery period, such as documents that cannot be opened due to encryption or other issues.

6. **Disclosure of Other Culling Parameters Required:** A producing Party is permitted to cull data using the agreed-upon custodial and non-custodial sources, agreed-upon date parameters, and agreed-upon search terms (if applicable), and a producing Party is permitted to remove known system or operating files (e.g., system files or program executables), such as those that appear on the National Software Reference Library (NSRL) hash list. To the extent a producing Party elects to use additional culling parameters, those parameters will be disclosed.

7. **Paper Documents:** Unless otherwise agreed by the parties, a document existing in paper form and scanned to PDF for purposes of discovery in this litigation will not be subjected to electronic search and will be manually reviewed.

## II.   SEARCH METHODS

The following TAR/CAL and Keyword Search Processes govern how collected data may be electronically culled in this matter.

### A.   TAR/CAL Search Process:

1. **Use of Search Terms with TAR/CAL:**

a.  No later than December 11, 2020, the requesting Party will propose to a producing Party a limited number of Document Custodians for whom, across their email accounts only, it requests that no search term pre-culling be used prior to applying TAR/CAL during the review process.  However, the other data culling parameters described in Paragraph I(B) may be applied to these Document Custodians, including to their email.

b.  No later than December 18, 2020, the Parties will meet and confer on any issues or disputes regarding the requesting Party's proposals.

2. **Producing Party TAR/CAL Disclosures:**

a.  No later than December 18, 2020, a producing Party that elects to use TAR/CAL will disclose the following information regarding its use of a TAR/CAL process: (a) the name of the TAR/CAL software and vendor, (b) a general description of how the producing Party's TAR/CAL process will work, including how it will train the algorithm, such as using exemplars, keyword search strings, or some other method, (c) a general description of the categories or sources of the documents included or excluded from the TAR/CAL process, and (d) what quality control measures will be taken.

3. **Requesting Party Response:**

a.  Within 10 days of receiving a producing Party's TAR/CAL Disclosures, the requesting Party may raise with the producing Party any concerns with the proposed TAR/CAL process or categories of documents that it proposes should be excluded from the TAR/CAL process.  A requesting Party may also propose any exemplars it proposes be used to train a TAR/CAL tool or narrow keyword search strings it proposes be used to generate exemplars to train a TAR/CAL tool.  A producing Party retains the right to reject and oppose any such requests, subject to resolution by the Court.

4. **Cooperation:**  The Parties agree to work together in good faith to resolve any differences that they may have over the producing Party's use of TAR/CAL and its processes, recall, and validation proposals.  If an agreement cannot be timely reached, then the Parties agree to raise this issue with the Court.

B. **Keyword Search Process:**

1. **Iterative Process:**  Developing efficient keyword search terms is an iterative process and will require transparent and cooperative efforts by both the producing and requesting Party; however, it is important to set certain limits in order to effectively and efficiently manage time and expense.

2.      **Search Software Disclosures:**  No later than December 18, 2020, the producing Parties will disclose any search software they have decided to use (including version number) and that software's default stop/noise words and search language syntax.  Additionally, the producing Parties should use best efforts to disclose information that answers these questions regarding their search tool:

   a.      What stop words have been excluded from the index (if different than the default stop words for the tool)?

   b.      Can searches be constrained by upper- and lowercase?

   c.      Can numbers and single letters be searched?

   d.      Are there characters that cannot be searched or are treated as spaces or ignored?

   e.      How are diacritics resolved?

   f.      Can searches be run so as to be limited to specific metadata fields?

   g.      Are proximity-limited search terms subject to an evaluation order, e.g., will terms structured X w/5 Y yield hits if the text reads Y w/5 X?

   h.      Does the tool offer synonym searching?

   i.      How does the tool account for common misspellings?

3.      **First Phase Search Term Proposals:**

   a.      *Producing Party Proposes an Initial Set of Search Terms*:  No later than December 18, 2020, the producing Party will propose a set of search terms.  The producing Party's proposal will include, to the extent known, semantic synonyms and common variant spellings of the keywords proposed.  Where a producing Party seeks to exclude false positives (aka, "noise hits") by modifying or excluding certain keywords, then it will supply contextual examples of such false positives to explain why they must be excluded.

   b.      *Requesting Party's Proposed Revisions*:  The requesting Party will provide any proposed revisions to the producing Party's search terms.

   c.      *Producing Party Provides Information Sufficient to Support Its Objections:*  Upon receipt of the requesting Party's proposed revisions, the producing Party will provide information sufficient to support its objections to specific search terms, which could include,

for example, estimates of the incremental number of false positive hits and the incremental number of true positive hits introduced by the disputed search terms, as well as contextual examples of the false positive hits.

d.      *Cooperation*:  The Parties agree to work together in good faith to reasonably increase the number of relevant documents returned and narrow the number of irrelevant documents captured as a result of the search terms.  To the extent any disputes remain concerning the sufficiency of the producing Party's information in support of its objections and/or the use of specific search terms after good faith negotiations have occurred, the parties may raise the issue with the Court.

4.      **Second Phase Search Term Proposals:**

a.      *Requesting Party Proposes an Additional Set of Search Terms*: The Parties agree that Plaintiffs collectively and Defendants collectively may propose additional search terms to a producing Party one time. No later than 60 days after the production of an agreed set of Priority Custodian documents by the producing Party, the requesting Party may propose a set of additional search terms.  The requesting Party will explain generally the basis for the additional requested terms, which could include, for example, identifying by Bates number exemplar documents that support the request.

b.      *Producing Party Provides Information Sufficient to Support Its Objections*:  No later than 10 days after the requesting Party provides an additional set of proposed search terms, the producing Party will provide information sufficient to support its objections to specific additional search terms, which could include, for example, estimates of the incremental number of false positive hits and the incremental number of true positive hits introduced by the disputed additional search terms, as well as examples of the false positive hits.

c.      *Requesting Party and Producing Party Will Meet and Confer Regarding Requesting Party's Proposed Additional Search Terms*: No later than 15 days after the requesting Party proposes an additional set of search terms, the Parties will meet and confer regarding any disputes or counter-proposals regarding the additional search terms.  To the extent any disputes remain concerning the sufficiency of the producing Party's information in support of its objections and/or the use of specific additional search terms after good faith negotiations have occurred, either Party may request the assistance of the Court in resolving such disputes.

d.    *Good Cause Inability of a Party to Meet the Deadlines Imposed in this Order*:  While it is expected that the Parties shall make their best efforts to comply with the deadlines set forth in this Order, it is conceivable that technical (or other) issues or unanticipated volumes may interfere with a Parties' best efforts to comply.  Should a Party anticipate that for good cause it may be unable to meet a deadline set forth in this Order, the Party shall promptly raise the issue with the other Parties, explain the reason for the inability to timely comply, and negotiate a reasonable extension for compliance.  If the Parties are unable to immediately agree upon a revised deadline for compliance, they shall promptly raise the issue with the Court for resolution.   This provision shall not be construed as blanket permission for a Party to modify or extend the deadlines agreed to by the Parties and set forth in this Order without good cause, but rather, to recognize that when dealing with search and review of large volumes of electronically stored information, there are sometimes legitimate, unanticipated challenges that may interfere with a Party's best efforts to fulfill its obligations and therefore, to afford the Parties reasonable flexibility and mutual accommodation should such eventuality occur.

## III.   VALIDATION PROTOCOL

A.    The review process should incorporate quality-control and quality-assurance procedures to ensure a reasonable production consistent with the requirements of Federal Rule of Civil Procedure 26(g).  Once a producing Party reasonably believes that it has produced or identified for production substantially all responsive non-privileged documents, it shall conduct validation according to the sampling protocol described below and in Appendix A. This Validation Protocol shall apply to the review process regardless of whether technology-assisted review ("TAR") or exhaustive manual review ("manual review") was used by the producing Party.

B.    The Document Collection ("Collection") is defined as including all documents identified for review for responsiveness and/or privilege following the application of keywords or other culling criteria.  This Validation Protocol assumes that the completeness or adequacy of the Collection has already been established.  For purposes of the three putative plaintiff classes' validation requirements under this Validation Protocol, the Collection refers to the combined set of documents of a particular proposed class of plaintiffs, rather than to each individual named representative of a particular class of plaintiffs.

C.    The Collection shall be partitioned into the following two or three Subcollections, for manual review or for TAR processes, respectively:

1.    Documents identified by the review as responsive to at least one Request for Production, including any privileged documents, but not including

family members of responsive documents, unless those family members are deemed to be responsive in their own right ("Subcollection C(1)");

2. Documents coded as non-responsive <u>by a human reviewer</u>, regardless of how the documents were selected for review (e.g., by TAR, manual review, or otherwise) ("Subcollection C(2)");

3. Documents excluded from manual review as the result of a TAR process ("Subcollection C(3)"). If the review process involved only manual review and no TAR, the Collection will not include Subcollection C(3).

4. Documents excluded by a keyword search process ("Subcollection C(4)"). Both a keyword search-only search process and a TAR search process that relies upon keyword search culling must include a Subcollection C(4).

D. A sample shall be drawn consisting of the following:

1. 500 documents selected at random from Subcollection C(1) ("Subsample D(1)");

2. 500 documents selected at random from Subcollection C(2), if TAR was used, otherwise 2,500 documents selected at random from Subcollection C(2), if manual review was used ("Subsample D(2)");

3. 2,000 documents selected at random from Subcollection 1(c) if TAR was used ("Sample D(3)"). If TAR was not used, there will be no Subsample D(3).

4. 2,000 documents selected at random from Subcollection C(4) if a keyword search-only search process was used or a TAR search process relied upon keyword search culling before application of TAR ("Sample D(4)"). If a TAR process did not rely upon keyword search culling before application of Tar, there will be no Subsample C(4).

E. Should a producing Party believe that the sample sizes specified in Paragraph III(D) would be disproportionate or unduly burdensome under the circumstances, that Party shall promptly raise the issue with the requesting Party. To the extent a dispute remains concerning the sample sizes to be used after good faith negotiations have occurred, either Party may request the assistance of the Court in resolving such dispute.

F. The sample of 3,000-5,000 documents comprised of the documents from Subsamples D(1), D(2), and, if TAR was used, D(3), and if keyword search culling was used, D(4), shall be combined into a single Validation Sample, with no indication of the Subcollection from which the documents were derived or how they were previously coded. The Validation Sample shall be reviewed and coded by a subject matter expert ("SME") who is knowledgeable about the subject matter of the litigation. This should be an attorney who is familiar with the RFPs and the

issues in the case. During the course of the review of the Validation Sample, the SME shall not be provided with any information concerning the Subcollection or Subsample from which any document was derived or the prior coding of any document. The intent of this requirement is to ensure that the review of the Validation Sample is blind; it does not preclude a Party from selecting as SMEs attorneys who may have had prior involvement in the original review process.

G.     Once the coding in Paragraph III(F) has been completed, the producing Party shall prepare a table listing each of the 3,000-5,000 documents in the Validation Sample. For each document, the table shall include:

   1.     the Bates number of the document (for documents produced), or a control/identification number (for non-produced documents);

   2.     the Subsample from which the document came (i.e., D(1), D(2), or, if TAR was used, D(3), or if keyword search culling was used, D(4));

   3.     the SME's responsiveness coding for the document (i.e., responsive or non-responsive);

   4.     the SME's privilege coding for the document (i.e., privileged or not privileged). If the document is coded as non-responsive, a privilege determination need not be made. All documents in the Validation Sample coded as privileged shall be included on the producing Party's Privilege Log, as per the requirements set forth in Paragraph 19 of the Protective Order (Dkt. 212).

   5.     for putative class plaintiffs, the named class representative associated with the document.

H.     The following items shall be provided to the requesting Party:

   1.     the table described in Paragraph III(G);

   2.     a copy of each responsive, non-privileged document in the Validation Sample that was not previously produced or identified for production to the requesting Party;

   3.     the statistics and recall estimate detailed in Appendix A to this Order.

I.     Once the requesting Party has received and has had an opportunity to review the items described in Paragraph III(H) and Appendix A, the Parties shall meet and confer to determine whether or not the Parties agree that the recall estimate, and the quantity and nature of the responsive documents identified through the sampling process, indicate that the review is substantially complete. If the recall estimate and the samples indicate that Subcollections C(2), C(3), and/or C(4) still contain a substantial number of non-marginal, non-duplicative responsive documents as compared to Subcollection C(1), the review and quality assurance

process shall continue, and the validation process shall be repeated, as warranted. If the parties are unable to agree on whether the review is substantially complete, or whether the validation process must be repeated, the parties may raise the issue with the Court.


SO ORDERED.

Dated: _____                    _____
                                         HILDY BOWBEER
                                         United States Magistrate Judge

# APPENDIX A

## Method of Recall Estimation

An estimate of recall shall be computed to inform the decision-making process described in III(H) of the Validation Protocol; however, the absolute number in its own right shall not be dispositive of whether or not a review is substantially complete. Also of concern is the novelty and materiality (or conversely, the duplicative or marginal nature) of any responsive documents identified in Subsamples D(2), D(3), and/or D(4). The estimate of recall shall be derived as described below, depending on whether or not the review process involved the use of TAR. It should be noted that, when conducted by an SME pursuant to Paragraph III(F) of the Validation Protocol, a recall estimate on the order of 70% to 80% is consistent with, but not the sole indicator of, an adequate (i.e., high-quality) review. A recall estimate somewhat lower than this does not necessarily indicate that a review is inadequate, nor does a recall in this range or higher necessarily indicate that a review is adequate; the final determination also will depend on the quantity and nature of the documents that were missed by the review process.

**Recall Estimation Method for a Review Process Involving TAR:**

The number of responsive documents found ≈ the size of Subcollection C(1) × the number of responsive docs in Subsample D(1) ÷ 500.

The number of responsive documents coded incorrectly ≈ the size of Subcollection C(2) × the number of responsive documents in Subsample D(2) ÷ 500.

The number of responsive documents not reviewed ≈ (size of Subcollection C(3) + size of Subcollection C(4)) × (the number of responsive documents in Subsample D(3) + the number of responsive documents in Subsample D(4) ÷ (total documents in Subcollection C(3) + C(4)).

Estimated recall ≈ the number of responsive documents found ÷ (the number of responsive documents found + the number of responsive documents coded incorrectly + the number of responsive documents not reviewed).

**Recall Estimation Method for a Review Process Involving Manual Review:**

The number of responsive documents found ≈ the size of Subcollection C(1) × the number of responsive documents in Subsample D(1) ÷ 500.

The number responsive documents coded incorrectly ≈ (the size of Subcollection C(2) + the size of Subcollection C(4)) × (the number of responsive documents in Subsample D(2) + the number of responsive documents in Subsample D(4)) ÷ (total documents in Subcollection C(3) + C(4)).

Estimated recall ≈ the number of responsive documents found ÷ (the number of responsive documents found + the number of responsive documents coded incorrectly).