# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-cv-1776 (JRT/HB) |
| This Document Relates to: | |
| All ACTIONS | |

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL CUSTODIANS AND DOCUMENTS

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................ 1

II.  LEGAL STANDARD ................................................................ 2

III.  ARGUMENT .............................................................................. 4

    A.  Any Redactions to Custodians' Work Calendars Must Strictly
    Comply with the ESI Protocol. ...................................................... 4

        1.  Plaintiffs Seek the Production of Complete Hardcopy
        and Electronic Calendars ....................................................... 4

        2.  Defendants' Intended Relevance Redactions Are
        Improper. ................................................................................ 6

    B.  Defendants Tyson and JBS Are Refusing to Search the Files
    of Senior Executives and Former Senior Executives that
    Should Be Document Custodians ................................................. 11

        1.  Tyson ...................................................................................... 12

        2.  JBS .......................................................................................... 14

IV.  CONCLUSION ........................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*In re Aspartame Antitrust Litig.*,
2008 WL 2275531 (E.D. Pa. May 13, 2008) ................................................... 3

*B–S Steel of Kan., Inc. v. Tex. Indus., Inc.*,
2003 WL 21939019 (D. Kan. July 22, 2003) ................................................. 3

*Bellingham v. BancInsure, Inc.*,
2014 WL 12600277 (D. Minn. May 13, 2014) ............................................... 2

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2014 WL 5462496 (N.D. Cal. Oct. 23, 2014) ................................................. 3

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices &*
*Antitrust Litig.*,
2018 WL 1440923 (D. Kan. Mar. 15, 2018) ............................................... 11

*In re Generic Pharms. Pricing Antitrust Litig.*,
2019 WL 1613437 (E.D. Pa. Apr. 10, 2019) ................................................. 8

*Hofer v. Mack Trucks, Inc.*,
981 F.2d 377 (8th Cir. 1992) ......................................................................... 2

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*,
2016 WL 6997113 (D. Minn. Sept. 6, 2016) ................................................. 2

*MariCal, Inc. v. Cooke Aquaculture, Inc.*,
2016 WL 9459260 (D. Me. Aug. 9, 2016) ................................................... 18

*Orduno v. Pietrzak*,
2016 WL 5853723, at *3 (D. Minn. Oct. 5, 2016) ........................................ 2

*In re Polaroid Corp.*,
2017 WL 1183983 (D. Minn. Mar. 29, 2017) ............................................... 2

*St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*,
198 F.R.D. 508 (N.D. Iowa 2000) ................................................................. 2

*State Farm Mut. Auto. Ins. Co. v. Healthcare Chiropractic Clinic, Inc.*,
2016 WL 9330708 (D. Minn. Sept. 2, 2016) ................................................. 3

*United States v. Dentsply Int'l., Inc.*,
    2000 WL 654286 (D. Del. May 10, 2000)....................................................... 3

*In re Urethane Antitrust Litig.*,
    261 F.R.D. 570 (D. Kan. 2009)..................................................................... 3

## FEDERAL RULES

Federal Rule of Civil Procedure 26 ............................................................. 2, 6

Federal Rule of Civil Procedure 37(a)............................................................. 2

# I.     INTRODUCTION

Despite Plaintiffs' good faith efforts, the parties have reached impasse on two threshold discovery disputes that require the Court's intervention.[1]

*First*, in any antitrust conspiracy, work calendars maintained by the alleged co-conspirators' executives are critical documents because they can expose, among other things, illicit contacts and coordination. Here, while Defendants have agreed to produce their custodians' work calendars, they impermissibly have reserved the right to make free-ranging "relevance" redactions before doing so. Such redactions are not authorized by the Federal Rules or the parties' negotiated ESI Protocol[2] (ECF No. 292), which permits redactions only to safeguard narrow categories of information (*e.g.*, certain medical, health, family, and highly confidential (non-relevant) business information). Defendants' redactions also risk extreme prejudice to Plaintiffs, particularly because the "relevance" of even the most important calendar entries—which may mention only a location or first name—are often inscrutable without the context the entire discovery record affords. Defendants should be compelled to follow the stipulated ESI Protocol and the strict limitations it imposes on redactions.

---

[1] The term "Plaintiffs" refers collectively to the Direct Purchaser Plaintiffs, the Consumer Indirect Purchaser Plaintiffs, and the Commercial and Institutional Indirect Purchaser Plaintiffs.

[2] "ESI Protocol" refers to Order Regarding Production of Electronically Stored Information and Paper Documents, Feb. 20, 2019, ECF No. 292. For easy reference, the ESI Protocol is also attached as Exhibit K in support of this motion.

***Second***, Defendants Tyson and JBS have impermissibly refused to designate certain senior executives and former senior executives as document custodians, notwithstanding compelling evidence that each requested custodian was involved in strategic decision-making germane to this case.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 26 provides that a party may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. Rule 26 is liberal in scope and interpretation.[3] The standard exists to allow the parties essentially equal access to the operative facts.[4] "Courts construe Rule 26(b)(1) broadly."[5]

A party may pursue a motion to compel discovery if the opposing party fails to answer a discovery request, or responds with an evasive or incomplete answer.[6] Once the party seeking the discovery has made a threshold showing of relevance, the burden shifts to the party resisting discovery to show specific facts demonstrating that the discovery is

---

[3] *Orduno v. Pietrzak*, No. 14-1393 ADM/JSM, 2016 WL 5853723, at *3 (D. Minn. Oct. 5, 2016); *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992).

[4] *Bellingham v. BancInsure, Inc.*, No. 13-0900 (SRN/JJG), 2014 WL 12600277, at *1 (D. Minn. May 13, 2014).

[5] *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-cv-3183 (ADM/LIB), 2016 WL 6997113, at *7 (D. Minn. Sept. 6, 2016) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

[6] Fed. R. Civ. P. 37(a); *In re Polaroid Corp.*, No. 16-cv-1357 (JRT), 2017 WL 1183983, at *6 (D. Minn. Mar. 29, 2017).

not relevant, or how it is overly broad, burdensome, or oppressive.[7] "[U]nsupported

assertions of burdensomeness and lack of proportionality," lacking an "affidavit stating

the expected cost and time associated with" the requested discovery are not

"persuasive."[8]

     In antitrust cases such as this, the "liberal policy favoring discovery is particularly

appropriate."[9] "'Broad discovery is permitted because direct evidence of an

anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy

frequently can be established only through circumstantial evidence, such as business

documents and other records.'"[10]

---

[7] *See St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000) ("the party resisting production bears the burden of establishing lack of relevancy or undue burden"); *Inline Packaging*, 2016 WL 6997113, at *7 (same).

[8] *State Farm Mut. Auto. Ins. Co. v. Healthcare Chiropractic Clinic, Inc.*, No. 15-cv-2527 (SRN/HB), 2016 WL 9330708, at *2-3 (D. Minn. Sept. 2, 2016).

[9] *See, e.g.*, *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 573 (D. Kan. 2009).

[10] *Id*. (quoting *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 14262004, WL 7200711, at *3 (E.D. Pa. Oct. 29, 2004); *B–S Steel of Kan., Inc. v. Tex. Indus., Inc.*, No. 01-2410-JAR, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003); *United States v. Dentsply Int'l., Inc*., No. Civ.A. 99-5 MMS, 2000 WL 654286, at *5 (D. Del. May 10, 2000); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2014 WL 5462496, at *8 (N.D. Cal. Oct. 23, 2014) ("'broad discovery may be needed to uncover evidence of invidious design, pattern, or intent'" in antitrust cases) (internal citation omitted); *In re Aspartame Antitrust Litig*., No. 2:06-CV-1732-LDD, 2008 WL 2275531, at *1 (E.D. Pa. May 13, 2008) ("This broad scope of discovery 'has been held to be particularly appropriate in antitrust cases.'" (Internal citation omitted.)).

## III.    ARGUMENT

**A.    Any Redactions to Custodians' Work Calendars Must Strictly Comply with the ESI Protocol.**

### 1.    Plaintiffs Seek the Production of Complete Hardcopy and Electronic Calendars.

As is common in antitrust litigation, Plaintiffs' document requests seek the production of complete hardcopy and electronic calendars for each of Defendants' document custodians. Specifically, Plaintiffs requested:

> **"For each Document Custodian, all:**
>
> **a.    Electronic and hard copy diaries, calendars, appointment books or notes, notebooks or to-do lists . . . ."[11]**

In their original and amended discovery responses, Defendants generally agreed to produce work calendars responsive to this request.[12] But several Defendants—namely, Hormel, JBS, Smithfield, Tyson and Agri Stats—stated that they will produce only those entries they deem relevant to the case. These Defendants' excerpted responses are as follows:

**Hormel:**

> Subject to and without waiving the above objections, Hormel Foods will produce nonprivileged, responsive documents that exist; that relate to the Company's Pork business and relate to contacts, correspondence, or meetings with Agri Stats, other named Defendants, or an agreed-upon Pork

---

[11] *See* Exhibit A, at 11 and Exhibit B at 10 to the Declaration of Arielle S. Wagner in Support of Plaintiffs' Motion to Compel Custodians and Documents ("Wagner Decl."), concurrently filed herewith.

[12] *See id.*, Exs. C-J.

Integrator; that are relevant to the parties' claims and defenses; and that are in its possession, custody, and control.[13]

**JBS:**

Subject to and without waiving the foregoing, and subject to an agreement on a reasonable number of Document Custodians to be used in this litigation as well as with regard to the Relevant Time Period only, JBS USA agrees to produce responsive, non-privileged documents requested in subparts (a)-(h) as indicated below and to the extent this information is in JBS USA's possession, custody, or control and able to be located by JBS USA through a reasonable search, as defined in Scope Limitation No. 5:

> a) Entries in electronic and hard copy diaries, calendars, appointment books, notebooks, Day Timers or day planners used for work purposes only, and which reference output, production capacity, price or customers for Pork in the U.S. JBS USA reserves the right to apply redactions consistent with the Court's orders or the Parties' agreements;. . . .[14]

**Smithfield:**

Subject to and without waiver of its Scope Limitations and objections, Smithfield will conduct a reasonable search of its agreed or Court-ordered document custodians' files and other sources using a search methodology and produce relevant, non-privileged documents responsive to this Request that exist, relate to work use, are relevant to the parties' claims and defenses, are reasonably available, and are in Smithfield's possession, custody, or control.[15]

**Tyson:**

Subject to the foregoing objections, Tyson responds as follows: Based on a reasonable search of the files of Tyson's agreed-upon custodians and non-custodial sources (which are still the subject of negotiations), Tyson will produce responsive, non-privileged documents that are relevant to the parties' claims or defenses and proportional to the needs of the case. Tyson will produce these responsive, relevant, non-privileged documents according

---

[13] *See id.*, Ex. D at 20.

[14] *Id.*, Ex. E at 17-18.

[15] *Id.*, Ex. G at 18.

to any order of the Court or agreement of the Parties. Tyson will withhold documents, to the extent they exist, on the basis of Tyson's objections to this Request.[16]

**Agri Stats:**

> Subject to these objections and its General Objections, Agri Stats will search for, using reasonably tailored search terms or other agreed-upon methodology to be negotiated according to the process set forth in the ESI Order, documents in Agri Stats's custodial document collections that reflect calendar appointments or meeting invites with Defendant Pork Integrators relating to pork. Agri Stats will also conduct reasonable, targeted searches for hard-copy work calendars within Agri Stats's possession, custody, and control for custodian account managers that reflect calendar appointments or meetings with Defendant Pork Integrators. Agri Stats also will conduct a reasonable, targeted search for any centralized logs of meetings with any Defendant Pork Integrators concerning pork services.[17]

Subsequently in meet-and-confers, *all* Defendants—including remaining Defendants Clemens, Seaboard, and Triumph—reserved the right to redact individual calendar entries on the basis of relevance.[18] In other words, while Defendants agree that work calendars are responsive documents that must be produced, Defendants have agreed to provide only those calendar entries they unilaterally deem relevant to the case.

### 2.   Defendants' Intended Relevance Redactions Are Improper.

As a threshold matter, the requested calendars are clearly relevant. Plaintiffs allege that Defendants engaged in a conspiracy to fix, raise, and stabilize the prices of pork products in the United States, including by coordinating efforts to artificially reduce and stabilize the supply of pork, knowing that those supply reductions would increase prices.

---

[16] *Id.*, Ex. I at 16.

[17] *Id.*, Ex. J at 23-24.

[18] *Id.*, ¶ 3.

Plaintiffs' document requests for work calendars clearly relate to the conduct at issue in the litigation, and would provide evidence regarding the communications between competitors, the opportunities for competitors to conspire, and the coordinated conduct between competitors. The discovery Plaintiffs seek flows directly from the allegations in their complaints and is well within the scope of Rule 26(b)(1), and is proportional to the needs of this case, especially given the effect of the nationwide-conspiracy on numerous direct and indirect purchasers. The concerns raised by Defendants during our meet-and-confer conversations are far outweighed by the benefit of the proposed discovery, and the prejudice to Plaintiffs if such withholdings and redactions are allowed.

Because custodians' work calendars are relevant and responsive documents, Defendants are not permitted to redact individual calendar entries based on Defendants' own view of relevance.

**First**, Section II(K) of the ESI Protocol already specifies what redactions are permitted in this litigation, and nowhere does it authorize the general relevance redactions Defendants propose. Specifically, to address any concerns Defendants may have regarding the disclosure of sensitive personal information, Section II(K)(1) permits certain "Personal Data Redactions."[19] Beyond that, this Court proposed, and the parties adopted in the ESI Protocol, a provision authorizing only "***limited***" relevance redactions.

---

[19] These permissible redactions apply to the following narrow categories: "(1) the information relates to medical or health issues of an individual; (2) social security numbers, bank account information, or personal passcodes; or (3) personal contact information of friends or family to the extent they do not work in in the Pork industry or work for a Party's competitors." *Id.*, Ex. K at 7.

*See* Order[20] at 1 (emphasis added). That provision permits relevance redactions only for "highly confidential business information" that is both "nonresponsive and irrelevant" and "would not assist in understanding or providing context for the relevant portion of the document or document family of which it is part." Order at 1; ESI Protocol at 7. In short, by restricting relevance redactions to a single, narrow category, the ESI Protocol unambiguously precludes Defendants from making the broader relevance redactions they are contemplating.

The ESI Protocol did not innovate in this regard. Relevance redactions are rarely permitted.[21] Particularly in light of Defendants' ability to redact sensitive categories of information, Defendants should not be permitted to redact or withhold specific calendar entries based on their own assessment of the entries' relevance. Allowing such redactions would materially impede Plaintiffs' ability to prosecute this action with no corresponding benefits whatsoever.

***Second,*** even if it were permitted, Defendants cannot feasibly cull calendar entries for general "relevance." As Defendants surely understand, calendars do not lend themselves to search terms because important evidence of relevant contacts between Defendants will be missed. For example, a calendar entry rarely contains the name of a specific competitor or Pork product, and the conventions people use for their calendars

---

[20] Order (regarding relevance redactions), Nov. 29, 2018, ECF No. 226.

[21] *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 16-MD-2724, 2019 WL 1613437, at *1 (E.D. Pa. Apr. 10, 2019) (ordering that the only information subject to redaction was "attorney-client privilege, protection under the work-product doctrine, and sensitive personally identifying information").

vary substantially. For instance, "mtg w/bill" or "WB meeting" or "Bill" or "meeting with William" could all mean the same thing. Similarly, even if the parties agree on extensive search terms, Plaintiffs would miss a relevant trade association event in Washington, D.C. if the custodian has calendared "trip to DC" rather than "attendance at [name-of-event]."

Alternatively, if Defendants conduct a manual review of each custodians' work calendars, the meaning of any particular entry often will not be clear without the benefit of the full discovery record. As noted, calendar entries are inherently idiomatic and personalized in ways that cannot be understood until they are examined in conjunction with other evidence, including testimony, emails, and the entries or other witnesses. For example, a calendar entry that says "call with Bill" may not appear responsive until further discovery reveals that Bill is not Cousin Bill, but rather CEO Bill at Competitor Company XYZ. Similarly, "Lunch at ABC Restaurant" may not seem relevant, until the larger record establishes that individuals from two other competitor companies also had lunch at ABC on the same day.

Moreover, these problems would not be alleviated even if each Defendant were to ask each custodian to walk through their calendar entries one by one. Such a process would instead entitle alleged co-conspirators to themselves pick and choose which calendar entries they perceive to relate to anticompetitive communications. Putting aside that the fox should never guard the henhouse, there is no assurance that the custodians themselves will understand their own cryptic calendar entries without the context of the broader discovery record (which they will not have reviewed, and can never review in

- 9 -

full under the Protective Order). Based on our conversations to date, Plaintiffs also have every reason to believe that Defendants will continue to take an unduly narrow view of relevance and either redact or withhold important circumstantial evidence of the conspiracy.

*Third*, Defendants may argue that their proposed redaction process is no different than reviewing an email for responsiveness. This is a false equivalency. Calendars are *themselves* relevant and responsive documents. Reviewing and redacting individual entries, as Defendants propose, is thus tantamount to withholding *portions* of otherwise responsive emails. This is not permitted. Moreover, calendar entries are simply different than emails. For one, they are directed to oneself. Notations are therefore truncated and cryptic, using, for example only first names or even initials. In contrast, an email necessarily has the name and usually an indication of the other person's employer *on the face of the document.* Additionally, calendar entries establish the Document Custodians' whereabouts, which may have significance separate and apart from the "content" of the message.

*Fourth*, adherence to the ESI Protocol's redaction parameters would result in no corresponding prejudice to Defendants. As noted, Defendants are already permitted to redact agreed categories of sensitive personal and competitive information. Any other potentially "non-relevant' information produced in calendars will be subject to the Protective Order and afforded all protections it ensures. Defendants also cannot reasonably argue that Plaintiffs' right to discovery is outweighed by Defendants' burden or expense. If anything, the path Defendants propose—conducting an additional

- 10 -

"relevance" review of calendar entries—would be more burdensome, expensive, and time consuming than producing the calendars in full. It is also more likely to generate further avoidable disputes and motion practice related to the propriety of Defendants' individual redactions. Defendants' restrictive approach is also at odds with caselaw allowing broad discovery in conspiracy cases, which recognizes the importance of gathering evidence that may illuminate the context and circumstances of the parties' dealings.

For all of these reasons, agreed custodians' hardcopy and electronic work calendars should be produced in their entirety, subject only to those redactions the ESI Protocol expressly authorizes.

**B.    Defendants Tyson and JBS Are Refusing to Search the Files of Senior Executives and Former Senior Executives that Should Be Document Custodians.**

For purposes of resolving disputes over designated ESI custodians, "determining what is relevant and proportional under the circumstances for each matter often requires a highly fact-specific inquiry."[22] Here, the parties dispute whether certain senior executives and former senior executives at Tyson and JBS should be included as custodians. In determining "whether to compel inclusion of a senior executive as an ESI custodian," courts consider "the senior executive's level of involvement in discussions and decisions serving as the basis for the claims at issue in the case."[23] Courts further consider whether

---

[22] The Sedona Principles, 3rd ed., 19 SEDONA CONF. J. 1, Cmt. 6.a., 119 (2018).

[23] *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018).

"the executive's relevant ESI is unique and would not be available from other designated custodians."[24]

### 1. Tyson

Tyson has refused to include Don Tyson and John H. Tyson as Document Custodians, asserting that "Don Tyson retired in 2001, and John left his position of CEO in 2006, both well before the relevant time period."[25] Tyson's argument ignores the active role both gentlemen continued to play in Tyson's affairs during the relevant time period. Both served as Board Members (indeed, John H. Tyson has served as Chairman of the Board throughout the relevant time period) and as controlling shareholders through the Tyson Limited Partnership ("TLP"), which owns the Company's super-voting shares.[26] Additionally, public statements by Tyson executives and other media reports reveal that both Don and John Tyson maintained a hands-on, active role in the Company's day-to-day operations during the relevant time period.

For example, following Richard Bond's departure as CEO, the Wall Street Journal reported in a January 5, 2009 article that Mr. Bond's departure "follows months of increased involvement in the company's daily affairs by Don Tyson, the 78-year-old

---

[24] *Id.*

[25] *See* Wagner Decl. Ex. L at 4.

[26] *See id.*, Ex. N at 3 ("The dual class stock system of Tyson Foods gives the Tyson family a 10 to 1 voting advantage with the class B shares owned entirely by Tyson Limited Partnership. Class A shareholders of the publicly traded stock with some 374.98 million shares can't outvote the 70 million shares of Class B stock held by the Tyson Family controlling 700 million votes. For this reason, Tyson Foods is considered by the Securities and Exchange Commission to be a 'controlled company.'").

chicken mogul who is the founder's son and controls nearly 70% of the voting shares [of Tyson]."[27] The article noted "growing industry speculation about the return to the company of what is known as its 'old guard,'" which included Don Tyson and "his two former top lieutenants." The article further observed that any CEO "replacement would have to be willing to work in the shadow of Mr. [Don] Tyson."[28] During this time period, Don Tyson received $1.2 million annually in compensation pursuant to a consulting contract with Tyson.[29] In addition, through at least August 2010, Don Tyson maintained an office adjacent to the office of the Company's CEO and came into the office 2 to 3 times a week.[30] In addition, the burden associated with producing Don Tyson's documents would be minimal, in part due to the shortened time period at issue, *i.e.,* from January 1, 2008 until his passing in early January 2011.

John Tyson similarly maintained a hands-on role in the company after stepping down as CEO in 2006. In addition to his role as Chairman of the Board and controlling shareholder via TLP, John Tyson has had an agreement throughout the relevant time period to provide "advisory services" to Tyson, for which he is compensated $500,000 per year, plus additional benefits.[31] As the Company has explained in its filings with the S.E.C., John has "devoted his professional career to the Company and brings extensive

---

[27] *See id.*, Ex. O at 1.

[28] *Id.* at 1-2.

[29] *Id.* at 2.

[30] *See id.*, Ex. P at 3.

[31] *See id.*, Ex. Q at 1, 4.

- 13 -

understanding of the Company, its operations and the protein and food processing industries to the Board" and provides "critical insight into the Company's business."[32] John Tyson's continued involvement in the day-to-day operations of the Company was acknowledged by then-CEO, Donnie Smith, who reported that "he speaks consistently, at least once a week, with John Tyson."[33] As of late 2020, John Tyson is still Chairman of the Board, a controlling stockholder through his ownership of TLP, and a paid advisor to the company.[34]

In sum, all available evidence shows—contrary to Tyson's representations—that Don and John H. Tyson played an active role in directing Tyson's affairs through the relevant period. This makes them critical, and not just relevant, custodians in the context of the alleged conspiracy. Their files should be searched.

### 2. JBS

For JBS, the parties are in dispute regarding the designation of the following custodians: Wesley Batista, Joesley Batista, Don Jackson, and Andre Nogueira. These individuals held the following roles at JBS USA or JBS parent companies during the relevant period:

| | |
|---|---|
| Wesley Batista | President & CEO of JBS USA (July 2007 – 2010) |
| Joesley Batista | CEO of JBS SA (2007-2011) |
| Don Jackson | President & CEO of JBS USA (December 2012 – December 2012) |

---

[32] See id., Ex. R at 10.

[33] See id., Ex. P at 3.

[34] See id., Ex. S at 13, 21.

| Andre Nogueira | President & CEO of JBS USA (January 2013 – present); CFO of JBS USA (July 2007 – January 2012) |
|---|---|

Each of these individuals held senior executive roles at JBS or its parent company, JBS SA, during the relevant period.  Indeed, JBS' own disclosures state that Wesley Batista, Don Jackson, and Andre Nogueira each "had responsibilities related to pork" and that they had responsibility for "investor/creditor relations."[35] Consistent with those disclosures, each of these individuals, in their role as either CEO of JBS USA or JBS SA, had ultimate responsibility for business decisions regarding pork supply, output, and pricing that are at the center of Plaintiffs' allegations of a conspiracy among Defendants to fix the price of pork sold in the United States.  Joesley and Wesley Batista's control over JBS USA's operation goes beyond their titles as CEOs during the relevant period - as noted in a recent SEC order, Joesley and Wesley Batista are also the owners and operators of both JBS USA and its parent companies.[36]  In 2011, Mr. Jackson, then CEO of JBS USA, publicly stated that "Wesley [Batista] and Joesley [Batista] run the company."[37] Indeed, Plaintiffs specifically relied on public statements made by Wesley Batista about JBS USA's business operations in their complaints. *See* DPP Compl.[38] ¶¶ 144, 149, 159.

---

[35] *See* Wagner Decl., Ex. M at 3-4.

[36] *See id.*, Ex. T at 3.

[37] *See id.* Ex. U at 6.

[38] "DPP Compl." refers to Direct Purchaser Plaintiffs' Third Amended and Consolidated Class Action Complaint, Jan. 15, 2020, ECF No. 431.

010736-11/1412087 V1

In addition, as outlined in Plaintiffs' complaints, both Mr. Nogueira and Mr. Wesley Batista served on the board of directors for the North American Meat Association during the relevant time period. As alleged in Plaintiffs' complaints, this organization and its predecessor, the American Meat Institute, provided numerous opportunities for Defendants to meet with each other face-to-face. *See* DPP Compl. ¶¶ 107-119. Therefore, the custodial files of Mr. Batista and Mr. Nogueira are particularly likely to contain unique, relevant information regarding potential competitor contacts through their leadership roles in these organizations.

Furthermore, JBS has designated individuals employed on its pork management team as custodians and argued that its designation of these custodians obviates the need for the individuals in dispute to be designated as custodians.  But JBS does not dispute the members of the JBS pork management each ultimately report to these senior executives.  And JBS provides no explanation for how the ESI of subordinates would capture communications between these four individuals with ultimate responsibility for JBS USA's pork operations.  For example, Mr. Jackson and Mr. Nogueira were, respectively, JBS USA CEO and JBS USA CFO from January 2010 through January 2012. If neither is designated as an ESI custodian, then there is no mechanism for capturing direct communications between them regarding JBS USA's pork operations during this period. Similarly, a senior JBS executive publicly stated in 2011 that Joesley and Wesley Batista, the individuals who ran JBS, "were always talking, always

debating."[39]  If neither Joesley and Wesley Batista, the owners and operators of JBS USA, are designated as ESI custodians, then these known, frequent communications between them about the operation of JBS USA will not be collected from the other ESI custodians.

The fact that these individuals also supervised other aspects of JBS's business operations, apart from their pork production, does not justify the refusal of JBS to designate them as custodians. First, the process of negotiating search terms and conducting a relevance review ensures that it is the relevant, responsive documents of these custodians that would be produced, rather than irrelevant alternative documents. Second, both Tyson and Hormel are also large food conglomerates with numerous business operations, separate from their pork production. Nevertheless, Tyson and Hormel have agreed to designate as custodians their CEOs for the entire relevant period whom supervised their entire business operations. Tyson has designated Richard Bond, Donnie Smith, and Thomas Hayes, who were the CEOs of Tyson from January 2008 to September 2018.  Similarly, Hormel has designated Jeff Ettinger and James Snee, who were CEOs of Hormel from 2006 to the present. Indeed, JBS is the *only* Defendant who has refused to designate any individuals as custodians who served as CEO during the relevant period.

---

[39] *See* Wagner Decl., Ex. U at 6.

Therefore, good cause exists for designating these individuals as ESI custodians because these individuals "maintained a position of prominence" in JBS' management, were "involved in discussions regarding" the subject matter of this litigation, and are likely to possess unique ESI that will not be collected from other designated custodians.[40]

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion in its entirety.

Date:  December 7, 2020                           Respectfully submitted,

/s/ Bobby Pouya                                   /s/ Arielle S. Wagner
Bobby Pouya (Pro Hac Vice)                        Arielle S. Wagner (MN #0398332)
Clifford H. Pearson (Pro Hac Vice)                W. Joseph Bruckner (MN #0147758)
Daniel L. Warshaw (Pro Hac Vice)                  Brian D. Clark (MN #0390069)
Michael H. Pearson (Pro Hac Vice)                 Craig S. Davis (MN #0148192)
PEARSON SIMON & WARSHAW, LLP                      Simeon A. Morbey (MN #0391338)
15165 Ventura Boulevard, Suite 400                Stephen M. Owen (MN # 0399370)
Sherman Oaks, CA 92403                            Stephanie A. Chen (MN #0400032)
Telephone: (818) 788-8300                         LOCKRIDGE GRINDAL NAUEN
Facsimile: (818) 788-8104                         P.L.L.P.
cpearson@pswlaw.com                               100 Washington Avenue South, Suite
dwarshaw@pswlaw.com                               2200
bpouya@pswlaw.com                                 Minneapolis, MN 55401
mpearson@pswlaw.com                               Telephone: (612) 339-6900
                                                  Facsimile: (612) 339-0981
Melissa S. Weiner (MN #0387900)                   aswagner@locklaw.com
Joseph C. Bourne (MN #0389922)                    wjbruckner@locklaw.com
PEARSON, SIMON & WARSHAW, LLP                     csdavis@locklaw.com
800 LaSalle Avenue, Suite 2150                    bdclark@locklaw.com
Minneapolis, MN 55402                             samorbey@locklaw.com
Telephone: (612) 389-0600                         smowen@locklaw.com
Facsimile: (612) 389-0610                         sachen@locklaw.com
mweiner@pswlaw.com
jbourne@pswlaw.com                                *Co-Lead Class Counsel for Direct*

Bruce L. Simon                                    *Purchaser Plaintiffs*
PEARSON, SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000

---

[40] *MariCal, Inc. v. Cooke Aquaculture, Inc.,* 14-cv-00366-JDL, 2016 WL 9459260, at *2 (D. Me. Aug. 9, 2016).

010736-11/1412087 V1

Facsimile: (415) 433-9008
bsimon@pswlaw.com

/s/ Shana E. Scarlett
Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO
LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Steve. W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO
LLP
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

/s/ Daniel E. Gustafson
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Britany N. Resch (#0397656)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
bresch@gustafsongluek.com

*Co-Lead Counsel for Consumer Indirect
Purchaser Plaintiffs*

/s/ Shawn M. Raiter
Shawn M. Raiter (MN# 240424)
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6518
sraiter@larsonking.com

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
Yifei "Evelyn" Li
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com
evelyn@cunelolaw.com

*Co-Lead Counsel for Commercial and
Institutional Indirect Purchaser Plaintiffs*