# EXHIBIT T

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 90170 / October 14, 2020

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 4189 / October 14, 2020

**ADMINISTRATIVE PROCEEDING**
File No. 3-20124

| | |
|---|---|
| **In the Matter of**<br><br>    **J&F INVESTIMENTOS, S.A.**<br>    **JBS, S.A.**<br>    **JOESLEY BATISTA**<br>    **WESLEY BATISTA**<br><br>**Respondents.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

    The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against J&F Investimentos, S.A., ("J&F"), JBS, S.A. ("JBS"), Joesley Batista, and Wesley Batista (collectively "Respondents").

**II.**

    In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, Respondents admit the Commission's jurisdiction over them and the subject matter of these proceedings, and consent to the entry of this Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-And-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' Offers of Settlement, the Commission finds[1] that:

### Summary

1.      This action arises from a bribery scheme by Joesley Batista and Wesley Batista (hereinafter "the Batistas"), their company J&F, and JBS, a company which J&F and its affiliates control, and which is the largest meat and protein producer in the world with net revenues in 2019 in excess of $50 billion. JBS's shares trade on the Brazilian stock exchange and its American Depositary Shares trade in the U.S. over-the-counter market. In 2009, the Batistas sought to continue to expand their meat business into the United States through acquisitions of multiple U.S. companies. From 2009 through 2015, the Batistas made illicit payments totaling approximately $150 million for the benefit of then Brazil Finance Minister ("Minister") and various political parties and candidates in Brazil at the request and direction of the Minister. The Batistas made the payments in return for the Minister's assistance, among other things, in obtaining and maintaining $2 billion in equity financing ("BNDES Investment") from the Brazilian National Development Bank and its affiliate (together "BNDES") in order to facilitate JBS' acquisition of U.S. issuer Pilgrim's Pride Corporation ("Pilgrims").

2.      At the time of the acquisition in December 2009, Pilgrims was under Chapter 11 bankruptcy protection as a result of the financial crisis' impact on its operations. The BNDES Investment, which the bribes facilitated, and which was preserved by the bribe scheme, allowed the Batistas to acquire Pilgrims and successfully have it exit bankruptcy and continue to operate as a going concern under the Batista family-controlled conglomerate. Following the acquisition, Wesley Batista served as CEO of JBS and Chairman of the board for Pilgrims, and Joesley Batista served as CEO of J&F and a member of the board of Pilgrims. As provided for in the share purchase and investment agreements, JBS acquired Pilgrims. After the acquisition, unbeknownst to Pilgrim's management, the Respondents carried out the bribery scheme and its funding using, at times, JBS operating accounts which contained funds that were commingled with funds obtained from Pilgrims through intercompany transfers, special dividends, and other means. The Respondents then paid bribes at the direction of the Minister. Pilgrim's books did not reflect this.

3.      The Batistas, individually and through J&F and JBS, exerted significant control over Pilgrims. Pilgrims shared office space, overlapping board members and executives, accounting and SAP systems, and certain internal accounting controls and policy documents with JBS and its U.S. affiliate, JBS USA. Throughout 2009 to 2015, unbeknownst to Pilgrims management, the Batistas continued the bribery scheme using, in part, certain JBS operating accounts which contained funds that were commingled with funds obtained from Pilgrims, through intercompany transfers, dividend payments, and other means. To further conceal their conduct, the

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

Batistas did not disclose to Pilgrims' accountants and independent public accountants during due diligence and audits that certain funds transferred to JBS were commingled with funds used to pay bribes in Brazil. As a result of this conduct, Joesley Batista, Wesley Batista, J&F, and JBS caused Pilgrims' books and records to inaccurately record the transfers and payments and caused Pilgrims' failure to maintain an adequate system of internal accounting controls in violation of the books and records and internal accounting controls provisions of the Foreign Corrupt Practices Act ("FCPA").

## Respondents

4. **J&F Investimentos, S.A.** ("J&F") is a private investment holding company based in Sao Paulo, Brazil. It is wholly owned by brothers Wesley Batista and Joesley Batista. J&F owns approximately 250 companies in 30 countries worldwide. J&F is the ultimate parent company of JBS and indirect parent of JBS USA Holdings Lux S.a.r.l. ("JBS USA") and Pilgrims. J&F controlled JBS during the relevant period.

5. **JBS, S.A**. ("JBS") is a global meat and protein producer incorporated and headquartered in Sao Paulo, Brazil. JBS is the world's largest meat and protein producer, is publicly traded on the Brazilian stock exchange (Bovespa), and its American Depositary Shares have been traded on the U.S. OTC markets under the symbol "JBSAY" since May 2009. JBS through its wholly-owned subsidiary JBS USA, was the indirect parent company of Pilgrims. During the relevant period, both Joesley and Wesley Batista held most senior executive roles at JBS.

6. **Joesley Batista**, age 48, is a Brazilian national who owned J&F and held multiple positions in J&F entities, including the roles of CEO and board member of J&F, CEO of JBS from 2006 through 2011, Chairman of the Board of Directors for JBS between 2011 and 2017, Director of JBS USA through 2017, and Director of Pilgrims from December 2009 through May 25, 2017.

7. **Wesley Batista**, age 50, is a Brazilian national who owned J&F and held multiple positions in J&F entities, including the roles of Director for J&F, CEO of JBS from 2011 to 2017, CEO of JBS USA from 2007 to 2011, board member of JBS and JBS USA until 2017, and Chairman of Pilgrims' board of directors and compensation committee between December 2009 and June 14, 2017.

## Other Relevant Entities

8. **JBS USA Holdings Lux S.a.r.l** ("JBS USA") is a Luxembourg holding subsidiary of JBS and parent company of Pilgrims and other U.S. based meat companies. JBS USA acquired controlling shares in Pilgrims on or around December 28, 2009, one year after Pilgrims had filed for Chapter 11 Bankruptcy protection as a result of the financial crisis' impact on the chicken market. JBS USA currently owns 78.5% of Pilgrims.

9. **Pilgrim's Pride Corporation** ("Pilgrims") is a large chicken and pork producer and distributor headquartered in Greeley, Colorado. Its common stock trades on the Nasdaq

Exchange under the ticker symbol "PPC."  From December 2009 to December 2012, its common stock traded on the New York Stock Exchange ("NYSE") under the same symbol.  From 1986 until December 2008, its common stock traded on the NYSE under the ticker symbol "PGPD."  Pilgrims was registered with the Commission under Section 12(b) of the Exchange Act during the relevant time period.  Joesley Batista and Wesley Batista served as directors for Pilgrims between December 2009 and May 2017 and June 2017 respectively.  Six out of nine total Pilgrims board members also served on JBS's board.  Pilgrims is majority-owned by JBS through its subsidiary JBS USA.

10. **Banco Nacional de Desenvolvimento Economico e Social** and its wholly-owned subsidiary BNDES Participações S.A. (together "BNDES") is a Brazilian state-owned and state-controlled bank that performed government functions, including providing financing to private companies for endeavors that contributed to the development of Brazil.  BNDES' President and Board of Directors are ultimately appointed by the President of Brazil.  BNDES is an "instrumentality" of a foreign government, and its officers and employees "foreign officials" as those terms are used in the FCPA.

11. **Brazil Finance Minister** ("Minister") was a high ranking executive at BNDES from in or about 2004 and 2006, and was a high ranking official in the executive branch of the Brazilian government between 2006 and 2015.  In those roles, Minister had significant influence over whether BNDES would provide financing to private companies like J&F.  Minister was a "foreign official" as that term is used in the FCPA.

## FACTS

### Background

12. In early 2009, Brazilian nationals Joesley and Wesley Batista owned and operated J&F, a Brazilian holding company, and JBS, which is the largest meat and protein producer in the world.  JBS was publicly traded on the Brazilian stock exchange and had American Depository Shares listed in the U.S. OTC market.  The entities operated in over 30 countries.  Joesley Batista held several executive roles at the J&F entities ranging from CEO to Chairman of the Board.  Wesley Batista also held several executive roles at the J&F entities, including CEO to board director.  At the time, the Batistas were very well-known in the meat industry and associated with the highest levels of Brazilian politicians, including several sitting Presidents of Brazil, Ministers, and other Brazilian officials.

### Bribery Scheme to Obtain the BNDES Investment

13. In 2009, Joesley and Wesley Batista were engaged in an aggressive effort to expand their business into the United States meat market by acquiring companies.  They acquired several U.S. meat companies, which they structured under JBS USA.  At the time, Pilgrims, a U.S. issuer based in Texas, was under Chapter 11 bankruptcy protection as a result of the financial crisis' impact on its operations.

14. In September 2009, JBS acting through JBS USA entered into a stock purchase agreement to acquire a 64% controlling interest in Pilgrims in exchange for $800 million. To facilitate the acquisition, Joesley Batistas agreed to pay bribes at the direction of the Minister in return for his assistance in ensuring JBS obtained and maintained a large equity investment by BNDES.

15. On December 22, 2009, JBS executed an investment agreement with BNDES for $2 billion convertible debentures. The agreement included language that a portion of the proceeds would be used to acquire Pilgrims' shares, as well as other acquisitions. On December 28, 2009, JBS through JBS USA, acquired 64% of Pilgrims' shares for $800 million, which was ultimately increased to 78.5% by 2012.

### Ownership and Control

16. After the acquisition, Pilgrims was majority-owned and controlled by JBS through JBS USA. Joesley Batista was the CEO and a board member of J&F, CEO and Chairman of the Board of JBS, member of the JBS USA board of directors, and member of the Pilgrims' board of directors. Wesley Batista was a board member of JBS, CEO and a board member of JBS USA, and Chairman of the Pilgrims' board of directors and compensation committee.

17. As directors and majority shareholders of Pilgrims, Joesley and Wesley Batista, and their companies J&F and JBS, were able to control Pilgrims and continue to orchestrate their bribery scheme, but did not disclose it to Pilgrims. By failing to disclose their improper relationship with the Minister and the funding of the bribery scheme, the Batistas ensured that Pilgrims internal accounting controls failed to detect and prevent their misconduct. Indeed, Respondents caused Pilgrims to rely extensively on JBS management and other services, including sharing office space with JBS USA, sharing the same senior officers and other key management positions. In addition, six of the nine board positions at Pilgrims between 2010 and at least 2016 were occupied by individuals associated with JBS entities. Pilgrims also shared the accounting and SAP systems, and relied on many of JBS' own policies and procedures and training materials, including the JBS Code of Ethics.

18. Pilgrims did not enact its own Code of Conduct until 2015, more than five years after being acquired by the Respondents, and as of 2018, nearly nine years after the Respondents acquired controlling shares, Pilgrims was still in the process of implementing a formal anti-bribery compliance program and developing policies that covered its employees and consultants. During this period, Pilgrims also lacked compliance personnel. Although Joesley and Wesley Batista signed the code of conduct prohibiting bribery, neither received any anti-corruption or ethics training.

**Bribes Paid at the Direction of the Minister**

19. After JBS USA acquired a majority interest in Pilgrims, and Wesley and Joesley Batista became directors of Pilgrims, Joesley Batista met multiple times with the Minister to arrange to make numerous bribe payments at the request and direction of the Minister, including directly to and for the benefit of various political parties and candidates in Brazil. The Batistas made the payments for the Minister's continued support for the BNDES Investment, among other things. Unbeknownst to Pilgrims' management, some of the funds used to pay bribes at the Minister's direction came from JBS operating accounts that contained certain funds that were commingled with funds indirectly transferred to JBS by Pilgrims. Pilgrim's books did not reflect this.

20. To facilitate the arrangement with the Minister, Joesley Batista, as per the request of the Minister, created a series of shell companies and opened bank accounts for the shell companies at a U.S. investment bank. Joesley Batista maintained accounts at the U.S. investment bank in New York, in which deposits were made for the use of the Minister when needed. Joesley Batista regularly presented the bank account statements to the Minister for his control and evaluation. Some of the meetings with the Minister took place in the United States. After 2011, Wesley Batista became aware that the accounts were held at the U.S. investment bank for the Minister's use.

21. The Batistas funded these accounts from 2010 to 2012 and then maintained them until ultimately making a total of $150 million in illicit payments to and for the benefit of various political parties and candidates in Brazil in 2014 and 2015 at the Minister's request and direction. A J&F employee tracked the payments as they were routed into the U.S. investment bank accounts held for the Minister's benefit. The Respondents made these payments with funds that had come, in part, from JBS operating accounts. In 2012, Joesley Batista also agreed to the Minister's demand that he make a $5 million sham loan to a company that he later learned the Minister's son had an equity participation in. Joesley Batista executed this transaction in 2015 with the assistance of the U.S. investment bank, using a bank account held by a Delaware incorporated entity.

22. From 2009 to 2015, unbeknownst to Pilgrims management, the Respondents carried out the bribery scheme and its funding using, at times, certain JBS operating accounts which contained funds that were commingled with funds obtained from Pilgrims through intercompany transfers, special dividend payments, and other means. Pilgrim's books did not reflect this. The Respondents then paid bribes out of the operating accounts using various mechanisms including fake invoices, official election donations, and cash. In some instances, the Minister would direct the bribe payments to be made as official election donations.

23. Through their control over Pilgrims and failure to disclose the improper payment arrangements with the Minister, the Batistas caused Pilgrims' books and records to inaccurately record certain intercompany transfers, and also caused Pilgrims failure to maintain an adequate system of internal accounting controls reasonably designed to detect and prevent the improper payments recorded on its books and records.

24. Further, Respondents Joesley and Wesley Batista knowingly caused Pilgrims' books, records, and accounts to be inaccurate. Respondents Joesley and Wesley Batista signed the Form 10-Ks on behalf of Pilgrims in their capacities as directors. They did not disclose their conduct to Pilgrims' accountants and independent public accountants in connection with their audit and review of Pilgrims' financial statements from 2009 to at least May 2017 while the accountants were performing due diligence processes and internal audits. Wesley Batista failed to disclose his knowledge of any bribes paid when inquiries were made about the FCPA by Pilgrims' independent public accountants engaged in the audit and review of Pilgrims financial statements included in reports filed by Pilgrims with the Commission.

25. Joesley and Wesley Batista did not disclose to Pilgrims' management until May 2017 their role and cooperation in a widespread Brazilian corruption scheme and investigation, that they had entered into collaboration agreements with the Brazilian PGR, and that J&F had entered into a corporate leniency agreement with the Brazilian MPF. J&F's leniency agreement required Joesley Batista not to serve as an officer or board member of a publicly traded company in Brazil for a period of five years. Following these disclosures, Joesley Batista resigned from Pilgrims' board on May 25, 2017, and Wesley Batista resigned from the board of Pilgrims on June 14, 2017. Respondents indirectly received approximately $800 million in 2015 and 2016 as a result of dividends paid by Pilgrims to JBS USA.

## **Legal Standards and Violations**

26. Under Section 21C(a) of the Exchange Act, the Commission may impose a cease-and-desist order upon any person who is violating, has violated, or is about to violate any provision of the Exchange Act or any rule or regulation thereunder, and upon any other person that is, was, or would be a cause of the violation, due to an act or omission the person knew or should have known would contribute to such violation.

27. As a result of the conduct described above, Respondents caused Pilgrims' violations of Section 13(b)(2)(A) of the Exchange Act, which requires issuers that have a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and disposition of their assets.

28. As a result of the conduct described above Respondents caused Pilgrims' violations of Section 13(b)(2)(B) of the Exchange Act, which requires issuers that have a class of securities registered pursuant to Section 12 of the Exchange Act and issuers with reporting obligations pursuant to Section 15(d) of the Exchange Act to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with

the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

29. As a result of the conduct described above, Respondents Joesley Batista and Wesley Batista violated Section 13(b)(5) of the Exchange Act, which provides that no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record or account, and Exchange Act Rule 13b2-1, which prohibits persons from directly or indirectly falsifying or causing to be falsified any book, record, or account.

30. As a result of the conduct described above, Respondents Joesley Batista and Wesley Batista violated Exchange Act Rule 13b2-2, which prohibits persons from making or causing to be made materially false or misleading statements or omissions to an accountant or auditor in connection with an audit, review, or examination of financial statements or in connection with the preparation or filing of documents and reports required to be filed with the Commission.

## **Cooperation and Remediation**

31. In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondents and cooperation afforded the Commission staff. Respondents' cooperation included providing translations of certain relevant documents, making current or former employees available to the Commission staff, including witnesses located overseas, and timely providing facts developed during the course of J&F's internal investigation. Respondents Joesley Batista and Wesley Batista also voluntarily provided the Commission staff with documents located overseas and participated in interviews.

32. Respondents' remediation included creating a compliance program that employs approximately 35 individuals at J&F and its affiliates to cover its operating entities including Pilgrims, updating its Code of Conduct, and creating anti-bribery policies and training programs. Respondents Wesley Batista and Joesley Batista resigned from board and management positions at Respondents J&F and JBS and also from JBS USA. JBS also removed other executives involved in corrupt activities in Brazil from their executive positions. In addition, Respondents hired an independent firm in April 2018 to oversee their compliance with the obligations in the Brazilian leniency agreement and a public accounting firm to help implement an integrity program throughout the companies in the J&F group. J&F will also create a compliance committee, hire auditing for due diligence of suppliers and customers and provide training to more than 120 directors at J&F and its affiliates in the areas of conflicts of interest, money laundering prevention and anti-corruption.

**Undertakings**

33.     Respondents J&F, JBS, Joesley Batista and Wesley Batista undertake to review, evaluate and report to the Commission staff periodically during a three-year term, the effectiveness of the anti-corruption policies, procedures, practices, internal accounting controls, recordkeeping, and financing reporting processes (collectively, "Policies and Procedures") for Respondents J&F and JBS and any U.S. issuers that are under Respondents J&F's, JBS's, Joesley Batista's and Wesley Batista's direct or indirect control, including Pilgrims ("Controlled Issuers"), and report on ongoing efforts to improve the effectiveness of the Policies and Procedures.  Respondent Wesley Batista and Respondent Joesley Batista also agree to undergo enhanced ethics and FCPA training and submit annual certifications of completion.  During this period, should any of the Respondents discover credible evidence, not already reported to Commission staff, that questionable or corrupt payments or questionable or corrupt transfers of value may have been offered, promised, paid, or authorized by Respondents or Controlled Issuers, or any entity or person acting on behalf of Respondents or Controlled Issuers, or that related false books and records have been maintained, Respondents shall promptly report such conduct to the Commission staff.  During this three-year period, Respondents shall: (1) conduct an initial review and submit an initial report and (2) conduct and prepare two follow-up reviews and reports, as described below:

a.  Respondents shall submit to the Commission staff a written report within 180 calendar days of the entry of this Order setting forth a complete description of their FCPA and anti-corruption related remediation efforts to date, their proposals reasonably designed to improve the Policies and Procedures for ensuring compliance with the Anti-corruption laws, and the parameters of the subsequent review (the "Initial Report"). The Initial Report shall be transmitted to Tracy L. Price, Deputy Chief, FCPA Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-5631.  Respondents may extend the time period for issuance of the Initial Report with prior written approval of the Commission staff.

b.  Respondents shall undertake two follow-up reviews, incorporating any comments provided by the Commission staff on the previous report, to further monitor and assess whether the Policies and Procedures are reasonably designed to detect and prevent violations of the Anti-corruption laws (the "Follow-Up Reports").

c.  The Follow-up Report shall be completed by no later than 270 days after the Initial Report. The second Follow-up Report shall be completed by no later than 450 days after the completion of the Initial Report. Respondents may extend the time period for issuance of the Follow-up Reports with prior written approval of the Commission staff.

d.  The periodic reviews and reports submitted by Respondents will likely include proprietary, financial, confidential, and competitive business information. Public disclosure of the reports could discourage cooperation, impede pending or potential

9

    government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain nonpublic, except (a) pursuant to court order, (b) as agreed by the parties in writing, (c) to the extent that the Commission staff determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (d) is otherwise required by law.

  e. During this three-year period of review, Respondents shall provide their external auditors with their annual internal audit plan and reports of the results of internal audit procedures and its assessment of its FCPA compliance policies and procedures.

  f. During the three-year period of review, Respondents shall provide Commission staff with any written reports or recommendations provided by Respondents' external auditors in response to Respondents' annual internal audit plan, reports of the results of internal audit procedures, and its assessment of their FCPA compliance policies and procedures.

 34. Respondents shall each certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondents agree to provide such evidence. The certification and supporting material shall be submitted to Tracy L. Price, Deputy Chief, FCPA Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-5631 no later than sixty (60) days from the date of the completion of the undertakings.

 35. Respondents undertake to do the following: in connection with this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, Respondents (i) agree to appear and be interviewed by Commission staff at such times and places as the staff requests upon reasonable notice; (ii) will accept service by mail or facsimile transmission of notices or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by Commission staff; (iii) appoint Respondents' undersigned attorney as agent to receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas, waives the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses Respondents' travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and (v) consents to personal jurisdiction over Respondents in any United States District Court for purposes of enforcing any such subpoena.

 In determining whether to accept the Offers, the Commission has considered the undertaking set forth in Paragraph 35.

**Criminal Plea Agreements**

36. Respondent J&F has entered into a plea agreement with the United States Department of Justice that acknowledges responsibility for criminal conduct relating to the findings in the Order. Specifically, in *United States v. J&F Investimentos, S.A.*, Crim. No. 20-CR-365 (E.D.N.Y.), J&F acknowledged responsibility for one count of conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act [18 U.S.C. § 371].

37. In May 2017, Joesley and Wesley Batista entered into collaboration agreements with the PGR in Brazil, and in June 2017, J&F entered into a leniency agreement with the MPF in Brazil, in which they admitted their role in widespread bribery of Brazilian officials, including for conduct described herein.[2]

**Non-Imposition of a Civil Penalty**

38. Respondents J&F and JBS acknowledge that the Commission is not imposing a civil penalty based upon the imposition of a $256,497,026 criminal fine as part of J&F's resolution with the U.S. Department of Justice.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that**:**

A. Pursuant to Section 21C of the Exchange Act, Respondents cease and desist from committing or causing any violations and any future violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

B. Pursuant to Section 21C of the Exchange Act, Respondents Joesley Batista and Wesley Batista cease and desist from committing or causing any violations and any future violations of Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder.

C. Respondents shall comply with the undertakings enumerated in paragraphs 33-34 above.

---

[2] Respondent J&F entered into a leniency agreement with the Brazilian Ministerio Publico Federal ("MPF"), and Respondents Joesley Batista and Wesley Batista entered into collaboration agreements with the Brazilian Procurador-Geral da República ("PGR") (collectively the "Brazilian Agreements"). As part of the Brazilian Agreements, Joesley Batista, Wesley Batista, and J&F have agreed to pay collectively BRL 10,300,000,000 (the approximate equivalent of $3.2 billion) of which $768,670,358 will be disgorged to BNDES. The facts contained in this Order are consistent with the Brazilian Agreements.

  D. Respondent JBS shall, within fourteen days of the entry of this Order, pay disgorgement of $26,866,565 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).

  E. Respondents Joesley Batista and Wesley Batista shall each, within ten days of the entry of this Order, pay a civil penalty of $550,000 to the Securities and Exchange Commission for transfers to the general fund of the United States Treasury, subject to Section 21F(g)(3) of the Exchange Act.

  F. If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600 or 31 U.S.C. § 3717.  Payment must be made in one of the following ways:

    (1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

    (2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

    (3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

  Payments by check or money order must be accompanied by a cover letter identifying J&F, JBS, Joesley Batista and Wesley Batista as Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Tracy L. Price, FCPA Deputy Unit Chief, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-5631.

  G. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondents Joesley Batista and Wesley Batista agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondents Joesley Batista and Wesley Batista agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this

proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent Joesley Batista or Wesley Batista by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

H. Respondents Joesley Batista and Wesley Batista acknowledge that the Commission is not imposing a civil penalty in excess of $550,000, based upon Respondents' cooperation in a Commission investigation. If at any time following the entry of the Order, the Division of Enforcement ("Division") obtains information indicating that Respondents knowingly provided materially false or misleading information or materials to the Commission, or in a related proceeding, the Division may, at its sole discretion and with prior notice to the Respondents, petition the Commission to reopen this matter and seek an order directing that the Respondents pay a civil money penalty or additional civil penalty. Respondents may contest by way of defense in any resulting administrative proceeding whether it knowingly provided materially false or misleading information, but may not: (1) contest the findings in the Order; or (2) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

I. It is further Ordered that, for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondents Wesley Batista and Joesley Batista, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents Wesley Batista and Joesley Batista under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondents Wesley Batista and Joesley Batista of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

    Vanessa A. Countryman
    Secretary