# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-cv-1776 (JRT/HB) |
| | The Honorable John R. Tunheim |
| | Magistrate Judge Hildy Bowbeer |
| This Document Relates to: | |
| All Direct Purchaser Actions | |

## AGRI STATS, INC'S ANSWER AND DEFENSES TO DIRECT PURCHASER PLAINTIFFS' THIRD AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

Defendant Agri Stats, Inc., by its attorneys, Hogan Lovells US LLP, as and for their Answer and Affirmative Defenses to Direct Purchaser Plaintiffs' Third Amended and Consolidated Class Action Complaint (the "Complaint"), state as follows:

## I.      NATURE OF ACTION[1]

1.      The pork integrator Defendants (*i.e.,* the Defendants other than Agri Stats) are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce. The United States pork industry is highly concentrated, with a small number of large companies controlling the supply. Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork integration market.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 1, and therefore denies the same.

2.      Defendants, Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation, Hormel Foods, LLC ("Hormel"), Indiana Packers Corporation ("Indiana Packers"), JBS USA Food Company ("JBS" or "JBS USA"), Seaboard Foods LLC, Seaboard Corporation ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson"), entered into a conspiracy from at least 2009 to the present to fix, raise, maintain, and stabilize the price of pork.[2] The principal (but not exclusive) method by which Defendants implemented and executed their conspiracy was by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume, and demand through their co-conspirator, Defendant Agri Stats.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 2 of the Complaint.

---

[1] The headings in this Answer are the headings in the Complaint. To the extent the headings contain substantive allegations. Agri Stats denies them.

[2] For the purposes of this complaint, "pork" includes pig meat purchased fresh or frozen, smoked ham, sausage, and bacon. From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

3.     Beginning in at least 2009, Agri Stats began providing highly sensitive "benchmarking" reports to the majority of pork integrators. Benchmarking allows competitors to compare their profits or performance against that of other companies. But Agri Stats' reports are unlike those of lawful industry reports. Agri Stats gathers detailed financial and production data from each of the pork integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. Instead, the provision of this detailed information acts as the modem equivalent of the proverbial smoke-filled room. Rather than meeting in a room with pen and paper, Agri Stats collected the pork integrators' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports it provided to the pork integrators. On a weekly and monthly basis, Agri Stats provides the pork integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), and regularly provides the keys to deciphering which data belongs to which participant. The effect of this information exchange was to allow the pork integrators to monitor each other's production and hence control supply and price in furtherance of their anticompetitive scheme.

**ANSWER**

Agri Stats admits that it offers procompetitive benchmarking services to pork integrators. Agri Stats admits that it receives data from its subscribers regarding their pork business and that it uses that data in the reports it produces. Agri Stats denies that the information in its reports is not the kind of information that would be disclosed in a competitive market. Agri Stats denies the remaining allegations contained in Paragraph 3 of the Complaint.

4.     The data exchanged through Agri Stats also bears all the hallmarks of the enforcement and implementation mechanism of a price-fixing scheme. First, the data is current and forward-looking - which courts consistently hold has "the greatest potential for generating anticompetitive effects."[3] Second, information contained in Agri Stats reports is specific to pork integrators, including information on profits, prices, costs, and production levels; instead of being aggregated as industry averages to avoid transactional specificity and the easy identification of specific integrators. Third, none of the Agri Stats information

---

[3] Todd v. Exxon Corp., 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting United States v. Gypsum Co., 438 U.S. 422, 441 n.16 (1978)).

was publicly available. Agri Stats is a subscription service which required the co-conspirators to pay millions of dollars over the Class Period - far in excess of any other pricing and production indices. Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market. Defendants utilize the information exchanges through Agri Stats in furtherance of their conspiracy to fix, raise, stabilize, and maintain artificially inflated prices for pork sold in the United States.

**ANSWER**

Agri Stats admits that it receives data from its subscribers regarding their pork

business and that it uses that data in the reports it produces. Agri Stats also admits that it is

a subscription service.  Agri Stats denies the remaining allegations contained in Paragraph

4 of the Complaint.

5.     While Defendants went to great lengths to keep the existence of the conspiracy a secret, they admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen. Furthermore, each Defendant engaged in acts in furtherance of the conspiracy by participating in such supply cuts and by limiting increases in supply that otherwise would have occurred.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 5 of the Complaint.

6.     In addition, there are numerous "plus factors" in the swine industry during the Class Period, including but not limited to multiple industry characteristics which facilitate collusion, such as vertically integrated operations, high barriers to entry preventing competitors from coming into the market, high pork industry consolidation and concentration, inelastic supply and demand, and homogeneity of pork products.[4] These plus factors add plausibility to plaintiffs' allegations of a price-fixing scheme.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 6 of the Complaint.

---

[4] Pork is homogenous within cut type — e.g., a pork belly from Tyson and Smithfield are virtually indistinguishable.

7.     Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to Plaintiffs and class members. Beginning in 2009, the earnings of the integrators began to increase, as they took an increasing amount of the profits available in the pork industry. As a result of Defendants' unlawful conduct, Plaintiffs and the class members paid artificially inflated prices for pork during the Class Period. Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market. Thus, Plaintiffs and class members were injured by Defendants' conduct.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 7 of the Complaint.

## II.     JURISDICTION AND VENUE

8.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Plaintiff Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER**

Paragraph 8 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

9.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**ANSWER**

Paragraph 9 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

10.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**ANSWER**

Paragraph 10 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

11.     This Court has personal jurisdiction over each Defendant because, ***inter alia,*** each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

 **ANSWER**

Paragraph 11 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

12.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

 **ANSWER**

Paragraph 12 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

13.     No other forum would be more convenient for the parties and witnesses to litigate this case.

 **ANSWER**

Paragraph 13 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

### III.     PARTIES

**A.     Plaintiffs**

14.     Maplevale Farms, Inc. is a New York corporation with its principal place of business in Falconer, New York. It purchased pork directly from one or more Defendants

during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 14 of the Complaint, and therefore denies the same.

15.     John Gross and Company, Inc. is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 15 of the Complaint, and therefore denies the same.

16.     Ferraro Foods, Inc. is a New Jersey corporation with its principal place of business in Piscataway, New Jersey. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 16 of the Complaint, and therefore denies the same.

17.     Ferraro Foods of North Carolina, LLC, is a North Carolina Limited Liability Company with its principal place of business in Mebane, North Carolina. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 17 of the Complaint, and therefore denies the same.

18.     Olean Wholesale Grocery Cooperative, Inc. is a New York corporation with its principal place of business in Olean, New York. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 18 of the Complaint, and therefore denies the same.

19.     Plaintiff Joe Christiana Food Distributors, Inc. is a Louisiana corporation with its principal place of business in Baton Rouge, Louisiana. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 19 of the Complaint, and therefore denies the same.

**B.      Defendants**

**Agri Stats**

20.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats acted as a co-conspirator and committed acts in furtherance of the conspiracy by facilitating the

exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

**ANSWER**

Agri Stats admits that it is an Indiana corporation headquartered in Fort Wayne, Indiana. Agri Stats denies the remaining allegations contained in Paragraph 20 of the Complaint.

**Clemens**

21.    Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania. During the Class Period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 21 of the Complaint, and therefore denies the same.

22.    The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC. During the Class Period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 22 of the Complaint, and therefore denies the same.

**Hormel**

23.     Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 23 of the Complaint, and therefore denies

the same.

24.     Hormel Foods, LLC is a Minnesota corporation headquartered in Austin, Minnesota. Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 24 of the Complaint, and therefore denies

the same.

### Indiana Packers

25.     Indiana Packers Corporation is an Indiana corporation headquartered in Delphi, Indiana. During the Class Period, Indiana Packers Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Indiana Packers Corporation's parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and Mitsubishi Corporation (Americas).

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 25 of the Complaint, and therefore denies the same.

### JBS

26.     JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado. During the Class Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### ANSWER

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 26 of the Complaint, and therefore denies the same.

### Seaboard

27.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation. During the Class Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### ANSWER

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 27 of the Complaint, and therefore denies the same.

28.     Seaboard Corporation is a Delaware corporation headquartered in Merriam, Kansas, and is the parent company of Seaboard Foods LLC. During the Class Period, Seaboard Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or

affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 28 of the Complaint, and therefore denies the same.

### Smithfield

29.    Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company. Smithfield Foods is headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 29 of the Complaint, and therefore denies the same.

### Triumph

30.    Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the Class Period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 30 of the Complaint, and therefore denies the same.

**Tyson**

31.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 31 of the Complaint, and therefore denies the same.

32.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 32 of the Complaint, and therefore denies the same.

33.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 33 of the Complaint, and therefore denies the same.

## IV.   FACTUAL ALLEGATIONS

34.     Starting in at least 2009 and continuing to the present, Defendants conspired to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their anticompetitive agreement, Defendants relied on a unique industry data sharing service provided by Agri Stats. Agri Stats provided a means for Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of Defendants' price-fixing scheme, resulting in a stable and successful anticompetitive cartel.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 34 of the Complaint.

35.     Agri Stats has played a central role in collusion in other industries, including involvement in the Broiler industry.[5] As alleged in the ***In re Broiler Chicken Antitrust Litigation,*** No. 16-cv-08637 (N.D. Ill.), the Broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

**ANSWER**

Agri Stats admits that it is a defendant in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.).  To the extent the allegations in Paragraph 35 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph 35.

36.     In the Broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, and sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various Broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each Broiler producer's complex, sometimes directly contacting the Broiler producers to verify the data. Agri Stats also provided detailed price reports to the Broiler industry through its subsidiary, Express Markets, Inc., also known as EMI. Agri Stats collected data

---

[5] "Broilers" are chickens raised to be slaughtered before the age of 13 weeks.

from the Broiler producers on a weekly basis and provided its reports to Broiler producers on a weekly and monthly basis.

**ANSWER**

Agri Stats admits that it receives data from clients regarding production of Broiler chickens.  Agri Stats admits that it audits the data received.  Agri Stats admits that it uses the audited data to create individual reports for each client.  To the extent the allegations in Paragraph 36 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

37.     The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The ***Broiler*** complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual Broiler complexes. The Broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger Broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 37 of the Complaint.

38.     In the Broiler industry, plaintiffs also alleged that Agri Stats - known to its co-conspirators to be a willing and informed conduit for illicit information exchanges - used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the Broiler industry facilitated the implementation of the agreement to restrict supply.

**ANSWER**

Agri Stats admits that its employees periodically host and present at chicken industry events and conferences. Agri Stats denies the remaining allegations contained in Paragraph 38 of the Complaint.

39.     In denying defendants' motions to dismiss in the ***In re Broiler Chicken Antitrust Litigation,*** the district court noted that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which raises significant antitrust concerns.[6]

**ANSWER**

To the extent the remaining allegations in this Paragraph purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent Paragraph 39 purports to allege legal conclusions, no response is required. To the extent a response is required, Agri Stats denies the allegations.

40.     Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the swine industry along the lines of the benchmarks used to restrain competition in the Broiler industry. Benchmarking is the act of comparing one company's practices, methods or performance against those of other companies.[7] Benchmarking of the type undertaken by Agri Stats and its co-conspirators here reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive, and typically proprietary, information among competitors.

**ANSWER**

---

[6] Memorandum Opinion and Order at 11, In re Broiler Chicken Antitrust Litigation, No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

[7] Thomas J. Rosch, Antitrust Issues Related to Benchmarking and Other Information Exchanges, Federal Trade Commission (May 3, 2011) (available at https://www.ftc.gov/sites/default/files/documents/public_statements/antitrust-issues-related-benchmarking-and-other-information-exchanges/110503roschbenchmarking.pdf).

Agri Stats admits that it provides benchmarks to the swine industry. To the extent the allegations in Paragraph 40 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 40.

41.     In 2008, Greg Bilbrey of Agri Stats told swine industry participants that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. ***Each and every commercial swine operation is encouraged to participate in some benchmarking effort.***"[8]

**ANSWER**

To the extent the allegations in Paragraph 41 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 41.

42.     Agri Stats emphasized to pork integrators that the goal of the agreement to share information was profitability, not production, and invited pork integrators again to participate in the benchmarking. Agri Stats emphasized that "We must remember that the ***ultimate goal is increasing profitability -*** not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. ***To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program.*** "[9]

**ANSWER**

---

[8] Greg Bilbrey, Benchmarking and Cost — Production Relationships, 19 Advances in Pork Production Journal, p. 43 (2008) (emphasis added).

[9] Id. at p. 46 (emphasis added).

To the extent the allegations in Paragraph 42 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 42.

43.     In April 2009, Greg Bilbrey of Agri Stats again invited swine integrators to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort.***" [10]

**ANSWER**

To the extent the allegations in Paragraph 43 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 43.

44.     Beginning no later than 2009, the pork integrators commenced participation in the detailed benchmarking scheme based upon and found in the Agri Stats reports. Defendants' agreement was to use the exchanged benchmarking information to coordinate supply and stabilize as well as increase prices of pork sold in the United States, to provide and receive information from Agri Stats, and to use this detailed sensitive information for the purposes of monitoring each other's production and pricing. The agreement was successful as pork prices rose significantly after the agreement was reached.

**ANSWER**

To the extent the allegations contained in Paragraph 44 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

---

[10] Greg Bilbrey, Benchmarking and Tools to Maximize Profit, London Swine Conference — Tools of the Trade (April 1-2, 2009).

form a belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

45.     Agri Stats provided pork integrators with an unparalleled ability to share
critical and proprietary information concerning key business metrics, such as production
levels and short and long-term production capacity. Agri Stats was key to the formation,
operation, and continuing stability of the Defendants' anticompetitive scheme. To
effectuate their agreement, the participants had to have confidence that each member was
following through with the agreement by limiting their production and stabilizing prices.
Agri Stats served that function.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 45 of the Complaint.

46.     Each member of the conspiracy, Defendants Clemens, Hormel, Indiana
Packers, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, were all Agri Stats
subscribers and reported their information to Agri Stats. Agri Stats' parent company, Eli
Lilly, stated that ***"over 90% of the poultry and pig market"*** uses Agri Stats in the United
States.[11]

**ANSWER**

To the extent the allegations in Paragraph 46 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats denies the remaining allegations in this

Paragraph.

47.     Agri Stats collects participant financial and production data electronically
each month. Internal auditors convert the data, prepare it for comparison, and perform the
monthly audits. Each company's financial data is reconciled to their general ledger to help

---

[11]Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016) (emphasis
added).

ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations so all company numbers are calculated the same way.[12]

**ANSWER**

Agri Stats admits that it receives data from its subscribers regarding their pork business and that it uses that data in the reports it produces. Agri Stats admits that it audits the data received. Agri Stats admits that it uses the audited data to create individual reports for each client. To the extent the remaining allegations in Paragraph 47 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

48. Unlike traditional "benchmark" services which rely upon unaudited and aggregated publicly available data, Agri Stats obtains audited data directly from the participating producers. When a producer joins Agri Stats, Agri Stats employees spend up to a month on site to learn, set up, audit, and prepare the producer to submit its data each month.[13] After submission Agri Stats "takes raw data and pulls it in to input system[s] in [the] right format and location each month."[14]This verified data allows participants to make "apples to apples" comparisons with competitors in order to increase profitability.[15]

**ANSWER**

Agri Stats admits that it receives data from its subscribers regarding their pork business and that it uses that data in the reports it produces. Agri Stats admits that it audits the data received. Agri Stats admits that it uses the audited data to create individual reports for each client. To the extent the allegations in Paragraph 48 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents

---

[13] See, e.g., Agri Stats Presentation (AGSTAT-P-0000000360).

[14] Id. at 372.

[15] Id.

speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in this Paragraph.

49.     Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies. Current month, previous quarter and previous twelve-month periods are reported. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales. [16] Participants may also receive an abbreviated Key Performance Indicator report, as well as historical graphs.[17]

**ANSWER**

Agri Stats admits that it offers procompetitive benchmarking services to pork integrator companies. To the extent the allegations in Paragraph 49 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in this Paragraph.

50.     Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about four years. This is a function of the hog biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly two years to substantially increase production.

**ANSWER**

---

[16] Greg Bilbrey, Benchmarking and Tools to Maximize Profit, supra note 10.

[17] Greg Bilbrey, Benchmarking and Cost-Production Relationships, supra note 9.

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in Paragraph 50 of the Complaint, and therefore denies the same.

51.    One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the pork market:[18]

Top 25% in Profit - Variances to Average Company - 2009-2007

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | | | | | | | | | | | | |
| ranking | 12 | | 1 | 5 | | 11 | 7 | 2 | 8 | 4 | 9 | 6 | 3 | 10 |

35,001,089 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | | | | | | | | | | | | |
| ranking | 11 | | 1 | 5 | | 10 | 6 | 7 | 2 | 4 | 8 | 9 | 3 | 12 |

30,786,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | | 3913 | 182.98 | 28.16 | 11.12 | 14.65 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | | | | | | | | | | | | |
| ranking | 11 | | 1 | 4 | | 10 | 7 | 2 | 6 | 8 | 5 | 9 | 3 | 12 |

22,306,500 Pigs finished

**ANSWER**

To the extent the allegations in Paragraph 51 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

52.    The purpose of these reports was not to provide better prices to customers or to lower the costs of production. Instead, the purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even further detail. The same presentation informed

[18] Greg Bilbrey, Key Drivers to Farm Profitability (2011).

pork integrators that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (ckg refers to 100 kilograms.) This underlines that the purpose of these reports was not to allow customers to save money through lower prices and more efficient production - in fact, the opposite was true, the purpose was the profitability of the Defendant companies and the impact was higher prices for pork customers.

**ANSWER**

To the extent the allegations in the first and second sentence of Paragraph 52 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations in the first and second sentence of Paragraph 52 purport to relate to Agri Stats, Agri Stats denies the same. To the extent the remaining allegations in Paragraph 52 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 52 of the Complaint.

53.     Much of the information shared by Agri Stats and the other Defendants was unnecessary to achieve any benefits for pork purchasers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.[19] In fact, in a truly competitive market, the participants would closely protect such proprietary information from disclosure as providing it to competitors would be disadvantageous: unless, of course, there is an agreement that the competitors will use the information to the joint benefit of each other as was the situation in the pork industry.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 53 of the Complaint.

---

[19] FTC Roundtable on Information Exchanges Between Competitors Under Competition Law Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

54.     Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies - allowing the companies to compare the "apples to apples" of its data analysis among competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data: [20]

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



**ANSWER**

To the extent the allegations in Paragraph 54 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph 54 of the Complaint.

55.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine **tolerance and outlier status and enforce,**" they must "[h]ave an

---

[20] Greg Bilbrey, Data Integrity, Slideshare.net (Sept. 21, 2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations

administrator to compile the data and enforce procedures," and most importantly, ***"[e]ach participant has to commit."*** [21]

**ANSWER**

To the extent the allegations in Paragraph 55 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

56.     In addition to these reports, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis. [22] The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the reports. The fee for the visits fluctuated based on the size and other factors.

**ANSWER**

Agri Stats admits that it conducted site visits for its subscribers.  Agri Stats admits that its employees possessed expertise in pork production. Agri Stats admits that it charged a fee for site visits.  Agri Stats denies the remaining allegations in Paragraph 56.

57.     A common saying by Agri Stats is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that ***"the ultimate goal is increasing profitability*** - not simply increasing level of production."

**ANSWER**

To the extent the allegations in Paragraph 57 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents

---

[21] Id.(emphasis added).

[22] Greg Bilbrey, Benchmarking and Tools to Maximize Profit, supra note 10.

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.

58.     In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets had provided its extensive pricing reports to Broiler producers since 2003. [23]

**ANSWER**

Agri Stats admits that Express Markets is a subsidiary of Agri Stats.  Agri Stats

admits it added pork to its Express Market analysis in 2015.  Agri Stats admits that it

provides reports to Broiler producers.  Agri Stats denies that the information in the reports

contained information beyond what would be disclosed in lawful industry reports.

59.     By providing detailed production statistics by participants, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits. Critically, Agri Stats provided forward-looking data that allowed the other Defendants to determine each other's future production in addition to their current production.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 59 of the Complaint.

60.     Agri Stats reports are organized by company and facility, but their names are not listed in the reports. Nevertheless, while ostensibly anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that participants can accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

**ANSWER**

Agri Stats admits that it anonymizes the reports.  Agri Stats denies that participants

can accurately identify the companies behind the metrics.  To the extent the allegations

---

[23] Steve Meyer, Paragon Economics Sold to Express Markets, National Hog Farmer, May 26, 2015 (available at http://www.nationalhogfarmer.com/marketing/paragon-economics-sold-express-markets).

contained in Paragraph 60 relate to other Defendants and/or third parties to this action, Agri

Stats lacks knowledge or information sufficient to form a belief concerning the truth of the

allegations, and therefore denies the same.  To the extent the allegations contained in this

Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

61.     Moreover, Agri Stats knew that the anonymity of its system was
compromised by individuals who had gleaned knowledge of competitors' identification
numbers, but reassigning numbers was an undertaking the company was not eager to
embark on.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 61 of the Complaint.

62.     Suppliers received as many as one dozen books of data at the end of each
quarter, augmented by smaller monthly update books featuring the latest year-to-date
information. Within these smaller monthly books, each supplier's own rows of year-to-
date numbers were highlighted. In the front of each book, there were also markings
indicating whose numbers were inside the book. The front of the book also included
information indicating which other companies were represented in the data, though which
number represented each competitor was not revealed.

**ANSWER**

 To the extent the allegations in Paragraph 62 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.

63.     Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a
participant's book to one of its competitors. At times, suppliers just kept their competitors'
books for future reference, which as noted above revealed the identity of that participant
given that their numbers were highlighted by Agri Stats in their books.

**ANSWER**

Agri Stats admits that it mailed reports to its subscribers.   Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in Paragraph 63 of the Complaint, and therefore denies the same.

64.     Mobility within the meat production industries led to a situation where many workers at most pork integrator operations knew the numbers of other regional facilities, removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats were aware of this fact, but did nothing to address it.

**ANSWER**

Agri Stats admits that one of its employees was hired by a Pork Integrator Defendant.   To the extent the allegations contained in Paragraph 64 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.   To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

65.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Price fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 65 of the Complaint.

66.     In a February 15, 2017, Bloomberg article relating to Agri Stats' roles in the Broiler industry, it was reported:

Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modem poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your coconspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. ***That is what creates stability for a cartel.***[24]

**ANSWER**

Agri Stats denies the allegation in Paragraph 66 that Agri Stats information was used to "create[] stability for a cartel."  To the extent the remaining allegations in this Paragraph purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent Paragraph 66 purports to allege legal conclusions, no response is required.  To the extent a response is required, Agri Stats denies the allegations.

67.    The class period was further characterized by the increased control over the breeding, production, growing, and processing of pork by the Defendants through vertical integration and the exclusive production contracts with hog farmers.

**ANSWER**

---

[24] Christopher Leonard, Is the Chicken Industry Rigged, Bloomberg, (Feb. 15, 2017), (available at https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged) (emphasis added).

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 67 of the Complaint, and therefore denies the same.

68.     Vertical integration is so pervasive that Defendants are commonly called pork or swine integrators by the industry, government, analysts, and academics. Vertical integration allows the integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter. Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 68 of the Complaint, and therefore denies the same.

69.     Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms." [25]This arrangement essentially converts independent farmers into contract employees that perform services for the pork integrator. The Defendants typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities. The pork integrators (*i.e.,* Defendants) typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market. The prevalence and use of contracts for hog production by Defendants increased significantly during the course of the conspiracy. By 2017 it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency as far as bid prices.

**ANSWER**

To the extent the allegations in Paragraph 69 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents

---

[25] Allen Harper, Hog Production Contracts: The Grower-Integrator Relationship, Virginia Cooperative, Virginia Cooperative Extension (2009).

speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 69 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

70.     Pork production starts at the farrowing stage—which is the term used to describe a female hog giving birth. Female hogs used in the farrowing stage are called sows. Sows will normally have anywhere from 11 to 13 pigs per litter. With a sow being able to farrow close to three times a year, one sow can have around 36 piglets in one year. After birth piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig weighs upwards of 50 pounds. At the last stage of production, the pigs will spend around 16 weeks in a finishing bam, reaching a final weight of over 250 pounds. After the pigs reach their final weight, they are sent to a packing plant to be harvested. Due to the nature of the pork production cycle, the reduction of sows—i.e. farrowing hogs—has a significant impact on the supply of pork.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 70 of the Complaint, and therefore denies the same.

71.     The following diagram shows the path for pork raised for meat consumption from birth through sale to consumers:



Figure 1: Value Chain of U.S. Pork Market

**ANSWER**

To the extent the allegations in Paragraph 71 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

72.     Under economic theory, vertical integration can have anticompetitive effects because there are fewer firms competing at all levels, which renders it easier to collude on price.

**ANSWER**

Paragraph 72 does not contain any factual allegations to which a response is required. To the extent a response is needed Agri Stats denies the allegations in Paragraph 72 of the Complaint.

73.     During the class period Defendant Smithfield has the distinction of being the largest producer and processer of pork in the United States. In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms. [26]

**ANSWER**

To the extent the allegations in Paragraph 73 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 73 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

74.     In 2009, Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers. [27] In its 2017 SEC 10-K report, Defendant Seaboard Corporation states that it raises "over five million hogs annually primarily at facilities

---

[26] Smithfield Foods Annual Report, at p. 27 (2014).

[27] 2009 Seaboard Annual Report, at p. 11.

owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts." [28]

**ANSWER**

To the extent the allegations in Paragraph 74 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 74 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

75. Defendant Clemens Food Group touts its vertical coordination on its website stating that, "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers." [29] A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania. [30]

**ANSWER**

To the extent the allegations in Paragraph 75 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 75 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or

---

[28] Seaboard Corporation Annual Report, at p. 2 (2017).

[29] See Clemens Food Group, Vertically Integrated Purposefully Coordinated (available at http://www.clemensfoodgroup.com/our-company/vertically-coordinated).

[30] See id.; see also The Clemens Family Corporation Companies (available at http://www.clemensfamilycorp.com/pages/companies.aspx).

information sufficient to form a belief concerning the truth of the allegations, and therefore

denies the same.

76.     As to JBS USA, a key aspect of JBS' purchase of its predecessor in interest,
Cargill, in 2015 was that it allowed JBS to exercise greater control over the production of
hogs, by acquiring four hog farms and two packing plants operated by Cargill.

**ANSWER**

. To the extent the allegations contained in Paragraph 76 relate to other Defendants

and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations, and therefore denies the same.

77.     Triumph was created with vertical integration in mind as it is owned by five
of the largest pork producers in the U.S.— Christiansen Farms, The Hanor Company, New
Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's
Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota. The
relationship with these owner producers allows Triumph to control the pork production
process from start to finish.

**ANSWER**

To the extent the allegations contained in Paragraph 77 relate to other Defendants

and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations, and therefore denies the same.

78.     As Defendant Tyson stated in its 2009 10K Report, "The majority of our live
hog supply is obtained through various procurement relationships with independent
producers." Additionally, Tyson raises a number of weanling swine to sell to independent
finishers and supply a minimal amount of live swine for its processing needs.

**ANSWER**

To the extent the allegations in Paragraph 78 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context. To the extent the allegations contained in Paragraph 78 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

79. Defendant Indiana Packers states on its website, "We're a fully integrated pork company operating entirely within the heart of the Midwest, so our team members can better partner with our surrounding farm neighbors to produce the freshest, highest- quality products." [31] "With our Midwest family-farm sourcing, pork-exclusive expertise and vertically integrated operation, it's no wonder customers from all sectors of the food industry trust Indiana Packers to be their primary pork supplier." [32]

**ANSWER**

To the extent the allegations in Paragraph 79 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 79 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

80. Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities. As Hormel stated in its 2009 annual report that, "[t]he live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements." Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.

**ANSWER**

---

[31] https://indianapackerscorp.com/ (viewed on August 27, 2019).

[32] Id.

To the extent the allegations in Paragraph 80 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 80 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

81.     Each of the Defendants further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports. Defendants including Smithfield, Clemens, Tyson, Hormel, Indiana Packers, Seaboard, Triumph, and JBS sell packaged pork under various name brands.

**ANSWER**

To the extent the allegations contained in Paragraph 81 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

82.     The United States Department of Agriculture ("USDA") has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality." [33]

**ANSWER**

To the extent the allegations in Paragraph 82 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents

---

[33] John King (USDA), Concentration and Technology in Agricultural Input Industries, at p. 2 (March 2001).

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations contained in this Paragraph, and

therefore denies the same.

83.     The hog integration sector is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

**ANSWER**

Paragraph 83 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

84.     Prior to and in the beginning of the Class Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share. Between 1988 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015. As shown in Figure 2 below, the top eight integrators had market share of well over 80 percent for the entire Class Period:



**Figure 2: Market Share of Top 8 Pork Integrators 1991 to 2017**

Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

**ANSWER**

To the extent the allegations contained in Paragraph 84 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 84 purport to relate to Agri Stats, Agri Stats denies the same.

85.   In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield. As noted above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and two packing plants operated by Cargill.

**ANSWER**

To the extent the allegations contained in Paragraph 85 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

86.    The acquisition was completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

**ANSWER**

To the extent the allegations contained in Paragraph 86 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

87.    The following timeline summarizes notable mergers between pork integrators since 1995 which led to an increased market concentration:

**Figure 3: History of Mergers and Acquisitions**

**ANSWER**

To the extent the allegations contained in Paragraph 87 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 87 purport to relate to Agri Stats, Agri Stats denies the same.

88.     As shown in Figure 4 below, by 2016, the top six pork processors comprised 82% of the total market. On their own, it would be difficult for any of these supposed competitors to exercise market power. But acting as a whole to manipulate the price of pork products, the combined market share of the six largest Defendants translates into an HHI[34] of 6724 (ignoring other pork processors that comprise the other 18% of the market), which is well above the threshold for highly-concentrated markets. In other words, if Defendants colluded with one another to restrict the supply of pork in the market, as alleged herein, the resulting market concentration of such concerted action gave them more than sufficient power to control the pork market. Even without combining the largest six Defendants, the pork industry has a "moderately concentrated" HHI of 1532.

**Figure 4: 2016 Pork Processing Market Shares[35]**

| Company | Share | HHI - Independent | HHI - Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | 6724 |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | |
| Others | 18% | 18 | 18 |
| | | | |
| **Total** | **100%** | **1532** | **6742** |

**ANSWER**

---

[34] "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice. See https://www.justice.gov/atr/herfindahl-hirschman-index. A HHI value of 1,500 to 2,500 suggests a market is moderately concentrated. A HHI in excess of 2,500 points suggests a market is highly concentrated.

[35] Ken Sullivan, Globalization of Agriculture: An Ownership and Market Perspective (March 7, 2017).

To the extent the allegations contained in Paragraph 88 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 88 purport to relate to Agri Stats, Agri Stats denies the same.

89.    The concentration level in the pork integration industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated." [36]Both of these factors - maturity and concentration - make an industry more susceptible to collusion.

**ANSWER**

To the extent the allegations in Paragraph 89 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

90.    The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a relative handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because the largest integrators were incapable of independently controlling prices on their own, such an agreement was necessary to inflate prices.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 90 of the Complaint.

---

[36] WH Group Interim Report, at p. 5 (2017).

91.     Concentration of the industry is also beneficial to the procurement of hogs by the pork processors. In some regions, consolidation has resulted in cases where only one pork processor is left to buy hogs from independent farmers, leaving the farmers with no leverage when negotiating terms with the pork processors. [37]

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 91 of the Complaint, and therefore denies

the same.

92.     In addition to market concentration, market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy. The following chart shows not only that the Defendants' collective share of the market was high throughout the class period, but also that each individual defendant's market share was largely stable throughout:



Figure 5: Market Concentration and Market Share Stability –
U.S. Market Share by Hog Slaughter Capacity

---

[37] Wise, Timothy A and Sarah E. Trist, "Buyer Power in U.S. Hog Markets: A Critical Review of the Literature", Global Development and Environment Institute, Working Paper No. 10-04, August 2010, at pp. 3 and 11.

**ANSWER**

Paragraph 92 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

93. The following figure shows that there was a substantial drop in market share volatility during the class period:

**Figure 6: Standard Deviation of Combined Defendant Market Share Pre- and Within Class Period**



**ANSWER**

Paragraph 93 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

94.    Large barriers to entry kept potential competitors out of the pork integration industry. New entry into pork processing is costly and time consuming. Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design and permitting costs are substantial. In 2012, it cost Cargill $25 million just to expand an existing facility. Building a facility from scratch would be considerably more, totaling hundreds of millions of dollars. [38]

**ANSWER**

To the extent the allegations contained in Paragraph 94 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

95.    The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants. And in other situations, the processor owns the hog from farrow to finish. Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably. [39]

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 95 of the Complaint, and therefore denies the same.

96.    Markets with a highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price. [40] A PED value

---

[38] *Anticompetitive Impacts of Proposed .IBS-Cargill Pork Acquisition,* at 4 (White Paper) at p. 7.

[39] Timothy A. Wise and Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature,* Global Development and Environment Institute, Working Paper No. 10-04 (August 2010), at p. 12.

[40] *See, e.g.,* Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of

between 0 and -1 indicates there is inelastic demand for the good or service, i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The average PED estimate for the pork market was -0.64 - meaning the demand for pork is inelastic.

**ANSWER**

The allegations contained in Paragraph 96 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is needed Agri Stats denies the allegations in Paragraph 96 of the Complaint.

97.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loins, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets. For example, as alleged above, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar nutritional values, branding and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure. [41]

**ANSWER**

Paragraph 97 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations. To the extent the allegations contained in Paragraph 97 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the

---

demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects,* 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.acili-fibich/Manuscripts/elasticity_JAMS.pdf.

[41] *See Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects,* The United States Department of Justice, https://wwwjustice.gov/atepreventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.") (last visited Aug. 16, 2018); Marc Ivaldi et al., *The Economics of Tacit Collusion* (March 2003), http://ec.europa.eu/competition/mergers/studies_reports/ the_ economics_of tacit_collusion_en.pdf.

allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

98.     Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct. Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

**ANSWER**

Agri Stats admits that it is a member of the North American Trade Association from 2016 to present.  Agri Stats admits that it was a member of the American Meat Association from 2010-2015.  Agri Stats denies that its membership in any trade association was used to facilitate a conspiracy of any kind. To the extent the allegations contained in Paragraph 98 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

99.     All pork producers and importers in the United States participate in a legislatively-mandated "Pork Checkoff," under which they pay an assessment when pigs are sold or pigs or imported into the United States. The money is used for programs to increase pork sales and exports, for research, and for producer and consumer education programs; funds cannot be used for lobbying or to influence government policy. The assessment amount and the amount to be returned to state pork associations for local programs is set annually by the Pork Act Delegate Body, which meets during the National Pork Producers Council's annual Pork Industry Forum. States are represented in the Delegate Body in proportion to their level of hog production, and each state is eligible to elect at least two Delegates. Executives from several integrator Defendants have served as Pork Act Delegates.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 99, and therefore denies the same.

100.    The Pork Act Delegates also elect a 15 -member National Pork Board ("Pork Board"), whose members are officially appointed by the U.S. Secretary of Agriculture. The Pork Board works with Pork Checkoff staff to ensure collection and distribution of Pork Checkoff funds. Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo. Executives from several pork integrator Defendants have served as members of the Pork Board. For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff. Skahill is the Pork Board's current Treasurer.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 100, and therefore denies the same.

101.    According to its website, "[t]he National Pork Producers Council ["NPPC"], which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets." Executives from the pork integrator Defendants have served on the NPPC Board of Directors during the Class Period, including: Cory Bollum of Hormel Foods, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats.

**ANSWER**

To the extent the allegations in Paragraph 101 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 101 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

102.    NPPC conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year. NPPC advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions. The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations in Paragraph 102, and therefore denies the same.

103.    In addition to its annual National Pork Industry Forum, NPPC sponsors many other programs that have provided ample opportunities for defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show." It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms). The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC.

- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations in Paragraph 103, and therefore denies the same.

104.    The National Pork Industry Conference ("NPIC") has taken place in the Wisconsin Dells each July since 2010 (and in the Ozarks before that). Descriptions on the conference website have said that NPIC "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America." After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow

numbers." [42] In July 2010, the Pork Checkoff website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded." [43] The website for the 2016 NPIC conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts." Seaboard Foods and Smithfield Foods are among the integrator Defendants whose executives have been session presenters at NPIC.

**ANSWER**

To the extent the allegations in Paragraph 104 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 104 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

105. Upon information and belief, CEOs and top level executives from Defendants attending NPIC and NPPC events discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top level executives comfort that their competitors remain committed to a plan to artificially restrict pork production.

**ANSWER**

To the extent the allegations contained in Paragraph 105 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the

---

[42] Mr. Greenwood was also a presenter at the 2018 NPIC, discussing swine operation financials.

[43] *See National Pork Board to meet during National Pork Industry Conference,* Pork Checkoff (July 8, 2010) (available at https://www.pork.org/news/national-pork-board-meet-national-pork-industry-conference/).

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

106.    In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues. For example, the 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year. A March 2011 *AgriMarketing* article about the club states that it consisted of "60 industry stake holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

**ANSWER**

To the extent the allegations in Paragraph 106 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  To the extent the allegations contained in Paragraph 106

relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or

information sufficient to form a belief concerning the truth of the allegations, and therefore

denies the same.  To the extent the allegations contained in this Paragraph purport to relate

to Agri Stats, Agri Stats denies the same.

107.    Defendants were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other organizations.

**ANSWER**

Agri Stats admits that some of its employees attended events sponsored by the

North American Meat Institute and the American Meat Institute.  Agri Stats lacks

knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 107, and therefore denies the same.

108.    Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association." AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

**ANSWER**

To the extent the allegations in Paragraph 108 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

109.    NAMI was formed in 2015 by merging the AMI and the North American Meat Association. The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars ... provide excellent networking and information-sharing opportunities for members of the industry."

**ANSWER**

To the extent the allegations in Paragraph 109 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

110.    All of the Defendants (or their closely-affiliated companies) have been members of AMI and then NAMI throughout the Class Period. Executives from the pork integrator Defendants have served on the AMI and NAMI Board of Directors during the Class Period, including:

a.      Mark Campbell and Rick Hoffman of Triumph Foods;

b.      Doug Clemens and Phil Clemens of Clemens Family Corporation;

c.      Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc., as well as Greg Schweitzer of Sara Lee/Hillshire Brands (later acquired by Tyson Foods);

d.      Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

e.      Gary Louis, Rod Brenneman and Terry Holton of Seaboard Foods;

f.      Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA;

g.      Jim Snee, Stephen Binder and Jeffrey Ettinger of Hormel Foods Corporation; and

h.      Gary Jacobson and Russ Yearwood of Indiana Packers Corporation.

**ANSWER**

Agri Stats admits that it is a member of the North American Trade Association from 2016 to present.  Agri Stats admits that it was a member of the American Meat Association from 2010-2015.  To the extent the allegations contained in Paragraph 110 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

111.    Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

**ANSWER**

To the extent the allegations contained in Paragraph 111 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

112.    Throughout the Class Period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has co-sponsored (with the Food Marketing Institute) the industry's "Annual Meat Conference." The conference website describes the conference as "a complete education and networking experience." Many of the Defendants' high-level executives attend the conference. For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President, Smithfield Foods and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

**ANSWER**

Agri Stats admits that it was a member of the American Meat Association from 2010-2015.  Agri Stats also admits that its employees attended trade association events sponsored by the American Meat Institute. To the extent the allegations in Paragraph 112 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 112 relate to other Defendants and/or third parties to

this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

113.    Throughout the Class Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry." All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc. (a subsidiary of Agri Stats, Inc.) through 2017. The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates and *industry capacity*." (emphasis added.) The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike. This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices. Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years." The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

**ANSWER**

Agri Stats admits that Steve Meyer was a Vice President of Pork Analysis at Express Markets. Agri Stats admits that Express Markets is a subsidiary of Agri Stats. Agri Stats admits that Steve Meyer gave various presentations at the Annual Meat Conferences. To the extent the allegations in Paragraph 113 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 113 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or

information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

114.    Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics ... as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action." Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015, and Phil Clemens of The Clemens Family Corporation in 2016.

**ANSWER**

To the extent the allegations in Paragraph 114 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 114 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

115.    For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics." The NAMI board met during the 2015 Management Conference.

**ANSWER**

To the extent the allegations in Paragraph 115 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

116.    In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit." In addition to education sessions, the summit has included, "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

**ANSWER**

To the extent the allegations in Paragraph 116 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

117.    AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012. In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 117, and therefore denies the same.

118.    In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations. Promotional

materials for the 2014 IPPE indicated that attendees included defendants Clemens Food Group, Hormel Foods, Hillshire Brands, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson. After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

**ANSWER**

To the extent the allegations contained in Paragraph 118 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

119. In the years leading up to the conspiracy period the steady expansion of pork production was virtually a given. As one industry commentator reported in 2007, "Some things you can just take to the bank. Sow herd expansion among the Pork Powerhouses would fall into that category - even in the face of the biggest run-up in feed prices in history." [44]

**ANSWER**

To the extent the allegations in Paragraph 119 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

120. This historical trend changed markedly during the conspiracy period. As demonstrated in Figure 7 below, at several points during the Class Period, the pork integrators changed their behavior and acted in a concerted way to decrease supply. In

---

[44] Freese, Betsy, *Pork Powerhouses 2007: Run-Up In Rations* (Oct. 3, 2007).

2009, 2010, and again in 2013, the pork industry cut production.[45] (The production dip in 2014 reflected the adverse impacts from the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer of 2014.) These production decreases marked a drastic change from the period prior to the conspiracy from 2000 through 2009, in which pork supply was stable and steadily increasing on a yearly basis.



Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000-2017

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 120, and therefore denies the same.

121.   These supply cuts were coordinated, historic and unprecedented. For example, in September 2009, Pork Powerhouses—which publishes reports and articles relating to pork production—published an article entitled "Big Boys Cut Back" and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers. These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.[46]

---

[45] *See* U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); *id.* at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

[46] Freese, Betsy, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009).

**ANSWER**

To the extent the allegations in Paragraph 121 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

122.   At the same time, pork producers were further reducing domestic supply by devoting more and more production exports to overseas markets. The U.S. has been a net exporter of pork products for a long time, but those exports have comprised a much larger share of total production in the past ten years. As shown in Figure 8 below, less than ten percent of U.S. pork production was exported in 2000. By 2011, more than twenty percent was being exported. Sending production overseas is another way in which Defendants were able to reduce the supply available to U.S. markets, thereby driving up prices. Notably, a 2017 analysis found that for every $1 million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt. In other words, selling pork on the global market added $50.20 to the market price of hogs. The significant expansion in exports meant that increases in hog production by Defendants did not result in an increase



Figure 8: U.S. Pork Exports as a Percent of Total Production, 2000-2017

in the supply of pork products in the United States market.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 122, and therefore denies the same.

123.    As part of their acts and conduct in furtherance of the conspiracy, each of the Defendants participated in these supply restraints. While the conspiracy was self-concealing in nature, the limited publicly available sources of information available regarding Defendants' supply decisions evidences these supply constraints. These supply restrictions included, but were not limited to, the conduct described herein.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 123 of the Complaint.

### a.    Smithfield

124.    In 2008 Smithfield stopped making traditional production increases and instead cut its number of sows, reporting that, "We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed." [47] In 2009, Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately. Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows). In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

**ANSWER**

To the extent the allegations contained in Paragraph 124 relate to other Defendants

and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

---

[47] Freese, Betsy *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

125.    Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

**ANSWER**

To the extent the allegations contained in Paragraph 125 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

### b.    Tyson

126.    Between 2008 and 2009 Tyson cut its sows by over 25%, marking a significant reduction. In 2010 Tyson reported a 3.3% decrease in its Pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate. In 2013 Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."

**ANSWER**

To the extent the allegations contained in Paragraph 126 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

### c.    JBS/Cargill

127.    In 2011 JBS USA reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS USA. Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand. This production restriction had the intended effect:

according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."

**ANSWER**

To the extent the allegations contained in Paragraph 127 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

### d.    Hormel

128.    Hormel's production statistics show that it cut its number of sows in 2008 and maintained such reduced production throughout the class period. Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through." [48]Hormel also reported lower sales of pork products in 2013. In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day. Hormel reported strong earnings from its pork exports in 2011.

**ANSWER**

To the extent the allegations contained in Paragraph 128 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

### e.    Seaboard

129.    Throughout the class period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales to foreign markets.

---

[48] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

[49]Seaboard dedicated several employees to international sales and exports. Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect—higher pork prices. Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic market." [50]Moreover, in 2017 Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

**ANSWER**

To the extent the allegations contained in Paragraph 129 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

### f.    Triumph

130.    In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows. In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry. Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide. These exports constituted a significant portion of its production throughout the class period, and reduced or otherwise limited Triumph's production in the United States.

**ANSWER**

To the extent the allegations contained in Paragraph 130 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the

---

[49]*See e.g.* 2010 Seaboard Annual Report ("export volumes increased particularly to our higher valued markets in the Far East while domestic volumes nearly kept pace with 2009."); 2011 Seaboard Annual Report ("Exports of US pork were up 23% to an all-time record as demand from the usual countries remained strong and the US continued its role as the main supplier.").

[50] *See* Seaboard 2013 Annual Report.

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

### g.   Clemens

131.   In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats. Furthermore, in 2014 Defendant Clemens had a competitive advantage over many pork producers, in that it had few PEDv infected pigs. But contrary to what one would expect to see in a competitive market, Clemens did not utilize its advantage and refused to increase its market share when it clearly had substantial market incentives to do so.

**ANSWER**

To the extent the allegations contained in Paragraph 131 relate to other Defendants

and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

### h.   Indiana Packers

132.   Indiana Packers is a private company with limited information available to the public regarding its production statistics. Nevertheless, in 2012 Indiana Packers indicated that it expected to reduce the number of hogs or pounds of pork processed at its facilities ostensibly because of high com prices.

**ANSWER**

To the extent the allegations contained in Paragraph 132 relate to other Defendants

and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

133.    As set forth herein, each of the aforementioned supply reductions during the class period were a departure from the integrator Defendants' market behavior prior to the conspiracy period. These supply restrictions involved a significant share of the Defendants' annual production and are in contravention of Defendants' individual economic self-interest. These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of pork. While Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources. As with their use of Agri Stats, Defendants exploited these public statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy, and couched the public disclosures in pretext so as to conceal what was really occurring. Although purchasers would not typically track and account for these statements, Defendants were, they have been unearth during the course of their investigation and are summarized below.

**ANSWER**

To the extent the allegations contained in Paragraph 133 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

134.    Defendants' conspiracy to restrict pork supply began in the last part of 2008. That same month, Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC, the production arm of Smithfield Foods, said "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed." [51]

**ANSWER**

To the extent the allegations contained in Paragraph 134 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the

---

[51] Freese, Betsy *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 134 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

135.    In October of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009. [52]

**ANSWER**

To the extent the allegations contained in Paragraph 135 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 135 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

136.    During Hormel's first quarter earnings call in January 2009, Mr. Ettinger once again communicated that he expected supply to decrease in 2009. Hormel CFO Jody Feragen confirmed that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."[53]

**ANSWER**

---

[52] Q4 2008 Hormel Foods Corporation Earnings Call Transcript (Oct. 26, 2008).

[53] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

To the extent the allegations contained in Paragraph 136 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 136 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

137.    Throughout 2009, pork industry participants noted the need to follow the supply restrictions imposed in the broiler industry. For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. Pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.

**ANSWER**

To the extent the allegations contained in Paragraph 137 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

138.    In May 2009, Larry Pope, the CEO and President of Smithfield, stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year—February of '08, not February of '09—*we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a*

*reduction of 50,000 sows and 1 million of our 18 million pigs, we*
*started taking out of the system.*[54]

**ANSWER**

To the extent the allegations in Paragraph 138 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

139.   In May 2009, Hormel confirmed that "[w]e see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."[55]

**ANSWER**

To the extent the allegations in Paragraph 139 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

---

[54] Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference — Final (May 13, 2009) (emphasis added).

[55] Q2 2009 Hormel Foods Corporation Earnings Conference Call — Final (May 21, 2009).

140.     In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our — I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . **That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.** We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.[56]

**ANSWER**

To the extent the allegations in Paragraph 140 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

141.     In July 2009, Smithfield's CEO went on to note in Smithfield's annual report in July 2009: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, **liquidation is now a recognized reality by all in the industry.** To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, **combined with the additional cuts by our fellow producers** should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue." (Emphasis added).

**ANSWER**

To the extent the allegations in Paragraph 141 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent

---

[56] Q4 2009 Smithfield Foods Earnings Conference Call — Final (June 16, 2009) (emphasis added).

therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

142.    In August of 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner, confirmed:

> Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability.*** We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.[57]

Mr. Lochner continued, "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4."[58]

**ANSWER**

To the extent the allegations in Paragraph 142 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

143.    Tyson 2009 10K Report further stated that, "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[59]

---

[57] Q3 2009 Tyson Foods, Inc. Earnings Conference Call (June 26, 2009) (emphasis added).

[58] *Id*

[59] *See* Tyson 2009 10K Report, at p. 20.

**ANSWER**

To the extent the allegations in Paragraph 143 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

144.   In August of 2009, Wesley Mendonca Batista, CEO of JBS USA, communicated the start of JBS USA's participation in hog liquidation efforts. Mr. Batista stated, "we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[60]

**ANSWER**

To the extent the allegations in Paragraph 144 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

145.   In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> *We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.* But again, I don't think they can solve it.

---

[60] JBS 2008 Earnings Conference Call (August 13, 2009).

> *I think this industry has got to solve it collectively.* I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. *But the answer is, yes, there are others cutting back. We're not the only one.*[61]

**ANSWER**

To the extent the allegations in Paragraph 145 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

146.   In December of 2009 the CEO of Smithfield confirmed it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance":

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs..! can tell you that I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves. We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.[62]

**ANSWER**

---

[61] Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009) (emphasis added).

[62] Q2 2010 Smithfield Foods Earnings Conference Call — Final (December 10, 2009).

To the extent the allegations in Paragraph 146 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

147.    In a January 2010 article, an industry insider noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 5% in 2009.

**ANSWER**

To the extent the allegations in Paragraph 147 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

148.    In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield, indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.[63]

**ANSWER**

---

[63] Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call — Final (Mar. 11, 2010).

To the extent the allegations in Paragraph 148 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

149.    On March 8, 2010, Wesley Mendonca Batista mentioned Defendant JBS' reduction in hog supply as a driver of profitability, and stated that these efforts were resulting in protein shortages. Mr. Batista stated:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.[64]

Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to limit hog supply.

**ANSWER**

To the extent the allegations contained in Paragraph 149 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 149 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent

---

[64] JBS Q2 2009 Earnings Conference Call (Mar. 8, 2010).

therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

150.    As of March 2010, US pork production was noted to be down 7% so far, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights. Defendants also were reported to have increased exports 8% by March 2010, which was expected to lead to higher hog prices.

**ANSWER**

To the extent the allegations contained in Paragraph 150 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 150 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

151.    The Defendants also acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have.*** And we have been certainly impressed with how our competitors have

been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[65]

As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

**ANSWER**

To the extent the allegations contained in Paragraph 151 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 151 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

152.    Supply level information regarding competitors allowed Defendants to know that supply would not increase in the future, given the lifecycles of the animals. Based on this knowledge, in November of 2010 Hormel CFO, Jody Feragen, stated that she did not think the industry would see large scale expansion given profitability for the pork integrators.[66]

**ANSWER**

To the extent the allegations contained in Paragraph 152 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

---

[65] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call — Final (Dec. 2010) (emphasis added).

[66] Q1 2010 Hormel Foods Corporation Earnings Conference Call — Final (Nov 23, 2010).

form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

153.    In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the provision of competitively sensitive information by a competitor of Tyson.

**ANSWER**

To the extent the allegations contained in Paragraph 153 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 153 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

154.    In the face of ever-increasing margins, when asked whether the type of profits would continue, in March 2011, Larry Pope and Robert (Bo) Manly of Smithfield confirmed to their competitors that it would not increase capacity, even in the face of the clear profitability:

LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . .

HEATHER JONES: So you are just striking a note of caution *because you know it can't stay this way indefinitely,* but it's not that you foresee this reversion to that norm over the near term?

BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have — should have good margins, but I can't believe —

LARRY POPE: Heather, we are sitting here today, we are halfway — closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.

BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.

HEATHER JONES: All right, okay. Thank you.

LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing.... *And by the way, we are not going to build a new plant to expand capacity.*[67]

### ANSWER

To the extent the allegations contained in Paragraph 154 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 154 of the Complaint purport to

---

[67] Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call — Final (Mar. 2011) (emphasis added).

characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

155.    In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had — there were rumors the Chinese buying com, and boom, all of a sudden the com market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. ***There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.***[68]

**ANSWER**

To the extent the allegations contained in Paragraph 155 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 155 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to

---

[68] Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference — Final (Mar. 26, 2012) (emphasis added).

form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

156.    By May 2012, industry observers were noting that the reductions in slaughter capacity meant Defendants may not have enough capacity to slaughter expected hog levels by the fall. In fact, Steve Meyer of Paragon Economics noted that slaughter capacity would not keep up with hog capacity through late 2013 given that Defendants were holding their slaughter levels constant.

**ANSWER**

To the extent the allegations contained in Paragraph 156 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 156 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

157.    In August 2012, Defendant Indiana Packers' president Gary Jacobson commented that the pork company "runs 'on a sold-out position.'" [69] Mr. Jacobson attempted to make excuses for reducing the supply of pork. "'It's been a good strong, steady growth, ' Jacobson said. 'Indiana is in the heart of com country and pigs are the heart of com consumption, so business has been very good. This summer's heat waves and drought are likely to affect pork prices starting this fall and into the spring,' said Jacobson. High com prices make pig farming less profitable, he explained, both reducing the supply of pork for processing plants come next spring and making the pork that is on the market more expensive. In the short run, high temperatures make pigs less hungry and they don't

---

[69] Sarah Einselen, *Food Packing Business Steady So Far,* Pharos-Tribune (Aug. 1, 2012).

fatten for market as quickly as they would in a cooler year. That means farmers either wait longer to bring their swine to market or take them to market as usual but at a lighter weight. 'So, the impact has not been really significant as far as production as a whole,' Jacobson said, but it remains to be seen how the drought will change the plant's supply in the coming months." [70]

**ANSWER**

To the extent the allegations in Paragraph 157 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

158. In December 2013 Robert Manly of Smithfield emphasized that coordinated industry action was necessary to "balance supply and demand:"

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group. We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.[71]

**ANSWER**

To the extent the allegations contained in Paragraph 158 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

---

[71] Q2 2014 Smithfield Foods Earnings Conference Call (December 23, 2013).

denies the same. To the extent the allegations in Paragraph 158 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

159.    On May 15, 2013, Wesley Mendonca Batista continued to demonstrate Defendant JBS' ability to constrain the pork market. During a quarterly earnings call he stated that "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business. ... So this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent in beef."

**ANSWER**

To the extent the allegations contained in Paragraph 159 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 159 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

160.    Defendants further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise. For example, during

the 2014 PEDv epidemic, which caused industry supply disruptions, Eric Haman, Defendant Clemens Food Group's communication manager, stated the disease "'had a very minimal impact on our hog flow, especially when you compare it to others in the industry' Haman said. 'That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this.'"[72] Yet, in furtherance of their conspiracy Defendant Clemens did not take advantage of having few PEDv infected pigs. Instead of attempting to increase their market share, they stayed the course with their fellow competitors.

**ANSWER**

To the extent the allegations contained in Paragraph 160 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 160 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

161.    Defendants' conspiracy was yielding substantial profits by 2014. In October 2014, Pork Powerhouses reported that "Hogs made history this summer. Pork producer profits were, quite simply, enormous — averaging $82 profit for each hog marketed in the third quarter." The report also noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast. The PED virus trimmed supply, but higher market weights helped compensate.'"

**ANSWER**

---

[72] Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds,* Bucks County Courier Times (May 4, 2014).

To the extent the allegations contained in Paragraph 161 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 161 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

162.    In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production. Specifically, pork producers rushed to sign contracts with Defendants that would protect them if production exceeded slaughter capacity as some feared.

**ANSWER**

To the extent the allegations contained in Paragraph 162 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

163.    In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50joint venture Seaboard Triumph Foods, LLC, to include a second shift.[73] In announcing the potential

---

[73] Tia Heidenbrecht, *New Pork Processing Plant Adds Second Shift In Sioux City* (Feb. 17, 2017) (available at hap ://www.ktiv. com/story/34534148/2017/02/
Friday/seaboard-triumph-foods-announces-plans-to-expand-pork-processing-plant-in-sioux-city).

second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry."[74] However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.[75]

**ANSWER**

To the extent the allegations contained in Paragraph 163 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 163 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

164.   Beginning in 2009, the pork industry showed abnormal price movements, *i.e.,* increases in prices for the average hog whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the pork integrators' margin during the class period; and (iv) the defendants' revenues before and during the class period. Each of these measures supports Plaintiffs' allegations that Defendants conspired to restrict production and otherwise acted in a concerted manner to increase pork prices in the U.S.

---

[74] *Id*

[75] Jeff DeYoung, *Pork Packing Capacity Faces Delay to Growth,* Iowa Farmer Today (June 2, 2018) (available at https://www.agupdate.com/iowafarmertoday/news/

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 164 of the Complaint.

165.    According to aggregate prices published by the USDA, prices for pork products were less than $ 1.40/lb from 2000 to 2009, the hog market year average price was at times substantially less. Thereafter, prices increased dramatically, rising to more than $ 1.80/lb in 2014, and never dropping or below $ 1.40/lb again. Figure 9 below shows the unprecedented increase in swine prices beginning in 2009, which stayed elevated through



Figure 9: Average Hog Wholesale Prices in Cents per lb., 2000-2018

2018.

**ANSWER**

To the extent the allegations in Paragraph 165 purport to characterize or describe

documents or other sources, Agri Stats states that such documents speak for themselves

and denies any characterization or description that is inconsistent therewith or taken out of

context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

166.    As Figure 10 below shows, publicly available data also demonstrates that pork integrators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits that was resistant to changes in price during the conspiracy period. These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply short of demand.



Figure 10: Integrator Earnings per Retail Weight, 2000-2017

**ANSWER**

To the extent the allegations in Paragraph 166 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of

context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

167.    During the Class Period various pork products saw substantial increases in prices, compared with before the Class Period. As shown in Figure 11 below, using one particular price for pork, the lean hog composite price, Plaintiffs have performed a pricing analysis which shows that the average price index increased significantly during the class period:



Figure 11: Lean Hog Composite Price 2000-2019

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 167 of the Complaint.

168.    For two of the largest defendants, Tyson and Smithfield, Plaintiffs' experts examined the spread between pork revenue and pork-related costs (costs of goods sold + operating costs), as a proxy for measuring the spread between a defendant's price of wholesale pork and its hog costs. This measurement accounts for Defendant-specific

operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the class period in 2009.

**ANSWER**

To the extent the allegations contained in Paragraph 168 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

169.   Figure 12 shows a break in revenues and costs around the start of the Class Period in 2009 for Tyson:



Figure 12: Tyson's Revenues vs Costs, April 2002 to April 2018

**ANSWER**

  To the extent the allegations contained in Paragraph 169 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

  170. The same analysis for Smithfield shows a similar break in revenues and costs beginning at the start of the class period:



Figure 13: Smithfield's Revenues vs Costs, January 2004 to June 2016

**ANSWER**

91

To the extent the allegations contained in Paragraph 170 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

171.    These analyses of the spread between costs and prices relate solely to each defendant's pork segment, and thus confirm that rising costs in pork production do not explain the increases in price seen during the Class Period.

**ANSWER**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in the first sentence of Paragraph 171 of the Complaint, and therefore denies the same.

172.    Pork is a commodity product in which the pork sold by competitors has no meaningful difference and is thus interchangeable. As such price is driven by the economic fundamentals of supply and demand. In the words of Tyson Foods, Inc. COO, James Lochner, "As you know decreased supply should be favorable to pricing."[76]

**ANSWER**

The first and second sentences of Paragraph 172 contain legal assertions to which no response is required. To the extent a response is required, Agri Stats denies the allegations.  To the extent the allegations in Paragraph 172 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to

---

[76] Q1 2010 Tyson Foods, Inc. Earnings Conference Call (February 12, 2010).

form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

173.     By reducing, stabilizing and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2012 the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."

**ANSWER**

Agri Stats denies the allegations in the first sentence of Paragraph 173. To the extent the allegations in Paragraph 173 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same. To the extent the allegations contained in Paragraph 173 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

174.     The volume of U.S. commerce in the pork industry is enormous. Total pork sales in the United States for a portion of the Class Period were:

- 2016-$18.9      billion
- 2015 - $21.0     billion
- 2014 - $26.4     billion
- 2013-$23.4       billion

**ANSWER**

To the extent the allegations in Paragraph 174 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

175.   Each Defendant's annual sales of pork products are also very large. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to class members.

**ANSWER**

To the extent the allegations contained in Paragraph 175 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

176.   The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI"). From the end of 2009 to the end of 2017, the CPI for all food products rose approximately 15.4 percent. Over the same period, prices for pork have increased substantially more for consumers over the Class Period. For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017, an increase of 56.9 percent:



Figure 14: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995-2017

**ANSWER**

To the extent the allegations in Paragraph 176 purport to describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

177. Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase over the Class Period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017 (approximately 29.3 percent):



Figure 15: CPI-Average Price Data for Other Pork, per pound, from 1998-2017

**ANSWER**

To the extent the allegations in Paragraph 177  purport to describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

178.    And the CPI for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017 (or 35.4 percent):



Figure 16: CPI-Average Price Data for Ham, per pound, from 1998-2017

**ANSWER**

To the extent the allegations in Paragraph 178  purport to describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

179.    In other words, the increases in the prices of pork far out-paced the growth in prices for other food products during the class period. These price increases were not the result of retailers' desire to move prices upward. Instead, they were the result of increased wholesale prices. In addition to CPIs, the Bureau of Labor Statistics also maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products. As shown in Figure 17 below, the processed pork wholesale prices appear to be the motivator of the higher retail prices, with prices climbing significantly beginning during the conspiracy:



Figure 17: PPI for Pork, Processed or Cured, Not Canned or Made Into Sausage, from 1995-2017

**ANSWER**

To the extent the allegations in Paragraph 179  purport to describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

180.    Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to artificially increase and stabilize the price and supply of pork was borne in large part by Plaintiffs and the Plaintiff Class.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 180 of the Complaint.

181.    Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for pork. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and class members.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 181 of the Complaint.

182.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 182 of the Complaint.

183.    In 2009, the President of Agri Stats, Brian Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background,*** and really our specialty is working directly with companies about their opportunities and so forth.[77]

**ANSWER**

---

[77] Sanderson Farms Investor Day — Final (Oct. 2009) (emphasis added).

To the extent the allegations in Paragraph 183 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  denies the remaining allegations in Paragraph 183 of the Complaint.

184.   At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."[78] And yet, despite refusing to show this information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.

**ANSWER**

To the extent the allegations in Paragraph 184 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 184 of the Complaint.

185.   Larry Pope, the CEO of Smithfield, made similar references to secret information in December 2010, explaining that he was confident pork supplies would not be increasing in the market, based on the information we think we have public ***plus what we think we know privately,*** how many they kill, what their processing levels are and things like [that]. ***This is information you may not quite have.***[79]

**ANSWER**

To the extent the allegations in Paragraph 185 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of

---

[78] *Id.*

[79] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call — Final (Dec. 2010) (emphasis added).

context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same. To the extent the allegations contained in Paragraph 185 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

186.    At other times, Defendants attributed the stability in the pork market to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, stated in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[80]

**ANSWER**

To the extent the allegations in Paragraph 186 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same. To the extent the allegations contained in Paragraph 186 relate to other Defendants and/or third parties to this

---

[80] Event Brief of Q4 2012 Smithfield Foods Earnings Conference Call — Final (June 14, 2012).

action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

187. Not until recently was the fact of the pork industry's use of Agri Stats widely known or reported. An investigative article published in February 2017 by Bloomberg Businessweek suggested the conspiracy that began among Broiler producers and Agri Stats was being replicated in the pork industry. [81]The article reported that Agri Stats

> has . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods. It appears that demand for the service is strong. At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services. His slideshow indicated that 27 companies had already signed up. [82]

While Bloomberg Businessweek article did not conclude that pork producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated article that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.

**ANSWER**

To the extent the allegations in Paragraph 187 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

188.   Only after the filing of a February 7, 2018, Second Consolidated and Amended Complaint by the End User Plaintiff Class in the ***In Re Broiler Chicken Antitrust Litigation,*** Case No. l:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats' provides to its clients in the Broiler industry.

---

[81] *See* Christopher Leonard, *Is the Chicken Industry Rigged?,* Bloomberg Businessweek (Feb. 15, 2017) (available at https://www.bloomberg.com/news/features/ 2017-02-15/ is-the-chicken-industry-rigged).

[82] *Id*

**ANSWER**

To the extent the allegations in Paragraph 188 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph 188 of the Complaint.

189.    The filing of this amended complaint, along with the February 2017 article by Bloomberg Businessweek disclosing the pork industry's use of Agri Stats, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 189 of the Complaint.

190.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Pork is not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' pork prices before these recent events.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 190 of the Complaint.

191.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 191 of the Complaint.

## V.    CLASS ACTION ALLEGATIONS

192.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

All persons who purchased pork directly from any of the Defendants or any co-conspirator identified in this action, or their respective subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2009 until the Present. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**ANSWER**

Paragraph 192 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

193.   **Class Identity:** The Plaintiff Class is readily identifiable and is one for which records should exist in the files of Defendants and their co-conspirators.

**ANSWER**

Paragraph 193 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

194.   **Numerosity:** Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of Defendants. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

**ANSWER**

Paragraph 194 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

195.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because Plaintiffs purchased pork directly from one or more of the Defendants, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

**ANSWER**

Paragraph 195 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

196.     **Common Questions Predominate:** There are questions of law and fact common to the Class, including, but not limited to:

        A.     Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of pork sold in interstate commerce in the United States;

        B.     The identity of the participants of the alleged conspiracy;

        C.     The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

        D.     Whether the alleged conspiracy violated the antitrust laws;

        E.     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the class;

        F.     The effect of Defendants' alleged conspiracy on the prices of pork sold in the United States during the Class Period;

        G.     Whether Plaintiffs and other members of the class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

        H.     The appropriate class-wide measure of damages.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

**ANSWER**

Paragraph 196 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

197.     **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased pork and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**ANSWER**

Paragraph 197 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

198.     **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**ANSWER**

Paragraph 198 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

199.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER**

Paragraph 199 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

200.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**ANSWER**

Paragraph 200 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

## VI.   ANTITRUST INJURY

201.    Defendants' anticompetitive conduct had the following effects, among others:

    A.    Price competition has been restrained or eliminated with respect to pork;

    B.    The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    C.    Direct purchasers of pork have been deprived of free and open competition; and

    D.    Direct purchasers of pork paid artificially inflated prices.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 201 of the Complaint.

202.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork. As a direct and foreseeable result, Plaintiffs and the Class paid supra-competitive prices for pork during the Class Period.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 202 of the Complaint.

203.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for pork than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 203 of the Complaint.

204.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 204 of the Complaint.

## VII.   VIOLATION OF SECTION 1 OF THE SHERMAN ACT

205.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**ANSWER**

Paragraph 205 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

206.   Defendants and all of their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 206 of the Complaint.

207.   Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 207 of the Complaint.

208.   At least as early as January 1, 2009, and continuing until present, the exact dates being unknown to Plaintiffs, Defendants and all of their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 208 of the Complaint.

209.   Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for pork throughout the United States.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 209 of the Complaint.

210.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 210 of the Complaint.

211.    As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for pork.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 211 of the Complaint.

212.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 212 of the Complaint.

      A.    Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

      B.    Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and Plaintiffs and members of the Class who directly purchased pork from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-co-conspirators, have been deprived of the benefits of free and open competition in the purchase of pork.

213.    Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 213 of the Complaint.

214.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for pork than they would have paid and will pay in the absence of the conspiracy.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 214 of the Complaint.

215.    The alleged contract, combination, or conspiracy is a ***per se*** violation of the federal antitrust laws.

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 215 of the Complaint.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

216.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that at a practicable time notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 216 of the Complaint.

217.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

**ANSWER**

Agri Stats denies the allegations contained in Paragraph 217 of the Complaint.

218.    Plaintiffs and the Class recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

**ANSWER**

This Paragraph of the Complaint does not contain any factual allegations to which a

response is required.  To the extent a response is required, Agri Stats incorporates by reference

its responses to each preceding Paragraph as if fully set forth herein.

219.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**ANSWER**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

220.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

**ANSWER**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

221.    Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**ANSWER**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

222.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**ANSWER**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

223.    Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

 **ANSWER**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

## IX.    JURY TRIAL DEMANDED

224.    Plaintiffs demand a trial by jury, pursuant to Rule 3 803) of the Federal Rules of Civil Procedure, of all issues so triable.

**ANSWER TO JURY DEMAND PARAGRAPH:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

**AFFIRMATIVE DEFENSES**

Without assuming any burden that it would not otherwise bear, Agri Stats asserts the following avoidances and defenses to Plaintiffs' claims.  Federal Rule of Civil Procedure 8 sets forth the avoidances and defenses that must be affirmatively stated in a pleading.  *See* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: [identified affirmative defenses].").  To the extent necessary, Agri Stats alleges Plaintiffs' claims are barred because the acts Plaintiffs allege Agri Stats undertook in furtherance of the alleged conspiracy were in Agri Stats' unilateral business interest.  Agri Stats reserves the right to assert additional avoidances and defenses as they

become known during discovery and based on the record as it develops, up to and including the time of trial.

**FIRST DEFENSE**

1.      Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

2.      The statute of limitations for Plaintiffs' federal claims is four years. 15 U.S.C. § 15(b).  Thus, Plaintiffs' claims are barred unless Plaintiffs establish that they could not have discovered such claims within the limitations period exercising reasonable diligence.

3.      Plaintiffs cannot satisfy this burden: the challenged conduct occurred between seven and ten years ago.

4.      Moreover, the facts Plaintiffs cite in support of their claims were made public more than four years ago.

5.      Plaintiffs' reliance on the doctrine of fraudulent concealment recycles the Complaint's underlying allegations and asserts fraudulent concealment in a conclusory fashion. Plaintiffs cannot establish any concealment of their claims, much less fraudulent concealment of their claims.

6.      Accordingly, Plaintiffs' Complaint is time-barred.

**SECOND DEFENSE**

7.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have suffered neither any injury in fact nor any injury cognizable under the antitrust laws.

8.      Plaintiffs' alleged harm lies in their speculation that a conspiracy among many companies colluded seamlessly over almost a decade resulting in their harm.  In essence,

Plaintiffs complain about the impact of naturally unpredictable changes in the market conditions that exist in a global economy.

9.      To the extent that Plaintiffs maintain that they were injured by these events, such an injury is not cognizable under the antitrust laws.

**THIRD DEFENSE**

10.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered.

11.     The facts Plaintiffs cite in support of their claims were made public years ago. Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

12.     To the extent Plaintiffs believed that Defendants agreed to cut chicken production and that such agreement had the effect of raising prices above competitive levels, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other producers.

13.     Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.

**FOURTH DEFENSE**

14.     Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages either were not legally or proximately caused by any acts or omissions of Defendants or were caused, if at all, solely and proximately by Plaintiffs' conduct or by the conduct of third parties including, without limitation, the prior, intervening or superseding conduct of Plaintiffs or such third parties.

**FIFTH DEFENSE**

15.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

16.    The facts Plaintiffs cites in support of their claims were made public more than four years ago.  Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

17.    Plaintiffs' continued purchases of pork at what they now allege are prices above the competitive level manifest an intention to waive any right to bring this suit and are inconsistent with any other intention.

18.    Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with defendant producers and relinquished their rights to bring suit.

## SIXTH DEFENSE

19.    Plaintiffs' claims are barred by the equitable doctrine of laches.

20.    Agri Stats hereby incorporates Paragraph 4 above in support of this defense. Plaintiffs demonstrated an unreasonable lack of diligence in bringing its claims.  As set forth in support of Agri Stats statute of limitations defense, the challenged conduct that underlies Plaintiffs' claims occurred between seven and ten years ago.  Likewise, the specific facts Plaintiffs cites in support of its claims were publicly available long ago.  This unreasonable lack of diligence in raising its claims now bars them.

## SEVENTH DEFENSE

21.    Plaintiffs' claims are barred, in whole or in part, due to the ratification of, and consent to, the conduct of Agri Stats.

22.    Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

23.     Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating its long-standing ratification of and consent to the complained-of conduct.

24.     For example, Plaintiffs have known for more than a decade that certain Pork producers participate in and receive reports from Agri Stats.  Some Plaintiffs have also received and continue to receive information from Express Markets, Inc., which includes, among other things, market analysis and long-term production and pricing forecasts.

25.     Accordingly, because Plaintiffs has been aware for years of the very same conduct it now challenges—much of which has provided Plaintiffs a direct benefit—Plaintiffs' claims are barred by the doctrine of ratification.

## EIGHTH DEFENSE

26.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seeks to impose liability on Defendants based on the exercise of any person or entity's right to petition federal, state and local governmental bodies, including through public statements, because such conduct was immune under the *Noerr-Pennington* doctrine and privileged under the First Amendment to the U.S. Constitution.

## NINTH DEFENSE

27.     Plaintiffs' claims are barred, in whole or in part, to the extent the sales contracts pursuant to which Plaintiffs purchased Pork contain arbitration clauses or clauses providing a different forum for the resolution of their claims.

## TENTH DEFENSE

116

28.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, by non-settling Defendants' right to set off any amounts paid to Plaintiffs by any Defendants who have settled, or do settle, Plaintiffs' claims against them in this action.

**ELEVENTH DEFENSE**

29.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

**TWELFTH DEFENSE**

30.     Plaintiffs' claims are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution and of the Eighth Amendment of the United States Constitution.

**THIRTEENTH DEFENSE**

31.     Plaintiffs' claims are barred, in whole or in part, by the Plaintiffs' active and knowing acquiescence, equal involvement and participation in the creation and origination of the restraints of trade alleged in the Complaint.

**FOURTEENTH DEFENSE**

32.     Upon information and belief, Plaintiffs' claims are barred, in whole or in part, by Agri Stats' right to set off any amount paid to Plaintiffs by damages attributable to Plaintiffs'

conduct to the extent Plaintiffs unlawfully coordinated regarding the purchase price of Pork, including by communicating and sharing competitively sensitive information.

**FIFTEENTH DEFENSE**

33.    Agri Stats adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Agri Stats.

**SIXTEENTH DEFENSE**

34.    Defendant reserves the right to assert other defenses as this action proceeds up to and including the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Agri Stats respectfully requests that judgment be entered in favor of the Agri Stats and the other Defendants and against Plaintiffs, dismissing the Complaint in its entirety with prejudice.  Defendant Agri Stats further request that this Court award the Agri Stats (i) their costs and disbursements, and (ii) such other and further relief as the Court deems proper.


Dated: December 16, 2020                    Respectfully submitted,

                                            */s/ Peter H. Walsh*
                                            Peter H Walsh (MN# 0388672)
                                            Hogan Lovells US LLP
                                            80 South 8th Street Ste 1225
                                            Minneapolis, MN 55402
                                            Tel: 612-402-3017
                                            Fax: (612) 339-5167
                                            Email:
                                            peter.walsh@hoganlovells.com

                                            William L. Monts III (Pro Hac Vice)
                                            Justin W. Bernick (Pro Hac Vice)
                                            HOGAN LOVELLS US LLP

555 Thirteenth Street, N.W.
Washington, D.C.  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

*Attorneys for Defendant Agri Stats, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

Peter H Walsh, an attorney, hereby certifies that on December 16, 2020 he caused a true and correct copy of the foregoing **Agri Stats, Inc.'s Answer and Defenses to Plaintiffs' Complaint** to be filed electronically with the Court's CM/ECF system, and that notice of this filing was sent by electronic mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to receive electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Peter H Walsh*