## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-cv-1776 (JRT/HB) |
| | The Honorable John R. Tunheim<br>Magistrate Judge Hildy Bowbeer |
| This Document Relates to:<br>All Consumer Indirect Purchaser Actions | |

## AGRI STATS, INC'S ANSWER AND DEFENSES TO
## CONSUMER INDIRECT PURCHASER PLAINTIFFS' SECOND AMENDED
## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Defendant Agri Stats, Inc., by its attorneys, Hogan Lovells US LLP, as and for their

Answer and Affirmative Defenses to Consumer Indirect Purchaser Plaintiffs' Second

Amended and Consolidated Class Action Complaint (the "Complaint"), state as follows:

## I.  NATURE OF ACTION[1]

1.  Few things have impacted the life of the average American as dramatically as the arrival of the internet. While the internet has brought enormous benefits – increased ease of access to information – this benefit comes with a darker side. Just as consumers are able to access information with more ease, so are companies able to collect and transfer enormous amounts of data. The true cost of the availability of this large amount of data is still hidden to most. But here, it became a central part of the defendants' collusion stabilizing the price and supply of pork being sold to consumers on a daily basis. Access to and exchange of competitively sensitive data gave the defendants pork processors – the ability to restrict and stabilize the supply and price of pork in a way that was unimaginable twenty years ago.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 1 of the Complaint.

2.  Key to this conspiracy was Agri Stats. Agri Stats is a small company, headquartered in Fort Wayne, Indiana. To the outside world, the role of Agri Stats is almost invisible. Paradoxically, Agri Stats has an almost minimal internet presence. Its current home page transmits little more than a bucolic rural scene:

---

[1] The headings in this Answer are the headings in the Complaint. To the extent the headings contain substantive allegations. Agri Stats denies them.



**ANSWER:**

Agri Stats admits that it is an Indiana corporation headquartered in Fort Wayne,

Indiana. Agri Stats denies the remaining allegations contained in Paragraph 2 of the

Complaint.

3.      No uninitiated visitor to this website would realize the profound and anticompetitive
impact Agri Stats has had on the supply and pricing of meat in this country.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 3 of the Complaint.

4.      Agri Stats' refusal to advertise is intentional because Agri Stats' services are not for
the public. Agri Stats refuses to sell its information and reports to just any customers.
Instead it focuses on its core business – collecting vast amounts of information from protein
companies, standardizing that data, and returning it to them in detailed weekly and monthly
reports. For the pork processors, Agri Stats provides current and forward-looking sensitive
information (such as profits, costs, sale prices and slaughter information), as well as, the
key to deciphering which data belongs to which producers.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 4 of the Complaint.

5.      The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. In a competitive market – each competitor would act independently, making supply decisions unilaterally and pricings its goods to market. Instead, Agri Stats' provision of detailed and sensitive information acted as the proverbial smoke-filled room of the cartels of yesteryear. Rather than meeting in a room with pen and paper, Agri Stats collected the pork processors' competitively-sensitive supply and pricing data and intentionally shared that information through detailed reports to market participants.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 5 of the Complaint.

6.      Starting in at least 2009 and continuing to the present, defendants coordinated to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their price-fixing agreement, defendants relied on Agri Stats as a means to obtain and monitor critical and competitively-sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of defendants' price-fixing scheme, resulting in a remarkably stable and successful anticompetitive cartel.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 6 of the Complaint.

7.      The data exchanged through Agri Stats bears all the hallmarks of the enforcement mechanism of a price-fixing scheme. First, the data is current and forward- looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[2] Second, information contained in Agri Stats reports is specific to the pork producers, including information on profits, prices, costs, and production levels. "Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity."[3] Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the co-conspirators to pay millions of dollars over the class period – far in excess of any other pricing and production indices. Indeed, Agri Stats only allowed co-conspirators to receive data if they themselves shared data. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[4]

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).
[3] *Id.* at 212.
[4] *Id.* at 213.

Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their pork business and that it uses that data in the reports it produces. Agri Stats also admits that it is a subscription service. Paragraph 7 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations  Agri Stats denies the remaining allegations contained in Paragraph 7 of the Complaint.

8. The pork processors admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen.

**ANSWER:**

To the extent the allegations contained in Paragraph 8 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

9. An economic analysis of the prices of pork during the class period show an abnormal shift, supporting the inference of collusion. Beginning in 2009, pork wholesale prices increased and remained at a higher level compared to the years prior to 2009. Another measurement of price, the pork cut-out composite price increased 18 percent during the class period (and at one point in 2014 had increased 56 percent from the start of the class period). In addition to price, the pork processors' margin also increased – that is the amount of money retained by the pork producer defendants (versus what was paid to farmers). And when tested, there was a statistically significant increase in the average hog-composite spread before the class period, when compared to during the class period. Moreover, when tested against two of the largest defendants, Tyson and Smithfield, plaintiffs analyzed their revenue and costs, which also show a dramatic increase in defendants' revenues during the

class period. These dramatic shifts in prices and revenues further support the inference of a conspiracy during the class period.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations in Paragraph 9, and therefore denies the same.

10.    Numerous "plus factors" exist in the pork industry during the class period, including but not limited to multiple industry characteristics which facilitate collusion, such as a high level of vertical integration, high pork industry consolidation and concentration, barriers to entry preventing competitors from coming into the market, inelastic demand for pork, and homogeneity of pork as a product.[5] These plus factors add plausibility to plaintiffs' allegations of a price-fixing scheme.

**ANSWER:**

Paragraph 10 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations  Agri Stats

denies the remaining allegations contained in Paragraph 10 of the Complaint.

11.    Moreover, the information exchange between processor defendants through Agri Stats was itself anticompetitive under a rule of reason analysis. The information exchanged was highly granular data on defendants' pricing, costs, and supply. The information exchange had anticompetitive effects. For example, in both sales reports and meetings with defendants, Agri Stats specifically identified "opportunities" for defendants to raise prices on specific products that were priced lower than that of their competitors. The information was current. Starting no later than early 2009, Agri Stats began distributing weekly sales reports to defendants that contained pricing information that was less than a month old. And all of this information was intentionally shielded from both the public and other industry participants, such as food retailers. This information exchange was particularly likely to have anticompetitive effects because the pork market is characterized by few sellers, a fungible product, a tendency towards uniform pricing, and inelastic demand.

**ANSWER:**

Paragraph 11 of the Complaint contains legal assertions as to which no response is

---

[5] Pork is homogenous within cut type – i.e., a pork belly from Tyson and Smithfield are virtually indistinguishable.

required. To the extent a response is required, Agri Stats denies the allegations  Agri Stats

denies the remaining allegations contained in Paragraph 11 of the Complaint.

12.     Defendants' restriction of pork supply and information exchange through Agri Stats
had the intended purpose and effect of increasing pork prices to plaintiffs and class
members. Beginning in 2009, the earnings of the processors began to increase, as they took
an increasing amount of the profits available in the pork industry. As a result of defendants'
unlawful conduct, plaintiffs and the classes paid artificially inflated prices for pork during
the class period. Such prices exceeded the amount they would have paid if the price for
pork had been determined by a competitive market. Thus, plaintiffs and class members
were injured by defendants' conduct.

**ANSWER:**

        Agri Stats denies the allegations contained in Paragraph 12 of the Complaint.

13.     Plaintiffs bring this complaint, alleging violations under both a *per se* or, in the
alternative, rule of reason standard under the federal and state antitrust and consumer
protection laws.

**ANSWER:**

        Paragraph 13 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

## II.     SUMMARY OF PARTIES

14.     Plaintiffs are consumers who have purchased pork as the end-consumers in the food
distribution chain.[6] *See* section VI.A, *infra* (detailed allegations regarding each plaintiff).
Plaintiffs bring this action on behalf of themselves individually and on behalf of various
state classes consisting of all persons and entities who purchased pork indirectly from a
defendant or co-conspirator for personal use in the United States from at least January 1,
2009 until the present (Class Period). *See* section VII, *infra*.

**ANSWER:**

        Paragraph 14 of the Complaint contains legal assertions as to which no response is

---

[6] For purposes of this complaint, pork includes pig meat purchased fresh or frozen, smoked ham,
sausage and bacon.

required. To the extent a response is required, Agri Stats denies the allegations.

15. The defendant pork processors are each of the major meat companies who, collectively, control over 80 percent of the pig slaughtering facilities in the United States. The pork processor defendants are Clemens Food Group, LLC, the Clemens Family Corporation, Hatfield Quality Meats (collectively, Clemens), Hormel Foods Corporation (Hormel), Indiana Packers Corporation (Indiana Packers), JBS USA Food Company (JBS USA), Seaboard Foods LLC (Seaboard), Smithfield Foods, Inc. (Smithfield), Triumph Foods, LLC (Triumph), and Tyson Foods, Inc., Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson). *See* section VI.B, *infra.*

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations in Paragraph 15, and therefore denies the same.

16. Defendant Agri Stats is the center of this conspiracy. Through Agri Stats, defendants were able to have access to standardized data (cost, price and supply information) from their erstwhile competitors which they used to extract the maximum amount of profits from the American consumer. *See* section VIII, *infra.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 16 of the Complaint.

### III.   FACTUAL ALLEGATIONS

17. The depth and breadth of Agri Stats reports make them difficult to describe through words alone. Prior to this litigation, Agri Stats reports were not publicly available. During the course of discovery in this case, plaintiffs obtained a small number of Agri Stats reports relating to the Pork industry from a production of documents made by Agri Stats to the DOJ nearly a decade ago. Plaintiffs attach the following examples of reports as exhibits:

- Exhibit A: An Agri Stats March 2009 weekly sales report;

- Exhibit B: An Agri Stats April 2008 Economic Impact Sales Report;

- Exhibit C: An Agri Stats August 2009 report for Tyson's Storm Lake facility;

- Exhibit D: An Agri Stats September 2009 report entitled "Bacon Demo,";

- Exhibit E: A June 2010 Agri Stats presentation to Hormel soliciting Hormel's participation in additional Agri Stats reporting services;

- Exhibit F: An Agri Stats May 2008 presentation entitled, "Hatfield Quality Meats Pork Kill & Cut Phone Review;" and

- Exhibit G: An Agri Stats February 2010 "Demo" Swine Processing report.

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

18. All programs at Agri Stats are done on a monthly basis, with the exception of sales which are done <u>weekly and monthly</u>. Plaintiffs describe below the content and import of each of these reports, as well as the process by which Agri Stats collects and disseminates the data.

**ANSWER:**

Agri Stats admits that it offers procompetitive benchmarking services to pork integrators. Agri Stats admits that it receives data from its subscribers regarding their pork business and that it uses that data in the reports it produces. Agri Stats denies the remaining allegations contained in Paragraph 18 of the Complaint.

19. Perhaps Agri Stats' most egregious service is its sales reports. These reports, on a weekly and monthly basis, contain not only current pricing information (to within a few weeks), but also calculate for competitors <u>exactly</u> how far they could raise prices to match their competitors on a per item basis. In others words, not only does Agri Stats provide Defendants with their competitors' pricing, they take it a step further – ensuring that consumers feel the brunt of Agri Stats' data collection operations, by performing the mathematic calculations that identify for its co-conspirators the price- raising opportunities that they can cash in on at the expense of the consumers.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 19 of the Complaint.

20. In early 2009, at the beginning of the conspiracy period, Agri Stats introduced new sales report formats containing weekly and monthly data. The new sales reports were designed to specifically allow a defendant to compare its prices with that of its competitors.

Brian Snyder, an Agri Stats employee, explained in an e-mail to Seaboard employees on March 5, 2009 that:

> Agri Stats is rolling out a new weekly and monthly sales report. I have attached week 8 for your review in the new format. **This report is a dramatic improvement to the legacy platform in evaluating sales**. It compares a company's price and sales mix versus the national price with the company mix. I would like to set up a 30 minute web review of the new weekly report to answer any questions. The new platform also allows us more audit tools regarding the data. All price variances 30% from the average will be kicked out to an exception report and investigated. This was a manual audit in the legacy system. With this new procedure automated, it should streamline and improve the audit of the sales number and identify the outliers. It will automatically generate the exceptions and let us investigate to make sure that we have all items coded correctly, and to have an understanding of items that deviate by more than 30%. (emphasis added).

The weekly sales report that Brian Snyder included is attached as **Exhibit A.** The weekly report included sales data that was only weeks old – the e-mail sent on March 5, 2009, covers data for the week ending on February 21, 2009. Furthermore, the report contained detailed data comparing the prices of defendants' products with their competitors. The report would identify a specific type of product, such as a type of cut of pork sparerib, and then compare the company's prices with the national average price and the national top 25% price.

**ANSWER:**

To the extent the allegations in Paragraph 20 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

21.    An excerpt of this weekly sales report follows:



**ANSWER:**

To the extent the allegations in Paragraph 21 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

22.   The sales reports allowed defendants to compare their prices for individual products against the national average net price, and the national top 25 percent average price. For each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed co-conspirators to see how much more they could charge if they charged either the national average or the average of the Top 25%. Notably, Agri Stats identified opportunities for Defendants to raise prices; Agri Stats did not make any attempt to identify products for which Defendants should cut prices in an attempt to gain additional sales.

**ANSWER:**

Agri Stats admits that it offers procompetitive benchmarking services to pork integrator companies.  To the extent the allegations in Paragraph 22 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in this Paragraph.

23.   Agri Stats clearly identified for defendants which companies and plants were providing information for the various reports. For example, Agri Stats' "Swine Sales Analysis – General Run" report is a monthly report which first indicates to competitors whose information is contained in the report. In one example, **Exhibit B**, a "demo" report for April 2008, Agri Stats listed the following as the "Economic Impact Section Participants":



**ANSWER:**

To the extent the allegations in Paragraph 23 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

24. Although this report lists eleven facilities – there are only nine competitors actually contained in this report. Both Smithfield and Cargill have two plants listed, meaning that only nine companies contribute information. (And of course, Smithfield and Cargill would be able to immediately know where each of their plants fell within this report.)

**ANSWER:**

To the extent the allegations in Paragraph 24 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

25. Because there are only nine companies listed in this report, providing the number for the Top 25% of sales, gives competitors the pricing of approximately the top two

competitors. This level of disaggregated information has no pro-competitive purpose, other than to allow the pork processors to extract the maximum amount of profits from their customers.

**ANSWER:**

Agri Stats admits that it offers procompetitive benchmarking services to pork integrators.  To the extent the allegations in Paragraph 25 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

26.    As a specific example, **Exhibit B**, the April 2008 Economic Impact Sales Report, Agri Stats specifically identified that the company's price of $58.29 for bone-in hams was below the national net price of $62.50 and the national top 25% net price of $73.40. Agri Stats further explained for the company's financial benefit that the company had a negative economic impact of $17,838 as compared to the Top 25% price because its prices were lower than its competitors. An excerpt of this Agri Stats sales report (containing 253 pages) is as follows:

**ANSWER:**

To the extent the allegations in Paragraph 26 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

27.     The above report was published in April 2008 (although circulated in June 2010 as a demo report), and contained information through April 26, 2008 – making the information in the report current at the time it was published.[7] The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators by encouraging them to collectively raise prices.

**ANSWER:**

Agri Stats admits that it offers procompetitive benchmarking services to pork integrators. To the extent the allegations in Paragraph 27 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

28.     A second example of an Agri Stats sales report containing sales data that is only weeks old is an August 2009 report for Tyson's Storm Lake facility that shows a similar pattern. **Exhibit C**. The report was published on October 13, 2009 and contains "Unit Price

---

[7] This report was subsequently circulated as a demo report in June 2010, indicating that Agri Stats considered this material sufficiently non-confidential to disclose to non- customers from whom it was circulating business.

Variance by Company" through August 29, 2009 – which makes the pricing information **only six weeks old**. The first page of the report lists the pricing variance against the national average for the thirteen plants in the report:



**ANSWER:**

To the extent the allegations in Paragraph 28 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

29.     The next page of the report lists the economic impact of sales for the Tyson Storm Lake facility, showing by product, how much more could be charged to meet the national average, and the average Top 25% of sales. Conservatively assuming that there were 13 companies in this report (and not simply 13 plants, owned by fewer than 13 companies), this Top 25% sales average informs competitors of what the top three plants are charging for each of these products.



**ANSWER:**

      To the extent the allegations in Paragraph 29 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

30.    A third example of a sales report is the Bacon Report, **<u>Exhibit D</u>**. This is a demonstration report that Agri Stats prepared as part of a project to begin offering a bacon-focused report in 2010. The Bacon Report shows how Agri Stats facilitated the exchange of sensitive information regarding costs, prices and profits between competitors. On information and belief, the Bacon Report was an actual report disseminated to the co-

conspirators.[8] For example, the attached slide compares a participant company's profits, cost, margin, and sales price with the average, the top 25%, and the top five of competitors:



**ANSWER:**

To the extent the allegations in Paragraph 30 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

31.  In pitching its services to defendants, Agri Stats made sure to detail exactly which competitors were participating in the various Agri Stats report services. For example, Agri Stats gave a presentation to Hormel on June 25, 2010 regarding Hormel participating in additional Agri Stats reporting services. Exhibit E, part of the proposal presentation, shows

---

[8] Agri Stats in its Responses and Objections to Plaintiffs' First Set of Requests for Production stated that it would produce "bacon reports sent by Agri Stats to subscribing Defendant Pork Integrators."

Agri Stats identifying each of the co-conspirators, including their facilities that were participating in the various Agri Stats reports.

## Pork Kill/Cut Participants

*USA:*
- Cargill – *Beardstown, Ottumwa\**
- Farmland – *Milan, Monmouth, Denison\*, Crete\**
- Hatfield Quality Meats
- Indiana Packers
- JBS – *Marshalltown*
- John Morrell – *Sioux Falls\**
- Seaboard
- Smithfield – *Clinton, Tar Heel, Virginia\**
- Triumph
- Tyson – *Storm Lake*

(DATE)
n = 16



## Participants – Pork Sales

*USA:*
- Cargill – Beardstown, Ottumwa*
- Farmland – Crete, Denison, Milan, Monmouth
- Hatfield
- Indiana Packers
- JBS – Louisville, Marshalltown, Worthington
- John Morrell – Sioux Falls
- Seaboard
- Smithfield – Clinton, Tar Heel, Virginia
- Triumph
- Tyson – Columbus Junction, Logansport, Madison, Perry

{DATE}
n = 21



**ANSWER:**

To the extent the allegations in Paragraph 31 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

32. Sharing the information in these various sales reports – detailed cost and sales data – between competitors was unnecessary to achieve any benefits for consumers. Should a competitor want to lower its costs – it is free to negotiate with vendors, labor groups, or reduce costs without reference to what a competitor is doing. Exchanging individual

company data (particularly current data on prices and costs), is not required to achieve major efficiencies.

**ANSWER:**

Agri Stats admits that it offers procompetitive benchmarking services to pork

integrators.  Agri Stats denies the remaining allegations contained in Paragraph 32 of the

Complaint.

33.    In addition to these highly detailed and anti-competitive sales reports, Agri Stats also provided defendants with a "sales data miner" tool that provided granular sales data broken down by "category, group, product type, preparation, additive, size, and inner packaging."



**ANSWER:**

To the extent the allegations in Paragraph 33 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.

34.    The sales data miner provided competitors with detailed pricing information. The following is an example of the type of weekly sales data that was provided to Tyson through Agri Stats' sales data miner.



**ANSWER:**

To the extent the allegations in Paragraph 34 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.

35.    Agri Stats further emphasized in conversations with defendants that the Agri Stats sales reports data specifically identified opportunities for defendants to raise their prices. For example, in June 2009, Deb McConnell, a Tyson employee, sent an e- mail to Agri

Stats employees titled "Audio Call with AgriStats: Follow-ups/action items." The e-mail stated that four sales/pricing tools are currently available for review/use by Tyson: "a.) Data Minor - Online system - information updated weekly. b.) Weekly Sales Report - published weekly with electronic copy sent to Tyson weekly. c.) Weekly 'PRICING' exception report - published weekly with electronic copy sent to Tyson weekly. d.) Weekly 'MIX' exception report - published weekly with electronic copy sent to Tyson weekly." Tyson requested that Agri Stats make a number of refinements to the sales reports that Agri Stats provided to Tyson, including segregating the region data into "East and West." The e-mail also stated that in the Weekly Sales Report, "price opportunity (company vs. national) is comparison of our net selling price, vs. the region on 'like SKUs.' Opp $'s are extrapolated against our sales pounds."

**ANSWER:**

To the extent the allegations in Paragraph 35 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

36.



**ANSWER:**

To the extent the allegations in Paragraph 36 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

37.   



**ANSWER:**

███████████████████████████████████████████████████████

███████    To the extent the allegations in Paragraph 37 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

38.    Defendants used the pricing information provided by Agri Stats (and indirectly, their competitors) to set their own prices of pork. But Agri Stats made sure that defendants understood the **exact** prices of their competitors. For example, on January 7, 2009, porksales@agristats.com sent Tyson employees an apparently standardly sent e- mail titled "week ending 12/27 sales" that attached numerous individual pdfs containing detailed current information on weekly sales, including files titled "WE12_27DetailedSalesAnalysis.pdf", WE12_27ProductOpportunity.pdf"; and "WE12_27BuyerDetail.PDF." This e-mail shows that Agri Stats was providing detailed sales data to Defendants that was less than two weeks old, since the sales data went through December 27th and the e-mail containing the sales data was sent on January 6th. Deb McConnell, a Tyson employee, emailed in response to Agri Stats, "what plants (locations are currently enrolled/displayed in the Sales Data Miner?" Porksales@agristats.com responded with a list of participants, identifying other defendant participants including JBS, Indiana Packers, Seaboard, Smithfield, Triumph, and Clemens. Deb McConnell then responded that Tyson was using the Agri Stats data for "revenue/return analysis" and that the list of participants provided by Agri Stats "will work." Following further e-mails, Deb McConnell, the Tyson employee, followed up to state that the "**sales group has already responded with some items**". In short, Agri Stats on a regular basis provided detailed data from the defendants on their sales, helped defendants determine the identity of their competitors, all with the understanding that the defendants were using the data to make decisions regarding their prices. Defendants' sales groups, in turn, carefully reviewed and used the information provided by Agri Stats.

**ANSWER:**

       To the extent the allegations in Paragraph 38 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

39.     Defendants also asked Agri Stats to help clarify the data that Agri Stats provided in order to help determine pricing-related opportunities. For example, Stacey Edwards, an Agri Stats employee, wrote an October 2009 document titled "J.B.S. Review Notes" that documents numerous specific questions that J.B.S. asked Agri Stats regarding pricing data, including: "What are some of the opportunities in injected boneless loins? Specifically there are four companies with returns" [i.e. prices] "at 225.77, 203.18, 218.77, and 279.98"; "What is driving the pricing structure for CT's?"; "Column b.9 on HC-4F, can we tell anything as to why there is such a spread in prices?"; and "**Why is #1 guy in sales book so far ahead of the competition every week?**" The document also included a request that Agri Stats "set Sue Tresham" (a JBS sales employee) "up in Data Miner."

**ANSWER:**

To the extent the allegations in Paragraph 39 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

40.     The defendants knew the purpose of these reports (as if there were any doubt) and asked Agri Stats to ensure that their "opportunities" to raise prices were clear. In one June 2009 Tyson email, Deb McConnell, a Tyson employee, wrote to Agri Stats regarding the Weekly Sales Report that Noel White, a senior Tyson executive, "is **insistent that the info be very clear/concise and indicate opp's with ease**." Noel White subsequently became the CEO of Tyson Foods in September 2018.

**ANSWER:**

To the extent the allegations in Paragraph 40 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

41.  Sometimes, a picture says a thousand words. And where large amounts of data are involved, graphics can be invaluable to assist people in understanding the import of numbers. For its pork processors, Agri Stats also provided graphics to highlight where they needed to raise prices. One example below is a regular detailed monthly package that Agri Stats prepared for defendant Hatfield Quality Meats (a subsidiary of Clemens Family Corporation), entitled "Swine Graph Package and Review." This package included colorful graphics explicitly comparing the price variance of types of pork products sold by Hatfield Quality Meats, and highlighting where opportunities to raise prices existed:



**ANSWER:**

To the extent the allegations in Paragraph 41 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

42. The monthly presentation by Agri Stats included charts comparing Hatfield's price in certain specific product categories with that of the other co- conspirators whose data had been collected by Agri Stats. For example, the following slides compare Hatfield's price for whole bone-in hams against those of its competitors, as well as breaking out the dollar impact of the difference in price:





**ANSWER:**

To the extent the allegations in Paragraph 42 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

43.    Agri Stats also provided similar reports for other defendants that contain detailed pricing data. This pricing information was current, containing pricing information that was less than six weeks old, as the cover e-mail for this presentation indicates that the report was circulated to Seaboard on September 14, 2010 and contained pricing information through July 2010. For example, attached as an exhibit is a 293-page presentation that Agri Stats prepared for Seaboard. The report contains numerous graphs comparing Seaboard's returns (i.e., prices) on specific types of pork products with that of an average of its competitors, such as the following:



**ANSWER:**

To the extent the allegations in Paragraph 43 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

44.     These types of reports had the effect of allowing co-conspirators to know exactly how far they could raise their prices to conform to their competitors' prices.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 44 of the Complaint.

45.     Another type of Agri Stats report (beyond the sales/pricing reports) was an Operations Profit report, or brown book (the color of the binding of the hard copy book), which included:

- Key Performance Indicator report for the current month, and the past three months;

- Monthly Summary Reconciliation by Plant;

- Monthly Detailed Reconciliation by Plant;

- Operations Profit Report;

- Ranking Report;

- Operations Profit Contributions; and

- Yielded Margin over Processing.

**ANSWER:**

To the extent the allegations in Paragraph 45 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

46.     **Exhibit F** is an Agri Stats May 2008 presentation entitled, "Hatfield Quality Meats Pork Kill & Cut Phone Review" The presentation contains an excerpt of this detailed Operations Profit report that is as follows (markings on original):



**ANSWER:**

To the extent the allegations in Paragraph 46 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

47.     Agri Stats reports also clearly identified the participants in each of the reports that were issued. Many of the reports had relatively few participants, and therefore the Top 25% of the report often provided data on less than 5 specific participants in the report. This 2008 Operations Profit report shows that there are 11 participants in the report (the line items numbered from 1 to 11). The report details the operations profits for each participant on a live pound, and carcass pound basis. It provides the purchased expense of live hogs, and the yielded margins for each of the 11 participating plants. The report contains information from March 2008 – and the report itself was published on May 21, 2008 – making the information less than three months old. The company involved in this report (Hatfield, a subsidiary of Clemens), is also provided with its report information for the November 2008 to February 2008 period, as well as its comparison against the weighted Top 25%. Given the existence of only 11 participants in this report, the Top 25% would be less than three firms.

**ANSWER:**

To the extent the allegations in Paragraph 47 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

48.     **Exhibit F** contains an excerpt of the May 21, 2008, key performance indicators section of the report that is as follows:



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    AGSTAT-P-0000019245

**ANSWER:**

To the extent the allegations in Paragraph 48 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

49.    The Key Performance Indicator report – here, for Hatfield, a subsidiary of Clemens – gives the detailed operations profits numbers for Hatfield against the national average, and against the Top 25% (again this would be less than three firms, given that only 11 firms appear in this report). The report details the "economic impact" for Hatfield for each of the items (including detailed Hourly Labor Cost, Supervision Cost, Kill Floor Cost – just to name a few), against the national average and the Top 25% average – this is the dollar amount that Hatfield/Clemens would save if it were to conform its costs to the national average, or the Top 25% average.

**ANSWER:**

To the extent the allegations in Paragraph 49 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

50.    Providing such detailed information regarding the profitability of competitors provided another mechanism by which competitors could monitor their co- conspirators to ensure there was no cheating on the agreement to restrain supply and raise prices.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 50 of the Complaint.

51.    A third type of Agri Stats report in the pork industry was the swine processing reports. These reports contain detailed cost information for each of the plants participating

in the reports. The processing reports themselves total over 300 pages. Plaintiffs attach a "Demo" Swine Processing report from February 2010 as **Exhibit G** to this complaint. This report is labelled as a "demo" and contains information which is nearly a decade old. On information and belief, the data contained in this "demo" report is the same as what was provided throughout the class period to the co-conspirators.

**ANSWER:**

To the extent the allegations in Paragraph 51 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

52.    The first page of the report itself indicates the "section participants" – the companies from which the data was gathered and to which this report was sent, including co-conspirators Cargill, Hatfield (a subsidiary of Clemens), Indiana Packers, JBS, Seaboard Foods, Smithfield, Triumph, and Tyson:



**ANSWER:**

To the extent the allegations in Paragraph 52 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

53.   Although this report lists eleven competitors, Farmland Foods and Smithfield both had two plants included for Region 10, meaning that there were truly only nine pork processors contained in this report.

**ANSWER:**

To the extent the allegations in Paragraph 53 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

54.   **Exhibit G**, The Swine Processing Report focuses on "Plant Cost Analysis," including: labor, material, supplies, M&R, utilities, water & sewage, inspection, overhead, depreciation, and support departments. An example of a page from this portion of the report is as follows:



**ANSWER:**

To the extent the allegations in Paragraph 54 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

55.     This page of the report (Total Plant Cost) provides a line entry for each of the 11 plants involved in the report. The plant for which this is a "demo" report is underlined (line 5). The report then provides a weighted Top 25% number – in this instance, with only 11 plants contained in this report, this would be an average number containing the data from the Top three plants. The report also contains weighted averages breaking companies out by the "East" (three companies) and "West" companies (eight companies).

**ANSWER:**

To the extent the allegations in Paragraph 55 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in this Paragraph, and therefore denies the same.

56.     Agri Stats also provided a "kill cost analysis," which includes data on costs such as labor, overhead, supplies, and staffing: The key components of the kill cost analysis are shown in the below slide prepared by Agri Stats.



**Swine Processing Report**

Kill Cost Analysis:
- Labor
- Inspection
- Supplies
- Utilities – electrical and gas/oil
- Overhead
- Depreciation
- Harvest Efficiency – Pigs/Manhour, Recovery Head & Organs, etc.
- Staffing

{DATE}

**ANSWER:**

      To the extent the allegations in Paragraph 56 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

57.    The report also includes "cut floor cost," which includes details on labor, supply, material, utilities, overhead, depreciation, "labor detail" and efficiency.

**ANSWER:**

      To the extent the allegations in Paragraph 57 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

58.    The provision of cost information across competitors has no redeeming purpose. Should a competitor wish to lower the costs of its overhead or improve its harvest

efficiency, of course it is perfectly free to do so. It has no need for this detailed cost information from its competitors to make these unilateral choices.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 58 of the Complaint..

59.    In addition to these reports, Agri Stats' account managers conduct on-site live reviews to assist with report utilization and analysis. The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the books. The fee for the visits fluctuated based on the size of the company and other factors.

**ANSWER:**

Agri Stats admits that it offers a service to meet with its clients to discuss client's

reports.   To the extent the allegations in Paragraph 59 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats denies the remaining allegations in this

Paragraph.

60.    In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets started providing its extensive pricing reports to broiler producers in 2003. Agri Stats had earlier marketed the EMI services to Tyson, explaining that "several producers and buyers have indicated to us that they are disappointed with the lack of pricing information available and feel that a program like this, designed for the pork industry, would be very beneficial." Agri Stats further explained that EMI would provide "valuable pricing information to know, because . . . it will help give guidance when making negotiations."

**ANSWER:**

Agri Stats admits that Express Markets is a subsidiary of Agri Stats.  Agri Stats

admits that Express Markets provides reports to Broiler and Pork producers.  To the extent

the allegations in Paragraph 60 of the Complaint purport to characterize or describe

documents or other sources, Agri Stats states that such documents speak for themselves

and denies any characterization or description that is inconsistent therewith or taken out of

context.  Agri Stats denies the remaining allegations in this Paragraph

61.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not
only in the fact that it supplies the data necessary to coordinate production limitations and
manipulate prices, but also in its stabilizing power. Price-fixing cartels are subject to
inherent instability in the absence of policing mechanisms, as each individual member of
the cartel may have incentive to cheat on other members of the cartel, for example by
ramping up pork production to capture higher prices as other cartel members act to limit
production. Agri Stats' detailed production statistics serve as an indispensable monitoring
function, allowing each member of the cartel to police each other's production figures
(which were trustworthy because they had been verified) for signs of cheating.

**ANSWER:**

        Agri Stats denies the allegations contained in Paragraph 61 of the Complaint.

62.     Without Agri Stats, the success of the pork cartel would have been much less certain.
When direct competitors enter into a conspiracy, there may not be honor amongst thieves.
Conspirators can provide incorrect information; they can cheat on the cartel by lowering
their prices and providing inaccurate pricing or supply information to their competitors –
allowing their cheating to go undetected. Agri Stats ensured none of that happened here.

**ANSWER:**

        Agri Stats denies the allegations contained in Paragraph 62 of the Complaint.

63.     Agri Stats audited the data to ensure the accuracy of its reports – even comparing it
against the companies' general ledgers.

**ANSWER:**

        Agri Stats admits that it audits the data received.  Agri Stats admits that it uses the

audited data to create individual reports for each client.  Agri Stats denies the remaining

allegations contained in Paragraph 63 of the complaint.

64.     Agri Stats required participation in the cartel by a large swath of the market, and competitors could not receive information without providing information.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 64 of the Complaint.

65.     Agri Stats assisted in concealing this conspiracy. By maintaining heightened level of sensitivity around the data to the public, Agri Stats ensured the operation of this cartel went undetected.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 65 of the Complaint.

66.     Large amounts of data from each co-conspirator, if it were inaccurate or unable to be compared across companies, might have had little use to the co-conspirators. But the value that Agri Stats brought to the conspiracy was that it ensured not only the timely collection and dissemination of data, but also its accuracy.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 66 of the Complaint.

67.     This value is highlighted in an email sent by Tyson to Agri Stats, when requesting its monthly results:

> We use this information (our position in Agri) in our quarterly presentations . . . 'and' in our metrics. . . .
>
> It is VERY VISIBLE within our company . . . we must make certain it is accurate . . . BUT at the same time, **I must have a high level of confidence that the OTHER companies are as accurate**!!! (emphasis added)

**ANSWER:**

To the extent the remaining allegations in Paragraph 67 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

68.    Agri Stats gave the co-conspirators exactly that – a high level of confidence in the accuracy of the data shared amongst competitors.

**ANSWER:**

Agri Stats admits that it uses the audited data to create individual reports for each

client.  Agri Stats denies that it had any involvement in a conspiracy to share competitive

information.

69.    To ensure this accuracy, Agri Stats itself went on site to the pork processors to collect the data for the reports. Agri Stats would first set up the initial data collection process, sending staff for a one week on-site setup meeting to identify data locations, files, formats, and to work with accounting and production staff.

**ANSWER:**

Agri Stats admits that it conducted site visits for its subscribers.  Agri Stats admits

that it charged a fee for site visits.  Agri Stats denies the remaining allegations in Paragraph

69.

70.    It would then take Agri Stats three weeks in the Agri Stats office to finish conversion, setup the input system, and to prepare auditors. Moving forward, the pork processor would send data monthly to Agri Stats on the 18th, and the data would be reported out the following month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data was reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. A typical turnaround from data submission to the finished report was two weeks.

**ANSWER:**

Agri Stats admits that it receives data from subscriber producers and that it audits

that data.  Agri Stats admits that it uses the audited data to create individual reports for each

client.  Agri Stats denies the remaining allegations in Paragraph 70.

71.    Agri Stats went to great lengths to ensure that the data is comparable across competitors – an "apples-to-apples" comparison. Agri Stats audits the producer's data by

ensuring it ties back to the general ledger, and by ensuring each company uses the same calculations.

**ANSWER:**

Agri Stats admits that it audits the data received.  Agri Stats admits that it uses the audited data to create individual reports for each client.  Agri Stats denies that it had any involvement in a conspiracy to share competitive information.

72.    In 2008, Agri Stats pitched its "new format" to JBS, proposing "comprehensive reports" and an "audit process":

# New Report Format / Process

- ✓ Comprehensive on site set up of all participants.
- ✓ Electronic processing of data.
- ✓ Tied out reports to the financials and production files.
- ✓ Checks and Balances / Audit Process.
- ✓ Comprehensive Reports Designed to identify and drill down to specific areas of opportunity.
- ✓ Multiple plant view.
- ✓ Industry groupings.

**ANSWER:**

To the extent the allegations in Paragraph 72 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  .

73.     Agri Stats itself travels on site to the pork processors to set up its data collection process. It then ensures the timely collection of this data, its auditing, but also that the data is <u>tied to the financial and production files</u> of the pork processors to ensure there is no cheating on the exchange of accurate information. Thus, Agri Stats performs a critical and unrivaled position in this cartel – acting as a disciplinary and cheating detection mechanism to ensure all members are fully and accurately participating in the exchange of competitively sensitive business information.

**ANSWER:**

Agri Stats admits that it conducted site visits for its subscribers.  Agri Stats admits

that it audits the data received.  Agri Stats denies the remaining allegations in Paragraph

73.

74.     Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis between competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis between competitors without Agri Stats auditing and standardizing the data:

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



**ANSWER:**

To the extent the allegations in Paragraph 74 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph 74.

75.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "[A]gree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "*[e]ach participant has to commit*."

**ANSWER:**

To the extent the allegations in Paragraph 75 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

76.     A critical component of a functioning conspiracy is that the co-conspirators must all provide information. Agreements to stabilize price and supply cannot be enforced unless competitors know the actions of their competitors. Agri Stats ensured that the agreement between competitors was a two-way street. Its policy was that it would not share the information of competitors if "someone [was] unwilling to share their own."

**ANSWER:**

To the extent the allegations in Paragraph 76 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph

76.

77.    For its program to be successful, Agri Stats has acknowledged that "**Industry participation must be high**." Each of the pork processor defendants participated in the Agri Stats reports.

**ANSWER:**

Agri Stats admits that it offers procompetitive benchmarking services to pork

integrators. To the extent the allegations in Paragraph 77 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.

78.    In a 2010 presentation, Agri Stats listed the following defendants as receiving pork sales reports:

## Participants – Pork Sales

*USA:*
- Cargill – Beardstown, Ottumwa*
- Farmland – Crete, Denison, Milan, Monmouth
- Hatfield
- Indiana Packers
- JBS – Louisville, Marshalltown, Worthington
- John Morrell – Sioux Falls
- Seaboard
- Smithfield – Clinton, Tar Heel, Virginia
- Triumph
- Tyson – Columbus Junction, Logansport, Madison, Perry

{DATE}
n = 21



**ANSWER:**

To the extent the allegations in Paragraph 78 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

79.    In a June 2010 e-mail, Josh Edwards, an Agri Stats employee provided a detailed list of the companies that were currently providing Agri Stats with sales data. The e-mail confirmed that Smithfield and Tyson were providing Agri Stats with sales data from all locations. Hatfield Quality Meats is a subsidiary of the Clemens Family Corporation.

```
-----Original Message-----
From: Josh Edwards
Sent: Thursday, June 24, 2010 6:51 AM
To: Greg Bilbrey
Subject: RE: Swine sales

Smithfield - Clinton, NC
Smithfield - Smithfield, VA
Smithfield - Tar Heel, NC
Farmland - Crete, NB
Farmland - Denison, IA
Farmland - Monmouth, IL
Farmland - Milan, MO
John Morrell - Sioux Falls, SD
Tyson - Waterloo, IA
Tyson - Perry, IA
Tyson - Logansport, IN
Tyson - Storm Lake, IA
Tyson - Col. Junction, IA
Tyson - Madison, NB
JBS - Worthington, MN
JBS - Marshalltown, IA
JBS - Louisville, KY
Cargill - Beardstown, IL
Cargill - Ottumwa, IA
Seaboard - Guymon, OK
Triumph - St. Joseph, MO
Indiana Packers - Delphi, IN
Hatfield - Hatfield, PA
```

**ANSWER:**

To the extent the allegations in Paragraph 79 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.

80.    Even as Agri Stats provided defendants with detailed anticompetitive information, it was reluctant to share similar information with governmental authorities. In 2009, Agri Stats was approached by the Canadian Government to provide information to the Canadian government. Agri Stats expressed great reluctance to the Canadian Government about sharing the data. Stacey Edwards, an Agri Stats employee, wrote to the Canadian Government that Agri Stats "data cannot be used in any sales and marketing campaigns and must be kept and used for internal use only. Our data cannot be used in any printed material or referenced/cited in publications." Internally, Agri Stats expressed great reluctance about sharing any data with the Canadian Government. Stacey Edwards wrote to Greg Bilbrey that another Agri Stats employee was "concerned about US producers finding out that we are helping Canadian producers via the government." Greg Bilbrey agreed that "**we cannot make things worse for our US companies**." Josh Edwards of Agri Stats eventually recommended sending the Canadian Government only one page of data from the processing book and that "**if they want more, I would charge them dearly for it and let them know that**."

**ANSWER:**

To the extent the allegations in Paragraph 80 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations contained in Paragraph 80 of the Complaint.

81.    Agri Stats reports are not publicly available and are only made available to companies that Agri Stats "feel[s] will use the data for the betterment of the industry and the profitability of [its] customers." This ensures that the information from Agri Stats is available to only one side of the market – the pork processors, and not others involved in the industry such as the customers of the pork. For example, a food retailer could not use Agri Stats sales reports to negotiate lower prices from defendants because Agri Stats would not give them access to such reports.

**ANSWER:**

To the extent the allegations in Paragraph 81 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats denies the remaining allegations contained in

Paragraph 81 of the Complaint.

82.     Agri Stats also limited the information that it provided to companies such as agricultural supply or veterinarian services that purchased Agri Stats data (companies viewed by Agri Stats as industry partners). In a presentation to Novartis Animal Health, Agri Stats stated that these companies must maintain confidentiality over the material:



**ANSWER:**

To the extent the allegations in Paragraph 82 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.

83.     By ensuring that only co-conspirators had access to these reports, Agri Stats deprived all market participants of access to information (such as supply and pricing), creating an information asymmetry. It ensured that the operations of this conspiracy went undetected by the public, by class members, or by the direct purchasers of pork.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 83 of the Complaint.

84.     While nominally anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that pork processors could accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

**ANSWER:**

Agri Stats admits that it anonymizes its reports.  To the extent the allegations in

Paragraph 84 of the Complaint purport to characterize or describe documents or other

sources, Agri Stats states that such documents speak for themselves and denies any

characterization or description that is inconsistent therewith or taken out of context.  Agri

Stats denies the remaining allegations contained in Paragraph 84 of the Complaint.

85.     Agri Stats disclosed to defendants who the other participants were in Agri Stats, including identifying the specific plants that were participating. For example, Agri Stats provided the following participant list as part of a June 2009 live review presentation to DuBreton, a Canadian pork integrator, that identified the specific companies and plants that were participating in Agri Stats:

# Participant List

## • U.S. Participants

- Cargill – Beardstown, IL
- Farmland Foods – Milan, MO
- Farmland Foods – Monmouth, IL
- Hatfield – Hatfield, PA
- JBS S.A. – Marshalltown, IA
- Seaboard Foods – Guymon, OK
- Smithfield Packing – Clinton, NC
- Smithfield Packing – Smithfield, VA
- Smithfield Packing – Tar Heel, NC
- Triumph Foods – St. Joseph, MO
- Tyson – Storm Lake, IA
- *Indiana Packers – Delphi, IN
  - June 8th Set Up for May data

## • Canadian Participants

- Conestoga – Breslau, Ontario
- Du Breton – Riviere-du-Loup, Quebec
- Maple Leaf Foods – Brandon, Manitoba
- Maple Leaf Foods – Burlington, Ontario
- Olymel – Red Deer, Alberta
- Quality Meat Packers – Toronto, Ontario
- *Springhill Farms – Neepawa, Manitoba
  - May 18th Set Up for April data

**ANSWER:**

To the extent the allegations in Paragraph 85 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

86.   Agri Stats also provided regular updates to defendants regarding either new participants or companies no longer participating in the Agri Stats reports that would aid in deanonymization efforts. For example, Agri Stats provided a September 2009 report to Hormel relating to pork that identified three specific companies that were no longer submitting data to Agri Stats while also stating that the report "added Maxwell Farms in Indiana." This type of information would greatly aid defendants in deanonymization efforts.

**ANSWER:**

To the extent the allegations in Paragraph 86 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats denies the remaining allegations contained in

Paragraph 86 of the Complaint.

87.    Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but failed to reassign numbers nonetheless.

**ANSWER:**

Agri Stats denies that the anonymity of its system was compromised.  Agri Stats

lacks knowledge as to whether subscribers learned the location identification numbers of

competitors, which regardless would not compromise the anonymity of Agri Stats

benchmarking reports.  Agri Stats denies the remaining allegations contained in

Paragraph 87 of the Complaint.

88.    Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to- date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

**ANSWER:**

Agri Stats admits that it receives data from its subscribers regarding their pork

business and that it uses that data in the reports it produces.

89.    Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a producer's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that producer given that their numbers were highlighted by Agri Stats in their books.

**ANSWER:**

Agri Stats admits that it mailed reports to its subscribers.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations contained in Paragraph 89 of the Complaint, and therefore denies the same.

90.    Mobility within the meat production industries led to a situation where many workers at most pork production operations knew the numbers of other regional facilities, removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in their offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats noticed this problem almost immediately but did nothing to fix it.

**ANSWER:**

Agri Stats admits that one of its employees was hired by a Pork Integrator Defendant.  To the extent the allegations contained in Paragraph 90 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.   To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

91.    Every conspiracy has a beginning. Here, the beginnings of collusion between the pork processors originated in the chicken industry. Agri Stats itself was formed as a mechanism to disseminate sensitive business information between the chicken processors. The success of defendants' conspiracy to restrain the price and supply of pork was almost assured from the start. First, Agri Stats had already been used successfully by poultry producers to restrain the supply and price of chicken. Second, many of the companies who used Agri Stats in the chicken market are also pork processors.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 91 of the Complaint.

92.    Agri Stats began its business in 1985 as an "Agricultural Performance Benchmarking business." Agri Stats' success originally came from the chicken industry,

where it touts that "[i]nitially, 100% of our focus was in developing and delivering a system for the Broiler Chicken Industry."

**ANSWER:**

To the extent the allegations in Paragraph 92 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

93.     The role of Agri Stats in the chicken industry was revealed in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.).[9] In the chicken market, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain ***line-by-line*** entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

**ANSWER:**

Agri Stats admits that it is a defendant in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.).  Agri Stats admits that it receives data from clients regarding production of Broiler chickens.  Agri Stats admits that it audits the data received. Agri Stats admits that it uses the audited data to create individual reports for each client. To the extent the allegations in Paragraph 36 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for

---

[9] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

themselves and denies any characterization or description that is inconsistent therewith or

taken out of context.

94.     The detail of these reports ensured that competitors could quickly decode the information of their erstwhile competitors. The *Broiler* complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

**ANSWER:**

       Agri Stats denies the allegations contained in Paragraph 94 of the Complaint.

95.     In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

**ANSWER:**

       Agri Stats admits that its employees periodically host and present at chicken

industry events and conferences.  Agri Stats denies the remaining allegations contained in

Paragraph 95 of the Complaint.

96.     The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation*, that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[10]

---

[10] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

**ANSWER:**

To the extent the remaining allegations in this Paragraph purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent Paragraph 96 purports to allege legal conclusions, no response is required. To the extent a response is required, Agri Stats denies the allegations.

97. The second reason the pork conspiracy was more likely to succeed was because of the overlapping ownership between pigs and chickens. Meat production in the United States is highly consolidated and some of the largest processing companies own both of these species. Some of the defendants in the *Broiler* antitrust litigation also participated in the pork antitrust conspiracy, including: Agri Stats, Inc., JBS USA Food Company (who owns Pilgrims – one of the largest broiler producers in the country), and Tyson Foods, Inc. The overlapping interests of these entities allowed them to practice and perfect their anticompetitive conduct in the broiler market before applying the most effective anticompetitive tactics to the pork market. This helped ensure the success of the pork conspiracy.

**ANSWER:**

To the extent the allegations contained in Paragraph 97 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

98. As demonstrated in the following chart, at several points during the class period, the pork processors acted in a concerted way to decrease supply. In 2009, 2010, and again in 2013, the pork industry cut production.

**Figure 1: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



**ANSWER:**

To the extent the allegations in Paragraph 98 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 98 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

99.     Defendants engaged in a parallel round of production cuts in 2009 through 2010. Throughout this period, defendants made statements regarding their intentions to either stabilize or decrease supply (although gave false reasons for this stabilization). For example, in May 2009, Larry Pope, the CEO and President of Smithfield stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year – February of '08, not February of '09 – *we made the decision with the over-supply* of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.

**ANSWER:**

To the extent the allegations in Paragraph 99 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 99 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

100.   Throughout 2009, pork industry participants noted the need to follow the supply restrictions imposed in the broiler industry. For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. Pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.

**ANSWER:**

To the extent the allegations contained in Paragraph 100 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

101.    By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000. In order to accomplish this reduction, Hormel sold sows in California and switched farms to finishing.

**ANSWER:**

To the extent the allegations contained in Paragraph 101 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

102.    In January 2009, Tyson stated that the capacity utilization for its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%. This indicated that Tyson was reducing the amount of pork that it processed in its plants. Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."

**ANSWER:**

To the extent the allegations in Paragraph 102 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. To the extent the allegations contained in Paragraph 102 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

103.    In February 2009, Hormel stated that "we still do expect to see a reduction in the supply of hogs in Fiscal 2009." In response to an industry analyst question on whether slaughter would be cut back, Hormel responded that **"you look at the opportunity to reduce your production numbers and we've certainly look[ed] for opportunities . . . where we could reduce the numbers that we had going through."** Hormel further emphasized that "if there were free market hogs that normally we would be bidding on, we're not looking to take them in."

**ANSWER:**

To the extent the allegations in Paragraph 103 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  . To the extent the allegations contained in Paragraph 103 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

104.    In May 2009, Hormel emphasized that "We see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."

**ANSWER:**

    To the extent the allegations in Paragraph 104 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 104 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

105.    In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87%, down from the previous year's rate of 90%. Tyson described pork "supplies coming down" and that "the worldwide supplies of pork are still down."

**ANSWER:**

    To the extent the allegations in Paragraph 105 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 105 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

106.    In June 2009, Jody Feragen, Hormel's CFO, stated at an investor conference that "we reduced production in our basic processing for…pork."

**ANSWER:**

To the extent the allegations in Paragraph 106 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 106 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

107.    In June 2009, the CEO of Smithfield announced that Smithfield was going to further reduce its swine herd by "3%, effective immediately." The CEO emphasized that the current cuts were not enough and more were needed to "fix" the hog industry and that "Somebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our – I'll tell you, it's our Texas operation that sells pigs to Seaboard. Seaboard knows that. . . . ***That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.*** We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.

**ANSWER:**

To the extent the allegations in Paragraph 107 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 107 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

108.    On the same conference call, Smithfield further explained that in order to fulfil its long-term contractual commitments to Seaboard and others, it would buy pigs on the open market to replace the sows that were being eliminated as a result of the hog liquidation, and that this would reduce pigs for the whole industry: "Some of these long- term contracts that people like Seaboard, so in actuality, we will reduce our sow numbers, we will then buy pigs in the open market to replace those obligations and deliver the pigs to Seaboard. So we will in effect reduce our exposure to the sow side and to that side of the business, ***reduce pigs for the whole industry as well as ourselves and meet all of our obligation***." Smithfield explained the substantial effect that its' planned reduction would have on Seaboard's business: "In terms of those operations, they are, frankly, a large part of Seaboard's business. ***We supply over 20 -- about 20% of Seaboard's raw material so they're going to have to address that issue at some point down the road***." Smithfield's cutbacks therefore may reduce the amount of pork that was sold by Seaboard over the long term.

**ANSWER:**

To the extent the allegations in Paragraph 108 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 108 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or

information sufficient to form a belief concerning the truth of the allegations, and therefore

denies the same.

109.    In August 2009, Wesley Mendonca Batista, CEO of JBS, communicated the start of JBS USA's participation in hog liquidation efforts. Mr. Batista stated, "we are seeting the start, we are seeing some increase in – not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters.

**ANSWER:**

To the extent the allegations in Paragraph 109 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  To the extent the allegations contained in Paragraph 109

relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or

information sufficient to form a belief concerning the truth of the allegations, and therefore

denies the same.

110.    In August 2009, Steve Meyer, an economist at Paragon Economics, subsequently acquired by Agi Stats, stated that "If we are to reduce output to drive prices up, we must reduce the sow herd by a larger percentage than the productivity growth."

**ANSWER:**

To the extent the allegations in Paragraph 110 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  To the extent the allegations contained in Paragraph 110

relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or

information sufficient to form a belief concerning the truth of the allegations, and therefore

denies the same.

111.   In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> **We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.** But again, I don't think they can solve it.
>
> I think this industry has got to solve it collectively. I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. **But the answer is, yes, there are others cutting back. We're not the only one.**

**ANSWER:**

To the extent the allegations in Paragraph 111 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 111 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

112.   Defendants responded to the encouragement from Smithfield to cut production. During 2009, Triumph reduced the number of sows that it had from 396,000 to 371,500. In particular, Triumph reduced the number of sows by 14,500 at its Christensen Facility; 4,000 at its New Fashion Pork Facility, 5,000 at its Eichelbarger facility. Notably, Triumph and Seaboard have a longstanding marketing agreement where hogs processed by Triumph were marketed by Seaboard.[11] Thus, the reduction in supply of sows raised by Triumph may result in a reduction in the amount of pork that was sold by Seaboard.

---

[11] According to Seaboard's 2010 Form 10-K, filed with the Securities and Exchange

**ANSWER:**

To the extent the allegations in Paragraph 112 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 112 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

113.    During 2009, Tyson reduced the number of sows that it had from 70,000 to 52,000. In particular, Tyson sold five farms and sent the sows to slaughter. Tyson's 2009 10K report further stated that "we expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."

**ANSWER:**

To the extent the allegations in Paragraph 113 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 113 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

---

Commission, "Seaboard's Pork Division has an agreement with a similar size pork processor, Triumph Foods LLC (Triumph), to market substantially all of the pork products produced at Triumph's plant in St. Joseph, Missouri."

114.    In November 2009, Hormel stated that "we've seen about a 2% liquidation" in hogs.

**ANSWER:**

To the extent the allegations in Paragraph 114 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

115.    In January 2010, Steve Meyer stated that the pork industry needed a 12% reduction in order to restore the pork industry to profitability.

**ANSWER:**

To the extent the allegations contained in Paragraph 115  relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.

116.    In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.

**ANSWER:**

To the extent the allegations in Paragraph 116 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

117.    On March 8, 2010, Wesley Mendonca Batista mentioned that there was a reduction in hog supply and that combined with an increase in consumption in emergent markets, this would result in "some shortage in protein going forward."[12]

**ANSWER:**

To the extent the allegations in Paragraph 117 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

118.    In August 2010, Hormel stated that "our hog supply is down 3 to 4%[13]

**ANSWER:**

To the extent the allegations in Paragraph 118 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

119.    The pork producers acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield stated:

> We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have.*** And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.

---

[12] JBS Q2 2009 Earnings Conference Call (Mar. 8, 2010).
[13] Hormel Q3 2010 earnings call.

Smithfield had access to competitively sensitive information from its competitors, through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

**ANSWER:**

To the extent the allegations in Paragraph 119 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  To the extent the allegations contained in Paragraph 119 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

120.    Supply level information regarding competitors allowed them to know that supply would not increase in the future, given the lifecycles of the animals. In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the provision of competitively sensitive information by a competitor of Tyson.

**ANSWER:**

To the extent the allegations contained in Paragraph 120 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same. To the extent the allegations in Paragraph 120 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

121.   When asked, in the face of ever-increasing margins, whether the type of profits would continue, in March 2011, Smithfield publicly signaled to its competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .
>
> HEATHER JONES: So you are just striking a note of caution *because you know it can't stay this way indefinitely*; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have – should have good margins, but I can't believe –
>
> LARRY POPE: Heather, we are sitting here today, we are halfway – closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.
>
> BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.
>
> HEATHER JONES: All right, okay. Thank you.

> LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . ***And by the way, we are not going to build a new plant to expand capacity***.

**ANSWER:**

To the extent the allegations contained in Paragraph 121 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 121 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

122.    In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had – there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. ***There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility***.

**ANSWER:**

To the extent the allegations contained in Paragraph 122 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 122 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

123.    On May 15, 2013, Wesley Mendonça Batista of JBS emphasized that JBS was able to maintain high margins through passing on higher prices on pork as a result of limited supply, stating that "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business."

**ANSWER:**

To the extent the allegations contained in Paragraph 123 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same. To the extent the allegations in Paragraph 123 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is

inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

124.    Beginning in 2009, the pork industry showed abnormal price movements, , increases prices for the average hog whole price unexplained by increases in costs. All these pricing measurements show a significant break between pricing prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to restrain prices of pork. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the pork processors' margin during the class period; and (iv) the defendants' revenues before and during the class period.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 124 of the Complaint.

125.    According to aggregate prices published by the USDA, the hog market year average price was at or below $50 every year between 1998 and 2009, before increasing to $76.30 in 2015. The following graph shows the unprecedented increase in swine prices beginning in 2009, and staying elevated through 2018:

**Figure 2: Average Hog Wholesale Prices in Cents per lbs, 2000-2018**



As this figure demonstrates, pork wholesale prices increased in 2009 and 2014, and continuously remained at this higher level compared to the years prior to 2009.

**ANSWER:**

To the extent the allegations in Paragraph 125 purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

126. During the class period, and particularly between 2009 and 2018, various pork products saw substantial increases in prices, compared with the pre-class period. Using one particular price for pork, the pork cut-out composite price, plaintiffs have performed a pricing analysis which shows that that pork cut-out composite prices increased by 56 percent between January 2009 and December 2014, and by 18 percent over the class period:

**Figure 3: Pork Cut-Out Composite Price**



**<u>ANSWER:</u>**

To the extent the allegations contained in Paragraph 126 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

127.   During the class period, at the same time as hog prices were increasing, pork integrator margins increased significantly. The change in integrator margins during the class period shows a divergence from pricing trends prior to the class period – and shows that rising costs do not explain the increases in prices seen during the class period. The following figure shows this increase in margin, retained by the defendant/co- conspirators, using the pork cut-out composite and live hog cost on a "dressed weight" basis (post slaughter and organ-removal weight):

**Figure 4: Hog-Composite Spread Widening During the Class Period**



**ANSWER:**

To the extent the allegations contained in Paragraph 127 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

128.   When tested, there is a statistically significant increase in the average hog-composite spread before the class period, when compared to during the class period:

**Figure 5: Statistically Significant Break in Hog-Composite Spread Comparing Before and During Class Period**



**ANSWER:**

To the extent the allegations contained in Paragraph 128 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To

the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

129.    For two of the largest defendants, Tyson and Smithfield, plaintiffs examined the spread between pork revenue and pork-related costs (costs of goods sold + operating costs), as a proxy for measuring the spread between a defendant's price of wholesale pork and their hog costs. This measurement accounts for defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the class period in 2009.

**<u>ANSWER:</u>**

To the extent the allegations contained in Paragraph 129 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

130.    The following chart shows a break in revenues and costs around the start of the class period in 2009 for Tyson:

**Figure 6: Tyson's Revenues vs Costs, March 2002 to March 2018**



**ANSWER:**

To the extent the allegations contained in Paragraph 130 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

131.   The same analysis for Smithfield shows a similar break in revenues and costs beginning at the start of the class period:

**Figure 7: Smithfield's Revenues vs Costs, January 2004 to June 2016**



**ANSWER:**

To the extent the allegations contained in Paragraph 131 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

132.    These analyses of the spread between costs and prices confirm one essential fact –
that rising costs do not explain the increases in price seen during the class period.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in the first sentence of Paragraph 132 of the Complaint,

and therefore denies the same.

133.    The USDA has stated that high levels of market concentration allow the largest
participants to extract more of the economic value from food transactions, but "consumers
typically bear the burden, paying higher prices for goods of lower quality."

**ANSWER:**

To the extent the allegations in Paragraph 133 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations contained in this Paragraph, and

therefore denies the same.

134.    As a matter of economic principle, firms must recover the short-run variable costs
of production when they price their products for the market, which ultimately get passed
to consumers in the form of higher retail prices. For a firm to be profitable, the firm must
recover its marginal cost of production. In a perfectly competitive market, firms price at
marginal cost and when marginal costs increase, the cost increases are passed through to
the consumer 1:1 or at a 100 percent pass through rate. As a general matter, the pass through
rate will be determined by the relative elasticities of supply and demand. When demand is
inelastic (as it is for pork) the pass through rate is closer to 100 percent.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations in Paragraph 134, and therefore denies the same.

135.   The Bureau of Labor Statistics tracks commonly purchased products in its
Consumer Price Index (CPI). Those prices show that the retail price of pork has increased
substantially for consumers over the class period. For example, the price of a pound of
bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017:

**Figure 8: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995 to 2017**



**ANSWER:**

To the extent the allegations in Paragraph 135  purport to describe documents or

other sources, Agri Stats states that such documents speak for themselves and denies any

characterization or description that is inconsistent therewith or taken out of context.  Agri

Stats lacks knowledge or information sufficient to form a belief concerning the truth of the

remaining allegations in this Paragraph, and therefore denies the same.

136.   Similarly, the CPI index for other pork products, excluding canned ham and
luncheon slices, show a marked increase over the class period, moving from $2.05 per
pound at the end of 2009 to $2.65 at the end of 2017:

**Figure 9: CPI-Average Price Data for Other Pork, per pound, from 1995 to 2017**



**ANSWER:**

To the extent the allegations in Paragraph 136  purport to describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

137.    And the CPI index for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017:

**Figure 10: CPI-Average Price Data for Ham, per pound, from 1995 to 2017**



**ANSWER:**

To the extent the allegations in Paragraph 137 purport to describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the remaining allegations in this Paragraph, and therefore denies the same.

138. Given these market conditions, the overcharge due to defendants' anticompetitive agreement to stabilize the price and supply of pork was passed on to the end consumers, the plaintiffs and classes here.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 138 of the Complaint.

139. Several unique characteristics of the pork processing industry facilitated the success of this conspiracy. First, the industry is nearly fully vertically integrated, meaning that fewer competitors exist and making it easier to collude on price. Second, the pork processing industry is highly concentrated, making an agreement on price and supply far easier for the co-conspirators. Third, barriers to entry kept other possible competitors out of the pork industry.

**ANSWER:**

Paragraph 139 of the Complaint contains legal assertions as to which no response

is required.  To the extent a response is required, Agri Stats denies the allegations.

140.    The processing of pig meat can loosely be divided into three stages: hog production, hog processing/intermediate pork processing and further processing. The pork industry is almost completely vertically integrated, with four major producers controlling 75 percent of pork integration. The defendants are commonly known as "contractors" or "integrators" who contract production of their hogs out to independent growers. Integration is so pervasive that major producers are commonly called pork or swine integrators by the industry, government, analysts and academics.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 140 of the Complaint, and therefore denies

the same.

141.    In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

**ANSWER:**

To the extent the allegations in Paragraph 141 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  To the extent the allegations contained in Paragraph 141

relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or

information sufficient to form a belief concerning the truth of the allegations, and therefore

denies the same.

142.    Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when. Under these contracts, the pork processors pay only fixed service fees to the farmers, who bear all the investment costs of the hog raising facilities. The pork integrator, here Smithfield, retains ownership of the hogs at all points in time. This arrangement essentially converts independent farmers that own their livestock into contract employees that perform services for the pork-packing industry.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 142 of the Complaint, and therefore denies

the same.

143.    The following diagram shows the path for pork from birth through sale to consumers:

## Figure 11: Value Chain of U.S. Pork Market



Sources: National Pork Producers' Council, WH Group Investor Relations, US Department of Agriculture

## **ANSWER:**

To the extent the allegations in Paragraph 143 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

144.   Under economic theory, vertical integration can have anticompetitive effects because there are fewer firms competing at all levels, which renders it easier to collude on price. The following table lists defendants that have significant operations (>=5% market share in at least two stages of the value chain:

| Defendant | Hog Production | Hog processing and intermediate pork processing/packing | Further Pork Processing |
|---|---|---|---|
| Smithfield | ✓ | ✓ | ✓ |
| Tyson | | ✓ | ✓ |
| Triumph | ✓ | ✓ | |
| Seaboard | ✓ | ✓ | |
| Hormel | | ✓ | ✓ |

**ANSWER:**

Paragraph 144 does not contain any factual allegations to which a response is required. To the extent a response is needed Agri Stats denies the allegations in Paragraph 144 of the Complaint.

145. The level of concentration in the pork industry rested in an ideal zone for collusion. Because the industry was dominated by a relative handful of processors, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because none of the largest producers were capable of independently controlling price through their own production, such an agreement was necessary to inflate price.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 145 of the Complaint.

146. Prior to and in the beginning of the class period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork processors controlling a large amount of market share. Between 1988 to 2015, the top four pork processors (Smithfield, Tyson, JBS and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015. The top eight integrators had market share exceeding 80 percent for the entire class period:

**Figure 12: Market Share of Top 8 Pork Processors 1991 to 2017**



**ANSWER:**

To the extent the allegations contained in Paragraph 146 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 146 purport to relate to Agri Stats, Agri Stats denies the same.

147.   The hog production sector is horizontally concentrated (only a few companies buy, slaughter and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Some pork packers also produce hogs themselves. Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

**ANSWER:**

Paragraph 147 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

148.    In July 2015, JBS USA announced it would be acquiring Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.

**ANSWER:**

To the extent the allegations contained in Paragraph 148 relate to other Defendants

and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

149.    The acquisition completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately US$6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS- Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

**ANSWER:**

To the extent the allegations contained in Paragraph 149 relate to other Defendants

and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

150.    The following timeline summarizes notable mergers between pork processors since 1995 which lead to an increased market concentration:

**Figure 13: History of Mergers and Acquisitions**



**ANSWER:**

To the extent the allegations contained in Paragraph 150 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in Paragraph 150 purport to relate to Agri Stats, Agri Stats denies the same.

151.    The following chart shows the high levels of market concentration during the class period, as well as the stability of each defendants' share:

**Figure 14: Market Concentration and Market Share Stability –
U.S. Market Share by Hog Slaughter Capacity**



## ANSWER:

To the extent the allegations contained in Paragraph 151 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in Paragraph 151 purport to relate to Agri Stats, Agri Stats denies the same.

152.    Market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy. The following figure shows that there was a substantial drop in market share volatility during the class period:

**Figure 15: Standard Deviation of Combined Defendant Market Share Pre- and Within Class Period**



**ANSWER:**

Paragraph 152 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

153. The Herfindahl-Hirschman index (HHI) is a commonly accepted measurement of market concentration. The HHI for hog processing and intermediate pork processing is 1,838 which exceeds the DOJ threshold for a "moderately concentrated industry." This HHI value exceeds the concentration levels for similar industries, as demonstrated in the following chart:

| Industry | HHI (value) |
|---|---|
| Hog processing and intermediate pork processing | 1,838 |
| Animal (except poultry) slaughtering | 1,085 |
| Meat processed from carcasses | 332 |
| Rendering and meat byproduct processing | 673 |
| All other miscellaneous food manufacturing | 284 |

**ANSWER:**

Paragraph 153 of the Complaint contains legal assertions as to which no response

is required.  To the extent a response is required, Agri Stats denies the allegations.

154.    The concentration level in the pork industry was optimal for collusion. WH Group
Limited, the parent company of Smithfield, characterized the U.S. market pork industry as
"relatively mature and concentrated." Both of these factors – maturity and concentration –
make an industry more susceptible to collusion.

**ANSWER:**

Paragraph 154 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

155.    Barriers to entry kept competitors out of the pork integration industry. New entry
into pork processing is costly and time consuming. In order to slaughter and process hogs
on an industrial scale, a slaughtering plants needs to be constructed. The cost to design and
build a 140,000 square foot plant with industry-standing packing equipment and a slaughter
capacity of 2,500 hogs a day is estimated at $33 million. In 2012, it cost Cargill $25 million
just to expand an existing facility. Large capital outlays such as these can limit market
entry, as it can be difficult for new firms to raise this sort of capital.

**ANSWER:**

Paragraph 155 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.  To the

extent the allegations contained in Paragraph 155 relate to other Defendants and/or third

parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief

concerning the truth of the allegations, and therefore denies the same.

156.    Plaintiffs and the members of the classes had neither actual nor constructive
knowledge of the facts constituting their claim for relief. Plaintiffs and members of the
classes did not discover, and could not have discovered through the exercise of reasonable
diligence, the existence of the conspiracy alleged herein until shortly before filing this
complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would
put plaintiffs or the classes on inquiry notice that there was a conspiracy to fix prices for

pork. Throughout the class period, defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from plaintiffs and class members.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 156 of the Complaint.

157.    The combination and conspiracy alleged herein was fraudulently concealed by defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 157 of the Complaint.

158.    Agri Stats is a highly secretive company. Although it admits it does "have a website but there is very little information about us there as we do no advertising."

**ANSWER:**

To the extent the allegations in Paragraph 158 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph 158 of the Complaint.

159.    In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of***

*just in the background*, and really our specialty is working
directly with companies about their opportunities and so forth.

**ANSWER:**

To the extent the allegations in Paragraph 159 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph

159 of the Complaint.

160.   At the same 2009 presentation, when discussing "bottom line numbers" (a
company's net earnings), Mr. Snyder declined to display those numbers publicly, stating
"I'm not going to display the actual bottom line to the group here just because of the
confidentiality nature of the information." And yet, despite refusing to show this
information publicly, Agri Stats provided producers with the "bottom line numbers" of
their competitors on a regular basis via the reports discussed above. These statements acted
to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public
in general.

**ANSWER:**

To the extent the allegations in Paragraph 160 purport to characterize or describe

documents or other sources, Agri Stats states that such documents speak for themselves

and denies any characterization or description that is inconsistent therewith or taken out of

context.  Agri Stats denies the remaining allegations in Paragraph 160 of the Complaint.

161.   Larry Pope, the CEO of Smithfield, made similar references to secret information
in December 2010, explaining that he was confident pork supplies would not be increasing
in the market, based on "the information we think we have public plus what we think we
know privately, how many they kill, what their processing levels are and things like [that].
This is information you may not quite have."

**ANSWER:**

To the extent the allegations in Paragraph 161 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same. To the extent the allegations contained in Paragraph 161 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same. To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

162.    At other times, Defendants attributed the stability in the pork market to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, stated in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?

> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.

> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.

**ANSWER:**

To the extent the allegations in Paragraph 162 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same. To the extent the allegations contained in Paragraph 162 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

163.   Not until recently was the fact of the pork industry's use of Agri Stats widely known or reported. An investigative article published in February 2017 by Bloomberg Businessweek suggested the conspiracy that began among broiler producers and Agri Stats was being replicated in the pork industry.[14] The article reported that Agri Stats:

> [H]as . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods. It appears that demand for the service is strong. At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services. His slideshow indicated that 27 companies had already signed up.[15]

While Bloomberg Businessweek article did not conclude that pork producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated article that

---

[14] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek (Feb. 15, 2017), https://www.bloomberg.com/news/features/2017-02- 15/is-the-chicken-industry-rigged.
[15] *Id.*

the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.

**ANSWER:**

To the extent the allegations in Paragraph 163 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

164.   Only after the filing of a February 7, 2018, Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In Re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats' provides to its clients in the Broiler industry.

**ANSWER:**

To the extent the allegations in Paragraph 164 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats denies the remaining allegations in Paragraph 164 of the Complaint.

165.   The filing of this amended complaint, along with the February 2017 article by Bloomberg Businessweek disclosing the pork industry's use of Agri Stats, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 165 of the Complaint.

166.    Defendants' anticompetitive conspiracy, by its very nature, was self- concealing. Pork is not exempt from antitrust regulation, and thus, before these recent events plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' pork prices before these recent events.

**ANSWER:**

        Agri Stats denies the allegations contained in Paragraph 166 of the Complaint.

167.    By virtue of the fraudulent concealment of their wrongful conduct by defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

**ANSWER:**

        Agri Stats denies the allegations contained in Paragraph 167 of the Complaint.

### IV.    PLAINTIFFS ALLEGE VIOLATIONS UNDER BOTH THE *PER SE* AND RULE OF REASON STANDARDS OF THE SHERMAN ACT

168.    This action alleges that the defendants' coordinated horizontal conduct was a *per se* violation of the federal and state antitrust and consumer protection laws. In the alternative, plaintiffs also allege that under Section 1 of the Sherman Act and the various state laws, defendants' agreement to unlawfully exchange competitively sensitive information amongst pork processors violates the rule of reason.

**ANSWER:**

        Paragraph 168 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

169.    Defendants ostensibly compete in the Pork industry for sales of pork to customers. The agreement, to exchange competitively sensitive information through Agri Stats, has enabled defendants to reduce competition in the market for pork.

**ANSWER:**

        To the extent the allegations contained in Paragraph 169 relate to other Defendants

and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations, and therefore denies the same.  Agri

Stats denies the remaining allegations in Paragraph 169 of the Complaint.

170.    The Pork processors agreed with Agri Stats to reciprocally exchange competitively
sensitive business information, including information regarding production levels and sales
of pork. As alleged above, each of the defendants subscribed to the Agri Stats service.

**ANSWER:**

Agri Stats admits that the defendants subscribed to its benchmarking services. Agri

Stats denies the remaining allegations in Paragraph 170.

171.    Agri Stats knew that its service only had value if it had sufficient participation from
the market. Thus, Agri Stats reached out to the pork processors to encourage them to
participate in its data-sharing operation. In 2008, Greg Bilbrey of Agri Stats told swine
industry producers that "***Each and every commercial swine operation is encouraged to
participate in some benchmarking effort***."

**ANSWER:**

To the extent the allegations in Paragraph 171 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph

171.

172.    Agri Stats emphasized to pork producers that the goal of the conspiracy (and the
agreement to share information) was profitability, not production, and invited pork
producers again, to participate in the benchmarking. Agri Stats emphasized that "We must
remember that the ***ultimate goal is increasing profitability*** – not always increasing the
level of production." Furthermore, Agri Stats told the industry that "[e]ach swine
production company should be participating in some type of benchmarking. ***To gain
maximum benefit, production, cost and financial performance should all be part of the
benchmarking program***."

**ANSWER:**

To the extent the allegations in Paragraph 172 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph 172.

173.   In April 2009, Agri Stats again openly encouraged swine producers to participate in the benchmarking effort led by Agri Stats. Greg Bilbrey of Agri Stats stated that "though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort***."

**ANSWER:**

To the extent the allegations in Paragraph 173 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph 173.

174.   Each Defendant entered into an agreement with Agri Stats to participate in benchmarking efforts. Each and every Defendant identified in their initial disclosures specific executives that were responsible for transmitting data to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export, or production levels.

- Clemens: Joshua Rennels (Treasurer, Clemens Food Group)

- Hormel: Paul Bogle (Director, Cost Accounting)

- Indiana Packers: Mark McCain (Director, Global Sales), David Murray (Vice President, Procurement), Galen Stiverson (Controller)

- JBS: Garry Albright (Head of Business Analysis), Kevin Arnold (Head of

Finance), Jamie Fosbery (Analyst), Raven Goodlow (Business Analyst), Robbie Kearns (Business Analyst), Lisa Peters (Business Analyst), Eli Zoske (Cost Accountant)

- Seaboard: Damon Ginther (Senior Director of Business Data & Analytics), Mel Davis (VP of Hog Procurement and Bio-Energy, Tom Dye (Operations Controller)

- Smithfield: Aimee Ward (Director, Hog Finance), Kent Hilbrands (Sr. Director, Operations Finance), Elizabeth Barger (Data Analyst)

- Triumph: Matt England (Chief Integrated Business Strategy Officer), Ken Grannas (Director Inventory/Reporting), Tom French (Director, Margin Management), Joe Diebold (Chief Financial Officer), Dan Marlow (Corporate Controller)

- Tyson: Deb McConnell (Division Controller)

**ANSWER:**

Agri Stats admits that the defendants subscribed to its benchmarking services.  To the extent the allegations in Paragraph 174 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats denies the remaining allegations in Paragraph 174.

175.    One tool that courts use to assess the competitive effects of concerted action is defining a relevant market – the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The case concerns the sale of pork for meat consumption in the United States.

**ANSWER:**

Paragraph 175 of the Complaint contains legal assertions as to which no response is required.  To the extent a response is required, Agri Stats denies the allegations.

176.    There is a single market for pork for meat consumption. Prices for pork sold in the United States are quoted generally in disassembled parts, with adjustments for

transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

**ANSWER:**

Paragraph 176 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

177.   The relevant geographic market is the United States.

**ANSWER:**

Paragraph 177 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

178.   As alleged above, high barriers to entry in the pork processing market exist, precluding other entrants or would-be competitors from entering the market for hogs raised for consumption.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations in Paragraph 178, and therefore denies the same.

179.   The integrator defendants possess market power in the market for pork for consumption. Defendants and their co-conspirators control 80 percent of the market for pork for meat consumption.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations in Paragraph 179, and therefore denies the same.

180.   Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the defendants was competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When Defendants that are competing for the same customers exchange their strategic plans,

comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of pork.

**ANSWER:**

Paragraph 180 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

181.   The information exchange took place in private settings and involved the exchange of confidential, non-public information.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 181 of the Complaint.

182.   The market for pork is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for pork features relatively few sellers, fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**ANSWER:**

Paragraph 182 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

183.   The pork market is highly concentrated, with relatively few sellers. The defendants control over 80 percent of pork slaughter facilities. WH Group Limited, the parent company of Smithfield, characterized the U.S. market pork industry as "relatively mature and concentrated." The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

**ANSWER:**

To the extent the allegations in Paragraph 183 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent

therewith or taken out of context. To the extent the allegations contained in Paragraph 183

relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in Paragraph 183 purport to relate to Agri Stats, Agri Stats denies the same.

184.    One of the distinct characteristics of the pork industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part. Existing studies have highlighted that pork is highly standardized characterized as a fungible industry as a whole. For example, the International Trade Commission relied on evidence that U.S. pork and Canadian pork are heavily fungible in a case regarding pork imports from Canada.

**ANSWER:**

To the extent the allegations in Paragraph 184 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

185.    As one scholar wrote, "consider the market for fungible goods, like pork bellies...[in this market] prices from different sellers should be truly simple to compare because, by definition, what they are selling is identical. From whom should Smithfield Farms buy pork bellies for the bacon it makes? Why the cheapest seller, if those bellies are in fact the same."

**ANSWER:**

To the extent the allegations in Paragraph 185 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context. Agri Stats lacks knowledge or information sufficient to

form a belief concerning the truth of the allegations contained in this Paragraph, and

therefore denies the same.

186.    Indeed, the Agri Stats reports themselves show that pork is fungible because they aggregate data across Defendants for particular types of pork products and allow Defendants to compare detailed information on prices for the same fungible product.

**ANSWER:**

Agri Stats admits that it aggregates data across defendants for pork products.  Agri

Stats denies the remaining allegations in Paragraph 186.

187.    Pork is a commodity market that faces price-based competition. For example, Arnold Drung, the president of Conestoga Meat Packers e-mailed Brian Snyder, an Agri Stat executive, that "Based on Agristats data, we know"… that "all further processors look to purchase commodity items at the lowest price possible."

**ANSWER:**

The first sentence of Paragraph 187 contains legal assertions as to which no response

is required.  To the extent a response is required, Agri Stats denies the allegations.  To the

extent the allegations in Paragraph 187 of the Complaint purport to characterize or describe

documents or other sources, Agri Stats states that such documents speak for themselves

and denies any characterization or description that is inconsistent therewith or taken out of

context.  To the extent the allegations contained in Paragraph 187 relate to other

Defendants and/or third parties to this action, Agri Stats lacks knowledge or information

sufficient to form a belief concerning the truth of the allegations, and therefore denies the

same.  To the extent the allegations contained in this Paragraph purport to relate to Agri

Stats, Agri Stats denies the same.

188.     Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[16] A PED value between 0 and -1 indicates there is inelastic demand for the good or service, i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The average PED estimate for the pork market was -0.64 – meaning the demand for pork is inelastic.

**ANSWER:**

The allegations contained in Paragraph 188 of the Complaint contain legal

conclusions to which no response is required.  To the extent a response is needed Agri

Stats denies the allegations in Paragraph 188 of the Complaint.

189.     Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loins, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets. For example, pork loin from Tyson and Smithfield are virtually indistinguishable, with similar nutritional values, branding and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.[17] The Pork Checkoff program, administered by the National Pork Board established by Congress, has stated that "U.S. pork production and pig prices vary in a predictable manner during the calendar year."

**ANSWER:**

Paragraph 189 of the Complaint contains legal assertions as to which no response

is required.  To the extent a response is required, Agri Stats denies the allegations.  To the

---

[16] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson,. et al., *Price Elasticity of Demand* (Nov. 13, 1997),
https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at*
http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.
[17] *See Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, The United States Department of Justice, https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and- market-allocation-post-disaster-rebuilding ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.") (last visited Aug. 16, 2018); Marc Ivaldi. et al., *The Economics of Tacit Collusion* (March 2003),
http://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusio n_en.pdf.

extent the allegations contained in Paragraph 189 relate to other Defendants and/or third

parties to this action, Agri Stats lacks knowledge or information sufficient to form a

belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri

Stats denies the same.

190.    Agri Stats specifically marketed its services to the Pork defendants as a mechanism
to "improve the bottom line profitability for all participants by providing accurate & timely
comparative data", such as shown in the below slide from a 2010 presentation that Agri
Stats gave to Hormel.



**ANSWER:**

To the extent the allegations in Paragraph 190 of the Complaint purport to

characterize or describe documents or other sources, Agri Stats states that such documents

speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.

191.    Thus, Agri Stats services provided defendant participants a way to mutually improve their profits by avoiding the natural market-based competition over things such as price that would lower their profits to the benefit of consumers.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 191 of the Complaint.

192.    A common saying in the Agri Stats circle is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "***the ultimate goal is increasing profitability.***"

**ANSWER:**

To the extent the allegations in Paragraph 192 of the Complaint purport to characterize or describe documents or other sources, Agri Stats states that such documents speak for themselves and denies any characterization or description that is inconsistent therewith or taken out of context.  Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in this Paragraph, and therefore denies the same.

193.    And indeed, Defendants used the strategic information obtained through the Agri Stats and Express Markets reports to reduce the uncertainty that they each should have faced from not knowing what their competitors were doing in the market. This strategic information was a material factor in their decisions to reduce supply while raising the price of pork. Thus, this knowledge tainted what should have been their independent decisions about the supply and price of pork.

**ANSWER:**

To the extent the allegations contained in Paragraph 193 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the

extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats

denies the same.

194.   Defendants' unlawful information exchanges through Agri Stats and Express Markets were not reasonably necessary to further any procompetitive purpose. The information directly and privately shared between high-level executives was disaggregated, company specific, current, confidential, and related to core characteristics of competition between them.

**ANSWER:**

Agri Stats denies the allegations in Paragraph 194 of the Complaint.

## V.   JURISDICTION AND VENUE

195.   Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of pork and increasing the price of pork. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**ANSWER:**

Paragraph 195 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

196.   Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**ANSWER:**

Paragraph 196 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

197.    This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

**ANSWER:**

Paragraph 197 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

198.    The activities of the defendants and all co-conspirators, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 198 of the Complaint.

## VI.    PARTIES

**A.    Plaintiffs**

199.    Plaintiff Borhan Ishani Afoosi was a resident at all relevant times of Glendale, Arizona. During the Class Period and while residing in Arizona, plaintiff Afoosi indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Afoosi suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 199 of the Complaint, and therefore denies

the same.

200.    Plaintiff Michael Anderson was a resident at all relevant times of Peoria, Arizona. During the Class Period and while residing in Arizona, plaintiff Anderson indirectly purchased pork and pork products for his own use and not for resale that was produced by

one or more defendants or their co-conspirators. Plaintiff Anderson suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 200 of the Complaint, and therefore denies

the same.

201.    Plaintiff Rebekah Kingsley was a resident at all relevant times of Bentonville, Arkansas. During the Class Period and while residing in Arkansas, plaintiff Kingsley indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Kingsley suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 201 of the Complaint, and therefore denies

the same.

202.    Plaintiff Sandra Steffen was a resident at all relevant times of Camarillo, California. During the Class Period and while residing in California, plaintiff Steffen indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Steffen suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 202 of the Complaint, and therefore denies

the same.

203.    Plaintiff Michael Pickett was a resident at all relevant times of the District of Columbia. During the Class Period and while residing in Washington, DC, plaintiff Pickett indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Pickett suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 203 of the Complaint, and therefore denies

the same.

204.    Plaintiff Lisa Axelrod is currently a resident of Hillsboro Beach, Florida. At all
times between 2009 and approximately March 2018 Plaintiff Lisa Axelrod resided in North
Hollywood, California. During the Class Period and while residing in California and
Florida, plaintiff Axelrod indirectly purchased pork and pork products for her own use and
not for resale that was produced by one or more defendants or their co-conspirators.
Plaintiff Axelrod suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 204 of the Complaint, and therefore denies

the same.

205.    Plaintiff David Look was a resident at all relevant times of Honolulu, Hawaii.
During the Class Period and while residing in Hawaii, plaintiff Look indirectly purchased
pork and pork products for his own use and not for resale that was produced by one or more
defendants or their co-conspirators. Plaintiff Look suffered injury as a result of defendants'
conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 205 of the Complaint, and therefore denies

the same.

206.    Plaintiff Joseph Realdine was a resident at all relevant times of Haleiwa, Hawaii.
During the Class Period and while residing in Hawaii, plaintiff Realdine indirectly
purchased pork and pork products for his own use and not for resale that was produced by
one or more defendants or their co-conspirators. Plaintiff Realdine suffered injury as a
result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 206 of the Complaint, and therefore denies the same.

207.    Plaintiff Ryan Kutil was a resident at all relevant times of Champaign, Illinois. During the Class Period and while residing in Illinois, plaintiff Kutil indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Kutil suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 207 of the Complaint, and therefore denies the same.

208.    Plaintiff Kory Bird was a resident at all relevant times of Des Moines, Iowa. During the Class Period and while residing in Iowa, plaintiff Bird indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Bird suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 208 of the Complaint, and therefore denies the same.

209.    Plaintiff Barbara Brueggemann was a resident at all relevant times of Shawnee, Kansas. During the Class Period and while residing in Kansas, plaintiff Brueggemann indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Brueggemann suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 209 of the Complaint, and therefore denies the same.

210.    Plaintiff Duncan Birch was a resident at all relevant times of Scarborough, Maine. During the Class Period and while residing in Maine, plaintiff Birch indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Birch suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 210 of the Complaint, and therefore denies the same.

211.    Plaintiff Paul Glantz was a resident at all relevant times of Agawam, Massachusetts. During the Class Period and while residing in Massachusetts, plaintiff Glantz indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Glantz suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 211 of the Complaint, and therefore denies the same.

212.    Plaintiff Jordan Chambers was a resident at all relevant times of Decatur, Michigan. During the Class Period and while residing in Michigan, plaintiff Chambers indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Chambers suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 212 of the Complaint, and therefore denies the same.

213.    Plaintiff Robert Eccles was a resident at all relevant times of Carleton, Michigan. During the Class Period and while residing in Michigan, plaintiff Eccles indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Eccles suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 213 of the Complaint, and therefore denies the same.

214.    Plaintiff Jennifer Sullivan was a resident at all relevant times of Elk River, Minnesota. During the Class Period and while residing in Minnesota, plaintiff Sullivan indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Sullivan suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 214 of the Complaint, and therefore denies the same.

215.    Plaintiff Anbessa Tufa was a resident at all relevant times of New Hope, Minnesota. During the Class Period and while residing in Minnesota, plaintiff Tufa indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Tufa suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 215 of the Complaint, and therefore denies

the same.

216.    Plaintiff Susan McCullough was a resident at all relevant times of Hernando,
Mississippi. During the Class Period and while residing in Mississippi, plaintiff Mississippi
indirectly purchased pork and pork products for her own use and not for resale that was
produced by one or more defendants or their co-conspirators. Plaintiff McCullough
suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 216 of the Complaint, and therefore denies

the same.

217.    Plaintiff Kenneth King was a resident at all relevant times of Winfield, Missouri.
During the Class Period and while residing in Missouri, plaintiff King indirectly purchased
pork and pork products for his own use and not for resale that was produced by one or more
defendants or their co-conspirators. Plaintiff King suffered injury as a result of defendants'
conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 217 of the Complaint, and therefore denies

the same.

218.    Plaintiff Craig Thomsen was a resident at all relevant times of Wayne, Nebraska.
During the Class Period and while residing in Nebraska., plaintiff Thomsen indirectly
purchased pork and pork products for his own use and not for resale that was produced by
one or more defendants or their co-conspirators. Plaintiff Thomsen suffered injury as a
result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 218 of the Complaint, and therefore denies the same.

219.    Plaintiff Alika Naehu was a resident at all relevant times of Las Vegas, Nevada. During the Class Period and while residing in Nevada, plaintiff Naehu indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Naehu suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 219 of the Complaint, and therefore denies the same.

220.    Plaintiff Wanda Duryea was a resident at all relevant times of Farmington, New Hampshire. During the Class Period and while residing in New Hampshire, plaintiff Duryea indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Duryea suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 220 of the Complaint, and therefore denies the same.

221.    Plaintiff Michael Reilly was a resident at all relevant times of Albuquerque, New Mexico. During the Class Period and while residing in New Mexico, plaintiff Reilly indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Reilly suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 221 of the Complaint, and therefore denies the same.

222.    Plaintiff Edwin Blakey was a resident at all relevant times of New Windsor, New York. During the Class Period and while residing in New York, plaintiff Blakey indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Blakey suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 222 of the Complaint, and therefore denies the same.

223.    Plaintiff Jeffrey Allison was a resident at all relevant times of Brooklyn, New York. During the Class Period and while residing in New York, plaintiff Allison indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Allison suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 223 of the Complaint, and therefore denies the same.

224.    Plaintiff Kenneth Neal was a resident at all relevant times of Salisbury, North Carolina. During the Class Period and while residing in North Carolina, plaintiff Neal indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Neal suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 224 of the Complaint, and therefore denies the same.

225.    Chad Nodland was a resident at all relevant times of Bismarck, North Dakota. During the Class Period and while residing in North Dakota, plaintiff Nodland indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Nodland suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 225 of the Complaint, and therefore denies the same.

226.    Plaintiff Chris Deery was a resident at all relevant times of Fargo, North Dakota. During the Class Period and while residing in North Dakota, plaintiff Deery indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Deery suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 226 of the Complaint, and therefore denies the same.

227.    Plaintiff Laura Wheeler was a resident at all relevant times of Middletown, Rhode Island. During the Class Period and while residing in Rhode Island, plaintiff Wheeler indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Wheeler suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 227 of the Complaint, and therefore denies

the same.

228.    Plaintiff Christina Hall was a resident at all relevant times of York, South Carolina.
During the Class Period and while residing in South Carolina, plaintiff Hall indirectly
purchased pork and pork products for her own use and not for resale that was produced by
one or more defendants or their co-conspirators. Plaintiff Hall suffered injury as a result of
defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 228 of the Complaint, and therefore denies

the same.

229.    Plaintiff Chase Hoke was a resident at all relevant times of Sparta, Tennessee.
During the Class Period and while residing in Tennessee, plaintiff Hoke indirectly
purchased pork and pork products for his own use and not for resale that was produced by
one or more defendants or their co-conspirators. Plaintiff Hoke suffered injury as a result
of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 229 of the Complaint, and therefore denies

the same.

230.    Plaintiff Donya Collins was a resident at all relevant times of Midvale, Utah. During
the Class Period and while residing in Utah, plaintiff Collins indirectly purchased pork and
pork products for her own use and not for resale that was produced by one or more
defendants or their co-conspirators. Plaintiff Collins suffered injury as a result of
defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 230 of the Complaint, and therefore denies the same.

231.   Thomas Cosgrove was a resident at all relevant times of Vergennes, Vermont. During the Class Period and while residing in Vermont, plaintiff Cosgrove indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Cosgrove suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 231 of the Complaint, and therefore denies the same.

232.   Plaintiff Rebecca Green Watson was a resident at all relevant times of Leesburg, Virginia. During the Class Period and while residing in Virginia, plaintiff Watson indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Watson suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 232 of the Complaint, and therefore denies the same.

233.   Plaintiff Charles Dye was a resident at all relevant times of Mount Lookout, West Virginia. During the Class Period and while residing in West Virginia, plaintiff Dye indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Dye suffered injury as a result of defendants' conduct alleged herein.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 233 of the Complaint, and therefore denies

the same.

## B.    Defendants

234.    Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats acted as a co-conspirator of the pork integrator-defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co- conspirators.

**ANSWER:**

Agri Stats admits that it is an Indiana corporation headquartered in Fort Wayne,

Indiana. Agri Stats denies the remaining allegations contained in Paragraph 234 of the

Complaint.

235.    Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania and is a wholly owned subsidiary of The Clemens Family Corporation. During the class period, Clemens and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 235 of the Complaint, and therefore denies

the same.

236.    Hatfield Quality Meats, Inc. is a wholly owned subsidiary of The Clemens Family Corporation. Hatfield Quality Meats is headquartered in Hatfield, Pennsylvania. During the class period, Hatfield Quality Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 236 of the Complaint, and therefore denies

the same.

237.   Hormel Foods Corporation is a Delaware corporation engaged in the production of
meat and food products, and the marketing of these products. Hormel is headquartered in
Austin, Minnesota. During the Class Period, Hormel Foods Corporation and/or its
predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate
commerce, directly or through its wholly owned or controlled affiliates, to purchasers in
the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 237 of the Complaint, and therefore denies

the same.

238.   Indiana Packers Corporation is an Indiana corporation engaged in the production of
meat and food products, and the marketing of these products. Indiana Packers is
headquartered in Delphi, Indiana and is wholly owned and controlled by Mitsubishi
Corporation (Americas). During the Class Period, Indiana Packers and/or its predecessors,
wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce,
directly or through its wholly owned or controlled affiliates, to purchasers in the United
States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 238 of the Complaint, and therefore denies

the same.

239.   JBS USA Food Company is a subsidiary of JBS USA Food Company Holdings and
is a Delaware corporation, headquartered in Greeley, Colorado. It is one of the world's
largest beef and pork processing companies. During the Class Period, JBS USA Food
Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates

sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 239 of the Complaint, and therefore denies the same.

240.    Seaboard Foods LLC, a wholly owned subsidiary of Seaboard Corporation, is a limited-liability company headquartered in Shawnee Mission, Kansas. During the Class Period, Seaboard and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 240 of the Complaint, and therefore denies the same.

241.    Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, the largest pork company in the world. Smithfield Foods is headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 241 of the Complaint, and therefore denies the same.

242.    Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the class period, Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 242 of the Complaint, and therefore denies the same.

243.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell pork products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 243 of the Complaint, and therefore denies the same.

244.    Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 244 of the Complaint, and therefore denies the same.

245.    Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations in Paragraph 245, and therefore denies the same.

## VII.   CLASS ACTION ALLEGATIONS

246.   Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following classes:

A.   **Nationwide Injunctive Relief class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in the United States during the Class Period.

B.   **Arizona class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Arizona during the Class Period.

C.   **California class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in California during the Class Period.

D.   **District of Columbia class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in the District of Columbia during the Class Period.

E.   **Florida class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Florida during the Class Period.

F.   **Hawaii class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Hawaii during the Class Period.

G.   **Illinois class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Illinois during the Class Period.

H.   **Iowa class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Iowa during the Class Period.

I.   **Kansas class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Kansas during the Class Period.

J.   **Maine class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Maine during the Class Period.

K.   **Massachusetts class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Massachusetts during the Class Period.

L.   **Michigan class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Michigan during the Class Period.

M.   **Minnesota class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Minnesota during the Class Period.

N.   **Mississippi class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Mississippi during the Class Period.

O.   **Missouri class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Missouri during the Class Period.

P.   **Nebraska class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Nebraska during the Class Period.

Q.   **Nevada class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Nevada during the Class Period.

R.   **New Hampshire class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in New Hampshire during the Class Period.

S.   **New Mexico class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in New Mexico during the Class Period.

T.   **New York class:** All persons and  who  indirectly  purchased  pork  from

Defendants or co-conspirators for personal use in New York during the Class Period.

U.   **North Carolina class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in North Carolina during the Class Period.

V.   **North Dakota class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in North Dakota during the Class Period.

W.   **Rhode Island class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Rhode Island during the Class Period.

X.   **South Carolina class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in South Carolina during the Class Period.

Y.   **Tennessee class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Tennessee during the Class Period.

Z.   **Utah class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Utah during the Class Period.

AA.   **Virginia**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Virginia during the Class Period.

BB.   **West Virginia**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in West Virginia during the Class Period.

**ANSWER:**

Paragraph 246 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

247.   Specifically excluded from these classes are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded from these classes are any federal, state or local governmental entities, any judicial officer

presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action. Further excluded from the classes and National Injunctive Relief Class are purchasers of value-added products not manufactured, supplied or processed by defendants, or otherwise not under the control of defendants.

**ANSWER:**

Paragraph 247 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

248.    Class Identity: The above-defined classes are readily identifiable and is one for which records should exist.

**ANSWER:**

Paragraph 248 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

249.    Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of pork. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

**ANSWER:**

Paragraph 249 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

250.    Typicality: Plaintiffs' claims are typical of the claims of the members of the classes because plaintiffs purchased pork indirectly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the classes and the relief sought is common to the classes.

**ANSWER:**

Paragraph 250 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

131

251.   <u>Common Questions Predominate</u>: There are questions of law and fact common to the classes, including, but not limited to:

A.   Whether defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of pork sold in interstate commerce in the United States;

B.   The identity of the participants of the alleged conspiracy;

C.   The duration of the conspiracy alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

D.   Whether the alleged conspiracy violated the antitrust and consumer protection laws of the various states;

E.   Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the classes;

F.   The effect of defendants' alleged conspiracy on the prices of pork sold in the United States during the Class Period;

G.   Whether plaintiffs and other members of the classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

H.   The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the classes, predominate over any questions affecting only individual members of the classes.

**<u>ANSWER:</u>**

Paragraph 251 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

252.   <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the classes in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the classes who indirectly purchased pork from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the classes.

**ANSWER:**

Paragraph 252 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

253.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the classes is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the classes to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**ANSWER:**

Paragraph 253 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

254.    The prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

**ANSWER:**

Paragraph 254 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

255.    Plaintiffs bring the classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more pork products that a defendant or co-conspirator produced for personal use during the respective class periods.

**ANSWER:**

Paragraph 255 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

256.   Defendants have acted on grounds generally applicable to the classes, thereby making final injunctive relief appropriate with respect to the classes as a whole.

**ANSWER:**

Paragraph 256 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

## VIII.   ANTITRUST INJURY

257.   Defendants' anticompetitive conduct had the following effects, among others:

    A.    Price competition has been restrained or eliminated with respect to pork;

    B.    The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    C.    Indirect purchasers of pork have been deprived of free and open competition; and

    D.    End-user consumers of pork who indirectly purchased pork for personal use, including plaintiffs, paid artificially inflated prices.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 257 of the Complaint.

258.   The pork that Plaintiffs and class members purchased was in substantially the same form as when they were initially sold by defendants. As a result, the pork follows a traceable physical chain from defendants to plaintiffs and class members, and the overcharges on pork can be traced from defendants to plaintiffs and class members.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 258 of the Complaint, and therefore denies

the same.

259.    As a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to consumers, plaintiffs and class members here, in the form of higher retail prices. When demand is inelastic, as it is for pork, the pass-through rate to end users is at or near 100 percent.

**ANSWER:**

Paragraph 259 of the Complaint contains legal assertions as to which no response

is required.  To the extent a response is required, Agri Stats denies the allegations.

260.    Consequently, while the direct purchasers were the first to pay supra- competitive prices, the overcharge was passed along the distribution chain and absorbed by plaintiffs and class members when they purchased the pork for personal use.

**ANSWER:**

Paragraph 260 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

261.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution to end-user consumers. Thus, the economic harm to plaintiffs and the class member can be quantified.

**ANSWER:**

Paragraph 261 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

262.    The purpose of the conspiratorial conduct of defendants and their co- conspirators was to raise, fix, or maintain the price of pork and, as a direct and foreseeable result. Plaintiffs and the classes paid supra-competitive prices for pork during the Class Period.

**ANSWER:**

Agri Stats denies the allegations in Paragraph 262 of the Complaint.

263.   By reason of the alleged violations of the antitrust laws, plaintiffs and the classes have sustained injury to their businesses or property, having paid higher prices for pork than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**ANSWER:**

Agri Stats denies the allegations in Paragraph 263 of the Complaint.

264.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**ANSWER:**

Agri Stats denies the allegations in Paragraph 264 of the Complaint.

**IX.   CAUSES OF ACTION**

**VIOLATION OF THE SHERMAN ACT**

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**15 U.S.C. § 1 FOR CONSPIRACY TO RESTRAIN PRODUCTION**
**(ON BEHALF OF NATIONWIDE CLASS FOR**
**INJUNCTIVE AND EQUITABLE RELIEF)**

265.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 265 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

266.   Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2009, and continuing through the present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding,

and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for pork in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 266 of the Complaint.

267.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

A.   Fixing, raising, and stabilizing the price of pork; and

B.   Allocating among themselves and collusively reducing the production of pork.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 267 of the Complaint.

268.   The combination and conspiracy alleged herein has had the following effects, among others:

A.   Price competition in the sale of pork has been restrained, suppressed, and/or eliminated in the United States;

B.   Prices for pork sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non- competitive levels throughout the United States; and

C.   Those who purchased pork indirectly from defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 268 of the Complaint.

269.   Plaintiffs and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for pork purchased indirectly from the defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 269 of the Complaint.

270. Plaintiffs and members of the classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 270 of the Complaint.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
## 15 U.S.C. § 1 FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION
## (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF)

271. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 271 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

272. Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2009, and continuing through the present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 272 of the Complaint.

273. The relevant product market is pork and the relevant geographic market is the continental United States.

138

**ANSWER:**

Paragraph 273 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

274.   Defendant Processors possess market power in the Relevant Market. Defendant Processors control more than 80 percent of the Relevant Market. Defendant Processors' collective market power includes the power to artificially deflate the amount of pork produced in the United States below competitive levels and to artificially inflate the price Plaintiffs pay for pork above competitive levels.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the

truth of the allegations contained in Paragraph 274 of the Complaint, and therefore denies

the same.

275.   An increase in the price of Pork could be imposed collectively by the Defendants without causing many consumers to switch their purchases to another product. Pork constitutes a unique product market.

**ANSWER:**

Paragraph 275 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

276.   Defendants view the pork products as fungible. Pork products are generally interchangeable, permitting Defendant Processors to readily to compare and match each other's pricing.

**ANSWER:**

Paragraph 276 of the Complaint contains legal assertions as to which no response is

required.  To the extent a response is required, Agri Stats denies the allegations.

277.   The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive and non-public information about current supply, production and pricing plans regarding pork. The information exchanges specifically included the exchange through Agri Stats of weekly and monthly reports

regarding Defendants' pork operations, including weekly sales data that allowed Defendants to compare their prices with their competitors and raise prices that were lower.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 277 of the Complaint.

278.   Defendants' regular information exchanges through Agri Stats reflected concerted action between horizontal competitors in the market for pork.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 278 of the Complaint.

279.   Each Defendant Integrator furnished competitively sensitive information to other Defendant Integrators with the understanding that it would be reciprocated. Agri Stats enforced this understanding by requiring Defendants to share data in order to receive comparable data.

**ANSWER:**

To the extent the allegations contained in Paragraph 279 relate to other Defendants and/or third parties to this action, Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations, and therefore denies the same.  To the extent the allegations contained in this Paragraph purport to relate to Agri Stats, Agri Stats denies the same.

280.   The agreement to regularly exchange detailed and non-public information about current production, supply, and pricing suppressed competition between the Defendants. Agri Stats specifically identified for Defendants "opportunities" where their pricing was lower than other Defendants and where they could raise their prices to match.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 280 of the Complaint.

281.   When defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Defendants used the data obtained through Agri Stats to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the pork

market. This strategic information was a material factor in Defendant Processors' decisions to inflate the prices that Plaintiffs paid for pork during the class period.

**ANSWER:**

Agri Stats lacks knowledge or information sufficient to form a belief concerning the truth of the allegations contained in Paragraph 281 of the Complaint, and therefore denies the same.

282.    Defendants' unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 282 of the Complaint.

283.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the market for pork in the United States and (2) inflating the prices of pork during the Class Period.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 283 of the Complaint.

284.    As a result of the unlawful agreement alleged herein to exchange information, Plaintiffs and the other Class Members have been injured in their business or property by paying artificially inflated prices for pork during the Class Period.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 284 of the Complaint.

## VIOLATIONS OF STATE ANTITRUST LAWS

285.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**ANSWER:**

Paragraph 285 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

286. The following claims for relief are pleaded under the antitrust laws of each jurisdiction identified below on behalf of the indicated class.

**ANSWER:**

Paragraph 286 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. § 44-1401, *ET SEQ.***
**(ON BEHALF OF THE ARIZONA CLASS)**

287. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

**ANSWER:**

Paragraph 287 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

288. By reason of the conduct alleged herein, defendants have violated Arizona Rev. Stat. § 44-1401, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 288 of the Complaint.

289.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Arizona.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 289 of the Complaint.

290.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 290 of the Complaint.

291.     Defendants' violations of Arizona law were flagrant.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 291 of the Complaint.

292.     Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 292 of the Complaint.

293.     As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 293 of the Complaint.

294.     By reason of the foregoing, plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 294 of the Complaint.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE § 16700, *ET SEQ.***
**(ON BEHALF OF THE CALIFORNIA CLASS)**

295.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 295 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

296.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

**ANSWER:**

Paragraph 296 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

297.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

**ANSWER:**

Paragraph 297 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

298.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

**ANSWER:**

Paragraph 298 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

299.   A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

**ANSWER:**

Paragraph 299 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

300.   Plaintiffs purchased pork within the State of California during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 300 of the Complaint.

301.   Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 301 of the Complaint.

302.   Plaintiffs and members of the California Class were injured in their business or property, with respect to purchases of pork in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 302 of the Complaint.

### FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT,
### D.C. CODE § 28-4501, *ET SEQ.*
### (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)

303.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 303 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

304.   The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

**ANSWER:**

Paragraph 304 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

305.   Plaintiffs purchased pork within the District of Columbia during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 305 of the Complaint

306.   Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

**ANSWER:**

Paragraph 306 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

307.   Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for pork within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 307 of the Complaint.

308.    Plaintiffs and members of the District of Columbia Class were injured with respect to purchases of pork in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 308 of the Complaint.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF THE ILLINOIS ANTITRUST ACT,
### 740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.*
### (ON BEHALF OF THE ILLINOIS CLASS)

309.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 309 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

310.    The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade. . . ." 740 ILCS 10/2.

**ANSWER:**

Paragraph 310 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

311.    Plaintiffs purchased pork within the State of Illinois during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 311 of the Complaint.

312.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

**ANSWER:**

Paragraph 312 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

313.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for pork sold, and/or for allocating customers or markets for pork within the intrastate commerce of Illinois.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 313 of the Complaint.

314.    Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for pork in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 314 of the Complaint.

315.    Plaintiffs and members of the Illinois Class were injured with respect to purchases of pork in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 315 of the Complaint.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE IOWA COMPETITION LAW**
**IOWA CODE § 553.1, *ET SEQ*.**
**(ON BEHALF OF THE IOWA CLASS)**

316.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 316 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

317.   The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

**ANSWER:**

Paragraph 317 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations

318.   Plaintiffs purchased pork within the State of Iowa during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 318 of the Complaint.

319.   Defendants contracted, combined or conspired to restrain or monopolize trade in the market for pork, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for pork, in violation of Iowa Code § 553.1, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 319 of the Complaint.

320.   Plaintiffs and members of the Iowa Class were injured with respect to purchases of pork in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 320 of the Complaint.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT**

## KAN. STAT. ANN. § 50-101, *ET SEQ.*
## (ON BEHALF OF THE KANSAS CLASS)

321.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 321 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

322.    The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

**ANSWER:**

Paragraph 322 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

323.    Plaintiffs purchased pork within the State of Kansas during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 323 of the Complaint.

324.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

**ANSWER:**

Paragraph 324 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

325.    Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of pork, increasing the price of pork, preventing competition in the sale of pork, or binding themselves not to sell pork, in a manner that established the price

of pork and precluded free and unrestricted competition among themselves in the sale of pork, in violation of Kan. Stat. Ann. § 50-101, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 325 of the Complaint.

326.    Plaintiffs and members of the Kansas Class were injured with respect to purchases of pork in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 326 of the Complaint.

**NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE MAINE'S ANTITRUST STATUTE**
**ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ*.**
**(ON BEHALF OF THE MAINE CLASS)**

327.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 327 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

328.    Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

**ANSWER:**

Paragraph 328 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

329.    Plaintiffs purchased pork within the State of Maine during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 329 of the Complaint.

330.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

**ANSWER:**

Paragraph 330 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

331.    Defendants contracted, combined or conspired in restraint of trade or commerce of pork within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of pork within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 331 of the Complaint.

332.    Plaintiffs and members of the Maine Class were injured with respect to purchases of pork in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 332 of the Complaint

**TENTH CLAIM FOR RELIEF**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT**
**MICH. COMP. LAWS § 445.771, *ET SEQ*.**
**(ON BEHALF OF THE MICHIGAN CLASS)**

333.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 333 does not contain any factual allegations to which a response is

required.  To the extent a response is required, Agri Stats incorporates by reference its

responses to each preceding Paragraph as if fully set forth herein.

334.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

**ANSWER:**

Paragraph 334 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

335.    Plaintiffs purchased pork within the State of Michigan during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 335 of the Complaint.

336.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

**ANSWER:**

Paragraph 336 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

337.    Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for pork, in violation of Mich. Comp. Laws § 445.772, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 337 of the Complaint.

338.    Plaintiffs and members of the Michigan Class were injured with respect to purchases of pork in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 338 of the Complaint.

## ELEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE MINNESOTA ANTITRUST LAW,
## MINN. STAT. § 325D.49, *ET SEQ.*
## (ON BEHALF OF THE MINNESOTA CLASS)

339.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 339 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

340.     The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

**ANSWER:**

Paragraph 340 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

341.     Plaintiffs purchased pork within the State of Minnesota during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 341 of the Complaint.

342.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

**ANSWER:**

Paragraph 342 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

343.   Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for pork within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for pork within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for pork within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 343 of the Complaint.

344.   Plaintiffs and members of the Minnesota Class were injured with respect to purchases of pork in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 344 of the Complaint.

**TWELFTH CLAIM FOR RELIEF**
**VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,**
**MISS. CODE ANN. § 74-21-1, *ET SEQ.***
**(ON BEHALF OF THE MISSISSIPPI CLASS)**

345.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 345 does not contain any factual allegations to which a response is

required.  To the extent a response is required, Agri Stats incorporates by reference its

responses to each preceding Paragraph as if fully set forth herein.

346.   Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

**ANSWER:**

Paragraph 346 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

347.     Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

**ANSWER:**

Paragraph 347 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

348.     Plaintiffs purchased pork within the State of Mississippi during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 348 of the Complaint.

349.     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

**ANSWER:**

Paragraph 349 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

350.     Defendants combined, contracted, understood and agreed in the market for pork, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of pork and hindering competition in the sale of pork, in violation of Miss. Code Ann. § 75-21-1(a), *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 350 of the Complaint.

351.    Defendants monopolized or attempted to monopolize the production, control or sale of pork, in violation of Miss. Code Ann. § 75-21-3, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 351 of the Complaint.

352.    Defendants' pork is sold indirectly via distributors throughout the State of Mississippi. During the Class Period, defendants' illegal conduct substantially affected Mississippi commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 352 of the Complaint.

353.    Plaintiffs and members of the Mississippi Class were injured with respect to purchases of pork in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 353 of the Complaint.

## THIRTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. ANN. STAT. § 407.010, *ET SEQ*. (ON BEHALF OF THE MISSOURI CLASS)

354.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 354 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

355.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

**ANSWER:**

Paragraph 355 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

356.    Plaintiffs purchased pork within the State of Missouri during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 356 of the Complaint.

357.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

**ANSWER:**

Paragraph 357 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

358.    Defendants contracted, combined or conspired in restraint of trade or commerce of pork within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the market for pork within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 358 of the Complaint.

359.    Plaintiffs and members of the Missouri Class were injured with respect to purchases of pork in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 359 of the Complaint.

**FOURTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEBRASKA JUNKIN ACT,**
**NEB. REV. STAT. § 59-801, *ET SEQ*.**
**(ON BEHALF OF THE NEBRASKA CLASS)**

360.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 360 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

361.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

**ANSWER:**

Paragraph 361 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

362.    Plaintiffs purchased pork within the State of Nebraska during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 362 of the Complaint.

363.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

**ANSWER:**

Paragraph 363 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

364.    Defendants contracted, combined or conspired in restraint of trade or commerce of pork within the intrastate commerce of Nebraska, and monopolized or attempted to

monopolize the market for pork within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 364 of the Complaint.

365.    Plaintiffs and members of the Nebraska Class were injured with respect to purchases of pork in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 365 of the Complaint.

### FIFTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010, *ET SEQ*. (ON BEHALF OF THE NEVADA CLASS)

366.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 366 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

367.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well- being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

**ANSWER:**

Paragraph 367 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

368.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

**ANSWER:**

Paragraph 368 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

369.    Plaintiffs purchased pork within the State of Nevada during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 369 of the Complaint.

370.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

**ANSWER:**

Paragraph 370 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

371.    Defendants fixed prices by agreeing to establish prices for pork in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of pork within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 371 of the Complaint.

372.    Plaintiffs and members of the Nevada Class were injured with respect to purchases of pork in Nevada in that at least thousands of sales of defendants' pork took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by defendants' conduct.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 372 of the Complaint.

373.   Accordingly, plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 373 of the Complaint.

374.   In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by plaintiffs.

**ANSWER:**

Paragraph 374 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

**SIXTEENTH CLAIM FOR RELIEF**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ*.**
**(ON BEHALF OF THE NEW HAMPSHIRE CLASS)**

375.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 375 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

376.   Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

**ANSWER:**

Paragraph 376 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

377.   Plaintiffs purchased pork within the State of New Hampshire during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 377 of the Complaint.

378.   Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

**ANSWER:**

Paragraph 378 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

379.   Defendants fixed, controlled or maintained prices for pork, allocated customers or markets for pork, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 379 of the Complaint.

380.   Plaintiffs and members of the New Hampshire Class were injured with respect to purchases of pork in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph  of 380 the Complaint.

## SEVENTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
### N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.*
### (ON BEHALF OF THE NEW MEXICO CLASS)

381.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 381 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

382.    The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

**ANSWER:**

Paragraph 382 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

383.    Plaintiffs purchased pork within the State of New Mexico during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 383 of the Complaint.

384.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

**ANSWER:**

Paragraph 384 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

385.    Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for pork within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 385 of the Complaint.

386.    Plaintiffs and members of the New Mexico Class were injured with respect to purchases of pork in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 386 of the Complaint.

**EIGHTEENTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 340 OF**
**THE NEW YORK GENERAL BUSINESS LAW**
**(ON BEHALF OF THE NEW YORK CLASS)**

387.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 387 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

388.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

**ANSWER:**

Paragraph 388 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

389.    Plaintiffs purchased pork within the State of New York during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 389 of the Complaint.

390.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

**ANSWER:**

Paragraph 390 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

391.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of pork and restrained competition in the free exercise of the conduct of the business of pork within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 391 of the Complaint.

392.    Plaintiffs and members of the New York Class were injured with respect to purchases of pork in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 392 of the Complaint.

**NINETEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES,**
**N.C. GEN. STAT. § 75-1, *ET SEQ*.**
**(ON BEHALF OF THE NORTH CAROLINA CLASS)**

393.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 393 does not contain any factual allegations to which a response is

required.  To the extent a response is required, Agri Stats incorporates by reference its

responses to each preceding Paragraph as if fully set forth herein.

394.    Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the pork market, a substantial part of which occurred within North Carolina.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 394 of the Complaint.

395.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 395 of the Complaint.

396.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 396 of the Complaint.

397.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 397 of the Complaint.

398.    By reason of the foregoing, plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under Gen. Stat. § 75-1, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 398 of the Complaint.

## TWENTIETH CLAIM FOR RELIEF
## VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, CENT. CODE § 51-08.1, *ET SEQ.* (ON BEHALF OF THE NORTH DAKOTA CLASS)

399.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 399 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

400.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq*.

**ANSWER:**

Paragraph 400 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

401.    Plaintiffs purchased pork within the State of North Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 401 of the Complaint.

402.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

**ANSWER:**

Paragraph 402 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

403.    Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for pork, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing or maintaining prices for pork, in violation of N.D. Cent. Code §§ 51- 08.1-02, 03.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 403 of the Complaint.

404.    Plaintiffs and members of the North Dakota Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 404 of the Complaint.

## TWENTY-FIRST CLAIM FOR RELIEF
### VIOLATION OF THE RHODE ISLAND ANTITRUST ACT, R.I. *GEN LAWS* § 6-36-1, *ET SEQ.* (ON BEHALF OF THE RHODE ISLAND CLASS)

405.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 405 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

406.    The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

**ANSWER:**

Paragraph 406 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

407.    Plaintiffs purchased pork within the State of Rhode Island during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 407 of the Complaint.

408.   Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a). In Rhode Island, the claims of plaintiffs and the Class alleged herein run from January 1, 2008, through the date that the effects of defendants' anticompetitive conduct cease.

**ANSWER:**

Paragraph 408 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

409.   Defendants contracted, combined and conspired in restraint of trade of pork within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of pork for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 409 of the Complaint.

410.   Plaintiffs and members of the Rhode Island Class were injured with respect to purchases of pork in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 410 of the Complaint

**TWENTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE, § 47-25-101, *ET SEQ.***
**(ON BEHALF OF THE TENNESSEE CLASS)**

411.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 411 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

412.    The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.

**ANSWER:**

Paragraph 412 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

413.    Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47- 25-101, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 413 of the Complaint.

414.    Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, defendants' combination or conspiracy had the following effects: (1) price competition for pork was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for pork were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and the Tennessee Class were deprived of free and open competition; and (4) Plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for pork.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 414 of the Complaint.

415.   During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce as pork was sold in Tennessee.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 415 of the Complaint.

416.   Plaintiffs and the Tennessee Class purchased pork within the State of Tennessee during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the Tennessee Class have been injured in their business and property and are threatened with further injury

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 416 of the Complaint.

417.   Under Tennessee law, indirect purchasers (such as plaintiffs and the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

**ANSWER:**

Paragraph 417 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

418.   Plaintiffs and members of the Tennessee Class were injured with respect to purchases of pork in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 418 of the Complaint.

**TWENTY-THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. §§ 76-10-911, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

419.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 419 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

420. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

**ANSWER:**

Paragraph 420 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

421. Plaintiffs purchased pork within the State of Utah during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 421 of the Complaint.

422. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

**ANSWER:**

Paragraph 422 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

423. Defendants contracted, combined or conspired in restraint of trade or commerce of pork, and monopolized or attempted to monopolize trade or commerce of pork, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 423 of the Complaint.

424.    Plaintiffs and members of the Utah Class who are either Utah residents or Utah citizens were injured with respect to purchases of pork in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 424 of the Complaint.

### TWENTY-FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W. VA. CODE §47-18-1, *ET SEQ.* (ON BEHALF OF THE WEST VIRGINIA CLASS)

425.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 425 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

426.    The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

**ANSWER:**

Paragraph 426 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

427.    During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 427 of the Complaint.

428.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 428 of the Complaint.

429.    As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the West Virginia Class have been injured in their business and property in that they paid more for pork than they otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, plaintiffs and members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 429 of the Complaint.

**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

430.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**ANSWER:**

Paragraph 430 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

431.    The following claims for relief are pled under the consumer protection or similar laws of each jurisdiction identified below, on behalf of the indicated class.

**ANSWER:**

Paragraph 431 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

**TWENTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. (THE "UCL")**
**(ON BEHALF OF THE CALIFORNIA CLASS)**

432.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 432 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

433.    The violations of federal antitrust law set forth above also constitute violations of section 17200*, et seq.* of California Business and Professions Code.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 433 of the Complaint.

434.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 434 of the Complaint.

435.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated the UCL.

**ANSWER:**

Paragraph 435 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

436.    The defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 436 of the Complaint.

437.   Defendants' acts, omissions, misrepresentations, practices, and non- disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 437 of the Complaint.

438.   Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 438 of the Complaint.

439.   The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 439 of the Complaint.

440.   The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiffs and the members of the California Class to pay supra-competitive and artificially inflated prices for pork sold in the State of California. Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 440 of the Complaint.

441.   As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Plaintiffs and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 441 of the Complaint.

## TWENTY-SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT,
## D.C. CODE § 28-3901, *ET SEQ*.
## (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)

442.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 442 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

443.   Plaintiffs and members of the District of Columbia Class purchased pork for personal, family, or household purposes.

**ANSWER:**

Paragraph 443 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

444.   By reason of the conduct alleged herein, defendants have violated D.C. Code § 28-3901, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 444 of the Complaint.

445.   Defendants are "merchants" within the meaning of D.C. Code § 28- 3901(a)(3).

**ANSWER:**

Paragraph 445 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

446.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Pork market, a substantial part of which occurred within the District of Columbia.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 446 of the Complaint.

447.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Pork Market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 447 of the Complaint.

448.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 448 of the Complaint.

449.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 449 of the Complaint.

450.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 450 of the Complaint.

451.    By reason of the foregoing, plaintiffs and members of the District of Columbia Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus reasonable attorney's fees and costs under D.C. Code § 28-3901*, et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 451 of the Complaint.

## TWENTY-SEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT,
## FLA. STAT. § 501.201(2), *ET SEQ.*
## (ON BEHALF OF THE FLORIDA CLASS)

452.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 452 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

453.    The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

**ANSWER:**

Paragraph 453 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

454.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

**ANSWER:**

Paragraph 454 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

455.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

**ANSWER:**

Paragraph 455 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

456.    Under Florida law, indirect purchasers have standing to maintain an action under
the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone
aggrieved by a violation of this [statute] may bring an action . . .").

**ANSWER:**

Paragraph 456 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

457.    Plaintiffs purchased pork within the State of Florida during the Class Period. But
for defendants' conduct set forth herein, the price per pound of pork would have been
lower, in an amount to be determined at trial.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 457 of the Complaint.

458.    Defendants entered into a contract, combination or conspiracy between two or more
persons in restraint of, or to monopolize, trade or commerce in the pork market, a
substantial part of which occurred within Florida.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 458 of the Complaint.

459.    Defendants established, maintained or used a monopoly, or attempted to establish a
monopoly, of trade or commerce in the market for pork, for the purpose of excluding
competition or controlling, fixing or maintaining prices in Florida at a level higher than the
competitive market level, beginning at least as early as 2008 and continuing through the
date of this filing.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 459 of the Complaint.

460.    Accordingly, defendants' conduct was an unfair method of competition, and an
unfair or deceptive act or practice within the conduct of commerce within the State of
Florida.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 460 of the Complaint.

461.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 461 of the Complaint.

462.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for pork and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 462 of the Complaint.

463.    By reason of the foregoing, plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 463 of the Complaint.

**TWENTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE HAWAII REVISED STATUTES**
**ANNOTATED §§ 480-1, *ET SEQ*.**
**(ON BEHALF OF HAWAII CLASS)**

464.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 464 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

465.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 465 of the Complaint.

466.   Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) pork prices were, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Hawaii Class were deprived of free and open competition; and (4) Plaintiffs and members of the Hawaii Class paid supra-competitive, artificially inflated prices for pork.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 466 of the Complaint.

467.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 467 of the Complaint.

468.   As a direct and proximate result of Defendants' unlawful conduct, plaintiffs and members of the Hawaii Class have been injured and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 468 of the Complaint.

**TWENTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**BUSINESS PRACTICES ACT,**
**815 ILL. COMP. STAT. ANN. 505/10A, *ET SEQ*.**
**(ON BEHALF OF THE ILLINOIS CLASS)**

469.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 469 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

470.    By reason of the conduct alleged herein, defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 470 of the Complaint.

471.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Illinois.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 471 of the Complaint.

472.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 472 of the Complaint.

473.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 473 of the Complaint.

474.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the classes.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 474 of the Complaint.

475.   Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 475 of the Complaint.

476.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Illinois Class were actually deceived and have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 476 of the Complaint.

477.   By reason of the foregoing, plaintiffs and members of the Illinois Class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 477 of the Complaint.

## THIRTIETH CLAIM FOR RELIEF
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS CH. 93A § 1, *ET SEQ.* (ON BEHALF OF THE MASSACHUSETTS CLASS)

478.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 478 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

479.   Plaintiffs reserve their right to bring a claim under Mass. Gen. Laws Ch. 93A *et seq.* Pursuant to Mass. Gen. Laws Ch. 93A § 9, plaintiffs served all defendants on June 27, 2018, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the defendants within 30 days. If necessary, plaintiffs will amend to add specific claims under Mass. Gen. Laws Ch. 93A *et seq.*

**ANSWER:**

Paragraph 479 of the Complaint contains legal assertions as to which no response is required. To the extent a response is required, Agri Stats denies the allegations.

### THIRTY-FIRST CLAIM FOR RELIEF
### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT,
### MICH. COMP. LAWS ANN. § 445.901, *ET SEQ.*
### (ON BEHALF OF THE MICHIGAN CLASS)

480. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 480 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

481. By reason of the conduct alleged herein, defendants have violated Mich. Comp. Laws Ann. § 445.901, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 481 of the Complaint.

482. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Michigan.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 482 of the Complaint.

483. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Michigan.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 483 of the Complaint.

484.    Defendants' conduct was conducted with the intent to deceive Michigan consumers regarding the nature of defendants' actions within the stream of Michigan commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 484 of the Complaint.

485.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Michigan.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 485 of the Complaint.

486.    Defendants' conduct misled consumers, withheld material facts, and took advantage of plaintiffs and members-of-the-classes' inability to protect themselves.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 486 of the Complaint.

487.    Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 487 of the Complaint.

488.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Michigan Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 488 of the Complaint

489.    By reason of the foregoing, plaintiffs and the Michigan Class are entitled to seek all forms of relief available under Mich. Comp. Laws Ann. § 445.911.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 489 of the Complaint.

**THIRTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT,**

## MINN. STAT. § 325F.68, *ET SEQ*.
## (ON BEHALF OF THE MINNESOTA CLASS)

490.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**<u>ANSWER:</u>**

Paragraph 490 does not contain any factual allegations to which a response is required.   To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

491.   By reason of the conduct alleged herein, defendants have violated Minn. Stat. § 325F.68, *et seq*.

**<u>ANSWER:</u>**

Agri Stats denies the allegations contained in Paragraph 491 of the Complaint.

492.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

**<u>ANSWER:</u>**

Agri Stats denies the allegations contained in Paragraph 492 of the Complaint.

493.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the pork market.

**<u>ANSWER:</u>**

Agri Stats denies the allegations contained in Paragraph 493 of the Complaint.

494.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

**<u>ANSWER:</u>**

Agri Stats denies the allegations contained in Paragraph 494 of the Complaint.

495.   Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 495 of the Complaint.

496.   Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 496 of the Complaint.

497.   Defendants' conduct was willful.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 497 of the Complaint.

498.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 498 of the Complaint.

499.   By reason of the foregoing, plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et *seq*. and applicable case law.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 499 of the Complaint.

### THIRTY-THIRD CLAIM FOR RELIEF
### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,
### NEB. REV. STAT. § 59-1602, *ET SEQ*.
### (ON BEHALF OF THE NEBRASKA CLASS)

500.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 500 does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

501. By reason of the conduct alleged herein, defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 501 of the Complaint.

502. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Nebraska.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 502 of the Complaint.

503. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 503 of the Complaint.

504. Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of defendants' actions within the stream of Nebraska commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 504 of the Complaint.

505. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 505 of the Complaint.

506.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the Nevada Class's ability to protect themselves.

**ANSWER:**

   Agri Stats denies the allegations contained in Paragraph 506 of the Complaint.

507.   Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

**ANSWER:**

   Agri Stats denies the allegations contained in Paragraph 507 of the Complaint.

508.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

   Agri Stats denies the allegations contained in Paragraph 508 of the Complaint.

509.   By reason of the foregoing, plaintiffs and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1614.

**ANSWER:**

   Agri Stats denies the allegations contained in Paragraph 509 of the Complaint.

**THIRTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598.0903, *ET SEQ*.**
**(ON BEHALF OF THE NEVADA CLASS)**

510.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

   Paragraph 510 does not contain any factual allegations to which a response is

required.   To the extent a response is required, Agri Stats incorporates by reference its

responses to each preceding Paragraph as if fully set forth herein.

511.    By reason of the conduct alleged herein, defendants have violated Nev. Rev. Stat. § 598.0903, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 511 of the Complaint.

512.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 512 of the Complaint.

513.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 513 of the Complaint.

514.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 514 of the Complaint.

515.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 515 of the Complaint.

516.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 516 of the Complaint.

517.    Defendants' conduct was willful.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 517 of the Complaint.

518.    As a direct and proximate cause of defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 518 of the Complaint.

519.    By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 519 of the Complaint.

**THIRTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. TIT. XXXI, § 358-A, *ET SEQ*.**
**(ON BEHALF OF THE NEW HAMPSHIRE CLASS)**

520.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 520 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

521.    By reason of the conduct alleged herein, defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 521 of the Complaint.

522.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within New Hampshire.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 522 of the Complaint.

523.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 523 of the Complaint.

524.    Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of defendants' actions within the stream of New Hampshire commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 524 of the Complaint.

525.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 525 of the Complaint.

526.    Defendants' conduct was willful and knowing.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 526 of the Complaint.

527.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the New Hampshire Class's ability to protect themselves.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 527 of the Complaint.

528.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 528 of the Complaint.

529.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 529 of the Complaint.

530.    By reason of the foregoing, plaintiffs and the members of the New Hampshire Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 530 of the Complaint.

## THIRTY-SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-3, *ET SEQ.* (ON BEHALF OF THE NEW MEXICO CLASS)

531.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 531 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

532.    By reason of the conduct alleged herein, defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 532 of the Complaint.

533.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within New Mexico.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 533 of the Complaint.

534.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 534 of the Complaint.

535.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 535 of the Complaint.

536.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the New Mexico Class.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 536 of the Complaint.

537.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 537 of the Complaint.

538.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico Class members and the price paid by them for pork as set forth in N.M. Stat. Ann. § 57-12-2E.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 538 of the Complaint.

539.   Defendants' conduct was willful.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 539 of the Complaint.

540.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 540 of the Complaint.

541.   By reason of the foregoing, plaintiffs and members of the New Mexico Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 541 of the Complaint.

## THIRTY-SEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT,
## N.C. GEN. STAT. § 75-1.1, *ET SEQ.*
## (ON BEHALF OF THE NORTH CAROLINA CLASS)

542.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 542 does not contain any factual allegations to which a response is required.   To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

543.   By reason of the conduct alleged herein, defendants have violated N.C. Gen. Stat. § 75-1.1, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 543 of the Complaint.

544.    Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within North Carolina.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 544 of the Complaint.

545.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 545 of the Complaint.

546.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 546 of the Complaint.

547.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the North Carolina Class.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 547 of the Complaint.

548.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 548 of the Complaint.

549.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 549 of the Complaint.

550.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 550 of the Complaint.

551.    By reason of the foregoing, plaintiffs and the members of the North Carolina Class are entitled to seek all forms of relief, including treble damages under Gen. Stat. § 7516.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 551 of the Complaint.

**THIRTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH DAKOTA UNFAIR PRACTICES LAW,**
**CENT. CODE § 51-10, *ET SEQ*.**
**(ON BEHALF OF THE NORTH DAKOTA CLASS)**

552.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 552 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

553.    By reason of the conduct alleged herein, defendants have violated N.D. Cent. Code § 51-10-01, et *seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 553 of the Complaint.

554.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 554 of the Complaint.

555.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within North Dakota, for the purpose of controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 555 of the Complaint.

556.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Dakota.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 556 of the Complaint.

557.   Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 557 of the Complaint.

558.   Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 558 of the Complaint.

559.   Defendants' conduct was willful.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 559 of the Complaint.

560.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 560 of the Complaint.

561.    By reason of the foregoing, plaintiffs and the members of the North Dakota Class are entitled to seek all forms of relief, including damages and injunctive relief under N.D. Cent. Code § 51-10-06.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 561 of the Complaint.

**THIRTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,**
**R.I. GEN. LAWS § 6-13.1-1, *ET SEQ.***
**(ON BEHALF OF THE RHODE ISLAND CLASS)**

562.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 562 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

563.    By reason of the conduct alleged herein, defendants have violated R.I. Gen Laws § 6-13.1-1, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 563 of the Complaint

564.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 564 of the Complaint.

565.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred

within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 565 of the Complaint.

566.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 566 of the Complaint.

567.   Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 567 of the Complaint.

568.   Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 568 of the Complaint.

569.   Defendants' conduct was willful.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 569 of the Complaint.

570.   Defendants deliberately failed to disclose material facts to plaintiffs and members of the Rhode Island Class concerning defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for pork.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 570 of the Complaint.

571.   Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of pork, constitutes information necessary to plaintiffs and members of the Rhode Island Class relating to the cost of pork purchased.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 571 of the Complaint.

572.   Plaintiffs and members of the Rhode Island class purchased goods, namely pork, primarily for personal, family, or household purposes.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 572 of the Complaint.

573.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 573 of the Complaint.

574.   By reason of the foregoing, plaintiffs and the members of the Rhode Island Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and damages under R.I. Gen Laws § 6-13.1-5.2.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 574 of the Complaint.

### FORTIETH CLAIM FOR RELIEF
### VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT,
### S.C. CODE ANN. §§ 39-5-10, *ET SEQ*.
### (ON BEHALF OF THE SOUTH CAROLINA CLASS)

575.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 575 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its

responses to each preceding Paragraph as if fully set forth herein.

576.    By reason of the conduct alleged herein, defendants have violated S.C. Code Ann. §§ 39-5-10.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 576 of the Complaint.

577.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within South Carolina.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 577 of the Complaint.

578.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 578 of the Complaint.

579.    Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of defendants' actions within the stream of South Carolina commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 579 of the Complaint.

580.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 580 of the Complaint.

581.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the South Carolina Class's ability to protect themselves.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 581 of the Complaint.

582.   Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 582 of the Complaint.

583.   Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as nearly all members of the public purchase and consume pork.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 583 of the Complaint.

## FORTY-FIRST CLAIM FOR RELIEF
## VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT, UTAH CODE ANN. §§ 13-11-1, *ET SEQ.* (ON BEHALF OF THE UTAH CLASS)

584.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 584 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

585.   By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-11-1, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 585 of the Complaint.

586.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Utah.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 586 of the Complaint.

587.    Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11-3.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 587 of the Complaint.

588.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 588 of the Complaint.

589.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 589 of the Complaint.

590.    Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 590 of the Complaint.

591.    Defendants knew or had reason to know that their conduct was unconscionable.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 591 of the Complaint.

592.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the Utah Class.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 592 of the Complaint.

593.   Defendants' unlawful conduct substantially affected Utah's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 593 of the Complaint.

594.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 594 of the Complaint.

595.   By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 595 of the Complaint.

**FORTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH UNFAIR PRACTICES ACT,**
**UTAH CODE ALL. §§ 13-5-1, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

596.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 596 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

597.   By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-5-1, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 597 of the Complaint.

598.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Utah.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 598 of the Complaint.

599.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 599 of the Complaint.

600.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 600 of the Complaint.

601.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 601 of the Complaint.

602.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 602 of the Complaint.

603.    By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, *et seq.*

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 603 of the Complaint.

**FORTY-THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**
**VA. CODE ANN. § 59.1- 196, *ET SEQ*.**
**(ON BEHALF OF THE VIRGINIA CLASS)**

604.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:**

Paragraph 604 does not contain any factual allegations to which a response is required.   To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

605.    By reason of the conduct alleged herein, defendants have violated Va. Code Ann. § 59.1- 196, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 605 of the Complaint.

606.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Virginia.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 606 of the Complaint.

607.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 607 of the Complaint

608.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Virginia.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 608 of the Complaint

609.    Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 609 of the Complaint

610.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Virginia Class have been injured in their business or property and are threatened with further injury.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 610 of the Complaint

611.    By reason of the foregoing, plaintiffs and the members of the Virginia Class are entitled to seek all forms of relief, including actual damages, treble damages, plus reasonable attorney's fees under Virginia Code Ann. § 59.1-196, *et seq*.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 611 of the Complaint

## FORTY-FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

612.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**ANSWER:**

Paragraph 612 does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

613.    As a result of their unlawful conduct described above, defendants have and will continued to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of pork.

**ANSWER:**

Agri Stats denies the allegations contained in Paragraph 613 of the Complaint.

614.    Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred on them by overpayments by plaintiffs and members of the classes in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Rhode Island, South Carolina, Tennessee, Utah, Virginia, and West Virginia.

**ANSWER:**

Paragraph 614 of the Complaint contains legal assertions as to which no response is

required. To the extent a response is required, Agri Stats denies the allegations.

## X.    REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the classes of all others so similarly situated, respectfully requests judgment against defendants as follows:

615.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which

a response is required.  To the extent a response is required, Agri Stats incorporates by

reference its responses to each preceding Paragraph as if fully set forth herein.

616.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

617.    Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiffs and the members of the Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

618.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

619.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

620.   Plaintiffs and the members of the classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

621.   Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

622.   Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**ANSWER:**

This Paragraph of the Complaint does not contain any factual allegations to which a response is required. To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

## XI.   JURY TRIAL DEMANDED

623.   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**ANSWER:**

Paragraph 623 of the Complaint does not contain factual allegations to which a response is required.  To the extent a response is required, Agri Stats incorporates by reference its responses to each preceding Paragraph as if fully set forth herein.

## GENERAL DENIAL

Agri Stats denies all allegations in the Complaint unless Agri Stats has expressly admitted those allegations herein.  Where an allegation in the Complaint is directed at another Defendant or a party that is not affiliated with Agri Stats, then except as otherwise expressly stated, Agri Stats denies the allegations set forth in the Complaint on the basis that it denies the knowledge or information sufficient to form a belief concerning the truth of such allegations.

## AFFIRMATIVE DEFENSES

Without assuming any burden that it would not otherwise bear, Agri Stats asserts the following avoidances and defenses to Plaintiffs' claims. Federal Rule of Civil Procedure 8 sets forth the avoidances and defenses that must be affirmatively stated in a pleading. See Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: [identified affirmative defenses]."). To the extent necessary, Agri Stats alleges Plaintiffs' claims are barred because the acts Plaintiffs allege Agri Stats undertook in furtherance of the alleged conspiracy were in Agri Stats' unilateral business interest. Agri Stats reserves the right to assert additional avoidances and defenses as they become known during discovery and based on the record

as it develops, up to and including the time of trial.

**FIRST DEFENSE**

1. Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

2. The statute of limitations for Plaintiffs' federal claims is four years. 15 U.S.C. § 15(b). Thus, Plaintiffs' claims are barred unless Plaintiffs establish that they could not have discovered such claims within the limitations period exercising reasonable diligence.

3. Plaintiffs cannot satisfy this burden: the challenged conduct occurred more than four ago.

4. Moreover, the facts Plaintiffs cite in support of their claims were made public more

than four years ago.

5. Plaintiffs' reliance on the doctrine of fraudulent concealment recycles the Complaint's underlying allegations and asserts fraudulent concealment in a conclusory fashion. Plaintiffs cannot establish any concealment of their claims, much less fraudulent concealment of their claims.

6. Accordingly, Plaintiffs' Complaint is time-barred.

**SECOND DEFENSE**

7. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have suffered neither any injury in fact nor any injury cognizable under the antitrust laws.

8. Plaintiffs' alleged harm lies in their speculation that a conspiracy among many companies colluded seamlessly over almost a decade resulting in their harm. In essence,

Plaintiffs complain about the impact of naturally unpredictable changes in the market conditions that exist in a global economy.

9. To the extent that Plaintiffs maintain that they were injured by these events, such an injury is not cognizable under the antitrust laws.

**THIRD DEFENSE**

10. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered.

11. The facts Plaintiffs cite in support of their claims were made public years ago. Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

12. To the extent Plaintiffs believed that Defendants agreed to cut pork production and that such agreement had the effect of raising prices above competitive levels, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other producers.

13. Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs may have suffered.

**FOURTH DEFENSE**

14. Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages either were not legally or proximately caused by any acts or omissions of Defendants or were caused, if at all, solely and proximately by Plaintiffs' conduct or by the conduct of third parties including, without limitation, the prior, intervening or superseding conduct of Plaintiffs or such third parties.

**FIFTH DEFENSE**

15. Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

16. The facts Plaintiffs cites in support of their claims were made public more than four years ago. Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

17. Plaintiffs' continued purchases of pork at what they now allege are prices above the competitive level manifest an intention to waive any right to bring this suit and are inconsistent with any other intention.

18. Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with defendant producers and relinquished their rights to bring suit.

**SIXTH DEFENSE**

19. Plaintiffs' claims are barred by the equitable doctrine of laches.

20. Agri Stats hereby incorporates Paragraph 4 above in support of this defense. Plaintiffs demonstrated an unreasonable lack of diligence in bringing its claims. As set forth in support of Agri Stats statute of limitations defense, the challenged conduct that underlies Plaintiffs' claims occurred more than four years ago. Likewise, the specific facts Plaintiffs cites in support of its claims were publicly available long ago. This unreasonable lack of diligence in raising its claims now bars them.

**SEVENTH DEFENSE**

21. Plaintiffs' claims are barred, in whole or in part, due to the ratification of, and consent to, the conduct of Agri Stats.

22. Agri Stats hereby incorporates Paragraph 4 above in support of this defense.

23. Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating its long-standing ratification of and consent to

the complained-of conduct.

24. For example, Plaintiffs have known for more than a decade that certain pork producers participate in and receive reports from Agri Stats. Some Plaintiffs have also received and continue to receive information from Express Markets, Inc., which includes, among other

things, market analysis and long-term production and pricing forecasts.

25. Accordingly, because Plaintiffs has been aware for years of the very same conduct it now challenges—much of which has provided Plaintiffs a direct benefit— Plaintiffs' claims are barred by the doctrine of ratification.

**EIGHTH DEFENSE**

26. Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seeks to impose liability on Defendants based on the exercise of any person or entity's right to petition federal, state and local governmental bodies, including through public statements, because such conduct was immune under the Noerr-Pennington doctrine and privileged under the First Amendment to the U.S. Constitution.

**NINTH DEFENSE**

27. Plaintiffs' claims are barred, in whole or in part, to the extent the sales contracts pursuant to which Plaintiffs purchased pork contain arbitration clauses or clauses providing a different forum for the resolution of their claims.

218

**TENTH DEFENSE**

28. Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, by non settling Defendants' right to set off any amounts paid to Plaintiffs by any Defendants who have settled, or do settle, Plaintiffs' claims against them in this action.

**ELEVENTH DEFENSE**

29. Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

**TWELFTH DEFENSE**

30. Plaintiffs' claims are barred, in whole or in part, to the extent they seek improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution and of the Eighth Amendment of the United States Constitution.

**THIRTEENTH DEFENSE**

31. Plaintiffs' claims are barred, in whole or in part, by the Plaintiffs' active and knowing acquiescence, equal involvement and participation in the creation and origination of the restraints of trade alleged in the Complaint.

**FOURTEENTH DEFENSE**

32. Upon information and belief, Plaintiffs' claims are barred, in whole or in part, by Agri Stats' right to set off any amount paid to Plaintiffs by damages attributable to

Plaintiffs' conduct to the extent Plaintiffs unlawfully coordinated regarding the purchase price of pork, including by communicating and sharing competitively sensitive information.

## FIFTEENTH DEFENSE

33.     Some or all of Plaintiffs' state-law claims cannot be brought against Defendants for a lack of jurisdiction. For instance, the laws of certain states, including, without limitation, Utah and West Virginia, are not intended to, and do not, apply to conduct occurring outside of those states.

34.     Many of the state laws allegedly giving rise to Plaintiffs' claims do not apply because the alleged conduct did not occur within or substantially affect the citizens or commerce of the respective states (as required in, for instance and without limitation, California, Illinois, Maine, Minnesota, Mississippi, North Carolina, Rhode Island, South Carolina, Tennessee, Utah, and Wisconsin) or because Defendants had no specific intent to impact the commerce of those states. As a result, the application of those state laws to Defendants conduct would violate the Due Process Clauses and Commerce Clause of the U.S. Constitution, the principle of federalism, the constitutions and laws of the respective states at issue.

35.     To the extent that the Complaint seeks to assert claims or obtain relief on behalf of indirect purchasers located outside of the jurisdictions governed by those laws, those claims are barred as improper assertions of extraterritorial jurisdiction and any effort to enforce those laws as to residents of other states would violate the Due Process Clause and the Commerce Clause of the U.S. Constitution and various state laws and constitutions.

**SIXTEENTH DEFENSE**

36.     Some of Plaintiffs' state-law claims are barred, in whole or in part, to the extent Plaintiffs seek damages under state laws (including, without limitation, Illinois) that do not permit recovery of damages by private plaintiffs.

**SEVENTEENTH DEFENSE**

37.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs failed to comply with the notice requirements under various state laws, including, without limitation, Arizona and Rhode Island.

**EIGHTEENTH DEFENSE**

38.     Some or all of Plaintiffs' claims, including, without limitation, those state-law claims brought under the laws of California, are barred because all of Defendants' conduct challenged by Plaintiffs was lawful, fair, non-deceptive, expressly authorized by law, justified, and pro-competitive; it constituted a bona fide business practice consistent with industry practices and was carried out in furtherance of legitimate business interests; and it was an essential part of Defendants' lawful business operations.

**NINETEENTH DEFENSE**

39.     Some or all of the respective state-law claims at issue, including, without limitation, any claims brought under the laws of Mississippi, Montana, and South Carolina, cannot be, and were not intended to be, applied in the class-action context.

**TWENTIETH DEFENSE**

40.     Agri Stats adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent that the defense would apply to Agri Stats.

**TWENTY-FIRST DEFENSE**

41.    Defendant reserves the right to assert other defenses as this action proceeds up to and including the time of trial.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant Agri Stats respectfully requests that judgment be entered in favor of the Agri Stats and the other Defendants and against Plaintiffs, dismissing the Complaint in its entirety with prejudice.  Defendant Agri Stats further request that this Court award the Agri Stats (i) their costs and disbursements, and (ii) such other and further relief as the Court deems proper

Dated: December 16, 2020          Respectfully submitted,

*/s/ Peter H. Walsh*
Peter H. Walsh (MN# 0388672)
Hogan Lovells US LLP
80 South 8th Street Ste 1225
Minneapolis, MN 55402
Tel: 612-402-3017
Fax: (612) 339-5167
Email: peter.walsh@hoganlovells.com

William L. Monts III (Pro Hac Vice)
Justin W. Bernick (Pro Hac Vice)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

*Attorneys for Defendant Agri Stats, Inc.*

## CERTIFICATE OF SERVICE

Peter H. Walsh, an attorney, hereby certifies that on December 16, 2020 he caused a true and correct copy of the foregoing **Agri Stats, Inc.'s Answer and Defenses to Consumer Indirect Purchaser Plaintiffs' Complaint** to be filed electronically with the Court's CM/ECF system, and that notice of this filing was sent by electronic mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to receive electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Peter H. Walsh*