## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE PORK ANTITRUST LITIGATION* | Case No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br><br>ALL DIRECT PURCHASER PLAINTIFF ACTIONS | |

## CLEMENS' ANSWER TO DIRECT PURCHASER PLAINTIFFS' THIRD AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

Clemens[1] is a family-owned corporation headquartered in Hatfield, Pennsylvania. Direct Purchaser Plaintiffs' ("Plaintiffs") Third Amended and Consolidated Class Action Complaint ("Complaint") alleges that eight pork producers all agreed to and engaged in anticompetitive supply cuts through benchmarking services offered by Agri Stats, Inc. (collectively with pork producers, "Defendants"). Plaintiffs are wrong. The crux of Plaintiffs' theory is that, during the relevant time period from January 1, 2008 to 2018, Defendants coordinated and limited their production by closing operations, consolidating complexes, and reducing output. Not so for Clemens, which took precisely the opposite track; *doubling its capacity* by opening a new processing plant in Coldwater, Michigan in 2017.

---

[1] The Clemens Defendants in this action are Clemens Food Group, LLC and The Clemens Family Corporation (collectively, "Clemens").

Clemens answers and sets forth its affirmative defenses to Plaintiffs' Complaint as follows. It denies each and every allegation in Plaintiffs' Complaint except as expressly admitted below.

**Complaint:**

Direct Purchaser Plaintiffs ("Plaintiffs") (footnote omitted) bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons and entities who purchased pork directly from a Defendant or co-conspirator named in this Second Amended and Consolidated Class Action Complaint in the United States from at least January 1, 2009 until the present (the "Class Period"). Plaintiffs bring this action against Defendants for injunctive relief and treble damages under the antitrust laws of the United States, and demand a trial by jury.

**Answer:**

Clemens admits that Plaintiffs purport to bring this putative class action under the antitrust laws of the United States, but denies that Plaintiffs can state a claim under those laws, have or can satisfy the requirements of Federal Rule of Civil Procedure 23, and/or that Plaintiffs are entitled to any of the requested relief. Clemens denies the remaining allegations in this paragraph.

## I.     NATURE OF ACTION[2]

**Complaint:**

1.     The pork integrator Defendants (*i.e.*, the Defendants other than Agri Stats) are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce. The United States pork industry is highly concentrated, with a small number of large companies controlling the supply. Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork integration market.

---

[2]     The headings and titles in Plaintiffs' Complaint are not factual allegations to which a response is required. To the extent that a response is deemed required, Clemens denies any allegations in Plaintiffs' headings and titles.

**Answer:**

Clemens admits that certain Defendants, including Clemens, are suppliers of pork,[3] and that annual domestic pork sales are substantial, but is without information sufficient to form a belief as to the precise dollar amount alleged in the first sentence of Paragraph 1 and on this basis denies the allegations in this sentence. As the term "pork industry" in the second sentence of Paragraph 1 is imprecise, Clemens is unable to form a belief as to the truth of the allegations contained in that sentence and on this basis denies the allegations in this sentence. To the extent the allegations in Paragraph 1 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 1.

**Complaint:**

2.      Defendants, Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation, Hormel Foods, LLC ("Hormel"), Indiana Packers Corporation ("Indiana Packers"), JBS USA Food Company ("JBS" or "JBS USA"), Seaboard Foods LLC, Seaboard Corporation ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson"), entered into a conspiracy from at least 2009 to the present to fix, raise, maintain, and stabilize the price of pork. (footnote omitted) The principal (but not exclusive) method by which Defendants implemented and executed their conspiracy was by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume, and demand through their co-conspirator, Defendant Agri Stats.

---

[3]   For purposes of its Answer only, to the extent Clemens refers to "pork" in its Answer, Clemens refers to pork as defined in the Complaint.

**Answer:**

Clemens denies the conspiracy alleged in the Complaint and denies each allegation in Paragraph 2.

**Complaint:**

3.      Beginning in at least 2009, Agri Stats began providing highly sensitive "benchmarking" reports to the majority of pork integrators. Benchmarking allows competitors to compare their profits or performance against that of other companies. But Agri Stats' reports are unlike those of lawful industry reports. Agri Stats gathers detailed financial and production data from each of the pork integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. Instead, the provision of this detailed information acts as the modem equivalent of the proverbial smoke-filled room. Rather than meeting in a room with pen and paper, Agri Stats collected the pork integrators' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports it provided to the pork integrators. On a weekly and monthly basis, Agri Stats provides the pork integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), and regularly provides the keys to deciphering which data belongs to which participant. The effect of this information exchange was to allow the pork integrators to monitor each other's production and hence control supply and price in furtherance of their anticompetitive scheme.

**Answer:**

Clemens admits that Agri Stats collected some information from Clemens and that Agri Stats reported anonymized information to Clemens on a regular basis for pro-competitive benchmarking purposes; as to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. To the extent the remaining allegations in Paragraph 3 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 3.

**Complaint:**

4.     The data exchanged through Agri Stats also bears all the hallmarks of the enforcement and implementation mechanism of a price-fixing scheme. First, the data is current and forward-looking - which courts consistently hold has "the greatest potential for generating anticompetitive effects." (footnote omitted) Second, information contained in Agri Stats reports is specific to pork integrators, including information on profits, prices, costs, and production levels; instead of being aggregated as industry averages to avoid transactional specificity and the easy identification of specific integrators. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service which required the co-conspirators to pay millions of dollars over the Class Period - far in excess of any other pricing and production indices. Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market. Defendants utilize the information exchanges through Agri Stats in furtherance of their conspiracy to fix, raise, stabilize, and maintain artificially inflated prices for pork sold in the United States.

**Answer:**

To the extent the allegations in Paragraph 4 relate to other Defendants and/or third

parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in

Paragraph 4.

**Complaint:**

5.     While Defendants went to great lengths to keep the existence of the conspiracy a secret, they admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen. Furthermore, each Defendant engaged in acts in furtherance of the conspiracy by participating in such supply cuts and by limiting increases in supply that otherwise would have occurred.

**Answer:**

To the extent the allegations in Paragraph 5 relate to other Defendants and/or third

parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in

Paragraph 5.

**Complaint:**

6.     In addition, there are numerous "plus factors" in the swine industry during the Class Period, including but not limited to multiple industry characteristics which facilitate collusion, such as vertically integrated operations, high barriers to entry preventing competitors from coming into the market, high pork industry consolidation and concentration, inelastic supply and demand, and homogeneity of pork products. (footnote omitted) These plus factors add plausibility to plaintiffs' allegations of a price-fixing scheme.

**Answer:**

Clemens denies the allegations in Paragraph 6.

**Complaint:**

7.     Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to Plaintiffs and class members. Beginning in 2009, the earnings of the integrators began to increase, as they took an increasing amount of the profits available in the pork industry. As a result of Defendants' unlawful conduct, Plaintiffs and the class members paid artificially inflated prices for pork during the Class Period. Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market. Thus, Plaintiffs and class members were injured by Defendants' conduct.

**Answer:**

Clemens denies the allegations in Paragraph 7 as they relate to Clemens; to the

extent the allegations in Paragraph 7 relate to other Defendants and/or third parties,

Clemens is without information sufficient to form a belief as to the truth of these allegations

and therefore denies these allegations. Clemens denies the remaining allegations in

Paragraph 7.

## II.    JURISDICTION AND VENUE

**Complaint:**

8.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Plaintiff Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer:**

Clemens admits that Plaintiffs purport to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to attempt to recover treble damages, costs and attorneys' fees for alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, but denies that Plaintiffs can state claims under the Clayton Act or Sherman Act, have or can satisfy the requirements of Federal Rule of Civil Procedure 23, and/or are entitled to any of the relief requested. Clemens denies the remaining allegations in Paragraph 8.

**Complaint:**

9.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**Answer:**

Clemens admits that the Court has subject matter jurisdiction over this action.

**Complaint:**

10.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**Answer:**

Clemens admits that venue properly lies in this District for purposes of this matter only. Clemens denies the remaining allegations in Paragraph 10.

**Complaint:**

11.     This Court has personal jurisdiction over each Defendant because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

**Answer:**

Clemens admits that the Court has personal jurisdiction over Clemens. Clemens admits that it transacts business in this District, but otherwise denies Subpart (a) of Paragraph 11. Clemens denies the allegations in Subpart (d) of Paragraph 11. To the extent that the allegations in Paragraph 11 relate to other Defendants and/or third parties to this action, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies any remaining allegations in Paragraph 11.

**Complaint:**

12.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

**Answer:**

Clemens admits that it sells pork in interstate commerce of the United States. Clemens denies the remaining allegations in Paragraph 12.

**Complaint:**

13.    No other forum would be more convenient for the parties and witnesses to litigate this case.

**Answer:**

Clemens denies the allegations in Paragraph 13.

### III.    PARTIES

**A.    Plaintiffs**

**Complaint:**

14.    Maplevale Farms, Inc. is a New York corporation with its principal place of business in Falconer, New York. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer:**

Clemens denies the allegations of conspiracy and antitrust injury in Paragraph 14.

Clemens is without information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 14 and therefore denies them.

**Complaint:**

15.    John Gross and Company, Inc. is a Pennsylvania corporation with its principal place of business in Mechanicsburg, Pennsylvania. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer:**

Clemens denies the allegations of conspiracy and antitrust injury in Paragraph 15.

Clemens is without information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 15 and therefore denies them.

**Complaint:**

16.     Ferraro Foods, Inc. is a New Jersey corporation with its principal place of business in Piscataway, New Jersey. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer:**

Clemens denies the allegations of conspiracy and antitrust injury in Paragraph 16.

Clemens is without information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 16 and therefore denies them.

**Complaint:**

17.     Ferraro Foods of North Carolina, LLC, is a North Carolina Limited Liability Company with its principal place of business in Mebane, North Carolina. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer:**

Clemens denies the allegations of conspiracy and antitrust injury in Paragraph 17.

Clemens is without information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 17 and therefore denies them.

**Complaint:**

18.     Olean Wholesale Grocery Cooperative, Inc. is a New York corporation with its principal place of business in Olean, New York. It purchased pork directly from one or more Defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**Answer:**

Clemens denies the allegations of conspiracy and antitrust injury in Paragraph 18.

Clemens is without information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 18 and therefore denies them.

**Complaint:**

19.     Plaintiff Joe Christiana Food Distributors, Inc. is a Louisiana corporation
with its principal place of business in Baton Rouge, Louisiana. It purchased pork directly
from one or more Defendants during the Class Period and suffered antitrust injury as a
result of the violations alleged in this Complaint.

**Answer:**

Clemens denies the allegations of conspiracy and antitrust injury in Paragraph 19.

Clemens is without information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 19 and therefore denies them.

B.     **Defendants**

       **Agri Stats**

**Complaint:**

20.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and
is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats acted as a co-
conspirator and committed acts in furtherance of the conspiracy by facilitating the
exchange of confidential, proprietary, and competitively sensitive data among Defendants
and their co-conspirators.

**Answer:**

Clemens denies the allegations of conspiracy in Paragraph 20. Clemens is without

information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and

therefore denies them.

**<u>Clemens</u>**

**Complaint:**

21.     Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania. During the Class Period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens admits the allegations in Paragraph 21.

**Complaint:**

22.     The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC. During the Class Period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens admits the allegations in Paragraph 22.

**<u>Hormel</u>**

**Complaint:**

23.     Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 23 and therefore denies them.

**Complaint:**

24.    Hormel Foods, LLC is a Minnesota corporation headquartered in Austin, Minnesota. Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 24 and therefore denies them.

### **Indiana Packers**

**Complaint:**

25.    Indiana Packers Corporation is an Indiana corporation headquartered in Delphi, Indiana. During the Class Period, Indiana Packers Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Indiana Packers Corporation's parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and Mitsubishi Corporation (Americas).

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 25 and therefore denies them.

### **JBS**

**Complaint:**

26.    JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado. During the Class Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 26 and therefore denies them.

### Seaboard

**Complaint:**

27.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation. During the Class Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 27 and therefore denies them.

**Complaint:**

28.     Seaboard Corporation is a Delaware corporation headquartered in Merriam, Kansas, and is the parent company of Seaboard Foods LLC. During the Class Period, Seaboard Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 28 and therefore denies them.

### Smithfield

**Complaint:**

29.     Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company. Smithfield Foods is headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or

affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 29 and therefore denies them.

## Triumph

**Complaint:**

30.     Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the Class Period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 30 and therefore denies them.

## Tyson

**Complaint:**

31.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 31 and therefore denies them.

**Complaint:**

32.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the

Class Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 32 and therefore denies them.

**Complaint:**

33.    Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 33 and therefore denies them.

## IV.    FACTUAL ALLEGATIONS

**Complaint:**

34.    Starting in at least 2009 and continuing to the present, Defendants conspired to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their anticompetitive agreement, Defendants relied on a unique industry data sharing service provided by Agri Stats. Agri Stats provided a means for Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of Defendants' price-fixing scheme, resulting in a stable and successful anticompetitive cartel.

**Answer:**

Clemens denies the allegations in Paragraph 34.

**A.    Defendants' anticompetitive scheme started from Agri Stats' central role in collusion in the Broiler industry.**

**Complaint:**

35.    Agri Stats has played a central role in collusion in other industries, including involvement in the Broiler industry. (footnote omitted) As alleged in the *In re Broiler*

*Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.), the Broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

**Answer:**

To the extent that the allegations in Paragraph 35 relate to other Defendants and/or third parties to this action and to unrelated lawsuits, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies any remaining allegations in Paragraph 35.

**Complaint:**

36.     In the Broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, and sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various Broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each Broiler producer's complex, sometimes directly contacting the Broiler producers to verify the data. Agri Stats also provided detailed price reports to the Broiler industry through its subsidiary, Express Markets, Inc., also known as EMI. Agri Stats collected data from the Broiler producers on a weekly basis and provided its reports to Broiler producers on a weekly and monthly basis.

**Answer:**

To the extent that the allegations in Paragraph 36 relate to other Defendants and/or third parties to this action and to conduct in the Broiler industry, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies any remaining allegations in Paragraph 36.

**Complaint:**

37.     The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual Broiler complexes. The

Broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger Broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

**Answer:**

To the extent the allegations in Paragraph 37 characterize or describe documents or sources related to the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017) litigation, Clemens notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent that the remaining allegations in Paragraph 37 relate to other Defendants and/or third parties to this action, to unrelated lawsuits, and to conduct in the Broiler industry, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies any remaining allegations in Paragraph 37.

**Complaint:**

38.     In the Broiler industry, plaintiffs also alleged that Agri Stats - known to its co-conspirators to be a willing and informed conduit for illicit information exchanges - used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the Broiler industry facilitated the implementation of the agreement to restrict supply.

**Answer:**

To the extent that the allegations in Paragraph 38 relate to other Defendants and/or third parties to this action, to unrelated lawsuits, and to conduct in the Broiler industry, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies any remaining allegations in Paragraph 38.

**Complaint:**

39.     In denying defendants' motions to dismiss in the *In re Broiler Chicken Antitrust Litigation,* the district court noted that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which raises significant antitrust concerns. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 39 characterize or describe a Memorandum Opinion and Order in *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent that the allegations in Paragraph 39 relate to other Defendants and/or third parties to this action, to unrelated lawsuits, and to conduct in the Broiler industry, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies any remaining allegations in Paragraph 39.

**B.     After success in the Broiler industry, Agri Stats began marketing its collusive scheme to the swine integrators.**

**Complaint:**

40.     Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the swine industry along the lines of the benchmarks used to restrain competition in the Broiler industry. Benchmarking is the act of comparing one company's practices, methods or performance against those of other companies. (footnote omitted) Benchmarking of the type undertaken by Agri Stats and its co-conspirators here reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive, and typically proprietary, information among competitors.

**Answer:**

To the extent that the allegations in Paragraph 40 relate to other Defendants and/or third parties to this action and to conduct in the Broiler industry, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies any remaining allegations in Paragraph 40.

**Complaint:**

41.   In 2008, Greg Bilbrey of Agri Stats told swine industry participants that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. ***Each and every commercial swine operation is encouraged to participate in some benchmarking effort.***" (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 41 characterize or describe statements made in 2008 by Greg Bilbrey of Agri Stats, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens denies any remaining allegations in Paragraph 41.

**Complaint:**

42.   Agri Stats emphasized to pork integrators that the goal of the agreement to share information was profitability, not production, and invited pork integrators again to participate in the benchmarking. Agri Stats emphasized that "We must remember that the ***ultimate goal is increasing profitability -*** not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. ***To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program.***" (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 42 characterize or describe statements made by Greg Bilbrey of Agri Stats, Clemens notes that such source speaks for itself and

20

denies any characterization or description that is inconsistent therewith. Clemens denies

any remaining allegations in Paragraph 42.

**Complaint:**

43.   In April 2009, Greg Bilbrey of Agri Stats again invited swine integrators to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort.***" (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 43 characterize or describe statements

made by Greg Bilbrey of Agri Stats, Clemens notes that such source speaks for itself and

denies any characterization or description that is inconsistent therewith. Clemens denies

any remaining allegations in Paragraph 43.

**Complaint:**

44.   Beginning no later than 2009, the pork integrators commenced participation in the detailed benchmarking scheme based upon and found in the Agri Stats reports. Defendants' agreement was to use the exchanged benchmarking information to coordinate supply and stabilize as well as increase prices of pork sold in the United States, to provide and receive information from Agri Stats, and to use this detailed sensitive information for the purposes of monitoring each other's production and pricing. The agreement was successful as pork prices rose significantly after the agreement was reached.

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 44.  Clemens admits that Agri

Stats collected some information from Clemens; as to other Defendants and/or third parties,

Clemens is without information sufficient to form a belief as to the truth of these allegations

and therefore denies them. To the extent the remaining allegations in Paragraph 44 relate

to other Defendants and/or third parties, Clemens is without information sufficient to form

a belief as to the truth of these allegations and therefore denies them. Clemens denies the

remaining allegations in Paragraph 44.

**C.**   **Agri Stats provided pork integrators the unparalleled ability to monitor pricing and production, and to discipline co-conspirators for not complying with the collusive agreement.**

**Complaint:**

45.   Agri Stats provided pork integrators with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as production levels and short and long-term production capacity. Agri Stats was key to the formation, operation, and continuing stability of the Defendants' anticompetitive scheme. To effectuate their agreement, the participants had to have confidence that each member was following through with the agreement by limiting their production and stabilizing prices. Agri Stats served that function.

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 45. Clemens admits that Agri

Stats collected some information from Clemens; as to other Defendants and/or third parties,

Clemens is without information sufficient to form a belief as to the truth of these allegations

and therefore denies them. To the extent the remaining allegations in Paragraph 45 relate

to other Defendants and/or third parties, Clemens is without information sufficient to form

a belief as to the truth of these allegations and therefore denies them. Clemens denies the

remaining allegations in Paragraph 45.

**Complaint:**

46.   Each member of the conspiracy, Defendants Clemens, Hormel, Indiana Packers, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, were all Agri Stats subscribers and reported their information to Agri Stats. Agri Stats' parent company, Eli Lilly, stated that "over ***90% of the poultry and pig market***" uses Agri Stats in the United States. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 46 characterize or describe statements made by representatives of Eli Lilly and Co., Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens admits that Agri Stats collected some information from Clemens and that Agri Stats reported anonymized information to Clemens on a regular basis for pro-competitive benchmarking purposes; as to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. To the extent the remaining allegations in Paragraph 46 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 46.

**Complaint:**

47.    Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison, and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations so all company numbers are calculated the same way. (footnote omitted)

**Answer:**

Clemens admits that Agri Stats collected some information from Clemens. To the extent that the allegations in Paragraph 47 relate to other Defendants and/or third parties to this action, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies any remaining allegations in Paragraph 47.

**Complaint:**

48.    Unlike traditional "benchmark" services which rely upon unaudited and aggregated publicly available data, Agri Stats obtains audited data directly from the participating producers. When a producer joins Agri Stats, Agri Stats employees spend up to a month on site to learn, set up, audit, and prepare the producer to submit its data each month. (footnote omitted) After submission Agri Stats "takes raw data and pulls it in to input system[s] in [the] right format and location each month." (footnote omitted) This verified data allows participants to make "apples to apples" comparisons with competitors in order to increase profitability. (footnote omitted)

**Answer:**

Clemens admits that Agri Stats collected some information from Clemens and that Agri Stats reported anonymized information to Clemens on a regular basis for pro-competitive benchmarking purposes; as to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. To the extent the allegations in Paragraph 48 characterize or describe documents and sources, including a presentation prepared by Agri Stats, Clemens notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the remaining allegations in Paragraph 48 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 48.

**Complaint:**

49.    Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies. Current month, previous quarter and previous twelve-month periods are reported. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales. (footnote omitted) Participants may also receive an

abbreviated Key Performance Indicator report, as well as historical graphs. (footnote omitted)

**Answer:**

Clemens admits that Agri Stats collected some information from Clemens and that Agri Stats reported anonymized information to Clemens on a regular basis for pro-competitive benchmarking purposes; as to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. To the extent the allegations in Paragraph 49 characterize or describe 2009 Agri Stats reports, Clemens notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 49.

**Complaint:**

50.   Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about four years. This is a function of the hog biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly two years to substantially increase production.

**Answer:**

As the terms "forward-looking supply information" and "typical hog production cycle" are imprecise, Clemens is unable to form a belief as to the truth of the allegations in the first two sentences of Paragraph 50, and on that basis denies those allegations. Clemens denies the remaining allegations in Paragraph 50.

**Complaint:**

51.   One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the pork market: (footnote omitted)

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

**Answer:**

To the extent the allegations in Paragraph 51 characterize or describe a document entitled *Key Drivers to Farm Profitability* prepared by Greg Bilbrey of Agri Stats, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 51.

**Complaint:**

52.    The purpose of these reports was not to provide better prices to customers or to lower the costs of production. Instead, the purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even further detail. The same presentation informed pork integrators that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (ckg refers to 100 kilograms.) This underlines that the purpose of these reports was not to allow customers to save money through lower prices and more

26

efficient production - in fact, the opposite was true, the purpose was the profitability of the Defendant companies and the impact was higher prices for pork customers.

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 52. To the extent the allegations in Paragraph 52 characterize or describe the Agri Stats presentation referenced in Paragraph 51 and other unidentified documents and sources, Clemens notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 52 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 52.

**Complaint:**

53.     Much of the information shared by Agri Stats and the other Defendants was unnecessary to achieve any benefits for pork purchasers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies. (footnote omitted) In fact, in a truly competitive market, the participants would closely protect such proprietary information from disclosure as providing it to competitors would be disadvantageous: unless, of course, there is an agreement that the competitors will use the information to the joint benefit of each other as was the situation in the pork industry.

**Answer:**

Clemens denies the allegations in Paragraph 53.

**Complaint:**

54.     Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies - allowing the companies to compare the "apples to apples" of its data analysis among competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data: (footnote omitted)

## *Data Integrity*

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



**Answer:**

To the extent the allegations in Paragraph 54 characterize or describe a presentation prepared by Greg Bilbrey of Agri Stats, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the remaining allegations in Paragraph 54 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 54.

**Complaint:**

55.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce"* they must "[h]ave an administrator

to compile the data and enforce procedures," and most importantly, ***"[e]ach participant has to commit."*** (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 55 characterize or describe a presentation prepared by Greg Bilbrey of Agri Stats, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the remaining allegations in Paragraph 55 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 55.

**Complaint:**

56.     In addition to these reports, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis. (footnote omitted) The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the reports. The fee for the visits fluctuated based on the size and other factors.

**Answer:**

Clemens admits that its employees have met in-person with Agri Stats employees. To the extent the allegations in Paragraph 56 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 56.

**Complaint:**

57.     A common saying by Agri Stats is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "**the *ultimate goal is increasing profitability*** - not simply increasing level of production."

**Answer:**

To the extent the allegations in Paragraph 57 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 57.

**Complaint:**

58.    In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets had provided its extensive pricing reports to Broiler producers since 2003. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 58 relate to other Defendants and/or third parties or to conduct in the Broilers industry, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 58.

**Complaint:**

59.    By providing detailed production statistics by participants, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits. Critically, Agri Stats provided forward-looking data that allowed the other Defendants to determine each other's future production in addition to their current production.

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 59. To the extent the allegations in Paragraph 59 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 59.

**Complaint:**

60.     Agri Stats reports are organized by company and facility, but their names are not listed in the reports. Nevertheless, while ostensibly anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that participants can accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

**Answer:**

To the extent the allegations in Paragraph 60 characterize or describe documents

and sources, including Agri Stats reports, Clemens notes that such sources speak for

themselves and denies any characterization or description that is inconsistent therewith.

Clemens denies the remaining allegations in Paragraph 60.

**Complaint:**

61.     Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but reassigning numbers was an undertaking the company was not eager to embark on.

**Answer:**

To the extent the allegations in Paragraph 61 relate to other Defendants and/or third

parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in

Paragraph 61.

**Complaint:**

62.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included

information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

**Answer:**

Clemens admits that Agri Stats collected some information from Clemens and that Agri Stats reported anonymized information to Clemens on a regular basis for pro-competitive benchmarking purposes; as to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. To the extent the allegations in Paragraph 62 characterize or describe Agri Stats books, Clemens notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 62.

**Complaint:**

63.    Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a participant's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

**Answer:**

Clemens admits that Agri Stats reported anonymized information to Clemens on a regular basis for pro-competitive benchmarking purposes. To the extent the allegations in Paragraph 63 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 63.

**Complaint:**

64.    Mobility within the meat production industries led to a situation where many workers at most pork integrator operations knew the numbers of other regional facilities,

removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats were aware of this fact, but did nothing to address it.

**Answer:**

To the extent the allegations in Paragraph 64 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 64.

**Complaint:**

65.    Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Price fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 65 and the allegation that Agri Stats served as a "monitoring function" to prevent the alleged members from increasing production.  On the contrary, Clemens notes that, as described in Figure 5 in Paragraph 92, *its market share doubled during the class period*. Clemens denies the remainder of the allegations in Paragraph 65.

**Complaint:**

66.    In a February 15, 2017, Bloomberg article relating to Agri Stats' roles in the Broiler industry, it was reported:

Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co- conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. ***That is what creates stability for a cartel.***" (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 66 characterize or describe a February 15, 2017 Bloomberg article "Is the Chicken Industry Rigged," Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 66.

**D.   Defendants controlled the supply and production of pork in the United States, which allowed the scheme to succeed.**

**Complaint:**

67.   The class period was further characterized by the increased control over the breeding, production, growing, and processing of pork by the Defendants through vertical integration and the exclusive production contracts with hog farmers.

**Answer:**

To the extent the allegations in Paragraph 67 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 67.

**Complaint:**

68.     Vertical integration is so pervasive that Defendants are commonly called pork or swine integrators by the industry, government, analysts, and academics. Vertical integration allows the integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter. Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

**Answer:**

As the term "vertical integration" is imprecise, Clemens is unable to form a belief

as to the truth of the allegations in Paragraph 68 and on this basis denies them. Clemens

denies the remaining allegations in Paragraph 68.

**Complaint:**

69.     Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms." (footnote omitted) This arrangement essentially converts independent farmers into contract employees that perform services for the pork integrator. The Defendants typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities. The pork integrators (*i.e.*, Defendants) typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market. The prevalence and use of contracts for hog production by Defendants increased significantly during the course of the conspiracy. By 2017 it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency as far as bid prices.

**Answer:**

To the extent the allegations in Paragraph 69 relate to other Defendants and/or third

parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them.  To the extent the allegations in Paragraph 69

characterize or describe documents and sources, including a 2009 document "Hog

Production Contracts: the Grower-Integrator Relationship" by Allen Harper, Clemens

notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 69.

**Complaint:**

70.    Pork production starts at the farrowing stage—which is the term used to describe a female hog giving birth. Female hogs used in the farrowing stage are called sows. Sows will normally have anywhere from 11 to 13 pigs per litter. With a sow being able to farrow close to three times a year, one sow can have around 36 piglets in one year. After birth piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig weighs upwards of 50 pounds. At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds. After the pigs reach their final weight, they are sent to a packing plant to be harvested. Due to the nature of the pork production cycle, the reduction of sows—i.e. farrowing hogs—has a significant impact on the supply of pork.

**Answer:**

Clemens admits that female hogs used for birthing piglets are called sows.  Clemens admits that the number of piglets per litter and the number of times sows are able to farrow per year both depend on a number of different factors.  Clemens admits from the birth to harvest generally takes approximately 25-27 weeks, and that the pigs may spend time at farrowing, nursery, and/or growing and finishing barns during this time. As the term "significant impact" in the final sentence of Paragraph 70 is imprecise, Clemens is unable to form a belief as to the truth of the allegations in that sentence and on this basis denies the allegations in that sentence. Clemens denies the remaining allegations in Paragraph 70.

**Complaint:**

71.    The following diagram shows the path for pork raised for meat consumption from birth through sale to consumers:



Figure 1: Value Chain of U.S. Pork Market

**Answer:**

Clemens admits that Plaintiffs purport to copy or create a graphic based on information from an unknown source and refer to the contents thereof. Clemens denies the remaining allegations in Paragraph 71.

**Complaint:**

72.     Under economic theory, vertical integration can have anticompetitive effects because there are fewer firms competing at all levels, which renders it easier to collude on price.

**Answer:**

Clemens denies the allegations in Paragraph 72.

**Complaint:**

73.     During the class period Defendant Smithfield has the distinction of being the largest producer and processer of pork in the United States. In 2014, Smithfield had

approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 73 characterize or describe a 2014 Annual Report produced by Smithfield, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 73 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 73.

**Complaint:**

74.     In 2009, Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers. (footnote omitted) In its 2017 SEC 10-K report, Defendant Seaboard Corporation states that it raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 74 characterize or describe a 2009 Annual Report or a 2017 SEC 10-K report produced by Seaboard, Clemens notes that such source speak for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 74 relate to other Defendants and/or third parties,

Clemens is without information sufficient to form a belief as to the truth of these allegations

and therefore denies them. Clemens denies the remaining allegations in Paragraph 74.

**Complaint:**

75.    Defendant Clemens Food Group touts its vertical coordination on its website stating that, "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers." (footnote omitted) A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania. (footnote omitted)

**Answer:**

Clemens admits the allegations in the first sentence of Paragraph 75. Clemens

further admits that its subsidiary, Country View Family Farms, manages a network of over

250 independent farms raising hogs under contract. Clemens denies the remaining

allegations in Paragraph 75.

**Complaint:**

76.    As to JBS USA, a key aspect of JBS' purchase of its predecessor in interest, Cargill, in 2015 was that it allowed JBS to exercise greater control over the production of hogs, by acquiring four hog farms and two packing plants operated by Cargill.

**Answer:**

To the extent the allegations in Paragraph 76 relate to other Defendants and/or third

parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in

Paragraph 76.

**Complaint:**

77.    Triumph was created with vertical integration in mind as it is owned by five of the largest pork producers in the U.S.— Christiansen Farms, The Hanor Company, New

Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota. The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

**Answer:**

To the extent the allegations in Paragraph 77 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 77.

**Complaint:**

78.     As Defendant Tyson stated in its 2009 10K Report, "The majority of our live hog supply is obtained through various procurement relationships with independent producers." Additionally, Tyson raises a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

**Answer:**

To the extent the allegations in Paragraph 78 characterize or describe a 2009 10-K Report produced by Tyson, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 78 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 78.

**Complaint:**

79.     Defendant Indiana Packers states on its website, "We're a fully integrated pork company operating entirely within the heart of the Midwest, so our team members can better partner with our surrounding farm neighbors to produce the freshest, highest-quality products." (footnote omitted) "With our Midwest family-farm sourcing, pork-exclusive expertise and vertically integrated operation, it's no wonder customers from all

sectors of the food industry trust Indiana Packers to be their primary pork supplier."
(footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 79 characterize or describe a website created by Indiana Packers, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 79 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 79.

**Complaint:**

80.    Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities. As Hormel stated in its 2009 annual report that, "[t]he live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements." Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.

**Answer:**

To the extent the allegations in Paragraph 80 characterize or describe a 2009 annual report produced by Hormel, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 80 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 80.

**Complaint:**

81.     Each of the Defendants further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports. Defendants including Smithfield, Clemens, Tyson, Hormel, Indiana Packers, Seaboard, Triumph, and JBS sell packaged pork under various name brands.

**Answer:**

Clemens admits it sells packaged pork under multiple name brands. To the extent the allegations in Paragraph 81 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 81.

**E.     The level of concentration in the pork industry was optimal for Defendants' collusive scheme.**

**Complaint:**

82.     The United States Department of Agriculture ("USDA") has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 82 characterize or describe statements made by the USDA or USDA officials, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 82 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 82.

**Complaint:**

83.     The hog integration sector is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

**Answer:**

To the extent the allegations in Paragraph 83 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 83.

**Complaint:**

84.     Prior to and in the beginning of the Class Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share. Between 1988 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015. As shown in Figure 2 below, the top eight integrators had market share of well over 80 percent for the entire Class Period:



**Figure 2: Market Share of Top 8 Pork Integrators 1991 to 2017**

Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI, Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

**Answer:**

To the extent the allegations in Paragraph 84 characterize or describe data, including in the graph above, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 84 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 84.

**Complaint:**

85.    In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United

States, behind only Smithfield. As noted above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and two packing plants operated by Cargill.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 85 and therefore denies them.

**Complaint:**

86.    The acquisition was completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 86 and therefore denies them.

**Complaint:**

87.    The following timeline summarizes notable mergers between pork integrators since 1995 which led to an increased market concentration:



**Figure 3: History of Mergers and Acquisitions**

**Answer:**

To the extent the allegations in Paragraph 87 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 87.

**Complaint:**

88.     As shown in Figure 4 below, by 2016, the top six pork processors comprised 82% of the total market. On their own, it would be difficult for any of these supposed competitors to exercise market power. But acting as a whole to manipulate the price of pork products, the combined market share of the six largest Defendants translates into an HHI (footnote omitted) of 6724 (ignoring other pork processors that comprise the other 18% of the market), which is well above the threshold for highly-concentrated markets. In other words, if Defendants colluded with one another to restrict the supply of pork in the market, as alleged herein, the resulting market concentration of such concerted action gave them more than sufficient power to control the pork market. Even without combining the largest six Defendants, the pork industry has a "moderately concentrated" HHI of 1532.

**Figure 4: 2016 Pork Processing Market Shares (footnote omitted)**

| Company | Share | HHI - Independent | HHI - Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | 6724 |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | |
| Others | 18% | 18 | 18 |
| | | | |
| **Total** | **100%** | **1532** | **6742** |

**Answer:**

To the extent the allegations in Paragraph 88 characterize or describe data or figures from a March 7, 2017 document entitled "Globalization of Agriculture:  An Ownership

and Market Perspective" by Ken Sullivan, including in the figure above, Clemens notes

that such source speaks for itself and denies any characterization or description that is

inconsistent therewith. To the extent the allegations in Paragraph 88 relate to other

Defendants and/or third parties, Clemens is without information sufficient to form a belief

as to the truth of these allegations and therefore denies them. Clemens denies the remaining

allegations in Paragraph 88.

**Complaint:**

89.     The concentration level in the pork integration industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated." (footnote omitted) Both of these factors - maturity and concentration - make an industry more susceptible to collusion.

**Answer:**

To the extent the allegations in Paragraph 89 characterize or describe statements

made by WH Group Limited, Clemens notes that such source speaks for itself and denies

any characterization or description that is inconsistent therewith. Clemens denies the

remaining allegations in Paragraph 89.

**Complaint:**

90.     The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a relative handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because the largest integrators were incapable of independently controlling prices on their own, such an agreement was necessary to inflate prices.

**Answer:**

Clemens denies the allegations in Paragraph 90.

**Complaint:**

91.     Concentration of the industry is also beneficial to the procurement of hogs by the pork processors. In some regions, consolidation has resulted in cases where only one pork processor is left to buy hogs from independent farmers, leaving the farmers with no leverage when negotiating terms with the pork processors. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 91 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 91.

**Complaint:**

92.     In addition to market concentration, market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy. The following chart shows not only that the Defendants' collective share of the market was high throughout the class period, but also that each individual defendant's market share was largely stable throughout:



**Figure 5: Market Concentration and Market Share Stability – U.S. Market Share by Hog Slaughter Capacity**

**Answer:**

Clemens denies that its market share was largely stable during the alleged class period. Clemens notes that, as described in Figure 5 in Paragraph 92, *its market share doubled during the class period*. To the extent the remaining allegations in Paragraph 92 relate to other Defendants and/or third parties and to an unknown data source, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 92.

**Complaint:**

93.     The following figure shows that there was a substantial drop in market share volatility during the class period:



**Figure 6: Standard Deviation of Combined Defendant Market Share Pre- and Within Class Period**

**Answer:**

Clemens denies that its market share was largely stable during the alleged class period.  Clemens notes that, as described in Figure 5 in Paragraph 92, *its market share doubled during the class period*. To the extent the remaining allegations in Paragraph 93 relate to other Defendants and/or third parties and to an unknown data source, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 93.

**Complaint:**

94.     Large barriers to entry kept potential competitors out of the pork integration industry. New entry into pork processing is costly and time consuming. Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design and permitting costs are substantial. In 2012, it cost Cargill $25 million just to expand an existing facility. Building a facility from scratch would be considerably more, totaling hundreds of millions of dollars. (footnote omitted)

**Answer:**

Clemens admits that building a pork production facility from scratch could cost hundreds of millions of dollars. Clemens admits that it spent at least $300,000,000 building a pork production facility from scratch in Coldwater, Michigan which began operation in 2017. To the extent the allegations in Paragraph 94 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 94.

**Complaint:**

95.     The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants. And in other situations, the processor owns the hog from farrow to finish. Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 95 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 95.

**F.    The inelastic demand for, and homogeneity of, pork products facilitated collusion**

**Complaint:**

96.    Markets with a highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price. (footnote omitted) A PED value between 0 and -1 indicates there is inelastic demand for the good or service, i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The average PED estimate for the pork market was -0.64 - meaning the demand for pork is inelastic.

**Answer:**

Clemens admits that Plaintiffs have defined "inelastic demand" as described in Paragraph 96, but denies the term necessarily has the specific meaning that Plaintiffs ascribe to it. To the extent the allegations in Paragraph 96 characterize or describe the textbook Microeconomics with Calculus by Jeffrey M. Perloff, or the article "The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects" by Gadi Fibich et. al., Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 96 relate to other Defendants and/or third parties and/or unknown data, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 96.

**Complaint:**

97.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loins, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets. For example, as alleged above, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar nutritional values, branding and packaging. These

products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure. (footnote omitted)

**Answer:**

Clemens denies the allegation that its products are indistinguishable in all respects from other pork products. To the extent the allegations in Paragraph 97 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 97.

### G.    Defendants took advantage of numerous opportunities to collude.

**Complaint:**

98.    Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct. Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

**Answer:**

Clemens admits that it is a member of certain pork-industry trade associations. Clemens denies the remainder of the first sentence of Paragraph 98 and the conspiracy alleged therein. To the extent the allegations in Paragraph 98 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 98.

**Complaint:**

99.    All pork producers and importers in the United States participate in a legislatively-mandated "Pork Checkoff," under which they pay an assessment when pigs are sold or pigs or imported into the United States. The money is used for programs to increase pork sales and exports, for research, and for producer and consumer education

programs; funds cannot be used for lobbying or to influence government policy. The assessment amount and the amount to be returned to state pork associations for local programs is set annually by the Pork Act Delegate Body, which meets during the National Pork Producers Council's annual Pork Industry Forum. States are represented in the Delegate Body in proportion to their level of hog production, and each state is eligible to elect at least two Delegates. Executives from several integrator Defendants have served as Pork Act Delegates.

**Answer:**

Clemens admits that it pays the legislatively-mandated assessments owed under the "Pork Checkoff" program, and that its executives previously served as Pork Act Delegates. To the extent the allegations in Paragraph 99 relate to the structure or function of the "Pork Checkoff" program, Clemens notes that such program was created by The Pork Promotion, Research and Consumer Information Act of 1985, which speaks for itself and Clemens denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 99.

**Complaint:**

100.    The Pork Act Delegates also elect a 15-member National Pork Board ("Pork Board"), whose members are officially appointed by the U.S. Secretary of Agriculture. The Pork Board works with Pork Checkoff staff to ensure collection and distribution of Pork Checkoff funds. Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo. Executives from several pork integrator Defendants have served as members of the Pork Board. For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff. Skahill is the Pork Board's current Treasurer.

**Answer:**

Clemens admits the allegations in the first sentence of Paragraph 100. To the extent the allegations in Paragraph 100 relate to other Defendants and/or third parties, Clemens is

without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 100.

**Complaint:**

101.    According to its website, "[t]he National Pork Producers Council ["NPPC"], which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets." Executives from the pork integrator Defendants have served on the NPPC Board of Directors during the Class Period, including: Cory Bollum of Hormel Foods, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats.

**Answer:**

To the extent the allegations in Paragraph 101 characterize or describe a NPPC website, Clemens notes that such source speak for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 101 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 101.

**Complaint:**

102.    NPPC conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year. NPPC advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions. The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

**Answer:**

To the extent the allegations in Paragraph 102 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 102.

**Complaint:**

103.    In addition to its annual National Pork Industry Forum, NPPC sponsors many other programs that have provided ample opportunities for defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show." It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms). The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC.

- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

**Answer:**

To the extent the allegations in Paragraph 103 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 103.

**Complaint:**

104.    The National Pork Industry Conference ("NPIC") has taken place in the Wisconsin Dells each July since 2010 (and in the Ozarks before that). Descriptions on the conference website have said that NPIC "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America." After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow numbers." (footnote omitted) In July 2010, the Pork Checkoff website noted that pork

producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded." (footnote omitted) The website for the 2016 NPIC conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts." Seaboard Foods and Smithfield Foods are among the integrator Defendants whose executives have been session presenters at NPIC.

**Answer:**

To the extent the allegations in Paragraph 104 characterize or describe websites, speeches, or other sources, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 104 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 104.

**Complaint:**

105.   Upon information and belief, CEOs and top level executives from Defendants attending NPIC and NPPC events discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top level executives comfort that their competitors remain committed to a plan to artificially restrict pork production.

**Answer:**

Clemens admits that certain of its executives have attended certain NPIC and NPPC events. Clemens denies that it discussed non-public, proprietary information at such events. Clemens denies the conspiracy alleged in Paragraph 105. To the extent the allegations in Paragraph 105 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 105.

**Complaint:**

106.   In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues. For example, the 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year. A March 2011 *AgriMarketing* article about the club states that it consisted of "60 industry stake holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

**Answer:**

To the extent the allegations in Paragraph 106 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 106.

**Complaint:**

107.   Defendants were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other organizations.

**Answer:**

Clemens admits that certain executives have attended certain events sponsored by the North American Meat Institute ("NAMI") and/or the American Meat Institutes ("AMI"). To the extent the allegations in Paragraph 107 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 107.

**Complaint:**

108.   Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association." AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

**Answer:**

To the extent the allegations in Paragraph 108 characterize or describe websites created or maintained by AMI, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 108 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 108.

**Complaint:**

109.   NAMI was formed in 2015 by merging the AMI and the North American Meat Association. The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars ... provide excellent networking and information-sharing opportunities for members of the industry."

**Answer:**

To the extent the allegations in Paragraph 109 characterize or describe websites created or maintained by NAMI, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 109 relate to other Defendants and/or third parties, Clemens is

without information sufficient to form a belief as to the truth of these allegations and

therefore denies them. Clemens denies the remaining allegations in Paragraph 109.

**Complaint:**

110.   All of the Defendants (or their closely-affiliated companies) have been members of AMI and then NAMI throughout the Class Period. Executives from the pork integrator Defendants have served on the AMI and NAMI Board of Directors during the Class Period, including:

a. Mark Campbell and Rick Hoffman of Triumph Foods;

b. Doug Clemens and Phil Clemens of Clemens Family Corporation;

c. Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc., as well as Greg Schweitzer of Sara Lee/Hillshire Brands (later acquired by Tyson Foods);

d. Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

e. Gary Louis, Rod Brenneman and Terry Holton of Seaboard Foods;

f. Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA;

g. Jim Snee, Stephen Binder and Jeffrey Ettinger of Hormel Foods Corporation; and

h. Gary Jacobson and Russ Yearwood of Indiana Packers Corporation.

**Answer:**

Clemens admits that it is and has been a member of AMI and NAMI, and that Doug

Clemens and Phil Clemens have served on the Board of Directors at certain points in time.

To the extent the allegations in Paragraph 110 relate to other Defendants and/or third

parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in

Paragraph 110.

**Complaint:**

111.   Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

**Answer:**

Clemens admits that it is and has been a member of AMI and NAMI, and that Doug

Clemens and Phil Clemens have served on the Executive Committees at certain points in

time. Clemens admits that Phil Clemens previously served as Chairman of AMI for a

certain period of time. To the extent the allegations in Paragraph 111 relate to other

Defendants and/or third parties, Clemens is without information sufficient to form a belief

as to the truth of these allegations and therefore denies them. Clemens denies the remaining

allegations in Paragraph 111.

**Complaint:**

112.   Throughout the Class Period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has co-sponsored (with the Food Marketing Institute) the industry's "Annual Meat Conference." The conference website describes the conference as "a complete education and networking experience." Many of the Defendants' high-level executives attend the conference. For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President, Smithfield Foods and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

**Answer:**

To the extent the allegations in Paragraph 112 characterize or describe websites or

other sources, Clemens states such sources speak for themselves and denies any

characterization or description that is inconsistent therewith. To the extent the allegations

in Paragraph 112 relate to other Defendants and/or third parties, Clemens is without

information sufficient to form a belief as to the truth of these allegations and therefore

denies them. Clemens denies the remaining allegations in Paragraph 112.

**Complaint:**

113.   Throughout the Class Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry." All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc. (a subsidiary of Agri Stats, Inc.) through 2017. The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates and ***industry capacity.***" (emphasis added.) The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike. This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices. Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years." The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

**Answer:**

To the extent the allegations in Paragraph 113 characterize or describe sources or

documents, Clemens states such sources speak for themselves and denies any

characterization or description that is inconsistent therewith. To the extent the allegations

in Paragraph 113 relate to other Defendants and/or third parties, Clemens is without

information sufficient to form a belief as to the truth of these allegations and therefore

denies them. Clemens denies the remaining allegations in Paragraph 113.

**Complaint:**

114.   Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics ... as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action." Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015, and Phil Clemens of The Clemens Family Corporation in 2016.

**Answer:**

Clemens admits that Phil Clemens was a scheduled presenter at the NAMI Annual Meeting and Outlook Conference in September 2016. To the extent the allegations in Paragraph 114 characterize or describe sources or documents, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 114 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 114.

**Complaint:**

115.   For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics." The NAMI board met during the 2015 Management Conference.

**Answer:**

Clemens cannot ascertain the truth or falsity of the specific allegations in Paragraph 115 with respect to when the NAMI board met in 2015 based on a reasonable effort at this time, and therefore denies the allegations.  To the extent the allegations in Paragraph 115

relate to other Defendants and/or third parties, Clemens is without information sufficient

to form a belief as to the truth of these allegations and therefore denies them. Clemens

denies the remaining allegations in Paragraph 115.

**Complaint:**

116.   In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit." In addition to education sessions, the summit has included, "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

**Answer:**

To the extent the allegations in Paragraph 116 relate to other Defendants and/or third

parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in

Paragraph 116.

**Complaint:**

117.   AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012. In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

**Answer:**

To the extent the allegations in Paragraph 117 relate to other Defendants and/or third

parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in

Paragraph 117.

**Complaint:**

118.    In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations. Promotional materials for the 2014 IPPE indicated that attendees included defendants Clemens Food Group, Hormel Foods, Hillshire Brands, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson. After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

**Answer:**

To the extent the allegations in Paragraph 118 relate to other Defendants and/or third

parties and/or promotional materials, Clemens is without information sufficient to form a

belief as to the truth of these allegations and therefore denies them. Clemens denies the

remaining allegations in Paragraph 118.

**H.    Defendants implemented capacity and supply restraints during the Class Period.**

**1.    Summary of Defendants' Conspiratorial Supply Restraints**

**Complaint:**

119.    In the years leading up to the conspiracy period the steady expansion of pork production was virtually a given. As one industry commentator reported in 2007, "Some things you can just take to the bank. Sow herd expansion among the Pork Powerhouses would fall into that category - even in the face of the biggest run-up in feed prices in history." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 119 characterize or describe the document

"Pork Powerhouses 2007: Run-Up In Rations," Clemens states such source speaks for itself

and denies any characterization or description that is inconsistent therewith. To the extent

the allegations in Paragraph 119 relate to other Defendants and/or third parties, Clemens is

without information sufficient to form a belief as to the truth of these allegations and

therefore denies them. Clemens denies the remaining allegations in Paragraph 119.

**Complaint:**

120.    This historical trend changed markedly during the conspiracy period. As demonstrated in Figure 7 below, at several points during the Class Period, the pork integrators changed their behavior and acted in a concerted way to decrease supply. In 2009, 2010, and again in 2013, the pork industry cut production. (footnote omitted) (The production dip in 2014 reflected the adverse impacts from the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer of 2014.) These production decreases marked a drastic change from the period prior to the conspiracy from 2000 through 2009, in which pork supply was stable and steadily increasing on a yearly basis.



Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000-2017

**Answer:**

Clemens denies the conspiracy alleged in the first sentence of Paragraph 120. To

the extent the allegations in Paragraph 120 characterize or describe data purportedly from

66

the U.S. I.T.C. Office of Industries, including in the graph above, Clemens notes that such

source speaks for itself and denies any characterization or description that is inconsistent

therewith. To the extent the allegations in Paragraph 120 relate to other Defendants and/or

third parties, Clemens is without information sufficient to form a belief as to the truth of

these allegations and therefore denies them. Clemens denies the remaining allegations in

Paragraph 120.

**Complaint:**

121. These supply cuts were coordinated, historic and unprecedented. For example, in September 2009, Pork Powerhouses—which publishes reports and articles relating to pork production—published an article entitled "Big Boys Cut Back" and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers. These companies report 200,000 fewer sows than one year ago, a drop of 6.4%. (footnote omitted)

**Answer:**

Clemens denies the conspiracy alleged in the first sentence of Paragraph 121. To

the extent the allegations in Paragraph 121 characterize or describe the 2009 article "Big

Boys Cut Back," Clemens states such sources speak for themselves and denies any

characterization or description that is inconsistent therewith. To the extent the allegations

in Paragraph 121 relate to other Defendants and/or third parties, Clemens is without

information sufficient to form a belief as to the truth of these allegations and therefore

denies them. Clemens denies the remaining allegations in Paragraph 121.

**Complaint:**

122. At the same time, pork producers were further reducing domestic supply by devoting more and more production exports to overseas markets. The U.S. has been a net exporter of pork products for a long time, but those exports have comprised a much larger share of total production in the past ten years. As shown in Figure 8 below, less than ten percent of U.S. pork production was exported in 2000. By 2011, more than twenty percent

was being exported. Sending production overseas is another way in which Defendants were able to reduce the supply available to U.S. markets, thereby driving up prices. Notably, a 2017 analysis found that for every $1 million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt. In other words, selling pork on the global market added $50.20 to the market price of hogs. The significant expansion in exports meant that increases in hog production by Defendants did not result in an increase in the supply of pork products in the United States market.

**Figure 8: U.S. Pork Exports as a Percent of Total Production, 2000-2017**



**Answer:**

To the extent the allegations in Paragraph 122 relate to other Defendants and/or third parties and to unknown data, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 122.

**Complaint:**

123.   As part of their acts and conduct in furtherance of the conspiracy, each of the Defendants participated in these supply restraints. While the conspiracy was self-concealing in nature, the limited publicly available sources of information available regarding Defendants' supply decisions evidences these supply constraints. These supply restrictions included, but were not limited to, the conduct described herein.

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 123. To the extent the allegations in Paragraph 123 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 123.

### a.    Smithfield

**Complaint:**

124.   In 2008 Smithfield stopped making traditional production increases and instead cut its number of sows, reporting that, "We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed." (footnote omitted) In 2009, Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately. Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows). In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 124 and therefore denies them.

**Complaint:**

125.   Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in

2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 125 and therefore denies them.

### b.    Tyson

**Complaint:**

126.   Between 2008 and 2009 Tyson cut its sows by over 25%, marking a significant reduction. In 2010 Tyson reported a 3.3% decrease in its Pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate. In 2013 Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 126 and therefore denies them.

### c.    JBS/Cargill

**Complaint:**

127.   In 2011 JBS USA reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS USA. Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand. This production restriction had the intended effect: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 127 and therefore denies them.

### d. Hormel

**Complaint:**

128. Hormel's production statistics show that it cut its number of sows in 2008 and maintained such reduced production throughout the class period. Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through." (footnote omitted) Hormel also reported lower sales of pork products in 2013. In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day. Hormel reported strong earnings from its pork exports in 2011.

**Answer:**

To the extent the allegations in Paragraph 128 characterize or describe 2009 statements made by Hormel's CEO or other sources and documents, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 128 and therefore denies them.

### e. Seaboard

**Complaint:**

129. Throughout the class period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales to foreign markets. (footnote omitted) Seaboard dedicated several employees to international sales and exports. Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect—higher pork prices. Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic market." (footnote omitted) Moreover, in 2017 Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

**Answer:**

To the extent the allegations in Paragraph 129 characterize or describe Annual Reports created by Seaboard or other sources and documents, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 129 and therefore denies them.

### f.      Triumph

**Complaint:**

130.   In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows. In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry. Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide. These exports constituted a significant portion of its production throughout the class period, and reduced or otherwise limited Triumph's production in the United States.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 130 and therefore denies them.

### g.      Clemens

**Complaint:**

131.   In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats. Furthermore, in 2014 Defendant Clemens had a competitive advantage over many pork producers, in that it had few PEDv infected pigs. But contrary to what one would expect to see in a competitive market, Clemens did not utilize its advantage and refused to increase its market share when it clearly had substantial market incentives to do so.

**Answer:**

Clemens denies that its market share did not increase during the alleged class period.

Clemens notes that, as described in Figure 5 in Paragraph 92, *its market share doubled during the class period*. Clemens denies the remaining allegations in Paragraph 131.

### h.   Indiana Packers

**Complaint:**

132.   Indiana Packers is a private company with limited information available to the public regarding its production statistics. Nevertheless, in 2012 Indiana Packers indicated that it expected to reduce the number of hogs or pounds of pork processed at its facilities ostensibly because of high com prices.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 132 and therefore denies them.

### 2.   Timeline of the Conspiracy

**Complaint:**

133.   As set forth herein, each of the aforementioned supply reductions during the class period were a departure from the integrator Defendants' market behavior prior to the conspiracy period. These supply restrictions involved a significant share of the Defendants' annual production and are in contravention of Defendants' individual economic self-interest. These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of pork. While Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources. As with their use of Agri Stats, Defendants exploited these public statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy, and couched the public disclosures in pretext so as to conceal what was really occurring. Although purchasers would not typically track and account for these statements, Defendants were, they have been unearth during the course of their investigation and are summarized below.

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 133. To the extent the allegations in Paragraph 133 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 133.

**Complaint:**

134.    Defendants' conspiracy to restrict pork supply began in the last part of 2008. That same month, Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC, the production arm of Smithfield Foods, said "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed." (footnote omitted)

**Answer:**

Clemens denies the allegation in the first sentence of Paragraph 134. To the extent the allegations in Paragraph 134 characterize or describe selected statements made by Joe Szaloky, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 134.

**Complaint:**

135.    In October of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 135 characterize or describe selected statements made by Hormel CEO Jeffrey Ettinger, Clemens states such sources speak for

themselves and denies any characterization or description that is inconsistent therewith.

Clemens denies the remaining allegations in Paragraph 135.

**Complaint:**

136.    During Hormels first quarter earnings call in January 2009, Mr. Ettinger once again communicated that he expected supply to decrease in 2009. Hormel CFO Jody Feragen confirmed that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 136 characterize or describe selected statements made by Hormel CEO Jeffrey Ettinger and Hormel CFO Jody Feragen, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 136.

**Complaint:**

137.    Throughout 2009, pork industry participants noted the need to follow the supply restrictions imposed in the broiler industry. For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. Pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.

**Answer:**

To the extent the allegations in Paragraph 137 characterize or describe selected statements made by AgStar VP Mark Greenwood, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 137 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 137.

**Complaint:**

138.    In May 2009, Larry Pope, the CEO and President of Smithfield, stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year—February of '08, not February of '09—we *made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.* (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 138 characterize or describe selected statements made by Larry Pope, CEO and President of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 138.

**Complaint:**

139.    In May 2009, Hormel confirmed that "[w]e see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 139 characterize or describe selected statements made by Hormel executives, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 139.

**Complaint:**

140.   In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our — I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . *That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.* We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 140 characterize or describe selected statements made by the CEO of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 140.

**Complaint:**

141.   In July 2009, Smithfield's CEO went on to note in Smithfield's annual report in July 2009: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, **liquidation is now a recognized reality by all in the industry.** To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, **combined with the additional cuts by our fellow producers** should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue." (Emphasis added).

**Answer:**

To the extent the allegations in Paragraph 141 characterize or describe selected statements made by the CEO of Smithfield, Clemens states such sources speak for

themselves and denies any characterization or description that is inconsistent therewith.

Clemens denies the remaining allegations in Paragraph 141.

**Complaint:**

142.    In August of 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner, confirmed:

> Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability.*** We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue. (footnote omitted)

Mr. Lochner continued, "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 142 characterize or describe selected statements made by Tyson Chief Operating Officer, James Lochner, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 142.

**Complaint:**

143.    Tyson 2009 10K Report further stated that, "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 143 characterize or describe Tyson's 2009 10-K filing, Clemens states such source speaks for itself and denies any characterization or

description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 143.

**Complaint:**

144.   In August of 2009, Wesley Mendonca Batista, CEO of JBS USA, communicated the start of JBS USA's participation in hog liquidation efforts. Mr. Batista stated, "we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 144 characterize or describe selected statements made by Wesley Mendonca Batista, CEO of JBS USA, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 144.

**Complaint:**

145.   In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> ***We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.*** But again, I don't think they can solve it.
>
> ***I think this industry has got to solve it collectively.*** I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. ***But the answer is, yes, there are others cutting back. We're not the only one.*** (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 145 characterize or describe selected statements made by the CEO of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 145.

**Complaint:**

146.   In December of 2009 the CEO of Smithfield confirmed it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance":

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs...I can tell you that I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves. We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 146 characterize or describe selected statements made by the CEO of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 146.

**Complaint:**

147.   In a January 2010 article, an industry insider noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 5% in 2009.

**Answer:**

To the extent the allegations in Paragraph 147 characterize or describe an unidentified January 2010 article, Clemens states such source speak for itself and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 147.

**Complaint:**

148.   In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield, indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 148 characterize or describe selected statements made by the CEO of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 148.

**Complaint:**

149.   On March 8, 2010, Wesley Mendonca Batista mentioned Defendant JBS' reduction in hog supply as a driver of profitability, and stated that these efforts were resulting in protein shortages. Mr. Batista stated:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong

> demand and this reduction in supply, so we believe that we will
> see some shortage in protein going forward. (footnote omitted)

Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to limit hog supply.

**Answer:**

To the extent the allegations in Paragraph 149 characterize or describe selected statements made by Wesley Mendonca Batista, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 149.

**Complaint:**

150.   As of March 2010, US pork production was noted to be down 7% so far, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights. Defendants also were reported to have increased exports 8% by March 2010, which was expected to lead to higher hog prices.

**Answer:**

Clemens cannot ascertain the truth or falsity of the statistics alleged in Paragraph 150 based on a reasonable effort at this time, and therefore denies the allegations. To the extent the allegations in Paragraph 150 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 150.

**Complaint:**

151.   The Defendants also acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we
> can. ***Given the information we think we have public plus what***
> ***we think we know privately, how many they kill, what their***

>    ***processing levels are and things like to. This is information
>    you may not quite have.*** And we have been certainly impressed
>    with how our competitors have been able to achieve margins
>    that we have not been able to achieve because our fresh pork
>    competes very competitively with theirs. (footnote omitted)

As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

**Answer:**

Clemens denies the allegation in the first sentence of Paragraph 151 as it relates to Clemens. To the extent the allegations in Paragraph 151 characterize or describe selected statements made by Larry Pope, the CEO of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 151 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 151.

**Complaint:**

152.   Supply level information regarding competitors allowed Defendants to know that supply would not increase in the future, given the lifecycles of the animals.  Based on this knowledge, in November of 2010 Hormel CFO, Jody Feragen, stated that she did not think the industry would see large scale expansion given profitability for the pork integrators. (footnote omitted)

**Answer:**

Clemens denies the allegations in the first sentence of Paragraph 152. To the extent the allegations in Paragraph 152 characterize or describe selected statements made by Hormel CFO Jody Feragen, Clemens states such sources speak for themselves and denies

any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 152.

**Complaint:**

> 153.   In February 2011, Tyson's chief operating officer (COO) stated:
>
>> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the provision of competitively sensitive information by a competitor of Tyson.

**Answer:**

To the extent the allegations in Paragraph 153 characterize or describe selected statements made by Tyson's chief operating officer, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 153.

**Complaint:**

> 154.   In the face of ever-increasing margins, when asked whether the type of profits would continue, in March 2011, Larry Pope and Robert (Bo) Manly of Smithfield confirmed to their competitors that it would not increase capacity, even in the face of the clear profitability:
>
>> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . .
>>
>> HEATHER JONES: So you are just striking a note of caution *because you know it can't stay this way indefinitely,* but it's not that you foresee this reversion to that norm over the near term?

BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have — should have good margins, but I can't believe —

LARRY POPE: Heather, we are sitting here today, we are halfway — closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.

BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.

HEATHER JONES: All right, okay. Thank you.

LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . ***And by the way, we are not going to build a new plant to expand capacity.*** (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 154 characterize or describe selected statements made by Larry Pope, Heather Jones, and Robert (Bo) Manly, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 154.

**Complaint:**

155.   In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had — there were rumors the Chinese buying com, and boom, all of a sudden the com market is up $0.20, $0.30. So there is some volatility there. And what

I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. ***There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.*** (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 155 characterize or describe selected statements made by VP of Finance and chief accounting officer of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 155.

**Complaint:**

156.    By May 2012, industry observers were noting that the reductions in slaughter capacity meant Defendants may not have enough capacity to slaughter expected hog levels by the fall. In fact, Steve Meyer of Paragon Economics noted that slaughter capacity would not keep up with hog capacity through late 2013 given that Defendants were holding their slaughter levels constant.

**Answer:**

To the extent the allegations in Paragraph 156 characterize or describe selected statements made by Steve Meyer of Paragon Economics or other industry observers, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 156.

**Complaint:**

157.    In August 2012, Defendant Indiana Packers' president Gary Jacobson commented that the pork company "runs 'on a sold-out position.'" (footnote omitted) Mr. Jacobson attempted to make excuses for reducing the supply of pork. "'It's been a good strong, steady growth,' Jacobson said. 'Indiana is in the heart of com country and pigs are the heart of com consumption, so business has been very good. This summer's heat waves

and drought are likely to affect pork prices starting this fall and into the spring,' said Jacobson. High corn prices make pig farming less profitable, he explained, both reducing the supply of pork for processing plants come next spring and making the pork that is on the market more expensive. In the short run, high temperatures make pigs less hungry and they don't fatten for market as quickly as they would in a cooler year. That means farmers either wait longer to bring their swine to market or take them to market as usual but at a lighter weight. 'So, the impact has not been really significant as far as production as a whole,' Jacobson said, but it remains to be seen how the drought will change the plant's supply in the coming months." (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 157 characterize or describe selected statements made by Indiana Packers' president Gary Jacobson, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 157.

**Complaint:**

158.   In December 2013 Robert Manly of Smithfield emphasized that coordinated industry action was necessary to "balance supply and demand:"

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group. We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 158 characterize or describe selected statements made by Robert Manly of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 158.

**Complaint:**

159.   On May 15, 2013, Wesley Mendonca Batista continued to demonstrate Defendant JBS' ability to constrain the pork market. During a quarterly earnings call he stated that "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business. ... So this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent in beef."

**Answer:**

To the extent the allegations in Paragraph 159 characterize or describe selected statements made by Wesley Mendonca Batista, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 159.

**Complaint:**

160.   Defendants further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise. For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Eric Haman, Defendant Clemens Food Group's communication manager, stated the disease "'had a very minimal impact on our hog flow, especially when you compare it to others in the industry' Haman said. 'That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this.'" (footnote omitted) Yet, in furtherance of their conspiracy Defendant Clemens did not take advantage of having few PEDv infected pigs. Instead of attempting to increase their market share, they stayed the course with their fellow competitors.

**Answer:**

To the extent the allegations in Paragraph 160 characterize or describe selected statements made by Eric Haman, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in the first sentence of Paragraph 160 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these

allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 160.

**Complaint:**

161.   Defendants' conspiracy was yielding substantial profits by 2014. In October 2014, Pork Powerhouses reported that "Hogs made history this summer. Pork producer profits were, quite simply, enormous — averaging $82 profit for each hog marketed in the third quarter." The report also noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast. The PED virus trimmed supply, but higher market weights helped compensate.'"

**Answer:**

Clemens denies the conspiracy alleged in the first sentence of Paragraph 161. To the extent the allegations in Paragraph 161 characterize or describe any sources, documents, or statements, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 161.

**Complaint:**

162.   In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production. Specifically, pork producers rushed to sign contracts with Defendants that would protect them if production exceeded slaughter capacity as some feared.

**Answer:**

To the extent the allegations in Paragraph 162 characterize or describe an unnamed source, document, or statement created by "Pig International," Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in the final sentence of Paragraph 162 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a

belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 162.

**Complaint:**

163.   In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift. (footnote omitted) In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry." (footnote omitted) However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 163 characterize or describe statements by Mark Porter, Seaboard Triumph Foods Chief Operating Officer, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 163 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 163.

## I.   Abnormal pricing during the Class Period demonstrates the success of the collusive scheme.

**Complaint:**

164.   Beginning in 2009, the pork industry showed abnormal price movements, *i.e.,* increases in prices for the average hog whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the pork integrators' margin during the class period; and (iv) the defendants' revenues before and during the class period. Each of these measures supports Plaintiffs' allegations

that Defendants conspired to restrict production and otherwise acted in a concerted manner to increase pork prices in the U.S.

**Answer:**

Clemens denies the allegations in Paragraph 164.

**1.    The average hog wholesale price experienced an unprecedented increase beginning in 2009.**

**Complaint:**

165.    According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb from 2000 to 2009, the hog market year average price was at times substantially less. Thereafter, prices increased dramatically, rising to more than $1.80/lb in 2014, and never dropping or below $1.40/lb again. Figure 9 below shows the unprecedented increase in swine prices beginning in 2009, which stayed elevated through 2018.



Figure 9: Average Hog Wholesale Prices in Cents per lb., 2000-2018

**Answer:**

To the extent the allegations in Paragraph 165 characterize or describe USDA data, including in the graph above, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 165 and therefore denies those allegations.

**Complaint:**

166.    As Figure 10 below shows, publicly available data also demonstrates that pork integrators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits that was resistant to changes in price during the conspiracy period. These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply short of demand.



Figure 10: Integrator Earnings per Retail Weight, 2000-2017

**Answer:**

To the extent the allegations in Paragraph 166 characterize or describe unidentified data, including in the graph above, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 166 and therefore denies those allegations.

## 2.   The pork cut-out composite price experienced a dramatic increase beginning in 2009 and continuing throughout the class period.

**Complaint:**

167.   During the Class Period various pork products saw substantial increases in prices, compared with before the Class Period. As shown in Figure 11 below, using one particular price for pork, the lean hog composite price, Plaintiffs have performed a pricing analysis which shows that the average price index increased significantly during the class period:



Figure 11: Lean Hog Composite Price 2000-2019

**Answer:**

To the extent the allegations in Paragraph 167 characterize or describe data, including in the graph above, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens is without

information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 167 and therefore denies those allegations.

### 3. Defendants' revenues increased beginning in 2009, even taking into account defendant-specific costs.

**Complaint:**

168.    For two of the largest defendants, Tyson and Smithfield, Plaintiffs' experts examined the spread between pork revenue and pork-related costs (costs of goods sold + operating costs), as a proxy for measuring the spread between a defendant's price of wholesale pork and its hog costs. This measurement accounts for Defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the class period in 2009.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 168 and therefore denies them.

**Complaint:**

169.    Figure 12 shows a break in revenues and costs around the start of the Class Period in 2009 for Tyson:

**Figure 12: Tyson's Revenues vs Costs, April 2002 to April 2018**



**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 169 and therefore denies them.

**Complaint:**

170.   The same analysis for Smithfield shows a similar break in revenues and costs beginning at the start of the class period:



**Figure 13: Smithfield's Revenues vs Costs, January 2004 to June 2016**

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 170 and therefore denies them.

**Complaint:**

171.   These analyses of the spread between costs and prices relate solely to each defendant's pork segment, and thus confirm that rising costs in pork production do not explain the increases in price seen during the Class Period.

**Answer:**

Clemens is without information sufficient to form a belief as to the truth of the allegations in Paragraph 171 and therefore denies them.

**J.     Overcharges due to the cartel were reflected in higher pork prices.**

**Complaint:**

172.    Pork is a commodity product in which the pork sold by competitors has no meaningful difference and is thus interchangeable. As such price is driven by the economic fundamentals of supply and demand. In the words of Tyson Foods, Inc. COO, James Lochner, "As you know decreased supply should be favorable to pricing." (footnote omitted)

**Answer:**

As the term "commodity product" in the first sentence of Paragraph 172 is

imprecise, Clemens is unable to form a belief as to the truth of the allegations contained in

that sentence and on this basis denies the allegations in the first two sentences of Paragraph

172. To the extent the allegations in the third sentence of Paragraph 172 characterize or

describe statements by Tyson Foods, Inc. Chief Operating Officer James Lochner, Clemens

states such sources speak for themselves and denies any characterization or description that

is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 172.

**Complaint:**

173.    By reducing, stabilizing and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2012 the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."

**Answer:**

Clemens denies the allegations in the first sentence of Paragraph 173. To the extent

the allegations in Paragraph 173 characterize or describe statement by Tyson's CEO,

Clemens states such sources speak for themselves and denies any characterization or

description that is inconsistent therewith. To the extent the allegations in Paragraph 173 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 173.

**Complaint:**

174.    The volume of U.S. commerce in the pork industry is enormous. Total pork sales in the United States for a portion of the Class Period were:

- 2016-$18.9 billion

- 2015-$21.0 billion

- 2014-$26.4 billion

- 2013-$23.4 billion

**Answer:**

To the extent the allegations in Paragraph 174 characterize or describe unidentified data, Clemens note that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 174 and therefore denies those allegations.

**Complaint:**

175.    Each Defendant's annual sales of pork products are also very large. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to class members.

**Answer:**

Clemens admits that it sells pork products each year, but as the term "very large" in the first sentence of Paragraph 175 is imprecise, Clemens is unable to form a belief as to the truth of the allegations contained in that sentence and on this basis denies the allegations in the first sentence of Paragraph 175. Clemens is without information sufficient to form a belief as to the truth of the second and third sentences in Paragraph 175 and therefore denies those allegations. Clemens denies the remaining allegations in Paragraph 175.

**Complaint:**

176.    The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI"). From the end of 2009 to the end of 2017, the CPI for all food products rose approximately 15.4 percent. Over the same period, prices for pork have increased substantially more for consumers over the Class Period. For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017, an increase of 56.9 percent:



Figure 14: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995-2017

**Answer:**

To the extent the allegations in Paragraph 176 characterize or describe Consumer Price Index data, including in the graph above, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 176 and therefore denies those allegations.

**Complaint:**

177.    Similarly, the CPI for other pork products, excluding cairned ham and luncheon slices, show a marked increase over the Class Period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017 (approximately 29.3 percent):



**Figure 15: CPI-Average Price Data for Other Pork, per pound, from 1998-2017**

**Answer:**

To the extent the allegations in Paragraph 177 characterize or describe Consumer Price Index data, including in the graph above, Clemens notes that such source speaks for

itself and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 177 and therefore denies those allegations.

**Complaint:**

178.   And the CPI for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017 (or 35.4 percent):



**Figure 16: CPI-Average Price Data for Ham, per pound, from 1998-2017**

**Answer:**

To the extent the allegations in Paragraph 178 characterize or describe Consumer Price Index data, including in the graph above, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 178 and therefore denies those allegations.

**Complaint:**

179.   In other words, the increases in the prices of pork far out-paced the growth in prices for other food products during the class period. These price increases were not the result of retailers' desire to move prices upward. Instead, they were the result of increased wholesale prices. In addition to CPIs, the Bureau of Labor Statistics also maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products. As shown in Figure 17 below, the processed pork wholesale prices appear to be the motivator of the higher retail prices, with prices climbing significantly beginning during the conspiracy:



Figure 17: PPI for Pork, Processed or Cured, Not Canned or Made Into Sausage, from 1995-2017

**Answer:**

To the extent the allegations in the first sentence of Paragraph 179 characterize or describe Consumer Price Index data, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the

allegations in Paragraph 179 characterize or describe Producer Price Index data, including in the graph above, Clemens notes that such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 179 and therefore denies those allegations.

**Complaint:**

180.  Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to artificially increase and stabilize the price and supply of pork was borne in large part by Plaintiffs and the Plaintiff Class.

**Answer:**

Clemens denies the allegations in Paragraph 180.

**K.     Defendants actively concealed the conspiracy and Plaintiffs did not and could not have discovered Defendants' anticompetitive conduct.**

**Complaint:**

181.   Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for pork. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and class members.

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 181. To the extent the allegations in Paragraph 181 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 181.

**Complaint:**

182.   The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

**Answer:**

Clemens denies the conspiracy alleged in Paragraph 182. To the extent the allegations in Paragraph 182 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 182.

**Complaint:**

183.   In 2009, the President of Agri Stats, Brian Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background,*** and really our specialty is working directly with companies about their opportunities and so forth. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 183 characterize or describe selected statements made by President of Agri Stats Brian Snyder, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 183.

**Complaint:**

184.   At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information." (footnote omitted) And yet, despite refusing to show this information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.

**Answer:**

To the extent the allegations in Paragraph 184 characterize or describe selected statements made by President of Agri Stats Brian Snyder, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 184.

**Complaint:**

185.   Larry Pope, the CEO of Smithfield, made similar references to secret information in December 2010, explaining that he was confident pork supplies would not be increasing in the market, based on the information we think we have public ***plus what we think we know privately,*** how many they kill, what their processing levels are and things like [that]. ***This is information you may not quite have.*** (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 185 characterize or describe selected statements made by Larry Pope, the CEO of Smithfield, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 185.

**Complaint:**

186.   At other times, Defendants attributed the stability in the pork market to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, stated in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy. (footnote omitted)

**Answer:**

To the extent the allegations in Paragraph 186 characterize or describe selected statements made by Larry Pope and others, Clemens states such sources speak for themselves and denies any characterization or description that is inconsistent therewith.

Clemens denies the remaining allegations in Paragraph 186.

**Complaint:**

187.   Not until recently was the fact of the pork industry's use of Agri Stats widely known or reported. An investigative article published in February 2017 by Bloomberg Businessweek suggested the conspiracy that began among Broiler producers and Agri Stats was being replicated in the pork industry. (footnote omitted) The article reported that Agri Stats

> has . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods. It appears that demand for the service is strong. At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services. His slideshow indicated that 27 companies had already signed up. (footnote omitted)

While Bloomberg Businessweek article did not conclude that pork producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated article that

the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.

**Answer:**

To the extent the allegations in Paragraph 187 characterize or describe a 2017 Bloomberg Businessweek article, Clemens states such source speaks for itself and denies any characterization or description that is inconsistent therewith. Clemens denies the remaining allegations in Paragraph 187.

**Complaint:**

188.   Only after the filing of a February 7, 2018, Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In Re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats' provides to its clients in the Broiler industry

**Answer:**

To the extent the allegations in Paragraph 188 characterize or describe the Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In Re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), Clemens states such source speaks for itself and denies any characterization or description that is inconsistent therewith. To the extent the allegations in Paragraph 188 relate to other Defendants and/or third parties, Clemens is without information sufficient to form a belief as to the truth of these allegations and therefore denies them. Clemens denies the remaining allegations in Paragraph 188.

**Complaint:**

189.   The filing of this amended complaint, along with the February 2017 article by Bloomberg Businessweek disclosing the pork industry's use of Agri Stats, collectively

disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy

**Answer:**

Clemens denies the allegations in Paragraph 189.

**Complaint:**

190.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Pork is not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' pork prices before these recent events.

**Answer:**

Paragraph 190 contains Plaintiffs' characterization of their claims, allegations

subject to proof, including by expert testimony, and/or legal conclusions, to which no

response is required. To the extent that a response is required and the allegations in

Paragraph 190 relate to other Defendants and/or third parties, Clemens is without

information sufficient to form a belief as to the truth of these allegations and therefore

denies them. Clemens denies the remaining allegations in Paragraph 190.

**Complaint:**

191.   By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

**Answer:**

Paragraph 191 contains Plaintiffs' characterization of their claims, allegations

subject to proof, including by expert testimony, and/or legal conclusions, to which no

response is required. To the extent that a response is required, Clemens denies the allegations in Paragraph 191.

## V.    CLASS ACTION ALLEGATIONS

**Complaint:**

192.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

> All persons who purchased pork directly from any of the Defendants or any co-conspirator identified in this action, or their respective subsidiaries or affiliates for use or delivery in the United States from at least as early as January 1, 2009 until the Present. Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

**Answer:**

Paragraph 192 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions, to which no response is required. To the extent that a response is required, Clemens admits that Plaintiffs purport to bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of the putative class alleged in Paragraph 192, but denies that Plaintiffs' claims are appropriate for class treatment and/or that Plaintiffs are entitled to any relief. Clemens denies the remaining allegations in Paragraph 192.

**Complaint:**

193.   **Class Identity:** The Plaintiff Class is readily identifiable and is one for which records should exist in the files of Defendants and their co-conspirators.

**Answer:**

Paragraph 193 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. Clemens denies the remaining allegations in Paragraph 193.

**Complaint:**

194.   **Numerosity:** Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of Defendants. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

**Answer:**

Paragraph 194 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. Clemens denies the remaining allegations in Paragraph 194.

**Complaint:**

195.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because Plaintiffs purchased pork directly from one or more of the Defendants, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

**Answer:**

Paragraph 195 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. Clemens denies the remaining allegations in Paragraph 195.

**Complaint:**

196.   **Common Questions Predominate:** There are questions of law and fact common to the Class, including, but not limited to:

     A.    Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of pork sold in interstate commerce in the United States;

     B.    The identity of the participants of the alleged conspiracy;

     C.    The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

     D.    Whether the alleged conspiracy violated the antitrust laws;

     E.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the class;

     F.    The effect of Defendants' alleged conspiracy on the prices of pork sold in the United States during the Class Period;

     G.    Whether Plaintiffs and other members of the class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

     H.    The appropriate class-wide measure of damages.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

**Answer:**

Paragraph 196 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. Clemens denies the remaining allegations in Paragraph 196.

**Complaint:**

197.   **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who directly purchased pork and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**Answer:**

Paragraph 197 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. Clemens denies the remaining allegations in Paragraph 197.

**Complaint:**

198.   **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents

far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**Answer:**

Paragraph 198 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. Clemens denies the remaining allegations in Paragraph 198.

**Complaint:**

199.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**Answer:**

Paragraph 199 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. Clemens denies the remaining allegations in Paragraph 199.

**Complaint:**

200.   Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**Answer:**

Paragraph 200 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no

response is required. To the extent that a response is deemed required, Clemens denies that this action can be properly maintained as a class action whether on behalf of the purported class or otherwise. Clemens denies the remaining allegations in Paragraph 200.

## VI.   ANTITRUST INJURY

**Complaint:**

201.   Defendants' anticompetitive conduct had the following effects, among others:

A.   Price competition has been restrained or eliminated with respect to pork;

B.   The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.   Direct purchasers of pork have been deprived of free and open competition; and

D.   Direct purchasers of pork paid artificially inflated prices.

**Answer:**

Clemens denies the allegations in Paragraph 201.

**Complaint:**

202.   The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork. As a direct and foreseeable result, Plaintiffs and the Class paid supra-competitive prices for pork during the Class Period.

**Answer:**

Clemens denies the allegations in Paragraph 202.

**Complaint:**

203.   By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for pork than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

**Answer:**

Clemens denies the allegations in Paragraph 203.

**Complaint:**

204.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**Answer:**

Paragraph 204 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies the allegations in Paragraph 204.

## VII.   VIOLATION OF SECTION 1 OF THE SHERMAN ACT

**Complaint:**

205.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**Answer:**

Clemens incorporates and re-alleges its answers to each allegation set forth in the preceding Paragraphs of the Complaint.

**Complaint:**

206.   Defendants and all of their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer:**

Clemens denies the allegations in Paragraph 206.

**Complaint:**

207.   Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**Answer:**

Clemens denies the allegations in Paragraph 207.

**Complaint:**

208.   At least as early as January 1, 2009, and continuing until present, the exact dates being unknown to Plaintiffs, Defendants and all of their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

**Answer:**

Clemens denies the allegations in Paragraph 208.

**Complaint:**

209.   Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for pork throughout the United States.

**Answer:**

Clemens denies the allegations in Paragraph 209.

**Complaint:**

210.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

**Answer:**

Clemens denies the allegations in Paragraph 210.

**Complaint:**

211.   As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been harmed by being forced to pay inflated, supracompetitive prices for pork.

**Answer:**

Clemens denies the allegations in Paragraph 211.

**Complaint:**

212. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A. Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

B. Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiffs and members of the Class who directly purchased pork from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-co-conspirators, have been deprived of the benefits of free and open competition in the purchase of pork.

**Answer:**

Clemens denies the allegations in Paragraph 212.

**Complaint:**

213. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

**Answer:**

Clemens denies the allegations in Paragraph 213.

**Complaint:**

214. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for pork than they would have paid and will pay in the absence of the conspiracy.

**Answer:**

Clemens denies the allegations in Paragraph 214.

**Complaint:**

215.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

**Answer:**

Paragraph 215 contains Plaintiffs' characterization of their claims, allegations subject to proof, including by expert testimony, and/or legal conclusions to which no response is required. To the extent that a response is deemed required, Clemens denies the allegations in Paragraph 215.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

**Complaint:**

216.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that at a practicable time notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

**Answer:**

Paragraph 216 contains no factual assertions to which a response is required. Paragraph 216 further states legal conclusions and Plaintiffs' characterizations of this action, with which Clemens disagrees and to which no response is required. To the extent Paragraph 216 may be deemed to require a response, Clemens admits that Plaintiffs seek class certification and related relief under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and (c)(2) in Paragraph 216, but denies that Plaintiffs have or can satisfy the

requirements of Federal Rule of Civil Procedure 23 or are entitled to any relief requested in Paragraph 216 or elsewhere in their Complaint.

**Complaint:**

217.   The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

**Answer:**

Paragraph 217 contains no factual assertions to which a response is required. Paragraph 217 further states legal conclusions and Plaintiffs' characterizations of this action, with which Clemens disagrees and to which no response is required. To the extent Paragraph 217 may be deemed to require a response, Clemens admits that Plaintiffs seek the relief requested in Paragraph 217, but denies that Plaintiffs are entitled to any relief requested in Paragraph 217 or elsewhere in their Complaint.

**Complaint:**

218.   Plaintiffs and the Class recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

**Answer:**

Paragraph 218 contains no factual assertions to which a response is required. Paragraph 218 further states legal conclusions and Plaintiffs' characterizations of this action, with which Clemens disagrees and to which no response is required. To the extent Paragraph 218 may be deemed to require a response, Clemens admits that Plaintiffs seek damages and a joint and several judgment in Paragraph 218, but denies that Plaintiffs are entitled to any relief requested in Paragraph 218 or elsewhere in their Complaint.

**Complaint:**

219.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

**Answer:**

Paragraph 219 contains no factual assertions to which a response is required.

Paragraph 219 further states legal conclusions and Plaintiffs' characterizations of this

action, with which Clemens disagrees and to which no response is required. To the extent

Paragraph 219 may be deemed to require a response, Clemens admits that Plaintiffs seek

the injunctive relief requested in Paragraph 219, but denies that Plaintiffs are entitled to

any relief requested in Paragraph 219 or elsewhere in their Complaint.

**Complaint:**

220.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

**Answer:**

Paragraph 220 contains no factual assertions to which a response is required.

Paragraph 220 further states legal conclusions and Plaintiffs' characterizations of this

action, with which Clemens disagrees and to which no response is required. To the extent

Paragraph 220 may be deemed to require a response, Clemens admits that Plaintiffs seek

the injunctive relief requested in Paragraph 220, but denies that Plaintiffs are entitled to any relief requested in Paragraph 220 or elsewhere in their Complaint.

**Complaint:**

221.    Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**Answer:**

Paragraph 221 contains no factual assertions to which a response is required. Paragraph 221 further states legal conclusions and Plaintiffs' characterizations of this action, with which Clemens disagrees and to which no response is required. To the extent Paragraph 221 may be deemed to require a response, Clemens admits that Plaintiffs seek pre- and post-judgment interest in Paragraph 221, but denies that Plaintiffs are entitled to any relief requested in Paragraph 221 or elsewhere in their Complaint.

**Complaint:**

222.    Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

**Answer:**

Paragraph 222 contains no factual assertions to which a response is required. Paragraph 222 further states legal conclusions and Plaintiffs' characterizations of this action, with which Clemens disagrees and to which no response is required. To the extent Paragraph 222 may be deemed to require a response, Clemens admits that Plaintiffs seek costs of suit, including reasonable attorneys' fees in Paragraph 222, but denies that Plaintiffs are entitled to any relief requested in Paragraph 222 or elsewhere in their Complaint.

**Complaint:**

223.   Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**Answer:**

Paragraph 223 contains no factual assertions to which a response is required. Paragraph 223 further states legal conclusions and Plaintiffs' characterizations of this action, with which Clemens disagrees and to which no response is required. To the extent Paragraph 223 is deemed to require a response, Clemens denies each and every allegation in Plaintiffs' Complaint except as expressly admitted and qualified above. Clemens requests that Plaintiffs' Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of Clemens, and that the Court award Clemens its attorneys' fees, costs, and expenses, and such other and further relief as the Court deems just and proper.

## IX.   JURY TRIAL DEMANDED

**Complaint:**

224.   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**Answer:**

Paragraph 224 contains no factual assertions to which a response is required. Paragraph 224 further states legal conclusions and Plaintiffs' characterizations of this action, with which Clemens disagrees and to which no response is required. To the extent Paragraph 224 may be deemed to require a response, Clemens admits that Plaintiffs purport

to demand a jury trial in Paragraph 224, but denies that Plaintiffs have stated claims that are triable. Clemens denies the remaining allegations in Paragraph 224.

## AFFIRMATIVE DEFENSES

Clemens states the following defenses to Plaintiffs' Complaint. Each defense is asserted as to all claims against Clemens. By setting forth these affirmative defenses, Clemens does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiffs. Nothing herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to the Plaintiffs' allegations. Clemens incorporates and re-alleges the factual allegations in the introduction to its Answer as if fully set forth below.

As separate and distinct affirmative defenses, Clemens alleges as follows:

1.     Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

2.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of laches, estoppel, waiver, unclean hands, and *in pari delicto*.

3.     Plaintiffs are precluded from recovering damages, in whole or in part, because and to the extent of, their failure to mitigate alleged damages, if any.

4.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs do not have standing to raise their claims.

5.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered an injury-in-fact or antitrust injury actually or proximately caused by Clemens's alleged conduct.

6.     Plaintiffs' claims are barred to the extent that they are subject to contractual arbitration and/or forum selection provisions.

7.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Clemens based on the exercise of any person or entity's right to petition federal, state and local legislative bodies, because such conduct was immune under the *Noerr-Pennington* doctrine and privileged under the First Amendment to the U.S. Constitution.

8.     Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs seek damages that would constitute a duplicative recovery.

9.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, due to the ratification of, and consent to, the conduct of Clemens.

10.     Without admitting the existence of any contract, combination or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by Clemens' right to set off any amounts paid to Plaintiffs by any Defendants other than Clemens who have settled, or do settle, Plaintiffs' claims against them in this action.

11.     Plaintiffs' claims and the claims of any putative class member are barred, in whole or in part, by the applicable limitations period set out in contracts and/or agreements executed by Plaintiffs.

12.     Plaintiffs' claims and the claims of any putative class members are barred, in whole or in part, by the doctrine of accord and satisfaction.

13.     Plaintiffs' claims are barred, in whole or in part, by the Filed Rate Doctrine.

14.     Plaintiffs fail, in whole or in part, to state a claim upon which relief could be granted.

15.     To the extent that Plaintiffs seek to collect compensatory damages, penalties, punitive damages, exemplary damages, attorneys' fees and expenses, and other monetary relief from Clemens, they seek a recovery that is so grossly excessive and inequitable that it would violate the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

16.     Clemens engaged in no behavior that it knew to be, or could reasonably foresee would ever be found to be, improper of forbidden under the federal law alleged by Plaintiffs, and thus neither actual nor treble damages may be awarded against it.

17.     To the extent Plaintiffs claim that Clemens fraudulently concealed any actions, Plaintiffs have failed to allege this fraud with the particularity required by Federal Rule of Civil Procedure 9(b).

18.     Plaintiffs' claims are barred, in whole or in part, because any alleged anti-competitive effects of the conduct alleged by Plaintiffs do not outweigh the pro-competitive benefits.

19.     Plaintiffs' claims are barred, in whole or in part, because Clemens' conduct did not cause harm to competition in any relevant market.

20.     Plaintiffs' claims are barred, in whole or in part, because Clemens acted unilaterally, in furtherance of its independent business interests.

21.     Plaintiffs' claims are barred, in whole or in part, because any contracts or agreements between Clemens and any other person were lawful business arrangements and cannot support a claim that Clemens engaged in any unlawful conspiracy.

22.     Plaintiffs' damages claims are barred, in whole or in part, because they have suffered no damages or because the damages they seek are speculative and uncertain.

23.     Plaintiffs' claims are barred, in whole or in part, because of a failure to join necessary and/or indispensable parties.

24.     Plaintiffs' claims are barred, in whole or in part, because of the *Copperweld* doctrine.

25.     Plaintiffs' claims are barred, in whole or in part, because Clemens did not act knowingly, willfully, or intentionally.

26.     Clemens adopts by reference any applicable defenses not otherwise expressly set forth herein that are or will be pleaded by any other Defendant in this action to the extent that such defenses are not inconsistent with Clemens' defenses.

## RESERVATION OF RIGHTS TO ASSERT ADDITIONAL DEFENSES

Clemens has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other applicable defenses that may become available or apparent as this matter proceeds. Clemens reserves the right to amend or seek to amend its answers and/or affirmative defenses.

## JURY DEMAND

Pursuant to the Federal Rules of Civil Procedure 38, Clemens demands a trial by jury of all claims and defenses upon which it is entitled to a jury trial.

## PRAYER FOR RELIEF

Clemens requests that Plaintiffs' Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of Clemens, and that the Court award Clemens its attorneys' fees, costs, and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

Dated: December 16, 2020

Respectfully submitted,

/s/ *Mark L. Johnson*

Mark L. Johnson (#0345520)
Virginia R. McCalmont (#0399496)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
vmccalmont@greeneespel.com

Daniel E. Laytin, P.C. (*pro hac vice*)
Christa C. Cottrell, P.C. (*pro hac vice*)
Christina L. Briesacher (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
312-862-2000
dlaytin@kirkland.com
ccottrell@kirkland.com
christina.briesacher@kirkland.com
*Counsel for Clemens Food Group, LLC (formerly Hatfield Quality Meats, Inc.) and The Clemens Family Corporation*