1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
      ------------------------------------------------------------
3                                      )
      In Re:  Pork Antitrust           )   File No. 18-CV-1776
4     Litigation                       )        (JRT/HB)
                                       )
5                                      )
                                       )   Minneapolis, Minnesota
6                                      )   December 18, 2020
                                       )   3:00 p.m.
7                                      )
                                       )
8                                      )
      ------------------------------------------------------------
9
                   BEFORE THE HONORABLE HILDY BOWBEER
10           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                 **(VIDEO CONFERENCE MOTIONS HEARING)**
11

12    **APPEARANCES**
       **For Direct Purchaser        LOCKRIDGE, GRINDAL, NAUEN, PLLP**
13     **Plaintiffs:                 BRIAN D. CLARK, ESQ.**
                                     **JOSEPH BRUCKNER, ESQ.**
14                                   100 Washington Avenue South
                                     Suite 2200
15                                   Minneapolis, MN 55401

16                                   **PEARSON, SIMON & WARSHAW**
                                     **BOBBY POUYA, ESQ.**
17                                   **MICHAEL PEARSON, ESQ.**
                                     **JOSEPH BOURNE, ESQ.**
18                                   800 LaSalle Avenue
                                     Suite 2150
19                                   Minneapolis, MN 55402

20     **For the Consumer            GUSTAFSON GLUEK, PLLC**
       **Indirect Purchaser         MICHELLE LOOBY, ESQ.**
21     **Plaintiffs:                 BRITANY RESCH, ESQ.**
                                     120 South Sixth Street
22                                   Suite 2600
                                     Minneapolis, MN 55402
23

24

25

```
 1                              HAGENS, BERMAN, SOBOL, SHAPIRO
                                SHANA E. SCARLETT, ESQ.
 2                              RIO PIERCE, ESQ.
                                BREANNA VAN ENGELEN, ESQ.
 3                              715 Hearst Avenue
                                Suite 202
 4                              Berkeley, CA 94710

 5
        For the Commercial and  LARSON KING, LLP
 6      Institutional Indirect  SHAWN M. RAITER, ESQ.
        Purchaser Plaintiffs:   30 East Seventh Street
 7                              Suite 2800
                                St. Paul, MN 55101
 8
                                CUNEO, GILBERT & LADUCA, LLP
 9                              A. BLAINE FINLEY, ESQ.
                                4725 Wisconsin Ave. NW
10                              Suite 2200
                                Washington, DC 20016
11
                                BARRETT LAW GROUP, P.A.
12                              DAVID McMULLAN, JR., ESQ.
                                404 Court Square North
13                              Lexington, MS 39095

14
        For the Commonwealth of SCHNEIDER, WALLACE,
15      Puerto Rico:            COTTRELL,KONECKY, LLP
                                MATTHEW WEILER, ESQ.
16                              2000 Powell St., Suite 1400
                                Emeryville, CA 94608
17
        Direct Action           AHERN AND ASSOCIATES, P.C.
18      Plaintiffs Winn-Dixie   PATRICK AHERN, ESQ.
        Stores, Inc. and Bi-Lo  590 North Sheridan Rd.
19      Holdings, LLC:          Lake Forest, IL 60045

20
        For Defendant Triumph   HUSCH BLACKWELL
21      Foods:                  GENE SUMMERLIN, ESQ.
                                CHRISTOPHER SMITH, ESQ.
22                              13330 California Street
                                Suite 200
23                              Omaha, NE 68154

24

25
```

```
 1      For Defendant JBS USA:      SPENCER FANE, LLP
                                    DONALD G. HEEMAN, ESQ.
 2                                  JESSICA NELSON, ESQ.
                                    100 South Fifth Street
 3                                  Suite 1900
                                    Minneapolis, MN 55402
 4
                                    QUINN EMANUEL URQUHART &
 5                                  SULLIVAN
                                    SAMI H. RASHID, ESQ.
 6                                  51 Madison Avenue
                                    22nd Floor
 7                                  New York, NY 10010

 8
        For Defendant               LARKIN, HOFFMAN, DALY & LINDGREN
 9      Smithfield Foods:           JOHN A. COTTER, ESQ.
                                    JOHN KVINGE, ESQ.
10                                  8300 Norman Center Dr.
                                    Suite 1000
11                                  Minneapolis, MN 55437

12                                  GIBSON, DUNN & CRUTCHER
                                    BRIAN EDWARD ROBISON, ESQ.
13                                  2100 McKinney Avenue,
                                    Suite 1100
14                                  Dallas, Texas 75201

15      For Defendant Tyson         AXINN, VELTROP & HARKRIDER, LLP
        Foods:                      RACHEL ADCOX, ESQ.
16                                  JAROD TAYLOR, ESQ.
                                    950 F Street NW,
17                                  7th Floor
                                    Washington, DC 20004

18

19      For Defendant Clemens       KIRKLAND & ELLIS, LLP
        Food Group:                 CHRISTINA BRIESACHER, ESQ.
20                                  300 North LaSalle
                                    Chicago, IL 60654
21
                                    GREENE ESPEL, PLLP
22                                  MARK JOHNSON, ESQ.
                                    222 S. 9th St., Suite 2200
23                                  Minneapolis, Minnesota 55402

24

25
```

```
 1      For Defendant Hormel          FAEGRE, DRINKER, BIDDLE & REATH,
        Foods:                        LLP
 2                                    CRAIG S. COLEMAN, ESQ.
                                      90 South 7th Street
 3                                    Suite 2200
                                      Minneapolis, MN 55402
 4

 5      For Defendants Seaboard       PETER J. SCHWINGLER, ESQ.
        Foods, LLC, and               50 South Sixth Street
 6      Seaboard Corporation:         Suite 2600
                                      Minneapolis, MN 55402
 7

 8      For Defendant Agri            HOGAN LOVELLS U.S., LLP
        Stats, Inc.:                  WILLIAM MONTS, III, ESQ.
 9                                    Columbia Square
                                      555 Thirteenth Street NW
10                                    Washington, D.C. 20004

11          Proceedings recorded by mechanical stenography;
        transcript produced by computer.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  We are convened for a Rule 16

2     conference by Zoom in the matter of In re Pork Antitrust

3     Litigation, which is Matter No. 18-cv-1776.  We do have a

4     court reporter for this Rule 16 conference, and so in a

5     couple minutes I'm going to give you some rules of the road

6     for helping us help her make sure that there is a complete

7     and accurate record.

8          I'm making a recording solely as a back-up for the

9     court reporter.  Just in case for some reason she loses her

10    connection to the Zoom conference, the recording will

11    capture whatever she wasn't here for.  But with those two

12    exceptions, the court reporter will be preparing the

13    official transcript and the Zoom recording that I'm making,

14    those are the only recordings of any kind -- photographic,

15    audiographic, videographic or any other kind of graphic --

16    that can be made of this proceeding.

17         I'm going to go through and get appearances next

18    now, and then I've got additional people who are coming in

19    from the waiting room and I'll make sure they are on.  Let

20    me go through and make appearances first.

21         Since we have so many people, I'm going to go

22    through and call the names of the people that I understand

23    are attending in order of the parties.  And then after each

24    party or group of parties I'll do a check as to whether

25    there's anybody in attendance whose name I didn't call.

1          There may also be members of the public who are

2     listening in this afternoon because this is a public

3     proceeding.  I'm not going to require identification or

4     appearances of them.  In case anybody is counting little

5     Zoom boxes and don't have names for every box, the others

6     would be -- my law clerk does have a name on her box;

7     otherwise, they are members of the public who are simply

8     listening but not making an appearance.

9          So let me start first on behalf of -- when I call

10    your name, please acknowledge your presence -- for John

11    Gross and Company, Bart Cohen?  Is Mr. Cohen on?

12         All right.  For the Direct Purchaser Plaintiffs,

13    Bobby Pouya?

14         MR. POUYA:  Good afternoon, Your Honor.

15         THE COURT:  Michael Pearson?

16         MR. PEARSON:  Good afternoon, Your Honor.

17         THE COURT:  Brian Clark?

18         MR. CLARK:  Good afternoon, Your Honor.

19         THE COURT:  Joseph Bruckner.  I think you're muted

20    Mr. Bruckner, and the audio isn't working as well.

21         Let me ask everybody who's not speaking to mute

22    their audio.

23         MR. BRUCKNER:  Good afternoon, Your Honor.

24         THE COURT:  Good afternoon, Mr. Bruckner.

25         Is there anybody else who is making an appearance

1    on behalf of the Direct Purchaser Plaintiffs?

2              MR. BOURNE:  Good afternoon, Your Honor.  Joe

3    Bourne from Pearson, Simon & Warshaw.

4              THE COURT:  Good afternoon.

5              Anyone else for the Direct Purchaser Plaintiffs?

6    All right.

7              Next, on behalf of the Consumer Indirect Purchaser

8    Plaintiffs, Shana Scarlett?

9              MS. SCARLETT:  Good afternoon, Your Honor.

10             THE COURT:  Rio Pierce?

11             MR. PIERCE:  Good afternoon, Your Honor.

12             THE COURT:  Breanna Van Engelen?

13             MS. VAN ENGELEN:  Good afternoon, Your Honor.

14             THE COURT:  Michelle Looby?

15             MS. LOOBY:  Good afternoon, Your Honor.

16             THE COURT:  Brittany Resch?

17             MS. RESCH:  Good afternoon, Your Honor.

18             THE COURT:  Anyone else for the Consumer Indirect

19   Purchaser Plaintiffs?

20             Turning to the Commercial and Institutional

21   Indirect Purchaser Plaintiffs, Shawn Raiter?

22             MR. RAITER:  Good afternoon, our Honor.

23             THE COURT:  Blaine Finley?

24             MR. FINLEY:  Good afternoon, Your Honor.

25             THE COURT:  Jonathan Cuneo?  Mr. Cuneo on?  I'm

1    not hearing him.

2              David McMullan?

3              MR. McMULLAN:  Good afternoon, Your Honor.

4              THE COURT:  Anyone else for the Commerical and

5    Institutional Indirect Purchaser Plaintiffs?

6              Now to the Commonwealth of Puerto Rico.  Matthew

7    Weiler?

8              MR. WEILER:  That's right.  Here, Your Honor.

9    Good afternoon.

10             THE COURT:  Did I pronounce it correctly?

11             MR. WEILER:  It's Weiler.  Yes, that's right.

12             THE COURT:  Weiler.

13             Anyone else for the Commonwealth of Puerto Rico?

14             And then for the Direct Action Plaintiffs

15   Winn-Dixie and Bi-Lo Holdings, Patrick Ahern?

16             MR. AHERN:  Good afternoon, Your Honor.

17             THE COURT:  Is there anyone else for the Direct

18   Action Plaintiffs Winn-Dixie and Bi-Lo?

19             MR. AHERN:  No, Your Honor.

20             THE COURT:  Have I missed anyone who wants their

21   appearance noted on behalf of any of the plaintiffs?

22             All right.  Let's turn to the defendants.  Agri

23   Stats.

24             MR. MONTS:  Good afternoon, Your Honor.  William

25   Monts.  And I'll be the only person appearing for Agri Stats

```
 1    this afternoon.  Thank you.

 2              THE COURT:  So Liam Phibbs is not on?

 3              MR. MONTS:  He will not be on, Your Honor.  Thank

 4    you.

 5              THE COURT:  All right.  For the Clemens

 6    Defendants, Christina Briesacher?

 7              MS. BRIESACHER:  Good afternoon, Your Honor.

 8              THE COURT:  Is it Bri-sacher or Bre-sacher?

 9              MS. BRIESACHER:  Bri-sacher.

10              THE COURT:  I will try to remember that.

11              Mark Johnson.

12              MR. JOHNSON:  I'm by phone, Your Honor.  Good

13    afternoon.

14              THE COURT:  Anyone else for the Clemens

15    Defendants?

16              Hormel Foods, Craig Coleman?

17              MR. COLEMAN:  Yes, Your Honor.

18              THE COURT:  Anyone else for Hormel?

19              MR. COLEMAN:  No, Your Honor.

20              THE COURT:  JBS Defendants, Donald Heeman?

21              MR. HEEMAN:  Good afternoon, Your Honor.

22              THE COURT:  Sami Rashid?

23              MR. RASHID:  Good afternoon, Your Honor.

24              THE COURT:  Jessica Nelson.  Is Ms. Nelson on?

25              MR. HEEMAN:  She will be appearing by phone, Your
```

1    Honor.

2              THE COURT:  So, Ms. Nelson, are you there?

3              MS. NELSON:  Your Honor, I am.  I'm sorry.  I

4    wasn't expecting to make an appearance.

5              THE COURT:  Oh, okay.  Well, you're of record, so

6    we'll note that you came.

7              Anybody else for the JBS Defendants?

8              Seaboard Foods, Peter Schwingler?

9              MR. SCHWINGLER:  Good afternoon, Your Honor.

10             THE COURT:  Anyone else for Seaboard?

11             MR. SCHWINGLER:  Just me today.  Thank you.

12             THE COURT:  Smithfield Foods, Brian Robison?

13             MR. ROBISON:  Good afternoon, Your Honor.

14             THE COURT:  Richard Parker?

15             MR. ROBISON:  Your Honor, Brian Robison.  I don't

16   think Mr. Parker is going to be on this.

17             THE COURT:  John Cotter?

18             MR. COTTER:  I'm here, Your Honor.

19             THE COURT:  And John Kvinge?

20             MR. KVINGE:  Good afternoon.

21             THE COURT:  Anyone else for Smithfield?

22             Triumph Foods, Christopher Smith?

23             MR. SMITH:  Good afternoon, Your Honor.

24             THE COURT:  And Gene Summerlin?

25             MR. SUMMERLIN:  Good afternoon, Your Honor.

1           THE COURT:  Anyone else for Triumph?

2           Well, on behalf of Tyson Foods, Tiffany Rider

3     Rohrbaugh?

4

5           MR. TAYLOR:  Your Honor, Ms. Rohrbaugh had an

6     emergency appointment, and she is being replaced by me and

7     my colleague, Rachel Adcox, appearing by telephone.

8           THE COURT:  Could you spell that for me or she can

9     spell it for herself.

10          MS. ADCOX:  Yes, Your Honor.  It's A-D-C-O-X.

11          THE COURT:  All right.

12          MR. TAYLOR:  Thank you very much.

13          THE COURT:  Anyone else for Tyson?

14          Is there anyone else for any of the defendants who

15    wants to make an appearance and has not had their name read?

16          All right.  So we've got two matters on the

17    agenda, if you will, for this afternoon.  One is the 26(f)

18    report, the Rule 16 -- what will ultimately be incorporated

19    into a Rule 16 Scheduling Order.  And the other is the

20    search methodology order that was the subject of the joint

21    letter brief filed on November 20th and on which there was

22    some considerable disagreement.

23          So I want to start with the Rule 26(f) report,

24    Rule 16 order.  My understanding is that Mr. Pouya is going

25    to be speaking on behalf of all plaintiffs as regards that

1    matter.

2             Is that correct, Mr. Pouya?

3             MR. POUYA:  That's correct, Your Honor.

4             THE COURT:  All right.  And, Mr. Robison, are you

5    speaking on behalf of defendants as to both of those matters

6    or is that responsibility being split among a couple of you?

7             MR. ROBISON:  Your Honor, Brian Robison.  I'll be

8    presenting argument for the defendants on the 26(f) report.

9    A different lawyer for our group will be handling the search

10   methodology order.

11            THE COURT:  All right.  And who will that be?

12            MR. ROBISON:  I think it's Jarod Taylor from the

13   Tyson team.

14            MR. TAYLOR:  Correct, Your Honor.

15            THE COURT:  All right.  Got it.

16            MR. POUYA:  And, Your Honor, on behalf of the

17   plaintiffs Mr. Clark, Brian Clark, is going to be handling

18   the search methodology issues.  I'll be addressing the

19   26(f).

20            THE COURT:  I'm sorry, my eyes saw it.  I thought

21   my mouth had said it.  Yes, I knew that.  Mr. Clark, I'll

22   look to you on that.

23            All right.  So let's start with the schedule for

24   this case.  And I've gone through the 26(f) report in some

25   detail.  Actually, one of the things I'm going to do first

1   is first make sure anybody who isn't going to be speaking to

2   this subject, make sure that you are muted.  And, actually,

3   even if you are going to be speaking, mute until you're

4   ready to speak.

5        In addition, when you begin speaking, and when you

6   begin speaking again during the meeting after someone else

7   has spoken, please state your name again.  You don't need to

8   state your full affiliation, but do state your name again.

9   With so many faces and so many names it will make it easier

10  for the court reporter to know who to attribute what remarks

11  to.  So do remember to do that.

12       Go slowly.  And if you're going to be reading

13  something, go really slowly.  If you have something that you

14  feel needs to be said while somebody else is talking, don't.

15  Don't interrupt.  It is virtually impossible for our court

16  reporter on Zoom to unravel intermingled threads of voices.

17  You just cancel each other out, and that doesn't do anybody

18  any good.  So please don't interrupt.

19       If there is something that seems like it's just

20  got to be clarified on the spot or the moment will be lost

21  forever, then wave your hand (indicating) or something to

22  get my attention visually.  And I'll halt whoever is

23  speaking and call on you.  But, other than that, please

24  don't interrupt.  And try to avoid even that unless it's

25  absolutely necessary to making sure that we are

1    understanding each other.

2         When you are speaking, pause for a breath every so

3    often so that I can get a question in edge-wise.  I will try

4    not to interrupt you either, but, obviously, I'm going to

5    have questions as we go along.  And so if you could pause

6    every so often so that I can state my questions or even a

7    reaction to what you're saying, that would be helpful,

8    again, not only to me but to the court reporter.

9         If I need to get your attention, I will try to

10   give you a visual signal (indicating), and I will interrupt

11   you with my voice only if you're not picking up on the

12   visual signal.  So keep an eye on the screen every so often

13   and watch for my cue that I would like to ask a question or

14   give you a reaction or perhaps move you on to a different

15   point.

16        So I think if we keep all of those things in mind,

17   we'll make life easier for our court reporter.

18        So with regard to the 26(f) report, there are a

19   number of things on which you agree, and I thank you for the

20   work that went into this.  I don't think I'm going to need

21   to ask many, if any, questions about the areas on which

22   you're in agreement.  Rather, we will spend our time on the

23   areas where you diverge in your views.

24        One question I did have, though, kind of starting

25   from the top of the order, Rule 16 requires that a

1    scheduling order have a deadline for motions to amend.  Now,

2    Judge Tunheim had already provided deadlines for amendments.

3    And I'm hoping we're not looking at motions to amend, but I

4    need to provide a deadline by which any such motions will be

5    made failing which you would have to not only make a motion

6    to amend but make a motion to amend the Scheduling Order as

7    well.  So I wondered whether there was some unity of

8    thinking along those lines.  Mr. Pouya?

9         MR. POUYA:  Your Honor, it's not reflected in the

10   Schedule.  I would confirm with the plaintiffs before

11   providing something, but I think that's something that could

12   be provided.  And certainly if it's required and should have

13   been put in the order, I think that's something we can meet

14   and confer on and supplement in short order.

15        THE COURT:  All right.  And let me ask,

16   Mr. Robison, do you have a reaction or do you want to confer

17   with your colleagues on the defense side and then with

18   plaintiffs and make a proposal to me in that regard?

19        MR. ROBISON:  Your Honor, yes.  Brian Robison from

20   the defendants.  I will say we did not talk to the

21   plaintiffs about a new deadline for amending pleadings, and

22   considering we're about to talk about the schedule for

23   discovery, search terms, class certification, experts, that

24   sort of thing and considering we just went through a major

25   undertaking to answer the five live complaints that we have

1    on the docket now, my guess -- not having talked to the

2    defense group, but my guess is we would not want to see

3    amended complaints at all or if we did see them, we would

4    want to see them really soon so that we're not having to

5    re-do all of the discovery efforts that we're about to

6    start.

7             THE COURT:  Believe me, I don't want to see

8    amended complaints.  We have to hit the restart button every

9    time it happens.  And it may be that the answer is that, as

10   far as the parties know -- and this was reflected in your

11   26(f) report -- as far as the parties know, the pleadings

12   are complete and that a motion to amend pleadings from

13   either side -- this could be motions by the defendants for

14   that matter -- could be made on a showing of good cause why

15   the motion wasn't made previously or words to that effect.

16   But have that conversation.  Let me know if there is

17   something you can agree on.  If not, I will put something in

18   of my own.

19             You've already done 26(a)(1) disclosures.  You

20   agree on a deadline for substantial completion of document

21   discovery.  But where you diverge in a major way, obviously,

22   is with regard to a closing date for fact discovery.  And

23   that seems to be also intertwined with your different views

24   on where the class certification motion briefing ought to

25   fit within the period of fact discovery.  So let me hear

1    first from Mr. Pouya on that with regard to plaintiffs'

2    perspective.

3         I will tell you that I'm -- just to kind of give

4    you my initial reaction so you know what you're dealing

5    with, I'm not feeling 12 full months of fact discovery.  On

6    the other hand, I think that the four months proposed by --

7    and, I'm sorry, I'm talking about from the deadline for

8    substantial completion of document discovery to make it

9    clear.  I'm not comfortable with another year after

10   substantial complete date.  But I also am inclined to agree

11   with plaintiffs that four months is too aggressive and makes

12   it almost certain that you will be back in front of me

13   asking for new extended deadlines.

14        With regard to where the class cert motion fits,

15   I'm inclined to agree -- I don't know for sure where I would

16   put it, but I'm inclined to agree conceptually with

17   plaintiffs' view that that fact discovery doesn't need to be

18   done before the cert motion gets brought.

19        So that's where I'm leaning and what in particular

20   you may want to focus on in your remarks.  So now Mr. Pouya.

21        MR. POUYA:  Thank you, Your Honor.  That's

22   helpful.  And, as the Court indicated, there are primarily

23   two areas where the parties disagree in the schedule, which

24   is reflected in page 12 of the report and the preceding

25   pages, and that's the deadline for completion of fact

1   discovery and the timing and order of briefing on class

2   certification.

3            With respect to the deadline for completion of

4   fact discovery, as the Court indicated, we have requested a

5   year after completion -- or substantial completion of

6   documents.  That's document production.

7            The reason we've requested a year is we believe

8   it's a sufficient amount of time and appropriate amount of

9   time, we believe, to conduct a review of those documents, a

10  review of privilege logs that are going to be produced not

11  until November of 2021, start of November.  So we see that

12  as being the start in earnest of the depositions in the

13  case.

14           There are 80 depositions, 30(b)(1) depositions,

15  that are going to happen for the eight defendant groups in

16  the case; a 30(b)(6) deposition of each defendant group and

17  as well as certain third-party depositions.  So just from

18  the plaintiffs' side we're looking at over 100 depositions

19  in the case.  And then there will be depositions that the

20  defendant will want to conduct of the plaintiffs.  So that

21  was the reason that we proposed a year.  And that's really

22  nine months of depositions.

23           I hear that the Court may want to truncate that a

24  bit, but certainly the four-and-a-half months that the

25  defendants have proposed would not be sufficient and we

1    would be in front of the Court.  And when we're in front of

2    the Court it makes it really difficult because then we don't

3    know what that schedule is going to look like in terms of

4    the depositions.  We want something that's workable for both

5    parties and we don't have to come back to you.  So that's

6    where we come from on the deadlines for substantial

7    completion.

8              THE COURT:  So, Mr. Pouya, just so I understand,

9    it sounds like a part of your concern is when the privilege

10   logs will be provided, which is after the substantial

11   completion of document discovery.  And so your sense is that

12   until the privilege logs are provided you can't really start

13   depositions in earnest.  Is that what I'm understanding?

14             MR. POUYA:  Correct, that as well as conducting

15   the review.  Now, the substantial completion, we expect that

16   to be millions of documents.  Most of the time they come in

17   near the deadline.

18             We have over 170 custodians that have been

19   designated.  We have to go through the documents, choose who

20   we're going to depose, review the documents for those

21   deponents, and then start the depositions.  So there is a

22   bit of lag time.  We can't just start depositions

23   immediately after getting substantial completion.  It does

24   take time.  And the privilege logs aren't going to come in

25   until November.

1          With respect to defendants' proposal, I mean,

2     there are the holidays there.  It would impact it more.  I

3     think once we get into the year we can really move on those

4     depositions.  So that's really what's driving our proposal

5     on the fact discovery.

6          With respect to the motions for class

7     certification, as we put in our papers -- and, you know, we

8     agree with the Court's initial position -- that there is not

9     a requirement or need to get to the close of fact discovery

10    before briefing class certification issues.  Rule 23

11    indicates that it should be at a reasonable and early -- an

12    early practicable time, which we believe we provided.

13         And we believe that the case law is pretty clear

14    that we do not need a full merits determination at the Rule

15    23 stage, and certainly that we don't believe it's efficient

16    to wait until the close of fact discovery and then simply

17    focus on class certification briefing for an extended period

18    of time where we're not doing anything in terms of fact

19    discovery.

20         And then the other piece of that is what the

21    defendants want to do in terms of the *Daubert* motions

22    relating to their motions for class certification.  We do

23    not believe that a *Daubert* motion that's related to class

24    certification, which the Eighth Circuit held in *In re Zurn*

25    is supposed to go to the elements of class certification

1     and, again, is not a full merits -- *Daubert* motion needs to

2     be held off until all the class certification briefing is

3     completed.

4              So we believe by having a little bit more time --

5     an appropriate amount of time on the fact discovery schedule

6     to conduct those depositions and conducting the class

7     certification motion concurrently, which is done in numerous

8     class actions and antitrust class actions, that allows us to

9     put together a schedule where we're able to conduct

10    reasonable discovery and finish class certification briefing

11    in a reasonable amount of time.

12             And I'd point out that, you know, with even the

13    one year that we've requested in terms of fact discovery

14    from the date of substantial completion, as well as the

15    class certification briefing, our schedule holds that both

16    those things will be completed by September 1st of 2022.

17    And defendants' schedule, while only permitting

18    four-and-a-half months of fact discovery, still has class

19    certification briefing through November of 2022.

20             So for all those reasons -- efficiency,

21    consistency with the law, and what needs to happen in the

22    case -- those, we believe, support the plaintiffs' schedule.

23             THE COURT:  Let me ask one question about -- I'm

24    looking at the chart that you provided starting on page 12

25    and looking at the fifth row down under "Plaintiffs'

1    Deadline," this deadline by which defendants will depose

2    plaintiffs' class certification experts.  You've got a

3    reference there "See above edit to footnote 1" and I've got

4    no idea what that refers to.

5             MR. POUYA:  Looking at it right now I couldn't

6    tell you, but I can tell you our position.  Our position is

7    stated under that statement.

8             THE COURT:  I think it might've been intended as a

9    reference to footnote 4, but I just wanted to make sure that

10   there wasn't something that maybe in the course of filing

11   got hidden or omitted.

12            MR. POUYA:  You know, Your Honor, as you stated it

13   and as I look at it, I think that's right in terms of the

14   timing of a deposition being 14 days after.  And maybe we

15   had fewer footnotes in the document when we first made that

16   reference.

17            THE COURT:  Okay.  All right.  So I think I

18   understand.  Let me see if I had any other questions about

19   your kind of overall vision for the schedule and then I'll

20   turn to Mr. Robison.

21            Okay.  I think I understand.  I think I understand

22   it.  So it's your expectation that by February 7th of 2022

23   that if there is a substantial completion document

24   production by September 1, 2021, that by February 7th, 2022

25   you will have been able to complete enough discovery,

1   including deposition discovery, to put together your motions

2   for class certification and any expert reports that should

3   be filed in connection with those motions; is that right?

4           MR. POUYA:  That's correct, Your Honor.

5           THE COURT:  Okay.  All right.

6           Mr. Robison.

7           MR. ROBISON:  Yes.  Thank you, Your Honor.  Brian

8   Robison for the defendants.

9           Your Honor, picking up on something you said at

10  the outset of your remarks, the parties really have agreed

11  on a substantial amount in this report, that the report

12  itself shows 100 percent agreement on everything except for

13  the schedule.  But then if we look at the schedule, there's

14  actually a substantial amount of agreement as far as the

15  overall time that it would require for the parties to do

16  fact discovery, expert discovery, and class certification.

17          The plaintiffs' proposed schedule stretches out to

18  September of 2022.  The defendants' proposed schedule

19  stretches out to, I think, November; although, looking at it

20  I think we can shave off a month or six weeks or so.

21          The only thing the defendants' schedule has after

22  the plaintiffs' September cut-off are two briefing deadlines

23  for *Daubert* motions, and I think those could be cut back

24  about a month.

25          So if we're looking at the overall schedule for

1   fact discovery, expert discovery, and class certification,

2   the parties are largely in agreement on how much time all of

3   that is going to take.

4          The only dispute really is on sequencing.  The

5   question is are we going to rush the class certification

6   process out early and then have literally seven full months

7   of depositions after the class briefs go in and the initial

8   expert reports go in, seven months literally of dozens of

9   depositions developing the fact record after the plaintiffs

10  are supposed to put in their initial reports and their class

11  briefs.  Is that how we're going to run the case?  Or

12  instead are we going to have the fact development done early

13  so that then the class briefs and the expert reports we're

14  relying on the facts?

15         And you can see from the diagram we put in to page

16  16 of the Rule 26(f) report, that lays out the sequence that

17  we think makes sense to us based on the law as it's

18  developed in class actions.

19         Facts have to matter.  Facts will matter to Judge

20  Tunheim as he is doing a rigorous analysis of the Rule 23

21  factors.  And we think it's a disservice to the court and it

22  doesn't follow what the Supreme Court and the Eighth Circuit

23  have done in class actions in recent years to have these

24  class briefs and these expert reports submitted on an

25  incomplete record that's going to shift for the next seven

1   months.  Instead, we think there needs to be a factual

2   record developed earlier and then the class cert briefs and

3   the class cert experts will build upon that.

4          Same thing would go for the class experts.  I

5   don't know how the experts would be able to opine on

6   basically a blank slate.  I don't think there'll be very

7   many depositions taken before February 7.  So I'm not sure

8   how the plaintiffs' experts by February 7 will be able to

9   opine on how pork products of various kinds are sold

10  throughout the country for example.  I think those facts are

11  going to continue to develop for the next seven months after

12  the plaintiffs put in their class brief.

13         If you look at page 15, the plaintiffs put in some

14  advocacy on their schedule.  On page 15 what the plaintiffs

15  say -- very interesting, the plaintiffs say they intend to

16  take 100 plus fact depositions in the case.  And they say

17  there they don't intend -- it looks like they don't intend

18  to start -- the first thing they say is they won't start

19  until November 1.  And they say our schedule unfairly crams

20  them into a very short period of time, November 1 to

21  January, to finish 100 plus depositions.  But then you flip

22  to the next page and they say they wouldn't really start

23  until November 21 to take these 100 plus depositions.  Then

24  we get into the holidays and November and December.

25         So if you look at the plaintiffs' schedule what

1    they're really talking about is a month of depositions --

2    maybe a few in December, a few in January -- and then they

3    file their class papers and their class expert reports on

4    February 7th.  So there's going to be precious little fact

5    development by the time the class briefs go in, which to us

6    means a lot of things are going to change when we get the

7    reply briefs and the rebuttal expert reports a few months

8    later.  And then even more facts are going to change as the

9    depositions continue to be taken.

10           Now, obviously we hear the Court.  The Court is

11   not excited about our January fact cut-off.  So if the fact

12   cut-off gets bumped to March for example, that's one thing.

13   But I don't think that we need to have a massive overlap of

14   class certification briefing, class experts, fact

15   development and then have fact development continue several

16   months beyond that.

17           If Your Honor wants me to talk about the *Daubert*

18   motions and all that, we can talk about that as well.  I

19   think the first issue Your Honor really raised was the fact

20   cut-off and how is the fact cut-off going to interplay with

21   class certification.

22           THE COURT:  In my experience -- and I have

23   presided over several class actions -- in my experience, the

24   briefing for the class certification motion has come during

25   fact discovery.  The parties have focused on getting that

1    fact discovery done that needs to be done to support the

2    briefing and then continuing and finishing fact discovery

3    while the briefing continues and while the court has the

4    motion under advisement.

5            I've not had a case in which the fact discovery

6    has been completed in its entirety -- not that I'm

7    remembering anyway -- and then and only then the class cert

8    motion being brought.  So to some extent my comments are

9    reflective of my experience and the schedules I've been

10   seeing in these kinds of cases.

11           Are you suggesting that it's not really

12   practicable to focus on and prioritize the depositions that

13   would be required to lay a foundation for robust briefing on

14   class cert and to complete other depositions that are

15   important to merits and/or to damages but not mission

16   critical for the class cert motion?

17           MR. ROBISON:  Your Honor, Brian Robison for the

18   defendants.

19           A couple of things.  First, I don't think in this

20   case either side has said anything about any way to

21   bifurcate class versus merits discovery.  I don't think

22   that's feasible here.  I think those two issues really meld

23   together.

24           THE COURT:  I'm not proposing that.  But I used

25   the word "prioritize" advisably.  I didn't say "bifurcate."

1       I didn't use the B word.

2              MR. ROBISON:  Sure.  Sure.  I was about to pick up

3       on your word prioritize.  And this gets back to something

4       Mr. Pouya mentioned a few minutes ago.  We think there's no

5       reason why the plaintiffs have to wait until substantial

6       completion of documents to start taking depositions.

7              We also don't think there's any reason they have

8       to wait for privilege logs to be finalized to start taking

9       depositions.  The plaintiffs could prioritize certain

10      custodians and say that we want certain custodians' emails

11      produced by April or by May and then they could start

12      deposing those people.

13             As far as the privilege log date, that was

14      negotiated last year, and the plaintiffs are right to point

15      that out.  They did not mention that before.  We saw that in

16      their 26(f) advocacy piece.  And I think we can work with

17      them on that.  If that's going to delay fact depositions and

18      delay the rest of the schedule, we certainly didn't realize

19      that last year when we were talking about privilege logs.  I

20      think that could be modified.  We could agree to rolling

21      privilege logs on some basis as we're producing documents

22      next year, maybe every 60 days or so, so that they are not

23      getting one single privilege log in November right before

24      Thanksgiving.

25             So I think there are ways to work with the

1    plaintiffs so that they're not having to sit around for 10

2    or 11 months next year taking zero depositions and then

3    having to rush into 100 depositions once all the documents

4    are in and all the privilege logs have been resolved.

5              I think Your Honor is on to something.  I think we

6    can prioritize certain custodians, get their documents out

7    early.  Then the plaintiffs can start taking depositions

8    early.  And they're not going to need a full year beyond the

9    document completion deadline, which means there would be far

10   less time for fact discovery after the class briefs go in,

11   which resolves a lot of our concern about having the class

12   briefs go in in February and then having dozens of

13   depositions get taken for the next seven months.

14             And, Your Honor, if it even matters, we have found

15   a few examples of class actions in Judge Tunheim's court

16   where the Court consistently had a fact cut-off followed by

17   all of the class certification briefing.  So we're not

18   advocating for something we think is out of the ordinary or

19   totally bizarre.  We think it's something that makes sense

20   under the law and has been done in this district.

21             THE COURT:  And certainly before I finalize a Rule

22   16 order, I will be conferring with Judge Tunheim to make

23   sure that the overall vision for the case schedule is one

24   that he is comfortable with as well.

25             Two things, I guess.  One is it sounds like one of

1    the things you're concerned about, Mr. Robison, is that if

2    there is significant deposition discovery after the opening

3    class certification briefing that the target will move, if

4    you will, and that reply briefing might take into account

5    facts that would extend during the opening brief and make it

6    more difficult for the defendants to manage their response.

7    Am I understanding that concern?

8            MR. ROBISON:  Yes, Your Honor.  That is definitely

9    one of our concerns.  And there's no impugning the lawyers

10   for the plaintiffs, but there are plenty of times when as

11   the class certification plays out and the experts play out

12   sometimes let's say the class definition might get amended

13   in the reply brief.  There's not going to be a wholesale

14   radical change, I would think, in their theory, but there

15   might be some changes in the reply briefs based on new facts

16   or based on arguments.  And so, yes, we do have a concern

17   the reply brief is going to have facts in it and we're stuck

18   without a chance to use those facts to our advantage.

19           But the bigger concern, I think, is once the reply

20   brief goes in on class certification, there's still going to

21   be many months of more depositions.  It seems tough for us

22   to understand how an expert, for example, would be able to

23   opine on how pork is sold, how pork products are priced

24   across all kinds of different products, all kinds of

25   different companies, how this is done and if it's done in

1       some common way without having a full record -- or maybe not

2       a full record but a substantial deposition record of sales

3       people, pricing people, executives, that sort of thing.

4                So it seems like if we flip the class

5       certification too far in advance of the fact cut-off that we

6       run the risk of a lot of shifting sand under the parties'

7       briefs and the class expert reports with all these facts

8       coming in later.

9                THE COURT:  All right.  Thank you, Mr. Robison.

10               I'm going to give you a chance to address the

11      *Daubert* motions in just a moment, but let me hear from

12      Mr. Pouya on those remarks so far.

13               MR. POUYA:  Yes, Your Honor.  I think we've

14      provided the Court with a good path forward in terms of our

15      schedule.  And I think the Court is right in terms of its

16      experience and the requirements of Rule 23.

17               Rule 23 doesn't require a rigorous analysis.  That

18      does not require a full merits discovery completion.  We

19      believe that we will be able to meet our burden on Rule 23.

20      We will have substantial completion of the documents -- the

21      documents and discovery will be done.  We believe we'll have

22      sufficient information for our experts to get their reports

23      in.  And there will continue to be depositions regarding

24      that go to the merits of the case and will go to summary

25      judgment and trial.  That's not unusual.  It happens in all

1    sorts of class action cases, including antitrust cases:  *In*

2    *re Broiler* case, *In re 1-800 Contacts*, *In re Packaged*

3    *Seafood*.  I mean, I could go on and on.

4         The Rule 23 briefing does not require a complete

5    and final record and certainly doesn't require all

6    depositions to have been completed.  And I think by -- that

7    is the tension in the defendants' report.

8         They have truncated fact discovery to prevent us

9    from being able to do any fact discovery while the Rule 23

10   class certification motions are pending.  And in doing that

11   they have put together a schedule that simply doesn't work.

12   It doesn't work on class certification and it doesn't work

13   on the merits in terms of that deadline.

14        So the fact of the matter is there's no

15   requirement for us to be able to put in a motion for class

16   certification and meet our burden on a final record.  And if

17   there's issues -- and the reply and responses on the

18   briefing are governed by the federal rules.

19        Our theory of the case isn't going to change.  We

20   can get information on how pork is sold before conducting

21   every deposition in the case.  I mean, these are concerns

22   that defendants wouldn't be waiving their rights on

23   certainly and we don't believe drive anything in terms of

24   class certification.

25        So, as I said, our schedule allows things to be

1    completed efficiently and properly without truncating either

2    the fact discovery or the class certification briefing and

3    still gets us done with those two pieces -- fact discovery

4    and class certification -- before the defendants' schedule,

5    which has 11-month class certification briefing where

6    there's nothing else going on in the case and only

7    four-and-a-half months to conduct depositions.

8              MR. ROBISON:  Your Honor, Brian Robison.  Can I

9    respond briefly?

10             THE COURT:  Yes.  And then I'm going to want to

11   hear a little bit more from you on the *Daubert* motion as

12   well, but yes.

13             MR. ROBISON:  I just want to respond to what

14   Mr. Pouya just said.  There is no truncation of fact

15   discovery in our schedule.  I want to repeat there is no

16   reason why these plaintiffs have to wait until Thanksgiving

17   of 2021 to start taking depositions, no reason.  They can

18   tell us here are two, here are four, here are five priority

19   custodians.  We want you to put them at the front of the

20   list.  We want to get a privilege log for their documents

21   earlier in the case.  They can start taking depositions next

22   summer.  They don't have to sit around for 10 or 11 months

23   next year waiting for documents and waiting for privilege

24   logs to start taking depositions.

25             So I don't think it's fair to say we are

1  truncating fact discovery.  We're setting a cut-off of next

2  January -- 13 months from now -- and it doesn't have to wait

3  for them to start until November.  So I think Your Honor's

4  idea of prioritizing custodians, my proposal of doing

5  rolling logs instead of waiting until the very end of

6  document production, I think our schedule works with a

7  couple of tweaks like that.  Maybe the Court is going to

8  give them a few months of fact discovery after the class

9  briefs go in.  That's very different from seven months.

10          So, again, I think the plaintiffs should be able

11  to take depositions long before Thanksgiving next year.

12          THE COURT:  Mr. Pouya, you have one other thing

13  you wanted to get in edge-wise here?

14          MR. POUYA:  Sure.  I just wanted to address that

15  specific proposal.  Rolling custodians and production sound

16  good, but we don't want to have depositions where we don't

17  have complete documents.  And part of having complete

18  documents is seeing what is relevant to a particular

19  custodian that may be found in someone else's file.  It's

20  not a standalone.  It's not that, you know, if I'm a

21  custodian, Mr. Pouya's documents are only in my file.  There

22  are files in competitors' documents involving everybody else

23  in that company.

24          And we also have to make a determination of who to

25  depose once we see documents.  Remember, we got 170 -- over

1    170 custodians, and we only get depositions of half those

2    people.  So, again, it's not a practicable solution overall

3    in terms of how we get a schedule that works in the case.

4            THE COURT:  Does this, at least as it stands -- I

5    don't think I saw any proposed deadlines in here for when

6    the parties would let each other know who they want to

7    depose.  Was that something that you'll be discussing as

8    time goes on or did I miss some interim deadlines in that

9    regard?

10           MR. POUYA:  Your Honor, there was no particular

11   deadline because it's driven by the document production.  So

12   in our proposal it was understood that you get documents and

13   then you take depositions.  That's the way we do it in these

14   cases and in typical cases.  So it's really driven in that

15   type of order.

16           The defendants are going to put together their

17   documents, they're going to provide a substantial

18   production, and then we will take those depositions.  And we

19   shouldn't have our rights prejudiced just because the

20   defendants want those scheduled in a certain way.

21           MR. ROBISON:  Your Honor, Brian Robison.

22           That's correct, we did not talk to the plaintiffs

23   about a date for exchanging names of deponents.  I think

24   when Mr. Pouya and I are finished talking to you about the

25   schedule and we get into the discussion on the search

1    methodology order, the parties have reached an agreement

2    that's going to narrow the areas of dispute on that.  And

3    part of that agreement involves the plaintiffs going ahead

4    and next week identifying two priority custodians per

5    defendant.  And then there's a date in April, I believe, for

6    the defendants to finish or to do substantial completion of

7    document production of those priority custodians.

8         So to answer your question, there is not a date

9    for the parties to give the be-all-end-all list of

10   deponents.  But the parties have already agreed on a date

11   for next week when the plaintiffs -- I think it's the DPPs

12   and the defendants will exchange lists of two priority

13   custodians and then documents will be produced for those

14   custodians by April, which, again, feeds into my point that

15   depositions can start next year long before Thanksgiving.

16        THE COURT:  Let me hear from you, Mr. Robison, on

17   the issue of *Daubert* motions.  Again, ordinarily in my

18   experience -- it sounds like -- well, obviously, it goes

19   without saying that Judge Tunheim has even broader

20   experience over his tenure on the bench.  But at least in my

21   experience typically, if there are going to be arguments --

22   whether by separate motion or arguments built into

23   briefing -- that the other side's experts aren't qualified

24   under *Daubert* or their opinions don't pass muster under

25   *Daubert* and therefore shouldn't be considered in support of

1    or in opposition to class certification, that all happens

2    while the briefs are going in.  And then if the class is

3    certified and we move on to wrapping up on merits, then

4    there may be another round of -- and, in fact, you build in,

5    I think, another round of expert reports post-certification

6    if there is certification, and there might be *Daubert*

7    motions there, too.

8            So I haven't seen a proposed scheduling order that

9    included or involved having briefing completed on class cert

10   first and then a round of briefing on whether the experts

11   who were discussed in the class cert briefing ought to be

12   taken into account or not.  That seems like that really

13   stretches out, really stretches out the briefing and pushes

14   consideration of an actual hearing on the motion itself

15   quite a bit farther down the line doesn't it?

16           MR. ROBISON:  Your Honor, we have, I guess, a

17   couple of concerns over what the plaintiffs proposed doing

18   *Daubert* motions.

19           The first concern is they want us to file our one

20   and only *Daubert* motion after their plaintiffs put in their

21   initial reports.  And by the time their initial reports are

22   in the experts are still a moving target.  So having us

23   attack the initial report before the rebuttal report comes

24   in, number one, we're shooting at a moving target.  The

25   expert doesn't finish his opinions.  Number two, it gives

1    them an incredible tactical advantage.  They get to see our

2    playbook on *Daubert* after the opening report before they do

3    the rebuttal report.  So it gives them a tactical advantage.

4    And, I guess, in their view it insulates the rebuttal report

5    from any sort of *Daubert* challenge because under their

6    schedule we've already filed our one and only *Daubert*

7    challenge against the initial report, so we don't get

8    another one on the rebuttal report.  Or maybe their proposal

9    is there be another round of *Daubert* briefing on the

10   rebuttal reports, which to me definitely is inefficient but

11   we also think hopelessly confusing for the court if we have

12   multiple different motions or multiple attacks on different

13   reports.

14          It seems to us -- and this goes both ways -- we're

15   not trying to see their playbook against our expert before

16   we finish our expert reports.  Our thought is the class

17   briefs should go in, all the class expert reports should go

18   in, and then the parties -- after they see the briefs and

19   the expert reports and how they fit together, whether the

20   expert reports fit the case as they are required to under

21   *Daubert* -- once all those briefs are in, once the experts

22   are in, then the parties can decide whether any expert is

23   really vulnerable to a *Daubert* motion and can decide whether

24   to file it.

25          But to us having us shoot at a moving target and

1    giving them the advantage of seeing our *Daubert* motion

2    before their expert is finished doing the work gives them an

3    amazing tactical advantage and possibly an inefficiency down

4    the road if we think we've got additional *Daubert* motions

5    against the reply briefs without the reports.

6            THE COURT:  Do you want to respond to that

7    argument?

8            MR. POUYA:  Yes.  Yes, Your Honor.  A couple

9    things.  I heard two things.  One, I repeatedly hear the

10   term "*Daubert* motion," but I just want to clarify what we're

11   talking about.

12           At class certification, as the Eighth Circuit held

13   in *In re Zurn*, the challenge is a focused or tailored

14   *Daubert* analysis that goes to the elements of Rule 23.

15           And I also hear the term "one and only *Daubert*

16   challenge."  That is also inaccurate.  The challenge that

17   we're talking about here is a challenge as to the report in

18   support of class certification.  There is a separate *Daubert*

19   motion and *Daubert* briefing that will occur at summary

20   judgment, at trial, prior to trial.  That is separate and

21   apart from what we're talking about.

22           So this isn't the only *Daubert* challenge in the

23   case.  It is driven by the elements of class certification.

24   And the challenge will be to either the qualifications of

25   the expert or the methodology of the expert.  Those two

1    things are going to be clear when the expert files its

2    initial report.  So those concerns are separate and apart.

3          It is typical in these situations, once that

4    report is in and a deposition has been taken, to file a

5    challenge as to those issues -- the qualifications and any

6    methodologies -- to the extent that they exist.  If any

7    issues come up on rebuttal, our schedule allows the reply

8    briefs to be put in after the rebuttal reports.  So those

9    are also taken into account.

10          I mean, this is really -- what we're talking about

11    is, like you said, a typical schedule that doesn't require

12    for two depositions of our experts -- one after the initial

13    report and one after rebuttal.  And it doesn't add an extra

14    four months to the class certification briefing schedule to

15    wait.  So it's just -- what they're proposing isn't

16    consistent with the law.  Again, it's inefficient, and it's

17    overkill in terms of what is required.

18          THE COURT:  I understand where you all are coming

19    from on these issues.  I will take these elements of the

20    schedule under advisement and including chatting with Judge

21    Tunheim to see if he has some preferences that he would like

22    me to take into account in setting up a schedule for this

23    case.

24          Let me see if there are other pieces.  I was glad

25    you agreed that no Rule 35 independent medical examinations

1    were required.  This is a good thing.  Let me see if there

2    is anything else that I have questions about with regard to

3    the schedule.

4           Were there any other points of departure with

5    regard to the scheduling order that you had hoped to discuss

6    with me that we've not already touched on, Mr. Pouya?

7           MR. POUYA:  No, not for plaintiffs, Your Honor.

8           THE COURT:  Mr. Robison, anything further?

9           MR. ROBISON:  No, Your Honor.  I think we've

10   covered everything, all the issues.

11          MR. WEILER:  For the Commonwealth of Puerto Rico I

12   do have one request.

13          THE COURT:  Yes, Mr. Weiler.  Although your audio

14   is really breaking up, but give it a try and let's see if we

15   can hear you.

16          MR. WEILER:  I'll speak slowly.  Is that better?

17          THE COURT:  No, it's not.  It looks like pretty

18   much everybody else is muted.  Although, Mr. Robison, I will

19   ask you to mute.  I doubt that that's the problem.

20          But, Mr. Weiler, I'm not sure what the issue is.

21   There's something that's breaking up your audio

22   transmission.  You want to try it?

23          MR. WEILER:  I will close down a couple of things

24   on my computer.  Is that any better?

25          THE COURT:  It's not great.  Speak slowly.  Let's

42

1    see.  I will be reliant on the court reporter to let me know

2    if it's just not good enough.  But let's take a shot at it.

3                    MR. WEILER:  Okay.  Thank you.  Thank you, Your

4    Honor.  Commonwealth of Puerto Rico has requested an

5    extension to January 22nd about what is to -- provides

6    Rule 26(a), initial disclosures and other information

7    requested by the Court.  The Commonwealth is shut down over

8    the holidays and the Commonwealth has had a turn over in

9    administration.  So the Commonwealth needs more time to

10   complete that.  And I also wanted to request that for the

11   record.

12                   THE COURT:  So this is a request for an extension

13   of the deadline for the Commonwealth to make it's initial

14   disclosures until was it January 26th did you say?

15                   MR. WEILER:  22nd, Your Honor.

16                   THE COURT:  22nd?

17                   MR. WEILER:  Yes.

18                   THE COURT:  Have you discussed that with other

19   counsel?

20                   MR. WEILER:  We have requested and reached out to

21   counsel for Smithfield and made the request.  And we have

22   not heard back.

23                   THE COURT:  All right.  So I'm going to repeat

24   that, what I'm hearing, just to make sure that I understand

25   it and to give our court reporter a little help as well.

1       What I understand is you've reached out to counsel

2   for Smithfield to make that request but haven't heard back

3   yet.  Is that correct?

4       MR. WEILER:  Correct.

5       THE COURT:  Mr. Robison or does one of the other

6   counsel want to speak to that or have you not had a chance

7   yet to consider it?

8       MR. ROBISON:  Your Honor, Brian Robison for

9   Smithfield.

10      I remember now getting a voicemail on my cell

11  phone yesterday from one of the lawyers for the Puerto Rico

12  plaintiff.  I don't think the voicemail stated the substance

13  of the request, and I have not had a chance to return it

14  yet.  So this is the first we're hearing about it.

15      In the 26(f) report on page 5 we put in there in

16  that drop-down the Winn-Dixie group and the Puerto Rico

17  group would produce not just their 26(a) disclosures but all

18  the other disclosures all the other parties have had to

19  produce, the ESI information and all of that.

20      So I hear what counsel is saying about the

21  problems that they may have.  I will need to take it back to

22  the defense group.  My only concern is these cases have been

23  pending for a long time.  And I understand places shut down

24  during the holidays, but it seems like a lot of this

25  information could've been gathered before the holidays.  But

1      I will take it back to the defense group and see what the

2      reaction is because, again, we need all of the parties -- if

3      we're going to have a discovery schedule starting with

4      search terms and TAR and that sort of thing in January, it's

5      going to be tough for Puerto Rico to stay on the same

6      schedule as everybody else if they're just starting the

7      custodian talks and the ESI talks in late January.  That's

8      the concern I've got, but I'll take it back to our group.

9              THE COURT:  And rather than have Mr. Weiler try to

10     repeat all of it, my understanding is that it's both about

11     the shutdown because of the holidays but also a change in

12     administration.  Was there a shutdown for other reasons than

13     the holidays, Mr. Weiler, or was it primarily a holiday

14     shutdown?

15             MR. WEILER:  Thanks, Your Honor.  A change-over in

16     administration, that I think is most important to make sure

17     before we enter into this substantial litigation on behalf

18     of Commonwealth discovery that the people that will be

19     managing this for the Commonwealth are the people that

20     signed off on the initial disclosures and the additional

21     information.

22             THE COURT:  All right.  Well, why don't you confer

23     about that.  I do share Mr. Robison's concern that we need

24     to be careful to not have people leaving the starting blocks

25     significantly staggered here; otherwise, this is just going

1    to get completely out of control.  But I also understand

2    some of the practical concerns you're describing.

3            So chat with Mr. Robison after this.  And could

4    you get me a letter, do you think, by the 22nd to let me

5    know if you have been able to reach some agreement that you

6    would like me to build into the scheduling order,

7    Mr. Weiler?

8            MR. WEILER:  Yes, Your Honor.  Thank you.

9            THE COURT:  Mr. Robison, does that give you

10   adequate time to confer with your folks?

11           MR. ROBISON:  Yes.  We'll definitely do that for

12   sure, Your Honor.

13           THE COURT:  All right.  Thank you.  So I'll look

14   for a letter by the 22nd on that particular issue.  And that

15   should be filed, not just emailed to chambers.  I'd like it

16   to be a joint letter.  I'm not going to have to make you

17   jointly -- not looking for two different signatures, but

18   whatever it is needs to be represented as having been

19   speaking on behalf of both sides about whether you have or

20   haven't reached an agreement and, if so, what that is.

21           All right.  Anything else that you need to get on

22   my radar with regard to the scheduling order?  Going once.

23   Going twice.

24           All right.  Then let's turn to the issue of the

25   search methodology order.  And I understand that Mr. Clark

1    is going to be addressing that for the plaintiffs and that

2    Mr. Taylor is going to be addressing that for the

3    defendants.  Is that right?

4          MR. CLARK:  Yes, Your Honor.  Brian Clark.

5          THE COURT:  Okay.

6          MR. TAYLOR:  Yes, Your Honor.

7          THE COURT:  So I'll ask everybody else make sure

8    you have muted your microphones.

9          Mr. Clark, your voice has been coming through very

10   quiet when you have spoken up, so do whatever you can to

11   crank up the volume so that I and our court reporter can

12   hear you.  Okay?

13         MR. CLARK:  Yes, Your Honor.  That's an unusual

14   complaint for my voice, but I will raise it.  Thank you.

15         THE COURT:  That's coming through well.  Thank

16   you.

17         MR. CLARK:  Okay.  Well, let me kind of explain

18   the playing field has changed a little here.  The parties

19   have continued to meet and confer since we filed the joint

20   letter brief on November 20th, and we believe we have

21   reached a resolution to most of the issues raised in the

22   joint letter brief regarding the search methodology order.

23   As these things happen, it came together at the last minute

24   here, so I think Mr. Taylor can explain it better than I,

25   but it sounds like defendants have tentatively signed off

1    with expectation that they will.  I think they kind of

2    reserved a right with maybe signing off the last defendant.

3    If you'd like, I can explain kind of what I think the

4    agreement is.

5         And then there is one issue that we still are

6    requesting the Court resolve, which is the validation order

7    portion of plaintiffs' request.

8         So if you'd like, I can explain what I believe the

9    agreement to be with a kind of caveat that I think

10   Mr. Taylor will share.

11        THE COURT:  All right.  Just a moment.  Let me

12   pull up what I will use as a reference, unless you suggest I

13   should use something different as a reference, is the

14   proposed order that can be found in -- let's see, it's Doc

15   No. -- it's one of the exhibits to the joint letter.  I've

16   got Doc No. 534-1, pages 47 through 56, which is a proposed

17   order regarding search methodology.  So is that what I ought

18   to be looking at?

19        MR. CLARK:  Yes, Your Honor.  And, specifically,

20   when we get to the validation protocol section, it's only

21   pages 52 through 56 of ECF 534-1 that will be at issue.

22        THE COURT:  Got it.  Okay.  So tell me first what

23   you think you've agreed on.  And, obviously, I'll give

24   Mr. Taylor an opportunity to let me know if he thinks

25   different.

1          MR. CLARK:  Sure.  So, as I understand, we expect

2     we'll be able to agree as follows:  The defendants agree --

3     the parties will submit a joint status letter by January

4     22nd on any disputes regarding the search process that

5     remain after meet and confers between now and then with a

6     status hearing to follow at the Court's convenience or

7     Court's availability after January 22nd.

8          Defendants agree that defendants and the Direct

9     Purchaser Plaintiffs will substantially complete production

10    for up to two priority custodians by April 15th, 2021.  This

11    gets a little wordy, but I'll read it also.  It's in the

12    record.  On the understanding that this is not an agreement

13    to the two-phase search term proposal in plaintiffs'

14    proposed search methodology order and that the ESI protocol

15    will instead continue to govern in the absence of an

16    agreement or court order otherwise.  Because defendants are

17    not sure who the proposed priority custodians will be they

18    reserve the right to object and negotiate over those

19    identities.  And to the extent there's any unforeseen

20    circumstances, such as a late order or late dispute over

21    search terms, if that makes April 15th impracticable, the

22    parties will agree to work together on the timing in good

23    faith.  And they understand that plaintiffs will -- we will

24    identify our priority custodians to defendant no later than

25    next Wednesday.  Ad we'll do it as soon as we can.  And

1    defendants will need a little bit more time to identify some

2    priority custodians from the Direct Purchaser Plaintiffs,

3    but they'll provide them as quickly as they can and we'll

4    proceed that way.

5            The third piece of the agreement I've already

6    indicated was that we would have argument today on the

7    validation protocols, pages 52 to 56 of ECF 534-1.

8            And then the fourth point is other portions of the

9    search methodology dispute that were in the November 20th

10   joint letter brief have now been muted, and the ESI protocol

11   will govern absent agreement or court order otherwise.

12           THE COURT:  So I understand -- well, first, once

13   you confirmed that in fact you got agreement on this, are

14   you going to be e-filing a letter or a stipulation or a

15   proposed order that captures this?  Because I think it would

16   be useful to have it captured on the docket in some manner

17   other than buried in a transcript.

18           MR. CLARK:  Yes, Your Honor.  Brian Clark for

19   plaintiffs.

20           Yeah, we haven't talked about the form.  I think

21   either a proposed order or stipulation are probably both

22   fine, but we have not talked about that with defendants.

23           THE COURT:  And you mentioned Direct Purchaser

24   Plaintiffs.  There are other plaintiffs and plaintiffs

25   groups.  Where do they fit into this if at all?

1           MR. CLARK:  Brian Clark for plaintiffs.

2           That was not part of the agreement.  I think just

3    to give you a little color why, if you can imagine a

4    Consumer Indirect Purchaser Plaintiff, there's one human

5    being generally per state.  Priority custodian for each of

6    those plaintiffs would get a little confusing.  So the

7    agreement is only with respect to Direct Purchaser

8    Plaintiffs and Defendants having [unintelligible].  I note

9    that Mr. Robison talked about some proposals from defendants

10   to further priority custodians which --

11          THE COURT:  You are talking way too fast.  Back it

12   up.  There was a proposal to Mr. Robison to what?

13          MR. CLARK:  No, I understood earlier in the

14   argument Mr. Robison was proposing, it sounded like, some

15   additional priority custodian, but we haven't talked about

16   that.  I'm just reacting to what I heard.  We'll, of course,

17   want to take that up.  If there's other priority custodians

18   we might not agree on in May, June, July we may want to talk

19   about that because that's the first I heard past April.

20          THE COURT:  But, in any event, what I am to

21   understand is that when you mentioned the Direct Purchaser

22   Plaintiffs but not other plaintiff groups in connection with

23   who would be doing what under this agreement, it was not to

24   suggest that there is still a dispute between the defendants

25   and those other plaintiff groups that I need to address but,

1    rather, that except for this validation protocol, the

2    agreement you've described resolves the disputes described

3    in your joint letter brief; is that correct?

4              MR. CLARK:  Correct, Your Honor.

5              THE COURT:  All right.  All right.  Thank you.

6              Mr. Taylor, do you want to elaborate, clarify?

7              MR. TAYLOR:  Maybe just two quick points, Your

8    Honor.  As Mr. Clark mentioned, this came together at the

9    last minute.  I believe defendants are universally signed

10   off but just haven't had a chance to do that confirmatory

11   roll call.  We'll want to do that and can follow up in very

12   short order.

13             Second, Mr. Clark can correct me if need be, but

14   my understanding is the priority custodians are not new

15   custodians but custodians that are otherwise already agreed

16   on or to be ordered by the Court based on standing.

17             MR. CLARK:  Brian Clark for plaintiffs.  That's

18   correct.

19             THE COURT:  Okay.  All right.  Very well.  And by

20   when do you think -- I like to assign deadlines where I can,

21   so by when do you think you would be in a position to file

22   whatever you choose to file that documents this agreement?

23             MR. CLARK:  My expectation, mostly because I'd

24   like to take the rest of the week off, shoot for Monday if

25   that works for Your Honor.

1          THE COURT:  Fine with me.  I assume one way or

2    another it will be a stipulation with some kind of proposed

3    order because you do want this to be an order, correct,

4    Mr. Clark?

5          MR. CLARK:  I believe so.  Yes.

6          THE COURT:  Mr. Taylor, do you think you'll be

7    able to do the necessary herding to have something on file

8    by close of business on Monday?

9          MR. TAYLOR:  Defendants are also certainly

10   amenable to an order, Your Honor.  In the interest of being

11   a little conservative, I might ask for Wednesday just in

12   case since we do have quite a few people to speak with and

13   I'm not sure what everyone's schedule looks like.  I don't

14   think there is immediacy in terms of urgency with respect to

15   that, but other than that, I think it's basically fine.

16         THE COURT:  So for the sake of all who would like

17   to take some part of next week off, obviously move it

18   through as expeditiously as you can, but I will look for

19   something on file by Wednesday.  Fair enough, Mr. Clark?

20         MR. CLARK:  Yes, Your Honor.  Thank you.

21         THE COURT:  Okay.  Mr. Taylor?

22         MR. TAYLOR:  Yes.  Thank you, Your Honor.

23         THE COURT:  Let me jot that down.

24         Okay.  So that means that I need to hear argument

25   on the validation protocol.  And, Mr. Clark, I am having no

1    trouble hearing you.

2            I will tell you, Mr. Taylor, that you are speaking

3    pretty quickly and your voice is tending to drop off a bit.

4    So when it gets to be your turn, I'm going to need you to

5    speak up and speak more slowly so I can hear you clearly.

6    Okay?

7            MR. TAYLOR:  Thank you, Your Honor.  Understood.

8            THE COURT:  All right.  So, Mr. Clark, do you want

9    to address the issue of the validation protocol first for

10   the plaintiffs?

11           MR. CLARK:  Yes, Your Honor.  Thank you.

12           We fully expect that most defendants will make

13   some use of TAR in the search process as they've done so in

14   most recent cases in the antitrust bar.  From our

15   perspective, I think just a factual perspective, TAR is a

16   black box.  No one on this call and, frankly, no one at most

17   of the vendors can fully explain how those algorithms work.

18   So the only way to know if it works is through some type of

19   validation.

20           The vendors defendants will be using -- and,

21   frankly, the vendors that plaintiffs already use -- do some

22   type of validation to know when the review is over, when you

23   found enough of the responsive documents that it's a decent

24   or a complete review.  And we are just asking that this

25   process be formalized and transparent.

1           The way to know if it works, the bottom line for

2     validation, is to have some kind of recall estimate.  This

3     concept of doing validation in modern litigation is not a

4     novel one.  We have cited to many cases in our joint letter

5     brief at ECF 534-1 -- or 534 on why validation has been

6     adopted in many courts around the country.

7           It's clear that TAR offers many substantial

8     savings over fully reviewing all search term results.  But

9     if you're going to use that, have those savings, you have to

10    make sure it actually works.  It can't be just let's use it

11    and we don't know if it actually found half or a quarter or

12    90 percent of the responsive documents.  And we also --

13          THE COURT:  Let me ask one check-in question.  Is

14    this a TAR specific issue, because the proposed protocols

15    seems to seek an order that covered any kind of review

16    methodology, not just TAR?

17          MR. CLARK:  Thank you, Your Honor.  No, it is not

18    specific only to TAR, and let me explain why.  Typically, we

19    face challenges when we ask for validation protocol to say,

20    well, you, plaintiffs, are just -- you're anticipating just

21    using search terms.  You only want us to do it.  So we have

22    learned -- and what's good for the goose is good for the

23    gander -- if we're using a search term process, we will do

24    validation as well and we will prove that our search process

25    has a recall number that is sufficiently high.  We think it

1    becomes best practices, in our view, with search to show

2    that your search is actually working.

3              So we do propose validation protocol apply to a

4    search term only process or a TAR only process or what we

5    suspect most defendants will end up doing, a search term

6    process followed by a TAR process.

7              There's no -- let me just address briefly -- there

8    is an argument in defendants' joint letter brief about a

9    second database.  That argument does not make sense to us.

10   Anyone using TAR would already be doing some validation.

11             You have a database.  You pull these random

12   samples to establish what your recall is.  There's no second

13   database.  This is something the parties are already having

14   to do to make sure and represent under Rule 23(g) that their

15   search process is objectively reasonable and accurate, and

16   we think formalizing it just makes sense.  And we've

17   provided some examples both for *Broilers* and *Peanut Farmers*

18   antitrust of substantially similar validation protocols that

19   the parties have successfully used.

20             THE COURT:  I've got several questions.  What

21   about defendants' argument that in the *Boiler Chicken*

22   litigation and in the *Peanut* litigation that those

23   validation methodologies were agreed to, the orders went in

24   because the parties agreed that there ought to be an agreed

25   validation protocol and that it ought to be in the form an

1  order?  That doesn't mean that while Ms. Grossman didn't

2  resolve a few disputes about the specifics, but my

3  understanding of her work is that it at least started with

4  an agreement among the parties that there ought to be such a

5  thing and that it ought to be embodied in an order, and then

6  the specifics were negotiated and she facilitated that.  So

7  could you respond to that concern on defendants' part?

8          MR. CLARK:  Sure.  In the *Peanut Farmer* antitrust

9  case, the ESI protocol punted on the issue.  Defendants said

10  no validation.  Plaintiffs said validation.  And the parties

11  eventually did agree on a validation protocol in this case.

12          In the *Broiler Chicken* case, I believe it was very

13  similar to this, that defendants did not want any

14  validation.  Plaintiffs wanted validation.  And, as I

15  recall -- I hate to speak to personal experience and

16  testify, but my recollection of that, because I was

17  involved, is Special Master Grossman actually drafted, if

18  not all, the vast majority of that entire validation

19  protocol and presented it to the parties.  And I don't

20  recall it changing very much after she drafted it.  And I

21  don't recall that the parties drafted it.

22          So it's hard to say when you have somebody guiding

23  the process like that that was agreed to.  I'm not in any

24  way expressing unhappiness with it because we're proposing

25  it here, but I don't think it was an agreed to validation

1    protocol.

2             THE COURT:  And then my sense is that there are

3    kind of three levels to the question here.  One is must

4    parties -- the producing parties -- all of the parties, but

5    must each producing party have a validation process?  In

6    other words, must validation happen in order to be compliant

7    with 26(g)?

8             Second, if yes or if there is a validation

9    process, must it be disclosed?  In other words, must there

10   be transparency to the other side about what process has

11   been used and implemented?

12            And then the third-level question, as I understand

13   it, is should there be a court order that says what

14   validation process the parties will use, what that protocol

15   will be such that it is uniform?

16            I don't necessarily see the answer to one question

17   dictating the answer to the next question down and the next

18   question down after that.  But am I missing something at

19   least in understanding that those are the components of the

20   dispute here?

21            MR. CLARK:  No.  I think that's right as to the

22   components.  I guess I would just offer on, I guess, step

23   two what should be disclosed -- and I think one of the

24   important things, especially in an antitrust case, goes to a

25   richness problem.

1          So the emails that plaintiffs will care by far the

2     most about are going to be few in number.  If what we allege

3     is true, there are going to be some emails that were meant

4     to be kept secret and are low in number.  And if all of

5     those get missed but everything else gets produced, that's a

6     really big problem.

7          So the reason that Special Master Grossman drafted

8     this in *Broilers* and was proposing it here and it's been

9     agreed to in other cases is what it lets us see is which

10    documents were missed by TAR or a human reviewer, and it

11    lets plaintiff see those documents they care most about that

12    were missed and have a conversation about ways to make sure

13    they aren't missed.

14          I mean, nowhere in *Broilers* did somebody come back

15    and say do your whole process over because there is this

16    disclosure, and the focus is on those low richness documents

17    that defendants will say don't exist and we think will

18    exist, but if they do will exist in low number.  And how do

19    you identify that they have been missed and deal with the

20    fact they have been missed, and a validation protocol lets

21    you do that.

22          THE COURT:  Thank you.

23          Mr. Taylor, you're up.

24          MR. TAYLOR:  Thank you, Your Honor.  Jarod Taylor.

25          So I do want to begin by emphasizing that I think

1    plaintiffs are right about one thing and Your Honor as well.

2    We will be conducting quality control in validation of our

3    processes -- whether it's TAR, whether it's search terms

4    only -- on an iterative basis during our review, but that

5    process will be defendant specific.  It will be specific to

6    defendant's specific software platforms, to how they

7    conducted their collections, and to how they did their

8    productions.

9          What plaintiffs are proposing is something that

10   comes at the end after all of the document production has

11   been substantially complete.  That takes place on top of

12   that process that has been going, and that is undoubtedly

13   additional cost and additional burden.

14         In their papers arguing for entry of the proposed

15   search methodology order plaintiffs relied heavily on the

16   need to avoid a do-over.  And I know they don't focus on

17   that as much with respect to the validation protocol, but to

18   be clear, the validation protocol would not help to prevent

19   a do-over.  It comes at the end as plaintiffs have proposed

20   it.  And it's instead pure discovery on discovery.

21         Plaintiffs explain that they believe this is now a

22   standard process.  I don't think anyone could claim that for

23   search terms and manual review for certain, and I do not

24   believe -- I agree that some defendants will likely use TAR.

25   I do not believe all defendants will use TAR.  And, in fact,

1    the standard under the Sedona principles is that there

2    should be no discovery on discovery absent specific,

3    tangible, evidence-based indicia of a material failure by

4    the responding party.

5              With respect to the richness concern that

6    Mr. Clark raised, plaintiffs will be getting, as

7    acknowledged at the outset of this hearing, millions of

8    documents from multiple defendant families.  That is

9    additional built-in redundancy that is going to already

10   mitigate that issue.

11             With respect to Mr. Clark's point that these

12   processes are a black box, they're not a black box under the

13   ESI protocol as is already in place.  The ESI protocol

14   requires that defendants disclose and describe both their

15   TAR tools and the processes those tools will go through.

16   And, of course, with respect to search terms that's even

17   farther off the mark because search terms will be negotiated

18   with plaintiffs and are being disclosed today under the ESI

19   protocol.

20             One more -- well, maybe not one more, but another

21   issue I want to raise with respect to the burden of doing

22   this, that defendants will already be doing their multiple

23   different unique processes is not a reason to say that

24   having to do this complete and separate process on the end

25   in addition to that isn't burdensome.  That's additional

1    burden.

2              With respect to the blind database -- I'm speaking

3    to my understanding of our firm's experience in *Broilers* --

4    the protocol requires a "blind reviewer."  And I believe how

5    we thought was the best way to do that there was to

6    essentially set up a separate duplicate database for the

7    protocol, the validation collection.

8              And plaintiffs try to essentially kind of hand

9    wave away the burden of doing this by pointing to the fact

10   that under the protocol it requires just a minimum of a few

11   thousand additional documents to be reviewed.  But the

12   problem is that at this point we can't see, we can't

13   determine what our productions will look like and all of the

14   problems that might arise to throw off a recall percentage

15   without actually indicating that a production was deficient.

16             So the bulk of the burden, I would say, is really

17   likely to come from trying to jam square pegs of all of our

18   different production into a round hole of this one

19   validation protocol.

20             So just as an example, TAR could exclude batches

21   of documents that are nevertheless produced putting that

22   batch of documents into the bucket of documents that were

23   excluded by TAR even though they're really responsive, even

24   though they were produced.  And it's just these seemingly

25   minor kind of lack of fit between specific productions and

1    protocol that in our experience just leads to litigation and

2    disputes over the process in burden trying to set up the

3    validation process to make sense with the specific

4    collection and production that was undertaken.

5          I think that pretty much addresses the bulk of our

6    objections to doing this.  Really it's an upfront

7    one-size-fits-all procedure that no one has shown will

8    actually be necessary to have the richness that Mr. Clark

9    mentioned.

10          THE COURT:  A couple of questions.  One is when

11   you talked about TAR not being a black box because the

12   defendants -- or the plaintiffs for that matter if they

13   choose to use TAR -- will be required to disclose the

14   platform they're using and this slows the processes, does

15   that contemplate that the validation processes will be

16   disclosed?  Is that a part of what the parties will be

17   disclosing to each other?

18          MR. TAYLOR:  I think that is something else that

19   will be best worked on -- to the extent that will be the

20   case should be worked on again on an iterative basis based

21   on discussions with plaintiffs.

22          There is a concern that over disclosure could get

23   into attorney work product.  You know, we want to avoid

24   that.  But, you know, I think we would certainly be willing

25   to -- we don't want to completely hide what we're doing or

1    stiff arm plaintiffs completely.

2            There is also a concern with micromanaging that no

3    matter what gets disclosed won't be good enough when there

4    hasn't been any showing based on the actual production that

5    there is a deficiency.  But I think that certainly is a

6    conversation that defendants would be willing to have with

7    plaintiffs.

8            THE COURT:  And then with regard to the *Broiler*

9    *Chicken* experience, you're describing concerns and burdens

10   that you anticipate.  Are there examples of that actually

11   coming to pass in the *Broiler Chicken* litigation?  In other

12   words, are there concrete anecdotes or examples of here are

13   the unintended consequences that followed from this

14   validation protocol that explains why we're so concerned for

15   real and not just in theory?

16           MR. TAYLOR:  Yes, Your Honor.  So the example I

17   gave about the batch of documents that was produced but that

18   were nevertheless excluded from TAR was one such example.  I

19   think it related to calendar entries or something along

20   those lines.

21           One other concrete example is how arbitrary a

22   percent recall cut-off can be.  For example, if the

23   production, the collection initially contained a lot of

24   "junk," things you can easily mark as nonresponsive, that

25   puts up your accuracy rate.  And, conversely, if someone has

1    excluded that "junk" from the beginning, it takes their

2    accuracy rate down, but that doesn't really act as a good

3    indicator of the quality of the actual production.

4            So those kinds of unnecessary disputes over

5    percentages and the difficulty of having the protocol

6    account for quirks in the production that will undoubtedly

7    happen over the course of the next nine months are the types

8    of issues that we experienced and, therefore, would expect

9    here as well.

10           THE COURT:  Anything else, Mr. Taylor?

11           MR. TAYLOR:  No, Your Honor.

12           THE COURT:  All right.  Mr. Clark, anything

13   further?

14           MR. CLARK:  Just a couple points to respond to

15   Mr. Taylor.

16           Just to kind of level set, you know, a lot of the

17   TAR fights a number of years ago were about how you train

18   the system, and that's where a lot of this case law was.  We

19   are not telling defendants how to train their tool, what

20   tool to pick.  We're saying use whatever tool you want --

21   whether it's search terms, TARs or both -- but we'd like to

22   know it worked.

23           And so if we're at the end of the process and, as

24   Mr. Taylor says, everybody is confident in the results, that

25   additional burden at the margin of reviewing the 3 to 5,000

1    documents in the validation protocol, we really don't think

2    it's all that much more.  It's confirming a process worked.

3    Or, you know, maybe you use some different methods at your

4    vendor and it turns out there was a problem, and it's

5    confirming a problem before you ever have to tell the other

6    side.  You only disclose these results when you're

7    comfortable with them.  So if you identify a problem, you

8    can fix it and you could run the blind test over again.

9    That was something that Professor Grossman advised the

10   parties to do in *Broilers*.  I don't know if anybody did that

11   because we just got one set of results.

12          The no discovery on discovery, that term doesn't

13   appear in the federal rules.  But what does appear in Rule

14   26(g) requires the parties, as attorneys and officers of the

15   court, sign off a process worked.  What's particularly

16   important, and I think particularly with TAR, is it is a

17   black box.  When I say a black box, I mean nobody knows why

18   an algorithm pulls one document up to review and pushes

19   another down.  It's a really complicated thing.  And no

20   attorney could jump in and say I understand that algorithm

21   and why it pushed this up or down.  What they can understand

22   is whether when you tested it or validated it at the end if

23   it worked.

24          You also asked what defendants are willing to

25   disclose.  It didn't sound like there was a lot of meat on

1    the bones there to me.  A conversation with plaintiffs, I

2    don't know what that means.  A conversation can have a

3    pretty wide spectrum of what that might mean.  But what I do

4    know is if we put a validation protocol down in writing, we

5    all know and all understand kind of the goal or what the

6    report card will be at the end of this process, and that's

7    what the validation protocol is meant to be, just kind of

8    your report card at the end.  You don't have to show your

9    work.  You just have to show what the actual answers were at

10   the end.

11          The burden that's mentioned about setting up the

12   database, I just don't think that's really a significant

13   burden, 5,000 documents compared to a million.  Vendors,

14   including our vendors, set this process up.  They know how

15   to use a random number generator and pull out the random

16   sample from the various sample populations.  I don't recall

17   that being an issue at all in *Broilers;* perhaps I'm

18   forgetting.

19          Kind of a lack of fit, this really shouldn't

20   depend on any particular vendor or any particular process.

21   It's kind of a neutral process.  It doesn't care what tool

22   is used.  It only cares about validating from the various

23   populations.

24          And I guess just, lastly, on the *Broilers*

25   experience, you asked for concrete anecdotes.  We noticed

1    there was no citation when defendants mentioned some

2    problems in *Broilers*.  We're not recalling the things, the

3    problems that are referenced but with no citation in

4    *Broilers*.

5          What we remember, though, is in a couple instances

6    -- in most instances the recall levels are somewhat

7    shocking, I think, to everybody.  They were in the ninety

8    percentile and there wasn't much more to be done, ninety

9    percent or higher.  But what happens is when you

10   extrapolated sometimes where you would find ten documents

11   that were competitor communications between the defendants

12   on a subject relevant to the lawsuit, you could extrapolate

13   and say, well, because those ten documents were missed in

14   the validation sample, you can extrapolate given it was a

15   million-document population size that maybe 5,000 such

16   competitor communications were missed.

17         What was done there is very targeted terms,

18   usually with a budget, based on how many were predicted to

19   be missed and somebody would go back and do a very targeted

20   review of those 5 or 10,000 documents that might have been

21   missed.

22         And, frankly, I felt like everybody had a much

23   higher confidence, especially plaintiffs, that the low

24   richness, most important documents to our case were found

25   and we didn't have to play a game of, well, we got these

1    five competitor communications, did you miss any.  And, of

2    course, what are we supposed to say?  We don't know what we

3    don't know.

4           But what we were able to do is when there were

5    misses that were identified by the validation protocol and

6    they were significant enough to be extrapolated from the

7    sample, we could go back with a very specific ask based on

8    those very specific documents and the problem was fixed and,

9    in our view, without a lot of extra costs compared to the

10   overall review.

11          THE COURT:  All right.  Thank you.

12          Mr. Taylor, anything further or have you told me

13   what you need me to know?

14          MR. TAYLOR:  I'll try to be brief, Your Honor, but

15   a quick response to a couple of the points that Mr. Clark

16   reiterated.

17          You know, we understand that "conversation" sounds

18   a little nebulous; I'm not going to deny that, it does.  But

19   part of that is because our processes are still nebulous.

20   We don't know what our tools will be and what kind of

21   validation processes our vendors will use and exactly how

22   much of a potential disclosure will intrude on our work

23   product.

24          That's part of defendants' objection, is that all

25   of this is coming so early in the process and is so rigid.

1    You know, that's a recipe for disputes and for problems down

2    the road, which has been our experience.

3          Mr. Clark hit again on some of the black box

4    nature of TAR, but, as Your Honor noted, their proposal is

5    not limited to TAR.  It even talks about reworking search

6    terms potentially at the end, after the parties have already

7    negotiated search terms and called for re-review of

8    documents that have already been reviewed by attorneys.

9          Discovery will never be perfect, but perfection is

10   not the standard.  And plaintiffs will certainly obtain

11   millions of documents that include innumerable

12   communications, you know, that they might be interested in

13   or think are relevant.  There's a lot of redundancy already

14   built into this process.  And if it seems like there are

15   holes, the standard process is for plaintiff to raise those

16   concerns and visit those on an ad hoc, tailored process once

17   those have been identified.

18          THE COURT:  Thank you.

19          All right.  I think I've heard what I need to hear

20   to take into consideration the proposed validation

21   protocols, so I will take that under advisement and get an

22   order out on that as soon as I can.  Otherwise, I think

23   we've concluded the work that we set for ourselves today.

24          The one thing that I meant to raise while we were

25   talking about the schedule, but it's not too late to raise

1    it now, is whether you all have discussed a -- or whether

2    periodic case management conferences would be helpful and,

3    if so, how soon should we begin and with what frequency

4    should we hold them.  Have you had that conversation yet or

5    is that something that you would like to talk amongst

6    yourselves and then get back to me with a proposal?

7            Let me ask Mr. Pouya if that's something that came

8    up in your conversations.  Or I can ask Mr. Clark, whichever

9    of you is the designated speaker on this topic.

10           MR. CLARK:  Brian Clark for plaintiffs.  I can

11   take this one.

12           I don't think we've talked more broadly.  I don't

13   think you'll be surprised to find plaintiffs generally find

14   status conferences are pretty helpful to keep discovery

15   moving.

16           What we have discussed as part of the search

17   methodology order is sometime after that joint status report

18   would be submitted on January 22nd, some reasonable amount

19   of time, subject to the Court's availability, after that we

20   think would be a really good check-in time, and we agreed we

21   would, I guess, raise it with you.  So we often find

22   agreeing on a status is best to do at the prior status.  I

23   would propose we do discuss that today subject to your

24   availability.

25           THE COURT:  So at some point subject to my

71

1    availability after January 22nd set at least an initial case

2    management conference and then we'll get how frequently they

3    ought to be set beyond that.

4           Mr. Robison, any proposals from the defendants'

5    perspective?

6           MR. ROBISON:  No, Your Honor.  I think the

7    parties' agreement on a large portion of the search

8    methodology order did contemplate this sort of joint status

9    report in January, and so I agree having one status

10   conference after that probably makes sense to resolve

11   anything that the parties have not been able to resolve or

12   to set a briefing schedule for any disputes that still need

13   to be briefed.

14          We don't have a view yet on how frequently beyond

15   January there need to be status conferences.  I think the

16   Court already has a hearing on January 8th to handle motions

17   to compel that have already been filed, and there may be

18   more motions to compel filed in January depending on how

19   some of these negotiations play out.

20          So I think right now if we were to set one in late

21   January to talk about whatever gets filed on the 22nd, I

22   think that would make sense.  But beyond that, I think it's

23   premature to try to guess how frequently we might need one.

24          THE COURT:  Well, I will take a look at my

25   calendar and get you a date either late January or very

1   early February to have a case management conference --

2   understanding that we will be getting together on January

3   8th, but that will be a motion hearing -- and no later than

4   that we will need to take a look at whether we want to set

5   case management conferences on a regular schedule.  When

6   we're dealing with this many people and my schedule, I

7   really can't continue to set them ad hoc.  But I also

8   recognize that you may need a little time to think about

9   what makes good sense that's often enough to keep the trains

10  running on time but not so often that it becomes make-work

11  and diverts you from getting the real work of the case done.

12          So give that some thought.  If you have a specific

13  agreed proposal before January 22nd, nothing stops you from

14  sending me a letter and telling me what it is.  But in the

15  meantime, what I will do now is set a case management

16  conference for sometime after January 22nd and we'll take it

17  from there.

18          All right.  I think that does what we needed to

19  do.  So I will thank you for your work both on the 26(f)

20  report, as well as your continued work on the disputes that

21  arose in connection with the search methodology protocol.

22          I will watch for your follow-up letters as we've

23  described here.  And I will wish you all happy, safe,

24  healthy holidays.  And we'll look forward to continuing to

25  work with you on this case.

1          And thank you to our court reporter very much for

2     your work this afternoon.

3          We're adjourned.

4          (Court adjourned at 4:51 p.m.)

5                          *      *      *

6          I, Debra Beauvais, certify that the foregoing is a

7     correct transcript from the record of proceedings in the

8     above-entitled matter.

9                Certified by:  *s/Debra Beauvais*
                                Debra Beauvais, RPR-CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25