```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2

3       ------------------------------------------------------------
                                    )
        IN RE PORK ANTITRUST        )  File No. 18-cv-1776
4       LITIGATION                  )          (JRT/HB)
                                    )
5       This document relates to:   )
                                    )  Saint Paul, Minnesota
6       ALL CASES                   )  January 8, 2021
                                    )  9:30 a.m.
7                                   )
                                    )  HEARING CONDUCTED VIA
8                                   )  ZOOM FOR GOVERNMENT
        ------------------------------------------------------------
9

10              BEFORE THE HONORABLE HILDY BOWBEER
            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11                          (MOTIONS HEARING)

12      APPEARANCES
        Co-Lead Counsel for the   LOCKRIDGE GRINDAL NAUEN PLLP
13      Direct Purchaser          ARIELLE WAGNER, ESQ.
        Plaintiffs:               BRIAN D. CLARK, ESQ.
14                                100 Washington Avenue South
                                  Suite 2200
15                                Minneapolis, Minnesota
                                  55401-2179
16
        Co-Lead Counsel for the   CUNEO GILBERT & LaDUCA, LLP
17      Commercial/               ALEC BLAINE FINLEY
        Institutional Indirect    4725 Wisconsin Avenue NW
18      Purchaser Plaintiffs:     Suite 200
                                  Washington, DC 20016
19
                                  BARRETT LAW GROUP, P.A.
20                                KATHERINE BARRETT RILEY, ESQ.
                                  404 Court Square North
21                                Lexington, Mississippi 39095

22

23

24

25
```

```
1        APPEARANCES
         Co-Lead Counsel for        HAGENS BERMAN SOBOL SHAPIRO, LLP
2        Consumer Indirect          RIO PIERCE, ESQ.
         Purchaser Plaintiffs:      715 Hearst Avenue
3                                   Suite 202
                                    Berkeley, California 94710
4
                                    HAGENS BERMAN SOBOL SHAPIRO LLP
5                                   BREANNA VAN ENGELEN, ESQ.
                                    1301 Second Avenue
6                                   Suite 2000
                                    Seattle, Washington 98101
7
                                    GUSTAFSON GLUEK PLLC
8                                   BRITTANY RESCH, ESQ.
                                    MICHELLE J. LOOBY, ESQ.
9                                   120 South Sixth Street
                                    Suite 2600
10                                  Minneapolis, Minnesota 55402

11       For Defendant Agri         HOGAN LOVELLS US LLP
         Stats, Inc.                JUSTIN BERNICK, ESQ.
12                                  555 13th Street NW
                                    Washington, DC 20004
13
         For Defendant Clemens     KIRKLAND & ELLIS LLP
14       Food Group, LLC:          CHRISTINA HENK BRIESACHER, ESQ.
                                   300 North LaSalle Street
15                                 Chicago, Illinois 60654

16                                 GREENE ESPEL PLLP
                                   MARK L. JOHNSON, ESQ.
17                                 222 South Ninth Street
                                   Suite 2200
18                                 Minneapolis, Minnesota 55402

19
         For Defendant Hormel      FAEGRE DRINKER BIDDLE & REATH
20       Foods:                    ISAAC B. HALL, ESQ.
                                   90 South Seventh Street
21                                 Suite 2200
                                   Minneapolis, Minnesota 55402
22
         For Defendant Seaboard    STINSON LLP
23       Foods:                    PETER J. SCHWINGLER, ESQ.
                                   50 South Sixth Street
24                                 Suite 2600
                                   Minneapolis, Minnesota 55402
25
```

```
 1        APPEARANCES
          For Defendant                GIBSON DUNN & CRUTCHER, LLP
 2        Smithfield Foods:            BRIAN EDWARD ROBISON, ESQ.
                                       2100 McKinney Avenue
 3                                     Suite 1100
                                       Dallas, Texas 75201
 4
                                       LARKIN HOFFMAN DALY & LINDGREN
 5                                     JOHN A. COTTER, ESQ.
                                       8300 Norman Center Drive
 6                                     Suite 1000
                                       Minneapolis, Minnesota
 7                                     55437-1060

 8        For Defendant Triumph        HUSCH BLACKWELL LLP
          Foods:                       CHRISTOPHER A. SMITH,
 9                                     190 Carondelet Plaza
                                       Suite 600
10                                     Saint Louis, Missouri 63105

11                                     HUSCH BLACKWELL LLP
                                       VOLLIS GENE SUMMERLIN, JR., ESQ.
12                                     13330 California Street
                                       Suite 200
13                                     Omaha, Nebraska 68154

14        For Defendant Tyson          AXINN VELTROP & HARKRIDER, LLP
          Foods, Inc.:                 JAROD TAYLOR, ESQ.
15                                     90 State House Square
                                       Hartford, Connecticut 06103
16
                                       AXINN VELTROP & HARKRIDER, LLP
17                                     TIFFANY RIDER ROHRBAUGH, ESQ.
                                       950 F Street NW
18                                     Washington, DC 20004

19        For Defendant JBS USA:       QUINN EMANUEL URQUHART &
                                       SULLIVAN LLP
20                                     SAMI H. RASHID, ESQ.
                                       51 Madison Avenue
21                                     New York, New York 10010

22                                     SPENCER FANE
                                       JESSICA J. NELSON, ESQ.
23                                     100 South Fifth Street
                                       Suite 2500
24                                     Minneapolis, Minnesota 55402

25
```

```
 1        APPEARANCES
          For the Commonwealth of    SCHNEIDER WALLACE COTTRELL
 2        Puerto Rico:                KONECKY LLP
                                      MATTHEW S. WEILER, ESQ.
 3                                    KYLE G. BATES, ESQ.
                                      2000 Powell Street
 4                                    Suite 1400
                                      Emeryville, California 94608
 5
          For Winn-Dixie Stores       AHERN AND ASSOCIATES PC
 6        and Bi-Lo Holdings,         PATRICK AHERN, ESQ.
          LLC:                        590 North Sheridan Road
 7                                    Lake Forest, Illinois 60045

 8

 9
          Court Reporter:             CARLA R. BEBAULT, RMR, CRR, FCRR
10                                    316 North Robert Street
                                      Suite 146 U.S. Courthouse
11                                    Saint Paul, Minnesota 55101

12

13

14        Proceedings recorded by mechanical stenography;
          transcript produced by computer.
15

16

17

18

19

20

21

22

23

24

25
```

1                     **P R O C E E D I N G S**

2                  **VIA ZOOM FOR GOVERNMENT**

3

4            THE COURT:  All right.  This is the United States

5      District Court for the District of Minnesota.  I'm

6      Magistrate Judge Hildy Bowbeer.  It looks like we've got at

7      least a couple of people still working on connecting to

8      audio so, Mr. Cotter, I see you're now connected.  We got

9      one other person still connecting to audio so let me just

10     give that another moment.  It looked like there may be some

11     challenges there.  Yes.  All right.  Now we've got

12     Mr. Rashid.  We got one other person connecting.  Okay, I

13     think we got everybody connected who intended to be

14     connected.

15           We are convened by Zoom for a hearing in the

16     matter of In Re: Pork Anti-Trust Litigation.  This is matter

17     number 18-cv-1776.  Specifically we are here for a hearing

18     in a motion that was filed only in that matter and not in

19     the other two related pork matters.  It's docket number 555

20     in 18-cv-1776 and it is plaintiffs' motion to compel

21     custodians and documents.

22           As for we have a court reporter on with us today

23     who will be preparing the only official transcript of this

24     proceeding.  I'm also recording the proceeding through the

25     Zoom platform as a backup to the court reporter in case she

1    loses her connection, but her work and the Zoom recording

2    that I'm making are the only recordings that may be made of

3    the proceeding.

4         Let me go through and get appearances of counsel.

5    I'll do it in the way I've done it before and which is

6    essentially to call the roll as I understand and according

7    to the information I got in advance of the hearing.

8         So first on behalf of plaintiffs and specifically

9    the Direct Purchaser Plaintiffs, first I understand that

10   Arielle Wagner is attending.  Ms. Wagner, are you on?

11        MS. WAGNER:  Yes.  Good morning.

12        THE COURT:  And Ms. Wagner, I understand that you

13   will be the one speaking for all of the plaintiffs with

14   regard to the motion to compel calendar -- production of

15   calendars; is that correct?

16        MS. WAGNER:  That is correct.

17        THE COURT:  All right.  In addition for the Direct

18   Purchaser Plaintiffs, Bobby Pouya.

19        MR. POUYA:  Yes.  Good morning, Your Honor.

20        THE COURT:  Good morning.  And Michael Pearson.

21        MR. PEARSON:  Good morning, Your Honor.

22        THE COURT:  Brian Clark.

23        MR. CLARK:  Good morning, Your Honor.

24        THE COURT:  Anyone else for the Direct Purchaser

25   Plaintiffs?  Okay.

1                Turning now to the Consumer Indirect Purchaser

2       Plaintiffs.  Rio Pierce.

3                MR. PIERCE:  Good morning, Your Honor.

4                THE COURT:  And I understand, Mr. Pierce, that you

5       will be the one speaking on behalf of all plaintiffs with

6       regard to the motion to compel additional custodians by

7       Tyson and JBS USA; is that correct?

8                MR. PIERCE:  Yes, that's correct, Your Honor.

9                THE COURT:  All right.  You're speaking a little

10      softly.  It's fine for now, but I may need you to speak up

11      when the time comes.

12               MR. PIERCE:  I understand.  Thank you.

13               THE COURT:  Turning now to the Commercial and

14      Institutional Indirect Purchaser Plaintiffs.  Shawn Raiter.

15      Mr. Raiter, are you on?  Not yet.

16               Blaine Finley.

17               MR. FINLEY:  Good morning, Your Honor.

18               THE COURT:  And Katherine Barrett Riley.

19               MS. BARRETT:  Good morning, Your Honor.

20               THE COURT:  Are you expecting Mr. Raiter to join

21      us?

22               MR. FINLEY:  Not necessarily, Your Honor.

23               THE COURT:  Okay.  So for right now his appearance

24      won't be noted.  I'm sorry.  I missed -- I think I missed

25      additional people on behalf of the Consumer Indirect

1    Purchaser Plaintiffs.  Let me back up to them.  Breanna Van

2    Engelen.

3              MS. VAN ENGELEN:  Good morning, Your Honor.

4              THE COURT:  Sorry to have overlooked you.

5    Michelle Looby.

6              MS. LOOBY:  Yes, good morning, Your Honor.

7              THE COURT:  Brittany Resch.

8              MS. RESCH:  Good morning, Your Honor.

9              THE COURT:  Are we expecting anyone else on behalf

10   of the Consumer Indirect Purchaser Plaintiffs?

11             MR. PIERCE:  No, Your Honor.

12             THE COURT:  Are we expecting anyone else on behalf

13   of the Commercial and Institutional Indirect Purchaser

14   Plaintiffs?

15             MR. FINLEY:  No, Your Honor.

16             THE COURT:  Turning now -- and I know this

17   matter -- this motion was not brought in the matter related

18   to the Commonwealth of Puerto Rico, but I understand that

19   there is counsel on the call for Puerto Rico.  Matthew

20   Weiler.

21             MR. WEILER:  Good morning, Your Honor.

22             THE COURT:  And Kyle Bates.

23             MR. BATES:  Good morning, Your Honor.

24             THE COURT:  Anyone else who would like their

25   appearance noted on behalf of the Commonwealth of Puerto

1    Rico?

2              (No response.)

3              THE COURT:  All right.  And then the other related

4    action, again, an action which this motion was brought but

5    wanting to recognize the appearance of counsel in connection

6    with the matter brought by Winn-Dixie Stores and Bi-Lo

7    Holdings.  Patrick Ahern.

8              MR. AHERN:  Good morning, Your Honor.

9              THE COURT:  Anyone else on behalf of Winn-Dixie

10   and Bi-Lo?

11             MR. AHERN:  No, Your Honor.

12             THE COURT:  All right.  Have I missed anyone who

13   would like their appearance noted on behalf of any of the

14   plaintiffs in these matters?

15             (No response.)

16             THE COURT:  Turning now to counsel for the

17   defendants.  Agri Stats, Justin Bernick.

18             MR. BERNICK:  Good morning, Your Honor.

19             THE COURT:  Anyone else for Agri Stats that you

20   know of, Mr. Bernick?

21             MR. BERNICK:  No, Your Honor.

22             THE COURT:  Clemens Food Group and the related

23   Clemens defendants.  Christina Briesacher.

24             MS. BRIESACHER:  Good morning, Your Honor.

25             THE COURT:  Mark Johnson.

1      MR. JOHNSON:  Good morning, Your Honor.

2      THE COURT:  And anyone else that wants to have

3  their appearance noted for the Clemens defendants?

4      (No response.)

5      THE COURT:  Okay.  Now, Hormel, I know there's a

6  dismissal pending for Hormel.  Do I have anyone on

7  representing Hormel this morning?

8      MR. HALL:  You do.  It's Isaac Hall, and I think

9  the dismissal is just for one of the Hormel defendants.

10     THE COURT:  Got it.  Okay.  And is there anyone

11  other than Mr. Hall appearing this morning on behalf of

12  Hormel?

13     MR. HALL:  Not to my knowledge.

14     THE COURT:  Next turning to Seaboard Foods.  Peter

15  Schwingler.

16     MR. SCHWINGLER:  Good morning, Your Honor.

17     THE COURT:  Anyone else on behalf of Seaboard

18  Foods?

19     MR. SCHWINGLER:  Not this morning.  Just me.

20  Thank you.

21     THE COURT:  Smithfield Foods.  Brian Robison.

22     MR. ROBISON:  Good morning, Your Honor.

23     THE COURT:  John Cotter.

24     MR. COTTER:  Good morning, Your Honor.

25     THE COURT:  Anyone else on behalf of Smithfield

1    Foods?

2              MR. ROBISON:  No, Your Honor, that's just the two

3    of us.

4              THE COURT:  Turning to Triumph Foods.  Christopher

5    Smith.

6              MR. SMITH:  Good morning, Your Honor.

7              THE COURT:  Anyone else on behalf of Triumph?

8              MR. SMITH:  I believe Gene Summerlin is also on by

9    audio.

10             THE COURT:  Mr. Summerlin, are you on?  I see a

11   little box with his name on it.  Mr. Summerlin, are you on?

12             MR. SUMMERLIN:  I am, Your Honor.

13             THE COURT:  All right.  Anyone else for Triumph?

14             MR. SMITH:  No, Your Honor.

15             THE COURT:  Tyson Foods.  Tiffany Rohrbaugh.

16             MS. ROHRBAUGH:  Good morning, Your Honor.

17             THE COURT:  Jarod Taylor.

18             MR. TAYLOR:  Good morning, Your Honor.

19             THE COURT:  And is anyone else on for Tyson?

20             (No response.)

21             THE COURT:  Okay.  And Mr. Taylor, I understand

22   you will be speaking at least to the custodians issue

23   relating to Tyson.  Are you going to be addressing any of

24   the other issues raised by the plaintiffs' motion?

25             MR. TAYLOR:  The reverse of that actually, Your

1    Honor.  I will be addressing the calendar issue on behalf of

2    all defendants.

3           THE COURT:  All right.  And who will be speaking

4    for Tyson with regard to the custodians issue?

5           MS. ROHRBAUGH:  Your Honor, this is Tiffany

6    Rohrbaugh.  I will be addressing the Tyson custodial issue.

7           THE COURT:  All right.  Got it.  Thank you.

8           Anyone else for Tyson?  I may have asked that

9    question.  Okay.  Nobody else.

10          And then on behalf of JBS USA.  Sami Rashid.

11          MR. RASHID:  Good morning, Your Honor.

12          THE COURT:  And Mr. Rashid, I understand that you

13   will be addressing the motion insofar as it pertains to

14   additional JBS custodians; is that correct?

15          MR. RASHID:  Yes, Your Honor.

16          THE COURT:  And it looks like Jessica Nelson is

17   also appearing for JBS.  Ms. Nelson.

18          MS. NELSON:  Good morning, Your Honor.

19          THE COURT:  Anyone else for JBS?

20          MR. RASHID:  No, Your Honor, just the two of us.

21          THE COURT:  Have I missed anyone who wants their

22   appearance noted on behalf of any of the defendants?

23          All right.  Well, I think we now have a complete

24   roll call.  I'm going to not go through my usual speech

25   about how I want you to behave today because you've heard

1    that speech already.  I will just remind everybody who is

2    not speaking at the time or about to speak to please mute

3    your audio; and I'll also ask anyone who isn't going to be

4    addressing some part of this motion also block video.  If

5    you're going to be speaking to some part of this motion,

6    whether it's calendars or custodians, please go ahead and

7    leave your video up, but otherwise I'll ask that you block

8    video.  And I'm going to take one moment here and block all

9    of those extra boxes.  All right.

10            So I am now seeing our court reporter, of course.

11   I am seeing Ms. Rohrbaugh, I'm seeing Mr. Rashid,

12   Mr. Taylor, Ms. Wagner and Mr. Pierce.  So I think I've got

13   everybody I need.  This is plaintiffs' motion.  I'm inclined

14   to start with the calendar issue unless you've got a strong

15   view to the contrary.  And so, Ms. Wagner, I believe that

16   one is yours; is that correct?

17            MS. WAGNER:  Yes, I will be speaking to the

18   calendar issue and I don't think we have a strong preference

19   on which one is presented first.

20            THE COURT:  All right.  Well, let's start there

21   then.

22            MS. WAGNER:  So we are asking defendants to

23   produce all electronic and hard copy diaries, calendars,

24   appointment books, to-do lists for each custodian.  We think

25   the calendars and related documents are critical in

1    anti-trust cases.  This is not the type of case that

2    defendants cite to in their brief.  It's not an employment

3    law case or a fraud case or an assault case.  It's

4    anti-trust conspiracy, and these types of documents that

5    we're talking about today often expose contacts and

6    coordination between competitors.

7             Calendars show things like internal meetings,

8    business meetings, you know, social outings with

9    competitors, and that's directly related to what we allege

10   in our complaint.

11            THE COURT:  Well, I don't -- I don't think the

12   defendants are disagreeing with the premise that really

13   relevant stuff can be found in calendar entries.  Where the

14   disconnect is is whether that mandates that they produce

15   custodians' entire calendars with all entries, saving out

16   some deeply personal or deeply and irrelevant,

17   competitively, sensitive information.  And so I think that's

18   what I'd like you to focus on, and particularly if -- and I

19   recognize your point that the cases they have cited aren't

20   anti-trust cases, but they do still generally stand for the

21   proposition that courts are loathe to require the production

22   of entire diaries, journals, calendars.  Have you got cases

23   in which -- anti-trust cases in which courts have required

24   that?

25            MS. WAGNER:  Your Honor, I mean, in my experience

1    we cited to the *In Re: Generic Drug Litigation* case, and in

2    that case, you know, anything that hit on a search term and

3    most go-get documents, you know, including hard copy

4    documents, electronic calendars, you know, were produced

5    wholesale unless there was attorney-client privilege or PHI

6    involved.  So there were even less, you know, redactions or

7    withholdings allowed, and that was appealed all the way up

8    to the Supreme Court.

9         THE COURT:  But you're saying that that's one in

10   which the parties agreed to search terms and agreed -- or

11   the Court ordered that everything that hit on a search term

12   would be produced with these very narrow exceptions.

13        MS. WAGNER:  The parties agreed to search terms

14   but the Court ordered that anything that was a search term

15   hit or a go-get document, and there were many categories of

16   go-get documents, were to be turned over without review.

17   And, you know, I think there were one or two companies where

18   the parties negotiated a limited relevance review that had a

19   sampling process in camera by a Special Master.  I don't

20   think anyone enjoyed that process.  I don't think we want to

21   suggest that.

22        THE COURT:  This is not volunteering to do that.

23        MS. WAGNER:  The default was the hard copy and

24   electronic calendars were turned over.  And in my experience

25   in the cases that I've worked on, which is almost all

1    anti-trust related, calendars were treated as go-get

2    documents and handed over, whether in hard copy or .pst

3    files.

4              THE COURT:  All right.  Go ahead.

5              MS. WAGNER:  Yes, our main concern is with having

6    large portions of the calendars, you know, redacted or

7    culled or withheld.  So what it comes down to is that the

8    calendars and journals and appointment books are just a

9    different sort of document because they are hard to decipher

10   without the whole context of discovery.  You know, I think

11   we have examples in our briefing of things like, you know,

12   WB meeting that we are concerned about, you know, things

13   that aren't relevant on the face of the documents but are

14   clearly relevant in context.

15             And so if there is a manual review, our concern is

16   that, you know, anyone looking at just one custodian's

17   calendar items will miss things that don't appear to be

18   relevant on their face.  It's hard for plaintiffs to look at

19   just one calendar and tell what's relevant.  It's only after

20   looking at the documents together with everyone else's

21   documents that we see patterns emerge.

22             THE COURT:  So at least in this case at this point

23   the parties have not agreed to treat calendars as go-get

24   document, right?

25             MS. WAGNER:  I believe that's correct.

1          THE COURT:  Okay.  And I know you argue that the

2    ESI Protocol and specifically the redactions clause, if you

3    will, of the ESI Protocol would preclude what the defendants

4    are proposing to do, but isn't the better understanding, at

5    least thinking about electronic calendars, isn't the better

6    understanding of electronic calendars that they are not a

7    single, integrated document; that calendar entries are

8    individual documents.  So I guess my sense is that that

9    redactions clause, at least insofar as we're talking about

10   electronic calendars, just doesn't apply here.  Do you --

11          MS. WAGNER:  I think the issues were a little bit

12   conflated in our briefing.  I don't think we're necessarily

13   saying that electronic calendars are one document.  I think

14   we were referring more to the hard copy calendars.  You

15   know, whether we call it a redaction of one document or

16   culling or withholding documents, we just don't agree you

17   can withhold for relevance.  So I think we're looking at,

18   you know, kind of two separate but related issues.  Because

19   I agree hard copy calendars and journals are a little bit

20   different from electronic calendars.

21          You know, with hard copy documents, it's more

22   straightforward because this, you know, one bound document,

23   like you said, or maybe one per year, and we think the ESI

24   Protocol is even more clear there.  But we're -- we're still

25   concerned with the hard copy documents because I believe

1   defendants said in their briefing they referenced leaving

2   out pages of calendars or hard copies, documents, and we

3   don't think that should be allowed under the ESI Protocol.

4          And electronic calendars are a little different

5   because they can be searched like an e-mail, but unlike

6   e-mail they serve a different function.  You know, some can

7   be sent to others, you know, with the domain address like an

8   e-mail, and that would be captured by a search term.  But

9   some calendar entries are for individual's own reference and

10   it might just say, Call Bill at 3:00.  So it's not clear

11   that we would be getting that document from, you know,

12   search terms or from a manual review.

13          THE COURT:  But essentially what you're saying is

14   because it may be especially difficult to cull or search or

15   review calendars, therefore there should be no requirement

16   that -- I'll speak to electronic calendars for the moment

17   because the hard copy calendars is a -- that's a tougher

18   question given the ESI Protocol and, I don't know, I'll have

19   a conversation with defendants about that.

20          But thinking about the electronic calendars, is --

21   where is the case law that supports the idea that because it

22   might be especially difficult to review, therefore it ought

23   to be turned over in its totality without regard to

24   relevance or responsiveness?

25          MS. WAGNER:  I mean, again, I would point to the

1    *In Re: Generic Drug* case.  I think there are things in

2    electronic calendars that we, you know, might agree to if

3    defendants want to take the time to go through each entry

4    one by one; but we don't think that electronic documents are

5    amenable to search terms.  I mean, we are -- we have

6    submitted our counterproposals to the search terms for

7    defendants that we are discussing right now, and there --

8    even if we go with our broadest search terms, there's still

9    a lot of calendar entries that wouldn't be hit by those

10   terms.  And we've been hesitant to go down that road because

11   it leads to the problem that we're talking about with the,

12   you know, Lunch with WB entries that can be relevant but

13   aren't clear on the face of the document.

14        So I think we could agree to some sort of manual

15   review of those calendars as long as there are clear

16   parameters.  And to be clear, we haven't talked about those

17   parameters with my colleagues; but, you know, perhaps

18   something like, you know, unless it's clearly not relevant,

19   we want it.  You know, we are very much interested in things

20   like internal meetings and business meetings and, you know,

21   the drinks with competitors, and those aren't things that

22   defendants have indicated will be produced.

23        THE COURT:  Anything else on this particular

24   issue?

25        MS. WAGNER:  I believe that that hits all of my

1    main points for now.

2            THE COURT:  Okay.  No doubt I'll come back to you

3    after I hear from defendants' counsel.  Now I understand,

4    Mr. Taylor, you're the one addressing calendars for the

5    defendants; is that right?

6            MR. TAYLOR:  Correct.  Good morning, Your Honor.

7            THE COURT:  Good morning.  Go ahead.

8            MR. TAYLOR:  Sure.  So just to start out with a

9    case that came up a couple of times during opposing

10   counsel's argument, I got what I believe the case to be open

11   in front of me, *In Re: Generic Pharmaceutical* case.  I don't

12   think it applies here.  I don't think it addressed calendar

13   entries.  The issue before the Court was whether the parties

14   may redact or withhold.

15           THE COURT:  Could you give me a cite so I can make

16   sure we're talking about the same case?

17           MR. TAYLOR:  Yes, I have -- it's a copy so there's

18   no Federal Reporter cite, but the Westlaw cite is 2019 WL

19   1613437.

20           THE COURT:  Go ahead.

21           MR. TAYLOR:  And so my understanding is that case

22   involved redactions of what were otherwise indisputably

23   responsive documents and not how we're going to find

24   responsive documents or whether indisputably nonresponsive

25   documents should be handed over just so that nothing is

1    misinterpreted or missed.  So I don't think it applies

2    directly to our issue here.

3              With respect to the latter part of the argument we

4    just heard, I will say I wished plaintiffs had raised that

5    with us before this morning.  My impression is that is a

6    conversation we tried to have during the meet and confer and

7    made no progress.  We asked --

8              THE COURT:  I'm going to -- there's some kind of

9    scraping noise.  I don't know, Mr. Taylor, if something

10   you're wearing is scraping against your microphone but,

11   yeah, why don't you try that.  Go ahead and speak again and

12   let's see if sitting up resolves it.

13             MR. TAYLOR:  I'm sure that was it, Your Honor.

14   I'll try to keep my mic away from my tie.  Better?

15             THE COURT:  Yes.

16             MR. TAYLOR:  Great.  Thank you.

17             So, you know, we are similarly open to a

18   discussion about what exactly plaintiffs are looking for

19   but, you know, the issue in the motion is whether we are

20   going to produce everything wholesale.  And I'm glad to hear

21   that perhaps that is no longer plaintiffs' position because

22   I do think that is, as set forth in our brief, there's no

23   case law support for it and there's no rationale for

24   treating this case differently from every other case that

25   involved review of electronic documents.

1          THE COURT:  What about the argument -- and I know

2     it was you that pointed it out in your brief that at this

3     point you don't necessarily know how many custodians had

4     those, you know, vettable Day Timers and, you know, the

5     calendars that we used to keep, but on the assumption that

6     there are some of those out there during the class period,

7     how do you square your position on those with the redactions

8     provision in the ESI Protocol?

9          MR. TAYLOR:  Well, the ESI Protocol, as they all

10     are, is necessarily, you know, it's a rule that is a broad

11     rule intended to address both of the issues the parties can

12     foresee at the time.  I would say that arguably this

13     specific issue wasn't really foreseen when that specific

14     provision was negotiated and that calendar entries are

15     different from the usual documents, and therefore the

16     rationale against redactions really doesn't apply to

17     calendar entries in the same way that it might to an e-mail.

18          You know, if you're taking a single document

19     that's a whole year or even a whole month, each of those

20     entries is a discrete entry.  It's put in at a different

21     time about a different subject matter for a different

22     purpose.  So, you know, as we described somewhat in our

23     brief, an entry made at one time in January just won't

24     likely provide context for a different entry about a

25     different subject made in September.

1          And that's completely different from the typical

2     document, a Word document or an e-mail to which the ESI

3     Protocol was more intended to apply to where it's all made

4     around the same time and therefore one part of it could

5     provide context to a different part of it.  I just think

6     calendar entries are radically different in that respect.

7          You know, as we discussed, the electronic

8     calendars are more clearly different documents where each

9     entry is a different document.  And I don't think it is

10    rational to treat them differently depending on whether they

11    are hard copy or electronic just because of the change in

12    technology.  The principle is just the same.  Each entry is

13    really discrete in a calendar and we have cited a number of

14    cases that at least indirectly, you know, hint at that.

15    That really diaries, calendars and similar documents

16    should -- each entry it is fair to treat as a separate

17    quasi-document, so to speak.

18          THE COURT:  All right.  Anything else?

19          MR. TAYLOR:  You know, I had a fair bit to say

20    about why defendant should not be required to produce every

21    entry; but again, on the understanding that that perhaps is

22    no longer plaintiffs' position, and we will go back to meet

23    and confer to the extent necessary, I think those are really

24    the highpoints as long as I've answered all of Your Honor's

25    questions.

1          THE COURT:  I guess I don't know for sure if

2     that's not still plaintiffs' position or if they were

3     suggesting, if I was bound and determined to go against

4     them, suggesting another possibility.  But let me check back

5     with Ms. Wagner and if it turns out that you overestimated

6     her position, I'll give you a chance to make any additional

7     points you care to.  So I'll let you go on mute.

8          Ms. Wagner.

9          MS. WAGNER:  Yeah, I -- I'm hesitant to say that

10     we are for sure going to agree to some sort of, you know,

11     clear parameters on what type of relevance review would be

12     allowed or not.  I think our position is still that we want

13     all of the calendar entries except for those that we have

14     carved out in the ESI Protocol.

15          And I think we have discussed certain limiters

16     before with defendants and we just could not agree.  I

17     think, for instance, some of the defendants referenced, you

18     know, producing only calendar entries that talked about pork

19     or production or output capacity; and, you know, that's just

20     not going to get plaintiffs what we are seeking.

21          And then I just want to clarify that I think I

22     agree with Mr. Taylor that the *Generic Drugs* order that I

23     cite doesn't specifically mention calendar entries in it.  I

24     was just expressing my experience in the case.

25          THE COURT:  All right.  I appreciate that.  Thank

1    you.

2              All right.  So, Mr. Taylor, with that

3    clarification, anything -- any additional points you wanted

4    to be sure to make?

5              MR. TAYLOR:  A few highpoints, yes.  If you will

6    entertain them, I appreciate it.

7              You know, I think it is worth emphasizing the

8    breadth of plaintiffs' original ask then.  There's really no

9    attempts to distinguish among custodians those who have

10   decision-making authority from those who don't, who are

11   involved in pork production from accountants or any other

12   custodian.  There's no attempt to limit the request to

13   relevant dates such as dates of the relevant trade

14   association events; and of course, as we have been

15   discussing, no attempts to limit the request to the relevant

16   subject matter.  You know, so this is really a complete, I

17   think as Your Honor noted, attempt to jettison the concept

18   of relevance with respect to these documents.

19             And to be clear to another point that came up

20   during the first portion of plaintiffs' argument, defendants

21   will be diligent in doing their responsiveness review.  As I

22   was preparing for this argument one of my colleagues gave an

23   anecdote from when she was an associate and she said she had

24   to review calendars and this one custodian only used

25   initials, but they went back and they found out what those

1    initials meant.  They did their diligence, and by the end of

2    the review she could read the calendar as well as the

3    custodian.

4         And we are not suggesting that we will be

5    lackadaisical about this, nor will we unilaterally determine

6    what is relevant and what is not.  All defendant seeks is to

7    determine what is responsive and what is not, which is the

8    ordinary course in review.  And plaintiffs' brief in fact

9    acknowledges, as I think it must, that not every calendar

10   entry is actually relevant to what they are seeking.  In

11   fact, I'm not sure that most internal meetings are really

12   relevant to what they are getting at.  Their brief mentions

13   competitor communications.  And certainly in that case most

14   of what plaintiffs are asking for will not be relevant.

15        In Tyson's case in particular I know that we have

16   custodians whose primary responsibility is or has been in

17   the relevant period other products other than pork.  So it

18   is really an extraordinary look under the hood that

19   plaintiffs seek and we don't believe that they have

20   justified turning discovery rules on its head so that

21   plaintiffs can do the respondent's review instead of

22   defendants.

23        And again, plaintiffs will have ample opportunity

24   to seek out the types of evidence they are seeking.  One of

25   their examples from their brief that they were worried could

1    be misinterpreted is a call with Bill.  But plaintiffs have

2    already received call records in this case and they have

3    subpoenaed call records from carriers.  At the end of the

4    day they are going to know who all of the calls were to and

5    from.  And they are similarly to receive millions of pages

6    of e-mails, dozens of depositions, which is the rationale

7    underlying a decision denying the production of complete

8    calendar entries in the *Eshelman v. Puma Biotechnology* case

9    that defendants cite in their brief.

10           And my last point is just that I don't think the

11   prejudice of what plaintiffs are seeking can be hand-waved

12   away by pointing to the protective order.  Discovery just

13   doesn't work by entering a protective order and then turning

14   over all documents to the opposing side for them to review.

15           You know, many employees don't keep a, quote,

16   unquote, work calendar.  They keep a calendar.  And that's

17   where they put their work appointments.  Yes, that's

18   probably most of what will be on the calendar, but that's

19   also where they put their personal appointments.  I know

20   that's how I do it.  The case law recognizes that as a cost.

21   It's just not fair to the employees to put all of their

22   information out there like that.  It's not enough you have

23   to turn it over to us.  I'm sure they're not happy to see us

24   coming, but sending it over to multiple -- probably

25   literally dozens of counsel, other counsel, is not what they

1    bargained for.

2           And similarly, plaintiffs just have no entitlement

3    to documents about tortillas or beef or chicken, internal

4    charitable efforts, prayer groups, all of the other things

5    that could go on a calendar entry.

6           So for those reasons we think that a

7    responsiveness review as in the ordinary course is warranted

8    here.

9           THE COURT:  So your proposal specifically,

10   Mr. Taylor, is what?  In other words, if this were to pursue

11   a process that defendants believe would make good sense in,

12   you know, in contrast to turning over all calendar entries

13   except highly personal information or highly sensitive,

14   highly-highly sensitive information that isn't relevant,

15   what would the process be?  What are you looking to have

16   happen?

17          MR. TAYLOR:  Well, just one clarification.  You

18   know, defendants don't seek merely to not produce

19   necessarily highly-sensitive information, but --

20          THE COURT:  I think that's what -- my

21   understanding is what the plaintiffs claim is you need --

22   default is all calendar entries come over except the narrow

23   categories that are described in the ESI Protocol for

24   redactions, and you want a different process.  What --

25   precisely what process are you proposing?

1          MR. TAYLOR:  For the calendar entries to be

2      treated like the other documents in this case and to go

3      through the normal review process, which could involve --

4          THE COURT:  Yeah, I'm sorry.  My question wasn't

5      very clear.  I do understand that.  But you've also talked

6      about you'd like to meet and confer with plaintiffs.  In

7      other words, there are a couple ways, if I were to deny the

8      motion, there are a couple of ways it could go.  Either you

9      all kind of do what you're gonna do with calendar entries

10     but be very clear in your written responses about exactly

11     what you did.  In other words, how you interpreted

12     responsiveness and precisely what parameters you applied, or

13     you -- and you suggested this as well here today and in your

14     brief -- you meet and confer with plaintiffs and try to come

15     to some consensus about -- and there are a couple of topics

16     on the table.

17          One is what will be responsive, what are the

18     parameters you look for.  And then there's also been some

19     discussion certainly on their part, and I think you were --

20     it sounded like you were amenable to it, about the means of

21     review.  Search terms versus manual, and you suggested you

22     might be open to a conversation about that as well.  So kind

23     of harkening back to my product liability days, what's your

24     proposed reasonable alternative design?

25          MR. TAYLOR:  We're always willing -- you know,

1    it's a little difficult to say.  We're always willing to

2    meet and confer with the other side.  If they have a request

3    to make that is more reasonable than hand everything over,

4    we are willing to hear them out.

5           I don't actually think that treating these

6    calendar entries, other than the other documents we're

7    negotiating about, differently from those documents is

8    warranted.  I really haven't heard a rationale justifying

9    that.  So we would propose producing what is responsive to

10   the merely 40 other document requests that plaintiffs have

11   issued.  Calendars entries are certainly a type of document

12   and we would review those and produce them to the extent

13   they are responsive to the other requests.

14          To the extent plaintiffs are seeking something

15   else, we are willing to hear them out.  Defendants don't

16   think it's appropriate for plaintiffs to have a say in how

17   each of the defendants reviewed those documents; but, again,

18   you know, we're willing to hear proposals out and kind of

19   work through that.

20          But it's difficult to make kind of a binding

21   commitment of exactly what we will do right now without

22   having that conversation.  So I'm just hesitant to do that,

23   Your Honor.  I don't mean to be evasive.

24          THE COURT:  All right.  Ms. Wagner, let me give

25   you one more chance at a reply here.

1          MS. WAGNER:  Okay.  So after hearing more about,

2     you know, what Mr. Taylor has to say, I think if we had some

3     guideposts on the electronic calendars, we would be willing

4     to discuss, you know, the exact parameters of where this

5     cutoff would be on a manual review.

6          And just to be clear, plaintiffs still really

7     don't think that redactions of hard copy journals and

8     calendars are appropriate at all.  We're particularly

9     concerned there, and it's really hard to do anything with

10     someone's hard copy calendar where pages have been ripped

11     out.  But, you know, I think we are willing to discuss, you

12     know, if we have some guideposts on the electronic calendar.

13          THE COURT:  All right.  Okay.  So kind of to cut

14     to the bottom line and then try to work my way back, I am

15     going to deny the plaintiffs' motion as framed, both as to

16     electronic calendars as well as the hard copy calendars,

17     although that is a closer call and I'll talk about that just

18     a bit.

19          But in that regard, I think Mr. Taylor's point,

20     which sort of translates to elevating form over substance,

21     if you will, I think that because entries on hard copy

22     calendars are also individual entries, and in this regard I

23     do think that the case law out there, albeit not in the

24     anti-trust context in which courts have not treated a

25     journal or a Day Timer or a diary as a single document, but

1    have said that individual entries should be produced as to

2    the extent relevant and responsive, although within any

3    individual entry you would not redact except as the ESI

4    Protocol permits.

5           So I'll apply this ruling both to hard copy and to

6    electronic documents and I'm persuaded that a wholesale

7    requirement that all calendar entries during the relevant

8    time period for all custodians, whether in hard copy or

9    electronically, goes against Rule 26 and the requirement of

10   relevance.

11          The question then is kind of what next.  I hear

12   the defendants saying that they would at a minimum read the

13   other requests, sort of the scope description of other

14   requests that have been made, onto the request for calendars

15   and produce responsive entries for calendars the same as

16   responsive entries for other types of documents and

17   communications.

18          That being said, I do agree with plaintiffs that

19   there are some respects in which calendar entries that

20   aren't on their face responsive or relevant -- well,

21   responsive, could still be relevant.  For example, I think

22   one of the points you made in your brief, Ms. Wagner, was

23   where were they?  And so you could have an appointment to

24   talk to so and so on Thursday, and potentially a note about

25   travel plans two days earlier would tell you something about

1    where that conversation was going to happen.

2            So what I'm going to require is that the parties

3    do meet and confer to try to come to a description of

4    relevant and, more particularly, responsive calendar entries

5    and see if you can get to agreement about what

6    responsibility the defendants are going to undertake to

7    produce calendar entries that fit those parameters.

8            With regard to the means of review, ultimately I

9    agree that's up to defendants, but I do think a good

10   conversation on that subject would also be helpful.  For

11   example, certainly hard copy calendars I think would be

12   immensely difficult to review other than manually.  And I

13   think a robust conversation about whether search terms will

14   be a part of a review strategy for electronic calendars or

15   whether there are additional means that would be taken, I'm

16   not saying that plaintiffs get to dictate that, but I do

17   think that a conversation about that and hopefully an

18   agreement on that subject could assist in avoiding the need

19   for repeating the work later.

20           But to that point, certainly, as Mr. Taylor

21   pointed out, you will have call records, you will have

22   e-mails, and if e-mails and call records and all of that

23   other discovery tells you down the line that there are

24   calendar entries that may have gotten missed, and those are

25   the kinds of gaps that get brought to the attention of the

1    other side and give rise either to a supplement or to a

2    motion requiring a supplementation.

3          So I'm denying the motion as framed, but I am

4    going to instruct you to have that meet and confer.

5    Whatever comes out of that, I want to be very clear with

6    defendants that I expect your written responses to reflect

7    clearly what scope you applied.  If it's an agreed scope,

8    then cite the agreement.  If you couldn't reach an agreement

9    and you came up with your own plan, describe the scope of

10   what you looked for.  I don't want you to say, Well, we

11   explained it in our brief; or, They should understood that

12   we were applying these other parameters from these other

13   requests.  Be clear in your response.  We looked for and we

14   produced calendar entries within the following parameters.

15         Mr. Taylor, do you understand what I'm getting at

16   there?

17         MR. TAYLOR:  Yes, Your Honor.

18         THE COURT:  Okay.  Any questions before we move on

19   to custodians, Ms. Wagner?

20         MS. WAGNER:  No, Your Honor.

21         THE COURT:  All right.  Mr. Taylor?

22         MR. TAYLOR:  No.  Thank you, Your Honor.

23         THE COURT:  All right.  So let's move on to the

24   issue of custodians.  And Mr. Pierce, I believe you were

25   going to be talking about custodians with respect to both of

1        the defendants.  Is that correct?

2                 MR. PIERCE:  Yes, that's correct, Your Honor.

3                 THE COURT:  All right.  Let me hear from you

4        there.

5                 MR. PIERCE:  Okay.  To start with, for JBS we have

6        asked for four custodians.  That would be Wesley Batista and

7        Don Jackson and Andrew Nogueira, who each served as CEO of

8        JBS USA during the relevant period.  We also asked for

9        Wesley Batista [sic] who was CEO of JBS South America, which

10       is the parent corporation of JBS USA and also, our

11       understanding, a controlling shareholder of JBS USA because

12       of the family's ownership of the company.

13                Our position is that these custodians are relevant

14       because we have good reasons for believing that each of them

15       had ultimate responsibility for JBS USA's pork operations.

16       JBS itself in its own brief stated that JBS USA does not

17       dispute some of the custodians had ultimate responsibility.

18       We understand JBS's point that those custodians, because

19       they were CEO of JBS USA, also oversaw other business units

20       at JBS USA; but we would also note that both Tyson and

21       Hormel are also large conglomerates who have multiple

22       business operations in various protein segments, and each of

23       those companies have designated those -- the CEOs of those

24       companies as custodians and we think the same is appropriate

25       here for JBS.

1          We think that the entire point of a search term

2     process is that it helps to narrow the ESI collected so

3     that, you know, through a combination of the search terms

4     that you hit upon, you're able to relatively easily -- I

5     don't mean to minimize the burden -- but if there is a

6     process that works, remove the relevant documents relating

7     to JBS's beef business and that should significantly lessen

8     any burden that JBS would face for designating these

9     individuals as custodians.

10          We have specific reasons for thinking that each of

11    these individuals have relevant information.  For example,

12    Mr. Batista gave several comments about JBS's pork

13    operations that we quoted in our complaint.  In particular,

14    in May 2013, Mr. Batista stated that given some restrictions

15    in supply, we have been able to pass price through the

16    system and we are seeing good margins in our pork business.

17    So this is a clear sign that we have been able to pass price

18    increases in chicken and pork.  We think that's a common --

19    that's very important for the central allegation in this

20    case, which is the supply restriction as well as

21    pass-through issues, which are important for class

22    certification and anti-trust impact.  So based on that kind

23    of statement, we think Mr. Batista should be a custodian.

24          We've also -- I think the case law is clear that

25    plaintiffs, when they make a request, should have reasons

1    for believing that ESI wouldn't be collected from other

2    sources.  We think there's good reasons to believe based on

3    JBS's own public statements that, for example, Mr. Batista

4    and Mr. Batista, the two brothers, were frequently and

5    directly communicating with each other; and if those

6    communications are just between them, then there's nobody

7    else who is going to have that ESI to the extent that it

8    exists in an e-mail.

9            Similarly, Mr. Jackson and Mr. Nogueira served as

10   CEO and CFO of JBS USA during a key portion of the

11   conspiracy period, and so we think that if they had a direct

12   e-mail communication and nobody else was on it, then it's

13   not going to be collected from other ESI.

14           So I think those were the key points I wanted to

15   hit initially.  Happy to take questions or move on to Tyson.

16           THE COURT:  Aren't there -- yes, in the sense that

17   one could always surmise that two people talk only with each

18   other and therefore if you don't collect from either of

19   them, you don't get those communications, but doesn't there

20   have to be some reason to anticipate that there are

21   communications that are truly pertinent to the issues here

22   and that wouldn't be reflected in the e-mails of the other

23   custodians?  I mean, yes, the CEO always has ultimate

24   responsibility, but that doesn't -- if that were the only

25   test, then every CEO would always have to be a custodian.

1          So I'm struggling with whether there's enough here

2    to show more than speculation that any of these individuals

3    have unique information within their e-mail accounts that

4    wouldn't either be in the e-mail accounts of the custodians

5    that are being searched or wouldn't be discernible once the

6    results of that production -- of that search were produced.

7          MR. PIERCE:  Sure.  We -- I understand that

8    concern, Your Honor.  I think we have a reasonable basis for

9    thinking that they have unique ESI based on their positions

10    in the company.  We also would note that we're talking about

11    several different individuals who we think are likely

12    communicating with each other about a very significant part

13    of JBS's business operations.  Our understanding is JBS USA

14    primarily has two business units, the pork business unit and

15    the beef business unit.

16          So we think this is distinct, for example, from a

17    case where you have a CEO of a large company and you're

18    dealing with an employment dispute or a dispute for a very

19    small segment of the company's business operations.  We're

20    talking about an important segment of the company's business

21    operations.

22          And we would also note that JBS provided a

23    declaration from Mr. Gaddis that simply stated how much ESI

24    just one of the custodians, Mr. Nogueira, had.  But they

25    have not done anything to show that, for instance, we have

1    done an initial look and there are no documents that are

2    uniquely hitting on these custodians' ESI versus the

3    custodians that we have already offered.  So based on that,

4    we think that we have a reasonable basis for thinking that.

5            We'd also note that based on the public statements

6    that Mr. Batista and Mr. Jackson and Mr. Nogueira also offer

7    public statements on JBS's pork operations, that these are

8    reasonable candidates for deposition.  And so we think in

9    order to take an effective deposition of them, it would be

10   reasonable to want their ESI up front.  So I also wanted to

11   flag that issue.

12           THE COURT:  Of course, I would imagine that if at

13   that point we'll probably be looking at motion practice

14   about apex depositions, right?

15           MR. PIERCE:  Sure, sure.

16           THE COURT:  All right.  Okay.  Anything else

17   before I hear from Mr. Rashid?

18           MR. PIERCE:  No, Your Honor.

19           THE COURT:  So Mr. Rashid, what about the point

20   that alone among the defendants here JBS is the only one

21   that has not included among its custodians the CEO or CEOs

22   during the relevant time period?

23           MR. RASHID:  Yeah.  I think, Your Honor -- first

24   of all, good morning and happy new year.  That's a fair

25   point to raise and I think it -- I mean, I think you need to

1    start with the standard, the legal standards surrounding

2    these types of disputes.  And I think if you look at page 11

3    of plaintiffs' briefs, they cite to the Sedona Principles

4    and they say:  For the purposes of resolving disputes over

5    designated ESI custodians, determining what is relevant and

6    proportional under the circumstances of each matter often

7    requires a highly fact-specific inquiry.  And we agree with

8    that, which is why we don't agree with the assertion that

9    being a CEO automatically makes you a document custodian.

10          But more to that, plaintiffs omit from their brief

11   that very next line in the Sedona Principles which states:

12   Thus the responding party, not the court or the requested

13   party, is both tasked with making those determinations and

14   generally in a better position to make those decisions.

15          And it's just simply not the case that because

16   other defendants determined for sake of compromise or for

17   sake of the way those companies were managed they were

18   willing to propose or accept their CEOs as custodians, it

19   doesn't mean that that's necessarily true here.  And I think

20   that what we've tried to show, Your Honor, through our brief

21   and through the declaration of Mr. Gaddis, who has been with

22   the company in senior human resources and legal roles since

23   2007 and beyond covering the entire relevant time period, is

24   that people who are really making the relevant decisions

25   that lie at the heart of plaintiffs' case, which are

1       decisions about, as they say on page 11 of their brief,

2       business decisions regarding pork supply, output and

3       pricing, that is the Pork Management Team.  That is

4       literally what that group, that leadership group is called,

5       and they meet day in and day out, and they manage and make

6       the decisions about the company's procurement and raising of

7       hogs for pork processing.  They make decisions about how

8       much their pork is going to be produced, and they make

9       decisions about the price at which the pork is sold.

10              And so the CEO, the disputed custodians, aren't

11      involved in those decisions that lie at the heart of this

12      dispute.  And that is why we said, you know, No, we don't

13      think they are necessary.  You know, we're not going to

14      limit our proposal at the end of the day to just the Pork

15      Management Team, although frankly I think that's defensible.

16      We ended up giving them a bunch more custodians so we're up

17      to 28 custodians.

18              But we said with respect to the CEOs and

19      Mr. Joesley Batista, who had no management role whatsoever

20      at JBS USA, we said, you know, they weren't involved in

21      these decisions.

22              So I don't think it's necessarily a situation

23      where what's good for the goose is good for the gander.

24      What's good for the other defendants is necessarily good for

25      JBS.

1          I think what we've tried to do is in conformity

2     with the case law make a determination that, in the words of

3     the *EpiPen* court, you know, these are not the -- you have to

4     assess both the level of involvement in discussions and

5     decisions serving as the basis for the claims at issue in

6     this case, end quote.  And I think as the *EpiPen* court went

7     on to say that mere speculation is not a basis for

8     designating senior executives of custodians.

9          And so what we have tried to explain to plaintiffs

10    first, and now to Your Honor in our briefing, is that we do

11    not believe the disputed custodians satisfy that criteria.

12    And, you know, Mr. Pierce pointed to some things that he

13    maintained satisfied that type of criteria.  But I think,

14    you know, I may be over reading some of Your Honor's

15    questions, but I think a lot of that, a lot of the

16    information that Mr. Pierce provided could be characterized,

17    as it is in a lot of the cases that we cited, as the type of

18    sort of generalized assertions that just because someone is

19    a senior executive they must have relevant and unique

20    information.

21          But that is not the approach that the courts take

22    in resolving these issues.  They really hold plaintiffs to a

23    higher standard in terms of showing, getting through the

24    gate and demonstrating factually that the disputed senior

25    executives have unique information about the decision making

1  that's at issue in the case before they allow them to be

2  document custodians.

3          And we see that in the *EpiPen* case.  I mean, the

4  *EpiPen* case, the court ordered the inclusion of the CEO

5  because plaintiffs sufficiently demonstrated that he was,

6  quote, involved in discussions and decisions regarding the

7  relevant price increases.  That's not the case here.

8          But in contrast, in the *Krueger* case the Court

9  came out the opposite way, which we cite to, because it

10  determined that the disputed custodian wasn't involved in

11  the decision making at issue.

12          So, you know, I think what we've tried to do and

13  what we have done is appropriate given the realities of

14  decision making at the company and in line with the case law

15  on these types of issues.

16          THE COURT:  What about Mr. Pierce's query about,

17  well, have you done any testing, have you done any sampling,

18  to see -- to test your assumption that there wouldn't be

19  anything unique in those accounts?

20          MR. RASHID:  Well, right, Your Honor, I think you

21  correctly surmised you're always going to expect that two

22  different people are going to have some unique documents,

23  right?  And so there is a proportionality analysis that

24  would have to be built into that.  But we haven't done any

25  specific testing, but what we have done is we've talked to

44

1      the company, we've talked to -- we understand how the Pork

2      Management Team works, and we understand the function and

3      the role of the disputed CEO custodians in that framework.

4           And it's undoubtedly clear, and we do not dispute,

5      that the CEOs have ultimate responsibility over the pork

6      business.  But as we point out, they have ultimate

7      responsibility over beef and lamb and even operations in

8      Australia.

9           And so I think we feel very comfortable on the

10     basis of our inquiry to say that to the extent the -- these

11     individuals were apprised of relevant pricing, procurement

12     or production decisions, those interactions are going to be

13     reflected in any interactions they had with the Pork

14     Management Team during the time, including the president of

15     the pork -- the President and the Chief Operating Officer of

16     the Pork Management Team during this entire period,

17     Mr. Marty Dooley.  He held that role from 2007 to late 2019,

18     so he was there for the entire period, and he's going to be

19     a document custodian.

20          And so to the extent that they are getting updates

21     on the business, it's going to be with him.  To the extent

22     they are asking questions about the business, it's going to

23     be through him.

24          So I can't say definitively, Your Honor, that

25     there's not going to be a single or any unique

1    communications out there as you yourself noted.  But I do

2    think that in sort of the context of the inquiry that we've

3    done with the company and the inquiry -- and the analysis

4    that the courts do in disputes like this as reflected by the

5    case law that we have cited, we have made a sufficient

6    showing to -- that plaintiffs -- that plaintiffs' request

7    here is at the very least premature and if not, you know, if

8    it shouldn't be entirely rejected.

9         THE COURT:  All right.  Mr. Pierce, anything

10   further on the JBS issue before I have you turn to Tyson?

11        MR. PIERCE:  Sure.  Just a few quick points.

12        Mr. Rashid acknowledged that there may be some

13   unique ESI for these custodians.  In fact he said that he

14   would expect that.  What I would say is that in anti-trust

15   cases these cases often turn on a relatively small number of

16   documents.

17        Another key issue in anti-trust law is the

18   seniority of the executives responsible for making

19   decisions.  For example, the common thing is shop talk among

20   sales reps is often not enough to survive summary judgment;

21   whereas, in comparison, I would think the shop talk among

22   CEOs would be enough to survive summary judgment.  And so

23   the fact that these CEOs who have ultimate responsibility of

24   the business have some unique ESI and are ultimately

25   responsible for the key business decisions on which

1     liability is going to rest in this case, to us justifies

2     under the relevance standards that it is proportional to

3     designate these individuals as custodians, especially since

4     Mr. Rashid has not provided any specific documentation of

5     how much unique ESI they have, or any additional information

6     besides a simple note that one of the custodians has a large

7     number of documents in his file.

8              THE COURT:  Okay.  Mr. Rashid, yes, you wanted to

9     respond.

10             MR. RASHID:  Right.  Your Honor, I mean, I think

11    when we're -- under Mr. Pierce's theory, respectfully, a CEO

12    would be a custodian in every anti-trust case and perhaps

13    almost any case because they are going to have some amount

14    of unique ESI.

15             And just to address briefly, because I didn't

16    touch on it before, this point about burden.  You know, we

17    have conducted a preliminary review.  We know that -- we

18    know that the document custodians have, at least with

19    respect to the e-mails, hundreds of thousands of documents

20    not including attachments.  But more to that, Your Honor, I

21    think since these disputed custodians are the ones

22    overseeing broader businesses, broader business issues,

23    including as to unrelated products and unrelated markets,

24    they are going to likely possess a high volume of irrelevant

25    and commercially-sensitive materials that would require a

47

1    more time consuming and more burdensome review than with

2    respect to the Pork Management Team.

3          And I'd also point out, Your Honor, with respect

4    to that under the ESI Protocol order, sort of as it came up

5    in the portion of the argument on calendars, in

6    Section II(K), we're allowed to redact otherwise responsive

7    documents or, quote, highly-confidential business

8    information relating to non-pork businesses.

9          Now, these individuals are going to have a lot of

10   highly-confidential business information relating to non-

11   pork businesses.  And so whatever that small amount of, you

12   know, unique ESI they may have, there's going to be a ton of

13   materials hit by plaintiffs' search terms that are going to

14   require a very burdensome review.

15          And, you know, there was a reference to

16   plaintiffs' proposed search terms in the last argument, and

17   just to -- and we're working with the plaintiffs on that.

18   We're hoping to reach an agreement with them.  But the

19   latest proposal that we have from them has 325 search terms

20   which reflect literally thousands of combinations.  And they

21   are broad.  They have words like "beef" and "chicken" in

22   them.  They have search terms for things like "price

23   expectation" or "pricing power," without any connection to

24   pork.  Another search string is "competition within 25 of

25   trend, challenge or outlook."  Another search term is

1      "highest within five of years, decade, cost or costs."

2              And so -- and we're still working through that,

3      Your Honor, but suffice to say we're going to end up

4      hopefully by agreement with a world -- in a world where

5      there's still going to be a hopefully narrowed but still

6      broad universe of search terms.  And when you're applying

7      them to people who are not involved in the decision making

8      that is at the heart of this litigation and who have

9      oversight over completely unrelated businesses, it is going

10     to make the review extremely burdensome.

11             Thank you, Your Honor.

12             THE COURT:  All right.  Thank you.

13             Let's turn to the custodian issue with regard to

14     Tyson.  And Mr. Pierce, you're up again.

15             MR. PIERCE:  Your Honor, I don't mean to stay on

16     JBS.  I just wanted to point out that we think it's

17     premature and unproductive to start discussing search term

18     negotiations that are in progress and their relevance to

19     this custodian dispute, so I'm not going to get into that.

20             What I would say is at the very least we think

21     that once we do finalize search terms, it would be very

22     helpful for understanding JBS's burden to see how those

23     search terms work when they are applied to these disputed

24     custodians, how many unique hits they generate, and that

25     would help us better understand both sides' positions.

1          But I will now turn to Tyson unless you want to --

2          THE COURT:  All right.  Mr. Rashid, was there

3   something you absolutely, positively needed to say in

4   response to that?

5          MR. RASHID:  Just, Your Honor, that that is not

6   the approach under the cases that have been cited by both

7   sides.  Plaintiffs have to come forward with a sufficient

8   factual showing.  They have to get out of the gate; and

9   respectfully, we don't believe plaintiffs have done so here.

10          THE COURT:  I understand.

11          All right.  Mr. Pierce, that doesn't necessarily

12   mean I agree, Mr. Pierce.  I'm just saying I understand the

13   point being made.

14          MR. PIERCE:  I won't test Your Honor's patience

15   any further.

16          THE COURT:  I understand the pertinence of the

17   reference to the discussion about search terms, but let's

18   talk about Tyson.

19          MR. PIERCE:  Thank you, Your Honor.

20          I think the dispute with Tyson should hopefully be

21   simpler to address or at least to state our positions.  Don

22   and John Tyson were both involved in the company's

23   operations.  Mr. John Tyson was chairman of the board

24   throughout I think the entire relevant period.  Don Tyson

25   for a short period of time was prominently involved in the

1    company's operations based on contemporaneous accounts at

2    the start of the relevant period.  We think -- we understand

3    that not all chairmen of the board should be custodians by

4    any means, but here we're talking about two individuals who,

5    because of their family status, control the company by

6    having a super majority of the voting shares.  So we think

7    their status is a little different than just an ordinary

8    chairman of the board or board member.

9           And we would also note for Don Tyson that he is --

10   his ESI would run a relatively short period of time from I

11   think approximately 2009 to 2011, so we think that would

12   further minimize the burden of, again, assigning him as a

13   custodian.  So that would be our basis for these

14   individuals.

15          THE COURT:  All right.  Other than -- well, I'll

16   probably circle back with that question, but I think I -- I

17   don't need you at this point.  Let me hear from

18   Ms. Rohrbaugh in response.

19          MS. ROHRBAUGH:  Yes, Your Honor.  Thank you.

20          So this is similar to what we have been hearing,

21   just merely that these two individuals are board members.

22   Even a chairman of the board does not seem to tie them to

23   any sort of decision making that is relevant in this case.

24   The fact that their name is Tyson, whether they were the

25   grandson or the son of someone who founded the company in

1    the 1930s or 40s does not indicate that they would have

2    information that is relevant to this case.

3           Just to sort of clarify a little bit on these two

4    individuals, they were just board members, not executives

5    during the time period.  Don Tyson has not been the CEO

6    since 1991.  That's nearly 20 years prior to the start of

7    the relevant time period and it's 10 years prior to Tyson's

8    acquisition of its pork business.  So the pork business

9    wasn't even acquired until 2001; and yes, he passed away in

10   2011, which would be early in this timeframe of the relevant

11   time period alleged by the plaintiffs.

12          John Tyson, his son, hasn't been CEO since 2006,

13   and it was over two years prior to the start of the relevant

14   time period.

15          So there's not been anything to substantiate, and

16   that is the burden, we agreed with Mr. Rashid of the

17   standard and the burden that needs to be met here.  We do

18   not feel it's been met.  We have worked with the plaintiff

19   to explain the status of these individuals.

20          And I do sort of want to correct that we did not

21   volunteer the CEOs.  We started with a list of, probably

22   similar to what we're hearing from Mr. Rashid, of

23   individuals making pork decisions.  The pork headquarters is

24   actually in South Dakota.  The individuals that are the CEOs

25   and the CFOs sit in Arkansas where the chicken headquarters

1    is.  So this is states away from one another, and their

2    allegations of, you know, references to John or Don Tyson

3    having offices near the CEO in Arkansas to us has little to

4    do with whether they could have walked down the hall and

5    talked to anyone related to the pork business which is

6    situated in South Dakota.

7            So we worked with the plaintiffs.  We offered 29

8    custodians.  We walked through, did our diligence of who

9    here has relevant information covering pricing, procurement,

10   sales, operation, production, finance; then into investor

11   relations and Agri Stats as requested by the plaintiffs, in

12   describing to them the structure and that they have relevant

13   people.

14           It was actually in a mode of comprise that they

15   requested our CEOs and our CFOs, we agreed to give the CEOs

16   and CFOs.  We do not know that they are the prime people to

17   be targeted for this information, but we conceded that we

18   would give them, but that's not a concession that they were

19   the relevant individuals.  So I do just want to make sure

20   that is corrected.

21           There is the predominant focus on chicken for

22   these individuals, the CEOs and CFOs.  But these board

23   members, Don Tyson and John Tyson that the plaintiffs are

24   now requesting, are even a step beyond any of these

25   executives and, you know, during this time period.  We then

1    offered a further compromise, a wait-and-see approach.  If

2    you see information within the custodians, you know, we

3    could entertain that at a later time.

4            We don't think that there's any basis, we don't

5    think there will be any basis, to have to bring these

6    individuals in as custodians, and we don't think that the

7    plaintiffs have met their burden.

8            THE COURT:  I guess I would maybe describe the

9    wait-and-see approach as a compromise.  That's always --

10   that's always a possibility that when discovery -- that's

11   how it works is that when discovery is produced, everybody

12   looks at it and if there's reason to believe in what was

13   produced that there are gaps, there are unique information,

14   there's proportionate information out there elsewhere, I'm

15   not sure it's a compromise to say, Well, we'll talk about

16   that.  You would be required to at least talk about that.

17           MS. ROHRBAUGH:  Yes, Your Honor.  I guess we were

18   just opening it up that we would be happy to discuss that at

19   any time.  They wouldn't need to do anything formal to

20   engage in those kind of discussions.  Because what is

21   required is that they meet the burden of showing that these

22   individuals have some basis here for decision making

23   relevant to this case.  And, you know, as I will note, some

24   courts consistently hold that simply pointing to someone's

25   hiring and title is not enough.  And that seems to be really

1    all that they have done with regard to these board members

2    that are not even executives.

3              THE COURT:  Thank you.

4              Mr. Pierce, you have the last word here.

5              MR. PIERCE:  We did not mean to imply that Tyson

6    had initially offered its CEOs as custodians and we do

7    appreciate, you know, that we were able to reach an

8    agreement with them regarding the inclusion of CEOs as part

9    of a compromise for the large majority of Tyson's

10   custodians.  We do want to assure the Court that we are not

11   pursuing a blind vendetta against all Tyson family members.

12   For instance, Barbara Tyson is a director for Tyson Foods.

13   We have not at any point asked for her as a custodian.  Our

14   request for John and Don Tyson is based on our understanding

15   of their role of the company.

16             But I think at this point both sides have stated

17   their positions pretty clearly so I don't have anything else

18   to add.

19             THE COURT:  Okay.  Let me -- I'm going to go off

20   camera for just a few minutes.  I want to go back and review

21   some things on this one.  I'd like to give you a decision

22   from the bench on this one as well, but I need just a few

23   minutes to consolidate my thinking.

24             So feel free to block video and mute your

25   microphones.  Just keep an eye out for when I reappear.

1              (Pause in proceedings from 10:54 to 11:02 a.m.)

2              THE COURT:  All right.  So I'm seeing Mr. Pierce,

3     Mr. Rashid, Ms. Rohrbaugh, and our court reporter, and I've

4     got all sorts of other boxes but I think the pertinent folks

5     are back on screen.

6              So having gone back and not only considered

7     counsels' arguments, of course, but also looked again at the

8     declarations, I am going to deny plaintiffs' motion with

9     respect to both Tyson and JBS custodians at this time, and

10    without prejudice to the opportunity to bring the issue back

11    if a more specific showing can be made as discovery

12    continues.

13             In determining whether to compel inclusion of a

14    senior -- of a senior executive as an ESI custodian, I do

15    look to the Sedona Principles and the fact that the courts

16    consider both that senior executive's level of involvement

17    in the pertinent decisions and discussions, as well as

18    whether the ESI is likely to be unique and not available

19    from other designated custodians.

20             In addition, both the Sedona Conference and the --

21    among others, the judge in the *EpiPen* decision that was

22    cited by defendants, do note, and I agree, that the party in

23    the best position to make custodial decisions is the party

24    who is responding to the discovery requests.  And the Court,

25    I think, generally should be loathe to mandate additional

1    custodians without a more specific reason to believe either

2    that the production that has been made is deficient or that

3    it was just manifestly unreasonable to leave the person out

4    in the first place.

5          And that showing just hasn't been made, given what

6    I've got here at this point in discovery.  It could be made

7    at some point; and if so, obviously the first thing that

8    needs to happen is to meet and confer and hopefully that

9    will resolve it.  If not, then you come back to me and there

10   may need to be some additional work done by defendants.  But

11   I -- what I have on the record at this point doesn't

12   persuade me that that showing has been made and that these

13   additional custodians ought to be mandated.  So I'm denying

14   the motion at this point for those reasons.

15         I think that covers the motion -- motions that

16   were -- I guess one motion, several points, that were in

17   front of me today.  But there is one other thing I want to

18   get on your radar, ask you all to meet and confer about, and

19   get back to me on it.  And that is whether it would make

20   sense to consolidate for administrative purposes under a

21   single caption the Winn-Dixie and Puerto Rico cases.

22         And I will note again here, as I did at the

23   beginning of the hearing, that Winn-Dixie and Puerto Rico

24   plaintiffs' counsel are -- unless they have dropped off, are

25   attending the hearing.  It is administratively a hassle,

1    I'll just put it that way, to manage the three different

2    dockets.  Now, I recognize that there is a difference in

3    plaintiffs' counsel among those cases.  I know that the

4    cases have -- there's been no motion to consolidate those

5    cases on more substantive grounds.

6            On the other hand, we are going to have a

7    scheduling order that sets a schedule for both the

8    *In Re: Pork* case and -- the currently consolidated case and

9    those other two cases that will set the same schedule across

10   the board.  And it just strikes me that administratively it

11   would be simpler for all concerned to have one docket,

12   although any particular motion could certainly designate if

13   it is In Re: Pork specific or Winn-Dixie or Puerto Rico

14   specific.  We can address that.

15           But all I would like you to do today, I'm not

16   looking for an immediate response, all I'd like you to do is

17   meet and confer with each other and get back to me by filing

18   a letter -- I suppose at this point it would have to be a

19   letter filed on all three dockets -- that gives me your

20   input about that.  If you have diverging opinions, you could

21   describe those diverging positions.  But let me know what

22   you think of that and, if it's going to be done, what

23   parameters you would propose setting.

24           I see Ms. Wagner, at least, waving a hand.  Yes,

25   Ms. Wagner.

1          MS. WAGNER:  Yes, if I could, the parties have

2     been discussing consolidation and we do have a draft

3     stipulation in progress.

4          THE COURT:  Bless you.  That's good news to start

5     2021 with.  So when do you think you would be able to kind

6     of wrap up that conversation and get something in front of

7     me?

8          MS. WAGNER:  I mean, I don't want to speak on

9     behalf of everybody, but my feeling is end of next week.

10         THE COURT:  That would be fine.  That would be

11    fine.  I tell you what.  I will look for something by the

12    end of next week.  If you get toward Thursday of next week

13    and it looks like you need a little while longer to get it

14    wrestled into submission, just send an e-mail to chambers

15    and let me know it looks like it's going to be the following

16    Wednesday or whatever.

17         So if not Friday, if not next Friday, then give me

18    some update about when I could look for it instead.  But I

19    will then back off and let you do what it sounds like you

20    were already working on doing, so thank you for that.

21         Anything else that we need to take up at this

22    time?

23         Going once, going twice.  All right.  Thank you

24    all.  And we are adjourned.

25         MR. PIERCE:  Thank you, Your Honor.

1          MR. RASHID:  Thank you, Your Honor.

2          MS. WAGNER:  Thank you, Your Honor.

3          (Court adjourned at 11:09 a.m.)

4                         *     *     *

5

6

7          I, Carla R. Bebault, certify that the foregoing is

8     a correct transcript from the record of proceedings in the

9     above-entitled matter.

10

11

12          Certified by:   s/Carla R. Bebault
                             Carla Bebault, RMR, CRR, FCRR
13

14

15

16

17

18

19

20

21

22

23

24

25