# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

IN RE PORK ANTITRUST LITIGATION

This Document Relates to:

All Consumer Indirect Purchaser Actions

Civil No. 18-cv-1776 (JRT/HB)

CONSUMER INDIRECT
PURCHASER PLAINTIFFS'
~~SECOND~~ THIRD AMENDED
CONSOLIDATED CLASS ACTION
COMPLAINT

DEMAND FOR JURY TRIAL

**(REDACTED VERSION)**

**TABLE OF CONTENTS**

$\underline{\text{Page}}$

I.    NATURE OF ACTION ................................................................. 1

II.   SUMMARY OF PARTIES ............................................................ 7

III.  FACTUAL ALLEGATIONS ........................................................... 8

    A.    Agri Stats enabled competitors to directly exchange, and restrain, supply and cost. .................................................................. 8

        1.    Agri Stats' detailed pricing reports provide competitors with a view of the entire market, removing all question of competition on price. ......................................................... 9

        2.    Beyond the pricing reports themselves, Agri Stats allowed the pork processors to directly access sales data through a "sales data miner" tool. ........................................................ 21

        3.    Just in case weekly sales reports and data mining were not enough to ensure the lack of pricing competition, Agri Stats also provided colorful graphs to highlight any differences in competitors' prices. ................................... 26

        4.    The Operations Profit Report provided competitors with information on the profitability of their competitors – allowing a further means to detect any cheating on the cartel. ..................................................................... 30

        5.    The Agri Stats Swine Processing Report provided detailed information regarding costs of the competitors. ........................... 34

    B.    Agri Stats' collection and standardization process provided pork processors the unparalleled ability to monitor, or discipline co-conspirators for not complying with their collusive agreement. ............... 39

        1.    Agri Stats audited the data to ensure co-conspirators could not cheat on the agreement. ............................................. 40

        2.    Agri Stats guaranteed to the co-conspirators that its competitors were equally participating in the scheme. .................. 43

        3.    Agri Stats acted as a gatekeeper, preventing public access to the reports, ensuring that the conspiracy went undetected. ............................................................. 46

010736-11/1208328 V1

C.	Agri Stats reports were easily deanonymized by the pork processors. ...........................................................................47

D.	Agri Stats succeeded in orchestrating the pork conspiracy because it leveraged its success in the chicken industry, and because both industries are controlled by the same companies.................50

    1.	Agri Stats is a repeat offender, playing a crucial role in a similar price-fixing and supply constraint conspiracy in the sale of chickens. ......................................................50

    2.	The same companies own both chickens and pigs. .........................52

E.	Defendants' conspiracy had its intended effect, with pork processors lowering supply during the class period both in the aggregate, and individually.........................................................................53

F.	Defendants' conspiracy had the intended effect of raising prices of pork during the class period................................................................61

    1.	The average hog wholesale price experienced an unprecedented increase beginning in 2009. ...................................62

    2.	The pork cut-out composite price experienced a dramatic increase beginning in 2009 and continuing throughout the class period. ...................................................................63

    3.	Pork processors' margin increased beginning in 2009 showing a statistically significant break from the pre-class period. ...........................................................................63

    4.	Defendants' revenues increased beginning in 2009, even taking into account defendant-specific costs.................................65

    5.	Overcharges due to the cartel were passed through to the indirect purchaser class. .................................................67

G.	The structure of the pork processing industry allowed the conspiracy to succeed. ....................................................................69

    1.	The pork industry is nearly fully vertically integrated, which allowed the scheme to succeed.............................................70

    2.	The level of concentration in the pork industry was optimal for the alleged collusive scheme. ......................................72

010736-11/1208328 V1

3.    Barriers to entry helped to keep competitors out of the pork integration market and ensure the success of the conspiracy. ......................................................... 77

H.    Defendants actively concealed the conspiracy and plaintiffs did not and could not have discovered defendants' anticompetitive conduct. ............................................................... 77

IV.   PLAINTIFFS ALLEGE VIOLATIONS UNDER BOTH THE *PER SE* AND RULE OF REASON STANDARDS OF THE SHERMAN ACT ............... 81

1.    The Unlawful Agreements ............................................. 82

2.    Defendants' information exchanges had the likely effect of harming competition. ................................................ 84

a.    Defendants have market power in the market for pork. ..................................................... 84

b.    There are high barriers to entry in the market for pork for meat consumption. ................................ 84

c.    The defendants have market power in the market for pork for meat consumption. ............................ 84

3.    The market for pork is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition. ........................................ 85

a.    The pork market features few sellers ................................. 85

b.    Pork is a fungible market .................................... 86

c.    The pork market features price-based competition ............. 86

d.    Demand for pork is relatively inelastic ............................... 87

e.    The pork market features a trend towards price uniformity. ........................................................ 87

4.    Defendants' information exchanges corrupted the competitive process. ....................................................... 88

V.    JURISDICTION AND VENUE ........................................................ 90

VI.   PARTIES ...................................................................................... 91

- iii -

A.    Plaintiffs ................................................................... 91

B.    Defendants ................................................................. 101

VII.   CLASS ACTION ALLEGATIONS .................................................. 104

VIII.  ANTITRUST INJURY ...................................................................... 110

IX.    CAUSES OF ACTION.................................................................... 112

VIOLATION OF THE SHERMAN ACT .................................................... 112

FIRST CLAIM FOR RELIEF VIOLATION OF SECTION 1 OF THE
     SHERMAN ACT 15 U.S.C. § 1 FOR CONSPIRACY TO RESTRAIN
     PRODUCTION (ON BEHALF OF NATIONWIDE CLASS FOR
     INJUNCTIVE AND EQUITABLE RELIEF)....................................... 112

SECOND CLAIM FOR RELIEF VIOLATION OF SECTION 1 OF THE
     SHERMAN ACT 15 U.S.C. § 1 FOR CONSPIRACY TO EXCHANGE
     COMPETITIVE INFORMATION (ON BEHALF OF NATIONWIDE
     CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF)........................... 113

VIOLATIONS OF STATE ANTITRUST LAWS........................................... 116

THIRD CLAIM FOR RELIEF VIOLATION OF ARIZONA'S UNIFORM
     STATE ANTITRUST ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ.*
     (ON BEHALF OF THE ARIZONA CLASS)....................................... 116

FOURTH CLAIM FOR RELIEF VIOLATION OF CALIFORNIA'S
     CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16700, *ET SEQ.*
     (ON BEHALF OF THE CALIFORNIA CLASS) ................................... 117

FIFTH CLAIM FOR RELIEF VIOLATION OF THE DISTRICT OF
     COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501, *ET SEQ.*
     (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)....................... 119

SIXTH CLAIM FOR RELIEF VIOLATION OF THE ILLINOIS
     ANTITRUST ACT, 740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.*
     (ON BEHALF OF THE ILLINOIS CLASS)....................................... 120

SEVENTH CLAIM FOR RELIEF VIOLATION OF THE IOWA
     COMPETITION LAW IOWA CODE § 553.1, *ET SEQ.* (ON BEHALF
     OF THE IOWA CLASS).................................................. 121

EIGHTH CLAIM FOR RELIEF VIOLATION OF THE KANSAS
    RESTRAINT OF TRADE ACT KAN. STAT. ANN. § 50-101, *ET SEQ.*
    (ON BEHALF OF THE KANSAS CLASS)......................................................... 122

NINTH CLAIM FOR RELIEF VIOLATION OF THE MAINE'S
    ANTITRUST STATUTE ME. REV. STAT. ANN. TIT. 10 § 1101, *ET
    SEQ.* (ON BEHALF OF THE MAINE CLASS) .................................................. 123

TENTH CLAIM FOR RELIEF VIOLATION OF THE MICHIGAN
    ANTITRUST REFORM ACT MICH. COMP. LAWS § 445.771, *ET
    SEQ.* (ON BEHALF OF THE MICHIGAN CLASS)........................................ 124

ELEVENTH CLAIM FOR RELIEF VIOLATION OF THE MINNESOTA
    ANTITRUST LAW, MINN. STAT. § 325D.49, *ET SEQ.* (ON
    BEHALF OF THE MINNESOTA CLASS)...................................................... 125

TWELFTH CLAIM FOR RELIEF VIOLATION OF THE MISSOURI
    MERCHANDISING PRACTICES ACT, MO. ANN. STAT. § 407.010,
    *ET SEQ.* (ON BEHALF OF THE MISSOURI CLASS)................................... 128

THIRTEENTH CLAIM FOR RELIEF VIOLATION OF THE NEBRASKA
    JUNKIN ACT, NEB. REV. STAT. § 59-801, *ET SEQ.* (ON BEHALF
    OF THE NEBRASKA CLASS) ........................................................................ 129

FOURTEENTH CLAIM FOR RELIEF VIOLATION OF THE NEVADA
    UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010,
    *ET SEQ.* (ON BEHALF OF THE NEVADA CLASS)...................................... 130

FIFTEENTH CLAIM FOR RELIEF VIOLATION OF NEW HAMPSHIRE'S
    ANTITRUST STATUTE, N.H. REV. STAT. ANN. TIT. XXXI, § 356,
    *ET SEQ.* (ON BEHALF OF THE NEW HAMPSHIRE CLASS)...................... 132

SIXTEENTH CLAIM FOR RELIEF VIOLATION OF THE NEW MEXICO
    ANTITRUST ACT, N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.* (ON
    BEHALF OF THE NEW MEXICO CLASS)................................................... 133

SEVENTEENTH CLAIM FOR RELIEF VIOLATION OF SECTION 340 OF
    THE NEW YORK GENERAL BUSINESS LAW (ON BEHALF OF
    THE NEW YORK CLASS) ............................................................................ 134

EIGHTEENTH CLAIM FOR RELIEF VIOLATION OF THE NORTH
    CAROLINA GENERAL STATUTES, N.C. GEN. STAT. § 75-1, *ET
    SEQ.* (ON BEHALF OF THE NORTH CAROLINA CLASS) .......................... 135

010736-11/1208328 V1

NINETEENTH CLAIM FOR RELIEF VIOLATION OF THE NORTH
     DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE
     § 51-08.1, *ET SEQ*. (ON BEHALF OF THE NORTH DAKOTA
     CLASS) .................................................................................................. 136

TWENTIETH CLAIM FOR RELIEF VIOLATION OF THE RHODE
     ISLAND ANTITRUST ACT, R.I. GEN LAWS § 6-36-1, *ET SEQ*. (ON
     BEHALF OF THE RHODE ISLAND CLASS) .................................................. 137

TWENTY-FIRST CLAIM FOR RELIEF VIOLATION OF THE
     TENNESSEE TRADE PRACTICES ACT, TENN. CODE, § 47-25-
     101, *ET SEQ*. (ON BEHALF OF THE TENNESSEE CLASS).......................... 138

TWENTY-SECOND CLAIM FOR RELIEF VIOLATION OF THE UTAH
     ANTITRUST ACT, UTAH CODE ANN. §§ 76-10-911, *ET SEQ*. (ON
     BEHALF OF THE UTAH CLASS) ................................................................ 140

TWENTY-THIRD CLAIM FOR RELIEF VIOLATION OF THE WEST
     VIRGINIA ANTITRUST ACT, W. VA. CODE §47-18-1, *ET SEQ*.
     (ON BEHALF OF THE WEST VIRGINIA CLASS)........................................ 141

VIOLATIONS OF STATE CONSUMER PROTECTION LAWS .............................. 142

TWENTY-FOURTH CLAIM FOR RELIEF VIOLATION OF
     CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. &
     PROF. CODE § 17200, *ET SEQ*. (THE "UCL") (ON BEHALF OF
     THE CALIFORNIA CLASS).......................................................................... 142

TWENTY-FIFTH CLAIM FOR RELIEF VIOLATION OF THE DISTRICT
     OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT,
     D.C. CODE § 28-3901, *ET SEQ*. (ON BEHALF OF THE DISTRICT
     OF COLUMBIA CLASS) .............................................................................. 144

TWENTY-SIXTH CLAIM FOR RELIEF VIOLATION OF THE FLORIDA
     DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT.
     § 501.201(2), *ET SEQ*. (ON BEHALF OF THE FLORIDA CLASS) ............... 146

TWENTY-SEVENTH CLAIM FOR RELIEF VIOLATION OF THE
     HAWAII REVISED STATUTES ANNOTATED §§ 480-1, *ET SEQ*.
     (ON BEHALF OF HAWAII CLASS).............................................................. 148

TWENTY-EIGHTH CLAIM FOR RELIEF VIOLATION OF THE ILLINOIS
     CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES
     ACT, 815 ILL. COMP. STAT. ANN. 505/10A, *ET SEQ*. (ON BEHALF
     OF THE ILLINOIS CLASS)........................................................................... 149

010736-11/1208328 V1

TWENTY-NINTH CLAIM FOR RELIEF VIOLATION OF THE
      NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT. §
      59-1602, *ET SEQ*. (ON BEHALF OF THE NEBRASKA CLASS) .................. 153

THIRTIETH CLAIM FOR RELIEF VIOLATION OF THE NEVADA
      DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. §
      598.0903, *ET SEQ*. (ON BEHALF OF THE NEVADA CLASS) ..................... 154

THIRTY-FIRST CLAIM FOR RELIEF VIOLATION OF THE NEW
      MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-3,
      *ET SEQ*. (ON BEHALF OF THE NEW MEXICO CLASS) ............................ 157

THIRTY-SECOND CLAIM FOR RELIEF VIOLATION OF THE NORTH
      CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT,
      N.C. GEN. STAT. § 75-1.1, *ET SEQ*. (ON BEHALF OF THE NORTH
      CAROLINA CLASS) ........................................................................................ 159

THIRTY-THIRD CLAIM FOR RELIEF VIOLATION OF THE NORTH
      DAKOTA UNFAIR TRADE PRACTICES LAW, N.D. CENT. CODE
      § 51-10, *ET SEQ*. (ON BEHALF OF THE NORTH DAKOTA CLASS) ......... 160

THIRTY-FOURTH CLAIM FOR RELIEF VIOLATION OF THE RHODE
      ISLAND DECEPTIVE TRADE PRACTICES ACT, R.I. GEN. LAWS
      § 6-13.1-1, *ET SEQ*. (ON BEHALF OF THE RHODE ISLAND
      CLASS) ............................................................................................................ 161

THIRTY-FIFTH CLAIM FOR RELIEF VIOLATION OF THE SOUTH
      CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE
      ANN. §§ 39-5-10, *ET SEQ*. (ON BEHALF OF THE SOUTH
      CAROLINA CLASS) ....................................................................................... 163

THIRTY-SIXTH CLAIM FOR RELIEF  UNJUST ENRICHMENT .......................... 168

REQUEST FOR RELIEF ..................................................................................... 169

JURY TRIAL DEMANDED ................................................................................. 170

010736-11/1208328 V1

Plaintiffs bring this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of the several states against Defendants. Plaintiffs demand a trial by jury.

## I.      NATURE OF ACTION

1.      Few things have impacted the life of the average American as dramatically as the arrival of the internet. While the internet has brought enormous benefits – increased ease of access to information – this benefit comes with a darker side. Just as consumers are able to access information with more ease, so are companies able to collect and transfer enormous amounts of data. The true cost of the availability of this large amount of data is still hidden to most. But here, it became a central part of the defendants' collusion stabilizing the price and supply of pork being sold to consumers on a daily basis. Access to and exchange of competitively sensitive data gave the defendants – pork processors – the ability to restrict and stabilize the supply and price of pork in a way that was unimaginable twenty years ago.

2.      Key to this conspiracy was Agri Stats. Agri Stats is a small company, headquartered in Fort Wayne, Indiana. To the outside world, the role of Agri Stats is almost invisible. Paradoxically, Agri Stats has an almost minimal internet presence. Its current home page transmits little more than a bucolic rural scene:



3.      No uninitiated visitor to this website would realize the profound and anticompetitive impact Agri Stats has had on the supply and pricing of meat in this country.

4.      Agri Stats' refusal to advertise is intentional because Agri Stats' services are not for the public. Agri Stats refuses to sell its information and reports to just any customers. Instead it focuses on its core business – collecting vast amounts of information from protein companies, standardizing that data, and returning it to them in detailed weekly and monthly reports. For the pork processors, Agri Stats provides current and forward-looking sensitive information (such as profits, costs, sale prices and slaughter information), as well as, the key to deciphering which data belongs to which producers.

- 2 -

5.      The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. In a competitive market – each competitor would act independently, making supply decisions unilaterally and pricings its goods to market. Instead, Agri Stats' provision of detailed and sensitive information acted as the proverbial smoke-filled room of the cartels of yesteryear. Rather than meeting in a room with pen and paper, Agri Stats collected the pork processors' competitively-sensitive supply and pricing data and intentionally shared that information through detailed reports to market participants.

6.      Starting in at least 2009 and continuing to the present, defendants coordinated to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their price-fixing agreement, defendants relied on Agri Stats as a means to obtain and monitor critical and competitively-sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of defendants' price-fixing scheme, resulting in a remarkably stable and successful anticompetitive cartel.

7.      The data exchanged through Agri Stats bears all the hallmarks of the enforcement mechanism of a price-fixing scheme. First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[1] Second, information contained in Agri Stats reports is specific

---

[1] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

- 3 -

to the pork producers, including information on profits, prices, costs, and production levels. "Courts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity."[2] Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service, which required the co-conspirators to pay millions of dollars over the class period – far in excess of any other pricing and production indices. Indeed, Agri Stats only allowed co-conspirators to receive data if they themselves shared data. "Public dissemination is a primary way for data exchange to realize its pro-competitive potential."[3] Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market.

8.      The pork processors admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen.

9.      An economic analysis of the prices of pork during the class period show an abnormal shift, supporting the inference of collusion. Beginning in 2009, pork wholesale prices increased and remained at a higher level compared to the years prior to 2009. Another measurement of price, the pork cut-out composite price increased 18 percent during the class period (and at one point in 2014 had increased 56 percent from the start of the class period). In addition to price, the pork processors' margin also increased – that

---

[2] *Id.* at 212.

[3] *Id.* at 213.

- 4 -

is the amount of money retained by the pork producer defendants (versus what was paid to farmers). And when tested, there was a statistically significant increase in the average hog-composite spread before the class period, when compared to during the class period. Moreover, when tested against two of the largest defendants, Tyson and Smithfield, plaintiffs analyzed their revenue and costs, which also show a dramatic increase in defendants' revenues during the class period. These dramatic shifts in prices and revenues further support the inference of a conspiracy during the class period.

10.     Numerous "plus factors" exist in the pork industry during the class period, including but not limited to multiple industry characteristics which facilitate collusion, such as a high level of vertical integration, high pork industry consolidation and concentration, barriers to entry preventing competitors from coming into the market, inelastic demand for pork, and homogeneity of pork as a product.[4] These plus factors add plausibility to plaintiffs' allegations of a price-fixing scheme.

11.     Moreover, the information exchange between processor defendants through Agri Stats was itself anticompetitive under a rule of reason analysis. The information exchanged was highly granular data on defendants' pricing, costs, and supply. The information exchange had anticompetitive effects. For example, in both sales reports and meetings with defendants, Agri Stats specifically identified "opportunities" for defendants to raise prices on specific products that were priced lower than that of their

---

[4] Pork is homogenous within cut type – i.e., a pork belly from Tyson and Smithfield are virtually indistinguishable.

- 5 -

competitors. The information was current. Starting no later than early 2009, Agri Stats began distributing weekly sales reports to defendants that contained pricing information that was less than a month old. And all of this information was intentionally shielded from both the public and other industry participants, such as food retailers. This information exchange was particularly likely to have anticompetitive effects because the pork market is characterized by few sellers, a fungible product, a tendency towards uniform pricing, and inelastic demand.

12.     Defendants' restriction of pork supply and information exchange through Agri Stats had the intended purpose and effect of increasing pork prices to plaintiffs and class members. Beginning in 2009, the earnings of the processors began to increase, as they took an increasing amount of the profits available in the pork industry. As a result of defendants' unlawful conduct, plaintiffs and the classes paid artificially inflated prices for pork during the class period. Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' conduct.

13.     Plaintiffs bring this complaint, alleging violations under both a *per se* or, in the alternative, rule of reason standard under the federal and state antitrust and consumer protection laws.

010736-11/1208328 V1

## II.    SUMMARY OF PARTIES

14.     Plaintiffs are consumers who have purchased pork as the end-consumers in the food distribution chain.[5] *See* section VI.A, *infra* (detailed allegations regarding each plaintiff). Plaintiffs bring this action on behalf of themselves individually and on behalf of various state classes consisting of all persons and entities who purchased pork indirectly from a defendant or co-conspirator for personal use in the United States from at least January 1, 2009 until the present (Class Period). *See* section VII, *infra*.

15.     The defendant pork processors are each of the major meat companies who, collectively, control over 80 percent of the pig slaughtering facilities in the United States. The pork processor defendants are Clemens Food Group, LLC, the Clemens Family Corporation, Hatfield Quality Meats (collectively, Clemens), Hormel Foods Corporation (Hormel), ~~Indiana Packers Corporation (Indiana Packers),~~ JBS USA Food Company (JBS USA), Seaboard Foods LLC (Seaboard), Smithfield Foods, Inc. (Smithfield), Triumph Foods, LLC (Triumph), and Tyson Foods, Inc., Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. (together and separately, Tyson). *See* section VI.B, *infra*.

16.     Defendant Agri Stats is the center of this conspiracy. Through Agri Stats, defendants were able to have access to standardized data (cost, price and supply information) from their erstwhile competitors which they used to extract the maximum amount of profits from the American consumer. *See* section VIII, *infra*.

---

[5] For purposes of this complaint, pork includes pig meat purchased fresh or frozen, smoked ham, sausage and bacon.

010736-11/1208328 V1

### III.   FACTUAL ALLEGATIONS

**A.   Agri Stats enabled competitors to directly exchange, and restrain, supply and cost.**

17.   The depth and breadth of Agri Stats reports make them difficult to describe through words alone. Prior to this litigation, Agri Stats reports were not publicly available. During the course of discovery in this case, plaintiffs obtained a small number of Agri Stats reports relating to the Pork industry from a production of documents made by Agri Stats to the DOJ nearly a decade ago. Plaintiffs attach the following examples of reports as exhibits:

- Exhibit A: An Agri Stats March 2009 weekly sales report;

- Exhibit B: An Agri Stats April 2008 Economic Impact Sales Report;

- Exhibit C: An Agri Stats August 2009 report for Tyson's Storm Lake facility;

- Exhibit D: An Agri Stats September 2009 report entitled "Bacon Demo,";

- Exhibit E: A June 2010 Agri Stats presentation to Hormel soliciting Hormel's participation in additional Agri Stats reporting services;

- Exhibit F: An Agri Stats May 2008 presentation entitled, "Hatfield Quality Meats Pork Kill & Cut Phone Review;" and

- Exhibit G: An Agri Stats February 2010 "Demo" Swine Processing report.

18.   All programs at Agri Stats are done on a monthly basis, with the exception of sales which are done underlined(weekly and monthly). Plaintiffs describe below the content and import of each of these reports, as well as the process by which Agri Stats collects and disseminates the data.

- 8 -

**1.     Agri Stats' detailed pricing reports provide competitors with a view of the entire market, removing all question of competition on price.**

19.     Perhaps Agri Stats' most egregious service is its sales reports. These reports, on a weekly and monthly basis, contain not only current pricing information (to within a few weeks), but also calculate for competitors <u>exactly</u> how far they could raise prices to match their competitors on a per item basis. In others words, not only does Agri Stats provide Defendants with their competitors' pricing, they take it a step further – ensuring that consumers feel the brunt of Agri Stats' data collection operations, by performing the mathematic calculations that identify for its co-conspirators the price-raising opportunities that they can cash in on at the expense of the consumers.

20.     In early 2009, at the beginning of the conspiracy period, Agri Stats introduced new sales report formats containing weekly and monthly data. The new sales reports were designed to specifically allow a defendant to compare its prices with that of its competitors. Brian Snyder, an Agri Stats employee, explained in an e-mail to Seaboard employees on March 5, 2009 that:

> Agri Stats is rolling out a new weekly and monthly sales report. I have attached week 8 for your review in the new format. **This report is a dramatic improvement to the legacy platform in evaluating sales**. It compares a company's price and sales mix versus the national price with the company mix. I would like to set up a 30 minute web review of the new weekly report to answer any questions. The new platform also allows us more audit tools regarding the data. All price variances 30% from the average will be kicked out to an exception report and investigated. This was a manual audit in the legacy system. With this new procedure automated, it should streamline and improve the audit of the sales number and identify the outliers. It will automatically generate the exceptions and let us investigate to make sure that we have all items coded correctly,

- 9 -

and to have an understanding of items that deviate by more
than 30%. (emphasis added).

The weekly sales report that Brian Snyder included is attached as **Exhibit A.** The weekly

report included sales data that was only weeks old – the e-mail sent on March 5, 2009,

covers data for the week ending on February 21, 2009. Furthermore, the report contained

detailed data comparing the prices of defendants' products with their competitors. The

report would identify a specific type of product, such as a type of cut of pork sparerib,

and then compare the company's prices with the national average price and the national

top 25% price.

    21.    An excerpt of this weekly sales report follows:

- 10 -



- 11 -

010736-11/1208328 V1

22.    The sales reports allowed defendants to compare their prices for individual products against the national average net price, and the national top 25 percent average price. For each product, Agri Stats specifically broke out the variance between the company's price and the national average price, as well as the economic impact of the variance. This allowed co-conspirators to see how much more they could charge if they charged either the national average or the average of the Top 25%. Notably, Agri Stats identified opportunities for Defendants to raise prices; Agri Stats did not make any attempt to identify products for which Defendants should cut prices in an attempt to gain additional sales.

23.    Agri Stats clearly identified for defendants which companies and plants were providing information for the various reports. For example, Agri Stats' "Swine Sales Analysis – General Run" report is a monthly report which first indicates to competitors whose information is contained in the report. In one example, **Exhibit B**, a "demo" report for April 2008, Agri Stats listed the following as the "Economic Impact Section Participants":



24.    Although this report lists eleven facilities – there are only nine competitors actually contained in this report. Both Smithfield and Cargill have two plants listed,

- 12 -

meaning that only nine companies contribute information. (And of course, Smithfield and Cargill would be able to immediately know where each of their plants fell within this report.)

25.     Because there are only nine companies listed in this report, providing the number for the Top 25% of sales, gives competitors the pricing of approximately the top two competitors. This level of disaggregated information has no pro-competitive purpose, other than to allow the pork processors to extract the maximum amount of profits from their customers.

26.     As a specific example, **Exhibit B**, the April 2008 Economic Impact Sales Report, Agri Stats specifically identified that the company's price of $58.29 for bone-in hams was below the national net price of $62.50 and the national top 25% net price of $73.40. Agri Stats further explained for the company's financial benefit that the company had a negative economic impact of $17,838 as compared to the Top 25% price because its prices were lower than its competitors. An excerpt of this Agri Stats sales report (containing 253 pages) is as follows:

- 13 -



- 14 -

010736-11/1208328 V1

27.     The above report was published in April 2008 (although circulated in June 2010 as a demo report), and contained information through April 26, 2008 – making the information in the report current at the time it was published.[6] The purpose of these reports was not to provide better prices to consumers or to lower the costs of production. Instead, the clear purpose was to improve the profitability of the co-conspirators by encouraging them to collectively raise prices.

28.     A second example of an Agri Stats sales report containing sales data that is only weeks old is an August 2009 report for Tyson's Storm Lake facility that shows a similar pattern. **Exhibit C**. The report was published on October 13, 2009 and contains "Unit Price Variance by Company" through August 29, 2009 – which makes the pricing information **only six weeks old**. The first page of the report lists the pricing variance against the national average for the thirteen plants in the report:

---

[6] This report was subsequently circulated as a demo report in June 2010, indicating that Agri Stats considered this material sufficiently non-confidential to disclose to non-customers from whom it was circulating business.

- 15 -



29.     The next page of the report lists the economic impact of sales for the Tyson Storm Lake facility, showing by product, how much more could be charged to meet the national average, and the average Top 25% of sales. Conservatively assuming that there were 13 companies in this report (and not simply 13 plants, owned by fewer than 13 companies), this Top 25% sales average informs competitors of what the top three plants are charging for each of these products.

- 16 -



30.     A third example of a sales report is the Bacon Report, **<u>Exhibit D</u>**. This is a demonstration report that Agri Stats prepared as part of a project to begin offering a bacon-focused report in 2010. The Bacon Report shows how Agri Stats facilitated the exchange of sensitive information regarding costs, prices and profits between competitors. On information and belief, the Bacon Report was an actual report

010736-11/1208328 V1

disseminated to the co-conspirators.[7] For example, the attached slide compares a
participant company's profits, cost, margin, and sales price with the average, the top
25%, and the top five of competitors:



31.     In pitching its services to defendants, Agri Stats made sure to detail exactly
which competitors were participating in the various Agri Stats report services. For
example, Agri Stats gave a presentation to Hormel on June 25, 2010 regarding Hormel
participating in additional Agri Stats reporting services. Exhibit E, part of the proposal
presentation, shows Agri Stats identifying each of the co-conspirators, including their
facilities that were participating in the various Agri Stats reports.

---

[7] Agri Stats in its Responses and Objections to Plaintiffs' First Set of Requests for
Production stated that it would produce "bacon reports sent by Agri Stats to subscribing
Defendant Pork Integrators."

## Pork Kill/Cut Participants

*USA:*

- Cargill – *Beardstown, Ottumwa\**
- Farmland – *Milan, Monmouth, Denison\*, Crete\**
- Hatfield Quality Meats
- Indiana Packers
- JBS – *Marshalltown*
- John Morrell – *Sioux Falls\**
- Seaboard
- Smithfield – *Clinton, Tar Heel, Virginia\**
- Triumph
- Tyson – *Storm Lake*

(DATE)
n = 16



- 19 -

### Participants – Pork Sales

**USA:**
- Cargill – Beardstown, Ottumwa*
- Farmland – Crete, Denison, Milan, Monmouth
- Hatfield
- Indiana Packers
- JBS – Louisville, Marshalltown, Worthington
- John Morrell – Sioux Falls
- Seaboard
- Smithfield – Clinton, Tar Heel, Virginia
- Triumph
- Tyson – Columbus Junction, Logansport, Madison, Perry

(DATE)
n = 21

32.     Sharing the information in these various sales reports – detailed cost and sales data – between competitors was unnecessary to achieve any benefits for consumers. Should a competitor want to lower its costs – it is free to negotiate with vendors, labor groups, or reduce costs without reference to what a competitor is doing. Exchanging individual company data (particularly current data on prices and costs), is not required to achieve major efficiencies.

- 20 -

**2.      Beyond the pricing reports themselves, Agri Stats allowed the pork processors to directly access sales data through a "sales data miner" tool.**

33.      In addition to these highly detailed and anti-competitive sales reports, Agri Stats also provided defendants with a "sales data miner" tool that provided granular sales data broken down by "category, group, product type, preparation, additive, size, and inner packaging."



34.      The sales data miner provided competitors with detailed pricing information. The following is an example of the type of weekly sales data that was provided to Tyson through Agri Stats' sales data miner.

- 21 -



35.     Agri Stats further emphasized in conversations with defendants that the

Agri Stats sales reports data specifically identified opportunities for defendants to raise

their prices. For example, in June 2009, Deb McConnell, a Tyson employee, sent an e-

mail to Agri Stats employees titled "Audio Call with AgriStats: Follow-ups/action items."

The e-mail stated that four sales/pricing tools are currently available for review/use by

Tyson: "a.) Data Minor - Online system - information updated weekly. b.) Weekly Sales

Report - published weekly with electronic copy sent to Tyson weekly. c.) Weekly

'PRICING' exception report - published weekly with electronic copy sent to Tyson

weekly. d.) Weekly 'MIX' exception report - published weekly with electronic copy sent

to Tyson weekly." Tyson requested that Agri Stats make a number of refinements to the

sales reports that Agri Stats provided to Tyson, including segregating the region data into

- 22 -

"East and West." The e-mail also stated that in the Weekly Sales Report, "price opportunity (company vs. national) is comparison of our net selling price, vs. the region on 'like SKUs.' Opp $'s are extrapolated against our sales pounds."



010736-11/1208328 V1



38.     Defendants used the pricing information provided by Agri Stats (and indirectly, their competitors) to set their own prices of pork. But Agri Stats made sure that defendants understood the **exact** prices of their competitors. For example, on January 7,  2009, porksales@agristats.com sent Tyson employees an apparently standardly sent e-mail titled "week ending 12/27 sales" that attached numerous individual pdfs containing detailed current information on weekly sales, including files titled

- 24 -

"WE12_27DetailedSalesAnalysis.pdf", WE12_27ProductOpportunity.pdf"; and

"WE12_27BuyerDetail.PDF." This e-mail shows that Agri Stats was providing detailed

sales data to Defendants that was less than two weeks old, since the sales data went

through December 27th and the e-mail containing the sales data was sent on January 6th.

Deb McConnell, a Tyson employee, emailed in response to Agri Stats, "what plants

(locations are currently enrolled/displayed in the Sales Data Miner?"

Porksales@agristats.com responded with a list of participants, identifying other defendant

participants including JBS, ~~Indiana Packers,~~ Seaboard, Smithfield, Triumph, and

Clemens. Deb McConnell then responded that Tyson was using the Agri Stats data for

"revenue/return analysis" and that the list of participants provided by Agri Stats "will

work." Following further e-mails, Deb McConnell, the Tyson employee, followed up to

state that the "**sales group has already responded with some items**". In short, Agri

Stats on a regular basis provided detailed data from the defendants on their sales, helped

defendants determine the identity of their competitors, all with the understanding that the

defendants were using the data to make decisions regarding their prices. Defendants'

sales groups, in turn, carefully reviewed and used the information provided by Agri Stats.

39.     Defendants also asked Agri Stats to help clarify the data that Agri Stats

provided in order to help determine pricing-related opportunities. For example, Stacey

Edwards, an Agri Stats employee, wrote an October 2009 document titled "J.B.S. Review

Notes" that documents numerous specific questions that J.B.S. asked Agri Stats regarding

pricing data, including: "What are some of the opportunities in injected boneless loins?

Specifically there are four companies with returns" [i.e. prices] "at 225.77, 203.18,

- 25 -

218.77, and 279.98"; "What is driving the pricing structure for CT's?"; "Column b.9 on HC-4F, can we tell anything as to why there is such a spread in prices?"; and "**Why is #1 guy in sales book so far ahead of the competition every week?**" The document also included a request that Agri Stats "set Sue Tresham" (a JBS sales employee) "up in Data Miner."

40.     The defendants knew the purpose of these reports (as if there were any doubt) and asked Agri Stats to ensure that their "opportunities" to raise prices were clear. In one June 2009 Tyson email, Deb McConnell, a Tyson employee, wrote to Agri Stats regarding the Weekly Sales Report that Noel White, a senior Tyson executive, "is **insistent that the info be very clear/concise and indicate opp's with ease**." Noel White subsequently became the CEO of Tyson Foods in September 2018.

**3.     Just in case weekly sales reports and data mining were not enough to ensure the lack of pricing competition, Agri Stats also provided colorful graphs to highlight any differences in competitors' prices.**

41.     Sometimes, a picture says a thousand words. And where large amounts of data are involved, graphics can be invaluable to assist people in understanding the import of numbers. For its pork processors, Agri Stats also provided graphics to highlight where they needed to raise prices. One example below is a regular detailed monthly package that Agri Stats prepared for defendant Hatfield Quality Meats (a subsidiary of Clemens Family Corporation), entitled "Swine Graph Package and Review." This package included colorful graphics explicitly comparing the price variance of types of pork products sold by Hatfield Quality Meats, and highlighting where opportunities to raise prices existed:

- 26 -



42.     The monthly presentation by Agri Stats included charts comparing Hatfield's price in certain specific product categories with that of the other co-conspirators whose data had been collected by Agri Stats. For example, the following slides compare Hatfield's price for whole bone-in hams against those of its competitors, as well as breaking out the dollar impact of the difference in price:

- 27 -



- 28 -

43. Agri Stats also provided similar reports for other defendants that contain detailed pricing data. This pricing information was current, containing pricing information that was less than six weeks old, as the cover e-mail for this presentation indicates that the report was circulated to Seaboard on September 14, 2010 and contained pricing information through July 2010. For example, attached as an exhibit is a 293-page presentation that Agri Stats prepared for Seaboard. The report contains numerous graphs comparing Seaboard's returns (i.e., prices) on specific types of pork products with that of an average of its competitors, such as the following:



- 29 -

44.     These types of reports had the effect of allowing co-conspirators to know

exactly how far they could raise their prices to conform to their competitors' prices.

**4.      The Operations Profit Report provided competitors with information on the profitability of their competitors – allowing a further means to detect any cheating on the cartel.**

45.     Another type of Agri Stats report (beyond the sales/pricing reports) was an

Operations Profit report, or brown book (the color of the binding of the hard copy book),

which included:

- Key Performance Indicator report for the current month, and the past three months;

- Monthly Summary Reconciliation by Plant;

- Monthly Detailed Reconciliation by Plant;

- Operations Profit Report;

- Ranking Report;

- Operations Profit Contributions; and

- Yielded Margin over Processing.

46.     **Exhibit F** is an Agri Stats May 2008 presentation entitled, "Hatfield

Quality Meats Pork Kill & Cut Phone Review" The presentation contains an excerpt of

this detailed Operations Profit report that is as follows (markings on original):

- 30 -



010736-11/1208328 V1

47.     Agri Stats reports also clearly identified the participants in each of the reports that were issued. Many of the reports had relatively few participants, and therefore the Top 25% of the report often provided data on less than 5 specific participants in the report. This 2008 Operations Profit report shows that there are 11 participants in the report (the line items numbered from 1 to 11). The report details the operations profits for each participant on a live pound, and carcass pound basis. It provides the purchased expense of live hogs, and the yielded margins for each of the 11 participating plants. The report contains information from March 2008 – and the report itself was published on May 21, 2008 – making the information less than three months old. The company involved in this report (Hatfield, a subsidiary of Clemens), is also provided with its report information for the November 2008 to February 2008 period, as well as its comparison against the weighted Top 25%. Given the existence of only 11 participants in this report, the Top 25% would be less than three firms.

48.     **Exhibit F** contains an excerpt of the May 21, 2008, key performance indicators section of the report that is as follows:

- 32 -



- 33 -

010736-11/1208328 V1

49.     The Key Performance Indicator report – here, for Hatfield, a subsidiary of Clemens – gives the detailed operations profits numbers for Hatfield against the national average, and against the Top 25% (again this would be less than three firms, given that only 11 firms appear in this report). The report details the "economic impact" for Hatfield for each of the items (including detailed Hourly Labor Cost, Supervision Cost, Kill Floor Cost – just to name a few), against the national average and the Top 25% average – this is the dollar amount that Hatfield/Clemens would save if it were to conform its costs to the national average, or the Top 25% average.

50.     Providing such detailed information regarding the profitability of competitors provided another mechanism by which competitors could monitor their co-conspirators to ensure there was no cheating on the agreement to restrain supply and raise prices.

**5.     The Agri Stats Swine Processing Report provided detailed information regarding costs of the competitors.**

51.     A third type of Agri Stats report in the pork industry was the swine processing reports. These reports contain detailed cost information for each of the plants participating in the reports. The processing reports themselves total over 300 pages. Plaintiffs attach a "Demo" Swine Processing report from February 2010 as **<u>Exhibit G</u>** to this complaint. This report is labelled as a "demo" and contains information which is nearly a decade old. On information and belief, the data contained in this "demo" report is the same as what was provided throughout the class period to the co-conspirators.

- 34 -

52.     The first page of the report itself indicates the "section participants" – the companies from which the data was gathered and to which this report was sent, including co-conspirators Cargill, Hatfield (a subsidiary of Clemens), ~~Indiana Packers,~~ JBS, Seaboard Foods, Smithfield, Triumph, and Tyson:



53.     Although this report lists eleven competitors, Farmland Foods and Smithfield both had two plants included for Region 10, meaning that there were truly only nine pork processors contained in this report.

54.     **Exhibit G**, The Swine Processing Report focuses on "Plant Cost Analysis," including: labor, material, supplies, M&R, utilities, water & sewage, inspection, overhead, depreciation, and support departments. An example of a page from this portion of the report is as follows:

010736-11/1208328 V1



010736-11/1208328 V1

55.     This page of the report (Total Plant Cost) provides a line entry for each of the 11 plants involved in the report. The plant for which this is a "demo" report is underlined (line 5). The report then provides a weighted Top 25% number – in this instance, with only 11 plants contained in this report, this would be an average number containing the data from the Top three plants. The report also contains weighted averages breaking companies out by the "East" (three companies) and "West" companies (eight companies).

56.     Agri Stats also provided a "kill cost analysis," which includes data on costs such as labor, overhead, supplies, and staffing: The key components of the kill cost analysis are shown in the below slide prepared by Agri Stats.



*Swine Processing Report*

Kill Cost Analysis:
• Labor
• Inspection
• Supplies
• Utilities – electrical and gas/oil
• Overhead
• Depreciation
• Harvest Efficiency – Pigs/Manhour, Recovery Head & Organs, etc.
• Staffing
(DATE)

57.     The report also includes "cut floor cost," which includes details on labor, supply, material, utilities, overhead, depreciation, "labor detail" and efficiency.

- 37 -

58.     The provision of cost information across competitors has no redeeming purpose. Should a competitor wish to lower the costs of its overhead or improve its harvest efficiency, of course it is perfectly free to do so. It has no need for this detailed cost information from its competitors to make these unilateral choices.

59.     In addition to these reports, Agri Stats' account managers conduct on-site live reviews to assist with report utilization and analysis. The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the books. The fee for the visits fluctuated based on the size of the company and other factors.

60.     In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets started providing its extensive pricing reports to broiler producers in 2003. Agri Stats had earlier marketed the EMI services to Tyson, explaining that "several producers and buyers have indicated to us that they are disappointed with the lack of pricing information available and feel that a program like this, designed for the pork industry, would be very beneficial." Agri Stats further explained that EMI would provide "valuable pricing information to know, because . . . it will help give guidance when making negotiations."

- 38 -

**B.    Agri Stats' collection and standardization process provided pork processors the unparalleled ability to monitor, or discipline co-conspirators for not complying with their collusive agreement.**

61.    Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Price-fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

62.    Without Agri Stats, the success of the pork cartel would have been much less certain. When direct competitors enter into a conspiracy, there may not be honor amongst thieves. Conspirators can provide incorrect information; they can cheat on the cartel by lowering their prices and providing inaccurate pricing or supply information to their competitors – allowing their cheating to go undetected. Agri Stats ensured none of that happened here.

63.    Agri Stats audited the data to ensure the accuracy of its reports – even comparing it against the companies' general ledgers.

64.    Agri Stats required participation in the cartel by a large swath of the market, and competitors could not receive information without providing information.

- 39 -

65.     Agri Stats assisted in concealing this conspiracy. By maintaining heightened level of sensitivity around the data to the public, Agri Stats ensured the operation of this cartel went undetected.

**1.      Agri Stats audited the data to ensure co-conspirators could not cheat on the agreement.**

66.     Large amounts of data from each co-conspirator, if it were inaccurate or unable to be compared across companies, might have had little use to the co-conspirators. But the value that Agri Stats brought to the conspiracy was that it ensured not only the timely collection and dissemination of data, but also its accuracy.

67.     This value is highlighted in an email sent by Tyson to Agri Stats, when requesting its monthly results:

> We use this information (our position in Agri) in our quarterly presentations . . . 'and' in our metrics. . . .
>
> It is VERY VISIBLE within our company . . . we must make certain it is accurate . . . BUT at the same time, **I must have a high level of confidence that the OTHER companies are as accurate**!!! (emphasis added)

68.     Agri Stats gave the co-conspirators exactly that – a high level of confidence in the accuracy of the data shared amongst competitors.

69.     To ensure this accuracy, Agri Stats itself went on site to the pork processors to collect the data for the reports. Agri Stats would first set up the initial data collection process, sending staff for a one week on-site setup meeting to identify data locations, files, formats, and to work with accounting and production staff.

- 40 -

70.     It would then take Agri Stats three weeks in the Agri Stats office to finish conversion, setup the input system, and to prepare auditors. Moving forward, the pork processor would send data monthly to Agri Stats on the 18th, and the data would be reported out the following month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data was reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way. A typical turnaround from data submission to the finished report was two weeks.

71.     Agri Stats went to great lengths to ensure that the data is comparable across competitors – an "apples-to-apples" comparison. Agri Stats audits the producer's data by ensuring it ties back to the general ledger, and by ensuring each company uses the same calculations.

72.     In 2008, Agri Stats pitched its "new format" to JBS, proposing "comprehensive reports" and an "audit process":

## New Report Format / Process

✓ Comprehensive on site set up of all participants.
✓ Electronic processing of data.
✓ Tied out reports to the financials and production files.
✓ Checks and Balances / Audit Process.
✓ Comprehensive Reports Designed to identify and drill down to specific areas of opportunity.
✓ Multiple plant view.
✓ Industry groupings.

73.     Agri Stats itself travels on site to the pork processors to set up its data collection process. It then ensures the timely collection of this data, its auditing, but also that the data is <u>tied to the financial and production files</u> of the pork processors to ensure there is no cheating on the exchange of accurate information. Thus, Agri Stats performs a critical and unrivaled position in this cartel – acting as a disciplinary and cheating detection mechanism to ensure all members are fully and accurately participating in the exchange of competitively sensitive business information.

74.     Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis between competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry

- 42 -

participants that they could not undertake such a detailed cost analysis between

competitors without Agri Stats auditing and standardizing the data:

## *Data Integrity*

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



75.     Agri Stats stated that to ensure data contained in the reports was accurate,

the participants had to "[A]gree on calculation and data collection procedures," they must

"[d]etermine ***tolerance and outlier status and enforce***," they must "[h]ave an

administrator to compile the data and enforce procedures," and most importantly, "***[e]ach***

***participant has to commit***."

> **2.      Agri Stats guaranteed to the co-conspirators that its competitors were equally participating in the scheme.**

76.     A critical component of a functioning conspiracy is that the co-conspirators

must all provide information. Agreements to stabilize price and supply cannot be

enforced unless competitors know the actions of their competitors. Agri Stats ensured

- 43 -

that the agreement between competitors was a two-way street. Its policy was that it <u>would not share</u> the information of competitors if "<u>someone [was] unwilling to share their own</u>."

77.     For its program to be successful, Agri Stats has acknowledged that "**<u>Industry participation must be high</u>**." Each of the pork processor defendants participated in the Agri Stats reports.

78.     In a 2010 presentation, Agri Stats listed the following defendants as receiving pork sales reports:

## Participants – Pork Sales

*USA:*
- Cargill – Beardstown, Ottumwa*
- Farmland – Crete, Denison, Milan, Monmouth
- Hatfield
- Indiana Packers
- JBS – Louisville, Marshalltown, Worthington
- John Morrell – Sioux Falls
- Seaboard
- Smithfield – Clinton, Tar Heel, Virginia
- Triumph
- Tyson – Columbus Junction, Logansport, Madison, Perry

(DATE)
n = 21 

79.     In a June 2010 e-mail, Josh Edwards, an Agri Stats employee provided a detailed list of the companies that were currently providing Agri Stats with sales data. The e-mail confirmed that Smithfield and Tyson were providing Agri Stats with sales

- 44 -

data from all locations. Hatfield Quality Meats is a subsidiary of the Clemens Family

Corporation.

-----Original Message-----
From: Josh Edwards
Sent: Thursday, June 24, 2010 6:51 AM
To: Greg Bilbrey
Subject: RE: Swine sales

Smithfield - Clinton, NC
Smithfield - Smithfield, VA
Smithfield - Tar Heel, NC
Farmland - Crete, NB
Farmland - Denison, IA
Farmland - Monmouth, IL
Farmland - Milan, MO
John Morrell - Sioux Falls, SD
Tyson - Waterloo, IA
Tyson - Perry, IA
Tyson - Logansport, IN
Tyson - Storm Lake, IA
Tyson - Col. Junction, IA
Tyson - Madison, NB
JBS - Worthington, MN
JBS - Marshalltown, IA
JBS - Louisville, KY
Cargill - Beardstown, IL
Cargill - Ottumwa, IA
Seaboard - Guymon, OK
Triumph - St. Joseph, MO
Indiana Packers - Delphi, IN
Hatfield - Hatfield, PA

Smithfield, Tyson and Farmland sales all come in one file. They are not separated out by company, but all locations are included.

80.     Even as Agri Stats provided defendants with detailed anticompetitive

information, it was reluctant to share similar information with governmental authorities.

In 2009, Agri Stats was approached by the Canadian Government to provide information

to the Canadian government. Agri Stats expressed great reluctance to the Canadian

Government about sharing the data. Stacey Edwards, an Agri Stats employee, wrote to

the Canadian Government that Agri Stats "data cannot be used in any sales and marketing

campaigns and must be kept and used for internal use only. Our data cannot be used in

any printed material or referenced/cited in publications." Internally, Agri Stats expressed

great reluctance about sharing any data with the Canadian Government. Stacey Edwards

wrote to Greg Bilbrey that another Agri Stats employee was "concerned about US

- 45 -

producers finding out that we are helping Canadian producers via the government." Greg

Bilbrey agreed that "**we cannot make things worse for our US companies**." Josh

Edwards of Agri Stats eventually recommended sending the Canadian Government only

one page of data from the processing book and that "**if they want more, I would charge**

**them dearly for it and let them know that**."

> **3.**    **Agri Stats acted as a gatekeeper, preventing public access to the
>           reports, ensuring that the conspiracy went undetected.**

81.    Agri Stats reports are not publicly available and are only made available to

companies that Agri Stats "feel[s] will use the data for the betterment of the industry and

the profitability of [its] customers." This ensures that the information from Agri Stats is

available to only one side of the market – the pork processors, and not others involved in

the industry such as the customers of the pork. For example, a food retailer could not use

Agri Stats sales reports to negotiate lower prices from defendants because Agri Stats

would not give them access to such reports.

82.    Agri Stats also limited the information that it provided to companies such

as agricultural supply or veterinarian services that purchased Agri Stats data (companies

viewed by Agri Stats as industry partners). In a presentation to Novartis Animal Health,

Agri Stats stated that these companies must maintain confidentiality over the material:

010736-11/1208328 V1



83.     By ensuring that only co-conspirators had access to these reports, Agri Stats deprived all market participants of access to information (such as supply and pricing), creating an information asymmetry. It ensured that the operations of this conspiracy went undetected by the public, by class members, or by the direct purchasers of pork.

**C.     Agri Stats reports were easily deanonymized by the pork processors.**

84.     While nominally anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that pork processors could accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

- 47 -

85.     Agri Stats disclosed to defendants who the other participants were in Agri Stats, including identifying the specific plants that were participating. For example, Agri Stats provided the following participant list as part of a June 2009 live review presentation to DuBreton, a Canadian pork integrator, that identified the specific companies and plants that were participating in Agri Stats:

# Participant List

## • U.S. Participants
- Cargill – Beardstown, IL
- Farmland Foods – Milan, MO
- Farmland Foods – Monmouth, IL
- Hatfield – Hatfield, PA
- JBS S.A. – Marshalltown, IA
- Seaboard Foods – Guymon, OK
- Smithfield Packing – Clinton, NC
- Smithfield Packing – Smithfield, VA
- Smithfield Packing – Tar Heel, NC
- Triumph Foods – St. Joseph, MO
- Tyson – Storm Lake, IA
- *Indiana Packers – Delphi, IN
  - June 8th Set Up for May data

## • Canadian Participants
- Conestoga – Breslau, Ontario
- Du Breton – Riviere-du-Loup, Quebec
- Maple Leaf Foods – Brandon, Manitoba
- Maple Leaf Foods – Burlington, Ontario
- Olymel – Red Deer, Alberta
- Quality Meat Packers – Toronto, Ontario
- *Springhill Farms – Neepawa, Manitoba
  - May 18th Set Up for April data

86.     Agri Stats also provided regular updates to defendants regarding either new participants or companies no longer participating in the Agri Stats reports that would aid in deanonymization efforts. For example, Agri Stats provided a September 2009 report to Hormel relating to pork that identified three specific companies that were no longer submitting data to Agri Stats while also stating that the report "added Maxwell Farms in

- 48 -

Indiana." This type of information would greatly aid defendants in deanonymization efforts.

87.     Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but failed to reassign numbers nonetheless.

88.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

89.     Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a producer's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that producer given that their numbers were highlighted by Agri Stats in their books.

90.     Mobility within the meat production industries led to a situation where many workers at most pork production operations knew the numbers of other regional facilities, removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in their offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats noticed this problem almost immediately but did nothing to fix it.

010736-11/1208328 V1

**D.  Agri Stats succeeded in orchestrating the pork conspiracy because it leveraged its success in the chicken industry, and because both industries are controlled by the same companies.**

91.     Every conspiracy has a beginning. Here, the beginnings of collusion between the pork processors originated in the chicken industry. Agri Stats itself was formed as a mechanism to disseminate sensitive business information between the chicken processors. The success of defendants' conspiracy to restrain the price and supply of pork was almost assured from the start. First, Agri Stats had already been used successfully by poultry producers to restrain the supply and price of chicken. Second, many of the companies who used Agri Stats in the chicken market are also pork processors.

**1.  Agri Stats is a repeat offender, playing a crucial role in a similar price-fixing and supply constraint conspiracy in the sale of chickens.**

92.     Agri Stats began its business in 1985 as an "Agricultural Performance Benchmarking business." Agri Stats' success originally came from the chicken industry, where it touts that "[i]nitially, 100% of our focus was in developing and delivering a system for the Broiler Chicken Industry."

93.     The role of Agri Stats in the chicken industry was revealed in the *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill.).[8] In the chicken market, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, sales

---

[8] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

- 50 -

data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain **_line-by-line_** entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets, Inc. or EMI. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

94.     The detail of these reports ensured that competitors could quickly decode the information of their erstwhile competitors. The _Broiler_ complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

95.     In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would

continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

96.     The district court noted, in denying the motions to dismiss in the *In re Broiler Chicken Antitrust Litigation*, that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests high antitrust concerns.[9]

## 2.     The same companies own both chickens and pigs.

97.     The second reason the pork conspiracy was more likely to succeed was because of the overlapping ownership between pigs and chickens. Meat production in the United States is highly consolidated and some of the largest processing companies own both of these species. Some of the defendants in the *Broiler* antitrust litigation also participated in the pork antitrust conspiracy, including: Agri Stats, Inc., JBS USA Food Company (who owns Pilgrims – one of the largest broiler producers in the country), and Tyson Foods, Inc. The overlapping interests of these entities allowed them to practice and perfect their anticompetitive conduct in the broiler market before applying the most effective anticompetitive tactics to the pork market. This helped ensure the success of the pork conspiracy.

---

[9] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

010736-11/1208328 V1

**E.    Defendants' conspiracy had its intended effect, with pork processors lowering supply during the class period both in the aggregate, and individually.**

98.    As demonstrated in the following chart, at several points during the class period, the pork processors acted in a concerted way to decrease supply. In 2009, 2010, and again in 2013, the pork industry cut production.

**Figure 1: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



99.    Defendants engaged in a parallel round of production cuts in 2009 through 2010. Throughout this period, defendants made statements regarding their intentions to either stabilize or decrease supply (although gave false reasons for this stabilization). For example, in May 2009, Larry Pope, the CEO and President of Smithfield stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year – February of '08, not February of '09 – *we made the decision with the over-supply*

- 53 -

*of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system*.

100.    Throughout 2009, pork industry participants noted the need to follow the supply restrictions imposed in the broiler industry. For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. Pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.

101.    By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000. In order to accomplish this reduction, Hormel sold sows in California and switched farms to finishing.

102.    In January 2009, Tyson stated that the capacity utilization for its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%. This indicated that Tyson was reducing the amount of pork that it processed in its plants. Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."

103.    In February 2009, Hormel stated that "we still do expect to see a reduction in the supply of hogs in Fiscal 2009." In response to an industry analyst question on whether slaughter would be cut back, Hormel responded that **"you look at the opportunity to reduce your production numbers and we've certainly look[ed] for**

- 54 -

**opportunities . . . where we could reduce the numbers that we had going through."**
Hormel further emphasized that "if there were free market hogs that normally we would
be bidding on, we're not looking to take them in."

104.   In May 2009, Hormel emphasized that "We see a contraction in the overall
supply of hogs for the year but not as much as we'd originally anticipated. And I would
expect that prices will be somewhat less than last year, but higher than what we've seen
in the first half of the year."

105.   In May 2009, Tyson stated that its capacity utilization rate for its pork
processing plants for the quarter was 87%, down from the previous year's rate of 90%.
Tyson described pork "supplies coming down" and that "the worldwide supplies of pork
are still down."

106.   In June 2009, Jody Feragen, Hormel's CFO, stated at an investor
conference that "we reduced production in our basic processing for…pork."

107.   In June 2009, the CEO of Smithfield announced that Smithfield was going
to further reduce its swine herd by "3%, effective immediately." The CEO emphasized
that the current cuts were not enough and more were needed to "fix" the hog industry and
that "Somebody else has got to do something":

> One of the things that we're doing is managing what you can
> do and the 3% relates to one of our operations and it's our –
> I'll tell you, it's our Texas operation that sells pigs to
> Seaboard. Seaboard knows that. . . . *That 3%, let me say that,*
> *our 3% will not fix the hog industry. That part I'm*
> *confident of. Somebody else has got to do something.* We cut
> 13%. The first 10% didn't fix it. I don't think us going from
> 10 to 13 is going to fix the hog business.

- 55 -

108.    On the same conference call, Smithfield further explained that in order to fulfil its long-term contractual commitments to Seaboard and others, it would buy pigs on the open market to replace the sows that were being eliminated as a result of the hog liquidation, and that this would reduce pigs for the whole industry: "Some of these long-term contracts that people like Seaboard, so in actuality, we will reduce our sow numbers, we will then buy pigs in the open market to replace those obligations and deliver the pigs to Seaboard. So we will in effect reduce our exposure to the sow side and to that side of the business, *reduce pigs for the whole industry as well as ourselves and meet all of our obligation*." Smithfield explained the substantial effect that its' planned reduction would have on Seaboard's business: "In terms of those operations, they are, frankly, a large part of Seaboard's business. *We supply over 20 -- about 20% of Seaboard's raw material so they're going to have to address that issue at some point down the road*." Smithfield's cutbacks therefore may reduce the amount of pork that was sold by Seaboard over the long term.

109.    In August 2009, Wesley Mendonca Batista, CEO of JBS, communicated the start of JBS USA's participation in hog liquidation efforts. Mr. Batista stated, "we are seeing the start, we are seeing some increase in – not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters.

- 56 -

110.    In August 2009, Steve Meyer, an economist at Paragon Economics,

subsequently acquired by Agi Stats, stated that "If we are to reduce output to drive prices

up, we must reduce the sow herd by a larger percentage than the productivity growth."

111.    In September 2009, the CEO of Smithfield stated that he had conversations

with "sizable large producers" and that they would be doing some liquidation:

> **We can't solve the problem. But the answer to that is yes, I
> have had conversations with several sizable, more than
> sizable large producers, in fact very large producers, and I
> would tell you they are doing some liquidation**. But again, I
> don't think they can solve it.
>
> I think this industry has got to solve it collectively. I do
> believe everyone is now looking, and when I'm talking to
> people who are financially extremely strong and they are
> cutting back, that's got to be a statement about those people
> who are not financially strong. **But the answer is, yes, there
> are others cutting back. We're not the only one.**

112.    Defendants responded to the encouragement from Smithfield to cut

production. During 2009, Triumph reduced the number of sows that it had from 396,000

to 371,500. In particular, Triumph reduced the number of sows by 14,500 at its

Christensen Facility; 4,000 at its New Fashion Pork Facility, 5,000 at its Eichelberger

facility. Notably, Triumph and Seaboard have a longstanding marketing agreement where

hogs processed by Triumph were marketed by Seaboard.[10] Thus, the reduction in supply

---

[10] According to Seaboard's 2010 Form 10-K, filed with the Securities and Exchange
Commission, "Seaboard's Pork Division has an agreement with a similar size pork
processor, Triumph Foods LLC (Triumph), to market substantially all of the pork
products produced at Triumph's plant in St. Joseph, Missouri."

- 57 -

of sows raised by Triumph may result in a reduction in the amount of pork that was sold

by Seaboard.

113.   During 2009, Tyson reduced the number of sows that it had from 70,000 to

52,000. In particular, Tyson sold five farms and sent the sows to slaughter. Tyson's 2009

10K report further stated that "we expect to see a gradual decline in hog supplies through

the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010,

resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal

2009)."

114.   In November 2009, Hormel stated that "we've seen about a 2% liquidation"

in hogs.

115.   In January 2010, Steve Meyer stated that the pork industry needed a 12%

reduction in order to restore the pork industry to profitability.

116.   In March 2010, when asked about fourth quarter and 2011 volumes for

pork, Larry Pope, the CEO of Smithfield indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to
> have the impact starting next fiscal year when there is going
> to be 13,000 less. But I think we'll pick up some of that in our
> other operations. But I think 8,000 or 9,000 or 10,000 of those
> a day will disappear from our operations and that represents
> about 8% of our, 8% of the hogs will be down. That's for also
> the fresh pork side.

- 58 -

117.    On March 8, 2010, Wesley Mendonca Batista mentioned that there was a

reduction in hog supply and that combined with an increase in consumption in emergent

markets, this would result in "some shortage in protein going forward."[11]

118.    In August 2010, Hormel stated that "our hog supply is down 3 to 4%"[12]

119.    The pork producers acknowledged access to information that allowed them

to know that the supply of pork would not be increasing. For example, in December

2010, Larry Pope, the CEO of Smithfield stated:

> We certainly compare ourselves to our competitors as best we
> can. ***Given the information we think we have public plus
> what we think we know privately, how many they kill, what
> their processing levels are and things like to. This is
> information you may not quite have***. And we have been
> certainly impressed with how our competitors have been able
> to achieve margins that we have not been able to achieve
> because our fresh pork competes very competitively with
> theirs.

Smithfield had access to competitively sensitive information from its competitors,

through the Agri Stats reports, which allowed it to know confidential supply information

from its competitors.

120.    Supply level information regarding competitors allowed them to know that

supply would not increase in the future, given the lifecycles of the animals. In February

2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and
> Pork profitability isn't sustainable. I want to again explain
> why we don't believe that is true. If we look at supply,

---

[11] JBS Q2 2009 Earnings Conference Call (Mar. 8, 2010).

[12] Hormel Q3 2010 earnings call.

- 59 -

current cattle and hogs production levels can't change much
in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the

provision of competitively sensitive information by a competitor of Tyson.

121.    When asked, in the face of ever-increasing margins, whether the type of

profits would continue, in March 2011, Smithfield publicly signaled to its competitors

that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs.
> Yet we are projecting over the next 90 days we will be up
> another 20% from that. I mean those are big numbers to get
> the meat prices in the retail and food service case to cover
> that. . . .
>
> HEATHER JONES: So you are just striking a note of caution
> *because you know it can't stay this way indefinitely*; but it's
> not that you foresee this reversion to that norm over the near
> term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable
> horizon. We are still going to have – should have good
> margins, but I can't believe –
>
> LARRY POPE: Heather, we are sitting here today, we are
> halfway – closing in on halfway through our fourth quarter,
> and we have had very good margins through February and
> March, through today. We have got double-digit margins
> today.
>
> BO MANLY: It will correct itself over the long run, because
> this type of return on investment would attract capital, would
> attract expansion, and we kill more pigs and drive the margins
> lower. So it will either happen by itself or someone is going
> to build a plant.
>
> HEATHER JONES: All right, okay. Thank you.
>
> LARRY POPE: You get two-year visibility on that, though.
> You get to know when somebody is building a plant because

- 60 -

they have got to file for a permit and they have actually got to
build the thing. . . . ***And by the way, we are not going to build
a new plant to expand capacity***.

122.    In March 2012, the VP of Finance and chief accounting officer of

Smithfield stated that no one in the industry would be "real excited about adding

capacity" when the losses of 24 to 36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations. Just
> two weeks ago, I think we had – there were rumors the
> Chinese buying corn, and boom, all of a sudden the corn
> market is up $0.20, $0.30. So there is some volatility there.
> And what I would tell you is that keeps a lid on pork
> production. The pork guys in the United States have not
> forgotten 24 or 36 months ago when there were significant
> losses in the industry. ***There is no one going to be real
> excited about adding capacity, adding sows at a time when
> we've got such volatility***.

123.    On May 15, 2013, Wesley Mendonça Batista of JBS emphasized that JBS

was able to maintain high margins through passing on higher prices on pork as a result of

limited supply, stating that "[i]n pork, given some restrictions in supply we have been

able to pass price through the system and we are seeing good margins in our pork

business."

**F.      Defendants' conspiracy had the intended effect of raising prices of pork
         during the class period.**

124.    Beginning in 2009, the pork industry showed abnormal price movements,

*i.e.*, increases prices for the average hog whole price unexplained by increases in costs.

All these pricing measurements show a significant break between pricing prior to 2009

and pricing after 2009, supporting the plausibility of a conspiracy to restrain prices of

pork. Plaintiffs have measured the various abnormal pricing movements in a number of

- 61 -

ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the pork processors' margin during the class period; and (iv) the defendants' revenues before and during the class period.

    **1.    The average hog wholesale price experienced an unprecedented increase beginning in 2009.**

    125.    According to aggregate prices published by the USDA, the hog market year average price was at or below $50 every year between 1998 and 2009, before increasing to $76.30 in 2015. The following graph shows the unprecedented increase in swine prices beginning in 2009, and staying elevated through 2018:

**Figure 2: Average Hog Wholesale Prices in Cents per lbs, 2000-2018**



As this figure demonstrates, pork wholesale prices increased in 2009 and 2014, and continuously remained at this higher level compared to the years prior to 2009.

- 62 -

**2.      The pork cut-out composite price experienced a dramatic increase beginning in 2009 and continuing throughout the class period.**

126.    During the class period, and particularly between 2009 and 2018, various pork products saw substantial increases in prices, compared with the pre-class period. Using one particular price for pork, the pork cut-out composite price, plaintiffs have performed a pricing analysis which shows that that pork cut-out composite prices increased by 56 percent between January 2009 and December 2014, and by 18 percent over the class period:

**Figure 3: Pork Cut-Out Composite Price**



**3.      Pork processors' margin increased beginning in 2009 showing a statistically significant break from the pre-class period.**

127.    During the class period, at the same time as hog prices were increasing, pork integrator margins increased significantly. The change in integrator margins during the class period shows a divergence from pricing trends prior to the class period – and

shows that rising costs do not explain the increases in prices seen during the class period. The following figure shows this increase in margin, retained by the defendant/co-conspirators, using the pork cut-out composite and live hog cost on a "dressed weight" basis (post slaughter and organ-removal weight):

**Figure 4: Hog-Composite Spread Widening During the Class Period**



128. When tested, there is a statistically significant increase in the average hog-composite spread before the class period, when compared to during the class period:

- 64 -

**Figure 5: Statistically Significant Break in Hog-Composite Spread Comparing Before and During Class Period**



   4.   **Defendants' revenues increased beginning in 2009, even taking into account defendant-specific costs.**

   129.   For two of the largest defendants, Tyson and Smithfield, plaintiffs examined the spread between pork revenue and pork-related costs (costs of goods sold + operating costs), as a proxy for measuring the spread between a defendant's price of wholesale pork and their hog costs. This measurement accounts for defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the class period in 2009.

   130.   The following chart shows a break in revenues and costs around the start of the class period in 2009 for Tyson:

- 65 -

**Figure 6: Tyson's Revenues vs Costs, March 2002 to March 2018**



131.    The same analysis for Smithfield shows a similar break in revenues and

costs beginning at the start of the class period:

**Figure 7: Smithfield's Revenues vs Costs, January 2004 to June 2016**

- 66 -

132.    These analyses of the spread between costs and prices confirm one essential

fact – that rising costs do not explain the increases in price seen during the class period.

**5.    Overcharges due to the cartel were passed through to the indirect
        purchaser class.**

133.    The USDA has stated that high levels of market concentration allow the

largest participants to extract more of the economic value from food transactions, but

"consumers typically bear the burden, paying higher prices for goods of lower quality."

134.    As a matter of economic principle, firms must recover the short-run

variable costs of production when they price their products for the market, which

ultimately get passed to consumers in the form of higher retail prices. For a firm to be

profitable, the firm must recover its marginal cost of production. In a perfectly

competitive market, firms price at marginal cost and when marginal costs increase, the

cost increases are passed through to the consumer 1:1 or at a 100 percent pass through

rate. As a general matter, the pass through rate will be determined by the relative

elasticities of supply and demand. When demand is inelastic (as it is for pork) the pass

through rate is closer to 100 percent.

135.    The Bureau of Labor Statistics tracks commonly purchased products in its

Consumer Price Index (CPI). Those prices show that the retail price of pork has increased

substantially for consumers over the class period. For example, the price of a pound of

bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017:

010736-11/1208328 V1

**Figure 8: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995 to 2017**



136.    Similarly, the CPI index for other pork products, excluding canned ham and luncheon slices, show a marked increase over the class period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017:

**Figure 9: CPI-Average Price Data for Other Pork, per pound, from 1995 to 2017**



- 68 -

137.    And the CPI index for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017:

**Figure 10: CPI-Average Price Data for Ham, per pound, from 1995 to 2017**



138.    Given these market conditions, the overcharge due to defendants' anticompetitive agreement to stabilize the price and supply of pork was passed on to the end consumers, the plaintiffs and classes here.

**G.    The structure of the pork processing industry allowed the conspiracy to succeed.**

139.    Several unique characteristics of the pork processing industry facilitated the success of this conspiracy. First, the industry is nearly fully vertically integrated, meaning that fewer competitors exist and making it easier to collude on price. Second, the pork processing industry is highly concentrated, making an agreement on price and supply far easier for the co-conspirators. Third, barriers to entry kept other possible competitors out of the pork industry.

- 69 -

1.     **The pork industry is nearly fully vertically integrated, which allowed the scheme to succeed.**

140.    The processing of pig meat can loosely be divided into three stages: hog production, hog processing/intermediate pork processing and further processing. The pork industry is almost completely vertically integrated, with four major producers controlling 75 percent of pork integration. The defendants are commonly known as "contractors" or "integrators" who contract production of their hogs out to independent growers. Integration is so pervasive that major producers are commonly called pork or swine integrators by the industry, government, analysts and academics.

141.    In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

142.    Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when. Under these contracts, the pork processors pay only fixed service fees to the farmers, who bear all the investment costs of the hog raising facilities. The pork integrator, here Smithfield, retains ownership of the hogs at all points in time. This arrangement essentially converts

- 70 -

independent farmers that own their livestock into contract employees that perform services for the pork-packing industry.

143.    The following diagram shows the path for pork from birth through sale to consumers:

**Figure 11: Value Chain of U.S. Pork Market**



144.    Under economic theory, vertical integration can have anticompetitive effects because there are fewer firms competing at all levels, which renders it easier to collude on price. The following table lists defendants that have significant operations (>=5% market share in at least two stages of the value chain:

- 71 -

| Defendant | Hog Production | Hog processing and intermediate pork processing/packing | Further Pork Processing |
|-----------|:--------------:|:-------------------------------------------------------:|:-----------------------:|
| Smithfield | ✓ | ✓ | ✓ |
| Tyson | | ✓ | ✓ |
| Triumph | ✓ | ✓ | |
| Seaboard | ✓ | ✓ | |
| Hormel | | ✓ | ✓ |

**2.  The level of concentration in the pork industry was optimal for the alleged collusive scheme.**

145.   The level of concentration in the pork industry rested in an ideal zone for collusion. Because the industry was dominated by a relative handful of processors, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because none of the largest producers were capable of independently controlling price through their own production, such an agreement was necessary to inflate price.

146.   Prior to and in the beginning of the class period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork processors controlling a large amount of market share. Between 1988 to 2015, the top four pork processors (Smithfield, Tyson, JBS and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015. The top eight integrators had market share exceeding 80 percent for the entire class period:

**Figure 12: Market Share of Top 8 Pork Processors 1991 to 2017**



147.    The hog production sector is horizontally concentrated (only a few companies buy, slaughter and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Some pork packers also produce hogs themselves. Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

148.    In July 2015, JBS USA announced it would be acquiring Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.

- 73 -

149.    The acquisition completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately US$6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

150.    The following timeline summarizes notable mergers between pork processors since 1995 which lead to an increased market concentration:

**Figure 13: History of Mergers and Acquisitions**



151.    The following chart shows the high levels of market concentration during the class period, as well as the stability of each defendants' share:

**Figure 14: Market Concentration and Market Share Stability –
U.S. Market Share by Hog Slaughter Capacity**



152.    Market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy. The following figure shows that there was a substantial drop in market share volatility during the class period:

- 75 -

**Figure 15: Standard Deviation of Combined Defendant Market Share Pre- and Within Class Period**



153.    The Herfindahl-Hirschman index (HHI) is a commonly accepted measurement of market concentration. The HHI for hog processing and intermediate pork processing is 1,838 which exceeds the DOJ threshold for a "moderately concentrated industry." This HHI value exceeds the concentration levels for similar industries, as demonstrated in the following chart:

| Industry | HHI (value) |
|---|---|
| Hog processing and intermediate pork processing | 1,838 |
| Animal  (except poultry) slaughtering | 1,085 |
| Meat processed from carcasses | 332 |
| Rendering and meat byproduct processing | 673 |
| All other miscellaneous food manufacturing | 284 |

154.    The concentration level in the pork industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. market pork

- 76 -

industry as "relatively mature and concentrated." Both of these factors – maturity and

concentration – make an industry more susceptible to collusion.

      **3.**      **Barriers to entry helped to keep competitors out of the pork
integration market and ensure the success of the conspiracy.**

     155.    Barriers to entry kept competitors out of the pork integration industry. New

entry into pork processing is costly and time consuming. In order to slaughter and process

hogs on an industrial scale, a slaughtering plants needs to be constructed. The cost to

design and build a 140,000 square foot plant with industry-standing packing equipment

and a slaughter capacity of 2,500 hogs a day is estimated at $33 million. In 2012, it cost

Cargill $25 million just to expand an existing facility. Large capital outlays such as these

can limit market entry, as it can be difficult for new firms to raise this sort of capital.

**H.**    **Defendants actively concealed the conspiracy and plaintiffs did not and could
not have discovered defendants' anticompetitive conduct.**

     156.    Plaintiffs and the members of the classes had neither actual nor constructive

knowledge of the facts constituting their claim for relief. Plaintiffs and members of the

classes did not discover, and could not have discovered through the exercise of

reasonable diligence, the existence of the conspiracy alleged herein until shortly before

filing this complaint. Defendants engaged in a secret conspiracy that did not reveal facts

that would put plaintiffs or the classes on inquiry notice that there was a conspiracy to fix

prices for pork. Throughout the class period, defendants effectively, affirmatively, and

fraudulently concealed their unlawful combination and conspiracy from plaintiffs and

class members.

010736-11/1208328 V1

157.    The combination and conspiracy alleged herein was fraudulently concealed by defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

158.    Agri Stats is a highly secretive company. Although it admits it does "have a website but there is very little information about us there as we do no advertising."

159.    In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth.

160.    At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information." And yet, despite refusing to show this

- 78 -

information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.

161.   Larry Pope, the CEO of Smithfield, made similar references to secret information in December 2010, explaining that he was confident pork supplies would not be increasing in the market, based on "the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like [that]. This is information you may not quite have."

162.   At other times, Defendants attributed the stability in the pork market to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, stated in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.

163.   Not until recently was the fact of the pork industry's use of Agri Stats widely known or reported. An investigative article published in February 2017 by Bloomberg Businessweek suggested the conspiracy that began among broiler producers

and Agri Stats was being replicated in the pork industry.[13] The article reported that Agri Stats:

> [H]as . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods. It appears that demand for the service is strong. At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services. His slideshow indicated that 27 companies had already signed up.[14]

While Bloomberg Businessweek article did not conclude that pork producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated article that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.

164.   Only after the filing of a February 7, 2018, Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In Re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats' provides to its clients in the Broiler industry.

165.   The filing of this amended complaint, along with the February 2017 article by Bloomberg Businessweek disclosing the pork industry's use of Agri Stats, collectively

---

[13] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek (Feb. 15, 2017), https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged.

[14] *Id.*

010736-11/1208328 V1

disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

166.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Pork is not exempt from antitrust regulation, and thus, before these recent events plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' pork prices before these recent events.

167.    By virtue of the fraudulent concealment of their wrongful conduct by defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

## IV.    PLAINTIFFS ALLEGE VIOLATIONS UNDER BOTH THE *PER SE* AND RULE OF REASON STANDARDS OF THE SHERMAN ACT

168.    This action alleges that the defendants' coordinated horizontal conduct was a *per se* violation of the federal and state antitrust and consumer protection laws. In the alternative, plaintiffs also allege that under Section 1 of the Sherman Act and the various state laws, defendants' agreement to unlawfully exchange competitively sensitive information amongst pork processors violates the rule of reason.

169.    Defendants ostensibly compete in the Pork industry for sales of pork to customers. The agreement, to exchange competitively sensitive information through Agri Stats, has enabled defendants to reduce competition in the market for pork.

- 81 -

010736-11/1208328 V1

### 1.     The Unlawful Agreements

170.    The Pork processors agreed with Agri Stats to reciprocally exchange competitively sensitive business information, including information regarding production levels and sales of pork. As alleged above, each of the defendants subscribed to the Agri Stats service.

171.    Agri Stats knew that its service only had value if it had sufficient participation from the market. Thus, Agri Stats reached out to the pork processors to encourage them to participate in its data-sharing operation. In 2008, Greg Bilbrey of Agri Stats told swine industry producers that "***Each and every commercial swine operation is encouraged to participate in some benchmarking effort***."

172.    Agri Stats emphasized to pork producers that the goal of the conspiracy (and the agreement to share information) was profitability, not production, and invited pork producers again, to participate in the benchmarking. Agri Stats emphasized that "We must remember that the ***ultimate goal is increasing profitability*** – not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. ***To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program***."

173.    In April 2009, Agri Stats again openly encouraged swine producers to participate in the benchmarking effort led by Agri Stats. Greg Bilbrey of Agri Stats stated that "though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial

- 82 -

benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort***."

174.    Each Defendant entered into an agreement with Agri Stats to participate in benchmarking efforts. Each and every Defendant identified in their initial disclosures specific executives that were responsible for transmitting data to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export, or production levels.

- Clemens: Joshua Rennels (Treasurer, Clemens Food Group)

- Hormel: Paul Bogle (Director, Cost Accounting)

- Indiana Packers: Mark McCain (Director, Global Sales), David Murray (Vice President, Procurement), Galen Stiverson (Controller)

- JBS: Garry Albright (Head of Business Analysis), Kevin Arnold (Head of Finance), Jamie Fosbery (Analyst), Raven Goodlow (Business Analyst), Robbie Kearns (Business Analyst), Lisa Peters (Business Analyst), Eli Zoske (Cost Accountant)

- Seaboard: Damon Ginther (Senior Director of Business Data & Analytics), Mel Davis (VP of Hog Procurement and Bio-Energy, Tom Dye (Operations Controller)

- Smithfield: Aimee Ward (Director, Hog Finance), Kent Hilbrands (Sr. Director, Operations Finance), Elizabeth Barger (Data Analyst)

- Triumph: Matt England (Chief Integrated Business Strategy Officer), Ken Grannas (Director Inventory/Reporting), Tom French (Director, Margin Management), Joe Diebold (Chief Financial Officer), Dan Marlow (Corporate Controller)

- Tyson: Deb McConnell (Division Controller)

2.      **Defendants' information exchanges had the likely effect of harming competition.**

a.      **Defendants have market power in the market for pork.**

175.    One tool that courts use to assess the competitive effects of concerted action is defining a relevant market – the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). The case concerns the sale of pork for meat consumption in the United States.

176.    There is a single market for pork for meat consumption. Prices for pork sold in the United States are quoted generally in disassembled parts, with adjustments for transportation, product form (i.e., degree of processing or added value), and packaging at the time of sale.

177.    The relevant geographic market is the United States.

b.      **There are high barriers to entry in the market for pork for meat consumption.**

178.    As alleged above, high barriers to entry in the pork processing market exist, precluding other entrants or would-be competitors from entering the market for hogs raised for consumption.

c.      **The defendants have market power in the market for pork for meat consumption.**

179.    The integrator defendants possess market power in the market for pork for consumption. Defendants and their co-conspirators control 80 percent of the market for pork for meat consumption.

- 84 -

**3.    The market for pork is the type of market where the information exchanges orchestrated by Agri Stats are likely to harm competition.**

180.    Competition is likely to be harmed when competitors with market power in concentrated markets, such as the market at issue, directly exchange strategic information about current and forward-looking plans for prices and supply. The strategic information exchanged between the defendants was competitively sensitive and a material factor in negotiations. Price, capacity, supply and costs are crucial aspects of competition. When Defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales of pork.

181.    The information exchange took place in private settings and involved the exchange of confidential, non-public information.

182.    The market for pork is characterized by numerous attributes that mean the type of information exchange facilitated by Agri Stats are particularly likely to have anticompetitive effects. In particular, the market for pork features relatively few sellers, fungible product, price-based competition, inelastic demand, and a trend toward price uniformity.

**a.    The pork market features few sellers**

183.    The pork market is highly concentrated, with relatively few sellers. The defendants control over 80 percent of pork slaughter facilities. WH Group Limited, the parent company of Smithfield, characterized the U.S. market pork industry as "relatively

- 85 -

mature and concentrated." The presence of few companies supports the inference that a conspiracy to exchange information had the intended effect of restraining competition.

       **b.**      **Pork is a fungible market**

184.    One of the distinct characteristics of the pork industry is its fungibility, also known as the ability to be freely exchangeable or replaceable in whole or in part. Existing studies have highlighted that pork is highly standardized characterized as a fungible industry as a whole. For example, the International Trade Commission relied on evidence that U.S. pork and Canadian pork are heavily fungible in a case regarding pork imports from Canada.

185.    As one scholar wrote, "consider the market for fungible goods, like pork bellies...[in this market] prices from different sellers should be truly simple to compare because, by definition, what they are selling is identical. From whom should Smithfield Farms buy pork bellies for the bacon it makes? Why the cheapest seller, if those bellies are in fact the same."

186.    Indeed, the Agri Stats reports themselves show that pork is fungible because they aggregate data across Defendants for particular types of pork products and allow Defendants to compare detailed information on prices for the same fungible product.

       **c.**      **The pork market features price-based competition**

187.    Pork is a commodity market that faces price-based competition. For example, Arnold Drung, the president of Conestoga Meat Packers e-mailed Brian Snyder,

an Agri Stat executive, that "Based on Agristats data, we know"… that "all further

processors look to purchase commodity items at the lowest price possible."

> **d.     Demand for pork is relatively inelastic**

188.   Price elasticity of demand (PED) is a measure used to quantify the degree

to which quantity demand for a good or service changes with respect to price.[15] A PED

value between 0 and -1 indicates there is inelastic demand for the good or service, i.e., a 1

percent increase in price induces a less than 1 percent decrease in quantity demanded.

The average PED estimate for the pork market was -0.64 – meaning the demand for pork

is inelastic.

> **e.     The pork market features a trend towards price uniformity.**

189.   Collusion becomes easier for manufacturers of a homogeneous product

when prices are the only way in which products can be differentiated from one another.

Pork loins, bacon, ribs, and other pork products are produced on a commercial scale and

sold in supermarkets. For example, pork loin from Tyson and Smithfield are virtually

indistinguishable, with similar nutritional values, branding and packaging. These

products are highly substitutable, making it easier for competing firms to reach an

agreement on a common pricing structure.[16] The Pork Checkoff program, administered

---

[15] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson,. et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

[16] *See Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, The United States Department of Justice,

- 87 -

by the National Pork Board established by Congress, has stated that "U.S. pork production and pig prices vary in a predictable manner during the calendar year."

### 4. Defendants' information exchanges corrupted the competitive process.

190. Agri Stats specifically marketed its services to the Pork defendants as a mechanism to "improve the bottom line profitability for all participants by providing accurate & timely comparative data", such as shown in the below slide from a 2010 presentation that Agri Stats gave to Hormel.

---

https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.") (last visited Aug. 16, 2018); Marc Ivaldi. et al., *The Economics of Tacit Collusion* (March 2003), http://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.pdf.

010736-11/1208328 V1

## PURPOSE

### *Agri Stats Mission*

**Improve the bottom line profitability**
for all participants by providing
**accurate & timely comparative data**
while preserving
**confidentiality of individual companies**.

{DATE}   

191.    Thus, Agri Stats services provided defendant participants a way to mutually improve their profits by avoiding the natural market-based competition over things such as price that would lower their profits to the benefit of consumers.

192.    A common saying in the Agri Stats circle is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "***the ultimate goal is increasing profitability***."

193.    And indeed, Defendants used the strategic information obtained through the Agri Stats and Express Markets reports to reduce the uncertainty that they each should have faced from not knowing what their competitors were doing in the market. This strategic information was a material factor in their decisions to reduce supply while

- 89 -

raising the price of pork. Thus, this knowledge tainted what should have been their

independent decisions about the supply and price of pork.

194.    Defendants' unlawful information exchanges through Agri Stats and

Express Markets were not reasonably necessary to further any procompetitive purpose.

The information directly and privately shared between high-level executives was

disaggregated, company specific, current, confidential, and related to core characteristics

of competition between them.

## V.    JURISDICTION AND VENUE

195.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C.

§ 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman

Act (15 U.S.C. § 1). Plaintiffs also bring these state law class claims on behalf of all the

classes to recover actual and/or compensatory damages, double and treble damages as

permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused

by defendants' conduct in restricting the supply of pork and increasing the price of pork.

Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter

jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15(a) and 26.

196.    Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d)

because one or more defendants resided or transacted business in this District, is licensed

to do business or is doing business in this District, and because a substantial portion of

the affected interstate commerce described herein was carried out in this District.

010736-11/1208328 V1

197.    This Court has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

198.    The activities of the defendants and all co-conspirators, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## VI.    PARTIES

### A.    Plaintiffs

199.    Plaintiff Borhan Ishani Afoosi was a resident at all relevant times of Glendale, Arizona. During the Class Period and while residing in Arizona, plaintiff Afoosi indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Afoosi suffered injury as a result of defendants' conduct alleged herein.

200.    Plaintiff Michael Anderson was a resident at all relevant times of Peoria, Arizona. During the Class Period and while residing in Arizona, plaintiff Anderson indirectly purchased pork and pork products for his own use and not for resale that was

produced by one or more defendants or their co-conspirators. Plaintiff Anderson suffered

injury as a result of defendants' conduct alleged herein.

201.    Plaintiff Rebekah Kingsley was a resident at all relevant times of
Bentonville, Arkansas. During the Class Period and while residing in Arkansas, plaintiff
Kingsley indirectly purchased pork and pork products for her own use and not for resale
that was produced by one or more defendants or their co-conspirators. Plaintiff Kingsley
suffered injury as a result of defendants' conduct alleged herein.

202.201.    Plaintiff Sandra Steffen was a resident at all relevant times of

Camarillo, California. During the Class Period and while residing in California, plaintiff

Steffen indirectly purchased pork and pork products for her own use and not for resale

that was produced by one or more defendants or their co-conspirators. Plaintiff Steffen

suffered injury as a result of defendants' conduct alleged herein.

203.202.    Plaintiff Michael Pickett was a resident at all relevant times of the

District of Columbia. During the Class Period and while residing in Washington, DC,

plaintiff Pickett indirectly purchased pork and pork products for his own use and not for

resale that was produced by one or more defendants or their co-conspirators. Plaintiff

Pickett suffered injury as a result of defendants' conduct alleged herein.

204.    Plaintiff Lisa Axelrod is currently a resident of Hillsboro Beach, Florida. At
all times between 2009 and approximately March 2018 Plaintiff Lisa Axelrod resided in
North Hollywood, California. During the Class Period and while residing in California
and Florida, plaintiff Axelrod indirectly purchased pork and pork products for her own
use and not for resale that was produced by one or more defendants or their co-

~~conspirators. Plaintiff Axelrod suffered injury as a result of defendants' conduct alleged herein.~~

~~205.~~203.    Plaintiff David Look was a resident at all relevant times of Honolulu, Hawaii. During the Class Period and while residing in Hawaii, plaintiff Look indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Look suffered injury as a result of defendants' conduct alleged herein.

~~206.~~204.    Plaintiff Joseph Realdine was a resident at all relevant times of Haleiwa, Hawaii. During the Class Period and while residing in Hawaii, plaintiff Realdine indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Realdine suffered injury as a result of defendants' conduct alleged herein.

~~207.~~205.    Plaintiff Ryan Kutil was a resident at all relevant times of Champaign, Illinois. During the Class Period and while residing in Illinois, plaintiff Kutil indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Kutil suffered injury as a result of defendants' conduct alleged herein.

~~208.~~206.    Plaintiff Kory Bird was a resident at all relevant times of Des Moines, Iowa. During the Class Period and while residing in Iowa, plaintiff Bird indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Bird suffered injury as a result of defendants' conduct alleged herein.

- 93 -

~~209.   Plaintiff Barbara Brueggemann was a resident at all relevant times of Shawnee, Kansas. During the Class Period and while residing in Kansas, plaintiff Brueggemann indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Brueggemann suffered injury as a result of defendants' conduct alleged herein.~~

~~210.~~207.    Plaintiff Duncan Birch was a resident at all relevant times of Scarborough, Maine. During the Class Period and while residing in Maine, plaintiff Birch indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Birch suffered injury as a result of defendants' conduct alleged herein.

~~211.   Plaintiff Paul Glantz was a resident at all relevant times of Agawam, Massachusetts. During the Class Period and while residing in Massachusetts, plaintiff Glantz indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Glantz suffered injury as a result of defendants' conduct alleged herein.~~

~~212.~~208.    Plaintiff Jordan Chambers was a resident at all relevant times of Decatur, Michigan. During the Class Period and while residing in Michigan, plaintiff Chambers indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Chambers suffered injury as a result of defendants' conduct alleged herein.

~~213.~~209.    Plaintiff Robert Eccles was a resident at all relevant times of Carleton, Michigan. During the Class Period and while residing in Michigan, plaintiff

- 94 -

Eccles indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Eccles suffered injury as a result of defendants' conduct alleged herein.

214.210.    Plaintiff Jennifer Sullivan was a resident at all relevant times of Elk River, Minnesota. During the Class Period and while residing in Minnesota, plaintiff Sullivan indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Sullivan suffered injury as a result of defendants' conduct alleged herein.

215.211.    Plaintiff Anbessa Tufa was a resident at all relevant times of New Hope, Minnesota. During the Class Period and while residing in Minnesota, plaintiff Tufa indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Tufa suffered injury as a result of defendants' conduct alleged herein.

216.    Plaintiff Susan McCullough was a resident at all relevant times of Hernando, Mississippi. During the Class Period and while residing in Mississippi, plaintiff Mississippi indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff McCullough suffered injury as a result of defendants' conduct alleged herein.

217.212.    Plaintiff Kenneth King was a resident at all relevant times of Winfield, Missouri. During the Class Period and while residing in Missouri, plaintiff King indirectly purchased pork and pork products for his own use and not for resale that

was produced by one or more defendants or their co-conspirators. Plaintiff King suffered

injury as a result of defendants' conduct alleged herein.

218.   Plaintiff Craig Thomsen was a resident at all relevant times of Wayne,

Nebraska. During the Class Period and while residing in Nebraska., plaintiff Thomsen

indirectly purchased pork and pork products for his own use and not for resale that was

produced by one or more defendants or their co-conspirators. Plaintiff Thomsen suffered

injury as a result of defendants' conduct alleged herein.

219.213.     Plaintiff Alika Naehu was a resident at all relevant times of Las

Vegas, Nevada. During the Class Period and while residing in Nevada, plaintiff Naehu

indirectly purchased pork and pork products for her own use and not for resale that was

produced by one or more defendants or their co-conspirators. Plaintiff Naehu suffered

injury as a result of defendants' conduct alleged herein.

220.214.     Plaintiff Wanda Duryea was a resident at all relevant times of

Farmington, New Hampshire. During the Class Period and while residing in New

Hampshire, plaintiff Duryea indirectly purchased pork and pork products for her own use

and not for resale that was produced by one or more defendants or their co-conspirators.

Plaintiff Duryea suffered injury as a result of defendants' conduct alleged herein.

221.215.     Plaintiff Michael Reilly was a resident at all relevant times of

Albuquerque, New Mexico. During the Class Period and while residing in New Mexico,

plaintiff Reilly indirectly purchased pork and pork products for his own use and not for

resale that was produced by one or more defendants or their co-conspirators. Plaintiff

Reilly suffered injury as a result of defendants' conduct alleged herein.

222.216.    Plaintiff Edwin Blakey was a resident at all relevant times of New Windsor, New York. During the Class Period and while residing in New York, plaintiff Blakey indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Blakey suffered injury as a result of defendants' conduct alleged herein.

223.217.    Plaintiff Jeffrey Allison was a resident at all relevant times of Brooklyn, New York. During the Class Period and while residing in New York, plaintiff Allison indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Allison suffered injury as a result of defendants' conduct alleged herein.

224.218.    Plaintiff Kenneth Neal was a resident at all relevant times of Salisbury, North Carolina. During the Class Period and while residing in North Carolina, plaintiff Neal indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Neal suffered injury as a result of defendants' conduct alleged herein.

225.219.    Chad Nodland was a resident at all relevant times of Bismarck, North Dakota. During the Class Period and while residing in North Dakota, plaintiff Nodland indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Nodland suffered injury as a result of defendants' conduct alleged herein.

226.220.    Plaintiff Chris Deery was a resident at all relevant times of Fargo, North Dakota. During the Class Period and while residing in North Dakota, plaintiff

- 97 -

Deery indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Deery suffered injury as a result of defendants' conduct alleged herein.

227.221.    Plaintiff Laura Wheeler was a resident at all relevant times of Middletown, Rhode Island. During the Class Period and while residing in Rhode Island, plaintiff Wheeler indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Wheeler suffered injury as a result of defendants' conduct alleged herein.

228.222.    Plaintiff Christina Hall was a resident at all relevant times of York, South Carolina. During the Class Period and while residing in South Carolina, plaintiff Hall indirectly purchased pork and pork products for her own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Hall suffered injury as a result of defendants' conduct alleged herein.

229.    Plaintiff Chase Hoke was a resident at all relevant times of Sparta, Tennessee. During the Class Period and while residing in Tennessee, plaintiff Hoke indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Hoke suffered injury as a result of defendants' conduct alleged herein.

230.223.    Plaintiff Donya Collins was a resident at all relevant times of Midvale, Utah. During the Class Period and while residing in Utah, plaintiff Collins indirectly purchased pork and pork products for her own use and not for resale that was

010736-11/1208328 V1

produced by one or more defendants or their co-conspirators. Plaintiff Collins suffered

injury as a result of defendants' conduct alleged herein.

231.224.      Thomas Cosgrove was a resident at all relevant times of Vergennes,

Vermont. During the Class Period and while residing in Vermont, plaintiff Cosgrove

indirectly purchased pork and pork products for his own use and not for resale that was

produced by one or more defendants or their co-conspirators. Plaintiff Cosgrove suffered

injury as a result of defendants' conduct alleged herein.

232.    Plaintiff Rebecca Green Watson was a resident at all relevant times of

Leesburg, Virginia. During the Class Period and while residing in Virginia, plaintiff

Watson indirectly purchased pork and pork products for her own use and not for resale

that was produced by one or more defendants or their co-conspirators. Plaintiff Watson

suffered injury as a result of defendants' conduct alleged herein.

225.    Plaintiff Charles Dye was a resident at all relevant times of Mount Lookout,

West Virginia. During the Class Period and while residing in West Virginia, plaintiff Dye

indirectly purchased pork and pork products for his own use and not for resale that was

produced by one or more defendants or their co-conspirators. Plaintiff Dye suffered

injury as a result of defendants' conduct alleged herein.

226.    Plaintiff Debbie Boyko is currently a resident of Naples, Florida. During

the Class Period and while residing in Florida, plaintiff Boyko indirectly purchased pork

and pork products for hiser own use and not for resale that was produced by one or more

defendants or their co-conspirators. Plaintiff Boyko suffered injury as a result of

defendants' conduct alleged herein.

227.    Plaintiff Pam Petersen is currently a resident of Bancroft, Nebraska. During the Class Period and while residing in Nebraska, plaintiff Petersen indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Petersen suffered injury as a result of defendants' conduct alleged herein.

228.    Plaintiff Stacy Troupe is currently a resident of Fremont, California. During the Class Period and while residing in California, plaintiff Troupe indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Troupe suffered injury as a result of defendants' conduct alleged herein.

229.    Plaintiff James Eaton is currently a resident of Overland Park, Kansas. During the class period and while residing in Kansas, plaintiff Eaton indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Eaton suffered injury as a result of defendants' conduct alleged herein.

230.    Plaintiff Isabelle Bell is currently a resident of Pulaski, Tennessee. During the class period and while residing in Tennessee, plaintiff Bell indirectly purchased pork and pork products for his own use and not for resale that was produced by one or more defendants or their co-conspirators. Plaintiff Bell suffered injury as a result of defendants' conduct alleged herein.

010736-11/1208328 V1

**B.**   **Defendants**

233.231.      Agri Stats, Inc. is an Indiana corporation located in Fort Wayne,

Indiana and is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats

acted as a co-conspirator of the pork integrator-defendants by facilitating the exchange of

confidential, proprietary, and competitively sensitive data among defendants and their co-

conspirators.

234.232.      Clemens Food Group, LLC is a limited-liability company

headquartered in Hatfield, Pennsylvania and is a wholly owned subsidiary of The

Clemens Family Corporation. During the class period, Clemens and/or its predecessors,

wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce,

directly or through its wholly owned or controlled affiliates, to purchasers in the United

States.

235.233.      Hatfield Quality Meats, Inc. is a wholly owned subsidiary of The

Clemens Family Corporation. Hatfield Quality Meats is headquartered in Hatfield,

Pennsylvania. During the class period, Hatfield Quality Meats and/or its predecessors,

wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce,

directly or through its wholly owned or controlled affiliates, to purchasers in the United

States.

236.234.      Hormel Foods Corporation is a Delaware corporation engaged in the

production of meat and food products, and the marketing of these products. Hormel is

headquartered in Austin, Minnesota. During the Class Period, Hormel Foods Corporation

and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in

010736-11/1208328 V1

interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

237.   Indiana Packers Corporation is an Indiana corporation engaged in the production of meat and food products, and the marketing of these products. Indiana Packers is headquartered in Delphi, Indiana and is wholly owned and controlled by Mitsubishi Corporation (Americas). During the Class Period, Indiana Packers and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

238.235.    JBS USA Food Company is a subsidiary of JBS USA Food Company Holdings and is a Delaware corporation, headquartered in Greeley, Colorado. It is one of the world's largest beef and pork processing companies. During the Class Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

239.236.    Seaboard Foods LLC, a wholly owned subsidiary of Seaboard Corporation, is a limited-liability company headquartered in Shawnee Mission, Kansas. During the Class Period, Seaboard and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

240.237.    Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, the largest

pork company in the world. Smithfield Foods is headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

241.238.    Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the class period, Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

242.239.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. It wholly owns and controls two subsidiaries, Tyson Prepared Foods, Inc. and Tyson Fresh Meats Inc. that slaughter and sell pork products. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

243.240.    Tyson Fresh Meats Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

244.241.    Tyson Prepared Foods, Inc. is a Delaware corporation that operates as a subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Prepared Foods, Inc.

and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in

interstate commerce, directly or through its wholly owned or controlled affiliates, to

purchasers in the United States.

## VII.   CLASS ACTION ALLEGATIONS

245. 242.      Plaintiffs bring this action on behalf of themselves, and as a class

action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking

injunctive relief pursuant to federal law, and damages pursuant to various state antitrust,

unfair competition, unjust enrichment, and consumer protection laws of the states listed

below on behalf of the members of the following classes:

A.   **Nationwide Injunctive Relief class:** All persons and entities who
     indirectly purchased pork from Defendants or co-conspirators for personal
     use in the United States during the Class Period.

B.   **Arizona class**: All persons and entities who indirectly purchased pork
     from Defendants or co-conspirators for personal use in Arizona during the
     Class Period.

C.   **California class:** All persons and entities who indirectly purchased pork
     from Defendants or co-conspirators for personal use in California during
     the Class Period.

D.   **District of Columbia class**: All persons and entities who indirectly
     purchased pork from Defendants or co-conspirators for personal use in the
     District of Columbia during the Class Period.

E.   **Florida class:** All persons and entities who indirectly purchased pork
     from Defendants or co-conspirators for personal use in Florida during the
     Class Period.

F.   **Hawaii class:** All persons and entities who indirectly purchased pork
     from Defendants or co-conspirators for personal use in Hawaii during the
     Class Period.

010736-11/1208328 V1

G.   **Illinois class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Illinois during the Class Period.

H.   **Iowa class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Iowa during the Class Period.

I.   **Kansas class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Kansas during the Class Period.

J.   **Maine class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Maine during the Class Period.

K.   ~~**Massachusetts class:**~~ ~~All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Massachusetts during the Class Period.~~

~~L.~~K.   **Michigan class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Michigan during the Class Period.

~~M.~~L.   **Minnesota class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Minnesota during the Class Period.

~~N.~~   ~~**Mississippi class:**~~ ~~All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Mississippi during the Class Period.~~

~~O.~~M.   **Missouri class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Missouri during the Class Period.

~~P.~~N.   **Nebraska class:** All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Nebraska during the Class Period.

~~Q.~~O.   **Nevada class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Nevada during the Class Period.

010736-11/1208328 V1

R.P. **New Hampshire class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in New Hampshire during the Class Period.

S.Q. **New Mexico class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in New Mexico during the Class Period.

T.R. **New York class**: All persons and who indirectly purchased pork from Defendants or co-conspirators for personal use in New York during the Class Period.

U.S. **North Carolina class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in North Carolina during the Class Period.

V.T. **North Dakota class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in North Dakota during the Class Period.

W.U.    **Rhode Island class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Rhode Island during the Class Period.

X.V. **South Carolina class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in South Carolina during the Class Period.

Y.W.    **Tennessee class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Tennessee during the Class Period.

Z.X. **Utah class**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Utah during the Class Period.

Z.    ~~Virginia~~: ~~All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in Virginia during the Class Period.~~

- 106 -

AA.Y.    **West Virginia**: All persons and entities who indirectly purchased pork from Defendants or co-conspirators for personal use in West Virginia during the Class Period.

246.243.    Specifically excluded from these classes are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded from these classes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action. Further excluded from the classes and National Injunctive Relief Class are purchasers of value-added products not manufactured, supplied or processed by defendants, or otherwise not under the control of defendants.

247.244.    Class Identity: The above-defined classes are readily identifiable and is one for which records should exist.

248.245.    Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of pork. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

249.246.    Typicality: Plaintiffs' claims are typical of the claims of the members of the classes because plaintiffs purchased pork indirectly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same

- 107 -

common course of conduct giving rise to the claims of the classes and the relief sought is common to the classes.

250.247.   Common Questions Predominate: There are questions of law and fact common to the classes, including, but not limited to:

A.   Whether defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of pork sold in interstate commerce in the United States;

B.   The identity of the participants of the alleged conspiracy;

C.   The duration of the conspiracy alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

D.   Whether the alleged conspiracy violated the antitrust and consumer protection laws of the various states;

E.   Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the classes;

F.   The effect of defendants' alleged conspiracy on the prices of pork sold in the United States during the Class Period;

G.   Whether plaintiffs and other members of the classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

H.   The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the classes, predominate over any questions affecting only individual members of the classes.

251.248.   Adequacy: Plaintiffs will fairly and adequately protect the interests of the classes in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the classes who indirectly purchased pork from defendants and

- 108 -

plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the classes.

252.249.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the classes is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the classes to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

253.250.    The prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

254.251.    Plaintiffs bring the classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more pork products that a defendant or co-conspirator produced for personal use during the respective class periods.

010736-11/1208328 V1

255.252.    Defendants have acted on grounds generally applicable to the classes, thereby making final injunctive relief appropriate with respect to the classes as a whole.

## VIII.  ANTITRUST INJURY

256.253.    Defendants' anticompetitive conduct had the following effects, among others:

A.  Price competition has been restrained or eliminated with respect to pork;

B.  The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.  Indirect purchasers of pork have been deprived of free and open competition; and

D.  End-user consumers of pork who indirectly purchased pork for personal use, including plaintiffs, paid artificially inflated prices.

257.254.    The pork that Plaintiffs and class members purchased was in substantially the same form as when they were initially sold by defendants. As a result, the pork follows a traceable physical chain from defendants to plaintiffs and class members, and the overcharges on pork can be traced from defendants to plaintiffs and class members.

258.255.    As a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to consumers, plaintiffs and class members here, in the form of

- 110 -

higher retail prices. When demand is inelastic, as it is for pork, the pass-through rate to
end users is at or near 100 percent.

259.256.    Consequently, while the direct purchasers were the first to pay
supra-competitive prices, the overcharge was passed along the distribution chain and
absorbed by plaintiffs and class members when they purchased the pork for personal use.

260.257.    Commonly used and well-accepted economic models can be used to
measure both the extent and the amount of the supra-competitive charge passed through
the chain of distribution to end-user consumers. Thus, the economic harm to plaintiffs
and the class member can be quantified.

261.258.    The purpose of the conspiratorial conduct of defendants and their co-
conspirators was to raise, fix, or maintain the price of pork and, as a direct and
foreseeable result. Plaintiffs and the classes paid supra-competitive prices for pork during
the Class Period.

262.259.    By reason of the alleged violations of the antitrust laws, plaintiffs
and the classes have sustained injury to their businesses or property, having paid higher
prices for pork than they would have paid in the absence of defendants' illegal contract,
combination, or conspiracy and as a result have suffered damages.

263.260.    This is an antitrust injury of the type that the antitrust laws were
meant to punish and prevent.

## IX.   CAUSES OF ACTION

### VIOLATION OF THE SHERMAN ACT

#### FIRST CLAIM FOR RELIEF
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT
15 U.S.C. § 1 FOR CONSPIRACY TO RESTRAIN PRODUCTION
(ON BEHALF OF NATIONWIDE CLASS FOR
INJUNCTIVE AND EQUITABLE RELIEF)**

~~264.~~261.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~265.~~262.    Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2009, and continuing through the present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for pork in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

~~266.~~263.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    A.  Fixing, raising, and stabilizing the price of pork; and

    B.  Allocating among themselves and collusively reducing the production of pork.

~~267.~~264.    The combination and conspiracy alleged herein has had the following effects, among others:

010736-11/1208328 V1

A. Price competition in the sale of pork has been restrained, suppressed, and/or eliminated in the United States;

B. Prices for pork sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

C. Those who purchased pork indirectly from defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition.

268.265.    Plaintiffs and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for pork purchased indirectly from the defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

269.266.    Plaintiffs and members of the classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**15 U.S.C. § 1 FOR CONSPIRACY TO EXCHANGE COMPETITIVE**
**INFORMATION**
**(ON BEHALF OF NATIONWIDE CLASS FOR**
**INJUNCTIVE AND EQUITABLE RELIEF)**

270.267.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271.268.    Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2009, and continuing through the present, the exact dates being

- 113 -

unknown to plaintiffs, defendants and their co-conspirators entered into a continuing

agreement to regularly exchange detailed, timely, competitively sensitive and non-public

information about their operations. This agreement is an unreasonable restraint of trade in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

272.269.     The relevant product market is pork and the relevant geographic

market is the continental United States.

273.270.     Defendant Processors possess market power in the Relevant Market.

Defendant Processors control more than 80 percent of the Relevant Market. Defendant

Processors' collective market power includes the power to artificially deflate the amount

of pork produced in the United States below competitive levels and to artificially inflate

the price Plaintiffs pay for pork above competitive levels.

274.271.     An increase in the price of Pork could be imposed collectively by the

Defendants without causing many consumers to switch their purchases to another

product. Pork constitutes a unique product market.

275.272.     Defendants view the pork products as fungible. Pork products are

generally interchangeable, permitting Defendant Processors to readily to compare and

match each other's pricing.

276.273.     The information regularly exchanged by Defendants pursuant to the

agreement has consisted of detailed, competitively sensitive and non-public information

about current supply, production and pricing plans regarding pork. The information

exchanges specifically included the exchange through Agri Stats of weekly and monthly

reports regarding Defendants' pork operations, including weekly sales data that allowed

Defendants to compare their prices with their competitors and raise prices that were
lower.

277.274.     Defendants' regular information exchanges through Agri Stats
reflected concerted action between horizontal competitors in the market for pork.

278.275.     Each Defendant Integrator furnished competitively sensitive
information to other Defendant Integrators with the understanding that it would be
reciprocated. Agri Stats enforced this understanding by requiring Defendants to share
data in order to receive comparable data.

279.276.     The agreement to regularly exchange detailed and non-public
information about current production, supply, and pricing suppressed competition
between the Defendants. Agri Stats specifically identified for Defendants "opportunities"
where their pricing was lower than other Defendants and where they could raise their
prices to match.

280.277.     When defendants that are competing for the same consumers
exchange competitive information, it reduces the incentives to compete on price.
Accordingly, Defendants used the data obtained through Agri Stats to reduce the
uncertainty that they each should have faced from not knowing what their competitors
were offering and providing in the pork market. This strategic information was a material
factor in Defendant Processors' decisions to inflate the prices that Plaintiffs paid for pork
during the class period.

281.278.     Defendants' unlawful agreements to exchange, and the actual
exchanges of nonpublic, timely, and detailed data were not reasonably necessary to

- 115 -

further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

282.279.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the market for pork in the United States and (2) inflating the prices of pork during the Class Period.

283.280.    As a result of the unlawful agreement alleged herein to exchange information, Plaintiffs and the other Class Members have been injured in their business or property by paying artificially inflated prices for pork during the Class Period.

**VIOLATIONS OF STATE ANTITRUST LAWS**

284.281.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

285.282.    The following claims for relief are pleaded under the antitrust laws of each jurisdiction identified below on behalf of the indicated class.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. § 44-1401, *ET SEQ.***
**(ON BEHALF OF THE ARIZONA CLASS)**

286.283.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

287.284.    By reason of the conduct alleged herein, defendants have violated Arizona Rev. Stat. § 44-1401, *et seq*.

- 116 -

288.285.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Arizona.

289.286.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

290.287.    Defendants' violations of Arizona law were flagrant.

291.288.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

292.289.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

293.290.    By reason of the foregoing, plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE § 16700, *ET SEQ*.**
**(ON BEHALF OF THE CALIFORNIA CLASS)**

294.291.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

- 117 -

295.292.     The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

296.293.     California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

297.294.     Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

298.295.     A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

299.296.     Plaintiffs purchased pork within the State of California during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

300.297.     Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

- 118 -

301.298.    Plaintiffs and members of the California Class were injured in their business or property, with respect to purchases of pork in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT,**
**D.C. CODE § 28-4501, *ET SEQ*.**
**(ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)**

302.299.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

303.300.    The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

304.301.    Plaintiffs purchased pork within the District of Columbia during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

305.302.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

- 119 -

306.303.    Defendants contracted, combined or conspired to act in restraint of

trade within the District of Columbia, and monopolized or attempted to monopolize the

market for pork within the District of Columbia, in violation of D.C. Code § 28-4501, *et*

*seq.*

307.304.    Plaintiffs and members of the District of Columbia Class were

injured with respect to purchases of pork in the District of Columbia and are entitled to

all forms of relief, including actual damages, treble damages, and interest, reasonable

attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.***
**(ON BEHALF OF THE ILLINOIS CLASS)**

308.305.    Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

309.306.    The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote

the unhampered growth of commerce and industry throughout the State by prohibiting

restraints of trade which are secured through monopolistic or oligarchic practices and

which act or tend to act to decrease competition between and among persons engaged in

commerce and trade. . . ." 740 ILCS 10/2.

310.307.    Plaintiffs purchased pork within the State of Illinois during the Class

Period. But for defendants' conduct set forth herein, the price per pound of pork would

have been lower, in an amount to be determined at trial.

- 120 -

311.308.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

312.309.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for pork sold, and/or for allocating customers or markets for pork within the intrastate commerce of Illinois.

313.310.    Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for pork in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq.*

314.311.    Plaintiffs and members of the Illinois Class were injured with respect to purchases of pork in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF
### VIOLATION OF THE IOWA COMPETITION LAW
### IOWA CODE § 553.1, *ET SEQ.*
### (ON BEHALF OF THE IOWA CLASS)

315.312.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

316.313.    The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

- 121 -

317.314.     Plaintiffs purchased pork within the State of Iowa during the Class
Period. But for defendants' conduct set forth herein, the price per pound of pork would
have been lower, in an amount to be determined at trial.

318.315.     Defendants contracted, combined or conspired to restrain or
monopolize trade in the market for pork, and attempted to establish or did in fact
establish a monopoly for the purpose of excluding competition or controlling, fixing or
maintaining prices for pork, in violation of Iowa Code § 553.1, *et seq.*

319.316.     Plaintiffs and members of the Iowa Class were injured with respect
to purchases of pork in Iowa, and are entitled to all forms of relief, including actual
damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs,
and injunctive relief.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT**
**KAN. STAT. ANN. § 50-101, *ET SEQ.***
**(ON BEHALF OF THE KANSAS CLASS)**

320.317.     Plaintiffs incorporate and reallege, as though fully set forth herein,
each and every allegation set forth in the preceding paragraphs of this Complaint.

321.318.     The Kansas Restraint of Trade Act aims to prohibit practices which,
*inter alia*, "tend to prevent full and free competition in the importation, transportation or
sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

322.319.     Plaintiffs purchased pork within the State of Kansas during the Class
Period. But for defendants' conduct set forth herein, the price per pound of pork would
have been lower, in an amount to be determined at trial.

- 122 -

323.320.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

324.321.    Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of pork, increasing the price of pork, preventing competition in the sale of pork, or binding themselves not to sell pork, in a manner that established the price of pork and precluded free and unrestricted competition among themselves in the sale of pork, in violation of Kan. Stat. Ann. § 50-101, *et seq*.

325.322.    Plaintiffs and members of the Kansas Class were injured with respect to purchases of pork in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

### NINTH CLAIM FOR RELIEF
**VIOLATION OF THE MAINE'S ANTITRUST STATUTE**
**ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ*.**
**(ON BEHALF OF THE MAINE CLASS)**

326.323.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

327.324.    Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

- 123 -

328.325.     Plaintiffs purchased pork within the State of Maine during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

329.326.     Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

330.327.     Defendants contracted, combined or conspired in restraint of trade or commerce of pork within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of pork within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

331.328.     Plaintiffs and members of the Maine Class were injured with respect to purchases of pork in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

**TENTH CLAIM FOR RELIEF**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT**
**MICH. COMP. LAWS § 445.771, *ET SEQ.***
**(ON BEHALF OF THE MICHIGAN CLASS)**

332.329.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

333.330.     The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

- 124 -

334.331.    Plaintiffs purchased pork within the State of Michigan during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

335.332.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

336.333.    Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for pork, in violation of Mich. Comp. Laws § 445.772, *et seq.*

337.334.    Plaintiffs and members of the Michigan Class were injured with respect to purchases of pork in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**ELEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. § 325D.49, *ET SEQ.***
**(ON BEHALF OF THE MINNESOTA CLASS)**

338.335.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

339.336.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to

- 125 -

establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

340.337.    Plaintiffs purchased pork within the State of Minnesota during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

341.338.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

342.339.    Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for pork within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for pork within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for pork within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

343.340.    Plaintiffs and members of the Minnesota Class were injured with respect to purchases of pork in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

010736-11/1208328 V1

### TWELFTH CLAIM FOR RELIEF
### VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,
### MISS. CODE ANN. § 74-21-1, *ET SEQ.*
### (ON BEHALF OF THE MISSISSIPPI CLASS)

344.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

345.   Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

346.   Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia,* restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

346.   Plaintiffs purchased pork within the State of Mississippi during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

346.   Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

347.   Defendants combined, contracted, understood and agreed in the market for pork, in a manner inimical to public welfare, with the effect of restraining trade,

increasing the price of pork and hindering competition in the sale of pork, in violation of Miss. Code Ann. § 75-21-1(a), *et seq.*

347.    Defendants monopolized or attempted to monopolize the production, control or sale of pork, in violation of Miss. Code Ann. § 75-21-3, *et seq.*

347.    Defendants' pork is sold indirectly via distributors throughout the State of Mississippi. During the Class Period, defendants' illegal conduct substantially affected Mississippi commerce.

347.    Plaintiffs and members of the Mississippi Class were injured with respect to purchases of pork in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**THIRTEENTH TWELFTH CLAIM FOR RELIEF**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT,**
**MO. ANN. STAT. § 407.010, *ET SEQ*.**
**(ON BEHALF OF THE MISSOURI CLASS)**

348.341.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

349.342.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

350.343.    Plaintiffs purchased pork within the State of Missouri during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

351.344.     Under Missouri law, indirect purchasers have standing to maintain

an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J.*

*Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

352.345.     Defendants contracted, combined or conspired in restraint of trade or

commerce of pork within the intrastate commerce of Missouri, and monopolized or

attempted to monopolize the market for pork within the intrastate commerce of Missouri

by possessing monopoly power in the market and willfully maintaining that power

through agreements to fix prices, allocate markets and otherwise control trade, in

violation of Mo. Ann. Stat. § 407.010, *et seq.*

353.346.     Plaintiffs and members of the Missouri Class were injured with

respect to purchases of pork in Missouri and are entitled to all forms of relief, including

actual damages or liquidated damages in an amount which bears a reasonable relation to

the actual damages which have been sustained, as well as reasonable attorneys' fees,

costs, and injunctive relief.

**FOURTEENTH THIRTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEBRASKA JUNKIN ACT,**
**NEB. REV. STAT. § 59-801, *ET SEQ.***
**(ON BEHALF OF THE NEBRASKA CLASS)**

354.347.     Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

355.348.     Chapter 59 of the Nebraska Revised Statute generally governs

business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act,

prohibit antitrust violations such as restraints of trade and monopolization.

010736-11/1208328 V1

356.349.     Plaintiffs purchased pork within the State of Nebraska during the

Class Period. But for defendants' conduct set forth herein, the price per pound of pork

would have been lower, in an amount to be determined at trial.

357.350.     Under Nebraska law, indirect purchasers have standing to maintain

an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev.

Stat. § 59-821.

358.351.     Defendants contracted, combined or conspired in restraint of trade or

commerce of pork within the intrastate commerce of Nebraska, and monopolized or

attempted to monopolize the market for pork within the intrastate commerce of Nebraska

by possessing monopoly power in the market and willfully maintaining that power

through agreements to fix prices, allocate markets and otherwise control trade, in

violation of Neb. Rev. Stat. § 59-801, *et seq.*

359.352.     Plaintiffs and members of the Nebraska Class were injured with

respect to purchases of pork in Nebraska and are entitled to all forms of relief, including

actual damages or liquidated damages in an amount which bears a reasonable relation to

the actual damages which have been sustained, as well as reasonable attorneys' fees,

costs, and injunctive relief.

### ~~FIFTEENTH~~ FOURTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,
### NEV. REV. STAT. § 598A.010, *ET SEQ.*
### (ON BEHALF OF THE NEVADA CLASS)

360.353.     Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

- 130 -

361.354.      The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

362.355.      The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

363.356.      Plaintiffs purchased pork within the State of Nevada during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

364.357.      Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

365.358.      Defendants fixed prices by agreeing to establish prices for pork in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of pork within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq*.

366.359.      Plaintiffs and members of the Nevada Class were injured with respect to purchases of pork in Nevada in that at least thousands of sales of defendants'

pork took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by defendants' conduct.

367.360.    Accordingly, plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

368.361.    In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by plaintiffs.

## SIXTEENTH FIFTEENTH CLAIM FOR RELIEF
### VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,
### N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.*
### (ON BEHALF OF THE NEW HAMPSHIRE CLASS)

369.362.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

370.363.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

371.364.    Plaintiffs purchased pork within the State of New Hampshire during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

372.365.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

- 132 -

373.366.    Defendants fixed, controlled or maintained prices for pork, allocated customers or markets for pork, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

374.367.    Plaintiffs and members of the New Hampshire Class were injured with respect to purchases of pork in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**SEVENTEENTH SIXTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.***
**(ON BEHALF OF THE NEW MEXICO CLASS)**

375.368.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

376.369.    The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

377.370.    Plaintiffs purchased pork within the State of New Mexico during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

378.371.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

010736-11/1208328 V1

379.372.    Defendants contracted, agreed, combined or conspired, and

monopolized or attempted to monopolize trade for pork within the intrastate commerce of

New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

380.373.    Plaintiffs and members of the New Mexico Class were injured with

respect to purchases of pork in New Mexico and are entitled to all forms of relief,

including actual damages, treble damages, reasonable attorneys' fees, costs, and

injunctive relief.

## ~~EIGHTEENTH~~ SEVENTEENTH CLAIM FOR RELIEF
### VIOLATION OF SECTION 340 OF
### THE NEW YORK GENERAL BUSINESS LAW
### (ON BEHALF OF THE NEW YORK CLASS)

381.374.    Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

382.375.    Article 22 of the New York General Business Law general prohibits

monopolies and contracts or agreements in restraint of trade, with the policy of

encouraging competition or the free exercise of any activity in the conduct of any

business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

383.376.    Plaintiffs purchased pork within the State of New York during the

Class Period. But for defendants' conduct set forth herein, the price per pound of pork

would have been lower, in an amount to be determined at trial.

384.377.    Under New York law, indirect purchasers have standing to maintain

an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

- 134 -

385.378.   Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of pork and restrained competition in the free exercise of the conduct of the business of pork within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

386.379.   Plaintiffs and members of the New York Class were injured with respect to purchases of pork in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

### ~~NINETEENTH~~ EIGHTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES, N.C. GEN. STAT. § 75-1, *ET SEQ.* (ON BEHALF OF THE NORTH CAROLINA CLASS)

387.380.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

388.381.   Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the pork market, a substantial part of which occurred within North Carolina.

389.382.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

390.383.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

- 135 -

391.384. As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

392.385. By reason of the foregoing, plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

## ~~TWENTIETH~~ NINETEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE § 51-08.1, *ET SEQ.* (ON BEHALF OF THE NORTH DAKOTA CLASS)

393.386. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

394.387. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq.*

395.388. Plaintiffs purchased pork within the State of North Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

396.389. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

397.390. Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for pork, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or

controlling, fixing or maintaining prices for pork, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

398.391.    Plaintiffs and members of the North Dakota Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**TWENTY-FIRST TWENTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,**
**R.I. GEN LAWS § 6-36-1, *ET SEQ*.**
**(ON BEHALF OF THE RHODE ISLAND CLASS)**

399.392.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

400.393.    The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

401.394.    Plaintiffs purchased pork within the State of Rhode Island during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

402.395.    Under the Rhode Island Antitrust Act, as of July 15, 2013, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a). In Rhode Island, the claims of plaintiffs and the

- 137 -

Class alleged herein run from ~~January 1, 2008.~~July 15, 2013 through the date that the effects of defendants' anticompetitive conduct cease.

~~403.~~396.    Defendants contracted, combined and conspired in restraint of trade of pork within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of pork for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

~~404.~~397.    Plaintiffs and members of the Rhode Island Class were injured with respect to purchases of pork in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**~~TWENTY SECOND~~ TWENTY-FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE, § 47-25-101, *ET SEQ.***
**(ON BEHALF OF THE TENNESSEE CLASS)**

~~405.~~398.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~406.~~399.    The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or

- 138 -

which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.

407.400.    Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

408.401.    Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, defendants' combination or conspiracy had the following effects: (1) price competition for pork was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for pork were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and the Tennessee Class were deprived of free and open competition; and (4) Plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for pork.

409.402.    During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce as pork was sold in Tennessee.

410.403.    Plaintiffs and the Tennessee Class purchased pork within the State of Tennessee during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the Tennessee Class have been injured in their business and property and are threatened with further injury

- 139 -

411.404.    Under Tennessee law, indirect purchasers (such as plaintiffs and the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

412.405.    Plaintiffs and members of the Tennessee Class were injured with respect to purchases of pork in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**TWENTY-THIRD TWENTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. §§ 76-10-911, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

413.406.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

414.407.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

415.408.    Plaintiffs purchased pork within the State of Utah during the Class Period. But for defendants' conduct set forth herein, the price per pound of pork would have been lower, in an amount to be determined at trial.

416.409.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

- 140 -

417.410.    Defendants contracted, combined or conspired in restraint of trade or commerce of pork, and monopolized or attempted to monopolize trade or commerce of pork, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

418.411.    Plaintiffs and members of the Utah Class who are either Utah residents or Utah citizens were injured with respect to purchases of pork in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

### TWENTY-FOURTHTWENTY-THIRD CLAIM FOR RELIEF
### VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,
### W. VA. CODE §47-18-1, *ET SEQ.*
### (ON BEHALF OF THE WEST VIRGINIA CLASS)

419.412.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

420.413.    The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

421.414.    During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq*.

422.415.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

423.416.    As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the West Virginia Class have been injured in their business and

- 141 -

property in that they paid more for pork than they otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, plaintiffs and members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

424.417.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

425.418.    The following claims for relief are pled under the consumer protection or similar laws of each jurisdiction identified below, on behalf of the indicated class.

**TWENTY-FIFTH TWENTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. (THE "UCL")**
**(ON BEHALF OF THE CALIFORNIA CLASS)**

426.419.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

427.420.    The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq*. of California Business and Professions Code.

428.421.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

- 142 -

429.422.     This claim is instituted pursuant to sections 17203 and 17204 of
California Business and Professions Code, to obtain restitution from these defendants for
acts, as alleged herein, that violated the UCL.

430.423.     The defendants' conduct as alleged herein violated the UCL. The
acts, omissions, misrepresentations, practices and non-disclosures of defendants, as
alleged herein, constituted a common, continuous, and continuing course of conduct of
unfair competition by means of unfair, unlawful, and/or fraudulent business acts or
practices within the meaning of the UCL, including, but not limited to, the violations of
section 16720, *et seq.*, of California Business and Professions Code, set forth above.

431.424.     Defendants' acts, omissions, misrepresentations, practices, and non-
disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of
California Business and Professions Code, and whether or not concerted or independent
acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

432.425.     Plaintiffs and members of the California Class are entitled to full
restitution and/or disgorgement of all revenues, earnings, profits, compensation, and
benefits that may have been obtained by defendants as a result of such business acts or
practices.

433.426.     The illegal conduct alleged herein is continuing and there is no
indication that defendants will not continue such activity into the future.

434.427.     The unlawful and unfair business practices of defendants, and each
of them, as described above, have caused and continue to cause plaintiffs and the
members of the California Class to pay supra-competitive and artificially inflated prices

- 143 -

for pork sold in the State of California. Plaintiffs and the members of the California Class

suffered injury in fact and lost money or property as a result of such unfair competition.

435.428.    As alleged in this Complaint, defendants and their co-conspirators

have been unjustly enriched as a result of their wrongful conduct and by defendants'

unfair competition. Plaintiffs and the members of the California Class are accordingly

entitled to equitable relief including restitution and/or disgorgement of all revenues,

earnings, profits, compensation, and benefits that may have been obtained by defendants

as a result of such business practices, pursuant to California Business and Professions

Code sections 17203 and 17204.

~~TWENTY-SIXTH~~ TWENTY-FIFTH <strong>CLAIM FOR RELIEF</strong><br>
<strong>VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION<br>
PROCEDURES ACT,<br>
D.C. CODE § 28-3901, <em>ET SEQ</em>.<br>
(ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)</strong>

436.429.    Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

437.430.    Plaintiffs and members of the District of Columbia Class purchased

pork for personal, family, or household purposes.

438.431.    By reason of the conduct alleged herein, defendants have violated

D.C. Code § 28-3901, *et seq.*

439.432.    Defendants are "merchants" within the meaning of D.C. Code § 28-

3901(a)(3).

- 144 -

440.433.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Pork market, a substantial part of which occurred within the District of Columbia.

441.434.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Pork Market.

442.435.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

443.436.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

444.437.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

445.438.    By reason of the foregoing, plaintiffs and members of the District of Columbia Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

- 145 -

**~~TWENTY-SEVENTH~~ TWENTY-SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. § 501.201(2), *ET SEQ*.**
**(ON BEHALF OF THE FLORIDA CLASS)**

~~446.~~439.     Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

~~447.~~440.     The Florida Deceptive & Unfair Trade Practices Act, Florida Stat.

§§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct

of any trade or commerce," including practices in restraint of trade. Florida Stat. §

501.204(1).

~~448.~~441.     The primary policy of the FDUTPA is "[t]o protect the consuming

public and legitimate business enterprises from those who engage in unfair methods of

competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of

any trade or commerce." Florida Stat. § 501.202(2).

~~449.~~442.     A claim for damages under the FDUTPA has three elements: (1) a

prohibited practice; (2) causation; and (3) actual damages.

~~450.~~443.     Under Florida law, indirect purchasers have standing to maintain an

action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. §

501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

~~451.~~444.     Plaintiffs purchased pork within the State of Florida during the Class

Period. But for defendants' conduct set forth herein, the price per pound of pork would

have been lower, in an amount to be determined at trial.

- 146 -

452.445.     Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Florida.

453.446.     Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for pork, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2008 and continuing through the date of this filing.

454.447.     Accordingly, defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

455.448.     Defendants' unlawful conduct substantially affected Florida's trade and commerce.

456.449.     As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for pork and are threatened with further injury.

457.450.     By reason of the foregoing, plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

- 147 -

### ~~TWENTY-EIGHTH~~ TWENTY-SEVENTH CLAIM FOR RELIEF
### VIOLATION OF THE HAWAII REVISED STATUTES
### ANNOTATED §§ 480-1, *ET SEQ*.
### (ON BEHALF OF HAWAII CLASS)

~~458.~~451.      Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~459.~~452.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

~~460.~~453.      Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) pork prices were, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Hawaii Class were deprived of free and open competition; and (4) Plaintiffs and members of the Hawaii Class paid supra-competitive, artificially inflated prices for pork.

~~461.~~454.      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

~~462.~~455.      As a direct and proximate result of Defendants' unlawful conduct, plaintiffs and members of the Hawaii Class have been injured and are threatened with further injury.

010736-11/1208328 V1

**~~TWENTY-NINTH~~ TWENTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**BUSINESS PRACTICES ACT,**
**815 ILL. COMP. STAT. ANN. 505/10A, *ET SEQ.***
**(ON BEHALF OF THE ILLINOIS CLASS)**

~~463.~~456.     Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

~~464.~~457.     By reason of the conduct alleged herein, defendants have violated

740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

~~465.~~458.     Defendants entered into a contract, combination, or conspiracy

between two or more persons in restraint of, or to monopolize, trade or commerce in the

pork market, a substantial part of which occurred within Illinois.

~~466.~~459.     Defendants established, maintained, or used a monopoly, or

attempted to establish a monopoly, of trade or commerce in the pork market, a substantial

part of which occurred within Illinois, for the purpose of excluding competition or

controlling, fixing, or maintaining prices in the pork market.

~~467.~~460.     Defendants' conduct was unfair, unconscionable, or deceptive within

the conduct of commerce within the State of Illinois.

~~468.~~461.     Defendants' conduct misled consumers, withheld material facts, and

resulted in material misrepresentations to plaintiffs and members of the classes.

~~469.~~462.     Defendants' unlawful conduct substantially affected Illinois's trade

and commerce.

- 149 -

470.463.     As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Illinois Class were actually deceived and have been injured in their business or property and are threatened with further injury.

471.464.     By reason of the foregoing, plaintiffs and members of the Illinois Class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

### THIRTIETH CLAIM FOR RELIEF
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS CH. 93A § 1, *ET SEQ.*
### (ON BEHALF OF THE MASSACHUSETTS CLASS)

472.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

473.     Plaintiffs reserve their right to bring a claim under Mass. Gen. Laws Ch. 93A *et seq.* Pursuant to Mass. Gen. Laws Ch. 93A § 9, plaintiffs served all defendants on June 27, 2018, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the defendants within 30 days. If necessary, plaintiffs will amend to add specific claims under Mass. Gen. Laws Ch. 93A *et seq.*

### THIRTY-FIRST TWENTY-NINTH CLAIM FOR RELIEF
### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS ANN. § 445.901, *ET SEQ.*
### (ON BEHALF OF THE MICHIGAN CLASS)

474.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**Formatted:** Not Highlight

- 150 -

475.   By reason of the conduct alleged herein, defendants have violated Mich. Comp. Laws Ann. § 445.901, *et seq.*

476.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Michigan.

477.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Michigan.

478.   Defendants' conduct was conducted with the intent to deceive Michigan consumers regarding the nature of defendants' actions within the stream of Michigan commerce.

479.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Michigan.

480.   Defendants' conduct misled consumers, withheld material facts, and took advantage of plaintiffs and members of the classes' inability to protect themselves.

481.   Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

482.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Michigan Class have been injured in their business or property and are threatened with further injury.

- 151 -

483. By reason of the foregoing, plaintiffs and the Michigan Class are entitled to seek all forms of relief available under Mich. Comp. Laws Ann. § 445.911.

**THIRTY-SECOND  THIRTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT,**
**MINN. STAT. § 325F.68, *ET SEQ*.**
**(ON BEHALF OF THE MINNESOTA CLASS)**

484. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

485. By reason of the conduct alleged herein, defendants have violated Minn. Stat. § 325F.68, *et seq.*

486. Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

487. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the pork market.

488. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

489. Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

490. Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

- 152 -

491.    Defendants' conduct was willful.

492.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

493.    By reason of the foregoing, plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

### ~~THIRTY-THIRD~~ TWENTY-NINTH CLAIM FOR RELIEF
### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,
### NEB. REV. STAT. § 59-1602, *ET SEQ.*
### (ON BEHALF OF THE NEBRASKA CLASS)

~~494.~~465.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

~~495.~~466.    By reason of the conduct alleged herein, defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

~~496.~~467.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Nebraska.

~~497.~~468.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

010736-11/1208328 V1

498.469.     Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of defendants' actions within the stream of Nebraska commerce.

499.470.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

500.471.     Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the Nevada Class's ability to protect themselves.

501.472.     Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

502.473.     As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

503.474.     By reason of the foregoing, plaintiffs and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59- 1614.

**THIRTIETH Y-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598.0903, *ET SEQ.***
**(ON BEHALF OF THE NEVADA CLASS)**

504.475.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

505.476.     By reason of the conduct alleged herein, defendants have violated Nev. Rev. Stat. § 598.0903*, et seq.*

- 154 -

506.477.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

507.478.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

508.479.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

509.480.   Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

510.481.   Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

511.482.   Defendants' conduct was willful.

512.483.   As a direct and proximate cause of defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

513.484.   By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

- 155 -

**THIRTY-THIRD FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. TIT. XXXI, § 358-A, *ET SEQ*.**
**(ON BEHALF OF THE NEW HAMPSHIRE CLASS)**

514.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

515.    By reason of the conduct alleged herein, defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq.*

516.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within New Hampshire.

517.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

518.    Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of defendants' actions within the stream of New Hampshire commerce.

519.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

520.    Defendants' conduct was willful and knowing.

- 156 -

521.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the New Hampshire Class's ability to protect themselves.

522.   Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

523.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

524.   By reason of the foregoing, plaintiffs and the members of the New Hampshire Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

**THIRTY-FIRST SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. §§ 57-12-3, *ET SEQ.***
**(ON BEHALF OF THE NEW MEXICO CLASS)**

525.485.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

526.486.   By reason of the conduct alleged herein, defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

527.487.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within New Mexico.

- 157 -

528.488.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

529.489.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

530.490.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the New Mexico Class.

531.491.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

532.492.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico Class members and the price paid by them for pork as set forth in N.M. Stat. Ann. § 57-12-2E.

533.493.    Defendants' conduct was willful.

534.494.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

535.495.    By reason of the foregoing, plaintiffs and members of the New Mexico Class are entitled to seek all forms of relief, including actual damages or up to

- 158 -

$300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat.

Ann. §§ 57-12-10.

### THIRTY-SECOND ~~SEVENTH~~ CLAIM FOR RELIEF
### VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT,
### N.C. GEN. STAT. § 75-1.1, *ET SEQ.*
### (ON BEHALF OF THE NORTH CAROLINA CLASS)

~~536.~~496.    Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

~~537.~~497.    By reason of the conduct alleged herein, defendants have violated

N.C. Gen. Stat. § 75-1.1, *et seq.*

~~538.~~498.    Defendants entered into a contract, combination, or conspiracy in

restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of

which occurred within North Carolina.

~~539.~~499.    Defendants' conduct was unfair, unconscionable, or deceptive within

the conduct of commerce within the State of North Carolina.

~~540.~~500.    Defendants' trade practices are and have been immoral, unethical,

unscrupulous, and substantially injurious to consumers.

~~541.~~501.    Defendants' conduct misled consumers, withheld material facts, and

resulted in material misrepresentations to plaintiffs and members of the North Carolina

Class.

~~542.~~502.    Defendants' unlawful conduct substantially affected North

Carolina's trade and commerce.

- 159 -

543.503.      Defendants' conduct constitutes consumer-oriented deceptive acts or

practices within the meaning of North Carolina law, which resulted in consumer injury

and broad adverse impact on the public at large, and harmed the public interest of North

Carolina consumers in an honest marketplace in which economic activity is conducted in

a competitive manner.

544.504.      As a direct and proximate cause of defendants' unlawful conduct,

plaintiffs and the members of the North Carolina Class have been injured in their

business or property and are threatened with further injury.

545.505.      By reason of the foregoing, plaintiffs and the members of the North

Carolina Class are entitled to seek all forms of relief, including treble damages under

N.C. Gen. Stat. § 7516.

### THIRTY-THIRD EIGHTH CLAIM FOR RELIEF
**VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES LAW,
N.D. CENT. CODE § 51-10, *ET SEQ*.
(ON BEHALF OF THE NORTH DAKOTA CLASS)**

546.506.      Plaintiffs incorporate and reallege, as though fully set forth herein,

each and every allegation set forth in the preceding paragraphs of this Complaint.

547.507.      By reason of the conduct alleged herein, defendants have violated

N.D. Cent. Code § 51-10-01, et *seq*.

548.508.      Defendants engaged in a deceptive trade practice with the intent to

injure competitors and consumers through supra-competitive profits.

549.509.      Defendants established, maintained, or used a monopoly, or

attempted to establish a monopoly, of trade or commerce in the pork market, a substantial

- 160 -

part of which occurred within North Dakota, for the purpose of controlling, fixing, or maintaining prices in the pork market.

550.510.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Dakota.

551.511.    Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

552.512.    Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

553.513.    Defendants' conduct was willful.

554.514.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

555.515.    By reason of the foregoing, plaintiffs and the members of the North Dakota Class are entitled to seek all forms of relief, including damages and injunctive relief under N.D. Cent. Code § 51-10-06.

### THIRTY-FOURTH NINTH CLAIM FOR RELIEF
**VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,
R.I. GEN. LAWS § 6-13.1-1, *ET SEQ.*
(ON BEHALF OF THE RHODE ISLAND CLASS)**

556.516.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

557.517.    By reason of the conduct alleged herein, defendants have violated R.I. Gen Laws § 6-13.1-1, *et seq.*

- 161 -

558.518.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

559.519.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the pork market.

560.520.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

561.521.    Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

562.522.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

563.523.    Defendants' conduct was willful.

564.524.    Defendants deliberately failed to disclose material facts to plaintiffs and members of the Rhode Island Class concerning defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for pork.

565.525.    Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of pork, constitutes information necessary to plaintiffs and members of the Rhode Island Class relating to the cost of pork purchased.

566.526.    Plaintiffs and members of the Rhode Island class purchased goods, namely pork, primarily for personal, family, or household purposes.

- 162 -

567.527.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

568.528.   By reason of the foregoing, plaintiffs and the members of the Rhode Island Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and damages under R.I. Gen Laws § 6-13.1-5.2.

### THIRTY-FIFTH ~~FORTIETH~~ CLAIM FOR RELIEF
**VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, *ET SEQ.* (ON BEHALF OF THE SOUTH CAROLINA CLASS)**

569.529.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

570.530.   By reason of the conduct alleged herein, defendants have violated S.C. Code Ann. §§ 39-5-10.

571.531.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within South Carolina.

572.532.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

010736-11/1208328 V1

573.533.    Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of defendants' actions within the stream of South Carolina commerce.

574.534.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

575.535.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the South Carolina Class's ability to protect themselves.

576.536.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

577.537.    Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as nearly all members of the public purchase and consume pork.

**FORTY-FIRST THIRTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT,**
**UTAH CODE ANN. §§ 13-11-1, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

578.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

579.    By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-11-1, *et seq*.

580.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Utah.

581.   Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11-3.

582.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

583.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

584.   Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions.

585.   Defendants knew or had reason to know that their conduct was unconscionable.

586.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the Utah Class.

587.   Defendants' unlawful conduct substantially affected Utah's trade and commerce.

588.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

010736-11/1208328 V1

589.   By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

**FORTY-SECOND FORTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH UNFAIR PRACTICES ACT,**
**UTAH CODE ALL. §§ 13-5-1, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

590.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

591.   By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-5-1, *et seq*.

592.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Utah.

593.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

594.   Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

595.   Defendants' unlawful conduct substantially affected Utah's trade and commerce.

010736-11/1208328 V1

596.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

597.   By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, *et seq.*

### FORTY-THIRD CLAIM FOR RELIEF
### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### VA. CODE ANN. § 59.1-196, *ET SEQ.*
### (ON BEHALF OF THE VIRGINIA CLASS)

598.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

599.   By reason of the conduct alleged herein, defendants have violated Va. Code Ann. § 59.1-196, *et seq.*

600.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the pork market, a substantial part of which occurred within Virginia.

601.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the pork market, a substantial part of which occurred within Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the pork market.

- 167 -

602.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Virginia.

603.    Defendants' unlawful conduct substantially affected Virginia's trade and commerce.

604.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Virginia Class have been injured in their business or property and are threatened with further injury.

605.    By reason of the foregoing, plaintiffs and the members of the Virginia Class are entitled to seek all forms of relief, including actual damages, treble damages, plus reasonable attorney's fees under Virginia Code Ann. § 59.1-196, *et seq.*

### ~~FORTY-FOURTH~~THIRTY-SIXTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

~~606.~~538.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

~~607.~~539.    As a result of their unlawful conduct described above, defendants have and will continued to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of pork.

~~608.~~540.    Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred on them by overpayments by plaintiffs and members of the classes in the following states: ~~Arizona,~~ California, District of Columbia, ~~Florida,~~ Hawaii, Illinois, Iowa, Kansas, Maine, ~~Massachusetts,~~ Michigan, Minnesota, ~~Mississippi,~~ Missouri, Nebraska, Nevada, New Hampshire, New Mexico,

- 168 -

North Carolina, Rhode Island, South Carolina, Tennessee, ~~Utah, Virginia,~~ and West

Virginia.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the classes of all others so

similarly situated, respectfully requests judgment against defendants as follows:

~~609.~~541.    The Court determine that this action may be maintained as a class

action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel,

and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of

Civil Procedure, be given to the Class, once certified;

~~610.~~542.    The unlawful conduct, conspiracy or combination alleged herein be

adjudged and decreed in violation of Section 1 of the Sherman Act and listed state

antitrust laws, unfair competition laws, state consumer protection laws, and common law;

~~611.~~543.    Plaintiffs and the Class recover damages, to the maximum extent

allowed under the applicable state laws, and that a joint and several judgments in favor of

plaintiffs and the members of the Classes be entered against defendants in an amount to

be trebled to the extent such laws permit;

~~612.~~544.    Defendants, their affiliates, successors, transferees, assignees and

other officers, directors, partners, agents and employees thereof, and all other persons

acting or claiming to act on their behalf or in concert with them, be permanently enjoined

and restrained from in any manner continuing, maintaining or renewing the conduct,

conspiracy, or combination alleged herein, or from entering into any other conspiracy or

010736-11/1208328 V1

combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

613.545.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

614.546.     Plaintiffs and the members of the classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

615.547.     Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

616.548.     Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**JURY TRIAL DEMANDED**

617.549.     Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

- 170 -

Dated: June 1, 2021          HAGENS BERMAN SOBOL SHAPIRO LLP

By:      /s/ Steve W. Berman
           STEVE W. BERMAN

Breanna Van Engelen (*Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Shana E. Scarlett (*Pro Hac Vice*)
Rio S. Pierce (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

*Interim Co-lead Counsel for Consumer Indirect
Purchaser Plaintiffs*

- 171 -

Fred T. Isquith, Sr.
Thomas H. Burt
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Ave.
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
isquith@whafh.com
burt@whafh.com

Carl V. Malmstrom (#391908)
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC
70 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone (312) 984-0000
Facsimile: (312) 214-3110
malmstrom@whafh.com

Kevin Landau
Miles Greaves
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, New York 10038
Telephone: (212) 931-0704
Facsimile: (212) 931-0703
klandau@tcllaw.com
mgreaves@tcllaw.com

Rick Paul
Ashlea Schwarz
PAUL LLP
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
rick@paulllp.com
ashlea@paulllp.com

- 172 -

Kenneth A. Wexler
Kara A. Elgersma
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346-2222
kaw@wexlerwallace.com
tad@wexlerwallace.com
kae@wexlerwallace.com
jnb@wexlerwallace.com


Simon B. Paris
Patrick Howard
Charles J. Kocher
SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.C.
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 496-8282
Facsimile: (215) 496-0999
sparis@smbb.com
phoward@smbb.com
ckocher@smbb.com


Dianne M. Nast
NAST LAW LLC
1101 Market Place, Suite 2801
Philadelphia, Pennsylvania 19107
Telephone: (215) 923-9300
Facsimile: (215) 923-9302
dnast@nastlaw.com

010736-11/1208328 V1

Brian D. Penny
GOLDMAN SCARLATO & PENNY, P.C.
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, Pennsylvania 19428
Telephone: (484) 342-0700
penny@lawgsp.com

Marc H. Edelson, Esq.
EDELSON & ASSOCIATES, LLC
3 Terry Drive, Suite 205
Newtown, Pennsylvania 18940
Telephone: (215) 867-2399
medelson@edelson-law.com

*Counsel for Consumer Indirect Purchaser Plaintiffs*

- 174 -