```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                    )
       In Re Pork Antitrust Litigation ) File No. 18-CV-1776
 4                                    )           (JRT/HB)
       This Document Relates to:      )
 5     All Actions                    )
                                      ) St. Paul, Minnesota
 6                                    ) September 7, 2021
                                      ) 3:41 p.m.
 7                                    )
       ------------------------------------------------------------
 8

 9

10              BEFORE THE HONORABLE HILDY BOWBEER
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11
                       (MOTIONS HEARING)
12

13

14     APPEARANCES (Via Zoom):

15     For Direct Purchaser      Lockridge, Grindal, Nauen, PLLP
       Plaintiffs:               JOSEPH C. BOURNE, ESQ.
16                               BRIAN D. CLARK, ESQ.
                                 ARIELLE WAGNER, ESQ.
17                               Suite 2200
                                 100 Washington Avenue South
18                               Minneapolis, Minnesota 55401

19                               Pearson, Simon & Warshaw, LLP
                                 CLIFFORD H. PEARSON, ESQ.
20                               MICHAEL H. PEARSON, ESQ
                                 BOBBY POUYA, ESQ.
21                               Suite 400
                                 15165 Ventura Boulevard
22                               Sherman Oaks, California 91403

23

24
           Proceedings reported by court reporter; transcript
25     produced by computer.
```

1    **CONTINUED APPEARANCES** (Via Zoom):

2    For Consumer and              Cuneo, Gilbert & LaDuca, LLP
     Institutional Indirect        ALEC BLAINE FINLEY, ESQ.
3    Purchaser Plaintiffs:         Suite 200
                                   4725 Wisconsin Avenue Northwest
4                                  Washington, D.C. 20016

5    For Consumer Indirect         Gustafson Gluek, PLLC
     Purchaser Plaintiffs:         DANIEL C. HEDLUND, ESQ.
6                                  Suite 2600
                                   120 South Sixth Street
7                                  Minneapolis, Minnesota 55402

8                                  Hagens, Berman, Sobol, Shapiro,
                                   LLP
9                                  SHANA SCARLETT, ESQ.
                                   Suite 202
10                                 715 Hearst Avenue
                                   Berkeley, California 94710
11
     For Defendant Hormel          Faegre, Drinker, Biddle &
12   Foods Corporation:            Reath, LLP
                                   CRAIG S. COLEMAN, ESQ.
13                                 Suite 2200
                                   90 South Seventh Street
14                                 Minneapolis, Minnesota 55402

15   For Subpoena Recipients:      Rock Hutchinson, PLLP
                                   JOHN ROCK, ESQ.
16                                 KATHRYN STEPHENS, ESQ.
                                   2050 Canadian Pacific Plaza
17                                 120 South Sixth Street
                                   Minneapolis, Minnesota 55402
18
     For Defendant The             Greene Espel, PLLP
19   Clemens Family                MARK L. JOHNSON, ESQ.
     Corporation:                  Suite 2200
20                                 222 South Ninth Street
                                   Minneapolis, Minnesota 55402
21
                                   Kirkland & Ellis, LLP
22                                 CHRISTINA SHARKEY, ESQ.
                                   300 North LaSalle
23                                 Chicago, Illinois 60654

24

25

1     **CONTINUED APPEARANCES** (Via Zoom):

2     For Defendant Triumph      Husch Blackwell, LLP
      Foods, LLC:                JASON HUSGEN, ESQ.
3                                Suite 600
                                 190 Carondelet Plaza
4                                St. Louis, Missouri 63105

5     For Defendant Seaboard     Stinson, Leonard, Street, LLP
      Foods, LLC:                WILLIAM THOMSON, ESQ.
6                                Suite 2600
                                 50 South Sixth Street
7                                Minneapolis, Minnesota 55402

8     For Defendant Tyson        Axinn, Veltrop & Harkrider, LLP
      Foods, Inc.:               JAROD TAYLOR, ESQ.
9                                90 State House Square
                                 Hartford, Connecticut 06103
10
      Court Reporter:            LORI A. SIMPSON, RMR-CRR
11                               Suite 146
                                 316 North Robert Street
12                               St. Paul, Minnesota 55101

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2    **IN OPEN COURT**

3    **(VIA ZOOM)**

4    THE COURT:  This is the United States District

5    Court for the District of Minnesota.  I am Magistrate Judge

6    Hildy Bowbeer.

7    And we are convened by Zoom for a hearing in the

8    matter of In re Pork Antitrust Litigation, 18-CV-1776, and

9    specifically on Docket Number 883, a motion by the direct

10   purchaser plaintiffs to compel Hormel to produce responsive

11   text message content and to enforce subpoenas to Hormel

12   custodians.

13   We've got a large group, including quite a few who

14   appear to be joining us by telephone.  I will try to make

15   some sense of it in terms of making sure our court reporter

16   knows who wants to make their appearance known and who not

17   so much.

18   So let me just start with the plaintiffs.  And

19   first on behalf of the direct purchaser plaintiffs, I will

20   call out the names of the people I spotted in the waiting

21   room and then I'll give folks an opportunity to let me know

22   if you didn't hear your name called but want your appearance

23   noted.

24   So on behalf of the direct purchaser plaintiffs, I

25   saw Bobby Pouya?

1          MR. POUYA:  Hello, Your Honor.

2          THE COURT:  Brian Clark?

3          MR. CLARK:  Good afternoon.

4          THE COURT:  Joseph Bourne?

5          MR. BOURNE:  Good afternoon, Your Honor.

6          THE COURT:  Arielle Wagner?

7          MS. WAGNER:  Good afternoon.

8          THE COURT:  And Michael Pearson?

9          MR. MICHAEL PEARSON:  Good afternoon, Your Honor.

10         THE COURT:  And is there anyone on behalf of the

11    direct purchaser plaintiffs whose name I didn't call?

12         MR. CLIFFORD PEARSON:  Good afternoon, Your Honor.

13    Clifford Pearson.

14         THE COURT:  All right.  Moving on to the consumer

15    and institutional indirect purchaser plaintiffs, I saw

16    Blaine Finley?

17         MR. FINLEY:  Good afternoon, Your Honor.

18         THE COURT:  And are there any other counsel on

19    this afternoon for the consumer and institutional indirect

20    purchaser plaintiffs?

21         MR. FINLEY:  I don't believe so, Your Honor.

22         THE COURT:  All right.  The consumer indirect

23    purchaser plaintiffs, I saw Shana Scarlett?

24         MS. SCARLETT:  Good afternoon, Your Honor.

25         THE COURT:  And Daniel Hedlund?

```
 1              MR. HEDLUND:  Good afternoon, Judge.

 2              THE COURT:  Anyone else whose name I didn't call

 3     on behalf of the consumer indirect purchaser plaintiffs?

 4              Is there anybody else on behalf of a plaintiff of

 5     any type who is attending and would like their appearance

 6     noted?

 7              All right.  Then moving on to the party involved

 8     or the defendant involved in this particular motion, on

 9     behalf of Hormel Foods Corporation, I saw Craig Coleman?

10              MR. COLEMAN:  Yes, Your Honor.  Good afternoon.

11              THE COURT:  Anyone else on behalf of Hormel Foods

12     Corporation?  And by that I will separate the appearance on

13     behalf of the document custodians.  Mr. Coleman, anyone else

14     appearing on behalf of the corporation?

15              MR. COLEMAN:  No, Your Honor.  I'm the only lawyer

16     appearing on behalf of Hormel Foods.  Steve Toeniskoetter,

17     senior attorney at Hormel Foods, is participating through

18     the audio line.

19              THE COURT:  All right.  And I've got -- the

20     spelling I've got on that is T-o-e-n-i-s-k-o-e-t-t-e-r.  Is

21     that correct?

22              MR. COLEMAN:  I believe that's correct, Your

23     Honor.

24              THE COURT:  All right.  We'll note his presence

25     here for the hearing.
```

1              And then I know there's counsel here on behalf of

2       the subpoena recipients, the document custodians.  John

3       Rock?

4              MR. ROCK:  Good afternoon, Your Honor.

5              THE COURT:  And Kathryn Stephens?

6              MS. STEPHENS:  Yes.  Good afternoon, Judge.

7              THE COURT:  And then I think I saw some others on

8       behalf of other defendants.  On behalf of The Clemens Family

9       Corporation, Christina Sharkey?

10             MS. SHARKEY:  Good afternoon, Your Honor.

11             THE COURT:  And I believe Mark Johnson as well?

12             MR. JOHNSON:  Yes, Your Honor.  Good afternoon.

13             THE COURT:  And on behalf of Triumph Foods, I

14      think I saw Jason Husgen?

15             MR. HUSGEN:  Yes.  Good afternoon, Your Honor.

16             THE COURT:  Did I mispronounce your name or did I

17      get it approximately --

18             MR. HUSGEN:  You are one of the few people who on

19      the first attempt pronounced it correctly, Your Honor.  I

20      appreciate it.

21             THE COURT:  Oh, now it's going to go to my head.

22      Anybody else on behalf of Triumph?

23             On behalf of Seaboard Foods, I think I saw William

24      Thomson?

25             MR. THOMSON:  Good afternoon, Your Honor.

 1              THE COURT:  And then I see some others, but I

 2     couldn't place them with a particular party.  So is there

 3     anyone whose name I did not call who wants to have their

 4     appearance noted this afternoon?

 5              MR. TAYLOR:  Your Honor, this is Jarod Taylor of

 6     Axinn, Veltrop & Harkrider appearing by phone only for the

 7     Tyson defendants.

 8              THE COURT:  All right.  Hold on one moment.  Just

 9     for the benefit of the court reporter, would you spell your

10     last name, please.

11              MR. TAYLOR:  T-a-y-l-o-r.

12              THE COURT:  Your first name is J-a-r-o-d, right?

13              MR. TAYLOR:  Yes, Your Honor.  You are batting a

14     thousand today, because most people don't get that right on

15     the first try either.

16              THE COURT:  All right.  Anyone else on behalf of

17     any party who wants to have their appearance noted this

18     afternoon?

19              All right.  Then one thing I am going to do is

20     adjust my video so that I don't see all of the little

21     telephone icons and can focus on those of you who are

22     actually going to be addressing this motion.  Oh, that's a

23     much less crowded screen.

24              And then with regard to the motion, it's my --

25     well, let me ask:  On behalf of the plaintiffs, who is going

1     to be taking the lead on speaking to this motion?

2          MR. BOURNE:  Good afternoon, Your Honor.  Joe

3     Bourne from Lockridge, Grindal, Nauen speaking on behalf of

4     the direct purchaser plaintiffs and the class plaintiffs who

5     joined in the motion.

6          THE COURT:  All right.  And then on behalf of

7     Hormel Foods Corporation, Mr. Coleman, I know you are going

8     to be speaking.  And, Mr. Rock, I believe you were going to

9     be doing the honors on behalf of the document custodians.

10    Is that right?

11         MR. ROCK:  Correct, Your Honor.

12         THE COURT:  All right.  Very well.  Then,

13    Mr. Bourne, this is your motion.

14         MR. BOURNE:  Thank you, Your Honor.  We are here

15    today because plaintiffs are receiving text messages and

16    cell phone data from every defendant except Hormel.

17    Plaintiffs have been unable to obtain the text messages of

18    Hormel's agreed document custodians either from Hormel or

19    from the custodians directly via subpoena.

20         And today we are asking the Court to compel Hormel

21    to produce its current employees' relevant and responsive

22    phone data; and, separately, we're asking the Court to

23    compel the custodians to comply with the subpoenas.

24         We knew from the outset of the case that important

25    information was likely only available on the cell phones of

1    defendants' employees.  So at the start of the litigation we

2    asked Hormel to image the mobile devices for five senior

3    executives that we identified, and Hormel said that it

4    would.  How did it do that?  Apparently by asking them and

5    obtaining their consent.  Hormel has never claimed that it

6    even asked any of its custodians for permission to search

7    their phones for text messages relevant to this litigation.

8            So once we learned that Hormel wasn't preserving

9    and collecting its custodians' cell phone data, plaintiffs

10   subpoenaed Hormel's document custodians as an additional

11   avenue to try to obtain the documents.  But even with the

12   subpoenas, the custodians have refused to run a robust

13   search based on their objection that they are third parties

14   to this litigation.

15           Both Hormel and its custodians' investigations are

16   inadequate.  It's our position that you have to search for

17   text messages using an adequate methodology, not just ask

18   the custodian if they believe that relevant documents exist.

19           In a similar context, you wouldn't rely on a

20   custodian's recollection rather than conduct a keyword

21   search or TAR search for e-mail, and the same should hold

22   true for text messages.

23           THE COURT:  Let me ask this.  When did Hormel

24   first let the plaintiffs know that it did not believe that

25   it had and did not take the position that it had possession,

1    custody, and control over its employees' cell phones?

2           MR. BOURNE:  Your Honor, I believe Hormel advised

3    plaintiffs of that in correspondence in 2018 or 2019

4    relating to those five senior executives on whose behalf it

5    advised Hormel doesn't believe that their phones are in its

6    possession, custody or control, but nevertheless it agreed

7    to image their phones, of those five executives, for

8    preservation purposes.

9           Plaintiffs didn't become aware or fully comprehend

10   that Hormel was not going to produce any text messages from

11   any of its custodians until earlier this year.

12          THE COURT:  And are you saying you've got -- that

13   you haven't gotten any text messages or anything that seems

14   to be a text message from any Hormel custodian at this

15   point?

16          MR. BOURNE:  That is my understanding, and I don't

17   understand Hormel to contest that point.  My understanding

18   from our meet-and-confers is that Hormel is universally

19   taking the position these are outside of our possession,

20   custody, or control and therefore we will not search for or

21   produce any text messages.

22          THE COURT:  So when they told you in, I think it

23   was, late October or so of 2018 that they were taking the

24   position that they don't have possession, custody, or

25   control over their employees' devices because their cell

1    phones are personally owned rather than company owned, are

2    you saying that since they had agreed to image the five

3    senior executive devices, that that meant that as

4    custodian -- so that as custodians were identified, they

5    would be imaging all of those?

6              MR. BOURNE:  Your Honor, I think that's a fair

7    inference from what they represented when they said in

8    October 2018 we'll image these five executives' phones even

9    though we take the position they're outside our possession,

10   custody, or control.  I think it would be a reasonable

11   inference to assume that the same would hold true for the

12   other custodians.

13             I can't say for sure what all of the class

14   plaintiffs thought at that time apart from the fact that it

15   didn't appear that we had a ripe dispute to bring to the

16   Court's attention.

17             THE COURT:  All right.  Go ahead.

18             MR. BOURNE:  In the meet-and-confer process and in

19   the briefing on this motion, we've learned that Hormel did

20   nothing to investigate the existence of relevant text

21   messages.  It apparently never interviewed the custodians

22   about text messages or phone data, and it never asked for

23   permission to search their phones.  On page 17 of its brief

24   Hormel even admits that it doesn't even know whether or

25   where cloud backups exist.

1    Third-party counsel for the custodians did do more

2    than that.  They interviewed the custodians and asked if

3    they used their phones for work-related text messages

4    outside of Hormel, and a few of them said yes.

5    But plaintiffs submit that investigation is still

6    not enough.  You can't always rely on someone's memory of

7    text messages they sent over, you know, a span of years to

8    know whether a Hormel person may have exchanged one or two

9    text messages with a Tyson employee, for example, and that's

10   why we would say go look for them and see if there's

11   anything there.

12   What we do know is that the custodians used their

13   phones for work.  We know that at least some of the

14   custodians sent text messages to work contacts based on the

15   incomplete carrier data that we've obtained so far.  We are

16   still waiting for carrier data from Jaguar, which I

17   understand applies to some of the Hormel custodians.  And

18   the carrier data also would not reveal an iMessage to

19   iMessage text message.  So we believe there are likely

20   others in addition to the text messages that we identified

21   in our papers.

22   But what we do know is that Hormel designated all

23   these people as custodians because they're likely to have

24   relevant, discoverable information.  And text messages are

25   important, therefore Hormel should go search for them and

1       the custodians should search for them.

2               THE COURT:  In terms of the information from

3       carriers, I mean, do you have any text content from the

4       carriers that tells you, yes, we've got examples of actual

5       substantive content that was communicated by text or is that

6       an inference you're drawing from the fact that it was a work

7       number to a work number communication?

8               MR. BOURNE:  We know of the existence of work

9       number to work number or phone number to phone number text

10      messages.  We don't know what any of them say.  The content

11      of the text messages is not available from the carriers.

12      But the defendants have provided both work numbers and cell

13      phone numbers for their employees, and based on that we have

14      some records of Hormel custodians using text messages and

15      sending them to other people who would be work contacts.

16              THE COURT:  All right.  Any that match your

17      inter-defendant screen?

18              MR. BOURNE:  Your Honor, most of the text messages

19      that we have from the carrier data we have so far appeared

20      to be Hormel to Hormel text messages, although in the

21      declaration of Ms. Stephens in support of the custodians'

22      opposition brief, she notes that some of the custodians

23      acknowledge that they sent text messages to employees at

24      other defendants.  I think "a few" is the language that's

25      used in her declaration.

1          THE COURT:  So essentially apart from the

2     possession, custody, and control issue, which I recognize

3     looms very large here, but essentially it's your argument

4     that if someone is identified as a custodian, then the

5     company ought to be doing a search of all means of

6     communication, even if -- that that custodian may have had

7     access to even if the custodian says, no, I didn't use that

8     means of communication when I was doing work?

9          MR. BOURNE:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. BOURNE:  The class period and the discovery

12     period are lengthy, and even -- you know, we're not trying

13     to impute bad intentions to anyone here, but the fact is

14     over a lengthy period of time you could think, hey, I

15     generally send e-mail or make phone calls for work and

16     innocuously answer, no, I didn't send work text messages,

17     only if you actually look at the text messages there could

18     be a few.  I mean, that's why you have to go and actually

19     look for them.  That is plaintiffs' position.

20          THE COURT:  Okay.  Go ahead.

21          MR. BOURNE:  Thank you.  Turning to the

22     possession, custody, or control issue with respect to

23     Hormel, in this district the case law defines "control" to

24     include both the legal right and the practical ability.

25     Hormel's case law, as cited in their brief, is limited to

1    the legal right standard, but that -- plaintiffs submit that

2    simply is not the law in this district.

3         As noted above, Hormel never even asked its

4    custodians if they would voluntarily provide their phones

5    for searching, but we have every reason to believe that the

6    custodians would have consented if Hormel made this request.

7    For example, the five senior executives mentioned before

8    consented to imaging their phones and, you know, that

9    usually people will want to help out their employer by

10   providing relevant information for a lawsuit that the

11   employer is involved in.

12        In addition, Hormel's mobile device policy

13   required employees to buy personal cell phones to use for

14   work, and it let Hormel remotely and instantly wipe the

15   entire contents of any employee's personal mobile device.

16   So this shows a level of control that Hormel has over its

17   employees' personal cell phones, at least with respect to

18   the ones who are still employees.  And the test isn't

19   possession or custody or ownership.  It's simply control.

20   Hormel exerts control through its policies.

21        THE COURT:  Isn't there a difference, though,

22   between the ability to reach out and wipe a phone and the

23   ability to insist that its contents be made available for

24   the employer to review and potentially produce to someone

25   else?  I mean, one involves just I don't know what it is, I

1    haven't seen it, but I'm wiping it out; and the other is I'm

2    going to look at it and then in the course of looking at it,

3    I'll probably see some stuff that doesn't have anything to

4    do with me, but -- and that you would rather I not see.

5            MR. BOURNE:  There is -- I mean, there is a

6    difference there, they're not exactly the same thing, but

7    our position is that goes to the test for control and it

8    goes back to this distinction between the legal right and

9    the practical ability.

10           So even if Hormel's policy doesn't give it the

11   legal right to take the phones and search them, based on its

12   status as an employer and the control that it does exercise,

13   it's reasonable to infer that Hormel has the practical

14   ability to obtain this information, which is all that is

15   required under the control test.

16           THE COURT:  Okay.  How does the scope of what

17   you're asking for here, either directly of Hormel or through

18   the subpoenas, compare with the scope of what would be

19   requested if these were company-owned devices and there was

20   no question that Hormel had control over them?

21           MR. BOURNE:  The scope of what we're asking for is

22   exactly the same, if I understand Your Honor's question

23   correctly.  We are asking for Hormel and/or its custodians

24   to search for relevant information.

25           And we proposed a search methodology, which is

1     attached to my declaration as I believe Exhibit 16, and that

2     methodology in a nutshell is, one, here's a list of phone

3     numbers that belong to the defendants or key nondefendant

4     pork industry participants.  We request that attorneys do a

5     relevant -- a relevance review of those phone number to

6     phone number contacts.  And then separately we provided a

7     list of search terms and requested that those search terms

8     hitting on any other phone numbers be -- hits on those

9     search terms be reviewed for relevance by an attorney.

10          And the goal here is essentially let's try to weed

11     out purely personal text messages so the volume of text

12     messages requiring attorney review would be limited and

13     reasonable, keeping in mind that text messages are different

14     than e-mails.  They're shorter, there will be fewer of them,

15     and there's more inconsistent spelling and grammar.

16          That basic proposal has been agreed to with some

17     minor modifications at the margins relating to some of the

18     phone numbers or search terms by many of the defendants, and

19     discussions are still ongoing with a minority -- I believe a

20     minority of the defendants.

21          But it's essentially what we're asking for across

22     the board from the defendants.  And in our view, the fact

23     that these employees are third parties doesn't change the

24     fact that this is a reasonable search and will lead to

25     relevant evidence -- or will potentially lead to relevant

1      evidence.

2              THE COURT:  I guess what I'm trying to understand

3      is Hormel has argued that the 23 additional custodians who

4      made the list, I think after considerable negotiation in

5      maybe November of last year, had for the most part fairly

6      narrow slices of the pie, if you will; in other words, that

7      there was some fairly active negotiating and there was an

8      understanding that, okay, we're going to add these two

9      people because they were in this particular role, we're

10     going to add these five because they were involved but only

11     during this period.  And so I wondered whether that was

12     accompanied by an understanding that searches of those

13     custodians' documents and ESI, e-mail, for example, would be

14     similarly tailored.

15             MR. BOURNE:  Your Honor, my understanding is that

16     it's possible there's one or two very small number of

17     exceptions, but in general, including for the Hormel

18     custodians across the board, search terms for e-mail did not

19     vary from custodian to custodian.

20             THE COURT:  All right.  And was that true for time

21     frame as well?  And maybe the time frame was a search term.

22             MR. BOURNE:  I believe that's true for a time

23     frame with the caveat that the time frame, you know, ends

24     when the person -- when Hormel no longer has their data.

25     I'm not 100 percent sure on whether there were any

1    variations in time frame for any of the particular Hormel

2    custodians, but I believe generally they were searched for

3    the relevant period, assuming that Hormel had their data for

4    that period, and I'm sure Mr. Coleman will correct me if I'm

5    wrong.

6                THE COURT:  What about Hormel's argument that they

7    did what the negotiated cell phone preservation protocol

8    called for them to do?  No more, but not less.

9                MR. BOURNE:  We aren't here today claiming that

10   Hormel did not comply with the agreed telephone preservation

11   protocol.  That document relates to preserving carrier data.

12   And so, you know, it's my understanding that Hormel did

13   comply with that document by either asking the carriers to

14   preserve carrier log data or sending letters on behalf of

15   the -- I believe that Hormel asked the carriers to preserve

16   relevant data.

17               And the log data that the carriers have is the

18   existence and timing of phone calls or text messages.  So

19   that's what that document speaks to.  It doesn't really

20   speak to the question of searching for text messages at all.

21               THE COURT:  Oh, okay.  Okay.  I will obviously be

22   interested in Mr. Coleman's response to that, but that's a

23   different -- that's certainly a different take on that

24   document than what I heard from Hormel.  So I will learn

25   more about that.

21

1    Okay.  So are you saying that there isn't a

2    negotiated -- or not negotiated, but there isn't a protocol

3    in place or an order in place in this case that prescribes

4    either an agreement or responsibilities with regard to

5    preserving text messages and other data like that on cell

6    phones?

7    MR. BOURNE:  I believe that the ESI protocol

8    requires the preservation of data on cell phones that are

9    within a party's possession, custody, or control.  And so

10   Hormel's argument that those phones are not within its

11   possession, custody, or control arguably takes those phones

12   outside of the ESI protocol, depending on how the Court

13   rules on the question of possession, custody, or control.

14   The other thing I would point to is the general

15   obligation under the Federal Rules of Civil Procedure to

16   preserve all relevant and potentially relevant data for a

17   litigation.

18   THE COURT:  Although that can certainly be

19   modified by agreement or order and so -- but what you are

20   saying is that the agreed protocol, which -- by the way, it

21   was certainly filed in connection with this motion.  I don't

22   think it was ever filed before, or at least I couldn't find

23   it anywhere on the docket.  But in any event, it was signed,

24   it looks like, May 13th of 2019.  That specifically is for

25   telephone records pertaining to document custodians in the

1    possession of their respective telephone service providers

2    and doesn't purport to govern more than that, is what you're

3    saying?

4              MR. BOURNE:  That's right, Your Honor.

5              THE COURT:  And that beyond that one has to look

6    either or both, from your perspective, at what the ESI

7    protocol says about preservation insofar as the data is

8    within the possession, custody, and control of the party,

9    but if not, then you're saying -- or if you believe it

10   isn't, then you're saying you still have to look at case law

11   and precedent on preservation obligations?

12             MR. BOURNE:  Yes, Your Honor, I believe that

13   accurately captures what I was saying.

14             THE COURT:  All right.  What else?

15             MR. BOURNE:  With respect to the custodians and

16   the subpoenas, I think it's important to keep in mind that

17   the case law, as cited in our brief, is pretty clear that

18   the relevance and discovery standard is the same.  We

19   disagree with the custodians' argument that there needs to

20   somehow be a greater relevance argument showing under

21   Rule 45 than under the other rules of discovery.  The way I

22   think it works is that you have to try to get the discovery

23   from a party, if possible, which we've tried to do and are

24   doing here, but otherwise relevance is the same and the

25   scope of discoverable information is the same.

1          THE COURT:  Is that true if you think about

2     proportionality and you think about the resources of the

3     party?  You're saying that I'm not -- that I can't take

4     account of sort of custodian-specific considerations?

5          MR. BOURNE:  That is a good question.  I think as

6     far as determining the need to show relevance, that is the

7     same.  Frankly, the case law on proportionality is so mixed

8     that it's hard to say for sure exactly what that means at

9     all times.

10          But I would submit that what the Court should do

11     here is look at the custodians and say, okay, we have these

12     custodians, they have cell phones, the process for searching

13     them is not that burdensome, and simply find that it's not

14     unduly burdensome under the facts of this case, without the

15     need to make a more generalized ruling as to that issue.

16          THE COURT:  Okay.  I'm going to need to turn to

17     Mr. Coleman here fairly quickly.  Are there additional

18     points you wanted to make sure you emphasized before I let

19     you off the hot seat?

20          MR. BOURNE:  Nothing else at this time, Your

21     Honor.

22          THE COURT:  Let me just check quickly and see if I

23     had other questions I wanted to ask you specifically.

24          One thing, I am pretty sure I understand it

25     correctly, but just wanted to confirm.  The list of phone

1    numbers and the list of search terms, those were, for lack

2    of a better word, disjunctive, right?  In other words, you

3    want -- you are looking for there to be a search and then a

4    relevance review of all hits for any of those phone numbers,

5    and separately for there to be a search for and a relevance

6    review of all hits on the search terms, right?

7              MR. BOURNE:  That's right.  So the way it would

8    work would be you would review the phone number to phone

9    number hits; and then for any separate phone numbers, run

10   the search terms and review any hits on those search terms.

11             THE COURT:  Okay.  At this point what's your best

12   evidence, if you will, or your best information, your best

13   reason to believe that these custodians, in fact, have

14   relevant text messages on their devices?

15             MR. BOURNE:  So separate from -- I guess there are

16   two pieces to that.  One is that we have the existence -- we

17   have log data showing the existence of some text messages

18   that, based on who the recipients are, appear to be about

19   work, which for these Hormel custodians would be about the

20   pork industry.

21             And apart from that, Your Honor, I would say

22   common sense.  People text all the time.  We saw in the

23   criminal indictment in the broilers case cited in our brief

24   that text messages became an important part of that

25   conspiracy.  And it's increasingly how people communicate.

1          THE COURT:  All right.  Okay.  Let me give

2     Mr. Coleman a chance to respond, then.  Thank you.

3          Mr. Coleman.

4          MR. COLEMAN:  Yes.  Thank you, Your Honor.

5          Hormel Foods' mobile device policy and its Bring

6     Your Own Device program are not litigation positions, and

7     its opposition to plaintiffs' motion is not about discovery

8     tactics.

9          The company's cell phone policies are longstanding

10    company policies and practices that go to the core of its

11    relationship with its employees and reflect Hormel Foods'

12    carefully-considered approach to the difficult compromises

13    and considerations that companies face regarding mobile

14    devices.

15         So just as a little perspective, Your Honor, the

16    relevant time period extends nearly to the introduction of

17    the first iPhone.  So this period covers a sea change in how

18    phones are used and what that means for companies and their

19    employees.

20         But throughout this time period Hormel Foods has

21    consistently taken the position that its employees' phones

22    are personal.  Cell phones are owned and controlled by its

23    employees.

24         And Hormel Foods' policies, practices, and IT

25    infrastructure mean that it does not have the right to

1    control -- it doesn't have the practical ability to control,

2    access, inspect, take custody of, or image those phones.

3    Hormel Foods certainly has never had possession or custody

4    of the phones in question.

5            So Hormel Foods --

6            THE COURT:  Let me just ask a couple of questions

7    here.  First -- I mean, Hormel didn't just make it optional

8    for people to have a personal phone and, if they had it,

9    give them the ability to use it for work.  Hormel required

10   people, as I understand it, to have such a device and to use

11   it for work, to access company data, company systems.

12           So it seems like that may not -- may or may not

13   mean -- I am not sure where I am yet on possession, custody,

14   and control, but it certainly means the company -- I'm

15   sorry, I keep having to admit people from the waiting

16   room -- but it certainly means that the company not only

17   knew, but expected that people would use their phones for

18   work, right?

19           MR. COLEMAN:  Your Honor, I don't believe it's

20   accurate that all employees and all of the custodians at

21   issue here were required to have phones for work purposes.

22           But even putting that aside, the Sedona Conference

23   guidance that Hormel cites in its brief is really helpful in

24   terms of reviewing the types of considerations that

25   companies have to make with regard to the design of a mobile

1     device program.  There's a host of considerations.  There's

2     the expense of the phones.  There's the imposition on

3     employees of, you know, when they are being used for work.

4     There's the right of access to company data or the company's

5     right of access to its phones.  And there's employee privacy

6     issues.

7          So companies have to work through those

8     considerations and reach a judgment call about what's right

9     for the company, its culture, and what its position is on

10    its legal right and its practical ability to access phones.

11    Hormel Foods did that here.

12         So even if it were true that employees are

13    required to have a personal phone and bring it to work,

14    Hormel Foods recognizes that those phones might be used to

15    access company systems and company data, but on the other

16    hand, they are used for a host of personal reasons that

17    include family pictures and all the kind of personal apps

18    that people use.

19         And it specifically committed in the mobile device

20    policy and program that it will not -- it does not claim the

21    legal right to access personal data on cell phones.  That's

22    the policy that Hormel Foods designed.  It designed it well

23    before -- years before this litigation.  It's been --

24         THE COURT:  Hold on.  I am having a little trouble

25    hearing you.  I don't know if you need to get a little

1    closer to the microphone, but some of your words are getting

2    a bit muffled.

3            MR. COLEMAN:  I'm sorry, Your Honor.  I'll lean in

4    and speak up; and if it continues, I can also dial in by

5    phone if that becomes necessary.

6            THE COURT:  Okay.

7            MR COLEMAN:  But I will do my best.  Thank you,

8    Your Honor.

9            THE COURT:  That's better.

10           MR. COLEMAN:  So let me know if I have answered

11   your question, and I think I will speak to it more as we

12   proceed and I do intend to address the possession, custody,

13   or control question with a little bit more detail.

14           But the mere fact that employees use their phone

15   for work purposes is not enough.  It does not address the

16   legal test as to whether a company has a legal right or

17   practical ability to access personal data on cell phones.

18           The plaintiffs, as I understand it, are not taking

19   the position that Hormel has the legal right to do it.  They

20   are falling back on the practical ability that Hormel can

21   march an employee into a conference room, demand access to a

22   phone, and the company -- and the employee will roll over

23   and give up to that.

24           As the Sedona Conference makes very clear, it's

25   wrong, it's improper for courts or litigants to assume that

1    an employer can demand access to an employee phone simply

2    because the custodian is an employee.

3              THE COURT:  Isn't there a fair amount of room on

4    the spectrum short of saying, you know, give me your phone

5    or I am your boss, give me your phone, please, and saying

6    I've got no ability to request any information from that

7    phone?

8              I mean, I think even in your brief you indicated

9    that to the extent there was -- I think you said that to the

10   extent there was information on personal devices that was

11   company information or e-mail, you searched for and produced

12   it, right?

13             MR. COLEMAN:  Company data on the phone duplicates

14   the material that was accessed.  So e-mail system.  If an

15   employee uses their iPhone to access the company's e-mail

16   system, that information is saved on Hormel Foods' systems.

17   So there's not -- with respect to the e-mail, there's not

18   unique responsive information on the employee phones.

19             THE COURT:  But if somebody used their phone to

20   send a substantive work-related text, isn't that company

21   data?

22             MR. COLEMAN:  No, Your Honor, it's not.  I would

23   refer Your Honor to the mobile device policies that Hormel

24   has established and the practical -- the IT infrastructure

25   that it has in place.  Hormel Foods does not claim a right

1    to personal data, including text messages on --

2              THE COURT:  I'm not talking about a personal text

3    message.  I'm talking about a work-related text message, a

4    text message somebody did for the purpose of, you know,

5    accomplishing something on the job.  Why isn't -- why

6    wouldn't that be company data?

7              MR. COLEMAN:  It's the same answer, Your Honor.

8    The only right that Hormel has claimed in its mobile device

9    policies is the ability to remotely wipe data to protect --

10   remotely wipe a phone to protect company data.  It does not

11   have visibility to text messages.  It doesn't claim an

12   ability to do that, to obtain company text messages.

13             THE COURT:  Did Hormel tell its employees that

14   they must not use text messaging or ephemeral messaging or

15   the like to conduct company business?

16             MR. COLEMAN:  I can't point to a specific policy

17   on that.  What I can point to are the facts that very few

18   custodians did that, and we can go through some of those

19   facts in detail.  Mr. Rock can speak to it as well because

20   he has also -- you know, he and his firm have spoken to each

21   and every custodian.

22             THE COURT:  Had Hormel interviewed the custodians

23   itself with regard to their use of their personal cell

24   phones to conduct company business by text message; had

25   Hormel asked those questions?

1           MR. COLEMAN:  Yes, Your Honor, and I want to speak

2      to that because Mr. Bourne's statement to the contrary is

3      flat-out wrong, and it bothers me because I personally told

4      Mr. Bourne during the meet-and-confer that Hormel Foods

5      interviewed the custodians about their use of cell phones.

6           And there was quite a bit of effort on Hormel

7      Foods' part and the part of its counsel to lead up to the

8      statement that it's not aware of unique responsive

9      information on its employee phones.  There was legwork that

10     went into that.  We told Mr. Bourne that.  I personally told

11     Mr. Bourne that.  And that wasn't good enough, being told

12     that was not good enough.  He asked for details about those

13     conversations and what was asked, and at that point I shut

14     the conversation down based on attorney-client privilege.

15     Hormel Foods does not waive privilege of its custodian

16     interviews, as it's its right not to do.

17          So, yeah, to set the record straight, Hormel Foods

18     did, in fact, as a matter of both preservation and document

19     collection, interview each and every custodian.

20          And I would add that Mr. Rock's, the firm -- the

21     efforts that his firm put into this matter substantiate

22     Hormel Foods' own efforts.  Mr. Rock's firm provided letters

23     to plaintiffs stating objections to the subpoena, but also

24     going through a lot of the details, disclosing a substantial

25     amount of information about how phones were or were not used

1     for work.  So plaintiffs have that information.

2          Hormel Foods' investigation is further

3     substantiated by the plaintiffs' own evidence.  They point

4     to a grand total of five custodians that texted other

5     numbers they purport for work.  Four of those are internal

6     Hormel Foods numbers, and plaintiffs want to assume that

7     that was for work purposes.  That's a leap.  These are

8     colleagues.  They could have been texting about where to

9     meet for happy hour.

10          But I also think we need to look -- the Court

11    should look, to understand the scope of what's at issue

12    here, the scope of potential discovery on cell phones, the

13    Court should look at the plaintiffs' own subpoena and that

14    subpoena established the outer limits of what's potentially

15    relevant from cell phones and we're talking about, one,

16    communications to other defendants; two, communications to

17    pork integrators; and, three, communications about the

18    conditions of supply and demand in the pork industry.

19          And all four of the internal Hormel Foods'

20    custodians that purportedly texted one another, those are

21    internal jobs.  Most of them are pricing-related jobs that

22    do not communicate with anybody outside of Hormel Foods for

23    work.  So unless they were sending substantive text messages

24    to one another about conditions of supply and demand in the

25    pork industry, there's no relevant discovery there.

1          And plaintiffs don't accept that -- they want it

2     searched, but I think it's entirely plausible that

3     Mr. Rock's custodian interviews are correct and they were

4     not texting one another about conditions of supply and

5     demand in the pork industry.  And even if there was a

6     work-related text, it was I'm running late to a meeting or,

7     you know, something like that, my kid is sick and whatever.

8          So Hormel did a substantial amount of effort to

9     interview its custodians and ensure preservation.  I can

10    tell you, Your Honor, standing here today -- sitting here

11    today in my office, that Hormel Foods is not aware of any

12    unique responsive information on its custodians' cell phones

13    and certainly not aware of any unique responsive information

14    that's been at issue or has been lost or is in danger of

15    being lost.

16         THE COURT:  So just to unpack that a little bit,

17    when you talk about unique, what you are saying is that

18    you're not aware of anything that's responsive that's on

19    their cell phones that isn't also in the e-mail system or

20    elsewhere in the -- among Hormel's data; is that what --

21         MR. COLEMAN:  That's correct, Your Honor.

22         THE COURT:  -- what you mean by "unique"?

23         MR. COLEMAN:  That language tracks the ESI

24    protocol.  I would refer Your Honor to paragraph V(E) and

25    that the ESI protocol specifies what the parties are

1    supposed to do with respect to their custodians' cell

2    phones; and the ESI protocol requires parties to use, quote,

3    unquote, reasonable steps to identify unique responsive

4    information on cell phones.  And we're quite confident that

5    reasonable steps includes actually talking to the custodians

6    and interviewing them.

7            Again I'd refer Your Honor to the Sedona

8    Conference principles that we cite in the brief.  There the

9    Sedona Conference refers to custodian interviews as an

10   appropriate method to establish whether unique responsive

11   information exists on phones.  That's also an old-school

12   method of discovery that's been used for time immemorial.

13   Every case I have been involved in, you start with a

14   custodian interview to understand where responsive documents

15   might reside and if, for example, a custodian tells the

16   lawyer that they don't save work-related documents in their

17   home office, I've never been in a situation where we just

18   refuse to believe them and nonetheless demand to go search

19   their home office, and that is effectively what -- that's

20   exactly what plaintiffs are asking here.

21           So even though a custodian doesn't have a job

22   responsibility that would involve communicating with another

23   defendant and even though a document custodian states that

24   they do not use their cell phone for work, plaintiffs are

25   nevertheless asking the Court to order imaging and search of

1    those phones.  That's unreasonable.

2             THE COURT:  And so, again, just to unpack, when

3    you said to plaintiffs and when you have said in your

4    briefing that Hormel is not aware, I mean, that was -- you

5    intended that as a much more active representation, that

6    this is not the, well, it hasn't come to my attention or --

7    but that there were active efforts to interview these

8    custodians specifically about text messages on their cell

9    phones?  In other words, just because Hormel doesn't believe

10   it has control over those, you specifically interviewed

11   about text messages on the cell phones; is that correct?

12            MR. COLEMAN:  That is correct, Your Honor, and

13   I --

14            THE COURT:  And --

15        (Simultaneous indiscernible crosstalk)

16            THE COURT:  And did you specifically tell them

17   that their preservation obligations extended to keeping text

18   messages -- relevant text messages on their cell phones?

19            MR. COLEMAN:  Yes, Your Honor.  So all custodians

20   were subject to a legal hold.  That legal hold was discussed

21   with plaintiffs.  It included cell phones.  And as further

22   proof of that point, I would point to the letters that

23   Mr. Rock's firm provided to plaintiffs that discuss and

24   disclose that they revisited the legal hold obligations with

25   the custodians and were assured that custodians understood

1     their obligations to preserve personal data on cell phones.

2              THE COURT:  Okay.  Go ahead, Mr. Coleman.

3              MR. COLEMAN:  So regarding -- returning to the

4     question of possession, custody, or control, I again would

5     urge the Court to or at least refer the Court to the Sedona

6     Conference guidance -- principles and guidance that we cite

7     in our brief just because it gives a thorough exposition of

8     the law and the consideration -- the underlying

9     considerations.

10             The Sedona Conference cites this court's decision

11    in the *Ewald* case that is cited on page 14 of our brief, and

12    that case supports Hormel Foods' position here where this

13    court drew a sharp distinction between employer-provided

14    phones and employee-owned phones.  And Hormel Foods'

15    position that it does not have a legal right or the

16    practical ability to access employee phones is upheld in

17    both the Sedona Conference principles and the *Ewald* case.

18             Now, with regard to Mr. Bourne, he does not seem

19    to be arguing that Hormel Foods has a legal right to access

20    employee phones.  He focuses on the practical ability, and

21    that reduces to the idea that, well, if you ask employees,

22    they're going to roll over, they know where their bread is

23    buttered.

24             I don't think -- so let me just start with

25    practical ability should focus on the technology and the

1    IT infrastructure and the actual program and policies in

2    place.  And with respect to that, Hormel Foods does not have

3    the ability to monitor its employees' phones, access phones,

4    et cetera.  It's made that choice.  That's something that it

5    could have required consent or acknowledgement and installed

6    that type of software.  Hormel Foods did not for principled

7    reasons that it has consistently adhered to over time.

8           And the Sedona Conference is quite clear that

9    employees should not be put to the burden or the coercion

10   of an employer saying, "Give me your phone, I want to image

11   it."

12          With respect to Your Honor's question about, well,

13   isn't there some way to kind of finesse this, some

14   reasonable middle ground, I would respectfully push back on

15   that notion and we just have to think through what does a

16   court order to Hormel Foods entail.

17          So the plaintiffs want to urge the Court to issue

18   an order declaring that Hormel Foods has possession,

19   custody, or control and that Hormel Foods must image and

20   search and produce documents on those phones.  Hormel Foods

21   doesn't have the phones.  It doesn't have the passwords.  So

22   it's got to literally walk its employees into the office,

23   ask them to turn over their phones and their passwords, and

24   then image the entire devices, which is extremely invasive

25   given the nature of phones and the expectation of privacy

1    that employees have in their phone, particularly given

2    Hormel Foods' custom, practice, and policies.

3              THE COURT:  Let me ask this.  Let's say those

4    interviews you conducted had turned out differently and you

5    had a half a dozen employees who said, "Yeah, I use text all

6    the time on these very subjects.  Yep, I got quite a few of

7    them."  What would you be doing then?  Are you saying that,

8    notwithstanding that, you would still be having to take the

9    position or would still be taking the position that Hormel

10   as a company couldn't insist that those text messages be

11   made available for -- to you for review and production?

12             MR. COLEMAN:  Hormel Foods' policy is its policy

13   and it would abide by the policy that it's committed to with

14   its employees.

15             So what I would -- obviously, preservation would

16   become all that much more important, not that Hormel Foods

17   didn't otherwise fulfill all of its preservation

18   obligations.  I think in that case you have to go out of

19   your way to ensure that materials were preserved.

20             But the recourse is exactly what plaintiffs avail

21   themselves of here.  They can see that they were notified of

22   Hormel Foods' position in the months after the litigation

23   was filed, all the way back to fall of 2018.  And once they

24   got into discovery, additional custodians were added.  Then

25   they decided they wanted discovery of all the custodians.

1   They went and issued subpoenas to every one of them, which

2   is their right to do.  We think it was overbroad and an

3   overreach, but they did it.  It's a tool under the federal

4   rules and they used it.

5          Not only that, but plaintiffs were aided by the

6   fact that the document custodians all retained a single

7   counsel, single point of contact.  So it was laid out for

8   them to go negotiate with the custodians' counsel and obtain

9   reasonable discovery of the phones.  We think that's the

10  appropriate answer --

11          THE COURT:  Okay.

12          MR. COLEMAN:  -- given Hormel Foods' policies and

13  positions.

14          THE COURT:  All right.  So you've got no quarrel

15  with the idea that subpoena is the recourse when it comes to

16  personally-owned phones, but you take issue with whether it

17  was used appropriately here given the information available

18  about what's probably not on those phones from your

19  perspective?

20          MR. COLEMAN:  Yes, Your Honor.  I mean, we'll

21  defer that to Mr. Rock's argument.  Hormel Foods has not

22  inserted itself into those negotiations.  It did not file a

23  motion to quash.  We haven't objected to the subpoenas.

24  We've let that run its course.

25          From the outside looking in at those negotiations,

1    Mr. Rock's firm was engaged with plaintiffs.  The chain of

2    correspondence reflects a desire to negotiate, a willingness

3    to negotiate.  And from our perspective, it seems clear that

4    plaintiffs just decided to turn their back on those

5    negotiations and file this motion instead.

6            THE COURT:  Okay.

7            MR. COLEMAN:  And I would in particular refer Your

8    Honor to Exhibit G to Ms. Stephens' declaration, which is

9    the last letter that plaintiffs [sic] sent before this

10   motion was filed, and it's all but begging plaintiffs to

11   negotiate.  Start with the phones that were imaged.  Let's

12   talk about search terms, get reasonable parameters.

13   Plaintiffs could and should have gone down that road and

14   obtained the discovery that they thought was appropriate.

15   For whatever calculated reasons, they didn't and they teed

16   this motion up instead.  I mean, we do think that is

17   improper.  I will let Mr. Rock speak to it.  Hormel Foods is

18   not -- it's not our argument or objection to make.

19           THE COURT:  All right.  Well, that suggests I

20   probably ought to let Mr. Rock get a word in edgewise.  And

21   then, of course, I will give Mr. Bourne a chance to reply.

22           MR. COLEMAN:  Thank you, Your Honor.

23           MR. ROCK:  Thank you, Your Honor.  As the Court

24   knows, my firm represents the 30 different subpoena

25   recipients that have been referred to by plaintiffs' motion.

1       Those are 30 different people, each with very different

2       situations and circumstances.  Basically the one thing -- or

3       maybe two things that each of them have in common is that

4       they at one time worked for Hormel and they have a cell

5       phone, and beyond that there is quite a bit of difference

6       between my clients.

7               That's, frankly, been one of the frustrating

8       issues in our meet-and-confers with plaintiffs' counsel and

9       then in responding to this motion, is that we've got -- of

10      our 30 clients, 13 of them are former employees.  Only 17 of

11      them are current employees.  The one who has been longest

12      retired retired in 2012, so more than nine years ago.

13              They also work in a variety of different

14      departments and have very different responsibilities.  One

15      of our compliance -- one of our clients was the director of

16      investor relations.  One of our clients is the CEO.  And it

17      runs the gamut from a person who was in charge of hog feed

18      at one time in the 2010s.  So everybody is very different.

19              And one thing -- it has come up in your questions

20      and from both of the counsel that have argued before me,

21      that I would like to address, is that we received the exact

22      same subpoena for each 30 of our clients, and they kind of

23      came in waves.

24              And after I was retained by a particular client,

25      either my colleague, Kathy Stephens, or I, we had a

1   conversation with the client and we learned about their

2   situation.  And we said:  Here's your subpoena.  Let's talk

3   about this and figure out what there is and if you've got

4   anything responsive, whether there are appropriate

5   objections or not.

6           And, you know, we talked about -- we talked with

7   them about their responsibilities and how -- at what time

8   they had what responsibility.  And, of course, in a

9   corporate setting, many of our clients changed

10  responsibilities and changed roles over this ten-year time

11  period.

12          And that's the other thing that has struck me --

13  and, of course, I'm very new and I guess hopefully temporary

14  to this case that I see is on at least Docket 925 now -- is

15  that the time frame at issue here is from 2008 to 2018, and

16  obviously there has been a lot of change in the world and in

17  communications over that time frame.

18          We talked with them about how they use their

19  telephones for work and we talked about -- we talked with

20  them about whether or not they use text messaging for work.

21  We talked with them about how many phones have they had

22  since 2008 and how many different cell carriers have they

23  had.

24          As I thought about this myself, I think I'm on

25  phone seven or eight since 2010, and it might be more than

1       that.  And that was really consistent throughout.  You know,

2       phones get lost.  Phones get broken.  Phones get updated.

3       So that was -- I guess another thing, besides everybody

4       having a phone, was that their phones had changed over the

5       past 13 years.

6              What we found out, also consistently from our

7       clients, is that most of them never texted about work and

8       especially with anybody outside of work about work.

9              And then when you drill down and one thing we need

10      to remember here is that the request -- and I think from

11      hearing Mr. Bourne's argument, it appears that the real

12      request from the subpoenas that is at issue here is Request

13      Number 1.

14             And Request Number 1 seeks copies of each text

15      message that you sent or received during the relevant time

16      period, which is 2008 through '18, with any employee or

17      representative of a pork integrator or other individual with

18      whom you communicated about supply and demand conditions in

19      the pork industry.  So, you know, ultimately that's where

20      our focus was on the text messages.

21             And I've noted, I guess, first from plaintiffs'

22      motion papers and then from Mr. Bourne's argument today,

23      that things have kind of quietly shifted from text messages

24      about supply and demand conditions in the pork industry to

25      work-related texts.  There is no subpoena request for

1    work-related texts.

2           And I think Your Honor's question to Mr. Bourne

3    early on and his response to that was telling in that in

4    their motion papers they talk about -- they identify five of

5    my clients who they say had work-related texts.  And as it

6    turns out, what they are calling work-related texts are

7    apparently texts between phone numbers of Hormel employees.

8           And, of course, Austin, Minnesota, is not a huge

9    town.  Most of my clients live in Austin, not all of them,

10   but most of them do.  And in a town of 25,000 people, Hormel

11   is by far the largest employer.  And to assume that because

12   two people who work at Hormel in Austin have texted one

13   another, that they are texting about work is really a very

14   far leap and there is no support for that.

15          What was most telling from Mr. Bourne's answer to

16   your question was that they have seen no text messages

17   between my clients and any other defendants from any other

18   companies.  And if there was something like that, we might

19   have something to talk about.

20          But interestingly enough, we were asking

21   Mr. Bourne and his colleague the same information during our

22   meet-and-confers, where we said:  Our people are very

23   different.  This is a wide-ranging subpoena in that it seeks

24   text messages that would hit on -- whatever it is -- 891

25   phone numbers, whose phone numbers are not identified, and

1    also would hit on 330 different keywords.

2            And the keywords, some of them are specific.  Some

3    of the keywords are "buy," b-u-y, "drive," "practice,"

4    "together."  And as a parent who used to have kids in

5    traveling sports, it's not beyond imagination to send a text

6    to a co-worker saying that I have to drive my kid to

7    practice or could you drive my kid to practice and so on and

8    so forth.  But the terms are very broad.

9            So we asked if, first of all, they would identify

10   some of our clients who they thought actually would have

11   responsive e-mails related to communications about supply

12   and demand conditions in the pork industry.  They wouldn't

13   do that.  They couldn't do that.

14           We asked them to consider cutting down the search

15   terms.  They flat out said, no, we won't do that.  It

16   appears that you don't want to deal with us.  So we will

17   file our motion, which is essentially what they told us in

18   our last meet-and-confer.

19           THE COURT:  Let me ask this.  I mean, certainly

20   Mr. Bourne and his colleagues are not asking that all

21   work-related texts be produced.  As I understand their

22   argument, it's they are looking for some way to determine

23   what the universe may be and then to have -- but still a

24   relevance review of things either that -- of texts that are

25   between numbers that are work numbers or that hit on terms

1       that could have been used in relevant e-mails.

2              So given that texts aren't really susceptible to

3       search in the same way that e-mails are, for example, have

4       you looked, for example, at what the burden would be here?

5       I mean, how many texts would actually have to be reviewed in

6       order to determine that they either are or aren't texts that

7       are responsive to their -- that are actually responsive to

8       their subpoena?

9              MR. ROCK:  First of all, as far as the number of

10      texts, I do not -- I cannot answer that question.  That, to

11      my understanding, would require us to get our clients'

12      phones, image them, and figure out how many text messages

13      they have.

14             As it relates to burden, here's what I do know.

15      It would require -- to have their phones imaged, it would

16      require each of our clients to bring their phone in.  Some

17      of them are in Austin, so presumably we could have the

18      forensic third-party provider do that at a location.

19             But they told us, the forensic provider told us

20      that that process per phone, depending on the type of phone,

21      how much data is on that phone, could take anywhere between

22      three hours to more than a day per phone.  That's a real

23      concern for my clients.  As Justice Roberts has famously

24      pointed out more recently, cell phones are really very

25      personal and we hardly function without them anymore.  So

1  that is a real burden just for the people that live in

2  Austin.

3          The burden would be greater for -- I have a client

4  who lives in Wisconsin, a client who lives -- a couple

5  clients in outstate Minnesota, another client in Nebraska, a

6  client in Washington, a client in Arizona.  And that is --

7  if we use the same provider, it's send their phone in and,

8  of course, that's a many-day ordeal to be separated from

9  their phone.

10         And then I asked the provider for just a -- what's

11  going to be the baseline cost to do this for 30 clients, and

12  the smallest number I got was $65,000 to do that for

13  everybody and I'm guessing that number is likely to go

14  higher than lower if we actually got to that point.  So

15  there are some real burden issues there.

16         One thing I did want to clarify is that while the

17  subpoena, Request Number 1, is clear that they are

18  requesting texts about supply and demand conditions in the

19  pork industry, Mr. Bourne in his letter to myself and

20  Ms. Stephens points out very clearly so that -- he says that

21  there is no question about it, is that their position is

22  that any text messages to any of the 700 or 800 phone

23  numbers on their list, that those are automatically

24  responsive and would have to be provided without a

25  relevance -- a further relevance review beyond that, which

1    that's one clear example of the compromise from plaintiffs

2    becoming much greater than the subpoena itself because that

3    is not in the subpoena at all.

4           Another thing that has struck me with this motion

5    is that it seems like my clients, kind of, really aren't the

6    issue here and I'm not sure the plaintiffs really want

7    whatever the searches return from their phones, and they

8    probably definitely don't want to find out that the phones

9    had been searched and find out that there are no responsive

10   text messages.

11          The motion itself does not identify one of my

12   clients.  It does not identify one of the requests or topics

13   from the subpoena.  And it does nothing to explain why any

14   or all of my clients are likely to have responsive text

15   messages.

16          And, I mean, we know why that is.  There's just --

17   they've got -- apparently have the data that shows the

18   inter-defendant communications and shows that text messages

19   happened or didn't happen, and they have not shown any

20   inter-defendant text messages involving my clients.

21          And that, as I said, was something that we had

22   asked for to see if there was a solution, a compromise

23   position, where we could identify a handful of people who

24   would likely have what they thought would be responsive; and

25   we've gotten nothing along those lines.

1          THE COURT:  I should give Mr. Bourne a chance to

2     reply.  Any other points?  And, obviously, I got thorough

3     briefs and 900 pages of information from you all.  But any

4     other points you wanted to make sure to address while you've

5     got me live and on screen?

6          MR. ROCK:  Yes.  Thank you, Your Honor.  Just one

7     last point, and this really dovetails with the information

8     that we got from our clients.

9          When asking kind of the ultimate question, do you

10    have any texts or did you ever text about supply and demand

11    conditions in the pork industry or about price-fixing, the

12    few of my clients who actually had anything to do with pork

13    or pricing or purchasing of pork laughed at me and said

14    that's silly because we had to buy most of our pork that we

15    used and it was -- it would be completely opposite of what

16    our job was, that we would be texting somebody else at a

17    competitor trying to figure out a way to prop up pork

18    prices, because I was trying to buy pork and my boss wasn't

19    going to be very happy if I worked out some great

20    price-fixing scheme to prop the price up.

21          So it wasn't as if our clients said, "No, I just

22    don't remember such a text."  It was:  "I don't remember

23    such a text and it would be crazy for me to have sent or

24    received such a text."  So a little more context there that

25    I think is helpful as well.

1          But unless the Court has any other questions for

2     me, I will yield.  I appreciate the Court's time.

3          THE COURT:  All right.  Thank you, Mr. Rock.

4          Mr. Bourne, back to you.

5          MR. BOURNE:  Thank you, Your Honor.

6          I think that asking someone whether they texted

7     about price-fixing, the result they're going to say no,

8     that's going to be predictable and it's largely beside the

9     point.

10         You know, I hear in there the idea that Hormel

11    didn't do what it's accused of doing in this lawsuit, but

12    the Complaint has been upheld and that's why we have

13    discovery.

14         I wanted to respond on the collection of text

15    messages.  My understanding is that it is now possible, and

16    this may have been hastened by the pandemic that we've all

17    been dealing with for the last year and a half, but it's now

18    possible to do a remote collection so that the vendor can

19    send a kit to the custodian and it can collect the data

20    overnight while the person is asleep.  So the disturbance to

21    the particular custodian would be minimal.

22         And as for the cost of compliance, I believe we

23    were talking about $65,000 in the aggregate, which is

24    obviously much smaller per person.  I could have

25    misunderstood.  But my understanding is that Hormel is

1    paying its custodians' bills here, which is why they have

2    all retained the same counsel, and so the cost to the actual

3    custodians would be nothing.

4          As far as people who don't have their cell phones

5    from 2012 anymore, you know, that's obviously true.  At a

6    certain point they all had a preservation obligation

7    beginning in 2018, and so at that point any text messages

8    certainly were required to be preserved and should not have

9    been lost.

10         But I think it's also important to keep in mind

11   that cloud backup exists and so if you have an iPhone,

12   there's a good chance that your text messages have all been

13   backed up to the cloud via Apple software.  I believe that

14   Google Message does the same thing on Android phones.

15         As for, you know, plaintiffs not having evidence

16   of the existence or content of inter-defendant texts, I

17   think it's important to keep in mind, again, that if it's an

18   iPhone to iPhone text, it will be using iMessage and we

19   won't get that log data.  The existence of the text message

20   from the carrier, that can only be obtained from the iPhone.

21         But also plaintiffs don't have an obligation to

22   prove the existence of conspiratorial communications in

23   order to discover those communications or have the relevant

24   parties search for them.  That would be a standard that

25   would be almost impossible to meet.

1          It also -- regarding the privacy concerns that

2     Mr. Coleman raised, I understand it would be possible for a

3     vendor to limit its data pull so the third-party vendor

4     could only pull the text messages or the content from a

5     messaging app and then the vendor could run the searches and

6     only provide to the attorneys the hits on those searches.

7     So the privacy issues would be as minimized as possible,

8     depending on how counsel and the vendor went about

9     undertaking this effort.

10          It also appears that Hormel is attempting to use

11     attorney-client privilege as both a sword and a shield here

12     by saying we asked these people and they don't have any

13     responsive text messages, but otherwise refusing to describe

14     the questions that they asked them about text messaging.

15          Ultimately, Your Honor, the plaintiffs submit that

16     it's just too hard for a custodian to know whether they've

17     sent relevant text messages.  The way to figure that out is

18     to search for them.  If there aren't any, then great,

19     there's nothing to produce.  If there are some, counsel can

20     review those for responsiveness and privilege and produce

21     whatever exists.

22          Unless Your Honor has any further questions from

23     me, that is all that I have at this point.

24          THE COURT:  All right.  No, I think -- let me just

25     take one more look through my notes.  Okay.  Nope, I think

1    one way or another we covered my questions.  Thank you,

2    Mr. Bourne.

3            All right.  I am going to take this under

4    advisement.  I will get an order out as quickly as I can.  I

5    appreciate the arguments this afternoon.  And we are

6    adjourned.

7        (Court adjourned at 5:06 p.m.)

8                            *      *      *

9

10

11            I, Lori A. Simpson, certify that the foregoing is a

12   correct transcript from the record of proceedings in the

13   above-entitled matter.

14

15                Certified by:   *s/ Lori A. Simpson*

16                              Lori A. Simpson, RMR-CRR

17

18

19

20

21

22

23

24

25