# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-1776 (JRT/HB) |
| | **MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT BETWEEN CONSUMER INDIRECT PURCHASER PLAINTIFFS AND JBS DEFENDANTS** |
| This Document Relates to: | |
| All Consumer Indirect Purchaser Actions | |

# TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................................. 1

II.   **BACKGROUND** ................................................................. 3

     A.    Settlement Terms ................................................... 3

     B.    Notice to class ......................................................... 5

     C.    Plan of Distribution .............................................. 7

III.   **ARGUMENT** ..................................................................... 7

     A.    The parties have complied with the Class Action Fairness Act. ................... 8

     B.    The settlement class meets all requirements of Rule 23(e). ........................ 8

         1.    Courts apply a relaxed standard under Rule 23(b) when the class is being certified for settlement. ................................. 9

         2.    An illegal price-fixing scheme impacts all purchasers of a price-fixed product in a conspiratorially affected market. ....................... 14

         3.    The record contains ample evidence that Plaintiffs' claims are subject to common proof. ................................. 15

             a.    Consumer IPPs can show through common proof that Defendants successfully conspired to reduce supply during the class period, both in the aggregate and individually. ....... 16

             b.    Consumer IPPs can show through common proof that Defendants' conspiracy inflated the price of pork during the class period. ................................. 17

             c.    Consumer IPPs can show through common proof that overcharges due to the cartel were passed through to the indirect purchaser class. ......................... 18

         4.    Class action is a superior means of resolving Consumer IPPs' claims. ................................. 19

         5.    The objector's fee objection falls with his predominance objection. ................................. 22

     C.    The proposed settlement is fair, adequate, and reasonable. ........................ 22

010736-11/1703766 V4

1.     The settlement is entitled to a presumption of fairness.................... 23

2.     Four fairness factors weigh in favor of settlement.......................... 24

   a.     The strength of the plaintiffs' case, weighed against the terms of the settlement, supports final approval. ............................ 25

   b.     The JBS Defendants' financial condition and ability to pay did not impact the amount of settlement. .............................. 25

   c.     The complexity and expense of further litigation supports final approval. ...................................................... 25

   d.     Settlement class members' positive reaction supports final approval. .............................................................. 27

D.     Plaintiffs have complied with Rule 23(c) notice requirements. .................. 27

E.     The plan of allocation is fair, reasonable, and adequate. ............................ 28

IV.   **CONCLUSION** ................................................................................... 29

010736-11/1703766 V4

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Alcoholic Beverages Litig.*,
   95 F.R.D. 321 (E.D.N.Y. 1982) .................................................................. 14

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) .......................................................................... *passim*

*In re Catfish Antitrust Litig.*,
   826 F. Supp. 1019 (N.D. Miss. 1993) ................................................... 14, 15

*In re Charter Commc'ns, Inc.*,
   2005 WL 4045741 (E.D. Mo. June 30, 2005) ........................................... 28

*DeBoer v. Mellon Mortg. Co.*,
   64 F.3d 1171 (8th Cir. 1995) ................................................................... 23

*In re Domestic Drywall Antitrust Litig.*,
   163 F. Supp. 3d 175 (E.D. Pa. 2016) ........................................................ 17

*Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*,
   703 F.3d 1104 (8th Cir. 2013) ................................................................. 17

*Grier v. Chase Manhattan Auto Fin. Co.*,
   2000 WL 175126 (E.D. Pa. Feb. 16, 2000) ............................................... 23

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) .............................................................. 12, 23

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) .............................................................. 10, 20

*In re Linerboard Antitrust Litig.*,
   2004 WL 1221350 (E.D. Pa. June 2, 2004) ............................................... 26

*Lumco Indus., Inc. v. Jeld-Win., Inc.*,
   171 F.R.D. 168 (E.D. Pa. 1997) ............................................................... 14

*In re Master Key Antitrust Litig.*,
   528 F.2d 5 (2d Cir. 1975) ........................................................................ 14

*Minnesota v. U.S. Steel Corp.*,
    44 F.R.D. 559 (D. Minn. 1968).................................................................................. 21

*Missourians for Fiscal Accountability v. Klahr*,
    830 F.3d 789 (8th Cir. 2016) ........................................................................... 17, 19

*In re Optical Disk Drive Antitrust Litig.*,
    2016 WL 467444 (N.D. Cal. Feb. 8, 2016) .................................................. 15, 18, 19

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)....................................................................................................... 10

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ............................................................................. *passim*

*Pickett v. Sheridan Health Care Ctr.*,
    664 F.3d 632 (7th Cir. 2011) ........................................................................... 17, 19

*In re Potash Antitrust Litig.*,
    159 F.R.D. 682 (D. Minn. 1995)................................................................. 14, 15, 21

*Transamerican Refining Corp. v. Dravo Corp.*,
    130 F.R.D. 70 (S.D. Tex. 1990).............................................................................. 15

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)...................................................................................................... 13

*United States v. Earth*,
    984 F.3d 1289 (8th Cir. 2021) ................................................................................. 17

*Van Horn v. Trickey*,
    840 F.2d 604 (8th Cir. 1988) .................................................................................. 24

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002)................................................................................. 14

*Wal–Mart Stores, Inc. v. Dukes*,
    131 S.Ct. 2541 (2011) ............................................................................................. 12

*White v. Nat'l Football League*,
    822 F.Supp. 1389 (D. Minn. 1993)...................................................................... 22, 23

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    2016 WL 4697338 (D. Minn. Sept. 7, 2016) ........................................................ 15

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
   396 F.3d 922 (8th Cir. 2005) ................................................................*passim*

*In re Workers' Compensation*,
   130 F.R.D. 99 (D. Minn. 1990)................................................................. 14

*Yarrington v. Solvay Pharms., Inc.*,
   2010 WL 11453553 (D. Minn. Mar. 16, 2010) ...................................... 26

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
   2012 WL 5055810 (D. Minn. Oct. 18, 2012). ......................................... 12

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
   2013 WL 716088 (D. Minn. Feb. 27, 2013) ......................................*passim*

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   267 F.R.D. 549 (D. Minn. 2010)........................................................ 11, 19

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   644 F.3d 604 (8th Cir. 2011) ..............................................................*passim*

## STATUTES

28 U.S.C. § 1715(b)........................................................................................ 8

28 U.S.C. § 1715(d) .................................................................................... 7, 8

Class Action Fairness Act (CAFA) ............................................................. 7, 8

## FEDERAL RULES

Fed. R. Civ. P. 23.................................................................................*passim*

Fed. R. Evid. 801 ......................................................................................... 16

Fed. R. Evid. 801(d)(2)........................................................................... 16, 18

Fed. R. Evid. 803(8) .............................................................................. 16, 17

## OTHER AUTHORITIES

2 William B. Rubenstein, Newberg on Class Actions § 4:63 (5th ed. 2018) .................. 10

*4 Alba Conte & Herbert Newberg, Newberg on Class Actions* § 11.41 (4th
   ed. 2002) ................................................................................................. 23

7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1778,
(3d ed. 2005) ............................................................................................................. 13

## I.    INTRODUCTION

Consumer Indirect Purchaser Plaintiffs ("Consumer IPPs") respectfully move for final approval of the settlement with Defendants JBS USA Food Company, JBS USA Food Company Holdings, and Swift Pork Company (collectively, "Settling Defendants" or "JBS"). On April 2, 2021, this court granted preliminary approval of this settlement, certifying the settlement class and preliminarily approving the settlement.[1] And on June 22, 2021, the Court ordered dissemination of notice to class members.[2]

The notice administrator provided notice in accordance with this Court's order. Of the millions of class members who received notice, none requested exclusion from the class, and only one individual objected to the settlement and the Consumer IPPs' fee request.

The sole objections to the settlement and fee request were filed by the same serial objector. This individual does not criticize the fairness of the settlement or Consumer IPPs' fee request. Instead, this individual merely claims in both submissions that Consumer IPPs have not met the evidentiary standard for Rule 23(b)(3) class certification. But the objector wholly misstates that standard. The objector furthermore ignores the Supreme Court's admonition that courts applying Rule 23(b)(3) certification standard must consider the context for certification: litigation or settlement. This

---

[1] Order Granting Prelim. Approval of the Class Action Settlement Between Consumer Indirect Purchaser Pls. and the JBS Defs., ECF No. 752.

[2] Order Granting Mot. to Approve the Manner and Form of Class Notice Regarding Settlement with JBS Defs., ECF No. 811.

individual also ignores the well-reasoned later *Zurn Pex* district court orders certifying a settlement class on a record that did not contain nearly the robust presentation of common evidence that Consumer IPPs present here. The objector also ignores the presumption of predominance in antitrust price-fixing cases. And finally, the objector here ignores the abundance of evidence that Consumer IPPs' Third Amended Complaint proffers common proof of: (1) Defendants' concerted conduct and public signaling of reductions in the supply of pork, (2) the resulting supra-competitive increases in pork prices during the class period, and (3) the pass through of those prices to the consumer IPP class. TAC, ¶¶ 98-123.[3] The objector's criticisms thus do not withstand scrutiny. And as those criticisms fall, so too does his objection to the Consumer IPPs' fee request, which expressly conditions itself on the denial of class certification.

The $20 million settlement with JBS is the result of arm's-length negotiations, conducted in front of an experienced mediator, which provides substantial monetary and non-monetary relief to the Consumer IPP class. JBS's agreement to provide cooperation will also strengthen plaintiffs' case against the remaining defendants. This settlement thus represents an outstanding result for the consumer indirect purchaser class and guarantees compensation for consumers in this long-running litigation. All factors regarding the fairness, adequacy, and reasonableness of these settlements support final approval. Respectfully, Consumer IPPs request that this Court grant final approval.

---

[3] "TAC" refers to the Consumer IPP Third Amended Complaint, ECF Nos. 865 (sealed) and 866 (redacted).

## II.     BACKGROUND

This Court is familiar with plaintiffs' allegations and the procedural posture of this case and Consumer IPPs therefore do not repeat them here. Consumer IPPs included a detailed discussion of the procedural history and IPPs' efforts in litigating this case in their motions for preliminary approval[4] and for attorneys' fees.[5]

### A.     Settlement Terms.

The settlement between JBS and the Consumer IPPs is the product of confidential, protracted, intense arm's-length negotiations by experienced counsel for all parties, and includes both monetary relief for the class and cooperation in the Consumer IPPs' litigation against the non-settling defendants.[6]

The settlement provides that JBS will pay $20 million into a settlement fund that will be used to compensate the Consumer IPP class and cover litigation fees and expenses, including the cost of notifying class members and administering the settlement.[7] Lead Counsel believe this sum is fair and reasonable in light of JBS's market share of class products and the significant cooperation JBS agreed to provide:

---

[4] *See* Memorandum in Support of Preliminary Approval of the Class Action Settlement between Consumer Indirect Purchaser Plaintiffs and JBS Defendants, ECF. No 742 (filed May 26, 2021) (hereinafter, "Memo. in Support of Prelim. App.") at 1-4.

[5] *See* Memorandum in Support of Consumer Indirect Purchaser Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses, ECF No. 951, (filed Oct. 6, 2021) at 2-7.

[6] Memo. in Support of Prelim. App. at 1-3, 7-9.

[7] Decl. of Shana E. Scarlett in Supp. of Prelim. Settlement Approval ("Scarlett Prelim. App. Decl."), ECF No. 743, Ex. A at 12-13.

Cooperation by JBS is a material term of this Settlement Agreement and shall include the following categories of cooperation:

a.      To the extent that JBS responds to discovery, produces documents, or provides proffers or other cooperation to other plaintiffs in the *In re: Pork Antitrust Litigation* it will serve or otherwise provide IPPs a copy of such materials reasonably soon after such production to any other plaintiff.

b.      JBS agrees to use reasonable efforts to respond to a reasonable number of IPPs' questions [] and otherwise assist IPPs to understand structured data produced by JBS in this matter (if any).

c.      JBS agrees to use reasonable efforts to authenticate documents and/or things produced by JBS in the Action where the facts indicate that the documents and/or things at issue are authentic, whether by declarations, affidavits, depositions, hearings and/or trials as may be necessary for the Action.[8]

In exchange, Consumer IPPs agree to release:

[T]he JBS Released Parties from any and all claims, demands, actions, suits, causes of action, whether class, individual, or otherwise in nature (whether or not any member of the Settlement Class has objected to the Settlement Agreement or makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively or in any other capacity) that the Releasing Parties ever had, now have, or hereafter can, shall, or may ever have, that exist as of the date of the order granting Preliminary Approval, on account of, or in any way arising out of; any and all known and unknown, foreseen and unforeseen, suspected or unsuspected, actual or contingent, liquidated or unliquidated claims, injuries, losses, damages, and the consequences thereof that have been asserted, or could have been asserted, under federal or state law in any way arising out of or relating in any way to the indirect purchase of Pork produced, processed or sold by JBS or any of the Defendants or their co-conspirators Defendants or their co-

---

[8] *Id.*, Ex. A at 11.

conspirators, and purchased indirectly by the Releasing Parties (the "Released Claims").[9]

The released claims "do not include (i) claims asserted against any Defendant or co-conspirator other than the JBS Released Parties; (ii) any claims wholly unrelated to the allegations in the Actions that are based on breach of contract, any negligence, personal injury, bailment, failure to deliver lost goods, damaged or delayed goods, product defect or securities claim; or (iii) damages claims under the state or local laws of any jurisdiction other than an Indirect Purchaser State."[10] For the purposes of this settlement, Pork means:

> "Pork" means porcine or swine products processed, produced or sold by JBS, or by any of the Defendants or their co-conspirators, including but not limited to: primals (including but not limited to loins, shoulders, picnics, butts, ribs, bellies, hams, or legs), trim or sub-primal products (including but not limited to backloins, tenderloins, backribs, boneless loins, boneless sirloins, riblets, chef's prime, prime ribs, brisket, skirt, cushion, ground meats, sirloin tip roast, or hocks), further processed and value added porcine products (including, but not limited to bacon, sausage, lunch meats, further processed ham, or jerky products).[11]

## B.    Notice to class

The notice administrator undertook and completed the proposed notice plan, pursuant to this Court's order directing notice.[12] The notice administrator provided direct

---

[9] *Id.*, Ex. A at 13-14.

[10] *Id.*

[11] *Id.* at 5.

[12] Decl. of Eric Schachter in Support of Pls.' Mot. for Final Approval of Settlement ¶¶ 2-3, filed concurrently herewith.

notice via e-mail (obtained from retailers of the products at issue in this case) to approximately 104,242 unique email addresses, to which 102,164 were successfully delivered.[13] On July 22, 2021, the notice administrator established a case-specific website, www.overchargedforpork.com.[14] The website address appeared on the Email Notice, Long-Form Notice, and *PR Newswire*.[15] The website includes case specific information, including relevant deadlines, downloadable versions of the Complaint, Settlement Agreement, the Notice in English and Spanish, and other relevant documents.[16] The website also includes functionality for Settlement Class Members to submit an online claim.[17] To date, the website has over 245,798 hits.[18] On October 7, 2021 the website was updated to include Consumer Indirect Purchaser Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses and associated documents.[19] A toll-free automated telephone support line was activated to provide answers to frequently asked questions by class members.[20] The notice administrators also engaged in an extensive public notice campaign, including:

    a. Digital banner and newsfeed advertisements appearing on various websites and social media platforms. Over 343 million impressions have been delivered resulting in over 268 thousand engagements and/or conversions

---

[13] *Id.* ¶ 5.

[14] *Id.* ¶ 10.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* ¶ 11.

[20] *Id.* ¶ 9.

across Google Display Network, Google AdWords, Facebook, Instagram, and YouTube;

b.  Creating a case-specific Facebook page as a landing page for the links in the Facebook and Instagram newsfeed advertisements;

c.  Releasing a national, party-neutral press release. This news release was distributed via PR Newswire to the news desks of approximately 10,000 newsrooms, including those of print, broadcast, and digital websites across the United States. The news release was also translated and published to PR Newswire's U.S. Hispanic media contacts and Hispanic news websites.[21]

In total, the indirect notice efforts generated over 343 million impressions.[22] The notice administrator confirms that at an estimated 81.1% of the target audience (and thus potential Settlement Class Members) were effectively reached by the notice plan.[23]

## C.    Plan of Distribution

Funds will be awarded based on the purchase of qualifying class products. Given that this is the first settlement for the Consumer IPP class, distribution is not being requested at this time, although class members are able to submit claims through a simplified form on the settlement website.

## III.    ARGUMENT

To approve a settlement in a class action, district courts in the Eighth Circuit conduct a multiple-step inquiry. *First*, courts assess whether defendants have met the notice requirements under the Class Action Fairness Act (CAFA).[24] *Second*, courts

---

[21] *Id.* ¶¶ 6-7.

[22] *Id.* ¶ 6.

[23] *Id.* ¶ 14.

[24] *See* 28 U.S.C. § 1715(d).

determine whether the provisions of Rule 23(e) have been satisfied. *Third,* courts determine whether the constitutional notice has been provided to the class pursuant to Federal Rule of Civil Procedure 23(c)(2)(B). *Finally*, courts conduct a hearing to determine whether the settlement agreement is "fair, reasonable, and adequate."[25] Each of these requirements are met here.

## A.    The parties have complied with the Class Action Fairness Act.

CAFA requires that "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve [notice of the proposed settlement] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official[.]"[26] The court may not grant final approval of a class action settlement until the CAFA notice requirement is met.[27] Here, the Settling Defendants provided the required CAFA notice to all Attorneys General and the U.S. Department of Justice.[28] No Attorneys General have submitted statements of interest or objections in response to these notices.

## B.    The settlement class meets all requirements of Rule 23(e).

In its order granting preliminary approval and certifying the class on April 2, 2021, the Court certified the settlement class after reviewing the Consumer IPP's Motion

---

[25] *See* Fed. R. Civ. P. 23(e)(2).

[26] 28 U.S.C. § 1715(b).

[27] 28 U.S.C. § 1715(d) ("An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under [28 U.S.C. § 1715(b).]").

[28] Scarlett Decl., ¶ 2, Ex. A.

for Preliminary Approval.[29] The same analyses—which also address the adequacy of counsel and class representatives consistent with the requirements of Rule 23(e)(2)(a)— should also apply here, and the Court should affirm its order certifying the class for settlement purposes.

The sole objector to this settlement claims that Consumer IPPs have not submitted evidence supporting Rule 23(b)(3) predominance requirement.[30] Notably, the objector does not dispute that common questions of fact or law predominate over individual ones.[31] This individual merely claims that the record must (but does not) contain admissible evidence to support predominance.[32] The objector is mistaken on both counts.

## 1. Courts apply a relaxed standard under Rule 23(b) when the class is being certified for settlement.

Rule 23(b)(3)'s requirement that common issues of fact or law must predominate over individual questions "tests whether proposed class members are sufficiently cohesive to warrant adjudication by representation."[33] Individual issues are those which require "evidence that varies from member to member" to make a prima facie showing.[34] Common questions are those for which a prima facie case can be established through

---

[29] Prelim. App. Order at 1-2, ECF No. 752.

[30] Objection to Class Certification, ECF No. 948.

[31] *See id.* at 4-5.

[32] *Id.*

[33] *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)).

[34] *In re Zurn Pex*, 644 F.3d at 618.

common evidence.[35] The predominance question at class certification is not whether the plaintiffs have already proven their claims through common evidence.[36] Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions.[37]

"[W]hether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement."[38] A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable.[39] When a class is being certified for settlement, "a district court need not inquire whether the case, if tried, would present intractable management problems."[40]

---

[35] *Id.*

[36] *Id.* at 619.

[37] *Id.*

[38] *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019)

[39] *Id.* (citing 2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ("Courts ... regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns.")). The objector cites *Amchem,* 521 U.S. at 601–02, and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 825 (1999), to argue that there must be heightened scrutiny of class certification at the settlement phase. But as explained by the Eighth Circuit in *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1145–46 (8th Cir. 1999), those cases "involved a situation in which the parties agreed upon a class definition and a settlement before formally initiating litigation, and then presented the district court with the complaint, proposed class, and proposed settlement." The difficulties presented by the *Amchem* and *Ortiz* settlement—including the possibility of "collusion between class counsel and the defendant ... [and] the need for additional protections when the settlement is not negotiated [at arms' length under the supervision of a professional mediator] by a court designated class representative," are not present here.

[40] *Amchem*, 521 U.S. 591 at 620.

The inquiry required is a "preliminary" look behind the pleadings "to determine whether, given the factual setting of the case, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class."[41] This does not mean that the court must call witnesses and review documents to determine that common questions of law predominate, only that the court must analyze "the elements necessary to establish liability for plaintiffs' claims" to determine whether those elements "can be proven on a systematic, class-wide basis."[42] At this stage, the court's analysis is "necessarily prospective."[43]

Notably, the objector here chose to cite the Eighth Circuit's approval of the district court's certification decision in *Zurn Pex*.[44] The context of that order was a litigated class certification motion, not a settlement class. And a comparison of the Eighth Circuit's ruling with later district court orders in the *Zurn Pex* litigation aptly illustrates the difference between the inquiry required when approving a litigation class versus a settlement-only class.

In the first *Zurn Pex* decision, the Eighth Circuit upheld the certification of a litigation class because the district court "carefully examined the homeowner claims along with Zurn's defenses."[45] The Eighth Circuit did not hold that a "focused" *Daubert*

---

[41] *In re Zurn Pex*, 644 F.3d at 618.

[42] *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 560 (D. Minn. 2010).

[43] *In re Zurn Pex*, 644 F.3d at 613.

[44] ECF No. 948 at 6.

[45] *In re Zurn Pex,* 644 F.3d at 618.

- 11 -

inquiry was required to grant certification under Rule 23(b)(3), only that it was not error for the district court to conduct such an analysis when certifying a litigation class.[46] In the later *Zurn Pex* decisions, the district court, "mindful of Rule 23 jurisprudence including *Wal–Mart Stores, Inc. v. Dukes*,[47] *Amchem Products, Inc. v. Windsor*,[48] *In re Zurn Pex Plumbing Prods. Liab. Litig.*,[49] and *Grunin v. Int'l House of Pancakes*,[50] granted preliminary[51] and then final[52] approval to a settlement, certifying the class under Rule 23(b) while applying the relaxed standard for settlement-only classes. In granting certification of the settlement class, the district court relied on the settlement agreement and negotiations to show that the class representatives, as well as the absent class members, all sought to remedy a shared legal grievance.[53] This result is consistent with the Eighth Circuit's rejection of objectors in *Petrovic v. Amoco Oil Co.*,[54] which emphasized the common remedial needs of the class when approving certification for settlement purposes.

---

[46] *Id.* at 613-614.

[47] 131 S.Ct. 2541 (2011).

[48] 521 U.S. 591 (1997).

[49] 644 F.3d 604 (8th Cir. 2011).

[50] 513 F.2d 114 (8th Cir. 1975).

[51] *In re Zurn Pex Plumbing Prod. Liab. Litig.*, No. 08-MDL-1958 ADM/AJB, 2012 WL 5055810, at *2, *4 (D. Minn. Oct. 18, 2012).

[52] *In re Zurn Pex Plumbing Prod. Liab. Litig.*, No. 08-MDL-1958 ADM/AJB, 2013 WL 716088, at *5 (D. Minn. Feb. 27, 2013).

[53] *Id.*

[54] 200 F.3d at 1147–48

Like the later *Zurn Pex* settlement orders and the Eighth Circuit's approval of the settlement class in *Petrovic*, Consumer IPPs here share a common grievance in this case concerning inflated prices of pork during the class period. This common remedial theory—recovery of a portion of the supra-competitive price paid for pork products—is reflected in the settlement agreement and negotiations here as it was for the *Zurn Pex* settlement class.[55] Notably, the release in this settlement agreement contains an exclusion for claims not related to an overcharge for price-fixing, such as "breach of contract, any negligence, personal injury, bailment, failure to deliver lost goods, damaged or delayed goods, product defect or securities claim."[56] It also excludes "damages claims under the state or local laws of any jurisdiction other than an Indirect Purchaser State."[57]

The common remedial theory proffered by this settlement is thus precisely the sort of common question that courts hold predominate when analyzing a settlement between sophisticated parties reached after years of protracted litigation.[58] As the Supreme Court has stressed, even if just one common question predominates, "the action may be considered proper under Rule 23(b)(3)."[59] Predominance is thus easily satisfied here.

---

[55] Scarlett Prelim. App. Decl., Ex. A.

[56] *Id.* at 13-14.

[57] *Id.*

[58] *In re Zurn Pex*, 2013 WL 716088, at *5 (final approval).

[59] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016) (quoting 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1778, pp. 123-124 (3d ed. 2005)).

2.      **An illegal price-fixing scheme impacts all purchasers of a price-fixed product in a conspiratorially affected market.**

Even in the context of litigated classes, predominance is routinely satisfied in antitrust actions alleging a conspiracy to fix prices.[60] Because the gravamen of a price-fixing claim is that the price in a given market is artificially high, courts recognize a presumption that an illegal price-fixing scheme affects all purchasers of a price-fixed product in the market affected by the conspiracy.[61] The presumption of predominance exists because liability evidence in a price fixing conspiracy "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among class members."[62] As aptly described by the *In re Potash* court, proof that Defendants agreed to inflate prices "relates solely to Defendants' conduct, and as such proof for these issues will not

---

[60] *See Amchem Prod.,* 521 U.S. at, 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *see also In re Potash Antitrust Litig.,* 159 F.R.D. 682, 693 (D. Minn. 1995); *In re Workers' Compensation,* 130 F.R.D. 99, 108 (D. Minn. 1990).

[61] *In re Potash Antitrust Litig.,* 159 F.R.D. at 695–97; *see also In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 327 (E.D.N.Y. 1982); *In re Catfish Antitrust Litig.,* 826 F. Supp. 1019, 1041 (N.D. Miss. 1993) ("[i]n an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price"); *In re Master Key Antitrust Litig.,* 528 F.2d 5, 12 n. 11 (2d Cir. 1975) ("jury could reasonably conclude that [Defendants'] conduct caused injury to each [class member]" if national conspiracy had the effect of "stabilizing prices above competitive levels").

[62] *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 264 (D.D.C. 2002) (citing in re *Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 29 (D.D.C. 2001) ("As is true in many antitrust cases, the alleged violations of the antitrust laws at issue here respecting price-fixing and monopolization relate 'solely to Defendants' conduct, and as such proof for these issues will not vary among class members.'"); *Lumco Indus., Inc. v. Jeld-Win., Inc.,* 171 F.R.D. 168, 172 (E.D. Pa. 1997) ("The fact-finder's focus of inquiry will be on the ... Defendants' words and actions; it will not vary among individual class members.").

- 14 -

vary among class members."[63] Likewise, identifying "reasonable substitute" products (if any exist) when proving the relevant product market in a price fixing case is a common inquiry.[64] Finally, showing pass-through of the overcharges to the retail consumer class here, is also demonstrated using data from non-parties and documents from the defendants' own files—all of which is common to the class.[65] In cases like these, even when certifying a disputed litigation class, courts need only be satisfied that this case is not "so dissimilar from the litany of antitrust price-fixing cases" routinely found to be appropriate for 23(b)(3) certification.[66]

### 3. The record contains ample evidence that Plaintiffs' claims are subject to common proof.

Further supporting certification is the evidence offered by Consumer IPPs in their Third Amended Complaint. There, Consumer IPPs proffer ample evidence of: (a) Defendants' conduct—common to all pork consumers—illegally agreeing to stabilize price and supply; (b) inflated wholesale prices—again, common to all pork consumers—

---

[63] *In re Potash.*, 159 F.R.D. at 694 (citing *In re Catfish.*, 826 F.Supp. at 1039 ("[e]vidence of a national conspiracy to fix the prices of catfish and processed catfish would revolve around what the defendants did, and said, if anything, in pursuit of a price fixing scheme")); *see also, Transamerican Refining Corp. v. Dravo Corp.*, 130 F.R.D. 70, 75 (S.D. Tex. 1990) (holding that proof of conspiracy is susceptible to generalized proof because focus is on what defendants did and said).

[64] *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2016 WL 4697338, at *14 (D. Minn. Sept. 7, 2016).

[65] *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 467444, at *8 (N.D. Cal. Feb. 8, 2016) (accepting proposed theory and methodology to permit Consumer IPPs to attempt to prove pass-through on a class-wide basis and certifying a Rule 23(b) class.).

[66] *In re Potash*, 159 F.R.D. at 697.

that broke significantly from the Defendants' pre-class-period margins; and (c) analyses of the consumer price index showing that overcharges were passed through from producers to all consumer indirect purchaser plaintiffs. TAC, ¶¶ 98-138. The focus of this litigation, and the upcoming class certification motion, will be on the conduct of Defendants and the stabilization of the pricing and supply of pork. And although the objector here is incorrect that this evidence must be "admissible" to be considered at class certification,[67] Consumer IPPs can, in any case, readily show that the weight of evidence offered is admissible on its face as either statements by a party opponent (Fed. R. Evid. 801) or as a public record (Fed. R. Evid. 803(8)).

### a. Consumer IPPs can show through common proof that Defendants successfully conspired to reduce supply during the class period, both in the aggregate and individually.

Consumer IPPs demonstrate through common proof that Defendants acted in a concerted way to reduce supply at least three times during the class period: 2009, 2010, and 2013. TAC, ¶¶ 98-123. Consumer IPPs show this by comparing public statements made by Defendants' (including JBS's) officers and executives against publicly available data on annual commercial hog production in the U.S. The public statements by Defendants' officers and executives telegraph the plans of each Defendant for reducing supply, and they are admissible at the very least as a party statement under Fed. R. Evid.

---

[67] *In re Zurn Pex*, 644 F.3d at 613 ("Zurn correctly points out that we require district courts to rely only on admissible evidence at the summary judgment stage . . . [i]n contrast, a court's inquiry on a motion for class certification is 'tentative,' 'preliminary,' and 'limited.'").

010737-11 1449936V1

801(d)(2),[68] if not also for the non-hearsay purpose of their effect on the hearer to show that other Defendants heard, analyzed, and acted on these signals.[69] Plaintiffs match these statements to USDA hog production data in the form of a chart at paragraph 98 of the Third Amended Complaint.[70] Together, the statements and the data demonstrate how Consumer IPPs intend to show—through common proof—a significant reduction in total supply corresponding with Defendants' illegal agreements to reduce supply. TAC, ¶ 98.

> **b.   Consumer IPPs can show through common proof that Defendants' conspiracy inflated the price of pork during the class period.**

Consumer IPPs also offer four examples common proof showing that the conspiracy had the intended effect of inflating the price of pork to supra-competitive levels during the class period. First, USDA data shows an unprecedented and sustained increase in average hog wholesale prices during the class period. TAC, ¶ 125 Fig. 2. Second, USDA data shows that the pork cut-out composite price saw a dramatic and

---

[68] *See In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 228 (E.D. Pa. 2016) (calling it "relatively straightforward" that statements made by Defendants' officers and directors, including in earnings calls, meet the 801(d)(2) hearsay exception).

[69] *United States v. Earth*, 984 F.3d 1289, 1294 (8th Cir. 2021).

[70] USDA's release of technical data is admissible pursuant to Fed. R. Evid. 803(8). *See Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1109–10 (8th Cir. 2013) (deeming a USDA technical briefing "admissible evidence" under 803(8) at the summary judgment phase of a contract dispute). And courts in this circuit regularly endorse judicial notice of reports available on official government websites. In *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016), the Eighth Circuit approvingly cited Seventh Circuit precedent recognizing "the authority of a court to take judicial notice of government websites." *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011).

sustained increase of 56% during the class period.[71] Third, Consumer IPPs again use USDA data to compare pork cut-out composite price to live hog cost to show a break between cost and price.[72] This disparity demonstrates, through common proof, that price increases cannot be explained by any corresponding rising costs.[73] Finally, Consumer IPPs identify a corresponding break in revenues and costs for individual Defendants citing publicly available data from Defendants' own statements in their SEC filings.[74]

> ### c. Consumer IPPs can show through common proof that overcharges due to the cartel were passed through to the indirect purchaser class.

Consumer IPPs likewise will all win or lose together on the issues of the overcharge and pass-through. Pass-through damages are subject to common proof measuring the inelasticity of the pork market.[75] And Consumer IPPs' analysis of the Consumer Price Index (CPI) published by the Bureau of Labor Statistics shows that the conspiracy directly resulted in inflated prices during the class period that were paid by the indirect purchaser class. TAC, ¶¶ 133-38. Using this index, Consumer IPPs show that the retail price for pork increased substantially for consumers, analyzing average price data

---

[71] TAC, ¶ 126 Figure 3.

[72] *Id.* ¶¶ 127-28 Figures 4-5.

[73] *Id.* USDA data is readily admissible as explained *supra*.

[74] *Id.* ¶¶ 129-32, Figures 6-7. As discussed *supra*, such statements are party opponent statements under Fed. R. Evid. 801(d)(2).

[75] *See In re ODD*, 2016 WL 467444, at *8 ("[T]he IPPs have presented a sufficient theory and methodology to permit them to attempt to prove pass-through on a class-wide basis. In broad terms, plaintiffs have proffered evidence that in competitive markets, economic theory (supported by empirical studies) consistently predicts that pass-through rates will be at or near 100%").

for bacon, ham, and "other pork" before and during the class period.[76] It thus constitutes admissible common evidence that supra-competitive prices were passed through to consumers.

### 4. Class action is a superior means of resolving Consumer IPPs' claims.

Rule 23(b)(3) also requires Plaintiffs to demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In price-fixing litigation, some courts hold that superiority is satisfied "almost *a fortiori* if common questions are found to predominate."[77]

Rule 23(b)(3) lists four non-exclusive factors "pertinent" to a superiority finding: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.[78] These factors must be considered in light of the

---

[76] *Id.* The Consumer Price Index is so reliable it has been deemed judicially noticeable by the Seventh Circuit in a ruling cited and endorsed by the Eighth Circuit. *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) (cited with approval by *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016).

[77] *In re ODD*, 2016 WL 467444, at *12.

[78] Fed. R. Civ. P. 23(b)(3); *In re Zurn Pex.*, 267 F.R.D. at 566 (D. Minn. 2010) (district court order on certification of the litigation class); *aff'd*, 644 F.3d 604 (8th Cir. 2011).

reason for which certification is sought—litigation or settlement.[79] As noted above, in deciding whether to certify a settlement-only class, "a district court need not inquire whether the case, if tried, would present intractable management problems."[80] So the fourth factor is moot in the settlement context because there will not be any further litigation or trial for the Court to manage.[81]

The first Rule 23(b)(3) factor is readily satisfied—no class member has opted out of the Consumer IPP settlement with JBS and no individual class member has expressed an interest in litigating these claims separately.[82] The second factor is also easily met. Consumer IPPs were the first to file litigation against the pork industry for their antitrust violations. Consumer IPPs are unaware of other litigation (other than the later-filed direct, commercial indirect and direct-action plaintiffs, all consolidated with this case), by indirect purchasers seeking recovery of the overcharge paid for Pork resulting from Defendants' alleged conspiracy to fix prices.

As to the third superiority factor, here again the nature of antitrust price fixing litigation supports superiority. Courts explain that separate proceedings would produce duplicate efforts, generate unnecessary litigation costs, create an "unwarranted burden on this Court and other courts throughout the country," and risk inconsistent results for

---

[79] *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019); *Amchem*, 521 U.S. at 619.

[80] *Id.* at 620, 117 S.Ct. 2231.

[81] *See Amchem*, 521 U.S. at 620.

[82] *See In re Zurn Pex*, 2013 WL 716088, at *5.

similarly situated parties.[83] And most importantly, the cost of pursuing an individual

claim would prohibit most indirect purchasers from bringing suit, resulting in unjust

enrichment to the Defendants, which is "precisely the result antitrust laws are designed to

remedy."[84] As the *United States Steel* court explained:

> [I]t is extremely difficult to bring an antitrust action against six
> major steel fabricators without the financial aid made possible by
> the class action device. Few are the individual claimants with a
> sufficient interest at stake or resources to bring a suit requiring
> proof of a conspiracy among business corporations. Discovery
> expenses alone normally would be prohibitive. The court therefore
> deems the class action device to be superior to any other
> alternative.... Since avoidance of multiplicity of litigation is greatly
> to be favored, the class action device as invoked in this instance
> well serves such purpose.[85]

Here, as in *U.S. Steel*, the average pork purchaser does not have the resources to take on

the major pork producers like Smithfield, Tyson, and JBS. Nor would it make sense for

the Court and others to expend resources in the litigation and trial of tens of thousands of

claims, most with less than 100 dollars at stake. As the Eighth Circuit has cautioned,

courts have "a duty to the silent majority as well as the vocal minority" in evaluating

class settlements.[86] Consistent with that duty, this Court should reject the lone objector's

criticisms and grant Final Approval.

---

[83] *In re Potash Antitrust Litig.*, 159 F.R.D. at 699.

[84] *Id.*

[85] *Minnesota v. U.S. Steel Corp.,* 44 F.R.D. 559, 572 (D. Minn. 1968).

[86] *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005).

5.      **The objector's fee objection falls with his predominance objection.**

The sole objector to this settlement also objects to Consumer IPPs' request for fees and expenses.[87] This objection expressly conditions itself on the denial of class certification.[88] The objector makes no additional substantive arguments, relying on his objection to final approval, admitting "nothing has changed."[89] Indeed it has not. The objector is still wrong on the facts and the law. And his criticisms should be rejected for the same reasons stated above.

C.      **The proposed settlement is fair, adequate, and reasonable.**

"The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context."[90] But the approval of a class action settlement is in nevertheless in the Court's sound discretion, and district courts must review class action settlements to ensure that they are "fair, reasonable, and adequate."[91]

The Consumer IPPs' settlement is fair, adequate, and reasonable under Rule 23(e)(2). First, the settlement is presumptively valid because courts attach "[a]n initial presumption of fairness . . . to a class settlement reached in arm's-length negotiations

---

[87] ECF No. 973.

[88] *Id.* at 1.

[89] *Id.*

[90] *White v. Nat'l Football League*, 822 F.Supp. 1389, 1416 (D. Minn. 1993).

[91] Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2)(C)(iii) also requires courts to consider "the terms of any proposed award of attorney's fees, including timing of payment." Plaintiffs address this subsection in their brief requesting attorney's fees, ECF No. 951.

between experienced and capable counsel after meaningful discovery."[92] Second, even

without this presumption, the settlement meets the four-factor test established by the

Eighth Circuit for evaluating fairness under Rule 23(e)(2).[93]

     **1.**      **The settlement is entitled to a presumption of fairness.**

Counsel involved here are experienced complex antitrust litigators, both in class

actions generally and in antitrust class action litigation specifically. The negotiations

between counsel were conducted before a well-respected mediator (Professor Eric

Green), who ensured that the negotiations were conducted at arm's length.[94] Given this,

the Court is entitled to rely on the judgment of the litigants and their counsel concerning

the adequacy of the settlement.[95]

Furthermore, as set forth in Consumer IPPs' Motion for Preliminary Approval,

Consumer IPPs have conducted meaningful investigations and discovery to assess the

merits of their claims, starting at least six months before the first complaint was filed.[96]

These efforts have given the Consumer IPPs sufficient information to understand the

---

[92] *Grier v. Chase Manhattan Auto Fin. Co.*, No. CIV. A.99-180, 2000 WL 175126, at
*5 (E.D. Pa. Feb. 16, 2000); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114,
123 (8th Cir. 1975); *White*, 836 F. Supp. at 1476-77 . *See also*, *4 Alba Conte & Herbert
Newberg, Newberg on Class Actions* § 11.41 at 90 (4th ed. 2002) ("There is usually a
presumption of fairness when a proposed class settlement, which was negotiated at arm's
length by counsel for the class, is presented for approval.").

[93] *See In re Zurn Pex*, 2013 WL 716088, at *7 (applying four-factor test after
determining that the settlement was presumptively valid).

[94] Memo. in Support of Prelim. App. at 7-8; Scarlett Prelim. App. Decl. at 1-2.

[95] *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1149 (8th Cir. 1999); *DeBoer v. Mellon
Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).

[96] Memo. in Support of Prelim. App. At 1-3, 8-9; Scarlett Prelim. App. Decl. at 1-2.

strength and weaknesses of their claims and JBS's defenses. The settlement should therefore be accorded a presumption of fairness.

### 2. Four fairness factors weigh in favor of settlement.

Even if a presumption of fairness does not attach, the settlement meets the four-factor test established by the Eighth Circuit for evaluating fairness, reasonableness, and adequacy under Rule 23(e).[97] Under that test, district courts consider: (1) the merits of the plaintiff's case weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement.[98] District courts "need not make a detailed investigation consonant with trying the case," rather, they need only provide a basis for determining that the decision rests on "well-reasoned conclusions" and is not "mere boilerplate."[99] The most important consideration in deciding whether a settlement is fair, reasonable, and adequate is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."[100]

---

[97] *See In re Zurn Pex*, 2013 WL 716088, at *7 (D. Minn. Feb. 27, 2013) (applying four-factor test after determining that the settlement was presumptively valid).

[98] *In re Wireless*, 396 F.3d at 932–33.

[99] *Id.*, *citing Van Horn v. Trickey,* 840 F.2d 604, 607 (8th Cir. 1988) (citations omitted).

[100] *Petrovic,* 200 F.3d at 1150 (internal quotations omitted).

- 24 -

> a.   **The strength of the plaintiffs' case, weighed against the terms of the settlement, supports final approval.**

The settlement provides substantial relief for the class. The $20 million settlement represents $1 million for each point of the JBS Defendants' market share,[101] putting the value of this case well over $100 million at this stage in the litigation. This is an outstanding result. In addition to the financial compensation, the cooperation that Consumer IPPs have secured from the settlement will bolster Consumer IPPs' claims against the seven non-settling Defendants. Weighing the uncertainty of relief against the immediate benefit provided to the class,[102] this factor supports final approval of the settlement terms.

> b.   **The JBS Defendants' financial condition and ability to pay did not impact the amount of settlement.**

While Plaintiffs believe that JBS is a well-funded company, its financial condition and ability to pay is a neutral factor in the analysis.[103]

> c.   **The complexity and expense of further litigation supports final approval.**

The third factor—complexity and expense of further litigation—also supports final approval. "An antitrust class action is arguably the most complex action to prosecute. . . .

---

[101] Although the defendants have not yet produced their data to plaintiffs, based on publicly available information, Consumer IPPs estimate that the JBS defendants have approximately 20 percent of the market share for Consumer IPP class products. *See* Scarlett Prelim. App. Decl. at ¶ 7.

[102] *In re Wireless*, 396 F.3d at 933.

[103] *Id.; see also Petrovic*, 200 F.3d at 1152 ("While it is undisputed that Amoco could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate.").

- 25 -

The legal and factual issues involved are always numerous and uncertain in outcome."[104] This case thus represents one of the most complex types of litigation—a conspiracy spanning eight defendant families alleging nationwide concerted action to reduce supply and raise the price of pork that started over a decade ago. This case has been pending since June of 2018, and all parties have demonstrated a willingness to continue to contribute significant time and resources to the case. Class certification presents one hurdle, but the class must also survive summary judgment and a trial on the merits. Any resolution could be further delayed by appeals, and "all the while the class members would receive nothing."[105] Thus even if Plaintiffs could theoretically recover more after a trial and appeal than in this settlement, it is uncertain whether an additional sum— recovered after years of protracted and costly litigation—would be more valuable to the class than an immediate payment of $20 million and the cooperation of JBS in the ongoing litigation against the remaining defendant families.[106] Because the Settlement Agreement will yield a certain, substantial, and prompt recovery, without further delay and expense, it substantially benefits the Consumer IPP class and approval is appropriate.

---

[104] *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) (citations omitted).

[105] *In re Wireless*, 396 F.3d at 933.

[106] *See Yarrington v. Solvay Pharms., Inc.*, No. 09-CV-2261 (RHK/RLE), 2010 WL 11453553, at *10 (D. Minn. Mar. 16, 2010).

### d.   Settlement class members' positive reaction supports final approval.

Of the millions of potential settlement class members, no settlement class members have opted out, and only one settlement class member objected.[107] This is particularly significant in light of the success of the Notice Program, which is estimated to have reached 81.1% of the target demographic of the Settlement Class. The amount of opposition to the settlement is thus substantially less even than what the Eighth Circuit called "miniscule" in *In re Wireless*,[108] a fact that weighs in favor of final approval of the settlement.[109]

The only objection on record concerns the evidentiary standard for evaluating predominance when certifying a settlement class. As discussed above, even that objector does not contend that individual questions predominate over common ones. Nor does that lone objector contend that the amount of the settlement is somehow unfair or that the cooperation provision is inadequate. The class is thus uniformly supportive of the substance of the settlement terms.

### D.   Plaintiffs have complied with Rule 23(c) notice requirements.

Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2), and upon settlement of a class action, "[t]he court must direct notice in a

---

[107] Scarlett Decl., ¶ 3.

[108] *In re Wireless*, 396 F.3d at 933.

[109] *Id.*; *see also*, *Petrovic*, 200 F.3d at 1152 ("[F]ewer than 4 percent of the class members objected to the settlement, significantly fewer than the number of objectors to other settlements that have been approved.").

reasonable manner to all class members who would be bound by the proposal."[110] Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including individual notice" of particular information.[111]

This Court approved the form of the proposed class notice and notice program.[112] Eric Schachter of A.B. Data Ltd., the Court-appointed notice administrator, implemented a direct notice campaign via email, as well as an indirect notice campaign in both hard-copy publications and on the Internet.[113] The notice administrators state that an estimated 81.1% percent of the target demographic (the Settlement Class) has received notice.[114] The notice itself informed class members of the nature of the action, the terms of the proposed settlements, the effect of the action and the release of claims, as well as class members' right to exclude themselves from the action and their right to object to the proposed settlements.[115] This notice complies with all of the requirements of Rule 23.

**E.     The plan of allocation is fair, reasonable, and adequate.**

A plan of allocation "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel."[116] Here, the Settlement

---

[110] Fed. R. Civ. P. 23(e)(l).

[111] Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

[112] ECF No. 811.

[113] Schachter Decl., ¶¶ 4-7.

[114] *Id.* ¶ 14.

[115]  *Id.* at Exhibits D-E.

[116] *In re Charter Commc'ns, Inc.*, No. 4:02-cv-1186 CAS, 2005 WL 4045741, at *10 (E.D. Mo. June 30, 2005) (citation omitted).

provides for a cash payment of $20 million which has been deposited into the Settlement Fund.[117] The Agreement provides that the Settlement Fund will fund the payment of valid claims of Settlement Class members, costs of notice, claims administration, payment for service awards to the Named Plaintiffs and attorneys' fees and costs.[118]

The proposed settlement also "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Funds will be awarded based on the *pro rata* share per class member of qualifying class products purchased and will be distributed through an electronic method. For efficiency's sake, however, Consumer IPPs propose that this plan of distribution and the distribution itself wait until later in the litigation when more settlement monies are available for distribution.

## IV.   CONCLUSION

For these reasons, Consumer IPPs respectfully requests that the Court grant final approval of the settlement agreement with JBS and certify the proposed Settlement Class.

---

[117] Scarlett Decl., ¶ 4.

[118] *See* Scarlett Prelim. App. Decl., Ex. A.

DATED: November 15, 2021                 Respectfully submitted,

                                         HAGENS BERMAN SOBOL SHAPIRO LLP

                                         By:   */s/ Shana E. Scarlett*
                                          SHANA E. SCARLETT
                                         Rio Pierce
                                         715 Hearst Avenue, Suite 202
                                         Berkeley, California 94710
                                         Telephone: (510) 725-3000
                                         Facsimile: (510) 725-3001
                                         shanas@hbsslaw.com
                                         riop@hbsslaw.om

                                         Steve W. Berman
                                         Breanna Van Engelen
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1301 Second Avenue, Suite 2000
                                         Seattle, Washington 98101
                                         Telephone: (206) 623-7292
                                         Facsimile: (206) 623-0594
                                         steve@hbsslaw.com
                                         breannav@hbsslaw.com

                                         Daniel E. Gustafson (#202241)
                                         Daniel C. Hedlund (#258337)
                                         Michelle J. Looby (#388166)
                                         Joshua J. Rissman (#391500)
                                         GUSTAFSON GLUEK PLLC
                                         120 South 6th Street, Suite 2600
                                         Minneapolis, MN 55402
                                         Telephone: (612) 333-8844
                                         Facsimile: (612) 339-6622
                                         dgustafson@gustafsongluek.com
                                         dhedlund@gustafsongluek.com
                                         mlooby@gustafsongluek.com
                                         jrissman@gustafsongluek.com

                                         *Interim Co-Lead Counsel for Consumer
                                         Indirect Purchaser Plaintiffs*