# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE PORK ANTITRUST LITIGATION* | Case No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br><br>ALL COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFF ACTIONS | **COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' FOURTH AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.   NATURE OF ACTION ............................................................................. 3

II.  JURISDICTION AND VENUE ................................................................ 7

III. PARTIES ................................................................................................. 8

   A.   Plaintiffs ......................................................................................... 8

   B.   Defendants ..................................................................................... 11

IV.  FACTUAL ALLEGATIONS ................................................................. 14

   A.   Defendants' anticompetitive scheme started from Agri Stats' central role in collusion in the Broiler industry ............................................. 14

   B.   After success in the Broiler industry, Agri Stats began marketing its collusive scheme to the swine integrators. .................................. 16

   C.   Agri Stats provided pork integrators the unparalleled ability to monitor pricing and production, and to discipline co-conspirators for not complying with the collusive agreement. ....................................... 18

   D.   Defendants controlled the supply and production of pork in the United States, which allowed the scheme to succeed. ........................... 27

   E.   The level of concentration in the pork industry was optimal for Defendants' collusive scheme. ................................................... 32

   F.   The inelastic demand for, and homogeneity of, pork products facilitated collusion ................................................................... 39

   G.   Defendants took advantage of numerous opportunities to collude. ......... 40

   H.   Defendants implemented capacity and supply restraints during the Class Period ........................................................................... 49

      1.   Summary of Defendants' Conspiratorial Supply Restraints ........... 49

         a.   Smithfield .............................................................. 52

         b.   Tyson .................................................................... 52

         c.   JBS/Cargill ............................................................ 53

         d.   Hormel .................................................................. 53

         e.   Seaboard ................................................................ 54

i

        f.     Triumph ................................................................................ 54

        g.    Clemens ............................................................................... 55

    2.    Timeline of the Conspiracy ............................................................ 55

I.     Abnormal pricing during the Class Period demonstrates the success of the collusive scheme ............................................................................................ 67

    1.    The average hog wholesale price experienced an unprecedented increase beginning in 2009 .............................................................. 67

    2.    The pork cut-out composite price experienced a dramatic increase beginning in 2009 and continuing throughout the class period. ...... 69

    3.    Defendants' revenues increased beginning in 2009, even taking into account defendant-specific costs. .................................................... 70

J.     Overcharges due to the cartel were reflected in higher pork prices. ........... 72

K.    Defendants actively concealed the conspiracy and Plaintiffs did not and could not have discovered Defendants' anticompetitive conduct. .............. 77

V.      CLASS ACTION ALLEGATIONS ....................................................................... 81

VI.     ANTITRUST INJURY ........................................................................................... 85

VII.    CAUSES OF ACTION .......................................................................................... 86

VIII.   RELIEF SOUGHT ............................................................................................... 115

IX.    JURY TRIAL DEMANDED ................................................................................ 116

Commercial and Institutional Indirect Purchaser Plaintiffs ("Plaintiffs")[1] bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all commercial and institutional indirect purchasers of pork from a Defendant or co-conspirator named in this Fourth Amended and Consolidated Class Action Complaint in the United States from at least January 1, 2009 until the present (the "Class Period"). Plaintiffs bring this action against Defendants for injunctive relief and treble damages under the antitrust laws of the United States and various state antitrust, consumer protection and unfair trade practices, and unjust enrichment laws and demands a trial by jury.

## I. NATURE OF ACTION

1. The pork integrator Defendants (*i.e.*, the Defendants other than Agri Stats) are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce. The United States pork industry is highly concentrated, with a small number of large companies controlling the supply. Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork integration market.

2. Defendants, Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation ("Hormel"), JBS USA Food Company ("JBS" or "JBS USA"), Seaboard Foods LLC ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson"), entered into a

---

[1] "Plaintiffs" refers collectively to each of the named plaintiffs identified in Section III(A) of this complaint.

conspiracy from at least 2009 to the present to fix, raise, maintain, and stabilize the price of pork.[2] The principal (but not exclusive) method by which Defendants implemented and executed their conspiracy was by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States. In furtherance of their conspiracy, Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume, and demand through their co-conspirator, Defendant Agri Stats.

3.     Beginning in at least 2009, Agri Stats began providing highly sensitive "benchmarking" reports to the majority of pork integrators. Benchmarking allows competitors to compare their profits or performance against that of other companies. But Agri Stats' reports are unlike those of lawful industry reports. Agri Stats gathers detailed financial and production data from each of the pork integrators, standardizes this information, and produces customized reports and graphs for the co-conspirators. The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. Instead, the provision of this detailed information acts as the modern equivalent of the proverbial smoke-filled room. Rather than meeting in a room with pen and paper, Agri Stats collected the pork integrators' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports it provided to the pork

---

[2] For the purposes of this complaint, "pork" includes pig meat purchased fresh or frozen, smoked ham, sausage, and bacon. From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

integrators. On a weekly and monthly basis, Agri Stats provides the pork integrators with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), and regularly provides the keys to deciphering which data belongs to which participant. The effect of this information exchange was to allow the pork integrators to monitor each other's production and hence control supply and price in furtherance of their anticompetitive scheme.

4. The data exchanged through Agri Stats also bears all the hallmarks of the enforcement and implementation mechanism of a price-fixing scheme. First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[3] Second, information contained in Agri Stats reports is specific to pork integrators, including information on profits, prices, costs, and production levels; instead of being aggregated as industry averages to avoid transactional specificity and the easy identification of specific integrators. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service which required the co-conspirators to pay millions of dollars over the Class Period – far in excess of any other pricing and production indices. Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market. Defendants utilize the information exchanges through Agri Stats in furtherance of their conspiracy to fix, raise, stabilize, and maintain artificially inflated prices for pork sold in the United States.

---

[3] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

5.　While Defendants went to great lengths to keep the existence of the conspiracy a secret, they admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen. Furthermore, each Defendant engaged in acts in furtherance of the conspiracy by participating in such supply cuts and by limiting increases in supply that otherwise would have occurred.

6.　In addition, there are numerous "plus factors" in the swine industry during the Class Period, including but not limited to multiple industry characteristics which facilitate collusion, such as vertically integrated operations, high barriers to entry preventing competitors from coming into the market, high pork industry consolidation and concentration, inelastic supply and demand, and homogeneity of pork products.[4] These plus factors add plausibility to plaintiffs' allegations of a price-fixing scheme.

7.　Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to Plaintiffs and class members. Beginning in 2009, the earnings of the integrators began to increase, as they took an increasing amount of the profits available in the pork industry. As a result of Defendants' unlawful conduct, Plaintiffs and the class members paid artificially inflated prices for pork during the Class Period. Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market. Thus, Plaintiffs and class members were injured by Defendants' conduct.

---

[4] Pork is homogenous within cut type – *e.g.*, a pork belly from Tyson and Smithfield are virtually indistinguishable.

## II.    JURISDICTION AND VENUE

8.    Plaintiffs seek damages, restitution, treble damages, disgorgement, other monetary relief, injunctive and other equitable relief under various state antitrust, consumer protection and unfair trade practices laws, and state unjust enrichment laws, as alleged specifically herein, as well as costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' violations of those laws.

9.    This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds $5,000,000, there are more than 100 members in each of the Classes, and there are members of some of the Classes who are citizens of different states than Defendants.

10.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

11.    This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of

causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

12.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

13.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.     PARTIES

**A.     Plaintiffs**

14.     Plaintiff Sandee's Bakery is located at 1284 E 2nd St, Jamestown, NY 14701. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

15.     Plaintiff Confetti's is located at 301 W. Bay St., EverBank Center, Jacksonville, FL 32202. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

16.     Plaintiff Francis T. Enterprises d/b/a Erbert & Gerbert's, operates sandwich shops in St. Cloud, Minnesota. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

17.     Plaintiff Joe Lopez, d/b/a Joe's Steak and Leaf, is located at 5012 W. 116th St., Los Angeles, CA 90045. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

18.     Plaintiff Longhorn's Steakhouse is located at 9456 Hwy 15, Sallis, MS 39160. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

19.     Plaintiff Betty's Eat Shop is located at 126 S. Whitworth Ave, Brookhaven, MS 39601. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

20.     Plaintiff Ziggy's BBQ Smokehouse & Ice Cream Parlor, LLC is located at 135 S. Main St., Oregon, WI 53575. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

21.     Plaintiff The Grady Corporation is located at 1400 SE Walton Blvd. #46, Bentonville, Arkansas 72712. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

22.     Plaintiff Mcmjoynt LLC d/b/a The Breakfast Joynt resides and has its principal place of business in Scottsdale, Arizona. It indirectly purchased pork made by

one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

23. Plaintiff Edley's Restaurant Group, LLC resides and has its principal place of business in Nashville, Tennessee. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

24. Plaintiff Basil Mt. Pleasant, LLC resides and has its principal place of business in Mount Pleasant, South Carolina. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

25. Plaintiff Basil Charlotte, Inc. resides and has its principal place of business in Charlotte, North Carolina. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

26. Plaintiff Farah's Courtyard Deli, Inc. resides and has its principal place of business in Jacksonville, Florida. It indirectly purchased pork made by one or more Defendants during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

27. Plaintiff Tri-Ten LLC resides and has its principal place of business in Council Bluffs, Iowa. It indirectly purchased pork made by one or more Defendants

during the Class Period for business use in commercial food preparation and suffered antitrust injury as a result of the violations alleged in this Complaint.

## B. Defendants

### Agri Stats

28. Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co. Throughout the Class Period, Agri Stats acted as a co-conspirator and committed acts in furtherance of the conspiracy by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

### Clemens

29. Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania. During the Class Period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

30. The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC. During the Class Period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Hormel**

31.     Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota. During the Class Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**JBS**

32.     JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado. During the Class Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Seaboard**

33.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation. During the Class Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Smithfield**

34.    Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company. Smithfield Foods is headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Triumph**

35.    Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri. During the Class Period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**Tyson**

36.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

37.    Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the

Class Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

38.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## IV.     FACTUAL ALLEGATIONS

39.     Starting in at least 2009 and continuing to the present, Defendants conspired to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their anticompetitive agreement, Defendants relied on a unique industry data sharing service provided by Agri Stats. Agri Stats provided a means for Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of Defendants' price-fixing scheme, resulting in a stable and successful anticompetitive cartel.

**A.     Defendants' anticompetitive scheme started from Agri Stats' central role in collusion in the Broiler industry.**

40.     Agri Stats has played a central role in collusion in other industries, including involvement in the Broiler industry.[5] As alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.), the Broiler producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices.

---

[5] "Broilers" are chickens raised to be slaughtered before the age of 13 weeks.

41.     In the Broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, and sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various Broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each Broiler producer's complex, sometimes directly contacting the Broiler producers to verify the data. Agri Stats also provided detailed price reports to the Broiler industry through its subsidiary, Express Markets, Inc., also known as EMI. Agri Stats collected data from the Broiler producers on a weekly basis and provided its reports to Broiler producers on a weekly and monthly basis.

42.     The detail of these reports ensured that competitors could quickly decode the information of their purported competitors. The *Broiler* complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual Broiler complexes. The Broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger Broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

43. In the Broiler industry, plaintiffs also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the Broiler industry facilitated the implementation of the agreement to restrict supply.

44. In denying defendants' motions to dismiss in the *In re Broiler Chicken Antitrust Litigation,* the district court noted that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which raises significant antitrust concerns.[6]

**B.** **After success in the Broiler industry, Agri Stats began marketing its collusive scheme to the swine integrators.**

45. Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the swine industry along the lines of the benchmarks used to restrain competition in the Broiler industry. Benchmarking is the act of comparing one company's practices, methods or performance against those of other companies.[7] Benchmarking of the type undertaken by Agri Stats and its co-conspirators here reduces

---

[6] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

[7] Thomas J. Rosch, *Antitrust Issues Related to Benchmarking and Other Information Exchanges*, Federal Trade Commission (May 3, 2011) (*available at* https://www.ftc.gov/sites/default/files/documents/public_statements/antitrust-issues-related-benchmarking-and-other-information-exchanges/110503roschbenchmarking.pdf).

strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive, and typically proprietary, information among competitors.

46.　　In 2008, Greg Bilbrey of Agri Stats told swine industry participants that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. *Each and every commercial swine operation is encouraged to participate in some benchmarking effort*."[8]

47.　　Agri Stats emphasized to pork integrators that the goal of the agreement to share information was profitability, not production, and invited pork integrators again to participate in the benchmarking. Agri Stats emphasized that "We must remember that the *ultimate goal is increasing profitability* – not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. *To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program*."[9]

48.　　In April 2009, Greg Bilbrey of Agri Stats again invited swine integrators to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could

---

[8] Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, p. 43 (2008) (emphasis added).

[9] *Id*. at p. 46 (emphasis added).

participate in benchmarking in some way. Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort***."[10]

49.     Beginning no later than 2009, the pork integrators commenced participation in the detailed benchmarking scheme based upon and found in the Agri Stats reports. Defendants' agreement was to use the exchanged benchmarking information to coordinate supply and stabilize as well as increase prices of pork sold in the United States, to provide and receive information from Agri Stats, and to use this detailed sensitive information for the purposes of monitoring each other's production and pricing. The agreement was successful as pork prices rose significantly after the agreement was reached.

**C.     Agri Stats provided pork integrators the unparalleled ability to monitor pricing and production, and to discipline co-conspirators for not complying with the collusive agreement.**

50.     Agri Stats provided pork integrators with an unparalleled ability to share critical and proprietary information concerning key business metrics, such as production levels and short and long-term production capacity. Agri Stats was key to the formation, operation, and continuing stability of the Defendants' anticompetitive scheme. To effectuate their agreement, the participants had to have confidence that each member was following through with the agreement by limiting their production and stabilizing prices. Agri Stats served that function.

---

[10] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

51.     Each member of the conspiracy, Defendants Clemens, Hormel, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, were all Agri Stats subscribers and reported their information to Agri Stats. Agri Stats' parent company, Eli Lilly, stated that "***over 90% of the poultry and pig market***" uses Agri Stats in the United States.[11]

52.     Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison, and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations so all company numbers are calculated the same way.[12]

53.     Unlike traditional "benchmark" services which rely upon unaudited and aggregated publicly available data, Agri Stats obtains audited data directly from the participating producers. When a producer joins Agri Stats, Agri Stats employees spend up to a month on site to learn, set up, audit, and prepare the producer to submit its data each month.[13] After submission Agri Stats "takes raw data and pulls it in to input system[s] in [the] right format and location each month."[14] This verified data allows participants to make "apples to apples" comparisons with competitors in order to increase profitability.[15]

---

[11] Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016) (emphasis added).

[12] Greg Bilbrey, *Implementing Simple and Useful Production Benchmarking*, London Swine Conference – A Time for Change (March 28-29, 2012).

[13] *See, e.g.*, Agri Stats Presentation (AGSTAT-P-0000000360).

[14] *Id.* at 372.

[15] *Id.*

54.     Participants in the scheme received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies. Current month, previous quarter and previous twelve-month periods are reported. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales.[16] Participants may also receive an abbreviated Key Performance Indicator report, as well as historical graphs.[17]

55.     Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about four years. This is a function of the hog biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly two years to substantially increase production.

56.     One presentation from Agri Stats shows the level of detail provided to competitors regarding profits in the pork market:[18]

---

[16] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 10.

[17] Greg Bilbrey, *Benchmarking and Cost-Production Relationships*, *supra* note 9.

[18] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

57. The purpose of these reports was not to provide better prices to customers or to lower the costs of production. Instead, the purpose was to improve the profitability of the co-conspirators. The particular Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even further detail. The same presentation informed pork integrators that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (ckg refers to 100 kilograms.) This underlines that the purpose of these reports was not to allow customers to save money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the

21

profitability of the Defendant companies and the impact was higher prices for pork customers.

58.     Much of the information shared by Agri Stats and the other Defendants was unnecessary to achieve any benefits for pork purchasers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.[19]   In fact, in a truly competitive market, the participants would closely protect such proprietary information from disclosure as providing it to competitors would be disadvantageous: unless, of course, there is an agreement that the competitors will use the information to the joint benefit of each other as was the situation in the pork industry.

59.     Agri Stats knew that it played a central role in this conspiracy. Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis among competitors. One presentation from Agri Stats spoke directly on this point, pointing out to industry participants that they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data:[20]

---

[19]   *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law* Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

[20]   Greg     Bilbrey,     *Data     Integrity*,     Slideshare.net     (Sept.     21,     2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations.

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



60.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine **tolerance and outlier status and enforce**," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "**[e]ach participant has to commit**."[21]

61.     In addition to these reports, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis.[22] The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of

---

[21] *Id.* (emphasis added).

[22] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 10.

production, and the value added by their insights was as important to the producers as the data in the reports. The fee for the visits fluctuated based on the size and other factors.

62.     A common saying by Agri Stats is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "*the ultimate goal is increasing profitability* – not simply increasing level of production."

63.     In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets had provided its extensive pricing reports to Broiler producers since 2003.[23]

64.     By providing detailed production statistics by participants, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits. Critically, Agri Stats provided forward-looking data that allowed the other Defendants to determine each other's future production in addition to their current production.

65.     Agri Stats reports are organized by company and facility, but their names are not listed in the reports. Nevertheless, while ostensibly anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that participants can accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but

---

[23] Steve Meyer, *Paragon Economics Sold to Express Markets*, National Hog Farmer, May 26, 2015 (*available at* http://www.nationalhogfarmer.com/marketing/paragon-economics-sold-express-markets).

recurring data points for other companies, as well as identify the other companies by general metrics and size.

66. Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but reassigning numbers was an undertaking the company was not eager to embark on.

67. Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

68. Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a participant's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

69. Mobility within the meat production industries led to a situation where many workers at most pork integrator operations knew the numbers of other regional facilities, removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in its offices, and then they would return to the industry

knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats were aware of this fact, but did nothing to address it.

70.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Price fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

71.     In a February 15, 2017, Bloomberg article relating to Agri Stats' roles in the Broiler industry, it was reported:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them

confidence—so they can trust you, that you're not cheating on them," he says. "***That is what creates stability for a cartel***."[24]

## D. Defendants controlled the supply and production of pork in the United States, which allowed the scheme to succeed.

72. The class period was further characterized by the increased control over the breeding, production, growing, and processing of pork by the Defendants through vertical integration and the exclusive production contracts with hog farmers.

73. Vertical integration is so pervasive that Defendants are commonly called pork or swine integrators by the industry, government, analysts, and academics. Vertical integration allows the integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter. Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

74. Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."[25] This arrangement essentially converts independent farmers into contract employees that perform services for the pork integrator. The Defendants typically pay only fixed service

---

[24] Christopher Leonard, *Is the Chicken Industry Rigged*, Bloomberg, (Feb. 15, 2017), (available at https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged) (emphasis added).

[25] Allen Harper, *Hog Production Contracts: The Grower-Integrator Relationship*, Virginia Cooperative, Virginia Cooperative Extension (2009).

fees to the farmers, who bear the investment costs of the hog-raising facilities. The pork integrators (*i.e.*, Defendants) typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market. The prevalence and use of contracts for hog production by Defendants increased significantly during the course of the conspiracy. By 2017 it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency as far as bid prices.

75.     Pork production starts at the farrowing stage—which is the term used to describe a female hog giving birth. Female hogs used in the farrowing stage are called sows. Sows will normally have anywhere from 11 to 13 pigs per litter. With a sow being able to farrow close to three times a year, one sow can have around 36 piglets in one year. After birth piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig weighs upwards of 50 pounds. At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds. After the pigs reach their final weight, they are sent to a packing plant to be harvested. Due to the nature of the pork production cycle, the reduction of sows—i.e. farrowing hogs—has a significant impact on the supply of pork.

76.     The following diagram shows the path for pork raised for meat consumption from birth through sale to consumers:

## Figure 1: Value Chain of U.S. Pork Market



Sources: National Pork Producers' Council, WH Group Investor Relations, US Department of Agriculture

77.  Under economic theory, vertical integration can have anticompetitive effects because there are fewer firms competing at all levels, which renders it easier to collude on price.

78.  During the class period Defendant Smithfield has the distinction of being the largest producer and processer of pork in the United States. In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014,

29

approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.[26]

79. In 2009, Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers.[27] In its 2017 SEC 10-K report, Seaboard Corporation states that it raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts."[28]

80. Defendant Clemens Food Group touts its vertical coordination on its website stating that, "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."[29] A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.[30]

---

[26] Smithfield Foods Annual Report, at p. 27 (2014).

[27] 2009 Seaboard Annual Report, at p. 11.

[28] Seaboard Corporation Annual Report, at p. 2 (2017).

[29] *See* Clemens Food Group, *Vertically Integrated Purposefully Coordinated* (available at http://www.clemensfoodgroup.com/our-company/vertically-coordinated).

[30] *See id.*; *see also* The Clemens Family Corporation Companies (available at http://www.clemensfamilycorp.com/pages/companies.aspx).

81.     As to JBS USA, a key aspect of JBS' purchase of its predecessor in interest, Cargill, in 2015 was that it allowed JBS to exercise greater control over the production of hogs, by acquiring four hog farms and two packing plants operated by Cargill.

82.     Triumph was created with vertical integration in mind as it is owned by five of the largest pork producers in the U.S.— Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota. The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

83.     As Defendant Tyson stated in its 2009 10K Report, "The majority of our live hog supply is obtained through various procurement relationships with independent producers." Additionally, Tyson raises a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

84.     Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities. As Hormel stated in its 2009 annual report that, "[t]he live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."  Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.

85.     Each of the Defendants further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means

including capacity reductions, controlling slaughter rates, and exports. Defendants including Smithfield, Clemens, Tyson, Hormel, Seaboard, Triumph, and JBS sell packaged pork under various name brands.

## E. The level of concentration in the pork industry was optimal for Defendants' collusive scheme.

86. The United States Department of Agriculture ("USDA") has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."[31]

87. The hog integration sector is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

88. Prior to and in the beginning of the Class Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share. Between 1988 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015. As shown in Figure 2 below,

---

[31] John King (USDA), *Concentration and Technology in Agricultural Input Industries*, at p. 2 (March 2001).

the top eight integrators had market share of well over 80 percent for the entire Class Period:

**Figure 2: Market Share of Top 8 Pork Integrators 1991 to 2017**



Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI.Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

89.     In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield. As noted above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and two packing plants operated by Cargill.

90.    The acquisition was completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

91.    The following timeline summarizes notable mergers between pork integrators since 1995 which led to an increased market concentration:

**Figure 3: History of Mergers and Acquisitions**



92.    As shown in Figure 4 below, by 2016, the top six pork processors comprised 82% of the total market. On their own, it would be difficult for any of these supposed competitors to exercise market power. But acting as a whole to manipulate the price of pork products, the combined market share of the six largest Defendants translates into an HHI[32] of 6724 (ignoring other pork processors that comprise the other 18% of the

---

[32] "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice. *See* https://www.justice.gov/atr/herfindahl-hirschman-

market), which is well above the threshold for highly-concentrated markets. In other words, if Defendants colluded with one another to restrict the supply of pork in the market, as alleged herein, the resulting market concentration of such concerted action gave them more than sufficient power to control the pork market. Even without combining the largest six Defendants, the pork industry has a "moderately concentrated" HHI of 1532.

**Figure 4: 2016 Pork Processing Market Shares[33]**

| Company | Share | HHI - Independent | HHI - Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | 6724 |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | |
| Others | 18% | 18 | 18 |
| | | | |
| **Total** | **100%** | **1532** | **6742** |

93.     The concentration level in the pork integration industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated."[34] Both of these factors – maturity and concentration – make an industry more susceptible to collusion.

94.     The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a relative handful

---

index. A HHI value of 1,500 to 2,500 suggests a market is moderately concentrated. A HHI in excess of 2,500 points suggests a market is highly concentrated.

[33] Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (March 7, 2017).

[34] WH Group Interim Report, at p. 5 (2017).

of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because the largest integrators were incapable of independently controlling prices on their own, such an agreement was necessary to inflate prices.

95.     Concentration of the industry is also beneficial to the procurement of hogs by the pork processors. In some regions, consolidation has resulted in cases where only one pork processor is left to buy hogs from independent farmers, leaving the farmers with no leverage when negotiating terms with the pork processors.[35]

96.     In addition to market concentration, market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy. The following chart shows not only that the Defendants' collective share of the market was high throughout the class period, but also that each individual defendant's market share was largely stable throughout:

---

[35] Wise, Timothy A and Sarah E. Trist, "Buyer Power in U.S. Hog Markets: A Critical Review of the Literature", Global Development and Environment Institute, Working Paper No. 10-04, August 2010, at pp. 3 and 11.

**Figure 5: Market Concentration and Market Share Stability –
U.S. Market Share by Hog Slaughter Capacity**



97.     The following figure shows that there was a substantial drop in market share volatility during the class period:

**Figure 6: Standard Deviation of Combined Defendant Market Share Pre- and Within Class Period**



98.     Large barriers to entry kept potential competitors out of the pork integration industry. New entry into pork processing is costly and time consuming. Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design and permitting costs are substantial. In 2012, it cost Cargill $25 million just to expand an existing facility. Building a facility from scratch would be considerably more, totaling hundreds of millions of dollars.[36]

---

[36] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition*, at 4 (White Paper) at p. 7.

99.     The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants. And in other situations, the processor owns the hog from farrow to finish. Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably.[37]

## F.     The inelastic demand for, and homogeneity of, pork products facilitated collusion

100.     Markets with a highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[38] A PED value between 0 and -1 indicates there is inelastic demand for the good or service, i.e., a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The average PED estimate for the pork market was -0.64 – meaning the demand for pork is inelastic.

---

[37] Timothy A. Wise and Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (August 2010), at p. 12.

[38] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), *available at* http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf.

101.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loins, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets. For example, as alleged above, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar nutritional values, branding and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.[39]

## G.    Defendants took advantage of numerous opportunities to collude.

102.    Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct. Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

103.    All pork producers and importers in the United States participate in a legislatively-mandated "Pork Checkoff," under which they pay an assessment when pigs are sold or pigs or imported into the United States. The money is used for programs to increase pork sales and exports, for research, and for producer and consumer education programs; funds cannot be used for lobbying or to influence government policy. The

---

[39] *See Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, The United States Department of Justice, https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.") (last visited Aug. 16, 2018); Marc Ivaldi et al., *The Economics of Tacit Collusion* (March 2003), http://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.pdf.

assessment amount and the amount to be returned to state pork associations for local programs is set annually by the Pork Act Delegate Body, which meets during the National Pork Producers Council's annual Pork Industry Forum. States are represented in the Delegate Body in proportion to their level of hog production, and each state is eligible to elect at least two Delegates. Executives from several integrator Defendants have served as Pork Act Delegates.

104.    The Pork Act Delegates also elect a 15-member National Pork Board ("Pork Board"), whose members are officially appointed by the U.S. Secretary of Agriculture. The Pork Board works with Pork Checkoff staff to ensure collection and distribution of Pork Checkoff funds. Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo. Executives from several pork integrator Defendants have served as members of the Pork Board. For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff. Skahill is the Pork Board's current Treasurer.

105.    According to its website, "[t]he National Pork Producers Council ["NPPC"], which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets." Executives from the pork

integrator Defendants have served on the NPPC Board of Directors during the Class Period, including: Cory Bollum of Hormel Foods, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats.

106.　NPPC conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year. NPPC advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions. The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

107.　In addition to its annual National Pork Industry Forum, NPPC sponsors many other programs that have provided ample opportunities for defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show." It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms). The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC.

- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

108. The National Pork Industry Conference ("NPIC") has taken place in the Wisconsin Dells each July since 2010 (and in the Ozarks before that). Descriptions on the conference website have said that NPIC "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America." After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow numbers."[40] In July 2010, the Pork Checkoff website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded."[41] The website for the 2016 NPIC conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts." Seaboard Foods and Smithfield Foods are among the integrator Defendants whose executives have been session presenters at NPIC.

---

[40] Mr. Greenwood was also a presenter at the 2018 NPIC, discussing swine operation financials.

[41] *See National Pork Board to meet during National Pork Industry Conference*, Pork Checkoff (July 8, 2010) (available at https://www.pork.org/news/national-pork-board-meet-national-pork-industry-conference/).

109.    Upon information and belief, CEOs and top level executives from Defendants attending NPIC and NPPC events discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top level executives comfort that their competitors remain committed to a plan to artificially restrict pork production.

110.    In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues. For example, the 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year. A March 2011 *AgriMarketing* article about the club states that it consisted of "60 industry stake holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

111.    Defendants were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other organizations.

112.    Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association." AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the

"excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

113.    NAMI was formed in 2015 by merging the AMI and the North American Meat Association. The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars … provide excellent networking and information-sharing opportunities for members of the industry."

114.    All of the Defendants (or their closely-affiliated companies) have been members of AMI and then NAMI throughout the Class Period. Executives from the pork integrator Defendants have served on the AMI and NAMI Board of Directors during the Class Period, including:

>    a.    Mark Campbell and Rick Hoffman of Triumph Foods;
>
>    b.    Doug Clemens and Phil Clemens of Clemens Family Corporation;
>
>    c.    Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc., as well as Greg Schweitzer of Sara Lee/Hillshire Brands (later acquired by Tyson Foods);
>
>    d.    Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;
>
>    e.    Gary Louis, Rod Brenneman and Terry Holton of Seaboard Foods;
>
>    f.    Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA; and

g.      Jim Snee, Stephen Binder and Jeffrey Ettinger of Hormel Foods Corporation.

115.    Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

116.    Throughout the Class Period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has co-sponsored (with the Food Marketing Institute) the industry's "Annual Meat Conference." The conference website describes the conference as "a complete education and networking experience." Many of the Defendants' high-level executives attend the conference. For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President, Smithfield Foods and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

117.    Throughout the Class Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry." All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice

46

President of Pork Analysis at Express Markets, Inc. (a subsidiary of Agri Stats, Inc.) through 2017. The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates and ***industry capacity***." (emphasis added.) The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike. This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices. Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years." The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

118. Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action." Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015, and Phil Clemens of The Clemens Family Corporation in 2016.

119. For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics,

including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics." The NAMI board met during the 2015 Management Conference.

120.    In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit." In addition to education sessions, the summit has included, "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

121.    AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012. In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

122.    In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations. Promotional materials for the 2014 IPPE indicated that attendees included defendants Clemens Food Group, Hormel Foods, Hillshire Brands, JBS, Seaboard, Smithfield Foods, Triumph

Foods, and Tyson. After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

## H. Defendants implemented capacity and supply restraints during the Class Period.

### 1. Summary of Defendants' Conspiratorial Supply Restraints

123. In the years leading up to the conspiracy period the steady expansion of pork production was virtually a given. As one industry commentator reported in 2007, "Some things you can just take to the bank. Sow herd expansion among the Pork Powerhouses would fall into that category – even in the face of the biggest run-up in feed prices in history."[42]

124. This historical trend changed markedly during the conspiracy period. As demonstrated in Figure 7 below, at several points during the Class Period, the pork integrators changed their behavior and acted in a concerted way to decrease supply. In 2009, 2010, and again in 2013, the pork industry cut production.[43] (The production dip in 2014 reflected the adverse impacts from the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer of 2014.) These production decreases marked a drastic change from the period prior to the conspiracy from 2000 through 2009, in which pork supply was stable and steadily increasing on a yearly basis.

---

[42] Freese, Betsy, *Pork Powerhouses 2007: Run-Up In Rations* (Oct. 3, 2007).

[43] *See* U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013; *id.* at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

**Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



125.   These supply cuts were coordinated, historic and unprecedented. For example, in September 2009, Pork Powerhouses—which publishes reports and articles relating to pork production—published an article entitled "Big Boys Cut Back" and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers. These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.[44]

126.   At the same time, pork producers were further reducing domestic supply by devoting more and more production exports to overseas markets. The U.S. has been a net exporter of pork products for a long time, but those exports have comprised a much larger share of total production in the past ten years. As shown in Figure 8 below, less than ten percent of U.S. pork production was exported in 2000. By 2011, more than twenty

---

[44] Freese, Betsy, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009).

percent was being exported. Sending production overseas is another way in which Defendants were able to reduce the supply available to U.S. markets, thereby driving up prices. Notably, a 2017 analysis found that for every $1 million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt. In other words, selling pork on the global market added $50.20 to the market price of hogs. The significant expansion in exports meant that increases in hog production by Defendants did not result in an increase in the supply of pork products in the United States market.

**Figure 8: U.S. Pork Exports as a Percent of Total Production, 2000-2017**



127.    As part of their acts and conduct in furtherance of the conspiracy, each of the Defendants participated in these supply restraints. While the conspiracy was self-

concealing in nature, the limited publicly available sources of information available regarding Defendants' supply decisions evidences these supply constraints. These supply restrictions included, but were not limited to, the conduct described herein.

### a.    Smithfield

128.    In 2008 Smithfield stopped making traditional production increases and instead cut its number of sows, reporting that ,"We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[45] In 2009, Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately. Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows). In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

129.    Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

### b.    Tyson

130.    Between 2008 and 2009 Tyson cut its sows by over 25%, marking a significant reduction. In 2010 Tyson reported a 3.3% decrease in its Pork sales volume

---

[45] Freese, Betsy *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate. In 2013 Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."

### c. JBS/Cargill

131. In 2011 JBS USA reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS USA. Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand. This production restriction had the intended effect: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."

### d. Hormel

132. Hormel's production statistics show that it cut its number of sows in 2008 and maintained such reduced production throughout the class period. Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through."[46] Hormel also reported lower sales of pork products in 2013. In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day. Hormel reported strong earnings from its pork exports in 2011.

---

[46] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

### e.      Seaboard

133.    Throughout the class period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales to foreign markets.[47] Seaboard dedicated several employees to international sales and exports. Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect—higher pork prices. Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic market."[48]    Moreover, in 2017 Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

### f.      Triumph

134.    In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows. In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry. Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide. These exports constituted a significant portion of its production

---

[47] *See e.g.* 2010 Seaboard Annual Report ("export volumes increased particularly to our higher valued markets in the Far East while domestic volumes nearly kept pace with 2009."); 2011 Seaboard Annual Report ("Exports of US pork were up 23% to an all-time record as demand from the usual countries remained strong and the US continued its role as the main supplier.").

[48] *See* Seaboard 2013 Annual Report.

throughout the class period, and reduced or otherwise limited Triumph's production in the United States.

### g. Clemens

135. In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats. Furthermore, in 2014 Defendant Clemens had a competitive advantage over many pork producers, in that it had few PEDv infected pigs. But contrary to what one would expect to see in a competitive market, Clemens did not utilize its advantage and refused to increase its market share when it clearly had substantial market incentives to do so.

## 2. Timeline of the Conspiracy

136. As set forth herein, each of the aforementioned supply reductions during the class period were a departure from the integrator Defendants' market behavior prior to the conspiracy period. These supply restrictions involved a significant share of the Defendants' annual production and are in contravention of Defendants' individual economic self-interest. These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of pork. While Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources. As with their use of Agri Stats, Defendants exploited these public statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy, and couched the public disclosures in pretext so as to conceal what was

really occurring. Although purchasers would not typically track and account for these statements, Defendants were, they have been unearth during the course of their investigation and are summarized below.

137.    Defendants' conspiracy to restrict pork supply began in the last part of 2008. That same month, Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC, the production arm of Smithfield Foods, said "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[49]

138.    In October of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009.[50]

139.    During Hormel's first quarter earnings call in January 2009, Mr. Ettinger once again communicated that he expected supply to decrease in 2009. Hormel CFO Jody Feragen confirmed that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."[51]

140.    Throughout 2009, pork industry participants noted the need to follow the supply restrictions imposed in the broiler industry. For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. Pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry

---

[49] Freese, Betsy *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

[50] Q4 2008 Hormel Foods Corporation Earnings Call Transcript (Oct. 26, 2008).

[51] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.

141.    In May 2009, Larry Pope, the CEO and President of Smithfield, stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--*we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system*.[52]

142.    In May 2009, Hormel confirmed that "[w]e see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated. And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."[53]

143.    In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . *That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.* We cut

---

[52] Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009) (emphasis added).

[53] Q2 2009 Hormel Foods Corporation Earnings Conference Call – Final (May 21, 2009).

13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.[54]

144.    In July 2009, Smithfield's CEO went on to note in Smithfield's annual report in July 2009: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, **liquidation is now a recognized reality by all in the industry**. To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, **combined with the additional cuts by our fellow producers** should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue." (Emphasis added).

145.    In August of 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner, confirmed:

> Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability.*** We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.[55]

Mr. Lochner continued, "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4."[56]

---

[54] Q4 2009 Smithfield Foods Earnings Conference Call – Final (June 16, 2009) (emphasis added).

[55] Q3 2009 Tyson Foods, Inc. Earnings Conference Call (June 26, 2009) (emphasis added).

[56] *Id.*

146.    Tyson 2009 10K Report further stated that, "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[57]

147.    In August of 2009, Wesley Mendonça Batista, CEO of JBS USA, communicated the start of JBS USA's participation in hog liquidation efforts. Mr. Batista stated, "we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[58]

148.    In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> *We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation*. But again, I don't think they can solve it.
>
> *I think this industry has got to solve it collectively.* I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people

---

[57] *See* Tyson 2009 10K Report, at p. 20.

[58] JBS 2008 Earnings Conference Call (August 13, 2009).

who are not financially strong. ***But the answer is, yes, there are others cutting back. We're not the only one.***[59]

149.    In December of 2009 the CEO of Smithfield confirmed it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance":

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs...I can tell you that I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves. We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.[60]

150.    In a January 2010 article, an industry insider noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 5% in 2009.

151.    In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield, indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents

---

[59] Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009) (emphasis added).

[60] Q2 2010 Smithfield Foods Earnings Conference Call – Final (December 10, 2009).

about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.[61]

152. On March 8, 2010, Wesley Mendonça Batista mentioned Defendant JBS' reduction in hog supply as a driver of profitability, and stated that these efforts were resulting in protein shortages. Mr. Batista stated:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.[62]

Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to limit hog supply.

153. As of March 2010, US pork production was noted to be down 7% so far, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights. Defendants also were reported to have increased exports 8% by March 2010, which was expected to lead to higher hog prices.

154. The Defendants also acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield, stated:

---

[61] Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call – Final (Mar. 11, 2010).

[62] JBS Q2 2009 Earnings Conference Call (Mar. 8, 2010).

> We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have***. And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[63]

As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

155.    Supply level information regarding competitors allowed Defendants to know that supply would not increase in the future, given the lifecycles of the animals. Based on this knowledge, in November of 2010 Hormel CFO, Jody Feragen, stated that she did not think the industry would see large scale expansion given profitability for the pork integrators.[64]

156.    In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the provision of competitively sensitive information by a competitor of Tyson.

---

[63] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010) (emphasis added).

[64] Q1 2010 Hormel Foods Corporation Earnings Conference Call – Final (Nov 23, 2010).

157.    In the face of ever-increasing margins, when asked whether the type of profits would continue, in March 2011, Larry Pope and Robert (Bo) Manly of Smithfield confirmed to their competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .
>
> HEATHER JONES: So you are just striking a note of caution **because you know it can't stay this way indefinitely**; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have -- should have good margins, but I can't believe --
>
> LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.
>
> BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.
>
> HEATHER JONES: All right, okay. Thank you.
>
> LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to

> build the thing. . . . ***And by the way, we are not going to build a new plant to expand capacity***.[65]

158. In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. ***There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility***.[66]

159. By May 2012, industry observers were noting that the reductions in slaughter capacity meant Defendants may not have enough capacity to slaughter expected hog levels by the fall. In fact, Steve Meyer of Paragon Economics noted that slaughter capacity would not keep up with hog capacity through late 2013 given that Defendants were holding their slaughter levels constant.

160. In December 2013 Robert Manly of Smithfield emphasized that coordinated industry action was necessary to "balance supply and demand:"

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group.

---

[65] Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call – Final (Mar. 2011) (emphasis added).

[66] Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012) (emphasis added).

> We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.[67]

161. On May 15, 2013, Wesley Mendonça Batista continued to demonstrate Defendant JBS' ability to constrain the pork market. During a quarterly earnings call he stated that "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business. . . . So this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent in beef."

162. Defendants further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise. For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Eric Haman, Defendant Clemens Food Group's communication manager, stated the disease "'had a very minimal impact on our hog flow, especially when you compare it to others in the industry' Haman said. 'That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this.'"[68] Yet, in furtherance of their conspiracy Defendant Clemens did not take advantage of having few PEDv infected pigs. Instead of attempting to increase their market share, they stayed the course with their fellow competitors.

---

[67] Q2 2014 Smithfield Foods Earnings Conference Call (December 23, 2013).

[68] Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds*, Bucks County Courier Times (May 4, 2014).

163.    Defendants' conspiracy was yielding substantial profits by 2014. In October 2014, Pork Powerhouses reported that "Hogs made history this summer. Pork producer profits were, quite simply, enormous -- averaging $82 profit for each hog marketed in the third quarter." The report also noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast. The PED virus trimmed supply, but higher market weights helped compensate.'"

164.    In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production. Specifically, pork producers rushed to sign contracts with Defendants that would protect them if production exceeded slaughter capacity as some feared.

165.    In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift.[69] In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the

---

[69] Tia Heidenbrecht, *New Pork Processing Plant Adds Second Shift In Sioux City* (Feb. 17, 2017) (available at http://www.ktiv.com/story/34534148/2017/02/ Friday/seaboard-triumph-foods-announces-plans-to-expand-pork-processing-plant-in-sioux-city).

industry."[70] However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.[71]

## I.   Abnormal pricing during the Class Period demonstrates the success of the collusive scheme.

166.   Beginning in 2009, the pork industry showed abnormal price movements, *i.e.*, increases in prices for the average hog whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork. Plaintiffs have measured the various abnormal pricing movements in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the pork integrators' margin during the class period; and (iv) the defendants' revenues before and during the class period. Each of these measures supports Plaintiffs' allegations that Defendants conspired to restrict production and otherwise acted in a concerted manner to increase pork prices in the U.S.

### 1.   The average hog wholesale price experienced an unprecedented increase beginning in 2009.

167.   According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb from 2000 to 2009, the hog market year average price was at times substantially less. Thereafter, prices increased dramatically, rising to more

---

[70] *Id.*

[71] Jeff DeYoung, *Pork Packing Capacity Faces Delay to Growth*, Iowa Farmer Today (June 2, 2018) (available at https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html.).

than $1.80/lb in 2014, and never dropping or below $1.40/lb again. Figure 9 below shows the unprecedented increase in swine prices beginning in 2009, which stayed elevated through 2018.

**Figure 9: Average Hog Wholesale Prices in Cents per lb., 2000-2018**



168. As Figure 10 below shows, publicly available data also demonstrates that pork integrators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits that was resistant to changes in price during the conspiracy period. These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply short of demand.

**Figure 10: Integrator Earnings per Retail Weight, 2000-2017**



2. **The pork cut-out composite price experienced a dramatic increase beginning in 2009 and continuing throughout the class period.**

169. During the Class Period various pork products saw substantial increases in prices, compared with before the Class Period. As shown in Figure 11 below, using one particular price for pork, the lean hog composite price, Plaintiffs have performed a pricing analysis which shows that the average price index increased significantly during the class period:

**Figure 11: Lean Hog Composite Price 2000-2019**



### 3. Defendants' revenues increased beginning in 2009, even taking into account defendant-specific costs.

170. For two of the largest defendants, Tyson and Smithfield, Plaintiffs' experts examined the spread between pork revenue and pork-related costs (costs of goods sold + operating costs), as a proxy for measuring the spread between a defendant's price of wholesale pork and its hog costs. This measurement accounts for Defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in 2009, where there was a divergence in revenue and costs beginning at the start of the class period in 2009.

171.   Figure 12 shows a break in revenues and costs around the start of the Class Period in 2009 for Tyson:

**Figure 12: Tyson's Revenues vs Costs, April 2002 to April 2018**



172.   The same analysis for Smithfield shows a similar break in revenues and costs beginning at the start of the class period:

**Figure 13: Smithfield's Revenues vs Costs, January 2004 to June 2016**



173.    These analyses of the spread between costs and prices relate solely to each defendant's pork segment, and thus confirm that rising costs in pork production do not explain the increases in price seen during the Class Period.

**J.    Overcharges due to the cartel were reflected in higher pork prices.**

174.    Pork is a commodity product in which the pork sold by competitors has no meaningful difference and is thus interchangeable. As such price is driven by the economic fundamentals of supply and demand. In the words of Tyson Foods, Inc. COO, James Lochner, "As you know decreased supply should be favorable to pricing."[72]

---

[72] Q1 2010 Tyson Foods, Inc. Earnings Conference Call (February 12, 2010).

175.    By reducing, stabilizing and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2012 the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."

176.    The volume of U.S. commerce in the pork industry is enormous. Total pork sales in the United States for a portion of the Class Period were:

- 2016 - $18.9 billion
- 2015 - $21.0 billion
- 2014 - $26.4 billion
- 2013 - $23.4 billion

177.    Each Defendant's annual sales of pork products are also very large. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to class members.

178.    The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI"). From the end of 2009 to the end of 2017, the CPI for all food products rose approximately 15.4 percent. Over the same period, prices for pork have increased substantially more for consumers over the Class Period. For example, the

price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017, an increase of 56.9 percent:

**Figure 14: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995-2017**



179.     Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase over the Class Period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017 (approximately 29.3 percent):

74

**Figure 15: CPI-Average Price Data for Other Pork, per pound, from 1998-2017**



180.    And the CPI for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017 (or 35.4 percent):

**Figure 16: CPI-Average Price Data for Ham, per pound, from 1998-2017**



181.    In other words, the increases in the prices of pork far out-paced the growth in prices for other food products during the class period. These price increases were not the result of retailers' desire to move prices upward. Instead, they were the result of increased wholesale prices. In addition to CPIs, the Bureau of Labor Statistics also maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products. As shown in Figure 17 below, the processed pork wholesale prices appear to be the motivator of the higher retail prices, with prices climbing significantly beginning during the conspiracy:

**Figure 17: PPI for Pork, Processed or Cured, Not Canned or Made Into Sausage, from 1995-2017**



182. Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to artificially increase and stabilize the price and supply of pork was borne in large part by Plaintiffs and the Plaintiff Class.

**K.      Defendants actively concealed the conspiracy and Plaintiffs did not and could not have discovered Defendants' anticompetitive conduct.**

183. Plaintiffs and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for pork. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and class members.

184. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their

competitor supply restraint and price discussions from non-conspirators (including customers).

185.    In 2009, the President of Agri Stats, Brian Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth.[73]

186.    At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."[74] And yet, despite refusing to show this information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.

187.    Larry Pope, the CEO of Smithfield, made similar references to secret information in December 2010, explaining that he was confident pork supplies would not be increasing in the market, based on

---

[73] Sanderson Farms Investor Day – Final (Oct. 2009) (emphasis added).

[74] *Id.*

the information we think we have public **plus what we think we know privately**, how many they kill, what their processing levels are and things like [that]. ***This is information you may not quite have.***[75]

188. At other times, Defendants attributed the stability in the pork market to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope, stated in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[76]

189. Not until recently was the fact of the pork industry's use of Agri Stats widely known or reported. An investigative article published in February 2017 by Bloomberg Businessweek suggested the conspiracy that began among Broiler producers and Agri Stats was being replicated in the pork industry.[77] The article reported that Agri Stats

---

[75] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010) (emphasis added).

[76] Event Brief of Q4 2012 Smithfield Foods Earnings Conference Call – Final (June 14, 2012).

[77] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek (Feb. 15, 2017) (available at https://www.bloomberg.com/news/features/2017-02-15/ is-the-chicken-industry-rigged).

> has . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods. It appears that demand for the service is strong. At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services. His slideshow indicated that 27 companies had already signed up.[78]

While Bloomberg Businessweek article did not conclude that pork producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated article that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.

190. Only after the filing of a February 7, 2018, Second Consolidated and Amended Complaint by the End User Plaintiff Class in the *In Re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats' provides to its clients in the Broiler industry.

191. The filing of this amended complaint, along with the February 2017 article by Bloomberg Businessweek disclosing the pork industry's use of Agri Stats, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

192. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Pork is not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a

---

[78] *Id.*

reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' pork prices before these recent events.

193.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

## V.    CLASS ACTION ALLEGATIONS

194.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All entities that indirectly purchased pork from Defendants or co-conspirators in the United States during the Class Period for their own business use in commercial food preparation.

195.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States")  on behalf of the following class (the "Damages Class"):

> All entities in the Indirect Purchaser States that indirectly purchased pork from Defendants or co-conspirators in the United States during the Class Period for their own business use in commercial food preparation.

196.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

197.    Plaintiffs reserve the right to modify the class definition at a later date, including to add the first level of indirect purchasers.

198.    While Plaintiffs do not know the exact number of the members of the Classes, there are likely thousands of class members.

199.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

A.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of pork in the United States;

B.   The identity of the participants of the alleged conspiracy;

C.   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

D.   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

E.   Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

F.   Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

G.   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

H.   The effect of the alleged conspiracy on the prices of pork sold in the United States during the Class Period;

> I.  Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for pork, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;
>
> J.  The appropriate injunctive and related equitable relief for the Nationwide Class; and
>
> K.  The appropriate class-wide measure of damages for the Damages Class.

200.  Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for pork purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

201.  Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

202.  The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

203. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the Indirect Purchaser States or as separate classes for certain groups of Indirect Purchaser States, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

204. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    ANTITRUST INJURY

205. Defendants' anticompetitive conduct had the following effects, among others:

> A.    Price competition has been restrained or eliminated with respect to pork;

B.     The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.     Commercial and Institutional Indirect purchasers of pork have been deprived of free and open competition; and

D.     Commercial and Institutional Indirect purchasers of pork paid artificially inflated prices.

206.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork. As a direct and foreseeable result, Plaintiffs and the Class paid supra-competitive prices for pork during the Class Period.

207.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for pork than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

208.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   CAUSES OF ACTION

### Count One

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

209.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

210. Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

211. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for pork, thereby creating anticompetitive effects.

212. The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

213. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated class members in the Nationwide Class that purchased pork have been harmed by being forced to pay inflated, supracompetitive prices for pork.

214. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

215. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for pork provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class who purchased pork indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

216.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for pork purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

217.    Defendants' contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

218.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

**Count Two**

**<u>Violation of State Antitrust Statutes</u>**
**<u>(on behalf of Plaintiffs and the Damages Class)</u>**

219.    Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

220.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of pork in

unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

221. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for pork and to allocate customers for pork in the United States and its territories.

222. In formulating and effectuating this conspiracy, defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price pork at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by plaintiffs and members of the Damages Class with respect to pork provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

223. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of pork. As a direct and proximate result, plaintiffs and members of the Damages Class were deprived of free and open competition and paid more for pork than they otherwise would have in the absence of defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes defendants' conduct unlawful.

224.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

225.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

226.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

227.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. §44-1401 *et seq.* Defendants' conspiracies had the following effects: (1) price competition for pork was restrained, suppressed and eliminated throughout Arizona; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, defendants' illegal conduct substantially affected Arizona commerce. Accordingly, plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §44-1401 *et seq.*

228.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §16700 *et seq.* During the Class Period, defendants and their coconspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal.

Bus. & Prof. Code §16720. Each defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, raise, stabilize, and maintain prices of pork at supracompetitive levels. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of pork. For the purpose of forming and effectuating the unlawful trust, defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of pork. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for pork has been restrained, suppressed and/or eliminated in the State of California; (2) prices for pork provided by defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California and throughout the United States; and (3) those who purchased pork indirectly from defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a result of defendants' violation of Cal. Bus. & Prof. Code §16720, plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

229. **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code §28-4501 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was

restrained, suppressed and eliminated throughout the District of Columbia; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and purchased pork in the District of Columbia, paid supracompetitive, artificially inflated prices for pork, including in the District of Columbia. During the Class Period, defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of D.C. Code §28-4501 *et seq*. Accordingly, plaintiffs and members of the Damages Class seek all forms of relief available under D.C. Code §28-4501 *et seq*.

230. **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §553.1 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Iowa; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §553.1 *et seq*. Accordingly, plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §553.1 *et seq*.

231. **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. §50-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained,

suppressed and eliminated throughout Kansas; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, defendants' illegal conduct substantially affected Kansas commerce. Accordingly, plaintiffs and members of the Damages Class seek all forms of relief available under Kan. Stat. §50-101 *et seq*.

232. **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Maine; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, defendants' illegal conduct substantially affected Maine commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

233. **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws §445.771 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Michigan; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, defendants' illegal conduct substantially affected Michigan commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under Mich. Comp. Laws §445.771 *et seq*.

234.  **Minnesota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §325D.49 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Minnesota; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under Minn. Stat. §325D.49 *et seq*.

235.  **Nebraska:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §59-801 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Nebraska; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska.  During the Class Period, defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under Neb. Rev. Stat. §59-801 *et seq.*

236.  **Nevada:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §598A.010 *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Nevada; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, defendants' illegal conduct substantially affected Nevada commerce.

Accordingly, plaintiffs and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. §598A.010 *et seq*.

237. **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. §356:1. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout New Hampshire; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §356:1 *et seq*.

238. **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout New Mexico; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

239. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) pork price

competition was restrained, suppressed and eliminated throughout New York; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York. During the Class Period, defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq.* Accordingly, plaintiffs and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq.*

240. **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout North Carolina; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; During the Class Period, defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq.*

241. **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code §51-08.1-01 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout North Dakota; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, defendants' illegal conduct had a substantial effect on

North Dakota commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under N.D. Cent. Code §51-08.1-01 *et seq.*

242. **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Oregon; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780 *et seq.*

243. **Rhode Island:**[79] Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq.* The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Rhode Island; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11 *et seq.*

---

[79] Claims under Rhode Island General Laws § 6-36-4, *et seq.*, are pursued only as to claims arising on July 15, 2013, or later.

244. **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout South Dakota; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.*

245. **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §47-25-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Tennessee; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under Tenn. Code Ann. §47-25-101 *et seq*.

246. **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Utah; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, defendants' illegal conduct had a substantial effect on Utah commerce.

Accordingly, plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

247. **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Vermont; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under 9 V.S.A. § 2465 *et seq.*

248. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, et seq. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout West Virginia; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, et seq.

249. **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. §133.01 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Wisconsin; (2) pork prices were raised, fixed,

maintained and stabilized at artificially high levels throughout Wisconsin. During the Class Period, defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, plaintiffs and members of the Damages Class seek all relief available under Wis. Stat. §133.01 *et seq*.

## Count Three

### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiffs and the Damages Class)

250.    Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

251.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

252.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of Ark. Code Ann. §4-88-101 *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at noncompetitive and artificially inflated levels, the prices at which pork was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from plaintiffs and members of the Damages Class.   The aforementioned conduct on the part of the defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) pork price competition was

restrained, suppressed and eliminated throughout Arkansas; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arkansas. During the Class Period, defendants' illegal conduct substantially affected Arkansas commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. §4-88-107(a)(10) and, accordingly, plaintiffs and the members of the Damages Class seek all relief available under that statute.

253. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.* During the Class Period, defendants manufactured, marketed, sold, or distributed pork in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200 *et seq.*, by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§17203 and 17204, to obtain restitution from these defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code §17200. The acts, omissions, misrepresentations, practices and nondisclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200 *et seq.*, including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code §16720 *et seq.*, set forth above.

Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §16720 *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) defendants' acts or practices are unfair to purchasers of pork in the State of California within the meaning of Cal. Bus. & Prof. Code §17200 *et. seq.*; and (4) defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code §17200 *et seq*. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future. The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiffs and the members of the Damages Class to pay supracompetitive and artificially inflated prices for pork. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code §17200 *et seq*. As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by

defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

254. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq.* Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout Florida; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida. During the Class Period, defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, plaintiff and members of the Damages Class seek all relief available under Fla. Stat. §501.201 *et seq.*

255. **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* Defendants' unlawful conduct had the following effects: (1) pork at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed pork at Issue in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and pork purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

256.

257. **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.* In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge … of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and plaintiffs and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing pork because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of pork, including their illegal conspiracy to secretly fix the price of pork at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of plaintiffs and the public. Defendants took grossly unfair advantage of plaintiffs and members of the Damages Class. Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout New Mexico; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for pork. During the Class Period, defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, plaintiffs and members of the Damages Class seek all relief available under that statute.

258. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which pork were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. The conduct of defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina

consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout North Carolina; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for pork. During the Class Period, defendants marketed, sold, or distributed pork in North Carolina, and defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed pork in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §75-1.1 *et seq*., and, accordingly, plaintiffs and members of the Damages Class seek all relief available under that statute.

259. **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels,

the prices at which pork at issue was sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for pork at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Pork at Issue was restrained, suppressed, and eliminated throughout North Dakota; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and pork purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

260. **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair

Trade Practices Act, S.C. Code Ann. §39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) pork price competition was restrained, suppressed and eliminated throughout South Carolina; (2) pork prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina. During the Class Period, defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §39-5-10 *et seq*., and, accordingly, plaintiffs and the members of the Damages Class seek all relief available under that statute.

261. **Vermont:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for pork. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' pork prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on

Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork, likely misled all commercial and institutional indirect food preparer purchasers acting reasonably under the circumstances to believe that they were purchasing pork at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

262. **West Virginia**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for pork at Issue. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive

and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Pork at Issue was restrained, suppressed, and eliminated throughout West Virginia; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and purchasers of pork. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of pork at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of pork at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

263. **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting,

fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which pork at issue was sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' pork at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for the Pork at Issue was restrained, suppressed, and eliminated throughout Wisconsin; (2) pork at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of pork. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of pork at Issue, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing pork at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of pork at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Count Four**

## Unjust Enrichment[80]
## (on behalf of Plaintiffs and the Damages Class)

264.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

265.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

266.   Defendants have unlawfully benefited from their sales of pork because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held commercial and institutional indirect food preparers, which purchased pork at prices that were more than they would have been but for Defendants' unlawful actions.

267.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

268.   Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

269.   Defendants have been enriched by revenue resulting from unlawful overcharges for pork while Plaintiffs have been impoverished by the overcharges they paid for pork imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

---

[80] Unjust enrichment claims are alleged herein under the laws of the states for which claims are alleged in Counts Two and Three above. Plaintiffs continue to pursue unjust enrichment claims under the unjust enrichment law of Massachusetts and Mississippi.

270.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

271.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

272.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of pork.

273.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of pork are ascertainable by review of sales records.

274.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of pork.

275.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased pork, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

276. The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for pork is a direct and proximate result of Defendants' unlawful practices.

277. The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

278. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except California, Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for pork derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

279. Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as pork prices remain inflated above pre-conspiracy levels.

280. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of pork.

281. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of pork by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## VIII. RELIEF SOUGHT

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

282. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

283. That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

284. Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

285. Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

286. Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair

competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

287. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

288. Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

289. Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

290. Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## IX.    JURY TRIAL DEMANDED

291. Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: June 2, 2021                    Respectfully submitted

   */s/ Blaine Finley*
Jonathan W. Cuneo (*Pro hac vice*)
Joel Davidow (*Pro hac vice*)
Blaine Finley (*Pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave. NW
Suite 200
Washington, DC 20016
Telephone: 202.789.3960
Facsimile: 202.589.1813
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com

Shawn M. Raiter (MN#240424)
**LARSON · KING LLP**
30 East Seventh Street
Suite 2800
St. Paul, MN 55101
Telephone: (651) 312-6518
sraiter@larsonking.com

*Interim Co-Lead Counsel for Commercial and Institutional Indirect Purchaser Plaintiff Class*