1                       UNITED STATES DISTRICT COURT
                            DISTRICT OF MINNESOTA
2
      ------------------------------------------------------------
3                                    )
      In Re Pork Antitrust              )    File No. 18-cv-1776
4     Litigation.                       )           (JRT/HB)
                                        )
5     This document relates to all      )
      actions                           )    St. Paul, Minnesota
6                                        )    Via Video Conference
                                        )    December 17, 2021
7                                        )    1:41 p.m.
                                        )
8                                        )
      ------------------------------------------------------------
9

10

                      BEFORE THE HONORABLE HILDY BOWBEER
11            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                        **(CIVIL MOTION HEARING)**
12

13

14

15

16

17

18

19

20        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
21

22

23

24

25


                        LYNNE M. KRENZ, RMR, CRR, CRC
                               (651)848-1226

```
 1    APPEARANCES:

 2    For Direct Purchaser        Lockridge Grindal Nauen PLLP
      Plaintiffs:                 Brian D. Clark, Esq.
 3                                Joseph C. Bourne, Esq.
                                  100 Washington Ave South
 4                                Suite 2200
                                  Minneapolis, MN 55401-2179
 5
                                  Pearson, Simon & Warshaw, LLP
 6                                Clifford H. Pearson, Esq.
                                  15165 Ventura Boulevard
 7                                Suite 400
                                  Sherman Oaks, CA 91403
 8
      For Commercial and          Zimmerman Reed, LLP
 9    Institutional Indirect      Ian F. McFarland, Esq.
      Purchaser Plaintiffs:       1100 IDS Center
10                                80 South 8th Street
                                  Minneapolis, MN 55402
11
                                  Cuneo Gilbert & LaDuca, LLP
12                                Alec Blaine Finley, Esq.
                                  4725 Wisconsin Avenue NW
13                                Suite 200
                                  Washington, DC 20016
14
      For Consumer Indirect       Gustafson Gluek, PLLC
15    Purchaser Plaintiffs:       Michelle J. Looby, Esq.
                                  120 South 6th Street, Suite 2600
16                                Minneapolis, MN 55402

17                                Hagens Berman Sobol Shapiro LLP
                                  Shana Scarlett, Esq.
18                                715 Hearst Avenue, Suite 202
                                  Berkeley, CA 94710
19
      For Defendant Hormel:       Faegre Drinker Biddle & Reath
20                                LLP
                                  Craig S. Coleman, Esq.
21                                90 South 7th Street
                                  Suite 2200
22                                Minneapolis, MN 55402

23    For Defendant Seaboard      Stinson Leonard
      Foods:                      Jaclyn Nicci Warr, Esq.
24                                7700 Forsyth
                                  Suite 1100
25                                St. Louis, MO 63105
```

```
 1

 2    For Defendant              Gibson, Dunn & Crutcher, LLP
      Smithfield Foods, Inc.:    Brian Edward Robison, Esq.
 3                               2001 Ross Avenue
                                 Suite 2100
 4                               Dallas, TX 75201

 5    For Defendant Triumph      Husch Blackwell
      Foods:                     Tessa K. Jacob, Esq.
 6                               4801 Main Street
                                 Suite 1000
 7                               Kansas City, MO 64112

 8    For Defendant Tyson        Axinn Veltrop & Harkrider, LLP
      Foods:                     Jarod Taylor, Esq.
 9                               90 State House Square
                                 Hartford, CT 06103
10
      For Defendant JBS USA      Spencer Fane LLP
11    Food Co.:                  Donald Heeman, Esq.
                                 100 South Fifth Street
12                               Suite 2500
                                 Minneapolis, MN 55402
13
                                 Quinn Emanuel Urquhart &
14                               Sullivan, LLP
                                 Richard Thomas Vagas, Esq.
15                               51 Madison Avenue
                                 Suite 22nd Floor
16                               New York, NY 10010

17    For Non-party Pacific      Sawyer & Labar, LLP
      Agri-Products, Inc.:       Adrian Sawyer, Esq.
18                               1700 Montgomery Street
                                 Suite 108
19                               San Francisco, CA 94111

20    Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
                                 Suite 146
21                               316 North Robert Street
                                 St. Paul, Minnesota 55101
22

23

24

25
```

1                    **P R O C E E D I N G S**

2                       **IN OPEN COURT**

3          THE COURT:  Good afternoon.  This is the United

4   States District Court for the District of Minnesota.  I'm

5   Magistrate Judge Hildy Bowbeer and we are gathered by zoom

6   this afternoon for a hearing in the matter of In Re Pork

7   Antitrust Litigation.  This is matter Number 18-cv-01776.

8          And the particular matter that's teed up for this

9   hearing at this time is Docket Number 1024, which is the

10  CIIPPS's motion to compel compliance with subpoena directed

11  to Pacific Agri-Products, Inc.

12         So let me find out first who I've got with me this

13  afternoon for the parties that are directly involved in that

14  motion and then I'll make sure I get appearances for others

15  who are of record in the litigation and would like their

16  appearance noted even though they may not be directly

17  involved in it.

18         First, do I have counsel here on behalf of Pacific

19  Agri-Products, Inc.?

20         MR. SAWYER:  Yes, Your Honor.  Good afternoon.

21         This is Adrian Sawyer from Sawyer & Labar from San

22  Francisco for Pacific Agri-Products, Inc.

23         THE COURT:  Okay.  Good afternoon.

24         And do you not have video available, Mr. Sawyer?

25         MR. SAWYER:  We were unclear as to -- I can get on

1    video immediately.

2              THE COURT:  And, you know, I apologize if any lack

3    of clarity was at our end, but it's certainly easier for me

4    I think to kind of follow the flow of the conversation,

5    perhaps for you as well, to have you on video.

6              So if you don't mind dropping off and coming back

7    on by video I will proceed, if it's all right with you, with

8    other appearances and then we'll circle back to you.  All

9    right?

10             MR. SAWYER:  Terrific.  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             MR. SAWYER:  Will do.

13             THE COURT:  All right.  Let's turn now to the

14   consumer indirect purchaser plaintiffs.

15             I was told ahead of time that Michelle Looby --

16   well, actually let my start with the commercial and

17   institutional indirect purchaser plaintiffs because they're

18   the ones directly involved in the motion.

19             And Ian McFarland, I see you.  Let me hear you.

20             MR. MCFARLAND:  Good afternoon, Your Honor.  I'm

21   Ian McFarland of Zimmerman Reed LLP for commercial and

22   institutional indirect purchaser plaintiffs.

23             THE COURT:  And when you're referring to

24   yourselves by your acronym, what do you call yourselves?

25             MR. MCFARLAND:  In writing CIIPPs, but because

1    that's kind of a mouthful I was planning on using commercial

2    indirects today.

3                THE COURT:  All right.  Very well.  Thank you.

4                And I believe I was also expecting Blaine Finley.

5    And I see you.

6                MR. FINLEY:  Good afternoon, Your Honor.

7                THE COURT:  Okay.  And Anthony Carter.  Is Mr.

8    Carter on?  All right.  I don't see him, Mr. Carter.

9                Is there anyone else wanting to have their

10   appearance noted for the commercial indirects?  All right.

11               Let's turn back, do we have, Mr. Sawyer yet?  Not

12   yet.  Okay.

13               Let's turn now to the other parties in the case

14   who aren't necessarily directly involved in this motion.

15               Let's first turn to the direct purchaser -- I'm

16   sorry, the consumer indirect purchaser plaintiffs, the

17   CIPPS.  And I was expecting Michelle Looby?

18               MS. LOOBY:  Yes.  Good afternoon, Your Honor.

19               THE COURT:  And Shana Scarlett?

20               MS. SCARLETT:  Good afternoon, Your Honor.

21               THE COURT:  Is there anyone else who wants their

22   appearance noted for the consumer indirect purchaser

23   plaintiffs?

24               Okay.  Turning to the direct purchaser plaintiffs.

25   Brian Clark?

1          MR. CLARK:  Yes, Your Honor.  Good afternoon.

2          THE COURT:  Joseph Bourne?

3          I thought I saw Mr. Bourne.

4          MR. BOURNE:  Good afternoon, Your Honor.

5          THE COURT:  Okay.  And I also -- I thought Mr.

6    Pearson was going to be attending.  Is Mr. Pearson on?

7          MR. PEARSON:  Yes, I am, Your Honor.  Good

8    afternoon.

9          THE COURT:  All right.  Good afternoon, Mr.

10   Pearson.

11         Anyone else who wants their appearance noted for

12   the direct purchaser plaintiffs?

13         All right.  And I think I just admitted, Mr.

14   Sawyer again.  We're just going to give him a moment to --

15         Ah, there you are.  Mr. Sawyer.

16         MR. SAWYER:  Good afternoon.  Thank you.

17         THE COURT:  Good afternoon.  And I can hear you

18   loud and clear, so we'll note your appearance as well.

19   We're still doing appearances.

20         Let's turn now -- hold on a moment.  Other people

21   I was expecting to -- or at least told me they were going to

22   be attending on behalf of the Clemens Food Group is Ms.

23   Barsanti on?  No?  All right.

24         On behalf of Hormel, Mr. Coleman?

25         MR. COLEMAN:  Good afternoon, Your Honor.  I'm

 1    present.

 2               THE COURT:  Good afternoon.  On behalf of Seaboard

 3    Foods, Ms. Warr?

 4               MS. WARR:  Good afternoon, Your Honor.  It's war.

 5    It's pronounced like it's one R.

 6               THE COURT:  All right, Ms. Warr.

 7               All right.  And, Mr. Schwingler, are you on.

 8               MS. WARR:  Mr. Schwingler will not able to join

 9    us, he may appear later during the hearing.

10               THE COURT:  Okay.  That's fine.

11               I mainly just wanted to make sure that people who

12    wanted to be on the record were.

13               On behalf of Smithfield Foods.  So do I have

14    anyone for Smithfield?

15               MR. ROBISON:  Yes, Your Honor.  Brian Robison from

16    Gibson, Dunn & Crutcher.  Good afternoon.

17               THE COURT:  Good afternoon, Mr. Robison.

18               Do I have anyone for Triumph?

19               MS. JACOB:  Good afternoon, Your Honor.  It's

20    Tessa Jacob from Husch Blackwell.

21               THE COURT:  On behalf of Tyson Foods?  Jared

22    Taylor?

23               MR. TAYLOR:  Present, Your Honor.

24               THE COURT:  And Tiffany Rider Rohrbaugh?

25               MR. TAYLOR:  Like Mr. Schwingler, Your Honor, she

1    may not be able to make it particularly for the first

2    portion of today's hearings.

3              THE COURT:  All right.  On behalf of JBS USA,

4    Donald Heeman?

5              MR. HEEMAN:  Good afternoon, Your Honor.

6              THE COURT:  And Mr. -- is it Vagas?

7              MR. VAGAS:  Vagas, Your Honor.  Good afternoon.

8              THE COURT:  Vagas.  All right.  Good afternoon.

9              And I think that covers the -- the kind of

10   preexisting plaintiffs and defendants in the actions before

11   the MDL.

12             Do any of the counsel for the MDL direct action

13   plaintiffs want to be shown as making their appearance for

14   this hearing?

15             MR. MITCHELL:  Your Honor, this is Mike Mitchell

16   from Boies Schiller & Flexner.  Not for this hearing.  But

17   for the next hearing.

18             THE COURT:  All right.  Very well.  And so I will

19   take role again when we get to the next hearing.

20             And I otherwise -- I think -- have I missed anyone

21   who specifically wants their appearance noted for the

22   hearing on the motion to compel compliance with subpoena

23   directed to Pacific Agri-Products?  Nope?  All right.

24             Then just a minute.  I am going to declutter my

25   screen here and I will ask that anyone who's not going to be

1   speaking to this motion turn off video.  If you hear

2   something that you really need to address then turn your

3   video back on and that will be my cue that you'd like to say

4   something.  And also it goes without saying that if you are

5   not yet speaking keep your microphone off as well.

6          So, Mr. McFarland, this is your motion.  I can

7   see.  I can see Mr. Sawyer.

8          So, Mr. McFarland, I will have you go ahead and

9   address the motion?

10          MR. MCFARLAND:  Thank you, Your Honor.  And may it

11   please the Court and counsel.

12          I'm sure you'll appreciate brevity, so I just want

13   to emphasize a few central points.

14          As you're aware, this motion concerns

15   transactional data that commercial indirects have requested

16   from PacAgri.

17          So to begin with, I'd like to emphasize just how

18   relevant the transactional data is to commercial indirects'

19   claims and how it will materially advance their case.

20          THE COURT:  Okay.  And in that regard I know that

21   you didn't have an opportunity to reply to their response to

22   your motion, but they obviously raise some specific

23   arguments around relevance as well as some suggestions about

24   ways of limiting the production to -- in a way that might

25   focus on what is more relevant.

1          So if you could particularly make sure that you

2     respond to those -- to those arguments that would be helpful

3     to me.

4          MR. MCFARLAND:  I'll do that.  Thank you, Your

5     Honor.

6          So to begin with, at class certification

7     commercial indirects are entitled to demonstrate that

8     defendants' conspiracy impacted the prices they paid for

9     pork products and their damages are calculable on a

10    class-wide basis.  That includes showing that any overcharge

11    on the price of pork was passed through the distribution

12    chain to them.

13         And the best way to do that is by analyzing the

14    transactional data of direct purchasers like PacAgri that

15    make purchases from defendants and then turned around and

16    sell those same products to indirect purchasers like

17    commercial indirects here.

18         And essentially what will help is that commercial

19    indirects' expert will take that transactional data and use

20    regression analysis to first establish that defendants

21    overcharged direct purchasers like PacAgri on the price of

22    pork.  And, second, measure how much of that overcharge the

23    direct purchasers passed through to commercial indirects.

24         This type of regression analysis has been widely

25    accepted by courts and it's really the gold standard for

1    demonstrating price impact to indirect purchaser classes.

2         As a result, courts consistently hold that the

3    transactional data that makes it possible is highly relevant

4    to indirect purchaser class actions.

5         Commercial indirects have cited several cases in

6    the brief to that effect.  But the one I'd like to highlight

7    is the *Broiler Chicken Antitrust Litigation* opinion.

8         In that case the underlying allegations were

9    substantially similar to those in this case but in a

10   different meat production industry and there the court

11   declined to quash a subpoena for the same exact type of

12   transactional data.

13        So there's really no question that the

14   transactional data sought by the subpoena is highly relevant

15   to the commercial indirects' case.

16        Now, I know you pointed out that PacAgri took

17   issue in the brief with commercial indirect's substantial

18   use because PacAgri does not conduct the most business with

19   defendants but I think that we'll be able to show that

20   commercial indirects still have a substantial use for

21   PacAgri's data for a couple reasons.

22        And the first is that for the regression analysis

23   the expert will conduct the more data analyzed, the more

24   robust and powerful the analysis.

25        All data moves the needle.  It all makes the

1    analysis more robust and the guiding principle here is

2    really the more data the better.

3            And in PacAgri's case we're dealing with purchases

4    from defendants that reflect millions of pounds of pork and

5    that's certainly enough to make the analysis more robust.

6    And that's especially in combination with the data

7    productions of other smaller or midsized distributors.

8            THE COURT:  So just so I understand, are you

9    agreeing with them that we -- that the focus of your

10   interest here in terms of what you'd like them to produce is

11   about what they bought from one or more of the defendants in

12   this case?  Not the transactions that -- the purchases from

13   nondefendants?

14           MR. MCFARLAND:  Right.  Yes.  We can absolutely

15   agree to that, Your Honor.

16           The only thing that we'd like to make clear is

17   that PacAgri's production also includes its sales data and

18   it's not just limited to its purchase data.

19           THE COURT:  Okay.  All right.

20           Just out of curiosity, in your meet and confers

21   with Mr. Sawyer or other PacAgri counsel had you been clear

22   that at least on the purchase side you were just looking for

23   purchases from these defendants?

24           MR. MCFARLAND:  No.  Initially we had requested

25   PacAgri's transactional data for its purchases in the entire

1    pork market.  But since the last meet and confer we've

2    revised our position and are now willing to limit the

3    transactional data to purchases with defendants and then

4    sales of those same products.

5              THE COURT:  All right.  All right.

6              One of the questions I will have for Mr. Sawyer is

7    whether purchases can be linked to sales.

8              And do you have any information -- in other words,

9    do you -- what are you asking for in terms of sales by

10   PacAgri and do those match up with defendants' purchases?

11             MR. MCFARLAND:  Yes, Your Honor.

12             If I understand your question correctly, we would

13   be requesting defendants -- or pardon me, PacAgri's sales

14   that reflect sales of products that they have purchased from

15   defendants.

16             THE COURT:  Got it.  Okay.  All right.

17             So I think I believe I understand your relevance

18   argument pretty well and I will want to hear more from Mr.

19   Sawyer and we'll give you an opportunity to respond.

20             But I primarily wanted to see if we could be on

21   the same page at least about limiting the universe of the

22   data you were looking for.

23             Let me ask this.  I know that when -- at least

24   when they originally objected to the subpoena they also,

25   among other things, complained about the time -- the scope

1      -- temporal scope of your request.

2              Have you talked to them about that or were you on

3      the same page that if data were going to be produced what

4      the appropriate temporal scope would be?

5              MR. MCFARLAND:  We have not discussed that in our

6      meet and confers recently.  But our position remains that we

7      would like their transactional data for as long a period of

8      time as they have it in a manner that's reasonably

9      accessible.

10             THE COURT:  All right.  What -- I'm just looking

11     at your request here because we're talking about Requests 2

12     and 4.

13             So you're asking from 2002 to present.  And as

14     we've now established, data specific to purchases from these

15     defendants and sales of product that was purchased from

16     these defendants.  But you're still maintaining your request

17     from 2002 to present?

18             MR. MCFARLAND:  Correct, Your Honor.

19             If PacAgri has data it's reasonably accessible

20     going back to 2002, we would request that data.

21             THE COURT:  And tell me about that importance of

22     2002 and why you're willing to go back that far.

23             MR. MCFARLAND:  Yes.  Thank you for the question,

24     Your Honor.

25             The reason why we're requesting data going back to

1    2002 is because the expert in his analysis is going to be

2    able to need to compare the price of pork before the time

3    period of the conspiracy that's alleged in the complaint to

4    the price of pork during the period of the time -- during

5    the time period of the conspiracy.

6           So it's essential that we have data from before

7    and after the conspiracy began.

8           THE COURT:  Okay.  All right.

9           So let's talk a little bit about the concern about

10   with regard to confidentiality.

11          And I will tell you that I'm satisfied that the

12   combination of data that shows purchase and sale, that that

13   mix of structured data is highly confidential so I'm

14   satisfied that it ought to be protected.

15          But I agree with the point you made in your brief

16   that just because it needs to be protected doesn't mean that

17   it isn't discoverable.  There are ways of protecting it.

18          I do think thought that they raise some good

19   arguments about the protective order.  Because as I read the

20   -- or reread, because I entered it on stipulation, the

21   protective order that you all -- meaning you and the

22   defendants, agreed to in this case, it actually didn't

23   really address nonparties explicitly at all.  The language

24   was all around parties and it didn't seem to call for any

25   ways of putting nonparty producers of information on notice

1    if their highly confidential information was going to be

2    used.

3           So have you -- have you looked at that?  Have you

4    thought at all about what changes might need to be made to

5    the protective order if I were to order them to produce some

6    part of this information but agree that it was highly

7    confidential?

8           MR. MCFARLAND:  Your Honor, I guess I would start

9    by saying that we believe that the protective order does

10   apply to information that's produced by nonparties to the

11   litigation but we are willing to clarify that, if you think

12   that's a change that would be necessary and helpful.

13          THE COURT:  Mm-hmm.  All right.  All right.

14          Let me see if I have any other questions for you,

15   but I may be ready to put Mr. Sawyer on the hot seat.  Hold

16   on just a moment.  I think -- I'm sure I'm going to have

17   some follow up from you but let me hear from Mr. Sawyer and

18   I will give you a chance to respond in just a moment, Mr.

19   McFarland.

20          So, Mr. Sawyer, as you know, I'm -- and actually,

21   Mr. McFarland, you can stay on screen, I just wanted to -- I

22   was just asking for people who weren't going to be speaking

23   at all to this motion, but I can keep track of four faces,

24   including my own.

25          But in any event, Mr. Sawyer, you heard me say

1    that I'm satisfied with your showing about the

2    confidentiality of this information, so I don't need you to

3    address that.  But I do think that Mr. McFarland has made a

4    good case for the relevance of both purchase and sales

5    information, albeit limited to transactions that involved

6    pork purchased from one of these defendants.

7    So, tell me why -- tell me why you shouldn't ought

8    to have to produce that?

9    MR. SAWYER:  Certainly.  Thank you, Your Honor.

10    I would focus on two points we made in our brief.

11    The first is that many of the, you know,

12    defendants here are competitors.  And so PacAgri is a

13    company that has had nothing to do with this litigation,

14    hasn't sought out any relief from the Court, has not

15    involved itself in the proceedings.  And is now faced with

16    not just producing its highly confidential information but

17    producing its highly confidential information in context

18    where parties to the lawsuit are its competitors.

19    Its purchases are very, very minor.  I think we

20    used graphs from the fourth amended consolidated class

21    action complaint to show that these purchases make up but a

22    small part of the overall market, a small part of the

23    defendants -- the main defendants' market share and there's

24    no showing on the part of the plaintiffs that PacAgri's

25    transactional data is going to move the needle -- be

1    material to any expert at all.  No expert has come forward

2    with a declaration.

3         And so I think on that basis alone there's a

4    failure to show that that PacAgri's transactional data, this

5    very small part of this big, big market is necessary and

6    particularly that it's necessary to an extent that it

7    overcomes PacAgri's recognized and significant interest in

8    protecting its confidential -- it's highly confidential

9    commercial information.

10        So that's what I would focus Your Honor's

11   attention on with respect to that point.

12        THE COURT:  So not that -- in kind of theoretical

13   terms it's not relevant but it's really just kind of a blip

14   on the scales or lost in the rounding and, therefore,

15   wouldn't be of material value to the plaintiffs in proving

16   whatever it is they would like to prove.

17        MR. SAWYER:  That's correct, Your Honor.

18   Particularly where PacAgri has come forward and has taken

19   these steps to protect its information.

20        I can't speak to what other distributors have

21   done.  It doesn't really matter.  This is what we have done

22   and we're working hard to protect our highly confidential

23   information.  And it is, you know, setting aside theoretical

24   relevance, I don't think there's a showing that it's

25   relevant in the overall massive mix of information that the

1    plaintiffs have been able to acquire and they acknowledge

2    acquiring in their papers.

3              THE COURT:  With regard to the -- with regard to

4    competition your -- as I understand it, some of the

5    defendants are competitors of yours but it sounds like some

6    of the defendants are suppliers of yours as well.  Is that

7    right?

8              MR. SAWYER:  Yeah.  Defendants who are vendors of

9    ours are also competitors of ours.  Because it's not like

10   they sell us products and refrain from selling directly.

11   And we do have situations where, as described in the

12   declaration of Brian Riaparbelli, you know, one of our

13   vendors, we develop a market, the vendor tries to move in

14   and capitalize on that market.

15             THE COURT:  But that is the idea that competitors

16   of litigants -- I mean, that comes up all the time, that's

17   true in most, you know, in most intellectual property

18   litigation, certainly true in antitrust litigation and

19   protective orders have long been crafted to try to deal with

20   that and I do think that this protective order would need to

21   be -- would need to be modified to make sure it dealt with

22   that.

23             But what about Mr. McFarland's argument that -- I

24   mean, essentially if everybody who wasn't a defendant said,

25   well, this is highly confidential information and therefore

1    -- and we're just a small player, you don't need it, what

2    they had left wouldn't be enough to make the case that their

3    expert needs to make.

4           MR. SAWYER:  So, Your Honor, assuming that that

5    statement is correct, I would point out that it does not

6    seem to be the case here.

7           And so here the plaintiffs have acquired a

8    nationwide cross section of transactional data and it seems

9    that many, many companies have handed over transactional

10   data.  So certainly it would -- I would imagine is

11   sufficient for the expert to conduct the regression analysis

12   that plays into the class certification inquiry, which is,

13   you know, are the -- are the overcharges passed through in a

14   way that it lends itself to common proof.

15          The -- you know, PacAgri is not in the same

16   situation as a competitor who comes to court seeking relief

17   against another competitor who invokes the authority of the

18   court for relief pertaining to their intellectual property,

19   for example, in the IP example that Your Honor gave.

20          And we cited to the *Waymo* case from the northern

21   district in which the question was, there is a protective

22   order here, does that warrant forcing this nonparty to

23   produce its confidential information to a competitor, and

24   the Court there determined that the protective order, even

25   though the protective order was in place, production was not

1    warranted, that that nonparty should not be compelled to

2    hand over its highly confidential information to a

3    competitor.

4          So there is -- there is, you know -- there is

5    authority for declining to compel compliance with a subpoena

6    in these circumstances particularly, again, where it's a

7    third-party, it's highly confidential information, a party

8    is a competitor, and there's no showing that this

9    information is going to -- this information, particularly,

10   is going to move the needle on the regression analysis

11   that's underway.

12         THE COURT:  Okay.  All right.

13         Anything else, Mr. Sawyer, before I give Mr.

14   McFarland a chance to respond?

15         MR. SAWYER:  No, Your Honor.  Everything else is

16   laid out in our papers.

17         THE COURT:  All right.

18         MR. SAWYER:  Thank you.

19         THE COURT:  Thank you.

20         So, Mr. McFarland, let's talk about the argument

21   then that other than you're saying, well, more is always

22   more is always better, there isn't anything here that shows

23   us that the little bit more that Mr. Sawyer says his client

24   has to contribute is enough better to be worth putting their

25   highly confidential information at risk.  And, of course,

1      proportionality analysis requires that kind of balancing.

2            So what kind -- what have you shown me about why

3      what they've got is big enough to make a difference?

4            MR. MCFARLAND:  Thank you, Your Honor.

5            You know, to begin with, I'd like to emphasize

6      that it's not just about volume here, it's also about having

7      data from a representative sample of the distributor market.

8      And that's because not all members of the class may make

9      their purchasers from the largest distributors.  A classic

10     example of that would be, you know, a restaurant buying

11     local.

12           So in addition to volume we also want to have data

13     sets from distributors that represent the entire range of

14     distributors in the direct purchaser market.

15           THE COURT:  Okay.  And so what do you already have

16     and what does PacAgri add to that?

17           MR. MCFARLAND:  That's a good question, Your

18     Honor.  Thank you for asking that, Your Honor.

19           I know we have -- I know we have around ten data

20     sets right now.  So, you know, to begin with, when -- we

21     wrote in the brief that we had subpoenaed a nationwide cross

22     section of distributors.  We have by no means, you know,

23     received datasets by every single direct purchaser that we

24     subpoenaed.

25           And I can tell you that we are in a push right now

1   to, you know, to collect all of the datasets that we can

2   because doing so will make the expert's analysis that more

3   robust.  We think it's meaningful.

4            THE COURT:  So is this a situation where there are

5   a lot of small players?

6            MR. MCFARLAND:  If -- let me begin to answer that

7   and let me know if I'm not answering that correctly.

8            You know, in the direct purchaser market, you

9   know, there are two very large distributors, you know, in

10  the market.

11           A lot of commerce flows through big players like

12  US Foods and Sysco.  But there are also, you know, many

13  smaller distributors and, you know, not all are class

14  members purchase -- make their purchases from the largest

15  distributors like US Foods and Sysco.

16           THE COURT:  All right.  All right.

17           Anything else, Mr. McFarland?

18           MR. MCFARLAND:  Not right now.  Thank you, Your

19  Honor.

20           THE COURT:  All right.  And, Mr. Sawyer, anything

21  further?

22           MR. SAWYER:  Only briefly to point out that I

23  think that the response from the plaintiffs in my view

24  consists of argument and I don't think there's been a

25  showing that PacAgri's data will move the needle sufficient

1    to overcome the protection that it's afforded.

2          Other than that I have nothing further, Your

3    Honor.  Thank you.

4          THE COURT:  Okay.  All right.  Let me take a

5    couple of minutes off screen here.  I want to go back

6    through my notes and see if I feel like I'm in a position to

7    actually rule from the bench on this and whether it's going

8    to require some further study.

9          So I'm going to turn off my microphone.  You're

10   welcome to do the same.  Just keep an eye on your screen for

11   when I pop back out again.  I will turn off the recording

12   for a moment.

13          (Recess at 2:15 p.m.)

14          (Reconvene at 2:25 p.m.)

15          THE COURT:  All right.

16          We can back on the record on Docket Number 1024 In

17   Re Pork Antitrust Litigation, the CIIPPs' motion to compel

18   compliance with the subpoena direct to Pacific

19   Agri-Products, Inc.

20          I am going to grant the motion to compel within

21   the following -- kind of within the following parameters.

22          First, I do find that when limited to transactions

23   that involve purchases from the defendants in this case and

24   sales of products made with the pork purchased from the

25   defendants in this case, I do find that that information is

1    relevant.

2          It is -- it may be a relatively small slice but on

3    the other hand a number of small slices can add up to a data

4    collection that does allow for a more robust analysis and

5    can improve both the increased data and more representative

6    data can make a difference there.

7          So I believe that the consumer -- I'm sorry, that

8    the commercial indirects here have demonstrated the

9    relevance of the information they're requesting on both the

10   purchase and the sales side when limited to these

11   defendants.

12         That being said I -- I do agree with PacAgri that

13   the information is highly confidential and I don't believe

14   that the current protective order adequately protects

15   nonparties in the process.

16         Among other things, it doesn't allow for notice to

17   nonparties when their information may be used in

18   depositions.  And that's just by way of example.  There may

19   be other concerns, but the protective order simply wasn't --

20   doesn't appear to have been drafted with nonparties in

21   mind.

22         So notwithstanding that I am ordering that the

23   information be produced, it's that production will not need

24   to be made until there has been a meet and confer between

25   PacAgri's counsel and counsel for the commercial indirects,

1      for starters.

2              Obviously, Mr. McFarland, you or one of your

3      colleagues is then going to have to play point with respect

4      to the other parties in the case because any change to the

5      protective order ultimately will affect how everybody else

6      does business at least with respect to nonparty information.

7      So there may be a bit of herding cats involved in this, but

8      I don't believe that the current protective order goes far

9      enough to protect the interests of nonparties and that's

10     going to need to be addressed.

11             So what I will ask is that you meet and confer,

12     see if between, at least the parties to this motion you can

13     come up with a proposal that addresses PacAgri's concerns,

14     and I'm not saying they get everything they think they need,

15     but I do think a -- I think there's more that can be done

16     and still allow -- and would still be workable within the

17     framework of this case.

18             So see if you can come up with a proposal that the

19     parties to this motion agree gets the job done.  And then,

20     Mr. McFarland, you or one of your colleagues, as I said,

21     will need to run point with one of the parties.

22             What I would like at the end of this, ideally, is

23     a stipulation to amend the protective order that everybody

24     can agree to and that I can simply enter.

25             If not, if there are -- is agreement on a great

 1   deal of it but still some parting of company on some of it,

 2   then what I would suggest is that you submit a proposed

 3   amended protective order, as you have done with some other

 4   things along the way, a proposed amended protective order

 5   that shows me what you agree on and where you disagree with

 6   the competing proposals for those sections.  And if I need

 7   to schedule another hearing to talk that through I can if

 8   you want to submit -- I think to start with it might make

 9   sense to show me the separate proposals and then have the

10   parties accompany that, including the nonparty, PacAgri --

11           MR. SAWYER:  Thank you, Your Honor.

12           THE COURT:  -- accompany that with an appropriate

13   letter brief to address why you disagree with the -- or

14   agree with the proposal being made.

15           I'd like to see all of that -- I know we're

16   dealing with the holidays, let me ask -- well, let me just

17   ask the question, understanding that that's the deliverable

18   I'm looking for, what would you propose by way of a

19   reasonable deadline for getting me that deliverable?

20           Mr. McFarland, you've probably got the heavier

21   lift here because you've got to deal with two different or

22   maybe three different sets of constituents.

23           What seems like a reasonable delivery date?

24           MR. MCFARLAND:  Thank you, Your Honor.

25           This is just actually the one question I did not

```
1    prepare for.  Let's see.
2              THE COURT:  Let me see.  I will suggest something
3    and you can tell me if it seems reasonable.  And obviously,
4    Mr. Sawyer, I'll give you a chance to weigh in as well.  As
5    I say, I do note we have holidays coming up.  I was
6    thinking -- hold on just a moment -- about, well, let me ask
7    whether January 7th seems reasonable.  I would think that's
8    the earliest you could probably put all of this together.
9              So let me toss out January 7th as an idea and get
10   a reaction to it.  Mr. McFarland?
11             MR. MCFARLAND:  That's acceptable to the consumer
12   indirects.
13             THE COURT:  Okay.  And, Mr. Sawyer, that seems
14   like something --
15             MR. SAWYER:  Yes.
16             THE COURT:  -- that you can do, as well?
17             MR. SAWYER:  Yes, Your Honor.  Thank you.
18             THE COURT:  So I'm not going to do a written order
19   on the specific ruling on this motion, it will be reflected
20   in the minute entry and, of course, in the transcript but
21   obviously once we get something we can work with in the way
22   of an amended protected order, that obviously will be in
23   writing on the record.
24             That said, are there any questions about this
25   ruling?
```

1            Mr. McFarland, any questions from you?

2            MR. MCFARLAND:  No questions.  Thank you very

3  much, Your Honor.

4            THE COURT:  Mr. Sawyer, any questions?

5            MR. SAWYER:  No questions.  Thank you, Your Honor.

6            THE COURT:  All right.  Thank you both.

7            So we have a hearing on an IDR involving different

8  sets of litigants here.

9            What I'm going to do is we're going to make that a

10  separate -- we're going to make it a separate hearing and

11  we'll have separate minutes.

12            Mr. Sawyer, you're certainly excused.  Your party

13  is done and we won't be revisiting yet in the next part of

14  the hearing.  So this hearing is adjourned.

15            MR. SAWYER:  Thank you.

16            THE COURT:  I am going to turn off the -- I'm

17  going to stop the recording for this hearing, and then let's

18  take a well, let me ask our court reporter.  Do you need --

19  we have told people we would start at 3:00 and what I don't

20  know is whether we've got everybody we need.

21            So I'm going to stop the recording, go off the

22  record, see who we've got and see whether we need to wait

23  for some other folks to show up.

24            (Hearing is adjourned at 2:34 p.m.)

25                  *          *          *

1

2                            **REPORTER'S CERTIFICATE**

3

4

                      I certify the foregoing pages of typewritten
5     material constitute a full, true and correct transcript of
      my original stenograph notes, as they purport to contain, of
6     the proceedings reported by me at the time and place
      hereinbefore mentioned.

7

8                     /s/Lynne M. Krenz
                      Lynne M. Krenz, RMR, CRR, CRC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25