```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
      -----------------------------------------------------------
3                                    )
      In Re:  Pork Antitrust         )   File No. 18-cv-1776
4     Litigation                     )           (JRT-HB)
                                      )
5                                     )
                                      )   St. Paul, Minnesota
6                                     )   January 31, 2022
                                      )   1:00 p.m.
7                                     )
                                      )
8                                     )
      -----------------------------------------------------------
9
                 BEFORE THE HONORABLE HILDY BOWBEER
10          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

11             (CASE MANAGEMENT CONFERENCE VIA ZOOM)

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
25
```

ERIN D. DROST, RMR-CRR
(651) 848-1227

```
 1        APPEARANCES VIA ZOOM:

 2            For Direct Purchaser Plaintiffs:

 3                    Lockridge, Grindal, Nauen, PLLP
                      BRIAN D. CLARK, ESQ.
 4                    JOSEPH BRUCKNER, ESQ.
                      JOSEPH C. BOURNE, ESQ.
 5                    Suite 2200
                      100 Washington Avenue South
 6                    Minneapolis, Minnesota 55401

 7                    Pearson, Simon & Warshaw, LLP
                      CLIFFORD H. PEARSON, ESQ.
 8                    BOBBY POUYA, ESQ.
                      MICHAEL PEARSON, ESQ.
 9                    15165 Ventura Boulevard
                      Suite 400
10                    Sherman Oaks, California 91403

11        For the Consumer Indirect Purchaser Plaintiffs:

12                    Gustafson Gluek, PLLC
                      DANIEL HEDLUND, ESQ.
13                    JOSHUA J. RISSMAN, ESQ.
                      Suite 2600
14                    120 South Sixth Street
                      Minneapolis, Minnesota 55402
15
                      Hagens, Berman, Sobol, Shapiro
16                    SHANA E. SCARLETT, ESQ.
                      Suite 202
17                    715 Hearst Avenue
                      Berkeley, California 94710
18
                      Hagens, Berman, Sobol, Shapiro, LLP
19                    BREANNA VAN ENGELEN, ESQ.
                      1301 Second Avenue
20                    Suite 2000
                      Seattle, Washington 98101
21
          For the Commercial and Institutional Indirect Purchaser
22        Plaintiffs:

23                    Cuneo, Gilbert & LaDuca, LLP
                      A. BLAINE FINLEY, ESQ.
24                    Suite 2200
                      4725 Wisconsin Avenue NW
25                    Washington, DC 20016
```

**For Winn-Dixie Stores, Inc., and Bi-Lo Holdings, LLC, Direct Action Plaintiffs:**

                Ahern and Associates, P.C.
                PATRICK AHERN, ESQ.
                590 North Sheridan Road
                Lake Forest, Illinois 60045

**For Commonwealth of Puerto Rico Direct Action Plaintiffs:**

                Hausfeld LLP
                KYLE G. BATES, ESQ.
                600 Montgomery Street
                Suite 3200
                San Francisco, California 94111

**For Dollar General Direct Action Plaintiffs:**

                Sperling & Slater, P.C.
                ALBERTO RODRIGUEZ, ESQ.
                55 West Monroe Street
                Suite 3200
                Chicago, Illinois 60603

                Sherrard, Roe, Voigt & Harbison, PLC
                CHRISTINA RAE BURGART LOPEZ, ESQ.
                150 Third Avenue South
                Suite 1100
                Nashville, Tennessee 37201

**For Cheney Brothers Direct Action Plaintiffs:**

                Carlton Fields, P.A.
                KRISTIN A. GORE, ESQ.
                525 Okeechobee Boulevard
                Suite 1200
                West Palm Beach, Florida 33401

**For Kroger Direct Action Plaintiffs:**

                Kenny Nachwalter, P.A.
                SAMUEL J. RANDALL, ESQ.
                MICHAEL PONZOLI, ESQ.
                1441 Brickell Avenue
                Suite 1100
                Miami, Florida 33131

 1      **For Action Meat Direct Action Plaintiffs:**

 2              Kaplan, Fox & Kilsheimer, LLP
                MATTHEW P. MCCAHILL, ESQ.
 3              ROBERT N. KAPLAN, ESQ.
                850 Third Avenue
 4              14th Floor
                New York, New York 10022

 5      **For Sysco Direct Action Plaintiffs:**

 6
                Boies, Schiller, Flexner, LLP
 7              MICHAEL MITCHELL, ESQ.
                SCOTT E. GANT, ESQ.
 8              1401 New York Avenue NW
                Washington, DC 20005

 9      **For Kraft Heinz Direct Action Plaintiffs:**

10
                Ahern and Associates, P.C.
11              PATRICK AHERN, ESQ.
                590 North Sheridan Road
12              Lake Forest, Illinois 60045

13      **For Nestle Direct Action Plaintiffs:**

14              Nexsen Pruet, LLC
                DAVID C. EDDY, ESQ.
15              1230 Main Street
                Suite 700
16              Columbia, South Carolina 29201

17      **For Defendant Triumph Foods:**

18              Husch Blackwell, LLP
                CHRISTOPHER SMITH, ESQ.
19              Suite 200
                13330 California Street
20              Omaha, Nebraska 68154

21              Husch Blackwell, LLP
                JASON HUSGEN, ESQ.
22              190 Carondelet Plaza
                Suite 600
23              St. Louis, Missouri 63105

24

25

```
 1        For Defendant JBS USA:

 2                 Spencer Fane, LLP
                   JESSICA NELSON, ESQ.
 3                 Suite 2500
                   100 South Fifth Street
 4                 Minneapolis, Minnesota 55402

 5                 Quinn, Emanuel, Urquhart & Sullivan, LLP
                   SAMI H. RASHID, ESQ.
 6                 51 Madison Avenue
                   22nd Floor
 7                 New York, New York 10010

 8        For Defendant Smithfield Foods:

 9                 Larkin, Hoffman, Daly & Lindgren
                   JOHN A. COTTER, ESQ.
10                 Suite 1000
                   8300 Norman Center Drive
11                 Minneapolis, Minnesota 55437

12                 Gibson, Dunn & Crutcher
                   BRIAN EDWARD ROBISON, ESQ.
13                 Suite 1100
                   2100 McKinney Avenue
14                 Dallas, Texas 75201

15        For Defendant Tyson Foods:

16                 Axinn, Veltrop & Harkrider, LLP
                   TIFFANY RIDER ROHRBAUGH, ESQ.
17                 950 F Street NW
                   7th Floor
18                 Washington, DC 20004

19                 Axinn, Veltrop & Harkrider, LLP
                   JAROD TAYLOR, ESQ.
20                 90 State House Square
                   Hartford, Connecticut 06103
21
          For Defendant Clemens Food Group:
22
                   Kirkland & Ellis, LLP
23                 MAX SAMELS, ESQ.
                   VANESSA ANNE BARSANTI, ESQ.
24                 300 North LaSalle
                   Chicago, Illinois 60654
25
```

1     **For Defendant Hormel Foods:**

2               Faegre, Drinker, Biddle & Reath, LLP
                CRAIG S. COLEMAN, ESQ.
3               Suite 2200
                90 South Seventh Street
4               Minneapolis, Minnesota 55402

5     **For Defendants Seaboard Foods, LLC, and Seaboard**
      **Corporation:**

6
                Stinson, LLP
7               PETER J. SCHWINGLER, ESQ.
                Suite 2600
8               50 South Sixth Street
                Minneapolis, Minnesota 55402

9
      **For Defendant Agri Stats, Inc.:**

10
                Hogan Lovells U.S., LLP
11              LIAM PHIBBS, ESQ.
                Columbia Square
12              555 Thirteenth Street NW
                Washington, DC 20004

13
      **Court Reporter:**

14
                ERIN D. DROST, RMR-CRR
15              Suite 146
                316 North Robert Street
16              St. Paul, Minnesota 55101

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2              **IN OPEN COURT**

3              **(Via Zoom)**

4          THE COURT:  We are gathered by Zoom for a case

5      management conference -- there's somebody else -- in the In

6      Re: Pork Antitrust Litigation.  This is proceeding under

7      Matter Number 18-cv-1776.

8          Now, I will tell you that because our courthouse

9      is closed, I'm -- because of the trial -- the federal civil

10     rights trial associated with the George Floyd death, I'm

11     working from home, and that means that all of you are

12     crowded on a very small laptop screen.  Once I get

13     appearances, I will do what I can to declutter the screen,

14     but if I don't see somebody, that's why.  In fact, there's

15     so many of you, you're on two laptop screens, but I only

16     have one laptop.

17         In any event, what I want to do first is take --

18     take roll, if you will.  I'm going to work from the list

19     that we got of people who told us by midmorning that you

20     were attending and wanted to have your appearance noted.  If

21     I don't call on you, it's because I didn't hear that you

22     were going to be attending.  But we'll see if we can get

23     everybody listed who wants their appearance noted.

24         Let's start with the class plaintiffs and start

25     among the class plaintiffs with the direct purchaser

```
 1    plaintiffs.  I have Bobby Pouya.

 2              MR. POUYA:  Present, Your Honor.

 3              THE COURT:  Brian Clark.

 4              MR. CLARK:  Good afternoon.

 5              THE COURT:  Clifford Pearson.

 6              MR. CLIFFORD PEARSON:  Good afternoon, Your Honor.

 7              THE COURT:  Joseph Bourne.

 8              MR. BOURNE:  Good afternoon, Your Honor.

 9              THE COURT:  Michael Pearson.

10              MR. MICHAEL PEARSON:  Good afternoon, Your Honor.

11              THE COURT:  Joseph Bruckner.

12              MR. BRUCKNER:  Yes, Your Honor.  Good afternoon.

13              THE COURT:  Now I don't have anyone else, at least

14    on my list, who had identified themselves as wanting to

15    attend and make an appearance for the direct purchaser

16    plaintiffs, but is there anyone else who does?

17              MR. BRUCKNER:  Your Honor, I think you've got the

18    whole list.

19              THE COURT:  All right.  Thank you.

20              Let's go now to the consumer indirect purchaser

21    plaintiffs.  I've got Breanna Van Engelen.

22              MS. VAN ENGELEN:  Good afternoon, Your Honor.

23              THE COURT:  Daniel Hedlund.

24              MR. HEDLUND:  Judge.

25              THE COURT:  Joshua Rissman.
```

1           MR. RISSMAN:  Good afternoon, Your Honor.

2           THE COURT:  And Shana Scarlett.

3           MS. SCARLETT:  Good afternoon, Your Honor.

4           THE COURT:  That's everyone that I knew of who

5      wanted their appearance noted for the consumer indirect

6      purchaser plaintiffs.  Am I missing anyone?

7           No.  All right.

8           Moving on to the commercial and institutional

9      indirect purchaser plaintiffs.  I don't know that I have

10     anybody who told me, at least by the time we put the list

11     together, that you wanted your appearance noted, but I bet

12     you there's somebody out there.  So who's going to take the

13     lead for the commercial and institutional indirect purchaser

14     plaintiffs this afternoon?

15          MR. FINLEY:  Good afternoon, Your Honor.  Blaine

16     Finley of Cuneo, Gilbert & LaDuca on behalf of the

17     commercial and institutional indirect purchaser plaintiffs,

18     and I apologize for not e-mailing with my appearance ahead

19     of time.

20          THE COURT:  Thank you.  I've got you now.  And is

21     there anybody else that you know of who was planning to make

22     an appearance for your group of class members?

23          MR. FINLEY:  I believe not, Your Honor, and I

24     don't see anyone on this call currently.

25          THE COURT:  All right.  That then moves us to the

1    direct action plaintiffs.  First on behalf of the

2    Commonwealth of Puerto Rico, I don't know that I got an

3    e-mail, but I did notice Kyle Bates in the waiting room.

4    Are you on, Mr. Bates?

5                MR. BATES:  I am.  Good morning, Your Honor.

6                THE COURT:  And are you anticipating anyone else

7    appearing on behalf of the Commonwealth of Puerto Rico?

8                MR. BATES:  I am not, Your Honor.  Thank you.

9                THE COURT:  Moving to the Winn-Dixie -- to

10   Winn-Dixie and Bi-Lo Holdings.  Again, I don't think I got

11   an e-mail, but I did notice Patrick Ahern in the waiting

12   room.  Are you on?

13               MR. AHERN:  I'm on, Your Honor.  Thank you.

14               THE COURT:  All right.  And are you expecting

15   anyone else on behalf of Winn-Dixie and Bi-Lo Holdings?

16               MR. AHERN:  I am not.

17               THE COURT:  Moving on to more recent direct action

18   plaintiffs.  There's a group of direct action plaintiffs

19   that is commonly represented with Dollar General.  I -- I

20   believe I understood -- or got an e-mail ahead of time that

21   Alberto Rodriguez would be appearing.  Are you on?

22               MR. RODRIGUEZ:  I am, Your Honor.  Good afternoon.

23               THE COURT:  Good afternoon.  And Christina Rae

24   Burgart Lopez.

25               MS. LOPEZ:  Yes, Your Honor.  Good afternoon.

```
1              THE COURT:  David Germaine?

2              MR. RODRIGUEZ:  Mr. Germaine may not be on,

3     Your Honor.

4              THE COURT:  So we don't have Mr. Germaine at least

5     at this point.  And then I also got an e-mail from Phillip

6     Cramer, although I'm not sure I have seen him having been --

7     you know, kind of made his appearance on CM/ECF, but is he

8     on the hearing this afternoon?

9              MS. LOPEZ:  I don't believe he's joining either.

10             THE COURT:  All right.  Does he intend to enter an

11    appearance?  If not for this afternoon, is he intending to

12    enter an appearance on behalf of the -- of this particular

13    group of direct action plaintiffs on the docket?

14             MS. LOPEZ:  Yes, Your Honor.  And I believe the

15    ECF paperwork just went through, so we'll make sure to get

16    that entered.

17             THE COURT:  Okay.  Very well.  Is there anybody

18    else who wanted an appearance noted for the group of direct

19    action plaintiffs that is commonly represented with Dollar

20    General?

21             All right.  Moving on, there's a group of direct

22    action plaintiffs that's commonly represented with Cheney

23    Brothers.  I don't know that I got an e-mail from any of

24    them, or, if I did, I missed it.  Who'd like to have their

25    appearance noted for the group of Cheney Brothers direct
```

1    action plaintiffs?

2              MS. GORE:  Good afternoon, Your Honor.  Kristin

3    Gore from Carlton Fields.

4              THE COURT:  All right.  And are you expecting

5    anyone else on behalf of that particular group of direct

6    action plaintiffs?

7              MS. GORE:  I do not believe so, Your Honor.

8    That's it.  Thank you.

9              THE COURT:  And we've got a group of direct action

10   plaintiffs that is commonly represented with Kroger.

11   Michael Ponzoli.

12             MR. PONZOLI:  Good afternoon, Your Honor.

13             THE COURT:  Samuel Randall.

14             MR. RANDALL:  Good afternoon, Your Honor.

15             THE COURT:  And William -- is it Blechman?

16             MR. PONZOLI:  Your Honor, I think Mr. Blechman had

17   a conflict that came up late and could not attend.

18             THE COURT:  All right.  Is there anybody else who

19   is appearing this afternoon on behalf of the group of direct

20   action plaintiffs that are represented along with Kroger?

21             MR. PONZOLI:  No, Your Honor.

22             THE COURT:  Next there's a group that is in common

23   representation with Topco.  I've got Matthew McCahill.

24             MR. MCCAHILL:  Yes, Your Honor.  That's Matt

25   McCahill from Kaplan Fox for the Action Meat plaintiffs,

1    Giant Eagle, and UniPro Foodservice, Inc.

2             THE COURT:  And, actually, I'm trying to come up

3    with a -- sort of a moniker for each group of direct action

4    plaintiffs.  Would you rather have this particular group

5    nicknamed by one of those other plaintiffs?

6             MR. MCCAHILL:  Yeah, we typically refer to our

7    group as the Action Meat plaintiffs.

8             THE COURT:  Okay.  I will make that change.  Thank

9    you.  And I believe Robert Kaplan was also going to be

10   attending.  Are you on?

11            MR. KAPLAN:  Yes, I am, Your Honor.  Good

12   afternoon.

13            THE COURT:  And is -- are you expecting anyone

14   else on behalf of the Action Meat direct action plaintiffs?

15            MR. MCCAHILL:  I don't believe so, no, Your Honor,

16   just myself and Mr. Kaplan.

17            THE COURT:  And next we have the Sysco direct

18   action plaintiffs, Sysco Corp. and Armory Investments.  I've

19   got Michael Mitchell.

20            MR. MITCHELL:  Present, Your Honor.

21            THE COURT:  And Scott Gant?

22            MR. GANT:  Yes.  I'm here.  Good afternoon,

23   Your Honor.

24            THE COURT:  Anyone else on behalf of the Sysco

25   direct action plaintiffs?

1              No.  Moving on to the direct action plaintiffs

2     that are commonly represented with Kraft Heinz foods.  I

3     don't think I got an e-mail about any particular attorney

4     who was going to be attending, but is there anyone who wants

5     their appearance noted?

6              MR. AHERN:  Your Honor, Patrick Ahern.  I am also

7     counsel for Kraft Heinz, along with members of the

8     Cadwallader firm.  I don't know if any of them are on right

9     now.

10             THE COURT:  Is there anybody else who wants their

11    appearance noted for -- from the Cadwallader firm or

12    anywhere else for the Kraft Heinz direct action plaintiffs?

13             No.  All right.  So, Mr. Ahern, I have you noted

14    for that.

15             Moving on to the group of direct action plaintiffs

16    that is commonly represented with Nestle.  I have got David

17    Eddy, are you on?

18             MR. EDDY:  Yes, I am, Your Honor.

19             THE COURT:  Is there anyone else who wants their

20    appearance noted for that group of direct action plaintiffs?

21             MR. EDDY:  I don't think there will be anyone

22    else.

23             THE COURT:  All right.  Now we move on to the

24    defendants.  Agri Stats, I've got Liam Phibbs.

25             MR. PHIBBS:  Good afternoon, Your Honor.

```
 1              THE COURT:  Anybody else for Agri Stats?

 2              MR. PHIBBS:  I think this will be it for us,

 3      Your Honor.  Thank you.

 4              THE COURT:  For Clemens Food Group and others in

 5      that family, I've got Max Samels.

 6              MR. SAMELS:  Here, Your Honor.

 7              THE COURT:  And I have got Vanessa Barsanti.

 8              MS. BARSANTI:  Good afternoon, Your Honor.

 9              THE COURT:  Anybody else for the Clemens

10      defendants?

11              Moving on to Hormel, I've got Craig Coleman.

12              MR. COLEMAN:  Yes, Your Honor.  Present.

13              THE COURT:  Anyone else for Hormel?

14              MR. COLEMAN:  No, Your Honor.

15              THE COURT:  JBS USA -- it looks like one was --

16      well, let's just say JBS.  One was terminated, but the JBS

17      defendant or defendants, Jessica Nelson.

18              MS. NELSON:  Good afternoon, Your Honor.

19              THE COURT:  Sami Rashid.

20              MR. RASHID:  Good afternoon, Your Honor.

21              THE COURT:  Anybody else on behalf of JBS?

22              MS. NELSON:  No, Your Honor.

23              THE COURT:  Seaboard Foods, I've got Peter

24      Schwingler.

25              MR. SCHWINGLER:  Good afternoon, Your Honor.
```

```
 1                THE COURT:  Anybody else for Seaboard?
 2                MR. SCHWINGLER:  No.  Just me.  Thank you.
 3                THE COURT:  Smithfield Foods, I have Brian
 4     Robison.
 5                MR. ROBISON:  Yes, Your Honor.  Good afternoon.
 6                THE COURT:  And John Cotter.
 7                MR. COTTER:  Good afternoon, Your Honor.
 8                THE COURT:  Anyone else for Smithfield?
 9                MR. COTTER:  No, Your Honor.
10                THE COURT:  All right.  Triumph Foods, Christopher
11     Smith.
12                MR. SMITH:  Good afternoon, Your Honor.
13                THE COURT:  Jason -- is it Husgen or Husgen?
14                MR. HUSGEN:  Husgen.  Good afternoon.
15                THE COURT:  Husgen.  And now I know you're on.
16     Anybody else for Triumph Foods?
17                Moving on to Tyson, Jarod Taylor.
18                MR. TAYLOR:  Good afternoon, Your Honor.
19                THE COURT:  And Tiffany Rider Rohrbaugh.
20                MS. ROHRBAUGH:  Good afternoon, Your Honor.
21                THE COURT:  Anyone else for Tyson?
22                MS. ROHRBAUGH:  No, Your Honor.
23                THE COURT:  All right.  Then I will assume that
24     I've got everybody who wants their appearance noted.  And,
25     again, to the extent that in connection with future hearings
```

1    or case management conferences you can let my chambers know

2    by 10:00 of the specific names who are going to be

3    attending.  Everybody did a pretty good job here, but just

4    remember to do that.  It makes a huge difference not only

5    for me, but it also makes a difference for the court

6    reporter.  And we want to make things easy for the court

7    reporter.

8         All right.  So we've got an agenda for the

9    conference today.  Are there any late, but, nevertheless,

10   met and conferred about additions to the agenda, or are the

11   parties satisfied with the agenda items as they were

12   submitted in Docket Number 1122 on January 17th?  You don't

13   need to signal your assent.  Just let me -- just speak up if

14   there is something new that you're proposing be added.

15        Hearing nothing, we'll go with that agenda.  And

16   the first item on the agenda was to -- for the parties to be

17   heard on the proposed case management order in the MDL DAP

18   cases, the direct action purchaser -- or direct action

19   plaintiff cases.  So let me set that aside and move to that

20   proposed scheduling order.

21        There were enough items -- as you could probably

22   tell from the fact I didn't enter a scheduling order, there

23   were enough items with enough implications for the

24   scheduling order as a whole that I thought it made sense to

25   just hear what you all had to say.  But I have a working

1    draft going and should be able to get it entered today or

2    tomorrow after having heard from you about the open items.

3            So let me first, with all due respect to everybody

4    who's here, I'm going to try to rid my screen of everyone

5    who isn't actually going to be speaking to this.  So if you

6    are not going to be speaking on this issue, I'm going to ask

7    you to block video, and then I'm going to hide non-video

8    participants so that I can focus on those of you who are

9    going to address these issues.

10           And let me find out first, who is going to be

11   speaking for this -- on these issues for the direct action

12   plaintiffs?

13           MR. MITCHELL:  Your Honor, this is Mike Mitchell,

14   and I will be addressing these issues on behalf of the MDL

15   DAPs.

16           THE COURT:  All right.  And, Mr. Pouya, I assume

17   that you are going to be speaking to it to the extent that

18   there are comments or concerns on behalf of the class

19   plaintiffs; is that right?

20           MR. POUYA:  I believe that may be Mr. Bourne, but

21   if it's not, I'm happy to address it.

22           THE COURT:  Oh, okay.  I don't see Mr. Bourne on,

23   and I do see you, so that's why I was jumping to that

24   conclusion.

25           MR. POUYA:  We'll go with that then.

1           THE COURT:  All right.  Either is fine.  Just want

2      to know who I should be looking for.

3           And then, let's see here, I've got Mr. Ahern, and

4      you may be addressing this for Winn-Dixie, I assume, and

5      possibly also for the Kraft Heinz direct action plaintiffs;

6      is that right?

7           MR. AHERN:  Yes, Your Honor, but mostly to just

8      put into context what had happened with the Winn-Dixie DAPs

9      previous to this, because that has been invoked in some

10     sense, and just to -- if Your Honor needs me to address any

11     of that.  If not, I will be happy to have Mr. Mitchell speak

12     for the Kraft Heinz as an MDL DAP.

13          THE COURT:  All right.  And then who will be

14     addressing this on behalf of the defendants?

15          MR. TAYLOR:  Jarod Taylor, Your Honor.

16          THE COURT:  All right.  And I see -- I see a box

17     with Brian Robison's name, but the camera is blocked.  So

18     I'm assuming he doesn't intend to speak up.  If somebody is

19     hearing something that they feel they do want to address,

20     then you can signal me to that effect by turning your camera

21     back on, and then I will find out what you wanted to

22     contribute to the conversation.

23          So I've got the -- what I've got in front of me is

24     a -- well, I had a Word version that you all had previously

25     submitted of the proposed case management order that you had

1    submitted to Judge Tunheim back in August.  You submitted a

2    variation on that in December.  I don't know that I ever got

3    a Word version of that.  But what I did is take the Word

4    version of what you had sent to Judge Tunheim in August, I

5    modified it to take into account your version submitted in

6    December, and, along the way, I may have some questions for

7    you about things that you took out between August and

8    December to find out if you meant to take them out or if

9    there's some reason they should not be included.

10             And I also understand that the principal concerns

11   or the principal disputes have to do with the deadline for

12   amended pleadings, with the limits -- proposed limits on

13   interrogatories and requests for admissions, with the limit

14   on depositions, and with whether there ought to be something

15   said about discovery limits applicable or some condition

16   precedent that ought to happen if there are new direct

17   action plaintiff cases who enter the -- this litigation

18   after some particular point, whether it's after today or

19   after January 10th or after some other designated date.

20             So those are the four disputes that I saw teed up

21   in the joint statement, and which I understood that the

22   parties wanted to have -- and at least the plaintiffs

23   indicated they wanted to have argument -- actual oral

24   argument on today.  Anything I've misunderstood about that

25   so far?

1          MR. MITCHELL:  I don't believe so, Your Honor.

2     This is Mike Mitchell.  I believe you've accurately

3     summarized what has been somewhat of a long and tortured

4     history in getting this proposal before you.

5          THE COURT:  All right.

6          MR. TAYLOR:  Your Honor, if I may?

7          THE COURT:  Yes, Mr. Taylor.

8          MR. TAYLOR:  I apologize.  I don't mean to

9     interrupt, but the other issue in dispute was whether the

10    MDL DAPs should file a consolidated complaint.

11         THE COURT:  I'm sorry.  That was -- I had sort of

12    in -- that was part of the same section, but you are right,

13    it is a different subject from deadlines.  And you are

14    absolutely right.  That is in there as well.

15         MR. TAYLOR:  Okay.  Perfect, Your Honor.  Thank

16    you.

17         THE COURT:  All right.  So let's start with the

18    issues around amended complaints.  And I guess I'm inclined

19    to start with the issue of the -- of whether there ought to

20    be a consolidated complaint, and then go from there -- a

21    consolidated amended complaint, and then go from there to

22    the deadline.

23         So I've read the parties' submissions on this.  I

24    think I understand the issues pretty clearly, but I am

25    interested in hearing any elaboration that either side may

1     want to add to what was in your written submission.

2              So, Mr. Mitchell, since you are arguing for the

3     direct action plaintiffs, let me hear from you about why the

4     direct action plaintiffs believe that a single consolidated

5     complaint is not where you want to go with this?

6              MR. MITCHELL:  Sure.  Thank you, Your Honor.  I

7     think that our written submissions on this point articulate

8     well the reasons why we think this is a bad idea.  But, in

9     short, we think that there are, first, a number of good

10    reasons not to do it, and I think, second, I don't think the

11    defendants have identified any good reason to do it.

12             So, first -- and I think these are set forth in

13    our papers, but I think there is one update that I think is

14    worth mentioning to the Court.  So the good reasons why not

15    to do -- or why there should not be a consolidated amended

16    complaint in this case is, first and foremost, that this is

17    an MDL proceeding in which each of the direct action

18    plaintiffs are separate entities and after pretrial

19    proceedings will have their complaints remanded back to the

20    courts in which they were originally filed.  So for that

21    reason, we believe it is important that each of our own

22    complaints remain that way since that is what will happen at

23    the end of pretrial proceedings in this MDL.

24             This is not a class action, as we state in our

25    papers, where a consolidated amended complaint is routine

1    because the various plaintiffs in that case -- in class

2    actions all represent or seek to represent the same class.

3    That is not the case with respect to the direct action

4    plaintiffs.

5              I think the other point that bears emphasizing is

6    the experience of many of the same parties in this

7    litigation in the *Broiler Chicken* litigation, where the

8    Courts did require a consolidated amended complaint be

9    filed, which I think -- and there may well be others,

10   including my colleague Scott Gant, who could add additional

11   color on this point -- has not at all lessened the burden on

12   the parties in that case, has, in fact, raised a whole host

13   of additional issues and complications, which, to this day,

14   remain unresolved.  Most significantly, whether such

15   consolidated amended complaint is simply there for

16   administrative convenience or whether it has some

17   substantive effect on the claims that are being pursued by

18   the direct action plaintiffs.  So, in short, I think it has

19   complicated matters there significantly, and drawing upon

20   that experience, we here likewise believe that that is not

21   the way to go -- not the way to go in this case.

22             THE COURT:  Let me just ask you a couple of

23   questions about the points you have made so far.  I mean,

24   one of the things defendants point out about *Broiler Chicken*

25   is that by the time the Court decided to require a

1    consolidated amended complaint, it was far along in the

2    case, a lot of plaintiffs had already filed complaints, and

3    the defendants suggest that's, to some extent, why -- if it

4    was -- if it turned into a tortured exercise, that it was

5    because of the point in the litigation in which it occurred.

6    And I would think that might also then explain why the --

7    trying to understand why it was in it for administrative

8    purposes or substantive purposes may also have been a bit

9    ambiguous.  So does the *Broiler Chicken* experience really

10   tell us much here given that we're significantly earlier in

11   the history of the and the number of direct action

12   plaintiffs?

13              MR. MITCHELL:  Your Honor, I see my colleague

14   Scott Gant has taken himself off mute.  I think given that

15   he has been deeply involved in those issues in *Broiler*

16   *Chicken*, I think he'd like to address that if you'd allow

17   it.

18              THE COURT:  I'd be fine hearing from him.

19   Mr. Gant, are you on audio only or are you on video as well?

20              MR. GANT:  I am on audio only because my laptop

21   camera is broken, Your Honor, and I have been unable to get

22   it repaired by the office, so I apologize.  May I proceed by

23   audio only to answer your questions?

24              THE COURT:  You absolutely may, but -- and the

25   record will reflect it's Mr. Gant who is speaking.  Just

1     speak slowly because it's probably another potential layer

2     of difficulty for the court reporter.  So speak slowly,

3     please.

4               MR. GANT:  I will, Your Honor.  Thank you.  And

5     just to add one other additional piece of information, I

6     also serve as the liaison counsel for the direct action

7     plaintiffs in the *Broiler Chicken* litigation.  So not only

8     have I represented clients in that case for almost four

9     years now but have served in the role of liaison counsel for

10    almost as long.  So I am knee-deep in the experience of that

11    case.

12              There are -- the short answer to your question,

13    Your Honor, is I don't think that actually fully explains

14    the difference.  And one thing that is important to keep in

15    mind about any of these comparisons to the *Broiler Chicken*

16    litigation is, although it has a lot of features of the

17    multidistrict litigation, it is not an MDL.  In fact, many

18    observers and sometimes even parties seem to forget that

19    fact.

20              Everyone who has filed a case there in Chicago is

21    staying there for the duration.  Here, however, very

22    intentionally -- we learned a lot of lessons from the

23    *Broiler Chicken* litigation and a lot of unintended

24    complications or problems that arose from the fact that it

25    is not an MDL, and it's for that reason, you may recall

1    Your Honor, that our group, our clients, along with the

2    lawyers from Carlton Fields for their clients, were the ones

3    who sought an MDL in this case very intentionally.

4            And as my colleague, Mr. Mitchell, points out,

5    unlike in *Broiler Chicken* where everyone is staying there,

6    here, at the end of pretrial proceedings, people will go

7    back to their own court.  So, for example, Your Honor, Sysco

8    filed its case in Texas in federal court.  And assuming,

9    hopefully, we will survive summary judgment, and then go

10   back there for trial as will the dozen or dozens of other

11   cases here.

12           And if we do go back, if we're forced to

13   consolidate a pleading over our objections, we will then

14   have to figure out what is the operative pleading for each

15   of the constituent direct action plaintiffs and then have to

16   file new complaints, presumably, that conform to our own

17   views when we go back.

18           So if we have -- are actually getting anything on

19   the front end from consolidation, the Court should -- and I

20   have doubts about that, which I'd be happy to address -- on

21   the back end, we're going to have new problems because we'll

22   have to create new complaints to take apart a consolidated

23   pleading.

24           But, in fact, in *Broilers*, there remains to this

25   day uncertainty about whether the pleading the Court

1    compelled the direct action plaintiffs to file together is

2    administrative or substantive.  The briefing on that issue

3    still hasn't been ruled on by the Court.  And we're just

4    carrying on.  The Court gave us an opportunity to file a

5    second amended complaint, which we'll be doing on

6    February 14th.

7            And just for some perspective, Your Honor, that

8    pleading will probably be approximately 500 pages.  So what,

9    in part, it ends up doing is just putting the individual

10   allegations and claims of different DAPs into a single piece

11   of paper.  It has not, I think, provided clarity about the

12   pleading in the case, and I don't think has materially

13   advantaged the defendants in terms of the burden of

14   responding.

15           The claim that I've heard both in this case and in

16   *Broilers* from the defendants is we just don't want to have

17   to file answers in responses to all the complaints.  I leave

18   it to the Court to decide whether or not the rules require

19   answers, notwithstanding what the administrative

20   conveniences may be.

21           But what's particularly imperative from my

22   perspective is that each plaintiff -- each direct action

23   plaintiff have affirmative -- defenses and affirmative

24   defenses from each defendant to its own allegations, because

25   the defenses and affirmative defenses may differ by direct

1    action plaintiff.  And each direct action plaintiff is

2    entitled at an early stage of the case to know what those

3    are so that it can conform its strategy in discovery to

4    address those.  And that is critically important, and I

5    think all direct action plaintiffs will share that

6    perspective.

7              Whether or not there's some kind of administrative

8    maneuver to defer other aspects of the answers to later in

9    the case, which may result in some minimizing of the burden

10   on defendants, I think at least our clients, Mr. Mitchell

11   and I, are open to that.  But it's imperative that we get

12   answers and affirmative defenses that are specific to our

13   own case, and we don't think that we should have to combine

14   our allegations with separately-filed cases into one

15   document.  We don't think that the rules actually provide

16   for that.  But there's no real savings.  And as I said,

17   we're going to be paying on the back end as well.

18             And then there's the question of whether it's

19   administrative or substantive, which still remains

20   unresolved in the *Broiler* case.  And if it's just

21   administrative, then, you know, there's a question about

22   what it actually means and how useful it is.  And if it's

23   substantive, then that raises its own problems.

24             THE COURT:  All right.  Thank you, Mr. Gant.

25             Mr. Mitchell, was there anything more you wanted

1      to say on this before I give Mr. Taylor his say?

2                      MR. MITCHELL:  No.  That is it, Your Honor.  Thank

3      you.

4                      THE COURT:  All right.  Mr. Taylor -- and you are

5      welcome to bring another lawyer in if you'd like to as

6      well -- but do you want to comment?

7                      MR. TAYLOR:  I'll start at least, Your Honor.

8      Yes, if I may, thank you.  So, first of all, just to clarify

9      what we're seeking, we are seeking a consolidated complaint

10     that would be the sole legally operative complaint but for

11     each MDL direct action plaintiff in its own individual

12     direct action.  This complaint would not legally merge the

13     actions.  Each action would still maintain separate

14     existence and could be remanded for trial after the pretrial

15     proceedings, but what the complaint would do is simplify the

16     administration of this case for the Court and reduce

17     unnecessary expense for the parties or at least certainly

18     for defendants.

19                     Defendants believe there are a myriad of reasons

20     to consolidate and no strong reason not to consolidate.  MDL

21     DAPs have raised the specter of some problems but I believe

22     haven't explained why there would actually be those -- those

23     problems would actually arise.  So let me go through in more

24     detail.

25                     First, with respect to assistance to the Court

1    with administration of the case, if the complaints aren't

2    consolidated, eventually, even under MDL DAPs' offer to

3    postpone answering most of the complaints, the docket will

4    be inundated with answers that defendants will have to spend

5    an unnecessary amount of time carefully and painstakingly

6    drafting.

7          There are now 24, I believe, at last count,

8    separate complaints with eight defendants.  If I did my math

9    right -- I got help from my 10-year-old on this one --

10   that's 192 answers.  JBS has settled with some DAPs, so that

11   192 answers isn't exact, but it's a ballpark.  There are

12   also 40 opt-outs from the JBS class settlement that have not

13   yet filed, and there are two current DAPs who did not opt

14   out from the JBS settlements, so we really don't know how

15   many more DAPs could enter and exactly how large this case

16   will balloon to, but it took a long time to call roll this

17   morning, and it's not an insignificant number.

18         In addition, there are other filings before then,

19   however, that will impact the docket as well and create

20   unnecessary complexity without a consolidated complaint.

21   For example, defendants will likely file partial motions to

22   dismiss the complaints to limit the damages period.  Based

23   on the statute of limitations and -- defendants would prefer

24   to fight -- to brief one motion and to have one opposition,

25   which we believe will be most efficient for the Court and

1    the parties.  And, similarly, a little ways down the road,

2    multiple complaints create the potential for multiple

3    motions for summary judgment against what are essentially

4    identical claims, or, at the very least, very unwieldy

5    appendicis setting out the multiple similar or identical

6    allegations asserted in each complaint.

7              The Court --

8              THE COURT:  Let me just ask a question,

9    Mr. Taylor.

10             MR. TAYLOR:  Of course.

11             THE COURT:  Is there any reason why those

12   particular concerns -- motions to dismiss, motions for

13   summary judgment, that sort of thing -- is there any reason

14   why those issues can't be addressed on their -- as they come

15   up?  In other words, it's not at all unheard of, and we've

16   done it in this and other cases, where the Court will order

17   the parties to collaborate on a joint motion for summary

18   judgment or a joint opposition, and then to file

19   supplemental briefs to the extent there are individualized

20   issues.  So I don't know that that -- we can do that.  We

21   can handle that.  I don't know why that necessarily drives a

22   decision about whether there will be a consolidated amended

23   complaint.

24             MR. TAYLOR:  I think it would be -- we would

25   certainly try, Your Honor, with or without direction from

1    the Court, I believe.  I think it would be simpler to limit

2    the necessity for supplemental briefs and to avoid potential

3    sandbagging from an allegation or a paragraph that might

4    appear in one complaint but not the others that didn't get

5    picked up in the consolidated motion to dismiss.  Defendants

6    acknowledge that, you know, parties do their best to try to

7    condense things and not give too much paper to the Court.  I

8    agree we might not need an actual completely separate motion

9    to dismiss that is, you know, identical in at least sections

10   against each complaint, but even the administration of those

11   motions, it would be simpler if there were one complaint

12   that all the parties and the Court could work from.

13               But to the next --

14               THE COURT:  So --

15               MR. TAYLOR:  Sure.  Go ahead.

16               THE COURT:  So it sounds like one of the things

17   you're proposing would be easier -- and we'll just talk

18   about motions to dismiss -- is if there -- if you are

19   supposed to answer individual complaints, is the idea that

20   you would also then be filing individual motions to dismiss,

21   and does that mean the Court might be seeing 20 motions to

22   dismiss rather than a single motion to dismiss a

23   consolidated amended complaint?  I mean, is that -- is that

24   the question you're raising?

25               MR. TAYLOR:  I don't -- I don't think that's the

1    question we're raising, Your Honor.  We would -- we would

2    need to file eight answers to a single consolidated

3    complaint, but I think there would still be consolidation of

4    the motion to dismiss.

5                 THE COURT:  Okay.

6                 MR. TAYLOR:  Because I think allegations to which

7    motions to dismiss would be directed, I think, are against

8    all defendants and not likely to be defendant-specific.

9                 THE COURT:  All right.  And I assume,

10   Mr. Mitchell -- and I'll certainly give you a chance to move

11   to your next point, Mr. Taylor -- but just as a check-in

12   question, Mr. Mitchell, the -- in opposing the idea of a

13   consolidated amended complaint, plaintiffs are not -- the

14   direct action plaintiffs are not saying that -- that

15   defendants would not only need to file separate answers to

16   each complaint but would also need to file separate motions

17   to dismiss as to each complaint?

18                 MR. MITCHELL:  That's correct, Your Honor.  We are

19   not saying that.

20                 THE COURT:  Okay.  Okay.  All right.  Please,

21   Mr. Taylor, go ahead.

22                 MR. TAYLOR:  Sure.  And just to elaborate on that

23   one once more with one more point before I move on,

24   Your Honor.  One thing, even if we had consolidated

25   briefing, that could be avoided with a consolidated

1      complaint is the lengthy footnote addressing all of the

2      relevant paragraphs from all of the different complaints.

3      And maybe that can be worked out.  Sometimes -- sometimes

4      it's difficult to work that out and simplify that process.

5      I think part of the issue is we know we can simplify things

6      on the front end, and it's hard to see exactly what

7      complications can arise later and the complexities that can

8      arise if we don't have consolidation.  And we are dealing

9      with 24-plus separate complaints throughout the pretrial

10     life of this case.

11             But separate from -- and my final point on this

12     item is, you know, I think we should remember that the order

13     to consolidate in the *Broilers* case was sua sponte.  I don't

14     want to put thoughts or words in the judge's mouth or head,

15     but it appeared to us that the judge had kind of had enough,

16     and, you know, we would like to avoid that here.  But there

17     is, of course -- defendants are focused.  We are

18     self-interested here, happy to admit.

19             It is unnecessarily burdensome to go through the

20     dozens or even hundred-plus pages of separate complaints

21     again and again to make answers.  And you might think, well,

22     if they are so similar, you know, it shouldn't be that

23     burdensome.  But the problem is an answer is, of course, an

24     impactful, meaningful document that no defendant can take

25     lightly.  We can be bound by what we put in there.  So to

1    some extent, you know, I don't want to say we're starting

2    over, but we have to -- we have to look at each allegation

3    and each different complaint separately, individually, one

4    by one with attorneys' eyes on each.  It is not something

5    that can be handled haphazardly.

6            And I think having all of those multiple answers

7    is something procedurally that has to be done.  It's

8    time-consuming and expensive, but, frankly, I don't think it

9    materially advances the ball for the case or any party to

10   have all of those answers sitting out there.  And if we were

11   to -- if defendants were to answer and provide -- and

12   provide affirmative defenses to a consolidated complaint, I

13   think it is relatively simple to specify to which DAPs any

14   affirmative defense applies.  That's a very simple list

15   after each affirmative defense.  I really don't think that

16   would be a problem.

17           Turning to MDL DAPs' reasons not to consolidate,

18   consolidated complaints, as was half acknowledged, I think,

19   by my colleague Mr. Mitchell, are a regular feature of

20   complex antitrust litigation.  To the extent they are not

21   regular features with respect to non-class actions or direct

22   action plaintiffs, that might be because before the *Broilers*

23   case, I don't think it was that routine for so many early

24   individual actions to file on top of a class action, but

25   that happened in that case, and the Court saw fit to order

1    consolidation on its own, and so it might become routine.

2         With respect to the MDL and remand point, I don't

3    believe MDL DAPs have actually cited to a case in which

4    remand was in any way impeded by consolidation.  There

5    certainly are cases that specify that cases will be remanded

6    back to their individual districts.  We did cite to at least

7    one MDL DAP case in our joint statement.  And there's just

8    no reason to believe why a consolidated complaint would

9    impede remand.  No Court that defendants are aware of has

10   been unable to remand, nor has an individual plaintiff been

11   surprised by some inadvertent waiver.  Even in a non-MDL

12   situation like *Broilers*, the individual direct action

13   plaintiffs are still entitled to try their case separately,

14   so they will have to be separated at the end for trial even

15   if in the northern district instead of another district.  So

16   I don't think that point is well taken.

17        THE COURT:  Let me ask this, I think -- I can't

18   remember if it was Mr. Mitchell or Mr. Gant made the point

19   that when the consolidated complaint -- amended complaint

20   was filed in *Broiler Chicken*, it was voluminous, to say the

21   least.  Was it that much -- and I guess my impression was it

22   was that much more voluminous than any of the individual

23   complaints had been leading up to it because of the need to

24   capture everything that everybody was saying, which doesn't,

25   to me, sound like an improvement on the status quo.  Can

1    you -- are you able to comment on that, Mr. Taylor?  How

2    did what ended up getting filed compare with the individual

3    complaints that had been filed previously?

4            MR. TAYLOR:  So, you know, two points, I think,

5    Your Honor.  One is defendants nevertheless would rather do

6    this one-and-done rather than do this seriatim.  There

7    certainly were some savings, some identical allegations.  I

8    don't think that can be denied.  But the *Broilers* case

9    became more varied than the *Pork* case is.

10           Without getting too deep into the weeds, there

11   were certain subsets of defendants that were what are known

12   as Georgia Dock defendants where alleged manipulation of a

13   pricing index was also alleged in addition to mere supply

14   reduction.  There were also other particularized allegations

15   of misconduct with respect to certain defendants that did

16   not apply to others.  It -- and there were also, I believe,

17   a greater number of differing claims, such as RICO claims,

18   by certain plaintiffs and not others.  So that is part of

19   the complexity there that we do not anticipate at least at

20   this point in the *Pork* case.

21           Nevertheless, even with that complexity, again,

22   better to go through that process one time rather than --

23   you know, all of those allegations would nevertheless have

24   been in the case simply in separate complaints.  It wasn't

25   on top of all the other complaints that all the parties

1     still had to do with.  There was one consolidated complaint,

2     as the name indicates, that everyone could refer to for all

3     purposes, which defendants did find both convenient and too,

4     in this case, where it is before we have answered, we would

5     find savings from having just the one answer.

6              THE COURT:  All right.

7              MR. KAPLAN:  Your Honor, it's Robert Kaplan for

8     the Action Meat plaintiffs.  May I add one point here,

9     please?

10             THE COURT:  Yes, Mr. Kaplan.

11             MR. KAPLAN:  Yeah, manageability.  If we had done

12    what the defendants wanted last August, we now have another

13    group of DAPs that have just been transferred in by the MDL,

14    would we have to now do another consolidated complaint?  I

15    believe another case has been filed, which will probably be

16    transferred here.  Would we have to then do another

17    consolidated complaint?  So this is a moving target.  As

18    more DAPs come in, we'd have to keep doing it, changing it,

19    so I don't -- you know, there's a manageability issue here

20    also.

21             THE COURT:  But isn't -- although I realize that

22    this scenario is somewhat unusual for antitrust cases,

23    hasn't it pretty routinely been the case in big product

24    liability MDLs that there will be a master complaint of a

25    short form complaint and a short form answer and the parties

1    sort of adopt (video and audio distortion) of the forms --

2    oops, hold on one moment.

3         I'm going to check with the court reporter.  Are

4    you hearing me okay?

5         THE COURT REPORTER:  Yeah, but you just froze up

6    just one second there.

7         THE COURT:  I did because my (video and audio

8    distortion).

9         THE COURT REPORTER:  Oh, now you're frozen again.

10        THE COURT:  Looks like we're freezing.

11        Okay.  Hold on a moment.  I just need to

12   reconnect.

13        THE COURT REPORTER:  And while we're waiting for

14   her to do that, the people that are on the phone, can you

15   make sure you are on mute, because some people are bumping

16   in and interrupting?

17        THE COURT:  Okay.  All right.  I think that should

18   be fine going forward.  Thank you for your patience.

19        So there are MDLs, particularly in the product

20   liability field, where despite the fact that they are all

21   going to go back to their respective states for trial, the

22   Court has -- has implemented a process that involves a

23   master complaint and to try to -- to try to have some

24   consistency to the pleadings.  So, Mr. Mitchell, or

25   whichever of you would like to address this, why doesn't

40

1    that make sense here?

2              MR. GANT:  Your Honor, it's Scott Gant.  If I may?

3              THE COURT:  All right.  Yes.  Thank you.

4              MR. GANT:  So I have a few points, but let me

5    start with the question you asked, Your Honor.  And just

6    for -- what we did in *Broilers*, after -- over our objections

7    filing a -- a consolidated pleading, is that the practice

8    has been to file a short form joinder.  But that does not,

9    necessarily, resolve Mr. Kaplan's question.  Because that

10   has been done not by order but by convention.  And there

11   would be nothing to stop a new direct action plaintiff in

12   the *Broiler* case to have filed their own complaint, which

13   may have differed in its take on the allegations, and then

14   we would have been presented with precisely the question

15   that Mr. Kaplan raises which has been a concern all along in

16   that case, which is, what do you do when there's an

17   amendment?

18             But we also raise -- if I could provide some

19   additional factual information, you honed in on a

20   particularly important and salient point from the *Broiler*

21   experience.  As I mentioned, the pleading was voluminous.  I

22   just looked.  And the consolidated -- amended -- we amended

23   the consolidated pleading once.  And I just pulled it up.

24   It was 401 pages before the signature blocks.  As I

25   mentioned, we are filing a new amended complaint in *Broilers*

1    on February 14th.  The current draft of that is

2    approximately 500 pages, and I can tell you from having gone

3    through this process now with the original consolidated

4    pleading and now two more amendments, each time it takes

5    hundreds of hours of direct action plaintiff attorney time

6    to put these together.

7           What the defendant -- the defendants are asking

8    the Court to undertake this measure to relieve them of

9    largely what they call administrative burdens of having to

10   answer individual complaints, but what they are really doing

11   is shifting the burden substantially from them to us.  And

12   that's not the structure of Rule 15, I submit.  Under the

13   rules, the plaintiffs file their complaints and then

14   defendants answer.  We have attempted to make constructive

15   practical suggestions consistent with Rule 15 to alleviate

16   some of the burdens on the defendants.  We proposed they

17   only answer one of the complaints as an exemplar, and I

18   think we gave them a specific complaint.  I think we

19   proposed the Sysco complaint, but I may be wrong at that.  I

20   said, Just answer one complaint in full as an exemplar and

21   then give each DAP its own answers and affirmative defenses

22   to the extent they differ.

23           And, of course, and oftentimes in my experience,

24   defendants forget that Rule 15 also obligates, to the extent

25   that they assert defenses, that they assert the factual

1    defenses.  So Mr. Taylor suggested, Oh, we'll just put a

2    list of affirmative defenses and say every DAP that applies

3    to.  I'm not sure that would satisfy Rule 15, because you

4    actually have to specify the factual basis and it may differ

5    for a particular DAP.  So, for example, if you have a

6    contract-based defense, you have to say what the contract

7    is.  It's not -- the same contract that applies to Sysco

8    doesn't apply to Cheney Brothers.

9          So we believe we're entitled to affirmative

10   defenses and affirmative defenses that actually satisfy the

11   rules, and we're entitled to those soon and in response to

12   one complaint as an exemplar, and then we're willing to

13   defer the rest of it until later, which should resolve most

14   of the administrative burden that the defendants are seeking

15   relief from.  And they are seeking relief from it by putting

16   an enormous burden on the plaintiffs.

17         They also assume, I think, incorrectly, that

18   there's going to be unanimity from the direct action

19   plaintiffs on every point.  And part of what took so long

20   about doing this in *Broilers* is there are differences of

21   views.  That's why the direct action plaintiffs have each

22   necessarily decided to file their own cases.  They want to

23   control their own destinies, they want to have their own

24   counsel, and they want to articulate their theory of the

25   case in their own ways.  There may be substantial overlap to

1     be sure, but there are also differences.

2          Mr. Taylor brought up the question of the statute

3     of limitations.  The DAP complaints are not unanimous in how

4     they are approaching that issue.  We had some arguments that

5     differed from people that filed after us.  And what are

6     we -- so all we're doing then is having to spend an enormous

7     amount of time caucusing and then putting in a complaint

8     things that may be different from one another or

9     contradictory to one another.  So this is an enormous shift

10    of work from them to us.  We were proposing to do everything

11    reasonably possible to alleviate them of unnecessary work

12    while allowing us to understand their defenses and then

13    litigate the case.

14          THE COURT:  We need to move on to a different

15    topic.  I will tell you where I am leaning, but this is

16    something I'm going to want to consult with Judge Tunheim

17    about, not only because he is the District Judge on this

18    case, but also because he is the chief judge in the district

19    and, therefore, may have some views on administrative

20    burdens and convenience and that sort of thing.

21          But I will tell you I am leaning against the

22    consolidated complaint.  I am -- I am probably -- after

23    consulting with Judge Tunheim, but if he does not disagree

24    with me, I am inclined not to adopt the consolidated

25    complaint approach.

1           I do have one question for either Mr. Mitchell or

2     Mr. Gant.  When you talk about, in your proposal, about the

3     defendants providing their -- not needing to answer every

4     complaint, but answering one exemplar complaint, and then

5     providing their defenses to each direct action plaintiff,

6     was that in -- what form had you imagined that would take?

7     Is that something that defendants would file?  Is that

8     something that defendants would serve?  Would it be part of

9     the initial disclosures?  What was the form that you had

10    contemplated for that disclosure by defendants?

11          MR. GANT:  Your Honor, this is Mr. Gant.  I'm not

12    sure we had gotten to the point of discussing the logistics

13    with the defendants, but it's certainly my view that the --

14    both the exemplar and the answers -- excuse me -- defenses

15    and affirmative defenses to specific DAP complaints should

16    be filed.  That that's the best practice.  But we're open to

17    any other suggestions from the Court or from the defendants

18    about the logistics of that.  But I do think that it's

19    important that those documents be filed, and I think that's

20    consistent with the letter and the spirit of Rule 15.

21          THE COURT:  Okay.  And the -- but the exemplar

22    answer or the answer to the exemplar complaint, that -- that

23    would -- you would view that as a real answer, not just a --

24    not just a sample answer?  But that would stand as the

25    defendants' answer to that particular complaint, and if they

1    wanted to amend it at some point, they would need to move to

2    amend the answer; is that right?

3          MR. GANT:  That's my view, Your Honor.

4    Admittedly, I don't think we've discussed that at length

5    within the group, so I hope I'm not out over my skis, but I

6    think that is right, Your Honor.

7          THE COURT:  Okay.  Okay.  All right.  So as I say,

8    I've told you where I'm leaning on this, and I'm leaning

9    pretty hard, although, Judge Tunheim, he weighs more than I

10   do.  He can push me back over the fence on the other side.

11   But I do think -- given my leaning, I do think it would make

12   sense for you all to talk about and see if you can reach

13   agreement on the logistics of that answer to an exemplar

14   complaint and the provision of defenses to the complaints

15   which aren't being answered yet, because it would work a lot

16   better if you crafted language that made practical sense to

17   you as opposed to me crafting language that might not

18   reflect the realities that you're dealing with.

19          So I'm going to direct you all to meet and confer

20   on that issue along a parallel path with my conversation

21   with Judge Tunheim.  And could you get me something by the

22   end of the week?  Understanding that it's not defendants

23   waiving any arguments they have got on the subject, but if

24   you could get me something by the end of the week that

25   captures the language that you believe ought to go into the

1    scheduling order, assuming that I reject the consolidated

2    amended complaint proposal.  All right.  Mr. Mitchell, that

3    work for you?

4            MR. MITCHELL:  We will do that, Your Honor.  Thank

5    you.

6            THE COURT:  Okay.  Mr. Taylor, for you as well?

7            MR. TAYLOR:  Sure.  We can do that, Your Honor.

8            THE COURT:  All right.  Thank you.

9            Let's move on to the issue of the deadline.  And I

10   heard -- I heard about some of this, I think, in prior

11   discussions, certainly read the letters.  I will tell you,

12   again, where I -- let me start by telling you where I'm

13   leaning and then let you respond to that.  Where I'm leaning

14   is to give the MDL direct action plaintiffs until the end of

15   April to file amended complaints but not to adopt their

16   language -- or to file a motion to amend the complaint, not

17   just -- you know, not just file as a matter of right, but a

18   motion to amend the complaint, but to -- I lost my train of

19   thought -- but to not adopt the language that said "or a

20   certain number of days before the conclusion of fact

21   discovery, whichever is -- whichever is later."  Now, it may

22   be -- and I didn't count -- I didn't count months -- that

23   the end of April is that many days from the conclusion

24   you've proposed for fact discovery, but I don't want that --

25   I don't want that sliding.  I want a date by which amended

1    complaints -- or motions to amend the complaints must be

2    filed.

3              Now, let me check first about that assumption,

4    because the plaintiffs' proposed language talked in one

5    sentence about amended complaints must be filed by, and then

6    in the next paragraph talked about motions to amend the

7    complaint.  So I'm assuming we're talking motions unless you

8    can amend as of right under the rules, but maybe I

9    misunderstood what you were asking for.  Mr. Mitchell.

10             MR. MITCHELL:  Yes, Your Honor.  I think, first,

11   let me respond to what you're proposing.  I think that that

12   makes sense to us.  I think when this -- when our proposal

13   was originally made back in August, obviously a lot of time

14   has transpired since then, and, you know, we are many months

15   later now and also many months later closer to the end of

16   fact discovery.  So omitting the language at the end,

17   the "or four months before the end of fact discovery,

18   whichever is later," I think is acceptable to us given where

19   we are now.

20             I think with respect to what we are proposing, I

21   believe that we had contemplated that we would be able to

22   file an amended complaint as of right by April 30th, 2022,

23   informed by the discovery that we had taken up to that

24   point.  I think -- and what we were -- what we were also

25   particularly trying to avoid is having to -- if we are

1     required to file a motion for leave to amend under Rule 15

2     before that date, what we do not believe is appropriate is

3     to also require us to have to satisfy Rule 16, the burden --

4     the standard for amending the scheduling order.  So if it is

5     that we are required to move to amend under Rule 15 in order

6     to amend the complaint by April 30th, then we would also ask

7     and it be made clear that we do not also have to satisfy

8     Rule 16 to do that.

9             THE COURT:  I mean, if -- it depends on what piece

10    of Rule 16 we're talking about.  I mean, but if the deadline

11    is April 30th for filing a motion to amend the complaint,

12    then, by definition, it's prior to the deadline set by the

13    scheduling order, and, therefore, you don't need to move to

14    amend the scheduling order in order to move to amend the

15    complaint.  A motion filed after that would require a motion

16    to amend the scheduling order, and, for example, you would

17    need to show good cause why something that you diligently

18    sought but did not get in time to inform your amended

19    complaint is good cause for moving to amend after the

20    deadline.  But I don't see how amending the scheduling order

21    would be an issue if you had -- if you filed your motion to

22    amend before April 30th.

23            The -- the main difference is that if the

24    defendant or defendants implicated by the proposed amended

25    complaint want to oppose it on grounds of futility, then

1    there's obviously a difference between getting to file your

2    amended complaint as a matter of right and then defendants

3    file their motion to dismiss if they so choose, or if you

4    move to amend the complaint and the defendants decide that

5    they are either going to agree -- you would have, of course,

6    done your meet and confer -- or if they are going to oppose,

7    and if they are going to oppose, are they opposing on

8    grounds of futility?  Essentially kind of jumping to the

9    12(b)(6) analysis at that point.

10          There are -- you know, I can imagine reasons that

11   would go either way, but in the ordinary course, a

12   scheduling order would set a deadline for filing a motion to

13   amend as opposed to a deadline just to, you know, file your

14   amended complaint.

15          I think the other reason it's important to be

16   clear here is that if we don't go the consolidated complaint

17   route and defendants are allowed to not answer the

18   complaints along the way, then that -- I don't want there to

19   be sort of a -- an endless opportunity left open by the fact

20   that a responsive pleading hasn't yet been filed.  And I

21   have not tried to figure out how that would interplay with

22   the rules, but I could see the potential for the sort of

23   continuing open season to file a -- an amended complaint

24   within X days after a responsive pleading has been filed.

25   And I -- I want to cut that off.

1           So, Mr. Taylor, any -- any comments or thoughts on

2     this one way or the other?

3           MR. TAYLOR:  No, Your Honor.  I don't think so.

4     But we do appreciate Your Honor's attention to clarity about

5     the implication of the deadline and exactly what it will be

6     and making sure there's not an open season for iterative

7     complaints.  But I think, you know, Your Honor read our

8     papers and we appreciate your consideration.

9           THE COURT:  All right.

10          MR. GANT:  Your Honor, this is Scott Gant.  May I

11    make one observation about the concern about open season for

12    amendment?

13          THE COURT:  Yes, Mr. Gant.

14          MR. GANT:  If you -- first of all, Your Honor, I

15    apologize.  When I was talking about answering defenses and

16    affirmative defenses, I meant to refer to Rule 12's

17    obligations and not Rule 15, I misspoke, which may have

18    confused you, but I apologize about that.  But if Your Honor

19    is taking us up on our suggestion that the defenses and

20    affirmative defenses to a complaint need to be filed, it

21    seems to me that would serve the same role as the filing of

22    a full answer for purposes of determining whether amendment

23    is permitted or not, wouldn't it?

24          THE COURT:  Potentially, but it's -- it's sort of

25    a new -- a new type of beast, and so I think bottom line we

1    just need to be clear about what it is and what it means for

2    purposes of the rule.  So I do think that's something that

3    ought to be a part of your meet and confer, you know.

4              MR. GANT:  Agreed, Your Honor, and I think -- and

5    we will not attempt to game play or exploit, but -- so we

6    will --

7              THE COURT:  And -- yeah, and I didn't think you

8    would, but I -- at all.  But I -- but to the extent we can

9    be clear now, then people know what to expect down the line.

10   All right.

11             MR. GANT:  Thank you, Your Honor.

12             THE COURT:  Let's move on, then, to -- I think

13   we've done as much as we can do on amended complaints.  And

14   I suppose theoretically there could be amended answers as

15   well.  By that I don't mean answers to amended complaints

16   but truly amended answers, and so you probably ought to

17   think as well about how we're going to treat this -- how

18   we're going to treat the document which will stand in place

19   of an answer until the defendant is required to serve a full

20   answer to any given complaint and how will that be treated

21   for purposes of motions to amend the answers.

22             All right.  Let's move on then.  Okay.  I'm just

23   moving in order to the things that are in your proposed case

24   management schedule.  Let me...

25             All right.  I did have one question at the very

1    beginning, just so I'm clear.  The -- you had in your -- in

2    the order you had originally filed, you had some

3    introductory language (inaudible due to audio distortion)

4    along the way.  But in your December version of the order,

5    some of that was deleted.  Was that deliberate or were you

6    just trying to hone in on where -- kind of what the guts

7    were, where the disputes were?  Mr. Mitchell?

8                MR. MITCHELL:  Sure.  If I can answer that.  So

9    the -- I would say in going back to the very beginning of

10   this conference when you were asking some questions about,

11   you know, what changed between the August and December

12   submission, I think what we were trying to do there was in

13   light of the consolidation order from Judge Tunheim which

14   said that the -- the -- all of the existing orders shall

15   apply to the MDL direct action cases, we tried to eliminate

16   as much of that language in our August proposed order that

17   was merely duplicative of something that is going to apply

18   to us by default.  So we stripped it -- we stripped the

19   proposed order down to only those issues as you said where

20   there's a live dispute, or at least tried to do it.

21               THE COURT:  Or something that needs to be

22   addressed, yeah.

23               MR. MITCHELL:  Correct.  Yes, Your Honor.

24               THE COURT:  Okay.  Okay.  Got it.

25               Mr. Taylor, do you have a different perspective on

1      that?

2              MR. TAYLOR:  No, Your Honor.  That's defendants'

3      understanding as well.

4              THE COURT:  All right.  All right.  Well, I

5      will -- I will do another compare and contrast before I

6      finalize and make sure I take that into account.

7              All right.  Let's move then to the provisions on

8      discovery.  And the first in order in which they appear in

9      the case management order or proposed case management order,

10     it looks like the issue of interrogatories comes up first.

11     I had one definitional question before we get into the guts

12     of the parties' dispute, and that is the term "MDL DAP

13     family" appears here, and I didn't know if that term is

14     defined somewhere?  You might all think you know what it

15     means.  But do we need a definition here for the avoidance

16     of doubt?

17             MR. MITCHELL:  I think we had -- I think there is

18     a common understanding.  As that term -- I know that that

19     term "family" appears in some of the preexisting orders, and

20     if we did not include a definition of that in here, I think

21     that was probably an oversight.  And so if it would be

22     helpful to provide that, I think -- I think we can do that,

23     and I'm fairly confident that we and the defendants can come

24     to some agreement about what that means.  But, you know,

25     we're -- to the extent there are multiple corporate entities

1    that really should be treated as one, then we would -- you

2    know, we would have them treated as one, whether we're

3    responding or propounding discovery.

4         THE COURT:  I think it would be -- number one, I

5    agree with the premise.  Number two, I think it would be

6    helpful to actually have a -- to have a definition, or, if

7    there's a definition in another document that's already on

8    the docket, something that says we're incorporating by

9    reference this -- this definition, just so there isn't any

10   question down the line, because, at the moment, it's not a

11   defined term in this particular document.

12        All right.  Let's turn to interrogatories then and

13   let me hear -- Mr. Taylor, let me hear first from you about

14   the defendants' perspective on limits on interrogatories.

15        MR. TAYLOR:  Thank you, Your Honor.  So, you know,

16   big picture, the MDL DAPs are seeking both to curtail the

17   discovery that they have to provide while at the same time

18   expanding the scope of discovery to which they are entitled.

19   MDL DAPs are seeking to quadruple the amount of

20   interrogatories that they would otherwise be allotted under

21   the pretrial scheduling order and to double the amount of

22   requests for admission.  And unlike depositions,

23   interrogatories have a way of getting used -- used up

24   whenever they are on the table.  It's much easier to write

25   an interrogatory than to answer one.

1              When the pretrial scheduling order was entered,

2      both the provisions on depositions and on interrogatories

3      and requests for admission applied by its terms to direct

4      action plaintiffs, not to Winn-Dixie and Bi-Lo and Cheney

5      Brothers, but to direct action plaintiffs.  And when it was

6      entered, there were already three direct action plaintiffs

7      in the case, and we knew at that time that more were likely

8      on the way.  So defendants do not see the justification for

9      upsetting the bargains that were struck in the pretrial

10     scheduling order.  Happily, I believe it was entered on

11     stipulation as a result of negotiations, and that involved

12     give and take, and defendants feel like DAPs' proposal

13     somewhat pulls the rug out from under them and is a one-way

14     ratchet, more from defendants, less to defendants, without

15     good justification.

16             If there is actually some need down the road for

17     interrogatories for information that MDL DAPs could not get

18     from the five otherwise allotted to them, in addition to the

19     25 allotted to plaintiffs collectively, let them come back

20     to defendants and, if necessary, to the Court if and when a

21     concrete need arises, rather than, again, putting those on

22     the table now where they will surely be taken advantage of

23     later, real need or not.

24             THE COURT:  And this is even though what they are

25     proposing is that the MDL DAPs would jointly serve 20, not

1      that each DAP or each DAP family, but that altogether, they

2      would get to serve another 20 on each defendant family;

3      right?

4              MR. TAYLOR:  Correct, Your Honor, because that was

5      the understanding when the pretrial scheduling order was

6      entered also.  There was a collective five for direct action

7      plaintiffs collectively in addition to the 25 from all

8      plaintiffs collectively on each defendant family.

9              THE COURT:  Okay.  All right.

10             Mr. Mitchell, let me hear from you.

11             MR. MITCHELL:  Sure.  So with respect -- first,

12     very quickly, with respect to interrogatories and RFAs,

13     interrogatories in particular.  As you know, I'm sure, under

14     Rule 33, each party typically has 25 interrogatories that it

15     may serve on each other party.  So we are talking -- the DAP

16     proposal here is a significant limitation on what the rules

17     provide.  Now, I understand, obviously, Mr. Taylor's

18     position about the existing order, but we think that having

19     the DAPs collectively -- and, by the way, with respect to

20     both the discovery limits on interrogatories and RFAs and on

21     depositions, which we'll get to in a moment, those were

22     deals struck, obviously, between the direct action

23     plaintiffs Winn-Dixie and Bi-Lo Holdings who are not part of

24     the MDL but struck those agreements without the

25     participation of any of the MDL DAPs.  We could not and did

1    not have any opportunity to participate in those

2    negotiations.  So holding us to those limits we think is

3    unfair, inappropriate.

4         But we don't think that collectively permitting

5    the MDL DAPs to have 20 interrogatories is unreasonable

6    given our own cases.  Certainly, we will not abuse the

7    process.  We are also obligated under the existing order to

8    confer with all other plaintiffs to ensure that any written

9    discovery we propound is not duplicative of other discovery.

10   So we will do and are obligated to do our best to coordinate

11   with the other plaintiffs so as not to propound unreasonable

12   or duplicative discovery.

13        So I will pause there before I turn to the

14   deposition issue.  I'm not sure if you wanted me to address

15   that now, but that's one the DAPs feel quite strongly about,

16   and so I would address it next but wanted to pause here for

17   a second.

18        THE COURT:  No, I was going to deal with

19   interrogatories and request for admissions and don't intend

20   to skip over depositions.  I was just taking things up as

21   they appear in the proposed order.  I think you may have

22   briefed them in slightly different order in your joint

23   submission.  Okay.

24        So let's turn just to -- to the request for

25   admissions then.  I understand the -- I understand the

1    parties' positions and -- on each with regard to the

2    interrogatories and I think requests for admissions.

3          Let me -- let me ask this, Mr. Taylor, on requests

4    for admissions, to what extent does defendants' proposal

5    account for the concern that requests for admission could be

6    highly individualized, in other words, in terms of there

7    could be requests for admissions that are uniquely about the

8    relationship between a particular direct action plaintiff

9    family and that -- and the defendant family, and that those

10   wouldn't be taken account of in the collective wisdom, if

11   you will.  How does your -- how does your proposal address

12   that?

13         MR. TAYLOR:  Sometimes there are, Your Honor, but

14   there are also requests for admission, of course, that

15   absolutely can be dealt with jointly, requesting admissions

16   of certain allegations in the complaint, for example.  I

17   think the response to that is defendants are always willing

18   to meet and confer in good faith.  If there are -- you know,

19   first, I think 75 allows -- is a large number that already

20   allows for MDL DAP-specific issues.  To the extent there are

21   requests that might be -- the answers to which might be MDL

22   DAP-specific, such as, you know, with respect to

23   jurisdiction or lack of an arbitrability defense, just

24   throwing things out there, again, that would be allowed

25   within the collective response even though each answer would

1    be individual.  To the extent certain MDL DAPs have

2    individualized issues, they can carve those up among the 75.

3    But if it's truly impossible and there's a good reason, you

4    know, defendants -- it's not going to be in our interests to

5    look unnecessarily obstreperous before Your Honor and brief

6    something that you are going to order us to do anyway.  So

7    we are always open to meet and confer and that's always a

8    possibility.

9         THE COURT:  Does anybody know how many of the 75

10   requests for admission have already been served in the

11   preexisting litigation?

12        MR. TAYLOR:  I don't believe any have been,

13   Your Honor, but if they would have been, it would have been

14   from class counsel and they -- someone could correct me.

15   But off the top of my head, I don't believe we have requests

16   for admission yet.

17        THE COURT:  Mr. Clark.  Oops.  You were there and

18   then you weren't.

19        MR. CLARK:  That's correct.  I don't recall that

20   we've served RFAs yet to date.

21        THE COURT:  All right.  All right.  Mr. Mitchell,

22   anything further on RFAs?

23        MR. MITCHELL:  No, Your Honor.

24        THE COURT:  Okay.  All right.  So now let's talk

25   about depositions, and I will move to that part of the -- or

1    move back to that part of the briefing.  I'll now move back

2    to that part.  So, Mr. Mitchell, you said that this is of

3    particular concern to the -- not that anything else isn't of

4    particular concern, but that it sounded like this one has

5    extra emphasis for you all.  So tell me about why this is

6    particularly troubling.

7                MR. MITCHELL:  Well, thank you, Your Honor.  I

8    think -- the issue is very straightforward.  I think it's

9    just a question of how many depositions of each MDL DAP the

10   defendants will be permitted to have, and the only argument

11   that the defendants make is that the MDL DAPs should be

12   stuck with what Winn-Dixie and Bi-Lo Holdings -- prior to

13   any of the MDL DAPs filing their cases and the MDL being

14   created -- that we should be stuck with that number, which

15   is five 30(b)(1) depositions and one 30(b)(6) deposition.

16               So for -- under the defendants' proposal, what

17   we're talking about is -- and there are around -- there are

18   currently around 60 DAPs -- 360 depositions, which we think

19   is beyond the pale.  In contrast, as I said, we don't think

20   we should be stuck with something we had no opportunity to

21   negotiate.

22               We have proposed two depositions per DAP, one

23   30(b)(1) and one 30(b)(6).  In our experience in the

24   *Broilers Chicken* litigation, that is more than sufficient

25   for the defendants to seek and get the discovery that they

1    need from the DAPs.  To the extent that they -- defendants

2    in that case felt like they needed additional depositions,

3    my understanding is that those issues were able to be worked

4    out.  I have every confidence that we would be able to do

5    that here.  But to out of the gate require the DAPs to sit

6    for potentially six depositions, we think is unreasonable.

7              THE COURT:  Mr. Taylor, tell me why at this

8    juncture you and -- you anticipate you're likely to need as

9    many as five 30(b)(1) and one 30(b)(6) depositions?  In

10   other words, what -- as you're thinking through the course

11   of discovery, what leads you to believe that you will need

12   this many depositions of each MDL DAP family?

13             MR. TAYLOR:  We actually agree with the MDL DAPs,

14   Your Honor, that we will likely not need that many

15   depositions in the pretrial phase for each MDL DAP.  What we

16   want instead is the ability to take that for the MDL DAPs

17   for which we do need that many depositions, and there will

18   likely be some.

19             Stepping back to first principles a moment, as MDL

20   DAPs are fond of reminding the Court and the defendants,

21   they brought their cases individually.  Many of them are

22   likely seeking hundreds of millions of dollars in damages

23   before trebling.  They knew when they brought those cases

24   individually that the federal rules provide for ten

25   depositions, not six.  Defendants are not seeking ten.  But

1      we are seeking the ability, where necessary, for a little

2      symmetry in terms of the record the parties are able to

3      build.

4            Moving to particulars, again, it is absolutely

5      right that in the *Broilers* case, which shares some counsel

6      with defendants' counsel here, we did not take even the

7      allotted two deposition for each MDL DAP.  Instead, we look

8      at the documents we have, the personnel at issue, how much

9      those issues overlap in single personnel, and make decisions

10     on that basis, and we will absolutely do the same here.

11            We do not expect to take 360 depositions, but to

12     take an example, MDL DAPs' definition of pork is very broad.

13     The relevant time period is lengthy.  And to take DAP Topco

14     for an example, defendants recently agreed to 22 document

15     custodians for Topco while reserving our right to request

16     more depending on what the documents look like.  In addition

17     to multiple purchasers at different levels of the

18     organization like most MDL DAPs -- or at least many of them

19     are likely to have, Topco also employs agricultural

20     economists and commodity analysts, various kinds of market

21     analysts that defendants will likely want to depose to

22     substantiate the market factors that affected supply of hogs

23     and/or pork throughout the relevant time period.  That's

24     just one example.

25            Given the number of DAPs here, as we've discussed

1    earlier, we are likely to benefit from -- and what you need

2    and what you don't need is always a judgment call, and the

3    rules struck that balance at ten as reasonable.  And at a

4    case of this magnitude, defending five, plus a potential

5    30(b)(6), is proportional given MDL DAPs' demand.

6             But we won't know exactly how many we need from

7    exactly which MDL DAP until we see their documents, until we

8    have some interrogatory responses, but what we don't want to

9    do is be stuck with one fact witness, plus a corporate

10   representative, and be at MDL DAPs' mercy with respect to

11   meet and confers and have to come to the Court each time we

12   think we need more than they do.  Five is the balance

13   struck, and MDL DAPs has said a few times today that it's

14   not fair for them to be held to the balances struck by prior

15   DAPs.  Of course, they are now in the process of striking

16   bargains for later MDL DAPs.  That's just the way these

17   cases go, and all parties expressly applied the provisions

18   and limitations in the pretrial scheduling order to direct

19   action plaintiffs as a class, not as any -- you know, the

20   three direct action plaintiffs in the case at that time.  So

21   for defendants, at least, that was our expectation.

22            THE COURT:  All right.  Anything further,

23   Mr. Mitchell?  Or, Mr. Ahern, you came on screen.  Was there

24   something you wanted to make sure I heard by context as one

25   of the early DAPs in the case?

1          MR. AHERN:  Yes, Your Honor -- thank you very much

2     -- as my clients' names have been taken in vain here or been

3     invoked.  So, Your Honor, obviously at the time that this --

4     the deposition limit was negotiated, we were the lone

5     private company DAP, and we didn't feel that, given the

6     desire for the parties and the Court to have a fruitful

7     negotiation, that we could throw a roadblock into that being

8     a lone DAP.  We certainly did not have any kind of critical

9     mass at that time unlike now.

10          And, of course, as Your Honor knows, we're seeing

11     this play out not only in this case, but we're likely to see

12     it play out in the *Beef* case.  And just it's one of those

13     things that just has to be sort of dealt with.  And, now,

14     with respect to the number, you know, I would have a hard

15     time coming up with five people for them to be able to

16     depose because of attrition at least in the retail grocery

17     industry, at least with my clients, and so that was

18     something that also came into our thinking on this.

19          But I guess it's my view, Your Honor, and the

20     final point is there's no way we could bind the MDL direct

21     action plaintiffs in what it was that we agreed to.  That

22     would just, you know, be unfair.  So I guess, Your Honor,

23     it's -- in my view, it's the idea of, well, if, you know,

24     the amount of work will expand to fill the space, and I

25     think the better cause of action is to limit it more and

1    then let the parties meet and confer.  I think that they

2    have -- that has worked out in *Broiler Chicken*, I think,

3    fairly well.  And so obviously even though we're -- even

4    though we will abide by what we agreed to, I think that

5    somewhere between a two- or a three-deposition limit, which

6    is really what we're going to be talking about with you on

7    Wednesday in *Beef*, will be -- will be something that is more

8    appropriate.

9               THE COURT:  All right.

10              MR. MCCAHILL:  Your Honor, I'm sorry.  Can I just

11   weigh in?  This is Matt McCahill from Kaplan Fox, and I

12   represent, along with my co-counsel, Topco, which is the

13   entity that Mr. Taylor was referring to.  In the *Broiler*

14   *Chicken* case where Topco agreed to a similar number of

15   custodians -- a similarly large number of custodians, they

16   have only taken one 30(b)(1) deposition.  They had planned,

17   but then withdrew, a 30(b)(6) notice.  So I guess my point

18   is the fact that there's a significant number of custodians

19   for a particular plaintiff doesn't necessarily mean that the

20   defendants are going to be keen to depose more than they

21   feel is necessary, so I just wanted to speak up for my -- on

22   behalf of my client.

23              THE COURT:  All right.  Ms. Gore, were you wanting

24   to weigh in?

25              MS. GORE:  Yes, Your Honor.  On behalf of Cheney

1   Brothers, I believe the defendants noted Cheney Brothers as

2   one of the plaintiffs who were present during the

3   negotiations that occurred when Winn-Dixie and Bi-Lo were a

4   part of the negotiations.  Just to clarify, Your Honor,

5   Cheney Brothers was not involved in those negotiations

6   during -- during that time.  I just wanted to make that

7   clear.

8            THE COURT:  All right.  All right.  Thank you.

9   The record will reflect that.

10           Okay.  All right.  I -- I'm leaning more toward

11  defendants' position on this, maybe not going with the five

12  plus one.  It might be four plus one or something like that,

13  but I am hearing that -- even from Mr. McCahill that the

14  defendants have done as Mr. Taylor indicated they have done,

15  which is not to use them just because they are there, and --

16  but to be able to use them if -- if they seem necessary

17  without having to come back to the Court to ask for more.

18  So I think I'm leaning in that direction, but I will give

19  that a bit more thought before I nail something -- before I

20  nail something down.

21           Let me think if there was anything else on -- oh,

22  for clarity, that includes non-party depositions noticed by

23  a -- by a defendant as well, or is there a separate --

24           UNIDENTIFIED SPEAKER:  Yep.

25           THE COURT:  Okay.  Who was that?  Just for the

1  record, who was that that chimed in yep?

2      UNIDENTIFIED SPEAKER: (Inaudible).

3      THE COURT:  I'm sorry.  I didn't hear.

4      MR. MITCHELL:  I think that may have been an

5  inadvertent failure to mute.  I could be wrong.

6      THE COURT:  Oh, all right.  So, Mr. Taylor, is --

7  am I correct in my understanding that that limit includes

8  non-party depositions and not just -- or is that just

9  depositions of -- by the defendants of the direct action

10  plaintiffs?

11      MR. TAYLOR:  Correct, Your Honor.  It is

12  depositions of a direct action plaintiff family.

13      THE COURT:  Is there at least at this point a

14  limit under discussion for a party's ability or a party

15  family's ability to notice up non-party depositions?  Is

16  there some aggregate limit or is that unlimited at least as

17  far as this order is concerned?

18      MR. TAYLOR:  So far, Your Honor, both under the

19  pretrialing scheduling order and under the MDL DAPs' and

20  defendants' proposed case management order, there is no

21  limit on third-party notices.

22      THE COURT:  Okay.

23      MR. TAYLOR:  Neither party has squawked so far in

24  the course of noticing those.

25      THE COURT:  All right.  And I certainly don't

1      intend to engender a dispute where there is none, but I just

2      wanted to be clear.  Okay.

3              MR. GANT:  Your Honor, this is Scott Gant.  May I

4      just follow up on that point?

5              THE COURT:  Yes, sir.

6              MR. GANT:  It's been my understanding that what

7      all the parties have been proposing vis-a-vis the deposition

8      limit is that whatever limit you decide to set, that it will

9      apply to both current and former employees.  And the former

10     employees are technically third parties under the rules; but

11     for purposes of the limits here, as they have been, for

12     example, in the *Broiler Chicken* case, they are treated for

13     counting deposition limits as if they are part of the

14     defendant -- excuse me -- as part of the family of the

15     noticed party, and I --

16             THE COURT:  Understood.

17             MR. GANT:  -- I don't understand Mr. Taylor to say

18     something different, but I just want to make sure we're not

19     misunderstanding them or you with respect to this, so

20     I'll -- go on.

21             THE COURT:  That's a good clarification.  I didn't

22     note that the proposed language in the scheduling order, as

23     I recall, was talking about current and former employees,

24     but that's definitely something that needs to be clarified.

25     Mr. Taylor, do you disagree?

1          MR. TAYLOR:  No, I do not, Your Honor, with one --

2    with one caveat.  The wording under the pretrial scheduling

3    order is "Percipient witnesses shall include corporate

4    plaintiffs' current employees as well as former employees

5    where the corporate plaintiff makes the witness available

6    for deposition."  So where their interests are essentially

7    aligned, defendants would agree, but only that far.

8          THE COURT:  Okay.  And, Mr. Gant, do you take

9    issue with that additional clarification?

10          MR. GANT:  Well, I can't take issue with what's

11   written there.  Frankly, I didn't remember that.  I can

12   think of a situation in *Broilers*, which I know Mr. Taylor is

13   familiar with, where there was a former employee, for

14   example, of Sysco who was currently employed by a defendant

15   and his deposition was taken and the parties agreed that

16   that was counted as a Sysco deposition even though he had

17   his own counsel and did not cooperate with Sysco.  I

18   personally don't think that we should treat that as a

19   non-Sysco deposition.  If the deposition is supposed to be

20   about the person's experience while employed by Sysco, I

21   would think that that should be counted even though the

22   person isn't quote, unquote, made available.  And I'm not

23   sure what "made available" means anyway because you can't

24   compel a former employee to appear.  They have to do it

25   voluntarily even if it's pursuant to some kind of separation

1   agreement, so I'm not exactly sure what that language means.

2   But that's my caveat to the language or my interpretation of

3   the language.  And if you'd like, Your Honor, we could work

4   on a proposed alternative language that more closely

5   reflects to include the situation I'm describing.

6          THE COURT:  Well, certainly if you are not on the

7   same page about how these depositions are going to be

8   counted, it would be a good thing to get on the same page

9   about that, whatever the number is.  In terms -- in terms of

10  "making available," my understanding of that -- just sort of

11  my practical understanding of that has always been if the

12  company said, Look, they are a former employee, but, no, you

13  don't have to subpoena them, we will make them available,

14  that's making them available.  If the company is saying,

15  I've got no control over them, I -- you know, I'm not going

16  to even try to ask them to come in, you are going to have to

17  subpoena them, then that's different.  Now, whether you want

18  to include both of those in the category of, quote, former

19  employees is perhaps something you want to see if you are on

20  the same page about or not.

21         MR. GANT:  We will confer on that, Your Honor.

22  And I don't want to -- you have been very generous with your

23  time, and I don't want to prolong the argument, but I did

24  have a few quick points on the number.  I understand and

25  respect your provisional view about the number, but if you

1    want to be here 60 more seconds, based on our experience in

2    *Broilers*, I'd welcome it, but obviously I know we've been

3    going long, so...

4           THE COURT:  Okay.  I will give you 60 more

5    seconds, but I -- my law clerk, and I'm noticing as well,

6    that there's still somebody on the telephone who is not

7    muting.  And don't make me come look for you, because my

8    reaction to looking for you when I find you may be to just

9    cut you out of the Zoom meeting, so please double-check your

10   phones and make sure that you are -- that you are muted.

11          All right.  Okay.  60 more seconds, Mr. Gant, that

12   was you?

13          MR. GANT:  Yes.  Thank you, Your Honor.  Just as a

14   reminder, in *Broilers* the order provided for depositions

15   between one and two direct action plaintiffs, and that

16   worked well.  I believe there were only two direct action

17   plaintiffs with respect to which there was not agreement

18   worked out.  So that system worked extremely well.  Direct

19   action plaintiffs, of course, want to have some

20   predictability or certainty, and I would respectfully

21   suggest that compromising on something like three or four

22   rather than six is appropriate.  It would be double the

23   number in *Broilers* and much more closer to what the

24   defendants are proposing with respect to interrogatories.

25   So if you compare the ratio of what's permitted under the

1    rules if it were an individual case, here, in the

2    interrogatory and the deposition issue, they are being much

3    more ambitious -- they are asking much more of us in

4    depositions than they are willing to give in

5    interrogatories, so I would expect something more

6    commensurate along their lines of three or four.  Thank you,

7    Your Honor.

8              THE COURT:  All right.  Thank you, Mr. Gant.

9              Let's move on then.  I think the last question is

10   discovery limits applicable to future DAP cases.  Here's --

11   here's what I'm thinking -- and I'm concerned our poor class

12   counsel are wondering if they'll ever get a chance to weigh

13   in in this particular conference.  So here's what I'm

14   thinking.  I'm -- I'm not comfortable with a -- with

15   defendants' proposal as -- as is, just saying you cannot

16   serve this discovery if you don't get an order finding

17   there's good cause.  But I do think that it might make sense

18   to have some requirement that before a new DAP comes in,

19   there needs to be -- they need to review the discovery

20   that's already been taken.  They need to meet and confer

21   with the defendants about what additional discovery they

22   think they want to serve, but I -- and that that ought to

23   happen at the very least before discovery is served in -- in

24   earnest.

25              But let me ask, Mr. Mitchell, when you -- when you

1    say you -- the -- the limits that you are negotiating here

2    are intended to apply to future DAPs as well; right?

3              MR. MITCHELL:  I believe that's correct,

4    Your Honor.

5              THE COURT:  Okay.  So the -- so you're not

6    arguing -- in arguing that there should not be something

7    akin to what the defendants are proposing, you're not

8    arguing that every time a new DAP comes in, that the limits

9    be up for -- that we're negotiating here and discussing here

10   and that I'm going to be ruling on here are up for grabs

11   every time a new plaintiff comes in?  That's not what you

12   are proposing; right?

13             MR. MITCHELL:  That -- that's -- I believe that

14   that's correct, Your Honor.  I think our -- I don't -- I

15   don't have any basis, based on my discussions with the other

16   DAPs, that that's -- that's -- anyone has a different view

17   about that.

18             THE COURT:  Okay.  All right.  So, Mr. Taylor,

19   if -- if that's -- if that's the case, and just accepting

20   that as a given, then if there -- whatever the limits are in

21   this order, are you -- are you just looking for something

22   that gives you confidence that a new DAP can't come in and

23   serve discovery that goes beyond the limits set by this

24   order without a showing of good cause, or are you looking

25   for something different from that?

 1              MR. TAYLOR:  It's a little more than that,

 2      Your Honor.  It's also, for example, a request for

 3      production.  I believe what sometimes happened in the

 4      *Broilers* action is we would get -- late-filed DAPs would say

 5      we need a new custodian, you know, and we want all of these

 6      documents as well.  And so we would be in the position we

 7      were in at the last status conference where now we're

 8      arguing over search terms again late in the game when

 9      depositions have already been taken, we're getting ready for

10      summary judgment or we're dealing with experts, and now we

11      have to deal with the new round of custodian negotiations

12      and document production, get our review crew back.

13      Practically speaking, I think all of the sophisticated pork

14      producers are on notice of their claims, and we don't want

15      them to upset the course of this litigation by sitting on

16      their rights.

17              All right.  Mr. Mitchell, do you want to comment

18      further?

19              MR. MITCHELL:  No, no.  Nothing else at this time,

20      Your Honor.

21              THE COURT:  All right.  I will give that some

22      additional thought then.  And my pen just ran out of ink.

23      Just a moment.  There we go.

24              All right.  I think that covers the issues that

25      you all raised.  There is other language that is typically a

1    part of my scheduling orders.  It is a part of the existing

2    scheduling order.  I will either make sure it's clear that

3    those other pieces apply here too, for example, my informal

4    dispute resolution process and that kind of thing, so I will

5    make sure that those are at least incorporated by reference.

6    Another example is my expectations if documents get filed

7    under seal, that kind of thing.  But, otherwise, I'll, as I

8    say, do another compare and contrast with what was in the

9    August version that's not in this one; and if I decide to

10   add something back in, it will be because I've concluded it

11   wasn't clearly covered before.

12          Still looking for that meet and confer letter by

13   Friday.  If you get to Friday and you're still meeting and

14   conferring in a productive way and you need until Monday to

15   land that plane, just drop a note to chambers.  Let me know

16   you need another day to really nail it down, but don't

17   just -- don't just let Friday come and go without letting me

18   know that.

19          Last call for anything we haven't addressed that

20   you felt we needed to address on the scheduling order?

21   Mr. Mitchell?

22          MR. MITCHELL:  I do not, Your Honor.  Thank you.

23          THE COURT:  Okay.  Mr. Taylor?

24          MR. TAYLOR:  Not substantively, Your Honor, but

25   just an update.  Judge Tunheim did reach out to the parties

1   last week and request a conference with us this coming

2   Friday, and he had originally requested a report on case

3   management issues in the MDL by Wednesday.  We talked to

4   Ms. Arent, his courtroom deputy, this morning and let him

5   know about the joint update letter and the disputes and that

6   we would be likely addressing them with you today.  And she

7   said thank you very much for letting us know, but we just

8   wanted to let you know.

9           THE COURT:  All right.  So is -- and I didn't

10  realize that but thank you for letting me know.  So that --

11  so that conference is going to happen on Friday, and she

12  will look at the joint update letter by way of update, or

13  were you going to be preparing an updated update?

14          MR. TAYLOR:  She told us we did not need to

15  prepare an updated update and that she would either send us

16  an invite or a cancellation depending on how today went and

17  likely his conversations with you in the interim.

18          THE COURT:  I will -- since there are a couple of

19  things I need to chat with him about anyway, I will reach

20  out to her and make sure that you get clear direction one

21  way or another on that.  But thank you very much on that.

22          All right.  Let's give our court reporter a break.

23  Ms. Drost, what do you need?  Would ten minutes work?

24          THE COURT REPORTER:  (Nods head.)

25          THE COURT:  All right.  We're going to take a

1    ten-minute break.  My clock says it's 2:54.  We will come

2    back on at five minutes after the hour and pick up the rest

3    of the agenda.

4         (Recess taken at 2:54 p.m.)

5                        *    *    *    *    *

6         (3:05 p.m.)

7                          **IN OPEN COURT**

8

9         THE COURT:  All right.  Well, let's pick back up

10   again, so anyone who wants to be a part of the next phase of

11   our discussion, why don't you go ahead and turn your audio

12   [sic] on but leave your microphones off.  Now I'm just

13   seeing Mr. Pouya.

14        MR. POUYA:  I was just confirming that I'm present

15   when you get back on after a break.  I think there's a

16   number of people that are going to be speaking in the next

17   phase.

18        THE COURT:  I think that's true.  All right.

19   Well, I will go ahead and start the recording again.  And we

20   are back on the record after a short break with our case

21   management conference in the In Re: Pork Antitrust

22   Litigation.  I think we have -- not only think, I know that

23   we have concluded our conversation about the scheduling

24   order in the -- involving the direct action plaintiffs and

25   we are ready to turn to the rest of the conference.

1           So Item Number 2 on the agenda is broadly titled

2      as Status of Discovery.  There are a number of topics there.

3      I have read the parties' joint update, and so I don't need

4      you necessarily to repeat what was in the update.  The

5      purpose of our conversation going forward is going to be if

6      there are things that you want to elaborate on or if there

7      are disputes bubbling up where we ought to be talking

8      about -- more concretely about whether and, if so, when they

9      may be ready for motion practice.

10          So I am seeing on my screen Mr. Pouya, Mr. Bourne,

11     Mr. McCahill, Mr. Taylor, and Ms. Scarlett, and Mr. Robison,

12     or he's about to show up.  There he is.  All right.  So I am

13     going to assume that these are the faces I'm going to be

14     hearing from over the next few minutes.

15          So I'm just going to go through the list of

16     subtopics under Status of Discovery, and you can let me know

17     if there's something beyond what's in the update letter that

18     you think we ought to spend some time talking about this

19     afternoon.  And for the court reporter's benefit, even

20     though your names are on your screens, if you could say who

21     you are when you start to speak, that can sometimes be a

22     little extra help for her.

23          So let's start with the issue of depositions.

24     You've indicated that you'll be prepared to discuss the

25     progress and status of depositions.  And I have reviewed the

1    couple of paragraphs in the joint update on that topic.  So

2    who would like to lead off in telling me any more about

3    where you are with depositions?  Mr. Bourne.  All right.

4         MR. BOURNE:  Good afternoon, Your Honor, Joe

5    Bourne, and I represent the direct purchaser plaintiffs.  We

6    put it in our update letter so I'm not sure there's a whole

7    lot more flavor to add here, but I thought Your Honor would

8    be pleased to hear that the parties have been working

9    together cooperatively to schedule and take all the

10   depositions that have occurred so far in this case.  There

11   haven't really been -- you know, there have been minor

12   hiccups related to technology and things like that, but

13   everything so far has been worked through and there are no

14   real concerning issues at this point for the Court.

15        THE COURT:  Excellent.  That is good to hear.

16   Anybody want to add any gloss to that, or should we just let

17   that positive report stand and shine on its own and move to

18   the next topic?

19        No.  All right.  We will leave it at that.  Thank

20   you.  And thank you for the work that -- and the

21   collaboration that necessarily underlies that report.

22        Let's move on to structured data and data

23   questions.  Again, I've got the parties' update which kind

24   of boiled down to there have been lots of questions.  The

25   defendants have been fielding those questions and believe

1   that they have answered the questions so far, but the

2   plaintiffs aren't yet ready to say that they have no further

3   questions.  So beyond that takeaway, who would like to tell

4   me a little more about where that all stands?  Ms. Scarlett?

5           MS. SCARLETT:  Your Honor, I think you've

6   summarized it correctly.  As you know, these data -- the

7   data in these cases is incredibly complex.  There's a lot of

8   parties that are producing them.  Experts are working hard

9   behind the scenes looking at the data, cleaning it, and

10   sending questions over across to defendants and we're

11   following up.  Certainly the process is not done.  Thus far

12   it's been very cooperative.  We are following up with some

13   number of defendants and outstanding questions, but we hope

14   to have that wrapped up pretty quickly.

15           THE COURT:  All right.  Excellent.  Anybody want

16   to add anything to that?

17           MR. RASHID:  Good afternoon, Your Honor, Sami

18   Rashid from JBS.  I just wanted to provide an update on the

19   footnote on the bottom of page 2 with respect to JBS's

20   efforts to restore backup tape.  We recently received an

21   update from our client that there have been some issues with

22   the restoration of the backup tape.  We don't have a clear

23   timeframe on the resolution of those issues, but we plan to

24   keep the plaintiffs updated.  But since it was in the

25   letter, I thought I'd just mention that now.

1      THE COURT:  So it sounds like the difficult -- as

2   of the letter, you said, absent any issues, this is when we

3   anticipate producing it.

4      MR. RASHID:  Yes.

5      THE COURT:  But what you are saying is some issues

6   have arisen since --

7      MR. RASHID:  That's correct.

8      THE COURT:  Got it.  All right.

9      MR. MCCAHILL:  And, Your Honor, this is Matt

10  McCahill from the direct action plaintiffs.  Just to follow

11  up on what Mr. Rashid said, we've been working, in

12  particular, with JBS to get updates on their structured data

13  productions.  I just got an e-mail from Sami earlier today

14  about the status of that, so those discussions continue.

15  They are collaborative, and that's all.  That's all I have

16  to say for the DAPs' perspective.

17     THE COURT:  All right.  Thank you, Mr. McCahill.

18     So, Mr. Rashid, you anticipate what I was going to

19  tell you anyway, which is keep the plaintiffs posted as to

20  your clients' efforts to get those -- to get that -- those

21  backup tapes -- is it one or more backup tapes?

22     MR. RASHID:  I believe it's just one, but I'm not

23  going to stand by that with 100 percent certainty.

24     THE COURT:  All right.  All right.  Keep them

25  posted on how the efforts are progressing to get that

 1    restored.

 2              MR. RASHID:  We will.  Thank you, Your Honor.

 3              THE COURT:  Moving on then to validation, and

 4    you -- again, I reviewed the update, and you have taken --

 5    taken away the right -- take away from the conversation we

 6    had on validation previously and it looks like are exploring

 7    with each other whether there are some concrete reasons to

 8    need to bring validation issues to me.  Is there an update

 9    since the letter on where those conversations stand, and, in

10    particular, are there any that look like they may be headed

11    in -- in my direction?  Who wants to address that?

12              MR. BOURNE:  Your Honor, Joe Bourne here again.

13    Since the time the parties submitted the letter, some of the

14    defendants have provided additional information or answers

15    to questions that we had posed.  So that's the new

16    information piece of it.  The parties are continuing to meet

17    and confer.

18              Generally, there are sort of two camps of what the

19    defendants did for a search methodology.  Some of them used

20    a Technology Assisted Review or TAR process, some of them

21    used search terms and then reviewed those -- all the hits

22    manually with humans rather than utilizing technology.  At

23    this point, it's still hard to say whether there will be any

24    disputes about that process or not.

25              The plaintiffs intend to -- some of the defendants

1      have provided, you know, everything that we've asked for.

2      Some of them are still doing a TAR validation process, and

3      the plaintiffs intend to continue to meet and confer to make

4      sure that the TAR validation is appropriate and will also be

5      conferring further with the defendants that utilize search

6      terms and human reviewers to discuss whether there's an

7      appropriate type of validation that could occur there.  At

8      this point, I don't think we can say that there will or

9      won't be a dispute ripe for the Court.

10          THE COURT:  All right.  Do you have a sense of

11     when you will know, in other words, by this time next month

12     or whatever that you will -- you expect to know whether

13     there either will or won't be -- will or won't need to be

14     elevated to -- to resolution by me?

15          MR. BOURNE:  From the plaintiffs' perspective,

16     it's possible that by this time next month we would know

17     whether there's going to be any kind of dispute related to

18     the human review of search terms.  It's possible, but harder

19     to predict, the same regarding TAR validation because many

20     of the TAR validation processes by the defendants are still

21     in progress.  And my understanding from defense counsel, for

22     at least some of them, is that their production of

23     additional documents in response to the DAPs' requests could

24     require redoing or supplementing that TAR validation

25     process, and it's just hard to know exactly how long that

1    will take.

2              THE COURT:  All right.  All right.

3              Anybody for the defendants want to weigh in on

4    this particular issue?

5              MR. TAYLOR:  I don't believe so, Your Honor.

6              THE COURT:  All right.  Thank you, Mr. Taylor.

7              Let's then turn to the defendants' responses to

8    the MDL DAPs' first request for production of documents and

9    the discussions relating to that.  Who would like to lead

10   off on behalf of the DAPs?

11             MR. MCCAHILL:  Your Honor, this is Matt McCahill

12   from Kaplan Fox for the MDL DAPs.  We don't -- as you can

13   see from our update letter filed on the 24th, we were able

14   to come to a joint statement with the defendants.  I'm not

15   aware of any updates in that -- for that specific item that

16   have arisen since -- since the submission of the letter.

17             THE COURT:  Okay.  Do you have -- let me ask kind

18   of the same question I asked on the last topic, which is do

19   you have a sense about when you will know whether there's

20   something that's going to need to come to me either through

21   an IDR or through motion practice?

22             MR. MCCAHILL:  I think from the MDL DAPs'

23   perspective, I think if there is going to be issues, it will

24   be sometime in the next few weeks, it will be relatively

25   soon, because the meet and confer process is ongoing as the

1   letter -- as the update letter states.  That's the best I

2   can say at this point.

3          THE COURT:  All right.  All right.  Thank you.

4   Mr. Taylor or anyone else want to address that issue for the

5   defendants?

6          MR. TAYLOR:  Your Honor, I don't believe

7   defendants have anything to add to the joint statement or

8   Mr. McCahill's statement.  We will continue to take MDL

9   DAPs' questions as they come, so we don't have any gloss on

10  when disputes could arise.

11         THE COURT:  Okay.  Then let's move to the next

12  topic, which is the plaintiffs' responses to defendants'

13  interrogatories.  And here there was an issue raised with

14  regard to a particular interrogatory that was directed to

15  the class plaintiffs.  I don't know if there's a similar

16  interrogatory out there with regard to the direct action

17  plaintiffs or not, but understanding that you are still

18  meeting and conferring and aren't submitting it for

19  resolution, was that something that you wanted to spend some

20  time talking about this afternoon, or was that just a

21  placeholder so I know that it's out there?

22         (Overlapping conversation.)

23         THE COURT:  I'm sorry, Mr. Pouya.

24         MR. POUYA:  Yeah, this is Bobby Pouya for the

25  class plaintiffs.  I believe there's no particular update

1    other than we received a letter on January 27th from the

2    defendants detailing their position regarding this issue.

3    The classes are considering it.  We've agreed to meet and

4    confer globally, and we will respond to the letter and let

5    the defendants know whether we're willing to amend or

6    supplement our responses this week.

7            THE COURT:  Okay.  Just so I understand what the

8    reach of that particular interrogatory is -- and I don't

9    know which of the defendants' counsel would be in a position

10   to address this -- but is that an interrogatory that was

11   directed to the direct action plaintiffs as well or is it

12   specific to the class context?

13           MR. SMITH:  This is Chris Smith.  I can speak.  I

14   think the focus of the dispute right now is with the class

15   plaintiffs.  You know, I think the issue is one that is, you

16   know, potentially broader.  You know, again, in our summary

17   we're focusing on, you know, witnesses and facts learned.

18            There is one piece I would put to this and one of

19   the reasons we wanted to flag it.  I know there are some

20   upcoming depositions.  I think there's a JBS deposition on

21   February 17th, and our hope is that we can have this

22   resolved in advance of those so we have some direction on

23   the legal issues.  Even though this is focused on the

24   interrogatories, I think it could impact other aspects of

25   the discovery, so that's why we wanted to flag it for the

1    Court.  And, again, we are in the middle -- we are meeting

2    and conferring, we are working through it, and hopefully we

3    can resolve it.

4         THE COURT:  All right.  I mean, if it does have

5    implications for the deposition on the 17th, obviously, it

6    doesn't allow much time to get it to me if you can't get it

7    sorted out on your own.  So ideally you'll get it sorted out

8    on your own, or it won't have any implications for the

9    deposition on the 17th, but -- so stay on top of that.  And

10   if it -- if it looks like it's going to turn into a

11   rate-limiting step, then let me know as soon as you can so

12   we can figure out how to address it.

13        MR. SMITH:  Absolutely.  Thank you, Your Honor.

14        THE COURT:  Anything else on that particular

15   topic?

16        All right.  There was one other thing that --

17   again, that we just sort of flagged with regard to

18   interrogatories that you're continuing to meet and confer

19   about and that is some of defendants' interrogatories

20   directed to class plaintiffs that the class plaintiffs are

21   viewing as contention interrogatories, and contention

22   interrogatories that are perhaps premature in the -- in the

23   journey of the litigation.  So anything -- other than that

24   you were continuing to meet and confer and, therefore,

25   presumably, nobody has declared impasse, is there anything

1    more you want me to understand about that particular

2    dispute?

3            MR. SMITH:  I can say, again, other than we're

4    continuing to meet and confer, I think that's just where we

5    are for now.

6            THE COURT:  And that was Mr. Smith; right?

7            MR. SMITH:  Sorry, Your Honor.  I should have

8    introduced myself.

9            THE COURT:  All right.  Mr. Pouya, you look like

10   perhaps you wanted to get in a word as well.

11           MR. POUYA:  No, I would agree with that.  We're

12   continuing to meet and confer.

13           THE COURT:  All right.  Okay.  I think then the

14   next topic takes us to the document productions by the MDL

15   DAPs, so these -- as I understand it, this is defendants'

16   requests for structured data and document productions that

17   are made to the MDL DAPs and that the MDL DAPs are in the

18   process of working on.  So who wants to tell me how that's

19   going from the defendants' perspective?

20           MR. ROBISON:  Your Honor, Brian Robison here for

21   Smithfield.  I can address this.  Your Honor, this -- this

22   topic really starts with the parties' proposed CMO that was

23   filed on December 10th.  That's ECF 1046-1.  We talked about

24   that a little bit earlier when we were talking about the

25   consolidation issues.

 1          In a footnote in that proposed CMO, the defendants

 2    and the MDL DAPs at that time agreed that today, January 31

 3    of 2022, would be the date for the DAPs to substantially

 4    complete their document and data productions.  And leading

 5    up to this conference, we reached out to the 27 DAPs that we

 6    think are covered by that footnote just to check on the

 7    status of document productions.  A couple of the 27 DAPs had

 8    made some document productions but the others have not.  So

 9    we reached out just to get a status report from each of

10    them.

11          Of the 27, we've heard from 24.  And I'm -- I can

12    summarize the 24 responses this way.  Mostly good news for

13    Your Honor.  We have heard from 10 of the DAPs that their

14    productions are already substantially complete or they will

15    be substantially complete today.  There were four additional

16    DAPs that asked for an extension to February 17, and the

17    defendants agreed to that.  And then there was one other

18    DAP, Cheney Brothers, that asked for an extension until

19    March 2nd, and we agreed to that.  So 15 of the 27 are on

20    track to hit the deadline today or on track to hit an agreed

21    extended deadline in the next few weeks, so that's the good

22    news.

23          THE COURT:  Got it.  Okay.  Okay.  Yes.  Go ahead.

24          MR. ROBISON:  Now, for the remaining 12, they kind

25    of fit into three categories.  The first is a category of

1    four that say that they could substantially complete their

2    productions within two weeks of reaching final agreement on

3    document custodians, and we have made substantial progress

4    with three of those four.  We have not made much progress on

5    the last one.  We're going to continue trying to meet and

6    confer to get the information that we think we need to reach

7    agreement on the proper custodians for that one last DAP.

8    On the other three, we think we're really close to reaching

9    agreement, and so it looks like for this group of four,

10   we'll have substantial completion at least in February

11   sometime.

12          There's another group of five, and this group, in

13   our view, is a little more vague.  They have told us that

14   they anticipate being substantially complete sometime in the

15   next few weeks.  So we're going to continue meeting and

16   conferring with them.  We would like to pin down a more

17   definite date with this group.  That didn't give us much

18   comfort.  So we will continue talking to them and again

19   hopefully reach agreement with them on a date certain when

20   they will substantially complete their document productions.

21          And then, finally, Your Honor, there are three

22   DAPs that have not responded to our recent request for

23   updates, so we are uncertain on when they will substantially

24   complete their document productions, so I'm not sure what to

25   tell you there about status or whether we may have a dispute

1   to bring to you.  But the goal here is just to keep things

2   on track with the current schedule so that we get the

3   documents that we think we need in order to take the

4   depositions we think we need to take during the fact

5   discovery period.

6             THE COURT:  Yeah.  All right.  Who would like to

7   address that for the DAPs?  Mr. McCahill, is that you?

8             MR. MCCAHILL:  Yeah, this is Matt McCahill for the

9   MDL DAPs.  So Mr. Robison's numbers, I generally agree with

10  them in terms of, again, the cataloging of the DAPs into

11  various categories based on what we either agreed to do or

12  have told defendants we will be anticipating substantial

13  completion of documents by one or more dates.

14            In terms of the -- those custodians -- or those

15  MDL DAPs who -- for whom we're finalized on custodians, some

16  of those are my clients.  Mr. Robison is correct.  We're

17  trying to get that sorted out as soon as we can.

18            In terms of -- my understanding in terms of at

19  least four other DAPs -- I'm sorry -- at least two other

20  DAPs is that the defendant -- they have -- they are awaiting

21  responses from the defendants as to custodian proposals and

22  were e-mailed -- counsel for those particular DAPs e-mailed

23  the defendants last week seeking follow up, and there was

24  no -- they have yet to receive any follow up with respect to

25  their custodian proposals.

1          THE COURT:  Let's -- let me just hold you right

2     there then.  Is that -- thinking about the different buckets

3     that Mr. Robison described, are those two that are waiting

4     for defendants to get back to them about their proposal with

5     regard to custodians among the three who haven't responded

6     yet or among the five who said that they'll be substantially

7     complete within the next few weeks or among the four whose

8     substantial completion date will be within two weeks of

9     reaching agreement on custodians?

10          MR. MCCAHILL:  As far as I'm aware, it's neither.

11     In terms of the four that are going to substantially

12     complete following agreement on custodians, these are --

13     these -- the two that I'm referring to I don't believe fall

14     into any of those particular categories, so maybe there's a

15     disconnect between what Brian -- how we're describing the

16     negotiations.  And I know that there are, on the line, DAP

17     counsel for most, if not all, of the DAPs on Mr. Robison's

18     list of 27 DAPs.

19          THE COURT:  Is somebody wanting to weigh in on the

20     telephone?  Hold on a second.  No.  Maybe it was just

21     somebody wasn't muted.

22          The main thing I'm trying to make sure of is that

23     Mr. Robison or his colleagues on the defense side aren't

24     sitting and thinking, well, the ball is in the -- in one of

25     the DAP's court to get back to them with a substantial

1     completion date while the thought level over that DAP's head

2     is I'm waiting for Mr. Robison or one of the defense lawyers

3     to get back to me about custodians.

4              MR. MCCAHILL:  Go ahead, Brian, if you want to.

5              MR. ROBISON:  Your Honor, I completely agree with

6     you, and I think, Mr. McCahill, we need to make sure we're

7     all on the same page.  You know, after this hearing, I could

8     e-mail him the four names that I have in my bucket that I'm

9     calling the bucket that will complete within two weeks of

10    reaching agreement on custodians.  And like I said, I think

11    three of the four in that bucket, the parties have made

12    substantial progress, and it may be that my list is

13    overlapping with his list and we just need to compare names.

14             MR. MCCAHILL:  Yeah, I think that's probably the

15    best thing to do.  I will say I just want to note for the

16    Court that, you know, there are DAPs who have filed

17    relatively recently who were just served with defendants'

18    RFPs and interrogatories, and they are in the process of

19    responding to those, and they are soon going to be serving

20    their initial disclosures as contemplated by the document

21    that Mr. Robison referred to, Document 1046-1, the

22    December 10th filing, pursuant to the schedule that's

23    outlined there -- the proposed schedule that's outlined

24    there.  I just wanted to note that.  I had been asked to

25    raise that just so it's clear that there are DAPs who are

1    not -- who were recently filed, recently transferred by the

2    MDL who are not subject -- who are not included in any of

3    the 27 that Mr. Robison is referring to and who are

4    proceeding on a schedule that is, at this point, you know,

5    proposed that's outlined in the December 10th, 2021, joint

6    filing.

7              THE COURT:  Right.  And that's the -- basically

8    the column headed "Deadline for New MDL DAPs"; right?

9              MR. MCCAHILL:  You're referring to 1046-1?  Yes,

10   correct.

11             THE COURT:  Yes, yes.  Okay.  Okay.  So I think,

12   Mr. Robison, maybe you and Mr. McCahill can chat afterward

13   either by phone or by e-mail, and, as you indicate,

14   Mr. Robison, you're interested in trying to get a somewhat

15   clearer sense of when substantial completion is going to

16   happen for the five that have said sometime in the next few

17   weeks and figure out whether there's anything they are

18   waiting for from you to nail that down and then figure out

19   why the three who haven't responded haven't responded and

20   whether it's because one or more of them thinks they are

21   waiting for something from one of the defendants before they

22   can respond.  All right.

23             MR. ROBISON:  Yes, Your Honor.  Those two buckets

24   are the biggest concern on our side, the five that have not

25   yet pinned down a date, and then the three that as far as we

1    can tell, have not told us anything in the last couple

2    weeks.  So I will work with Mr. McCahill to put these -- to

3    put names in each of these buckets, and then we can

4    hopefully pin -- pin some of these additional questions

5    down.

6              THE COURT:  All right.

7              MR. MCCAHILL:  That's right.  And, Brian, we will

8    confer after this, make sure we're not missing each other

9    anymore.  It sounds like that's what might be happening, but

10   we are committed to resolving and getting this -- getting

11   Mr. Robison's concerns addressed.

12             THE COURT:  All right.  Thank you, Mr. McCahill

13   and Mr. Robison.

14             Let's move on then to production of the direct

15   purchaser plaintiffs' class member purchase information,

16   which is a request that seems to have arisen primarily out

17   of the Smithfield and JBS settlements.  Who wants to address

18   the status of that?

19             MR. POUYA:  Thank you, Your Honor.  This is Bobby

20   Pouya on behalf of the direct purchaser plaintiffs.  So as

21   indicated in the papers, the definition of the approved JBS

22   and Smithfield settlements, the definition of "pork" is

23   broader than the litigation class definition.  So we've

24   requested that the non-settling defendants produce

25   additional information to help us administer the

1   settlements, send out claim forms to the class members so we

2   can pay out the monies that have been approved from those

3   settlements.

4        I am happy to report we've reached an agreement

5   with three of the non-settling defendants.  Clemens,

6   Triumph, and Seaboard have confirmed that they either have

7   already produced or will produce this information.  We will

8   continue to try and reach a resolution with the other two

9   non-settling defendants, which is Hormel and Tyson.  We

10  believe we can do that in the next week or so.  And if we're

11  not able to, I think as part of our proposal for the

12  dissemination of the notice and claims process, we can

13  present any sort of additional request for that information

14  and have the Court determine what, if any, additional

15  information those remaining non-settling defendants should

16  provide for those purchases that fall within the class

17  definition.

18        THE COURT:  All right.  Now, in your letter, you

19  indicated that you -- or at least suggested that you would

20  present the issue to the Court as part of your motion for

21  approval of the settlement class claims distribution

22  process.  So I didn't know if you anticipated that was an

23  issue that might go to Judge Tunheim, and, if so, maybe I

24  should give him a heads up about that, or an issue that you

25  anticipated presenting to me sort of contemporaneously with

1    these pieces going to Judge Tunheim?

2            MR. POUYA:  So I think to the extent that the

3    issue exists, it would be part of the motion for the claims

4    process.  And I think you're correct that it would be in

5    front of Judge Tunheim who's approved the notices and the

6    settlements.

7            THE COURT:  Got it.  All right.  Thank you.

8    Anything else from the defense perspective on that issue, or

9    does that fairly state how things --

10           MR. COLEMAN:  Yes, Your Honor.  It's Craig Coleman

11   from Faegre for Hormel.  I can speak to some extent on

12   behalf of all defendants, but as Mr. Pouya previewed, I

13   think the burden of this request falls differently on

14   different defendants, and so we may be differently aligned.

15           For Hormel Foods -- well, really for all

16   defendants, I think I can say with confidence that the Court

17   has had some visibility to the substantial efforts that have

18   been made to produce structured data in the litigation and,

19   in particular, sales data.  The Court will recall there was

20   quite a bit of negotiation about the scope and the timing of

21   structured data, and it really was a massive undertaking to

22   comply with that.

23           I'm pleased that -- I think I can speak for

24   everybody in the courtroom, including Your Honor -- that we

25   were able to do that and comply with -- abide by the

1      agreements that we reached and comply with the plaintiffs'

2      request for accelerated production.  We were able to do all

3      that without the Court's involvement.

4              So at this stage, the request for additional sales

5      data arises in connection with the direct purchaser

6      plaintiffs' request for additional information to administer

7      their settlements with JBS and Smithfield.  And for Hormel

8      Foods, in particular, this does create some really serious

9      concerns that we've been trying to address with the DPPs.

10             As mentioned, I think there is some variation in

11     terms of the burden of what the plaintiffs are seeking for

12     each defendant.  But for my client, you know, based on what

13     we've heard from the DPPs and what we've tried to

14     communicate to them, it would be massive.  And, in fact,

15     responding to their requests, as we understand it, would be

16     at least as burdensome and likely more burdensome than the

17     original production of structured sales data.

18             So Mr. Pouya is correct, obviously we're hopeful

19     to reach an agreement.  We'd like to avoid having a dispute,

20     you know, teed up for the Court.  I don't know whether we're

21     going to get there.  And it is important to us.  The burden

22     that we're talking about is massive.  We also think there is

23     an important legal principle in play, that we are not aware

24     of a legal basis for plaintiffs to be demanding that

25     non-settling parties help to administer a class settlement

1    with other defendants.  So we're not a party to the

2    settlement, and, effectively, what the request would involve

3    is Hormel business people undertaking significant efforts to

4    generate reports and data for use to -- for the plaintiffs'

5    use in administering the settlement.  That's a problem for

6    us potentially if we can't get it resolved, and so it will

7    be important for us to have an opportunity for that dispute

8    to be teed up in front of the Court likely through formal

9    motion practice in one form or another.  We would understand

10   that we would need to submit briefs and declarations to

11   substantiate the burden and work through the legal issues

12   for the Court.

13        THE COURT:  Uh-huh.  Uh-huh.  All right.  All

14   right.  Thank you.  That's helpful context, although it

15   sounds like it may not ultimately be something that comes to

16   me for resolution.  But, Mr. Pouya, anything further on

17   that?

18        MR. POUYA:  No, other than I think -- I understand

19   where Mr. Coleman is coming from.  I think we can work

20   together to find a resolution like we have with the other

21   defendants, and I am hopeful we can do so.  We're still

22   willing to engage in the process.  We're mindful of some of

23   the burdens.  But it is obviously important to have this

24   information to make sure that the class members for the

25   settlements that have been approved are able to get their

1    portion of those funds, so we believe it's important and

2    we'll continue to engage to see if we can come to a

3    resolution without Court intervention.

4              THE COURT:  All right.  All right.  Thank you,

5    Mr. Pouya.

6              I think then that that covers everything except

7    your very polite nudge about the -- about the Hormel order.

8    And in answer to your question is there anything more I need

9    from you, no, it is on me.  And, actually, I have a draft.

10   It is my plan to get that order out by the end of this week.

11   So you've been waiting longer than you should have for that.

12   As I say, that's on me, but it wasn't for lack of brief and

13   argument.  So I have that draft on my desk and you should

14   have it by the end of the week.

15             Dates for future case management conferences,

16   you've suggested every couple of months, and that sounds

17   about right to me as well, which means we will be looking

18   for a date toward the end of March or very early April,

19   unless you tell me that there -- that I misunderstood your

20   suggested timeframe.

21             MS. VAN ENGELEN:  Good afternoon, Your Honor.

22   Breanna Van Engelen for the consumer and direct purchaser

23   plaintiffs.  We did suggest every two months, and the end of

24   March or beginning of April would work for us.

25             THE COURT:  All right.  Is -- are there any dates

1    at this point -- well, no.  There's so many people involved

2    that that -- that way lies chaos if I ask if there are any

3    particular dates that will work.  I know we're right in the

4    middle of holiday and spring break season, but I'm just

5    going to have to pick something that works on my calendar

6    and hope that you all can make it work for -- for yours.

7            So one of the things I'll do, as soon as we're off

8    this call, is get with my assistant and pick -- in fact,

9    we'll probably go ahead and at least schedule the next

10   couple, so pick a date at the end of March, pick another

11   date at the end of May, not Memorial Day, and at least give

12   you a couple of these conferences on your calendar.

13           Anything else -- I'm sorry.  Okay.  Anything else

14   that we ought to address?

15           Mr. Finley, I see you.  Is there something we

16   haven't covered that we ought to?

17           MR. FINLEY:  Yes, Your Honor.  My group commercial

18   and direct plaintiffs would just note in passing that in

19   relation to guidance provided by Your Honor, at Docket 1103,

20   a joint update letter in regard to Pacific Agri-Products'

21   proposed amendments to the protective order has been filed.

22   From my plaintiffs groups' perspective, that process has

23   been completed.  However, we are ready and willing to

24   provide formal or any supplemental briefing that Your Honor

25   may desire.

1              THE COURT:  Okay.  The -- yes.  And what I --

2    because I issued or finalized a protective order on that.  I

3    wasn't sure if it's already hit the docket or not, but I

4    finalized the amended protective order and a memorandum

5    explaining my -- my reasoning earlier today.  And so that

6    should -- if it hasn't been docketed, it will be docketed

7    before the end of the afternoon.  So I think we should be

8    set on that.

9              MR. FINLEY:  Thank you, Your Honor.

10             THE COURT:  All right.  Ms. Van Engelen, anything

11   further?

12             MS. VAN ENGELEN:  Nothing further from us.  Thank

13   you.

14             THE COURT:  All right.  Last call?

15             All right.  Well, thank you all.  I appreciate

16   both your patience and the hard work that went into all of

17   the progress that you have reported in your updates, so I've

18   identified a letter I'm going to look for from -- on the

19   DPP -- or the DAP side of things at the end of this week,

20   and I will also issue an order with new dates for the next

21   couple of case management conferences shortly.  So thank you

22   all, and have a good rest of your week.

23             MR. MCCAHILL:  Thank you, Your Honor.

24        (Court adjourned at 3:45 p.m.)

25                            *     *     *

1

2

3          I, Erin D. Drost, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter to the best of my ability.

6

7                    Certified by:   *s/ Erin D. Drost*

8                                    Erin D. Drost, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25