# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br><br>ALL ACTIONS | **DECLARATION OF ROBERT ENTWISLE IN SUPPORT OF NON-PARTY INDIANA PACKERS CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL INDIANA PACKERS CORPORATION TO COMPLY WITH SUBPOENA *DUCES TECUM*** |

I, Robert Entwisle, declare as follows:

1.      I am an attorney with the law firm of Mayer Brown LLP, representing non-party Indiana Packers Corporation ("IPC") in its response to plaintiffs' subpoena *duces tecum* in the above-captioned matter. I submit this declaration in support of IPC's Response to Plaintiffs' Motion to Compel Indiana Packers Corporation to Comply with Subpoena *Duces Tecum*.

2.      Attached as **Exhibit A** is a true and correct copy of a Memorandum of Law in Support of Indiana Packers Corporation's Motion to Quash Subpoena and Motion for Attorneys' Fees and Expenses, and supporting exhibits, filed in the United States District Court for the Southern District of Indiana on March 28, 2022.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 28th day of March, 2022.

*/s/ Robert Entwisle*
Robert Entwisle

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

IN RE PORK ANTITRUST LITIGATION

Misc. Case No. 1:22-mc-25

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MINNESOTA

Civil No. 18-cv-01776-(JRT/LIB)
Civil No. 19-cv-01578-(JRT/LIB)
Civil No. 19-cv-02723-(JRT/LIB)

## MOTION TO QUASH SUBPOENA AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

Pursuant to Federal Rule of Civil Procedure 45(d), Indiana Packers Corporation ("IPC"), by counsel, respectfully moves the Court to quash a subpoena for documents served by class plaintiffs in the action *In re Pork Antitrust Litigation*, No. 18-cv-01776, pending in the District of Minnesota. Compliance with the Subpoena would require IPC to incur more than $70,000 in electronic discovery vendor fees, and an estimated $220,000 in initial attorney review costs, yet the information sought by the Subpoena is either irrelevant or cumulative of information available to the class plaintiffs through the parties to the litigation. IPC also seeks reimbursement for its attorneys' fees and expenses because class plaintiffs have refused to take reasonable steps to avoid imposing undue burden on IPC, necessitating this Motion. In support of the foregoing, IPC refers to and incorporates its Memorandum of Law, filed contemporaneously herewith.

## CERTIFICATE OF CONFERENCE

Pursuant to LR 7-1(g) and LR 37-1, counsel for class plaintiffs and IPC conferred via email and letter on the following dates regarding the subpoena that is the subject of this motion: July 9, 2021, October 13, 2021, October 27, 2021, October 29, 2021, November 1, 2021, December 2, 2021, December 28, 2021, March 11, 2022, March 17, 2022, March 18, 2022, March 25, and March 28, 2022. The parties also had a call on October 8, 2021. The participants in those communications included Britt Miller, Jaime Stilson, William Stallings, and Robert Entwisle (for IPC) and Brian Clark, Joseph Bourne, Elizabeth Sipe, and Stephen Owen (for class plaintiffs). After class plaintiffs moved to compel compliance with the subpoena in Minnesota on March 17, 2022, and refused to withdraw that motion pursuant to their email on March 18, 2022, counsel for IPC sent an email to counsel for plaintiffs on March 25, 2022, explaining that IPC intends to move to quash the subpoena in this Court and would also seek its attorney fees and expenses incurred in bringing its motion. Counsel for IPC stated that IPC would move forward with this motion unless class plaintiffs would agree to withdraw their motion to compel filed in Minnesota and agree to discuss material modifications to the subpoena requests, and requested a response by 1 ET / 12 CT on March 28, 2022, the due date for IPC's response to the motion to compel. Counsel for IPC (Robert Entwisle and Jaime Stilson) also reached out to counsel for plaintiffs (Joseph Bourne) by phone on March 25, 2022, but did not reach Mr. Bourne that day. Plaintiffs (Joseph Bourne) responded on March 28 by email and informed counsel for IPC that they would not withdraw their motion to compel filed in Minnesota, and counsel for IPC (Robert Entwisle) responded that because the Indiana federal courts have jurisdiction over this matter, it would proceed with filing this motion. As IPC and plaintiffs dispute jurisdiction in this matter, and plaintiffs will not withdraw their motion to compel filed in Minnesota, IPC now brings this motion to quash. The

parties' written communications are reflected in Ex. 4, Ex. 5, Ex. 6 and Ex. 11, attached to IPC's Memorandum of Law.

Dated: March 28, 2022                                Respectfully submitted,

                                                     Indiana Packers Corporation

                                                     s/ *John R. Maley*
                                                     John R. Maley (14300-89)
                                                     Kendall Millard (25430-49)
                                                     BARNES & THORNBURG LLP
                                                     11 South Meridian Street
                                                     Indianapolis, IN 46204
                                                     317.231.7464
                                                     john.maley@btlaw.com
                                                     kendall.millard@btlaw.com

                                                     Britt M. Miller (*pro hac vice* forthcoming)
                                                     Robert Entwisle (*pro hac vice* forthcoming)
                                                     MAYER BROWN LLP
                                                     71 South Wacker Drive
                                                     Chicago, IL 60606-4637
                                                     (312) 782-0600
                                                     bmiller@mayerbrown.com
                                                     rentwisle@mayerbrown.com

                                                     William Stallings (*pro hac vice* forthcoming)
                                                     MAYER BROWN LLP
                                                     1999 K Street, N.W.
                                                     Washington, D.C. 20006-1101
                                                     (202) 263-3000
                                                     wstallings@mayerbrown.com

                                                     *Counsel for Indiana Packers Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The foregoing Motion was electronically served on all counsel of record today, March 28, 2022, through the Court's CM/ECF system and via email and first-class U.S. mail, postage prepaid, to the following:

Joseph C. Bourne
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2179
612-339-6900
Email: jcbourne@locklaw.com

Brian D. Clark
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2179
612-339-6900
Email: bdclark@locklaw.com

*s/ John R. Maley*
John R. Maley

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

IN RE PORK ANTITRUST LITIGATION

Misc. Case No. 1-22-mc-25

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MINNESOTA

Civil No. 18-cv-01776-(JRT/LIB)
Civil No. 19-cv-01578-(JRT/LIB)
Civil No. 19-cv-02723-(JRT/LIB)

## MEMORANDUM OF LAW IN SUPPORT OF
## INDIANA PACKERS CORPORATION'S MOTION TO QUASH SUBPOENA AND
## MOTION FOR ATTORNEYS' FEES AND EXPENSES

**TABLE OF CONTENTS**

**Page**

BACKGROUND ............................................................................................................... 4

ARGUMENT ................................................................................................................... 9

I.     THE SUBPOENA SHOULD BE QUASHED BECAUSE IT UNNECESSARILY
SUBJECTS IPC TO UNDUE BURDEN AND SEEKS IRRELEVANT
INFORMATION ........................................................................................................ 9

II.    THE SUBPOENA ALSO SHOULD BE QUASHED BECAUSE OF
PLAINTIFFS' UNREASONABLE DELAY. ............................................................... 14

III.   NO EXCEPTIONAL CIRCUMSTANCES SUPPORT CLASS PLAINTIFFS'
EFFORTS TO FORCE IPC BACK INTO COURT IN MINNESOTA. .......................... 15

IV.   THE COURT SHOULD AWARD ATTORNEYS' FEES BECAUSE
PLAINTIFFS FAILED TO TAKE REASONABLE STEPS TO AVOID
IMPOSING UNDUE BURDEN OR EXPENSE ON IPC ............................................. 18

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
    2020 WL 8673437 (N.D. Fla. Nov. 18, 2020) ........................................................................17

*Acuity v. Kerstiens Home & Designs, Inc.*,
    2018 WL 3375015 (S.D. Ind. July 10, 2018) .................................................................9, 11

*Agri-Labs Holdings, LLC v. TapLogic, LLC*,
    2015 WL 13655779 (N.D. Ind. Oct. 20, 2015) ...............................................................4

*Alerding Castor Hewitt v. Fletcher*,
    2017 WL 60355327 (S.D. Ind. Dec. 5, 2017) ...............................................................19

*Am. Soc. of Media Photographers Inc. v. Google*,
    2013 WL 1883204 (N.D. Ill. May 6, 2013) ...................................................................19

*In re ClassicStar Mare Lease Litig.*,
    2017 WL 27455 (E.D. Ky. Jan. 3, 2017) .......................................................................18

*Cook v. Howard*,
    484 Fed. App'x 805 (4th Cir. 2012) ...............................................................................14

*Donald v. Outlaw*,
    2020 WL 2899689 (N.D. Ind. June 2, 2020) ..........................................................10, 11, 14

*Drics v. Duffy*,
    2014 WL 5323737 (S.D. Ind. Oct. 16, 2014) ...............................................................19

*Elliot v. Mission Tr. Servs. LLC*,
    2015 WL 1567901 (N.D. Ill. Apr. 7, 2015) ...................................................................19

*Kyner v. Loveridge*,
    2019 WL 1778663 (S.D. Ind. Apr. 23, 2019) ...............................................................14

*Little v. JB Pritzker for Gov.*,
    2020 WL 1939358 (N.D. Ill. Apr. 22, 2020) ..........................................................11, 13, 18

*In re Modern Plastics Corp.*,
    890 F.3d 244 (6th Cir. 2018) ..........................................................................................19

*In re Monat Hair Care Prods. Mktg., Sales Practices, and Prods. Liab. Litig.*,
    2020 WL 1950463 (S.D. Fla. Apr. 23, 2020) ...............................................................17

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Monitronics Int'l, Inc.*,
2015 WL 12748329 (N.D.W. Va. Feb. 20, 2015) ...................18

*Night Hawk Ltd. v. Briarpatch Ltd., L.P.*,
2003 WL 23018833 (S.D.N.Y. Dec. 23, 2003) ...................19

*In re Packaged Seafood Products Antitrust Litig.*,
15-MD-2670-JLS-MDD, 2018 WL 454440 (S.D. Cal. Jan. 17, 2018) .......16, 17, 18

*In re Pork Antitrust Litig.*,
2019 WL 3752497 (D. Minn. Aug. 8, 2019) ...................1, 4

*In re Pork Antitrust Litig.*,
495 F. Supp. 3d 753 (D. Minn. 2020) ...................1, 4

*In re Pork Antitrust Litigation*,
No. 18-cv-01776 ................... *passim*

*In Re Pork Antitrust Litigation*,
No. 21-md-2998 (D. Minn.) ...................4

*Renasant Bank, Inc. v. AVE, Inc.*,
2021 WL 254373 (S.D. Ill. Jan. 26, 2021) ...................19

*Rossman v. EN Eng'g, LLC*,
467 F. Supp. 3d 586 (N.D. Ill. 2020) ...................13, 14

*Spottswood v. Wash. Cnty. MN*,
2021 WL 838769 (D. Minn. Mar. 5, 2021) ...................11

*In re Subpoena Served on Affiliated Foods, Inc.*,
2021 WL 4439796 (N.D. Tex. Sept. 28, 2021) ...................10, 16, 17, 18

*In re Turkey Antitrust Litigation*,
No. 1:19-cv-08318 ...................10, 12

*WM High Yield v. O'Hanlon*,
460 F. Supp. 2d 891 (S.D. Ind. 2006) ...................10, 13

*Xcentric Ventures, LLC v. Borodkin*,
934 F. Supp. 2d 1125 (D. Ariz. 2013) ...................14

**Statutes**

28 U.S.C. § 1407 ...................17, 18

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Other Authorities**

Fed. R. Civ. P. 45 ................................................................................................................ *passim*

Indiana Packers Corporation ("IPC") moves pursuant to Fed. R. Civ. P. 45(d) to quash a subpoena ("Subpoena") issued by class plaintiffs in *In re Pork Antitrust Litigation*, No. 18-cv-01776 ("*Pork*"), pending in the District of Minnesota. Complying with the Subpoena would impose substantial costs on IPC, including more than $70,000 in electronic discovery processing expenses to process 2 terabytes of data, and an estimated initial cost of more than $220,000 in attorneys' fees and other expenses for document review and production. The information sought is either irrelevant or cumulative of information class plaintiffs can obtain through the parties to the litigation, and plaintiffs admit they have not exhausted their efforts to obtain responsive information from the actual parties.

In *Pork*, the class plaintiffs[1] claim certain pork producers conspired to restrict supply and raise their prices in violation of the Sherman Act. IPC was dismissed from *Pork*—twice—because plaintiffs failed to state a claim against the company. *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *10 (D. Minn. Aug. 8, 2019); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 765 (D. Minn. 2020). The Minnesota District Court also rejected the class plaintiffs' request for reconsideration, affirming its dismissal of IPC **with prejudice**. *See Pork*, No. 18-cv-1776, Order re Reconsideration at 5 & n.1 (Feb. 4, 2021) (Dkt. 672). Thus, the Minnesota District Court has ruled three times that IPC should not be—and is not—a party to the litigation.

Before IPC's dismissal, class plaintiffs obtained extensive early discovery that provided detailed information about IPC's operations, personnel, participation in industry associations, and other information. Class plaintiffs also served Rule 34 requests on all of the defendants, and

---

[1] The class plaintiffs are putative classes comprised of direct pork purchasers (those who claim they purchased pork directly from one or more of the defendants), consumer indirect purchasers, and institutional indirect purchaser plaintiffs (consumers or institutional plaintiffs that claim to have purchased pork indirectly, through an intermediary), along with the Commonwealth of Puerto Rico. They are referred to collectively herein as "class plaintiffs" or "plaintiffs."

consistent with the Minnesota court's orders, IPC provided written responses while the motions to dismiss were pending. As IPC was dismissed with prejudice, however, it was not required to comply with those requests by producing responsive documents.

IPC brings this motion because class plaintiffs re-issued some of their most burdensome and all-encompassing Rule 34 demands to IPC through the Subpoena, and are attempting to impose essentially the same burdens on IPC as a non-party that they would have sought had IPC remained a party to the litigation. Compliance would be extraordinarily burdensome, as class plaintiffs have demanded that IPC process emails, text messages, and other data for nine individuals over a thirteen-year period (estimated currently at about 2 terabytes of data), apply more than 100 search terms arbitrarily selected by class plaintiffs that are likely to result in tens of thousands of false positives, and then review and produce documents responsive to the Subpoena's broad requests.

IPC made good faith efforts to resolve this matter without the need for Court intervention,[2] which included offers to produce more than a dozen years' worth of transactional data sought by the class plaintiffs, and other discrete searches that would provide the types of information sought without necessitating a burdensome and costly review of custodial files. Over the nine months since class plaintiffs served their Subpoena, they have failed to explain why the information they seek is necessary for their case or why the number of custodians, search terms, and document requests are reasonable or proportional given that IPC is now a non-party.  Most recently, after more than two-and-a-half months of silence, class plaintiffs summarily informed IPC that the parties were at impasse, and then filed a motion to compel in Minnesota in which their argument essentially is that IPC should incur all of the costs associated with processing the data for class plaintiffs' entire slate of custodians originally identified when IPC was a party to the litigation,

---

[2] *See* Motion, Certificate of Conference.

and then run "hit reports" on the 100+ search strings to determine whether IPC's claims of burden are real. *See* Ex. 1 (Mem. in Support of Motion to Compel ("Mem.".) But that puts the cart before the horse and is inconsistent with Rule 45's express directive that class plaintiffs "*must take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena.*" Fed. R. Civ. P. 45(d)(1) (emphasis added). The costs associated with processing the data in question alone, without running any search terms, is an immense burden and expense for a non-party. And that is before even considering the attorneys' fees and costs that would be incurred after processing, which include analyzing the search results for class plaintiffs' proposed searches, attempting to negotiate reasonable parameters, retaining and overseeing contract lawyers to conduct the review, and the further reviews for responsiveness or privilege by counsel that would be required before producing documents in response to the overbroad Subpoena.

In addition, as IPC repeatedly made clear that the Minnesota court is without jurisdiction to enforce the Subpoena because class plaintiffs sought compliance in this jurisdiction, and this Court is the appropriate one to resolve the dispute. Accordingly, IPC now respectfully requests that this Court quash the Subpoena.

IPC also moves for its attorneys' fees and costs pursuant to Fed. R. Civ. P. 45(d)(1) for the time and expense incurred in bringing this motion. Class plaintiffs' misuse of Rule 45 to simply re-issue the same burdensome and irrelevant discovery that they sought before IPC was dismissed is improper, and instead of attempting to avoid imposing undue burdens on IPC as required by Rule 45, they have affirmatively sought to increase IPC's burdens and costs.

## BACKGROUND

IPC is headquartered in Delphi, Indiana and produces pork products.[3] In June 2018, putative class plaintiffs began filing actions alleging a conspiracy by various pork producers to constrain supply and raise the price of pork products in the United States. *See, e.g.*, *Pork*, No. 18-cv-1776, Compl. at 1 (Dkt. 1).[4] The parties engaged in certain early discovery while awaiting the Minnesota court's ruling on defendants' joint motion to dismiss. In addition to normal Rule 26(a) disclosures, the Minnesota court required—at class plaintiffs' request—extensive further affirmative disclosures by the defendants about their organizations, participation in industry benchmarking, and trade associations, and also required all defendants to provide written responses to Rule 34 requests for production. *See, e.g., Pork*, Feb. 7, 2019 Order (Dkt. 290). IPC complied in full with the Minnesota court's requirements while the motions to dismiss were pending.

Notwithstanding all of the early discovery class plaintiffs received, they were never able to state a claim against IPC. The Minnesota court granted defendants' joint motion to dismiss in August 2019. *Pork*, 2019 WL 3752497, at *10. Plaintiffs were then granted leave to amend their complaints, and all defendants filed renewed motions to dismiss. This time the Minnesota court dismissed only IPC, with prejudice, while allowing the case to proceed against the remaining defendants. *Pork*, 495 F. Supp. 3d at 765. Class plaintiffs asked the Minnesota court to reconsider,

---

[3] Jurisdiction in this Court is proper under Fed. R. Civ. P 45(d)(3) because although IPC is headquartered in Delphi, Indiana, the Subpoena commands the production of documents in Indianapolis, Indiana. *See* Ex. 2 at 1. "Most courts look to the subpoena to determine where compliance is required," and the place of compliance has been identified as "the district in which the documents are to be produced." *Agri-Labs Holdings, LLC v. TapLogic, LLC*, 2015 WL 13655779, at *1 (N.D. Ind. Oct. 20, 2015) (citations omitted).

[4] The class cases were consolidated for discovery under No. 18-cv-1776. More recently, certain opt-out cases were consolidated into an MDL also in the District of Minnesota, where the class cases have been pending since 2018. *In Re Pork Antitrust Litigation*, No. 21-md-2998 (D. Minn.).

but that request was denied, with the court stating for a third time that "[class plaintiffs] failed to clear the initial hurdle to plead a plausible Sherman Act claim against IPC." *Pork*, 2021 WL 728841, at *1 (D. Minn. Feb. 4, 2021). Class plaintiffs and the remaining defendants are engaged in discovery in *Pork*.

On June 4, 2021, counsel for class plaintiffs sent counsel for IPC a copy of the Subpoena. IPC agreed to accept service through counsel on June 15, 2021, while reserving all rights with regard to objections or any necessary motion practice, and then objected but offered to engage in discussions regarding the scope of the Subpoena to see if an acceptable resolution could be reached. Ex. 3 (June 15, 2021 email); Ex. 4 (July 9, 2021 letter). Class plaintiffs did not even follow-up on that offer substantively until October, and it was not until December 2, 2021—almost six months after they first sent the Subpoena—that they finally described the scope of what they were seeking in sufficient detail to enable IPC to consider the requests. Ex. 5 (December 2 Email from J. Bourne); Ex. 6 (December 1, 2021 Letter).[5] Class plaintiffs seek both structured data (categories of confidential transactional data about IPC's pork sales to customers going back to 2008) and thirteen years' worth of ESI and hard copy documents in the form of email, text messages, and other materials for nine individuals who were identified as potential discovery custodians while IPC was in the litigation. *Id.*

In their December 2 proposal, class plaintiffs made clear that they were not attempting to comply with their obligation to avoid imposing undue burden, and instead said they wished to impose the very same burdens on IPC through the Subpoena that they were seeking to impose when it was a party. For example, in discussing the scope of their requests, class plaintiffs said: "IPC and Plaintiffs previously agreed upon [nine] custodians in August 2019 when IPC was a party

---

[5] The letter was actually sent on December 2, even though it is misdated as having been sent on December 1, 2021.

to the litigation…. These are the same custodians Plaintiffs propose now." Ex. 6 at 3. The Subpoena also includes seven pages of burdensome "Instructions" and "Definitions," along with demands for grossly overbroad categories of documents and information from IPC. The requests are virtually identical to a number of the most burdensome Rule 34 requests class plaintiffs served while IPC was a defendant in the litigation. *Compare* Subpoena Requests (Ex. 2 at 7-10 of Schedule A) with the relevant Rule 34 Requests (Ex. 7). Specifically:

- **Subpoena Requests 1 and 2** seek communications between IPC and other pork producers and benchmarking company Agri Stats, including "email and text messages." These Requests are near verbatim copies of Rule 34, Request No. 3. Such communications—to the extent they exist—are completely irrelevant because IPC is no longer a party to the litigation and was not part of any conspiracy. Moreover, class plaintiffs can, and are believed to be, obtaining communications from the remaining defendants. Plaintiffs' recent motion filed in Minnesota suggests that there are unspecified "gaps" in defendants' productions, but they do not identify those gaps, explain how they relate to IPC, what they mean to the case, and concede they have not even confirmed any actual gaps exist. *See* Ex. 1 (Mem. at 9; Ex. 8 (Decl. of J. Bourne at 4).

- **Subpoena Request 4** seeks undefined categories of IPC "structured data," which Plaintiffs only defined months after issuing the Subpoena to include more than a dozen categories of information. *See* Ex. 6 (December 1, 2021 letter). The information sought is of limited value at best, as class plaintiffs are on information and belief already obtaining structured data from the defendants in the *Pork* litigation.

- **Subpoena Request 9** seeks "All Documents relating to Competitive Conditions in the market for Pork" and lists fifteen sub-parts as examples. Like the other requests, this request is a near verbatim copy of Rule 34, Request No. 18. It would be extremely burdensome for IPC to attempt to comply with this request for any time period, and more so because class plaintiffs want IPC to search across 9 custodians for a thirteen-year time period. Also, once again, details about so-called "competitive conditions" can and presumably are being obtained through the parties to the litigation, which include seven of the largest pork producers in the country. *See, e.g.*, Third Am. Compl. ¶¶ 1-2, Case No. 18-cv-1776 (Dkt. 431).[6] Class plaintiffs have not articulated, let alone demonstrated, a need to burden IPC with this request.

According to class plaintiffs, to respond to the Subpoena, IPC must also negotiate a "search methodology" with them, and then apply 116 search strings to any documents collected, many of which are vague terms untethered to any of their claims in the litigation and likely to draw in thousands of false positives (*i.e.*, terms like "disappearance"). *See* Ex. 9.[7] Given the two-terabytes of data IPC expects would need to be searched, and the breadth of class plaintiffs' requests, IPC likely would be forced to retain dozens of attorneys to perform an initial review of the documents—an undertaking estimated to cost more than $220,000 for first level contract attorney review alone.

---

[6] It is unclear whether class plaintiffs intend to continue to pursue Requests 3, 5-7, and 8, which duplicate and are mostly copied from Rule 34 requests 5, 25, 29, 2 and 6, respectively. Based on their papers filed in the District of Minnesota, they do not appear to be pursuing those requests, but as they have not formally withdrawn them, IPC respectfully requests that the Court quash those requests as well.

[7] Class plaintiffs' only cost concession was a superficial offer to host the documents on their vendor's review platform, likely a very nominal e-discovery cost savings that pales in comparison to the tens of thousands of dollars in fees IPC would be forced to incur by the Subpoena. Moreover, had class plaintiffs discussed further with IPC's counsel before filing their motion, they would have learned that IPC does not require a platform for hosting the documents.

*See* Ex. 10 (Complete Discovery Source Estimate); Ex. A (Decl. of R. Entwisle). And for IPC to even attempt to provide further detail as to the scope of the review burden involved its vendor has informed counsel that processing costs alone for the nine individuals class plaintiffs demand would cost more than $70,000 in vendor fees. *See id*. In other words, just to have the ESI demanded by class plaintiffs avaliable to "test" the 116 search strings they request, IPC would be forced to incur $70,000. There would be additional fees for licenses and review management that would quickly go into the tens of thousands of dollars as well, and all just to then, ultimately, negotiate with class plaintiffs regarding their overbroad requests and search terms. *Id.*[8] Based on these estimates— which do not even include the time and cost required for IPC to produce the structured data Plaintiffs demand over a 13-year period—IPC will incur close to $300,000 *in vendor fees and costs* alone. And IPC would, of course, also incur outside counsel fees to oversee the review, perform quality control analysis, oversee a privilege review, and ultimately finalize a production of responsive documents. This is clearly an undue burden on a non-party.

IPC investigated these matters and responded to class plaintiffs' December 2 letter over the holidays, on December 28, offering to produce extensive categories of transactional data—a burdensome undertaking in and of itself—and stated that it had been willing to produce readily identifiable categories of further information beyond what class plaintiffs already received, but rejected the unreasonable demands that would require IPC to engage in protracted negotiations about custodians and search terms, and then review and produce documents.[9] Ex. 11 (December

---

[8] It is also possible that IPC would be required to collect, process, and review an unknown number of hard copy documents. These estimates focus on known ESI and other materials previously collected.

[9] Class plaintiffs have characterized this good faith attempt to collect responsive documents in a way that would not require burdensome custodial searches as a "hollow offer," but they have no basis to make such a claim that the document examples provided would be insufficient or that other sources of sufficient information could not be provided. Ex. 1 (Mem. at 12).

28 Letter). Class plaintiffs did not respond until almost *two-and-a-half months later*, on Friday, March 11, 2022, and, without addressing the concerns raised in the December 28, 2021 letter, summarily announced they would move to compel IPC to respond to the Subpoena in the District of Minnesota, although they invited counsel for IPC to discuss the matter. Ex. 5 (March 11, 2022 Email from J. Bourne). Then, before IPC had a chance to respond, class plaintiffs filed their motion to compel on Thursday, March 17, 2022. IPC will respond to that motion on March 28 as required by local rule, and will advise the Minnesota court that class plaintiffs have improperly sought relief in Minnesota and that IPC is seeking resolution of this dispute in this Court.

In light of the foregoing, and for the reasons set forth below, IPC respectfully asks that the Court quash the Subpoena in its entirety.

## ARGUMENT

### I.   The Subpoena Should Be Quashed Because it Unnecessarily Subjects IPC to Undue Burden and Seeks Irrelevant Information.

#### A.   Class Plaintiffs' Requests Would Impose Substantial Six-Figure Burdens on IPC.

Parties must "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Courts further consider "relevance, the need of the party for documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are requested, and the burden imposed." *Acuity v. Kerstiens Home & Designs, Inc.*, 2018 WL 3375015, at *1 (S.D. Ind. July 10, 2018) (internal citation and quotations omitted).

Far from taking steps to avoid undue burden, class plaintiffs are affirmatively trying to impose it. They re-issued grossly overbroad requests served on IPC while it was a party, and seek more than thirteen-years of documents and data, including "all Documents" or "Communications" relating to the pork industry. Two other courts have rejected similar, all-encompassing requests by

counsel for some of these same plaintiffs. *See* Order at 11, *In re Turkey Antitrust Litigation,* No. 1:19-cv-08318 (Dkt. 305) (N.D. Ill. Oct. 6, 2021) (granting motion for protective order "in full" as to similar request for documents relating to "competitive conditions" in the turkey industry); *see also In re Subpoena Served on Affiliated Foods, Inc.*, 2021 WL 4439796, at \*3-\*5 (N.D. Tex. Sept. 28, 2021) ("*Affiliated Foods*") (quashing subpoena issued by the class plaintiffs in *Pork* that made similar requests for "all documents" as facially overbroad and unduly burdensome). The class plaintiffs' "broad, sweeping requests for documents" that "encompass an unlimited range of information" or excessively long time periods are completely improper. *WM High Yield v. O'Hanlon*, 460 F. Supp. 2d 891, 896 (S.D. Ind. 2006) (quashing subpoena for eight years of records); *Donald v. Outlaw*, 2020 WL 2899689, at \*9-\*10 (N.D. Ind. June 2, 2020) (quashing subpoena seeking records relating to a six-year span even if they post-dated these six years).

Class plaintiffs claimed in their recent filing in Minnesota that their proposal for custodians and search terms limits the burden, but nothing could be further from the truth—these requests would require IPC to have an e-discovery vendor process an estimated *two terabytes* worth of data at a cost of more than $70,000, before the parties even get to the point of engaging in a "search methodology" discussion class plaintiffs contemplate as a cost savings, which based on IPC's experience with these counsel while it was a party in the litigation will require dozens of attorney hours. And IPC would then still need to retain a large review team to review the documents for responsiveness and privilege. Comparable antitrust cases have required reviews and productions of tens or hundreds of thousands of documents, and there is no reason to expect that the result would be different here given the breadth of these Requests, the time period involved, and the amount of data that would need to be searched. *See* Ex. 10 (Complete Discovery Source Estimate). The vendor fees and costs alone are estimated to reach close to $300,000. *Id.*

IPC's non-party status is also a "significant factor" supporting the motion to quash. *Acuity*, 2018 WL 3375015 at *1. While parties to litigation expect to bear the costs of discovery, non-parties "have a different set of expectations" and "experience an unwanted burden." *Little v. JB Pritzker for Gov.*, 2020 WL 1939358, at *2 (N.D. Ill. Apr. 22, 2020) (internal citation omitted). As a result, "concern for the unwanted burden thrust upon non-parties is a factor entitled to *special weight* in evaluating the balance of competing needs." *Donald*, 2020 WL 2899689 at *6 (emphasis in original) (internal citation omitted). Class plaintiffs argue to the Minnesota court (Ex. 1 (Mem. at 9)) that there is no "former litigant" exception under the federal rules, but that is also a red herring. Class plaintiffs do not (and cannot) dispute that IPC is *now* a non-party and that the burden analysis under Rule 45 is different than for parties under Rule 34. And the fact that IPC was previously a defendant in the *Pork* litigation, and was subjected to the burdens and costs of antitrust litigation for more than two years, should weigh heavily in the Court's assessment of the additional burdens the Subpoena would impose were IPC required to comply. *See, e.g.*, *Spottswood v. Wash. Cnty. MN*, 2021 WL 838769, at *6 (D. Minn. Mar. 5, 2021) (quashing subpoena to dismissed party where files sought were available from the remaining parties.)

## B. Class Plaintiffs Cannot Show The Information is Relevant or Needed.

The Subpoena consists almost entirely of requests for irrelevant information, or information that class plaintiffs should be getting from the parties—the largest pork producers in the country according to plaintiffs. *See* Third Am. Compl. ¶¶ 1-2. For example, Subpoena Requests 1 and 2 seek information about IPC's communications with competitors and other market participants, specifically, email, text messages and phone records. IPC has been dismissed, so any interactions or communications with others are irrelevant to class plaintiffs' case, which seeks to prove an antitrust conspiracy among the remaining defendants. However, to the extent communications that involve IPC exist, class plaintiffs can—and admit that they have—obtained

11

that information from the remaining parties. The same is true for Subpoena Request 9 and its fifteen subparts seeking information about the purported "Competitive Conditions" in the pork industry—the request like the one the court in *Turkey* found should be rejected "in full" due to is overbreadth. *See* Order at 11, *In re Turkey Antitrust Litig.,* No. 1:19-cv-08318 (Dkt. 305) ("Defendants cannot reasonably be expected to produce 'all' of their documents or communications 'related to Competitive Conditions' as Plaintiffs defined them.") The idea that IPC, with its one pork processing plant in Delphi, Indiana and, according to plaintiffs, limited share of the pork market, could add materially more to what plaintiffs have already received from the other defendants that purportedly comprise 70% of the pork market is incredible. Class plaintiffs are getting discovery from companies they claim collectively control the market, so they have no need for this information from IPC, which at best would be cumulative.

The remaining requests—to the extent plaintiffs intend to pursue them—fare no better. Subpoena Requests 3 and 8 are absurdly overbroad, and seeks a host of private information about IPC employees, such as their phone records, contact information, personnel files, CVs, and calendars. Once again, such information has no bearing on liability with respect to the parties that remain in the litigation, and the Request would be exceptionally burdensome to comply with. Subpoena Requests 5-7 ask about record retention, organizational information, and antitrust policies, but that information is also completely irrelevant (and Plaintiffs already have received much of this information anyway, so it is not clear what else they want and why they might conceivably have a legitimate need for it).

Even if class plaintiffs argue that some of these topics might be relevant to establishing the liability of the remaining parties to the litigation, that still gets them nowhere. "Before seeking discovery from a non-party…, a litigant must first attempt to obtain the discovery from another

party in the lawsuit if it appears that the party would have the information that the litigant seeks," and if it fails, "the litigant must provide a reasonable explanation for why it was unable to do so." *Little*, 2020 WL 1939358 at *7. Failure to show that the requested information cannot be obtained from other parties weighs heavily in determining undue burden because a party that does not "exhaust other avenues before targeting a non-party" violates "the basic prohibition against heaping unnecessary burdens on non-parties." *Rossman v. EN Eng'g, LLC*, 467 F. Supp. 3d 586, 592 (N.D. Ill. 2020); *WM High Yield*, 460 F. Supp. 2d at 896. "Accordingly, [a] non-party subpoena seeking information that is readily available from a party through discovery may be quashed as duplicative or cumulative." *Little*, 2020 WL 1939358 at *7 (internal citation and quotation marks omitted). Subpoena requests are unreasonably cumulative when even half of the categories of documents requested duplicate those directed to defendants to the case. *Rossman*, 467 F. Supp. 3d at 590 (collecting cases).

Class plaintiffs have no need for any of this information from IPC, and their best argument appears to be that they think there *may* be some gaps in what they have received from the defendants in the litigation to date, or perhaps there is something internal to IPC that they might find relevant. *See, e.g.,* Ex. 1 (Mem. at 9) (claiming without support that "Indiana Packers *likely* received important industry information and *could have* shared that information with a Defendant or other Pork Integrator, thereby furthering the conspiracy, whether intentionally or inadvertently on Indiana Packers' part.") (Emphasis added). That is plainly not sufficient to sustain the Subpoena; class plaintiffs' vague suspicions do not justify wholesale searches of files for nine individuals over a thirteen-year period. And at the threshold, class plaintiffs' reasons are speculative—they concede they have not even finished conferring with the Defendants about

whether such "gaps" actually exist, or what such gaps represent and why they are essential to their case. *See* Ex. 8 (Decl. of J. Bourne at ¶ 22).[10]

In these circumstances, the Subpoena should be quashed. *See*, *e.g.*, *Cook v. Howard*, 484 Fed. App'x 805, 812-813 (4th Cir. 2012) (finding subpoena properly quashed where "[t]he overwhelming majority of the materials … sought were directed at matters related to the dismissed claims against the [former defendant]"); *Kyner v. Loveridge*, 2019 WL 1778663, at *4 and *6 (S.D. Ind. Apr. 23, 2019) (granting motion to quash subpoenas because the third party was "no longer a defendant," and "her records are no longer relevant"); *Xcentric Ventures, LLC v. Borodkin*, 934 F. Supp. 2d 1125, 1144 (D. Ariz. 2013) (same).

Nor should the Court expend its resources parsing these requests to find a subset of documents that might be suitable for production. Indeed, class plaintiffs have already rejected efforts to reasonably tailor their Subpoena. To rewrite class plaintiffs' Subpoena in these circumstances "would be to unfairly reward [them] despite [the] failure to comply with Federal Rule of Civil Procedure 45's mandate that the party serving a subpoena take reasonable steps to avoid the imposition of an undue burden." *Donald*, 2020 WL 2899689, at *9; *Rossman*, 467 F. Supp. 3d at 592 (refusing to determine which requests were appropriate and which were not because it "is not a court's job to become, in effect, a lawyer for one of the parties").

## II. The Subpoena Also Should Be Quashed Because of Plaintiffs' Unreasonable Delay.

Plaintiffs' claims that they need to impose substantial six-figure burdens on IPC to obtain documents is belied by the fact that they have been dilatory in pursuing the Subpoena. They sent

---

[10] Class plaintiffs' "gap" argument proves too much. If, at some point, they establish that there is a bona fide gap where a highly relevant communication is missing, they could discuss such a gap with counsel for IPC to determine whether the putative missing records are available. The solution is not for IPC to conduct an extensive document review in advance just in case class plaintiffs are unable to resolve their concerns about missing documents with the actual defendants.

the Subpoena to IPC on June 4, 2021, and IPC responded on July 9, 2021. Plaintiffs then took about three months to even begin to engage substantively, and it was not until December 2, 2021 that they actually outlined in detail the specifics about what they actually were seeking. IPC dutifully investigated and responded to those specifics on December 28th. Silence then followed again, this time for another *two and a half months*, before class plaintiffs surfaced on March 11th. Plaintiffs have shown little interest in this process over the past nine months, so they are hard pressed to credibly claim they actually need the information sought, and their sharp tactics in choosing to resurface and then race to another courthouse should not be rewarded. IPC respectfully requests that the Court quash the Subpoena for class plaintiffs' failure to diligently pursue it. *Miller v. Huron Reg'l Med. Ctr., Inc.*, 2013 WL 5755598, at \*2 (D.S.D. Oct. 23, 2013) (quashing third-party subpoena after finding that plaintiff "has abandoned her pursuit of the subpoena by failing to make a motion to compel under Rule 45(d)(2)(B)(i)," where plaintiff served the subpoena on June 13, 2013 and took no further action before the court's ruling on October 23, 2013); *Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620, 622 (D. Nev. 1999) (holding as "untimely" a motion to compel discovery filed one hundred thirty-six days after the receipt of opposing party's answers to interrogatories and request for production of documents); *West v. Miller*, 2006 WL 2349988, at \*6 (N.D. Ill. Aug. 11, 2006), *aff'd*, 2007 WL 541943 (N.D. Ill. Feb. 13, 2007) (denying motion to compel based on "four months of discovery inaction" and "repeated rounds of defective subpoena attempts").

### III. No Exceptional Circumstances Support Class Plaintiffs' Efforts to Force IPC Back Into Court in Minnesota.

Class plaintiffs' recent Minnesota filing cannot divest this Court of its jurisdiction to resolve this dispute. Rule 45(d)(2)(B)(i) provides that this Court—the compliance court—is where class plaintiffs must seek relief. And Rule 45(f) provides transfer elsewhere is appropriate only if

the parties consent or exceptional circumstances exist. IPC does not consent to a transfer. IPC was already—wrongly—brought into the District of Minnesota to defend against these class plaintiffs' claims and was dismissed twice, and the court also denied reconsideration of those decisions. IPC is an Indiana-based company and is entitled to ask the Indiana federal courts to hear its motion and decide this matter. It has no desire to be forced back to the litigation in Minnesota that it was improperly party to for more than two years.

Nor can class plaintiffs demonstrate any exceptional circumstances exist that would warrant transfer, as was the case recently where the class plaintiffs sought transfer of another subpoena dispute in this same litigation. *See Affiliated Foods, Inc.*, 2021 WL 4439796, at *3-*5 (denying transfer of a motion to quash a subpoena issued by these class plaintiffs, and explaining that it is the issuing party's burden to establish exceptional circumstances exist). While Rule 45(f) does not define exceptional circumstances that might warrant transfer, as the 2013 Advisory Committee notes state, a court's "prime concern should be avoiding burdens on local nonparties subject to subpoenas," and courts should not assume "that the issuing court is in a superior position to resolve subpoena-related motions"; *see also Affiliated Foods*, 2021 WL 4439796, at *4. Furthermore, "transfer is appropriate only if [case management] interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion." *Id.*

At the outset, there is no basis to suggest that if this Court decides this motion to quash it would somehow disrupt the *Pork* court's case management, and the mere existence of an MDL is insufficient to warrant transfer. *Id.*; *see also In re Packaged Seafood Prods. Antitrust Litig.*, 2018 WL 454440, at *2 (S.D. Cal. Jan. 17, 2018). This Court is perfectly capable of resolving the parties' dispute with regard to the Subpoena, and class plaintiffs cannot describe any specialized knowledge or skills that are needed and lacking here. IPC's interest in local resolution, by contrast,

is substantial. As the court explained when it quashed these class plaintiffs' subpoena in the *Affiliated Foods* matter, "businesses suffer a multitude of consequences from the overshadowing cloud of ongoing litigation, including damage to reputation, employee morale, and limits on ability to expand. A nonparty business has not subjected itself to litigation and thus should not suffer any more such consequences than absolutely necessary… [a non-party] has a strong interest in immediate resolution without being told to take additional steps in a foreign jurisdiction for the benefit of the parties to the litigation." 2021 WL 4439796 at *4. That is all the more true given that IPC was previously dismissed from the litigation with prejudice.

Class plaintiffs rely on the MDL statute, 28 U.S.C. § 1407, which provides in relevant part that MDL judges "may exercise the powers of a district judge in any district for the purpose of conducting *pretrial depositions* in such coordinated or consolidated pretrial proceedings." (emphasis added). Some courts have read this phrase expansively as authorizing an MDL judge to also rule on subpoenas for documents, and the *Pork* court indicated in a footnote to an unrelated case consolidation order that it is open to that interpretation.[11] However, the *Pork* court did not by any means suggest it was the sole jurisdiction that could hear motions to quash document subpoenas, or purport to rule on this dispute.

In any event, while courts are split on whether Section 1407 can be read so broadly, many courts reject such an expansive interpretation, particularly in light of Rule 45(f), which was added in 2013. *See, e.g., In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2020 WL 8673437 (N.D. Fla. Nov. 18, 2020) (MDL court has no jurisdiction to consider motion to compel, which should have been brought in the compliance court); *In re Monat Hair Care Prods. Mktg., Sales Pracs., and Prods. Liab. Litig.*, 2020 WL 1950463 (S.D. Fla. Apr. 23, 2020) (compliance court had

---

[11] *See* Case Management Order, No. 0:18-cv-01776-JRT-HB (Dkt. 985) at 8, n.1 (November 14, 2021).

jurisdiction to consider motion to compel, which need not have been brought in MDL court); *In re Packaged Seafood Prods. Antitrust Litig.*, 2018 WL 454440 (MDL court had no jurisdiction to consider motion to compel); *see also In re ClassicStar Mare Lease Litig.*, 2017 WL 27455, at *1 n. 4 (E.D. Ky. Jan. 3, 2017) (collecting cases considering the interaction between the MDL statute and Rule 45 and concluding that the majority position is that the proper court is the compliance court); *In re Monitronics Int'l, Inc.*, 2015 WL 12748329, at *2 (N.D.W. Va. Feb. 20, 2015) (motion to compel "more properly filed" in compliance court than MDL court). As the *Affiliated Foods* court explained, the plain language of the MDL statute applies to pretrial depositions only, and Congress' 2013 addition of Rule 45(f) provides that a Court *may* transfer the motion based on either consent of the parties or upon the Court finding exceptional circumstances—but the compliance Court is never *required* to transfer. 2021 WL 4439796 at *4. As a result, Section 1407 does not provide class plaintiffs with a basis to require this Court to transfer this matter to Minnesota.

## IV. The Court Should Award Attorneys' Fees Because Plaintiffs Failed to Take Reasonable Steps to Avoid Imposing Undue Burden or Expense on IPC.

If a party issuing a subpoena does not "take reasonable steps to avoid imposing undue burden or expense" on the recipient, "[t]he court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." Fed. R. Civ. P. 45(d)(1). Such an award is "appropriate when there is insufficient evidence to show that the issuing party took reasonable steps to ensure the subpoena would not result in an undue burden." *Little*, 2020 WL 1939358 at *8 (internal citation and quotations omitted). Reasonable steps include evidence of attempts to obtain information from parties to the case before involving non-parties, which may "obviate the need for non-party subpoenas or at least allow Plaintiff to more narrowly tailor his

non-party subpoenas." *Drics v. Duffy*, 2014 WL 5323737, at *7 (S.D. Ind. Oct. 16, 2014). Parties that continue to seek a non-party's confidential business information after learning that its business is not relevant to their claims or it has been dismissed from the lawsuit likewise fail to take reasonable measures. *Am. Soc. of Media Photographers Inc. v. Google*, 2013 WL 1883204, at *6 (N.D. Ill. May 6, 2013); *Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, 2003 WL 23018833, at *8-*9 (S.D.N.Y. Dec. 23, 2003). Further, refusing to accommodate the subpoena recipient's reasonable efforts to reduce its burden is additional evidence indicating the issuer's noncompliance with its duty and justifies reimbursement of attorney fees and expenses. *Renasant Bank, Inc. v. AVE, Inc*., 2021 WL 254373, at *1-*2 (S.D. Ill. Jan. 26, 2021); *Elliot v. Mission Tr. Servs. LLC*, 2015 WL 1567901, at *6 (N.D. Ill. Apr. 7, 2015); *In re Modern Plastics Corp*., 890 F.3d 244, 251 (6th Cir. 2018); *see also Alerding Castor Hewitt v. Fletcher*, 2017 WL 60355327, at *3 (S.D. Ind. Dec. 5, 2017) (awarding reasonable expenses and fees for motion to quash third-party subpoena pursuant to Fed. R. Civ. P. 37(a)(5) after entering protective order preventing production of documents).

After IPC was dismissed from the underlying litigation, Plaintiffs used Rule 45 to continue to pursue the company with facially burdensome requests that seek irrelevant information. Furthermore, class plaintiffs have refused any reasonable efforts to narrow their requests, and have improperly sought relief in another jurisdiction, driving-up IPC's costs to resolve this matter. As a result, it is appropriate for the Court to award IPC's attorney's fees and expenses associated with this motion for Plaintiffs' failure to take measures to avoid undue burden on IPC. *Elliot*, 2015 WL 1567901, at *6 (movant entitled to award of attorney's fees); *Media Photographers*, 2013 WL 1883204, at *6 (awarding attorney's fees and costs associated with the motion to quash). IPC respectfully requests that the Court award IPC its attorneys' fees and costs, and permit IPC to submit details about those expenses incurred in bringing this motion.

## **CONCLUSION**

IPC respectfully requests that this Court grant IPC's Motion to Quash and Motion for Attorneys' Fees and Expenses.

Dated: March 28, 2022

Respectfully submitted,

Indiana Packers Corporation

s/ *John R. Maley*
John R. Maley (14300-89)
Kendall Millard (25430-49)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
317.231.7464
john.maley@btlaw.com
kendall.millard@btlaw.com

Britt M. Miller (*pro hac vice* forthcoming)
Robert Entwisle (*pro hac vice* forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

William Stallings (*pro hac vice* forthcoming)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000
wstallings@mayerbrown.com

*Counsel for Indiana Packers Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The foregoing Motion was electronically served on all counsel of record today, March 28, 2022, through the Court's CM/ECF system and via email and first-class U.S. mail, postage prepaid, to the following:

Joseph C. Bourne
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2179
612-339-6900
Email: jcbourne@locklaw.com

Brian D. Clark
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2179
612-339-6900
Email: bdclark@locklaw.com

*s/ John R. Maley*
John R. Maley

Case 2:16-cv-00256-DRH-JFB Document 2 Filed 03/28/21 Page 33 of 27 PageID #: 901

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

IN RE PORK ANTITRUST LITIGATION

Misc. Case No. 1:22-mc-25

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MINNESOTA

Civil No. 18-cv-01776-(JRT/LIB)
Civil No. 19-cv-01578-(JRT/LIB)
Civil No. 19-cv-02723-(JRT/LIB)

## NON-PARTY INDIANA PACKERS CORPORATION'S
## APPENDIX OF EVIDENCE

| Exhibit | Description | Date |
|---|---|---|
| 1 | Plaintiffs' Memorandum in Support of Motion to Compel IPC to Comply with Subpoena | March 17, 2022 |
| 2 | Subpoena to PIC to Produce Documents, Information, or Objects or Permit Inspection of Premises in a Civil Action | June 7, 2021 |
| 3 | J. Stilson email to S. Owen re accepting service of subpoena | June 15, 2021 |
| 4 | B. Miller letter to B. Clark and S. Owen responding to Rule 45 subpoena for documents | July 9, 2021 |
| 5 | R. Entwisle email to J. Bourne, J. Stilson, et. al, re subpoena compliance | March 25, 2022 |
| 6 | J. Bourne letter to B. Miller re structured and unstructured data requests | December 1, 2021 |
| 7 | Plaintiffs' First Set of Requests for Production of Documents to the Pork Integrator Defendants | November 1, 2018 |

| 8 | Declaration of Joseph C. Bourne in Support of Plaintiffs' Motion to Compel Indiana Packers Corporation to Produce Documents Responsive to Subpoena Duces Tecum | March 17, 2022 |
|---|---|---|
| 9 | Spreadsheet of Search Terms | December 2, 2021 |
| 10 | CDS letter to R. Entwisle re IPC Antitrust Cost Estimate | March 25, 2022 |
| 11 | B. Miller letter to B. Clark and J. Bourne re compromise with respect to subpoena | December 28, 2021 |
| A | R. Entwisle Declaration | March 28, 2022 |

Dated: March 28, 2022

Respectfully submitted,

Indiana Packers Corporation

s/ *John R. Maley*
John R. Maley (14300-89)
Kendall Millard (25430-49)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
317.231.7464
john.maley@btlaw.com
kendall.millard@btlaw.com

Britt M. Miller (*pro hac vice* forthcoming)
Robert Entwisle (*pro hac vice* forthcoming)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
rentwisle@mayerbrown.com

William Stallings (*pro hac vice* forthcoming)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000
wstallings@mayerbrown.com

*Counsel for Indiana Packers Corporation*

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE PORK ANTITRUST LITIGATION* | Civil No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br><br>ALL ACTIONS | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL INDIANA PACKERS CORPORATION TO COMPLY WITH SUBPOENA DUCES TECUM** |

## <u>REDACTED VERSION – FILED PUBLICLY</u>

565243.5

**<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND .................................................................................................. 2

III.   LEGAL STANDARD ........................................................................................... 5

IV.   ARGUMENT ....................................................................................................... 6

       A.     The Subpoena Seeks Relevant Information. .................................................. 6

       B.     Indiana Packers Cannot Show an Undue Burden and Has Made No
              Effort to Negotiate Search Parameters ......................................................... 9

IV.   CONCLUSION ................................................................................................... 14

## I.   <u>INTRODUCTION</u>

Direct Purchaser Plaintiffs, Consumer Indirect Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, and the Commonwealth of Puerto Rico (collectively, "Plaintiffs") issued a subpoena to Indiana Packers Corporation ("Indiana Packers") seeking nine limited categories of documents. After meeting and conferring, Plaintiffs agreed to seek only Indiana Packers' structured data (e.g., transaction data) and three categories of documents that all, generally, concern competitive conditions in the pork industry (communications with other Pork Integrators, communications with Agri Stats, and other documents concerning competitive conditions in the pork market).

Ultimately, Indiana Packers was willing to produce only its structured data and limited substantive documents that can be acquired through a "go get" search; this was expressly conditioned upon Plaintiffs not seeking emails or other ESI that would require search terms to locate it. As a practical matter, the types of documents that can be obtained through a "go get" search (e.g., board minutes, investor calls and earnings reports, or Agri Stats reports) are unlikely to evince the Defendants' conspiratorial communications and are instead more probative of Indiana Packers' day-to-day business and more general industry information.

Plaintiffs proposed search terms and custodians to Indiana Packers. The search terms were substantially similar to those utilized by other third parties in this litigation, but Plaintiffs also expressly offered to modify and tailor the search methodology if it hit on too many documents. Plaintiffs also offered to provide a document hosting and review platform, at Plaintiffs' expense but which only Indiana Packers could access. Indiana

Packers rejected Plaintiffs' offer and stated that it and Plaintiffs were at an impasse unless Plaintiffs would agree not to seek *any* custodian-based searches for documents.

The information Plaintiffs seek from Indiana Packers is relevant and proportional to the needs of the case. Plaintiffs remain willing to negotiate a search methodology—including the identity and number of custodians, and the particular search terms to be utilized—but will not agree to forego the production of any emails or custodial documents at all. Because Indiana Packers and Plaintiffs are at an impasse, Plaintiffs now seek an Order compelling Indiana Packers to comply with the subpoena (specifically, requests 1, 2, 4, and 9).

## II.  <u>BACKGROUND</u>

Indiana Packers describes itself as "one of the Midwest's premier food companies" and "a fully integrated food supplier with a strong pork background that operates its sourcing, production, sales and shipping all from one Midwest location."[1] Emphasizing that it oversees all stages of production, from procurement to processing and shipping,[2] Indiana Packers offers a wide variety of products, from hams and lunchmeats to bacon and fresh pork items.[3]

Indiana Packers was previously named as a Defendant in this litigation. *See, e.g.*, Direct Purchaser Plaintiffs' Third Am. & Consolidated Class Action Compl., ECF No. 431

---

[1] https://indianapackerscorp.com/company/message-from-president/ (last accessed 1/21/2022); https://indianapackerscorp.com/company/ (last accessed 1/21/2022).
[2] *Id.*
[3] *See* https://indianapackerscorp.com/sales/retail/ (last accessed 1/21/2022).

("Complaint" or "TAC"). The Defendants moved to dismiss, and the Court granted the motion with respect to Indiana Packers (but not the other Defendants), concluding that Plaintiffs did not sufficiently allege parallel conduct—specifically, supply reduction—involving Indiana Packers. Mem. Op. & Order 14, ECF No. 519.



*See, e.g.*, Ex. 1[4] (JBS-PORK-00880538); Ex. 2 (SBF0349004); Ex. 3 (SMITHFIELD01177237).

*See, e.g.*, Ex. 4 (SMITHFIELD03678665). Because of Indiana Packers' size, prominence within the pork industry,

, Plaintiffs subpoenaed Indiana Packers. *See* Ex. 5 (Subpoena to Indiana Packers). The original subpoena contained nine requests, but after Indiana Packers served objections, and following several meet and confers, Plaintiffs limited the subpoena to four. *See* Ex. 6 (Objections and Responses to Subpoena); Ex. 7 (Email Exchange at Oct. 29, 2021 email from J. Bourne); Ex. 8 (Dec. 1, 2021 Letter from J. Bourne). These requests are:

> **Request No. 1**: Communications between You and any Pork Integrator relating to Competitive Conditions[5] in the Pork Industry, including email and text messages;

---

[4] All references to "Exhibit __" in this Memorandum refer to the Exhibits to the Declaration of Joseph C. Bourne in Support of Plaintiffs' Motion to Compel Indiana Packers Corporation to Produce Documents Responsive to Subpoena Duces Tecum ("Bourne Declaration").

[5] The term "Competitive Conditions" is defined in the Schedule A to the subpoena as "Pork costs, pricing, production/output, capacity, sales, demand, supply, imports, exports, or market shares."

> **Request No. 2:** Communications between You and Agri Stats relating to Competitive Conditions in the Pork Industry;
>
> **Request No. 4:** Structured data, such as databases regarding customer purchases of Pork during the Relevant Time Period. Plaintiffs will meet and confer with you regarding the exact data fields and format of the production of the structured data; and
>
> **Request No. 9:** All Documents relating to Competitive Conditions in the market for Pork, including reports, presentations, industry publications, business plans, studies, analyses, or other Documents concerning forecasted, projected, estimated, planned or actual: (i) market shares; (ii) consolidation, mergers, acquisitions, or joint ventures; (iii) production or processing capacity, capacity reduction, capacity utilization, or operating rates; (iv) fixed or variable costs; (v) pricing; (vi) inventories; (vii) entry or exit conditions; (viii) inventories; (ix) supplies/supply trends; (x) data, publications, or other sources use in the regular course of business by You to monitor Pork demand in the United States; (xi) substitute products; (xii) exports; (xiii) raw materials; (xiv) Pork Supply Factors; or (xv) other industry statistics.

*See* Ex. 5 (Subpoena); Ex. 8 (Dec. 1, 2021 Letter from J. Bourne).

With respect to Request No. 4, Plaintiffs provided a list of 17 fields for which they sought data (to the extent those data fields exist and are maintained by Indiana Packers). *See* Ex. 8 (Email Exchange at Oct. 29, 2021 email from J. Bourne); Ex. 8 (Dec. 1, 2021 Letter from J. Bourne). Regarding Requests Nos. 1, 2, and 9, Plaintiffs provided a list of 116 search strings to be run against the custodial files of nine current and former employees of Indiana Packers. *See* Ex. 9 (Search Terms); Ex. 8 (Dec. 1, 2021 Letter from J. Bourne). The search terms are substantially the same as the search terms used in the negotiations with other non-parties in this case. Bourne Decl. ¶ 11. The proposed custodians are the

same custodians that Indiana Packers and Plaintiffs agreed to when Indiana Packers was a Defendant in the case. *See* Ex. 8 (Dec. 1, 2021 Letter from J. Bourne). To further minimize the burden in reviewing and producing these documents, Plaintiffs offered a document hosting and review platform (DISCO) to Indiana Packers to use for their search, review, and production, at no cost to them. *See id.*

With respect to Request No. 4, a request for structured data, Indiana Packers stated it could produce 12 of the 17 proposed data fields. *See* Ex. 10 (Dec. 28, 2021 Letter from B. Miller). Indiana Packers conditioned this potential production, however, on Plaintiffs eliminating Requests Nos. 1, 2, and 9. *See id.* Thus, Indiana Packers conditionally agreed to produce a subset of the requested structured data, but only if Plaintiffs completely withdraw their requests for any unstructured data requiring a search of any custodial files. Indiana Packers has made clear that is a firm line in the sand from its perspective; it will not search for or produce any emails, regardless of any further negotiation and narrowing of proposed search terms and custodians that could occur. *See id.*

### III. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 45(a)(1)(D) authorizes the issuance of a subpoena to a non-party to produce documents, electronically stored information, or other tangible things for inspection. The scope of discovery under Rule 26(b), which permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," applies equally to subpoenas under Rule 45. Fed. R. Civ. P. 45 Advisory Comm.'s Note (1970) ("[T]he scope of discovery through a subpoena

is the same as that applicable to Rule 34 and other discovery rules."); Fed. R. Civ. P. 34(a)

("A party may serve on any other party a request within the scope of Rule 26(b).").

   "[P]ursuant to a subpoena, a non-party can be compelled to produce evidence

regarding any matter relevant to the claim or defense of any party, unless a privilege

applies." *Macro Techs., LLC v. Midkiff*, No. 19-cv-2323 (PJS/LIB), 2020 WL 12442102,

at \*4 (D. Minn. Dec. 7, 2020) (quoting *Keefe v. City of Minneapolis*, No. 09-cv-2941

(DSD/SER), 2012 WL 7766299, at \*3 (D. Minn. May 25, 2012) (internal quotations and

alterations omitted)); *see also* Fed. R. Civ. P. 34(c) ("As provided in Rule 45, a nonparty

may be compelled to produce documents and tangible things or to permit an inspection.").

While a Rule 45 subpoena's requests must be relevant and proportional to the needs of the

case, "[r]elevancy in this context has been construed broadly to encompass any matter that

bears on, or that reasonably could lead to other matter that could bear on, any issue that is

or may be in the case." *Jeffcoat Enters., Inc. v. Charter Commc'ns, Inc.*, No. 4:20-MC-

00112-AGF, 2020 WL 2104732, at \*2 (E.D. Mo. May 1, 2020) (internal quotations

omitted). The party that resists production bears the burden of establishing lack of

relevancy or undue burden. *Midkiff*, 2020 WL 12442102, at \*4.

## IV.    **ARGUMENT**

### A.    **The Subpoena Seeks Relevant Information.**

   Indiana Packers' documents and materials are "relevant to any party's claim or

defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Plaintiffs allege

that a conspiracy to fix, raise, maintain, and stabilize the price of pork was carried out from

at least 2009 through the present. TAC ¶¶ 1-2. Plaintiffs further allege that during this period, eight companies controlled eighty percent of the wholesale pork integration market, one of which was Indiana Packers. TAC ¶¶ 1-2. Indeed, Indiana Packers holds itself out to be not only "one of the Midwest's premier food companies" but also a vertically integrated food supplier with a strong pork background that operates its own sourcing, production, sales, and shipping. As a major player in the pork industry during the relevant period, Indiana Packers possesses documents relevant to Plaintiffs' claims of price fixing and supply restraints in the pork industry. The subpoena requests, therefore, satisfy the liberal discovery permitted by Rule 26(b).

Notably, Indiana Packers engaged in conduct similar to the conduct the Defendants used to effect the conspiracy, and thus is likely to have documents relevant to the Defendants' participation in the conspiracy. Indiana Packers participated in Agri Stats, a benchmarking service that collected and provided easily de-anonymized benchmarking data to its participants. Although Indiana Packers was dismissed from the case as a Defendant, as a participant in Agri Stats, it received information about the remaining Defendants' data while compiling and sending its own data to Agri Stats, which Defendants could have ultimately used to carry out the conspiracy. *See, e.g.*, TAC ¶¶ 34, 40-42, 44-49, 52-57. Internal communications between Indiana Packers employees concerning its communications with Agri Stats also almost certainly exist.

Defendants and their co-conspirators also had opportunities to conspire through their participation in various forums, such as industry and trade association meetings. These occasions provided industry members the ability to discuss pricing, production, and

7

other non-public proprietary information. TAC ¶ 98. For example, Indiana Packers executives Gary Jacobson and Russ Yearwood served on the boards of the former American Meat Institute and the subsequent North American Meat Institute, organizations that boasted "95 percent of red meat . . . in the US and their suppliers throughout America." TAC ¶¶ 109; 110(h). ██████████████████████████████

████████████████████████████████████████████████

████████████ *See* Ex. 11 (SBF0218426). ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ *See* Ex. 12 (JBS-PORK-00096504); Ex. 13 (TF-P-001698022); Ex. 14 (HFC-PORKAT0000025940). ████████████████

████████████████████████████████████████████████

██████████████████████████ *See* Ex. 15 (TF-P-001604401).

Of course, communications pertaining to the pork industry were not limited to invitations and mass emails; Indiana Packers employees communicated with other Defendants and Pork Integrators through independent emails. For example, ██████

████████████████████████████████████████████████

████████████████████████████████████ *See e.g.*, Ex. 16 (SMITHFIELD01237636). Other documents indicate that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ *See* Ex. 17 (TF-P-000646687); Ex. 18 (TF-P-000581785). Still other

documents reflect ████████████████████████████████████████
████████. *See* Ex. 19 (JBS-PORK-01009311). Further, employees of Indiana Packers

likely received important industry information and could have shared that information with

a Defendant or other Pork Integrator, thereby furthering the conspiracy, whether

intentionally or inadvertently on Indiana Packers' part. Documents in response to Requests

No. 1 and 9 capture these communications.

### B. Indiana Packers Cannot Show an Undue Burden and Has Made No Effort to Negotiate Search Parameters

Indiana Packers has not shown, and cannot show, that complying with this subpoena

is disproportional to the needs of the case. The information Plaintiffs seek to obtain is

highly relevant and cannot be fully obtained from the parties to the litigation. While

Defendants' productions include some communications between them and Indiana

Packers, Plaintiffs cannot rely solely on Defendants to produce the same documents that

are in the possession, custody, or control of Indiana Packers. There appear to be some gaps

in Defendants' document productions that, to-date, have not been resolved. Bourne Decl.

¶ 22. And in any event, internal communications *about* communications between Indiana

Packers and a Defendant can be produced only by Indiana Packers.

Indiana Packers has also suggested that because it had the burden of participating in

the litigation until it was dismissed from the case as a Defendant, any non-party discovery

from Indiana Packers is not proportional to the needs of the case. *See* Ex. 10 (Dec. 28, 2021

Letter from B. Miller). But there is no such "former litigant" exception in the text of Rule

45. Indeed, courts have instructed parties that subpoenas are the appropriate method for

getting discovery from a former party. *See, e.g.*, *Wagle v. Mich. Dept. of Corrs.*, No. 10–CV–10506, 2012 WL 4795638, at *2 (E.D. Mich. Oct. 9, 2012) (stating that a party must use a Rule 45 subpoena to retrieve documents from a party that was dismissed from the case); *Gil v. Cty. of Suffolk*, No. CV06-1683(LDW)(ARL), 2007 WL 2071701, at *1 (E.D.N.Y. July 13, 2007) ("As a threshold matter, . . . [the district court judge] granted defendant Spota's motion to dismiss the claims asserted against him. Given that he is no longer a party, the plaintiffs correctly acknowledge that his deposition must be compelled by subpoena."); *Bouchard v. New York Archdiocese*, No. 04 Civ. 9978(CSH)(HBP), 2007 WL 2728666, at *5 n.3 (S.D.N.Y Sept. 19, 2007) ("Since Cardinal Egan is no longer a party to this action, plaintiff will now have to serve a subpoena to compel his deposition."); *Rushing v. Bd. of Supervisors of the Univ. of La. Sys. (Southeastern Louisiana University)*, No. 06–623–RET–SCR, 2008 WL 4330186, at *2 (M.D. La. Sept. 15, 2008) (former defendant could not appear for deposition unless he was issued a subpoena). Even in a case where the court determined that a subpoena to a former party was too broad, the court simply ordered the subpoenaing party to issue renewed, more tailored requests. *Agilysys, Inc. v. Hall*, No. 1:16-CV-03557-ELR, 2018 WL 1229990, at *6 (N.D. Ga. Jan. 11, 2018) (ordering more tailored requests when the original subpoena contained 29 requests, many of which were no longer relevant to the plaintiff's claims). Plaintiffs' efforts to negotiate the requests and search terms, propose custodians, and provide a free document review platform are consistent with these principles.

In its correspondence, Indiana Packers sought to analogize to an order in *In re Turkey Antitrust Litigation*, No. 1:19-cv-08318, Doc No 305. *See* Ex. 10 (Dec. 28, 2021

Letter from B. Miller); Ex. 20 (Turkey Order). There, following initial discovery requests, the defendants moved for a protective order arguing that the plaintiffs' discovery requests were overly burdensome, not proportional to the needs of the case, and that they improperly related to a claim that was dismissed from the case. *See* Ex. 20 (Turkey Order at 2-3, 5). Relevant here, the court determined that one of the plaintiffs' discovery requests was vague and overbroad as written. The original request was, as paraphrased by the court: "all documents or communications between Defendants related to competitive conditions in the turkey industry." *See id.* at 11. As such, the court simply instructed the plaintiffs to reformulate the request more specifically, stating it would "leave that task to the parties." *Id.*

The *Turkey* order does not foreclose the relief Plaintiffs seek. The *Turkey* court did not comment on the appropriateness of search term and custodial file searches to refine the requests; to the contrary, the court instructed the parties to engage in a "meet-and-confer consultation" and to discuss "reasonable search terms for electronically-stored information." *Id.* at 7. Here, Plaintiffs have proposed just that. Plaintiffs sent search terms and proposed document custodians to further refine and narrow the requests. In their proposal, Plaintiffs offered to review search term hit reports and listen to any particular concerns Indiana Packers might have with the specific search terms. See Ex. 8 (Dec. 1, 2021 Letter from J. Bourne). If necessary, Plaintiffs offered to modify and tailor search terms in order to decrease the total number of documents Indiana Packers has to review. *See id.* Plaintiffs offered a document hosting and review platform to which Plaintiffs would have no access and which would be free to Indiana Packers. *See id.* These efforts to work

collaboratively with Indiana Packers mitigate the burden on Indiana Packers. However, Indiana Packers rejected these offers and has foreclosed any further negotiation of search methodology by refusing to consider any request involving search terms and custodians.

Indiana Packers' decision to draw a line in the sand at the use of search terms on custodial ESI is contrary to how courts in this District evaluate disputed document requests. Courts routinely encourage parties to negotiate search terms and custodial files to identify and produce relevant documents. *See, e.g.*, *B. Riley FBR, Inc. v. Clarke*, No. 18-CV-2318 (NEB/BRT), 2020 WL 2488045, at *1 (D. Minn. May 13, 2020) (parties agreed, after hearing, to meet and confer to discuss which search terms to apply in response to a subpoena); *In re Telehealth Prods. Corp. Ltd.*, No. 0:20-mc-00060-WMW-KMM, 2021 WL 1758965, at *1 (D. Minn. May 4, 2021) (requiring that the parties meet and confer regarding the use of search terms); *Hodges v. Pfizer*, No. 14-cv-4855 (ADM/TNL), 2015 WL 13804602, at *8-9 (D. Minn. Dec. 15, 2015) (approving use of approximately 228 search terms across 21 custodians*); Escamilla v. SMS Holdings Corp.*, No. 09–2120 (ADM/JSM), 2011 WL 13243580, at *42 (D. Minn. June 28, 2011) (requiring the parties to develop a list of search terms to use on the Defendants' key custodians). Indiana Packers' demand that Plaintiffs specifically request discrete documents, i.e., "go get" documents, is unhelpful because of the information asymmetry between it and Plaintiffs. *See* Ex. 11 (Dec. 28, 2021 Letter from B. Miller). It is also a hollow offer. The types of documents Plaintiffs could seek with a "go get" search would be limited to documents such as board minutes, meeting minutes, investor calls, and corporate filings—documents that, while relevant and

discoverable, would be far less probative of the Defendants' conspiracy than emails and other communications concerning competitive conditions in the pork industry.

Finally, Indiana Packers has not shown why Plaintiffs' requests and proposals are disproportional to the needs of the case. *See N.U. v. Wal-Mart Stores, Inc.*, No. 15-cv-4885, 2016 WL 3654759, at *7 (D. Kan. July 8, 2016) (overruling "relevance and overbreadth" objections in part because the party resisting discovery failed to address the Rule 26(b) factors). Indeed, it is Indiana Packers' burden to quantify its claimed burden so Plaintiffs and the Court can evaluate it. *Abhe & Svoboda, Inc. v. Hedley*, No. CV 15-1952 (WMW/BRT), 2016 WL 11509914, at *3 (D. Minn. Mar. 15, 2016) ("A party asserting undue burden should submit something in support, whether it be by affidavit or other evidence, to specify the nature of the burden."). Indiana Packers has not provided hit reports or any specific, factual information about its claimed burden, such as the volume of any ESI to be collected, the sources where it is maintained, or the time and expense involved in making such a collection. Instead, it has chosen not to quantify its burden and instead rest on the legally unsupported proposition that email searches are not proportional when the third party is a former party.

As Plaintiffs' efforts to negotiate and work with Indiana Packers demonstrate, Indiana Packers' compliance with Requests 1, 2, 4 and 9 in the subpoena will be proportional to the needs of the case. Third parties routinely produce structured data in antitrust litigation. *See, e.g.*, *In re Novartis & Par Antitrust Litig.*, No. 2:19-MC-00149, 2019 WL 5722055, at *6 (E.D. Pa. Nov. 5, 2019). Plaintiffs have proposed a reasonable search methodology that other third parties have accepted, and they remain willing to

negotiate the particulars of that proposed search methodology, including further refinement of both the custodians and the search terms.

## IV.     CONCLUSION

For the reasons set forth above, and on the basis of the entire record in this litigation, Plaintiffs respectfully request the Court grant Plaintiffs' Motion.

Dated: March 17, 2022

Respectfully submitted,

/s/ Joseph C. Bourne
Joseph C. Bourne (MN #0389922)
W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
Simeon A. Morbey (MN #0391338)
Stephen M. Owen (MN # 0399370)
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South, Suite
2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
jcbourne@locklaw.com
wjbruckner@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com
samorbey@locklaw.com
smowen@locklaw.com

/s/ Bobby Pouya
Bobby Pouya (Pro Hac Vice)
Clifford H. Pearson (Pro Hac Vice)
Daniel L. Warshaw (Pro Hac Vice)
Michael H. Pearson (Pro Hac Vice)
PEARSON, SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Melissa S. Weiner (MN #0387900)
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pswlaw.com

Bruce L. Simon
Benjamin E. Shiftan
PEARSON, SIMON & WARSHAW, LLP
350 Sansome Street, Suite 680
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
bshiftan@pswlaw.com

*Co-Lead Class Counsel for Direct
Purchaser Plaintiffs*

/s/ Shana E. Scarlett
Shana E. Scarlett
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

*Co-Lead Counsel for Consumer Indirect Purchaser Plaintiffs*

/s/ Shawn M. Raiter
Shawn M. Raiter (MN# 240424)
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6518
sraiter@larsonking.com

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com

*Co-Lead Counsel for Commercial and Institutional Indirect Purchaser Plaintiffs*

/s/ Kyle G. Bates
Kyle G. Bates
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
T: (415) 633-1908
kbates@hausfled.com

Peter B. Schneider
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
3700 Buffalo Speedway, Suite 300
Houston, Texas 77098
T: (713) 338-2560
F: (415)421-7105
pschneider@schneiderwallace.com

Todd M. Schneider
Matthew S. Weiler
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell St., Suite 1400
Emeryville, California 94608
T: (415) 421-7100
tschneider@schneiderwallace.com
mweiler@schneiderwallace.com

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
T: (480) 428-0145
gwotkyns@schneiderwallace.com

Domingo Emanuelli-Hernández
Attorney General
Guarionex Díaz Martínez
Assistant Attorney General
Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
T: (787) 721-2900, ext. 2600, 2601
F: (787) 721-3223
gdiaz@justicia.pr.gov

*Counsel for the Commonwealth of Puerto Rico*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

*IN RE PORK ANTITRUST LITIGATION*

This Document Relates To:
ALL ACTIONS

Civil No. 0:18-cv-01776-JRT-HB

**CERTIFICATE OF COMPLIANCE**

I, Joseph C. Bourne, certify that this brief complies with the type-volume limitation of D. Minn. L.R. 7.1(f) and with the type-size limit of D. Minn. L.R. 7.1(h). The brief has 3,668 words of type, font size 13 and was prepared using Microsoft Word 2016, which includes all text, including headings, footnotes, and quotations in the word count.

*/s/ Joseph C. Bourne*
Joseph C. Bourne (MN #0389922)
W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
Simeon A. Morbey (MN #0391338)
Stephen M. Owen (MN # 0399370)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
jcbourne@locklaw.com
wjbruckner@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com
samorbey@locklaw.com
smowen@locklaw.com

# EXHIBIT 2

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

)
IN RE PORK ANTITRUST           )     Civil Action No. 0:18-CV-01776-JRT-HB
LITIGATION                    )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Indiana Packers Corporation, P.O. Box 318, Highway 421 South, County Road 100 North, Delphi, IN 46923
      *(Name of person to whom this subpoena is directed)*

     ☑      *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **As described in the attached Schedule A.**

| Place:   111 Monument Circle, Suite 4350 <br>        Indianapolis, IN 46204 | Date and Time: July 7, 2021, 9:00 a.m. |
|---|---|

     ☐      *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

     The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   June 7, 2021

        *CLERK OF COURT*

                                   OR

                                          s/ Brian D. Clark

    *Signature of Clerk or Deputy Clerk*                        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Class Plaintiffs, who issues or requests this subpoena, are:

Brian D. Clark, Lockridge Grindal Nauen P.L.L.P., 100 Washington Avenue South, Suite 2200 Minneapolis, MN 55401 (612) 339-6900 bdclark@locklaw.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:16-CV-08637-TMD

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)*_____.

☐ I served the subpoena by delivering a copy to the named person as follows:

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United State, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____     _____
*signature*

_____
*Server's Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A)  within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B)  within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i)  is a party or a party's officer; or
    (ii)  is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  (A)  production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B)  inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  *(A)  Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  *(B)  Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i)  At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii)  These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i)  fails to allow a reasonable time to comply;
    (ii)  requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii)  requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv)  subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i)  shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii)  ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  *(A)  Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  *(B)  Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  *(C)  Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  *(D)  Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i)  expressly make the claim; and
    (ii)  describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## PLAINTIFFS' REQUESTS FOR PRODUCTION
## TO INDIANA PACKERS CORPORATION

Pursuant to the foregoing subpoena *duces tecum*, Indiana Packers Corporation is required to produce, by the date stated on the subpoena, the documents requested herein.

## INSTRUCTIONS

1.     Counsel for Direct Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, End-User Consumer Plaintiffs, and the Commonwealth of Puerto Rico ("Plaintiffs") will discuss with you the format and manner in which electronic and paper documents shall be produced.  Unless otherwise agreed, all documents shall be provided in compliance with all provisions of the ESI Protocol Order in place for this matter (Dkt. No. 292, attached).  However, Plaintiffs are willing to receive native productions of documents from You and Bates number those documents on Your behalf to minimize the burden and expense associated with processing and labeling the documents.

2.     Pursuant to Section II.J of the November 26, 2018, Protective Order (Dkt. No. 212, attached), You are entitled to the protections of the Protective Order as a third party receiving a subpoena in this matter.

3.     The Relevant Time Period for each request below is January 1, 2008 through the present, unless otherwise noted.

## DEFINITIONS

1.     "And" and "or" are to be read interchangeably so as to give the broadest possible meaning to a particular request in which either or both is used.

2.     "Communication" or "Communicated" means, without limitation, any exchange of thoughts, messages, or information, as by speech, signals, writing, or behavior, including but not

limited to, any advice, advisement, announcement, articulation, assertion, contact, conversation, written or electronic correspondence, declaration, discussion, dissemination, elucidation, expression, interchange, memoranda, notes publication, reception, revelation, talk, transfer, transmission, or utterance. The phrase "communication between" is defined to include instances where one party addresses the other party but the other party does not necessarily respond.

3.      "Competitive Conditions" means Pork costs, pricing, production/output, capacity, sales, demand, supply, imports, exports, or market shares.

4.      "Defendant" means any company, organization, entity or person presently or subsequently named as a Defendant in this litigation including its predecessors, wholly owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates and any organization or entity managed or controlled by a named Defendant, including those merged with or acquired, together with all present and former directors, officers employees, agents, attorneys, representatives or any persons acting or purporting to act on behalf of a Defendant. The currently named Defendants in this litigation are Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation, Hormel Foods, LLC ("Hormel"), JBS USA Food Company ("JBS" or "JBS USA"), Seaboard Foods LLC, Seaboard Corporation ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson").

5.      "Document" shall have the same meaning as used in Rule 34 of the Federal Rules of Civil Procedure, and shall be construed in its broadest sense to include, without limitation, the final form and all drafts and revisions of any paper or other substance or thing, original or reproduced, and all copies thereof that are different in any way from the original, on which any

words, letters, numbers, symbols, pictures, graphics, or any other form of information is written, typed, printed, inscribed, or otherwise visibly shown, and also every other form of stored or recorded information, whether on film, tape, disks, cards, computer memories, or any other medium and/or device whereby stored information can, by any means whatsoever, be printed or otherwise recovered, generated or displayed in the form of visible, audible, or otherwise perceptible words, letters, numbers, symbols, pictures, or graphics. To illustrate (and not to limit) the breadth of this definition, "document" in this sense papers or objects bearing handwritten notes, material written in Braille, contracts, letters, bills, telegrams, notes, e-mail, voice mail, books, desk calendars, memoranda, envelopes, drafts or partial copies of anything, signs, photographic negatives and prints, video and audio recordings of all kinds and the contents of storage media used in data-processing systems. Each and every draft of a document is a separate document for purposes of these document requests.

6.      "Identity" or "identify" means:

      a.      when used with reference to a natural person, to state his or her full name, and if known, his or her present home address, present business address, present home and business telephone numbers, present or last known position and business affiliation and contact information; and

      b.      when used in reference to any entity, such as a partnership, joint venture, trust or corporation, to state the full legal name of such entity, each name under which such entity does business, the entity's street address, the entity's telephone number, the identity of the chief operating officer, manager, trustee or other principal representative and the identity of those persons employed by or otherwise acting for such entity who are

known or are believed to possess the knowledge or information responsive to the document request and for which the entity was identified.

7.     "Electronically stored information" or "ESI" means and refers to computer generated information or data of any kind, stored in or on any storage media located on computers, file servers, disks, the cloud, tape, or other real or virtualized devices or media. Non-limiting examples of ESI include:

- Digital communications (e.g., email, phone calls and logs of phone calls, voice mail, text messaging, instant messaging, and ephemeral messaging (Snap Chat, Confide, Signal, etc.);

- Email Server Stores (e.g., Lotus Domino .NSF or Microsoft Exchange.EDB);

- Word processing documents (e.g., MS Word or WordPerfect files and drafts);

- Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);

- Accounting Application Data (e.g., Quickbooks, Money, Peachtree data);

- Image and Fascimile Files (e.g., PDF, .TIFF, .JPG, .GIF images);

- Sound recordings (e.g., .WAV and .MP3 files);

- Video and Animation (e.g., AVI and .MOV files);

- Unstructured Data;

- Structured Databases (e.g., Access, Oracle, SQL Server data, SAP);

- Contact and Relationship Management Data (e.g., Outlook, ACT!);

- Calendar and Diary Application Data (e.g., Outlook PST, blog entries);

- Online Access Data (e.g., Temporary Internet Files, History, Cookies)

- Presentations (e.g., PowerPoint, Corel Presentations);

- Network Access and Server Activity Logs;

- Project Management Application Data;

- Backup and Archival Files (e.g., Veritas, Zip, .GHO, iTunes archives of iPhone content);

- Cloud based or other virtualized ESI, including application, infrastructure and data.

8. "Employee" means, without limitation, any Person that You employ or employed during the Relevant Time Period.

9. "Including" is used to emphasize certain types of Documents requested and should not be construed as limiting the request in any way. Including therefore means "including, but not limited to," or "including without limitation."

10. "Meeting" means, without limitation, any assembly, convocation, encounter, communication or contemporaneous presence (whether in person or via any electronic, computer-assisted, digital, analog, video or telephonic method of communication) of two or more persons for any purpose, whether planned or arranged, scheduled or not.

11. "Person" means, without any limitation, any individual, corporation, partnership or any variation thereof (e.g., limited partnership, limited liability partnership), limited liability company, proprietorship, joint venture, association, group or other form of legal entity or business existing under the laws of the United States, any state, or any foreign country.

12. "Policy" or "Procedure" means any rule, practice, or course of conduct, guidelines or business methods or traditions whether formal or informal, written or unwritten, recorded or unrecorded, which was recognized or followed, explicitly or implicitly, by You.

13. "Pork" and "Swine" have the same meaning as the definition in ¶ 2, n.2 of Direct Purchaser Plaintiffs' Third Amended and Consolidated Complaint (ECF No. 431), which states:

> For the purposes of this complaint, "pork" includes pig meat purchased fresh or frozen, smoked ham, sausage, and bacon. From time to time in this complaint,

"pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

14.     "Pork Integrator" means any Defendant (see above) and any non-Defendant entity, including but not limited to: Abbyland Foods, Inc.; ALL Holding Co., LLC; Allied Producers Cooperative; Applegate Farms, LLC; BEF Foods, Inc. (a Post Holdings Co.); Boar's Head; Butterball, LLC (Gusto Packing Co.); Carthage System; Cargill Pork, LLC; Christensen Farms; Clougherty Packing LLC; Conestoga Meat Packers; Eichelberger Farms; Farmington Foods; Fisher Ham and Meat Co.; Golden State Foods; Godshall's Quality Meats; Granjas Carroll de Mexico; Greenwood Packing; Hanor; Holden Farms; HyLife; Indiana Packers Corporation; Iowa Select Farms; J.H. Routh Packing Co.; Johnsonville Sausage; Kayem Foods; Kekén; La Coop Fédérée (Olymel); Maple Leaf Agri-Farms (Maple Leaf Foods); Maxwell Foods; New Fashion Pork; OSI Group; Perdue Farms; Pillen Family Farms; Pine Ridge Farms; Pipestone System; Pork King Packing; Premium Iowa Pork; Prestage Farms; Proteina Animal (PROAN); ProVista Agriculture; Rantoul Foods; Rose Packing; Sara Lee; Schwartz Farms; Sierra Meat and Seafood; Sioux-Preme Packing; Specialty Foods Group; SuKarne; Swaggerty Farm; Swift Pork Co. (part of Swift & Company); Swine Graphics Enterprises; The Maschhoffs; Texas Farm LLC; Trim-Rite Food Corp. (part of Rantoul Foods); TriOak Foods; Wakefield Pork; Williams Sausage; and Wolverine Packing Co.

15.     "Relating to," "referring to," "regarding," "with respect to" or "concerning" mean without limitation the following concepts: concerning, constituting, discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part, directly indirectly. Documents are considered relating to the subject matter whether they are viewed alone or in combination with other Documents.

16. "Representative" shall mean any and all agents, employees, servants, consultants, officers, directors, or other persons authorized to act on Your behalf.

17. "Structured Data" or "Structured Database" refers to data stored in a fixed field within a database or other structured record or file according to specific form and content rules as defined by each field.

18. "Unstructured data" is data that does not conform to a specific, pre-defined data model; it may be human generated and in various formats that fit into structured database tables and columns. Common examples include, but are not limited to, word processing documents, emails, blogs, social media extracts, tweets, picture captions, GPS data, and others of similar variable formats.

19. "You," Your," or "Your company" means Indiana Packers Corporation including its predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates and any organization or entity that You manage or control, including those merged with or acquired, together with all present and former directors, officers, employees, agents, attorneys, representatives or any persons acting or purporting to act on their half.

20. All other words have their plain and ordinary meaning.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** Communications between You and any Pork Integrator relating to Competitive Conditions in the Pork Industry, including email and text messages.

**REQUEST NO. 2:** Communications between You and Agri Stats relating to Competitive Conditions in the Pork Industry or any Pork Integrator.

**REQUEST NO. 3:** For each document custodian we agree upon or the court orders you to collect and produce documents from, produce the following:

    a.  electronic and hard copy diaries, calendars, appointment books, notebooks, to-do lists, Day Timers, day planners or appointment notes;

    b.  contact information maintained in Microsoft Outlook, similar programs, Rolodex cards, or any other format, for any Person who is or was: (i) an owner, employee, consultant, officer, board member, representative, or agent of a Pork Integrator or Agri Stats; (ii) Industry Analyst; or (iii) employee of a Trade Association;

    c.  trip and travel logs, records, expenses, and other supporting Documents;

    d.  expense and entertainment reports, including supporting Documents;

    e.  bills, statements, records, and supporting Documents concerning local, long distance, and cellular telephone calls by such employees, including calls made using telephones not paid for by You (such as home office, fax, and personal telephone numbers, personal cellphones, and temporary pay-as-you go cellphones) if such telephones were used for business purposes;

    f.  Documents relating to membership in any Trade Association or industry group or attendance at any Industry Meeting or Industry Conference;

    g.  a copy of the Person's most recently created resume or curriculum vitae (CV);

    h.  personnel file, including any discipline or performance evaluations, and any terms of employment (such as confidentiality or non-compete agreements);

    i.  copies of any transcripts or recordings of prior testimony relating to Competitive Conditions in the market for Pork, such as testimony at a deposition, trial, or public hearing; and

    j.  Documents sufficient to show the Document Custodian's complete contact information, including all phone numbers, social media user names or "handles," and email addresses used by such persons for any business purposes, even if only sparingly.

**REQUEST NO. 4:** Structured data, such as databases regarding customer purchases of Pork during the Relevant Time Period. Plaintiffs will meet and confer with you regarding the exact data fields and format of the production of the structured data.

**REQUEST NO. 5:** Documents relating to guidelines and policies for compliance with competition or antitrust laws, including training manuals and alleged, suspected, potential or actual violations of such guidelines or policies.

**REQUEST NO. 6:** Documents sufficient to identify your policies and procedures during the Relevant Time Period relating to electronically stored information, including retention periods, use of auto-delete for email or other systems, and employee cellphone use.

**REQUEST NO. 7:** Documents sufficient to identify Your organizational structure, including but not limited to any constitution, formation or organizational documents, articles of incorporation, business licenses, or organizational charts.

**REQUEST NO. 8:** Copies of all Telephone Records in your possession, custody, or control, including Telephone Records of your main phone number(s), main fax number(s), Document Custodian's direct dial or shared phone numbers, and any phone number used as a switchboard for any of your relevant facilities such as your headquarters, administrative offices, Pork processing plants, and Pork sales offices.

**REQUEST NO. 9:** All Documents relating to Competitive Conditions in the market for Pork, including reports, presentations, industry publications, business plans, studies, analyses, or other Documents concerning forecasted, projected, estimated, planned or actual: (i) market shares; (ii) consolidation, mergers, acquisitions, or joint ventures; (iii) production or processing capacity, capacity reduction, capacity utilization, or operating rates; (iv) fixed or variable costs; (v) pricing; (vi) inventories; (vii) entry or exit conditions; (viii) inventories; (ix) supplies/supply trends; (x) data, publications, or other sources used in the regular course of business by You to monitor Pork demand in the United States; (xi)

substitute products; (xii) exports; (xiii) raw materials; (xiv) Pork Supply Factors; or (xv) other industry statistics.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re Pork Antitrust Litigation | Case No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br>All Actions | **ORDER REGARDING<br>PRODUCTION OF<br>ELECTRONICALLY STORED<br>INFORMATION AND<br>PAPER DOCUMENTS** |

This Order Regarding Production Of Electronically Stored Information And Paper Documents ("ESI Protocol Order") shall govern the Parties in the above-captioned case whether they currently are involved or become so in the future, and any related actions that may later be consolidated with this case (collectively, the "Litigation").

## I.   GENERAL PROVISIONS

A.   **Applicability:**  This ESI Protocol Order will govern the production of ESI and paper documents.  To the extent that a Party collected and processed documents prior to the entry of this ESI Protocol Order, and production of such documents cannot be made in accordance with the terms of this ESI Protocol Order, the Parties will meet and confer concerning the potential formats of the production of any such documents.

B.   **Limitations & Non-Waiver:**  Nothing in this ESI Protocol Order shall be construed to affect the admissibility of discoverable information.  All objections to the admissibility of any documents are preserved and may be asserted at any time.  Pursuant to the terms of this ESI Protocol Order, information regarding search process and electronically-stored information ("ESI") practices may be disclosed, but compliance with this ESI Protocol Order does not constitute a waiver, by any Party, of any objection to the production of particular ESI for any reason, including as irrelevant, undiscoverable, or otherwise inadmissible, unduly burdensome or not reasonably accessible, or privileged, nor does it constitute a waiver of any right to discovery by any Party.  For the avoidance of doubt, a Party's compliance with this ESI Protocol Order will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.  All

parties preserve all such privileges and protections, and all parties reserve the right to object to any such privileges and protections.

C.   **ESI Liaisons:**

1.   **Designation:**  Each Party agrees to designate an ESI Liaison within 7 days after entry of this ESI Protocol Order.  Any Party is free to change its designated ESI Liaison by providing written notice to the other Parties.

2.   **Duties of ESI Liaison:**  Each ESI Liaison will be prepared to participate in the resolution of any e-discovery disputes or ESI issues that may arise (or designate another person as primarily responsible) and have access to personnel most knowledgeable about the Party's electronic systems and capabilities in order to, as appropriate, answer pertinent questions.

3.   **Time Frame for ESI Issue Resolution:**  Each ESI Liaison will acknowledge receipt of an ESI-related inquiry from another ESI Liaison within 3 business days after the initial inquiry and respond substantively no later than 10 business days after the initial inquiry. If the responding ESI Liaison believes the ESI issue in question is particularly complex and requires more than 10 business days to respond substantively, then within 10 business days the responding ESI Liaison will provide a general explanation of the process necessary to answer the question and provide an estimated response date.

D.   **Deadlines:** References to schedules and deadlines in this ESI Protocol Order shall comply with Fed. R. Civ. P. 6 with respect to computing deadlines.

E.   **Definitions:**

1.   "Discovery Material" is defined as all information produced, given, or exchanged by and among all Parties, or received from non-Parties in the Litigation, including all deposition testimony, testimony given at hearings or other proceedings, interrogatory answers, documents and all other discovery materials, whether produced informally or in response to requests for discovery.

2.   Plaintiffs and Defendants, as well as their officers, directors, employees, agents, and legal counsel, are referred to as the "Parties" solely for the purposes of this ESI Protocol Order.  A single Plaintiff or Defendant, as well as, where applicable, its respective officers,

directors, employees, agents, and legal counsel, may also be referred to as a "Party" solely for the purposes of this ESI Protocol Order.

3.     "Plaintiffs" as used herein shall mean the putative Direct Purchaser Plaintiff class, Commercial and Institutional Indirect Purchaser Plaintiff class, and End-User Consumer Plaintiff class as set forth in the respective operative complaints.

4.     "Defendants" as used herein shall mean Defendants named in the Direct Purchaser, Commercial and Institutional Indirect Purchaser, and End-User Consumer Complaints.

5.     To avoid misunderstandings about terms, all Parties should consult the most current edition of The Sedona Conference Glossary.

F.     **Authenticity and Admissibility:**  Nothing in this ESI Protocol Order shall be construed to affect the authenticity or admissibility of any document or data.  All objections to the authenticity or admissibility of any document or data are preserved and may be asserted at any time.

G.     **Confidential Information:**  For the avoidance of doubt, nothing herein shall contradict the Parties' rights and obligations with respect to any information designated as confidential under the Agreed Confidentiality Order (Dkt.[X]).

## II.     GENERAL PRODUCTION FORMAT PROTOCOLS

A.     **TIFFs:**  Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files.  Each image will have a file name that is the unique Bates number of that image, pursuant to ¶ II(E).  Original document orientation should be maintained to the extent reasonably practicable and technologically possible for a producing Party's vendor (i.e., portrait to portrait and landscape to landscape).  The imaged Data shall retain all attributes of the native or hard-copy file, such as document breaks.  Produced TIFF images will show all text and images that are visible in the form in which the electronic document was last saved, with the exception of redacted portions.  Hidden content, tracked changes or edits, comments, notes, and other similar information, to the extent viewable within a document in its native file format and visible in the form in which the electronic document was last saved, shall also be imaged so that such content is viewable on the image file.  Nothing in this subsection requires the modification or alteration of any document or data in order to make any hidden content, tracked changes or edits, comments, notes, and other similar information viewable if it is not already viewable in the

form in which the electronic document was last saved. Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively." A producing Party retains the option to produce ESI in alternative formats if so agreed by the requesting Party, which may include native format, or a combination of native and TIFF formats.

B.    **Text Files:**  Each ESI item produced under this ESI Protocol Order shall be accompanied by a text file as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page. Each text file shall be named to use the Bates number of the first page of the corresponding production item.

   1.    **OCR:**  A producing Party may make paper documents available for inspection and copying/scanning in accordance with FED. R. CIV. P. 34 or, additionally or alternatively, scan and OCR paper documents. Where OCR is used, the Parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR text files should indicate page breaks where possible. Even if OCR is used by a producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR.

   2.    **ESI:**  Except for redacted documents, emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available. For redacted documents, Parties shall provide OCR text in accordance with the specifications in Section II.B(1).

C.    **Production of Native Items:**  The Parties agree that ESI shall be produced as TIFF images consistent with the format described in section II.A. with an accompanying load file, which will contain, among other data points, the ESI data points listed in Appendix 1 hereto. The exception to this rule shall be spreadsheet-application files (e.g., MS Excel), presentation files (e.g., MS PowerPoint), personal databases (e.g., MS Access), and multimedia audio/visual files such as voice and video recordings (e.g., .wav, .mpeg, and .avi), for which all ESI items shall be produced in native format upon reasonable request. In the case of personal database (e.g., MS Access) files containing confidential or privileged information, the Parties shall meet and confer to determine the appropriate form of production. When producing the above file types in native format, the producing Party shall produce a single-page TIFF slip sheet indicating that a native item was produced. The corresponding load file shall include NativeFileLink information for each native file that is produced. Further, the Parties agree to meet and confer

prior to producing native file types other than spreadsheet application files, presentation files, and multimedia audio/visual file types such as .wav, .mpeg and .avi. Prior to processing non-standard native files for production, the producing Party shall disclose the file type to and meet and confer with the requesting Party on a reasonably useable production format. The Parties agree to meet and confer to the extent that there is data in database application files, such as SQL, to determine a reasonable form of production of usable data. Through the pendency of the Litigation, the producing Party shall exercise reasonable, good faith efforts to maintain all preserved and produced native files in a manner that does not materially alter or modify the file or the metadata.

D. **Requests for Other Native Files:** Other than as specifically set forth above, a producing Party need not produce documents in native format. If a Party would like a particular document produced in native format and this ESI Protocol Order does not require the production of that document in its native format, the Party making such a request shall explain the reason for its request that the document be produced in its native format. The requesting Party will provide a specific Bates range for documents it wishes to be produced in native format. Any native files that are produced should be produced with a link in the NativeLink field, along with all extracted text and applicable metadata fields set forth in Appendix 1.

E. **Bates Numbering:**

1. All images must be assigned a Bates number that must always: (1) be unique across the entire document production; (2) maintain a constant prefix and length (ten-digits and 0-padded) across the entire production; (3) contain no special characters or embedded spaces, except hyphens or underscores; (4) be sequential within a given document; and (5) identify the producing Party. To the extent reasonably practicable, the Bates number must also maintain consistent numbering across a family of documents.

2. If a Bates number or set of Bates numbers is skipped in a production, the producing Party will so note in a cover letter or production log accompanying the production.

3. The producing Party will brand all TIFF images at a location that does not obliterate or obscure any part of the underlying images.

F. **Parent-Child Relationships:** Parent-child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business should be preserved to the extent

reasonably practicable. For example, if a Party is producing a hard copy printout of an email with its attachments, the attachments should be processed in order behind the e-mail to the extent reasonably practicable.

G. **Entire Document Families: Subject to Paragraphs II(K)(1) and II(K)(2) below,** entire Document families must be produced, even if only the parent email or an attachment to an email is responsive, excepting (1) junk files and non-user-created content routinely excluded during processing (provided such routine processing-generated exclusions are agreed to among the parties), and (2) documents that are withheld on the basis of privilege and in compliance with the parties' stipulation or the Court's order on such assertions of privilege.

H. **Load Files:** All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (such as an Opticon file) as well as a metadata (.dat) file with the metadata fields identified below on the document level to the extent available. The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the Image Load files in the production.

I. **Color:** Documents or ESI containing color need not be produced initially in color. However, if an original document or ESI item contains color markings and it is necessary to see those markings in their original color to understand the meaning or content of the document, then the requesting Party may, in good faith, request that the document or ESI item be produced in its original colors. For such documents, the requesting Party shall provide a list of Bates numbers of the imaged documents sought to be produced in color. The production of documents and/or ESI in color shall be made in single-page JPEG format (300 DPI). All requirements for productions stated in this ESI Protocol Order regarding productions in TIFF format apply to any productions of documents and/or ESI in color made in such an alternative format. Requests that a document be produced in color for the reasons set forth in this ¶ II(I) will not be unreasonably denied by the producing Party. If a producing Party wishes to object, it may do so by responding in writing and setting forth its objection(s) to the production of the requested document in color.

J. **Confidentiality Designations:** If a particular paper document or ESI item qualifies for confidential treatment pursuant to any applicable federal, state, or common law (e.g., Personally Identifiable Information or Protected Health Information), or to the terms of a Protective Order entered by the Court in the Litigation or a confidentiality stipulation entered into by the Parties, the

designation shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying images. This designation also should be included in the appropriate data field in the load file. For documents produced in native format with image placeholders, the placeholder image for the native file should be branded with the appropriate confidentiality designation to the extent possible. Requesting parties shall ensure that the confidentiality claim follows the document regardless of whether the designation imprints on the file when viewed in printed form. Failure to comply with the procedures set forth in this ESI Protocol Order, any protective order or confidential order, or any confidential stipulation shall not waive any protection or confidential treatment. The Parties recognize that document review using technological means may result in the application of greater or lesser confidentiality designations than otherwise appropriate. The Parties agree to work together on an as-needed (and per document) basis to address any potential over (or under) designation.

K.  **Redactions**

1.  **Personal Data Redactions:** A producing Party may redact personal information to the extent that the information falls within one of the following categories: (1) the information relates to medical or health issues of an individual; (2) social security numbers, bank account information, or personal passcodes; or (3) personal contact information of friends or family to the extent they do not work in in the Pork industry or work for a Party's competitors. Such redactions should be identified as "Redacted – Personal Data" on the document.

2.  **Redactions of Nonresponsive Highly Confidential Business Information**: A producing Party may redact specific highly confidential business information relating to non-pork businesses provided (1) the redacted information is both nonresponsive and irrelevant; and (2) the redacted information would not assist in understanding or providing context for the relevant portion of the document or document family of which it is a part. Such redactions must be identified as "Redacted – Highly Confidential Nonresponsive Information.

L.  **Production Media & Protocol:** A producing Party may produce documents via email, readily accessible computer or electronic media, including CD-ROM, DVD, or external hard drive (with standard PC compatible interface) ("Production Media"), or via file-sharing service, including any network-based secure file transfer mechanism or SFTP. Any requesting Party that is unable to resolve any technical issues with the electronic production method used for a particular production may request that a producing Party provide

a copy of that production using Production Media. The producing Party may encrypt Production Media, and will provide a decryption key to the requesting Party in a communication separate from the production itself.

## III. PAPER DOCUMENT PRODUCTION PROTOCOLS

A. **Scanning:** A producing Party may make paper documents available for inspection and copying in accordance with FED. R. CIV. P. 34 or, additionally or alternatively, OCR paper documents. Where OCR is used, the Parties agree that the following ¶¶ III(B)-(E) shall apply.

B. **Coding Fields:** The following information shall be produced in the load file accompanying production of paper documents: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian, (f) Confidentiality, and (g) Redacted (Y/N) or otherwise indicating that a redaction is present. Additionally, all paper documents will be produced with a coding field named "Paper Document" marked with a "Y" or otherwise indicate that the document originated in paper, and such indication shall be explained to the requesting party.

C. **Unitization of Paper Documents:** Paper documents should be logically unitized for production to the extent reasonably practicable. Generally, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records. The Parties will make reasonable efforts to unitize documents correctly.

1. **Relationship:** The relationship among the documents in a folder or other grouping should be reflected in proper coding of the beginning and ending document and attachment fields to the extent reasonably practicable.

2. **Identification:** Where a document, or a document group – such as folder, clipped bundle, or binder – has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

## IV. ESI METADATA FORMAT AND PROCESSING ISSUES

A. **System Files:** ESI productions may be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology as it exists at the time of de-NISTing. Other file types may be added to the list of excluded files if they clearly do not have user-created content.

B.  **Metadata Fields and Processing:**

1.  **Time Zone:** To the extent reasonably practicable, ESI items shall be processed using a consistent time zone (e.g., GMT), and the time zone used shall be disclosed to the requesting Party.

2.  **Auto Date/Time Stamps:** To the extent reasonably practicable, ESI items shall be processed so as to preserve the date/time shown in the document as it was last saved, not the date of collection or processing.

3.  Except as otherwise set forth in this ESI Protocol Order, ESI files shall be produced with at least each of the data fields set forth in Appendix 1 that can reasonably be extracted from a document.

4.  The Parties are not obligated to manually populate any of the fields in Appendix 1 if such fields cannot reasonably be extracted from the document using an automated process, with the exception of the following fields: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian, (f) Confidentiality, (g) Redacted (Y/N), and (h) NativeLink fields, which should be populated regardless of whether the fields can be populated pursuant to an automated process.

C.  **Redaction:**

1.  The Parties agree that, where ESI items need to be redacted, they shall be produced solely in TIFF format with each redaction clearly indicated, except in the case of personal database files (e.g., MS Access), which shall be governed by ¶ II(C), *supra*. Any metadata fields reasonably available and unnecessary to protect the privilege protected by the redaction shall be provided. The Parties understand that for certain MS Excel documents or other file types or files, TIFF redactions may be impracticable. These documents may be redacted in native format.

2.  If the items redacted and partially withheld from production are audio/visual files, the producing Party shall, to the extent reasonably practicable, provide the unredacted portions of the content. If the content is a voice recording, the Parties shall meet and confer to discuss the appropriate manner for the producing Party to produce the unredacted portion of the content.

D.  **Email Collection and Processing:**

1.  **Email Threading:** The Parties may use email thread suppression to avoid review and production of information contained within an

existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression eliminate (a) the ability of a requesting Party to identify every custodian who had a copy of a produced document or email, or (b) remove from a production any unique branches and/or attachments contained within an email thread.

2. **Email Domains:** Producing parties may utilize an ESI search process to identify categories of documents, such as emails from domains typically associated with junk email, such as fantasy football-related emails, retailer advertising, and newsletters or alerts from non-industry sources. To the extent a Party opts to exclude uniquely identifiable email domain names (e.g., emails from domains typically associated with junk or irrelevant topics like sports, fantasy team competitions, retailer advertising, and newsletters or alerts from non-industry sources) as part of its initial filter of potentially responsive documents, the Parties agree to disclose domain names excluded under this paragraph and to meet and confer on the timing for such disclosures.

E. **De-duplication:** A producing Party may de-duplicate any file globally (i.e., across Document Custodians, *see infra* ¶ V(B)(1)) at the "family" level (i.e., families should not be broken due to de-duplication). Each party may also de-duplicate emails in such a way as to eliminate earlier or incomplete chains of emails and therefore produce only the most complete iteration of an email chain. The producing Party will make a reasonable effort to identify all custodians who were in possession of any de-duplicated documents through an appropriate load file such as DuplicateCustodian or CustodianAll/Other. Additionally, all BCC recipients whose names would have been included in the BCC metadata field, to the extent such metadata exists, but are excluded because of horizontal/global de-duplication, must be identified in the BCC metadata field specified in Appendix 1 to the extent such metadata exists. In the event of rolling productions of documents or ESI items, the producing Party will, as needed, supplement the load files with updated duplicate custodian information, as well as BCC information to the extent such metadata exists. Duplicate custodian information may be provided by a metadata "overlay" and will be provided by a producing Party after the Party has substantially completed its production of ESI.

1. Duplicate electronic documents shall be identified by a commercially accepted industry standard (e.g., MD5 or SHA-1 hash values) for binary file content. All electronic documents bearing an identical value are a duplicate group. The producing Party shall use reasonable

efforts to produce only one document image or native file for duplicate ESI documents within the duplicate group to the extent practicable. The producing Party is not obligated to extract or produce entirely duplicate ESI documents. Any other methodology for identification of duplicates, including email field selection for hash value creation, must be discussed with the requesting Party and approved in writing before implementation.

2. Duplicate messaging files shall be identified by a commercially accepted industry standard (e.g., MD5 hash values) for the email family, which includes the parent and email attachments. Duplicate messaging materials will be identified at a family level, including message and attachments. Email families bearing an identical value are considered a duplicate group. The producing Party shall use reasonable efforts to produce only one document image or native file for duplicate emails within the duplicate group to the extent practicable.

F. **Zero-byte Files:** The Parties may, but are not required to, filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names. If the requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the requesting Party may request that the producing Party produce the zero-byte file. The requesting Party may provide a Bates number to the producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production.

G. **Microsoft "Auto" Feature:** To the extent reasonably practicable and technologically possible for a producing Party's vendor, Microsoft Excel (.xls) and Microsoft PowerPoint (.ppt) documents should be analyzed for the "auto" features, where documents have an automatically updated date and time in the document, file names, file paths, or similar information that when processed would be inaccurate for how the document was used in the ordinary course of business. If "auto date," "auto file name," "auto file path," or similar features are identified, the produced document shall be identified in a load file, metadata field, or otherwise as having these features.

H. **Hidden Text:** ESI items shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments.

I. **Embedded Objects:** Microsoft Excel (.xls) spreadsheets embedded in Microsoft Word documents will be extracted as separate documents and

treated like attachments to the document. The Parties agree that other embedded objects, including, but not limited to, logos, icons, emoticons, and footers, may be culled from a document set and need not be produced as separate documents by a producing Party (e.g., such embedded objects will be produced within the document itself, rather than as separate attachments).

J.   **Compressed Files:**  Compression file types (i.e., .CAB, .GZ, .TAR, .Z, and .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

K.   **Password-Protected, Encrypted, or Proprietary-Software Files:**  With respect to any ESI items that are password-protected or encrypted within the scope of review, the producing Party will take reasonable steps based on industry standards to break the protection so that the documents can be reviewed and produced if appropriate.  In the event that encrypted or password-protected documents, which are reasonably likely to be responsive to a document request, remain for a particular custodian after such reasonable efforts have been made, the producing Party shall advise the requesting Party. ESI that cannot be reviewed because proprietary software is necessary to view the ESI will be disclosed to a requesting Party, and the Parties shall meet and confer regarding the next steps, if any, with respect to such ESI.

## V.   PARAMETERS FOR CULLING AND REVIEWING ESI AND PAPER DOCUMENTS

A.   **General Provisions:**

1.   **Time Period:** Except as noted elsewhere in this paragraph, the Parties agree that they may limit the processing of discoverable information to that which was created, modified, sent, or received from a start date to be negotiated by the parties within 30 days of a ruling on the motions to dismiss, through June 30, 2018.

2.   **Meet and Confer:**

a.   **Commencement of Custodian Discussions:** The parties will commence discussions about Document Custodians and non-custodial document sources.

b.   If the Parties cannot reach agreement under the provisions of this Section V, any dispute may be presented to the Court.  All meet and confer sessions under this Section V will involve

each Party's respective ESI Liaison and will give appropriate consideration to minimizing expense.

3.   **Non-Waiver:**  The Parties' discussion of proposed search terms, Document Custodians or Sources does not preclude a Party from requesting additional search terms, Document Custodians or  Sources pursuant to the terms of this ESI Protocol Order, nor does it preclude a Party from objecting to any such additional requests.

B.   **Document Custodians and Sources:**

1.   **Initial Document Custodians and Sources**:   Consistent with paragraph V.A.2.a. of this ESI Protocol, the Parties agree to commence discussions about Document Custodians and non-custodial document sources, including the process and procedure for negotiating and disclosing such sources.

2.   **Additional Document Custodians or Sources:**  If, after the initial Document Custodian and Source negotiations and order described in the preceding paragraph, a Requesting Party determines that additional Document Custodians or Sources should be added, then the Requesting Party shall advise the Producing Party in writing of the proposed additional Document Custodians or Sources and the basis for the request.  If the Parties have not agreed whether to add the Document Custodian or Source within 21 days of the Requesting Party's request, then the Parties may bring the matter to the Court via motion within 21 days or the issue is waived, unless the parties agree to defer resolution of the issue.   The parties shall raise disputed Document Custodians or Sources via a joint letter brief not to exceed five pages split equally between Plaintiffs and Defendants.

3.   Except by agreement of the Parties or by order of the Court, a Producing Party is not required to add Document Custodians or Sources after the deadlines identified in paragraphs V(B)(1).

C.   **Search Methodology**

1.   **Use of Search Terms to Cull Unstructured ESI:**

a.   The Parties may use search terms and other limiters, including, by way of example only, date ranges and email domains in metadata fields, as a means of limiting the volumes of information to be reviewed for responsiveness.  To the extent that search terms are used to identify responsive ESI, a

Producing Party will notify the Requesting Party of its intent to use search terms and disclose to the Requesting Party (1) an initial list of search terms the Producing Party intends to use and (2) whether the Producing Party intends to use different search terms with different Document Custodians or Sources. The Parties will meet and confer in good faith regarding the disclosure and formulation of appropriate search terms and protocols to cull unstructured ESI.

b. **Addition or Removal of Search Terms After Initial Search Term Negotiation:** If, after the completion of the initial search methodology negotiations, a requesting or producing Party determines that any search terms should be added to or removed from the initial search term list, then the requesting or producing Party shall advise the affected Parties in writing of the proposed change(s) to the search term(s) and of the reason(s) for the proposed change(s).

c. Except by agreement of the Parties or by order of the Court, a Producing Party is not required to add search terms after completion of the process described in paragraph V(C)(1)(a).

2. **Use of Technology Assisted Review or Other Advanced Technology-Based Analytics to Cull Unstructured ESI:**

a. **Use of TAR:** A Party may use Technology Assisted Review ("TAR") to sort documents for linear review without disclosure of that use. If a Party elects to use TAR to cull or otherwise limit the volume of unstructured ESI subject to linear review, the parties will meet and confer regarding the following parameters that will apply to the use of TAR.

   i. **Paper Documents:** The Parties agree to meet and confer to determine whether paper documents may be included in a TAR process.

   ii. **The TAR Tool:** A Producing Party shall describe to a Requesting Party the vendor and the TAR technology or tool being used, including a description of the TAR tool's procedures.

b. A Producing Party need not conduct any additional review of information subjected to, but not retrieved by, a TAR tool as

part of the identification of the subset of information that will be subject to review and production.

D. **Structured Data:** To the extent a response to discovery requires production of discoverable ESI contained in a structured database, the Parties shall meet and confer in an attempt to agree upon a set of queries to be made for discoverable information and generate a report in a reasonably usable and exportable electronic file for review by the Requesting Party. Upon review of the report, the Requesting Party may make reasonable requests for additional information to explain the database schema, codes, abbreviations, and different report formats or to request specific data from identified fields.

E. **Custodial Cellphone & Personal Communications Data:**

1. **Cellphones:** For Document Custodians agreed on by the Parties or ordered by the Court, a Producing Party will take reasonable steps to identify whether any unique responsive communications are located on any cellphones in the possession, custody, or control of the Producing Party. Unless agreed otherwise, the following shall govern the identification of unique, responsive, and non-privileged communications for cellphone-based data for the agreed or ordered Document Custodians with respect to cellphones in the possession, custody, or control of the Producing Party.

   a. A Producing Party shall use reasonable due diligence to ensure that reasonably available sources of data/applications on a cellphone and related backups and archives, if those data sources/applications are used for work purposes, are evaluated and considered as a potential source of data subject to discovery, including without limitation call and voicemail logs, text messages, contacts, and social media. Prior to any culling of the cellphone data, a Producing Party will disclose whether or not the Producing Party claims that a cellphone used by the Document Custodian for work purposes is not within its possession, custody, or control. A Producing Party shall not be required to disclose any other cellphone-related information prior to any culling of cellphone data.

   b. A Producing Party will consider the sources of information on a cellphone identified below, to the extent reasonably available, to identify unique, responsive, and discoverable information. The parties will meet and confer regarding any culling of the sources of information below.

i.  **Cellphone Call and Voicemail Logs:** The logs of any calls made/received and logs of voicemails left on a cellphone that the Document Custodian used for work purposes, if any, if the cellphone is in the possession, custody, or control of a producing Party.

ii. **Text Messages:** All text messages and/or iMessages on the cellphone device used for work purposes or contained in available backups/archives associated with the device, if any, if the cellphone is in the possession, custody, or control of a Producing Party.

2.  **"Contacts":** A Document Custodian's relevant contacts (e.g., MS Outlook Contacts or cellphone-based contacts) in the possession, custody or control of a Producing Party will be exported to MS Excel (or .csv) with all reasonably available metadata fields. A Producing Party is entitled to redact or withhold information from the contacts file that does not relate to the Document Custodian's work—including, but not limited to, the name and contact information for any family or friends not involved in the Pork industry. If, after reviewing the redactions, the Requesting Party believes that more information is needed about the redactions, then the Parties will meet and confer regarding the information redacted, and the producing Party shall provide explanations for information redacted or withheld. Any document produced with redactions permitted under this ESI Protocol shall maintain the electronic search capabilities of the other data in the spreadsheet.

3.  **Social Media Data:** If a Document Custodian confirms that he or she (1) used Social Media for business purposes and (2) used that Social Media to communicate with an employee of another Defendant or otherwise regarding a subject relevant to the Litigation and included within a Request for Production, subject to objections to that Request, then the requested communication(s) must be produced if it is reasonably accessible, in the Producing Party's possession, custody, or control, and not withheld as privileged and/or as illegal to produce under applicable privacy laws. The Parties shall meet and confer to the extent there are any issues with respect to the format of such Social Media data.

## VI.  **MISCELLANEOUS PROVISIONS**

A.  **Inaccessible ESI:** If a producing Party asserts that certain categories of ESI that are reasonably likely to contain responsive information are inaccessible

or otherwise unnecessary under the circumstances, or if the requesting Party asserts that, following production, certain ESI is not reasonably usable, the Parties shall meet and confer with their respective technology experts to discuss resolving such assertions.  If the Parties cannot resolve any such disputes after such a meet and confer has taken place, the issue shall be presented to the Court for resolution.

B.    **Variations or Modifications:**  Variations from this ESI Protocol Order may be required.  Any practice or procedure set forth herein may be varied by agreement of all affected Plaintiffs and all affected Defendants, which will be confirmed in writing.  In the event a producing Party determines that a variation or modification is appropriate or necessary to facilitate the timely and economical production of documents or ESI, the producing Party will notify the requesting Party of the variation or modification.  Upon request by the requesting Party, those Parties will meet and confer to address any issues in a reasonable and timely manner prior to seeking Court intervention.

**SO ORDERED.**

Dated:  February 20, 2019                      s/ Hildy Bowbeer
                                                              HILDY BOWBEER
                                                              United States Magistrate Judge

535532.3                                          17

## Appendix 1: ESI Metadata and Coding Fields

| Field Name[1] | Populated For (Email, Edoc, Calendar, Contact, Cellphone, or All) | Field Description |
|---|---|---|
| BegBates | All | Control Numbers. |
| EndBates | All | Control Numbers. |
| BegAttach | All | Control Numbers (First production Bates number of the first document of the family). |
| EndAttach | All | Control Numbers (Last production Bates number of the last document of the family). |
| Custodian | All | Custodian name (ex. John Doe). |
| DupCust, CustodianOther, or CustodianAll | All | All custodians who were in possession of a de-duplicated document besides the individual identified in the "Custodian" field. |
| LogicalPath | All ESI Items | The directory structure of the original file(s). Any container name is included in the path. |
| Hash Value | All | The MD5 or SHA-1 hash value. |
| NativeFile | All | Native File Link. |
| Email Thread ID | Email | Unique identification number that permits threading of email conversations. For instance, unique MS Outlook identification number ("PR_CONVERSATION_INDEX") is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, that facilitates use of email threading. |
| Thread Index | Email | Message header identifier, distinct from "PR_Conversation_Index", that permits threading of email chains in review software. |
| EmailSubject | Email | Subject line of email. |
| DateSent | Email | Date email was sent. |
| DateMod | Email, Edoc | Date the document was modified. |
| TimeSent | Email | Time email was sent. |
| TimeZoneUsed | All | Time zone used to process data during document collection and processing. |

[1] Field Names can vary from system to system and even between different versions of systems. Thus, Parties are to be guided by these Field Names and Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI Protocol Order.

| Field Name[1] | Populated For (Email, Edoc, Calendar, Contact, Cellphone, or All) | Field Description |
|---|---|---|
| ReceiveTime | Email | Time email was received. |
| To | Email | All recipients that were included on the "To" line of the email. |
| From | Email | The name and email address of the sender of the email. |
| CC | Email | All recipients that were included on the "CC" line of the email. |
| BCC | Email | All recipients that were included on the "BCC" line of the email. |
| DateCreated | Edoc | Date the document was created. |
| FileName | Email, Edoc | File name of the edoc or email. |
| Title | Edoc | Any value populated in the Title field of the document properties. |
| Subject | Edoc | Any value populated in the Subject field of the document properties. |
| Author | Edoc | Any value populated in the Author field of the document properties. |
| DocExt | All | File extension of the document. |
| TextPath | All | Relative path to the document level text file. |
| Redacted | All | "X," "Y," "Yes," and "True" are all acceptable indicators that the document is redacted. Otherwise, blank. |
| Withheld Placeholder | All | To the extent a document is fully withheld (on the basis of privilege or otherwise), this field must be populated with a "Y" |
| Privilege Asserted | All | To the extent a document has been withheld on the basis of privilege or redacted on the basis of privilege, the text pertaining to such assertion of privilege shall be included as a metadata field (e.g., "Redacted – Attorney Client Privileged" or "Withheld – Attorney Client Privileged") |
| Paper | All | "Y" if document is scanned from hard copy in connection with the collection and production of documents in this matter. |
| Legend/Confidentiality | All | Indicates if document has been designated as "Confidential" or "Highly Confidential" under the Protective Order. |

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| In re Pork Antitrust Litigation | Civil No. 18-cv-1776 (JRT/HB) |
| This Document Relates To:  All Actions | **PROTECTIVE ORDER** |

Pursuant to the proposed Protective Order, attached as Exhibit A to the Joint Status Report and Letter Brief (ECF No. 203-1), e-filed by the parties on October 30, 2018,

**IT IS HEREBY ORDERED** that the proposed Protective Order (ECF No. 203-1) is **ADOPTED**, and confidential information shall be disclosed only in the following ways:

1. **Scope.** All documents, electronically stored information, items, and other information produced or adduced in the course of discovery, regardless of the medium or manner generated, stored, maintained or revealed (including, among other things, initial disclosures, responses to discovery requests, deposition testimony, and exhibits), and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Order concerning Confidential or Highly Confidential Information as defined below.  This Order shall apply to any named party to this action (including all of its officers, directors, employees, retained experts, outside counsel (and their support staff)).  This Order is subject to the Local Rules of this District and the Federal Rules of

Civil Procedure on matters of procedure and calculation of time periods.

      2.     **Confidential Information.**  As used in this Order, "Confidential Information" means any document, or any portion thereof, which contains confidential or proprietary business, commercial, research, personnel, product or financial content belonging to the producing party, and which is designated as "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" for purposes of this litigation.  Confidential Information may fall within one or more of the following categories:  (a) information prohibited from disclosure by statute or contractual agreement; (b) information that reveals trade secrets; (c) research, technical, commercial or financial information that the party has maintained as confidential; (d) medical information concerning any individual; (e) personal identity information; (f) income tax returns (including attached schedules and forms), W-2 forms and 1099 forms; or (g) personnel or employment records of a person who is not a party to the case.  The parties will make reasonable efforts to ensure that information or documents that are available to the public are not designated as Confidential Information.

      3.     **Highly Confidential Information.**  As used in this Order, "Highly Confidential Information" means any document, or any portion thereof, which a producing party or non-party believes to be so highly sensitive that:  (i) it is the subject of reasonable efforts to maintain its secrecy; (ii) it is sufficiently valuable and secret to afford a potential or actual advantage over others; (iii) its disclosure to existing or potential competitors or customers would cause injury to the business, commercial, competitive, or financial interests of the producing party or non-party; and (iv) it is

designated as "HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" for purposes of this litigation.  By way of example only, Highly Confidential Information may include but is not limited to:  (a) current or future business strategies and other strategic planning information; (b) projections or plans regarding performance, budgets, production, output, sales, marketing or distribution practices; (c) research and development information; (d) manufacturing know-how or technology; (e) board of directors materials and presentations; (f) customer lists or information; (g) negotiation strategies; (h) proprietary software, systems, or processes; (i) margin, cost, and pricing information; or (j) intellectual property.  If required by applicable privacy laws, Highly Confidential Information may also include personnel files that are designated as such for purposes of this litigation.

   **4.    Designation.**

   (a)    A party may designate a document as Confidential or Highly Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" on the document and on all copies in a manner that will not interfere with the legibility of the document.   To the extent a document is produced in a form in which placing or affixing the words "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" on the document is not practicable, the producing party may designate the document as confidential by cover letter, slip sheet, or by affixing a label to the production media containing the document.

As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries or descriptions that contain the Confidential or Highly Confidential Information. The marking "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" shall be applied prior to or at the time the documents are produced or disclosed. Applying such marking to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" shall also be so marked, except that indices, electronic databases or lists of documents that do not contain substantial portions or images of the text of documents designated as Confidential or Highly Confidential Information and do not otherwise disclose the substance of the Confidential or Highly Confidential Information are not required to be marked.

   (b)  Though the parties understand that the designation of a document as Confidential or Highly Confidential Information is a certification by an attorney that the document contains Confidential or Highly Confidential Information as defined in this Order, the parties recognize that document review using technological means may result in the application of greater or lesser confidentiality designations than otherwise appropriate. The parties agree to work together on an as-needed (and per document) basis to address any potential over (or under) designation.

   5.  **Depositions.** Unless all parties agree otherwise on the record at the time

the deposition testimony is taken, all deposition testimony taken in this case shall be treated as Confidential Information for a period of thirty (30) days after the transcript is delivered to the party being deposed.   If counsel for any party states on the record that the deposition testimony should be treated as Highly Confidential Information, such testimony will be treated as Highly Confidential Information for the thirty (30)-day period following the delivery of the transcript to the party seeking to designate material as confidential.  No later than the thirtieth day after the transcript is delivered to the party being deposed or a party seeking to designate material as confidential, whichever is later, a party may serve a Notice of Designation to all parties of record and the court reporter for the deposition in question as to specific pages of the transcript that are designated Confidential or Highly Confidential Information, and thereafter only those portions identified in the Notice of Designation shall be protected by the terms of this Order.  The court reporter shall provide a final copy of the transcript that reflects any designations of pages of the transcript as Confidential or Highly Confidential Information in the lower left-hand corner of each designated page.

   **6.  Protection of Confidential or Highly Confidential Material.**

   (a)  **General Protections.**  Except as set forth below, Confidential or Highly Confidential Information shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in subparagraph (b) for any purpose whatsoever other than the prosecution or defense of claims in, or the settlement of, this litigation, including any appeal thereof.  In this putative class action, Confidential or Highly Confidential Information may be disclosed only to the named plaintiffs and not to any

other member of the putative class unless and until a class including the putative member

has been certified.  Nothing in this Order, however, shall prevent or prejudice any party

designating materials Confidential or Highly Confidential Information from using its own

such designated documents for any purpose, including privately disclosing its own

Confidential or Highly Confidential Information to others not mentioned in this

Paragraph 6, and such private disclosure shall not waive the protections of this Order.

      (b)     **Limited Third-Party Disclosures.**  The parties and counsel for the

parties shall not disclose or permit the disclosure of any Confidential or Highly

Confidential Information to any third person or entity except as set forth below in

subparagraphs (1)-(10) and (1)-(9), respectively.  Subject to these requirements, the

following categories of persons may be allowed to review Confidential Information:

      (1)    Counsel.  Outside or in-house counsel for the parties (or in-house

counsel for the parties' affiliates) and employees of such counsel who

have responsibility for the preparation and trial of the action;

      (2)    Parties.  Individual parties and employees or former employees of a

party, but only to the extent counsel has a good-faith basis for

believing such Confidential Information is relevant to events,

transactions, discussions, communications or data about which the

individual party, employee, or former employee has knowledge;

disclosure to such individual party, employee, or former employee is

limited to the portion of the document about such events, transactions,

discussions, communications, or data; and such party, employee, or

former employee has completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound to this Order;

(3)     The Court and its personnel;

(4)     Court Reporters and Recorders.  Court reporters and recorders engaged for depositions;

(5)     Contractors.  Those persons specifically engaged for the limited purpose of making copies of documents or organizing or processing documents, including outside vendors hired to process electronically stored documents;

(6)     Consultants and Experts.  Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action but only after such persons have completed the certification contained in Attachment A to this Order;

(7)     Witnesses.  During depositions or testimony at trial or any hearing, witnesses in this action to whom disclosure is reasonably necessary, provided that counsel for the party intending to disclose the information has a good-faith basis for believing such Confidential Information is relevant to events, transactions, discussions, communications or data about which the witness is expected to testify or about which the witness may have knowledge.  Witnesses shall not retain a copy of documents containing Confidential Information,

except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts. Pages of transcribed testimony that are designated as Confidential Information pursuant to Paragraph 5 may not be disclosed to anyone except as permitted under this Order.

(8)     Author or recipient. The author or recipient of the document (not including a person who received the document solely in the course of litigation);

(9)     Identified Persons. Any person who is referenced in the document or whose conduct is purported to be identified in the document, provided that counsel for the party intending to disclose the information has a good-faith basis for believing such Confidential Information is relevant to events, transactions, discussions, communications or data about which the person has knowledge; disclosure to such person is limited to the portion of the document in which the person or person's conduct is identified or referenced; and such person has completed the certification contained in Attachment A to this Order; and

(10)    Others by Consent. Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered, but such consent shall not be unreasonably withheld.

The following categories of persons may be allowed to review Highly Confidential Information:

(1)     Counsel.  Outside counsel for the parties and employees of such counsel who have responsibility for the action, provided that such individuals do not regularly participate in the commercial business activities of the party;

(2)     The Court and its personnel;

(3)     Court Reporters and Recorders.  Court reporters and recorders engaged for depositions;

(4)     Contractors.  Those persons specifically engaged for the limited purpose of making copies of documents or organizing or processing documents, including outside vendors hired to process electronically stored documents;

(5)     Consultants and Experts.  Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action but only after such persons have completed the certification contained in Attachment A to this Order;

(6)     Witnesses.  During depositions or testimony at trial or any hearing, witnesses in this action to whom disclosure is reasonably necessary, provided that counsel for the party intending to disclose the information has a good-faith basis for believing such Highly Confidential Information is relevant to events, transactions,

discussions, communications or data about which the witness is expected to testify or about which the witness may have knowledge. Before disclosing any document pursuant to this paragraph, counsel who intends to disclose the document must first notify counsel for the designating party of their intent to do so. At depositions, trial or hearings, such notice may be accomplished by presenting a copy of the Highly Confidential Information to counsel for the designating party and permitting counsel an opportunity to object before the document is shown to the witness. Until the designating party agrees to the disclosure, or the Court orders such disclosure, Highly Confidential Information shall not be disclosed to or discussed with any witness. Witnesses shall not retain a copy of documents containing Highly Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts. Pages of transcribed testimony or exhibits to depositions that are designated as Highly Confidential Information must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

(7)     Author or recipient. The author or recipient of the document (not including a person who received the document solely in the course of litigation);

(8)     Identified Persons. Any person who is referenced in the document

10

or whose conduct is purported to be identified in the document,

provided that counsel for the party intending to disclose the

information has a good-faith basis for believing such Highly

Confidential Information is relevant to events, transactions,

discussions, communications or data about which the person has

knowledge; disclosure to such person is limited to the portion of the

document in which the person or person's conduct is identified or

referenced; and such person has completed the certification

contained in Attachment A to this Order; and

(9)     Others by Consent.  Other persons only by written consent of the

producing party or upon order of the Court and on such conditions as

may be agreed or ordered, but such consent shall not be unreasonably

withheld.

To the extent any person is required to complete the certification contained in

Attachment A to this Order, facsimile signatures or signatures transferred in electronic

format (*e.g.,* PDF) shall be treated as original signatures purposes of this Order.

(c)     **High Level Summaries**.  Notwithstanding the provisions of

paragraph 6(b), outside counsel for a party that is a corporation or other type of business

entity may provide high level summaries or characterizations of the evidence in the case to

individuals employed by the party who have responsibility to make decisions regarding the

defense or settlement of the case.  Nothing in this Order is intended to bar or otherwise

prevent any counsel from rendering advice to his or her client with respect to this litigation

and, in the course of rendering such advice, from relying upon his or her examination or knowledge of Confidential or Highly Confidential Information.

(d)      **Control of Documents.**  Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential or Highly Confidential Information.  Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of three years after the termination of the case.

7.      **Absent Class Members.**  Confidential or Highly Confidential Information may not be disclosed to absent members of a certified class (each an "Absent Class Member") who have not intervened or otherwise appeared in this litigation, except under the circumstances described in Paragraph 6(a)-(b) of this Order.  If, however, Confidential or Highly Confidential Information is contained in a filing with the Court pursuant to Paragraph 9 of this Order, such filing may be disclosed to counsel for the Absent Class Member (or the Absent Class Member if not represented) for purposes of evaluating any settlement affecting the Absent Class Member, provided that such counsel, if any, and the Absent Class Member have completed the certification contained in Attachment A to this Order.

8.      **Inadvertent Failure to Designate.**  An inadvertent failure to designate a document as Confidential or Highly Confidential Information does not, standing alone, waive the right to so designate the document.  If a party designates a document as Confidential or Highly Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to ensure

12

that the document is treated in accordance with the provisions of this Order.   No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential or Highly Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential or Highly Confidential Information.

9.      **Filing of Confidential or Highly Confidential Information.**  This Order does not, by itself, authorize the filing of any document under seal.  Any party wishing to file a document designated as Confidential or Highly Confidential Information in connection with a motion, brief or other submission to the Court must comply with Local Rule 5.6.

10.      **No Greater Protection of Specific Documents.**  Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection.  Nothing in this Order shall prevent a party from seeking greater or lesser protection with respect to the use of any Confidential or Highly Confidential Information.

11.      **Challenges by a Party to Designation as Confidential or Highly Confidential Information.**  The designation of any document as Confidential or Highly Confidential Information is subject to challenge by any party.  The following procedure shall apply to any such challenge.

(a)      **Meet and Confer.**  A party challenging the designation of Confidential or Highly Confidential Information must do so in good faith and must begin

the process by conferring directly with counsel for the designating party. In conferring, the challenging party must explain the basis for its belief that the confidentiality designation was not proper and must give the designating party an opportunity to review the designated document, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation. The designating party must respond to the challenge within five (5) business days of the meet and confer.

(b)     **Judicial Intervention.**  A party that elects to challenge a confidentiality designation may (i) seek informal dispute resolution with the Court if such process can be mutually agreed upon with the designating party; or (ii) file and serve a motion that identifies the challenged document and sets forth in detail the basis for the challenge. Each such motion's supporting brief may not exceed five (5) pages and must be accompanied by a competent declaration that affirms that the movant has complied with the meet and confer requirements of this procedure outlined above. The burden of persuasion in any such challenge proceeding shall be on the designating party, who shall have the right to respond to any motion filed by a challenging party. Until the Court rules on the challenge, all parties shall continue to treat the document as Confidential or Highly Confidential Information under the terms of this Order. As such, any motion challenging a confidentiality designation must not publicly file the documents with contested designations nor describe them in a manner that would reveal Confidential or Highly Confidential Information.

12.     **Action by the Court.**  Applications to the Court for an order relating to documents designated Confidential or Highly Confidential Information shall be by motion.

Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

13.     **Use of Confidential or Highly Confidential Documents or Information at Trial.**  Nothing in this Order shall be construed to limit the use of any document at any trial or hearing provided that the parties take necessary advance precautions to avoid the public disclosure of Confidential or Highly Confidential Information.  A party that intends to present or that anticipates that another party may present Confidential or Highly Confidential Information at a hearing or trial shall bring that issue to the Court's and parties' attention by motion or in a pretrial memorandum sufficiently in advance of the proceeding without disclosing the Confidential or Highly Confidential Information. The Court may thereafter make such orders as are necessary to govern the use of such documents at hearing or trial.

14.     **Third Parties.**  In seeking discovery from third parties, the parties shall attach this Order to a copy of any subpoena or other discovery request.  Third parties from whom discovery is requested are parties to this Order and are entitled to the protections of this Order in responding to such requests.

**15.     Confidential or Highly Confidential Information Subpoenaed or Ordered Produced in Other Litigation.**

(a)     If a receiving party is served with a subpoena or an order issued in other litigation that would compel disclosure of any document designated in this action as Confidential or Highly Confidential Information, the receiving party must so notify the

designating party, in writing, immediately and in no event more than three court days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

(b)     The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order. In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c)     The purpose of imposing these duties is to alert the interested persons to the existence of this Order and to afford the designating party in this case an opportunity to try to protect its Confidential or Highly Confidential Information in the court from which the subpoena or order issued. The designating party shall bear the burden and the expense of seeking protection in that court of its Confidential or Highly Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody or control Confidential or Highly Confidential Information by the other party to this case.

16.     **Challenges by Members of the Public to Sealing Orders.**  If a party or interested member of the public challenges the sealing of particular documents that have been filed under seal, the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

16

17.     **Unauthorized Disclosure or Use.**  If a party learns that it or its counsel, officers, directors, employees, consultants, experts or other agents have disclosed documents designated Confidential or Highly Confidential Information in any circumstance not authorized under this Order, that party must within two (2) business days of learning of such disclosure (a) notify the designating party of the disclosure and all pertinent facts relating thereto, (b) make every reasonable effort to prevent disclosure by each unauthorized person who received such information, (c) use reasonable best efforts to retrieve all copies of the protected documents disclosed to unauthorized persons, (d) inform the person or persons to whom unauthorized disclosures were made of the terms of this Order, and (e) request that each such person execute the certification contained in Exhibit A to this Order.  Nothing contained herein shall limit the right of the designating party to seek relief against the party responsible for such disclosure.

18.     **Limitations on Waiver of Privilege.**

(a)     **Clawback of Inadvertent Disclosure.**  This Order is entered, *inter alia*, pursuant to Federal Rule of Evidence 502(d).  If a party or non-party that produces or otherwise discloses information in connection with this Litigation (the "Producing Party") thereafter claims that such information is protected by any privilege or attorney work product protection ("Disclosed Protected Information"), the disclosure of the Disclosed Protected Information shall not constitute or be deemed a waiver or forfeiture of any claim of privilege or work product protection that the Producing Party would otherwise be entitled to assert with respect to the Disclosed Protected Information and its subject matter in this proceeding or in any other federal or state proceeding.  The parties

17

stipulate that by entering this Confidentiality Order, the Court shall provide the maximum protection allowed by Rule 502(d).

          (1)      **Assertion of a Clawback.**  Any Producing Party may request, in writing, the return of any Disclosed Protected Information by identifying it and stating the basis for withholding such material or information from production.  The Producing Party must also provide a privilege log explaining the basis for the assertion of the privilege within 3 business days of asserting a clawback.

          (2)      **Clawbacks before Deposition.**  To the extent a party believes a clawback made prior to a scheduled deposition impacts that deposition, the parties will meet and confer and a party may seek guidance from the Court if the meet and confer does not reach a successful resolution.

          (3)      **Clawback  Process.**  <u>Federal Rule of Civil Procedure 26(B)(5)(b)</u> shall govern the clawback of Disclosed Protected Information.

          a.      If a Producing Party requests the return of such Disclosed Protected Information then in the custody of one or more parties, the receiving parties shall—unless it contests the claim of attorney-client privilege or work product protection in accordance with sub-paragraph 18(b)(2)(b) – within ten (10) business days of receipt of written notice (i) destroy or return to the Producing Party the Disclosed Protected Information and all copies thereof, and (ii) provide a certification of counsel that all of the Disclosed Protected Information has been returned or destroyed.

          b.      **Challenging a Clawback.**  Notify the producing Party or non-Party that it wishes to challenge the claim of privilege or work product

protection and has sequestered the material until the issue can be resolved.  The Parties

agree to meet and confer regarding the claim of privilege.  If, at the conclusion of the

meet and confer process, the Parties are still not in agreement, they may bring the issue to

the Court.  A Party challenging a clawback request under this paragraph may use the

clawed-back document and its contents for the purpose of filing a motion with the Court

under seal that challenges whether or not the document is privileged or work product only

in accordance with the provisions of Fed. R. Civ. P. 26(b)(5)(B).

                       c.      The parties may stipulate to extend the time periods set

forth in sub-paragraph (a).

                       d.      Disclosed Protected Information that is sought to be

reclaimed by the parties to this case pursuant to this Order shall not be used as grounds by

any third party to argue that any waiver of privilege or protection has occurred by virtue of

any production in this case.

                       e.      The Producing Party retains the burden of

establishing the privileged or protected nature of the Disclosed Protected Information.

Nothing in this paragraph shall limit the right of any party to petition the Court for an *in*

*camera* review of the Disclosed Protected Information.

                   (b)      Where a party agrees to or is ordered to destroy a clawed back

document, the party must instruct their e-discovery vendor to delete the document entirely

from their e-discovery database and delete other copies of the clawed back document.

To the extent that it is not technologically feasible for a receiving party to destroy a

clawed back document (for example, if the clawed back document is part of a production

provided on read-only production media such that the clawed back document cannot be destroyed without destroying the entire production media), the parties will meet and confer as to an acceptable alternative approach.

(c)     **Receiving Party's Obligation.**  Without waiving the ability to challenge a clawback under ¶ 18(a)(3)(b) a party who discovers that it may have received an inadvertently disclosed or produced protected document must promptly notify the disclosing or producing party.  A party who is notified or discovers that it may have received a protected document must comply with <u>Fed. R. Civ. P. 26(b)(5)(B)</u>.

### 19.    Claims of Privilege and Redactions

(a)     **Production of Privilege Logs.**  Except as provided otherwise below, for any document withheld in its entirety or produced but redacted, the producing Party will produce privilege/redaction logs in MS Excel format or any other format that permits electronic sorting and searching.  All privilege logs will served within 60 days after Substantial Completion of Document Productions.

(b)     **Exclusions from Logging Potentially Privileged Documents.** The following categories of documents do not need to be contained on a producing Party's initial privilege log, unless good cause exists to require that a Party do so.

>  (1)     Information generated after June 30, 2018.  This provision does not apply to third parties to the Litigation.
>
>  (2)     Any communications exclusively between a producing Party and its outside counsel, an agent of outside counsel other than the Party, any non-testifying experts in connection with

specific litigation, or with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts in connection with specific litigation.

(3)  Any privileged materials or work product created by or specifically at the direction of a Party's outside counsel, an agent of outside counsel other than the Party, any non-testifying experts in connection with specific litigation, or with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts in connection with specific litigation.

(c)  Privilege Log Requirements:

(1)  **Metadata Log.**  To the extent applicable, each Party's privilege log only needs to provide objective metadata (to the extent it is reasonably available and does not reflect privileged or protected information) and an indication of the privilege or protection being asserted.

a.  Objective metadata includes the following (as applicable to the document types as shown in Appendix A to the ESI Protocol Order):

i.  A unique privilege log identifier that makes clear the familial relationship of documents, i.e., parent/child.
ii.  Custodian
iii.  DuplicateCustodian, CustodianOther or

21

<div style="margin-left: 3em;">
                CustodianAll (if applicable)
</div>

|       |                |
|-------|----------------|
| iv.   | File Name      |
| v.    | Email Subject  |
| vi.   | Author         |
| vii.  | From           |
| viii. | To             |
| ix.   | CC             |
| x.    | BCC            |
| xi.   | Date Sent      |
| xii.  | Date Received  |
| xiii. | Date Created   |

        b.      In addition to the objective metadata fields, a Party must also include a field on its privilege log entitled "Attorney/Description of Privileged Material" if the basis for the privilege asserted is not apparent from the objective metadata (e.g., the name of the attorney will be provided if not included in the objective metadata). Further, a Party must manually populate on its privilege log an author and date for any withheld document where that information is not provided by the objective metadata, unless such information is not reasonably discernable from the document or the information is not necessary to evaluate the claim of privilege in light of the metadata that is discernable and/or the information provided in the Attorney/Description of Privileged Material field.

        c.      With respect to the "Email Subject" or "File Name" field, the producing Party may substitute a description of the document where the contents of these fields may reveal privileged information. In the privilege log(s), the producing Party shall identify each instance in which it has modified the content of the "Email Subject" or "File Name" field (e.g., "[metadata redacted/altered to protect privilege].")

        d.      Should a receiving Party, in good faith, have reason

to believe a particular entry on a metadata-generated privilege log is responsive and does not reflect privileged discoverable information, the receiving Party may request, and the producing Party will not unreasonably refuse to provide, more information about the basis of the asserted privilege in compliance with Fed. R. Civ. P. 26(b)(5).

(2)     **Email Chains.**  If there is more than one branch of (i.e., more than one unique group of recipients of) an email thread, each branch will be individually logged; however, each individual email within the thread need not be logged if the recipients of the email chain are all identical.   A Party asserting privilege over a chain of emails may produce only a single redacted copy of such email chain consistent with the ESI Protocol to the extent some portions are only partially privileged, except that any unique branches of the email chain must also either be produced in redacted form or included on the metadata privilege log.

(3)     **Email Families.**  Attachments to emails shall be logged as separate documents on the log, with family relationships identified.

(d)     **Documents Redacted for Privilege.**  As an initial production matter, redacted documents need not be logged as long as (a) for emails, the objective metadata (i.e., to, from, cc, bcc, recipients, date, and time, unless the privilege or protection is contained in these fields) is not redacted, and the reason for the redaction, including the nature of the privilege asserted, is noted on the face of the document, or, if noting the nature on the face of the document is not technologically feasible, is noted in the metadata field provided in section F below (for redacted documents where the subject matter is not decipherable as a result of redactions, a description of the contents of the

document that is sufficient to understand the subject matter of the document may be requested); and (b) for non-email documents, the reason for the redaction is noted on the face of the document in the redacted area.   The producing Party will undertake reasonable efforts to make limited, line-by-line redactions of privileged or work product information.   After receipt of the production, the requesting Party may request in good faith that the producing Party create a privilege log for specific redacted documents. Electronic documents that are redacted shall be identified as such in a "redaction" field in the accompanying data load file.

(e)      **Challenges to Privilege Claims.**  Following the receipt of a privilege/redaction log, a requesting Party may identify, in writing (by Bates/unique identified number), the particular documents that it believes require further explanation. The producing Party shall endeavor to respond to such a request within 14 days.  If a Party challenges a request for further information, the Parties shall meet and confer to try to reach a mutually agreeable solution.   If they cannot agree, the matter may be brought to the Court.

(f)      **Privilege Metadata Fields.**  Where a document is either withheld in full or redacted on the basis of a privilege, then that privilege shall be provided in a metadata field entitled "Privilege Asserted" and list a short description of the privilege asserted (e.g., "Attorney Client Privilege", "Attorney Work Product").

**20.      Obligations on Conclusion of Litigation.**

(a)      **Order Continues in Force.**  Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to

further appeal.

(b)      **Obligations at Conclusion of Litigation.**  Within sixty (60) days

after dismissal or entry of final judgment not subject to further appeal, all Confidential and

Highly Confidential Information, including copies as defined in Paragraph 4(a), shall be

returned to the producing party unless:  (1) the document has been offered into evidence

or filed without restriction as to disclosure; (2) the parties agree to destruction to the extent

practicable in lieu of return; or (3) as to documents bearing the notations, summations or

other mental impressions of the receiving party, that party elects to destroy the documents

and certifies to the producing party that it has done so.

(c)      **Retention of Work Product and Filed Documents.**

Notwithstanding the above requirements to return or destroy documents, counsel may

retain (1) email correspondence related to their representation, (2) attorney work product,

including an index that refers or relates to designated Confidential or Highly Confidential

Information so long as that work product does not duplicate verbatim substantial portions

of Confidential or Highly Confidential Information; and (3) one complete set of (a) all

documents filed with or by the Court, including those filed under seal; (b) all transcripts of

depositions, including exhibits; and (c) all final expert witness reports and supporting

materials disclosed pursuant to Rule 26 of the Federal Rules of Civil Procedure.  Any

retained Confidential or Highly Confidential Information shall continue to be protected

under this Order.  An attorney may use his or her work product in subsequent litigation,

provided that its use does not disclose Confidential or Highly Confidential Information.

Nothing in this Order shall be construed to require the destruction or return of Confidential

or Highly Confidential Information stored in counsels' archives, back-up media, or disaster recovery media.

(d)      **Deletion of Documents filed under Seal from Electronic Case Filing (ECF) System.**  Filings under seal shall be deleted from the ECF system only upon order of the Court.

21.      **Order Subject to Modification.**  This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

22.      **No Prior Judicial Determination.**  This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document designated Confidential or Highly Confidential Information by counsel or the parties is entitled to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue.

23.      **Persons Bound.**  This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

24.      **Future Parties.**  The terms of this Order shall be binding upon all current and future parties to this litigation and their counsel; any party appearing in the litigation following entry of this Order shall be deemed to have joined the case subject to its provisions.

25.      **Personal Jurisdiction.**  Nothing herein shall be construed as a

determination by the Court, or as a consent or waiver by any party, or parent or affiliate of

any party, that such party, or parent or affiliate of a party, is subject to personal

jurisdiction in this Court or that discovery as to such party, or parent or affiliate of a party,

shall proceed pursuant to the Federal Rules of Civil Procedure.


Dated:  November 26, 2018              _s/ Hildy Bowbeer_____
                                       HILDY BOWBEER
                                       United States Magistrate Judge

27

## ATTACHMENT A TO PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re Pork Antitrust Litigation

Civil No. 18-cv-1776 (JRT/HB)

This Document Relates To:  All Actions

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

The undersigned hereby acknowledges that he/she has read the Protective Order in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms.  The undersigned submits to the jurisdiction of the United States District Court for the District of Minnesota in matters relating to the Protective Order and understands that the terms of the Protective Order obligate him/her to use materials designated as Confidential or Highly Confidential Information in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential or Highly Confidential Information to any other person, firm, or concern.

The undersigned acknowledges that violation of the Protective Order may result in penalties for contempt of court.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

_____

Date: _____     _____
                                   Signature

# EXHIBIT 3

## Spadafora, Andrew

| | |
|---|---|
| **From:** | smowen@locklaw.com |
| **Sent:** | Tuesday, June 15, 2021 10:29 AM |
| **To:** | stilson.jaime@dorsey.com |
| **Cc:** | Clark, Brian D. (EXTERNAL CONTACT); Sipe, Elizabeth M. (EXTERNAL CONTACT) |
| **Subject:** | RE: [EXTERNAL] Subpoena to Indiana Packers Corporation in In re Pork Antitrust Litigation,  No. 18-CV-01176-JRT-HB |

Yes, agreed.

**From:** stilson.jaime@dorsey.com <stilson.jaime@dorsey.com>
**Sent:** Tuesday, June 15, 2021 10:23 AM
**To:** Owen, Stephen M. <smowen@locklaw.com>
**Cc:** Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>; stilson.jaime@dorsey.com
**Subject:** RE: [EXTERNAL] Subpoena to Indiana Packers Corporation in In re Pork Antitrust Litigation, No. 18-CV-01176-JRT-HB

Hi Steve,

To be clear on timing, I am accepting service of the subpoena to IPC (attached) as of today, June 15.

Thanks,
Jaime

**From:** Owen, Stephen M. <smowen@locklaw.com>
**Sent:** Tuesday, June 15, 2021 10:14 AM
**To:** Stilson, Jaime <stilson.jaime@dorsey.com>
**Cc:** Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Subject:** RE: [EXTERNAL] Subpoena to Indiana Packers Corporation in In re Pork Antitrust Litigation, No. 18-CV-01176-JRT-HB

Thank you for getting back to us, Jaime. You should have the subpoena through the email we sent on Friday June, 4.

**From:** stilson.jaime@dorsey.com <stilson.jaime@dorsey.com>
**Sent:** Monday, June 14, 2021 2:44 PM
**To:** Owen, Stephen M. <smowen@locklaw.com>
**Cc:** Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Subject:** RE: [EXTERNAL] Subpoena to Indiana Packers Corporation in In re Pork Antitrust Litigation, No. 18-CV-01176-JRT-HB

Hi Steve,

Circling back on your request below. I am authorized to accept service of the subpoena on behalf of IPC.

Thanks,
Jaime

**From:** Stilson, Jaime
**Sent:** Monday, June 7, 2021 2:01 PM
**To:** 'Owen, Stephen M.' <smowen@locklaw.com>
**Cc:** Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Subject:** RE: [EXTERNAL] Subpoena to Indiana Packers Corporation in In re Pork Antitrust Litigation, No. 18-CV-01176-JRT-HB

Hi Steve,

I write to acknowledge receipt of your inquiry regarding the subpoena to IPC in this matter. Given receipt of your email after business hours on Friday, I am checking with lead counsel/the client and will circle back on the service question.

Thanks,
Jaime

---

**From:** Owen, Stephen M. <smowen@locklaw.com>
**Sent:** Friday, June 4, 2021 6:11 PM
**To:** Stilson, Jaime <stilson.jaime@dorsey.com>
**Cc:** Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Subject:** [EXTERNAL] Subpoena to Indiana Packers Corporation in In re Pork Antitrust Litigation, No. 18-CV-01176-JRT-HB

Hello Jaime,

My name is Steve Owen and I represent the Direct Purchaser Plaintiffs in *In re Pork Antitrust Litigation*, No. 18-CV-01176-JRT-HB. We intend to serve the attached subpoena on Indiana Packers Corporation on Monday. However, as you previously represented IPC in this matter, we wanted to know whether you are accepting service on their behalf before serving IPC directly.

Please let us know.

Thank you.

Best,
Steve
This e-mail may contain information that is privileged, confidential or otherwise protected from disclosure. If you are not the intended recipient or otherwise have received this message in error, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you are not the intended recipient or otherwise have received this message in error, please notify us immediately by e-mail, discard any paper copies and delete all electronic files of the message.

# EXHIBIT 4



<div align="right">
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
United States of America

T: +1 312 782 0600
F: +1 312 701 7711

mayerbrown.com
</div>

July 9, 2021

<u>BY EMAIL</u>
Brian Clark
Stephen Owen
LOCKRIDGE GRINDAL NAUEL P.L.L.P.
100 Washington Avenue South
Minneapolis, MN  55401-2179
bdclark@locklaw.com
smowen@locklaw.com

Re:     <u>Rule 45 Subpoena to Indiana Packers</u>
        <u>Corporation</u>

Counsel,

This letter responds to the Rule 45 subpoena for documents that Plaintiffs[1] served on Indiana Packers Corporation ("IPC") as of June 15, 2021 ("Subpoena" or "Requests").  As you know, IPC was dismissed with prejudice from the *Pork Antitrust Litigation* because Plaintiffs twice failed to "allege Indiana Packers' involvement in the conspiracy."  *See* Am. Order at 25 (Oct. 20, 2020) (Dkt. 520); *see also* Am. Order (Aug. 8, 2019) (Dkt. 361).  The Court also rejected Plaintiffs' request to reconsider that dismissal with prejudice, finding that "concerted action by IPC could not be reasonably inferred" and that Plaintiffs "failed to clear the initial hurdle to plead a plausible Sherman Act claim against IPC."  Order at 5 & n.1 (Feb. 4, 2021) (Dkt. 672).

Notwithstanding Judge Tunheim's *three* prior dismissal orders, Plaintiffs are improperly using Rule 45 to simply reissue burdensome discovery requests that were served on IPC while it was a party to the lawsuits.  These reissued Requests do not seek relevant information and much, if not all, of the information sought is cumulative and duplicative of discovery Plaintiffs are already obtaining ***from the actual defendants*** in the litigation.  Plaintiffs also have made no attempt to avoid the significant expense and undue burden that these Requests would impose on IPC, in contravention of Rule 45.

Accordingly, at the outset we want to make clear that IPC reserves all rights to seek appropriate relief in response to the Subpoena, including sanctions and attorney's fees from Plaintiffs and their counsel.  Further, although Plaintiffs purport to issue the Subpoena from the District of Minnesota, IPC does not consent to that Court's jurisdiction in connection with the Subpoena

---

[1] The Subpoena defines the "Plaintiffs" as "Direct Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, End-User Consumer Plaintiffs, and the Commonwealth of Puerto Rico."

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 2

and any proceeding related to the Subpoena must be brought in the U.S. District Court for the N.D. Indiana.

## OBJECTIONS TO INSTRUCTIONS

1.      IPC objects to the Subpoena's compliance deadline as it does not provide sufficient time for IPC to respond to the Requests, if required to do so.  Indeed, IPC understands that the parties to the litigation are not even required to substantially complete their own productions until September 2021, based on discovery requests issued and negotiated during 2019, and third party discovery need not be completed until September 2022.

2.      IPC objects to Instruction No. 1 as unduly burdensome.  To the extent IPC produces any documents in response to the Subpoena Requests, IPC reserves the right to produce such documents in a reasonably useable format of its choosing that minimizes its expense and burden.

3.      IPC objects to Instruction No. 2 to the extent that the provisions of the Protective Order do not provide sufficient protection for information responsive to the Subpoena.  IPC reserves all rights to require appropriate protection for any materials that it agrees to produce, whether or not provided for in the Protective Order.

4.      IPC objects to Instruction No. 3, which defines the "Relevant Time Period" as "January 1, 2008 through the present" as overly broad, unduly burdensome, and to the extent it seeks information that even Plaintiffs themselves have agreed is irrelevant in the underlying litigation.  *See, e.g.*, March 15, 2019 Letter from B. Clark to Defendants.  IPC does not adopt Plaintiffs' expansive and unwarranted thirteen-year time period in response to any of the Subpoena Requests.

## OBJECTIONS TO DEFINITIONS

1.      IPC objects to the definitions of "and" and "or" as overly broad and unduly burdensome in purporting to "give the broadest possible meaning" to the Requests.

2.      IPC objects to the definitions of "Communication" or "Communicated" as overly broad, unduly burdensome, and vague.  As written, the terms encompass matters that are not reasonably understood as constituting a "communication" (*e.g.*, "behavior," "contact," "revelation," "reception.")

3.      IPC objects to the definition of "Competitive Conditions" as overly broad, unduly burdensome, and encompassing information that is irrelevant, and is vague, ambiguous, and subject to multiple interpretations.

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 3

4.    IPC objects to the definition of "Defendant" as overly broad, unduly burdensome, vague, ambiguous and subject to multiple interpretations, and because it purports to include entities and persons that are not Defendants in the litigation.

5.    IPC objects to the definition of "Documents" as it includes materials not within IPC's possession, custody, or control, and because its application would be unduly burdensome. The definition encompasses information that is not proportional to the needs of the litigation and would require IPC to attempt to access, review, and produce information that is not reasonably accessible due to undue burden or cost.

6.    IPC objects to the definitions of "Identity" and "Identify" as overly broad, vague, ambiguous, subject to multiple interpretations, and unduly burdensome in that they purport to require IPC to answer the Subpoena requests as though they were interrogatories. IPC further objects to the extent these definitions seek information that is not within IPC's possession, custody, or control.

7.    IPC objects to the definition of "ESI" as overly broad and unduly burdensome. The definition not only includes materials not within IPC's possession, custody, or control but encompasses information that is not proportional to the needs of the litigation, and would require IPC to attempt to access, review, and produce information that is not reasonably accessible due to undue burden or cost.

8.    IPC objects to Plaintiffs' incorporation of their definitions of "Person" and "You" "without limitation," and "Relevant Time Period" into the definition of "Employee," the definition is overly broad and unduly burdensome and it purports to include individuals and entities who are not employed by IPC, and seeks information beyond IPC's possession, custody, or control.

9.    IPC objects to the extent that applying the definition of "Including" would be unduly burdensome.

10.    IPC objects to the definition of "Meeting" as overly broad in that it goes far beyond any normal interpretation of that term and would be unduly burdensome to apply. IPC further objects to the extent that this definition seeks information that is neither reasonably accessible, nor within IPC's possession, custody, or control.

11.    IPC objects to the term "Person" as overly broad, unduly burdensome, and vague, ambiguous, and subject to multiple interpretations.

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 4

12.   IPC objects to the definition of "Policy" or "Procedure" as overly broad and unduly burdensome, particularly in its reference to "course[es] of conduct," "business methods or traditions" that may be "informal" or "unwritten" or followed by some unidentified person "implicitly."  This definition includes matters that are not legitimately viewed or considered to be policies or procedures.

13.   IPC objects to the term "Pork Integrator" as vague and ambiguous as it is not a term recognized in the industry and instead appears to be a term that Plaintiffs have created for purposes of this litigation, and to the extent that it seeks information not within IPC's possession, custody, or control.

14.   IPC objects to the definitions of "relating to," "referring to," "regarding," "with respect to" or "concerning" as overly broad and unduly burdensome as worded.  In addition, the definition is grossly vague (*e.g.*, "[d]ocuments are considered relating to the subject matter whether they are viewed alone or in combination with other Documents.")

15.   IPC objects to the definition of "Representative" as overly broad, vague, ambiguous, and unduly burdensome to the extent it encompasses individuals who are not IPC's "representatives" and seeks information not within IPC's possession, custody, or control.

16.   IPC objects to the definition of "Structured Data" as overly broad, vague, ambiguous, subject to multiple interpretations, and unduly burdensome.  IPC further objects to this definition to the extent that it purports to require the production of information that is neither reasonably accessible nor within IPC's possession, custody, or control.

17.   IPC objects to the definition of "Unstructured Data" as overly broad, vague, ambiguous, subject to multiple interpretations, and unduly burdensome.  IPC further objects to this definition to the extent that it purports to require the production of information that is neither reasonably accessible nor within IPC's possession, custody, or control.

18.   IPC objects to the definition of "You," "Your" or "Your company" as overly broad in its reference to entities such as affiliates, subsidiaries, parents, along with directors, agents, or those "purporting to act on their [be]half," for example.  The definition also is vague, ambiguous, and subject to multiple interpretations by including entities that are purportedly managed or controlled by IPC, along with "any persons acting or purporting to act" on IPC's behalf.  IPC further objects to the extent that, through this expansive definition, Plaintiffs seek documents not within IPC's possession, custody, or control.  IPC responds on its own behalf, and not on behalf of any other entity or person.

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 5

## OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

**REQUEST NO. 1:** Communications between You and any Pork Integrator relating to Competitive Conditions in the Pork Industry, including email and text messages.

**RESPONSE:** IPC incorporates its objections to Plaintiffs' definitions for the defined terms used in this Request. IPC objects to this Request because it seeks information that is completely irrelevant in light of IPC's dismissal, with prejudice, from the *Pork* litigation and its status as a non-party. IPC's purported communications with "Pork Integrators" are of no probative value and the information sought is cumulative and duplicative of information that Plaintiffs are presumably obtaining through discovery of the actual defendants in the litigation. IPC further objects to this Request as grossly overbroad and unduly burdensome as it would require IPC to incur significant expense if required to respond for a thirteen-year period, particularly for "email and text messages." Moreover, the Request, as written, plainly violates Fed. R. Civ. P. 45(d)(1) and is copied almost verbatim from Plaintiffs' First Request for Production No. 3, which was served on the defendants prior to IPC's dismissal with prejudice. IPC objects to Plaintiffs' efforts to circumvent the Court's orders by simply reissuing requests under the guise of Rule 45. IPC further objects to the extent that this Request seeks documents and materials not within IPC's possession, custody, or control. Finally, IPC objects to this Request to the extent it purports to require the production of information protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege.

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 6

**REQUEST NO. 2:** Communications between You and Agri Stats relating to Competitive Conditions in the Pork Industry or any Pork Integrator.

**RESPONSE**: IPC refers to and incorporates its objections to Request No. 1 as if fully

set forth herein.

**REQUEST NO. 3:** For each document custodian we agree upon or the court orders you to collect and produce documents from, produce the following:

   a. electronic and hard copy diaries, calendars, appointment books, notebooks, to-do lists, Day Timers, day planners or appointment notes;

   b. contact information maintained in Microsoft Outlook, similar programs, Rolodex cards, or any other format, for any Person who is or was: (i) an owner, employee, consultant, officer, board member, representative, or agent of a Pork Integrator or Agri Stats; (ii) Industry Analyst; or (iii) employee of a Trade Association;

   c. trip and travel logs, records, expenses, and other supporting Documents;

   d. expense and entertainment reports, including supporting Documents;

   e. bills, statements, records, and supporting Documents concerning local, long distance, and cellular telephone calls by such employees, including calls made using telephones not paid for by You (such as home office, fax, and personal telephone numbers, personal cellphones, and temporary pay-as-you go cellphones) if such telephones were used for business purposes;

   f. Documents relating to membership in any Trade Association or industry group or attendance at any Industry Meeting or Industry Conference;

   g. a copy of the Person's most recently created resume or curriculum vitae (CV);

   h. personnel file, including any discipline or performance evaluations, and any terms of employment (such as confidentiality or non-compete agreements);

   i. copies of any transcripts or recordings of prior testimony relating to Competitive Conditions in the market for Pork, such as testimony at a deposition, trial, or public hearing; and

   j. Documents sufficient to show the Document Custodian's complete contact information, including all phone numbers, social media user names or "handles," and email addresses used by such persons for any business purposes, even if only sparingly.

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 7

**RESPONSE:** IPC incorporates its objections to Plaintiffs' definitions for the defined terms used in this Request. IPC further objects to this Request because it seeks information that is completely irrelevant in light of IPC's dismissal, with prejudice, from the *Pork* litigation and its status as a non-party. This overly broad Request seeks various items that have nothing to do with the parties' claims and defenses, such as IPC employee calendars, personnel files, Rolodex cards, expense reports, court records, CVs, and if IPC were to be required to comply it would be oppressive and cause IPC to incur significant expense, thereby making the Request unduly burdensome. Moreover, the Request, as written, plainly violates Fed. R. Civ. P. 45(d)(1) and is copied almost verbatim from Plaintiffs' First Request for Production No. 5, which was served on the defendants prior to IPC's dismissal with prejudice. IPC objects to Plaintiffs' efforts to circumvent the Court's dismissal orders by reissuing requests under the guise of Rule 45. Moreover, the Request is also vague, ambiguous, and subject to multiple interpretations in that it includes a variety of undefined terms (*e.g.*, Industry Analyst, Day Timers, Industry Meeting, Industry Analyst) and other references that fail to reasonably describe the information sought. Finally, IPC objects to this Request insofar as it seeks documents or information not within IPC's possession, custody, or control.

**REQUEST NO. 4:** Structured data, such as databases regarding customer purchases of Pork during the Relevant Time Period. Plaintiffs will meet and confer with you regarding the exact data fields and format of the production of the structured data.

**RESPONSE:** IPC incorporates its objections to Plaintiffs' definitions for the defined terms used in this Request. IPC objects to this Request for "Structured Data" as overly broad, vague, and ambiguous in that it fails to make any effort whatsoever to describe the information

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 8

sought. Nor can Plaintiffs appropriately defer providing any reasonable descriptions of what they are seeking by suggesting they are willing to "meet and confer" about all of IPC's Structured Data that may exist for a thirteen-year period. IPC further objects because this Request is an effort to circumvent the Court's dismissal orders through improper use of Rule 45 as Plaintiffs have directed numerous of their structured data Requests to the parties in the *Pork* litigation. IPC was dismissed with prejudice and is no longer a party and its "Structured Data" is not relevant to the parties' claims or defenses in the litigation, and would be cumulative of the structured data available from the remaining parties in the litigation. Indeed, the parties are in the process of negotiating structured data productions. *See* Minute Entry, *In re Pork Antitrust Litigation* (Dkt. 795). Finally, IPC objects to the extent that the "Structured Data" Plaintiffs seek (whenever sufficiently defined) would be unduly burdensome to produce, would impose significant costs on IPC, or require the production of information that is not reasonably accessible.

**REQUEST NO. 5:** Documents relating to guidelines and policies for compliance with competition or antitrust laws, including training manuals and alleged, suspected, potential or actual violations of such guidelines or policies.

**RESPONSE:** IPC incorporates its objections to Plaintiffs' definitions for the defined terms used in this Request. IPC objects to this Request as overly broad in that it seeks information that is completely irrelevant in light of IPC's dismissal, with prejudice, from the *Pork* litigation and its status as a non-party. IPC further objects because this Request not only seeks information that is of no probative value to the underlying litigation, but it is unduly burdensome as it would require IPC to incur significant expense if required to respond for the

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 9

thirteen-year period encompassed by this Request. Moreover, the Request, as written, plainly

violates Fed. R. Civ. P. 45(d)(1) and is copied from Plaintiffs' First Request for Production No.

25 and other disclosure requests, which were served on the defendants prior to IPC's dismissal

with prejudice. IPC objects to Plaintiffs' efforts to circumvent the Court's dismissal orders by

reissuing those requests under the guise of Rule 45. IPC already produced relevant policies and

procedures to Plaintiffs as required by the Court while the motions to dismiss were pending, a

fact Plaintiffs were well aware of before they served the instant Subpoena. As a result, this

Request plainly seeks information already in Plaintiffs' possession and thus is unduly

burdensome. Finally, IPC objects to the extent this Request purports to require the production of

documents protected from disclosure by the attorney-client privilege and/or the work product

doctrine.

**REQUEST NO. 6:** Documents sufficient to identify your policies and procedures during
the Relevant Time Period relating to electronically stored information, including retention
periods, use of auto-delete for email or other systems, and employee cellphone use.

**RESPONSE:** IPC incorporates its objections to Plaintiffs' definitions for the defined

terms used in this Request. IPC objects to this Request as IPC is no longer a party to the

underlying litigation, and the Request plainly seeks preservation-related "discovery about

discovery" that is wholly irrelevant. IPC also objects to this Request as it not only seeks

information that is of no probative value to the underlying litigation, but would be extremely

burdensome to comply with as worded and require IPC to incur significant expense if IPC were

required to respond for the thirteen-year period encompassed by this Request. Moreover, the

Request, as written, plainly violates Fed. R. Civ. P. 45(d)(1) and is copied from Plaintiffs' First

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 10

Request for Production No. 29 and the other disclosure requests, which were served on the
defendants prior to IPC's dismissal with prejudice. IPC objects to Plaintiffs' efforts to
circumvent the Court's dismissal orders by reissuing those requests under the guise of Rule 45.
IPC already has produced relevant policies and procedures as required by the Court while the
motions to dismiss were pending, a fact Plaintiffs were well aware of before they served the
instant Subpoena. As a result, this Request seeks information already in Plaintiffs' possession
and thus is unduly burdensome.

**REQUEST NO. 7:** Documents sufficient to identify Your organizational structure,
including but not limited to any constitution, formation or organizational documents, articles of
incorporation, business licenses, or organizational charts.

**RESPONSE:** IPC incorporates its objections to Plaintiffs' definitions for the defined
terms used in this Request. IPC objects to this Request as IPC is no longer a party to the *Pork*
litigation, and the Request plainly seeks information about IPC's organizational structure, a topic
that is wholly irrelevant to the litigation. IPC also objects to this Request as it not only seeks
information that is of no probative value to the underlying litigation, but would be extremely
burdensome to comply with as worded and require IPC to incur significant expense if IPC were
required to respond for the thirteen-year period encompassed by this Request. Moreover, the
Request, as written, plainly violates Fed. R. Civ. P. 45(d)(1) and is copied from Plaintiffs' First
Request for Production No. 2, which was served on the defendants prior to IPC's dismissal with
prejudice. IPC objects to Plaintiffs' efforts to circumvent the Court's dismissal orders by
reissuing requests under the guise of Rule 45. IPC already has produced relevant organizational
information as required by the Court while the motions to dismiss were pending, a fact Plaintiffs

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 11

were well aware of before they served the instant Subpoena.  As a result, this Request seeks information already in Plaintiffs' possession and thus is unduly burdensome.  Finally, IPC objects to this Request insofar as it seeks information that is publicly available.

**REQUEST NO. 8:** Copies of all Telephone Records in your possession, custody, or control, including Telephone Records of your main phone number(s), main fax number(s), Document Custodian's direct dial or shared phone numbers, and any phone number used as a switchboard for any of your relevant facilities such as your headquarters, administrative offices, Pork processing plants, and Pork sales offices.

**RESPONSE:** IPC incorporates its objections to Plaintiffs' definitions for the defined terms used in this Request.  On its face, this Request seeks information that is wholly irrelevant and/or would be cumulative and duplicative of information that Plaintiffs sought from the remaining defendants in the litigation (or the phone carriers to which Plaintiffs have directed subpoenas).  *See* Stipulation, *In re Pork Antitrust Litigation*, (Dkt. 660).  Moreover, the Request, as written, plainly violates Fed. R. Civ. P. 45(d)(1) and is copied almost verbatim from Plaintiffs' First Request for Production No. 6, which was served on the defendants prior to IPC's dismissal with prejudice.  IPC objects to Plaintiffs' efforts to circumvent the Court's dismissal orders by reissuing requests under the guise of Rule 45.  IPC further objects to this Request as it not only seeks information that is of no probative value to the underlying litigation, but is unduly burdensome as it would require IPC to incur significant expense if IPC were required to locate and produce telephone records for the thirteen-year period encompassed by this Request.  Finally, IPC objects to this Request insofar as it seeks information that is not within IPC's possession, custody, or control.

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 12

**REQUEST NO. 9:** All Documents relating to Competitive Conditions in the market for Pork, including reports, presentations, industry publications, business plans, studies, analyses, or other Documents concerning forecasted, projected, estimated, planned or actual: (i) market shares; (ii) consolidation, mergers, acquisitions, or joint ventures; (iii) production or processing capacity, capacity reduction, capacity utilization, or operating rates; (iv) fixed or variable costs; (v) pricing; (vi) inventories; (vii) entry or exit conditions; (viii) inventories; (ix) supplies/supply trends; (x) data, publications, or other sources used in the regular course of business by You to monitor Pork demand in the United States; (xi) substitute products; (xii) exports; (xiii) raw materials; (xiv) Pork Supply Factors; or (xv) other industry statistics.

**RESPONSE:**    IPC incorporates its objections to Plaintiffs' definitions for the defined terms used in this Request.  IPC objects to this Request as patently over broad in that it seeks information that is completely irrelevant in light of IPC's dismissal, with prejudice, from the *Pork* litigation and its status as a non-party.  Moreover, the information sought by this Request regarding so-called "Competitive Conditions" is cumulative and duplicative of information Plaintiffs presumably are obtaining from the remaining defendants in the litigation.  If required to comply with this Request, which seeks vague categories of materials like "reports," "business plans," "analyses," "operating rates," "entry or exit conditions," or "other industry statistics," IPC would incur substantial expense, thereby making the Request unduly burdensome. Moreover, the Request, as written, plainly violates Fed. R. Civ. P. 45(d)(1) and is copied almost verbatim from Plaintiffs' First Request for Production No. 18, which was served on the defendants prior to IPC's dismissal with prejudice.  IPC objects to Plaintiffs' efforts to circumvent the Court's dismissal orders by reissuing requests under the guise of Rule 45. Finally, IPC also objects to this Request insofar as it seeks documents or information not within IPC's possession, custody, or control, or information that is available from public sources.

Mayer Brown LLP

Brian Clark
Stephen Owen
July 9, 2021
Page 13

\*\*\*\*\*\*\*\*

If you believe it would be productive to discuss the foregoing, please feel free to reach
out to find a mutually-convenient time to meet-and-confer.

Sincerely,

*Britt M. Miller*

Britt M. Miller

cc:     William H. Stallings
        Jaime Stilson
        Robert E. Entwisle

# EXHIBIT 5

# Spadafora, Andrew

| From: | Bourne, Joseph C. <jcbourne@locklaw.com> |
|---|---|
| Sent: | Monday, March 28, 2022 1:12 PM |
| To: | Entwisle, Robert E.; stilson.jaime@dorsey.com; Miller, Britt M.; Owen, Stephen M.; Clark, Brian D. (EXTERNAL CONTACT); Sipe, Elizabeth M. (EXTERNAL CONTACT) |
| Cc: | Stallings, William H. |
| Subject: | RE: FRCP 45 Subpoena to Indiana Packers Corp. |

**EXTERNAL SENDER**

Bob,

As noted below, plaintiffs believe Minnesota is the appropriate forum under the MDL statute, as well as the logistical and efficiency benefits related to having a subpoena dispute decided there. Since it sounds like neither side is amenable to changing its position, I don't believe a call at 2:30 is necessary. However, I'm happy to talk then if you believe it's necessary under any applicable meet-and-confer requirement or otherwise may be useful.

Best,
Joe

Joseph C. Bourne | he/him | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

**From:** Entwisle, Robert E. <REntwisle@mayerbrown.com>
**Sent:** Monday, March 28, 2022 12:40 PM
**To:** Bourne, Joseph C. <jcbourne@locklaw.com>; stilson.jaime@dorsey.com; Miller, Britt M. <BMiller@mayerbrown.com>; Owen, Stephen M. <smowen@locklaw.com>; Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Joe,

Thanks very much, and we hope that your toddler is feeling better. As mentioned in the note below, IPC believes that the Indiana federal courts have jurisdiction over this matter, and that the parties' dispute must be resolved there, rather than in Minnesota. Since plaintiffs are unwilling to withdraw their motion filed in Minnesota, and our response is due today, we intend to move forward with the motion to quash in Indiana and respond in Minnesota. Nevertheless, we appreciate the offer to discuss, and if a call might lead to plaintiffs changing their position, we can be available at 2:30 PM CT today.

Please just let us know.

Best,
Bob

**From:** Bourne, Joseph C. <jcbourne@locklaw.com>
**Sent:** Monday, March 28, 2022 11:02 AM
**To:** Entwisle, Robert E. <REntwisle@mayerbrown.com>; stilson.jaime@dorsey.com; Miller, Britt M.

&lt;[BMiller@mayerbrown.com](mailto:BMiller@mayerbrown.com)&gt;; Owen, Stephen M. &lt;[smowen@locklaw.com](mailto:smowen@locklaw.com)&gt;; Clark, Brian D. (EXTERNAL CONTACT) &lt;[bdclark@locklaw.com](mailto:bdclark@locklaw.com)&gt;; Sipe, Elizabeth M. (EXTERNAL CONTACT) &lt;[emsipe@locklaw.com](mailto:emsipe@locklaw.com)&gt;
**Cc:** Stallings, William H. &lt;[WStallings@mayerbrown.com](mailto:WStallings@mayerbrown.com)&gt;
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

**\*\*EXTERNAL SENDER\*\***

Bob,

Thanks for your email, as well as the voicemail on Friday. Sorry I missed your call (my toddler was home sick with a fever).

Plaintiffs have considered your request and decline to withdraw their motion to compel. I'm available to discuss this afternoon, if you would like. If so, please let me know when you're available.

Best,
Joe

Joseph C. Bourne | he/him | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | [www.locklaw.com](http://www.locklaw.com)

**From:** Entwisle, Robert E. &lt;[REntwisle@mayerbrown.com](mailto:REntwisle@mayerbrown.com)&gt;
**Sent:** Friday, March 25, 2022 5:07 PM
**To:** Bourne, Joseph C. &lt;[jcbourne@locklaw.com](mailto:jcbourne@locklaw.com)&gt;; [stilson.jaime@dorsey.com](mailto:stilson.jaime@dorsey.com); Miller, Britt M. &lt;[BMiller@mayerbrown.com](mailto:BMiller@mayerbrown.com)&gt;; Owen, Stephen M. &lt;[smowen@locklaw.com](mailto:smowen@locklaw.com)&gt;; Clark, Brian D. &lt;[bdclark@locklaw.com](mailto:bdclark@locklaw.com)&gt;; Sipe, Elizabeth M. &lt;[emsipe@locklaw.com](mailto:emsipe@locklaw.com)&gt;
**Cc:** Stallings, William H. &lt;[WStallings@mayerbrown.com](mailto:WStallings@mayerbrown.com)&gt;
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Joe,

We continue to view plaintiffs' position that IPC must engage in burdensome searches of the identified custodian's records to respond to plaintiffs' subpoena as unreasonable and improper under Rule 45. In addition, and as we repeatedly made clear in our correspondence on these matters, any dispute regarding compliance with the subpoena was required to be filed in federal court in Indiana. As such, IPC intends to move to quash the subpoena in the Southern District of Indiana and also intends to seek attorney fees and expenses for the costs incurred in bringing its motion. Pursuant to Indiana Local Rule 37-1, we are willing to discuss this matter with you, but please let us know if plaintiffs will withdraw their motion to compel and agree to materially modify their subpoena, in which case we can set-up a mutually convenient time to discuss these matters further. If we do not hear back from you by noon CT Monday that you will agree to withdraw the motion to compel and agree to discuss material modifications to plaintiffs' subpoena requests, IPC intends to move forward with its motion to quash and for fees.

Best,
Bob

**From:** Bourne, Joseph C. &lt;[jcbourne@locklaw.com](mailto:jcbourne@locklaw.com)&gt;
**Sent:** Friday, March 18, 2022 4:48 PM
**To:** [stilson.jaime@dorsey.com](mailto:stilson.jaime@dorsey.com); Miller, Britt M. &lt;[BMiller@mayerbrown.com](mailto:BMiller@mayerbrown.com)&gt;; Owen, Stephen M. &lt;[smowen@locklaw.com](mailto:smowen@locklaw.com)&gt;; Clark, Brian D. (EXTERNAL CONTACT) &lt;[bdclark@locklaw.com](mailto:bdclark@locklaw.com)&gt;; Sipe, Elizabeth M. (EXTERNAL CONTACT) &lt;[emsipe@locklaw.com](mailto:emsipe@locklaw.com)&gt;

**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; Entwisle, Robert E. <REntwisle@mayerbrown.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

**\*\*EXTERNAL SENDER\*\***

Jaime,

Britt's previous letter stated that Plaintiffs and IPC "are at impasse" as long as Plaintiffs continue to seek searches of custodial ESI. Plaintiffs' position on that has not changed. If IPC has a counter-proposal regarding which custodians and what search terms it would be willing to use, Plaintiffs are willing to consider it, as we have always made clear. Plaintiffs will not withdraw their motion at this time.

Best,
Joe

Joseph C. Bourne | he/him | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN  55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

---

**From:** stilson.jaime@dorsey.com <stilson.jaime@dorsey.com>
**Sent:** Friday, March 18, 2022 2:01 PM
**To:** Bourne, Joseph C. <jcbourne@locklaw.com>; BMiller@mayerbrown.com; Owen, Stephen M. <smowen@locklaw.com>; Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Cc:** WStallings@mayerbrown.com; REntwisle@mayerbrown.com; stilson.jaime@dorsey.com
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Joe,

Plaintiffs' communications to IPC over the last week have been unproductive.  You have consistently invited a response from us without giving us a reasonable amount of time to consult with our client to properly and adequately respond, particularly when, prior to last Friday, we had not heard from Plaintiffs in two and a half months.

For example, by email yesterday afternoon you invited IPC to consent to service of the motion papers after filing your motion to compel, but then put them in the mail the same afternoon.  We were already in the process of conferring with our client about consenting to service until receipt of your email this morning.  That could have been avoided had you simply told us service was being effectuated by mail.

In any event, because you served by mail, IPC plans to respond the motion to compel—which is improper for myriad reasons, including that it should be heard, if at all, in Indiana—on Monday, March 28, consistent with Federal Rules of Civil Procedure 5(b)(2)(C), 6(a)(1)(C), and 6(d).

Finally, we note that Plaintiffs failed to wait for any reasonable period of time for IPC's response to your March 10 email suggesting that we may be at an impasse—a response that, as noted above, came two and a half months after IPC's December 28 offer.  We urge Plaintiffs to withdraw their motion to compel and to complete the meet-and-confer process as required by the rules.  Should Plaintiffs not do so, IPC reserves all rights, including the right to seek attorneys' fees and costs with respect to these matters.

Regards,
Jaime

**From:** Bourne, Joseph C. <jcbourne@locklaw.com>
**Sent:** Friday, March 18, 2022 10:01 AM
**To:** Miller, Britt M. <BMiller@mayerbrown.com>; Owen, Stephen M. <smowen@locklaw.com>; Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; Stilson, Jaime <stilson.jaime@dorsey.com>; Entwisle, Robert E. <REntwisle@mayerbrown.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

EXTERNAL: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Attached for your convenience are electronic copies of the public filings, which we served by mail yesterday. As soon as the defendants whose confidential documents are included in the filing confirm their agreement under the protective order, we will also provide copies of the sealed filings.

Joseph C. Bourne | he/him | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

---

**From:** Bourne, Joseph C.
**Sent:** Thursday, March 17, 2022 3:57 PM
**To:** 'Miller, Britt M.' <BMiller@mayerbrown.com>; Owen, Stephen M. <smowen@locklaw.com>; Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Cc:** 'Stallings, William H.' <WStallings@mayerbrown.com>; 'stilson.jaime@dorsey.com' <stilson.jaime@dorsey.com>; 'Entwisle, Robert E.' <REntwisle@mayerbrown.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Britt and all,

We filed a motion to compel in the District of Minnesota today.

Can you please let us know if you will accept email service? Otherwise we will serve you by mail per the Federal Rules.

I'm happy to provide a courtesy copy by email in any event. Currently only some of the documents have been filed, but I can send it over when that process is completed.

Best,
Joe

Joseph C. Bourne | he/him | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

---

**From:** Bourne, Joseph C.
**Sent:** Tuesday, March 15, 2022 1:52 PM
**To:** 'Miller, Britt M.' <BMiller@mayerbrown.com>; Owen, Stephen M. <smowen@locklaw.com>; Clark, Brian D. <bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Cc:** 'Stallings, William H.' <WStallings@mayerbrown.com>; 'stilson.jaime@dorsey.com' <stilson.jaime@dorsey.com>;

'Entwisle, Robert E.' <REntwisle@mayerbrown.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Hi Britt,

I'm writing to follow up on the email below, and look forward to your response and/or discussing soon.

Best,
Joe

Joseph C. Bourne | he/him | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

---

**From:** Bourne, Joseph C.
**Sent:** Friday, March 11, 2022 2:48 PM
**To:** 'Miller, Britt M.' <BMiller@mayerbrown.com>; Owen, Stephen M. <smowen@locklaw.com>; Clark, Brian D.
<bdclark@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; stilson.jaime@dorsey.com; Entwisle, Robert E.
<REntwisle@mayerbrown.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Britt,

It appears we have an impasse. Plaintiffs remain willing to discuss further if such discussion may be helpful.

Plaintiffs are prepared to file a motion to compel Indiana Packers to comply with the subpoena, which would be limited to the specific relief we discussed.

I'd also like to discuss an orderly process for seeking court intervention. Do you have a good time to talk early next week?

The appropriate court to resolve this dispute is the District of Minnesota. This litigation is now an MDL, and the court has specifically indicated that section 1407(b)'s grant of authority extends to document-only subpoenas as well as deposition subpoenas. See attached Order at 8 n.1 (ECF No. 985). The court has already heard disputes regarding document subpoenas to third parties located outside of Minnesota. As the court is familiar with the proceedings, that is the more sensible and efficient forum to resolve this dispute, rather than a court in Indiana that has no familiarity with the litigation. This may also streamline issues with respect to the protective order.

I'd be happy to call the court with you, or one of your colleagues, to request a hearing date and make sure it works for both sides, as well as to discuss a briefing schedule if you wish. As your client is no longer a party, I also request confirmation of whether your client will accept electronic service by email. Finally, if you could please sign the acknowledgment to the amended protective order (attached, ECF No. 1155), that will facilitate providing you with a copy of any sealed filings in support of the motion.

Best,
Joe

Joseph C. Bourne | he/him | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

**From:** Miller, Britt M. <[BMiller@mayerbrown.com](mailto:BMiller@mayerbrown.com)>
**Sent:** Tuesday, December 28, 2021 4:12 PM
**To:** Bourne, Joseph C. <[jcbourne@locklaw.com](mailto:jcbourne@locklaw.com)>; Owen, Stephen M. <[smowen@locklaw.com](mailto:smowen@locklaw.com)>; Clark, Brian D. <[bdclark@locklaw.com](mailto:bdclark@locklaw.com)>; Sipe, Elizabeth M. <[emsipe@locklaw.com](mailto:emsipe@locklaw.com)>
**Cc:** Stallings, William H. <[WStallings@mayerbrown.com](mailto:WStallings@mayerbrown.com)>; [stilson.jaime@dorsey.com](mailto:stilson.jaime@dorsey.com); Entwisle, Robert E. <[REntwisle@mayerbrown.com](mailto:REntwisle@mayerbrown.com)>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.


Joe –

Please see the attached correspondence.  As always, happy to discuss further.

Best for the New Year – Britt

_____

**Britt M. Miller**
*Managing Partner-Chicago/Co-Lead Global Antitrust Practice*
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL  60606
T +1 312 701 8663

[LinkedIn](#) | [Twitter](#)
[mayerbrown.com](http://mayerbrown.com)

---

**From:** Bourne, Joseph C. <[jcbourne@locklaw.com](mailto:jcbourne@locklaw.com)>
**Sent:** Tuesday, December 14, 2021 1:32 PM
**To:** Miller, Britt M. <[BMiller@mayerbrown.com](mailto:BMiller@mayerbrown.com)>; Owen, Stephen M. <[smowen@locklaw.com](mailto:smowen@locklaw.com)>; Entwisle, Robert E. <[REntwisle@mayerbrown.com](mailto:REntwisle@mayerbrown.com)>; Clark, Brian D. (EXTERNAL CONTACT) <[bdclark@locklaw.com](mailto:bdclark@locklaw.com)>
**Cc:** Stallings, William H. <[WStallings@mayerbrown.com](mailto:WStallings@mayerbrown.com)>; [stilson.jaime@dorsey.com](mailto:stilson.jaime@dorsey.com); Sipe, Elizabeth M. (EXTERNAL CONTACT) <[emsipe@locklaw.com](mailto:emsipe@locklaw.com)>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

**\*\*EXTERNAL SENDER\*\***

Hi Britt,

Just checking in here. We look forward to hearing from you.

Best,
Joe

Joseph C. Bourne | he/him/his | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN  55401
V: 612-339-6900 | F: 612-339-0981 | [www.locklaw.com](http://www.locklaw.com)

---

**From:** Bourne, Joseph C.
**Sent:** Thursday, December 2, 2021 2:31 PM
**To:** 'Miller, Britt M.' <[BMiller@mayerbrown.com](mailto:BMiller@mayerbrown.com)>; Owen, Stephen M. <[smowen@locklaw.com](mailto:smowen@locklaw.com)>; Entwisle, Robert E. <[REntwisle@mayerbrown.com](mailto:REntwisle@mayerbrown.com)>; Clark, Brian D. <[bdclark@locklaw.com](mailto:bdclark@locklaw.com)>
**Cc:** Stallings, William H. <[WStallings@mayerbrown.com](mailto:WStallings@mayerbrown.com)>; [stilson.jaime@dorsey.com](mailto:stilson.jaime@dorsey.com); Sipe, Elizabeth M.

&lt;emsipe@locklaw.com&gt;
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Britt and all,

Please see the attached correspondence. We look forward to your response and are happy to discuss at your convenience.

Best regards,
Joe

Joseph C. Bourne | he/him/his | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

---

**From:** Miller, Britt M. &lt;BMiller@mayerbrown.com&gt;
**Sent:** Monday, November 1, 2021 2:48 PM
**To:** Bourne, Joseph C. &lt;jcbourne@locklaw.com&gt;; Owen, Stephen M. &lt;smowen@locklaw.com&gt;; Entwisle, Robert E. &lt;REntwisle@mayerbrown.com&gt;; Clark, Brian D. &lt;bdclark@locklaw.com&gt;
**Cc:** Stallings, William H. &lt;WStallings@mayerbrown.com&gt;; stilson.jaime@dorsey.com&gt;; Sipe, Elizabeth M. &lt;emsipe@locklaw.com&gt;
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Joe –

Thanks. As made clear in our July responses and objections to plaintiffs' subpoena, IPC does not believe that the subpoena, as written, is either reasonable or enforceable.

Plaintiffs' continued demands that IPC undertake the substantial effort to investigate all of the categories of data that plaintiffs are requesting, including one that literally asks for "any other data available in your database concerning the purchase, sale or distribution of the pork for each sale" and the intimation that the questions of whether IPC has such data and whether it is accessible is somehow determinative of burden are misguided. There is burden in even undertaking the inquiry you are suggesting which is why we asked for the types of data plaintiffs are seeking in the first instance.

As for plaintiffs' unstructured data requests, as we discussed during our meet-and-confer, IPC has no interest in undertaking some drawn out process of negotiating custodians or search terms in response to these requests especially ones, like Request No. 9, that ask for virtually every document IPC has related to its business. Nor does it have any appetite for incurring the costs of the collection, processing, and production of some as yet undefined set of documents for some as yet undefined number of custodians. We made clear that we were willing to entertain requests for "go get" documents that could be retrieved without significant burden, but your proposal does not appear to have taken us up on that offer. And plaintiffs' commitment to work with us on "search methodology" again puts the cart before the horse. Plaintiffs have had our organizational charts for over a year. They have had discovery from the defendants in the litigation for months (indeed, we understand that the parties were substantially complete with their productions this past September). If plaintiffs are willing to identify which custodians they are interested in, if they can point to something in the parties' discovery record that leads them to believe that IPC was involved in any of the sorts of communications requested by the subpoena, and if they can identify the sorts of documents related to IPC's pork operations that they would be looking for—*i.e.*, something other than "all documents"—all of that information would materially advance these discussions. Of course, if plaintiffs are willing to bear the costs associated with any collection, processing and production of unstructured data IPC might undertake, that would be highly relevant as well.

As stated in my prior email, plaintiffs need to make a comprehensive proposal on structured data and unstructured data so that we can evaluate the overall burden and determine whether further discussion would be fruitful or whether the parties need to take the issue up in the N.D. Indiana.

If you believe a conversation this week would be productive we, of course, are willing to engage and would ask that you propose some dates/times.

Regards – Britt

_____
**Britt M. Miller**
*Managing Partner-Chicago/Co-Lead Global Antitrust Practice*
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
T +1 312 701 8663

LinkedIn | Twitter
mayerbrown.com

---

**From:** Bourne, Joseph C. <jcbourne@locklaw.com>
**Sent:** Friday, October 29, 2021 2:55 PM
**To:** Miller, Britt M. <BMiller@mayerbrown.com>; Owen, Stephen M. <smowen@locklaw.com>; Entwisle, Robert E. <REntwisle@mayerbrown.com>; Clark, Brian D. (EXTERNAL CONTACT) <bdclark@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; stilson.jaime@dorsey.com; Sipe, Elizabeth M. (EXTERNAL CONTACT) <emsipe@locklaw.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

**\*\*EXTERNAL SENDER\*\***

Britt,

Thank you for your email.

In order to meaningfully discuss and reach resolution regarding both structured data and other documents together, as you request, Plaintiffs need to know the extent of available structured data, including the time period for which it is available. We also need to know if you contend any of this data exists but is not accessible, and if so, to what extent.

Regarding the substantive document requests, or non-structured data, Plaintiffs will agree to seek documents responsive only to requests 1, 2, and 9. These are, generally, communications with the Defendants about competitive conditions in the pork industry and other documents concerning competitive conditions in the pork industry. We would work with you to reach agreement on search methodology (e.g., custodians and search terms), which we expect could further address your client's burden concerns.

We continue to believe the subpoena is enforceable as written, and our willingness to narrow the scope of the subpoena is contingent upon reaching agreement on the scope of IPC's response.

We look forward to hearing from you and are available to discuss further next week, if that would be helpful.

Best,
Joe

Joseph C. Bourne | he/him/his | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401

V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

---

**From:** Miller, Britt M. <BMiller@mayerbrown.com>
**Sent:** Wednesday, October 27, 2021 4:37 PM
**To:** Bourne, Joseph C. <jcbourne@locklaw.com>; Owen, Stephen M. <smowen@locklaw.com>; Entwisle, Robert E. <REntwisle@mayerbrown.com>; Clark, Brian D. <bdclark@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; stilson.jaime@dorsey.com; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Joe –

Thank you for your follow-up email and your earlier clarifications. As discussed during our meet-and-confer, IPC needs to understand the full scope of what plaintiffs are seeking—structured and unstructured data—in response to their subpoena before we can meaningfully move forward as the burden is cumulative. In other words, we are not going to do this piecemeal. In your October 13 email, you indicated that plaintiffs intended to "follow up soon about a proposal regarding the remaining requests in the subpoena". Once we receive that proposal, we will be in a better position to evaluate plaintiffs' request and respond.

Regards – Britt

_____

**Britt M. Miller**
*Managing Partner-Chicago/Co-Lead Global Antitrust Practice*
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
T +1 312 701 8663

LinkedIn | Twitter
mayerbrown.com

---

**From:** Bourne, Joseph C. <jcbourne@locklaw.com>
**Sent:** Wednesday, October 27, 2021 1:43 PM
**To:** Owen, Stephen M. <smowen@locklaw.com>; Miller, Britt M. <BMiller@mayerbrown.com>; Entwisle, Robert E. <REntwisle@mayerbrown.com>; Clark, Brian D. (EXTERNAL CONTACT) <bdclark@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; stilson.jaime@dorsey.com; Sipe, Elizabeth M. (EXTERNAL CONTACT) <emsipe@locklaw.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

**\*\*EXTERNAL SENDER\*\***

Britt,

Following up here. Can you please let us (1) whether IPC will agree to produce such structured data, to the extent it exists; (2) if IPC contends any of the data sought exists but is inaccessible (if so, please specify); and (3) whether IPC will agree to the same definition of "pork" for purposes of this request as Plaintiffs agreed with Defendants in this action?

Thanks,
Joe

Joseph C. Bourne | he/him/his | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401

V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

**From:** Bourne, Joseph C.
**Sent:** Wednesday, October 13, 2021 1:25 PM
**To:** Owen, Stephen M. <smowen@locklaw.com>; Miller, Britt M. <BMiller@mayerbrown.com>; Entwisle, Robert E. <REntwisle@mayerbrown.com>; Clark, Brian D. <bdclark@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; stilson.jaime@dorsey.com; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Britt and all,

It was good speaking with you on Friday.

Plaintiffs request the following fields of structured data in the most disaggregated form (i.e., at the transaction level) in which it is kept, to be produced in a comma delimited text file (e.g., a file with a file extension of .csv or .txt). We suggest providing a data sample so we can review and ask any questions before your client makes a complete production.

   a.   The terms of each sale;
   b.   The invoice number;
   c.   The purchase order number;
   d.   The location from which the pork was shipped;
   e.   The customer's name, phone number(s), address(es), email address(es), including the identity of the customer that was billed and the location to which the pork was shipped;
   f.   The date you shipped the pork, the date you billed for the pork, and the date the customer took delivery;
   g.   The grade, cut, product form, and/or type of pork, including any product numbers, unique purchaser-specific identifier, any description of characteristics, and product descriptions sold for each transaction;
   h.   The quantity (and units of measure) for each sale;
   i.   All pricing information concerning the sale, including shipping, tax, or similar charges, and the gross and net unit price for each item in the sale;
   j.   The currency in which the sale was billed and paid;
   k.   Any discounts, rebates, credits, freight allowances, returns, free goods, and/or services or any other pricing adjustment for each sale, with sufficient information to attribute these adjustments to individual sales;
   l.   If a resale, the supplier of each pork sold in connection with each sale;
   m.   The price you paid your supplier for each type of pork sold in connection with each sale, including gross and net aggregate and per-unit prices;
   n.   Any fixed or variable costs or costs of goods sold concerning the sale (including freight charge and transportation cost, sales and distribution cost, raw materials, intermediates, marketing or sales cost, and any other cost attributed or allocated to the sale);
   o.   For any sale or purchase from another pork integrator, Electronic Data Interchange fields for which the user can freely enter text, such as "comments" or similar fields;
   p.   Any structured database field summarizing the terms of sale or agreements or contracts for customers;
   q.   Any other data available in your database concerning the purchase, sale or distribution of the pork for each sale.

Please let us know if you contend any of this data exists but is not accessible (e.g., if it is available only on backup tapes that would need to be restored), and if so, for what fields and during what time period.

The subpoena seeks structured data for "Pork." For the avoidance of doubt and ambiguity, Plaintiffs reached agreement with Defendants to exclude products that Defendants categorize as: 1) byproducts or offal (with the exception of hearts and feet sold in Puerto Rico); 2) multi-protein sausages; and 3) multi-ingredient products. We propose the same definition and exclusions here.

We will follow up soon about a proposal regarding the remaining requests in the subpoena, but in the meantime would like to keep this moving regarding IPC's structured data.

Best,
Joe

Joseph C. Bourne | he/him/his | Senior Counsel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN  55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

**From:** Owen, Stephen M. <smowen@locklaw.com>
**Sent:** Tuesday, October 5, 2021 12:55 PM
**To:** Miller, Britt M. <BMiller@mayerbrown.com>; Entwisle, Robert E. <REntwisle@mayerbrown.com>; Clark, Brian D. <bdclark@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; stilson.jaime@dorsey.com; Bourne, Joseph C. <jcbourne@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Britt,

11:00 am central on Friday will work for us. We will send dial-in information/a calendar entry.

Thanks.

**From:** Miller, Britt M. <BMiller@mayerbrown.com>
**Sent:** Tuesday, October 5, 2021 12:19 PM
**To:** Owen, Stephen M. <smowen@locklaw.com>; Entwisle, Robert E. <REntwisle@mayerbrown.com>; Clark, Brian D. <bdclark@locklaw.com>
**Cc:** Stallings, William H. <WStallings@mayerbrown.com>; stilson.jaime@dorsey.com; Bourne, Joseph C. <jcbourne@locklaw.com>; Sipe, Elizabeth M. <emsipe@locklaw.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Counsel –

We are available to meet-and-confer this Friday at 11:00 a.m. Central.  If that works, we would ask that you circulate a calendar entry/dial-in information.

Regards – Britt

_____

**Britt M. Miller**
*Managing Partner-Chicago/Co-Lead Global Antitrust Practice*
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL  60606
T +1 312 701 8663

LinkedIn | Twitter
mayerbrown.com

**From:** Owen, Stephen M. <smowen@locklaw.com>
**Sent:** Monday, October 4, 2021 3:27 PM

**To:** Entwisle, Robert E. <REntwisle@mayerbrown.com>; Clark, Brian D. (EXTERNAL CONTACT) <bdclark@locklaw.com>
**Cc:** Miller, Britt M. <BMiller@mayerbrown.com>; Stallings, William H. <WStallings@mayerbrown.com>;
stilson.jaime@dorsey.com; Bourne, Joseph C. <jcbourne@locklaw.com>; Sipe, Elizabeth M. (EXTERNAL CONTACT)
<emsipe@locklaw.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

**\*\*EXTERNAL SENDER\*\***

Counsel,

Following up on the below. Can you please let us know when you're available to meet and confer?

Thank you.

Best,
Steve

---

**From:** Owen, Stephen M.
**Sent:** Tuesday, September 28, 2021 3:01 PM
**To:** 'Entwisle, Robert E.' <REntwisle@mayerbrown.com>; Clark, Brian D. <bdclark@locklaw.com>
**Cc:** Miller, Britt M. <BMiller@mayerbrown.com>; Stallings, William H. <WStallings@mayerbrown.com>;
stilson.jaime@dorsey.com; Bourne, Joseph C. <jcbourne@locklaw.com>
**Subject:** RE: FRCP 45 Subpoena to Indiana Packers Corp.

Counsel,

We would like to set up a meet-and-confer to discuss the subpoena and objections. Can you please let us know a time
that works for you?

Thank you.

Best,
Steve

---

**From:** Entwisle, Robert E. <REntwisle@mayerbrown.com>
**Sent:** Friday, July 9, 2021 4:58 PM
**To:** Clark, Brian D. <bdclark@locklaw.com>; Owen, Stephen M. <smowen@locklaw.com>
**Cc:** Miller, Britt M. <BMiller@mayerbrown.com>; Stallings, William H. <WStallings@mayerbrown.com>;
stilson.jaime@dorsey.com
**Subject:** FRCP 45 Subpoena to Indiana Packers Corp.

Counsel,

Please see the attached letter.

_____

**Robert Entwisle**
*Counsel*
Mayer Brown LLP
71 S. Wacker
Chicago, IL 60606
T +1 312 701 8151 | M +1 312 782 0600

LinkedIn | Twitter
mayerbrown.com

---

This email and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. If you are not the named addressee you should not disseminate, distribute or copy this e-mail.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities, including Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership) and Tauil & Chequer Advogados (a Brazilian partnership).

Information about how we handle personal information is available in our Privacy Notice.

This e-mail may contain information that is privileged, confidential or otherwise protected from disclosure. If you are not the intended recipient or otherwise have received this message in error, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you are not the intended recipient or otherwise have received this message in error, please notify us immediately by e-mail, discard any paper copies and delete all electronic files of the message.

# EXHIBIT 6

**LOCKRIDGE**
**GRINDAL**
**NAUEN**
P . L . L . P .

Attorneys at Law

w w w . l o c k l a w . c o m

**Joseph C. Bourne**
jcbourne@locklaw.com
Phone: 612.339.6900

**MINNEAPOLIS**
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401-2179
T 612.339.6900
F 612.339.0981

December 1, 2021

**VIA E-MAIL**

Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
bmiller@mayerbrown.com

> Re:   *In re Pork Antitrust Litigation*, Case No. 0:18-cv-1776
>        Subpoena to Indiana Packers Corporation

Dear Britt:

I write to follow up on our conversations regarding the subpoena Plaintiffs served on Indiana Packers Corporation on June 7, 2021. In our last correspondence, IPC requested Plaintiffs make a "comprehensive proposal on structured data and unstructured data" so IPC could evaluate overall burden.

Plaintiffs continue to seek structured data from IPC that is the same as the structured data requested from, and produced by, Defendants. As noted in my October 13, 2021 email, this would be the following fields of structured data in the most disaggregated form (i.e., at the transaction level) in which it is kept, to be produced in a comma delimited text file (e.g., a file with a file extension of .csv or .txt). We suggest providing a data sample so we can review and ask any questions before your client makes a complete production.

   a.   The terms of each sale;

   b.   The invoice number;

   c.   The purchase order number;

   d.   The location from which the pork was shipped;

   e.   The customer's name, phone number(s), address(es), email address(es), including the identity of the customer that was billed and the location to which the pork was shipped;

Britt M. Miller
December 1, 2021
Page 2

f.      The date you shipped the pork, the date you billed for the pork, and the date the customer took delivery;

g.      The grade, cut, product form, and/or type of pork, including any product numbers, unique purchaser-specific identifier, any description of characteristics, and product descriptions sold for each transaction;

h.      The quantity (and units of measure) for each sale;

i.      All pricing information concerning the sale, including shipping, tax, or similar charges, and the gross and net unit price for each item in the sale;

j.      The currency in which the sale was billed and paid;

k.      Any discounts, rebates, credits, freight allowances, returns, free goods, and/or services or any other pricing adjustment for each sale, with sufficient information to attribute these adjustments to individual sales;

l.      If a resale, the supplier of each pork sold in connection with each sale;

m.      The price you paid your supplier for each type of pork sold in connection with each sale, including gross and net aggregate and per-unit prices;

n.      Any fixed or variable costs or costs of goods sold concerning the sale (including freight charge and transportation cost, sales and distribution cost, raw materials, intermediates, marketing or sales cost, and any other cost attributed or allocated to the sale);

o.      For any sale or purchase from another pork integrator, Electronic Data Interchange fields for which the user can freely enter text, such as "comments" or similar fields;

p.      Any structured database field summarizing the terms of sale or agreements or contracts for customers;

q.      Any other data available in your database concerning the purchase, sale or distribution of the pork for each sale.

The subpoena seeks structured data for "Pork." For the avoidance of doubt and ambiguity, Plaintiffs reached agreement with Defendants to exclude products that Defendants categorize as: (1) byproducts or offal (with the exception of hearts and feet sold in Puerto Rico); (2) multi-protein sausages; and (3) multi-ingredient products. We propose the same definition and exclusions here.

Britt M. Miller
December 1, 2021
Page 3

Again, we request that you let us know the extent of the available structured data, including the time period for which it is available. If you contend any of this data exists but is not accessible, please let us know.

As to substantive documents or non-structured data, as noted in my October 29, 2021 email, Plaintiffs are willing to compromise and seek only documents responsive to Requests 1, 2, and 9. These are, generally, emails and other documents concerning competitive conditions in the pork industry.

IPC expressed concern about undertaking a drawn-out process of negotiating custodians and search terms. We propose the following.

First, as to custodians, IPC and Plaintiffs previously agreed upon custodians in August 2019 when IPC was a party to the litigation. *See* Brittany Resch August 22, 2019 letter to Bob Entwisle at page 4. At that time, the parties agreed on the following custodians: Gary Jacobson, Russell Yearwood, David Murray, Galen (Paul) Stiverson, Mark McCain, James Allen, Robert Kastens, Carl Wollenburg, and Randy Toleman.[1] These are the same custodians Plaintiffs propose now.

Second, as to search terms, Plaintiffs attach a list of proposed terms that are substantially the same as those Plaintiffs have proposed, and generally agreed to utilize, with other third parties. Plaintiffs are willing to consider hit reports and listen to any other specific concerns you have with particular terms. As we have with other third parties, we can, if necessary, modify and tailor the search terms in a meaningful way when we receive those hit reports.

Further, to minimize the burden in producing such documents, Plaintiffs are willing to make available a document hosting and review platform (DISCO), at no cost to IPC. Plaintiffs have reached such agreement with other third parties. In a nutshell, we can execute an agreement with you and DISCO to allow you to utilize that platform to host and efficiently review the documents. Plaintiffs would not have access to those documents; only you and your colleagues would.

We hope to engage in a collaborative process that will enable us to obtain the relevant, responsive documents IPC possesses, while minimizing the burden on IPC in collecting and producing its structured data and substantive documents. We look forward to hearing from you.

Very truly yours,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

*/s/Joseph C. Bourne*

---

[1] In August 2019, IPC confirmed that some documents were retained for Mr. Toleman after he left IPC in 2012 and that those documents would be produced subject to search terms.

Britt M. Miller
December 1, 2021
Page 4


Joseph C. Bourne


Attachment


  cc:     Robert Entwisle
            William Stallings
            Jaime Stilson

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re Pork Antitrust Litigation | Case No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br><br>All Actions | **ALL PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE PORK INTEGRATOR DEFENDANTS** |

## SPECIFIC DOCUMENT REQUESTS

The "Relevant Time Period" for these requests is January 1, 2008, through and including August 17, 2018, unless otherwise noted.

**REQUEST NO. 1:** All Documents relating to competition in the Pork industry produced to the Department of Justice, Federal Trade Commission, U.S. Department of Agriculture, U.S. Securities & Exchange Commission, states' attorneys general, or other government agencies or regulators voluntarily or pursuant to any civil investigative demand, grand jury subpoena, or other investigative request.

**REQUEST NO. 2:** Documents sufficient to show Your corporate organizational structure throughout the Relevant Time Period, including, but not limited to, departments, divisions, parents, subsidiaries, joint ventures, affiliates, units or other subdivisions that had any role at any time during the Relevant Time Period in the production, processing, distribution, marketing, pricing or sale of Pork.

**REQUEST NO. 3:** All Documents or Communications between You and any other Defendant or Pork Integrator, relating to Competitive Conditions in the Pork Industry.

**REQUEST NO. 4:** All Communications and Documents relating to the scheduling, attendance, or otherwise referencing any in-person, telephonic, or other meeting between You and any other Defendant or Pork Integrator.

**REQUEST NO. 5:** For each Document Custodian, all:

    a)    electronic and hard copy diaries, calendars, appointment books or notes, notebooks, or to-do lists ;

    b)    contact information maintained in electronic or hard copy format, for any Person who is or was: (i) an owner, employee, consultant, officer, board

member, Representative, or agent of a Pork Integrator or Agri Stats; (ii) a Creditor Representative or Industry Analyst; (iii) an employee of a Trade Association; or (iv) an employee of any entity that falls within the definition of Industry Meeting.

c)      trip and travel logs and records, expense reports, and entertainment reports, including any other supporting Documents;

d)      bills, statements, records, and supporting Documents concerning local, long distance, and cellular telephone calls by such employees, including calls made using telephones not paid for by You (such as home office, fax, and personal telephone numbers, personal cellphones, and temporary pay-as-you go cellphones) if such telephones were used for business purposes;

e)      Documents relating to membership in any Trade Association or industry group or attendance at any Trade Association, Industry Meeting or Creditor Conference, including announcements, membership lists, presentations (including speaker notes), agendas, minutes, notes, attendance lists, and correspondence;

f)      a copy of the Person's most recently created resume or curriculum vitae (CV);

g)      copies of any transcripts or recordings of prior testimony relating to Competitive Conditions in the market for Pork, such as testimony at a deposition, trial, or public hearing;

h)      Documents sufficient to show the Document Custodian's complete contact information, including all phone numbers, social media user names or "handles," and email addresses used by such persons for any business purposes, even if only sparingly; and

i)      Any severance agreements in connection with the Document Custodian ceasing employment or changing employment status with You (without time limitation).

**REQUEST NO. 6:**      Copies of all Telephone Records in your possession, custody, or control, including Telephone Records of your main phone number(s), main fax number(s), and any phone number used as a switchboard for any of your relevant

facilities such as your headquarters, administrative offices, Pork Farms, Pork Processing Facilities, and Pork sales offices.

**REQUEST NO. 7:**    All Documents relating to Communications with investors, Industry Analysts, benchmarking services, and/or Creditor Representatives regarding Competitive Conditions in the Pork industry.

**REQUEST NO. 8:**    All Documents and Communications regarding the terms of all purchases, sales, trades, exchanges, or swaps of Pork between You and any other Pork Integrator, including any contracts, co-packing agreements, joint ventures, other agreements (whether formal or informal), and any contemplated, proposed, or actual bids.

**REQUEST NO. 9:**    All Documents relating to budgets, projections, estimates, or related studies, presentations, or reports regarding Pork regularly prepared or received by Your current or former directors, officers, or Management on a regular basis (weekly, monthly, quarterly, or annually) regarding the following topics:

    a.    cost and/or cost accounting reports (including, production, sale and distribution);

    b.    audited or unaudited financial statements (including all appendices);

    c.    cost and supply of raw material and/or inputs, including any back-integration of raw materials, swaps or sales of raw materials with other Pork Integrators, or hedging of purchased raw materials and/or inputs for Pork;

    d.    distribution channels for Pork;

    e.    export markets for Pork including a breakdown of country of destination and product form;

    f.    Pork product information regarding the types and product forms of Pork sold by You;

formulas, procedures or authorization procedures for Sales Personnel to quote a price, price changes, price lists, pricing policies, violations of pricing policies and Documents providing guidance to Sales Personnel about implementation of price changes.

**REQUEST NO. 15:** All Documents relating to or communicating Pork price announcements, price changes, explanations of the reasons for price changes, price lists, pricing policies, pricing guidelines, pricing methods, pricing formulas, analysis of market prices, monitoring of competitor pricing, price changes of Pork produced or sold in the U.S. (including price announcements or explanations of the reasons for price changes), price increase and surcharge announcements, and any other Communications concerning Pork price increases or the imposition of surcharges.

**REQUEST NO. 16:** All Documents or Communications relating to or exchanged with Agri Stats or its affiliates (including Express Markets, Inc.), including any consideration of the risks and/or benefits of providing information to or receiving information from Agri Stats, the anonymity of individual Pork Integrator data received from Agri Stats, any reverse-engineering processes employed by You to de-anonymize Agri Stats data, any contracts or agreements with Agri Stats, any presentations, Communications, or meeting minutes received from or provided to Agri Stats, and all copies of reports received from Agri Stats.

**REQUEST NO. 17:** All Documents or Communications relating to meetings with Agri Stats or its affiliates (including Express Markets, Inc.).

**REQUEST NO. 18:** All Documents relating to Competitive Conditions in the market for Pork, including reports, presentations, industry publications, business plans, studies,

analyses, or other Documents concerning forecasted, projected, estimated, planned or actual: (i) market shares; (ii) consolidation, mergers, acquisitions, or joint ventures; (iii) production or processing capacity, capacity reduction, capacity utilization, or operating rates; (iv) fixed or variable costs; (v) pricing; (vi) inventories; (vii) entry or exit conditions; (viii) inventories; (ix) supplies/supply trends; (x) data, publications, or other sources used in the regular course of business by You to monitor Pork demand in the United States; (xi) substitute products; (xii) exports; (xiii) raw materials; (xiv) Pork Supply Factors; or (xv) other industry statistics.

**REQUEST NO. 19:**      All Documents concerning Pork supply rationalization, industry leadership, industry discipline, production discipline, supply discipline, capacity discipline, or other so-called disciplined approaches or practices relating to the Pork industry.

**REQUEST NO. 20:**      Documents concerning the porcine epidemic diarrhea virus and its impact on Pork production.

**REQUEST NO. 21:**      All Documents and Communications relating to any benchmarking or information sharing services relating to Pork industry profitability, pricing, production, or supply other than Agri Stats or Express Markets, Inc.

**REQUEST NO. 22:**      Documents sufficient to identify any tentative, proposed or consummated sale, acquisition, merger, joint venture, divestiture, transfer of assets, spin-off, or any other form of change of ownership or control or business combination concerning any Pork-related business, production facilities, product lines, or other assets (including both businesses or assets owned or controlled by You and those owned or

controlled by other Persons), and any minutes, notes, reports, studies, analysis, presentations, expert or market participant comments, and any analysis or other information submitted to or received from any governmental agency.

**REQUEST NO. 23:**    All Documents and Communications relating to the immediately prior Request that reflect the disclosure of any non-public information to another Pork Integrator concerning Pork Supply Factors, Pork pricing, or any future Pork supply plans, including documents made available to You or by You through an electronic "data room" associated with a proposed transaction.

**REQUEST NO. 24:**    All Documents relating to public announcements, press releases, or corporate Communications by You concerning Competitive Conditions for Pork.

**REQUEST NO. 25:**    All Documents relating to compliance policies, whether implemented, adopted, used or considered, concerning federal, state, or international antitrust laws, competition laws, anti-monopoly laws, anti-cartel laws, unfair competition laws, anti-bribery laws and any similar laws or regulations, or contacts and/or Communications with Your competitors (including current and former versions of compliance policies and procedures, presentations, seminars, programs, memos, statements signed by Your employees with responsibility for Pork that acknowledge receipt of or compliance with such policies arising from or relating to any prior legal proceedings), and all Documents relating to any inquiries or investigations concerning compliance with such policies including those listed in the prior Request.

**REQUEST NO. 26:**    All Documents relating to the Named Plaintiffs.

**REQUEST NO. 27:**    Documents relating to actions to conceal or avoid detection of any potential violations of federal, state, or international antitrust laws, competition laws, anti-monopoly laws, anti-cartel laws, unfair competition laws, anti-bribery laws and any similar laws, rules or regulations (including the use of code words or otherwise masking the identity of any Person or entity, meeting in locations or communicating at times or via methods with the intent to avoid detection by any Person or entity, using non-traceable prepaid calling cards or cellphones, non-contract or disposable cell phones, placing calls from public phones, and destroying, secreting, altering or forging Documents).

**REQUEST NO. 28:**    All Documents necessary to understand the operation of any of the computer hardware and systems, software, Structured Databases, ESI, database, storage, backup and archiving systems and Communications systems and devices information requested herein (including, but not limited to, Documents describing or defining the fields contained in any such database file naming conventions and standards); user manuals; Help features or documentation; password, encryption, and other security protocols; diskette, CD, DVD, and other removable media labeling standards; email storage conventions, e.g., limitations on mailbox sizes/storage locations; schedule and logs for storage; software and hardware upgrades (including patches) for the Relevant Time Period (including who and what organization conducted such upgrades); and Backup tape rotation.

**REQUEST NO. 29:**    Documents sufficient to identify and describe Your computer hardware and systems (including email systems), software, ESI, Structured Databases, storage, backup and archiving systems and Communications systems and devices used in

connection with Documents called for by production of these Requests for Production, including data maps, data dictionaries, explanations of information contained in each system or database, and document retention policies.

**REQUEST NO. 30:**    All Documents referenced or relied upon in responding to any Interrogatory served by any party in this Action.

**REQUEST NO. 31:**    Documents sufficient to show all forms of Your contracts and invoices, and any summaries of the terms, with contract farmers or Pork Growers.

**REQUEST NO. 32:**    All contracts, and any summaries of the terms (including duration, price protection, terms for price modification, surcharges, discounts, or rebates) for the sale of Pork in the U.S. to Your customers.

**REQUEST NO. 33:**    All Documents relating to any decision to change the pricing terms for Your customers' contracts for Pork, including any analyses regarding changes from fixed-price to adjustable price provisions.

**REQUEST NO. 34:**    All Documents relating to complaints received from any Pork customer regarding prices, pricing, or terms or conditions of sale or the refusal or failure to supply Pork and any responses thereto, and all Documents reflecting any policy of Your company concerning the handling of such complaints.

**REQUEST NO. 35:**    For the period January 1, 2005 through the present, Documents sufficient to identify all of Your Pork Growers, Pork Farms, and Pork Processing Facilities.

**REQUEST NO. 36:**    Structured Data regarding the terms of all purchases, sales, trades, exchanges, or swaps of Pork between You and any other Pork Integrator,

        3.     Name and description of program (e.g., volume rebate or discounts);

        4.     Payment amount;

        5.     Information pertaining to which customer the rebate applied to;

        6.     Total purchase dollars and volume of Pork on which basis the rebate is paid.

     b.    Any supplier agreements or other Documents describing the terms of the program.

**REQUEST NO. 39:**   Documents sufficient to describe in detail the Pork products You sold, marketed, or distributed from January 1, 2003 through the present, including any variations relating to brand name, physical properties and characteristics, packaging, product form, cut, further processing, grade, specialty products and any other factors influencing price.

Dated: November 1, 2018         Respectfully submitted,

               /s/ Brian D. Clark
            W. Joseph Bruckner (MN #0147758)
            Elizabeth R. Odette (MN #0340698)
            Brian D. Clark (MN #0390069)
            Simeon A. Morbey (MN # 0391338)
            Arielle S. Wagner (MN #0398332)
            LOCKRIDGE GRINDAL NAUEN P.L.L.P.
            100 Washington Avenue South, Suite 2200
            Minneapolis, MN 55401
            T: (612) 339-6900
            F: (612) 339-0981
            wjbruckner@locklaw.com
            erodette@locklaw.com
            bdclark@locklaw.com
            aswagner@locklaw.com

Bruce L. Simon
Neil Swartzberg
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
T: (415) 433-9000
F: (415) 433-9008
bsimon@pswlaw.com
nswartzberg@pswlaw.com

Clifford H. Pearson
Daniel Warshaw
Bobby Pouya
Michael H. Pearson
PEARSON SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
T: (818) 788-8300
F: (818) 788-8104
cpearson@pswlaw.com
dwarshaw@pswlaw.com
bpouya@pswlaw.com
mpearson@pswlaw.com

Melissa S. Weiner (MN #0387900)
PEARSON, SIMON & WARSHAW, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
T: (612) 389-0600
F: (612) 389-0610
mweiner@pswlaw.com

*Interim Co-Lead Class Counsel for Direct
Purchaser Plaintiffs*

DATED: November 1, 2018

HAGENS BERMAN SOBOL SHAPIRO LLP

By:     */s/ Shana Scarlett*
             Shana E. Scarlett

715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000

Facsimile: (510) 725-3001
shanas@hbsslaw.com

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2nd Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
beth@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Britany N. Resch (#0397656)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

*Interim Co-Lead Counsel for Consumer
Indirect Purchaser Plaintiffs*

DATED: November 1, 2018

LARSON • KING, LLP

By:_____ /s/ Shawn M. Raiter _____
        Shawn M. Raiter

Shawn M. Raiter (MN# 240424)
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6518
sraiter@larsonking.com

Jonathan W. Cuneo
Joel Davidow
Blaine Finley
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
bfinley@cuneolaw.com

## CERTIFICATE OF SERVICE

I, Brian D. Clark, hereby affirms that on November 1, 2018, I caused a true and correct copy of **ALL PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO THE PORK INTEGRATOR DEFENDANTS** to be served on counsel listed on the attached schedule via email.

Dated: November 1, 2018                     Respectfully submitted,


s            /s/ Brian D. Clark
W. Joseph Bruckner (MN #0147758)
Elizabeth R. Odette (MN #0340698)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0571
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com

*Interim Co-Lead Class Counsel for Direct Purchaser Plaintiffs*

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

*IN RE PORK ANTITRUST LITIGATION*

This Document Relates To:

ALL ACTIONS

Civil No. 0:18-cv-01776-JRT-HB

**DECLARATION OF JOSEPH C. BOURNE IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL INDIANA PACKERS CORPORATION TO PRODUCE DOCUMENTS RESPONSIVE TO SUBPOENA DUCES TECUM**

I, Joseph C. Bourne, declare as follows:

1.      I am an attorney with the law firm of Lockridge Grindal Nauen P.L.L.P., appointed by the Court as Interim Co-Lead Class Counsel for the Direct Purchaser Plaintiff ("DPP") Class in the above-captioned matter. I submit this declaration in support of Plaintiffs' Motion to Compel Indiana Packers Corporation to Produce Documents Responsive to Subpoena Duces Tecum

2.      Attached as **Exhibit 1** is a true and correct copy of a document bates labeled JBS-PORK-00880538, which JBS designated as Highly Confidential in its production.

3.      Attached as **Exhibit 2** is a true and correct copy of a document bates labeled SBF0349004, which Seaboard designated as Confidential in its production.

4.      Attached as **Exhibit 3** is a true and correct copy of a document bates labeled SMITHFIELD01177237, which Smithfield designated as Confidential in its production.

5.    Attached as **Exhibit 4** is a true and correct copy of a document bates labeled SMITHFIELD03678665, which Smithfield designated as Highly Confidential in its production.

6.    Attached as **Exhibit 5** is a true and correct copy of the subpoena duces tecum Direct Purchaser Plaintiffs, Consumer Indirect Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, and the Commonwealth of Puerto Rico (collectively, "Plaintiffs") served on Indiana Packers Corporation ("Indiana Packers"), which is dated June 7, 2021.

7.    Attached as **Exhibit 6** is a true and correct copy of the Objections and Responses Indiana Packers served on Plaintiffs on July 9, 2021.

8.    Attached as **Exhibit 7** is a true and correct copy of the email exchange between counsel for Direct Purchaser Plaintiffs and counsel for Indiana Packers from July 9, 2021 through December 28, 2021.

9.    Attached as **Exhibit 8** is a true and correct copy of the December 1, 2021 letter from Joseph C. Bourne to Britt M. Miller.

10.    Attached as **Exhibit 9** is a true and correct copy of the search terms Plaintiffs proposed to Indiana Packers for it to use in its search for documents responsive to the subpoena.

11.    Plaintiffs have served subpoenas on non-parties in this case, seeking communications with Agri Stats, communications with Pork Integrators, and documents related to pork costs, pricing, production, output, capacity, sales, demand, supply, imports exports, or market shares. Where applicable, Plaintiffs have proposed sets of search terms

for the non-parties to use when searching for responsive documents. These search terms have all contained terms, phrases, and email domains that are unique to the pork industry. The search terms ultimately proposed to Indiana Packers are substantially the same as the terms proposed to and used by other non-parties in response to subpoenas in this case.

12.     Attached as **Exhibit 10** is a true and correct copy of the December 28, 2021 letter from Britt M. Miller to Joseph C. Bourne.

13.     Attached as **Exhibit 11** is a true and correct copy of a document bates labeled SBF0218426, which Seaboard designated as Confidential in its production.

14.     Attached as **Exhibit 12** is a true and correct copy of a document bates labeled JBS-PORK-00096504, which JBS designated as Confidential in its production.

15.     Attached as **Exhibit 13** is a true and correct copy of a document bates labeled TF-P-001698022, which Tyson designated as Confidential in its production.

16.     Attached as **Exhibit 14** is a true and correct copy of a document bates labeled HFC-PORKAT0000025940, which Hormel designated as Confidential in its production.

17.     Attached as **Exhibit 15** is a true and correct copy of a document bates labeled TF-P-001604401, which Tyson designated as Confidential in its production.

18.     Attached as **Exhibit 16** is a true and correct copy of a document bates labeled SMITHFIELD01237636, which Smithfield designated as Confidential in its production.

19.     Attached as **Exhibit 17** is a true and correct copy of a document bates labeled TF-P-000646687, which Smithfield designated as Confidential in its production.

20.     Attached as **Exhibit 18** is a true and correct copy of a document bates labeled TF-P-000581785, which Tyson designated as Confidential in its production.

21.     Attached as **Exhibit 19** is the true and correct copy of document bates labeled JBS-PORK-01009311, which JBS designated as Highly Confidential in its production.

22.     Plaintiffs are meeting and conferring with certain Defendants about what appear to be some gaps in certain Defendants' document productions. Those discussions have not yet been resolved.

23.     Attached as **Exhibit 20** is a true and correct copy of the court's order in the Turkey antitrust litigation concerning a motion for a protective order pursuant to Federal Rule of Civil Procedure 26. *See* Order, ECF No. 305, *Olean Wholesale Grocery Cooperative, Inc. v. Agri Stats, Inc.*, Case No. 1:19-cv-08318 (N.D. Ill. Oct. 6, 2021).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 17th day of March, 2022, at Minneapolis, Minnesota.

*/s/Joseph C. Bourne*
Joseph C. Bourne

# EXHIBIT 9

| | A |
|---|---|
| 1 | **Search Terms** |
| 2 | Smithfield |
| 3 | "Murphy Brown" |
| 4 | "Farmland" |
| 5 | "John Morrell" |
| 6 | Hormel |
| 7 | JBS |
| 8 | Seaboard |
| 9 | "sea board" |
| 10 | STF |
| 11 | SBF |
| 12 | Clemens |
| 13 | Hatfield |
| 14 | hqm |
| 15 | CFG |
| 16 | CVF |
| 17 | Triumph |
| 18 | Tyson |
| 19 | TSN |
| 20 | TYSN |
| 21 | Cargill |
| 22 | "country view family farms" |
| 23 | "Farmer John" |
| 24 | "Agri Stats" OR agristat! OR agstat! OR "A-stat" OR "agri-stats" OR "agri-metrix" OR agrimetrix OR "agri metrix" OR "agri tech" OR "AG-stats" OR agsts OR astats OR agst OR agrimetric! OR "agri metric" OR "agrimetrics" OR "agri-metrics" OR EMI OR "Express Markets" OR "Express Market" OR ExpressMarket! OR paragon! OR agristats! OR expressmarketsinc! OR emianalytics! |
| 25 | PFFJ! |
| 26 | smithfieldfoods! |
| 27 | murphybrownllc! |
| 28 | farmlandfoods! |
| 29 | cvff! |
| 30 | clemensfoodgroup! |
| 31 | tyson! |
| 32 | triumphfoods! |
| 33 | seaboardfoods! |
| 34 | hormel! |
| 35 | cvff! |
| 36 | clemensfoodgroup! |
| 37 | jbssa! |

| | A |
|---|---|
| 38 | cargill! |
| 39 | jmfg! |
| 40 | sf-fl! |
| 41 | sf.fl! |
| 42 | seaboardtriumphfoods! |
| 43 | farmerjohn! |
| 44 | clemensdevelopment! |
| 45 | clemensfamilycorp! |
| 46 | Maplevale! |
| 47 | (Ronald or Ron) w/2 Freed |
| 48 | ron@clemens* |
| 49 | Rebecca w/2 Roddy |
| 50 | RMRoddy* |
| 51 | mafia |
| 52 | Robert.A.Brown@cox.net |
| 53 | Copa OR Dubbert OR (Ron! /2 Knowles) OR ((robert or bo) /2 manly) OR Phalen OR (Larry /2 Pope) OR (Scott /2 Saunders) OR (Gregg /2 Schmidt) OR (Dhamu or Thamodaran) OR Barger OR Bogaard OR Dohlman OR (Su! /2 Dow) OR (Vic! /2 Flemming) OR Kaster OR Lombardo OR ((Robert or Bob!) /2 Moore) OR Sabin OR Szaloky OR Luckman OR (Ken! /2 Sullivan) OR (Keller /2 Watts) OR ((joe or joseph) /2 Weber) OR luter OR Schellpeper OR Nunziata OR Sebring OR Dokken OR (Arn! /2 Silver) OR Mallahan OR (Jerry /2 Lamb) OR Kapella OR French |
| 54 | (Doug! /2 Clemens) OR Edsill OR (Eric /2 Patton) OR Rennells OR ((Rob! OR Bob) / Ruth) OR Groff OR Masotta OR Schmberbeck OR Budnick OR (Phil! /2 Clemens) |
| 55 | (Don! /2 Tyson) OR John! /2 Tyson) OR ((Thomas or Tom) /2 Hayes) OR (Don! /2 Smith) OR (Rich! /2 Bond) OR (Noel /2 White) OR Stouffer OR (Todd /2 Neff) OR (Shane /2 Miller) OR Krehbiel OR Solsma OR ((James or Jim) /2 Schmitz) OR (Steve! /2 Billups) OR (Deborah /2 McConnell) OR Tollett OR Lochner OR (Leah /2 Anders!) OR Brester OR Machan OR (Jeremy /2 Dickinson) OR (John! /2 Thomas) OR Kathol OR Wisener OR Holbrook OR Leatherby OR (Ray! /2 McGaugh) OR Sheneman OR Hollingsworth OR Gingerich OR Glendinning OR Johnk OR alderson OR King OR Roel OR Andriessen OR Fick |
| 56 | Brian w/2 Gordon |
| 57 | bgordon* |
| 58 | Brandi w/2 McClure |
| 59 | brandi.mcclure* |
| 60 | brandi_mcclure* |

| | A |
|---|---|
| 61 | (Mark /2 Campbell) OR Papenberg OR (Matt! /2 England) OR Wedeking OR Lehenbauer OR ((Tom! or Thomas) /2 French) OR (Ken! /2 Grannas) OR Diebold OR ((Rick or Rich!) /2 Hoffman) OR Kleiniein OR Larimer OR (Pat! /2 Lilly) OR (Dan! /2 Marlow) OR Schmerbach OR McClain OR Southwell OR (Clay /2 Swan) OR Conaway OR Reeder OR (Misty /2 Taylor) |
| 62 | Blumhardt OR Brenneman OR (Mel /2 Davis) OR Dye OR Getzel OR Ginther OR Hast OR (Kevin /2 Henn) or (Ter! / Holton) OR Hunderdosse OR (Gary /2 Lewis) OR (Duke /2 Sand) OR (Kevin /2 Smith) OR (Josh! /2 Stewart) OR Summerlin OR Taphorn OR (Joan /2 Contreras) OR Lecluyse OR (Lesa /2 Tuley) |
| 63 | (Brian /2 Synder) OR Grismore OR Scholer OR Bilbrey OR (Stac! /2 Edwards) OR (Stac! /2 Brooks) OR Dess OR Agne OR (Josh! /2 Edwards) OR Feitz OR (Steve! /2 Meyer) OR Stegall OR Neff OR (Blair /2 Synder) |
| 64 | Bogle OR Bollum OR Chenoweth OR Hoefflin OR Peil OR (Jose /2 Rojas) OR Temperley OR Adwell OR Annis OR (Steve! /2 Binder) OR ((Tom or Thomas) /2 Day) OR Ettinger or Farnsworth OR Feragen OR (Jana /2 Haynes) OR Hyland or Lieberum OR ((Jim or James) /2 Sheehan) OR ((William or Bill) /2 Snyder) OR Coffey OR Fiala OR Leitch OR Meiergerg OR Snee OR Gyarmarty OR (Neal /2 Hull) OR ((Jennifer or Jenny) /2 Johnson) OR LaVallie OR Steinbach OR Venenga |
| 65 | (wesley /2 batista) OR (joesley /2 batista) OR (Don! /2 Jackson) OR Nogueira OR Bruett OR Denilson OR (Garry /2 Albright) OR (Kevin /2 Arnold) OR (Ed! /2 Bick) OR (Jerry /2 Bick) OR (Jerry /2 Brooks ) OR Dooley OR Goulding OR (Tim! /2 Hiller) OR ((Bob OR Robert) /2 Krebs) OR (Kristina /2 Lambert) OR Lorenger OR (Matt! /2 Turner) OR (Eric /2 Wallin) OR Andersland OR Fosbery OR Huebner OR (Rob! /2 Kearns) OR Kupfer OR (Ron! /2 Ott) OR (Lisa /2 Peters) OR (George /2 Price) OR ((Mike OR Michael) /2 Swanson) OR (Joe! /2 Newhart) OR ((Mike or Michael) /2 McCarthy) OR (Sara /2 Armstrong) OR (Beth /2 Foss) OR (Jeannie /2 Foster) OR (Jeff! /2 Greene) OR (Tim! /2 Uber) |

| | A |
|---|---|
| 66 | timshellpeper! OR toschellpeper! OR ebarger! OR ddubbert! OR srphalen! OR joeweber! OR markcopa! OR dandubbert! OR ronknowles! OR robertmanly! OR shellyphalen! OR clarrypope! OR larrypope! OR scottsaunders! OR greggschmidt! OR dhamuthamodaran! OR elizabethbarger! OR robertbogaard!OR jessedohlman! OR susandow! OR victorflemming! OR collettekaster! OR keiralombardo! OR robertmoore! OR dansabin! OR joeszaloky! OR jeffluckman! OR kennethsullivan! OR kellerwatts! OR josephluter! OR glennnunziata! OR josephsebring! OR russelldokken! OR arnoldsilver! OR karolinamallahan! OR jerrylamb! OR dankapella! OR johnfrench! OR jfrench! |
| 67 | dgroff! OR dclemens! OR cedsill! or epatton! OR jrennells! OR rruth! OR jmasotta! OR jschmerbeck! OR dbudnick! OR pclemens! |
| 68 | deb.mcconnell! OR noel.white! OR todd.neff! OR shane.miller! OR jason.brester! OR gary.machan! OR john.c.thomas! OR don.tyson! OR john.h.tyson! OR thomas.hayes! OR donnie.smith! OR richard.bond! OR stephen.stouffer! OR jay.krehbiel! OR jason.solsma! OR james.schmitz! OR steve.billups! OR leland.tollett! OR james.lochner! OR leah.andersen! OR jeremy.dickinson! OR jon.kathol! OR ruth.wisener! OR ruth.a.wisener! OR jerry.holbrook! OR dennis.leatherby! OR ray.mcgaugh! OR gary.sheneman! OR raymond.hollingsworth! OR mark.gingerich! OR steward.glendinning! OR lanny.johnk! OR tim.alderson! OR donnie.king! OR roel.andriessen! OR melissa.fick! |
| 69 | kgrannas! OR mengland! OR alarimer! OR mcampbell! OR fpapenberg! OR kwedeking! OR jlehenbauer! OR tfrench! OR jdiebold! OR rhoffman! OR jkleiniein! OR plilly! OR dmarlow! OR dschmerbach! OR msouthwell! OR cswan! OR kconaway! OR jreeder! OR mtaylor! |
| 70 | stephen_summerlin! OR damon_ginther! OR rod_brenneman! OR terry_holton! OR marty_hast! OR thomas_blumhardt! OR mel_davis! OR tom_dye! OR bret_getzel! OR kevin_henn! OR aaron_hunderdosse! OR gary_lewis! OR duke_sand! OR kevin_smith! OR josh_stewart! OR brian_taphorn! OR joan_contreras! OR anna_lecluyse! OR lesa_tuley! |
| 71 | dgrismore! OR sedwards! OR bhsnyder! OR escholer! OR gbilbrey! OR gdess! OR cagne! OR jedwards! OR jfeitz! OR smeyer! OR cstegall! OR tneff! OR bsnyder! OR sbrooks! |
| 72 | jnsheehan! OR cdbollum! OR paul_l_peil! |

| | A |
|---|---|
| 73 | kevin.arnold! OR wesley.batista! OR joesley.batista! OR don.jackson! OR andre.nogueira! OR cameron.bruett! OR denilson.molina! OR garry.albright! OR ed.bick! OR jerry.brooks! OR martin.dooley! OR roger.goulding! OR tim.hiller! OR bob.krebs! OR kristina.lambert! OR brad.lorenger! OR matthew.turner! OR eric.wallin! OR ryan.andersland! OR jamie.fosbery! OR pat.huebner! OR robbie.kearns! OR joh.kupfer! OR ron.ott! OR lisa.peters! OR george.price! OR michael.swanson! OR joe.newhart! OR mike.mccarthy! OR sara.armstrong! OR beth.foss! OR jeannie.foster! OR jeff.greene! OR tim.uber! |
| 74 | "supply and demand" OR "law of supply" OR "laws of supply" OR "laws of demand" OR "law of demand" |
| 75 | (Production OR supply OR volume OR industry) AND ("price response" OR "pricing response" OR "pricing action" OR "price action") |
| 76 | (withdraw! OR liquid! OR "back off" OR restrain! OR reduc! OR grow! OR tight! OR balanc! OR  control! OR depop! OR de-pop! OR cut! OR retire OR (kill /10 early)) AND (pork OR hog! OR swine OR porcine OR pig! OR sow OR shoat! OR boar! OR gilt OR bacon! OR sausage OR ham OR shoulder OR loin! OR backloin! OR tenderloin! OR chop! OR hock! OR picnics OR butt OR butts OR rib OR ribs OR backrib! OR bellies OR primal! OR "sub-primal" OR subprimal OR brisket OR jowl! OR lard OR herd OR drift OR drove OR litter! OR passel OR sounder OR singular) |
| 77 | (surplus OR excess OR tight! OR capacity OR utlilization) AND (pork OR hog! OR swine OR porcine OR pig! OR sow OR shoat! OR boar! OR gilt OR bacon! OR sausage OR ham OR shoulder OR loin! OR backloin! OR tenderloin! OR chop! OR hock! OR picnics OR butt OR butts OR rib OR ribs OR backrib! OR bellies OR primal! OR "sub-primal" OR subprimal OR brisket OR jowl! OR lard OR herd OR drift OR drove OR litter! OR passel OR sounder OR singular) |
| 78 | market /3 supply |
| 79 | (oversuppl! OR (over /2 suppl!) OR over-suppl! OR fair-share OR "fair share") |
| 80 | rationaliz! AND (facility OR facilities OR production OR plant OR complex! supply OR supplies OR produc! OR inventor! OR warehous! OR demand OR capacit! OR plants OR line!) |

| | A |
|---|---|
| 81 | (pric! OR varian!) AND (pork OR hog! OR swine OR porcine OR pig! OR sow OR shoat! OR boar! OR gilt OR bacon! OR sausage OR ham OR shoulder OR loin! OR backloin! OR tenderloin! OR chop! OR hock! OR picnics OR butt OR butts OR rib OR ribs OR backrib! OR bellies OR primal! OR "sub-primal" OR subprimal OR brisket OR jowl! OR lard OR herd OR drift OR drove OR litter! OR passel OR sounder OR singular) |
| 82 | (pric! OR return) AND opportunity |
| 83 | (improve OR increase OR raise OR advantage OR disadvantage) AND (sale OR return OR price OR profit!) |
| 84 | ("elasticity of demand" or "demand elasticity" or "price elastic!" or "inelasticity of demand" or "inelastic demand" or "price sensitiv!") AND (pig! OR pork OR hog! OR swine OR sow!) |
| 85 | ((monitor! OR analy! OR forecast! OR project! OR graph!,OR curv! OR trend!) AND (pig!, hog!, swine, sow, pork! OR porcine  OR shoat! OR boar! OR gilt OR bacon! OR sausage OR ham OR shoulder OR loin! OR backloin! OR tenderloin! OR chop! OR hock! OR picnics OR butt OR butts OR rib OR ribs OR backrib! OR bellies OR primal! OR "sub-primal" OR subprimal OR brisket OR jowl! OR lard OR herd OR drift OR drove OR litter! OR passel OR sounder OR singular) |
| 86 | ((revenue OR revenues OR profit! OR loss! OR P&L OR  PnL  OR  financ! OR future! OR cost) AND (pig!, hog!, swine, sow, pork! OR porcine  OR shoat! OR boar! OR gilt OR bacon! OR sausage OR ham OR shoulder OR loin! OR backloin! OR tenderloin! OR chop! OR hock! OR picnics OR butt OR butts OR rib OR ribs OR backrib! OR bellies OR primal! OR "sub-primal" OR subprimal OR brisket OR jowl! OR lard OR herd OR drift OR drove OR litter! OR passel OR sounder OR singular) |
| 87 | ((compet! OR landscape OR market OR industry OR share) AND (pig! OR hog! OR swine OR sow OR pork! OR porcine OR pig! OR sow OR shoat! OR boar! OR gilt OR bacon! OR sausage OR ham OR shoulder OR loin! OR backloin! OR tenderloin! OR chop! OR hock! OR picnics OR butt OR butts OR rib OR ribs OR backrib! OR bellies OR primal! OR "sub-primal" OR subprimal OR brisket OR jowl! OR lard OR herd OR drift OR drove OR litter! OR passel OR sounder OR singular) |
| 88 | Saturday w/3 (harvest* OR kill) |
| 89 | pric! /3 courag! |
| 90 | industry /5 collective! |
| 91 | manipulat! /5 (pric! OR market OR sow OR pork) |
| 92 | liquidat* w/15 (sow OR hog OR hogs OR pork OR herd OR herds) |
| 93 | rumor! |

| | A |
|---|---|
| 94 | (agro /2 bauer) |
| 95 | (aspen /2 pork) |
| 96 | (cottonwood /2 river) |
| 97 | ((eichelberger /2 farm!) OR !eichelbergerfarms@gmail.com OR !eichfarms.com OR !eichelbergerfarms.com) |
| 98 | (IC /2 pork) |
| 99 | (kronseder /2 farm!) |
| 100 | (nfp /2 west) |
| 101 | (oak /2 research) |
| 102 | (southern /2 minnesota /2 farm!) |
| 103 | (hanor OR !hanorusa.com OR !hanorcompany.com) |
| 104 | (Trioak OR !trioak.com) |
| 105 | (upper /2 midwest /2 swine) |
| 106 | ((allied /2 producer!) OR !alliedproducers.com) |
| 107 | ((christensen /2 farm!) OR !christensenfarms.com) |
| 108 | (crown /2 prairie) |
| 109 | (ewington /2 farm!) |
| 110 | ((new /2 fashion /2 pork) OR !nfpinc.com) |
| 111 | (roberts /2 ranch) |
| 112 | (((daily's OR dailys) /2 premium) OR !dailysmeats.com) |
| 113 | rank* w/10 (guess or switch*) |
| 114 | supply w/10 withdraw* |
| 115 | index w/2 "operating efficiency" w/2 (metric* or metrix or matrix) |
| 116 | disappearance |
| 117 | Export w/ 10 sale* |

# EXHIBIT 10



March 25, 2022

Robert E. Entwisle, Esq.
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606

Re:  **IPC Antitrust Cost Estimate**

Dear Robert,

You requested that we provide an estimate of the amount of data available for the individuals referenced below, and an estimate of the costs to process that data for a potential keyword search and document review.  We understand that the individuals at issue are:

- Gary Jacobson
- Russell Yearwood
- David Murray
- Galen (Paul) Stiverson
- Mark McCain
- James Allen
- Robert Kastens
- Carl Wollenburg
- Randy Toleman

There is a total of approximately two terabytes of data for these individuals.  We estimate that the processing costs for these individuals would be approximately $72,000.

To provide you with an estimate as to potential document review costs, it is common for CDS to use an assumed 500 docs/GB to 2,500 docs/GB to estimate a review population.  It is likewise common to consider the review population from another matter.  Here, we considered the review population from another Mayer Brown antitrust matter that had 1.2TB of data collected from 8 custodians and resulted in about 90,000 documents being reviewed after more than 80 search strings were applied.  Maintaining the same ratio of collected data size and applying that to a potential review population, we estimate that there could be 150,000 documents for review in the instant matter.

First level review costs for 150,000 documents based on hourly bill rates of $48 per hour for first level reviewers and $125 per hour for Review Managers would be approximately $220,000. The review for



150,000 documents based on a per document rate of $1.50 per document would be approximately $225,000.

If search and review of these materials becomes necessary, additional costs would include Relativity user fees and costs for our professional services to support the review. User fees are billed per month, per user based upon the number of active users each month. We typically estimate 10 users per month for most projects, but if a large document review occurs, the user fees can easily be in excess of 100 users per month for a large document review team. The user fees costs are $75/user/month. For illustration purposes, we think it is reasonable to assume 20 users, and that results in an estimated cost of $1,500 per month.

For professional service hours (Project Management and technical support), it is difficult to estimate how much support would be needed on any project. Typically, clients average 10 hours per month for low activity months to over 40 hours per month for high activity months. At $175/hour, and assuming 20 hours per month, the cost estimate is $3,500 per month. Please note that these are estimates only for illustration purposes, and that CDS bills for costs as incurred.

Please feel free to reach out to Marla Carlson or myself should you have any questions.

Sincerely,

Regina Chepalis

Digitally signed by Regina Chepalis
DN: cn=Regina Chepalis, o=CDS, Inc, ou=WDC,
email=rchepalis@cdslegal.com, c=US
Date: 2022.03.25 15:40:18 -04'00'

Regina M. Chepalis
Managing Director
Complete Discovery Source
1110 Vermont Ave, NW Suite 725
Washington DC 20005


cc: Marla Carlson

# EXHIBIT 11



<div align="right">
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
United States of America

T: +1 312 782 0600
F: +1 312 701 7711

mayerbrown.com
</div>

December 28, 2021

BY EMAIL
Brian Clark
Joseph Bourne
LOCKRIDGE GRINDAL NAUEL P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401-2179
bdclark@locklaw.com
jbourne@locklaw.com

Re:     Rule 45 Subpoena to Indiana Packers
        Corporation

Counsel,

I write in response to your letter dated December 1, 2021 (but actually sent December 2) regarding the June 15, 2021 subpoena directed to Indiana Packers Corporation ("IPC") ("Subpoena" or "Requests"). Notwithstanding the fact that IPC has been dismissed *with prejudice* from the *Pork* litigation, Plaintiffs' Subpoena, and your December 1 proposal, attempts to treat IPC as though it remains a party to the litigation, seeking information that is neither relevant nor unavailable to Plaintiffs through actual party discovery. Without suggesting that IPC has any duty to comply with the Subpoena, but solely in the interest of a potential compromise, we provide the following information and proposal.

**Structured Data Request**

Subpoena Request No. 4 provided none of the details regarding the types of "structured data" sought by the Subpoena, and IPC has no obligation to attempt to respond on the basis of this Request as drafted. That said, our client has evaluated the categories outlined in your December 1 letter. Based on our investigation to date, we expect that IPC could produce data maintained in the ordinary course from its active database for customers in the United States for the following Items: a (terms of sale); b (invoice number); c (purchase order number); d (shipping location); e (customer contact information); f (shipping dates, invoice dates, and delivery dates, where available); g (pork descriptions and identifiers); h (quantity); i (pricing information, broken down by item, shipping, and tax, where available); j (currency); k, n (discount details and transactional level costs, again, where tracked and available). IPC does not appear to track information in its database on Items l, m, o (resale details, to the extent such "resales" even occurred) and Plaintiffs' "catchall" Items p and q, which essentially seek whatever other data IPC has in its systems, are facially (and ridiculously) overbroad and IPC will not provide any such data.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities including Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership) and Tauil & Chequer Advogados (a Brazilian partnership).

Mayer Brown LLP

Brian Clark
Joseph Bourne
December 28, 2021
Page 2

We expect IPC would have data for US sales for the above referenced categories for the period January 1, 2008 through June 30, 2018, to the extent that information was entered into its transaction database in the ordinary course.

If Plaintiffs will withdraw the unstructured data requests outlined in their December 1 letter, our client is prepared to commit to providing a sample within 21 days, and estimates that it will be able to produce a full data set within 30 days of agreement based on the sample. The sample and any data production would be designated Highly Confidential under the Protective Order (Dkt. 212).

As investigating these matters, preparing a sample, and ultimately preparing data for production has been, and will continue to be, a burdensome and unwarranted process, it more than satisfies IPC's obligations under Rule 45. And so there is no confusion, IPC is willing to take on this considerable burden if and only if Plaintiffs withdraw their unstructured data requests (below) and commit that they will not seek further documents or material from IPC in connection with the litigation. If Plaintiffs so agree, IPC will not seek reimbursement of its costs in complying with the agreed-upon portions of the Subpoena.

**Unstructured Data Requests**

As we repeatedly stated during this process, IPC was willing to consider requests for discrete, "go-get" type documents if it would obviate the need for motion practice, but will not engage in burdensome efforts to collect, search, review, and produce email and other documents. Your proposal ignores our previously stated position on this, and instead asks that IPC engage in the very same discovery Plaintiffs sought while it was a party. Plaintiffs' letter is unambiguous in this regard: "IPC and Plaintiffs previously agreed upon custodians in August 2019 when IPC was a party to the litigation…. These are the same custodians Plaintiffs propose now." Plaintiffs then ask that IPC search those nine custodians' files over a 10+ year period using such blatantly overbroad terms like "disappearance" or "mafia"—which Plaintiffs have failed to demonstrate the relevance of to the lawsuit, much less the three Requests that you claim constitute a narrowing of the Subpoena. Based on our experience in other litigation (in which your Firm represents another plaintiff), similar undertakings have resulted in more than 100,000 documents to be reviewed, and based on the breadth of Plaintiffs' search terms we would expect that to be the case here. Review and production of that volume of documents would inevitably result in IPC spending hundreds of thousands of dollars to satisfy Plaintiffs' requests. Such an undertaking is clearly not required of a third party under Rule 45 (and would likely be subject to a challenge of proportionality even if IPC were a party, which it is not).

Moreover, Plaintiffs' proposal continues to put the cart before the horse, as they have not proffered any information to suggest that these individuals maintain information relevant to these

Mayer Brown LLP

Brian Clark
Joseph Bourne
December 28, 2021
Page 3

Requests that cannot be obtained from the parties to the litigation. And at least one court has rejected similar requests by Plaintiffs directed at parties in other litigation. *See* Order at 11, *In re Turkey Antitrust Litigation*, No. 1:19-cv-08318 (Dkt. 305) (granting motion for protective order "in full" as to similar request for documents relating to "competitive conditions" in the turkey industry). In short, your proposal that IPC provide the very same burdensome discovery sought while it was a party, and review documents from nine custodians using more than 100 search strings to respond to requests that other courts have already rejected "in full" because they were too burdensome, is not a reasonable compromise, nor is it compliant with your obligations under Rule 45 to avoid imposing undue burden on non-parties.

********

As stated above, IPC will agree to produce the transactional data detailed above if it will *resolve* the Subpoena and Plaintiffs' discovery efforts as they related to IPC. If Plaintiffs persist in their requests for facially burdensome custodian-based searches for documents, then we are at impasse and we will raise the matter with the court in Indiana. Please let us know. If you believe that a further discussion of these issues would be productive, we are happy to engage.

Sincerely,

Britt M. Miller

cc:     William H. Stallings
        Jaime Stilson
        Robert E. Entwisle

745252587

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

IN RE PORK ANTITRUST LITIGATION

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

Civil No. 18-cv-01776-(JRT/LIB)
Civil No. 19-cv-01578-(JRT/LIB)
Civil No. 19-cv-02723-(JRT/LIB)

## <u>DECLARATION OF ROBERT ENTWISLE</u>

I, Robert Entwisle, declare under penalty of perjury as follows:

1.      I am an attorney with Mayer Brown LLP.

2.      I submit this declaration in support of Indiana Packers Corporation's ("IPC") Motion to Quash the subpoena received from the class plaintiffs in *In re Pork Antitrust Litigation*, No. 18-cv-01776, pending in the District of Minnesota.

3.      Exhibit 10 is a true and correct copy of a letter from Complete Discovery Source, dated March 25, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of March, 2022.

*/s/ Robert Entwisle*
Robert Entwisle
Counsel, Mayer Brown LLP

1