## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE PORK ANTITRUST LITIGATION* | Case No. 18-cv-1776 (JRT/HB) |
| This Document Relates To:<br>All Class Actions | **ORDER ON MOTION TO COMPEL HORMEL AND HORMEL CUSTODIANS TO PRODUCE RESPONSIVE TEXT MESSAGE CONTENT** |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the court on Class Plaintiffs' Motion to Compel Hormel to Produce Responsive Text Message Content and to Enforce Subpoenas to Hormel Custodians. [ECF No. 883.] Plaintiffs seek an order: (1) compelling defendant Hormel Foods Corporation to produce the text message content of its currently employed custodians, including backup content stored on cloud services; (2) declaring Hormel had at the outset of the litigation an obligation to image text message content from all of its custodians' mobile devices and cloud backups, and an accompanying order for Hormel to do so now; and to the extent necessary (3) enforcing the subpoenas to the Hormel custodians for the same material. For the reasons set forth below, the Court grants in part and denies in part the motion.

## I.    Background

Plaintiffs in this coordinated multidistrict litigation, which includes several putative plaintiff classes and a number of "direct action plaintiffs," allege that Defendants, among America's largest pork producers and integrators, conspired to limit

the supply of pork and thereby fix prices in violation of federal and state antitrust law.
(See Oct. 20, 2020 Am. Mem. Op. & Ord. at 2 [ECF No. 520].)  They allege Defendants
were able to carry out the conspiracy in two ways: 1) by exchanging detailed,
competitively sensitive, and closely guarded non-public information about prices,
capacity, sales, volume, and demand through Agri Stats—a private service that gathers
data from Defendants and produces market reports for paying subscribers; and 2) by
signaling the need to cut production through public statements aimed at one another.  (*Id.*
at 6.)  Plaintiffs allege that through these mechanisms, Defendants stabilized or increased
the price of pork products from 2009 to the present.

In 2018, Class Plaintiffs requested that Hormel preserve data from personal cell
phones of five company executives, James Snee, Jim Sheehan, Thomas Day, Steven
Binder, and Cory Bollum, through forensic imaging.  (Hormel Ex. 2 [ECF No. 929-1].)
After objecting on several grounds, Hormel agreed to forensically image the phones.
(Hormel Ex. 3 [ECF No. 929-2]; Hormel Ex. 4 [ECF No. 929-3].)

In 2019, Hormel and the Plaintiffs agreed to an ESI Protocol [ECF No. 292] and a
Protocol for Preservation of Phone Records (Hormel Ex. 5 [ECF No. 929-4]).  The
Preservation Protocol applied to Hormel and its document custodians.  Hormel initially
identified seven document custodians.  (Hormel Ex. 6 at 4 [ECF No. 929-5].)  As a result
of negotiations concluding in November 2020, the custodians now number thirty.  (*See*
Hormel Ex. 9 [ECF No. 929-8].)  Seventeen are current employees; thirteen are former
employees.  (Custodians' Mem. at 2 [ECF No. 925].)

In November 2018, Plaintiffs served their first requests for production, in part seeking communications and meetings between the Defendants or related to the lawsuit's subject matter, and information regarding supply, demand, and price of pork products. (Bourne Decl. Ex. 5 at Requests 3–8, 14–19 [ECF Nos. 888-2].)  It defined "document" to include text messages and cloud backups or archived text message data.  (Bourne Decl. Ex. 5 at Definitions ¶¶ 8, 10.)  Hormel objected that it did not have possession, custody, or control of the custodians' personal cell phone data.  (Bourne Decl. Ex. 13 at 20 [ECF No. 888-2].)  Hormel responded to the same effect to Plaintiffs' November 2020 interrogatories, which sought further information about the make, model, and use of the custodians' cell phones, though Hormel did provide the cell phone numbers of the custodians.  (Bourne Decl. Ex. 4 at 20–23 [ECF 887-1].)  On April 19, 2021, Plaintiffs asked whether Hormel had produced the text messages of two custodians' cell phones, to which Hormel responded that it did not have possession, custody, or control over those phones, so it would not produce those messages.  (Bourne Decl. Ex. 6 [ECF No. 888-2].)  Plaintiffs complained that Hormel had not alerted them earlier that it disclaimed control over those cell phones and insisted that Hormel produce the texts.  (Bourne Decl. Exs. 7, 9 [ECF No. 888-2].)  Hormel replied that it had complied with its duties under the phone record preservation protocol and general preservation obligation related to the personal cell phones outside its control.  (Bourne Decl. Exs. 8, 10 [ECF No. 888-2].)

While disagreeing with Hormel, Plaintiffs also subpoenaed the custodians directly for the information.  (Bourne Decl. Ex. 17 [ECF No. 888-2].)  The custodians' counsel interviewed each custodian to determine whether they might have potentially responsive

communications on their cell phones.  (Stephens Decl. ¶ 5 [ECF No. 926].)  All of the custodians responded that they were currently using different phones from the phones they had used during the relevant time-period (January 1, 2008 – August 17, 2018). (Bourne Decl. Ex. 2.)[1]  As summarized by the custodians' counsel,

> Of the thirty Subpoena Recipients, only a small group reported using their personal cell phones for work-related text communications external to Hormel during the relevant time period. More than half of those reported having their devices previously imaged. None of the Subpoena Recipients reported having any text communications with anyone outside of Hormel regarding supply and demand conditions in the pork industry. The vast majority of the Subpoena Recipients either did not use text messaging for work related communications or only used text messaging for communications with other Hormel employees.

(Stephens Decl. ¶ 8.)  Somewhat more detail is provided in the information that was attached to the declaration of Plaintiffs' counsel.  For purposes of this motion, the custodians' responses to the question of whether and to what extent they used their personal cell phones for work purposes and/or texted for work purposes, generally fell into five categories:

- Rarely communicated by text message for work-related matters: Cory Bollum, Donald Temperley, Eric Steinbach, Glenn Leitch, Holly LaVallie, James Fiala, and Jose Rojas.
- Did not communicate by text outside Hormel: Paul Bogle, Nathan Annis, Jerry Aldwell, Mark Coffey, Neal Hull, Steven Binder, Steven Venenga, and William Snyder, and Al Lieberum.

---

[1]  Exhibit 2 to the Bourne Declaration [ECF No. 888-2 at 12–162] are the full letters and objections transmitted to Plaintiffs' counsel by the custodians through their counsel. Exhibit 1 to that declaration [ECF No. 888-2 at 1–11] is a chart created by Plaintiffs' counsel summarizing the responses.  The Court notes that none of the subpoena responses included (or were required to include) sworn declarations by the custodians.

- Did not use text for communications of the nature sought by the subpoena: Jim Sheehan, Thomas Day, Jeff Ettinger, Jody Feragen, and James Snee.
- Never texted about work-related matters: Paul Peil, Lance Hoefflin, Alan Meiergerd, Jana Haynes, Jennifer Johnson, Michael Gyarmaty, Bryan Farnsworth, and Jesse Hyland.
- Never used their personal cell phone at all for work-related communications: Jessica Chenoweth.

(Bourne Decl. Ex. 1.)  All custodians objected to the subpoenas.  (Bourne Decl. Ex. 2.)

In further negotiations, Plaintiffs and the custodians discussed imaging the phones and allowing a forensic search with mutually agreed upon search terms.  (Stephens Decl. ¶ 10.)  Plaintiffs proposed that all phones be searched for all text messages sent to or received from 781 phone numbers associated with individuals affiliated with Hormel or any other Defendant or any of the other identified pork integrators, plus remaining texts containing any of 330 keywords, following which the custodians' counsel would review the results and produce relevant messages.  (*Id.*, Ex. B [ECF No. 926-2]; Bourne Decl. ¶ 12 [ECF No. 887], Ex. 16 [ECF No. 888-2].)  Plaintiffs demanded, however, that all "inter-defendant" text messages be produced without a further relevance review, on the ground that all such messages were relevant.  (Stephens Decl. Ex. B.)

Ultimately, the custodians maintained that Plaintiffs had not shown that all thirty custodians were likely to have texts responsive to the subpoenas, and that the proposed searches were overly broad and unduly burdensome.  (Stephens Decl. ¶ 17.)  The two sides also disagreed about which of them would bear the costs of the proposed searches. (Stephens Decl. ¶¶ 10, 17, Ex. B.)

Failing to reach an agreement with Hormel or the custodians, Plaintiffs filed this motion.  Plaintiffs move this Court to compel Hormel to produce text message content

relevant to its conspiracy claims within Hormel's possession, custody, or control, in

response to its requests for production seeking that information. They seek the same

relief with regard to the custodians they subpoenaed.

Plaintiffs also seek a declaration that Hormel had from the outset of the litigation

an obligation to image text message content from all of its custodians' mobile devices

and cloud backups, and an accompanying order for Hormel to do so now.

## II. Whether Hormel Can Be Compelled to Produce Its Employees' Text Message Data

Parties may obtain discovery that is

> relevant to any party's claim or defense and proportional to the
> needs of the case, considering the importance of the issues at
> stake in the action, the amount in controversy, the parties'
> relative access to relevant information, the parties' resources,
> the importance of the discovery in resolving the issues, and
> whether the burden or expense of the proposed discovery
> outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Rule 34 requires the production of any relevant and responsive

documents in the responding party's possession, custody, or control, including text

message content. *See, e.g.*, *Paisley Park v. Boxill*, 330 F.R.D. 226, 234 (D. Minn. 2019).

Here, Hormel alleges that it does not have the requisite "possession, custody, or control"

over the text messages sent by and to its employees on their personally-owned cell

phones.

### A. The Meaning of "Control"

Plaintiffs claim Hormel has failed to identify and produce relevant text message

content from its document custodians over which Hormel has control. (Pls.' Mem. at 8

6

[ECF No. 885].)  Hormel disputes control.  While the Eighth Circuit has not weighed in, district courts in this Circuit have applied varying definitions of "control." Some have interpreted "control" to mean the legal right to obtain the documents.  *See, e.g., Beyer v. Medico Ins. Group,* Case No. 08-CV-5058, 2009 WL 736759, at *5 (D.S.D. Mar. 17, 2009) ("The rule that has developed is that if a party 'has the legal right to obtain the document' then the document is within that party's 'control' and, thus, subject to production under Rule 34." (internal citation omitted)).

Other courts, including courts in this District, have held that "control" may also include the "practical ability" to obtain the documents.  *See, e.g., Afremov v. Sulloway & Hollis, P.L.LC.*, Case No. 09-cv-03678 (PSJ/JSM), 2011 WL 13199154, at *2 (D. Minn. Dec. 2, 2011) ("'Control' encompasses actual physical possession of the documents, but also the legal right or practical ability to demand the documents from a third party."); *In re Hallmark Cap. Corp.*, 534 F. Supp. 2d 981, 982 (D. Minn. 2008) ("documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action"); *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 636 (D. Minn. 2000) (stating that "under Rule 34, control does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability, to obtain the documents from a non-party to the action" (quotations omitted), and directing the defendant to produce not only documents in its physical possession but also those that it was "capable of obtaining upon demand"); *New Alliance Bean & Grain Co. v. Anderson*

*Commodities, Inc.,* Case No. 8:12-CV-197, 2013 WL 1869832, at *3 (D. Neb. May 2, 2013) ("documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action"); *Handi-Craft v. Action Trading, S.A.,* Case No. 4:02-CV-1731, 2003 WL 26098543, at *6 (E.D. Mo. Nov. 25, 2003) (holding that "the appropriate test is not of legal entitlement, but of control or practical ability to obtain the documents").

Where the practical ability test is applied, the burden of demonstrating that the party from whom discovery is sought has the practical ability to obtain the documents at issue lies with the party seeking discovery. *New Alliance Bean & Grain,* 2013 WL 1869832, at *5. In assessing whether a party has the practical ability to obtain documents from a non-party, courts have focused on the "mutuality" of the responding party's relationship with the document owner, including whether the documents sought are considered records which the party is apt to request and obtain in the normal course of business, or whether the prior history of the case demonstrates cooperation by the non-party, including the production of documents and other assistance in conducting discovery, and the non-party has a financial interest in the outcome of the litigation. *See Afremov*, 2011 WL 13199154, at *2 (D. Minn. Dec. 2, 2011) (collecting cases). The undersigned has also applied a practical ability analysis in ruling on a motion seeking to compel a U.S.-based party to produce documents in the possession of a Brazilian affiliate. Order, *M-I Drilling Fluids UK Ltd. v. Dynamic Air Inc.*, 14-cv-4857 (D. Minn. Nov. 13, 2015) [ECF No. 171].

That said, the Eighth Circuit has never decided whether the "legal right" or "practical ability" standard should govern, and other circuits are split on the issue. *See generally,* The Sedona Conference, Commentary on Rule 34 and Rule 45 "Possession, Custody, or Control," 17 Sedona Conf. J. 467, 482-92 (2016) (collecting cases). Indeed, in part because of that variability, the Sedona Conference has urged adoption of a consistent, "reliable, objective approach" that defines control "as the legal right to obtain and produce the Documents and ESI on demand." *Id.* at 528. The Sedona Conference has criticized the "practical ability" standard on several grounds, including that its imprecision "has resulted in inconsistent and, at times, inequitable results in many contexts." *Id.* It describes the standard as "inherently vague," "unevenly applied," having the potential to lead to "disparate results," and potentially leading to inequitable or even "futile" results. To that last point, the commentary cites by way of example one court's observation that even if it were to order a party employer to collect and turn over personal emails of its employees, the moving party had not identified any authority under which the employer could *force* the employees to turn them over. *Id.* at 542 n. 126, citing *Matthew Enter., Inc. v. Chrysler Grp. LLC,* Case No. 13-cv-04236-BLF, 2015 WL 84982256 (N.D. Cal. Dec. 10, 2015).

Relatedly, the Ninth Circuit has recognized that "[o]rdering a party to produce documents that it does not have the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of getting those documents." *In re Citric Acid Litig.*, 191 F.3d 1090, 1108 (9th Cir. 1999). And yet, a strong argument can be made that if a party's relationship with a non-party is such that the former routinely

9

obtains certain kinds of documents from the latter in the ordinary course of business, and perhaps has already even leveraged that access to obtain documents for its own use in the litigation, fairness would require that it also be required to do so for purposes of responding to discovery.  Order, *M-I Drilling*, 14-cv-4857, at 7–9.

In this case, however, the Court need not choose between the "legal right" and "practical ability" standard because, for the reasons discussed below, it finds that regardless of the standard applied, Plaintiffs have not shown that Hormel has control over text messages on the personally-owned phones of its employees.

## B.    Whether Hormel's BYOD Policy Gives Hormel Control Over Text Messages on Personally-Owned Cell Phones

Plaintiffs argue that Hormel has control of the custodians' personal text messages because its "bring your own device" (BYOD) requires employees to use their cell phones to conduct business, and Hormel controls all data on those phones through the BYOD policy and the ability afforded as a result of that policy to wipe all data on personally-owned phones whenever it deems necessary.  (Pls.' Mem. at 9–11.)  Hormel responds that the BYOD policy does not give it the legal authority to access, view, image, or control the text messages, and therefore it lacks control over those messages.  (Hormel Mem. at 12–13.)

Hormel has had a BYOD policy since at least 2011.[2]  (*See* Bourne Decl. Ex. 14 [ECF No. 887-1]; Hormel Ex. 1 [ECF No. 930].)  The policy allows employees to use their personally-owned cell phones to interact remotely with certain Hormel corporate

systems.  (*See* Hormel Ex. 1 § A.)  It also provides for employees who have a defined business need to be reimbursed for mobile device service for a personally-owned phone, although the employee is responsible for all costs associated with purchasing and maintaining the phone and any accessories, as well as the costs of any application downloads or purchases.  (Hormel Ex. 1 at 4, 5 § B; Morrison Decl. ¶¶ 10, 15–16 [ECF No. 928].)  Hormel claims ownership of all "data that is sourced from Hormel systems and synced between the mobile device and its servers."  (*See* Hormel Ex. 1 at 6 § F; Morrison Decl. ¶¶ 7–8.)  Such data "primarily consists of company email, calendars, and contacts (if set up through an employee's corporate email account)," but does not include "text messages or other information on a personally-owned device."  (Morrison Decl. ¶¶ 8–9.)  The policy does not explicitly assert ownership, control, or ability to access, inspect, copy, image, or limit personal text messages.  (*See* Hormel Ex. 1 § F.)

Hormel requires an employee who accesses Hormel data using their personal phone to install the MobileIron application.  (Morrison Decl. ¶¶ 11, 14, 18.)  MobileIron prevents an employee from copying or backing up Hormel-owned data residing on their phone.  (Morrison Decl. ¶¶ 13–14.)  It does not interfere with or limit the employee's ability to copy, delete, or back up text messages, nor does it enable Hormel to access or image text messages.  (Morrison Decl. ¶¶ 18–20.)  Through the BYOD policy, Hormel reserves the right to remotely remove MobileIron and the company data controlled by MobileIron, or to remotely wipe (i.e. factory reset) the phone in order to wipe all Hormel-

---

[2] The conspiracy allegedly began in 2009 and none of the parties address pre-BYOD policy communications.

owned data, but the policy warns that such a wipe may delete <u>all</u> data the phone, including personal data such as text messages.  (Hormel Ex. 1 § F; Morrison Decl. ¶¶ 11–12.)  However, following a wipe, the employee may freely restore any personal data he or she had previously backed up to external storage.  (Morrison Decl. ¶ 17.)

Plaintiffs read the BYOD policy's provision that "[a]ll approved employees will be expected to use a personally-owned mobile device" to mean that all Hormel employees are required to own personal cell phones and to use them for business.  (Pls.' Mem. at 8.)  Plaintiffs misconstrue the policy by taking this statement out of its context. An employee must request Hormel's permission to use a personally-owned cell phone to access Hormel's systems, and may request that Hormel reimburse the employee for monthly carrier service charges.  Hormel will approve such a request if it concludes the employee has a "defined business need" to use the phone in the ordinary course of his or her work for the company.  (*See* Hormel Ex. 1 § A, App. A.)  However, nothing in the policy appears to require any employee to use a personally-owned phone to conduct work, and nothing in the policy requires any employee who uses a personally-owned phone to use text messaging to conduct work.

Plaintiffs next argue Hormel's remote wipe ability gives it control over employee texts, but the Court disagrees.  The MobileIron application does not give Hormel the ability to access, inspect, copy, or image text messages; it only gives Hormel the ability to wipe those messages as part of a remote factory reset of the phone if Hormel concludes the security of its own data on the phone has been put at risk and if it cannot limit the wipe to only company data.  Similarly, the BYOD policy does not assert Hormel's

ownership over any data other than data "sourced from Hormel systems and synced between the mobile device and its servers"—which does not include text messages (except, perhaps, if the employee copied data sourced from a Hormel system and embedded it in a text)—nor does it assert Hormel's right to demand that its employees allow it to access or inspect any other data. Hormel's right and ability to remotely wipe an entire phone is for the sole and express purpose of removing company data—such as in response to the phone being lost or stolen. The company's ability to wipe personal data from a personally-owned device by resetting the device to a factory floor state in order to purge company data does not give the company control—legal or practical— over that personal data. The Sedona Conference has taken the position that an employer does not legally control personal text messages despite a BYOD policy when the policy does not assert employer ownership over the texts and the employer cannot legally demand access to the texts. The Sedona Conference, *Commentary on BYOD: Principles and Guidance for Developing Policies and Meeting Discovery Obligations*, 19 Sedona Conf. J. 495, 531 (2018).

The Court is not persuaded otherwise by *H.J. Heinz Co. v. Starr Surplus Lines Ins. Co.* Case No. 2:15-cv-00631-AJS, 2015 WL 12791338, at *4 (W.D. Pa. July 28, 2015), *report and recommendation adopted*, 2015 WL 12792025 (W.D. Pa. July 31, 2015). (Pls.' Mem. at 9–10.) The special master in *Heinz* concluded that since Heinz's BYOD program provided that all company information and emails on both company-owned and personally-owned mobile devices were the sole property of the company, the company had custody and control of its own data on those devices. The special master did not,

however, suggest that the control extended to any personal data on the phone.  2015 WL 12791338 at *4.  Notably, the special master was not required to resolve the question of whether Heinz had control over text messages on personally-owned phones because the only such custodian specifically before the special master stated he did not use his personal phone to send or receive text messages related to substantive Heinz business. And while the special master recommended that the company be required to interview other custodians about the existence of any potentially relevant text messages on their phones and to produce such messages if they existed, it is not clear whether that requirement was limited to the scope of the underlying reasoning—i.e., text messages on company-owned phones and text messages on personally-owned phones that contained company data—or whether the special master assumed Heinz could require that its employees produce for inspection, review, and production text messages on personally-owned phones that did not include company-owned data (and if so, on what legal basis). Nothing in the special master's report and recommendation suggested, as Plaintiffs do here, that the company had overall control over text messages on an personally-owned cell phones.

Therefore, the Court is not persuaded by Plaintiffs' arguments that the BYOD policy gives Hormel control over the text messages on personally-owned cell phones.

### C.    Whether the Relationship Between Hormel and the Custodians Gives Hormel Control Over Text Messages on Personally-Owned Cell Phones

Plaintiffs argue that even if the BYOD policy did not give Hormel the legal right to demand access to text messages on personally-owned phones, the relationship between

it and its employees gives it the practical ability to demand access to that data.  Plaintiffs

argue Hormel could have asked all of its custodians to give it access to text messages and

all custodians likely would have agreed.  They base that argument in part on the fact that

Hormel had previously asked for and received permission to *image* (although not to

inspect, copy, or produce the content of) the personal cell phones of five executive

custodians: James Snee, Jim Sheehan, Thomas Day, Steven Binder, and Cory Bollum.

(Tr. at 15–16 [ECF No. 945].)  (Hormel Exs. 2–3; Bourne Ex. 1.)

The Court disagrees.  It is one thing to show that a responding party may *ask* for

documents in the possession of someone with whom it has a relationship, but quite

another to conclude that the party has the practical ability to *demand* such documents,

and therefore has "control" over them.  The Court is particularly sensitive to this

distinction in the context of the employment relationship.  While one might argue that the

employees' fear for their job security or interest in the financial well-being of the

company will incentivize them to say "yes" to turning over their text messages for

inspection and possible production is not, in the opinion of the undersigned, the kind of

"practical ability" contemplated by that standard.  Practical ability to demand access to

documents has generally been found where the relationship between the party and non-

party, and the types of data or documents at stake, give rise to the conclusion that the

non-party would give (and often, has given) the party access to those data and documents

in the ordinary course of business.  *See, e.g.,* Order, *M-I Drilling*, 14-cv-4857, at 7–9*;*

*Camden Iron & Metal, Inc. v. Marubeni Amer. Corp.,* 138 F.R.D. 438, 443 (D.N.J. 1991)

("The proper inquiry here is whether the documents sought are considered records which

[the defendant subsidiary] is apt to request [from the non-party parent] and obtain in its normal course of business."); *Cooper Indus., Inc. v. British Aerospace,* 102 F.R.D. 918, 919–20 (S.D.N.Y. 1984) (holding that where the defendant was the distributor and servicer of the non-party affiliate's planes, it must produce certain documents in the possession of the affiliate, and noting that the documents sought "all relate to the planes that defendant works with every day; it is inconceivable that defendant would not have access to these documents and the ability to obtain them for its usual business.").

Here, there is no evidence that in the ordinary course of business Hormel seeks, needs, or expects to gain access to the content of employees' text messages on their personally-owned phones.  That five executives agreed to have their phones imaged for the purpose of preserving the data does not establish that Hormel has the practical ability to demand that it be allowed to inspect or produce the data, and it is no evidence at all that other custodians would be amenable to doing so.  Plaintiffs contend that at least those custodians who are currently employed by Hormel will wish to help their employer in this case.  (Tr. at 15–16.)  But while those custodians may feel a sense of company loyalty and/or have an interest in the company's financial health, it goes too far to extrapolate from that a practical ability on Hormel's part to demand access to the data on their phones.  *Cf. U.S. Intern. Trade Com'n v. ASAT, Inc.,* 411 F.3d 245, 255 (D.C. Cir. 2005) (rejecting the "untenable position" that simply because the parent may have a financial interest in the outcome of litigation involving its subsidiary, the subsidiary has the ability to control its parent's documents).

Similarly, the fact that Hormel employees willingly responded to questions from Hormel's counsel regarding whether and to what extent they conducted company business by use of personal text messages, (Tr. at 30–31), does not establish a practical ability to demand that the data on those telephones be turned over to Hormel for imaging, review and production.  While Hormel owns, and therefore may have a legal right to demand, company data that resides on a personal cell phone—even if that data may reside in a text message—what Plaintiffs are demanding here is that Hormel leverage that putative right in order to demand access to *all* text messages so that it can review and produce those deemed responsive to discovery in this case, regardless of whether they include company data over which Hormel claims ownership per the BYOD policy.  The Court shares the Sedona Conference's view that "organizations should not be compelled to terminate or threaten employees who refuse to turn over their devices for preservation or collection." 19 Sedona Conf. J. at 531.

Accordingly, the Court denies Plaintiff's motion insofar as it seeks to compel Hormel to collect, review, and produce responsive text messages on its employees' personally-owned cell phones.

## III.   Whether Plaintiffs' Subpoenas to Hormel's Employees and Former Employees Should Be Enforced

Plaintiffs also move that the Court enforce their subpoenas directed to the custodians for text message information in their phones and cloud backups.  (Pls.' Mem. at 14.)  The scope of discovery for a Rule 45 subpoena is the same as the scope of discovery under Rules 34 and 26 and is subject to the same constraints on relevance and

17

proportionality.  *See* Fed. R. Civ. P. 34(c), 45; *Mille Lacs Band of Ojibwe v. Cty. of Mille Lacs*, No. 17-cv-5155 (SRN/LIB), 2020 WL 1847574, at *5 (D. Minn. Apr. 13, 2020); *Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 236 (D. Minn. 2013).  A person subject to a subpoena may object to the subpoena, as the custodians did here, in which case the requesting party may move the court to compel production.  Fed. R. Civ. P. 45(d)(2)(B). (Custodians' Mem. at 7–8 [ECF No. 925].)

Under Rule 45(d)(1), even if the subpoena seeks relevant information, discovery is not permitted where it imposes an undue burden on the subpoenaed person, considering the same factors as those relied on for proportionality in Rule 26(b).  *See Misc. Docket Matter No. 1 v. Misc. Docket Matter No. 2*, 197 F. 3d 922, 925 (8th Cir. 1999); *see also Deluxe Fin. Servs., LLC v. Shaw*, Case No. 16-cv-3065 (JRT/HB), 2017 WL 7369890, at *4 (D. Minn. Feb. 13, 2017) ("These considerations are echoed in the proportionality factors set forth in the amended Rule 26(b)(1).").  Concern for the burden on a non-party subject to a subpoena carries special weight when balancing competing needs.  *Id.*  The Court must quash or modify a subpoena that imposes an undue burden on the non-party or requests irrelevant information.  Fed. R. Civ. P. 45(c)(3)(A)(iv).

Neither party bears a rigid evidentiary burden in this dispute.  The advisory committee notes for the 2015 amendments to Rule 26 advise that the parties and the Court bear "collective" responsibility to consider relevance and proportionality/undue burden.  A party requesting production should be able to explain the ways the requested information bears on the issues of the case, while the person resisting production will ordinarily have much better or the only information about the burden and expense of

production.  *Id.*  The Court does not place the burden of proving relevance or

proportionality/undue burden on any party, but instead considers all the information

brought by the parties to determine the appropriate scope of the subpoenas.  *Deluxe Fin.*

*Servs., LLC v. Shaw*, Case No. 16-cv-3065 (JRT/HB), 2017 WL 7369890, at *4 (D.

Minn. Feb. 13, 2017).[3]

Plaintiffs' subpoenas made seven requests, and all custodians gave substantively

the same response to each.  (*See* Bourne Decl. Ex. 2.)  Plaintiffs do not identify the

specific requests for which they seek the motion to compel, but their arguments address

the information requested by Requests 1 and 5, and they do not raise any issues with the

---

[3] Hormel and the custodians object at the outset that Plaintiffs did not engage in good faith meet-and-confer efforts prior to filing this motion.  (Hormel Mem. at 27; Custodians' Mem. at 10–11 [ECF No. 925].)  "Before filing a motion . . . the moving party must, if possible, meet and confer with the opposing party in a good-faith effort to resolve the issues raised by the motion," and certify the same to the Court alongside its motion.  D. Minn. L.R. 7.1, 37.1; *see also* Fed. R. Civ. P. 37(a)(1).  This obligation is only fulfilled when parties have engaged in a genuine and good-faith discussion about each discovery request that is in dispute.  *Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, Case No. 17-cv-05009 (JRT/KMM), 2019 WL 2024538, at *1 (D. Minn. May 8, 2019).

Based on the record of the parties' communications, the Court overrules this objection.  Before this motion was filed, Plaintiffs and Hormel exchanged numerous emails and letters arguing their opposing positions regarding whether Hormel had control over its custodians' personal cell phones, whether it met its obligations to preserve text message data, and whether it had to produce that data.  (*See* Bourne Decl. Exs. 6–10 [ECF No. 888-2].)  In addition, the record reflects that after the custodians received the subpoenas, their counsel "participated in meet and confer communications with opposing counsel including four letters, several e-mails, and two telephone conferences" on June 1 and August 2.  (Stephens Decl. ¶¶ 9–18.)  The parties' descriptions of their telephone meetings, and the letters and emails in the record, show an effort by both to explain their positions and concerns, and explore possible compromises, but finally conclude that they were too far apart.  (*Id.*; Exs. A–G.)  The exchanges show both sides engaged in a genuine discussion over these issues but refused to concede their positions after bringing factual and legal arguments to bear.  This satisfies the meet-and-confer requirement.

custodians' responses to the other requests.  (*Compare* Pls.' Mem. at 14-16, *with*, Bourne Decl. Ex. 17 Requests 1–7.)  The Court accordingly confines its review to Requests Nos. 1 and 5.  Those requests and the custodians' responses are as follows:

> **Request No. 1**: Produce a copy of each Text Message that you sent or received during the Relevant Time Period with an Employee or Representative of a Pork Integrator, or any other individual with whom you communicated about supply and demand conditions in the Pork industry.

> **Response:** [The custodian] objects to this request as vague and ambiguous, and overbroad and unduly burdensome to the extent it seeks information not relevant to any party's claims or defenses in this litigation, and is disproportionate to the needs of the case. [The custodian] objects to this request to the extent it imposes an undue burden on a non-party by seeking "each Text Message" exchanged with the identified individuals over a ten-year period that ended three years ago. [The custodian] further objects to this request to the extent it seeks information equally available from another source that would be less burdensome and more appropriate under the circumstances. Subject to and without waiving the foregoing objections, [the custodian] is not aware of any documents responsive to this request.

> **Request No. 5**: Documents sufficient to show, and provide access to the forensic vendor for collection purposes, the location, date, and scope of any archived copies of your cellphone data, such as iTunes archives or iCloud archives.

> **Response**: [The custodian] objects to this request as vague and ambiguous, and overbroad and unduly burdensome to the extent it seeks information not relevant to any party's claims or defenses in this litigation, and is disproportionate to the needs of the case. [The custodian] objects to this request to the extent it imposes an undue burden on a non-party by seeking all archived cellphone data over an unreasonably long period of time.

(Bourne Decl. Ex. 2.)  The custodians' explained their objections further in letters
attached to the responses and during the motion hearing and in their memorandum
opposing Plaintiffs' motion.  (*Id.*; Custodians' Mem. at 10; Tr. at 45–48.)  They objected
that the subpoenas seek irrelevant information, are ambiguous and vague, and that
information sought was equally available from their cell phone service providers; the
subpoenas imposed an undue burden on them; the definition of "pork integrator" was
overbroad and unduly burdensome; Plaintiffs had not shown that responsive texts were
likely to exist on their phones or data backups; and there was no adequate protective
order to protect private and confidential information on their phones.[4]  (*See, e.g.*, Bourne
Decl. Ex 2 at ECF 13–14, 18–19.  *See also* Custodians' Mem. at 9–11; Tr. at 45–48.)

### A.  Whether the Custodians' Have Adequately Demonstrated That They Do Not Have Responsive Texts

Counsel for the custodians argue they have undertaken reasonable steps to
investigate whether unique responsive information exists on any custodian's cell phone;
both Hormel and the custodians argue that those inquiries have suggested that no such
information exists, while Plaintiffs have not shown reason to conclude to the contrary.
(Hormel Mem. at 25–28; Custodian's Mem. at 9–10; *see generally* Stephens Decl.)

A court may deny a motion to compel when the information sought is "almost
certainly nonexistent or the object of pure speculation."  *Struzyk v. Prudential Ins. Co. of*

---

[4] Hormel raises objections to the subpoenas in its memorandum.  (Hormel Mem. at 28–
29.)  Hormel is not subject to the subpoenas nor moving for a protective order, so it lacks
standing to quash or modify the subpoenas.  *Shukh v. Seagate Tech., LLC*, 295 F.R.D.
228, 236 (D. Minn. 2013).  The Court will consider its arguments only to the extent they
shed additional light or support for or against the custodians' objections.

*Am.*, Case No. 99-1736 (JRT/FLN), 2003 WL 21302966, at *2 (D. Minn. May 16, 2003). A court will do so when evidence shows that the responding party has searched for the information but cannot find it or disclaims its existence after the search, and the movant shows no evidence to suggest the information exists. *See id.* (denying motion to compel where responding party argued that it produced all responsive documents and presented detailed affidavits of its efforts to locate any responsive documents, while the movant presented no contrary evidence); *Johnson v. Charps Welding & Fabricating, Inc.*, Case No. 14-cv-2081 (RHK/LIB), 2017 WL 9516243, at *11 (D. Minn. Mar. 3, 2017) (denying in part motion to compel where responding party agreed to produce certain responsive documents, argued that no additional related documents existed, and presented an affidavit describing the creation and storage of the documents, while the movant presented no contrary evidence); *compare Farmers Ins. Exch. v. West*, Case No. 11-cv-2297 (PAM/JJK), 2012 WL 12894845, at *5 (D. Minn. Sept. 21, 2012) (granting in part motion to compel where responding party disclaimed the existence of responsive documents, but the record failed to show that the party searched for them and the movant presented evidence suggesting that the documents existed).

This standard strikes a balance between two interests in discovery. A responding party has a duty under the Federal Rules of Civil Procedure to affirmatively, reasonably search for responsive information available to it. *Farmers Ins. Exch.*, 2012 WL 12894845, at *5. But once it fulfills that responsibility, "[t]he Court must accept, at face value, a party's representation that it has fully produced all materials that are discoverable . . . because the Court has no means to test the veracity of such avowals."

*Bombardier Recreational Prod., Inc. v. Arctic Cat, Inc.*, Case No. 12-cv-2706 (MJD/LIB), 2014 WL 5685463, at *7 (D. Minn. Sept. 24, 2014).

Here, the custodians' counsel interviewed the custodians to ascertain whether it was likely that potentially relevant and responsive texts would be on their phones. They represent that in those interviews, all of the custodians disclaimed on one basis or another having any texts that might be responsive. (Bourne Decl. Exs. 1, 2; Stephens Decl. ¶¶ 5–8.) But with the exception of Jessica Chenowith, who stated unequivocally that she *never* used her personal cell phones for work-related communications, the Court cannot conclude from the responses that adequate steps were taken to describe to the custodians what kinds of communications might be relevant and responsive information in the context of this complex litigation, or to test the accuracy of their recall about whether, at some point over the relevant period or periods, they sent or received relevant or responsive texts.

Granted, the evidence that responsive texts *do* exist is quite weak. Plaintiffs declare under oath that they obtained records from a telephone service provider showing custodians Eric Steinbach, Holly LaVallie, James Fiala, Michael Gyarmaty, and Steven Venenga texted work-related contacts. (Pls.' Mem. at 15–16; Bourne Decl. ¶¶ 18–20.) But the provider had no information about the content of the messages, and the fact that the texts were sent to or from work-related contacts does not mean the content of the texts was work-related, let alone that the content was relevant to the claims or defenses in this case. Plaintiffs also argue that certain of the custodians—Paul Bogle, Corwyn Bollum, Jessica Chenoweth, Lance Hoefflin, Paul Peil, Jose Rojas, and Donald Temperley—

worked with Agri Stats and/or managed the throughput of pork in Hormel's operations, suggesting that they are more likely to have responsive texts.  (Hormel Exs. 6, 8 at 2.) Several of them—Bogle, Bollum, Rojas, and Temperley—also implied or acknowledged in their subpoena responses that they used text messaging for business to some degree. (Bourne Decl. Ex. 1.)

Provided Chenowith submits to Plaintiffs a sworn declaration reiterating her unequivocal representation that she did not use her personal cell phone for work related communications at all, the Court concludes Chenowith has adequately shown that responsive texts on her cell phone or in her archived data are "almost certainly nonexistent or the object of pure speculation."  *Struzyk*, 2003 WL 21302966, at *2. Unlike the other custodians, Chenowith alone appears to have observed a clear boundary about the use of her personal cell phone, and could say without qualification that she did not use it in any manner for work purposes.  Plaintiffs have offered no evidence to the contrary.  Accordingly, the Court will not enforce the subpoena directed to Chenowith with regard to Requests Nos. 1 and 5.

But as to the remaining custodians, the Court is not satisfied that the inquiries made by counsel and the resulting representations by the custodians adequately demonstrate that there was a reasonable search for responsive texts such that the Court can conclude such texts are almost certainly nonexistent.  *See Farmers Ins. Exch.*, 2012 WL 12894845, at *5.  All custodians but Chenowith either acknowledge they might have used their cell phones for work related communications, even if only minimally, or they made no representations at all on that subject.  Nothing suggests the custodians did, or

were asked to do, anything beyond consulting their memories about whether they might have sent or received responsive or relevant texts, or even that they understood the full scope of what kinds of communications that might encompass.  No evidence suggests that anything was done to test their memories, which is particularly problematic given that the time periods are in some instances years in the past and text-messaging is by its very nature short, quick, often reactive, and therefore unlikely to be particularly memorable.

Since for all custodians other than Chenowith, the evidence does not show a reasonable search or that responsive texts are "almost certainly nonexistent or the object of pure speculation" *Struzyk*, 2003 WL 21302966, at *2, this argument does not provide a basis for the Court to decline to enforce Requests Nos. 1 and 5 as to those custodians.

**B.    Whether the Court Should Decline to Enforce the Requests Because They Are Vague or Ambiguous, or Because the Information is Available From Other Sources**

The Court overrules the custodians' objections regarding vagueness and ambiguity, including with respect to the definition of "pork integrator," because they provide no arguments, explanation, or evidence to support those objections.  *Mead Corp. v. Riverwood Nat. Res. Corp.*, 145 F.R.D. 512, 515 (D. Minn. 1992) ("[A]n objection to a discovery request cannot be merely conclusory, and . . . intoning the 'overly broad and burdensome' litany, without more, does not express a valid objection.")  Though the Court does not place an evidentiary burden on those objections, the Court cannot determine the grounds on which the custodians base these objections without some explanation to support them.  Moreover, vagueness and ambiguity objections, even if

otherwise well-taken, can be addressed in a meaningful meet-and-confer. These objections are therefore overruled.

The Court also overrules the objection that the information sought is equally available from the cell phone providers. Plaintiffs declare under oath that they obtained records from a telephone service carrier showing that custodians Eric Steinbach, Holly LaVallie, James Fiala, Michael Gyarmaty, and Steven Venenga sent texts to work-related contacts. (Pls.' Mem. at 15–16; Tr. at 13; Bourne Decl. ¶¶ 18–20.) The carrier did not record the content of any text messages, so the information is not available from that source. (Tr. at 14.) Plaintiffs also point out that carrier data would not reveal iMessage to iMessage content, as that content is only available on the respective iPhones. (Tr. at 51.) The custodians do not offer any concrete support for their claim that the content of any relevant and responsive text messages would be available from any other source. Thus, the record fails to substantiate this objection.

### C.   Whether Imaging the Phones and Searching the Data Imposes an Undue Burden and is Disproportionate to the Needs of the Case

The custodians object that the very imposition of the requests for cell phone data imposes an undue burden on the custodians that is disproportionate to the needs of the case. (*See, e.g.*, Bourne Decl. Ex. 2 at ECF 13–14, 18–19. *See also* Custodians' Mem. at 9–11; Tr. at 45–48.). Undue burden in the subpoena context relies on similar factors to proportionality in the broader context of a motion to compel, though courts have heightened concern for and reluctance to impose discovery burdens on a non-party compared to a party. *Deluxe Fin. Servs.*, 2017 WL 7369890, at \*4. Any order

compelling compliance with a subpoena "must protect a person who is neither a party nor

a party's officer from significant expense resulting from compliance." Fed. R. Civ. P.

45(d)(2)(B)(ii).

> An objection that discovery is overly broad and unduly
> burdensome must be supported by affidavits or offering
> evidence revealing the nature of the burden and why the
> discovery is objectionable. It is not sufficient to simply state
> that the discovery is overly broad and burdensome, nor is a
> claim that answering the discovery will require the objecting
> party to expend considerable time and effort analyzing 'huge
> volumes of documents and information' a sufficient factual
> basis for sustaining the objection.

*Abhe & Svoboda, Inc. v. Hedley*, Case No. 15-cv-1952 (WMW/BRT), 2016 WL

11509914, at *3 n.5 (D. Minn. Mar. 15, 2016). Though the non-party resisting a

subpoena is often in the best position to provide information to sustain its objection, the

Court will examine all evidence in the record. *Id.* at *3.

The custodians argue burden along several lines. They allege that they have an

estimate of between $65,000 and $85,000 in total to image all thirty phones[5], that

imaging each phone will take between three hours and more than a day based on the

amount of data on the phone, and that some number of them live out of state or in rural

Minnesota and will have to mail their phones to Hormel's third-party forensic imaging

provider. (Custodians' Mem. at 10; Tr. at 45–48.) They also argue the production will

capture significant amounts of private and confidential information unrelated to this case.

(*Id.*) The Court addresses these concerns in order.

First, as to the costs or time to image the phones, there are no affidavits or other evidence of record establishing the amount of data on any individual custodian's phone or the estimated time or cost to image it.  Furthermore, it is not entirely clear to the Court that the cell phones would need to be imaged in their entirety, or whether text messages in particular can be extracted more economically.  Nor is it clear to the Court that all cell phones would need to be imaged, given that currently used cell phones were not in use during the period from January 1, 2008 – August 17, 2018 and messaging data from prior phones may not have been carried over to the new phone. Furthermore, the custodians acknowledge that they have no estimate of the number of texts that might be captured and reviewed for relevance under Plaintiffs' proposed search method, nor do they seem to have explored other means of capturing and filtering the data more cost-effectively, so the Court cannot assess the time or cost for that aspect of the production process.  The Court accepts in the abstract that the imaging may be costly, but it has no information on how custodians calculated their cost estimate or how much it might cost any particular custodian.

That said, the Court agrees with the custodians that of all the players in this mix, the individual custodians are least equipped to bear the financial burden of having their cell phones imaged.  As discussed below in Section III.D., the Court will compel the custodians to search for and produce text messages within certain parameters, and to preserve data in the event this production, or other discovery, reveals a basis to expand

---

[5] The Court assumes that this estimate does not include the cost for imaging the five phones that were already imaged by Hormel.  Obviously, if it does, this total cost

the search.  Consequently, the Court directs Plaintiffs' counsel, Hormel's counsel, and the custodians' counsel to meet and confer regarding which devices should be imaged, or from which devices text messaging data should be extracted by other means, taking into account the time period during which those devices were in service and whether older data was carried over.

In addition, to the extent the result of those discussions results in the imaging of any cell phones, or the forensic extraction of text messaging data by other means, the Court exercises its discretion and orders that the reasonable costs associated with that imaging or data extractions must be split equally between the Class Plaintiffs, on the one hand, and Hormel, on the other.  The Court further orders that the reasonable costs associated with conversion and storage of any data obtained from those phones as well as conversion and storage of any data obtained from archives or cloud storage be borne equally by the Class Plaintiffs and Hormel.  The Court finds this cost-sharing arrangements appropriate as to Plaintiffs because Rule 45(d)(1) clearly places on the party serving the subpoena the obligation to avoid imposing undue burden or expense on the person subject to the subpoena.  It finds this arrangement appropriate as to Hormel because its BYOD policy not only allowed but to some extent financially supported the use of personal cell phones for work purposes, and so it is appropriate that it share in the cost of harvesting and storing the data so that it can be ascertained whether there are relevant and responsive work-related texts.

_____

estimate overstates that aspect of the burden.

The Court also recognizes that being deprived of a phone for more than a day either to mail it in and image it, or simply image it, may be inconvenient, and perhaps burdensome. But no evidence suggests which custodians will have to mail their phones rather than drop them off in person, or that it will take more than a day rather than three hours to image any custodian's phone. Nor is it clear that the custodians have explored alternatives to "mailing in" their phones.[6] In short, the Court cannot sustain these aspects of each custodian's burden in the absence of evidence showing how the burden actually, rather than theoretically, would fall on the custodians and that the custodians have diligently explored alternatives that would reduce that burden.

As for the privacy concerns, the Court accepts as a matter of common knowledge that modern smart phones store a tremendous amount of their owner's personal, private, or confidential information. But the custodians have not persuaded the Court that that concern cannot be managed through targeted searches. Plaintiffs allege that forensic imaging vendors can target specific phone applications or types of data, in which case a vendor could image only the messages saved in communication apps on the phone. (Tr. at 52.) The custodians have done nothing to persuade the Court that they have explored the options for more targeted data extraction and come up empty-handed. Furthermore, the Court is aware that reputable forensic imaging vendors employ strict protocols to

---

[6] Plaintiffs suggest, for example, that it is possible to mail imaging kits to custodians for whom mailing their phone or travelling to Hormel would be burdensome. (Tr. at 50.) To the extent the custodians are arguing that having to mail in their phones is the necessary result of working with Hormel's vendor, it undercuts their complaint regarding monetary burden, as it suggests strongly that Hormel and not the individual custodians will be paying for the imaging in any event.

protect data within their control, and in any event, as will be discussed below, the Court's order will provide that only relevant and responsive information will be delivered to Plaintiffs, reducing the risk that a custodian's personal confidential information will be transmitted.  Finally, the information may be produced subject to the protective order in this case, further minimizing any risk of public disclosure of private information.  Thus, the Court finds the custodians' privacy concerns, while understandable, are manageable and not a basis for declining to enforce Requests Nos. 1 and 5 of the subpoenas.

### D.   Whether the Court Should Decline to Enforce Requests Nos. 1 and 5 on the Grounds That They Are Overly Broad and Seek Irrelevant Information

The Court concludes that while Requests Nos. 1 and 5 seek some relevant information, they extend beyond the bounds of relevance and must therefore be narrowed to target relevant and proportional information.

The Court observes at the outset that it is unclear on the face of Request No. 1 whether it seeks the production of all texts on the custodians' phones exchanged with other Hormel employees, Defendants' employees, and employees of other pork integrators (defined as any of the Defendants and any of over sixty other named companies), regardless of content, or whether the phrase "about supply and demand conditions in the Pork industry" at the end of the request qualifies and limits not only the second clause of the request but the first as well.  (Bourne Decl. Ex. 17 Definitions ¶ 14, Request 1.)  Request No. 5 does not, on its face, actually seek texts, but seeks information from which a "forensic vendor" could gain access to all archived copies of the custodians' cell phone data, including relevant text messages, in locations like cloud

31

backups, older cell phones, or non-internet archives, without regard to subject matter.
(Bourne Decl. Ex. 17 Request 1.)

Plaintiffs proposed a search method that sheds some light on their intended scope. Plaintiffs propose that *all* texts exchanged with any number on a list of 781 phone numbers associated with individuals affiliated with Hormel or any other Defendant or any of the other identified pork integrators, be produced without regard to content. As to all other texts, they propose a key term search, the results of which would be reviewed for relevance by the custodians' counsel. (Bourne Decl. ¶ 12 [ECF No. 887], Ex. 16 [ECF No. 888-2].) This same protocol would, presumably, be applied to both data residing on the cell phones and data gathered from other locations pursuant to Request No. 5. Plaintiffs argue that all texts exchanged with any of the 781 numbers are presumptively relevant as "work-related texts," so they do not need relevance review before production, while any other texts are less likely to be relevant, so a keyword search to narrow the universe, followed by a relevance review of all "hits" is appropriate. (Pls.' Mem. at 15.)

Unquestionably some of the information encompassed by each request is relevant. Request No. 1 seeks text messages between Defendants' employees about pork supply, demand, and pricing (the subject matter of the conspiracy) during the relevant time-period, and between Defendants and other pork integrators. Plaintiffs argue these messages are relevant to help Plaintiffs understand the tone, language, and content of Defendants' communications about that subject matter, and potentially to reveal substance of the alleged conspiracy, and neither Hormel nor the custodians argue persuasively to the contrary. Request No. 5 similarly includes within its scope some

relevant information, insofar as the custodians have changed phones and prior relevant messages may be saved in the custodians' archives, cloud backups, or older phones. While Hormel and the custodians dispute whether it is likely that any relevant texts will be found on the cell phones, they do not seriously disagree that *if* there are texts pertaining to pork supply, demand, and pricing, that were sent during the relevant time period among Hormel employees, or between Hormel employees and other pork integrators, those texts would likely be relevant and responsive to discovery in this case.

But not all texts to all individuals on the 781 phone numbers connected to Defendants and pork integrators will involve this subject matter, and Plaintiffs do not satisfactorily explain why the Court should presume otherwise. The evidence does not show that the custodians texted those numbers only (if at all) about the relevant subject matter, as opposed to other work-related topics or even non-work topics like social plans. Just because there may be some relevant texts within a data set does not make all texts within that set presumptively relevant.

For the same reasons, Request No. 5 also sweeps too broadly in effectively demanding access to all archived text messaging data from all of the custodians' phones.

Furthermore, the time-period of the requested production, January 1, 2008 – August 17, 2018, was not tailored to the job responsibilities of the individual custodians, and therefore also is overly broad. The custodians held different job duties at different times throughout this period, and some of them retired during that period. (*See, e.g.*, Hormel Ex. 10 at 5, Ex. 11 [ECF Nos. 929-9, -10].) The parties designated each custodian based on relevant job duties held during specific subsets of the period of the

alleged conspiracy.  (*See, e.g.*, Hormel Ex. 8 at 2, Ex. 10 at 5, Ex. 11 [ECF Nos. 929-7, -9, -10].)  Their text data within those time periods are potentially a source of relevant communications, but those distinctions were ignored by Plaintiffs' subpoena requests, which were "one-size-fits-all."  While that uniform time frame makes good sense for efficient conduct of party discovery, it is not as appropriate for individual custodians whose confidential personal information is at stake, nor is it proportional in view of the narrower time periods within which these individuals were in relevant roles and therefore may have had relevant communications (if at all).

Accordingly, the Court will enforce the subpoenas as to Requests Nos. 1 and 5 (for all custodians except Chenowith) and orders the custodians (other than Chenowith) to search for and produce relevant text messages within a modified scope and subject to a modified search protocol, as follows:  Each subpoena will be limited to the time period or periods within which that custodian held the position that resulted in his or her being identified as a custodian.  Plaintiffs' counsel, Hormel's counsel, and the custodian's counsel shall meet and confer to confirm they have a common understanding on that subject. The text messaging data, including data extracted from the custodians' current phones, older phones, or archive or backup data from those phones, must be searched first to identify all texts that were sent to or received from any number on the list of 781 phone numbers identified by Plaintiffs within the time period or periods pertaining to that custodian.  The number of resulting texts for each custodian must be reported to Plaintiffs' counsel.  The custodian's counsel may then choose to manually review all of the resulting texts for that custodian for relevance; however, the custodian's counsel may

meet and confer with Plaintiffs' counsel about a threshold volume of messages for a custodian that would trigger the application of search terms (to be negotiated between counsel), the results of which further filtering would then be reviewed for relevance by the custodian's counsel.

The Court does not rule out the possibility that review by Plaintiffs of the resulting text message production, or other discovery in this case, may provide a more concrete basis upon which to justify an expanded search for relevant messages beyond what the Court has permitted here.  Accordingly, the custodians are further ordered to preserve all text messaging data and all archived and cloud-stored text messaging data for the period January 1, 2008 – August 17, 2018, until December 31, 2022, or until such other date as may be agreed upon by the parties or ordered by the Court.  Relatedly, Chenowith is also ordered to preserve all text messages, including all archived and cloud-stored messages, from the period January 1, 2008 – August 17, 2018 (or, in the alternative, to arrange at Hormel's and Plaintiffs' shared expense to have such text messages imaged and preserved).

IV.   **Hormel's Preservation Duty Did Not Extend to Imaging Personally-Owned Cell Phones and Archiving Cloud Backups**

Plaintiffs assert that Hormel knew or should have known that its custodians were conducting substantive work-related business over text message so that it was under an obligation to image those phones and preserve cloud backups at the start of the litigation; they request a declaration that Hormel had an obligation at the start of litigation to preserve its custodians' text message content by imaging their phones and preserving

35

their cloud backup data, and an order compelling Hormel to do so now.  (Pls.' Mem. at 11–14.)  The duty to preserve evidence arises when a party knows or should have known that the evidence in its control is relevant to current or reasonably foreseeable litigation, at which point the party must take reasonable steps to preserve it.  *Paisley Park*, 330 F.R.D. at 232; Fed. R. Civ. P. 37(e).  "The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence."  *Paisley Park*, 330 F.R.D. at 232.  The duty "extends to those persons likely to have relevant information – the key players in the case, and applies to unique, relevant evidence that might be useful to the adversary."  *Id.* at 233.

Whether a party has taken reasonable steps to preserve information is a factual inquiry considering the context of the case, the information sought, and the steps taken. *See id.* at 233–35 (holding that the defendants unreasonably failed to preserve their personal text messages by purging their phone data even though they texted for work purposes and knew of pending litigation involving their business); *In re Petters Co., Inc.*, 606 B.R. 803, 822 (Bankr. D. Minn. 2019).

Here, however, the Court has found Hormel did not control the text messages on the personally-owned cell phones of its custodians.  It did communicate litigation holds to reasonably anticipated custodians and Plaintiffs have not shown that those holds were inadequate to communicate to those custodians that they should preserve relevant information under their own control, including text messaging data.   (Hormel Mem. at 21–22.)  The Court therefore denies Plaintiffs' motion for a "declaration" that Hormel

had a duty to do more than it did.[7]  Plaintiffs' concerns for preservation going forward are addressed by the Court's order described above in Section III.D.


      Accordingly, based on all the files, records, and proceedings, **IT IS HEREBY ORDERED** that Class Plaintiffs' Motion to Compel Hormel To Produce Responsive Text Message Content and to Enforce Subpoenas to Hormel Custodians [ECF No. 883] is **GRANTED IN PART** and **DENIED IN PART** as described fully herein.


Dated:  March 31, 2022              */s Hildy Bowbeer*
                                   HILDY BOWBEER
                                   United States Magistrate Judge

---

[7] The Court does not address Hormel's argument that Plaintiffs did not follow proper procedure to request a declaratory judgment.  (Hormel Mem. at 18.)