UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

AMORY INVESTMENTS LLC,

               Plaintiff,

-vs.-

AGRI STATS, INC.; CLEMENS FOOD
GROUP, LLC; CLEMENS FAMILY
CORPORATION; HORMEL FOODS
CORPORATION; JBS USA FOOD
COMPANY; SEABOARD FOODS LLC;
SMITHFIELD FOODS, INC.; TRIUMPH
FOODS, LLC; TYSON FOODS, INC.;
TYSON PREPARED FOODS, INC.; and
TYSON FRESH MEATS, INC.,

               Defendants.

**AMENDED COMPLAINT**[1]

**0:21-cv-01697**

**MDL 2998**

**Jury Trial Demanded**

---

[1] Transferred from the United States District Court for the Northern District of New York, Case No. 3:21-CV-798 (GLS/ML), under 28 U.S.C. § 1407.

## TABLE OF CONTENTS

I.     NATURE OF ACTION ................................................................................... 1

II.    JURISDICTION AND VENUE .................................................................... 5

III.   PARTIES ....................................................................................................... 6

  A.  Plaintiff ...................................................................................................... 6

  B.  Defendants .................................................................................................. 6

IV.    CO-CONSPIRATORS AND AGENTS ........................................................ 9

V.     FACTUAL ALLEGATIONS ...................................................................... 11

  A.  Agri Stats' Central Role In Collusion In The Broiler Chicken Industry. ......................... 12

  B.  Agri Stats Began Marketing Its Collusive Scheme To Pork Integrators. ......................... 13

  C.  Agri Stats Allowed Pork Integrators To Monitor Each Other's Pricing And Production, And To Discipline Co-Conspirators For Not Complying With The Collusive Agreement...... 16

  D.  Defendants and Co-Conspirators Controlled The Supply And Production Of Pork In The United States, Which Allowed The Scheme To Succeed. ....................................... 25

  E.  The Level Of Concentration In The Pork Industry Facilitated the Collusive Scheme........... 30

  F.  The Inelastic Demand For, And Homogeneity Of, Pork Products Facilitated Collusion ....... 36

  G.  Defendants Took Advantage Of Numerous Opportunities To Collude............................... 37

  H.  Defendants Implemented Capacity And Supply Restraints During The Relevant Period...... 45

    1.  Summary of Defendants' Conspiratorial Supply Restraints............................... 45

    2.  Timeline of the Conspiracy........................................................................... 51

  I.  Indiana Packers' Role in the Conspiracy........................................................... 69

  J.  Abnormal Pricing During The Relevant Period Demonstrates The Success Of the Conspiracy. ............................................................................................... 80

    1.  The average hog wholesale price experienced an unprecedented increase in 2009. ......... 80

2.   The pork cut-out composite price experienced a dramatic increase in 2009 and continuing throughout the Relevant Period. .......................................................................... 82

3.   Defendants' revenues increased in 2009, even taking into account Defendant-specific costs. ................................................................................................................................. 83

J.   Overcharges Due To The Cartel Were Reflected In Higher Pork Prices Than Would Have Existed In the Absence of Defendants' Conspiracy. ................................................................ 84

K.   The Results of the DOJ's Criminal Investigation in Broilers Supports an Inference of the Existence of a Similar Conspiracy in the Pork Industry .......................................................... 87

L.   Defendants Actively Concealed The Conspiracy, And Plaintiff Did Not And Could Not Have Discovered Defendants' Anticompetitive Conduct. ........................................................ 88

V.   ANTITRUST INJURY ......................................................................................................... 105

VI.   CLAIMS FOR RELIEF AND CAUSES OF ACTION ..................................................... 106

COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT ..................................... 107

VII.   REQUEST FOR RELIEF ................................................................................................... 110

VIII. JURY TRIAL DEMANDED ............................................................................................... 111

Plaintiff Amory Investments LLC ("Plaintiff" or "Amory"), by and through its undersigned counsel, files this Amended Complaint against the Defendants identified below, for their illegal conspiracy beginning at least as early as 2008 and continuing through the present, which increased the prices of pork sold in the United States. Plaintiff brings this action against Defendants for injunctive relief and treble damages under the antitrust laws of the United States, and demands a trial by jury.

## I.   NATURE OF ACTION

1.      From at least 2008 to the present (the "Relevant Period"), the Defendants and their co-conspirators entered into a conspiracy to fix, raise, stabilize, and maintain the price of pork.

2.      Defendants Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"); Hormel Foods Corporation ("Hormel"); JBS USA Food Company ("JBS"); Seaboard Foods LLC ("Seaboard"); Smithfield Foods, Inc. ("Smithfield"); Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson") (collectively referred to at times as "pork integrator Defendants"); and co-conspirator Indiana Packers Corporation ("Indiana Packers" or "IPC") are the leading suppliers of pork[2] in an industry with approximately $20 billion in annual sales. The United States pork industry is highly concentrated, with a small number of large companies controlling the supply. The pork integrator Defendants collectively control over 80 percent of the wholesale pork market.

3.      Defendant Agri Stats, Inc. ("Agri Stats") is a specialized information-sharing service that, among other things, obtains data from participating industry pork and hog producers

---

[2] For the purposes of this complaint, "pork" includes pig meat purchased fresh or frozen, smoked ham, sausage, and bacon. In this complaint, "pork" and "swine" are often used interchangeably.

and develops comprehensive reports based on that data. Agri Stats provides its reports and findings to the participating industry producers.

4.      The pork industry is characterized by several other factors conducive to the anticompetitive conduct alleged herein, including: vertically integrated operations; high barriers to entry preventing competitors from coming into the market; consolidation and concentration; inelastic supply and demand; and homogeneity of pork products.

5.      Beginning in 2008, as the pork integrator Defendants' profitability deteriorated in the midst of a global recession, Smithfield initiated efforts between Defendants and co-conspirators to conspire through their mutual trade associations and industry groups to achieve a coordinated reduction in the domestic supply of pork.

6.      The pork integrator Defendants and co-conspirators also conspired with companies that provided services to the pork industry but did not produce or sell pork, including Defendant Agri Stats (a data benchmarking firm) and Compeer (formerly known as AG Star, a financial services company that specialized in loans to hog producers).

7.      Beginning in 2008, the CEO of Smithfield attended a trade association meeting with other Defendants and co-conspirators at which he announced Smithfield's plans to reduce its pork supplies and urged others to follow. Although Defendants recognized that a reduction in the supply of pork was necessary to achieve their desired levels of profitability, some pork integrators were hesitant about reducing their pork supply without some mechanism to prevent smaller independent producers from increasing their own supply of pork in response to a coordinated reduction by Defendants. To address this issue, Smithfield's CEO enlisted the help of AgStar's VP responsible for lending to hog producers. After discussions with Smithfield's CEO, AgStar agreed to put

financial pressure on smaller producers to reduce hog production, provided that the pork integrator Defendants lead the initiative and announce their own production cuts publicly.

8.      As detailed in this Complaint, between early 2008 and late 2009, pork integrator Defendants and co-conspirators met numerous times through trade associations and other industry groups, which allowed them to coordinate their unlawful agreement to reduce the supply of pork. And although pork integrators announced their supply reductions publicly, their coordination allowed each to justify its own supply reduction as a natural outcome of the economic conditions facing the industry.  However, this was untrue.  As detailed in this Complaint, pork integrators recognized internally that it was in each pork producer's independent self-interest to produce as much pork as it could.  Accordingly, the supply reductions were not justified by input costs or other economic factors. Instead, the cuts were based on an understanding that all major producers would implement similar supply reductions and that Compeer would pressure small industry participants to cut supply by cutting off funding to those that did not comply.  This allowed pork integrators to reduce their supply through a collusive agreement or understanding that was reached in secret and then concealed from the public.

9.      By late 2009, this plan succeeded, as the pork industry cut its supply markedly, primarily through the liquidation of sow herds (female pigs used for breeding) that had begun in 2008.

10.     With this structural reduction in the supply of pork, pork integrators were able to monitor their conspiracy through Defendant Agri Stats.  During the conspiracy, pork integrator Defendants  and co-conspirators—who controlled more than 80% of the pork market at times relevant to Plaintiffs' claims—used  Agri Stats to exchange with each other detailed, competitively-sensitive, and closely-guarded, non-public information about their pork businesses, including benchmarking reports about their respective pork prices, production, volume, costs, slaughter information, capacity,

- 3 -

sales volume, inventory levels, and plant-specific information about production lines and yields (collectively "Competitively-Sensitive Information").

11.     As explained below, Agri Stats collected this information from the pork integrator Defendants and co-conspirators and intentionally shared this information with them in detailed reports.  The pork integrator Defendants and co-conspirators knew when they provided their respective Competitively-Sensitive Information to Agri Stats that it would be reported to their competitors in the private Agri Stats reports.  They also knew at the time that their Competitively-Sensitive Information in the Agri Stats reports were deciphered by their co-Defendants and co-conspirators so that each of them would learn which Competitively-Sensitive Information belonged to which pork integrator Defendant or co-conspirator.  This enabled the pork integrator Defendants and co-conspirators to monitor each other's Competitively-Sensitive Information and enforce the conspiracy, and effectively control domestic pork supply and price.

12.     As another example, the pork integrators conspired with Compeer to pressure all pig farmers to reduce their sow herds and limit importation of pork from Canada by withholding funding from companies that did not get on board with the supply reduction conspiracy.

13.     Defendants' and co-conspirators' unlawful coordination, including the restriction of pork supply, had the intended purpose and effect of increasing pork prices to Plaintiff, one of the largest individual pork buyers in the United States.  As a result of this unlawful conduct, Plaintiff paid artificially inflated prices for pork during the Relevant Period.  Such prices exceeded the amount it would have paid if the price for pork had been determined by a competitive market.  Thus, Plaintiff was injured by the alleged unlawful conduct.

## II.    JURISDICTION AND VENUE

14.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

17.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

18.    The activities of the Defendants, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

### III.    PARTIES

#### A.    Plaintiff

19.    Plaintiff Amory Investments LLC is a Delaware limited liability company which, on or around March 31, 2021, acquired various assets of Maines Paper & Food Service, Inc., and its affiliates (collectively "Maines"), including the claims that are the subject of this action. During the Relevant Period, Maines had its principal place of business in Conklin, New York, and purchased hundreds of millions of dollars of pork at artificially inflated prices directly from various Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

20.    Amory is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15, U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26.

#### B.    Defendants

##### (i) <u>Agri Stats</u>

21.    Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and, from 2013 until 2018, was a subsidiary of Eli Lilly & Co.  Agri Stats is now a wholly owned subsidiary of Agri Stats Omega Holding Co. LP.  Throughout the Relevant Period, Agri Stats acted as a co-conspirator and has knowingly played an important and active role as participant in, and a facilitator of, Defendants' collusive scheme detailed in this Amended Complaint.  All of Agri Stats' wrongful actions described in this Amended Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the

management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority.

### (ii) Clemens

22.     Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania.  During the Relevant Period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

23.     The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC.  During the Relevant Period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### (iii) Hormel

24.     Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota.  During the Relevant Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### (iv) JBS

25.     JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-

producing companies in the world.  JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado.  During the Relevant Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### (v) Seaboard

26.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation.  During the Relevant Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, including without limitation Daily Foods, Inc., John R. Daily, Inc., and any other subsidiary doing business as Daily's Premium Meats and/or Daily's, or affiliates, including Daily's Premium Meats and Seaboard Triumph Foods, LLC, sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### (vi) Smithfield

27.     Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company.  Smithfield Foods is headquartered in Smithfield, Virginia.  During the Relevant Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### (vii) Triumph

28.     Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri.  During the Relevant Period, Triumph Foods, LLC and/or its predecessors, wholly

owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through Seaboard Foods, or its wholly owned or controlled affiliates, to purchasers in the United States.

### (viii) **Tyson**

29.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Relevant Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

30.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the Relevant Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

31.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the Relevant Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## IV.    CO-CONSPIRATORS AND AGENTS

32.     Other entities and individuals not named as Defendants in this Amended Complaint, including, without limitation, Indiana Packers, Daily's Premium Meats, Seaboard and Triumph Foods, and Compeer Financial ("AgStar"), combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Amended Complaint.

### (i) **Indiana Packers**

33.     Indiana Packers Corporation is an Indiana corporation engaged in the production of meat and food products, and the marketing of these products.  Indiana Packers is headquartered in Delphi, Indiana.  During the Relevant Period, Indiana Packers and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.  Indiana Packers Corporation's parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and Mitsubishi Corporation (Americas).

### (ii) Daily's Premium Meats

34.     Co-Conspirator Daily's Premium Meats, LLC is a Delaware limited liability company headquartered in Kansas City, Missouri. During the Relevant Period, Daily's Premium Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States. During the Relevant Period until July 10, 2014, Daily's Premium Meats was wholly owned by Defendant, Seaboard. Beginning on or about September 27, 2014, and continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50% interest in Daily's Premium Meats.

### (iii) Seaboard Triumph Foods

35.     Co-Conspirator Seaboard Triumph Foods, LLC is a Delaware limited liability company headquartered in Sioux City, Iowa. It is a joint venture between Seaboard Foods and Triumph Foods.  During the Relevant Period, Seaboard Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States.  Beginning on or about May 13, 2015, and

continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50% interest in Seaboard Triumph Foods.

36.     The individuals employed by Defendants and co-conspirators who participated in the conspiracy did so on behalf of their respective employer Defendant or co-conspirator, and their conduct in furtherance of the conspiracy was undertaken by each of them during the course and scope of their employment by their Defendant or co-conspirator employer.

### (iv) Compeer

37.     Compeer Financial ("AgStar") is a financial services company that specialized in loans to pork producers.  According to its website, "Compeer Financial is a member-owned, Farm Credit cooperative serving and supporting agriculture and rural communities."  Compeer is headquartered in Sun Prairie, Wisconsin. In 2017, AgStar Financial Services, based in Mankato and a major agricultural lender for farmers in Minnesota and northwest Wisconsin merged with two other cooperatives — Badgerland Financial in Wisconsin and 1st Farm Credit Services in Illinois.  The three became Compeer Financial.

38.     During the Relevant Period, Compeer Financial and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates made loans to pork producers across the United States, directly or through its wholly owned or controlled affiliates.

## V.     FACTUAL ALLEGATIONS

39.     Starting in at least 2008 and continuing to the present, Defendants and co-conspirators conspired to fix, raise, stabilize, and maintain pork prices.  To effectuate, maintain, and enforce their agreement, the pork integrators relied on a specialized industry data sharing service provided by Agri Stats, which served a critical role in the price-fixing scheme.  Through

Agri Stats, Defendants and co-conspirators shared and monitored critical and competitively sensitive business information regarding each other's production metrics.

     **A.**     **Agri Stats' Central Role In Collusion In The Broiler Chicken Industry.**

     40.     Agri Stats has played a central role in collusion in other industries, including involvement in the Broiler chicken ("Broiler") industry.[53]  As alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.) ("*Broilers*"), the defendant producers used Agri Stats as a part of their conspiracy to restrain production and inflate prices of Broilers.

     41.     Specifically, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, and sales data for finished product form and type, amongst other pieces of competitively sensitive business information.  The Agri Stats reports contain line-by-line entries for plants, lines, and yields of various Broiler facilities.  Agri Stats relied upon a detailed audit process to verify the accuracy of data from each Broiler producer's facilities, sometimes directly contacting the Broiler producers to verify the data.  Agri Stats also provided detailed price reports to the Broiler producers through its subsidiary, Express Markets, Inc., also known as EMI.  Agri Stats collected data from the Broiler producers on a weekly basis and provided its reports to Broiler producers on a weekly and monthly basis.

     42.     The detail of these reports ensured that Broiler producers could decode the information of their competitors.  The *Broilers* complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual Broiler facilities.  The Broiler reports, in parts, contained so few

---

[3] "Broilers" are chickens raised to be slaughtered before the age of 13 weeks.

producers participating that the identities were obvious.  Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger Broiler defendants such as Tyson.  The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

43.     In *Broilers*, plaintiffs also alleged that Agri Stats—known to its co-conspirators to be a willing and informed conduit for illicit information exchanges—used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did.  Agri Stats' own statements in the Broiler industry facilitated the implementation of the agreement to restrict supply.

44.     In denying defendants' motions to dismiss in the *In re Broiler Chicken Antitrust Litigation*, the district court noted that given the nature of the Agri Stats reports, the co-conspirators were sharing future anticipated production information with each other, which raises significant antitrust concerns.[4]

**B.     Agri Stats Began Marketing Its Collusive Scheme To Pork Integrators.**

45.     Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the pork integrators similar to the benchmarks used to restrain competition in the Broiler industry. Benchmarking is the act of comparing one company's practices, methods or performance against those of other companies.[5]  Benchmarking of the type undertaken by Agri Stats and the other Defendants and co-conspirators here reduces strategic uncertainty in the market and changes the

---

[4] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 784 (N.D. Ill. 2017).

[5] Antitrust Issues Related to Benchmarking and Other Information Exchanges, Federal Trade Commission (May 3, 2011), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/antitrust-issuesrelated-benchmarking- and-other-information- exchanges/110503roschbenchmarking.pdf.

incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition.  This is especially true where benchmarking involves the exchange of commercially sensitive, and typically proprietary, information among competitors.

46.    In 2008, Greg Bilbrey of Agri Stats wrote in the *Advances in Pork Production Journal* that benchmarking in the swine industry "could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons.  ***Each and every commercial swine operation is encouraged to participate in some benchmarking effort***."[6]

47.    Agri Stats emphasized to pork integrators that the goal of the agreement to share information was profitability, not production, and invited them again to participate in the benchmarking.  Agri Stats emphasized that "We must remember that ***the ultimate goal is increasing profitability***—not always increasing the level of production."  Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking.  ***To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program***."[7]

48.    In April 2009, Agri Stats again invited pork producers to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way.

---

[6] Greg Bilbrey, *Benchmarking and Cost-Production Relationships*, 19 Advances in Pork Production Journal, 43 (2008) (emphasis added).

[7] *Id.* at 46 (emphasis added).

Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort***."[8]

49.    Defendants and co-conspirator pork integrators accepted this invitation and, beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports.  Their agreement was to use the exchanged benchmarking information to coordinate supply and stabilize, as well as increase, prices of pork sold in the United States, to provide and receive information from Agri Stats, and to use this detailed sensitive information for the purposes of monitoring each other's production and pricing.  The agreement was successful as pork prices rose significantly after the agreement was reached.

50.    Each pork integrator Defendant and co-conspirator identified specific executives that were responsible for transmitting data to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export, or production levels.

- Clemens: Joshua Rennels (Treasurer, Clemens Food Group)

- Hormel: Paul Bogle (Director, Cost Accounting)

- JBS: Garry Albright (Head of Business Analysis), Kevin Arnold (Head of Finance), Jamie Fosbery (Analyst), Raven Goodlow (Business Analyst), Robbie Kearns (Business Analyst), Lisa Peters (Business Analyst), Eli Zoske (Cost Accountant)

- Seaboard: Damon Ginther (Senior Director of Business Data & Analytics), Mel Davis (Vice President of Hog Procurement and Bio-Energy, Tom Dye (Operations Controller)

- Smithfield: Aimee Ward (Director, Hog Finance), Kent Hilbrands (Sr. Director, Operations Finance), Elizabeth Barger (Data Analyst)

- Triumph: Matt England (Chief Integrated Business Strategy Officer), Ken Grannas (Director Inventory/Reporting), Tom French (Director, Margin

---

[8] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

Management), Joe Diebold (Chief Financial Officer), Dan Marlow (Corporate Controller)

- Tyson: Deb McConnell (Division Controller)

- ███████████████████████████████████████

**C.    Agri Stats Allowed Pork Integrators To Monitor Each Other's Pricing And Production, And To Discipline Co-Conspirators For Not Complying With The Collusive Agreement.**

51.    Agri Stats provided pork integrators with an unparalleled ability to share proprietary information concerning key business metrics, such as production levels and short and long-term production capacity.  Agri Stats was key to the formation, operation, and continuing stability of the anticompetitive scheme.  To effectuate their agreement, the participants had to have confidence that each member was following through with the agreement by limiting their production and stabilizing prices.  Agri Stats served that function.

52.    Defendants Clemens, Hormel, JBS, Seaboard, Smithfield, Triumph, and Tyson, and co-conspirator Indiana Packers were all Agri Stats subscribers and reported a wide variety of information to Agri Stats.  Agri Stats' former parent company, Eli Lilly, stated during a 2016 earnings call that "***over 90% of the poultry and pig market***" uses Agri Stats in the United States.[9]

53.    Agri Stats collects commercially sensitive financial and production data electronically each month from each pork integrator.  Internal auditors convert the data, prepare it for comparison, and perform the monthly audits.  Each company's financial data is reconciled to

---

[9] Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sep. 13, 2016) (emphasis added).

their general ledger to help ensure actual costs are reported.  Raw numbers are used in Agri Stats'

standardized calculations so all company numbers are calculated the same way.[10]

54.     Unlike traditional "benchmark" services which rely upon unaudited and aggregated

publicly available data, Agri Stats obtains audited data directly from the participating producers.

When a producer joins Agri Stats, Agri Stats employees help the producer learn, set up, audit, and

prepare the producer to submit its data each month.  When the producer submits its data to Agri

Stats, Agri Stats then enters the data into its system and ensures that the data is in a format that

allows participants to make "apples to apples" comparisons with competitors.

55.     The pork integrators received monthly detailed reports and graphs allowing them

to compare their performance and costs to other participants, the average of all companies, the top

25 percent and the top five companies.  Current month, previous quarter and previous twelve-

month periods are reported.  As of 2009, each monthly report contained nine sections for analysis

and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig

Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales.[11]  Participants

may also receive an abbreviated Key Performance Indicator report, as well as historical graphs.[12]

56.     Due to the nature of a hog's life and production cycle, even current and historical

information regarding hog production provides forward-looking supply information to

competitors.  The typical hog production cycle, which is largely a function of the hog biological

cycle, lasts about four years.  Given the length of time needed to breed an existing sow, choose

---

[10] Greg Bilbrey, *Implementing Simple and Useful Production Benchmarking*, London Swine Conference — A Time for Change (Mar. 28-29, 2012).

[11] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 8.

[12] Greg Bilbrey, *Benchmarking and Cost-Production Relationships*, *supra* note 6.

and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes nearly two years to substantially increase production.

57.     On information and belief, one presentation from Agri Stats shows the level of detail provided to Defendants regarding profits in the pork market:[13]

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

58.     The purpose of the reports was to improve the pork integrators profitability by enabling them to restrict output and raise prices.  The Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average.  On information and belief, the Agri Stats report actually circulated to competitors contained even more detail, and Agri Stats informed Defendants and co-conspirators about the "Advantages for Top 25% in Profit," which included information about the

---

[13] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

"Sales Price."  This information underscores that the purpose of these reports was not to allow customers to save money through lower prices and more efficient production.  Rather, the opposite was true: the purpose was to increase the Defendants' and co-conspirators profitability, and the impact was higher prices for pork purchasers like Plaintiff.

59.    A Special Report from the Banff Pork Seminar 2011, featured another presentation by Greg Bilbrey of Agri Stats and Tom Stein of MetaFarms who "showed producers at the 2011 Banff Pork Seminar that better records mean better financial performance."[14]  The report explained that the Agri Stats benchmarking process requires producers to supply all of their production records and all financial records so that benchmarking results can be tied back to general ledger cost data. Mr. Bilbrey further explained the importance of the Agri Stats reports in increasing profitability: "This past 12 months top producers had about a $20 difference in profit, $11 a head lower cost and about $9 a head advantage in sales, the price they got for their pigs."[15]

60.    Much of the information shared among Defendants and co-conspirators through Agri Stats was unnecessary to achieve any benefits for pork purchasers.  Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.[16]  To the contrary, in a truly competitive market, the participants would closely protect such proprietary information from disclosure because providing it to competitors would be

---

[14] *Tough Years in Pork Business Show Benefits of Benchmarking, Recordkeeping*, Inside BPS (Jan. 25, 2011), available at http://www.meristem.com/meeting/bps_2011-inside_bps.htm#15 .

[15] *Id.*

[16]    *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law*, Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-andother-  international-competition-fora/1010informationexchanges.pdf.

disadvantageous: unless, of course, there is an agreement that the competitors will use the information to the joint benefit of each other, as was the situation in the pork industry.

61.     Agri Stats knew that it played a central role in this conspiracy.  Agri Stats repeatedly touted its role in standardizing the costs across companies—allowing the companies to compare the "apples to apples" of its data analysis among competitors.

62.     In one presentation, Agri Stats emphasized to industry participants that they could not perform a detailed cost comparison across competitors or "implement an effective benchmarking program" without Agri Stats auditing and standardizing the data.  The presentation contained a slide with the heading "Data Integrity," which stated:

- "Benchmarking is very important but it is hard to make sure data is comparable across companies."

- "Even if all companies include the same costs the costs can be calculated differently."

- "Lots of variation in cost accounting in industry."

- "Companies can select key metrics, common calculations and implement an effective benchmarking program."[17]

63.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," and they must "[h]ave an administrator to compile the data and enforce procedures."  Most importantly, Agri Stats urged that "*[e]ach participant has to commit*."[18]

---

[17]   Greg   Bilbrey,   *Data   Integrity*,   Slideshare.net   (Sep.   21,   2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-forbenchmarking-and-operations.

[18] *Id.* (emphasis added).

64.     In addition, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis.[19] The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the pork integrator Defendants and co-conspirators in understanding the intricacies and implications of the data.  Agri Stats' employees possessed expertise in a specific areas of production, and the value added by their insights was as important to the producers as the data in the reports.  The fee for the visits fluctuated based on size and other factors.

65.     Throughout the Relevant Period, Agri Stats executives and account managers fanned out across the pork-producing regions of the country to meet with their clients and co-conspirators, the pork integrators.  Because Agri Stats travels and presents among Defendants and co-conspirators regularly, discussing non-public, proprietary data, Agri Stats is in a unique position to share information among Defendants and co-conspirators at these regular meetings.

66.     A common saying by Agri Stats is "you cannot produce your way to the top of the page."  Rather, Agri Stats has stated that "***the ultimate goal is increasing profitability*** – not simply increasing level of production."[20]

67.     In May 2015, a subsidiary of Agri Stats, Express Markets (EMI), announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers.  EMI had provided its extensive pricing reports to Broiler producers since 2003.[21]

---

[19] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 8.

[20] *Id.* (emphasis added).

[21] Steve Meyer, *Paragon Economics Sold to Express Markets*, National Hog Farmer (May 26, 2015),   *available   at*   http://www.nationalhogfarmer.com/marketing/paragoneconomics-sold-express-markets.

68.     Among EMI's offered services are "Poultry Market Forecasts," which are not actually limited to the poultry market.  As described on its website:

> EMI's economists construct industry forecasts and provide detailed commentary which benefit our clients with market visibility. This forward-looking analysis can be utilized for a multitude of pricing and planning purposes. Forecasts include, but are not limited to: production, supply, prices, feed ingredients, industry cost and returns, exports, and international trade.  Beef and pork perspectives are presented in relation to their impact on the poultry industry. Monthly webcasts are held to discuss developing issues affecting the market. Talking points include feed ingredients, broiler cost and returns, broiler markets, broiler production, turkey production and price, international trade, and outlooks on beef and pork.

69.     By providing detailed production statistics by participants, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits.  Critically, Agri Stats provided forward-looking data that allowed the other Defendants and co-conspirators to determine each other's future production in addition to their current production.

70.     Agri Stats reports are organized by company and facility, but the names are not listed in the reports. While ostensibly anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that participants can accurately identify the companies behind the metrics.  For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as general metrics and size.  Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers.

71.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information.  Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted.

In the front of each book, there were also markings indicating whose numbers were inside the book.  The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

72.    Agri Stats mailed the reports to customers.  On occasion, Agri Stats shipped a participant's book to one of its competitors.  At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

73.    Mobility within the meat production industries led to a situation where many workers at most pork integrator operations knew the numbers of other regional facilities, negating any purported anonymization of the data.  Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers.  Those working at Agri Stats were aware of this fact, but did nothing to address it.

74.    Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power.  Price-fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example by ramping up pork production to capture higher prices as other cartel members act to limit production.  Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

75.    Agri Stats has also played a similar role in the Broilers industry and has been named as a defendant in dozens of civil suits alleging its active participation in a price-fixing and

production-restriction conspiracy akin to that alleged in this Complaint.  In denying defendants'

motions to dismiss in the *Broiler Chicken* litigation pending in the Northern District of Illinois, the

district court noted that, given the nature of the Agri Stats reports in that market, the defendants

were in fact sharing future anticipated production information with one another, which raises

significant antitrust concerns.

76.     A sworn declaration from a poultry and egg industry expert in Freedom of

Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports

stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are
> familiar enough with the industry to connect the information
> supplied with the individual companies at issue. My experience is
> that competitors ... are prolific at quantifying their competitor's
> business information on their own. For example, industry processors
> share commercial data through companies such as AGRISTATS
> (Fort Wayne, IN), a shared business database company ... started for
> the poultry industry in 1985. AGRISTATS has the following
> mission   statement:   "IMPROVE   THE   BOTTOM   LINE
> PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING
> ACCURATE AND TIMELY COMPARATIVE DATA WHILE
> PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL
> COMPANIES." Note the mission is to share comparative data while
> protecting individual companies. I can speak personally that I have
> seen and read these broiler industry reports, and, based on my
> familiarity with the industry, I can easily connect the information
> supplied with the individual companies whose confidentiality is
> supposedly preserved. Therefore, it is my opinion that virtually
> everyone in the industry can connect the information supplied in
> AGRISTATS with the individual companies who supplied the data.

77.     Similarly, a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the

Broiler industry reported:

> Peter Carstensen, a law professor at the University of Wisconsin and
> former Justice Department antitrust lawyer who has studied Agri
> Stats while researching the modern poultry industry, casts the level
> of plant-by-plant detail in the company's reports as "unusual." He
> explains that information-sharing services in other industries tend to

deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."[22]

**D.      Defendants and Co-Conspirators Controlled The Supply And Production Of Pork In The United States, Which Allowed The Scheme To Succeed.**

78.      The Relevant Period was further characterized by increased control over the breeding, production, growing, and processing of pork by the Defendants and co-conspirators through vertical integration and exclusive production contracts with hog farmers.

79.      Vertical integration is so pervasive that Defendants and co-conspirators are commonly called pork or swine integrators by the industry, government, analysts, and academics. Vertical integration allows the integrators to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter.  Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

80.      Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."[23]   This arrangement

---

[22]  Christopher Leonard, *Is the Chicken Industry Rigged*, Bloomberg (Feb. 15, 2017), *available at* https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged (emphasis added).

[23]  Allen Harper, *Hog Production Contracts: The Grower-Integrator Relationship*, Virginia Cooperative, Virginia Cooperative Extension (2009).

essentially converts independent farmers into contract employees that perform services for the integrators. The Defendants and co-conspirators typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities. The pork integrators typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market. The prevalence and use of contracts for hog production by Defendants and co-conspirators increased significantly during the course of the conspiracy. By 2017 it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency as far as bid prices.

81.     Pork production starts at the farrowing stage—which is the term used to describe a female hog giving birth. Female hogs used in the farrowing stage are called sows. Sows will normally have anywhere from 11 to 13 pigs per litter. With a sow being able to farrow close to three times a year, one sow can have around 36 piglets in one year. After birth piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig weighs upwards of 50 pounds. At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds. After the pigs reach their final weight, they are sent to a packing plant to be harvested. Due to the nature of the pork production cycle, the reduction of sows—*i.e.*, farrowing hogs—has a significant impact on the supply of pork.

82.     The following diagram shows the path for pork raised for meat consumption from birth through sale to consumers:

**Figure 1: Value Chain of U.S. Pork Market**



83.     Under economic theory, vertical integration can have anticompetitive effects because there are fewer firms competing at all levels, which renders it easier to collude on price.

84.     During the Relevant Period, Defendant Smithfield was the largest producer and processer of pork in the United States.  In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States.[24]  Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers.  n 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.[25]

---

[24] WH Group Limited Annual Report, at 27 (2014).

[25] *Id.*

85.     In 2009, Seaboard Corporation, the parent company of Seaboard, reported that Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers.[26]  In its parent company, Seaboard Corporation's 2017 SEC 10-K report, it was reported that Seaboard raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts."[27]

86.     Defendant Clemens Food Group touts its vertical coordination on its website stating that, "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."[28]  A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.[29]

87.     As to JBS, a key aspect of JBS's purchase of its predecessor in interest, Cargill, in 2015 was that it allowed JBS to exercise greater control over the production of hogs, by acquiring four hog farms and two packing plants operated by Cargill.

88.     Triumph was created with vertical integration in mind as it is owned by five of the largest pork producers in the U.S.—Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of

---

[26] Seaboard Corporation Annual Report, at 10 (2009).

[27] Seaboard Corporation Annual Report, at 2 (2017).

[28] Clemens Food Group, *Vertically Integrated Purposefully Coordinated*, *available at* http://www.clemensfoodgroup.com/our-company/vertically-coordinated.

[29] *See id.*; *see also* The Clemens Family Corporation Companies, *available at* http://www.clemensfamilycorp.com/pages/companies.aspx.

producers in Iowa, Nebraska, Kansas, and Minnesota.  The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

89.     As Defendant Tyson stated in its 2009 10K Report, "The majority of our live hog supply is obtained through various procurement relationships with independent producers."[30] Additionally, Tyson raises a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

90.     Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities.  As Hormel stated in its 2009 annual report that, "[t]he live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."[31]  Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.[32]

91.     Co-conspirator Indiana Packers states on its website, "We're a fully integrated pork company operating entirely within the heart of the Midwest, so our team members can better partner with our surrounding farm neighbors to produce the freshest, highest quality products."[33] "With our Midwest family-farm sourcing, vertically integrated operation and broad product portfolio, it's no wonder customers from all sectors of the food industry trust Indiana Packers to be their supplier."[34]

---

[30] Tyson Corporation 10-K Annual Report, at 4 (2009).

[31] Hormel Foods Corporation Annual Report, at 32 (2009).

[32] *Id.*

[33] https://indianapackerscorp.com/ (visited April 27, 2022).

[34] *Id.*

92.     Each of the pork integrators further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports.  Defendants Smithfield, Clemens, Tyson, Hormel, Seaboard, Triumph, and JBS sell packaged pork under various name brands.

**E.     The Level Of Concentration In The Pork Industry Facilitated the Collusive Scheme.**

93.     The United States Department of Agriculture ("USDA") has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."[35]

94.     The hog integration sector is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production). Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

95.     Prior to and in the beginning of the Relevant Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share.  Between 1988 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015.  As shown in Figure 2 below, the top eight integrators had market share of well over 80 percent for the entire Relevant Period:

---

[35] John King (USDA), *Concentration and Technology in Agricultural Input Industries*, at 2 (March 2001),                                        *available                                        at* https://www.ers.usda.gov/webdocs/publications/42325/31960_aib763_002.pdf?v=9626.9.

**Figure 2: Market Share of Top 8 Pork Integrators, 1991-2017**



Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI.Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

96.     In July 2015, JBS announced it would acquire Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.  As noted above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and two packing plants operated by Cargill.

97.     The acquisition was completed in October 2015 and resulted in further consolidation in the industry.  The resulting pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week.[36] After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork

---

[36] *See* Notice to Market: JBS Concludes Cargill Pork Acquisition (Oct. 30, 2015), *available at* https://jbssa.com/about/news/2015/10-30/#.X8ZpZ2hKiUk.

integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).[37]

98.     By 2016, the top six pork processors comprised 82% of the total market.  On their own, it would be difficult for any of these supposed competitors to exercise market power.  But acting jointly to manipulate the price of pork products, the combined market share of the six largest pork integrator Defendants translates into an HHI[38] of 6724 (without taking into account the other pork processors comprising the other 18% of the market), which is well above the threshold for highly-concentrated markets.

99.     In other words, if Defendants colluded with one another to restrict the supply of pork in the market, as alleged herein, the resulting market concentration of such concerted action gave them more than sufficient power to control the pork market.  Even without combining the largest six pork integrator Defendants, the pork industry has a "moderately concentrated" HHI of 1532.

---

[37] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), at 4, *available at* https://inmotionmagazine.com/ra15/JBS-CargillWhitePaper.pdf.

[38] "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice.  *See* https://www.justice.gov/atr/herfindahl-hirschmanindex.  A HHI value of 1,500 to 2,500 suggests a market is moderately concentrated.  A HHI in excess of 2,500 points suggests a market is highly concentrated.

**Figure 3: 2016 Pork Processing Market Shares**[39]

| Company | Share | HHI - Independent | HHI - Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | 6724 |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | |
| Others | 18% | 18 | 18 |
| | | | |
| **Total** | **100%** | **1532** | **6742** |

100.    The level of concentration in the pork integration industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated."[40]  Both of these factors—maturity and concentration—make an industry more susceptible to collusion.

101.    The level of concentration in the pork integration industry therefore provided an environment ripe for collusion.  Because the industry was dominated by just a handful of integrators, it was feasible to manipulate prices through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because the largest integrators were incapable of independently controlling prices on their own, such an agreement was necessary to inflate prices.

102.    Concentration of the industry is also beneficial to the procurement of hogs by the pork processors.  In some regions, consolidation has resulted in cases where only one pork processor is left

---

[39] Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (Mar. 7, 2017).

[40] WH Group Interim Report, at 5 (2017).

to buy hogs from independent farmers, leaving the farmers with no leverage to negotiate terms with the pork processors.[41]

103.    In addition to market concentration, market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy.  The following chart shows not only that the pork integrators' collective share of the market was high throughout the Relevant Period, but also that each individual Defendant and co-conspirator's market share was largely stable throughout:

---

[41] Timothy A. Wise and Sarah E. Trist, "*Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*," Global Development and Environment Institute, Working Paper No. 10-04 (August 2010), at 3 and 11.

**Figure 4: Market Concentration and Market Share Stability –
U.S. Market Share by Hog Slaughter Capacity**



104.     Large barriers to entry kept potential competitors out of the pork integration industry. New entry into pork processing is costly and time consuming.  Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design, and permitting costs are substantial.  In 2012, it cost Cargill $25 million just to expand an existing facility.[42]  Building a facility from scratch would be considerably more, totaling hundreds of millions of dollars.[43]

---

[42] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition*, *supra* note 35, at 7.

[43] *Id.*

105.    The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants or co-conspirators.  And in other situations, the processor owns the hog from farrow to finish.  Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably.[44]

**F.    The Inelastic Demand For, And Homogeneity Of, Pork Products Facilitated Collusion**

106.    Markets with highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded.  Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[45]  A PED value between 0 and -1 indicates there is inelastic demand for the good or service, *i.e.*, a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded.  The average PED estimate for the pork market was -0.64—meaning the demand for pork is inelastic.

107.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another.  Pork loins, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets.  For example, as alleged above, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar

---

[44] *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, *supra* note 39, at 12.

[45] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), available at http://www.math.tau.acili-fibich/Manuscripts/elasticity_JAMS.pdf.

nutritional values, branding and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.[46]

### G.     Defendants Took Advantage Of Numerous Opportunities To Collude.

108.    Defendants and co-conspirators are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct. Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' and co-conspirators' CEOs and top-level executives regularly attend these events.

109.    All pork producers and importers in the United States participate in a legislatively-mandated "Pork Checkoff," under which they pay an assessment when pigs are sold or pigs or imported into the United States. The money is used for programs to increase pork sales and exports, for research, and for producer and consumer education programs; funds cannot be used for lobbying or to influence government policy. The assessment amount and the amount to be returned to state pork associations for local programs is set annually by the Pork Act Delegate Body, which meets during the National Pork Producers Council's annual Pork Industry Forum. States are represented in the Delegate Body in proportion to their level of hog production, and each state is eligible to elect at least two Delegates. Executives from several integrator Defendants have served as Pork Act Delegates.

110.    The Pork Act Delegates also elect a 15-member National Pork Board ("Pork Board"), whose members are officially appointed by the U.S. Secretary of Agriculture. The Pork Board works

---

[46] *See Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, The United States Department of Justice, *available at* https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service."); Marc Ivaldi et al., *The Economics of Tacit Collusion* (March 2003), *available at* http://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.pdf.

with Pork Checkoff staff to ensure collection and distribution of Pork Checkoff funds. Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo. Executives from several pork integrator Defendants and co-conspirators have served as members of the Pork Board. For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff. Skahill is the Pork Board's current Vice President, and also recently served as its Treasurer.

111.    The National Pork Producers Council ("NPPC"), "which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets."[47] Executives from the pork integrator Defendants and co-conspirators have served on the NPPC Board of Directors during the Relevant Period, including: Cory Bollum of Hormel Foods, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats.

112.    According to the NPPC website, its primary source of funds is the "Strategic Investment Program." Unlike the Pork Checkoff funds, NPPC describes these funds as unrestricted and can be utilized to address legislation, regulatory policy and trade policy as directed by state and national leadership. Pork producers participate by voluntarily investing a percentage of the sales of each market hog sold. Investors are described as producers of all types and sizes,

---

[47] National Pork Producers Council, NPPC.org.

representing 43 states.  "This unified investment allows NPPC and its state affiliates to act with one voice and effectively utilize these resources."[48]

113.    NPPC conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year.  NPPC advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions.  The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

114.    In addition to its annual National Pork Industry Forum, NPPC sponsors many other programs that have provided ample opportunities for defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show."  It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms).  The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC.

- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

115.    The National Pork Industry Conference ("NPIC") takes place each July, with the 25th Annual Conference planned for July 2021.[49]   NPIC describes the conference as attracting "800

---

[48]  *Strategic Investment Program*, NPPC.org., http://nppc.org/join-us/strategic-investment-program/.

[49]  *National Pork Industry Conference*, Porkconference.com (July 11–14, 2021).

attendees with most producer participants representing the Top 150 Pork Production Systems in North America."[50]

116.     After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow numbers."[51]   In July 2010, the Pork Checkoff website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded."[52]

117.     ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████

118.     The website for the 2016 NPIC conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts."   Seaboard Foods and Smithfield Foods are among the integrator Defendants whose executives have been session presenters at NPIC.

---

[50] *Id.*

[51] Mr. Greenwood was also a presenter at the 2018 NPIC, discussing swine operation financials.

[52] *See National Pork Board to meet during National Pork Industry Conference*, Pork Checkoff (July 8, 2010), *available at* https://www.pork.org/news/national-pork-boardmeet-national-pork-industry-conference/.

119.    Upon information and belief, CEOs and top-level executives from Defendants and co-conspirators attending NPIC and NPPC events discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings.  These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict pork production.  For example, at the 2009 Pork Expo in early June 2009, the Defendant and co-conspirator pork producers met and discussed cutting (*i.e.*, "liquidating") production, which Smithfield CEO Larry Pope later described "was the key subject of the discussion of every producer," and as "something [that] has got to happen.  And so that's [] very positive."[53]

120.    In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues.  For example, the 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year.  A March 2011 AgriMarketing article about the club states that it consisted of "60 industry stake holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

121.    Defendants and co-conspirators were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other organizations.

122.    Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association."  AMI's website routinely boasted that AMI's Packer and

---

[53] Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009).

Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

123.   NAMI was formed in 2015 by merging the AMI and the North American Meat Association.  The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars . . . provide excellent networking and information-sharing opportunities for members of the industry."

124.   All of the pork integrator Defendants and co-conspirators (and/or their affiliates) have been members of AMI and then NAMI throughout the Relevant Period.  Executives from the pork integrator Defendants and co-conspirators have served on the AMI and NAMI Board of Directors during the Relevant Period, including:

    a.   Mark Campbell and Rick Hoffman of Triumph Foods;

    b.   Doug Clemens and Phil Clemens of Clemens Family Corporation;

    c.   Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc., as well as Greg Schweitzer of Sara Lee/Hillshire Brands (later acquired by Tyson Foods);

    d.   Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

    e.   Gary Louis, Rod Brenneman and Terry Holton of Seaboard Foods;

    f.   Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS; and

    g.   Jim Snee, Stephen Binder and Jeffrey Ettinger of Hormel Foods Corporation.

    h.   Gary Jacobson and Russ Yearwood of Indiana Packers.

125.     Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

126.     Throughout the Relevant Period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has co-sponsored (with the Food Marketing Institute) the industry's "Annual Meat Conference."   The conference website describes the conference as "a complete education and networking experience."   Many of the Defendants' high-level executives attend the conference.   For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President, Smithfield Foods and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

127.     Throughout the Relevant Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry."   All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc. (a subsidiary of Agri Stats, Inc.) through 2017.  The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates

and *industry capacity*."[54]   The descriptions of the 2016, 2017, and 2018 sessions were virtually identical: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike.  This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices.  Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years."  The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

128.   Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall.  The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action."  Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015, and Phil Clemens of The Clemens Family Corporation in 2016.

129.   For years, NAMI also sponsored an annual "Meat Industry Management Conference."  NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics."  The NAMI board met during the 2015 Management Conference.

130.   In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit."  In addition to

---

[54]   Brochure, National Meat Conference, at 5 (2015), *available at* http://www.meatconference.com/sites/default/files/books/2015_AMC_Brochure.pdf   (emphasis added).

education sessions, the summit has included, "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

131. AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012. In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

132. In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations. Promotional materials for the 2014 IPPE indicated that attendees included defendants Clemens Food Group, Hormel Foods, Hillshire Brands, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson. After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

### H. Defendants Implemented Capacity And Supply Restraints During The Relevant Period.

#### 1. Summary of Defendants' Conspiratorial Supply Restraints

133. In the years leading up to the Relevant Period, pork production expanded steadily. As one industry commentator reported in 2007, "Some things you can just take to the bank. Sow herd

expansion among the Pork Powerhouses would fall into that category—even in the face of the biggest run-up in feed prices in history."[55]

134.    This historical trend changed markedly during the Relevant Period.  In 2008, several Defendants began cutting sows.  And as demonstrated in Figure 5 below, in 2009, 2010, and again in 2013, the pork industry cut production.[56]  These production decreases marked a drastic change from the period prior to the conspiracy from 2000 through 2009, in which pork supply was stable and steadily increasing on a yearly basis.

**Figure 5: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



135.    The supply cuts starting in 2009 were coordinated, historic, and unprecedented. For example, in September 2009, Pork Powerhouses—which publishes reports and articles relating to

---

[55] Betsy Freese, *Pork Powerhouses 2007: Run-Up In Rations* (Oct. 3, 2007).

[56] *See* U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); *id.* at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

pork production—published an article entitled "Big Boys Cut Back" and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers. These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.[57]

136.     These supply cuts were not easily reversible.  For example, as alleged earlier, attempting to replace breeding sows takes considerable time, during which a company could lose meaningful market share to its competitors with no ability to rapidly increase production to retain its customers, unless its competitors also cut their production.  In other words, each pork integrator Defendant and co-conspirator took significant business risk by restricting output.  Their production restrictions were not economically rational without coordination among them as alleged in this Complaint.

137.     In addition to restricting hogs, pork producers were further reducing domestic supply by increasing production exports to overseas markets.  The United States has been a net exporter of pork products for a long time, but those exports have comprised a much larger share of total production in the past ten years.  As shown in Figure 6 below, less than ten percent of U.S. pork production was exported in 2000.  By 2011, more than twenty percent was being exported.  Sending production overseas is another way in which Defendants were able to reduce the supply available to U.S. markets, thereby driving up prices.  Notably, a 2017 analysis found that for every $1 million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt.  In other words, selling pork on the global market added $50.20 to the market price of hogs.  The significant expansion in exports meant that increases in hog production by Defendants and co-conspirators did not result in an increase in the supply of pork products in the United States market.

_____

[57] Betsy Freese, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009).

**Figure 6: U.S. Pork Exports as a Percent of Total Production, 2000-2017**



138.    As part of their acts and conduct in furtherance of the conspiracy, each of the

Defendants participated in these supply restraints.

### a. Smithfield

139.    In 2008 Smithfield stopped making traditional production increases and instead cut its

number of sows, reporting that, "We are focused on reducing the number of pigs that come off sow

farms, and making sure the ones that come off are worthy of the investment in feed."[58]   In 2009,

Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market

hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective

immediately.[59]   Smithfield made additional production cuts in 2010, reporting a cut in its domestic

---

[58] Betsy Freese, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

[59] *Smithfield Reduces Pig Herd to Cover Losses*, Pig Progress (June 18, 2009), *available at* https://www.pigprogress.net/Home/General/2009/6/Smithfield-reduces-pig-herd-to-cover-losses-PP003085W/.

sow herd by 5% (about 45,000 sows).[60]  In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

140.    Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

### b.  Tyson

141.    Between 2008 and 2009 Tyson cut its sows by over 25%, marking a significant reduction. In 2010 Tyson reported a 3.3% decrease in its pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate.[61]  In 2013 Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand. . . ."[62]

### c.  JBS/Cargill

142.    In 2011 JBS reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS.[63]  Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand. This production restriction had the intended effect: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."[64]

---

[60]  Betsy Freese, *Pork Powerhouses 2010: Back in Black* (Sep. 14, 2010), *available at* https://www.agriculture.com/livestock/hogs/pk-powerhouses-2010-back-in-black_283-ar9801.

[61]  Tyson Foods, Inc. 10-K Report, at 26 (2010).

[62]  Tyson Foods, Inc. 10-K Report, at 24 (2013).

[63]  JBS Annual Report, at 15 (2011).

[64]  JBS Annual Report, at 68 (2016).

#### d. Hormel

143.    In January 2008, the Farmer John's division of Hormel announced liquidation of about 10,000 sows in California, which was confirmed to have taken place in its 2008 Annual Report. Hormel's production statistics also show that it cut its number of sows in 2008 and maintained such reduced production throughout the Relevant Period.

144.    Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report.  This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through."[65]   Hormel also reported lower sales of pork products in 2013.  In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day. Hormel reported strong earnings from its pork exports in 2011.

#### e. Seaboard

145.    Throughout the Relevant Period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales to foreign markets.[66]  Seaboard dedicated several employees to international sales and exports.  Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect—higher pork prices.  Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic

---

[65] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009)

[66] *See, e.g.*, 2010 Seaboard Annual Report ("export volumes increased particularly to our higher valued markets in the Far East while domestic volumes nearly kept pace with 2009."); 2011 Seaboard Annual Report ("Exports of US pork were up 23% to an all-time record as demand from the usual countries remained strong and the US continued its role as the main supplier.").

market."[67]  Moreover, in 2017 Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

### f.   Triumph

146.    In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.[68]  In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry.[69]  Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide.  These exports constituted a significant portion of its production throughout the Relevant Period, and reduced or otherwise limited Triumph's production in the United States.

### g.   Clemens

147.    In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats.[70]  Furthermore, in 2014 Defendant Clemens had a competitive advantage over many pork producers, in that it had few PEDv-infected pigs.  But contrary to what one would expect to see in a competitive market, Clemens did not utilize its advantage and refused to increase its market share when it clearly had substantial market incentives to do so.

### 2.   Timeline of the Conspiracy

148.    As set forth herein, each of the aforementioned supply reductions during the Relevant Period were a departure from the pork integrator Defendants' market behavior prior to the Relevant

---

[67]  Seaboard Corporation Annual Report, at 17 (2013).

[68]  Betsy Freese, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008), *available at* https://www.agriculture.com/livestock/hogs/The-big-squeeze-Pork-Powerhouses-2008_283-ar4443.

[69] Betsy Freese, *Pork Powerhouses 2009*, Successful Farming (2009).

[70] Betsy Freese, *Pork Powerhouses 2011*, Successful Farming (2011).

Period.  These supply restrictions involved a significant share of the pork integrator Defendants' annual production and are contrary to pork integrator Defendants' individual economic self-interest.  These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially fix, raise, stabilize, and maintain the price of pork.  While pork integrator Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources.  As with their use of Agri Stats, pork integrator Defendants exploited these public statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy, and couched the public disclosures in pretext to conceal what was really occurring.  Although purchasers would not typically track and account for these statements, they have now been unearthed and are summarized below.

149.    As early as January 2008, the CEOs and other senior-most executives of each of the pork integrator Defendants recognized that, as a result of expansion and productivity increases in their operations, there was an oversupply of pork. However, the substantial supply reductions that were necessary to return the industry to the Defendants' desired level of profitability were against the individual self-interest of each Defendant.  In the absence of an agreement between all Defendants to reduce supply, it did not make financial sense for any company to reduce its own supply levels.  Accordingly, Defendants began to use their positions on the American Meat Institute ("AMI") and the Twenty-First Century Pork Club ("Pork Club") to coordinate supply cuts that could not be achieved in the absence of collusion. Defendants and co-conspirators affirmatively shaped the rules of these organizations to conceal the way they were using them to coordinate the supply reductions (and this hide the existence of the conspiracy).  For example, the Pork Club had a rule prohibiting meeting attendees from attributing comments to specific speakers

that attended their meetings.  In this way, because of this "no attribution" rule, executives of the Defendants could and did make statements about their company's intentions at these meetings about the production, supply and/or pricing of the swine herd or pork without fear that anyone who did not attend the meeting could identify which executive or which company made the statement.

150.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

151.  Although Smithfield shared this information with its competitors in the hope of inducing them to reduce supply as well, other Defendants were unwilling to follow Smithfield's lead without assurances that all major producers were on board. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████

152.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ █  ███████████████████████████

██████████████████████

153.   In November of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009.[72] Also in November 2008, Dick Bond, President and CEO of Tyson Foods, stated that there were likely to be fewer hogs in 2009.[73]

154.   Throughout 2009, pork industry participants continued to note the need to reduce supply.  For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. Pork producers to follow the lead of the Broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.[74]  Notably, Greenwood's efforts to publicly encourage pork producers to decrease supply made no mention of the financial pressure that AgStar was putting on companies to comply with Greenwood's advice.

---

[71]  Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

[72]  Q4 2008 Hormel Foods Corporation Earnings Conference Call (Nov. 25, 2008).

[73]  Q4 2008 Tyson Foods, Inc. Earnings Conference Call (Nov. 10, 2008).

[74]  Dale Miller, *Industry's Stimulus Package - Cull Sows*, National Hog Farmer (Mar. 15, 2009), *available at* https://www.nationalhogfarmer.com/marketing/0315-industrys-stimulus-package.

155.   By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000.  In order to accomplish this reduction, Hormel sold sows in California and switched farms to finishing.

156.   In January 2009, Tyson stated that the capacity utilization for its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%.[75]  This indicated that Tyson was reducing the amount of pork that it processed in its plants. Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."[76]

157.   In February 2009, Hormel stated, "We still do expect to see a reduction in the supply of hogs in fiscal 2009[.]"  In addressing whether slaughter would be cut back, Hormel said that "*you look at the opportunity to reduce your production numbers and we've certainly . . . look[ed] for opportunities . . . where we could reduce the numbers that we had going through* . . . ." Hormel further emphasized that "if there were free market hogs that normally we would be bidding on, we're not looking to take them in . . . ."[77]

158.   In February 2009, Smithfield said that it would close six processed meat plants.

159.   In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87%, down from the previous year's rate of 90%.[78]  Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."[79]

160.   In May 2009, Larry Pope, Smithfield's CEO and President, stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--*we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because*

---

[75] Q1 2009 Tyson Foods, Inc. Earnings Conference Call (Jan. 26, 2009).

[76] *Id.*

[77] Q1 2009 Hormel Foods Corporation Earnings Conference Call (Feb. 19, 2009).

[78] Q2 2009 Tyson Foods, Inc. Earnings Conference Call (May 4, 2009).

[79] *Id.*

> *we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system*.[80]

161.   In May 2009, Hormel confirmed that "[w]e see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated.  And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."[81]

162.   In June 2009, Jody Feragen, Hormel's CFO, stated at an investor conference that "we reduced production in our basic processing for . . . pork."[82]

163.   In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our --I'll tell you, it's our Texas operation that sells pigs to seaboard.  Seaboard knows that. . . .  *That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of.  Somebody else has got to do something.*  We cut 13%.  The first 10% didn't fix it.  I don't think us going from 10 to 13 is going to fix the hog business.[83]

164.   During the same call in June 2009, the Smithfield CEO, when asked to describe his expectations for whether the rest of the industry would "liquidate" (*i.e.*, cut production), he described how at the 2009 Pork Expo in early June 2009, cutting supply was the "key subject of the discussion

---

[80] Transcript, Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference (May 13, 2009) (emphasis added).

[81] Q2 2009 Hormel Foods Corporation Earnings Conference Call (May 21,2009).

[82] Transcript, Hormel Foods Corporation at Stephens Spring Investment Conference (June 2, 2009).

[83] Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009) (emphasis added).

of every producer," adding that such supply reduction is "something [that] has got to happen. And so that's very positive."[84]

165.    In July 2009, Smithfield's CEO, Larry Pope, went on to note:

> I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, ***liquidation is now a recognized reality by all in the industry***. To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, ***combined with the additional cuts by our fellow producers*** should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue."[85]

166.    

167.

168.    Tyson was the next company to follow Smithfield with the public announcement of a major sow liquidation. In May 2009, Tyson stated that its capacity utilization rate for its pork

---

[84] Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009).

[85] *High Hog Production Lead to Loss at Smithfield*, Meat & Poultry (June 16, 2009), *available at* https://www.meatpoultry.com/articles/1056-high-hog-production-costs-lead-to-loss-at-smithfield (emphasis added).

processing plants for the quarter was 87% down from the previous year's rate.   Tyson described

pork "supplies coming down" and that "the worldwide suppliers of pork are still down."

169.    More significantly (and following Smithfield's major announcement in June), Tyson

announced in July 2009 that it was liquidating 20,000 sows from its herd. Upon information and

belief, Tyson executives informed its competition of this supply cut during AMI's Executive

Committee meeting, which was held between July 9-11, 2009.

170.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████

171.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████

172.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

173.   ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

174.   In August of 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner, confirmed:

> Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability.*** We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.[86]

175.   Mr. Lochner continued: "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4."[87]

176.   Tyson's 2009 10-K Annual Report further stated that: "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[88]

---

[86] Q3 2009 Tyson Foods, Inc. Earnings Conference Call (June 26, 2009) (emphasis added).

[87] *Id.*

[88] Tyson Foods, Inc. 10-K Annual Report, at 20 (2009).

177.   In August of 2009, Wesley Mendonça Batista, CEO of JBS, communicated the start of JBS's participation in hog liquidation efforts.  Mr. Batista stated, "we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation.  So we think we will continue to see the margin in the processing side strong this whole year.  But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[89]

178.   In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> *We can't solve the problem.  But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation*.  But again, I don't think they can solve it.
>
> *I think this industry has got to solve it collectively.*  I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong.  *But the answer is, yes, there are others cutting back.  We're not the only one*.[90]

179.   Defendants agreed to Smithfield's exhortation for the "industry" to cut production.  During 2009, Triumph reduced the number of sows that it had from 396,000 to 371,500.  In particular, Triumph reduced the number of sows by 14,500 at its Christensen Facility, 4,000 at its New Fashion Pork Facility, and 5,000 at its Eichelberger facility.[91]   Notably, Triumph and Seaboard have a longstanding marketing agreement where hogs processed by Triumph were marketed by Seaboard.[92]

---

[89] Q2 2008 JBS Earnings Conference Call (Aug. 13, 2009).

[90] Q1 2010 Smithfield Foods Earnings Conference Call (Sep. 8, 2009) (emphasis added).

[91] Betsy Freese, *Pork Powerhouses 2009*, Successful Farming (2009).

[92] According to Seaboard Corporation's 2010 Form 10-K, filed with the Securities and Exchange Commission, "Seaboard's Pork Division has an agreement with a similar size pork processor, Triumph Foods LLC (Triumph), to market substantially all of the pork products produced at Triumph's plant in St. Joseph, Missouri."

Thus, the reduction in supply of sows raised by Triumph may result in a reduction in the amount of pork that was sold by Seaboard.

180.   During 2009, Tyson reduced its number of sows from 70,000 to 52,000.  In particular, Tyson sold five farms and sent the sows to slaughter.  Tyson's 2009 10-K report further stated that "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[93]

181.   In November 2009, Hormel stated that "we've seen about a 2% liquidation" in hogs.[94]

182.   In December of 2009, the CEO of Smithfield communicated to the other Defendants that it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance":

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs . . . . I can tell you that I know in the east, it[']s been pretty public about some of the producers on the east coast that have been cutting back besides ourselves. We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.[95]

183. ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

---

[93] Tyson Foods, Inc. 10-K Annual Report, at 20 (2009).

[94] Q4 2009 Hormel Foods Corporation Earnings Conference Call (Nov. 24, 2009).

[95] Q2 2010 Smithfield Foods Earnings Conference Call (Dec. 10, 2009).

184.   In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield, indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.[96]

185.   In that same timeframe, Smithfield issued a press release stating:

> The action items called for in the Pork Group restructuring plan are complete and the benefits are meeting expectations. As of this month, we have closed all six plants that were announced as part of the restructuring plan early last year. . . .
>
> We anticipate that fresh pork margins will improve as hog slaughter levels continue to decline and the Sioux City plant is closed in April.[97]

186.   Those press release statements were confirmed in Smithfield's quarterly results filing for the quarterly period ending January 2010: "In January 2010 (fiscal 2010), we announced that we will be closing our fresh pork processing plant located in Sioux City, Iowa in April 2010 (fiscal 2010) . . . . Modest contractions in the U.S. sow herd have contributed to tightening supplies which, in turn, is resulting in higher live hog market prices in the U.S."[98]

187.   On March 8, 2010, Wesley Mendonça Batista mentioned Defendant JBS's reduction in hog supply as a driver of profitability, and stated that these efforts were resulting in protein shortages. Mr. Batista stated:

---

[96] Q3 2010 Smithfield Foods Earnings Conference Call (Mar. 11, 2010).

[97] *Smithfield Foods Reports Third Quarter Results See Regulation G Disclosures*, Smithfieldsfoods.com (Mar. 11, 2010), available at https://www.smithfieldfoods.com/press-room/company-news/smithfield-foods-reports-third-quarter-resultsbr-a-href-common-download-downloadcfmcompanyidsfdfileid358280filekeyedc0cf30-565b-446b-8455-a0ad88ae54a1filenamereg-g-disclosurespdf-target-blanksee-regulation-g-disclosures-a.

[98] Smithfield Foods 10-Q Report, at 12 (2010).

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.[99]

188.   Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to limit hog supply.

189.   As of March 2010, US pork production was noted to be down 7% so far, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights.  Defendants also were reported to have increased exports 8% by March 2010, which was expected to lead to higher hog prices.

190.   In May 2010, Tyson stated in its Q2 2010 earnings conference call, "Worldwide protein supplies and US domestic availability are expected to remain below '08 and '09 levels. We have seen good interest in Beef and Pork exports to a variety of global destinations."[100]  Similarly, in August 2010, Tyson stated in its earnings call that "Pork supplies in 2011 are anticipated to be below their peak supplies in calendar 2008 and 2009, and most projections show no material changes compared to 2010."[101]

191.   In August 2010, Hormel stated that "Our hog supply is down 3 to 4%."[102]

192.   In September 2010, Smithfield stated in a press release that the closure of its Sioux City plant in April 2010 had led to an 11% reduction in its processing rate from the prior year. Smithfield further stated, "Industry-wide, slaughter volumes were down 3.5%," and "Lower industry slaughter

---

[99] Q4 2009 JBS Earnings Conference Call (Mar. 8, 2010).

[100] Q2 2010 Tyson Foods, Inc. Earnings Conference Call (May 10, 2010).

[101] Q3 2010 Tyson Foods, Inc. Earnings Conference Call (Aug. 9, 2010).

[102] Q3 2010 Hormel Foods Corporation Earnings Conference Call (Aug. 20, 2010).

levels are expected to persist well into the company's second quarter."[103]  Smithfield's quarterly results from that time reflected that the volume reductions "should help stabilize prices at healthier levels than fiscal 2010."

193.    The Defendants acknowledged access to information that allowed them to know that the supply of pork would not be increasing.  For example, in December 2010, Larry Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have.*** And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[104]

194.    As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

195.    Knowledge of supply level information regarding competitors allowed Defendants to rest assured that supply would not increase in the future, given the lifecycles of the animals.  Based on this knowledge, in November of 2010 Hormel CFO, Jody Feragen, stated that she did not think the industry would see large scale expansion given profitability for the pork integrators.[105]

196.    In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable.  I want to again explain why we don't believe that is true.  If we look at supply, current cattle and hogs

---

[103] *Smithfield Foods Reports Record First Quarter Results*, Smithfieldfoods.com (Sep. 8, 2010), *available at*  https://www.smithfieldfoods.com/press-room/company-news/smithfield-foods-reports-record-first-quarter-results-2.

[104] Q2 2011 Smithfield Foods Earnings Conference Call (Dec. 2010) (emphasis added).

[105] Q1 2010 Hormel Foods Corporation Earnings Conference Call (Nov. 23, 2010).

production levels can't change much in 2011 because of the limits of the animals' lifecycles.[106]

197.   Again, Tyson knew the level of production in the industry by receiving competitively sensitive information about its competitors through Agri Stats.

198.   In the face of ever-increasing margins, when asked whether the type of profits would continue, in March 2011, Larry Pope and Robert (Bo) Manly of Smithfield confirmed to their competitors that it would not increase capacity,:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .
>
> HEATHER JONES: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have -- should have good margins, but I can't believe –
>
> LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.
>
> BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.
>
> HEATHER JONES: All right, okay. Thank you.
>
> LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . ***And by the way, we are not going to build a new plant to expand capacity***.[107]

---

[106] Q1 2011 Tyson Foods, Inc. Earnings Conference Call (Feb. 4, 2011).

[107] Q3 2011 Smithfield Foods Earnings Conference Call (Mar. 10, 2011) (emphasis added).

199.   In March 2012, the VP of Finance and Chief Accounting Officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations.  Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there.  And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry.  ***There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility***.[108]

200.   By May 2012, industry observers were noting that the reductions in slaughter capacity meant pork integrators may not have enough capacity to slaughter expected hog levels by the fall.  In fact, Steve Meyer of Paragon Economics noted that slaughter capacity would not keep up with hog capacity through late 2013 given that the pork integrators were holding their slaughter levels constant.

201.   ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

202.   In September 2013, Joe Szaloky, Vice President of Procurement and Business Development for Smithfield, confirmed the company's intention to maintain its sow number, not adding any more.[109]

---

[108] Transcript, Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference (Mar. 26, 2012) (emphasis added).

[109] Betsy Freese, *Pork Powerhouses 2013: Disease Hits, Growth Continues*, Successful Farming (Sept. 29, 2013), *available at* https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-growth_283-ar34203.

203.   In December 2013 Robert Manly of Smithfield emphasized that coordinated industry action was necessary to "balance supply and demand":

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group.  We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.[110]

204.   On May 15, 2013, Wesley Mendonça Batista continued to demonstrate Defendant JBS's ability to constrain the pork market.  During a quarterly earnings call he stated that "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business. . . . So this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent in beef."[111]

205.   Defendants further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise. For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Eric Haman, Defendant Clemens Food Group's communication manager, stated the disease "'had a very minimal impact on our hog flow, especially when you compare it to others in the industry' Haman said. 'That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this.'"[112]  Yet, in furtherance of their conspiracy Defendant Clemens did not take advantage of having few PEDv infected pigs.  Instead of attempting to increase their market share, they stayed the course with their fellow competitors.

---

[110] Q2 2014 Smithfield Foods Earnings Conference Call (Dec. 23, 2013).

[111] Q1 2014 JBS Earnings Conference Call (May 15, 2014).

[112] Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds*, Bucks County Courier Times (May 4, 2014).

206.    Defendants' conspiracy was yielding substantial profits by 2014.  In October 2014, Pork Powerhouses reported that "Hogs made history this summer.  Pork producer profits were, quite simply, enormous -- averaging $82 profit for each hog marketed in the third quarter."[113]  The report also noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast.  The PED virus trimmed supply, but higher market weights helped compensate.'"[114]

207.    In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production.  Specifically, pork producers rushed to sign contracts with Defendants that would protect them if production exceeded slaughter capacity as some feared.

208.    In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift.[115]  In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as

---

[113] Betsy Freese, *Pork Powerhouses 2014: Record Profits Trigger Expansion* (Oct. 30, 2014), *available at* https://www.agriculture.com/livestock/hogs/pk-powerhouses-recd-profits-trigger_283-ar45884.

[114] *Id.*

[115] David Eaheart, *Seaboard Triumph Foods Announces Plans to Expand Pork Processing Plant* (Feb. 17, 2017), *available at* https://seaboardfoods.com/news/Pages/Seaboard%20Triumph%20Foods%20announce%20plans%20to%20expand%20pork%20processing%20plant.aspx#:~:text=17%2C%202017)%20%2D%20Seaboard%20Triumph,approximately%206%20million%20hogs%20annually.

ongoing growth in the industry."[116]  However, in furtherance of the conspiracy, Triumph/Seaboard

postponed the addition of a second shift.[117]

I.      **Indiana Packers' Role in the Conspiracy**

209.  Like the pork integrator Defendants, Indiana Packers' interactions with its

competitors occurred at the highest levels of the company.  For example, ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

210.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[116] *Id.*

[117] Jeff DeYoung, *Pork Packing Capacity Faces Delay to Growth*, Iowa Farmer Today (June 2, 2018), *available at* https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html.

███████████████████████████████████████████████

████████████████████████████

211.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

    i.    ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ███████████████████████████████

    ii.   ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

        ██████████████████████████████████████

███████████████████████████████████████████

█████████████

iii.   ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

iv.   ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

v. █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████

vi. █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████

vii. █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

███

viii. ███████████████████████████████████████

████████████████████████████

ix. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████

x. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

xi. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

xii. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████ ███████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██

xiii. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████

xiv. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████

xv. ████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
████████

xvi. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

xvii. ███████████████████████████████
███████████████████████████████
███████████████████████████████
██████████████

xviii. ██████████████████████████████
███████████████████████████
██████████████████████████████
████████████████████

xix. ██████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
██████████████████

212. ██████████████████████████████
███████████████████████████████████

i. ███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████





███████████████████████████████████

████████████

213.   ███████████████████████████████

█████████████████████████████

    i.   ███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███

   ii.   ███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████

214.   ███████████████████████████████

███████████████████████████████████

█████████████

215.   ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████

**J.      Abnormal Pricing During The Relevant Period Demonstrates The Success Of the Conspiracy.**

216.    In 2009, the pork industry showed abnormal price movements, *i.e.*, increases in prices for the average hog whole price unexplained by increases in costs.  All of these pricing measurements show a significant break between pricing prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork.  These abnormal pricing movements can be measured in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the pork integrators' margin during the Relevant Period; and (iv) the defendants' revenues before and during the Relevant Period.  Each of these measures supports Plaintiff's allegations that Defendants conspired to restrict production and otherwise acted in a concerted manner to increase pork prices in the U.S.

**1.      The average hog wholesale price experienced an unprecedented increase in 2009.**

217.    According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb from 2000 to 2009, the hog market year average price was at times substantially less. Thereafter, prices increased dramatically, rising to more than $1.80/lb in 2014, and never dropping or below $1.40/lb again.  Figure 7 below shows the unprecedented increase in swine prices in 2009, which stayed elevated above pre-conspiracy levels through 2018.

**Figure 7: Average Hog Wholesale Prices in Cents per lb., 2000-2018**



218.   As Figure 8 below shows, publicly available data also demonstrates that pork integrators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits resistant to changes in price during the Relevant Period.  These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply below demand.

**Figure 8: Integrator Earnings per Retail Weight, 2000-2017**



### 2. The pork cut-out composite price experienced a dramatic increase in 2009 and continuing throughout the Relevant Period.

219.   During the Relevant Period various pork products saw substantial increases in prices, compared with before the Relevant Period.   As shown in Figure 9 below, using one particular price for pork—the lean hog composite price—a pricing analysis shows that the average price index increased significantly during the Relevant Period.

**Figure 9: Lean Hog Composite Price, 2000-2019**



### 3. Defendants' revenues increased in 2009, even taking into account Defendant-specific costs.

220.   An examination of the spread between pork revenue and pork-related costs (*i.e.*, costs of goods sold plus operating costs) for two of the largest Defendants (Tyson and Smithfield)—which can be used as a proxy for measuring the spread between the Defendant producer's price of wholesale pork and its hog costs—confirms a divergence between revenue and costs in 2009.

221.   Specifically, such an examination shows a break in Tyson's revenues and costs around the start of the Relevant Period: from 2001 to 2009, Tyson's average profit on pork was 3.7 percent; from 2010 to 2017, Tyson's average profit on pork jumped to 8.7 percent.

222.   The same analysis for Smithfield shows a similar break in revenues and costs beginning at the start of the Relevant Period: from 2004 to 2009, Smithfield's average profit on pork was 3.2 percent; from 2010 to 2016, Smithfield's average profit on pork increased to 6.3 percent.

223.   These analyses of the spread between costs and prices relate solely to each defendant's pork segment, and thus confirm that rising costs in pork production do not explain the increases in price seen during the Relevant Period.

**J.      Overcharges Due To The Cartel Were Reflected In Higher Pork Prices Than Would Have Existed In the Absence of Defendants' Conspiracy.**

224.   Pork is a commodity product, which means the pork sold by competitors has no meaningful difference and is interchangeable.   As a result, price is driven by the economic fundamentals of supply and demand.   In the words of Tyson Foods, Inc. COO, James Lochner, "As you know decreased supply should be favorable to pricing."[118]

225.   By reducing, stabilizing and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2012 the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."[119]

226.   The volume of U.S. commerce in the pork industry is enormous.   Total pork sales in the United States for a portion of the Relevant Period were:

- 2016 - $18.9 billion

---

[118] Q1 2010 Tyson Foods, Inc. Earnings Conference Call (Feb. 5, 2010).

[119] Transcript, Tyson Foods at Goldman Sachs Agribusiness Conference (Feb. 26, 2013).

- 2015 - $21.0 billion
- 2014 - $26.4 billion
- 2013 - $23.4 billion

227.   Each pork integrator Defendant's annual sales of pork products is also substantial. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales.  That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to Plaintiff.

228.   The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI").  From the end of 2009 to the end of 2017, the CPI for all food products rose approximately 15.4 percent.  Over the same period, prices for pork have increased substantially more for consumers over the Relevant Period.  For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017, an increase of 56.9 percent:

**Figure 10: CPI-Average Price Data for Bacon, Sliced, per pound, 1995-2017**



229.   Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase over the Relevant Period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017 (approximately 29.3 percent).

**Figure 11: CPI-Average Price Data for Other Pork, per pound, 1998-2017**



230.   And the CPI for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017 (or 35.4 percent):

**Figure 12: CPI-Average Price Data for Ham, per pound, 1998-2017**





231.   In other words, the increases in the prices of pork far out-paced the growth in prices for other food products during the Relevant Period.   These price increases were not the result of retailers' desire to move prices upward.   Instead, they were the result of increased wholesale prices. In addition to CPIs, the Bureau of Labor Statistics also maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products.   As shown in Figure 13

below, the processed pork wholesale prices appear to be the motivator of the higher retail prices, with prices climbing significantly beginning during the conspiracy:

**Figure 13: PPI for Pork, Processed or Cured,
Not Canned or Made Into Sausage, 1995-2017**



232.    Given these market conditions, the overcharge due to Defendants and co-conspirators' anticompetitive agreement to artificially fix, raise, stabilize, and maintain the price and limit the supply of pork was borne in large part by Plaintiff and other direct purchasers.

**K.     The Results of the DOJ's Criminal Investigation in Broilers Supports an Inference of the Existence of a Similar Conspiracy in the Pork Industry**

233.    The U.S. Department of Justice Antitrust Division (DOJ) has an ongoing criminal antitrust investigation into anticompetitive conduct in the Broilers industry.  The DOJ has indicted numerous current and former poultry industry executives, including from Pilgrim's Pride, which is majority owned by JBS USA Food Company Holdings, the parent of Defendant JBS.

234.    On February 23, 2021, Pilgrim's Pride pled guilty to charges brought by the DOJ for "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in

violation of the Sherman Antitrust Act, 15 U.S.C. § 1" from "at least as early as 2012 and continuing through at least early 2017," and agreed to pay approximately $107 million in a criminal fine.

235.    Defendant Tyson, after being served with a grand jury subpoena in April 2019 in DOJ's Broilers investigation, applied for leniency from prosecution under the DOJ's Corporate Leniency Program, pursuant to which Tyson must, in order to avoid criminal prosecution and fines, admit to having participated in activity constituting a criminal antitrust violation and fully cooperate with the DOJ.

236.    The guilty plea by Pilgrim's Pride (owned by Defendant JBS's parent) and Tyson's grant of leniency in the DOJ's criminal price-fixing investigation in the Broilers industry serve as a "plus factor" supporting the plausibility of the pork industry conspiracy alleged herein, particularly given the similar structural characteristics between the Broilers industry and the pork industry.

237.    In addition, upon information and belief, the same antitrust policies and practices that resulted in antitrust violations by Pilgrim's Pride and Tyson with respect to Broilers governed JBS's and Tyson's conduct with respect to pork and the conduct alleged herein.

238.    Pilgrim's and Tyson's antitrust violations concerning Broilers were concealed and only established by the DOJ's criminal investigation, just like the alleged conduct here has been concealed by Defendants, as discussed below.

**L.      Defendants Actively Concealed The Conspiracy, And Plaintiff Did Not And Could Not Have Discovered Defendants' Anticompetitive Conduct.**

239.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before its claims were tolled

until at least 2018 or later.  Defendants and co-conspirators engaged in a secret conspiracy that did not reveal facts that put Plaintiff on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiff.

240.   An investigative article published in February 2017 by Bloomberg Businessweek suggested the conspiracy that began among Broiler producers and Agri Stats was being replicated in the pork industry.[120]  The article reported that Agri Stats:

> has . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods. It appears that demand for the service is strong. At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services. His slideshow indicated that 27 companies had already signed up.[121]

The article did not state that pork producers were engaged in a horizontal conspiracy, but it did suggest for the first time in a widely circulated publication, that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.  Indeed, this was the first time the pork industry's *use* of Agri Stats was even widely known or reported.

241.   Then, the December 8, 2017 filing of a direct purchaser complaint against Agri Stats in *Affiliated Foods, Inc. v. Claxton Poultry Farms, Inc.*, No: 1:17-cv-08850 (N.D. Ill.), and subsequent Complaints in *In re Broilers*, presented in further detail, the confidential services that Agri Stats provides to its clients in the Broiler industry.

242.   The Bloomberg Businessweek article disclosing the pork industry's use of Agri Stats, the *Affiliated Foods* Complaint, and subsequent public filings in *Broilers*, collectively

---

[120] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek (Feb. 15, 2017), *available at* https://www.bloomberg.com/news/features/ 2017-02-15/ is-the-chicken-industry-rigged.

[121] *Id.*

disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

243.   Until that time, the combination and conspiracy alleged herein was fraudulently concealed by Defendants and co-conspirators by various means and methods, including but not limited to planning and conducting private meetings during which anticompetitive conduct was shielded from public view; communications between Defendants and co-conspirators by the use of the telephone to prevent the existence of written records; limiting any explicit reference to competitor pricing or supply restraint communications on documents; communicating competitively sensitive data to one another through Agri Stats—a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret; making misleading statements to investors and the public designed to conceal their wrongful conduct, including about the nature of the information shared with and among competitors through Agri Stats; and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

244.   Agri Stats is a secretive company, and repeatedly made affirmative statements about the public's lack of access to and information about its services.  For example, in 2009, the President of Agri Stats, Blair Snyder, explained:

> Agri Stats has always been kind of a quiet company.  ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do.  It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth.[122]

---

[122] Sanderson Farms Investor Day (Oct. 2009) (emphasis added).

245.   But Agri Stats did not just conceal the conspiracy alleged herein by being a "quiet" company" that did not advertise or "talk about what we do" in public, it also engaged in numerous affirmative acts to conceal the alleged conspiracy during the Relevant Period.  Specifically, Agri Stats made repeated false or misleading statements about the true nature of the information that it provided to the pork integrators, all of which served to exclude suspicion and prevent discovery of Defendants' and co-conspirators' illegal scheme.

246.   For example, in the same 2009 presentation discussed above about the "quiet" and secretive nature of Agri Stats, Mr. Snyder also emphasized that he was not at liberty to discuss "bottom line numbers" (a company's net earnings), and declined to display those numbers publicly, stating: "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."[123]  However, while affirmatively asserting that it was unable to share this information publicly due to "confidentiality" concerns, Agri Stats was at the same time providing producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above.  These statements thus acted to conceal the true detail and nature of the Agri Stats reports from Plaintiff and the public in general.

247.   Similarly, Agri Stats repeatedly asserted in public that its reports did not disclose or identify any individual participant's data to any other participant and that each producer's data were kept confidential: "The fact that we collect a tremendous amount of data, and you'll see that throughout the presentation as we talk. I've got some demo examples of what we do.  Obviously, *no individual companies are identified or talked about*"; "We'll talk about comparison of data in a little bit, but *the main thing is that we want to preserve the confidentiality of individual companies*, so you'll hear that word a lot throughout the presentation. *I apologize but that's what*

---

[123] *Id.*

*we're all about"*; and "The confidentiality, *only your company is underlined; you don't know who anybody else is*."[124]   Contrary to these statements, however, the participants, including the Defendants and co-conspirators, were able to identify individual firm information in the Agri Stats reports.

248.   These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.  In other words, Agri Stats was stating publicly that it could not share information publicly and it did not provide any Producer's information to another because it was "confidential," but in private, Agri Stats knowingly and intentionally shared each pork integrator Defendant and co-conspirator's Competitively-Sensitive Information with the others.

249.



250.

251.

---

[124] *Id.* (emphasis added).



258.   Defendants also used announcements, marketing materials, and other customer communications to provide pretextual explanations for reduced supply and increased prices that would conceal their conspiracy.

259.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

260.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

261.   In 2012, Tyson's CEO insisted publicly that Tyson Foods "need[ed] to get our pricing improvements in order to get paid for those higher raw materials."  His statements indicate at the time that he understood customers would – in his words – "understand that these higher grain prices are going to require higher prices."

262. 

263.

264.

265. Defendants and co-conspirators' affirmative acts of concealment also included pretextual explanations for the industry's stability and improved profitability. For example, in June 2012, Larry Pope, Smithfield CEO, attributed his expectation for improved profitability to other reasons such as "good programs with our retailers" and "lower grain costs":

KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?

LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine.  I guess beyond that, you've got chicken and beef that are going to be down significantly.

BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[125]

266.   Defendants and co-conspirators also used trade associations and industry conferences as mechanisms for exchanging information under pretext of legitimacy.

267.   For example, ███████████████████████████████████████
████████████████████████████████████████

268.   █████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████

269.   █████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

---

[125] Q4 2012 Smithfield Foods Earnings Conference Call (June 14, 2012).



270. ███████████████████████████████████

271. ███████████████████████████████████

272.  In a likely effort to provide additional assurances to his competitors, Pope of Smithfield continue to speak publicly about the progress of Smithfield's efforts to reduce supply. On May 13, 2009 he reportedly stated at an industry conference that:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down.  We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.

273.  Following this public statement by Pope, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

274.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

275.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

276.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

277. █████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████

278. █████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████

279. █████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████

280. █████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████

281. █████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

282.   Defendants and co-conspirators also communicated in secret in order to coordinate their supply reductions and price increases, including by sending to competitors their future supply and pricing plans, communicating with each other under the guise of supply relationships, and instructing colleagues to conceal or delete evidence of their unlawful actions.

283.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

284.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

285.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

286. ██████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████████████████

287. ██████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
███

288. ██████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████

289. ██████████████████████████████
██████████████████████████████████
██████████████████████████████████
█████████

290. ██████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████████

291.  As alleged *supra* ¶¶ 208- ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

292.  ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

293.  ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

294.  ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

295.  ██████████████████████████████████████████

████████████████████████████████████████

296.  ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

297.

298.

299.

300.

301.



302.

303.

304.

305.

306.

307.   

308.   By virtue of the fraudulent concealment of their wrongful conduct by Defendants and co-conspirators, the running of any statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' and co-conspirators' unlawful conspiracy alleged in this Complaint under the injury discovery rule, fraudulent concealment doctrine, and/or doctrine of equitable estoppel.

309.   Further, Defendants' and co-conspirators' conspiracy and anticompetitive conduct, as alleged above, including their use of Agri Stats' reports and data, continued into and throughout the Relevant Period.

310.   Additionally, Plaintiff was a member of the direct purchaser class action complaint, as asserted against Defendants, including but not limited to, in *Maplevale v. Agri Stats, Inc. and John Gross and Co., Inc.*, No. 0:18-cv-01810-JRT-HB (Dkt. No. 1) (D. Minn. June 29, 2018).

311.   Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities, during the pendency of the direct purchaser class action asserted against Defendants, commencing at least as early as June 29, 2018.

## V.   ANTITRUST INJURY

312.   During the Relevant Period, Plaintiff purchased substantial amounts of pork from one or more Defendants or co-conspirators.

313.    As a direct and proximate result of Defendants' and co-conspirators' above-described illegal conduct, Plaintiff was compelled to pay, and did pay, artificially inflated prices for pork during the Relevant Period.

314.    As a direct and proximate consequence of Defendants' and co-conspirators' above-described illegal conduct, Plaintiff sustained substantial losses and damage to its business and property in the form of overcharges for pork.  The full amount and forms and components of such damages will be calculated after discovery, and presented upon proof at trial.

315.    Defendants' and co-conspirators' anticompetitive conduct had the following effects, among others:

> A.    Price competition has been restrained with respect to pork;
>
> B.    The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;
>
> C.    Plaintiff has paid artificially inflated pork prices as a result of Defendants' and co-conspirators' conduct.

316.    The purpose of the conspiratorial conduct of the Defendants and co-conspirators was to fix, raise, stabilize, or maintain the price of pork. As a direct and foreseeable result, Plaintiff paid supracompetitive prices for pork during the Relevant Period.

317.    By reason of the alleged violations of the antitrust laws, Plaintiff has sustained injury to its businesses or property, having paid higher prices for pork than it would have paid in the absence of Defendants' and co-conspirators' illegal contract, combination, or conspiracy and as a result have suffered damages.

318.    This is an antitrust injury of the type that the antitrust laws were meant to prohibit.

## VI.    CLAIMS FOR RELIEF AND CAUSES OF ACTION

319.    "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," and "the policy

unequivocally laid down by the Act is competition." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). "The Sherman Act adopted the term 'restraint of trade' along with its dynamic potential," and it "refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731-32 (1988); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The [Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victim of the forbidden practices by whomever they may be perpetrated.").

320.   Among the "quite different sorts of agreements in varying times and circumstances" that can violate the Sherman Act are coordination or collusion concerning output, exchanges of information about output and pricing, manipulation of pricing mechanisms or indexes, and rigging of bids. Count I alleges a violation of Section 1 of the Sherman Act. That violation was accomplished by various means, illustrated here, each of which unreasonably restrained trade—with the exact means to be established at trial, with the benefit of full discovery.

## COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT

321.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

322.   Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

323.   Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

324.   At least as early as January 1, 2008, and continuing until present, the exact dates being unknown to Plaintiff, Defendants entered into a continuing agreement, understanding and

conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

325.   Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by fixing, raising, stabilizing, or maintaining prices for pork throughout the United States.

326.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

327.   As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supracompetitive prices for pork.

328.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A.   Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

B.   Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C.   Plaintiff has directly purchased pork from Defendants, their divisions, subsidiaries, and affiliates have been deprived of the benefits of free and open competition in the purchase of pork.

329.   Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

330.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff has been injured in its business or property and will continue to be injured in its business and

property by paying more for pork than it would have paid and will pay in the absence of the conspiracy.

331.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

332.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

333.    Plaintiff recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

334.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

335.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

336.    Plaintiff recover its costs of suit, including reasonable attorneys' fees, as provided by law; and

337.    Plaintiff have such other and further relief as the case may require and the Court may deem just and proper.

## VIII.  JURY TRIAL DEMANDED

338.   Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: April 29, 2022

*/s/  Michael S. Mitchell*
Scott E. Gant
Michael S. Mitchell
Sarah L. Jones
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Tel: 202-237-2727
Fax: 202-237-6131
sgant@bsfllp.com
mmitchell@bsfllp.com

Colleen Harrison
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel: 914-749-8204
Fax: 914-749-8300
charrison@bsfllp.com

Ryan T. McAllister
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Tel: (518) 434-0600
rmcallister@bsfllp.com

*Counsel for Plaintiff Amory Investments LLC*