UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CHENEY BROTHERS, INC., | Case No.: 0:21-CV-01373-JRT-HB[1] |
| Plaintiff, | |
| | **MDL 2998** |
| v. | |
| | **[PUBLIC REDACTED VERSION]** |
| AGRI STATS, INC., CLEMENS FOOD GROUP, LLC, THE CLEMENS FAMILY CORPORATION, HORMEL FOODS CORPORATION, HORMEL FOODS, LLC, JBS USA FOOD COMPANY, SEABOARD FOODS LLC, SMITHFIELD FOODS, INC., TRIUMPH FOODS, LLC, TYSON FOODS, INC., TYSON PREPARED FOODS, INC., AND TYSON FRESH MEATS, INC., | |
| Defendants. | |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

---

[1] Transferred from the Southern District of Florida, Case No. 21-cv-80424, under 28 U.S.C. § 1407.

# Table of Contents

I.       NATURE OF ACTION ...................................................................................1

II.     JURISDICTION AND VENUE ....................................................................6

III.    PARTIES ......................................................................................................7

   A.  Plaintiff ...................................................................................................7

   B.  Defendants ..............................................................................................7

       1.    Agri Stats ......................................................................................7

       2.    Clemens ........................................................................................8

       3.    Hormel .........................................................................................8

       4.    JBS ...............................................................................................9

       5.    Seaboard ......................................................................................9

       6.    Smithfield .................................................................................10

       7.    Triumph .....................................................................................10

       8.    Tyson .........................................................................................11

   C.  Co-Conspirators...................................................................................11

IV.    FACTUAL ALLEGATIONS .....................................................................13

   A.  Agri Stats' central role in collusion in the Broiler industry............................13

   B.  Agri Stats markets its collusive scheme to Defendants. ..................................15

   C.  Agri Stats provided the other Defendants the unique ability to monitor pricing and production and discipline co-conspirators that did not comply with the anticompetitive agreement..............................................................................................17

   D.  Defendants and Co-Conspirators controlled the supply and production of pork in the United States, which allowed the scheme to succeed. ..........................................27

   E.  The level of concentration in the pork industry was optimal for Defendants' collusive scheme. ...................................................................................................32

   F.  The inelastic demand for, and homogeneity of, pork products facilitated collusion. .......37

   G.  Defendants took advantage of numerous opportunities to collude. ..................................38

   H.  Defendants implemented capacity and supply restraints during the Relevant Period.......46

   I.  Abnormal pricing during the Relevant Period demonstrates the success of the collusive scheme. ...................................................................................................80

   J.  Overcharges due to the cartel were reflected in higher pork prices than what they would have been absent the conspiratorial activity. ..........................................................84

   K.  The results of the DOJ's criminal investigation in the Broilers industry support an inference of the existence of a similar conspiracy in the pork industry..................................88

L.   Defendants actively concealed the conspiracy, and Plaintiff did not and could not have discovered Defendants' anticompetitive conduct ................................................................... 89

**V.**      ANTITRUST IMPACT .......................................................................................... 109

**VI.**     COUNT I:  VIOLATION OF SECTION 1 OF THE SHERMAN ACT ................... 110

**VII.**    REQUEST FOR RELIEF ...................................................................................... 111

**VIII.**   JURY TRIAL DEMANDED .................................................................................. 112

Pursuant to Fed. R. Civ. P. 15(a), Plaintiff Cheney Brothers, Inc. amends its Complaint as a matter of course and brings this action against the Defendants identified below, for their illegal conspiracy, which increased the prices of pork sold in the United States beginning at least as early as 2008 and continuing through the present. Plaintiff brings this action for treble damages and injunctive relief under Section 1 of the Sherman Act.

## I.    NATURE OF ACTION

1.      Defendants—other than Agri Stats—are the leading suppliers of pork in an industry with more than $20 billion in annual sales. The United States pork industry is highly concentrated, with a small number of large companies controlling supply. Together with their co-conspirators, Defendants collectively control approximately 80% of the wholesale pork market.

2.      Defendant Agri Stats, Inc. ("Agri Stats") is a specialized information-sharing service that, among other things, obtains data from participating industry producers and develops comprehensive reports based on that data. Agri Stats provides its reports and findings to the participating industry producers.

3.      Defendants Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"); Hormel Foods Corporation and Hormel Foods, LLC ("Hormel"); JBS USA Food Company ("JBS"); Seaboard Foods LLC ("Seaboard"); Smithfield Foods, Inc. ("Smithfield"); Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson") (collectively referred to at times as "pork integrator Defendants" or "pork producers") and Agri Stats entered into a conspiracy beginning in at least 2008 and continuing through the present (the "Relevant Period") to fix, raise, maintain, and stabilize the price of pork.[2] Defendants implemented their conspiracy by, among other things, coordinating

_____

[2] For purposes of this complaint, "pork" includes all pork products, regardless of the form in which they are sold, and all products containing pig meat, whether purchased fresh or frozen, including

with each other to restrict output and limit production, with the intended purpose and expected result of increasing and stabilizing pork prices in the United States. In furtherance of the conspiracy, Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume, and demand, including through their co-conspirator, Defendant Agri Stats.

4.     Defendants and their co-conspirators' anticompetitive coordination to restrict the pork supply and increase prices of pork sold to Plaintiff and others occurred in several ways.

5.      Beginning in 2008, as the pork integrator Defendants' profitability deteriorated in the midst of a global recession, Smithfield initiated efforts between Defendants to conspire through their mutual trade associations and industry groups to achieve a coordinated reduction in the domestic supply of pork.

6.     The pork integrator Defendants also conspired with companies that provided services to the pork industry but did not produce or sell pork, such as Agri Stats (a data benchmarking firm) and AG Star, a financial services company now known as Compeer that specialized in loans to pork producers).

7.     Beginning in 2008, the CEO of Smithfield attended a trade association meeting with other Defendants in which he announced Smithfield's plans to reduce its pork supply and urged others to follow.  Although Defendants recognized that a reduction in the supply of pork was necessary to achieve their desired levels of profitability, the other major producers were hesitant about reducing their supply without some mechanism to prevent smaller independent producers from increasing their own supply of pork in response to a coordinated reduction by

_____

but not limited to smoked ham, sausage, and bacon.  In this complaint, "pork" and "swine" are often used interchangeably.

2

Defendants.  To address this issue, Smithfield's CEO enlisted the help of AgStar's VP responsible for lending to pork producers.  After discussions with Smithfield's CEO, AgStar agreed to aid Defendants' efforts to reduce the domestic supply of pork by putting financial pressure on smaller producers to reduce production, provided that the pork integrator Defendants lead the initiative and announce their own production cuts publicly.  As detailed in this Complaint, between early 2008 and late 2009, Defendants met numerous times through trade associations and other industry groups, which allowed them to coordinate their unlawful agreement to reduce the supply of pork. And although the pork integrator Defendants announced their supply reductions publicly, their coordination allowed each Defendant to justify its own supply reduction as a natural outcome of the economic conditions facing the industry.  However, this was untrue. As detailed in this Complaint, Defendants recognized internally that it was in each producer's independent self-interest to produce as much pork as it could. Accordingly, the supply reductions were not justified by input costs or other economic factors. Instead, the cuts were based on an understanding that all major producers would implement similar supply reductions and that Compeer would pressure smaller producers to cut supply by cutting off funding to those that did not comply.  This allowed the pork integrator Defendants to reduce their supply through a collusive agreement or understanding that was reached in secret and then concealed from the public.

8.     By late 2009, this plan succeeded, as the pork industry cut its supply by approximately 6.4%, primarily through the liquidation of sow herds (female pigs used for breeding).  With this structural reduction in the supply of pork, Defendants were able to monitor their conspiracy through Defendant Agri Stats.

9.     During the conspiracy, Agri Stats began providing highly sensitive benchmarking reports to the pork integrator Defendants. Benchmarking allows competitors to compare their

3

profits or performance against that of other companies. However, Agri Stats reports are unlike those of other lawful industry reports. Agri Stats gathers detailed financial and production data from each of the pork integrator Defendants and their Co-Conspirators, standardizes this information, and produces customized reports and graphs for the conspirators. The type of information available in these reports is not the type of information that competitors would provide to one another in a normal, competitive market.

10.     Agri Stats collected the pork integrator Defendants' competitively sensitive supply and pricing data and intentionally shared that information through the detailed reports it provided them. On at least a monthly basis, and often far more frequently (*e.g.,* weekly or every other week), Agri Stats provides the pork integrator Defendants with current and forward-looking sensitive information (such as profits, costs, prices, and slaughter information), and regularly provides the keys to deciphering which data belongs to which participant. The effect of this information exchange allowed Defendants to coordinate their anticompetitive conduct, monitor each other's production, and thereby control pork supply and price in furtherance of their anticompetitive scheme.

11.     The data exchanged through Agri Stats is a classic enforcement and implementation mechanism of a price-fixing scheme. First, the data is current and forward-looking, which courts have consistently held has "the greatest potential for generating anti-competitive effects."[3] Second, the information contained in Agri Stats reports is specific to pork producers, including information on profits, prices, costs, and production levels—instead of being aggregated as industry averages, which provides transactional specificity and the easy identification of individual producers. Third,

---

[3] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

none of the Agri Stats information was publicly available. Agri Stats is a subscription service that required the pork integrator Defendants and the Co-Conspirators to pay millions of dollars over the Relevant Period—far in excess of any other pricing and production indices. Agri Stats ensured that its detailed, sensitive business information was available only to the pork integrator Defendants and the Co-Conspirators and not to any buyers in the market. Defendants utilized the information exchanged through Agri Stats in furtherance of their conspiracy to fix, raise, stabilize, and maintain artificially inflated prices for pork sold in the United States.

12.     While Defendants went to great lengths to keep the existence of the conspiracy a secret, they admitted in public calls that they had discussed production cuts at least once and publicly signaled to each other that no supply increases would happen. Furthermore, each Defendant engaged in acts in furtherance of the conspiracy by participating in such supply cuts and by limiting increases in supply that would not have otherwise occurred.

13.     In addition, there are numerous "plus factors" in the pork industry during the Relevant Period, including, but not limited to, multiple industry characteristics that facilitate collusion, such as vertically integrated operations, high barriers to entry preventing competitors from coming into the market, high pork industry consolidation and concentration, inelastic supply and demand, and homogeneity of pork products (within each cut type).

14.     Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices for Plaintiff. Beginning in or around 2009, the pork integrator Defendants' earnings began to increase, as they took an increasing amount of the profits available in the pork industry. As a result of Defendants' unlawful conduct, Plaintiff paid artificially inflated prices for pork during the Relevant Period. Such prices exceeded the amount it would have paid if the price

for pork had been determined by a competitive market. Thus, Plaintiff was injured by Defendants' anticompetitive conduct.

## II.     JURISDICTION AND VENUE

15.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26.

17.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 & 26 and 28 U.S.C. § 1391(b), (c) & (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, or because a substantial portion of the affected interstate commerce described herein was carried out in this District.

18.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

19.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

### III.    PARTIES

#### A.    <u>Plaintiff</u>

20.    Plaintiff Cheney Brothers, Inc. ("Plaintiff") or ("Cheney") is a Florida corporation with its principal place of business in Riviera Beach, Florida. Cheney brings this action on its own behalf, and on behalf of its affiliates, including its predecessors and subsidiaries, who purchased pork directly from one or more Defendants during the Relevant Period, and suffered antitrust injury as a result of the violations alleged in this Complaint.

#### B.    <u>Defendants</u>

##### 1.    Agri Stats

21.    Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and from 2013 until 2018, was a subsidiary of Eli Lilly & Co.  Agri Stats is now a wholly owned subsidiary of Agri Stats Omega Holding Co. LP, a limited partnership based in Indiana.  Throughout the Relevant Period, Agri Stats acted as a co-conspirator and has knowingly played an important and active role as participant in, and a facilitator of, Defendants' collusive scheme detailed in this Complaint. Agri Stats has a unique and deep relationship with the pork industry generally, and specifically with each of the Defendants identified below, all of which are Agri Stats' primary customers. Defendants Clemens, Hormel, JBS USA, Seaboard, Triumph, Smithfield and Tyson, and Co-Conspirator Indiana Packers, are all Agri Stats subscribers and report a wide variety of information to Agri Stats.

22.    All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of

7

their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the United States, including in this District.

### 2.    Clemens

23.    Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania. During the Relevant Period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

24.    The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania and the parent company of Clemens Food Group, LLC. During the Relevant Period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

25.    The Clemens Food Group, LLC and the Clemens Family Corporation are referred to here collectively as "Clemens." Clemens reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### 3.    Hormel

26.    Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota. During the Relevant Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC,

sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

27.     Hormel Foods, LLC is a Minnesota corporation headquartered in Austin, Minnesota. Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation. During the Relevant Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

28.     Hormel Foods, LLC and Hormel Foods Corporation are referred to here collectively as "Hormel." Hormel reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### 4.     JBS

29.     JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5% controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork. During the Relevant Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

### 5.     Seaboard

30.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee

9

Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation. During the Relevant Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, including without limitation Daily Foods, Inc., John R. Daily, Inc., and any other subsidiary doing business as Daily's Premium Meats and/or Daily's through July 10, 2014, or affiliates, including Daily's Premium Meats and Seaboard Triumph Foods, LLC, sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District. Seaboard reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### 6. Smithfield

31.     Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company. Smithfield Foods is headquartered in Smithfield, Virginia, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork. During the Relevant Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

### 7. Triumph

32.     Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork. During the Relevant Period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled

subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States, including in this District.

### 8.    Tyson

33.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Relevant Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

34.    Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly owned subsidiary of Tyson Foods, Inc. During the Relevant Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

35.    Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly owned subsidiary of Tyson Foods, Inc. During the Relevant Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

36.    Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc. and Tyson Foods, Inc. are referred to here collectively as "Tyson." Tyson reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### C.    Co-Conspirators

37.    Co-Conspirator Indiana Packers Corporation is an Indiana corporation headquartered in Delphi, Indiana, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of

pork.  During the Relevant Period, Indiana Packers Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.  Indiana Packers Corporation's parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and Mitsubishi Corporation (Americas).

38.     Co-Conspirator Daily's Premium Meats, LLC is a Delaware limited liability company headquartered in Kansas City, Missouri.  During the Relevant Period, Daily's Premium Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States.  During the Relevant Period until July 10, 2014, Daily's Premium Meats was wholly owned by Defendant, Seaboard. Beginning on or about September 27, 2014, and continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50% interest in Daily's Premium Meats.

39.     Co-Conspirator Seaboard Triumph Foods, LLC is a Delaware limited liability company headquartered in Sioux City, Iowa. It is a joint venture between Seaboard Foods and Triumph Foods.  During the Relevant Period, Seaboard Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States. Beginning on or about May 13, 2015, and continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50% interest in Seaboard Triumph Foods.

40.     Various other persons, firms, and corporations not named as defendants have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this

complaint.  Throughout this Complaint, Indiana Packers Corporation, Daily's Premium Meats, Seaboard Triumph Foods, and the other persons, firms, and corporations not named as defendants that performed acts and made statements in furtherance of the conspiracy are collectively referred to as "Co-Conspirators."

## IV.   FACTUAL ALLEGATIONS

41.   Beginning in 2008 and continuing to the present, Defendants conspired to fix, raise, maintain and stabilize pork prices. To effectuate, maintain, and enforce their agreement, the pork integrator Defendants relied on a specialized industry data sharing service provided by Agri Stats, which served a critical role in Defendants' price-fixing scheme. Defendant Agri Stats provided a means for the pork integrator Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of Defendants' price-fixing scheme, resulting in a stable and successful anticompetitive cartel.

### A.   Agri Stats' central role in collusion in the Broiler industry.

42.   Agri Stats has played a central role in collusion in other industries, including the Broiler chicken ("Broiler") industry. As alleged in several Complaints in *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.), the defendants in that action used Agri Stats to facilitate their conspiracy to restrain production and inflate prices of Broilers.

43.   Specifically, Agri Stats collected and disseminated to the defendants disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, and sales data by finished product form and type, amongst other competitively sensitive business information. Agri Stats also provided detailed price reports to the Broiler industry through its subsidiary, Express Markets, Inc. ("EMI"). Agri Stats reports contained line-by-line entries for plants, lines, and yields of various Broiler

facilities. Agri Stats relied upon (and the Defendants agreed to) a detailed audit process to verify the accuracy of data from each Broiler producer's facilities, sometimes directly contacting co-conspirators to verify the data. Agri Stats collected data from the Broiler producers on a weekly basis and provided its reports to Broiler producers on a weekly and monthly basis.

44.    The detail of these reports ensured that the Broiler producers could decode the information of their competitors. The *Broiler* complaints allege it was common knowledge among Broiler producers that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual Broiler complexes and facilities. The Broiler reports, in parts, contained so few producers participating that the identities were obvious to the other producers. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for large Broiler producers. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

45.    In *Broilers*, plaintiffs also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did.  Agri Stats' own statements in the Broiler industry facilitated implementation of the agreement to restrict supply.

46.    At the same time, Broiler producers relied on the purportedly "anonymous" nature of the reports to hide their conspiracy from the public.  For example, plaintiffs in the *Broiler* complaints allege that Sanderson Farms CEO Joe Sanderson claimed, "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data

to.  Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."

47.     In denying defendants' motions to dismiss in *In re Broiler Chicken Antitrust Litigation*, the district court noted that, given the nature of the Agri Stats reports, the co-conspirators were sharing future anticipated production information with each other, which raised significant antitrust concerns.[4]

**B.     Agri Stats markets its collusive scheme to Defendants.**

48.     Beginning in at least 2008 or before, Agri Stats began to propose a series of benchmarks to the pork integrator Defendants similar to the benchmarks used to restrain competition in the Broiler industry. Benchmarking is the act of comparing practices, methods or performance against those of other companies.[5] Benchmarking of the type undertaken by Agri Stats and the pork integrator Defendants reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive and typically proprietary information among competitors.

49.     In 2008, Greg Bilbrey of Agri Stats wrote in the *Advances in Pork Production Journal*, benchmarking in the swine industry "could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. *Each and every commercial swine operation is encouraged to participate in some benchmarking effort*."[6]

---

[4] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 784 (N.D. Ill. 2017).
[5] *Antitrust Issues Related to Benchmarking and Other Information Exchanges*, Federal Trade Commission (May 3, 2011), available at https://www.ftc.gov/public-statements/2011/05/antitrust-issues-related-benchmarking-and-other-information-exchanges.
[6] Greg Bilbrey, *Benchmarking and Cost—Production Relationships*, 19 Advances in Pork Production Journal 43 (2008) (emphasis added).

50.     Agri Stats emphasized to pork producers that the goal of the agreement to share information was profitability, not production, and invited them again to participate in the benchmarking: "We must remember that the ***ultimate goal is increasing profitability***—not always increasing the level of production." Finally, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. ***To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program.***"[7]

51.     In April 2009, Agri Stats again invited pork producers to design and operate their own benchmarking efforts. Thus, Greg Bilbrey of Agri Stats wrote: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort***."[8] Defendants accepted this invitation and, beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports. Their agreement was to use the exchanged benchmarking information to coordinate supply and stabilize, as well as increase, prices of pork sold in the United States; provide and receive information from Agri Stats; and use this detailed sensitive information to monitor each other's production and pricing. The agreement was successful, as pork prices rose significantly after the agreement was reached.

52.     Each pork integrator Defendant identified specific executives that were responsible for transmitting data to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export, or production levels.

---

[7] *Id.* at 41–46 (emphasis added).
[8] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference—Tools of the Trade (Apr. 1–2, 2009) (emphasis added).

- Clemens: Joshua Rennels (Treasurer, Clemens Food Group)

- Hormel: Paul Bogle (Director, Cost Accounting)

- JBS: Garry Albright (Head of Business Analysis), Kevin Arnold (Head of Finance), Jamie Fosbery (Analyst), Raven Goodlow (Business Analyst), Robbie Kearns (Business Analyst), Lisa Peters (Business Analyst), Eli Zoske (Cost Accountant)

- Seaboard: Damon Ginther (Senior Director of Business Data & Analytics), Mel Davis (Vice President of Hog Procurement and Bio-Energy, Tom Dye (Operations Controller)

- Smithfield: Aimee Ward (Director, Hog Finance), Kent Hilbrands (Sr. Director, Operations Finance), Elizabeth Barger (Data Analyst)

- Triumph: Matt England (Chief Integrated Business Strategy Officer), Ken Grannas (Director Inventory/Reporting), Tom French (Director, Margin Management), Joe Diebold (Chief Financial Officer), Dan Marlow (Corporate Controller)

- Tyson: Deb McConnell (Division Controller)

53.     The volume of U.S. commerce in the pork industry is enormous. Total pork sales in the United States for a portion of the Relevant Period were:

> 2016 - $18.9 billion
> 2015 - $21.0 billion
> 2014 - $26.4 billion
> 2013 - $23.4 billion

54.     Each pork integrator Defendant's annual sales of pork products is also very large. For example, in 2016, Smithfield reported $3.7 billion of fresh pork sales and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such sizeable revenues, the ability to stabilize or increase the margin, even in small amounts, has a significant impact on profits.

### C.     Agri Stats provided the other Defendants the unique ability to monitor pricing and production and discipline co-conspirators that did not comply with the anticompetitive agreement.

55.     Agri Stats provided pork integrator Defendants with an unparalleled ability to share critical, proprietary, and commercially sensitive information concerning key business metrics,

such as production levels and short and long-term production capacity. Agri Stats was central and critical to the formation, operation, and continuing stability of the Defendants' anticompetitive scheme. To effectuate their agreement, the participants had to have confidence that each member was following through with the agreement by limiting its production and stabilizing prices. Agri Stats served that function.

56.     Each pork integrator member of the conspiracy, including Defendants Clemens, Hormel, JBS, Seaboard, Smithfield, Triumph, and Tyson was an Agri Stats subscriber and reported its information to Agri Stats. Agri Stats' then parent company, Eli Lilly, stated during a 2016 earnings call that "*over 90% of the poultry and pig market*" uses Agri Stats in the United States.[9]

57.     Agri Stats collects commercially sensitive financial and production data from the pork integrator Defendants, audits and verifies the data, and ultimately reports back to, the pork integrator Defendants detailed statistics on nearly every operating metric within the industry. Agri Stats' survey methodology involves - from and to the pork integrator Defendants - direct electronic data submissions of financial, production, hog placement, size and weaning age, capacity, cost, and numerous other categories of information by each pork producer on a weekly and monthly basis. At each of the pork integrator Defendants' pork facilities, certain employees, typically in the accounting department, are responsible for regularly submitting the data to Agri Stats. Agri Stats uses a detailed audit process to verify the accuracy of data from each producer, often directly contacting the pork integrator Defendants to verify data before issuing reports to Agri Stats subscribers.

---

[9] Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016) (emphasis added).

58.     Unlike traditional "benchmark" services which rely upon unaudited and aggregated publicly available data, Agri Stats obtains audited data directly from the participating producers. When a producer joins Agri Stats, Agri Stats employees help the producer learn, set up, audit, and prepare the producer to submit its data each month.  When the producer submits its data to Agri Stats, Agri Stats then enters the data into its system and ensures that the data is in a format that allows participants to make "apples to apples" comparisons with competitors.

59.     The pork integrator Defendants received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25%, and the top five companies. Current month, previous quarter, and previous twelve-month periods are reported. As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, and Profit and Sales.[10] Participants may also have received an abbreviated Key Performance Indicator report, as well as historical graphs.[11]

60.     Due to a hog's life and production cycle, even current and historical information regarding hog production numbers provides forward-looking supply information to competitors. The typical hog production cycle lasts about 4 years, in large part due to a hog's biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and raise the resulting crop of piglets, it takes nearly 2 years to substantially increase production.

61.     Upon information and belief, one presentation from Agri Stats below shows the level of detail provided to competitors regarding profits in the pork market.[12]

---

[10] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 7.
[11] Greg Bilbrey, *Benchmarking and Cost-Production Relationships*, *supra* note 5.
[12] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 35,001,089 Pigs Finished | | | | | | | | | | | | |
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 30,785,319 Pigs finished | | | | | | | | | | | | |
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |
| 22,306,500 Pigs finished | | | | | | | | | | | | |

62.     The purpose of the reports was to improve the pork integrator Defendants' and their Co-Conspirators' profitability by enabling them to restrict output and raise prices. The Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even more detail.  On information and belief, the same presentation informed the pork integrator Defendants about each of the "Advantages for Top 25% in Profit", underscoring that the purpose of these reports was not to allow customers to save more money through lower prices and more efficient production—in fact, the opposite was true; the purpose was to increase the pork integrator Defendants' profitability, and the result was higher prices for pork purchasers, like Plaintiff.

63.     A Special Report from the Banff Pork Seminar 2011 featured another presentation by Greg Bilbrey of Agri Stats and Tom Stein of MetaFarms who "showed producers at the 2011

Banff Pork Seminar that better records mean better financial performance."[13] The report explained that the Agri Stats benchmarking process requires producers to supply all of their production records and all financial records so that benchmarking results can be tied back to general ledger cost data. Mr. Bilbrey further explained the importance of the Agri Stats reports in increasing profitability. "This past 12 months top producers had about a $20 difference in profit, $11 a head lower cost and about $9 a head advantage in sales, the price they got for their pigs."[14]

64.     Much of the information shared by Agri Stats and the pork integrator Defendants was not necessary to achieve any benefits for their customers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.[15] In fact, in a truly competitive market, the participants would closely protect such proprietary information from disclosure, as providing it to competitors would be disadvantageous—unless, of course, there is an agreement that the competitors will use the information to the joint benefit of each other, as was the situation in the pork industry.

65.     Agri Stats knew that it played a central role in this conspiracy. It generated confidential industry data considerably more detailed than any similar types of available reports. Agri Stats repeatedly touted its role in standardizing the costs across companies, allowing the companies to compare the "apples to apples" of its data analysis among competitors. In one presentation, Agri Stats specifically addressed this issue, pointing out to industry participants that

---

[13] *Tough Years in Pork Business Show Benefits of Benchmarking, Recordkeeping*, Inside BPS (Jan. 25, 2011), available at http://www.meristem.com/meeting/bps_2011-inside_bps.htm#15.
[14] *Id.*
[15] *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law Organization for Economic Cooperation and Development*, (Oct. 21, 2010) at 6, available at https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data:[16]



66.     Agri Stats stated that, to ensure data contained in the reports was accurate, the participants had to "[a]gree on calculation and data collection procedures". They also had to "[d]etermine *tolerance and outlier status and enforce*," and must "[h]ave an administrator to compile the data and enforce procedures". Most importantly, "*[e]ach participant has to commit*."[17]

67.     In addition, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis.[18] The information provided by Agri Stats was so detailed that clients frequently requested site visits by Agri Stats employees to assist the pork integrator Defendants and Co-Conspirators in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by

---

[16] Greg Bilbrey, *Data Integrity*, Slideshare.net (Sept. 21, 2015), available at https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations.

[17] *Id.* (emphases added).

[18] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 7.

their insights was as important to the producers as the data in the reports. The fee for the visits fluctuated based on size and other factors.

68.     Throughout the Relevant Period, Agri Stats executives and account managers fanned out across the pork-producing regions of the country to meet with their clients and co-conspirators, the pork integrator Defendants and Co-Conspirators. Because Agri Stats travels and presents among pork integrator Defendants regularly, discussing each pork integrator Defendant's non-public, proprietary data, Agri Stats is in a unique position to share information among pork integrator Defendants at these regular meetings.

69.     A common saying by Agri Stats is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "*the ultimate goal is increasing profitability*—not simply increasing level of production."[19]

70.     In May 2015, a subsidiary of Agri Stats, EMI announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. EMI had provided its extensive pricing reports to Broiler producers since 2003.[20]

71.     Among EMI's offered services are "Poultry Market Forecasts" which are not actually limited to the poultry market.  As described on its website:

> EMI's economists construct industry forecasts and provide detailed commentaries which benefit our clients with market visibility.  This forward-looking analysis can be utilized for a multitude of pricing and planning purposes.  Forecasts include, but are not limited to:  production, supply, prices, feed ingredients, industry cost and returns, exports, and international trade.  Beef and pork perspectives are presented in relation to their impact on the poultry industry.  Monthly webcasts are held to discuss developing issues affecting the market.  Talking points include feed

---

[19] *Id.* (emphasis added).
[20] Steve Meyer, *Paragon Economics Sold to Express Markets*, National Hog Farmer (May 26, 2015), available at https://www.nationalhogfarmer.com/marketing/paragon-economics-sold-express-markets.

ingredients, broiler cost and returns, broiler markets, broiler production, turkey production and price, international trade, and outlooks on beef and pork.

72.     By providing detailed production statistics by participants, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits. Critically, Agri Stats provided forward-looking data that allowed the other Defendants to determine each other's future production in addition to their current production.

73.     Agri Stats reports are organized by company and facility, but the names are not listed in the reports. While ostensibly anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that participants can accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as general metrics and size. Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers.

74.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there also were markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, although the number representing each competitor was not revealed.

75.     Agri Stats mailed these reports to their customers. On occasion, Agri Stats shipped a participant's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which—as noted above—revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

76.     Mobility within the meat production industries led to a situation where many workers at most pork integrator operations knew the numbers of other regional facilities, removing any anonymization of the data that existed. Agri Stats would hire industry participants to work in its offices, and then they would return to the industry, knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats were aware of this fact but did nothing to address it.

77.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power. Price-fixing or output-restricting cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example, by ramping up pork production to capture higher prices as other cartel members act to limit production. Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures for signs of cheating.

78.     Agri Stats has also played a similar role in the Broilers industry and has been named as a defendant in dozens of civil suits alleging its active participation in a price-fixing and production-restriction conspiracy akin to that alleged in this Complaint, In denying defendants' motions to dismiss in the Broiler Chicken litigation pending in the Northern District of Illinois, the district court noted that, given the nature of the Agri Stats reports in that market, the defendants were in fact sharing future anticipated production information with one another, which raises significant antitrust concerns.

79.     A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors ... are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company ... started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

80.     In a February 15, 2017 Bloomberg article relating to Agri Stats' roles in the Broiler industry, it was reported:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "***That is what creates stability for a cartel***."[21]

---

[21] Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg (Feb. 15, 2017), available at https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged (emphasis added).

**D.**    **Defendants and Co-Conspirators controlled the supply and production of pork in the United States, which allowed the scheme to succeed.**

81.    The Relevant Period was further characterized by the increased control over the breeding, production, growing, and processing of pork by the pork integrator Defendants through vertical integration (pork packers have tight contractual relationships with hog producers throughout all stages of production) and the exclusive production contracts with hog farmers.

82.    Vertical integration is so pervasive that Defendants and co-conspirators – other than Agri Stats – are commonly called pork or swine integrators by the industry, government, analysts, and academics. Vertical integration allows the pork integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter. Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

83.    Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."[22] This arrangement essentially converts independent farmers into contract employees that perform services for the Defendants. The pork integrator Defendants typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities. The pork integrator Defendants typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market. The prevalence and use of contracts for hog production by the pork integrator Defendants increased significantly during the course of the

---

[22] Allen Harper, *Hog Production Contracts: The Grower-Integrator Relationship*, Virginia Cooperative, Virginia Cooperative Extension (2009).

conspiracy. By 2017, it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency as far as bid prices.

84.     Pork production generally starts at the farrowing stage—which is the term used to describe a female hog giving birth. Female hogs used in the farrowing stage are called sows. Sows will normally have anywhere from 11 to 13 pigs per litter. With a sow typically being able to farrow up to three times a year, one sow can have around 36 piglets in one year. After birth, piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig weighs upwards of 50 pounds. At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds. After the pigs reach their final weight, they are sent to a packing plant to be harvested. Due to the nature of the pork production cycle, the reduction of sows—i.e., farrowing hogs—has a significant impact on the supply of pork.

85.     The following diagram shows the path for pork raised for meat consumption from birth through sale to entities such as Plaintiff:

**Figure 1: Value Chain of U.S. Pork Market**



86.     Under economic theory, vertical integration can have anticompetitive effects because there are fewer firms competing at all levels, which renders it easier to collude on price.

87.     During the Relevant Period, Defendant Smithfield had the distinction of being the largest producer and processer of pork in the United States. In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. [23] Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract

---

[23] WH Group Limited Annual Report, at 27 (2014).

farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.[24]

88.     In 2009, Seaboard Corporation, the parent company of Seaboard, reported that Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers.[25] In its parent company Seaboard Corporation's 2017 SEC 10-K report, it was reported that Seaboard raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts."[26]

89.     Defendant Clemens touts its vertical coordination on its website stating that, "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."[27] A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.[28]

90.     As JBS stated in its 2014 annual report, "The meat production of JBS Foods is vertically integrated, whereby the company produces 100% of its poultry supply and 95% of its pork supply. This provides it with greater control over the health and nutrition conditions of the animals, insuring quality, food safety and efficiency in the production and cost of its products."[29] Furthermore, a key aspect of Defendant JBS's purchase of its predecessor in interest, Cargill, in

---

[24] *Id.*
[25] Seaboard Corp. Annual Report, at 10 (2009).
[26] Seaboard Corp. 10-K Annual Report, at 2 (2017).
[27] *See* Clemens Food Group, Vertically Integrated Purposefully Coordinated, available at https://clemensfoodgroup.com/our-company/vertically-coordinated.
[28] *See id.*; *see also* The Clemens Family Corporation Companies, available at http://www.clemensfamilycorp.com/pages/companies.aspx.
[29] JBS Annual and Sustainability Report 2014, at 69.

30

2015 was that it allowed JBS to exercise greater control over the production of hogs by acquiring four hog farms and two packing plants operated by Cargill.

91.     Defendant Triumph was created with vertical integration in mind, as it is owned by five of the largest pork producers in the U.S.—Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota. The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

92.     As Defendant Tyson stated in its 2009 10-K Report, "The majority of our live hog supply is obtained through various procurement relationships with independent producers."[30] Additionally, Tyson raises a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

93.     Defendant Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities. As Hormel stated in its 2009 annual report, "The live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."[31] Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term," accounting for 93% of the hogs purchased by Hormel in 2009.[32]

94.     Co-Conspirator Indiana Packers' website notes that it is "a fully integrated pork company operating entirely within the heart of the Midwest," and heralds the company's "pork-exclusive expertise and vertically integrated operation."

---

[30] Tyson Corp. 10-K Annual Report, at 4 (2009).
[31] *See* Hormel Foods Corp. Annual Report, at 32 (2009).
[32] *Id.*

95.     Each of the pork integrator Defendants further control the manner in which the pork is processed and have the ability to restrict and reduce supply through a number of means, including capacity reductions, controlling slaughter rates, and exports. Defendants, including Smithfield, Clemens, Tyson, Hormel, Seaboard, Triumph, and JBS, and Co-Conspirators, sell packaged pork directly or through affiliates under various brand or trade names.

**E.      The level of concentration in the pork industry was optimal for Defendants' collusive scheme.**

96.     The United States Department of Agriculture ("USDA") has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."[33]

97.     The hog integration sector is horizontally concentrated (as only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated, as was discussed in the previous section. Meatpacking concentration levels are among the highest of any industry in the United States and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

98.     Prior to and in the beginning of the Relevant Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share. Between 1988 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34% in 1988 to just under 70% by 2015. As shown in Figure 2 below, the top eight integrators had market share of well over 80% for the entire Relevant Period:

---

[33] John King, *Concentration and Technology in Agricultural Input Industries*, USDA, at 2 (Mar. 2001), available at https://www.ers.usda.gov/webdocs/publications/42325/31960_aib763_002.pdf?v=9626.9.

**Figure 2: Market Share of Top 8 Pork Integrators, 1991–2017**



99.    In July 2015, JBS announced it would acquire Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson, and JBS became the second largest hog processor in the United States, behind only Smithfield. As noted above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and two packing plants operated by Cargill.

100.    The acquisition was completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week.[34] After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under 5% of the national slaughter capacity).[35]

---

[34] *See* Notice to Market: JBS Concludes Cargill Pork Acquisition (Oct. 30, 2015), available at https://jbssa.com/about/news/2015/10-30/#.X8ZpZ2hKiUk.
[35] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), at 4, available at https://inmotionmagazine.com/ra15/JBS-CargillWhitePaper.pdf.

101.    By 2016, the top six pork processors comprised 82% of the total market. On their own, it would be difficult for any of these supposed competitors to exercise market power. But acting as a whole to manipulate the price of pork products, the combined market share of the six largest pork integrator Defendants translates into an HHI[36] of 6724 (without taking into account the other pork processors comprising the other 18% of the market), which is well above the threshold for highly-concentrated markets.

102.    In other words, if Defendants colluded with one another to restrict the supply of pork in the market, as alleged herein, the resulting market concentration of such concerted action gave them more than sufficient power to control the pork market. Even without combining the largest six pork integrator Defendants, the pork industry has a "moderately concentrated" HHI of 1532.

**Figure 3: 2016 Pork Processing Market Shares[37]**

| Company | Share | HHI - Independent | HHI - Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | 6724 |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | |
| Others | 18% | 18 | 18 |
| | | | |
| **Total** | **100%** | **1532** | **6742** |

---

[36] "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice. *See* https://www.justice.gov/atr/herfindahl-hirschman-index. An HHI value of 1,500 to 2,500 suggests a market is moderately concentrated. An HHI in excess of 2,500 points suggests a market is highly concentrated.

[37] Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (Mar. 7, 2017).

103.     The concentration level in the pork integration industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated." [38] Both of these factors—maturity and concentration—make an industry more susceptible to collusion.

104.     The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a handful of integrators, it was feasible to manipulate prices through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because the largest integrators were incapable of independently controlling prices on their own, such an agreement was necessary to inflate prices.

105.     Concentration of the industry is also beneficial to the procurement of hogs by the pork processors. In some regions, consolidation has resulted in cases where only one pork processor is left to buy hogs from independent farmers, leaving the farmers with no leverage when negotiating terms with the pork processors.[39]

106.     In addition to market concentration, market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy. The following chart shows not only that the pork integrator Defendants' collective share of the market was high throughout the Relevant Period, but also that each individual pork integrator Defendant's market share was largely stable throughout:

---

[38] WH Group Interim Report, at 5 (2017).
[39] Timothy A. Wise & Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (Aug. 2010), at 3, 11.

**Figure 4: Market Concentration and Market Share Stability—
U.S. Market Share by Hog Slaughter Capacity**



107.    Large barriers to entry kept potential competitors out of the pork integration industry. New entry into pork processing is costly and time consuming. In order to slaughter and process hogs on an industrial scale, a slaughtering plant needs to be constructed. The cost to design and build a 140,000 square foot plant with industry-standing packing equipment and a slaughter capacity of 2,500 hogs a day is estimated at $33 million. Construction of a large-scale slaughter facility would therefore take tens if not hundreds of millions of dollars and the additional planning, design, and permitting costs are substantial. In 2012, it cost Cargill $25 million just to expand an existing facility.[40] Building a facility from scratch would be considerably more, totaling hundreds of millions of dollars.[41]

108.    The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the

---

[40] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition*, *supra* note 39, at 7.
[41] *Id.*

pork integrator Defendants. And in other situations, the processor owns the hog from farrow to finish. Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably.[42]

### F. The inelastic demand for, and homogeneity of, pork products facilitated collusion.

109.     Markets with highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[43] A PED value between 0 and -1 indicates there is inelastic demand for the good or service, i.e., a 1% increase in price induces a less than 1% decrease in quantity demanded.  The average PED estimate for the pork market was -0.64—meaning the demand for pork is inelastic.

110.     Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loin, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets. For example, as alleged above, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar nutritional values, branding, and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.[44] The

---

[42] Timothy A. Wise & Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (Aug. 2010), at 12.

[43] *See, e.g.*, Jeffrey M. Perloff, *Microeconomics with Calculus*, 28–31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), available at https://scholar. harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66–78 (2005).

[44] *See Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, The United States Department of Justice, available at https:// www.justice.gov/sites/default/files/atr/legacy/2013/01/31/disaster_primer.pdf

Pork Checkoff program (explained in further detail below), administered by the National Pork Board established by Congress, has stated that "U.S. pork production and pig prices vary in a predictable manner during the calendar year."

**G.    Defendants took advantage of numerous opportunities to collude.**

111.    Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct. Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

112.    All pork producers and importers in the United States participate in a legislatively-mandated "Pork Checkoff," under which they pay an assessment when pigs are sold or pigs are imported into the United States. The money is used for programs to increase pork sales and exports, for research, and for producer and consumer education programs; funds cannot be used for lobbying or to influence government policy. The assessment amount and the amount to be returned to state pork associations for local programs is set annually by the Pork Act Delegate Body, which meets during the National Pork Producers Council's annual Pork Industry Forum. States are represented in the Delegate Body in proportion to their level of hog production, and each state is eligible to elect at least two Delegates. Executives from several integrator Defendants have served as Pork Act Delegates.

113.    The Pork Act Delegates also elect a 15-member National Pork Board ("Pork Board"), whose members are officially appointed by the U.S. Secretary of Agriculture. The Pork

---

("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service."); Marc Ivaldi et al., *The Economics of Tacit Collusion* (March 2003), available at https://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.pdf

Board works with Pork Checkoff staff to ensure collection and distribution of Pork Checkoff funds. Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo. Executives from several integrator Defendants have served as members of the Pork Board. For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff. Skahill has acted as the Pork Board's Treasurer and Vice President.

114.    The National Pork Producers Council ("NPPC"), "which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets." [45] Executives from the pork integrator Defendants have served on the NPPC board of directors during the Relevant Period, including: Cory Bollum of Hormel Foods, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats.

115.    According to the NPPC website, its primary source of funds is the "Strategic Investment Program" (SIP). Unlike the Pork Checkoff funds, NPPC describes these funds as unrestricted and can be utilized to address legislation, regulatory policy and trade policy as directed by state and national leadership.  Pork producers participate by voluntarily investing a percentage of the sales of each market hog sold.  Investors are described as producers of all types and sizes,

---

[45] National Pork Producers Council, NPPC.org.

representing 43 states.  "This unified investment allows NPPC and its state affiliates to act with one voice and effectively utilize these resources."[46]

116.    NPPC conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year. NPPC advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions. The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

117.    In addition to its annual National Pork Industry Forum, NPPC sponsors many other programs that have provided ample opportunities for Defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show." It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms). The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC.

- A public policy Pork Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the U.S. pork industry."

118.    The National Pork Industry Conference ("NPIC") takes place each July, with the 25th Annual Conference planned for July 2021.[47] NPIC describes the conference as attracting 800 attendees with most producer participants representing "the top 150 pork production systems in North America."[48]

---

[46] *Strategic Investment Program*, NPPC.org., http://nppc.org/join-us/strategic-investment-program/.
[47] *National Pork Industry Conference*, Porkconference.com (July 11–14, 2021).
[48] *Id.*

119.   After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow numbers."[49] In July 2010, the Pork Checkoff website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded."[50]

120.   The website for the 2016 NPIC conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts." Seaboard and Smithfield are among the integrator Defendants whose executives have been session presenters at NPIC.

121.   Upon information and belief, CEOs and top level executives from Defendants attending NPIC and NPPC events, discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict pork production. For example, at the 2009 Pork Expo in early June 2009, the Defendant pork producers met and discussed cutting (i.e., "liquidating") production, which Smithfield CEO Larry Pope later described "was the key subject of the discussion of every producer," and as "something [that] has got to happen. And so that's [] very positive.[51]

---

[49] Mr. Greenwood also was a presenter at the 2018 NPIC, discussing swine operation financials.
[50] *See National Pork Board to meet during National Pork Industry Conference*, Pork Checkoff (July 8, 2010), available at https://www.pork.org/news/national-pork-board-meet-national-pork-industry-conference/.
[51] Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009).

122.    In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues. For example, the 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year. A March 2011 AgriMarketing article about the club states that it consisted of "60 industry stake holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

123.    Defendants were also able to meet with each other at meat industry meetings, conferences, conventions and expositions sponsored by several other organizations including the North American Meat Institute ("NAMI"), and its predecessor, the American Meat Institute ("AMI"), and other organizations.

124.    Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association."  AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of red meat and 70 percent of turkey in the US" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

125.    NAMI was formed in 2015 by merging the AMI and the North American Meat Association. The NAMI website contains similar information, stating that NAMI is "a trade association that represents companies that process 95 percent of beef, pork, veal and 70 percent of turkey products in the US and their suppliers," and its "many meetings and educational seminars . . . provide excellent networking and information-sharing opportunities for members of the industry."

126.     All of the Defendants (and/or their affiliates) have been members of AMI and then NAMI throughout the Relevant Period. Executives from the pork integrator Defendants have served on the AMI and NAMI Board of Directors during the Relevant Period, including:

a.  Mark Campbell and Rick Hoffman of Triumph Foods;

b.  Doug Clemens and Phil Clemens of Clemens Family Corporation;

c.  Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc., as well as Greg Schweitzer of Sara Lee/Hillshire Brands (later acquired by Tyson Foods);

d.  Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

e.  Gary Louis, Rod Brenneman, and Terry Holton of Seaboard;

f.  Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS;

g.  Jim Snee, Stephen Binder, and Jeffrey Ettinger of Hormel Foods Corporation; and

h.  Gary Jacobson and Russ Yearwood of Co-Conspirator Indiana Packers Corporation.

127.     Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

128.     Throughout the Relevant Period, AMI (through 2014) and its offshoot, the North American Meat Institute (since 2015), has co-sponsored with the Food Marketing Institute, the industry's "Annual Meat Conference." The conference website describes the conference as "a complete education and networking experience." Many of the Defendants' high-level executives attend the conference. For example, registered attendees in 2012 included Steven Binder, then the Executive Vice President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President of Smithfield

43

Foods, and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder Chairman of the Board and President, respectively, of Agri Stats.

129.    Throughout the Relevant Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry." All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc. (a subsidiary of Agri Stats, Inc.) through 2017. The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates and *industry capacity*."[52] The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other:

> The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike. This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices. Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years.

The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

130.    Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education

---

[52] Brochure, National Meat Conference, at 5 (2015), available at http://www.meat conference.com/sites/default/files/books/2015_AMC_Brochure.pdf (emphasis added).

provided by Issues Answers Action." Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015 and Phil Clemens of The Clemens Family Corporation in 2016.

131.    For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics." The NAMI board met during the 2015 Management Conference.

132.    In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit." In addition to education sessions, the summit has included "networking opportunities" and social events, including a golf tournament, receptions, and an "Issues Answers and Actions Breakfast", as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

133.    AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012. In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its Board of Directors.

134.    In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations. Promotional materials for the 2014 IPPE

indicated that attendees included Defendants Clemens Food Group, Hormel Foods, Hillshire Brands, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson. After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

### H.   Defendants implemented capacity and supply restraints during the Relevant Period.

#### 1.   Summary of Defendants' Conspiratorial Supply Restraints

135.   In the years leading up to the Relevant Period, the steady expansion of pork production was virtually certain. As one industry commentator reported in 2007, "Some things you can just take to the bank. Sow herd expansion among the Pork Powerhouses would fall into that category—even in the face of the biggest run-up in feed prices in history."[53]

136.   This historical trend changed markedly during the Relevant Period. As demonstrated in Figure 5 below, at several points during the Relevant Period, the pork integrators changed their behavior and acted in a concerted way to decrease supply. In 2008 and 2009, and again in 2012 and 2013, the pork industry cut production.[54] These production decreases marked a drastic change from the period prior to the conspiracy from 2000 through 2008, in which pork supply was stable and steadily increasing on a yearly basis.

---

[53] Betsy Freese, *Pork Powerhouses 2007: Run-Up In Rations* (Oct. 3, 2007), available at https://www.agriculture.com/livestock/hogs/Pork-Powerhouses-2007_283-ar3178.

[54] *See also* U.S. I.T.C. Office of Industries, *Pork and Swine Industry and Trade Summary*, at 22 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); *id.* at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008 and 2010, and that in 2012 the number of animals kept for breeding remained 5% below the level observed in 2008).

**Figure 5: U.S. Annual Commercial Hog Production by Weight, 2000–2017**



137.   These supply cuts were coordinated, historic, and unprecedented. For example, in September 2009, Pork Powerhouses® which publishes reports and articles relating to pork production, published an article entitled "Big Boys Cut Back" and reported that "For the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers. These companies report 200,000 fewer sows than one year ago, a drop of 6.4%."[55]

138.   At the same time, pork producers were further reducing domestic supply by devoting more and more production exports to overseas markets. The U.S. has been a net exporter of pork products for a long time, but those exports have comprised a much larger share of total production in the past ten years. As shown in Figure 6 below, less than 10% of U.S. pork production was exported in 2000. By 2011, more than 20% was being exported. Sending

---

[55] Betsy Freese, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009), available at https://www.agriculture.com/livestock/hogs/pk-powerhouses-2009-big-boys-cut-back_283-ar5700.

production overseas is another way in which Defendants were able to reduce the supply available to U.S. markets, thereby driving up prices. Notably, a 2017 analysis found that for every $1 million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt.[56] In other words, selling pork on the global market added $50.20 to the market price of hogs. The significant expansion in exports meant that increases in hog production by the pork integrator Defendants did not result in an increase in the supply of pork products in the United States market.

**Figure 6: U.S. Pork Exports as a Percent of Total Production, 2000–2017**



139.    As part of their acts and conduct in furtherance of the conspiracy, each of the pork integrator Defendants participated in these supply restraints. While the conspiracy was self-concealing in nature, the limited publicly available sources of information available regarding the pork integrator Defendants' supply decisions evidence these supply constraints. These supply restrictions included, but were not limited to, the conduct described herein.

(a)    **Smithfield**

140.    Beginning in 2008, Smithfield stopped making traditional production increases and instead cut its number of sows, reporting, "We are focused on reducing the number of pigs that

---

[56] Pork Checkoff Report, Vol. 36 No. 2, at 19 (Summer 2017), available at https://www.pork.org/wp-content/uploads/2017/06/pork-checkoff-report-summer-2017.pdf.

come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[57] In 2009, Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately.[58] Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows).[59] In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

141.    Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

### (b)    Tyson

142.    Between 2008 and 2009, Tyson cut its sows by over 25%, marking a significant reduction. In 2010, Tyson reported a 3.3% decrease in its Pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate.[60] In 2013, Tyson reported a 3.6% decrease in sales volume and decreased its capacity utilization in an effort to "balance[ ] our supply with customer demand…."[61]

---

[57] Betsy Freese, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008), available at https://www.agriculture.com/livestock/hogs/The-big-squeeze-Pork-Powerhouses-2008_283-ar4443.

[58] *Smithfield Reduces Pig Herd to Cover Losses*, Pig Progress (June 18, 2009), available at https://www.pigprogress.net/Home/General/2009/6/Smithfield-reduces-pig-herd-to-cover-losses-PP003085W/.

[59] Betsy Freese, *Pork Powerhouses 2010: Back in Black* (Sept. 14, 2010), available at https://www.agriculture.com/livestock/hogs/pk-powerhouses-2010-back-in-black_283-ar9801.

[60] Tyson Foods, Inc. 10-K Report, at 26 (2010).

[61] Tyson Foods, Inc. 10-K Report, at 24 (2013), Chris Harris, "Tyson's Year Off to Good Start" *The Pig Site* (Feb. 4, 2013) https://www.thepigsite.com/news/2013/02/tysons-year-off-to-good-start-1.

### (c)   JBS/Cargill

143.   In 2011, JBS reported that, in the prior two years, its pork export volume had grown from 15% to 20% of total production at JBS.[62] Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016, despite increased consumer demand. This production restriction had the intended effect: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."[63]

### (d)   Hormel

144.   In January 2008, the Farmer John's division of Hormel announced liquidation of about 10,000 sows in California, which was confirmed to have taken place in its 2008 Annual Report. Hormel's production statistics also show that it cut its number of sows in 2008 and maintained such reduced production throughout the Relevant Period.

145.   Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities, particularly in January, where we could reduce the numbers [of hogs] that we had going through…."[64] Hormel also reported lower sales of pork products in 2013. In June 2014, it was reported that Hormel reduced capacity at its Los Angeles plant by 500 head per day. Hormel reported strong earnings from its pork exports in 2011.

---

[62] JBS Annual Report, at 15 (2011).
[63] JBS Annual Report, at 68 (2016).
[64] Q1 2009 Hormel Foods Corp. Earnings Conference Call (Feb. 19, 2009).

### (e)   Seaboard

146.   Throughout the Relevant Period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales to foreign markets.[65] Seaboard dedicated several employees to international sales and exports. Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect: higher pork prices. Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic market . . . ."[66] Moreover, in 2017, Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

### (f)   Triumph

147.   In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.[67] In 2009, Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry.[68] Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide. These exports constituted a significant portion of its production throughout the Relevant Period and reduced or otherwise limited Triumph's production in the United States.

---

[65] *See, e.g.*, Seaboard Corp. Annual Report, at 3 (2010) ("[E]xport volumes increased particularly to our higher valued markets in the Far East while domestic volumes nearly kept pace with 2009."); Seaboard Corp. Annual Report, at 2 (2011) ("Exports of US pork were up 23% to an all-time record as demand from the usual countries remained strong and the US continued its role as the main supplier.").

[66] *See* Seaboard Corp. Annual Report, at 17 (2013).

[67] Betsy Freese, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008), available at https://www.agriculture.com/livestock/hogs/The-big-squeeze-Pork-Powerhouses-2008_283-ar4443.

[68] Betsy Freese, *Pork Powerhouses 2009*, Successful Farming (2009).

**(g)      Clemens**

148.     In 2011, Clemens reported production of approximately 1,000 fewer sows through its subsidiary Hatfield Quality Meats. [69] Furthermore, in 2014, Defendant Clemens had a competitive advantage over many pork producers, in that comparatively few of its pigs were affected by the virus causing porcine epidemic diarrhea (known as "PED," which for several months disrupted the ability of many of Clemens' competitors to readily supply pork to the market). But contrary to what one would expect to see in a competitive market, Clemens did not utilize its advantage and refused to increase its market share when it clearly had substantial market incentives to do so.

**(h)      Co-Conspirator Indiana Packers**

149.     Co-Conspirator Indiana Packers is a private company with limited information available to the public regarding its production statistics.  Nevertheless, in 2012, Indiana Packers indicated that it expected to reduce the number of hogs or pounds of pork processed at its facilities ostensibly because of high corn prices.

**2.      Timeline of Conspiratorial Actions**

150.     As set forth herein, each of the aforementioned supply reductions during the Relevant Period were a departure from the pork integrator Defendants' market behavior prior to the Relevant Period. These supply restrictions involved a significant share of the pork integrator Defendants' annual production and are in contravention of Defendants' individual economic self-interests. These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of pork. While Defendants went to great lengths to maintain the secrecy of their

---

[69] Betsy Freese, *Pork Powerhouses 2011*, Successful Farming (2011).

unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources. As with their use of Agri Stats, the pork integrator Defendants exploited these public statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy and couched the public disclosures in pretext so as to conceal what was really occurring. Although purchasers would not typically track and account for these statements, they have now been unearthed and are summarized below.

151.    As early as January 2008, the CEOs and other senior-most executives of each of the pork integrator Defendants recognized that, as a result of expansion and productivity increases in their operations, there was an oversupply of pork. However, the substantial supply reductions that were necessary to return the industry to the Defendants' desired level of profitability were against the individual self-interest of each Defendant.  In the absence of an agreement among all Defendants to reduce supply, it did not make financial sense for any company to reduce its own supply levels.  Accordingly, Defendants began to use their positions at the American Meat Institute ("AMI") and the Twenty-First Century Pork Club ("Pork Club") to coordinate supply cuts that could not be achieved in the absence of collusion. Defendants and co-conspirators affirmatively shaped the rules of these organizations to conceal the way they were using them to coordinate the supply reductions (and thus hide the existence of the conspiracy).  For example, the Pork Club had a rule prohibiting meeting attendees from attributing comments to specific speakers that attended their meetings.  Because of this "no attribution" rule, executives of the Defendants could and did make statements about their company's intentions at these meetings about the production, supply and/or pricing of the swine herd or pork, without fear that anyone who did not attend the meeting could identify which executive or which company made the statement.

152. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

153.    Although Smithfield shared this information with its competitors to induce them to

reduce supply as well, other Defendants were unwilling to follow Smithfield's lead at the time

without assurances that all major producers were on board. █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████  ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████  ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

154. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████ █ ███████████████████

██████████████

155.    As another example, in January 2009, Tyson stated that the capacity utilization of its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%.[71] This indicated that Tyson was reducing the amount of pork that it processed in its plants.  Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."[72]

156.    However, during this early phase of the conspiracy, only Hormel took steps to follow Smithfield's lead and reduce its sow population by the target of 10% or more.  In November 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009.[73]  During Hormel's first quarter earnings call in January 2009, its CEO once again communicated that he expected pork supply to decrease in 2009. Hormel's CFO confirmed publicly that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."[74]  By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000 (a reduction of almost 15%).

157.    Also in November 2008, Dick Bond, President and CEO of Tyson Foods, stated that there were likely to be fewer hogs in 2009.[75]

---

[70] Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).
[71] Q1 2009 Tyson Foods, Inc. Earnings Conference Call (Jan. 26, 2009).
[72] *Id.*
[73] Q4 2008 Hormel Foods Corp. Earnings Conference Call (Nov. 25, 2008).
[74] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).
[75] Q4 2008 Tyson Foods, Inc. Earnings Conference Call (Nov. 10, 2008).

158.     During this early phase of the conspiracy, the Defendants recognized that more coordination was necessary between them to decrease supply at a sufficient level.  Recognizing that the many trade associations and industry groups that each Defendant belonged to provided the infrastructure for such coordination, Defendants began to use their frequent meetings to implement their collusive supply reduction. Defendants even acknowledged as much internally. █████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

159.     In early 2009, pork industry participants continued to note the need to reduce supply. For instance, in February 2009, Greenwood of AgStar publicly called on U.S. Pork producers to follow the lead of the Broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5–10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.[76]  Notably, Greenwood's efforts to publicly encourage pork producers to decrease supply made no mention of the financial pressure that AgStar was putting on companies to comply with Greenwood's advice.

160.     Similarly, in February 2009, Hormel stated, "We still do expect to see a reduction in the supply of hogs in fiscal 2009[.]" In response to an industry analyst question on whether slaughter would be cut back, Hormel responded that **"you look at the opportunity to reduce your production numbers and we've certainly . . . look[ed] for opportunities . . . where we could reduce the numbers that we had going through . . . ."** Hormel further emphasized that "if there

---

[76] Dale Miller, *Industry's Stimulus Package - Cull Sows*, National Hog Farmer (Mar. 15, 2009), available at https://www.nationalhogfarmer.com/marketing/0315-industrys-stimulus-package.

were free market hogs that normally we would be bidding on, we're not looking to take them in .
. . ."[77]

161.    Around this time in early 2009, certain high level executives from Defendants met in Minneapolis (where both Tyson and Hormel have large offices).  The attendees at this meeting included at least Bill Rupp (Meyer Foods), Rod Brenneman (Seaboard), Bill Buckner (Cargill), and a number of executives from Tyson and Hormel. Upon information and belief, executives at this meeting discussed whether each pork integrator Defendant would commit supply reductions.

162.    However, a number of the large producers continued to take a wait-and-see approach before implementing these commitments to reduce supply.  Indeed, by this point, although Smithfield announced intentions to reduce its supply, it had not committed to liquidate 10% of its sows. ████████████████████████████████████████

████████████████    Upon information and belief, Ettinger voiced concerns to Brenneman that the pork integrator Defendants were not taking sufficient steps to reduce the supply of pork.

163. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[77] Q1 2009 Hormel Foods Corp. Earnings Conference Call (Feb. 19, 2009).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

164.    This "hedging" reflected other Defendants' concern that even Smithfield had not committed to a 10% supply reduction. For example, on May 21, 2009, Ettinger (Hormel) confirmed that "we still see a contraction in the overall supply of hogs for the year but not as much as we originally anticipated.  And I would expect that prices will be somewhat less then [sic] last year, but higher then [sic] what we've seen in the first half of the year."[78]

165.    In a likely effort to provide additional assurances to his competitors, Pope (Smithfield) continued to speak publicly about the progress of Smithfield's efforts to reduce supply. On May 13, 2009 he reportedly stated at an industry conference:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down.  We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.[79]

166.    Following this public statement by Pope, ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

---

[78] Q2 2009 Hormel Foods Corporation Earnings Conference Call – Final (May 21, 2009).
[79] Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009).

167. 

.

169.     On June 16, 2009, Pope (Smithfield) stated during an earnings call that Smithfield's current cuts were not enough, that more were needed to "fix" the hog industry, and that "[s]omebody else has got to do something:"

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to Seaboard.  Seaboard knows that. ...  That 3%, let me say that, our 3% will not fix the hog industry.  That part I'm confident of.  Somebody else has got to do something.  We cut 13%.  The first 10% didn't fix it.  I don't think us going from 10 to 13 is going to fix the hog business.[80]

Also during this call, when asked to describe his expectations for whether the rest of the industry would "liquidate" (*i.e.*, cut production), Pope described that at the 2009 Pork Expo in early June 2009, cutting supply was the "key subject of the discussion of every producer," adding that such supply reduction is "something [that] has got to happen.  And so that's very positive."[81]

---

[80] Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009).
[81] *Id.*

170.     Tyson was the next company to follow Smithfield with the public announcement of a major sow liquidation. In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87% down from the previous year's rate.[82]  Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."[83]

171.     More significantly (and following Smithfield's major announcement in June), Tyson announced in July 2009 that it was liquidating 20,000 sows from its herd. Upon information and belief, Tyson executives informed its competition of this supply cut during AMI's Executive Committee meeting, which was held between July 9-11, 2009.

172.     ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████

173.     ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████
███    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[82] Q2 2009 Tyson Foods, Inc. Earnings Conference Call (May 4, 2009).
[83] *Id.*

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

175.   ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████   ███████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

176.   ████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

177.    These efforts by Defendants provided the assurances that other producers needed to reduce supply as well (even though producers would have been better off financially by

61

maintaining their production levels in anticipation of the price impact from the Smithfield, Hormel, and Tyson supply cuts).

178.    In June 2009, Pope (Smithfield) also stated:

> I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, ***liquidation is now a recognized reality by all in the industry***. To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, combined with the additional cuts by our fellow producers should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue.[84]

179.    In June 2009, Jody Feragen, Hormel's CFO, stated at an investor conference that "we reduced production in our basic processing for . . . pork."

180.    On July 25, 2009, it was publicly disclosed that both Tyson ***and*** Smithfield would concurrently be engaging in sow reductions of a total of 47,000 sows in the near future.[85]

181.    In August 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner, confirmed:

> Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability***. We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.[86]

Mr. Lochner continued, "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our Fiscal Year with additional year over year declines into Q3 and Q4."[87]

---

[84] *High Hog Production Lead to Loss at Smithfield*, Meat & Poultry (June 16, 2009), available at https://www.meatpoultry.com/articles/1056-high-hog-production-costs-lead-to-loss-at-smithfield (emphasis added).

[85] *Weekly Review: Smithfield, Tyson to Liquidate Sows*, The Pig Site (July 25, 2009), available at https://www.thepigsite.com/news/2009/07/weekly-review-smithfield-tyson-to-liquidate-sows-1.

[86] Q3 2009 Tyson Foods, Inc. Earnings Conference Call (Aug. 3, 2009) (emphasis added).

[87] Q4 2009 Tyson Foods, Inc. Earnings Conference Call (Nov. 23, 2009).

182.    Tyson's 2009 10-K Annual Report further stated that, "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[88]

183.    In August 2009, Wesley Mendonça Batista (CEO of JBS) communicated the start of JBS's participation in hog liquidation efforts. Mr. Batista stated, "So when we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[89]

184.    The other pork integrator Defendants and co-conspirators agreed to or accepted Smithfield's exhortation for the "industry" to cut production and to announce those cuts to other producers.   During 2009, Triumph reduced the number of sows that it had from 396,000 to 371,500.  In particular, Triumph reduced the number of sows by 14,500 at its Christensen Facility, 4,000 at its New Fashion Pork Facility, and 5,000 at its Eichelberger facility.[90]  Notably, Triumph and Seaboard had a longstanding marketing agreement in which hogs processed by Triumph were marketed by Seaboard.[91]  Thus, the reduction in supply of sows raised by Triumph would result in a reduction in the amount of pork that was sold by Seaboard.

185.    ████████████████████████████████████████████

████████████████████████████████████████████████

---

[88] *See* Tyson Foods, Inc. 10-K Annual Report, at 20 (2009).
[89] Q2 2008 JBS Earnings Conference Call (Aug. 13, 2009).
[90] Betsy Freese, *Pork Powerhouses 2009*, Successful Farming (2009).
[91] According to Seaboard Corporation's 2010 Form 10-K, filed with the Securities and Exchange Commission, "Seaboard's Pork Division has an agreement with a similar size pork processor, Triumph Foods LLC (Triumph), to market substantially all of the pork products produced at Triumph's plant in St. Joseph, Missouri"



187.    In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> **We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.** But again, I don't think they can solve it.

> **I think this industry has got to solve it collectively.** I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. **But the answer is, yes, there are others cutting back. We're not the only one.**[92]

---

[92] Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009) (emphases added).

188. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

██   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

190.    In November 2009, Hormel stated that "we've seen about a 2% liquidation" in hogs.[93]

191.    In December 2009, the CEO of Smithfield confirmed, and communicated to the other Defendants, it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance":

---

[93] Q4 2009 Hormel Foods Corp. Earnings Conference Call (Nov. 24, 2009).

We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs . . . . I can tell you that I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves. We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.[94]

192.     In a January 2010 article, Steve Meyer of Paragon Economics noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 5% between 2007 and 2009.

193.     In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope (CEO of Smithfield) indicated that further cuts were still to come:

Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.[95]

194.     In that same timeframe, Smithfield issued a press release stating:

The action items called for in the Pork Group restructuring plan are complete and the benefits are meeting expectations. As of this month, we have closed all six plants that were announced as part of the restructuring plan early last year. . . .

We anticipate that fresh pork margins will improve as hog slaughter levels continue to decline and the Sioux City plant is closed in April.[96]

195.     Those press release statements were confirmed in Smithfield's quarterly results filing for the quarterly period ending January 2010: "In January 2010 (fiscal 2010), we announced

---

[94] Q2 2010 Smithfield Foods Earnings Conference Call (Dec. 10, 2009).
[95] Q3 2010 Smithfield Foods Earnings Conference Call (Mar. 11, 2010).
[96] *Smithfield Foods Reports Third Quarter Results See Regulation G Disclosures*, Smithfieldsfoods.com (Mar. 11, 2010), available at https://www.smithfieldfoods.com/press-room/company-news/smithfield-foods-reports-third-quarter-resultsbr-a-href-common-download-downloadcfmcompanyidsfdfileid358280filekeyedc0cf30-565b-446b-8455-a0ad88ae54a1filenamereg-g-disclosurespdf-target-blanksee-regulation-g-disclosures-a.

that we will be closing our fresh pork processing plant located in Sioux City, Iowa in April 2010 (fiscal 2010) . . . . Modest contractions in the U.S. sow herd have contributed to tightening supplies which, in turn, is resulting in higher live hog market prices in the U.S."[97]

196.    On March 8, 2010, JBS's CEO mentioned JBS's reduction in hog supply as a driver of profitability and stated that these efforts were resulting in protein shortages. He stated:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.[98]

Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to limit hog supply.

197.    As of March 2010, U.S. pork production was noted to be down 7% so far, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights. Defendants also were reported to have increased exports 8% by March 2010, which was expected to lead to higher hog prices.

198.    In May 2010, Tyson stated in its Q2 2010 earnings conference call, "Worldwide protein supplies and US domestic availability are expected to remain below '08 and '09 levels. We have seen good interest in Beef and Pork exports to a variety of global destinations."[99] Similarly, in August 2010, Tyson stated in its earnings call that "Pork supplies in 2011 are anticipated to be below their peak supplies in calendar 2008 and 2009, and most projections show no material changes compared to 2010."[100]

---

[97] Smithfield Foods 10-Q Report, at 12 (2010).
[98] Q4 2009 JBS Earnings Conference Call (Mar. 8, 2010).
[99] Q2 2010 Tyson Foods, Inc. Earnings Conference Call (May 10, 2010).
[100] Q3 2010 Tyson Foods, Inc. Earnings Conference Call (Aug. 9, 2010).

199.    In August 2010, Hormel stated that "Our hog supply is down 3 to 4%."[101]

200.    In September 2010, Smithfield stated in a press release that the closure of its Sioux City plant in April 2010 had led to an 11% reduction in its processing rate from the prior year. Smithfield further stated, "Industry-wide, slaughter volumes were down 3.5%," and "Lower industry slaughter levels are expected to persist well into the company's second quarter."[102] Smithfield's quarterly results from that time reflected that the volume reductions "should help stabilize prices at healthier levels than fiscal 2010."[103]

201.    Defendants also acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, Larry Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have***. And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[104]

As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

202.    Supply level information regarding competitors allowed Defendants to know that supply would not increase in the future, given the lifecycles of the animals. Based on this

---

[101] Q3 2010 Hormel Foods Corp. Earnings Conference Call (Aug. 20, 2010).
[102] *Smithfield Foods Reports Record First Quarter Results*, Smithfieldfoods.com (Sept. 8, 2010), available at https://www.smithfieldfoods.com/press-room/company-news/smithfield-foods-reports-record-first-quarter-results-2.
[103] *See* Smithfield Foods, Inc. Form 10-Q, at 22 (March 11, 2011).
[104] Q2 2011 Smithfield Foods Earnings Conference Call (Dec. 2010) (emphasis added).

knowledge, in November 2010 Hormel CFO, Jody Feragen, stated that she did not think the industry would see large scale expansion given profitability for the pork integrators.[105]

203.    In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true. If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.[106]

Again, the way to know the level of production in the industry would be through the provision of competitively sensitive information by a competitor of Tyson.

204.    In the face of ever-increasing margins, when asked whether the type of profits would continue, Larry Pope and Robert (Bo) Manly (Smithfield) confirmed in March 2011 to their competitors that it would not increase capacity:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that . . . .

> HEATHER JONES: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?

> BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have-- should have good margins, but I can't believe--

> LARRY POPE: Heather, we are sitting here today, we are halfway-- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.

> BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. So it will either happen by itself or someone is going to build a plant.

> HEATHER JONES: All right, okay. Thank you.

---

[105] Q1 2010 Hormel Foods Corporation Earnings Conference Call (Nov. 23, 2010).
[106] Q1 2011 Tyson Foods, Inc. Earnings Conference Call (Feb. 4, 2011).

LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . ***And by the way, we are not going to build a new plant to expand capacit***y.[107]

205.    In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had-- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. ***There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility***.[108]

206.    By May 2012, industry observers were noting that the reductions in slaughter capacity meant the pork integrators may not have enough capacity to slaughter expected hog levels by the fall. In fact, Steve Meyer of Paragon Economics noted that slaughter capacity would not keep up with hog capacity through late 2013 given that the pork integrators were holding their slaughter levels constant.

207.    

---

[107] Q3 2011 Smithfield Foods Earnings Conference Call (Mar. 10, 2011) (emphasis added).

[108] Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference (Mar. 26, 2012) (emphasis added).

[109] SBF0157510-11

---

[110] SBF0157510-11

[111] SBF0157510-11

[112] SBF0157510-11.  During his tenure as Indiana Packers' President and COO, Gary Jacobson communicated with James Lochner, his counterpart at Tyson, and Donnie Temperley, a senior executive at Hormel.  *See* TF-P-002049389 and HFC-PORKAT0000356213.



---

[113] JBS-PORK-01003328
[114] JBS-PORK-01003328
[115] JBS-PORK-02442743
[116] SMITHFIELD03678665
[117] SMITHFIELD03678665

---
[118] JBS-PORK-01010358-0359
[119] JBS-PORK-01010358-0359
[120] JBS-PORK-01010358-0359
[121] JBS-PORK-01001946

---

[122] JBS-PORK-00880535-0536
[123] JBS-PORK-01008433
[124] JBS-PORK-01008761
[125] JBS-PORK-01008793
[126] JBS-PORK-01008784-8785

---

[127] JBS-PORK-01018001
[128] JBS-PORK-01008722
[129] JBS-PORK-01008849
[130] JBS-PORK-02438051

k. █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

█ █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ ████████████

---

[131] JBS-PORK-01008827
[132] JBS-PORK-02437270
[133] SBF0349004



210.    In September 2013, Joe Szaloky, Vice President of Procurement and Business Development for Smithfield, confirmed the company's intention to maintain its sow number, not adding any more.[136]

211.    In December 2013, Steve Meyer of Paragon Economics said, "The breeding herd figure implies NO GROWTH in spite of much lower costs and terrific profit opportunities in the coming year."[137]

212.    In December 2013, Robert Manly (Smithfield) emphasized that coordinated industry action was necessary to "balance" supply and demand:

---

[134] SMITHFIELD01177237
[135] JBS-PORK-00444481-4484
[136] Betsy Freese, *Pork Powerhouses 2013: Disease Hits, Growth Continues*, Successful Farming (Sept. 29, 2013), available at https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-growth_283-ar34203.
[137] Steve Meyer, 2014 *Looks Good for U.S. Pork Producers*, National Hog Farmer (Dec. 30, 2013), available at https://www.nationalhogfarmer.com/print/9053 (emphasis in original)

[S]o I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group. We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.[138]

213.    On May 15, 2014, Wesley Mendonça Batista continued to demonstrate Defendant JBS's ability to constrain the pork market. During a quarterly earnings call, he stated, "In pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margin in our pork business . . . . So this is a clear sign that we have been able to pass price increases in chicken and pork and not in the same extent in beef."[139]

214.    The pork integrator Defendants further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise. For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Eric Haman, Defendant Clemens Food Group's communication manager, stated the disease "'had a very minimal impact on our hog flow, especially when you compare it to others in the industry . . . . That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this.'"[140] Yet, in furtherance of their conspiracy, Defendant Clemens did not take advantage of having few PEDv infected pigs. Instead of attempting to increase its market share, it stayed the course with its fellow competitors.

215.    Defendants' and co-conspirators' conspiracy was yielding substantial profits by 2014. In October 2014, Pork Powerhouses reported that "Hogs made history this summer. Pork

---

[138] Q2 2014 Smithfield Foods Earnings Conference Call (Dec. 23, 2013).
[139] Q1 2014 JBS Earnings Conference Call (May 15, 2014).
[140] Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds*, Bucks County Courier Times (May 4, 2014).

producer profits were, quite simply, enormous -- averaging $82 profit for each hog marketed in the third quarter."[141] The report also noted that "Joe Szaloky, Vice President of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast . . . . The PED virus trimmed supply, but higher market weights helped compensate.'"[142]

216.    In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production. Specifically, pork producers rushed to sign contracts with Defendants that would protect them if production exceeded slaughter capacity as some feared.

217.    In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift.[143] In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated, "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry."[144] However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.[145]

---

[141] Betsy Freese, *Pork Powerhouses 2014: Record Profits Trigger Expansion* (Oct. 30, 2014), available at https://www.agriculture.com/livestock/hogs/pk-powerhouses-recd-profits-trigger_283-ar45884.

[142] *Id.*

[143] David Eaheart, *Seaboard Triumph Foods Announces Plans to Expand Pork Processing Plant* (Feb. 17, 2017), available at https://seaboardfoods.com/news/Pages/Seaboard%20Triumph%20Foods%20announce%20plans%20to%20expand%20pork%20processing%20plant.aspx#:~:text=17%2C%202017)%20%2D%20Seaboard%20Triumph,approximately%206%20million%20hogs%20annually.

[144] *Id.*

[145] Jeff DeYoung, *Pork Packing Capacity Faces Delay to Growth*, Iowa Farmer Today (June 2, 2018), available at https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html.

### I.  Abnormal pricing during the Relevant Period demonstrates the success of the collusive scheme.

218.  Beginning in approximately 2009, the pork industry showed abnormal price movements, i.e., increases in prices for the average hog whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork. These abnormal pricing movements can be measured in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the pork integrators' margin during the Relevant Period; and (iv) the Defendants' revenues before and during the Relevant Period. Each of these measures supports Plaintiff's allegations that Defendants conspired to restrict production and otherwise acted in a concerted manner to increase pork prices in the U.S.

### 1.  The average hog wholesale price experienced an unprecedented increase beginning in 2009.

219.  According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb. from 2000 to 2009, the hog market year average price was at times substantially less. Thereafter, prices increased dramatically, rising to more than $1.80/lb. in 2014, and never dropping or below $1.40/lb. again. Figure 7 below shows the unprecedented increase in wholesale pork prices beginning in 2009, which stayed elevated through 2018.

**Figure 7: Average Hog Wholesale Prices in Cents per lb., 2000–2018**



As Figure 8 below shows, publicly available data also demonstrates that pork integrators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits that was resistant to changes in price during the Relevant Period. These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply short of demand.

**Figure 8: Integrator Earnings per Retail Weight, 2000–2017**



81

**2.     The pork cut-out composite price experienced a dramatic increase beginning in 2009 and continuing throughout the Relevant Period.**

220.    During the Relevant Period, various pork products saw substantial increases in prices compared with before the Relevant Period. As shown in Figure 9 below, using one particular price for pork, the lean hog composite price, a pricing analysis has been performed, which shows that the average price index increased significantly during the Relevant Period.

**Figure 9: Lean Hog Composite Price, 2000–2019**



### 3. Defendants' revenues increased beginning around 2009, even taking into account Defendant-specific costs.

221.    Upon information and belief, an examination of the spread between pork revenue and pork-related costs (*i.e.,* costs of goods sold plus operating costs) for two of the largest Defendants (Tyson and Smithfield)—which can be used as a proxy for measuring the spread between the Defendant producer's price of wholesale pork and its hog costs—confirms a divergence between revenue and costs beginning at the start of the Relevant Period in 2009. This divergence in revenue and costs starting in 2009 indicates the beginning of abnormal pricing in 2009.

222.     Specifically, such an examination shows a break in Tyson's revenues and costs around the start of the Relevant Period:  from 2001 to 2009, Tyson's average profit on pork was 3.7 percent; from 2010 to 2017, Tyson's average profit on pork jumped to 8.7 percent.

223.     The same analysis for Smithfield shows a similar break in revenues and costs beginning at the start of the Relevant Period:  from 2004 to 2009, Smithfield's average profit on pork was 3.2 percent; from 2010 to 2016, Smithfield's average profit on pork increased to 6.3 percent.

224.     These analyses of the spread between costs and prices relate solely to each defendant's pork segment, and thus confirm that rising costs in pork production do not explain the increases in price seen during the Relevant Period.

### J.     Overcharges due to the cartel were reflected in higher pork prices than what they would have been absent the conspiratorial activity.

225.     Pork is a commodity product in which the pork sold by competitors has no meaningful difference and is thus interchangeable. As such, price is driven by the economic fundamentals of supply and demand. As Tyson Foods, Inc. COO, James Lochner put it, "As you know decreased total supply should be favorable to pricing."[146]

226.     By reducing, stabilizing, and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2013, the CEO of Tyson reported that these efforts were successful, stating: "What we are seeing happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand; same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."[147]

---

[146] Q1 2010 Tyson Foods, Inc. Earnings Conference Call (Feb. 5, 2010).
[147] Transcript, Tyson Foods at Goldman Sachs Agribusiness Conference (Feb. 26, 2013).

227.    Again, each pork integrator Defendant's annual sales of pork products is substantial.  For example, in 2016, Smithfield reported $3.7 billion of fresh pork sales and an additional $5 billion in packaged pork product sales. The same year Tyson reported $4.9 billion in pork sales.  With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to Plaintiff.

228.    The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI"). From the end of 2009 to the end of 2017, the CPI for all food products rose approximately 15.4%. Over the same period, prices for pork have increased substantially more for consumers over the Relevant Period. For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017:

**Figure 10: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995–2017**



229.    Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase over the Relevant Period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017 (approximately 29.3%):

**Figure 11: CPI-Average Price Data for Other Pork, per pound, from 1998–2017**



230.    And the CPI for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017 (or 35.4%):

**Figure 12: CPI-Average Price Data for Ham, per pound, from 1998–2017**



231.    In other words, the increases in the prices of pork far out-paced the growth in prices for other food products during the Relevant Period. These price increases were not the result of retailers' desire to move prices upward. Instead, they were the result of increased wholesale prices.

In addition to CPIs, the Bureau of Labor Statistics also maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products. As shown in Figure 13 below, the processed pork wholesale prices appear to be the motivator of the higher retail prices, with prices climbing significantly beginning during the conspiracy:

**Figure 13: PPI for Pork, Processed or Cured,
Not Cured, or Made into Sausage, from 1995–2017**



232.    Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to artificially increase and stabilize the price and supply of pork was borne in large part by Plaintiff and other direct purchasers.

87

**K.**     **The results of the DOJ's criminal investigation in the Broilers industry support an inference of the existence of a similar conspiracy in the pork industry.**

233.     The U.S. Department of Justice Antitrust Division (DOJ) has an ongoing criminal antitrust investigation into anticompetitive conduct in the Broilers industry. The DOJ has indicted numerous current and former poultry industry executives, including from Pilgrim's Pride, which is majority owned by JBS USA Food Company Holdings, the parent of Defendant JBS.

234.     On February 23, 2021, Pilgrim's Pride pled guilty to charges brought by the DOJ for "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1" from "at least as early as 2012 and continuing through at least early 2017," and agreed to pay approximately $107 million in a criminal fine.

235.     Defendant Tyson, after being served with a grand jury subpoena in April 2019 in DOJ's Broilers investigation, applied for leniency from prosecution under the DOJ's Corporate Leniency Program, pursuant to which Tyson must, in order to avoid criminal prosecution and fines, admit to having participated in activity constituting a criminal antitrust violation and fully cooperate with the DOJ.

236.     The guilty plea by Pilgrim's Pride (owned by Defendant JBS's parent) and Tyson's grant of leniency in the DOJ's criminal price-fixing investigation in the Broilers industry serve as a "plus factor" supporting the plausibility of the pork industry conspiracy alleged herein, particularly given the similar structural characteristics between the Broilers industry and the pork industry.

237.    In addition, upon information and belief, the same antitrust policies and practices that resulted in antitrust violations by Pilgrim's Pride and Tyson with respect to Broilers governed JBS's and Tyson's conduct with respect to pork and the conduct alleged herein.

238.    Pilgrim's and Tyson's antitrust violations concerning Broilers were concealed and only established by the DOJ's criminal investigation, just like the alleged conduct here has been concealed by Defendants, as discussed below.

**L.      Defendants actively concealed the conspiracy, and Plaintiff did not and could not have discovered Defendants' anticompetitive conduct**

239.    Plaintiff's claims have been brought within the applicable statute of limitations period.

240.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least 2018 or later. Defendants and co-conspirators engaged in a secret conspiracy that did not reveal facts that put Plaintiff on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiff.

241.    An investigative article published in February 2017 by Bloomberg Businessweek suggested the possibility that the conspiracy that began among Broiler producers and Agri Stats was being replicated in the pork industry.[148] The article reported that Agri Stats:

> has . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods. It appears that demand for the service is strong. At a hog industry trade show in 2011,

---

[148] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek (Feb. 15, 2017), available at https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged.

an Agri Stats employee pitched the company's services. His slideshow indicated that 27 companies had already signed up.[149]

The article did not conclude that pork producers were engaged in a horizontal conspiracy, but it did suggest for the first time in a widely circulated article, that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.  Indeed, this was the first time the pork industry's _use_ of Agri Stats was even widely known or reported.

242.    Then, the December 8, 2017 filing of a direct purchaser complaint against Agri Stats in _Affiliated Foods, Inc. v. Claxton Poultry Farms, Inc._, No: 1:17-cv-08850 (N.D. Ill.), and subsequent Complaints in _In re Broilers_, presented in further detail, the confidential services that Agri Stats provides to its clients in the Broiler industry.

243.    The Bloomberg Businessweek article disclosing the pork industry's use of Agri Stats, the Affiliated Foods Complaint, and subsequent public filings in Broilers, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

244.    Until that time, the combination and conspiracy alleged herein was fraudulently concealed by Defendants and co-conspirators by various means and methods, including, but not limited to (1) planning and conducting private meetings during which anticompetitive conduct was shielded from public view; communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, (2) communicating competitively sensitive data to one another through Agri Stats, a purportedly proprietary, privileged, and confidential system that kept both the content and participants in the system secret,  (3) making misleading statements to investors and the public designed to conceal their wrongful conduct,

---

[149] _Id._

including about the nature of the information shared with and among competitors through Agri

Stats, and (4) concealing the existence and nature of their competitor supply restraint and price

discussions from non-conspirators (including customers).

245.   Agri Stats is a secretive company, and repeatedly made affirmative statements

about the public's lack of access to its services.

246.   For example, in 2009, the President of Agri Stats, Blair Snyder, commented on how

secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of
> people that know a lot about us obviously due to confidentiality that we try to
> protect. We don't advertise. We don't talk about what we do. It's always kind of
> just in the background***, and really our specialty is working directly with companies
> about their opportunities and so forth.[150]

247.   But Agri Stats did not just conceal the conspiracy alleged herein by being a "quiet

company" that did not advertise or "talk about what we do" in public, it also engaged in numerous

affirmative acts to conceal the alleged conspiracy during the Relevant Period. Specifically, Agri

Stats made repeated false or misleading statements about the true nature of the information that it

provided to the other Defendants, all of which served to exclude suspicion and prevent discovery

of Defendants' illegal scheme.

248.   For example, in the same 2009 presentation, Mr. Snyder emphasized that he was

not at liberty to discuss "bottom line numbers" (a company's net earnings), and declined to display

those numbers publicly, stating "I'm not going to display the actual bottom line to the group here

just because of the confidentiality nature of the information."[119] However, while affirmatively

asserting that it was unable to share this information publicly due to "confidentiality" concerns,

---

[150] Sanderson Farms Investor Day—Final (Oct. 2009) (emphasis added).

91

Agri Stats was at the same time providing producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiff and the public in general.

249.    Similarly, Agri Stats repeatedly asserted in public that its reports did not disclose or identify any individual participant's data to any other participant and that each producer's data were kept confidential: "The fact that we collect a tremendous amount of data, and you'll see that throughout the presentation as we talk. I've got some demo examples of what we do. Obviously, no individual companies are identified or talked about"; "We'll talk about comparison of data in a little bit, but the main thing is that we want to preserve the confidentiality of individual companies, so you'll hear that word a lot throughout the presentation. I apologize but that's what we're all about"; and "The confidentiality, only your company is underlined; you don't know who anybody else is." Contrary to these statements, however, the participants, including the Defendants, were able to identify individual firm information in the Agri Stats reports.

250.    Larry Pope, the CEO of Smithfield, made similar references to secret information in December 2010, explaining that he was confident pork supplies would not be increasing in the market, based on the following:

> the information we think we have public *plus what we think we know privately*, how many they kill, what their processing levels are and things like [that]. *This is information you may not quite have*.[151]

251.    Defendants' affirmative acts of concealment also included pretextual explanations for the industry's stability and improved profitability. For example, in June 2012, Larry Pope, Smithfield CEO, attributed his expectation for improved profitability to other reasons such as "good programs with our retailers" and "lower grain costs." As Larry Pope stated in June 2012:

---

[151] Q2 2011 Smithfield Foods Earnings Conference Call (Dec. 2010) (emphasis added).

KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?

LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.

BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[152]

252.    As alleged above, Defendants and co-conspirators also used trade associations and industry conferences as mechanisms for exchanging information under pretext of legitimacy.

253.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. For example, Agri Stats' coordination coupled with direct industry communications denied Plaintiff the opportunity to know of the conspiracy.  Pork is not exempt from antitrust regulation, and thus, before these recent events Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' pork prices before these recent events.

254.    Defendants also used announcements, marketing materials, and other customer communications to provide pretextual explanations for reduced supply and increased prices that would conceal their conspiracy. Pork integrator Defendants and co-conspirators publicly and pretextually claimed that increases in their pork production input costs or other seemingly plausible reasons were responsible for increased pork prices when, in fact, they were not.  This created the illusion that the price of pork that they sold to Plaintiff was competitive, when, in fact, it was not because their pork prices were the result of the conspiracy.  For example:

---

[152] Q4 2012 Smithfield Foods Earnings Conference Call (June 14, 2012).

(a)   Producers claimed that decreased supply and higher prices were caused by the

H1N1 outbreak. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████   ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

(b)   ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

(c)   In 2012, Tyson's CEO insisted publicly that Tyson Foods "need[ed] to get our pricing

improvements in order to get paid for those higher raw materials."[153]  His statements

---

[153] Q4 2011 Tyson Earnings Conference Call (November 21, 2011).

indicate at the time that he understood customers would – in his words – "understand that these higher grain prices are going to require higher prices."[154]

(d) ████████████████████████████████████████

████████████████████     ████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████   ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

■ ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

(f) ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[154] Q4 2012 Tyson Earnings Conference Call (November 19, 2012).

anticipating reduced volumes in the Spring and Summer. While we did have reduced kills, the hog weights made up for the overall volume decline that was expected and therefore the anticipated shortage was never realized."

255.    Defendants also communicated in secret in order to coordinate their supply reductions and price increases, including by sending to competitors their future supply and pricing plans and instructing colleagues to conceal or delete evidence of their unlawful actions. For example:

(a)    ████████████████████████████████████████
████████████████████  ████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████  ██████████████████████████████
████████████████████████████████████████
██████████████████████████████

(b)    ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████
██  ████████████████████████████████████
████████████████████████████████████████

(m)

(r)



256.    Additionally, the Agri Stats' reports provided to the pork integrator Defendants and co-conspirators were the equivalent of competitors (here, the pork integrator Defendants and co-conspirators facilitated by Agri Stats) meeting in secret to exchange competitively-sensitive information with each other in furtherance of their conspiracy. Instead of meeting in secret in a hotel room and using a white board to conspire, the Defendants and co-conspirators, facilitated by

Agri Stats, used the non-public Agri Stats' reports that they received to exchange, *i.e.*, communicate, with each other in secret their competitively-sensitive information to implement, monitor and enforce their conspiracy.

(a)     For example, in 2009, the President of Agri Stats, Brian Snyder, reportedly commented about the secretive nature of Agri Stats: "Agri Stats has always been kind of a quiet company.  There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do.  It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth."  Sanderson Farms Investor Day – Final (Oct. 2009).

(b)     At the same 2009 presentation, when discussing "bottom line numbers" (*i.e.*, a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information." *Id.* Yet, despite refusing to reveal this information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above.

(c)     These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.  In other words, Agri Stats was stating publicly that it could not share information publicly and it did not provide any producer's information to another because it was "confidential," but in private, Agri Stats knowingly and intentionally shared each pork integrator Defendant and co-conspirator's competitively-sensitive information with the others.

(d)     ████████████████████████████████████
        ████████████████████████████████████
        ████████████████████████████████████

105

(l)



257.    Plaintiff's claims are timely because, as alleged above, overt actions by Defendants and co-conspirators in furtherance of the conspiracy occurred throughout the Relevant Period, including, without limitation: (a) Defendants and co-conspirators unlawfully coordinated to restrict pork production, including, without limitation, using the Agri Stats reports to exchange competitively-sensitive information with each other to monitor and enforce the conspiracy in 2015, 2016, 2017 and 2018 (if not later); (b) Clemens did not attempt to take advantage of the 2014 PEDv epidemic by increasing market share, although its hogs were largely unaffected by the epidemic and, had it acted rationally, it would have increased production to increase its market share for the year; (c) after it acquired Cargill's pork enterprise in approximately October 2015, JBS opted to decrease supply despite increased consumer demand; (d) in 2017, Seaboard and Triumph postponed expansion of facilities despite publicly acknowledging a growing demand and growth in pork consumption that would have supported expansion; and/or (e) in 2015, 2016, 2017 and 2018, pork integrator Defendants and co-conspirators coordinated in the export of pork.

258.    By virtue of Defendants and all of their co-conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful conspiracy alleged in this Complaint

under the injury discovery rule, fraudulent concealment doctrine, and/or doctrine of equitable estoppel.

259.     Further, Defendants' conspiracy and anticompetitive conduct, as alleged above, including their use of Agri Stats' reports and data, continued into and throughout the Relevant Period.

260.     Additionally, Plaintiff was a member of the direct purchaser class action complaint, as asserted against Defendants, including but not limited to, in *John Gross and Co., Inc. v. Agri Stats, Inc. and* No. 0:18-cv-01810-JRT-HB (Dkt. No. 1) (D. Minn. June 29, 2018).

261.     Plaintiff's claims were tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities, during the pendency of the direct purchaser class action asserted against Defendants, commencing at least as early as June 29, 2018.

262.     Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. The Agri Stats coordination coupled with direct industry communications (at trade shows, in-person meetings, calls and otherwise) denied Plaintiff the opportunity to know of the conspiracy. Moreover, pork is not exempt from antitrust regulation, and thus, before these recent events Plaintiff reasonably considered the U.S. pork industry to be a competitive industry.  Plaintiff also reasonably believed its suppliers to be dealing with them on fair and honest terms.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' pork prices before these recent events.

## V.     ANTITRUST IMPACT

263.     During the Relevant Period, Plaintiff purchased substantial amounts of pork from one or more Defendants or Co-Conspirators.

264.     As a direct and proximate result of Defendants' above-described illegal conduct, Plaintiff was compelled to pay, and did pay, artificially inflated prices for pork during the Relevant Period.

265.     As a direct and proximate consequence of Defendants' above-described wrongful conduct, Plaintiff sustained substantial losses and damage to their businesses and property in the form of overcharges for pork.  The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.

266.     Defendants' anticompetitive conduct had the following effects, among others:

A.     Price competition has been restrained or eliminated with respect to pork;

B.     The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.     Plaintiff has been deprived of free and open competition; and

D.     Plaintiff has paid artificially inflated pork prices as a result of Defendants' conduct.

267.     The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork. As a direct and foreseeable result, Plaintiff paid supra-competitive prices for pork during the Relevant Period.

268.     By reason of the alleged violations of the antitrust laws, Plaintiff has sustained injury to its business or property, having paid higher prices for pork than it would have paid in the

absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

269.     This is an antitrust injury of the type that the antitrust laws were meant to prohibit.

## VI.     COUNT I:  VIOLATION OF SECTION 1 OF THE SHERMAN ACT

270.     Plaintiff incorporates by reference each of the allegations in the preceding paragraphs.

271.     Defendants and their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

272.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

273.     At least as early as January 1, 2009, and continuing until present, the exact dates being unknown to Plaintiff, Defendants and all of their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

274.     Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for pork throughout the United States.

275.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

276.     As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supra-competitive prices for pork.

277.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and all of their co-conspirators did those things that they combined and

conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

    A.    Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

    B.    Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

    C.    Plaintiff—who directly purchased pork from one or more Defendants, their divisions, subsidiaries, affiliates, or co-conspirators—has been deprived of the benefits of free and open competition in the purchase of pork.

278.    Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

279.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff has been injured in its business or property and will continue to be injured by paying more for pork than it would have paid and will pay in the absence of the conspiracy.

280.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

281.    Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times, Defendants possessed significant market power in the market for pork and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

## VII.   REQUEST FOR RELIEF

    WHEREFORE, Plaintiff demands judgment against Defendants as follows:

282.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

283.    Plaintiff recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

284.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

285.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

286.    Plaintiff recover its costs of suit, including reasonable attorneys' fees, as provided by law; and

287.    Plaintiff have such other and further relief as the case may require and the Court may deem just and proper.

## VIII.   JURY TRIAL DEMANDED

288.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 30, 2022       By:    /s/ David B. Esau

David B. Esau (Florida Bar No. 650331)
Email:  desau@carltonfields.com
Kristin A. Gore (Florida Bar No. 59090)
Email:  kgore@carltonfields.com
Garth T. Yearick (Florida Bar No. 96105)
Email:  gyearick@carltonfields.com
CARLTON FIELDS, P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida  33401
Tel: (561) 659-7070
Fax: (561) 659-7368

Roger S. Kobert (Florida Bar No. 765295)
Email: rkobert@carltonfields.com
CARLTON FIELDS, P.A.
405 Lexington Avenue, 36th Floor
New York, New York 10174
Tel: (212) 785-2577
Fax: (212) 785-5203

Aaron A. Holman (Florida Bar No. 1010729)
Email: aholman@carltonfields.com
CARLTON FIELDS, P.A.
200 S. Orange Avenue, Suite 1000
Orlando, Florida 32801
Tel: (407) 849-0300
Fax: (407) 648-9099

*Counsel for Plaintiff Cheney Brothers, Inc.*