## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Case No. 18-cv-01776 (JRT-HB) |
| | Honorable John R. Tunheim |
| This Document Relates To: | |
| THE DIRECT PURCHASER PLAINTIFF ACTION | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## [CONFIDENTIAL VERSION - FILED UNDER SEAL]

972191.17

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. INTRODUCTION .................................................................................................... 1

II. FACTUAL BACKGROUND .................................................................................. 3

    A. Defendants Restricted Supply and Coordinated Prices During the Conspiracy Period ......................................................................................... 3

        1. Defendants Implemented Coordinated Supply Restraints as Early as 2008 .................................................................................. 4

        2. Defendants Continued to Coordinate Regarding Supply and Pricing During the Conspiracy Period ........................................... 13

    B. The Integrator Defendants Utilized Agri Stats in Furtherance of the Conspiracy ................................................................................................... 23

        1. Signaling ........................................................................................ 26

        2. Information Exchanges ................................................................... 27

III. LEGAL STANDARD ........................................................................................... 28

IV. ARGUMENT ........................................................................................................ 31

    A. THE PROPOSED CLASS IS OBJECTIVELY DEFINED AND ASCERTAINABLE ...................................................................................... 31

    B. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a) ................................................................................................. 32

        1. The Proposed Class is Sufficiently Numerous ............................... 33

        2. Questions of Law and Fact are Common to the Proposed Class ............................................................................................... 33

        3. Plaintiffs' Claims are Typical of Those of Proposed Class Members ......................................................................................... 34

        4. Plaintiffs and Their Counsel Will Adequately Represent the Interests of the Proposed Class ...................................................... 36

    C. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)(3) ............................................................................................ 37

        1. Common Issues of Law and Fact Predominate Over Individual Issues ............................................................................ 38

            (a) Common Evidence Will be Used to Prove the Antitrust Conspiracy ................................................................. 41

(b)    Common Evidence Will be Used to Show the Class-wide
Impact of Defendants' Conspiracy ...................................................42

(c)    Damages Can be Calculated on a Class-wide Basis Using
Common Evidence........................................................................49

2.    A Class Action is the Superior Method for Adjudicating the
Claims at Issue .................................................................................. 53

V.    CONCLUSION ....................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpern v. UtiliCorp United, Inc*.,
   84 F.3d 1525 (8th Cir. 1996) ...............................................35

*Am. Sales Co., LLC v. Pfizer, Inc*.,
   No. 2:14-CV-361, 2017 WL 3669604 (E.D. Va. July 28, 2017)............................................53

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)....................................................38, 39, 41

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)..................................................38, 39

*Ark. Ed. Ass'n v. Bd. of Ed. of Portland, Ark. Sch. Dist.*,
   446 F.2d 763 (8th Cir. 1971) ...............................................33

*Avritt v. Reliastar Life Ins. Co.*,
   615 F.3d 1023 (8th Cir. 2010) ...............................................38

*Bell v. WestRock CP, LLC*,
   No. 3:17-CV-829, 2019 WL 1874694 (E.D. Va. Apr. 26, 2019) ............................................53

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ........................................... *passim*

*In re Blood Reagents Antitrust Litig.*,
   No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ....................................46

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982)....................................................42

*Boyd v. Ozark Air Lines, Inc.*,
   568 F.2d 50 (8th Cir. 1977) ...............................................33

*Buetow v. A.L.S. Enters., Inc.*,
   259 F.R.D. 187 (D. Minn. 2009)...............................................41

*In re Bulk Popcorn Antitrust Litig.*,
   792 F. Supp. 650 (D. Minn. 1992)...............................................49

*In re Capacitors Antitrust Litig. (No. III)*,
   No. 14-CV-03264, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) .........................................50

*In re Catfish Antitrust Litig.*,
    826 F. Supp. 1019 (N.D. Miss. 1993) ................................................................. 41

*Chapman v. First Index, Inc.*,
    796 F.3d 783 (7th Cir. 2015) ............................................................................... 31

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ....................................................................................... 43, 49

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ..................................................................... 46, 49

*Donaldson v. Pillsbury Co.*,
    554 F.2d 825 (8th Cir. 1977) ............................................................................... 32

*Elizabeth M. v. Montenez*,
    458 F.3d 779 (8th Cir. 2006) ............................................................................... 30

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
    No. 17-MD-2785, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) ............................. 50

*Gries v. Standard Ready Mix Concrete, L.L.C.*,
    252 F.R.D 479 (N.D. Iowa 2008) ....................................................................... 33

*H & T Fair Hills, Ltd. v. All. Pipeline L.P.*,
    No. 19-CV-1095, 2021 WL 2526737 (D. Minn. June 21, 2021) ............................ 32

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972) ........................................................................................... 29

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ................................................................... 43, 46, 53

*Huyer v. Wells Fargo & Co.*,
    295 F.R.D. 332 (S.D. Iowa 2016) ....................................................................... 35

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2009) ......................................................................... 40, 43

*Kleen Prods. LLC v. Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ...................................................................... *passim*

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) ............................................................................... 50

*In re Linerboard Antitrust Litig*,
    305 F.3d 145 (3d Cir. 2002) ............................................................................... 35

*Maplevale Farms, Inc. v. Agri Stats, Inc., et al.*,
No. 0:18-cv-01803 (D. Minn.) ............................................................................1

*McKeage v. TMBC, LLC*,
847 F.3d 992 (8th Cir. 2017) .............................................................................32

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ...................................................................... *passim*

*In re Modafinil Antitrust Litig.*,
837 F.3d 238 (3d Cir. 2016).................................................................................51

*In re Monosodium Glutamate Antitrust Litig.*,
205 F.R.D. 229 (D. Minn. 2001)..........................................................................36

*Mooney v. Allianz Life Ins. Co. of N. Am.*,
No. CIV. 06-545, 2009 WL 511572 (D. Minn. Feb. 26, 2009) ............................29

*In re Mushroom Direct Purchaser Antitrust Litig.*,
319 F.R.D. 158 (E.D. Pa. 2016)...........................................................................51

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
No. 19-56514, 2022 WL 1053459 (9th Cir. Apr. 8, 2022) ........................... *passim*

*Paxton v. Union Nat'l Bank*,
688 F.2d 552 (8th Cir. 1982) ..........................................................................33, 36

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands, Corp.*,
215 F.R.D. 523 (E.D. Tex. 2003).........................................................................49

*In re Polyester Staple Antitrust Litig.*,
No. 3:03-CV-1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007).......................50

*In re Potash Antitrust Litig.*,
159 F.R.D. 682 (D. Minn. 1995).............................................................41, 43, 49

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 171 (E.D. Pa. 2015)......................................................................50, 51

*Rodriguez v. West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ..............................................................................36

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005).....................................................................29, 35

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) ..........................................................................31, 32

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008) ..........................................................................39

*In re St. Jude Med., Inc.*,
  425 F.3d 1116 (8th Cir. 2005) ........................................................................38

*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020)...........................................................................51

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ..........................................................................43

*Sullivan v. DB Invs.*,
  667 F.3d 273 (3d Cir. 2011) (*en banc*) .........................................................29

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  309 F.R.D. 482 (D. Minn. 2015).....................................................................49

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ....................................................................50

*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012).........................................................................54

*In re Urethane Antitrust Litig.*,
  251 F.R.D. 629 (D. Kan. 2008).........................................................29, 35, 36, 55

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) .......................................................................50

*In re Visa Check/Mastermoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001)............................................................................40

*In re Vitamin Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002)....................................................................29, 39

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...........................................................................30, 33, 34

*In re Wirebound Boxes Antitrust Litig.*,
  128 F.R.D. 268 (D. Minn. 1989)..............................................................29, 34, 41, 49

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  267 F.R.D. 549 (D. Minn. 2010).............................................................. *passim*

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  644 F.3d 604 (8th Cir. 2011) .................................................................29, 38, 39, 40

**Other Authorities**

1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:13 (4th ed. 2002) .................34

6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18.28 (4th ed. 2002) ...............42

6 William B. Rubenstein, *Newberg on Class Actions* § 20:52 (5th ed. 2011)............................43

7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 (3d ed. 2005)..........42

Federal Rule of Civil Procedure 23(a) .......................................................................................32

Federal Rule of Civil Procedure 23(a)(1) ..................................................................................33

Federal Rule of Civil Procedure 23(a)(2) ..................................................................................33

Federal Rule of Civil Procedure 23(a)(3) ..................................................................................34

Federal Rule of Civil Procedure 23(a)(4) ..................................................................................36

Federal Rule of Civil Procedure 23(b)(3) .........................................................................31, 37, 53

| INDEX OF DEFINED TERMS* | |
|---|---|
| **Defined Term** | **Meaning** |
| Bruckner Decl. | Declaration of W. Joseph Bruckner filed concurrently herewith. |
| Class | As defined in Section IV.A, *infra*. |
| Class Period | June 29, 2014 through June 30, 2018, inclusive. |
| Class Pork Products | The following types of Pork, or products derived from the following types of Pork, included in the Class definition: fresh or frozen loins, shoulders, ribs, bellies, bacon, or hams. For this lawsuit, Class Pork Products excludes any product that is marketed as organic or as no antibiotics ever (NAE); any product that is fully cooked or breaded; any product other than bacon that is marinated, flavored, cured, or smoked; and ready-to-eat bacon. *See* Section IV.A, *infra*. |
| Class Representatives | Plaintiffs Maplevale Farms, Inc.; John Gross and Company, Inc.; Ferraro Foods, Inc. and Ferraro Foods of North Carolina, LLC; and Olean Wholesale Grocery Cooperative, Inc. |
| Class Rep. Decls. | Collectively refers to the following declarations on behalf of each of the named Plaintiffs, filed as Exhibits to the Declaration of Bobby Pouya: (1) Maplevale Farms, Inc. (Ex. 3); (2) John Gross and Company, Inc. (Ex. 4); (3) Ferraro Foods, Inc. and Ferraro Foods of North Carolina, LLC (Ex. 5); and (4) Olean Wholesale Grocery Cooperative, Inc. (Ex. 6). |
| Complaint or TCAC | Direct Purchaser Plaintiffs' operative Third Amended and Consolidated Class Action Complaint (ECF No. 431). |
| Conspiracy Period | January 1, 2009 through June 30, 2018, inclusive. |
| Defendants | All defendants named in the Complaint, except Indiana Packers Corporation (*see* ECF No. 520 (granting Indiana Packers' motion to dismiss). Unless otherwise noted, references to each Defendant in this Motion have the same meaning as set forth in the Complaint |

| INDEX OF DEFINED TERMS* | |
|---|---|
| [Name] Dep. | Refers to the excerpt of the deposition transcript for the named individual on the indicated date, attached as an Exhibit to the Declaration of Bobby Pouya. |
| DPPs or Plaintiffs | Direct Purchaser Plaintiffs |
| Integrator Defendants | All Defendants, except for Agri Stats. |
| Mangum Report | Report of Dr. Russell Mangum filed concurrently herewith. |
| Motion | Direct Purchaser Plaintiffs' Motion for Class Certification. |
| Pork | Porcine or swine products. "Pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry. Other related terms, such as hogs and sows, are intended to reference traditional industry meanings. *See, e.g.*, Mangum Report ¶¶ 8, 38, 39. |
| Pouya Decl. | Declaration of Bobby Pouya filed concurrently herewith. All references to "Ex." refer to exhibits to the Pouya Decl. unless otherwise noted. |
| *\* All capitalized terms not defined in this Index have the same meaning as in the Complaint.* | |

## I.   <u>INTRODUCTION</u>

Direct Purchaser Plaintiffs allege that Defendants violated the Sherman Act, 15 U.S.C. § 1, when they colluded to fix, raise, and stabilize the price of Pork sold in the United States. Plaintiffs' claims and the evidence to date demonstrate that this case clearly fits the paradigm for prosecution as a class action.

Defendants are the largest producers in the United States of Pork, a commodity product, and collectively control the Pork market. During the Conspiracy Period,[1] Defendants exploited their market power by collectively coordinating output and limiting production, in addition to other collusive acts described in this brief and illustrated in the supporting evidence. Defendants constrained supply through a variety of available methods, *e.g.:* (1) "liquidation"—*i.e.*, reducing hog herd size over the long term; (2) "harvest reduction"—*i.e.*, reducing the number of pigs slaughtered; and (3) strategically exporting Pork to reduce domestic supply. The Integrator Defendants also routinely exchanged confidential and competitively sensitive information regarding Pork production and prices with each other through Defendant Agri Stats and other means. As intended, Defendants' unlawful conspiracy fixed, raised, and stabilized Pork prices. Indeed, the collusive supply restraints at the industry level were an effective means to increase prices

---

[1] The Court limited the period for which DPPs could seek damages based on the statute of limitations. *See* ECF No. 520 at p. 23. Thus, the Class Period is different from the Conspiracy Period. The Class Period commences on June 29, 2014 (four years prior to the date the Complaint was filed (*see Maplevale Farms, Inc. v. Agri Stats, Inc., et al.*, No. 0:18-cv-01803, ECF No. 1 (D. Minn.)), and runs through June 30, 2018.

to all DPPs, who are first in the chain of distribution and buy directly from the Integrator Defendants.

Well-established economic principles, legal precedent, and compelling evidence all weigh in favor of certification of Plaintiffs' proposed Class. Although merits determinations are premature at the class certification stage, Plaintiffs' Motion is replete with evidence of how Defendants implemented the conspiracy—all of which is common to Class members and can ultimately be presented in a single Class trial. Furthermore, this Motion is supported by the expert economic analysis of Dr. Russell Mangum, who studied the industry in depth and utilized a widely-accepted methodology to calculate the Class-wide impact of Defendants' conspiracy and the resulting damages to Class members.

Plaintiffs have satisfied each element required by Federal Rule of Civil Procedure 23: (i) the Class is sufficiently numerous (thousands of direct purchasers); (ii) the proposed Class Representatives' claims are typical of other Class members' claims, and the proposed Class Representatives will adequately represent the Class; (iii) the Class is represented by experienced and qualified counsel (who have vigorously and effectively prosecuted this matter to date); (iv) core issues relating to the existence of the alleged conspiracy and impact on Class members are common to all Class members; (v) issues common to the Class predominate over any individual issues (as shown by the predominance analysis, supporting evidence, and expert analysis herein); and (vi) a class action is a superior and more efficient means of adjudicating the claims of the Class members (rather than thousands of individual lawsuits).

Accordingly, Plaintiffs respectfully request that the Court certify the proposed Class, appoint the named Plaintiffs as Class Representatives, and appoint Lockridge Grindal Nauen P.L.L.P. and Pearson, Simon & Warshaw, LLP as Co-Lead Class Counsel.

## II.    FACTUAL BACKGROUND

Integrator Defendants, the leading suppliers in the multi-billion-dollar U.S. Pork market, collectively control over 86% of the wholesale Pork market. *See* Mangum Report ¶¶ 101, 104. Prior to the Conspiracy Period, steady expansion of Pork production was a given: "Some things you can just take to the bank. Sow herd expansion among the Pork Powerhouses would fall into that category – even in the face of the biggest run-up in feed prices in history." *See* Ex. 7, SMITHFIELD03994749; Mangum Report ¶ 75. As detailed below, however, that historically steady expansion decreased significantly once Defendants' alleged conspiracy got underway.

### A.    Defendants Restricted Supply and Coordinated Prices During the Conspiracy Period

Defendants' agreement to limit supply caused Plaintiffs to pay artificially-inflated prices for Pork. *See* Mangum Report ¶¶ 183-184. This is grounded in the fundamentals of supply and demand. A coordinated effort to limit domestic supply (*e.g.*, by production cutbacks or increased exports) plus consistent demand will lead to higher prices. *See* Mangum Report ¶¶ 210-211. Defendants acknowledged this throughout the Conspiracy Period. *See, e.g.*, Ex. 8, HFC-PORKAT0000033238 (Hormel explaining that it had learned that Smithfield was planning "to sell about 600 containers of different cuts to China" and that "[t]his might result[] U.S. Price to go up." [sic]); Ex. 9, SMITHFIELD01071523 at

538-539 (Smithfield COO Kenneth M. Sullivan: "The fact is the more U.S. pork that gets out of the country, the better for the values of the meat that remains in the United States.").

      1.      Defendants Implemented Coordinated Supply Restraints as Early as 2008

Frustrated by increasing supply hurting their bottom line, Defendants began coordinating to restrict domestic Pork supply in 2008. In April 2008, at a regular meeting of the "Pork Club" (run by the 21st Century Forum), there were many discussions about how Pork producers needed to curtail supply expansion. *See* Ex. 10, CLMNS-0000030331. "Debate swirled around *just how many sows need to leave North America in order to bring back profitability*." *Id*. (emphasis added). At that same meeting, Clemens conducted "'informal' late night poll[s]" to determine which of their competitors were reducing supply "through euthanasia, or the likes." *Id*. at 332. Phil Clemens of Clemens testified that in 2009, at another regular Pork Club meeting, he and other Pork Club participants felt the solution to the challenges facing the industry was to reduce hogs. *See* Ex. 11, Phil Clemens Dep. 217:3-11, Mar. 10, 2022. More specifically, on September 2, 2009, at a Pork Club meeting, Phil Clemens said: "We continue to produce too much pork for the amount that is being consumed. In the last few weeks we have started to see reduction in the sow herd - but still not even close to what really has to happen." Ex. 12, CLMNS-0000645909. Phil Clemens also emphasized that Defendants must "work together whenever possible. **As an industry we must be willing to speak with one voice in a very compelling manner**. We must prioritize our issues and spend the majority of our time working on things we have control over." *Id.* (emphasis added); *see also* Ex. 13, SBF0184228-229 (email from Steve

Weiss to Seaboard's Rod Brenneman and Gary Louis attaching and summarizing his meeting notes from the same September 2009 Pork Club meeting, emphasizing the necessity of a supply reduction, and stating there must be "350k less US sows," "200k less CND sows…").

In its July 2008 Annual Report, Smithfield, the industry giant, confirmed that it intended to be a leader in the coordinated industry effort to reduce supply: "In response to this adverse environment, Smithfield led the industry in announcing plans to reduce its U.S. sow herd by 4 to 5 percent, or 40,000 to 50,000 sows. This ultimately will result in production of 800,000 to 1 million fewer market hogs annually." Ex. 14, SMITHFIELD02229051 at 056.[2] Smithfield understood that these supply restraints would lead to increased Pork prices. *See* Ex. 16, SMITHFIELD01062391 ("As production is reduced and costs rise, meat prices will increase.").

In October 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009. *See* Ex. 17, HFC-

---

[2]   *See also* Ex. 15, http://www.meatscience.org/TheMeatWeEat/topics/fresh-meat/article/2017/03/09/pork-production-farrow-to-finish-process (Sows are female hogs used in the farrowing (or breeding) of pigs. Sows will normally have anywhere from 11 to 13 piglets per litter. With a sow being able to farrow close to three times a year, one sow can have around 36 piglets in one year. After birth, piglets grown for meat consumption move to a nursery for about six to eight weeks, or until the pig weighs upwards of 50 pounds. At the last stage of production, they spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds. After the pigs reach their final weight, they are sent to a packing plant to be harvested. Due to the nature of the pork production cycle, the reduction of sows—*i.e.*, farrowing hogs—has a significant impact on the supply of pork); Mangum Report ¶¶ 8, 38, 39.

PORKAT0000365507.[3] On that same earnings call, Hormel CFO Jody Feragen confirmed that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through." Ex. 19, HFC-PORKAT0000365340.

Tyson followed suit. In March 2009, Tyson confirmed that the key to profitability was decreasing domestic supply. As Tyson's Noel White put it in an email on March 30, 2009, "the key will be export shipments in Q3/Q409 to *create the disappearance* to keep the industry profitable." Ex. 20, TF-P-000518663 (emphasis added).

Smithfield continued to confirm publicly that it was proactively taking a leadership role in the coordinated effort to reduce domestic supply. In June 2009, Smithfield's CEO Larry Pope stated that the current restraints were not enough, more cuts were needed to "fix" the Pork industry, and that others had to step up and do their share:

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. *Somebody else has got to do something*. We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.

Ex. 21, TF-P-000013975 (emphasis added); *see also id.* at 985 (Q4 2009 Smithfield Foods Earnings Conference Call Transcript, L. Pope: "I think we solidly need -- that's my prediction, that we solidly need a 10% cutback. I think that would make the industry very profitable."). The next month—July 2009—Smithfield's Pope used the company's quarterly reporting to beat the drum again about the importance of supply reductions:

---

[3] Hormel's production statistics show that it cut its number of sows in 2008. In addition, in September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows. Ex. 18, DPP-Pork0000007801.

> I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, ***liquidation is now a recognized reality by all in the industry***. To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, ***combined with the additional cuts by our fellow producers*** should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue.

Ex. 22, SMITHFIELD01062874 at 877 (emphasis added).[4]

Defendants heard Smithfield's comments. *See, e.g.*, Ex. 24, TF-P-000014052 (internal email from Tyson's Director of Investor Relations, Jason Hudlow, summarizing the Smithfield earnings call). Tyson commented internally that it believed Smithfield's call to restrain production was too brazen for a public forum. *See id*. at 053 ("They were very aggressive, ***almost careless***, in discussing the rest of the industry." (emphasis added)); *see also* Ex. 25, TF-P-000514416 (Tyson email monitoring a Bloomberg article that referenced Smithfield's May 14, 2009 public statement that "Smithfield is 'disappointed' that competitors didn't liquidate their sow herds and would like to see the North American herds reduced by 3 percent to 4 percent.").

Tyson followed Smithfield's lead, announcing in July 2009 that it was reducing "its sow herd by 20,000 head over the next 10 weeks," which "represents roughly 29% of the firm's hog production operations." Ex. 26, TF-P-000179765 (July 15, 2009 Cleveland Research Company report noting, with respect to Tyson's announced restraints,

---

[4] The importance of supply restraints were top of mind among Smithfield high-ranking executives during the summer of 2009. As Smithfield's Pope wrote in a "Board Strategy Work" email on July 17, 2009, "[W]e all agree that ***fewer hogs likely means better overall results/returns for the company***." Ex. 23, SMITHFIELD00837212 (emphasis added).

"*Importantly, this follows SFD's announced 30,000 sow reduction last month* and several subsequent small and mid-sized herd liquidations." (emphasis added)). The report also confirmed that the industry needed to further restrain supply if they wanted to improve their margins:

> There have been few sizable operations (10K+) being liquidated and industry sow kills are still well below what is needed in order to restore profitability. We believe the industry will need to move closer to full sow kill capacity for 4-5 months in order to offset the productivity gains experienced in the past few years and better align supply and demand. *We continue to look toward herd liquidation as the primary catalyst for improvement in hog production margins for SFD*.

*Id*. (emphasis added).

Defendants paid attention to the announced supply restraints. For example, Tyson and Seaboard emailed each other about them. On July 15, 2009, Mel Davis from Seaboard emailed Steve Thompson from Tyson: "Steve, Haven't talked to you in a long while. . . . With regards to the sow reduction at Tyson are you selling the sows to someone else who will continue to produce with those sows or are the sows being liquidated?" Ex. 27, SBF0181317. Apparently unfazed by a *direct competitor asking for sensitive information about supply*, Thompson responded: "The sows are being liquidated and the sow units are being taken out of production." *Id*. Davis forwarded this information to others at Seaboard, stating: "Just checked with Tyson. The 20,000 sow reduction they have announced will result in 20,000 sows being liquidated." *Id*.

Clemens also heard the call to reduce production. On July 17, 2009, Phil Clemens wrote the Board of Directors to relay that the company was on board: "Tyson announced this week that they are reducing their sow herd by 20,000 sows. Some they are closing,

others they are trying to sell. ***Remember, we believe the sow herd needs to come down by about 600,000 to bring hogs back to real profitability***." Ex. 28, CLMNS-0000022228 (emphasis added). Shortly thereafter, Clemens held a Special Board Meeting on July 31, 2009, during which Phil Clemens was confident that producers would give up some sows, and re-emphasized the "need to lose 600,000 sows out of the US production system." Ex. 29, CLMNS-0000600011.

In August 2009, Tyson's Senior Group VP of Fresh Meats and Margin Optimization, James Lochner, further signaled that Tyson knew overall supply reduction was critical to improving industry profits, stating in an earnings call:

> Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate*** and pork production decrease into 2010 and beyond ***to improve producer profitability***. We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.

Ex. 30, TF-P-000014545 at 550 (emphasis added).[5] On the same call, Rick Greubel, Tyson's Group VP and International President, affirmed that Tyson was in lockstep with its competitors regarding exports. *See id*. at 558.

The same month—August 2009—industry giant JBS communicated its commitment to Defendants' alleged conspiracy to cut supply. That month, Wesley Mendonça Batista, CEO of JBS USA, publicly signaled JBS's participation in hog liquidation efforts.[6]

---

[5] Smithfield circulated internally various "key excerpts" from the Tyson's earning call, including this one. Ex. 31, SMITHFIELD01311002 at 003.

[6] *See* Ex. 32, JBS 2008 Earnings Conference Call (August 13, 2009).

In September 2009, Smithfield's Pope announced that he had been communicating with competitors and called for a "collective" solution:

> Smithfield cannot solve this problem alone, unless we were to take everything out. We can't solve the problem. But the answer to that is yes, *I have had conversations with several sizable, more than sizable producers, large producers, in fact very large producers, and I would tell you they are doing some liquidation*. But again, I don't think they can solve it. *I think this industry has got to solve it collectively*. I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. But the answer is, *yes, there are others cutting back. We're not the only one*.

Ex. 33, TF-P-002159632 at 641 (emphasis added); *see also* Ex. 34, TF-P-001718524 at 533.

In October 2009, Rod Brenneman, President and CEO of Seaboard Foods, stated before the House Committee on Agriculture Subcommittee on Livestock, Dairy, and Poultry, that "*we will need to 'right size' the industry by either a further reduction in supply*, an increase in demand, or more likely, some of both." Ex. 35, SBF0186877 at 878 (emphasis added).

A few months later, in December 2009, Smithfield's Pope confirmed that Smithfield had done more than its fair share, and publicly urged competitors to continue cutting supply to "put this industry back in balance:"

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so *I think we've certainly done more than our fair share in terms of what this industry needs*....

Ex. 36, DPP-Pork0000006250 (emphasis added).[7]

Defendants continued to cut domestic supply in various ways in 2010, and continued to publicly signal to each other to keep doing the same. Smithfield's Pope continued to lead the charge. For example, in March 2010, when asked on an earnings call about fourth quarter and 2011 volumes for pork, Pope publicly stated that Smithfield was planning future supply restraints. *See* Ex. 39, TF-P-001718577.[8] As expected, Tyson was listening, and created a PowerPoint to analyze Smithfield's statements on the earnings call, which confirmed that "Smithfield has liquidated 13% of their sow herd." *See* Ex. 41, TF-P-000015025; *see also id.* at 029.

Following Smithfield's lead, in 2010 Tyson reported a 3.3% decrease in its Pork sales volume along with increased export sales, which also accounted for a decrease in its capacity utilization rate. Ex. 42, TF-P-000160097. Tyson boasted about its efforts to tighten supply in its May 2010 "Tyson Monthly Commodity Outlook." Ex. 43, TF-P-000032520; *see also id.* ("Pork exports during March were the highest on record for that month in spite of trade disruptions with China and Russia.").

---

[7] Other Defendants also announced supply restraints in 2009. Hormel further reported reductions for its pork operations during its Q2 2009 earnings conference call. *See* Ex. 37, SMITHFIELD01311143. Triumph reported cutbacks of approximately 24,500 sows, representing over 6% of its sow herd. *See* Ex. 38, Betsy Freese, Pork Powerhouses 2009, Successful Farming (2009).

[8] JBS also announced in March 2010 that its pork supply restraints would result in "shortage in protein going forward." Ex. 40, Q4 2009 JBS Earnings Conference Call (Mar. 8, 2010).

The Integrator Defendants' coordinated actions were facilitated by the detailed and sensitive information they obtained about each other from Agri Stats reports. At least as early as June 2010, the subscribing Defendants began to have routine access to deanonymized Agri Stats reports. Tyson, for example, had access to very specific and sensitive deanonymized data reflecting the status of many of its "competitors," including Clemens, Seaboard, and others. *See, e.g.*, Ex. 44, TF-P-000220756 (identifying "Live wt," "Export in %," and "loin price" for Seaboard, Triumph, Clemens, and others for the month of September 2009 for various types of Pork); Ex. 45, TF-P-000218761 at 763 (listing information as specific as the "% Skin on bellies" for Clemens, Triumph, Seaboard, and others during March 2010). In December 2010, Smithfield's Pope suggested that this information went beyond ordinary market intelligence: "We certainly compare ourselves to our competitors as best we can. Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. ***This is information you may not quite have***." Ex. 46, TF-P-001718780 (emphasis added).

Industry experts also got the signals that Pope and others sent about production. For example, at the National Pork Board Swine Educators Conference in January 2010, AgStar Financial Services ACA, as part of their presentation, emphasized that sow liquidation had "not been enough and more needs to occur." Ex. 47, CLMNS-0000512149. Furthermore, in July 2010, Robert Brown (an industry consultant on "Meat Price Forecasting" and "Meat Industry") forecasted the "pork disappearance" that would continue in 2010 and 2011, causing "historically high pork prices." Ex. 48, TF-P-000040396.

Tyson also confirmed in December 2010 that Defendants' plan to decrease supply in order to increase prices was working as intended. Specifically, Tyson circulated a document entitled "2011 Protein Fundamentals Outlook" which stated that "tight protein supplies" contributed to "higher prices." Ex. 49, TF-P-000028527.

> 2.  Defendants Continued to Coordinate Regarding Supply and Pricing During the Conspiracy Period

Following coordinated production restraints in in 2008 and at the beginning of the Conspiracy Period, the Integrator Defendants continued to coordinate in furtherance of the conspiracy. Tyson employees confirmed in emails that they successfully deanonymized Agri Stats reports. For example, in a February 7, 2011 email, Tyson's Jason Brester explicitly confirmed that he knew about JBS's plans after having successfully deanonymized JBS's data from the Agri Stats reporting. Ex. 50, TF-P-000981481.[9]

In May 2011, Cargill's Commercial Manager, Bill Hale, invited Tyson's President and CEO Donnie Smith to discuss various mutually beneficial business opportunities:

> Hope all is well with you Donnie and you are navigating these turbulent times in the commodity markets as well as possible. It is going to be a very interesting year with the world not in a good position to suffer too many crop problems without a violent reaction to price. ***So let's cross our fingers or***

---

[9] *See also* Ex. 51, TF-P-000212656 (Tyson's Deb McConnell email included specific indices of operating efficiency for competitors' individual facilities—*e.g.*, "Smithfield – Tarheel, NC est IOE $6.88"); Ex. 52, TF-P-000102225-226 (McConnell circulated an excel sheet with deanonymized competitor data); Ex. 53, TF-P-000212871 (McConnell emailed a deanonymized Agri Stats file with the note: "This information is VERY CONFIDENTIAL!!! It contains documents where estimates were made on identifying our competitors."). McConnell was not the only person at Tyson who circulated deanonymized Agri Stats information. For example, Todd Neff also did. *See, e.g.*, Ex. 54, TF-P-000188320 (June 4, 2013 email attaching a deanonymized March 2013 Agri Stats review). So did Gary Machan. *See, e.g.*, Ex. 55, TF-P-000187927 (February 26, 2013 email attaching a deanonymized December 2012 Agri Stats review).

*have a good plan to deal with it*! . . . *We would like to talk about any possibilities where we might work more closely together for mutual benefit*.

Ex. 56, TF-P-001131273 (emphasis added); *see also* Ex. 57, TF-P-001843852.

Tyson knew coordination with competitors was illegal and thus instructed employees to use discretion. Tyson's General Counsel ***did not*** instruct employees not to collude with competitors about slowing down production. ***Rather, he just instructed them not to do it in writing***. *See* Ex. 58, TF-P-000205973. When Tyson employees communicated in writing, they emphasized that it should be deleted. *See* Ex. 59, TF-P-000122482 (May 29, 2012, United Food Group "Competitive Analysis" that contained competitor-specific information, with a cover email stating: "This analysis shows the competitive information. Interesting. ***We will have to delete by the end of the day from our computers***." (emphasis added)).

Other Defendants also continued sharing competitively sensitive information. In March 2012, Smithfield's Shane Horsley discussed the forward-looking "current expected cutbacks" for Indiana Packers, Seaboard, Triumph, and Tyson. Ex. 60, SMITHFIELD00861337; *see also* Ex. 61, SMITHFIELD01943195. In April 2012, Seaboard circulated documents showing that it had access to competitors' and co-conspirators' sensitive forward-looking information. *See, e.g.*, Ex. 62, SBF0066764 at 767 (Weekly Update Week 13 from Terry Holton to Steve Bresk: "Believe we will get help with the shortening of hog numbers the next few weeks," and discussing Indiana Packers and other competitors' future supply plans—*e.g.*, "IPC has acknowledged the ***higher hog***

*prices* and will be cutting their kill by 1500 head per day next week. Triumph Foods has a greater need for hogs next week than they have had for several weeks." (emphasis added)).

Tyson continued to deanonymize competitors' data in 2012. For example, in August 2012, Tyson's Deb McConnell circulated a document entitled "Agristats: Competitor Hog Cost Recap," which evidences Tyson's deanonymization efforts. *See* Ex. 63, TF-P-000538548-549.[10] In the email, McConnell warned: "Be very confidential with this!!!" *Id*.

All of these actions, *i.e.*, signaling the need for Defendants to scale back production, assuring each other of their commitment to the common cause, and sharing the confidential information necessary to confirm that commitment, reassured Defendants that if they restrained production, their "competitors" would not undermine them by increasing their own supply. This allowed them to demonstrate "pricing courage" and demand higher prices, knowing that the artificially-restrained supply would not be undermined by competitors. *See* Ex. 65, CLMNS-0000042575 at 579 (Clemens presentation from February 2012: "Fresh Picnics saw their highest return per hog over the last 5 years. This is driven by *pricing courage*. . . ." (emphasis added)).

Pork prices remained artificially inflated and Defendants reaped the benefits of their conspiracy. In May 2013, Clemens reported a continuing record of export shipments (*see* Ex. 66, CLMNS-0000503311), and in June 2013, Tyson explicitly noted that it was using exports to "increase overall domestic disappearance" (Ex. 67, TF-P-000021759), which

---

[10] *See also* Ex. 64, TF-P-000304473 (May 7, 2012 email from Tyson's McConnell to Tyson's Crystal Coburn: "Crystal - we want the companies WRITTEN in our book...as we determine who is who...then make copies of that...so others do not have to re-identify.....thanks, Debbie.").

would increase domestic prices. Furthermore, in 2013, Tyson reported a 4.6% decrease in sales volume and decreased its capacity utilization. *See* Ex. 68, TF-P-000069594. In May 2013, Agri Stats began tracking export sales. *See* Ex. 69, SMITHFIELD00675637; *see also* Ex. 70, SMITHFIELD00662439.

Tyson was not alone in acquiring sensitive competitor information at this time; other Defendants were doing the same. For example, Seaboard's Brian Taphorn testified that Seaboard's sales team would use information about Defendants' planned cutbacks (*see, e.g.*, Ex. 71, SBF0349004) to increase Seaboard's offering prices. *See* Ex. 72, Brian Taphorn Dep. 107:5-11, Jan. 25, 2022. Furthermore, Seaboard shared its overall sales strategy with JBS. *See* Ex. 73, JBS-PORK-01220675 (October 24, 2013 email from Seaboard's Brian Taphorn to JBS's Gary Albright and numerous Seaboard employees instructing the Seaboard sales team to "make sure we are not putting any quotes out there beyond November/December and anything during that period without much discussion and increased protection in the pricing.").

In November 2013, Smithfield internally questioned whether Smithfield and other Defendants have "started the assent to higher price levels" and Dhamu Thamodaran of Smithfield commented, "if Packers cut back kill levels, by 50K per week, then we may see a slow climb." Ex. 74, SMITHFIELD00302380. In the same e-mail, Thamodaran also noted Smithfield's reduction in kill levels, having "already pulled 15K out of Midwest kill levels, next week." *Id*. In December 2013, Smithfield continued to emphasize that coordinated industry action was necessary to "balance supply and demand" in order "to be able to determine ***can the industry move prices up collectively as a group***." Ex. 75,

SMITHFIELD01074263 (emphasis added). This public pronouncement that supply restraints were necessary is consistent with what Smithfield had been doing privately— acquiring information about competitors' supply. *See, e.g.*, Ex. 76, SMITHFIELD01228025 at 027 (Smithfield email thread from July 2013: Question: "What are we hearing on cut backs in industry?" Answer: "TYS and possibly IPC have cut back a little. Swift was supposedly looking and the live buys at 77 were likely Cargill, but mkt took a nice drop."); *see also* Ex. 77, SMITHFIELD00888909 (internal email thread from December 2013, wherein Smithfield reports the kill status of various Defendants, including Triumph, Seaboard, and Tyson); Ex. 78, SMITHFIELD01177237.

Rather than viewing Smithfield's decreased production as an opportunity to capture market share, as would occur in a competitive market, Hormel instead saw an opportunity for the Integrators to increase prices:

> Please communicate this information to the team. Again, despite what we want to believe, ***the markets should not trend down when the largest producer only harvesting/working 4 days per week. We can not afford to get caught. We must start selling the market higher***.

Ex. 79, HFC-PORKAT0000095315 (emphasis added). Furthermore, Hormel continued to monitor and acquire information about competitors' supply. For example, in an internal March 7, 2014 email entitled "Reduced harvest industry info," Hormel's James Fiala noted that Hormel had "picked up some very specific info on the Smithfield group's reduced harvest schedules that we understand started this week. **This reduction represents 61,900 head per week or 10.8% below their capacity, assuming no Saturday harvest**." Ex. 80, HFC-PORKAT0000068283 (emphasis in original). In the same email, Hormel confirmed

that Indiana Packers had reduced 5,000 heads per week, representing 6% of its 16,500 daily capacity, and that Hormel continued "to hear that JBS Swift is preparing/communicating reduced harvest levels at both Worthington & Marshalltown." *Id.* Hormel also continued to monitor and acquire information about competitors' exports. For example, in an email dated September 22, 2014, Hormel's Paul Peil informed Mike LoBiondo of Wegmans Food Markets that "the President of Smithfield made an announcement on their earnings release that it is their goal to continue to increase export volume early last week. That message or direction has not changed since they were purchased. . . . They are all about increasing exports to tighten the domestic supply with the goal of elevating markets." Ex. 81, HFC-PORKAT0000102529.

In the first six months of 2015, Smithfield increased its pork shipments to China by 45%. Ex. 82, SBF0528026. This shift in volume of Smithfield's exports to China prompted Seaboard to acknowledge that Smithfield's exports contributed to what the pork industry was seeing "in terms of domestic price support." *Id.* In October 2015, Smithfield COO, Kenneth Sullivan, told investors and the public on an earnings call the obvious logic of Defendants' export strategy—increase exports to decrease domestic supply to increase price of domestic pork: "The fact is the more U.S. pork that gets out of the country, the better for the values of the meat that remains in the United States." Ex. 9, SMITHFIELD01071523 at 538-539; *see also* Ex. 83, SMITHFIELD00872455.

"Other things equal, the combination of steadily increasing population and increasing domestic demand for pork should lead to a steady increase in the amount of pork available to U.S. purchasers." Mangum Report ¶ 82. However, through the exploitation of

the export market, Defendants achieved their purpose of reducing the supply and thus raising the price of domestic Pork: "The increase in pork exports has absorbed much of the increase in pork production so far and helps explain why pork prices are holding together so far." Ex. 84, HFC-PORKAT0000014557 at 558 (National Pork Board publication). The publication reminded Defendants that they must remain committed to exports to sustain U.S. Pork prices: "Going forward, robust export demand will be key in sustaining pork prices and helping pork producers keep their margins in the black." Ex. 85, SMITHFIELD00308346. Another publication reported that Pork cutout had unexpectedly been up $2 due to the demand for hams and loins, and noted that "exports could continue to hold the cutout strong and demand may be tipping its hat as to next year's expectations." Ex. 86, CLMNS-0000594415 (December 16, 2016 Informa Economics IEG report).

Defendants recognized that their increased exports reduced domestic supply and increased prices. "By increasing exports relative to demand, Defendants have lowered the supply of pork domestically. As a matter of economics, this leads to higher prices paid by DPPs for the pork that remained in the U.S. marketplace." *See* Mangum Report ¶ 83. In an internal Tyson email, dated March 3, 2016, regarding U.S. harvest capacity utilization, Jason Brester noted to Shane Miller that;

> the closing of the JMC plant here in town helped. From my perspective, I think you head [sic] the nail on the head with the industry has done a better exercising restraint and not solely focus on market share ... we have continued to grow our volume (and net exports as percentage of production) at a faster rate than the slaughter has grown in the past few years. Simply it would suggest that ham disappearance has aided the returns of the industry.

Ex. 87, TF-P-001381827; *see also* Ex. 88, TF-P-000923546 (Internal Tyson PowerPoint presentation, November 15, 2016, discussing Tyson's focus on export disappearance, particularly how Tyson "must win with key Japanese and other Asian customers to create necessary disappearance," as well as pushing for more exports to Mexico and Central America.). Seaboard's Brian Taphorn also testified that increased sales to China could soak up some potential domestic supply issues. *See* Ex. 72, Taphorn Dep. 264:16-21.

At the end of 2016, Hormel confirmed the effects of production restraints on the market in an email containing competitive intelligence: "Smithfield shut down their Tarheel plant last week one day last week [sic] and they are doing the same this week….'maintenance' …. ***more like 'manipulating the market'***." Ex. 89, HFC-PORKAT0000153244 (emphasis added). Nick Schweitzer of Hormel replied: "***We are doing the same*** for hams." *Id*. (emphasis added). Hormel's Troy Hawkshead also emailed his colleagues regarding Tyson shorting orders and customers, as well as a spike in international exports:

> Wheels are falling off at Tyson...they are converting to SAP and shorting orders in full...Mike [Dougherty (VP of Sales and Marketing at Burke Corporation)] also thought they may be potentially making a play to rid themselves of lower margin business. That would definitely explain spike in International and lower end chicken pepp [sic] type items, as well as the manufacturer type items that carry lower margins. They are also shorting Dominos and Little Caesars as well.

Ex. 90, HFC-PORKAT0000356767.

Rod Brenneman of Seaboard also understood that increasing exports led to higher domestic prices, and communicated with Clemens regarding the same: "Glad to see you are working on some higher value export opportunities in Japan/Korea as that will help

take some of the pressure off of domestic sales with the volumes increasing so fast *as well as provide some nice margins*. Let me know if I can be of any help or a sounding board on that." Ex. 91, CLMNS-0000031400 (emphasis added).

In the first quarter of 2017, several industry events provided opportunities for competitors to exchange production information. For example, from February 21-23, competitors attended the 21st Century Strategic Forums, LLC "Emerging Leaders Pork Club" meeting at the Tropicana in Las Vegas. There, many Defendants—including Clemens, Smithfield, Tyson, and JBS[11]— met to discuss topics key to their common interests. *See* Ex. 93, 21CFORUM-0000041548. On the agenda, most notably, were *plans to ramp up exports* ("Exports....how can we become more aggressive..."). *Id*. at 550.

In March 2017, Defendants also gathered at an industry meeting in Florida and exchanged competitor information. For example, Hormel's Cory Bollum learned about Smithfield's planned future production (*see* Ex. 94, HFC-PORKAT0000056924) and Smithfield received sensitive information about Hormel's production levels (*see, e.g.*, Ex. 95, SMITHFIELD00879785).

In June 2017, Clemens's Dan Groff attended a weeklong World Pork Expo conference in Des Moines, Iowa and heard about the egg industry's antitrust woes and decreased prices and reported his takeaway: "we have to find a way to avoid this with pork. *Stay united*, keep activists at bay, inform and educate customers, etc…." Ex. 96, CLMNS-0000102598 (emphasis added). The July 2017 National Pork Producers Association

---

[11] *See* Ex. 92, 21CFORUM-0000041544.

meeting in Broken Bow, Nebraska featured a "Negotiating" seminar that was converted from an in-person meeting to a webinar because, as Hormel hog procurement manager Ron Browning put it, "National Pork Board Lawyer felt that with that many producers in the room they could be guilty of collusion." Ex. 97, HFC-PORKAT0000061340.

Hormel, however, ignored these antitrust concerns and confirmed just a few months later, in October 2017, that it continued to engage in "market discovery discussions." Ex. 98, HFC-PORKAT0000062300. The sensitive nature of the information Hormel acquired is illustrated by what it learned about Tyson's production capacity in June 2018. *See* Ex. 99, HFC-PORKAT0000064709; *see also* Ex. 100, HFC-PORKAT0000064704 at 706 ("Use this to your benefit! This shows major harvest changes at Tyson! Please keep very close to your chest! Highly confidential!"). Upon receipt, Hormel's Arthur Shute emailed Hormel's Cory Bollum detailed production information Hormel received about Tyson's changes to its harvest schedule:

> These changes alone are a reduction of about 67,000 head over 3 weeks. This on top of any hours reductions they already took, assuming that they took the single shift plants from 9/10 hour days back to 8 hour days. Roughly 81,000/day capacity = 1,220,250 over 3 weeks. 5.5% reduction just in this email.

*Id*. Hormel's Paul Peil forwarded the information, stating: "***FYI. Keep this confidential as we shouldn't have this document*** . . . ." Ex. 101, HFC-PORKAT0000130969 (emphasis added). Cory Bollum also testified that "[I]t's certainly not normal" for Hormel to possess Tyson's kill schedule. Ex. 102, Cory Bollum Dep. 171:23-172:5, Dec. 1, 2021.

**B.     The Integrator Defendants Utilized Agri Stats in Furtherance of the Conspiracy**

During the Conspiracy Period, Defendants conspired to fix, raise, maintain and stabilize Pork prices. To perpetuate and ensure the stability of their anticompetitive agreement, Defendants relied on the unique services provided by Agri Stats.

Defendant Agri Stats is a data-sharing service company that regularly compiles and disseminates to its subscribers, including the Integrator Defendants, critical information pertaining to the price, production, cost, and supply of Pork. *See, e.g.*, Ex. 103, AGSTAT-P-0000000360; Mangum Report ¶ 19. During the Conspiracy Period, Agri Stats facilitated the exchange of confidential information between Integrator Defendants. By 2016, 90% of the swine market used Agri Stats in the United States and Canada. *See* Ex. 104, AGSTAT-P-0003424595 at 601; *see also* Mangum Report ¶ 147. Each Integrator Defendant subscribed to Agri Stats and reported information to Agri Stats. *Id.* Agri Stats' "benchmarking" reports allowed Defendants to monitor each other's competitively sensitive business information regarding production and pricing metrics, thereby serving as a critical part of Defendants' stable and successful price-fixing scheme.[12] *See* Mangum Report ¶¶ 130-33, 147.

As Agri Stats emphasized to its subscribers, including Defendants, reducing domestic Pork supply would increase domestic prices and profits: "We must remember that the ultimate goal is increasing profitability – not always increasing the level of production."

---

[12] *See* Ex. 105, Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

Ex. 106, DPP-Pork0000000031. Agri Stats told the industry, "Each swine production company should be participating in some type of benchmarking. To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program." *Id*.

To ensure the data in its reports was accurate, Agri Stats told participants: (i) they had to "agree on calculation and data collection procedures," (ii) they must "[d]etermine tolerance and outlier status and enforce," (iii) they must "[h]ave an administrator to compile the data and enforce procedures," and, most importantly, (iv) "[e]ach participant has to commit." Ex. 107, AGSTAT-P-0002624471. By 2009, Agri Stats successfully signed up and began providing benchmarking reports to most Integrator Defendants, which allowed them to monitor each other's production, in furtherance of the alleged conspiracy. *See* Mangum Report ¶ 147.

The Integrator Defendants recognized that Agri Stats reports were critical to their production and pricing decisions. *See, e.g.*, Ex. 108, AGSTAT-P-0002819815 (Cargill's James Russell in 2011: "I spent 17 years in the chicken biz, and while I cussed agristats regularly, the amount of information is impressive and ***essential in decision making***.") (emphasis added); Ex. 109, TF-P-002048085 (Tyson's Gary Machan emphasized the importance of the reports to supply and pricing decisions in 2012; the reports were the focal point of "an ***industry effort*** for a more extensive benchmarking system." (emphasis added)); *see also* Ex. 110, TF-P-000515626 (Tyson's Jerry Pfeifer discussed how deanonymization was critical to success: "[M]uch of the value we have realized from the Agri Stat process ***was being able to discuss competitors and putting an estimated name***

*with each location*." (emphasis added)). Defendants also found Agri Stats reports essential in helping them identify opportunities to increase prices. For example, Smithfield's Mark Copa testified that Smithfield used Agri Stats red books (sales books) to identify opportunities to increase prices. *See* Ex. 111, Mark Copa Dep. 93:22-19, Jan. 27, 2022; *see also* Ex. 112, SMITHFIELD01007102.

Although Agri Stats purported to provide "anonymized" information regarding competitors, those "competitors" routinely deanonymized the data. *See, e.g.*, Ex. 113, TF-P-001692331. Defendants felt confident in being able to deanonymize Agri Stats data. *See, e.g.*, Ex. 114, Damon Ginther Dep. 282:1-9, Dec. 7, 2021; *see also* Ex. 115, SBF0459029. Competitors would "'reach out to agri'" (*see* Ex. 116, TF-P-000513839)[13] to facilitate this "competitor reconstruction" (*see* Ex. 117, TF-P-000100077). *See also* Ex. 118, TF-P-000513842.[14]

Agri Stats data was so important to the alleged conspiracy that some Integrator Defendants paid executives and other employees bonuses based upon how well the company fared in the Agri Stats reports. *See, e.g.*, Ex. 121, AGSTAT-P-0002793886 at 902 (Smithfield "incorporated AS into Executive bonus calculations"); Ex. 122, SMITHFIELD00472630 (Shelly Phalen—Smithfield's Senior Vice President, Business

---

[13] Tyson described the process of deanonymizing competitor data as "competitor reconstruction." *See* Ex. 117, TF-P-000100077.

[14] Agri Stats provided additional information to enable Defendants to deanonymize Agri Stats reports. *See, e.g.*, Ex. 119, SMITHFIELD00456587 (Agri Stats account manager Curtis Stegall providing information to Smithfield regarding the makeup of the competitors participating in Agri Stats); *see also* Ex. 120, TF-P-000466138.

Management, Fresh Pork—referencing "handing out bonus letters" in connection with the tracking of Agri Stats improvement).

During the Class Period, the Pork industry had many additional characteristics that facilitated the alleged conspiracy. For instance, Pork products are homogeneous commodities. *See* Mangum Report ¶¶ 120-127. In addition, Defendants had the means to implement the alleged conspiracy, by virtue of their vertical integration and collective control of the production, supply, and price of Pork. *See id.* ¶¶ 47, 107, 108-118. As stated above, Integrator Defendants also used Agri Stats reports to exchange competitively sensitive, non-public, and detailed information with their co-conspirators, and otherwise monitor the alleged conspiracy. *See id.* ¶¶ 155-157.

In addition to Agri Stats, Defendants employed signaling and other information exchanges to implement and ensure adherence to the alleged conspiracy.

      1.   <u>Signaling</u>

Defendants publicly signaled to each other: (i) that they intended to decrease supply, (ii) to call for supply reductions, or (iii) to indicate they would not increase supply. This served no legitimate competitive purpose, but was essential to assure other Defendants that if they too cut production, they would not lose sales and market share to "competitors" increasing their own production. For example, in 2009, then-President and CEO of Seaboard Foods Rod Brenneman—at the time the Chairman of the American Meat Institute—sounded the rallying cry to other Defendants, stating that "the swine industry must liquidate 10% to achieve a sustainable supply/demand balance." Ex. 123, SMITHFIELD02010630 (former American Meat Institute Chairman Robert Manly

recounting Brenneman's comments); *see also* Ex. 30, TF-P-000014545 at 550 (Tyson's James Lochner signaling on an August 2009 earnings call that Tyson viewed supply reductions as a critical catalyst for success: "Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate*** and pork production decrease into 2010 and beyond ***to improve producer profitability***. We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue." (emphasis added)); Ex. 28, CLMNS-0000022228 (In a July 17, 2009 newsletter, Phil Clemens of Clemens noted that Tyson announced in a press release earlier that week that it was "reducing their sow herd by 20,000 sows. Some they are closing, others they are trying to sell. ***Remember, we believe the sow herd needs to come down by about 600,000 to bring hogs back to real profitability***. Don't know what the current reduction is, but it isn't anywhere close to 600,000." (emphasis added)).

### 2.     Information Exchanges

In addition to the information shared through Agri Stats, Defendants constantly exchanged information to ensure that nobody was "cheating" on the alleged conspiracy. *See, e.g.*, Ex. 124, SMITHFIELD00948364 at 365 ("I had several producers ask about how far out we were booked, and it sounded like other packers were booked ahead quite well also."). Defendants were so comfortable exchanging information with one another that they made business decisions with *the expectation* that they could convince competitors to follow suit (versus act independently in an effort to gain market share). *See, e.g.*, Ex. 125, SMITHFIELD00460210 at 211 (internal October 1, 2015 Smithfield email: "I would think we still see the market go up today with Hormel and JBS still needing hogs. We could take

the increase in the market for next week out of $5 per head. It would most likely impact the rate of increase ***until we get competition to pull their kills as well***." (emphasis added)). Defendants' information exchanges were also facilitated by their friendly relationships. *See, e.g.*, Ex. 126, TF-P-000726140 (September 2013 Cargill (Louis-Paul Ricard) email to Tyson (Donnie Smith) inviting Tyson representatives to visit Cargill headquarters in Minnesota to "*explore opportunities around data sharing*," to which Tyson's Smith responded, "I do love Minnesota in January!" (emphasis added)). Information also flowed between family members who worked at competitor companies. *See, e.g.*, Ex. 127, HFC-PORKAT0000290902 (Hormel's Alison Pospisil wrote: "FYI. Two weeks ago, or so, we had transportation providers tell us in Fremont, that Triumph sent loads of hogs away for improper boarding and bedding of the livestock trailers. ***I talked to my brother this week end, he works there. He confirmed the story***." (emphasis added)).

## III.   **LEGAL STANDARD**

The Supreme Court has long recognized the importance of private actions in enforcing federal antitrust laws:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation. By offering potential litigants the prospect of recovery of three times the amount of their damages, Congress encouraged these persons to serve as "private attorneys general."
> . . . Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture.

*Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (citation omitted); *see also In re Vitamin Antitrust Litig.*, 209 F.R.D. 251, 258 (D.D.C. 2002).

Price-fixing conspiracies typically succeed by extracting relatively small amounts from many victims over time. As a result, federal courts have certified classes in numerous antitrust conspiracy cases involving a range of products and industries, reflecting the fact that these cases are "particularly well suited" for Rule 23 class treatment. *See, e.g.*, *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 635 (D. Kan. 2008); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 271 (D. Minn. 1989); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012); *Sullivan v. DB Invs.*, 667 F.3d 273, 298 (3d Cir. 2011) (*en banc*); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) ("a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers.") (citations omitted).

To obtain class certification, plaintiffs must show by a preponderance of the evidence that their proposed class satisfies Rule 23(a) and at least one subsection of Rule 23(b). *See, e.g.*, *Mooney v. Allianz Life Ins. Co. of N. Am.*, No. CIV. 06-545, 2009 WL 511572, at *4 (D. Minn. Feb. 26, 2009). The principal inquiry is whether evidence common to the class can be used to prove or disprove plaintiffs' central allegations. If so, those common issues will predominate over any individual issues and, assuming Rule 23's other requirements are met, certification is appropriate. *See, e.g.*, *In re Zurn Pex Plumbing Prods. Liab. Litig.* ("*Zurn Pex II*"), 644 F.3d 604, 619 (8th Cir. 2011).

Plaintiffs need not prove their case on the merits at the class certification stage, but nevertheless courts perform a "rigorous analysis" under Rule 23. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011); *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006) ("The 'rigorous analysis' under this preliminary inquiry 'involve[s] the consideration of what the parties must prove.'"). Such an analysis may require courts to "look beyond the pleadings," scrutinize the record presented (including the expert reports), and determine whether plaintiffs' claims are susceptible to common proof at trial:

> To determine whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings. In conducting this preliminary inquiry, however, the court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class. When the decision on class certification comes before full merits discovery has been completed, the court must necessarily conduct this preliminary inquiry prospectively.

*Blades v. Monsanto Co.*, 400 F.3d 562, 566-67 (8th Cir. 2005) (internal citations omitted). However, "in conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *See Messner*, 669 F.3d at 811.

The existence of the conspiracy, class-wide impact, and measure of damages are three central issues in antitrust conspiracy cases. In this case, as in many other similar cases before it, all three elements will be proven or disproven with evidence common to the Class. As discussed below, Plaintiffs meet all the requirements for class certification under Rule 23(a) and (b)(3).

IV.   **ARGUMENT**

Plaintiffs seek to certify the following Class pursuant to Rule 23(b)(3):

> All persons and entities who directly purchased one or more of the following types of pork, or products derived from the following types of pork, from Defendants, or their respective subsidiaries or affiliates, for use or delivery in the United States from June 29, 2014 through June 30, 2018: fresh or frozen loins, shoulders, ribs, bellies, bacon, or hams. For this lawsuit, pork excludes any product that is marketed as organic or as no antibiotics ever (NAE); any product that is fully cooked or breaded; any product other than bacon that is marinated, flavored, cured, or smoked; and ready-to-eat bacon.

Excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.[15]

### A.   THE PROPOSED CLASS IS OBJECTIVELY DEFINED AND ASCERTAINABLE

"[I]n order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016). The Eighth Circuit does not impose an

---

[15] This definition is narrower than the definition in DPPs' Complaint, but refinement of the class definition as the case proceeds is common and proper. *See Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015) (stating revised class definition does not require amendment to complaint because "the obligation to define the class falls on the judge's shoulders under Fed. R. Civ. P. 23(c)(1)(B)"). As a result of discovery, and consistent with the law, the class definition may be amended at the class certification stage to conform with evidence. *Messner*, 669 F.3d at 826 n.15.

"administrative feasibility" requirement, but rather "adheres to a rigorous analysis of the Rule 23 requirements. *Id.* Accordingly, "[a] class may be ascertainable when its members may be identified by reference to objective criteria."*McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017); *see also id.* "Ascertainability does not require that a plaintiff must be able to identify all class members at the time of class certification; rather, a plaintiff need only show that class members can be identified." *H & T Fair Hills, Ltd. v. All. Pipeline L.P.*, No. 19-CV-1095, 2021 WL 2526737, at *5 (D. Minn. June 21, 2021).

Here, the Class definition is sufficiently precise and includes direct purchasers of the Class Pork Products, which can be readily identified from Defendants' transactional sales data. *See* Mangum Report ¶ 84. The proposed Class Period has a clear beginning and ending date, the Class is limited to purchases of Class Pork Products directly from Defendants for use or delivery in the United States. Thus, the Class is properly defined with reference to objective criteria and its members are ascertainable.

## B.   THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(a)

Rule 23(a) requires that the Court determine:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*See also Donaldson v. Pillsbury Co.*, 554 F.2d 825, 829 (8th Cir. 1977). Plaintiffs' proposed Class satisfies each of these requirements.

1.    <u>The Proposed Class is Sufficiently Numerous</u>

Rule 23(a)(1) requires that the class be so numerous as to make joinder of its members "impracticable." Impracticability of joinder is to be determined by the court "based upon all the circumstances surrounding a case." *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 55 (8th Cir. 1977); *see also Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559-60 (8th Cir. 1982). No rigid rule of thumb has been developed in the Eighth Circuit as to how many potential class members satisfies the requirement. *Gries v. Standard Ready Mix Concrete, L.L.C.*, 252 F.R.D 479, 484 (N.D. Iowa 2008); *Ark. Ed. Ass'n v. Bd. of Ed. of Portland, Ark. Sch. Dist.*, 446 F.2d 763, 765-66 (8th Cir. 1971) (17-20 member class satisfied numerosity).

The proposed Class consists of thousands of entities that purchased Pork directly from Defendants during the Class Period (*see* Mangum Report ¶ 84), and therefore satisfies Rule 23(a)(1).

2.    <u>Questions of Law and Fact are Common to the Proposed Class</u>

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim and "[e]ven a single [common] question will" satisfy the commonality requirement. *Wal-Mart Stores*, 564 U.S. at 359. Commonality "requires only that the course of conduct giving rise to a cause of action affects all class members, and that at least one of the elements of that cause of action is shared by all class members." *In re Zurn Pex Plumbing Prods. Liab. Litig.* ("*Zurn Pex I*"), 267 F.R.D. 549, 559 (D. Minn. 2010), *aff'd*, 644 F.3d 604 (8th Cir. 2011) (internal quotations omitted).

As in all nationwide price-fixing conspiracy class actions, proof and defense of the existence of Defendants' alleged conspiracy will be common to all Class members. *See, e.g.*, *Blades*, 430 F.3d at 566 ("For a class to be certified, plaintiffs need to demonstrate that common issues prevail as to the existence of a conspiracy and the fact of injury."); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016) (recognizing that antitrust conspiracies are conducive to common proof). In addition to this overarching common question, this case is replete with other questions common to the Class, including but not limited to: (1) whether the conduct of Defendants and their co-conspirators injured Plaintiffs and the proposed Class; (2) the effect of Defendants' alleged conspiracy on U.S. Pork prices during the Class Period; and (3) the appropriate measure of damages. Each of these and other questions is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350.

Commonality is satisfied where, as here, Plaintiffs allege a horizontal antitrust conspiracy. *See, e.g.*, *In re Wirebound Boxes*, 128 F.R.D. at 271 (proof of horizontal conspiracy "involves primarily common issues of fact and law").

### 3.   Plaintiffs' Claims are Typical of Those of Proposed Class Members

Rule 23(a)(3) requires that class representatives' claims be typical of other class members' claims. Typicality "determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:13 (4th ed. 2002). Typicality is closely related to

commonality and "a finding of one generally compels a finding of the other." *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 349 (S.D. Iowa 2016). The typicality requirement "is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory. The burden is fairly easily met so long as other class members have claims similar to the named plaintiff." *Zurn Pex I*, 267 F.R.D. at 559 (citations and internal quotations omitted); *see also Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

In antitrust cases, typicality is satisfied where "plaintiffs and all class members alleg[e] the same antitrust violations by defendants." *See In re Rubber Chems.*, 232 F.R.D. at 351 (quotation marks omitted); *see also Urethane*, 251 F.R.D. at 640. Where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical[.]" *See In re Linerboard Antitrust Litig*, 305 F.3d 145, 207 (3d Cir. 2002) (quoting *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1035 (N.D. Miss. 1993)).

Plaintiffs allege here that: (i) Defendants illegally conspired to fix, raise, maintain and stabilize Pork prices (Complaint ¶¶ 7, 14-19, 180); (ii) they purchased Pork directly from a Defendant, or their subsidiaries or affiliates, in the United States from June 29, 2014 through June 30, 2018 (*see* Class Rep. Decls. ¶ 3); and (iii) they suffered antitrust injury as a result (*see* Mangum Report ¶¶ 257-258; *see also* Class Rep. Decls. ¶ 3). To prevail, Plaintiffs will prove the same elements that other proposed Class members would need to prove, *e.g.*, the existence and effect of the conspiracy, and the resulting injury and damages they suffered. Thus, the typicality requirement of Rule 23(a)(3) is satisfied.

4.     Plaintiffs and Their Counsel Will Adequately Represent the Interests
of the Proposed Class

Rule 23(a)(4) requires the court to find that "the representative parties will fairly and adequately protect the interests of the class." Adequacy is a two-part test: "(1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562-63; *Zurn Pex I*, 267 F.R.D. at 560; *Urethane*, 251 F.R.D. at 644. "The adequacy of representation requirement is satisfied as long as one of the class representatives is an adequate class representative." *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009).

The standard is satisfied here. First, the interests of proposed Class members and named Plaintiffs are aligned. Plaintiffs allege that proposed Class members were injured by the *same conduct* and in the *same manner*. Plaintiffs, like all DPPs, assert claims arising from Defendants' conspiracy to raise Pork prices and share the same interest in establishing Defendants' liability and maximizing Class-wide damages. *See* Class Rep. Decls. ¶¶ 3-5, 8; *see also In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 233 (D. Minn. 2001) (finding adequacy where, "if the common claims of an antitrust conspiracy are not proven, none of the class members, including the named Plaintiffs, will recover"). Further, there are no foreseeable intra-Class conflicts.

Second, Plaintiffs and their counsel will continue to effectively represent the interests of the proposed Class members. Plaintiffs have already represented the proposed Class by actively participating in the litigation. *See* Class Rep. Decls. ¶¶ 6-7. They

understand the case and their responsibilities as Class Representatives, and they are committed to continuing to represent the proposed Class members throughout this litigation. *Id* ¶¶ 4-5.

As the Court has already recognized in appointing Lockridge Grindal Nauen P.L.L.P. and Pearson, Simon & Warshaw, LLP as Interim Co-Lead Class Counsel, and in granting final approval to the JBS and Smithfield settlements, these firms and their attorneys are qualified, experienced, and thoroughly familiar with antitrust class action litigation. *See* ECF Nos. 94 (Motion to Appoint Co-Lead Counsel); 149 (Order Appointing Co-Lead Counsel); 631 and 838 (JBS Preliminary and Final Approval Orders); 870 and 1154 (Smithfield Preliminary and Final Approval Orders); *see also* Bruckner Decl. ¶¶ 5, 11-14, Ex. 1; Pouya Decl. ¶¶ 4-10, Exs. 1, 2. Interim Co-Lead Class Counsel have successfully litigated many significant antitrust actions, have vigorously and effectively prosecuted this lawsuit to date, and will continue to diligently represent the Class throughout this litigation. *See* Bruckner Decl. ¶¶ 11-16, Ex. 1; Pouya Decl. ¶¶ 6-13, Exs. 1, 2.

### C. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)(3)

In conjunction with Rule 23(a)'s four prerequisites, Plaintiffs must also show that the proposed Class satisfies the predominance and superiority requirements of Rule 23(b)(3) by showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed.

R. Civ. Proc. 23(b)(3); *see also In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). Each of these requirements is satisfied in this case.

> 1.     <u>Common Issues of Law and Fact Predominate Over Individual Issues</u>

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 625 (1997) ("Predominance is a test readily met in certain cases alleging. . . violations of the antitrust laws."). "At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) (citing *Blades*, 400 F.3d at 566). The question is whether "questions of law or fact capable of resolution through common evidence predominate over individual questions." *Zurn Pex II*, 644 F.3d at 619. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Avritt*, 615 F.3d at 1029 (citing *Blades*, 400 F.3d at 566) (internal quotations and citations omitted).

"Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013) (alterations and internal quotations omitted). Rather, "[w]hat the rule does require is that common questions 'predominate over any questions affecting only individual [class] members.'" *Id*.

(alterations in original) (quoting Fed. R. Civ. P. 23(b)(3)). Predominance is typically met where "there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis[.]" *See In re Vitamin*, 209 F.R.D. at 262.

Courts in this circuit conduct a rigorous analysis to determine predominance, however: "that inquiry should be limited to determining whether, if the plaintiffs 'general allegations are true, common evidence could suffice to make out a prima facie case for the class.'" *Zurn Pex II*, 644 F.3d at 618 (quoting *Blades*, 400 F.3d at 566); *see also Amgen*, 568 U.S. at 465-66 ("Although we have cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.") (quoting *Wal-Mart Stores*, 564 U.S. at 351)). Predominance exists where, as here, a common nucleus of anticompetitive conduct is at the core of all class members' claims and each class member suffered the same injury from that common conduct. *See, e.g.*, *Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging. . . violations of the antitrust laws."); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (predominance in antitrust cases can often be met by proof of conspiracy).

"Because the application of Rule 23 to certify a class does not alter the defendants' rights or interests in a substantive way, there is no basis for applying a heightened standard of proof beyond the traditional preponderance standard." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC* ("*Tuna*"), No. 19-56514, 2022 WL 1053459, at *5 (9th Cir. Apr. 8, 2022) (*en banc*) (collecting cases). "In carrying the burden of proving facts

necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence." *Id.* at *6 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)).

"The question at class certification is not whether the plaintiffs have already proven their claims through common evidence. Rather, it is **whether questions of law or fact capable of resolution through common evidence predominate over individual questions**." *Zurn Pex II*, 644 F.3d at 619 (citing *Blades*, 400 F.3d at 566-67) (emphasis added); *see also Tuna*, 2022 WL 1053459, at *7 ("In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial.") (emphasis in original).

Here, Plaintiffs must prove: (1) Defendants violated federal antitrust laws, (2) Plaintiffs and Class members suffered some resulting injury, and (3) a measure of damages. *Blades*, 400 F.3d at 566; *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009); *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001). Common evidence will be used to prove each of these three elements, and thus satisfies the requirements of Rule 23(b)(3). *See Zurn Pex I*, 267 F.R.D. at 565 (certifying class where "[p]laintiffs may or may not ultimately prove their negligence claims, but the facts they offer to prove their theory will be largely uniform for all class members").

(a)   *Common Evidence Will be Used to Prove the Antitrust Conspiracy*

Whether a question is common or individual depends on the nature of the evidence. *See Blades*, 400 F.3d at 566. "[A] claim will meet the predominance requirement when generalized evidence proves or disproves the elements of the claim on a class-wide basis, because such proof obviates the need to examine each class member's individual position." *Buetow v. A.L.S. Enters., Inc*., 259 F.R.D. 187, 190 (D. Minn. 2009) (internal quotations and alterations omitted); *see also Blades*, 400 F.3d at 566; *Tuna*, 2022 WL 1053459, at *7.

Proof of an antitrust conspiracy "involves primarily common issues of fact and law." *In re Wirebound Boxes*, 128 F.R.D. at 271; *see also Blades*, 400 F.3d at 572. In antitrust conspiracy cases such as this, common proof of Defendants' conduct at trial will support the key elements of Plaintiffs' claims. Those elements are whether Defendants conspired, the contours of the conspiracy, each Defendant's role in the conspiracy, and whether the conspiracy violated the antitrust laws. *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging … violations of the antitrust laws."); *Catfish*, 826 F. Supp. at 1039 ("As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment."). Evidence of that conspiracy "relates solely to Defendants' conduct, and as such proof for th[is] issue[] will not vary among class members." *In re Potash Antitrust Litig*., 159 F.R.D. 682, 694 (D. Minn. 1995); *see Blades*, 400 F.3d at 572 ("Evidence that appellees entered into a conspiracy that would affect all class members would perforce be evidence common to all class members for proving the conspiracy.").

As detailed in Section II, *supra*, and in the supporting evidence, the existence and scope of the alleged conspiracy will be proven with common evidence of Defendants' improper supply restraints and other means to increase prices industrywide. The conduct at issue here are particularly suitable for class treatment; as a reduction in the supply of Pork impacts the supply of all Class Pork Products derived from the animal. *See* Mangum Report ¶¶ 32-34.

Proving the conspiracy on behalf of all Class members will focus on common evidence, including deposition testimony, telephonic and electronic communications, and documents. *Kleen*, 831 F.3d at 927 (recognizing that such antitrust conspiracies can be proven using common evidence). Such common proof is precisely why the existence of a conspiracy "is a common question that is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)." *See* 7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 at 228 (3d ed. 2005); *accord* 6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18.28 at 102 (4th ed. 2002).

(b)    *Common Evidence Will be Used to Show the Class-wide Impact of Defendants' Conspiracy*

"Impact" refers to the injury caused by the alleged antitrust violation. *Blades*, 400 F.3d at 569. "[A]n increase in price resulting from a dampening of competitive market forces is assuredly one type of [antitrust] injury." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982). Plaintiffs allege such an injury, and common evidence will show that all or almost all Class members paid a supra-competitive price during the Class Period.

"[A]s a general rule in antitrust price-fixing cases, questions common to the members of the class will predominate over questions affecting only individual members." *In re Potash*, 159 F.R.D. at 693 (citing *Catfish*, 826 F. Supp. at 1039). At the class certification stage, "to satisfy the 'predominance' standard, plaintiffs must show that both conspiracy and impact can be proven on a systematic, class-wide basis." *Blades*, 400 F.3d at 569. Plaintiffs' burden is not to prove impact itself, but only to demonstrate that the element of antitrust impact "is capable of proof at trial through evidence that is common to the class rather than individual to its members." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013); *see also In re Hydrogen Peroxide*, 552 F.3d at 311-12; *Tuna*, 2022 WL 1053459, at *14 ("[T]he district court recognized that at this stage of the proceedings, its task was to determine whether Dr. Mangum's evidence was capable of showing class-wide impact, not to reach a conclusion on the merits of the DPPs' claims."). Moreover, predominance does not require a showing "that every class member must prove at least some impact." *See Kleen*, 831 F.3d at 927; *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) ("[i]f the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong.").

"[P]roof of injury in a price-fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supracompetitive prices ...." *Blades*, 400 F.3d at 569 (citing *State of Alabama v. Blue Bird Body Co., Inc*., 573 F.2d 309, 327 (5th Cir. 1978)); *see also In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d 651, 656 (7th Cir. 2002) (Explaining structural conditions under which collusion is likely to "have an effect on price"); 6 William B. Rubenstein, *Newberg on Class Actions* § 20:52

(5th ed. 2011) ("Classes alleging horizontal price-fixing conspiracies will typically satisfy the predominance requirement because all of the customers that purchased the product from the defendants paid higher prices than they would have paid absent the anticompetitive acts and were therefore impacted in the same way.") (citations omitted). "To establish antitrust impact, an expert is 'required to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive.'" *Blades*, 400 F.3d at 569 (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000)).

In this case, predominance is supported by economic theory that, in a commodity industry, agreements among producers to restrict output will typically cause higher prices market-wide. *See* Mangum Report ¶¶ 120, 197-199. This is undoubtedly true for Pork products, which are commodity products for which price is closely tied to supply and demand. *See Id*. Indeed, establishing common impact is "relatively simple" in cases involving straightforward theories of "supply and demand." *Messner*, 669 F.3d at 816. DPPs' price-fixing theory is not "novel" or "complex," but rather "a simple one-step theory: the [Pork Integrators] conspired to raise [Pork] prices, resulting in higher prices for all buyers." *Tuna*, 2022 WL 1053459, at *17. Similarly, DPPs here "offer[] well-developed expert testimony and regression modeling supporting common impact." *Id*. After rigorous analysis, "[Dr. Mangum] concluded that **the structure and characteristics of the pork industry made it conducive to the formation and maintenance of the alleged price-fixing conspiracy**." Mangum Report ¶ 181 (emphasis added). As Dr. Mangum further explains (*see* Mangum Report § III), the Pork market has several economic factors which

made it conducive to collusion and made it more likely the conspiracy would succeed, including:

1.  <u>The Pork market is highly concentrated and dominated by Defendants</u>. "In this case, the number of alleged conspirators is low; other things equal, this benefits the cartel's formation and maintenance. … [T]he market for pork is collectively dominated by Defendants." Mangum Report ¶ 96. *See also id.* ¶¶ 95-107.

2.  <u>Influence in the Pork market</u>. "Defendants are heavily involved in the hog production stage, either through direct ownership and vertical integration, or through buyer power and monopolization of the downstream market." *Id.* ¶ 108. "Defendants control nearly all U.S. packing capacity, which also grants them significant power in the hog market. … Thus, not only do hog growers have limited, if any, options outside of selling to Defendants, but any negotiating power they would have is further restricted due to the nature of their product." *Id.* ¶ 109. *See also id.* ¶¶ 108-118.

3.  <u>Commodity-like nature of Pork products</u>. "Economists have recognized that cartels are more likely to form when the products sold by the would-be competitors are homogeneous or commodity-like." *Id.* ¶ 119. "Pork industry participants, including analysts, purchasers, and Defendants themselves, recognized that pork products are commodity products." *Id.* ¶ 121. Indeed, customers purchased Pork from numerous Defendants, and Defendants purchased and sold Pork between themselves; thereby showing the commodity nature of the product. *See id.* ¶¶ 123, 128. *See also id.* ¶¶ 119-140.

4.  <u>Barriers to entry</u>. "The usual purpose of a supply restraint conspiracy is to generate higher profits for the participants[, however] … there are significant barriers to entry for pork production." *Id.* ¶ 141. "[T]here have been significant barriers to entry in the pork packing industry throughout the Conspiracy Period. Other things equal, such barriers would have facilitated the formation and maintenance of the alleged conspiracy." *Id.* ¶ 145. *See also id.* ¶¶ 141-145.

5.  <u>Opportunities for forming, monitoring, and enforcing the alleged conspiracy</u>. Defendants each participated in, received, and relied on Agri Stats' benchmarking services (*see id.* ¶¶ 146-157); actively participated in various industry trade associations (*see id.* ¶¶ 158-167); and utilized public announcements and earnings calls to facilitate the alleged antitrust conspiracy (*see id.* ¶ 168). These actions

"illustrate[] Defendants' opportunities for forming, monitoring, and enforcing the alleged conspiracy." *Id.* ¶ 146.

*See also* Mangum Report § II (analyzing the industry background) and § III (analyzing the structure and economic characteristics of the Pork market).

Based on his training and experience, as well as his examination of the Pork industry and the nature of the alleged conspiracy, Dr. Mangum concludes that: (i) the structure and characteristics of the Pork industry made it conducive to the formation and maintenance of a successful price-fixing conspiracy; and (ii) the alleged conspiracy would have impacted prices paid by all (or nearly all) members of the DPP Class. *See* Mangum Report ¶ 181. This type of economic analysis, based on a qualified expert's analysis of the market and the evidentiary record, is an accepted method of supporting common impact and predominance. *See Blades*, 400 F.3d at 569; *Concord Boat*, 207 F.3d at 1055; *see also Kleen*, 831 F.3d at 927 (finding predominance is satisfied based on plaintiffs showings and evidence regarding the structure of the market which made it susceptible to cartelization); *In re High Fructose*, 295 F.3d at 657 (Product standardization facilitates a more "successful conspiracy"); *Tuna*, 2022 WL 1053459, at *17; *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *31, 32 (E.D. Pa. Oct. 19, 2015) ("[m]any courts have accepted market-structure analyses in finding predominance with respect to antitrust impact" where relevant structural features are shown to be present, and accepting plaintiffs' expert's "analysis of the structure of the TBR market as persuasive evidence supporting a finding of predominance with respect to impact").

Dr. Mangum further supported his opinions with analysis of Pork prices using the results of his multiple regression model, as well as a price correlation analysis. *See* Mangum Report ¶¶ 213, 200. Dr. Mangum' multiple regression model is commonly employed for estimating impact and damages in antitrust litigation. *See id.* § V (multiple regression analysis showing the overcharge paid by DPPs), § VI (damages analysis and calculation); *see also Tuna*, 2022 WL 1053459, at *15 ("In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members.") (citing *Kleen*, 831 F.3d at 929; *Urethane*, 768 F.3d at 1263; *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 97, 107 (2d Cir. 2007); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188-89 (9th Cir. 2002); *Linerboard*, 305 F.3d at 153).

In order to test Class-wide impact Dr. Mangum applied the model to Class members at the transactional level to determine whether the prices they actually paid were higher than but-for prices. This test examines the "economic factors and considerations [that] affect the prices DPPs pay for pork products." *See* Mangum Report ¶ 218. Dr. Mangum's regression model shows that over 99% of DPPs were impacted by paying an actual price during the Class Period that exceeds the but-for price. *See* Mangum Report ¶ 256. Dr. Mangum further notes, the less-than-1% of customers who appear to be unimpacted under these tests have substantially fewer purchases (*i.e.*, observations)—they account for 0.001% of all transactions in the data. *Id.*  This is powerful evidence of common impact.

*See Tuna*, 2022 WL 1053459, at *17 (specifically holding Dr. Mangum's regression model possessed the "ability to provide evidence of common impact.").

Dr. Mangum also ran correlation analyses in which he confirmed that "transaction prices customers paid for pork move together across and within a) pork product types (or "cuts"), b) Defendants, and c) geographic locations. This empirical analysis is further evidence that individual DPPs could not have avoided the impact of the alleged conspiracy." *See* Mangum Report ¶ 200. Dr. Mangum further found:

a)     "That Defendants' prices are highly correlated with each other is empirical evidence that the alleged conspiracy would have affected all or virtually all DPPs, because DPPs would not have been able to avoid the impact of the alleged conspiracy by switching from one Defendant to another." *Id.* ¶ 205.

b)     "This correlation analysis is a strong indicator that individual customers could not have avoided impact from the alleged conspiracy. Because there is a structure to pork prices across these key dimensions, this correlation analysis is evidence that a) pork products are priced in ways that are consistent with commodity products, and b) the alleged conspiracy would have affected all or virtually all customers." *Id.* ¶ 207.

c)     "[T]he price index for each state follows the same pattern, with prices generally rising and falling closely together, despite differences in geography. … This further supports a finding of common impact, because it indicates that the effects of the alleged conspiracy would have been nationwide, rather than limited to any specific geographical area." *Id.* ¶ 209.

Dr. Mangum's conclusion that Pork products are highly correlated—*i.e.*, the movement of Pork prices in conjunction with one another—confirms the operation of the economic principles on which Dr. Mangum based his conclusions, and further demonstrates that all or virtually all Class members would have been impacted by

Defendants' alleged conspiracy. *See* Mangum Report ¶ 256. This combination of market-based and statistical analysis shows that Class-wide impact can be proven at trial through common evidence. *Blades*, 400 F.3d at 569; *Concord Boat*, 207 F.3d at 1055; *Comcast*, 569 U.S. at 30.

(c)    *Damages Can be Calculated on a Class-wide Basis Using Common Evidence*

At class certification, plaintiffs must show that "damages are capable of measurement on a classwide basis," but they "need not be exact." *See Comcast*, 569 U.S. at 34-35. "In proving the *amount* of damage, the antitrust plaintiff need only present evidence from which the fact finder may make a just and reasonable estimate of the damage that is not based on speculation or guesswork." *In re Bulk Popcorn Antitrust Litig.*, 792 F. Supp. 650, 653 (D. Minn. 1992) (citing *Nat'l Farmers Org., Inc. v. Assoc. Milk Producers, Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988) (emphasis in original); *Piggly Wiggly Clarksville, Inc. v. Interstate Brands, Corp.*, 215 F.R.D. 523, 530 (E.D. Tex. 2003) ("[D]amages in the antitrust context need not be proven with exact particularity, [but] may not be merely speculative."). Individual issues in calculating damages do not preclude class certification, unless those individual issues overwhelm common issues. *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 489 (D. Minn. 2015); *In re Potash*, 159 F.R.D. at 697 ("[T]he fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis."); *In re Wirebound Boxes*, 128 F.R.D. at 272 ("The amount of damages largely

involves individualized questions. This is typically true in antitrust class actions, however, and does not preclude certification.").

Dr. Mangum presented a workable and widely-accepted methodology to calculate Class-wide damages based on standardized statistical analyses of industry pricing based on Defendants' transactional data. *See* Mangum Report §§ IV, V. Dr. Mangum's multiple regression analysis is a common and well-accepted method to calculate damages in antitrust cases. *See* Mangum Report ¶ 218 (citing authority); *see also Tuna*, 2022 WL 1053459, at *15; *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260-61 (10th Cir. 2014); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010) ("Courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis."); *In re Polyester Staple Antitrust Litig.*, No. 3:03-CV-1516, 2007 WL 2111380, at *1 (W.D.N.C. July 19, 2007) (expert regression analysis accepted as common proof of impact); *In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-03264, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018) ("[A] multiple regression approach [] is a widely used econometric technique for determining whether prices were higher during a class period than they otherwise would have been without anti-competitive conduct."); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 193 (E.D. Pa. 2015) ("Courts frequently recognize that regression analysis can be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price, like cost and demand." (quotation marks omitted)); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785,

2020 WL 1180550 (D. Kan. Mar. 10, 2020); *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 202 (E.D. Pa. 2016).

Dr. Mangum's damages methodology aligns with Plaintiffs' liability theory, *i.e.*, that Defendants artificially raised Pork prices in violation of the Sherman Act, by means including but not limited to restraining supply. *See* Mangum Report ¶¶ 7, 17, 155, 189; *see also In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 270 (3d Cir. 2020) (accepting plaintiffs' damage model which examined "the totality of [defendant's] actions" and "all the acts taken together [to determine whether they] show the willful acquisition or maintenance of a monopoly."); *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016) (accepting plaintiffs' damage model because "their theory of liability is that each individual agreement contributed to the market-wide harm, and that all five original defendants are jointly and severally liable for this harm as concurrent tortfeasors. This theory may ultimately be proven wrong, but it does match Plaintiffs' damages theory."); *In re Processed Egg*, 312 F.R.D. at 192; *In re Mushroom*, 319 F.R.D. at 207 (accepting Plaintiffs' single damage model which resulted in a single overcharge accounting for "both the supply control and price fixing claims [that] remain in this case.").

Dr. Mangum's damages model shows that Class members paid higher prices for Class Pork Products during the Class Period. *See* Mangum Report ¶¶ 257-258. As discussed, Dr. Mangum used well-established and well-supported methodologies in creating his model (*see id.* ¶ 218):

> Multiple regression analysis is a tool used by economists to test hypotheses about statistical relationships between observed outcomes and factors thought to explain those observed outcomes. … More specifically, regression

analysis attempts to estimate the statistical relationships between a dependent variable and a set of key explanatory variables of interest, while controlling for other factors that theoretically affect the dependent variable.

*Id*. ¶ 214. "Here, a central question relates to what economic factors and considerations affect the prices DPPs pay for pork products." *Id.* ¶ 218. "The dependent variable[16] in each pork category model is the average monthly price paid by a particular customer." *Id.* ¶¶ 219, 226. To identify and measure the effect of Defendants' conspiracy, Dr. Mangum compared Defendants' prices during the Conspiracy Period to Defendants' prices during a benchmark period presumed to be unaffected by the alleged misconduct: January 2005 through September 2009. *See id.* ¶ 233. In addition, Dr. Mangum included appropriate explanatory variables in his model:

> Aside from the binary indicator variable related to the Conspiracy and benchmark periods discussed above, my proposed regression model includes appropriate explanatory supply and demand variables to account for non-collusive factors that the evidence in this case, as well as economic theory, indicate would impact prices for pork products.

*Id.* ¶ 235. Dr. Mangum's additional variables are cost variables, seasonal effects, competing proteins, macroeconomic controls, product and consumer characteristics, and time-specific events.[17] *See id.* ¶¶ 236-245. Including these appropriate variables in this regression model leads to statistically significant results: **the members of the DPP Class were overcharged for the Class Pork Products by over $5 billion**. *See id.* ¶¶ 257-258.

---

[16] "The data for the dependent variable comes from Defendants' transaction data." *Id.* ¶ 219.

[17] These events include the swine-flu outbreak of 2009-2010 and the porcine epidemic diarrhea virus in 2014. *See id.* ¶¶ 243-245.

This well-reasoned and evidence-based expert opinion, combined with Plaintiffs'

other substantial record evidence, provide relevant, probative and common evidence to

estimate damages on a Class-wide basis. *See In re High Fructose*, 295 F.3d at 660-61

(expert's statistical analysis held admissible to establish class-wide impact at trial); *Am.*

*Sales Co., LLC v. Pfizer, Inc.*, No. 2:14-CV-361, 2017 WL 3669604, at *17 (E.D. Va. July

28, 2017) ("Plaintiffs rely upon a widely-accepted mathematical formula for assessing

damages with class wide proof. The fact that individualized inquiry may be necessary to

allocate those damages will not defeat class certification.") (internal citation omitted); *Bell*

*v. WestRock CP, LLC*, No. 3:17-CV-829, 2019 WL 1874694, at *5 (E.D. Va. Apr. 26,

2019) (finding predominance satisfied because "'if liability is found, the issue of damages

can be decided by a special master or by another method.'") (citation omitted).

Therefore, the predominance requirement of Rule 23(b)(3) is satisfied.

2.      A Class Action is the Superior Method for Adjudicating the Claims at
        Issue

Under Rule 23(b)(3), certification is warranted if a class-wide trial is "superior to

other available methods for fairly and efficiently adjudicating the controversy." *See* Fed.

R. Civ. P. 23(b)(3). Superiority is evaluated by:

> (A) the interest of the members of the class in individually controlling the
> prosecution or defense of separate actions; (B) the extent and nature of any
> litigation concerning the controversy already commenced by or against
> members of the class; (C) the desirability or undesirability of concentrating
> the litigation of the claims in the particular forum; (D) the difficulties likely
> to be encountered in the management of the class action.

*See id*; *see also Zurn Pex I*, 267 F.R.D. at 566-67.

Class adjudication is more efficient than any other procedure available for resolving the relevant factual and legal issues here. *See Messner*, 669 F.3d at n.5 ("There are so many common issues of law and fact relating to the issue of [liability], however, that the superiority requirement likely poses no serious obstacle to class certification here."). The record to date—showing that Plaintiffs can establish their claims on a Class-wide basis using predominantly common proof—underscores the superiority of the class mechanism. *See Kleen*, 831 F.3d at 929.

In finding the superiority requirement satisfied, courts have explained that the alternative—litigating hundreds or thousands of lawsuits individually—would be wasteful, inefficient and unfeasible for many class members. *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 349 (D. Md. 2012) ("[T]his Court concludes that because common issues predominate, class action treatment is superior to other available methods of adjudicating the Plaintiffs' claims."). Here, there are no superior alternatives for adjudicating this case. While a handful of direct action Plaintiffs—generally very large purchasers—have opted out of the direct purchaser action to bring individual suits against Defendants, this is not feasible for the vast majority of Class members. *See, e.g.*, Declarations of Eric Schachter in Support of Final Approval of DPP Settlements with JBS and Smithfield (ECF Nos. 827 and 1154, respectively) (reflecting less than 100 valid opt-out requests representing approximately 1,600 entities per settlement (with significant overlap), out of over 55,000 potential Class member entities). Thus, denying certification would likely result in the filing of additional individual actions or, just as likely, the abandonment of claims by Class members whose injuries, while quite real, are not large enough to economically justify the

costs of litigation. The first alternative—additional individual actions—would be grossly inefficient, costly, and time consuming, because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation. The second—abandonment of meritorious claims—is directly contrary to the well-established principle that private actions are essential to the effective enforcement of the antitrust laws.

In addition, Class members are dispersed across the country, each with materially identical claims. The most feasible and efficient way for these Class members to pursue their claims is by way of a class action. *See Urethane*, 237 F.R.D. at 453.

Accordingly, the proposed class action is superior to other available methods (if any) to fairly and efficiently adjudicate Plaintiffs' claims.

## V.   <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully submit that the proposed Class meets all requirements under Rule 23 and that the Court should certify the proposed Class, appoint the named Plaintiffs as Class Representatives, and appoint Lockridge Grindal Nauen P.L.L.P. and Pearson, Simon & Warshaw, LLP as Co-Lead Class Counsel.

Date: May 2, 2022

*/s/ W. Joseph Bruckner*
W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Joseph C. Bourne (MN #0389922)
Arielle S. Wagner (MN #0398332)
Stephen M. Owen (MN #0399370)
**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
T:  (612) 339-6900
F:  (612) 339-0981
*wjbruckner@locklaw.com*
*bdclark@locklaw.com*
*jcbourne@locklaw.com*
*aswagner@locklaw.com*
*smowen@locklaw.com*

Clifford H. Pearson (*Pro Hac Vice*)
Daniel Warshaw (*Pro Hac Vice*)
Thomas J. Nolan (*Pro Hac Vice*)
Bobby Pouya (*Pro Hac Vice*)
Michael H. Pearson (*Pro Hac Vice*)
**PEARSON, SIMON & WARSHAW,
LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
T:  (818) 788-8300
F:  (818) 788-8104
*cpearson@pswlaw.com*
*dwarshaw@pswlaw.com*
*tnolan@pswlaw.com*
*bpouya@pswlaw.com*
*mpearson@pswlaw.com*

Bruce L. Simon (*Pro Hac Vice*)
Benjamin E. Shiftan (*Pro Hac Vice*)
Neil Swartzberg (*Pro Hac Vice*)
**PEARSON, SIMON & WARSHAW,
LLP**
350 Sansome Street, Suite 680
San Francisco, CA 94104
T:  (415) 433-9000
F:  (415) 433-9008
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*
*nswartzberg@pswlaw.com*

Melissa S. Weiner (MN #0387900)
**PEARSON, SIMON & WARSHAW,
LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
T:  (612) 389-0600
F:  (612) 389-0610
*mweiner@pswlaw.com*

*Interim Co-Lead Class Counsel for the
Direct Purchaser Plaintiff Class*