# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE PORK ANTITRUST LITIGATION* | Case No. 0:18-cv-01776-JRT-HB |
| This Document Relates To:<br><br>ALL COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFF ACTIONS | **MEMORANDUM IN SUPPORT OF COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF LEAD COUNSEL AND PLAINTIFFS' STEERING COMMITTEE** |

**REDACTED**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................... III

I.      INTRODUCTION ............................................................................................ 1

II.     STATEMENT OF FACTS .............................................................................. 3

        A.      Perceptions of Plentiful Supply Characterized the Pork Industry at the Start
                of the Conspiracy ........................................................................................ 5

        B.      Defendants Conspired to Reduce the Supply of Pork Over the Course of
                Nearly a Decade to Increase the Price of Pork and their Profits. .................. 6

                1.      Defendants Called for Supply Cuts and Answered those Calls
                        Through a Combination of Public and Secret Communications ........ 7

                2.      Defendants Exchanged Competitively Sensitive Information
                        Throughout the Class Period in Effecting the Conspiracy .............. 10

                3.      Defendants Demonstrated their Adherence to the Conspiracy by
                        Refusing to Increase Capacity in the Face of Clear Opportunities to
                        Gain Share ..................................................................................... 14

        C.      The Effects of the Conspiracy Included Supracompetitive Prices for Pork
                Products. ................................................................................................... 17

        D.      Summary of Common Issues of Law and Fact. ........................................ 17

III.    STANDARD FOR CLASS CERTIFICATION ............................................. 18

IV.     PLAINTIFFS SATISFY RULE 23(A) .......................................................... 22

        A.      Numerosity: The Proposed Class Is Numerous ......................................... 22

        B.      Commonality: A Question of Law or Fact Is Common to Class Members. 22

        C.      Typicality: The Proposed Representatives' Claims Are Typical. ............... 24

        D.      Adequacy: Plaintiffs Will Fairly and Adequately Represent the Class. ..... 25

V.      PLAINTIFFS SATISFY RULE 23(B)(2) ..................................................... 28

VI.    PLAINTIFFS SATISFY RULE 23(B)(3) ............................................................ 29

      A.    Common Issues Predominate in the Case as a Whole under Rule 23(b)(3).
            ...................................................................................................... 29

      B.    The Elements of the Class's Claims Confirm that the Predominance
            Requirement is Satisfied.............................................................. 33

            1.    Evidence of the alleged antitrust violation is common to the class. 33

            2.    Common evidence shows impact to the class. .................................. 33

                  a.    Common Evidence of General Price Inflation. ...................... 37

                  b.    Common Evidence of Widespread Impact............................. 38

                        i.    Under his first method, Dr. Williams analyzed the
                              types of sales and structure of the market at issue. .... 40

                        ii.   Dr. Williams' second method of analysis—testing for
                              common impact using statistical analysis analyzing
                              every transaction by certain distributors—confirmed
                              that both overcharges and their pass-through widely
                              impacted the Class. .................................................... 44

                  c.    Common Issues Predominate Regarding Aggregate Damages..
                        ...................................................................................... 48

      C.    Similarities in the Applicable Law Confirm Predominance. ...................... 49

      D.    A Class Action Is Superior to Individual Actions....................................... 51

VII.   THE COURT SHOULD APPOINT CLASS COUNSEL...................................... 55

VIII.  CONCLUSION ................................................................................................. 55

## TABLE OF AUTHORITIES

### Cases

*Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525 (8th Cir. 1996) ................................. 24, 25

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................. 20, 21, 29, 33, 49

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455 (2013) ...................... 19, 30

*Arthur Young & Co. v. Reves*, 937 F.2d 1310 (8th Cir. 1991) .......................................... 20

*Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir. 2010) ........................................ 18

*B & R Supermarket v. Mastercard Int'l*, No. 17-cv-02738 (MKB) (JO), 2021 WL 234550
   (E.D.N.Y. Jan. 19, 2021) ................................................................................................. 35

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341 (Cal. Ct. App.
   1987) ........................................................................................................................ 41, 42

*Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-786, 2016 WL
   4098741 (D. Minn. July 28, 2016) ................................................................................. 22

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) .................................................... 35

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ............................................................. 53

*Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121 (9th Cir. 2017) ..................................... 54

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S.
   598 (2001) ....................................................................................................................... 28

*Burnett v. National Association of Realtors*, No. 19-CV-00332-SRB, 2022 WL 1203100
   (W.D. Mo. Apr. 22, 2022) ................................................................................... 24, 35, 48

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ..................................... 53

*Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820 (D.N.J. 2015) .............................34, 35

*City of Farmington Hills Emps. Ret. Sys. V. Wells Fargo Bank, N.A.*, 281 F.R.D. 347 (D. Minn. 2012) ........................................................................................................51

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)..................................................................48

*Custom Hair Designs by Sandy v. Cent. Payment*, 984 F.3d 595 (8th Cir. 2020) ............30

*Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817 (8th Cir. 2016)................................29

*Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977) ...............................................24

*Drake v. Steak N Shake Operations, Inc.*, 286 F. Supp. 3d 1040 (E.D. Mo. 2017) ..........22

*Ebert v. Gen. Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016) ...................................................22

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .........................................................18

*Elizabeth M. v. Montenez*, 458 F.3d 779 (8th Cir. 2006) ..................................................18

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09-CV-00852, 2012 WL 3841397 (E.D. Wis. Sep. 5, 2012)..................................................................................41

*Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982) .......................................18

*Glenn v. Daddy Rocks, Inc.*, 203 F.R.D. 425 (D. Minn. 2001) .........................................22

*Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175 (3d. Cir. 2014)................................51

*Greene v. Jacob Transportation Servs., LLC*, No. 209CV00466GMNCWH, 2017 WL 4158605 (D. Nev. Sept. 19, 2017)..................................................................................54

*Gress v. Freedom Mortg. Corp.*, 386 F. Supp. 3d 455 (M.D. Pa. 2019)...........................26

*H & T Fair Hills, Ltd. v. All. Pipeline L.P.*, No. 19-CV-1095 (JNE/BRT), 2021 WL 2526737 (D. Minn. June 21, 2021)................................................................................48

iv

*Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258 (2014) ...........................................35

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968)............................36

*Hospital Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms.*, 333
   F.R.D. 390 (M.D. Tenn. 2019) ......................................................................................26

*Hyland v. Homeservices of Am., Inc.*, No. 3:05-CV-612-R, 2008 WL 4858202 (W.D. Ky.
   Nov. 7, 2008) .........................................................................................................24, 32

*In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, 2014 WL 7882100
   (E.D.N.Y. Oct. 15, 2014).................................................................................39, 44, 46

*In re Alcoholic Beverages Litig.*, 95 F.R.D. 321 (E.D.N.Y. 1982) ...................................43

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001) ....................33, 48

*In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993)................................32

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606 (N.D. Cal. 2015) ....32, 44

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5391159 (N.D.
   Cal. Sept. 24, 2013) .......................................................................................................39, 46

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5429718 (N.D.
   Cal. June 20, 2013) ........................................................................................................39, 41

*In re CenturyLink Sales Prac. & Sec. Litig.*, 337 F.R.D. 193 (D. Minn. 2020)...............24

*In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200 (M.D. Penn. 2012) 40, 44,
   46

*In re Cipro Cases I and II*, 121 Cal. App. 4th 402 (Cal. Ct. App. 2004).........................42

*In re Control Data Corp. Sec. Litig.*, 116 F.R.D. 216 (D. Minn. 1986)...........................20

v

*In re Domestic Drywall Antitrust Litig.*, 322 F.R.D 188 (E.D. Penn. 2017)................ 40, 44

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82 (D.

    Conn. 2009) ........................................................................................ 41, 54

*In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal.

    June 9, 2010) ...................................................................................... 41

*In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555 (N.D. Cal. 2013)......................... 21

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ............... 18, 19, 34

*In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052 (N.D.

    Cal. Jan. 19, 2017) ......................................................... 40, 41, 42, 43, 44, 46

*In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal.

    Feb. 21, 2017) ..................................................................................... 37, 48

*In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001).................................... 33

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2016 WL 948874 (N.D.

    Cal. Mar. 14, 2016)............................................................................... 27

*In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001)............. 21

*In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168 (D. Mass. 2013) ............. 36

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ................................ 36, 37, 48, 50

*In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 07-cv-4446, 2018 WL

    2383098 (N.D. Ill. Mar. 31, 2018) ................................................................ 26

*In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064 (N.D.

    Cal. Dec. 23, 2010).................................................................................... 31

*In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444 (N.D.
Cal. Feb. 8, 2016) ................................................... 38, 43

*In re Pork Direct & Indirect Purchaser Antitrust Litig.*, 544 F. Supp. 3d 1379 (JPML
2021) .................................................................. 52

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995) ..... 21, 23, 24, 25, 36, 43, 48

*In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL
5632089 (W.D. Mo. Nov. 9, 2021) ................................... 38

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir.
1998) ................................................................ 36, 51

*In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. 450 (D.N.J. 1997) ..... 36

*In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005) ........ 21, 31, 32, 33

*In re School Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986) ................................ 51

*In re Select Comfort Corp. Securities Litigation*, 202 F.R.D. 598 (D. Minn. 2001)... 23, 51

*In re Southeastern Milk Antitrust Litig.*, No. 2:08-MD-1000, 2010 WL 3521747 (E.D.
Tenn. Sept. 7, 2010) ................................................ 32

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal.
2009) ............................................................. 31, 42, 44

*In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154 (D. Minn. 2014) ......... 50

*In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 291 (N.D. Cal. 2010) .. 31, 35, 53

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010) . 21, 32, 39,
41, 42, 43, 44, 54

vii

*In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013) ......................... 49

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-2247, 2012 WL 2512750 (D. Minn. June 29, 2012) .............................................................................. 22

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ......................................... 32

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013) .................................................................................................................. 30

*In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. 268 (D. Minn. 1989) ...................... 25

*In re Workers' Compensation*, 130 F.R.D. 99 (D. Minn. 1990) ................................ 23, 24

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 267 F.R.D. 549 (D. Minn. 2010) .......... 49, 54

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) .......... 18, 20, 22

*Khoday v. Symantec Corp.*, No. CIV. 11-180 JRT/TNL, 2014 WL 1281600 (D. Minn. Mar. 13, 2014) ........................................................................................................ 25

*Kimball v. Frederick J. Hanna & Assocs., P.C.*, No. 10-130, 2011 WL 3610129 (D. Minn. Aug. 15, 2011) ................................................................................................ 51

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) ......................................... 36, 49, 51

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009) ................................... 36

*Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559 (D. Minn. 2014) ................................. 25

*Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569 (D. Minn. 1995)............. 20

*Marcus v. Kansas Dep't of Revenue*, 206 F.R.D. 509 (D. Kan. 2002) ............................. 28

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012)......................................... 36

*Meijer, Inc. v. Abbott Labs*, No. C 07-5985 CW, 2008 WL 4065839 (N.D. Cal. Aug. 27,
2008) ................................................................................................................ 48

*Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802 (7th Cir. 2012) ............... 34, 36

*Microsoft I-V Cases*, 2002-2 Trade Cas. (CCH) 2000 WL 35568182 (Cal. Sup. Ct. Aug.
29, 2000) ........................................................................................................... 42

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015) ........................................... 54

*Mund v. EMCC, Inc*., 259 F.R.D. 180 (D. Minn. 2009) ...................................................... 51

*Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010 (D. Minn. 2007) ................. 23

*Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016) ......... 34, 39

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, No. 19-56514, 2022
WL 1053459 (9th Cir. Apr. 8, 2022) ....................................................... 27, 30

*Paper Sys., Inc. v. Nippon Paper Indus. Co*., 281 F.3d 629 (7th Cir. 2002) .................... 37

*Paxton v. Union Nat'l Bank*, 688 F.2d 552 (8th Cir. 1982) ......................................... 24, 26

*Payton v. County of Kane,* 308 F.3d 673 (7th Cir. 2002) .................................................. 26

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ..................................................... 19

*Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929 (D. Minn. 2018) .............................. 22

*Sobel v. Hertz Corp.*, 291 F.R.D. 525 (D. Nev. 2013) ...................................................... 54

*Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371 (8th Cir. 2018) ................................ 48

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ............................ 33, 50, 53

*Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, No. CV 19-3071 (JRT/BRT), 2021
WL 6127880 (D. Minn. Dec. 28, 2021) ........................................... 21, 26, 55

ix

*Thinesen v. JBC Legal Group, P.C.*, No. 05-518 (DWF/SRN), 2005 WL 2346991 (D.

    Minn. Sept. 26, 2005) ....................................................................................... 53

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209

    F.R.D. 159 (C.D. Cal. 2002)....................................................................... 33, 34

*Torres v. Mercer Canyons Inc.,* 835 F.3d 1125 (9th Cir. 2016)........................ 30, 33, 36

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)....................................... 29, 30, 48

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d

    802 (9th Cir. 2010) ......................................................................................... 18

*Wal-Mart v. Dukes*, 564 U.S. 338 (2011)........................................................... 3, 19, 22, 23

*Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986) .............................................. 50

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000) ........................ 50

*Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168 (9th Cir. 2010) ............... 53, 54

## Other Authorities

Charles Alan Wright, Arthur Miller & Mary Kay Kane, FEDERAL PRACTICE AND

    PROCEDURE (3d ed. 2004) ............................................................................. 31

Hal J. Singer, *Economic Evidence of Common Impact for Class Certification in Antitrust*

    *Cases: A Two-Step Analysis*, 25 Antitrust 34 (2011) ..................................... 45

Larry Kramer, *Choice of Law in American Courts in 1990: Trends and Developments*, 39

    Am. J. Comp. L. 465 (1991)........................................................................... 50

NEWBERG ON CLASS ACTIONS (3d ed. 1992) ................................................................. 23

NEWBERG ON CLASS ACTIONS (5th ed. 2012) ................................................................ 23

NEWBERG ON CLASS ACTIONS, (4th ed. 2002)................................................................31

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.

   Rev. 97, 132 (2009) ...........................................................................................3

**Rules**

Fed. R. Civ. P. 23(a)(1) .......................................................................................22

Fed. R. Civ. P. 23(b)(3) .................................................... 1, 3, 20, 29, 47, 51, 52, 54

## I.     INTRODUCTION

This matter is a classic antitrust conspiracy case against America's largest pork suppliers.  Courts have widely recognized such cases as particularly appropriate for class treatment, and plaintiffs move for class certification here, pursuant to Fed. R. Civ. P. 23(b)(3).

This suit alleges that the Defendants[1] conspired to limit the supply and fix, raise, and maintain prices for pork products in the United States from at least 2009 through at least June 30, 2018, a *per se* violation of federal antitrust law.[2] Defendants implemented this conspiracy by coordinating with each other to restrict the supply of pork products with the goal, and expected result, of artificially inflating U.S. pork prices.[3] As planned, their illegal conduct allowed Defendants to reap increased profits at the expense of consumers

---

[1] For the purpose of this motion, Defendants are Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation ("Hormel"), JBS USA Food Company ("JBS" or "JBS USA"), Seaboard Foods LLC ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson"). CIIPPs have settled with the JBS defendants and are seeking approval of a pending settlement with defendant Smithfield.

[2] Commercial and Institutional Indirect Purchaser Plaintiffs' Fourth Amended and Consolidated Class Action Complaint, ECF No. 808 ("Compl.") ¶ 217.

[3] Compl. ¶ 210.

and business purchasers, who were forced to pay inflated prices for pork products throughout the class period.[4]

The conspiracy injured three distinct groups of class action plaintiffs, each of which has brought actions that are pending in this Court. This suit is brought by commercial and institutional indirect purchasers of pork products ("Commercial and Institutional Indirect Purchaser Plaintiffs" or "CIIPPs").[5] The CIIPPs include restaurants and other retail food service establishments, caterers, and institutional food services like schools and company cafeterias who purchased pork products indirectly from the conspiring Defendants at inflated prices. They seek to represent claims in 27 states[6] and the District of Columbia and seek to proceed as representatives of all members of the proposed CIIPP class.

As this Motion outlines, the central elements of Class members' claims can—and will—be proven through evidence common to all members of the class. CIIPPs have adduced substantial common liability evidence, both documentary and testimonial,

---

[4] Compl. ¶ 213.

[5] As used herein, "CIIPPs" shall mean the current named plaintiffs in the CIIPP case: Sandee's Bakery; Francis T. Enterprises d/b/a Erbert & Gerbert's; Joe Lopez, d/b/a Joe's Steak and Leaf; Longhorn's Steakhouse; The Grady Corporation; Mcmjoynt LLC d/b/a The Breakfast Joynt; Edley's Restaurant Group, LLC; Basil Mt. Pleasant, LLC; Basil Charlotte, Inc.; Farah's Courtyard Deli, Inc.; and Tri-Ten LLC.

[6] The states in which CIIPPs allege claims are Arkansas, Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

demonstrating that Defendants engaged in a conspiracy to artificially inflate the prices of pork products, causing overcharges that were passed through the distribution chain in a manner common to CIIPP class members. CIIPPs' econometric expert, a leading industrial organization economist, has analyzed the common documentary and testimonial evidence using well-established econometric methods. Should the case proceed to trial, he will explain that evidence common to the class shows Defendants' alleged conspiratorial conduct impacted and damaged the class as a whole. The jury's acceptance—or rejection— of this common body of evidence will resolve "issue[s] central to the validity of each one of the claims in one stroke," and thereby "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009) (emphasis in original)). As courts in this Circuit and elsewhere have repeatedly found, antitrust cases such as this one warrant certification under Rule 23(b)(3).

## II.   STATEMENT OF FACTS[7]

The pork Integrator Defendants[8] are the United States' leading suppliers of pork, an industry with annual revenues of approximately $20 billion.[9] The U.S. pork industry is

---

[7] Unless otherwise noted, exhibit references throughout refer to documents attached to the Declaration of Blaine Finley ("Finley Decl.") filed concurrently herewith.

[8] The "pork integrator" Defendants are the Defendants, except for defendant Agri Stats, Inc.

[9] *See, e.g.*, Ex. 1, Structure and Importance of the U.S. Pork Industry, Dr. Steve R. Meyer, Dr. Barry Goodwin, at 6, *available at* https://nppc.org/wp-

moderately concentrated, with a small number of large companies controlling the supply.[10] Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork integration market.[11]

CIIPPs are some of the most familiar dining establishments and food preparers in the nation. They each purchase pork products indirectly from the integrator Defendants, via distributors such as Sysco and US Foods, who in turn transact directly with integrators. CIIPPs allege that, beginning in 2009 through at least June 30, 2018, Defendants conspired to fix, raise, maintain, and stabilize the price of pork by coordinating output and limiting

---

content/uploads/2021/06/Competition_Paper_FINALWD.pdf ("[Hogs] provided farm-level cash receipts of over $22 billion" in 2020).

[10] *See, e.g.*, Ex. 2, Brian Deese, Sameera Fazili, and Bharat Ramamurti, "Addressing Concentration in the Meat-Processing Industry to Lower Food Prices for American Families," September 8, 2021, *available at* https://www.whitehouse.gov/briefing-room/blog/2021/09/08/addressing-concentration-in-the-meat-processing-industry-to-lower-food-prices-for-american-families; Ex. 3, Padilla, Samantha L., Lee L. Schulz, Kate Vaiknoras, Matthew J. MacLachlan, "COVID-19 Working Paper: Changes in Regional Hog Slaughter During COVID-19," Working Paper #AP-095, at 12 (December 2021), USDA Economic Research Service, *available at* https://www.ers.usda.gov/webdocs/publications/102784/ap-095.pdf?v=2095.3 ("The current U.S. pork industry includes fewer, larger hog production and packing operations."); *see also* Ex. 4, Fordham, Evie, "Smithfield Foods CEO Ken Sullivan to retire in early 2021," FoxBusiness, (October 19, 2020), *available at* https://www.foxbusiness.com/economy/smithfield-foods-ceo-ken-sullivan-retiring.

[11] ███████████████████████████████████████████████████████████████████ Ex. 5, Expert Report of Michael A. Williams, Ph.D. ("Williams Rpt.") at ¶ 72; *see also* USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity, Compl. ¶ 88, Fig. 2, p. 33. The market share of Integrator Defendants remained relatively stable throughout the conspiracy period. *See* Compl. ¶ 96 and Figure 5: Market Concentration and Market Share Stability – U.S. Market Share by Hog Slaughter Capacity.

production. Throughout this period, Defendants engaged in a wide range of collusive activities, in public and behind closed doors, to carry out their conspiracy. A central component of their scheme was the exchange of competitively sensitive, non-public information. That information enabled Defendants to collude to reduce supply and monitor each others' production with precision and speed.

### A. Perceptions of Plentiful Supply Characterized the Pork Industry at the Start of the Conspiracy.

At the start of the conspiracy, the Integrator Defendants faced a difficult competitive environment. Competitive dynamics had driven increases in pork production. While competition benefited pork purchasers, it had negative effects on Defendants' bottom lines. The pork industry was characterized by low profits and a perception on Defendants' part that pork producers had created too much supply. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████[12] The following year, in July 2009, Smithfield's CEO noted in the company's annual report:

> I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, liquidation is now a recognized reality by all in the industry. To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, combined with the additional cuts by our fellow producers should

---

[12] Ex. 6, CLMNS-0000031646.

shrink supply to a point where the industry can return to profitability. This liquidation is long overdue.[13]

One industry insider noted in a 2010 article that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 6.1% in 2007.[14] ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ " It continued: ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████[15]

**B.     Defendants Conspired to Reduce the Supply of Pork Over the Course of Nearly a Decade to Increase the Price of Pork and their Profits.**

---

[13] *See* Ex. 7, Meat+Poultry, *High hog production costs lead to loss at Smithfield*, June 16, 2009, *available at* https://www.meatpoultry.com/articles/1056-high-hog-production-costs-lead-to-loss-at-smithfield; Pig Progress, *Smithfield reduces pig herd to cover losses*, June 18, 2009, *available at* https://www.pigprogress.net/home/smithfield-reduces-pig-herd-to-cover-losses/.

[14] Ex. 8, Steven Meyer, What Does the Future Hold for the U.S. Swine Industry?, Kansas State University, 2010 Swine Profitability Conference, p. 49, *available at* https://www.asi.k-state.edu/doc/swine-info/2010-spc-proceedings.pdf.

[15] *See* Ex. 9, SBF0149251 and Ex. 10, SBF0149252.

The suggestions of a supply cut did not fall on deaf ears. Beginning as early as 2009, Defendants responded to the pork industry's poor financial performance by engaging in a wide-ranging conspiracy to reduce the supply of pork products.

### 1.     Defendants Called for Supply Cuts and Answered those Calls Through a Combination of Public and Secret Communications.

The conspiracy took shape as the Integrator Defendants made numerous public announcements signaling that they were cutting back on their production of pork. These announcements included statements released by privately owned firms, such as Clemens Food Group, who had no obligation to communicate their production plans to external stakeholders. The announcements also included statements by public companies that extended far beyond their disclosure obligations under the securities laws. These statements were readily observable by industry participants and provided a key avenue through which the Integrator Defendants invited their co-conspirators to join in the collective effort to cut supply. They also provided a mechanism for Defendants to communicate their acceptance and adherence to the conspiracy, which they later did by sharing detailed information about their individual supply reduction plans and activities.

The present record shows express discussions of supply cuts among Integrator Defendants beginning in Spring 2008.[16] Once the decision to cut supply had been made

---

[16] *See* Ex. 11, ███████████████████████ ███████ (CLMNS-0000030331) ('███████

collectively via trade association meetings, such as the 21st Century Pork Club and the Pork Processors Industry Council ("PPIC"), Integrator Defendants began to use their earnings conference calls to make public statements announcing their actions in furtherance of the conspiracy:

- ████████████████████████████████████████████████████████████████

  ████████████████████████ [17]

- ████████████████████████████████████████████████████████████████

  ████████████████████████████████████████████████████████████ [18]

- ████████████████████████████████████████████████████████████████

  ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ ); see also Ex. 12, Taphorn Dep. 67:25-70:24, 92:16-20; 99:16-100:7, and Ex. 10 (SBF0149252) at SBF0149255 ( ████████

████████████████████████████████████████████████████████████████████

████████████████████ (emphasis in original).

---

[17] See Ex. 13, SMITHFIELD01062388 ████████████████████████████████

████████████, Ex. 14, SMITHFIELD01062391 (attachment) ████████████████

████████████████████████████████████████████; see also Ex. 15, September 2008 interview with Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC, Smithfield's production arm, "[w]e are focused on reducing the number of pigs that come off sow farms…" Betsy Freese, *Pork Powerhouses 2008: The Big Squeeze*, Successful Farming, Sept. 4, 2008.

[18] See Ex. 16, ████████████████████████████████████████████████████

████; see also Ex. 17, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



[19]

- [20]

- [21]

- [22]

- 

[19] *See* Ex. 18, ███████ Ex. 19-20 ███████ (TF-P-002172392, TF-P-000514416).

[20] Ex. 21, ███████

[21] *See* Ex. 22, TF-P-001528132 ███████ *See* Ex. 23, TF-P-000014052 ███████

[22] Ex. 24, ███████; *see also* Ex. 25-26, ███████ (TF-P-000179764, TF-P-000179765); Ex. 27, ███████ (AGSTAT P-0003383857) ███████

[23] Ex. 28, CMLNS-0000022228.



This expectation—███████████████████████████████████████

█████████████████████—was communicated directly among Defendants, who

confirmed they were sticking to the plan. In July 2009, for instance, Tyson's Steve

Thompson wrote to Seaboard's Mel Davis that ████████████████████████████

████████████████████████"[26]

### 2. Defendants Exchanged Competitively Sensitive Information Throughout the Class Period in Effecting the Conspiracy.

In a cartel, conspirators have an incentive to cheat by selling at competitive prices

and taking market share from co-conspirators. To effect and ensure the stability of the

_____

[24] Ex. 29, JBS 2008 Earnings Conference Call (August 13, 2009).

[25] Ex. 30, (TF-P-001718524) ████████████████████████
████████████████████████████████

[26] *See* Ex. 31, ████████████████████████████████████
██████ (SBF0181317):

█████████████████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████

conspiracy, Defendants used several methods to monitor each other for compliance. These efforts were pervasive and extended to all stages of production, including hog production.[27]

At the center of Defendants' monitoring efforts was Agri Stats, an "information" service through which Defendants supplied one another with detailed information about their respective production levels and received detailed information concerning their competitors' activities. Agri Stats represented that it provided only anonymized information about general market conditions and trends. In reality, the reports the company produced and distributed gave Defendants a detailed—and ongoing—window into one another's production activities.

In the early stages of the conspiracy, Integrator Defendants participated in a benchmarking scheme, which they helped design, to share sensitive price and output data. The scheme relied, in part, on regular reports prepared and distributed by Agri Stats. Defendants regularly submitted a set of agreed upon data to Agri Stats.[28] In turn, Agri Stats provided the participating Integrator Defendants with current and forward-looking

_____

[27] *See* Ex. 32, DPP-Pork0000000031 ████████████████████████████████

[28] *See* Ex. 33, AGSTAT-P-0002613772 ████████████████████████████

11

sensitive information (such as profits, costs, prices and slaughter information) in the form of weekly and monthly benchmarking reports.[29] Defendants used this exchange of information to monitor each other's production.[30]

Although the disaggregated information included in Agri Stats' pork industry reports was supposed to be anonymous, it was not and Defendants knew it.[31] Industry reports such as those provided by the USDA contain only aggregate industry statistics. In contrast, Agri Stats provided detailed *plant-level* cost and performance metrics, including metrics for integrators' pork production that included items such as average sales prices, costs, and profitability. The "anonymity" of Agri Stats' reports rested entirely on the fact that individual plants were identified by number. While Agri Stats' reports identified the recipient's facilities by name, competitors' plants would be identified by a number, without stating the name of the facility or which competitor owned it. But Agri Stats reported additional information for each complex, such as its location or production volume, that made it possible for ordinary industry participants to de-anonymize the data.

---

[29] *See* Ex. 34, Copa Dep. 20:4-18; Ex. 35, Bollum Dep. 364:8-366:18.

[30] ███████████████████████████████████████████████████ *See* Ex. 36, Copa Dep. 106:6-11.

[31] *See* Ex. 37, TF-P-000298231 ████████████████████████████████████████ ; *see also,* Ex. 38, TF-P-000314709 ███████████████████████ Ex. 39, TRI0000433907 ████████████████ Ex. 40, Ginther Dep. 369:9-377:17, Ex. 41, SBF0623353-54.

Not only did Defendants de-anonymize reports they received from Agri Stats, Agri Stats ████████████████████████████████████████████████████████████████████ ████████[32] Communications among the Integrator Defendants and Agri Stat employees suggest the ability to de-anonymize Agri Stats' reports was an open secret:

- ████████████████████████████████████████████████████████████████ ██████████████[33]

- ████████████████████████████████████████████████████████████████ ████████████████████████[34]████████████████████████████████████████ ████████████████████████[35]

- ████████████████████████████████████████████████████████████████ ██████████████████████████████████

---

[32] *See* Ex. 42, Edwards Dep. 172:8-174:4; *see also* Ex. 43, Copa Dep. 118:19-133:6; Ex. 44 (SMITHFIELD00676666), Ex. 45 (SMITHFIELD00456587), Ex. 46, (AGSTAT-P-0002817067), Ex. 47 (SMITHFIELD00742363) ████████████████████████████ ████████████

[33] *See* Ex. 48, TF-P-000100077.

[34] *See, e.g.*, Ex. 49, TF-P-000220756 ████████████████████████████████ ████████████████████████████████████████████ Ex. 50 (TF-P-000218761) and Ex. 51 (TF-P-000218763) ████████████████████████████████████████████ ██████████████████████████████

[35] *See* Ex. 52 (TF-P-002076990), Ex. 53 (TF-002076991). ████████████████ ████████████████████████████ Ex. 54 (TF-P-002105264), Ex. 55 (TF-P-002105265) ████████████████████████; Ex. 56 (TF-P-002108462), Ex. 57 (TF-P-002108463) ██████████████████████████; Ex. 58 (TF-P-002110757), Ex. 59 (TF-P-002110758) ██████████████████████████; Ex. 60 (TF-P-002110288), Ex. 61 (TF-P-002110289) ██████████████████████); Ex. 62 (TF-P-002112531), Ex. 63 (TF-P-002112532) (██████████████████████████████; *see also* Ex. 64 (TF-P-000228062) ████████████████████████████████████████████████████

13



### 3. Defendants Demonstrated their Adherence to the Conspiracy by Refusing to Increase Capacity in the Face of Clear Opportunities to Gain Share

Over the period from 2009 through 2018, Defendants demonstrated their adherence to the conspiracy by refusing to increase their capacity for pork harvesting and processing—even in the face of clear opportunities to gain market share.

---

[36] *See* Ex. 65, SBF0459029; Ex. 66, SBF0459031; Ex. 67, SBF0459032.

[37] *See* Ex. 68, TF-P-000513839.

[38] *See* Ex. 69, AGSTAT-P-0002621876.

For example, during the 2014 PEDv epidemic, Eric Haman, communications manager for Clemens Food Group, ████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████[39] Despite having a competitive advantage of having few PEDv infected pigs, Defendant Clemens did not attempt to increase its market share, but rather stayed the course in furtherance of the conspiracy.

In addition, Integrator Defendants regularly learned about their competitors' harvest and processing schedules, sometimes via direct communications. When Defendants learned their competitors were cutting harvest and processing, they acted in furtherance of the conspiracy by following suit and/or increasing prices. For example, ████████████ █████████████████████████████████████████████████[40] and ███████████ ██████████████[41] ████████████████████████████████████████████████

---

[39] *See* Ex. 70, Kyle Bagentose, *Local concern over killer pig virus spreading*, Bucks County Courier Times, May 4, 2014, *available at* https://www.buckscountycouriertimes.com/story/news/2014/05/04/local-concern-over-killer-pig/18032473007/.

[40] *See* Ex. 71, HFC-PORKAT000095315 ████████████████████ ██████████████████████████████████████████ Ex. 72, HFC-PORKAT0000068283 █████████████████████████████████ ███████████████████████████████████████████████████

15



Consistent with their failure to increase output in response to new competitive opportunities, Defendants used information about competitor supply reductions to raise prices to their customers.[46] For example

[41] *See* Ex. 73, HFC-PORKAT0000140175

[42] *See* Ex. 74, Peil Dep. 218:14-224:18; Ex. 75, HFC-PORKAT0000139342.

[43] *See* Ex. 76, SBF0222683

[44] *See* Ex. 77, HFC-PORKAT0000064622
Ex. 78, HFC-PORKAT0000064626

[45] *See* Ex. 79, HFC-PORKAT0000064704
*see also* Ex. 80, HFC-PORKAT0000130969
.

[46] *See, e.g,* Ex. 81, Taphorn Dep. 167:2-7; 169:18-170:19



[48]

**C.     The Effects of the Conspiracy Included Supracompetitive Prices for Pork Products.**

Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to CIIPPs and class members. Beginning in 2009, the earnings of the integrators began to increase, as they took an increasing amount of the profits available in the pork industry. As a result of Defendants' unlawful conduct, the CIIPPs paid artificially inflated prices for pork during the Class Period that exceeded the prices CIIPPs would have paid in a competitive market.

**D.     Summary of Common Issues of Law and Fact.**

This litigation involves numerous common issues of law and fact including:

---

[47] *See* Ex. 82, SBF0391616

*See* Ex. 83,
(HFC-PORKAT0000272985)

[48] *See* Ex. 84,
TF-P-001381827).

a.     Whether the Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain, or stabilize the prices of pork sold in the United States and each of the States involved in the Complaint;

b.     The identity of the participants in the alleged conspiracy;

c.     Whether Defendants' conduct inflated prices above competitive levels in general;

d.     The amount of the aggregate damages that the proposed Class incurred; and

e.     The appropriate relief for the Class, including injunctive and equitable relief.

As CIIPPs will also show, the applicable antitrust, consumer protection and unjust enrichment laws of the States involved in the Complaint are similar in their application to the alleged conduct.

## III.    STANDARD FOR CLASS CERTIFICATION

In deciding whether to certify a class, a court must conduct a rigorous inquiry. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 611 (8th Cir. 2011); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir. 2010); *Elizabeth M. v. Montenez*, 458 F.3d 779 (8th Cir. 2006); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008), *as amended* (Jan. 16, 2009). The question, however, is whether Rule 23 is satisfied, not whether Plaintiffs will prevail on the merits of the case. *See United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974)). Certification of an appropriate class allows the

class's claims to be resolved fairly and efficiently—win or lose. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 808 (1985) ("The absent parties would be bound by the decree so long as the named parties adequately represented the absent class and the prosecution of the litigation was within the common interest.").

While merits questions may overlap with the findings required by Rule 23, a court should assess the merits only to the extent necessary to determine whether certification is warranted under Rule 23. *Amgen v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); *Wal-Mart*, 564 U.S. at 352 n.6 (noting that a district court has no "authority to conduct a preliminary inquiry into the merits of a suit" at the class certification stage unless such inquiry is needed "to determine the propriety of certification.") (internal quotations omitted).

Rule 23 is not a "mere pleading standard," but requires the court to find whether a case satisfies the requirements for certification. *Id.* at 350. "[A] district court exercising proper discretion in deciding whether to certify a class will resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all relevant evidence and arguments presented by the parties." *Hydrogen Peroxide*, 552 F.3d at 320. Because the certification decision requires informed judgment about the course of future proceedings, a district court has "broad discretion in determining whether to certify a class," provided it makes the required Rule 23 findings.

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (quoting *Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1323 (8th Cir. 1991)).

Class certification under Rule 23(a) requires four showings: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition to the Rule 23(a) prerequisites, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Rule 23(b)(3), relevant here, requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In exercising its "broad discretion in determining whether or not to certify a class under Rule 23," *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 573 (D. Minn. 1995), the Court should resolve any doubt "in favor of allowing the class action" so that it will remain an effective tool for deterring wrongdoing. *In re Control Data Corp. Sec. Litig.*, 116 F.R.D. 216, 219 (D. Minn. 1986) (citation and quotation omitted). "If at a later stage the theories undergirding class certification fall apart and individualized questions come to predominate, the Court may decertify the class at this time." *Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, No. CV 19-3071 (JRT/BRT), 2021 WL 6127880, at *22 n. 17

(D. Minn. Dec. 28, 2021).

Antitrust cases are particularly well-suited for class certification. *Amchem*, 521 U.S. at 625; *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 231 (D. Minn. 2001) (reasoning that, given "the important role class actions play in the private enforcement of antitrust actions, courts resolve doubts in these actions in favor of certifying the class." (quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 688-89 (D. Minn. 1995))); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 563 (N.D. Cal. 2013) (hereinafter "*High-Tech I*") ("The Supreme Court has long recognized that class actions serve a valuable role in the enforcement of antitrust laws."); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010) (hereinafter "*TFT-LCD I*") ("[A] class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers." (citation omitted)); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) ("Class actions play an important role in the private enforcement of antitrust actions. For this reason, courts resolve doubts in these actions in favor of certifying the class.") (citations omitted). Federal courts routinely certify classes in price-fixing antitrust cases brought by indirect purchasers. *See*, *e.g.*, *TFT-LCD I,* 267 F.R.D. at 592 (quoting *Rubber Chems.*, 232 F.R.D. at 350) ("Courts have stressed that price-fixing cases are appropriate for class certification.").

All of the requirements of Rule 23(a) and 23(b)(3) are satisfied here.

## IV.     PLAINTIFFS SATISFY RULE 23(a)

### A.     Numerosity: The Proposed Class Is Numerous.

Rule 23(a)(1) "requires that a class be so numerous that joinder of all members is impracticable." No specific rules govern the required size of a class, and "what constitutes impracticability depends upon the facts of each case." *Glenn v. Daddy Rocks*, 203 F.R.D. 425, 428–29 (D. Minn. 2001). "Numerosity" is generally satisfied when a proposed class includes more than forty members. *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 944 (D. Minn. 2018); *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings*, No. 14-786, 2016 WL 4098741, at *12 (D. Minn. July 28, 2016) (quoting *In re Uponor, F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-2247, 2012 WL 2512750, at *4 (D. Minn. June 29, 2012)). Here, the proposed Class includes thousands of members. Williams Rpt. at ¶¶ 271-273. Numerosity is satisfied.

### B.     Commonality: A Question of Law or Fact Is Common to Class Members.

Commonality requires only a single significant issue of law or fact common to a class. *Wal-Mart*, 564 U.S. at 359 ("[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do." (quotation marks and citation omitted)); *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016); *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 945 (D. Minn. 2018); *Drake v. Steak N Shake Operations*, 286 F. Supp. 3d 1040, 1052 (E.D. Mo. 2017). Class members' claims present common questions of law and fact, for which "a prima facie case can be established through common evidence." *See In re Zurn Plex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (citation omitted).

Commonality "will be found if the defendant has engaged in a 'course of conduct that affects a group of persons and gives rise to a cause of action.'" *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 603 (D. Minn. 2001) (quoting NEWBERG ON CLASS ACTIONS § 3:10 (3d ed. 1992)). In price-fixing cases alleging a conspiracy that affected a class of purchasers, the existence of the conspiracy is a common question. *See Potash*, 159 F.R.D. at 689 (citing 4 NEWBERG ON CLASS ACTIONS § 18:05 (3d ed. 1992)) ("Insofar as Plaintiffs allege that Defendants engaged in a conspiracy to fix the wholesale price of potash, they have satisfied the commonality requirement of Rule 23(a)."); *In re Workers' Comp.*, 130 F.R.D. 99, 105 (D. Minn. 1990) (recognizing that "[a]ntitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy") (citation omitted); 1 NEWBERG ON CLASS ACTIONS § 20:38 (5th ed. 2012) ("Courts have long noted that antitrust claims are particularly suited for class treatment . . . . In particular, an allegation of a price-fixing conspiracy is usually considered to be a common question of sufficient importance to satisfy Rule 23(a)(2)."). The presence of a legal question linking the class members that drives the resolution of the litigation likewise satisfies the commonality requirement. *Wal-Mart*, 564 U.S. at 350; *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1031 (D. Minn. 2007). Common issues here include: (1) whether the defendants conspired to restrict supply and fix prices; (2) whether their conduct inflated prices above competitive levels in general; and (3) whether the class members suffered damages calculable on a classwide basis.

**C.      Typicality: The Proposed Representatives' Claims Are Typical.**

Class representatives' claims are typical in that other members of the class "have the same or similar grievances" as do the named plaintiff. *See Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562 (8th Cir. 1982) (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)); s*ee also* Fed. R. Civ. P. 23(a)(3). The typicality requirement "'is fairly easily met so long as other class members have claims similar to the named plaintiff[s].'" *In re CenturyLink Sales Prac. & Sec. Litig.*, 337 F.R.D. 193, 203 (D. Minn. 2020) (quoting *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996)).

Because victims of an antitrust conspiracy have the same "grievance"—supracompetitive prices—typicality is readily satisfied in cases involving antitrust violations. *See Potash*, 159 F.R.D. at 691; *Workers' Comp.*, 130 F.R.D. at 106 ("An antitrust price fixing case generally will involve claims sufficiently similar to satisfy Rule 23(a)(3)."); *Burnett v. Nat'l Assoc. of Realtors*, No. 19-CV-00332-SRB, 2022 WL 1203100, at *6 (W.D. Mo. Apr. 22, 2022) ("In the antitrust context, typicality is established when the named plaintiffs and all class members alleged the same antitrust violations by defendants. Specifically, named plaintiffs' claims are typical in that they must prove a conspiracy, its effectuation, and damages therefrom—precisely what the absent class members must prove to recover." (quoting *Hyland v. Homeservices of Am., Inc.*, No. 3:05-CV-612-R, 2008 WL 4858202, at *4 (W.D. Ky. Nov. 7, 2008))).

Even if some factual variation among class members may exist, any differences "will not normally preclude class certification," where, as here, "the claim arises from the

24

same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Khoday v. Symantec*, No. CIV. 11-180 JRT/TNL, 2014 WL 1281600, at *16 (D. Minn. Mar. 13, 2014) (quoting *Alpern*, 84 F.3d at 1540). Perfect identity of claims is not required. *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 270 (D. Minn. 1989). A "strong similarity" between the legal theories of Plaintiffs and those of the class members satisfies the typicality requirement. *Potash*, 159 F.R.D. at 690.

Plaintiffs' claims, like those of the Class members, stem from the Defendants' antitrust conspiracy directed toward the same commodity, pork. Like all members of the Class, each of the proposed Class representatives paid supracompetitive prices as a result of Defendants' violations of antitrust law. Further, common evidence shows that each of the named Plaintiffs paid an overcharge on at least one of their purchases.[49] Williams Rpt., ¶¶ 258-280. The proposed Class representatives' claims are typical of the Class they seek to represent.

### D.  Adequacy: Plaintiffs Will Fairly and Adequately Represent the Class.

The final requirement of Rule 23(a) is adequacy of representation. There are two aspects to adequacy: "whether the class representatives will vigorously prosecute the interests of the class through qualified counsel" and whether "the class representatives have common interests with the members of the class." *Krueger v. Ameriprise Fin.*, 304 F.R.D. 559, 574 (D. Minn. 2014) (quoting *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562–63 (8th

---

[49] ████████████████████████████████████████████ Williams Rpt. at ¶¶ 258-280.

Cir. 1982)). Plaintiffs satisfy the adequacy test because they do not have interests in conflict with those of the Class regarding the litigation and because they and their counsel have vigorously represented and will continue to vigorously represent the interests of the Class.

"Perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable. To forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole." *Taqueria*, 2021 WL 6127880, at *13. Nonetheless, the interests of the named Plaintiffs here are fully aligned with those of absent Class members in proving that the Defendants violated the antitrust laws and thereby artificially inflated prices for pork above competitive levels.

As for the quality of Plaintiffs' representation, each Class representative[50] is a member of the Class they seek to represent and has actively participated in the case by

---

[50] If this Court finds any of the proposed class representatives to be inadequate, other CIIPP class representatives who satisfy the Rule 23 criteria may adequately represent the class in their place. *Payton v. County of Kane,* 308 F.3d 673, 680 (7th Cir. 2002) (concluding that plaintiffs may be entitled to represent a class suing all 19 defendant counties if they fulfill the requirements of Rule 23); *Hospital Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms.,* 333 F.R.D. 390, 414 (M.D. Tenn. 2019) (rejecting contention that indirect purchasers were required for every state where claims were asserted and finding that out of state class representatives could adequately protect absent class members in those states because the antitrust claims were virtually the same); *Gress v. Freedom Mortg. Corp.*, 386 F. Supp. 3d 455, 462 (M.D. Pa. 2019) ("capacity to state claims under the laws of other states on behalf of putative class members, who themselves likely would have standing to raise those claims, is a matter to be decided under the rubric of Rule 23…"). If an additional or alternative class representative is necessary, CIIPPs request leave to substitute. *See, e.g., In re NorthShore Univ. HealthSystem Antitrust Litig*., No. 07-cv-4446, 2018 WL 2383098, at *1 (N.D. Ill. Mar. 31, 2018) (permitting substitution); *In re Lithium*

participating in the discovery process, including by together producing thousands of documents in response to discovery requests. Finley Decl., ¶ 13. Class representatives and their counsel have no known conflicts of interest that would compromise their representation of the Class. Finley Decl., ¶ 14. Further, Plaintiffs and their counsel have represented and will represent the Class vigorously. The Plaintiffs have responded appropriately to the obligations thus far imposed on them, including such discovery as has been propounded. Their efforts have already led to two substantial settlements, one of which is pending judicial approval. *See supra* n.1.

Proposed co-lead counsel for the Commercial and Institutional Indirect Purchaser Plaintiffs in this case are Shawn M. Raiter and Larson King, LLP, and Blaine Finley and Cuneo Gilbert & LaDuca, LLP. These firms and individuals have been appointed lead counsel in other matters, including on behalf of groups of commercial and institutional indirect purchaser plaintiffs. Indeed, Cuneo Gilbert & LaDuca serves as lead counsel in *In re Seafood Prods. Antitrust Litig.*, No. 15-2670 (S.D. Cal.) for a class of commercial indirect purchaser plaintiffs, certification of which was recently affirmed in *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, No. 19-56514, 2022 WL 1053459 (9th Cir. Apr. 8, 2022) (en banc). In addition, these firms and their members have been designated as Lead Counsel, Co-Lead Counsel, or Settlement Counsel in other antitrust class action matters, including *In re Cattle and Beef Antitrust Litig.,* No. 20-01319

---

*Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2016 WL 948874 (N.D. Cal. Mar. 14, 2016) (permitting substitution).

(D. Minn.), *In re Turkey Antitrust Litig.*, No. 20-2295 (N.D. Ill.), and *In re Automotive Parts Antitrust Litigation*, No. 2:12-md-02311 (E.D. Mich.). Finley Decl., ¶¶ 6-9. The firms of proposed co-lead counsel as well as members of the firms proposed for the CIIPP-specific Plaintiffs' Steering Committee also possess similar experience and qualifications. *See* ECF Nos. 700-03. Attorneys and non-attorney professionals of diverse backgrounds have performed and will continue to perform extensive, substantive work and assume responsibility in connection with the prosecution of the CIIPP actions by proposed co-lead counsel and the proposed CIIPP-specific Plaintiffs' Steering Committee. *See* Finley Decl., ¶ 12; ECF Nos. 722, 723, and 725. "In absence of evidence to the contrary, courts will presume the proposed class counsel is adequately competent to conduct the proposed litigation." *Marcus v. Kansas Dep't of Revenue*, 206 F.R.D. 509, 512 (D. Kan. 2002).

The Class representatives and Class Counsel satisfy the adequacy requirement.

## V.    PLAINTIFFS SATISFY RULE 23(b)(2)

Plaintiffs have adduced substantial evidence of a far-reaching, ongoing conspiracy to inflate pork prices on a nationwide basis and seek injunctive relief to protect them from the conspiracy's continued effects. Their request for injunctive relief survives until it is clear that the alleged misconduct will not recur. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001) (citation and quotation omitted). In addition, issues about the Defendants' past, current, and future information sharing, whether via Agri Stats or otherwise, remain live issues in the instant litigation. Accordingly, Plaintiffs seek certification of a class action under Rule 23(b)(2) "so that final

28

injunctive relief or corresponding declaratory relief" may be entered "respecting the class as a whole."

## VI.    PLAINTIFFS SATISFY RULE 23(b)(3)

In addition to injunctive relief, Plaintiffs seek compensation for the supra-competitive prices they were forced to pay by reason of Defendants' alleged conspiracy. To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

### A.    Common Issues Predominate in the Case as a Whole under Rule 23(b)(3).

"Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625. "The predominance inquiry requires an analysis of whether a *prima facie* showing of liability can be proved by common evidence or whether this showing varies from member to member." *Day v. Celadon Trucking Servs.*, 827 F.3d 817, 833 (8th Cir. 2016). Certification is appropriate if "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The Supreme Court has held that the appropriate frame of reference for assessing predominance is the case as a whole; Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is

29

susceptible to class wide proof." *Amgen*, 568 U.S. at 469. "Predominance gauges 'the relationship between common and individual questions *in a case*.'" *Custom Hair Designs by Sandy v. Cent. Payment*, 984 F.3d 595, 601 (8th Cir. 2020) (emphasis added; quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)); s*ee also Torres v. Mercer Canyons Inc.,* 835 F.3d 1125, 1134 (9th Cir. 2016) (predominance inquiry asks court to make a "global determination of whether common questions prevail over individualized ones"); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 859 (6th Cir. 2013) (predominance "does not mandate that a plaintiff seeking class certification prove that each element of the claim is susceptible to classwide proof"). Here, as in many antitrust cases, the litigation will focus overwhelmingly on common issues, particularly on the defendants' conduct.

By their very nature, the antitrust violations alleged in this case impacted class members in a common manner; this case thus presents a classic Rule 23(b)(3) scenario, where the central issues in dispute involve the existence and nature of Defendants' violations of the antitrust laws. As Judge Ikuta recently reasoned for the *en banc* Ninth Circuit in an indirect purchaser case with noteworthy parallels to this one, "[i]t is not implausible to conclude that a conspiracy could have a class-wide impact, 'even when the market involves diversity in products, marketing, and prices . . . .' *Olean Wholesale Grocery Coop.*, 2022 WL 1053459, at *16. Whether an anticompetitive conspiracy exists is a common question that predominates over other issues "because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class

members." *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 291, 310 (N.D. Cal. 2010) (citing cases) (hereinafter "*TFT-LCD II*"). "[T]he existence, scope, and efficacy of the alleged conspiracy. . . are common questions that all plaintiffs must address." *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *3 (N.D. Cal. Dec. 23, 2010), *aff'd*, 779 F.3d 934 (9th Cir. 2015) (quoting *Rubber Chems.,* 232 F.R.D. at 351). The central questions in dispute in this litigation involve "what defendants did, rather than what plaintiffs did." *TFT-LCD II*, 267 F.R.D. at 310 (internal quotation marks omitted). If the Court finds that common proof of Defendants' antitrust conspiracy will be the predominant issue at trial, the Court may find class certification is warranted on that basis alone. *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1227 (N.D. Cal. Oct. 24, 2013) (hereinafter "*High-Tech II*") (The "question [of defendants' antitrust violation] is likely to be central to this litigation."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) ("[P]laintiffs need not show that there will be common proof on each element of the claim" especially where proof of the violation is "the predominant issue" (citation omitted)) (hereinafter "*SRAM II*"); 6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ("[C]ommon liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues."); 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE, § 1781 (3d ed. 2004) ("[W]hether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3).").

As recently stated in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, courts "have stressed that price-fixing cases are appropriate for class certification because a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental . . . ." 308 F.R.D. 606, 612 (N.D. Cal. 2015) (hereinafter "*CRT I*") (quoting *In re TFT–LCD I*, 267 F.R.D. at 592). "Courts therefore 'resolve doubts in these actions in favor of certifying the class.'" *Id.* at 612 (quoting *Rubber Chems.*, 232 F.R.D. at 350); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002) (finding common issues predominated with respected to alleged conspiracies to fix the prices of vitamins and choline chloride). Allegations of "a per se violation of the antitrust laws are exactly the kind of allegations which may be proven on a class-wide basis through common proof." *In re Southeastern Milk Antitrust Litig.*, No. 2:08-MD-1000, 2010 WL 3521747, at *10 (E.D. Tenn. Sept. 7, 2010). "Courts have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present." *Id.* at *9 (quotation marks and citations omitted). "As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1039 (N.D. Miss. 1993); *Hyland*, 2008 WL 4858202, at *4.

In this case, the litigation and trial will focus overwhelmingly on common issues including: whether Defendants colluded; whether the conduct generally resulted in overcharges; and the measure of aggregate damages.

32

**B.**     **The Elements of the Class's Claims Confirm that the Predominance Requirement is Satisfied.**

Although the predominance of common issues in the case as a whole is sufficient to establish predominance under Rule 23(b), common issues also predominate with respect to the specific elements that plaintiffs will be required to prove: violation; causation and impact; and damages. Here again, class members' claims will be established through a common body of evidence that does not vary from one class member to the next.

**1.**     **Evidence of the alleged antitrust violation is common to the class.**

Proof of an antitrust violation often focuses on a defendant's conduct and is therefore entirely common. *Amchem,* 521 U.S. at 625; *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 336 (3d Cir. 2011) (*en banc*).

**2.**     **Common evidence shows impact to the class.**

Antitrust claims require proof of impact, *i.e.*, that the plaintiff paid a supracompetitive price by reason of the antitrust violation. *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 301 (E.D. Mich. 2001). Courts have frequently held that common issues predominate when common evidence is used to establish "common impact," or widespread harm to a class. *See, e.g.*, *Torres*, 835 F.3d at 1138; *High-Tech II*, 985 F. Supp. 2d at 1192; *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 220 (E.D. Pa. 2001); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 166 (C.D. Cal. 2002); *Rubber Chems.*, 232 F.R.D. at 352-53. Evidence establishes common impact if it is common to the class and supports the conclusion that Defendants' conduct

caused injury (or fact of damage) that is widespread across class members. *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 818-19 (7th Cir. 2012); *High-Tech II*, 985 F. Supp. 2d at 119; *Thomas & Thomas*, 209 F.R.D. at 166-67. "[S]o long as the common proof can adequately demonstrate some damage to each individual," variations in the quantum of damages each class member suffered do not preclude class certification. *See Hydrogen Peroxide*, 552 F.3d at 325.

To make this showing here, Plaintiffs rely on a standard two-step impact analysis that is regularly used in antitrust cases. *See High-Tech II*, 985 F. Supp. 2d at 1206; *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847 (D.N.J. 2015). The first step of the analysis examines whether evidence common to all class members shows that alleged antitrust violation inflated prices *in general*. *High-Tech II*, 985 F. Supp. 2d at 1206. The second step again analyzed evidence common to all class members to determine that price inflation had a *widespread* effect across Class members. *Id.*; *see also Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 297-98 (N.D. Cal. 2016) (granting class certification where plaintiffs' expert analyses proceeded in two steps, first showing that "classwide evidence was capable of showing that the alleged conspiracy suppressed compensation of class members generally," and then that "economic studies and theory, documentary evidence, and statistical analyses were capable of showing that this compensation suppression had widespread effects on all class members"); *Castro*, 134 F. Supp. 3d at 847 (noting that the "two-step method to prove antitrust impact is not novel.").

34

Several legal principles inform both steps of this analysis. First, as *Amgen* teaches, Plaintiffs need only offer common proof *capable* of showing widespread harm to the Class to establish common impact; they need not *prove* classwide harm. *See Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005) ("[T]o satisfy the "predominance" standard, plaintiffs must show that both conspiracy and impact can be proven on a systematic, class-wide basis."); *Burnett*, 2022 WL 1203100, at *11 ("[T]he question is whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact." (quoting *B & R Supermarket v. Mastercard Int'l*, No. 17-cv-02738 (MKB) (JO), 2021 WL 234550, at *22 (E.D.N.Y. Jan. 19, 2021))); *High-Tech II*, 985 F. Supp. 2d at 1192 ("[T]he Court is not tasked at this phase with determining whether Plaintiffs will prevail on the[ir] theories. Rather, the question is narrower: whether Plaintiffs have presented a sufficiently reliable theory to demonstrate that common evidence can be used to demonstrate impact."); *TFT-LCD II*, 267 F.R.D. at 311-13 ("Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." (citations omitted)).

Second, because the question is whether common issues *predominate*—and not whether the case involves *any* individual issues—Plaintiffs can establish common impact by showing widespread harm: "[t]he existence of occasional outliers does not defeat predominance of common issues of antitrust impact." *Castro*, 134 F. Supp. 3d at 847 (citing *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 276 (2014)) ("That the defendant

might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.").

Certification is appropriate so long as the need for individualized proceedings does not outweigh the efficiencies secured via class certification. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004) ("[T]he more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims"); *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. 450, 511 (D.N.J. 1997) ("To evaluate predominance, the Court must determine whether the efficiencies gained by class resolution of the common issues are outweighed by individual issues presented for adjudication."), *aff'd sub nom. In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998). Certification is appropriate so long as a class does not contain "large numbers of class members who were never *exposed* to the challenged conduct to begin with." *Torres*, 835 F.3d at 1136 (emphasis in original) (citing, *inter alia, Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012)).[51]

The antitrust impact concept differs from the related task of assessing antitrust damages. *See Potash*, 159 F.R.D. at 693; *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 179 (D. Mass. 2013), *aff'd sub nom. In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) (citing *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489–90 (1968)). A class member's payment of a single overcharge—of whatever amount—is

---

[51] *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (class may contain uninjured members); *Nexium*, 777 F.3d at 22 (same); *Messner,* 669 F.3d at 818 (same).

sufficient to establish impact. *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367 at *21 (N.D. Cal. Feb. 21, 2017); *Nexium,* 777 F.3d at 27 ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage.") (citation omitted); *see also Paper Sys. v. Nippon Paper Indus. Co*., 281 F.3d 629, 633 (7th Cir. 2002) ("The monopoly overcharge is the excess price at the initial sale"). This is true even if a purchaser made additional purchases not subject to an overcharge, and even if the purchaser enjoyed some offsetting benefits from the conduct at issue. *Nexium*, 777 F.3d at 27-28; *Lidoderm,* 2017 WL 679367 at *21.

### a.      Common Evidence of General Price Inflation.

Beginning with the first step, Plaintiffs show that Defendants' conspiracy had a *general tendency* to harm the Class members—here, by raising prices above competitive levels. Plaintiffs' evidence includes documents, testimony, and various forms of economic analysis. This evidence shows the very purpose of Defendants' conspiracy was to raise and maintain the prices of pork above competitive levels. *See supra* Sections I.B.1., I.B.2., and I.B.3. Internal communications, as well as testimony in the ensuing litigation, confirm that Defendants' aim was to inflate their prices. *Id.*

A jury could reasonably find the conspiracy inflated market prices on the basis of this evidence alone. Plaintiffs' expert economist, Dr. Michael A. Williams, has confirmed Defendants' statements through regression analyses of Defendants' prices. Dr. Williams tested whether Defendants inflated their prices for pork during the Class Period. Relying

on a common set of sales data provided by Defendants, Dr. Williams examined whether the prices Defendants charged were inflated above competitive levels as a result of the Defendants' conspiracy and whether those overcharges were passed through to Class members. Williams Rpt. at ¶¶ 202-280. ████████████████████████████

████████████████████████████ *Id.* at ¶ 263, Table 6. He further finds

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.* at ¶ 256, Table 5. This econometric analysis provides the jury with an additional, independent basis for concluding that Defendants' price-fixing conspiracy generally inflated prices to Class members during the Class Period.

### b. Common Evidence of Widespread Impact.

At the second step, Plaintiffs show the resulting impact was *widespread* across Class members—here, that the conspiracy inflated prices above competitive levels across Class members. Because this is an indirect purchaser class action, proof of widespread harm to Class members involves evidence of both: (1) *Overcharges*: Defendants imposed overcharges widely across sales to the distributors from which the Class members bought; and (2) *Pass-through*: the distributors passed on the overcharges they paid widely across their sales to Class members. *See, e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *6 (W.D. Mo. Nov. 9, 2021); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444, at *7 (N.D. Cal. Feb. 8, 2016).

To show the widespread nature both of the overcharges and of their pass-through, Plaintiffs rely on two methods. First, analyses of the effects of Defendants' conduct on various categories of sales and of the structure of the market support the conclusion that Defendants' conduct had a classwide effect.[52] Second, a model assessing all purchases for each Class member that purchased from several distributors that provided structured data containing specific transaction information ███████████████████ shows impact to over ████ of their customers, and evidence demonstrates that this analysis provides a conservative estimate for the overcharge percentage for customers from the other distributors.[53] Each method relies on common evidence to demonstrate widespread

––––––––––––––––––––

[52] *See, e.g.*, *Nitsch*, 315 F.R.D. at 297–98 (as part of second step of common impact analysis, plaintiffs' expert analyses showed that "economic studies and theory, documentary evidence, and statistical analyses were capable of showing that this compensation suppression had widespread effects on all class members"); *High-Tech II*, 985 F. Supp. 2d at 1206 (relying on documentary and quantitative evidence about the nature of the market suggesting effect on the class would be widespread in certifying a class); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5429718, at *13-20 (N.D. Cal. June 20, 2013) (concluding indirect purchaser class in antitrust case should be certified based on economic theory, market characteristics, and sampling of aggregate and average data to establish overcharges and pass-through) (hereinafter "*CRT II*"), *adopted by In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) (hereinafter "*CRT III*"); *TFT-LCD I*, 267 F.R.D. at 600-06 (relying on market characteristics, regression showing overcharges to direct purchasers, and pass-through analysis based on averaged and aggregate data to certify class of indirect purchasers).

[53] *See In re Air Cargo Shipping Servs. Antitrust Litig.*, MDL No. 1775, 2014 WL 7882100, at *55 (E.D.N.Y. Oct. 15, 2014) (observing that defendants did not even dispute that an analogous "'customer model' is methodologically capable of showing the percentage of class members impacted, nor do they dispute that 95.7% would be sufficiently 'classwide' for purposes of common proof"); *In re Chocolate Confectionary Antitrust Litig.*, 289

impact.

### i.     Under his first method, Dr. Williams analyzed the types of sales and structure of the market at issue.

Dr. Williams first determined using a common body of evidence supplied by distributors that sales to Class members in various categories were subject to overcharges and pass-through at very high rates. Dr. Williams analyzed the overcharges Defendants imposed. ██████████████████████████████████████████

████████████████████████████████████████ Williams Rpt. at ¶ 262.

Dr. Williams also analyzed the pass-through of overcharges for each distributor. ████████

████████████████████████████████████████████████████

████████████████ *Id.* at ¶ 256 & Table 5. All distributor pass-through rates estimated by Dr. Williams were positive and statistically significant.  The very high rates of overcharge and pass-through in these categories will provide the jury with a strong basis for concluding that the Defendants' conduct imposed at least one overcharge on all or nearly all Class members. These results are particularly robust thanks to the billions of dollars of distributor transactional data analyzed in estimating and pass-through rates.[54]



---

F.R.D. 200, 221 (M.D. Penn. 2012) (certifying class based on analogous customer impact model relying on sampling); *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D 188, 217 (E.D. Penn. 2017) (certifying class where similar econometric model showed 98% of class members impacted); *Korean Ramen*, 2017 WL 235052, at *6 (certifying indirect purchaser class based, in part, on a multiple regression model confirming that 98% of direct purchasers were impacted and additional evidence from sampling of a high pass-through rate of those overcharges to indirect purchasers).

Beyond the unusually granular nature of Dr. Williams' analysis, other aspects of the U.S. pork industry make proof of classwide impact in this case more straightforward—and reliable—than it is in other cases where courts have certified classes of indirect purchasers. Plaintiffs purchased Defendants' pork products in the same packages in which Defendants originally sold them. Defendants' standardized packaging, and the fact that their products were not altered or incorporated into another product, support the conclusion that supracompetitive prices passed through the distribution chain in a uniform or nearly uniform manner. *Cf. In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 95 (D. Conn. 2009) ("[T]he plaintiffs have met their burden of demonstrating that the element of injury-in-fact can be proved by evidence common to the class—the six national price lists that ostensibly applied to every customer, in conjunction with the general analysis of the characteristics of the EPDM market, support the notion that the price list increases had class-wide impact.").[55]

---

[54] *CRT II*, 2013 WL 5429718, at *17-18,  (quoting *TFT-LCD I*, 267 F.R.D. at 605) (relying on aggregate evidence and sampling to establish common impact and predominance for certification of indirect purchaser class); *Korean Ramen*, 2017 WL 235052, at *5-8 (using aggregate data for overcharge rate and sampling for pass-through rate in certifying indirect purchaser class in antitrust case).

[55] *See also B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1352-53 (Cal. Ct. App. 1987) (noting common impact is particularly likely when a product is resold in the same form it was originally sold, giving rise to a presumption of widespread impact); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *13 (N.D. Cal. June 9, 2010) (discussing *B.W.I. Custom Kitchen* and noting presumption of widespread impact is appropriate but only where product remained in original form); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09-CV-00852, 2012 WL 3841397, at *3 (E.D. Wis. Sep. 5, 2012) ("Since [the price-fixed goods] travel down the chain of

What's more, Plaintiffs here bought from distributors, limiting the chain of distribution and simplifying the pass-through analysis. *In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052, at *19 (N.D. Cal. Jan. 19, 2017) (noting common impact is more easily established when the chain of distribution is relatively simple to class members and the product is sold only on a "stand-alone basis" rather than also "bundled" in other products).[56] Indeed, under California law, when a good is subject to price fixing and indirect purchasers bought the good in unmodified form, there is a presumption of antitrust impact. *TFT-LCD I*, 267 F.R.D. at 600-01; *SRAM II*, 264 F.R.D. at 612; *In re Cipro Cases I and II*, 121 Cal. App. 4th 402, 418 (Cal. Ct. App. 2004); *B.W.I. Custom Kitchen*, 191 Cal. App. 3d at 1351-53. The court need not rely on this presumption here, because the record contains ample common evidence from which the jury may find classwide impact. Courts' use of the presumption, however, underscores that in finding classwide impact from Plaintiffs' evidence, the jury will be following mainstream antitrust

---

distribution substantially unchanged, the price charged by the manufacturer will largely determine the price paid by the end user.").

[56] Courts have found that common impact is established in matters much more complex than the comparatively simple distribution chain here. *See TFT-LCD I*, 267 F.R.D. at 604 (certifying a class because plaintiffs could show the pass-through rate was measurable, "regardless of the path or the number of steps the panel went through from defendants to class members."); *SRAM II*, 264 F.R.D. at 613-15 (rejecting defendants' claim that the SRAM distribution chain is "too complex from which to discern evidence of pass-through"); *see also Microsoft I-V Cases*, 2002-2 Trade Cas. (CCH) ¶ 88, 563, 2000 WL 35568182 (Cal. Sup. Ct. Aug. 29, 2000) (Docket No. 1024-10, Ex. 9) (recognizing that the case presented complexities from multiple products and distribution channels, but that "the court is not persuaded that a comprehensive analysis of the issues cannot be made within the context of properly managed trial proceedings").

analysis. "[B]ecause the gravamen of a price-fixing claim is that the price in a given market is artificially high," it is—at a minimum—reasonable to infer "that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." *See Potash*, 159 F.R.D. at 695 (suggesting that the presumption apply in the Eighth Circuit and quoting *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 327 (E.D.N.Y. 1982)).

Further supporting proof of common impact is the fact that the distributors who resold the pork to Class members operate in a very competitive industry, Williams Rpt. at ¶¶ 265-268, leaving them small profit margins and forcing them to pass on to their customers the higher prices they paid as a result of Defendants' overcharges. Their inability to absorb overcharges without operating at a loss further confirms that the effect of Defendants' conduct was widespread across Class members. *Id.*; *see also TFT-LCD I*, 267 F.R.D. at 601-02 (noting pass-through rate is higher in highly competitive markets, supporting finding of common impact).

Courts have found that the kind of evidence Plaintiffs proffer here—*viz.*, economic analysis of industry structure, competitive conditions, and transactional data—is a common body of evidence that allows the jury to find widespread, common impact. *See, e.g.*, *Korean Ramen*, 2017 WL 235052, at *16, 19-20 (expert's analysis based on anecdotal evidence and econometric analysis are a "reliable and accepted source of classwide proof of impact"); *Optical Disk Drive*, 2016 WL 467444, at *7 (expert's analysis presented adequate explanation for why classwide impact would have existed, including means for testing data

and calculating overcharges); *CRT I*, 308 F.R.D. at 629 (expert's report, supported by both documentary facts and industry data, and including econometric analysis, is "well established as a means of providing classwide proof of antitrust injury and damages"); *TFT-LCD I*, 267 F.R.D. at 606 (expert's report was supported by transactional and industry data and "courts have accepted multiple regression analyses as means of proving antitrust injury and damages on a class-wide basis."); *SRAM II*, 264 F.R.D. at 614-15 (experts' analyses, including regression models, are "plausible methodologies that will be used to perform quantitative analyses to demonstrate class-wide injury.").

> ii.   **Dr. Williams' second method of analysis—testing for common impact using statistical analysis analyzing every transaction by certain distributors—confirmed that both overcharges and their pass-through widely impacted the Class.**[57]

Dr. Williams, however, undertook another form of analysis that is even more rigorous. To test the conclusions he reached using his first method, Dr. Williams assessed the percentage of class members injured by Defendants' conduct using customer-identifying transactional data for several of the distributors. Williams Rpt. at ¶¶ 269-277, Figure 16. Application of this methodology at the customer level of intermediaries represents an unusually rigorous showing and was possible only because certain intermediaries for Defendants' products maintained granular transactional data that CIIPPs

---

[57] *See Air Cargo*, 2014 WL 7882100, at *55 (granting class certification based on this model); *Chocolate Confectionary*, 289 F.R.D. at 221 (same); *Domestic Drywall*, 2017 WL 3623466, at *27 (same); *Korean Ramen*, 2017 WL 235052, at *6 (same).

obtained in discovery.[58] That data and the resulting analysis provides the Court with an uncommonly rigorous basis for assessing predominance in the context of an indirect purchaser antitrust suit, which confirms that common issues predominate.

Using the transactional data supplied by three distributors noted above, Dr. Williams performed regression analyses to determine the prices each of the class members would have paid to those distributors in the absence of the conspiracy and compared those amounts to the prices the Class members actually paid. *Id.* Dr. Williams' analysis confirmed

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Williams Rpt. at ¶ 274, Figure 16. He then considered the conclusions concerning the Class that should be drawn from these findings. Dr. Williams determined that, in light of industry characteristics and market conditions, the small percentage of class purchasers who did not appear to have paid an overcharge in fact likely did pay one; the outliers were small buyers, and statistical noise—rather than the absence of an overcharge—likely explains why the data are unable to show they were harmed. *Id.* at ¶ 262, n.229, ¶ 271, n.237, ¶ 272, n.238, ¶ 273, n.239.

---

[58] *Cf.* Hal J. Singer, *Economic Evidence of Common Impact for Class Certification in Antitrust Cases: A Two-Step Analysis*, 25 Antitrust 34, 34 (2011) (observing that, in the typical case, "proof of common impact involves two basic inquiries: (1) Is there a plausible economic theory (and corroborating evidence) that links the challenged conduct to anticompetitive effects generally, and (2) Is there some mechanism that would reliably transmit these anticompetitive effects (typically in the form of an overcharge) to all or a large share of the proposed class?").

The more limited nature of the data other distributors provided did not allow for a similar analysis. However, Dr. Williams concludes for various reasons that purchasers from the three distributors provide an appropriate benchmark for the percentage of impact on purchasers from the other distributors, that is, ███████████████████████████ ██████████████████████████████ *Id*. at ¶ 275-277. As discussed above, his econometric analysis of different categories of pork product sales and his analysis of the structure of the market confirm that Defendants' conduct would cause virtually all Class members to have paid an overcharge. *Id*. at ¶ 264, Table 7, ¶¶ 278-280. So does evidence that the distributors all operate in highly competitive industries with narrow profit margins, forcing them to pass on the overcharges they paid to their customers, the Class members. *Id*. at ¶¶ 265-268.

The analysis of the distributors' data provides powerful evidence of classwide impact in general. *See Korean Ramen*, 2017 WL 235052, at *19 (relying on average pass-through rates from "an admittedly small sampling of resellers" to show widespread impact on indirect purchasers); *Air Cargo*, 2014 WL 7882100, at *56 (holding analysis of percentage of impact that omitted data for 100,000 class members was sufficient to draw inference of widespread impact to Class as a whole); *Chocolate Confectionary*, 289 F.R.D. at 212-13, 221-22 (relying on data from just a single customer to analyze percentage of impact and eliminating from that data various sales that were not susceptible to analysis or were outliers); *CRT III*, 2013 WL 5391159, at *8 (approving use of sampling in certifying indirect purchaser class action).

There is a final reason that this analysis understates the percentage of Class members that paid overcharges as a result of Defendants' conduct. Some Class members purchased pork from more than one of the distributors. If they did, then even if they did not pay an overcharge to one of the distributors, they very likely paid an overcharge to a different one. Dr. Williams' analysis ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████ *Id.* at ¶ 274, Figure 16. As a result, his analysis likely understates the percentage of Class members that paid an overcharge. The above analysis is often not feasible in antitrust cases—in part because of limitations in the available data—but when it is feasible, it provides an extraordinarily rigorous basis for establishing common impact and predominance. Based on all these factors, and using his analysis of the distributors as a benchmark, Dr. Williams' analysis thus allows the jury to find, based on evidence common to the Class, that Defendants' conspiracy had an antitrust impact for all or virtually all Class members.

In sum, common evidence demonstrates general price inflation, and each of Dr. Williams' two methods establishes the widespread nature of the impact of those price increases on the Class. Since Defendants' violation and the Class's aggregate damages will also be established through common evidence, the common impact of Defendants' violation shows that common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

### c.   Common Issues Predominate Regarding Aggregate Damages.

The aggregate amount of damages caused by an antitrust conspiracy is a common question when Plaintiffs offer a common body of evidence through which it may be calculated for all Class members. *See Lidoderm*, 2017 WL 679367, at *15 (approving use of aggregate damages) (citing *Meijer v. Abbott Labs*, No. C 07-5985 CW, 2008 WL 4065839, at *7 (N.D. Cal. Aug. 27, 2008)); *see also Nexium*, 777 F.3d at 19 (approving aggregate measure of classwide damages); *Cardizem,* 200 F.R.D. at 324 ("As observed by a leading commentator on class actions: 'aggregate computation of class monetary relief is lawful and proper.'") (citation omitted).

"Plaintiffs' damages model 'must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" *Burnett*, 2022 WL 1203100, at *16 (quoting *Comcast Corp. v. Behrend*, 569 US 27, 37 (2013)). But plaintiffs in price-fixing cases "do not need to supply a precise damage formula at the certification stage of an antitrust action." *Potash*, 159 F.R.D. at 697. And it is well established that the need to perform individual damages calculations will not defeat certification, provided those calculations do not predominate over common issues. *See Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 375 (8th Cir. 2018) ("A class may be certified based on common issues "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." (quoting *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016)); *H & T Fair Hills v. All. Pipeline*, No. 19-CV-1095 (JNE/BRT), 2021 WL 2526737, at *9 (D. Minn. June 21, 2021)

48

(citing same). Here, Plaintiffs have not merely proposed a methodology for calculating the aggregate Class damages. Dr. Williams has calculated those damages using common evidence, █████████████████████████████████████████████████ ████████  Williams Rpt. at ¶ 288, Table 12. Given the amount Plaintiffs are prepared to prove, the amount of aggregate damages is certain to be a central point of contention at trial. Plaintiffs' ability to prove aggregate damages through common evidence confirms that common issues predominate over questions affecting only individual class members.

### C.   Similarities in the Applicable Law Confirm Predominance.

Although Plaintiffs seek to represent claims under the laws of 27 States and the District of Columbia, they fundamentally allege only a single type of claim: that they overpaid for pork products and are entitled to recover overcharges resulting from Defendants' alleged illegal anticompetitive conduct. The uniformity in the laws governing Plaintiffs' claims confirms the proposed Class is "sufficiently cohesive to warrant adjudication by representation." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 267 F.R.D. 549, 560 (D. Minn. 2010) (quoting *Amchem*, 521 U.S. at 623)).

"To certify a multi-state class action, a plaintiff must prove through 'extensive analysis' that there are no material variations among the law of the states for which certification is sought." *Klay*, 382 F.3d at 1262 (citation omitted). "[T]he crucial inquiry is not whether the laws of multiple jurisdictions are implicated, but whether those laws differ in a material manner that precludes the predominance of common issues." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013) (citing *Walsh v. Ford*

*Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986). "[W]hile in theory all fifty states could have different laws, in practice there are seldom more than two or three rules on any given question, each adopted by many states." Larry Kramer, *Choice of Law in American Courts in 1990: Trends and Developments*, 39 Am. J. Comp. L. 465, 475 (1991).

The attached surveys confirm that, here, the causes of action asserted by CIIPPs and the CIIPP class members are materially uniform across jurisdictions. *See* Appendix A, B, C. The state antitrust statutes invoked by CIIPPs parallel federal law and contain harmonization provisions. The consumer protection statutes in question permit indirect purchaser standing and are harmonized with federal law, when appropriate. Similarly, state unjust enrichment laws do not materially vary. *See In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1177-78 (D. Minn. 2014) ("The substantive law of unjust enrichment is consistent across all jurisdictions.").

As such, it is unsurprising that other circuits have approved the certification of similar classes. *See, e.g.*, *Nexium*, 777 F.3d at 14 (affirming certification of a nationwide class of indirect purchasers pursuing claims "under the antitrust and consumer protection laws of 24 states and the District of Columbia");[59] *Sullivan*, 667 F.3d at 302 ("Where 'a sufficient constellation of common issues binds class members together,' differences in

---

[59] *Accord Waste Mgmt. Holdings, Inc. v. Mowbray,* 208 F.3d 288, 296 (1st Cir. 2000) (rejecting argument that variations in twenty states' laws concerning reliance, waiver, and statutes of limitations defeated predominance, holding that "as long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)").

state law treatment of indirect purchaser claims likely fall into a handful of clearly discernible statutory schemes.") (citation omitted);[60] *Klay,* 382 F.3d at 1262 ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards," then certification of subgroups "embracing each of the dominant legal standards can be appropriate."). The court may mold, shape and otherwise define the Classes as it sees proper. *See Select Comfort*, 292 F.R.D. at 604.

### D.   A Class Action Is Superior to Individual Actions.

In addition to considering whether common issues predominate, Rule 23(b)(3) instructs courts to a making a finding with respect to whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

This District has evaluated superiority using the four "non-exclusive" factors identified in Rule 23(b)(3). *See City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 356 (D. Minn. 2012); *Mund v. EMCC, Inc.*, 259 F.R.D. 180, 186 (D. Minn. 2009); *Kimball v. Frederick J. Hanna & Assocs., P.C.*, No. 10-130, 2011 WL 3610129, at *7 (D. Minn. Aug. 15, 2011); Fed. R. Civ. P. 23(b)(3). All of the factors

---

[60] *Prudential*, 148 F.3d at 315 (denying a class settlement objector's arguments and noting that "[c]ourts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit." (citing *In re School Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986))). *But see Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183 (3d. Cir. 2014) (affirming denial of certification of multistate class where "[n]o effort has been made to demonstrate how Plaintiffs' claims of deception through overbilling could be proven under the statutes' varying elements of reliance, state of mind, and causation, to name a few").

here weigh in favor of certifying a class.

To begin, Plaintiffs are unaware of any large number of commercial indirect purchaser actions asserting indirect purchaser damages claims under state law with an "interest[] in individually controlling" separate commercial indirect purchaser actions challenging the Defendants' alleged anticompetitive conduct. Fed. R. Civ. P. 23(b)(3)(2)(A). Although some restaurant groups have brought suit, they by and large assert damages claims under federal law, apparently via assignment from the direct purchaser distributors from which they purchased pork. *See, e.g.*, ECF No. 1309, at 7. Plaintiffs are similarly unaware of other litigation "concerning the controversy already begun by or against class members," Fed. R. Civ. P. 23(b)(3)(B), and the Judicial Panel on Multidistrict Litigation has ordered that all related cases be transferred to this Court for coordinated pre-trial proceedings. *See, e.g.*, *In re Pork Direct & Indirect Purchaser Antitrust Litig.*, 544 F. Supp. 3d 1379 (JPML 2021).

The crucial factor showing the superiority of a class action in this case, however, is the desirability of "concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). Defendants' conspiracy was uniformly directed at thousands of Class members. If Class members brought individual actions seeking compensation for their injuries, this Court would be forced to repeatedly determine, using evidence substantially similar or identical to the evidence Plaintiffs rely on here, whether Defendants conspired to limit the supply of pork; whether their conspiracy caused antitrust impact; and the amount of damages they caused. Such seriatim adjudication would undermine the

goals—among them "redress of injuries, procedural due process, efficiency, horizontal equity among injured claimants, and finality"—of both the Federal Rules of Civil Procedure and the class action device. *See Sullivan*, 667 F. 3d at 340 (Scirica, J., concurring). The economies of adjudicating similar, potentially small-size claims through a class action strongly supports a superiority finding. *See Thinesen v. JBC Legal Group, P.C.*, No. 05-518 (DWF/SRN), 2005 WL 2346991, at *10 (D. Minn. Sept. 26, 2005).

Seriatim litigation is equally at odds with the statutory goals of the antitrust laws. As Dr. Williams' report illustrates, Class members' claims require rigorous economic analysis of the alleged conspiracy and its effects. Whereas a class action permits Class members to share the costs of that proof equitably among themselves, *see Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), individual proceedings would sound the death knell for many Class members' claims, because their damages, even trebled, are too small to warrant litigation. *TFT-LCD II*, 267 F.R.D. at 314–15; *see also Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168, 1175-76 (9th Cir. 2010). To paraphrase Judge Posner, the realistic alternative to a class action in this case is not thousands of individual suits, but zero. *Cf. Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all."). Courts have frequently found that these dynamics make

a class action superior to individual proceedings.[61]

Finally, "the likely difficulties in managing a class action" again weigh in favor of certification. *See* Fed. R. Civ. P. 23(b)(3)(D). Any trial of indirect purchasers' claims, whether it involves a single Plaintiff or all Class members, will focus on the same questions and the same evidence. Either Defendants engaged in an antirust conspiracy, or they did not; either they violated the antitrust laws or they did not; either they inflated prices or they did not. Accordingly, proceeding on a class action basis will be more manageable than entertaining thousands of individual actions litigating the same issues with the same proof. *See, e.g.*, *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 104 (D. Conn. 2009); *Greene v. Jacob Transportation Servs., LLC*, No. 209CV00466GMNCWH, 2017 WL 4158605 (D. Nev. Sept. 19, 2017) ("Because the Court finds that it would be more efficient and consistent to pool these claims together, the superiority requirement has been satisfied.").

In short, this suit is a natural class action. The superiority of proceeding on a class action basis is plain.

---

[61] *See, e.g, Zurn*, 267 F.R.D. at 567 (granting in part a motion for class certification in the context of the assertion that "since any individual class member's recovery will be relatively modest, requiring each class member to bring an individual lawsuit against Zurn for damages is not economically feasible"); *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121, 1128 (9th Cir. 2017) (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663–64 (7th Cir. 2015)); *TFT-LCD I*, 267 F.R.D. at 608; *Sobel v. Hertz Corp.*, 291 F.R.D. 525, 544 (D. Nev. 2013) ("[A] class action is particularly appropriate where, as here, the alternative involves class members 'filing hundreds of individual lawsuits that could involve duplicating discovery and costs that exceed the extent of the proposed class members' individual injuries.'" (quoting *Wolin*, 617 F.3d at 1176)).

## VII.  THE COURT SHOULD APPOINT CLASS COUNSEL.

In addition to moving for class certification, Plaintiffs ask the Court to appoint class counsel to represent the certified Classes. Under Rule 23(g), if the Court grants class certification, it should appoint class counsel who will "fairly and adequately" represent the Class. *See Taqueria*, 2021 WL 6127880, at *15. Plaintiffs have retained highly skilled counsel with extensive experience in prosecuting antitrust class actions. *See supra* Section IV.D. Proposed class counsel have vigorously pursued the interests of the proposed Class and will continue to do so. *See* Finley Decl., ¶ 11 (describing the work counsel have undertaken to date on behalf of the proposed Class); *see also* Declaration of Shawn M. Raiter, ECF No. 1255, at ¶ 4. As a result, appointment of class counsel is appropriate under Rule 23(g).

## VIII.  CONCLUSION

For the foregoing reasons, the Court should grant CIIPPs' Motion for Class Certification and for Appointment of Lead Counsel and Plaintiffs' Steering Committee.

Dated: May 2, 2022                    **CUNEO GILBERT & LADUCA, LLP**

By: */s/ Blaine Finley*
        Jonathan W. Cuneo (*pro hac vice*)
        Joel Davidow (*pro hac vice*)
        Blaine Finley (p*ro hac vice*)
        4725 Wisconsin Ave. NW
        Suite 200
        Washington, DC 20016
        Telephone: 202.789.3960
        Facsimile: 202.589.1813
        jonc@cuneolaw.com
        joel@cuneolaw.com
        bfinley@cuneolaw.com

By: */s/ Shawn M. Raiter*
        Shawn M. Raiter (MN#240424)
        **LARSON · KING LLP**
        30 East Seventh Street Suite
        2800 St. Paul, MN 55101
        Telephone: (651)312-6518
        sraiter@larsonking.com

        ***Interim Co-Lead Counsel for Commercial
        and Institutional Indirect Purchaser
        Plaintiffs***

        Don Barrett (*pro hac vice*)
        Katherine Barrett Riley (*pro hac vice*)
        Sterling Aldridge (*pro hac vice*)
        BARRETT LAW GROUP, P.A.
        P.O. Box 927
        404 Court Square
        Lexington, MS 39095
        Telephone: (662) 834-2488
        dbarrett@barrettlawgroup.com
        kbriley@barrettlawgroup.com
        saldridge@barrettlawgroup.com

Jon Tostrud (*pro hac vice*)
Anthony Carter (*pro hac vice*)
**TOSTRUD LAW GROUP, PC**
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

David M. Cialkowski (MN#0306526)
Ian F. McFarland (MN#0392900)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com
ian.mcfarland@zimmreed.com

Marcus Bozeman (*pro hac vice*)
**BOZEMAN LAW FIRM P.A.**
400 W. Capitol Avenue, Ste. 1700
Little Rock, AR 72201
mbozeman@bozemanfirm.com

*Interim Plaintiffs' Steering Committee for Commercial and Institutional Indirect Purchaser Plaintiffs*

57