UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>All Consumer Indirect Purchaser Actions | Case No. 0:18-cv-01776-JRT-HB<br><br>**DECLARATION OF ERIC SCHACHTER IN SUPPORT OF CONSUMER INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

I, Eric Schachter, hereby declare as follows:

1. I am a Vice President with A.B. Data, Ltd. ("A.B. Data"). I am fully familiar with the facts contained herein based upon my personal knowledge, and if called as a witness, could and would testify competently thereto. I submit this declaration at the request of Co-Lead Counsel in connection with the above-captioned action (the "Action").

2. A.B. Data has been appointed as Notice, Claims, and/or Settlement Administrator in thousands of class actions, administering some of the largest and most complex notice and settlement programs of all time, involving all aspects of media, direct, and third-party notice programs, data management, claims administration, and settlement fund distribution. A profile of A.B. Data's background and capabilities, including representative case and client lists, is attached as Exhibit A.

3. I have over 20 years of experience in the settlement administration industry that includes implementing and maintaining notice plans and claims administration

programs in hundreds of class action cases and related proceedings, including complex consumer, antitrust, and securities class actions; Securities and Exchange Commission settlements and related distributions; and civil rights, employment, and insurance class actions. In my career, I have provided testimony to courts in support of class action notice programs in numerous cases, including the cases from the preceding four years listed in Exhibit B to this Declaration.

4.  A.B. Data is being compensated by Co-Lead Counsel at a rate of $350.00 per hour for my work on this matter, and my compensation is not contingent on my findings or on the outcome of this matter.

5.  As detailed in my previous Declaration of Eric Schachter in Support of Plaintiffs' Motion for Final Approval of Settlement (ECF No. 994) (the "Final Approval Declaration"), A.B. Data is acting as Notice and Settlement Administrator in connection with previously reached settlements in this Action with Defendants JBS USA Food Company, JBS USA Food Company Holdings, Swift Pork Company, and related or affiliated entities ("JBS Settlement").

6.  Pursuant to the Court's Order Granting Motion to Approve the Manner and Form of Class Notice Regarding Settlement with JBS Defendants dated June 22, 2021 (ECF No. 811) (the "JBS Settlement Notice Order"), on or about July 22, 2021, A.B. Data began to effectuate notice to potential JBS Settlement Class Members defined as follows:

> All persons and entities who indirectly purchased Pork from any of the Defendants or any co-conspirator, or their respective subsidiaries or affiliates, for personal use in the United States from January 1, 2009, through April 2, 2021. Specifically excluded from the Settlement Class are the

Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from this Settlement Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

7. The JBS Settlement Notice Plan included direct notice by email utilizing contact information for potential JBS Settlement Class Members provided by third parties that had been subpoenaed by Co-Lead Counsel. Email notice was successfully sent to potential Settlement Class Members using that contact information. I understand that Co-Lead Counsel has issued additional subpoenas such that additional Settlement Class Member email addresses will be available for subsequent rounds of notice.

8. Many grocery stores and club stores retain members' purchase histories and contact information. For example, one of the largest grocery stores in the country, Kroger collects "Contact Information such as your email or postal address" and "Behavioral Information such as your purchase and transaction histories."[1] Similarly, Albertson's, which operates grocery stores in 34 states under 20 well-known brand names, including Safeway, Von's,, and Jewel-Osco, collect members' "name, address, phone number, [and] email address," along with "transactional and other information such as the date of [] purchase, the items purchased, the dollar amount or value of the transaction."[2]

---

[1] See Kroger Privacy Policy, (https://www.kroger.com/content/v2/binary/document/info/privacy-policy_printable_english_08242021-1629830920810.pdf) (last accessed April 28, 2022).

[2] See Albertson's Privacy Policy, (https://www.albertsonscompanies.com/policies-and-disclosures/privacy-policy/default.aspx) (last accessed April 28, 2022).

9. Likewise, grocery stores such as Food Lion,[3] Stop-and-Shop,[4] Fry's,[5] Meijer,[6] Shop-n-Save,[7] Big Y,[8] Bi-Lo,[9] D&W Fresh Market,[10] Dillions,[11] Harris Teeter,[12] Ralphs,[13] Piggly Wiggly,[14] Winn Dixie,[15] and others have similar rewards programs. Because these programs usually store members' purchase histories and contact information, these data sources are often used to contact consumers in the event of a product recall or safety issue.

10. Here, the class contact and purchase history data collected from these third parties could be used to identify and notify class members. Once a class is certified,

---

[3] *See* Food Lion MVP Program, (https://www.foodlion.com/mvp-program/) (last accessed April 28, 2022).

[4] *See* Stop-n-Shop GO Rewards, (https://stopandshop.com/rewards/) (last accessed April 28, 2022).

[5] See Fry's Privacy Policy – How We Collect Your Information (https://www.frysfood.com/i/privacy-policy/how-we-protect-your-information) (last accessed April 28, 2022).

[6] See Meijer MPerks (https://www.meijer.com/mperks.html) (last accessed April 28, 2022).

[7] See Shop-n-Save Loyalty Card Program Privacy Policy (https://www.shopnsavefood.com/MoreInfo/privacy%20policy) (last accessed April 28, 2022).

[8] See Big Y Silver Savings, (bigy.com/membership) (last accessed April 28, 2022).

[9] See Bi-Lo Rewards Terms & Conditions (https://www.bi-lo.com/archive/register-now) (last accessed April 28, 2022).

[10] See D&W Fresh Market – Yes! Rewards (https://www.shopdwfreshmarket.com/DW-yes) (last accessed April 28, 2022).

[11] See Dillions Food Stores, Fuel Points Program (https://www.dillons.com/d/fuel-points-program) (last accessed April 28, 2022).

[12] See Harris Teeter Fuel Points (https://www.harristeeter.com/d/fuel-points-program) (last accessed April 28, 2022).

[13] See Ralphs, Fuel Points Program (https://www.ralphs.com/d/fuel-points-program) (last accessed April 28, 2022).

[14] See Piggly Wiggly, Pig Points (https://www.shopthepig.com/pig-points) (last accessed April 28, 2022).

[15] See Winn Dixie, Rewards (https://www.winndixie.com/rewards) (last accessed April 28, 2022).

Plaintiffs can subpoena class contact and transactional information from these third party retailers, for the sole purpose of notifying class members of their claims.

11. It is my understanding that Co-Lead Counsel has already subpoenaed additional contact information from grocery retailers, including Costco and Amazon. In my experience, these retailers often have robust contact information that allows us to directly notify millions of class members. Class members who are directly notified via email can be directed to submit claims online.

12. A.B. Data implements several best practices to maximize deliverability when sending email notice, such as: running the list of recipient email addresses through a deliverability analysis to ensure the email addresses are valid; working with our consultants and contacts at the email service providers to develop sending strategies to achieve optimal deliverability; formatting the content of the email notice as embedded HTML to increase readability; ensuring no inclusion of words or phrases known to trigger SPAM or junk filters; not including attachments to the emails; and sending the emails in tranches over a period of days.

13. To supplement direct notice efforts, the JBS Settlement notice plan also included targeted digital banner and newsfeed ads to appear on various websites and social media platforms. To target the ads to potential JBS Settlement Class Members, A.B. Data's media experts profiled the JBS Settlement Class using the accredited resource, MRI-Simmons 2020 Doublebase data.[16] MRI is used by advertising agencies and other

---

[16] MRI-Simmons (formerly known as GfK MRI) Survey of the American Consumer is the country's largest, most comprehensive, and most reliable consumer and media and product/service *(footnote continued)*

marketing professionals to understand the demographics, interests, and activities of a targeted group of people and aids in the proper selection of media to reach that target audience. It is also instrumental in developing the estimated net reach of a particular notice plan and uses the type of accepted methodology that the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* advises be used in class action notice plans.

14. MRI measures a combined category called "Households Used in the Last 6 Months: Pork (Chops) or Other Pork Meat Fresh/Frozen or Pork Roasts or Bacon and Breakfast Strips or Sausage or Cold Cuts or Ham or Salami or Cooked Hams," which was used to review the demographics and media habits. This research defines the target audience as having the following characteristics:

- Age 25 and older;

- Have attended/graduated from college;

- Employed full or part time;

- Married or living with partner and own their home; and

---

usage database. Data from MRI's Survey of the American Consumer, conducted continuously since 1979, are used in most media and marketing plans written in the United States. The firm's multidimensional database is the largest and most reliable source for integrated media planning. About 450 U.S. advertising agencies, including 90 of the top 100, subscribe to MRI Research, as does A.B. Data; and more than 200 national marketers access the MRI database. MRI-Simmons offers the most detailed and representative picture of U.S. demographics and lifestyles, including information on usage of nearly 6,000 product and service brands across 550 categories, the magazines and newspapers audiences read, the websites they look at, the television programs they watch, and the radio stations they listen to. MRI has been accredited by the Media Ratings Council ("MRC") since 1988. MRC requires its members to disclose all the methodological aspects, meet MRC standards for rating research, and submit to MRC-designed audits.

- Live in large urban and suburban metropolitan areas.

15. To identify the best vehicles to deliver the message to the target audience, A.B. Data reviewed the media-quintile profiles, which measure the degree to which an audience uses media relative to the general population. This analysis showed that "Households Used in the Last 6 Months: Pork (Chops) or Other Pork Meat Fresh/Frozen or Pork Roasts or Bacon and Breakfast Strips or Sausage or Cold Cuts or Ham or Salami or Cooked Hams" spend an average amount of time using digital media.

16. Based upon this information, A.B. Data implemented a digital media campaign that delivered over 343 million impressions, resulting in over 268 thousand engagements and/or conversions across Google Display Network, Google AdWords, Facebook, Instagram, and YouTube. A case-specific Facebook page was also created as a landing page for the links in the Facebook and Instagram newsfeed ads. Supplemental notice through digital media has become commonplace in class action notice programs and, in our experience, is a practicable way to provide notice to class members.

17. To further supplement direct notice efforts, the JBS Settlement notice plan included the dissemination of a news release via *PR Newswire*'s US1 Newsline distribution list. This news release was distributed via *PR Newswire* to the news desks of approximately 10,000 newsrooms, including those of print, broadcast, and digital websites across the United States. The news release was also translated and published to *PR Newswire*'s U.S. Hispanic media contacts and Hispanic news websites.

18. A.B. Data also implemented and maintains a case-specific website for this matter at www.overchargedforpork.com. The Website Notice, which contains a detailed summary of the terms of the JBS Settlement, is posted prominently. The website also provides, among other things, a summary of the case, all relevant documents, important dates, and any pertinent updates concerning the litigation or the settlement process. The website is secure, with an "https" designation. Google Analytics and Facebook Pixel tracking codes ensure accurate optimization with the digital and social media ads. To date, the website has over 200,000 visits.

### Conclusion

19. It is my opinion, based on my individual expertise and experience and that of my A.B. Data colleagues, that the notice methodologies described herein are the best practicable under the circumstances for this Action and are designed to effectively reach class members and provide them with the information in an informative and easy to understand manner. Through a multi-media approach that includes direct notice, microtargeted notice on social media and digital networks, and earned media, notice can be delivered with a reach and frequency that conforms to the requirements of Rule 23 and due process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of May 2022 in Milwaukee, Wisconsin.

_____
ERIC SCHACHTER