```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
    -----------------------------------------------------------
3                                    )
    In Re Pork Antitrust Litigation  ) File No. 18-cv-1776
4                                    )              (JRT/HB)
    This Document Relates to:        )
5   All Actions                      ) St. Paul, Minnesota
                                     ) May 9, 2022
6                                    ) 9:08 a.m.
                                     )
7   -----------------------------------------------------------
                                     )
8   Indiana Packers Corporation,     ) File No. 22-mc-26
                                     )              (JRT/HB)
9            Petitioner,             )
                                     ) St. Paul, Minnesota
10  vs.                              ) May 9, 2022
                                     ) 9:08 a.m.
11  Direct Purchaser Plaintiffs,     )
                                     )
12           Respondent.             )
                                     )
13  -----------------------------------------------------------

14

15

16          BEFORE THE HONORABLE HILDY BOWBEER
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

17

18                    (MOTIONS HEARING)

19

20

21

22

23

24
        Proceedings reported by court reporter; transcript
25  produced by computer.
```

1    **APPEARANCES** (Via Zoom Videoconference):

2    For Direct Purchaser        Lockridge, Grindal, Nauen, PLLP
     Plaintiffs:                 JOSEPH C. BOURNE, ESQ.
3                                Suite 2200
                                 100 Washington Avenue South
4                                Minneapolis, Minnesota 55401

5    For Commercial and          Cuneo, Gilbert & LaDuca, LLP
     Institutional Indirect      ALEC BLAINE FINLEY, ESQ.
6    Purchaser Plaintiffs:       Suite 200
                                 4725 Wisconsin Avenue Northwest
7                                Washington, D.C. 20016

8    For Consumer Indirect       Gustafson Gluek, PLLC
     Purchaser Plaintiffs:       LING SHAN WANG, ESQ.
9                                Suite 2600
                                 120 South Sixth Street
10                               Minneapolis, Minnesota 55402

11                               Hagens, Berman, Sobol, Shapiro,
                                 LLP
12                               RIO PIERCE, ESQ.
                                 Suite 202
13                               715 Hearst Avenue
                                 Berkeley, California 94710
14
     For Sysco DAPs:             Boies, Schiller, Flexner, LLP
15                               SARAH L. JONES, ESQ.
                                 1401 New York Avenue Northwest
16                               Washington, D.C. 20005

17   For Clemens Food Group,     Kirkland & Ellis
     LLC, et al.:                MAX SAMELS, ESQ.
18                               300 North LaSalle
                                 Chicago, Illinois 60654
19
     For Hormel Foods Corp.:     Faegre, Drinker, Biddle &
20                               Reath, LLP
                                 CRAIG S. COLEMAN, ESQ.
21                               Suite 2200
                                 90 South Seventh Street
22                               Minneapolis, Minnesota 55402

23

24

25

```
 1      CONTINUED APPEARANCES (Via Zoom Videoconference):

 2        For JBS USA Food Co.:      Spencer Fane
                                     JESSICA J. NELSON, ESQ.
 3                                   Suite 2500
                                     100 South Fifth Street
 4                                   Minneapolis, Minnesota 55402

 5                                   Quinn, Emanuel, Urquhart &
                                     Sullivan, LLP
 6                                   RICHARD T. VAGAS, ESQ.
                                     22nd Floor
 7                                   51 Madison Avenue
                                     New York, New York 10010

 8
          For Seaboard Foods, LLC:  Stinson, Leonard, Street, LLP
 9                                   WILLIAM THOMSON, ESQ.
                                     Suite 2600
10                                   50 South Sixth Street
                                     Minneapolis, Minnesota 55402

11
          For Smithfield Foods,     Brown Fox, PLLC
12        Inc.:                     BRIAN E. ROBISON, ESQ.
                                     Suite 450
13                                   6303 Cowboys Way
                                     Frisco, Texas 75034

14
                                     Gibson, Dunn & Crutcher, LLP
15                                   ROD STONE, ESQ.
                                     333 South Grand Avenue
16                                   Los Angeles, California 90071

17        For Tyson Foods, Inc.,    Axinn, Veltrop & Harkrider, LLP
          et al:                    JAROD TAYLOR, ESQ.
18                                   90 State House Square
                                     Hartford, Connecticut 06103

19
          For Nonparty Indiana      Mayer Brown, LLP
20        Packers Corporation:      BRITT M. MILLER, ESQ.
                                     ROBERT ENTWISLE, ESQ.
21                                   71 South Wacker Drive
                                     Chicago, Illinois 60606

22
                                     Dorsey & Whitney, LLP
23                                   JAIME STILSON, ESQ.
                                     Suite 1500
24                                   50 South Sixth Street
                                     Minneapolis, Minnesota 55402

25
```

1      **<u>CONTINUED APPEARANCES</u>** (Via Zoom Videoconference):

2      For Nonparty Indiana        Mayer Brown, LLP
       Packers Corporation:        ANDREW J. SPADAFORA, ESQ.
3                                  1999 K Street Northwest
                                   Washington, D.C. 20006
4
       Court Reporter:            LORI A. SIMPSON, RMR-CRR
5                                  Suite 146
                                   316 North Robert Street
6                                  St. Paul, Minnesota 55101

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

**(VIA ZOOM VIDEOCONFERENCE)**

1

2

3

4          THE COURT:  Good morning, everyone.  This is the

5  United States District Court for the District of Minnesota.

6  I am Magistrate Judge Hildy Bowbeer.

7          And we are gathered this morning by Zoom in two

8  matters.  One is *In re Pork Antitrust Litigation*,

9  18-cv-1776, and in that matter we are gathered on ECF

10  Number 1219, the plaintiffs' motion to compel Indiana

11  Packers Corporation to produce documents responsive to a

12  subpoena duces tecum.  We're also gathered on matter

13  number 22-mc-26, ECF Number 1, which is Indiana Packers

14  Corporation's motion to quash subpoena.

15          So essentially we are dealing with kind of mirror

16  image motions, that second motion, of course, having been

17  transferred in, pursuant to Rule 45(f), from the Southern

18  District of Indiana.

19          So let me start by getting appearances from those

20  who are going to be arguing on those motions, and then I

21  will circle back to get appearances from counsel for other

22  parties.

23          So, first, on behalf of Indiana Packers

24  Corporation, it looks like I'm expecting Britt Miller.

25          MS. MILLER:  Good morning, Your Honor.  Britt

1    Miller on behalf of IPC.

2              THE COURT:  Good morning.

3              And Robert Entwisle?

4              MR. ENTWISLE:  Good morning, Your Honor.

5              THE COURT:  Jaime Stilson?

6              MS. STILSON:  Good morning, Your Honor.

7              THE COURT:  And is there anyone else who is on or

8    who you are expecting -- actually, I see a little box for

9    Andrew Spadafora, correct?

10             MR. SPADAFORA:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             Anyone else who is on screen with me this morning

13   or just listening in but who wants their appearance noted on

14   behalf of Indiana Packers Corporation?  No.

15             All right.  In addition -- well, actually, it

16   might be easier for me just to go through counsel for the

17   parties, but as I call your name, let me know if you

18   anticipate speaking to the motion this morning.

19             First, on behalf of the class plaintiffs, the

20   direct purchaser plaintiffs, Joseph Bourne?

21             MR. BOURNE:  Good morning, Your Honor.  And, yes,

22   I anticipate speaking.

23             THE COURT:  All right.  Good morning.

24             Anyone else who wants their appearance noted for

25   the direct purchaser plaintiffs?

1              Turning to the consumer indirect purchaser

2     plaintiffs, it looks like Ling Shan Wang.

3              MS. WANG:  Yes.  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              And Rio Pierce?

6              MR. PIERCE:  Good morning, Your Honor.

7              THE COURT:  Anyone else with me this morning on

8     behalf of the consumer indirect purchaser plaintiffs?  No.

9              All right.  Moving on to the commercial and

10    institutional indirect purchaser plaintiffs, Blaine Finley?

11             MR. FINLEY:  Good morning, Your Honor.

12             THE COURT:  And is there anyone else who wants

13    their appearance noted for commercial and institutional

14    indirect purchaser plaintiffs?

15             MR. FINLEY:  I believe not, Your Honor.

16             THE COURT:  All right.  Turning to the direct

17    action plaintiffs, is there anyone who wants their

18    appearance noted on behalf of the Commonwealth of Puerto

19    Rico?  No.

20             What about on behalf of the direct action

21    plaintiffs who are commonly represented with Dollar General?

22    No.

23             How about the direct action plaintiffs who are

24    commonly represented with Cheney Brothers?  No.

25             The direct action plaintiffs who are commonly

1    represented with Kroger?  No.

2              The direct action plaintiffs who are commonly

3    represented with Action Meat?  Also no.

4              And on behalf of the Sysco direct action

5    plaintiffs, I do know that I was expecting Sarah Jones.

6              MS. JONES:  Good morning, Your Honor.

7              THE COURT:  Good morning.

8              Anyone else for the Sysco direct action

9    plaintiffs?

10             What about the direct action plaintiffs who are

11   commonly represented with Kraft Heinz and Winn-Dixie?  No.

12             The direct action plaintiffs who are commonly

13   represented with Nestle?  No.

14             All right.  Anyone whose name I haven't called who

15   wants their appearance noted for any sort of plaintiff

16   whatsoever?  No.

17             All right.  Let's turn now to defense counsel.  Is

18   there anyone here on behalf of Agri Stats?  No.

19             On behalf of the Clemens Food Group, Max Samels?

20             MR. SAMELS:  Yes, Your Honor.

21             THE COURT:  Good morning.

22             Anyone else for the Clemens Food Group?

23             How about the Hormel defendants?  I see Craig

24   Coleman.

25             MR. COLEMAN:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          Anyone else for Hormel?

3          MR. COLEMAN:  No, Your Honor.

4          THE COURT:  On behalf of the JBS defendants, I see

5     Jessica Nelson.

6          MS. NELSON:  Good morning, Your Honor.

7          THE COURT:  And Richard Vagas?

8          MR. VAGAS:  Good morning, Your Honor.

9          THE COURT:  Anyone else for the JBS defendants?

10          MR. VAGAS:  No, Your Honor.

11          THE COURT:  Turning to the Seaboard Foods

12     defendant, William Thomson?

13          MR. THOMSON:  Good morning, Your Honor.

14          THE COURT:  Anyone else for Seaboard Foods?

15          MR. THOMSON:  I don't believe so.

16          THE COURT:  On behalf of Smithfield Foods, Brian

17     Robison?

18          MR. ROBISON:  Good morning, Your Honor.

19          THE COURT:  Anyone else for -- oh.  Rod Stone?

20          MR. STONE:  Good morning, Your Honor.

21          THE COURT:  Anyone else who wants their appearance

22     noted for Smithfield?

23          Turning to Triumph Foods, I don't think I knew of

24     anyone who was planning to attend, but is there anyone who

25     wants their appearance noted?  No.

1          And then the Tyson defendants, Jarod Taylor?

2          MR. TAYLOR:  Good morning, Your Honor.

3          THE COURT:  Anyone else for Tyson?

4          MR. TAYLOR:  No.

5          THE COURT:  Anybody else on behalf of any

6    defendant or defendant group whose name I haven't called and

7    wanted their appearance noted?

8          All right.  So that's appearances.  Let's turn now

9    to the motions, and we've got sort of mirror image motions

10   here.

11         We've already agreed that insofar as there was a

12   jurisdictional argument raised in the motion that was filed

13   in the *In re Pork Antitrust Litigation* case, the 18-cv-1776

14   case, that that is now moot in light of the motion that was

15   transferred in from the Southern District of Indiana.

16         But let me hear -- let me go ahead and hear first

17   from the plaintiffs since at the end of the day you're the

18   ones who are looking to enforce these requests, whether it's

19   in connection with the motion you filed or in response to

20   the motion to quash.

21         So, Mr. Bourne, I understand you've got the

22   virtual microphone.

23         MR. BOURNE:  Thank you.  Good morning, Your Honor.

24         Plaintiffs believe that the information they're

25   seeking from Indiana Packers is relevant and proportional to

1       the needs of the case.

2               What we're really seeking is communications with

3       the defendants about competitive conditions in the pork

4       industry or other communications and documents about

5       competitive conditions in the pork industry.

6               And so that latter set of documents would

7       encompass internal e-mails.  So if Indiana Packers had a

8       conversation with Smithfield or Tyson or whoever and

9       internally e-mailed about it, that would be a document that

10      we would be seeking and believe we could get only from

11      Indiana Packers.

12              By competitive conditions in the pork industry, we

13      are referring to pricing, supply, exports, things that are

14      sort of the core features of the antitrust conduct that we

15      allege in this case.

16              THE COURT:  Just to be clear, your Request

17      Number 9 wasn't limited to communications or to documents

18      reflecting communications with other defendants, right?  It

19      was all documents that related to or spoke to competitive

20      conditions in the pork industry, right?

21              MR. BOURNE:  That's right, Your Honor.  We believe

22      it would encompass those types of internal communications,

23      but it's not limited to communications.  It would also

24      include, you know, industry reports that we anticipate

25      Indiana Packers receives and that we know that, you know,

1    third-party industry participants have provided to the

2    defendants in the case, analysis of market conditions,

3    things like that, which in our experience in this case often

4    include information about how the pork industry is operating

5    and how the defendants are operating in terms of their

6    capacity, their production plans, pricing, and things like

7    that.

8              THE COURT:  All right.  Go ahead.

9              MR. BOURNE:  We believe that Indiana Packers very

10   likely has unique relevant documents.

11             Exhibits 1 through 4 to my declaration in support

12   of the plaintiffs' original motion filed in this court

13   appear to reflect Indiana Packers' information about its

14   supply and capacity plans, including forward-looking,

15   near-term information, having been shared with the

16   defendants.  In one instance we see Indiana Packers sharing

17   it with one of the defendants themselves.  The other ones,

18   the origin of that information is less clear.

19             And those are documents that we have received from

20   the defendants and so Indiana Packers very likely has

21   documents concerning sort of how its information came to be

22   shared with the other defendants.

23             Ultimately, you know, we can't prove what exact

24   documents Indiana Packers has because we simply don't -- we

25   don't know.  We haven't seen their documents.  But based on

1    the information that we do have, we believe that it likely

2    has important information for the case, particularly because

3    antitrust cases can often turn on a small -- a relatively

4    small universe of documents at the end of the day.

5           We don't believe it's our burden to identify

6    specific documents that are missing, as Indiana Packers has

7    suggested in its briefing.  What we really want is -- you

8    know, Request 9 says what it says, as we discussed earlier

9    this morning, but in particular we would be particularly

10   interested in internal e-mails as well as external e-mails

11   with the defendants under Requests 1 and 2 that may fill

12   gaps in the defendants' productions.  This is a conspiracy

13   dating back 13 or 14 years, so there are invariably going to

14   be some gaps from what the defendants still have.

15          The parties met and conferred, and the plaintiffs

16   proposed certain custodians and search terms and offered to

17   have an iterative process, hoping to work together to try to

18   be able to reach some agreement, and Indiana Packers

19   essentially said, no, we're not going to do any custodial

20   ESI searching.  We're willing to look for documents on a

21   "go get" search, which would be like board minutes, things

22   like that; and those just aren't as useful in an antitrust

23   case as e-mails.  So we think that an e-mail search is

24   appropriate.

25          The plaintiffs proposed the nine custodians that

1      Indiana Packers had originally agreed to when it was a

2      party.  Of course, it's not a party anymore.  But Indiana

3      Packers' position was zero custodians, so there was no more

4      negotiation to occur there.  But we believe that that is

5      still a reasonable number, either as a starting point or for

6      the Court to simply compel.

7            One of the other third parties in this case has

8      produced documents for eight custodians, or has agreed to.

9      One of the third parties has produced over 114,000

10     documents.  A couple more right now are reviewing hits after

11     negotiating search terms to bring the number down to a more

12     reasonable figure, between 100 and 200 thousand documents it

13     hit on those search terms.

14            So, you know, we're not trying to treat Indiana

15     Packers like a party, but we believe that, as a third party,

16     it likely has information that could be important for the

17     plaintiffs to prove their claims against the defendants or

18     potentially for the defendants to prove their defenses to

19     the plaintiffs.

20            THE COURT:  Let me ask this.  I know that you have

21     offered to negotiate search terms, but, of course, search

22     terms are a mechanism of kind of filtering the universe to

23     get at the documents that are responsive to the request.

24            Their argument is that the requests themselves are

25     overly broad.  So was there any negotiation about the scope

1    of any of those three -- well, I am thinking of the three

2    requests.  There's the structured data, but I will set that

3    aside for the moment.

4          The three requests that called for documents, was

5    there any discussion about an attempt to narrow the breadth

6    of the requests themselves, not how you might go looking for

7    it, but what the request itself was?

8          MR. BOURNE:  Your Honor, I would say no, not

9    really.  We did, of course, agree to eliminate or to not

10   pursue certain other requests that were in the subpoena, but

11   the actual scope of these requests, you know, I think it's

12   fair to say there wasn't really much attempt for negotiation

13   on either side.  The plaintiffs believe that search terms

14   could sort of reduce the burden in a search for responsive

15   documents.

16         The one caveat I would have there is, you know, I

17   believe the request might use the word "all documents."  Of

18   course, when you are talking about an ESI search, it's not

19   possible to produce all documents and what I believe that

20   really means in this kind of context is, you know,

21   responsive documents subject to a reasonable search or

22   something along those lines.

23         THE COURT:  Um-hmm.

24         MR. BOURNE:  Because, for example, if we had

25   agreed on the nine custodians the plaintiffs proposed or

1    some subset of that after negotiation, you know, you would

2    get responsive documents from those individuals' files, but

3    you wouldn't necessarily get documents from anyone else's

4    files.

5           THE COURT:  Right.  Right.  But insofar as those

6    searches turned up documents in any way, shape, or form on

7    competitive conditions in the pork industry, those -- that

8    scope was not something that was subject to negotiation, at

9    least from plaintiffs' perspective, right?

10          MR. BOURNE:  Right.  I don't believe that that

11   scope was ever negotiated or really meaningfully attempted

12   to be negotiated by either side.

13          THE COURT:  Okay.  So in dealing with a subpoena,

14   and I hear you loud and clear that just because somebody was

15   a party doesn't mean they get -- and then dismissed doesn't

16   mean they get a pass on subpoenas, but am I not supposed to

17   be looking at -- in the context of a subpoena, am I not

18   supposed to be looking at whether the kinds of information

19   being sought are reasonably likely to be available from the

20   parties in the case?

21          I mean, isn't there in that sense a heightened

22   responsibility on my part and I suppose a heightened

23   responsibility on your part to not go after third parties

24   for documents that are reasonably likely to be in the hands

25   of the parties?

1          MR. BOURNE:  You know, I think the answer to that

2     is slightly nuanced because the cases do say that, you know,

3     the scope of discovery and relevance is the same under

4     Rule 45 as it is under the other discovery rules.

5          But, yeah, I think as a general principle that is

6     a fair statement, that if we can get it from a party, then

7     we should try to get it from a party rather than from a

8     third party, whether that third party was a former defendant

9     or not.

10         What we've seen in this case from the third-party

11    productions that we've gotten is that they often include

12    important information and information that we believe is

13    going to help us prove our claims against the defendants,

14    and we don't see any reason that it would be different for

15    Indiana Packers here.  Every search is a little bit

16    different, and this is an alleged conspiracy that dates back

17    quite a fair amount of time.

18         The other thing I think is important is, yes,

19    Indiana Packers was dismissed from the case, but the

20    information we have obtained about Indiana Packers in

21    discovery suggests that its information was being shared

22    among the defendants and being utilized by the defendants in

23    a similar way to the remaining defendants' information, and

24    that makes us believe that Indiana Packers very likely has

25    unique relevant documents.

 1          Again, internal e-mails, I think, are the clearest

 2     example of this, where there's no possible way a party could

 3     have Indiana Packers' internal e-mails, and those e-mails

 4     could very likely be highly probative of our claims against

 5     the defendants.

 6          THE COURT:  Insofar as those internal documents

 7     commented on or described communications with the other

 8     defendants, you mean?

 9          MR. BOURNE:  Yes, described communications with

10     the other defendants or information-sharing mechanisms in

11     the pork industry related to, you know, competitive

12     conditions, which means price, supply, capacity, exports,

13     et cetera.

14          THE COURT:  All right.  What about the order in

15     *Turkey* and why does either that -- would you either take

16     issue with that reasoning in the first instance, which

17     obviously you're free to do, or do you believe that doesn't

18     have relevance here?

19          MR. BOURNE:  I believe the *Turkey* order is of

20     limited relevance here.

21          As I read the order, it says -- you know, on its

22     face it might appear to have some relevance, but what it

23     really says is the plaintiffs are seeking all documents

24     about, you know, certain categories of information, and

25     those are similar to the ones we've sought here.

1        But my understanding of what occurred there is the

2    court said, okay, you have to go back and work out a process

3    for seeking more limited information and you need to

4    negotiate a search methodology, search terms, and custodians

5    that will allow you to do that in a reasonable manner.

6        And here, through the negotiations that occurred,

7    we offered and attempted to do that kind of refinement.  So

8    I believe that takes us out of the *Turkey* order's realm of

9    relevance.

10       THE COURT:  Let me see if I had other -- anything

11   else you wanted to make sure and get on my radar before I

12   move to Ms. Miller?  I am looking to see if I had other

13   questions for you.

14       So it sounds like at this point -- well, I mean,

15   you mention that there are gaps in defendants' production,

16   but you don't tell me what those are or what you think they

17   are or what they're likely to be.

18       Can you give me any further reason to believe that

19   there are gaps in the defendants' production that can likely

20   only be filled by enforcing this subpoena against Indiana

21   Packers?

22       MR. BOURNE:  Your Honor, one of the reasons we

23   believe there are gaps is simply because of the length of

24   the relevant discovery period here.  And because of Indiana

25   Packers' important role in the industry as another major

1    pork integrator, we believe that it likely would be in a

2    position to have documents that have gone missing over time.

3         The plaintiffs have seen some instances of

4    documents, you know, that appear to have been missing, no

5    longer exist.  There was a deposition of a Seaboard witness

6    at one point where, you know, communications between a

7    Seaboard employee and an employee of another defendant had

8    only been produced by that other defendant and, you know, we

9    followed up and it appeared that Seaboard no longer -- you

10   know, didn't have documents that would have -- if they had

11   existed, it would have produced them, right?

12        And so that isn't a specific example of Indiana

13   Packers only having it, but it is an example of, you know,

14   we've seen instances where inter-defendant communications or

15   inter-competitor communications that should exist on both

16   sides haven't, and we expect the same would likely be true

17   of Indiana Packers.

18        And then because Indiana Packers is a significant

19   pork integrator who subscribed to Agri Stats during the

20   conspiracy period and had overlapping trade association

21   involvement and things like that with the defendants and its

22   information about its forward-looking production plans and

23   pricing plans was shared with its competitors, we anticipate

24   that Indiana Packers would likely have a wealth of highly

25   probative information about that information-sharing with --

1   among its competitors that we haven't been able to obtain so

2   far.

3             THE COURT:  All right.  Thank you.  Anything else

4   you wanted me to hear from you before I turn things over to

5   Ms. Miller?

6             MR. BOURNE:  Nothing else at this point, Your

7   Honor.

8             THE COURT:  Thank you, Mr. Bourne.  I will have

9   you mute.

10            And Ms. Miller, you're up.

11            MS. MILLER:  Thank you, Your Honor.

12            You have already touched on a number of issues

13   that we would have raised and so I will try not to repeat

14   here.

15            As Your Honor is aware, there are four requests

16   that are at issue.  The first two requests, 1 and 2, seek

17   Indiana Packers' communications with Agri Stats and the

18   defendants.  Plaintiffs can clearly get these from the

19   parties and they don't need to get them from IPC.

20            Even today Mr. Bourne has only been able to say

21   there may be gaps, we expect there to be documents, there

22   likely is, but has been able to point to nothing that would

23   indicate that IPC has something that plaintiffs can't get or

24   haven't already gotten from the defendants in this case.

25            To my knowledge -- and plaintiffs have not

1    represented that they have approached the other defendants

2    about any alleged gaps in their productions that may reveal

3    some necessary need for IPC to produce documents here.

4           Request Number 4 we'll set aside for a moment,

5    which is structured data.  Plaintiffs have said nothing

6    about how that will help them establish a conspiracy among

7    the other defendants, but we'll move on from that.

8           Request Number 9, as Your Honor has pointed out,

9    seeks all documents relating to competitive conditions in

10   the market for pork.  We are, quite frankly, at a loss as to

11   how a request seeking all documents about the pork industry

12   is specific or targeted, as plaintiffs' papers say it is, or

13   how any documents that would be responsive to that request

14   would be uniquely in Indiana Packers' possession.

15          Plaintiffs have already said that they've received

16   some 3.5 million documents from the actual defendants in

17   this case who, at least according to plaintiffs, control

18   70 percent of the pork industry.  We would imagine that some

19   measure of those 3.5 million documents have documents

20   related to competitive conditions surrounding pork.

21          Mr. Bourne specifically referenced third-party

22   industry reports that have been provided to the defendants.

23   They clearly have those because they have them in their

24   possession, if they've been provided to defendants, because

25   the defendants have produced them.

1          At no point have plaintiffs, during this entire

2    process, have plaintiffs explained what they actually need

3    from IPC without pure speculation.  Might have, likely to

4    have, but they have not explained at any point why the nine

5    custodians they have identified would have the information

6    that they are supposedly missing, which, again, they have

7    not described in any meaningful way.

8          THE COURT:  What about the argument -- and I'm

9    sure you probably have found this in your experience

10   handling document discovery in large cases, that not

11   everyone's approach to keeping documents is the same and as

12   the time frame expands, it's less likely that there will be

13   uniformity in who kept what and that, therefore, it's

14   reasonable to imagine that, to the extent there were

15   communications between Indiana Packers and other defendants,

16   that Indiana Packers could -- that bear on the issues and

17   the claims against those other defendants -- that Indiana

18   Packers could have its copies of those things where those

19   other defendants might not have retained them.

20         MS. MILLER:  Your Honor, I can't speak as to the

21   other defendants' document retention policies.  I, quite

22   frankly, do not know them and I don't know how they stack up

23   against IPC's, but that strikes me as a needle in a haystack

24   in the sense of they haven't -- again, they have not

25   identified, plaintiffs have not identified a single gap or

1    major amount of information that they claim is missing or a

2    time period that is missing.

3           To be sure, an occasional e-mail may have been

4    deleted and it doesn't exist, but that doesn't mean that IPC

5    should be asked to undergo a massive burden, massive

6    six-figure burden to undertake to search nine custodians'

7    documents on the hope that there might be an e-mail that IPC

8    has that somebody else, in the 3.5 million documents,

9    accidentally deleted and it's somehow not there anymore.

10          Plaintiffs have not identified a single issue that

11   they seem to be missing information on or reason to believe

12   that there is a -- there has been a massive deletion or that

13   one of the other defendant's document retention policies was

14   not followed or was insufficient to provide them with the

15   information.

16          To my knowledge, there's been no discussion, and

17   plaintiffs can certainly correct me if I'm wrong, but

18   there's been no discussion with the defendants about gaps in

19   their productions or concerns about their document retention

20   policies or anything else.

21          This is nothing but rank speculation that we might

22   have something that might have been deleted at some point

23   that can't be identified in a 13-year-long period.  They

24   speculate that we would likely have received relevant

25   information.  They can point to nothing that says we have

1    received relevant information.

2              As Your Honor noted, Rule 45 requires more, not

3    only why it is relevant, but why the parties' productions

4    are insufficient.  They have never at any point explained

5    why the nine custodians and the 116 search strings are

6    narrowed to seek responsive information.  The only

7    explanation they have given us is, well, these are the nine

8    you agreed to when you were a party, so let's use the same

9    nine when you're a nonparty.

10             They have at no point, during the year-plus-long

11   saga of this subpoena, explained why Person 1 they think is

12   going to have documents that they think are missing or

13   documents that would be uniquely in the possession of IPC.

14             To be sure, all nine of them I am absolutely sure

15   have information in their files that relate to competitive

16   conditions in pork.  They're in the pork business.  But that

17   can't be enough to require IPC to process two terabytes of

18   data to try to find some document that may or may not exist

19   about topics that plaintiffs clearly have gotten and can

20   continue to get directly from the defendants in this case.

21             There's been no explanation whatsoever as to the

22   role of these nine or why these nine might have anything

23   unique to this case.  All they have said is these are the

24   nine.

25             And to your point, Your Honor, *Turkey* does apply.

1        It is not enough, as Your Honor made the point, to say,

2   after they've served an overly broad and burdensome subpoena

3   request, to say, well, once you go ahead and process the two

4   terabytes of data and incur those costs and then you run the

5   116 search terms and you see some search hits, well, we

6   might be able to narrow it from there.  But then the costs

7   are already sunk.  The *Turkey* order is clearly applicable

8   and says, no, a document request like that that says "all"

9   is clearly burdensome, and that was with respect to parties.

10        And to Your Honor's inquiry and as Mr. Bourne

11   admitted, at no point did they ever try to narrow the scope

12   of Request Number 9.  Their attempt to narrow it was, well,

13   we'll do that using custodians and search terms.

14        It shouldn't be IPC's obligation to explain why,

15   nor could it explain how, any of these nine custodians won't

16   have information unique to IPC when we don't even know what

17   it is they are seeking from IPC other than a generic

18   description of communications with the defendants, which

19   they can already get from the defendants, and general

20   documents about competitive conditions in the pork

21   marketplace.  That's ridiculously broad.

22        The burden is on them to show why they need these

23   documents, why they are specific and targeted, and why they

24   would be unique to IPC such that it would warrant the

25   imposition of the severe burdens we are talking about here.

1          THE COURT:  What about Mr. Bourne's rejoinder,

2     though, on *Turkey*, that what the judge actually did there

3     was to -- was what the plaintiffs are proposing here, which

4     is send the parties back to talk about search methodology?

5     Is that accurate, as you understand what went on there?

6          MS. MILLER:  As I understand it, the court had the

7     parties go back and talk about the requests and see if the

8     requests could be narrowed.  Certainly, I'm sure, search

9     terms and custodians are part of that discussion.

10          But the plaintiffs didn't seek to enforce -- here,

11     the plaintiffs did not seek to enforce a narrowed request.

12     They didn't talk about this.  This is the first time we are

13     hearing about industry third-party reports.

14          If they want industry publications, that could be

15     something that we could go look for in centralized files

16     without having to process two terabytes of data.  This is

17     the first time we have heard about sort of generalized

18     information about prices or exports.  Again, they at no

19     point ever tried to narrow the request that we are talking

20     about here.

21          And, again, the burden is higher on a Rule 45

22     subpoena than it is for a party.  They should have to --

23     they have to show some level of not only relevance, but why

24     this information can only be found with IPC.  It's not

25     enough that we might have it, we could have it, we likely

1   have it, somebody else in another deposition showed that

2   they had it.  They have said nothing other than you are a

3   pork producer, ergo you should produce documents.  That

4   can't be enough under the circumstances.

5            THE COURT:  So are you saying that the burden on

6   the plaintiffs or on any party that seeks to enforce a

7   subpoena under Rule 45 is to show that the only source of

8   this information is the subpoena recipient, that they've got

9   to rule out parties as a source of the information before

10  they can move forward with a subpoena?  I'm not sure I have

11  seen it --

12           MS. MILLER:  I don't think they have to rule it

13  out as a matter of absolute, but they do have to take into

14  account the burden on third parties; and if the documents

15  can be as easily gotten from the parties who are in the case

16  and fully defending their interests in the case and fully

17  participating in discovery, then there should be -- then

18  there has to be some indicia that this extra burden is

19  required of this third party.

20           There's no indicia of that here.  We are literally

21  talking about documents, about communications between the

22  IPC and the defendants.  If the defendants had a

23  communication with IPC, then it should be in the defendants'

24  production.

25           A couple of the documents that Mr. Bourne attached

1       to his declaration, in fact, are.  They don't say what

2       Mr. Bourne says they say, but they're in that production.

3       Your Honor can look at them plainly.  So they already have

4       those documents and haven't been able to identify why, other

5       than pure speculation, we might have something else.

6              We could go spend $500,000 to process these and

7       review these and it turns out we have nothing more than what

8       the defendants have already done in terms of communications

9       by and between the defendants and IPC, and then IPC is out

10      those hundreds of thousands of dollars and plaintiffs are in

11      no different position than where they were.

12             I'm not saying they have to rule it out across the

13      board, but there has to be some indicia of something they

14      can't get from a party before they force a third party to

15      incur these kind of expenses, and inter-party communications

16      and general information about the pork industry can't be

17      specific enough to put that burden on a third party.

18             THE COURT:  How would the burden on IPC be changed

19      if -- and I hear you on reasons why you think that it's

20      unlikely or that plaintiffs have not made the showing they

21      need to show that IPC has information about communications

22      with other defendants that those defendants don't have or

23      haven't produced.

24             But how would your -- the burden on IPC be changed

25      if, for example, we were just looking at that request?  In

1   other words, if we were just talking about Request Number 1

2   and the request -- and so therefore you are only looking at

3   documents that reflect communications with other defendants,

4   wouldn't that affect your showing of burden, or would it

5   not?

6           MS. MILLER:  I think it might affect it, but it

7   won't affect the upfront.  Again, we are talking about nine

8   custodians, which, again, plaintiffs have not described why

9   these nine custodians are the appropriate custodians for

10  what they are looking for.  They have simply said it's the

11  same nine as when you were a party.  But we would still have

12  to incur that 70 to 100 thousand dollars to process that

13  data, that two terabytes of data, in order to try to find

14  those things.

15          Then, yes, if we were only looking for documents

16  that have a smithfield.com or a jbs.com or, you know, some

17  subsequent -- a search for just the domain names, that would

18  be a lesser search and review, so the post search and review

19  presumably would be less than if we had to look for

20  competitive conditions.  But it doesn't obviate the upfront

21  costs of having to process all of that data in order to run

22  those searches for those domain names.

23          THE COURT:  How about the argument that plaintiffs

24  made in their reply brief relating to the *Paisley Park* case,

25  in other words, that the burden is just one of the

1    considerations when you are looking at whether a subpoena

2    imposes essentially an undue burden on the other side?

3    What -- that case identified three factors, of which the

4    amount involved is only one of the considerations.  So how

5    would you respond to how, if at all, that case would apply

6    here?

7              MS. MILLER:  Sure.  The three factors, as I

8    understood, are the recipient's interest in the outcome of

9    the case, whether the recipient can more readily bear the

10   costs than the requesting party, and whether the litigation

11   is of public importance.  I appreciate that all of those are

12   factors.  Those are not exclusive to all of the other

13   factors under Rule 45.

14             The recipient's interest in the outcome of the

15   case and whether the recipient can more readily bear the

16   costs than the requesting party, we are not in this case,

17   obviously, so whether plaintiffs prevail or do not prevail,

18   that's, quite frankly, between them and the defendants.

19             And it shouldn't be enough simply that we can bear

20   the cost.  First, the cost has to be justified.  It's

21   certainly the case that if, in fact, plaintiffs had met

22   their initial burden to show that this stuff is relevant,

23   that they can only get it from us or have more than just

24   speculation that they could get it from us, then if it were

25   otherwise reasonable, then simply saying it costs too much

1    would not defeat their ability to get documents pursuant to

2    a Rule 45 subpoena.  But you don't get there until you've

3    made those threshold showings.

4            It's not to say that IPC can't spend the money.

5    It's saying that it shouldn't have to spend the money when,

6    in fact, plaintiffs haven't met their threshold question of

7    whether or not they have shown that it is relevant and

8    proportional and it meets the standards of Rule 45.  They

9    haven't.

10           So you don't even need to reach the question of

11   whether or not Indiana Packers can bear the cost because

12   they haven't even gotten past whether or not they should

13   bear them.

14           THE COURT:  Okay.  Anything else, Ms. Miller,

15   before I give Mr. Bourne a brief opportunity to reply?

16           MS. MILLER:  No, Your Honor.

17           THE COURT:  Oh, actually, I've got one other

18   question.  You set aside the structured data piece and never

19   returned to it, and I would like to hear about that because

20   that was something that, as I understand, IPC was willing to

21   provide and negotiated to provide fairly early on.

22           And I know that there have been other motions and

23   other arguments in this and other cases about the relevance

24   of that kind of structured data, even from nonparties.  So

25   why isn't that -- at least that a fair ask here?

1          MS. MILLER:  Sure.  Your Honor, I will say at

2     least in plaintiffs' papers, all they have said as to the

3     relevance of our sales data is that it will help establish a

4     conspiracy amongst the defendants.  We have no idea how our

5     sales data might show a conspiracy as in between the

6     defendants, but in an effort to resolve this as a

7     compromise, we did offer to produce our transactional data,

8     which is a burden in and of itself.  I believe we said we

9     had 12 out of the 17 fields that plaintiffs requested.

10         And, Your Honor, we'll stand by that offer if this

11     will resolve the issue.  If this is about transactional

12     data, we will undertake that burden and provide that and

13     that's why we offered it, because although we don't see the

14     relevance of it, we understand and we appreciate that in a

15     number of these cases structured data can be of some use to

16     the parties.

17         And so we offered that, and we stand by that

18     despite the fact that plaintiffs have not articulated a

19     single reason why that data might show the alleged

20     conspiracy as and amongst the other defendants.

21         THE COURT:  All right.  Okay.  Thank you.  Now I

22     think that's all I have for you, Ms. Miller.

23         MS. MILLER:  Thank you, Your Honor.

24         THE COURT:  Mr. Bourne, you're up again.

25         MR. BOURNE:  Thank you, Your Honor.

1          As to structured data, you know, it isn't really

2    emphasized in the papers.  As we've gone further down this

3    path, frankly, I think the other documents are more

4    important.

5          So Ms. Miller's offer, you know, to produce the

6    structured data if that will resolve this, you know,

7    wouldn't be -- it was something that the plaintiffs didn't

8    agree to when it was on the table and it's something that

9    we -- to the extent this were a voluntary negotiation right

10   now, it's something we wouldn't agree to right now.

11         We do believe that it's relevant and it provides a

12   more fulsome picture of the market, and of course that helps

13   the experts with their econometric models, although, as Your

14   Honor is aware, we have now moved for class certification

15   and so it probably would be a little less useful now than it

16   would have been a few months ago.

17         THE COURT:  Why did it take this long to get to

18   this point on this subpoena?  As I understand it, you had

19   held off on pursuing this with IPC while you were waiting

20   for the defendants' documents to come in; and yet once the

21   defendants' documents are in, as I understand it, you still

22   haven't pulled, you know, at least significant examples of

23   gaps, you know, here we see that these defendants don't have

24   anything before this date or they've got this giant hole

25   when it comes to this particular issue.

1          So you waited for those documents.  It's been

2     months since the subpoena was served.  Why did you wait this

3     long if it wasn't for the purpose of being able to point me

4     to gaps in the defendants' production?

5          MR. BOURNE:  Your Honor, we wanted to evaluate the

6     defendants' productions and begin taking depositions and see

7     where things stood.

8          You know, I think it's true that we can't point to

9     a major gap, like Hormel doesn't have any documents from

10    2008 to 2012 or, you know, for some reason Smithfield

11    doesn't have any communications with Indiana Packers.  We

12    haven't been able to identify any gaps like that.

13         But we do believe, based on what we've seen, that

14    there are likely some gaps -- there are certainly some gaps

15    and, you know, we anticipate that Indiana Packers could in

16    some instances help to fill those.

17         The other piece of this is that, as we've

18    evaluated the evidence, it has become increasingly clear to

19    the plaintiffs that Indiana Packers, its role in the

20    industry leaves it in the position -- and this is something

21    we learned from the evidence that we have from the

22    defendants -- its role in the industry leaves it in the

23    position where we believe it likely would have important

24    communications about competitive conditions in the pork

25    industry.

1          And, you know, the types of sort of discrete

2    documents that we talked about earlier and that Ms. Miller

3    mentioned, like industry reports and things like that, those

4    are relevant.  There's no question they're relevant.

5          But what I think really we can say with

6    100 percent certainty only Indiana Packers has is its

7    internal e-mails about competitive conditions in the pork

8    industry and its internal e-mails concerning communications

9    with the defendants about what was going on in the industry.

10         And what we believe was going on in the industry

11   was the defendants were conspiring to reduce supply and

12   raise the price of pork, and we believe the Indiana Packers'

13   internal e-mails about those things are of critical

14   importance.

15         And because what we really ultimately think is the

16   most important thing here is internal e-mails, that means

17   that trying to narrow the scope of the requests wouldn't do

18   a whole lot of good in terms of burden.

19         Because, you know, if we weeded out trade

20   association meeting minutes, if we weeded out industry

21   reports from other third parties, even if we weeded out

22   communications directly with the defendants, we would still

23   be left in the position where the plaintiffs believe that

24   it's important to have a custodial search of e-mails

25   concerning, you know, things like communications with the

1  defendants, right?  And so you've got to run the same sorts

2  of searches to get to that point.

3          You know, you would still be -- even if you want

4  to know if Indiana Packers is talking about a discussion

5  with Smithfield, not to pick on Smithfield, but that was

6  just the name that popped into my head, you would need to do

7  searches for Smithfield domains and the word "Smithfield"

8  and the identities of key individuals at Smithfield, and

9  those are search terms in our proposal that we made to

10 Indiana Packers.

11         THE COURT:  All right.  Okay.  We're going to take

12 a break.  I am going to think about whether I can rule on

13 this from the bench or whether I'm going to need to take it

14 under advisement.  So I am going to block audio and video

15 and shut down the recording for the moment.  And then when I

16 pop back on screen, that will be your cue that you should

17 pop back on screen as well.

18         MS. MILLER:  Thank you, Your Honor.

19     (Recess taken at 9:59 a.m.)

20                 *   *   *   *   *

21     (10:11 a.m.)

22                 **IN OPEN COURT**

23         THE COURT:  We are back on the record in the

24 matter of *In re Pork Antitrust Litigation*, 18-cv-1766, and

25 specifically Docket Number 1219; and *Indiana Packers Corp.*

1    *vs. Direct Purchaser Plaintiffs*, 22-mc-26, and in that

2    matter we are referring to ECF Number 1.

3         Starting with the second of those, ECF Number 1,

4    which is Indiana Packers Corporation motion to quash

5    subpoena in 22-mc-26, I am going to grant the motion in part

6    and deny it in part.

7         I am denying the motion to quash with regard to

8    the structured data that had been negotiated between the

9    parties to be produced by Indiana Packers in response to

10   Request Number 4, understanding full on, Mr. Bourne, that

11   that was not a deal the plaintiffs had agreed to and I'm not

12   denying the motion to quash for that reason, but I find that

13   that request is appropriate and I believe the structured

14   data, insofar as it was described in those negotiations, is

15   likely to be relevant and noncumulative, particularly with

16   regard to the econometric models of plaintiffs' experts.

17   And Indiana Packers didn't really try very hard to persuade

18   me that it wasn't relevant and there wasn't really any

19   discussion of burden.  So I am denying the motion to quash

20   as to that data.

21        But I am granting the motion to quash in regard to

22   the other requests that plaintiffs seek to enforce, namely,

23   Requests Numbers 1, 2, and 9, on the grounds that plaintiffs

24   haven't shown that the breadth of information sought by

25   those requests is relevant or, to the extent that there is

1    relevant information within the bounds of those requests,

2    plaintiffs haven't shown me that there is important

3    information that cannot be or hasn't already been obtained

4    from defendants in this litigation to a degree that would

5    justify imposing the burden of those undertakings on Indiana

6    Packers.

7           To be clear, my ruling isn't based in any way on

8    the idea that Indiana Packers' previous dismissal from the

9    case somehow raises the bar that the plaintiffs need to

10   clear or gives them some, you know, full or absolute or

11   qualified immunity from responding to a subpoena.  The

12   burdens and costs of having previously been a defendant

13   don't put a thumb on the scale in Indiana Packers' favor in

14   connection with a subsequent subpoena.

15          That said, the dismissal bears on the relevance in

16   the sense that much of the plaintiffs' arguments, kind of

17   when you boil them down, seem to be more about the relevance

18   of the subpoena requests to Indiana Packers' conduct as

19   opposed to the claims about the conduct of the current

20   defendants.  Not saying that's exclusively true, but many of

21   the arguments sort of boil down to that.

22          In particular, the plaintiffs just don't explain

23   the ways in which the breadth of the underlying information

24   sought here bears on the issues in litigation.  They talk

25   about documents sort of generally relating to competitive

1   conditions or generally relating to communications that may

2   have occurred between Indiana Packers and the defendants

3   that bear on the claims against the defendants, but it's

4   still got to get tied to the issues in dispute with regard

5   to the claims that are actually in the case.  As I said,

6   that doesn't mean that there may not be relevant information

7   in there somewhere, but the contested requests are overly

8   broad.

9        And although plaintiffs have offered to negotiate

10   search terms, I don't think that's the point here.  Rule 34

11   requires that requests for documents be made with

12   particularity.  And I think search terms is a way of

13   relieving the burden of searching for that particularized

14   information, but search terms aren't themselves a

15   particularized request.

16        And I think as -- although there are some

17   differences in the setting between here and the setting that

18   was under consideration in the order in *Turkey*, still, as

19   the court found in that case, requests for all documents or

20   all communications relating to competitive conditions, in

21   this case in the pork industry, I don't consider those to be

22   sufficiently particularized in this setting.

23        And I distinguish what we're dealing with here

24   from the situation with parties.  But I do think that the

25   bar is raised where you're talking about a Rule 45 subpoena

1     to a nonparty because of the importance of showing that

2     there is important information that cannot be or has not

3     been gathered from the parties in the case.

4          And as Chief Judge Tunheim noted in the *Plowiecki*

5     case, a party can't issue an unduly burdensome subpoena to

6     force the other party to meet and confer on a narrower

7     subpoena.  The requests need to meet the requirements of

8     Rules 26 and 45 and, of course, by implication Rule 34.

9          To the extent that there are relevant documents,

10    and I think there may be relevant documents within the scope

11    of the requests, as I said, I don't think plaintiffs have

12    shown me why party discovery has been insufficient to gather

13    that information, and I am emphasizing the word

14    "information" as opposed to documents.

15         Indiana Packers may have different documents, but

16    the question, when you're talking about proportionality and

17    about the reasons for imposing burdens, whether on parties

18    or nonparties, is whether there are gaps in information that

19    would be important to proving the claims against the

20    defendants.

21         Again, looking at Judge Tunheim's ruling affirming

22    Judge Thorson's order in *Plowiecki*, the Court is mindful of

23    the need to give special weight in evaluating the balance of

24    competing needs where discovery is sought from nonparties.

25         As we discussed during the arguments, the subpoena

42

1    has been outstanding for a number of months while plaintiffs

2    gathered discovery from the other defendants, but there just

3    isn't anything in plaintiffs' papers that gives me any

4    particular reason to believe that there are real gaps in the

5    production that would justify a search by Indiana Packers to

6    the tune of, you know, $70,000 just for the processing fees

7    and more for the searches and review themselves on the off

8    chance that they've got important information that is

9    relevant to important issues in the case that would fill in

10   some hypothetical gaps in what the defendants [sic] have

11   already gotten.

12            And I want to be clear that I understand that the

13   parties' two-way chain of communication may have chosen to

14   keep different things and there may be different groups of

15   documents in one -- on one side or on the other.

16            But with requests of this breadth and with the

17   burdens sought to be imposed here, the speculation that

18   there may be gaps or likely to be gaps, but without any

19   reason to believe that they are significant in their

20   importance to the issues of this case, I think just fall

21   short of the showing the plaintiffs need to make here.

22            So denying the motion to quash with regard to

23   structured data.  Granting the motion to quash with regard

24   to the other requests.

25            Denying the motion brought by Indiana Packers

1    insofar as it seeks an award of fees since I'm granting the

2    motion except in the structured data, and I've got no reason

3    to believe that that represents a failure to take reasonable

4    steps to impose an undue burden.

5           With regard to the requests that I'm not

6    enforcing, the requests as to which I am granting the motion

7    to quash, by definition as a result of my order, Indiana

8    Packers isn't having to undergo that burden and so I don't

9    see a basis under Rule 45(d)(1) to award fees or sanctions

10    against plaintiffs.

11           And even if you look at it as a Rule 37 inquiry, I

12    can't find that plaintiffs' position here was so unjustified

13    as to make it appropriate to shift fees in connection with

14    this motion practice.

15           So I think that covers each of the pieces on

16    Docket Number 1 in 22-mc-26.  I am denying as moot the

17    motion to compel brought in 18-cv-1776 because of my ruling

18    on the motion to quash.

19           My remarks on the record will stand as my

20    statement of reasons on both of these motions.  I will do a

21    minute entry that reflects the bottom-line ruling, but I

22    don't intend to issue a written order with my statement of

23    reasons.  You can rely on the transcript for that.

24           And I see Mr. Robison on screen.  Something that

25    needs to be raised at this point, sir?

```
 1              MR. ROBISON:  Your Honor, I'm sorry.  I did not
 2    mean to interrupt.  There was a housekeeping matter I just
 3    wanted to flag for the Court that has nothing to do with the
 4    IPC motions.  That was the only reason I was going back on
 5    video.
 6              THE COURT:  All right.  Give me just a moment.
 7    Are there any questions about my ruling on the motions that
 8    we were just talking about?  Mr. Bourne?
 9              MR. BOURNE:  No.  Thank you, Your Honor.
10              THE COURT:  Ms. Miller?
11              MS. MILLER:  I have one quick question, Your
12    Honor, and that is, in light of plaintiffs' class
13    certification filing for those four years, should IPC be
14    limiting the production of data for those four years or will
15    it be required for the entire period?
16              THE COURT:  Why don't -- well, Mr. Bourne, if
17    you've got an immediate response to that, that would be
18    fine.  I don't know that I've got enough in front of me to
19    kind of talk off the cuff on that.  I might leave you to
20    meet and confer on that question and then come back to me if
21    you have a parting of the company.
22              But, Mr. Bourne, do you have an immediate response
23    on that?
24              MR. BOURNE:  Your Honor, we would be happy to meet
25    and confer about it, but in general, you know, the
```

1    structured data for an econometric model usually needs to

2    predate the alleged conspiracy to be useful, and the alleged

3    conspiracy dates back further than the damages period under

4    the statute of limitations here.

5            THE COURT:  And that's my recollection as well

6    from some earlier motion practice relating to the provision

7    of structured data.

8            So I guess I would encourage you to meet and

9    confer and to have that prior ruling in mind in that regard,

10   but if you can't reach an agreement on that -- well, here's

11   what I will do.  Why don't you file a joint letter by, let's

12   see, by Friday of this week and let me know whether you've

13   either resolved that or whether there is something we need

14   to come back together for me to decide.  All right?

15           MS. MILLER:  Happy to do so, Your Honor.  Thank

16   you.

17           THE COURT:  All right.  Thank you.  I think that

18   closes out the discussion with regard to these two motions.

19           So, yes, Mr. Robison.

20           MR. ROBISON:  Your Honor, I just wanted to make

21   sure the Court was aware we had filed a letter last Friday

22   evening related to the DAP cases.

23           The DAPs have recently filed amended complaints I

24   think in 20 of the DAP cases.  As the Court knows, there are

25   some open case management issues related to maybe a

1   consolidated complaint, maybe an exemplar complaint, and so

2   the defendants thought that the need to answer or otherwise

3   respond to the new DAP complaints was, in effect, stayed or

4   held in abeyance while the Court decided whether there would

5   be a consolidation or an exemplar complaint.

6        We reached out to the DAPs last Wednesday, talked

7   to them again on Friday, and it sounds like most of the DAP

8   groups were agreeable to that sort of an arrangement,

9   provided the defendants give a list of affirmative defenses

10  that were being asserted in each DAP case by, I think,

11  May 27th.  Some of the other DAP groups just didn't have

12  time to come to a final decision by the time we wanted to

13  get a letter on file.

14       So I know that most DAP lawyers are not on this

15  Zoom hearing, so I'm not looking for argument.  I just

16  literally am just wanting to make sure this did not get lost

17  in the Court's shuffle.

18       THE COURT:  Right.  No, we noticed that.  In fact,

19  my law clerk and I were talking about it first thing this

20  morning.

21       Do you believe you will be able to connect with

22  the remainder of the DAPs and potentially get some agreement

23  on file shortly that would obviate the need for a -- well,

24  obviously there would need to be an order one way or the

25  other, but do you think that there's anything more to be

1   gained through additional conversation to see if everybody

2   is on board or have you gone as far as you think you can in

3   relaying the status of your discussions with the other --

4   with the DAP plaintiffs?

5          MR. ROBISON:  We will reach out again today,

6   hoping to get a final answer from each group.  I don't know

7   what the answer is going to be yet, obviously, from the DAP

8   groups that did not respond yet.

9          So, yes, our thought was a stipulation submitted

10   to the Court with a proposed order was the way to go to

11   resolve something that seemed pretty basic, considering all

12   the case management issues that are still open.

13          But we'll do that again and if there's some sort

14   of disagreement, then unfortunately somebody will have to

15   file another letter with the Court, but hopefully we will

16   have agreement from everybody and then get a stipulated

17   order on file.

18          THE COURT:  All right.  All right.  Thank you.

19          Anything else before we close this hearing down

20   for this morning?

21          All right.  Thank you, all.  We are adjourned.

22          MS. MILLER:  Thank you, Your Honor.

23          MR. BOURNE:  Thank you, Your Honor.

24      (Court adjourned at 10:29 a.m.)

25                    *      *      *

1

2          I, Lori A. Simpson, certify that the foregoing is a
correct transcript from the record of proceedings in the
3    above-entitled matter.

4                 Certified by:   *s/ Lori A. Simpson*

5                                 Lori A. Simpson, RMR-CRR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25