UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>Commercial and Institutional Indirect Purchaser Actions | Case No. 0:18-cv-1776-JRT-HB |

**DECLARATION OF CAMERON R. AZARI, ESQ. REGARDING NOTICE PROGRAM**

I, Cameron Azari, declare as follows:

1. My name is Cameron R. Azari, Esq. I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

2. I am a nationally recognized expert in the field of legal notice, and I have served as an expert in hundreds of federal and state cases involving class action notice plans.

3. I am a Senior Vice President with Epiq Class Action & Claims Solutions, Inc. ("Epiq") and the Director of Legal Notice for Hilsoft Notifications ("Hilsoft"); a firm that specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. Hilsoft is a business unit of Epiq. I previously filed declarations in this matter related to Epiq's administration of the settlement with the JBS Defendants.

4. Hilsoft has been involved with some of the most complex and significant notice programs in recent history, examples of which are discussed below. With experience in more than 500 cases, including more than 45 multidistrict litigations, Hilsoft has prepared notices which have appeared in 53 languages and been distributed in almost every country, territory, and dependency in the world. Courts have recognized and approved numerous notice plans developed by Hilsoft, and those decisions have invariably withstood appellate and collateral review.

**EXPERIENCE RELEVANT TO THIS CASE**

5. I have served as a notice expert and have been recognized and appointed by courts

to design and provide notice in many large and significant cases, including:

        a)     *In Re Pork Antitrust Litigation (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (JBS), 18-cv-01776 (D. Minn.), involved a $12.75 million settlement with Defendants JBS USA Food Company, JBS USA Food Company Holdings, Swift Pork Company, and related or affiliated entities ("JBS"). The Notice Program (individual notice and supplemental media - nationally distributed digital and social media) reached 71% of the settlement class, with an average frequency of 2.6 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

        b)     *In Re Turkey Antitrust Litigation* 1:19-cv-08318 (N.D. Ill.) - *Sandee's Catering et al. v. Agri Stats, Inc. et al., (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (Tyson), No. 1:20-cv-02295 (N.D. Ill.), involved a $1.75 million settlement with Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and the Hillshire Brands Company ("Tyson"). The Notice Program (individual notice and supplemental media – nationally distributed digital and social media) reached 73% of the settlement class, with an average frequency of 2.7 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

        c)     *In re Takata Airbag Products Liability Litigation*, 1:15-md-02599-FAM (S.D. Fla), involved $1.91 billion in settlements with BMW, Mazda, Subaru, Toyota, Honda, Nissan, Ford, Volkswagen regarding Takata airbags. The notice plans in those settlements included individual mailed notice to more than 61.8 million potential class members and extensive nationwide media via consumer publications, U.S. Territory newspapers, radio spots, internet banners, mobile banners, and behaviorally targeted digital media. Combined, the notice plans reached more than 95% of adults aged 18+ in the U.S. who owned or leased a subject vehicle, with a frequency of 4.0 times each.

        d)     *Hale v. State Farm Mutual Automobile Insurance Company, et al.*, 12-cv-00660 (S.D. Ill.), involved a $250 million settlement with approximately 4.7 million class members. The extensive notice program provided individual notice via postcard or email to

approximately 1.43 million class members and implemented a robust publication program which, combined with individual notice, reached approximately 78.8% of all U.S. adults aged 35+ approximately 2.4 times each.

       e)    *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Product Liability Litigation (Bosch Settlement)*, MDL No. 2672 (N.D. Cal.), involved a comprehensive notice program that provided individual notice to more than 946,000 vehicle owners via first class mail and to more than 855,000 via email. A targeted internet campaign further enhanced the notice effort.

       f)    *In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.), involved a $6.05 billion settlement reached by Visa and MasterCard in 2012 with an intensive notice program, which included over 19.8 million direct mail notices to class members together with insertions in over 1,500 newspapers, consumer magazines, national business publications, trade and specialty publications, and language & ethnic targeted publications. Hilsoft also implemented an extensive online notice campaign with banner notices, which generated more than 770 million adult impressions, a settlement website in eight languages, and acquisition of sponsored search listings to facilitate locating the website. For the subsequent superseding $5.54 billion settlement reached by Visa and MasterCard in 2019, Hilsoft implemented an extensive notice program, which included over 16.3 million direct mail notices to class members together with over 354 print publication units and banner notices, which generated more than 689 million adult impressions.

       g)    *In Re: Premera Blue Cross Customer Data Security Breach Litigation*, 3:15-md-2633 (D. Ore.), involved an extensive individual notice program, which included 8.6 million double-postcard notices and 1.4 million email notices. The notices informed class members of a $32 million settlement for a "security incident" regarding class members' personal information stored in Premera's computer network, which was compromised. The individual notice efforts reached 93.3% of the settlement class. A settlement website, an informational release, and a geo-targeted publication notice further enhanced the notice efforts.

       h)    *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico,*

*on April 20, 2010*, MDL No. 2179 (E.D. La.), involved dual landmark settlement notice programs to distinct "Economic and Property Damages" and "Medical Benefits" settlement classes for BP's $7.8 billion settlement of claims related to the Deepwater Horizon oil spill. Notice efforts included more than 7,900 television spots, 5,200 radio spots, and 5,400 print insertions and reached over 95% of Gulf Coast residents.

      i)    *In re: Checking Account Overdraft Litigation*, MDL No. 2036 (S.D. Fla.), for multiple bank settlements from 2010-2020, the notice programs involved direct mail and email to millions of class members, as well as publication in relevant local newspapers. Representative banks included Fifth Third Bank, National City Bank, Bank of Oklahoma, Webster Bank, Harris Bank, M & I Bank, PNC Bank, Compass Bank, Commerce Bank, Citizens Bank, Great Western Bank, TD Bank, BancorpSouth, Comerica Bank, Susquehanna Bank, Associated Bank, Capital One, M&T Bank, Iberiabank, and Synovus are among the more than 20 banks.

6.    Courts have recognized our testimony as to which method of notification is appropriate for a given case, and I have provided testimony on numerous occasions on whether a certain method of notice represents the best notice practicable under the circumstances. For example:

      a)    *In Re Pork Antitrust Litigation (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (JBS) 0:18-cv-01776 (D. Minn.), Judge John R. Tunheim stated on (Nov. 18, 2021):

> *The notice given to the Settlement Class, including individual notice to all members of the Settlement Class who could be identified through reasonable effort, was the most effective and practicable under the circumstances. This notice provided due and sufficient notice of the proceedings and of the matters set forth therein, including the proposed settlement, to all persons entitled to such notice, and this notice fully satisfied the requirements of Rules 23(c)(2) and 23(e)(1) of the Federal Rules of Civil Procedure and the requirements of due process.*

      b)    *In Re Turkey Antitrust Litigation* 1:19-cv-08318 (N.D. Ill.) - *Sandee's Catering et al. v. Agri Stats, Inc. et al., (Commercial and Institutional Indirect Purchaser Plaintiff Action)*, (Tyson) No. 1:20-cv-02295 (N.D. Ill.), Judge Virginia M. Kendall stated on (Feb. 10, 2022):

> *The notice given to the Settlement Class, including individual notice all members of the Settlement Class who could be identified through reasonable efforts, was the most effective and practicable under the circumstances. This notice provided due and sufficient notice of proceedings and of the matters set forth therein, including the proposed Settlement, to all persons entitled to such notice, and this notice fully satisfied the requirements of Rules 23(c)(2) and 23(e)(1) of the Federal Rules of Civil Procedure and the requirements of due process.*

c)      *In re: Lithium Ion Batteries Antitrust Litigation*, 4:13-md-02420, MDL No. 2420 (N.D. Cal.), Judge Yvonne Gonzalez Rogers stated on December 10, 2020:

> *The proposed notice plan was undertaken and carried out pursuant to this Court's preliminary approval order prior to remand, and a second notice campaign thereafter. (See Dkt. No. 2571.) The class received direct and indirect notice through several methods – email notice, mailed notice upon request, an informative settlement website, a telephone support line, and a vigorous online campaign. Digital banner advertisements were targeted specifically to settlement class members, including on Google and Yahoo's ad networks, as well as Facebook and Instagram, with over 396 million impressions delivered. Sponsored search listings were employed on Google, Yahoo and Bing, resulting in 216,477 results, with 1,845 clicks through to the settlement website. An informational released was distributed to 495 media contacts in the consumer electronics industry. The case website has continued to be maintained as a channel for communications with class members. Between February 11, 2020 and April 23, 2020, there were 207,205 unique visitors to the website. In the same period, the toll-free telephone number available to class members received 515 calls.*

d)      *Lusnak v. Bank of America, N.A.*, CV 14-1855 (C.D. Cal.), Judge George H. Wu stated on August 10, 2020:

> *The Court finds that the Notice program for disseminating notice to the Settlement Class, provided for in the Settlement Agreement and previously approved and directed by the Court, has been implemented by the Settlement Administrator and the Parties. The Court finds that such Notice program, including the approved forms of notice: (a) constituted the best notice that is practicable under the circumstances; (b) included direct individual notice to all Settlement Class Members who could be identified through reasonable effort; (c) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the nature of the Lawsuit, the definition of the Settlement Class certified, the class claims and issues, the opportunity to enter an appearance through an attorney if the member so desires; the opportunity, the time, and manner for requesting*

*exclusion from the Settlement Class, and the binding effect of a class judgment; (d) constituted due, adequate and sufficient notice to all persons entitled to notice; and (e) met all applicable requirements of Federal Rule of Civil Procedure 23, due process under the U.S. Constitution, and any other applicable law.*

e) *Waldrup v Countrywide Financial Corporation, et al.*, 2:13-cv-08833 (C.D. Cal.), Judge Christina A. Snyder stated on July 16, 2020:

*The Court finds that mailed and publication notice previously given to Class Members in the Action was the best notice practicable under the circumstances, and satisfies the requirements of due process and FED. R. CIV. P. 23. The Court further finds that, because (a) adequate notice has been provided to all Class Members and (b) all Class Members have been given the opportunity to object to, and/or request exclusion from, the Settlement, it has jurisdiction over all Class Members. The Court further finds that all requirements of statute (including but not limited to 28 U.S.C. § 1715), rule, and state and federal constitutions necessary to effectuate this Settlement have been met and satisfied.*

f) *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.) Judge Margo K. Brodie stated on December 13, 2019:

*The notice and exclusion procedures provided to the Rule 23(b)(3) Settlement Class, including but not limited to the methods of identifying and notifying members of the Rule 23(b)(3) Settlement Class, were fair, adequate, and sufficient, constituted the best practicable notice under the circumstances, and were reasonably calculated to apprise members of the Rule 23(b)(3) Settlement Class of the Action, the terms of the Superseding Settlement Agreement, and their objection rights, and to apprise members of the Rule 23(b)(3) Settlement Class of their exclusion rights, and fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, any other applicable laws or rules of the Court, and due process.*

g) *In re: Takata Airbag Products Liability Litigation (Ford),* MDL No. 2599 (S.D. Fla.), Judge Federico A. Moreno stated on December 20, 2018:

*The record shows and the Court finds that the Class Notice has been given to the Class in the manner approved by the Court in its Preliminary Approval Order. The Court finds that such Class Notice: (i) is reasonable and constitutes the best practicable notice to Class Members under the circumstances; (ii) constitutes notice that was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action*

and the terms of the Settlement Agreement, their right to exclude themselves from the Class or to object to all or any part of the Settlement Agreement, their right to appear at the Fairness Hearing (either on their own or through counsel hired at their own expense) and the binding effect of the orders and Final Order and Final Judgment in the Action, whether favorable or unfavorable, on all persons and entities who or which do not exclude themselves from the Class; (iii) constitutes due, adequate, and sufficient notice to all persons or entities entitled to receive notice; and (iv) fully satisfied the requirements of the United States Constitution (including the Due Process Clause), FED. R. Civ. P. 23 and any other applicable law as well as complying with the Federal Judicial Center's illustrative class action notices.

h)      *Hale v. State Farm Mutual Automobile Insurance Company, et al.,* 3:12-cv-00660 (S.D. Ill.), Judge Herndon stated on December 16, 2018:

*The Class here is estimated to include approximately 4.7 million members. Approximately 1.43 million of them received individual postcard or email notice of the terms of the proposed Settlement, and the rest were notified via a robust publication program "estimated to reach 78.8% of all U.S. Adults Aged 35+ approximately 2.4 times." Doc. 966-2 ¶¶ 26, 41. The Court previously approved the notice plan (Doc. 947), and now, having carefully reviewed the declaration of the Notice Administrator (Doc. 966-2), concludes that it was fully and properly executed, and reflected "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." See Fed. R. Civ. P. 23(c)(2)(B). The Court further concludes that CAFA notice was properly effectuated to the attorneys general and insurance commissioners of all 50 states and District of Columbia.*

i)      *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation* (Bosch), MDL No. 2672 (N.D. Cal.), Judge Charles R. Breyer stated on May 17, 2017:

*The Court is satisfied that the Notice Program was reasonably calculated to notify Class Members of the proposed Settlement. The Notice "apprise[d] interested parties of the pendency of the action and afford[ed] them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). Indeed, the Notice Administrator reports that the notice delivery rate of 97.04% "exceed[ed] the expected range and is indicative of the extensive address updating and re-mailing protocols used." (Dkt. No. 3188-2 ¶ 24.).*

      j)      *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL No. 2179 (E.D. La.), Judge Carl J. Barbier stated on January 11, 2013:

> *The Court finds that the Class Notice and Class Notice Plan satisfied and continue to satisfy the applicable requirements of Federal Rule of Civil Procedure 23(c)(2)(b) and 23(e), the Class Action Fairness Act (28 U.S.C. § 1711 et seq.), and the Due Process Clause of the United States Constitution (U.S. Const., amend. V), constituting the best notice that is practicable under the circumstances of this litigation.*
>
> *The notice program surpassed the requirements of Due Process, Rule 23, and CAFA. Based on the factual elements of the Notice Program as detailed below, the Notice Program surpassed all of the requirements of Due Process, Rule 23, and CAFA.*
>
> *The media notice effort alone reached an estimated 95% of adults in the Gulf region an average of 10.3 times each, and an estimated 83% of all adults in the United States an average of 4 times each. These figures do not include notice efforts that cannot be measured, such as advertisements in trade publications and sponsored search engine listings. The Notice Program fairly and adequately covered and notified the class without excluding any demographic group or geographic area, and it exceeded the reach percentage achieved in most other court-approved notice programs.*

7.      Numerous other court opinions and comments regarding my testimony, and the adequacy of our notice efforts, are included in Hilsoft's curriculum vitae included as **Attachment 1**.

8.      In forming expert opinions, my staff and I draw from our in-depth class action case experience, as well as our educational and related work experiences. I am an active member of the Oregon State Bar, having received my Bachelor of Science from Willamette University and my Juris Doctor from Northwestern School of Law at Lewis and Clark College. I have served as the Director of Legal Notice for Hilsoft since 2008 and have overseen the detailed planning of virtually all of our court-approved notice programs during that time. Before assuming my current role with Hilsoft, I served in a similar role as Director of Epiq Legal Noticing (previously called Huntington Legal Advertising). Overall, I have over 22 years of experience in the design and implementation of legal notification and claims administration programs, having been personally involved in well over one hundred successful notice programs.

9. The facts in this declaration are based on my personal knowledge, as well as information provided to me by my colleagues in the ordinary course of my business at Hilsoft and Epiq.

## OVERVIEW

10. This declaration will describe the Settlement Notice Program for the Commercial and Institutional Indirect Purchaser Plaintiffs ("Notice Program" or "Notice Plan") and notice (the "Notice" or "Notices") proposed here for *In re Pork Antitrust Litigation (Indirect Purchaser Actions)*, Case No. 0:18-cv-01776 (D. Minn.) for Settling Defendant Smithfield Foods, Inc, and related or affiliated entities ("Smithfield"). Hilsoft developed the Notice Program based on our prior experience and research into the notice issues in this case. We have analyzed and propose the most effective method practicable of notice for this Settlement Class.

11. In my opinion, the proposed Notice Program is designed to reach the greatest practicable number of Settlement Class members through the use of individual notice and targeted media notice.

## NOTICE PROGRAM METHODOLOGY

12. Federal Rule of Civil Procedure 23 directs that notice must be the best notice practicable under the circumstances must include "individual notice to all members who can be identified through reasonable effort."[1] The proposed Notice Program will satisfy this requirement. Notice will be provided by an individual notice effort and will be supplemented by a targeted, media campaign.

13. Data sources and tools that are commonly employed by experts in this field were used to analyze and develop the media portion of this Notice Program. These include MRI-Simmons data,[2] which provides statistically significant readership and product usage data,

---

[1] Fed. R. Civ. P. 23(c)(2)(B).
[2] MRI-Simmons is a leading source of publication readership and product usage data for the communications industry. MRI-Simmons is the new name for the joint venture of GfK Mediamark Research & Intelligence, LLC ("MRI") and Simmons Market Research. MRI-Simmons offers comprehensive demographic, lifestyle, product usage and exposure to all forms of advertising

Comscore,[3] and Alliance for Audited Media ("AAM")[4] statements, which certify how many readers buy or obtain copies of publications. These tools, along with demographic breakdowns indicating how many people use each media vehicle, as well as computer software that take the underlying data and factor out the duplication among audiences of various media vehicles, allow us to determine the net (unduplicated) reach of a particular mailing and media schedule. We combine the results of this analysis to help determine notice plan sufficiency and effectiveness.

14. ***Tools and data trusted by the communications industry and courts.*** Virtually all of the nation's largest advertising agency media departments utilize, scrutinize, and rely upon such independent, time-tested data and tools, including net reach and de-duplication analysis methodologies, to guide the billions of dollars of advertising placements that we see today, providing assurance that these figures are not overstated. These analyses and similar planning tools have become standard analytical tools for evaluations of notice programs and have been regularly accepted by courts.

---

media collected from a single sample. As the leading U.S. supplier of multimedia audience research, the company provides information to magazines, televisions, radio, Internet, and other media, leading national advertisers, and over 450 advertising agencies—including 90 of the top 100 in the United States. MRI-Simmons's national syndicated data is widely used by companies as the basis for the majority of the media and marketing plans that are written for advertised brands in the United States.

[3] Comscore is a global Internet information provider on which leading companies and advertising agencies rely for consumer behavior insight and Internet usage data. Comscore maintains a proprietary database of more than two million consumers who have given comScore permission to monitor their browsing and transaction behavior, including online and offline purchasing. Comscore panelists also participate in survey research that captures and integrates their attitudes and intentions.

[4] Established in 1914 as the Audit Bureau of Circulations ("ABC") and rebranded as Alliance for Audited Media ("AAM") in 2012, AAM is a non-profit cooperative formed by media, advertisers, and advertising agencies to audit the paid circulation statements of magazines and newspapers. AAM is the leading third-party auditing organization in the U.S. It is the industry's leading, neutral source for documentation on the actual distribution of newspapers, magazines, and other publications. Widely accepted throughout the industry, it certifies thousands of printed publications as well as emerging digital editions read via tablet subscriptions. Its publication audits are conducted in accordance with rules established by its Board of Directors. These rules govern not only how audits are conducted, but also how publishers report their circulation figures. AAM's Board of Directors is comprised of representatives from the publishing and advertising communities.

15. In fact, advertising and media planning firms around the world have long relied on audience data and techniques: AAM data has been relied on since 1914; 90 to 100% of media directors use reach and frequency planning;[5] all of the leading advertising and communications textbooks cite the need to use reach and frequency planning.[6] Ninety of the top one hundred media firms use MRI-Simmons data, Comscore is used by the major holding company agencies worldwide which includes Dentsu Aegis Networking, GroupM, IPG and Publicis, in addition to independent agencies for TV and digital media buying and planning, and at least 25,000 media professionals in 100 different countries use media planning software.

## NOTICE PROGRAM DETAIL

16. I have reviewed the *Long-Form Settlement Agreement Between Commercial and Institutional Indirect Purchaser Class Plaintiffs and Smithfield Foods, Inc.* ("Settlement Agreement") and the *Order Granting Commercial and Institutional Indirect Purchaser Plaintiffs' Motion for Preliminary Approval of Proposed Settlement with Smithfield Foods, Inc. and Provisional Certification of Settlement Class* ("Preliminary Approval Order") and understand that the Settlement Class is defined as:

> All entities who indirectly purchased Pork from Defendants or co-conspirators or their respective subsidiaries or affiliates in the United States during the Class Period for their own business use in commercial food preparation.
>
> Specifically excluded from the Settlement Class are Defendants; the officers, directors, or employees of any Defendant; the parent companies of any Defendant; the subsidiaries of any Defendant and any

---

[5] See generally Peter B. Turk, Effective Frequency Report: Its Use And Evaluation By Major Agency Media Department Executives, 28 J. ADVERTISING RES. 56 (1988); Peggy J. Kreshel et al., How Leading Advertising Agencies Perceive Effective Reach and Frequency, 14 J.ADVERTISING 32 (1985).

[6] Textbook sources that have identified the need for reach and frequency for years include: JACK S. SISSORS & JIM SURMANEK, ADVERTISING MEDIA PLANNING, 57-72 (2d ed. 1982); KENT M. LANCASTER & HELEN E. KATZ, STRATEGIC MEDIA PLANNING 120-156 (1989); DONALD W. JUGENHEIMER & PETER B. TURK, ADVERTISING MEDIA 123-126 (1980); JACK Z. SISSORS & LINCOLN BUMBA, ADVERTISING MEDIA PLANNING 93 122 (4th ed. 1993); JIM SURMANEK, INTRODUCTION TO ADVERTISING MEDIA: RESEARCH, PLANNING, AND BUYING 106-187 (1993).

entity in which Defendant has a controlling interest; purchasers of Pork that purchased Pork directly from any Defendant, including those that directly purchased Pork for resale in an unmodified and untransformed form; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Settlement Class are any federal, state, or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action.

The Settlement Class Period is from January 1, 2009, to April 19, 2022.

17. It is my understanding that all Settlement Class members are members of the nationwide class and only Settlement Class members in the following jurisdictions are eligible to potentially recover money from the settlement funds: Arkansas, Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and/or Wisconsin.

18. Given our experience with similar notice efforts, including the Notice Program that we implemented for the settlement with the JBS Defendants, we expect that the proposed Notice Program (individual notice and supplemental media - nationally distributed digital and social media) will reach at least 70% of the Settlement Class, with an average frequency of 2.6 times each. "Reach" refers to the estimated percentage of the unduplicated audience exposed to the notice. Notice exposure is defined as the opportunity to see a notice. "Frequency" of notice exposure is the average number of times that those reached by a notice would be exposed to the notice. The reach will be further enhanced by internet sponsored search listings, an informational release, and a settlement website, which are not included in the estimated reach calculation. In my experience, the projected reach of the Notice Program is consistent with other court approved notice programs, is the best notice practicable under the circumstances of this case and has been designed to satisfy the requirements of due process, including its "desire to actually inform"

requirement.[7]

## INDIVIDUAL NOTICE

### *Email Notice – Direct Mail*

19. Epiq will acquire an email list of approximately 90,000 - 100,000 restaurants nationwide ("potential Settlement Class List"). This data will be used to provide individual notice to the Settlement Class. Epiq will use the potential Settlement Class List to send an Email Notice to all facially valid email addresses contained in the List.

20. Industry standard best practices will be followed for the Email Notice effort. The Email Notice will be drafted in such a way that the subject line, the sender, and the body of the message overcome SPAM filters and ensure readership to the fullest extent reasonably practicable. For instance, the Email Notice will use an embedded html text format. This format will provide easy to read text without graphics, tables, images, attachments, and other elements that would increase the likelihood that the message could be blocked by Internet Service Providers (ISPs) and/or SPAM filters. The Email Notices will be sent from an IP address known to major email providers as one not used to send bulk "SPAM" or "junk" email blasts. Each Email Notice will be transmitted with a digital signature to the header and content of the Email Notice, which will allow ISPs to programmatically authenticate that the Email Notices are from our authorized mail servers. Each Email Notice will also be transmitted with a unique message identifier. The Email Notice will include an embedded link to the settlement website. By clicking the link, recipients will be able access the Long Form Notice, Settlement Agreement, and other information about the Settlement. The proposed Email Notice is included as **Attachment 2**. The proposed Long Form Notice is included as **Attachment 3**.

21. If the receiving email server cannot deliver the message, a "bounce code" will

---

[7] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . .").

be returned along with the unique message identifier. For any Email Notice for which a bounce code is received indicating that the message was undeliverable for reasons such as an inactive or disabled account, the recipient's mailbox was full, technical auto-replies, etc., at least two additional attempts will be made to deliver the Notice by email.

### *Media Plan*

#### *Targeted Internet Banner Advertising*

22. Internet advertising has become a standard component in legal notice programs. The internet has proven to be an efficient and cost-effective method to target class members as part of providing notice of class certification and/or a settlement for a class action case. According to MRI-Simmons data, 94% of all adults are online and 83% of all adults use social media.[8]

23. The Notice Program includes targeted banner advertising on selected advertising networks, which will be targeted to Settlement Class members. The internet Banner Notices will link directly to the settlement website, thereby allowing visitors easy access to relevant information and documents.

24. The internet Banner Notices use language from the Notices, which will allow users to identify themselves as potential Settlement Class members. As an additional way to draw the interest of Settlement Class members, and to be consistent with FJC recommendations that a picture or graphic may help class members self-identify, the internet Banner Notices will prominently feature a high-resolution graphic of a diagram of the pork butcher cuts identified on a pig. Examples of the proposed Banner Notices are included as **Attachment 4**.

25. The Notice Program includes internet Banner Notices in various sizes, which will be placed on the advertising networks, *Google Display Network* and *Yahoo Audience Network*. Combined, these ad networks cover 90% of the United States' population that is online. All internet Banner Notices will run on desktop, mobile and tablet devices and will be distributed to the selected targeted audiences nationwide as described below. Banner Notices will also be

---

[8] MRI-Simmons 2021 Survey of the American Consumer®.

targeted (remarketed) to people who visit the website after clicking on a Banner Notice.

26.     The Notice Program also includes advertising on social media, which will consist of internet Banner Notices on *Facebook* and *LinkedIn* in multiple sizes. *Facebook* is the leading social networking site in the United States with more than 220 million users in the United States and *LinkedIn* is the world's largest professional network on the internet with more than 178 million members in the United States.

27.     More details regarding the target audiences, distribution, and specific ad sizes of the internet Banner Notices, are included in the following table.

| *Network/Property* | *Target* | *Distribution* | *Ad Sizes* | *Planned Impressions* |
|---|---|---|---|---|
| *Google Display Network* | Adults 18+ | National | 728x90, 300x250, 300x600, 970x250 | 11,066,000 |
| *Google Display Network* | Custom Affinity Audience:[9] Business Owner | National | 728x90, 300x250, 300x600, 970x250 | 27,978,000 |
| *Google Display Network* | Custom Intent Audience:[10] Food Service | National | 728x90, 300x250, 300x600, 970x250 | 27,978,000 |
| *Google Display Network* | Custom Affinity Audience: Food Service | National | 728x90, 300x250, 300x600, 970x250 | 27,978,000 |
| *Yahoo Audience Network* | Finance/Business Channels | National | 728x90, 300x250, 300x600, 970x250 | 30,000,000 |
| *Facebook* | Adults 18+ | National | Newsfeed & Right Hand Column | 5,050,000 |
| *Facebook* | Interests include Business Ownership | National | Newsfeed & Right Hand Column | 14,150,000 |
| *Facebook* | Interests include Food Service | National | Newsfeed & Right Hand Column | 14,150,000 |
| *Facebook* | Demographics Targeting: Food and Restaurants | National | Newsfeed & Right Hand Column | 14,150,000 |
| *LinkedIn* | Jobs in the Food Service Industry | National | LinkedIn Ads | 8,400,000 |
| **TOTAL** | | | | **180,900,000** |

28.     Combined, approximately 180.9 million targeted impressions will be generated by

---

[9] "Custom Affinity Audience" means Banner Notices will be targeted to specific website content, here meaning websites, blogs, etc. that focus on business owners, small businesses, business opportunities, and business formation.

[10] "Custom Intent Audience" means Banner Notices will be targeted to individuals who have searched for the targeted topic, here meaning the food service, restaurant, & hospitality industry.

the internet Banner Notices, which will run for approximately 31 days nationwide.[11] Clicking on the Banner Notices will link the reader to the settlement website, where they can easily obtain detailed information about the case.

29. Throughout the implementation of the Notice Program, Hilsoft will continuously monitor the effectiveness of the Notice Program to ensure impression goals are met to satisfy a combined reach of at least 70%.

### *Sponsored Search Listings*

6. The Notice Program includes purchasing sponsored search listings to facilitate locating the settlement website. Sponsored search listings will be acquired on the three most highly visited internet search engines: *Google*, *Yahoo!,* and *Bing*. When search engine visitors search on selected common keyword combinations related to the case, the sponsored search listing will be generally displayed at the top of the page prior to the search results or in the upper right-hand column. Representative search terms will include word and phrase variations related to the Settlement. The sponsored search listings will be displayed nationwide. All sponsored search listing ads will link directly to the case website.

### *Informational Release*

30. To build additional reach and extend exposures, a party-neutral Informational Release will be issued broadly over PR Newswire to approximately 5,000 general media (print and broadcast) outlets, including local and national newspapers, magazines, national wire services, television and radio broadcast media across the United States as well as approximately 4,500 websites, online databases, internet networks and social networking media. The informational release will also be distributed to more than 530 journalists that report specifically on restaurants and the food industry.

---

[11] The third-party ad management platform, ClickCease will be used to audit the digital Banner Notice ad placements. This type of platform tracks all Banner Notice ad clicks to provide real-time ad monitoring, fraud traffic analysis, blocks clicks from fraudulent sources, and quarantines dangerous IP addresses. This helps reduce wasted, fraudulent, or otherwise invalid traffic (*e.g.*, ads being seen by 'bots' or non-humans, ads not being viewable, etc.).

31. The Informational Release will include the address of the settlement website and the toll-free telephone number. Although there is no guarantee that any news stories will result, the Informational Release will serve a valuable role by providing additional notice exposures beyond that which was provided by the paid media.

*Settlement Website, Toll-free Telephone Number, and Postal Mailing Address*

32. The existing settlement website (www.PorkCommercialCase.com) established for the previous settlement with the JBS Defendants in this case will be updated with information regarding the Smithfield Settlement. The settlement website will allow Settlement Class members to obtain detailed information about the case and review key documents, including the Complaints, Long Form Notice, Settlement Agreement, Preliminary Approval Order, Motion for Attorneys' Fees and Expenses, and Final Approval Order, as well as answers to frequently asked questions ("FAQs"). The website address will be displayed prominently on all Notice documents.

33. The existing toll-free telephone number (1-855-867-0738) established for the previous settlement with the JBS Defendants in this case will be updated with information regarding the Smithfield Settlement. Settlement Class members will be able to call for additional information, listen to answers to FAQs, and request that a Notice be mailed to them. The toll-free telephone number will be prominently displayed in the Notice documents as well. The automated phone system will be available 24 hours per day, 7 days per week.

34. A post office box and an email address for correspondence about the case will also be established and maintained, allowing Settlement Class members to contact the Settlement Administrator by mail with any specific requests or questions.

**PLAIN LANGUAGE NOTICE DESIGN**

35. The proposed Notices are designed to be "noticed" and reviewed by Settlement Class members and are written in plain language so the Notices will be understood by Settlement Class members. The design of the Notices follows the principles embodied in the Federal Judicial Center's illustrative "model" notices posted at www.fjc.gov. Many courts, and as previously cited, the FJC itself, have approved notices that we have written and designed in a similar fashion.

The proposed Notices contain substantial, albeit easy-to-read, summaries of all of the key information about Settlement Class members' rights and options. Consistent with our normal practice, all notice documents will undergo a final edit for grammatical errors and accuracy.

36. The proposed Notices are designed to increase noticeability and comprehension. Once people "notice" the Notices, it is critical that they can understand them. As such, the proposed Notices, as written, are clearly worded with an emphasis on simple, plain language to encourage readership and comprehension.

37. The proposed Notices feature a prominent headline in bold text. These design elements will alert recipients and readers that the Notice is an important document authorized by a court and that the content may affect them, thereby supplying reasons to read the Notice.

38. The proposed Long Form Notice provides substantial information to Settlement Class members. It begins with a summary page, which provided a concise overview of the important information and a table, which highlights key options available to Settlement Class members. A table of contents, categorized into logical sections, helps to organize the information, while a question and answer format makes it easy to find answers to common questions by breaking the information into simple headings.

## **CONCLUSION**

39. In class action notice planning, execution, and analysis, we are guided by due process considerations under the United States Constitution, and by case law pertaining to the recognized notice standards under Rule 23. This framework directs that the notice plan be optimized to reach the class and, in a settlement notice situation such as this, that the notice or notice plan itself not limit knowledge of legal rights—nor the ability to exercise other options—to class members in any way. Based on the information that has been provided to me at this point, all of these requirements will be met in this case.

40. The Notice Program includes individual notice to potential identified Settlement Class members and supplemental media. I reasonably expect the Notice Program (individual notice and supplemental media - nationally distributed digital and social media) will reach at least

70% of the Settlement Class. The reach will be further enhanced internet sponsored search listings, an informational release, and a settlement website. In 2010, the Federal Judicial Center issued a Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide. This Guide states that, "the lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%."[12] Here, we have developed a Notice Program that will readily achieve a reach within that standard.

41. The proposed Notice Program follows the guidance for how to satisfy due process obligations that a notice expert gleans from the United States Supreme Court's seminal decisions, which are: a) to endeavor to actually inform the class, and b) to demonstrate that notice is reasonably calculated to do so:

> A. "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," *Mullane v. Central Hanover Trust*, 339 U.S. 306, 315 (1950).
>
> B. "[N]otice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) citing *Mullane* at 314.

42. The Notice Program described in this declaration provides for the best notice practicable under the circumstances of this case, conforms to all aspects of Federal Rules of Civil Procedure, Rule 23, and comports with the guidance for effective notice articulated in the Manual for Complex Litigation 4th Ed, and follows the Federal Judicial Center's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010).

43. The Notice Program schedule affords sufficient time to provide full and proper notice to Settlement Class members before the exclusion request and objection deadlines.

---

[12] FED. JUDICIAL CTR, JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3 (2010), available at https://www.fjc.gov/content/judges-class-action-notice-and-claims-process-checklist-and-plain-language-guide-0.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed on May 18, 2022, at Beaverton, Oregon.

_____
Cameron R. Azari