# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| THE KROGER CO., ALBERTSONS COMPANIES, INC., HY-VEE, INC., SAVE MART SUPERMARKETS, and US FOODS, INC.<br><br>                  Plaintiffs,<br>vs.<br><br>AGRI STATS, INC.; CLEMENS FOOD GROUP, LLC, THE CLEMENS FAMILY CORPORATION; HORMEL FOODS CORPORATION; SEABOARD FOODS LLC; SMITHFIELD FOODS, INC.; TRIUMPH FOODS, LLC; TYSON FOODS, INC., TYSON PREPARED FOODS, INC., AND TYSON FRESH MEATS, INC.<br><br>                  Defendants. | Case No. 18-1776<br><br>MDL 2998<br><br>Individual Case No. 22-CV-72[1]<br><br>**Filed Under Seal** |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

---

[1]    Transferred from the Northern District of California, Case No. 21-cv-10037-BLF.

**TABLE OF CONTENTS**

I.      NATURE OF ACTION .................................................................................................1

II.     JURISDICTION AND VENUE ...............................................................................4

III.    PARTIES .................................................................................................................6

        A.      Plaintiffs .......................................................................................................6

        B.      Defendants ....................................................................................................8

                (1)     Agri Stats ..........................................................................................8

                (2)     Clemens..............................................................................................8

                (3)     Hormel ...............................................................................................9

                (4)     Seaboard.............................................................................................9

                (5)     Smithfield.........................................................................................10

                (6)     Triumph............................................................................................10

                (7)     Tyson................................................................................................10

IV.     CO-CONSPIRATORS AND AGENTS ..................................................................11

V.      TRADE AND COMMERCE.................................................................................12

VI.     THE IMPORTANCE OF AGRI STATS TO THE UNLAWFUL CONSPIRACY
        ALLEGED IN THIS COMPLAINT........................................................................13

        A.      Agri Stats Markets its Collusive Scheme to Pork Producers .....................13

        B.      Agri Stats Provided Producer Defendants and Co-Conspirators With the
                Ability to Monitor and Enforce Their Collective Restriction of the Pork
                Supply, and to Discipline Co-Conspirators For Not Complying With the
                Conspiracy ..................................................................................................15

VII.    THE MARKET FOR THE PRODUCTION AND SALE OF PORK WAS
        CONDUCIVE TO CARTELIZATION ...................................................................24

        A.      Pork is a Commodity Product With Inelastic Demand.............................24

        B.      The Producer Defendants and Co-Conspirators Controlled the Production
                and Supply of Pork in the United States, Which Allowed the Conspiracy to
                Succeed .......................................................................................................25

        C.      The Market For the Production and Sale of Pork Was Concentrated...................31

        D.      There Were Barriers to Entry in the Market For the Integrated Production
                and Sale of Pork ........................................................................................36

E.  Select Trade Associations Facilitated Collusion .................................................. 37

VIII.  DEFENDANTS AND CO-CONSPIRATORS IMPLEMENTED COLLUSIVE, ANTICOMPATITIVE CAPACITY AND PRODUCTION RESTRICTIONS ............... 39

A.  Overview of the Restriction of the Pork Supply During the Conspiracy ............. 39

(1)  Smithfield ................................................................................................ 42

(2)  Tyson ...................................................................................................... 43

(3)  JBS/Cargill ............................................................................................. 44

(4)  Hormel ................................................................................................... 44

(5)  Seaboard ................................................................................................ 45

(6)  Triumph .................................................................................................. 45

(7)  Clemens .................................................................................................. 45

A.  Timeline of the Conspiracy .................................................................................. 46

IX.  ABNORMAL PRICING DURING THE CONSPIRACY DEMONSTRATES THE SUCCESS OF THE CONSPIRACY ................................................................................ 65

X.  THE CONSPIRACY WAS EFFECTIVE IN INCREASING THE PRICE OF PORK SOLD TO PLAINTIFFS AND OTHERS IN THE UNITED STATES .......................... 68

XI.  THE RESULTS OF THE DOJ'S CRIMINAL INVESTIGATION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN THE PORK INDUSTRY ................................................................. 70

XII.  PLAINTIFFS' CLAIMS ARE TIMELY ......................................................................... 71

COUNT I – ANTITRUST VIOLATION .......................................................................... 87

COUNT II – VIOLATION OF THE PACKERS AND STOCKYARD ACT (AGAINST ALL DEFENDANTS EXCEPT AGRI STATS) ........................................... 90

Pursuant to Fed. R. Civ. P. 15(a), Plaintiffs The Kroger Co., Albertsons Companies, Inc., Hy-Vee, Inc., and Save Mart Supermarkets, which are supermarket chains, and US Foods, Inc., which is a food distributor (collectively "Plaintiffs") amend their Complaint as a matter of course and sue Defendants Agri Stats, Inc., Clemens Food Group, LLC, The Clemens Family Corporation, Hormel Foods Corporation, Seaboard Foods LLC, Smithfield Foods, Inc., Triumph Foods, LLC, Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. (collectively "Defendants") and allege as follows:

## I.     NATURE OF ACTION

1.     As more fully alleged below, beginning in approximately 2008 and continuing until 2018, if not later, and with a lingering effect thereafter, Defendants and their co-conspirators engaged in a conspiracy to fix, increase, maintain and/or stabilize the price of pork[2] sold to Plaintiffs and others in the United States, and implemented this conspiracy through anticompetitive conduct, including, without limitation: (1) coordinating among themselves to restrict the output and limit the production[3] of their swine herd in order to reduce the domestic supply of pork; (2) exchanging highly confidential information about their operations through Agri Stats, which allowed each Defendant to confirm its competitors were complying with the conspiracy; and (3) communicating with each other in secret about their current and future pricing, so that each Defendant could further increase its supracompetitive pricing for pork sold to Plaintiffs and others.

---

[2]     For purposes of this Complaint, "pork" includes all pork products, regardless of the form in which they are sold, and all products containing pig meat, whether purchases fresh or frozen, including but not limited to, smoked ham, sausage, and bacon.  From time to time in this Complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

[3]     Restricting output or production, and limiting production, can mean reducing output in absolute or relative terms, or maintaining or not increasing output, *i.e.*, limiting output, as much as a firm would do so in a competitive market.

2.     Defendants and their co-conspirators' anticompetitive coordination to restrict the pork supply and increase prices of pork sold to Plaintiffs and others occurred in several ways.

3.     Beginning in 2008, as Defendants' profitability deteriorated in the midst of a global recession, Smithfield initiated efforts between Defendants to conspire through their mutual trade associations and industry groups to achieve a coordinated reduction in the domestic supply of pork.

4.     Defendants also conspired with companies that provided services to the pork industry but did not produce or sell pork, such as Agri Stats (a data benchmarking firm) and AgStar, a financial services company now known as Compeer that specialized in loans to pork producers.

5.     Beginning in January 2008, the CEO of Smithfield attended a trade association meeting with other Defendants in which he announced Smithfield's plans to reduce its pork supplier and urged others to follow.  Although Defendants recognized that a reduction in the supply of pork was necessary to achieve their desired levels of profitability, the other major producers were hesitant about reducing their supply without some mechanism to prevent smaller independent producers from increasing their own supply of pork in response to a coordinated reduction by Defendants. To address this issue, Smithfield's CEO enlisted the help of AgStar's VP responsible for lending to pork producers. After discussions with Smithfield's CEO, AgStar agreed to aid Defendants' efforts to reduce the domestic supply of pork by putting financial pressure on smaller producers to reduce production, provided that the Producer Defendants lead the initiative and announce their own production cuts publicly.  As detailed in this Complaint, between early 2008 and late 2009, Defendants met numerous times through trade associations and other industry groups, which allowed them to coordinate their unlawful agreement to reduce the supply of pork. And although Defendants announced their supply reductions publicly, their coordination allowed

each Defendant to justify its own supply reduction as a natural outcome of the economic conditions facing the industry.   However, this was untrue.   As detailed in this Complaint, Defendants recognized internally that it was in each producer's independent self-interest to produce as much pork as it could.   Accordingly, the supply reductions were not justified by input costs or other economic factors.   Instead, the cuts were based on an understanding that all major producers would implement similar supply reductions and that Compeer would pressure smaller producers to cut supply by cutting off funding to those that did not comply.   This allowed Defendants to reduce their supply through a collusive agreement or understanding that was reached in secret and then concealed from the public.

6.   By late 2009, this plan succeeded, as the pork industry cut its supply by approximately 6.4%, primarily through the liquidation of sow herds (female pigs used for breeding).   With this structural reduction in the supply of pork, Defendants were able to monitor their conspiracy through Defendant Agri Stats.   During the conspiracy, the Producer Defendants[4] and co-conspirators[5] – who controlled more than 80% of the pork market at times relevant to Plaintiffs' claims – used Agri Stats to exchange with each other detailed, competitively-sensitive, and closely guarded non-public information about their pork businesses, including benchmarking reports about their respective pork prices, production, volume, costs, slaughter information, capacity, sales volume, inventory levels, and plant-specific information about production lines and yields (collectively "Competitively-Sensitive Information").   As explained below, Agri Stats

---

[4]   As used in this Complaint, the phrase "Producer Defendants" means Clemens, Hormel, Seaboard, Smithfield, Triumph, and Tyson as each is defined below.   Agri Stats is a Defendant, but not a Producer Defendant.

[5]   As used in this Complaint, the phrase "co-conspirator" includes other pork producers including without limitation, JBS, Indiana Packers, Daily's, and SFT as described below.   The phrase "co-conspirator" also includes AgStar as well as other firms and individuals.

collected this information from the Producer Defendants and co-conspirators and intentionally shared this information with them in detailed reports.  The Producer Defendants and co-conspirators knew when they provided their respective Competitively-Sensitive Information to Agri Stats that it would be reported to their competitors in the private Agri Stats reports.  They also knew at the time that their Competitively-Sensitive Information in the Agri Stats reports were deciphered by their co-Defendants and co-conspirators so that each of them would learn which Competitively-Sensitive Information belonged to which Producer Defendant or co-conspirator. This enabled the Producer Defendants and co-conspirators to monitor each other's Competitively-Sensitive Information and enforce the conspiracy, and effectively control domestic pork supply and price.

7.     As another example, the Producer Defendants conspired with Compeer to pressure all pork farmers to reduce their sow herds and limit importation of pork from Canada by withholding funding from companies that did not get on board with the supply reduction conspiracy.

8.     Plaintiffs allege that Defendants and their co-conspirators' conspiracy is a *per se* violation of Section One of the Sherman Act,15 U.S.C. § 1 (Count I), and the Producer Defendants and co-conspirators' conduct as alleged in this Complaint violates the Packers and Stockyards Act as well (Count II).

## II.     <u>JURISDICTION AND VENUE</u>

9.     Each Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 308 of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 209, for the injuries sustained by each Plaintiff as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 202 of the PSA, 7 U.S.C. § 192.

10.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 308 of the PSA, 7 U.S.C. § 209.

11.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 & 26, 28 U.S.C. § 1391(b), (c) and (d), and Section 308 of the PSA, 7 U.S.C. § 209,  because: (a) one or more Defendants resides or resided, is found, transacts or transacted business in this District, or is licensed to do business or is doing business in this District; (b) a substantial portion of the affected interstate commerce described in this Complaint was carried out in this District; (c) each Defendant is subject to personal jurisdiction in this District; and/or (d) to the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

12.     This Court has personal jurisdiction over each Defendant because, among other reasons, each Defendant: (a) inhabits, transacts business in, has continuing or systematic contacts with, or is found in this District; (b) has sufficient minimum contacts in the United States sufficient to satisfy due process; (c) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including in this District; (d) belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District, including, without limitation, selling pork to one or more Plaintiffs and others in this District at artificially inflated prices; and/or (e) engaged in unlawful conduct that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing or located in, or doing business throughout, the United States, including in this District.

## III.   **PARTIES**

### A.   **Plaintiffs**

13.   Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Kroger brings this action on its own behalf and on behalf of its assignors (including, without limitation: Kroger Limited Partnership I; KRGP Inc.; Kroger Texas L.P.; The Kroger Co. of Michigan; Fred Meyer, Inc.; Fred Meyer Stores, Inc.; Food 4 Less Holdings, Inc.; Ralph's Grocery Company; Smith's Food & Drug Centers, Inc.; Dillon Companies, LLC; Roundy's Inc.; and Harris Teeter, LLC), each of which directly purchased pork from one or more Defendants and their co-conspirators during the conspiracy.  The reference in this Complaint to "Kroger" refers to The Kroger Co. and its assignors.  Kroger owns and operates retail stores that sell pork.  During the time period relevant to Plaintiffs' claims, Kroger directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

14.   Plaintiff Albertsons Companies, Inc. is a Delaware limited liability company with its principal place of business in Boise, Idaho.  Albertsons Companies, Inc. is the parent corporation of Albertsons LLC, New Albertsons Inc., and Safeway Inc. (collectively "Albertsons").  Albertsons Companies, Inc. brings this action on its own behalf and on behalf of its assignors (including, without limitation: Safeway Inc.; Carr-Gottstein Foods Co.; Dominick's Finer Foods, LLC; Genuardi's Family Markets LP; Lucerne Foods, Inc.; Randall's Food & Drugs LP; The Vons Companies, Inc.; New Albertsons, Inc.; Albertsons LLC; ACME Markets, Inc.; Jewel Food Stores, Inc.; Shaw's Supermarkets, Inc.; and Star Market Company, Inc.), each of which directly purchased pork from one or more Defendants and their co-conspirators during the conspiracy.  The reference in this Complaint to "Albertsons" includes Albertsons' assignors.

Albertsons owns and operates retail stores that sell pork.  During the time period relevant to Plaintiffs' claims, Albertsons directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

15.     Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation with its principal place of business in West Des Moines, Iowa.  Hy-Vee brings this action on its own behalf and on behalf of its assignor (Topco Associates, LLC), each of which directly purchased pork from one or more Defendants and their co-conspirators during the conspiracy.  The reference in this Complaint to "Hy-Vee" includes Hy-Vee's assignor.  Hy-Vee owns and operates retail stores that sell pork.  During the time period relevant to Plaintiffs' claims, Hy-Vee itself, and as assignee of Topco, directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

16.     Plaintiff Save Mart Supermarkets ("Save Mart") is a California corporation with its principal place of business in Modesto, California.  The reference in this Complaint to "Save Mart" refers to Save Mart Supermarkets and banners under which it does business, including, without limitation, Save Mart, Lucky Supermarkets, FoodMaxx, and MaxxValue Foods.  Save Mart owns and operates retail stores that sell pork.  During the time period relevant to Plaintiffs' claims, Save Mart directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

17.     Plaintiff US Foods, Inc. is a Delaware corporation ("US Foods") with its principal place of business in Rosemont, Illinois.  US Foods is a food distributor that sells pork.  During the

time period relevant to Plaintiffs' claims, US Foods directly purchased pork in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

18.     Each Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26, and Section 209(b) of the Packers and Stockyards Act, 7 U.S.C. § 209(b).

### B.     Defendants

#### (1)     Agri Stats

19.     Agri Stats, Inc. ("Agri Stats") is an Indiana corporation located in Fort Wayne, Indiana.  Until about 2018, Agri Stats was a subsidiary of Eli Lilly & Co.  Agri Stats is now a wholly-owned subsidiary of Agri Stats Omega Holding Co. LP, a limited partnership based in Indiana.  During the time period relevant to Plaintiffs' claims in this Complaint, Agri Stats directly participated in the conspiracy alleged in this Complaint; facilitated the exchange of the Producer Defendants and their co-conspirators' Competitively-Sensitive Information among Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

#### (2)     Clemens

20.     Clemens Food Group, LLC is a limited-liability company with its principal place of business in Hatfield, Pennsylvania.  During the time period relevant to Plaintiffs' claims in this Complaint, Clemens Food Group, LLC participated in the conspiracy alleged in this Complaint; and directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

21.     The Clemens Family Corporation is a Pennsylvania corporation with its principal place of business in Hatfield, Pennsylvania.  The Clemens Family Corporation is the parent company of Clemens Food Group, LLC.  During the time period relevant to Plaintiffs' claims in this Complaint, The Clemens Family Corporation participated in the conspiracy alleged in this Complaint; and directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

22.     Clemens Food Group, LLC and The Clemens Family Corporation are referred to in this Complaint as "Clemens."  During the time period relevant to Plaintiffs' claims in this Complaint, Clemens engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

            (3)     Hormel

23.     Hormel Foods Corporation ("Hormel") is a Delaware corporation with its principal place of business in Austin, Minnesota.  During the time period relevant to Plaintiffs' claims in this Complaint, Hormel participated in the conspiracy alleged in this Complaint; directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

            (4)     Seaboard

24.     Seaboard Foods LLC ("Seaboard") is a limited-liability company with its principal place of business in Shawnee Mission, Kansas.  Seaboard is a wholly owned subsidiary of Seaboard Corporation.  During the time period relevant to Plaintiffs' claims in this Complaint, Seaboard participated in the conspiracy alleged in this Complaint; directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States; and

engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.  For example, Seaboard sold pork to Plaintiffs and others through affiliates such as Daily's Premium Meats, LLC, and Seaboard Triumph Foods, LLC.

(5)   Smithfield

25.   Smithfield Foods, Inc. ("Smithfield") is a Commonwealth of Virginia corporation with its principal place of business in Smithfield, Virginia.  Smithfield is a subsidiary of WH Group Limited, a Chinese company.   During the time period relevant to Plaintiffs' claims in this Complaint, Smithfield participated in the conspiracy alleged in this Complaint; directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

(6)   Triumph

26.   Triumph Foods, LLC ("Triumph") is a limited-liability company with its principal place of business in St. Joseph, Missouri.  During the time period relevant to Plaintiffs' claims in this Complaint, Triumph participated in the conspiracy alleged in this Complaint; directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States; and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

(7)   Tyson

27.   Tyson Foods, Inc. is a Delaware corporation with its principal place of business in Springdale, Arkansas.  During the time period relevant to Plaintiffs' claims in this Complaint, Tyson Foods, Inc. participated in the conspiracy alleged in this Complaint; and directly or through

an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

28.     Tyson Prepared Foods, Inc. is a Delaware corporation with its principal place of business in Springdale, Arkansas.  Tyson Prepared Foods, Inc. is a wholly owned subsidiary of Tyson Foods, Inc.  During the time period relevant to Plaintiffs' claims in this Complaint, Tyson Prepared Foods, Inc. participated in the conspiracy alleged in this Complaint; and directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

29.     Tyson Fresh Meats, Inc. is a Delaware corporation with its principal place of business in Springdale, Arkansas.  Tyson Fresh Meats, Inc. is a wholly owned subsidiary of Tyson Foods, Inc.  During the time period relevant to Plaintiffs' claims in this Complaint, Tyson Fresh Meats, Inc. participated in the conspiracy alleged in this Complaint; and directly or through an affiliate co-conspirator sold pork in interstate commerce to Plaintiffs and others in the United States.

30.     Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc. are referred to in this Complaint as "Tyson."  During the time period relevant to Plaintiffs' claims in this Complaint, Tyson engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

## IV.    CO-CONSPIRATORS AND AGENTS

31.     Other entities and individuals not named as Defendants in this Complaint, including, without limitation, JBS USA Food Company ("JBS"), Indiana Packers Corporation ("Indiana Packers"), AgStar Financial Services, PCA ("AgStar") (n/k/a Compeer Financial), Daily's Premium Meats, LLC ("Daily's") and Seaboard Triumph Food, LLC ("SFT"), combined,

conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

32.     The individuals employed by Defendant and co-conspirators who participated in the conspiracy did so on behalf of their respective employer Defendant or co-conspirator, and their conduct in furtherance of the conspiracy was undertaken by each of them during the course and scope of their employment by their Defendant or co-conspirator employer.

## V.     TRADE AND COMMERCE

33.     During the time relevant to Plaintiffs' claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate commerce, and the effect of that business on interstate commerce is substantial.  In particular, the activities of Defendants and co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that: (a) Defendants and their co-conspirators sold and shipped substantial quantities of pork in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the pork; (b) data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States; and/or (c) money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States.

34.     The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiffs' claims.

## VI.   THE IMPORTANCE OF AGRI STATS TO THE UNLAWFUL CONSPIRACY ALLEGED IN THIS COMPLAINT

35.     Agri Stats had a central role in the conspiracy alleged in this Complaint.  As explained below, it collected and disseminated the Producer Defendants and co-conspirators' Competitively Sensitive Information, and Agri Stats provided detailed price reports to the Producer Defendants and co-conspirators through its subsidiary, Express Markets, Inc.  Agri Stats' role in the conspiracy is further described below.

### A.     Agri Stats Markets its Collusive Scheme to Pork Producers

36.     Beginning in 2008 or before, Agri Stats proposed a series of benchmarks to the pork industry to monitor pork production.  Benchmarking is the act of comparing one company's practices, methods or performance against those of other companies.  Benchmarking of the type undertaken by Agri Stats and the Producer Defendants and co-conspirators reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition.  This is especially true when, as alleged in this Complaint, benchmarking involves the exchange of commercially sensitive, and typically non-public, information among competitors about a commodity product.  As Smithfield led the efforts to persuade its competitors to reduce supply, the Agri Stats reports became an essential tool to allow Defendants to monitor the conspiracy's progress. For example, although it took Smithfield more than a year to succeed in its conspiratorial goals, the Agri Stats reports provided Smithfield with comfort that its initial supply reductions were not being undercut by its co-conspirators.

37.     In 2008, Greg Bilbrey ("Bilbrey") of Agri Stats told swine industry participants: Benchmarking in the swine industry "could range from simple production comparisons to

elaborate and sophisticated total production and financial comparisons. Each and every commercial swine operation is encouraged to participate in some benchmarking effort."[6]

38.     Agri Stats emphasized to the Producer Defendants and co-conspirators that the goal of collectively sharing their Competitively-Sensitive Information was to increase their profits in the sale of pork and not to increase their pork production. As Agri Stats explained at the time: "We must remember that the ultimate goal is increasing profitability – not always increasing the level of production." Furthermore, Agri Stats told the industry: "Each swine production company should be participating in some type of benchmarking. To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program."[7]

39.     In April 2009, Agri Stats' Bilbrey again invited pork producers, including Producer Defendants and co-conspirators, to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. Producer groups could design and operate their own benchmarking effort."[8]

40.     The Producer Defendants and co-conspirators accepted this invitation and, not later than 2009, they started participating in the detailed benchmarking scheme using Agri Stats and its reports. The Producer Defendants and co-conspirators recognized, understood and agreed that the Competitively-Sensitive Information that they received about each other's pork business in the Agri Stats' reports provided them with a means to collectively restrict pork production and monitor

---

[6]     Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, at 43 (2008).

[7]     *Id*. at 46.

[8]     Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

and enforce their respective compliance with such collective action for the purpose and with the effect of increasing, fixing, maintaining and/or stabilizing the price of pork sold to Plaintiffs and others.

41.     Each Producer Defendant identified specific executives who were responsible for transmitting data to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export or production levels.

- Clemens: Joshua Rennels (Treasurer, Clemens Food Group)

- Hormel: Paul Bogle (Director, Cost Accounting)

- JBS: Gary Albright (Head of Business Analysis ), Kevin Arnold (Head of Finance), Jamie Fosbery (Analyst), Raven Goodlow (Business Analyst), Robbie Kearns (Business Analyst), Lisa Peters (Business Analyst), Eli Zoske (Cost Accountant)

- Seaboard: Damon Ginther (Senior Director of Business Data & Analytics), Mel Davis (Vice President of Hog Procurement and Bio-Energy), Tom Dye (Operations Controller)

- Smithfield: Aimee Ward (Director, Hog Finance), Kent Hillbrands (Sr. Director, Operations Finance), Elizabeth Barger (Data Analyst)

- Triumph: Matt England (Chief Integrated Business Strategy Officer), Ken Grannas (Director Inventory/Reporting), Tom French (Director, Margin Management), Joe Diebold (Chief Financial Officer), Dan Marlow (Corporate Controller)

- Tyson: Deb McConnell (Division Controller)

**B.    Agri Stats Provided Producer Defendants and Co-Conspirators With the Ability to Monitor and Enforce Their Collective Restriction of the Pork Supply, and to Discipline Co-Conspirators For Not Complying With the Conspiracy**

42.     Agri Stats provided the Producer Defendants and co-conspirators with the ability to share critical and proprietary information concerning key pork business metrics, including production levels and short and long-term production capacity.  Agri Stats was key to the formation, operation, and continuing stability of the conspiracy alleged in this Complaint.  For

their conspiracy to be effective, the Producer Defendants and co-conspirators had to have confidence that each of them was restricting pork production. Agri Stats provided that assurance.

43.     Clemens, Hormel, JBS, Seaboard, Smithfield, Triumph and Tyson were Agri Stats subscribers and reported their Competitively-Sensitive Information to Agri Stats. In 2016, Agri Stats' then-parent company, Eli Lilly, reportedly stated that "over 90% of the poultry and pig market"[9] uses Agri Stats in the United States. Therefore, if enough of the Producer Defendants and co-conspirators subscribed to Agri Stats during the conspiracy – which they did – and if enough of them restricted pork production during that period – which they did – then the conspiracy would be effective in increasing, maintaining, stabilizing and/or fixing the price of pork sold to Plaintiffs and others above a competitive level – which it was.

44.     Bilbrey of Agri Stats told the London Swine Conference[10] in March of 2012: "Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison, and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way."[11]

---

[9]     Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016).

[10]     The London Swine Conference began in 2001, and "[i]ts main aim is to provide a forum for the exchange of credible, science-based information for decision makers and influencers in the pork industry, to encourage the exchange and adoption of knowledge for the betterment of the industry." https://www.londonswineconference.ca (last accessed Dec. 13, 2021).

[11]     Greg Bilbrey, *Implementing Simple and Useful Production Benchmarking*, London Swine Conference – A Time for Change (March 28-29, 2012).

45.     Unlike traditional "benchmark" services that rely upon unaudited and aggregated publicly available data, Agri Stats reportedly obtained audited data directly from Producer Defendants and co-conspirators during the conspiracy.  When a producer joined Agri Stats, the latter's employees spent up to a month at the producer's site to learn, set up, audit, and prepare the producer to submit its data each month.  After submission, Agri Stats took raw data and pulled it into input systems in the right format and location each month.  This verified data allowed participants to make an "apples to apples" comparisons with competitors in order to increase profitability.

46.     During the conspiracy, Producer Defendants and co-conspirators who subscribed to Agri Stats received monthly detailed reports and graphs that allowed them to compare their performance and costs to other participants, the average of all companies, the top 25 percent, and the top five companies.  Current month, previous quarter and previous twelve-month periods were reported.  As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales.[12]  Agri Stats' Bilbrey advised that their reports provided subscribers, including the Producer Defendants and co-conspirators, with "monthly detailed reports and performance summaries that allow them to compare their performance to other participants, the average of all companies and the top 25%."[13]

47.     Because of the nature of the life of a hog, even current and historical information regarding the production numbers of hogs provides forward-looking supply information to

---

[12]     Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

[13]     Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, p. 41 (2008).

competitors.  The typical hog production cycle lasts about four years.  This is a function of the hog biological cycle.  Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes a producer nearly two years to increase production substantially.

48.     On information and belief, one presentation from Agri Stats shows the level of detail provided to Defendants regarding profits in the pork market.[14]

Top 25% in Profit - Variances to Average Company - 2009-2007

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.89 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 3 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| *35,001,809 Pigs Finished* | | | | | | | | | | | | |
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.60 | 32.52 | 11.83 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 83.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| *30,785,319 Pigs finished* | | | | | | | | | | | | |
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.80 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.23 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |
| *22,306,500 Pigs finished* | | | | | | | | | | | | |

49.     Agri Stats knew that it played a central role in this conspiracy.  Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis among competitors.

---

[14]     Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

50.     The purpose of the Agri Stats reports was not to increase competition or save customers money through lower prices and more efficient productions.  Instead, their purpose was to provide a means or mechanism for participating companies to monitor their collective effort to manipulate a commodity market tracked by Agri Stats, such as pork, in order to improve their profitability while artificially elevating prices of the product sold to Plaintiffs and others.

51.     A Special Report from the Banff Pork Seminar 2011 featured another presentation by Bilbrey of Agri Stats and Tom Stein of MetaFarms who "showed producers at the 2011 Banff Pork Seminar that better records mean better financial performance."[15]  The report explained that the Agri Stats benchmarking process requires producers to supply all of their production records and all financial records so that benchmarking results can be tied back to general ledger cost data. Bilbrey further explained the importance of the Agri Stats reports in increasing profitability: "This past 12 months top producers had about a $20 difference in profit, $11 a head lower cost and about $9 a head advantage in sales, the price they got for their pigs."[16]

52.     Much of the information shared by Agri Stats and the Producer Defendants and co-conspirators was unnecessary to achieve any legitimate benefits for pork purchasers.  Exchanging Competitively-Sensitive Information is not required to achieve major efficiencies.[17]  In fact, in a truly competitive market, the participants would closely protect their Competitively-Sensitive

---

[15]     *Tough Years in Pork Business Show Benefits of Benchmarking, Recordkeeping,* Inside BPS (Jan. 25, 2011), *available at* http:www.meristem.com/meetings/bps_2011-inside_bps.htm#15.

[16]     *Id.*

[17]     *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law* Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

Information from disclosure, because providing it to competitors would be to their disadvantage - unless, of course, there was an agreement or understanding among them that they would use the information to the joint benefit of each other as occurred in the pork industry.

53.     In the lead up to and then during the conspiracy, Agri Stats knew that it played a central role in the formation, implementation and enforcement of the conspiracy alleged in this Complaint.  Agri Stats repeatedly touted its role in standardizing costs across its subscribers – allowing each of the Producer Defendants and co-conspirators to make an "apples to apples" comparison of its data against its competitors.  One presentation from Agri Stats spoke directly to this point, noting to industry participants that they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data:[18]

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



54.     Agri Stats stated that to ensure data contained in the reports were accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine

---

[18]     Greg Bilbrey, *Data Integrity*, Slideshare.net (Sept. 21, 2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations.

tolerance and outlier status and enforce," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "[e]ach participant has to commit."[19]

55.     In addition to these reports, "Agri Stats account managers conduct[ed] on-site live reviews to assist with report utilization and analysis."[20]  The information provided by Agri Stats was so detailed that clients, including Producer Defendants and co-conspirators, requested the site visits by Agri Stats employees to assist them in understanding the intricacies and implications of the data.  Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the Producer Defendants and co-conspirators as the data in the reports themselves.  The fee for the visits fluctuated based on the size and other factors, but was substantial.

56.     During the time relevant to Plaintiffs' claims, Agri Stats' executives and account managers fanned out across the pork-producing regions of the United States to meet with their clients, including the Producer Defendants and co-conspirators.  Because Agri Stats traveled and was present among them regularly, discussing their respective Competitively-Sensitive Information, Agri Stats was in a unique position to share information among Defendants and co-conspirators at these regular meetings.

57.     A common saying by Agri Stats was "you cannot produce your way to the top of the page."  Rather, Agri Stats has stated that "the ultimate goal is increasing profitability – not simply increasing level of production."[21]

---

[19]     *Id.*

[20]     Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *from The Pig Site* *https://www.thepigsite.com/articles/benchmarking-and-tools-to-maximise-profit.*

[21]     Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

58.     By providing Competitively-Sensitive Information to Producer Defendants and co-conspirators, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated pork production limits.  Critically, Agri Stats provided forward-looking data that allowed the Producer Defendants and co-conspirators to determine each other's future production in addition to their current production.

59.     During the conspiracy, Agri Stats' reports were organized by company and facility, but their names were not listed in the reports.  Nevertheless, while ostensibly anonymous, the reports contained such detailed figures covering many aspects of pork production and sales that participants could accurately identify the companies behind the metrics.  For example, long-time industry insiders were sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size. The Producer Defendants and co-conspirators decoded the Agri Stats' reports so they knew their rivals' Competitively-Sensitive Information.

60.     Moreover, Agri Stats knew during the conspiracy that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers.

61.     Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information.  Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book.  The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

62.     Agri Stats mailed the reports to customers.  On occasion, Agri Stats reportedly shipped a participant's book to one of its competitors.  At times, suppliers reportedly kept their competitors' books for future reference, which as noted above revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

63.     Mobility within the meat production industries led to a situation in which workers at Defendants and co-conspirators' Producer operations knew the numbers of other regional facilities, removing any anonymization of the data that existed.  Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers.  And during the conspiracy, Agri Stats was aware of these facts.

64.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limits and manipulate prices, but also in its stabilizing power.  Price fixing cartels may be unstable in the absence of policing mechanisms, as each individual member of the cartel may have an incentive to cheat on other members of the cartel, for example, by increasing pork production to capture higher prices and market share as other cartel members limit their production.  Agri Stats' detailed production statistics served as an indispensable monitoring function, allowing each member of the conspiracy to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

65.     There remains a continuing and real threat of anticompetitive conduct by Defendants and co-conspirators because of, among other reasons, and as described in this Complaint, the continued existence of Agri Stats' reports with Competitively-Sensitive Information, Defendants and co-conspirators' opportunities to collude, the characteristics of the

pork market, and the extent to which Producer Defendants and/or co-conspirators continue to exchange Competitively-Sensitive Information with each other through the Agri Stats reports.

## VII.   THE MARKET FOR THE PRODUCTION AND SALE OF PORK WAS CONDUCIVE TO CARTELIZATION

66.     As explained below, there were one or more conditions and events in the pork industry during the conspiracy, or "plus factors," that made the market for the production and sale of pork conducive to cartelization.

### A.   Pork is a Commodity Product With Inelastic Demand

67.     Pork products are a commodity or possesses commodity-like characteristics in that the product of one seller is interchangeable with the product of another.  Pork had this characteristic during the conspiracy and at other times relevant to Plaintiffs' claims.  As such, all things being equal, it would not be profitable for Producer Defendants and their co-conspirators to unilaterally increase pork prices in the United States, because a unilateral price increase by any one Producer Defendant or co-conspirator would allow another Producer Defendant or co-conspirator to take substantial market share by simply holding its price.   The commodity or commodity-like characteristic of pork products made the market for the production and sale of pork conducive to cartelization.

68.     Markets with a highly inelastic demand can help facilitate collusion as producers have the ability to raise prices without a significant impact on quantity demanded.  Price elasticity of demand is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.  A price elasticity of demand value between 0 and -1 indicates there is inelastic demand for the good or service, *i.e.*, a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded.  During the conspiracy and at other times relevant to Plaintiffs' claims, the demand for pork was inelastic.

69. To the extent that a relevant market definition is or becomes necessary in this case, it is defined as the market in the continental United States for the production of hogs that are slaughtered to become pork products. As alleged earlier, the Producer Defendants and co-conspirators had greater than an 80% share of this relevant market, *i.e.,* substantial market power, during the conspiracy.

**B.** **The Producer Defendants and Co-Conspirators Controlled the Production and Supply of Pork in the United States, Which Allowed the Conspiracy to Succeed**

70. From approximately 1992 to 2009, the number of hog farms in the United States decreased by about 70%, from over 240,000 farms to 71,000 farms. Despite fewer hog farms, the nation's pork inventory remained relatively stable during this period, averaging about 60 million hogs.

71. During the conspiracy, however, there was increased control over the breeding, production, growing, and processing of pork by the Producer Defendants and co-conspirators through vertical integration and exclusive production contracts with hog farmers. Their vertical integration made it easier for them to collude on the production and price of pork.

72. Vertical integration allowed the Producer Defendants and co-conspirators to control directly the production and supply of pork through their wholly-owned and operated farms, where hogs were raised, fed, and prepared for slaughter. Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

73. Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or

her farm until animals are ready for market or transfer to other farms."[22]  This arrangement essentially converts independent farmers into contract employees who perform services for the pork producer.  The Producer Defendants and co-conspirators typically paid only fixed  service fees to the farmers, who bore the investment costs of the hog-raising facilities.  The Producer Defendants and co-conspirators typically retained ownership of the hogs and set the terms for how they were raised, allowing them to further control the supply of the pork on the market.  The prevalence and use of contracts for hog production by Producer Defendants and co-conspirators increased significantly during the course of the conspiracy.  For example, during Hormel's 2012 fiscal year, it purchased approximately 97% of its hogs under supply contracts.  By 2017, there reportedly were only a small number of independent producers who sold hogs to the open market for transparency as far as bid prices.[23]

74.     Pork production starts at the farrowing stage – which is the term used to describe a female hog giving birth.  Female hogs used in the farrowing stage are called sows.  Sows will normally have anywhere from 11 to 13 pigs per litter.  With a sow being able to farrow close to three times a year, one sow can have around 36 piglets in one year.  After birth, piglets grown for meat consumption are moved to a nursery for about six to eight weeks, or until the pig weighs upwards of 50 pounds.  At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds.  After the pigs reach their final weight, they are sent to a packing plant to be harvested.  Importantly in the context of this case, due to the

---

[22]     Allen Harper, *Hog Production Contracts: The Grower-Producer Relationship*, Virginia Cooperative, Virginia Cooperative Extension (2009).

[23]     *See e.g.*, 2019 Hormel Annual Report, at 8 ("The live hog industry has evolved to large, vertically-integrated operations using long-term supply agreements.  This has resulted in fewer hogs being available on the case spot market.  Consequently, the Company uses long-term supply contracts based on market-based formulas or the cost of production to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long-term.").

nature of the pork production cycle, the reduction of sows – *i.e.*, farrowing hogs – have a significant impact on the supply of pork.

75.     The following diagram shows the path for pork raised for meat consumption from birth through sale to consumers:

**Figure 1: Value Chain of U.S.  Pork Market**



Source: CGGC.

76.     During the conspiracy, Defendant Smithfield was the largest producer and processer of pork in the United States.  At the start of the conspiracy, Smithfield had approximately 1.1 million sows and produced 18.7 million market hogs per year in the United States.  By 2014, Smithfield reportedly had approximately 500 company-owned farms and about 2,190 contract farms in the United States.

77.     Seaboard stated in its 2009 annual report: "In 2009, Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements

27

purchased primarily under contracts from independent producers."[24]  In its 2017 SEC 10-K report, Seaboard stated that it raised "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts."[25]  During the conspiracy, Seaboard sold pork produced in Triumph's plant or produced in a plant jointly owned by Seaboard and Triumph.

78.     Clemens Food Group touts its vertical coordination on its website, stating: "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."[26]  A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 100 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.[27]

79.     JBS's purchase of its predecessor in interest, Cargill, in 2015 allowed JBS to exercise greater control over the production of hogs by acquiring four hog farms and two packing plants operated by Cargill.

80.     Triumph was owned by five of the largest pork producers in the U.S. – Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms – as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota.

---

[24]     2009 Seaboard Annual Report, at p. 11.

[25]     2017 Seaboard 10-K, at p. 2 https://www.sec.gov/Archives/edgar/data/88121/000008812118000012/seb-20171231x10k.htm.

[26]     *See* Clemens Food Group, *Vertically Integrated Purposefully Coordinated* (*available at* http://www.clemensfoodgroup.com/our-company/vertically-coordinated).

[27]     *See id.*; *see also* The Clemens Family Corporation Companies (*available at* http://www.clemensfamilycorp.com/pages/companies.aspx).

The relationship with these owner producers provided for vertical integration and allowed Triumph to control the pork production process from start to finish.

81.     Tyson stated in its 2009 10K Report: "The majority of our live hog supply is obtained through various procurement relationships with independent producers."[28]  Additionally, Tyson raised a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

82.     Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities.  Hormel stated in its 2009 annual report: "The live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."[29]  Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.[30]

83.     Each of the Producer Defendants and co-conspirators further controls the manner in which pork is processed, and has the ability to restrict and reduce supply through a number of means, including capacity reductions, controlling slaughter rates, and exports.

84.     Producer Defendants, including Smithfield, Clemens, Tyson, Hormel, Seaboard, Triumph, and JBS sell packaged pork under various name brands.

---

[28]     2009 Tyson 10-K, at p. 4, https://s22.q4cdn.com/104708849/files/doc_financials/annual/Tyson_FY2009_10K.pdf.

[29]     2009 Hormel 10-k, at p. 32.   https://d18rn0p25nwr6d.cloudfront.net/CIK-0000048465/f625f7ed-f161-478e-94f1-6b1ff37eeb31.html.

[30]     *Id.*

85.     The volume of U.S. commerce in the pork industry is huge.  The total production value of hogs in the United States is reflected in Figure 2 below for 2009-2019:



Figure 2: US Total Production Value of Hogs 2009-2019 in Billions USD

86.     Each Producer Defendant and co-conspirator's annual sales of pork products are also very substantial.  For instance, in 2016, Smithfield reported $5.089 billion of fresh pork sales, and an additional $7.089 billion in packaged pork product sales.[31]  That same year, Tyson reported $4.9 billion in pork sales.[32]  These substantial revenues meant that during the conspiracy, if the Producer Defendants and co-conspirators could successfully fix, increase, stabilize and/or maintain pork prices at artificially elevated levels (which they did), then this would (and did) translated into significant overcharges by Plaintiffs and others and substantial profits for the Producer Defendants and co-conspirators.

---

[31]     Smithfield 2016 10-K at 40.

[32]     Tyson 2016 10-K at 27.

C.      **The Market For the Production and Sale of Pork Was Concentrated**

87.     During the conspiracy, the market for the production and sale of pork was dominated by the Producer Defendants and co-conspirators.  As alleged earlier, the Producer Defendants and co-conspirators had more than an 80% share of the U.S. market for the production and sale of pork.  But for the conspiracy alleged in this Complaint, the Producer Defendants and co-conspirators would have had to compete on price.

88.     The hog integration sector of the market for pork production is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production).  Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

89.     Prior to and during time relevant to the allegations in this Complaint, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork producers controlling a large amount of market share.  Between 1988 and 2015, just the top four pork producers increased their market share from 34 percent in 1988 to 70 percent by 2018.  As shown in Figure 3 below, the top four the top four pork producers had market share greater than 60 percent during the conspiracy:

Figure 3: Market Concentration of Four Largest Companies



90.    In 1999, Smithfield acquired Carroll's Foods, Inc., which was, at the time, the second largest hog production company in the U.S., and its affiliated companies and partnerships. In 2003, Smithfield acquired Farmland Foods, which was, at the time, the sixth largest pork producer in the United States.  In 2016, Smithfield announced the acquisition of farm operations in three U.S. states from Hormel Foods Corp.

91.    In July 2015, JBS announced that it would acquire Cargill's pork business for $1.45 billion.  The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield. As noted above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and two packing plants operated by Cargill.

92.    The Cargill acquisition was completed in October 2015 and resulted in further consolidation in the industry.  The resulting pork business had pro forma net revenue of

approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week.  After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork Producer (Hormel), and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).

93.    The following timeline summarizes notable mergers and joint ventures between pork Producers since 1995, which led to an increased market concentration:



Figure 4: History of Mergers and Acquisitions

94.    As shown in Figure 5 below, by 2016, the top six pork processors comprised 82% of the total market.  The top two pork processors alone compromised over 45% of the market share, with Smithfield holding the largest overall share of the market at 26%.  On their own, it would be difficult for any of these companies to exercise market power.  However, acting collectively to manipulate the price of pork products, the combined market share of the six largest pork Producers, *i.e.*, the Producer Defendants and co-conspirators, translates into an HHI[33] of 6724 (ignoring other

---

[33]    "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice.  *See* https://www.justice.gov/atr/herfindahl-hirschman-index.

pork processors that comprise the other 18% of the market), which is well above the threshold for highly-concentrated markets.   In other words, if, as alleged in this Complaint, the Producer Defendants and co-conspirators colluded with one another to restrict the domestic supply of pork – which they did – then the resulting market concentration of this concerted action gave them more than sufficient power to control the pork market.   Even without combining the largest six pork producers, the pork industry had a "moderately concentrated" HHI of 1532.

**Figure 5: 2016 Pork Processing Market Shares[34]**



95.     The concentration level in the pork integration industry was optimal for collusion. WH Group Limited, which acquired Smithfield in 2013, characterized the U.S. pork integration

---

A HHI value of 1,500 to 2,500 suggests a market is moderately concentrated.  An HHI in excess of 2,500 points suggests a market is highly concentrated.

[34]     Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (March 7, 2017).

industry as "relatively mature and concentrated."[35]   Both of these conditions – maturity and concentration – made the pork industry more susceptible to collusion.

96.     The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion.  Because the industry was dominated by a relatively small number of pork producers, *i.e.*, the Producer Defendants and co-conspirators, it was feasible for them to manipulate prices through an agreement among them, whose market power greatly simplified the organizational complexity of the conspiracy.  Further, because the Producer Defendants and co-conspirators were incapable of independently controlling pork prices on their own, such an agreement was necessary to artificially inflate pork prices above a competitive level.

97.     Concentration of the industry was also beneficial to the procurement of hogs by the pork processors.  In some regions, consolidation resulted in cases in which only one pork processor was left to buy hogs from independent farmers, leaving the farmers with no leverage when negotiating terms with the pork processors.[36]

98.     In addition to market concentration, market stability is consistent with the conspiracy alleged in this Complaint.  Figure 6 below shows not only that the Producer Defendants and co-conspirators' collective share of the market was high during the conspiracy, but also that their market shares were relatively stable during this period:

---

[35]     WH Group Interim Report, at p. 5 (2017).

[36]     Wise, Timothy A. and Sarah E. Trist, "Buyer Power in U.S. Hog Markets: A Critical Review of the Literature", Global Development and Environment Institute, Working Paper No. 10-04, August 2010, at pp. 3 and 11.

**Figure 6: Market Concentration and Market Share Stability
U.S. Market Share by Hog Slaughter Capacity[37]**



Figure 6: Market Share of American Slaughter Capacity

### D. There Were Barriers to Entry in the Market For the Integrated Production and Sale of Pork

99.     Large barriers to entry kept potential competitors out of the pork integration industry during the conspiracy.  New entry into pork processing was costly and time consuming. Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design and permitting costs were substantial.  In 2012, it cost Cargill $25 million just to expand an existing facility.  During the conspiracy, constructing a facility from

---

[37]     This data comes from Pork Checkoff and several issues of Hog Farmer.  The figure omits 2008 and 2010 due to data sourcing issues for those years.

scratch would have cost considerably more money, totaling hundreds of millions of dollars.[38] Indeed, Seaboard Triumph Foods's 600,000 square foot plant in Sioux City cost $264 million to build.

100.    The prevalence of contracts in the market for hogs also served as an entry barrier during the conspiracy.  Most of the hogs produced in the U.S. were sold under multi-year contracts, typically to one of the Producer Defendants or co-conspirators.  In other situations, the processor owned the hog from farrow to finish.  Even if a market entrant had been able to lay out capital for the construction of a new processing facility, it would have had trouble finding enough hogs to operate that facility profitably.[39]

### E.    Select Trade Associations Facilitated Collusion

101.    Industry trade association and trade group (collectively "trade groups") meetings and events brought together senior executives from Defendants and co-conspirators, and afforded them the opportunity to discuss restricting the pork supply and artificially elevating pork prices. Against this backdrop, and knowing now that during the conspiracy, the Producer Defendants and co-conspirators were privately exchanging their respective Competitively-Sensitive Information with each other through the Agri Stats reports and signaling or communicating with each other publicly about their intention to restrict pork supply, it is not unreasonable, and indeed is plausible, to believe that Defendants and co-conspirators were secretly discussing the collective restriction of the pork supply when their executives met at or incident to these trade group meetings or events.

---

[38]    *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), July 2015 at p. 7.

[39]    Timothy A. Wise and Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (August 2010), at p. 12.

102.     In addition to the Pork Club and AMI – which were both central to the operation of the conspiracy alleged in the Complaint, other examples of pork industry trade groups in which Producer Defendants and co-conspirators participated during the conspiracy and that allegedly provided cover for the collusion include, without limitation: (a) the National Pork Producers Council (whose members included Cory Bollum of Hormel Foods, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats); (b) the Pork Industry Forum; (c) the National Pork Industry Conference; (d) the World Pork Expo; (e) the National Pork Board (whose members included at least three executives associated with Smithfield (Conley Nelson, Chris Hodges, and Michael Skahill);[40] (f) the National Pork Industry Conference (met annually and included the top pork production systems in North America); and (g) the International Production and Processing Expo (attended by Producer Defendants and co-conspirators).

103.     During the conspiracy, the AMI (later the NAMI) meetings brought Defendants and co-conspirators together and provided them with cover to discuss pork industry economics. For example, NAMI and AMI's Annual Meat Conference often included an economic presentation of the meat industry, including pork, by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc., a subsidiary of Agri

---

[40]     *National Hog Farmer,* "Pork Checkoff names 2019-2020 officers," (Jun 5, 2019) https://www.nationalhogfarmer.com/business/pork-checkoff-names-2019-20-officers.

Stats.[41]  In 2017, NAMI sponsored a Meat Industry Summit at which John Nalivka of Sterling

Marketing made a presentation about economic issues regarding the meat industry.[42]

## VIII.   DEFENDANTS AND CO-CONSPIRATORS IMPLEMENTED COLLUSIVE, ANTICOMPATITIVE CAPACITY AND PRODUCTION RESTRICTIONS

### A.   Overview of the Restriction of the Pork Supply During the Conspiracy

104.     Defendants and co-conspirators' secret exchange of Competitively-Sensitive

Information about each other through Agri Stats in a market with conditions that made it conducive

to cartelization made possible their implementation and enforcement of an understanding or

agreement among the Producer Defendants and co-conspirators to fix, increase, maintain and/or

stabilize pork prices by restraining the domestic supply of pork.  This Section alleges facts relevant

to the start of the conspiracy and then provides a detailed chronology of Defendants and co-

conspirators' conspiracy communications.

105.     In the years leading up to the conspiracy, pork production steadily expanded.  As

one industry commentator reported in 2007: "Some things you can just take to the bank.  Sow herd

expansion among the Pork Powerhouses would fall into that category – even in the face of the

biggest run-up in feed prices in history."[43]

106.     This historical trend changed markedly during the conspiracy as Producer

Defendants and co-conspirators dramatically shifted their behavior and restricted the pork supply

---

[41]     *Annual Meat Conference,* "2015 AMC Brochure," at 5, http://www.meatconference.com/sites/default/files/books/2015_AMC_Brochure.pdf; *Annual Meat Conference,* "2016 AMC Brochure," at 6 http://www.meatconference.com/sites/ default/files/books/2016_AMC_Brochure.pdf and *Annual Meat Conference,* "2017 AMC Brochure," p. 5, http://meatconference.com/sites/default/ files/books/2017_MeatBrochure.pdf.

[42]     Meat and Poultry, *NAMI Offers New Meat Summit,* Feb. 16, 2017, https://www.meatpoultry.com/articles/15855-nami-offers-new-meat-summit.

[43]     Freese, Betsy, *Pork Powerhouses 2007: Run-Up In Rations* (Oct. 3, 2007).

in an act that was against their self-interest unless, as was the case, they had an understanding or agreement to restrict the domestic pork supply through collective action.

107.    As demonstrated in Figure 7 below, at several points during the conspiracy, the pork Producer Defendants and co-conspirators changed their behavior and acted in a concerted way to decrease pork supply.  With their conspiracy in place, in 2008 and 2009, and again in 2012 and 2013, the pork industry cut production.  These industry production decreases, shown by negative annual growth rates, marked a drastic change in the Producer Defendants and co-conspirators' business practices from the pre-conspiracy period between approximately 2001 and 2008, in which pork supply was steadily increasing on a yearly basis.

**Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000-2020**



108.    These supply cuts were coordinated among Producer Defendants and co-conspirators, and were historic and unprecedented.  For example, in September 2009, Pork Powerhouses – an annual report of the largest pork producers in the United States, published by *Successful Farming* magazine – titled its annual report "Big Boys Cut Back," and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's

largest 25 producers have cut sow numbers.  These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.[44]

109.    These supply cuts were not easily reversible.  For example, as alleged earlier, attempting to replace breeding sows takes considerable time, during which a company could lose meaningful market share to its competitors with no ability to rapidly increase production to retain its customers, unless its competitors also cut their production.  In other words, each Producer Defendant and co-conspirator took significant business risk by restricting output.  Their production restrictions were not economically rational without coordination among them as alleged in this Complaint.

110.    While the Producer Defendants and co-conspirators were restricting pork production, they also further reduced the domestic supply of pork by increasing production exports.  The U.S. had been a net exporter of pork for a lengthy period, but those exports have comprised a much larger share of total production in the past ten years.  As shown by Figure 8 below, less than 10% of U.S. pork production was exported in 2000.  However, by 2011, more than 20% was being exported.  Exporting pork was another means by which Defendants were able to reduce the supply available in the United States.

---

[44]    Freese, Betsy, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009).

**Figure 8: US Pork Exports as a Percent of Total Production, 2000-2017**



111.    By restricting the supply of pork, even when confronted with increasing demand, Defendants and co-conspirators' common goal was to increase the price of pork and their margins. In 2012, the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."[45]

(1)    Smithfield

112.    Beginning in 2008, Smithfield stopped making historical production increases and instead cut its number of sows, reporting: "We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in

---

[45]    Transcript, Tyson Foods at Goldman Sachs Agribusiness Conference (Feb. 26, 2013).

feed."[46]   Given its market share, Smithfield knew that as long as a sufficient number of its competitors accepted its offer to reduce production – or not increase production sufficiently to make up for the reduction in production (*i.e.*, maintain production or increase production less than it could have) – then its significant production cuts would reduce herd inventory sufficiently to artificially increase, maintain, fix and/or increase pork prices.   In 2009, Smithfield confirmed publicly – in a call to action to its co-conspirators – that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately.   The cuts were immediately effective, as Smithfield beat Wall Street analysts' expectations for the 4th quarter of 2009 and forecasted a profit in the current half of its 2010 fiscal year, driven by profits earned from the sale of packaged meats.[47]   Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows).   In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, vowed publicly that it did not intend to increase capacity, and sold its Dalhart, Texas production facility to Cargill, Inc., which had been depopulated by August of 2009 as part of its sow reduction initiative.

113.   Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

(2)   Tyson

114.   Between 2008 and 2009, Tyson cut its sows by over 25%, from 70,000 sows to 50,000 sows, marking a significant reduction.   In 2010, Tyson reported a 3.3% decrease in its pork

---

[46]   Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

[47]   *Smithfield   Posts   Loss,   but   Beats   Forecasts* (*available   at* https://www.nytimes.com/2009/12/11/business/11food.html) (last accessed Dec. 13, 2021).

sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate. In 2013, Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."[48]

      (3)    JBS/Cargill

115.    In 2011, JBS reported that in the prior two years, its pork export volume had grown from 15% to 20% of total production at JBS. Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand. This production restriction had the effect intended by the conspirators: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."[49]

      (4)    Hormel

116.    In early 2008, Hormel announced that its Corcoran, California hog production division, Farmer John, cut its number of sows in 2008 by about 9,000. Hormel maintained such reduced production during the conspiracy. Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through."[50] Hormel also reported lower sales of pork products in 2013. In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day. Hormel reported strong earnings from its pork exports in 2011.

---

[48]    Chris Harris, "Tyson's Year Off to Good Start" *The Pig Site* (Feb. 4, 2013) https://www.thepigsite.com/news/2013/02/tysons-year-off-to-good-start-1.

[49]    JBS Annual Sustainability Report, 2016.

[50]    Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

(5)     Seaboard

117.    Seaboard reduced supply in 2013 and, once again, these reductions had their intended effect – higher pork prices.  Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market," which resulted in "higher prices for pork products sold in the domestic market."[51]  Moreover, in 2017, Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

(6)     Triumph

118.    In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.[52]  In 2009, Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry.[53]  In 2017, Triumph, along with Seaboard, delayed starting a second shift at their joint facility.

(7)     Clemens

119.    In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats.  Furthermore, in 2014, Clemens had a competitive advantage over many pork producers in that it had few porcine epidemic diarrhea (PEDv) infected pigs.  However, contrary to what one would expect in a competitive market, Clemens did not use this commercial

---

[51]     *See* Seaboard 2013 Annual Report.

[52]     Betsy Freese, *Pork Powerhouses 2008: The Big Squeeze* (Sep.  4, 2008), *available at*  https://www.agriculture.com/livestock/hogs/The-big-squeeze-Pork-Powerhouses-2008_283-ar4443.

[53]     Betsy Freese, *Pork Powerhouses 2009: Big Boys Cutback* (Sep. 14, 2009), *available at*  https://www.agriculture.com/livestock/hogs/pk-powerhouses-2009-big-boys-cut-back_283-ar5700.

advantage to its benefit, and it elected not to increase its market share when it clearly had a commercial incentive to do so.

A.    <u>**Timeline of the Conspiracy**</u>[54]

120.    Each of the supply reductions during the conspiracy were a departure from the Producer Defendants and co-conspirators' market behavior prior to the start of the conspiracy. These supply restrictions involved a significant share of the Defendants and co-conspirators' annual production, and they were in contravention of their individual economic self-interest.

121.    As early as January 2008, the CEOs and other senior-most executives of each of the Defendants recognized that, as a result of expansion an productivity increases in their operations, there was an oversupply of pork. However, the substantial supply reductions that were necessary to return the industry to the Defendants' desired level of profitability were against the individual self-interest of each Defendant. In the absence of an agreement between all Defendants to reduce supply, it did not make financial sense for any company to reduce its own supply levels. Accordingly, Defendants began to use their positions on the American Meat Institute ("AMI") and the Twenty-First Century Pork Club ("Pork Club") to coordinate supply cuts that could not be achieved in the absence of collusion. Defendants and co-conspirators affirmatively shaped the rules of these organizations to conceal the way they were using them to coordinate the supply reductions (and this hide the existence of the conspiracy. For example, the Pork Club had a rule prohibiting meeting attendees from attributing comments to specific speakers that attended their meetings. In this way, because of this "no attribution" rule, executives of the Defendants could and did make statements about their company's intentions at these meetings about the production,

---

[54]    Additional discovery will be necessary to reveal the full scope and details of the conspiracy. To that end, Plaintiffs reserve the right to supplement or amend this Complaint based on additional discovery in this case.

supply and/or pricing of the swine herd or pork without fear that anyone who did not attend the meeting could identify which executive or which company made the statement.

122.    In January 2008, Larry Pope, the CEO of Smithfield, met with the CEOs of the major pork producers – including Rod Brenneman of Seaboard, Dick Bond of Tyson, and Phil Clemens of Clemnes – through AMI's executive committee.  At that meeting, Pope spoke of the need for the industry to reduce its supply, and minutes of that meeting reflect that Pope "shared that [Smithfield] will begin reducing their herd immediately.  Strategy is to push hogs through 1 week earlier to lower weights; then leave the barns open for that week (also help with animal health); they will look at their poorest producers and discontinue business with the bottom 5%."

123.    Although Smithfield shared this information with its competitors to induce them to reduce supply as well, other Defendants were unwilling to follow Smithfield's lead at the time without assurances that all major producers were on board.  On July 25, 2008, Marc Greenwood – the VP of Agri Business Capital at AgStar Financial – spoke by phone with Larry Pope of Smithfield.  As the largest lender to the pork industry, AgStar faced financial ruin if a large number of producers declared bankruptcy.  During this call, Greenwood recognized the problem with Smithfield's efforts to get its competitors to reduce supply – cutting production was against each individual producer's self-interest and a "majority must participate" in order for the supply reductions to increase profitability.  During the call, Greenfield informed Pope that AgStar would begin denying loans to companies that would not agree to reduce production levels by 10%. Greenwood also shared a PowerPoint presentation with Pope in which he requested that the "larger systems [*i.e.*, the Producer Defendants] must lead the way – top 30 must publicly state what they are going to do."  During the call, Pope "commended" Greenfield "for taking this strong stand," and informed him that Smithfield supported this approach.

124.     Over the next six months following this exchange between Pope and Greenwood, some large producers took smaller steps towards reducing supply.

125.     For example, in late 2008, Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC, the entity at Smithfield Foods that dealt with production, said according to the trade press: "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[55]  Similarly, In February 2009, Smithfield said that it would close six processed meat plants.

126.     As another example, in January 2009, Tyson stated that the capacity utilization of its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%.[56] This indicated that Tyson was reducing the amount of pork that it processed in its plants.  Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."[57]

127.     However, during this early phase of the conspiracy, only Hormel took steps to follow Smithfield's lead and reduce its sow population by the target of 10% or more.  In November 2008, Jeff Ettinger, Hormel's CEO, confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009.[58]  During Hormel's first quarter earnings call in January 2009, its CEO once again communicated that he expected pork supply to decrease in 2009. Hormel's CFO confirmed publicly that Hormel would "certainly look for opportunities particularly

---

[55]     Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

[56]     Q1 2009 Tyson Foods, Inc. Earnings Conference Call (Jan. 26, 2009).

[57]     *Id*.

[58]     Q4 2008 Hormel Foods Corporation Earnings Call Transcript (Nov. 25, 2008).

in January where we could reduce the numbers that we had going through."[59]  By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000 (a reduction of almost 15%).

128.    During this early phase of the conspiracy, the Defendants recognized that more coordination was necessary between them to decrease supply at a sufficient level.  Recognizing that the many trade associations and industry groups that each Defendant belonged to provided the infrastructure for such coordination, Defendants began to use their frequent meetings to implement their collusive supply reduction.  Defendants even acknowledged as much internally.  As Matt Geyer, a senior Seaboard executive, noted in an internal email sent on October 13, 2009, in addition to Agri Stats – which provided "confidential competitor comparisons" – Mr. Brenneman's "involvement in AMI" was one of Seaboard's primary "sources of external information" related to "competitor information."

129.    In early 2009, pork industry participants continued to note the need to reduce supply.  For instance, in February 2009, Greenwood of AgStar, publicly called on U.S. pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.[60]  Notably, Greenwood's efforts to publicly encourage pork producers to decrease supply made no mention of the financial pressure that AgStar was putting on companies to comply with Greenwood's advice.

130.    Similarly, in February 2009, Hormel stated: "We still do not expect to see a reduction in the supply of hogs in fiscal 2009[.]"  In addressing whether slaughter would be cut back, Hormel said that "you look at the opportunity to reduce your production numbers and we've

---

[59]    Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

[60]    Dale Miller, "Industry's Stimulus Package – Cull Sows," *National Hog Farmer,* (Mar 15, 2009.

certainly ... look[ed] for opportunities ... where we could reduce the numbers that we had going

through ....."  Hormel further emphasized that "if there were free market hogs that normally we

would be bidding on, we're not looking to take them in…."[61]

131. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

132. ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

133. ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[61]     Q1 2009 Hormel Foods Corporation Earnings Conference Call (Feb. 19, 2009).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

134.     This "hedging" reflected other Defendants' concern that even Smithfield had not committed to a 10% supply reduction.  For example, on May 21, 2009, Ettinger of Hormel confirmed that "we still see a contraction in the overall supply of hogs for the year but not as much as we originally anticipated.  And I would expect that prices will be somewhat less then [sic] last year, but higher then [sic] what we've seen in the first half of the year."[62]

135.     In an effort to provide additional assurances to his competitors, Pope of Smithfield continued to speak publicly about the progress of Smithfield's efforts to reduce supply. On May 13, 2009, he reportedly stated at an industry conference that:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down.  We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.[63]

136.     Following this public statement by Pope, on May 16, 2009, Brenneman (Seaboard) recruited Larry Pope (Smithfield's CEO) to attend an AMI meeting and join Brenneman's subcommittee, which ensured that Pope would also be in regular contact with other committee members over the coming months.

---

[62]     Q2 2009 Hormel Foods Corporation Earnings Conference Call – Final (May 21, 2009).

[63]     Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009).

137.    On June 9, 2009, Brenneman (Seaboard) told Steve Weiss (the co-founder of the Pork Club) that "I saw the announcement of the sow liquidation last week. Congratulations.  Did Smithfield decide to come along?  Any details that you feel okay sharing with me? (size, etc.)" Rather than respond with this information in writing, Weiss responded: "We should discuss over the phone."

138.    Within days of this exchange between Weiss and Brenneman, Pope of Smithfield called Brenneman directly to give him the "heads up" that Smithfield would be reducing its supply through a sow liquidation and to provide details on those plans.  Pope provided this information directly to Brenneman before announcing it publicly during Smithfield's earnings call on June 16, 2009.

139.    On June 16, 2009, Pope of Smithfield stated during an earnings call that Smithfield's current cuts were not enough, that more were needed to "fix" the hog industry, and that "[s]omebody else has got to do something:"

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to Seaboard.  Seaboard knows that. ... That 3%, let me say that, our 3% will not fix the hog industry.  That part I'm confident of.  Somebody else has got to do something.  We cut 13%.  The first 10% didn't fix it.  I don't think us going from 10 to 13 is going to fix the hog business.[64]

Also during this call, when asked to describe his expectations for whether the rest of the industry would "liquidate" (*i.e.*, cut production), Pope described how at the 2009 Pork Expo in early June 2009, cutting supply was the "key subject of the discussion of every producer," adding that such supply reduction is "something [that] has got to happen.  And so that's very positive."[65]

---

[64]    Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009).

[65]    *Id.*

140.    Tyson was the next company to follow Smithfield with the public announcement of a major sow liquidation. In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87% down from the previous year's rate.[66]  Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."[67]

141.    More significantly (and following Smithfield's major announcement in June), Tyson announced on July 15, 2009, that it was liquidating 20,000 sows, eliminating over 28% of its herd.  In particular, Tyson sold five farms and sent the sows to slaughter.  Tyson's 2009 10-K report further stated: "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal year 2009)."[2]  Upon information and belief, Tyson executives informed its competition of this supply cut during AMI's Executive Committee meeting, which was held between July 9-11, 2009.

142.    On July 15, 2009, Mel Davis (Seaboard) spoke with Steve Thompson of Tyson in order to get additional details on Tyson's production cuts, including the fact that Tyson would be liquidating the 20,000 sows rather than selling them, which meant that the domestic sow herd would be reduced, and not just Tyson's own herd.  Mr. Davis forwarded this information to Mr. Brenneman and others at Seaboard.

143.    In a memorandum to his shareholders sent on July 17, 2009, Phil Clemens (Clemens' CEO) commented on Tyson's herd reduction announcement, but complained that "we

---

[66]     Q2 2009 Tyson Foods, Inc. Earnings Conference Call (May 4, 2009).

[67]     *Id*.

[2]     Tyson Foods, Inc. 10-K Annual Report, at 20 (2009).

believe the sow herd needs to come down by about 600,000 to bring hogs back to real profitability. Don't know what the current reduction is, but it isn't anywhere close to 600,000."

144.    Although Smithfield's public statements indicated that supply reductions were dictated by the economic factors facing pork producers, its internal communications acknowledged that this was not true.  On July 19, 2009, Joe Luter, Smithfield's Executive VP emailed Pope and the CEO of the National Pork Board and asked the National Pork Board do more to help Smithfield coordinate the supply reduction. "[W]e have too many hogs in this country and need to take 6-8 million market hogs out of our supply.  Cheap corn is likely going to slow liquidation and I don't think this is good for the industry over the next 2-5 years." The National Pork Board's CEO responded in an attempt to distance his organization from Luter's request, writing "while I know there have been several different discussions underway on reducing supplies, (i.e., [AgStar's] Producer Retirement Program), most of these efforts haven't sufficiently addressed anti-trust concerns and/or generated the necessary producer support."

145.    Around this time, AgStar began to increase the pressure it was putting on pork producers to liquidate sows, including by informing producers that were not taking sufficient steps to reduce supply that they were out of compliance on their loans.  In an internal presentation prepared in late June 2009 supporting its own decision to liquidate sows, Tyson noted that "Producer equity levels have fallen and major ag lenders like Ag Star/Farm Credit are notifying producers that loans are out of compliance.  Producers may be forced to exit the business or seek high interest loans, packer/customer cash flow assistance, or relief from finishing unit rent and wean pig suppliers....  Ag Star/Farm Credit has $1.2 billion in pork production debt and will pull back operating loans shortly, based on producer cost to produce effectiveness, and a willingness to liquidate production.  They have said they will not provide operating loans to the wean to finish

operator who imports Canadian wean pigs.  [sic]  Ag Star is serious about forcing sow liquidation, to drop supply quickly and improve a sustained profitability."

146.    In a July 30, 2009 presentation to its board, Tyson reported that "Major Ag Lender like Farm Credit/Ag Star considering pulling back operating loans based on producer cost effectiveness and willingness to permanently pull back production."

147.    These efforts by Smithfield, Hormel, and Tyson provided the assurances that other producers needed to reduce supply as well (even though producers would have been better off financially by maintaining their production levels in anticipation of the price impact from the Smithfield, Hormel, and Tyson supply cuts).

148.    In August 2009, Tyson Foods, Inc. Chief Operating Officer confirmed:

> Hog supplies will be down in Q4 year over year but still adequate.  We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability.  We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue. . . . Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4.[68]

149.    Tyson's 2009 10K Report further stated: "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[69]

150.    In August 2009, JBS's CEO communicated the start of JBS's participation in hog liquidation efforts.  He reportedly stated: "[W]e are seeing the start, we are seeing some increase in – not increase, we are seeing some more [hog] liquidation.  So we think we will continue to see the

---

[68]    Q3 2009 Tyson Foods, Inc.  Earnings Conference Call (August 3, 2009).

[69]    *See* Tyson 2009 10K Report, at 20.

margin in the processing side strong this whole year.  But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[70]

151.    The other Producer Defendants and co-conspirators agreed to or accepted Smithfield's exhortation for the "industry" to cut production and to announce those cuts to other producers.  During 2009, Triumph reduced the number of sows that it had from 396,000 to 371,500.  In particular, Triumph reduced the number of sows by 14,500 at its Christensen Facility, 4,000 at its New Fashion Pork Facility, and 5,000 at its Eichelberger facility.[71]  Notably, Triumph and Seaboard had a longstanding marketing agreement in which hogs processed by Triumph were marketed by Seaboard.[72]  Thus, the reduction in supply of sows raised by Triumph would result in a reduction in the amount of pork that was sold by Seaboard.

152.    On September 2, 2009, at the Pork Club meeting in Philadelphia, Pennsylvania, Phil Clemens (Clemens' CEO) commented that "Our production has not slowed and we are in a typical supply demand curve problem.  We continue to produce too much pork for the amount that is being consumed. In the last few weeks we have started to see a reduction in the sow herd - but still not even close to what really has to happen."  As a result of the "no attribution" rule, those in attendance agreed not to identify Mr. Clemens as the source of these comments.  Also at this meeting, Steve Meyer – an industry economist – gave a presentation to attendees detailing the

---

[70]    Q2 2008 JBS Earnings Conference Call (Aug. 13, 2009) https://sec.report/otc/financial-report/24091.

[71]    Betsy Freese, *Pork Powerhouses 2009*, Successful Farming (2009).

[72]    According to Seaboard Corporation's 2010 Form 10-K, filed with the Securities and Exchange Commission, "Seaboard's Pork Division has an agreement with a similar size pork processor, Triumph Foods LLC (Triumph), to market substantially all of the pork products produced at Triumph's plant in St. Joseph, Missouri.

degree of supply reductions that the pork industry needed in order to return to high levels of profitability.

153.    Two days later, on September 4, 2009, Steve Weiss (co-founder of the Pork Club) sent to Rod Brenneman and Gary Louis at Seaboard notes from the September 2 Pork Club meeting, which included (without attribution) Mr. Clemens' comments about how the industry needed to take additional steps to reduce supply, as well as Meyer's economic presentation. Weiss also passed on encouragement from Mr. Pope that one of the Seaboard executives should join the Pork Club and attend future meetings.

154.    In September 2009, the CEO of Smithfield reportedly stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation. But again, I don't think they can solve it.
>
> I think this industry has got to solve it collectively. I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. But the answer is, yes, there are others cutting back. We're not the only one.[73]

155.    On September 24, 2009, shortly after receiving the notes of Mr. Clemens' and Mr. Meyer's comments, Mr. Brenneman (Seaboard) spoke at an AMI luncheon and opined that the swine industry "must liquidate 10% to achieve a sustainable supply/demand balance." In other words, Brenneman spoke to a room of industry executives about the need for each of the companies to reduce supply, perfectly echoing the comments of Smithfield's CEO from June and Clemens' CEO from three weeks earlier.

---

[73]    Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009).

156.     Among those in attendance at that AMI luncheon was Robert Manly, Smithfield's CFO.  In response to Brenneman's comments, Manly drafted an op-ed in which he pointed out that, as of August 2009, Seaboard had yet to take steps to reduce its own supply from 2008 levels. A draft of the op-ed stated that "It is clear Rod knows what it takes to make the industry healthy and advocates that economically painful production cuts are necessary, but Seaboard is unwilling to make their own sacrifices and wants other producers to suffer so Seaboard can reap all the benefits."  Smithfield's communications team took steps to publish the piece, but then withdrew it after receiving assurances that Triumph (Seaboard's joint venture partner) was in the process of reducing its production levels by approximately 32,000 sows (an 8% reduction from its 2007 levels) and that Seaboard was taking steps to reduce its purchases and slaughter of hogs, which would further reduce supply.

157.     In November 2009, Hormel stated that "we have seen about a 2% liquidation" in hogs.[74]

158.     In December 2009, the CEO of Smithfield confirmed that it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance:"

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs... I can tell you that I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves.  We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.[75]

---

[74]     Q4 2009 Hormel Foods Corporation Earnings Conference Call (Nov. 24, 2009).

[75]     Q2 2010 Smithfield Foods Earnings Conference Call – Final (Dec. 10, 2009).

159.    In March 2010, when asked about fourth quarter and 2011 volumes for pork, the

CEO of Smithfield reportedly indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year.  That's going to have the impact
> starting next fiscal year when there is going to be 13,000 less.  But I think
> we'll pick up some of that in our other operations.  But I think 8,000 or 9,000
> or 10,000 of those a day will disappear from our operations and that
> represents about 8% of our, 8% of the hogs will be down.  That's for also
> the fresh pork side.[76]

160.    On March 8, 2010, JBS's CEO mentioned JBS's reduction in hog supply as a driver

of profitability, and he stated that these efforts were resulting in protein shortages.  He stated:

> combination of reduction in supply for cattle, for hogs and for chicken and
> in the other hand the improvement and increase in consumption in the
> emergent markets we are very optimistic about our business, about the
> margin that we will see a strong demand and this reduction in supply, so we
> believe that we will see some shortage in protein going forward.[77]

Despite having the economic incentive (increased demand) to increase supply and capture market

share, JBS adhered to the conspiracy to artificially elevate pork prices by restricting the hog supply.

161.    As of March 2010, U.S. pork production was noted to be down 7%, with 6% of the

reduction coming from a reduction in slaughter and 1% from lower market weights.  The Producer

Defendants and co-conspirators also were reported to have increased exports 8% by March 2010,

which was expected to lead to higher hog prices.

162.    In May 2010, Tyson stated in its Q2 2010 earnings conference call: "Worldwide

protein supplies and US domestic availability are expected to remain below '08 and '09 levels.

We have seen good interest in Beef and Pork exports to a variety of global destinations."[78]

---

[76]    Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call – Final (Mar. 11, 2010).

[77]    JBS Q4 2009 Earnings Conference Call (Mar. 8, 2010).

[78]    Q2 2010 Tyson Foods, Inc. Earnings Conference Call (May 10, 2010).

Similarly, in August 2010, Tyson stated in its earnings call that "Pork supplies in 2011 are anticipated to be below their peak supplies in calendar 2008 and 2009, and most projections show no material changes compared to 2010."[79]

163.    In August 2010, Hormel stated: "Our hog supply is down 3 to 4%."[80]

164.    In September 2010, Smithfield stated in a press release that the closure of its Sioux City plant in April 2010 had led to an 11% reduction in its processing rate from the prior year. Smithfield further stated: "Industry wide, slaughter volumes were down 3.5%," and "Lower industry slaughter levels are expected to persist well into the company's second quarter."[81] Smithfield's quarterly results from that time reflected that the volume reductions "should help stabilize prices at healthier levels than fiscal 2010."[82]

165.    Defendants acknowledged access to information that allowed them to know that the supply of pork would not be increasing.  For example, in December 2010, the CEO of Smithfield reportedly stated:

> We certainly compare ourselves to our competitors as best we can.  Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to.  This is information you may not quite have.  And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[83]

---

[79]    Q3 2010 Tyson Foods, Inc. Earnings Conference Call (Aug. 20, 2010).

[80]    Q3 2010 Hormel Foods Corporation Earnings Conference Call (Aug. 20, 2010).

[81]    *Smithfield Foods Reports Record First Quarter Results*, Smithfieldfoods.com (Sept. 8, 2010).

[82]     *See* Smithfield Foods, Inc. Form 10-Q, at 22 (March 11, 2011).

[83]    Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010).

As alleged above, Smithfield had access to Competitively-Sensitive Information from its competitors through, among other means, the Agri Stats reports, which allowed it to know confidential supply information from and about its competitors.

166.    Supply level information regarding competitors allowed Defendants and co-conspirators to know that supply would not increase in the future, given the lifecycles of the animals. Based on this knowledge, in November 2010, Hormel's CFO stated that she did not think the industry would see large scale expansion given profitability for the pork Producers.[84]

167.    In February 2011, Tyson's chief operating officer (COO) stated:

> I think there's still a widely held belief that our Beef and Pork profitability isn't sustainable.  I want to again explain why we don't believe that's true. If we look at supply, current cattle and hog production levels can't change much in 2011 because of the limits of the animal's life cycle.[85]

168.    In the face of ever-increasing margins, when asked whether the type of profits would continue, in March 2011, Smithfield's executives reportedly confirmed to their competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs.  Yet we are projecting over the next 90 days we will be up another 20% from that.  I mean those are big numbers to get the meat prices in the retail and food service case to cover that....
>
> HEATHER JONES: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon.  We are still going to have -- should have good margins, but I can't believe --
>
> LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good

---

[84]    Q4 2010 Hormel Foods Corporation Earnings Conference Call – Final (Nov. 23, 2010).

[85]    Q1 2011 Tyson Foods Earning Conference Call – Final (Feb 4, 2011).

margins through February and March, through today.  We have got double-digit margins today.

BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower.  So it will either happen by itself or someone is going to build a plant.

HEATHER JONES: All right, okay.  Thank you.

LARRY POPE: You get two-year visibility on that, though.  You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing....  And by the way, we are not going to build a new plant to expand capacity.[86]

169.    In March 2012, the VP of Finance and chief accounting officer of Smithfield reportedly stated that no one in the industry would be "real excited about adding capacity"[87] when the losses of 24 to 36 months ago were considered:

Nonetheless, you see some pretty significant fluctuations.  Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30.  So there is some volatility there.  And what I would tell you is that keeps a lid on pork production.  The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry.  There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.[88]

170.    By May 2012, pork industry observers were noting that the reductions in slaughter capacity meant the Producer Defendants and co-conspirators may not have enough capacity to slaughter expected hog levels by the fall.  In fact, Steve Meyer of Paragon Economics noted that

---

[86]    Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call – Final (Mar. 2011).

[87]    Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012).

[88]    Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012).

slaughter capacity would not keep up with hog capacity through late 2013 given that Producer Defendants and co-conspirators were holding their slaughter levels constant.

171.    In September 2013, Joe Szaloky, Vice President of Procurement and Business Development for Smithfield, confirmed the company's intention to maintain its sow number, not adding any more.[89]

172.    In December 2013, Robert Manly of Smithfield emphasized that coordinated industry action was necessary to "balance supply and demand:"

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group.  We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.[90]

173.    On May 15, 2013, JBS's CEO continued to demonstrate JBS's ability to constrain the pork market.  During a quarterly earnings call he stated: "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business…. So this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent with beef.[91]

174.    The Producer Defendants and co-conspirators further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise. For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Eric

---

[89]    Betsy Freese, *Pork Powerhouse 2013: Disease Hits, Growth Continues*, Successful Farming (Sept. 29, 2013), *available at* https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-growth_283-ar34203.

[90]    Q2 2014 Smithfield Foods Earnings Conference Call (December 23, 2013).

[91]    Q1 2014 JBS Earning Conference Call (May 15, 2014).

Haman, Clemens Food Group's communication manager, stated the disease "had a very minimal impact on our hog flow, especially when you compare it to others in the industry."  He stated: "That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this."[92]  Yet, in furtherance of their conspiracy, Clemens did not take advantage of having few PEDv infected pigs. Instead of attempting to increase its market share, it stayed the course with its fellow competitors.

175.    Defendants and co-conspirators' conspiracy was yielding substantial profits by 2014.  In October 2014, the Pork Powerhouses report stated: "Hogs made history this summer. Pork producer profits were, quite simply, enormous – averaging $82 profit for each hog marketed in the third quarter."[93]  The report also noted: "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast.  The PED virus trimmed supply, but higher market weights helped compensate.'"[94]

176.    In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to expand significantly pork production.  Specifically, pork producers rushed to sign contracts with Producer Defendants and co-conspirators that would protect them if production exceeded slaughter capacity as some feared.

177.    In February 2017, Seaboard and Triumph announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture, Seaboard

---

[92]    Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds*, Bucks County Courier Times (May 4, 2014).

[93]    Freese, Betsy, *Pork Powerhouses 2014: High on the Hog* (Sep. 30, 2014).

[94]    *Ibid.*

Triumph Foods, LLC, to include a second shift.[95]  In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry."[96]  However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.[97]

178.    The conspiracy – in which Defendants communicated extensively about their plans to reduce supply and also exchanged highly sensitive information about their operations through Agri Stats – also fostered an environment in which Defendants communicated extensively with each other about their pricing.  Accordingly, as detailed in this Complaint, the collusion on supply also allowed Defendants to coordinate their pricing and throughout the conspiracy, as detailed in this Complaint, Defendants engaged in extensive communications about their supply cuts, slaughter levels, and pricing for pork.

## IX.    ABNORMAL PRICING DURING THE CONSPIRACY DEMONSTRATES THE SUCCESS OF THE CONSPIRACY

179.    Beginning in approximately 2009, the pork industry showed abnormal price movements, *i.e.*, increases in prices for the average hog whole price unexplained by increases in costs.  All of these pricing measurements show a significant break between pricing prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork.  These

---

[95]    Farm Futures, *Seaboard Triumph Foods Will Add Second Shift At Plant Under Construction* (Feb. 24, 2017) (*available at* https://www.farmprogress.com/hog/seaboard-triumph-foods-will-add-second-shift-plant-under-construction).

[96]    Farm Futures, *Seaboard Triumph Foods Will Add Second Shift At Plant Under Construction* (Feb. 24, 2017) (*available at* https://www.farmprogress.com/hog/seaboard-triumph-foods-will-add-second-shift-plant-under-construction).

[97]    Jeff DeYoung, *Pork Packing Capacity Faces Delay to Growth*, Iowa Farmer Today (June 2, 2018) (*available at* https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html).

abnormal pricing movements can be measured in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the Producer Defendants and co-conspirators' margin during the conspiracy; and (iv) the Producer Defendants and co-conspirators' revenues before and during the conspiracy.  Each of these measures supports Plaintiffs' allegations that Defendants and co-conspirators conspired to restrict production and otherwise acted in a concerted manner to artificially increase pork prices in the U.S.

      (a)     The Average Hog Wholesale Price Experienced an Unprecedented Increase Beginning in 2009

180.    According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb from 2000 to 2009, and the hog market yearly average price was at times substantially less.  Thereafter, prices increased dramatically, rising to more than $1.80/lb in 2014, and never dropping below $1.40/lb again.  The movements in the price of pork before and during the conspiracy are illustrated in Figure 9 below reflecting average hog wholesale prices in cents per pound between 2000 and 2018:

**Figure 9: Average Hog Wholesale Prices in Cents per lb., 2000-2018**



181.    Publicly-available data also demonstrates that Producer Defendants and co-conspirators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits resistant to changes in price during the conspiracy. These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply below demand.

      (b)     The Producer Defendants and Co-Conspirators' Revenues Increased Beginning in 2009, Even Taking Into Account Their Specific Costs

182.    Upon information and belief, an examination of the spread between pork revenue and pork-related costs (*i.e.*, costs of goods sold plus operating costs) for two of the largest Producer Defendants (Tyson and Smithfield) – which can be used as a proxy for measuring the spread between the Producer Defendants producer's price of wholesale pork and its hog costs – confirms a divergence between revenue and costs at the approximate start of the conspiracy.  This divergence in revenue and costs starting in 2009 reflects the beginning of abnormal pricing in 2009.

183.    Specifically, such an examination shows a break in Tyson's revenues and costs around the start of the conspiracy: from 2001 to 2009, Tyson's average profit on pork was 3.7 percent; from 2010 to 2017, Tyson's average profit on pork jumped to 8.7 percent.

184.    The same analysis for Smithfield shows a similar break in revenues and costs beginning at the start of the conspiracy: from 2004 to 2009, Smithfield's average profit on pork was 3.2 percent; from 2010 to 2016, Smithfield's average profit on pork increased to 6.3 percent.

185.    These analyses of the spread between costs and prices relate solely to each Producer Defendant's pork segment, and thus confirms that rising costs in pork production do not explain the increases in price seen during the conspiracy.

X.   **THE CONSPIRACY WAS EFFECTIVE IN INCREASING THE PRICE OF PORK SOLD TO PLAINTIFFS AND OTHERS IN THE UNITED STATES**

186.   As explained below, the conspiracy was effective in artificially and substantially elevating the price of pork sold to Plaintiffs and others in the U.S.

187.   The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI").  From the end of 2009 to the end of 2020, the CPI for all food products increased approximately 18.0 percent.[98]  Over the same period, prices for pork – including bacon, ham, and other pork products – have increased substantially during the conspiracy.  The graphs and information below provide examples showing how pork prices have increased at substantially higher rates, since the conspiracy began in 2009, than prices for food products as measured by the Bureau of Labor Statistics.  The information that follows is a proxy for the artificially higher prices that each Plaintiff paid for pork because of and during the conspiracy.

188.   For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.83 at the end of 2017, an increase of 63.3 percent.  Figure 10 below shows the extent that prices for a pound of bacon increased dramatically during the conspiracy period compared to general food prices.[99]

---

[98]   U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers: Food at Home in U.S. City Average [CUSR0000SAF11], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/CUSR0000SAF11, November 30, 2021.

[99]   U.S. Bureau of Labor Statistics, Average Price: Bacon, Sliced (Cost per Pound/453.6 Grams) in U.S. City Average [APU0000704111], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0000704111, Nov. 30, 2021.



Figure 10: Price Index for Bacon and Food

189.    Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase during the conspiracy, moving from $2.05 per pound at the end of 2009 to $2.99 at the end of 2020 (approximately 45.9 percent).[100]

190.    Further, the CPI for another commonly purchased consumer item – ham – shows an increase from $2.13 in December of 2009 to $3.53 in January of 2021 (or 65.7 percent).[101]

---

[100]    U.S. Bureau of Labor Statistics, Average Price: All Other Pork (Excluding Canned Ham and Luncheon Slices) (Cost per Pound/453.6 Grams) in U.S. City Average [APU0000FD4101], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0000FD4101, Nov. 30, 2021.

[101]    U.S. Bureau of Labor Statistics, Average Price: All Ham (Excluding Canned Ham and Luncheon Slices) (Cost per Pound/453.6 Grams) in the Midwest Census Region - Urban [APU0200FD2101], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0200FD2101, Nov. 30, 2021.

XI.   **THE RESULTS OF THE DOJ'S CRIMINAL INVESTIGATION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN THE PORK INDUSTRY**

191.   The U.S. Department of Justice Antitrust Division ("DOJ") has an ongoing criminal antitrust investigation into anticompetitive conduct in the broiler chickens industry.  The DOJ has indicted numerous current and former poultry industry executives, including from Pilgrim's Pride, which is majority owned by JBS USA Food Company Holdings, the parent of JBS.

192.   On February 23, 2021, Pilgrim's Pride pled guilty to charges brought by DOJ for "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Action, 15 U.S.C. § 1" from "at least as early as 2012 and continuing through at least 2017," and agreed to pay approximately $107 million in a criminal fine.

193.   Tyson, after being served with a grand jury subpoena in April 2019 in DOJ's broiler chicken investigation, applied for leniency from prosecution under DOJ's Corporate Leniency Program, pursuant to which Tyson must, in order to avoid criminal prosecution and fines, admit to having participated in activity constituting a criminal antitrust violation and fully cooperate with DOJ.

194.   The guilty plea by Pilgrim's Pride and Tyson's grant of leniency in DOJ's criminal price-fixing investigation in the broiler chicken industry serve as a "plus factor" supporting the plausibility of the pork industry conspiracy alleged in this Complaint, particularly given the similar structural characteristics between the broiler chicken industry and the pork industry.

195.   In addition, upon information and belief, the same antitrust policies and practices that resulted in antitrust violations by Pilgrim's Pride and Tyson with respect to broiler chickens governed JBS's and Tyson's conduct with respect to pork and the conduct alleged herein.

196.     Pilgrim's Pride and Tyson's antitrust violations concerning broiler chickens were concealed and only established by DOJ's criminal investigation, just like the alleged conduct in this Complaint has been concealed by Defendants, as discussed below.

## XII.    PLAINTIFFS' CLAIMS ARE TIMELY

197.     Plaintiffs' Sherman Act and PSA claims have been brought within the applicable statute of limitations period.

198.     Plaintiffs' Sherman Act claims are timely because the filing of the first class action on June 29, 2018 suspended the running of the statute of limitations on Plaintiffs' claims against Defendants from that date until the date of this Complaint.  That class action has now been centralized with the other cases in *In re Pork Antitrust Litigation*, MDL 2998 and Civil Case No. 18-1776 (D. Minn.).

199.     Plaintiffs' Sherman Act and PSA claims are timely because each of them did not know of (and could not have reasonably discovered) the existence of the conspiracy alleged in this Complaint – in the case of the Sherman Act claims, at least four years or more before June 28, 2014 – and in the case of the PSA claims, at least four years before filing this Complaint – because of Defendants and co-conspirators' active concealment of their conspiracy as alleged below. Defendants and their co-conspirators' affirmative and fraudulent concealment of their unlawful conspiracy as described in this Complaint tolled the statute of limitations for each Plaintiff's Sherman Act and PSA claims.

200.     During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, and as alleged in detail in this Complaint, Defendants and co-conspirators both conducted their conspiracy in secret and created pretexts to allow additional communication, including coordinating their supply plans at or incident to trade group

meetings and events in order to give their collusive meetings the appearance of legitimacy; communicating through third parties or through backchannels; avoiding references to the conspiracy in their internal communications and describing information received directly from competitors as "rumors" in order to avoid naming their sources in writing; communicating with each other by telephone to avoid written records of what they said and limiting knowledge of the conspiracy to only an inner circle of senior executives; deleting evidence of the conspiracy and instructing others to do the same, all so that there would not be a paper trail of their unlawful scheme; coordinating between family members who worked for different Defendants; and by providing deceptive and pretextual statements to their customers and to the public in justifying supply cuts and price increases that were intended to conceal – and did in fact conceal – that these actions were the result of collusion.

201.    During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Producer Defendants and co-conspirators publicly and pretextually claimed that increases in their pork production input costs or other seemingly plausible reasons were responsible for increased pork prices when, in fact, they were not.  This created the illusion that the price of pork that they sold to Plaintiffs was competitive, when, in fact, it was not because their pork prices were the result of the conspiracy.  For example:

(a)     Producers claimed that decreased supply and higher prices were caused by the H1N1 outbreak.  But a National Pork Board customer tracking research report dated May 6, 2009, stated that "The overall perception of the safety of pork remains in a good trajectory" and that "Among pork consumers, we continue to see purchase intent stabilizing...."  And, Bret Getzel from Seaboard confirmed H1N1's short term impact on the pork market in a May 21, 2009 email to Chuck Faughnan, where he told

72

him "There was some very short term weakness in the market as a result of the H1N1 negative press, but this came and went pretty fast.  The market had pretty much recovered by 05/08."

(b)



(c)    In 2012, Tyson's CEO insisted publicly that Tyson Foods "need[ed] to get our pricing improvements in order to get paid for those higher raw materials."[102]  His statements indicate at the time that he understood customers would – in his words – "understand that these higher grain prices are going to require higher prices."[103]

(d)

---

[102]    Q4 2011 Tyson Earnings Conference Call (November 21, 2011).

[103]    Q4 2012 Tyson Earnings Conference Call (November 19, 2012).

███████████████████████████████████████████████

██████████████

(e)   ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

(f)       The PEDv scare was also a pretext for higher prices due to allegedly short supply.  On November 4, 2014, in response to a question about pork belly pricing, Brandi McClure, Product Manager at Seaboard, wrote, "PED Scare – Starting late last Fall and well into the Spring, packers/customers were putting product into the freezer anticipating reduced volumes in the Spring and Summer.  While we did have reduced kills, the hog weights made up for the overall volume decline that was expected and therefore the anticipated shortage was never realized."

202.    Defendants also communicated in secret in order to coordinate their supply reductions and price increases, including by sending to competitors their future supply and pricing plans and instructing colleagues to conceal or delete evidence of their unlawful actions.  For example:

(a)       For example, on August 14, 2008, Dick Bond, Tyson's CEO, reviewed an internal analysis of Tyson's projected financial performance.  Bond recognized that the projections were not all that useful without similar data from Tyson's competitors and asked an employee if Tyson could get data from "our competitors like Pilgrim, Smithfield, Hormel, etc.?"  When the

74

employee responded that the data could be obtained through a special third-party survey, Bond responded that he "could call the companies I listed and probably get some info.  Is that O.K.?"

(b)    Brenneman and Larry Pope – the CEOs of Seaboard and Smithfield, respectively – also spoke a number of times between late 2008 and late 2009 under the auspices of a supply contract between the two companies in which Smithfield provided hogs to Seaboard. Although the two did discuss this buyer/seller arrangement, they also used the relationship to discuss in detail the supply plans of their respective companies and pressure each other to commit to supply reductions."

(c)    On January 22, 2009, Seaboard executives Brian Taphorn and Tom Blumhardt received from a sales broker an email attaching a spreadsheet with competitors' pricing and cautioned that "I got this from a source for you to help see the most current on the SBR competition. Please guard it carefully."

(d)    On July 8, 2009, Tom Padgett of Tyson circulated internally to Todd Neff and Jay Krehbiel the current prices to retailers offered by Seaboard and Smithfield for bone-in loins, and noted that Cargill and JBS had "nothing to offer" because they were short on product. Neff then forwarded the email to others at Tyson and instructed them to "read and delete."

(e)    On October 29, 2009, Clemens' Dan Groff emailed senior company management that he had "heard through the grapevine yesterday that Smithfield had called a meeting on November 17th with a group of PA independent hog producers."  He further noted that he was "very curious about this" and would "try and ask around" but asked "if anyone has any reliable Smithfield contacts or can think of anyone who might know some information that you give them a call.

(f) ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

(g)     On November 23, 2010, Brian Taphorn of Seaboard emailed internally to Terry Holton Smithfield's 1/8" trim price list, which he had obtained from National Beef.  Taphorn told Holton, "Want to keep this confidential, as I'm sure no one else at National knows this has been forwarded to us."

(h)     On October 19, 2011, Todd Neff, a Senior VP at Tyson, complained to two co-workers about Tyson's decision not to add shifts at its plants and increase its slaughter volumes. Neff complained that "we should sltr more than we are at times ... we have earned the right to get our fair share of sltr [slaughter] since we are performing well vs. industry i.e. – make the other guys cut back! I trust you'll read and delete and not repeat this."

(i)     Brothers Brad Lorenger (VP of Sales at JBS) and Doug Lorenger (a senior sales executive at Indiana Packers) communicated frequently to coordinate on pricing and supply between their respective companies.



iii. 

iv.

v.



vi.

vii.

viii.

ix.

x.

(j)      Beginning in 2012, the Pork Club added a "Just Pigs" meeting limited to just pork producers.  This was intended to facilitate "informal roundtable" discussions amongst the competitors.  Legal counsel did not attend these meetings

(k)      On March 16, 2012, Dhamu Thamedaran and Shane Horsley of Smithfield discussed Smithfield's supply forecast for the upcoming week based on "rumors" that could only

possibly have come directly from competitors.  For example, Horsley reported that "Triumph is expected not to harvest next Saturday.  However, expect them to be in buying hogs next week for the following week."  Thamaduran responded by confirming Horsley's Triumph intel, and also reporting that Seaboard would not be killing hogs on Saturday, while at Tyson there was "talk of possible reduction is [sic] Saturday kill but no confirmation yet."

(l)   ███████████████████████████████

████████████████████████████████████

████████████████████

(m)   On November 9, 2012, senior-most executives from Cargill, Tyson, Smithfield, Hormel, and JBS met in Chicago.  Within two months of the meeting, Defendants began cutting back their kill rates, and reported these reductions to the competition.

(n)   For example, on January 30, 2013, while circulating a new price list, Brian Taphorn informed Seaboard personnel that, "There is, finally, talk of some kill cutbacks coming down the pike into next week.  Tyson has said to cancel all kill plans for the weekend of 2/9; Excel talking of slowing down some daily overtime hours; and Swift taking more of a stand against paying over the top for hogs versus just going without.  We believe it would take real cutbacks to make a real supportive move in the markets."

(o)   Later that year, on July 9, 2013, Taphorn (Seaboard) circulated the "latest 'Price List' from Smithfield," asking his team to "PLEASE KEEP THIS IN HOUSE AND CONFIDENTIAL."

(p)   On February 23, 2014, in an email entitled "Summary of last week's conference" and sent to senior Clemens' management, Dan Groff (Clemens") wrote that "I wanted to pass along a few interesting anecdotes from my conference last week.  As always, most of the

interesting stuff comes out in the hallways and at dinner rather than in the actual meetings.…"  In the bullet that followed, Groff wrote that "Farmland, Smithfield and Triumph all have sizeable holes in hog supply to fill in the next two months, nothing new there but it's a very real problem for them…."  The summary also included information about kill schedules, hog weights, hog diets, and discussion of Tyson's welfare announcement, during which Tyson management admitted they overreacted to customer pressure."

(q)      On May 22, 2014, Taphorn (Seaboard) predicted in an email to colleagues that pork prices would move up in June and July because there were 11 plants "that are either currently on a 4 day kill schedule, or will be transitioning into the 4 day schedule the first half of June....  We should expect others to join that fold, as we get deeper into June and July."

(r)      Backchannel and confidential communications regarding confidential supply and pricing information between Defendants became so common that Defendants' personnel began giving such communications nicknames.  On August 11, 2015, Hormel's Corwyn Bollum told a group of fellow Hormel employees that he "just heard through the pig mafia rumor mill, that JBS is going to be moving to Ractopamine free starting October 1, 2015."

(s)      On March 23, 2017, Rob Bogaard of Smithfield reported internally on a call with a Tyson hog buyer during which the Tyson buyer informed Smithfield that Tyson and other competitors believed that the supply of pork bellies was tight and that there would be insufficient supply for bacon suppliers that were not vertically integrated with hog farmers.  Bogarrd instructed his team that the details of the call were "CONFIDENTIAL."

(t)      In 2017, when both Clemens and Seaboard/Triumph added new plants, both companies made sure to inform their competitors of the impact of these new plants in an effort to avoid retribution from the other conspirators for adding capacity.

(u)      On April 21, 2017, Shane Miller of Tyson spoke with a contact a Clemens. Miller forwarded the information on to others at Tyson and Greg Schweitzer commented "Nice job Shane.  Clemens is telling us Coldwater [the new Clemens plant] is scheduled to come up right after Labor Day in Sept. Jay Krehbiel of Tyson then forwarded this exchange to others but cautioned them to "read and delete please."

(v)      On June 9, 2017, Dan Groff of Clemens emailed internally several senior executives and reported on a conversation he had with Gary Louis of Seaboard about the production plans and slaughter numbers for Seaboard and Triumph.  Groff noted that he "kept this DL list relatively small because there are a few sensitive things on here, so if you want to share anything specific, please copy/paste to a separate message."

(w)      Notwithstanding this messaging from Clemens and Seaboard/Triumph, during a March 2018 meeting several senior Tyson executives, including Todd Neff, Shane Miller, and others, Tyson discussed "how do we punish our competition for their capacity investments?"

(x)      On August 10, 2017, Susan Dow of Smithfield circulated Indiana Packer's pricing list to others at Smithfield.  Although she was scolded by Bob Darrell because "it isn't legal for us to have a competitor's price list," another Smithfield employee removed Darrell from the thread and joked to Dow that "we'll all made this mistake....  I did it too."

(y)      Hormel's antitrust compliance policy explicitly prohibited any discussions with competitor suppliers about anything other than bid price.  Despite this, Hormel used its procurement relationship with other Defendants as a pretext for sharing their confidential information. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████

203.    Additionally, the Agri Stats' reports provided to the Producer Defendants and co-conspirators were the equivalent of competitors (here, the Producer Defendants and co-conspirators facilitated by Agri Stats) meeting in secret to exchange Competitively-Sensitive Information with each other in furtherance of their conspiracy.  Instead of meeting in secret in a hotel room and using a white board to conspire, the Producer Defendants and co-conspirators, facilitated by Agri Stats, used the non-public Agri Stats' reports that they received to exchange, *i.e.*, communicate, with each other in secret their Competitively-Sensitive Information to implement, monitor and enforce their conspiracy.

(a)    For example, in 2009, the President of Agri Stats, Brian Snyder, reportedly commented about the secretive nature of Agri Stats: "Agri Stats has always been kind of a quiet company.  There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do.  It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth."  Sanderson Farms Investor Day – Final (Oct. 2009).

(b)    At the same 2009 presentation, when discussing "bottom line numbers" (*i.e.*, a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."  *Id*.  Yet, despite refusing to reveal this information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above.

(c)    These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.  In other words, Agri Stats was stating publicly that it could not share information publicly and it did not provide any Producer's information to

another because it was "confidential," but in private, Agri Stats knowingly and intentionally shared each Producer Defendant and co-conspirator's Competitively-Sensitive Information with the others.

(d)     On May 9, 2012, Deb McConnell (Tyson's submitter to Agri Stats) inquired of Agri Stats which specific plants were included in Agri Stats' kill/cut figures.  Greg Dess of Agri Stats responded with the 12 specific plants for which Agri Stats received this information. McConnell then circulated Dess' response to others at Tyson and instructed them to "keep confidential."

(e)     On June 15, 2012, McConnell then revealed to Agri Stats's Josh Edwards that Tyson could use Smithfield's earnings release information to decipher which of the locations listed in Agri Stats's studies belong to Smithfield.

(f)     In fact, by May 7, 2012 McConnell had begun orchestrating Tyson's regular deanonymization of the information of its competitors in Agri Stats reports.  McConnell would disseminate deanonymized competitor information from Agri Stats in monthly printed "packets" for Tyson employees to review in meetings.

(g)     In a company-wide email sent on April 6, 2018, Tyson reminded its employees that its procurement policy (*i.e.*, its guidelines for purchasing materials) prohibited the sharing of any confidential information because such conduct would put Tyson at a competitive disadvantage in obtaining lower prices for the materials it purchased.  Notwithstanding this policy for its procurement processes, Tyson consistently shared its confidential information with respect to its pricing and production information through Agri Stats knowing that there were methods to deanonymize the Agri Stats reports.

(h) ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

204.     Plaintiffs' Sherman Act and PSA claims are timely because, as alleged above, overt actions by Defendants and co-conspirators in furtherance of the conspiracy occurred after June 28, 2014 and continued until at least June 28, 2018, if not later, including, without limitation: (a) Defendants and co-conspirators unlawfully coordinated to restrict pork production, including, without limitation, using the Agri Stats reports to exchange Competitively-Sensitive Information with each other to monitor and enforce the conspiracy in 2015, 2016, 2017 and 2018 (if not later); (b) Clemens did not attempt to take advantage of the 2014 PEDv epidemic by increasing market share, although its hogs were largely unaffected by the epidemic and, had it acted rationally, it would have increased production to increase its market share for the year; (c) after it acquired Cargill's pork enterprise in approximately October 2015, JBS opted to decrease supply despite increased consumer demand; (d) in 2017, Seaboard and Triumph postponed expansion of facilities despite publicly acknowledging a growing demand and growth in pork consumption that would have supported expansion; and/or (e) in 2015, 2016, 2017 and 2018, Producer Defendants and co-conspirators coordinated in the export of pork.

205.     Each of the foregoing overt acts was a new and independent act in furtherance of the conspiracy and not merely a reaffirmation of a previous act.

206.     Each of the foregoing overt acts, or one or more of them in combination, inflicted new and accumulating injury on each Plaintiff.

207.     Defendants and co-conspirators' parallel conduct as alleged above, including their coordinated restriction of the domestic pork supply, would not have occurred in 2015, 2016, 2017 and 2018 (or later) had the conspiracy been disbanded, but it was not.

208.     "Plus factors" supporting the existence of the conspiracy were still present in 2015, 2016, 2017 and 2018, if not later, including, without limitation, pork remained a commodity product with inelastic demand; the Producer Defendants and co-conspirators wielded substantial market power because of their high collective market share and industry concentration; there remained barriers to other producers entering the domestic market for the production of pork; and/or trade group meetings and events occurred that provided Defendants and co-conspirators with the opportunity to conspire, which they did.

209.     Defendants and co-conspirators intended for their affirmative acts of concealment to conceal the existence of their unlawful conspiracy from Plaintiffs, and Plaintiffs were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment during the conspiracy or, at a minimum, either before June 28, 2014 or four years before filing this Complaint.  As a direct result of Defendants and their co-conspirators' affirmative acts of concealment, each Plaintiff did not have actual or constructive knowledge of its claims alleged in this Complaint, or the facts that might reasonably have led any Plaintiff to discover or suspect that it had the claims against Defendants and co-conspirators – in the case of Plaintiffs' Sherman Act claims, prior to June 24, 2014 – and in the case of Plaintiffs' PSA claims, more than four years before filing this Complaint.  Before then, no Plaintiff was aware of facts that would

have alerted it (or a reasonably diligent person in Plaintiff's position) of the need to investigate whether it had the claims alleged in this Complaint.

210.    Plaintiffs' Sherman Act and PSA claims are timely because each of them did not know of (and could not have reasonably discovered) the existence of the conspiracy alleged in this Complaint – in the case of the Sherman Act claims, at least four years or more before June 28, 2014 – and in the case of the PSA claims, at least four years before filing this Complaint – because of Defendants and co-conspirators' active concealment of their conspiracy as alleged below. Defendants and their co-conspirators' affirmative and fraudulent concealment of their unlawful conspiracy as described in this Complaint tolled the statute of limitations for each Plaintiff's Sherman Act and PSA claims.

211.    During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Defendants and co-conspirators conducted their conspiracy in secret, including communicating in secret in furtherance of the conspiracy during trade group meetings and events; and, upon information and belief, avoiding references to the conspiracy in their documents, and communicating with each other by telephone to avoid written records.  In the context of *this* case, the Agri Stats' reports provided to the Producer Defendants and co-conspirators were the equivalent of competitors (here, the Producer Defendants and co-conspirators facilitated by Agri Stats) meeting in secret to exchange Competitively-Sensitive Information with each other in furtherance of their conspiracy.  Instead of meeting in secret in a hotel room and using a white board to conspire, the Producer Defendants and co-conspirators, facilitated by Agri Stats, used the non-public Agri Stats' reports that they received to exchange, *i.e.*, communicate, with each other in secret their Competitively-Sensitive Information to implement, monitor and enforce their conspiracy.

86

212.     Plaintiffs did not have a reasonable basis to suspect that they had claims in this case until no earlier than 2018 in connection with their Court filings in the *Broiler Chicken Antitrust Litigation* in the Northern District of Illinois.  Until at least then, the conspiracy among Defendants and co-conspirators was fraudulently concealed from Plaintiffs.

213.     Further, throughout the conspiracy, each Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for pork.  For example and without limitation, each Plaintiff used a method of purchasing pork – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith at the time that it was receiving competitive prices for pork that it purchased from the Producer Defendants and co-conspirators.

## COUNT I

## ANTITRUST VIOLATION

214.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 213 above.

215.     Beginning at a time yet to be determined, but no later than 2009, and continuing in force and effect, or both, until 2018 (with an effect that continued thereafter), Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy to fix, increase, stabilize and/or maintain the price of pork sold to Plaintiffs and others in the U.S. at artificially elevated levels in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

216.     The contract, combination and conspiracy among Defendants and co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and

practice of conduct regarding the production and pricing of pork in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

217.    The course, pattern and practice of conduct described above included, among other things, and without limitation, a continuing agreement, understanding and concert of action among Defendants and co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)    To control and restrict the production and/or sale of pork to Plaintiffs and others in the United States;

(b)    To fix, stabilize, maintain and/or raise prices of pork sold to Plaintiffs and others in the United States;

(c)    To earn supra-competitive profits on the price of pork sold to Plaintiffs and others in the United States that resulted from Defendants and co-conspirators' collusion; and/or

(d)    They agreed to restrict, and did restrict, the supply of pork in the United States.

218.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged in this Complaint):

(a)    The agreed to exchange, and did exchange, current and future Competitively-Sensitive Information about pork sold in the United States;

(b)    They agreed to coordinate, and did coordinate, production levels for the production of pork in the United States; and/or

(c)    They agreed on production, or production levels of pork produced in the United States.

219.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in communications to discuss the restriction of pork production in the United States; participating in communications concerning the implementation of and adherence to their conspiracy; issuing statements about their restriction of pork production in accordance with the conspiracy; and/or exchanging Competitively-Sensitive Information on the production, pricing and/or sale of pork in the United States.

220.     As a result of Defendants and co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time period relevant to Plaintiffs' claims:

(a)     Price competition in the sale of pork among Producer Defendants and co-conspirators to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)     Prices for pork sold by Producer Defendants and co-conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supra-competitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of pork produced and sold by Producer Defendants and co-conspirators have been deprived of the benefit of free and open competition.

221.     Each Plaintiff has been injured in its business or property by reason of Defendants and co-conspirators' antitrust violations in amounts not yet ascertained.  Each Plaintiff's injury as a direct purchaser of pork is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.      A jury verdict in the amount of the compensatory damages sustained by each Plaintiff.

B.      A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorneys' fees, costs and interest as allowable by law.

C.      A Permanent Injunction enjoining Defendants from communicating or exchanging Competitively-Sensitive Information through Agri Stats in a manner that enables each of them to know the other's Competitively-Sensitive Information, and, in the interest of protecting competition, requiring Agri Stats to take those reasonable steps necessary to make sure that a given pork producer's Competitively-Sensitive Information is not known or knowable by its competitors.

D.      Such other and further relief as the Court may deem just and proper.

## COUNT II

### VIOLATION OF THE PACKERS AND STOCKYARD ACT
**(Against All Defendants Except Agri Stats)**

222.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 213 above.

223.    The purpose of the PSA is, among other things, to provide for fair trade practices in the sale and marketing of livestock and meat products.  The PSA is remedial legislation and should be construed liberally to give effect its purposes.  *E.g.*, *Armour and Co. v. United States*, 402 F.2d 712, 717, 722 (7th Cir. 1968); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968).  The PSA provides for a private right of action for persons injured by a violation of its provisions.  7 U.S.C. § 209.

224.    Each of the Producer Defendants and each named Co-Conspirator (other than AgStar) is a "packer" as that term is defined in Section 201 of the PSA, 7 U.S.C. § 191, in that each of them are persons engaged in the business of: (a) buying livestock in commerce for purposes of slaughter; (b) manufacturing or preparing meats or meat food products for sale or shipment in commerce; and/or (c) marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce.

225.    Under Section 202 of the PSA, 7 U.S.C. § 192, it is unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form to:

(a)    Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device;

(b)    Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;

(c)    Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly;

(d)    Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(e)    Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(f)    Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; and/or

(g)     Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d), or (e).

226.    The PSA's enacting regulations contain further restrictions.  For example, the regulations limit packers' rights to share pricing information with competitors.

> No packer, dealer, or market agency, in connection with transactions subject to the provisions of the act, shall, in person, or through employed buyers, for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock, prior to, or during the conduct of, his buying operations: (a) Furnish competitor packers, dealers, market agencies, or their buyers or representatives, similarly engaged in buying livestock, with information concerning his proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid; or (b) furnish any other buying information to competitor buyers.

9 C.F.R. § 201.69.

227.    The regulations also require that "each packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."  9 C.F.R. § 201.70.

228.    The Competitively-Sensitive Information that the Producer Defendants and co-conspirators privately sent to or received from one another through the Agri Stats reports is/are an "article" under the PSA.  Additionally, inasmuch as Producer Defendants and co-conspirators buy livestock, including sows, information about their respective purchase volume of sows, and any of the other Competitively-Sensitive Information that they sent, received, communicated or exchanged with each other through the Agri Stats reports is an "article" under the PSA.

229.    As alleged above, the Producer Defendants and co-conspirators sent or received the Competitively-Sensitive Information for the purpose and with the effect of manipulating the price of pork sold to Plaintiffs and others in the United States.

230.    As alleged above, the Producer Defendants and co-conspirators engaged in other conduct, including without limitation, communicating, arranging, or signaling or otherwise coordinating with each other to restrict pork production in the United States in order to increase, fix, stabilize, and/or maintain the price of pork sold to Plaintiffs and others in the United States.

231.    Even if the actions of each Producer Defendant or co-conspirator to signal or communicate its intentions to restrict pork production were arguably lawful – and based on the allegations in this Complaint they were and are not – this conduct by each of them, in concert, made their restriction of the domestic pork supply unlawful as alleged in this Complaint.

232.    The actions of each Producer Defendant and co-conspirator, as set forth above, constitute one or more violations of 7 U.S.C. § 192 and the enacting regulations of the PSA.

233.    Section 308 of the PSA, 7 U.S.C. § 209, provides that if any person subject to the PSA violates any of the provisions of the PSA, then that person shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation. Further, this section provides that such liability may be enforced by suit in any District Court of the United States of competent jurisdiction.

234.    The violations of 7 U.S.C. § 192 committed by the Producer Defendants and co-conspirators have illegally limited the supply of pork, manipulated its price, injured the Plaintiffs, and caused them damages by forcing them to pay inflated, supra-competitive prices for pork.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against each Producer Defendant as follows:

A.    Damages to the maximum extent allowed under law in consequence of the violations of the PSA, and a joint and several judgment in favor of Plaintiffs and against all Producer Defendants.

B.      Attorneys' fees, costs of suit, and interest as allowable by law.

C.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  April 29, 2022                                   Respectfully submitted,


By: _____
     Richard A. Arnold, Esquire
     William J. Blechman, Esquire
     Anna T. Neill, Esquire
     Kevin A. Murray, Esquire
     Douglas H. Patton, Esquire
     Samuel J. Randall, Esquire
     Michael A. Ponzoli, Esquire
     KENNY NACHWALTER P.A.
     1441 Brickell Avenue
     Suite 1100
     Miami, Florida  33131
     Tel:   (305) 373-1000
     Fax:  (305) 372-1861
     E-mail:   rarnold@knpa.com
                    wblechman@knpa.com
                    aneill@knpa.com
                    kmurray@knpa.com
                    dpatton@knpa.com
                    srandall@knpa.com
                    mponzoli@knpa.com

     *Counsel for Plaintiffs*

645510.1

94