EXHIBIT C

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| BJ'S WHOLESALE CLUB, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>AGRI STATS, INC., CLEMENS FOOD GROUP, LLC, THE CLEMENS FAMILY CORPORATION, HORMEL FOODS CORPORATION, HORMEL FOODS, LLC, JBS USA FOOD COMPANY, SEABOARD FOODS LLC, SMITHFIELD FOODS, INC., TRIUMPH FOODS, LLC,  TYSON FOODS, INC., TYSON PREPARED FOODS, INC., AND TYSON FRESH MEATS, INC.,<br><br>    Defendants. | Case No. 18-cv-1776<br>Individual Case No. 0:21-cv-01875<br><br>**FIRST AMENDED COMPLAINT**<br><br><br>**Jury Trial Demanded** |

## Table of Contents

I.    NATURE OF ACTION .................................................................................. 1

II.   JURISDICTION AND VENUE ..................................................................... 4

III.  PARTIES ....................................................................................................... 5

    A.    Plaintiff ................................................................................................ 5

    B.    Defendants ........................................................................................... 5
        (i)    Agri Stats .................................................................................... 5
        (ii)   Clemens ...................................................................................... 6
        (iii)  Hormel ........................................................................................ 6
        (iv)   JBS .............................................................................................. 7
        (v)    Seaboard ..................................................................................... 7
        (vi)   Smithfield ................................................................................... 7
        (vii)  Triumph ...................................................................................... 8
        (viii) Tyson .......................................................................................... 8

    C.    Co-Conspirators .................................................................................. 8

IV.   FACTUAL ALLEGATIONS .......................................................................... 9

    A.    Agri Stats' central role in collusion in the Broiler industry. ....................... 9

    B.    Agri Stats markets its collusive scheme to Defendants. ........................... 11

    C.    Agri Stats provided Defendants the unique ability to monitor pricing and
        production and discipline co-conspirators that did not comply with the
        anticompetitive agreement ........................................................................ 13

    D.    Defendants controlled the supply and production of pork in the United
        States, which allowed the scheme to succeed. ......................................... 20

    E.    The level of concentration in the pork industry was optimal for
        Defendants' collusive scheme. .................................................................. 25

    F.    The inelastic demand for, and homogeneity of, pork products facilitated
        collusion .................................................................................................... 32

    G.    Defendants took advantage of numerous opportunities to collude. .......... 33

    H.    Defendants implemented capacity and supply restraints during the relevant
        period. ....................................................................................................... 42

I.      Abnormal pricing during the relevant period demonstrates the success of the collusive scheme. .................................................................................. 68

J.      Overcharges due to the cartel were reflected in higher pork prices than what they would have been absent the conspiratorial activity. ................. 75

K.      Defendants actively concealed the conspiracy and Plaintiff did not and could not have discovered Defendants' anticompetitive conduct. ............ 79

V.      ANTITRUST INJURY ............................................................................ 92

VI.     VIOLATION OF SECTION 1 OF THE SHERMAN ACT ................................. 93

VII.    REQUEST FOR RELIEF ......................................................................... 95

VIII.   JURY TRIAL DEMANDED ...................................................................... 96

## I.     NATURE OF ACTION

1.      Defendants are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce. The United States pork industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork market.

2.      Defendants Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation, Hormel Foods, LLC ("Hormel"), JBS USA Food Company ("JBS" or "JBS USA"), Seaboard Foods LLC ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson"), entered into a conspiracy from around 2008 or early 2009 through the present (referred to herein generally as "relevant period" or the "class period") to fix, raise, maintain, and stabilize the price of pork.[1]  Along with their co-conspirators, Defendants implemented their conspiracy by agreeing with their competitors to restrict output and limit production with the express intended purpose and expected result of increasing and stabilizing pork prices in the United States. In furtherance of the conspiracy, Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume and demand through their co-conspirator, Defendant Agri Stats.

3.      Beginning at least as early as 2009 and continuing through 2017 or later, Agri Stats began providing highly sensitive "benchmarking" reports to Defendants. Benchmarking allows

---

[1] For the purposes of this Complaint, pork includes all pork products, regardless of the form in which they are sold, and all products containing pig meat, whether purchased fresh or frozen, including but not limited to smoked ham, sausage, and bacon.  From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

competitors to compare their profits or performance against that of other companies. However, Agri Stats' reports are unlike those of other lawful industry reports. Agri Stats gathers detailed financial and production data from each of the Defendants, standardizes this information, and produces customized reports and graphs for the co-conspirators. The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market. Instead, the provision of this detailed information acts as the modern equivalent of the proverbial smoke-filled room. Rather than meeting in a room with pen and paper, Agri Stats collected Defendants' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports it provided to them. On a weekly and monthly basis, Agri Stats provides Defendants with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), and regularly provides the keys to deciphering which data belongs to which producer. The effect of this information exchange was to allow Defendants to coordinate their anticompetitive conduct, monitor each other's production and hence control supply and price.

4.      This data exchange through Agri Stats is a classic enforcement and implementation mechanism of a price-fixing scheme.  First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[2]  Second, information contained in Agri Stats reports is specific to pork producers, including information on profits, prices, costs and production levels, instead of being aggregated as industry averages, thus providing transactional specificity and easy identification of specific producers. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service which required

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

the co-conspirators to pay millions of dollars over the relevant period – far in excess of any other pricing and production indices.  Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market.  Defendants utilize the information exchanges through Agri Stats in furtherance of their conspiracy to fix, raise, stabilize, and maintain artificially inflated prices for pork sold in the United States.

5.      While Defendants went to great lengths to keep the existence of the conspiracy a secret, they admitted in public calls that they had discussed production cuts at least once, and publicly signaled to each other that no supply increases would happen. Furthermore, each Defendant engaged in acts in furtherance of the conspiracy by participating in such supply cuts and by limiting increases in supply that otherwise would have occurred.

6.      In addition, there are numerous "plus factors" in the pork industry during the relevant period, including but not limited to multiple industry characteristics which facilitate collusion, such as vertically integrated operations, high barriers to entry preventing competitors from coming into the market, high pork industry consolidation and concentration, inelastic supply and demand, and homogeneity of pork products.[3]

7.      Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to Plaintiff.  Around 2009, Defendants' earnings began to increase, as they took an increasing amount of the profits available in the pork industry.  As a result of Defendants' unlawful conduct, Plaintiff paid artificially inflated prices for pork during the relevant period. Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market, without Defendants' anticompetitive behavior. Thus, Plaintiff suffered injury and damages due to Defendants' anticompetitive conduct.

---

[3] Pork is homogenous within cut type—*e.g.*, pork bellies produced by two different Defendants are virtually indistinguishable.

## II.     JURISDICTION AND VENUE

8.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

10.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

11.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

12.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

13.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.    PARTIES

### A.  Plaintiff

14.     Plaintiff BJ's Wholesale Club, Inc. is a Delaware corporation with its principal place of business in Westborough, Massachusetts.  Plaintiff brings this action on its own behalf and as the assignee of Burris Logistics, a food-service redistributor that, during the relevant period, purchased pork directly from one or more Defendants for resale to Plaintiff.  Burris Logistics has assigned claims arising out of those purchases to Plaintiff.  Plaintiff is a leading warehouse club operator on the East Coast of the United States.  Plaintiff's clubs sell edible and non-edible grocery products, as well as general merchandise, gas and a variety of ancillary services.  During the relevant period, Plaintiff and its assignor purchased pork at artificially inflated prices directly from one or more Defendants, and their affiliates and co-conspirators, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.  Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B.  Defendants

(i)     <u>Agri Stats</u>

15.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a former subsidiary of Eli Lilly & Co.  Throughout the relevant period, Agri Stats acted as a co-conspirator and committed acts in furtherance of the conspiracy by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

(ii)     Clemens

16.     Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania.   During the relevant period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

17.     The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC.   During the relevant period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(iii)     Hormel

18.     Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota.  During the relevant period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

19.     Hormel Foods, LLC is a Minnesota corporation headquartered in Austin, Minnesota.   Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation.   During the relevant period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(iv)   <u>JBS</u>

20.     JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world.  JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado.  During the relevant period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(v)   <u>Seaboard</u>

21.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation.  During the relevant period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or including without limitation Daily Foods, Inc., John R. Daily, Inc., and any other subsidiary doing business as Daily's Premium Meats and/or Daily's through July 10, 2014, or affiliates, including Daily's Premium Meats and Seaboard Triumph Foods, LLC, sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(vi)   <u>Smithfield</u>

22.     Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company.  Smithfield Foods is headquartered in Smithfield, Virginia.  During the relevant period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

7

(vii)   <u>Triumph</u>

23.     Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri.  During the relevant period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(viii)  <u>Tyson</u>

24.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the relevant period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

25.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the relevant period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

26.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the relevant period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**C.  Co-Conspirators**

27.     Other entities and individuals not named as Defendants in this Complaint, including, without limitation, Indiana Packers Corporation ("Indiana Packers"), Daily's Premium Meats, LLC ("Daily's") and Seaboard Triumph Food, LLC ("SFT"), combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

28.     Various other persons, firms, and corporations not named as defendants have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.  Throughout this Complaint, Indiana Packers Corporation, Daily's Premium Meats, Seaboard Triumph Foods, and the other persons, firms, and corporations not named as defendants that performed acts and made statements in furtherance of the conspiracy are collectively referred to as "Co-Conspirators."

## IV.     FACTUAL ALLEGATIONS

29.     Starting at least as early as January 1, 2009 and continuing to the present, Defendants coordinated to fix, raise, maintain and stabilize pork prices. To implement and enforce their anticompetitive agreement, Defendants relied on a unique industry data sharing  service known as Agri Stats, through which Defendants shared and monitored critical, competitively sensitive business information regarding each other's production metrics, serving a critical role in Defendants' price-fixing scheme, and resulting in a stable, successful anticompetitive cartel.

## A.  Agri Stats' central role in collusion in the Broiler industry.

30.     Agri Stats has played a central role in collusion in other industries, including involvement in the Broiler chicken industry.  As alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.), the Broiler producers used Agri Stats to implement their conspiracy to restrain production and inflate prices.

31.     In the Broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, and sales data by finished product form and type, amongst other competitively sensitive business information. Agri Stats reports contain line-by-line entries for plants, lines, and yields of various

Broiler facilities.  Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each Broiler producer's facilities, sometimes directly contacting co-conspirators to verify the data. Agri Stats also provided detailed price reports to the Broiler industry through its subsidiary, Express Markets, Inc., also known as EMI.  Agri Stats collected data from the Broiler producers weekly and provided its reports to Broiler producers weekly and monthly.

32.     The detail of these reports ensured that the Broiler chicken producers could quickly decode the information of their purported competitors. It was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes and facilities. The Broiler reports, in parts, contained so few producers participating that the identities were obvious.  Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger Broiler co-conspirators such as Tyson. Agri Stats purposefully circulated this information to top executives to facilitate their agreement on supply constraints and price.

33.     In the Broiler industry, Agri Stats – known to its co-conspirators as a willing conduit for illicit information exchanges – conveyed information to the Broiler Chicken co-conspirators that furthered the conspiracy's purposes by reassuring them that production cuts would continue, and inducing the Broiler Chicken co-conspirators to continue to act in concert to ensure that the cuts continued. Agri Stats' statements in the Broiler industry facilitated the implementation of the agreement to restrict supply.

34.     When it denied motions to dismiss in *In re Broiler Chicken Antitrust Litigation,* the district court noted that given the nature of the Agri Stats reports, the co-conspirators were sharing future anticipated production information, which raises significant antitrust concerns.[4]

**B.  Agri Stats markets its collusive scheme to Defendants.**

35.     Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to Defendants similar to the benchmarks used to restrain competition in the Broiler industry. Benchmarking is the act of comparing practices, methods or performance against those of other companies.[5] Benchmarking of the type undertaken by Agri Stats and its co-conspirators reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition.  This is especially true where benchmarking involves the exchange of commercially sensitive, and typically proprietary information among competitors.

36.     In 2008, Greg Bilbrey of Agri Stats wrote in the Advances in Pork Production Journal that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons.  ***Each and every commercial swine operation is encouraged to participate in some benchmarking effort.***"[6]

37.     Agri Stats emphasized to pork producers that the goal of the agreement to share information was profitability, not production, and invited them again to participate in the

---

[4] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.

[5] *Antitrust Issues Related to Benchmarking and Other Information Exchanges*, Federal Trade Commission (May 3, 2011), available at https://www.ftc.gov/sites/default/files/documents/public_statements/antitrust-issues-related-benchmarking-and-other-information-exchanges/110503roschbenchmarking.pdf   (last visited December 5, 2019).

[6] Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, 43 (2008).

benchmarking. "We must remember that the ***ultimate goal is increasing profitability*** – not always increasing the level of production." Finally, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. ***To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program***."[7]

38.    In April 2009, Agri Stats again invited swine producers to design and operate their own benchmarking effort. Thus, Greg Bilbrey of Agri Stats wrote: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort.***"[8] Defendants accepted this offer and, beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports. Their agreement  was to use the exchanged benchmarking information to coordinate supply and stabilize as well as increase prices of pork sold in the United States, provide and receive information from Agri Stats, and use this detailed sensitive information to monitor each other's production and pricing. The agreement was successful as pork prices rose significantly after the agreement was reached.

39.    Each and every Defendant identified specific executives that were responsible for transmitting data to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export, or production levels.

- Clemens: Joshua Rennels (Treasurer, Clemens Food Group)

- Hormel: Paul Bogle (Director, Cost Accounting)

---

[7] *Id*. at 41-46.
[8] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009) (emphasis added).

- JBS: Garry Albright (Head of Business Analysis), Kevin Arnold (Head of Finance), Jamie Fosbery (Analyst), Raven Goodlow (Business Analyst), Robbie Kearns (Business Analyst), Lisa Peters (Business Analyst), Eli Zoske (Cost Accountant)

- Seaboard: Damon Ginther (Senior Director of Business Data & Analytics), Mel Davis (VP of Hog Procurement and Bio-Energy), Tom Dye (Operations Controller)

- Smithfield: Aimee Ward (Director, Hog Finance), Kent Hilbrands (Sr. Director, Operations Finance), Elizabeth Barger (Data Analyst)

- Triumph: Matt England (Chief Integrated Business Strategy Officer), Ken Grannas (Director Inventory/Reporting), Tom French (Director, Margin Management), Joe Diebold (Chief Financial Officer), Dan Marlow (Corporate Controller)

- Tyson: Deb McConnell (Division Controller)

40.     The volume of U.S. commerce in the pork industry is enormous. Total pork sales in the United States for a portion of the relevant period were:

        2016 - $18.9 billion
        2015 - $21.0 billion
        2014 - $26.4 billion
        2013 - $23.4 billion

41.     Each Defendant's annual sales of pork products are also very large. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits.

## C. Agri Stats provided Defendants the unique ability to monitor pricing and production and discipline co-conspirators that did not comply with the anticompetitive agreement.

42.     Agri Stats provided Defendants with an unparalleled ability to share critical, proprietary and commercially sensitive information concerning key business metrics, such as production levels and short and long-term production capacity. Agri Stats was central and critical

13

to the formation, operation and continuing stability of the Defendants' anticompetitive scheme. To effectuate their agreement, Defendants had to ensure that each member was following through with the agreement by limiting their production and stabilizing prices.  Agri Stats served that function.

43.     Each member of the conspiracy, including Defendants Clemens, Hormel, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, and other pork producers, such as Indiana Packers Corporation, was an Agri Stats subscriber and reported its information to Agri Stats.  Agri Stats' former parent company, Eli Lilly, stated that "***over 90% of the poultry and pig market***" uses Agri Stats in the United States.[9]

44.     Agri Stats collects commercially sensitive financial and production data electronically each month from each Defendant. Internal auditors convert the data, prepare it for comparison, and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw data are used in Agri Stats' standardized calculations so all company numbers are calculated and reported the same way.[10]

45.     Unlike traditional "benchmark" services which rely upon unaudited and aggregated publicly available data, Agri Stats obtains audited data directly from the participating producers.

46.     Participants in the scheme (including Defendants) received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies.  Current month, previous quarter and previous twelve-month periods are reported.  As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and

---

[9] Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016).
[10] Greg Bilbrey, *Implementing Simple and Useful Production Benchmarking*, London Swine Conference – A Time for Change (March 28-29, 2012).

Sales.[11]  Participants may also have received an abbreviated Key Performance Indicator report, as well as historical graphs.[12]

47.     Due to a hog's life and production cycle, even current and historical information regarding hog production numbers provides forward-looking supply information to competitors. The typical hog production cycle lasts about 4 years, in large part due to a hog's biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and raise the resulting crop of piglets, it takes nearly 2 years to substantially increase production.

48.     One presentation from Agri Stats shows the level of detail provided to Defendants regarding profits in the pork market:[13]

### Top 25% in Profit - Variances to Average Company - 2009-2007

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs Finished

---

[11] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 8.
[12] Greg Bilbrey, *Benchmarking and Cost-Production Relationships*, *supra* note 6.
[13] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

49.     The purpose of these reports was not to provide better prices to customers or to lower the costs of production.  Instead, it was to improve Defendants' profitability by enabling them to restrict output and raise prices. The Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average.  On information and belief, the Agri Stats report actually circulated to competitors contained even more detail. The same presentation informed Defendants that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (ckg refers to 100 kilograms.) This underscores that the purpose of these reports was not to allow customers to save more money through lower prices and more efficient production – in fact, the opposite was true; the purpose was Defendants' profitability and the result was higher prices for pork customers.

50.     Much of the information shared by Defendants through Agri Stats was not necessary to achieve any benefits for customers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.[14] In fact, in a truly competitive market, the participants would closely protect such proprietary information from disclosure as providing it to competitors would be disadvantageous: unless, of course, there is an agreement that the competitors will use the information to the joint benefit of each other as was the situation in the pork industry.

51.     Agri Stats knew that it played a central role in this conspiracy.  Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis among competitors. In one presentation, Agri Stats

---

[14] *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law* Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, available at https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf (last visited December 5, 2019).

16

pointed out to industry participants that they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data:[15]

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



52.     Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine tolerance and outlier status and enforce," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "[e]ach participant has to commit."[16]

53.     In addition to these reports, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis.[17]  The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data.  Agri Stats'

---

[15] Greg Bilbrey, *Data Integrity*, Slideshare.net (Sept. 21, 2015), available at https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations (last visited December 5, 2019).
[16] *Id*.
[17] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 8.

employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the producers as the data in the reports. The fee for the visits fluctuated based on the size and other factors.

54.     A common saying by Agri Stats is "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "***the ultimate goal is increasing profitability*** – not simply increasing level of production."

55.     In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets had provided its extensive pricing reports to Broiler producers since 2003.[18]

56.     By providing detailed production statistics by participants, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits. Critically, Agri Stats provided forward-looking data that allowed the other Defendants to determine each other's future production in addition to their current production.

57.     Agri Stats reports are organized by company and facility, but their names are not listed in the reports. Nevertheless, while ostensibly anonymous, the reports contain such detailed figures covering every aspect of pork production and sales that participants can accurately identify the companies behind the metrics. For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

---

[18] Steve Meyer, *Paragon Economics Sold to Express Markets*, National Hog Farmer, May 26, 2015, available at https://www.nationalhogfarmer.com/marketing/paragon-economics-sold-express-markets (last visited December 5, 2019).

58. Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but reassigning numbers was an undertaking the company was not eager to embark on.

59. Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

60. Agri Stats mailed the reports to customers. On occasion, Agri Stats shipped a participant's book to one of its competitors. At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

61. Mobility within the meat production industries led to a situation where many workers at most pork integrator operations knew the numbers of other regional facilities, removing any anonymization of the data which existed. Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers. Those working at Agri Stats were aware of this fact, but did nothing to address it.

62. Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power. Price-fixing cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may

19

have incentive to cheat on other members of the cartel, for example, by ramping up pork production to capture higher prices as other cartel members act to limit production.  Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

63.    In a February 15, 2017, Bloomberg article relating to Agri Stats' roles in the Broiler industry, it was reported:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual."  He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state.  Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another.  Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement.  "This is one of the ways you do it.  You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says.  "***That is what creates stability for a cartel***."[19]

## D.  Defendants controlled the supply and production of pork in the United States, which allowed the scheme to succeed.

64.    The relevant period was further characterized by the increased control over the breeding, production, growing, and processing of pork by the Defendants through vertical integration (pork packers have tight contractual relationships with hog producers throughout all stages of production) and the exclusive production contracts with hog farmers.

---

[19] Christopher Leonard, *Is the Chicken Industry Rigged*, Bloomberg (Feb. 15, 2017), available at https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged (emphasis added) (last visited December 5, 2019).

65.     Vertical integration is so pervasive that Defendants are commonly called pork or swine integrators by the industry, government, analysts, and academics.  Vertical integration allows the integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter.  Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

66.     Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."[20]  This arrangement essentially converts independent farmers into contract employees that perform services for the pork integrator.  The Defendants typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities.  The pork integrators (i.e., Defendants) typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market.  The prevalence and use of contracts for hog production by Defendants increased significantly during the course of the conspiracy.  By 2017 it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency as far as bid prices.

67.     Pork production generally starts at the farrowing stage—which is the term used to describe a female hog giving birth.  Female hogs used in the farrowing stage are called sows.  Sows will normally have anywhere from 11 to 13 pigs per litter.  With a sow typically being able to farrow up to three times a year, one sow can have around 36 piglets in one year.  After birth, piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig

---

[20] Allen Harper, *Hog Production Contracts: The Grower-Integrator Relationship*, Virginia Cooperative, Virginia Cooperative Extension (2009).

weighs upwards of 50 pounds.  At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds.  After the pigs reach their final weight, they are sent to a packing plant to be harvested.  Due to the nature of the pork production cycle, the reduction of sows—*i.e.*, farrowing hogs—has a significant impact on the supply of pork.

68.     The following diagram shows the path for pork raised for meat consumption from birth through sale to consumers:

**Figure 1: Value Chain of U.S. Pork Market**



69.     Vertical integration can have anticompetitive effects because there are fewer firms competing at all levels, which renders it easier to collude on price.  The following table lists Defendants that have significant operations (>=5% market share in multiple stages of the supply chain:

| Defendant | Hog Production | Hog processing and intermediate pork processing/packing | Further Pork Processing |
|---|---|---|---|
| Smithfield | ✓ | ✓ | ✓ |
| Tyson | | ✓ | ✓ |
| Triumph | ✓ | ✓ | |
| Seaboard | ✓ | ✓ | |
| Hormel | | ✓ | ✓ |

70.     During the relevant period Defendant Smithfield has the distinction of being the largest producer and processer of pork in the United States.  In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years.  We retain ownership of the hogs raised by our contract farmers.   In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.[21]

71.     In 2009, Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers.[22] In its 2017 SEC 10-K report, Seaboard Corporation states that it raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts."[23]

---

[21] Smithfield Foods Annual Report, at p. 27 (2014).
[22] Seaboard Corporation Annual Report, at p. 11 (2009)
[23] Seaboard Corporation Annual Report, at p. 2 (2017).

72.     Defendant Clemens Food Group touts its vertical coordination on its website stating that, "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."[24]   A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.[25]

73.     As JBS stated in its 2014 annual report, "The meat production of JBS Foods is vertically integrated, whereby the company produces 100% of its poultry supply and 95% of its pork supply.  This provides it with greater control over the health and nutrition conditions of the animals, insuring quality, food safety and efficiency in the production and cost of its products." Furthermore, a key aspect of JBS's purchase of its predecessor in interest, Cargill, in 2015 was that it allowed JBS to exercise greater control over the production of hogs, by acquiring four hog farms and two packing plants operated by Cargill.

74.     Triumph was created with vertical integration in mind as it is owned by five of the largest pork producers in the U.S.— Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota. The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

75.     As Defendant Tyson stated in its 2009 10K Report, "The majority of our live hog supply is obtained through various procurement relationships with independent producers." As set forth above, these procurement contracts are controlled and dictated by Tyson which exercises

---

[24] *See* Clemens Food Group, *Vertically Integrated Purposefully Coordinated*, available at
http://www.clemensfoodgroup.com/our-company/vertically-coordinated (last visited December 5, 2019).
[25] *See id.; see also* The Clemens Family Corporation Companies, available at
http://www.clemensfamilycorp.com/pages/companies.aspx (last visited December 5, 2019).

tremendous market power over hog formers. Additionally, Tyson raises a number of weanling swine to sell to independent finishers and supply a live swine for its processing needs.

76.     Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities. As Hormel stated in its 2009 annual report that, "[t]he live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements." Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.

77.     Each of the Defendants further controls the manner in which the pork is processed and have the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports.  Defendants including Smithfield, Clemens, Tyson, and Hormel, Seaboard, Triumph, and JBS sell packaged pork under various name brands.

## E.  The level of concentration in the pork industry was optimal for Defendants' collusive scheme.

78.     The United States Department of Agriculture ("USDA") has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."[26]

79.     The hog integration sector is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated, as was discussed in the previous section.  Meatpacking concentration levels are among the highest of any industry in the

---

[26] John King (USDA), *Concentration and Technology in Agricultural Input Industries*, at p. 2 (Mar. 2001).

United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

80.    Prior to and in the beginning of the relevant period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share.  Between 1988 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015.  As shown in Figure 2 below, the top eight integrators had market share of well over 80 percent for the entire relevant period:

**Figure 2: Market Share of Top 8 Pork Integrators 1991-2017**



Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI.Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

81.    In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion.  The acquisition joined the third and fourth largest pork packing companies to

surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield. As noted above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and two packing plants operated by Cargill.

82. The acquisition was completed in October 2015 and resulted in further consolidation in the industry. The resulting pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week.[27] After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with under five percent of the national slaughter capacity).[28]

83. The following timeline summarizes notable mergers between pork integrators since 1995 which led to an increased market concentration:

**Figure 3: History of Mergers and Acquisitions**



84. As shown in Figure 4 below, by 2016, the top six pork processors comprised 82% of the total market. On their own, it would be difficult for any of these supposed competitors to exercise market power. But acting as a whole to manipulate the price of pork products, the

---

[27] *See* NOTICE TO MARKET: JBS Concludes Cargill Pork Acquisition (Oct. 30, 2015).
[28] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), at p. 4.

combined market share of the six largest Defendants translates into an HHI[29] of 6724 (ignoring other pork processors that comprise the other 18% of the market), which is well above the threshold for highly-concentrated markets. In other words, if Defendants colluded with one another to restrict the supply of pork in the market, as alleged herein, the resulting market concentration of such concerted action gave them more than sufficient power to control the pork market. Even without combining the largest six Defendants, the pork industry has a "moderately concentrated" HHI of 1532.

**Figure 4: 2016 Pork Processing Market Shares[30]**

| Company | Share | HHI - Independent | HHI - Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | 6724 |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | |
| Others | 18% | 18 | 18 |
| | | | |
| **Total** | **100%** | **1532** | **6742** |

85.    This HHI value exceeds the concentration levels for similar industries, as demonstrated in the following chart:

| Industry | HHI (value) |
|---|---|
| Pork processing | 1,532 |
| Animal (except poultry) slaughtering | 1,085 |
| Meat processed from carcasses | 332 |

---

[29] "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice. *See* https://www.justice.gov/atr/herfindahl-hirschman-index. An HHI value of 1,500 to 2,500 suggests a market is moderately concentrated. An HHI in excess of 2,500 points suggests a market is highly concentrated.
[30] Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (Mar. 7, 2017).

| Rendering and meat byproduct processing | 673 |
|---|---|
| All other miscellaneous food manufacturing | 284 |

86.     The concentration level in the pork integration industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated."[31]   Both of these factors – maturity and concentration – make an industry more susceptible to collusion.

87.     The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion.  Because the industry was dominated by a handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement.  Further, because the largest integrators were incapable of independently controlling prices on their own, such an agreement was necessary to inflate prices.

88.     Concentration of the industry is also beneficial to the procurement of hogs by the pork processors.  In some regions, consolidation has resulted in cases where only one pork processor is left to buy hogs from independent farmers, leaving the farmers with no leverage when negotiating terms with the pork processors.[32]

89.     In addition to market concentration, market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy. The following chart shows not only that the Defendants' collective share of the market was high throughout the relevant period, but also that each individual Defendant's market share was largely stable throughout:

---

[31] WH Group Interim Report, at p. 5 (2017).
[32] Timothy A. Wise and Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (Aug. 2010), at pp. 3 and 11.

**Figure 5: Market Concentration and Market Share Stability –
U.S. Market Share by Hog Slaughter Capacity**



90.    The following figure shows that there was a substantial drop in market share volatility during the relevant period:

**Figure 6: Standard Deviation of Combined Defendant Market Share
Pre- and Within Relevant Period (referred to as class period in the chart)**



91.     Large barriers to entry kept potential competitors out of the pork integration industry.  New entry into pork processing is costly and time consuming.  In order to slaughter and process hogs on an industrial scale, a slaughtering plant needs to be constructed.  The cost to design and build a 140,000 square foot plant with industry-standing packing equipment and a slaughter capacity of 2,500 hogs a day is estimated at $33 million. Construction of a large-scale slaughter facility would therefore take tens if not hundreds of millions of dollars and the additional planning, design and permitting costs are substantial.  In 2012, it cost Cargill $25 million just to expand an

existing facility.  Building a facility from scratch would be considerably more, totaling hundreds of millions of dollars.[33]

92.     The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants.  And in other situations, the processor owns the hog from farrow to finish.  Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably.[34]

**F.  The inelastic demand for, and homogeneity of, pork products facilitated collusion**

93.     Markets with a highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded. Price elasticity of demand (PED) is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[35] A PED value between 0 and -1 indicates there is inelastic demand for the good or service, *i.e.*, a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. The average PED estimate for the pork market was -0.64 – meaning the demand for pork is inelastic.

94.     Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loins, bacon, ribs,

---

[33] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), at p. 7.

[34] Timothy A. Wise and Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (Aug. 2010), at p. 12.

[35] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28-31 (2d Ed.); Patrick L. Anderson, et al., *Price Elasticity of Demand* (Nov. 13, 1997), available at https://scholar.harvard.edu/files/alada/files/price_elasticity_of_demand_handout.pdf (last visited December 5, 1029); Gadi Fibich, Arieh Gavious & Oded Lowengart, *The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects*, 33 J. Academy Mktg. Science 66-78 (2005), available at http://www.math.tau.ac.il/~fibich/Manuscripts/elasticity_JAMS.pdf. (last visited December 5, 2019)

and other pork products are produced on a commercial scale and sold in supermarkets. For example, as alleged above, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar nutritional values, branding and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.[36]  The Pork Checkoff program, administered by the National Pork Board established by Congress, has stated that "U.S. pork production and pig prices vary in a predictable manner during the calendar year."

**G.  Defendants took advantage of numerous opportunities to collude.**

95.    Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct.  Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

96.    All pork producers and importers in the United States participate in a legislatively-mandated "Pork Checkoff," under which they pay an assessment when pigs are sold or pigs are imported into the United States.  The money is used for programs to increase pork sales and exports, for research, and for producer and consumer education programs; funds cannot be used for lobbying or to influence government policy.  The assessment amount and the amount to be returned to state pork associations for local programs is set annually by the Pork Act Delegate

---

[36] *See Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects*, The United States Department of Justice, available at https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and- market-allocation-post-disaster-rebuilding ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.") (last visited December 5, 2018); Marc Ivaldi et al., *The Economics of Tacit Collusion* (March 2003), available at https://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.pdf (last visited December 5, 2019)

Body, which meets during the National Pork Producers Council's annual Pork Industry Forum. States are represented in the Delegate Body in proportion to their level of hog production, and each state is eligible to elect at least two Delegates. Executives from several integrator Defendants have served as Pork Act Delegates.

97.     The Pork Act Delegates also elect a 15-member National Pork Board ("Pork Board"), whose members are officially appointed by the U.S. Secretary of Agriculture. The Pork Board works with Pork Checkoff staff to ensure collection and distribution of Pork Checkoff funds. Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo. Executives from several integrator Defendants have served as members of the Pork Board. For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff. Skahill is the Pork Board's current Treasurer.

98.     According to its website, "[t]he National Pork Producers Council ["NPPC"], which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets." Executives from the pork integrator Defendants have served on the NPPC Board of Directors during the relevant period, including:

a.      Cory Bollum of Hormel Foods

b.      Don Butler of Smithfield Foods/Murphy-Brown LLC

c.      Chris Hodges of Smithfield Foods, and

d.     Todd Neff of Tyson Fresh Meats.

99.     NPPC conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year.   NPPC advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions.   The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

100.     In addition to its annual National Pork Industry Forum, NPPC sponsors many other programs that have provided ample opportunities for Defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show."   It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms).   The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC.

- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

101.     The National Pork Industry Conference ("NPIC") has taken place in the Wisconsin Dells each July since 2010 (and in the Ozarks before that).   Descriptions on the conference website have said that NPIC "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America."   After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons'

lead on reducing sow numbers."[37]  In July 2010, the Pork Checkoff website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded."[38]  The website for the 2016 NPIC conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts."   Seaboard and Smithfield are among the integrator Defendants whose executives have been session presenters at NPIC.

102.   Upon information and belief, CEOs and top level executives from Defendants attending NPIC and NPPC events discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings.  These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top level executives comfort that their competitors remain committed to a plan to artificially restrict pork production.

103.   In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues.  For example, the 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year.  A March 2011 *AgriMarketing* article about the club states that it consisted of "60 industry stake holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

104.   Defendants were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North

---

[37] Mr. Greenwood was also a presenter at the 2018 NPIC, discussing swine operation financials.
[38] *See National Pork Board to meet during National Pork Industry Conference*, Pork Checkoff (July 8, 2010), available at https://www.pork.org/news/national-pork-board-meet-national-pork-industry-conference/ (last visited December 5, 2019).

American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other organizations.

105.    Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association."  AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

106.    NAMI was formed in 2015 by merging the AMI and the North American Meat Association.  The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars … provide excellent networking and information-sharing opportunities for members of the industry."

107.    All of the Defendants (and/or their affiliates) have been members of AMI and then NAMI throughout the relevant period.  Executives from the pork integrator Defendants have served on the AMI and NAMI Board of Directors during the relevant period, including:

a.    Mark Campbell and Rick Hoffman of Triumph Foods;

b.    Doug Clemens and Phil Clemens of Clemens Family Corporation;

c.    Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc., as well as Greg Schweitzer of Sara Lee/Hillshire Brands (later acquired by Tyson Foods);

d.    Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

e.    Gary Louis, Rod Brenneman, and Terry Holton of Seaboard Foods;

f.  Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA; and

g.  Jim Snee, Stephen Binder, and Jeffrey Ettinger of Hormel Foods Corporation.

108.  Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

109.  Throughout the relevant period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has co-sponsored (with the Food Marketing Institute) the industry's "Annual Meat Conference."  The conference website describes the conference as "a complete education and networking experience."  Many of the Defendants' high-level executives attend the conference.  For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President of Smithfield Foods, and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

110.  Throughout the relevant period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry."  All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc. (a subsidiary of Agri Stats, Inc.) through 2017.  The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of

consumer spending trends, unemployment rates and ***industry capacity***." (emphasis added.) The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike.  This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices.  Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years."  The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

111.    Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall.  The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action."  Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015 and Phil Clemens of The Clemens Family Corporation in 2016.

112.    For years, NAMI also sponsored an annual "Meat Industry Management Conference."  NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics."  The NAMI board met during the 2015 Management Conference.

113.    In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit."  In addition

to education sessions, the summit has included "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business."  The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

114.    AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012.  In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

115.    In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations.  Promotional materials for the 2014 IPPE indicated that attendees included Defendants Clemens Food Group, Hormel Foods, Hillshire Brands, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson.  After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

116.    Defendants also conspired with companies that provided services to the pork industry but did not produce or sell pork, such as Agri Stats (a data benchmarking firm) and AgStar, a financial services company now known as Compeer that specialized in loans to pork producers).

117.    Beginning in 2008, the CEO of Smithfield attended a trade association meeting with other Defendants in which he announced Smithfield's plans to reduce its pork supplier and

urged others to follow. Although Defendants recognized that a reduction in the supply of pork was necessary to achieve their desired levels of profitability, the other major producers were hesitant about reducing their supply without some mechanism to prevent smaller independent producers from increasing their own supply of pork in response to a coordinated reduction by Defendants. To address this issue, Smithfield's CEO enlisted the help of AgStar's VP responsible for lending to pork producers. After discussions with Smithfield's CEO, AgStar agreed to aid Defendants' efforts to reduce the domestic supply of pork by putting financial pressure on smaller producers to reduce production, provided that the Producer Defendants lead the initiative and announce their own production cuts publicly. As detailed in this Complaint, between early 2008 and late 2009, Defendants met numerous times through trade associations and other industry groups, which allowed them to coordinate their unlawful agreement to reduce the supply of pork. And although Defendants announced their supply reductions publicly, their coordination allowed each Defendant to justify its own supply reduction as a natural outcome of the economic conditions facing the industry. However, this was untrue. As detailed in this Complaint, Defendants recognized internally that it was in each producer's independent self-interest to produce as much pork as it could. Accordingly, the supply reductions were not justified by input costs or other economic factors. Instead, the cuts were based on an understanding that all major producers would implement similar supply reductions and that Compeer would pressure smaller producers to cut supply by cutting off funding to those that did not comply. This allowed Defendants to reduce their supply through a collusive agreement or understanding that was reached in secret and then concealed from the public.

**H.  Defendants implemented capacity and supply restraints during the relevant period.**

**1.  Summary of Defendants' Conspiratorial Supply Restraints**

118.    In the years leading up to the relevant period the steady expansion of pork production was virtually a given. As one industry commentator reported in 2007, "Some things you can just take to the bank. Sow herd expansion among the Pork Powerhouses would fall into that category—even in the face of the biggest run-up in feed prices in history."[39]

119.    This historical trend changed markedly during the relevant period.  As demonstrated in Figure 7 below, at several points during the relevant period, the pork integrators changed their behavior and acted in a concerted way to decrease supply.  In 2009, 2010, and again in 2013, the pork industry cut production.[40]  (The production dip in 2014 reflected the adverse impacts from the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer of 2014.)  These production decreases marked a drastic change from the period prior to the conspiracy from 2000 through 2009, in which pork supply was stable and steadily increasing on a yearly basis.

---

[39] Freese, Betsy, *Pork Powerhouses 2007: Run-Up In Rations* (Oct. 3, 2007).
[40] *See* U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); *id.* at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

**Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



120.    These supply cuts were coordinated, historic and unprecedented. For example, in September 2009, Pork Powerhouses—which publishes reports and articles relating to pork production—published an article entitled "Big Boys Cut Back" and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers. These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.[41]

121.    At the same time, pork producers were further reducing domestic supply by devoting more and more production exports to overseas markets.  The U.S. has been a net exporter of pork products for a long time, but those exports have comprised a much larger share of total

---

[41] Freese, Betsy, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009).

production in the past ten years.  As shown in Figure 8 below, less than ten percent of U.S. pork production was exported in 2000.  By 2011, more than twenty percent was being exported. Sending production overseas is another way in which Defendants were able to reduce the supply available to U.S. markets, thereby driving up prices.  Notably, a 2017 analysis found that for every $1 million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt. In other words, selling pork on the global market added $50.20 to the market price of hogs. The significant expansion in exports meant that increases in hog production by Defendants did not result in an increase in the supply of pork products in the United States market.

**Figure 8: U.S. Pork Exports as a Percent of Total Production, 2000-2017**



122.    As part of their acts and conduct in furtherance of the conspiracy, each of the Defendants participated in these supply restraints. While the conspiracy was self-concealing in

nature, the limited publicly available sources of information available regarding Defendants' supply decisions evidences these supply constraints. These supply restrictions included, but were not limited to, the conduct described herein.

### a. Smithfield

123.    In 2008 Smithfield stopped making traditional production increases and instead cut its number of sows, reporting that, "We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[42] In 2009, Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately. Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows). In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

124.    Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

### b. Tyson

125.    Between 2008 and 2009 Tyson cut its sows by over 25%, marking a significant reduction. In 2010 Tyson reported a 3.3% decrease in its Pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate. In 2013 Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."

---

[42] Freese, Betsy *Pork Powerhouses 2008: The Big Squeeze* (Sept. 4, 2008).

### c.  JBS/Cargill

126.    In 2011 JBS USA reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS USA. Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand. This production restriction had the intended effect: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."

### d.  Hormel

127.    In January 2008, the Farmer John's division of Hormel announced liquidation of about 10,000 sows in California, which was confirmed taken place in its 2008 Annual Report. Hormel's production statistics also show that it cut its number of sows in 2008 and maintained such reduced production throughout the relevant period.

128.    Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through."[43] Hormel also reported lower sales of pork products in 2013. In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day. Hormel reported strong earnings from its pork exports in 2011.

### e.  Seaboard

129.    Throughout the relevant period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales to foreign markets.[44]

---

[43] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009)
[44] *See e.g.* Seaboard Corporation Annual Report (2010) ("export volumes increased particularly to our higher valued markets in the Far East while domestic volumes nearly kept pace with 2009."); Seaboard

Seaboard dedicated several employees to international sales and exports. Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect—higher pork prices. Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic market."[45] Moreover, in 2017 Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

### f.   Triumph

130.   In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows. In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry. Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide. These exports constituted a significant portion of its production throughout the relevant period, and reduced or otherwise limited Triumph's production in the United States.

### g.   Clemens

131.   In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats. Furthermore, in 2014 Defendant Clemens had a competitive advantage over many pork producers, in that it had few PEDv-infected pigs. But contrary to what one would expect to see in a competitive market, Clemens did not utilize its advantage and refused to increase its market share when it clearly had substantial market incentives to do so.

---

Corporation Annual Report (2011) ("Exports of US pork were up 23% to an all-time record as demand from the usual countries remained strong and the US continued its role as the main supplier.").
[45] *See* Seaboard Corporation Annual Report (2013).

### 2. Timeline of Conspiratorial Actions

132.    As set forth herein, each of the aforementioned supply reductions during the relevant period were a departure from the integrator Defendants' market behavior prior to the relevant period. These supply restrictions involved a significant share of the Defendants' annual production and are in contravention of Defendants' individual economic self-interest. These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of pork.   While Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources.  As with their use of Agri Stats, Defendants exploited these public statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy, and couched the public disclosures in pretext so as to conceal what was really occurring. Although purchasers would not typically track and account for these statements, they have now been unearthed and are summarized below.

133.    Defendants' conspiracy to restrict pork supply began around or shortly after the last part of 2008. In that timeframe, Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC (the production arm of Smithfield Foods) said "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[46]

134.    In January 2008, Larry Pope, the CEO of Smithfield, met with the CEOs of the major pork producers—including Rod Brenneman of Seaboard, Dick Bond of Tyson, and Phil Clemens of Clemens—through AMI's executive committee.  At that meeting, Pope spoke of the

---

[46] Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

need for the industry to reduce its supply, and minutes of that meeting reflect that Pope "shared that [Smithfield] will begin reducing their herd immediately.  Strategy is to push hogs through 1 week earlier to lower weights; then leave the barns open for that week (also help with animal health); they will look at their poorest producers and discontinue business with the bottom 5%."

135.   Defendants recognized that their many trade associations and industry groups provided the infrastructure for coordination and Defendants began to use their frequent meetings to implement their collusive supply reduction.  As Matt Geyer, a senior Seaboard executive, noted in an internal email sent on October 13, 2009, in addition to Agri Stats—which provided "confidential competitor comparisons"—Mr. Brenneman's "involvement in AMI" was one of Seaboard's primary "sources of external information" related to "competitor information."

136.   On July 25, 2008, Marc Greenwood—the VP of Agri Business Capital at AgStar Financial—spoke by phone with Larry Pope of Smithfield.  As the largest lender to the pork industry, AgStar faced financial ruin if a large number of producers declared bankruptcy.  During this call, Greenwood recognized the problem with Smithfield's efforts to get its competitors to reduce supply—that cutting production was against each individual producer's self-interest and that a "majority must participate" in order for the supply reductions to increase profitability.  Accordingly, Greenwood developed a plan to put financial pressure on pork producers to reduce supply.  During the call, Greenfield informed Pope that AgStar would begin denying loans to companies that would not agree to reduce production levels by 10%.  Greenwood also shared a PowerPoint presentation with Pope in which he requested that the "larger systems must lead the way . . . top 30 must publicly state what they are going to do."  During the call, Pope "commended" Greenfield "for taking this strong stand," and informed him that Smithfield supported this plan.

137.    Over the next six months following this exchange between Pope and Greenwood, some large producers took smaller steps towards reducing supply.  For example, in late 2008, Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC, the entity at Smithfield Foods that dealt with production, said according to the trade press: "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[47]  Similarly, in February 2009, Smithfield said that it would close six processed meat plants.

138.    In October of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009.[48]  Tyson followed in November 2008 and Dick Bond, president and CEO of Tyson Foods, stated that there were likely to be fewer hogs in 2009.[49]

139.    During Hormel's first quarter earnings call in January 2009, Mr. Ettinger once again communicated that he expected supply to decrease in 2009.  Hormel CFO Jody Faragan confirmed that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."[50]

140.    Throughout 2009, pork industry participants noted the need to follow the supply restrictions imposed in the Broiler industry. For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. Pork producers to follow the lead of the Broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.

---

[47]  Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sept. 4, 2008).
[48]  Q4 2008 Hormel Foods Corporation Earnings Call Transcript (Oct. 26, 2008).
[49]  Q4 2008 Tyson Foods Earnings Call Transcript (Nov. 10, 2008).
[50]  Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

141.    By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000.  In order to accomplish this reduction, Hormel sold sows in California and switched farms to finishing.

142.    In January 2009, Tyson stated that the capacity utilization for its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%.  This indicated that Tyson was reducing the amount of pork that it processed in its plants.  Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."

143.    In February 2009, Hormel stated that "we still do expect to see a reduction in the supply of hogs in Fiscal 2009." In response to an industry analyst question on whether slaughter would be cut back, Hormel responded that **"you look at the opportunity to reduce your production numbers and we've certainly look[ed] for opportunities . . . where we could reduce the numbers that we had going through."** Hormel further emphasized that "if there were free market hogs that normally we would be bidding on, we're not looking to take them in."

144.    In February 2009, Smithfield said that it would close six processed meat plants.

145.    ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

146.     In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87%, down from the previous year's rate of 90%.  Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."

147.     In May 2009, Larry Pope, the CEO and President of Smithfield, stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--*we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down.  We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system*.[51]

148.     In May 2009, Hormel confirmed that "[w]e see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated.  And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."[52]

149.     On May 16, 2009, Brenneman (Seaboard) recruited Larry Pope (Smithfield's CEO) to attend an AMI meeting and join Brenneman's subcommittee, which ensured that Pope would also be in regular contact with other committee members.

150.     On June 9, 2009, Brenneman (Seaboard) told Steve Weiss (the co-founder of the Pork Club) that "I saw the announcement of the sow liquidation last week. Congratulations.  Did Smithfield decide to come along?  Any details that you feel okay sharing with me? (size, etc.)" Rather than respond to this information in writing, Weiss responded, "We should discuss over the phone."

---

[51] Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009) (emphasis added).
[52] Q2 2009 Hormel Foods Corporation Earnings Conference Call – Final (May 21, 2009).

151.    Within days of this exchange between Weiss and Brenneman, Pope of Smithfield called Brenneman directly to give him the "heads up" that Smithfield would be reducing its supply through a sow liquidation and to provide details on those plans.  Pope provided this information directly to Brenneman before announcing it publicly during Smithfield's earnings call on June 16, 2009.

152.    In June 2009, Jody Feragen, Hormel's CFO, stated at an investor conference that "we reduced production in our basic processing for…pork."

153.    In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to seaboard.  Seaboard knows that. . . .  ***That 3%, let me say that, our 3% will not fix the hog industry.  That part I'm confident of.  Somebody else has got to do something.***  We cut 13%.  The first 10% didn't fix it.  I don't think us going from 10 to 13 is going to fix the hog business.[53]

154.    In July 2009, Smithfield's CEO went on to note in Smithfield's annual report: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, **liquidation is now a recognized reality by all in the industry**. To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, combined with the additional cuts by our fellow producers should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue." (Emphasis added).

---

[53] Q4 2009 Smithfield Foods Earnings Conference Call – Final (June 16, 2009) (emphasis added).

155.    On July 15, 2009, Mel Davis (Seaboard) spoke with Steve Thompson of Tyson in order to get additional details on Tyson's production cuts, including the fact that Tyson would be liquidating the 20,000 sows rather than selling them, which meant that the domestic sow herd would be reduced, and not just Tyson's own herd.  Mr. Davis forwarded this information to Mr. Brenneman and others at Seaboard.

156.    On July 19, 2009, Joe Luter IV (the great grandson of the founder and Executive Vice President of Smithfield) emailed Chris Novak, the CEO of the National Pork Board, and cc to Larry Pope, "I share this with you because it suggests what we have advocated--we have too many hogs in this country and need to take 6-8 million market hogs out of our supply.  Cheap corn is likely going to slow liquidation and I don' think this is good for the industry over the next 2-5 years."

157.    In a memorandum to his shareholders sent on July 17, 2009, Phil Clemens (Clemens' CEO) commented on Tyson's herd reduction announcement, but complained that "we believe the sow herd needs to come down by about 600,000 to bring hogs back to real profitability. Don't know what the current reduction is, but it isn't anywhere close to 600,000."

158.    On July 25, 2009, it was publicly disclosed that both Tyson *and* Smithfield would concurrently be engaging in sow reductions of a total of 47,000 sows in the near future.[54]

159.    Also following Smithfield's announcement, AgStar began to increase the pressure it was putting on pork producers to liquidate sows, including informing producers that they were not taking sufficient steps to reduce supply and that they were out of compliance on their loans. In an internal presentation prepared in late June 2009 supporting its own decision to liquidate sows,

---

[54] *Weekly Review: Smithfield, Tyson to Liquidate Sows*, The Pig Site (July 25, 2009), available at https://thepigsite.com/news/2009/07/weekly-review-smithfield-tyson-to-liquidate-sows-1 (last visited December 5, 2019)

Tyson noted that "Producer equity levels have fallen and major ag lenders like Ag Star/Farm Credit are notifying producers that loans are out of compliance.  Producers may be forced to exit the business or seek high interest loans, packer/customer cash flow assistance, or relief from finishing unit rent and wean pig suppliers. . . . Ag Star/Farm Credit has $1.2 billion in pork production debt and will pull back operating loans shortly, based on producer cost to produce effectiveness, and a willingness to liquidate production. They have said they will not provide operating loans to the wean to finish operator who imports Canadian wean pigs. [*sic*]  Ag Star is serious about forcing sow liquidation, to drop supply quickly and improve a sustained profitability."

160.    In a July 30, 2009 presentation to its board, Tyson reported that "Major Ag Lenders like Farm Credit/Ag Star [the predecessor to Compeer] [are] considering pulling back operating loans based on producer cost effectiveness and willingness to permanently pull back production."

161.    In August of  2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner, confirmed:

> Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability.*** We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.[55]

Mr. Lochner continued, "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4."[56]

162.    Tyson's 2009 10K Report further stated that, "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of

---

[55] Q3 2009 Tyson Foods, Inc. Earnings Conference Call (June 26, 2009) (emphasis added).
[56] *Id.*

fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[57]

163.    In August of 2009, Wesley Mendonça Batista, CEO of JBS USA, communicated the start of JBS USA's participation in hog liquidation efforts.  Mr. Batista stated, "we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year.  But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[58]

164.    In August 2009, Steve Meyerof Paragon Economics,  subsequently acquired by Agri Stats, stated that "If we are to reduce output to drive prices  up, we must reduce the sow herd by a larger percentage than the productivity growth."

165.    On September 2, 2009, at the Pork Club meeting in Philadelphia, Pennsylvania, Phil Clemens (Clemens' CEO) commented that "Our production has not slowed and we are in a typical supply demand curve problem.  We continue to produce too much pork for the amount that is being consumed.  In the last few weeks we have started to see a reduction in the sow herd—but still not even close to what really has to happen."  As a result of the "no attribution" rule, those in attendance agreed not to identify Mr. Clemens as the source of these comments.  Also at this meeting, Steve Meyer—an industry economist—gave a presentation to attendees detailing the degree of supply reductions that the pork industry needed in order to return to high levels of profitability.

166.    Two days later, on September 4, 2009, Steve Weiss (co-founder of the Pork Club) sent Rod Brenneman and Gary Louis of Seaboard notes from the September 2 Pork Club meeting, which included (without attribution) Mr. Clemens' comments about how the industry needed to

---

[57] *See* Tyson 2009 10K Report, at p. 20.
[58] JBS 2008 Earnings Conference Call (Aug. 13, 2009).

take additional steps to reduce supply, as well as Meyer's economic presentation.  Weiss also

passed on encouragement from Mr. Pope that one of the Seaboard executives should join the Pork

Club and attend future meetings.

167.    In September 2009, the CEO of Smithfield stated that he had conversations with

"sizable large producers" and that they would be doing some liquidation:

> We can't solve the problem.  But the answer to that is yes, I have
> had conversations with several sizable, more than sizable large
> producers, in fact very large producers, and I would tell you they are
> doing some liquidation.  But again, I don't think they can solve it.
>
> **I think this industry has got to solve it collectively.**  I do believe
> everyone is now looking, and when I'm talking to people who are
> financially extremely strong and they are cutting back, that's got to
> be a statement about those people who are not financially strong.
> **But the answer is, yes, there are others cutting back.  We're not
> the only one.**[59]

168.    Defendants responded to the encouragement from Smithfield to cut production.

During 2009, Triumph reduced the number of sows that it had from 396,000  to 371,500. In

particular, Triumph reduced the number of sows by 14,500 at its Christensen Facility; 4,000 at its

New Fashion Pork Facility, 5,000 at its Eichelbarger facility. Notably, Triumph and Seaboard have

a longstanding marketing agreement where  hogs processed by Triumph were marketed by

Seaboard.[60] Thus, the reduction in supply of sows raised by Triumph may result in a reduction in

the amount of pork that was sold by Seaboard.

169.    During 2009, Tyson reduced the number of sows that it had from 70,000 to 52,000.

In particular, Tyson sold five farms and sent the sows to slaughter. Tyson's 2009  10K report

---

[59] Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009) (emphasis added).
[60] According to Seaboard Corporation's 2010 Form 10-K, filed with the Securities and Exchange
Commission, "Seaboard's Pork Division has an agreement with a similar size pork processor, Triumph
Foods LLC (Triumph), to market substantially all of the pork products produced at Triumph's plant in St.
Joseph, Missouri."

further stated that "we expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."

170.     On September 24, 2009, shortly after receiving the notes of Mr. Clemens' and Mr. Meyer's comments, Mr. Brenneman (Seaboard) spoke at an AMI luncheon and opined that the swine industry "must liquidate 10% to achieve a sustainable supply/demand balance."  In other words, Brenneman spoke to a room of industry executives about the need for each of the companies to reduce supply, perfectly echoing the comments of Smithfield's CEO from June and of Clemens' CEO from three weeks earlier.

171.     Among those in attendance at that AMI luncheon was Robert Manly, Smithfield's CFO.  In response to Brenneman's comments, Manly drafted an op-ed in which he pointed out that, as of August 2009, Seaboard had yet to take steps to reduce its own supply from 2008 levels. A draft of the op-ed stated that "It is clear Rod knows what it takes to make the industry healthy and advocates that economically painful production cuts are necessary, but Seaboard is unwilling to make their own sacrifices and wants other producers to suffer so Seaboard can reap all the benefits."  Smithfield's communications team took steps to publish the piece, but then withdrew it after receiving assurances that Triumph (Seaboard's joint venture partner) was in the process of reducing its production levels by approximately 32,000 sows (an 8% reduction from its 2007 levels) and that Seaboard was taking steps to reduce its purchases and slaughter of hogs, which would further reduce supply.

172.     In November 2009, Hormel stated that "we've seen about a 2% liquidation" in hogs.

173.   In December of 2009 the CEO of Smithfield confirmed it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance":

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs . . . .   I can tell you that I know in the east, its [*sic*] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves.   We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.[61]

174.   In a January 2010 article, an industry insider (believed to be Steve Meyer) noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 5% in 2009.

175.   In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield, indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year.   That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations.   But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down.   That's for also the fresh pork side.[62]

176.   In that same timeframe, Smithfield issued a press release stating:

> The action items called for in the Pork Group restructuring plan are complete and the benefits are meeting expectations. As of this month, we have closed all six plants that were announced as part of the restructuring plan early last year. . . .
>
> We anticipate that fresh pork margins will improve as hog slaughter levels continue to decline and the Sioux City plant is closed in April.

---

[61] Q2 2010 Smithfield Foods Earnings Conference Call – Final (Dec. 10, 2009).
[62] Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call – Final (Mar. 11, 2010).

177.     Those press release statements were confirmed in Smithfield's quarterly results filing for the quarterly period ending January 2010: "In January 2010 (fiscal 2010), we announced that we will be closing our fresh pork processing plant located in Sioux City, Iowa in April 2010 (fiscal 2010). . . . Modest contractions in the U.S. sow herd have contributed to tightening supplies which, in turn, is resulting in higher live hog market prices in the U.S."

178.     On March 8, 2010, Wesley Mendonça Batista mentioned Defendant JBS' reduction in hog supply as a driver of profitability, and stated that these efforts were resulting in protein shortages.  Mr. Batista stated:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.[63]

Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to limit hog supply.

179.     As of March 2010, US pork production was noted to be down 7% so far, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights. Defendants also were reported to have increased exports 8% by March 2010, which was expected to lead to higher hog prices.

180.     In May 2010, Tyson stated in its Q2 2010 earnings conference call that "Worldwide protein supplies and US domestic availability are expected to remain below '08 and '09 levels. We have seen good interest in Beef and Pork exports to a variety of global destinations."  Similarly, in August 2010, Tyson stated in its earnings call that "Pork supplies in 2011 are anticipated to be

---

[63] JBS Q2 2009 Earnings Conference Call (Mar. 8, 2010).

below their peak supplies in calendar 2008 and 2009, and most projections show no material

changes compared to 2010."

181.    In August 2010, Hormel stated that "our hog supply is down 3 to 4%."[64]

182.    In September 2010, Smithfield stated in a press release that the closure of its Sioux

City plant in April 2010 had led to an 11% reduction in its processing rate from the prior year.

Smithfield further stated that "Industry-wide, slaughter volumes were down 3.5%" and "Lower

industry slaughter levels are expected to persist well into the company's second quarter."

Smithfield's quarterly results from that time reflected that the volume reductions "should help

stabilize prices at healthier levels than fiscal 2010."

183.    The Defendants also acknowledged access to information that allowed them to

know that the supply of pork would not be increasing.  For example, in December 2010, Larry

Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we can.
> Given the information we think we have public plus what we think
> we know privately, how many they kill, what their processing levels
> are and things like to.  This is information you may not quite have.
> And we have been certainly impressed with how our competitors
> have been able to achieve margins that we have not been able to
> achieve because our fresh pork competes very competitively with
> theirs.[65]

As set forth above, Smithfield had access to competitively sensitive information from its

competitors through the Agri Stats reports, which allowed it to know confidential supply

information from its competitors.

---

[64] Q3 2010 Hormel Foods Corporation Earnings Call.
[65] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010) (emphasis added).

184.    Supply level information regarding competitors allowed Defendants to know that supply would not increase in the future, given the lifecycles of the animals.  Based on this knowledge, in November of 2010 Hormel CFO, Jody Feragen, stated that she did not think the industry would see large scale expansion given profitability for the pork integrators.[66]

185.    In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable.  I want to again explain why we don't believe that is true.  If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the provision of competitively sensitive information by a competitor of Tyson.

186.    In the face of ever-increasing margins, when asked whether the type of profits would continue, in March 2011, Larry Pope and Robert (Bo) Manly of Smithfield confirmed to their competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs.  Yet we are projecting over the next 90 days we will be up another 20% from that.  I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . .
>
> HEATHER JONES: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon.  We are still going to have -- should have good margins, but I can't believe --
>
> LARRY POPE: Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today.  We have got double-digit margins today.

---

[66] Q1 2010 Hormel Foods Corporation Earnings Conference Call – Final (Nov 23, 2010).

BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower.  So it will either happen by itself or someone is going to build a plant.

HEATHER JONES: All right, okay.  Thank you.

LARRY POPE: You get two-year visibility on that, though.  You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . ***And by the way, we are not going to build a new plant to expand capacity.***[67]

187. ███████████████████████████████████████████████

███████████████████████████████████████████  ██████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████

188. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[67] Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call – Final (Mar. 2011) (emphasis added).

███████████████████████████████████████████

███████████████████████████████████████████

189.    In March 2012, the VP of Finance and chief accounting officer of Smithfield stated

that no one in the industry would be "real excited about adding capacity" when the losses of 24 to

36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations.  Just two
> weeks ago, I think we had -- there were rumors the Chinese buying
> corn, and boom, all of a sudden the corn market is up $0.20, $0.30.
> So there is some volatility there.  And what I would tell you is that
> keeps a lid on pork production.  The pork guys in the United States
> have not forgotten 24 or 36 months ago when there were significant
> losses in the industry.  ***There is no one going to be real excited
> about adding capacity, adding sows at a time when we've got such
> volatility.***[68]

190.    By May 2012, industry observers were noting that the reductions in slaughter

capacity meant Defendants may not have enough capacity to slaughter expected hog levels by the

fall. In fact, Steve Meyer of Paragon Economics noted that slaughter capacity would not keep up

with hog capacity through late 2013 given that Defendants were holding their slaughter levels

constant.

191.    In August 2012, Indiana Packers' president Gary Jacobson commented that the

pork company "runs 'on a sold-out position.'"[69] Mr. Jacobson attempted to make excuses for

reducing the supply of pork.  "'It's been a good strong, steady growth,' Jacobson said.  'Indiana is

in the heart of corn country and pigs are the heart of corn consumption, so business has been very

good.  This summer's heat waves and drought are likely to affect pork prices starting this fall and

into the spring,' said Jacobson.  High corn prices make pig farming less profitable, he explained,

---

[68] Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012) (emphasis added).
[69] Sarah Einselen, *Food Packing Business Steady So Far*, Pharos-Tribune (Aug. 1, 2012).

both reducing the supply of pork for processing plants come next spring and making the pork that is on the market more expensive.  In the short run, high temperatures make pigs less hungry and they don't fatten for market as quickly as they would in a cooler year.  That means farmers either wait longer to bring their swine to market or take them to market as usual but at a lighter weight. 'So, the impact has not been really significant as far as production as a whole,' Jacobson said, but it remains to be seen how the drought will change the plant's supply in the coming months."[70]

192.    On May 15, 2013, Wesley Mendonça Batista continued to demonstrate Defendant JBS's ability to constrain the pork market.  During a quarterly earnings call, he stated that "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business.  So this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent in beef."

193.    In September 2013, Joe Szaloky, vice president of procurement and business development for Smithfield, confirmed the company's intention to maintain its sow number, not adding any more.[71]

194.    ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

---

[70] *Id.*

[71] Freese, Betsy, *Pork Powerhouses 2013: Disease Hits, Growth Continues,"* Successful Farming, (September 29, 2013), available at https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-growth_283-ar34203 (last visited December 5, 2019)

195.    In December 2013, Steve Meyer of Paragon Economics said, "The breeding herd figure implies NO GROWTH in spite of much lower costs and terrific profit opportunities in the coming year."[72]

196.    In December 2013, Robert Manly of Smithfield emphasized that coordinated industry action was necessary to "balance supply and demand":

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group.  We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.[73]

197.    Defendants further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise.  For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Eric Haman, Defendant Clemens Food Group's communication manager, stated the disease "'had a very minimal impact on our hog flow, especially when you compare it to others in the industry. . . .  That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this.'"[74]  Yet, in furtherance of their conspiracy Defendant Clemens did not take advantage of having few PEDv infected pigs.  Instead of attempting to increase their market share, they stayed the course with their fellow competitors.

198.    Defendants' conspiracy was yielding substantial profits by 2014. In October 2014, Pork Powerhouses reported that "Hogs made history this summer. Pork producer profits were,

---

[72] Meyer, Steve, "2014 Looks Good for U.S. Pork Producers," *National Hog Farmer* (December 30, 2013), available at https://www.nationalhogfarmer.com/print/9053 (last visited December 5, 2019)
[73] Q2 2014 Smithfield Foods Earnings Conference Call (Dec. 23, 2013).
[74] Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds*, Bucks County Courier Times (May 4, 2014).

quite simply, enormous -- averaging $82 profit for each hog marketed in the third quarter." The report also noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast. The PED virus trimmed supply, but higher market weights helped compensate.'"

199.    In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production. Specifically, pork producers rushed to sign contracts with Defendants that would protect them if production exceeded slaughter capacity as some feared.

200.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

201.    In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift.[75]  In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for

---

[75] David Eaheart, *Seaboard Triumph Foods Announces Plans to Expand Pork Processing Plant* (Feb. 17, 2017), available at
https://seaboardfoods.com/news/Pages/Seaboard%20Triumph%20Foods%20announce%20plans%20to%20expand%20pork%20processing%20plant.aspx (last visited December 5, 2019).

a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry."[76]   However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.[77]

202.   On August 10, 2017, Smithfield Senior Account Manager Susan Dow obtained a native Microsoft Excel copy of Indiana Packers' price list and distributed it to other Smithfield employees, one of whom reacted, "Please delete this ASAP.  We should not receive a competitor's price list . . . It isn't legal for us to have a competitor's price list."

## I.   Abnormal pricing during the relevant period demonstrates the success of the collusive scheme.

203.   Beginning in 2009, the pork industry showed abnormal price movements, *i.e.*, increases in prices for the average hog whole price unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork. Plaintiff has measured the various abnormal pricing movements in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the pork integrators' margin during the relevant period, and (iv) the Defendants' revenues before and during the relevant period. Each of these measures supports Plaintiff's allegations that Defendants conspired to restrict production and otherwise acted in a concerted manner to increase pork prices in the U.S.

---

[76] *Id.*

[77] Jeff DeYoung, *Pork Packing Capacity Faces Delay to Growth*, Iowa Farmer Today (June 2, 2018), *available at* https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html (last visited December 5, 2019).

1. **The average hog wholesale price experienced an unprecedented increase beginning in 2009.**

204.    According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb from 2000 to 2009, and the hog market year average price was at times substantially less. Thereafter, prices increased dramatically, rising to more than $1.80/lb in 2014, and never dropping below $1.40/lb again. Figure 9 below shows the unprecedented increase in swine prices beginning in 2009, which stayed elevated through 2018.

**Figure 9: Average Hog Wholesale Prices in Cents per lb., 2000-2018**



205.    As Figure 10 below shows, pork integrators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits that was resistant to changes in price during the relevant period. These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply short of demand.

**Figure 10: Integrator Earnings per Retail Weight, 2000-2017**



**2. The pork cut-out composite price experienced a dramatic increase beginning in 2009 and continuing throughout the relevant period.**

206.    During the relevant period various pork products saw substantial increases in prices, compared with before the relevant period. As shown in Figure 11 below, using one particular price for pork, the lean hog composite price, a pricing analysis has been performed which shows that the average price index increased significantly during the relevant period. A similar effect is shown in Figure 12 below, using another metric of pork pricing, the pork cut-out composite price (the relevant period is referred to herein as the class period in the charts below).

**Figure 11: Lean Hog Composite Price 2000-2019**



**Figure 12: Pork Cut-Out Composite Price**



### 3. Pork processor's margin increased beginning in around 2009 showing a meaningful increase from earlier time periods.

207.    Starting in 2008 or early 2009, at the same time as hog prices were increasing, pork integrator margins increased significantly. The change in integrator margins during the relevant period shows a divergence from pricing trends prior to the relevant period—and shows that rising costs do not explain the increases in prices seen during the relevant period. The following figure shows this increase in margin, retained by the Defendant/co-conspirators, using the pork cut-out composite and live hog cost on a "dressed weight" basis (post slaughter and organ-removal weight):

**Figure 13: Hog Spread Widening During the relevant period**



208.    When tested, there is a statistically significant increase in the average hog-composite spread before that time period, when compared to during the relevant period (these periods are sometimes referred to herein as the pre-class and class periods, including in the chart below):

72

**Figure 14: Statistically Significant Break in Hog Composite Spread Comparing Before and During Relevant Period**



### 4. Defendants' revenues increased beginning in around 2009, even taking into account defendant-specific costs.

209.    For two of the largest Defendants, Tyson and Smithfield, experts examined the spread between pork revenue and pork-related costs (costs of goods sold + operating costs), as a proxy for measuring the spread between a Defendant's price of wholesale pork and its hog costs. This measurement accounts for Defendant-specific operating costs. This analysis confirms the beginning of abnormal pricing in around 2009, where there was a divergence in revenue and costs beginning at the start of the relevant period in 2009.

210.    Figure 15 shows a break in revenues and costs for Tyson around the start of the relevant period, in 2009:

**Figure 15: Tyson's Revenues vs Costs, April 2002 to April 2018**



211.    The same analysis for Smithfield shows a similar break in revenues and costs

beginning around the beginning of the relevant period:

**Figure 16: Smithfield's Revenues vs Costs, January 2004 to June 2016**



212.    These analyses of the spread between costs and prices relate solely to each Defendant's pork segment, and thus confirm that rising costs in pork production do not explain the increases in price seen during the relevant period.

**J.  Overcharges due to the cartel were reflected in higher pork prices than what they would have been absent the conspiratorial activity.**

213.    Pork is a commodity product in which the pork sold by competitors has no meaningful difference and is thus interchangeable.  As such price is driven by the economic fundamentals of supply and demand.  In the words of Tyson Foods, Inc. COO, James Lochner, "As you know decreased supply should be favorable to pricing."[78]

_____

[78] Q1 2010 Tyson Foods, Inc. Earnings Conference Call (Feb. 12, 2010).

214.    By reducing, stabilizing, and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2012, the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."

215.    For example, in 2016, Smithfield reported $3.7 billion of fresh pork sales and an additional $5 billion in packaged pork product sales.   With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to Plaintiff.

216.    The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI").  From the end of 2009 to the end of 2017, the CPI for all food products rose approximately 15.4 percent.  Over the same period, prices for pork have increased substantially more for consumers over the relevant period.  For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017:

**Figure 17: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995-2017**



217.    Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase over the relevant period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017 (approximately 29.3 percent):

**Figure 18: CPI-Average Price Data for Other Pork, per pound, from 1998-2017**



218.    And the CPI for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017 (or 35.4 percent):

**Figure 19: CPI-Average Price Data for Ham, per pound, from 1998-2017**



219.     In other words, the increases in the prices of pork far out-paced the growth in prices for other food products during the relevant period.  These price increases were not the result of retailers' desire to move prices upward. Instead, they were the result of increased wholesale prices. In addition to CPIs, the Bureau of Labor Statistics also maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products.  As shown in Figure 20 below, the processed pork wholesale prices appear to be the motivator of the higher retail prices, with prices climbing significantly beginning during the conspiracy:

**Figure 20: PPI for Pork, Processed or Cured, Not Canned or Made Into Sausage, from 1995-2017**



220.    Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to artificially increase and stabilize the price and supply of pork was borne in large part by Plaintiff and other direct purchasers.

**K. Defendants actively concealed the conspiracy and Plaintiff did not and could not have discovered Defendants' anticompetitive conduct.**

221.    Plaintiff had neither actual nor constructive knowledge of the facts constituting its claim for relief. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the filing of a direct purchaser class action, *Maplevale Farms, Inc. v. Agri Stats, Inc. et al.*, in June 2018. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix prices for pork. Throughout the relevant period, Defendants

effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

222.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats—a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

223.    Agri Stats is a highly secretive company.  Although it admits it does "have a website but there is very little information about us there as we do no advertising."

224.    In 2009, the President of Agri Stats, Brian Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company.  There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do.  It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth.[79]

225.    At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature

---

[79] Sanderson Farms Investor Day – Final (Oct. 2009) (emphasis added).

of the information."[80]  And yet, despite refusing to show this information publicly, Agri Stats

provided producers with the "bottom line numbers" of their competitors on a regular basis via the

reports discussed above.  These statements acted to conceal the true detail and nature of the Agri

Stats reports from Plaintiff and the public in general.

226.   Larry Pope, the CEO of Smithfield, made similar references to secret information

in December 2010, explaining that he was confident pork supplies would not be increasing in the

market, based on the following:

> the information we think we have public ***plus what we think we know privately***, how many they kill, what their processing levels are and things like [that].  ***This is information you may not quite have***.[81]

227.   At other times, Defendants attributed the stability in the pork market to other

reasons such as "good programs with our retailers" and "lower grain costs."  As Larry Pope, stated

in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine.  I guess beyond that, you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[82]

228.   Not until recently was the fact of the pork industry's use of Agri Stats widely known

or reported.  An investigative article published in February 2017 by Bloomberg Businessweek

---

[80] *Id.*
[81] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010) (emphasis added).
[82] Event Brief of Q4 2012 Smithfield Foods Earnings Conference Call – Final (June 14, 2012).

suggested the conspiracy that began among Broiler producers and Agri Stats was being replicated in the pork industry.[83]  The article reported that Agri Stats

> has . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods.  It appears that demand for the service is strong.  At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services.  His slideshow indicated that 27 companies had already signed up.[84]

While Bloomberg Businessweek article did not conclude that pork producers were engaged in a horizontal conspiracy, it did suggest for the first time in a widely circulated article that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.

229.    Only after the filing of a February 7, 2018, Second Consolidated and Amended Complaint by the End User Plaintiff Class in the In Re Broiler Chicken Antitrust Litigation, Case No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the confidential services that Agri Stats' provides to its clients in the Broiler industry.

230.    The filing of that amended complaint, along with the February 2017 article by Bloomberg Businessweek disclosing the pork industry's use of Agri Stats, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

231.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Pork is not exempt from antitrust regulation, and, thus, before these recent events Plaintiff reasonably considered it to be a competitive industry.  Accordingly, a reasonable person under the

---

[83] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek (Feb. 15, 2017), *available at*  https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged  (last visited December 5, 2019).
[84] *Id.*

circumstances would not have been alerted to begin to investigate the legitimacy of Defendants'
pork prices before these recent events.

232.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants
and all of their co-conspirators, the running of any statute of limitations has been tolled and
suspended with respect to any claims and rights of action that Plaintiff has as a result of the
unlawful combination and conspiracy alleged in this Complaint.

233.    While pork producers claimed that decreased supply and higher prices were caused
by the H1N1 outbreak, a National Pork Board customer-tracking research report dated May 6,
2009, stated that "The overall perception of the safety of pork remains in a good trajectory" and
that "Among pork consumers, we continue to see purchase intent stabilizing...."  Further, Bret
Getzel from Seaboard confirmed H1N1's short-term impact on the pork market in a May 21, 2009
email to Chuck Faughnan, where he told him "There was some very short term weakness in the
market as a result of the H1N1 negative press, but this came and went pretty fast. The market had
pretty much recovered by 05/08."

234.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████       ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████

235. 

"

236.

237.    The PEDv scare was also a pretext for higher prices due to allegedly short supply. On November 4, 2014, in response to a question about pork belly pricing, Brandi McClure, Product Manager at Seaboard, wrote, "PED Scare – Starting late last Fall and well into the Spring, paackers/customers were putting product into the freezer anticipating reduced volumes in the Spring and Summer.  While we did have reduced kills, the hog weights made up for the overall volume decline that was expected and therefore the anticipated shortage was never realized."

238.    Defendants sent information to competitors regarding their future supply and pricing plans, instructing colleagues to conceal or delete evidence of their unlawful actions. For example:

(a)    On August 14, 2008, Dick Bond, Tyson's CEO, reviewed an internal analysis of Tyson's projected financial performance.  Bond recognized that the projections were not all that useful without similar data from Tyson's competitors and asked an employee if Tyson could get data from "our competitors like Pilgrim, Smithfield, Hormel, etc.?"  When the employee responded that the data could be obtained through a special third-party survey, Bond responded that he "could call the companies I listed and probably get some info.  Is that O.K.?"

(b)    Brenneman and Larry Pope—the CEOs of Seaboard and Smithfield, respectively—also spoke a number of times between late 2008 and late 2009 under the auspices of a supply contract between the two companies in which Smithfield provided hogs to Seaboard.  Although the two did discuss this buyer/seller arrangement, they also used the relationship to discuss in detail the supply plans of their respective companies and pressure each other to commit to supply reductions.

(c)    On January 22, 2009, Seaboard executives Brian Taphorn and Tom Blumhardt received from a sales broker an email attaching a spreadsheet with competitors' pricing and cautioned that "I got this from a source for you to help see the most current on the SBR competition. Please guard it carefully."

(d)    On July 8, 2009, Tom Padgett of Tyson circulated internally to Todd Neff and Jay Krehbiel the current prices to retailers offered by Seaboard and Smithfield for bone-in loins, and noted that Cargill and JBS had "nothing to offer" because they were short on product.  Neff then forwarded the email to others at Tyson and instructed them to "read and delete."

(e)    On October 29, 2009, Clemens' Dan Groff emailed senior company management that he had "heard through the grapevine yesterday that Smithfield had called a meeting on November 17th with a group of PA independent hog producers."  He further noted that he was "very curious about this" and would "try and ask around" but asked "if anyone has any reliable Smithfield contacts or can think of anyone who might know some information that you give them a call."

(f)   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

(g)   On November 23, 2010, Brian Taphorn of Seaboard emailed internally to Terry Holton Smithfield's 1/8 trim price list, which he had obtained from National Beef.  Taphorn told Holton, "Want to keep this confidential, as I'm sure no one else at National knows this has been forwarded to us."

(h)   On October 19, 2011, Todd Neff, a Senior VP at Tyson, complained to two co-workers about Tyson's decision not to add shifts at its plants and increase its slaughter volumes. Neff complained that "we should sltr  [slaughter] more than we are at times . . . we have earned the right to get our fair share of sltr since we are performing well vs. industry i.e. – make the other guys cut back! I trust you'll read and delete and not repeat this."

(i)   Brothers Brad Lorenger (VP of Sales at JBS) and Doug Lorenger (a senior sales executive at Indiana Packers) communicated frequently to coordinate on pricing and supply between their respective companies.

i.   ████████████████████████████████████████

███████████████████████████████████████

ii.   ████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

iii.   ███████████████████████████████████████

████████████████████  ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████



iv.

v.

vi.

vii.

viii.

ix.



(j)     Beginning in 2012, the Pork Club added a "Just Pigs" meeting limited to just pork producers.   This was intended to facilitate "informal roundtable" discussions amongst the competitors.  Legal counsel did not attend these meetings.

(k)     On March 16, 2012, Dhamu Thamodaran and Shane Horsley of Smithfield discussed Smithfield's supply forecast for the upcoming week based on "rumors" the only plausible source being competitors.  For example, Horsley reported that "Triumph is expected not to harvest next Saturday.  However, expect them to be in buying hogs next week for the following week."  Thamodaran responded by confirming Horsley's Triumph intel, and also reporting that Seaboard would not be killing hogs on Saturday, while at Tyson there was "talk of possible reduction is [*sic*] Saturday kill but no confirmation yet."

(l)     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

(m)     On November 9, 2012, senior-most executives from Cargill, Tyson, Smithfield, Hormel, and JBS met in Chicago.  Within two months of the meeting, Defendants began cutting back their kill rates, and reported these reductions to the competition.

(n)     For example, on January 30, 2013, while circulating a new price list, Brian Taphorn informed Seaboard personnel that, "There is, finally, talk of some kill cutbacks coming down the pike into next week.  Tyson has said to cancel all kill plans for the weekend of 2/9; Excel talking

of slowing down some daily overtime hours; and Swift taking more of a stand against paying over the top for hogs versus just going without.  We believe it would take real cutbacks to make a real supportive move in the markets."

(o)     Later that year, on July 9, 2013, Taphorn (Seaboard) circulated the "latest 'Price List' from Smithfield," asking his team to "PLEASE KEEP THIS IN HOUSE AND CONFIDENTIAL."

(p)     On February 23, 2014, in an email titled "Summary of last week's conference" and sent to senior Clemens' management, Dan Groff (Clemens) wrote that "I wanted to pass along a few interesting anecdotes from my conference last week.  As always, most of the interesting stuff comes out in the hallways and at dinner rather than in the actual meeting."  In the bullet that followed, Groff wrote that "Farmland, Smithfield and Triumph all have sizeable holes in hog supply to fill in the next two months, nothing new there but it's a very real problem for them…."  The summary also included information about kill schedules, hog weights, hog diets, and discussion of Tyson's welfare announcement, during which Tyson management admitted they overreacted to customer pressure.

(q)     On May 22, 2014, Taphorn (Seaboard) predicted in an email to colleagues that pork prices would move up in June and July because there were 11 plants "that are either currently on a 4 day kill schedule, or will be transitioning into the 4 day schedule the first half of June. . . .  We should expect others to join that fold, as we get deeper into June and July."

(r)     Backchannel and confidential communications regarding confidential supply and pricing information between Defendants became so common that Defendants' personnel began giving such communications nicknames.  On August 11, 2015, Hormel's Corwyn Bollum told a group of fellow Hormel employees that he "just heard through the pig mafia rumor mill, that JBS is going to be moving to Ractopamine free starting October 1, 2015."

(s)     On March 23, 2017, Rob Bogaard of Smithfield reported internally on a call with a Tyson hog buyer during which the Tyson buyer informed Smithfield that Tyson and other competitors believed that the supply of pork bellies was tight and that there would be insufficient

supply for bacon suppliers that were not vertically integrated with hog farmers. Bogaard instructed his team that the details of the call were "CONFIDENTIAL."

(t)     In 2017, when both Clemens and Seaboard/Triumph added new plants, both companies made sure to inform their competitors of the impact of these new plants in an effort to avoid retribution from the other conspirators for adding capacity.

(u)     On April 21, 2017, Shane Miller of Tyson spoke with a contact at Clemens. Miller forwarded the information on to others at Tyson, and Greg Schweitzer commented,\: "Nice job Shane. Clemens is telling us Coldwater [the new Clemens plant] is scheduled to come up right after Labor Day in Sept." Jay Krehbiel of Tyson then forwarded this exchange to others but cautioned them to "read and delete please."

(v)     On June 9, 2017, Dan Groff of Clemens emailed internally several senior executives and reported on a conversation he had with Gary Louis of Seaboard about the production plans and slaughter numbers for Seaboard and Triumph. Groff noted that he "kept this DL list relatively small because there are a few sensitive things on here, so if you want to share anything specific, please copy/paste to a separate message."

(w)     Notwithstanding this messaging from Clemens and Seaboard/Triumph, during a March 2018 meeting several senior Tyson executives, including Todd Neff, Shane Miller, and others, Tyson discussed "how do we punish our competition for their capacity investments?"

(x)     On August 10, 2017, Susan Dow of Smithfield circulated Indiana Packer's pricing list to others at Smithfield. Although she was scolded by Bob Darrell because "it isn't legal for us to have a competitor's price list," another Smithfield employee removed Darrell from the thread and joked to Dow that "we'll [sic] all made this mistake. . . . I did it too."

(y)     Hormel's antitrust compliance policy explicitly prohibited any discussions with competitor suppliers about anything other than bid price. Despite this, Hormel used its procurement relationship with other Defendants as a pretext for sharing their confidential information. ██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

239.    Defendants and their co-conspirators used the non-public Agri Stats' reports to exchange and communicate Competitively-Sensitive Information to implement, monitor and enforce their conspiracy.  For example:

(a)    In 2009, the President of Agri Stats, Brian Snyder, reportedly commented about the secretive nature of Agri Stats: "Agri Stats has always been kind of a quiet company.  There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do.  It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth."  Sanderson Farms Investor Day – Final (Oct. 2009).

(b)    At the same 2009 presentation, when discussing "bottom line numbers" (*i.e.*, a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."  *Id.*  Yet, despite refusing to reveal this information publicly, Agri Stats provided producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above.

(c)    These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiff and the public in general.  In other words, Agri Stats was stating publicly that it could not share information publicly and it did not provide any Producer's information to another because it was "confidential," but in private, Agri Stats knowingly and intentionally shared each Producer Defendant and co-conspirator's Competitively-Sensitive Information with the others.

(d)    On May 9, 2012, Deb McConnell (Tyson's submitter to Agri Stats) inquired of Agri Stats which specific plants were included in Agri Stats' kill/cut figures.  Greg Dess of Agri Stats responded with the 12 specific plants for which Agri Stats received this information.  McConnell then circulated Dess' response to others at Tyson and instructed them to "keep confidential."

(e)　　On June 15, 2012, McConnell then revealed to Agri Stats's Josh Edwards that Tyson could use Smithfield's earnings release information to decipher which of the locations listed in Agri Stats's studies belong to Smithfield.

(f)　　In fact, by May 7, 2012, McConnell had begun orchestrating Tyson's regular deanonymization of the information of its competitors in Agri Stats reports.  McConnell would disseminate deanonymized competitor information from Agri Stats in monthly printed "packets" for Tyson employees to review in meetings.

(g)　　In a company-wide email sent on April 6, 2018, Tyson reminded its employees that its procurement policy (*i.e.*, its guidelines for purchasing materials) prohibited the sharing of any confidential information because such conduct would put Tyson at a competitive disadvantage in obtaining lower prices for the materials it purchased.  Notwithstanding this policy for its procurement processes, Tyson consistently shared its confidential information with respect to its pricing and production information through Agri Stats knowing that there were methods to deanonymize the Agri Stats reports.

(h)　　███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

## V.　ANTITRUST INJURY

240.　Defendants' anticompetitive conduct had the following effects, among others:

　　　A.　Price competition has been restrained or eliminated with respect to pork;

　　　B.　The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

　　　C.　Plaintiff has been deprived of free and open competition; and

D.     Plaintiff has paid artificially inflated prices.

241.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork.  As a direct and foreseeable result, Plaintiff paid supra-competitive prices for pork during the relevant period.

242.    By reason of the alleged violations of the antitrust laws, Plaintiff has sustained injury to its businesses or property, having paid higher prices for pork than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

243.    This is an antitrust injury of the type that the antitrust laws were meant to prohibit.

## VI.     VIOLATION OF SECTION 1 OF THE SHERMAN ACT

244.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

245.    Defendants and all of their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

246.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

247.    At least as early as January 1, 2009, and continuing until present, the exact dates being unknown to Plaintiff, Defendants and all of their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

248.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for pork throughout the United States.

93

249.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

250.   As a result of Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supra-competitive prices for pork.

251.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.  Defendants' conspiracy had the following effects, among others:

A.   Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

B.   Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C.   Plaintiff—which, including through its assignment with Burris Logistics, directly purchased pork from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators—has been deprived of the benefits of free and open competition in the purchase of pork.

252.   Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

253.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff has been injured in its business or property and will continue to be injured in its business and property by paying more for pork than it would have paid and will pay in the absence of the conspiracy.

254.   The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

## VII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

255.   The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

> A.   An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and
>
> B.   A *per se* violation of Section 1 of the Sherman Act;

256.   Plaintiff recovers damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

257.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

258.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

259.    Plaintiff be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

260.    Plaintiff recovers its costs of suit, including reasonable attorneys' fees, as provided by law; and

261.    Plaintiff receives such other and further relief as the case may require and the Court may deem just and proper.

## VIII.   JURY TRIAL DEMANDED

262.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: April 29, 2022

Respectfully submitted,


*/s/ Philip J. Iovieno*
Philip J. Iovieno
Nicholas A. Gravante, Jr.
Jack G. Stern
Mark A. Singer
Elizabeth R. Moore
Zygimante Andrijauskaite
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000
Fax: (212) 504-6666
E-mail: philip.iovieno@cwt.com
            nicholas.gravante@cwt.com
            jack.stern@cwt.com
            mark.singer@cwt.com
            elizabeth.moore@cwt.com
            zygimante.andrijauskaite@cwt.com