EXHIBIT I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **IN RE PORK ANTITRUST LITIGATION** | **Case No. 0:18-cv-01776-JRT-HB** |
| ACTION MEAT DISTRIBUTORS, INC., et al.,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>AGRI STATS, INC., et al.,<br><br>　　　　Defendants. | Case No. 0:21-cv-01454-JRT-HB |
| GIANT EAGLE, INC.,<br><br>　　　　Plaintiff,<br><br>v.<br><br>AGRI STATS, INC., et al.,<br><br>　　　　Defendants. | Case No. 0:21-cv-01874-JRT-HB |
| UNIPRO FOODSERVICE, INC.,<br><br>　　　　Plaintiff,<br><br>v.<br><br>AGRI STATS, INC., et al.,<br><br>　　　　Defendants. | Case No. 0:21-cv-02757-JRT-HB |

## PLAINTIFFS' AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
### FILED UNDER SEAL

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.     NATURE OF ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ................................................... 5

III.   PARTIES ................................................................................... 6

    A.   *Plaintiffs* ............................................................................. 6

    B.   *Defendants* ........................................................................ 10

        1.   Agri Stats .................................................................... 10

        2.   Clemens ...................................................................... 11

        3.   Hormel ........................................................................ 12

        4.   Seaboard ..................................................................... 13

        5.   Smithfield .................................................................... 13

        6.   Triumph ...................................................................... 13

        7.   Tyson .......................................................................... 14

        8.   Co-Conspirators Indiana Packers, JBS, and AgStar ........... 14

IV.   FACTUAL ALLEGATIONS ...................................................... 16

    A.   *Agri Stats' Detailed Reports Enable the Producer Defendants to Accurately Assess and Monitor Their Competitors' Production Levels* ....................................... 20

    B.   *The Producer Defendants' Control Over the Production and Supply of Pork in the United States* ............................................... 25

V.    THE PRODUCER DEFENDANTS' CURTAILMENT OF PORK PRODUCTION .......................................................................... 39

    A.   *Overview of Defendants' Conspiratorial Restriction of the Pork Supply* .............. 39

        1.   Smithfield .................................................................... 41

        2.   Tyson .......................................................................... 42

        3.   Hormel ........................................................................ 42

        4.   Seaboard ..................................................................... 43

        5.   Triumph ...................................................................... 43

        6.   Clemens ...................................................................... 43

        7.   Co-Conspirator Indiana Packers ...................................... 44

        8.   Co-Conspirator JBS ...................................................... 44

    B.   *Timeline of the Conspiracy* ................................................. 45

VI.   ABNORMAL PRICING AND THE EFFECT ON PLAINTIFFS IN THE FORM OF HIGHER PRICES DEMONSTRATES THE SUCCESS OF THE CONSPIRACY ......................................................................................... 70

VII.   OVERCHARGES FROM THE CARTEL REFLECTED IN HIGHER PORK PRICES PLAINTIFFS PAID .......................................................... 71

VIII.   THE RESULTS OF THE DOJ'S CRIMINAL INVESTIGATION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN THE PORK INDUSTRY ................................. 73

IX.   PLAINTIFFS' CLAIMS ARE TIMELY ......................................... 74

   A.  *Class Action Tolling* ....................................................................74

   B.  *Fraudulent Concealment Tolling* ...............................................74

X.   ANTITRUST INJURY ................................................................ 91

   *COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT* ............................91

   *COUNT II: VIOLATION OF THE PACKERS AND STOCKYARD ACT* ......................93

XI.   REQUEST FOR RELIEF .......................................................... 96

XII.   JURY TRIAL DEMANDED ...................................................... 97

## PLAINTIFFS' AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Action Meat Distributors, Inc., Topco Associates, LLC, Alex Lee, Inc., Merchants Distributors, LLC, Associated Food Stores, Inc., Brookshire Grocery Company, Certco, Inc., Colorado Boxed Beef Co., The Golub Corporation, Nicholas & Co., Inc., PFD Enterprises, Inc., SpartanNash Company, Springfield Grocer Company, The Distribution Group d/b/a Van Eerden Foodservice Co., Troyer Foods, Inc., URM Stores, Inc., Giant Eagle, Inc., and UniPro Foodservice, Inc. (collectively, "Plaintiffs"), by and through their undersigned attorneys, files this Complaint against Defendants Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation, Hormel Foods, LLC ("Hormel"), Seaboard Foods LLC ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson").  Plaintiffs bring this action against Defendants for treble damages under the antitrust laws of the United States and demand a trial by jury.

## I.      NATURE OF ACTION

1.      The pork producer defendants are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce in the United States.  The United States pork industry is highly concentrated, with a small number of large companies controlling the supply. Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork market.

2.      Defendants Agri Stats, Clemens, Hormel, Seaboard, Smithfield, Triumph, and Tyson, along with Co-Conspirators JBS USA Food Company ("JBS" or "JBS USA") and Indiana Packers Corporation ("Indiana Packers") (JBS and Indiana Packers will be referred to collectively as the "Producer Co-Conspirators"), entered into a conspiracy from at least 2009 to

the present (the "Conspiracy Period") to fix, raise, maintain, and stabilize the price of pork.[1]  The defendants, other than Agri Stats, are referred to here collectively as the "Producer Defendants."

3.      One method by which Defendants implemented and executed their conspiracy was by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States.

4.      Beginning in 2008, as the Producer Defendants' profitability deteriorated in the midst of a global recession, Smithfield initiated efforts between Defendants to conspire through their mutual trade associations and industry groups to achieve a coordinated reduction in the domestic supply of pork.

5.      The Producer Defendants also conspired with companies that provided services to the pork industry but did not produce or sell pork, such as Defendant Agri Stats (a data benchmarking firm) and AgStar, a financial services company now known as Compeer that specialized in loans to pork producers.  Agstar and the Producer Co-Conspirators will be collectively referred to as the "Co-Conspirators."

6.      Beginning in 2008, the CEO of Smithfield attended a trade association meeting with other Defendants in which he announced Smithfield's plans to reduce its pork supply and urged others to follow.  Although Defendants recognized that a reduction in the supply of pork was necessary to achieve their desired levels of profitability, the other major producers were hesitant about reducing their supply without some mechanism to prevent smaller independent producers from increasing their own supply of pork in response to a coordinated reduction by Defendants. To address this issue, Smithfield's CEO enlisted the help of AgStar's VP responsible for lending to pork

---

[1] For the purposes of this complaint, "pork" includes pig meat purchased fresh or frozen, smoked ham, sausage, and bacon.  From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

producers. After discussions with Smithfield's CEO, AgStar agreed to aid Defendants' efforts to reduce the domestic supply of pork by putting financial pressure on smaller producers to reduce production, provided that the Producer Defendants lead the initiative and announce their own production cuts publicly. As detailed in this Complaint, between early 2008 and late 2009, Defendants met numerous times through trade associations and other industry groups, which allowed them to coordinate their unlawful agreement to reduce the supply of pork. And although Defendants announced their supply reductions publicly, their coordination allowed each Defendant to justify its own supply reduction as a natural outcome of the economic conditions facing the industry. However, this was untrue. As detailed in this Complaint, Defendants recognized internally that it was in each producer's independent self-interest to produce as much pork as it could. Accordingly, the supply reductions were not justified by input costs or other economic factors. Instead, the cuts were based on an understanding that all major producers would implement similar supply reductions and that AgStar n/k/a Compeer would pressure smaller producers to cut supply by cutting off funding to those that did not comply. This allowed Defendants to reduce their supply through a collusive agreement or understanding that was reached in secret and then concealed from the public.

7.    By late 2009, this plan succeeded, as the pork industry cut its supply by approximately 6.4%, primarily through the liquidation of sow herds (female pigs used for breeding). With this structural reduction in the supply of pork, Defendants were able to monitor their conspiracy through Defendant Agri Stats.

8.    In furtherance of their conspiracy, the Producer Defendants and their Producer Co-Conspirators exchanged detailed, competitively sensitive, and closely guarded non-public

information about prices, capacity, sales volume, and demand, including through their co-conspirator, defendant Agri Stats.

9.      Beginning in at least 2009, Defendant Agri Stats began providing highly sensitive "benchmarking" reports to the Producer Defendants and the Producer Co-Conspirators. Benchmarking allows competitors to compare their profits or performance against that of other companies.  Yet Agri Stats' reports are unlike those of lawful industry reports; rather, Agri Stats gathers detailed financial and production data from each of the Producer Defendants and the Producer Co-Conspirators, standardizes this information, and produces customized reports and graphs for the conspirators.  The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market.

10.      On at least a monthly basis, and often far more frequently (*e.g.*, weekly or every other week), Agri Stats provides the Producer Defendants and their Producer Co-Conspirators with current and forward-looking sensitive information (such as profits, costs, prices, and slaughter information), and regularly provides the keys to deciphering which data belongs to which participant.  The effect of this information exchange was to allow the pork producers to monitor each other's production, and therefore control supply and price in furtherance of their anticompetitive scheme.

11.      The data exchanged through Agri Stats also bears all the hallmarks of the enforcement and implementation mechanism of a price-fixing scheme.  First, the data is current and forward-looking – which courts have consistently held has "the greatest potential for generating anticompetitive effects."  Second, information contained in Agri Stats reports is specific to pork producers, including information on profits, prices, costs, and production levels; instead of being aggregated as industry averages to avoid transactional specificity and the easy identification of specific producers.  Third, none of the Agri Stats information was publicly available.  Agri Stats is a

subscription service which required the co-conspirators to pay millions of dollars over the Conspiracy Period – far in excess of any other pricing and production indices.  Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market.  Defendants utilize the information exchanges through Agri Stats in furtherance of their conspiracy to fix, raise, stabilize, and maintain artificially inflated prices for pork sold in the United States.

12. Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to Plaintiffs.  As a result of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for pork during the Conspiracy Period.  Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market.  Thus, Plaintiffs were injured in their business or property by Defendants' unlawful conduct.

13. Plaintiffs allege that Defendants and their co-conspirators' conspiracy is a *per se* violation of Section One of the Sherman Act,15 U.S.C. § 1 (Count I), and the Producer Defendants and co-conspirators' conduct as alleged in this Complaint violates the Packers and Stockyards Act as well (Count II).

## II.    JURISDICTION AND VENUE

14. This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiffs resulting from Defendants' conspiracy to restrain trade in the pork market.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

15. Venue is proper in this District under 15 U.S.C. §§ 15(a); 22 and 28 U.S.C. §§ 1391(b); (c); and (d) because during the relevant period, Defendants resided, transacted business,

were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

16.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

17.     This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District and the state of Illinois – has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy.  The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District and the state of Illinois.

## III.    PARTIES

### A.    Plaintiffs

18.     Plaintiff Action Meat Distributors, Inc. ("Action Meat") is a Texas corporation with its principal place of business in Houston, Texas.  From 2009 to the present, Action Meat and/or its affiliates purchased pork at artificially inflated prices directly from one of more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

19.     Plaintiff Topco Associates, LLC ("Topco") is a privately held company with its principal place of business in Elk Grove Village, Illinois, within this District.  Topco provides aggregation, innovation, and knowledge management solutions for its leading food industry member-owners and customers, including grocery retailers, wholesalers, and food service companies.  From

6

2009 to the present, Topco and/or its affiliates purchased pork at artificially high prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct and seeks damages from Defendants for all pork purchases it has not assigned to other parties.

20.     Plaintiff Alex Lee, Inc., and its subsidiaries and affiliates Merchants Distributors, LLC, Lowe's Food Stores, Inc., and W. Lee Flowers & Company (collectively referred to here as "Alex Lee") is a North Carolina corporation with its principal place of business in Hickory, North Carolina.  From 2009 to the present, Alex Lee and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

21.     Plaintiff Associated Food Stores, Inc. ("Associated Food") is a Utah corporation with its principal place of business in Salt Lake City, Utah.  From 2009 to the present, Associated Food and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

22.     Plaintiff Brookshire Grocery Company ("Brookshire's") is a Texas corporation with its principal place of business in Tyler, Texas.  From 2009 to the present, Brookshire's and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

23.     Plaintiff Certco, Inc. ("Certco") is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.  From 2009 to the present, Certco and/or its affiliates purchased

pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

24.     Plaintiff Colorado Boxed Beef Co. ("CBBC") is a Florida corporation with its principal place of business in Lakeland, Florida.  From 2009 to the present, CBBC and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

25.     Plaintiff The Golub Corporation ("Golub"), which does business under the banners Price Chopper Supermarkets, Market Bistro, and Market 32, is a New York corporation with its principal place of business in Schenectady, New York.  From 2009 to the present, Golub and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

26.     Plaintiff Nicholas & Co., Inc. ("Nicholas") is a Utah corporation with its principal place of business in Salt Lake City, Utah.  From 2009 to the present, Nicholas and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

27.     Plaintiff PFD Enterprises, Inc. d/b/a Pacific Food Distributors ("PFD") is an Oregon corporation with its principal place of business in Clackamas, Oregon.  From 2009 to the present, PFD and/or its affiliates purchased pork at artificially inflated prices directly from one or more

producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

28.     Plaintiff SpartanNash Company ("SpartanNash"), formerly known as Spartan Stores, Inc., is a Michigan corporation with its principal place of business in Byron Center, Michigan.  As used herein, "SpartanNash" refers to SpartanNash Company, Spartan Stores, Inc., Nash-Finch Company, Spartan Stores Distribution, LLC, and affiliated companies.  From 2009 to the present, SpartanNash and/or its affiliates purchased pork at artificially inflated prices directly from one or more of the Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct and proximate result of all Defendants' wrongful conduct.

29.     Plaintiff Springfield Grocer Company, Inc. ("Springfield") is a Missouri corporation with its principal place of business in Springfield, Missouri.  From 2009 to the present, Springfield and/or its affiliates purchased pork at artificially inflated prices directly from one or more of the Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct and proximate result of al Defendants' wrongful conduct.

30.     Plaintiff The Distribution Group, d/b/a Van Eerden Foodservice Co. ("Van Eerden") is a Michigan corporation with its principal place of business in Grand Rapids, Michigan.  From 2009 to the present, Van Eerden and/or its affiliates purchased pork at artificially inflated prices directly from one or more of the Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct and proximate result of all Defendants' wrongful conduct.

31.     Plaintiff Troyer Foods, Inc. ("Troyer") is an Indiana corporation with its principal place of business in Goshen, Indiana.  From 2009 to the present, Troyer and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or

their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

32.     Plaintiff URM Stores, Inc. ("URM") is a Washington corporation with its principal place of business in Spokane, Washington.  From 2009 to the present, URM and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

33.     Plaintiff Giant Eagle is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.  From 2009 to the present, Giant Eagle and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

34.     Plaintiff UniPro Foodservice, Inc. ("Plaintiff") is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Plaintiff and/or its affiliates purchased pork at artificially inflated prices directly from one or more Producer Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of all Defendants' wrongful conduct.

### B.     Defendants

#### 1.     Agri Stats

35.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and was, for a portion of the Conspiracy Period, a subsidiary of Eli Lilly & Co., a publicly held corporation headquartered in Indianapolis.  Agri Stats is now a wholly owned subsidiary of Agri Stats Omega Holding Co, LP, a limited partnership based in Indiana.  Agri Stats is a co-conspirator of the Producer Defendants and has knowingly played an important and active role as

participant in, and a facilitator of, Defendants' collusive scheme detailed in this Complaint.  Agri Stats has a unique and deep relationship with the pork industry generally, and specifically with each of the Defendants identified below, all of which are Agri Stats' primary customers. Defendants Clemens, Hormel, Seaboard, Triumph, Smithfield and Tyson, and Co-Conspirators JBS USA and Indiana Packers, are all Agri Stats subscribers and report a wide variety of information to Agri Stats, which, according to a 2016 Eli Lilly earnings call, is used by "over 90% of the poultry and pig market" in the United States.

36.     All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority.  Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.

### 2.     Clemens

37.     Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania.  During the Conspiracy Period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

38.     The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC.  During the Conspiracy Period, The Clemens Family Corporation and/or its predecessors, wholly owned or

controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

39.     The Clemens Food Group, LLC and the Clemens Family Corporation are referred to here collectively as "Clemens."  Clemens reports a wide variety of pork data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of pork.

### 3.     Hormel

40.     Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota.  During the Conspiracy Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

41.     Hormel Foods, LLC is a Minnesota corporation headquartered in Austin, Minnesota. Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation.  During the Conspiracy Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

42.     Hormel Foods, LLC and Hormel Foods Corporation are referred to here collectively as "Hormel."  Hormel reports a wide variety of pork data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of pork.

12

### 4.     Seaboard

43.     Seaboard is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation.[2]  During the Conspiracy Period, Seaboard and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

44.     Seaboard reports a wide variety of pork data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of pork.

### 5.     Smithfield

45.     Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company.  Smithfield Foods is headquartered in Smithfield, Virginia, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of pork.  During the Conspiracy Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

### 6.     Triumph

46.     Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of pork.  During the Conspiracy Period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled

---

[2] Seaboard Corporation is a Delaware corporation headquartered in Merriam, Kansas, and is the parent company of Seaboard Foods LLC.

subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

### 7.   Tyson

47.   Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Conspiracy Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

48.   Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Conspiracy Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

49.   Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly owned subsidiary of Tyson Foods, Inc.  During the Conspiracy Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

50.   Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc. and Tyson Foods, Inc. are referred to here collectively as "Tyson."  Tyson reports a wide variety of pork data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of pork.

### 8.   Co-Conspirators Indiana Packers, JBS, and AgStar

51.   Co-Conspirator Indiana Packers Corporation is an Indiana corporation headquartered in Delphi, Indiana, and reports a wide variety of pork data to Agri Stats, including,

without limitation, highly detailed, confidential information regarding its production and sales of pork.  During the Conspiracy Period, Indiana Packers and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.  Indiana Packers' parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and Mitsubishi Corporation (Americas).

52.     JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world, which recently plead guilty to antitrust violations in the chickens market.  JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of pork.  During the Conspiracy Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

53.     Compeer Financial is a member-owned, Farm Credit cooperative based in the Upper Midwest which, among other things, provides loans, leases, risk management and other financial services to agribusinesses, including those in the livestock business such as swine producers.  It was formed on July 1, 2017, through the merger of AgStar Financial Services, 1st Farm Credit Services, and Badgerland Financial.  As detailed above and below, AgStar n/k/a Compeer is alleged to be a Co-Conspirator.

15

54.     Various other persons, firms, and corporations not named as defendants have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this complaint.  Throughout this Complaint, JBS, Indiana Packers, AgStar, and the other persons, firms, and corporations not named as defendants that performed acts and made statements in furtherance of the conspiracy are collectively referred to as "Co-Conspirators."

## IV.     FACTUAL ALLEGATIONS

55.     Starting in at least 2009 and continuing to the present, Defendants and their co-conspirators conspired to fix, raise, maintain, and stabilize pork prices.  To effectuate and ensure the stability of their anticompetitive agreement, the Producer Defendants relied on a unique industry data sharing service provided by Defendant Agri Stats, Inc.  Agri Stats provided a means for the Producer Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of Defendants' price-fixing scheme, resulting in a stable and successful anticompetitive cartel.

56.     The Chicago Mercantile Exchange ("CME"), the U.S. Department of Agriculture ("USDA") and various other entities publicly publish aggregated daily, weekly, monthly, and annual supply and pricing information concerning the U.S. pork industry, including:  the CME Lean Hog Index, which reflects prices paid for hogs in the U.S.; the CME Pork Cutout Index, which reflects the prices paid for pork (a "cutout" is the approximate value of a hog calculated using the prices paid for wholesale cuts of pork); and USDA's National Daily Hog and Pork Summary.  The pricing and production information in those reports and indices is completely anonymous and aggregated (or averaged), and indeed the USDA reports clearly state that, for certain prices are "not reported due to confidentiality."

57.     But only Agri Stats receives from the Producer Defendants, and then provides to the Producer Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency.  Agri Stats is a company that generates confidential pork industry data considerably more detailed than any similar types of available reports, and the Agri Stats reports include the following data categories:

(a)  Performance Summary;

(b)  Feed Mill;

(c)  Ingredient Purchasing;

(d)  Weaned-Pig Production;

(e)  Nursery;

(f)  Finishing;

(g)  Wean-to-Finish;

(h)  Market Haul; and

(i)  Financial information, including profits and sales.

58.     Much of the information shared by Agri Stats and the Producer Defendants was unnecessary to achieve any benefits for pork producers.  Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.  In fact, in a truly competitive market, the participants would closely protect such proprietary information from disclosure as providing it to competitors would be disadvantageous: unless, of course, there is an agreement that the competitors will use the information to the joint benefit of each other as was the situation in the pork industry.

59.     Agri Stats describes itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of

17

performance." But describing Agri Stats as a "benchmarking" service does not accurately reflect its critical role in the pork industry and the fundamental importance Agri Stats has to the Producer Defendants.

60.     Beginning in 2008, after two decades focusing primarily on the poultry industry, Agri Stats began selling its so-called "benchmarking" services to pork producers, including the Defendants. Pork producers were told by Agri Stats' Greg Bilbrey that "benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. Each and every commercial swine operation is encouraged to participate in some benchmarking effort."

61.     Agri Stats emphasized to pork producers that sharing information through "benchmarking" could help achieve "ultimate goal [of] increasing profitability – not always increasing the level of production." Agri Stats told the industry that each pig producer "should be participating in some type of benchmarking. To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program. . . .Producer groups could design and operate their own benchmarking effort," and, most importantly, "[e]ach participant has to commit" to ensure the accuracy and reliability of the data collected and submitted to Agri Stats.

62.     Agri Stats collects data from the Producer Defendants, audits and verifies the data, and ultimately reports back to, the Producer Defendants detailed statistics on nearly every operating metric within the industry. Agri Stats' survey methodology involves – from and to the Producer Defendants – direct electronic data submissions of financial, production, hog placement, size and weaning age, capacity, cost, and numerous other categories of information by each pork producer on a weekly and monthly basis. At each of the Producer Defendants'

pork facilities, certain employees, typically in the accounting department, are responsible for regularly submitting the data to Agri Stats. Agri Stats uses a detailed audit process to verify the accuracy of data from each producer, often directly contacting the Producer Defendants to verify data before issuing reports to Agri Stats subscribers.

63.     Because of the nature of the life of a hog, even current and historical information about hog production numbers effectively gives forward-looking supply information to competitors. A typical production cycle for a hog is roughly four years, which is a function of the biological cycle for hogs, which involves time needed for: (1) breeding an existing sow, (2) selecting and retaining piglets, and (3) breeding and rearing the selected piglets. All of those elements factor into the time necessary to substantially increase production, which can be as much as two years.

64.     Agri Stats' critical importance for a collusive production-restriction scheme in the pork market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power. Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel – for example, by boosting pork production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production.

65.     Agri Stats' detailed statistics – coupled with its regular, in-person meetings with each Producer Defendant and routine participation in trade association events widely attended by the Producer Defendants' senior executives – serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are

trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

### A. Agri Stats' Detailed Reports Enable the Producer Defendants to Accurately Assess and Monitor Their Competitors' Production Levels

66.     Agri Stats claims to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific facilities by name, but not identifying by name other producers' facilities described in the report.

67.     However, contrary to these assertions, the Producer Defendants can (and do) readily determine "whose numbers the numbers belong to."  Agri Stats reports are so detailed that any reasonably informed producer can easily discern the identity of its competitors' individual facilities.  It is common knowledge among producers that others can do so, with some of the Producer Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."

68.     Indeed, each Producer Defendant knows that when it provides its internal, confidential information to Agri Stats, the other producers will be able to access that information and identify the Producer Defendant that submitted it.  There is no legitimate purpose to provide this specific, competitively sensitive information to Agri Stats, nor is there any legitimate purpose for Agri Stats to disseminate the information in the detailed, readily decipherable form in which it is sent to Defendants; rather, it is provided, compiled, and transmitted for anti-competitive purposes.

69.     Agri Stats' role in the pork industry extends far beyond the collection and dissemination of competitively sensitive data.  It is an active and knowing participant in, and facilitator of, Defendants' scheme.  Agri Stats' employees confirm for the Producer Defendants

the data for a particular company at regular meetings with each company, or at the numerous trade association meetings where Agri Stats executives make presentations on a regular basis.

70.     Agri Stats offers a service to the Producer Defendants and all Co-Conspirators whereby personnel from Agri Stats regularly meet with each Producer Defendant's employees and give presentations about both company- and industry-wide data.  Throughout the relevant time period, Agri Stats executives and account managers fanned out across the pork-producing regions of the country to meet with their clients and co-conspirators, the Producer Defendants and Co-Conspirators.  Since Agri Stats travels and presents among the Producer Defendants regularly, discussing each Producer Defendant's non-public, proprietary data, Agri Stats is in a unique position to share information among the Producer Defendants at these regular meetings. And that is exactly what happened.

71.     In addition to its in-person meetings with the Producer Defendants, Agri Stats employees, including Greg Bilbrey, regularly host, or present at, pork industry events, often citing Agri Stats data in discussing market, production, and demand trends in the pork industry. A publicly available excerpt of a presentation from Mr. Bilbrey shows the level of detail provided to competitors regarding profits in the pork market:

**Top 25% in Profit - Variances to Average Company - 2009-2007**

**2009**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

**2008**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

**2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

72.    The purpose of these reports was not to provide better prices to customers or to lower the costs of production.  Instead, the purpose was to improve the profitability of the Producer Defendants and their co-conspirators.  The particular Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average.

73.    On information and belief, the Agri Stats report actually circulated to competitors in the pork market contained even further detail.  The same presentation informed pork producers that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (ckg refers to 100 kilograms.)  This underlines that the purpose of these reports was not to allow customers to save money through lower prices and more efficient production – in fact, the opposite was true, the purpose was the profitability of the Producer Defendant companies and the impact was higher prices for pork customers.

22

74.     There is no plausible, non-conspiratorial justification for the Producer Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their hog size and age, pricing, capacity, production, and costs at the level of detail at which they do. In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic theory suggests that the routine exchange among competitors of such sensitive internal company information reduces competition.

75.     One chicken industry expert testified in a case against Pilgrim's Pride, a subsidiary of Co-Conspirator JBS USA, brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern."  The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most producers is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed.

76.     When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

77.     A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue.

23

My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own.  For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985.  AGRISTATS has the following mission statement:  "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES."  Note the mission is to share comparative data while protecting individual companies.  I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved.  Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

78.    Agri Stats has also played a similar role in the chickens industry and has been named as a defendant in dozens of civil suits alleging its active participation in a price-fixing and production-restriction conspiracy akin to that alleged in this Complaint.  In denying Defendants' motions to dismiss in the *Broiler Chicken* litigation pending in the Northern District of Illinois, the district court noted that, given the nature of the Agri Stats reports in that market, the defendants are in fact sharing future anticipated production information with one another, which raises significant antitrust concerns.

79.    And a 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their chickens cartel, which is equally applicable to the pork cartel alleged in this Complaint:

Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual."  He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state.  Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another.  Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement.  "This is one of the ways you do it.  You make sure that your co-conspirators have the kind of

information that gives them confidence – so they can trust you, that you're not cheating on them," he says.  "That is what creates stability for a cartel."

**B.      The Producer Defendants' Control Over the Production and Supply of Pork in the United States**

80.      The structure of the modern U.S. pork industry makes it a market that is ripe for the type of collusion alleged in this Complaint.

81.      **Vertically-Integrated Companies and the Control of Hog-Raising through Contract Growing.**  The Conspiracy Period was further characterized by the increased control over the breeding, production, growing, and processing of pork by the Producer Defendants through vertical integration and the exclusive production contracts with hog farmers.

82.      Vertical integration is so pervasive that the Producer Defendants are commonly called pork or swine "integrators" by the industry, government, analysts, and academics. Vertical integration allows the Producer Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter.  Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

83.      Under pork production contracts, "a contractor or producer provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."  This arrangement essentially converts independent farmers into contract employees that perform services for the pork producer.  The Producer Defendants typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities.  The Producer Defendants typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market.  The prevalence and use of contracts for hog production by the Producer Defendants increased significantly during the course of the

conspiracy.  By 2017 it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency for bid prices.

84.     Pork production begins with "farrowing," the term used to describe a female hog (called "sows") giving birth to piglets.  Sows will normally have anywhere from 11 to 13 pigs per litter.  With a sow being able to "farrow" as often as every four months, a single sow can have around 36 piglets in one year.  After birth piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig weighs upwards of 50 pounds.  At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds.  After the pigs reach their final weight, they are sent to a packing plant to be harvested.  Due to the nature of the pork production cycle, the reduction of sows—*i.e.*, farrowing hogs—has a significant impact on the supply of pork.

85.     The following diagram shows the path for pork raised for meat consumption from birth through sale to entities such as Plaintiffs, who are wholesalers, distributors, or retailers:



86.     The Producer Defendants directly or indirectly control every part of the supply chain in the diagram above except for the final one (wholesale); this is known as vertical integration. Economic theory holds that vertical integration can have anticompetitive effects because there are fewer firms competing with each other at all levels of the supply chain, which in turn can facilitate collusion on price.  Vertical integration is a hallmark of the postwar pork industry in the United States.

87.     Defendant Smithfield was the largest producer and processer of pork in the United States during the Conspiracy Period.  In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States.  Smithfield's 2014 annual report described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers.  In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

88.     In 2009, Defendant Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers.  Seaboard's 2017 SEC 10-K report states that it raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts."

89.     Defendant Clemens Food Group emphasizes its vertical coordination on its website, stating that the "vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers." A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.

27

90.     Defendant Triumph was created with vertical integration in mind as it is owned by five of the largest pork producers in the U.S.—Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota.  The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

91.     As Defendant Tyson stated in its 2009 10K Report, "The majority of our live hog supply is obtained through various procurement relationships with independent producers." Additionally, Tyson raises a number of weanling swine to sell to independent finishers and supplies a minimal amount of live swine for its processing needs.

92.     Defendant Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities.  As Hormel stated in its 2009 annual report, "[t]he live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."  Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.

93.     A primary consideration in Co-Conspirator JBS' 2015 purchase of Cargill's pork business was that it gave JBS more control over the production of hogs, by acquiring four hog farms and two packing plants operated by Cargill.

94.     Co-Conspirator Indiana Packers' website notes that it is "a fully integrated pork company operating entirely within the heart of the Midwest," and heralds the company's "pork-exclusive expertise and vertically integrated operation."

95.     Each of the Defendants further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports.  Defendants including Smithfield, Clemens, Tyson, Hormel, Seaboard, and Triumph, and Co-Conspirators Indiana Packers and JBS, sell packaged pork under various brand or trade names.

96.     **A Highly Concentrated Industry.**  The USDA has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."

97.     The hog integration sector is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production).  Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

98.     Prior to and in the beginning of the Conspiracy Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork producers controlling a large amount of market share.  Between 1988 and 2015, the top four pork producers (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015.

99.     In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion.  The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.  As noted

above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and two packing plants operated by Cargill.

100.    The acquisition was completed in October 2015 and resulted in further consolidation in the industry.  JBS' resulting pork business had *pro forma* net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork producer (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with roughly five percent of the national slaughter capacity).

101.    By 2016, the top six pork processors comprised 82% of the total market:  Smithfield (26% market share); JBS (20%); Tyson (18%); Hormel (8%); and Triumph and Seaboard (5% each). On their own, it would be difficult for any of these supposed competitors to exercise market power. But acting as a whole to manipulate the price of pork products, the combined market share of the six largest Defendants is, using the Herfindahl-Hirschman Index (the "HHI," the U.S. Department of Justice's measure of market concentration), well above the threshold for a "highly-concentrated" market.

102.    This high level of concentration in the pork industry was optimal for collusion.  WH Group Limited, the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated."  Both of these factors – maturity and concentration – make an industry more susceptible to collusion.

103.    The level of concentration in the pork production industry therefore facilitated collusion.  Because the industry was dominated by a relative handful of producers, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement.  Further,

because the largest producers were incapable of independently controlling prices on their own, such an agreement was necessary to inflate prices.

104.    **Barriers to Entry.**  Large barriers to entry kept potential competitors out of the pork integration industry.  New entry into pork processing is costly and time consuming.  Construction of a large-scale slaughter facility would cost hundreds of millions of dollars and the additional planning, design and permitting costs are substantial.  In 2012, it cost Cargill, whose pork business was later acquired by Co-Conspirator JBS USA, $25 million just to expand an existing facility.  Building a facility from scratch would cost considerably more, totaling hundreds of millions of dollars.

105.    The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants.  And in other situations, the processor owns the hog from farrow to finish.  Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably.

106.    **Inelastic Demand and Standardized, Commodity Products Where Competition is Principally on Price.**  Inelastic demand means that it is profitable for members of a cartel to raise the price of a good above competitive levels.  In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price.  In other words, demand elasticities measure the sensitivity of the quantity of a product purchased in response to changes in the price of a product and its closest substitutes.  Markets with a highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded.  Research shows that the demand for pork is inelastic, and that there is limited substitution between pork and other meat products.[3]

---

[3] Ronald L. Meekhof, *Pork Slaughter and Processing Sector Facility-Level Model*, June 2007 (showing that a one-percent increase in the price of pork resulted in a 0.636 decrease in pork demand).

107.     Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another.  Pork loins, bacon, ribs, and other pork products are produced on an industrial scale.  For example, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar nutritional values, branding, and packaging.  These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.

108.     **Opportunities to Collude at Industry Conferences and Trade Association Meetings.**  All Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct.  Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

109.     For example, a 15-member National Pork Board ("Pork Board," initially established by federal law) includes several senior executives of the Producer Defendants.  Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo.  Executives from several of the Producer Defendants are known to have served as members of the Pork Board.  For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff.  Skahill is the Pork Board's current Vice President, and also recently served as its Treasurer.

110.     According to its website, "[t]he National Pork Producers Council ["NPPC"], which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the

pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets." Executives from the Producer Defendants have served on the NPPC Board of Directors during the Conspiracy Period, including Cory Bollum of Hormel Foods, Don Butler and Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats.

111.    NPPC conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year. NPPC advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions. The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

112.    In addition to its annual National Pork Industry Forum, NPPC sponsors many other programs that have provided ample opportunities for defendants to meet with each other in person, including:

(a) The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show." It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms). The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

(b) Legislative Action conferences each spring and fall in Washington DC.

(c) A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

113.    The National Pork Industry Conference ("NPIC") has taken place in Wisconsin each July since 2010 (and in the Ozarks before that). Descriptions on the conference website have said

that NPIC "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America." After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow numbers." In July 2010, an industry website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded." The website for the 2016 NPIC conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts." Seaboard and Smithfield Foods are among the Producer Defendants whose executives have been session presenters at NPIC.

114.   Upon information and belief, CEOs and top-level executives from the Producer Defendants attending NPIC and NPPC events discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict pork production. For example, at the 2009 Pork Expo in early June 2009, the Producer Defendants met and discussed cutting (*i.e.*, "liquidating") production, which Smithfield CEO Larry Pope later described "was the key subject of the discussion of every producer," and as "something [that] has got to happen. And so that's [] very positive."

115.   In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues. For example, the 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year. A March 2011 AgriMarketing article about the club states that it consisted of "60 industry stake

holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

116.    All Defendants were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other organizations.

117.    Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association."  AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

118.    NAMI was formed in 2015 by merging the AMI and the North American Meat Association.  The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars . . . provide excellent networking and information-sharing opportunities for members of the industry."

119.    All of the Producer Defendants (or their closely affiliated companies) have been members of AMI and then NAMI throughout the Conspiracy Period.  Executives from the pork producer Defendants and Co-Conspirators JBS and Indiana Packers have served on the AMI and NAMI Board of Directors during the Conspiracy Period, including:

(a) Mark Campbell and Rick Hoffman of Triumph Foods;

(b) Doug Clemens and Phil Clemens of Clemens Family Corporation;

(c) Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc;

(d) Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

(e) Gary Louis, Rod Brenneman and Terry Holton of Seaboard;

(f) Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA;

(g) Jim Snee, Stephen Binder and Jeffrey Ettinger of Hormel Foods Corporation; and

(h) Gary Jacobson and Russ Yearwood of Co-Conspirator Indiana Packers Corporation.

120.    Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard.

121.    Throughout the Conspiracy Period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has sponsored the industry's "Annual Meat Conference." The conference website describes the conference as "a complete education and networking experience." Many of the Defendants' and Co-Conspirators' high-level executives attend the conference. For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President, Smithfield Foods and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

122.     Throughout the Conspiracy Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry."  All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc. (an affiliate of Agri Stats) through 2017.  The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates and industry capacity."

123.     The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike.  This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices.  Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years."  The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

124.     Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member-to-member education provided by Issues Answers Action."  Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015, and Phil Clemens of The Clemens Family Corporation in 2016.

125.     For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics."  The NAMI board met during the 2015 Management Conference.

126.     In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit."  In addition to education sessions, the summit has included, "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business."

127.     AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012. In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

128.     In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations.  Promotional materials for the 2014 IPPE indicated that attendees included Producer Defendants Clemens Food Group, Hormel Foods, Seaboard, Smithfield Foods, Triumph Foods, and Tyson, as well as Co-Conspirator JBS.  After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

129.     In addition to trade associations and industry meetings, pork executives also had supply agreements with one another which gave them opportunities to discuss pricing and

production.  For example, during the conspiracy period, Indiana Packers had supply agreements with Seaboard, Hormel, and Smithfield, giving all four companies ample opportunities to discuss pricing and production issues.

## V.   THE PRODUCER DEFENDANTS' CURTAILMENT OF PORK PRODUCTION

### A.   Overview of Defendants' Conspiratorial Restriction of the Pork Supply

130.   In the years leading up to the conspiracy period the steady expansion of pork production was virtually a given.  As one industry commentator reported in 2007, "Some things you can just take to the bank. Sow herd expansion among the *Pork Powerhouses* would fall into that category – even in the face of the biggest run-up in feed prices in history."

131.   This historical trend changed markedly during the Conspiracy Period.  As demonstrated in Figure 1 below, at several points during the Conspiracy Period, the pork producers changed their behavior and acted in a concerted way to decrease supply.  In 2009, 2010, and again in 2013, the pork industry cut production.[4]  These production decreases marked a drastic change from the period prior to the conspiracy from 2000 through 2009, in which pork supply was stable and steadily increasing on a yearly basis.

---

[4] *See* U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); *id.* at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

**Figure 1: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



132.     These supply cuts were coordinated, historic and unprecedented.  For example, in September 2009, industry publication *Pork Powerhouses* published an article entitled "Big Boys Cut Back" and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers.  These companies report 200,000 fewer sows than one year ago, a drop of 6.4%."

133.     At the same time, the Producer Defendants were further reducing domestic supply by devoting more and more production exports to overseas markets.  The U.S. has been a net exporter of pork products for a long time, but those exports have comprised a much larger share of total production in the past ten years.  As shown in Figure 2 below, less than ten percent of U.S. pork production was exported in 2000.  By 2011, more than twenty percent was being exported.  Sending production overseas is another way in which the Producer Defendants were able to reduce the supply available to U.S. markets, thereby driving up prices.  Notably, a 2017 analysis found that for every $1 million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt.  In other words, selling pork on the global market added $50.20 to the market price of hogs.  The

significant expansion in exports meant that increases in hog production by the Producer Defendants did not result in an increase in the supply of pork products in the United States market:

**Figure 2: U.S. Pork Exports, Millions of USD**



134.    As part of their acts and conduct in furtherance of the conspiracy, each of the Producer Defendants participated in these supply restraints, and concealed their concerted, unlawful conduct.

###    1.    Smithfield

135.    In 2008 Smithfield stopped instituting traditional production increases and instead reduced its number of sows, reporting that, "We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."

In 2009, Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately. Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows). In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

136.    Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

### 2.    Tyson

137.    Between 2008 and 2009 Tyson reduced its sows by over 25%, marking a significant reduction. In 2010 Tyson reported a further 3.3% decrease in its pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate. In 2013 Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."

### 3.    Hormel

138.    Hormel's production statistics show that it cut its number of sows in 2008 and maintained such reduced production throughout the Conspiracy Period. Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through." Hormel also reported lower sales of pork products in 2013. In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day.

### 4. Seaboard

139.    Throughout the Conspiracy Period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales.  Seaboard dedicated several employees to international sales and exports.  Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect—higher pork prices.  Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic market." Moreover, in 2017 Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

### 5. Triumph

140.    In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.  In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry.  Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide.  These exports constituted a significant portion of its production throughout the Conspiracy Period and reduced or otherwise limited Triumph's sales in the United States.

### 6. Clemens

141.    In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats.  Furthermore, in 2014 Defendant Clemens had a competitive advantage over many pork producers, in that comparatively few of its pigs were affected by the virus causing porcine epidemic diarrhea (known as "PED," which for several months disrupted the ability of many of Clemens' competitors to readily supply pork to the market).  But contrary to what one would expect

to see in a competitive market, Clemens did not utilize its advantage during the PED epidemic and refused to increase its market share when it clearly had substantial market incentives to do so.

### 7.   Co-Conspirator Indiana Packers

142.   Co-Conspirator Indiana Packers is a private company with limited information available to the public regarding its production statistics.  Nevertheless, in 2012 Indiana Packers indicated that it expected to reduce the number of hogs or pounds of pork processed at its facilities ostensibly because of high corn prices.

### 8.   Co-Conspirator JBS

143.    In 2011 JBS USA reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS USA.  Also, after acquiring Cargill's hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand.  This production restriction had the intended effect: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."

144.   As set forth above, each of these supply reductions during the Conspiracy Period were a departure from the Producer Defendants' market behavior prior to the conspiracy period. These supply restrictions involved a significant share of the Producer Defendants' annual production and are in contravention of the Producer Defendants' individual economic self-interest.  These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of pork.  While the Producer Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources.  As with their use of Agri Stats, the Producer Defendants exploited these public statements in order to communicate their planned supply restrictions to their competitors

in furtherance of the conspiracy and couched the public disclosures in pretext so as to conceal what was really occurring.

**B.     Timeline of the Conspiracy**

145.    Defendants' conspiracy to restrict pork supply began in 2008.

146.    In January 2008, Larry Pope, the CEO of Smithfield, met with the CEOs of the major pork producers – including Rod Brenneman of Seaboard, Dick Bond of Tyson, and Phil Clemens of Clemens – through AMI's executive committee.  At that meeting, Pope spoke of the need for the industry to reduce its supply, and minutes of that meeting reflect that Pope "shared that [Smithfield] will begin reducing their herd immediately.  Strategy is to push hogs through 1 week earlier to lower weights; then leave the barns open for that week (also help with animal health); they will look at their poorest producers and discontinue business with the bottom 5%."

147.    Although Smithfield shared this information with its competitors in the hope of inducing them to reduce supply as well, other Defendants were unwilling to follow Smithfield's lead without assurances that all major producers were on board.  On July 25, 2008, Marc Greenwood – the VP of Agri Business Capital at AgStar Financial – spoke by phone with Larry Pope of Smithfield.  As the largest lender to the pork industry, AgStar faced financial ruin if a large number of producers declared bankruptcy.  During this call, Greenwood recognized the problem with Smithfield's efforts to get its competitors to reduce supply – cutting production was against each individual producer's self-interest and that a "majority must participate" in order for the supply reductions to increase profitability.  Accordingly, Greenwood developed a plan to put financial pressure on pork producers to reduce supply. During the call, Greenwood informed Pope that AgStar would begin denying loans to companies that would not agree to reduce production levels by 10%. Greenwood also shared a PowerPoint presentation with Pope in which he requested that the "larger systems [i.e., the Producer Defendants] must lead the way

45

– top 30 must publicly state what they are going to do."  During the call, Pope "commended" Greenwood "for taking this strong stand," and informed him that Smithfield supported this approach.

148.    Over the next six months following this exchange between Pope and Greenwood, some large producers took smaller steps towards reducing supply. For example, in late 2008, Joe Szaloky, director of financial planning and analysis with Murphy-Brown LLC, the entity at Smithfield Foods that dealt with production, said according to the trade press:  "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[5]  Similarly, In February 2009, Smithfield said that it would close six processed meat plants.

149.    In October of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in industry-wide pork supply in 2009.

150.    Other producers were also meeting during this time period.  During the summer of 2008, Rod Brenneman, Seaboard's CEO, met in Japan with Kikuchi Kiyotaka, the COO of the Fresh Foods Division of Mitsubishi Corporation, the parent company of Indiana Packers. Kiyotaka e-mailed Brenneman on October 2, 2008, to arrange a follow-up meeting at Seaboard's office around the time of Indiana Packers' November board meeting, writing that he "appreciate[d] your time to discuss frankly last time.  As I indicated at that meeting, I will go to Indiana Packers for their Board meeting on Nov. 3," telling Brenneman that he would be joined by Ted Matsunaga (Indiana Packers' CEO) and Gary Jacobsen [*sic*] (Indiana Packers' President and COO).  Brenneman replied on October 13, 2008, confirming that he and Darwin "Duke" Sand, then Seaboard's V.P. of Sales and Marketing (and Brenneman's successor as CEO) could

---

[5] Freese, Betsy, *Pork Powerhouses 2008:  The Big Squeeze* (Sep. 4, 2008).

meet with the delegation from Indiana Packers and Mitsubishi on November 4.  Indiana Packers'
CEO Matsunaga confirmed the competitors' November 4, 2008 meeting at Seaboard's offices,
telling Brenneman that, "if it works for you, we (Kikuchi, Gary Jacobson & I) would like to have
dinner with you after the meeting."

151.    During Hormel's first quarter earnings call in January 2009, Mr. Ettinger once again
communicated that he expected industry-wide supply to decrease in 2009.  Hormel CFO Jody
Feragen confirmed that Hormel would "certainly look for opportunities particularly in January where
we could reduce the numbers that we had going through."

152.    As another example, in January 2009, Tyson stated that the capacity utilization of
its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%.[6]
This indicated that Tyson was reducing the amount of pork that it processed in its plants.  Tyson
stated that it would "continue to watch forward hog supplies and make adjustments
accordingly."[7]

153.    Throughout 2009, pork industry participants noted the need to follow the supply
restrictions imposed in the broiler industry.  For instance, in February 2009, AgStar VP Mark
Greenwood called on U.S. pork producers to follow the lead of the broiler and dairy industries by
reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%,
which at the low end would mean reducing the nation's sow herd by 300,000 sows.

154.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[6] Q1 2009 Tyson Foods, Inc. Earnings Conference Call (Jan. 26, 2009).
[7] *Id.*

████████████████████████████████████████████

█████████████████████████████████████████████████

155.    ██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

156.    ███████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████.

157.    In May 2009, Larry Pope, the CEO and President of Smithfield, stated during an investor conference attended by other pork industry executives:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down.  We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.

158.    Following this public statement by Pope, on May 16, 2009, Brenneman (Seaboard) recruited Larry Pope (Smithfield's CEO) to attend an AMI meeting and join Brenneman's subcommittee, which ensured that Pope would also be in regular contact with other committee members in the ensuing months.

159.    On June 9, 2009, Brenneman (Seaboard) told Steve Weiss (the co-founder of the Pork Club) that "I saw the announcement of the sow liquidation last week. Congratulations.  Did Smithfield decide to come along?  Any details that you feel okay sharing with me? (size, etc.)" Rather than respond with this information in writing, Weiss responded, "We should discuss over the phone."

160.    Within days of this exchange between Weiss and Brenneman, Pope of Smithfield called Brenneman directly to give him the "heads up" that Smithfield would be reducing its supply through a sow liquidation and to provide details on those plans.  Pope provided this information directly to Brenneman before announcing it publicly during Smithfield's earnings call on June 16, 2009.

161.    In June 2009, the CEO of Smithfield stated on an earnings call that the current cuts were not enough, and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something:"[8]

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our --I'll tell you, it's our Texas operation that sells pigs to Seaboard.  Seaboard knows that. . .. That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of.  Somebody else has got to do something.  We cut 13%.

---

[8] Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009).

The first 10% didn't fix it.  I don't think us going from 10 to 13 is going to fix the hog business.

*Id.*

162.    During the same call in June 2009, the Smithfield CEO, when asked to describe his expectations as to whether the rest of the industry would "liquidate" (*i.e.*, cut production), he described how at the 2009 Pork Expo in early June 2009, cutting supply was the "key subject of the discussion of every producer," adding that such supply reduction is "something [that] has got to happen.  And so that's very positive."  *Id.*

163.    A month later, Smithfield's CEO Larry Pope went on to note in the company's annual report that: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, liquidation is now a recognized reality by all in the industry.  To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately.  This reduction, combined with the additional cuts by our fellow producers should shrink supply to a point where the industry can return to profitability.  This liquidation is long overdue."

164.    Tyson was the next company to follow Smithfield with the public announcement of a major sow liquidation.  In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87% down from the previous year's rate.[9]  Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."[10]

---

[9] Q2 2009 Tyson Foods, Inc. Earnings Conference Call (May 4, 2009).
[10] *Id.*

165.    More significantly (and following Smithfield's major announcement in June), Tyson announced on July 15, 2009, that it was liquidating 20,000 sows, eliminating over 28% of its herd.  In particular, Tyson sold five farms and sent the sows to slaughter.  Tyson's 2009 10-K report further stated: "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal year 2009)."[11]  Upon information and belief, Tyson executives informed its competition of this supply cut during AMI's Executive Committee meeting, which was held between July 9-11, 2009.

166.    On July 15, 2009, Mel Davis (Seaboard) spoke with Steve Thompson of Tyson in order to get additional details on Tyson's production cuts, including the fact that Tyson would be liquidating the 20,000 sows rather than selling them, which meant that the domestic sow herd would be reduced, and not just Tyson's own herd.  Mr. Davis forwarded this information to Mr. Brenneman and others at Seaboard.

167.    In a memorandum to his shareholders sent on July 17, 2009, Phil Clemens (Clemens' CEO) commented on Tyson's herd reduction announcement but complained that "we believe the sow herd needs to come down by about 600,000 to bring hogs back to real profitability.  Don't know what the current reduction is, but it isn't anywhere close to 600,000."

168.    Although Smithfield's public statements indicated that supply reductions were dictated by the economic factors facing pork producers, its internal communications acknowledged that this was not true.  On July 19, 2009, Joe Luter, Smithfield's Executive VP emailed Pope and the CEO of the National Pork Board and asked the National Pork Board to do more to help Smithfield coordinate the supply reduction.  "[W]e have too many hogs in this

---

[11] Tyson Foods, Inc. 10-K Annual Report, at 20 (2009).

country and need to take 6-8 million market hogs out of our supply.  Cheap corn is likely going to slow liquidation and I don't think this is good for the industry over the next 2-5 years."  The National Pork Board's CEO responded in an attempt to distance his organization from Luter's request, writing "while I know there have been several different discussions underway on reducing supplies, (i.e., [AgStar's] Producer Retirement Program), most of these efforts haven't sufficiently addressed anti-trust concerns and/or generated the necessary producer support."

169.    Around this time, AgStar began to increase the pressure it was putting on pork producers to liquidate sows, including by informing producers that were not taking sufficient steps to reduce supply that they were out of compliance on their loans.  In an internal presentation prepared in late June 2009 supporting its own decision to liquidate sows, Tyson noted that "Producer equity levels have fallen and major ag lenders like Ag Star/Farm Credit are notifying producers that loans are out of compliance.  Producers may be forced to exit the business or seek high interest loans, packer/customer cash flow assistance, or relief from finishing unit rent and wean pig suppliers. . . . Ag Star/Farm Credit has $1.2 billion in pork production debt and will pull back operating loans shortly, based on producer cost to produce effectiveness, and a willingness to liquidate production.  They have said they will not provide operating loans to the wean to finish operator who imports Canadian wean pigs. [sic] Ag Star is serious about forcing sow liquidation, to drop supply quickly and improve a sustained profitability."

170.    In a July 30, 2009, presentation to its board, Tyson reported that "Major Ag Lender like Farm Credit/Ag Star considering pulling back operating loans based on producer cost effectiveness and willingness to permanently pull back production."

171.     These efforts by Smithfield, Hormel, and Tyson provided the assurances that

other producers needed to reduce supply as well (even though producers would have been better

off financially by maintaining their production levels in anticipation of the price impact from the

Smithfield, Hormel, and Tyson supply cuts).

172.     In August of 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner,

confirmed on an earnings call that:

> Hog supplies will be down in Q4 year over year but still adequate.  We do expect
> to see liquidation accelerate and pork production decrease into 2010 and beyond to
> improve producer profitability.  We will continue to watch forward hog supplies to
> drive more exports, monitor demand, focus on cost, mix, and pricing to generate
> revenue.[12]

Mr. Lochner continued, stating that, "Looking forward in the pork segment we will see a gradual

decline in hog supplies to the first half of our fiscal year with additional year over year declines

into Q3 and Q4."[13]

173.     Tyson's 2009 10K Report further stated: "We expect to see a gradual decline in

hog supplies through the first half of fiscal 2010, which will accelerate into the second half of

fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than

fiscal 2009)."[14]

174.     On an August 2009 earnings call, Wesley Mendonça Batista, CEO of JBS USA,

communicated the start of JBS USA's participation in hog liquidation efforts.  Mr. Batista

reportedly stated, "we are seeing the start, we are seeing some increase in—not increase, we are

seeing some more [hog] liquidation.  So, we think we will continue to see the margin in the

---

[12] Q3 2009 Tyson Foods, Inc.  Earnings Conference Call (August 3, 2009).
[13] Id.
[14] See Tyson 2009 10K Report, at 20.

processing side strong this whole year.  But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."

175.    The other Producer Defendants and co-conspirators agreed to or accepted Smithfield's exhortation for the "industry" to cut production and to announce those cuts to other producers.  During 2009, Triumph reduced the number of sows that it had from 396,000 to 371,500.  In particular, Triumph reduced the number of sows by 14,500 at its Christensen Facility, 4,000 at its New Fashion Pork Facility, and 5,000 at its Eichelberger facility.[15]  Notably, Triumph and Seaboard had a longstanding marketing agreement in which hogs processed by Triumph were marketed by Seaboard.[16]  Thus, the reduction in supply of sows raised by Triumph would result in a reduction in the amount of pork that was sold by Seaboard, absent Seaboard obtaining supply elsewhere.

176.    On September 2, 2009, at the Pork Club meeting in Philadelphia, Pennsylvania, Phil Clemens (Clemens' CEO) commented that "Our production has not slowed and we are in a typical supply demand curve problem.  We continue to produce too much pork for the amount that is being consumed.  In the last few weeks we have started to see a reduction in the sow herd - but still not even close to what really has to happen."  As a result of the "no attribution" rule, those in attendance agreed not to identify Mr. Clemens as the source of these comments.  Also at this meeting, Steve Meyer – an industry economist – gave a presentation to attendees detailing the degree of supply reductions that the pork industry needed in order to return to high levels of profitability.

---

[15] Betsy Freese, *Pork Powerhouses 2009*, Successful Farming (2009).
[16] According to Seaboard Corporation's 2010 Form 10-K, filed with the Securities and Exchange Commission, "Seaboard's Pork Division has an agreement with a similar size pork processor, Triumph Foods LLC (Triumph), to market substantially all of the pork products produced at Triumph's plant in St. Joseph, Missouri.

177.    Two days later, on September 4, 2009, Steve Weiss (co-founder of the Pork Club) sent to Rod Brenneman and Gary Louis at Seaboard notes from the September 2 Pork Club meeting, which included (without attribution) Mr. Clemens' comments about how the industry needed to take additional steps to reduce supply, as well as Meyer's economic presentation. Weiss also passed on encouragement from Mr. Pope that one of the Seaboard executives should join the Pork Club and attend future meetings.

178.    Similarly, on a September 2009 earnings call, Smithfield's CEO Larry Pope reportedly stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> We can't solve the problem.  But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.  But again, I don't think they can solve it.

> I think this industry has got to solve it collectively.  I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong.  But the answer is, yes, there are others cutting back.  We're not the only one.

179.    On September 24, 2009, shortly after receiving the notes of Mr. Clemens' and Mr. Meyer's comments, Mr. Brenneman (Seaboard) spoke at an AMI luncheon and opined that the swine industry "must liquidate 10% to achieve a sustainable supply/demand balance."  In other words, Brenneman spoke to a room of industry executives about the need for each of the companies to reduce supply, perfectly echoing the comments of Smithfield's CEO from June and Clemens' CEO from three weeks earlier.

180.    Among those in attendance at that AMI luncheon was Robert Manly, Smithfield's CFO.  In response to Brenneman's comments, Manly drafted an op-ed in which he pointed out that, as of August 2009, Seaboard had yet to take steps to reduce its own supply from 2008 levels.  A draft of the op-ed stated that "It is clear Rod knows what it takes to make the industry

healthy and advocates that economically painful production cuts are necessary, but Seaboard is unwilling to make their own sacrifices and wants other producers to suffer so Seaboard can reap all the benefits."  Smithfield's communications team took steps to publish the piece, but then withdrew it after receiving assurances that Triumph (Seaboard's joint venture partner) was in the process of reducing its production levels by approximately 32,000 sows (an 8% reduction from its 2007 levels) and that Seaboard was taking steps to reduce its purchases and slaughter of hogs, which would further reduce supply.

181.     In November 2009, Hormel stated that "we've seen about a 2% liquidation" in hogs.[17]

182.     On a December 2009 earnings call, Mr. Pope further confirmed that Smithfield had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance:"

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs . . . . I can tell you that I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves. We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.

183.     In a January 2010 article, an industry insider noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 5% in 2009.  Into 2010, the Producer Defendants continued their collusive efforts to do just that.  In March 2010, when asked on an earnings call

---

[17] Q4 2009 Hormel Foods Corporation Earnings Conference Call (Nov. 24, 2009).

about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield, indicated

that further cuts were still to come:

> Hog volumes for the rest of the fiscal year.  That's going to have the impact starting next
> fiscal year when there is going to be 13,000 less.  But I think we'll pick up some of that in
> our other operations.  But I think 8,000 or 9,000 or 10,000 of those a day will disappear
> from our operations and that represents about 8% of our, 8% of the hogs will be down.
> That's for also the fresh pork side.

184.    On a March 8, 2010, earnings call, JBS CEO Wesley Mendonça Batista

mentioned the company's reduction in hog supply as a driver of profitability and stated that these

efforts were resulting in protein shortages.  Mr. Batista stated:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other
> hand the improvement and increase in consumption in the emergent markets we are very
> optimistic about our business, about the margin that we will see a strong demand and this
> reduction in supply, so we believe that we will see some shortage in protein going forward.

185.    Despite having the economic incentive (increased demand) to increase supply and

capture market share, JBS adhered to the Producer Defendants' agreed upon scheme to limit hog

supply.

186.    As of March 2010, U.S. pork production was noted to be down 7% year to date,

with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights.

The Producer Defendants also were reported to have increased exports 8% by March 2010, which

was expected to lead to higher hog prices.

187.     In May 2010, Tyson stated in its Q2 2010 earnings conference call:  "Worldwide

protein supplies and US domestic availability are expected to remain below '08 and '09 levels.

We have seen good interest in Beef and Pork exports to a variety of global destinations."[18]

Similarly, in August 2010, Tyson stated in its earnings call that "Pork supplies in 2011 are

---

[18] Q2 2010 Tyson Foods, Inc. Earnings Conference Call (May 10, 2010).

anticipated to be below their peak supplies in calendar 2008 and 2009, and most projections show no material changes compared to 2010."[19]

188.    In August 2010, Hormel stated: "Our hog supply is down 3 to 4%."[20]

189.    In September 2010, Smithfield stated in a press release that the closure of its Sioux City plant in April 2010 had led to an 11% reduction in its processing rate from the prior year.  Smithfield further stated: "Industry wide, slaughter volumes were down 3.5%," and "Lower industry slaughter levels are expected to persist well into the company's second quarter."[21]  Smithfield's quarterly results from that time reflected that the volume reductions "should help stabilize prices at healthier levels than fiscal 2010."[22]

190.    The Producer Defendants also acknowledged access to information that allowed them to know that the supply of pork would not be increasing.  For example, in a December 2010 earnings call, Larry Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we can.  Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like that.  This is information you may not quite have.  And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.

191.    As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

192.    Supply level information regarding competitors allowed Defendants to know that supply would not increase in the future, given the lifecycles of the animals.  Based on this

---

[19] Q3 2010 Tyson Foods, Inc. Earnings Conference Call (Aug. 20, 2010).
[20] Q3 2010 Hormel Foods Corporation Earnings Conference Call (Aug. 20, 2010).
[21] *Smithfield Foods Reports Record First Quarter Results*, Smithfieldfoods.com (Sept. 8, 2010).
[22] See Smithfield Foods, Inc. Form 10-Q, at 22 (March 11, 2011).

knowledge, in November of 2010, Hormel CFO Jody Feragen stated on an earnings call that she did

not think the industry would see large scale expansion given profitability for the pork producers.

193.    In February 2011, Tyson's COO similarly stated:

I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that is true.  If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

194.    In the face of ever-increasing margins, when asked whether the type of profits would

continue, in a March 2011 earnings call, Larry Pope and Robert (Bo) Manly of Smithfield

confirmed to their competitors that it would not increase capacity, even in the face of the increased

profitability:

LARRY POPE:  We closed last night at nearly $64 for hogs.  Yet we are projecting over the next 90 days we will be up another 20% from that.  I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .

HEATHER JONES [industry analyst]:  So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?

BO MANLY:  I don't see it on the horizon, on the foreseeable horizon.  We are still going to have -- should have good margins, but I can't believe –

LARRY POPE:  Heather, we are sitting here today, we are halfway -- closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today.  We have got double-digit margins today.

BO MANLY:  It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. . . .

HEATHER JONES [industry analyst]:  All right, okay.  Thank you.

LARRY POPE:  You get two-year visibility on that, though.  You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . And by the way, we are not going to build a new plant to expand capacity.

195.    Also in 2011, competitors were exchanging competitively sensitive information

regarding exports and pricing.  Indiana Packers' Doug Lorenger, a senior sales executive whose

prior tenures at both Tyson and Hatfield gave him entrée across the entire industry, regularly discussed customers and market conditions, and exchanged highly sensitive competitive pricing and production information with Indiana Packers' competitors, including but not limited to JBS (where his brother, Brad Lorenger, worked as V.P. of Sales). ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████

196.    On January 31, 2011, within minutes of receiving it from his boss Mark McCain, Doug Lorenger forwarded to Smithfield's Dennis Shea an internal Indiana Packers' announcement of a coming price increase for bacon and pork bellies that included specifics about the amount and timing of the pricing action, with McCain's email to the Indiana Packers' sales team stating in part that "belly demand will continue to be high and supplies will become increasingly tighter as we go forward.  Effective immediately all belly formulas and overages will be increased by .05/lb.  This increase will encompass all fresh and frozen belly products. All increases and modifications will be in place by WB 2-14-11."  Shea then sent Lorenger's email along to several fellow Smithfield executives, noting that "Ind Pk just increased their formula pricing as well[.]"

197.    ████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

198.

199.

████████████████████████████████████████████████████████

██████████████

200.     Supply discussions also continued in 2012.  In March 2012, Smithfield's VP of Finance and Chief Accounting Officer stated, at an analyst conference widely attended by his competitors, that no one in the industry would be "real excited about adding capacity:"

> Nonetheless, you see some pretty significant fluctuations.  Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30.  So there is some volatility there.  And what I would tell you is that keeps a lid on pork production.  The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry.  There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.

201.     By May 2012, industry observers were noting that the reductions in slaughter capacity meant the Producer Defendants may not have enough capacity to slaughter expected hog levels by the fall.  In fact, Steve Meyer of Paragon Economics (an industry publication later sold to Agri Stats affiliate Express Markets, Inc.) noted that slaughter capacity would not keep up with hog capacity through late 2013 given that the Producer Defendants were holding their slaughter levels constant.

202.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

203. ███████████████████████████████████████

████████████████████████████████████████████

██████████

204. ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

205. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████

206.    On May 15, 2013, JBS' CEO Wesley Mendonça Batista continued to demonstrate Co-Conspirator JBS' ability to constrain the pork market.  During a quarterly earnings call, he stated that "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business. . . . So, this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent in beef."

207. ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████ Indiana Packers' planned cutbacks were soon confirmed by the company's ostensible competitors, including Seaboard, who in an internal email on June 5, 2013, noted that "there are a lot of kill cutbacks already being planned for this week.  Total, as of this morning, looking to be in the 42-45 head area . . . Tyson taking up to 16 hours out next week . . . Hormel will be taking out 10 hours.  Swift [JBS] and Farmland [Smithfield] will be making decisions on next week by tomorrow morning. IPC still needs 2000 head for this week," and it was "trying to hold the line."  Smithfield executives also reported to their colleagues on July 29, 2013, that they heard that "IPC cut 800 per day."

208.    In September 2013, Joe Szaloky, Vice President of Procurement and Business Development for Smithfield, confirmed the company's intention to maintain its sow number, not adding any more.[23]

209.    In December 2013, Robert Manly of Smithfield emphasized on an earnings call that coordinated industry action was necessary to "balance supply and demand":

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group.  We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.

210.    

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████

---

[23] Betsy Freese, *Pork Powerhouse 2013:  Disease Hits, Growth Continues*, Successful Farming (Sept. 29, 2013), *available at* https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-growth_283-ar34203.

211. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████

212. █████████████████████████████████
████████████████████████████████████
████████████████████████████████

213. ████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████

214. ██████████████████████████████████
████████████████████████████████████
████████████████████████████████

215.   ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

216.   Defendants' conspiracy was yielding substantial profits by 2014.  In October 2014, *Pork Powerhouses* reported that "Hogs made history this summer.  Pork producer profits were, quite simply, enormous -- averaging $82 profit for each hog marketed in the third quarter."  The report also noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast.'"  In early 2015, *Pig International* noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production.

217.   In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to expand significantly pork production.  Specifically, pork producers rushed to sign contracts with Producer Defendants and co-conspirators that would protect them if production exceeded slaughter capacity as some feared.

218.   Co-Conspirator Indiana Packers' communications with its competitors about supply and production continued into 2015.  On June 25, 2015, Indiana Packers' Doug Lorenger emailed Dan Dubbert, then Smithfield's V.P. of Industrial Sales, regarding "bellies," writing that "got you [sic] message we are short this week maybe something late next week depends on if the bacon department works on Monday 7/6/15 because the plant is closed?  Are you looking for hams?"

219.    On July 29, 2015, Russell Yearwood, Gary Jacobson's successor as Indiana Packers' President, emailed Scott Saunders, the President of Smithfield's Fresh Pork Division, "Hey Scott, I know that life must be crazy with your new position, but is there a time that I could give you a shout and get caught up with you?  Nothing urgent just want to see how you are doing."  Yearwood and Saunders spoke later that day.  The following day, Yearwood followed up with Saunders, proposing an in-person meeting in September, writing "after our conversation yesterday, I got a call from Tokyo asking if I could arrange a meeting with you for Mike Horio?  As I stated yesterday, he is the CEO of [Japanese meat processor] Itoham but I believe he will retire towards the end of this fiscal year.  Would you be available to meet with him?  He will arrive in the US on 9/27 and depart on 10/2.  Our current CEO, Don Hanji and I would also attend.  If it is convenient, we could meet you at your new digs in Virginia or wherever is convenient for you.  I believe that he would also like to say hello to Joe Sebring [the President of Smithfield's Packaged Meats Division] as well."  Saunders replied to Yearwood on August 11, 2015, stating, "Just talked to Joe [Sebring].  The best day would be Monday the 28th [of September] if that is possible.  We could meet in Cincy, or Chicago, or Virginia.  Which is ever easiest."  Yearwood responded, "Thanks Scott for getting back to me.  I will check with Tokyo and let you know."

220.    On August 24, 2015, Yearwood and Saunders arranged to meet in Chicago, with Saunders asking Yearwood "You staying at the Drake [hotel]?  We are still on right?" to which Yearwood replied, "We are still on if you are available.  We will be staying at the Westin River North [hotel]."

221.

222.

223.

224.



225.    Indiana Packers and its competitors coordinated their meetings around the time of

trade shows, including the annual World Pork Expo.  For example, on June 6-7, 2016, just prior

to that year's conference in Des Moines, David Murray, Indiana Packers' V.P. of Procurement,

arranged to meet with Scott Saunders, the President of Smithfield's Fresh Pork Division. The two confirmed that they were each booked in at the same time in the same hotel, the Renaissance Des Moines Savery Hotel, then agreed to meet at Smithfield's tent for happy hour beginning at 4pm on the afternoon of Thursday, June 9th, 2016.

226. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████

227.    In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift. In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry." However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.

228.    On August 10, 2017, Smithfield Senior Account Manager Susan Dow obtained a native Microsoft Excel copy of Indiana Packers' price list and distributed it to other Smithfield employees, one of whom reacted, "Please delete this ASAP. We should not receive a competitor's price list . . . It isn't legal for us to have a competitor's price list."

229.     The conspiracy – in which Defendants communicated extensively about their plans to reduce supply and also exchanged highly sensitive information about their operations through Agri Stats – also fostered an environment in which Defendants communicated extensively with each other about their pricing.  Accordingly, as detailed in this Complaint, the collusion on supply also allowed Defendants to coordinate their pricing and throughout the conspiracy, as detailed in this Complaint, Defendants engaged in extensive communications about their supply cuts, slaughter levels, and pricing for pork.

## VI.   ABNORMAL PRICING AND THE EFFECT ON PLAINTIFFS IN THE FORM OF HIGHER PRICES DEMONSTRATES THE SUCCESS OF THE CONSPIRACY

230.     Beginning in 2009, the pork industry showed abnormal price movements, *i.e.*, increases in prices for the average hog whole price unexplained by increases in costs.  All of these pricing measurements show a significant break between pricings prior to 2009 and pricing after 2009, supporting the plausibility of a conspiracy to increase prices of pork.  Average wholesale hog prices started to increase in an unprecedented way beginning in 2009, leading to increased earnings among the Producer Defendants and damaging Plaintiffs in the form of higher prices for pork than should have prevailed in a competitive market.

231.     According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb from 2000 to 2009, the hog market year average price was at times substantially less.  Thereafter, prices increased dramatically, rising to more than $1.80/lb in 2014, and never dropping or below $1.40/lb again.  Figure 3 below shows the unprecedented increase in wholesale hog prices beginning in 2009, which stayed elevated through 2018:

**Figure 3: Average Hog Wholesale Prices in Cents per lb., 2000-2018**



## VII. OVERCHARGES FROM THE CARTEL REFLECTED IN HIGHER PORK PRICES PLAINTIFFS PAID

232.    Pork is a commodity product; pork sold by competitors has no meaningful difference and is thus interchangeable. As such price is driven by the economic fundamentals of supply and demand. In the words of Tyson's COO during a 2010 earnings call, "As you know decreased supply should be favorable to pricing."

233.    By reducing, stabilizing, and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2012 the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."

234.    The volume of U.S. commerce in the pork industry is enormous.  Total pork sales in the United States exceeded $20 billion for much of the Conspiracy Period.  Each of the Producer Defendant's annual sales of pork products are also very large.  For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales.  That same year, Tyson reported $4.9 billion in pork sales.  With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to Plaintiffs.

235.    The Bureau of Labor Statistics ("BLS") maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products paid by Plaintiffs.  The PPI for Pork (Processed or Cured – Not Canned/Made into Sausage) shows a marked increase beginning in 2009 and continuing through 2017:



**VIII.   THE RESULTS OF THE DOJ'S CRIMINAL INVESTIGATION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN THE PORK INDUSTRY**

236.   The U.S. Department of Justice Antitrust Division ("DOJ") has an ongoing criminal antitrust investigation into anticompetitive conduct in the broiler chickens industry.  The DOJ has indicted numerous current and former poultry industry executives, including from Pilgrim's Pride, which is majority owned by JBS USA Food Company Holdings, the parent of JBS.

237.   On February 23, 2021, Pilgrim's Pride pled guilty to charges brought by DOJ for "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Action, 15 U.S.C. § 1" from "at least as early as 2012 and continuing through at least 2017," and agreed to pay approximately $107 million in a criminal fine.

238.   Tyson, after being served with a grand jury subpoena in April 2019 in DOJ's broiler chicken investigation, applied for leniency from prosecution under DOJ's Corporate Leniency Program, pursuant to which Tyson must, in order to avoid criminal prosecution and fines, admit to having participated in activity constituting a criminal antitrust violation and fully cooperate with DOJ.

239.   The guilty plea by Pilgrim's Pride and Tyson's grant of leniency in DOJ's criminal price-fixing investigation in the broiler chicken industry serve as a "plus factor" supporting the plausibility of the pork industry conspiracy alleged in this Complaint, particularly given the similar structural characteristics between the broiler chicken industry and the pork industry.

240.    In addition, upon information and belief, the same antitrust policies and practices that resulted in antitrust violations by Pilgrim's Pride and Tyson with respect to broiler chickens governed JBS's and Tyson's conduct with respect to pork and the conduct alleged herein.

241.    Pilgrim's Pride and Tyson's antitrust violations concerning broiler chickens were concealed and only established by DOJ's criminal investigation, just like the alleged conduct in this Complaint has been concealed by Defendants, as discussed below.

## IX.    PLAINTIFFS' CLAIMS ARE TIMELY

242.    Plaintiffs' Sherman Act and PSA claims have been brought within the applicable statute of limitations period.

### A.    Class Action Tolling

243.    Plaintiffs purchased pork directly from one or more Defendants or Co-Conspirators first alleged in the class action captioned *Maplevale Farms, Inc. v. Agri Stats, Inc. et al.*, Case No. 18-cv-1803 (D. Minn.), filed in the U.S. District Court for the District of Minnesota on June 29, 2018.  Plaintiffs had neither actual nor constructive knowledge of the facts constituting its claim for relief, and Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before its claims were tolled by the filing of the *Maplevale* complaint on June 29, 2018.

244.    By virtue of the filing of the *Maplevale* complaint, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs may have as a result of the unlawful combination and conspiracy alleged in this complaint.

### B.    Fraudulent Concealment Tolling

245.    Plaintiffs' Sherman Act and PSA claims are timely because each of them did not know of (and could not have reasonably discovered) the existence of the conspiracy alleged in

this Complaint – in the case of the Sherman Act claims, at least four years or more before June 29, 2018 – and in the case of the PSA claims, at least four years before filing this Complaint – because of Defendants and co-conspirators' active concealment of their conspiracy as alleged below.  Defendants and their co-conspirators' affirmative and fraudulent concealment of their unlawful conspiracy as described in this Complaint tolled the statute of limitations for each Plaintiff's Sherman Act and PSA claims.

246.    During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, and as alleged in detail in this Complaint, Defendants and co-conspirators both conducted their conspiracy in secret and created pretexts to allow additional communication, including coordinating their supply plans at or incident to trade group meetings and events in order to give their collusive meetings the appearance of legitimacy; communicating through third parties or through backchannels; avoiding references to the conspiracy in their internal communications and describing information received directly from competitors as "rumors" in order to avoid naming their sources in writing; communicating with each other by telephone to avoid written records of what they said and limiting knowledge of the conspiracy to only an inner circle of senior executives; deleting evidence of the conspiracy and instructing others to do the same, all so that there would not be a paper trail of their unlawful scheme; coordinating between family members who worked for different Defendants; and by providing deceptive and pretextual statements to their customers and to the public in justifying supply cuts and price increases that were intended to conceal – and did in fact conceal – that these actions were the result of collusion.

247.    During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Producer Defendants and co-conspirators publicly and

pretextually claimed that increases in their pork production input costs or other seemingly plausible reasons were responsible for increased pork prices when, in fact, they were not. This created the illusion that the price of pork that they sold to Plaintiffs was competitive, when, in fact, it was not because their pork prices were the result of the conspiracy. For example:

(a) Producers claimed that decreased supply and higher prices were caused by the H1N1 outbreak. But a National Pork Board customer tracking research report dated May 6, 2009, stated that "The overall perception of the safety of pork remains in a good trajectory" and that "Among pork consumers, we continue to see purchase intent stabilizing...." And, Bret Getzel from Seaboard confirmed H1N1's short term impact on the pork market in a May 21, 2009, email to Chuck Faughnan, where he told him "There was some very short term weakness in the market as a result of the H1N1 negative press, but this came and went pretty fast. The market had pretty much recovered by 05/08."

(b) ███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████

(c) In 2012, Tyson's CEO insisted publicly that Tyson Foods "need[ed] to get our pricing improvements in order to get paid for those higher raw materials."[24]  His statements indicate at the time that he understood customers would – in his words – "understand that these higher grain prices are going to require higher prices."[25]

(d) ███████████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████

(e) ██████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████

(f) The PEDv scare was also a pretext for higher prices due to allegedly short supply.  On November 4, 2014, in response to a question about pork belly pricing, Brandi McClure, Product Manager at Seaboard, wrote, "PED Scare – Starting late last Fall and well into the Spring, paackers/customers were putting product into the freezer anticipating reduced

---

[24] Q4 2011 Tyson Earnings Conference Call (November 21, 2011).
[25] Q4 2012 Tyson Earnings Conference Call (November 19, 2012).

volumes in the Spring and Summer.  While we did have reduced kills, the hog weights made up for the overall volume decline that was expected and therefore the anticipated shortage was never realized."

248.    Defendants also communicated in secret in order to coordinate their supply reductions and price increases, including by sending to competitors their future supply and pricing plans and instructing colleagues to conceal or delete evidence of their unlawful actions. For example:

(a)    On August 14, 2008, Dick Bond, Tyson's CEO, reviewed an internal analysis of Tyson's projected financial performance.  Bond recognized that the projections were not all that useful without similar data from Tyson's competitors and asked an employee if Tyson could get data from "our competitors like Pilgrim, Smithfield, Hormel, etc.?"  When the employee responded that the data could be obtained through a special third-party survey, Bond responded that he "could call the companies I listed and probably get some info.  Is that O.K.?"

(b)    Brenneman and Larry Pope – the CEOs of Seaboard and Smithfield, respectively – also spoke a number of times between late 2008 and late 2009 under the auspices of a supply contract between the two companies in which Smithfield provided hogs to Seaboard. Although the two did discuss this buyer/seller arrangement, they also used the relationship to discuss in detail the supply plans of their respective companies and pressure each other to commit to supply reductions."

(c)    On January 22, 2009, Seaboard executives Brian Taphorn and Tom Blumhardt received from a sales broker an email attaching a spreadsheet with competitors' pricing and

cautioned that "I got this from a source for you to help see the most current on the SBR competition.  Please guard it carefully."

(d) On July 8, 2009, Tom Padgett of Tyson circulated internally to Todd Neff and Jay Krehbiel the current prices to retailers offered by Seaboard and Smithfield for bone-in loins and noted that Cargill and JBS had "nothing to offer" because they were short on product.  Neff then forwarded the email to others at Tyson and instructed them to "read and delete."

(e) On October 29, 2009, Clemens' Dan Groff emailed senior company management that he had "heard through the grapevine yesterday that Smithfield had called a meeting on November 17th with a group of PA independent hog producers."  He further noted that he was "very curious about this" and would "try and ask around" but asked "if anyone has any reliable Smithfield contacts or can think of anyone who might know some information that you give them a call.

(f) ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████

(g) On November 23, 2010, Brian Taphorn of Seaboard emailed internally to Terry Holton Smithfield's 1/8" trim price list, which he had obtained from National Beef.  Taphorn told Holton, "Want to keep this confidential, as I'm sure no one else at National knows this has been forwarded to us."

(h) On October 19, 2011, Todd Neff, a Senior VP at Tyson, complained to two co-workers about Tyson's decision not to add shifts at its plants and increase its slaughter volumes.

Neff complained that "we should sltr more than we are at times . . . we have earned the right to get our fair share of sltr [slaughter] since we are performing well vs. industry i.e. – make the other guys cut back! I trust you'll read and delete and not repeat this."

(i) As set forth in detail above, brothers Brad Lorenger (VP of Sales at JBS) and Doug Lorenger (a senior sales executive at Indiana Packers) communicated frequently to coordinate on pricing and supply between their respective companies.

    a.  █████████████████████████████████████
█████████████████████████████████████████

    b.  ███████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████

    c.  ███████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████

    d.  ████████████████████████████████████████
█████████████████████████████████████████

80



e.

f.

g.

h.

i.

j.

(j) Beginning in 2012, the Pork Club added a "Just Pigs" meeting limited to just pork producers.  This was intended to facilitate "informal roundtable" discussions amongst the competitors.  Legal counsel did not attend these meetings

(k) On March 16, 2012, Dhamu Thamaduran and Shane Horsley of Smithfield discussed Smithfield's supply forecast for the upcoming week based on "rumors" that could only possibly have come directly from competitors.  For example, Horsley reported that "Triumph is expected not to harvest next Saturday.  However, expect them to be in buying hogs next week for the following week."  Thamaduran responded by confirming Horsley's Triumph intel, and also reporting that Seaboard would not be killing hogs on Saturday, while at Tyson there was "talk of possible reduction is [sic] Saturday kill but no confirmation yet."

(l) ███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

(m)  On November 9, 2012, senior-most executives from Cargill, Tyson, Smithfield, Hormel, and JBS met in Chicago.  Within two months of the meeting, Defendants began cutting back their kill rates, and reported these reductions to the competition.

(n) For example, on January 30, 2013, while circulating a new price list, Brian Taphorn informed Seaboard personnel that, "There is, finally, talk of some kill cutbacks coming down the pike into next week.  Tyson has said to cancel all kill plans for the weekend of 2/9; Excel talking of slowing down some daily overtime hours; and Swift taking more of a stand against paying over the top for hogs versus just going without.  We believe it would take real cutbacks to make a real supportive move in the markets."

(o) Later that year, on July 9, 2013, Taphorn (Seaboard) circulated the "latest 'Price List' from Smithfield," asking his team to "PLEASE KEEP THIS IN HOUSE AND CONFIDENTIAL."

(p) On February 23, 2014, in an email entitled "Summary of last week's conference" and sent to senior Clemens' management, Dan Groff (Clemens") wrote that "I wanted to pass along a few interesting anecdotes from my conference last week.  As always, most of the interesting stuff comes out in the hallways and at dinner rather than in the actual meetings……"  In the bullet that followed, Groff wrote that "Farmland, Smithfield and Triumph all have sizeable holes in hog supply to fill in the next two months, nothing new there but it's a very real problem for them…."  The summary also included information about kill schedules, hog weights, hog diets, and discussion of Tyson's welfare announcement, during which Tyson management admitted they overreacted to customer pressure."

(q) On May 22, 2014, Taphorn (Seaboard) predicted in an email to colleagues that pork prices would move up in June and July because there were 11 plants "that are either currently on a 4 day kill schedule, or will be transitioning into the 4 day schedule the first half of June. . . .  We should expect others to join that fold, as we get deeper into June and July."

(r) Backchannel and confidential communications regarding confidential supply and pricing information between Defendants became so common that Defendants' personnel began giving such communications nicknames.  On August 11, 2015, Hormel's Corwyn Bollum told a group of fellow Hormel employees that he "just heard through the pig mafia rumor mill, that JBS is going to be moving to Ractopamine free starting October 1, 2015."

(s) On March 23, 2017, Rob Bogaard of Smithfield reported internally on a call with a Tyson hog buyer during which the Tyson buyer informed Smithfield that Tyson and other competitors believed that the supply of pork bellies was tight and that there would be

insufficient supply for bacon suppliers that were not vertically integrated with hog farmers. Bogaard instructed his team that the details of the call were "CONFIDENTIAL."

(t)  In 2017, when both Clemens and Seaboard/Triumph added new plants, both companies made sure to inform their competitors of the impact of these new plants in an effort to avoid retribution from the other conspirators for adding capacity.

(u)  On April 21, 2017, Shane Miller of Tyson spoke with a contact at Clemens.  Miller forwarded the information on to others at Tyson and Greg Schweitzer commented "Nice job Shane.  Clemens is telling us Coldwater [the new Clemens plant] is scheduled to come up right after Labor Day in Sept."  Jay Krehbiel of Tyson then forwarded this exchange to others but cautioned them to "read and delete please."

(v)  On June 9, 2017, Dan Groff of Clemens emailed internally several senior executives and reported on a conversation he had with Gary Louis of Seaboard about the production plans and slaughter numbers for Seaboard and Triumph.  Groff noted that he "kept this DL list relatively small because there are a few sensitive things on here, so if you want to share anything specific, please copy/paste to a separate message."

(w) Notwithstanding this messaging from Clemens and Seaboard/Triumph, during a March 2018 meeting several senior Tyson executives, including Todd Neff, Shane Miller, and others, Tyson discussed "how do we punish our competition for their capacity investments?"

(x)  On August 10, 2017, Susan Dow of Smithfield circulated Indiana Packer's pricing list to others at Smithfield.  Although she was scolded by Bob Darrell because "it isn't legal for us to have a competitor's price list," another Smithfield employee removed Darrell from the thread and joked to Dow that "we'll all made this mistake. . . .  I did it too."

(y) Hormel's antitrust compliance policy explicitly prohibited any discussions with competitor suppliers about anything other than bid price.  Despite this, Hormel used its procurement relationship with other Defendants as a pretext for sharing their confidential information.  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

(z) Senior executives of Defendants and Co-Conspirators also concealed their conspiracy by communicating with their counterparts at competing companies using personal email addresses.  For example, Indiana Packers' President and COO Gary Jacobson used his Hotmail account (garyljacobson@hotmail.com) to exchange emails with Hormel's Don Temberley in February 2013 to discuss, *inter alia*, meat quality.

249.    Additionally, the Agri Stats' reports provided to the Producer Defendants and co-conspirators were the equivalent of competitors (here, the Producer Defendants and co-conspirators facilitated by Agri Stats) meeting in secret to exchange Competitively sensitive information with each other in furtherance of their conspiracy.  Instead of meeting in secret in a hotel room and using a white board to conspire, the Producer Defendants and co-conspirators, facilitated by Agri Stats, used the non-public Agri Stats' reports that they received to exchange, *i.e.*, communicate, with each other in secret their Competitively sensitive information to implement, monitor and enforce their conspiracy.

(a) For example, in 2009, the President of Agri Stats, Brian Snyder, reportedly commented about the secretive nature of Agri Stats: "Agri Stats has always been kind of a quiet company.  There's not a whole lot of people that know a lot about us obviously due to

confidentiality that we try to protect.  We don't advertise.  We don't talk about what we

do.  It's always kind of just in the background, and really our specialty is working

directly with companies about their opportunities and so forth."  Sanderson Farms

Investor Day – Final (Oct. 2009).

(b) At the same 2009 presentation, when discussing "bottom line numbers" (*i.e.*, a

company's net earnings), Mr. Snyder declined to display those numbers publicly, stating

"I'm not going to display the actual bottom line to the group here just because of the

confidentiality nature of the information."  Id.  Yet, despite refusing to reveal this

information publicly, Agri Stats provided producers with the "bottom line numbers" of

their competitors on a regular basis via the reports discussed above.

(c) These statements acted to conceal the true detail and nature of the Agri Stats reports from

Plaintiffs and the public in general.  In other words, Agri Stats was stating publicly that it

could not share information publicly and it did not provide any Producer's information to

another because it was "confidential," but in private, Agri Stats knowingly and

intentionally shared each Producer Defendant and co-conspirator's Competitively

sensitive information with the others.

(d) On May 9, 2012, Deb McConnell (Tyson's submitter to Agri Stats) inquired of Agri Stats

which specific plants were included in Agri Stats' kill/cut figures.  Greg Dess of Agri

Stats responded with the 12 specific plants for which Agri Stats received this information.

McConnell then circulated Dess' response to others at Tyson and instructed them to

"keep confidential."

(e) On June 15, 2012, McConnell then revealed to Agri Stats's Josh Edwards that Tyson could use Smithfield's earnings release information to decipher which of the locations listed in Agri Stats's studies belong to Smithfield.

(f) In fact, by May 7, 2012, McConnell had begun orchestrating Tyson's regular deanonymization of the information of its competitors in Agri Stats reports.  McConnell would disseminate deanonymized competitor information from Agri Stats in monthly printed "packets" for Tyson employees to review in meetings.

(g) In a company-wide email sent on April 6, 2018, Tyson reminded its employees that its procurement policy (*i.e.*, its guidelines for purchasing materials) prohibited the sharing of any confidential information because such conduct would put Tyson at a competitive disadvantage in obtaining lower prices for the materials it purchased.  Notwithstanding this policy for its procurement processes, Tyson consistently shared its confidential information with respect to its pricing and production information through Agri Stats knowing that there were methods to deanonymize the Agri Stats reports.

(h) 

250.    Plaintiffs' Sherman Act and PSA claims are timely because, as alleged above, overt actions by Defendants and co-conspirators in furtherance of the conspiracy occurred after

June 28, 2014 and continued until at least June 28, 2018, if not later, including, without limitation:  (a) Defendants and co-conspirators unlawfully coordinated to restrict pork production, including, without limitation, using the Agri Stats reports to exchange Competitively sensitive information with each other to monitor and enforce the conspiracy in 2015, 2016, 2017 and 2018 (if not later); (b) Clemens did not attempt to take advantage of the 2014 PEDv epidemic by increasing market share, although its hogs were largely unaffected by the epidemic and, had it acted rationally, it would have increased production to increase its market share for the year; (c) after it acquired Cargill's pork enterprise in approximately October 2015, JBS opted to decrease supply despite increased consumer demand; (d) in 2017, Seaboard and Triumph postponed expansion of facilities despite publicly acknowledging a growing demand and growth in pork consumption that would have supported expansion; and/or (e) in 2015, 2016, 2017 and 2018, Producer Defendants and co-conspirators coordinated in the export of pork.

251.    Each of the foregoing overt acts was a new and independent act in furtherance of the conspiracy and not merely a reaffirmation of a previous act.

252.    Each of the foregoing overt acts, or one or more of them in combination, inflicted new and accumulating injury on each Plaintiff.

253.    Defendants and co-conspirators' parallel conduct as alleged above, including their coordinated restriction of the domestic pork supply, would not have occurred in 2015, 2016, 2017 and 2018 (or later) had the conspiracy been disbanded, but it was not.

254.    "Plus factors" supporting the existence of the conspiracy were still present in 2015, 2016, 2017 and 2018, if not later, including, without limitation, pork remained a commodity product with inelastic demand; the Producer Defendants and co-conspirators wielded substantial market power because of their high collective market share and industry

concentration; there remained barriers to other producers entering the domestic market for the production of pork; and/or trade group meetings and events occurred that provided Defendants and co-conspirators with the opportunity to conspire, which they did.

255.    Defendants and co-conspirators intended for their affirmative acts of concealment to conceal the existence of their unlawful conspiracy from Plaintiffs, and Plaintiffs were unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment during the conspiracy or, at a minimum, either before June 28, 2014, or four years before filing this Complaint.  As a direct result of Defendants and their co-conspirators' affirmative acts of concealment, each Plaintiff did not have actual or constructive knowledge of its claims alleged in this Complaint, or the facts that might reasonably have led any Plaintiff to discover or suspect that it had the claims against Defendants and co-conspirators – in the case of Plaintiffs' Sherman Act claims, prior to June 24, 2014 – and in the case of Plaintiffs' PSA claims, more than four years before filing this Complaint.  Before then, no Plaintiff was aware of facts that would have alerted it (or a reasonably diligent person in Plaintiff's position) of the need to investigate whether it had the claims alleged in this Complaint.

256.    Plaintiffs' Sherman Act and PSA claims are timely because each of them did not know of (and could not have reasonably discovered) the existence of the conspiracy alleged in this Complaint – in the case of the Sherman Act claims, at least four years or more before June 28, 2014 – and in the case of the PSA claims, at least four years before filing this Complaint – because of Defendants and co-conspirators' active concealment of their conspiracy as alleged below.  Defendants and their co-conspirators' affirmative and fraudulent concealment of their unlawful conspiracy as described in this Complaint tolled the statute of limitations for each Plaintiff's Sherman Act and PSA claims.

257.    During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Defendants and co-conspirators conducted their conspiracy in secret, including communicating in secret in furtherance of the conspiracy at or incident to trade group meetings and events; and, upon information and belief, avoiding references to the conspiracy in their documents, and communicating with each other by telephone to avoid written records.  In the context of *this* case, the Agri Stats' reports provided to the Producer Defendants and co-conspirators were the equivalent of competitors (here, the Producer Defendants and co-conspirators facilitated by Agri Stats) meeting in secret to exchange Competitively sensitive information with each other in furtherance of their conspiracy.  Instead of meeting in secret in a hotel room and using a white board to conspire, the Producer Defendants and co-conspirators, facilitated by Agri Stats, used the non-public Agri Stats' reports that they received to exchange, *i.e.*, communicate, with each other in secret their Competitively sensitive information to implement, monitor and enforce their conspiracy.

258.    Plaintiffs did not have a reasonable basis to suspect that they had claims in this case until no earlier than 2018 in connection their Court filings in the *Broiler Chicken Antitrust Litigation* in the Northern District of Illinois.  Until at least then, the conspiracy among Defendants and co-conspirators was fraudulently concealed from Plaintiffs.

259.    Further, throughout the conspiracy, each Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for pork.  For example, and without limitation, each Plaintiff used a method of purchasing pork – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith at the time that it was

receiving competitive prices for pork that it purchased from the Producer Defendants and co-conspirators.

## X.      ANTITRUST INJURY

260.      Defendants' anticompetitive conduct had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to pork;

(b) The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

(c) Plaintiffs had paid artificially inflated pork prices as a result of Defendants' conduct.

261.      The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork. As a direct and foreseeable result, Plaintiffs paid supra-competitive prices for pork during the Conspiracy Period.

262.      By reason of the alleged violations of the antitrust laws, Plaintiffs have sustained injury to their businesses or property, having paid higher prices for pork than it would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

263.      This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

### COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (Against All Defendants)

264.      Plaintiffs incorporates by reference the allegations in the preceding paragraphs.

265.      Defendants and all of their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

266.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

267.     At least as early as January 1, 2009, and continuing until present, the exact dates being unknown to Plaintiffs, Defendants and all of their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

268.     Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for pork throughout the United States.

269.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

270.     As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supracompetitive prices for pork.

271.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

(c) Plaintiffs have directly purchased pork from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, have been deprived of the benefits of free and open competition in the purchase of pork.

272.     Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

273.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs have been injured in their businesses or property by paying more for pork than they would have paid in the absence of the conspiracy.

274.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## COUNT II: VIOLATION OF THE PACKERS AND STOCKYARD ACT
### (Against All Defendants Except Agri Stats)

275.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

276.     The purpose of the PSA is, among other things, to provide for fair trade practices in the sale and marketing of livestock and meat products.  The PSA is remedial legislation and should be construed liberally to give effect its purposes.  *E.g.*, *Armour and Co. v. United States*, 402 F.2d 712, 717, 722 (7th Cir. 1968); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968).  The PSA provides for a private right of action for persons injured by a violation of its provisions.  7 U.S.C. § 209.

277.     Each of the Producer Defendants and co-conspirators is a "packer" as that term is defined in Section 201 of the PSA, 7 U.S.C. § 191, in that each of them are persons engaged in the business of:  (a) buying livestock in commerce for purposes of slaughter; (b) manufacturing or preparing meats or meat food products for sale or shipment in commerce; and/or (c) marketing

meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce.

278.    Under Section 202 of the PSA, 7 U.S.C. § 192, it is unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form to:

(a)    Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device;

(b)    Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;

(c)    Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly;

(d)    Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(e)    Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(f)    Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; and/or

(g)    Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d), or (e).

279.    The PSA's enacting regulations contain further restrictions.  For example, the regulations limit packers' rights to share pricing information with competitors.

No packer, dealer, or market agency, in connection with transactions subject to the provisions of the act, shall, in person, or through employed buyers, for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock, prior to, or during the conduct of, his buying operations:  (a)

94

Furnish competitor packers, dealers, market agencies, or their buyers or representatives, similarly engaged in buying livestock, with information concerning his proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid; or (b) furnish any other buying information to competitor buyers.

9 C.F.R. § 201.69.

280.     The regulations also require that "each packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."  9 C.F.R. § 201.70.

281.     The competitively sensitive information that the Producer Defendants and co-conspirators privately sent to or received from one another through the Agri Stats reports is/are an "article" under the PSA.  Additionally, inasmuch as Producer Defendants and co-conspirators buy livestock, including sows, information about their respective purchase volume of sows, and any of the other competitively sensitive information that they sent, received, communicated or exchanged with each other through the Agri Stats reports is an "article" under the PSA.

282.     As alleged above, the Producer Defendants and co-conspirators sent or received the competitively sensitive information for the purpose and with the effect of manipulating the price of pork sold to Plaintiffs and others in the United States.

283.     As alleged above, the Producer Defendants and co-conspirators engaged in other conduct, including without limitation, communicating, arranging, or signaling or otherwise coordinating with each other to restrict pork production in the United States in order to increase, fix, stabilize, and/or maintain the price of pork sold to Plaintiffs and others in the United States.

284.     Even if the actions of each Producer Defendant or co-conspirator to signal or communicate its intentions to restrict pork production were arguably lawful – and based on the

allegations in this Complaint they were and are not – this conduct by each of them, in concert, made their restriction of the domestic pork supply unlawful as alleged in this Complaint.

285.    The actions of each Producer Defendant and co-conspirator, as set forth above, constitute one or more violations of 7 U.S.C. § 192 and the enacting regulations of the PSA.

286.    Section 308 of the PSA, 7 U.S.C. § 209, provides that if any person subject to the PSA violates any of the provisions of the PSA, then that person shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.  Further, this section provides that such liability may be enforced by suit in any District Court of the United States of competent jurisdiction.

287.    The violations of 7 U.S.C. § 192 committed by the Producer Defendants and co-conspirators have illegally limited the supply of pork, manipulated its price, injured the Plaintiffs, and caused them damages by forcing them to pay inflated, supra-competitive prices for pork.

## XI.    REQUEST FOR RELIEF

288.    WHEREFORE, Plaintiffs demand judgment against all Defendants as follows:

(a) The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

(b) Plaintiffs recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

(c) Damages to the maximum extent allowed under law in consequence of the violations of the PSA, and a joint and several judgment in favor of Plaintiffs and against all Producer Defendants;

(d)  Plaintiffs be awarded pre- and post- judgment interest as provided by law, and that such

interest be awarded at the highest legal rate from and after the date of service of this

Complaint;

(e)  Plaintiffs recover their costs of suit, including reasonable attorneys' fees, as provided by

law; and

(f)  Plaintiffs have such other and further relief as the case may require and the Court may

deem just and proper.

## XII.  JURY TRIAL DEMANDED

289.   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.

Dated: April 30, 2022                          Respectfully submitted,

*s/ Richard L. Coffman*
Richard L. Coffman
THE COFFMAN LAW FIRM
3355 W. Alabama Street, Suite 240
Houston, TX 77098
Telephone: 713-528-6700
E-mail: rcoffman@coffmanlaw.com

L&G LAW GROUP, LLP
Eric R. Lifvendahl
175 W. Jackson, Suite 950
Chicago, IL 60604
Telephone: 312-456-2707
Facsimile: 312-364-1003
E-mail: elifvendahl@lgcounsel.com

KAPLAN FOX & KILSHEIMER, LLP
Robert N. Kaplan
Matthew P. McCahill
Jason A. Uris
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: 212-687-1980

Facsimile: 212-687-7714
E-mail: rkaplan@kaplanfox.com
E-mail: mmccahill@kaplanfox.com
E-mail: juris@kaplanfox.com

MARCUS & SHAPIRA LLP
Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
301 Grant Street
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219-6401
Telephone: 412-471-3490
Facsimile: 412-391-8758
E-mail: marcus@marcus-shapira.com
E-mail: cain-mannix@marcus-shapira.com
E-mail: hill@marcus-shapira.com

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 30, 2022, a true and correct copy of the foregoing was electronically filed and served via operation of the Court's CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record entitled to notice who are registered users of ECF.

<u>*s/ Richard L. Coffman*</u>
Richard L. Coffman