EXHIBIT R

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

|  |  |  |
|---|---|---|
| CONAGRA BRANDS, INC. | ) | |
| | ) | Case No. 0:18-cv-01776 |
| | ) | Individual Case No. 0:21-cv-01873 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | |
| AGRI STATS, INC.; CLEMENS FOOD | ) | **Jury Trial Demanded** |
| GROUP, LLC; CLEMENS FAMILY | ) | |
| CORPORATION; HORMEL FOODS | ) | |
| CORPORATION; HORMEL FOODS | ) | |
| LLC; JBS USA FOOD COMPANY; | ) | |
| SEABOARD FOODS LLC; SMITHFIELD | ) | |
| FOODS, INC.; TRIUMPH FOODS, LLC; | ) | |
| TYSON FOODS, INC.; TYSON | ) | |
| PREPARED FOODS, INC.; and TYSON | ) | |
| FRESH MEATS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# **TABLE OF CONTENTS**

**Page(s)**

I.   NATURE OF ACTION ................................................................................... 4

II.   JURISDICTION AND VENUE .................................................................... 7

III.   PARTIES ........................................................................................................ 8

    A.   Plaintiff.............................................................................................. 8

    B.   Defendants......................................................................................... 9

        a.   Agri Stats ............................................................................... 9

        b.   Clemens.................................................................................. 10

        c.   Hormel ................................................................................... 10

        d.   JBS ......................................................................................... 11

        e.   Seaboard ................................................................................ 12

        f.   Smithfield............................................................................... 12

        g.   Triumph.................................................................................. 13

        h.   Tyson ..................................................................................... 13

        i.   Co-Conspirators .................................................................... 14

IV.   FACTUAL ALLEGATIONS......................................................................... 15

    A.   Agri Stats' Detailed Reports Enable the Producer Defendants to
        Accurately Assess and Monitor their Competitors' Production Levels ............... 19

    B.   The Producer Defendants' Control Over the Production and Supply of
        Pork in the United States........................................................... 24

    C.   Vertically-Integrated Companies and the Control of Hog-Raising through
        Contract Growing...................................................................... 24

    D.   A Highly-Concentrated Industry.......................................................... 28

    E.   Barriers to Entry ..................................................................................... 29

    F.   Inelastic Demand and Standardized, Commodity Products Where Competition
        is Principally on Price ........................................................... 30

G.     Opportunities to Collude at Industry Conferences and Trade Association Meetings ........................................................................................................ 31

H.     The Producer Defendants' Curtailment of Pork Production

      a.    Smithfield ................................................................................ 39

      b.    Tyson ...................................................................................... 40

      c.    JBS ......................................................................................... 40

      d.    Hormel ................................................................................... 40

      e.    Seaboard ................................................................................. 41

      f.    Triumph .................................................................................. 41

      g.    Clemens .................................................................................. 41

      h.    Co-Conspirator Indiana Packers ........................................... 42

I.     Timeline of the Conspiracy ……………………………………………………43

V.     ABNORMAL PRICING AND THE EFFECT ON PLAINTIFF IN THE FORM OF HIGHER PRICES ..................................................................................... 67

VI.     OVERCHARGES FROM THE CARTEL REFLECTED IN HIGHER PORK PRICES PLAINTIFF PAID ............................................................................ 68

VII.     DOJ'S CRIMINAL ANTITRUST PROSECUTION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN PORK…………………………………………………………………..70

VIII.     TOLLING OF THE STATUTE OF LIMITATIONS ....................................... 71

A.     *American Pipe* Tolling…………………………………………………...71

B.     Fraudulent Concealment (and Further Factual Allegations)………………………72

IX.     ANTITRUST INJURY ................................................................................... 86

X.     COUNT 1:  VIOLATION OF SECTION 1 OF THE SHERMAN ACT ........................ 87

XI.     REQUEST FOR RELIEF ............................................................................... 88

XII.     JURY TRIAL DEMANDED ........................................................................... 89

Pursuant to Fed.R.Civ. 15(a), Plaintiff Conagra Brands, Inc. by and through its undersigned counsel, files as a matter of course this Amended Complaint against the Defendants identified below, for their illegal conspiracy, which increased the prices of pork sold in the United States beginning at least as early as 2008 and continuing until 2018, if not later. Plaintiff brings this action against Defendants for treble damages and for such other damages to the maximum extent allowed under the antitrust laws of the United States, and demand a trial by jury.

## I.   NATURE OF ACTION

1. The pork producer defendants are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce in the United States. The United States pork industry is highly concentrated, with a small number of large companies controlling the supply. Defendants and their Co-Conspirators collectively control over 80 percent of the wholesale pork market.

2. Defendants Agri Stats, Clemens, Hormel, JBS USA, Seaboard, Smithfield, Triumph, and Tyson entered, along with Co-Conspirators Indiana Packers Corporation, Daily's Premium Meats, LLC, Seaboard Triumph Foods, LLC, and others, into a conspiracy from at least 2008 to 2018 if not later (the "Conspiracy Period") to fix, raise, maintain, and stabilize the price of pork.[1] The defendants, other than Agri Stats, are referred to here collectively as the

---

[1] For the purposes of this Complaint, "pork" includes, but is not limited to, a variety of meat products from pigs (also referred to in the industry as porcine or swine) purchased fresh, frozen, processed, rendered or non-rendered, including but not limited to any and all processed pork products, (e.g., smoked ham, sausage, bacon, pepperoni, lunch meats), and other processed products and by-products containing pork. "Pork by-products" can include, but is not limited to, offal and individual parts or organs from pigs used in pet foods (e.g., livers, kidneys, lungs, hearts, cheeks) and/or rendered products (e.g., meat meals and bone meals). From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry. See, e.g. DPP Class Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of Class Settlement between Direct Purchaser Plaintiff and Defendant JBS at 2, n.2, *In re: Pork Antitrust Litigation,* Case No. 0:18-cv-01776 (D. Minn.).

"Defendants" or "Producer Defendants."

3.      One method by which Defendants implemented and executed their conspiracy was by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States.

4.      In furtherance of their conspiracy, the Producer Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information, such as prices, capacity, production, sales volume, and demand, including through their co-conspirator, Defendant Agri Stats.

5.      Beginning in at least 2008, as Defendants' profitability deteriorated in the midst of a global recession and an increase in the productivity of pork producers, Defendants began to coordinate through their mutual trade associations and industry groups to achieve a coordinated reduction in the domestic supply of pork.

6.      Defendants also conspired with companies that provided services to the pork industry but did not produce or sell pork, such as Agri Stats (a data benchmarking firm).

7.      Beginning in 2008, the CEO of Smithfield attended a trade association meeting in which he announced Smithfield's plans to reduce its pork supply and urged others to follow. Smithfield's CEO then coordinated with AgStar's VP responsible for lending to pork producers and agreed to the plan to put financial pressure on producers to reduce production, while encouraging the major producers to announce their own production cuts publicly.  As detailed in this Complaint, between early 2008 and late 2009, Defendants met numerous times through trade associations and other industry groups, which allowed them to coordinate their unlawful agreement to reduce the supply of pork.  And although Defendants announced their supply reductions publicly, their coordination allowed each Defendant to justify its own supply reduction as a natural outcome of the economic conditions facing the industry.  However, this was untrue.  As detailed in this Complaint, Defendants recognized internally that it was in each producer's independent self-interest to produce

as much pork as it could. Accordingly, the supply reductions were not justified by input costs or other economic factors. Instead, the cuts were based on an understanding that all major producers would implement similar supply reductions. This allowed Defendants to reduce their supply through a collusive agreement or understanding that was reached in secret and then concealed from the public.

8.  Defendant Agri Stats began providing highly sensitive "benchmarking" reports to the Producer Defendants. Legitimate benchmarking allows competitors to compare their profits or performance against that of other companies. Yet Agri Stats' reports are unlike those of lawful industry reports; rather, Agri Stats gathers detailed financial and production data from each of the Producer Defendants and their Co-Conspirators, standardizes this information, and produces customized reports and graphs for the conspirators. The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market.

9.  On at least a monthly basis, and often far more frequently (*e.g.*, weekly or every other week), Agri Stats provides the Producer Defendants with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), and regularly provides the keys to deciphering which data belong to which participant. The effect of this information exchange was to allow the pork producers to monitor each other's production, and therefore control supply and price in furtherance of their anticompetitive scheme.

10. The data exchanged through Agri Stats also bears all the hallmarks of the enforcement and implementation mechanism of a price-fixing scheme. First, the data are current and forward-looking—which courts have consistently held has "the greatest potential for generating anticompetitive effects." Second, information contained in Agri Stats reports is specific to pork producers—including information on profits, prices, costs, and production levels—instead of being aggregated as industry averages to avoid transactional specificity and the easy identification of specific producers. Third, none of the Agri Stats information was publicly available. Agri Stats is a

subscription service that required the co-conspirators to pay millions of dollars over the Conspiracy Period—far in excess of any other pricing and production indices. Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market. Defendants utilize the information exchanges through Agri Stats in furtherance of their conspiracy to fix, raise, stabilize, and maintain artificially inflated prices for pork sold in the United States.

11.     Further, the Producer Defendants coordinated with industry lenders to pressure all pork farmers to reduce their sow herds and limit importation of pork from Canada by withholding funding from companies that did not get on board with the supply reduction conspiracy.

12.     By late 2009, this plan succeeded, as the pork industry cut its supply by approximately 6.4%, primarily through the liquidation of sow herds (female pigs used for breeding). With this structural reduction in the supply of pork, Defendants were able to monitor their conspiracy through Defendant Agri Stats.

13.     Plaintiffs allege that Defendants and their co-conspirators' conspiracy is a *per se* violation of Section One of the Sherman Act, 15 U.S.C. § 1 (Count I). Defendants' purposeful restriction of pork supply had the intended effect of increasing pork prices to Plaintiff. As a result of Defendants' unlawful conduct, Plaintiff paid artificially inflated prices for pork during the Conspiracy Period. Such prices exceeded the amount Plaintiff would have paid if the price for pork had been determined by a competitive market. Thus, Plaintiff was injured in its businesses or property by Defendants' unlawful conduct.

## II.    JURISDICTION AND VENUE

14.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants'

conspiracy to restrain trade in the pork market.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

15.    Venue is proper in this District under 15 U.S.C. §§ 15(a); 22 and 28 U.S.C. §§ 1391(b); (c); and (d) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

16.    Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and  the Illinois long-arm statute 735 ILCS 5/2-209, because  each Defendant has  transacted business in this state and because the Illinois long-arm statute extends jurisdiction to  the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.

17.    This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District and  the state of Illinois -- has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy.  The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District and the state of Illinois.

## III.    PARTIES

### A.    Plaintiff

18.    Plaintiff Conagra Brands, Inc. ("Conagra") is a Delaware corporation with its principal place of business in Chicago, Illinois.  Conagra is one of North America's leading branded food companies.  Conagra's brands include Healthy Choice, Marie Callender's, Banquet, Bertolli, Chef Boyardee, and Frontera, among others.  From 2009 to the present, Conagra and its subsidiaries, affiliates, and other owned or controlled entities and predecessors in interest (including Pinnacle

Foods, Inc., which was acquired by Conagra in October 2018 and is no longer in operation) purchased pork at artificially inflated prices directly from various Defendants and their affiliates and Co-Conspirators, and it suffered injury to its business or property as a direct and proximate result of Defendants' wrongful conduct.

### B.   Defendants

#### a.   Agri Stats

19.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and was,  for a portion of the Conspiracy Period, a subsidiary of Eli Lilly & Co., a publicly-held corporation headquartered in Indianapolis.  Agri Stats is now a wholly owned subsidiary of Agri  Stats  Omega Holding Co. LP, a limited partnership based in Indiana.   Agri Stats is a co- conspirator of the Producer Defendants and has knowingly played an important and active role by participating in and a facilitating the Producer Defendants' collusive scheme detailed in this Complaint.  Agri  Stats has a unique and deep relationship with the pork industry generally, and specifically with  each of the Defendants identified below, all of which are Agri Stats' primary customers.   Defendants Clemens, Hormel, JBS USA, Seaboard, Triumph, Smithfield, and Tyson, and Co-Conspirator Indiana Packers, are all Agri Stats subscribers and report a wide variety of information to Agri Stats, which, according to a 2016 Eli Lilly earnings call, is used by "over  90% of the poultry and pig market" in the United States.

20.     All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in  by Agri Stats' various officers, agents, employers, or other representatives while actively engaged   in the management and operation of Agri Stats' business affairs within the course and scope of  their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri  Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its   conduct was

within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the U.S., including in this District.

### b.   Clemens

21.   Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania. During the Conspiracy Period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

22.   The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC.  During the Conspiracy Period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

23.   The Clemens Food Group, LLC and the Clemens Family Corporation are referred to here collectively as "Clemens."  Clemens reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### c.   Hormel

24.   Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota.  During the Conspiracy Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

25.   Hormel Foods, LLC is a Minnesota corporation headquartered in Austin,

Minnesota.  Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation.  During the Conspiracy Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

26.    Hormel Foods, LLC and Hormel Foods Corporation are referred to here collectively as "Hormel."   Hormel reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### d.    JBS

27.    JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world w h i c h   r e c e n t l y  plead guilty to antitrust violations in the broiler chickens market.  JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado, and reports a wide variety of pork data to Agri Stats, including, without limitation,  highly-detailed, confidential information regarding its production and sales of pork. During the  Conspiracy Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates (hereinafter collectively referred to as "JBS USA") sold pork in interstate commerce, directly or through its  wholly owned or controlled affiliates, to purchasers in the  United  States, including  in this  District.

28.    Plaintiff timely opted out and excluded itself from the DPP class settlements with JBS USA, which was approved by the Court in *In re: Pork Antitrust Litigation,* Case No. 0:18-cv-01776 (D. Minn.).

### e.   Seaboard

29.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation.  During the Conspiracy Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, including without limitation Daily Foods, Inc., John R. Daily, Inc., and any other subsidiary doing business as Daily's Premium Meats and/or Daily's through July 10, 2014, or affiliates, including Daily's Premium Meats and Seaboard Triumph Foods, LLC, (herein collectively referred to as "Seaboard") sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, including joint ventures, to purchasers in the United States, including in this District.

### f.   Smithfield

30.     Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company.  Smithfield Foods is headquartered in Smithfield, Virginia, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.  During the Conspiracy Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.  Smithfield Foods has entered into agreements to settle with the DPP class in *In re: Pork Antitrust Litigation,* Case No. 0:18-cv-01776, ECF 815, (D. Minn.) and with the CIIPP class (ECF 1252) for a total payment of $125 million. Plaintiff timely opted out and excluded itself from the DPP class settlement with Smithfield, which was approved by the Court in *In re: Pork Antitrust Litigation,* Case No. 0:18-cv-01776 (D. Minn.).

### g.    Triumph

31.    Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.   During the Conspiracy Period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates (hereinafter collectively referred to as "Triumph") sold pork in interstate commerce, directly or through Seaboard Foods, or its wholly owned  or controlled affiliates or joint ventures, to purchasers in the United States, including in this District.

### h.    Tyson

32.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.   During the Conspiracy Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including  in this District.

33.    Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During  the  Conspiracy Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or  through its wholly-owned or controlled affiliates, to purchasers in the United States, including in  this District.

34.    Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the Conspiracy Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned  or controlled affiliates, to purchasers in the United States, including in this District.

35.    Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc. and Tyson Foods, Inc. are referred to here collectively as "Tyson."   Tyson reports a wide variety of pork data to Agri Stats,

including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### i.      Co-Conspirators

36.      Co-Conspirator Indiana Packers Corporation is an Indiana corporation headquartered in Delphi, Indiana, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.  During the Conspiracy Period, Indiana Packers Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates (hereinafter collectively referred to as "Indiana Packers") sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.  Indiana Packers Corporation's parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and  Mitsubishi Corporation (Americas).

37.      Co-Conspirator Daily's Premium Meats, LLC is a Delaware limited liability company headquartered in Kansas City, Missouri. During the Conspiracy Period, Daily's Premium Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States.  During the Conspiracy Period until July 10, 2014, Daily's Premium Meats was wholly owned by Defendant, Seaboard.  Beginning on or about September 27, 2014, and continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50% interest in Daily's Premium Meats.

38.      Co-Conspirator Seaboard Triumph Foods, LLC is a Delaware limited liability company headquartered in Sioux City, Iowa.  It is a joint venture between Seaboard Foods and Triumph Foods.  During the Conspiracy Period, Seaboard Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States.  Beginning on or about May 13, 2015, and continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50%

interest in Seaboard Triumph Foods.

39.     Various other persons, firms, and corporations not named as defendants have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not named as defendants in this Complaint, and whether or not identified herein as a co-conspirator.  Throughout this Complaint, Indiana Packers, Daily's Premium Meats, Seaboard Triumph Foods, and the other persons, firms, and  corporations not named as defendants or specifically listed as a Co-Conspirator herein, that performed acts and made statements in furtherance of  the conspiracy are collectively referred to as "Co-Conspirators."

## IV.     FACTUAL ALLEGATIONS

40.     Starting in at least 2008 and continuing until if not beyond 2018, each of Defendants and their Co-Conspirators conspired to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their anticompetitive agreement, each of the Producer Defendants relied on a unique industry data sharing service provided by Defendant Agri Stats, Inc.  Agri Stats provided a means for each of the Producer Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and   critical part of each of the Defendants' price-fixing scheme, resulting  in a stable and successful  anticompetitive cartel.

41.     The Chicago Mercantile Exchange ("CME"), the U.S. Department of Agriculture ("USDA"), and various other entities publish publically available aggregated daily, weekly, monthly, and  annual supply and pricing information concerning the U.S. pork industry, including: the CME  Lean Hog Index, which reflects prices paid for hogs in the U.S.; the CME Pork Cutout Index,  which reflects the prices paid for pork (a "cutout' is the approximate value of a hog calculated  using the prices paid for wholesale cuts of pork); and USDA's National Daily Hog

and Pork Summary. The pricing and production information in those reports and indices is completely anonymous and aggregated (or averaged), and indeed the USDA reports clearly state that certain prices are "not reported due to confidentiality."

42.     Only Agri Stats receives from each of the Producer Defendants, and then provides to all of the Producer Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency.   Agri Stats is a company that generates confidential pork industry data considerably more detailed than any similar types of available reports, and the Agri Stats reports include the following data categories:

       a)    Performance Summary;

       b)    Feed Mill;

       c)    Ingredient Purchasing;

       d)    Weaned-Pig Production;

       e)    Nursery;

       f)    Finishing;

       g)    Wean-to-Finish;

       h)    Market Haul; and

       i)    Financial information, including profits and sales.

43.     Much of the information shared by Agri Stats and the Producer Defendants was unnecessary to achieve any benefits for pork producers.   Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.   In a competitive market, the participants would closely protect such proprietary information from disclosure as providing it to competitors would be disadvantageous—unless, of course, there is an agreement that the competitors will use the information to the joint benefit of each other as was the situation in the pork industry.

44.     Agri Stats describes itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance." But describing Agri Stats as a "benchmarking" service does not accurately reflect its critical role in the pork industry and the fundamental importance Agri Stats has to the Producer Defendants.

45.     Beginning in 2008, after two decades focusing primarily on the poultry industry, Agri Stats began selling its so-called "benchmarking" services to pork producers, including to each of the Defendants. Pork producers were told by Agri Stats' Greg Bilbrey that "benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. Each and every commercial swine operation is encouraged to participate in some benchmarking effort."

46.     Agri Stats emphasized to pork producers that sharing information through "benchmarking" could help achieve the "ultimate goal [of] increasing profitability— not always increasing the level of production." Agri Stats told the industry that each pig producer "should be participating in some type of benchmarking. To gain maximum benefit, production, cost, and financial performance should all be part of the benchmarking program. . . . Producer groups could design and operate their own benchmarking effort," and, most importantly, "[e]ach participant has to commit" to ensure the accuracy and reliability of the data collected and submitted to Agri Stats.

47.     Agri Stats collects data from each of the Producer Defendants, audits and verifies the data, and ultimately reports back to the Producer Defendants detailed statistics on nearly every operating metric within the industry. Agri Stats' survey methodology involves—from and to the Producer Defendants—direct electronic data submissions of financial, production, hog placement, size and weaning age, capacity, cost, and numerous other categories of information by each pork

17

producer on a weekly and monthly basis.  At each of the Producer Defendants' pork facilities, certain employees, typically in the accounting department, are responsible for regularly submitting the data to Agri Stats.  Agri Stats uses a detailed audit process to verify the accuracy of data from each producer, often directly contacting the Producer Defendants to verify data before issuing reports to Agri Stats subscribers.

48.     Because of the nature of the life of a hog, even current and historical information about hog production numbers effectively gives forward-looking supply information to competitors.  A typical production cycle for a hog is roughly four years, which is a function of the biological cycle for hogs, involving time needed for: (1) breeding an existing sow; (2) selecting and retaining piglets; and (3) breeding and rearing the selected piglets.  All of those elements factor into the time necessary to substantially increase production, which can be as much as two years.

49.     Agri Stats' critical importance for a collusive production-restriction scheme in the pork market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power.  Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel— for example, by boosting pork production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production.

50.     In August 2007 Tyson re-engaged with and returned to Agri Stats reports in Broilers in return for Agri Stats getting *pork* producers JBS and Hormel to sign-on to Agri Stats pork reports. According to Tyson, Snyder of Agri Stats made "a commitment to Tyson that you would get JBS and Hormel completely onboard."

51.     Agri Stats' detailed statistics—coupled with its regular, in-person meetings with

each Producer Defendant and routine participation in trade association events widely attended by each of the Producer Defendants' senior executives - serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

**A.    Agri Stats' Detailed Reports Enable the Producer Defendants to Accurately Assess and Monitor their Competitors' Production Levels**

52.    Agri Stats claims to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific facilities by name, but not identifying by name other producers' facilities described in the report.

53.    However, contrary to these assertions, each of the Producer Defendants can (and do) readily determine "whose numbers the numbers belong to."  Agri Stats reports are so detailed that any reasonably informed producer can easily discern the identity of its competitors' individual facilities.  It is common knowledge among producers that others can do so, with some  of the Producer Defendants referring to the task of determining the identity  of individual  competitor's data as "reverse engineering."

54.    Indeed, each Producer Defendant knows that when it provides its internal, confidential information to Agri Stats, the other producers will be able to access that information and identify the Producer Defendant that submitted it.  There is no legitimate purpose to provide this specific, competitively  sensitive information to Agri Stats, nor is there any  legitimate  purpose for Agri Stats to disseminate the information in the detailed, readily decipherable form  in which it is sent to Defendants; rather, it is provided, compiled and transmitted for anti- competitive purposes.

55.    Agri  Stats'  role  in  the  pork  industry  extends  far  beyond  the  collection  and

dissemination of competitively sensitive data. It is an active and knowing participant in, and facilitator of, Defendants' scheme.   Agri Stats' employees confirm for each of the Producer Defendants the data for a particular company at regular meetings with each company, or at the numerous trade association meetings where Agri Stats executives make presentations on a regular basis.

56.     Agri States offers a service to each of the Producer Defendants and all Co-Conspirators whereby personnel from Agri Stats regularly meet with each Producer Defendant's employees and give presentations about both company- and industry-wide data.   Throughout the relevant time period, Agri Stats executives and account managers fanned out across the pork-producing regions of the country to meet with their clients and Co-Conspirators, the Producer Defendants and Co-Conspirators.   Since Agri Stats travels and presents among the Producer Defendants regularly, discussing each Producer Defendant's non-public, proprietary data, Agri Stats is in a unique position to share information among the Producer Defendants at these regular meetings.   And that is exactly what happened.

57.     In addition to its in-person meetings with e a c h  o f  the Producer Defendants, Agri Stats employees, including Greg Bilbrey, regularly host, or present at, pork industry events, often citing Agri Stats data in discussing market, production, and demand trends in the pork industry.   A publicly-available excerpt of a presentation from Mr. Bilbrey shows the level of detail provided to competitors regarding profits in the pork market:

Top 25% in Profit - Variances to Average Company - 2009-2007

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

35,001,089 Pigs Finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |

30,785,319 Pigs finished

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |

22,306,500 Pigs finished

58.     The purpose of these reports was not to provide better prices to customers or to lower the costs of production.  Instead, the purpose was to improve the profitability of e a c h o f  the Producer Defendants and their Co-Conspirators.   The particular Agri Stats report referenced  above shows the ranking of each company in profitability, and compares the company to its  competitors by providing the variance from the average.

59.     On information and belief, the Agri Stats report actually circulated to competitors in the pork market contained even further detail.  The same presentation informed pork producers that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg."  (ckg refers to 100 kilograms.)  This underlines that the purpose of these reports was not to allow  customers  to save  money  through  lower  prices  and  more  efficient  production— in  fact,  the  opposite  was true, the purpose was the profitability of the Producer Defendant companies and the  impact was higher prices for pork customers.

21

60.     There is no plausible, non-conspiratorial justification for the Producer Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their hog size and age, pricing, capacity, production, and costs at the level of detail at which they do.  In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret.  Economic theory shows how the routine exchange among competitors of such sensitive internal company information reduces competition.

61.     One chicken industry expert testified in a case against Pilgrim's Pride, a subsidiary of Producer Defendant JBS USA, brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern."  The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue.  Grower payout and cost information shared by most producers is incredibly detailed and comprehensive.  As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry.  An intensive inquiry is needed.

62.     When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

63.     A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual

companies at issue.   My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own.   For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS  BY  PROVIDING  ACCURATE  AND  TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES."  Note the mission is to share comparative data while protecting individual companies.  I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved.  Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

64.    Agri Stats has also played a similar role in the chicken industry and has been named as a defendant in dozens of civil antitrust suits alleging its active participation in a price-fixing and  production-restriction conspiracy akin to that alleged in this Complaint.   In denying defendants'  motions to dismiss in the *Broiler Chicken* litigation pending in the Northern District of Illinois,  the district court noted that, given the nature of the Agri Stats reports in that market,  the  defendants are in fact sharing future anticipated production information with one another, which  raises significant antitrust concerns.

65.    A 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged?  Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to  monitor  and  police  their  chicken  cartel,  which  is  equally applicable to the pork cartel alleged in this Complaint:

Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual."  He explains that information-sharing services in other  industries  tend to  deal in averaged-out aggregated data—for  example, insurance rates in a given state.  Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to

make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

**B.    The Producer Defendants' Control over the Production and Supply of Pork in the United States**

66.    The structure of the modern U.S. pork industry makes it a market that is ripe for the type of collusion alleged in this Complaint.

**C.    Vertically-Integrated Companies and the Control of Hog-Raising through Contract Growing**

67.    The Conspiracy Period was further characterized by the increased control over the breeding, production, growing, and processing of pork by the Producer Defendants through vertical integration and the exclusive production contracts with hog farmers.

68.    Vertical integration is so pervasive that the Producer Defendants are commonly called pork or swine "integrators" by the industry, government, analysts, and academics. Vertical integration allows the Producer Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter. Fully-integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

69.    Under pork production contracts, "a contractor or producer provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms." This arrangement essentially converts independent farmers into contract employees that perform services for the pork producer. The Producer Defendants each typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities. The Producer Defendants each typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further

24

control the supply of the pork on the market. The prevalence and use of contracts for hog production by each of the Producer Defendants increased significantly during the course of the conspiracy. By 2017 it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency for bid prices.

70.     Pork production begins with "farrowing," the term used to describe a female hog (called "sows") giving birth to piglets.   Sows will normally have anywhere from 11 to 13 pigs per litter.   With a sow being able to "farrow" as often as every four months, a single sow can have around 36 piglets in one year.  After birth piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig weighs upwards of 50 pounds.  At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds.   After the pigs reach their final weight, they are sent to a packing plant to be harvested.  Due to the nature of the pork production cycle, the reduction of sows—*i.e.*, farrowing hogs—has a significant impact on the supply of pork.

71.     The following diagram shows the path for pork raised for meat consumption from birth through sale to entities such as Plaintiff:



72.     The Producer Defendants directly or indirectly control every part of the supply chain in the diagram above except for the final one (wholesale); this is known as vertical integration. Economic theory holds that vertical integration can have anticompetitive effects because there are fewer firms competing with each other at all levels of the supply chain, which in turn can facilitate collusion on price. Vertical integration is a hallmark of the pork industry in the United States.

73.     Defendant Smithfield was the largest producer and processer of pork in the United States during the Conspiracy Period.   In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield's 2014 annual report described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years.  We retain ownership of the hogs raised by our contract farmers.  In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

74.     In 2009, Defendant Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers.  Seaboard's 2017 SEC 10-K report states that it raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts."

75.     Defendant Clemens Food Group emphasizes its vertical coordination on its website, stating that the "vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."   A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.

76.     Defendant Triumph was created with vertical integration in mind as it is owned by five of the largest pork producers in the U.S.—Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota.   The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

77.     As Defendant Tyson stated in its 2009 10-K Report, "The majority of our live hog supply is obtained through various procurement relationships with independent producers." Additionally, Tyson raises a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

78.     Defendant Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities.  As Hormel stated in its 2009 annual report that, "[t]he live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."  Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.

79.     A primary consideration in Defendant JBS' 2015 purchase of Cargill's pork business was that it gave JBS more control over the production of hogs, by acquiring four hog farms and two packing plants operated by Cargill.

80.     Co-Conspirator Indiana Packers' website notes that it is "a fully integrated pork company operating entirely within the heart of the Midwest," and heralds the company's "pork-exclusive expertise and vertically integrated operation."

81.     Each of the Defendants further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means including capacity reductions,

27

controlling slaughter rates, and exports.  Defendants including Smithfield, Clemens, Tyson, Hormel, Seaboard, Triumph, and JBS USA, and Co-Conspirator Indiana Packers, Daily's Premium Meats, and Seaboard Triumph Foods, sell packaged  pork under various brand or trade names.

**D.     A Highly-Concentrated Industry**

82.     The USDA has stated that high levels of market  concentration  allow  the  largest participants  to  extract more  of  the  economic  value  from food  transactions,  but "consumers  typically bear  the  burden,  paying  higher  prices  for  goods  of  lower  quality."

83.     The hog integration sector is horizontally concentrated (only a few companies buy, slaughter,  and  process  the  majority  of  hogs)  and  vertically  integrated  (pork  packers  have  tight contractual  relationships  with  hog  producers  throughout  all  stages  of  production).   Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

84.     Prior to and in the beginning of the Conspiracy Period, the pork industry underwent a period  of  unprecedented  concentration,  resulting  in  a  small  number  of  pork  producers  controlling  a large amount of market share.   Between 1988 and 2015, the top four pork producers (Smithfield, Tyson, JBS USA, and Hormel) increased their market share from 34 percent in 1988 to just under 70  percent by 2015.

85.     In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion.  The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.  As noted above,  the  acquisition  allowed  JBS  U S A  to  exercise  greater  control  over  the  production  of  pork, by  acquiring four hog farms and two packing plants operated by Cargill.

86.     The acquisition was completed in October 2015 and resulted in further consolidation in  the  industry.  JBS USA's  resulting  pork  business  had  *pro forma*  net  revenue  of  approximately

$6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork producer (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with roughly five percent of the national slaughter capacity).

87.     By 2016, the top six pork processors comprised 82% of the total market: Smithfield (26% market share); JBS USA (20%); Tyson (18%); Hormel (8%); and Triumph and Seaboard (5% each).  On their own, it would be difficult for any of these supposed competitors to exercise market power.   But, acting as a whole to manipulate the price of pork products, the combined market share of the six largest Defendants is, using the Herfindahl-Hirschman Index (the "HHI," the U.S. Department of Justice's measure of market concentration), well above the threshold for a "highly-concentrated" market.

88.     This high level of concentration in the pork industry provided an environment, together with Agri Stats' help, that was optimal for collusion.  WH Group Limited (whose website states that it "is the largest pork company in the world"), the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated." Both of these factors – maturity and concentration – make an industry more susceptible to collusion.

89.     Because the industry was highly concentrated and dominated by a handful of producers, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further, because the largest producers were incapable of independently controlling prices solely on their own, such an agreement was necessary to inflate prices.

### E.     Barriers to Entry

90.     Large barriers to entry kept potential competitors out of the pork integration industry. New entry into pork processing is costly and time consuming.   Construction of a large-scale slaughter

facility would cost hundreds of millions of dollars and the additional planning, design, and permitting costs are substantial. In 2012, it cost Cargill, whose pork business was later acquired by Defendant JBS USA, $25 million just to expand an existing facility. Building a facility from scratch would cost considerably more, totaling hundreds of millions of dollars.

91.     The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants. And in other situations, the processor owns the hog from farrow to finish. Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably.

### F.     Inelastic Demand and Standardized, Commodity Products Where Competition is Principally on Price

92.     Inelastic demand means that it is profitable for members of a cartel to raise the price of a good above competitive levels. In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price. In other words, demand elasticities measure the sensitivity of the quantity of a product purchased in response to changes in the price of a product and its closest substitutes. Markets with a highly inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without a significant impact on quantity demanded. Research shows that the demand for pork is inelastic, and that there is limited substitution between pork and other meat products.[2]

93.     Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loins, bacon, ribs, and other pork products are produced on an industrial scale. For example, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar nutritional values, branding and packaging.

---

[2] Ronald L. Meekhof, Pork Slaughter and Processing Sector Facility-Level Model, June 2007 (showing that a one-percent increase in the price of pork resulted in a 0.636 decrease in pork demand).

These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.

### G.     Opportunities to Collude at Industry Conferences and Trade Association Meetings

94.     All Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct. Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

95.     For example, a 15-member National Pork Board ("Pork Board," initially established by federal law) has included several senior executives of the Producer Defendants. Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo. Executives from several of the Producer Defendants are known to have served as members of the Pork Board. For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff. Skahill recently served as a Pork Board Vice President and its Treasurer.

96.     According to its website, "[t]he National Pork Producers Council (the "Pork Council"), which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets." Executives from the Producer Defendants have served on the Pork Council Board of Directors during the Conspiracy Period, including: Cory Bollum of Hormel Foods, Don Butler and Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats.

31

97.     The Pork Council conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year.  The Pork Council advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions.  The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

98.     In addition to its annual National Pork Industry Forum, the Pork Council sponsors many other programs that have provided ample opportunities for defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show."  It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms).  The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC.

- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

99.     The National Pork Industry Conference ("Pork Industry Conference") has taken place in Wisconsin each July since 2010 (and in the Ozarks before that).   Descriptions on the conference website have said that the Pork Industry Conference "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America."   After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow numbers."  In July 2010, an industry website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded."   The website for the 2016 Pork Industry Conference's conference,

emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts." Seaboard Foods and Smithfield Foods are among the Producer Defendants whose executives have been session presenters at the Pork Industry Conference.

100. Upon information and belief, CEOs and top-level executives from the Producer Defendants attending the Pork Industry Conference and the Pork Council events discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top-level executives comfort that their competitors remain committed to a plan to artificially restrict pork production. For example, at the 2009 Pork Expo in early June 2009, the Producer Defendants met and discussed cutting (*i.e.*, "liquidating") production, which Smithfield CEO Larry Pope later described "was the key subject of the discussion of every producer," and as "something [that] has got to happen. And so that's [] very positive."

101. In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues. For example, the 21st Century Pork Club, founded in 1997 by former Pork Council executive Larry Graham, meets twice a year. A March 2011 AgriMarketing article about the club states that it consisted of "60 industry stake holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

102. All Defendants were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other organizations.

103. Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and

largest meat and poultry trade association." AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

104. NAMI was formed in 2015 by merging the AMI and the North American Meat Association. The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars . . . provide excellent networking and information-sharing opportunities for members of the industry."

105. All of the Producer Defendants (or their closely-affiliated companies) have been members of AMI and then NAMI throughout the Conspiracy Period. Executives from the pork producer Defendants have served on the AMI and NAMI Board of Directors during the Conspiracy Period, including:

a. Mark Campbell and Rick Hoffman of Triumph Foods;

b. Doug Clemens and Phil Clemens of Clemens Family Corporation;

c. Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc.;

d. Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

e. Gary Louis, Rod Brenneman and Terry Holton of Seaboard Foods;

f. Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA;

g. Jim Snee, Stephen Binder and Jeffrey Ettinger of Hormel Foods Corporation; and

       h.     Gary Jacobson and Russ Yearwood of Co-Conspirator Indiana Packers Corporation.

106.    Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

107.    Throughout the Conspiracy Period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has sponsored the industry's "Annual Meat Conference." The conference website describes the conference as "a complete education and networking experience." Many of the Defendants' high-level executives attend the conference. For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President, Smithfield Foods and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

108.    Throughout the Conspiracy Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry." All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express Markets, Inc. (an affiliate of Agri Stats) through 2017. The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates and industry capacity."

109.    The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike.   This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices.   Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years."   The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

110.    Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action."   Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015, and Phil Clemens of The Clemens Family Corporation in 2016.

111.    For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics."   The NAMI board met  during the 2015 Management Conference.

112.    In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit."  In addition to education sessions, the summit has included, "networking opportunities and social events," including  a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings  to discuss

policies and association business."

113.     AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012.  In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

114.     In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations. Promotional materials for the 2014 IPPE indicated that attendees included Producer Defendants Clemens Food Group, Hormel Foods, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson.  After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

### H.     The Producer Defendants' Curtailment of Pork Production

115.     In the years leading up to the conspiracy period the steady expansion of pork production was virtually a given.  As one industry commentator reported in 2007, "Some things you can just take to the bank.  Sow herd expansion among the *Pork Powerhouses* would fall into that category – even in the face of the biggest run-up in feed prices in history."

116.     This historical trend changed markedly during the Conspiracy Period.  As demonstrated in Figure 1 below, at several points during the Conspiracy Period, the pork producers changed their behavior and acted in a concerted way to decrease supply.  In 2009, 2010, and again in 2013, the pork industry cut production.[3]  These production decreases marked a drastic change from the period prior to the conspiracy from 2000, in which pork supply was stable and steadily increasing on a yearly basis.

---

[3] See U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); id. at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

**Figure 1: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



117.    These supply cuts were coordinated, historic, and unprecedented.  For example, in September 2009, industry publication *Pork Powerhouses* published an article entitled "Big Boys Cut Back" and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers.  These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.

118.    At the same time, each of the Producer Defendants were further reducing domestic supply by devoting more and more production exports to overseas markets.  The U.S. has been a net  exporter of pork products for a long time, but those exports have comprised a much larger share of  total production in the past ten years.   As shown in Figure 2 below, less than ten percent of U.S. pork production was exported in 2000.   By 2011, more than twenty percent was being exported.  Sending production overseas is another way in which each of the Producer Defendants were able to reduce the supply  available to U.S. markets, thereby driving up prices.    Notably, a 2017 analysis found that for every $1  million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt.  In other words, selling pork on the global market added $50.20 to the market price of hogs.  The significant expansion in exports meant that increases in hog production by each of the Producer

Defendants did not result in an increase in the supply of pork products in the United States market:

**Figure 2: U.S. Pork Exports, Millions of USD**



119.    As part of their acts and conduct in furtherance of the conspiracy, each of the Producer Defendants participated in these supply restraints, and concealed their concerted, unlawful conduct.

        a.      **Smithfield**

120.    In 2008 Smithfield stopped instituting traditional production increases and instead reduced its number of sows, reporting that, "We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed." In 2009, Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective

immediately.   Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows). In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

121.   Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

### b.   Tyson

122.   Between 2008 and 2009 Tyson reduced its sows by over 25%, marking a significant reduction.  In 2010 Tyson reported a further 3.3% decrease in its pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate.   In 2013 Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."

### c.   JBS

123.   In 2011 JBS USA reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS USA.   Also, after acquiring Cargill's hog production facilities, JBS USA reduced the number of sows it produced in 2016 despite increased consumer demand.   This production restriction had the intended effect: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."

### d.   Hormel

124.   Hormel's production statistics show that it cut its number of sows in 2008 and maintained such reduced production throughout the Conspiracy Period. Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report.   This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in

40

January where we could reduce the numbers [of hogs] that we had going through."   Hormel also reported lower sales of pork products in 2013.  In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day.

### e.   Seaboard

125.   Throughout the Conspiracy Period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales.   Seaboard dedicated several employees to international sales and exports.   Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect—higher pork prices.   Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic market." Moreover, in 2017 Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

### f.   Triumph

126.   In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.  In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry.   Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide.  These exports constituted a significant portion of its production throughout the Conspiracy Period, and reduced or otherwise limited Triumph's sales in the United States.

### g.   Clemens

127.   In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats.   Furthermore, in 2014 Defendant Clemens had a competitive advantage over many pork producers, in that comparatively few of its pigs were affected by the virus causing porcine

epidemic diarrhea (known as "PED," which for several months disrupted the ability of many of Clemens' competitors to readily supply pork to the market). But contrary to what one would expect to see in a competitive market, Clemens did not utilize its advantage during the PED epidemic, and refused to increase its market share when it clearly had substantial market incentives to do so.

### h.   Co-Conspirator Indiana Packers

128.   Co-Conspirator Indiana Packers is a private company with limited information available to the public regarding its production statistics. Nevertheless, in 2012 Indiana Packers indicated that it expected to reduce the number of hogs or pounds of pork processed at its facilities ostensibly because of high corn prices.

129.   Like the Producer Defendants, Indiana Packers' interactions with its competitors occurred at the highest levels of the company. For example, during the summer of 2008, Rod Brenneman, Seaboard's CEO, met in Japan with Kikuchi Kiyotaka, the COO of the Fresh Foods Division of Mitsubishi Corporation, the parent company of Indiana Packers. Kiyotaka e-mailed Brenneman on October 2, 2008 to arrange a follow-up meeting at Seaboard's office around the time of Indiana Packers' November board meeting, writing that he "appreciate[d] your time to discuss frankly last time. As I indicated at that meeting, I will go to Indiana Packers for their Board meeting on Nov. 3," telling Brenneman that he would be joined by Ted Matsunaga (Indiana Packers' CEO) and Gary Jacobsen [*sic*] (Indiana Packers' President and COO). Brenneman replied on October 13, 2008, confirming that he and Darwin "Duke" Sand, then Seaboard's V.P. of Sales and Marketing (and Brenneman's successor as CEO) could meet with the delegation from Indiana Packers and Mitsubishi on November 4. Indiana Packers' CEO Matsunaga confirmed the competitors' November 4, 2008 meeting at Seaboard's offices, telling Brenneman that, "if it works for you, we (Kikuchi, Gary Jacobson & I) would like to have dinner with you after the meeting."

130.   During his tenure as Indiana Packers' President and COO, Gary Jacobson,

communicated with James Lochner, his counterpart at Tyson, and Donnie Temperley, a senior executive at Hormel.  Indiana Packers' Doug Lorenger, a senior sales executive whose prior tenures at both Tyson and Hatfield gave him entrée across the entire industry, regularly discussed customers and market conditions, and exchanged highly-sensitive competitive pricing and production information with Indiana Packers' competitors, including JBS (where his brother, Brad Lorenger, worked as V.P. of Sales), Tyson, Smithfield and Seaboard.  Many of these collusive discussions between Indiana Packers and its competitors related to forward-looking price and production information and detailed assessments of the U.S. and export pork markets.

### I.       Timeline of the Conspiracy

131.    As set forth above, each of these supply reductions during the Conspiracy Period were  a departure from the Producer Defendants' market behavior prior to the Conspiracy Period.   These supply restrictions involved a significant share of the Producer Defendants' annual production and  are in contravention of the Producer Defendants' individual economic self-interest.  These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by  competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of  pork.   While the Producer Defendants went to great lengths to maintain the secrecy of their unlawful   anticompetitive agreements, they disclosed certain of their supply restriction efforts in public  earnings calls and other sources.   As with their use of Agri Stats, each of the Producer Defendants exploited  these public statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy, and couched the public disclosures in pretext so as to conceal what  was really occurring.

132.    As early as January 2008, the CEOs and other senior-most executives of each of the Defendants recognized that, as a result of expansion and productivity increases in their operations, there was an oversupply of pork.  However, the substantial supply reductions that were necessary to

return the industry to the Defendants' desired level of profitability were against the individual self-interest of each Defendant.  In the absence of an agreement between all Defendants to reduce supply, it did not make financial sense for any company to reduce its own supply levels.  Accordingly, Defendants began to use their positions on the American Meat Institute ("AMI") and the Twenty-First Century Pork Club ("Pork Club") to coordinate supply cuts that could not be achieved in the absence of collusion.  Defendants and co-conspirators affirmatively shaped the rules of these organizations to conceal the way they were using them to coordinate the supply reductions (and hide) the existence of the conspiracy.  For example, the use of the Pork Club's rule prohibiting meeting attendees from attributing comments to specific speakers that attended their meetings, executives of the Defendants could and did make statements about their company's intentions at these meetings about the production, supply and/or pricing of the swine herd or pork without fear that anyone who did not attend the meeting could identify which executive or which company made the statement.

133.    In January 2008, Larry Pope, the CEO of Smithfield, met with the CEOs of the major pork producers – including Rod Brenneman of Seaboard, Dick Bond of Tyson, and Phil Clemens of Clemens – through AMI's executive committee.  At that meeting, Pope spoke of the need for the industry to reduce its supply, and minutes of that meeting reflect that Pope "shared that [Smithfield] will begin reducing their herd immediately.  Strategy is to push hogs through 1 week earlier to lower weights; then leave the barns open for that week (also help with animal health); they will look at their poorest producers and discontinue business with the bottom 5%."

134.    Although Smithfield shared this information with its competitors in the hope of inducing them to reduce supply as well, other Defendants were unwilling to follow Smithfield's lead without assurances that all major producers were on board.  On July 25, 2008, Marc Greenwood – the VP of Agri Business Capital at AgStar Financial – spoke by phone with Larry Pope of Smithfield.  During this call, Greenwood recognized the problem with Smithfield's efforts to get its competitors

to reduce supply – cutting production was against each individual producer's self-interest and that a "majority must participate" in order for the supply reductions to increase profitability. Accordingly, Greenwood developed a plan to put financial pressure on pork producers to reduce supply. During the call, Greenfield informed Pope that AgStar would begin denying loans to companies that would not agree to reduce production levels by 10%. Greenwood also shared a PowerPoint presentation with Pope in which he requested that the "larger systems must lead the way – top 30 must publicly state what they are going to do." During the call, Pope "commended" Greenwood "for taking this strong stand," and informed him that Smithfield supported this plan.

135.    Over the next six months following this exchange between Pope and Greenwood, some large producers took smaller steps towards reducing supply. For example, in late 2008 Joe Szaloky, director of financial planning and analysis at Smithfield Foods' production arm, said "[w]e are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."

136.    In October of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in industry-wide pork supply in 2009.

137.    During Hormel's first quarter earnings call in January 2009, Mr. Ettinger once again communicated that he expected industry-wide supply to decrease in 2009. Hormel CFO Jody Feragen confirmed that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."

138.    In January 2009, Tyson stated that the capacity utilization of its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%. This indicated that Tyson was reducing the amount of pork that it processed in its plants. Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."

139.    During Hormel's first quarter earnings call in January 2009, its CEO once again

communicated that he expected pork supply to decrease in 2009.  Hormel's CFO confirmed publicly that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."  By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000 (a reduction of almost 15%).

140.    In February 2009, Smithfield said that it would close six processed meat plants.

141.    In early 2009, pork industry participants continued to push the need to reduce supply. For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000.

142.    Similarly, in February 2009, Hormel stated: "We still do not expect to see a reduction in the supply of hogs in fiscal 2009[.]"  In addressing whether slaughter would be cut back, Hormel said that "you look at the opportunity to reduce your production numbers and we've certainly ... look[ed] for opportunities ... where we could reduce the numbers that we had going through ...."  Hormel further emphasized that: "if there were free market hogs that normally we would be bidding on, we're not looking to take them in…."

143.    During this early phase of the conspiracy, the Defendants recognized that more coordination was necessary between them to decrease supply at a sufficient level.  Recognizing that the many trade associations and industry groups that each Defendant belonged to provided the infrastructure for such coordination, Defendants began to use their frequent meetings to implement their collusive supply reduction.  Defendants even acknowledged as much internally.  As Matt Geyer, a senior Seaboard executive, noted in an internal email sent on October 13, 2009, in addition to Agri Stats – which provided "confidential competitor comparisons" – Mr. Brenneman's "involvement in AMI" was one of Seaboard's primary "sources of external information" related to "competitor

46

information."

144. █████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████

145. █████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████████████████████

146. █████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
███████████████████████████████████████████████

147. This "hedging" reflected other Defendants' concern that even Smithfield had not

committed to a 10% supply reduction.  In May 2009, Hormel executives confirmed in an earnings call that "[w]e still see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated.  And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."

148.    In May 2009, Larry Pope, the CEO and President of Smithfield, stated during an investor conference attended by other pork industry executives:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09—we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down.  We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.

149.    Following this public statement by Pope, on May 16, 2009, Brenneman (Seaboard) recruited Larry Pope (Smithfield's CEO) to attend an AMI meeting and join Brenneman's subcommittee, which ensured that Pope would also be in regular contact with other committee members.

150.    On June 9, 2009, Brenneman (Seaboard) told Steve Weiss (the co-founder of the Pork Club) that "I saw the announcement of the sow liquidation last week. Congratulations.  Did Smithfield decide to come along?  Any details that you feel okay sharing with me? (size, etc.)" Rather than respond with this information in writing, Weiss responded: "We should discuss over the phone."

151.    Within days of this exchange between Weiss and Brenneman, Pope of Smithfield called Brenneman directly to give him the "heads up" that Smithfield would be reducing its supply through a sow liquidation and to provide details on those plans.  Pope provided this information directly to Brenneman before announcing it publicly during Smithfield's earnings call on June 16,

2009.

152.    In June 2009, the CEO of Smithfield stated on an earnings call that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something:"

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our—I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something. We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.

153.    During the same call in June 2009, the Smithfield CEO, when asked to describe his expectations as to whether the rest of the industry would "liquidate" (i.e., cut production), he described how at the 2009 Pork Expo in early June 2009, cutting supply was the "key subject of the discussion of every producer," adding that such supply reduction is "something [that] has got to happen. And so that's very positive."

154.    Tyson was the next company to follow Smithfield with the public announcement of a major sow liquidation. In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87% down from the previous year's rate. Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."

155.    More significantly (and following Smithfield's major announcement in June), Tyson announced in July 2009 that it was liquidating 20,000 sows from its herd. Upon information and belief, Tyson executives informed its competition of this supply cut during AMI's Executive Committee meeting, which was held between July 9-11, 2009.

156.    On July 15, 2009, Mel Davis (Seaboard) spoke with Steve Thompson of Tyson in order to get additional details on Tyson's production cuts, including the fact that Tyson would be liquidating the 20,000 sows rather than selling them, which meant that the domestic sow herd would

be reduced, and not just Tyson's own herd. Mr. Davis forwarded this information to Mr. Brenneman and others at Seaboard.

157.     In a memorandum to his shareholders sent on July 17, 2009, Phil Clemens (Clemens' CEO) commented on Tyson's herd reduction announcement, but complained that "we believe the sow herd needs to come down by about 600,000 to bring hogs back to real profitability.  Don't know what the current reduction is, but it isn't anywhere close to 600,000."

158.     On July 19, 2009, Joe Luter IV (the great grandson of the founder and Executive Vice President of Smithfield) emailed Chris Novak, the CEO of the National Pork Board, and copying Larry Pope, "I share this with you because it suggests what we have advocated--we have too many hogs in this country and need to take 6-8 million market hogs out of our supply.  Cheap corn is likely going to slow liquidation and I don' think this is good for the industry over the next 2-5 years."

159.     In an internal presentation prepared in late June 2009 supporting Tyson's decision to liquidate sows, Tyson noted that "Producer equity levels have fallen and major ag lenders like Ag Star/Farm Credit are notifying producers that loans are out of compliance.  Producers may be forced to exit the business or seek high interest loans, packer/customer cash flow assistance, or relief from finishing unit rent and wean pig suppliers. . . . Ag Star/Farm Credit has $1.2 billion in pork production debt and will pull back operating loans shortly, based on producer cost to produce effectiveness, and a willingness to liquidate production.  They have said they will not provide operating loans to the wean to finish operator who imports Canadian wean pigs. [sic]  Ag Star is serious about forcing sow liquidation, to drop supply quickly and improve a sustained profitability."

160.     In a July 30, 2009 presentation to its board, Tyson reported that "Major Ag Lender like Farm Credit/Ag Star considering pulling back operating loans based on producer cost effectiveness and willingness to permanently pull back production."

161.     In August 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner,

confirmed on an earnings call that:

> Hog supplies will be down in Q4 year over year but still adequate. We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability. We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.

162.    Mr. Lochner continued, stating that, "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4," a statement echoed in the company's 2009 10K, which again noted that "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."

163.    These efforts by Defendants provided the assurances that other producers needed to reduce supply as well, even though producers would have been better off financially by maintaining their production levels in anticipation of the price impact from the Smithfield, Hormel, and Tyson supply cuts.  In July 2009, Smithfield's CEO Larry Pope went on to note in the company's annual report that: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, liquidation is now a recognized reality by all in the industry.  To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately.  This reduction, combined with the additional cuts by our fellow producers should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue."

164.    In August 2009, JBS's CEO communicated the start of JBS's participation in hog liquidation efforts.  He reportedly stated: "[W]e are seeing the start, we are seeing some increase in – not increase, we are seeing some more [hog] liquidation.  So we think we will continue to see the

margin in the processing side strong this whole year.  But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."

165.    The other Producer Defendants and co-conspirators agreed to or accepted Smithfield's offer or exhortation for the "industry" to cut production and to announce those cuts to other producers.  During 2009, Triumph reduced the number of sows that it had from 396,000 to 371,500.  In particular, Triumph reduced the number of sows by 14,500 at its Christensen Facility, 4,000 at its New Fashion Pork Facility, and 5,000 at its Eichelberger facility.  Notably, Triumph and Seaboard had a longstanding marketing agreement in which hogs processed by Triumph were marketed by Seaboard.  Thus, the reduction in supply of sows raised by Triumph may result in a reduction in the amount of pork that was sold by Seaboard.

166.    On September 2, 2009, at the Pork Club meeting in Philadelphia, Pennsylvania, Phil Clemens (Clemens' CEO) commented that "Our production has not slowed and we are in a typical supply demand curve problem.  We continue to produce too much pork for the amount that is being consumed.  In the last few weeks we have started to see a reduction in the sow herd - but still not even close to what really has to happen."  As a result of the "no attribution" rule, those in attendance agreed not to identify Mr. Clemens as the source of these comments.  Also at this meeting, Steve Meyer – an industry economist – gave a presentation to attendees detailing the degree of supply reductions that the pork industry needed in order to return to high levels of profitability.

167.    Two days later, on September 4, 2009, Steve Weiss (co-founder of the Pork Club) sent to Rod Brenneman and Gary Louis at Seaboard notes from the September 2 Pork Club meeting, which included (without attribution) Mr. Clemens' comments about how the industry needed to take additional steps to reduce supply, as well as Meyer's economic presentation.  Weiss also passed on encouragement from Mr. Pope that one of the Seaboard executives should join the Pork Club and attend future meetings.

168.    On an August 2009 earnings call, Wesley Mendonça Batista, CEO of JBS USA, communicated the start of JBS USA's participation in hog liquidation efforts. Mr. Batista stated, "we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation.  So we think we will continue to see the margin in the processing side strong this whole year.  But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."

169.    Similarly, on a September 2009 earnings call, Smithfield's CEO Larry Pope stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> We can't solve the problem.  But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.  But again, I don't think they can solve it.  I think this industry has got to solve it collectively.  I do believe everyone is now looking, and when I'm talking to people who are  financially extremely strong and they are cutting back, that's got to  be a statement about those people  who are  not financially strong.   But the answer is, yes, there are others cutting back.  We're not the  only one.

170.    On September 24, 2009, shortly after receiving the notes of Mr. Clemens' and Mr. Meyer's comments, Mr. Brenneman (Seaboard) spoke at an AMI luncheon and opined that the swine industry "must liquidate 10% to achieve a sustainable supply/demand balance."  In other words, Brenneman spoke to a room of industry executives about the need for each of the companies to reduce supply, perfectly echoing the comments of Smithfield's CEO from June and Clemens' CEO from three weeks earlier.

171.    Among those in attendance at that AMI luncheon was Robert Manly, Smithfield's CFO.  In response to Brenneman's comments, Manly drafted an op-ed in which he pointed out that, as of August 2009, Seaboard had yet to take steps to reduce its own supply from 2008 levels.  A draft

of the op-ed stated that "It is clear Rod knows what it takes to make the industry healthy and advocates that economically painful production cuts are necessary, but Seaboard is unwilling to make their own sacrifices and wants other producers to suffer so Seaboard can reap all the benefits." Smithfield's communications team took steps to publish the piece, but then withdrew it after receiving assurances that Triumph (Seaboard's joint venture partner) was in the process of reducing its production levels by approximately 32,000 sows (an 8% reduction from its 2007 levels) and that Seaboard was taking steps to reduce its purchases and slaughter of hogs, which would further reduce supply.

172.    On a December 2009 earnings call, Mr. Pope further confirmed that Smithfield had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance:"

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs . . . . I can tell you that I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves.  We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.

173.    In a January 2010 article, an industry insider noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 5% in 2009.  Into 2010, each of the Producer Defendants continued their collusive efforts to do just that.  For example, in March 2010, when asked on an earnings call about fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield, indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year.  That's going to have the impact starting next fiscal year when there is going to be 13,000

54

less.   But I think we'll pick up some of that in our other
operations.  But I think 8,000 or 9,000 or 10,000 of those a day
will disappear from our operations and that represents about 8% of
our, 8% of the hogs will be down.   That's for also the fresh pork
side.

174.    In January 2010, a presentation was made to the National Pork Board with respect to

"Sow Liquidation," stating that despite "controlled liquidation" in the Southeast and "shutdown" in

the Midwest, "it has not been enough and more needs to occur."

175.    On a March 8, 2010 earnings call, JBS CEO Wesley Mendonça Batista mentioned the

company's reduction in hog supply as a driver of profitability, and stated that these efforts were

resulting in protein shortages.  Mr. Batista stated:

[A] combination of reduction in supply for cattle, for hogs and for
chicken and in the other hand the improvement and increase in
consumption in the emergent markets we are very optimistic about
our business, about the margin that we will see a strong demand and
this reduction in supply, so we believe that we will see some shortage
in protein going forward.

176.    Despite having the economic incentive (increased demand) to increase supply and

capture market share, JBS adhered to the Producer Defendants' agreed-upon scheme to limit hog

supply.

177.    As of March 2010, U.S. pork production was noted to be down 7% so far, with 6% of

the reduction coming from a reduction in slaughter and 1% from lower market weights.   The

Producer Defendants also were reported to have collectively increased exports 8% by March 2010,

which was expected to lead to higher hog prices.

178.    The Producer Defendants also acknowledged access to information that allowed them

to know that the supply of pork would not be increasing.  For example, in a December 2010 earnings

call, Larry Pope, the CEO of Smithfield, stated:

We certainly compare ourselves to our competitors as best we can.
Given the information we think we have public plus what we think

55

we know privately, how many they kill, what their processing levels are and things like to.  This is information you may not quite have.  And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.

179.    As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

180.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████

181.    On January 31, 2011, within minutes of receiving it from his boss Mark McCain, Doug Lorenger forwarded to Smithfield's Dennis Shea an internal Indiana Packers announcement of a coming price increase for bacon and pork bellies that included specifics about the amount and timing of the pricing action, with McCain's email to the Indiana Packers sales team stating in part that "belly demand will continue to be high and supplies will become increasingly tighter as we go forward.  Effective immediately all belly formulas and overages will be increased by .05/lb.  This increase will encompass all fresh and frozen belly products.  All increases and modifications will be in place by WB 2-14-11."  Shea then sent Lorenger's email along to several fellow Smithfield executives, noting that "Ind Pk just increased their formula pricing as well[.]"

182.   Supply level information regarding competitors allowed Defendants to know that supply would not increase in the future, given the lifecycles of the animals.  Based on this knowledge, in November of 2010, Hormel CFO Jody Feragen stated on an earnings call that she did not think the industry would see large scale expansion given profitability for the pork producers.

183.   In February 2011, Tyson's COO similarly stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable.  I want to again explain why we don't believe that is true.  If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

184.   ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

185.   In the face of ever-increasing margins, when asked whether the type of profits would

continue, in a March 2011 earnings call, Larry Pope and Robert (Bo) Manly of Smithfield confirmed

to their competitors that it would not increase capacity, even in the face of the increased profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .
>
> HEATHER JONES [industry analyst]: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have—should have good margins, but I can't believe –
>
> LARRY POPE: Heather, we are sitting here today, we are halfway— closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today. We have got double-digit margins today.
>
> BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. . . .
>
> HEATHER JONES [industry analyst]: All right, okay. Thank you.
>
> LARRY POPE: You get two-year visibility on that, though. You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . And by the way, we are not going to build a new plant to expand capacity.

186. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

187. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

188.    In March 2012, Smithfield's VP of Finance and Chief Accounting Officer stated, at an analyst conference widely-attended by his competitors, that no one in the industry would be "real excited about adding capacity:"

> Nonetheless, you see some pretty significant fluctuations.  Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there.  And what I would tell you is that keeps a lid on pork production.  The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry.  There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.

189.    By May 2012, industry observers were noting that the reductions in slaughter capacity meant the Producer Defendants may not have enough capacity to slaughter expected hog levels by the fall.  In fact, Steve Meyer of Paragon Economics (an industry publication later sold to Agri Stats affiliate Express Markets, Inc.) noted that slaughter capacity would not keep up with hog capacity through late 2013 given that the Producer Defendants were holding their slaughter levels constant.

190.    ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

191.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

192.   At the National Pork Board conference held in Savannah, GA on June 19-22, 2012, presenters and participants continued to discuss the need to reduce hog supply.  Dan Groff of Clemens noted that "we are in for a dog fight. Sow expansion has eclipsed the level of sustainability, roughly 100,000 more sows in the past year (this figure was on the low end of collective opinion)."

193.   ████████████████████████████████████

████████████████████████████████████████

194.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

195.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



196. ██████████████████████████████████████████████████████

197. ██████████████████████████████████████████████████████

████████ Indiana Packers' planned cutbacks were soon confirmed by the company's ostensible competitors, including Seaboard, who in an internal email on June 5, 2013 noted that "there are a lot of kill cutbacks already being planned for this week.  Total, as of this morning, looking to be in the 42-45 head area . . . Tyson taking up to 16 hours out next week . . . Hormel will be taking out 10 hours.  Swift [JBS] and Farmland [Smithfield] will be making decisions on next week by tomorrow morning.  IPC [Indiana Packers] still needs 2000 head for this week," and it was "trying to hold the line."  Smithfield executives also reported to their colleagues on July 29, 2013 that they heard that "IPC cut 800 per day."

198.    On May 15, 2013, JBS' CEO Wesley Mendonça Batista continued to demonstrate Defendant JBS' ability to constrain the pork market.  During a quarterly earnings call, he stated that

"[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business. . . . So this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent in beef."

199.   In December 2013, Robert Manly of Smithfield emphasized on an earnings call that coordinated industry action was necessary to "balance supply and demand:"

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group.   We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.

200.   ██████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████

201.   ██████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████

202.   ██████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

203.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

204.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

205.   The Producer Defendants and co-conspirators further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise. For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Clemens Food Group's communication manager, stated the disease "had a very minimal impact on our hog flow, especially when you compare it to others in the industry."  He stated: "That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this."  Yet, in furtherance of their conspiracy, Clemens did not take advantage of having few PEDv infected pigs.  Instead of attempting to increase

its market share, it stayed the course with its fellow competitors.

206.    Defendants' conspiracy was yielding substantial profits by 2014.  In October 2014, Pork Powerhouses reported that "Hogs made history this summer.  Pork producer profits were, quite simply, enormous—averaging $82 profit for each hog marketed in the third quarter."  The report also noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast.'"  In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production.

207.    Indiana Packers' communications with its competitors about supply and production continued into 2015.  On June 25, 2015, Indiana Packers' Doug Lorenger emailed Dan Dubbert, then Smithfield's V.P. of Industrial Sales, regarding "bellies," writing that "got you [sic] message we are short this week maybe something late next week depends on if the bacon department works on Monday 7/6/15 because the plant is closed? Are you looking for hams?"

208.    On July 29, 2015 Russell Yearwood -- Gary Jacobson's successor as Indiana Packers' President—emailed Scott Saunders, the President of Smithfield's Fresh Pork Division, "Hey Scott, I know that life must be crazy with your new position, but is there a time that I could give you a shout and get caught up with you?  Nothing urgent just want to see how you are doing."  Yearwood and Saunders spoke later that day.  The following day, Yearwood followed up with Saunders, proposing an in-person meeting in September, writing "after our conversation yesterday, I got a call from Tokyo asking if I could arrange a meeting with you for Mike Horio?  As I stated yesterday, he is the CEO of [Japanese meat processor] Itoham but I believe he will retire towards the end of this fiscal year.  Would you be available to meet with him?  He will arrive in the US on 9/27 and depart on 10/2.  Our current CEO, Don Hanji and I would also attend.  If it is convenient, we could meet you at your new digs in Virginia or wherever is convenient for you.  I believe that he would also like

64

to say hello to Joe Sebring [the President of Smithfield's Packaged Meats Division] as well."
Saunders replied to Yearwood on August 11, 2015, stating, "Just talked to Joe [Sebring].  The best
day would be Monday the 28th [of September] if that is possible.  We could meet in Cincy, or
Chicago, or Virginia.  Which is ever easiest."  Yearwood responded, "Thanks Scott for getting back
to me.  I will check with Tokyo and let you know."

209.    On August 24, 2016, Yearwood and Saunders arranged to meet in Chicago, with
Saunders asking Yearwood "You staying at the Drake [hotel]? We are still on right?" to which
Yearwood replied "We are still on if you are available.  We will be staying at the Westin River North
[hotel]."

210.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

211.    ████████████████████████████████████████████████████

████████████████████████████████████

212.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

213.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

214.     Indiana Packers and its competitors coordinated their meetings around the time of trade shows, including the annual World Pork Expo.  For example, on June 6-7, 2016, just prior to that year's conference in Des Moines, David Murray, Indiana Packers' V.P. of Procurement, arranged to meet with Scott Saunders, the President of Smithfield's Fresh Pork Division.  The two confirmed that they were each booked in at the same time in the same hotel, the Renaissance Des Moines Savery Hotel, then agreed to meet at Smithfield's tent for happy hour beginning at 4pm on the afternoon of Thursday, June 9th, 2016.

215.     ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

216.     On August 10, 2017, Smithfield Senior Account Manager Susan Dow obtained a native Microsoft Excel copy of Indiana Packers' price list and distributed it to other Smithfield employees, one of whom reacted "Please delete this ASAP.  We should not receive a competitor's price list . . . It isn't legal for us to have a competitor's price list."

217.    Indiana Packers also had during the conspiracy period supply agreements with Seaboard, Hormel and Smithfield, giving all four companies ample opportunities to discuss pricing and production issues.

218.    Indiana Packers' senior-most executives, including President and COO Gary Jacobson, communicated with their counterparts at competing companies using personal email addresses.  For example, Jacobson used his Hotmail account (garyljacobson@hotmail.com) to exchange emails with Hormel's Don Temberley in February 2013; the discussion related in part to meat quality, but also evidenced a close personal relationship between Jacobson and Temberley, as the two exchanged updates about their families, houses, and hunting.

219.    In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift.  In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry."  However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.

## V.    ABNORMAL PRICING AND THE EFFECT ON PLAINTIFF IN THE FORM OF HIGHER PRICES

220.    Early in the Conspiracy Period, the pork industry showed abnormal price movements, i.e., increases in prices for the average hog whole price unexplained by increases in costs.  All of these pricing measurements show a significant break between pricing prior to and after the Conspiracy Period, supporting the plausibility of a conspiracy to increase prices of pork.  Average wholesale hog prices started to increase in an unprecedented way beginning in 2009, leading to increased earnings among the Producer Defendants and damaging Plaintiff in the form of higher

prices for pork than should have prevailed in a competitive market.

221.   According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb. from 2000 to 2009, the hog market year average price was at times substantially less.  Thereafter, prices increased dramatically, rising to more than $1.80/lb. in 2014, and never dropping or below $1.40/lb. again.  Figure 3 below shows the unprecedented increase in wholesale hog prices beginning in 2009, which stayed elevated through 2018:

**Figure 3: Average Hog Wholesale Prices in Cents per lb., 2000-2018**



## VI.   OVERCHARGES FROM THE CARTEL REFLECTED IN HIGHER PORK PRICES PLAINTIFF PAID

222.   Pork is a commodity product; pork sold by competitors has no meaningful difference and is thus interchangeable.  As such price is driven by the economic fundamentals of supply and demand.  In the words of Tyson's COO during a 2010 earnings call, "As you know decreased supply should be favorable to pricing."

223.   By reducing, stabilizing and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins.

In 2012 the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."

224.    The volume of U.S. commerce in the pork industry is enormous.  Total pork sales in the United States exceeded $20 billion for much of the Conspiracy Period.  Each of the Producer Defendant's annual sales of pork products are also very large.  For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales.  With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to Plaintiff.

225.    The Bureau of Labor Statistics ("BLS") maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products paid by Plaintiff.  The PPI for Pork (Processed or Cured – Not Canned/Made into Sausage) shows a marked increase beginning in 2009 and continuing through 2017:



## VII.   DOJ's CRIMINAL ANTITRUST PROSECUTION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN PORK

226.   The U.S. Department of Justice Antitrust Division (DOJ) has an ongoing criminal antitrust prosecution into anticompetitive conduct in the Broiler Chickens industry.  The DOJ has indicted numerous current and former poultry industry executives, including from Pilgrim's Pride, which is majority owned by JBS USA Food Company Holdings, the parent of Defendant JBS USA.

227.   On February 23, 2021, Pilgrim's Pride pleaded guilty to charges brought by the DOJ for "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act, 15 U.S.C. § l" from "at least as early as 2012 and continuing through at least early 2017, and agreed to pay approximately $107 million in a criminal fine.

228.   Defendant Tyson, after being served with a grand jury subpoena in April 2019 in DOJ's Broilers investigation, applied for leniency from prosecution under the DOJ's Corporate

70

Leniency Program, pursuant to which Tyson must, in order to avoid criminal prosecution and fines, admit to having participated in activity constituting a criminal antitrust violation and fully cooperate with the DOJ.

229.    The guilty plea by Pilgrim's Pride (owned by Defendant JBS USA's parent) and Tyson's grant of leniency in the DOJ's criminal price-fixing investigation in the Broiler Chickens industry serve as "plus factors" supporting the plausibility of the pork industry conspiracy alleged herein, particularly given the similar structural characteristics shared by the broiler and pork industries.

230.    In addition, upon information and belief, the same antitrust policies and practices that resulted in antitrust violations by Pilgrim's Pride and Tyson with respect to Broiler Chickens governed JBS USA's and Tyson's conduct with respect to pork and the conduct alleged herein.

231.    Pilgrim's and Tyson's antitrust violations concerning Broilers were concealed and only established by the DOJ's criminal investigation, just like the alleged conduct here has been concealed by Defendants, as discussed below.

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.  *American Pipe* Tolling

232.    Plaintiff, having purchased pork directly from one or more Defendants or Co-Conspirators, is a member of the putative direct-purchaser class first alleged Maplevale Farms in In re: Pork Antitrust Litigation, Case No. 0:18-cv-01776 (D. Minn.) filed in the U.S. District Court for the District of Minnesota on June 29, 2018.  Plaintiff had neither actual nor constructive knowledge of the facts constituting its claims for relief, and Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before its claims were tolled by the filing of the Maplevale complaint on June 29, 2018.

233.    By virtue of the filing of the Maplevale complaint, Plaintiff's claims were tolled

beginning at least as early as June 29, 2018, under American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), and related authorities, and remain tolled during the pendency of the direct purchaser class action asserted against Defendants.

### B. Fraudulent Concealment (and Further Factual Allegations)

234.   Plaintiff had neither actual nor constructive knowledge of the facts constituting its claim for relief.  Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before its claims were tolled until at least 2018 or later.  Plaintiffs' Sherman Act claims are further timely, as each of the Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiff on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiff.

235.   During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Defendants and co-conspirators both conducted their conspiracy in secret and created pretexts to allow additional communication, including coordinating their supply plans at or incident to trade group meetings and events in order to give their meetings the appearance of legitimacy; communicating through third parties or through backchannels; avoiding references to the conspiracy in their internal communications; communicating with each other by telephone to avoid written records of what they said and limiting knowledge of the conspiracy to only an inner circle of senior executives; deleting evidence of the conspiracy and instructing others to do the same, all so that there would not be a paper trail of their unlawful scheme; and by providing deceptive and pretextual statements to their customers and to the public in justifying supply cuts and price increases that were intended to conceal – and did in fact conceal – that these actions were the result of collusion.

236.   During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Producer Defendants and co-conspirators publicly and pretextually claimed that increases in their pork production input costs or other seemingly plausible reasons were

responsible for increased pork prices when, in fact, they were not. This created the illusion that the price of pork that they sold to Plaintiffs was competitive, when, in fact, it was not because their pork prices were the result of the conspiracy. For example:

237.   Producers claimed that decreased supply and higher prices were caused by the H1N1 outbreak. But a National Pork Board customer tracking research report dated May 6, 2009, stated that "The overall perception of the safety of pork remains in a good trajectory" and that "Among pork consumers, we continue to see purchase intent stabilizing...." And, Bret Getzel from Seaboard confirmed H1N1's short term impact on the pork market in a May 21, 2009 email to Chuck Faughnan, where he told him "There was some very short term weakness in the market as a result of the H1N1 negative press, but this came and went pretty fast. The market had pretty much recovered by 05/08."

238.   ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

239.   In 2012, Tyson's CEO insisted publicly that Tyson Foods "need[ed] to get our pricing improvements in order to get paid for those higher raw materials. His statements indicate at the time that he understood customers would – in his words – "understand that these higher grain prices are going to require higher prices."

240.   ███████████████████████████████████████████████

73

241. ████████████████████████████████████████████

242.     The PEDv scare was also a pretext for higher prices due to allegedly short supply.  On November 4, 2014, in response to a question about pork belly pricing, Brandi McClure, Product Manager at Seaboard, wrote, "PED Scare – Starting late last Fall and well into the Spring, packers/customers were putting product into the freezer anticipating reduced volumes in the Spring and Summer.  While we did have reduced kills, the hog weights made up for the overall volume decline that was expected and therefore the anticipated shortage was never realized."

243.     Defendants also communicated in secret in order to coordinate their supply reductions and price increases, including by sending to competitors their future supply and pricing plans and instructing colleagues to conceal or delete evidence of their unlawful actions.

244.     For example, on August 14, 2008, Dick Bond, Tyson's CEO, reviewed an internal analysis of Tyson's projected financial performance.  Bond recognized that the projections were not all that useful without similar data from Tyson's competitors and asked an employee if Tyson could get data from "our competitors like Pilgrim, Smithfield, Hormel, etc.?"  When the employee

74

responded that the data could be obtained through a special third-party survey, Bond responded that he "could call the companies I listed and probably get some info.  Is that O.K.?"

245.    Brenneman and Larry Pope – the CEOs of Seaboard and Smithfield, respectively – also spoke a number of times between late 2008 and late 2009 under the auspices of a supply contract between the two companies in which Smithfield provided hogs to Seaboard.  Although the two did discuss this buyer/seller arrangement, they also used the relationship to discuss in detail the supply plans of their respective companies and pressure each other to commit to supply reductions."

246.    On January 22, 2009, Seaboard executives Brian Taphorn and Tom Blumhardt received from a sales broker an email attaching a spreadsheet with competitors' pricing and cautioned that "I got this from a source for you to help see the most current on the SBR competition. Please guard it carefully."

247.    On July 8, 2009, Tom Padgett of Tyson circulated internally to Todd Neff and Jay Krehbiel the current prices to retailers offered by Seaboard and Smithfield for bone-in loins, and noted that Cargill and JBS had "nothing to offer" because they were short on product.  Neff then forwarded the email to others at Tyson and instructed them to "read and delete."

248.    On October 29, 2009, Clemens' Dan Groff emailed senior company management that he had "heard through the grapevine yesterday that Smithfield had called a meeting on November 17th with a group of PA independent hog producers."  He further noted that he was "very curious about this" and would "try and ask around" but asked "if anyone has any reliable Smithfield contacts or can think of anyone who might know some information that you give them a call.

249.    █████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████

250.    On November 23, 2010, Brian Taphorn of Seaboard emailed internally to Terry Holton Smithfield's 1/8" trim price list, which he had obtained from National Beef.  Taphorn told Holton, "Want to keep this confidential, as I'm sure no one else at National knows this has been forwarded to us."

251.    On October 19, 2011, Todd Neff, a Senior VP at Tyson, complained to two co-workers about Tyson's decision not to add shifts at its plants and increase its slaughter volumes. Neff complained that "we should sltr more than we are at times . . . we have earned the right to get our fair share of sltr [slaughter] since we are performing well vs. industry i.e. – make the other guys cut back! I trust you'll read and delete and not repeat this."

252.    Brothers Brad Lorenger (VP of Sales at JBS) and Doug Lorenger (a senior sales executive at Indiana Packers) communicated frequently to coordinate on pricing and supply between their respective companies.

253.    ████████████████████████████████████████
████████████████████████████████████

254.    ████████████████████████████████████████
████████████████████████████████████████
██████████████████████

255.    ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

256. █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

257. █████████████████████████████████████████

██████████████████████████████████

258. █████████████████████████████████████████

█████████████████████

259. █████████████████████████████████████████

██████████████

260. █████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

261. █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████

262. █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██

263. █████████████████████████████████

264.     Beginning in 2012, the Pork Club added a "Just Pigs" meeting limited to just pork producers.   This was intended to facilitate "informal roundtable" discussions amongst the competitors.  Legal counsel did not attend these meetings.

265.     On March 16, 2012, Dhamu Thamedaran and Shane Horsley of Smithfield discussed Smithfield's supply forecast for the upcoming week based on "rumors" that could only possibly have come directly from competitors.  For example, Horsley reported that "Triumph is expected not to harvest next Saturday.  However, expect them to be in buying hogs next week for the following week."  Thamaduran responded by confirming Horsley's Triumph intel, and also reporting that Seaboard would not be killing hogs on Saturday, while at Tyson there was "talk of possible reduction is [sic] Saturday kill but no confirmation yet."

266.     ████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████

267.     On November 9, 2012, senior-most executives from Cargill, Tyson, Smithfield, Hormel, and JBS met in Chicago.  Within two months of the meeting, Defendants began cutting back their kill rates, and reported these reductions to the competition.

268.     For example, on January 30, 2013, while circulating a new price list, Brian Taphorn informed Seaboard personnel that, "There is, finally, talk of some kill cutbacks coming down the pike into next week.  Tyson has said to cancel all kill plans for the weekend of 2/9; Excel talking of slowing down some daily overtime hours; and Swift taking more of a stand against paying over the top for hogs versus just going without.  We believe it would take real cutbacks to make a real supportive move in the markets."

269.     Later that year, on July 9, 2013, Taphorn (Seaboard) circulated the "latest 'Price List' from Smithfield," asking his team to "PLEASE KEEP THIS IN HOUSE AND CONFIDENTIAL."

270.    On February 23, 2014, in an email entitled "Summary of last week's conference" and sent to senior Clemens' management, Dan Groff (Clemens") wrote that "I wanted to pass along a few interesting anecdotes from my conference last week.  As always, most of the interesting stuff comes out in the hallways and at dinner rather than in the actual meetings……"  In the bullet that followed, Groff wrote that "Farmland, Smithfield and Triumph all have sizeable holes in hog supply to fill in the next two months, nothing new there but it's a very real problem for them…."  The summary also included information about kill schedules, hog weights, hog diets, and discussion of Tyson's welfare announcement, during which Tyson management admitted they overreacted to customer pressure."

271.    On May 22, 2014, Taphorn (Seaboard) predicted in an email to colleagues that pork prices would move up in June and July because there were 11 plants "that are either currently on a 4 day kill schedule, or will be transitioning into the 4 day schedule the first half of June. . . .  We should expect others to join that fold, as we get deeper into June and July."

272.    Backchannel communications regarding confidential supply and pricing information between Defendants became so common that Defendants' personnel began giving such communications nicknames.  On August 11, 2015, Hormel's Corwyn Bollum told a group of fellow Hormel employees that he "just heard through the **pig mafia** rumor mill, that JBS is going to be moving to Ractopamine free starting October 1, 2015." (Emphasis added.)

273.    In October 2016, a hog producer emailed Smithfield complaining about the lack of competitiveness of packers and their depression of supply.  "What was so unbelievable to me regarding Steve Meyer and Joe Kerns' presentation was this; Everyone was in a tizzy about the unprecedented plant expansion. Everyone was concerned about selling the product.   What no one had the balls to address is what precipitated the capital investment in the plants. What is **the purpose of a confidential industry group** if all we are doing is skirting issues?" (Emphasis added)

79

274.    On March 23, 2017, Rob Bogaard of Smithfield reported internally on a call with a Tyson hog buyer during which the Tyson buyer informed Smithfield that Tyson and other competitors believed that the supply of pork bellies was tight and that there would be insufficient supply for bacon suppliers that were not vertically integrated with hog farmers. Bogarrd instructed his team that the details of the call were "CONFIDENTIAL."

275.    In 2017, when both Clemens and Seaboard/Triumph added new plants, both companies made sure to inform their competitors of the impact of these new plants in an effort to avoid retribution from the other conspirators for adding capacity.

276.    On April 21, 2017, Shane Miller of Tyson spoke with a contact a Clemens. Miller forwarded the information on to others at Tyson and Greg Schweitzer commented "Nice job Shane. Clemens is telling us Coldwater [the new Clemens plant] is scheduled to come up right after Labor Day in Sept. Jay Krehbiel of Tyson then forwarded this exchange to others but cautioned them to "read and delete please."

277.    On June 9, 2017, Dan Groff of Clemens emailed internally several senior executives and reported on a conversation he had with Gary Louis of Seaboard about the production plans and slaughter numbers for Seaboard and Triumph. Groff noted that he "kept this DL list relatively small because there are a few sensitive things on here, so if you want to share anything specific, please copy/paste to a separate message."

278.    Notwithstanding this messaging from Clemens and Seaboard/Triumph, during a March 2018 meeting several senior Tyson executives, including Todd Neff, Shane Miller, and others, Tyson discussed "how do we punish our competition for their capacity investments?"

279.    On August 10, 2017, Susan Dow of Smithfield circulated Indiana Packers' pricing list to others at Smithfield. Although she was scolded by Bob Darrell because "it isn't legal for us to have a competitor's price list," another Smithfield employee removed Darrell from the thread and

joked to Dow that "we'll all made this mistake. . . .  I did it too."

280.    Hormel's antitrust compliance policy explicitly prohibited any discussions with competitor suppliers about anything other than bid price.  Despite this, Hormel used its procurement relationship with other Defendants as a pretext for sharing their confidential information.  ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

281.    An investigative article published in February 2017 by Bloomberg Businessweek suggested the conspiracy that began among Broiler producers and Agri Stats was being replicated in the pork industry.[4]  The article reported that Agri Stats:

> has . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods.  It appears that demand for the service is strong.  At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services.  His slideshow indicated that 27 companies had already signed up.[5]

The article did not state that pork producers were engaged in a horizontal conspiracy, but it did suggest for the first time in a widely circulated publication, that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.   Indeed, this was the first time the pork industry's *use* of Agri Stats was even widely known or reported.

282.    Then, the December 8, 2017 filing of a direct purchaser complaint against Agri Stats in Affiliated Foods, Inc. v. Claxton Poultry Farms, Inc., No: 1:17-cv-08850 (N.D. Ill.), and subsequent Complaints in In re Broilers, presented in further detail the confidential services that Agri

---

[4] See Christopher Leonard, "Is the Chicken Industry Rigged?," Bloomberg Businessweek (Feb. 15, 2017), available at https://www.bloomberg.com/news/features/ 2017-02-15/ is-the-chicken- industry-rigged.

[5] *Id.*

Stats provides to its clients in the Broiler industry.

283.    The Bloomberg Businessweek article disclosing the pork industry's use of Agri Stats, the Affiliated Foods Complaint, and subsequent public filings in Broilers, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

284.    Until that time, the combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to planning and conducting private meetings during which anticompetitive conduct was shielded from public view; communications between Defendants by the use of the telephone to prevent the existence of written records; limiting any explicit reference to competitor pricing or supply restraint communications on documents; communicating competitively sensitive data to one another through Agri Stats' "proprietary, privileged, and confidential "system that kept both the content and participants in the system secret; making misleading statements to investors and the public designed to conceal their wrongful conduct, including about the nature of the information shared with and among competitors through Agri Stats; and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

285.    Additionally, the Agri Stats' reports provided to the Producer Defendants and co-conspirators were the equivalent of competitors (here, the Producer Defendants and co-conspirators facilitated by Agri Stats) meeting in secret to exchange Competitively-Sensitive Information with each other in furtherance of their conspiracy.  Instead of meeting in secret in a hotel room and using a white board to conspire, the Producer Defendants and co-conspirators, facilitated by Agri Stats, used the non-public Agri Stats' reports that they received to exchange, i.e., communicate, with each other in secret their Competitively-Sensitive Information to implement, monitor and enforce their conspiracy.

286.    Agri Stats is a secretive company, and repeatedly made affirmative statements about the public's lack of access to and information about its services.  For example, in 2009, the President of Agri Stats, Blair Snyder, explained:

> Agri Stats has always been kind of a quiet company.  *There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.   We don't advertise.  We don't talk about what we do. It's always kind of just in the background,* and really our specialty is working directly with companies about their opportunities and so forth.[6]

287.    But Agri Stats did not just conceal the conspiracy alleged herein by being a "quiet company" that did not advertise or "talk about what we do" in public, it also engaged in numerous affirmative acts to conceal the alleged conspiracy during the Conspiracy Period.  Specifically, Agri Stats made repeated false or misleading statements about the true nature of the information that it provided to the pork integrator Defendants, all of which served to exclude suspicion and prevent discovery of Defendants' illegal scheme.

288.    For example, in the same 2009 presentation discussed above about the "quiet" and secretive nature of Agri Stats, Mr. Snyder also emphasized that he was not at liberty to discuss "bottom line numbers" (a company's net earnings), and declined to display those numbers publicly, stating: "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."  However, while affirmatively asserting that it was unable to share this information publicly due to "confidentiality" concerns, Agri Stats was at the same time providing producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above.  These statements thus acted to conceal the true detail and nature of the Agri Stats reports from Plaintiff and the public in general.

289.    Similarly, Agri Stats repeatedly asserted in public that its reports did not disclose or

---

[6] Sanderson Farms Investor Day (Oct. 2009) (emphasis added).

identify any individual participant's data to any other participant and that each producer's data were kept confidential: "The fact that we collect a tremendous amount of data, and you'll see that throughout the presentation as we talk. I've got some demo examples of what we do. Obviously, no individual companies are identified or talked about'; "We'll talk about comparison of data in a little bit, but the main thing is that we want to preserve the confidentiality of individual companies, so you'll hear that word a lot throughout the presentation. I apologize but that's what we're all about"; and "The confidentiality, only your company is underlined; you don't know who anybody else is." Contrary to these statements, however, the participants, including the Defendants, were able to identify individual firm information in the Agri Stats reports.

290. On May 9, 2012, Deb McConnell (Tyson's submitter to Agri Stats) inquired of Agri Stats which specific plants were included in Agri Stats' kill/cut figures. Greg Dess of Agri Stats responded with the 12 specific plants for which Agri Stats received this information. McConnell then circulated Dess' response to others at Tyson and instructed them to "keep confidential."

291. On June 15, 2012, McConnell then revealed to Agri Stats' Josh Edwards that Tyson could use Smithfield's earnings release information to decipher which of the locations listed in Agri Stats' studies belong to Smithfield.

292. In fact, by May 7, 2012 McConnell had begun orchestrating Tyson's regular deanonymization of the information of its competitors in Agri Stats reports. McConnell would disseminate deanonymized competitor information from Agri Stats in monthly printed "packets" for Tyson employees to review in meetings. Tyson employees also deanonymized Agri Stats' Bottom Line Reports for broiler chickens, and these deanonymized reports were circulated to senior Tyson executives, such as Donnie King (Tyson COO and Senior Group VP), who also oversaw the pork business.

293. In a company-wide email sent on April 6, 2018, Tyson reminded its employees that

its procurement policy (i.e., its guidelines for purchasing materials) prohibited the sharing of any confidential information because such conduct would put Tyson at a competitive disadvantage in obtaining lower prices for the materials it purchased.  Notwithstanding this policy for its procurement processes, Tyson consistently shared its confidential information with respect to its pricing and production information through Agri Stats knowing that there were methods to deanonymize the Agri Stats reports.

294. ███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

295.     Defendants' affirmative acts of concealment also included pretextual explanations for the industry's stability and improved profitability.  For example in June 2012, Larry Pope, Smithfield CEO, attributed his expectation for improved profitability to other reasons such as "good programs with our retailers" and "lower grain costs":

> KEN ZASLOW:  What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?

> LARRY POPE: Strong exports,  $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that,  you've got chicken and beef that are going to be down significantly.

> BO MANLY: And I think there is also some optimism that the US consumer  may have some greater disposable income from

less gasoline prices and improvement in the economy.[7]

296.    By virtue of the fraudulent concealment of their wrongful conduct by each of the Defendants, the running of any statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful conspiracy alleged in this Complaint under the injury discovery rule, fraudulent concealment doctrine, and/or doctrine of equitable estoppel.

## IX.    ANTITRUST INJURY

297.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Price competition has been restrained or eliminated with respect to pork;

B.    The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels; and,

C.    Plaintiff paid artificially inflated pork prices as a result of each of the Defendants' conduct.

298.    The purpose of the conspiratorial conduct of the Defendants and their co- conspirators was to raise, fix, or maintain the price of pork.  As a direct and foreseeable result, Plaintiff paid supra-competitive prices for pork during the Conspiracy Period.

299.    By reason of the alleged violations of the antitrust laws, Plaintiff sustained injury to its businesses or property, having paid higher prices for pork than it would have paid in the absence of each of the Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

300.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

---

[7] Q4 2012 Smithfield Foods Earnings Conference Call (June 14, 2012).  Further, Defendants' conspiracy and anticompetitive conduct, as alleged above, including their use of Agri Stats' reports and data, continued into and throughout the Conspiracy Period.

## X.      COUNT 1:   VIOLATION OF SECTION 1 OF THE SHERMAN ACT

301.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

302.    Each of the Defendants and all of their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

303.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

304.    At least as early as 2008 and continuing until 2018 if not later (and with effects thereafter), the exact dates being unknown to Plaintiff, each of the Defendants and all of their Co-Conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

305.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for pork throughout the United States.

306.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

307.    As a result of each of the Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supracompetitive prices for pork.

308.    In formulating and carrying out the alleged agreement, understanding and conspiracy, each of the Defendants and all of their Co-Conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.  Defendants' conspiracy had the following effects, among others:

> A.    Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

87

     B.    Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

     C.    Plaintiff, having directly purchased pork from Defendants, their divisions, subsidiaries, and affiliates, and all of their Co-Conspirators, has been deprived of the benefits of free and open competition in the purchase of pork.

309.    Each of the Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

310.    As a direct and proximate result of each of the Defendants' anticompetitive conduct, Plaintiff has been injured in its businesses or property by paying more for pork than they would have paid in the absence of the conspiracy.

311.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## XI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against each and all Defendants as follows:

312.    The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

313.    Plaintiff recovers damages to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff be entered against each and all of the Defendants in an amount to be trebled under U.S. antitrust laws;

314.    Plaintiff be awarded pre- and post- judgment interest as provided by law, and that

such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

315.   Plaintiff recovers its costs of suit, including reasonable attorneys' fees, as provided by law; and

316.   Plaintiff be granted such other and further relief as the case may require and the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

317.   Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

April 30, 2022

Respectfully submitted,

s/ David C. Eddy
David C. Eddy
Dennis J. Lynch
Travis C. Wheeler

NEXSEN PRUET LLC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: (803) 771-8900
Facsimile: (803) 253-8277

deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiff Conagra Brands, Inc.*