# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| COMPASS GROUP USA, INC. | ) | |
| | ) | Case No. 0:18-cv-01776 JRT/JFD |
| Plaintiff, | ) | Individual Case No. 0:22-cv-01610 |
| | ) | |
| v. | ) | |
| | ) | **AMENDED COMPLAINT** |
| AGRI STATS, INC.; CLEMENS FOOD | ) | |
| GROUP, LLC; CLEMENS FAMILY | ) | **Jury Trial Demanded** |
| CORPORATION; HORMEL FOODS | ) | |
| CORPORATION; HORMEL FOODS | ) | |
| LLC; JBS USA FOOD COMPANY; | ) | |
| SEABOARD FOODS LLC; SMITHFIELD | ) | |
| FOODS, INC.; TRIUMPH FOODS, LLC; | ) | |
| TYSON FOODS, INC.; TYSON | ) | |
| PREPARED FOODS, INC.; and TYSON | ) | |
| FRESH MEATS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## TABLE OF CONTENTS

I.      NATURE OF ACTION ................................................................................ 4

II.     JURISDICTION AND VENUE ................................................................. 8

III.    PARTIES ..................................................................................................... 9

    A.      Plaintiff .............................................................................................. 9

    B.      Defendants ......................................................................................... 9

        a.      Agri Stats ................................................................................. 9

        b.      Clemens .................................................................................. 10

        c.      Hormel .................................................................................... 11

        d.      JBS .......................................................................................... 12

        e.      Seaboard ................................................................................. 12

        f.      Smithfield ............................................................................... 13

        g.      Triumph ................................................................................... 13

        h.      Tyson ....................................................................................... 14

        i.      Co-Conspirators ..................................................................... 14

IV.     FACTUAL ALLEGATIONS ..................................................................... 16

    A.      Agri Stats' Detailed Reports Enable the Producer Defendants to Accurately  Assess and Monitor their Competitors' Production Levels ................................. 20

    B.      The Producer Defendants' Control over the Production and Supply of Pork  in the United States, which Allowed the Collusive Scheme to Succeed .......................... 24

    C.      The Level of Concentration in the Pork Industry Facilitated the Collusive Scheme ..................................................................................................... 28

    D.      Barriers to Entry ............................................................................... 31

    E.      Inelastic Demand and Standardized, Commodity Products Where Competition  is Principally on Price ..................................................................................... 32

    F.      Opportunities to Collude at Industry Conferences and Trade Association Meetings .......................................................................................... 33

G.    The Producer Defendants' Curtailment of Pork Production ................................... 39

    a.    Smithfield ................................................................................ 41

    b.    Tyson ...................................................................................... 42

    c.    JBS ......................................................................................... 42

    d.    Hormel ................................................................................... 42

    e.    Seaboard ................................................................................ 43

    f.    Triumph .................................................................................. 43

    g.    Clemens .................................................................................. 44

    h.    Co-Conspirator Indiana Packers ............................................ 44

V.    ABNORMAL PRICING AND THE EFFECT ON PLAINTIFF IN THE FORM  OF HIGHER PRICES ................................................................................................ 71

VI.    OVERCHARGES FROM THE CARTEL REFLECTED IN HIGHER PORK  PRICES PLAINTIFF PAID ...................................................................................... 72

VII.    DOJ's CRIMINAL ANTITRUST PROSECUTION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN PORK ...................................................................................... 73

VIII.    TOLLING OF THE STATUTE OF LIMITATIONS ........................................... 75

    A.    *American Pipe* Tolling .......................................................................... 75

    B.    Fraudulent Concealment (and Further Factual Allegations) ................................... 75

IX.    ANTITRUST INJURY ............................................................................................. 90

X.    COUNT 1:   VIOLATION OF SECTION 1 OF THE SHERMAN ACT ......................... 91

XI.    REQUEST FOR RELIEF ........................................................................................ 92

XII.    JURY TRIAL DEMANDED .................................................................................... 93

Pursuant to Fed.R.Civ. 15(a), Plaintiff Compass Group USA, Inc. by and through its undersigned counsel, files as a matter of course this Amended Complaint against the Defendants identified below, for their illegal conspiracy, which increased the prices of pork sold in the United States beginning at least as early as 2008 and continuing until 2018, if not later.    Plaintiff brings this action against  Defendants for treble damages and for such other damages to the maximum extent allowed under the antitrust laws of the United States, and demand a trial by jury.

## I.    NATURE OF ACTION

1.    The pork producer defendants are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce in the United States.  The United States pork industry is highly concentrated, with a small number of large companies controlling the supply. Defendants and their Co-Conspirators collectively control over 80 percent of the wholesale pork market.

2.    Defendants Agri Stats, Clemens, Hormel, JBS USA, Seaboard, Smithfield, Triumph,  and Tyson entered, along with Co-Conspirators Indiana Packers Corporation, Daily's Premium Meats, LLC, Seaboard Triumph Foods, LLC, and others,  into a conspiracy  from at least 2008 to 2018 if not later (the "Conspiracy Period") to fix, raise, maintain, and stabilize the price of pork.[1]  The defendants, other than Agri Stats, are referred to here collectively as the "Defendants" or "Producer Defendants."

---

[1] For the purposes of this Complaint, "pork" includes, but is not limited to, a variety of meat products from pigs (also referred to in the industry as porcine or swine) purchased fresh, frozen, processed, rendered or non-rendered, including but not limited to any and all processed pork products, (e.g., smoked ham, sausage, bacon, pepperoni, lunch meats), and other processed products and by-products containing pork. "Pork by-products" can include, but is not limited to, offal and individual parts or organs from pigs used in pet foods (e.g., livers, kidneys, lungs, hearts, cheeks) and/or rendered products (e.g., meat meals and bone meals).  From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.  See, e.g. DPP Class Memorandum of Points and Authorities in Support of Motion for

3.     One method by which Defendants implemented and executed their conspiracy was by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States.

4.     In furtherance of their conspiracy, the Producer Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information, such as prices, capacity, production, sales volume, and demand, including through their co-conspirator, Defendant Agri Stats.

5.     From at least 2008 to the present (the "Relevant Period"), the Defendants and their co-conspirators entered into a conspiracy to fix, raise, stabilize, and maintain the price of pork.

6.     Beginning in at least 2008, as Defendants' profitability deteriorated in the midst of a global recession and an increase in the productivity of pork producers, Defendants began to coordinate through their mutual trade associations and industry groups to achieve a coordinated reduction in the domestic supply of pork.

7.     Beginning in 2008, the CEO of Smithfield attended a trade association meeting in which he announced Smithfield's plans to reduce its pork supply and urged others to follow. Smithfield's CEO then coordinated with AgStar's VP responsible for lending to pork producers and agreed to the plan to put financial pressure on producers to reduce production, while encouraging the major producers to announce their own production cuts publicly.  As detailed in this Complaint, between early 2008 and late 2009, Defendants met numerous times through trade associations and other industry groups, which allowed them to coordinate their unlawful agreement to reduce the supply of pork.  And although Defendants announced their supply reductions publicly, their coordination allowed each Defendant to justify its own supply reduction as a natural outcome of the economic conditions facing the industry.  However, this was untrue.  As detailed in this Complaint,

---

Preliminary Approval of Class Settlement between Direct Purchaser Plaintiff and Defendant JBS at 2, n.2, *In re: Pork Antitrust Litigation,* Case No. 0:18-cv-01776 (D. Minn.).

Defendants recognized internally that it was in each producer's independent self-interest to produce as much pork as it could. Accordingly, the supply reductions were not justified by input costs or other economic factors. Instead, the cuts were based on an understanding that all major producers would implement similar supply reductions. This allowed Defendants to reduce their supply through a collusive agreement or understanding that was reached in secret and then concealed from the public.

8.     Defendants also conspired with companies that provided services to the pork industry but did not produce or sell pork, such as Agri Stats. A specialized information-sharing service, Agri Stats, among other things, obtains data from participating industry pork and hog producers and develops comprehensive reports based on that data. Agri Stats provides its reports and findings to the participating industry producers.

9.     Defendant Agri Stats began providing highly sensitive "benchmarking" reports to the Producer Defendants.   Legitimate benchmarking allows competitors to compare their profits or performance against that of other companies. Yet Agri Stats' reports are unlike those of lawful industry reports; rather, Agri Stats gathers detailed financial and production data from each of the Producer Defendants and their Co-Conspirators, standardizes this information, and produces customized reports and graphs for the conspirators. The type of information available in these reports is not the type of information that competitors would provide each other in a normal, competitive market.

10.     On at least a monthly basis, and often far more frequently (*e.g.*, weekly or every other week), Agri Stats provides the Producer Defendants with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), and regularly provides the keys  to deciphering which data belong to which participant.    The effect of this information exchange was to allow the pork producers to monitor each other's production, and therefore control supply and price in furtherance of their anticompetitive scheme.

11.     The data exchanged through Agri Stats also bears all the hallmarks of the enforcement and implementation mechanism of a price-fixing scheme.  First, the data are current and forward-looking—which courts have consistently held has "the greatest potential for generating anticompetitive effects."  Second, information contained in Agri Stats reports is specific to pork producers—including information on profits, prices, costs, and production levels—instead of being aggregated as industry averages to avoid transactional specificity and the easy identification of specific producers.  Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service that required the co-conspirators to pay millions of dollars over the  Conspiracy Period—far in excess of any other pricing and production indices.  Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market.  Defendants utilize the information exchanges through Agri Stats in furtherance of their conspiracy to fix, raise, stabilize, and maintain artificially inflated prices for pork  sold in the United States.

12.     Further, the Producer Defendants coordinated with industry lenders to pressure all pork farmers to reduce their sow herds and limit importation of pork from Canada by withholding funding from companies that did not get on board with the supply reduction conspiracy.

13.     By late 2009, this plan succeeded, as the pork industry cut its supply by approximately 6.4%, primarily through the liquidation of sow herds (female pigs used for breeding).  With this structural reduction in the supply of pork, Defendants were able to monitor their conspiracy through Defendant Agri Stats.

14.     The pork industry is characterized by several other factors conducive to the anticompetitive conduct alleged herein, including: vertically integrated operations; high barriers to entry preventing competitors from coming into the market; consolidation and concentration; inelastic supply and demand; and homogeneity of pork products.

15.     Plaintiffs allege that Defendants and their co-conspirators' conspiracy is a *per se* violation of Section One of the Sherman Act, 15 U.S.C. § 1 (Count I).   Defendants' purposeful restriction of pork supply had the intended effect of increasing pork prices to Plaintiff.  As a result of Defendants' unlawful conduct, Plaintiff paid artificially inflated prices for pork during the Conspiracy Period. Such prices exceeded the amount Plaintiff would have paid if the price for pork had been determined by a competitive market.  Thus, Plaintiff was injured in its businesses or property by Defendants' unlawful conduct.

## II.     JURISDICTION AND VENUE

16.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by Plaintiff resulting from Defendants' conspiracy to restrain trade in the pork market.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

17.     Venue is proper in this District under 15 U.S.C. §§ 15(a); 22 and 28 U.S.C. §§ 1391(b); (c); and (d) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District.

18.     Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the North Carolina long-arm statute N.C.G.S.A. § 1-75.4, because each Defendant has transacted business in this state and because the North Carolina long-arm statute extends jurisdiction to the outer limits allowable under federal Due Process, and each Defendant has sufficient minimum contacts with the state of North Carolina to satisfy Due Process.

19.     This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District and the state of North Carolina -- has transacted

business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District and the state of North Carolina.

## III. PARTIES

### A. Plaintiff

20. Plaintiff Compass Group USA, Inc. is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Compass Group USA, Inc. brings this action on behalf of itself and its subsidiaries, affiliates and division, including but not limited to Foodbuy, LLC (collectively, "Compass Group" or "Plaintiff"), as an assignee from Sysco Corporation, and its affiliates, subsidiaries, and predecessors (collectively referred to as "Sysco"), with respect to Sysco's direct purchases of pork from Defendants made for Compass Group. Based on those direct purchases, Sysco has assigned its federal antitrust claims to Compass Group. From at least as early 2008 and continuing until if not beyond 2018, Compass Group purchased pork at artificially inflated prices directly from various Defendants and their affiliates and Co-Conspirators, and it suffered injury to its business or property as a direct and proximate result of Defendants' wrongful conduct.

### B. Defendants

#### a. Agri Stats

21. Agri Stats, Inc. ("Agri Stats") is an Indiana corporation located in Fort Wayne, Indiana and was, for a portion of the Conspiracy Period, a subsidiary of Eli Lilly & Co., a publicly-held corporation headquartered in Indianapolis. Agri Stats is now a wholly owned subsidiary of Agri Stats Omega Holding Co. LP, a limited partnership based in Indiana. Agri Stats is a co-conspirator of the Producer Defendants and has knowingly played an important and active role by participating in and a facilitating the Producer Defendants' collusive scheme detailed in this

Complaint.  Agri  Stats has a unique and deep relationship with the pork industry generally, and specifically with  each of the Defendants identified below, all of which are Agri Stats' primary customers.   Defendants Clemens, Hormel, JBS USA, Seaboard, Triumph, Smithfield, and Tyson, and  Co-Conspirator Indiana Packers, are all Agri Stats subscribers and report a wide variety of information to Agri Stats, which, according to a 2016 Eli Lilly earnings call, is used by "over 90% of the poultry and pig market" in the United States.

22.     All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in  by Agri Stats' various officers, agents, employers, or other representatives while actively engaged   in the management and operation of Agri Stats' business affairs within the course and scope of  their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri  Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its  conduct  was within the flow of, was intended to, and did have a substantial effect on the  interstate commerce of the U.S., including in this District.

**b.     Clemens**

23.     Clemens Food Group, LLC is a limited-liability company headquartered in  Hatfield, Pennsylvania. During the Conspiracy Period, Clemens Food Group, LLC and/or its  predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate  commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the  United States, including in this District.

24.     The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC.  During the Conspiracy Period, The Clemens Family Corporation and/or its predecessors, wholly owned or

controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

25.    The Clemens Food Group, LLC and the Clemens Family Corporation are referred to here collectively as "Clemens."  Clemens reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### c.    Hormel

26.    Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota.  During the Conspiracy Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

27.    Hormel Foods, LLC is a Minnesota corporation headquartered in Austin, Minnesota.  Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation.  During the Conspiracy Period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

28.    Hormel Foods, LLC and Hormel Foods Corporation are referred to here collectively as "Hormel."  Hormel reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### d.  JBS

29.    JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken- producing companies in the world which recently plead guilty to antitrust violations in the broiler chickens market.  JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.    During the Conspiracy Period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates (hereinafter collectively referred to as "JBS" or "JBS USA") sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

30.    Plaintiff timely opted out and excluded itself from the DPP class settlements with JBS USA, which was approved by the Court in *In re: Pork Antitrust Litigation,* Case No. 0:18-cv-01776 (D. Minn.).

### e.  Seaboard

31.    Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation.   During the Conspiracy Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, including without limitation Daily Foods, Inc., John R. Daily, Inc., and any other subsidiary doing business as Daily's Premium Meats and/or Daily's through July 10, 2014, or affiliates, including Daily's Premium Meats and Seaboard Triumph Foods, LLC, (herein collectively referred to as "Seaboard") sold pork in interstate commerce, directly or through its wholly owned or

12

controlled affiliates, including joint ventures, to purchasers in the United States, including in this District.

### f.    Smithfield

32.    Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company.  Smithfield Foods  is headquartered in Smithfield, Virginia, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.  During the Conspiracy Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including  in this District.  Smithfield Foods has entered into agreements to settle with the DPP class in *In re: Pork Antitrust Litigation,* Case No. 0:18-cv-01776, ECF 815, (D. Minn.) and with the CIIPP class (ECF 1252) for a total payment of $125 million. Plaintiff timely opted out and excluded itself from the DPP class settlement with Smithfield, which was approved by the Court in *In re: Pork Antitrust Litigation,* Case No. 0:18-cv-01776 (D. Minn.).

### g.    Triumph

33.    Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.   During the Conspiracy Period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates (hereinafter collectively referred to as "Triumph") sold pork in interstate commerce, directly or through Seaboard Foods, or its wholly owned  or controlled affiliates or joint ventures, to purchasers in the United States, including in this District.

13

### h. Tyson

34.     Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the Conspiracy Period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States, including in this District.

35.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the Conspiracy Period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States, including in  this District.

36.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the Conspiracy Period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States, including in this District.

37.     Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc. and Tyson Foods, Inc. are referred to here collectively as "Tyson."  Tyson reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.

### i. Co-Conspirators

38.     Co-Conspirator Indiana Packers Corporation is an Indiana corporation headquartered in Delphi, Indiana, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork.  During the Conspiracy Period, Indiana Packers Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates (hereinafter collectively referred to as "Indiana

Packers") sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Indiana Packers Corporation's parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and Mitsubishi Corporation (Americas).

39.     Co-Conspirator Daily's Premium Meats, LLC is a Delaware limited liability company headquartered in Kansas City, Missouri. During the Conspiracy Period, Daily's Premium Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States. During the Conspiracy Period until July 10, 2014, Daily's Premium Meats was wholly owned by Defendant, Seaboard. Beginning on or about September 27, 2014, and continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50% interest in Daily's Premium Meats.

40.     Co-Conspirator Seaboard Triumph Foods, LLC is a Delaware limited liability company headquartered in Sioux City, Iowa. It is a joint venture between Seaboard Foods and Triumph Foods. During the Conspiracy Period, Seaboard Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States. Beginning on or about May 13, 2015, and continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50% interest in Seaboard Triumph Foods.

41.     Various other persons, firms, and corporations not named as defendants have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not named as defendants in this Complaint, and whether or not identified herein as a co-conspirator. Throughout this Complaint, Indiana Packers, Daily's Premium Meats, Seaboard Triumph Foods, and the other persons, firms, and corporations not named as defendants or specifically listed as a Co-Conspirator herein, that

performed acts and made statements in furtherance of the conspiracy are collectively referred to as "Co-Conspirators."

## IV.   FACTUAL ALLEGATIONS

42.    Starting in at least 2008 and continuing until if not beyond 2018, each of Defendants and their Co-Conspirators conspired to fix, raise, maintain and stabilize pork prices. To effectuate and ensure the stability of their anticompetitive agreement, each of the Producer Defendants relied on a unique industry data sharing service provided by Defendant Agri Stats, Inc. Agri Stats provided a means for each of the Producer Defendants to obtain and monitor critical and competitively sensitive business information regarding each other's production metrics, thereby serving as a central and critical part of each of the Defendants' price-fixing scheme, resulting in a stable and successful anticompetitive cartel.

43.    The Chicago Mercantile Exchange ("CME"), the U.S. Department of Agriculture ("USDA"), and various other entities publish publically available aggregated daily, weekly, monthly, and annual supply and pricing information concerning the U.S. pork industry, including: the CME Lean Hog Index, which reflects prices paid for hogs in the U.S.; the CME Pork Cutout Index, which reflects the prices paid for pork (a "cutout' is the approximate value of a hog calculated using the prices paid for wholesale cuts of pork); and USDA's National Daily Hog and Pork Summary. The pricing and production information in those reports and indices is completely anonymous and aggregated (or averaged), and indeed the USDA reports clearly state that certain prices are "not reported due to confidentiality."

44.    Only Agri Stats receives from each of the Producer Defendants, and then provides to all of the Producer Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency. Agri Stats is a company that generates confidential

pork industry data considerably more detailed than any similar types of available reports, and the Agri Stats reports include the following data categories:

a)   Performance Summary;

b)   Feed Mill;

c)   Ingredient Purchasing;

d)   Weaned-Pig Production;

e)   Nursery;

f)   Finishing;

g)   Wean-to-Finish;

h)   Market Haul; and

i)   Financial information, including prices, sales and profits.

45.    Much of the information shared by Agri Stats and the Producer Defendants was unnecessary to achieve any benefits for pork producers.   Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.   In a competitive market, the participants would closely   protect such proprietary   information from disclosure as providing it to competitors would be disadvantageous—unless, of  course, there is an agreement that the competitors will use the information to the joint benefit of each other as was the situation in the pork industry.

46.    Agri Stats describes itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."  But describing Agri Stats as a "benchmarking" service does not accurately reflect  its critical  role  in  the  pork  industry  and  the  fundamental  importance  Agri  Stats  has  to  the Producer Defendants.

17

47.     Beginning in 2008, after two decades focusing primarily on the poultry industry, Agri Stats began selling its so-called "benchmarking" services to pork producers, including to each of the Defendants.   Pork producers were told by Agri Stats' Greg Bilbrey that "benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. Each and every commercial swine operation is  encouraged to participate in some benchmarking effort."

48.     Agri Stats emphasized to pork producers that sharing information through "benchmarking" could help achieve the "ultimate goal [of] increasing profitability— not always increasing the level of production."   Agri Stats told the industry that each pig producer "should be participating in some type of benchmarking.   To gain maximum benefit, production, cost, and financial performance should all be part of the benchmarking program. . . .  Producer groups could design and operate their own benchmarking effort," and, most importantly, "[e]ach participant has to commit" to ensure the accuracy and reliability of the data collected and submitted to Agri Stats.

49.     Agri Stats collects data from each of the Producer Defendants, audits and verifies the  data, and ultimately reports back to the Producer Defendants detailed statistics on nearly every operating metric within the industry.  Agri Stats' survey methodology involves—from and to the Producer Defendants—direct electronic data submissions of financial, production, hog placement, size and weaning age, capacity, cost, and numerous other categories of information  by each pork producer on a weekly and monthly basis.  At each of the Producer Defendants' pork  facilities, certain employees, typically in the accounting department, are responsible for  regularly submitting the data to Agri Stats.  Agri Stats uses a detailed audit process to verify the  accuracy of data from each producer, often directly contacting the Producer Defendants to verify  data before issuing reports to Agri Stats subscribers.

50.     Because of the nature of the life of a hog, even current and historical information about hog production numbers effectively gives forward-looking supply information to competitors.  A typical production cycle for a hog is roughly four years, which is a function of the biological cycle for hogs, involving time needed for: (1) breeding an existing sow; (2) selecting and retaining piglets; and (3) breeding and rearing the selected piglets.  All of those elements factor into the time necessary to substantially increase production, which can be as much as two years.

51.     Agri Stats' critical importance for a collusive production-restriction scheme in the pork market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power.  Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel— for example, by boosting pork production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production.

52.     In August 2007 Tyson re-engaged with and returned to Agri Stats reports in Broilers in return for Agri Stats getting *pork* producers JBS and Hormel to sign-on to Agri Stats pork reports.

████████████████████████████████████████████████████████

████████████████████████

53.     Agri Stats' detailed statistics—coupled with its regular, in-person meetings with each Producer Defendant and routine participation in trade association events widely attended by each of the Producer Defendants' senior executives - serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

19

A.    **Agri Stats' Detailed Reports Enable the Producer Defendants to Accurately Assess and Monitor their Competitors' Production Levels**

54.    Agri Stats claims to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific facilities by name, but not identifying by name other producers' facilities described in the report.

55.    However, contrary to these assertions, each of the Producer Defendants can (and do) readily determine "whose numbers the numbers belong to."  Agri Stats reports are so detailed that any reasonably informed producer can easily discern the identity of its competitors' individual facilities.   It is common knowledge among producers that others can do so, with some  of the Producer Defendants referring to the task of determining the identity  of individual  competitor's data as "reverse engineering."

56.    Indeed, each Producer Defendant knows that when it provides its internal, confidential information to Agri Stats, the other producers will be able to access that information and identify the Producer Defendant that submitted it.   There is no legitimate purpose to provide this specific, competitively  sensitive information to Agri Stats, nor is there any  legitimate  purpose for Agri Stats to disseminate the information in the detailed, readily decipherable form  in which it is sent to Defendants; rather, it is provided, compiled and transmitted for anti- competitive purposes.

57.    Agri Stats' role in the pork industry extends far beyond the collection and dissemination of competitively sensitive data. It is an active and knowing participant in, and facilitator of, Defendants' scheme.   Agri Stats' employees confirm for each of the Producer Defendants  the data for a particular company at regular meetings with each company, or at the numerous  trade association meetings where Agri Stats executives make presentations on a regular basis.

58.     Agri States offers a service to each of the Producer Defendants and all Co-Conspirators whereby personnel from Agri Stats regularly meet with each Producer Defendant's employees and give presentations about both company- and industry-wide data.   Throughout the relevant time period, Agri Stats executives and account managers fanned out across the pork-producing regions of the country to meet with their clients and Co-Conspirators, the Producer Defendants and Co-Conspirators.   Since Agri Stats travels and presents among the Producer Defendants regularly, discussing each Producer Defendant's non-public, proprietary data, Agri Stats is in a unique position to share information among the Producer Defendants at these regular meetings.   And that is exactly what happened.

59.     In addition to its in-person meetings with each of the Producer Defendants, Agri Stats employees, including Greg Bilbrey, regularly host, or present at, pork industry events, often citing Agri Stats data in discussing market, production, and demand trends in the pork industry.   A publicly-available excerpt of a presentation from Mr. Bilbrey shows the level of detail provided to competitors regarding profits in the pork market:

**Top 25% in Profit - Variances to Average Company - 2009-2007**

**2009**

|  | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 |  |  | 11 | 7 |  | 8 |  | 9 | 6 |  | 10 |
| ranking |  | 1 | 5 |  |  | 2 |  | 4 |  |  | 3 |  |

35,001,089 Pigs Finished

**2008**

|  | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 |  |  | 10 | 6 |  | 7 |  | 8 | 9 |  | 12 |
| ranking |  | 1 | 5 |  |  | 2 |  | 4 |  |  | 3 |  |

30,785,319 Pigs finished

**2007**

|  | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 |  |  | 10 | 7 |  | 6 | 8 |  | 9 |  | 12 |
| ranking |  | 1 | 4 |  |  | 2 |  |  | 5 |  | 3 |  |

22,306,500 Pigs finished

21

60.     The purpose of these reports was not to provide better prices to customers or to lower the costs of production.  Instead, the purpose was to improve the profitability of each of the Producer Defendants and their Co-Conspirators.  The particular Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average.

61.     On information and belief, the Agri Stats report actually circulated to competitors in the pork market contained even further detail.  The same presentation informed pork producers that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg."  (ckg refers to 100 kilograms.)  This underlines that the purpose of these reports was not to allow  customers  to save  money  through  lower  prices  and  more  efficient  production— in  fact,  the  opposite  was true, the purpose was the profitability of the Producer Defendant companies and the  impact was higher prices for pork customers.

62.     There is no plausible, non-conspiratorial justification for the Producer Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their hog size and age, pricing, capacity, production, and costs at the level of detail at which they do.  In a competitive  market,  such  proprietary,  competitively  sensitive  information  should  be  a  closely guarded  secret.   Economic  theory  shows  how  the  routine  exchange  among  competitors  of  such sensitive internal company information reduces competition.

63.     One chicken  industry  expert  testified  in  a  case  against  Pilgrim's  Pride,  a subsidiary of Producer Defendant JBS USA, brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay  for  contract  farmers  creates  "a  potential  vehicle  for  collusion"  and  presents  a  "classical antitrust concern."  The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

[t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue.  Grower payout and cost information shared by most producers is incredibly detailed and comprehensive.  As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry.  An intensive inquiry is needed.

64.     When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

65.     A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue.  My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own.  For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES."  Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

66.     Agri Stats has also played a similar role in the chicken industry and has been named as a defendant in dozens of civil antitrust suits alleging its active participation in a price-fixing and  production-restriction conspiracy akin to that alleged in this Complaint.  In denying defendants' motions to dismiss in the *Broiler Chicken* litigation pending in the Northern District of Illinois,

the district court noted that, given the nature of the Agri Stats reports in that market, the defendants are in fact sharing future anticipated production information with one another, which raises significant antitrust concerns.

67.    A 2017 *Bloomberg News* article titled "Is the Chicken Industry Rigged?  Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their chicken cartel, which is equally applicable to the pork cartel alleged in this Complaint:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual."  He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state.  Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it.  You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says.  "That is what creates stability for a cartel."

**B.    The Producer Defendants' Control over the Production and Supply of Pork  in the United States, which Allowed the Collusive Scheme to Succeed**

68.    The structure of the modern U.S. pork industry makes it a market that is ripe for the type of collusion alleged in this Complaint.

69.    The Conspiracy Period was further characterized by the increased control  over the breeding, production, growing, and processing of pork by the Producer Defendants  through vertical integration and the exclusive production contracts with hog farmers.

70.    Vertical integration is so pervasive that the Producer Defendants are commonly called pork or swine "integrators" by the industry, government, analysts, and academics.   Vertical integration allows the Producer Defendants to directly control the production and supply of  pork

24

through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter. Fully-integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

71.     Hog production and marketing practices in the U.S. pork industry have changed dramatically over the past two decades. In the early 1990s, nearly 90% of hogs were purchased in the spot market through auctions, dealers or directly by packers. By early 2010, the percent of spot market hogs had fallen to 5-7%. The remaining 93-97% were processor owned or purchased under contract.

72.     Under pork production contracts, "a contractor or producer provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."  This arrangement essentially converts independent farmers into contract employees that perform services for the pork producer.  The Producer Defendants each typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities.  The Producer Defendants each typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market.  The prevalence and use of contracts for hog production by each of the Producer Defendants increased significantly during the course of the conspiracy.  By 2017, it was reported that there were only a small handful of independent producers who sell any hogs to the open market for transparency for bid prices.

73.     Pork production begins with "farrowing," the term used to describe a female hog (called "sows") giving birth to piglets.   Sows will normally have anywhere from 11 to 13 pigs per litter.   With a sow being able to "farrow" as often as every four months, a single sow can have around 36 piglets in one year.  After birth piglets grown for meat consumption are moved to a nursery for about six to eight weeks or until the pig weighs upwards of 50 pounds.  At the last stage

of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds.   After the pigs reach their final weight, they are sent to a packing plant to be harvested.  Due to the nature of the pork production cycle, the reduction of sows—*i.e.*, farrowing hogs—has a significant impact on the supply of pork.

74.     The following diagram shows the path for pork raised for meat consumption from birth through sale to entities such as Plaintiff:



75.     The Producer Defendants directly or indirectly control every part of the supply chain in the diagram above except for the final one (wholesale); this is known as vertical integration. Economic theory holds that vertical integration can have anticompetitive effects because there are fewer firms competing with each other at all levels of the supply chain, which in turn can facilitate collusion on price.  Vertical integration is a hallmark of the pork industry in the United States.

76.     Defendant Smithfield was the largest producer and processer of pork in the United States during the Conspiracy Period.   In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States. Smithfield's 2014 annual report described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years.  We retain ownership of the hogs raised by our contract farmers.  In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

77.     In 2009, Defendant Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers.  Seaboard's 2017 SEC 10-K report states that it raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated  by third parties with whom Seaboard has grower contracts."

78.     Defendant Clemens Food Group emphasizes its vertical coordination on its website, stating that the "vertically-coordinated company directly oversees the entire production chain, from  the farm all the way to our retail and foodservice customers."   A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.

79.     Defendant Triumph was created with vertical integration in mind as it is owned by five of the largest pork producers in the U.S.—Christiansen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota.   The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

80.     As Defendant Tyson stated in its 2009 10-K Report, "The majority of our live hog supply is obtained through various procurement relationships with independent producers." Additionally, Tyson raises a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

81.     Defendant Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities.  As Hormel stated in its 2009 annual report that, "[t]he live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."   Accordingly, Hormel "uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.

82.     A primary consideration in Defendant JBS' 2015 purchase of Cargill's pork business was that it gave JBS more control over the production of hogs, by acquiring four hog farms and two packing plants operated by Cargill.

83.     Co-Conspirator Indiana Packers' website notes that it is "a fully integrated pork company operating entirely within the heart of the Midwest," and heralds the company's "pork-exclusive expertise and vertically integrated operation."

84.     Each of the Defendants further controls the manner in which pork is processed and has the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports.  Defendants including Smithfield, Clemens, Tyson, Hormel, Seaboard, Triumph, and JBS USA, and Co-Conspirator Indiana Packers, Daily's Premium Meats, and Seaboard Triumph Foods, sell packaged  pork under various brand or trade names.

## C.     The Level of Concentration in the Pork Industry Facilitated the Collusive Scheme

85.     The USDA has stated that high levels of market  concentration allow  the  largest participants to  extract more of the  economic value from food  transactions, but "consumers typically bear the burden, paying higher prices for goods of lower  quality."

86.     The hog integration sector is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production).   Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

87.     Prior to and in the beginning of the Conspiracy Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork producers controlling a large amount of market share.   Between 1988 and 2015, the top four pork producers (Smithfield, Tyson, JBS USA, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015.

88.     In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion.  The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.  As noted above, the acquisition allowed JBS U S A  to exercise greater control over the production of pork, by  acquiring four hog farms and two packing plants operated by Cargill.

89.     The acquisition was completed in October 2015 and resulted in further consolidation in the industry. JBS USA's resulting pork business had *pro forma* net revenue of approximately $6.3  billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per  week.  After the acquisition closed, the new JBS-Cargill entity was twice as large as the next largest pork producer (Hormel) and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with roughly five percent of the national slaughter capacity).

90.     By 2016, the top six pork processors comprised 82% of the total market: Smithfield (26% market share); JBS USA (20%); Tyson (18%); Hormel (8%); and Triumph and Seaboard (5% each).   On their own, it would be difficult for any of these supposed competitors to exercise market

power.   But, acting as a whole to manipulate the price of pork products, the combined market share of the six largest Defendants is, using the Herfindahl-Hirschman Index (the "HHI," the U.S. Department of Justice's measure of market concentration), an HHI of 6724[2] as reflected in the following chart[3]-- well above the threshold for a "highly-concentrated" market:

| Company | Share | HHI - Independent | HHI - Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | 6724 |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | |
| Others | 18% | 18 | 18 |
| Total | 100% | 1532 | 6742 |

91.     This high level of concentration in the pork industry provided an environment, together with Agri Stats' help, that was optimal for collusion.  WH Group Limited (whose website states that it "is the largest pork company in the world"), the parent company of Smithfield, characterized the U.S. pork integration industry as  "relatively mature and concentrated."  Both of these factors – maturity and concentration – make an  industry more susceptible to collusion.

92.     Because the industry was highly concentrated and dominated by a handful of producers, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement. Further,  because the largest producers were incapable of independently controlling prices solely on their own, such  an agreement was necessary to inflate prices.

---

[2] An HHI value of 1,500 to 2,500 suggests a market is moderately concentrated. An HHI in excess of 2,500 indicates that a market is highly concentrated.

[3] Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (Mar. 7, 2017).

93.     In addition to market concentration, market stability is consistent with an agreement to fix prices, as is greater instability before or after a conspiracy.  The following chart shows not only that the pork integrators' collective share of the market was high throughout the Relevant Period, but also that each individual Defendant and co-conspirator's market share was largely stable throughout:



### D.     Barriers to Entry

94.     Large barriers to entry kept potential competitors out of the pork  integration industry. New entry into pork processing is costly and time consuming.    Construction of a  large-scale slaughter facility would cost hundreds of millions of dollars and the additional planning,  design, and permitting costs are substantial.   In 2012, it cost Cargill, whose pork business was later  acquired by Defendant JBS USA, $25 million just to expand an existing facility.   Building a facility  from scratch would cost considerably more, totaling hundreds of millions of dollars.

95.     The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants.   And in other situations, the processor owns the hog from farrow to finish.   Even if a market entrant were able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably.

**E.     Inelastic Demand and Standardized, Commodity Products Where Competition is Principally on Price**

96.     Inelastic demand means that it is profitable for members of a cartel to raise  the price of a good above competitive levels.   In simple terms, demand is inelastic when the loss in  volume arising from a price increase is small relative to the magnitude of the increase in price.   In other words, demand elasticities measure the sensitivity of the quantity of a product purchased in  response to changes in the price of a product and its closest substitutes.  Markets with a highly  inelastic demand can help facilitate collusion as manufacturers have the ability to raise prices without  a significant impact on quantity demanded.  Research shows that the demand for pork is inelastic, and that there is limited substitution between pork and other meat products.[4]

97.     Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another.   Pork loins, bacon, ribs, and other pork products are produced on an industrial scale.   For example, pork loin from Tyson and Smithfield is virtually indistinguishable, with similar nutritional values, branding and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement  on a common pricing structure.

---

[4] Ronald L. Meekhof, Pork Slaughter and Processing Sector Facility-Level Model, June 2007 (showing that a one-percent increase in the price of pork resulted in a 0.636 decrease in pork demand).

F.      **Opportunities to Collude at Industry Conferences and Trade Association Meetings**

98.     All Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct.  Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

99.     For example, a 15-member National Pork Board ("Pork Board," initially established by federal law) has included several senior executives of the Producer Defendants.  Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo.  Executives from several of the Producer Defendants are known to have served as members of the Pork Board.   For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff. Skahill recently served as a  Pork Board Vice President and its Treasurer.

100.    According to its website, "[t]he National Pork Producers Council (the "Pork Council"), which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing  opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world  markets."  Executives from the Producer Defendants have served on the Pork Council Board of Directors  during the Conspiracy Period, including: Cory Bollum of Hormel Foods, Don Butler and Chris  Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats.

101.    The Pork Council conducts its annual business meeting and election of officers and directors  during its "National Pork Industry Forum" typically held in early March each year.  The Pork

Council advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions. The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

102.    In addition to its annual National Pork Industry Forum, the Pork Council sponsors many other programs that have provided ample opportunities for defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show." It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms). The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC.

- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

103.    The National Pork Industry Conference ("Pork Industry Conference") has taken place in Wisconsin each July since 2010 (and in the Ozarks before that). Descriptions on the conference website have said that the Pork Industry Conference "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America." After the 2009 conference, Mark Greenwood, a Senior VP at lender AgStar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least 300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow numbers." In July 2010, an industry website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded." The website for the 2016 Pork Industry Conference's conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic

experts."  Seaboard Foods and Smithfield  Foods are among the Producer Defendants whose executives
have been session presenters at the Pork Industry Conference.

104.    Upon information and belief, CEOs and top-level executives from the Producer
Defendants attending the Pork Industry Conference and the Pork Council events discuss topics with
one another relating to pricing, production, and other non-public, proprietary information in a number
of informal settings.   These regular, informal, and in-person opportunities to discuss pricing and
production in the pork industry  give CEOs and top-level executives comfort that their competitors
remain committed to a plan to  artificially restrict pork production.   For example, at the 2009 Pork
Expo in early June 2009, the  Producer Defendants met and discussed cutting (*i.e.*, "liquidating")
production, which Smithfield  CEO Larry Pope later described "was the key subject of the discussion
of every producer," and as  "something [that] has got to happen.  And so that's [] very positive."

105.    In addition to the large pork industry associations, there are smaller pork clubs that
permit members to meet regularly and privately discuss competitive issues.   For example, the 21st
Century Pork Club, founded in 1997 by former Pork Council executive Larry Graham, meets twice a
year.   A March 2011 AgriMarketing article about the club states that it consisted of "60 industry
stake  holders" and that since its inception, the club's two rules have been "nothing that was said in
the  meeting was to be repeated outside the group, with a name attached" and members will be dismissed
from the group if they miss two meetings in a row without a valid reason.

106.    All Defendants were able to meet with each other not only at pork-specific events,
but also at the many meetings, conferences, conventions, and expositions sponsored by the North
American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other
organizations.

107.    Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and
largest meat and poultry trade association."   AMI's website routinely boasted that AMI's Packer and

35

Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

108.    NAMI was formed in 2015 by merging the AMI and the North American Meat Association.  The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars . . . provide excellent networking and information-sharing opportunities for members of the industry."

109.    All of the Producer Defendants (or their closely-affiliated companies) have been members of AMI and then NAMI throughout the Conspiracy Period.  Executives from the pork producer Defendants have served on the AMI and NAMI Board of Directors during the Conspiracy Period, including:

        a.    Mark Campbell and Rick Hoffman of Triumph Foods;

        b.    Doug Clemens and Phil Clemens of Clemens Family Corporation;

        c.    Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc.;

        d.    Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

        e.    Gary Louis, Rod Brenneman and Terry Holton of Seaboard Foods;

        f.    Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA;

        g.    Jim Snee, Stephen Binder and Jeffrey Ettinger of Hormel Foods Corporation; and

   h.   Gary Jacobson and Russ Yearwood of Co-Conspirator Indiana Packers
        Corporation.

110.   Almost all of these executives also serve or have served on the 25-person AMI and/or

NAMI Executive Committees, and several have been among the five officers of AMI or NAMI,

including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod

Brenneman of Seaboard Foods.

111.   Throughout the Conspiracy Period, AMI (through 2014) or its offshoot the American

Meat Institute Foundation (since 2015) has sponsored the industry's "Annual Meat Conference."

The conference website describes the conference as "a complete education and networking

experience."   Many of the Defendants' high-level executives attend the conference.   For example,

registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel

Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight

executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson

executives; Chris Hodges, then Senior Vice President, Smithfield Foods and ten additional Smithfield

Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President,

respectively, of Agri Stats.

112.   Throughout the Conspiracy Period, the Annual Meat Conference has included a

plenary session focused on how economic issues affect the meat industry, usually entitled "The

Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry."  All (or

almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D.,

President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express

Markets, Inc. (an affiliate of Agri Stats) through 2017.   The description for the 2015 presentation

stated that it would address "how you may need to adapt your business because of consumer

spending trends, unemployment rates and industry capacity."

37

113.    The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike.   This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices.   Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years."   The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

114.    Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action."   Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015, and Phil Clemens of The Clemens Family Corporation in 2016.

115.    For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics."   The NAMI board met  during the 2015 Management Conference.

116.    In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit."  In addition to education sessions, the summit has included, "networking opportunities and social events," including  a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual  Board

of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business."

117.     AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012.  In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

118.     In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations. Promotional materials for the 2014 IPPE indicated that attendees included Producer Defendants Clemens Food Group, Hormel Foods, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson.  After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

### G.     The Producer Defendants' Curtailment of Pork Production

119.     In the years leading up to the conspiracy period the steady expansion of pork production was virtually a given.  As one industry commentator reported in 2007, "Some things you can just take to the bank.  Sow herd expansion among the *Pork Powerhouses* would fall into that category – even in the face of the biggest run-up in feed prices in history."

120.     This historical trend changed markedly during the Conspiracy Period.  As demonstrated in the chart below, at several points during the Conspiracy Period, the pork producers changed their behavior and acted in a concerted way to decrease supply.  In 2009, 2010, and again in 2013, the pork industry cut production.[5]  These production decreases marked a drastic change from

---

[5] See U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); id. at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

the period prior to the conspiracy from 2000, in which pork supply was stable and steadily increasing on a yearly basis.

**U.S. Annual Commercial Hog Production by Weight, 2000-2017**



121.    These supply cuts were coordinated, historic, and unprecedented.  For example, in September 2009, industry publication *Pork Powerhouses* published an article entitled "Big Boys Cut Back" and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's largest 25 producers have cut sow numbers.  These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.

122.    At the same time, each of the Producer Defendants were further reducing domestic supply by devoting more and more production exports to overseas markets.  The U.S. has been a net exporter of pork products for a long time, but those exports have comprised a much larger share of total production in the past ten years.   As shown in the chart below, less than ten percent of U.S. pork production was exported in 2000.  By 2011, more than twenty percent was being exported. Sending production overseas is another way in which each of the Producer Defendants were able to reduce the supply available to U.S. markets, thereby driving up prices.   Notably, a 2017 analysis found

40

that for every $1 million of pork exported out of the U.S., the live value in U.S. hogs climbs by 20 cents per cwt.  In other words, selling pork on the global market added $50.20 to the market price of hogs.  The significant expansion in exports meant that increases in hog production by each of the Producer Defendants   did not result in an increase in the supply of pork products in the United States market:

**U.S. Pork Exports as a Percent of Total Production, 2000-2017**



123.    As part of their acts and conduct in furtherance of the conspiracy, each of the Producer Defendants participated in these supply restraints, and concealed their concerted, unlawful conduct.

   a.    **Smithfield**

124.   In 2008 Smithfield stopped instituting traditional production increases and instead reduced its number of sows, reporting that, "We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."  In

2009, Smithfield confirmed publicly that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd, effective immediately. Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows). In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, and vowed publicly that it did not intend to increase capacity.

125.    Smithfield also focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

### b.    Tyson

126.    Between 2008 and 2009 Tyson reduced its sows by over 25%, marking a significant reduction. In 2010 Tyson reported a further 3.3% decrease in its pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate. In 2013 Tyson reported a 3.6% decrease in sales volume and decrease its capacity utilization in an effort to "balance[ ] our supply with customer demand."

### c.    JBS

127.    In 2011 JBS USA reported that in the prior two years its pork export volume had grown from 15% to 20% of total production at JBS USA. Also, after acquiring Cargill's hog production facilities, JBS USA reduced the number of sows it produced in 2016 despite increased consumer demand. This production restriction had the intended effect: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."

### d.    Hormel

128.    Hormel's production statistics show that it cut its number of sows in 2008 and maintained such reduced production throughout the Conspiracy Period. Hormel further reported

tonnage reductions for its pork operations in its 2009 Annual Report.   This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through."   Hormel also reported lower sales of pork products in 2013.  In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day.

### e.   Seaboard

129.   Throughout the Conspiracy Period, including in 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales.   Seaboard dedicated several employees to international sales and exports.   Seaboard also reduced supply in 2013 and, once again, these reductions had their intended effect—higher pork prices.   Despite having an almost identical capacity as in 2012, it reported in 2013 that it had "lower sales volume of pork products in the domestic market" which resulted in "higher prices for pork products sold in the domestic market." Moreover, in 2017 Seaboard announced that it would delay establishing a second shift at the Seaboard Triumph Foods processing facility.

### f.   Triumph

130.   In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.  In 2009 Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its sow herd, contributing to historic production restraints in the pork industry.   Additionally, Triumph focused its production on exports, and stated on its website that it is one of the top exporters of pork products worldwide.  These exports constituted a significant portion of its production throughout the Conspiracy Period, and reduced or otherwise limited Triumph's sales in the United States.

g.      **Clemens**

131.    In 2011 Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats.    Furthermore, in 2014 Defendant Clemens had a competitive advantage over many pork producers, in that comparatively few of its pigs were affected by the virus causing porcine epidemic diarrhea (known as "PED," which for several months disrupted the ability of many of Clemens' competitors to readily supply pork to the market).  But contrary to what one would expect  to see in a competitive market, Clemens did not utilize its advantage during the PED epidemic, and refused to increase its market share when it clearly had substantial market incentives to do so.

h.      **Co-Conspirator Indiana Packers**

132.    Co-Conspirator Indiana Packers is a private company with limited information available to the public regarding its production statistics.  Nevertheless, in 2012 Indiana Packers indicated that it expected to reduce the number of hogs or pounds of pork processed at its facilities ostensibly because of high corn prices.

133.    Like the Producer Defendants, Indiana Packers' interactions with its competitors occurred at the highest levels of the company.  For example, ███████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

44



134. ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ Many of these collusive discussions between Indiana Packers and its competitors related to forward-looking price and production information and detailed assessments of the U.S. and export pork markets.

I.     **Timeline of the Conspiracy**

135.     As set forth above, each of these supply reductions during the Conspiracy Period were a departure from the Producer Defendants' market behavior prior to the Conspiracy Period.   These supply restrictions involved a significant share of the Producer Defendants' annual production and are in contravention of the Producer Defendants' individual economic self-interest.   These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of pork.   While the Producer Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources.   As with their use of Agri Stats, each of the Producer Defendants exploited these public statements in order to communicate their planned supply restrictions to their competitors in furtherance

of the conspiracy, and couched the public disclosures in pretext so as to conceal what   was really occurring.

136.    As early as January 2008, the CEOs and other senior-most executives of each of the Defendants recognized that, as a result of expansion and productivity increases in their operations, there was an oversupply of pork.  However, the substantial supply reductions that were necessary to return the industry to the Defendants' desired level of profitability were against the individual self-interest of each Defendant.  In the absence of an agreement between all Defendants to reduce supply, it did not make financial sense for any company to reduce its own supply levels.  Accordingly, Defendants began to use their positions on the American Meat Institute ("AMI") and the Twenty-First Century Pork Club ("Pork Club") to coordinate supply cuts that could not be achieved in the absence of collusion.  Defendants and co-conspirators affirmatively shaped the rules of these organizations to conceal the way they were using them to coordinate the supply reductions (and hide) the existence of the conspiracy.  For example, the use of the Pork Club's rule prohibiting meeting attendees from attributing comments to specific speakers that attended their meetings, executives of the Defendants could and did make statements about their company's intentions at these meetings about the production, supply and/or pricing of the swine herd or pork without fear that anyone who did not attend the meeting could identify which executive or which company made the statement.

137.    ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

138.    Although Smithfield shared this information with its competitors in the hope of inducing them to reduce supply as well, other Defendants were unwilling to follow Smithfield's lead without assurances that all major producers were on board. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

139.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

140.    In October of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in industry-wide pork supply in 2009.

141.    During Hormel's first quarter earnings call in January 2009, Mr. Ettinger once again communicated that he expected industry-wide supply to decrease in 2009.  Hormel CFO Jody

Feragen confirmed that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."

142.     In January 2009, Tyson stated that the capacity utilization of its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%. This indicated that Tyson was reducing the amount of pork that it processed in its plants. Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."

143.     During Hormel's first quarter earnings call in January 2009, its CEO once again communicated that he expected pork supply to decrease in 2009. Hormel's CFO confirmed publicly that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through." By January 2009, Hormel had reduced its sow numbers from 63,000 to 54,000 (a reduction of almost 15%).

144.     In February 2009, Smithfield said that it would close six processed meat plants.

145.     In early 2009, pork industry participants continued to push the need to reduce supply. For instance, in February 2009, AgStar VP Mark Greenwood called on U.S. pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000.

146.     Similarly, in February 2009, Hormel stated: "We still do not expect to see a reduction in the supply of hogs in fiscal 2009[.]" In addressing whether slaughter would be cut back, Hormel said that "you look at the opportunity to reduce your production numbers and we've certainly ... look[ed] for opportunities ... where we could reduce the numbers that we had going through ...." Hormel further emphasized that: "if there were free market hogs that normally we would be bidding on, we're not looking to take them in...."

147.     During this early phase of the conspiracy, the Defendants recognized that more coordination was necessary between them to decrease supply at a sufficient level.  Recognizing that the many trade associations and industry groups that each Defendant belonged to provided the infrastructure for such coordination, Defendants began to use their frequent meetings to implement their collusive supply reduction.  Defendants even acknowledged as much internally.  ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████

148.     In early 2009, certain high level executives from Defendants met in Minneapolis (where both Tyson and Hormel have large offices).  The attendees at this meeting included at least Bill Rupp (Meyer Foods), Rod Brenneman (Seaboard), Bill Buckner (Cargill), and a number of executives from Tyson and Hormel.

149.     However, a number of the large producers continued to take a wait-and-see approach before implementing these commitments to reduce supply.  Indeed, by this point, even Smithfield had not committed to a 10% supply reduction.  █████████████████████████

██████████████████████████████

150.     █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

151.    This "hedging" reflected other Defendants' concern that even Smithfield had not committed to a 10% supply reduction.  In May 2009, Hormel executives confirmed in an earnings call that "[w]e still see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated.  And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."

152.    In May 2009, Larry Pope, the CEO and President of Smithfield, stated during an investor conference attended by other pork industry executives:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09—we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down.  We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.

153.    Following this public statement by Pope, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

154.    In June 2009, Jody Feragen, Hormel's CFO, stated at an investor conference that "we reduced production in our basic processing for . . . pork."

155.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████

156.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████

157.   In June 2009, the CEO of Smithfield stated on an earnings call that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do something:"

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our—I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . That 3%, let me say that, our 3% will not fix the hog industry.  That part I'm confident of. Somebody else has got to do something.   We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.

158.   During the same call in June 2009, the Smithfield CEO, when asked to describe his expectations as to whether the rest of the industry would "liquidate" (i.e., cut production), he described how at the 2009 Pork Expo in early June 2009, cutting supply was the "key subject of the discussion of every producer," adding that such supply reduction is "something [that] has got to happen.  And so that's very positive."

159.   Tyson was the next company to follow Smithfield with the public announcement of a major sow liquidation.  In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87% down from the previous year's rate.  Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."

160.     More significantly (and following Smithfield's major announcement in June), Tyson announced in July 2009 that it was liquidating 20,000 sows from its herd.  Upon information and belief, Tyson executives informed its competition of this supply cut during AMI's Executive Committee meeting, which was held between July 9-11, 2009.

161.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

162.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

163.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

164.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



166.    In August 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner, confirmed on an earnings call that:

> Hog supplies will be down in Q4 year over year but still adequate. We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability. We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.

167.    Mr. Lochner continued, stating that, "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4," a statement echoed in the company's 2009 10K, which again noted that "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."

168.    These efforts by Defendants provided the assurances that other producers needed to reduce supply as well, even though producers would have been better off financially by maintaining their production levels in anticipation of the price impact from the Smithfield, Hormel, and Tyson supply cuts.  In July 2009, Smithfield's CEO Larry Pope went on to note in the company's annual report that: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, liquidation is now a recognized reality by all in the industry.  To

date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, combined with the additional cuts by our fellow producers should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue."

169.    In August 2009, JBS's CEO communicated the start of JBS's participation in hog liquidation efforts. He reportedly stated: "[W]e are seeing the start, we are seeing some increase in – not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."

170.    The other Producer Defendants and co-conspirators agreed to or accepted Smithfield's offer or exhortation for the "industry" to cut production and to announce those cuts to other producers. During 2009, Triumph reduced the number of sows that it had from 396,000 to 371,500. In particular, Triumph reduced the number of sows by 14,500 at its Christensen Facility, 4,000 at its New Fashion Pork Facility, and 5,000 at its Eichelberger facility. Notably, Triumph and Seaboard had a longstanding marketing agreement in which hogs processed by Triumph were marketed by Seaboard. Thus, the reduction in supply of sows raised by Triumph may result in a reduction in the amount of pork that was sold by Seaboard.

171.    ██████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

172.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

173.    On an August 2009 earnings call, Wesley Mendonça Batista, CEO of JBS USA, communicated the start of JBS USA's participation in hog liquidation efforts. Mr. Batista stated, "we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation.  So we think we will continue to see the margin in the processing side strong this whole year.  But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."

174.    Similarly, on a September 2009 earnings call, Smithfield's CEO Larry Pope stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> We can't solve the problem.  But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation.  But again, I don't think they can solve it.  I think this industry has got to solve it collectively. I do believe everyone is now looking, and when I'm talking to people who are  financially extremely strong and they are cutting back, that's got to  be  a  statement  about  those  people  who  are  not financially strong.   But the answer is, yes, there are others cutting back.  We're not the  only one.

175. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

176. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

177.   In November 2009, Hormel stated that "we've seen about a 2% liquidation" in hogs.

178.   On a December 2009 earnings call, Mr. Pope further confirmed that Smithfield had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance:"

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs . . . . I can tell you that I know in the east,

56

> its [sic] been pretty public about some of the producers on the east
> coast that have been cutting back besides ourselves. We are getting
> a little more information in the Midwest and I am saying that I
> have not seen the significant Midwest reduction that would
> probably be needed to put this industry back in balance.

179.    In a January 2010 article, an industry insider noted that the pork industry still needed

a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had

already dropped by over 5% in 2009. Into 2010, each of the Producer Defendants continued their

collusive efforts to do just that. For example, in March 2010, when asked on an earnings call about

fourth quarter and 2011 volumes for pork, Larry Pope, the CEO of Smithfield, indicated that further

cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have
> the impact starting next fiscal year when there is going to be 13,000
> less. But I think we'll pick up some of that in our other
> operations. But I think 8,000 or 9,000 or 10,000 of those a day
> will disappear from our operations and that represents about 8% of
> our, 8% of the hogs will be down. That's for also the fresh pork
> side.

180.    In that same timeframe, Smithfield issued a press release stating:

> The action items called for in the Pork Group restructuring plan are complete and the
> benefits are meeting expectations. As of this month, we have closed all six plants that
> were announced as part of the restructuring plan early last year. . . .

> We anticipate that fresh pork margins will improve as hog slaughter levels continue
> to decline and the Sioux City plant is closed in April.97

181.    Those press release statements were confirmed in Smithfield's quarterly results filing

for the quarterly period ending January 2010: "In January 2010 (fiscal 2010), we announced that we

will be closing our fresh pork processing plant located in Sioux City, Iowa in April 2010 (fiscal 2010)

. . . . Modest contractions in the U.S. sow herd have contributed to tightening supplies which, in turn,

is resulting in higher live hog market prices in the U.S."

182. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

183.     On a March 8, 2010 earnings call, JBS CEO Wesley Mendonça Batista mentioned the company's reduction in hog supply as a driver of profitability, and stated that these efforts were resulting in protein shortages.  Mr. Batista stated:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.

184.     Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to the Producer Defendants' agreed-upon scheme to limit hog supply.

185.     As of March 2010, U.S. pork production was noted to be down 7% so far, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights.  The Producer Defendants also were reported to have collectively increased exports 8% by March 2010, which was expected to lead to higher hog prices.

186.     In May 2010, Tyson stated in its Q2 2010 earnings conference call, "Worldwide protein supplies and US domestic availability are expected to remain below '08 and '09 levels. We have seen good interest in Beef and Pork exports to a variety of global destinations."100 Similarly, in August 2010, Tyson stated in its earnings call that "Pork supplies in 2011 are anticipated to be below their peak supplies in calendar 2008 and 2009, and most projections show no material changes compared to 2010."

187.     In August 2010, Hormel stated that "Our hog supply is down 3 to 4%."

188.    In September 2010, Smithfield stated in a press release that the closure of its Sioux City plant in April 2010 had led to an 11% reduction in its processing rate from the prior year. Smithfield further stated, "Industry-wide, slaughter volumes were down 3.5%," and "Lower industry slaughter levels are expected to persist well into the company's second quarter."103 Smithfield's quarterly results from that time reflected that the volume reductions "should help stabilize prices at healthier levels than fiscal 2010."

189.    The Producer Defendants also acknowledged access to information that allowed them to know that the supply of pork would not be increasing.  For example, in a December 2010 earnings call, Larry Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we can. Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to.  This is information you may not quite have. And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.

190.    As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

191.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████

192.   ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

193.   Supply level information regarding competitors allowed Defendants to know that supply would not increase in the future, given the lifecycles of the animals.  Based on this knowledge, in November of 2010, Hormel CFO Jody Feragen stated on an earnings call that she did not think the industry would see large scale expansion given profitability for the pork producers.

194.   In February 2011, Tyson's COO similarly stated:

> I think there is still a widely held belief that our Beef and Pork profitability isn't sustainable.  I want to again explain why we don't believe that is true.  If we look at supply, current cattle and hogs production levels can't change much in 2011 because of the limits of the animals' lifecycles.

195.   ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

60

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

196.    In the face of ever-increasing margins, when asked whether the type of profits would continue, in a March 2011 earnings call, Larry Pope and Robert (Bo) Manly of Smithfield confirmed to their competitors that it would not increase capacity, even in the face of the increased profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs.  Yet we are projecting over the next 90 days we will be up another 20% from that.  I mean those are big numbers to get the meat prices in the retail and food service case to cover that. . . .
>
> HEATHER JONES [industry analyst]: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable horizon.  We are still going to have—should have good margins, but I can't believe –
>
> LARRY POPE: Heather, we are sitting here today, we are halfway—closing in on halfway through our fourth quarter, and we have had very good margins through February and March, through today.  We have got double-digit margins today.

61

BO MANLY: It will correct itself over the long run, because this type of return on investment would attract capital, would attract expansion, and we kill more pigs and drive the margins lower. . . .

HEATHER JONES [industry analyst]: All right, okay.  Thank you.

LARRY POPE: You get two-year visibility on that, though.  You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . And by the way, we are not going to build a new plant to expand capacity.

197.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

198.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

199.   In March 2012, Smithfield's VP of Finance and Chief Accounting Officer stated, at an analyst conference widely-attended by his competitors, that no one in the industry would be "real excited about adding capacity:"

Nonetheless, you see some pretty significant fluctuations.  Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there.  And what I would tell you is that keeps a lid on pork production.  The pork guys in the United States

have not forgotten 24 or 36 months ago when there were significant losses in the industry. There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.

200. By May 2012, industry observers were noting that the reductions in slaughter capacity meant the Producer Defendants may not have enough capacity to slaughter expected hog levels by the fall. In fact, Steve Meyer of Paragon Economics (an industry publication later sold to Agri Stats affiliate Express Markets, Inc.) noted that slaughter capacity would not keep up with hog capacity through late 2013 given that the Producer Defendants were holding their slaughter levels constant.

201. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

202. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

203. ███████████████████████████████████████

███████████████████████████████████████

204.

205.

206.

207.

208.   ███████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████

209.   ███████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

210.   In September 2013, Joe Szaloky, Vice President of Procurement and Business Development for Smithfield, confirmed the company's intention to maintain its sow number, not adding any more.

211.   In December 2013, Robert Manly of Smithfield emphasized on an earnings call that coordinated industry action was necessary to "balance supply and demand:"

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group.   We've got limited ability to do

it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.

212. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████

213. ███████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████

214. ███████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



215.

216.

217.    The Producer Defendants and co-conspirators further refused to increase their capacity and gain market share even when market fundamentals and economics dictated otherwise. For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Clemens Food Group's communication manager, stated the disease "had a very minimal impact on our hog flow, especially when you compare it to others in the industry."  He stated: "That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this."  Yet, in furtherance of their conspiracy, Clemens did not take advantage of having few PEDv infected pigs.  Instead of attempting to increase its market share, it stayed the course with its fellow competitors.

218.    Defendants' conspiracy was yielding substantial profits by 2014.  In October 2014, Pork Powerhouses reported that "Hogs made history this summer.  Pork producer profits were, quite simply, enormous—averaging $82 profit for each hog marketed in the third quarter."  The report also noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the

industry expands too fast.'"   In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production.

219. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

220. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

221.

222.

223.

224.

225.

226. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

227. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████

228. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

229.    Indiana Packers also had during the conspiracy period supply agreements with Seaboard, Hormel and Smithfield, giving all four companies ample opportunities to discuss pricing and production issues.

230. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

231.    In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift.   In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry."   However, consistent with the conspiracy, Triumph/Seaboard postponed the addition of a second shift.

## V.   ABNORMAL PRICING AND THE EFFECT ON PLAINTIFF IN THE FORM OF HIGHER PRICES

232.    Early in the Conspiracy Period, the pork industry showed abnormal price movements, i.e., increases in prices for the average hog whole price unexplained by increases in costs.   All of these pricing measurements show a significant break between pricing prior to and after the Conspiracy Period, supporting the plausibility of a conspiracy to increase prices of pork.   Average wholesale hog prices started to increase in an unprecedented way beginning in 2009, leading to increased earnings among the Producer Defendants and damaging Plaintiff in the form of higher prices for pork than should have prevailed in a competitive market.

233.    According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb. from 2000 to 2009, the hog market year average price was at times substantially less.   Thereafter, prices increased dramatically, rising to more than $1.80/lb. in 2014, and never

dropping or below $1.40/lb. again.   The following chart shows the unprecedented increase in

wholesale hog prices beginning in 2009, which stayed elevated through 2018:

**Average Hog Wholesale Prices in Cents per lb., 2000-2018**



## VI.    OVERCHARGES FROM THE CARTEL REFLECTED IN HIGHER PORK PRICES PLAINTIFF PAID

234.    Pork is a commodity product; pork sold by competitors has no meaningful difference

and is thus interchangeable.   As such price is driven by the economic fundamentals of supply and

demand.   In the words of Tyson's COO during a 2010 earnings call, "As you know decreased supply

should be favorable to pricing."

235.    By reducing, stabilizing and maintaining the supply of pork even in the face of

increasing demand, Defendants' common goal was to increase the price of pork and their margins.

In 2012 the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've

seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply,

increased global demand, same with pork prices inflating from reduced supply and global demand,

putting less domestic product on the market."

236.    The volume of U.S. commerce in the pork industry is enormous.  Total pork sales in the United States exceeded $20 billion for much of the Conspiracy Period.  Each of the Producer Defendant's annual sales of pork products are also very large.  For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales.  That same year, Tyson reported $4.9 billion in pork sales.  With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to Plaintiff.

237.    The Bureau of Labor Statistics ("BLS") maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products paid by Plaintiff.  The PPI for Pork (Processed or Cured – Not Canned/Made into Sausage) shows a marked increase beginning in 2009 and continuing through 2017:



**VII.   DOJ's CRIMINAL ANTITRUST PROSECUTION IN BROILER CHICKENS SUPPORTS AN INFERENCE OF THE EXISTENCE OF A SIMILAR CONSPIRACY IN PORK**

238.    The U.S. Department of Justice Antitrust Division (DOJ) has an ongoing criminal antitrust prosecution into anticompetitive conduct in the Broiler Chickens industry.  The DOJ has indicted numerous current and former poultry industry executives, including from Pilgrim's Pride, which is majority owned by JBS USA Food Company Holdings, the parent of Defendant JBS USA.

239.    On February 23, 2021, Pilgrim's Pride pleaded guilty to charges brought by the DOJ for "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act, 15 U.S.C. § l" from "at least as early as 2012 and continuing through at least early 2017, and agreed to pay approximately $107 million in a criminal fine.

240.    Defendant Tyson, after being served with a grand jury subpoena in April 2019 in DOJ's Broilers investigation, applied for leniency from prosecution under the DOJ's Corporate Leniency Program, pursuant to which Tyson must, in order to avoid criminal prosecution and fines, admit to having participated in activity constituting a criminal antitrust violation and fully cooperate with the DOJ.

241.    The guilty plea by Pilgrim's Pride (owned by Defendant JBS USA's parent) and Tyson's grant of leniency in the DOJ's criminal price-fixing investigation in the Broiler Chickens industry serve as "plus factors" supporting the plausibility of the pork industry conspiracy alleged herein, particularly given the similar structural characteristics shared by the broiler and pork industries.

242.    In addition, upon information and belief, the same antitrust policies and practices that resulted in antitrust violations by Pilgrim's Pride and Tyson with respect to Broiler Chickens governed JBS USA's and Tyson's conduct with respect to pork and the conduct alleged herein.

243.    Just like the alleged conduct here has been concealed by Defendants, as is further discussed below, Pilgrim's and Tyson's antitrust violations concerning Broilers were concealed and

only established by the DOJ's criminal investigation.  Indeed, it was announced recently on July 13, 2022, that a Colorado Grand Jury handed down a superseding indictment against a former Pilgrim's Pride executive facing criminal price-fixing charges, further charging him with pressuring a potential witness in January 2018 to withhold evidence from both the civil *Broiler* case and the DOJ investigation and, between January 2018 and February 2019, destroying one or more phones in an effort to impede prosecution of the civil and criminal cases.

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.      *American Pipe* Tolling

244.    Plaintiff, having purchased pork directly from one or more Defendants or Co-Conspirators, is a member of the putative direct-purchaser class first alleged by Maplevale Farms in *In re: Pork Antitrust Litigation*, Case No. 0:18-cv-01776 (D. Minn.) filed in the U.S. District Court for the District of Minnesota on June 29, 2018.  Plaintiff had neither actual nor constructive knowledge of the facts constituting its claims for relief, and Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before its claims were tolled by the filing of the *Maplevale* complaint on June 29, 2018.

245.    By virtue of the filing of the *Maplevale* complaint, Plaintiff's claims were tolled beginning at least as early as June 29, 2018, under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and related authorities, and remain tolled during the pendency of the direct purchaser class action asserted against Defendants.

### B.      Fraudulent Concealment (and Further Factual Allegations)

246.    Plaintiff had neither actual nor constructive knowledge of the facts constituting its claim for relief.  Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before its claims were tolled until at least 2018 or later.  Plaintiffs' Sherman Act claims are further timely, as each of the Defendants

engaged in a secret conspiracy that did not reveal facts that put Plaintiff on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiff.

247.    During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Defendants and co-conspirators both conducted their conspiracy in secret and created pretexts to allow additional communication, including coordinating their supply plans at or incident to trade group meetings and events in order to give their meetings the appearance of legitimacy; communicating through third parties or through backchannels; avoiding references to the conspiracy in their internal communications; communicating with each other by telephone to avoid written records of what they said and limiting knowledge of the conspiracy to only an inner circle of senior executives; deleting evidence of the conspiracy and instructing others to do the same, all so that there would not be a paper trail of their unlawful scheme; and by providing deceptive and pretextual statements to their customers and to the public in justifying supply cuts and price increases that were intended to conceal – and did in fact conceal – that these actions were the result of collusion.

248.    During the period more than four years before the filing of this Complaint, including the period before June 28, 2014, Producer Defendants and co-conspirators publicly and pretextually claimed that increases in their pork production input costs or other seemingly plausible reasons were responsible for increased pork prices when, in fact, they were not.  This created the illusion that the price of pork that they sold to Plaintiffs was competitive, when, in fact, it was not because their pork prices were the result of the conspiracy.  For example:

249.    Producers claimed that decreased supply and higher prices were caused by the H1N1 outbreak.  But a National Pork Board customer tracking research report dated May 6, 2009, stated that "The overall perception of the safety of pork remains in a good trajectory" and that "Among pork consumers, we continue to see purchase intent stabilizing...." ███████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

250.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

251.   In 2012, Tyson's CEO insisted publicly that Tyson Foods "need[ed] to get our pricing improvements in order to get paid for those higher raw materials. His statements indicate at the time that he understood customers would – in his words – "understand that these higher grain prices are going to require higher prices."

252.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

253.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

77

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

254.     The PEDv scare was also a pretext for higher prices due to allegedly short supply. ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

255.     Defendants also communicated in secret in order to coordinate their supply reductions and price increases, including by sending to competitors their future supply and pricing plans and instructing colleagues to conceal or delete evidence of their unlawful actions.

256.     For example, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

257.     ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

258. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

259. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

260. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

261. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

262. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████

263. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

264. ████████████████████████████████████████████████

265. ████████████████████████████████████████████████

266. ████████████████████████████████████████████████

267. ████████████████████████████████████████████████

268. ████████████████████████████████████████████████

269. ████████████████████████████████████████████

████████████████████████████████████

270. ████████████████████████████████████████████

███████████████████████

271. ████████████████████████████████████████████

████████████████

272. ████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

273. ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

274. ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███

275. ██████████████████████████████████████

276. ████████████████████████████████████████████

██████   ███████████████████████████████████████

██████████████████████████

277. ████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

278.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

279.   ████████████████████████████████████████████████

██████████████████████████████   Within two months of the meeting, Defendants began
cutting back their kill rates, and reported these reductions to the competition.

280.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

281.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

282.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

82

283. ████████████████████████████████

████████████████████████████████████

284. ████████████████████████████████

███████████████████████ (Emphasis added.)

285. ████████████████████████████████

███████████████████ (Emphasis added)

286. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

287.    In 2017, when both Clemens and Seaboard/Triumph added new plants, both companies made sure to inform their competitors of the impact of these new plants in an effort to avoid retribution from the other conspirators for adding capacity.

288. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

289. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

290. █████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

291. █████████████████████████████████████████

████████████████████████████████████████████████



292.

293.    An investigative article published in February 2017 by Bloomberg Businessweek suggested the conspiracy that began among Broiler producers and Agri Stats was being replicated in the pork industry.[6]  The article reported that Agri Stats:

> has . . . been branching out into the hog business, which has, over the past 30 years, started to look more and more like the chicken industry, with hogs being raised under contract for vertically integrated companies such as Smithfield Foods.  It appears that demand for the service is strong.  At a hog industry trade show in 2011, an Agri Stats employee pitched the company's services.  His slideshow indicated that 27 companies had already signed up.[7]

The article did not state that pork producers were engaged in a horizontal conspiracy, but it did suggest for the first time in a widely circulated publication, that the pork industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.   Indeed, this was the first time the pork industry's *use* of Agri Stats was even widely known or reported.

294.    Then, the December 8, 2017 filing of a direct purchaser complaint against Agri Stats in *Affiliated Foods, Inc. v. Claxton Poultry Farms, Inc.*, No: 1:17-cv-08850 (N.D. Ill.), and

---

[6] See Christopher Leonard, "Is the Chicken Industry Rigged?," Bloomberg Businessweek (Feb. 15, 2017), available at https://www.bloomberg.com/news/features/ 2017-02-15/ is-the-chicken- industry-rigged.

[7] *Id.*

subsequent Complaints in *In re Broilers*, presented in further detail the confidential services that Agri Stats provides to its clients in the Broiler industry.

295.    The Bloomberg Businessweek article disclosing the pork industry's use of Agri Stats, the *Affiliated Foods* Complaint, and subsequent public filings in *Broilers*, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

296.    Until that time, the combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to planning and conducting private meetings during which anticompetitive conduct was shielded from public view; communications between Defendants by the use of the telephone to prevent the existence of written records; limiting any explicit reference to competitor pricing or supply restraint communications on documents; communicating competitively sensitive data to one another through Agri Stats' "proprietary, privileged, and confidential "system that kept both the content and participants in the system secret; making misleading statements to investors and the public designed to conceal their wrongful conduct, including about the nature of the information shared with and among competitors through Agri Stats; and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

297.    Additionally, the Agri Stats' reports provided to the Producer Defendants and co-conspirators were the equivalent of competitors (here, the Producer Defendants and co-conspirators facilitated by Agri Stats) meeting in secret to exchange Competitively-Sensitive Information with each other in furtherance of their conspiracy.  Instead of meeting in secret in a hotel room and using a white board to conspire, the Producer Defendants and co-conspirators, facilitated by Agri Stats, used the non-public Agri Stats' reports that they received to exchange, i.e., communicate, with each

other in secret their Competitively-Sensitive Information to implement, monitor and enforce their conspiracy.

298.    Agri Stats is a secretive company, and repeatedly made affirmative statements about the public's lack of access to and information about its services.  For example, in 2009, the President of Agri Stats, Blair Snyder, explained:

> Agri Stats has always been kind of a quiet company.   *There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.   We don't advertise.  We don't talk about what we do.  It's always kind of just in the background,* and really our specialty is working directly with companies about their opportunities and so forth.[8]

299.    But Agri Stats did not just conceal the conspiracy alleged herein by being a "quiet company" that did not advertise or "talk about what we do" in public, it also engaged in numerous affirmative acts to conceal the alleged conspiracy during the Conspiracy Period.  Specifically, Agri Stats made repeated false or misleading statements about the true nature of the information that it provided to the pork integrator Defendants, all of which served to exclude suspicion and prevent discovery of Defendants' illegal scheme.

300.    For example, in the same 2009 presentation discussed above about the "quiet" and secretive nature of Agri Stats, Mr. Snyder also emphasized that he was not at liberty to discuss "bottom line numbers" (a company's net earnings), and declined to display those numbers publicly, stating: "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information."  However, while affirmatively asserting that it was unable to share this information publicly due to "confidentiality" concerns, Agri Stats was at the same time providing producers with the "bottom line numbers" of their competitors on a regular basis via the

---

[8] Sanderson Farms Investor Day (Oct. 2009) (emphasis added).

reports discussed above.  These statements thus acted to conceal the true detail and nature of the Agri Stats reports from Plaintiff and the public in general.

301.    Similarly, Agri Stats repeatedly asserted in public that its reports did not disclose or identify any individual participant's data to any other participant and that each producer's data were kept confidential: "The fact that we collect a tremendous amount of data, and you'll see that throughout the presentation as we talk.  I've got some demo examples of what we do.  Obviously, no individual companies are identified or talked about'; "We'll talk about comparison of data in a little bit, but the main thing is that we want to preserve the confidentiality of individual companies, so you'll hear that word a lot throughout the presentation.  I apologize but that's what we're all about"; and "The confidentiality, only your company is underlined; you don't know who anybody else is." Contrary to these statements, however, the participants, including the Defendants, were able to identify individual firm information in the Agri Stats reports.

302.  ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

303.  ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

304.  ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████

305.   ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████

306.   ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

307.   Defendants' affirmative acts of concealment also included pretextual explanations for the industry's stability and improved profitability.  For example, in June 2012, Larry Pope, Smithfield CEO, attributed his expectation for improved profitability to other reasons such as "good programs with our retailers" and "lower grain costs":

> KEN ZASLOW:  What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?

> LARRY POPE: Strong exports,  $71 hog today, good programs with  our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond  that,  you've got chicken and beef that are going to be down significantly.

89

> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[9]

308.    By virtue of the fraudulent concealment of their wrongful conduct by each of the Defendants, the running of any statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful conspiracy alleged in this Complaint under the injury discovery rule, fraudulent concealment doctrine, and/or doctrine of equitable estoppel.

## IX.    ANTITRUST INJURY

309.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Price competition has been restrained or eliminated with respect to pork;

B.    The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels; and,

C.    Plaintiff paid artificially inflated pork prices as a result of each of the Defendants' conduct.

310.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork.  As a direct and foreseeable result, Plaintiff paid supra-competitive prices for pork during the Conspiracy Period.

311.    By reason of the alleged violations of the antitrust laws, Plaintiff sustained injury to its businesses or property, having paid higher prices for pork than it would have paid in the absence of each of the Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

---

[9] Q4 2012 Smithfield Foods Earnings Conference Call (June 14, 2012).  Further, Defendants' conspiracy and anticompetitive conduct, as alleged above, including their use of Agri Stats' reports and data, continued into and throughout the Conspiracy Period.

312.     This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X.     COUNT 1:   VIOLATION OF SECTION 1 OF THE SHERMAN ACT

313.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

314.     Each of the Defendants and all of their Co-Conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

315.     Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

316.     At least as early as 2008 and continuing until 2018 if not later (and with effects thereafter), the exact dates being unknown to Plaintiff, each of the Defendants and all of their Co-Conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

317.     Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for pork throughout the United States.

318.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

319.     As a result of each of the Defendants' unlawful conduct, Plaintiff has been harmed by being forced to pay inflated, supracompetitive prices for pork.

320.     In formulating and carrying out the alleged agreement, understanding and conspiracy, each of the Defendants and all of their Co-Conspirators did those things that they combined and

conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.  Defendants' conspiracy had the following effects, among others:

    A.    Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

    B.    Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their Co-Conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

    C.    Plaintiff, having directly purchased pork from Defendants, their divisions, subsidiaries, and affiliates, and all of their Co-Conspirators, has been deprived of the benefits of free and open competition in the purchase of pork.

321.    Each of the Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

322.    As a direct and proximate result of each of the Defendants' anticompetitive conduct, Plaintiff has been injured in its businesses or property by paying more for pork than they would have paid in the absence of the conspiracy.

323.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## XI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against each and all Defendants as follows:

324.    The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act;

325.    Plaintiff recovers damages to the maximum extent allowed under federal antitrust laws, and that a joint and several judgements in favor of Plaintiff be entered against each and all of the Defendants in an amount to be trebled under U.S. antitrust laws;

326.    Plaintiff be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

327.    Plaintiff recovers its costs of suit, including reasonable attorneys' fees, as provided by law; and

328.    Plaintiff be granted such other and further relief as the case may require and the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

329.    Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

July 19, 2022                                 Respectfully submitted,

                                              s/ David C. Eddy
                                              David C. Eddy
                                              Dennis J. Lynch
                                              Travis C. Wheeler

                                              NEXSEN PRUET LLC
                                              1230 Main Street, Suite 700
                                              Columbia, SC 29201
                                              Telephone: (803) 771-8900
                                              Facsimile: (803) 253-8277

                                              deddy@nexsenpruet.com
                                              dlynch@nexsenpruet.com
                                              twheeler@nexsenpruet.com

                                              *Attorneys for Plaintiff Compass Group USA, Inc.*