# EXHIBIT 30

# Filed Under Seal

**In the Matter Of:**

*In Re: Pork Antitrust Litigation*

*MICHAEL WILLIAMS, PH.D.*

*June 21, 2022*



25

1    documenting Triumph's sales of pork products.

2        Q. And that structured data does not include

3    data on Triumph's hog production.  Correct?

4        MR. FINLEY:  Hold on.  Objection on the

5    basis of the expert stip to the extent that this

6    is getting into materials possibly considered but

7    not relied upon.

8        A. Yeah.  The dependent variable in the

9    overcharge regression, again, it's Triumph's.

10   Part of the dependent variable would be Triumph's

11   sales, not its output.

12       Q. Not its hog production.  Correct?

13       MR. FINLEY:  Objection to form.

14       A. It's -- the dependent variable is

15   Triumph's sales of the disputed pork products.

16   That's part of the dependent variable.

17       Q. Under your assumptions, when did the

18   conspiracy start?

19       MR. FINLEY:  Objection, form.

20       A. So the plaintiffs allege that the

21   conspiracy began in January of 2009.

22       Q. And under your assumption, was the

23   conspiracy continuous for the entire period

24   between January 2009 and June of 2018?

25       MR. FINLEY:  And objection, form.  Also

26

1    objection on the basis of expert stip to the

2    extent this gets into materials considered but not

3    relied upon.

4         A. Yes.  My understanding is that the

5    plaintiffs allege a single conspiracy that was

6    present during that time period.

7         Q. Are you assuming that the conspiracy was

8    effective continuously throughout that time period

9    or were there periods when it fell apart?

10        MR. FINLEY:  Objection, form.

11        A. I'm not making an assumption in that

12   regard one way or the other.  The overcharge

13   regression doesn't assume that the alleged

14   conspiracy had any effect on prices.  It tests

15   whether or not there was an effect on prices.

16        Q. Are you assuming that defendants agreed to

17   restrict hog production in each year between 2009

18   and 2018?

19        MR. FINLEY:  Objection, form.  Also,

20   objection on the basis of expert stipulation.

21        A. My report doesn't make a specific

22   statement in that regard.

23        But I believe it's correct, as I just

24   testified a moment ago, that the plaintiffs have

25   asserted that there was a single conspiracy that

27

1   affected pork prices of the relevant products and

2   that that alleged conspiracy was present from

3   January 2009 through June 2018.

4       Q. Are you assuming that defendants agreed to

5   restrict hog production in 2016?

6       MR. FINLEY:  Objection, form.  Also,

7   objection on the basis of expert stipulation.

8       A. Again, my report doesn't have a specific

9   statement to that effect.  But the -- I believe

10  that, as I said, the complaint alleges that there

11  was a conspiracy as the complaint says -- I'm

12  looking at Paragraph 6 -- "'Starting in at least

13  2009 and continuing to the present, Defendants

14  conspired to fix, raise, maintain and stabilize

15  pork prices.'"

16      And then it goes on to talk about -- the

17  complaint goes on to talk about various mechanisms

18  through which this alleged conspiracy was

19  effectuated --

20      Q. And I'd like to talk -- go ahead.  Please

21  finish.

22      A. I'm sorry.

23      -- again, over the relevant time period,

24  which would be January 2009 to June 2018.

25      Q. And you mentioned mechanisms.  That's what

1    answered, lack of foundation.

2        A. Yeah.  I'm assuming that in 2016 the

3    defendants engaged in the conduct that's alleged

4    in the complaint as it relates to conduct that

5    allegedly supported the claimed conspiracy.

6        Q. Are you assuming that all decreases in sow

7    inventory between January of 2009 and June of 2018

8    were a result of the alleged conspiracy?

9            MR. FINLEY:  Hold on.  And objection,

10   form, also on the basis of expert stipulation.

11   This is something possibly considered, not

12   necessarily relied on.

13       A. My report doesn't offer such an opinion.

14   My report doesn't make such.  It doesn't have a

15   statement about that.

16       Q. Are you assuming that all decreases in hog

17   production between January of 2009 and June

18   of 2018 were a result of the conspiracy?

19           MR. FINLEY:  Same objection.

20       A. Again, the -- I mean, the complaint speaks

21   for itself.  So I'm assuming that the allegations

22   in the complaint are true as it pertains to those

23   allegations that are relevant to the alleged

24   conspiracy.

25           I don't specifically recall right now if

In Re: Pork Antitrust Litigation                    Michael Williams, Ph.D.
                                                           June 21, 2022

32

1    the complaint has the statement that you just

2    made.  I don't remember right now.

3        Q. Are you assuming that all increases in

4    exports between January 2009 and June 2018 were a

5    result of a conspiracy?

6            MR. FINLEY:  Same objections.

7        A. Yeah.  I'll repeat my answer.

8            My answer is that I am assuming that the

9    allegations in the complaint are true as it

10   pertains to the alleged conspiracy.  I don't

11   specifically recall right now if the complaint

12   makes such an allegation.

13       Q. Do you recall whether the complaint

14   alleges the defendants coordinated reductions in

15   kill levels at their plants?

16       A. I don't recall that right now.

17       Q. Does the conspiracy, as you understand it

18   or assume it, involve an agreement not to expand

19   capacity?

20       A. I don't specifically recall that statement

21   in the complaint.

22       Q. Are you making any assumptions for

23   purposes of your opinions about defendants'

24   slaughter capacity?

25           MR. FINLEY:  Same objections as above.

33

1        A. My report doesn't contain a specific

2    statement about slaughter capacities.

3        Q. Could we take a look at the complaint,

4    Paragraph 162, which is on page 65.

5            THE VIDEOGRAPHER:  Counsel, what page is

6    it again?

7            MR. SCHWINGLER:  I believe it's on

8    page 65.

9            Caylob, it's on the next page,

10   Paragraph 162.

11       Q. So plaintiffs allege, "Defendants further

12   refused to increase their capacity and gain market

13   share even when market fundamentals and economics

14   dictated otherwise.  For example, during the 2014

15   PEDv epidemic, which caused industry supply

16   disruptions, Eric Haman, Defendant Clemens Food

17   Group's communications manager, stated the disease

18   '"had a very minimal impact on our hog flow,

19   especially when you compare it to others in the

20   industry," Haman said.  "That's one of the many

21   benefits of raising hogs in Pennsylvania, since we

22   have a much lower density of pigs than other

23   states, which decreases the risk of (a virus) like

24   this."'"

25            Did I read that right?

34

1      A. I believe so.

2      Q. And then the plaintiffs go on to allege,

3  "Yet, in furtherance of their conspiracy Defendant

4  Clemens did not take advantage of having few PEDv

5  infected pigs.  Instead of attempting to increase

6  their market share, they stayed the course with

7  their fellow competitors."

8         Did I read that right?

9      A. I believe so.

10     Q. Are you assuming that allegation to be

11 true?

12        MR. FINLEY:  Objection, form.

13     A. Well, the overcharge regression doesn't

14 have data on Clemens's production of hogs.  It has

15 data on Clemens's sales of hogs.  But it's just

16 empirically looking at those prices and then

17 asking whether or not those prices are consistent

18 with the nonconspiratorial explanatory factors; in

19 other words, the other right-hand-side variables

20 in the regression.

21        And as it pertains to the production

22 regression, as we talked about earlier, the

23 production regression doesn't use any defendant's

24 individual hog production.

25     Q. Does whether or not Clemens took advantage

43

1   page 16.

2       Q. So in Paragraph 34 you write, "In this

3   Section, I will review the horizontal and vertical

4   structure of the pork industry, including long-run

5   trends in the industry structure economically

6   relevant in this matter."

7       Did I read that right?

8       A. I believe so.

9       Q. What do you mean by "economically

10  relevant"?

11      A. I would refer you generally to

12  Section III.A., where I talk about the market

13  structure of the pork industry.

14      So I would say the economically relevant

15  aspects that I'm discussing in Paragraph 34 are

16  those that pertain to the discussion that appears

17  later in Section III.A.

18      Q. I guess here is what I'm getting at.  By

19  "economically relevant," are you referring to the

20  trends in industry structure that are relevant to

21  assessing whether the alleged conspiracy impacted

22  pork prices?

23      A. No, I wouldn't say it that way.

24      I would say that "economically relevant,"

25  the phrase that appears in Paragraph 34, is

44

1  connected with the discussion that begins on

2  page 34, particularly Paragraph 69, which talks

3  about the market structure of the pork industry

4  and whether or not that market structure is or is

5  not conducive to the existence of collusion.

6      Q. Now look at the paragraph, the section

7  that starts on Paragraph 34 and spans, you know,

8  several pages.  Do you see a header about

9  "Consolidation and specialization of farming

10  operations"?  That's Romanette i.

11      The next subheader, Romanette ii, "Hog

12  farming and hog packing are increasingly

13  integrated," and then -- I guess those are the

14  two.

15      My question is, are the subject matter of

16  these paragraphs in your report, is that

17  information that is relevant to assessing whether

18  the alleged conspiracy impacted pork prices?

19      A. No, I wouldn't say it that way.

20      I would say that as the -- remember, the

21  name of this section was "Industry Background."

22      So I would say that these sections are

23  providing industry background for the edification

24  of the reader and that the -- generally, in this

25  section I tried to focus on, as it says in

In Re: Pork Antitrust Litigation

Michael Williams, Ph.D.
June 21, 2022

45

1   Paragraph 34, the economically relevant aspects of

2   the industry background.

3        And those -- as I said earlier, the

4   economically relevant parts of the industry

5   background that are discussed in Section II are

6   those that pertain primarily to the discussion

7   that is present in Section III.A.

8        Q. In Paragraph 35 of your report, which is

9   on page 16, you write -- the last sentence --

10  well, the second to the last sentence reads, "The

11  resulting industry structure is now moderately

12  concentrated among a relatively few large

13  companies, including the pork integrator

14  Defendants.  Many of these companies, including

15  Defendants, have also acquired upstream hog

16  farming operations or entered into long-term,

17  vertical contracts with hog farms, thereby

18  increasing the pork integrator Defendants' degree

19  of upstream vertical control."

20        Did I read that right?

21      A. I believe so.

22      Q. And is that an example of a trend in

23  industry structure that you deem economically

24  relevant in this matter?

25        MR. FINLEY:  Objection to form.

67

1        Q. This is your opportunity to tell us

2   whether your opinions -- whether this scenario,

3   whether defendants preventing other companies from

4   expanding or causing them to grow fewer hogs is

5   relevant to your opinions.  I've asked it every

6   way I can think of.  So we'll move on.  We'll

7   reserve all rights to go to the court on this one.

8            MR. SCHWINGLER:  We've been going for

9   about an hour 25.  Is now a good time for a break?

10  I'm happy to keep going.

11           THE WITNESS:  I'm happy to keep going.

12           THE REPORTER:  I could use a restroom

13  break.

14           THE VIDEOGRAPHER:  The time is 9:24 a.m.

15  We're now going off the record.

16           (Recess from 9:24 a.m. to 9:36 a.m.)

17           THE VIDEOGRAPHER:  The time is 9:36 a.m.

18  We're now back on the record.

19  BY MR. SCHWINGLER:

20       Q. Dr. Williams, I'd like to ask some

21  questions about exports.

22           First things first, in your understanding,

23  is an agreement to increase exports part of the

24  alleged conspiracy?

25           MR. FINLEY:  Objection, form, calls for a

68

1   legal conclusion.

2      A.  Yeah.  I was going to say, that sounds

3   like you're really asking for a legal opinion.

4         As I've said earlier, the complaint speaks

5   for itself.  I've assumed that the -- as we talked

6   about in the first sentence in Paragraph 12, that

7   for purposes of estimating overpayments, if any,

8   caused by the alleged conspiracy, I've assumed

9   that the allegations in the complaint are true.

10        I don't specifically remember a statement

11   about an alleged agreement to restrict exports.

12        Again, as I said earlier, my understanding

13   is that the plaintiffs allege a single conspiracy

14   and then describe various mechanisms that the

15   defendants allegedly used to carry out that

16   alleged conspiracy.

17        I don't specifically remember right now

18   whether or not there is an allegation about an

19   alleged agreement to restrict exports.  I just

20   don't recall that.

21      Q. When you constructed your regressions to

22   measure the impact of the alleged conspiracy on

23   pork prices, did you assume that the conspiracy

24   included increased exports?

25        MR. FINLEY:  Objection, form, vague,

69

1   ambiguous, lack of foundation.

2       A. Well, again, I won't repeat the answer I

3   just gave you.  But again, I'd just take you back

4   to that first sentence in Paragraph 12.  But then

5   if we look at the output regression on page 105 in

6   Table 4, there is no export variable in this

7   regression.

8       Q. What's the significance of that?

9       A. Well, the significance of it is you're

10  asking if I made an assumption about exports.  And

11  the answer is that it's not -- there isn't an

12  export variable regression.  So there's no

13  specific assumption about exports one way or the

14  other.

15      Q. The purpose -- the high-level purpose of

16  your regressions is to isolate the effects of

17  defendants' alleged conspiracy from the effects of

18  nonconspiratorial factors.  Is that fair?

19          MR. FINLEY:  Objection, form.

20      A. Yeah.  That's a little vague.  But I'd say

21  I would generally agree with that.

22      Q. In order to do that, you need to start

23  with what defendants are alleged to have done.

24  Correct?

25          MR. FINLEY:  Objection to form.

77

1   Illinois Brick states, and then using the

2   pass-through information and other information

3   that's discussed in Sections IV and V to come up

4   with the estimate of damages, which is in

5   Table 12.

6         But those discussions don't specifically

7   rely on Figure 6.

8      Q. You're not opining that the members of the

9   commercial and institutional indirect purchaser

10  class paid higher prices for pork as a result of

11  increases in exports?

12        MR. FINLEY:  And objection, vague,

13  ambiguous, calls for speculation, calls for a

14  legal conclusion.

15     A. Yeah.  We talked earlier about the

16  overcharge regression, which is in a sense the

17  beginning of the damage calculation.

18        And there is no variable in that

19  overcharge regression which appears in Table 4,

20  there is no variable in there for exports, so

21  there's not -- certainly no direct connection

22  between Figure 6 and the estimated overcharge.

23        And then as I mentioned a moment ago, the

24  actual calculation of damages, which of course

25  goes through a number of steps to get to the

78

1    relevant volume of commerce, is in a sense

2    affected by exports, but it's really looking at

3    the domestic sales of the relevant pork products.

4        Q. Are you offering an opinion that increases

5    in exports resulted in higher prices for members

6    of the class during the period 2009 to June 2018?

7            MR. FINLEY:  Objection to form, vague,

8    ambiguous.

9        A. No.  I don't believe my report says that.

10   Again, as we've talked about, Table 4 does not

11   have a variable for exports.

12       Q. Let's take a look at Paragraph 62 of your

13   report, which is on page 31.

14       A. Yes.  I'm here.

15       Q. And this paragraph -- well, the header

16   above this paragraph is "Events affecting pork

17   exports."  Correct?

18       A. That is correct.

19       Q. And then in Paragraph 62 you wrote, "Net

20   U.S. pork exports increased during 2000 through

21   2020, this increase was not uniform."

22           Did I read that right?

23       A. You did.

24       Q. And then you say, "As Figure 6 above

25   shows, net exports fell in some years (2009 and

1    2013-2015) before rebounding later."

2         Did I read that right?

3     A. You did.

4     Q. And then you wrote, "These temporary

5    decreases in exports are often due to factors and

6    events outside of the control of U.S. pork

7    producers and pork processors."

8         Did I read that correctly?

9     A. Yes, you did.

10     Q. And it's in your report.  I take it you

11    agree with that statement?

12     A. Yes, I agree.

13     Q. And then you quote from the USDA.  You

14    say, "For example, in April 2009, the USDA

15    reported:

16         "'Deterioration in the global economic

17    situation, restrictive trade policies, the

18    stronger U.S. dollar and changing market

19    conditions, are among the reasons for falling

20    demand in some major importing countries.'"

21         Did I read that right?

22     A. You did.

23     Q. And then you say, "This decline was

24    transitory, and international meat trade rebounded

25    in 2010, benefitting U.S." . . . "exporters."

1        So as I said, the goal would be to

2   identify a period of time for the benchmark that

3   was unaffected by the disputed conduct.

4        And I believe that the econometric

5   evidence and the production regression, the other

6   evidence in the paragraphs I cited earlier, as

7   well as the evidence in the complaint, supports

8   the instruction I received about what period I

9   should use as the damages period.

10       And then I believe it's appropriate to use

11  as the benchmark period the period of time that

12  just precedes the onset of the damages period and

13  then working back from there.

14  Q. Other than the fact that 2008 just

15  precedes the alleged damages period, you're not

16  relying on any analysis of industry factors for

17  market conditions in 2008 that, in your opinion,

18  support using it as a benchmark for analyzing the

19  production that came in the years to follow.  Is

20  that fair?

21       MR. FINLEY:  Objection, asked and

22  answered.

23  A. I don't think I'd agree with quite the way

24  you're saying it.

25       What I testified earlier to was my report,

142

1    for example, does not contain an opinion that

2    there was -- obviously I'm not going to repeat

3    everything that's in Subsection III.B., which

4    relates to actions against the defendants'

5    unilateral self-interest in the absence of an

6    agreement.

7          But my report -- maybe I'll state it in

8    the alternative.

9          My report does not offer an opinion that

10   2008 is contaminated by the disputed conduct.  So

11   I believe that 2008 is an appropriate year to

12   include in the benchmark.

13       Q. And I'm not asking whether you think '08

14   is contaminated by the disputed conduct.  I'm just

15   trying to understand what you're relying on in

16   selecting your benchmark period.

17          So I understand it's a year before the

18   alleged conspiracy started.  I understand you have

19   data available for that year.

20          Other than those two things, is there

21   anything else about 2008 that you're relying on

22   when you select it as part of your benchmark?

23          MR. FINLEY:  Same objection.

24       A. Well, again, I'm not going to repeat the

25   long answers that I've given in the last couple of

Michael Williams, Ph.D.
June 21, 2022

143

1    minutes.

2            But the -- I believe it's appropriate to

3    include 2008 in the benchmark because it's not in

4    the damages period.  It precedes the damages

5    period, precedes the period used, for example, in

6    the production regression.

7            I won't go through all of them, obviously,

8    but the two different sets of paragraphs I cited

9    earlier about evidence about communications, the

10   information that's in the complaint.

11           As I said, so far as I'm aware, it is

12   appropriate in the context of the production

13   regression and the overcharge regression to use --

14   to consider 2008 as part of the benchmark period.

15           And as I said earlier, the goal would

16   be -- is always in identifying a benchmark period

17   to identify a period of time in which the disputed

18   conduct was not present.

19           And so far as I know, the disputed conduct

20   was either not present or certainly less present.

21   Again, it's preferable from an econometric

22   perspective if there's no disputed conduct in the

23   benchmark period.

24       Q. Is your production regression sensitive to

25   including 2008 in the benchmark period?

144

1          MR. FINLEY:  Objection.  And I'm

2     definitely going to object on the basis of the

3     expert stip here since this does seem to ask for

4     preliminary work product or alternate calculations

5     if they were made.

6          MR. SCHWINGLER:  I'm going to be very

7     clear about what I'm asking for.  I'm not asking

8     for preliminary models.  I'm asking whether the

9     model that he is offering is sensitive to

10    inclusion of 2008 in the benchmark period.  This

11    is his opportunity to answer that question.

12         If you're going to instruct him not to

13    answer, you can do that.  But my question is not

14    about preliminary work.  It's about whether his --

15    the work he is relying on is sensitive to that

16    variable.

17         MR. FINLEY:  And perhaps there are other

18    ways he could answer this without reference to

19    preliminary work.  But it seems like one thing

20    this -- the one salient thing this might call for

21    is preliminary work.

22         Sorry.  In other words, are you defining

23    "sensitivity" in a way that doesn't include

24    preliminary work, reference to preliminary work?

25         MR. SCHWINGLER:  I want to know if he's

152

1      A. My report doesn't offer an opinion about

2  that.

3      Q. You would agree that in order to make

4  pork, you have to have a hog.  Correct?

5      A. That would be my understanding.

6      Q. So do you dispute that hog supply impacts

7  the quantity of pork produced in the United

8  States?

9          MR. FINLEY:  Objection, form.

10     A. I don't have a specific reason to dispute

11 that.  I'm just correctly noting that my report

12 doesn't offer an opinion.

13     Q. And your production regression does not

14 control for changes in hog supply, does it?

15         MR. FINLEY:  Objection, form.

16     A. Well, it controls for a number of factors

17 that affect -- related to that.

18         It controls for hog costs.  It controls

19 for the plant costs of pork processing.  It

20 controls for the piglet loss rate.  It controls

21 for swine flu.

22         So it controls for a number of factors,

23 all the factors that are listed in Table 3.  It

24 doesn't have a specific variable called "supply of

25 hogs."

In Re: Pork Antitrust Litigation                                      Michael Williams, Ph.D.
June 21, 2022

153

1    Q. You don't use USDA data on how many hogs

2   were actually produced between 2005 and whatever

3   the year was, 2020, as an input into your

4   production regression, do you?

5    A. That is correct.  There's no independent

6   variable of what -- of the type that you're

7   describing now.

8    Q. There's also no independent variable that

9   accounts for changes in hog prices.  Correct?

10       MR. FINLEY:  Objection, form.

11   A. Yes.  There's a variable -- there are

12  related variables, but there's not a variable

13  that's specifically called "hog prices."

14   Q. And Paragraph 25 of your report -- sorry

15  to jump around.  It's on this topic.

16       MR. SCHWINGLER:  It's on page 12, Caylob.

17   Q. So in Paragraph 25 you write, "The cost of

18  acquiring live hogs -- be it from a packer-owned

19  farm, a contract farm, or the public market -- is

20  the most significant part of packing and

21  processing operations, accounting for

22  approximately 70% of the total cost."

23       Did I read that correctly?

24   A. Yes, sir.

25   Q. And you would agree with me that in

154

1    circumstances where a packer buys a hog from a

2    third-party producer, its cost of acquiring that

3    hog would be the price it paid for the hog.

4    Correct?

5         A. That sounds right.

6         Q. Does the total U.S. sow inventory affect

7    the quantity of pork produced in the United

8    States?

9         MR. FINLEY:  Objection, calls for

10   speculation.

11        A. My report doesn't offer an opinion on

12   that.

13        Q. And your production regression does not

14   include a control variable for sow inventory.

15   Correct?

16        A. That is correct.

17        Q. Does the number of pigs imported from

18   Canada affect the quantity of pork produced in the

19   United States?

20        A. My report does not offer an opinion on

21   that.

22        Q. And your production regression does not

23   include a control variable to address changes in

24   pigs imported from Canada.  Correct?

25        A. That is correct.

155

1      Q. Does overseas demand for U.S. pork affect

2   the quantity of pork produced in the United States

3   net of net exports?

4      A. My report does not offer an opinion on

5   that.  No.

6      Q. Your production regression does not

7   include a control variable that addresses changes

8   in overseas demand for U.S. pork.  Correct?

9      A. That is correct.

10     Q. Do changes in pork supply overseas, such

11  as a disease outbreak in China, impact the

12  quantity of pork exported out of the United States

13  to other countries?

14         MR. FINLEY:  Objection, form.

15     A. My report does not offer an opinion on

16  that.

17     Q. And your report does not include a control

18  variable to address changes in overseas pork

19  supply.  Correct?

20     A. That is correct.

21         MR. FINLEY:  Objection.

22     Q. Do changes in currency exchange rates

23  impact or affect the quantity of pork exported to

24  other countries?

25         MR. FINLEY:  Same objection.

202

1    Q. And I can't remember.  I know I asked you

2    these questions about your production regression.

3    I'm drawing a blank on whether I asked as to the

4    overcharge.  So apologies if we're double-dipping

5    here.

6         Did you run any sensitivity checks on the

7    overcharge regression that you report -- that you

8    disclose in your report?

9         MR. FINLEY:  Sure.  And so the question

10   has changed.  I'll object on the basis of expert

11   stip to the extent this is calling for calculation

12   that is not shown in the report or relied upon.

13    A. So the only overcharge regression that I'm

14   showing in my report is the one shown in Table 4.

15    Q. And you're not defending this overcharge

16   report -- the overcharge regression that you

17   disclose in your report on the basis that it is

18   not sensitive to slight modifications and

19   assumptions.  Is that fair?

20        MR. FINLEY:  Objection, form.

21    A. I would say that what I'm relying on are

22   the analyses that I've undertaken to perform the

23   overcharge regression results.  And that's -- and

24   all of the bases for that, all of the facts, all

25   of the data, all the modeling, that is all

In Re: Pork Antitrust Litigation
Michael Williams, Ph.D.
June 21, 2022

203

1    disclosed in my report.

2        Q. Is your overcharge regression sensitive to

3    your decision to designate one damages period

4    covering 2009 through June 2018?

5        MR. FINLEY:  Objection on the basis of the

6    expert stip.

7        A. My report only shows -- only relies on a

8    single dummy variable for that period January 2009

9    through June 2018.

10       MR. SCHWINGLER:  I want to make sure the

11   record is clear on this and I'm not -- this isn't

12   an attempt to be argumentative.

13       Blaine, are you instructing him not to

14   answer my question?

15       MR. FINLEY:  Well, I thought I did.

16       MR. SCHWINGLER:  You objected.  I didn't

17   hear an instruction.  He did not answer my

18   question.  I want to make sure the record is clear

19   as to why.

20       MR. FINLEY:  What's the pending question?

21       MR. SCHWINGLER:  Let me do the question

22   again.  This isn't an attempt to -- this isn't

23   rhetorical.  I just want to make sure the

24   transcript is clear.

25       So I need to scroll back up -- here we go.

In Re: Pork Antitrust Litigation                              Michael Williams, Ph.D.
                                                              June 21, 2022

204

1          So my question is, "Is your overcharge

2    regression sensitive to your decision to designate

3    one damages period covering 2009 through

4    June 2018?"

5          MR. FINLEY:  Sure.  And so I will object

6    on the basis of the expert stip to the extent that

7    the only basis of knowledge is preliminary

8    calculations or other preliminary work product

9    done in anticipation of this report.

10          Otherwise, the witness may answer.

11      A. So the answer is, I have reported one

12    regression result for the overcharge regression.

13          And the bases for that regression are all

14    disclosed in my report, everything I've relied on,

15    all the data I've relied on, all the modeling I've

16    relied on, and that's what's presented in Table 4.

17      Q. And are you unwilling to answer the

18    question whether you -- whether your model is

19    sensitive to using one damages period?

20          MR. FINLEY:  Objection, form, lack of

21    foundation.  Also objection on the basis of the

22    expert stip.

23      A. I think I've answered your question.  My

24    answer -- I won't repeat the answer I just gave

25    because I've given it two or three times now.  I

205

1    really don't have anything else to add.

2        Q. Your answer didn't state whether or not

3    your regression model was sensitive to the

4    decision to use one damages period.

5            And I'm just trying to understand, is that

6    a question you're not answering based on Counsel's

7    objections?  Is it a question you don't know the

8    answer to?

9            It's unclear to me from the record right

10   now which is which.

11           MR. FINLEY:  It's a broad question.  But

12   also, are you asking him about something in his

13   report or are you just asking this general

14   proposition that may touch on preliminary work

15   product?

16           MR. SCHWINGLER:  I'm asking him whether

17   his overcharge regression is sensitive to using

18   one damages period.  That's the question.

19           Look, this is your opportunity to let your

20   expert defend his work.  If you're going to

21   instruct him not to do that, then the record is we

22   asked the question, "Is your model sensitive?"

23           Plaintiff counsel instructed the witness

24   not to answer.

25           MR. FINLEY:  Now you're mischaracterizing

In Re: Pork Antitrust Litigation

Michael Williams, Ph.D.
June 21, 2022

206

1    the record.   And I disagree with that

2    characterization of the record.   And there would

3    be a lot of criticism to this line of questioning

4    that I would level that maybe doesn't make sense

5    to go into right now on the record, but we can.

6         MR. SCHWINGLER:  If you're not instructing

7    him not to answer, then I want an answer to the

8    question.

9         MR. FINLEY:  Part of the problem is the

10   question is very broad and vague and ambiguous;

11   and therefore, it's unclear to what degree this

12   question will touch on preliminary work product.

13        But it seems that it may well, since -- I

14   mean, is there anything labeled "sensitivity

15   analysis" in the report you're asking him about?

16        MR. SCHWINGLER:  I have not seen it.

17        MR. FINLEY:  Then that . . .

18   BY MR. SCHWINGLER:

19      Q. Dr. Williams, do you understand what I

20   mean by -- when I ask you whether your model is

21   sensitive to a certain choice you make and how you

22   constructed the model?

23      A. I would say it's very vague because a

24   model can be sensitive for different reasons.  As

25   I've said, my regression results are shown in

207

1    Table 4, period.

2        Q. I'm going to ask the question one more

3    time.

4            MR. SCHWINGLER:   Blaine, you're going to

5    have to be clear on what you're doing or not

6    doing.   And I'm not going to ask it again.   We'll

7    reserve our rights to come back and get an answer

8    to the question --

9            MR. FINLEY:   We always reserve our rights.

10   Absolutely.

11       Q. Just one more time.   And I will move on

12   after this.

13           Dr. Williams, is your overcharge

14   regression sensitive to your decision to designate

15   one damages period covering 2009 through

16   June 2018?

17           MR. FINLEY:   Sure.   And I'll object on the

18   basis of the expert stipulation, among other

19   reasons, because this question seems -- is vague

20   and ambiguous and also seems to be directed toward

21   preliminary calculations and work product that may

22   or may not exist, since it has not been specified

23   what analysis, in particular sensitivity analysis,

24   in the report is being referenced, since Counsel

25   will not identify any sensitivity analysis that

In Re: Pork Antitrust Litigation                                    Michael Williams, Ph.D.
June 21, 2022

208

1    this question pertains to.

2            But if outside of preliminary analysis

3    work product there's an answer to this question,

4    Dr. Williams may answer.

5        A. I really don't have anything else to add

6    to my prior answers.

7        Q. All right.  And what happens to the

8    results in your overcharge regression if you split

9    the damages period into smaller segments?

10           MR. FINLEY:  Same objection.  This is

11   clearly -- objection on the basis of the expert

12   stip.  This seems clearly directed toward

13   preliminary work product analysis.

14           MR. SCHWINGLER:  Is that an instruction

15   not to answer?

16           MR. FINLEY:  Yes, unless there's something

17   in the report that touches on this.  I mean, is

18   there something in the report you're referencing?

19           MR. SCHWINGLER:  I have not seen anything

20   in the report on this.

21           MR. FINLEY:  Well, then is your goal to

22   pierce the expert stip?

23           MR. SCHWINGLER:  I'm asking a question.

24   You can decide whether you want to instruct the

25   witness not to answer.

209

1          MR. FINLEY:  Then I will because I don't

2     understand how this isn't directed toward just

3     going right around or piercing the expert stip.

4          MR. SCHWINGLER:  I'm not going to debate

5     this point on the record any more.  You just make

6     a decision whether you're instructing the witness

7     not to answer the question or not, and we'll deal

8     with it later.

9          MR. FINLEY:  I definitely am making that

10    decision.

11         MR. SCHWINGLER:  And you're instructing

12    him not to answer?

13         MR. FINLEY:  Like I've put on the record a

14    number of times, I'm instructing the witness not

15    to answer to the extent that the answer is

16    exclusively or really is intertwined with

17    preliminary work product.

18         And as per our back-and-forth, that would

19    seem to be a binding instruction, since you've

20    refused to identify anything concrete specifically

21    in the report that is a sensitivity analysis that

22    you're asking a question about.

23         MR. SCHWINGLER:  And I'm not refusing to

24    do anything.  You and I both know it's not in the

25    report.  I've been clear about that.

210

```
 1          Why don't I ask a few questions and then
 2     we'll move on.
 3     BY MR. SCHWINGLER:
 4       Q. Dr. Williams, isn't it true that your
 5     report contains no sensitivity analysis of your
 6     overcharge regression?
 7          MR. FINLEY:  Objection, form.
 8       A. Well, I suppose it depends on what you
 9     think "sensitivity analysis" means.
10          But my report contains -- with respect to
11     the overcharge regression, it contains a single
12     overcharge regression.  And my report explains all
13     of the data and modeling choices and variables on
14     which I'm relying to perform the regression that's
15     shown in Table 4.
16       Q. Your report contains no -- it does not
17     report any results for your regression where the
18     damages period has been split into smaller
19     segments.  Correct?
20          MR. FINLEY:  Objection, form.
21       A. That is correct.  There is a single dummy
22     variable for the damages period in the overcharge
23     regression in Table 4.  There is a single dummy
24     variable for the period January 2009 through
25     June 2018.
```

259

1          MR. FINLEY:  Objection, form.

2       A. Are you referring -- just so I'm clear,

3   are you referring now to the three regressions we

4   were talking about in Paragraphs 271, -72, and

5   -73?  Are you talking about Table 4 or --

6       Q. Let's talk about Table 4.  I think the

7   questions are -- could apply to all, but you can

8   correct me if I'm wrong.

9          The dependent variable in that regression

10  is the price of pork.  Correct?

11      A. Yeah.  If you look at Paragraph 220, it's

12  not very long.  I'll just read it.

13         It says, "Dependent variable.  I use the

14  natural logarithm of per pound pork product price.

15  The use of the natural logarithm of prices is

16  common and allows the regression estimates to be

17  interpreted in terms of percentage price effects,

18  rather than absolute effects in dollars."

19         So it's the natural logarithm of the

20  per-pound pork product price.

21      Q. And what your overcharge regression does

22  is it attempts to explain changes in the dependent

23  variable based on the independent variables on the

24  right-hand side of the equation.  Right?

25         MR. FINLEY:  Objection, form.

260

1        A. That is correct.

2        Q. And the output, once you've run the

3    regression, is an equation that expresses -- has a

4    variable for each of the control variables in the

5    coefficients.  And that is the way the model

6    predicts pork prices.  Correct?

7            MR. FINLEY:  Objection, form.

8        A. Yeah.  I don't know if I'd say it quite

9    that way.

10           But after you run the regression, then you

11   get the results that were shown in Table 4.  And

12   as you said, each independent variable has its own

13   coefficient, its own standard error.

14           And then it's the use of all of those

15   results, all of those estimated coefficients,

16   including of course the indicator or the dummy

17   variable for the damages period.  It's the use of

18   that regression output that yields the but-for

19   prices.

20       Q. Is there a term that you use to describe

21   the prices that the model generates?  Would you

22   call that a predicted price or an estimated price?

23           MR. FINLEY:  Objection, form.

24       A. I just called it the but-for price.  I

25   don't think it would be wrong to call it -- you

261

 1    could call it a predicted but-for price.

 2        Q. As I understand it, to get to the but-for

 3    price you have to subtract out the effect of the

 4    dummy variable that covers the conspiracy period.

 5    Correct?

 6            MR. FINLEY:  Objection, form.

 7        A. Yeah.  I don't know if I'd state it quite

 8    that way.  But yeah, that's essentially correct.

 9            You have to -- basically to calculate the

10    but-for prices, you're turning on -- you can think

11    of it as turning on or off that dummy variable.

12        Q. I may be oversimplifying it.  There's

13    nothing strategic here.  I'm just trying to make

14    sure we're talking about the same thing.

15            Your model has a number of explanatory

16    variables, including the damages period.  Correct?

17        A. Right.

18            MR. FINLEY:  Objection to form.

19        A. I think you're referring to the first

20    variable in Table 4 where the indicator of damages

21    period, which was that dummy variable, which is 1

22    in the time period January 2009 through June 2018.

23            And if we're not in that period, then

24    it's 0.

25        Q. And so to get to the but-for price, you

262

1   would take the price that the model predicts,

2   including all of the variables, and then you would

3   either remove or subtract the effect of the

4   indicator for the damages period.  Is that right?

5        MR. FINLEY:  Objection to form.

6        A. I don't think I'd state it quite that way,

7   but I think in essence you're stating it

8   correctly.

9        Q. Thank you.  Let's take a look at

10  Paragraph 261.

11       (Interruption)

12       A. I apologize.  Somebody walked into the

13  room.  They're gone now.

14       Q. We can go off the record, if you need to.

15       A. They're gone.  They were checking --

16  well . . .

17       Q. So in Paragraph 261 you say, "In addition,

18  I evaluate whether my model, which controls for

19  differences among direct purchasers with the

20  inclusion of direct purchaser (and product) fixed

21  effects, supports my conclusion that Defendants'

22  alleged conspiracy had a common impact on all or

23  virtually all direct purchasers.  To accomplish

24  this, I use my model to predict but-for prices and

25  compare those prices to the actual prices for each