# EXHIBIT 38

# Filed Under Seal

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 2 of 20
In re Pork Antitrust Litigation
Hal Singer
June 24, 2022

1

1  UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF MINNESOTA
2

3       Civil Action No. 0:18-cv-01776-JRT-HB

4

5  IN RE:

6  PORK ANTITRUST LITIGATION,

7       _____/

8

9

10

11              DEPOSITION OF
                HAL SINGER
12

13

14
                Friday, June 24, 2022
15              9:39 a.m. - 6:03 p.m.

16

17              Remote Location
          Via Zoom Videoconference
18            All Parties Remote

19

20

21

22

23

24       Stenographically Reported By:
              Erica Field, FPR
25

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 3 of 20
In re Pork Antitrust Litigation                                    Hal Singer
                                                                June 24, 2022

36

1  coordination that was done on an explicit
2  basis, right?
3       A.   The allegation by plaintiffs is
4  that there was a price-fixing conspiracy that
5  involved the sharing of competitively
6  sensitive information through Agri Stats,
7  and, you know, if you go into the complaint,
8  they'll talk about how that agreement touched
9  many aspects of the conduct of the firms at
10 issue and how they were able to achieve a
11 reduction in output in a coordinated way.
12           But I think that the centerpiece,
13 at least as I understand it and the way that
14 I've written up my report, is the information
15 exchange -- antitrust competitive information
16 exchange.
17      Q.   Okay.  So there was an agreement
18 to exchange information through Agri Stats,
19 right?
20      A.   Well, as alleged in the complaint.
21 You know, I'm loathed to tell you that there
22 was an agreement.  Whenever you ask me today
23 about whether there was an agreement, I'm
24 going to tell you that it is alleged.
25      Q.   Well, let's come back -- you used

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 4 of 20
In re Pork Antitrust Litigation
Hal Singer
June 24, 2022

37

1   "challenged conduct" maybe dozens of times in

2   your report, and I want a definition of what

3   you meant by it.

4            So is your -- your answer is just

5   whatever happened to be in the complaint, or

6   does challenged conduct actually mean

7   something specific to you?

8       A.   It means -- it means something --

9   well, I don't know if those are -- it could

10  be both, right.  But I give you my best

11  understanding of the challenged conduct in

12  Paragraph 2.  And so I can't do any better

13  than that here, and I've tried to paraphrase

14  what's in Paragraph 2.

15           And that's my -- that's my

16  understanding of the challenged conduct.

17  It's a price -- an alleged price-fixing

18  conspiracy.

19      Q.   Well, let's step back for a

20  minute.

21           So an agreement, a conspiracy,

22  whatever, an exchange of information, is that

23  a per se violation in and of itself?

24           MR. RISSMAN:  Objection.  That

25      calls for a legal conclusion.

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 5 of 20
In re Pork Antitrust Litigation                                     Hal Singer
                                                                 June 24, 2022

38

1    A.    Yeah.  I don't think that you want
2  to come to me for that as to how this is
3  going to be adjudicated.  I mean, I feel like
4  that's ultimately going to be the Court's
5  decision as to whether or not to apply the
6  per se -- or rule of reason standard.
7  BY MR. COLEMAN:
8     Q.    Is -- in your mind, is everything
9  you define as challenged conduct unlawful?
10          MR. RISSMAN:  Object to form.
11      And calls for a legal conclusion.
12     A.    Right.  I don't have any opinions
13  with respect to what -- what is unlawful.  I
14  have opinions as to whether or not the
15  conduct was anticompetitive.  I can answer
16  that question, but I can't -- I can't go into
17  areas of law.
18  BY MR. COLEMAN:
19     Q.    And -- well, answer that question,
20  then.
21          Is all of the challenged conduct
22  anticompetitive in economic terms?
23     A.    Oh, I concluded that the
24  challenged conduct was anticompetitive using
25  both my qualitative assessment and my

1  quantitative methods, yes.
2      Q.    Does challenged conduct include
3  increasing -- defendants increasing exports
4  of pork products?
5      A.    Well, if you go into the
6  complaint, you will find allegations that the
7  agreement implicated the defendants' decision
8  making with respect to exports, and there
9  were, in fact, in the record episodes of
10 coordination on the decision of how much to
11 export.
12           But I don't consider exporting to
13 be a restraint that is being challenged in
14 the case.  In other words, my mandate was to
15 remove the challenged conduct, which I
16 interrupted to mean the centerpiece was this
17 price-fixing conspiracy held together by
18 information exchange.
19           In other words, no one -- no one
20 said, Dr. Singer, I want you to assume that
21 exporting is zero in the but-for world.  No
22 one asked me to treat exporting as if it were
23 a restraint.
24           Now, exporting would likely fall
25 in the but-for world as you remove the

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 7 of 20
In re Pork Antitrust Litigation
Hal Singer
June 24, 2022

40

1   challenged conduct.  But I don't consider

2   exporting to be a restraint that I should

3   remove when modeling the but-for world.

4        Q.   Yeah.  So it -- just so the record

5   is clear, the but-for world is the world in

6   which there was no conspiracy or challenged

7   conduct, right?

8        A.   Correct.

9        Q.   So in the but-for world, we assume

10  away any unlawful coordination or any

11  challenged conduct, right?

12       A.   That's fair.

13       Q.   And so at least as to exports, do

14  you have an opinion in that but-for world

15  whether exports would have stayed flat or

16  would have increased?

17       A.   So what I've -- what I've

18  quantified is the extent to which domestic

19  production would be -- would have been

20  greater in the but-for world absent the

21  challenged conduct.

22            What I have not done is said where

23  would that come from.  Would it necessarily

24  come from exports, or would it be new supply.

25  I haven't -- I haven't -- I haven't said

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 8 of 20
In re Pork Antitrust Litigation                                  Hal Singer
                                                                June 24, 2022

60

1           MR. RISSMAN:  Objection.

2      A.     I think the complaint alleges that

3 the agreement touched the decision making

4 with respect to liquidation.  But -- and I

5 said -- I will say the same thing for

6 liquidation that I said for exporting.

7           I'm not removing liquidation in

8 the but-for world.  Right.  I do not set

9 liquidation to zero in the but-for world and

10 then solve for the price fix.  I do not set

11 exporting to zero in the but-for world.  It

12 is not a restraint along the lines of the

13 restraint that I have removed, which is the

14 sharing of competitively sensitive

15 information among the defendants via

16 Agri Stats.

17           So just to put a bow on this,

18 there will be some liquidation in the but-for

19 world.  There will be some exporting in the

20 but-for world.  It's not a restraint to be

21 eliminated in the but-for world when I said

22 about modeling the but-for world and the

23 challenged conduct.

24 BY MR. COLEMAN:

25      Q.     So how much would sows -- the sow

61

```
 1   herd have been reduced in the but-for world?
 2             MR. RISSMAN:  I'm going to
 3         instruct the witness that if he hasn't
 4         formed an opinion on that, he
 5         shouldn't answer.
 6   BY MR. COLEMAN:
 7       Q.    Let's set that as a precursor.
 8             Did you form an opinion on how
 9   much the sow herd would have been reduced in
10   the but-for world?
11       A.    I have not.  I've estimated, like
12   I said, how much more domestic supply would
13   have occurred in the but-for world absent the
14   alleged conspiracy, and I have not performed
15   a decomposition as to how that output
16   increase would be achieved.
17             But I think it's reasonable to
18   infer that it would be achieved through some
19   combination of the mechanisms that were
20   employed by the defendants to reduce domestic
21   output.
22       Q.    So just coming back to the basic
23   question as to whether or not you formed an
24   opinion about how much the sow herd would
25   have been reduced, if at all, in the but-for
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 10 of 20
In re Pork Antitrust Litigation                               Hal Singer
                                                              June 24, 2022

62

1  world.
2           The answer is you did not form an
3  opinion on that subject; is that right?
4       A.   Well, I want the record to be very
5  clear.  I estimated with -- with great
6  precision, in my opinion, the extent of the
7  output reduction that could be attributed to
8  the challenged conduct.  I have not performed
9  a decomposition of that output reduction
10 according to the three primary mechanisms the
11 defendants used to reduce domestic supply.
12          I have not done that.  I don't
13 think such a decomposition is necessary, and
14 I will leave it at that.
15      Q.   Well -- and I'm just a lawyer.
16 I'm not sure I understand what decomposition
17 is.  I guess what I want to know is did your
18 model or any opinion that you formed in this
19 case allow you to assess whether sow herd
20 reductions would have occurred in the but-for
21 world?
22      A.   Oh.  The model doesn't tell us
23 that, but I think just economic insight
24 analysis and review of the qualitative
25 record, all the institutional details, is

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 11 of 20
In re Pork Antitrust Litigation                          Hal Singer
                                                         June 24, 2022

68

1  agreed on price?
2       A.   No, I don't know what --
3            MR. RISSMAN:  Object to form.
4       A.   I don't know what you mean by
5  "agreed," but to an economist if -- if an
6  information broker is exchanging
7  competitively sensitive information across to
8  defendants, and they utilize and rely on that
9  information to effectuate a price increase
10 that otherwise would not have been possible,
11 and that is an anticompetitive price effect.
12           Now, if you want to call it -- I
13 think -- what was the word that you were
14 trying to use -- agreement -- you know, I'm
15 not offering opinions on agreements.  I'm
16 offering economic opinions.  I will leave it
17 at that.
18 BY MR. COLEMAN:
19      Q.   So when was the conspiracy formed?
20      A.   Well, the complaint --
21           MR. RISSMAN:  Object to form and
22      foundation.
23      A.   The complaint -- can you give me
24 the question again?
25

```
 1   BY MR. COLEMAN:
 2        Q.    When was the conspiracy formed?
 3              MR. RISSMAN:  Same objection.
 4        A.    The complaint asserts that the
 5   conduct period began in 2009 with the release
 6   of certain Agri Stats reports, and so that's
 7   why I define the conduct variable in my model
 8   to begin in 2009.
 9   BY MR. COLEMAN:
10        Q.    And is that why you treated 2008
11   as a preconspiracy benchmark year?
12        A.    Yes.
13        Q.    And so you understood that 2008
14   predated the conspiracy?
15              MR. RISSMAN:  Object to form.
16         And calls for a legal conclusion.
17   BY MR. COLEMAN:
18        Q.    Well, at least that's the
19   assumption.
20              MR. COLEMAN:  I am sorry, Josh.
21         Yeah.  Go ahead.
22              I apologize to the court
23         reporter, too.
24              Did you catch his objection?
25              THE STENOGRAPHER:  Yes.
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 13 of 20
In re Pork Antitrust Litigation                                    Hal Singer
                                                                June 24, 2022

70

1  BY MR. COLEMAN:
2      Q.   And so your model -- you can
3  strike the previous question.
4           Your model assumes that 2008 was a
5  preconspiracy year, right?
6           MR. RISSMAN:  Object to form.
7      A.   The model does treat 2008 as a
8  preconspiracy year.  That is correct.  And I
9  recognize that I've -- there is some evidence
10 in the record to suggest that Agri Stats had
11 already begun, at least through its marketing
12 campaign, to -- to move -- place the wheels
13 in motion to form this alleged conspiracy or
14 this cartel.
15          And to the extent that any prices
16 in 2008, which I've considered to be an edge
17 year, reflect the effects of that preliminary
18 coordination, then my benchmark -- my clean
19 benchmark will naturally produce a
20 conservative estimate of the price effect
21 owing to the conspiracy.
22 BY MR. COLEMAN:
23     Q.   So you've mentioned that harvest
24 agreement was one of the mechanisms used to
25 reduce the domestic supply of pork.

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 14 of 20
In re Pork Antitrust Litigation                                    Hal Singer
                                                                June 24, 2022

103

1  could give you a very precise estimate of the
2  duration.
3      Q.   And you are not aware of anything
4  stopping independent producers from expanding
5  their sow herd in response to cutbacks by
6  Smithfield or any other defendant, right?
7           MR. RISSMAN:  I will instruct
8      the witness to answer to the extent he
9      has an opinion about that.
10     A.   I don't have an opinion on that.
11 BY MR. COLEMAN:
12     Q.   What's a gilt?
13     A.   I think we have -- it's a female
14 pig that has -- is not ready to deliver
15 piglets or something like that.
16     Q.   And do you know whether gilts are
17 capable of becoming sows?
18     A.   Are they incapable?
19     Q.   Capable.
20     A.   I think eventually they might be
21 capable, but I think that that is the word to
22 describe them at a certain stage of their
23 lives.
24     Q.   You don't know how long it takes
25 for a gilt to become a sow or capable of

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 15 of 20
In re Pork Antitrust Litigation
Hal Singer
June 24, 2022

104

```
 1   becoming a sow?
 2         A.    I've -- I've read that -- I've
 3   read that, I'm sure, in putting together the
 4   background section, but I can't give you that
 5   statistic off the top of my head.
 6         Q.    Do you know anything about
 7   Smithfield's inventory or Tyson's inventory
 8   of gilts on their farms when they liquidated
 9   sows?
10         A.    Sitting here, no, I can't give you
11   a characterization of that.
12         Q.    Do you know anything about
13   circovirus?
14         A.    No, I've studied other viruses.
15   But circa virus?
16         Q.    Circovirus?
17         A.    Oh, circovirus.  I looked at two
18   other viruses, but not circo, I don't think.
19         Q.    Do you know whether circovirus and
20   the vaccine to reduce or eliminate circovirus
21   had any impact on supply during the relevant
22   time period?
23         A.    No, but to the extent that it
24   affected the pig mortality rate, it would be
25   controlled for in my pig mortality variable,
```

105

1  but I don't know enough about that virus.
2       Q.    You understand that pig diseases
3  can have significant impacts on the supply of
4  hogs and ultimately the supply of pork,
5  right?
6       A.    Correct.
7       Q.    Could you turn to Tab 62?
8             MR. RISSMAN:  Give me just a
9       second because it's in the back of
10      this.
11            MR. COLEMAN:  I had the same
12      problem.  The binder is it too big.
13            Jacob, you could go ahead and
14      call it up on the screen.
15  BY MR. COLEMAN:
16      Q.    Are you with me?
17      A.    Yes.
18      Q.    And what's been marked as
19  Exhibit 3 is a USDA report with the title
20  "Users Guide to USDA's LMR Hog Price
21  Reports," right?
22            (Exhibit 3 was marked for
23            identification.)
24      A.    Yes.
25  BY MR. COLEMAN:

247

 1   the -- during the conduct period.  It is
 2   telling us what the effect is across the
 3   entirety of the conduct period.  So I will
 4   leave it that.
 5         Q.    And can your model tell us the
 6   amount of overcharge in any particular time
 7   frame, like, say, a given month in a given
 8   year at any point in the time period?
 9         A.    Well, you could -- using my model,
10   you could go make a prediction within a
11   particular month if you were very interested
12   in a particular month for some reason.  You
13   could make a prediction of what the prices
14   would have been in the absence of the
15   challenged conduct, and you can compare those
16   prices to the actual prices, if you were so
17   inclined.
18               Now, there's no apriority reason
19   to do that given that the allegations are for
20   an alleged conspiracy that spanned from 2009
21   to 2018.  So number one, you wouldn't be
22   testing the theory of the case, the theory of
23   harm.
24               And number two, I haven't seen any
25   -- I'm not aware of any record evidence that

1   would suggest that we should go looking for a
2   structural break in January of 2010; that is,
3   there's no suggestion that the information
4   exchange was any more or less wholesome in
5   January of 2010.
6          The information exchange of
7   competitively sensitive information was the
8   same across the challenged conduct -- across
9   the conduct period.
10      Q.   Do you know whether every
11  defendant subscribed to all the Agri Stats
12  report throughout the time period?
13      A.   I got a chart that shows you which
14  ones each defendant subscribed to in each
15  year.  But, you know, I know you want this to
16  be a memorization test, but I can't tell you
17  which boxes are checked by memory.  We can go
18  to the table.
19      Q.   Coming back to 151 and beta one in
20  that line of questioning, so does it mean --
21  is it your opinion that, for example, the
22  direct purchasers of class products paid a
23  12.8 percent overcharge in every month from
24  January of 2009 to June of 2018?
25      A.   I think that the model I've

249

1  constructed, which constrains the parameter
2  to be the same across the challenged conduct
3  period -- the conduct period would suggest
4  that it was the same overcharge in each
5  month.  That's correct.
6       Q.   So in each incremental month from
7  January 1, 2009, through the end of the
8  conspiracy period, it's your opinion that
9  there was an overcharge of a specified
10 amount.
11           Here it's 12.8 percent for direct
12 purchasers of class products?
13      A.   I can conceive -- I think that in
14 reality that the inflation likely varied
15 slightly over time, but this model and this
16 specification, which constrains the parameter
17 to be the same across the entirety of the
18 conduct period, the best prediction that I
19 would have for your favorite month, which is
20 January 2010, would be the parameter is
21 estimated.
22      Q.   So does it mean that -- it's not
23 my favorite month.  I'm just picking that as
24 an example, just to have a point of
25 reference.

CASE 0:18-cv-01776-JRT-JFD   Doc. 1442-38   Filed 08/24/22   Page 20 of 20
In re Pork Antitrust Litigation
Hal Singer
June 24, 2022

250

1            But is your testimony -- your
2   opinion mean that regardless of the specific
3   actions that defendants took, your model
4   assumes that the alleged conspiracy had the
5   same effect in every month?
6        A.   No, that's not -- that's not what
7   it means.  The model as constructed here is
8   seeking to estimate an effect that stretched
9   over the entirety of the challenged conduct
10  for the conduct period.  The plants are not
11  asserting a sequence of mini conspiracies,
12  you know, lasting one month apiece.
13           If they were, if that were the
14  allegation, you know, we could go out and
15  test for differential effects by month, but
16  they're not.  They're alleging a single
17  conspiracy that spanned the duration of the
18  conduct period, and I will leave it at that.
19       Q.   But the levers of the conspiracy
20  are multifaceted and -- whether it's exports
21  or sow reductions or something else?
22       A.   Or price hikes -- or price hikes,
23  yes.
24       Q.   Sure.  And so is it your opinion
25  that regardless of what levers were pulled at