# EXHIBIT 6

# Filed Under Seal

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MINNESOTA

3    Case No. 0:18-cv-01776-JRT-HB

4

5

6    ------------------------------------------

7    IN RE PORK ANTITRUST LITIGATION

8    This Document Relates to: All Actions

9    ------------------------------------------

10

11

12

13

14    HIGHLY CONFIDENTIAL

15    REMOTE TESTIMONY OF SCOTT MCCANN -

16    OLEAN WHOLESALE GROCERY COOPERATIVE, INC.

17    30(B)(6)

18    AUGUST 10, 2022 - 10:00 A.M. EDT

19

20

21

22

23

24

25    JOB NO. 2022-855882

82

```
 1    SCOTT MCCANN - HIGHLY CONFIDENTIAL

 2   important factors of what we just talked

 3   about?

 4     A     Low -- best price and quality.

 5     Q     And so earlier when we were

 6   talking about the harm that Olean has

 7   suffered, it relates to paying more for

 8   pork than it believes it should have; is

 9   that right?

10     A     That's fair.

11     Q     And what is your factual basis

12   for stating that Olean was harmed and paid

13   more than it should have?

14     A     Factual?

15     Q     Yes.

16     A     I have no -- I cannot give you

17   pork butts were a $1.19 a pound and they

18   should have been .99.  I don't have any

19   factual numbers to share.

20     Q     Aside from numbers, are there any

21   other facts you can point to to support

22   that Olean should have been paying

23   different prices?

24           MR. BOURNE:  Objection.

25           THE WITNESS:  Say again.
```

SCOTT MCCANN - HIGHLY CONFIDENTIAL

1

2  BY MS. ZIMMERMAN:

3      Q     You know, aside from that number

4  example you gave, is there any other facts

5  you can point to to support that Olean was

6  harmed in this matter?

7      A     Yes.  Our lead counsel helps us

8  and directs us on those issues.

9      Q     So your factual basis for

10  understanding Olean's harm in this case --

11  do you have any independent basis for

12  understanding Olean's harm in this case,

13  aside from what you learned from counsel?

14      A     No.

15      Q     How do you know that -- how does

16  Olean know that it's been harmed in this

17  case?

18             MR. BOURNE:  Objection.  Form.

19        Asked and answered.

20             THE WITNESS:  Through our

21        counsel.

22  BY MS. ZIMMERMAN:

23      Q     Does Olean have any independent

24  basis outside of information from counsel

25  that it's been harmed in this case?

84

```
1      SCOTT MCCANN - HIGHLY CONFIDENTIAL

2      A     Excuse me.  No.

3      Q     What companies are responsible

4   for the harm that Olean suffered?

5      A     All the pork companies listed.

6      Q     Listed in the -- in what?

7      A     In just about every bit of

8   paperwork I have seen so far.

9      Q     So the defendants in this case,

10  is that who you're referencing?

11     A     I'm sorry, all the defendants.

12     Q     When did Olean begin being harmed

13  by the conspiracy in this case?

14     A     Most likely since '09.

15     Q     Have you personally investigated

16  whether Olean was harmed in this case?

17     A     I have not.

18     Q     We talked about factual basis.

19  But a little bit different, you know, what

20  is your evidence that Olean has been

21  harmed?

22              MR. BOURNE:  Object to form.

23              THE WITNESS:  I'm sorry, again.

24  BY MS. ZIMMERMAN:

25     Q     What is Olean's evidence that
```

85

```
 1     SCOTT McCANN - HIGHLY CONFIDENTIAL

 2   it's been harmed in this case?

 3               MR. BOURNE:  Object to form.

 4         Asked and answered.

 5               THE WITNESS:  I'm sorry.  Joe,

 6         did you --

 7               MR. BOURNE:  I just made an

 8         objection.  But you can answer the

 9         question.

10               THE WITNESS:  Again, Sarah, I'm

11         sorry.  How do I know I have been

12         harmed?

13   BY MS. ZIMMERMAN:

14      Q     What is your evidence?

15      A     Oh, what is the evidence.

16      Q     Correct.

17      A     My evidence is through my

18   counsel.

19      Q     Are there -- would you expect

20   that records showing Olean's pork

21   purchases in this case would be used to

22   support the harm that it suffered?

23      A     Yes.

24      Q     Would that include things like

25   the transactional data reflecting Olean's
```

86

```
1      SCOTT MCCANN - HIGHLY CONFIDENTIAL

2    pork purchases in this case?

3       A      I would believe so, Sarah.

4       Q      And I believe you mentioned

5    earlier that Olean does not have that data

6    any longer; is that correct?

7       A      Electronic data, no.

8       Q      Was that data stored in any

9    particular database?

10      A      It was.

11      Q      What was that database called?

12      A      You know, Sarah, I guess call me

13   simple, it was a room with a data server

14   in there and it was all in there.

15      Q      Can you describe -- let me ask it

16   this way.

17             Are you familiar with the term

18   "Retalix"?

19      A      Yes.

20      Q      And what does Retalix mean to

21   you?

22      A      It's a software company, I

23   believe.

24      Q      And was that software used to

25   maintain this type of data?
```

1    SCOTT MCCANN - HIGHLY CONFIDENTIAL

2       A      Correct.

3       Q      And so that Retalix database

4    would have maintained Olean's historical

5    pork purchases for the time period of --

6    for a particular time period?

7       A      Correct.

8       Q      Do you know what time period that

9    database was used by Olean?

10      A      Wow, let's -- to the best of my

11   knowledge, '13, '14, '15, up until we sold

12   the assets.

13      Q      Was that an asset that was sold?

14      A      Yes.

15      Q      Are you still able to access the

16   Retalix database?

17      A      No.  As far as I know, it's in

18   the dumpster.

19      Q      Do you know when it was thrown

20   away?

21      A      I do not.  Again, as far as I

22   know, that might not even be the case.  I

23   have no idea.

24      Q      Were you able to access that

25   database while you were employed at C&S?

88

```
 1     SCOTT MCCANN - HIGHLY CONFIDENTIAL

 2         A       No.

 3         Q       Do you know if anyone at C&S was

 4     able to access it?

 5         A       I don't -- I do not know that.

 6         Q       Are you familiar with a Great

 7     Plains database?

 8         A       Yes.

 9         Q       And what is that?

10         A       I believe that was our warehouse

11     system and I think it had some accounting

12     tied to that.

13         Q       To your knowledge, would that

14     database also have reflected Olean's pork

15     purchases for a particular time period?

16         A       Yes.

17         Q       Do you recall what time period

18     that system was used?

19         A       I do not.  That wasn't my

20     umbrella.

21         Q       Was it used, to the best of your

22     recollection, before the Retalix database?

23         A       I believe so.

24         Q       Are you still able to access that

25     Great Plains database?
```

89

1    SCOTT MCCANN - HIGHLY CONFIDENTIAL

2        A       No, ma'am.

3        Q       So is it fair to say that Olean

4    does not have access to the transactional

5    data reflecting its pork purchases between

6    2009 and 2018?

7                    MR. BOURNE:   Object to form.

8                    THE WITNESS:   That's just -- no,

9        we don't have access.

10   BY MS. ZIMMERMAN:

11       Q       And is it also fair to say that

12   Olean cannot access that transactional

13   data reflecting its pork purchases between

14   2009 and 2018?

15       A       No, we cannot access that.

16       Q       Aside from these -- this

17   transactional data we have been discussing

18   reflecting these historical pork

19   purchases, are there other documents you

20   expect Olean would rely on to support the

21   harm it suffered in this case?

22                    MR. BOURNE:   Object to form.

23                    THE WITNESS:   I think just the

24       material we have already produced.

25   BY MS. ZIMMERMAN:

90

1    SCOTT MCCANN - HIGHLY CONFIDENTIAL

2    Q     Are you referencing anything in

3    particular within what you have produced?

4    A     Yes.  I think we produced 50 --

5    50-plus boxes of invoices, hard -- you

6    know, the papers -- the paper trail, if

7    you will.

8    Q     And would those invoices

9    reflect -- what do those invoices

10   reflects?

11   A     I think those are invoices of all

12   the pork purchases.

13   Q     For --

14             (Simultaneous Crosstalk.)

15   A     A certain period.

16   Q     -- what time period?

17   A     I don't have the exact time

18   period of that.

19   Q     Do you know if those invoices

20   date back to 2009?

21             MR. BOURNE:  Object to scope.

22             THE WITNESS:  I believe so.

23   BY MS. ZIMMERMAN:

24   Q     And they would contain every pork

25   purchase -- they would reflect every pork

1      SCOTT MCCANN - HIGHLY CONFIDENTIAL

2      Q      And the e-mail down below says,

3    "Hormel cooked ham."  I think that is a 1

4    or an I -- "need five pallets for next

5    Tuesday.  Need cost for po number."

6      A      Yes.

7      Q      Can you tell me who Joe Mancuso

8    is?

9      A      I do not know a John Mancuso.

10           Again, as vice president of

11   procurement and member development, I

12   didn't get involved in day-to-day

13   operations of the buyers.  I didn't -- I

14   was oversaw the buyers, but they worked

15   independently, if you will.

16     Q      Would it appear to you that Mark

17   is trying to order pork from Mr. Mancuso?

18     A      Yes.

19     Q      So -- and Mancuso, it appears,

20   works with a company called Mancuso

21   Marketing; is that fair?

22     A      Yes.

23     Q      So Mancuso would be a supplier of

24   pork for Olean; is that correct?

25     A      Yes.

122

1    SCOTT McCANN - HIGHLY CONFIDENTIAL

2        Q     And you are not familiar with

3    Mancuso?

4        A     No.

5        Q     Are you prepared to testify about

6    Olean's purchases of pork from Mancuso?

7        A     I am not.  I don't know Mancuso

8    other than he's a supplier for us.

9        Q     Let's go ahead -- so, you --

10   sorry, go ahead.

11              MS. ZIMMERMAN:  Let's go ahead

12       and scroll up to page 23773 which is

13       page 4 of the PDF.

14              Right there.

15   BY MS. ZIMMERMAN:

16       Q     So as you can see this is an

17   e-mail kind of later in the chain we were

18   just looking at, again, from Mark Hale --

19   who is with Olean, correct?

20       A     Yes.

21       Q     He was a pork buyer for Olean?

22       A     Mark Hale?

23       Q     Yes.

24       A     Yes.

25       Q     And he's sending an e-mail to

123

1    SCOTT MCCANN - HIGHLY CONFIDENTIAL

2   Jeff Gangloff; is that right?

3     A    Yes.

4     Q    Are you familiar with Mr.

5   Gangloff?

6     A    I am not.

7          Again, they work pretty much

8   independently, unless there was a problem.

9   They did report to me.  I did not rule or

10  supervise over the shoulder, let's say.

11  They worked all independently and we

12  collaborated once a week on different

13  things.  But, no.

14    Q    Mr. McCann, you are here to

15  testify on behalf of Olean as a corporate

16  representative; is that correct?

17    A    Yes.

18    Q    And one of the topics that we

19  reviewed earlier, you looked through the

20  topics in Exhibit 1.

21         Do you recall that?

22    A    Yes.  From Tab 1?

23    Q    Yes, Tab 1 or Exhibit 1 --

24         (Simultaneous Crosstalk.)

25    A    -- 1.

1     SCOTT MCCANN - HIGHLY CONFIDENTIAL

2   number is?

3     A     Well, it looks like a growth

4   number in this circumstance would be

5   maybe -- I can't speak clearly to that --

6   but maybe like a rebate program.

7     Q     And what do you mean by "a rebate

8   program"?

9     A     Well, rebate program could be

10   many things.  You purchase dollars

11   amount -- dollar amounts, poundage,

12   particular brands, cases, you could get a

13   rebate through the manufacturer.

14     Q     And so it sounds like in response

15   to Mark telling Jeff that someone else, a

16   competitor, is offering a lower price,

17   Jeff points out the rebate dollars that

18   are at stake here through their program;

19   is that fair?

20     A     Yes.

21     Q     Are growth programs and rebates

22   usually negotiated terms?

23     A     No.

24     Q     A manufacturer will simply offer

25   their growth program and you accept it

131

```
1      SCOTT MCCANN - HIGHLY CONFIDENTIAL

2   wholesale?

3      A      Sure.  Yes.

4             MS. ZIMMERMAN:  Bryan, you can

5       take this one down.

6   BY MS. ZIMMERMAN:

7      Q      Does Olean purchase pork pursuant

8   to contracts?

9      A      I'm sorry, Sarah, did you just

10  say price contract?

11     Q      Any contract.

12            Does Olean purchase pork pursuant

13  to contracts?

14     A      Yes.

15     Q      And when does Olean purchase pork

16  pursuant to a contract?

17     A      I do not know that answer.

18     Q      Are there particular

19  circumstances where they might purchase

20  pursuant to a contract as opposed to

21  without?

22     A      I do not know that answer either.

23     Q      Are there typical terms that you

24  include in those contracts?

25     A      I would believe so.
```

In re Pork Antitrust Litigation

Scott McCann

Highly Confidential, 30(B)(6)

August 10, 2022

132

```
 1    SCOTT MCCANN - HIGHLY CONFIDENTIAL

 2       Q      And what would those be?

 3       A      I do not know the answer.

 4       Q      Have you seen contracts between

 5    Olean and pork suppliers for --

 6              (Simultaneous Crosstalk.)

 7       A      I have not.

 8       Q      -- purchase of pork?

 9       A      I have not.

10       Q      But that is a mechanism that

11    Olean would use to purchase pork from

12    suppliers; is that right?

13       A      Yes.

14       Q      Are you familiar with any of the

15    terms that would be in those agreements?

16       A      No, ma'am.

17       Q      So we talked about the two

18    suppliers of pork you recalled Tyson and

19    Seaboard.

20              I would like to go through those

21    in a little more -- little more detail.

22              So what types of pork did Olean

23    purchase from Tyson?

24       A      To the best of my knowledge --

25    from Tyson?
```

133

```
1     SCOTT MCCANN - HIGHLY CONFIDENTIAL

2     Q      Correct.

3     A      To the best of my knowledge, just

4   regular pork; anywhere between the rear

5   end and the neck, I should say.

6     Q      So Olean didn't have a specific

7   subset of products that it would source

8   from Tyson?

9     A      No.

10    Q      When did Olean begin purchasing

11  pork from Tyson?

12    A      I don't know that answer.

13    Q      Is there someone who would?

14    A      No.

15    Q      There's no one from Olean that

16  would know when Tyson began purchasing

17  pork from the company?

18              MR. BOURNE:  Object to form.

19              THE WITNESS:  Not, not that I

20      would know of.  Some have passed away

21      and some have moved on, retired.

22              So, yes, there may be somebody.

23      No, I wouldn't know where I would even

24      start with.

25  BY MS. ZIMMERMAN:
```

172

```
 1     SCOTT MCCANN - HIGHLY CONFIDENTIAL

 2   store called Ried's Food Barn.

 3     Q     David Ried owns the food store;

 4   is that correct?

 5     A     Ried's Food Barn, yes.

 6     Q     Was Ried's Food Barn a customer

 7   of Olean or a member retailer?

 8     A     Yes, Sarah.

 9     Q     So in the e-mail you just

10   reviewed, is it fair to say Ried is

11   generally outlining to Mark Hale why

12   Ried's purchases from Olean have declined?

13     A     I see that.

14     Q     And Ried provides his reasons for

15   increasing volumes from other suppliers.

16           Do you see that?

17     A     Yes.

18              MR. BOURNE:  Object to scope.

19   BY MS. ZIMMERMAN:

20     Q     Suppliers like Sherwood Food

21   Distributors?

22              MR. BOURNE:  Same objection.

23              THE WITNESS:  Yes.

24   BY MS. ZIMMERMAN:

25     Q     Are you familiar with Sherwood
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-6   Filed 08/24/22   Page 20 of 23
In re Pork Antitrust Litigation                                    Scott McCann
Highly Confidential, 30(B)(6)                      August 10, 2022

173

```
 1      SCOTT MCCANN - HIGHLY CONFIDENTIAL
 2   Food Distributors?
 3      A      I have heard of them.  I am not
 4   familiar with them.
 5      Q      Would you consider them a
 6   competitor of Olean Wholesale?
 7      A      Yes.
 8      Q      It sounds like Ried is explaining
 9   to Mr. Hale that one of the reasons they
10   are purchasing more from Sherwood is
11   because they found a greater selection of
12   products at Sherwood; is that fair?
13      A      Yes.
14      Q      So is it fair to say that
15   customers have preferences for certain
16   products or value a selection?
17      A      Yes.
18      Q      And those preferences may impact
19   which products Olean sells; is that fair?
20      A      Say the question again, Sarah.
21      Q      Would you say those customer
22   preferences impact which products Olean
23   purchases?
24      A      Yes and no.
25      Q      What do you mean by that?
```

In re Pork Antitrust Litigation
Highly Confidential, 30(B)(6)

Scott McCann
August 10, 2022

174

1     SCOTT MCCANN - HIGHLY CONFIDENTIAL

2          A      So a lot of times at Olean

3    Wholesale, when a member would maybe find

4    a particular product from like Sherwood,

5    and they like the product, and a lot of

6    times as a co-op, Olean would bring those

7    products into Olean Wholesale and offer

8    them to everybody, which happened almost

9    daily because of all the different

10   members.

11          Obviously there is different

12   geographic areas, and things sold

13   differently in one area to the next.  But

14   at Olean wholesale, these type of examples

15   right here, we took a good hard look at

16   and brought those items into the wholesale

17   to retain that business.  Right.  So this

18   is pretty good example of that.

19          Q      So this is a good example of an

20   instance where one of Olean's customers

21   makes you aware of problems with either

22   the selection or other issues with what

23   Olean is offering; is that fair?

24          A      Yes.

25          Q      And then Olean was able to adjust

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-6   Filed 08/24/22   Page 22 of 23
In re Pork Antitrust Litigation                                    Scott McCann
Highly Confidential, 30(B)(6)                          August 10, 2022

175

   SCOTT MCCANN - HIGHLY CONFIDENTIAL

2   the pork products that they offered

3   accordingly?

4       A      Yes.

5       Q      Would customers -- you know, in

6   this instance the customer shared various

7   reasons for moving to a different supplier

8   or using a different supplier more than

9   Olean.

10          Would they ever share factors

11  like pricing in these kind of e-mails

12  complaining about what was being offered

13  by Olean?

14      A      I can't speak to that.

15      Q      At a high level, are you aware of

16  that ever happening, of customers

17  providing prices?

18      A      Not to me.  I am not aware of it.

19          MS. ZIMMERMAN:  You can go ahead

20      and take this down, Bryan.

21  BY MS. ZIMMERMAN:

22      Q      So you mentioned -- I am just

23  looking through my notes.

24          Mentioned earlier that you are

25  aware that Olean purchased pork products

1    SCOTT MCCANN - HIGHLY CONFIDENTIAL

2  from Tyson, right?

3      A    Yes.

4      Q    And I said -- and I believe you

5  testified that you believe that Olean

6  purchased pork products from Seaboard; is

7  that correct?

8      A    Yes.

9      Q    Do you know for a fact whether

10  Olean purchased pork products from

11  Seaboard?

12     A    I don't know that for a fact.

13     Q    Do you have any basis to believe

14  that Olean purchased pork products from

15  Seaboard?

16     A    Do I have any basis?

17     Q    Yes.

18     A    Well, kind of, yes.  And what do

19  I mean by kind of?

20         We carried over 6,000 items in

21  our meat department, so I kind of believe,

22  yes.

23     Q    So your basis for stating that

24  Olean purchased pork products from

25  Seaboard is that you carried so many