# EXHIBIT 7

# Filed Under Seal

```
 1                UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MINNESOTA

 3      --------------------------------x

 4      IN RE:                              Court File No.
                                            0:18-cv-01776-JRT-HB
 5      PORK ANTITRUST LITIGATION

 6      --------------------------------x

 7

 8

 9            RULE 30(b)(6) VIDEOTAPED DEPOSITION

10                           OF

11                      SCOTT WAGNER

12               taken remotely via Zoom

13                     July 22, 2022

14

15

16

17

18

19

20

21

22

23

24
        Stenographically Reported by:  Amy L. Larson, RPR
25      Job No. 2022-850120
```

16

1           It sounds like some of the

2    conversations you had were about collecting

3    documents for the case, right?

4              MR. OWEN:  Object to form.

5              THE WITNESS:  Actually, Zach Gross

6    was copied on all of the emails coming back

7    and forth.  And when it was for

8    documentation, he took care of seeing that

9    the IT person was getting that information.

10 BY MR. BHATTACHARYYA:

11 Q.  Got it.  Did you ever have any conversations

12    with anyone at John Gross & Company about the

13    allegations in this lawsuit?

14 A.  Other than Brian Gross, no.

15 Q.  And what did you discuss with Brian Gross

16    about the allegations in this lawsuit?

17 A.  Basically what it was about.

18 Q.  And did he provide any reactions or comments

19    back to you?

20 A.  No.

21 Q.  So the only discussion you had with

22    Brian Gross about the allegations in this

23    lawsuit were to summarize the Complaint?

24              MR. OWEN:  Object to form.

25              THE WITNESS:  Yes.

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 4 of 19
In Re - Pork Antitrust Litigation                                        Scott Wagner
30(b)(6)                                                                 July 22, 2022

17

1  BY MR. BHATTACHARYYA:
2  Q. Are you being compensated in any way for your
3     time for this deposition?
4  A. No.
5  Q. You mentioned that you testified before at a
6     deposition.  Have you ever testified in court
7     or in any other setting?
8  A. No.
9  Q. Have you ever been convicted of a crime?
10 A. No.
11 Q. Have you ever filed for bankruptcy?
12 A. No.
13 Q. John Gross & Company is a class
14    representative in this case; is that correct?
15 A. Plaintiff, yes.
16 Q. And what do you understand to be the role of
17    a class representative in a class action
18    lawsuit?
19 A. I'm basically speaking for everybody in the
20    lawsuit.
21 Q. And do you have an understanding of who are
22    the class members that you represent?
23 A. ==My belief is they would be other food==
24    ==service distributors like us, like==
25    ==John Gross & Company.==

CASE 0:18-cv-01776-JRT-JFD Doc. 1446-7 Filed 08/24/22 Page 5 of 19
In Re - Pork Antitrust Litigation
30(b)(6)
Scott Wagner
July 22, 2022

18

1  Q. And when you say, "Food service
2     distributors," how do you define that?
3  A. Someone who purchases food and then resells
4     it.
5  Q. Do you -- is your understanding that
6     John Gross & Company is a representative for
7     grocery stores?
8           MR. OWEN:  Object to form.
9           THE WITNESS:  Yeah.  Yes.  Well,
10    to the people who distribute to grocery
11    stores, yes.
12 BY MR. BHATTACHARYYA:
13 Q. So your -- your understanding is -- when you
14    say, "Distributors," you're -- when you say,
15    "Distributors," that means companies that are
16    not selling to end consumers; is that fair?
17          MR. OWEN:  Object to form.
18          THE WITNESS:  Yes.
19 BY MR. BHATTACHARYYA:
20 Q. I want to ask you some questions about how
21    you stay updated about the status of this
22    case.  Do you regularly receive updates from
23    your counsel?
24 A. No.
25 Q. So besides the meetings you had to prepare

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 6 of 19
In Re - Pork Antitrust Litigation                                    Scott Wagner
30(b)(6)                                                          July 22, 2022

27

1        describe what you mean?
2                    MR. OWEN:  Object to scope.
3        Again, implicates downstream information.
4                    THE WITNESS:  Our competitors.
5    BY MR. BHATTACHARYYA:
6    Q.  So you're saying you will consider prices
7        offered by your competitors and that will
8        impact the price that you can offer?
9                    MR. OWEN:  Object to scope,
10       downstream information.
11                   THE WITNESS:  Yes.
12                   MR. BHATTACHARYYA:  Counsel, just
13       to kind of, you know, keep this moving, I'm
14       fine if -- with a standing objection to this
15       line of questions about pricing if that's
16       okay with you all.
17                   MR. BOURNE:  Amarto, I mean, we'll
18       accept having a standing objection on the
19       record.  We'll probably keep making the
20       objection.  I think we're getting really
21       close to cutting the witness off.  Like I
22       told you during our meet and confer, we're
23       not here to testify about that.  So just as a
24       heads up, we're going to start instructing
25       him not to answer these questions.

1                     MR. BHATTACHARYYA:  Okay.  I don't
2         have too much more of this.  And I think like
3         we discussed, this does impact purchasing as
4         well, but I -- I hear what you're saying.
5    BY MR. BHATTACHARYYA:
6    Q.   Okay.  You mentioned earlier that you
7         maintain -- you used the phrase, "We have in
8         place the margins."
9                     Do you maintain a specific margin for
10        each pork product that you sell?
11                    MR. OWEN:  Again, object to scope,
12        calls for downstream information.
13                    THE WITNESS:  We have percentages
14        that we sell products at.
15   BY MR. BHATTACHARYYA:
16   Q.   When the purchase price for pork increases,
17        can you describe what John Gross & Company
18        does with respect to its selling price?
19                    MR. OWEN:  Object to form.  Object
20        to scope.  Again, calls for downstream
21        information.
22                    THE WITNESS:  We enter the new
23        price into the computer system, the set
24        factors that are in the system, then price
25        it.  It's based on percentages.

```
 1   BY MR. BHATTACHARYYA:
 2   Q.  Aside from pork, what other protein or meats
 3       does John Gross & Company purchase?
 4   A.  Seafood, beef, chicken.  Poultry, I should
 5       say.
 6   Q.  And would you agree with me that pork
 7       products compete with seafood, beef, poultry
 8       products?
 9               MR. OWEN:  Object to form.
10               THE WITNESS:  Could you rephrase
11       that?
12   BY MR. BHATTACHARYYA:
13   Q.  Sure.  When your purchasers are purchasing
14       pork products, they may consider purchasing
15       beef or poultry or seafood products instead,
16       right?
17   A.  No.
18   Q.  In terms of the geographic scope of
19       John Gross & Company, is it nationwide or is
20       there a particular region that it focuses on?
21               MR. OWEN:  Object to form.
22               THE WITNESS:  Our distribution
23       area is roughly 150 to 200 miles from
24       Mechanicsburg, Pennsylvania.
25   BY MR. BHATTACHARYYA:
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 9 of 19
In Re - Pork Antitrust Litigation                                Scott Wagner
30(b)(6)                                                         July 22, 2022

30

1  Q.  And is that distribution region all within
2      the state of Pennsylvania?
3  A.  Yeah, I believe -- we may go into Maryland
4      just a little bit.
5  Q.  So there are circumstances where you purchase
6      pork in Pennsylvania and sell it in Maryland?
7              MR. OWEN:  Object to form.
8              THE WITNESS:  I'm not sure.
9              MR. BHATTACHARYYA:  I'm going to
10     pull up -- Juan, if you can mark Tab H and
11     then share it with everybody and pull it up
12     on the screen.
13             THE VIDEOGRAPHER:  This will be
14     Exhibit 2?
15             MR. BHATTACHARYYA:  Yes.
16             THE VIDEOGRAPHER:  Okay.
17             (Exhibit 2 marked.)
18             MR. BHATTACHARYYA:  And if you can
19     scroll down to the first email in time, Juan.
20             THE VIDEOGRAPHER:  (Complies.)
21 BY MR. BHATTACHARYYA:
22 Q.  I'm showing you what's marked as Exhibit 2.
23     Do you see that on my screen -- or on the
24     screen, Mr. Wagner?
25 A.  Yes.

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 10 of 19
In Re - Pork Antitrust Litigation
30(b)(6)
Scott Wagner
July 22, 2022

31

1  Q. And the first email in time, which is at the
2     bottom, or I should say the second email, is
3     from Peggy Marshall to Craig Silsbee.
4            Do you see that?
5  A. Yes.
6  Q. Craig Silsbee works for Clemens Food Group?
7  A. I don't recall that name.
8            MR. BHATTACHARYYA: Okay.  Juan,
9     if you could scroll up just to the next email
10    up.
11           THE VIDEOGRAPHER: (Complies.)
12 BY MR. BHATTACHARYYA:
13 Q. Do you see where the next email says,
14    "craigsilsbee@clemensfoodgroup.com"?
15 A. Yup.  Yes.
16 Q. Okay.  And, you know, if you need to take a
17    second, then feel free to do so.  But this
18    email from Craig Silsbee is providing a quote
19    for a particular ham product.
20           Would you agree?
21 A. Yes.
22 Q. And after Craig sends that quote,
23    Peggy Marshall forwards it to you and says,
24    "Here you go."
25           Do you see that one right above it?

40

1  A.  We would use what's called a redistributor in
2      our market -- or in our industry.  We would
3      have purchased a fair amount of pork over
4      those years through them, but not -- we
5      wouldn't be purchasing it direct from the
6      manufacturer.
7  Q.  Do you recall which redistributors you
8      purchased from?
9  A.  G&C Foods.  And possibly in that time scope
10     Empire Beef, which is no longer in business.
11 Q.  When you purchase from a redistributor, were
12     you purchasing the same products that you
13     purchased directly from pork processors?
14 A.  Not necessarily.
15              MR. OWEN:  Object to form.
16 BY MR. BHATTACHARYYA:
17 Q.  So is that sometimes you would and sometimes
18     you would not?
19              MR. OWEN:  Object to form.
20              THE WITNESS:  Yes.
21 BY MR. BHATTACHARYYA:
22 Q.  And when you were purchasing the same product
23     from a redistributor that you also supplied
24     directly from the processor, did you pay the
25     same prices or would you pay more if it was

```
 1          coming from a redistributor?
 2                    MR. OWEN:  Object to form.
 3                    THE WITNESS:  It's a commodity.
 4          It changed daily, so it's impossible to
 5          answer that question.
 6                    MR. BHATTACHARYYA:  Let's go to
 7          Tab A.  Let's mark it as Exhibit 3, Juan.
 8                    (Exhibit 3 marked.)
 9                    THE WITNESS:  Okay.
10     BY MR. BHATTACHARYYA:
11     Q.   I'm showing you an email from John Sanders to
12          you.
13                    Do you see that?
14     A.   Yes.
15     Q.   And it's dated June 27, 2018?
16     A.   Yes.
17     Q.   Who is John Sanders?
18     A.   He works for UniPro.
19     Q.   And can you describe who UniPro is?
20                    MR. OWEN:  Object to form.
21                    THE WITNESS:  UniPro is a food
22          service procurement company owned by food
23          service distributors.
24     BY MR. BHATTACHARYYA:
25     Q.   And can you describe what is the business
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 13 of 19
In Re - Pork Antitrust Litigation                                      Scott Wagner
30(b)(6)                                                              July 22, 2022

42

1      relationship between John Gross & Company and
2      UniPro?
3   A. We're a member --
4              MR. OWEN:  Object to form.
5              THE WITNESS:  We're a member,
6      slash, owner.
7   BY MR. BHATTACHARYYA:
8   Q. And what benefits does John Gross & Company
9      get from its relationship with UniPro?
10             MR. OWEN:  Object to form.
11             THE WITNESS:  Their ability to
12     procure products for us.
13  BY MR. BHATTACHARYYA:
14  Q. When you say, "Procure products for us," what
15     specific role do they have?
16             MR. OWEN:  Object to form.
17             THE WITNESS:  They do the
18     negotiating.
19  BY MR. BHATTACHARYYA:
20  Q. And how many owners does UniPro have?
21             MR. OWEN:  Object to form.
22             THE WITNESS:  I don't know.
23  BY MR. BHATTACHARYYA:
24  Q. The email that I'm showing you on the screen,
25     John Sanders says to you, "Following is the

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 14 of 19
In Re - Pork Antitrust Litigation                                                    Scott Wagner
30(b)(6)                                                                          July 22, 2022

43

1         pricing for each of the UniPro Foodservice
2         Titled Pork Suppliers."
3               Do you see that?
4    A.   Yes.
5    Q.   And then beneath there there are some links
6         to a variety of different companies.
7               Do you see that?
8    A.   Yes.
9    Q.   And the companies included in the list of
10        links is Swift, Indiana Packers, Indiana
11        Kitchens, Seaboard Foods, IBP, and
12        Clemens/Hatfield, and then there's a
13        reference to Smithfield, right?
14   A.   Yes.
15   Q.   Do you recall this email?
16   A.   No.
17   Q.   Looking at it today, what did you understand
18        was the purpose of this email?
19              MR. OWEN:  Object to form.
20              THE WITNESS:  He's simply asking
21        you to save those to your browsers so you can
22        click on them and get daily pricing from each
23        one of those manufacturers.
24   BY MR. BHATTACHARYYA:
25   Q.   And is that something John Gross & Company

1       does when purchasing pork, look at updated
2       daily price lists?
3    A. Not daily, no.
4    Q. When John Gross purchases pork from Clemens,
5       is there a -- is there a contract that you
6       have for each product that you purchase?
7    A. Not a contract.
8    Q. Would you say they're, kind of, spot
9       purchases?
10   A. I would say we -- they quote prices, and
11      that's what this email is about.
12   Q. And is the price that's quoted limited to one
13      particular day or is it, you know, this is
14      the price we'll give you for the whole month,
15      for the whole year?
16              MR. OWEN:  Object to form.
17              THE WITNESS:  No, it's for a day
18      or a few days.
19   BY MR. BHATTACHARYYA:
20   Q. In terms of the companies listed on this
21      email, did John Gross & Company purchase from
22      Swift?
23              MR. OWEN:  Object to form.
24              THE WITNESS:  No.
25   BY MR. BHATTACHARYYA:

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 16 of 19
In Re - Pork Antitrust Litigation                                        Scott Wagner
30(b)(6)                                                                 July 22, 2022

45

```
 1   Q.  Has John Gross & Company ever purchased from
 2       Indiana Packers?
 3                   MR. OWEN:  Object to form.
 4                   THE WITNESS:  No.
 5   BY MR. BHATTACHARYYA:
 6   Q.  Has John Gross & Company purchased from
 7       Indiana Kitchens?
 8                   MR. OWEN:  Object to form.
 9                   THE WITNESS:  No.
10   BY MR. BHATTACHARYYA:
11   Q.  Has the company purchased from Seaboard?
12                   MR. OWEN:  Object to form.
13                   THE WITNESS:  Not directly.
14   BY MR. BHATTACHARYYA:
15   Q.  IBP, did John Gross purchase from IBP?
16                   MR. OWEN:  Object to form.
17                   THE WITNESS:  Yes.
18                   MR. BHATTACHARYYA:  Counsel,
19       what's the objection?
20                   MR. OWEN:  You haven't laid a
21       proper foundation to establish that they were
22       even, you know, negotiating or -- or making
23       purchases from those companies, so
24       foundation.
25                   MR. BHATTACHARYYA:  Okay.  I'll
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 17 of 19
In Re - Pork Antitrust Litigation
30(b)(6)
Scott Wagner
July 22, 2022

55

1   A.   Yes.
2   Q.   And the bottom email is from Peggy Marshall
3        at John Gross & Company on September 28th,
4        2015, to Craig Silsbee, right?
5   A.   Yes.
6   Q.   And Peggy asks, "How much are the 1035 pork
7        butts?  I need a bunch.  I could not get
8        ahold of Joe H.  Help."
9             Right?
10  A.   Yes.
11            MR. BHATTACHARYYA:  And then if we
12       can scroll up to the next email.
13            THE VIDEOGRAPHER:  (Complies.)
14  BY MR. BHATTACHARYYA:
15  Q.   Craig Silsbee replies, right?
16  A.   Yes.
17  Q.   And his email address is at
18       clemensfoodgroup.com?
19  A.   Yes.
20  Q.   And Craig says, "How many do you need?  I
21       took this right off the price sheet for
22       Wednesday.  Thursday has not come out yet,
23       but let's see what Joe says."  And then
24       underneath it says, "1035," and then,
25       "$1.36."

```
 1   A.   Yes.
 2   Q.   So here Craig Silsbee is describing the price
 3        for that product from a price sheet, right?
 4   A.   Yes.
 5              MR. OWEN:  Object to form.
 6   BY MR. BHATTACHARYYA:
 7   Q.   And then if we go to the top email, Peggy
 8        replies, right?
 9   A.   Yes.
10   Q.   And she says, 1.50 to 1.75?  Last time I paid
11        1.25.  Joe usually gives me a better price
12        than the list.  Is Joe not there?"
13              Did I read that correctly?
14   A.   You read it correctly.
15   Q.   So John Gross & Company doesn't always pay
16        exactly what's listed on a price list, right?
17              MR. OWEN:  Object to form.
18              THE WITNESS:  Yes.
19   BY MR. BHATTACHARYYA:
20   Q.   The company will negotiate with a supplier to
21        try to get a better price than what's listed
22        on the price list?
23   A.   Based on the volume, yes.
24   Q.   Earlier you mentioned that UniPro usually
25        handles the negotiations with the supplier.
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1446-7   Filed 08/24/22   Page 19 of 19
In Re - Pork Antitrust Litigation                                    Scott Wagner
30(b)(6)                                                          July 22, 2022

57

1    I guess, can you help me understand, you
2    know, when Peggy would be negotiating versus
3    when UniPro would be negotiating?
4            MR. OWEN:  Object to form.
5            THE WITNESS:  In this case, we
6    were not buying any pork products through
7    UniPro, so Peggy was doing the negotiating
8    herself.
9  BY MR. BHATTACHARYYA:
10 Q.  Do you know about what percentage of
11   John Gross's pork products are purchased
12   through UniPro?
13 A.  Today?
14 Q.  Yes.
15 A.  Ninety percent.
16 Q.  And around 2009 do you know what that
17   percentage was?
18 A.  That was purchased through UniPro?
19 Q.  Yes.
20 A.  Very little, if any.
21 Q.  Do you recall when John Gross's purchases
22   primarily -- of pork primarily went through
23   UniPro, when that started?
24 A.  Within the last two years maybe.
25 Q.  So before June 2018, did John Gross & Company