# EXHIBIT 14

1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MINNESOTA

3

4   - - - - - - - - - - - - - - -+

5                                 |
    IN RE: PORK ANTITRUST          |
6                                 |
    LITIGATION                     |    Case Number:
7                                 |
                                  |    0:18-cv-01776
8   This document relates to       |    JRT-HB
    all actions.                   |
9                                 |
    - - - - - - - - - - - - - - -+
10

11

12         Rule 30(b)(6) and Rule 30(b)(1)

13              Video Deposition of

14                   TAYLOR COX

15             Thursday, June 2, 2022

16                   9:25 a.m.

17

18

19

20

21

22

23   Job No. 845664

24   Reported by:  Laurie Donovan, RPR, CRR, CLR

25

CASE 0:18-cv-01776-JRT-JFD   Doc. 1447-14   Filed 08/24/22   Page 3 of 13
IN RE: PORK ANTITRUST LITIGATION                                  Taylor Cox
30(b)(6)                                                     June 02, 2022

32

1   to, to indicate, to inform what packers are
2   required to report.
3           When they, when they began reporting, as
4   I said, the statute prescribes four daily reports,
5   a prior-day report, a slaughter report, and then
6   an AM and a PM purchase report.  Those are
7   submitted to AMS an hour before the report is
8   released, by statute.
9           For example, the -- this morning's
10  purchase report comes out at 11:00 a.m. Central
11  Time.  The packers have to have the data to us
12  covering the prior period of reporting by
13  10:00 a.m.  We receive the data.  It goes through
14  our systems, aggregation, et cetera, and then we
15  release the data at the end of that hour, four
16  times a day on the hogs.  All the other
17  commodities are primarily twice daily, not
18  including the weekly reports, et cetera.
19      Q   So the, the reports in this green box,
20  it's saying they get broken out by -- these hog
21  reports get broken out by time of day that the
22  purchase or sale of the hog has occurred; is that
23  right?
24      A   Correct.
25      Q   And morning, afternoon, prior day.

1           They also get broken out by region; is
2  that right?
3       A    Correct.
4       Q    So that means where the hog was bought
5  or sold?
6       A    Yes.  It's -- as you can see the regions
7  here, we report -- we aggregate the data into a
8  national basis as well, and then -- in addition to
9  where the hogs are, are purchased.  So you see,
10 for example, Iowa/Minnesota hogs would be those
11 hogs --
12      Q    Why --
13      A    -- from that region.
14      Q    Why report out in this level of detail
15 and specificity?  Why, why do it so frequently,
16 morning, afternoon?
17      A    Well, we're required by law to do it
18 this frequently is my first response to that.  I
19 mean the statute -- I'm sure you've spent plenty
20 of time in reviewing.  It's quite prescriptive,
21 specifically on swine, so it, it prescribes to us
22 our reporting frequency.
23      Q    And do you, do you have a view as why
24 the -- why you're required to report by region?
25 Is it because hog prices and hog markets can vary

1    in different parts of the country?
2                MR. RISSMAN:  Object to form.
3                MR. SIMON:  Object to form.
4         Outside the scope as to the, this witness'
5         opinions.
6    BY MR. RUGE:
7         Q    Do you have a personal view, as a USDA
8    witness not representing USDA, as to why?  In your
9    experience in all your years in AMS marketing and
10   the livestock industry, is there -- are there
11   different markets for hogs in different parts of
12   the country that make reporting by region
13   valuable?
14               MR. RISSMAN:  I object to form.  It
15        calls for expert testimony, and it's outside
16        the scope of the, the notice.  There is no
17        30(b)(1) notice.
18               (Reporter clarification.)
19   BY MR. RUGE:
20        Q    You can still answer.
21               MR. SIMON:  And this, this is
22        Mr. Simon here.  You can answer as an, as an
23        individual agency employee, not as a 30(b)(6)
24        designee.
25               THE WITNESS:  In my opinion, the

1      reason we report in region -- as I mentioned
2      earlier, our agency's primary mission is to
3      help assist with the efficient marketing of
4      livestock products of, of a lot of
5      commodities, livestock specifically here
6      we're talking about today.
7               When you report swine, in this case
8      in an Iowa/Minnesota or a western region,
9      those producers within that region are either
10     marketing there or contemplating marketing
11     there.  As I mentioned when I was describing
12     our LMR reporting on the hogs, we, we, we
13     report a national, national aggregate,
14     sometimes you will see in, within the region,
15     price differentials, basis national or Iowa/
16     Minnesota versus western.
17              So it's really just a,
18     historically, a producer-driven want to see
19     I'm raising a product in the state I'm in or
20     the region I'm included in, and when I sell
21     said product, to see that reported, to see
22     that transparency is why we have the
23     regionality.
24   BY MR. RUGE:
25       Q    Right.  So a farmer, a hog farmer in

36

1    Minnesota is going to be more interested in the
2    demand for hogs in Minnesota than in California?
3                 MR. RISSMAN:  Object to form, and
4         it calls for expert testimony.
5                 MR. SIMON:  I'm going to object to
6         form as well.  Subject to the objection, the
7         witness can answer.
8                 (Whereupon, reporter reads
9                 requested material.)
10                THE WITNESS:  I can't speak for hog
11        farmers in Minnesota, of course, but as I
12        described, producers within the state or
13        region certainly have interest in seeing
14        market transparency within said state or
15        region.  I couldn't speak to a Minnesota
16        producer.  I couldn't gauge their level of
17        interest of what they would have in
18        California, for example.
19   BY MR. RUGE:
20        Q    No problem.  So page -- let's turn to
21   page 3.  There's an example, Daily Direct Hog
22   Prior-Day-Purchased Swine report.
23             Is this one of the many reports that get
24   published every day by AMS about hog purchases?
25        A    It is.

CASE 0:18-cv-01776-JRT-JFD   Doc. 1447-14   Filed 08/24/22   Page 8 of 13
IN RE: PORK ANTITRUST LITIGATION                                Taylor Cox
30(b)(6)                                                    June 02, 2022

37

1    Q    So can you help me understand some of
2  the terms that are used here.
3         So I'm seeing this broken out by
4  producer-sold and packer-sold, and then it's
5  broken out by prior day, a week ago, a year ago.
6         Are those -- and that's current volume,
7  is that it, that's sold or purchased?
8    A    Correct.  In this case, when you're
9  talking about swine reporting, these are all
10 purchases, the sales we cover, the product sales
11 on the meat side, so correct.  This is -- for
12 example, producers sold -- negotiated 8,145 head
13 as the volume sold for that reporting period, the
14 covered period.
15   Q    And what does it mean to be a
16 packer-owned hog?
17   A    Yeah, those are swine that are
18 historically defined by and, and defined in
19 statute by packers owning those 14 days prior,
20 immediately prior to slaughter.
21   Q    A packer is a processor of meat; is that
22 right?
23   A    Correct.
24   Q    And packers can sometimes own their own
25 hogs that they process?

CASE 0:18-cv-01776-JRT-JFD   Doc. 1447-14   Filed 08/24/22   Page 9 of 13
IN RE: PORK ANTITRUST LITIGATION                                    Taylor Cox
                              30(b)(6)                         June 02, 2022

157

```
 1         not sure how they quantify that.  I assume
 2         positive or negative.
 3   BY MR. RUGE:
 4         Q    Yeah, it's just -- I'm just -- it might
 5   seem like an obvious question --
 6         A    Yeah.
 7         Q    -- because it is.  It's --
 8         A    I mean it's --
 9         Q    -- not meant to --
10         A    It's a --
11         Q    -- elicit any -- it's just meant to say
12   that providers can use this to decide how many
13   sows, which just means they can decide to have
14   more sows or fewer sows based on this information,
15   right?
16              MR. RISSMAN:  Same objection.
17              MR. SIMON:  I'm going to, I'm going
18        to also object at this point.  I mean asking
19        the witness, who's said he doesn't have any
20        knowledge beyond what's stated in the
21        document itself, repetitive questions about
22        the same line in the document, I don't think
23        he needs to be spending his time.
24   BY MR. RUGE:
25         Q    You can answer if you understand.
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1447-14   Filed 08/24/22   Page 10 of 13
IN RE: PORK ANTITRUST LITIGATION                                Taylor Cox
30(b)(6)                                                     June 02, 2022

158

```
 1        A    Yeah, I, I understand the question.
 2   I'll just reiterate.  It's a sister program.  I
 3   have awareness of the library.  I can't speak
 4   specifically what is meant by that, but it is -- I
 5   agree it is stated there, they can decide how many
 6   sows to breed.
 7        Q    On that next sentence, "A producer may
 8   use this report to decide whether to contract with
 9   packers in regions where packers have fewer
10   numbers of swine committed for delivery," what's
11   your understanding, not -- just when you read
12   that, what do you interpret that to mean?
13              MR. RISSMAN:  Object to form.
14              MR. BERGMAN:  Form and foundation
15        objections.
16              MR. RUGE:  He has no foundation?
17        He has no foundation to interpret that
18        sentence?  That's your objection?
19              MR. RISSMAN:  I think I stated my
20        objection.  If you want to argue my
21        objection, we can stay here a little longer.
22   BY MR. RUGE:
23        Q    So plaintiffs' counsel thinks you have
24   no basis for understanding this sentence.  Do you
25   agree?
```

CASE 0:18-cv-01776-JRT-JFD   Doc. 1447-14   Filed 08/24/22   Page 11 of 13
IN RE: PORK ANTITRUST LITIGATION
30(b)(6)
Taylor Cox
June 02, 2022

159

1            MR. RISSMAN:  Object to form and
2    it's argumentative.
3            MR. BERGMAN:  I'll join my learned
4    colleague's objection.
5            MR. KENDALL:  The question might be
6    does he have any specialized knowledge that
7    any layperson reading this wouldn't have.
8            MS. COTTRELL:  I think he's --
9            MR. KENDALL:  That's the, that's
10   the sort of scope objection that I think that
11   Jeremy Simon has repeated is, you know, if a
12   document says what it says, it says what it
13   says, and if there's no basis for him to have
14   any special knowledge beyond what anybody who
15   picks it up and reads it would have, then
16   it's unclear where we go from here, because
17   it sounds like he's answered in that regard.
18   It appears to be what it says.
19           MR. RUGE:  My question still
20   stands.  I'm just asking him what -- how he
21   reads this sentence.  It's not a sentence
22   I've asked him about before, and I'm not
23   asking him for expert testimony on it.  I'm
24   just asking him how he reads it.
25           MR. KENDALL:  Okay.

160

1               MR. RISSMAN:  Form objection.
2               THE WITNESS:  Well, I believe it to
3       be another tool, as I have expressed before,
4       and they've -- the division who oversees this
5       put a couple of examples down, and again, I
6       just -- I read it as, just like our volume
7       and price reporting, this swine library being
8       another tool where it has available -- it's
9       available to everyone, and they can utilize
10      it as they see, as they see fit, and this
11      division, as they write, thought that was a
12      couple of examples on how it could be used.
13   BY MR. RUGE:
14      Q    Does AMS expect that packers may also
15   review this Swine Contract Library?
16      A    We don't have an expectation in AMS on
17   any of our data releases as to who will utilize
18   it.  If there was any expectation, it would be
19   everybody utilizes it.  It's made available -- as
20   I pointed out already, it's made available to
21   everybody.  It's very transparent and clear on our
22   AMS websites, so I believe the expectation is no
23   different than the price and volume reporting, and
24   that it's utilized by all.  If that, if that
25   includes packers, then yes.

161

1      Q    All right.  Let's talk about trade
2   association events.
3      A    Yes.
4      Q    You mentioned at the beginning this was
5   one of -- I believe you said one of the ways you
6   stay up to date on what's happening in the pork
7   and hog industry.
8           Do you attend trade association events?
9      A    I do.
10     Q    For -- that are put on by pork
11  producers?
12     A    For example, next week the National Pork
13  Producers Council will host the World Pork Expo,
14  and I will be in attendance, yes.
15     Q    Okay, and why?
16     A    Again, the majority of the agency and
17  specifically my program is built upon customer
18  service, whether that be grading services or
19  Market News services, and ensuring, if anybody has
20  any questions, we are just very available.
21          We, we can learn from -- you know, hard
22  data is one thing, but trying to understand, when
23  we see things in data as we're releasing it, to
24  understand trends and to try to -- so it's very
25  important that we are involved with our