# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>THE DIRECT PURCHASER PLAINTIFF ACTION | Case No. 18-cv-01776-JRT-JFD<br><br>Honorable John R. Tunheim<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DR. RUSSELL MANGUM** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................iv

INTRODUCTION ......................................................................................... 1

SUMMARY OF ARGUMENT.......................................................................... 3

LEGAL STANDARD .................................................................................... 6

ARGUMENT................................................................................................ 8

I.   Dr. Mangum's Testimony Regarding the Pork Industry and His Narration of
Plaintiff's Factual Allegations and Legal Theories Are Unreliable Because These
Subjects Are Outside the Scope of His Expertise. ....................................... 8

II.  Dr. Mangum Provides No Reliable Economic Analysis Sufficient to Yield a
Classwide Basis for Finding That All or Substantially All DPPs Were Impacted by
The Alleged Conspiracy.............................................................................. 11

   A.   Dr. Mangum's Regression Analysis Is Unreliable Because the Benchmark
Period Was Chosen Without Examination and Includes an Anomalous Year That
Substantially Skews the Results of Dr. Mangum's Estimated Overcharges. ...... 13

   B.   Dr. Mangum's Regression Analysis Is Further Unreliable Because Its Averaging
Methodology Conceals Critical Variations Among Direct Purchasers.............. 19

     1.   Dr. Mangum's Averaging Methodology Does Not Allow for a Finding That
Any Given DPP Was Injured by The Alleged Conspiracy. .............................. 20

     2.   Dr. Mangum's Averaging Methodology Does Not Show Classwide Impact
Because in Fact a Substantial Percentage of Top Direct Purchasers Were Not
Injured at All. ................................................................................................ 21

   C.   Dr. Mangum's Opinion That Characteristics of the Pork Packing Market
Facilitated the Success of the Alleged Conspiracy Is Unreliable Because the
Market Does Not Contain the Characteristics Dr. Mangum Asserts.................. 24

     1.   Dr. Mangum's Unexplained Decision to Examine Characteristics of the So-
Called "Pork Packing Market" Is at Odds With the Facts of This Case and the
DPPs' Theory of This Case. .......................................................................... 25

2. The Domestic Pork Supply Market Is Neither Highly Concentrated nor Dominated by Defendants. .................................................................. 28

3. No Defendant Is Fully Vertically Integrated, and Most Purchase the Overwhelming Majority of Hogs They Slaughter From Independent Producers. . ................................................................................................................ 30

4. Defendants' Purchasing Practices Do Not Confer Them With Significant Power Over the Domestic Pork Supply Market. ........................................................ 31

5. Processors and Processing Capacity Expanded Over the Course of the Alleged Conspiracy and Putative Class Periods. ........................................................... 33

D. Dr. Mangum's Correlation Analysis by Itself Is Not Common Evidence That All or Nearly All Putative Class Members Were Injured by the Alleged Conspiracy. . ................................................................................................................ 34

HB: 4885-5538-9997.6

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ................................................................. 22, 23

*Champagne Metals v. Ken-Mac Metals, Inc.*,
   458 F.3d 1073 (10th Cir. 2006) ................................................................. 27

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*,
   838 F.2d 268 (8th Cir. 1988) ..................................................................... 29

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................................... 22

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ................................................. 27, 33, 34, 37

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................ 6, 7, 8

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
   No. 2:18-cv-00923-SVW-RAO, 2019 WL 12074086 (C.D. Cal. July 1, 2019) .......... 10

*Halvorson v. Auto-Owners Ins. Co.*,
   718 F.3d 773 (8th Cir. 2013) ..................................................................... 24

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) ....................................................................... 23

*In re Fla. Cement & Concrete Antitrust Litig.*,
   No. 09-23187-CIV, 2012 WL 27668 (S.D. Fla. Jan. 3, 2012) ...................... 25

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   957 F.3d 184 (3d Cir. 2020) ...................................................................... 21

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ....................................................... 18

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. ........................................................................................ 21, 24

iv

*In re Pharmacy Benefit Managers Antitrust Litig.*,
Civil Action Nos. 06-1782, 03-4730, 06-4305, 06-4114, 06-4115, 2017 WL 275398
(E.D. Pa. Jan. 18, 2017) ................................................................................21

*In re Plastics Additives*,
No. 03-CV-2038, 2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) .............................24, 25

*In re Pork Antitrust Litig.*,
495 F.Supp.3d 753 (D. Minn. 2020)................................................................25

*In re Pre-Filled Propane Tank Antitrust Litig.*,
No. 14-02567-MD-W-GAF, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021)...........21, 22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019) ........................................................................23

*In re Wholesale Grocery Prods. Antitrust Litig.*,
946 F.3d 995 (8th Cir. 2019) ..........................................................................14

*In re Wholesale Grocery Prods. Antitrust Litig.*,
No. 09-MD-2090 ADM/TNL, 2012 WL 3031085 (D. Minn. July 25, 2012).........22, 23

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) ............................................................................7

*In re: Domestic Drywall Antitrust Litig.*,
322 F.R.D. 188 (E.D. Pa. 2017).................................................................14, 15

*Johannessohn v. Polaris Indus. Inc.*,
9 F.4th 981 (8th Cir. 2021) ............................................................................24

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)........................................................................................7

*Lauzon v. Senco Prods., Inc.*,
270 F.3d 681 (8th Cir. 2001) .......................................................................6, 7

*Marmo v. Tyson Fresh Meats, Inc.*,
457 F.3d 748 (8th Cir. 2006) ...............................................................6, 7, 33

*McMahon v. Robert Bosch Tool Corp.*,
5 F.4th 900 (8th Cir. 2021) ......................................................................6, 25

v

*Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*,
  408 F.3d 410 (8th Cir. 2005) ....................................................................... 25

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
  49 F.Supp.3d 385 (S.D.N.Y. 2014) ............................................................. 14

*Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*,
  Nos. 2:15-CV-512-WCB, 2:16-CV-198-WCB, 2017 WL 1319553
  (E.D. Tex. Apr. 10, 2017) ....................................................................... 8, 11

*S.E.C. v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) ......................................................... 11

*Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C,
  07528, 2014 WL 3558690 (N.D. Ill. July 17, 2014) ................................... 11

*Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*,
  577 F. Supp. 3d 970 (D. Minn. 2021) ............................................................ 7

*Wagner v. Hesston Corp.*,
  450 F.3d 756 (8th Cir. 2006) .................................................................... 6, 7

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
  254 F.3d 706 (8th Cir. 2001) ................................................................... 7, 10

*Winter v. Novartis Pharms. Corp.*,
  No. 06-4049-CV-C-MJW, 2012 WL 827305 (W.D. Mo. Mar. 8, 2012) ..................... 10

**Rules**

Federal Rule of Evidence 702 ................................................................... 4, 6, 8

**Other Authorities**

John H. Johnson & Gregory K. Leonard, *Rigorous Analysis of Class Certification Comes
  of Age*, 77 Antitrust L.J. 569 (2011) ............................................................ 36

Gregory J. Werden, *The Admissibility of Expert Testimony*, in 1 ISSUES IN COMPETITION
  LAW & POLICY 801, 806 (ABA Antitrust Law Section 2008) ....................... 8

HB: 4885-5538-9997.6

Defendants respectfully submit this memorandum of law in support of their motion to exclude the expert report and testimony of Dr. Russell Mangum.[1]

## **INTRODUCTION**

The Direct Purchaser Plaintiffs' ("DPPs") expert, economist Dr. Russell Mangum had to make glaring and fundamental errors in his report to reach the conclusions he reached. As a result, his opinions offered in support of class certification are unreliable, and the Court should exclude them.

Dr. Mangum's opinions can be boiled down to three analyses aimed at showing common impact: (a) a benchmark regression analysis of estimated average overcharges; (b) a qualitative assessment of purported market characteristics; and (c) a correlation analysis of prices direct purchasers paid across Defendants, products, and geographies. And there are serious problems with each of them.

As an initial matter, Dr. Mangum spends dozens of pages in his report reiterating Plaintiffs' factual narrative and theories, as though he were an industry expert. He is not, and his recitation of Plaintiffs' narrative is not only plainly improper, but also much of what he says is plainly inaccurate. Time and again, his narrative is contradicted by record evidence and actual industry experts, including Defendants' experts and third-party experts, like the Chief Economist of the USDA, as well as other agricultural economists who have been studying the industry for decades. This testimony should be excluded.

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in Defendants' Omnibus Opposition to All Class Plaintiffs' Motions for Class Certification, dated August 24, 2022 ("Defendants' Omnibus Opposition"), Dkt. 1441.

HB: 4885-5538-9997.6

Dr. Mangum's purported common impact analyses fare no better. In short, Dr. Mangum rigs his results, and a rigged study is not a reliable one. Dr. Mangum's benchmark regression analysis of estimated average overcharges is unreliable from the start because of the benchmark he chose and his failure to provide any passable explanation for that choice. Given that the cornerstone of a benchmark regression analysis is the benchmark itself, it is common sense that choosing a rigged benchmark will rig the entire analysis. That is exactly what Dr. Mangum did. His benchmark runs from January 2005 through December 2008, but as any industry expert would explain (and they have in record evidence), 2008 was an outlier year in the industry. And not just a slight outlier; it was an extreme outlier. Dr. Mangum's benchmark period capitalizes on the unprecedented nature of 2008, while ignoring the inevitable economic reaction to those factors. Indeed, when Defendants' expert Dr. Laila Haider controlled for the events of 2008, and separately when she eliminated 2008 from the benchmark period, the results of Dr. Mangum's own models are flipped, and whether any direct purchaser was impacted becomes a highly individualized inquiry that depends on what products they purchased and when. Dr. Mangum's analysis is not reliable, and it should be excluded.

Yet another key problem with Dr. Mangum's benchmark regression analysis is that he relies exclusively on averages to determine purported overcharges. The reason why is obvious: to mask direct purchasers who were not injured. Indeed, when Dr. Haider pressure-tested Dr. Mangum's overbroad averages, she discovered that accounting for even minimal differences across direct purchasers reveals a substantial percentage of them suffered no injury whatsoever under Dr. Mangum's own modeling. An analysis that is so

2

unreliable in identifying whether a direct purchaser was injured at all is inadmissible and should be excluded.

In addition, Dr. Mangum's market characteristics analysis is so unreliable and infected with outcome-determinative errors and inaccuracies that it can hardly be taken seriously. To begin with, Dr. Mangum does not even analyze the market segment where he—and the DPPs—say the conspiracy occurred. Further, his bedrock assumptions about the industry could not be more wrong. As stated above, he is not an expert in the industry, and that becomes especially clear when looking at those crucial assumptions; for example, he assumes that pork processors (the Defendants) control pork supply. Again, any industry expert, including Defendants' experts and economists at the USDA, will say that assumption is baseless, as approximately 70% of industrywide supply is controlled by independent producers. And that inaccuracy is just one of many. Dr. Mangum's market characteristics analysis must be excluded.

Finally, Dr. Mangum's correlation analysis is widely criticized junk science that fails to exclude anticompetitive conduct. To the extent he finds any correlation among prices moving together, Dr. Mangum fails to even try to determine whether those prices moved together due to the alleged anticompetitive conduct or entirely lawful reasons.

The list of problems with Dr. Mangum's analyses is long, but the conclusion is plain: his opinion must be excluded.

## SUMMARY OF ARGUMENT

Dr. Mangum's testimony arrives after two years of discovery and against a factual backdrop set forth in detail in Defendants' Omnibus Opposition and adopted here. *See* Dkt.

HB: 4885-5538-9997.6

1441 at 7-27.  The crux of Dr. Mangum's testimony is a set of three analyses aimed at showing common impact. These analyses are preceded by and interspersed with lengthy factual narrations about the pork industry and the DPPs' factual allegations, which have no underpinning in Dr. Mangum's expertise as an economist. All of the above is inadmissible under Federal Rule of Evidence 702 and should be excluded.

*First*, Dr. Mangum's testimony is admissible only to the extent it is rooted in his area of expertise (economics) and he explains how he applied that expertise to his testimony. The DPPs cannot satisfy their burden on this score as to Dr. Mangum's testimony regarding how the pork industry operates or his testimony regurgitating the DPPs' factual allegations. Consequently, those portions of Dr. Mangum's testimony should be excluded.

*Second*, Dr. Mangum's primary attempt at showing common impact, through a benchmark regression analysis of estimated average overcharges, should be excluded for several reasons. Dr. Mangum's analysis turns on his selection of the benchmark period January 2005 through December 2008 as a series of "normal" years to compare against the Alleged Conspiracy Period. But Dr. Mangum did nothing to examine whether this was an appropriate benchmark period and, in fact, 2008 was an historically unprecedented abnormal year in the pork industry. When this economic reality is accounted for within Dr. Mangum's own analysis, it is clear that his inclusion of 2008 in the benchmark period poisons his analysis by hiding the fact that whether or not any direct purchaser suffered a single overcharge during the Class Period turns on individualized questions as to what they purchased and when.

HB: 4885-5538-9997.6

In addition, Dr. Mangum's benchmark regression analysis is unreliable because it averages impact across products and purchasers over the decade-long Alleged Conspiracy Period. But average impact is not common impact because it disguises whether any given direct purchaser was injured. Indeed, when Dr. Mangum's own analysis is allowed to vary across top direct purchasers, who account for approximately 90% of Defendants' sales during the Class Period, over 50% of those direct purchasers suffered no injury whatsoever. For this reason, and because of Dr. Mangum's unjustified (and unjustifiable) inclusion of 2008 in his benchmark period, Dr. Mangum's benchmark regression analysis is unreliable and should be excluded.

*Third*, Dr. Mangum's two additional stabs at showing common impact—an analysis of purported market characteristics and a price correlation analysis—are unreliable because they do not fit the facts of this case and fail to distinguish between lawful and unlawful conduct. Specifically, Dr. Mangum's market characteristics analysis ignores key record evidence that shows he analyzes the wrong market and that, regardless, his analysis does not hold up against the market as described by actual pork industry experts. And Dr. Mangum's correlation analysis is plain pseudoscience because it makes no effort to link any price correlations to alleged anticompetitive conduct or, indeed, to any causal factor. So these two analyses—which are not standalone bases for demonstrating common impact in the first place—should be excluded because they ignore the record, ignore market realities, and do not separate lawful from unlawful conduct.

HB: 4885-5538-9997.6

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony, *McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 903 (8th Cir. 2021), and it provides that:

> A witness who is qualified as an expert … may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under the framework developed in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), "trial courts must serve as gatekeepers to insure that proffered expert testimony is both relevant and reliable." *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006) (quotation omitted). In the Eighth Circuit, "proposed expert testimony must meet three prerequisites in order to be admitted under Rule 702." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

"First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy." *Lauzon*, 270 F.3d at 686 (citation omitted) *Id*. "To show that the expert testimony is relevant, the proponent must show that the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (citing *Daubert*, 509 U.S. at 591-93).

HB: 4885-5538-9997.6

Second, the proposed witness must be qualified to assist the finder of fact, *Lauzon*, 270 F.3d at 686, and "it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge" to assist the finder of fact in deciding the specific issues in a case. *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999)).

"Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Lauzon*, 270 F.3d at 686 (citing *Daubert*, 509 U.S. at 591 (quotation omitted)). "To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Marmo*, 457 F.3d at 757-58 (citing *Daubert*, 509 U.S. at 589-90).

At the class certification stage, courts in the Eighth Circuit are tasked with "conducting a focused *Daubert* analysis which scrutinize[s] the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011). "The proposed evidence must be useful, the witness must be qualified to provide the proposed evidence, and the evidence must be reliable or trustworthy." *Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, 577 F. Supp. 3d 970, 985 (D. Minn. 2021) (Tunheim, C.J.) (citing *Lauzon*, 270 F.3d at 686). "The proponent[] of the testimony bear[s] the burden of proving its admissibility." *Id*. (citing *Wagner*, 450 F.3d at 758).

7

## <u>ARGUMENT</u>

I.     **Dr. Mangum's Testimony Regarding the Pork Industry and His Narration of Plaintiff's Factual Allegations and Legal Theories Are Unreliable Because These Subjects Are Outside the Scope of His Expertise.**

The very idea that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation … is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592 (cleaned up); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.").

So under Rule 702, "[t]estimony with purported basis in economics is admissible only to the extent that its conclusions are shown to have been derived from the application of the tools of economics, i.e., only to the extent that those conclusions are supported by economic reasoning and predicated on economic models or empirical methods used in economics." Gregory J. Werden, *The Admissibility of Expert Testimony*, in 1 Issues in Competition Law & Policy 801, 806 (ABA Antitrust Law Section 2008).[2] And "testimony from a witness qualified as an expert in aspects of economics must be excluded if the lens of economics is not employed." *Id*. at 809-10; *see also Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, Nos. 2:15-CV-512-WCB, 2:16-CV-198-WCB, 2017 WL

---

[2] For the Court's convenience, a true and correct copy of Gregory J. Werden, *The Admissibility of Expert Testimony*, in 1 Issues in Competition Law & Policy 801 (ABA Antitrust Law Section 2008) is filed contemporaneously herewith as Exhibit B to the Declaration of Christopher A. Smith.

1319553, at *8 (E.D. Tex. Apr. 10, 2017) ("Ms. Salters is not an expert in the PVC-coated conduit industry or any related field. She is an economist. As such, she may be qualified to address subjects such as the calculation of damages, but she is not qualified to speak as an expert on the PVC-coated conduit market ….").

Nevertheless, the DPPs attempt to filter an extraordinary volume of non-economic facts and analysis through Dr. Mangum, pertaining to: (a) how hogs are produced and butchered (Expert Report of Russell W. Mangum III, Ph.D., Dkt. 1330 ("Mangum Rpt.") ¶¶ 32-34); (b) pork consumption (*id.* ¶¶ 35-36); (c) how pork is packed and processed (*id.* ¶¶ 37-49); and (d) how processors source hogs (*id.* ¶¶ 50-55). And Dr. Mangum goes much further than such descriptive assessments, proceeding forth into slanted and selective attempts to (a) recount the claimed sow herd reductions at the onset of the Alleged Conspiracy Period (*id.* ¶¶ 74-78) and (b) detail the supposed "[s]cores of documents" demonstrating Defendants' purported utilization of Agri Stats to make business decisions. *Id.* ¶¶ 148-57.

In each instance, however, Dr. Mangum is neither relying on nor applying economic methods (*i.e.*, his area of expertise). Instead, he is relying on pleadings and documents produced in this case and, occasionally, industry news publications. He brings no disciplinary expertise to bear in reading and interpreting these documents. Indeed, Dr. Magnum concedes that he is not "in a unique position of [] ability" to assess the pork industry as he does "on pages 8 to 50 of [his] report" (*i.e.*, Paragraphs 19-92 of his report).

Deposition of Dr. Russell Mangum ("Mangum Dep.") 382:2-22.[3] And Dr. Mangum "can't recall somebody serving as an expert and all they do is read and interpret a document." *Id*. 62:5-25. "I don't know if that's an expert role." *Id*.

So a key threshold question as to Dr. Mangum is: "what is he an expert about?" *Wheeling Pittsburgh Steel Corp.*, 254 F.3d at 715. He may well qualify as an expert in "economic analysis and damages quantification"—the stated focus of his professional practice. Mangum Rpt. Ex. A at 1 (Dkt. 1330 at 155). But he is not qualified to displace the factfinder's role by applying non-economic spin to the evidence in this case. Dr. Mangum admits that whatever "expertise" he could be said to have in "the economics of the pork market and hog market" is "limited to the work [he has] done in this case." Mangum Dep. 38:20-39:6. "Statements not made based on expertise, but merely an expert's subjective personal interpretation, are not admissible." *Winter v. Novartis Pharms. Corp.*, No. 06-4049-CV-C-MJW, 2012 WL 827305, at *12 (W.D. Mo. Mar. 8, 2012).

Because Dr. Mangum applies no expertise when serving as a mouthpiece for the DPPs' factual allegations, those portions of Dr. Mangum's testimony—set forth in Mangum Rpt. ¶¶ 32-55, 74-78, and 148-57—are inadmissible and should be excluded. *See Grasshopper House, LLC v. Clean & Sober Media LLC*, No. 2:18-cv-00923-SVW-RAO, 2019 WL 12074086, at *3 (C.D. Cal. July 1, 2019) (citation omitted) ("Dr. Mangum is qualified to testify as an expert on economics, based on Dr. Mangum's background as an economist. … However, in Dr. Mangum's expert report, … Dr. Mangum spends extensive

---

[3] Cited excerpts of the Deposition of Dr. Russell Mangum are filed contemporaneously herewith as Exhibit A to the Declaration of Christopher A. Smith.

time discussing Cliffside's factual allegations and legal theories regarding Passages' false advertising, which exceeds the scope of a damages analysis."); *Robroy Indus.-Tex., LLC*, 2017 WL 1319553, at *3 (excluding portions of expert opinion that "contain[] what amounts to a summary of the defendant's theory of the case, supported by citations to witness depositions" because "[a]s to that evidence, she is not serving as an expert, but is simply passing along information provided by others and laying out the defendant's theory of the case" without "the application of expertise to particular subject matter within the scope of her expertise").[4]

## II. Dr. Mangum Provides No Reliable Economic Analysis Sufficient to Yield a Classwide Basis for Finding That All or Substantially All DPPs Were Impacted by The Alleged Conspiracy.

Dr. Mangum offers up three purported bases for finding classwide impact: (a) a benchmark regression analysis of estimated average overcharges; (b) a qualitative assessment of certain market characteristics; and (c) a correlation analysis of prices paid across Defendants, products, and geographies. Dr. Mangum admits that his correlation analysis is not proof of classwide impact. And caselaw makes clear that a market characteristics assessment of the kind put forward by Dr. Mangum does not establish classwide impact.

---

[4] *See also, e.g.*, *Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690, at *5 (N.D. Ill. July 17, 2014) (an expert's reading an interpretation of documents is "merely gratuitous, and would be unhelpful to a prospective jury" where the expert "does not draw on any expert qualifications or experience"); *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (citations omitted) ("It is … inappropriate for experts to become a vehicle for factual narrative" because "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise ….").

Everything therefore hinges, ultimately, on Dr. Mangum's overcharge analysis, which is unreliable for two primary reasons. *First*, Dr. Mangum failed to conduct any analysis to determine an appropriate benchmark period. Had he done any analysis, it would have been clear that 2008 does not belong in the benchmark period. And Dr. Mangum's unjustified inclusion of 2008 in the benchmark period skews the results of his overcharge analysis so significantly that impact, under that analysis, would have to be determined on a plaintiff-by-plaintiff basis, depending on what products any given direct purchaser purchased and when. *Second*, Dr. Mangum's overcharge analysis rests on estimated average overcharges across the entirety of the Alleged Conspiracy Period and all direct purchasers. Such an approach does not permit a conclusion that any individual direct purchaser suffered an overcharge. And indeed when Dr. Mangum's own analysis is permitted to vary across top direct purchasers, *approximately 25%* of top direct purchasers during the Alleged Conspiracy Period and *over 50%* of top direct purchasers during the Class Period suffered *no statistically significant overcharge*.

While these overwhelming defects in Dr. Mangum's regression analysis end the matter, there is more. In addition, Dr. Mangum's analysis of market characteristics, which he asserts shows a market conducive to conspiratorial conduct where direct purchasers could not avoid the impact of the alleged conspiracy, is legally insufficient on its own as a basis for showing common impact, and is inadmissible where, as here, it repeatedly overlooks market realities and key facts in the case. Lastly, Dr. Mangum's admittedly insufficient correlation analysis—which he acknowledges is a mere aid to inform his

regression analysis—is unreliable because it does not account for whether or not the observed correlations are the result of any alleged anticompetitive conduct.

> **A.    Dr. Mangum's Regression Analysis Is Unreliable Because the Benchmark Period Was Chosen Without Examination and Includes an Anomalous Year That Substantially Skews the Results of Dr. Mangum's Estimated Overcharges.**

Dr. Mangum proposes benchmark regression models to estimate alleged overcharges sustained by direct purchasers for a nine-and-a-half-year Alleged Conspiracy Period spanning January 1, 2009, through June 30, 2018. Mangum Rpt. ¶¶ 229-34. "In such a model, prices during the period alleged to be affected by the conspiracy are compared to prices during a 'benchmark' period, which is assumed to be unaffected by the conspiracy." *Id*. ¶ 229. Dr. Mangum estimates alleged overcharges by comparing prices paid during the Alleged Conspiracy Period with prices paid during a benchmark period from January 2005 through December 2008, after purportedly accounting for other factors that affected prices paid for the products at issue. *Id*. ¶¶ 229-34. Dr. Mangum's regression model falls incurably short for two reasons. *First*, Dr. Mangum performed no analysis to determine whether January 2005 through December 2008 is an appropriate benchmark period in the first place. *Second*, if Dr. Mangum had performed such an analysis, the facts make plain that 2008 was not a "normal" year in the pork industry, and accounting for the abnormalities shows that impact cannot be determined on a classwide basis, but instead turns on individualized inquiries as to what products direct purchasers purchased, and when, in order to assess impact on any given direct purchaser.

HB: 4885-5538-9997.6

"The benchmark period has been conceptually defined as 'normal' years against which an antitrust plaintiff compares alleged 'conspiracy years' to show the impact of the conspiracy." *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 224 (E.D. Pa. 2017). "When constructing a benchmark statistic, … some passably scientific analysis must undergird the selection of the frame of reference" in order for a regression analysis to be admissible. *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F.Supp.3d 385, 400 (S.D.N.Y. 2014) (citation omitted), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). The proponent of the regression analysis bears the burden of "demonstrate[ing] the veracity of the benchmark chosen." *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019) (affirming district court's holding that benchmark chosen by plaintiff's expert was unreliable).

Dr. Mangum's selection of a benchmark period from January 2005 through December 2008 is unreliable because *no* "passably scientific analysis"—and indeed no analysis whatsoever—formed the basis for his selection. *Reed Const. Data Inc.*, 49 F. Supp. 3d at 400. Rather, Dr. Mangum chose January 2005 as the front end of his benchmark period based on the mere fact that it was "the earliest date that multiple Defendants produced transactional data …." Mangum Rpt. ¶ 233. And he offers no explanation at all for his selection of December 2008 as the back end of his benchmark period. *Id*. The only conceivable justification presented for the selection of December 2008 as the back end of Dr. Mangum's benchmark period is that it falls before January 2009—the beginning of the Alleged Conspiracy Period. *Id*. ¶ 232. But that is no justification at all, because Dr.

Mangum performed no analysis to determine whether December 2008 was part of a "normal" year. *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. at 224.

And in reality, 2008 was no normal year at all. The economic downturn and several industry events made 2008 an unusual year for the pork industry. Expert Report of Dr. Laila Haider ("Haider Rpt.") ¶ 126.[5] For one, in 2008, per capita expenditures for pork—a proxy for the condition of pork demand—hit their lowest point during the 31-year period from 1991 to 2021. *Id*. The historically weak demand in 2008 coincided with historically high feed costs, leading to one of the most challenging times in history for hog producers. *Id*. In point of fact, industry economists contemporaneously concluded that "2008 was the worst financial year for hog producers since 1998." Deposition of Seth Meyer, Ph.D. ("Meyer Dep.") 180:20-181:4.[6] The Chief Economist of the USDA himself testified that it "makes sense to [him] as an economist" that the poor profitability the industry experienced in 2008 led to "contraction in the following year" in hog supply. *Id*. at 181:15-182:4; *see also* Deposition of Shayle Shagam ("Shagam Dep.") 101:24-104:4 (describing how 2008 was historically different from earlier years due to Great Recessing and spiking feed costs).[7] Despite industry-wide acceptance that 2008 was an extreme outlier, so much that

---

[5] The Expert Report of Dr. Laila Haider is filed contemporaneously herewith at Exhibit 1 to the Declaration of Lindsey Strang Aberg in Support of Defendants' Oppositions to Plaintiffs' Motions for Class Certification.

[6] Cited excerpts of the Deposition of Seth Meyer, Ph.D. are filed contemporaneously herewith as Exhibit E to the Declaration of Christopher A. Smith.

[7] Cited excerpts of the Deposition of Shayle Shagam are filed contemporaneously herewith as Exhibit C to the Declaration of Christopher A. Smith.

third-party economists predicted supply impact, Dr. Mangum made an unexplained choice to include it in his benchmark period.

Also troubling, Dr. Mangum acknowledges the disruptions that recessionary periods and economic shocks like COVID-19 brought to the pork industry, Mangum Rpt. ¶ 240-41, just not in 2008 because he needed to include 2008 in his benchmark period to get the regression results he wanted. Indeed, Dr. Mangum chose to account for the latter—the COVID-19 period—differently from the unprecedented decline in demand during the financial crisis in 2008. Haider Rpt. ¶ 126. For COVID-19, Dr. Mangum included an indicator variable to account for the disruption caused by the pandemic. Mangum Rpt. ¶ 241. But he did not apply the same treatment to the year 2008 in the benchmark period, when the pork industry experienced one of its worst years in decades. Haider Rpt. ¶ 126; *see also* Meyer Dep. 51:12-52:2 (Chief Economist of USDA agreeing that Great Recession reduced demand for pork because consumers earned reduced income); Shagam Dep. 123:5-124:6 (same). And by failing to account for a negative demand shock in the benchmark period, Dr. Mangum's approach artificially inflates the alleged overcharge. *Id.*

In addition to the severe economic downturn, the pork industry also experienced an unprecedented change in hog supply in 2008. Haider Rpt. ¶ 127. As a result of the circovirus vaccine, which became widely available by mid-2007, hog mortality levels decreased rapidly in the latter part of 2007 and 2008, meaning a greater percentage of pigs survived to market weight than anticipated by producers when they made breeding decisions. *Id.* USDA economists also acknowledge that the vaccine led to an increase in hog production. Shagam Dep. 166:10-15. This factor, coupled with increasing productivity

16

in hog farming, resulted in an oversupply of hogs, and hog prices fell consistently below the cost of raising hogs. *Id*. Dr. Mangum ignores the effect that the circovirus vaccine had on hog supply, hog prices, and pork prices in 2008. *Id*. In other words, he fails to account for relevant, non-conspiratorial factors that led to lower pork prices during his selected benchmark period, resulting in a suppressed average price during that period, which in turn artificially inflates any alleged overcharges. *Id*.

When these industry events are accounted for in a manner similar to how Dr. Mangum accounts for the effect of, for example, COVID-19, his estimated overcharges decline. Haider Rpt. ¶ 128-29 & Ex. 23. So Dr. Mangum's failure to account for 2008 being an anomalous year within the benchmark period results in artificially inflated overcharge estimates, and his omission of variables creates a proposed methodology that yields biased results and is unreliable for the assessment of classwide impact. *Id*. Specifically, when the industry events of 2008 are accounted for by including an indicator variable in Dr. Mangum's regression, and leaving that same regression otherwise unchanged, the estimated overcharge during the Alleged Conspiracy Period declines for ribs and shoulders, and it is negative for all other products. *Id*. And when the alleged overcharge is allowed to differ between the pre-Class Period segment of the Alleged Conspiracy Period and the Class Period itself, the result is *negative* and statistically significant overcharges for bacon, belly, and fresh ham during the Class Period. *Id*.

Further, Dr. Mangum acknowledges that his results may be sensitive to the treatment of 2008. Mangum Rpt. ¶ 232 & n.500. But he incorrectly hypothesizes that his inclusion of 2008 in the benchmark period, rather than in the Alleged Conspiracy Period,

is a "conservative" choice. Haider Rpt. ¶ 132; *see also* Mangum Rpt. ¶ 323 ("[W]hile I use January 2009 as the starting point for my Conspiracy Period indicator variable, this may be a conservative starting point for the analysis."). In fact, when 2008 is treated as part of the Alleged Conspiracy Period and Dr. Mangum's regression is otherwise unchanged, the estimated overcharge during the Alleged Conspiracy Period for *all products* is *negative* and statistically significant. Haider Rpt. ¶ 132 & Ex. 26. Further, when the alleged overcharge is allowed to differ between the pre-Class Period segment of the Alleged Conspiracy Period and the Class Period itself, the result is *negative* and statistically significant for bacon, belly, fresh ham, and ribs during the Class Period. *Id*.

Ultimately then, Dr. Mangum's overcharge estimate is highly dependent on his unexplained definition of the benchmark period and his treatment (i.e., non-treatment) of the unusual events during the year 2008. When the variables that make 2008 an abnormal year are accounted for, Dr. Mangum's analysis fails to hold water, and so too when 2008 is included in the Alleged Conspiracy Period rather than the benchmark period. Dr. Mangum's regression analysis is therefore inadmissible, not only because he undertook no passably scientific analysis to determine whether his benchmark period was an appropriate, normal frame of reference, but also because it includes a clear outlier year—2008—without justification. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 483-84 (S.D.N.Y. 2018) (holding that benchmark period which included one year "qualitatively different" than others within period rendered regression model unreliable, "[a]bsent an affirmative justification" for including it, and a "robust explanation for why" including it "does not skew the results").

18

**B.** **Dr. Mangum's Regression Analysis Is Further Unreliable Because Its Averaging Methodology Conceals Critical Variations Among Direct Purchasers.**

Dr. Mangum proposes regression models that estimate a single *average* overcharge across the Alleged Conspiracy Period for each product at issue—in this case, each primal cut—by pooling monthly sales transactions across all direct purchasers and, thus, assumes that the effects of the alleged conduct (*i.e.*, the estimated overcharges) were uniform throughout the nine-and-a-half-year Alleged Conspiracy Period and across direct purchasers. Haider Rpt. ¶¶ 143-44. As designed, these regressions do not and *cannot* establish that all or virtually all direct purchasers sustained an overcharge—*i.e.*, that all or virtually all of direct purchasers were injured by the asserted conspiracy. Haider Rpt. ¶ 141. And, when Dr. Mangum's overcharge regression is allowed to vary across the top direct purchasers (and also specifically during the Class Period), it turns out that a substantial portion of the top direct purchasers suffered *no injury* during the Alleged Conspiracy Period (*approximately 25%*), and an even larger portion sustained *no injury* during the Class Period (*nearly 53%*). *Id.*

The fact that Dr. Mangum's models do not show injury as to a substantial portion of the putative class members is fatal to his ability to offer expert testimony for at least three related reasons. *First*, Dr. Mangum's failing veils substantial variations amongst the DPPs in terms of bargaining power, as evidenced in part by how many direct purchasers have opted to pursue their own individual actions, and by who they are, *e.g.*, large foodservice companies like Sysco and US Foods, and some of the nation's biggest grocery store chains like Albertsons and Kroger. The record shows that numerous customers

19

engaged in individual negotiations with Defendants to obtain lower prices and negotiated contract terms based on their individual considerations. Haider Rpt. ¶ 114. It also shows that Defendants lowered prices to win business from competitors, including co-Defendants, and made pricing decisions based on fear of losing sales. *Id.*[8] *Second*, Dr. Mangum's averaging methodology does not simply veil variations amongst the DPPs, it fails to show that any given purchaser was injured by the supposed conspiracy. And *third*, when the veil is lifted and Dr. Mangum's own models are used as an analytical basis point, large percentages of the DPPs were not individually impacted by the conspiracy the DPPs allege.

        1.   <u>Dr. Mangum's Averaging Methodology Does Not Allow for a Finding That Any Given DPP Was Injured by The Alleged Conspiracy.</u>

Dr. Mangum's overcharge regressions do not allow for the possibility that some DPPs may have been situated so as to avoid (or negotiate away) an alleged overcharge. Haider Rpt. ¶ 143. Instead, his method assumes that either all DPPs buying the pork products at issue sustained an overcharge or none did, thus concealing whether some portion of the DPPs sustained any overcharge at all. *Id.*

Dr. Mangum's approach—relying on a purported "average overcharge" instead of assessing individual direct purchaser overcharges—has been widely criticized in antitrust economics literature. *Id.* ¶ 143 & n.260.

---

[8] Dr. Mangum conceded the individualized inquiry presented by negotiated purchases during his deposition, when testifying as to whether, on the other side of the market, Defendants exercised control over producers via their purchasing practices—something that, according to Dr. Mangum, would depend on the contractual terms of the purchases. Mangum Dep. 92:15-97:3, 463:23-464:25.

And "[n]umerous courts have rejected the use of average price differentials to show evidence of antitrust impact that is common to the class." *In re Pharmacy Benefit Managers Antitrust Litig.*, Civil Action Nos. 06-1782, 03-4730, 06-4305, 06-4114, 06-4115, 2017 WL 275398, at *21 (E.D. Pa. Jan. 18, 2017) (collecting authority); *see also, e.g.*, *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 192-94 (3d Cir. 2020) (holding that district court abused its discretion by finding common impact based on average hypothetical price paid by direct purchasers in market characterized by, among other things, individual negotiations); *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *9-10 (W.D. Mo. Nov. 9, 2021) (holding that average overcharge regression was not a sufficient basis to find predominance, because it did not employ evidence "capable of demonstrating that any given purchaser was overcharged" and, instead, concealed pricing variation among purchasers); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. at 321 (regression analysis that applied common overcharge across all purchasers and product models throughout entire class period could not "establish that all (or nearly all) members of the class suffered damage as a result of defendants' alleged anti-competitive conduct" because it "assume[d] the very proposition that the DPPs are now offering it, in part, to show").

This Court should follow suit and hold that Dr. Mangum's averaging methodology is not a reliable method of showing common impact.

      2.    <u>Dr. Mangum's Averaging Methodology Does Not Show Classwide Impact Because in Fact a Substantial Percentage of Top Direct Purchasers Were Not Injured at All.</u>

Dr. Mangum's regression models do not aid the DPPs unless the models show that "impact can be proven … for *all class members* with the same evidence." *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2012 WL 3031085, at *11 (D. Minn. July 25, 2012) (citing *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005); emphasis added)), *aff'd*, 752 F.3d 728 (8th Cir. 2014). Without such proof, the DPPs cannot establish predominance under Rule 23(b)(3). *Comcast Corp. v. Behrend*, 569 U.S. 27, 36-38 (2013); *see also In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089, at *4 (citing authority) ("Predominance is lacking in circumstances where a plaintiff's common proof of impact fails to show that all or nearly all class members were in fact injured."). Dr. Mangum's regression models fall well short of the impact showing required under this standard.

Dr. Mangum pools monthly sales transactions to estimate a single overcharge across all direct purchasers. Haider Rpt. ¶ 144. But when his estimated overcharge is allowed to vary across each of the hundreds of top direct purchasers during the Alleged Conspiracy Period, using data on actual prices paid, 174 of the 694 top direct purchasers—*i.e.*, *approximately 25% of top direct purchasers—sustained no positive and statistically significant overcharge*. *Id.* ¶ 145 & Ex. 31.[9] More specifically, during the Alleged Conspiracy Period, 119 of the top direct purchasers' overcharges were not statistically significant and thus, as a matter of basic statistics, their positive results say nothing, while 13 of the top direct purchasers actually had negative and statistically significant

---

[9] These 694 top direct purchasers account for 90.4% of the Defendants' sales during the Class Period. Haider Rpt. ¶ 146 n.271.

overcharges, and 42 more had negative and not statistically significant overcharges. *Id*. Examples of top direct purchasers with no positive and statistically significant overcharges during the Alleged Conspiracy Period include Publix Supermarket, Aldi, Boar's Head, Meijer, and Target. *Id*.

Worse, applying the same analysis to top direct purchasers during the Class Period, 367 of the 694 top direct purchasers—*i.e.*, *nearly 53% of top direct purchasers—sustained no positive and statistically significant overcharge. Id*. ¶ 146 & Ex. 31. More specifically during the Class Period, there are 213 direct purchasers with positive and not statistically significant overcharges, 111 with negative and not statistically significant overcharges, and 43 with negative and statistically significant overcharges. *Id*. Examples of top purchasers with no positive and statistically significant overcharges include Sam's Club, Publix Supermarket, Aldi, Boar's Head, Save A Lot, and Meijer.

This number of uninjured putative class members negates any notion that Dr. Mangum's regression models show that impact can be proven for all class members with the same evidence. *In re Wholesale Grocery Prods. Antitrust Litig.*, 2012 WL 3031085, at *11 (citing *Blades*, 400 F.3d at 566); *see also, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623-26 (D.C. Cir. 2019) (discussing authority) (predominance not established where evidence showed that 12.7% of putative class members were not injured—a "percent figure … more than twice th[e] approximate upper bound [of uninjured class members] reflected in analogous caselaw"); *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) (holding that class where 10% of members were uninjured could not be certified because individualized injury inquiries would

predominate); *In re Plastics Additives*, No. 03-CV-2038, 2010 WL 3431837, at *19 (E.D. Pa. Aug. 31, 2010) ("Dr. Beyer admits that his regressions are not necessarily representative of individual class member experience, and unrefuted evidence shows that some class members suffered impact while others did not. We therefore find that Plaintiffs cannot rely on Dr. Beyer's regressions to demonstrate impact on a basis common to the class.").[10]

## C.   Dr. Mangum's Opinion That Characteristics of the Pork Packing Market Facilitated the Success of the Alleged Conspiracy Is Unreliable Because the Market Does Not Contain the Characteristics Dr. Mangum Asserts.

Dr. Mangum relies heavily on supposed characteristics of the "pork packing market" as the basis for his opinion that the alleged conspiracy had classwide impact. *See* Mangum Rpt. ¶¶ 94-168. Market characteristics purportedly conducive to anticompetitive activity "may be preconditions for any colorable case of class-wide impact, [but] they *do not* establish such impact." *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 320 (N.D. Cal. 2014) (emphasis added). And even as preconditions to establishing impact, market conditions are relevant *only* if it is "show[n] that the market at issue here possesses

---

[10] Although the Eighth Circuit has not, insofar as Defendants are aware, framed the issue of uninjured class members in quite the same manner appellate courts like the D.C. Circuit and First Circuit have, the Eighth Circuit has expressed similar concerns as to the issue, but framed them in relation to Article III standing. *See Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 987-88 (8th Cir. 2021) (holding that class could not be certified on Article III standing grounds where all putative class members claimed economic injury resulting from product defect but not all purchasers were injured by that defect); *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779-80 (8th Cir. 2013) (holding that class must be defined such that anyone within it would have standing, and reversing grant of class certification because "individual inquiries" necessary to determine which class members were uninjured "overwhelm[ed] questions common to the class").

those characteristics" asserted. *In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23187-CIV, 2012 WL 27668, at *11 (S.D. Fla. Jan. 3, 2012); *see also In re Plastics Additives Antitrust Litig.*, No 03-CV-2038, 2010 WL 343187, at *7 (E.D. Pa. Aug. 31, 2010) (stating that plaintiffs cannot demonstrate classwide impact based on market characteristics if "the markets at issue … do not actually possess those characteristics"). Dr. Mangum wrongly frames the market itself and, however the market is framed, Dr. Mangum ignored readily available—including publicly available—evidence time and again to mischaracterize numerous key features of the market. His market assessment must therefore be excluded because "[a]n expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported" and offers no assistance to the finder of fact. *McMahon*, 5 F.4th at 903 (quoting *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005)).

     1.    <u>Dr. Mangum's Unexplained Decision to Examine Characteristics of the So-Called "Pork Packing Market" Is at Odds With the Facts of This Case and the DPPs' Theory of This Case.</u>

The DPPs' theory of this case is that Defendants agreed to limit the domestic supply of pork, by cutting back production of hogs and increasing exports of pork, in order to artificially inflate pork prices. *See In re Pork Antitrust Litig.*, 495 F.Supp.3d 753, 769-72 (D. Minn. 2020) (holding that DPPs plausibly alleged parallel conduct amongst Defendants on the basis of certain Defendants' purported reductions in sow-herd size and others' claimed increases in export sales). So according to the DPPs, Defendants implemented the alleged conspiracy in the upstream hog market, where hogs are grown and raised, and in the downstream pork market, where hogs are processed and pork is sold.

Dr. Mangum conceded this when describing the market as he understands it. *See* Mangum Dep. 37:23-38:19 ("If I refer to a market, it means the sales of something including how that was procured, whether it was assembled or manufactured or grown, et cetera. But this also would apply in this case to the hog market, and as I talk about it in my report, the elements of raising pigs and then selling them downstream to someone who will be processing pigs."); Mangum Dep. 78:14-25:

> Q    Is the pork market the same as the hog market?
>
> A    No, not how I have described it in my report and how I understand it's described in the industry.
>
> Q    What is the distinction between the pork market on the one hand and the hog market on the other?
>
> A    Pork is sale of meat which is processed, butchered from whole animals. The hog market has to do with selling whole animals.

*Id*.

Yet, Dr. Mangum chose to evaluate neither the upstream hog market, nor the downstream pork market, but instead (and without economic justification) the so-called "pork packing market." *See* Mangum Rpt. ¶ 94 (noting as to Mangum Rpt. ¶¶ 95-179: "I discuss and evaluate [therein] how characteristics of the pork packing market during this relevant time period facilitated the formation, survival, and effectiveness of Defendants' alleged conspiracy"). Dr. Mangum's unexplained selection of this market, in lieu of the alleged markets at issue per the theory the DPPs pled and are pursuing, does not fit the facts of this case.

In this case, to properly examine the market in which the alleged conspiracy took place, it is critical to assess Defendants' position within—and the pertinent characteristics

of—the domestic pork supply market as a whole. The market under examination must be sufficiently expansive to encompass the upstream hog and the downstream pork markets— and not merely the artificially narrow "pork packing market" that Dr. Mangum purports to examine—because the DPPs allege that Defendants took actions to restrict domestic supply both upstream and downstream. Dr. Mangum does not account for his failure to get the market right in the first instance, so his attempt to show classwide impact via market characteristics is inadmissible right out of the gate. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (an expert's opinion in antitrust disputes must "incorporate all aspects of the economic reality of the … market" at issue); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1079-80 (10th Cir. 2006) (affirming district court's exclusion of economics expert who offered no explanation for his use of defendants' downstream market share as an indicator of their upstream market share, where alleged anticompetitive conduct occurred in upstream market).

Moreover, when the focus is properly placed on the domestic pork supply market as a whole, it is clear the market does not possess multiple, critical characteristics Dr. Mangum claims are present. And the same failings hold in many instances even if Dr. Mangum's market framing is accepted as true. The only market characteristics that hold up against the evidence—that pork might be a commodity or commodity-like product, that Defendants were subscribers to Agri Stats, and that Defendants are members of certain trade associations—do nothing to demonstrate the alleged conspiracy had classwide impact.

27

2.     The Domestic Pork Supply Market Is Neither Highly Concentrated
nor Dominated by Defendants.

The domestic pork supply market is neither highly concentrated nor dominated by

Defendants. Dr. Mangum is only able to reach such a conclusion by "[u]sing slaughter

capacity as a proxy for actual production," Mangum Rpt. ¶ 105, without explaining how or

why that "proxy" makes economic sense, reflects economic reality, or is consistent with

the DPPs' theory of liability.[11]

Processors (or packers) are an element of the domestic pork supply market, in the

business of slaughtering and breaking down the carcasses of finished hogs that producers

sell to them. Expert Report of James Mintert, Ph.D. ("Mintert Rpt.") ¶ 29;[12] *see also*

Shagam Dep. 41:4-42:3 ("[B]y 'packers,' I am using the companies that are providing the

---

[11] Indeed, as Dr. Mangum describes matters, slaughter capacity is only a sliver of the whole
picture underpinning the DPPs' theory of liability as he understands it:

> As a matter of economics, reducing or restricting the supply of pork has the
> effect of raising prices. Defendants could impact the supply of pork in the
> United States in several ways. First, Defendants have significant influence—
> either through direct ownership or through extensive contracting—over the
> volume of hogs that are raised domestically. If Defendants reduce or restrict
> growth in hog raising, that will necessarily lead to a reduction in the amount
> of pork that can be produced. Second, Defendants could reduce packing
> capacity, thereby reducing the total amount of pork that enters the
> marketplace. Third, Defendants could limit the amount of pork available to
> U.S. customers by increasing the share of domestic production that is
> exported to other countries.

Mangum Rpt. ¶ 73; *see also* Mangum Dep. 171:17-23 ("Paragraph 73 [of my report] is
talking generally about the domestic supply of pork, right? And, you know, factors that
could affect them. The paragraph speaks for itself.").

[12] The Expert Report of James Mintert, Ph.D. is filed contemporaneously herewith at
Exhibit 2 to the Declaration of Lindsey Strang Aberg in Support of Defendants'
Oppositions to Plaintiffs' Motions for Class Certification.

facilities, buy the live animals or arrange for the live animals to be delivered to the slaughter plant, kill those animals, and then sell the meat further on up the, up the chain."); Deposition of Taylor Cox ("Cox Dep.") 37:21-23 (testifying that a packer is a processor of meat).[13] Processors source their hogs from many different producers that operate under a variety of business models, ranging from small, family-owned farms, to large sow operations, to vertically integrated farms owned by processors. *Id.* ¶ 38.

In 2009, the first year of the Alleged Conspiracy Period, the majority of U.S. hog production was dispersed across more than 60,000 different entities. *Id.* ¶ 50. And throughout the Alleged Conspiracy Period and the Class Period, according to the USDA, almost 70% of total hogs purchased by processors (*i.e.*, all processors, including but not limited to Defendants) were owned and/or sold by these producers, not by processors generally or Defendants specifically. Mintert Rpt. ¶ 57 & Table 2; *see also* Shagam Dep. 177:1-16 (testifying that approximately 75% of hogs being slaughtered are purchased by packers from producers); Cox Dep. 77:5-78:5 (testifying that, from 2008 to 2016, approximately 70% of hogs sold for slaughter in the United States were producer-owned, not packer-owned). So Defendants' level of power within or control over the domestic pork supply market is not significant. *See City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 279 (8th Cir. 1988) ("Ninety percent of the market is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not." (cleaned up)).

---

[13] Cited excerpts of the Deposition of Taylor Cox are filed contemporaneously herewith as Exhibit D to the Declaration of Christopher A. Smith.

3.    <u>No Defendant Is Fully Vertically Integrated, and Most Purchase the Overwhelming Majority of Hogs They Slaughter From Independent Producers.</u>

Contrary to Dr. Mangum's assessment, Defendants are not "heavily involved in the hog production stage … through … vertical integration …." Mangum Rpt. ¶ 108. In the agricultural context, the USDA defines vertical integration as a mechanism that combines the farm and downstream use of a commodity under single ownership. Mintert Rpt. ¶ 41. "For example, a winery may own and operate vineyards, a citrus processor may own and operate orange groves, and a meatpacker may own and operate hog farms or cattle feedlots." *Id*. (quotation omitted); *see also* Haider Rpt. ¶ 64 n. 70 ("A firm that participates in more than one successive stage of the production or distribution of goods and services is vertically integrated. Nonvertically integrated firms buy the inputs or services they need for their production or distribution processes from other firms" (quoting Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 395 (4th ed. 2005)).

Defendants here are not significantly vertically integrated because, during the Class Period, Defendants collectively purchased approximately 75% of the hogs they slaughtered. Mintert Rpt. ¶ 57 & Table 2. Moreover, no single Defendant is purely vertically integrated, Mintert Rpt. ¶ 54, and four of the six Defendants (Hormel, JBS, Triumph, and Tyson) owned fewer than 15% of the hogs they slaughtered during the Alleged Conspiracy Period. Haider Rpt. ¶ 24. Dr. Mangum acknowledges this:

> [T]here are packers that are much more heavily vertically integrated and some that are not very vertically integrated at all – formally by the idea of, you know, owning, raising for themselves, and then basically internally supplying the hogs for themselves when they, you know, make things to sell in the pork market.

Mangum. Dep. 110:11-111:6. And he similarly admits that none of the Defendants is "close to a hundred percent vertically integrated" and that some Defendants purchased close to 100% of the hogs they slaughtered. *Id.* 109:18-111:6.

> 4. Defendants' Purchasing Practices Do Not Confer Them With Significant Power Over the Domestic Pork Supply Market.

Defendants' hog procurement practices—their purported "buyer power" (Mangum Rpt. ¶ 108)—do not confer them with power or control over hog supply in lieu of their relatively insignificant levels of direct ownership and vertical integration. Dr. Mangum claims otherwise based on a fundamental misunderstanding of how Defendants purchased hogs during the Alleged Conspiracy Period and the terms of the contracts pursuant to which they purchased.

The overwhelming majority of procurement during the Alleged Conspiracy Period was done via so-called "marketing contracts," which are non-exclusive, provide that hogs are producer-owned prior to being sold for slaughter, and do not place a cap on the number of hogs a producer can produce. Mintert Rpt. ¶¶ 60-78; *see also* Haider Rpt. ¶ 67 ("Under marketing contracts, pork processors do not own the hogs and do not control the supply of the independent producers they contract with. … [T]he evidence I have reviewed suggests that marketing contracts are typically non-exclusive, specify minimum purchase volumes, sometimes over a long time horizon, and may include penalties if either party defaults (for example by not supplying or purchasing the agreed upon number of hogs)."). Dr. Mangum concedes the crux of this, *e.g.*, non-exclusivity, when it suits him: "The commodity-like nature of pork is supported by the fact that hog growers—especially larger ones—supplied

31

multiple Defendants, often simultaneously." Mangum Rpt. ¶ 136; *see also* Mangum Dep. 111:7-112:11 ("But I do understand that it's not uncommon for farmers to have more than one packer that they would sell to."). Dr. Mangum fails to appreciate, however, that this fact evidences the growers' bargaining power, not the Defendants'.

Moreover, the facts evidencing the core characteristics of marketing contracts in the domestic pork supply market are readily found in the USDA's Swine Contract Library, which catalogs a representative sample of processor-producer contracts and contains a Contract Summary Report that summarizes actual provisions contained in such contracts. Mintert Rpt. ¶ 65. Dr. Mangum admits that whether "a contract can effectively amount to the same thing as ownership" depends on "the contents of the contract." Mangum Dep. 98:17-99:22. But Dr. Mangum did not look at this publicly available USDA database, or even the entirety of the record. Instead, he cherry-picked for review a handful of contracts, cited in Footnote 235 of his report, to support the proposition that Defendants made "*extensive* use" of contracts that "burden the grower with restrictions" and grant Defendants "a degree of control over the hog supply beyond what their individual shares in the hog market suggest." Mangum Rpt. ¶ 111 & n.235 (emphasis added). When asked why he "rel[ied] on a selection of contracts as opposed to an inventory of all contracts[,]" Dr. Mangum stated that the "contracts that [he] found met [his] needs of finding examples of the contracts that are out there" and ultimately admitted that he "doesn't know what is in" the USDA's Swine Contract Library. Mangum Dep. 470:21-472:15.

HB: 4885-5538-9997.6

In sum, Dr. Mangum analyzed his chosen contracts not because those contracts actually evidence "extensive use" of those contracts, but rather because he had already concluded as much, despite the evidence, and felt the need to cite something:

> Q. Why did you review the contracts that are listed in footnote 235 in particular, Dr. Mangum?
>
> A. I think what I was looking for is I had an idea of the exemplar type of terms that I believe were things that were restrictive on the growers, right? -- to meet the requirements of the buyers. And once I remember from the review of documents that me and my staff found, I thought, okay, well, if we are going to list those terms that we came up, the examples of those type of terms, let's -- I said let's just make sure we actually then cite two documents, contracts, that have those terms we are talking about. So that was the goal. It started with the list, and then we said let's find contracts that mention these terms.

Mangum Dep. 465:21-466:17. This type of "expert analysis," unsupported by sufficient facts and contrary to available evidence, is impermissible and inadmissible. *Marmo*, 457 F.3d at 758; *Concord Boat Corp.*, 207 F.3d at 1057.

5.   Processors and Processing Capacity Expanded Over the Course of the Alleged Conspiracy and Putative Class Periods.

Dr. Mangum overlooks, and sometimes flat-out ignores, key industry facts to suggest that there were significant barriers to entry during the Alleged Conspiracy Period, and especially during the Class Period. *See* Mangum Rpt. ¶ 141 (stating among other things that "cartels are more likely to be effective when there are significant barriers to entry" as these "can discourage expansion or prevent new firms from coming into the marketplace"). To the contrary, there was an overall increase in domestic slaughter capacity over the course of the alleged conspiracy, as processors made significant investments to increase capacity and new plants opened. Haider Rpt. ¶ 47; Mintert Rpt. ¶ 162-68 & Exs. 25-27.

33

Processing capacity trended upward from 2000-2018, including during the alleged conspiracy and Class Periods, and capacity utilization was stable and consistently above 90%. Mintert Rpt. ¶¶ 163-65 & Ex. 24. From 2009-2018, the industry added capacity to slaughter an estimated additional 12.4 million head per year. *Id*. ¶ 164.

Two particularly notable examples of investment to expand capacity were the openings of Clemens's Coldwater, Michigan plant and Seaboard Triumph Foods' (a joint venture between Seaboard and Triumph) plant in Sioux City, Iowa, both in September 2017. In addition, five non-Defendant processors opened plants during the Alleged Conspiracy Period. *Id*. ¶ 164. Indeed, Dr. Mangum himself describes the openings of "[t]hree large, state-of-the-art plaints built in the Midwest between 2017 and 2019"—the aforementioned Clemens and Seaboard Triumph Foods plants, and a third built by non-Defendant Prestage Farms in Mason City, Iowa—thus effectively admitting that industry processing capacity increased during the Class Period. Mangum Rpt. ¶ 143.

Dr. Mangum's contention that expansion was depressed or discouraged by barriers to entry in the market, particularly during the Class Period, is thus divorced from the facts and properly excluded. *See Concord Boat Corp.*, 207 F.3d at 1056 (emphasizing that, "[i]f a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate").

### D. Dr. Mangum's Correlation Analysis by Itself Is Not Common Evidence That All or Nearly All Putative Class Members Were Injured by the Alleged Conspiracy.

In addition to purporting to assess market characteristics and proposing a set of regression models, Dr. Mangum puts forward a correlation analysis, which he claims "can

be helpful in shedding light on the question of whether all or virtually all customers would likely be affected by the alleged conspiracy." Mangum Rpt. ¶ 200. But Dr. Mangum himself recognizes that "correlation analysis is not, on its own, conclusive 'proof' of anticompetitive impact" and instead a means of "help[ing] inform other areas of analysis, like regression modeling." Mangum Rpt. ¶ 202. Here that makes his correlation analysis a moot point, given the fatal deficiencies in his regression analysis. *See supra* pp. 13-24 (explaining why Dr. Mangum's regression models fail as reliable methods of showing common impact on a classwide basis).

Regardless, Dr. Mangum's standalone correlation analysis is not instructive as to direct purchaser impact and fails to show that no customer would have been able to avoid an overcharge. Haider Rpt. ¶ 156, 158. Using customer- and product-specific pricing, there is actually a *lack* of a common price response among purchasers following certain actions related to the alleged conspiracy and major industry events during the Alleged Conspiracy Period. *Id*. ¶ 156. Specifically, there was a lack of a common price response among the DPPs, within any one Defendant and also across Defendants, in response to the onset of the Alleged Conspiracy Period in January 2009. Haider Rpt. ¶ 164-67 & Exs. 32-33 & App'x D. Instead, prices paid for pork products by the DPPs within any one Defendant and also across Defendants moved in different directions following January 2009. *Id*. The same holds true in response to the outbreak of the H1N1 virus (commonly referred to as "swine flu") in 2009. *Id*. ¶ 140. And in response to the outbreak of the porcine epidemic diarrhea virus (PEDv) in 2013-2014, although there were higher prices for a large majority of

customer-product combinations following the outbreak, this was not the case across the board for all DPPs and all pork products. *Id*. ¶ 147.

But of course, it is not Defendants' burden to unmask the lack of common price response in relation to the alleged conspiracy (and to non-conspiratorial triggers). Ultimately, Dr. Mangum's showing that aggregate price indices are correlated with one another is not informative of direct purchaser impact because highly aggregated prices may well track each other over time because of, for example, seasonality and industry events, as Dr. Mangum himself recognizes, even when individual customers paid different prices and experienced different price movements. Haider Rpt. ¶ 130 (citing Mangum Rpt. ¶¶ 244-245 & 247). The analysis does not address the relevant question of whether the alleged conduct affected prices paid by all or virtually all customers. *Id*. This is because, even generally speaking, the question is not whether there are some similar factors that influenced prices paid by different customers for pork products at issue; rather, the question is whether prices paid by all or virtually all customers were higher as a result of the alleged conduct. *Id*.

Ultimately, "plaintiffs commit a basic error in logic when they attempt to infer from a correlation between two prices, often driven by one or more common factors unrelated to the alleged conduct, that the alleged conduct itself would have a common impact." *Id*. ¶ 130 n.335 (quoting John H. Johnson & Gregory K. Leonard, *Rigorous Analysis of Class Certification Comes of Age*, 77 Antitrust L.J. 569, 585 (2011)). And Dr. Mangum does not purport to show that his price correlations tie back to the alleged conspiracy, *i.e.*, his

HB: 4885-5538-9997.6

correlation analysis does nothing to "separate lawful from unlawful conduct" and should therefore be excluded. *Concord Boat Corp.*, 207 F.3d at 1057.


Dated: August 24, 2022                              Respectfully submitted,

                                                    /s/ Christopher A. Smith
                                                    Aaron Chapin (#0386606)
                                                    Christopher A. Smith (*pro hac vice*)
                                                    Tessa K. Jacob (*pro hac vice*)
                                                    A. James Spung (*pro hac vice*)
                                                    Jason Husgen (*pro hac vice*)
                                                    Sarah L. Zimmerman (MDL registered)
                                                    Kate Ledden (MDL registered)
                                                    Tanner Cook (MDL registered)
                                                    HUSCH BLACKWELL LLP
                                                    190 Carondelet Plaza, Ste 600
                                                    St. Louis, MO 63105
                                                    Telephone: (314) 480-1500
                                                    aaron.chapin@huschblackwell.com
                                                    chris.smith@huschblackwell.com
                                                    tessa.jacob@huschblackwell.com
                                                    james.spung@huschblackwell.com
                                                    jason.husgen@huschblackwell.com
                                                    sarah.zimmerman@huschblackwell.com
                                                    kate.ledden@huschblackwell.com
                                                    tanner.cook@huschblackwell.com

                                                    **Counsel for Triumph Foods, LLC**
/s/ Mark L. Johnson                                 /s/ Craig. S. Coleman
Mark L. Johnson (#0345520)                          Richard A. Duncan (#0192983)
Davida S. McGhee (#0400175)                         Aaron D. Van Oort (#0315539)
GREENE ESPEL PLLP                                   Craig S. Coleman (#0325491)
222 South Ninth Street, Suite 2200                  Emily E. Chow (#0388239)
Minneapolis, MN 55402                               Isaac B. Hall (#0395398)
(612) 373-0830                                      FAEGRE DRINKER BIDDLE & REATH
mjohnson@greeneespel.com                            LLP
dwilliams@greeneespel.com                           2200 Wells Fargo Center
                                                    90 South Seventh Street
Daniel Laytin, P.C. (*pro hac vice*)                Minneapolis, MN 55402-3901
Christa Cottrell, P.C. (*pro hac vice*)             (612) 766-7000

HB: 4885-5538-9997.6

Jenna Stupar (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
jenna.stupar@kirkland.com

**Counsel for Clemens Food Group, LLC and The Clemens Family Corporation**

richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund (*pro hac vice*)
Stephanie A. Koltookian (*pro hac vice*)
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE &
REATH LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

Jonathan H. Todt (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

John S. Yi (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

**Counsel for Hormel Foods Corporation**

/s/ *Peter H. Walsh*
Peter H. Walsh (#0388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
(612) 402-3000
peter.walsh@hoganlovells.com

/s/  Tiffany Rider Rohrbaugh
Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW

HB: 4885-5538-9997.6

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

**Counsel for Agri Stats, Inc.**

Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com
lstrang@axinn.com
avissichelli@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

Craig M. Reiser (*pro hac vice*)
Kail Jethmalani (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
creiser@axinn.com
kjethmalani@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

**Counsel for Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc.**

*/s/ Peter J. Schwingler*
William L. Greene (#0198730)
Peter J. Schwingler (#0388909)
William D. Thomson (#0396743)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500

39

william.greene@stinson.com
peter.schwingler@stinson.com
william.thomson@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

***Counsel for Seaboard Foods LLC and
Seaboard Corporation***