**EXHIBIT
A**

**In the Matter Of:**

*In Re - Pork Antitrust Litigation*

*RUSSELL MANGUM*

*July 13, 2022*



10

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2          THE VIDEOGRAPHER:  We are on

3      the record on July 13, 2022, at

4      9:10 a.m. Pacific Time for the

5      remote deposition of Dr. Russell

6      Mangum, in the matter of In Re:

7      Pork Antitrust Litigation.

8          My name is Caylob Suarez and I

9      am the videographer and document

10     technician on behalf of Lexitas.

11         All present will be noted on

12     the stenographic record.

13         Will the court reporter please

14     swear in the witness.

15

16   DR. RUSSELL MANGUM, Testifies under penalty

17   of perjury as follows:

18         THE WITNESS:  I do.

19

20                 EXAMINATION

21   BY MR. REISER:

22       Q    Good morning, Dr. Mangum.  My

23   name is Craig Reiser.  I represent the

24   Tyson defendants.

25             How are you doing this

36

1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2              So what you just described I

3    think was work you have done as an expert

4    witness; is that fair?

5              MR. POUYA:  Objection to form.

6         Misstates the testimony.

7              MR. REISER:  Have I misstated

8         the testimony, Dr. Mangum?

9              THE WITNESS:  I think I have

10        two questions before me.  I think I

11        will answer your -- your -- the

12        last question you had for me, which

13        I think was in response to an

14        objection by Mr. Pouya.

15             I have talked in my last

16        answers about things that were

17        beyond just litigation, although my

18        last answer I did highlight items

19        and elements of my experience and

20        training that were related to

21        litigation.

22   BY MR. REISER:

23        Q    Have you ever taken courses

24   in the production of pork products?

25        A    I have not taken a course or

37

1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2     given a course that was limited to the

3     production of pork, no.

4         Q     You anticipated my next

5     question, so I don't have to go there.

6                 Are you hoping to offer an

7     expert opinion on this case on hog

8     growing, Dr. Mangum?

9             MR. POUYA:  Objection to form.

10            THE WITNESS:  I don't

11       personally have any hopes for

12       offering opinions.  I have rendered

13       opinions and I understand I might

14       be asked to testify or take further

15       steps in litigation process.

16            The opinions as I have

17       described them are listed in my

18       report, but they -- they will

19       relate -- and as you can see in my

20       report -- they do relate to hog

21       production, yes.

22    BY MR. REISER:

23        Q     Are you an expert in hog

24     growing, Dr. Mangum?

25            A     I believe I am an expert in

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2    the economics of the pork market,

3    including the way that market operates,

4    including mechanisms and economic factors

5    that affect both the downstream and

6    upstream elements of that pork market,

7    including the hog market.

8          Q     The hog growing market?

9          A     That's what I meant.  Yes.

10               In other words, if I refer to

11   a market, it means the sales of something

12   including how that was procured, whether

13   it was assembled or manufactured or grown,

14   et cetera.  But this also would apply in

15   this case to the hog market, and as I talk

16   about it in my report, the elements of

17   raising pigs and then selling them

18   downstream to someone who will be

19   processing pigs.

20         Q     Excluding from your answer

21   whatever work you have done in connection

22   with this case, what expertise, if any, do

23   you have in hog growing?

24               MR. POUYA:  Objection.  Form.

25               THE WITNESS:  The expertise in

39

 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2       the economics of the pork market

 3       and the hog market, which includes

 4       growing the hogs is, I believe,

 5       limited to the work I have done in

 6       this case.

 7   BY MR. REISER:

 8       Q     What about pork packing,

 9   Dr. Mangum, are you an expert on that?

10       A     I think I am an expert in the

11   economics of the pork market, including

12   the process of packing and what economic

13   factors relate to packing of pork and

14   acquiring necessary inputs for packing of

15   pork, et cetera.

16       Q     And excluding from your

17   answer whatever work you have done in

18   connection with this case, what expertise

19   if any, do you have in pork packing?

20       MR. POUYA:  Objection to form.

21     Asked and answered.

22       MR. REISER:  No, it wasn't

23     asked nor was it answered.

24       Go ahead, Dr. Mangum.

25       MR. POUYA:  I am going to

40

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL
 2       disagree with that.
 3            MR. REISER:  You can disagree
 4       all you want but I would like an
 5       answer to that question.
 6            THE WITNESS:  As I mentioned
 7       earlier when you asked and I
 8       answered, I toured a pork
 9       processing facility outside of the
10       context of this case; that was part
11       of my process of analyzing, you
12       know, what happened, understanding
13       the processes, the inputs, the
14       mechanisms and machinery of that
15       processing.
16   BY MR. REISER:
17       Q    Why did you tour a pork
18   processing facility, Dr. Mangum?
19       A    The allegations in that case,
20   as part of my preparation and forming of
21   my opinions, I wanted to know about the
22   machinery and equipment and the process by
23   which, you know, elements, inputs in this
24   case hogs, come into a facility and they
25   are processed, and then obviously leave
```

1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2         A    No, I wouldn't be able to

3    describe that just by that phrase.

4         Q    You are not aware of the

5    Securities Act of 1933?

6              MR. POUYA:  Objection to form.

7              THE WITNESS:  No.  I am aware

8       of that.  I teach about it.  I tell

9       students what the meaning was.  I

10      didn't know what you meant by "the

11      '33 Act."  I didn't know what that

12      was.

13   BY MR. REISER:

14        Q    But it's not something that

15   you are an expert in, right?

16        A    Well, it's undergraduate

17   students seeking degrees in economics that

18   learn from me about the existence of the

19   Securities and Exchange Act.  Initially,

20   as far as I think there was expansions

21   beyond like one year later about what it

22   would apply to in secondary markets.  So I

23   talk about that.

24              But if someone said, hey,

25   great, come to my whole firm, my public

62

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2    company, and you will be everything I need

3    to know about that act, I would say I am

4    not a holistic expert on that.

5         Q     Are you an expert in reading

6    documents and interpreting them,

7    Dr. Mangum?

8          MR. POUYA:  Objection to form.

9          THE WITNESS:  I do read

10      documents and I interpret them,

11      given my training as an economist

12      as part of the work I have done and

13      my education and my training, being

14      an expert.

15          I wouldn't think -- I can't

16      recall somebody serving as an

17      expert and all they do is read and

18      interpret a document.  I don't know

19      if that's an expert role.  But I

20      think people that form expert

21      opinions have different ways to

22      gain information that informs them.

23      And as part of my analysis, I do

24      look at evidentiary evidence and

25      part of it is in documents.

63

```
 1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2     BY MR. REISER:

 3         Q     Can you describe for me,

 4     Dr. Mangum, the process by which a market

 5     hog is bred for production?

 6         A     The process by a market hog.

 7     Well, hogs, before they bear young, are

 8     called gilts.  They are raised -- I know

 9     there are certain breeds that are very

10     common for being market hogs, I talk about

11     that in my report.

12                 I know that I talk in the

13     report about the period of which a gilt

14     would have to raise to have its child -- I

15     am saying it again, not child -- piglet

16     bearing years, about how long it takes to

17     mature to be in that rearing age.

18                 I understand there's the

19     concept of farrowing, which sometimes is

20     just giving birth, oftentimes it also

21     includes the immediate, you know, growth

22     of piglets before weaning occurs.

23                 I am aware of that.  I am

24     aware of the finishing stage after there's

25     weaning and finishing, et cetera.
```

                                                                77

 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2       that example.  Doesn't mean me.  I

 3       always get my Starbucks in the

 4       morning, even if my local store

 5       decides to produce less Starbucks,

 6       for example, by closing.

 7    BY MR. REISER:

 8           Q      If an owner or grower of hogs

 9    decided to have less sows, that wouldn't

10    necessarily mean that there would be fewer

11    market hogs, right?

12           MR. POUYA:  Objection to form.

13       Misstates the testimony.  Lacks

14       foundation.

15           THE WITNESS:  I would need to

16       know the context.  You are asking

17       about market outcomes by what one

18       party would do.  And so there is no

19       direct economic answer to your

20       question without getting more

21       information.

22    BY MR. REISER:

23           Q      I think you testified that

24    cuts to sows wouldn't necessarily impact

25    the supply of hogs and you would need to

```
 1  DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2   know more information; is that right?

 3          MR. POUYA:  Objection to form.

 4      Misstates the testimony.

 5          THE WITNESS:  I am saying

 6      there's no single answer

 7      economically to what happens to the

 8      pork market if all I am given is,

 9      well, there's one entity that has

10      sows decides to have less sows.

11      That's --

12          (Simultaneous Crosstalk.)

13   BY MR. REISER:

14      Q    Is the pork market the same

15   as the hog market?

16      A    No, not how I have described

17   it in my report and how I understand it's

18   described in the industry.

19      Q    What is the distinction

20   between the pork market on the one hand

21   and the hog market on the other?

22      A    Pork is sale of meat which is

23   processed, butchered from whole animals.

24   The hog market has to do with selling

25   whole animals.
```

79

1  DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2       Q    Do you have an understanding

3  of who the defendants and the alleged

4  co-conspirators are in this case are,

5  Dr. Mangum?

6       A    I believe so.  I have got

7  them all listed in my report.  But,

8  generally, yes, I am familiar.

9       Q    Do you know how many sows

10  were owned by the defendants and/or

11  alleged co-conspirators in this case over

12  the 2009 to 2018 timeframe?

13       MR. POUYA:  Objection to form.

14       THE WITNESS:  I do talk about

15     that in my report and I give the

16     numbers.  I go kind of defendant by

17     defendant with what I am aware of.

18     It's different sources and bits of

19     information I have.  I am not sure

20     if it's exhaustive.

21       What I know, what I have

22     relied on and understood in my

23     report, is in my report.  I haven't

24     got that in my short-term memory.

25  BY MR. REISER:

91

```
 1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2             But as I described in my

 3        report, the other way that the

 4        packers are involved is a large and

 5        increasing portion of hogs are sold

 6        through either growing contracts,

 7        where what is sort of being

 8        provided by the farmer is simply

 9        growing services to hogs that are

10        owned by others, or marketing

11        contracts, where -- where one of

12        the packers is under a contract to

13        buy the hogs, right? -- under terms

14        and conditions laid out, that are

15        grown and owned by someone else in

16        that process.

17             So we have that relationship

18        to varying degrees as far as the

19        defendants, the packers; you know,

20        how much they are involved in

21        growing hogs, how much they are

22        involved with buying hogs under a

23        contract of one sort or another, or

24        buying them from each other, I talk

25        about, the defendants buy from each
```

92

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2       other, buy and sell to each other,

3       or going to a negotiated spot

4       market.

5   BY MR. REISER:

6       Q     What does vertical

7   integration mean, Dr. Mangum?

8       A     I did just answer this.

9   Shall I give the same answer?  I don't

10  know --

11          (Simultaneous Crosstalk.)

12      Q     I want --

13      A     -- if you didn't understand

14  it.

15      Q     I didn't understand it

16  because you referenced not only ownership

17  but also contracts.

18          Is vertical integration --

19  what, if anything, does vertical

20  integration have to do with contracts?

21      A     Okay.  I will try this way.

22  We sometimes, as economists, refer to

23  something being upstream versus

24  downstream.  And to some people that just

25  has its own definitional use.  It goes

93

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2    back to a time when, you know, people

3    would do something upstream and literally

4    float things down a stream to someone

5    else.  Like I will cut the tree, I am a

6    logger, and then the tree floats down the

7    stream to the person downstream or maybe I

8    put them on a barge, I deliver my product

9    downstream, then somebody takes the logs

10   and prepares them into timber.

11           We have used this idea of

12   upstream and downstream, and it's used

13   very generally now in talking about

14   markets.  Vertical integration would mean

15   that an entity is involved in more than

16   one level of that upstream downstream

17   process.  So if somebody uses an input and

18   makes a product, it could be making pork

19   from using hogs; they might buy a hog and

20   not be vertically integrated or they might

21   actually use hogs they grew, so therefore,

22   part of that entity is upstream, raising

23   hogs, we call that vertical.

24           So the idea of vertical

25   integration is being involved in two

94

1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2    stages.  Generally people talk about that

3    meaning immediately adjacent stages, and

4    it's upstream, downstream, but it need not

5    necessarily be adjacent.

6              The extra amount of detail

7    that I talk about in my report for this

8    case is that aside from simply being -- if

9    you have a company that is a processer,

10   vertical integration may mean that they do

11   own hogs, so they provide themselves as a

12   packer with hogs, right? -- for

13   processing, but they hire people to

14   provide growing services of the hogs they

15   own.

16             To the outside eye, it might

17   look like, wait a minute, those are

18   farmers, they are raising hogs.  The

19   contractual relationship and what is

20   actually being provided, right? -- is

21   a growing service to a hog that's owned by

22   a packer, you wouldn't see from the

23   outside, but I think that could be

24   included in a distribution definition of

25   vertically integrated.

95

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2                   As I talk about in my report,

3    there are also instances where a packer

4    will contractually arrange to buy a hog,

5    but they don't own it, although it's being

6    raised and grown and finished.  But they

7    have an agreement by which they basically

8    contracted to receive that hog under the

9    terms of the agreement.  That is a type

10   of -- I call indirect or soft vertical

11   integration.

12                  And as I cite in my expert

13   report, economic literature has shown that

14   that process basically be a proxy for the

15   same thing as vertical integration,

16   depending on the contract terms.

17                  So anyway, hopefully that

18   gives you a definition of this vertical

19   integration incorporating the question of,

20   well, does that mean ownership or not.

21        Q    Hypothetically, if hog packer

22   owned 100 percent of the hogs that it

23   packed, is it your opinion that that hog

24   packer is as vertically integrated as a

25   hog packer who contracts for 100 percent

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2    of the hogs that it packs?

 3         MR. POUYA:  Objection to form.

 4      Vague.  Incomplete hypothetical.

 5         THE WITNESS:  Yeah, I think it

 6      would depend on -- well, someone

 7      could be talking about, are they

 8      legally vertically integrated

 9      versus are they economically.  The

10      answer could be different.

11         I think you could have a

12      situation where somebody contracts

13      for something, but economically,

14      there they are, you know, for all

15      intents and purposes, in effect,

16      vertically integrated, although

17      they technically don't own it.  So

18      they are not there.

19         So I think there could be a

20      different answer if it's a legal

21      question versus an economic

22      question.  But it also would relate

23      to the terms of the contract,

24      right.  I mean, I think you said

25      there's a contract to buy it.  But
```

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2       it could depend on what the terms

 3       are.

 4    BY MR. REISER:

 5       Q    Under what circumstances can

 6    a contract effectively amount to the same

 7    thing as ownership?

 8            MR. POUYA:  Objection to form.

 9       Vague.

10            THE WITNESS:  Well, oftentimes

11       a contract -- I will speak as an

12       economist, not as an attorney --

13       but a contract might try to attempt

14       to say, one person ahead of time

15       will become the owner of something

16       to lock up that ownership, but it's

17       not until a point in time.  And

18       what guides it is this contract.

19       Right?  So they might be set up to

20       be that way.

21            And if there are clauses that

22       ensure what is going to happen, if

23       there is a breach what that might

24       mean, how much oversight the person

25       contracting to buy gets.  I
```

98

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2        describe in my report what I have

 3        seen in this case, they can be very

 4        detailed as far as inspections and

 5        things in the processes by which

 6        how they are grown and medication

 7        options that are used, things like

 8        that they can be very detailed.

 9             There can be clauses on the

10        contrary, where people have the

11        ability to walk away without

12        recourse, with just notice.  And so

13        it gets in the idea of the terms

14        about how many options still remain

15        for either party in the contract.

16   BY MR. REISER:

17        Q     So the answer to my question

18   about when a contract can effectively

19   amount to the same thing as ownership

20   depends on what the contract says; is that

21   fair?

22        A     I think so.  Contracts don't

23   say anything.  And I know you probably

24   just meant the contents of the contract.

25   But it also -- it's more than that,
```

1  DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2   because as I describe in my report, I

3   point to some evidence that commentators

4   in the industry have described the case

5   that there's so much of this contracting

6   and so few relatively to the hog

7   producers, you know, much fewer number of

8   buyers for processing that the sellers, as

9   I state in my report, have this

10   take-it-or-leave-it option.

11            Well, I bring that up because

12   sometimes you may have a contract and you

13   might be wondering what you are going to

14   do.  It's not only what is in the

15   contract, it could be, well, what options

16   would I have.  That could be just as

17   important of an element.

18            So I would agree that it

19   would include the contents of the

20   contract, but it should also include the

21   context of options the parties to have

22   outside the contract.

23        Q    Do you have an understanding

24   of the number of hogs that Tyson packs

25   that come from its own herd?

```
 1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2            MR. POUYA:  Objection.  Form.

 3      Vague.

 4            THE WITNESS:  I talk about --

 5      this very question about vertical

 6      integration, and, you know, who

 7      grows hogs for themselves.  I think

 8      I talk about who grows them at all

 9      and they may sell to other entities

10      and still may be buying from other

11      entities.

12            I remember talking about Tyson

13      and if I recall, they are one of

14      the defendants that don't have a

15      large amount of growing, but would

16      I want to go back and look at the

17      report to come up with any number.

18      I don't have any numbers I could

19      tell you as far as a hog count or a

20      portion of their hogs.

21            But if I am correct in

22      remembering my report, I think

23      Tyson's was one of the entities --

24      was not one of the larger -- one of

25      the defendants, the packers who had
```

108

1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2        there's other reasons why hogs

3        could be grown, if they are going

4        for the hog market -- the hog

5        market, kind of that answers the

6        question.

7            In other words, they grow them

8        because they believe that their

9        efforts of, you know, feed,

10       location, facilities, time, will

11       lead to having something they cn

12       sell and receive compensation for.

13       They grow them to sell them to

14       somebody who wants to buy a hog.

15   BY MR. REISER:

16       Q    You agree, Dr. Mangum, that

17   there are independent hog growers that are

18   not affiliated with the defendants and

19   alleged co-conspirators in this case,

20   right?

21       A    Affiliated is a pretty vague

22   term.  One might say that if I sell -- I

23   am affiliated with Starbucks as a

24   customer.

25            So do you mean that are not

109

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2    affiliated, meaning they have no business

 3    relationship or interaction with them

 4    ever?

 5        Q    You agree, Dr. Mangum, that

 6    there are independent hog growers who sell

 7    hogs to the defendants that the defendants

 8    and alleged co-conspirators this case do

 9    not own, right?

10        A    Oh, oh, yes.  I talk about

11    that in my report.

12             In other words, I could only

13    say no to that if I thought that the

14    packer market was 100 percent vertically

15    integrated, which clearly it's not, as I

16    talk about in my report.  There are

17    independent growers.

18        Q    And many of the defendants

19    and alleged co-conspirators this case are

20    not anywhere near a hundred percent

21    vertically integrated, right?

22        MR. POUYA:  Objection to form.

23     Vague.  Lacks foundation.

24        THE WITNESS:  I don't believe

25     that the defendants which are
```

In Re - Pork Antitrust Litigation                                    Russell Mangum
Highly Confidential                                          July 13, 2022

110

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2      packers and sell things in the pork

 3      market, I don't think any of them

 4      are close to a hundred percent

 5      vertically integrated in the formal

 6      sense they own and sell just for

 7      themselves.  No, I don't think

 8      there's any one close to

 9      100 percent.

10   BY MR. REISER:

11      Q    Some of them are close to a

12   hundred percent in terms of buying hogs

13   from somebody other than their company,

14   right?

15      A    I think so.  But it gets

16   back, you know, to the questions you were

17   asking me about percentages for certain

18   entities, and if I would be surprised that

19   number is for Hormel and Tyson, and I just

20   don't have those numbers.

21           But I do know that, as I

22   describe in my report, there are packers

23   that are much more heavily vertically

24   integrated and some that are not very

25   vertically integrated at all -- formally
```

111

1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2     by the idea of, you know, owning, raising

3     for themselves, and then basically

4     internally supplying the hogs for

5     themselves when they, you know, make

6     things to sell in the pork market.

7         Q    Do the independent hog

8     growers who sell hogs to the defendants

9     that they otherwise don't own, sell to

10    just one defendant?

11         MR. POUYA:  Objection to form.

12      Vague.  Foundation.  Compound.

13         THE WITNESS:  There can be

14      practices where you might say for a

15      period of time it could be that a

16      relationship -- might look like,

17      this farmer, this grower, really

18      mainly works with that defendant,

19      but there is a lot of swapping.  I

20      would not generally say that we get

21      these direct match ups that kind of

22      retain for long time.  But it

23      depends on the practices.

24         As I mentioned in my report,

25      you have got location issues about

```
1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2        depending on where a grower is and

3        there are shipping costs involved

4        and who are the possible purchasers

5        of the hogs, it's not as if they

6        have equal access economically,

7        even, to be selling to everyone.

8            But I do understand that it's

9        not uncommon for farmers to have

10       more than one packer that they

11       would sell to.

12   BY MR. REISER:

13       Q    What do you mean by

14   "swapping"?

15            You just referred to swapping

16   in your answer.  Can you elaborate on what

17   that means?

18       A    I don't remember where I used

19   the word swapping, but I think I just

20   meant that there might be a practice where

21   some farmer sells to so and so and they

22   have a practice for a while, and then they

23   make a change.

24            And then it might be that

25   they add someone else, retaining the
```

170

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL
 2    price of pork, right?
 3            MR. POUYA:  Objection to form.
 4            THE WITNESS:  That's one
 5       element but not a main element.  I
 6       wouldn't say that is the principal
 7       element.  I mean, I have got a
 8       substantial amount of my work and
 9       my discussions -- and the opinions
10       in this case that relates to the
11       industry and which factors would be
12       conducive for conclusion.
13            I have got analysis of -- I
14       look to see whether or not across
15       defendants, across geographies,
16       across different customers, if
17       there would be common affect of
18       what is being alleged.
19            I do have a regression.  I put
20       forward a methodology that I have
21       shown can be used to estimate a
22       price effects.  I have also looked
23       beyond just the price effects, I
24       have looked to see if I believe
25       those effects would be -- would be
```

171

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL
 2       felt by all or nearly all
 3       purchasers.
 4           So those are the main elements
 5       that I can cite now for memory from
 6       my report.  One of them is a model.
 7       I do several different models I
 8       mention in my report about
 9       estimating price effects.
10           But this is not -- the main
11       thing I am doing is damages
12       involving price.  Right?  I see
13       that as one element, but really not
14       even a majority of what I do in my
15       report.
16   BY MR. REISER:
17       Q    What are you doing in
18   paragraph 73 of your report?
19       A    Paragraph 73 is talking
20   generally about the domestic supply of
21   pork, right?  And, you know, factors that
22   could affect them.  The paragraph speaks
23   for itself.
24           I wouldn't want to say, let
25   me subtract all the words I have in my
```

172

```
1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2    sentence and give you today a replacement

3    phrase.  I will let the paragraph speak

4    for itself.

5        Q    Do you think your damages

6    analysis has to be tethered in any way to

7    what the theory of liability is?

8             MR. POUYA:  Objection.  Form.

9             THE WITNESS:  My damage

10       analysis is tied to the conspiracy

11       as I understand it.  I have

12       developed it through a benchmark

13       model such that what I am in

14       looking at the price effects.  It

15       is built such that it separates

16       non-conspiratorial factors from

17       conspiratorial.  So in that sense,

18       that's what mine does.

19           That was the aim to build

20       something that would look at nested

21       in exactly what is the allegation,

22       right? -- and to say, okay, if

23       that's -- if that's what liability

24       will be found for, let me build a

25       model that can be helpful to
```

381

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2    What sections would you include in there,

 3    if you are going to be talking about --

 4    you know, expertise is knowing -- you

 5    know, there probably should be a section

 6    on export, there should be section on

 7    procurement processes.

 8            So I bring kind of my

 9    organizational expertise above and beyond

10    what I actually find in those sections

11    that I thought was relevant to cover.

12        Q    Is it fair to say that if

13    someone read the materials you're citing,

14    they could draft something summarizing

15    this type of information on pages 8 to 50

16    of your report which has been marked

17    Mangum Exhibit 1?

18            MR. POUYA:  Objection.  Vague.

19        Compound.  Foundation.

20            THE WITNESS:  Yes.  If I

21        understood your question, I think

22        you simply asked could on someone

23        read it and summarize it in

24        writing.  I think so, yeah.

25    BY MR. REISER:
```

382

```
 1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2         Q    I was referring to the

 3    materials that you are citing in your

 4    report.

 5              Can someone read those and do

 6    an analysis of the kind you have done on

 7    pages 8 to 50 of your report which has

 8    been marked Mangum Exhibit 1?

 9         MR. POUYA:  Objection.  Vague.

10       Foundation.  Speculation.

11         THE WITNESS:  Well, I mean, I

12       think it would depend -- it would

13       depend on who that someone is.  I

14       don't believe that I am the only

15       one that could have done this.  But

16       I think someone else with an

17       understanding of what is relevant

18       to touch on and what information

19       should be described to give a

20       context for this case.  I don't

21       think I have got a unique position

22       of the ability to do this.

23    BY MR. REISER:

24         Q    Let's look at paragraph 39.

25              Why don't you give that a
```

383

```
1    DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL
2     read and we can pull it up on the screen
3     in the meantime, and tell me when you are
4     done.
5          A    Okay.  (Reviewing.)
6               Yep.  I am finished with
7     paragraph 39.
8          Q    In the last sentence you say
9     here that "Litter generally increased over
10    the past several decades."
11              Do you see that?
12         A    I do.
13         Q    Do you know why?
14         A    I mean, I cited a report
15    which gives more information.  But I think
16    efficiency in the process of the general
17    idea of raising pigs, part of it has to do
18    with some of the medical, right? --
19    virus -- et cetera, those type of things,
20    and vaccines.
21              Other things has to do with
22    improvements over time with feed mixes,
23    vitamins.  Essentially an issue of kind of
24    health during the process, treatment of
25    the animals as they grow.  But I think
```

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2    contractual terms.

3        Q    But you are not opining that

4    a contract stating what a packer will buy

5    and how it will buy it is the same as

6    owning the hog.

7              You're just saying it

8    approximates owning the hog, right?

9          MR. POUYA:  Objection.

10     Misstates the testimony.

11     Foundation.

12         THE WITNESS:  Well, I don't

13     mean to give any assessment that is

14     a legal assessment or opinion.  So,

15     owning to some extent is a legal

16     thing.

17         Economically, I do believe

18     it's feasible with contracts.  For

19     example, a contract that simply

20     says, you know, I get to buy from

21     you something in a year, right?  Or

22     maybe starting in a month for a

23     year with nothing else.  That's

24     very different than one that says,

25     I get to buy this from you but

463

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2       everything you grow, you sell to

 3       me.  If you grow more, I get to buy

 4       it, I may not have to pay the same

 5       high price.  And by the way, you

 6       have to do all these -- I mean,

 7       depending -- these are some of the

 8       terms I have highlighted as being

 9       relevant for this case.

10           Those get really, really close

11       to taking much -- almost all of the

12       flexibility, if you will, away from

13       the grower because they are

14       basically having to act just as

15       they are being told to the

16       contract.

17           And I get there's value to the

18       contracts.  Some growers apparently

19       are willing, given some of the rift

20       sharing involved and price terms

21       and formulas they lock in.

22           But the part of the literature

23       that I am citing, what I think is

24       relevant for the control is with

25       the large amounts of terms I have
```

464

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2       seen that direct what growers have

 3       to do in this case, it's much more

 4       closer to vertical integration,

 5       approximating the same.  Compared

 6       to just, well, I am going to send

 7       you hogs and that is my only

 8       limitation, the number of hogs.

 9    BY MR. REISER:

10          Q    And the burdens in

11    particular, those are identified in

12    paragraph 111 of your report that we are

13    looking at right now, right?

14              MR. POUYA:  Objection.  Asked

15       and answered.

16              THE WITNESS:  This is a place

17       that I talk about those burdens.  I

18       don't know if it is to the

19       exclusion of elsewhere.

20              But, yeah, this is, as I

21       remember, the place in my report

22       that I talk about those examples.

23       I say "for example," as opposed to

24       exhaustively.  I do list those and

25       also give the contracts listed
```

465

```
 1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

 2       there I am that I am referring to.

 3    BY MR. REISER:

 4       Q    Did you do any analysis to

 5    separate packers on the one hand that buy

 6    most or all of their hogs from packers on

 7    the other hand that do not?

 8       A    Yes.  I think we talked

 9    earlier today, we went through a couple of

10    paragraphs.  And I had one paragraph that

11    I was talking about people like Tyson and

12    people like Hormel.  Right?

13            And so I talked about them

14    separately.  And then I moved to the next

15    paragraph.  And you think said isn't this

16    the paragraph where you're now talking

17    about people who actually were -- and to a

18    larger degree vertically integrated.  So I

19    did talk about those separately and list

20    them separately.

21       Q    Why did you review the

22    contracts that are listed in footnote 235

23    in particular, Dr. Mangum?

24       A    I think what I was looking

25    for is I had an idea of the exemplar type
```

466

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2    of terms that I believe were things that

3    were restrictive on the growers, right? --

4    to meet the requirements of the buyers.

5              And once I remember from the

6    review of documents that me and my staff

7    found, I thought, okay, well, if we are

8    going to list those terms that we came up,

9    the examples of those type of terms,

10   let's -- I said let's just make sure we

11   actually then cite two documents,

12   contracts, that have those terms we are

13   talking about.

14             So that was the goal.  It

15   started with the list, and then we said

16   let's find contracts that mention these

17   terms.

18        Q    Do you have any understanding

19   as to whether growers have any way to know

20   what contractual terms are typical in

21   contracts with packers?

22        MR. POUYA:  Objection.

23     Foundation.  Speculation.

24        THE WITNESS:  I do

25     understand -- as I talk about in my

467

1   DR. RUSSELL MANGUM - HIGHLY CONFIDENTIAL

2       report, I do understand that

3       growers typically service multiple

4       farmers.  So they were their own

5       dealings that I am aware of, will

6       see the different types of

7       contracts that exist from different

8       types of packers.

9           I also note, as I highlighted

10      in the report, there are industry

11      publications, there are industry

12      groups.  People share information

13      over time.  But that I am surmising

14      what I know generally about

15      agricultural type of markets and

16      participants there.

17          But I do know they operate

18      themselves with multiple types of

19      buyers.  Maybe not the full range

20      at the same time, but over time

21      particularly.

22   BY MR. REISER:

23          Q    If there was a way for you to

24   analyze all of the types of contractual

25   terms that are in contracts between