# EXHIBIT 11



Deposition of:

# Melvin Davis

*December 16, 2021*

In the Matter of:

# Pork Antitrust Litigation

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL NO. 18-1776 (JRT/HB)

0:21-MD-02998-JRT-HB

MDL NO. 2998

IN RE:  PORK ANTITRUST LITIGATION

This Document Relates to:  All Actions

HIGHLY CONFIDENTIAL

REMOTE VIDEO DEPOSITION OF MELVIN DAVIS

December 16, 2021

REPORTED BY:  Laura H. Nichols

　　　　　　　Certified Realtime Reporter,

　　　　　　　Registered Professional

　　　　　　　Reporter and Notary Public

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 104

1                    MR. SWARTZBERG:  The question stands.
2                    MR. SCHWINGLER:  I'm instructing the
3     witness not to answer unless you can answer without
4     revealing the substance of privileged
5     communications with counsel.
6           A.       Would you ask the question again,
7     please?
8                    MR. SWARTZBERG:  The question stands.
9     The objection stands.
10          Q.       (BY MR. SWARTZBERG:)  Do you have an
11    understanding of whether it's proper for employees
12    to have communications with competitors about
13    production?
14                   MR. SCHWINGLER:  Same objections,
15    same instruction.
16          A.       It would depend on the situation.
17          Q.       (BY MR. SWARTZBERG:)  Is it proper
18    for a competitor to indicate whether it is reducing
19    its -- its hog herd and to convey that information
20    to a competitor?
21                   MR. SCHWINGLER:  The same objections
22    and the same instruction.  Do not reveal the
23    substance of any communications with counsel.
24          A.       It would depend on the situation.
25          Q.       (BY MR. SWARTZBERG:)  If I could have

Page 105

1   you or the court reporter hand you what's been
2   marked as Tab 8.
3             MR. SCHWINGLER:  So I've got a FedEx
4   box of the courtesy copies.  So I'll just go ahead
5   and open that and pull out Tab 8.  And we'll leave
6   the other things in there.
7             Is this 181317, just to make sure
8   we've got the right document?
9             MR. SWARTZBERG:  Tab 8 is 181 -- yes.
10            THE REPORTER:  Do you want this
11  marked as an exhibit?
12            MR. SWARTZBERG:  Yeah, could I have
13  that marked as Exhibit 147?
14            (Exhibit 147 was marked for
15             identification.)
16       Q.   (BY MR. SWARTZBERG:)  Look at the
17  email generally or the document generally.  Can you
18  confirm -- I apologize, for this document and other
19  documents, I'm going to go through a series of what
20  might sound like repetitive questions.  I'm doing
21  it to establish that the document is what it
22  appears to be and, in some cases, whether it's a
23  business record.
24            So Mr. Davis, could you take a look
25  at what's been marked as 147?  And for the record

Page 106

1  that's SBF0181371.  And could you confirm this is
2  an email chain dated 7/15/09 between you and Steve
3  Thompson at Tyson, and then between you and Terry
4  Holton, Rod Brenneman, Gary Louis and Stephen
5  Summerlin at Seaboard, and the title is regarding
6  sow reduction.
7          A.      Yes, I have that here in front of me.
8          Q.      Okay.  And was this document written
9  in the ordinary course and as part of your work at
10 Seaboard?
11         A.      Yes.
12         Q.      And does the document -- was the
13 document, the email made at or near the time of the
14 events described in the document?
15         A.      I suppose so.
16         Q.      And the document was kept by Seaboard
17 in the regular course of business?
18         A.      I suppose so, yes.
19         Q.      Okay.  If you could tell me, who are
20 the recipients of the documents, starting with
21 Steve Thompson?
22         A.      Steve Thompson was an employee at
23 Tyson.
24         Q.      Okay.  And Tyson is one of Seaboard's
25 competitors?

Page 107

1        MR. SCHWINGLER:  Objection, form.
2        A.   Well, in this situation, Tyson was a
3   supplier of hogs to our plant.
4        Q.   (BY MR. SWARTZBERG:)  Can you tell
5   me, Terry Holton, who that is?
6        A.   Terry Holton at this time, I'm
7   supposing, was head of the sales department.
8        Q.   Okay.  Rod Brenneman?
9        A.   CEO.
10       Q.   Gary Louis?
11       A.   Gary Louis was my boss, and at that
12  time, I'm not sure what his title was.
13       Q.   And Stephen Summerlin?
14       A.   Stephen Summerlin was head of our hog
15  operations.
16       Q.   If I could have you read the initial
17  bottom portion of the email from you into the
18  record.
19       A.   Oh, to --
20       MR. SCHWINGLER:  Read it aloud.
21       A.   Okay.  So it says:  Steve, haven't
22  talked to you in a long while.  Hope you are doing
23  okay.  With regards to the sow reduction at Tyson,
24  are you selling the sows to someone else who will
25  continue to produce with those sows, or are the

Page 108

1  sows being liquidated?
2          Q.     (BY MR. SWARTZBERG:)  Okay.  How did
3  you first become aware of there being a sow
4  reduction at Tyson?
5          A.     I don't recall.
6          Q.     Okay.  Why were you asking a Tyson
7  employee whether the sows would be sold to someone
8  else who intended to produce the sows or if the
9  sows were being liquidated?
10         A.     Because they were hogs and sows in
11 sort of our procurement area.  So I was interested
12 to know whether there would continue to be hogs
13 produced with those sows or not which might be
14 available to me to procure for our plant.
15         Q.     Okay.  But why did you need to know
16 whether they were being -- whether someone else
17 would continue to produce them or if they were
18 being liquidated?
19         A.     If someone else would continue to
20 produce those, then there would be hogs on the
21 ground available to purchase.  If they're being
22 liquidated, then you're not going to produce any
23 more baby pigs.
24         Q.     Okay.  So is it fair to say that you
25 wanted to get a picture of whether the industry was

Page 109

1  going to have an increase or a decrease in the
2  availability of pigs, availability of sows?
3              MR. SCHWINGLER:  Objection, form.
4       A.     Primarily for our area.
5       Q.     (BY MR. SWARTZBERG:)  Okay.  Because
6  having an understanding of the availability of sows
7  available would have an impact on price of the
8  hogs; is that fair to say?
9              MR. SCHWINGLER:  Objection, form,
10 foundation.
11      A.     It might have an impact on price, but
12 really it would have an impact on my, you know,
13 opportunities to procure animals nearby.
14      Q.     (BY MR. SWARTZBERG:)  Well, if you
15 couldn't procure animals nearby, you would have to
16 pay a higher price for them from farther off; is
17 that right?
18             MR. SCHWINGLER:  Objection, form,
19 foundation.
20      A.     There are opportunities here for if
21 these sows were going to continue to exist, you
22 know, there were opportunities perhaps to get the
23 baby pigs finished even closer to our facility,
24 which, you know, would cut freight cost.  It might
25 be favorable.  It just depends.

HIGHLY CONFIDENTIAL

Page 110

```
1         Q.    (BY MR. SWARTZBERG:)  So knowing on
2    whether the sows were going to be produced by
3    someone else or be liquidated helped you know in
4    the future what the cost of hogs that Seaboard was
5    procuring, right?
6               MR. SCHWINGLER:  Objection, form,
7    foundation.
8         A.    Maybe -- maybe, maybe not.  It
9    depends on where, you know, the pigs ended up at
10   and --
11        Q.    (BY MR. SWARTZBERG:)  It made a
12   difference for you to know --
13              MR. SCHWINGLER:  Sorry, Counsel, he
14   didn't finish his answer.
15              That's all right.  You can finish if
16   you still have --
17        A.    Go ahead.
18        Q.    (BY MR. SWARTZBERG:)  Did you care
19   whether they were being liquidated or whether they
20   were being produced by someone else?
21        A.    Yes.
22        Q.    Why did you care?
23        A.    Because it might reduce the
24   availability of hogs in our area.
25        Q.    And that would impact Seaboard's
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 111

```
 1   future procurement of hogs, correct?
 2              MR. SCHWINGLER:  Objection, form.
 3         A.   Possibly.
 4         Q.   (BY MR. SWARTZBERG:)  Including the
 5   price that Seaboard would pay for those hogs,
 6   right?
 7              MR. SCHWINGLER:  Objection, form,
 8   foundation.
 9         A.   Possibly.
10         Q.   (BY MR. SWARTZBERG:)  Is there
11   someone at Seaboard that asked you to get this
12   information from Tyson?
13         A.   Not that I recall.
14         Q.   Okay.  Do you know what prompted you
15   to get this information?
16         A.   You know, I don't recall where I got
17   it.  But, you know, I was just trying to find out
18   whether the sows were still going to be, you know,
19   in production or liquidated.
20         Q.   Okay.  And in response to your email,
21   about an hour later, Tyson's Steve Thompson tells
22   you that the sows are being liquidated and the sow
23   units are being taken out of production, right?
24         A.   Correct.
25         Q.   Okay.  And then in response to that
```