# EXHIBIT S

LEXITAS

Page 5

```
                EXHIBIT INDEX

No.       Description        Page

Exhibit A          COLLINS0000378 ..........19

Exhibit B          Consumer Indirect .......53
        Purchaser Plaintiffs' Fourth Amended
        Consolidated Class Action Complaint
        (Redacted Version)

Exhibit C          Consumer Indirect .......78
        Purchaser Plaintiffs' Supplemental
        Objections  Responses to Defendants
        First Set of Interrogatories

Exhibit D          COLLINS00258 ............92

Exhibit E          Defendants First .......150
        Requests for Production to the Consumer
        Indirect Purchaser Plaintiffs
```

Page 6

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We are on the record on March 30th 2022, at approximately 9:03 Mountain Time, for the remote video deposition of Mr. Donya Collins, in the matter of In Re Pork Antitrust Litigation.

My name is Jacob Figueroa. I'm the videographer on behalf of Lexitas. Will counsel please introduce themselves for the record, and who they represent, beginning with the party noticing this proceeding?

MR. COOK: Sure. So my name is Tanner Cook. I'm with the law firm, Husch Blackwell LLP, and I represent Triumph Foods.

MS. WANG: This is Ling Wang, of Gustafson Gluek. Counsel for the witness and the Consumer Indirect Purchasers.

MS. LOOBY: Michelle Looby, Gustafson Gluek. Also for the witness and the  Consumer Indirect Purchaser

Page 7

Class.

MR. SPUNG: James Spung. Also from the law firm of Husch Blackwell.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

DONYA COLLINS
Having been duly sworn testified as follows:
EXAMINATION BY MR. COOK:

Q. Good morning, Mr. Collins. How are you doing today?

A. Pretty good.

Q. Good. So, my name is Tanner Cook. As I said, I represent Triumph Foods in this case.

Could you please state your full name for the record?

A. Yes. Donya Collins.

Q. Okay. And have you ever gone by any other name?

A. No.

Q. Okay. Fantastic. So just sort of laying some ground rules here. Kind of, you know, how this is going to proceed.

I'm going to ask you a series

Page 8

of questions. My questions and your answers are all going to be on the record here for the court reporter.

To make the court reporter's job easier, we're both going to kind of have to speak up and, you know, talk slowly and clearly. Try to make sure we don't interrupt each other. And, you know, certainly, that goes for both of us. I'll try not to interrupt you.

And, you know, while I'm asking questions, if you could wait until I finish my question and then answer, you know, that will just make things go along more smoothly.

You know, I'll ask that you answer my questions as fully as possible, answering every part of the question.

If, for some reason, you don't understand the question or, you know, part of it that you didn't catch, you know, please let me know. I want to make sure that you're understanding the questions that I'm asking.

Occasionally, your attorney might object to a question that I've asked. Unless you've been specifically instructed not

Page 97

case asked you to produce any credit cards or bank statements, in connection with those apps or, in general?
 A. I do not recall.
 Q. Okay. Are you aware that the defendants have requested that your credit card and bank statements be produced?
 A. I am not aware.
 Q. Okay. So, Mr. Collins, changing the topic a little bit here, we've established that for part of the time frame from 2008 to 2018, you've lived outside of Utah.
  During that same time period, did you travel outside of Utah to any other states?
 A. To -- you said 2008 to 2018?
 Q. Yeah. 2008 to 2018, did you travel outside of Utah?
 A. Yes.
 Q. Okay. Do you recall where you traveled?
 A. I do not.
 Q. You don't remember any of the states that you visited during that time frame?
 A. I don't remember. I mean, you know,

Page 98

I can tell you I visited some states, but I couldn't tell you when -- what part of the state.
 Q. Sure. Just the state is fine.
 A. Okay. Nevada. Wyoming. Florida. I guess that's -- that's about it.
 Q. Okay. And were any of those for longer periods of time? Say, you know, longer than a week that you were out of the state of Utah?
 A. Just nothing outside of what I've had in my initial -- when you initially asked me anywhere I lived.
 Q. Okay. So, Mr. Collins, between 2008 and 2018, you know, how did you go about deciding where to purchase pork products? What was the most important factor to you in making that decision?
 A. Kind of the combination of what was closest, and where we assumed was cheapest.
 Q. Okay. So, proximity to your home and general pricing. Is that accurate?
 A. That. And, obviously, sometimes if I needed, you know, other special ingredients for cooking. So...

Page 99

 Q. Okay. What about things like the quality of the product or the selection that was offered at the store? Was that important to you?
 A. If I am understanding correctly, like I said, sometimes I'd have to go to a different store to get different types of products.
 Q. Okay. Specifically for pork products. Was that a consideration? The quality or the selection?
 A. I do not recall.
 Q. Okay. Did you ever factor in things like promotions; or sales; or discounts that were offered on pork products? Did that play a role in your -- your decision of where to purchase pork?
   MS. WANG: Objection. Form.
 A. No.
 Q. Okay. Mr. Collins, how did you decide between different pork products? You know, when you're at the store and you see two option there. Sort of what was the deciding factor?
 A. I don't understand your question.

Page 100

Are you asking if I -- bacon from different companies? Or are you asking -- are you asking between bacon and sausage?
 Q. Sure.
 A. I don't understand your question.
 Q. So, we can take them one at a time. Right? So, you know, if you were choosing between different types of pork products, did you have a preference, you know, one over the other, for instance?
 A. No. Like all types of -- I like all types of pork.
 Q. Sure. And then, when you were purchasing pork products, you know, say, for the sake of the example that it's bacon, how would you decide, you know, which brand or which cut of bacon to get?
 A. I'm -- there is no real deciding factor. Sometimes went with what was cheapest. Sometimes we went with what looked good. Sometimes we went with what we liked.
 Q. Sure. Did you ever shop for organic pork? Is that an important factor to you?
 A. That is not.
 Q. Okay. What about antibiotic-free

Page 101

pork?
   A. No.
   Q. Okay. What about free range or crate-free pork? Was that important in your decision?
   A. No.
   Q. Okay. When you were buying pork products, did you ever compare the prices of different stores and retailers before deciding where to shop?
   A. No.
   Q. Did you ever see a specific advertisement from a store and decided to shop there because of that advertisement? Or did you ever receive a coupon that prompted you to go shop at that store?
       MS. WANG: Objection. Form.
   A. No.
   Q. So now, between 2008 and 2018, were you more likely to purchase a particular brand of product? You know, whether that be due to availability or familiarity?
       MS. WANG: Same objection.
   A. No.
   Q. Okay. Did you ever buy any private

Page 102

label brands?
   A. I don't understand what a private label brand is.
   Q. Sure. So, safe to say, to your knowledge, you didn't buy any pork products from any private label brands.
       Is that correct?
   A. I mean, I couldn't -- I can't answer that question yes or no. Because like I say, I don't know what it is. So...
   Q. So now, going back to something we had discussed earlier, you had mentioned that you don't know what a hog producer is, for instance.
       So, would it be safe to say that of the products you purchased, you can't say certainly who the hog producer was. Is that correct?
   A. That is correct.
   Q. So it's possible that the pork you purchased between 2008 and 2018 was produced by a company that was not a defendant in this case.
       Is that correct?
       MS. WANG: Objection. Form.

Page 103

   A. I don't know who the hog -- I mean, I don't know how to answer that question, because I'm not sure.
   Q. So, since you're not sure about who the hog producers were for the products you purchased, you can't say whether any of those producers are a defendant in this case.
       Is that correct?
   A. That's something I would have --
       MS. WANG: Objection --
       THE WITNESS: Sorry.
     It's something I would have relied on my lawyers for.
BY MR. COOK:
   Q. And the same goes for the hog processors. Correct? You don't know who the hog processors were for the products you purchased, so you can't say, with any certainty, whether it's one of the defendants in this case.
       Is that correct?
       MS. WANG: Same objection.
   A. Once again, it's something I would have relied on my lawyers for.
   Q. Okay. Mr. Collins, do you believe

Page 104

that there is any specific cut of pork that is a premium product over other parts?
       MS. WANG: Same objection.
   A. I mean, I'm sure, just like, I think there is -- there's always a premium. Right?
   Q. Sure. And have you ever been dissatisfied with the quality of pork you purchased?
   A. Yes.
   Q. Okay. Do you recall when and what type of product it was?
   A. I do not.
   Q. Okay. Do you recall the brand?
   A. I do not.
   Q. Do you recall where the product was purchased from?
   A. I do not.
   Q. Okay. Do you recall sort of what the issue was, that resulted in your dissatisfaction with the product?
   A. I do not recall the issue.
   Q. Okay. Did you return or exchange the product?
   A. No.
   Q. Okay. Do you recall contacting

Page 105

anyone about your dissatisfaction with the product?
 A. No.
 Q. Okay. Have you ever communicated any concerns regarding any pork products you purchased with the retail store or the pork brand?
 A. Could you ask the --
  MS. WANG: Objection.
 A. Could you ask that question again, please?
 Q. Sure. Put it a little more simply, did you ever communicate with any of the retailers or the -- the pork brand companies about any of your concerns?
 A. (No audible response.)
 Q. Mr. Collins, was there ever a time, during the relevant period, between 2008 and 2018, when you walked into a grocery store intending to purchase pork, but purchased something else instead?
  MS. WANG: Objection. Form.
 A. No.
 Q. Okay. So, is it safe to say that to the best of your memory, any time you intended

Page 106

to purchase pork, you would purchase pork? You wouldn't opt for another product, for instance?
 A. That is correct.
 Q. Okay. So, Mr. Collins, you may recall back in 2008, 2009, there was an economic downturn?
  Is that correct?
  MS. WANG: Objection. Form.
 A. I do not recall. Because one of those years, I -- well, most of those two years, I was a minor, and not concerned with something like that at the time. Not aware of something like that at the time.
 Q. So you don't recall that there was a sort of financial collapse, that's been called, you know, the "financial crisis," or the "great recession?"
  That is not something that you recall?
  MS. WANG: Same objection.
 A. No.
 Q. Okay. Mr. Collins, have you ever heard of the PED virus?
 A. I cannot say I have.

Page 107

 Q. Okay. And just to be clear, "PED" stands for "Porcine Epidemic Diarrhea Virus?"
  Have you ever heard of this?
 A. I cannot say I have.
 Q. Do you recall that between roughly 2009 and 2010, there was a virus going around called the "H1N1 Swine Flu?"
 A. I knew of Swine Flu. I didn't know what it was at the time.
 Q. Okay. Were you aware that it impacted pork supply?
 A. No.
 Q. Okay. Do you recall if pork demand was impacted by it?
  MS. WANG: Object to form.
 A. I do not recall.
 Q. Okay. Mr. Collins, would you agree with me that it would make sense that industry-wide supply would decrease as a result of the reduced demand from this disease?
  Is that something that you would agree with?
  MS. WANG: Same objection.
 A. I wouldn't know how to -- I don't

Page 108

know how to answer that question. I'm not --
 Q. Sure.
 A. -- familiar with that, you know, business.
 Q. Okay. We can move on.
  Mr. Collins, I'm going to ask you some questions about your understanding of the harm that you've alleged in the complaint.
  So, in your own words, how have you been harmed by the conspiracy you allege?
 A. I've had to pay more money for, I mean, just to -- just to eat.
 Q. Okay. And how much more money do you believe you've paid as a result of this alleged conspiracy?
  MS. WANG: Objection. Form.
 A. I'm not aware of any -- I don't know exactly any amounts.
 Q. Okay. And which companies do you claim are responsible for the harm that you allegedly suffered?
  MS. WANG: Same objection.
 A. I'm not sure. Maybe company names. I think there's a lot in the -- for the defendants in this case.

Page 125

me.
   Q. Okay. And what was the nature of that case?
   A. I do not recall what -- it's one of -- it was one of two -- one of two cases.
   Q. Okay. And how did your involvement with the Paul law firm, as you are calling it, lead to your involvement with this case?
   A. Like I said, I don't remember exactly how -- how I was reached out to, or how we got -- how I got to work with them on this one, specifically.
      I unfortunately don't remember at this time.
   Q. Okay. Is that other case that you mentioned still ongoing?
   A. Negative.
   Q. Okay. What was the outcome of that case? Did it -- did it settle? Was it -- did it go to trial?
   A. I don't know the specifics of the outcome of the case. I just know I received a small -- small check in the mail.
   Q. Okay. So you were a class member in that case, then. Right?

Page 126

   A. Yes.
   Q. Because you had testified before that you had not been a class representative or a named plaintiff.
         Is that correct?
   A. Yes, Sir. That is correct.
   Q. Okay. So, sitting here today, you can't say how it is that you became a plaintiff in this litigation.
         Is that correct?
         MS. WANG: Object to form.
   A. I'm saying I can't recall. Yes. I don't remember exactly how, three years ago, I got specifically involved.
   Q. Okay. Do you recall reviewing any documents before you became a plaintiff in this case?
   A. Yes.
         MS. WANG: Object to form.
   A. Yes.
   Q. Okay. Do you recall what those documents were?
   A. No. I don't recall the specifics of the documents. I just know I reviewed the documents.

Page 127

   Q. Were those documents that were ultimately filed in this litigation?
         MS. WANG: Object to form.
   A. I believe they were. I know one of them was the complaint and other court documents. I just don't remember the other court documents --
   Q. Did you review --
   A. -- or their names.
   Q. Sorry. Did you review any documents about the U.S. pork industry, prior to becoming a plaintiff in this case?
   A. I cannot answer whether I have or have not. What I mean is, I don't -- have I read some things about pork? Yes. But I would not know how to answer your question.
   Q. So, when you say you've read some things about pork, what are you -- what are you referring to?
   A. I just mean -- I just mean in general, I've read, you know...
   Q. So, Mr. Collins, right now, as we speak, you can't recall how you decided to become a class representative? Is that just sort of the --

Page 128

         MS. WANG: Objection --
   Q. -- the general?
   A. Yes. I can't recall what happened for me to get to this point.
   Q. Okay. Mr. Collins, who is included in the class that you are looking to represent?
         MS. WANG: Object to form.
   A. Everyone who's purchased pork in -- I'm representing everyone who's purchased pork in the state of Utah.
   Q. Okay. Are there others looking to represent the same class as you?
         MS. WANG: Same objection.
   A. I don't understand the question.
   Q. Sure. Is there anyone else who you are aware of, who is looking to represent the same class of purchasers that you are looking to represent in this litigation?
   A. I don't know if other people are willing or looking to do it. I don't --
   Q. Okay. Do you know any of the other plaintiffs in this litigation?
   A. If I'm understanding correctly, I mean -- if I'm understanding the plaintiff,

Page 129

everyone who's -- I'm representing. Right? I mean, everyone who has purchased pork. Everyone in the state of Utah that I'm representing.
   Q. Sure. So I'll rephrase the question.
       Do you know any of the other named plaintiffs in this litigation? People such as yourself.
   A. No.
   Q. Okay. Have you done any investigation into whether another law firm would take this case on, perhaps, more favorable terms for the class that you represent?
           MS. WANG: Objection. Form.
   A. No.
   Q. Okay. And since becoming a plaintiff, how have you monitored your lawyers?
           MS. WANG: Objection. Form.
   A. I don't understand the question. I mean, we have been in constant communication with each other through phone calls; emails.
   Q. Okay. When you say "constant

Page 130

communication," how often would you say you're communicating with your lawyers?
   A. Anywhere from once or twice a week to once a month.
   Q. And these communications -- again, not asking for the substance of them -- are these phone calls? Emails? Sort of -- what is the -- what's the form of these communications?
   A. Emails and phone calls.
   Q. Okay. And you, personally? How much time would you say you're spending on this litigation, in any given week?
   A. Any given week? Any given week, one to two hours. I mean...
   Q. And how often do you receive updates on the case from your lawyers?
   A. At least once or twice a month.
   Q. Who provides these updates?
   A. Unfortunately, I am not aware of the names. I see a lot of names.
   Q. Okay. And since becoming a plaintiff, which documents filed in this case have you reviewed?
           MS. WANG: Objection. Form.

Page 131

   A. Like I said before, I know I reviewed the complaint. But I don't -- I don't remember exactly what else. I reviewed a lot of documents.
   Q. When was the last time you received a document that was filed in this case?
   A. Yesterday.
   Q. Okay. Now, since becoming a plaintiff, how many updates have you received from your counsel on litigation strategy?
       And, to be clear, I'm not asking about the substance of that. I'm just asking how often they communicate to you about the litigation strategy.
           MS. WANG: Object to form. I will instruct the witness not to answer.
           MR. COOK: On what grounds?
           MS. WANG: You are asking him to reveal attorney/client privileges.
           MR. COOK: I was very clear. I'm not asking about the substance of the communication. Just how often he receives strategy updates.
           MS. WANG: Well, that would

Page 132

give insight into, you know, attorney/client communications. So, I would --
           MR. COOK: I'm sorry. The frequency of communication would give insight into the attorney/client communications?
           MS. WANG: Yes. The strategy updates are [Technical difficulty.] so that could give insights. I will instruct the witness not to answer.
           MR. COOK: Okay. Once again, I'm not asking about what is being said. Just the frequency.
           MS. WANG: I understand your position. And I'm instructing the witness not to answer.
           MR. COOK: Okay. So just so I am clear, you're objecting to the frequency being disclosed?
           MS. WANG: You're asking about the substance.
           MR. COOK: I made it clear. I'm not asking -- I am not interested is what has been communicated. Just the

Page 133

frequency of the communications.
          MS. WANG: Well, the frequency of the communications, you know, goes into the strategy. So I just don't think you need to go into that.
          MR. COOK: Okay. We'll move on.
BY MR. COOK:
   Q.   Mr. Collins, since becoming a plaintiff, how much time have you spent reviewing documents that have been filed with the court?
   **A.   I don't have an exact time of how long I've spent reviewing documents.**
   Q.   Do you have an estimate?
   **A.   I do not.**
   Q.   Mr. Collins, have you ever provided any input into the documents that you reviewed? Again, not asking for what input was provided.
          Just a "yes" or "no." Have you, or have you not?
          MS. WANG: Object to form. Vague.
   **A.   I'm not sure how to answer that**

Page 134

**question. Because I don't -- I don't know if anything that I may have said, or helped, may have went into these documents.**
   Q.   Okay. Mr. Collins, do you know what court this case is before?
   **A.   Yes. It's in the Federal Court in Minnesota, if I'm not mistaken.**
   Q.   Okay. Do you know the name of the judge overseeing the case?
   **A.   Yes. Judge Tunheim.**
   Q.   Okay. And do you know if there is a Magistrate judge overseeing the case?
   **A.   Yes. I believe there is a Magistrate judge --**
   Q.   Okay.
   **A.   -- overseeing the case.**
   Q.   Do you know the Magistrate judge's name?
   **A.   At this time, I do not. His name escapes me.**
   Q.   Okay. Do you know why the case was filed in the District of Minnesota?
          MS. WANG: Object to form.
   **A.   I do not.**
   Q.   So, it's safe to say, you did not

Page 135

play a role in the decision to file the case in the District of Minnesota?
          MS. WANG: Same objection.
   **A.   Not to my knowledge.**
   Q.   Okay. Mr. Collins, who is your counsel in this litigation?
   **A.   I mean, Ling. Right? And the...**
   Q.   Okay. Can you name any of the other attorneys who represent you?
   **A.   I believe Michelle as well.**
   Q.   Okay. If we could go to tab two again? And, Mr. Collins, I'm going to ask you to turn to pages 156 through 159. Starting on 156.
   **A.   I'm there.**
   Q.   Okay. Great. Do you recognize the names on -- that are listed, kind of from page 156 to page 159?
   **A.   I believe I do. But I'm not sure. I believe I recognize one name, but --**
   Q.   Okay. And which name is that?
   **A.   On page 158. This Rick Paul. The Paul LLP, I believe. But I couldn't be -- I couldn't say for sure.**
   Q.   And is it your understanding that

Page 136

Rick Paul represents you in this case?
   **A.   Once again, I'm not sure, exactly.**
   Q.   Now, given that Rick Paul is the only name on the list that you mentioned, is it fair to say that you haven't met or spoken with any of the other individuals on this list?
          MS. WANG: Object to form.
   **A.   I wouldn't say that like a -- I see -- I get a lot of -- I get some emails, and I don't know. I couldn't say that.**
   Q.   Okay. But you don't recall communicating or meeting with anyone specifically on this list. Correct?
          MS. WANG: Same objection.
   **A.   I don't recall, either way.**
   Q.   Outside of this case, have any of the persons on this list represented you in any other matters?
   **A.   Like I said, I believe I've worked with this Paul LLP, but I'm not entirely sure. I don't remember who exactly represented me in the last case.**
   Q.   And, Mr. Collins, outside of this case, have you done any business with any