# EXHIBIT U

Page 1

```
 1           VOLUME 1
            PAGES: 1-94
 2         EXHIBITS: See Index
 3
       UNITED STATES DISTRICT COURT
 4      FOR THE DISTRICT OF MINNESOTA
 5
      _____
 6             )
   IN RE:      ) No. 0:18-cv-01776-JRT-HB
 7             )
   PORK ANTITRUST LITIGATION )
 8             )
      _____)
 9
10
11
12   VIDEOTAPED DEPOSITION of WANDA DURYEA
13    - CONDUCTED BY VIDEOCONFERENCE -
14        Tuesday, March 1, 2022
15     10:07 a.m. Eastern Standard Time
16
17
18
19      Michelle Keegan, RMR, CRR
20              Lexitas
21   508-478-9795 ~ 508-478-0595 (Fax)
22          www.LexitasLegal.com
23
24
25
```

Page 2

```
 1  A P P E A R A N C E S:
 2
 3  GUSTAFSON GLUEK PLLC
       By:  Joshua J. Rissman, Esq.
 4     By:  Abou B. Amara, Jr., Esq.
       Canadian Pacific Plaza
 5     120 South Sixth Street, Suite 2600
       Minneapolis, Minnesota 55402
 6     Phone:  (612) 333-8844
       Email: jrissman@gustafsongluek.com
 7     Email: aamara@gustafsongluek.com
       Counsel for Consumer Indirect Purchaser
 8     Plaintiffs and the Witness
 9
    HAGENS BERMAN SOBOL SHAPIRO LLP
10     By:  Abigail Pershing, Esq.
       1301 Second Avenue, Suite 2000
11     Seattle, Washington 09101
       Phone:  (206) 623-7292
12     Email: abigailp@hbsslaw.com
       Counsel for Consumer Indirect Purchaser
13     Plaintiffs
14
    STINSON LLP
15     By:  Jonathan Ripa, Esq.
       50 South Sixth Street, Suite 2600
16     Minneapolis, Minnesota 55402
       Phone:  (612) 335-1500
17     Email: jon.ripa@stinson.com
       Counsel for Seaboard Foods, LLC
18
19  GIBSON, DUNN & CRUTCHER LLP
       By:  Christopher F. Kopp, Esq.
20     1050 Connecticut Avenue, N.W.
       Washington, D.C. 20036
21     Phone:  (202) 955-8500
       Email: ckopp@gibsondunn.com
22     Counsel for Smithfield Foods, Inc.
23
    Also Present:
24     Jacob Figueroa, Videographer
25
```

Page 3

```
 1            I N D E X
 2
    Videotaped Deposition of:         Page
 3
    WANDA DURYEA
 4
      By Mr. Kopp                       5
 5
 6
           E X H I B I T S
 7
    No.                           Page
 8
    Exhibit 1  Resume of Wanda J. Duryea,    12
 9             Bates-numbered Duryea_00007
               through -09
10
    Exhibit 2  Consumer Indirect Purchaser   30
11             Plaintiffs' Fourth Amended
               Consolidated Class Action
12             Complaint
13  Exhibit 3  Emails sent April and August  48
               2021, with multiple attachments,
14             Bates-numbered Duryea_00083
               through -126
15
    Exhibit 4  Two Market Basket receipts    52
16
    Exhibit 5  Receipts, Bates-numbered      52
17             Duryea_00010 through -35
18  Exhibit 6  Consumer Indirect Purchaser   64
               Plaintiffs' Objections and
19             Responses to Defendants' First
               Set of Interrogatories
20
    Exhibit 6A Chart with heading "Exhibit A -  64
21             ROG 5-6"
22
23
24
25
```

Page 4

```
 1           P R O C E E D I N G S
 2      THE VIDEOGRAPHER:  Good morning.  We are
 3  on the record on March 1st, 2022, at approximately
 4  10:07 a.m. Eastern Time for the remote video
 5  deposition of Wanda Duryea in the matter of In Re:
 6  Pork Antitrust Litigation.
 7      My name is Jacob Figueroa.  I'm the
 8  videographer on behalf of Lexitas.
 9      Will counsel please introduce themselves
10  for the record, who they represent, beginning with
11  the party noticing this proceeding.
12      MR. KOPP:  My name is Christopher Kopp.
13  I'm from the law firm Gibson, Dunn & Crutcher, and
14  I represent Smithfield.
15      MR. RISSMAN:  Josh Rissman, Gustafson
16  Gluek, for the consumer indirect purchaser
17  plaintiffs and the witness.
18      THE VIDEOGRAPHER:  Will the court reporter
19  please swear in the witness.
20
21           WANDA DURYEA,
22  having been satisfactorily identified and duly
23  sworn by the Notary Public, was examined and
24  testified as follows:
25
```

Page 33

1  A. No.
2  Q. Prior to 2018, had you ever listened to a
3  Smithfield earnings report or read a Smithfield
4  earnings report?
5  A. No.
6  Q. What about an earnings report by any other
7  defendant?
8  A. No.
9  Q. Do you ever recall reading press releases
10 by pork companies?
11 A. No.
12 Q. Can we turn to page 79, Paragraph 161.
13 A. Okay.
14 Q. So this is a -- you can feel free to read
15 that paragraph.
16 A. Okay. I read it.
17 Q. Okay. Have you ever read that -- any of
18 this information aside from -- did you read that
19 information in 2010 or was the first time you read
20 this information in connection with this case?
21 A. In connection with this case.
22 Q. Okay. And 162, there's some quotes here.
23 Feel free to read Paragraph 162.
24 A. Okay.
25 Q. Do you recall reading this statement

Page 34

1  before today?
2  A. No, I did not.
3  Q. Okay. Are you familiar with another case
4  alleging that chicken companies had engaged in an
5  antitrust conspiracy?
6  A. I heard about it.
7  Q. Okay. Do you remember when you heard
8  about it?
9  A. A few years ago. Probably about the same
10 time that I heard about this one but didn't know
11 that it had been going on prior to that.
12 Q. Okay. Did you ever read a Bloomberg
13 article about Agri Stats and the chicken industry?
14 A. No.
15 Q. Can you turn to page 84, Paragraph 179.
16 Okay. Feel free to read that paragraph.
17 A. Okay.
18 Q. Do you know what percentage of hogs are
19 raised on farms owned or operated by the
20 defendants?
21 A. I just had trouble hearing you.
22 Q. I'm sorry. Let me ask a different
23 question.
24    What was the source of your information
25 for this paragraph?

Page 35

1  A. The lawyers.
2  Q. And you haven't done any independent
3  research aside from what the attorneys have told
4  you?
5  A. No, I have not.
6  Q. Let's go to page 94, Paragraph 213.
7     MR. KOPP: Can you go up a little bit
8  more?
9  A. I'm sorry?
10 Q. I'm sorry. I was talking to Jacob.
11    MR. KOPP: 213, the paragraph.
12 Q. So this says that at all relevant times
13 you were a resident in Farmington, New Hampshire.
14 I think we covered that earlier.
15 A. Right.
16 Q. It's accurate that you lived in Farmington
17 except for the few months that you described in
18 2018, 2019. Is that accurate?
19 A. Yes.
20 Q. Okay. And between 2008 and 2018, which
21 defendants did you purchase pork from?
22 A. I probably purchased from Smithfield,
23 Hormel, Tyson, maybe Hatfield and various "I don't
24 know" from store brand.
25 Q. And do you know for the private label, you

Page 36

1  don't know which defendants produced the pork that
2  you purchased?
3  A. I do not. I asked Mr. Rissman, and he
4  said that --
5     MR. RISSMAN: Hold on, hold on, hold on.
6  Stop. Don't reveal anything that we talked about.
7     THE WITNESS: Okay.
8  Q. Do you know if the hogs were raised on
9  farms owned by the defendants or by third parties?
10    MR. RISSMAN: I object to form.
11 A. I have no way of knowing.
12 Q. Okay. Do you know whether the price of
13 pork in fact increased during the 2008 to 2018
14 time period?
15 A. I've seen it go up. Yes.
16 Q. Okay. You've seen it go up. I know we've
17 all seen a lot of prices go up the last year or
18 two. Do you know prior to 2018 if prices had
19 increased?
20 A. Yes. I saw them going up because I buy a
21 lot of pork.
22 Q. Okay. Do you know if it was more or less
23 than the rate of inflation?
24 A. I don't.
25 Q. Do you know if it increased more or less

Page 37

1 than other types of meat?
2     MR. RISSMAN: I object to form.
3     A. I don't know.
4     Q. Okay.
5     MR. KOPP: Can we just take a five-minute
6 break?
7     MR. RISSMAN: Sure.
8     THE VIDEOGRAPHER: The time is 10:49 a.m.
9 We are going off the record.
10     (Recess from 10:49 a.m. to 10:57 a.m.)
11     THE VIDEOGRAPHER: The time is 10:57 a.m.
12 We are back on the record.
13 BY MR. KOPP:
14     Q. And, Ms. Duryea, do you know whether
15 between 2008 and 2018 any specific defendant cut
16 the supply of pork?
17     A. Do I know specifically? No.
18     Q. Okay. Did you do any independent research
19 into whether the defendants cut their supply of
20 pork during that period?
21     A. No.
22     Q. And do you have any information, aside
23 from what your attorney provided, about the pork
24 supply?
25     A. I didn't hear the last word.

Page 38

1     Q. Oh. Do you have any information -- have
2 you -- do you have any knowledge or information
3 aside from what your attorney told you about the
4 pork supply?
5     A. No.
6     Q. All right. So the following questions
7 relate to the time period 2008 to 2018 and your
8 purchases of pork. So just to start off, have you
9 purchased pork products during that time period?
10     A. Oh, yes.
11     Q. What types of pork?
12     A. Ham and bacon and sausage and pork loin,
13 shoulder, and lots of ham.
14     Q. Okay. Do you have any idea how much? Is
15 there any way for you to estimate the quantity of
16 pork that you bought over that decade-long period?
17     A. I have no way of knowing how much, but I
18 consistently buy a large amount of pork.
19     Q. Okay. And I think you mentioned this
20 earlier, but which defendants did you purchase
21 from during that period?
22     A. I'm sure Smithfield and Hormel, probably
23 Tyson. And the others, I'm not sure.
24     Q. Okay. And do you know if the pork that
25 you purchased originated from a farm that was

Page 39

1 owned by one of the defendants, or do you have any
2 way of knowing that?
3     A. I do not.
4     Q. Okay. So I'd like to ask you about some
5 of the factors that you think about when you
6 decide where to purchase pork in terms of the
7 actual location.
8     A. Okay.
9     Q. Are there -- how do you go about deciding
10 whether or not to go to a grocery store or Walmart
11 or any other location?
12     A. Sometimes it may just be because I'm in
13 the store. I look and I like that or I feel like
14 eating it. Or other times I make a planned trip
15 to go -- the discount stores that I go to, the
16 big-box stores are not close to my home. Each one
17 I go to is an hour away, so I make plans to go
18 there.
19     Q. And that's, like, Walmart, Sam's Club,
20 Costco, things like that?
21     A. Walmart is relatively close, within about
22 a half an hour of my house. Costco is quite a
23 ways from my home, two hours. Sam's and BJ's are
24 within an hour.
25     Q. Okay. Do you ever shop online? Do you

Page 40

1 do, like, delivery?
2     A. For meat?
3     Q. Yeah, for meat.
4     A. Prior to this pandemic, I had not.
5     Q. Have you done it since 2020 or since the
6 pandemic started?
7     A. Since the pandemic, I tried some meal
8 plans.
9     Q. So it sounds like the main criteria is
10 just the fact of distance from your home? Sounds
11 like that's the biggest factor affecting --
12     A. That does determine when and where I shop.
13 Yes.
14     Q. Okay. So let's just focus on ham as an
15 example. You said you bought large amounts of
16 ham. Is that right?
17     A. Right.
18     Q. And how do you -- so thinking about ham,
19 how do you choose what kind of ham you want to
20 buy?
21     A. So I like ham for breakfast. And almost
22 every day I eat ham and Swiss for breakfast, and I
23 have generally had ham at Thanksgiving.
24     Q. Do you eat prepackaged ham or is it deli
25 ham?

Page 57

1  Q. You do not buy -- okay.
2     Do you know how Walmart sets its prices?
3  A. I do not.
4  Q. BJ's and Market Basket, do you know the
5  wholesale price that they pay?
6  A. No.
7  Q. Do you ever shop at farmer's markets?
8  A. No.
9  Q. What about -- I think you mentioned some
10 wholesale clubs like Costcos or Sam's Club. Do
11 you shop at either of those or any other wholesale
12 clubs?
13 A. Costco is too far away from me in
14 New Hampshire. It's about two hours. Sam's Club,
15 I do go to.
16 Q. Okay. How far away is Sam's Club?
17 A. About an hour and 15 minutes.
18 Q. And like how often would you purchase pork
19 from Sam's Club?
20 A. Maybe once every two or three months.
21 Q. Do you know how Sam's Club sets its
22 prices?
23 A. I do not.
24 Q. And I assume you don't know the wholesale
25 price that they pay or the markup?

Page 58

1  A. No, I do not.
2  Q. Do you ever buy pork from convenience
3  stores?
4  A. No.
5  Q. Specialty shops?
6  A. No.
7  Q. Dollar stores?
8  A. No.
9  Q. Do you ever purchase pork from
10 restaurants?
11 A. When I go out to eat, yes.
12 Q. Are you seeking damages for -- from
13 restaurants?
14    MR. RISSMAN: Objection, calls for a legal
15 conclusion.
16 A. Not that I'm aware of.
17    MR. RISSMAN: Hold on, let me object.
18    Objection, calls for a legal conclusion.
19 Q. I think you can answer again. I don't
20 know if --
21 A. I said, "Not that I'm aware of."
22 Q. Okay. Are there any other places that you
23 purchase pork from that we have not discussed?
24    MR. RISSMAN: I object to form.
25 A. Not that I'm aware of.

Page 59

1  Q. Okay. I think earlier you mentioned some
2  delivery services. What delivery services do you
3  use?
4     MR. RISSMAN: Are you talking about --
5  A. Nobody because they --
6     MR. RISSMAN: Sorry. Hold on. Are you
7  talking about the relevant period or not?
8     MR. KOPP: Okay. Let me reframe it.
9  Q. Earlier you said -- when did you start
10 using delivery services?
11 A. I don't use delivery services.
12 Q. Okay. So from 2008 to 2018, is it fair to
13 say you did all your shopping in person?
14 A. Yes.
15 Q. Okay. All right. Let's go to Tab 6.
16    Okay. Feel free to scroll through this,
17 and let me know when you're ready for me to ask
18 you a few questions.
19 A. What you're showing is not what I have
20 under Tab 6.
21 Q. What do you have under Tab 6?
22 A. I have "Exhibit A - ROG 5-6."
23 Q. Is there a 6A? They might have gotten it
24 backwards when they mailed it.
25    Can you look in your binder and --

Page 60

1  A. Wait a minute. Several pages in. Okay.
2  I see this.
3  Q. Have you ever seen this document before?
4  A. No.
5  Q. So prior to seeing this document today,
6  were you aware that the defendants had asked you
7  to provide answers to interrogatories?
8  A. Yes.
9     MR. RISSMAN: Objection to form.
10 Q. Okay. Did you have any input on your
11 response or on the plaintiffs' response to the
12 defendants' interrogatories?
13 A. Yes. I answered all of the questions.
14 Q. Did you review a draft of the objections
15 to defendants' interrogatories?
16    MR. RISSMAN: Objection.
17 A. Yes.
18    MR. RISSMAN: Hold on, Wanda.
19    Objection. Calls for attorney-client
20 privilege.
21    She already answered, so I'll have to let
22 that one go.
23    Wanda, make sure you pause and give me a
24 chance to --
25    THE WITNESS: All right. I'm sorry.

Page 61

1     MR. RISSMAN: That's okay.
2     Q. I think we can turn to Exhibit A.
3     A. In this section or all the way back?
4     Q. I believe it's Tab 6A. It's this kind of
5  like a spreadsheet.
6     A. Oh, so that's -- they did it backwards.
7  Okay. Gotcha. Okay.
8     Q. All right. And if you go down to Row 42.
9     A. Okay.
10    Q. So there are five stores next to your
11 name. And I think we've discussed all of these
12 stores: Walmart, Sam's Club, BJ's, Costco, Market
13 Basket?
14    A. Yes.
15    Q. Are there any other stores that you
16 purchased from that you are seeking damages with
17 respect to?
18       MR. RISSMAN: I object to form and calls
19 for a legal conclusion.
20    A. Not that I'm aware of.
21    Q. Okay. Are there other products that you
22 are seeking damages on aside from the products
23 listed in Column C?
24       MR. RISSMAN: Same objection.
25    A. Not from me, that I'm aware of.

Page 62

1     Q. On the -- in Column G, it lists four
2  brands. Is that right?
3     A. Yes.
4     Q. Why would you buy branded versus store
5  label and vice versa?
6       MR. RISSMAN: Objection to form.
7     A. Sometimes there isn't what I want by the
8  brand.
9     Q. So mostly availability?
10    A. Right.
11    Q. Is there a pricing difference?
12    A. The thing that I mostly buy that is not
13 branded is sausage. And I don't see any branded
14 sausage when I buy this.
15    Q. Okay. And do you know if the sausage is
16 processed by one of the defendants?
17    A. I do not.
18    Q. Okay. Can we go up to the top of this
19 exhibit? So in H, Column H says "hog producer."
20       Do you have an understanding of what the
21 "hog producer" means?
22    A. I would think that they would be the
23 farmer that takes care of them.
24    Q. Okay. And looking at Column I, "hog
25 processor," do you have an understanding of what

Page 63

1  "hog processor" means?
2       MR. RISSMAN: Objection.
3     A. That would probably be the butcher.
4     Q. So if we go back down to Row 42, I see
5  that these are empty. Is it fair to say you don't
6  know who the farmer or hog producer is or who the
7  hog processor is for the specific cuts of meat?
8     A. Correct.
9     Q. Okay. So I'm going to shift gears a
10 little bit. I know earlier we discussed you lived
11 in New Hampshire.
12       So between 2008 and 2018, aside from the
13 time that you mentioned spending a month here, a
14 month there in New York, were there other times
15 that you left the state for more than, say, a week
16 at a time?
17    A. No.
18    Q. I'm sure you recall that there was an
19 economic calamity in 2008 and 2009. Correct?
20    A. Yeah.
21    Q. Did the financial crisis affect you
22 personally?
23    A. I lost my job.
24    Q. Okay.
25       MR. RISSMAN: Chris, do you want to take

Page 64

1  down the Tab 6A?
2       MR. KOPP: Oh, yeah. Sure.
3       Can we please Mark Tab 6 and Tab 6A as
4  exhibits.
5       (Exhibits 6 and 6A marked for
6  identification)
7       MR. RISSMAN: Sorry to interrupt.
8       MR. KOPP: No problem.
9     Q. So you lost your job in 2008, 2009. How
10 did that affect your purchasing decisions?
11       MR. RISSMAN: I object to form.
12    A. I don't remember that it changed anything
13 that I would buy or wouldn't.
14    Q. Okay. Did it make you more conscious of
15 prices or anything else when shopping?
16       MR. RISSMAN: Objection.
17    A. I believe I --
18       THE WITNESS: I'm sorry.
19       MR. RISSMAN: Go ahead.
20    A. I believe I'm always conscious of the
21 price I'm paying.
22    Q. Did you buy less meat during that period?
23    A. No.
24    Q. Did you buy -- did you buy any less pork?
25    A. No.

Page 65

1  Q. Have you ever heard of something called
2 the Porcine Epidemic Diarrhea Virus, something
3 called PEDV?
4  A. No.
5  Q. Do you recall the swine flu epidemic?
6  A. Yes.
7  Q. Did the swine flu affect your choice to
8 eat swine or pork?
9  A. No.
10  Q. Do you recall reading anything about how
11 it impacted the pork supply nationally?
12    MR. RISSMAN: Objection.
13  A. I don't think I read anything.
14  Q. What about do you recall anything
15 regarding how the swine flu affected pork demand?
16    MR. RISSMAN: I object to form.
17  A. No.
18  Q. Have you been harmed by the conspiracy
19 that you allege in this case?
20  A. I believe so.
21  Q. And how have you been harmed?
22  A. I believe I paid more for pork products
23 than I should have.
24  Q. Okay. And do you have any idea how much
25 more you've had to pay than you should have?

Page 66

1    MR. RISSMAN: Objection, calls for expert
2 testimony.
3  A. I'm going to rely on the experts that the
4 lawyers retained.
5  Q. Do you know which companies are
6 responsible for the harm that you suffered?
7    MR. RISSMAN: I object to form.
8  A. It seems as though everyone that I've
9 bought pork from.
10  Q. Okay. Has Smithfield harmed you?
11  A. I believe so.
12  Q. And how has Smithfield harmed you?
13  A. By charging me more than what I would have
14 paid in a free market system.
15  Q. How have the other defendants harmed you?
16  A. In the same way.
17  Q. And how did you learn that you've -- how
18 did you learn that you've been harmed?
19  A. By speaking with Hagens Berman.
20  Q. Do you have any information, aside from
21 what you've received from Hagens Berman, about the
22 harm that you've suffered?
23  A. No.
24  Q. Have any defendants in this case settled
25 with you?

Page 67

1  A. There is a settlement with Hagens Berman,
2 not directly with me.
3  Q. Okay. And which defendant is that?
4  A. I believe it's JBS.
5  Q. Okay. Can you tell me roughly how much
6 money you spent on pork product purchases between
7 2008 and 2018?
8    MR. RISSMAN: I object to form.
9  A. I have no way to tell you. If I had
10 receipts, I would have given them to you.
11  Q. Okay. So earlier I think you said Market
12 Basket has really good pricing?
13  A. Yes.
14  Q. Do you think you were overcharged when you
15 bought pork at Market Basket?
16  A. Yes.
17  Q. What about at Walmart? Do you think
18 Walmart overcharged you for pork that was
19 purchased there?
20    MR. RISSMAN: Object to the form.
21  A. Yes.
22  Q. Okay. And how much -- do you have any way
23 of knowing how much you were overcharged?
24    MR. RISSMAN: Objection, calls for expert
25 testimony.

Page 68

1  A. No.
2  Q. Okay. Aside from what you've learned from
3 your attorneys or the information provided to you
4 from your attorneys, do you have any way of
5 calculating the amount that you've been
6 overcharged from any of these retailers?
7  A. No.
8  Q. Did you ever purchase pork directly from
9 any of the producers, like Tyson or Smithfield?
10  A. No.
11  Q. Is it your theory or is it your
12 understanding that grocery stores were overcharged
13 by the -- by Smithfield and Tysons?
14    MR. RISSMAN: I object to form.
15  A. It's my opinion that they were overcharged
16 and they then marked that up and I was
17 overcharged.
18  Q. But am I correct, you know, we don't --
19 you don't have any information, aside from what
20 you've been provided from your attorneys, about,
21 you know, the -- you don't have any information
22 about the wholesale prices, the markup that the
23 whole -- that the retailers are charged by the
24 wholesalers. Is that correct?
25    MR. RISSMAN: I object to form.