# EXHIBIT V

**In the Matter Of:**

*In re Pork Antitrust Litigation*

*HAL SINGER*

*June 24, 2022*



**Page 1**

```
 1              UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MINNESOTA
 2

 3        Civil Action No. 0:18-cv-01776-JRT-HB

 4

 5   IN RE:

 6   PORK ANTITRUST LITIGATION,

 7   _____/

 8

 9

10

11                  DEPOSITION OF

                    HAL SINGER
12

13

14

              Friday, June 24, 2022
15
             9:39 a.m. - 6:03 p.m.
16

17               Remote Location

             Via Zoom Videoconference
18           All Parties Remote

19

20

21

22

23

24        Stenographically Reported By:

               Erica Field, FPR
25
```

**Page 2**

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
        GUSTAFSON GLUEK
 3      120 S. 6th Street
        Suite 2600
 4      Minneapolis, Minnesota 55402
        (612) 333-8844
 5      BY: JOSHUA RISSMAN, ESQUIRE
        jrissman@gustafsongluek.com
 6

        HAGENS BERMAN SOBOL SHAPIRO
 7      715 Hearst Ave
        Suite 202
 8      Berkeley, California 94710
        (510) 725-3000
 9      BY: SHANA SCARLETT, ESQUIRE
            ABIGAIL PERSHING, ESQUIRE
10          shanas@hbsslaw.com
            abigailp@hbsslaw.com
11

        NEXSEN PRUET
12      1230 Main Street
        Suite 700
13      Columbia, South Carolina 29201
        (803) 771-8900
14      BY: DAVID EDDY, ESQUIRE
15
16   On behalf of Tyson Foods, Inc., Tyson
     Prepared Foods, Inc., and Tyson Fresh Meats,
17   Inc.:
        AXINN, VELTROP & HARKRIDER
18      1901 L Street N.W.
        Washington, D.C. 20036
19      (202) 912-4700
        BY: KEITH HOLLERAN, ESQUIRE
20      kholleran@axinn.com
21
     On behalf of Triumph Foods:
22      HUSCH BLACKWELL
        190 Carondelet Plaza
23      Suite 600
        St. Louis, Missouri 63015
24      (314) 480-1500
        BY: CHRISTOPHER SMITH, ESQUIRE
25      chris.smith@huschblackwell.com
```

**Page 3**

```
 1   APPEARANCES CONTINUED:
 2   On behalf of Seaboard Foods:
        STINSON LLP
 3      50 South Sixth Street
        Suite 2600
 4      Minneapolis, Minnesota 55402
        (612) 335-1808
 5      BY: PETER SCHWINGLER, ESQUIRE
        peter.schwingler@stinson.com
 6
 7   On behalf of Smithfield Foods:
        GIBSON DUNN
 8      1050 Connecticut Avenue, N.W.
        Washington, D.C. 20036
 9      (202) 887-3756
        BY: RICHARD PARKER, ESQUIRE
10      rparker@gibsondunn.com
11
     On behalf of Clemens Food Group:
12      KIRKLAND & ELLIS
        300 North LaSalle Drive
13      Chicago, Illinois 60654
        (312) 862-2000
14      BY: AMARTO BHATTACHARYYA, ESQUIRE
        amarto.bhattacharyya@kirkland.com
15
16   On behalf of Hormel Foods Corporation:
        FAEGRE BAKER DANIELS
17      90 S. 7th Street
        Suite 2200
18      Minneapolis, Minnesota 55402
        (612) 766-8862
19      BY: CRAIG COLEMAN, ESQUIRE
            JONATHAN TODT, ESQUIRE
20          EMILY CHOW, ESQUIRE
        craig.coleman@faegredrinker.com
21      jonathan.todt@faegredrinker.com
        emily.chow@faegredrinker.com
22
23   ALSO PRESENT:
        Bac Tran, Charles River Associates
24
     VIDEOGRAPHER:
25      Jacob Figueroa
```

**Page 4**

```
 1              INDEX OF PROCEEDINGS
 2   WITNESS                         PAGE
     HAL SINGER                      5
 3   DIRECT EXAMINATION BY MR. COLEMAN      5
     CROSS-EXAMINATION BY MR. RISSMAN     342
 4   CERTIFICATE OF REPORTER         348
     ERRATA SHEET                    349
 5
 6
 7
 8              EXHIBITS
        EXHIBIT    DESCRIPTION         PAGE
 9   Exhibit 1  Expert Report of Dr. Singer    6
     Exhibit 2  Apotex, Inc. v. Cephalon, Inc.   18
10   Exhibit 3  Users Guide to USDA's LMR Hog    105
                Price Reports
11   Exhibit 4  US Hog Marketing Contract       121
                Study
12   Exhibit 5  Production-Packer Match Point    139
     Exhibit 6  Quick Facts, The Pork Industry   152
13              at a Glance
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1  Thereupon,
2  the proceedings began at 9:39 a.m.:
3        THE VIDEOGRAPHER:  We are on the
4  record on June 24, 2022, at
5  approximately 9:39 a.m. Eastern Time
6  for the remote video deposition of Hal
7  Singer in the matter of In Re: Pork
8  Antitrust Litigation.
9        My name is Jacob Figueroa.  I'm
10  the videographer on behalf of Lexitas.
11        All appearances will be noted on
12  the stenographic record.
13        Will the court reporter please
14  swear in the witness.
15  Whereupon,
16        HAL SINGER,
17  having been first duly sworn or affirmed, was
18  examined and testified as follows:
19        THE WITNESS:  I do.
20        DIRECT EXAMINATION
21  BY MR. COLEMAN:
22    Q.   Good morning.  Can you state your
23  name for the record?
24    A.   Hal Jason Singer.
25    Q.   And just the first order of

Page 6

1  business, we'll mark your expert report of
2  Dr. Hal Singer, which is Tab 1, as Exhibit 1.
3        (Exhibit 1 was marked for
4        identification.)
5        MR. COLEMAN:  Jacob, you could
6  leave that up, if you want.
7        I will direct you around the
8  report if we need it or if Dr. Singer
9  needs it.
10  BY MR. COLEMAN:
11    Q.   But I will note, Dr. Singer, on
12  Page 191 of your report, it looks like you
13  list about 50 cases in which you testified as
14  an expert since 2012.  Is that right?
15    A.   I haven't counted them, but
16  that's -- since 2012, but that sounds like a
17  reasonable estimate.
18    Q.   And it appears that about half of
19  those involve antitrust claims.  Is that a
20  reasonable approximation?
21    A.   I think that it's more than half.
22  I think that the only other area where my
23  practice covers is consumer protection, and
24  I've done a few there, but certainly not
25  half.  So I think the vast majority of my

Page 7

1  appearance is in antitrust cases.
2    Q.   And in those antitrust cases, how
3  many times have you submitted a report on
4  behalf of an antitrust plaintiff?
5    A.   Oh, I don't have a count.  I don't
6  have a count for you.
7    Q.   Can you give me your best
8  estimate?
9    A.   Well, you want a count of the
10  cases in which I've submitted a report on
11  behalf of a plaintiff in an antitrust case?
12    Q.   And if it's easier, you can start
13  with how many times have you submitted a
14  report on behalf of an antitrust defendant?
15    A.   On at least one occasion.  I think
16  that Verizon was an antitrust defendant in a
17  case that I worked on.
18    Q.   Any other cases come to mind in
19  which you submitted a report on behalf of an
20  antitrust defendant?
21    A.   Not that I can think of, no.
22    Q.   And so in every other antitrust
23  case in which you have submitted a report,
24  that report would have been on behalf of an
25  antitrust plaintiff; is that right?

Page 8

1    A.   Correct.
2    Q.   In reviewing your experience, I
3  note that you have quite a bit of experience
4  identifying overcharges that you claim
5  resulted from antitrust misconduct; is that
6  right?
7    A.   Oh, I don't claim it.  I've been
8  asked to estimate overcharges.  But, yes,
9  I've done -- I've estimated overcharges in
10  many cases.
11    Q.   And do you consider identifying
12  and quantifying antitrust overcharges to be
13  an expertise of yours?
14    A.   I think that quantifying damages
15  in antitrust matters is certainly an area of
16  expertise of mine, yes.
17    Q.   And I'm specifically interested in
18  your expertise in identifying and quantifying
19  antitrust overcharges.
20        Is that an area of your expertise?
21    A.   You keep saying "identifying."  I
22  -- and I'm generally pushing back.  I
23  wouldn't describe my expertise as
24  "identifying," but I'm certainly asked to
25  quantify damages that flow from an alleged

Page 9

1  anticompetitive restraint.
2      Q.   And to quantify an antitrust
3  overcharge, the overcharge needs to exist; is
4  that fair?
5      A.   Yes.  I think it's -- it goes
6  without saying that if there's no liability
7  or no violation, then there is no overcharge.
8      Q.   In how many cases have you been
9  asked to opine on antitrust overcharge caused
10  by conduct challenged under the antitrust
11  laws?
12          MR. RISSMAN:  Objection.  Asked
13      and answered.
14      A.   I don't -- I don't have a count
15  for you, but I think that in every antitrust
16  matter that I've testified in, there's been
17  an allegation of a violation of the -- of the
18  antitrust laws, whether they're federal
19  antitrust laws or state antitrust laws.
20  BY MR. COLEMAN:
21      Q.   And in all of those cases, were
22  you asked to opine on the existence and the
23  amount of an antitrust overcharge?
24          MR. RISSMAN:  Object to form.
25      A.   Not in every case.  In some cases,

Page 10

1  I've been asked to opine only on matters
2  relating to liability in which the -- the
3  plaintiff has retained a separate expert to
4  do damages.  I don't know if I'm going to be
5  able to cull up examples of that, but in most
6  cases, I will grant you that I'm asked to
7  examine issues relating to antitrust impact
8  and quantifying aggregate damages.
9  BY MR. COLEMAN:
10      Q.   Have you ever declined an
11  engagement to testify because you were unable
12  to either identify or quantify an antitrust
13  overcharge?
14          MR. RISSMAN:  Object to form.
15      A.   Well, I've declined engagements
16  before, but I can't recall accepting
17  engagement and then discovering, you know,
18  midway through that I couldn't present an
19  estimate.  I've -- the decision to go or
20  no-go has typically occurred at the front end
21  of the case.
22          If I think that the case doesn't
23  conform, you know, to my understanding or my
24  practice, I would turn down the case.
25

Page 11

1  BY MR. COLEMAN:
2      Q.   And how many times has that
3  happened?
4      A.   On a handful of occasions.
5      Q.   How many times have you declined
6  to write an expert report because you were
7  unable to identify or quantify an antitrust
8  overcharge?
9      A.   Like I said, it wouldn't -- it
10  wouldn't get to that.  It wouldn't get to me
11  being retained and then studying the matter
12  more and not being able to do it.  I have to
13  make that determination on the front end.
14          If I -- if I feel that there's a
15  plausible methodology that's reliable and it
16  is within my toolkit, then I will typically
17  accept the case and perform the requisite
18  analyses.  The times that I've declined cases
19  is when I've decided up front that there was
20  something -- there was a problem with the
21  case.
22      Q.   And did you do that analysis in
23  this case prior to your retention?
24          MR. RISSMAN:  I'm going -- I'm
25      going to object as it's not asking for

Page 12

1      an opinion that he's given in this
2      case.  It's asking for preliminary
3      analysis, and I will instruct the
4      witness not to answer.
5          THE WITNESS:  Okay.
6  BY MR. COLEMAN:
7      Q.   So in every case in which you were
8  retained to quantify an antitrust overcharge,
9  you were able to apply your expertise to --
10  to do so, right?
11      A.   Well, I think what you're asking
12  is tautological.  I -- whenever I accepted a
13  matter, I wouldn't have done so unless I
14  thought I could apply my expertise.  So when
15  you see the final product in cases that I
16  accepted, it naturally follows that I -- I
17  was able to apply my expertise.
18      Q.   I'm not sure I see the tautology
19  here, Dr. Singer.  I -- it strikes you as
20  unreasonable that once you've been retained,
21  dug through the facts, looked at the data,
22  that you might realize that the facts in the
23  record lead you to be unable to quantify an
24  antitrust overcharge?
25          MR. RISSMAN:  Objection.  Calls

Page 13

1    for hypothetical.
2  BY MR. COLEMAN:
3     Q.   Did that ever happen?
4        MR. RISSMAN:  I am sorry.
5        Objection.  Calls for
6  hypothetical.
7     A.   When you put it that way, I can --
8  I can conceive of that happening in a case.
9  But I can't recall that happening in my
10  experience; that is, I can't recall finding a
11  case where, you know, the data were so
12  unreliable, or there was no anticompetitive
13  effects such that I -- I felt the need to
14  pull out of the case.  I can't -- I can't
15  recall that happening in my experience.
16  BY MR. COLEMAN:
17     Q.   So when you been retained, you dig
18  into the data, and in every instance, you
19  have been able to quantify an antitrust
20  overcharge if asked to do so; is that right?
21     A.   Well, like I said, you're --
22  you're skipping over a very important part,
23  which is on the front end, if I make a
24  determination that I'm not going to be able
25  to -- to assess and quantify damages in a

Page 14

1  reliable way, then I will pull out of the
2  case in that moment.
3        So I have not had an occasion yet
4  where I've made that determination that
5  damages would be feasible and reliably
6  estimated and then reversed.  I haven't done
7  that.  I will grant you that.
8     Q.   Yeah.  And, again, my question was
9  upon retention, in every case in which you
10  have been retained as an expert to quantify
11  overcharge, you have been able to dig into
12  the record, apply your expertise and -- and
13  identify and then quantify an overcharge --
14  an antitrust overcharge; is that right?
15        MR. RISSMAN:  Object to form.
16     A.   I heard the question and I think I
17  answered it -- I think I answered it just
18  fine the last time.  I will give you the same
19  answer, which is that you're swiping over
20  the -- an initial assessment --
21        (Simultaneous unreportable
22        crosstalk.)
23        MR. RISSMAN:  Don't interrupt
24  the witness.
25        No, you're not interrupting the

Page 15

1  witness.
2        MR. COLEMAN:  Well, he's not
3  answering the question.
4        MR. RISSMAN:  Well, you can't
5  interrupt him.  You asked the same
6  question over again, and so he's
7  answered it.
8  BY MR. COLEMAN:
9     Q.   The predicate of the question was
10  upon retention.  I didn't ask what you did
11  before retention.
12        MR. RISSMAN:  Well, don't
13  interrupt the witness again.
14        MR. COLEMAN:  Well, I will do it
15  if he -- he needs to listen to the
16  questions.
17        MR. RISSMAN:  If you are going
18  to interrupt him, I am going to
19  interrupt you, so it is not going to
20  work.
21  BY MR. COLEMAN:
22     Q.   Go ahead, Dr. Singer.  Please
23  answer the question.
24     A.   Are you saying that conditional on
25  my assessing the case during the initial

Page 16

1  screening process and accepting the matter
2  under the belief that I would, in fact, be
3  able to -- to offer a reliable estimate of
4  damages?
5        I have gone forward and completed
6  every instance where I have been retained,
7  but I just want -- I think that's an
8  important element to the question, and I just
9  want the record to be clear that I'm not
10  going to accept a case if I don't think that
11  having studied it, the complaint, and met
12  with the -- with the clients, if I don't
13  think that there's something available there
14  for me to dig into and to apply my skills,
15  then I will -- I will pass on the case.
16     Q.   You understand that -- the Daubert
17  standard, right?
18        MR. RISSMAN:  Objection.  Calls
19  for a legal conclusion.
20     A.   I have an understanding of the
21  Daubert standard, yes.
22  BY MR. COLEMAN:
23     Q.   And it's important to you to use
24  reliable methods and submit economic analysis
25  that meets the Daubert standard, right?

Page 17

1    A.    Yes.
2    Q.    You recognize that your opinions
3  as an expert must be based on the facts in
4  the case, right?
5    A.    Yes.
6    Q.    And you must account for the facts
7  in the particular industry that you're
8  analyzing, right?
9    A.    Yes.
10        MR. RISSMAN:  Object to form.
11    A.    Yes.
12  BY MR. COLEMAN:
13    Q.    And the opinions that you form
14  must be the product of reliable principals
15  and methods, right?
16    A.    Yes.
17    Q.    And in the antitrust context, it's
18  particularly important that expert economic
19  analysis show that claimed damages were, in
20  fact, caused by the unlawful acts of
21  defendants rather than other factors such as
22  unlawful -- such as lawful competition,
23  right?
24        MR. RISSMAN:  Object to form.
25    A.    Well, causation is an important

Page 18

1  element for plaintiffs.  I will grant you
2  that.  But it's not always within my domain
3  to -- to assess causation.  I have been asked
4  sometimes to estimate damages under the
5  assumption that someone else is going to
6  establish causation.
7        MR. COLEMAN:  Can you please
8    pull up Tab 6 and mark it as
9    Exhibit 2?
10        (Exhibit 2 was marked for
11        identification.)
12        THE WITNESS:  Okay.  I've got
13    Tab 6 here.
14  BY MR. COLEMAN:
15    Q.    And in Tab 6 -- what's been marked
16  as Exhibit 2 is a case captioned Apotex, Inc.
17  v. Cephalon, Inc.
18        You're familiar with this case,
19  right?
20    A.    Yes.
21    Q.    And if we go to Page 15 of the
22  document, the second paragraph starting
23  "however," states:  However, the burden is
24  placed upon the plaintiff to show that the
25  damage claim was, in fact, caused by the

Page 19

1  unlawful acts of the defendant and did not
2  result from some other factor such as lawful
3  competition by the defendant.
4        Do you see that?
5    A.    Yes.
6    Q.    And you agree with that, right?
7        MR. RISSMAN:  Objection.  Calls
8    for a legal conclusion.
9    A.    Yeah, that's consistent with what
10  I told you, that it is the burden of the
11  plaintiff, and it's sometimes my burden
12  depending on my assignment.
13        But, yes, I will grant you, it's
14  always the burden of the plaintiff to
15  establish causation.
16  BY MR. COLEMAN:
17    Q.    And it's important for antitrust
18  plaintiffs and economic analysis on behalf of
19  antitrust plaintiffs to distinguish lawful
20  from unlawful conduct, right?
21        MR. RISSMAN:  Object to form.
22    A.    For -- for plaintiffs to establish
23  it, yes.
24  BY MR. COLEMAN:
25    Q.    And you understand that economic

Page 20

1  analysis that assumes away rational economic
2  behavior by competitors is subject to
3  exclusion under the Daubert standard, right?
4        MR. RISSMAN:  Objection.  That
5    calls for a legal conclusion.
6    A.    Yeah.  I don't think I have an
7  opinion on that.
8  BY MR. COLEMAN:
9    Q.    Go to Page 23 of the document.
10  And if we highlight the paragraph that starts
11  with "accordingly."
12        Accordingly, because Dr. Singer's
13  calculation two assumes a but-for world for
14  which there is no factual support, which
15  requires assuming away rational economic
16  behavior by competitors and measures damages
17  in excess of Apotex's lost profits,
18  calculation two will be excluded.
19        Do you see that?
20    A.    Yes.
21    Q.    Did you disagree with the Court's
22  assessment?
23    A.    No.  In fact, during my
24  deposition, I -- they asked me -- defense
25  counsel asked me explicitly if I thought

Page 21

1  there was an economic basis, and I explained
2  that plaintiff's counsel had asked me to
3  calculate damages under an alternative legal
4  theory in which Apotex, the one generic that
5  did not go along with the illegal scheme, was
6  entitled to 100 percent of the ill-gotten
7  gains of all conspiring generic defendants.
8       I said during my deposition, there
9  wasn't an economic basis for that, but
10  counsel has instructed me as an alternative
11  damages methodology -- that's why it's
12  described there as calculation two -- to
13  estimate the totality of the ill-gotten gains
14  by the conspiring generic defendants, and I
15  did so.
16       And I said so in my report, and I
17  said so in my deposition. And here, the
18  judge is saying I'm not going to allow that
19  calculation in under that legal theory.
20    Q.   So you agree -- you appreciate
21  that economic analysis that assumes away
22  rational economic behavior by competitors is
23  subject to exclusion under the Daubert
24  standard, right?
25       MR. RISSMAN: Objection. Calls

Page 22

1    for a legal conclusion.
2       (Reporter clarification.)
3       THE WITNESS: Yeah. Let me just
4  hear it back because there was
5  something that I -- that I disagreed
6  with.
7       But let me -- is it okay if I
8  just hear back the question? Court
9  reporter, can you read it back to me?
10       (The previous question was read
11       back by the court reporter as
12       follows:
13       "QUESTION: So you agree -- you
14       appreciate that economic analysis
15       that assumes away rational economic
16       behavior by competitors is subject
17       to exclusion under the Daubert
18       standard, right?")
19    A.   I don't know if that is the
20  takeaway from this episode. So when you say
21  I appreciate -- I mean, the wisdom or the
22  knowledge that I took away from this case --
23  from this episode was that if plaintiff's
24  counsel offers a legal theory, that the Court
25  rejects, then the damages that are associated

Page 23

1  with that legal theory go away.
2       And that's -- that's the only
3  takeaway that I -- that I have from that. My
4  other opinion was accepted, and I even got to
5  testify in front of the jury on that matter.
6  BY MR. COLEMAN:
7    Q.   I'm just reading what the Court
8  held, and the Court held that your analysis,
9  calculation two, is excluded because it
10  assumed away rational economic behavior by
11  competitors, right?
12    A.   I think the plaintiff's theory of
13  harm -- their alternative legal theory in
14  which Apotex was entitled to 100 percent of
15  the ill-gotten gains of the conspiring
16  generic defendants was rejected, and
17  accordingly, any damages that were associated
18  with that alternative legal theory were also
19  rejected.
20    Q.   Do you dispute that an expert
21  opinion in an antitrust case in order to be
22  admissible needs to separate lawful from
23  unlawful conduct?
24       MR. RISSMAN: Objection. Calls
25    for a legal conclusion. Form.

Page 24

1    A.   I don't think I have an opinion on
2  the law there. But I can tell you as an
3  economist that I wanted to isolate the effect
4  of the anticompetitive conduct when
5  estimating damages, and I want to control for
6  all the other factors that could be affecting
7  prices or wages or whatever I'm trying to
8  model.
9  BY MR. COLEMAN:
10    Q.   And so you recognize that a
11  model -- an economic model or economic
12  analysis that does not adequately isolate
13  unlawful conduct and distinguish it from
14  lawful conduct is problematic. It's not good
15  economics, and it's not reliable?
16       MR. RISSMAN: Object to form.
17       Hypothetical.
18    A.   I mean, the way that I would put
19  it in economic parlance is that an economic
20  model, for example, a regression model, it
21  failed to control for some key omitted
22  variable that -- that better explained the
23  conduct and was well grounded in economic
24  theory and the facts of the case, that that
25  model could not be used to isolate the effect

Page 25

1 of the challenged conduct on prices.
2 BY MR. COLEMAN:
3    Q.   If a business has sound legitimate
4 basis for a decision that is grounded and
5 legitimate economic purposes, the economic
6 model should not treat that as unlawful
7 conduct, right?
8       MR. RISSMAN:  Object to form.
9 Incomplete hypothetical.
10    A.   I don't know if I -- if I caught
11 that one.  Maybe -- maybe you could give it
12 back to me.
13 BY MR. COLEMAN:
14    Q.   If a business has a valid
15 legitimate basis for its business decision
16 that's being evaluated by an economic model,
17 the model should not treat that decision as
18 unlawful conduct, right?
19       MR. RISSMAN:  Same objection.
20    A.   I would say it depends on what
21 kind of case that we are dealing with.  There
22 is some conduct, as you are aware, that is
23 per se legal under the antitrust laws, and so
24 it would not be a valid exercise on behalf of
25 the plaintiff's or the defendants' expert to

Page 26

1 go looking for valid -- I'm trying to
2 paraphrase what you said -- valid efficiency,
3 justified motivation for engaging the
4 conduct.
5 BY MR. COLEMAN:
6    Q.   Well, we can use the language of
7 the Apotex court, and you understand that the
8 Apotex court referred to rational economic
9 behavior by competitors.
10       Do you recall that from what we
11 read?
12    A.   Yes.
13    Q.   And you understand that concept,
14 right?
15    A.   Yes.
16    Q.   And an economic model that treats
17 rational economic behavior in the
18 self-interest of a particular firm as
19 unlawful conduct is problematic, right?
20       MR. RISSMAN:  Object to form and
21 calls for incomplete hypothetical.
22    A.   Again, I don't think that comes
23 from the Apotex decision, but I can say,
24 divorced from the Apotex decision, that an
25 economic model in a Section 2 case where

Page 27

1 conduct might be motivated for procompetitive
2 reasons needs to be able to account for those
3 efficiency justifications.
4       And a Section 1 case, a per se
5 violation, I don't think it is the burden of
6 the expert to try to justify or explain away
7 the conduct with efficiency bases.
8 BY MR. COLEMAN:
9    Q.   So an antitrust plaintiff does not
10 need to exclude an explanation for conduct
11 that's grounded in legitimate business
12 reasons?
13    A.   I think the question presumes that
14 we are starting off with conduct that could
15 be motivated for procompetitive reasons, and
16 I'm questioning the premise of your question.
17       There are many cases, including
18 this one, in which we're dealing with a
19 price-fixing conspiracy in which case it is
20 not the burden of the expert to go looking
21 for deficiency justifications.  It would only
22 be in a Section 2 case, in a single-firm
23 monopoly case or single-firm monopsony case
24 where we would have to distinguish
25 anticompetitive motivations from

Page 28

1 procompetitive motivations.
2    Q.   But you would recognize that it's
3 not appropriate to assume collusion from
4 behavior that is consistent with rational
5 economic self-interest, right?
6       MR. RISSMAN:  Object to form.
7    A.   I don't know if I have an opinion
8 about assuming collusion.  I have to assume
9 in certain parts of what I do that the
10 challenged conduct occurred.  But in a
11 price-fixing case such as this one, as you --
12 as you have observed in my report, I don't
13 assume, but instead I make an assessment of
14 whether the conduct is consistent with the
15 conspiracy based on qualitative and
16 quantitative factors.
17 BY MR. COLEMAN:
18    Q.   Did you make an effort in your
19 analysis to rule out lawful explanations for
20 the conduct that you assess in this case?
21    A.   I think so.  I think that I have a
22 section at the end titled "Plus Factors,"
23 which we wouldn't get to unless the Court
24 were to determine that we had to go there.
25 And so -- so the answer to your question is,

Page 29

1  yes, I do think that I went and tried to
2  inform the plus factors based on the evidence
3  that I reviewed in this record.
4      Q.   Yeah.  We'll get into this in some
5  more detail.
6          How many times have you had an
7  opinion or analysis deemed inadmissible by a
8  court under the Daubert standard?
9      A.   I have had two exclusions -- two
10  full exclusions under the Daubert standard in
11  my career.
12     Q.   And what cases were those?
13     A.   Jimmy John's is one, and the other
14  was -- it was the Society of Reproductive --
15  ASRM, I think, is -- was the defendant, and I
16  am -- I forget what the ASRM stood for, but
17  it was Reproductive Society.  It involved
18  donor eggs.
19     Q.   In how many -- Apotex was a case
20  in which the court ruled a particular
21  calculation or opinion to be inadmissible
22  under Daubert, right?
23     A.   Right.  Yeah, in that case, I
24  think, I filed, you know, the standard for
25  assessing reverse payments, went up to the

Page 30

1  Supreme Court in the middle of may case and
2  had to go back and refile reports.  I think
3  that I filed something on the order of five
4  reports, maybe a thousand pages of testimony,
5  and one calculation got excluded in that
6  case.  That is right.
7      Q.   So I'm also interested in that, in
8  an instance in which a court excluded part of
9  your opinion or a particular calculation or a
10  model.
11         How many times has that happened?
12     A.   Right.  That's happened on a few
13  occasions.  Let me see if I can -- you got --
14  you got the major one.  I can think of --
15  when I say "major," I mean, the -- I didn't
16  consider to be a major exclusion, but -- but
17  you got the -- the important one in my
18  portfolio.
19         I think that -- I have to think
20  back.  There was -- okay.  Here's one.  In
21  the capacitors case, the judge ruled that I
22  could assess qualitative evidence using
23  economic criteria, but that I could not
24  assess it using the DOJ and FTC collaboration
25  guidelines.

Page 31

1      Q.   Any others come to mind?
2      A.   Oh, Yes.  MacBook -- In Re:
3  MacBook Keyboard case, which is a consumer
4  protection case where the class was certified
5  around my impact model.  The judge did not
6  allow an alternative model to come through.
7          That was called a hedonic
8  progression model.  And so the only -- the
9  only model that I will be able to show the
10  jury in that case is the conjoint model.
11     Q.   Did you disagree with any of those
12  decisions?
13     A.   Oh, yes.
14         You want to tick through one by
15  one?
16     Q.   Do you disagree with them all?
17     A.   Oh, I don't know if I -- no, I
18  don't disagree with them all.  That's why it
19  would be better, I think, if we -- we tick
20  through them, if you have the time, if you
21  want to know my opinion.  You know, very few
22  people ever asked, but I am happy to tell you
23  which ones I agree with and which ones I
24  don't.
25     Q.   Well, let's just ask this:  Do you

Page 32

1  acknowledge that you've made errors in your
2  analysis in any of those cases?
3      A.   Oh, no.  No.  Never made an error.
4      Q.   Throughout your report, you refer
5  to "Challenged Conduct."  Capital C on
6  "challenged" and capital C on "conduct."
7          What exactly was the challenged
8  conduct in this case?
9      A.   Yeah.  So I summarized it in
10  Paragraph 2, and I don't think I can do it
11  better here in realtime, but I -- in broad
12  strokes, the challenged conduct is an alleged
13  price-fixing conspiracy that involved the
14  exchange of competitively sensitive
15  information through Agri Stats that served as
16  an information exchange facilitating device
17  for collusion.
18         And so that's -- that's just my
19  on-the-fly summary of what Paragraph 2 says.
20     Q.   Okay.  So there was -- there was a
21  conspiracy, and a conspiracy involves an
22  agreement among competitors, right?
23     A.   I think that could be how the law
24  interprets it.  I think that economists don't
25  necessarily use the word "agreement" to

Page 33

1  explain conspiracies, but that is my
2  understanding, that the law considers an
3  agreement to be at the heart of a conspiracy.
4      Q.   Was there an agreement here?
5      A.   Well --
6          MR. RISSMAN:  Object to form.
7      A.   Yeah, I typically --
8          MR. RISSMAN:  Calls for a legal
9  conclusion.
10         (Reporter clarification.)
11         MR. RISSMAN:  Calls for a legal
12  conclusion.
13     A.   Yeah.  In my -- in my price-fixing
14  cases, I'm told by counsel that I'm not to
15  opine on the existence of an agreement.  So I
16  don't.  What I do instead is I assess
17  qualitative and quantitative evidence that is
18  consistent with the existence of, but I'm
19  not -- I'm not supposed to opine on whether
20  or not I believe the agreement exists.
21  BY MR. COLEMAN:
22     Q.   Coming back to what you understand
23  challenged conduct to be, which is a term
24  that you used throughout your report.  You
25  think it includes a conspiracy among the

Page 34

1  defendants, right?
2      A.   Yes.
3      Q.   And how do you define
4  "conspiracy"?
5      A.   Well, I can give you an economic
6  definition.  I think that I would send you to
7  the complaint to see how the plaintiffs have
8  defined a conspiracy.  But an economic
9  definition of conspiracy is the notion that
10  the decision making with regard to prices and
11  output were done on a coordinated basis
12  rather than on -- on a unilateral basis and
13  done so explicitly.
14     Q.   What do you mean by "explicitly"?
15     A.   Well, what we are trying to do in
16  many of these cases is rule out what an
17  economist would call tacit collusion.  And so
18  it's possible in certain industries, say,
19  that are highly concentrated -- I am just
20  thinking of a hypothetical industry where
21  firms might be able to feel their way to the
22  monopoly prices without -- without explicitly
23  coordinating.
24     Q.   Why is it important to rule out
25  tacit coordination?

Page 35

1      A.   Well, when you say "important,"
2  I'm answering this, of course, not from a legal
3  economic perspective, not from a legal
4  perspective, although I do understand the law
5  cares about that, too.
6          But from an economic perspective,
7  I think that the economist, when assessing
8  the evidence, both qualitative and
9  quantitative, should be on the lookout for
10  the possibility that the information they're
11  seeing could also be consistent with tacit
12  collusion and to rule that out, and I believe
13  I've done that here.
14     Q.   You mentioned that the challenged
15  conduct -- coordination among the
16  defendants -- explicit coordination, right?
17     A.   Oh, I'm sorry.  I am sorry.
18  What's the question?  I am sorry.  Give it to
19  me again.
20     Q.   Well, i just want to -- we need to
21  get through what challenged conduct means.
22     A.   Right.
23     Q.   And I think as a first step, I
24  think we have established that it includes,
25  in your mind, a conspiracy, and there's

Page 36

1  coordination that was done on an explicit
2  basis, right?
3      A.   The allegation by plaintiffs is
4  that there was a price-fixing conspiracy that
5  involved the sharing of competitively
6  sensitive information through Agri Stats,
7  and, you know, if you go into the complaint,
8  they'll talk about how that agreement touched
9  many aspects of the conduct of the firms at
10  issue and how they were able to achieve a
11  reduction in output in a coordinated way.
12         But I think that the centerpiece,
13  at least as I understand it and the way that
14  I've written up my report, is the information
15  exchange -- antitrust competitive information
16  exchange.
17     Q.   Okay.  So there was an agreement
18  to exchange information through Agri Stats,
19  right?
20     A.   Well, as alleged in the complaint.
21  You know, I'm loathed to tell you that there
22  was an agreement.  Whenever you ask me today
23  about whether there was an agreement, I'm
24  going to tell you that it is alleged.
25     Q.   Well, let's come back -- you used

Page 37

1  "challenged conduct" maybe dozens of times in
2  your report, and I want a definition of what
3  you meant by it.
4      So is your -- your answer is just
5  whatever happened to be in the complaint, or
6  does challenged conduct actually mean
7  something specific to you?
8      A.   It means -- it means something --
9  well, I don't know if those are -- it could
10  be both, right.  But I give you my best
11  understanding of the challenged conduct in
12  Paragraph 2.  And so I can't do any better
13  than that here, and I've tried to paraphrase
14  what's in Paragraph 2.
15      And that's my -- that's my
16  understanding of the challenged conduct.
17  It's a price -- an alleged price-fixing
18  conspiracy.
19      Q.   Well, let's step back for a
20  minute.
21      So an agreement, a conspiracy,
22  whatever, an exchange of information, is that
23  a per se violation in and of itself?
24      MR. RISSMAN:  Objection.  That
25      calls for a legal conclusion.

Page 38

1      A.   Yeah.  I don't think that you want
2  to come to me for that as to how this is
3  going to be adjudicated.  I mean, I feel like
4  that's ultimately going to be the Court's
5  decision as to whether or not to apply the
6  per se -- or rule of reason standard.
7  BY MR. COLEMAN:
8      Q.   Is -- in your mind, is everything
9  you define as challenged conduct unlawful?
10      MR. RISSMAN:  Object to form.
11      And calls for a legal conclusion.
12      A.   Right.  I don't have any opinions
13  with respect to what -- what is unlawful.  I
14  have opinions as to whether or not the
15  conduct was anticompetitive.  I can answer
16  that question, but I can't -- I can't go into
17  areas of law.
18  BY MR. COLEMAN:
19      Q.   And -- well, answer that question,
20  then.
21      Is all of the challenged conduct
22  anticompetitive in economic terms?
23      A.   Oh, I concluded that the
24  challenged conduct was anticompetitive using
25  both my qualitative assessment and my

Page 39

1  quantitative methods, yes.
2      Q.   Does challenged conduct include
3  increasing -- defendants increasing exports
4  of pork products?
5      A.   Well, if you go into the
6  complaint, you will find allegations that the
7  agreement implicated the defendants' decision
8  making with respect to exports, and there
9  were, in fact, in the record episodes of
10  coordination on the decision of how much to
11  export.
12      But I don't consider exporting to
13  be a restraint that is being challenged in
14  the case.  In other words, my mandate was to
15  remove the challenged conduct, which I
16  interrupted to mean the centerpiece was this
17  price-fixing conspiracy held together by
18  information exchange.
19      In other words, no one -- no one
20  said, Dr. Singer, I want you to assume that
21  exporting is zero in the but-for world.  No
22  one asked me to treat exporting as if it were
23  a restraint.
24      Now, exporting would likely fall
25  in the but-for world as you remove the

Page 40

1  challenged conduct.  But I don't consider
2  exporting to be a restraint that I should
3  remove when modeling the but-for world.
4      Q.   Yeah.  So it -- just so the record
5  is clear, the but-for world is the world in
6  which there was no conspiracy or challenged
7  conduct, right?
8      A.   Correct.
9      Q.   So in the but-for world, we assume
10  away any unlawful coordination or any
11  challenged conduct, right?
12      A.   That's fair.
13      Q.   And so at least as to exports, do
14  you have an opinion in that but-for world
15  whether exports would have stayed flat or
16  would have increased?
17      A.   So what I've -- what I've
18  quantified is the extent to which domestic
19  production would be -- would have been
20  greater in the but-for world absent the
21  challenged conduct.
22      What I have not done is said where
23  would that come from.  Would it necessarily
24  come from exports, or would it be new supply.
25  I haven't -- I haven't -- I haven't said

Page 41

1  that.  But I think that my kind of high-level
2  opinion is that exports would be lower in the
3  but-for world but would not be zero.
4         And so, you know, I'm going back
5  and saying something earlier.  No one asked
6  me to eliminate exporting in the but-for
7  world and then solve for the price effects.
8  That was not -- that was not my mandate.  My
9  mandate was to remove the challenged conduct.
10     Q.   We'll be able to look at some
11  numbers in a bit.
12         But I mean, you understand that
13  exports have increased year over year for
14  pork products for -- you know, going back for
15  decades now, right?
16     MR. RISSMAN:  Object to form.
17     A.   That's probably fair, yes.  I
18  mean, just as the world economy grows, that
19  would make sense.
20  BY MR. COLEMAN:
21     Q.   So do you have an opinion as to
22  whether the exports in the but-for world
23  would have increased?
24     A.   Well, relative to the actual
25  world, my opinion is that exports would have

Page 42

1  been smaller in the but-for world.  But if
2  you drew them on a graph, they would be
3  increasing over time, no doubt, even in the
4  but-for world.
5     Q.   So I want come back to your answer
6  that I'm not -- it's not clear to me, that --
7  you said there was -- we're going back to the
8  challenged conduct and what it was.  And I'm
9  trying to explain -- or understand exactly
10  what's included in challenged conduct.  And I
11  think we have established that there -- you
12  think there was a conspiracy, or you assume
13  there was a conspiracy, and I want to
14  understand what the conspiracy agreed to do,
15  conspiracy to do what.
16         Was there a conspiracy to increase
17  exports of pork products?
18     MR. RISSMAN:  Object to form.
19  And calls for a legal conclusion.
20     A.   I think the alleged conspiracy
21  involved reducing domestic output and
22  increasing domestic prices.  Now, how that
23  manifested itself could occur in many ways.
24         You know, I go into my report --
25  talk about harvest reduction and exporting

Page 43

1  and liquidation.  There are many different
2  mechanisms by which allegedly conspiring
3  firms could reduce domestic output.  And I'm
4  also aware in the complaint, and in my
5  report, I've summarized some record evidence
6  that speaks to coordinated conduct with
7  respect to exporting.
8         But I think it's a mistake to --
9  to focus on exporting and to treat exporting
10  as a restraint that should be eliminated in
11  the but-for world.  I'm just trying to make
12  this -- you said I wasn't being clear.  I'm
13  trying to be as clear as possible.
14         The restraint is an alleged
15  conspiracy to reduce domestic output and to
16  raise prices.  And the way that that was
17  achieved -- the way that that was achieved
18  was through a variety of mechanisms, right,
19  that I detail in my report.  And I guess I
20  will leave it as that.
21  BY MR. COLEMAN:
22     Q.   So what was the underlying
23  agreement among defendants?  It was to reduce
24  pork -- domestic pork supply?  Is that -- is
25  that your testimony?

Page 44

1         MR. RISSMAN:  Objection.  Legal
2  conclusion.  Form.
3     A.   Right.  So, again, I can't -- I
4  can't speak to the existence of the
5  agreement, but I can tell you my
6  understanding of the allegations in the
7  complaint was that there was a single
8  agreement among the defendants, with
9  Agri Stats working as the center piece, to
10  reduce domestic pork supply and increase
11  prices.
12  BY MR. COLEMAN:
13     Q.   And the -- you talk quite a bit
14  about cartel, and you review cartel
15  literature, and I think you accuse Agri Stats
16  of doing the work of a cartel here, right?
17     A.   I -- I think that my opinion is
18  that Agri Stats performed like a textbook
19  cartel, yes -- a cartel ringleader, yes.
20     Q.   Okay.  Are you -- did you form the
21  opinion that a cartel existed here or not?
22         MR. RISSMAN:  Objection.  Calls
23  for a legal conclusion.
24     A.   I mean, I just told you that I
25  think that Agri Stats was -- was acting like

Page 45

1  a cartel. But I think that my primary
2  economic opinion is that the qualitative and
3  quantitative evidence is consistent with a
4  conspiracy to inflate prices and reduce
5  domestic output.
6  BY MR. COLEMAN:
7      Q.   And so, again, the cartel
8  agreement here, to the extent one existed,
9  was to reduce supply, and the cartel has left
10  it to the defendant firms to figure out how
11  to do that?
12         How does this work in your mind?
13     A.   No, I don't --
14         MR. RISSMAN: Object to form and
15     lacks foundation.
16     A.   My review of the record and the
17  qualitative evidence does not -- shows that
18  it was not left to defendants to figure it
19  out; that there was, in fact, coordination
20  with respect to how to figure it out, with
21  respect to reducing exporting, for example --
22  sorry, increasing exporting so as to reduce
23  domestic supply.
24         So, I guess, I reject -- I reject
25  the question respectfully, but I don't think

Page 46

1  it was just left to the defendants to figure
2  it out on their own.
3      Q.   Okay. So what exactly was the
4  coordination to reduce exports?
5          MR. RISSMAN: Same objections.
6      A.   I think that I've reviewed both
7  allegations in the complaint and record
8  evidence that's in my report under the
9  exporting section in which two or more
10  defendants were coordinating with respect to
11  their export decision making.
12  BY MR. COLEMAN:
13     Q.   And what does "coordination" mean
14  in your mind there?
15     A.   Coordination is distinct from the
16  unilateral conduct; that is, they're reaching
17  the decision in cahoots or in coordination
18  with arrival -- horizontal arrival.
19     Q.   Can you point to a single document
20  that indicates that two defendants that
21  were -- were in, quote/unquote, cahoots when
22  making their -- a decision to export pork
23  products?
24     A.   Well, I believe I have such
25  evidence in my report. I don't know if I can

Page 47

1  take you there right now in realtime, but I
2  think that I do, in fact, point to such
3  evidence in the report.
4      Q.   Well, we can go through -- we'll
5  go through it in some detail, but sitting
6  here, at this moment, you're not -- you can't
7  point to a single document in which two
8  defendants were in, quote/unquote, cahoots to
9  increase exports?
10         MR. RISSMAN: Objection.
11     Mischaracterizes testimony.
12     A.   Sitting here, I don't think I have
13  it memorized, but I have two separate
14  sections on exports, and I've -- you know,
15  I've read them a few times recently, and I
16  seem to recall an episode in which two or
17  more defendants were coordinating in their
18  export decisions.
19  BY MR. COLEMAN:
20     Q.   Which defendants?
21     A.   Sitting here, I can't say.
22     Q.   Have you reviewed any data about
23  how much pork products any of the defendants
24  exported in any particular year?
25     A.   I believe I have, yes.

Page 48

1      Q.   And what data?
2      A.   Oh, I think -- I think Agri Stats
3  kept data on exports, and I also think I've
4  seen data on exports that were kept by the
5  defendants themselves.
6      Q.   Okay. So my client is Hormel.
7  How much did Hormel export in any particular
8  year?
9          MR. RISSMAN: Object to form.
10     A.   Oh, sitting here, I can't tell
11  you.
12  BY MR. COLEMAN:
13     Q.   Have you reviewed data showing how
14  much pork products Hormel exported?
15     A.   It's possible I have, yes, or a
16  staff member has, yes.
17     Q.   So are you familiar with the
18  concept of direct evidence of a conspiracy or
19  agreement?
20         MR. RISSMAN: Objection. That
21     calls for a legal conclusion.
22     A.   No. No, I'm not.
23  BY MR. COLEMAN:
24     Q.   Have you reviewed any documents in
25  which there was correspondence from one

Page 49

1  defendant to another indicating that they had
2  agreed to increase exports?
3          MR. RISSMAN:  I'm going to
4  object on legal conclusion, and I also
5  instruct the witness that he should
6  only testify as to things he's formed
7  an opinion on and not -- merely
8  analyzed but had not formed an opinion
9  on.
10          MR. COLEMAN:  And I guess I will
11    revise the question.
12  BY MR. COLEMAN:
13      Q.   In response to the -- you think
14  that there's evidence in this case indicating
15  that two or more defendants were in,
16  quote/unquote, cahoots to increase exports.
17          And I'm concerned about that.
18  It's a serious allegation.  If it's true,
19  it's a crime.  So you're accusing my client
20  and other defendants of crimes.
21          I want to know exactly what you're
22  talking about when you think there's evidence
23  in this case showing that two or more
24  defendants were in, quote/unquote, cahoots to
25  increase exports?

Page 50

1          MR. RISSMAN:  Object to form.
2  BY MR. COLEMAN:
3      Q.   As of -- as of the moment, you're
4  not able to identify to a -- a specific
5  document, right?
6          MR. RISSMAN:  Object to form.
7    And long narrative.  I'm not really
8    sure what the question was.
9          But if you understood it, Mr. --
10    Dr. Singer, you can answer.
11      A.   My recollection is that there's
12  evidence in my report that describes how two
13  defendants, either acting directly or via
14  Agri Stats, were coordinating and sharing
15  information or cajoling one another with
16  respect to decision making over exports.
17  BY MR. COLEMAN:
18      Q.   And so that's how we would
19  identify that -- that evidence that you have
20  in mind, is that one defendant is,
21  quote/unquote, cajoling another defendant to
22  increase exports?
23          MR. RISSMAN:  Objection.
24    Mischaracterizes the testimony.
25          MR. COLEMAN:  I'm not.

Page 51

1  BY MR. COLEMAN:
2      Q.   I'm just trying to understand what
3  you're talking about.
4      A.   Sure.
5      Q.   I looked through the record, and I
6  haven't seen it, so help me out here.
7          MR. RISSMAN:  Objection.
8    Argumentative.
9  BY MR. COLEMAN:
10      Q.   Go ahead.
11      A.   I'm telling you what my memory is
12  of the evidence, and I also seem to recall in
13  the complaint that there was an allegation
14  that the -- that the agreement touched export
15  decision making as well.
16          I will leave it at that.
17      Q.   Well, I'm interested in how we
18  would go about identifying this document in
19  which one defendant is cajoling another one.
20          How did that work in your mind?
21      A.   Okay.  Those are two separate
22  questions.  But how we would go about it,
23  which is the first question, is I'd want to
24  go back and review the evidence that I put
25  forward in my export session.

Page 52

1          I have two sections on exports,
2  and I seem to recall at least one paragraph
3  in which two or more defendants were involved
4  in the communication that concerned the
5  decision making around exporting.
6      Q.   Okay.  So when we come back to
7  challenged conduct -- challenged conduct, it
8  includes a conspiracy.  There was a
9  conspir -- an agreement, conspiracy, whatever
10  you want to call it, to participate in
11  Agri Stats, right?
12          MR. RISSMAN:  Object to form.
13    And mischaracterizes testimony in the
14    report.
15  BY MR. COLEMAN:
16      Q.   Yeah.  If I mischaracterize your
17  testimony, go ahead and correct me.  I'm just
18  trying to understand what you mean by
19  "challenged conduct."
20      A.   Sure.
21          MR. RISSMAN:  Objection.  Asked
22    and answered.
23      A.   Sure.  The challenged conduct as
24  described in Paragraph 2 is an alleged
25  agreement among defendants to reduce domestic

Page 53

1 pork supply, increase prices through the use
2 of an information exchange provided by
3 Agri Stats.
4 BY MR. COLEMAN:
5    Q.   Okay.  So the conspiracy is not
6 just to -- in your mind, it's not just to
7 exchange information through Agri Stats, but
8 it is also to reduce the domestic supply of
9 pork?
10    A.   I think that the conspiracy as
11 alleged here was designed to reduce the
12 domestic supply of pork and to increase
13 domestic prices.
14    Q.   Yeah.  And was there a conspiracy
15 to increase exports?
16         MR. RISSMAN:  Objection.  Form.
17    A.   Yeah, I'm -- I don't offer an
18 opinion on the existence of a conspiracy or
19 the existence of an agreement.  All I can
20 tell you, in my economic opinion, is that my
21 review of the qualitative factors according
22 to the criteria that economists use to
23 ascertain cartel behavior as well as the
24 quantitative evidence, the method I used to
25 assess price and output effects is all

Page 54

1 pointing in the direction and consistent with
2 the existence of an agreement and the
3 existence of a conspiracy.
4         And that's as far as I can go.
5 BY MR. COLEMAN:
6    Q.   Did that include the conspiracy to
7 increase exports?
8         MR. RISSMAN:  Object to form.
9    A.   I think that in the complaint,
10 there's an allegation that the conspiracy
11 reached decision making with respect to
12 exporting.  But I wouldn't consider that
13 aspect to be a standalone agreement.  There
14 are many ways in which output -- domestic
15 output can be reduced.  I go through the
16 different ways in my report.
17         And I think the best way to
18 explain and to understand the challenged
19 conduct is a single agreement to reduce
20 domestic supply and raise domestic prices.
21 BY MR. COLEMAN:
22    Q.   Is increase in exports part of the
23 challenged conduct?
24         MR. RISSMAN:  Object to form.
25    A.   Well, I don't -- I don't include

Page 55

1 increasing exports, in quotes, that phrase,
2 in Paragraph 2 when I complain the challenged
3 conduct.  I've now -- I think I've defined it
4 for you about five times, and it's -- you
5 know, Paragraph 2 is the best I can do.
6         But, again, I will say that
7 increasing exports is an aspect or an element
8 that flowed from the challenged conduct.
9 That is the mechanism -- is one of the
10 mechanisms by which the defendants allegedly
11 were able to reduce domestic pork supply.
12    Q.   And so again -- are you not able
13 to give me a yes-or-no answer as to whether
14 increased exports fits your definition of
15 challenged conduct?
16         MR. RISSMAN:  Object to form.
17         And asked and answered.
18    A.   That's correct.  I can't --
19         MR. COLEMAN:  I wish it had been
20 answered.
21 BY MR. COLEMAN:
22    Q.   Is that a -- that's not subject to
23 a yes-or-no question?
24    A.   I guess there's --
25         MR. RISSMAN:  Same objection.

Page 56

1    A.   Oh.  It is not subject to a
2 yes-or-no answer.
3 BY MR. COLEMAN:
4    Q.   How about the reduction in sow
5 herd by some of the defendants?  Is that part
6 of your definition of challenged conduct?
7    A.   Are you talking about the
8 liquidation, for example, as another method
9 to reduce domestic supply?
10    Q.   Yes.
11    A.   So I see liquidation, harvest
12 reduction, and exporting as different
13 mechanisms by which the defendants were able
14 to effectuate the alleged conspiracy.  But I
15 don't -- I don't see liquidation, for
16 example, or exporting to be a separate and
17 standalone restraint that I need to remove in
18 the but-for world.
19         What I need to remove in the
20 but-for world is the challenged conduct; that
21 is, the agreement -- the single agreement to
22 reduce output and raise prices via sharing of
23 competitively sensitive information through
24 Agri Stats.  That's what I have to remove.
25    Q.   And so at least in this context,

Page 57

1  you're familiar with what an agreement is.
2  Your model accounts for an agreement among
3  defendants that -- to share information
4  through Agri Stats?
5      A.   I think you're speaking of my
6  econometric model here.
7      Q.   I'm -- yeah, I'm just referring to
8  the testimony you just offered, that your
9  model needs to account for and remove the
10 agreement to exchange information through
11 Agri Stats.
12     A.   Well, as you know, I set the -- I
13 used a conduct variable, which is a very
14 traditional approach to estimating price
15 effects from alleged price-fixing
16 conspiracies, and I set that conduct variable
17 equal to one at a certain point in 2009, as
18 you know, because that's when Agri Stats
19 began to produce, I believe, the sales
20 report.
21         So the whole -- the whole
22 construct of the model is turning on this
23 information exchange by Agri Stats.
24 That's -- that's when I set the variable
25 equal to one.

Page 58

1      Q.   So there was an agreement to
2  participate in Agri Stats, right?
3      A.   I don't -- I don't like --
4      MR. RISSMAN:  Object to form.
5  Mischaracterizes his testimony, again.
6      MR. COLEMAN:  I'm literary
7  quoting from what he just said.
8         But go ahead.  Go ahead.  If you
9  want to --
10     MR. RISSMAN:  He --
11     MR. COLEMAN:  -- make your
12 testimony, that's fine.
13     A.   No, I wouldn't -- I wouldn't say
14 an agreement to participate in Agri Stats.
15 That's -- that's not how I would describe the
16 challenged conduct.  That's not how I've
17 defined it, you know, over the five or six
18 times you have asked me during this call --
19 during this deposition.
20         It is the agreement to suppress
21 domestic supply and to raise -- or the
22 alleged agreement, to suppress domestic
23 supply and to domestic prices was achieved
24 principally through coordination made
25 possible through the sharing of competitively

Page 59

1  sensitive information by Agri Stats.
2         So participate just kind of
3  glosses over the anticompetitive act.
4  BY MR. COLEMAN:
5      Q.   Right.  So there was -- all right.
6  I just want to understand your articulation
7  of what the challenged conduct was.
8         So there was an agreement to
9  reduce supply; is that right?
10     MR. RISSMAN:  Objection.
11 Mischaracterizes testimony.
12     A.   That's -- that's an aspect of the
13 agreement, but I think that the best way to
14 understand the agreement is -- now I've said
15 it about ten times.
16         But it's the -- the agreement is
17 to reduce domestic supply -- the alleged
18 agreement is to reduce domestic supply and to
19 increase domestic prices through the sharing
20 of competitively sensitive information by
21 Agri Stats.
22 BY MR. COLEMAN:
23     Q.   And, again, coming back to the sow
24 herd reduction, was there an agreement to
25 reduce sows?

Page 60

1         MR. RISSMAN:  Objection.
2      A.   I think the complaint alleges that
3  the agreement touched the decision making
4  with respect to liquidation.  But -- and I
5  said -- I will say the same thing for
6  liquidation that I said for exporting.
7         I'm not removing liquidation in
8  the but-for world.  Right.  I do not set
9  liquidation to zero in the but-for world and
10 then solve for the price fix.  I do not set
11 exporting to zero in the but-for world.  It
12 is not a restraint along the lines of the
13 restraint that I have removed, which is the
14 sharing of competitively sensitive
15 information among the defendants via
16 Agri Stats.
17         So just to put a bow on this,
18 there will be some liquidation in the but-for
19 world.  There will be some exporting in the
20 but-for world.  It's not a restraint to be
21 eliminated in the but-for world when I said
22 about modeling the but-for world and the
23 challenged conduct.
24 BY MR. COLEMAN:
25     Q.   So how much would sows -- the sow

Page 61

1  herd have been reduced in the but-for world?
2      MR. RISSMAN:  I'm going to
3   instruct the witness that if he hasn't
4   formed an opinion on that, he
5   shouldn't answer.
6  BY MR. COLEMAN:
7      Q.   Let's set that as a precursor.
8          Did you form an opinion on how
9   much the sow herd would have been reduced in
10  the but-for world?
11     A.   I have not.  I've estimated, like
12  I said, how much more domestic supply would
13  have occurred in the but-for world absent the
14  alleged conspiracy, and I have not performed
15  a decomposition as to how that output
16  increase would be achieved.
17         But I think it's reasonable to
18  infer that it would be achieved through some
19  combination of the mechanisms that were
20  employed by the defendants to reduce domestic
21  output.
22     Q.   So just coming back to the basic
23  question as to whether or not you formed an
24  opinion about how much the sow herd would
25  have been reduced, if at all, in the but-for

Page 62

1  world.
2          The answer is you did not form an
3  opinion on that subject; is that right?
4      A.   Well, I want the record to be very
5  clear.  I estimated with -- with great
6  precision, in my opinion, the extent of the
7  output reduction that could be attributed to
8  the challenged conduct.  I have not performed
9  a decomposition of that output reduction
10 according to the three primary mechanisms the
11 defendants used to reduce domestic supply.
12         I have not done that.  I don't
13 think such a decomposition is necessary, and
14 I will leave it at that.
15     Q.   Well -- and I'm just a lawyer.
16 I'm not sure I understand what decomposition
17 is.  I guess what I want to know is did your
18 model or any opinion that you formed in this
19 case allow you to assess whether sow herd
20 reductions would have occurred in the but-for
21 world?
22     A.   Oh.  The model doesn't tell us
23 that, but I think just economic insight
24 analysis and review of the qualitative
25 record, all the institutional details, is

Page 63

1   that some liquidation, of course, would occur
2   in the but-for world.  Some exporting would
3   occur in the but-for world.
4          What I haven't done is, once my
5   model generates the output effect -- because
6   I understand that output effect is a
7   requisite element of the proof of
8   anticompetitive injury here.
9          What my model doesn't do is then
10  take a step forward and say, okay, of that
11  reduced output, I can tell you that X percent
12  is coming from increased exports, Y percent
13  is coming from Harvard -- harvest reduction,
14  and Z percent is coming from liquidation --
15  came from liquidation -- increased
16  liquidation.
17         I don't do that.  I don't do such
18  a decomposition.  I don't think such a
19  decomposition is necessary.  And I feel like
20  that is what you are getting at with this
21  question.  And I just want the record to be
22  clear as to what I have done and have not
23  done.
24     Q.   Well, you understand that economic
25  analysis and this kind of modeling will often

Page 64

1   include a comparison of the -- you know, the
2   assumed world with the conduct that you're
3   focused on, take that and compare it to what
4   would have happened in the but-for world.
5   Right?
6          I mean, that's -- that's not a --
7   you're familiar with that sort of economic
8   reasoning, right?
9      A.   Well, I think you're describing
10  benchmarking, which is precisely what I've
11  done by comparing prices in a dirty or
12  contaminated environment with a clean
13  environment which predates the conduct
14  period.  That's precisely what I've done
15  here.
16     Q.   Right.  But your model is not
17  delivering an answer as to what would have
18  happened to exports in the but-for world or
19  the sow herd in the but-for world, right?
20         MR. RISSMAN:  Objection.  Asked
21  and answered.
22     A.   I think my model is giving a --
23  can be used, as I've used it, to give an
24  estimation of the output effect going to
25  challenged conduct across the various

Page 65

1  mechanisms.  But it does not provide a
2  decomposition of that output effect into the
3  three categories of -- or mechanisms that
4  were used by defendants to reduce domestic
5  supply.
6  BY MR. COLEMAN:
7      Q.   Did you just reference three
8  mechanisms to reduce domestic supply of pork?
9      A.   Yes.
10     Q.   And so what was the third?
11     A.   Well, these were the ones that
12  I -- that I include in my report, but it's --
13  I will show you the section.  It's
14  8(C)(1)(a), and those are -- those are
15  liquidation, harvest reduction and exports.
16     Q.   Right.  And exactly what was the
17  harvest reduction?  Explain how that --
18  exactly what lever was used there?
19         MR. RISSMAN:  Object to form.
20     A.   Just a second.
21         So Paragraph 213 explains the
22  definition of harvest reduction, occurs when
23  defendants decrease the number of plant hours
24  or suspend operation so that fewer hogs would
25  be slaughtered, which temporarily decreases

Page 66

1  the domestic availability of pork products.
2  BY MR. COLEMAN:
3      Q.   Yeah, we'll circle back to that.
4      A.   Okay.
5      Q.   And anything else that -- any
6  other conduct that you think is -- meets that
7  definition of harvest reduction in your mind?
8      A.   Well, I have a whole section that
9  describes the record evidence on harvest
10  reduction.  But I think the definition I just
11  gave you is the top-line definition of what
12  harvest reduction is.
13     Q.   So we've got three levers of the
14  assumed conspiracy:  increase in exports,
15  reduce in sows, harvest reductions.  Anything
16  else?
17     A.   No.  I would say that output will
18  also fall naturally -- just consumption in
19  the domestic market will fall naturally with
20  price increases.  And so to the extent the
21  conspiracy helped elevate prices artificially
22  above competitive levels, that's a movement
23  up the demand curve and a reduction in the
24  amount of output in the US market.
25     Q.   That sounds like the effects of

Page 67

1  those three levers, not a -- not a separate
2  mechanism or lever to reduce output, right?
3      A.   I think there is some overlap in
4  those, but I do think that you can -- you can
5  think about the output effects as a way of
6  moving up the demand curve from higher
7  prices.  I will leave it at that.
8      Q.   Well, what -- what exactly did the
9  defendants do other than the three things we
10  have identified?
11     A.   Oh, they conspired to raise
12  prices.  They alleged -- they conspired to
13  raise prices.  Right.  And so if you -- if
14  you -- if an information intermediary like
15  Agri Stats is providing you profit-making
16  opportunities to raise prices that you
17  wouldn't otherwise know, and you raise prices
18  because of that, the effect is going to be a
19  reduction in consumption in the US market as
20  an output effect.
21         It really has nothing to do with,
22  you know, the three levers that we talked
23  about before.
24     Q.   Yeah.  So did -- did you review
25  evidence in which two or more defendants ever

Page 68

1  agreed on price?
2      A.   No, I don't know what --
3         MR. RISSMAN:  Object to form.
4      A.   I don't know what you mean by
5  "agreed," but to an economist if -- if an
6  information broker is exchanging
7  competitively sensitive information across to
8  defendants, and they utilize and rely on that
9  information to effectuate a price increase
10  that otherwise would not have been possible,
11  and that is an anticompetitive price effect.
12         Now, if you want to call it -- I
13  think -- what was the word that you were
14  trying to use -- agreement -- you know, I'm
15  not offering opinions on agreements.  I'm
16  offering economic opinions.  I will leave it
17  at that.
18  BY MR. COLEMAN:
19     Q.   So when was the conspiracy formed?
20     A.   Well, the complaint --
21         MR. RISSMAN:  Object to form and
22  foundation.
23     A.   The complaint -- can you give me
24  the question again?
25

Page 69

1  BY MR. COLEMAN:
2     Q.   When was the conspiracy formed?
3          MR. RISSMAN:  Same objection.
4     A.   The complaint asserts that the
5  conduct period began in 2009 with the release
6  of certain Agri Stats reports, and so that's
7  why I define the conduct variable in my model
8  to begin in 2009.
9  BY MR. COLEMAN:
10    Q.   And is that why you treated 2008
11 as a preconspiracy benchmark year?
12    A.   Yes.
13    Q.   And so you understood that 2008
14 predated the conspiracy?
15         MR. RISSMAN:  Object to form.
16 And calls for a legal conclusion.
17 BY MR. COLEMAN:
18    Q.   Well, at least that's the
19 assumption.
20         MR. COLEMAN:  I am sorry, Josh.
21 Yeah.  Go ahead.
22         I apologize to the court
23 reporter, too.
24         Did you catch his objection?
25         THE STENOGRAPHER:  Yes.

Page 70

1  BY MR. COLEMAN:
2     Q.   And so your model -- you can
3  strike the previous question.
4          Your model assumes that 2008 was a
5  preconspiracy year, right?
6          MR. RISSMAN:  Object to form.
7     A.   The model does treat 2008 as a
8  preconspiracy year.  That is correct.  And I
9  recognize that I've -- there is some evidence
10 in the record to suggest that Agri Stats had
11 already begun, at least through its marketing
12 campaign, to -- to move -- place the wheels
13 in motion to form this alleged conspiracy or
14 this cartel.
15         And to the extent that any prices
16 in 2008, which I've considered to be an edge
17 year, reflect the effects of that preliminary
18 coordination, then my benchmark -- my clean
19 benchmark will naturally produce a
20 conservative estimate of the price effect
21 owing to the conspiracy.
22 BY MR. COLEMAN:
23    Q.   So you've mentioned that harvest
24 agreement was one of the mechanisms used to
25 reduce the domestic supply of pork.

Page 71

1     Q.   Do you assume that there was any
2  agreement to refrain from slaughtering all
3  pigs available for purchase in any given
4  year?
5          MR. RISSMAN:  I'm going to
6     object as mischaracterizing the
7     testimony, and object to form.
8     A.   I don't think that I make such an
9  assumption, and, again, when use the word
10 "agreement," the only -- the only agreement
11 that I'm assuming away is the single
12 agreement to reduce domestic supply and to --
13 and to increase domestic prices -- the
14 alleged agreement.
15         I just want it to be -- the record
16 to be clear.  I know I've said this now five
17 times, but I don't think there is a -- there
18 is alleged to be a separate agreement
19 pertaining to harvesting or distinct or
20 separate agreement with respect to exporting.
21         I think there's one single
22 agreement, as I understand the complaint.
23 BY MR. COLEMAN:
24    Q.   Are you aware of any instance in
25 which the defendants did not slaughter all

Page 72

1  pigs that were raised domestically in a given
2  year?
3     A.   Am I aware of such an episode?  I
4  don't know if I understand the question.  All
5  defendants or any defendant did not slaughter
6  all pigs?
7     Q.   Yeah.  We'll just break it down.
8  I mean, I think you realize that market hogs
9  are raised on hog farms.  We sometimes call
10 them -- refer to those hog farms as hog
11 producers, right?
12    A.   Okay.  Right.
13    Q.   And so biological lifestyle --
14 lifecycle of hogs involves a sow farrowing a
15 litter, right?
16    A.   Okay.  That's fair.
17    Q.   And the litter is weaned, and pigs
18 are fed to a market weight and are available
19 for slaughter, right?
20    A.   That is fair.
21    Q.   And I'm wondering whether you have
22 identified any instance in which defendants
23 failed to slaughter all of the domestic hogs
24 that were at market weight and available for
25 slaughter?

Page 73

1        MR. RISSMAN:  I will just
2     instruct the witness not to -- to only
3     testify as to opinions he's offered in
4     this case.
5     A.    Yeah.  I mean, sitting here, I'm
6  not aware of an occasion where they failed
7  to.  I'm not even sure I understand -- I
8  understand the question.  But I can't tell
9  you an instance where defendants failed or
10  did not fail.  I just don't -- I don't have
11  recall on that.
12  BY MR. COLEMAN:
13     **Q.    Is that something you looked at?**
14        MR. RISSMAN:  Same -- same
15     instruction.  Instruct the witness not
16     to answer any questions about
17     preliminary analysis or opinions he
18     has not formed.
19     A.    I think the only opinions that I
20  formed with respect to liquidation, if that's
21  the topic that we are discussing, and maybe
22  it's not.  I may be confused.
23  BY MR. COLEMAN:
24     **Q.    It's not.**
25     A.    Okay.  What's the topic?  I'm

Page 74

1  sorry.
2     **Q.    At any given time, there's an**
3  **inventory of market hogs available on farms,**
4  **available for slaughter weights, right?**
5     A.    Okay.
6     **Q.    And I am wondering if you're aware**
7  **of any instance in which the defendants**
8  **collectively failed to purchase all of those**
9  **market hogs available for slaughter?**
10        MR. RISSMAN:  I'm going to give
11     the same instruction.
12     A.    Yeah.  I don't recall that being
13  alleged in the complaint, if that's what you
14  are asking.
15  BY MR. COLEMAN:
16     **Q.    And you're not -- are you aware of**
17  **any facts indicating that that ever happened?**
18        MR. RISSMAN:  Same instruction.
19     A.    Yeah.  I don't think that I've
20  come across such facts.  I don't have an
21  opinion on that.
22  BY MR. COLEMAN:
23     **Q.    And so coming back to the harvest**
24  **issue.  If a defendant doesn't run a Saturday**
25  **shift, some hogs -- the hogs that would have**

Page 75

1  **been slaughtered on that particular Saturday**
2  **are still on the farms getting bigger by the**
3  **day, right?**
4        MR. RISSMAN:  Objection.  Form.
5     Foundation.
6        Same instruction not to offer
7     opinions -- offer testimony about
8     things you haven't formed an opinion
9     on.
10     A.    You -- the hypothetical here is
11  that they're still available on the hog farm,
12  and that seems to suggest they haven't made
13  their way to the processor yet.  But I think
14  that this notion of harvest reduction is
15  agnostic as to the timing of the delivery of
16  the hog to the processing plant.  Right.
17        It could affect -- it could affect
18  output in myriad ways.  It could slow down
19  hogs coming, but it could also just slow down
20  the output, the production, the processing of
21  hogs that have already came.
22  BY MR. COLEMAN:
23     **Q.    Right.  And I'm trying to connect**
24  **the dots here.  So if there's a temporary**
25  **reduction in slaughter, one or more**

Page 76

1  **defendants don't run a Saturday shift and**
2  **slaughter fewer hogs, what happens to those**
3  **hogs?**
4        MR. RISSMAN:  Same objection.
5     Foundation.
6     A.    Well, I think lots of things could
7  happen to them, but the -- what's not
8  happening is they're not being processed and
9  put into the relevant market that we are
10  setting here, and that could generate an
11  output effect and the concomitant price
12  effect.
13  BY MR. COLEMAN:
14     **Q.    Okay.  So I want -- I want to push**
15  **back on that.**
16        The hogs that are not slaughtered
17  **on a particular Saturday still exist, right?**
18  **They're not slaughtered?**
19        MR. RISSMAN:  Objection.  Form
20     and foundation.
21     A.    They're not slaughtered, but
22  they're not being put into the market -- the
23  relevant market here.
24  BY MR. COLEMAN:
25     **Q.    Right.  And are you aware of any**

Page 77

1   producers ever liquidating marketing hogs
2   because a processor wouldn't buy them?
3          MR. RISSMAN:  Object to form.
4    And I will give the same instruction
5    on not offering testimony on opinions
6    you haven't formed.
7    A.   I think the allegations here -- so
8   let me just make clear, the allegations here
9   are that liquidation was a strategy, or
10  lever, to use your word, that was employed by
11  defendants to reduce domestic supply.
12          And you're asking me for the -- do
13  I know of an occasion which liquidation was
14  triggered by a particular processor who had
15  slowed things down.  And I don't think that
16  that -- that is what's being alleged, and I
17  don't think that's the -- consistent with the
18  evidence that I've reviewed.
19  BY MR. COLEMAN:
20    Q.   Yeah.  And in particular, there's
21  allegations about the liquidation of sows,
22  right?
23    A.   Yes.
24    Q.   And are you aware of any
25  allegations or evidence that there was

Page 78

1   liquidation of market hogs?
2          MR. RISSMAN:  Same objection and
3    instruction.
4    A.   I have to go back through the
5   records that I reviewed and the section on
6   liquidation to see if any of it touches hogs.
7   So just sitting here, I'm not going to be
8   able to answer the question.  I would have to
9   go back through my section -- through my
10   section of the report.
11  BY MR. COLEMAN:
12    Q.   My question is whether you're
13  aware of anything.
14          Do you recall any allegations or
15  evidence, as you're sitting here today, on
16  that point?
17          MR. RISSMAN:  So if the witness
18    hasn't formed on opinion about it, I
19    will instruct him not to answer the
20    question.
21          MR. COLEMAN:  I'm asking about
22    facts, not opinion.  I'm asking him,
23    is he aware of any facts or any
24    allegation that there has ever been,
25    or at least during the relevant class

Page 79

1    period, a liquidation of market hogs.
2          MR. RISSMAN:  Yeah.  I think
3    it's -- same -- same instruction.
4   BY MR. COLEMAN:
5    Q.   Do you know of any such facts?
6          MR. RISSMAN:  If you haven't
7    formed an opinion on it, I'm
8    instructing you not to answer.
9    A.   Okay.  I have not formed an
10  opinion on it.
11          MR. COLEMAN:  Josh, I'm asking
12    about what facts he knows, and you're
13    instructing him not to answer.
14          MR. RISSMAN:  Well, the stip
15    very clearly says that any facts
16    considered but not relied upon in
17    forming an opinion are not -- are out
18    of bounds.
19  BY MR. COLEMAN:
20    Q.   You did form an opinion that the
21  reduction in harvest among defendants -- the
22  alleged reduction in harvest among defendants
23  reduced supply, right?
24    A.   Yes.
25    Q.   And the particular lever you point

Page 80

1   to is a reduction in shifts, Saturday
2   harvest, things of that sort, right?
3    A.   Correct.
4    Q.   And I'm just trying to understand
5   if there was not liquidation of market hogs,
6   how can that temporary pause in the slaughter
7   reduce the domestic supply of pork?
8    A.   Oh, because we are talking about
9   the supply in the relevant market, and so if
10  you're not processing the pork, you're not
11  putting it into the relevant market, that
12  reduces output, and that could have an effect
13  of prices at least in the short run.
14    Q.   What's the -- what's the time
15  effect of how long a reduction in a shift or
16  a Saturday slaughter would reduce domestic
17  supply?
18    A.   Well, can I ask you, are you --
19  you want me to assume that they took out
20  Saturday operation on one Saturday or on
21  consecutive Saturdays or two months or a
22  quarter?
23          I think it would help me with the
24  hypothetical.
25    Q.   It's not a hypothetical.  I'm

Page 81

1  asking what actually happened on the market.
2  And you formed an opinion that the reduction
3  in Saturday harvest is capable of reducing
4  supply.  I want to know how that happened.
5        If all those pigs that weren't
6  harvested on a particular Saturday are on the
7  farms getting fatter by the day, how did the
8  decision to not run a Saturday shift reduce
9  the overall supply of pork?
10     A.   Well, it reduces the supply of
11  pork in the relevant market.  Right.  When
12  they're on the farm, they're not in the
13  relevant market.  We defined the relevant
14  market here as -- as pigs that are available
15  post-processing.  Processed pork for direct
16  purchasers.  So while they're on the farm,
17  they're not -- they're not yet in the
18  relevant market.
19     Q.   Do you have an understanding of
20  how much weight hogs gain per day when
21  they're at market weight?
22     A.   I don't know the per day.  I know
23  that they're targeting something on the order
24  of 270 pounds, but I -- but I don't know how
25  fast they're going per day.

Page 82

1     Q.   And you understand that the supply
2  of pork is a function of how many hogs are
3  slaughtered and how big those hogs are,
4  right?
5     A.   You have to specify as -- into
6  which market.  Are we talking about the
7  relevant market here or an upstream market on
8  the farm?
9     Q.   I'm just talking about the supply
10  of -- the volume of the pork produced by the
11  harvest.
12     A.   From the farms?
13     Q.   Hogs are harvested, and how big
14  those hogs are, right?
15     A.   You're speaking about supply of
16  the farm at the upstream market, correct?
17     Q.   No, I'm talking about the
18  processing.
19     A.   Oh, processing.  Okay.
20     Q.   Right.  The slaughter of hogs, the
21  harvest of hogs.
22     A.   Okay.
23     Q.   The volume of pork produced from
24  the slaughter of hogs is a function of how
25  many hogs are slaughtered and the weight of

Page 83

1  those hogs at the time of slaughter, right?
2     A.   I think that's fair.
3     Q.   So if we are in a situation where
4  there's not a liquidation of market hogs,
5  pausing the slaughter means that those hogs
6  get bigger, right?
7        MR. RISSMAN:  Objection.
8  Foundation.
9     A.   Well, they could, but you're also
10  asking me to assume away the liquidation that
11  apparently has occurred, so -- but for the
12  hypothetical, I can assume that liquidation
13  is not occurring.
14  BY MR. COLEMAN:
15     Q.   Well, I thought we established
16  that you're not aware of any instance of
17  liquidation of market hogs, right?
18     A.   Oh.  So I'm aware of liquidation,
19  but as to what type of pig, hog versus sow,
20  I -- you know, that I can't tell you sitting
21  here.
22     Q.   And I will be specific.  So,
23  again, I went through this, but you're not
24  aware of any instance in which defendants or
25  producers in the relevant time period

Page 84

1  liquidated market hogs, are you?
2     A.   I'm only aware of the stuff that I
3  reviewed and relied on and made it into the
4  liquidation section of my report, and I don't
5  have perfect recall as to the decomposition
6  of the type of pig in that section sitting
7  here.
8        MR. RISSMAN:  Craig, we have
9  been going about an hour 25.  Do you
10  want take a break?
11        MR. COLEMAN:  Yeah, that works.
12  How much time do you need?
13        THE VIDEOGRAPHER:  Time is
14  11:05 a.m.  Going off the record.
15    (A brief recess was held from 11:05
16  a.m. to 11:21 a.m.)
17        THE VIDEOGRAPHER:  The time is
18  11:21 a.m.  We are back on the record.
19  BY MR. COLEMAN:
20     Q.   So your econometric model is
21  designed to control for the cost of the pig
22  itself, right?
23     A.   I mean, that's not what it's
24  designed for, but I do control for the cost
25  of the pig as one of my control variables.

Page 85

1    Q.    And for all hogs purchased by a
2  packer from a producer, that cost of the pig
3  to the packer is the price that the packer
4  pays to the producer, right?
5    A.    That's fair, yes.
6    Q.    And you have data from the
7  defendants showing their purchases of market
8  hogs, right?
9    A.    I believe so, yes.
10    Q.    But you did not use that data as a
11  control for the cost of pigs to the
12  defendants, did you?
13    A.    I think that's fair.  I used the
14  cost to rear the pig 270 pounds as kept by
15  the Iowa researchers as my -- as my control
16  variable.
17    Q.    And that's the cost of raising the
18  pig, or at least one of the costs for raising
19  the pigs to the producer, whomever that
20  producer might be, right?
21    A.    Yes.  The upstream, yes.  The cost
22  incurred by the upstream producer of the pig,
23  yes.
24    Q.    And you also know that the sales
25  of pigs to packers are subject to USDA

Page 86

1  mandatory price reporting, right?
2    A.    I don't know if I know that.  I
3  may be aware of it, but just sitting here, I
4  can't vouch for that fact.
5    Q.    So you could confirm that you did
6  not look at USDA data regarding the sales
7  price of market hogs to the packers; is that
8  right?
9        MR. RISSMAN:  Objection.  Goes
10    beyond the expert step.
11        I will instruct the witness not
12    to answer.
13        THE WITNESS:  Okay.
14        MR. COLEMAN:  Well, I think he
15    testified he didn't know if it exists,
16    right?
17        MR. RISSMAN:  You asked him what
18    he looked at, and -- and the stip
19    doesn't allow you to ask about things
20    that he looked at but didn't consider
21    in forming his opinions, so objection
22    stands.
23  BY MR. COLEMAN:
24    Q.    Let's just circle back to make
25  sure we have a clear question and answer.

Page 87

1        Do you know whether the sales of
2  pigs to packers are subject to USDA mandatory
3  price reporting?
4    A.    It's possible.  I've come across
5  that in the record.  It's possible that one
6  of my staffers has reviewed that data, the
7  USDA data, but as you know, I used the Iowa
8  data instead as my control variable for the
9  cost of the pig.
10    Q.    Now, when you say the "Iowa data,"
11  is that the Iowa State data on corn costs?
12    A.    No.  Corn was just one of the
13  inputs.  But if you -- if you go into the
14  section of my report, it talks about the
15  total cost of rearing a pig at 270; corn
16  being one of the inputs.
17    Q.    Are you aware of whether Iowa
18  State also produces data showing break-even
19  amounts for producers?
20    A.    Sitting here, I'm not aware of it.
21    Q.    Are you familiar with the concept
22  of a break-even amount with regard to market
23  hogs?
24    A.    You'd have to give me more context
25  than just break even.  Break even in what?

Page 88

1  In terms of profits?  I don't know what -- I
2  don't know.  Just by the word "break even,"
3  it's not cuing me into anything.
4    Q.    Yeah.  You haven't seen that term
5  used in the materials that you reviewed or
6  relied upon?
7    A.    I don't think so.
8    Q.    There is a point at which -- a
9  producer raising a pig incurs cost to raise
10  the pig, right?
11    A.    Yes.
12    Q.    And then the producer can sell
13  that pig for either the market price or a
14  contracted price, right?
15    A.    It could.  I think those are two
16  ways, yes.
17    Q.    And there is a point at which the
18  producer breaks even on its costs if the
19  price is sufficient, right?
20        MR. RISSMAN:  Object to form.
21    A.    Well, there's always a price such
22  that the price just covers your incremental
23  costs, if that's what you're asking.
24  BY MR. COLEMAN:
25    Q.    That's a basic economic concept,

Page 89

1   right, that there's a point in which
2   anybody -- any firm that produces widgets or
3   whatever is making money on a marginal or
4   incremental sale, right?
5       A.   Yes.  And I would just also note
6   that for a vertically integrated processor,
7   there is no price at the upstream level
8   because they're selling to themselves.  But I
9   presume all of these questions are about a
10  nonvertically integrated processor, who is
11  having to actually buy from a third party.
12      Q.   Right.  That's a helpful
13  clarification.
14           You're aware that there are a
15  number of producers of market hogs in the
16  United States that are not vertically
17  integrated, right?
18      A.   Correct.
19      Q.   And for those -- are you
20  comfortable with us referring to those as
21  independent producers; that is, they're not
22  owned or controlled by a packer?
23      A.   Sure.  I can use that term.
24      Q.   For those independent producers,
25  like any firm in just about any industry,

Page 90

1   there's a point at which they -- they could
2   break even on their costs based on the price,
3   right?
4       A.   I think I will grant you that
5   there's a price at which they break even
6   depending on some relevant measure of cost,
7   yes.
8       Q.   But in any case, your -- the data
9   that -- or the variable -- your control
10  focused on the cost of raising a hog rather
11  than profitability to the farmer or the
12  producer, right?
13      A.   I think that's fair.  I'm looking
14  at the cost as opposed to the profitability.
15  They're certainly going to be related, but
16  I'm using the cost as my control variable for
17  what's happening upstream.
18           I have another control variable,
19  too.  It's just -- the pig mortality rate,
20  but -- but -- that's capturing upstream
21  activity as well.  But, yes, the cost
22  variable I use is the one I describe in my
23  report, the Iowa variable.
24      Q.   And you did not control for
25  profitability of hog production for

Page 91

1   independent producers, right?
2       A.   I did not control for it, but I
3   did -- you know, I absolutely looked at.  You
4   know, in my background section I looked at
5   the profitability of the upstream hog
6   producers, and I analyzed, you know, what
7   share of the retail and of the wholesale that
8   they were capturing and how it was falling
9   over time.
10           So I looked at that.  I certainly
11  assessed it, but it was not explicitly
12  controlled for in my econometric model.
13      Q.   If an independent hog producer
14  makes its own decision to reduce the number
15  of sows it maintains or the number of hogs it
16  raises, you agree that that should not be
17  deemed challenged conduct, right?
18      A.   I don't think that's part of the
19  challenged conduct here.  If I'm
20  understanding the question correctly, it's
21  just independent upstream hog producer
22  decides to make fewer hogs.  That is not --
23  that's not part of the challenged conduct, as
24  I understand it.
25      Q.   And if an independent hog producer

Page 92

1   is losing money on every hog that it sells,
2   it's economically reasonable for that
3   producer to reduce production, right?
4           MR. RISSMAN:  Object to form.
5   Incomplete hypothetical.
6       A.   That's not quite the shutdown rule
7   in economics.  I could tell you the shutdown
8   rule, but it's a little more complicated.
9   It's whether -- whether the price goes below
10  your average variable cost.  That would
11  suggest shutting down.
12           But so long as you're making -- so
13  long as you're making contributions that are
14  paying down your fixed costs, an economist
15  would advise you to stay in business, keep
16  producing.
17  BY MR. COLEMAN:
18      Q.   And if a hog producer makes the
19  judgment that it's economically rational for
20  it to reduce its hog production, based on
21  loss of profitability or whatever is going on
22  in the hog market, then it's economically
23  reasonable to reduce production, right?
24           MR. RISSMAN:  Object to form.
25      A.   There could be myriad reasons why

Page 93

1 an independent hog farmer reduces production.
2 I will grant you that.
3 BY MR. COLEMAN:
4    **Q.   And why --**
5       (Simultaneous unreportable
6       crosstalk.)
7    A.   I'm sorry.
8    **Q.   Go ahead.**
9    A.   No.  I was just going to say,
10 including your hypothetical, which is
11 profitability, yes.
12   **Q.   And similarly, if a hog producer**
13 **is not finding it profitable to raise hogs,**
14 **it might make the decision to engage in fewer**
15 **farrowings or buy fewer weaner pigs, right?**
16      MR. RISSMAN:  Object to form and
17      calls for incomplete hypothetical.
18   A.   I just want to make sure, we are
19 still talking about the upstream hog
20 producer, and you're asking if they could
21 make a decision to buy fewer pigs themselves?
22 Is that -- is that fair?
23      Do you want to give it to me
24 again?  I am sorry.  I may have lost this.
25

Page 94

1 BY MR. COLEMAN:
2    **Q.   Yes.  Yes.**
3       **So in a period of unprofitability**
4 **where an independent producer is losing money**
5 **on their operation, it may be reasonable for**
6 **that producer to have fewer pigs on the farm,**
7 **right?**
8      MR. RISSMAN:  Object to form and
9      incomplete hypothetical.
10   A.   I mean, I have to accept that
11 there are conditions under which it would
12 make sense for an independent to reduce
13 output.  I mean, that's -- you're asking me
14 almost a possibility here.  Of course, it's
15 possible.
16 BY MR. COLEMAN:
17   **Q.   And there's a number of ways for**
18 **an independent producer to reduce its output**
19 **of market hogs, including fewer farrowings,**
20 **buying fewer weaner pigs, just raising**
21 **fewer -- fewer weaned pigs, right?**
22   A.   Well, now you're asking me, like,
23 if I accept the predicate that its -- prices
24 have fallen below the farmer's average
25 variable costs.  There are many different

Page 95

1 ways that they can achieve an output
2 reduction.  I think the ones that you name
3 are reasonable.
4    **Q.   Did you analyze whether there were**
5 **any time periods from 2009 to 2018 in which**
6 **it was economically sensible or rational for**
7 **independent producers to cut back on hog**
8 **production?**
9      MR. RISSMAN:  I'll instruct the
10      witness to only answer to the extent
11      he is offering an opinion in this
12      case.
13 BY MR. COLEMAN:
14   **Q.   Did you analyze that?**
15      MR. RISSMAN:  Same objection.
16      If you analyzed it but are not
17      offering an opinion, I'm instructing
18      you not to answer.  In other words --
19   A.   Okay.  Well, I did not after an
20 opinion on it, so counsel is instructing me
21 not to answer it.
22 BY MR. COLEMAN:
23   **Q.   Do you know whether there were any**
24 **periods between 2009 and 2018 in which it was**
25 **economic rational for independent producers**

Page 96

1 **to cut back on hog production?**
2      MR. RISSMAN:  Object to form.
3      Same instruction.
4    A.   Oh, okay.  You have seen the
5 background section of my report, and I
6 understand counsel doesn't want me to go into
7 new opinions, so I'm not going to answer it.
8 BY MR. COLEMAN:
9    **Q.   So you might know, but you're not**
10 **going to tell me?**
11   A.   I have to do what my counsel tells
12 me to do, and I've been instructed not to
13 answer it.  I don't know what else I can say.
14      MR. RISSMAN:  If you have an
15      opinion -- if you have offered an
16      opinion about it in the report, you
17      can go into it, or if you have an
18      opinion about it, you're prepared to
19      testify to, but...
20   A.   I have not offered an opinion on
21 the profitability.  I will leave it at that.
22 BY MR. COLEMAN:
23   **Q.   If you're studying the extent to**
24 **which decreased pork supply can be attributed**
25 **to the defendants in a trust misconduct,**

Page 97

1  isn't it important to know whether
2  independent producers have their own reasons
3  for cutting back on supply?
4      A.   No.  And that's -- the answer is
5  no in many ways.  I mean, that's not what I'm
6  studying, and even if I were studying that,
7  that wouldn't be what's important.
8          I mean, I am studying whether or
9  not there are any price effects.  My
10  econometric model is studying whether there
11  are price effects that can be attributed to
12  the challenged conduct.
13         And decision making with respect
14  to upstream on supply, it could -- they could
15  be competitive.  It could be monopolized.  It
16  could be all sorts of things.  But what we
17  are studying here is the output effects on
18  the relevant market, which is in the
19  processing market, and that's what I aimed my
20  analyses at, is what happened to the output
21  in the processing market.
22      Q.   If independent producers restrict
23  the number of pigs they're raising on a farm,
24  that reduces the supply of pork, right?
25         MR. RISSMAN:  Object to form.

Page 98

1      A.   That's correct.  But if you
2  understand the mechanics of my output
3  assessment, it turns entirely on the price
4  effects that can be attributed to the
5  challenged conduct, so it would be impossible
6  to say that that output estimate is being
7  driven by forces that are occurring upstream.
8  BY MR. COLEMAN:
9      Q.   What percentage of market hogs
10  sold -- or what percentage of hogs
11  slaughtered by the defendants were raised by
12  independent producers and sold to the
13  packers?
14      A.   Sitting --
15      Q.   And, again, during the relevant
16  time period or any particular year during the
17  time period?
18         MR. RISSMAN:  Object to form.
19      A.   Sitting here, I don't think I have
20  an estimate for you.  I know that some but
21  not all of the defendants were vertically
22  integrated into the production -- upstream
23  production of pigs.  But I don't -- I don't
24  know what percentage of, say, the sales and
25  the transaction data were sourced internally

Page 99

1  from the upstream provider -- an integrated
2  upstream provider.
3  BY MR. COLEMAN:
4      Q.   So, for example, for Smithfield,
5  do you know what percentage of the hogs that
6  it slaughters were produced by its farms that
7  it owned versus purchased from independent
8  producers?
9      A.   Sitting here, I don't have that
10  number, and I also don't think it would
11  effect -- even knowing it, it couldn't be
12  used in any of the calculations I did.
13      Q.   And if we go through the other
14  defendants, Tyson, Hormel, et cetera, do you
15  know what percentage of any of those
16  defendants purchased -- purchased from
17  independent producers as opposed to raise
18  themselves?
19      A.   Well, I know which ones are
20  vertically integrated, but I took your
21  question to mean of those that are vertically
22  integrated, you know, what percentage are
23  coming from their own versus third parties.
24         Maybe I misinterpreted the
25  question.  But that -- sitting here, I can't

Page 100

1  tell you those splits.
2      Q.   Does any defendant raise more than
3  50 percent of the hogs that it slaughters
4  itself?
5      A.   Again, sitting here, I can't tell
6  you the percentage.  So it's possible that
7  some are over 50, but I just can't tell you.
8      Q.   So one of your -- one of the
9  allegations and part of that challenged
10  conduct is a reduction in the sow herd,
11  right?
12         MR. RISSMAN:  Object to form.
13      A.   I would say --
14         (Simultaneous unreportable
15         crosstalk.)
16  BY MR. COLEMAN:
17      Q.   I am trying to orient you to --
18  because it's what I want to talk about.
19         Bit if you don't think that's part
20  of the allegations, then that's fine.
21      A.   No, I wasn't -- that wasn't where
22  I was going.  I just wanted to make clear
23  that there's -- my understanding of the
24  challenged conduct is that it's a single
25  restraint, and it may have touched

Page 101

1  liquidation.
2      That could have been the
3  mechanism, but there wasn't a separate
4  restraint that's being challenged that -- of
5  an agreement that only pertains to
6  liquidation.  I will grant you that
7  liquidation is one of the levers by which the
8  alleged conspiracy reduced domestic supply.
9      **Q.  What percentage of the sow herd in**
10 **the United States is owned by the defendants**
11 **versus independent producers?**
12     A.  I -- sitting here, I don't know
13 that split.
14     **Q.  And have you been able to identify**
15 **any barriers to an independent producer**
16 **expanding its sow herd in response to a**
17 **defendant reducing its sow herd?**
18     MR. RISSMAN:  I'm going to -- if
19     the witness has an opinion about that,
20     he can offer it.  But if he doesn't
21     have an opinion, I will instruct him
22     not to answer.
23     A.  Yeah.  I don't have an opinion,
24 and the only entry barriers that I looked at,
25 as you know, are in the relevant market and

Page 102

1  the processing market.
2  BY MR. COLEMAN:
3      **Q.  How long does it take to produce a**
4  **sow that's capable of farrowing piglets?**
5      A.  Sitting here, I don't know that.
6  I don't know that by memory.
7      **Q.  Well, you did opine that**
8  **Smithfield's reduction in sows had lingering**
9  **effects -- long-lasting effects on the**
10 **marketplace, right?**
11     A.  I think so.  I think I made that
12 opinion, but you can take me to it.  But why
13 don't we just accept it for purposes of the
14 next question.
15     **Q.  And so how long could that effect**
16 **last in your mind?**
17     A.  I -- sitting here, I don't think
18 it can tell you precisely how long it lasts.
19 I think that I have a table or figure that
20 plots kind of the suppression of the domestic
21 production over time, and I think that that
22 could be indicative of how long the effects
23 could last, if you look at how long the line
24 was below the projected.
25     But otherwise, I don't think I

Page 103

1  could give you a very precise estimate of the
2  duration.
3      **Q.  And you are not aware of anything**
4  **stopping independent producers from expanding**
5  **their sow herd in response to cutbacks by**
6  **Smithfield or any other defendant, right?**
7      MR. RISSMAN:  I will instruct
8      the witness to answer to the extent he
9      has an opinion about that.
10     A.  I don't have an opinion on that.
11 BY MR. COLEMAN:
12     **Q.  What's a gilt?**
13     A.  I think we have -- it's a female
14 pig that has -- is not ready to deliver
15 piglets or something like that.
16     **Q.  And do you know whether gilts are**
17 **capable of becoming sows?**
18     A.  Are they incapable?
19     **Q.  Capable.**
20     A.  I think eventually they might be
21 capable, but I think that that is the word to
22 describe them at a certain stage of their
23 lives.
24     **Q.  You don't know how long it takes**
25 **for a gilt to become a sow or capable of**

Page 104

1  becoming a sow?
2      A.  I've -- I've read that -- I've
3  read that, I'm sure, in putting together the
4  background section, but I can't give you that
5  statistic off the top of my head.
6      **Q.  Do you know anything about**
7  **Smithfield's inventory or Tyson's inventory**
8  **of gilts on their farms when they liquidated**
9  **sows?**
10     A.  Sitting here, no, I can't give you
11 a characterization of that.
12     **Q.  Do you know anything about**
13 **circovirus?**
14     A.  No, I've studied other viruses.
15 But circa virus?
16     **Q.  Circovirus?**
17     A.  Oh, circovirus.  I looked at two
18 other viruses, but not circo, I don't think.
19     **Q.  Do you know whether circovirus and**
20 **the vaccine to reduce or eliminate circovirus**
21 **had any impact on supply during the relevant**
22 **time period?**
23     A.  No, but to the extent that it
24 affected the pig mortality rate, it would be
25 controlled for in my pig mortality variable,

Page 105

1 but I don't know enough about that virus.
2    Q.    You understand that pig diseases
3 can have significant impacts on the supply of
4 hogs and ultimately the supply of pork,
5 right?
6    A.    Correct.
7    Q.    Could you turn to Tab 62?
8        MR. RISSMAN:  Give me just a
9    second because it's in the back of
10    this.
11        MR. COLEMAN:  I had the same
12    problem.  The binder is it too big.
13    Jacob, you could go ahead and
14    call it up on the screen.
15 BY MR. COLEMAN:
16    Q.    Are you with me?
17    A.    Yes.
18    Q.    And what's been marked as
19 Exhibit 3 is a USDA report with the title
20 "Users Guide to USDA's LMR Hog Price
21 Reports," right?
22        (Exhibit 3 was marked for
23        identification.)
24    A.    Yes.
25 BY MR. COLEMAN:

Page 106

1    Q.    And that's a document you have
2 seen before, and, in fact, it was included in
3 your reliance materials, right?
4    A.    I believe so.
5    Q.    And it says in the first paragraph
6 that:  Livestock mandatory reporting provides
7 all market participants with the same open
8 and transparent data for slaughter cattle,
9 swine, sheep, box beef, lamb and wholesale
10 pork.
11        Do you see that?
12    A.    Yes.
13    Q.    And it goes on to say:  LMR
14 encourages competition in the marketplace by
15 vastly improving price and supply
16 information, bringing transparency, breadth
17 and depth to market reporting.  Correct?
18    A.    Yes.
19    Q.    And if we go to that subheader,
20 "Purchase data," it says:  Purchase data
21 represents hogs that are purchased during a
22 specified time period.  Data includes base
23 prices for carcass-purchased hogs and net
24 prices and hog weights for any live hogs
25 purchased, right?

Page 107

1    A.    Yes.
2    Q.    And does that help you with your
3 understanding that sales of hogs to packers
4 are subject to USDA mandatory price
5 reporting?
6    A.    That is an inference you could
7 make from that.  It doesn't say that in the
8 text, but I think it's a fair inference that
9 you could make.
10    Q.    Did you read this?
11    A.    I've read portions of it, not the
12 entire thing, but I've -- the portion that
13 you just had me read does not say it's a
14 requirement that you report your sales to
15 USDA.  It's an inference you're making.
16    Q.    Do you know what mandatory price
17 reporting is?
18    A.    Well, from the phrase "mandatory
19 price reporting," it would imply that price
20 reporting is compelled.  It's mandatory.
21    Q.    You're inferring that from my use
22 of the phrase and not your knowledge of what
23 it actually is?
24        MR. RISSMAN:  Object to form.
25

Page 108

1 BY MR. COLEMAN:
2    Q.    I just want to know what you know
3 and don't know.
4        So I mean, do you know -- do you
5 know anything about USDA mandatory price
6 reporting, what's included in the reports
7 they publish?
8        MR. RISSMAN:  Object to form.
9    A.    I have some idea, yes.  What I
10 understand is that, unlike Agri Stats, USDA
11 is collecting data and presenting it in an
12 aggregated form such that members of an
13 alleged conspiracy could not find out where
14 they are in relation to any particular rival.
15 BY MR. COLEMAN:
16    Q.    So if we go to -- well, the --
17 actually, the last bullet point where it says
18 net price, on that page, and that's under the
19 header "Key LMR Definitions."
20        Do you see that?
21    A.    Yes.
22    Q.    And the net price is total amount
23 paid by the packer to a producer, right?
24    A.    Yes.
25    Q.    And if we turn the page, there are

Page 109

1 a number of purchase types explained. So
2 there's a purchase type header.
3         Let Jacob catch up with us.
4         And purchase types include a
5 negotiated purchase, which is defined to be a
6 cash or spot market purchase by a packer of
7 livestock from a producer under which the
8 base price for livestock is determined by the
9 seller-buyer interaction and agreement on
10 delivery date.
11        Do you see that?
12    A.   Yes.
13    Q.   And a negotiated purchase would be
14 an example of a packer paying money for a
15 market hog to an independent producer, right?
16        MR. RISSMAN:  Objection.
17 Foundation.
18    A.   I don't see that there, but if you
19 want me to interpret that language --
20 BY MR. COLEMAN:
21    Q.   No, that's fair.  Josh's
22 foundation objection is well taken.  I don't
23 want to put you past what you know and what
24 you don't know.
25        So if you don't know what a

Page 110

1 negotiated purchase involves, tell me.
2         And so the question is, do you
3 understand whether negotiated purchases of
4 hogs involve a packer paying an independent
5 producer for hogs?
6    A.   I think it can include that.  I
7 will leave it at that.
8    Q.   Right.  So in a negotiated
9 purchase, you got a packer, you got an
10 independent producer, and you got a hog.  And
11 the packer pays the hog.  And this is one
12 type of the pricing mechanism for that
13 purchase, right?
14    A.   Okay.
15    Q.   Do you understand that?
16    A.   Sure.
17    Q.   And then the other purchase types
18 include a negotiated formula purchase, swine
19 or pork formula purchase or other market
20 formula purchase.
21        Do you see that?
22    A.   Actually, I can't see that, so I
23 will go back to the -- I'm looking back at my
24 paper version.
25    Q.   It makes life easier on Jacob,

Page 111

1 too.
2    A.   Okay.  I see the different
3 purchase types.  And this is -- my
4 understanding is this is what would be
5 reported to USDA.
6    Q.   And in each of those purchase
7 types listed here -- there's actually five of
8 them -- negotiated purchase, negotiated
9 formula purchase, swine or pork market
10 formula purchase, other market formula
11 purchase or other purchase agreement.
12        In each of those, we have a packer
13 producing hogs by an independent producer,
14 right?
15    A.   I mean, you could have that.  I --
16 you keep saying independent producer.  I
17 don't know why this would necessarily rule
18 out a vertically integrated producer, but I
19 mean, I can accept that these definitely
20 include independents.
21    Q.   Well, we have a definition of --
22 if we scroll down, entities and sellers.  And
23 there's a specific category for packer-owned
24 swine, right?
25        MR. COLEMAN:  Oh, I'm sorry.

Page 112

1         Stay on the same page, Jacob.
2         Packer-owned swine is right there.
3    A.   Yeah, I see it under entity
4 sellers.
5 BY MR. COLEMAN:
6    Q.   Right.
7    A.   Yeah, I see it.  I'm looking at
8 the paper version.  I've got it.
9    Q.   So the USDA requires packers to
10 report whether they've -- whether the --
11 those hogs that are reported are
12 packer-owned, right?
13        MR. RISSMAN:  Objection to form
14 and foundation.
15    A.   I think -- yeah, you couldn't tell
16 that from this -- this page by itself.  So I
17 don't know --
18        (Simultaneous unreportable
19         crosstalk.)
20    A.   No, I don't know the exact, you
21 know, reporting requirements, but it would be
22 reasonable to tell the USDA whether or not
23 you owned -- were vertically integrated.
24    Q.   And, in fact, if we look at
25 Figure 1 on the next page, it provides a

Page 113

1  sample report, and there's a category for
2  producer-sold hogs, and it includes all the
3  hogs sold under the various pricing
4  mechanisms, right?
5      A.   Yes.
6      Q.   And then we have packer-sold hogs,
7  right?
8      A.   Yes.
9      Q.   And so for any given report, we
10  can tell which hogs were produced by
11  vertically integrated packers as packer-owned
12  or packer-sold and which were produced by
13  independent producers, right?
14        MR. RISSMAN:  Objection.  That
15     mischaracterizes the document pretty
16     blatantly.  I think if you looked at
17     the document, you would know that's
18     not the case.
19        MR. COLEMAN:  Josh, I'm not
20     going to -- you can object.
21        MR. RISSMAN:  I'm going to make
22     an objection that the bullet point
23     next to packer-sold needs to be read
24     into the record so it's a complete
25     record.

Page 114

1        MR. COLEMAN:  Yeah.  I'm just
2     trying to figure out what Dr. Singer
3     knows, and I'm getting the impression
4     that he does not understand the
5     difference -- how to ascertain from a
6     USDA report which hogs were produced
7     by independent producers and which
8     were produced by a packer, so --
9        MR. RISSMAN:  Well, I object to
10     the narrative, and I still object to
11     your questioning because I think you
12     were intentionally mischaracterizing
13     the document.
14        MR. COLEMAN:  I appreciate that.
15     Go ahead, Dr. Singer.
16        MR. RISSMAN:  What's the
17     question?
18  BY MR. COLEMAN:
19      Q.   My question is whether you can
20  look at a USDA report and ascertain which
21  hogs were obtained by independent producers
22  by looking at the producer sold category?
23      A.   My interpretation of this page
24  that you're showing me is what would have to
25  be filed and submitted to the USDA.  What

Page 115

1  I -- what I -- I do not get the impression
2  from this page is that this is what's
3  necessarily available to the public.
4      Q.   Do you know whether this
5  information is reported out to the public?
6      A.   My understanding is that what's
7  reported out to the public is -- is
8  aggregated first so that you wouldn't be able
9  to see the kind of detail that might be on a
10  report that is filled out and submitted by a
11  particular packer.
12      Q.   Do you know whether the USDA
13  produces reports that show how many hogs sold
14  in any given time period were producer-sold
15  and subject to those various purchase types
16  or pricing formulas that are listed there?
17      A.   Again, my understanding is that
18  such reporting would be aggregated across
19  multiple packers, and would also come with
20  some time delay.
21      Q.   Yeah.  I'm not asking whether you
22  can identify particular packers or particular
23  producers.  I'm simply asking whether -- you
24  know whether we can look at the producer-sold
25  category and look at any particular USDA

Page 116

1  report to understand how many pigs were
2  produced by independent producers from that
3  report?
4      A.   I think that you could look at a
5  report and get an understanding of what's
6  happening in the industry at large across all
7  packers with some time delay.  But I think
8  one of the questions or maybe series of
9  questions was -- created an impression -- and
10  I just wanted to push back on it -- but that
11  this is the kind of detail that a rival could
12  observe about another rival packer's
13  purchases.  I think --
14      Q.   I don't recall asking any
15  questions about that.
16      A.   You actually used the word --
17        (Reporter clarification.)
18      A.   You actually used the word, "this
19  is something we can infer from the report,"
20  and it was very misleading because it seemed
21  to suggest that "we" is just a casual
22  third-party user or some rival packer can see
23  this kind of level of detail for a rival
24  packer, and I just wanted to make sure the
25  record is clear on that.

Page 117

1    Q.   Okay.  I appreciate that.
2        I asked you whether you know
3    whether any point in time throughout the
4    alleged conspiracy period how many hogs were
5    produced by independent producers versus
6    vertically integrated packers.
7        And I believe your testimony was
8    that you didn't know, right?
9    A.   No, that was not my testimony.  My
10   testimony was sitting here, I can't give you
11   the exact number, but I'm sure we could go
12   look it up on a USDA report in the aggregate.
13   Q.   Right.  And the way we would do
14   that is look at this, the report, reporting
15   out this kind of data, right?
16       MR. RISSMAN:  Object to form.
17   And that mischaracterizes the
18   document.
19   A.   Right.  This is the -- this is the
20   document as I understand --
21       THE WITNESS:  Sorry, Josh, are
22   you still going?
23       MR. RISSMAN:  Well, I just think
24   that you need to -- if you're going to
25   ask that question, you need to read

Page 118

1    into the record at what point --
2        MR. COLEMAN:  No.
3        MR. RISSMAN:  No, don't
4    interrupt my objection.
5        (Reporter clarification.)
6        THE STENOGRAPHER:  One at a
7    time.  I can't --
8        MR. RISSMAN:  I'm making a 601
9    objection.  I think you are really
10   trying to blatantly mischaracterize
11   this document.  So if you want to be
12   complete, you need to read in the fact
13   that the packer-sold category is
14   defined as one packer selling to
15   another packer, which is right there
16   next --
17       MR. COLEMAN:  You're testifying,
18   Josh.
19       MR. RISSMAN:  Stop
20   mischaracterizing the document.
21       MR. COLEMAN:  You're testifying.
22   That was improper, and you know it.
23       MR. RISSMAN:  Well, I think
24   you're trying to make this document be
25   something it's not.

Page 119

1        MR. COLEMAN:  You stated your
2    objection.
3    BY MR. COLEMAN:
4    Q.   Please answer the question,
5    Dr. Singer.
6        THE WITNESS:  Can I have the
7    question back, please?
8        (The previous question was read
9        back by the court reporter as
10       follows:
11       "QUESTION:  And the way we would do
12       that is look at this, the report,
13       reporting out this kind of data,
14       right?")
15       MR. RISSMAN:  Same objections.
16   A.   So I think that you might be able
17   to get at the question that you're asking
18   through some USDA report.  I'm not sure if
19   this is the report that you would use, and,
20   again, I just want to focus on the fact that,
21   setting aside what's in that bullet about
22   packer-to-packer sales, that this is the kind
23   of reporting that would come from a packer to
24   USDA.
25       It's not necessarily the reporting

Page 120

1    that a rival packer could observe to monitor
2    an agreement or alleged agreement with one of
3    its horizontal rivals.
4    BY MR. COLEMAN:
5    Q.   Yeah.  And I'm just trying to
6    understand whether any point in time we can
7    tell -- whether you know we can tell how many
8    hogs are produced by independent producers
9    versus vertically integrated packers by
10   looking at a USDA report.
11       Do you know whether we can
12   ascertain that information through USDA
13   reports?
14   A.   I think we probably could.  I
15   don't think we could do it just from this
16   report in light of how that packer sold is
17   defined, but I imagine that sort of
18   information is available if you wanted to
19   analyze it.
20   Q.   Let me call up Exhibit 65.
21       THE VIDEOGRAPHER:  Do you mean
22   Tab 65, sir?
23       MR. COLEMAN:  Thank you.  I
24   appreciate that.
25       And this will be Exhibit 4.

Page 121

1       (Exhibit 4 was marked for
2    identification.)
3    A.   Okay.  I see this.
4  BY MR. COLEMAN:
5    Q.   Yeah.  So what been marked as
6  Exhibit 4 is a -- entitled "US Hog Marketing
7  Contract Study."  The authors are Glenn
8  Grimes and Ron Plain.
9       Are you familiar with Dr. Grimes
10 or Dr. Plain?
11   A.   No.
12   Q.   And this is -- the letterhead at
13 the top refers to the University of Missouri
14 College of Agriculture, Food and Natural
15 Resources.
16      Do you see that?
17   A.   No, I don't.  I'm sorry, which -
18   Q.   At the very top.
19   A.   Oh, let's see.  Oh, yes.  I see
20 it.  I see it, University of Missouri, yes.
21   Q.   If we turn to the second page,
22 very top, we've got date January 2009, Glenn
23 Grimes, Professor Emeritus, and Ron Plain,
24 Professor at the University of Minnesota
25 [sic], right?

Page 122

1    A.   Missouri.
2    Q.   Did I say "Minnesota"?
3    A.   Yes.
4    Q.   Thanks for that.
5       Yeah.  University of Missouri.
6    A.   Okay.
7    Q.   And this is described as a
8  Department of Agricultural Economics working
9  paper, right?
10   A.   Yes.
11   Q.   If we go to the middle of the
12 page, it says:  Here are the current
13 definitions of the arrangements reported
14 under the MBR system and the changes
15 affecting comparisons of data with earlier
16 studies.
17      Do you see that?
18   A.   Yes.
19   Q.   And this lists six categories
20 of -- for the reporting of the sale of market
21 hogs, right?
22   A.   Yes.  It lists six.
23   Q.   And so, for example, we got
24 negotiated, and we went -- reviewed the
25 definition of negotiated sales of market hogs

Page 123

1  in the context of Exhibit 3, right?
2    A.   Yes.
3    Q.   Sometimes called the spot market,
4  right?
5    A.   Right.
6    Q.   And there are also the swine or
7  market -- pork market formula, right?
8    A.   I see that.  It's number two.
9    Q.   And number three is other market
10 formula, and number four is other purchase
11 arrangement, right?
12   A.   Right.
13   Q.   And then number five is
14 packer-sold hogs, right?
15   A.   Right.  Can you let me just
16 read -- read down real quick, so I know where
17 we're going.
18   Q.   Sure.
19   A.   Okay.
20      I got five and six now in my head.
21   Q.   Five and six would be the category
22 of hogs raised by packers that are vertically
23 integrated, right?
24      MR. RISSMAN:  Object to form.
25   A.   I think there's a certain amount

Page 124

1  of vertical integration certainly in six and
2  most likely in five.
3  BY MR. COLEMAN:
4    Q.   And do you know whether those
5  other four categories are hogs that are --
6  were raised by independent producers and then
7  sold to packers?
8    A.   I think that's a pretty fair
9  inference, that they are independent given
10 that five and six -- so hopefully these
11 categories are mutually exclusive, but if
12 they are -- with that caveat, you could infer
13 that one through four is capturing or
14 launching independents.
15   Q.   And if we go to the next page on
16 Table 1, there's a table that sets out the
17 data on the percent of US hogs sold through
18 various pricing arrangements, right?
19   A.   Right.
20   Q.   And 2009, Table 1 shows that
21 5.6 percent of the hogs reported to USDA that
22 were packer-sold, right?
23   A.   Yes.
24   Q.   And 25.7 percent of the hogs that
25 year were packer-owned, right?

Page 125

1    A.    Yes.
2    Q.    And the remaining hogs were those
3 other four categories of hogs that were
4 raised by independent producers prior to sale
5 of a packer, right?
6    A.    I think that's a reasonable
7 inference that the other categories are
8 capturing independents.
9    Q.    So in 2009, about 70 percent of
10 the hogs -- market hogs sold are slaughtered
11 and reported to USDA were raised by
12 independent producers, right?
13    A.    I take it you're just subtracting
14 5.6 and 25.7 from a hundred?
15    Q.    Yes.
16    A.    Okay.  I can follow you.  I can do
17 the math.  I can get you to that 70, yes.
18    Q.    And so by looking at that USDA
19 market mandatory reporting data,
20 Professor Plain and Professor Grimes were
21 able to set up the numbers showing us that
22 70 percent of the hogs slaughtered and
23 reported to USDA in 2009 were produced by
24 independent producers, right?
25    A.    That is --

Page 126

1        MR. RISSMAN:  Objection.
2    Foundation.
3    A.    It's a reasonable inference.  I
4 don't want to fully embrace it because, you
5 know, I'm seeing it for the first time
6 sitting here.  But if you asked me to go out
7 and estimate that number by year, it seems
8 like this study could help inform that
9 answer.
10 BY MR. COLEMAN:
11    Q.    On the next page -- the top of the
12 page, the first sentence says that:  By
13 adding the percentage of hogs purchased in
14 the negotiated markets to the percentage of
15 purchased on a swine-pork market formula, the
16 current study indicates that the price of at
17 least 49 percent of the hogs in the US was
18 directly determined by the negotiated market.
19    Do you see that?
20    A.    Yes.
21    Q.    And do you have any basis to
22 disagree with that?
23    A.    It's definitional so if that's how
24 you want to define the negotiated market, it
25 just naturally follows.  So I don't have a

Page 127

1 basis sitting here to dispute it.
2    Q.    And I think we previously
3 ascertained that you don't know what -- for
4 any given defendant, you don't know what
5 percentage of their hogs they purchased from
6 an independent producer as opposed to produce
7 themselves; is that right?
8    A.    I think, sitting here, I don't
9 know that.  I surmise that I can probably
10 find that out for you, but sitting here, I
11 don't know it.
12    Q.    Do you recognize that there are
13 some defendants that are more vertically
14 integrated than others?
15    A.    Sure.
16    Q.    For example, do you have any idea
17 for Smithfield, what percentage of the hogs
18 that it slaughters were raised by its own
19 farms -- vertically integrated farms as
20 opposed to bought from an independent
21 producer?
22        MR. RISSMAN:  Objection.  Asked
23    and answered.
24    A.    I don't have a different answer
25 for you.  Still sitting here, I don't know

Page 128

1 what it is, and I don't think I reported that
2 either in my report.
3 BY MR. COLEMAN:
4    Q.    Is it your opinion that defendants
5 shared the same interest with respect to the
6 price they paid for hogs regardless of how
7 many hogs they produce themselves?
8        MR. RISSMAN:  I will instruct
9    the witness to only answer if he has
10    an opinion on that topic.
11    A.    I don't have an opinion, so I
12 guess I won't answer it.
13 BY MR. COLEMAN:
14    Q.    Well, one of the levers to
15 implement the conspiracy, as I understand it,
16 was to reduce the sow herd, restrict the
17 number of hogs on farms.  I mean, that's your
18 opinion, that that is part of challenged
19 conduct or the way that defendants
20 implemented the underlying conspiracy, right?
21    A.    I think that liquidation is one of
22 several ways in which they reduced output,
23 yes -- alleged to -- yeah, reduced output.
24 That's right.
25    Q.    Do you have an opinion as to

Page 129

1  whether the reduction in the sow herd or any
2  kind of consequent reduction in the number of
3  hogs produced was in the interest of all
4  defendants?
5       MR. RISSMAN:  Same limiting
6       instruction.
7       A.   I think that my model shows that
8  the challenged conduct can be associated with
9  artificially inflated prices at the packer or
10 processing level, and the extent that all
11 defendants are processors, then they would
12 have a shared and common interest in engaging
13 in conduct that artificially inflated those
14 prices that would artificially inflate their
15 profits.
16 BY MR. COLEMAN:
17      Q.   And so you have the opinion that
18 it was in Hormel's interest, for example, to
19 raise the price of the hogs that it
20 purchased?
21           MR. RISSMAN:  Objection.  Form.
22      Mischaracterizes testimony.  And same
23      limiting instruction on whether you
24      have an opinion on that.
25      A.   Yeah.  I don't have opinions on --

Page 130

1  and that's not even characterizing the
2  effects of the alleged conspiracy.  The
3  effects of the alleged conspiracy is to
4  inflate prices in the relevant market, and
5  you're asking me whether price effects in the
6  upstream market was consistent with the
7  interest of Hormel.
8       I don't have opinions about the
9  price effects in the upstream.  I don't think
10 the alleged conspiracy was aimed at
11 effectuating price effects in the upstream
12 market.
13 BY MR. COLEMAN:
14      Q.   Yeah.  Because that wouldn't make
15 sense, right, for pork packers to conspire to
16 raise the price that they pay for market
17 hogs?
18           MR. RISSMAN:  Object to form.
19      A.   I think that if there were
20 conspiracy, that the objective would be to
21 artificially inflate the prices of processed
22 pigs that they sold.
23 BY MR. COLEMAN:
24      Q.   One of the levers to do that would
25 be to -- in your mind, was to reduce the sow

Page 131

1  herd and consequently reduce the supply of
2  market hogs available right?
3       A.   That's one of the three levers.
4  That one occurs, I will grant you, in the
5  upstream market, but the other two are
6  occurring in relevant markets.
7       Q.   And did you evaluate the extent to
8  which the reduction in sow herd raised the
9  price of market hogs?
10      A.   Again, are you asking me about the
11 upstream prices?  I don't have a model that
12 explains how the challenged conduct affected
13 upstream prices.  I'm aiming my analysis and
14 attention on price effects in the relevant
15 market.
16      Q.   Yeah, I appreciate that
17 clarification.
18           Just so we are clear, by "upstream
19 market," do you mean the price that packers
20 pay for the hogs that they're purchasing from
21 independent producers?
22      A.   Not the price, but hog production.
23 The price would be part of it, but yes.
24 It's -- the upstream market is the hog
25 production market, yes.

Page 132

1       Q.   Do you have any opinion as to
2  whether the defendant pork packers compete to
3  purchase hogs?
4       A.   Not really.  I have no opinions
5  for the purpose of this case.  I don't.  I
6  haven't studied the nature of the rivalry in
7  the upstream market.
8       Q.   How many hog farms are there in
9  the United States?
10      A.   I don't know.
11      Q.   And do you -- in your mind, do you
12 have any opinion as to whether hog production
13 is relatively concentrated or unconcentrated?
14      A.   My understanding is that it, at
15 least compared to the packer market, the
16 relevant market here is les concentrated.
17 But I can't -- sitting here, I haven't
18 studied the level of concentration in the
19 upstream market.
20      Q.   The USDA maintains data and
21 information about the number and size of hog
22 producers, right?
23           MR. RISSMAN:  Objection.
24      Foundation.
25      A.   It's possible they do.

Page 133

1    BY MR. COLEMAN:
2       **Q.   You just don't know one way or the**
3    **other?**
4       A.   It's not something I studied.  I
5    studied phenomenon in the relevant market,
6    not in the upstream market.
7       **Q.   Is it -- do you think the hog**
8    **market and production by independent**
9    **producers is completely irrelevant to your**
10   **analysis?**
11      A.   I think that to the extent there
12   was a conspiracy to raise prices and suppress
13   output in the processing market, that that
14   could have anticompetitive effects regardless
15   of what is going on upstream.
16          So "irrelevant" is kind of a harsh
17   term, but I'm having a hard time
18   contemplating a fact pattern, whether it's
19   perfectly competitively supplied upstream,
20   perfectly monopolized upstream.  That would
21   somehow upset or negate a conspiracy to raise
22   prices in the relevant market.
23          I'm having a hard time figuring
24   out how you get out of that one by pointing
25   to what's happening upstream.

Page 134

1       **Q.   Well, you're not aware of any**
2    **instance in which -- in the relevant time**
3    **period in which packers declined to purchase**
4    **and harvest the hogs produced by independent**
5    **farmers, right?**
6          MR. RISSMAN:  Objection.  Form.
7    Calls for speculation.
8       A.   I don't think that was one of the
9    levers that I reviewed.  I reviewed
10   liquidation, which is happening upstream, and
11   harvest reduction and exports.  Those are the
12   levers that I reviewed.
13   BY MR. COLEMAN:
14      **Q.   And independent producers make the**
15   **decision about how many sows they want to**
16   **maintain, right?**
17          MR. RISSMAN:  Objection.
18   Foundation.
19      A.   I think that a firm that lacks
20   market power is going -- can produce as much
21   it wants at the prevailing market price.
22      **Q.   But prevailing market price for an**
23   **independent producer is the price that the**
24   **packers paid for the hog, right?**
25      A.   Well, it's the price that is set

Page 135

1    by the market.  Now, to the extent that the
2    packers have buying power, they could
3    suppress the price below competitive levels,
4    and that's consistent with, I think, Figure 4
5    in my report in the background section.
6       **Q.   And that would be the packers'**
7    **interest, if anything, right?**
8          **If there was a conspiracy and**
9    **cartel behavior with respect to buying hogs,**
10   **it would be to lower the price they were**
11   **paying for hogs, right?**
12          MR. RISSMAN:  Object to form.
13      A.   No, I don't like -- I don't like
14   how you put it because you act as if that's
15   the only thing that could raise their
16   profits.  It's true that if they could
17   conspire to reduce the price of an input,
18   that would increase their profits.
19          But it's also true that if they
20   could conspire to raise the price of what
21   they're selling in the relevant market, the
22   processing market, that would also increase
23   their profits.  They aren't mutually
24   exclusive.
25

Page 136

1    BY MR. COLEMAN:
2       **Q.   My point was if there was -- if a**
3    **conspiracy extended to the purchase of market**
4    **hogs, and the cartel that you assumed to have**
5    **exist existed, the interest of the cartel**
6    **would have been in lowering the price that**
7    **they paid for -- for hogs, right?**
8          MR. RISSMAN:  Object to form.
9       A.   Yeah.  I don't think that's what
10   the conspiracy -- the alleged conspiracy is
11   about, as I understand the complaint and
12   challenged conduct.  I don't think there's an
13   attempt to suppress prices by virtue -- in
14   the upstream market by virtue of
15   coordination.
16          I just don't recall that being an
17   element of the case.
18   BY MR. COLEMAN:
19      **Q.   There's no allegation of that kind**
20   **of collusion, right?**
21      A.   I don't recall one.  I would have
22   to -- you know, to feel comfortable and
23   confident, I would have to go back through
24   the complaint, but my understanding is that
25   the allegations are aimed at competitive

Page 137

1  facts or anticompetitive facts in the
2  processing market and what's sold by the
3  defendants.
4      Q.    And you would agree that a
5  decision by an individual farm to
6  underproduce in a competitive market is met
7  by rivals filling the production gap, right?
8          MR. RISSMAN: Objection. Vague
9      and incomplete hypothetical.
10     A.    Just to make sure I have it, this
11  is a -- an independent firm or just a firm in
12  a competitive market, you want me to assume?
13  BY MR. COLEMAN:
14     Q.    Yes.
15     A.    Yeah. And their decision not to
16  produce is going to redound to the benefit of
17  other rivals; that's what you're asking?
18     Q.    My question was whether -- if
19  it -- in a competitive market, if one
20  individual firm reduces its production or
21  underproduces -- that loss of production will
22  be met by rivals filling in the production
23  gap, right?
24          MR. RISSMAN: Object to form.
25     A.    I think that's fair. By

Page 138

1  definition, if we are ask -- we are talking
2  about an atomistic firm that lacks market
3  power, then its decision to withhold
4  production by itself is not going to affect
5  market prices.
6  BY MR. COLEMAN:
7      Q.    So what prevented the independent
8  producers from expanding their sow herds or
9  adding production, increase the farrowings
10  and buying more weaner pigs from Canada, any
11  of those things in response to Smithfield or
12  Tyson reducing their sow herd?
13          MR. RISSMAN: Object to form.
14      And if you studied that and have an
15      opinion to offer, you can do that.
16     A.    I haven't studied the reaction of
17  independents to the liquidation that occurred
18  here. But I will note that based on the
19  figure that you just gave me, about
20  30 percent being controlled by the packers
21  themselves, that seems to be a substantial
22  and economically significant share such that
23  if there were attempts by the packers to
24  liquidate and to reduce supply that could
25  have an effect that wouldn't be easily met by

Page 139

1  the independents. I will just leave it at
2  that.
3  BY MR. COLEMAN:
4      Q.    You haven't studied that?
5      A.    I have not. I have not.
6      Q.    I'm going to pull up Tab 66.
7          MR. COLEMAN: Jacob, are we on
8  Exhibit 5?
9          MR. RISSMAN: This one has been
10      marked previously. Do you want to
11      keep the same marking or --
12          MR. COLEMAN: Oh, yeah. Thanks
13      for that.
14      (Exhibit 5 was marked for
15      identification.)
16  BY MR. COLEMAN:
17     Q.    Yeah. This has been previously
18  marked as Meyer Exhibit 2.
19          And, Dr. Singer, let me know when
20  you're -- when you're with us and ready to --
21     A.    I'm with you. I've not read the
22  study, but, yeah, I've seen it. Now I've
23  looked at it, at least the title.
24     Q.    And you're familiar with
25  Dr. Meyer, right, Dr. Steve Meyer, who

Page 140

1  authored this article?
2      A.    I don't know if I'm familiar.
3  It's possible that I've cited something else
4  he's done, but I -- just sitting here, the
5  name is not familiar.
6      Q.    You cited him multiple times in
7  your report, right?
8      A.    I would have to go back. I don't
9  remember the author of every study. You
10  know, the report has hundreds of citations,
11  so it's possible that I cited him multiple
12  times.
13     Q.    You recognize that Dr. Meyer is an
14  agricultural economist with particular focus
15  on the hog industry, right?
16          MR. RISSMAN: Object to form.
17      Foundation.
18  BY MR. COLEMAN:
19     Q.    If you -- I am sorry. If you
20  don't know, you don't know.
21     A.    I mean, based on -- all I can do
22  is -- based on the study that you're showing
23  me, that looks like it's certainly an
24  interest of his.
25     Q.    If you turn to page -- the second

Page 141

1  page of the document, scroll down to:  The
2  importance of packing capacity.
3       And the second paragraph there
4  says:  Furthermore, no one in the packing
5  industry sector decides how much to produce.
6  That decision rests solely with the people
7  who breed and farrow sows.
8       Do you see that?
9  A.   Yes.
10  Q.   Do you have a basis to disagree
11  with Dr. Meyer's assessment on that point?
12       MR. RISSMAN:  Object to form and
13  foundation.
14  A.   Yes, I do have a basis.  If what
15  he's saying is producing in a relevant
16  market, then I've seen record evidence that
17  is inconsistent with that claim.
18       If he's using the word "produce"
19  to explain what's happening upstream in the
20  pig production market, then I would agree
21  with it.  It's not clear and I can't -- I
22  can't -- I would have to read the surrounding
23  paragraphs to understand what he means by how
24  much to produce.
25

Page 142

1  BY MR. COLEMAN:
2  Q.   Yeah, I appreciate that
3  clarification.
4       So you would gree with respect to
5  the supply of hogs available, decisions about
6  how many hogs to produce rests with the
7  people who breed and farrow sows, right?
8  A.   Yes, with the caveat, that some of
9  those people are packers themselves.  So I
10  think you need to carve out those, and just
11  as you did with your prior questions, you had
12  asked me, you know, if the packers have
13  control over what the independents are
14  producing, and I would say yes, to the extent
15  that they can effectuate a price reduction
16  from those independents, they could -- they
17  could -- they could, in fact, influence how
18  much is being produced in the upstream
19  market.
20  Q.   And specifically what packers had
21  the ability to material -- materially control
22  the volume of hogs being produced in the
23  upstream market as you described it?
24  A.   So -- so I think we have
25  identified through this Q&A two mechanisms

Page 143

1  that would allow a large packer to influence
2  the output in the upstream market.  One is to
3  the extent they're vertically integrated,
4  that's their decision about how much to
5  produce.
6       But, two, to the extent they have
7  monopsony power -- and a lot of these
8  defendants are very large buyers in the
9  upstream market -- they could -- they could
10  suppress output by pushing the upstream
11  prices below the marginal revenue product
12  below the competitive levels.
13  Q.   Yeah.  We have established that
14  there's no allegation or evidence that you've
15  reviewed of an exercise of monopsony power by
16  the defendants, right?
17  A.   No, that's not true.  Well, I just
18  -- for the record, I've got a figure showing
19  that there does appear to have been a squeeze
20  on the independent farmers over the course of
21  the class period.
22       And, second, I'm aware of many
23  studies, including one that was issued by the
24  White House recently, suggesting that, in
25  fact, the packers are exercising buying power

Page 144

1  in squeezing independent farmers in the
2  upstream market.
3  Q.   Is that an allegation anywhere in
4  the complaint?
5  A.   I don't think that it relates to
6  the complaint.  You're asking me if I'm aware
7  of it, and I'm aware of such studies.
8  Q.   Did you form any opinions about
9  that?
10  A.   Not for the purpose of this
11  report.  Not for the purpose of this report.
12  But I'm aware of authoritative sources saying
13  that that has, in fact, happened.
14  Q.   Did you provide those as materials
15  relied upon?
16  A.   Yes.  I think that around
17  Figure 4, I cite a study that was recently
18  released by, I believe the White House.  We
19  can go look around Figure 4 and Figure 5.
20       I don't know if I'm going to be
21  able to call up the site, but I do remember
22  that in my report about -- about agencies or
23  the White House recently investigating this
24  issue.
25  Q.   And --

Page 145

1      (Simultaneous unreportable
2   crosstalk.)
3      A.   I found it.  I didn't mean -- but
4   it is in Footnote 18.  That's the Brian Deese
5   study that came out of the White House.
6   BY MR. COLEMAN:
7      Q.   What page of your report are you
8   looking at?
9      A.   Page 10, Footnote 18.
10     Q.   And -- yeah.  So tell us about
11  this White House investigation on which
12  you're relying.  What years was that -- were
13  they investigating?
14     A.   Well, they were investigating the
15  past -- I mean, it just came out in September
16  of 2021.  So they would be studying a period
17  that coincides with the class period and the
18  conduct period here.
19     Q.   Sure about that?
20     A.   Yes.
21     Q.   And did you attempt to -- did you
22  view that as challenged conduct --
23     A.   No.  I mean --
24     Q.   -- an exercise of monopsony power
25  to squeeze independent pork producers?

Page 146

1      A.   I don't think that that's part of
2   the challenged conduct, but you're asking me
3   if I thought the packers could wield any
4   influence as to production or output
5   decisions upstream, and the answer is yes.
6          And I've given you two mechanisms
7   by which they could do that.
8      Q.   But you have not formed any
9   opinions as to whether they actually used
10  monopsony power in this period, right?
11     A.   I don't think that I formed
12  economic opinions.  I just relayed the
13  research from the White House.  And I -- and
14  in Figure 5, as you know, I show that the
15  spread that was being enjoyed by the packers
16  was growing over time, and if you compare it
17  to Figure 4, you can see part of that
18  enhanced spread came off the backs of the
19  farmers.
20     Q.   Do you -- independent producers
21  decide how many barns and how much
22  infrastructure for raising hogs they want to
23  have on their farms, right?
24         MR. RISSMAN:  Objection.  Form.
25  Foundation.

Page 147

1      A.   Well, they decide how much in
2   response to various market phenomenon,
3   including market prices, and if prices are
4   being artificially suppressed by packers with
5   buying power that could affect their decision
6   of how much to supply.
7   BY MR. COLEMAN:
8      Q.   My question was whether they make
9   that decision as to how many barns to
10  maintain or infrastructure for raising hogs.
11         That's the farmer's decision,
12  right?
13     A.   Ultimately --
14         MR. RISSMAN:  Objection.
15     A.   Ultimately, they make the decision
16  in response to prevailing market conditions,
17  and to the extent that packers with buying
18  power can suppress prices below competitive
19  levels of the upstream market, that could
20  affect the decision by independent farmers as
21  to how much to produce.
22  BY MR. COLEMAN:
23     Q.   But they make the decision, right?
24         MR. RISSMAN:  Same objection.
25     A.   I mean, again, with the caveat

Page 148

1   that they're not making it in a vacuum.  They
2   are making it in response to market forces,
3   some of which are influenced directly by
4   defendants.
5   BY MR. COLEMAN:
6      Q.   And, again, you did not form any
7   opinion as to whether the packers were
8   conspiring or deliberately collectively
9   suppressing the market price of hogs, right?
10         MR. RISSMAN:  Objection.  Asked
11     and answered.
12     A.   I don't think that's part of my
13  opinion, and I don't think that's part of the
14  allegation here.
15  BY MR. COLEMAN:
16     Q.   Which packers are engaged in a
17  material amount of hog production?
18         MR. RISSMAN:  Object to form.
19     Vague.
20     A.   I think that I have a table that
21  shows which ones are vertically integrated.
22  I don't know if I will be able to take it to
23  you in realtime, but I seem to recall listing
24  that -- oh, on Page 20, I describe which ones
25  are vertically integrated.

Page 149

```
 1        But I seem to recall a table to
 2   the same effect.  And I don't think that I
 3   distinguished between materially.  I don't
 4   even know if that means materially integrated
 5   versus nonmaterially.  I just did integrated.
 6   BY MR. COLEMAN:
 7        Q.   Can you give me name?  I think we
 8   said Smithfield and Tyson had a sow, or
 9   anybody else -- do you know whether any other
10   defendant is vertically integrated?
11        A.   Well, let's go through Page 20
12   where I bullet out each of the defendants.
13        Q.   Is that the extent of the
14   information you have about the vertically
15   integration of the defendants?
16        MR. RISSMAN:  Object to form.
17        A.   I don't -- I don't think it's the
18   extent because I seem to remember a table --
19   and I could be misremembering -- that tells
20   us which ones are vertically integrated.  But
21   I know that in this summary on Page 20, I say
22   that -- yeah.  I don't think that this is --
23   this is the place.  I am reading 20 now.
24   BY MR. COLEMAN:
25        Q.   Yeah.  That's fine.  So one -- one
```

Page 150

```
 1   source of information if we wanted to know
 2   the extent to which each defendant is
 3   vertically integrated would be to look at
 4   their hog acquisition data, right, to tell
 5   how many hogs they acquired and from what
 6   source?
 7        A.   Yeah, I think Agri Stats would
 8   provide that in at least one of its reports.
 9        Q.   And do you know whether defendants
10   produced hog acquisition data in this case
11   themselves?
12        A.   Well, I think that we have access
13   to all of the -- all of the Agri Stats
14   reports.  And I think there are some reports
15   that are aimed at the upstream market, and
16   that's where I would go to try to get that
17   sort of information.
18        MR. RISSMAN:  We have been going
19   another hour 20.  Hal is on the
20   East Coast.
21        So I don't know how you feel
22   about lunch, Dr. Singer.  If you want
23   to keep going or what you want to do.
24        THE WITNESS:  Well, I think that
25   we should be moving in hour-and-a-half
```

Page 151

```
 1   increments, so what's the time -- how
 2   long have we been going in this
 3   session?
 4        MR. RISSMAN:  Little less than
 5   an hour 20.
 6        THE WITNESS:  Why don't we take
 7   it to an hour and 30.  Is that all
 8   right?  And we could just kind of
 9   stick to the hour 30 on each session.
10        Is that all right?
11        MR. RISSMAN:  It's fine with me.
12        Is that okay with you, Craig?
13        MR. COLEMAN:  I'm fine with
14   that, and feel free to interrupt me
15   when you're ready.
16        THE WITNESS:  I'm not keeping
17   time.  But if someone were to tell me
18   we are at the 1:30 point on this tape,
19   that would be nice.
20        MR. RISSMAN:  That's fine.
21   BY MR. COLEMAN:
22        Q.   Let's have you turn to Tab 26.
23        MR. COLEMAN:  And, Jacob, you
24   could pull that up on the screen.
25        And I've got to engage in the
```

Page 152

```
 1   same binder-flipping exercise that you
 2   do.
 3        MR. RISSMAN:  This is 5?
 4        MR. COLEMAN:  I want to say 6.
 5   Jacob, can you help us out?
 6        THE VIDEOGRAPHER:  It should be
 7   6, sir.
 8        (Exhibit 6 was marked for
 9   identification.)
10   BY MR. COLEMAN:
11        Q.   Dr. Singer, are you with us?
12        A.   Yeah.
13        Q.   So what's been marked as Exhibit 6
14   is a document created by the Pork Checkoff
15   with the title:  Quick Facts.  The Pork
16   Industry at a Glance.
17        Are you with me?
18        A.   Yes.
19        Q.   And are you familiar with Pork
20   Checkoff?
21        A.   It's not ringing a bell, but I --
22   leave it at that.
23        Q.   This was a document on which you
24   relied in your report, right?
25        A.   You have to take me to -- I've got
```

Page 153

1 hundreds of documents.
2    Q.    Footnote 24.
3    A.    What page, sorry?
4    Q.    Footnote 24.
5    A.    Let me go look.
6        Yes, I cite it -- I cite it for
7 that proposition that:  For decades, pigs
8 have been genetically bred to be leaner yet
9 heavier than their wild predecessors.
10    Q.    Did you read the report?
11    A.    I think that for something like
12 this on the background section, that a
13 staffer would have read it and showed it to
14 me, and we would have decided whether or not
15 it was worthy of inclusion in the background
16 section.
17    Q.    Page 45 of the document --
18        MR. COLEMAN:  Jacob, for your
19    benefit, I think it's 50 out of 134 of
20    the PDF.
21        MR. RISSMAN:  I'm sorry.  What
22    page are you on, Craig?
23        MR. COLEMAN:  I'm on Page 45,
24    referring to the numbered page of the
25    document.

Page 154

1        There we go.  Guy Fieri is a
2    helpful reference point.
3 BY MR. COLEMAN:
4    Q.    So in 2008, the Pork Checkoff
5 tells us that:  Historically unprecedented
6 high feed costs led to one of the most
7 challenging times in the history for pork
8 producers.  The blow, softened only by
9 record-high market hog prices, caused many
10 producers extreme financial distress.
11        Do you see that?
12    A.    Yes.  And it makes me excited that
13 I controlled for the cost of rearing a pig in
14 my regression.
15    Q.    Yeah.  Notwithstanding higher
16 prices that year, it was a period of extreme
17 financial distress for producers, right?
18    A.    It actually says the opposite.  It
19 says that prices went up to accommodate those
20 higher costs, which is what I'm hoping my
21 cost variable, at least in part, has
22 captured.
23        So this episode shows that when
24 costs go up, prices go up in the upstream
25 market.

Page 155

1    Q.    Right.  And if that doesn't
2 happen, that's a major problem for producers,
3 right?
4        MR. RISSMAN:  Object to form.
5    A.    If -- if -- I mean, I'm going to
6 accept your hypothetical.  I don't know how
7 it could happen, but it costs went up in a
8 competitively provided industry but prices
9 didn't go up -- I mean, it's counterfactual,
10 but I am just setting aside all the problems
11 with it.
12        If you're just asking me to assume
13 a vacuum, then, yes, I mean, that would be
14 bad for -- for producers.
15 BY MR. COLEMAN:
16    Q.    In any case, the Pork Checkoff
17 board tells us that in 2008 was a period that
18 caused many producers extreme financial
19 distress, right?
20        MR. RISSMAN:  Objection.
21    Foundation.
22    A.    That's what it says, yes.
23 BY MR. COLEMAN:
24    Q.    And do you dispute that 2008 was a
25 period of extreme financial hardship for many

Page 156

1 pork producers?
2    A.    I don't have a reason to dispute
3 it.
4    Q.    And if we go to the next page,
5 Page 46, there's a reference to:  Beginning
6 in April of 2009:  News coverage of H1N1 or
7 swine flu, as it was erroneously referred to
8 by the media, added to an already challenging
9 economic time for producers.  It was
10 estimated that producers lost more than
11 $2 billion after the outbreak of H1N1.
12        Do you see that?
13    A.    Yes.  And it also makes me excited
14 that I controlled for H1N1 with a new dummy
15 variable.
16    Q.    Yeah.  And your testimony was that
17 it was a counterfactual scenario where
18 producers would be faced with increasing
19 costs but lowering prices.  But the reality
20 is that's exactly what happened, isn't it?
21    A.    I don't see how you get that from
22 that bullet in 2009.  All it says is that --
23 is that they lost more than 2 billion after
24 the outbreak of H1N1.
25        You're asking if that was an

Page 157

1  episode in which prices went below cost?
2      Q.    Do you know whether the swine flu
3  lowered demand for US pork and ultimately
4  domestic hogs?
5      A.    Yes, I do know.
6      Q.    And do you know whether that
7  reduction in demand for US pork and US hogs
8  resulted in prices for market hogs declining?
9      A.    That I haven't studied.  I haven't
10  studied that, but it's a reasonable
11  inference.
12      Q.    And do you have any basis to
13  dispute that producers lost more than
14  $2 billion in this time period?
15      A.    No, but it -- again, it's
16  something that I controlled for explicitly in
17  my model with an H1N1 dummy variable.
18      Q.    In an environment in which hog
19  producers are collectively losing $2 billion,
20  you as an economist would expect production
21  to decrease, right?
22      MR. RISSMAN:  Object to form.
23  Incomplete hypothetical.
24      A.    I don't know if they would be able
25  to turn down the production that quickly, but

Page 158

1  it's a reasonable inference that production
2  could have decreased upstream.
3      Q.    There could be some --
4      (Reporter clarification.)
5      MR. RISSMAN:  Sorry.  Did the
6  witness finish his answer?
7      THE WITNESS:  No, I can wait.
8  It's fine.
9  BY MR. COLEMAN:
10      Q.    I didn't mean to interrupt.  I
11  thought you were done.
12      So if you have something to add,
13  go ahead.
14      A.    No.  Just that this is why it was
15  important to include a new dummy variable for
16  the existence of the H1N1 virus.
17      Q.    What you didn't control for was
18  the profitability of -- for producers of
19  raising hogs, right?
20      A.    I would say that I didn't control
21  for that explicitly, but I do have the cost
22  of the producers as a control variable, and I
23  think in normal circumstances, outside of an
24  H1N1 virus that scared people off of pork
25  temporarily, I think that costs and prices

Page 159

1  would move together.
2      And I think that in 2009, it
3  appears in this bullet that costs and prices
4  may have diverged.  In which case, I'm glad
5  that I controlled for some special
6  circumstance in 2009 with the H1N1 variable.
7      Q.    And you -- I think I took from
8  your previous answer that you don't dispute
9  that you would expect hog production to
10  decrease in an environment in which hog
11  producers were collectively losing
12  $2 billion; is that right?
13      MR. RISSMAN:  Object to form and
14  incomplete hypothetical.
15      A.    I think that if there were a
16  permanent reduction in profitability
17  upstream, that could be associated with a
18  decline in upstream production.  I will grant
19  you that.
20      If the H1N1 catastrophe was
21  short-lived, then it's possible that
22  production wasn't able to react in sufficient
23  time.
24  BY MR. COLEMAN:
25      Q.    If we flip to Page 81 of the

Page 160

1  document; go to the top of page.  We have a
2  nice picture of Dr. Meyer.
3      It says:  For America's pork
4  producers, 2008 and 2009 were among the most
5  difficult years ever.  In fact, the combined
6  losses incurred by producers in 2008 and 2009
7  exceeded the previously worst two-year period
8  on record, 1998 and 1999.
9      By the end of 2009, US pork
10  producers have lost money in 24 of the last
11  26 months amounting to nearly $6 billion.
12      Do you see that?
13      A.    Yes.
14      Q.    And you don't dispute the facts
15  that American pork producers lost $6 billion
16  over that two-year time frame, right?
17      A.    I don't have anything to dispute
18  it with here, but if you want, I can just
19  accept that as being the best estimate.
20      Q.    And, again, my question is, in
21  that kind of environment where pork producers
22  have lost money to the tune of $6 billion
23  collectively, it wouldn't be unreasonable to
24  see reductions in sow herd, reductions on
25  number of hogs on farms and a reduction in

Page 161

1 the supply of hogs generally?
2        MR. RISSMAN: Object to form and
3    incomplete hypothetical.
4    A.   It's certainly possible that that
5 happened, but that's precisely what would be
6 controlled for by my dummy variable for H1N1.
7 That's to say if there was a unique set of
8 circumstances that upset the relevant market,
9 the pork processing market, you would want to
10 control for that, and I did.
11 BY MR. COLEMAN:
12    Q.   And, again, this brings us to the
13 but-for world.  So absent the challenged
14 conduct, the existence of an alleged
15 conspiracy, how much would the sow herd have
16 been reduced in this environment where US
17 pork producers lost $6 billion over a
18 two-year period?
19        MR. RISSMAN: Objection.  Asked
20    and answered.
21    A.   To the extent that H1N1 virus
22 upset supply, then an economist would want to
23 control for that in a regression model, and
24 that's precisely what I've done; that is, you
25 cannot allege that my model is misattributing

Page 162

1 the price inflation that we are seeing during
2 the conduct to the H1N1.  I am already
3 controlling for it.
4 BY MR. COLEMAN:
5    Q.   That wasn't my question.
6        My question was, in the but-for
7 world, how much would producers have
8 decreased the sow herd given the financial
9 losses that they were incurring in this time
10 period?
11        MR. RISSMAN: Objection.  And
12    I'm going to instruct the witness that
13    if he has an opinion on that he can
14    give it, but if he doesn't -- hasn't
15    performed that analysis, he shouldn't
16    give an opinion.
17    A.   I haven't performed a
18 decomposition of the output effect attributed
19 to the challenged conduct and to nothing
20 else.
21 BY MR. COLEMAN:
22    Q.   And the same answer is true with
23 respect to number of farrowings or number of
24 hogs being raised on farms, right?
25        MR. RISSMAN: Same objection and

Page 163

1    instruction.
2    A.   I perform an output effect that
3 turns from a challenged conduct -- on the
4 challenged conduct, and I have not decomposed
5 it across the various ways in which output
6 was suppressed.
7        MR. COLEMAN: I think we have
8    gone 10, 15 minutes.  Why don't we
9    pause there.
10        MR. RISSMAN: Okay.
11        THE VIDEOGRAPHER:  Time is
12    12:54 p.m.  We are going off the
13    record.
14    (A lunch recess was held from
15    12:54 p.m. to 1:41 p.m.)
16        THE VIDEOGRAPHER:  The time is
17    1:41 p.m.  We are back on the record.
18 BY MR. COLEMAN:
19    Q.   Dr. Singer, did you discuss the
20 substance of your testimony with counsel
21 during the lunch break or any other break?
22    A.   Now I'm trying to remember what we
23 discussed.  I think we discussed where I was
24 going to eat, but I think that nothing of
25 substance, no.  Like, how are you doing?  Do

Page 164

1 you feel all right?  And stuff like that.
2    Q.   Before lunch, we were in the Pork
3 Checkoff document, Exhibit 6.
4    A.   Okay.
5    Q.   And we are on Page 81 of the
6 document.
7        MR. COLEMAN:  And, Jacob, if you
8    could just get the profit and losses
9    table on the screen.
10 BY MR. COLEMAN:
11    Q.   Dr. Singer, do you understand that
12 the profit and losses table here, the Iowa
13 farrow-to-finish hog operations, is a
14 graphical depiction of their relative
15 profitability of hog farms?
16    A.   That's what it reports to show,
17 yes.
18    Q.   And if we look at the period of
19 2009 to 2010, that appears to be -- those
20 appear to be years in which there were a
21 significant -- a period of significant
22 unprofitability for those hog operations,
23 right?
24    A.   Well, it goes back up.  So there's
25 oscillation just over time.  There's periods

Page 165

1  of large profits and they go through bad
2  periods and they go through large profits
3  again.  It seems like that pattern repeats
4  itself over time.
5       Q.   Yeah.  And I think that's a fair
6  point.
7            Are you familiar with the concept
8  of the hog cycle?
9       A.   I have come across it.  I don't
10  know if I can give you a definition realtime.
11      Q.   And are you familiar with the
12  concept as reflected in the chart we are
13  looking at, that there's a longstanding cycle
14  in which we have oscillations from
15  unprofitability to profitability for hog
16  operations?
17      A.   Yes.
18      Q.   Are you familiar with that?
19      A.   Yes.
20      Q.   And are you familiar with the
21  reality in periods of profitability, hog
22  farmers tend to expand production, and in
23  periods of unprofitability, they tend to
24  contract?
25           MR. RISSMAN:  Object to form.

Page 166

1       Overbroad and incomplete hypothetical.
2       A.   I'm not necessarily familiar with
3  the expansion and contraction, but I will
4  leave it at that.
5  BY MR. COLEMAN:
6       Q.   Is that something you studied or
7  accounted for?
8       A.   Well, I certainly accounted for
9  what was going on in the upstream market in
10  two ways in my progression model.  And what
11  these profitability figures are showing me,
12  big losses in '09 and big gains in '10, that
13  seems to suggest that profitability is not
14  going to be correlated with the challenged
15  conduct, right.
16           So I think the theory -- the
17  alternative theory that you're offering is
18  that I omitted some -- some variable
19  profitability that would explain the price
20  increases that we observed during the class
21  period and just from what -- what I've seen,
22  you haven't shown me the full time series.
23           But the fact that you've got
24  losses in '09 and big gains in '10, tells me,
25  at least for those two years, it's not going

Page 167

1  to be correlated.  And then when I look back
2  prior to that, when our conduct variable is
3  equal to zero, it's also not going to be
4  correlated.
5            There is periods where it's
6  profitable, and it goes unprofitable, as you
7  say.  So I don't think that this is going to
8  explain away the effect that we are capturing
9  in the conduct period.
10      Q.   I didn't ask that question.  I
11  didn't offer a theory.  I just asked whether
12  you're familiar with the fact that over a
13  period of decades, there is something called
14  a hog cycle in which there are periods of
15  unprofitability and hog farmers expand and
16  periods -- I am sorry, periods of
17  unprofitability in which they can track and
18  periods of profitability in which hog farmers
19  tend to expand.
20           Are you familiar with that or not?
21           MR. RISSMAN:  Object to form.
22      A.   Not the --
23           MR. RISSMAN:  Hold on.  Hold on.
24           Object to form.  Incomplete
25  hypothetical.

Page 168

1       A.   Not the expansion and contraction
2  part, but I do have some familiarity with the
3  idea that profitability goes in waves.  So I
4  will give you that part of it.
5            I don't see evidence right here
6  that production upstream could be explained
7  with variations in profitability.  It's
8  possible.  But you haven't established that
9  through this exhibit.
10  BY MR. COLEMAN:
11      Q.   Sure.  Would that surprise you if
12  producers respond to the relative
13  profitability of their operation by expanding
14  or contracting?
15           MR. RISSMAN:  Object to form.
16      A.   I think -- I think they might try
17  to do that, but, you know, I would want to
18  see evidence that those things are
19  correlated, but even if they were, I don't
20  think I'm missing anything in my regression
21  level.
22      Q.   If we turn to Page 93.  Yeah,
23  right up there.  US Breeding Herd, Quarterly.
24           Have you examined the general --
25  what's happened to the quantity of sows in

Page 169

1  the breeding herd in the United States over
2  time?
3      A.    No.  I have not examined that.
4  I'm looking at the phenomenon in the relevant
5  market.
6      Q.    Well, one of the allegations in
7  the complaint that you address is a reduction
8  in the sow breeding herd, right?
9      A.    Among defendants, yes, that's an
10 allegation in the complaint.  But I took your
11 question to mean have I been studying
12 upstream production at large across all
13 providers -- to independents over time, and I
14 have not done that.
15     Q.    And one thing we see from looking
16 at that chart is that there's a longstanding
17 reduction going back to the mid-'90s in the
18 size of the US breeding herd, right?
19     A.    Yes, I will grant you that the
20 blue line, which is not labeled here, but I
21 presume that's quarterly breeding herd --
22 they've labeled the orange line but not the
23 blue line.
24        You want to me the assume that the
25 blue line is quarterly breeding herd?

Page 170

1      Q.    Let's look at the chart on the
2  right where it says, US breeding herd,
3  quarterly.
4      A.    Okay.
5      Q.    And that reflects that dating to
6  the mid-'90s, there's a significant reduction
7  over time in the size of the sow breeding
8  herd, right?
9      A.    Yeah.  And a trend that looks like
10 that would be captured in my time trend,
11 right.  So -- so to the extent it continues
12 doing that, then I feel comfortable that my
13 model would have accommodated that trend.
14     Q.    I'm surprised by that because, as
15 I understand it, your model measures a before
16 period of -- well, how many years before
17 2009?
18     A.    I think the data goes back -- I
19 would have to check to see when the beginning
20 of the data runs.  I would have to go check
21 in the regression section how far it goes
22 back.  Several years.
23     Q.    And what we see when looking at
24 the data, is that there was an uptick in the
25 breeding herd dating to 2004, 2005.

Page 171

1      If we look at that period through
2  about 2008, the breeding herd was expanding,
3  right?
4      A.    Yeah.  But still below its
5  long-term historical high.  You're saying
6  there is a slight upturn in '04, '05, I will
7  grant you that.  But you're still well below
8  where it was, you know, in the early '90s.
9      Q.    So how does your model account for
10 the long-term reduction in the size of the
11 swine breeding herd?
12     A.    Right.  So if there's a trend like
13 this that is secular and occurring throughout
14 the data period, the period that we study,
15 then a linear time trend is going to capture
16 the effect of such trends.
17     Q.    But your data period dates to
18 2005, not to the early '90s, right?
19     A.    I would have to go back and check
20 when it goes.  But the data period from
21 '05 -- what you're not showing me is what the
22 US breeding herd looks like past 2009.  And
23 to the extent, I will say that, that the
24 trend is a linear trend -- linear downward,
25 that would be ticked up by the time trends.

Page 172

1      Q.    And do you have any understanding
2  as to the reasons for a long-term reduction
3  in the US sow breeding herd?
4      A.    I think that the White House
5  report might offer the notion that if
6  independent farmers are being squeezed by
7  packers with significant buying power, that
8  could result in a reduction in output.
9      Q.    Any other reasons come to mind as
10 to why the sow herd would have been steadily
11 reducing over time?
12        MR. RISSMAN:  Objection.
13 Foundation.
14     A.    No.  Sitting here, I don't know if
15 I can give you other reasons.
16 BY MR. COLEMAN:
17     Q.    If producers are able to produce
18 fewer gains and efficiency, genetic feed or
19 whatever, more piglets per sow, then it would
20 be economically prudent to reduce the number
21 of sows while still expanding production,
22 right?
23        MR. RISSMAN:  Object to form.
24 And calls for incomplete hypothetical.
25     A.    Yeah.  I don't think I could

Page 173

1  answer that.  I think that's outside the
2  scope of economists.  You'd want to ask
3  probably a farmer that.
4  BY MR. COLEMAN:
5      Q.   Or an agricultural economist,
6  right?
7      A.   No, these are the things that --
8  you wouldn't go to an economist for the
9  technical explanations of how breeding works.
10  You want to go to a technical expert.
11     Q.   In any case, if we look at the
12  long-term trendline from the mid-'90s to the
13  end of the graph -- we'll say at the end of
14  2009, 2010, in that range, we would expect
15  some reduction if that trend continues in the
16  sow herd in subsequent years, right?
17         MR. RISSMAN:  Objection.
18         Hypothetical.
19     A.   It's possible that that trend
20  persisted.  And as I said before, if it did,
21  that would be the kind of phenomena that
22  would be captured by the linear time frame.
23  BY MR. COLEMAN:
24     Q.   To the extent you looked at data
25  covering that full time period, right?

Page 174

1      A.   We know what data I looked at,
2  right.  So you're asking if I assume that it
3  continued a downward trend from 2009 onward.
4  I think our data went through something like
5  2020.  Then that linear trend would be
6  captured by the time trend.
7      Q.   That's actually not what I'm
8  asking.  You4 data does not predate 2005,
9  does it?
10     A.   I think you might be right.  I
11  need to go back and check the initial period
12  and how we define the preperiod.  I think
13  you're right, but I just would want to go
14  into the regression section and see the exact
15  start date of the regression data.
16         If you want, I can go get that for
17  you.
18     Q.   Well, yeah.  I think you should do
19  that.  I mean, as I understand it, your model
20  is built on a comparison of a before period,
21  comparing that to the conspiracy period.  So,
22  again, surprised that you don't know what the
23  before period is.
24     A.   No, no, no.  I know what the
25  period is.  I don't know the precise start

Page 175

1  date of the preperiod.  So let's keep the
2  record straight.
3         But it looks like we have data
4  going back to January 1, 2005.
5      Q.   Right.  And so your data did not
6  account for that long-term trend dated in the
7  mid-'90s of the sow herd being reduced,
8  right?
9      A.   Well, it's inappropriate and
10  uneconomic for you to say such a thing.  The
11  data period does not cover that earlier
12  period, so to say it's not accounting for it
13  is just nonsensical.
14         I account for phenomena that moved
15  prices around over the period I studied.
16     Q.   And the period you studied was
17  2005 going forward, right?
18     A.   Correct.
19     Q.   Fundamentally, your model controls
20  for certain variables that affect the supply
21  and demand for pork, right?
22     A.   Correct.  In the relevant
23  market -- in the relevant processing market,
24  correct.
25     Q.   And you view that the hog market

Page 176

1  is not part of the relevant market?
2      A.   Absolutely not.  It's a related
3  market.  It's the upstream market.  It's a
4  separate market, and I do control for certain
5  phenomena that are occurring up there, but my
6  aim -- the objective of the model is to
7  isolate the effect of the challenged conduct
8  on prices that direct and indirect consumers
9  paid in this antitrust litigation.
10     Q.   So you include variables that
11  control for hog costs, processing costs,
12  demand, trends over time, right?
13     A.   You have just given an incomplete
14  list.  We could go to all the variables that
15  I got.  But what I'm trying to do is capture
16  the supply and demand phenomena in the
17  relevant processing market.
18     Q.   So what I want to understand is
19  whether your model effectively means that any
20  other price increase is not correlated with
21  one of the control variables as defined by
22  you to be challenged conduct?
23     A.   I didn't understand that.  Let's
24  say it -- let's say it back.  Sorry.  I just
25  didn't follow what you're saying.

Page 177

1    Q.   Yeah.  Is the implication of your
2  model that any price increases that occurred
3  during the class period not correlated with
4  one of your control variables is defined by
5  you to be challenged conduct?
6    A.   No.  That's not how I put it.
7    Q.   How would you put it?
8    A.   I would say what the model is
9  trying do is to isolate the inflation in
10  prices that can be attributed to the
11  challenged conduct by using a benchmark of a
12  clean preperiod controlling for all other
13  factors that could have influenced prices
14  over the data window.
15    Q.   Are you familiar with the concept
16  of packer margins?
17    A.   Well, I know what a packer margin
18  is.  If you're asking what margin the packers
19  were earning...
20    Q.   What is a packer margin?
21    A.   Well, as I'm hearing you describe
22  it, margin has a very precise meaning in
23  economics, which is the difference between
24  the price and the cost, and you're asking for
25  packer.  So that would be the margin for

Page 178

1  packers.
2    Q.   Okay.  Are you familiar with the
3  industry term -- industry usage of the term
4  "packer margins"?
5       MR. RISSMAN:  Object to form.
6    A.   Packer margins, you mean?
7  BY MR. COLEMAN:
8    Q.   Yes.
9    A.   It's possible I've come across
10  that term.  And I have given you what my
11  understanding is as you have just described
12  it.
13    Q.   So if we are just relying on your
14  definition of packer margins, if they're
15  negative, it's economically reasonable for a
16  processor to cut back its production, right?
17       MR. RISSMAN:  Object to form.
18  Incomplete hypothetical.
19    A.   And I would say not necessarily.
20  BY MR. COLEMAN:
21    Q.   If a packer can purchase primals,
22  so we add up all the -- you understand what
23  primals are?
24    A.   Yes.
25    Q.   And if we add up -- a carcass

Page 179

1  yields a certain set of primals, the belly,
2  the shoulders, butts, et cetera, right?
3    A.   I haven't heard a question yet,
4  but --
5       (Simultaneous unreportable
6       crosstalk.)
7    Q.   I just want to make sure you
8  follow me.
9       When a packer slaughters a hog, it
10  cuts it up into primals.  That carcass
11  yields, well, really, two of every primal,
12  right?
13    A.   A what of every primal?  I am
14  sorry.
15  BY MR. COLEMAN:
16    Q.   Two.  You get two bellies, two
17  ribs, two shoulders, two butts, right?
18    A.   Okay.  I will accept that's the
19  number you get when you cut it up.  I don't
20  know if I've come across that yet, but go
21  ahead.
22    Q.   You don't know what a hog carcass
23  produces?
24    A.   I mean, I've got pictures
25  depicting what the hog carcass produces, but

Page 180

1  I haven't stated it as two of each, but we
2  are symmetric animals, so that follows.
3    Q.   Right.  You get one snout and one
4  tail, but other than that, when it comes to
5  primals, there's two of the primals on each
6  hog that's slaughtered, right?
7    A.   Okay.
8    Q.   Not something that's occurred to
9  you before, I gather?
10    A.   We haven't been -- I haven't --
11  there's nowhere in my report that I discuss
12  two of each.  I just talk about units, but go
13  ahead.
14    Q.   If a -- and you understand that
15  there's a market -- there's the buying and
16  selling of primals that's distinct from a
17  market for hogs that -- for market hogs that
18  still need to be slaughtered, right?
19    A.   I don't understand the question.
20    Q.   Do you know, for example, whether
21  my client Hormel, in addition to harvesting
22  hogs, also purchases primals?
23    A.   So are you asking, again, that --
24  the fact that some processors are both -- are
25  vertically integrated in the sense that

Page 181

1 they're making the hogs themselves upstream
2 and also buying them?
3     Q.   No.  I'm asking whether you -- I
4 mean, you're aware that Hormel, for example,
5 buys hogs to slaughter and run through its
6 plant, right?
7     A.   Yes.
8     Q.   Are you aware that it also goes
9 out and buys primals that have already been
10 slaughtered and cut up into primals by other
11 packers?
12     A.   They might do that, but that's not
13 something I studied.  I'm looking at the
14 defendant sales data when they're the
15 processor.
16     Q.   And my question, again, was
17 whether you're aware of there being a market
18 for hogs ready to slaughter that's distinct
19 from a market for primals?
20     A.   No, I don't make that distinction
21 in my report.  That's not how I define the
22 relevant market.
23     Q.   If a packer like Hormel is in the
24 position of being able to buy primals for
25 cheaper than the price of a market hog, it

Page 182

1 would make sense for Hormel or any other
2 processor in that position to do that, right?
3          MR. RISSMAN:  Object to form.
4 Incomplete hypothetical.
5     A.   Yeah.  I don't have an opinion
6 there.  It's not something I studied.
7 BY MR. COLEMAN:
8     Q.   What's a lag variable?
9     A.   A lag variable is that if you want
10 to allow for the possibility that the effect
11 of a variable doesn't occur in the instant
12 period but instead occurs in some future
13 period, you would use a lag effect.
14     Q.   And why did you apply a lag
15 variable to PVD?
16     A.   Because we think that that best
17 explains the data.  That we don't see the
18 effect of the PVD until -- until a later
19 period.  I would have to go back and see if
20 I've given a basis here.
21          Strike that.  We -- we are
22 using -- for that virus, we are using the
23 pork -- the pig mortality rate.  We don't
24 have a separate variable for that -- for that
25 virus.  We just have pig loss rate of six

Page 183

1 months prior.
2          Is that what you're asking about?
3     Q.   Yeah.  Right.  Yeah.  And that's a
4 good clarification.  And we should start
5 there.
6          So, I mean, I think you recognize
7 that PDV [sic] was a significant industry
8 event, and you made efforts to account for
9 it, right?
10     A.   Correct, through the -- through
11 the pig loss ratio rate, and we also --
12 piglet loss rate, and we also provide in the
13 bottom of 119 as to why we lagged it.  It's
14 roughly the time it takes for a pig to reach
15 slaughter maturity.
16     Q.   Yeah.  I am sorry.  Was it
17 Paragraph 119?
18     A.   Page 119, at the bottom.
19     Q.   Yeah.  And why did you focus on
20 piglet loss as the right metric?
21     A.   Well, we thought piglet loss could
22 have an important power in explaining prices
23 in the -- in the processing market.  So we
24 wanted to control for it, and we also thought
25 the PVD virus manifested its way through the

Page 184

1 piglet loss rate, so that would be a fine way
2 to put -- to account for it.
3     Q.   You aware of any other impacts of
4 PVD other than the piglet loss rate?
5     A.   No, I'm not.
6     Q.   And then coming back to the lag
7 variable, so we've got -- if you're
8 accounting for -- you're controlling for PVD,
9 you're focusing on piglet loss, explain why
10 it would be important to apply a lag variable
11 to piglet -- piglet loss numbers.
12     A.   Oh, so as I say, you wouldn't
13 expect to see any price effect for six months
14 because that's the time it takes for a pig to
15 reach slaughter maturity.  So if you went
16 looking a price effect as soon as the piglet
17 loss rate changed, you might not see it.
18          And my understanding is that we
19 tried it, you know, both in contemporaneous
20 and in lag terms, and the lag term did a
21 better job explaining variational data.
22     Q.   So you thought based on your
23 analysis, that was the appropriate way to
24 account for PDV, was to lag that -- the fact
25 of piglet mortality?

Page 185

1    A.    Well, I wouldn't quite put it that
2   way.  I would say that the piglet loss rate
3   is accounting for more than just the PVD
4   virus, but it also accounts for the PVD
5   virus.  So we didn't think a separate new
6   dummy variable was needed.
7    **Q.    Yeah.  And I'm interested**
8   **specifically in the decision to lag the**
9   **impact.  That's routed in the biology of the**
10  **pigs?**
11   A.    Not only the biology of the pig
12  but also in explanatory power of the data.
13  So you could go back and you can remove the
14  lag and just use the contemporaneous pig loss
15  rate, right, and see which one does a better
16  job explaining variation prices.
17   **Q.    Got it.  So in your mind, the --**
18  **applying the lag variable is the better way**
19  **to explain the impact of PVD?**
20   A.    No.  That's not what I'm saying.
21  I'm saying the lag variable is the better way
22  to explain the piglet loss rate.  And I'm
23  capturing the PVD virus through the piglet
24  loss rate variable.
25       You keep saying it as if the PVD

Page 186

1   virus was the only thing that I had in mind
2   when using and constructing this series.
3   It's not.
4    **Q.    What else did you have in mind?**
5       **And I'm honestly not trying to put**
6   **words in your mouth or make any assumptions.**
7   **I just want you to explain what you're doing**
8   **and why you picked the lag variable.**
9       **So what other -- what else were**
10  **you trying to account for other than PDV?**
11   A.    Oh, anything that changes the
12  piglet loss rate, right.  So anything that
13  changes it could, in theory, have an effect
14  on prices in the relevant market.  I wanted
15  to control for that.
16   **Q.    Okay.  So -- but if you want to**
17  **understand the impact of piglet loss on**
18  **market prices, then it would be important to**
19  **lag the effect based on the biology of the**
20  **pig?**
21   A.    I think that's one basis, but a
22  second basis is whether or not it does a
23  better job explaining variation in the
24  pricing data in the relevant market than the
25  unlagged, and so I want to look at both of

Page 187

1   those bases.
2    **Q.    And that's -- that's what --**
3   **that's what you found here, was that it had**
4   **better explanatory power if you lagged the**
5   **impact?**
6    A.    That's my understanding, yes.
7    **Q.    Coming back for the -- the concept**
8   **of there being a marketplace for primals, and**
9   **ultimately -- is that, in your mind, an**
10  **upstream market, or is that part of the same**
11  **market?**
12   A.    Well, I'm looking at defendants'
13  sales data, where they served as the
14  processor, and I think what you're asking is
15  what happens when some other party serves as
16  the processor.  And sitting here, it sounds
17  like that would not be captured in our
18  database.
19       It's conceivable it is, but I
20  would want to run that down.  It is something
21  that -- it sounds like from your description
22  if they're not -- if they're not processing
23  it, I'd just query whether or not that's
24  going to be contained in our data.
25   **Q.    So you recognize that a**

Page 188

1   **defendant's decision to export pork products**
2   **is not in itself evidence of a conspiracy,**
3   **right?**
4    A.    I think that -- if that's all you
5   had, and the decision was unilaterally made,
6   you know, that would not constitute the basis
7   of an antitrust theory of harm.
8    **Q.    Yeah.  In fact, a decision to**
9   **export products can be perfectly rational and**
10  **consistent with a competitive environment,**
11  **right?**
12   A.    Well, divorced from all the facts
13  of the case and in a vacuum, it could.  But
14  if we look at record evidence, including the
15  evidence I mentioned earlier about, I think,
16  direct communications between CEOs on the
17  question of exporting and whether or not it
18  would be beneficial to the industry, you
19  know, everything is in context.
20   **Q.    Was that important to your**
21  **analysis, that you believe there's been**
22  **direct communications between defendant CEOs**
23  **on exports?**
24   A.    Well, it's important enough to
25  make it into my export section.  And it's

Page 189

1 important in the sense that it substantiates
2 part of the challenged conduct. I will leave
3 it at that.
4 **Q. But coming back to whether it may**
5 **be rational to export pork, it's not your**
6 **opinion that all exports of pork in the class**
7 **period were challenged conduct and unlawful,**
8 **right?**
9 MR. RISSMAN: Object to form.
10 A. Well, remember, I -- I don't
11 consider exporting in the abstract to be a
12 restraint that is being challenged here. I
13 think that exporting, as I said many times
14 now, is one of several levers or mechanisms
15 by which domestic output was reduced.
16 But I think that there's record
17 evidence that's consistent with plaintiff's
18 claims that the decision to export was made
19 on a coordinated basis. And just, you know,
20 sitting here, I could go through my report --
21 I can spare you the pain, but we talk about
22 communications between CEOs regarding
23 exporting activity and also, you know, the
24 Agri Stat export report itself was allowing
25 the defendants to coordinate in their

Page 190

1 decisions of how much to export.
2 They can monitor each other's
3 decision making with respect to exporting,
4 see how much of the production was being
5 shipped abroad.
6 BY MR. COLEMAN:
7 **Q. So if in some instances -- so if**
8 **one of the defendants was able to obtain a**
9 **higher price for a particular product by**
10 **exporting it, that's perfectly lawful, right?**
11 MR. RISSMAN: Object to form.
12 Calls for a legal conclusion.
13 A. I think I would have to know more
14 about the hypothetical, but I think I cite
15 the opposite in my report, which are
16 instances where exporting was occurring at a
17 lower price, but they were doing it for the
18 good of the -- you know, the alleged
19 conspiracy by suppressing prices in the
20 domestic market.
21 BY MR. COLEMAN:
22 **Q. What was notable about that, in**
23 **your mind, was the fact that, at least your**
24 **understanding, that there may have been**
25 **exports at a loss, I guess. Is that right?**

Page 191

1 A. Either at loss or just not as
2 profitable as selling in the US.
3 **Q. And on the other hand, if the**
4 **exports are more profitable than domestic**
5 **sales, it would not be fair to treat that as**
6 **challenged conduct, right?**
7 MR. RISSMAN: Object to form.
8 Calls for a legal conclusion.
9 A. Again, I'm not treating the
10 exporting as a restraint that is going to be
11 eliminated when I move to the but-for world.
12 It's one mechanism by which the defendants
13 allegedly reduced domestic supply.
14 BY MR. COLEMAN:
15 **Q. Yeah. And so one thing you did**
16 **was you looked at qualitative evidence, and**
17 **you mentioned that there might have been**
18 **conversations among defendant CEOs about**
19 **exports as an example of that kind of**
20 **qualitative evidence, showing that there was**
21 **coordination on exports, right?**
22 A. As well as the Agri Stats export
23 report itself, yes.
24 **Q. Right. So I want to get your**
25 **understanding of qualitatively, how we assess**

Page 192

1 **any given export to determine whether it was**
2 **economically rational and reasonable or --**
3 **or -- on the one hand or part of the**
4 **conspiracy on the other hand?**
5 A. Yeah. I would say that's a bit of
6 a fool's error. That certainly was not a
7 part of my scope or my study. I'm trying to
8 figure out the pricing model, what portion of
9 the price increase the defendants took that
10 could be attributed to the challenged
11 conduct.
12 And I have an associated output
13 model. But I'm not trying to simulate what
14 exports would have been in the absence of a
15 challenged conduct. I have not done such an
16 analysis. And frankly, at this moment in
17 time, I'm not planning on doing such an
18 analysis on the merits.
19 **Q. So in your mind, it's not**
20 **important to determine whether any of the**
21 **defendants' exports in this time period**
22 **were -- in their economic interest, whether**
23 **or not there was a conspiracy?**
24 A. I'm not -- I'm not trying to
25 predict exports in the but-for world, and so

Page 193

1  I'm trying to predict domestic output in the
2  but-for world.  I don't know if there was a
3  model.  There was certainly not anything that
4  I offered that would allow one to project
5  what exports would have looked like in a
6  but-for world.
7     Q.   Can you point to any particular
8  export by any defendant that you think was
9  the product of collusion?
10        MR. RISSMAN:  Object to form.
11     A.   I mean, I don't do that and, you
12  know, what I do instead is I review record
13  evidence that's consistent with the criteria
14  that economists have identified as being --
15  as being supportive or indicative of
16  anticompetitive conduct.
17        And so I told you, I looked at
18  CEOs communicating with each other directly
19  over export decision.  The Agri Stats export
20  report itself provided information that would
21  allow monitoring among the defendants to --
22  to increase -- artificially increase
23  exporting.  But I never endeavored to
24  estimate for any given export of pork whether
25  that export, you know, was -- would or would

Page 194

1  not have occurred in the but-for world.  I
2  don't do that.
3  BY MR. COLEMAN:
4     Q.   Did you identify any particular
5  transaction by any defendant in which it
6  exported products at a price less than it
7  could obtain in the domestic market?
8     A.   I'm remembering one document -- I
9  think I mentioned this before -- where it
10  appeared that either it was at a loss or less
11  profitable, but yet it was still good for the
12  alleged cartel or the alleged conspiracy for
13  them to go forward with it anyway.
14     Q.   We may look at that.  Is that a
15  Smithfield document?  Do you think you know?
16     A.   It sounds right, but I can't
17  remember which -- which exact document it was
18  sitting here.
19     Q.   Can you turn to Page 167 of your
20  report.
21     A.   Sure.
22        MR. COLEMAN:  Jacob, if you
23  could pull up Exhibit 1, if it's
24  helpful, 167.
25        THE WITNESS:  Okay.

Page 195

1  BY MR. COLEMAN:
2     Q.   And in Paragraph 219, you talk
3  about Smithfield predicting internally that
4  exports expected to be larger than the prior
5  year.  Domestic -- decrease in domestic
6  availability should help keep pork prices
7  above prior year -- prior year through the
8  remainder of 2016.
9        Sorry for stumbling.  But that's
10  what it says, right --
11     A.   Yes.
12     Q.   -- the quoted portion of the
13  Smithfield document.
14        And that does not refer to
15  defendant-to-defendant communication about
16  exports, right?
17     A.   I think defendant to defendant
18  might be 217.  You're taking me to 219.
19     Q.   I'm sorry.  219.  Yeah.  Page 167.
20     A.   But so that paragraph in 219 --
21  let's see.  You just want me to look at that
22  one line about Smithfield?
23     Q.   Review the paragraph, and I think
24  at the end -- I don't know which excerpts in
25  your mind reflect defendant-to-defendant

Page 196

1  communications about exports.
2     A.   Let's --
3        (Simultaneous unreportable
4        crosstalk.)
5     A.   Let's go to the bottom of 219.
6  Sorry.  This is a Seaboard CEO using his
7  personal e-mail to tell Doug Clemens of
8  Clemens that he was, quote, glad to see you
9  were working on some higher value export
10  opportunities in Japan, Korea because that
11  will help take some of the pressure off of
12  domestic sales, end quote.
13     Q.   Yeah.  Is that what had in mind
14  when you were thinking about CEO-to-CEO
15  communications between defendants?
16     A.   Yes.
17     Q.   Are you aware of any others?
18     A.   Sitting here, I don't think I'm
19  aware of any others, no.
20     Q.   Do you know whether in 2018,
21  Mr. Brenneman was the CEO of Seaboard?
22     A.   I mean, that's what the language
23  says there.
24     Q.   That's what you wrote?
25     A.   Yes, that's what I wrote.

Page 197

1      Q.   You would agree that it's
2   important to take care that actions
3   consistent with rational self-interest are
4   not treated as evidence of an antitrust
5   conspiracy, right?
6      A.   I think that's fair, yes.
7      Q.   And a good test for exports in
8   particular and whether an export raises
9   antitrust suspicions is whether the exports
10  are sold at prices in foreign markets below
11  what could have been achieved in the domestic
12  market, right?
13     A.   It's an indicator.  I don't know
14  if it's a good test.  I mean, if you get
15  communication between two CEOs coordinating
16  their export decision, at that point, I don't
17  need to know if the price is above or
18  below --
19         (Reporter clarification.)
20     A.   -- some requisite level to
21  determine whether or not that's potentially
22  anticompetitive.
23     Q.   At that point, the fact of the CEO
24  correspondence sort of overrides whatever the
25  economics is in your mind?

Page 198

1      A.   No, not overrides the economics.
2   It is direct communication of a strategy that
3   is designed here, obviously, to support
4   higher domestic prices.  It is consistent
5   with a cartel-like behavior, period, end of
6   story.
7         It is economic -- it's an economic
8   analysis.  It derives from an economic
9   criteria designed by economists to identify
10  conspiracies.  So I just -- the way that you
11  phrase the question was just wrong.
12     Q.   That's fair.  It sounds to me like
13  you view the correspondence between CEOs that
14  we discussed in 2019 as being important to
15  informing your analysis, right?
16     A.   I mean, it's important, but I
17  think that everything that I cite is
18  important.  I don't want to give it any more
19  weight than any other documents that are
20  cited here.  Just it's an important document
21  in the case that is supportive of the
22  allegations in the complaint for the
23  existence of a conspiracy.
24     Q.   I heard you reference a
25  conversation between CEOs of the defendant

Page 199

1   about exports like four or five times in this
2   deposition.  Is that fair?
3         MR. RISSMAN:  Object to form.
4      You're asking questions, not just
5      referencing things.
6         MR. COLEMAN:  Yeah.
7      A.   Yes.  I remember saying it, and
8   then you suggesting that I was making it up
9   and I was saying no, no, no, I remember it.
10  You said, no, we'll see about that.
11        And so it's been kind of a bone of
12  contention today as whether or not this thing
13  exists.  So, yes, we have mentioned it a lot,
14  and I was right.
15  BY MR. COLEMAN:
16     Q.   You were right that you wrote that
17  allegation in your report, right?
18     A.   I was right that that record
19  evidence, consistent with collusion, was in
20  my report.  You disputed that it was in my
21  report, and I couldn't remember the paragraph
22  when the report was closed, but now having
23  you taking me to Paragraph 219, it refreshes
24  my recollection.
25     Q.   And that's what you're relying on

Page 200

1   as evidence of collusion between CEOs of
2   defendants?
3      A.   You know what --
4         MR. RISSMAN:  Object to form.
5      Mischaracterizes his testimony.
6      A.   You know what section this is
7   coming in.  It's coming in as the end of how
8   you can do a mapping of the evidence that I
9   reviewed so far of the plus factors, and -- I
10  will leave it at that.
11  BY MR. COLEMAN:
12     Q.   Coming back to this idea again,
13  you don't -- you're not opining that all
14  exports that occurred during the class period
15  were the product of the alleged conspiracy,
16  right?
17        MR. RISSMAN:  Objection.  Asked
18     and answered again.
19     A.   I don't know how I could better --
20  better say it.  But it's not my opinion that
21  exports would be zero in the but-for world.
22  There's some amount of exports that would
23  continue to occur in the but-for world for
24  sure.
25

Page 201

BY MR. COLEMAN:

**Q. And I'm interested in whether a reasonable approach to distinguishing between roughly lawful valid exports on the one hand and exports that are part of the conspiracy on the other hand is whether the exports were sold at prices in foreign markets below what could have been achieved in the domestic market.**

MR. RISSMAN: Objection. Asked and answered.

BY MR. COLEMAN:

**Q. Is there a reasonable way to distinguish lawful from unlawful exports?**

MR. RISSMAN: Objection. Asked and answered, and calls for a legal conclusion.

A. In the absence of direct evidence, the two CEOs were coordinating in their export decisions and one could look at the price and whether or not the firm -- or the defendant incurred a loss. That would be -- if they did that could be indicative of anticompetitive conduct.

But I'm going to say, again, if

Page 202

you have direct evidence of communication, if you have a sort of evidence that we see from Agri Stats where firms are able to monitor each other's exports, right, then we don't necessarily have to go and see if, in fact, there was a profit sacrifice taken.

I think the profit sacrifice is helpful, and it certainly is indicative when it happens, but it's not a necessary condition.

BY MR. COLEMAN:

**Q. Do you have any concerns that your model could have -- could be treating economically rational exports as challenged conduct?**

A. No. I have no concerns -- are you referring to my econometric model of prices?

**Q. Yes.**

A. Well, as you know, I'm only looking domestic supply in my dependent variable, and so I don't think there's any way that I could be misattributing the effects of the challenged conduct to something else including levels of export.

I feel like that -- I said this a

Page 203

thousand times now -- that exports likely increased in the actual world relative to the but-for world because of the challenged conduct to the extent it was part of the scheme. But I don't think there's any chance that I've failed to account properly for exports when measuring the effect of the challenged conduct and the single alleged conspiracy to suppress output and raise prices when we are looking at that on domestic prices.

**Q. Do you agree that if a model purports to show evidence of an antitrust conspiracy, it should be sure to exclude or control for economically rational decisions that are in a firm's interests?**

A. Again, I'm not --

MR. RISSMAN: Object to form.

A. I'm not sure which model you're referring to. Are you referring to my regression model?

BY MR. COLEMAN:

**Q. Just in general. If you're going to offer antitrust -- you know, an econometric model or an economic model in an**

Page 204

**antitrust case purporting to quantify anticompetitive activity or the economic impact of economic activity, is it important that the model exclude or control for economically rational decisions that are in the firm's interest?**

MR. RISSMAN: Object to form.

A. Well, if we're talking about the regression model, what's important to control for are all of the phenomenon that could be affecting pricing during the study period so that you don't inadvertently attribute the price effects that we're seeing to the challenged conduct when, in fact, it's something else including procompetitive reasons.

And I feel like I've done that. Nothing that you have said today caused my to want to go back and add an additional control variable.

With respect to the qualitative factors, you know, I'm following the criteria that have been identified in the economic literature by Suslow, and, you know, things like inducements to collude and monitoring,

Page 205

1  and so I'm kind of going through and looking
2  at the record evidence in light of that
3  three-pronged criteria, and I feel like the
4  evidence is consistent with the existence of
5  a conspiracy.
6         And I think it's the combination
7  of the two.  It's the fact that the
8  qualitative criteria satisfied and in
9  conjunction with the econometric model, it
10  gives me confidence that what I'm looking at
11  has the look and feel of a cartel --
12  anticompetitive cartel.
13  BY MR. COLEMAN:
14     Q.   If we go back to Tab 45, the Pork
15  Checkoff -- I got that as Exhibit 6 -- and go
16  to page -- let's go to Page 42.
17     A.   Okay.
18         THE VIDEOGRAPHER:  Did you say
19  42?
20         MR. COLEMAN:  Yeah.
21     A.   Okay.  I'm at 42.
22  BY MR. COLEMAN:
23     Q.   1995, it says that:  At the
24  request of producers, the Pork Checkoff
25  increases to 45 cents of 1 percent (45 cents

Page 206

1  per hundred dollar value).  This checkoff
2  rate stays the same until 2002.
3         Do you see that?
4     A.   Yes.
5     Q.   And do you have any understanding
6  of how Pork Checkoff funds are raised?
7     A.   No.  And it's not defined in the
8  bullet you give me.  I mean, that's not even
9  a sentence.  It just says Pork Checkoff
10  increases and presumes the reader knows how
11  Pork Checkout -- the institution is called
12  Pork Checkoff, and they've designed a metric
13  with the same name, Pork Checkoff, and they
14  say that their institution's name has
15  increased to .451 percent.
16         I mean, just looking at that, it's
17  impossible to know what they are talking
18  about.
19     Q.   Yeah.  And so -- not a test.  But
20  I just want to know if you -- maybe
21  established this already, and I'm going to
22  get an asked and answered objection.
23         But do you know what the Pork
24  Checkoff is?
25     A.   I don't recall what the Pork

Page 207

1  Checkoff is, no.
2     Q.   If we turn to the next page,
3  Page 43.  It says:  In 2003 -- the top of the
4  page -- the United States continues to export
5  more pork setting a new record for pork
6  exports for the 12th consecutive year.
7         Do you see that?
8     A.   Yes.
9     Q.   Do you know whether the Pork
10  Checkoff actively supported the export of
11  pork produced in the United States?
12     A.   Actively supported it, no, I don't
13  know -- I don't know what you mean.  Lobbying
14  for it?  What do you mean by supporting it?
15     Q.   Sounds like you have no knowledge
16  here, so defining terms is not going to help
17  us.
18     A.   You used the word "support," which
19  is fairly ambiguous in that sentence.  I
20  don't know what you mean by "support."
21     Q.   You understand whether American
22  pork producers, independent producers have
23  taken measures to support an increase exports
24  of pork produced in the United States?
25     A.   I think that someone selling pork

Page 208

1  would be looking for opportunities to make
2  export sales.
3     Q.   And not only that, but independent
4  hog producers have long supported exports of
5  domestically raised pork, right?
6         MR. RISSMAN:  Object to form.
7  Foundation.
8     A.   I don't know if that's true.
9  BY MR. COLEMAN:
10     Q.   The next page, Page 50 -- I'm
11  sorry.  Page 44.  I'm sorry.  I'm sending you
12  on a goose chase.
13         2005, it says that:  America's
14  pork producers continue to grow sales abroad
15  with the United States becoming the largest
16  pork exporter.
17         Do you see that?
18     A.   Yes.
19     Q.   And, again, that would appear to
20  indicate that America's pork producers, the
21  mission of theirs to expand pork exports,
22  right?
23         MR. RISSMAN:  Object to form and
24  foundation.
25     A.   It just says that America's pork

Page 209

1  producers continue to grow sales abroad, with
2  the United States as one of the largest pork
3  exporters.
4  BY MR. COLEMAN:
5      Q.    And if we looked on the next page,
6  2007, so on Page 45, it says:  US pork
7  exports broke records for the 16th
8  consecutive years -- year.  Exports totaled
9  1.3 million metric tons, nearly 2.9 billion
10  pounds at a value exceeding 3.15 billion.
11       Do you see that?
12     A.    Yes.
13     Q.    And you don't dispute this was an
14  effort by independent pork producers, right?
15       MR. RISSMAN:  Object to form.
16     Foundation.
17     A.    I don't think from that bullet you
18  can tell that it's effort from independent
19  pork producers.  I don't know how you get
20  that from that bullet.
21  BY MR. COLEMAN:
22     Q.    I am asking about your knowledge.
23     A.    Oh.  I don't know -- I don't know
24  what independent pork producers were
25  advocating in 2007.

Page 210

1      Q.    Increased exports is good -- are
2  good for independent pork producers, right?
3       MR. RISSMAN:  Object to form.
4     And instruct the witness to only
5     answer questions he's -- has an
6     opinion about.
7     A.    Well, I don't have an opinion on
8  those.
9  BY MR. COLEMAN:
10     Q.    Do you have -- you don't have
11  opinion one way or the other whether
12  increased exports benefit independent hog
13  farmers?
14       MR. RISSMAN:  I will just
15     clarify that I mean an opinion in this
16     case.
17     A.    No, I haven't offered an opinion
18  in this case on that.
19  BY MR. COLEMAN:
20     Q.    Do you have any opinion as to
21  whether increased exports of pork have over
22  time encouraged the expansion of domestic hog
23  farms?
24       MR. RISSMAN:  Same instruction.
25     A.    Not in this case, no.

Page 211

1  BY MR. COLEMAN:
2      Q.    But you do offer the opinion that
3  increase in exports raised the price of pork,
4  right?
5     A.    I offer record evidence suggesting
6  that that was the effect and that was the
7  understanding of the defendants in the case,
8  that they could move pork outside of the US
9  and put it abroad, that it could cause the
10  prices in the US to rise.
11     Q.    And if the price of pork
12  increases, the value of hogs increased,
13  right?
14       MR. RISSMAN:  Objection.  Same
15     instruction.  If you have an opinion
16     you're offering in this case, you can
17     give it; otherwise, you shouldn't
18     answer.
19     A.    Yeah, that's not an opinion that
20  I'm offering in this case.
21  BY MR. COLEMAN:
22     Q.    So you don't know one way or the
23  other whether increased exports over time
24  have raised hog values and supported domestic
25  production of hogs?

Page 212

1       MR. RISSMAN:  Same instruction.
2     A.    I don't have an opinion, and that
3  would require a different model unrelated to
4  the relevant market here.  It would be
5  modeling production upstream.
6  BY MR. COLEMAN:
7      Q.    Well, it would increase quantity
8  of hogs and ultimately pork, right?  More
9  hogs are being produced on American farms?
10       MR. RISSMAN:  Object to form.
11     And same instruction.
12     A.    You said "it."  I'm not sure what
13  the "it" is.  What's the trigger that
14  supposedly increases production upstream?
15  BY MR. COLEMAN:
16     Q.    Higher hog value would encourage
17  farmers to grow more hogs, right?
18       MR. RISSMAN:  Same instruction.
19     A.    Yeah.  I'm not offering an opinion
20  there.  I do use, you know, cost of the --
21  the cost of the -- to raise the hog is an
22  explanatory variable of prices in the
23  relevant market.  But I hear your question
24  as, you know, whether there's some kind of
25  feedback effect in the upstream market.  I

Page 213

1  haven't studied that.
2      MR. COLEMAN:  Jacob, can you go
3  to Page 104.  There we go.  It's
4  called the chart -- I'm interested in
5  the chart with the header:  US Pork
6  Exports.
7  BY MR. COLEMAN:
8      Q.   And that chart shows that dating
9  to the mid-'90s, when NAFTA was signed,
10  there's been a steady upward tick in US pork
11  exports, right?
12     A.   Correct.
13     Q.   And that long predates the class
14  period and the control period -- the before
15  period that you used, right?
16     MR. RISSMAN:  Object to form.
17  Mischaracterizes the document.
18     A.   What I will say is that this --
19  this trend of increasing exports predates the
20  class period.
21  BY MR. COLEMAN:
22     Q.   And it also predates the before
23  period that is 2005 to 2008, right?
24     A.   Correct.  And I'm not -- I'm
25  studying prices.  I'm not trying to come up

Page 214

1  with an empirical model to predict output or
2  exports.  I'm setting the effect of the
3  alleged conspiracy on prices in my
4  econometric model.
5      Q.   I mean, another interesting thing
6  about this graph is that the first-time
7  exports declined from NAFTA in 1994 to the
8  end of the graph is 2009, the first year
9  where there's supposed cartel in which
10  there's a conspiracy to export pork, right?
11     MR. RISSMAN:  Object to form.
12     A.   So the conspiracy is not
13  exclusively about exporting.  We have
14  mentioned this now about ten times.  But
15  exporting is one of several levers that the
16  defendants allegedly use to reduce domestic
17  supply.
18     The fact that it fell in '9
19  relative to this stupendous year in '8 isn't
20  all that remarkable.  What I want to see is
21  -- '9 is still an impressive upward trend
22  relative to all preceding years except for
23  '8, and I want to see what the trend looked
24  like beyond that if I were inclined to model
25  what exports would have looked like in a

Page 215

1  but-for world.
2      You know, I didn't do that.  I can
3  tell you what the graph would look like is
4  that it would still continue going upward.
5  It just wouldn't have gone up by as fast a
6  rate as it did absent the challenged conduct.
7  BY MR. COLEMAN:
8      Q.   How would you go about modeling
9  what exports would have looked like in the
10  but-for world?
11     A.   I think I would need just to aim
12  my machinery not at prices but at exports.  I
13  would try making exports the dependent
14  variable, but, you know, that's not how I set
15  about establishing anticompetitive injury
16  here.
17     Maybe some other expert is
18  interested in doing that, but I'm not trying
19  to come up with a decomposition, as I told
20  you, of the causes of the domestic reduction.
21  We can see it very clearly in one of my first
22  figures where we show that the domestic
23  production fell below trend.
24     And, you know, what I'm trying to
25  figure out is how much of that domestic

Page 216

1  production declined can be attributed to the
2  challenged conduct.  And I -- you're familiar
3  with my output section.  It turns on the
4  price effects and the own price of elasticity
5  of demand faced by the defendants.
6      Q.   So we have a snapshot of the
7  preconspiracy period.  What happened to
8  exports on the post-conspiracy period?
9      A.   You mean after 2018?
10     Q.   Yes.
11     A.   Sitting here, I can't tell you
12  what happened.
13     Q.   So you're not aware that pork
14  exports increased 11 percent in 2020, for
15  example?
16     A.   No, but that wouldn't surprise me.
17  It seems like just as the world markets are
18  growing, especially the demand for
19  US-produced pork, I would expect that exports
20  would trend up over time.
21     That doesn't mean the -- an
22  agreement to shift into overdrive could not
23  have amplified or accelerated exports over
24  what it would have been in the absence of the
25  challenged conduct.  There's a secular trend

Page 217

1  upward.  So the fact that it continues to go
2  up, I don't think is dispositive to tell us
3  what the effect of the challenged conduct was
4  on exports.
5      **Q.   And included in your answer is a**
6  **recognition that there's been increasing**
7  **demand for US agricultural products including**
8  **pork over time, right?**
9          MR. RISSMAN:  Object to form.
10      A.   I think that that's fair, and
11  that's why I control for certain things in my
12  regression -- in my price regression model.
13  It's not an export model.  It's a price
14  regression model, including a time trend.
15  BY MR. COLEMAN:
16      **Q.   Did you control for foreign demand**
17  **for US pork?**
18      A.   Well, like I just said, the time
19  trend might capture it.  Let me look just to
20  see if there are any other variables that
21  might pick that up.
22          Well, the only other variable that
23  I think would pick that up -- I mean,
24  everything could be affected in theory, but
25  the most logical is that real GDP per capita

Page 218

1  would increase with exports generally.  And
2  so if exports generally were going up over
3  time, then real GDP per capita could capture
4  that as well.
5          But I think the time trend is
6  probably what's most aimed at capturing a
7  steady secular trend -- upward trend exports
8  for US pork.
9      **Q.   Did it control for perceptions**
10  **about the safety or quality of US pork,**
11  **whether positive or --**
12      A.   Sure.  Sure.  That's the swine flu
13  flag.
14      **Q.   Anything else?**
15      A.   No.  I think that's the one that
16  would have affected US consumers' perception
17  of the quality of pork or the safety of pork.
18      **Q.   Do you have any sense of whether**
19  **there's been anything else that's affected**
20  **the foreign perceptions of the safety or**
21  **quality of US pork?**
22      A.   In my model, I don't think that
23  I've got other things that are capturing
24  foreign perceptions of US safety besides the
25  variable that captures the swine flu.

Page 219

1      **Q.   Did you control for the foreign**
2  **production of hogs in Japan, China, Russia,**
3  **et cetera?**
4      A.   No, I did not and, you know,
5  there's a technical problem in doing that, is
6  that we want to avoid putting quanties on the
7  right-hand side of a price regression.  This
8  model reduced for a price regression, so if
9  you introduce quanties, you can encounter
10  what econometrician call the endogeneity
11  problems.
12          So we -- we are trying to come up
13  with variables that move the supply and
14  demand around for the product at issue
15  without bringing quanties explicitly into the
16  model.
17      **Q.   If foreign production of pork**
18  **drops because of disease, drought, any other**
19  **factors like that, that might increase demand**
20  **for US pork, right?**
21          MR. RISSMAN:  Object to form.
22      Incomplete hypothetical.
23      A.   You could tell all sorts of
24  stories, but the problem is that if foreign
25  production is a function of the US pork

Page 220

1  price, then it cannot enter the right-hand
2  side of a regression model.  You would have
3  to come up with some instrument for foreign
4  production.
5  BY MR. COLEMAN:
6      **Q.   You control for currency**
7  **fluctuations?**
8      A.   I think in one model we do, but I
9  would have to kind of go through this.  It
10  might not be until we do the passthrough.
11  But it seems -- it seems familiar, but it's
12  possible.  I would just have to look through.
13      **Q.   Do you control for trade**
14  **agreements or trade policies?**
15      A.   No, we don't control for trade
16  policies.
17      **Q.   There were been several in the**
18  **class period, right, that would impact the**
19  **demand for US pork?**
20      A.   During the class period?  I mean,
21  NAFTA would predate the class period.  Maybe
22  you can tell me which trade policies you have
23  in mind from 2014 forward.
24      **Q.   Nothing comes to mind as you sit**
25  **here today?**

Page 221

1    A.   The big trade agreements I think
2  predated 2014, but you could tell me which
3  one you have in mind, or not.
4    Q.   Did you control for actions by
5  other countries increasing or decreasing
6  restrictions on US pork?
7    A.   No.  Because we are looking at
8  domestic pork sales, and this is -- it would
9  be meant for the US market.  So looking at
10  restrictions in foreign countries would be
11  irrelevant.
12    Q.   Well, so, for example, if a
13  country lifts the restriction on ractopamine
14  or imposes a restriction on ractopamine used
15  in pigs, that might affect foreign demand for
16  domestically raised pigs, right?
17    A.   I'm not modeling domestically
18  raised pigs.  I'm looking at sales of pork
19  into the United States.  I'm not looking at
20  exports.  These are just domestic production
21  for domestic consumption.
22    Q.   Well, you're -- one of the levers
23  of the supposed conspiracy is increasing
24  exports, right?
25    A.   One of the levers that were

Page 222

1  designed to reduce the supply for the
2  domestic consumption was exporting.  That is
3  correct.
4    Q.   And I think we have gone through a
5  number of things that could -- factors that
6  could influence the export of US pork, right?
7        MR. RISSMAN:  Object to form.
8  And that mischaracterizes the
9  testimony.
10    A.   Sitting here, I don't recall the
11  factors -- if we have identified factors that
12  influence exports.  We just talked about the
13  secular trend of increasing exports over
14  time.
15  BY MR. COLEMAN:
16    Q.   Well, do you deny that the
17  relative value of US dollar for currency
18  fluctuation would affect foreign demand for
19  US pork?
20    A.   It could affect foreign demand,
21  but that's not what I'm modeling.  I'm not
22  modeling exports.  I'm modeling domestic
23  consumption of pork.
24    Q.   And your view is that exports were
25  used to lower domestic consumption, right?

Page 223

1    A.   In part, but that was just one of
2  three different levers, and then also the
3  price increases -- the artificial price
4  increases would have reduced output as well.
5    Q.   Go to Tab 60.
6    A.   Okay.
7    Q.   Do you understand that the US
8  Department of Agriculture has actively
9  promoted the export of pork among other
10  domestically raised agricultural products?
11    A.   Well, I mean, now that I'm looking
12  at this document, I can't help from doing it.
13  I think that the USDA might do that in
14  general, but I can accept this premise, that
15  that's one of their missions is to help
16  export US products.
17    Q.   And, in fact, do you recognize
18  that the 2014 farm bill, part of its mission
19  to increase -- the Department of Agriculture
20  increase exports by promoting domestically
21  raised products like pork and other products?
22        MR. RISSMAN:  Objection.
23  Foundation.
24    A.   Yeah.  I mean, the first paragraph
25  says something to that effect.

Page 224

1  BY MR. COLEMAN:
2    Q.   You are not aware of that on your
3  own?
4    A.   Sitting here, I don't have -- I
5  did not -- I did not study the ramifications
6  of the 2014 farm bill.
7    Q.   It allocated a significant amount
8  of money to promoting USA pork, right --
9  exports of US pork?
10        MR. RISSMAN:  Object to form.
11    A.   You can't know that from the -- at
12  least the first paragraph.
13  BY MR. COLEMAN:
14    Q.   Did you control for whatever
15  impact the government's promotion of US pork
16  might have had?
17    A.   No, because I'm not modeling --
18  sorry.  I thought you were done.  Sorry.  Why
19  don't you go ahead.
20    Q.   No, go ahead.  I'm good.
21    A.   I'm not modeling the export
22  markets.  I'm modeling domestic consumption.
23  So what the government is doing to promote
24  exports is beyond the scope of what I'm
25  investigating.

Page 225

1    Q.   I'm having a hard time
2    understanding that because, on the one hand,
3    you're telling me that there was a
4    conspiracy -- one of the levers of which was
5    to increase exports for the purpose of
6    increasing prices in the US.
7         On the other hand, you're telling
8    me you're just uninterested in whether the
9    government was actively promoting exports and
10   what impact that might have had on increased
11   exports during the class period.
12        How should I be reconciling that
13   in my mind?
14        MR. RISSMAN:  Object to --
15   A.   I said if I were --
16        MR. RISSMAN:  Hold on.
17        Object to form.  Argumentative.
18   A.   Yeah, if I were interested in
19   modeling exports, this would be a reasonable
20   inquiry.  But I'm not intent on demonstrating
21   anticompetitive effects here through some
22   model of exports that showed exports being in
23   excess of what they otherwise would have been
24   in the absence of a challenged conduct.
25        That's not my -- that's not my

Page 226

1    model.  It's not what I set out to do.  It
2    could be an interesting academic exercise,
3    but it's not in my report.  It's not in proof
4    of impact.  We can talk about alternative
5    models that I didn't put forward until we are
6    blue in the face, but all I can do today is
7    defend my model, the logic of my model, the
8    control variables of my model, and my model
9    is a price model in the domestic market.
10   BY MR. COLEMAN:
11   Q.   So are you able to distinguish
12   exports -- increases in exports that are
13   attributable to the US government promoting
14   US pork versus exports that resulted from the
15   supposed conspiracy?
16   A.   I don't aim to do that.  I am not
17   modeling exports.  I don't have an export
18   model.
19   Q.   And you're aware that many of the
20   exports of pork products from the United
21   States or other countries include products
22   that are not class products, using your
23   definition, right?
24   A.   It is conceivable that some of US
25   exports of pork sit outside of the class

Page 227

1    definition, sure.
2    Q.   For example, ham would be a good
3    example.  Do you have any insights into how
4    much ham the United States exports?
5    A.   No.
6    Q.   You didn't look at that?
7    A.   I don't offer an export model, and
8    I'm not using an estimate of exports as my
9    proof of antitrust injury here.
10   Q.   You're also aware that there's a
11   significant amount of exports of offal and
12   what are sometimes referred to as variety
13   meats, right?
14   A.   Variety meats?  Yes.  I missed the
15   first -- the first word that you said.  Did
16   you say offal?
17   Q.   Offal.  Offal.  I pronounce it as
18   offal because it's closer to what these
19   products actually sound like.
20   A.   Okay.
21   Q.   Right?  Are you familiar with what
22   offal is?
23   A.   I'm familiar -- I've come across
24   some variety once.  I don't know if I have
25   come across offal.

Page 228

1    Q.   Are you familiar with the fact
2    that -- well, the defendants increase -- I am
3    sorry, export a significant amount of pig
4    parts like bungs, snouts, organ meat to other
5    markets?
6    A.   I'm sure they -- I am sure they
7    could.
8         MR. RISSMAN:  Object to form.
9    A.   I am sorry.
10        I'm sure they could.  It's outside
11   of the class definition, outside of the
12   market that I'm interested in setting, which
13   is domestic consumption.  So all the things
14   that are happening outside of scope of my
15   study, I'm not studying by definition.
16   BY MR. COLEMAN:
17   Q.   Do the data on which you relied to
18   assess US exports include offal and variety
19   meats?
20   A.   No.  I widow out everything that
21   doesn't meet the class definition before
22   running my model.
23   Q.   What data set were you using for
24   that?
25   A.   Defendants' data.

Page 229

1    Q.    You were using defendants' data of
2    exports?
3    A.    No.  I'm not looking at exports.
4    I don't know how many times I have to say
5    this.  I'm looking at defendants' domestic
6    sales -- the transaction data for domestic
7    sales.  But after I removed exports, I then
8    remove everything that doesn't meet the class
9    definition.
10    Q.    So exports are a lever of the
11    supposed conspiracy, but you're not able to
12    point to any particular export of a class
13    product by any defendant in the class period?
14    A.    Liquidation and harvest reduction
15    are also levers by which output was reduced,
16    and I don't have variables on the right-hand
17    side to capture those strategies either.
18        I'm using a conduct dummy that
19    tracks when Agri Stats started sharing
20    competitively sensitive information among
21    defendants.  That's my measure of the
22    challenged conduct, not these ancillary
23    mechanisms by which output was suppressed.  I
24    don't want to have three or four conduct
25    variables in my model.

Page 230

1        I just want one, and it turns to
2    one in the year 2009 when Agri Stats launched
3    certain documents that would support or
4    facilitate the alleged conspiracy here.
5    Q.    So you are not able -- sitting
6    here today, you're not able to point to a
7    single sale -- a foreign sale of a pork
8    product in the class period that you are able
9    to identify as caused by the conspiracy?
10        MR. RISSMAN:  Object to form.
11    A.    It just was not an objective of
12    mine.  It wasn't part of the assignment to go
13    and do a decomposition of exports of those
14    that would have occurred in the but-for world
15    and those that occurred in the actual.  That
16    was not part of my assignment.
17    BY MR. COLEMAN:
18    Q.    Can you call up Tab 27.
19        So how did -- a challenged conduct
20    that's been alleged and one of the levers of
21    the supposed conspiracy that you point to is
22    a reduction in the sow herd by Smithfield,
23    and I think there's also an allegation about
24    Tyson, right?
25    A.    We would have to go to my

Page 231

1    liquidation section and see which defendants
2    are described there.
3    Q.    Is Smithfield one of them?
4    A.    I believe so.  But I can't do this
5    by memory.  Do you want turn to the section?
6    160 -- Page 160.
7    Q.    Go ahead.
8    A.    Smithfield is mentioned in
9    Paragraph 211 and 212.
10    Q.    Are you aware of any other
11    defendant that increased its sow herd --
12    decreased its sow herd in the class period?
13    A.    Well, we are talking about in
14    2012.  We mentioned Tyson and Seaboard, and
15    then we are talk in 210 about this industry
16    council that appeared to be intent on
17    reducing the sow herd.
18    Q.    Yeah.  What were you referring to
19    specifically with the industry council?
20    A.    This Producer Packer Industry
21    Council, PPIC.  It's in the middle of 210.
22    Q.    Yeah.  And who participates in
23    that NIPC [sic] organization?
24    A.    Well, if you look at Footnote 394,
25    it says the PPIC meeting invitation was sent

Page 232

1    to Clemens, Hormel, JBS, Seaboard and
2    Smithfield and Tyson.
3    Q.    Are those the only participants?
4    A.    For this document.  I mean, it's
5    conceivable that others were participating,
6    but I mean, that would be enough.
7    Q.    Well, if there are any number of
8    independent producers and others in the
9    room --
10    A.    No, no.  These are -- these are
11    packers.  This has nothing to do with
12    upstream.  So these are -- these are --
13        (Simultaneous unreportable
14        crosstalk.)
15    Q.    Do you know whether the -- I am
16    sorry.
17    A.    Can I finish?
18    Q.    Yeah, you can finish.
19    A.    To clarify what I meant, these --
20    this isn't -- an invitation to reduce the sow
21    herd that was sent to the defendant packers
22    could only affect the upstream production
23    done by the defendant packers.  It couldn't
24    implicate the independents from my read of
25    this.

Page 233

1    Q.    So your reading of the document
2  that you're citing is that was specifically a
3  meeting limited to the packers; is that
4  right?
5        MR. RISSMAN:  Objection.  Form.
6    A.    Well, Footnote 340 -- 394 lists
7  the defendants who received it, but I
8  can't -- I can't rule out the possibility
9  that others received the same -- the same
10  note.
11  BY MR. COLEMAN:
12    Q.    Let's be real.  You have no idea,
13  right?
14        MR. RISSMAN:  Objection.  It's
15    just argumentative and rude and
16    disrespectful.
17        MR. COLEMAN:  Well, he's making
18    it up as he goes along.
19        MR. RISSMAN:  Well, that's just,
20    again, so unprofessional.  You can
21    just ignore that question, Dr. Singer.
22    It's not a real question.
23        (Reporter clarification.)
24  BY MR. COLEMAN:
25    Q.    Who was in that meeting, the

Page 234

1  Producer Packer Industry Council meeting?
2    A.    Well, it says -- the language here
3  says that it was an industrywide
4  recommendation.
5    Q.    Did you write that?
6    A.    Yes.
7    Q.    So you must have had some
8  knowledge about what you were writing at the
9  time, right?
10    A.    Well, to me what was important was
11  the fact that I highlighted it, which was
12  that it was sent out to the defendants.  You
13  are asking me who else it was sent out to.  I
14  don't know who else it was sent out to.
15    Q.    It's an industrywide
16  recommendation.  You don't know whether that
17  include -- that industrywide recommendation
18  included the 70 percent of hog production
19  that's controlled by independent producers,
20  do you?
21        MR. RISSMAN:  Object to form.
22    A.    I don't know for a fact.  I mean,
23  it's a reasonable inference from the language
24  there, but you're asking do I know for a fact
25  who received it.  I don't.  Sitting here, I

Page 235

1  don't know.
2  BY MR. COLEMAN:
3    Q.    Yeah.  Okay.  So let's come back
4  to Paragraph 212.
5    A.    Okay.
6    Q.    There's a reference to Smithfield
7  liquidating 130,000 sows in 2009, right?
8    A.    Yes.
9    Q.    And a reference to Tyson
10  liquidating 20,000 sows in 2009, right?
11    A.    Yes.
12    Q.    And Seaboard liquidating 30,000
13  sows in 2009, right?
14    A.    Yes.
15    Q.    And you wrote that, right, that
16  sentence?
17    A.    Yes.
18    Q.    You stand by it?
19    A.    Yes.
20    Q.    And what did you do to investigate
21  that Seaboard liquidated 30,000 sows in 2009?
22    A.    I've got two sources for it in
23  403.
24    Q.    What are they?
25    A.    Well, one is the TFP that ends in

Page 236

1  765, and then SPF that ends in 924.
2    Q.    And as you sit here today, you
3  continue to believe it's true that Seaboard
4  liquidated 30,000 sows in 2009?
5    A.    Yeah, that's -- yes.
6    Q.    Are you aware of any other sow
7  reduction in the class period by any other
8  defendant?
9    A.    Well, you're just looking at 212,
10  but I think that -- I think 212 captures each
11  of the defendants that I'm aware of that
12  liquidated sows in 2009 or during the conduct
13  period.
14    Q.    Focusing on Smithfield, do you
15  have any idea what its -- whether it was
16  suffering operating losses in 2009?
17    A.    No.
18    Q.    Do you know whether it was losing
19  money on its hog production operation?
20    A.    You just asked me about its
21  upstream division?
22    Q.    Yeah, its production of hogs.
23    A.    No.  I don't know that.
24    Q.    Do you know whether it had good
25  economic reasons for liquidating 130,000

Page 237

1  sows?
2      MR. RISSMAN:  Object to form.
3      A.  No.  I don't know what the
4  economic reasons was for that liquidation.
5  BY MR. COLEMAN:
6      Q.   And same question for Tyson.  Do
7  you know whether Tyson was facing losses on
8  its hog production operation in 2009?
9      A.   No idea.
10     Q.   And do you know whether the
11 liquidation of 20,000 sows by Tyson in 2009
12 benefited its overall profitability?
13     MR. RISSMAN:  Object to form.
14     A.   I think that if you go by what you
15 said on -- in Paragraph 210, that liquidation
16 was needed to improve profitability of the
17 upstream industry, and so my surmise would be
18 that as a result of the liquidation that we
19 saw, that immediately followed that, that
20 assisted the upstream industry.
21     MR. COLEMAN:  I think we are at
22     a point where we are about on the
23     90-minute cadence.  So we can take a
24     pause.
25     MR. RISSMAN:  Sounds good.

Page 238

1      THE VIDEOGRAPHER:  The time is
2  3:13 p.m.  We are going off the
3  record.
4      (A brief recess was held from
5      3:13 p.m. to 3:25 p.m.)
6      THE VIDEOGRAPHER:  The time is
7  3:25 p.m., and we are back on the
8  record.
9  BY MR. COLEMAN:
10     Q.   Can you call up -- well, let's
11 refer to -- first to Paragraph 42 of your
12 report.  It's about exports.  And the first
13 line of Paragraph 42 is:  The evidence
14 indicates starting around 2009, defendant
15 processors and Agri Stats made exporting pork
16 to keep it out of the US market a deliberate
17 strategy, right?
18     A.   Yes.
19     Q.   You wrote -- and you cite some
20 documents that you believe support that
21 proposition, right?
22     A.   Yes.
23     Q.   And one of the documents you cited
24 is -- we see at Tab 47, the Bates number
25 SPF00294998, right?

Page 239

1      A.  I don't know.  Let me -- let me go
2  to 47.
3      Q.   Yeah.  Take your time.
4      A.   Okay.  Let me see.
5      Okay.
6      Q.   And on Page 5007, Page 10 of the
7  document -- yeah, we are on the right spot --
8  there's a section on pork trade update.
9      Are you with me?
10     A.  Yes.
11     Q.   And in the middle of the
12 paragraph, it says:  Effects from the FMD
13 crisis in South Korea and the nuclear
14 concerns in Japan caused export surges during
15 the spring, and China has stepped up again
16 during the second half of year, resulted in
17 much stronger exports than anticipated
18 heading into the year.
19     Do you see that?
20     A.  Yes.
21     Q.   Do you know what the FMD crisis in
22 South Korea was about?
23     A.  No.
24     Q.   In any case, nothing in that
25 paragraph relates to the purported

Page 240

1  conspiracy, does it?
2      A.   I would have to read the whole
3  paragraph.  Just give me one second.  You
4  just want me to address that paragraph?
5      Q.   Sure.
6      A.   Hold on one second.
7      I think I grant you that the rest
8  of those examples provided in that paragraph
9  seem to be unrelated to the challenge
10 conduct.
11     Q.   And this is an independent, or at
12 least nondefendant -- the document was
13 produced by Informa Economics, which is a
14 nondefendant, right?
15     A.   Well, they're a nondefendant.
16 They might work for defendants, but they're
17 not a defendant.  That's correct.
18     Q.   And Informa Economics doesn't say
19 anything about deliberate strategy of pork
20 producers to coordinate on export of pork
21 products, does it?
22     A.   That's correct.  Fair.
23     Q.   At the end of that paragraph, it
24 says:  Informa is of the belief that a
25 forecast of a 4 percent decline in exports in

Page 241

1   2012 is being optimistic and could have some
2   downside risk.
3        Do you see that?
4        A.   Yes.
5        Q.   And, in fact, there was a decline
6   in exports that year, right?
7        MR. RISSMAN:  Objection.
8   Mischaracterizes the document.
9        A.   Well, it -- you couldn't know that
10  from the document because the document was
11  produced in '11, so I can't tell you what
12  happened in '12.
13  BY MR. COLEMAN:
14       Q.   This was a forecast.  Informa
15  was -- their forecast of the market was there
16  would be a decline in exports, and my
17  question is whether you know whether that
18  actually happened?
19       A.   No, I don't.
20       Q.   And we go to 5002 -- yeah.  So go
21  up above that graph.
22       A.   Okay.
23       Q.   There's a reference to culling the
24  sow herd, and it says:  In particular, but
25  given the strength in cull sow prices,

Page 242

1   producers were able to replace the older sows
2   with younger and fresher genetics are
3   receiving the top value for the culls.
4        Do you see that?
5        A.   Yes.
6        Q.   But did your model account for the
7   price that Tyson or Smithfield obtained for
8   the sows that they liquidated?
9        A.   No.  I'm trying to estimate prices
10  in a different market -- in a relevant market
11  here to process for clients, so I'm trying to
12  control --
13       (Simultaneous unreportable
14       crosstalk.)
15       MR. COLEMAN:  In any case --
16       MR. RISSMAN:  Let the witness
17  complete his question.
18       A.   I just wanted to add that I'm
19  trying to control for factors that would
20  affect prices in the relevant market, not in
21  the upstream market.
22  BY MR. COLEMAN:
23       Q.   Yeah.  I'm just interested in
24  whether Smithfield made -- or Tyson made
25  economically sound decisions to cull their

Page 243

1   sow herd.
2        Do you have an opinion on that?
3        A.   No, I don't have opinion, but I
4   would -- I think it's consistent with the
5   theory of harm, with the allegations in the
6   case, that some liquidation would have
7   occurred even in a but-for world.  I don't
8   think that the theory of harm posits that
9   liquidation would be zero.
10       And there could be good
11  justification for a particular liquidation.
12  The -- the theory of harm as spelled out in
13  the complaint is that there are -- some of
14  the incremental liquidation that occurred can
15  be attributed to the challenged conducts.
16       Q.   And you -- you don't quantify how
17  much?
18       A.   I'm trying to estimate prices in
19  the processor market, and that meant --
20  exercise to me is an academic one.  It would
21  not inform what I'm tying to estimate in my
22  report.
23       Q.   In any case, the replacement of
24  older sows with younger and fresher genetics
25  would be procompetitive, right?

Page 244

1        MR. RISSMAN:  Object to form.
2   Calls for a legal conclusion.
3        A.   I don't think that that
4   motivation, as you have just described it,
5   has any kind of anticompetitive tint to it.
6   BY MR. COLEMAN:
7        Q.   Coming back to the -- there was
8   some question and answer earlier about the
9   benchmark period versus the conspiracy
10  period.
11       So to some extent, I think you've
12  addressed this already, but I want to revisit
13  it.  I will just ask you, how did you go
14  about choosing the benchmark period?
15       A.   Well, the benchmark period was a
16  clean period in which the alleged challenged
17  conduct -- I should say, in which the
18  challenged conduct was absent.  And so that's
19  the 2005 to 2008 period that we are using as
20  the clean period.
21       Q.   And Paragraph 151 of your
22  report -- and I will give you a minute to get
23  there.
24       A.   Paragraph -- give it to me again.
25       Q.   151.  This is in your

Page 245

1 quantitative.
2    A.   Okay.
3    Q.   You write that the -- quote, the
4 percentage change in price associated with
5 the challenged conduct is given by B1 or beta
6 one --
7    A.   Right.
8    Q.   -- end quote, which I take is the
9 regression coefficient for that dummy
10 variable, right?
11    A.   Correct.
12       MR. RISSMAN:  I'm sorry.  Craig,
13 are you on -- you are on
14 Paragraph 151?
15       MR. COLEMAN:  Yes.
16       MR. RISSMAN:  Okay.  I think the
17 screen is not with you.
18       There we go.
19       THE WITNESS:  I'm looking at my
20 report.
21 BY MR. COLEMAN:
22    Q.   And it says:  The equation above,
23 the percentage change in price associated
24 with challenged conduct is given by B1 or
25 beta one, right?

Page 246

1    A.   Right.
2    Q.   And if the percentage changed
3 given by beta one is positive, this implies
4 the challenged conduct is associated with an
5 increase in pork prices holding other factors
6 constant, right?
7    A.   Correct.
8    Q.   Can you just explain how we should
9 interpret percentage changes in beta one?
10 What you mean by that?
11    A.   Right.  So in a -- in a -- we do
12 it -- e do it in levels in, and we do it in
13 logs.  And so I think the log model is
14 probably the easiest one to explain, and that
15 quite literally is telling you the percentage
16 change in prices that can be attributed to
17 the presence of the challenged conduct.
18    Q.   And so if we look at particular
19 time periods, like, say, a month, like
20 January 2010, just to pick an example, does
21 your model tell us anything about the
22 overcharge in that particular month?
23    A.   The way that the model is
24 constructed now, it doesn't tell us anything
25 specific about the particular month during

Page 247

1 the -- during the conduct period.  It is
2 telling us what the effect is across the
3 entirety of the conduct period.  So I will
4 leave it that.
5    Q.   And can your model tell us the
6 amount of overcharge in any particular time
7 frame, like, say, a given month in a given
8 year at any point in the time period?
9    A.   Well, you could -- using my model,
10 you could go make a prediction within a
11 particular month if you were very interested
12 in a particular month for some reason.  You
13 could make a prediction of what the prices
14 would have been in the absence of the
15 challenged conduct, and you can compare those
16 prices to the actual prices, if you were so
17 inclined.
18       Now, there's no apriority reason
19 to do that given that the allegations are for
20 an alleged conspiracy that spanned from 2009
21 to 2018.  So number one, you wouldn't be
22 testing the theory of the case, the theory of
23 harm.
24       And number two, I haven't seen any
25 -- I'm not aware of any record evidence that

Page 248

1 would suggest that we should go looking for a
2 structural break in January of 2010; that is,
3 there's no suggestion that the information
4 exchange was any more or less wholesome in
5 January of 2010.
6       The information exchange of
7 competitively sensitive information was the
8 same across the challenged conduct -- across
9 the conduct period.
10    Q.   Do you know whether every
11 defendant subscribed to all the Agri Stats
12 report throughout the time period?
13    A.   I got a chart that shows you which
14 ones each defendant subscribed to in each
15 year.  But, you know, I know you want this to
16 be a memorization test, but I can't tell you
17 which boxes are checked by memory.  We can go
18 to the table.
19    Q.   Coming back to 151 and beta one in
20 that line of questioning, so does it mean --
21 is it your opinion that, for example, the
22 direct purchasers of class products paid a
23 12.8 percent overcharge in every month from
24 January of 2009 to June of 2018?
25    A.   I think that the model I've

Page 249

1  constructed, which constrains the parameter
2  to be the same across the challenged conduct
3  period -- the conduct period would suggest
4  that it was the same overcharge in each
5  month. That's correct.
6      **Q. So in each incremental month from**
7  **January 1, 2009, through the end of the**
8  **conspiracy period, it's your opinion that**
9  **there was an overcharge of a specified**
10 **amount.**
11      **Here it's 12.8 percent for direct**
12 **purchasers of class products?**
13     A. I can conceive -- I think that in
14  reality that the inflation likely varied
15  slightly over time, but this model and this
16  specification, which constrains the parameter
17  to be the same across the entirety of the
18  conduct period, the best prediction that I
19  would have for your favorite month, which is
20  January 2010, would be the parameter is
21  estimated.
22     **Q. So does it mean that -- it's not**
23 **my favorite month. I'm just picking that as**
24 **an example, just to have a point of**
25 **reference.**

Page 250

1      **But is your testimony -- your**
2  **opinion mean that regardless of the specific**
3  **actions that defendants took, your model**
4  **assumes that the alleged conspiracy had the**
5  **same effect in every month?**
6      A. No, that's not -- that's not what
7  it means. The model as constructed here is
8  seeking to estimate an effect that stretched
9  over the entirety of the challenged conduct
10  for the conduct period. The plants are not
11  asserting a sequence of mini conspiracies,
12  you know, lasting one month apiece.
13      If they were, if that were the
14  allegation, you know, we could go out and
15  test for differential effects by month, but
16  they're not. They're alleging a single
17  conspiracy that spanned the duration of the
18  conduct period, and I will leave it at that.
19     **Q. But the levers of the conspiracy**
20 **are multifaceted and -- whether it's exports**
21 **or sow reductions or something else?**
22     A. Or price hikes -- or price hikes,
23  yes.
24     **Q. Sure. And so is it your opinion**
25 **that regardless of what levers were pulled at**

Page 251

1  **one point in time, the model assumes that the**
2  **conspiracy had the same effect?**
3      A. The model doesn't assume it,
4  right. I'm constraining the parameter to be
5  the same across the conduct period. That's
6  my design because, as I told you, I think
7  that's most consistent with the plaintiff's
8  theory of harm as a single conspiracy that
9  spanned the duration of the conduct period.
10      If I thought that plaintiffs were
11  asserting a series of mini conspiracies that
12  are stacked against each other in time, we
13  could have done something differently, but
14  that's not what I understand the theory of
15  harm to be.
16     **Q. Did you do anything to evaluate**
17 **whether there were periods during the class**
18 **period in which overcharges were less than**
19 **the average?**
20     A. No. You know, economics and
21  econometrics teachings is very clear in this,
22  that we don't go looking for structural
23  breaks without a good a priori reason. If
24  you do so, it is arbitrary, and you could
25  reach the wrong inference.

Page 252

1      So, you know, I go back to this,
2  that what you're positing isn't consistent
3  with a theory of harm. And also there is no
4  a priori reason in the record to suggest that
5  the conspiracy would have turned off or would
6  have been less potent in January of 2010 than
7  in any other month.
8      So for those reasons, I don't do
9  it. And economic -- econometric teachings
10  would counsel not doing it.
11     **Q. You are aware that there was a**
12 **significant expansion of processing capacity**
13 **late in the class period that was, you know,**
14 **planned for and -- as early 2014 or 2015,**
15 **right?**
16     MR. RISSMAN: Object to form.
17     A. I don't have a variable for
18  processing capacity, so I can't say that
19  that's something that I have studied.
20 BY MR. COLEMAN:
21     **Q. So, for example, Clemens opened a**
22 **new plant during the class period, right?**
23     A. It's possible they did.
24     **Q. And Triumph Seaboard opened a new**
25 **plant as well, right?**

Page 253

1    A.    I mean, the class period is a very
2  long duration in time, so I would be
3  surprised if there were no openings.
4    **Q.    Really?  I thought we had the**
5  **existence of a cartel restricting pork**
6  **supply.**
7    A.    You interpret that --
8      (Simultaneous unreportable
9      crosstalk.)
10   A.    I know -- I know of your
11 confusion, but go ahead.
12   **Q.    Well, I would have thought that**
13 **individual defendants investing tens or**
14 **hundreds of millions of dollars to build a**
15 **new packing plant to increase the supply of**
16 **pork products would be conduct dramatically**
17 **at odds with a conspiracy to restrict the**
18 **supply of pork, right?**
19   A.    Not at all.  Not at all.
20   **Q.    Okay.  Go ahead and explain.**
21   A.    Because you are interpreting the
22 conspiracy to mean that they -- it was a
23 conspiracy to shut output or keep their
24 capacity down to zero.  That's not what's
25 being alleged.  What is being alleged is that

Page 254

1  they took actions to tamper output relative
2  to what it would have been in the but-for
3  world.
4      So it's conceivable that we could
5  see capacity growing over time, and the
6  relevant question is, you know, would
7  capacity have been greater in a but-for world
8  absent the challenged conduct.
9      I know you look at the -- at an
10 increase and say, aha, that's evidence that
11 there's no conspiracy, but that's not how an
12 economist looks at it.  An economist is
13 thinking about the margin -- the marginal
14 effect of the challenged conduct on capacity
15 at any point in time.
16     So the mere fact that you have
17 something going up is largely irrelevant.
18 It's kind of, you know, something -- you will
19 hear lawyers say something like, oh, prices
20 fell, so, therefore, there couldn't have been
21 a price effect in that month.
22     No.  The question is:  Did prices
23 fall by less than they would have in the
24 absence of a conspiracy?
25   **Q.    Well, a structural -- you refer to**

Page 255

1  **the concept of a structural break in the**
2  **class period.  And I would have thought that**
3  **an individual defendant's decision to invest**
4  **in a new packing plant and significantly**
5  **expand production would have been a good**
6  **example of that, and you could have tested**
7  **whether -- the impact of that on an**
8  **overcharge, right?**
9      MR. RISSMAN:  Objection.
10 Compound.
11   A.    I think you're getting confused
12 about -- about how I construct the conduct
13 variable.  The conduct variable is equal to
14 one with the advent of Agri Stats' reports
15 that permitted and facilitated cartel-like
16 behavior, right.
17     And so it sounds like what you're
18 saying is I should depart from my
19 construction of the conduct variable, the way
20 I've done it, and redo it whenever someone
21 expands capacity.
22     And so, no, no, that's not what
23 I'm trying to capture.  I'm trying to capture
24 the effect of the challenged conduct on
25 prices controlling for all of the things.

Page 256

1  I'm not going to -- I'm not going to revisit
2  my construction of the conduct parameter in
3  light of new capacity coming.
4  BY MR. COLEMAN:
5    **Q.    Your testimony was that there was**
6  **a conspiracy to -- I believe the word you**
7  **used was tamp down the supply of pork, right?**
8    A.    Domestic supply of pork, yes.
9    **Q.    And a decision by defendants to**
10 **build new packing plants is at odds with**
11 **that -- the goal of that conspiracy, isn't**
12 **it?**
13   A.    No, because the relevant question
14 is what the capacity would have looked like
15 in a but-for world absent the challenged
16 conduct.  So the fact that you can point to
17 an episode of capacity expansion, right,
18 doesn't tell me anything about the effect of
19 the conduct on capacity.
20     And moreover, I just want to kind
21 of refocus.  I'm trying to predict the effect
22 of the alleged conspiracy on pricing.  My
23 model is a pricing model.  I'm not trying to
24 predict capacity in the marketplace.  Had
25 I've done so, then, you know, it would have

Page 257

1  been a completely different model with
2  completely different control variables, but
3  that's not what I'm trying to model.
4      Q.   How many pork processing plants
5  would have been built in the class period but
6  for the conspiracy?
7      A.   Again, I'm not -- I am modeling
8  capacity.  Had my model been pointed at
9  capacity, I could tell you the answer to that
10  question.  I'm trying to model the effect of
11  prices from the challenged conduct.
12      Q.   You're telling me that capacity
13  was constrained in the world that you studied
14  versus the but-for world, and that my
15  question is missing the mark because in the
16  but-for world, there would have been
17  something better than what actually happened,
18  and I want to know how.
19      A.   Right.  So in the qualitative
20  section -- I think that there may be
21  confusion about my two models.  So I have
22  one -- I have a quantitative model.  That's a
23  regression model.  It's trying to model the
24  prices in the but-for world.
25          And in the qualitative section, I

Page 258

1  am looking at record evidence that's
2  consistent with the allegations of the
3  complaint, namely, an attempt to suppress
4  output.  And I point to a lot of record
5  evidence that's consistent with that.  And so
6  when I see record evidence that suggests that
7  firms are coordinating the decisions on
8  output, that tells me that that coordination
9  allowed them to lower output relative to the
10  but-for world.
11          That does not tell me that output
12  has to be falling necessarily in the actual
13  world.  It just tells me that output is lower
14  than it would have been absent the conduct.
15      Q.   And with respect to processing
16  capacity, are you referring to the Saturday
17  shifts or something else?
18      A.   Anything.  I have a -- I have an
19  entire -- I will send you to the section of
20  my report where I try to inform the
21  three-part test that economists use to make
22  qualitative assessments of a likelihood of a
23  conspiracy.
24      Q.   Well, I'm focused on what conduct
25  occurred that restricted processing capacity.

Page 259

1      I did read your report and took note of
2  allegations about -- or claims about Saturday
3  shifts being reduced, and wondering
4  whether you think there was any agreement,
5  coordination, otherwise about the
6  construction of new packing plants?
7      MR. RISSMAN:  Objection.  Calls
8    for a legal conclusion.
9      A.   Well, I don't include that in the
10  levers that I review.  If you look at the
11  levers I review, liquidation concerns the
12  upstream market, and then harvest reduction
13  and exports, which concerns the relevant
14  processing market.  Exports being things that
15  would have otherwise sold -- some of which
16  would have otherwise sold in the United
17  States.
18          So as I hear your question, a
19  conspiracy to reduce capacity with other --
20  with other providers.  Is that what -- is
21  that what the question is?
22  BY MR. COLEMAN:
23      Q.   Yeah.  And I guess -- I mean, to
24  cut to the chase, you don't have any reason
25  to believe that there would have been more

Page 260

1  packing plants but for the conspiracy?
2      MR. RISSMAN:  Objection.  I'm
3    going to instruct the witness to only
4    testify to that if he has an opinion
5    on that and is offering that in this
6    case.
7      A.   I'm not offering that.  I don't
8  have an opinion there.
9  BY MR. COLEMAN:
10      Q.   And so, again, I'm getting at your
11  testimony here.  You admonished me for not
12  properly comparing the world that happened to
13  the but-for world, and I want to know what
14  the but-for world would have looked like.
15          We don't know whether there would
16  have been -- you don't know or haven't
17  offered an opinion about whether there would
18  have been more packing plants, right?
19      A.   I'm not offering an opinion on the
20  number of packing -- packing plants, no.
21      Q.   And I mean, is your opinion that
22  there would have been more Saturday shifts
23  run in the but-for world?
24      A.   I cite to evidence suggesting
25  that -- that some of these decisions with

Page 261

1 respect to harvest reduction could have been
2 flown from -- or could have -- could have
3 been motivated by or could have occurred as a
4 result of the challenged conduct, but I'm not
5 offering an opinion as to -- as to the number
6 of Saturdays that would have been operational
7 in the but-for world. I'm not offering an
8 opinion on that.
9     Q.   And when you point to decisions
10 about, quote/unquote, harvest reductions, are
11 you aware or are you pointing to any
12 decisions by any defendant to reduce its
13 annual harvest of hogs during that class
14 period?
15     A.   Well, I think that -- we can go to
16 that section, but I think that I do give
17 episodes of defendants making decisions to
18 reduce their harvest.
19     Q.   I'm specifically interested in the
20 concept of the annual harvest versus a
21 Saturday shift and that -- the timing of
22 harvest.
23         Do you know whether any defendant
24 reduced the number of harvest days, for
25 example, in a year during the class period?

Page 262

1     A.   Well, I think that if you shut
2 down Saturdays, that would affect the number
3 of days in the year.
4     Q.   Did any defendant shut down
5 Saturdays?
6     A.   I think we have discussed this
7 before.
8     Q.   Episodically, maybe a Saturday
9 here or there. But did any defendant reduce
10 the number of harvest days they had year to
11 year?
12     A.   No. We can go through each line,
13 you know, in 164. An internal Hormel e-mail
14 states that Smithfield shut down their Tar
15 Heel plant last week -- one day last week,
16 and they are doing the same this week for
17 maintenance, which Hormel said was more like
18 manipulating the market, and it was doing
19 it -- doing the same for hams.
20     Q.   Did that reduce Smithfield's
21 annual production that year?
22     A.   It could have.
23     Q.   Is it anticompetitive to reduce
24 the plant for maintenance or to close the
25 plant for maintenance?

Page 263

1     A.   Well, you are -- you are accepting
2 that they were doing it for maintenance
3 reasons. The question is whether or not this
4 shutdown was derived from the challenged
5 conduct.
6     Q.   And you don't know, do you?
7     A.   Well, I --
8         MR. RISSMAN: Object to form.
9     A.   I'm offering evidence that's
10 consistent with the alleged conspiracy,
11 right. It's hard for me to say here
12 definitively that that came from it, but, you
13 know, I mean, the record evidence says what
14 it says.
15 BY MR. COLEMAN:
16     Q.   There's a lot of conduct that you
17 say is consistent with challenged conduct,
18 but in this instance, it's also consistent
19 with Smithfield's plant needing maintenance,
20 right?
21         MR. RISSMAN: Object to form.
22 BY MR. COLEMAN:
23     Q.   How do we know which is which?
24         MR. RISSMAN: Object to form.
25     A.   I think that some record evidence

Page 264

1 in the qualitative section is more consistent
2 with -- with conduct from a cartel than
3 others, and then there's some evidence that
4 could be consistent with both.
5         And I feel like I'm not prepared
6 to make a determination that that evidence
7 alone has constituted anticompetitive
8 conduct. What my position is, and has been
9 all along, is that it's the combination of
10 the quantitative model that shows unexplained
11 inflation among defendants' prices during the
12 conduct period, plus the record evidence,
13 that allows me to conclude that this conduct
14 is more consistent with the cartel than with
15 unilateral behavior.
16 BY MR. COLEMAN:
17     Q.   Are you aware of any specific
18 Saturday slaughter that a defendant decided
19 to go or you can pinpoint it to a deliberate
20 effort to facilitate the supposed conspiracy?
21         MR. RISSMAN: Objection. Calls
22     for a legal conclusion.
23     A.   Yeah. I don't know how one would
24 go about designing a test for something like
25 that. So what I did was -- you saw what I

Page 265

1  did.  I've reviewed evidence that's
2  consistent with --
3  BY MR. COLEMAN:
4      Q.    Right.
5      A.    -- a decision to reduce output as
6  part of a coordinated information-sharing
7  scheme.
8      Q.    Is there a single document that
9  you reviewed in which a defendant indicates
10  that it chose not to run a Saturday shift
11  because it wanted to facilitate a conspiracy
12  to reduce pork supply?
13      A.    I don't think that you're going to
14  find a document -- I mean, it's possible, but
15  I've cited one -- but I don't think you're
16  going to find, generally, documents that say,
17  the reason why we are doing this is to
18  promote the well being of our conspiracy.
19          I mean, defendants aren't going to
20  put something like that in writing.  So what
21  we have to do instead is we have to look at
22  the quantitative evidence of the pricing,
23  which I've done, and see if there was am
24  unexplained price hike around the time the
25  challenged conduct.  And then we look at

Page 266

1  record evidence that's consistent with the
2  cartel and meets the economic criteria.
3          But I can tell you that I'm not
4  going to make a conclusion based exclusively
5  on the record evidence that I've looked at
6  under the qualitative criteria.  All the
7  qualitative criteria can do for an economist
8  is kind of point in that direction or to show
9  that the hypothesis -- the anticompetitive
10  hypothesis is plausible.
11          And then I go out and I test the
12  hypothesis empirically, using the
13  quantitative methods.  It's the combination
14  of the two.  That allows me to make the
15  inference that I do that this -- this conduct
16  appears to be anticompetitive.
17      Q.    Why don't you turn to 160.
18      A.    Page 160?
19      Q.    I am sorry.  Paragraph 160 in your
20  report.
21      A.    Okay.
22      Q.    I will get there, too.  Not that
23  I'm looking to quote it, but I just want to
24  orient you to what I am -- some of the
25  questions are directed.

Page 267

1      A.    Okay.
2      Q.    And so the first question is:
3  What's the expected sign for the price of
4  pork substitutes, i.e., beef -- the beef,
5  chicken price index?
6      A.    Positive.
7      Q.    And why is that?
8      A.    That as the price of a week
9  substitute goes up, the demand for pork
10  should go up as well, and that would put
11  upward pressure on prices.
12      Q.    If we looked at Paragraph 192 and
13  Table 23, does it appear that you have a
14  negative sign on the beef, chicken price
15  index?
16      A.    I think you just pointed me to
17  the -- I'm on Paragraph 160.  Do you want me
18  to change paragraphs?
19      Q.    Yeah.  Go ahead and look at
20  Table 23, which is attached to 192.
21      A.    Sorry.  Page 193?
22      Q.    Paragraph 192.
23      A.    Paragraph 192.  I'm heading there.
24  Okay.  I'm in Paragraph 192.
25      Q.    And do you have a negative sign on

Page 268

1  the beef, chicken price index for your belly
2  by cut overcharge regression?
3      A.    You can't see that from Table 23.
4      Q.    Do you know whether you do?
5      A.    No, I don't know whether I do.
6      Q.    In your mind, the sign should be
7  positive, in any case?
8      A.    It should be positive.  But
9  sometimes the signs don't work out the way
10  you expect.  But you're telling me for a
11  particular -- what did you think the sign was
12  negative for the belly?
13      Q.    Yeah.  The beef, chicken price
14  index --
15      A.    I know.  But for which --
16      Q.    -- for the belly -- for the belly
17  by cut overcharge regression.
18      A.    Yeah.  I would have to look at the
19  coefficients, but I would note that the
20  belly, you know, accounts for the 3 percent
21  of the sales -- defendant sales, but it is --
22  you know, I will leave it at that.  I don't
23  know that it has the wrong sign.
24      Q.    Okay.  And how about your bacon by
25  cut overcharge regression?  Do you know what

Page 269

1    the sign was on that?
2         A.    On the --
3         (Simultaneous unreportable
4         crosstalk.)
5         Q.    If you don't, then I guess I would
6    take what you would expect it to be.
7         A.    I would expect it to be positive,
8    yes.
9         Q.    Would you -- I mean, sitting here
10   today -- I'm not trying to put you on the
11   spot, but would you think it was an error if
12   it was negative?
13        A.    Oh, no.  Oh, no.  No, no, no.
14   This happens all the time in econometrics,
15   that you do a slice of the data for some
16   subset of the cuts, and one of your 20
17   control variables shows the wrong sign.  I
18   mean, does that cause you to lose faith in
19   the model?  Absolutely not.
20        Q.    And can you give any sort of
21   description at what point you would start to
22   have concerns about the model if it had
23   unexpected results like that?
24        A.    No.  I think that -- I think that
25   we would evaluate the model as -- from

Page 270

1    Table 12 on Page 125.  This is across all
2    cuts and controlling for the cut type, you
3    know, in the fixed effects.  I've got
4    processor product and then processor product
5    customer.
6         And there's where, I think, we
7    would make an evaluation that if we had a
8    variable -- let's just assume that -- that
9    beef, chicken index entered this model as a
10   negative consistently.  That would -- that
11   would suggest to me that I might not be
12   measuring the beef, chicken index correctly.
13        But the fact that it enters
14   positively and statistically significant in
15   this general equation gives me confidence
16   that, you know, it's the right variable --
17   it's a good variable to use.
18        And that for a separate cut it
19   might change signs does not -- does not cause
20   me to lose any faith at all in those kind of
21   tire-kicking exercises to make sure that
22   no -- no cut was immunized from the
23   challenged conduct.
24        Q.    While we are talking about how to
25   evaluate econometric models, I note that you

Page 271

1    cite to Professor Wooldridge quite a bit as
2    an authority on econometrics.
3         Who is -- who is Professor
4    Wooldridge, and why do you view him as
5    authoritative?
6         A.    Well, he has one of the seminal
7    textbooks on econometrics, and I've just been
8    using it for a big portion of my career, and
9    I think that even in grad school, it may have
10   been the textbook that was used.
11        Q.    And do you accept him as
12   authoritative on how to do econometrics?
13        A.    I do.  I accept that textbook as
14   being authoritative, yes.
15        Q.    What's the expected sign for GDP
16   per capita?  Again, if you -- you could use
17   Paragraph 160 as a reference point, if it's
18   helpful.
19        A.    It should be positive.
20        Q.    And why is that?
21        A.    That all things equal, an increase
22   in income would put upward pressure on prices
23   in the relevant market.
24        Q.    Okay.  And how about the expected
25   sign for hog costs?

Page 272

1         A.    Positive.
2         Q.    And why is that?
3         A.    Well, these costs eventually have
4    to be recovered in the price in the relevant
5    market.  So to the extent these hog costs go,
6    it's going to put upward pressure on the
7    prices in the relevant market.
8         Q.    And would it undermine your
9    confidence and the reliability of your model
10   if it coefficient for hog cost is negative
11   and not statistically significant?
12        A.    In one of these special cuts, no
13   pun intended, to test whether any defendant
14   or cut escaped impact, no.
15        Q.    Why not?
16        A.    Because these -- these are being
17   designed for different purpose.  I mean,
18   Table 12 is the model that I'm offering.
19   These other -- these other models are tests
20   to see whether defendants somehow can't be
21   shown to have inflated prices or a particular
22   cut can't be shown to have -- to have
23   experienced a price increase.
24        It's -- when you do selective
25   slices of the data this way, it's not that

Page 273

1  surprising that the sign on a control
2  variable and one of the specifications may
3  flip unexpectedly.
4      Q.   And what's your expected sign for
5  the COVID control?
6          You know, I should help -- help
7  orient you.  You can look at Paragraph 156.
8      A.   Okay.  So there's a -- there's a
9  supply story that could be told for COVID,
10  which is that to the extent that COVID
11  creates dislocations in supply because, for
12  example, it's hard to staff processing plants
13  because people are getting sick, that could
14  be associated with the increase of prices.
15      Q.   So would you expect the sign on
16  that COVID variable to be positive?
17      A.   Yes, I would, and it is in
18  Table 12.  It's positive.
19      Q.   And expected to be statistically
20  significant?
21      A.   And it is always in Table 12.
22      Q.   And would it -- does it cause you
23  any trouble if some of the cuts -- specific
24  cuts like the rib cut for overcharge
25  regression for the COVID coefficient is

Page 274

1  negative?
2      A.   No.
3      Q.   And why not?
4      A.   Because anything can happen when
5  you go into these selective cuts.  I mean,
6  you're losing a bunch of observations, and,
7  you know, COVID may have affected these --
8  these products different than others.
9      Q.   There's a lot of factors that
10  impact the price of any given primal, right?
11          MR. RISSMAN:  Object to form.
12      A.   I think that in the -- in the
13  models that you have seen, kind of the
14  sensitivity models that you're referring to
15  towards the end of the report, I allowed for
16  the coefficients on all the parameters to
17  vary for each cut and for each defendant.
18          And, again, if you were inclined
19  not to allow them to vary, there's a very
20  straightforward econometric technique to
21  constrain all the parameters to be the same
22  across the cuts and across the defendants and
23  just to, what we call interact the conduct
24  variable with defendant dummies or with cut
25  dummies, and we could -- we could perform

Page 275

1  similar tests.
2  BY MR. COLEMAN:
3      Q.   Did you view it as important to
4  run separate overcharge models by primal cut?
5      A.   Yeah, I did think it was
6  important.  I wanted to -- to run to ground
7  the possibility that a certain type of primal
8  cut escaped impact, and I found the opposite,
9  that all of these cuts had prices that were
10  inflated that were trivial to the challenged
11  conduct.
12      Q.   And what sensitivities did you run
13  outside of the four main models?
14      A.   You mean, the five different
15  subgroups in Table 23?
16      Q.   Yeah.
17      A.   So I did -- I did one by
18  defendant.  I did defendant-specific models
19  as well.
20      Q.   Why was it important for you to do
21  that, in your mind?
22      A.   I think that we just want to -- we
23  just want to make sure that no defendant was
24  deviating from the pricing patterns that we
25  observed for the rest of the defendants.

Page 276

1      Q.   And did you run separate
2  overcharge models by direct purchaser type?
3      A.   I did not.
4      Q.   Why not?
5      A.   I don't think there's good either
6  economic basis for doing it or econometric
7  basis for doing it.  You know, you could --
8  you're going to lose so much efficiency and
9  explanatory power by shrinking the data sets,
10  just that of one direct, depending on which
11  direct we are looking at.
12          There's really no economic theory
13  that would suggest why one direct purchaser
14  was somehow immunized from the harm that came
15  from the challenged conduct.  Just there's
16  a -- there's a lot of reasons that that's not
17  what you do.  And then I'm referencing the
18  reference manual and other econometric
19  textbooks, and none of them would -- would
20  suggest running separate regressions by
21  customer.  It's just not done.
22      Q.   And did you say -- did you say
23  direct purchaser type or direct purchaser?
24      A.   I said direct purchaser type.  And
25  what I mean by that is, you understand

Page 277

1   there's a difference between a large grocery
2   retailer that buys direct versus a food
3   service distributor versus a wholesaler or
4   broker.
5       **Q.   We could come up with different**
6   **categories of direct purchasers, right?**
7       A.   Right.  And I'm sorry.  I
8   interpreted your question to mean individual
9   direct purchasers.  Do you want me to.  Can
10  I -- I think we were talking past each other.
11      **Q.   Yeah.  You can clarify the record.**
12      A.   Okay.  So I did in Table 25 run
13  separate models for each subgroup of direct
14  purchaser type.  I interpreted your question
15  to mean would I run a separate regression for
16  a given direct purchaser, and the answer is
17  no.
18      **Q.   And why did you do that?**
19      A.   So why did I present Table 25?
20      **Q.   Yes.**
21      A.   Yeah.  So for 25, I wanted to make
22  sure that there was no large grouping of
23  direct purchasers, you know, by type that
24  somehow escaped antitrust impacts.
25      **Q.   Did you run an overcharge model**

Page 278

1   **based on USDA prices?**
2       A.   I did.
3       **Q.   And I think I refer you to**
4   **Table 14.**
5       A.   Do you mind telling me the page?
6       **Q.   Oh, sorry.  I want to say 164 --**
7   **Paragraph 164.**
8       A.   Okay.
9       **Q.   So coming back to the -- the**
10  **question was just whether you ran an**
11  **overcharged model using USDA prices?**
12      A.   And the answer is yes.
13      **Q.   And can you explain why you did**
14  **that?**
15      A.   It was another sensitivity test.
16  We just wanted to make sure that the patterns
17  that we were detecting and the correlations
18  we were detecting in the defendant data would
19  also be seen in the USDA data.
20          Now, the reason why we could do
21  this is because the defendants represent
22  something on the order of 80 percent of the
23  marketplace, and so that gave me confidence
24  that we can look at USDA prices -- wholesale
25  prices writ large to study the same effects

Page 279

1   and same patterns.
2       **Q.   And did you run a model without**
3   **the -- what you described as the lingering**
4   **effects period, I believe 156?**
5       A.   I did do one sensitivity in which
6   I dropped the post -- the after period, if
7   that's what you're asking about.
8       **Q.   Yes.**
9       A.   Yes, I did.
10      **Q.   And explain why you did that.**
11      A.   I wanted to make sure that -- to
12  the extent that the inclusion of the after
13  period was driving the conduct coefficient, I
14  wanted to make sure it wasn't.  So the
15  simplest way to do that was just to remove
16  those data.
17          And I found, sure enough, that the
18  effect is still positive and statistically
19  significant, albeit different, but it is
20  still positive and statistically significant.
21      **Q.   So if we go to Paragraph 158.**
22      A.   Okay.
23      **Q.   It says in Model 2, Table 12,**
24  **Column 2, you used a processor-product fixed**
25  **effects to hold constant individual product**

Page 280

1   **from each defendant.  In Model 3, you used a**
2   **processor-product, customer-type fixed**
3   **effects, which additionally holds the**
4   **constant the type of direct purchaser.**
5       A.   Yes.
6       **Q.   Do you see that?**
7       A.   Yes.
8       **Q.   Can you explain what a**
9   **processor-product fixed effect is?**
10      A.   Sure.  So now we are giving more
11  information to the model, right.  Now we are
12  telling the model, when you're looking at the
13  given transaction, I want to allow for
14  the fact that if it comes from a particular
15  processor and it covers a particular cut,
16  that that could explain why the price is what
17  it is, whereas in the prior model before you
18  put these fixed effects in, the computer
19  doesn't know that information.
20      **Q.   And did you include processor and**
21  **product fixed effects?**
22      A.   The combination.  So -- so for the
23  same product type, you know, you get two
24  different dummies depending upon who the
25  processor was.

Page 281

1    Q.   And did you also include customer
2 ID fixed effects?
3    A.   Yes.
4    Q.   And why did you do that?
5    A.   Because it's possible that a
6 certain customer, that is, a certain direct
7 purchaser in the data has a special effect on
8 pricing.  We want to be able to control for
9 that if it happens.
10    Q.   And what's on a customer side,
11 looking at the defendant's side, why is it
12 important to account for the particular
13 defendant?
14    A.   Well, we do.  In that -- in that
15 fixed effect, it's the combination of the
16 processor product and customer ID that gets
17 its own dummy verdict.  So we're controlling
18 for both sides of the transaction, the seller
19 and the buyer, as well as the cut involved.
20    Q.   And that reflects the reality that
21 different defendants may have different
22 variations of the product or different brands
23 that could command different prices, right?
24    A.   Correct.  But you asked me about
25 this last one that brought in the customer

Page 282

1 ID, and you left out -- and the question,
2 just to be -- just to be complete is that
3 it's conceivable that a given customer is
4 able to push back on price increases because
5 of countervailing power, and to the extent
6 that that happens, you know, we want to be
7 able to control for that.
8    Q.   Yeah.  You want to control for
9 both sides of the equation, the defendant on
10 the one hand or the customer -- the defendant
11 or, slash, supplier on the one hand and
12 customer on the other?
13    A.   Correct.
14    Q.   In Paragraph 155 -- so apologies
15 for bouncing around, but that's where we are
16 at now -- you note that you added a linear
17 time trend to control for any general changes
18 that occurred over time such as technological
19 or efficiency increases, which may also have
20 had an effect on pork prices.
21        Can you explain why you did that?
22    A.   Yeah.  This is fairly standard.
23 It's just any secular trend that's unfolding
24 in a linear fashion could have an effect in
25 prices, and the time trend would pick that

Page 283

1 up.  We talked about exports, and I think you
2 showed me another series that looked fairly
3 linear over time, and anything -- anything
4 that is unfolding in a linear fashion could
5 be picked up in the time travel.
6    Q.   So you mentioned technological or
7 efficiency increases.  Anything specific
8 along those lines come to mind?
9        It's not a test.  If you know, you
10 know.  If you don't --
11    A.   We talked earlier today about
12 efficiency in terms of -- you know, I think
13 we talked about the ability to produce more
14 piglets, you know, given a certain -- certain
15 number of inputs.  And so if there's a
16 technological innovation that is unfolding in
17 a linear fashion such as that, you know, it
18 could be -- it could be captured in the time
19 trend.
20    Q.   And why wouldn't those kinds of
21 technological or efficiency trends be
22 captured by the plant cost variable?
23    A.   Oh, they very well may be.  So we
24 just want to make sure that to the extent any
25 of our other control variables are not

Page 284

1 capturing things that shift the supply or
2 demand curve around and that are correlated
3 with time, we are going to pick it up in the
4 time trend.
5    Q.   So bouncing back up to the fixed
6 effects.  I meant to ask you about why the
7 product fixed effect is important, or why you
8 did it.
9    A.   Yeah.
10    Q.   Can you explain?
11    A.   Yeah.  Because knowing -- telling
12 the computer the nature of the product could
13 be highly helpful in predicting what the
14 price was for the transaction that you're
15 looking at.
16    Q.   And why is that?
17    A.   Because different products
18 could -- could command different premiums
19 based on what's being sold.  You know, I --
20 you go to a restaurant, you will see pork
21 chops as being a high-end cut that's served,
22 you know, in a menu alongside steaks, and
23 it's conceivable that as a result, the loin
24 or different cuts that contain the meat of a
25 pork chop realize premium in the relevant

Page 285

1  market.
2      Q.   I think we also mentioned brand or
3  label or that kind of thing is -- packaging
4  product enhancements as -- and other things
5  that might affect the product, right?
6      A.   It's possible that -- that the
7  processor ID could affect pricing.  My
8  opinion is, you know, that these products are
9  largely homogeneous, but bringing the
10 processor ID at least allows for the
11 possibility that the processor commands some
12 kind of premium or discount relative to
13 average prices.
14     Q.   So when you control for hog costs,
15 that's -- we had some questions and answers
16 about that this morning.  I think we
17 ascertained that you control for hog costs by
18 using a data series provided by Iowa State
19 University; is that right?
20     A.   Correct.
21     Q.   And I could direct you to
22 Paragraph 153, if that's helpful.
23     A.   Yes.
24     Q.   But I'm specifically interested in
25 what -- what you know about what costs are

Page 286

1  captured by that variable.
2      A.   So there's a description of my
3  understanding of what's going into the
4  variable, and it's right in the middle of
5  153, and it says:  The change in cost of
6  animal feed composed of ingredients such as
7  the cost of corn and soybean meal as well as
8  nonfeed costs across time for a rank-and-file
9  Iowa producer.
10     Q.   And do you know -- do you know
11 what the percentage of costs for raising a
12 hog is attributable to feed?
13     A.   No, no.
14     Q.   Do you know whether that cost
15 includes labor?
16     A.   The sentence above suggests that
17 it is, and I would have to -- it's just been
18 too long since I went back through this.  But
19 it says here that the average cost of
20 producing a 270-pound finished pig.  And so I
21 think labor could enter in as the nonfeed
22 cost, but I would just want to go back and
23 check that out.
24     Q.   Do you know whether Iowa State
25 makes any assumptions regarding sow

Page 287

1  productivity or corn prices or soybean
2  prices, et cetera, in generating that data
3  set?
4      A.   No, I don't -- I don't know of the
5  assumptions, but certainly productivity
6  would -- could influence these costs.  So I
7  would hope that those sorts of productivity
8  changes would already be impounded in this
9  price that we are looking at.
10     Q.   Coming back to your model and how
11 you tested for impact and a comparative
12 impact.
13         Did you always subtract the same
14 overcharge percentage from the predicted
15 price to arrive at the but-for price?
16     A.   No.  No.  So to get the but-for
17 price during the conduct period, I take all
18 the right-hand side variables in the model,
19 all right, and I use those values for that
20 transaction, and I predict using all of the
21 coefficients in the model, not just the --
22 not just the conduct parameter, but I use all
23 of the coefficients to make a prediction of
24 what the price would have been in the absence
25 of the challenged conduct, and then I

Page 288

1  subtract what the actual price was.
2          And it's that difference between
3  the predicted conditional on all of the
4  attributes and all of the parameters in the
5  model minus the actual.  So I am not just
6  moving everything up by -- bu the conduct
7  parameter.
8      Q.   So you -- you do have a
9  calculation of a predicted competitive price,
10 right?
11     A.   For each transaction, I can
12 predict what the price would have been in the
13 but-for world given the parameters that I've
14 estimated in the model and given all of the
15 right-hand side variables of that particular
16 transaction.
17     Q.   Is it always the same percentage
18 across transactions?
19     A.   No.  You mean, percentage
20 inflation?  No.  In fact, you can tell by the
21 99-point-something percentage, there's going
22 to be some transactions that appear to have
23 escaped injury.  So if what you were saying
24 were true, and everything just automatically
25 moves by the same percentage, my test would

Page 289

1  present a hundred percent impact, and it does
2  not.
3      Q.   Is it true that the percent
4  difference between the predicted price and
5  your predicted competitive price is always
6  12.8 percent?
7      A.   Well, I don't -- I don't perform
8  that.  I take the predicted price in the
9  but-for world, which I would call the -- is
10  the competitive price, and I compare it to
11  the actual price.  And that difference is not
12  always 12.4 percent.
13          On average, it's 12.4 percent, but
14  it's not always 12.4 percent.  And, in fact,
15  just to repeat this point, sometimes the
16  prediction comes in above the actual price in
17  which that transaction by this test would
18  appear to have escaped injury, and that
19  happens in fewer than, you know, 1 percent of
20  the transactions, but it does happen.
21      Q.   I'm interested in -- I mean, you
22  are aware that defendants produced data on a
23  wide variety of pork products in this case.
24  Some you even included in your analysis, and
25  some you didn't, right?

Page 290

1      A.   Right.  I eliminated anything that
2  did not meet the class definition before
3  running the test.
4      Q.   And how did you come up with that
5  class definition?
6      A.   It was given to me by counsel.
7      Q.   So do you have any economic
8  analysis to determine what was -- what
9  products should be in or out of the class
10  products?
11      A.   I'm not -- no one asked me what
12  should be in or out of the class.  That's up
13  to the plaintiffs.  What I -- I do an
14  analysis of what should be in or out of
15  product market.  And in my opinion, the
16  product market is larger than the class
17  products, but you would have to ask counsel
18  as to why they eliminated certain products
19  from the class.  That was not my decision.
20      Q.   But in any case, it was your
21  intention to limit your analysis to the
22  products at issue in the class?
23      A.   I mean, I have to.  I understand
24  that's my instructions.  My assignment is to
25  estimate -- to show impact and to estimate

Page 291

1  aggregate damages associated with the class
2  product.  So if I were to include products in
3  there that were not in the class, I would be
4  overstating damages.
5      Q.   In your pass-through analysis --
6  and just for point of reference, I could
7  direct you to Paragraph 181.
8      A.   Give me one second.
9      Q.   Yep.
10      A.   Okay.
11      Q.   Did you account for the -- for
12  seasonality?
13      A.   Well, I know I accounted for
14  seasonality in the -- in the overcharge
15  regression to directs, but let me see if I
16  got the control -- the capture seasonality in
17  the pass-through.
18          So I'm not seeing it here.  My
19  recollection is that we have already
20  accounted for seasonality in Stage 1, which
21  was to get to the overcharge to the directs.
22  But we -- I don't think we account for
23  seasonality in the pass-through regressions.
24  That would be something that would be fairly
25  trivial to do, and would also be common to

Page 292

1  the class.
2      Q.   Do you account for the cut or type
3  of pork?
4      A.   We are accounting for -- and to
5  the extent we are matching up the wholesale
6  and the retail price of the same cut, that
7  is, we are not mixing apples with oranges.
8  You know, we are taking the price paid by the
9  distributor, for example, and comparing it to
10  the price -- let's see how we do this -- paid
11  for the same cut, that is, what the
12  distributor paid for and sold the same cut,
13  right.
14          So in that sense, we are
15  controlling for the cut.  We are not mixing
16  apples and oranges.  But if you're asking do
17  we allow for a different pass-through by cut,
18  I think the answer is no.
19      Q.   And does your price measure price
20  per pound or price per unit?
21      A.   I think it's units, but it's
22  something I want to go back and check.  I
23  think we are doing it in units.
24      Q.   Do you have an answer, or are you
25  still looking?

Page 293

1      A.    Oh.  Sorry.  I was done.
2      Q.    I was thinking you were confirming
3   whether you --
4      A.    No.  As I'm thinking about it, I
5   don't think that it would affect -- that it
6   would have any effect on the pass-through
7   rates as long as we are doing apples to
8   apples.  So you'd get the same pass-through
9   rate if you were doing -- you know, it's a
10  cut versus a cut.
11          And I can go during a break and
12  check if it's units or pounds, but I don't
13  see why that would make a difference.
14     Q.    Well, if it's price per unit, the
15  products -- pork products can come in
16  different size packages, right?
17     A.    Right.  And so, you know, I know
18  that one of the challenges here was making
19  sure that we got comparable units on the buy
20  side and on the sell side for given a direct
21  purchaser.  And we think that when you see
22  very skewed ratios of prices of cost that
23  would suggest that you have a mismatch on the
24  unit.
25          So I'm fairly confident -- I can

Page 294

1   go back and check with the researcher -- that
2   we did do this in units.
3      Q.    Does brand matter to the
4   pass-through analysis?
5      A.    Brand of the retailer?
6      Q.    Of the product being sold.
7      A.    No, I don't think it would.  These
8   are largely homogenous.  You could -- if you
9   were so inclined, you could estimate separate
10  pass-through rates by -- you're saying for --
11  based on the source of the product, or you
12  could -- you could control for the source.
13  But that's not, you know, what we did.
14          We were looking at pass-through
15  from the perspective of the -- of the direct
16  purchaser.
17     Q.    For example, did you indicate or
18  examine the possibility of differential
19  pass-through rates for branded versus
20  private-label products?
21     A.    Oh, for a given retailer, we did
22  not.
23     Q.    Did you account for any product
24  characteristics other than -- well,
25  seasonality we mentioned and the cut/type of

Page 295

1   pork?
2      A.    Sitting here, I don't think so,
3   but that's something I can check as to what
4   controls, if any, were -- were included on
5   the right-hand side of these regressions.  I
6   just performed these too long ago, but I
7   can't tell you which -- which controls are
8   included right now.
9      Q.    And how many pass-through rates
10  did you estimate for each intermediary
11  seller?
12     A.    One.
13          So when you say "intermediary
14  seller," you can look at Table 21.  I've got
15  a pass-through rate for 7-Eleven, Aldi,
16  Amazon Fresh, and it goes down, and then I do
17  the same thing for the distributors.
18     Q.    So did you allow the pass-through
19  rate to vary over time?
20     A.    No.  I just estimated one
21  pass-through rate across the data set.
22     Q.    Do you allow the pass-through rate
23  to vary by cut or by defendant?
24     A.    Still no.  I mean, I think I told
25  you that I didn't do it by defendant earlier.

Page 296

1   And by cut, I think that's still no.  Same
2   answer.  I didn't do separate pass-through
3   rates by cut.
4      Q.    Did you evaluate any products sold
5   by nondefendant packers?
6      A.    Let's see.  Are you asking in my
7   pass-through analysis in particular or just
8   in general?
9      Q.    Yes, yes.  Sorry.  In your
10  pass-through analysis.
11     A.    I don't think so because we were
12  matching with defendants' data.  But that's
13  something that I could -- you know, I could
14  run to ground.  I think it was just for the
15  pass-through rate that could be matched with
16  defendants' data.
17     Q.    Did you study whether retailers
18  could -- retailers' pass-through or cost
19  changes when they're running a promotion?
20     A.    I allowed for -- I allowed for
21  promotions to be in the data, yes.
22     Q.    Or whether retailers' pass-through
23  cost charges for all -- all brands?
24     A.    Well, I don't provide separate
25  pass-throughs for these retail stores by

Page 297

1  brands.  I've got one pass-through for the
2  retail.
3      Q.    So that same answer would hold
4  true for changes -- or differences at
5  different stores or regions or distribution
6  centers or that kind of thing?
7      A.    I mean, I think it's fair that
8  right now in Tables 21 and 22, that's just
9  one for the -- for the direct purchaser.
10     Q.    And it's your -- in terms of the
11  level of granularity, the model focuses on
12  intermediary, monthly level and at a product
13  level, right?
14     A.    Correct.
15        MR. COLEMAN:  Let's take a quick
16     break here.  I'm not even sure how
17     long we have been going.
18        THE VIDEOGRAPHER:  The time is
19     4:43 p.m.  We are off the record.
20        (A brief recess was held from
21     4:43 p.m. to 4:56 p.m.)
22        THE VIDEOGRAPHER:  The time is
23     4:56 p.m.  We are back on the record.
24  BY MR. COLEMAN:
25     Q.    Dr. Singer, I understand you

Page 298

1  wanted to clarify some previous testimony.
2      A.    There's just two things where I
3  think I either got tired or misstated it.
4  Let me just clear it up.
5        On Paragraph 181, I talk about the
6  controls that went into the pass-through
7  model, and you will see that I controlled for
8  product category and by months, seasonality.
9  So that's in Paragraph 181, and you had asked
10  me earlier what controls went into the
11  pass-through regression.  I told you I didn't
12  know.  I just couldn't do it by memory.
13        And the second thing that I wanted
14  to clear up, is you asked me about how the
15  matching was done, and the matching -- I said
16  it was -- I thought it was per unit.  I think
17  it was both, per unit and per pound, and the
18  reason why it happened this way is that in
19  many occasions, we -- the direct purchaser
20  did the matching for us, and it was typically
21  matching on SKU, and so I think the best way
22  to answer your prior question was not by
23  pound or by unit, but instead by SKU, and
24  that resulted in some matches being lined up
25  on a per-pound basis and other matches being

Page 299

1  lined up on a per-unit basis.
2      Q.    So what was it that you were
3  focused on to do that match -- the product
4  match?
5      A.    Was I focused on?
6      Q.    Yeah.  How did you -- what was the
7  key criteria that matched products?
8      A.    We just wanted to make sure that
9  we were talking about the same product that
10  was being bought and sold because that's --
11  you know, we wanted to trace what a cost
12  increase would be to a direct into its price
13  that it charged in retail.
14     Q.    Okay.  Got it.  Yeah, yeah, yeah.
15     A.    So many times, you had asked me if
16  we did the match.  The answer is that in many
17  times, the third party, either distributor or
18  retailer did the match for us.  And other
19  times, we had to do the match.  But what --
20  what invariably was taking place was matching
21  along SKU.
22        So the SKU would be the -- what
23  would identify in the database, the
24  particular cut that was purchased and turned
25  around and resold by -- by the direct.

Page 300

1      Q.    Okay.  Anything else?
2      A.    That's it.
3      Q.    Turning back to Agri Stats.  I
4  believe your testimony is that Agri Stats was
5  central to the conspiracy that you understood
6  to have existed between 2009 and 2018, right?
7      A.    Central to the plaintiff's theory
8  of harm or alleged period of the challenged
9  conduct.  That's correct.
10     Q.    In a -- in Paragraph 136 of your
11  report, for example, you say that collection
12  and the dissemination of competitively
13  sensitive information is the day-to-day work
14  of a cartel, right?
15     A.    Yes.
16     Q.    And you cite quite a bit of
17  literature on cartel conduct.  And I gather
18  that participants in a cartel, one of the key
19  things they need to do is monitor compliance
20  with a cartel agreement; is that right?
21     A.    Correct.
22     Q.    And your -- your opinion is that
23  Agri Stats was consistent with that
24  monitoring mechanism that a cartel needs for
25  stability over time, right?

Page 301

1    A.    Correct.
2    Q.    And one of the problems that
3    cartels have is the constant incentive for
4    individual members of the cartel to cheat on
5    the agreement, right?
6    A.    Yes.
7    Q.    And the monitoring mechanism
8    allows other participants in the cartel to
9    see the cheating and pursue enforcement,
10   right?
11   A.    Correct.
12   Q.    And so the key thing that
13   monitoring allows for a cartel is to give
14   participants visibility into what each
15   individual firm is doing, whether they're
16   complying with the cartel, and then setting
17   the stage for enforcement of the cartel
18   agreement, right?
19   A.    Right.
20   Q.    And to have that kind of -- to
21   function as that kind of monitoring
22   mechanism, the participants in the cartel
23   need to monitor the individual firm
24   activities of cartel members, right?
25   A.    Correct.

Page 302

1    Q.    So one thing that I am not seeing
2    in the documents that you have cited is any
3    enforcement mechanism through Agri Stats or
4    otherwise.
5          What do you have in mind as an
6    example of the alleged pork cartel's efforts
7    to enforce the agreement that you think
8    existed?
9          MR. RISSMAN:  Object to form.
10   A.    So enforcement, of course, is only
11   needed when someone deviates, and so I'm
12   not -- I'm not aware of episodes on which
13   someone deviated and -- and undercut their
14   rival's prices.  In fact, what we observed in
15   the record evidence is that Agri Stats was
16   alerting defendants of opportunities to
17   increase the price.  And that was generally
18   followed from what I -- what I observed.
19         But I -- you know, one of the
20   prongs that we are trying to -- to evaluate
21   is not enforcement per se but monitoring, and
22   monitoring was -- was the prong that I looked
23   at, and I think that there is pretty good
24   evidence that monitoring, in fact, was made
25   possible by -- by Agri Stats.

Page 303

1    BY MR. COLEMAN:
2    Q.    Right.  So that the reason
3    monitoring is helpful is keep cartel members
4    in line and make sure the agreement is
5    stable, right?
6    A.    Yes.
7    Q.    And is it your opinion that there
8    are -- that none of cartel members from the
9    2009 to 2018 period deviated from the cartel
10   agreement that is alleged to have existed?
11   A.    No.  That's not my opinion.  I
12   just -- I think that would give us insight
13   into what the enforcement would look like,
14   and I'm just not aware of a particular
15   episode happening.
16   Q.    How would we identify an example
17   of deviation from the purported cartel
18   agreement?
19   A.    Well, I mean, I think the -- you
20   could -- I'm just -- you know, I'm giving you
21   a hypothetical, but you could see in a report
22   that one participant is coming in
23   consistently below each of its rivals.  And
24   then another participant questioning why
25   they're going along, and then the punishment

Page 304

1    could take one of two forms.
2          It could be we kick you out of the
3    cartel, or we would retaliate by dropping our
4    own prices.  That would be kind of evidence
5    of enforcement that we would look for.
6    Q.    And that kind of evidence is
7    something that we don't have here, at least
8    not in your report, right?
9    A.    It's not -- I do not think it's in
10   my report.  The enforcement when someone
11   deviated, just sitting here, I can't -- I
12   can't think of episodes that I came across.
13   Q.    And I also don't see any documents
14   cited in your report in which Agri Stats
15   appears to have any recognition that it's
16   facilitating a cartel?
17         MR. RISSMAN:  Object to form.
18   A.    I don't think I would agree with
19   that characterization.  I think that
20   Agri Stats recognized that it was creating
21   profit making and price increases that
22   wouldn't have otherwise been available
23   without the information, and use that as part
24   of its marketing to induce outsiders to join
25   the club.

Page 305

1  BY MR. COLEMAN:
2      Q.   Are you aware of any documents in
3  the case in which Agri Stats refers to an
4  agreement among the defendants to coordinate
5  prices or output?
6      A.   Well, you know, I imagine that
7  Agri Stats wouldn't do something that was so
8  blatant and obvious to send up, you know,
9  alarm bells like that.  I -- I just came off
10  of a price-fixing case on capacitors.  No one
11  ever wrote down, like, let's perpetuate the
12  price-fixing agreement.  It's just things
13  they know not to do.
14          In that case, they swapped around
15  at these monthly meetings Excel spreadsheets
16  that everybody would fill out of their
17  current and future prices.
18          So I'm not sure that you're going
19  to find such explosive and incriminating
20  language in a communication because people
21  know from their antitrust counsel that they
22  couldn't be saying things like that.
23      Q.   So Agri Stats did the,
24  quote/unquote, day-to-day work of a cartel
25  for nine years in the period, and yet you're

Page 306

1  not aware of any instance in which it was
2  referring to an agreement among defendants?
3          MR. RISSMAN:  Object to form.
4      Mischaracterizes his testimony.
5      A.   Yeah.  As an economist, you know,
6  I -- I'm not looking for, you know, an
7  agreement per se.  I'm looking for conduct
8  that would facilitate collusive outcomes.
9  I'm looking at this through the lens of an
10  economist.  The economist doesn't use the
11  word "agreement" when we're assessing
12  anticompetitive effects.
13          I want to know could -- could the
14  price hikes that were made possible through
15  the information-sharing regime, could those
16  have been achieved absent the information
17  sharing, and I think it would have been very,
18  very hard to do that, and that's why I think
19  that the information sharing effectuated
20  anticompetitive effects.
21  BY MR. COLEMAN:
22      Q.   And one of your opinions is that
23  even average prices can have the effect of
24  pulling up prices over time as lower priced
25  members of the cartel see the average and

Page 307

1  then boost their price.  Is that how that
2  operates?
3      A.   The average is important, but of
4  course they were getting a lot of more than
5  the average here.  They were getting
6  precisely where they sat on the distribution,
7  and so knowing that the granular level down
8  to the plant level and knowing where you were
9  on that distribution would give a participant
10  much more confidence in -- in raising prices
11  than if they only knew where they were with
12  respect to the average.
13      Q.   I want to make sure I understand.
14  By "distribution," do you mean their ranking
15  in the Agri Stats report on --
16      A.   Correct.
17      Q.   So in your mind, the key things
18  the Agri Stats report provided was, first,
19  you get an average price by various products,
20  and then you get the defendants -- each
21  defendants knows its position with respect to
22  not only the average price but its overall
23  kind of ranking in the industry; is that
24  right?
25      A.   Not just in the industry.  I mean,

Page 308

1  ranking down to very, very granular product
2  levels.  Right?  The Agri Stats reports
3  aren't just giving, you know, industry-level
4  price.
5          They are giving things down to the
6  cut and done to the plant, and so, you know,
7  I would submit that if someone wants to come
8  in below average but he finds out that he's
9  at the very bottom, and he can move up, you
10  know, that's a great opportunity to take a
11  price increase that may not be available
12  absent the information-sharing exchange.
13      Q.   USDA publishes reports showing the
14  average price by primal in -- on an ongoing
15  realtime basis in the marketplace, right?
16      A.   Well, it's at an aggregated level,
17  so my understanding is that they're not
18  breaking it out by processor, and they are
19  not breaking it out by plant.  And when you
20  say "realtime," I'm sure it comes with a lag,
21  and -- and I -- just leave it at that.
22      Q.   Do you know whether USDA prices
23  are more current than Agri Stats' prices that
24  are distributed to the defendants?
25      A.   I don't know.  I don't know for a

Page 309

1  fact which one is more -- more current.
2      Q.   But in any case, the in terms of
3  monitoring and enforcement, the ability to
4  de-anonymize the data, identify who is who is
5  important to the role that Agri Stats played
6  in the purported cartel, right?
7      A.   Yes, and would not be available if
8  all you had, say, was the USDA aggregated
9  data.  You wouldn't be able to punish, for
10 example, or identify who was cheating on the
11 cartel.
12     Q.   Right.  And -- yeah.  And the
13 difference between Agri Stats and USDA, among
14 others, one thing is you have the opinion
15 that defendants were able to de-anonymize the
16 participants in Agri Stats' reports, right?
17     A.   Yes.
18     Q.   Did you make any effort to
19 de-anonymize any of the reports to identify
20 who was who in any given report?
21     A.   No.  I don't think that I, as a
22 third party, would have that capability, but
23 I was convinced that the participants could
24 and, in fact, asked Agri Stats for assistance
25 when they couldn't.

Page 310

1      So I feel like that is sufficient.
2  Whether I could do it as an outsider just by
3  looking at a report, I think is irrelevant.
4  It's whether or not the participants could,
5  and I think I've shown a lot of evidence they
6  could.
7      Q.   Any understanding as to the
8  mechanism of how the purported de-anonymizing
9  worked?
10         MR. RISSMAN:  Objection.
11     Foundation.
12     A.   I described the mechanism, but I
13 think that Agri Stats would provide a list of
14 the participants at the top and would give
15 details about the plant that tipped off the
16 other participants as to whose plant it was
17 and where it was.
18     In any event, they were able to
19 figure it out, and they boasted about being
20 able to figure it out.  I will leave it at
21 that.
22 BY MR. COLEMAN:
23     Q.   Any instance that you're aware of
24 where Hormel attempted to de-anonymize an
25 Agri Stats report?

Page 311

1      A.   I would have to go into my
2  de-anonymization section and see if there
3  were attempts, successful or unsuccessful, by
4  Hormel.  But sitting here, at this late hour,
5  I can't tell you if Hormel was in that
6  section of the report.
7      Q.   Do you have any effort by Seaboard
8  to de-anonymize Agri Stats reports?
9      A.   I mean, it's the same answer.  I
10 would have to go into that section of my
11 report.
12     Q.   Did you -- you know, given the
13 importance of de-anonymizing to your theory
14 of how Agri Stats functioned, did you make
15 any effort to check whether all defendants
16 attempted to de-anonymize Agri Stats'
17 reports?
18     A.   I think I made some effort in that
19 direction.  I mean, I put forward the
20 evidence that I thought was most consistent
21 with the claim.  Whether or not I was able to
22 show it for all defendants is another
23 question.
24     I don't know if I did.  But that
25 was certainly -- you know, we sought to get

Page 312

1  as much data on that question as we could.
2      Q.   Do you have any information as to
3  whether Clemens ever attempted to
4  de-anonymize an Agri Stats report?
5      A.   It would be the same answer; that
6  I would send you to that section of the
7  report to see if Clemens was there.  I would
8  have to say that it would be surprising that
9  some could and some couldn't.
10     I think it would be more of an all
11 or nothing, and I also think that it's part
12 of the marketing to ensnare, you know, future
13 processors into the ring.  You would -- it
14 would be weird for Agri Stats to deny that
15 sort of benefit for some members but not
16 others.
17     Q.   Yeah.  And why would that be
18 surprising if there were some -- some members
19 of Agri Stats or subscribers of Agri Stats
20 that were not able or didn't de-anonymize?
21     A.   Because I think that's the
22 fundamental value added that the Agri Stats
23 report is bringing.  It's allowing you to
24 find price-making opportunities, price
25 increases that you wouldn't otherwise be able

Page 313

1   to find, and the firms needed confidence and
2   knowing, you know, who was where and where
3   they ranked.
4         And it just seems like you would
5   cut a lot of the value to a prospective
6   member if you denied them that -- that
7   luxury.
8       Q.   And I assume that part of that
9   role that de-anonymizing would play would be
10  important for the de-anonymizing to be --
11  well, as you described it, the participants
12  would need some confidence in the accuracy of
13  what they -- what they were doing and what
14  they were seeing, right?
15      A.   I think that's fair.  I think that
16  they have to -- they have to believe what
17  they're looking at is real data as opposed to
18  made-up data.
19      Q.   Did you see any documents in which
20  Agri Stats was trying to ensure that the
21  participants could de-anonymize their
22  reports?
23      A.   I recall efforts by certain
24  defendants complaining to Agri Stats that
25  they weren't able to do it as easily as they

Page 314

1   should and asking for further information.
2       Q.   Yeah.  And how did Agri Stats
3   respond from what you can recollect?
4       A.   I don't know if I -- I don't know
5   if I -- in each of those occasions, I don't
6   know if I showed what Agri Stats response
7   was.  I only showed the overture by the
8   member.
9       Q.   But it would be your expectation,
10  given the role that Agri Stats was playing,
11  that it would facilitate de-anonymizing, if
12  requested by the members; is that right?
13      A.   I think that's fair.
14         MR. RISSMAN:  Form.
15  BY MR. COLEMAN:
16      Q.   Are you aware of any evidence of a
17  formative meeting for what we'll call the
18  Agri Stats pork cartel?
19      A.   A formative meeting?
20      Q.   Right.  When did this cartel come
21  into existence?
22         MR. RISSMAN:  Objection.  It
23      calls for a legal conclusion, and I
24      will instruct the witness to not
25      answer and to the extent that he

Page 315

1   doesn't have an opinion that's he
2   offering in this case.
3       A.   Yeah.  I mean, I can tell you when
4   the challenged conduct came into existence
5   for the complaint, which is in 2009, when
6   Agri Stats started producing these specific
7   reports.
8         And then I think you had a
9   two-part question for me.  I can't remember
10  what the other --
11  BY MR. COLEMAN:
12      Q.   Yeah.  I'm actually not interested
13  in your opinion as much as just what evidence
14  you have seen or reviewed, included in your
15  report that -- of the formative meeting of
16  the cartel members to engage in,
17  quote/unquote, challenged conduct?
18         MR. RISSMAN:  Object to form.
19      A.   I think I detailed some industry
20  meetings or association meetings that would
21  have allowed these participants to interact
22  in person, and I've also, I think, documented
23  direct communications.  I will leave it at
24  that.
25

Page 316

1   BY MR. COLEMAN:
2       Q.   So there are mediums in which
3   they -- some of the defendants were --
4   attended, so they had an opportunity to talk
5   to one another.  That's your testimony?
6       A.   Correct.
7       Q.   Did you see any evidence that they
8   actually did and discussed an agreement to
9   engage in the challenged conduct?
10      A.   I don't think I'm privy to what
11  was discussed at those -- at those meetings.
12      Q.   Do you know whether there was any
13  indication of what the specific agreement was
14  as to whether there was an agreement to cut
15  pork supply by some amount or -- what were
16  the terms of the agreement, to the best that
17  you understand it?
18         MR. RISSMAN:  Objection.  Calls
19      for a legal conclusion and lacks
20      foundation.
21      A.   I think you might be taking the
22  word "agreement" literally as if they drew up
23  written documents, and these are the
24  objections of the cartel, right.
25         That's not what's in my analysis.

Page 317

```
 1   What I'm trying to figure out is whether the
 2   conduct using qualitative evidence according
 3   to the economic criteria.  My quantitative
 4   evidence is consistent with the existence of
 5   an agreement, but in the abstract, an
 6   agreement that -- to raise prices and to
 7   reduce domestic output.
 8   BY MR. COLEMAN:
 9       Q.    So you have an opinion that
10   Agri Stats was used -- Agri Stats reports was
11   used to raise prices, right?
12       A.   Yes.
13       Q.    And do you have any opinion as to
14   whether there was any kind of specific
15   agreement on prices or not to compete based
16   on a specific price in Agri Stats or anything
17   along those lines?
18           Just wanting to understand how you
19   think this mechanism worked?
20       MR. RISSMAN:  I'm going to
21       object to form.
22       A.    So the mechanism work, as I, you
23   know, spelled it out in my report, is that I
24   think -- I think it's best understood as
25   information exchange, where the information
```

Page 318

```
 1   that was exchanged was competitively
 2   sensitive.  And that facilitated coordinated
 3   decision making with respect to prices and
 4   output.
 5   BY MR. COLEMAN:
 6       Q.    Well, you know, defendant could
 7   get the information -- I think you even
 8   mentioned this, that perhaps in collusion,
 9   defendants wouldn't want to exchange
10   information because they might undercut the
11   prices with knowledge of a defendant's
12   prices, right?
13       A.   Right.  Absent -- absent collusion
14   that if I just volunteered to you that I'm
15   taking my plant capacity down, and we didn't
16   have a, quote/unquote, agreement in place,
17   then you could undercut me by increasing
18   output or stealing my clients or my
19   customers.
20       Q.    And the same thing on price,
21   right?
22       A.    Correct.  So, yeah, committing to
23   raise prices in the absence of an agreement
24   is dangerous to the extent that it would
25   allow a rival who wasn't on the same page to
```

Page 319

```
 1   undercut you.
 2       Q.    Or a -- I think what you're
 3   intending to say is an agreement to exchange
 4   pricing information absent the agreement
 5   would be dangerous; is that right?
 6       A.   Well, I mean, something more
 7   basic.  That sharing of current prices or
 8   capacity with rivals in a granular level can
 9   facilitate anticompetitive outcomes.  I think
10   that's a pretty basic proposition that most
11   economists subscribe to.
12       Q.    And do you have -- so I understand
13   that you engage in the economic analysis to
14   kind of quantify the effect of the exchange
15   of information on prices.  I'm interested in
16   what understanding you have reached based on
17   your review of the record as to how that
18   mechanism actually worked in practice.
19           Can you provide any more detail
20   how Agri Stats reports were used by
21   individual defendants to coordinate on
22   prices?
23       MR. RISSMAN:  I'm going to
24       object to instruct the witness to only
25       answer as to opinions that he's
```

Page 320

```
 1   offered in this case.
 2       A.    The opinion that I offered in the
 3   case -- the analysis I offered shows how
 4   defendants were able to exploit the
 5   competitively sensitive information that I
 6   have provided to identify price increases
 7   that were safe to take.
 8           And my opinion is that in the
 9   absence of that sharing mechanism, it would
10   have been much harder to exploit and to take
11   those -- even learn of those problem max --
12   maximizing profiting opportunities.
13   BY MR. COLEMAN:
14       Q.    And did you -- and the -- the
15   Agri Stats sales reports would be the -- in
16   your mind, the key mechanism for that kind of
17   price coordination, right?
18       MR. RISSMAN:  Object to form.
19       A.    I think they were key, but I think
20   I go through and talk about how each of the
21   reports could have facilitated coordinated
22   pricing decisions and output decisions.
23   BY MR. COLEMAN:
24       Q.    Are you aware of any individual
25   transaction that you can point to where a
```

Page 321

1 defendant used an Agri Stats report as the
2 driver for the primary rationale for price
3 increase?
4       MR. RISSMAN:  Object to form.
5    A.   I don't know if we could go point
6 to a transaction, but we can definitely, and
7 we do, review episodes in which Agri Stats
8 identified a price-taking opportunity for a
9 participant, and the participant seizes and
10 exploits that information, and it's
11 conceivable we could go find out the affected
12 transactions.
13       But as you know that my -- my
14 price regression doesn't look at the effects
15 on any particular transaction.  It's looking
16 at the effect during the totality of the
17 conduct period, you know, in relation to this
18 clean benchmark period beforehand.
19 BY MR. COLEMAN:
20    Q.   Yeah.  So when I reviewed the
21 evidence that you cited, I see a lot of
22 Agri Stats presenting sales reports that
23 identify, quote/unquote, pricing
24 opportunities.
25       So I see that, and I understand

Page 322

1 it's presented in your reports, and I see
2 some instances of executives that get the
3 reports and say, oh, yeah, we are not doing
4 well.  We got to do better on our pricing,
5 you know, presumably raise the pricing.
6       What I don't see is any instance
7 of an individual defendant making a pricing
8 decision actually based on that information.
9 Right?
10       MR. RISSMAN:  Object -- object
11    to form and just the narrative and
12    your characterization of the evidence.
13 BY MR. COLEMAN:
14    Q.   Yeah.  You can correct me if I'm
15 wrong, Dr. Singer.
16       Where's the evidence of a
17 defendant taking the Agri Stats pricing
18 information and adjusting their bid or using
19 it in a bid or raising their price list or
20 anything like that?
21    A.   Well, I think I have a section
22 that describes how defendants came to rely on
23 the Agri Stats report for decision making.
24 And I think that it's also fair to infer
25 that -- that price-taking opportunities that

Page 323

1 were identified by Agri Stats for defendant
2 were seized upon.
3       I mean, that was the whole purpose
4 of subscribing to the -- the report.
5    Q.   So certain defendants didn't
6 subscribe to Agri Stats sales reports for
7 long stretches of the conspiracy period,
8 right?
9    A.   I had a table that, I think, shows
10 little check marks for which report who took
11 and of when, but I'm going to admit again
12 that I don't have it memorized.
13    Q.   Why would it make sense for a
14 defendant not to subscribe to the Agri Stats
15 report if it's a member of the supposed
16 cartel?
17       MR. RISSMAN:  Object to form.
18    Calls for speculation.
19    A.   Well, I would want to look at the
20 series, but it's conceivable that you would
21 have someone who just came late to the party.
22 They just came -- there's a few years during
23 the conduct period they weren't yet in, and
24 eventually show up subscribing.
25

Page 324

1 BY MR. COLEMAN:
2    Q.   In your mind, would the
3 subscription of the Agri Stats sales report
4 be a key indicator of whether they were
5 participating in the cartel?
6       MR. RISSMAN:  Objection.  That
7    calls for a legal conclusion.
8    A.   Well, you keep seizing on the
9 sales, and I will grant you, it was very
10 important.  But I think that the other
11 reports were also helpful in facilitating
12 coordinated, you know, pricing or output
13 decisions.
14       I mean, the export report, for
15 example, would tell you whether your rivals
16 were abiding by an effort to move product out
17 of the domestic market so as to prop up
18 domestic prices.
19       If you saw someone's export ratio
20 plummet well below what the other firms were
21 doing, that would be an indication that they
22 weren't -- they weren't going along.
23 BY MR. COLEMAN:
24    Q.   So if we want to know if a farm is
25 participating in the cartel, we would look at

Page 325

1  subscription of sales report and the export
2  report; is that right?
3        MR. RISSMAN:  Object to form.
4  That calls for a legal conclusion.
5        MR. COLEMAN:  Actually not.
6  BY MR. COLEMAN:
7     Q.   I'm interested in your economic
8  opinion.
9        MR. RISSMAN:  Well,
10  participation -- if you're going to
11  quibble with me, participation in a
12  conspiracy is a legal question.
13     A.   Yeah.  So my criteria -- when you
14  think about the economic criteria that I
15  employ from the economic literature, you
16  know, monitoring like inducements.  I mean,
17  these are -- these are elements that in
18  indicia that economists have come up with in
19  their study of cartels over time.  These are
20  characteristics that consistent with.
21        And so I do -- I do highlight who
22  was subscribing to which report and when, but
23  I don't know if I would allow that table to
24  dictate at least my inference as to when
25  someone was participating, and, you know, I

Page 326

1  also just want to say that participating in
2  an agreement is something that's outside of
3  my domain again.
4        I'm just merely looking at
5  qualitative evidence that's consistent with
6  the economic criteria of a cartel.
7  BY MR. COLEMAN:
8     Q.   Yeah.  That's what I'm -- I'm
9  interested in is your assessment of the
10  record evidence as an economist, and when
11  you're looking at one or more firms that
12  aren't subscribing to the Agri Stats reports,
13  that would indicate to you as an economist
14  that they don't appear to be taking
15  advantages of the purported cartel, right?
16        MR. RISSMAN:  Objection.  I will
17  instruct the witness not to offer
18  opinions he's not offering in this
19  case.
20  BY MR. COLEMAN:
21     Q.   You're not going to answer?
22        MR. RISSMAN:  He can answer if
23  he has an opinion about that that he's
24  offered in this case.
25     A.   I have not offered an opinion as

Page 327

1  to why someone was out and not in on a
2  particular report in a particular year.  I'm
3  not offering an opinion on that.
4  BY MR. COLEMAN:
5     Q.   If defendants are requested by a
6  grocery retailer, for example, to submit bids
7  to an RFP, do you have any opinion as to how
8  the Agri Stats reports would help them win
9  that business?
10        MR. RISSMAN:  Objection.  Calls
11  for speculation, and I will also,
12  again, instruct the witness to the
13  extent he has an opinion about that in
14  this case, he can -- he can give it.
15     A.   Yeah.  I think that -- implicit in
16  your question is that -- is that the buyers
17  have access to the Agri Stats reports, the
18  same level of granularity as the defendants.
19  I'm not sure that that's the case.
20  BY MR. COLEMAN:
21     Q.   No.  I actually -- yeah.  We'll
22  assume that the buyers don't have any access
23  to the Agri Stats reports.  So we've got the
24  defendants who are, you know, pork packers.
25  They're selling pork to a retailer or a

Page 328

1  wholesaler, and the wholesale is asking them,
2  sharpen your pencil.  We want your best
3  prices, you know, for a specified product
4  list.
5        Do you ever see any indication
6  that the packers were consulting the
7  Agri Stats reports to figure out how to
8  respond to that bid?
9        MR. RISSMAN:  Object to form.
10  Incomplete hypothetical.
11     A.   Sitting here, I don't know if I
12  put forward evidence of the use of Agri Stats
13  to -- to inform a bid to an RFP.
14  BY MR. COLEMAN:
15     Q.   Do you have any opinion or theory
16  as to how Agri Stats would be useful for that
17  scenario?
18     A.   I haven't formed an opinion on
19  that yet, no.
20     Q.   Can we turn to Tab 61?
21     A.   Sure.
22     Q.   Tell me when you're there.
23     A.   I'm there.
24        MR. COLEMAN:  And, Jacob, if you
25  want to pull it up, we are on the

Page 329

1    first page of the document.
2  BY MR. COLEMAN:
3      Q.   So what's been marked as
4  Exhibit 61 is a Clemens document that you
5  cite in Footnote 259 of your report.  But I'm
6  interested in -- the Clemens document applied
7  an industry overview.  It talks about
8  production.  That's the third header down.
9  It mentions that expansion of pork production
10  is already in the works.  Farrowing
11  intentions, as reported by USDA, for this
12  fall and winter are up 4 percent.  Higher
13  farrowings this fall should be palpable in
14  the form of increased pork production in the
15  spring of 2015.
16         Do you see that?
17         MR. RISSMAN:  Take your time to
18      look at the document and the footnote
19      that it is cited in.  You said 259, I
20      think.
21         THE WITNESS:  Just one second.
22         MR. RISSMAN:  Yeah.  Footnote
23      259.
24  BY MR. COLEMAN:
25      Q.   Tell me when you're ready.

Page 330

1      A.   So I've read the three sub-bullets
2  under production.
3      Q.   Yes.  And the one I hadn't yet
4  read into the record is the third one that
5  said:  Pork production expansion will
6  continue into 2016, which will put downward
7  pressure on prices.  Right?
8      A.   Yes.
9      Q.   So at least in this period, which
10  based on the dates referenced in the
11  document, 2015 going into 2016, was the
12  period of expanded pork production, right?
13         MR. RISSMAN:  Objection.
14      Foundation.  Assumes facts.
15      A.   Well, the document says pork
16  production expansion will continue into 2016.
17  So it suggests that at least for 2015, pork
18  production was expanding.
19  BY MR. COLEMAN:
20      Q.   And that's an internal Clemens
21  document, right?
22      A.   Correct.
23      Q.   That's their assessment of what's
24  happening in the marketplace in this -- in
25  this period of time, right?

Page 331

1         MR. RISSMAN:  Objection.
2      Foundation.
3      A.   That's their assessment.  I think
4  that's fine, yes.
5  BY MR. COLEMAN:
6      Q.   And you recognize that Clemens had
7  announced a new plant in 2014, right?
8      A.   You will have to take me to that.
9  I know you mentioned that earlier today.  But
10  is that in this document?
11      Q.   Are you aware of that fact?
12      A.   I don't know if I was aware of it,
13  but you have mentioned that today, so I could
14  either take your word for it.
15         Do you think this document
16  establishes that?
17      Q.   I don't know if it does or
18  doesn't, but I'm interested in what you're
19  aware of.
20      A.   Yeah.  I haven't done a study of
21  which plants were created by year.
22      Q.   Paragraph 78 of your report refers
23  to the Seaboard Triumph plans being announced
24  for a new plant being announced in 2015,
25  right?

Page 332

1      A.   Let me get to 78.
2         So, yes, there's a 2015 press
3  release that I mentioned about -- about the
4  cost of starting a new plant of 264 million
5  as indicative of high-entry rigors.
6      Q.   Right.  And that was --
7  notwithstanding that cost, Seaboard and
8  Triumph committed to it -- to pay that price
9  in that time period, 2014 and 2015, right?
10         MR. RISSMAN:  Objection.
11      Foundation.
12      A.   Yes.  They -- they brought that
13  plant online, and is also consistent with the
14  conspiracy to suppress output.  It's -- the
15  theory of harm is not that the restraints
16  were going to set capacity to zero.  It's
17  that the capacity would be less than it
18  otherwise would be.
19         So episodes of capacity increasing
20  during the conduct period does not disprove
21  the plants' theory of harm.
22  BY MR. COLEMAN:
23      Q.   So investing hundreds of millions
24  of dollars in a new pork packing plant is
25  consistent with the conspiracy to restrict

Page 333

1  the supply of pork; that's your opinion?
2      A.   It's not inconsistent.  I think
3  I'd put it that way.  But the mere fact that
4  a plant comes online during the conduct
5  period doesn't disprove the theory of harm.
6      **Q.   In any case, is the period 2014,**
7  **2015, which we have at least two defendants**
8  **announcing new packing plants and in the**
9  **Clemens document in Tab 61, we see it's also**
10 **a period of expanded pork production and hog**
11 **production, right?**
12         MR. RISSMAN:  Object to form.
13     A.   I mean, that's what the
14  document -- this Clemens document says, that
15  pork production expansion will continue into
16  2016.  It is what the document says.
17  BY MR. COLEMAN:
18     **Q.   When you looked at the data of**
19  **what happened to the supply of pork, did you**
20  **observe significant increases in supply in**
21  **the period from 2014 to 2018?**
22     A.   I mean, it's possible I came
23  across production data, but I wasn't trying
24  to model production.  I think that other
25  experts may have modeled production as their

Page 334

1  dependant variable, their key lens through
2  which the harm would have manifested itself.
3  I'm looking at pricing.
4      **Q.   And I think we've established**
5  **this, but just to revisit, did you do any**
6  **analysis to assess what happened to the price**
7  **of class products specifically in that period**
8  **of 2014 to 2018?**
9      A.   What happened to class products
10  between 2014 and '18?
11     **Q.   Yeah, the price of those products.**
12     A.   Sorry.  Of which products?
13     **Q.   The class products.  Pork products**
14  **that you have included -- defined as class**
15  **products.**
16     A.   So 2014 to 2018 is inside the
17  conduct period.  It's also inside the class
18  period.  So I absolutely analyzed the price
19  of those products.
20     **Q.   And I am interested in**
21  **specifically whether you focused on the**
22  **overcharge for those products in that period**
23  **between 2014 and 2018?**
24     A.   I didn't treat those differently.
25  You know, the 2014 start date is limited by

Page 335

1  the statute of limitations, as I understand
2  it.  So there's not an economically
3  significant phenomenon that would cause me to
4  think that you would want to treat 2014
5  special.  It's just as far back as plaintiffs
6  could go to recover damages.
7         So the start date for the conduct
8  period is 2009, and I wouldn't expect there
9  to be differences from 2009 to '14 from, say,
10  2014 to 2018.  Once you control for all other
11  things, it will explain pork prices at the
12  time.
13     **Q.   Well, we have new plant and**
14  **expanded hog production and significant**
15  **increases and overall pork production in that**
16  **period of 2014 to 2018, right?**
17     A.   Well, if you are right --
18         MR. RISSMAN:  Object to form.
19     It assumes facts not in evidence.
20     A.   If you're right that capacity is
21  increasing from '14 to '18, then that should
22  put downward pressure on prices, and if
23  that -- and if that occurred, then the
24  conduct parameter would have the opposite
25  sign of the sign that I observed, which was

Page 336

1  positive and statistically significant.
2         So something doesn't add up in
3  your story, and I think that looking at the
4  capacity is perfectly reasonable, but I don't
5  think that whatever episodes you're pointing
6  to was enough to negate inflationary effect
7  of the conduct on prices.
8  BY MR. COLEMAN:
9      **Q.   Well, it would -- one way you**
10  **would know would be to isolate that period of**
11  **2014 to 2018 and analyze whether there was an**
12  **overcharge specifically in that period,**
13  **right?**
14     A.   No.  I wouldn't do it that way.  I
15  think that you might be able to convince me
16  to consider a measure of capacity as a
17  further control variable, but I wouldn't want
18  to go looking for arbitrary structural
19  breaks, just applying the Chow test
20  willy-nilly because economists know that you
21  will -- you will get wrong inferences that
22  way.
23         And with the caveat, of course,
24  that when you bring something like capacity
25  in on the right-hand side of a reduced form

Page 337

1  price regression, you could be engendering
2  endogeny, so you have to be careful about how
3  that enters the model.
4      Q.   I'm interested not just in
5  capacity, but that we know -- we have the
6  fact of capacity -- we have increased pork
7  production in that period, and I'm interested
8  in whether you see any merit in analyzing
9  that period of 2014 to 2018 --
10     A.   Not --
11     Q.   -- the total class period?
12     A.   No, no, not separately because we
13  don't -- we don't believe that the conduct --
14  the challenged conduct has changed during
15  those period.  Agri Stats is still putting
16  out the same kind of information-sharing rig
17  as it was in the prior years.
18        So I'm gently pushing back on the
19  notion of treating those years as distinct
20  for the purposes of the economic model.  I
21  think that -- that if you thought there were
22  significant shifts in the supply that my
23  model wasn't accounting for, those are the
24  types of variables you could bring it, but I
25  would be very loathed to estimate separate

Page 338

1  effects in those years.
2      Q.   We talked about, you know, the
3  fact that cartels can fracture with cheating
4  based on the incentives of individual firms,
5  and why -- wouldn't you have expected to see
6  with Clemens or Seaboard Triumph operating
7  new plants, other members of the cartel
8  expressing some angst that the cartel members
9  are blowing open an agreement to restrict
10  pork supply by significantly increasing
11  capacity?
12        MR. RISSMAN:  Object to form.
13     A.   Well, I'm sure that competitors
14  don't like to see rivals increasing capacity.
15  All things equal, they consider that to be a
16  bad thing.  But I don't know if any of them
17  are in a position to stop all capacity
18  increases.
19        What -- what is being alleged here
20  is that there was a drawdown through various
21  means, the three mechanisms that we talked
22  about, in addition to just raising prices
23  generally that reduced capacity relative to
24  what it would have been in the absence of the
25  challenged conduct.

Page 339

1  BY MR. COLEMAN:
2      Q.   What are the three mechanisms to
3  reduce --
4        (Simultaneous unreportable
5        crosstalk.)
6      A.   It's a marginal effect.  It's not
7  a wipeout capacity.
8      Q.   One of the three levers of the
9  purported cartel was reducing the harvest of
10  hogs, right?
11     A.   Right.
12     Q.   And building a new plant and
13  increasing the harvest of hogs is
14  fundamentally at odds with that mechanism of
15  the cartel, right?
16        MR. RISSMAN:  Objection.  Asked
17     and answered.
18     A.   I mean, when viewed in isolation,
19  it's certainly not helpful, but the fact that
20  there were some capacity -- some plants
21  brought online during, you know, this huge
22  period, 2009 to 2020 -- you know, the fact
23  that you can point to a plant coming online
24  doesn't -- doesn't lead me to believe that
25  that is dispositive and therefore, their --

Page 340

1  you know, the plaintiff's theory of harm must
2  be rejected.  That would be an overreaction
3  to that effect.
4      Q.   Yeah.  That might be true.  But I
5  would expect to see other members of this
6  cartel, if it existed, expressing
7  consternation that the participants in the
8  cartel are significantly increasing capacity
9  in violation of how the cartel functioned
10  over time, right?
11        MR. RISSMAN:  Object to form.
12     And calls for speculation.
13     A.   You might expect to see that, and
14  maybe -- maybe it's somewhere in the record
15  evidence those -- those three reactions.  I
16  haven't studied the defendants' reactions to
17  these episodes of new plant openings.
18        MR. COLEMAN:  Why don't we take
19     a break.  I think I may be close to
20     done.  I am probably close to done on
21     the time anyway.
22        MR. RISSMAN:  Yeah, you got
23     13 minutes.
24        MR. COLEMAN:  Oh, okay.  So
25     really close.  So, yeah, I will take a

Page 341

1    break and see if there's any wrap-up.
2         THE VIDEOGRAPHER:  The time is
3    5:48 p.m.  We are going off the
4    record.
5         (A brief recess was held from 5:48
6    p.m. to 5:56 p.m.)
7         THE VIDEOGRAPHER:  The time is
8    5:56 p.m.  We are back on the record.
9    BY MR. COLEMAN:
10        Q.   This is our last question or
11   couple of questions.  I would like to know
12   what you did to prepare for the deposition
13   today.
14        A.   Right.  So I met with my staff to
15   review certain questions that I had.  Met
16   with counsel.  And I went back and read my
17   report.
18        Q.   And how long did you meet with
19   staff --
20        A.   I don't know if I -- yeah.
21        Q.   -- for preparation of the
22   deposition?
23        A.   I don't know if I have a good
24   estimate of hours.  You know, I would say
25   hours.  And sometimes it's just a phone call

Page 342

1    for me to -- you know, to a case manager
2    asking him a question.
3         Q.   How long did you meet with
4    counsel?
5         A.   I think we had one session that
6    was about an hour, and another session that
7    was about two hours.
8         Q.   And how long did you spend
9    reviewing your report in preparation for the
10   deposition?
11        A.   I know -- I think it's easier to
12   give it to you in days than hours, but I
13   think that there were several days of
14   reviewing the documents and the report.  It's
15   a long report.
16        MR. COLEMAN:  Okay.  I have no
17   further questions.
18        MR. RISSMAN:  Dr. Singer, I do
19   just have one question for you.
20        CROSS-EXAMINATION
21   BY MR. RISSMAN:
22        Q.   I understand there are -- outside
23   of the errata that you've already issued,
24   there are a few additional errata that you
25   wanted to put on the record.  And if you

Page 343

1    would like to do that now, that would be
2    great.
3         A.   Yeah, that's great.  It's just a
4    handful, but as I was reading through it the
5    last few days, I just spotted a few things
6    that didn't make it into the errata, so I'll
7    go through this very quick.
8         Paragraph 112, I used the word
9    "below" -- I should have used the word
10   "below" instead of "above."  It's when
11   identifying pricing opportunities, and
12   Smithfield was below the average, not above
13   the average.
14        Q.   Okay.
15        A.   In Paragraph 114, I would like to
16   amend a line about what the Clemens data --
17   what can and cannot inform.  Let me get to
18   Paragraph 114.
19        Sorry.  Give me one second.  It's
20   in the regression section.
21        Q.   Is that Page 114?
22        A.   It was Page 114.  I apologize.
23   It's in the middle of the page.  It is
24   talking about what we can and cannot do with
25   Clemens data.

Page 344

1         And the line that begins:  This
2    means the defendants' Clemens data cannot --
3    and it should read:  Directly inform the
4    conduct parameter but will still contribute
5    indirectly to informing the other parameters
6    in the model with or without
7    defendant-specific fixed effects.
8         So the line as -- as it was
9    written could create the impression that it's
10   only informing these other parameters without
11   defendant-specific fixed effects, and it
12   turns out that the Clemens data, despite the
13   fact it only shows up during the conduct
14   period, is indirectly informing the conduct
15   parameter via its influence on all the other
16   parameters in the model, and that's true with
17   or without fixed effects.
18        And that's true as a theoretical
19   matter, but also we've now run a model where
20   you just take Clemens out using fixed
21   effects -- defendant fixed effects, and the
22   conduct parameter changes.
23        So it's one way of saying that the
24   defendant -- the Clemens data is informing,
25   albeit indirectly, the conduct parameter

Page 345

1  despite the fact that it only shows up during
2  the conduct period.
3        And if I wasn't clear about that,
4  feel free to ask me any follow-on, but I
5  didn't think the sentence as written here was
6  correct.
7        There's a similar and related
8  issue in, I think it is Paragraph 193 where I
9  create the impression that Clemens is only
10  indirectly informing the conduct parameter in
11  the model without fixed effects, and it turns
12  out it's also indirectly informing the
13  conduct parameter even in the model with
14  defendant -- fixed effects.
15        That's Paragraph 193. Let me just
16  double check. Yes.
17        In the middle -- in the middle of
18  Paragraph 193 on Page 151, it says: However,
19  its conduct period data does contribute to
20  the conduct coefficient in Table 12, Model 1,
21  which does not use any fixed effects --
22  "effects" is misspelled. But it's -- more
23  importantly, it actually is informing the
24  conduct parameter indirectly in every model
25  in Table 12, including those that used

Page 346

1  defendant fixed effects.
2        And then, finally, in
3  Paragraph 175 is the last one. It's a small
4  one, but it's important. The last line of
5  175 reads: You know, which is consistent
6  with economic theory that predicts that a
7  hundred percent of marginal cost increases
8  would be passed through to end users, and I
9  should have said in a competitively supplied
10  industry.
11        And, of course, the pass-through
12  rate is not a hundred percent in all cases.
13  So I left out an important caveat in that --
14  in that line.
15        So those were -- those were things
16  that I just caught in my last read-through,
17  and, Mr. Coleman, if you wanted to ask me
18  follow-ons -- I realize I'm hitting you with
19  that now, but I didn't want to take away from
20  your time today.
21        MR. COLEMAN: I don't have any
22  further questions about that.
23        MR. RISSMAN: Okay. I think
24  we're done.
25        We'll read and sign.

Page 347

1        THE VIDEOGRAPHER: So if there
2  are no further questions, the time is
3  6:03 p.m. This concludes today's
4  deposition.
5        (Thereupon, the proceedings
6  concluded at 6:03 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 348

1        CERTIFICATE OF REPORTER
2
3  UNITED STATES DISTRICT COURT )
4  DISTRICT OF MINNESOTA )
5
6     I, ERICA FIELD, Stenographic Reporter,
7  certify that I was authorized to and did
8  stenographically report the deposition of HAL
9  SINGER, pages 1 through 347; that a review of
10  the transcript was requested; and that the
11  transcript is a true and complete record of
12  my stenographic notes.
13     I further certify that I am not a
14  relative, employee, attorney, or counsel of
15  any of the parties, nor am I a relative or
16  employee of any of the parties' attorney or
17  counsel connected with the action, nor am I
18  financially interested in the action.
19
20     DATED this 28th day of June, 2022.
21
22        _Erica Field_
22
        Erica Field
23
24
25

Page 349

```
 1               ERRATA SHEET
        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
 2                  HERE
             IN RE: Pork Antitrust Litigation
 3           CASE NO. 0:18-CV-01776-JRT-HB
               WITNESS:  HAL SINGER
 4             TAKEN:  06/24/2022
 5   PAGE    LINE    CHANGE    REASON FOR CHANGE
 6       _____
 7       _____
 8       _____
 9       _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       _____
16       _____
17       _____
18       _____
19       _____
20       _____
21       _____
22       _____
23     Under penalties of perjury, I declare
     that I have read the foregoing document and
24   that the facts stated in it are true.
25   _____   _____
     Date              Hal Singer
```

## $

**$2** 156:11 157:14,19 159:12

**$6** 160:11,15,22 161:17

## 0

**04** 171:6

**05** 171:6,21

**09** 166:12,24

## 1

**1** 4:9 6:2,3 27:4 112:25 124:16,20 175:4 194:23 205:25 249:7 289:19 291:20 345:20

**1.3** 209:9

**10** 145:9 163:8 166:12,24 239:6

**100** 21:6 23:14

**104** 213:3

**105** 4:10

**1050** 3:8

**11** 216:14 241:11

**112** 343:8

**114** 343:15,18,21,22

**119** 183:13,17,18

**11:05** 84:14,15

**11:21** 84:16,18

**12** 241:12 270:1 272:18 273:18,21 279:23 345:20,25

**12.4** 289:12,13,14

**12.8** 248:23 249:11 289:6

**121** 4:11

**125** 270:1

**12:54** 163:12,15

**12th** 207:6

**13** 340:23

**130,000** 235:7 236:25

**134** 153:19

**136** 300:10

**139** 4:12

**14** 278:4 335:9,21

**15** 18:21 163:8

**151** 244:21,25 245:14 248:19 345:18

**152** 4:12

**153** 285:22 286:5

**155** 282:14

**156** 273:7 279:4

**158** 279:21

**160** 231:6 266:17,18,19 267:17 271:17

**164** 262:13 278:6,7

**167** 194:19,24 195:19

**16th** 209:7

**175** 346:3,5

**18** 4:9 145:4,9 334:10 335:21

**181** 291:7 298:5,9

**191** 6:12

**192** 267:12,20,22,23,24

**193** 267:21 345:8,15,18

**1994** 214:7

**1995** 205:23

**1998** 160:8

**1999** 160:8

**1:30** 151:18

**1:41** 163:15,17

## 2

**2** 4:9 18:9,10,16 26:25 27:22 32:10,19 37:12,14 52:24 55:2,5 139:18 156:23 279:23,24

**2.9** 209:9

**20** 148:24 149:11,21,23 150:19 151:5 269:16

**20,000** 235:10 237:11

**2002** 206:2

**2003** 207:3

**20036** 3:8

**2004** 170:25

**2005** 170:25 171:18 174:8 175:4,17 208:13 213:23 244:19

**2007** 209:6,25

**2008** 69:10,13 70:4,7,16 154:4 155:17,24 160:4,6 171:2 213:23 244:19

**2009** 57:17 69:5,8 95:5,24 121:22 124:20 125:9,23 156:6,22 159:2,6 160:4,6,9 164:19 170:17 171:22 173:14 174:3 214:8 230:2 235:7,10, 13,21 236:4,12,16 237:8,11 238:14 247:20 248:24 249:7 300:6 303:9 315:5 335:8,9 339:22

**2010** 164:19 173:14 246:20 248:2,5 249:20 252:6

**2012** 6:14,16 231:14 241:1

**2014** 220:23 221:2 223:18 224:6 252:14 331:7 332:9 333:6,21 334:8, 10,16,23,25 335:4,10,16 336:11 337:9

**2015** 252:14 329:15 330:11,17 331:24 332:2,9 333:7

**2016** 195:8 330:6,11,16 333:16

**2018** 95:5,24 196:20 216:9 247:21 248:24 300:6 303:9 333:21 334:8,16, 23 335:10,16 336:11 337:9

**2019** 198:14

**202 887-3756** 3:9

**2020** 174:5 216:14 339:22

**2021** 145:16

**2022** 5:4

**21** 295:14 297:8

**210** 231:15,21 237:15

**211** 231:9

**212** 231:9 235:4 236:9,10

**213** 65:21

**217** 195:18

**219** 195:2,18,19,20 196:5 199:23

**22** 297:8

**2200** 3:17

**23** 20:9 267:13,20 268:3 275:15

**24** 5:4 153:2,4 160:10

**25** 84:9 277:12,19,21

**25.7** 124:24 125:14

**259** 329:5,19,23

**26** 151:22 160:11

**2600** 3:3

**264** 332:4

**27** 230:18

**270** 81:24 85:14 87:15

**270-pound** 286:20

---

**3**

**3** 4:10 105:19,22 123:1 268:20 280:1

**3.15** 209:10

**30** 138:20 151:7,9

**30,000** 235:12,21 236:4

**312 862-2000** 3:13

**340** 233:6

**342** 4:3

**348** 4:4

**349** 4:4

**394** 231:24 233:6

**3:13** 238:2,5

**3:25** 238:5,7

---

**4**

**4** 4:11 120:25 121:1,6 135:4 144:17,
19 146:17 240:25 329:12

**403** 235:23

**42** 205:16,19,21 238:11,13

**43** 207:3

**44** 208:11

**45** 153:17,23 205:14,25 209:6

**451** 206:15

**46** 156:5

**47** 238:24 239:2

**49** 126:17

**4:43** 297:19,21

**4:56** 297:21,23

---

**5**

**5** 4:2,3,12 139:8,14 144:19 146:14
152:3

**5.6** 124:21 125:14

**50** 3:3 6:13 100:3,7 153:19 208:10

**5002** 241:20

**5007** 239:6

**55402** 3:4,18

**5:48** 341:3,5

**5:56** 341:6,8

---

**6**

**6** 4:9,12 18:8,13,15 152:4,7,8,13
164:3 205:15

**60** 223:5

**601** 118:8

**60654** 3:13

**61** 328:20 329:4 333:9

**612 335-1808** 3:4

**612 766-8862** 3:18

**62** 105:7

**65** 120:20,22

**66** 139:6

**6:03** 347:3,6

---

**7**

**7-eleven** 295:15

**70** 125:9,17,22 234:18

**765** 236:1

**78** 331:22 332:1

**7th** 3:17

---

**8**

**8** 214:19,23

**8(c)(1)(a)** 65:14

**80** 278:22

**81** 159:25 164:5

---

**9**

**9** 214:18,21

**90** 3:17

**90-minute** 237:23

**90s** 171:8,18

**924** 236:1

**93** 168:22

**99-point-something** 288:21

**9:39** 5:2,5

---

**A**

**a.m.** 5:2,5 84:14,16,18

**abiding** 324:16

**ability** 142:21 283:13 309:3

**abroad** 190:5 208:14 209:1 211:9

**absence** 192:14 201:18 216:24
225:24 247:14 254:24 287:24 318:23
320:9 338:24

**absent** 40:20 61:13 161:13 215:6
244:18 254:8 256:15 258:14 306:16
308:12 318:13 319:4

**absolutely** 91:3 176:2 269:19
334:18

**abstract** 189:11 317:5

**academic** 226:2 243:20

**accelerated** 216:23

**accept** 11:17 16:10 94:10,23 102:13
111:19 155:6 160:19 179:18 223:14
271:11,13

**accepted** 12:12,16 23:4

**accepting** 10:16 16:1 263:1

**access** 150:12 327:17,22

**accommodate** 154:19

**accommodated** 170:13

**account** 17:6 27:2 57:9 171:9 175:6,
14 183:8 184:2,24 186:10 203:6
242:6 281:12 291:11,22 292:2 294:23

**accounted** 166:7,8 291:13,20

**accounting** 175:12 184:8 185:3
292:4 337:23

**accounts** 57:2 185:4 268:20

**accuracy** 313:12

**accuse** 44:15

**accusing** 49:19

**achieve** 36:10 95:1

**achieved** 43:17 58:23 61:16,18

197:11 201:8 306:16

**acknowledge** 32:1

**acquired** 150:5

**acquisition** 150:4,10

**act** 59:3 135:14

**acting** 44:25 50:13

**actions** 197:2 221:4 250:3 254:1

**actively** 207:10,12 223:8 225:9

**activities** 301:24

**activity** 90:21 189:23 204:2,3

**acts** 17:20 19:1

**actual** 41:24 203:2 230:15 247:16
258:12 288:1,5 289:11,16

**add** 158:12 178:22,25 204:19 242:18
336:2

**added** 156:8 282:16 312:22

**adding** 126:13 138:9

**addition** 180:21 338:22

**additional** 204:19 342:24

**additionally** 280:3

**address** 169:7 240:4

**addressed** 244:12

**adequately** 24:12

**adjudicated** 38:3

**adjusting** 322:18

**admissible** 23:22

**admit** 323:11

**admonished** 260:11

**advantages** 326:15

**advent** 255:14

**advise** 92:15

**advocating** 209:25

**affect** 75:17 138:4 147:5,20 175:20
221:15 222:18,20 232:22 242:20
262:2 285:5,7 293:5

**affected** 104:24 131:12 217:24
218:16,19 274:7 321:11

**affecting** 24:6 122:15 204:11

**affirmed** 5:17

**agencies** 144:22

**aggregate** 10:8 117:12 291:1

**aggregated** 108:12 115:8,18 308:16
309:8

**agnostic** 75:15

**agree** 19:6 21:20 22:13 31:23 91:16
137:4 141:20 197:1 203:12 304:18

**agreed** 42:14 49:2 68:1,5

**agreement** 32:22,25 33:3,4,15,20
36:8,17,22,23 37:21 39:7 43:23 44:5,
8 45:8 48:19 51:14 52:9,25 53:19
54:2,13,19 56:21 57:1,2,10 58:1,14,
20,22 59:8,13,14,16,18,24 60:3 68:14
70:24 71:2,10,12,14,18,20,22 101:5
109:9 111:11 120:2 216:22 259:4
300:20 301:5,18 302:7 303:4,10,18
305:4,12 306:2,7,11 316:8,13,14,16,
22 317:5,6,15 318:16,23 319:3,4
326:2 338:9

**agreements** 68:15 220:14 221:1

**Agri** 32:15 36:6,18 44:9,15,18,25
48:2 50:14 52:11 53:3,7 56:24 57:4,
11,18,23 58:2,14 59:1,21 60:16 67:15
69:6 70:10 108:10 150:7,13 189:24
191:22 193:19 202:3 229:19 230:2
238:15 248:11 255:14 300:3,4,23
302:3,15,25 304:14,20 305:3,7,23
307:15,18 308:2,23 309:5,13,16,24
310:13,25 311:8,14,16 312:4,14,19,
22 313:20,24 314:2,6,10,18 315:6
317:10,16 319:20 320:15 321:1,7,22
322:17,23 323:1,6,14 324:3 326:12
327:8,17,23 328:7,12,16 337:15

**agricultural** 122:8 140:14 173:5
217:7 223:10

**Agriculture** 121:14 223:8,19

**aha** 254:10

**ahead** 15:22 51:10 52:17 58:8 69:21
93:8 105:13 114:15 158:13 179:21
180:13 224:19,20 231:7 253:11,20
267:19

**aim** 176:6 215:11 226:16

**aimed** 97:19 130:10 136:25 150:15
218:6

**aiming** 131:13

**alarm** 305:9

**albeit** 279:19 344:25

**Aldi** 295:15

**alerting** 302:16

**allegation** 9:17 36:3 49:18 51:13
54:10 78:24 136:19 143:14 144:3
148:14 169:10 199:17 230:23 250:14

**allegations** 39:6 44:6 46:7 77:7,8,
21,25 78:14 100:9,20 136:25 169:6
198:22 243:5 247:19 258:2 259:2

**allege** 161:25

**alleged** 8:25 32:12 36:20,24 37:17
42:20 43:14 52:24 53:11 56:14 57:15
58:22 59:17 61:14 67:12 70:13 71:14,
18 74:13 77:16 79:22 101:8 108:13
117:4 120:2 128:23 130:2,3,10
136:10 161:14 190:18 194:12 200:15
203:8 214:3 230:4,20 244:16 247:20
250:4 253:25 256:22 263:10 300:8
302:6 303:10 338:19

**allegedly** 43:2 55:10 191:13 214:16

**alleges** 60:2

**alleging** 250:16

**allocated** 224:7

**allowed** 258:9 274:15 296:20 315:21

**allowing** 189:24 312:23

**alongside** 284:22

**alternative** 21:3,10 23:13,18 31:6
166:17 226:4

**AMARTO** 3:14

**amarto.bhattacharyya@kirkland.
com** 3:14

**Amazon** 295:16

**ambiguous** 207:19

**amend** 343:16

**America's** 160:3 208:13,20,25

**American** 160:15 207:21 212:9

**amount** 9:23 66:24 87:22 108:22
123:25 148:17 200:22 224:7 227:11
228:3 247:6 249:10 316:15

**amounting** 160:11

**amounts** 87:19

**amplified** 216:23

**analyses** 11:18 97:20

**analysis** 11:22 12:3 16:24 17:19
19:18 20:1 21:21 22:14 23:8 24:12
28:19 29:7 32:2 62:24 63:25 73:17
131:13 133:10 162:15 184:23 188:21
192:16,18 198:8,15 289:24 290:8,14,
21 291:5 294:4 296:7,10 316:25

319:13 320:3 334:6

**analyze** 95:4,14 120:19 336:11

**analyzed** 49:8 91:6 95:16 334:18

**analyzing** 17:8 337:8

**ancillary** 229:22

**angst** 338:8

**animal** 286:6

**animals** 180:2

**announced** 331:7,23,24

**announcing** 333:8

**annual** 261:13,20 262:21

**answering** 15:3 35:2

**answers** 285:15

**anticipated** 239:17

**anticompetitive** 9:1 13:12 24:4 27:25 38:15,22,24 59:3 63:8 68:11 133:14 137:1 193:16 197:22 201:24 204:2 205:12 215:15 225:21 244:5 262:23 264:7 266:9,16 306:12,20 319:9

**antitrust** 5:8 6:19 7:1,2,4,11,14,16, 20,22,25 8:5,12,15,19 9:2,9,10,15,18, 19,23 10:7,12 11:7 12:8,24 13:19 14:14 17:17 19:17,19 23:21 25:23 27:9 36:15 176:9 188:7 197:4,9 203:13,24 204:1 227:9 277:24 305:21

**apiece** 250:12

**apologies** 282:14

**apologize** 69:22 343:22

**Apotex** 4:9 18:16 21:4 23:14 26:7,8, 23,24 29:19

**Apotex's** 20:17

**apparently** 83:11

**appearance** 7:1

**appearances** 3:1 5:11

**appeared** 194:10 231:16

**appears** 6:18 159:3 164:19 266:16 304:15

**apples** 292:7,16 293:7,8

**applied** 329:6

**apply** 12:9,14,17 14:12 16:14 38:5 182:14 184:10

**applying** 185:18 336:19

**approach** 57:14 201:3

**approximately** 5:5

**approximation** 6:20

**April** 156:6

**apriority** 247:18

**arbitrary** 251:24 336:18

**area** 6:22 8:15,20

**areas** 38:17

**Argumentative** 51:8

**argumentive** 225:17 233:15

**arrangement** 123:11

**arrangements** 122:13 124:18

**arrival** 46:18

**arrive** 287:15

**article** 140:1

**articulation** 59:6

**artificial** 223:3

**artificially** 66:21 129:9,13,14 130:21 147:4 193:22

**ascertain** 53:23 114:5,20 120:12

**ascertained** 127:3 285:17

**aspect** 54:13 55:7 59:12

**aspects** 36:9

**ASRM** 29:15,16

**asserting** 250:11 251:11

**asserts** 69:4

**assess** 13:25 18:3 28:20 30:22,24 33:16 53:25 62:19 191:25 228:18 334:6

**assessed** 91:11

**assessing** 15:25 29:25 35:7 306:11

**assessment** 14:20 20:22 28:13 38:25 98:3 141:11 326:9 330:23 331:3

**assessments** 258:22

**assignment** 19:12 230:12,16 290:24

**assistance** 309:24

**assisted** 237:20

**Associates** 3:23

**association** 315:20

**assume** 28:3,8,13 39:20 40:9 42:12 71:1 80:19 83:10,12 137:12 155:12 169:24 174:2 251:3 270:8 313:8 327:22

**assumed** 23:10 64:2 66:14 136:4

**assumes** 20:1,13 21:21 22:15 70:4 250:4 251:1 330:14 335:19

**assuming** 20:15 28:8 71:11

**assumption** 18:5 69:19 71:9

**assumptions** 186:6 286:25 287:5

**atomistic** 138:2

**attached** 267:20

**attempt** 136:13 145:21 258:3

**attempted** 310:24 311:16 312:3

**attempts** 138:23 311:3

**attended** 316:4

**attention** 131:14

**attributable** 226:13 286:12

**attribute** 204:12

**attributed** 62:7 96:24 97:11 98:4 162:18 177:10 192:10 216:1 243:15 246:16

**attributes** 288:4

**author** 140:9

**authored** 140:1

**authoritative** 144:12 271:5,12,14

**authority** 271:2

**authors** 121:7

**automatically** 288:24

**availability** 66:1 195:6

**Avenue** 3:8

**average** 92:10 94:24 251:19 285:13 286:19 289:13 306:23,25 307:3,5,12, 19,22 308:8,14 343:12,13

**avoid** 219:6

**aware** 25:22 43:4 71:24 72:3 73:6 74:6,16 76:25 77:24 78:13,23 83:16, 18,24 84:2 86:3 87:17,20 89:14 103:3 134:1 143:22 144:6,7,12 181:4,8,17 184:3 196:17,19 216:13 224:2 226:19 227:10 231:10 236:6,11 247:25 252:11 261:11 264:17 289:22 302:12 303:14 305:2 306:1 310:23 314:16 320:24 331:11,12,19

**B**

**B1** 245:5,24

**Bac** 3:23

**back** 8:22 22:4,8,9,11 25:12 30:2,20
33:22 36:25 37:19 41:4,14 42:5,7
51:24 52:6 59:23 61:22 66:3 74:23
76:15 78:4,9 84:18 86:24 95:7 96:1
97:3 105:9 110:23 116:10 119:7,9
136:23 140:8 163:17 164:24 167:1
169:17 170:18,22 171:19 174:11
175:4 176:24 178:16 182:19 184:6
185:13 187:7 189:4 200:12 204:19
205:14 235:3 238:7 244:7 248:19
252:1 278:9 282:4 284:5 286:18,22
287:10 292:22 294:1 297:23 300:3
335:5 337:18 341:8,16

**background** 91:4 96:5 104:4 135:5
153:12,15

**backs** 146:18

**bacon** 268:24

**bad** 155:14 165:1 338:16

**BAKER** 3:16

**barns** 146:21 147:9

**barriers** 101:15,24

**base** 106:22 109:8

**based** 17:3 28:15 29:2 90:2 92:20
138:18 140:21,22 184:22 186:19
266:4 278:1 284:19 294:11 317:15
319:16 322:8 330:10 338:4

**bases** 27:7 187:1

**basic** 61:22 88:25 319:7,10

**basis** 21:1,9 25:4,15 34:11,12 36:2
126:21 127:1 141:10,14 157:12
182:20 186:21,22 188:6 189:19
276:6,7 298:25 299:1 308:15

**Bates** 238:24

**beef** 106:9 267:4,14 268:1,13 270:9,
12

**began** 5:2 57:19 69:5

**begin** 69:8

**beginning** 156:5 170:19

**begins** 344:1

**begun** 70:11

**behalf** 3:2,7,11,16 5:10 7:4,11,14,19,
24 19:18 25:24

**behavior** 20:2,16 21:22 22:16 23:10
26:9,17 28:4 53:23 135:9 198:5
255:16 264:15

**belief** 16:2 240:24

**bell** 152:21

**bellies** 179:16

**bells** 305:9

**belly** 179:1 268:1,12,16,20

**benchmark** 69:11 70:18,19 177:11
244:9,14,15 321:18

**benchmarking** 64:10

**beneficial** 188:18

**benefit** 137:16 153:19 210:12 312:15

**benefited** 237:12

**beta** 245:5,25 246:3,9 248:19

**BHATTACHARYYA** 3:14

**bid** 322:18,19 328:8,13

**bids** 327:6

**big** 82:3,13 105:12 166:12,24 221:1
271:8

**bigger** 75:2 83:6

**bill** 223:18 224:6

**billion** 156:11,23 157:14,19 159:12
160:11,15,22 161:17 209:9,10

**binder** 105:12

**binder-flipping** 152:1

**biological** 72:13

**biology** 185:9,11 186:19

**bit** 8:3 41:11 44:13 100:19 192:5
271:1 300:16

**blatant** 305:8

**blatantly** 113:16 118:10

**blow** 154:8

**blowing** 338:9

**blue** 169:20,23,25 226:6

**board** 155:17

**boasted** 310:19

**bone** 199:11

**boost** 307:1

**bottom** 183:13,18 196:5 308:9

**bought** 127:20 299:10

**bouncing** 282:15 284:5

**bounds** 79:18

**bow** 60:17

**box** 106:9

**boxes** 248:17

**brand** 285:2 294:3,5

**branded** 294:19

**brands** 281:22 296:23 297:1

**breadth** 106:16

**break** 72:7 84:10 87:25 88:2 90:2,5
163:21 248:2 255:1 293:11 297:16
340:19 341:1

**break-even** 87:18,22

**breaking** 308:18,19

**breaks** 88:18 251:23 336:19

**bred** 153:8

**breed** 141:7 142:7

**breeding** 168:23 169:1,8,18,21,25
170:2,7,25 171:2,11,22 172:3 173:9

**Brenneman** 196:21

**Brian** 145:4

**bring** 336:24 337:24

**bringing** 106:16 219:15 285:9
312:23

**brings** 161:12

**broad** 32:11

**broke** 209:7

**broker** 68:6 277:4

**brought** 281:25 332:12 339:21

**bu** 288:6

**build** 253:14 256:10

**building** 339:12

**built** 174:20 257:5

**bullet** 108:17 113:22 119:21 149:12
156:22 159:3 206:8 209:17,20

**bunch** 274:6

**bungs** 228:4

**burden** 18:23 19:10,11,14 27:5,20

**business** 6:1 25:3,14,15 27:11 92:15
327:9

**but-for** 20:13 39:21,25 40:3,5,9,14,

20 41:3,6,22 42:1,4 43:11 56:18,20
60:8,9,11,18,20,21,22 61:1,10,13,25
62:20 63:2,3 64:4,18,19 161:13 162:6
191:11 192:25 193:2,6 194:1 200:21,
23 203:3 215:1,10 230:14 243:7
254:2,7 256:15 257:14,16,24 258:10
260:13,14,23 261:7 287:15,16 288:13
289:9

**butts** 179:2,17

**buy** 77:2 89:11 93:15,21 181:24
293:19

**buyer** 281:19

**buyers** 143:8 327:16,22

**buying** 94:20 135:2,9 138:10 143:25
147:5,17 172:7 180:15 181:2

**buys** 181:5,9 277:2

---

**C**

**cadence** 237:23

**cahoots** 46:17,21 47:8 49:16,24

**cajoling** 50:15,21 51:19

**calculate** 21:3

**calculation** 20:13,18 21:12,19 23:9
29:21 30:5,9 288:9

**calculations** 99:12

**call** 34:17 52:10 58:18 68:12 72:9
105:14 120:20 144:21 219:10 230:18
238:10 274:23 289:9 314:17 341:25

**called** 31:7 123:3 167:13 206:11
213:4

**calls** 12:25 13:5 16:18 19:7 20:5
21:25 23:24 26:21 33:8,11 37:25
38:11 42:19 44:22 48:21 69:16 93:17
134:7 172:24 190:12 191:8 201:16
244:2 259:7 264:21 314:23 316:18
323:18 324:7 325:4 327:10 340:12

**campaign** 70:12

**Canada** 138:10

**capability** 309:22

**capable** 81:3 102:4 103:17,19,21,25

**capacitors** 30:21 305:10

**capacity** 141:2 252:12,18 253:24
254:5,7,14 255:21 256:3,14,17,19,24
257:8,9,12 258:16,25 259:19 318:15
319:8 332:16,17,19 335:20 336:4,16,
24 337:5,6 338:11,14,17,23 339:7,20
340:8

**capita** 217:25 218:3 271:16

**capital** 32:5,6

**captioned** 18:16

**capture** 171:15 176:15 217:19 218:3
229:17 255:23 291:16

**captured** 154:22 170:10 173:22
174:6 187:17 283:18,22 286:1

**captures** 218:25 236:10

**capturing** 90:20 91:8 124:13 125:8
167:8 185:23 218:6,23 284:1

**carcass** 178:25 179:10,22,25

**carcass-purchased** 106:23

**care** 197:2

**career** 29:11 271:8

**careful** 337:2

**cares** 35:5

**cartel** 44:14,16,19,21 45:1,7,9 53:23
70:14 135:9 136:4,5 194:12 205:11,
12 214:9 253:5 264:2,14 266:2
300:14,17,18,20,24 301:4,8,13,16,17,
22,24 303:3,8,9,17 304:3,16 305:24
306:25 309:6,11 314:18,20 315:16
316:24 323:16 324:5,25 326:6,15
338:7,8 339:9,15 340:6,8,9

**cartel's** 302:6

**cartel-like** 198:5 255:15

**cartels** 301:3 325:19 338:3

**carve** 142:10

**case** 7:11,17,23 9:25 10:21,22,24
11:17,21,23 12:2,7 13:8,11,14 14:2,9
15:25 16:10,15 17:4 18:16,18 22:22
23:21 24:24 25:21 26:25 27:4,19,22,
23 28:11,20 29:19,23 30:1,6,21 31:3,
4,10 32:8 39:14 49:14,23 62:19 73:4
90:8 95:12 113:18 132:5 136:17
150:10 155:16 159:4 173:11 188:13
198:21 204:1 210:16,18,25 211:7,16,
20 239:24 242:15 243:6,23 247:22
260:6 268:7 289:23 290:20 305:3,10,
14 309:2 315:2 320:1,3 326:19,24
327:14,19 333:6 342:1

**cases** 6:13 7:1,2,10,18 8:10 9:8,21,
25 10:6 11:18 12:15 27:17 29:12 32:2
33:14 34:16 346:12

**cash** 109:6

**casual** 116:21

**catastrophe** 159:20

**catch** 69:24 109:3

**categories** 65:3 122:19 124:5,11
125:3,7 277:6

**category** 111:23 113:1 114:22
115:25 118:13 123:21 298:8

**cattle** 106:8

**caught** 25:10 346:16

**causation** 17:25 18:3,6 19:15

**caused** 9:9 17:20 18:25 154:9
155:18 204:18 230:9 239:14

**caveat** 124:12 142:8 147:25 336:23
346:13

**center** 44:9

**centerpiece** 36:12 39:16

**centers** 297:6

**central** 300:5,7

**cents** 205:25

**CEO** 196:6,21 197:23

**CEO-TO-CEO** 196:14

**CEOS** 188:16,22 189:22 191:18
193:18 197:15 198:13,25 200:1
201:19

**Cephalon** 4:9 18:17

**CERTIFICATE** 4:4

**certified** 31:4

**cetera** 99:14 179:2 219:3 287:2

**challenge** 240:9

**challenged** 9:10 25:1 28:10 32:5,6,
7,12 33:23 35:14,21 37:1,6,11,16
38:9,21,24 39:2,13,15 40:1,6,11,21
41:9 42:8,10 52:7,19,23 54:18,23
55:2,8,15 56:6,20 58:16 59:7 60:23
62:8 64:25 91:17,19,23 97:12 98:5
100:9,24 101:4 128:18 129:8 131:12
136:12 145:22 146:2 161:13 162:19
163:3,4 166:14 176:7,22 177:5,11
189:2,7,12 191:6 192:10,15 202:14,
23 203:3,8 204:14 215:6 216:2,25
217:3 225:24 229:22 230:19 243:15
244:16,18 245:5,24 246:4,17 247:15
248:8 249:2 250:9 254:8,14 255:24
256:15 257:11 261:4 263:4,17 265:25
270:23 275:10 276:15 287:25 300:8
315:4,17 316:9 337:14 338:25

**challenges** 293:18

**challenging** 154:7 156:8

**chance** 203:5

**change** 245:4,23 246:16 267:18 270:19 286:5

**changed** 184:17 246:2 337:14

**characteristics** 294:24 325:20

**characterization** 104:11 304:19 322:12

**characterizing** 130:1

**charged** 299:13

**charges** 296:23

**Charles** 3:23

**chart** 165:12 169:16 170:1 213:4,5,8 248:13

**chase** 208:12 259:24

**cheaper** 181:25

**cheat** 301:4

**cheating** 301:9 309:10 338:3

**check** 170:19,20 171:19 174:11 286:23 292:22 293:12 294:1 295:3 311:15 323:10 345:16

**checked** 248:17

**checkoff** 152:14,20 154:4 155:16 164:3 205:15,24 206:1,6,9,12,13,24 207:1,10

**Checkout** 206:11

**Chicago** 3:13

**chicken** 267:5,14 268:1,13 270:9,12

**China** 219:2 239:15

**choosing** 244:14

**chop** 284:25

**chops** 284:21

**chose** 265:10

**Chow** 3:20 336:19

**circa** 104:15

**circle** 66:3 86:24

**circo** 104:18

**circovirus** 104:13,16,17,19,20

**circumstance** 159:6

**circumstances** 158:23 161:8

**citations** 140:10

**cite** 144:17 153:6 190:14 198:17 238:19 260:24 271:1 300:16 329:5

**cited** 140:3,6,11 198:20 238:23 265:15 302:2 304:14 321:21 329:19

**citing** 233:2

**claim** 8:4,7 18:25 141:17 311:21

**claimed** 17:19

**claims** 6:19 189:18 259:2

**clarification** 22:2 33:10 89:13 116:17 118:5 131:17 142:3 158:4 183:4 197:19 233:23

**clarify** 210:15 232:19 277:11 298:1

**class** 31:4 78:25 143:21 145:17 166:20 177:3 189:6 200:14 213:13,20 220:18,20,21 225:11 226:22,25 228:11,21 229:8,12,13 230:8 231:12 236:7 248:22 249:12 251:17 252:13, 22 253:1 255:2 257:5 261:13,25 290:2,5,9,12,16,19,22 291:1,3 292:1 334:7,9,13,14,17 337:11

**clean** 64:12 70:18 177:12 244:16,20 321:18

**clear** 16:9 40:5 42:6 43:12,13 62:5 63:22 71:16 77:8 86:25 100:22 116:25 131:18 141:21 251:21 298:4, 14 345:3

**Clemens** 3:11 196:7,8 232:1 252:21 312:3,7 329:4,6 330:20 331:6 333:9, 14 338:6 343:16,25 344:2,12,20,24 345:9

**client** 48:6 49:19 180:21

**clients** 16:12 242:11 318:18

**close** 262:24 340:19,20,25

**closed** 199:22

**closer** 227:18

**club** 304:25

**Coast** 150:20

**coefficient** 245:9 272:10 273:25 279:13 345:20

**coefficients** 268:19 274:16 287:21, 23

**coincides** 145:17

**Coleman** 3:19 4:3 5:21 6:5,10 9:20 10:9 11:1 12:6 13:2,16 15:2,8,14,21 16:22 17:12 18:7,14 19:16,24 20:8 23:6 24:9 25:2,13 26:5 27:8 28:17 33:21 38:7,18 41:20 43:21 44:12 45:6 46:12 47:19 48:12,23 49:10,12 50:2, 17,25 51:1,9 52:15 53:4 54:5,21 55:19,21 56:3 58:6,11 59:4,22 60:24

61:6 65:6 66:2 68:18 69:1,9,17,20 70:1,22 71:23 73:12,23 74:15,22 75:22 76:13,24 77:19 78:11,21 79:4, 11,19 83:14 84:11,19 86:14,23 88:24 92:17 93:3 94:1,16 95:13,22 96:8,22 98:8 99:3 100:16 102:2 103:11 105:11,15,25 108:1,15 109:20 111:25 112:5 113:19 114:1,14,18 118:2,17, 21 119:1,3 120:4,23 121:4 124:3 126:10 128:3,13 129:16 130:13,23 133:1 134:13 136:1,18 137:13 138:6 139:3,7,12,16 140:18 142:1 145:6 147:7,22 148:5,15 149:6,24 151:13, 21,23 152:4,10 153:18,23 154:3 155:15,23 158:9 159:24 161:11 162:4,21 163:7,18 164:7,10 166:5 168:10 172:16 173:4,23 178:7,20 179:15 182:7 190:6,21 191:14 194:3, 22 195:1 199:6,15 200:11 201:1,12 202:11 203:22 205:13,20,22 208:9 209:4,21 210:9,19 211:1,21 212:6,15 213:2,7,21 215:7 217:15 220:5 222:15 224:1,13 226:10 228:16 230:17 233:11,17,24 235:2 237:5,21 238:9 241:13 242:15,22 244:6 245:15,21 252:20 256:4 259:22 260:9 263:15,22 264:16 265:3 275:2 297:15,24 303:1 305:1 306:21 310:22 314:15 315:11 316:1 317:8 318:5 320:13,23 321:19 322:13 324:1,23 325:5,6 326:7,20 327:4,20 328:14,24 329:2,24 330:19 331:5 332:22 333:17 336:8 339:1 340:18,24 341:9 342:16 346:17,21

**collaboration** 30:24

**collecting** 108:11

**collection** 300:11

**collectively** 74:8 148:8 157:19 159:11 160:23

**College** 121:14

**collude** 204:25

**collusion** 28:3,8 32:17 34:17 35:12 136:20 193:9 199:19 200:1 318:8,13

**collusive** 306:8

**Column** 279:24

**combination** 61:19 205:6 264:9 266:13 280:22 281:15

**combined** 160:5

**comfortable** 89:20 136:22 170:12

**command** 281:23 284:18

**commands** 285:11

committed 332:8

committing 318:22

common 129:12 291:25

communicating 193:18

communication 52:4 195:15
197:15 198:2 202:1 305:20

communications 188:16,22 189:22
196:1,15 315:23

comparable 293:19

comparative 287:11

compare 64:3 146:16 247:15 289:10

compared 132:15

comparing 64:11 174:21 260:12
292:9

comparison 64:1 174:20

comparisons 122:15

compelled 107:20

compete 132:2 317:15

competition 17:22 19:3 106:14

competitive 36:15 66:22 97:15
135:3 136:25 137:6,12,19 143:12
147:18 188:10 288:9 289:5,10

competitively 32:14 36:5 56:23
58:25 59:20 60:14 68:7 133:19 155:8
229:20 248:7 300:12 318:1 320:5
346:9

competitors 20:2,16 21:22 22:16
23:11 26:9 32:22 338:13

complain 55:2

complaining 313:24

complaint 16:11 34:7 36:7,20 37:5
39:6 43:4 44:7 46:7 51:13 54:9 60:2
68:20,23 69:4 71:22 74:13 136:11,24
144:4,6 169:7,10 198:22 243:13
258:3 315:5

complete 113:24 118:12 242:17
282:2

completed 16:5

completely 133:9 257:1,2

compliance 300:19

complicated 92:8

complying 301:16

composed 286:6

Compound 255:10

computer 280:18 284:12

conceivable 187:19 226:24 232:5
254:4 282:3 284:23 321:11 323:20

conceive 13:8 249:13

concentrated 34:19 132:13,16

concentration 132:18

concept 26:13 48:18 87:21 88:25
165:7,12 177:15 187:7 255:1 261:20

concerned 49:17 52:4

concerns 202:12,16 239:14 259:11,
13 269:22

conclude 264:13

concluded 38:23 347:6

concludes 347:3

conclusion 16:19 19:8 20:5 22:1
23:25 33:9,12 37:25 38:11 42:19
44:2,23 48:21 49:4 69:16 190:12
191:8 201:17 244:2 259:8 264:22
266:4 314:23 316:19 324:7 325:4

concomitant 76:11

condition 202:10

conditional 15:24 288:3

conditions 94:11 147:16

conduct 9:10 19:20 23:23 24:4,13,
14,23 25:1,7,18,22 26:4,19 27:1,7,10,
14 28:10,14,20 32:5,6,8,12 33:23
35:15,21 36:9 37:1,6,11,16 38:9,15,
21,24 39:2,15 40:1,7,11,21 41:9 42:8,
10 43:6 46:16 52:7,19,23 54:19,23
55:3,8,15 56:6,20 57:13,16 58:16
59:7 60:23 62:8 64:2,13,25 66:6 69:5,
7 91:17,19,23 97:12 98:5 100:10,24
128:19 129:8,13 131:12 136:12
145:18,22 146:2 161:14 162:2,19
163:3,4 166:15 167:2,9 176:7,22
177:5,11 189:2,7 191:6 192:11,15
193:16 201:24 202:15,23 203:4,8
204:14 215:6 216:2,25 217:3 225:24
229:18,22,24 230:19 236:12 240:10
244:17,18 245:5,24 246:4,17 247:1,3,
15 248:8,9 249:2,3,18 250:9,10,18
251:5,9 253:16 254:8,14 255:12,13,
19,24 256:2,16,19 257:11 258:14,24
261:4 263:5,16,17 264:2,8,12,13
265:25 266:15 270:23 274:23 275:11
276:15 279:13 287:17,22,25 288:6
300:9,17 306:7 315:4,17 316:9 317:2
321:17 323:23 332:20 333:4 334:17
335:7,24 336:7 337:13,14 338:25

344:4,13,14,22,25 345:2,10,13,19,20,
24

conducts 243:15

confidence 205:10 270:15 272:9
278:23 307:10 313:1,12

confident 136:23 293:25

confirm 86:5

confirming 293:2

conform 10:23

confused 73:22 255:11

confusion 253:11 257:21

conjoint 31:10

conjunction 205:9

connect 75:23

Connecticut 3:8

consecutive 80:21 207:6 209:8

consequent 129:2

conservative 70:20

considered 70:16 79:16

considers 33:2

consistent 19:9 28:4,14 33:18 35:11
45:3 54:1 77:17 130:6 135:4 188:10
189:17 193:13 197:3 198:4 199:19
205:4 243:4 251:7 252:2 258:2,5
263:10,17,18 264:1,4,14 265:2 266:1
300:23 311:20 317:4 325:20 326:5
332:13,25 346:5

consistently 270:10 303:23

conspir 52:9

conspiracies 33:1 57:16 198:10
250:11 251:11

conspiracy 27:19 28:15 32:13,21
33:3,25 34:4,8,9 35:25 36:4 37:18,21
39:17 40:6 42:12,13,14,15,16,20
43:15 45:4 48:18 52:8,9 53:5,10,14,
18 54:3,6,10 56:14 61:14 66:14,21
68:19 69:2,14 70:13,21 101:8 108:13
117:4 128:15,20 130:2,3,10,20
133:12,21 135:8 136:3,10 161:15
174:21 188:2 190:19 192:4,23 194:12
197:5 198:23 200:15 201:5 203:9,14
205:5 214:3,10,12 221:23 225:4
226:15 229:11 230:4,9,21 240:1
244:9 247:20 249:8 250:4,17,19
251:2,8 252:5 253:17,22,23 254:11,
24 256:6,11,22 257:6 258:23 259:19
260:1 263:10 264:20 265:11,18 300:5

323:7 325:12 332:14,25

**conspire** 130:15 135:17,20

**conspired** 67:11,12

**conspiring** 21:7,14 23:15 43:2 148:8

**constant** 246:6 279:25 280:4 301:3

**consternation** 340:7

**constitute** 188:6

**constituted** 264:7

**constrain** 274:21

**constrained** 257:13

**constraining** 251:4

**constrains** 249:1,16

**construct** 57:22 255:12

**constructed** 246:24 249:1 250:7

**constructing** 186:2

**construction** 255:19 256:2 259:6

**consulting** 328:6

**consumer** 6:23 31:3

**consumers** 176:8

**consumers'** 218:16

**consumption** 66:18 67:19 221:21 222:2,23,25 224:22 228:13

**contained** 187:24

**contaminated** 64:12

**contemplating** 133:18

**contemporaneous** 184:19 185:14

**contention** 199:12

**context** 17:17 56:25 87:24 123:1 188:19

**continue** 200:23 208:14 209:1 215:4 236:3 330:6,16 333:15

**continued** 3:1 174:3

**continues** 170:11 173:15 207:4 217:1

**contract** 4:11 121:7 165:24

**contracted** 88:14

**contracting** 168:14

**contraction** 166:3 168:1

**contribute** 344:4 345:19

**contributions** 92:13

**control** 24:5,21 84:21,24,25 85:11, 15 87:8 90:9,16,18,24 91:2 142:13,21 158:17,20,22 161:10,23 176:4,11,21 177:4 183:24 186:15 203:15 204:4,9, 19 213:14 217:11,16 218:9 219:1 220:6,13,15 221:4 224:14 226:8 242:12,19 257:2 269:17 273:1,5 281:8 282:7,8,17 283:25 285:14,17 291:16 294:12 335:10 336:17

**controlled** 89:22 91:12 104:25 138:20 154:13 156:14 157:16 159:5 161:6 234:19 298:7

**controlling** 162:3 177:12 184:8 255:25 270:2 281:17 292:15

**controls** 175:19 295:4,7 298:6,10

**conversation** 198:25

**conversations** 191:18

**convince** 336:15

**convinced** 309:23

**coordinate** 189:25 240:20 305:4 319:21

**coordinated** 34:11 36:11 43:6 189:19 265:6 318:2 320:21 324:12

**coordinating** 34:23 46:10 47:17 50:14 197:15 201:19 258:7

**coordination** 34:25 35:15,16 36:1 39:10 40:10 45:19 46:4,13,15,17 58:24 70:18 136:15 191:21 258:8 259:5 320:17

**corn** 87:11,12,15 286:7 287:1

**Corporation** 3:16

**correct** 8:1 40:8 52:17 55:18 70:8 80:3 82:16 89:18 98:1 105:6 106:17 175:18,22,24 183:10 213:12,24 222:3 240:17,22 245:11 246:7 249:5 281:24 282:13 285:20 297:14 300:9,21 301:1,11,25 307:16 316:6 318:22 322:14 330:22 345:6

**correctly** 91:20 270:12

**correlated** 166:14 167:1,4 168:19 176:20 177:3 284:2

**correlations** 278:17

**correspondence** 48:25 197:24 198:13

**cost** 84:21,24 85:2,11,14,17,21 87:9, 15 88:9 90:6,10,14,16,21 92:10 154:13,21 157:1 158:21 177:24 212:20,21 272:10 283:22 286:5,7,14, 19,22 293:22 296:18,23 299:11

332:4,7 346:7

**costs** 85:18 87:11 88:18,23 90:2 92:14 94:25 154:6,20,24 155:7 156:19 158:25 159:3 176:11 271:25 272:3,5 285:14,17,25 286:8,11 287:6

**council** 231:16,19,21 234:1

**counsel** 20:25 21:2,10 22:24 33:14 95:20 96:6,11 163:20 252:10 290:6, 17 305:21 341:16 342:4

**count** 7:5,6,9 9:14

**counted** 6:15

**counterfactual** 155:9 156:17

**countervailing** 282:5

**countries** 221:5,10 226:21

**country** 221:13

**couple** 341:11

**court** 5:13 22:8,11,24 23:7,8 26:7,8 28:23 29:8,20 30:1,8 69:22 119:9

**Court's** 20:21 38:4

**cover** 175:11

**coverage** 156:6

**covering** 173:25

**covers** 6:23 88:22 280:15

**COVID** 273:5,9,10,16,25 274:7

**Craig** 3:19 84:8 151:12 153:22 245:12

**craig.coleman@faegredrinker. com** 3:20

**create** 344:9 345:9

**created** 116:9 152:14 331:21

**creates** 273:11

**creating** 304:20

**crime** 49:19

**crimes** 49:20

**crisis** 239:13,21

**criteria** 30:23 53:22 193:13 198:9 204:22 205:3,8 266:2,6,7 299:7 317:3 325:13,14 326:6

**CROSS-EXAMINATION** 4:3 342:20

**crosstalk** 14:22 93:6 100:15 112:19 145:2 179:6 196:4 232:14 242:14 253:9 269:4 339:5

**cuing** 88:3

**cull** 10:5 241:25 242:25

**culling** 241:23

**culls** 242:3

**currency** 220:6 222:17

**current** 122:12 126:16 305:17 308:23 309:1 319:7

**curve** 66:23 67:6 284:2

**customer** 270:5 276:21 281:1,6,10, 16,25 282:3,10,12

**customer-type** 280:2

**customers** 318:19

**cut** 95:7 96:1 178:16 179:19 181:10 259:24 268:2,17,25 270:2,18,22 272:14,22 273:24 274:17,24 275:4,8 280:15 281:19 284:21 292:2,6,11,12, 15,17 293:10 295:23 296:1,3 299:24 308:6 313:5 316:14

**cut/type** 294:25

**cutbacks** 103:5

**cuts** 179:10 269:16 270:2 272:12 273:23,24 274:5,22 275:9 284:24

**cutting** 97:3

**cycle** 165:8,13 167:14

---

**D**

**D.C.** 3:8

**damage** 18:25

**damages** 8:14,25 10:4,8 13:25 14:5 16:4 17:19 18:4 20:16 21:3,11 22:25 23:17 24:5 291:1,4 335:6

**dangerous** 318:24 319:5

**DANIELS** 3:16

**data** 12:21 13:11,18 47:22 48:1,3,4, 13 85:6,10 86:6 87:6,7,8,10,11,18 90:8 98:25 106:8,20,22 108:11 117:15 119:13 122:15 124:17 125:19 132:20 150:4,10 170:18,20,24 171:14,17,20 173:24 174:1,4,8,15 175:3,5,11 177:14 181:14 182:17 184:21 185:12 186:24 187:13,24 228:17,23,25 229:1,6 269:15 272:25 276:9 278:18,19 279:16 281:7 285:18 287:2 289:22 295:21 296:12,16,21 309:4,9 312:1 313:17,18 333:18,23 343:16,25 344:2,12,24 345:19

**database** 187:18 299:23

**date** 109:10 121:22 174:15 175:1 334:25 335:7

**dated** 175:6

**dates** 171:17 330:10

**dating** 170:5,25 213:8

**Daubert** 16:16,21,25 20:3 21:23 22:17 29:8,10,22

**day** 75:3 81:7,20,22,25 262:15

**day-to-day** 300:13 305:24

**days** 261:24 262:3,10 342:12,13 343:5

**de-anonymization** 311:2

**de-anonymize** 309:4,15,19 310:24 311:8,16 312:4,20 313:21

**de-anonymizing** 310:8 311:13 313:9,10 314:11

**dealing** 25:21 27:18

**decades** 41:15 153:7 167:13

**decide** 146:21 147:1

**decided** 11:19 153:14 264:18

**decides** 91:22 141:5

**decision** 10:19 25:4,15,17 26:23,24 34:10 38:5 39:7,10 46:11,17,22 50:16 51:15 52:5 54:11 60:3 81:8 91:14 93:14,21 97:13 134:15 137:5,15 138:3 141:6 143:4 147:5,9,11,15,20, 23 185:8 188:1,5,8 189:18 190:3 193:19 197:16 255:3 256:9 265:5 290:19 318:3 322:8,23

**decisions** 31:12 47:18 142:5 146:5 190:1 201:20 203:15 204:5 242:25 258:7 260:25 261:9,12,17 320:22 324:13

**decline** 159:18 240:25 241:5,16

**declined** 10:10,15 11:5,18 134:3 214:7 216:1

**declining** 157:8

**decomposed** 163:4

**decomposition** 61:15 62:9,13,16 63:18,19 65:2 84:5 162:18 215:19 230:13

**decrease** 65:23 157:21 159:10 195:5

**decreased** 96:24 158:2 162:8 231:12

**decreases** 65:25

**decreasing** 221:5

**deemed** 29:7 91:17

**Deese** 145:4

**defend** 226:7

**defendant** 7:14,16,20 19:1,3 29:15 45:10 49:1 50:20,21 51:19 72:5 74:24 100:2 101:17 103:6 127:4 132:2 149:10 150:2 181:14 188:22 191:18 193:8 194:5 195:17 198:25 201:22 229:13 231:11 232:21,23 236:8 238:14 240:17 248:11,14 261:12,23 262:4,9 264:18 265:9 268:21 272:13 274:17,24 275:18,23 278:18 280:1 281:13 282:9,10 295:23,25 318:6 321:1 322:7,17 323:1,14 344:21,24 345:14 346:1

**defendant's** 188:1 255:3 281:11 318:11

**defendant-specific** 275:18 344:7, 11

**defendant-to-defendant** 195:15, 25

**defendants** 17:21 21:7,14 23:16 34:1 35:16 39:3 43:23 44:8 45:18 46:1,10,20 47:8,17,20,23 48:5 49:15, 20,24 50:13 52:3,25 55:10 56:5,13 57:3 60:15 61:20 62:11 65:4,23 67:9, 25 68:8 71:25 72:5,22 73:9 74:7 76:1 77:11 79:21,22 83:24 85:7,12 96:25 98:11,21 99:14,16 101:10 127:13 128:4,19 129:4,11 137:3 143:8,16 148:4 149:12,15 150:9 169:9 189:25 190:8 191:12 192:9 193:21 196:15 200:2 211:7 214:16 216:5 228:2 229:21 231:1 233:7 234:12 236:11 240:16 250:3 253:13 256:9 261:17 265:19 272:20 274:22 275:25 278:21 281:21 289:22 302:16 305:4 306:2 307:20,21 308:24 309:15 311:15,22 313:24 316:3 318:9 319:21 320:4 322:22 323:5 327:5,18,24 333:7

**defendants'** 25:25 39:7 187:12 192:21 228:25 229:1,5 264:11 296:12,16 340:16 344:2

**defense** 20:24

**deficiency** 27:21

**define** 34:3 38:9 69:7 126:24 174:12 181:21

**defined** 34:8 55:3 58:17 81:13 109:5 118:14 120:17 176:21 177:4 206:7 334:14

**defining** 207:16

**definition** 34:6,9 37:2 55:14 56:6
65:22 66:7,10,11 111:21 122:25
138:1 165:10 178:14 226:23 227:1
228:11,15,21 229:9 290:2,5

**definitional** 126:23

**definitions** 108:19 122:13

**definitively** 263:12

**delay** 115:20 116:7

**deliberate** 238:16 240:19 264:19

**deliberately** 148:8

**deliver** 103:14

**delivering** 64:17

**delivery** 75:15 109:10

**demand** 66:23 67:6 157:3,7 175:21
176:12,16 216:5,18 217:7,16 219:14,
19 220:19 221:15 222:18,20 267:9
284:2

**demonstrating** 225:20

**denied** 313:6

**deny** 222:16 312:14

**depart** 255:18

**Department** 122:8 223:8,19

**dependant** 334:1

**dependent** 202:20 215:13

**depending** 19:12 90:6 276:10
280:24

**depends** 25:20

**depicting** 179:25

**depiction** 164:14

**deposition** 5:6 20:24 21:8,17 58:19
199:2 341:12,22 342:10 347:4

**depth** 106:17

**derived** 263:4

**derives** 198:8

**describe** 8:23 58:15 90:22 103:22
148:24 177:21

**describes** 50:12 66:9 322:22

**describing** 64:9

**description** 4:8 187:21 269:21
286:2

**design** 251:6

**designed** 53:11 84:21,24 198:3,9
206:12 222:1 272:17

**designing** 264:24

**detail** 29:5 43:19 47:5 115:9 116:11,
23 319:19

**detailed** 315:19

**details** 62:25 310:15

**detecting** 278:17,18

**determination** 11:13 13:24 14:4
264:6

**determine** 28:24 192:1,20 197:21
290:8

**determined** 109:8 126:18

**deviated** 302:13 303:9 304:11

**deviates** 302:11

**deviating** 275:24

**deviation** 303:17

**device** 32:16

**dictate** 325:24

**difference** 114:5 177:23 277:1 288:2
289:4,11 293:13 309:13

**differences** 297:4 335:9

**differential** 250:15 294:18

**differently** 251:13 334:24

**difficult** 160:5

**dig** 13:17 14:11 16:14

**direct** 4:3 5:20 6:7 48:18 81:15 176:8
188:16,22 198:2 201:18 202:1 248:22
249:11 276:2,10,11,13,23,24 277:2,6,
9,13,16,23 280:4 281:6 285:21 291:7
293:20 294:15 297:9 298:19 299:12,
25 315:23

**directed** 266:25

**direction** 54:1 266:8 311:19

**directly** 50:13 126:18 148:3 193:18
344:3

**directs** 291:15,21

**dirty** 64:11

**disagree** 20:21 31:11,16,18 126:22
141:10

**disagreed** 22:5

**discount** 285:12

**discovering** 10:17

**discuss** 163:19 180:11

**discussed** 163:23 198:14 262:6
316:8,11

**discussing** 73:21

**disease** 219:18

**diseases** 105:2

**dislocations** 273:11

**dispositive** 217:2 339:25

**disprove** 332:20 333:5

**dispute** 23:20 127:1 155:24 156:2
157:13 159:8 160:14,17 209:13

**disputed** 199:20

**disrespectful** 233:16

**dissemination** 300:12

**distinct** 46:15 71:19 180:16 181:18
337:19

**distinction** 181:20

**distinguish** 19:19 24:13 27:24
201:14 226:11

**distinguished** 149:3

**distinguishing** 201:3

**distress** 154:10,17 155:19

**distributed** 308:24

**distribution** 297:5 307:6,9,14

**distributor** 277:3 292:9,12 299:17

**distributors** 295:17

**diverged** 159:4

**division** 236:21

**divorced** 26:24 188:12

**document** 18:22 20:9 46:19 47:7
50:5 51:18 106:1 113:15,17 114:13
117:18,20 118:11,20,24 141:1
152:14,23 153:17,25 160:1 164:3,6
194:8,15,17 195:13 198:20 213:17
223:12 232:4 233:1 239:7 240:12
241:8,10 265:8,14 329:1,4,6,18
330:11,15,21 331:10,15 333:9,14,16

**documented** 315:22

**documents** 48:24 153:1 198:19
230:3 238:20,23 265:16 302:2 304:13
305:2 313:19 316:23 342:14

**DOJ** 30:24

**dollar** 206:1 222:17

**dollars** 253:14 332:24

**domain** 18:2 326:3

**domestic** 40:18 42:21,22 43:3,15,24 44:10 45:5,23 52:25 53:8,12,13 54:14,20 55:11 56:9 58:21,22,23 59:17,18,19 61:12,20 62:11 65:4,8 66:1,19 70:25 71:12,13 72:23 77:11 80:7,16 101:8 102:20 157:4 189:15 190:20 191:4,13 193:1 194:7 195:5 196:12 197:11 198:4 201:8 202:20 203:11 210:22 211:24 214:16 215:20, 22,25 221:8,20,21 222:2,22,25 224:22 226:9 228:13 229:5,6 256:8 317:7 324:17,18

**domestically** 72:1 208:5 221:16,17 223:10,20

**donor** 29:18

**dots** 75:24

**double** 345:16

**doubt** 42:3

**Doug** 196:7

**downside** 241:2

**downward** 171:24 174:3 330:6 335:22

**dozens** 37:1

**dramatically** 253:16

**drawdown** 338:20

**drew** 42:2 316:22

**Drive** 3:12

**driven** 98:7

**driver** 321:2

**driving** 279:13

**dropped** 279:6

**dropping** 304:3

**drops** 219:18

**drought** 219:18

**dug** 12:21

**duly** 5:17

**dummies** 274:24,25 280:24

**dummy** 156:14 157:17 158:15 161:6 185:6 229:18 245:9 281:17

**DUNN** 3:7

**duration** 103:2 250:17 251:9 253:2

# E

**e-mail** 196:7 262:13

**earlier** 41:5 122:15 175:11 188:15 244:8 283:11 295:25 298:10 331:9

**early** 171:8,18 252:14

**earning** 177:19

**easier** 7:12 110:25 342:11

**easiest** 246:14

**easily** 138:25 313:25

**East** 150:20

**Eastern** 5:5

**eat** 163:24

**econometric** 57:6 84:20 91:12 97:10 202:17 203:25 205:9 214:4 252:9 270:25 274:20 276:6,18

**econometrician** 219:10

**econometrics** 251:21 269:14 271:2, 7,12

**economic** 16:24 17:18 19:18,25 20:1,15 21:1,9,21,22 22:14,15 23:10 24:11,19,23 25:5,16 26:8,16,17,25 28:5 30:23 34:5,8 35:3,6 38:22 45:2 53:20 62:23 63:24 64:7 68:16 88:25 95:25 146:12 156:9 192:22 198:7,8 203:25 204:2,3,23 236:25 237:4 252:9 266:2 276:6,12 290:7 317:3 319:13 325:7,14,15 326:6 337:20 346:6

**economically** 92:2,19,22 95:6 138:22 172:20 178:15 192:2 202:14 203:15 204:5 242:25 335:2

**economics** 24:15 92:7 122:8 177:23 197:25 198:1 240:13,18 251:20

**economist** 24:3 34:17 35:7 68:5 92:14 140:14 157:20 161:22 173:5,8 254:12 266:7 306:5,10 326:10,13

**economists** 32:24 53:22 173:2 193:14 198:9 258:21 319:11 325:18 336:20

**economy** 41:18

**edge** 70:16

**effect** 24:3,25 63:5,6 64:24 65:2 67:18,20 68:11 70:20 76:11,12 80:12, 15 99:11 102:15 138:25 149:2 162:18 163:2 167:8 171:16 176:7 182:10,13, 18 184:13,16 186:13,19 203:7 211:6

212:25 214:2 217:3 223:25 247:2 250:5,8 251:2 254:14,21 255:24 256:18,21 257:10 279:18 280:9 281:7,15 282:20,24 284:7 293:6 306:23 319:14 321:16 336:6 339:6 340:3

**effectively** 176:19

**effects** 13:13 41:7 53:25 57:15 66:25 67:5 70:17 97:9,11,17 98:4 102:9,22 130:2,3,5,9,11 131:14 133:14 202:23 204:13 216:4 225:21 239:12 250:15 270:3 278:25 279:4,25 280:3,18,21 281:2 284:6 306:12,20 321:14 338:1 344:7,11,17,21 345:11,14,21,22 346:1

**effectuate** 56:14 68:9 142:15

**effectuated** 306:19

**effectuating** 130:11

**efficiency** 26:2 27:3,7 172:18 276:8 282:19 283:7,12,21

**effort** 28:18 209:14,18 264:20 309:18 311:7,15,18 324:16

**efforts** 183:8 302:6 313:23

**eggs** 29:18

**elasticity** 216:4

**element** 16:8 18:1 55:7 63:7 136:17

**elements** 325:17

**elevate** 66:21

**eliminate** 41:6 104:20

**eliminated** 43:10 60:21 191:11 290:1,18

**ELLIS** 3:12

**embrace** 126:4

**Emeritus** 121:23

**EMILY** 3:20

**emily.chow@faegredrinker.com** 3:21

**empirical** 214:1

**empirically** 266:12

**employ** 325:15

**employed** 61:20 77:10

**encounter** 219:9

**encourage** 212:16

**encouraged** 210:22

encourages 106:14

end 10:20 11:13 13:23 28:22 160:9
173:13 195:24 196:12 198:5 200:7
214:8 240:23 245:8 249:7 274:15
346:8

endeavored 193:23

endogeneity 219:10

endogeny 337:2

ends 235:25 236:1

enforce 302:7

enforcement 301:9,17 302:3,10,21
303:13 304:5,10 309:3

engage 93:14 151:25 315:16 316:9
319:13

engaged 148:16

engagement 10:11,17

engagements 10:15

engaging 26:3 129:12

engendering 337:1

enhanced 146:18

enhancements 285:4

enjoyed 146:15

ensnare 312:12

ensure 313:20

enter 220:1 286:21

entered 270:9

enters 270:13 337:3

entire 107:12 258:19

entirety 247:3 249:17 250:9

entities 111:22

entitled 21:6 23:14 121:6

entity 112:3

entry 101:24

environment 64:12,13 157:18
159:10 160:21 161:16 188:10

episode 22:20,23 47:16 72:3 154:23
157:1 256:17 303:15

episodes 39:9 261:17 302:12 304:12
321:7 332:19 336:5 340:17

Episodically 262:8

equal 57:17,25 167:3 255:13 271:21
338:15

equation 245:22 270:15 282:9

errata 4:4 342:23,24 343:6

erroneously 156:7

error 32:3 192:6 269:11

errors 32:1

escaped 272:14 275:8 277:24
288:23 289:18

ESQUIRE 3:5,9,14,19,20

establish 18:6 19:15,22

established 35:24 42:11 83:15
143:13 168:8 206:21 334:4

establishes 331:16

establishing 215:15

estimate 6:17 7:8 8:8 10:19 16:3
18:4 21:13 70:20 98:6,20 103:1 126:7
160:19 193:24 227:8 242:9 243:18,21
250:8 290:25 294:9 295:10 337:25
341:24

estimated 8:9 14:6 61:11 62:5
156:10 249:21 288:14 295:20

estimating 24:5 57:14

estimation 64:24

evaluate 131:7 251:16 269:25
270:25 296:4 302:20

evaluated 25:16

evaluation 270:7

event 183:8 310:18

eventually 103:20 272:3 323:24

evidence 29:2 30:22 33:17 35:8 43:5
45:3,17 46:8,25 47:3 48:18 49:14,22
50:12,19 51:12,24 53:24 66:9 67:25
70:9 77:18,25 78:15 141:16 143:14
168:5,18 188:2,14,15 189:17 191:16,
20 193:13 197:4 199:19 200:1,8
201:18 202:1,2 203:13 205:2,4 211:5
238:13 247:25 254:10 258:1,5,6
260:24 263:9,13,25 264:3,6,12 265:1,
22 266:1,5 302:15,24 304:4,6 310:5
311:20 314:16 315:13 316:7 317:2,4
321:21 322:12,16 326:5,10 328:12
335:19 340:15

exact 112:20 117:11 174:14 194:17

EXAMINATION 4:3 5:20

examine 10:7 294:18

examined 5:18 168:24 169:3

examples 10:5 240:8

exceeded 160:7

exceeding 209:10

Excel 305:15

excerpts 195:24

excess 20:17 225:23

exchange 32:14,16 36:15,16,18
37:22 39:18 53:2,7 57:10,23 248:4,6
308:12 317:25 318:9 319:3,14

exchanged 318:1

exchanging 68:6

excited 154:12 156:13

exclude 27:10 203:14 204:4

excluded 20:18 23:9 30:5,8

exclusion 20:3 21:23 22:17 30:16

exclusions 29:9,10

exclusive 124:11 135:24

exclusively 214:13 266:4

executives 322:2

exercise 25:24 143:15 145:24 152:1
226:2 243:20

exercises 270:21

exercising 143:25

exhibit 4:8,9,10,11,12 6:2,3 18:9,10,
16 105:19,22 120:20,25 121:1,6
123:1 139:8,14,18 152:8,13 164:3
168:9 194:23 205:15 329:4

EXHIBITS 4:8

exist 9:3 76:17 136:5

existed 44:21 45:8 136:5 300:6
302:8 303:10 340:6

existence 9:22 33:15,18 44:4 53:18,
19 54:2,3 158:16 161:14 198:23
205:4 253:5 314:21 315:4 317:4

exists 33:20 86:15 199:13

expand 165:22 167:15,19 208:21
255:5

expanded 330:12 333:10 335:14

expanding 101:16 103:4 138:8
168:13 171:2 172:21 330:18

expands 255:21

expansion 166:3 168:1 210:22
252:12 256:17 329:9 330:5,16 333:15

**expect** 157:20 159:9 173:14 184:13 216:19 268:10 269:6,7 273:15 335:8 340:5,13

**expectation** 314:9

**expected** 195:4 267:3 271:15,24 273:4,19 338:5

**experience** 8:2,3 13:10,15

**experienced** 272:23

**expert** 4:9 6:1,14 10:3 11:6 14:10 17:3,18 23:20 25:25 27:6,20 86:10 173:10 215:17

**expertise** 8:13,16,18,20,23 12:9,14, 17 14:12

**experts** 207:6 333:25

**explain** 27:6 33:1 42:9 54:18 65:17 141:19 166:19 167:8 184:9 185:19,22 186:7 246:8,14 253:20 278:13 279:10 280:8,16 282:21 284:10 335:11

**explained** 21:1 24:22 109:1 168:6

**explaining** 183:22 184:21 185:16 186:23

**explains** 65:21 131:12 182:17

**explanation** 27:10

**explanations** 28:19 173:9

**explanatory** 185:12 187:4 212:22 276:9

**explicit** 35:16 36:1

**explicitly** 20:25 34:13,14,22 91:11 157:16 158:21 219:15

**exploit** 320:4,10

**exploits** 321:10

**explosive** 305:19

**export** 39:11 46:11,22 47:18 48:7 51:14,25 188:1,9,25 189:5,18,24 190:1 191:22 192:1 193:8,19,24,25 196:9 197:8,16 201:20 202:24 207:4, 10 208:2 214:10 217:13 222:6 223:9, 16 224:21 226:17 227:7 228:3 229:12 239:14 240:20 324:14,19 325:1

**exported** 47:24 48:14 194:6

**exporter** 208:16

**exporters** 209:3

**exporting** 39:12,21,22,24 40:2 41:6 42:25 43:7,9 45:21,22 46:9 52:5 54:12 56:12,16 60:6,11,19 63:2 71:20 188:17 189:11,13,23 190:3,10,16

**exports** 39:3,8 40:13,15,24 41:2,13, 22,25 42:17 46:4 47:9,14 48:3,4 49:2, 16,25 50:16,22 52:1 53:15 54:7,22 55:1,7,14 63:12 64:18 65:15 66:14 134:11 188:23 189:6 190:25 191:4, 19,21 192:14,21,25 193:5 195:4,16 196:1 197:7,9 199:1 200:14,21,22 201:4,5,6,14 202:4,14 203:1,7 207:23 208:4,21 209:7,8 210:1,12,21 211:3, 23 213:6,11,19 214:2,7,25 215:9,12, 13 216:8,14,19,23 217:4 218:1,2,7 221:20,24 222:12,13,22,24 223:20 224:9,24 225:5,9,11,19,22 226:12,14, 17,20,25 227:4,8,11 228:18 229:2,3, 7,10 230:13 238:12 239:17 240:25 241:6,16 250:20 259:13,14 283:1

**expressing** 338:8 340:6

**extended** 136:3

**extent** 40:18 45:8 62:6 66:20 70:15 95:10 96:23 103:8 104:23 129:10 131:7 133:11 135:1 142:14 143:3,6 147:17 149:13,18 150:2 161:21 170:11 171:23 173:24 203:4 244:11 272:5 273:10 279:12 282:5 283:24 292:5 314:25 318:24 327:13

**extreme** 154:10,16 155:18,25

## F

**face** 226:6

**faced** 156:18 216:5

**facilitate** 230:4 264:20 265:11 306:8 314:11 319:9

**facilitated** 255:15 318:2 320:21

**facilitating** 32:16 304:16 324:11

**facing** 237:7

**fact** 16:2 17:20 18:25 20:23 39:9 45:19 47:2 86:4 106:2 112:24 118:12 119:20 133:18 142:17 143:25 144:13 160:5 166:23 167:12 180:24 184:24 188:8 190:23 197:23 202:5 204:14 205:7 214:18 217:1 223:17 228:1 234:11,22,24 241:5 254:16 256:16 270:13 280:14 288:20 289:14 302:14, 24 309:1,24 331:11 333:3 337:6 338:3 339:19,22 344:13 345:1

**factor** 19:2

**factors** 17:21 24:6 28:16,22 29:2 53:21 177:13 200:9 204:22 219:19

**facts** 4:12 12:21,22 17:3,6 24:24 74:17,20 78:22,23 79:5,12,15 137:1 152:15 160:14 188:12 330:14 335:19

**factual** 20:14

**FAEGRE** 3:16

**fail** 73:10

**failed** 24:21 72:23 73:6,9 74:8 203:6

**fair** 9:4 40:12 41:17 72:16,20 83:2 85:5,13 90:13 93:22 107:8 109:21 124:8 137:25 165:5 191:5 197:6 198:12 199:2 217:10 240:22 297:7 313:15 314:13 322:24

**fairly** 207:19 282:22 283:2 291:24 293:25

**faith** 269:18 270:20

**fall** 39:24 66:18,19 254:23 329:12,13

**fallen** 94:24

**falling** 91:8 258:12

**familiar** 18:18 48:17 57:1 64:7 87:21 121:9 139:24 140:2,5 152:19 165:7, 11,18,20 166:2 167:12,20 177:15 178:2 216:2 220:11 227:21,23 228:1

**familiarity** 168:2

**farm** 75:11 81:12,16 82:8,16 94:6 97:23 137:5 223:18 224:6 324:24

**farmer** 90:11 93:1 173:3

**farmer's** 94:24 147:11

**farmers** 134:5 143:20 144:1 146:19 147:20 165:22 167:15,18 172:6 210:13 212:17

**farms** 72:9,10 74:3 75:2 81:7 82:12 99:6 104:8 127:19 128:17 132:8 146:23 160:25 162:24 164:15 210:23 212:9

**farrow** 141:7 142:7

**farrow-to-finish** 164:13

**farrowing** 72:14 102:4 329:10

**farrowings** 93:15 94:19 138:9 162:23 329:13

**fashion** 282:24 283:4,17

**fast** 81:25 215:5

**fatter** 81:7

**favorite** 249:19,23

**feasible** 14:5

**fed** 72:18

**federal** 9:18

**feed** 154:6 172:18 286:6,12

**feedback** 212:25

**feel** 11:14 34:21 38:3 63:19 136:22
150:21 151:14 164:1 170:12 202:25
204:17 205:3,11 264:5 310:1 345:4

**fell** 214:18 215:23 254:20

**felt** 13:13

**female** 103:13

**fewer** 65:24 76:2 91:22 93:14,15,21
94:6,19,20,21 172:18 289:19

**Fieri** 154:1

**Figueroa** 3:25 5:9

**figure** 45:10,18,20 46:1 102:19
112:25 114:2 135:4 138:19 143:18
144:17,19 146:14,17 192:8 215:25
310:19,20 317:1 328:7

**figures** 166:11 215:22

**figuring** 133:23

**filed** 29:24 30:3 114:25

**fill** 305:16

**filled** 115:10

**filling** 137:7,22

**final** 12:15

**finally** 346:2

**financial** 154:10,17 155:18,25 162:8

**find** 39:6 108:13 127:10 265:14,16
305:19 312:24 313:1 321:11

**finding** 13:10 93:13

**finds** 308:8

**fine** 14:18 58:12 100:20 149:25
151:11,13,20 158:8 184:1 331:4

**finish** 158:6 232:17,18

**finished** 286:20

**firm** 26:18 89:2,25 134:19 137:11,20
138:2 201:21 301:15,23

**firm's** 203:16 204:6

**firms** 34:21 36:9 43:3 45:10 202:3
258:7 313:1 324:20 326:11 338:4

**first-time** 214:6

**fits** 55:14

**fix** 60:10

**fixed** 92:14 270:3 279:24 280:2,9,18,
21 281:2,15 284:5,7 344:7,11,17,20,
21 345:11,14,21 346:1

**flag** 218:13

**flat** 40:15

**flip** 159:25 273:3

**flow** 8:25

**flowed** 55:8

**flown** 261:2

**flu** 156:7 157:2 218:12,25

**fluctuation** 222:18

**fluctuations** 220:7

**FMD** 239:12,21

**focus** 43:9 119:20 140:14 183:19

**focused** 64:3 90:10 258:24 299:3,5
334:21

**focuses** 297:11

**focusing** 184:9 236:14

**follow** 125:16 176:25 179:8

**follow-on** 345:4

**follow-ons** 346:18

**food** 3:11 121:14 277:2

**Foods** 3:2,7,16

**fool's** 192:6

**footnote** 145:4,9 153:2,4 231:24
233:6 329:5,18,22

**forces** 98:7 148:2

**forecast** 240:25 241:14,15

**foreign** 197:10 201:7 217:16 218:20,
24 219:1,17,24 220:3 221:10,15
222:18,20 230:7

**forget** 29:16

**form** 9:24 10:14 14:15 17:10,13,24
19:21 23:25 24:16 25:8 26:20 28:6
33:6 38:10 41:16 42:18 44:2,20 45:14
48:9 50:1,6 52:12 53:16 54:8,24
55:16 58:4 61:8 62:2 65:19 68:3,21
69:15 70:6,13 71:7 75:4 76:19 77:3
79:20 88:20 92:4,24 93:16 94:8 96:2
97:25 98:18 100:12 107:24 108:8,12
112:13 117:16 123:24 129:21 130:18
134:6 135:12 136:8 137:24 138:13

140:16 141:12 144:8 146:24 148:6,18
149:16 155:4 157:22 159:13 161:2
165:25 167:21,24 168:15 172:23
178:5,17 182:3 189:9 190:11 191:7
193:10 199:3 200:4 203:18 204:7
208:6,23 209:15 210:3 212:10 213:16
214:11 217:9 219:21 222:7 224:10
225:17 228:8 230:10 233:5 234:21
237:2,13 244:1 252:16 263:8,21,24
274:11 302:9 304:17 306:3 314:14
315:18 317:21 320:18 321:4 322:11
323:17 325:3 328:9 329:14 333:12
335:18 336:25 338:12 340:11

**formative** 314:17,19 315:15

**formed** 49:6,8 61:4,23 62:18 68:19
69:2 73:18,20 75:8 77:6 78:18 79:7,9
81:2 146:8,11 328:18

**forming** 79:17 86:21

**forms** 304:1

**formula** 110:18,19,20 111:9,10
123:7,10 126:15

**formulas** 115:16

**forward** 16:5 51:25 63:10 175:17
194:13 220:23 226:5 311:19 328:12

**found** 145:3 187:3 275:8 279:17

**foundation** 45:15 68:22 75:5 76:5,
20 83:8 109:17,22 112:14 126:2
132:24 134:18 140:17 141:13 146:25
155:21 172:13 208:7,24 209:16
223:23 310:11 316:20 330:14 331:2
332:11

**fracture** 338:3

**frame** 160:16 173:22 247:7

**frankly** 192:16

**free** 151:14 345:4

**Fresh** 295:16

**fresher** 242:2 243:24

**front** 10:20 11:13,19 13:23 23:5

**FTC** 30:24

**full** 29:10 166:22 173:25

**fully** 126:4

**function** 82:2,24 219:25 301:21

**functioned** 311:14 340:9

**fundamental** 312:22

**fundamentally** 175:19 339:14

**funds** 206:6

**future** 182:12 305:17 312:12

### G

**gain** 81:20

**gains** 21:7,13 23:15 166:12,24 172:18

**gap** 137:7,23

**gather** 180:9 300:17

**gave** 66:11 138:19 278:23

**GDP** 217:25 218:3 271:15

**general** 168:24 203:23 223:14 270:15 282:17 296:8

**generally** 8:22 161:1 218:1,2 265:16 302:17 338:23

**generate** 76:10

**generates** 63:5

**generating** 287:2

**generic** 21:4,7,14 23:16

**genetic** 172:18

**genetically** 153:8

**genetics** 242:2 243:24

**gently** 337:18

**GIBSON** 3:7

**gilt** 103:12,25

**gilts** 103:16 104:8

**give** 7:7 14:18 25:11 34:5 35:18 37:10 55:13 64:23 68:23 74:10 77:4 87:24 93:23 103:1 104:4,10 105:8 117:10 149:7 162:14,16 165:10 168:4 172:15 198:18 206:8 211:17 240:3 244:22,24 261:16 269:20 291:8 301:13 303:12 307:9 310:14 327:14 342:12 343:19

**giving** 64:22 280:10 303:20 308:3,5

**glad** 159:4 196:8

**Glance** 4:13 152:16

**Glenn** 121:7,22

**glosses** 59:3

**goal** 256:11

**good** 5:22 24:14 183:4 190:18 194:11 197:7,14 210:1,2 224:20 227:2 236:24 237:25 243:10 251:23 255:5 270:17 276:5 302:23 341:23

**goose** 208:12

**government** 224:23 225:9 226:13

**government's** 224:15

**grad** 271:9

**grant** 10:6 14:7 18:1 19:13 90:4 93:2 101:6 131:4 159:18 169:19 171:7 240:7 324:9

**granular** 307:7 308:1 319:8

**granularity** 297:11 327:18

**graph** 42:2 173:13 214:6,8 215:3 241:21

**graphical** 164:14

**great** 62:5 308:10 343:2,3

**greater** 40:20 254:7

**gree** 142:4

**Grimes** 121:8,9,23 125:20

**grocery** 277:1 327:6

**ground** 275:6 296:14

**grounded** 24:23 25:4 27:11

**Group** 3:11

**grouping** 277:22

**grow** 208:14 209:1 212:17

**growing** 146:16 216:18 254:5

**grows** 41:18

**guess** 43:19 45:24 49:10 55:24 62:17 128:12 190:25 259:23 269:5

**Guide** 4:10 105:20

**guidelines** 30:25

**Guy** 154:1

### H

**H1n1** 156:6,11,14,24 157:17 158:16, 24 159:6,20 161:6,21 162:2

**Hal** 4:2 5:6,16,24 6:2 150:19

**half** 6:18,21,25 239:16

**ham** 227:2,4

**hams** 262:19

**hand** 191:3 192:3,4 201:4,6 225:2,7 282:10,11

**handful** 11:4 343:4

**happen** 13:3 76:7 155:2,7 274:4 289:20

**happened** 11:3 30:11,12 37:5 64:4, 18 74:17 81:1,4 97:20 144:13 156:20 161:5 168:25 216:7,12 241:12,18 257:17 260:12 298:18 333:19 334:6,9

**happening** 13:8,9,15 76:8 90:17 116:6 133:25 134:10 141:19 228:14 303:15 330:24

**happy** 31:22

**hard** 133:17,23 225:1 263:11 273:12 306:18

**harder** 320:10

**hardship** 155:25

**harm** 23:13 188:7 243:5,8,12 247:23 251:8,15 252:3 276:14 300:8 332:15, 21 333:5 334:2 340:1

**harsh** 133:16

**Harvard** 63:13

**harvest** 42:25 56:11 63:13 65:15,17, 22 66:7,9,12,15 70:23 74:23 75:14 79:21,22 80:2 81:3 82:11,21 134:4,11 229:14 259:12 261:1,10,13,18,20,22, 24 262:10 339:9,13

**harvested** 81:6 82:13

**harvesting** 71:19 180:21

**head** 104:5 123:20

**header** 108:19 109:2 213:5 329:8

**heading** 239:18 267:23

**hear** 22:4,8 212:23 254:19 259:18

**heard** 14:16 179:3 198:24

**hearing** 177:21

**heart** 33:3

**heavier** 153:9

**hedonic** 31:7

**Heel** 262:15

**held** 23:8 39:17 84:15 163:14 238:4 297:20 341:5

**helped** 66:21

**helpful** 89:12 154:2 194:24 202:8 271:18 284:13 285:22 303:3 324:11 339:19

**herd** 56:5 59:24 61:1,9,24 62:19 64:19 100:10 101:9,16,17 103:5 128:16 129:1 131:1,8 138:12 160:24

161:15 162:8 168:23 169:1,8,18,21,
25 170:2,8,25 171:2,11,22 172:3,10
173:16 175:7 230:22 231:11,12,17
232:21 241:24 243:1

**herds** 138:8

**high** 154:6 171:5

**high-end** 284:21

**high-entry** 332:5

**high-level** 41:1

**higher** 67:6 154:15,20 190:9 196:9
198:4 212:16 329:12

**highlight** 20:10 325:21

**highlighted** 234:11

**highly** 34:19 284:13

**hike** 265:24

**hikes** 250:22 306:14

**historical** 171:5

**Historically** 154:5

**history** 154:7

**hitting** 346:18

**hog** 4:10,11 72:9,10 75:11,16 83:19
90:10,25 91:5,13,21,25 92:1,18,20,22
93:1,12,19 95:7 96:1 105:20 106:24
109:15 110:10,11 121:6 131:22,24
132:8,12,21 133:7 134:24 140:15
148:17 150:4,10 154:9 157:18 159:9,
10 164:13,15,22 165:8,15,21 167:14,
15,18 175:25 176:11 179:9,22,25
180:6 181:25 208:4 210:12,22 211:24
212:16,21 234:18 236:19 237:8
271:25 272:5,10 285:14,17 286:12
333:10 335:14

**hogs** 65:24 72:8,14,23 74:3,9,25
75:19,21 76:2,3,16 77:1 78:1,6 79:1
80:5 81:20 82:2,3,13,14,20,21,24,25
83:1,4,5,17 84:1 85:1,8 86:7 87:23
89:15 91:15,22 93:13 94:19 98:9,10
99:5 100:3 105:4 106:21,23,24 107:3
110:4,5 111:13 112:11 113:2,3,6,10
114:6,21 115:13 117:4 120:8 122:21,
25 123:14,22 124:5,17,21,24 125:2,3,
10,22 126:13,17 127:5,17 128:6,7,17
129:3,19 130:17 131:2,9,20 132:3
134:4 135:9,11 136:4,7 142:5,6,22
146:22 147:10 148:9 150:5 157:4,7,8
158:19 160:25 161:1 162:24 180:17,
22 181:1,5,18 211:12,25 212:8,9,17
219:2 236:22 261:13 339:10,13

**hold** 167:23 225:16 240:6 279:25

297:3

**holding** 246:5

**holds** 280:3

**homogeneous** 285:9

**homogenous** 294:8

**honestly** 186:5

**hope** 287:7

**hoping** 154:20

**horizontal** 46:18 120:3

**Hormel** 3:16 48:6,7,14 99:14 130:7
180:21 181:4,23 182:1 232:1 262:13,
17 310:24 311:4,5

**Hormel's** 129:18

**hour** 84:9 150:19 151:5,7,9 311:4
342:6

**hour-and-a-half** 150:25

**hours** 65:23 341:24,25 342:7,12

**House** 143:24 144:18,23 145:5,11
146:13 172:4

**huge** 339:21

**hundred** 125:14 206:1 289:1 346:7,
12

**hundreds** 140:10 153:1 253:14
332:23

**hypothesis** 266:9,10,12

**hypothetical** 13:1,6 24:17 25:9
26:21 34:20 75:10 80:24,25 83:12
92:5 93:10,17 94:9 137:9 155:6
157:23 159:14 161:3 166:1 167:25
172:24 173:18 178:18 182:4 190:14
219:22 303:21 328:10

---

**I**

**i.e.** 267:4

**ID** 281:2,16 282:1 285:7,10

**idea** 108:9 127:16 168:3 200:12
233:12 236:15 237:9

**identification** 6:4 18:11 105:23
121:2 139:15 152:9

**identified** 67:10 72:22 142:25
193:14 204:23 222:11 321:8 323:1

**identify** 10:12 11:7 14:13 50:4,19
101:14 115:22 194:4 198:9 230:9
299:23 303:16 309:4,10,19 320:6
321:23

**identifying** 8:4,11,18,21,24 51:18
343:11

**ignore** 233:21

**ill-gotten** 21:6,13 23:15

**illegal** 21:5

**Illinois** 3:13

**imagine** 120:17 305:6

**immediately** 237:19

**immunized** 270:22 276:14

**impact** 10:7 31:5 104:21 185:9,19
186:17 187:5 204:3 220:18 224:15
225:10 226:4 255:7 272:14 274:10
275:8 287:11,12 289:1 290:25

**impacts** 105:3 184:3 277:24

**implement** 128:15

**implemented** 128:20

**implicate** 232:24

**implicated** 39:7

**implication** 177:1

**implicit** 327:15

**implies** 246:3

**imply** 107:19

**importance** 141:2 311:13

**important** 13:22 16:8,23 17:18,25
19:17 30:17 34:24 35:1 97:1,7 158:15
183:22 184:10 186:18 188:20,24
189:1 192:20 197:2 198:14,16,18,20
204:3,9 234:10 275:3,6,20 281:12
284:7 307:3 309:5 313:10 324:10
346:4,13

**importantly** 345:23

**imposes** 221:14

**impossible** 98:5 206:17

**impounded** 287:8

**impression** 114:3 115:1 116:9 344:9
345:9

**impressive** 214:21

**improper** 118:22

**improve** 237:16

**improving** 106:15

**inadmissible** 29:7,21

**inadvertently** 204:12

**inappropriate** 175:9

**incapable** 103:18

**incentive** 301:3

**incentives** 338:4

**inclined** 214:24 247:17 274:18 294:9

**include** 39:2 54:6,25 64:1 65:12 109:4 110:6,18 111:20 158:15 176:10 226:21 228:18 234:17 259:9 280:20 281:1 291:2

**included** 42:10 106:2 108:6 217:5 234:18 289:24 295:4,8 315:14 334:14

**includes** 33:25 35:24 52:8 106:22 113:2 286:15

**including** 27:17 93:10 94:19 143:23 147:3 188:14 202:24 204:15 217:7,14 345:25

**inclusion** 153:15 279:12

**income** 271:22

**incomplete** 25:9 26:21 92:5 93:17 94:9 137:9 157:23 159:14 161:3 166:1 167:24 172:24 176:13 178:18 182:4 219:22 328:10

**inconsistent** 141:17 333:2

**increase** 42:16 44:10 47:9 49:2,16, 25 50:22 53:1,12,15 54:7,22 59:19 61:16 66:14 68:9 71:13 135:18,22 138:9 176:20 192:9 193:22 207:23 211:3 212:7 218:1 219:19 223:19,20 225:5 228:6 246:5 253:15 254:10 271:21 272:23 273:14 299:12 302:17 308:11 321:3

**increased** 40:16 41:13,23 55:14 63:12,15 203:2 206:15 210:1,12,21 211:12,23 216:14 225:10 231:11 329:14 337:6

**increases** 66:20 166:20 177:2 205:25 206:10 211:12 212:14 223:3,4 226:12 282:4,19 283:7 304:21 312:25 320:6 333:20 335:15 338:18 346:7

**increasing** 39:3 42:3,22 45:22 55:1, 7 156:18 213:19 217:6 221:5,23 222:13 225:6 318:17 332:19 335:21 338:10,14 339:13 340:8

**incremental** 88:22 89:4 243:14 249:6

**increments** 151:1

**incriminating** 305:19

**incurred** 85:22 160:6 201:22

**incurring** 162:9

**incurs** 88:9

**independent** 89:21,24 91:1,13,21, 25 93:1 94:4,12,18 95:7,25 97:2,22 98:12 99:7,17 101:11,15 103:4 109:15 110:4,10 111:13,16 113:13 114:7,21 116:2 117:5 120:8 124:6,9 125:4,12,24 127:6,20 131:21 133:8 134:4,14,23 137:11 138:7 143:20 144:1 145:25 146:20 147:20 172:6 207:22 208:3 209:14,18,24 210:2,12 232:8 234:19 240:11

**independents** 111:20 124:14 125:8 138:17 139:1 142:13,16 169:13 232:24

**index** 4:1 267:5,15 268:1,14 270:9,12

**indicating** 49:1,14 74:17

**indication** 316:13 324:21 328:5

**indicative** 102:22 193:15 201:23 202:8 332:5

**indicator** 197:13 324:4

**indicia** 325:18

**indirect** 176:8

**indirectly** 344:5,14,25 345:10,12,24

**individual** 137:5,20 253:13 255:3 277:8 279:25 301:4,15,23 319:21 320:24 322:7 338:4

**induce** 304:24

**inducements** 204:25 325:16

**industries** 34:18

**industry** 4:12 17:7 34:20 89:25 116:6 140:15 141:5 152:16 155:8 178:3 183:7 188:18 231:15,19,20 234:1 237:17,20 307:23,25 315:19 329:7 346:10

**industry-level** 308:3

**industrywide** 234:3,15,17

**infer** 61:18 116:19 124:12 322:24

**inference** 107:6,8,15 124:9 125:7 126:3 157:11 158:1 234:23 251:25 266:15 325:24

**inferences** 336:21

**inferring** 107:21

**inflate** 45:4 129:14 130:4,21

**inflated** 129:9,13 272:21 275:10

**inflation** 162:1 177:9 249:14 264:11 288:20

**inflationary** 336:6

**influence** 142:17 143:1 146:4 222:6, 12 287:6 344:15

**influenced** 148:3 177:13

**inform** 29:2 126:8 243:21 258:20 328:13 343:17 344:3

**Informa** 240:13,18,24 241:14

**information** 32:15,16 35:10 36:6,14, 15,18 37:22 39:18 50:15 53:2,7 56:23 57:3,10,23 59:1,20 60:15 67:14 68:6, 7,9 106:16 115:5 120:12,18 132:21 149:14 150:1,17 193:20 229:20 248:3,6,7 280:11,19 300:13 304:23 306:16,19 312:2 314:1 317:25 318:7, 10 319:4,15 320:5 321:10 322:8,18

**information-sharing** 265:6 306:15 308:12 337:16

**informing** 198:15 344:5,10,14,24 345:10,12,23

**infrastructure** 146:22 147:10

**ingredients** 286:6

**initial** 14:20 15:25 174:11

**injury** 63:8 215:15 227:9 288:23 289:18

**innovation** 283:16

**input** 135:17

**inputs** 87:13,16 283:15

**inquiry** 225:20

**inside** 334:16,17

**insight** 62:23 303:12

**insights** 227:3

**instance** 13:18 16:6 30:8 71:24 72:22 73:9 74:7 83:16,24 134:2 263:18 306:1 310:23 322:6

**instances** 190:7,16 322:2

**instant** 182:11

**institution** 206:11

**institution's** 206:14

**institutional** 62:25

**instruct** 12:3 49:5 61:3 73:2,15 78:19 86:11 95:9 101:21 103:7 128:8 162:12 210:4 260:3 314:24 319:24 326:17 327:12

**instructed** 21:10 96:12

**instructing** 79:8,13 95:17,20

**instruction** 73:15 74:11,18 75:6 77:4 78:3 79:3 96:3 129:6,23 163:1 210:24 211:15 212:1,11,18

**instructions** 290:24

**instrument** 220:3

**integrated** 89:6,10,17 98:22 99:1,20, 22 111:18 112:23 113:11 117:6 120:9 123:23 127:14,19 143:3 148:21,25 149:4,5,10,20 150:3 180:25

**integration** 124:1 149:15

**intended** 272:13

**intending** 319:3

**intent** 225:20 231:16

**intention** 290:21

**intentionally** 114:12

**intentions** 329:11

**interact** 274:23 315:21

**interaction** 109:9

**interest** 128:5 129:3,12,18 130:7 135:7 136:5 140:24 192:22 204:6

**interested** 8:17 30:7 51:17 185:7 201:2 213:4 215:18 225:18 228:12 242:23 247:11 261:19 285:24 289:21 315:12 319:15 325:7 326:9 329:6 331:18 334:20 337:4,7

**interesting** 214:5 226:2

**interests** 203:16

**intermediary** 67:14 295:10,13 297:12

**internal** 262:13 330:20

**internally** 98:25 195:3

**interpret** 109:19 246:9 253:7

**interpretation** 114:23

**interpreted** 277:8,14

**interpreting** 253:21

**interprets** 32:24

**interrupt** 14:23 15:5,13,18,19 118:4 151:14 158:10

**interrupted** 39:16

**interrupting** 14:25

**introduce** 219:9

**invariably** 299:20

**inventory** 74:3 104:7

**invest** 255:3

**investigate** 235:20

**investigating** 144:23 145:13,14 224:25

**investigation** 145:11

**investing** 253:13 332:23

**invitation** 231:25 232:20

**involve** 6:19 110:4

**involved** 29:17 32:13 36:5 42:21 52:3 281:19

**involves** 32:21 72:14 110:1

**Iowa** 85:15 87:7,10,11,17 90:23 164:12 285:18 286:9,24

**irrelevant** 133:9,16 221:11 254:17 310:3

**isolate** 24:3,12,25 176:7 177:9 336:10

**isolation** 339:18

**issue** 36:10 74:24 144:24 219:14 290:22 345:8

**issued** 143:23 342:23

**issues** 10:7

**J**

**Jacob** 3:25 5:9 6:5 105:13 109:3 110:25 112:1 139:7 151:23 152:5 153:18 164:7 194:22 213:2 328:24

**January** 121:22 175:4 246:20 248:2, 5,24 249:7,20 252:6

**Japan** 196:10 219:2 239:14

**Jason** 5:24

**JBS** 232:1

**Jimmy** 29:13

**job** 184:21 185:16 186:23

**John's** 29:13

**join** 304:24

**JONATHAN** 3:19

**jonathan.todt@faegredrinker. com** 3:21

**Josh** 69:20 79:11 113:19 117:21

118:18

**Josh's** 109:21

**judge** 21:18 30:21 31:5

**judgment** 92:19

**June** 5:4 248:24

**jury** 23:5 31:10

**justification** 243:11

**justifications** 27:3,21

**justified** 26:3

**justify** 27:6

**K**

**keeping** 151:16

**key** 24:21 108:19 299:7 300:18 301:12 307:17 320:16,19 324:4 334:1

**Keyboard** 31:3

**kick** 304:2

**kind** 25:21 41:1 59:2 63:25 102:20 115:9 116:11,23 117:15 119:13,22 129:2 133:16 136:19 151:8 160:21 173:21 191:19 199:11 205:1 212:24 220:9 244:5 254:18 256:20 266:8 270:20 274:13 285:3,12 297:6 301:20,21 304:4,6 307:23 317:14 319:14 320:16 337:16

**kinds** 283:20

**KIRKLAND** 3:12

**knew** 307:11

**knowing** 99:11 284:11 307:7,8 313:2

**knowledge** 22:22 107:22 207:15 209:22 234:8 318:11

**Korea** 196:10 239:13,22

**L**

**label** 285:3

**labeled** 169:20,22

**labor** 286:15,21

**lacks** 45:15 134:19 138:2 316:19

**lag** 182:8,9,13,14 184:6,10,20,24 185:8,14,18,21 186:8,19 308:20

**lagged** 183:13 187:4

**lamb** 106:9

**language** 26:6 109:19 196:22 234:2, 23 305:20

**large** 116:6 143:1,8 165:1,2 169:12 277:1,22 278:25

**largely** 254:17 285:9 294:8

**larger** 195:4 290:16

**largest** 208:15 209:2

**Lasalle** 3:12

**lasting** 250:12

**lasts** 102:18

**late** 252:13 311:4 323:21

**launched** 230:2

**launching** 124:14

**law** 24:2 32:23 33:2 35:4 38:17

**lawful** 17:22 19:2,19 23:22 24:14 28:19 190:10 201:4,14

**laws** 9:11,18,19 25:23

**lawyer** 62:15

**lawyers** 254:19

**lead** 12:23 339:24

**leaner** 153:8

**learn** 320:11

**leave** 6:6 43:20 51:16 62:14 67:7 68:16 96:21 110:7 139:1 152:22 166:4 189:2 200:10 247:4 250:18 268:22 308:21 310:20 315:23

**led** 154:6

**left** 45:9,18 46:1 282:1 346:13

**legal** 16:19 19:8 20:5 21:3,19 22:1,24 23:1,13,18,25 25:23 33:8,11 35:3 37:25 38:11 42:19 44:1,23 48:21 49:4 69:16 190:12 191:8 201:16 244:2 259:8 264:22 314:23 316:19 324:7 325:4,12

**legitimate** 25:3,5,15 27:11

**lens** 306:9 334:1

**les** 132:16

**letterhead** 121:12

**level** 89:7 116:23 129:10 132:18 168:21 197:20 297:11,12,13 307:7,8 308:16 319:8 327:18

**levels** 66:22 135:3 143:12 147:19 202:24 246:12 308:2

**lever** 65:18 67:2 77:10 79:25 229:10

**levers** 66:13 67:1,22 101:7 128:14 130:24 131:3 134:9,12 189:14 214:15 221:22,25 223:2 225:4 229:15 230:20 250:19,25 259:10,11 339:8

**Lexitas** 5:10

**liability** 9:6 10:2

**life** 110:25

**lifecycle** 72:14

**lifestyle** 72:13

**lifts** 221:13

**light** 120:16 205:2 256:3

**likelihood** 258:22

**limit** 290:21

**limitations** 335:1

**limited** 233:3 334:25

**limiting** 129:5,23

**linear** 171:15,24 173:22 174:5 282:16,24 283:3,4,17

**lined** 298:24 299:1

**lines** 60:12 283:8 317:17

**lingering** 102:8 279:3

**liquidate** 138:24

**liquidated** 84:1 104:8 235:21 236:4, 12 242:8

**liquidating** 77:1 235:7,10,12 236:25

**liquidation** 43:1 56:8,11,15 60:4,6,7, 9,18 63:1,14,15,16 65:15 73:20 77:9, 13,21 78:1,6 79:1 80:5 83:4,10,12,17, 18 84:4 101:1,6,7 128:21 134:10 138:17 229:14 231:1 237:4,11,15,18 243:6,9,11,14 259:11

**list** 6:13 176:14 310:13 322:19 328:4

**listed** 111:7 115:16

**listen** 15:15

**listing** 148:23

**lists** 122:19,22 233:6

**literally** 246:15 316:22

**literary** 58:6

**literature** 44:15 204:24 300:17 325:15

**litigation** 5:8 176:9

**litter** 72:15,17

**live** 106:24

**lives** 103:23

**livestock** 106:6 109:7,8

**LLP** 3:2

**LMR** 4:10 105:20 106:13 108:19

**loathed** 36:21 337:25

**Lobbying** 207:13

**log** 246:13

**logic** 226:7

**logical** 217:25

**logs** 246:13

**loin** 284:23

**long** 50:7 80:15 92:12,13 102:3,15, 18,22,23 103:24 151:2 208:4 213:13 253:2 286:18 293:7 295:6 297:17 323:7 341:18 342:3,8,15

**long-lasting** 102:9

**long-term** 171:5,10 172:2 173:12 175:6

**longstanding** 165:13 169:16

**looked** 12:21 51:5 73:13 86:18,20 91:3,4,10 101:24 104:17 113:16 139:23 173:24 174:1 191:16 193:5,17 209:5 214:23,25 215:9 256:14 260:14 266:5 267:12 283:2 302:22 333:18

**lookout** 35:9

**lose** 269:18 270:20 276:8

**losing** 92:1 94:4 157:19 159:11 236:18 274:6

**loss** 92:21 137:21 182:25 183:11,12, 20,21 184:1,4,9,11,17 185:2,14,22,24 186:12,17 190:25 191:1 194:10 201:22

**losses** 160:6 162:9 164:8,12 166:12, 24 236:16 237:7

**lost** 20:17 93:24 156:10,23 157:13 160:10,15,22 161:17

**lot** 143:7 199:13 258:4 263:16 274:9 276:16 307:4 310:5 313:5 321:21

**lots** 76:6

**lower** 41:2 135:10 190:17 222:25 258:9,13 306:24

**lowered** 157:3

**lowering** 136:6 156:19

**lunch** 150:22 163:14,21 164:2

**luxury** 313:7

---

**M**

**Macbook** 31:2,3

**machinery** 215:12

**made** 14:4 32:1,3 58:24 75:12 84:3 102:11 183:8 188:5 189:18 238:15 242:24 302:24 306:14 311:18

**made-up** 313:18

**main** 275:13

**maintain** 134:16 147:10

**maintains** 91:15 132:20

**maintenance** 262:17,24,25 263:2,19

**major** 30:14,15,16 155:2

**majority** 6:25

**make** 11:13 13:23 28:13,18 41:19 43:11 58:11 71:8 77:8 86:24 91:22 93:14,18,21 94:12 100:22 107:7,9 113:21 116:24 118:24 130:14 134:14 137:10 147:8,15,23 179:7 181:20 182:1 186:6 188:25 208:1 247:10,13 258:21 264:6 266:4,14 270:7,21 275:23 277:21 278:16 279:11,14 283:24 287:23 293:13 299:8 303:4 307:13 309:18 311:14 323:13 343:6

**makes** 91:14 92:18 110:25 154:12 156:13 286:25

**making** 34:10 39:8 46:11,22 50:16 51:15 52:5 54:11 60:3 89:3 92:12,13 97:13 107:15 118:8 148:1,2 181:1 190:3 199:8 215:13 233:17 261:17 293:18 304:21 318:3 322:7,23

**manager** 342:1

**mandate** 39:14 41:8,9

**mandatory** 86:1 87:2 106:6 107:4, 16,18,20 108:5 125:19

**manifested** 42:23 183:25 334:2

**manipulating** 262:18

**manual** 276:18

**mapping** 200:8

**margin** 177:17,18,20,22,25 254:13

**marginal** 89:3 143:11 254:13 339:6 346:7

**margins** 177:16 178:4,6,14

**mark** 6:1 18:8 257:15

**marked** 6:3 18:10,15 105:18,22 121:1,5 139:10,14,18 152:8,13 329:3

**market** 66:19,24 67:19 72:8,18,24 74:3,9 76:9,22,23 78:1 79:1 80:5,9,11 81:1,11,13,14,18,21 82:6,7,16 83:4, 17 84:1 85:7 86:7 87:22 88:13 89:15 92:22 94:19 97:18,19,21 98:9 101:25 102:1 106:7,17 109:6,15 110:19 111:9,10 122:20,25 123:3,7,9 125:10, 19 126:15,18,24 130:4,6,12,16 131:2, 5,9,15,19,24,25 132:7,15,16,19 133:5,6,8,13,22 134:20,21,22 135:1, 21,22 136:3,14 137:2,6,12,19 138:2,5 141:16,20 142:19,23 143:2,9 144:2 147:2,3,16,19 148:2,9 150:15 154:9, 25 157:8 161:8,9 166:9 169:5 175:23, 25 176:1,3,4,17 180:15,17 181:17,19, 22,25 183:23 186:14,18,24 187:10,11 190:20 194:7 197:12 201:9 212:4,23, 25 221:9 226:9 228:12 238:16 241:15 242:10,20,21 243:19 259:12,14 262:18 271:23 272:5,7 285:1 290:15, 16 324:17

**marketing** 4:11 70:11 77:1 121:6 304:24 312:12

**marketplace** 102:10 106:14 187:8 256:24 278:23 308:15 330:24

**markets** 126:14 131:6 197:10 201:7 216:17 224:22 228:5

**marking** 139:11

**marks** 323:10

**match** 4:12 299:3,4,16,18,19

**matched** 296:15 299:7

**matches** 298:24,25

**matching** 292:5 296:12 298:15,20, 21 299:20

**material** 142:21 148:17

**materially** 142:21 149:3,4

**materials** 88:5 106:3 144:14

**math** 125:17

**matter** 5:7 9:16 11:11 12:13 16:1 23:5 294:3 344:19

**matters** 8:15 10:1

**maturity** 183:15 184:15

**max** 320:11

**maximizing** 320:12

**MBR** 122:14

**meal** 286:7

**meaning** 177:22

**means** 35:21 37:8 83:5 141:23 149:4 176:19 250:7 338:21 344:2

**meant** 37:3 221:9 232:19 243:19 284:6

**measure** 90:6 229:21 292:19 336:16

**measures** 20:16 170:15 207:23

**measuring** 203:7 270:12

**meat** 228:4 284:24

**meats** 227:13,14 228:19

**mechanics** 98:2

**mechanism** 55:9 67:2 101:3 110:12 191:12 300:24 301:7,22 302:3 310:8, 12 317:19,22 319:18 320:9,16 339:14

**mechanisms** 43:2,18 55:10 56:13 61:19 62:10 65:1,3,8 70:24 113:4 142:25 146:6 189:14 229:23 338:21 339:2

**media** 156:8

**mediums** 316:2

**meet** 228:21 229:8 290:2 341:18 342:3

**meeting** 231:25 233:3,25 234:1 314:17,19 315:15

**meetings** 305:15 315:20 316:11

**meets** 16:25 66:6 266:2

**member** 48:16 313:6 314:8 323:15

**members** 108:12 301:4,24 303:3,8 306:25 312:15,18 314:12 315:16 338:7,8 340:5

**memorization** 248:16

**memorized** 47:13 323:12

**memory** 51:11 102:6 231:5 248:17 298:12

**mentioned** 35:14 70:23 188:15 191:9 194:9 199:13 214:14 231:8,14 283:6 285:2 294:25 318:8 331:9,13 332:3

**mentions** 329:9

**menu** 284:22

**mere** 254:16 333:3

**merit** 337:8

**merits** 192:18

**met** 16:11 137:6,22 138:25 341:14,15

**method** 53:24 56:8

**methodology** 11:15 21:11

**methods** 16:24 17:15 39:1 266:13

**metric** 183:20 206:12 209:9

**Meyer** 139:18,25 140:13 160:2

**Meyer's** 141:11

**mid-'90s** 169:17 170:6 173:12 175:7 213:9

**middle** 30:1 122:11 231:21 239:11 286:4 343:23 345:17

**midway** 10:18

**million** 209:9 332:4

**millions** 253:14 332:23

**mind** 7:18 31:1 35:25 38:8 45:12 46:14 50:20 51:20 53:6 66:7 102:16 130:25 132:11 172:9 185:17 186:1,4 187:9 190:23 192:19 195:25 196:13 197:25 220:23,24 221:3 225:13 268:6 275:21 278:5 283:8 302:5 307:17 320:16 324:2

**mine** 8:16 230:12

**mini** 250:11 251:11

**Minneapolis** 3:4,18

**Minnesota** 3:4,18 121:24 122:2

**minus** 288:5

**minute** 37:20 244:22

**minutes** 163:8 340:23

**misattributing** 161:25 202:22

**mischaracterize** 52:16 118:10

**mischaracterizes** 47:11 50:24 52:13 58:5 59:11 113:15 117:17 129:22 200:5 213:17 222:8 241:8 306:4

**mischaracterizing** 71:6 114:12 118:20

**misconduct** 8:5 96:25

**misinterpreted** 99:24

**misleading** 116:20

**mismatch** 293:23

**misremembering** 149:19

**missed** 227:14

**missing** 168:20 257:15

**mission** 208:21 223:18

**missions** 223:15

**Missouri** 121:13,20 122:1,5

**misspelled** 345:22

**misstated** 298:3

**mistake** 43:8

**mixing** 292:7,15

**model** 24:8,11,20,25 25:6,16,17 26:16,25 30:10 31:5,6,8,9,10 57:2,6, 9,22 62:18,22 63:5,9 64:16,22 69:7 70:2,4,7 84:20 91:12 97:10 129:7 131:11 157:17 161:23,25 166:10 170:13,15 171:9 174:19 175:19 176:6,19 177:2,8 192:8,13 193:3 202:13,17 203:12,19,21,25 204:4,9 205:9 212:3 214:1,4,24 217:12,13,14 218:22 219:8,16 220:2,8 225:22 226:1,7,8,9,18 227:7 228:22 229:25 242:6 246:13,21,23 247:5,9 248:25 249:15 250:3,7 251:1,3 256:23 257:1, 3,8,10,22,23 264:10 269:19,22,25 270:9 272:9,18 277:25 278:11 279:2, 23 280:1,11,12,17 287:10,18,21 288:5,14 297:11 298:7 333:24 337:3, 20,23 344:6,16,19 345:11,13,20,24

**modeled** 333:25

**modeling** 40:3 60:22 63:25 212:5 215:8 221:17 222:21,22 224:17,21,22 225:19 226:17 257:7

**models** 226:5 257:21 270:25 272:19 274:13,14 275:4,13,18 276:2 277:13

**moment** 14:2 47:6 50:3 192:16

**money** 89:3 92:1 94:4 109:14 160:10,22 224:8 236:19

**monitor** 120:1 190:2 202:3 300:19 301:23

**monitoring** 193:21 204:25 300:24 301:7,13,21 302:21,22,24 303:3 309:3 325:16

**monopolized** 97:15 133:20

**monopoly** 27:23 34:22

**monopsony** 27:23 143:7,15 145:24 146:10

**month** 246:19,22,25 247:7,11,12 248:23 249:5,6,19,23 250:5,12,15 252:7 254:21

**monthly** 297:12 305:15

**months** 80:21 160:11 183:1 184:13 298:8

**morning** 5:22 285:16

**mortality** 90:19 104:24,25 182:23 184:25

**motion** 70:13

**motivated** 27:1,15 261:3

**motivation** 26:3 244:4

**motivations** 27:25 28:1

**mouth** 186:6

**move** 70:12 159:1 191:11 211:8 219:13 308:9 324:16

**moved** 175:14

**movement** 66:22

**moves** 288:25

**moving** 67:6 150:25 288:6

**multifaceted** 250:20

**multiple** 115:19 140:6,11

**mutually** 124:11 135:23

**myriad** 75:18 92:25

---

**N**

**N.W.** 3:8

**NAFTA** 213:9 214:7 220:21

**narrative** 50:7 114:10 322:11

**Natural** 121:14

**naturally** 12:16 66:18,19 70:19 126:25

**nature** 132:6 284:12

**necessarily** 32:25 40:23 111:17 115:3 119:25 166:2 178:19 202:5 258:12

**needed** 185:6 237:16 302:11 313:1

**needing** 263:19

**negate** 133:21 336:6

**negative** 178:15 267:14,25 268:12 269:12 270:10 272:10 274:1

**negotiated** 109:5,13 110:1,3,8,18 111:8 122:24,25 126:14,18,24

**net** 106:23 108:18,22

**News** 156:6

**nice** 151:19 160:2

**NIPC** 231:23

**no-go** 10:20

**nondefendant** 240:12,14,15 296:5

**nonfeed** 286:8,21

**nonmaterially** 149:5

**nonsensical** 175:13

**nonvertically** 89:10

**normal** 158:23

**North** 3:12

**notable** 190:22

**note** 6:11 8:3 89:5 138:18 233:10
259:1 268:19 270:25 282:16

**noted** 5:11

**notion** 34:9 75:14 172:5 337:19

**notwithstanding** 154:15 332:7

**nuclear** 239:13

**number** 65:23 89:15 91:14,15 94:17
97:23 99:10 109:1 117:11 123:8,9,10,
13 126:7 128:17 129:2 132:21 160:25
162:23 172:20 179:19 222:5 232:7
238:24 247:21,24 260:20 261:5,24
262:2,10 283:15

**numbered** 153:24

**numbers** 41:11 125:21 184:11

---

**O**

**object** 9:24 10:14 11:25 14:15 17:10,
24 19:21 24:16 25:8 26:20 28:6 33:6
38:10 41:16 42:18 45:14 48:9 49:4
50:1,6 52:12 54:8,24 55:16 58:4
65:19 68:3,21 69:15 70:6 71:6,7 77:3
88:20 92:4,24 93:16 94:8 96:2 97:25
98:18 100:12 107:24 108:8 113:20
114:9,10 117:16 123:24 130:18
135:12 136:8 137:24 138:13 140:16
141:12 148:18 149:16 155:4 157:22
159:13 161:2 165:25 167:21,24
168:15 172:23 178:5,17 182:3 189:9
190:11 191:7 193:10 199:3 200:4
203:18 204:7 208:6,23 209:15 210:3
212:10 213:16 214:11 217:9 219:21
222:7 224:10 225:14,17 228:8 230:10
234:21 237:2,13 244:1 252:16 263:8,
21,24 274:11 302:9 304:17 306:3
315:18 317:21 319:24 320:18 321:4

**objection** 9:12 12:25 13:5 16:18
19:7 20:4 21:25 23:24 25:19 37:24
44:1,22 47:10 48:20 50:23 51:7 52:21
53:16 55:25 59:10 60:1 64:20 69:3,24
75:4 76:4,19 78:2 83:7 86:9,21 95:15
109:16,22 112:13 113:14,22 118:4,9
119:2 126:1 127:22 129:21 132:23
134:6,17 137:8 146:24 147:14,24
148:10 155:20 161:19 162:11,25
172:12 173:17 200:17 201:10,15
206:22 211:14 223:22 233:5,14 241:7
255:9 259:7 260:2 264:21 310:10
314:22 316:18 324:6 326:16 327:10
330:13 331:1 332:10 339:16

**objections** 46:5 119:15 316:24

**objective** 130:20 176:6 230:11

**observations** 274:6

**observe** 116:12 120:1 333:20

**observed** 28:12 166:20 275:25
302:14,18 335:25

**obtain** 190:8 194:7

**obtained** 114:21 242:7

**obvious** 305:8

**occasion** 7:15 14:3 73:6 77:13

**occasions** 11:4 30:13 298:19 314:5

**occur** 42:23 63:1,3 182:11 200:23

**occurred** 10:20 28:10 61:13 62:20
83:11 138:17 177:2 180:8 194:1
200:14 230:14,15 243:7,14 258:25
261:3 282:18 335:23

**occurring** 83:13 98:7 131:6 171:13
176:5 190:16

**occurs** 65:22 131:4 182:12

**odds** 253:17 256:10 339:14

**offal** 227:11,16,17,18,22,25 228:18

**offer** 16:3 53:17 75:6,7 101:20
138:15 167:11 172:5 203:24 211:2,5
227:7 326:17

**offered** 57:8 73:3 96:15,20 193:4
210:17 260:17 320:1,2,3 326:24,25

**offering** 68:15,16 77:5 95:11,17
166:17 211:16,20 212:19 260:5,7,19
261:5,7 263:9 272:18 315:2 326:18
327:3

**offers** 22:24

**older** 242:1 243:24

**omitted** 24:21 166:18

**on-the-fly** 32:19

**ongoing** 308:14

**online** 332:13 333:4 339:21,23

**onward** 174:3

**open** 106:7 338:9

**opened** 252:21,24

**openings** 253:3 340:17

**operates** 307:2

**operating** 236:16 338:6

**operation** 65:24 80:20 94:5 168:13
236:19 237:8

**operational** 261:6

**operations** 164:13,22 165:16

**opine** 9:9,22 10:1 33:15,19 102:7

**opining** 200:13

**opinion** 12:1 20:7 23:4,21 24:1 28:7
29:7,21 30:9 31:21 40:14 41:2,21,25
44:17,21 45:2 49:7,8 53:18,20 61:4,8,
24 62:3,6,18 74:21 75:8 78:18,22
79:7,10,17,20 81:2 95:11,17,20
96:15,16,18,20 101:19,21,23 102:12
103:9,10 128:4,10,11,18,25 129:17,
24 132:1,12 138:15 148:7,13 162:13,
16 182:5 189:6 200:20 210:6,7,11,15,
17,20 211:2,15,19 212:2,19 243:2,3
248:21 249:8 250:2,24 260:4,8,17,19,
21 261:5,8 285:8 290:15 300:22
303:7,11 309:14 315:1,13 317:9,13
320:2,8 325:8 326:23,25 327:3,7,13
328:15,18 333:1

**opinions** 17:2,13 38:12,14 68:15,16
73:3,17,19 75:7 77:5 86:21 96:7
129:25 130:8 132:4 144:8 146:9,12
306:22 319:25 326:18

**opportunities** 67:16 196:10 208:1
302:16 312:24 320:12 321:24 322:25
343:11

**opportunity** 308:10 316:4 321:8

**opposed** 90:14 99:17 127:6,20
313:17

**opposite** 154:18 190:15 275:8
335:24

**optimistic** 241:1

**orange** 169:22

**oranges** 292:7,16

**order** 5:25 23:21 30:3 81:23 278:22

**organ** 228:4

**organization** 231:23

**orient** 100:17 266:24 273:7

**oscillation** 164:25

**oscillations** 165:14

**other's** 190:2 202:4

**outbreak** 156:11,24

**outcomes** 306:8 319:9

**output** 34:11 36:11 42:21 43:3,15
45:5 53:25 54:14,15 56:22 61:15,21
62:7,9 63:5,6,11 64:24 65:2 66:17,24
67:2,5,20 75:18,20 76:11 80:12
94:13,18 95:1 97:17,20 98:2,6
128:22,23 133:13 143:2,10 146:4
162:18 163:2,5 172:8 189:15 192:12
193:1 203:9 214:1 216:3 223:4
229:15,23 253:23 254:1 258:4,8,9,11,
13 265:5 305:5 317:7 318:4,18
320:22 324:12 332:14

**outsider** 310:2

**outsiders** 304:24

**Overbroad** 166:1

**overcharge** 9:3,7,9,23 10:13 11:8
12:8,24 13:20 14:11,13,14 246:22
247:6 248:23 249:4,9 255:8 268:2,17,
25 273:24 275:4 276:2 277:25 287:14
291:14,21 334:22 336:12

**overcharged** 278:11

**overcharges** 8:4,8,9,12,19 251:18

**overdrive** 216:22

**overlap** 67:3

**overreaction** 340:2

**overrides** 197:24 198:1

**overstating** 291:4

**overture** 314:7

**overview** 329:7

**owing** 70:21

**owned** 89:22 99:7 101:10 112:23

---

**P**

**p.m.** 163:12,15,17 238:2,5,7 297:19,
21,23 341:3,6,8 347:3,6

**packages** 293:16

**packaging** 285:3

**packer** 85:2,3 89:22 108:23 109:6,14
110:4,9,11 111:12 114:8 115:11
116:22,24 118:14,15 119:23 120:1,16
125:5 129:9 132:15 143:1 177:16,17,
20,25 178:4,6,14,21 179:9 181:23
231:20 234:1

**packer's** 116:12

**packer-owned** 111:23 112:2,12
113:11 124:25

**packer-sold** 113:6,12,23 118:13
123:14 124:22

**packer-to-packer** 119:22

**packers** 85:25 86:7 87:2 98:13 107:3
112:9 113:11 115:19,22 116:7 117:6
120:9 123:22 124:7 130:15 131:19
132:2 134:3,24 135:2 138:20,23
142:9,12,20 143:25 146:3,15 147:4,
17 148:7,16 172:7 177:18 178:1
181:11 232:11,21,23 233:3 296:5
327:24 328:6

**packers'** 135:6

**packing** 141:2,4 253:15 255:4
256:10 259:6 260:1,18,20 332:24
333:8

**pages** 30:4

**paid** 108:23 128:6 134:24 136:7
176:9 248:22 292:8,10,12

**pain** 189:21

**palpable** 329:13

**paper** 110:24 112:8 122:9

**paragraph** 18:22 20:10 32:10,19
37:12,14 52:2,24 55:2,5 65:21 106:5
141:3 183:17 195:2,20,23 199:21,23
223:24 224:12 231:9 235:4 237:15
238:11,13 239:12,25 240:3,4,8,23
244:21,24 245:14 266:19 267:12,17,
22,23,24 271:17 273:7 278:7 279:21
282:14 285:22 291:7 298:5,9 300:10
331:22 343:8,15,18 345:8,15,18
346:3

**paragraphs** 141:23 267:18

**parameter** 249:1,16,20 251:4 256:2
287:22 288:7 335:24 344:4,15,22,25
345:10,13,24

**parameters** 274:16,21 288:4,13
344:5,10,16

**paraphrase** 26:2 37:13

**PARKER** 3:9

**parlance** 24:19

**part** 13:22 30:8 54:22 56:5 91:18,23
100:9,19 128:18 131:23 146:1,17
148:12,13 154:21 168:2,4 176:1
187:10 189:2 192:3,7 201:5 203:4
223:1,18 230:12,16 265:6 304:23
312:11 313:8

**participant** 303:22,24 307:9 321:9

**participants** 106:7 232:3 300:18
301:8,14,22 309:16,23 310:4,14,16
313:11,21 315:21 340:7

**participate** 52:10 58:2,14 59:2

**participates** 231:22

**participating** 232:5 324:5,25 325:25
326:1

**participation** 325:10,11

**parties** 99:23

**parts** 28:9 228:4

**party** 89:11 187:15 299:17 309:22
323:21

**pass** 16:15

**pass-through** 291:5,17,23 292:17
293:6,8 294:4,10,14,19 295:9,15,18,
21,22 296:2,7,10,15,18,22 297:1
298:6,11 346:11

**pass-throughs** 296:25

**passed** 346:8

**passthrough** 220:10

**past** 109:23 145:15 171:22 277:10

**pattern** 133:18 165:3

**patterns** 275:24 278:16 279:1

**pause** 80:6 163:9 237:24

**pausing** 83:5

**pay** 130:16 131:20 332:8

**paying** 92:14 109:14 110:4 135:11

**payments** 29:25

**pays** 85:4 110:11

**PDF** 153:20

**PDV** 183:7 184:24 186:10

**pencil** 328:2

**people** 31:22 141:6 142:7,9 158:24

273:13 305:20

**per-pound** 298:25

**per-unit** 299:1

**percent** 21:6 23:14 63:11,12,14
100:3 124:17,21,24 125:9,22 126:17
138:20 205:25 206:15 216:14 234:18
240:25 248:23 249:11 268:20 278:22
289:1,3,6,12,13,14,19 329:12 346:7,
12

**percentage** 98:9,10,24 99:5,15,22
100:6 101:9 126:13,14 127:5,17
245:4,23 246:2,9,15 286:11 287:14
288:17,19,21,25

**perception** 218:16

**perceptions** 218:9,20,24

**perfect** 84:5

**perfectly** 133:19,20 188:9 190:10
336:4

**perform** 11:17 163:2 274:25 289:7

**performed** 44:18 61:14 62:8 162:15,
17 295:6

**period** 64:14 69:5 79:1 83:25 94:3
98:16,17 104:22 106:22 115:14 117:4
134:3 143:21 145:16,17,18 146:10
154:16 155:17,25 157:14 160:7
161:18 162:10 164:18,21 166:21
167:9,13 170:16 171:1,14,17,20
173:25 174:11,20,21,23,25 175:11,
12,15,16 177:3 182:12,13,19 189:7
192:21 198:5 200:14 204:11 213:14,
15,20,23 216:7,8 220:18,20,21
225:11 229:13 230:8 231:12 236:7,13
244:9,10,14,15,16,19,20 247:1,3,8
248:9,12 249:3,8,18 250:10,18 251:5,
9,18 252:13,22 253:1 255:2 257:5
261:14,25 264:12 279:4,6,13 287:17
300:8 303:9 305:25 321:17,18 323:7,
23 330:9,12,25 332:9,20 333:5,6,10,
21 334:7,17,18,22 335:8,16 336:10,
12 337:7,9,11,15 339:22 344:14
345:2,19

**periods** 95:5,24 164:25 165:2,21,23
167:5,14,16,18 246:19 251:17

**permanent** 159:16

**permitted** 255:15

**perpetuate** 305:11

**persisted** 173:20

**person** 315:22

**personal** 196:7

**perspective** 35:3,4,6 294:15

**pertaining** 71:19

**pertains** 101:5

**PETER** 3:5

**peter.schwingler@stinson.com**
3:5

**phenomena** 173:21 175:14 176:5,16

**phenomenon** 133:5 147:2 169:4
204:10 335:3

**phone** 341:25

**phrase** 55:1 107:18,22 198:11

**pick** 217:21,23 246:20 282:25 284:3

**picked** 186:8 283:5

**picking** 249:23

**picture** 160:2

**pictures** 179:24

**piece** 44:9

**pig** 83:19 84:6,21,25 85:2,14,18,22
87:9,15 88:9,10,13 90:19 103:14
104:24,25 105:2 141:20 154:13
182:23,25 183:11,14 184:14 185:11,
14 186:20 228:3 286:20

**piglet** 183:12,20,21 184:1,4,9,11,16,
25 185:2,22,23 186:12,17

**piglets** 102:4 103:15 172:19 283:14

**pigs** 71:3 72:1,6,17 81:5,14 85:11,19,
25 87:2 93:15,21 94:6,20,21 97:23
98:23 116:1 130:22 138:10 153:7
185:10 221:15,16,18

**pinpoint** 264:19

**place** 70:12 149:23 299:20 318:16

**Plain** 121:8,10,23 125:20

**plaintiff** 7:4,11,25 10:3 18:24 19:11,
14 27:9

**plaintiff's** 21:2 22:23 23:12 25:25
189:17 251:7 300:7 340:1

**plaintiffs** 18:1 19:18,19,22 34:7 36:3
251:10 290:13 335:5

**planned** 252:14

**planning** 192:17

**plans** 331:23

**plant** 65:23 75:16 181:6 252:22,25
253:15 255:4 262:15,24,25 263:19
283:22 307:8 308:6,19 310:15,16

318:15 331:7,24 332:4,13,24 333:4
335:13 339:12,23 340:17

**plants** 250:10 256:10 257:4 259:6
260:1,18,20 273:12 331:21 333:8
338:7 339:20

**plants'** 332:21

**plausible** 11:15 266:10

**play** 313:9

**played** 309:5

**playing** 314:10

**plots** 102:20

**plummet** 324:20

**point** 4:12 46:19 47:2,7 57:17 78:16
79:25 88:8,17 89:1 90:1 108:17
113:22 117:3 118:1 120:6 136:2
141:11 151:18 154:2 165:6 193:7
197:16,23 229:12 230:6,21 237:22
247:8 249:24 251:1 254:15 256:16
258:4 261:9 266:8 269:21 271:17
289:15 291:6 320:25 321:5 339:23

**pointed** 257:8 267:16

**pointing** 54:1 133:24 261:11 336:5

**policies** 220:14,16,22

**pork** 4:12 5:7 39:4 41:14 42:17 43:24
44:10 46:22 47:23 48:14 53:1,9,12
55:11 65:8 66:1 70:25 80:7,10 81:9,
11,15 82:2,10,23 96:24 97:24 105:4
106:10 110:19 111:9 123:7 130:15
132:2 145:25 152:14,15,19 154:4,7
155:16 156:1 157:3,7 158:24 160:3,9,
15,21 161:9,17 164:2 175:21 182:23
188:1 189:5,6 193:24 195:6 205:14,
24 206:6,9,11,12,13,23,25 207:5,9,
11,22,24,25 208:5,14,16,20,21,25
209:2,6,14,19,24 210:2,21 211:3,8,11
212:8 213:5,10 214:10 216:13,19
217:8,17 218:8,10,17,21 219:17,20,
25 220:19 221:6,8,18 222:6,19,23
223:9,21 224:8,9,15 226:14,20,25
230:7 238:15 239:8 240:19,20 246:5
253:5,16,18 256:7,8 257:4 265:12
267:4,9 282:20 284:20,25 289:23
292:3 293:15 295:1 302:6 314:18
316:15 327:24,25 329:9,14 330:5,12,
15,17 332:24 333:1,10,15,19 334:13
335:11,15 337:6 338:10

**portfolio** 30:18

**portion** 107:12 192:8 195:12 271:8

**portions** 107:11

**positing** 252:2

**position** 181:24 182:2 264:8 307:21 338:17

**positive** 218:11 246:3 267:6 268:7,8 269:7 271:19 272:1 273:16,18 279:18,20 336:1

**positively** 270:14

**posits** 243:8

**possibility** 35:10 94:14 182:10 233:8 275:7 285:11 294:18

**post** 279:6

**post-conspiracy** 216:8

**post-processing** 81:15

**potent** 252:6

**potentially** 197:21

**pound** 292:20 298:17,23

**pounds** 81:24 85:14 209:10 293:12

**power** 134:20 135:2 138:3 143:7,15, 25 145:24 146:10 147:5,18 172:7 183:22 185:12 187:4 276:9 282:5

**PPIC** 231:21,25

**practice** 6:23 10:24 319:18

**preceding** 214:22

**precise** 103:1 174:25 177:22

**precisely** 64:10,14 102:18 161:5,24 307:6

**precision** 62:6

**preconspiracy** 69:11 70:5,8 216:7

**precursor** 61:7

**predate** 174:8 220:21

**predated** 69:14 221:2

**predates** 64:13 213:13,19,22

**predecessors** 153:9

**predicate** 15:9 94:23

**predict** 192:25 193:1 214:1 256:21, 24 287:20 288:12

**predicted** 287:14 288:3,9 289:4,5,8

**predicting** 195:3 284:13

**prediction** 247:10,13 249:18 287:23 289:16

**predicts** 346:6

**preliminary** 12:2 70:17 73:17

**premise** 27:16 223:14

**premium** 284:25 285:12

**premiums** 284:18

**preparation** 341:21 342:9

**prepare** 341:12

**prepared** 96:18 264:5

**preperiod** 174:12 175:1 177:12

**presence** 246:17

**present** 3:23 10:18 277:19 289:1

**presented** 322:1

**presenting** 108:11 321:22

**press** 332:2

**pressure** 196:11 267:11 271:22 272:6 330:7 335:22

**presume** 89:9 169:21

**presumes** 27:13 206:10

**pretty** 113:15 124:8 302:23 319:10

**prevailing** 134:21,22 147:16

**prevented** 138:7

**previous** 22:10 70:3 119:8 159:8 298:1

**previously** 127:2 139:10,17 160:7

**price** 4:10 37:17 41:7 53:25 57:14 60:10 66:20 68:1,9,11 70:20 76:11 85:3 86:1,7 87:3 88:13,14,19,21,22 89:7 90:2,5 92:9 97:9,11 98:3 105:20 106:15 107:4,16,19 108:5,18,22 109:8 126:16 128:6 129:19 130:5,9, 11,16 131:9,14,19,22,23 134:21,22, 23,25 135:3,10,17,20 136:6 142:15 148:9 162:1 166:19 176:20 177:2,24 181:25 184:13,16 190:9,17 192:9 194:6 197:17 201:21 204:13 211:3,11 216:4 217:12,13 219:7,8 220:1 223:3 226:9 242:7 245:4,23 250:22 254:21 265:24 267:3,5,8,14 268:1,13 272:4, 23 274:10 280:16 282:4 284:14 287:9,15,17,24 288:1,9,12 289:4,5,8, 10,11,16 292:6,8,10,19,20 293:14 299:12 302:17 304:21 306:14 307:1, 19,22 308:4,11,14 312:24 317:16 318:20 320:6,17 321:2,14 322:19 332:8 334:6,11,18 337:1

**price-fixing** 27:19 28:11 32:13 33:13 36:4 37:17 39:17 57:15 305:10, 12

**price-making** 312:24

**price-taking** 321:8 322:25

**priced** 306:24

**prices** 24:7 25:1 34:10,22 42:22 43:16 44:11 45:4 53:1,13 54:20 56:22 58:23 59:19 64:11 66:21 67:7,12,13, 16,17 70:15 71:13 80:13 94:23 106:23,24 129:9,14 130:4,21 131:11, 13 133:12,22 136:13 138:5 143:11 147:3,18 154:9,16,19,24 155:8 156:19 157:1,8 158:25 159:3 175:15 176:8 177:10,13 183:22 185:16 186:14,18 190:19 195:6 197:10 198:4 201:7 202:17 203:10,11 211:10 212:22 213:25 214:3 215:12 225:6 241:25 242:9,20 243:18 246:5,16 247:13,16 254:19,22 255:25 257:11, 24 264:11 267:11 271:22 272:7,21 273:14 275:9 278:1,11,24,25 281:23 282:20,25 285:13 287:1,2 293:22 302:14 304:4 305:5,17 306:23,24 307:10 308:22,23 317:6,11,15 318:3, 11,12,23 319:7,15,22 324:18 328:3 330:7 335:11,22 336:7 338:22

**pricing** 110:12 113:3 115:16 124:18 186:24 192:8 204:11 256:22,23 265:22 275:24 281:8 285:7 319:4 320:22 321:23 322:4,5,7,17 324:12 334:3 343:11

**primal** 179:11,13 274:10 275:4,7 308:14

**primals** 178:21,23 179:1,10 180:5, 16,22 181:9,10,19,24 187:8

**primary** 45:1 62:10 321:2

**principally** 58:24

**principals** 17:14

**prior** 11:23 125:4 142:11 167:2 183:1 195:4,7 280:17 298:22 337:17

**priori** 251:23 252:4

**private-label** 294:20

**privy** 316:10

**problem** 11:20 105:12 155:2 219:5, 24 320:11

**problematic** 24:14 26:19

**problems** 155:10 219:11 301:2

**proceedings** 4:1 5:2 347:5

**process** 16:1 242:11

**processed** 76:8 81:15 130:21

**processing** 75:16,20 80:10 82:18,19 97:19,21 102:1 129:10 133:13 135:22

137:2 161:9 175:23 176:11,17 183:23
187:22 252:12,18 257:4 258:15,25
259:14 273:12

**processor** 75:13 77:2,14 89:6,10
178:16 181:15 182:2 187:14,16
243:19 270:4 280:15,20,25 281:16
285:7,10,11 308:18

**processor-product** 279:24 280:2,9

**processors** 129:11 180:24 238:15
312:13

**procompetitive** 27:1,15 28:1
204:15 243:25

**produce** 57:19 70:19 102:3 127:6
128:7 134:20 137:16 141:5,18,24
142:6 143:5 147:21 172:17 283:13

**produced** 82:10,23 99:6 113:10,12
114:6,8 116:2 117:5 120:8 125:23
129:3 134:4 142:18,22 150:10
207:11,24 212:9 240:13 241:11
289:22

**producer** 85:2,4,19,20,22 88:9,12,18
90:12 91:13,21,25 92:3,18 93:12,20
94:4,6,18 101:15 108:23 109:7,15
110:5,10 111:13,16,18 114:22 127:6,
21 134:23 231:20 234:1 286:9

**producer-sold** 113:2 115:14,24

**producers** 72:11 77:1 83:25 87:19
89:15,21,24 91:1,6 95:7,25 97:2,22
98:12 99:8,17 101:11 103:4 113:13
114:7,21 115:23 116:2 117:5 120:8
124:6 125:4,12,24 131:21 132:22
133:9 134:14 138:8 145:25 146:20
154:8,10,17 155:2,14,18 156:1,9,10,
18 157:13,19 158:18,22 159:11
160:4,6,10,15,21 161:17 162:7
168:12 172:17 205:24 207:22 208:4,
14,20 209:1,14,19,24 210:2 232:8
234:19 240:20 242:1

**produces** 87:18 89:2 115:13 179:23,
25

**producing** 92:16 111:13 141:15
142:14 286:20 315:6

**product** 12:15 17:14 143:11 190:9
193:9 200:15 219:14 229:13 230:8
270:4 279:25 280:21,23 281:16,22
284:7,12 285:4,5 290:15,16 291:2
294:6,11,23 297:12 298:8 299:3,9
308:1 324:16 328:3

**production** 40:19 75:20 90:25 92:3,
20,23 93:1 95:8 96:1 98:22,23 102:21
131:22,25 132:12 133:8 137:7,20,21,
22 138:4,9 141:20 146:4 148:17

157:20,25 158:1 159:9,18,22 165:22
168:6 169:12 172:21 178:16 190:4
211:25 212:5,14 215:23 216:1 219:2,
17,25 220:4 221:20 232:22 234:18
236:19,22 237:8 255:5 262:21 329:8,
9,14 330:2,5,12,16,18 333:10,11,15,
23,24,25 335:14,15 337:7

**Production-packer** 4:12

**productivity** 287:1,5,7

**products** 39:4 41:14 42:17 46:23
47:23 48:14 66:1 188:1,9 194:6 217:7
223:10,16,21 226:20,21,22 227:19
240:21 248:22 249:12 253:16 274:8
284:17 285:8 289:23 290:9,10,17,18,
22 291:2 293:15 294:20 296:4 299:7
307:19 334:7,9,11,12,13,15,19,22

**Professor** 121:23,24 125:20 271:1,3

**profit** 164:8,12 202:6,7 304:21

**profit-making** 67:15

**profitability** 90:11,14,25 91:5 92:21
93:11 96:21 158:18 159:16 164:15
165:15,21 166:11,13,19 167:18
168:3,7,13 237:12,16

**profitable** 93:13 167:6 191:2,4
194:11

**profiting** 320:12

**profits** 20:17 88:1 129:15 135:16,18,
23 165:1,2

**progression** 31:8 166:10

**project** 193:4

**projected** 102:24

**promote** 224:23 265:18

**promoted** 223:9

**promoting** 223:20 224:8 225:9
226:13

**promotion** 224:15 296:19

**promotions** 296:21

**prong** 302:22

**prongs** 302:20

**pronounce** 227:17

**proof** 63:7 226:3 227:9

**prop** 324:17

**properly** 203:6 260:12

**proposition** 153:7 238:21 319:10

**prospective** 313:5

**protection** 6:23 31:4

**provide** 65:1 144:14 150:8 183:12
296:24 310:13 319:19

**provided** 53:2 155:8 193:20 240:8
285:18 307:18 320:6

**provider** 99:1,2

**providers** 169:13 259:20

**providing** 67:15

**prudent** 172:20

**public** 115:3,5,7

**publish** 108:7

**publishes** 308:13

**pull** 13:14 14:1 18:8 139:6 151:24
194:23 328:25

**pulled** 250:25

**pulling** 306:24

**pun** 272:13

**punish** 309:9

**punishment** 303:25

**purchase** 71:3 74:8 106:20 109:1,2,
4,5,6,13 110:1,9,13,17,18,19,20
111:3,6,8,9,10,11 115:15 123:10
132:3 134:3 136:3 178:21

**purchased** 85:1 99:7,16 106:21,25
126:13,15 127:5 129:20 299:24

**purchaser** 276:2,13,23,24 277:14,16
280:4 281:7 293:21 294:16 297:9
298:19

**purchasers** 81:16 248:22 249:12
277:6,9,23

**purchases** 85:7 110:3 116:13
180:22

**purchasing** 131:20

**purported** 239:25 303:17 309:6
310:8 326:15 339:9

**purporting** 204:1

**purports** 203:13

**purpose** 132:5 144:10,11 225:5
272:17 323:3

**purposes** 25:5 102:13 337:20

**pursue** 301:9

**push** 76:14 116:10 282:4

**pushing** 8:22 143:10 337:18

**put** 13:7 24:18 51:24 60:17 76:9,22
109:23 135:14 177:6,7 184:2 185:1
186:5 211:9 226:5 265:20 267:10
269:10 271:22 272:6 280:18 311:19
328:12 330:6 333:3 335:22 342:25

**putting** 80:11 104:3 219:6 337:15

**PVD** 182:15,18 183:25 184:4,8 185:3,
4,19,23,25

---

**Q**

**Q&a** 142:25

**qualitative** 28:15 30:22 33:17 35:8
38:25 45:2,17 53:21 62:24 191:16,20
204:21 205:8 257:19,25 258:22 264:1
266:6,7 317:2 326:5

**qualitatively** 191:25

**quality** 218:10,17,21

**quanties** 219:6,9,15

**quantified** 40:18

**quantify** 8:25 9:2 10:12 11:7 12:8,23
13:19,25 14:10,13 204:1 243:16
319:14

**quantifying** 8:12,14,18 10:8

**quantitative** 28:16 33:17 35:9 39:1
45:3 53:24 245:1 257:22 264:10
265:22 266:13 317:3

**quantity** 168:25 212:7

**quarter** 80:22

**quarterly** 168:23 169:21,25 170:3

**query** 187:23

**question** 14:8,16 15:3,6,9,23 16:8
22:8,10,13 27:13,16 28:25 35:18
38:16,19 45:25 49:11 50:8 51:23
55:23 61:23 63:21 68:24 70:3 72:4
73:8 78:8,12,20 86:25 91:20 99:21,25
102:14 110:2 114:17,19 117:25
119:4,7,8,11,17 137:18 147:8 160:20
162:5,6 167:10 169:11 179:3 180:19
181:16 188:17 198:11 212:23 233:21,
22 237:6 241:17 242:17 244:8 254:6,
22 256:13 257:10,15 259:18,21 263:3
267:2 277:8,14 278:10 282:1 298:22
311:23 312:1 315:9 325:12 327:16
341:10 342:2,19

**questioning** 27:16 114:11 248:20
303:24

**questions** 15:16 51:22 73:16 89:9
116:8,9,15 142:11 199:4 210:5

266:25 285:15 341:11,15 342:17
346:22 347:2

**quibble** 325:11

**quick** 4:12 123:16 152:15 297:15
343:7

**quickly** 157:25

**quote** 196:8,12 245:3,8 266:23

**quote/unquote** 46:21 47:8 49:16,24
50:21 261:10 305:24 315:17 318:16
321:23

**quoted** 195:12

**quotes** 55:1

**quoting** 58:7

---

**R**

**ractopamine** 221:13,14

**raise** 43:16 54:20 56:22 58:21 67:11,
13,16,17 88:9 93:13 99:17 100:2
129:19 130:16 133:12,21 135:15,20
203:9 212:21 317:6,11 318:23 322:5

**raised** 72:1,9 98:11 123:22 124:6
125:4,11 127:18 131:8 162:24 206:6
208:5 211:3,24 221:16,18 223:10,21

**raises** 91:16 197:8

**raising** 85:17,18 88:9 90:10 94:20
97:23 146:22 147:10 158:19 286:11
307:10 322:19 338:22

**ramifications** 224:5

**ran** 278:10

**range** 173:14

**rank-and-file** 286:8

**ranked** 313:3

**ranking** 307:14,23 308:1

**rate** 90:19 104:24 182:23,25 183:11,
12 184:1,4,17 185:2,15,22,24 186:12
206:2 215:6 293:9 295:15,19,21,22
296:15 346:12

**rates** 293:7 294:10,19 295:9 296:3

**ratio** 183:11 324:19

**rational** 20:1,15 21:22 22:15 23:10
26:8,17 28:4 92:19 95:6,25 188:9
189:5 192:2 197:3 202:14 203:15
204:5

**rationale** 321:2

**ratios** 293:22

**reach** 183:14 184:15 251:25

**reached** 54:11 319:16

**reaching** 46:16

**react** 159:22

**reaction** 138:16

**reactions** 340:15,16

**read** 22:9,10 26:11 47:15 104:2,3
107:10,11,13 113:23 117:25 118:12
119:8 123:16 139:21 141:22 153:10,
13 232:24 240:2 259:1 330:1,4
341:16 344:3 346:25

**read-through** 346:16

**reader** 206:10

**reading** 23:7 149:23 233:1 343:4

**reads** 346:5

**ready** 103:14 139:20 151:15 181:18
329:25

**real** 123:16 217:25 218:3 233:12,22
313:17

**reality** 156:19 165:21 249:14 281:20

**realize** 12:22 72:8 284:25 346:18

**realtime** 32:11 47:1 148:23 165:10
308:15,20

**rear** 85:14

**rearing** 87:15 154:13

**reason** 38:6 156:2 247:12,18 251:23
252:4 259:24 265:17 278:20 298:18
303:2

**reasonable** 6:17,20 61:17 92:2,23
94:5 95:3 112:22 125:6 126:3 157:10
158:1 178:15 192:2 201:3,13 225:19
234:23 336:4

**reasoning** 64:8

**reasons** 27:2,12,15 92:25 97:2
172:2,9,15 204:16 236:25 237:4
252:8 263:3 276:16

**recall** 10:16 13:9,10,15 26:10 47:16
51:12 52:2 73:11 74:12 78:14 84:5
116:14 136:16,21 148:23 149:1
206:25 222:10 313:23

**received** 233:7,9 234:25

**receiving** 242:3

**recently** 47:15 143:24 144:17,23

**recess** 84:15 163:14 238:4 297:20 341:5

**recognition** 217:6 304:15

**recognize** 17:2 24:10 28:2 70:9 127:12 140:13 183:6 187:25 223:17 331:6

**recognized** 304:20

**recollect** 314:3

**recollection** 50:11 199:24 291:19

**recommendation** 234:4,16,17

**reconciling** 225:12

**record** 5:4,12,23 12:23 14:12 16:9 29:3 39:9 40:4 43:5 45:16 46:7 51:5 62:4,25 63:21 66:9 70:10 71:15 84:14,18 87:5 113:24,25 116:25 118:1 141:16 143:18 160:8 163:13,17 175:2 188:14 189:16 193:12 199:18 205:2 207:5 211:5 238:3,8 247:25 252:4 258:1,4,6 263:13,25 264:12 266:1,5 277:11 297:19,23 302:15 319:17 326:10 330:4 340:14 341:4,8 342:25

**record-high** 154:9

**records** 78:5 209:7

**recover** 335:6

**recovered** 272:4

**redo** 255:20

**redound** 137:16

**reduce** 43:3,15,23 44:10 45:4,9,22 46:4 52:25 53:8,11 54:19 55:11 56:9, 22 59:9,17,18,25 60:21 62:11 65:4,8 66:15 67:2 70:25 71:12 77:11 80:7,16 81:8 91:14 92:3,20,23 94:12,18 104:20 128:16 130:25 131:1 135:17 138:24 172:20 214:16 222:1 232:20 259:19 261:12,18 262:9,20,23 265:5, 12 317:7 339:3

**reduced** 54:15 61:1,9,25 63:11 79:23 101:8 128:22,23 161:16 175:7 189:15 191:13 219:8 223:4 229:15 259:3 261:24 336:25 338:23

**reduces** 80:12 81:10 93:1 97:24 137:20

**reducing** 42:21 45:21 81:3 101:17 138:12 172:11 231:17 339:9

**reduction** 36:11 42:25 56:4,12 59:24 62:7,9 63:13 65:15,17,22 66:7,10,12, 23 67:19 75:14,25 79:21,22 80:1,15 81:2 95:2 100:10 102:8 129:1,2 131:8

134:11 142:15 157:7 159:16 160:25 169:7,17 170:6 171:10 172:2,8 173:15 215:20 229:14 230:22 236:7 259:12 261:1

**reductions** 62:20 66:15 160:24 250:21 261:10

**refer** 32:4 72:10 195:14 238:11 254:25 278:3

**reference** 65:7 154:2 156:5 198:24 235:6,9 241:23 249:25 271:17 276:18 291:6

**referenced** 330:10

**referencing** 199:5 276:17

**referred** 26:8 156:7 227:12

**referring** 57:7 89:20 153:24 202:17 203:20 231:18 258:16 274:14 306:2

**refers** 121:13 305:3 331:22

**refile** 30:2

**reflect** 70:17 195:25

**reflected** 165:12

**reflects** 170:5 281:20

**refocus** 256:21

**refrain** 71:2

**refreshes** 199:23

**regard** 34:10 87:22

**regime** 306:15

**regions** 297:5

**regression** 24:20 154:14 161:23 168:20 170:21 174:14,15 203:21 204:9 217:12,14 219:7,8 220:2 245:9 257:23 268:2,17,25 273:25 277:15 291:15 298:11 321:14 337:1 343:20

**regressions** 276:20 291:23 295:5

**reject** 45:24

**rejected** 23:16,19 340:2

**rejects** 22:25

**related** 90:15 176:2 345:7

**relates** 144:5 239:25

**relating** 10:2,7

**relation** 108:14 321:17

**relative** 41:24 164:14 168:12 203:2 214:19,22 222:17 254:1 258:9 285:12 338:23

**relayed** 146:12

**release** 69:5 332:3

**released** 144:18

**relevant** 76:9,23 78:25 80:9,11 81:11,13,18 82:7 83:25 90:6 97:18 98:15 101:25 104:21 130:4 131:6,14 132:16 133:5,22 134:2 135:21 141:15 161:8 169:4 175:22,23 176:1,17 181:22 186:14,24 212:4,23 242:10,20 254:6 256:13 259:13 271:23 272:4,7 284:25

**reliability** 272:9

**reliable** 11:15 14:1 16:3,24 17:14 24:15

**reliably** 14:5

**reliance** 106:3

**relied** 79:16 84:3 88:6 144:15 152:24 228:17

**rely** 68:8 322:22

**relying** 145:12 178:13 199:25

**remainder** 195:8

**remaining** 125:2

**remarkable** 214:20

**remember** 140:9 144:21 149:18 163:22 189:10 194:17 199:7,9,21 315:9

**remembering** 194:8

**remote** 5:6

**remove** 39:15,25 40:3 41:9 56:17,19, 24 57:9 185:13 229:8 279:15

**removed** 60:13 229:7

**removing** 60:7

**repeat** 289:15

**repeats** 165:3

**replace** 242:1

**replacement** 243:23

**report** 4:9 6:1,8,12 7:3,10,14,19,23, 24 11:6 21:16 28:12 32:4 33:24 36:14 37:2 42:24 43:5,19 46:8,25 47:3 50:12 52:14 54:16 57:20 65:12 78:10 84:4 87:14 90:23 96:5,16 105:19 107:14 112:10 113:1,9 114:6,20 115:10 116:1,3,5,19 117:12,14 119:12,18,19 120:10,16 128:2 135:5 140:7,10 144:11,22 145:7 152:24 153:10 172:5 180:11 181:21 189:20,

24 190:15 191:23 193:20 194:20 199:17,20,21,22 226:3 238:12 243:22 244:22 245:20 248:12 258:20 259:1 266:20 274:15 300:11 303:21 304:8, 10,14 307:15,18 309:20 310:3,25 311:6,11 312:4,7,23 315:15 317:23 321:1 322:23 323:4,10,15 324:3,14 325:1,2,22 327:2 329:5 331:22 341:17 342:9,14,15

**reported** 111:5 112:11 115:5,7 122:13 124:21 125:11,23 128:1 329:11

**reporter** 4:4 5:13 22:2,9,11 33:10 69:23 116:17 118:5 119:9 158:4 197:19 233:23

**reporting** 86:1 87:3 106:6,17 107:5, 17,19,20 108:6 112:21 115:18 117:14 119:13,23,25 122:20 125:19

**reports** 4:10 30:2,4 69:6 105:21 108:6 115:13 120:13 150:8,14 164:16 255:14 308:2,13 309:16,19 311:8,17 313:22 315:7 317:10 319:20 320:15, 21 321:22 322:1,3 323:6 324:11 326:12 327:8,17,23 328:7

**represent** 278:21

**represents** 106:21

**Reproductive** 29:14,17

**request** 205:24

**requested** 314:12 327:5

**require** 212:3

**requirement** 107:14

**requirements** 112:21

**requires** 20:15 112:9

**requisite** 11:17 63:7 197:20

**research** 146:13

**researcher** 294:1

**researchers** 85:15

**resold** 299:25

**Resources** 121:15

**respect** 38:13 39:8 43:7 45:20,21 46:10 50:16 54:11 60:4 71:20 73:20 97:13 128:5 135:9 142:4 162:23 190:3 204:21 258:15 261:1 307:12,21 318:3

**respectfully** 45:25

**respond** 168:12 314:3 328:8

**response** 49:13 101:16 103:5 138:11 147:2,16 148:2 314:6

**rest** 240:7 275:25

**restaurant** 284:20

**restraint** 9:1 39:13,23 40:2 43:10,14 56:17 60:12,13,20 100:25 101:4 189:12 191:10

**restraints** 332:15

**restrict** 97:22 128:16 253:17 332:25 338:9

**restricted** 258:25

**restricting** 253:5

**restriction** 221:13,14

**restrictions** 221:6,10

**rests** 141:6 142:6

**result** 19:2 172:8 237:18 261:4 284:23

**resulted** 8:5 157:8 226:14 239:16 298:24

**results** 269:23

**retail** 91:7 292:6 296:25 297:2 299:13

**retailer** 277:2 294:5,21 299:18 327:6, 25

**retailers** 296:17

**retailers'** 296:18,22

**retained** 10:3 11:11 12:8,20 13:17 14:10 16:6

**retaliate** 304:3

**retention** 11:23 14:9 15:10,11

**revenue** 143:11

**reverse** 29:25

**reversed** 14:6

**review** 44:14 45:16 51:24 53:21 62:24 67:24 193:12 195:23 259:10,11 319:17 321:7 341:15

**reviewed** 29:3 46:6 47:22 48:13,24 77:18 78:5 84:3 87:6 88:5 122:24 134:9,12 143:15 200:9 265:1,9 315:14 321:20

**reviewing** 8:2 342:9,14

**revise** 49:11

**revisit** 244:12 256:1 334:5

**RFP** 327:7 328:13

**rib** 273:24

**ribs** 179:17

**RICHARD** 3:9

**rig** 337:16

**right-hand** 219:7 220:1 229:16 287:18 288:15 295:5 336:25

**rigors** 332:5

**ring** 312:13

**ringing** 152:21

**ringleader** 44:19

**rise** 211:10

**risk** 241:2

**RISSMAN** 4:3 9:12,24 10:14 11:24 12:25 13:4 14:15,23 15:4,12,17 16:18 17:10,24 19:7,21 20:4 21:25 23:24 24:16 25:8,19 26:20 28:6 33:6,8,11 37:24 38:10 41:16 42:18 44:1,22 45:14 46:5 47:10 48:9,20 49:3 50:1,6, 23 51:7 52:12,21 53:16 54:8,24 55:16,25 58:4,10 59:10 60:1 61:2 64:20 65:19 68:3,21 69:3,15 70:6 71:5 73:1,14 74:10,18 75:4 76:4,19 77:3 78:2,17 79:2,6,14 83:7 84:8 86:9,17 88:20 92:4,24 93:16 94:8 95:9,15 96:2,14 97:25 98:18 100:12 101:18 103:7 105:8 107:24 108:8 109:16 112:13 113:14,21 114:9,16 117:16,23 118:3,8,19,23 119:15 123:24 126:1 127:22 128:8 129:5,21 130:18 132:23 134:6,17 135:12 136:8 137:8,24 138:13 139:9 140:16 141:12 146:24 147:14,24 148:10,18 149:16 150:18 151:4,11,20 152:3 153:21 155:4,20 157:22 158:5 159:13 161:2, 19 162:11,25 163:10 165:25 167:21, 23 168:15 172:12,23 173:17 178:5,17 182:3 189:9 190:11 191:7 193:10 199:3 200:4,17 201:10,15 203:18 204:7 208:6,23 209:15 210:3,14,24 211:14 212:1,10,18 213:16 214:11 217:9 219:21 222:7 223:22 224:10 225:14,16 228:8 230:10 233:5,14,19 234:21 237:2,13,25 241:7 242:16 244:1 245:12,16 252:16 255:9 259:7 260:2 263:8,21,24 264:21 274:11 302:9 304:17 306:3 310:10 314:14,22 315:18 316:18 317:20 319:23 320:18 321:4 322:10 323:17 324:6 325:3,9 326:16,22 327:10 328:9 329:17,22 330:13 331:1 332:10 333:12 335:18 338:12 339:16 340:11,22 342:18,21 346:23

In re: Premier litigation. CASE Unitst Litigation 76-JRT-JFD Doc. 1463-22 Filed 08/24/22 Page 121 of 127

Hal Singer
June 24, 2022

**rival** 108:14 116:11,12,22,23 120:1
318:25

**rival's** 302:14

**rivalry** 132:6

**rivals** 120:3 137:7,17,22 303:23
319:8 324:15 338:14

**River** 3:23

**role** 309:5 313:9 314:10

**Ron** 121:8,23

**room** 232:9

**roughly** 183:14 201:4

**routed** 185:9

**rparker@gibsondunn.com** 3:10

**rude** 233:15

**rule** 28:19 34:16,24 35:12 38:6 92:6,8
111:17 233:8

**ruled** 29:20 30:21

**run** 74:24 76:1 80:13 81:8 181:5
187:20 260:23 265:10 275:4,6,12
276:1 277:12,15,25 279:2 296:14
344:19

**running** 228:22 276:20 290:3 296:19

**runs** 170:20

**Russia** 219:2

---

**S**

**sacrifice** 202:6,7

**safe** 320:7

**safety** 218:10,17,20,24

**sale** 89:4 122:20 125:4 230:7

**sales** 57:19 85:24 86:6 87:1 98:24
107:3,14 119:22 122:25 181:14
187:13 191:5 196:12 208:2,14 209:1
221:8,18 229:6,7 268:21 320:15
321:22 323:6 324:3,9 325:1

**sample** 113:1

**sat** 307:6

**satisfied** 205:8

**Saturday** 74:24 75:1 76:1,17 80:1,
16,20 81:3,6,8 258:16 259:2 260:22
261:21 262:8 264:18 265:10

**Saturdays** 80:21 261:6 262:2,5

**scared** 158:24

**scenario** 156:17 328:17

**scheme** 21:5 203:5 265:7

**school** 271:9

**SCHWINGLER** 3:5

**scope** 173:2 192:7 224:24 228:14

**screen** 105:14 151:24 164:9 245:17

**screening** 16:1

**scroll** 111:22 141:1

**Seaboard** 3:2 196:6,21 231:14 232:1
235:12,21 236:3 252:24 311:7 331:23
332:7 338:6

**seasonality** 291:12,14,16,20,23
294:25 298:8

**section** 26:25 27:4,22 28:22 46:9
65:13 66:8 78:5,9,10 84:4,6 87:14
91:4 96:5 104:4 135:5 153:12,16
170:21 174:14 188:25 200:6 216:3
231:1,5 239:8 257:20,25 258:19
261:16 264:1 311:2,6,10 312:6
322:21 343:20

**sections** 47:14 52:1

**sector** 141:5

**secular** 171:13 216:25 218:7 222:13
282:23

**seeking** 250:8

**seized** 323:2

**seizes** 321:9

**seizing** 324:8

**selective** 272:24 274:5

**self-interest** 26:18 28:5 197:3

**sell** 88:12 293:20

**seller** 281:18 295:11,14

**seller-buyer** 109:9

**sellers** 111:22 112:4

**selling** 89:8 118:14 135:21 180:16
191:2 207:25 327:25

**sells** 92:1

**seminal** 271:6

**send** 34:6 258:19 305:8 312:6

**sending** 208:11

**sense** 41:19 94:12 130:15 180:25
182:1 189:1 218:18 292:14 323:13

**sensitive** 32:14 36:6 56:23 59:1,20
60:14 68:7 229:20 248:7 300:13
318:2 320:5

**sensitivities** 275:12

**sensitivity** 274:14 278:15 279:5

**sentence** 126:12 206:9 207:19
235:16 286:16 345:5

**separate** 10:3 23:22 47:13 51:21
56:16 67:1 71:18,20 101:3 176:4
182:24 185:5 270:18 275:4 276:1,20
277:13,15 294:9 296:2,24 337:25

**separately** 337:12

**September** 145:15

**sequence** 250:11

**series** 116:8 166:22 186:2 251:11
283:2 285:18 323:20

**served** 32:15 187:13 284:21

**serves** 187:15

**service** 277:3

**session** 51:25 151:3,9 342:5,6

**set** 57:12,16,24 60:8,10 61:7 125:21
134:25 161:7 179:1 215:14 226:1
228:23 287:3 295:21 332:16

**sets** 124:16 276:9

**setting** 76:10 119:21 155:10 207:5
214:2 228:12 301:16

**share** 57:3 91:7 138:22

**shared** 128:5 129:12

**sharing** 36:5 50:14 56:22 58:25
59:19 60:14 229:19 306:17,19 319:7
320:9

**sharpen** 328:2

**sheep** 106:9

**SHEET** 4:4

**shift** 74:25 76:1 80:15 81:8 216:22
261:21 265:10 284:1

**shifts** 80:1 258:17 259:3 260:22
337:22

**shipped** 190:5

**short** 80:13

**short-lived** 159:21

**shoulders** 179:2,17

**show** 17:19 18:24 31:9 65:13 115:13
146:14 164:16 203:13 215:22 266:8

290:25 311:22 323:24

**showed** 153:13 225:22 283:2 314:6, 7

**showing** 48:13 49:23 85:7 87:18 114:24 125:21 140:22 143:18 166:11 171:21 191:20 308:13

**shown** 166:22 272:21,22 310:5

**shows** 45:17 124:20 129:7 148:21 154:23 213:8 248:13 264:10 269:17 320:3 323:9 344:13 345:1

**shrinking** 276:9

**shut** 253:23 262:1,4,14

**shutdown** 92:6,7 263:4

**shutting** 92:11

**sic** 121:25 183:7 231:23

**sick** 273:13

**side** 219:7 220:2 229:17 281:10,11 287:18 288:15 293:20 295:5 336:25

**sides** 281:18 282:9

**sign** 267:3,14,25 268:6,11,23 269:1, 17 271:15,25 273:1,4,15 335:25 346:25

**signed** 213:9

**significant** 105:3 138:22 164:21 170:6 172:7 183:7 224:7 227:11 228:3 252:12 270:14 272:11 273:20 279:19,20 333:20 335:3,14 336:1 337:22

**significantly** 255:4 338:10 340:8

**signs** 268:9 270:19

**similar** 275:1 345:7

**similarly** 93:12

**simplest** 279:15

**simply** 115:23

**simulate** 192:13

**simultaneous** 14:21 93:5 100:14 112:18 145:1 179:5 196:3 232:13 242:13 253:8 269:3 339:4

**Singer** 4:2,9 5:7,16,24 6:2,8,11 12:19 15:22 39:20 50:10 114:2,15 119:5 139:19 150:22 152:11 163:19 164:11 233:21 297:25 322:15 342:18

**Singer's** 20:12

**single** 44:7 46:19 47:7 54:19 56:21 71:11,21 100:24 203:8 230:7 250:16

251:8 265:8

**single-firm** 27:22,23

**sir** 120:22 152:7

**sit** 220:24 226:25 236:2

**site** 144:21

**sitting** 47:5,12,21 48:10 73:5 78:7,15 83:20 84:6 86:3 87:20 98:14,19 99:9, 25 100:5 101:12 102:5,17 104:10 117:10 126:6 127:1,8,10,25 132:17 140:4 172:14 187:16 189:20 194:18 196:18 216:11 222:10 224:4 230:5 234:25 269:9 295:2 304:11 311:4 328:11

**situation** 83:3

**Sixth** 3:3

**size** 132:21 169:18 170:7 171:10 293:16

**skewed** 293:22

**skills** 16:14

**skipping** 13:22

**SKU** 298:21,23 299:21,22

**slash** 282:11

**slaughter** 71:25 72:5,19,23,25 74:4, 9 75:25 76:2 80:6,16 82:20,24 83:1,5 106:8 181:5,18 183:15 184:15 264:18

**slaughtered** 65:25 75:1 76:16,18,21 82:3,25 98:11 125:10,22 180:6,18 181:10

**slaughtering** 71:2

**slaughters** 99:6 100:3 127:18 179:9

**slice** 269:15

**slices** 272:25

**slight** 171:6

**slightly** 249:15

**slow** 75:18,19

**slowed** 77:15

**small** 346:3

**smaller** 42:1

**Smithfield** 3:7 99:4 103:6 127:17 138:11 149:8 194:15 195:3,13,22 230:22 231:3,8 232:2 235:6 236:14 242:7,24 262:14 343:12

**Smithfield's** 102:8 104:7 262:20 263:19

**snapshot** 216:6

**snout** 180:3

**snouts** 228:4

**Society** 29:14,17

**softened** 154:8

**sold** 98:10,12 113:3 114:22 115:13 120:16 124:7,17 125:10 130:22 137:2 197:10 201:7 259:15,16 284:19 292:12 294:6 296:4 299:10

**solely** 141:6

**solve** 41:7 60:10

**someone's** 324:19

**sort** 64:7 80:2 120:17 150:17 197:24 202:2 269:20 312:15

**sorts** 97:16 219:23 287:7

**sought** 311:25

**sound** 25:3 227:19 242:25

**sounds** 6:16 66:25 187:16,21 194:16 198:12 207:15 237:25 255:17

**source** 150:1,6 294:11,12

**sourced** 98:25

**sources** 144:12 235:22

**South** 3:3 239:13,22

**sow** 56:4 59:23 60:25 61:9,24 62:19 64:19 72:14 83:19 100:10 101:9,16, 17 102:4 103:5,25 104:1 128:16 129:1 130:25 131:8 138:8,12 149:8 160:24 161:15 162:8 169:8 170:7 172:3,10,19 173:16 175:7 230:22 231:11,12,17 232:20 236:6 241:24,25 243:1 250:21 286:25

**sows** 59:25 60:25 66:15 77:21 91:15 102:8 103:17 104:9 134:15 141:7 142:7 168:25 172:21 235:7,10,13,21 236:4,12 237:1,11 242:1,8 243:24

**soybean** 286:7 287:1

**spanned** 247:20 250:17 251:9

**spare** 189:21

**speak** 44:4

**speaking** 57:5 82:15

**speaks** 43:6

**special** 159:5 272:12 281:7 335:5

**specific** 37:7 50:4 83:22 111:23 246:25 250:2 264:17 273:23 283:7 315:6 316:13 317:14,16

**specifically** 8:17 142:20 185:8 231:19 233:2 261:19 285:24 334:7,21 336:12

**specification** 249:16

**specifications** 273:2

**speculation** 134:7 323:18 327:11 340:12

**spelled** 243:12 317:23

**spend** 342:8

**SPF** 236:1

**SPF00294998** 238:25

**split** 101:13

**splits** 100:1

**spot** 109:6 123:3 239:7 269:11

**spotted** 343:5

**spread** 146:15,18

**spreadsheets** 305:15

**spring** 239:15 329:15

**squeeze** 143:19 145:25

**squeezed** 172:6

**squeezing** 144:1

**stability** 300:25

**stable** 303:5

**stacked** 251:12

**staff** 48:16 273:12 341:14,19

**staffer** 153:13

**staffers** 87:6

**stage** 103:22 291:20 301:17

**stand** 235:18

**standalone** 54:13 56:17

**standard** 16:17,21,25 20:3 21:24 22:18 29:8,10,24 38:6 282:22

**stands** 86:22

**start** 7:12 174:15,25 183:4 269:21 334:25 335:7

**started** 229:19 315:6

**starting** 18:22 27:14 238:14 332:4

**starts** 20:10

**Stat** 189:24

**state** 5:22 9:19 87:11,18 285:18 286:24

**stated** 119:1 180:1

**states** 18:23 89:16 101:10 132:9 169:1 207:4,11,24 208:15 209:2 221:19 226:21 227:4 259:17 262:14

**statistic** 104:5

**statistically** 270:14 272:11 273:19 279:18,20 336:1

**Stats** 32:15 36:6,18 44:9,15,18,25 48:2 50:14 52:11 53:3,7 56:24 57:4, 11,18,23 58:2,14 59:1,21 60:16 67:15 69:6 70:10 108:10 150:7,13 191:22 193:19 202:3 229:19 230:2 238:15 248:11 300:3,4,23 302:3,15,25 304:14,20 305:3,7,23 307:15,18 308:2 309:5,13,24 310:13,25 311:8, 14 312:4,14,19,22 313:20,24 314:2,6, 10,18 315:6 317:10,16 319:20 320:15 321:1,7,22 322:17,23 323:1,6,14 324:3 326:12 327:8,17,23 328:7,12, 16 337:15

**Stats'** 255:14 308:23 309:16 311:16

**statute** 335:1

**stay** 92:15 112:1

**stayed** 40:15

**stays** 206:2

**steadily** 172:10

**steady** 213:10 218:7

**steaks** 284:22

**stealing** 318:18

**STENOGRAPHER** 69:25 118:6

**stenographic** 5:12

**step** 35:23 37:19 63:10 86:10

**stepped** 239:15

**Steve** 139:25

**stick** 151:9

**STINSON** 3:2

**stip** 79:14 86:18

**stood** 29:16

**stop** 118:19 338:17

**stopping** 103:4

**stores** 296:25 297:5

**stories** 219:24

**story** 198:6 273:9 336:3

**straight** 175:2

**straightforward** 274:20

**strategies** 229:17

**strategy** 77:9 198:2 238:17 240:19

**Street** 3:3,17

**strength** 241:25

**stretched** 250:8

**stretches** 323:7

**strike** 70:3 182:21

**strikes** 12:19

**strokes** 32:12

**stronger** 239:17

**structural** 248:2 251:22 254:25 255:1 336:18

**studied** 16:11 104:14 132:6,18 133:4,5 138:14,16 139:4 157:9,10 166:6 175:15,16 181:13 182:6 213:1 252:19 257:13 340:16

**studies** 122:16 143:23 144:7

**study** 4:11 121:7 126:8,16 139:22 140:9,22 144:17 145:5 171:14 192:7 204:11 224:5 228:15 278:25 296:17 325:19 331:20

**studying** 11:11 96:23 97:6,8,10,17 145:16 169:11 213:25 228:15

**stuff** 84:2 164:1

**stumbling** 195:9

**stupendous** 214:19

**sub-bullets** 330:1

**subgroup** 277:13

**subgroups** 275:15

**subheader** 106:19

**subject** 20:2 21:23 22:16 55:22 56:1 62:3 85:25 87:2 107:4 115:15

**submit** 16:24 308:7 327:6

**submitted** 7:3,10,13,19,23 114:25 115:10

**subscribe** 319:11 323:6,14

**subscribed** 248:11,14

**subscribers** 312:19

**subscribing** 323:4,24 325:22 326:12

**subscription** 324:3 325:1

**subsequent** 173:16

**subset** 269:16

**substance** 163:20,25

**substantial** 138:21

**substantiates** 189:1

**substitute** 267:9

**substitutes** 267:4

**subtract** 287:13 288:1

**subtracting** 125:13

**successful** 311:3

**suffering** 236:16

**sufficient** 88:19 159:22 310:1

**suggest** 70:10 75:12 92:11 116:21
166:13 248:1 249:3 252:4 270:11
276:13,20 293:23

**suggesting** 143:24 199:8 211:5
260:24

**suggestion** 248:3

**suggests** 258:6 286:16 330:17

**Suite** 3:3,17

**summarized** 32:9 43:5

**summary** 32:19 149:21

**supplied** 133:19 346:9

**supplier** 282:11

**supply** 40:24 43:24 44:10 45:9,23
53:1,8,12 54:20 55:11 56:9 58:21,23
59:9,17,18 61:12 62:11 65:5,8 70:25
71:12 77:11 79:23 80:7,9,17 81:4,9,
10 82:1,9,15 96:24 97:3,14,24 101:8
104:21 105:3,4 106:15 131:1 138:24
142:5 147:6 161:1,22 175:20 176:16
191:13 202:20 214:17 219:13 222:1
253:6,15,18 256:7,8 265:12 273:9,11
284:1 316:15 333:1,19,20 337:22
338:10

**support** 20:14 198:3 207:18,20,23
230:3 238:20

**supported** 207:10,12 208:4 211:24

**supporting** 207:14

**supportive** 193:15 198:21

**supposed** 33:19 214:9 221:23
226:15 229:11 230:21 264:20 323:15

**supposedly** 212:14

**suppress** 58:20,22 133:12 135:3

136:13 143:10 147:18 203:9 258:3
332:14

**suppressed** 147:4 163:6 229:23

**suppressing** 148:9 190:19

**suppression** 102:20

**Supreme** 30:1

**surges** 239:14

**surmise** 127:9 237:17

**surprise** 168:11 216:16

**surprised** 170:14 174:22 253:3

**surprising** 273:1 312:8,18

**surrounding** 141:22

**Suslow** 204:24

**suspend** 65:24

**suspicions** 197:9

**swapped** 305:14

**swear** 5:14

**swine** 106:9 110:18 111:9,24 112:2
123:6 156:7 157:2 171:11 218:12,25

**swine-pork** 126:15

**swiping** 14:19

**sworn** 5:17

**symmetric** 180:2

**system** 122:14

**T**

**Tab** 6:2 18:8,13,15 105:7 120:22
139:6 151:22 205:14 223:5 230:18
238:24 328:20 333:9

**table** 102:19 124:16,20 148:20 149:1,
18 164:9,12 248:18 267:13,20 268:3
270:1 272:18 273:18,21 275:15
277:12,19 278:4 279:23 295:14 323:9
325:23 345:20,25

**Tables** 297:8

**tacit** 34:17,25 35:11

**tail** 180:4

**takeaway** 22:20 23:3

**takes** 103:24 183:14 184:14

**taking** 195:18 199:23 292:8 299:20
316:21 318:15 322:17 326:14

**talk** 36:8 42:25 44:13 100:18 180:12
189:21 195:2 226:4 231:15 298:5
316:4 320:20

**talked** 67:22 222:12 283:1,11,13
338:2,21

**talking** 49:22 51:3 56:7 80:8 82:6,9,
17 93:19 138:1 204:8 206:17 231:13
270:24 277:10 299:9 343:24

**talks** 87:14 329:7

**tamp** 256:7

**tamper** 254:1

**tape** 151:18

**Tar** 262:14

**targeting** 81:23

**tautological** 12:12

**tautology** 12:18

**teachings** 251:21 252:9

**technical** 173:9,10 219:5

**technique** 274:20

**technological** 282:18 283:6,16,21

**telling** 51:11 225:3,7 246:15 247:2
257:12 268:10 278:5 280:12 284:11

**tells** 96:11 149:19 154:5 155:17
166:24 258:8,13

**temporarily** 65:25 158:25

**temporary** 75:24 80:6

**ten** 59:15 214:14

**tend** 165:22,23 167:19

**tens** 253:13

**term** 33:23 88:4 89:23 133:17 178:3,
10 184:20

**terms** 38:22 88:1 184:20 207:16
283:12 297:10 309:2 316:16

**test** 197:7,14 206:19 248:16 250:15
258:21 264:24 266:11 272:13 278:15
283:9 288:25 289:17 290:3 336:19

**tested** 255:6 287:11

**testified** 5:18 6:13 9:16 86:15

**testify** 10:11 23:5 49:6 73:3 96:19
260:4

**testifying** 118:17,21

**testimony** 30:4 43:25 47:11 50:24
52:13,17 57:8 58:5,12 59:11 71:7
75:7 77:5 117:7,9,10 129:22 156:16

163:20 200:5 222:9 250:1 256:5
260:11 298:1 300:4 306:4 316:5

**testing** 247:22

**tests** 272:19 275:1

**text** 107:8

**textbook** 44:18 271:10,13

**textbooks** 271:7 276:19

**TFP** 235:25

**theoretical** 344:18

**theory** 21:4,19 22:24 23:1,12,13,18
24:24 166:16,17 167:11 186:13 188:7
217:24 243:5,8,12 247:22 251:8,14
252:3 276:12 300:7 311:13 328:15
332:15,21 333:5 340:1 346:6

**thing** 60:5 107:12 135:15 169:15
175:10 186:1 191:15 199:12 214:5
285:3 295:17 297:6 298:13 301:12
302:1 309:14 318:20 338:16

**things** 49:6 67:9 75:8 76:6 77:15
80:2 86:19 97:16 138:11 168:18
173:7 199:5 204:24 217:11 218:23
222:5 228:13 255:25 259:14 271:21
284:1 285:4 298:2 300:19 305:12,22
307:17 308:5 335:11 338:15 343:5
346:15

**thinking** 34:20 196:14 254:13 293:2,
4

**third-party** 116:22

**thought** 12:14 20:25 83:15 146:3
158:11 183:21,24 184:22 224:18
251:10 253:4,12 255:2 298:16 311:20
337:21

**thousand** 30:4 203:1

**three-part** 258:21

**three-pronged** 205:3

**tick** 31:14,19 213:10

**ticked** 171:25

**time** 5:5 14:18 31:20 42:3 74:2 80:14
83:1,25 84:12,13,17 91:9 95:5 98:16,
17 102:21 104:22 106:22 115:14,20
116:7 117:3 118:7 120:6 126:5
133:17,23 134:2 146:16 151:1,17
156:9 157:14 159:23 160:16 162:9
163:11,16 164:25 165:4 166:22
169:2,13 170:7,10 171:15,25 172:11
173:22,25 174:6 176:12 183:14
184:14 192:17,21 210:22 211:23
216:20 217:8,14,18 218:3,5 222:14
225:1 234:9 238:1,6 239:3 246:19

247:6,8 248:12 249:15 251:1,12
253:2 254:5,15 265:24 269:14
282:17,18,25 283:3,5,18 284:3,4
286:8 295:19 297:18,22 300:25
306:24 325:19 329:17 330:25 332:9
335:12 340:10,21 341:2,7 346:20
347:2

**times** 7:3,13 11:2,5,18 29:6 30:11
37:1 47:15 55:4 58:18 59:15 71:17
140:6,12 154:7 189:13 199:1 203:1
214:14 229:4 299:15,17,19

**timing** 75:15 261:21

**tint** 244:5

**tipped** 310:15

**tire-kicking** 270:21

**tired** 298:3

**title** 105:19 139:23 152:15

**titled** 28:22

**today** 36:22 78:15 199:12 204:18
220:25 226:6 230:6 236:2 269:10
283:11 331:9,13 341:13 346:20

**today's** 347:3

**TODT** 3:19

**told** 19:10 33:14 44:24 193:17 215:19
251:6 273:9 295:24 298:11

**tons** 209:9

**toolkit** 11:16

**top** 104:5 121:13,18,22 126:11 160:1
207:3 242:3 310:14

**top-line** 66:11

**topic** 73:21,25 128:10

**total** 87:15 108:22 337:11

**totaled** 209:8

**totality** 21:13 321:16

**touched** 36:8 51:14 60:3 100:25

**touches** 78:6

**trace** 299:11

**track** 167:17

**tracks** 229:19

**trade** 220:13,14,15,22 221:1 239:8

**traditional** 57:14

**Tran** 3:23

**transaction** 98:25 194:5 229:6
280:13 281:18 284:14 287:20 288:11,

16 289:17 320:25 321:6,15

**transactions** 288:18,22 289:20
321:12

**transparency** 106:16

**transparent** 106:8

**travel** 283:5

**treat** 25:6,17 39:22 43:9 70:7 191:5
334:24 335:4

**treated** 69:10 197:4

**treating** 191:9 202:13 337:19

**treats** 26:16

**trend** 170:9,10,13 171:12,15,24
173:15,19 174:3,5,6 175:6 213:19
214:21,23 215:23 216:20,25 217:14,
19 218:5,7 222:13 282:17,23,25
283:19 284:4

**trendline** 173:12

**trends** 171:16,25 176:12 283:21

**trigger** 212:13

**triggered** 77:14

**Triumph** 252:24 331:23 332:8 338:6

**trivial** 275:10 291:25

**trouble** 273:23

**true** 49:18 135:16,19 143:17 162:22
208:8 236:3 288:24 289:3 297:4
340:4 344:16,18

**trust** 96:25

**tune** 160:22

**turn** 10:24 105:7 108:25 121:21
140:25 151:22 157:25 168:22 194:19
207:2 231:5 266:17 328:20

**turned** 252:5 299:24

**turning** 57:22 300:3

**turns** 98:3 163:3 216:3 230:1 344:12
345:11

**two-part** 315:9

**two-year** 160:7,16 161:18

**tying** 243:21

**type** 83:19 84:6 109:2 110:12 270:2
275:7 276:2,23,24 277:14,23 280:4,
23 292:2

**types** 109:1,4 110:17 111:3,7 115:15
337:24

**typically** 10:20 11:16 33:7 298:20

**Tyson** 99:14 138:12 149:8 230:24 231:14 232:2 235:9 237:6,7,11 242:7, 24

**Tyson's** 104:7

---

**U**

**ultimately** 38:4 105:4 147:13,15 157:3 187:9 212:8

**unable** 10:11 11:7 12:23

**unconcentrated** 132:13

**undercut** 302:13 318:10,17 319:1

**underlying** 43:22 128:20

**undermine** 272:8

**underproduce** 137:6

**underproduces** 137:21

**understand** 16:16 19:25 26:7,13 33:22 35:4 36:13 41:12 42:9,14 51:2 52:18 54:18 59:6,14 62:16 63:6,24 71:22 72:4 73:7,8 80:4 82:1 91:24 96:6 98:2 105:2 108:10 110:3,15 114:4 116:1 117:20 120:6 128:15 136:11 141:23 164:11 170:15 174:19 176:18,23 178:22 180:14,19 186:17 207:21 223:7 251:14 276:25 290:23 297:25 307:13 316:17 317:18 319:12 321:25 335:1 342:22

**understanding** 10:23 16:20 33:2 37:11,16 44:6 81:19 91:20 100:23 107:3 111:4 115:6,17 116:5 132:14 136:24 172:1 178:11 184:18 187:6 190:24 191:25 206:5 211:7 225:2 286:3 308:17 310:7 319:16

**understood** 50:9 69:13 300:5 317:24

**uneconomic** 175:10

**unexpected** 269:23

**unexpectedly** 273:3

**unexplained** 264:10 265:24

**unfolding** 282:23 283:4,16

**unilateral** 34:12 46:16 264:15

**unilaterally** 188:5

**uninterested** 225:8

**unique** 161:7

**unit** 292:20 293:14,24 298:16,17,23

**United** 89:16 101:10 132:9 169:1 207:4,11,24 208:15 209:2 221:19 226:20 227:4 259:16

**units** 180:12 292:21,23 293:12,19 294:2

**University** 121:13,20,24 122:5 285:19

**unlagged** 186:25

**unlawful** 17:20,22 19:1,20 23:23 24:13 25:6,18 26:19 38:9,13 40:10 189:7 201:14

**unlike** 108:10

**unprecedented** 154:5

**unprofessional** 233:20

**unprofitability** 94:3 164:22 165:15, 23 167:15,17

**unprofitable** 167:6

**unreasonable** 12:20 160:23

**unrelated** 212:3 240:9

**unreliable** 13:12

**unreportable** 14:21 93:5 100:14 112:18 145:1 179:5 196:3 232:13 242:13 253:8 269:3 339:4

**unsuccessful** 311:3

**update** 239:8

**upset** 133:21 161:8,22

**upstream** 82:7,16 85:21,22 89:7 90:17,20 91:5,21 93:19 97:14 98:7,22 99:1,2 130:6,9,11 131:5,11,13,18,24 132:7,19 133:6,15,19,20,25 134:10 136:14 141:19 142:18,23 143:2,9,10 144:2 146:5 147:19 150:15 154:24 158:2 159:17,18 166:9 168:6 169:12 176:3 181:1 187:10 212:5,14,25 232:12,22 236:21 237:17,20 242:21 259:12

**uptick** 170:24

**upturn** 171:6

**upward** 213:10 214:21 215:4 217:1 218:7 267:11 271:22 272:6

**US-PRODUCED** 216:19

**USA** 224:8

**usage** 178:3

**USDA** 85:25 86:6 87:2,7 105:19 107:4,15 108:5,10 111:5 112:9,22 114:6,20,25 115:12,25 117:12

119:18,24 120:10,12 124:21 125:11, 18,23 132:20 223:13 278:1,11,19,24 308:13,22 309:8,13 329:11

**USDA's** 4:10 105:20

**user** 116:22

**users** 4:10 105:20 346:8

**utilize** 68:8

---

**V**

**vaccine** 104:20

**vacuum** 148:1 155:13 188:13

**Vague** 137:8 148:19

**valid** 25:14,24 26:1,2 201:4

**values** 211:24 287:19

**variable** 24:22 57:13,16,24 69:7 85:16 87:8 90:9,16,18,22,23 92:10 94:25 104:25 154:21 156:15 157:17 158:15,22 159:6 161:6 166:18 167:2 182:8,9,11,15,24 184:7,10 185:6,18, 21,24 186:8 202:21 204:20 212:22 215:14 217:22 218:25 245:10 252:17 255:13,19 270:8,16,17 273:2,16 274:24 283:22 286:1,4 334:1 336:17

**variables** 84:25 175:20 176:10,14,21 177:4 217:20 219:13 226:8 229:16,25 257:2 269:17 283:25 287:18 288:15 337:24

**variation** 185:16 186:23

**variational** 184:21

**variations** 168:7 281:22

**varied** 249:14

**variety** 43:18 227:12,14,24 228:18 289:23

**vary** 274:17,19 295:19,23

**vast** 6:25

**vastly** 106:15

**verdict** 281:17

**Verizon** 7:16

**version** 110:24 112:8

**versus** 83:19 99:7,23 101:11 117:5 120:9 149:5 226:14 244:9 257:14 261:20 277:2,3 293:10 294:19

**vertical** 124:1

**vertically** 89:6,16 98:21 99:20,21 111:18 112:23 113:11 117:6 120:9

123:22 127:13,19 143:3 148:21,25
149:10,14,20 150:3 180:25

**video** 5:6

**view** 145:22 175:25 198:13 222:24
271:4 275:3

**viewed** 339:18

**violation** 9:7,17 27:5 37:23 340:9

**virtue** 136:13,14

**virus** 104:15 105:1 158:16,24 161:21
182:22,25 183:25 185:4,5,23 186:1

**viruses** 104:14,18

**visibility** 301:14

**volume** 82:10,23 142:22

**volunteered** 318:14

**vouch** 86:4

---

**W**

**wages** 24:7

**wait** 158:7

**wanted** 24:3 100:22 116:10,24
120:18 150:1 183:24 186:14 242:18
265:11 275:6 277:21 278:16 279:11,
14 298:1,13 299:8,11 342:25 346:17

**wanting** 317:18

**Washington** 3:8

**waves** 168:3

**ways** 42:23 54:14,16 75:18 88:16
94:17 95:1 97:5 128:22 163:5 166:10

**weaned** 72:17 94:21

**weaner** 93:15 94:20 138:10

**week** 262:15,16 267:8

**weight** 72:18,24 81:20,21 82:25
198:19

**weights** 74:4 106:24

**weird** 312:14

**wheels** 70:12

**White** 143:24 144:18,23 145:5,11
146:13 172:4

**wholesale** 91:7 106:9 278:24 292:5
328:1

**wholesaler** 277:3 328:1

**wholesome** 248:4

**whomever** 85:19

**wide** 289:23

**widgets** 89:2

**widow** 228:20

**wield** 146:3

**wild** 153:9

**willy-nilly** 336:20

**win** 327:8

**window** 177:14

**winter** 329:12

**wipeout** 339:7

**wisdom** 22:21

**withhold** 138:3

**wondering** 72:21 74:6 259:3

**Wooldridge** 271:1,4

**word** 32:25 68:13 71:9 77:10 88:2
103:21 116:16,18 141:18 207:18
227:15 256:6 306:11 316:22 331:14
343:8,9

**words** 39:14,19 95:18 186:6

**work** 15:20 44:16 45:12 51:20 240:16
268:9 300:13 305:24 317:22

**worked** 7:17 310:9 317:19 319:18

**working** 44:9 122:8 196:9

**works** 84:11 173:9 329:10

**world** 20:13 39:21,25 40:3,5,9,14,20
41:3,7,18,22,25 42:1,4 43:11 56:18,
20 60:8,9,11,19,20,21,22 61:1,10,13
62:1,21 63:2,3 64:2,4,18,19 161:13
162:7 191:11 192:25 193:2,6 194:1
200:21,23 203:2,3 215:1,10 216:17
230:14 243:7 254:3,7 256:15 257:13,
14,16,24 258:10,13 260:12,13,14,23
261:7 288:13 289:9

**worst** 160:7

**worthy** 153:15

**wrap-up** 341:1

**writ** 278:25

**write** 11:6 234:5 245:3

**writing** 234:8 265:20

**written** 36:14 316:23 344:9 345:5

**wrong** 198:11 251:25 268:23 269:17
322:15 336:21

**wrote** 196:24,25 199:16 235:15
238:19 305:11

---

**Y**

**year** 41:13 47:24 48:8 69:11 70:5,8,
17 71:4 72:2 98:16 124:25 126:7
154:16 195:5,7 207:6 209:8 214:8,19
230:2 239:16,18 241:6 247:8 248:15
261:25 262:3,10,11,21 327:2 331:21

**years** 145:12 160:5 164:20 166:25
170:16,22 173:16 209:8 214:22
305:25 323:22 337:17,19 338:1

**yes-or-no** 55:13,23 56:2

**yields** 179:1,11

**You4** 174:8

**younger** 242:2 243:24