# Exhibit E

**FILE COPY**

October 31, 2006

**BY EMAIL AND OVERNIGHT MAIL**
**CONFIDENTIAL TO U.S. DEPARTMENT OF JUSTICE**

Chan Mazumdar
Department of Justice, Antitrust Division
325 Seventh Street N.W., Suite 500
Washington, DC 20004

    Re:    **Proposed Merger Of Smithfield Foods And Premium Standard Farms**

Dear Chan:

    On behalf of Hormel Foods Corporation ("Hormel"), this letter provides follow-up information to our meeting on October 19, 2006, with you and other representatives of the Department of Justice ("Department"). Professor Brian Buhr also contributed information reflected in this letter. As previously, Hormel requests CONFIDENTIAL treatment of this submission by the Department.

    The issues addressed herein generally fall under the headings of geographic market definition, issues relating to Smithfield Foods, Inc.'s ("Smithfield") manipulation of the Western Cornbelt price, barriers to entry/barriers to expansion, and Smithfield's ability to successfully pursue a strategy of raising rivals' costs. The Department has also requested that we address the potential impact of the merger of Smithfield and Premium Standard Farms, Inc. ("PSF") on output markets for pork products, and the subject of Hormel's expansion of its packing plants in Fremont, Nebraska, and Austin, Minnesota.

**I.    GEOGRAPHIC MARKET DEFINITION**

    With regard to the subject of geographic market definition, the Department raised the question of whether processing plants west and north of the North Carolina Region could serve as a destination for finished hogs should post-merger Smithfield depress returns to producers in the North Carolina Region below competitive levels. Such movement has not previously occurred to any significant extent, and transportation costs for finished hogs would make it highly unlikely to occur in the future.

CFTC261

    

Chan Mazumdar
October 31, 2006
Page 2

### A.     The North Carolina Region Is A Discrete Geographic Market

Hog movement data show that Kentucky, Pennsylvania and Indiana packing plants are not viable destinations for any significant number of North Carolina Region hogs. The National Pork Board maintains data showing the distances traveled by finished (or "market") hogs for slaughter. As shown in Exhibit A, as is true with most states, a significant share of North Carolina hogs are shipped out of state for slaughter.[1] However, the average distance for such out-of-state shipments is only 177 miles. Even this figure gives an exaggerated picture of the distance hogs travel to slaughter. Nationwide, in 1999, 90 percent of hogs were shipped less than 200 miles for slaughter. See Exhibit B.

The distances from the prime eastern North Carolina hog raising areas to packing plants in Kentucky, Pennsylvania and Indiana substantially exceed these average shipment distances. From Clinton, North Carolina, to Louisville, Kentucky is a distance of 630 miles; from Clinton to Hatfield, Pennsylvania is 500 miles; from Clinton to Delphi, Indiana is 817 miles. The fact that it is not economically feasible to ship market hogs such distances is borne out again in the Pork Board data, which show that in 1999 only 80,684 hogs were shipped from North Carolina to Kentucky for slaughter -- approximately 0.6 percent of the 13 million hogs raised in North Carolina that year. See Exhibit C. The comparable numbers of North Carolina hogs shipped to Indiana and Pennsylvania were 103,134 and 571,554 respectively, meaning that a total of 755,372 hogs out of 13 million raised, or only 5.8 percent, were shipped from North Carolina to these three states for slaughter. Id. The North Carolina Region is properly defined as a distinct geographic market for the slaughtering of hogs.

### B.     This Merger Remains A Merger-To-Monopsony In North Carolina

Economically, trucking finished hogs from the North Carolina Region to remote destinations in Kentucky, Pennsylvania, or Indiana is not a feasible way to break a Smithfield monopsony. Specifically, transportation costs preclude such a business model.

Professor Buhr spoke directly with a major production company (greater than 100,000 sows but prefers to remain anonymous). Its current hog transport rate is $2.35 per loaded

---

[1] All data in Exhibits A through C comes from National Pork Board hog movement data. 1999 data was the most recent collated data to which we had access. We believe the National Pork Board continues to maintain hog movement data; however, the data is maintained on a transaction basis and is not readily available in summary form. While data that are more recent could be obtained, it would be a time-consuming process. Unless the Department possesses information suggesting otherwise, we believe the 1999 hog transport data to still be representative.

CFTC262

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    HFC-PORKAT0000296668

Chan Mazumdar
October 31, 2006
Page 3

mile with a fuel surcharge of $1.30 for a total cost per loaded mile of $3.65. Professor Buhr believes this transportation charge to be conservative as compared to the rest of the market.

Iowa State University's report on Estimated Returns to Swine Production shows that from 1996 to 2005, farrow-to-finish profits have averaged $2.50/head. Comparable reports from the University of Minnesota show profits to have averaged $4.81/head. Assuming 185 hogs per truck, the breakeven distance for hauling hogs based on these data is between 127 and 244 miles. Shipping hogs 500 miles or more for slaughter is economically infeasible.

In short, hog transport costs are too high compared to any reasonably foreseeable hog prices to provide producers in the North Carolina Region with an economically feasible alternative to dealing with a post-merger Smithfield monopsony.

## II. THE WESTERN CORNBELT PRICE WILL REMAIN THE PRINCIPAL FORMULA-CONTRACT REFERENT FOR THE FORESEEABLE FUTURE

As discussed in the White Paper, the majority of the hogs sold to packers are sold pursuant to formula-based contracts, including contracts tied to the Western Cornbelt Negotiated Purchase Swine Price ("WCB"), the Iowa/Minnesota Negotiated Purchase Swine Price (a subset of the WCB), the Pork Carcass Cutout Price, and the CME Lean Hog Futures Price. Among these alternatives, Hormel's experience has been that the WCB is the producer-preferred basis for contracting hogs delivered to packers. The drawbacks of alternatives to the WCB, and other issues that significantly slow or preclude a shift to a new price series for contracts as a competitive response to Smithfield's ability to manipulate the WCB, are discussed below.

### A. Alternative Prices For Formula-Based Contracts Are Inferior

At our October 19 meeting, there was substantial discussion around the topic of whether packers harmed by a Smithfield strategy of manipulating the WCB higher to raise rivals' costs could sidestep the effects of Smithfield's manipulative activities by contracting based on indexes other than the WCB.[2] Following are the various potential alternative price

---

[2] At our meeting on October 19, Brian Stevens and Sheldon Kimmel discussed the effects on the Western Cornbelt price of the activities of Smithfield affiliates Prestage-Stoecker and Prestage Farms in presenting uniform high asking prices for spot market hogs, following the April 2004 purchase of the Farmland plant by Smithfield. Mr. Stevens indicated to Mr. Kimmel that there were some occasions on which he did purchase hogs at the high asking price from the Smithfield affiliates. (He also stated that he was not complaining to the Department about these instances.) Just to clarify, what Mr. Stevens does complain about is the frequent occasions on which the high, uniform (or nearly uniform) offers from Prestage-Stoecker and Prestage Farms then set the high end of the daily spot market through sales by these two entities to Smithfield's Farmland and John Morrell plants, with a consequent

(footnote continued)

CFTC263

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   HFC-PORKAT0000296669

Chan Mazumdar
October 31, 2006
Page 4

series, along with reasons why these alternatives are inferior to the WCB and hence why there are significant barriers to substituting them for contracts based on the WCB price.

### 1.   Pork Carcass Cutout Price

The pork carcass cutout price is a composite price based on the prices of primal cuts. One week of daily prices is shown in the following table. (Units are cents per pound.)[3]

| Date | Cutout | Primal Composite Values | | | | | |
|------|--------|------|------|--------|--------|-------|-------|
|      |        | Loin | Butt | Picnic | Rib | Ham | Belly |
| 06/06/05 | 66.52 | 91.01 | 70.73 | 45.78 | 126.55 | 53.47 | 66.30 |
| 06/07/05 | 66.90 | 91.15 | 69.87 | 46.14 | 132.34 | 54.06 | 66.30 |
| 06/08/05 | 66.58 | 86.50 | 69.93 | 46.15 | 130.41 | 54.71 | 71.18 |
| 06/09/05 | 67.90 | 90.93 | 69.86 | 46.93 | 131.38 | 54.95 | 71.18 |
| 06/10/05 | 68.37 | 91.22 | 71.01 | 46.93 | 135.24 | 55.42 | 71.18 |

The prices determined in the market are the prices of the primal cuts. The cutout is a weighted average of the primals. To calculate the weighted average, USDA uses a standard technical conversion of the yield (primal weight divided by carcass weight) of each primal from the carcass. Use of the cutout value to price hogs has the following limitations:

- The technical conversion factors for primals to carcass may not be accurate due to real changes in carcass yields over time.

- On any given day, the primal cutout trade is a thin market, in some cases with no transactions for a particular primal. For example on October 26, 2006, AMS reported a total of 59 carlots and on October 20, 2006, they reported only 30 carlots -- a very small fraction of the market.

- It is not a transparent market in relation to hog prices and does not directly represent the transaction between the producer and packer that is for a live hog or a carcass weight-based hog.

---

(footnote continued from previous page)

heightening of the Western Cornbelt price, which raises the cost of hogs purchased by competing packers on formulas tied to the WCB price.

[3] Source: USDA, Agricultural Marketing Service. National Daily Carlot Pork. Publication NW_LS500. Available at http://www.ams.usda.gov/1smnpubs/mpork.htm

CFTC264

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HFC-PORKAT0000296670

Chan Mazumdar
October 31, 2006
Page 5

- The primal yield assumptions USDA uses may not be representative of the quality of actual hog deliveries to a packer. Depending on characteristics of the hog, and hog grading systems, the yield value would need to be adjusted.

- The packer and producer must agree to a conversion factor to go from a cutout value to a carcass equivalent or live hog basis. The method usually used to calculate this conversion is to compare the pork cutout value to the Western Cornbelt price. If the WCB is suspect, any conversion factor will be suspect.

### 2.   Lean Hog Futures Price

The lean hog futures price is a price discovered at the Chicago Mercantile Exchange ("CME"). The contract is specified as 40,000 pounds of carcass weight hogs that fall within the packer's base weight range. Contract months traded are Feb, Apr, May, Jun, Jul, Aug, Oct and Dec. The CME Lean Hog Futures contract is not a physical delivery contract, but rather a cash settled contract. The contract is cash settled to a two day weighted average of the negotiated and swine packer formula contract prices from the USDA report LM_HG201: National Daily Direct Hog Prior Day Report-slaughtered swine (for details refer to: http://www.cme.com/trading/prd/ag/lhindex3423.html or for a complete description see CME Rulebook Chapter 152, http://rulebook.cme.com/Rulebook/Chapters/pdffiles/152.pdf). Use of the CME Lean Hog Futures Contract to price hogs has the following limitations:

- The lack of several contract months (missing Jan, Mar, Sep, Nov) creates a gap in the daily hog pricing. Complex formulas are necessary to bridge this gap, introducing error and reducing transparency.

- The hogs delivered to the plant may not match the defined quality specification of the Lean Hog Futures Contract; therefore, the base price would need to be adjusted for such quality differentials.

- Futures contracts inherently include future price risk premiums. For example, even with an existing Feb contract, on February 1 the Feb Lean Hog Futures Contract is valuing hogs that are to be cash settled at the expiration of the CME Lean Hog Futures Contract (the 10th business day from the start of the month) -- not the spot delivered hogs on February 1. This requires the adjustment of a futures price to a current period except at expiration when it can be cash settled. Hence, the futures price may overpredict or underpredict current transaction prices depending on how far the spot sales transaction is from futures contract expiration.

- Because the CME Lean Hog Futures Contract is a cash settled contract, a distortion in the cash market price will distort the CME Lean Hog Futures Contract at expiration.

CFTC265

Chan Mazumdar
October 31, 2006
Page 6

### 3.   Retail Cut Series And Retail Meat Scanner Series

There are two major retail meat cut price series: 1) the Bureau of Labor Statistics ("BLS") Series which is primarily used for calculating Consumer Price Indexes and 2) the Livestock Marketing Information Center/Economic Research Service scanner data based series ("Scanner Series"). Questions and answers regarding these series are found at: http://www.retail-lmic.info/CD/questions.htm. Both series have significant shortcomings:

- BLS prices are reported based on a survey of retail stores and collected only periodically.

- BLS prices do not reflect features and promotions, such as coupons, which significantly affect retail prices.

- The Scanner Series gains insight into features and promotions, but still obtains only a small sub-sample of pork cuts, approximately twenty. Brian Stevens indicated at our October 19 meeting that he does not have confidence in the Scanner Series data for this reason, and would not use it in its current form for formula-based pricing.

- Scanner Series prices have only been collected for three years and it is not clear how robust the sampling is.

- Issues related to carcass pricing are compounded by the need to make technical conversions from retail cuts to primal cuts to carcass cutouts to whole carcass to live basis prices, reducing transparency.

- There are significant time lags between retail prices and hog prices at the plant, and there are significant differences in seasonal patterns of prices of retail cuts compared to live hogs.

- It would be necessary to benchmark any formula to a cash market hog price such as the WCB and any benchmark would be suspect if the underlying WCB is suspect.

### 4.   Cost Of Production-Based Series

In the past packers have attempted to use cost of production as a basis for prices. Usually the payment is calculated by determining a cost index for feed inputs based on their utilization rates in feeding hogs. Then this index is correlated to a representative cash hog price usually reported by USDA. Problems include:

CFTC266

Chan Mazumdar
October 31, 2006
Page 7

- Feed costs have a low correlation with hog prices. This occurs because changes in demand for feed inputs (e.g., ethanol and biodiesel) dramatically affect hog/feed price relationships.

- As with carcass or retail pricing, it is necessary to develop a feed cost conversion matrix to convert corn and soybean meal prices to hog prices. Feed efficiency coefficients and relative mixes of corn and soymeal in diets must be assumed. This process is not transparent and can lead to biases.

- Cost-based formulas do not incorporate demand side price factors into hog prices. For example, an increase in pork demand would be expected to increase pork and hog prices but would not be reflected in a corn/soymeal cost-based formula. To overcome this defect, cost formulas typically include an adjustment to a market hog price. A distortion of the market price will also distort the cost-based contract.

**B.    Converting To WCB Alternatives Is A Long-Term Process**

For a variety of reasons, formula-based hog procurement contracts generally have a multiple year term. As a result, existing contracts which are tied to the WCB will not be subject to renewal or renegotiation for up to several years. Therefore, any movement to formula-based contracts not tied to the WCB will take several years to complete.

Procurement contracts provide packers with a flow of hogs and provide producers with access to shackle space. Procurement contracts enable packers to obtain a committed supply that, depending upon the packer, could be as high as 90%. Packers negotiate with producers in order to achieve their committed supply goals. Such negotiations cause the parties to incur costs, including time away from other activities and transaction costs.[4] For this reason, packers and producers prefer formula-based contracts that last for some time.

Hormel's procurement contract portfolio is as follows: 25% negotiated purchase, 42% WCB-tied formula contract, 9% CME-tied formula contract, 3% cost of production-based formula contract, and 21% other formula contract. Brian Stevens estimates that, because of the incorporation of a WCB component in many of these formula prices, 55% to 60% of Hormel's total hog purchases are priced based in whole or in part on the WCB price.

---

[4] There are significant costs associated with the development of a new procurement contract. These costs include the analysis to benchmark and test the new price formula, legal costs, and renegotiating contracts with producers. For instance, Hormel has approximately 300 contracts with producer-suppliers. Were Hormel to adjust its benchmark and move away from the WCB, Hormel would be required to renegotiate many of these contracts.

CFTC267

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    HFC-PORKAT0000296673

Chan Mazumdar
October 31, 2006
Page 8

Hormel's WCB-tied formula contracts have an average term of one to two years, but range in duration from six months to five years.

To understand the full potential impact of Smithfield's conduct related to contract pricing it is necessary to investigate the typical duration of hog production contracts, the frequency of types of formulas in marketing contracts, and the frequency of reliance on AMS reported negotiated series. Although not publicly available, this information is potentially available from AMS as a result of mandatory price reporting. Also, the Grain Inspection and Packers and Stockyards Administration has access to packer contracts as part of mandatory price reporting. Finally, the Department can interview other packers on the subject. Hormel is informed and believes that such investigation would reveal that procurement contracts are primarily tied to the WCB and are typically for a period of multiple years.

### C.   Because Of The Lack Of Transparency In The Alternatives, Producers Will Be Reluctant To Convert Their Contracts

All of the foregoing assumes that producers would be willing to move away from the WCB, something that is highly uncertain. An efficient, transparent market price for hog sales from producers to packers, a market that is supposed to be reflected by the WCB, is the first best price. The alternatives discussed above are designed to serve as the basis for the formulation of a price that reflects what is supposed to be reflected by the WCB. Because the alternatives described above require calculations to derive the hog price, they are necessarily less transparent. Such formulas are open to differences of opinion and suspicion. Given the extra steps involved to obtain the hog price, the complicated nature of such formulas, and the risk/fear that such formulas are inaccurate and/or slanted in favor of packers, producers will likely be very reluctant to accept the available alternatives.

### D.   Packers And Producers Need To Be Able To Rely Upon The WCB

In addition to being impractical, the suggestion that competing packers and producers should shift their formula-based contracts to alternatives to the WCB in response to Smithfield's price manipulation activities is incongruous at a very basic level. Were a mugger to assault a man walking on the most direct route from his work to his house, the police officer who patrols the route is unlikely to suggest that the victim take a different, less direct route, home. Rather, the mugger would be arrested and prosecuted.

So to in the case with the WCB and Smithfield's price manipulation scheme. Producers, packers and the government have a strong interest in protecting the integrity of the mandatory price-reporting system. In Hormel's experience, up until the April 2004 acquisition of Farmland by Smithfield, the WCB was the most accurate publicly reported pricing data -- the most direct route home. If the government imposes a cost on a market, as by requiring mandatory reporting, it has an obligation to ensure that the benefits of the mandatory program are not eroded by manipulation by the largest player in the market.

CFTC268

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                      HFC-PORKAT0000296674

Chan Mazumdar
October 31, 2006
Page 9

### III. BARRIERS TO ENTRY/BARRIERS TO EXPANSION WILL PERPETUATE SMITHFIELD'S ABILITY TO PURSUE A STRATEGY OF RAISING RIVALS' COSTS IN THE WESTERN CORNBELT

The White Paper outlines Smithfield's past and ongoing manipulation of the market for hogs within the Western Cornbelt Region. Specifically, the White Paper describes how Smithfield has increased its rivals' costs by artificially increasing the WCB, thereby increasing the price paid for over half of the hogs purchased in the region. The Department has suggested that a supply response to manipulated prices may occur, impeding Smithfield's ultimate anticompetitive goals. As described briefly in the White Paper, and as set forth in detail below, a material supply response in the Western Cornbelt Region is unlikely. The packing plants in the Western Cornbelt Region are likely fixed with nominal expansion and hog production is likely fixed with nominal expansion. Based upon its past conduct and statements, if the merger is consummated, Smithfield will control enough production and packing within the Western Cornbelt Region to pursue a strategy of manipulating the WCB price to raise rivals' cost, with a significant likelihood of anticompetitive impact.

As explained in the White Paper, and as described by the USDA, modern swine production is segmented into at least two parts, farrowing and finishing. Most producers, and in particular producers in the Western Cornbelt Region, specialize in one segment. Such specialization occurs because economies of scale require larger production systems. The example provided below illustrates the barriers to entry or expansion that exist to such production.

Assume that an independent farmer-producer, Producer A, desires to construct a new 2,500 head concentrated animal feeding operation ("CAFO"), a moderately sized finishing facility in today's swine industry. The facility will accommodate approximately two groups of weaner pigs per year. In order to operate the facility efficiently and for disease management purposes, the facility should be filled with weaner pigs from a single farrowing facility, which are as close in age as possible. In order to meet Producer A's need for a supply of 2,500 head of weaner pigs twice a year, Producer A must identify a farrowing producer, Producer Z, that is also expanding and building a new farrowing facility. To meet the needs of Producer A, Producer Z's facility must farrow over 250 sows at a time. However, Producer Z's farrowing facility cannot operate economically if it only farrows sows twice a year. Instead, Producer Z must farrow 250 sows every month, the capacity of his facility. Thus, Producer Z must produce twelve 2,500 head groups of pigs per year, only two of which can go to Producer A. Therefore, for Producer Z to expand, he must expand by 1,500 sows and find five other producers -- Producers B, C, D, E, and F -- who all want to

CFTC269

Chan Mazumdar
October 31, 2006
Page 10

expand their finishing operation by 2,500 head. Thus, in order for one producer to expand, a group of producers within an integrated system must elect to expand.[5]

The primary barriers to entry or expansion, for each of the above-described producers, are high capital costs and regulation. The cost of a farrowing facility, equipment, and sows would be approximately $1,100 per sow, or $1,650,000. The cost of the finishing facilities and equipment for Producers A-F would be approximately $600,000 per producer, or $3,600,000. The total cost for the entire expansion for Producers A-F and Z, would be approximately $3,500 per sow, or $5,250,000, a significant capital investment.

In addition to capital costs, both the construction and operation of a CAFO are heavily regulated activities. For the above-described expansion to occur, Producers A-F and farrowing Producer Z must first construct a CAFO. To do so, each Producer must first obtain and/or identify land for the CAFO site, contract with engineers to design the facility and its manure management structure, submit detailed applications for construction permits to applicable regulatory agencies, submit detailed plans regarding the management of manure to applicable agencies, and receive all applicable permits. Missouri, the headquarters of PSF, exemplifies the difficulties associated with these tasks. Federal and Missouri statutes and regulations promulgated by both the U.S. Environmental Protection Agency ("EPA") and the Missouri Department of Natural Resources ("MDNR") prescribe specific and comprehensive standards of conduct applicable to the construction and operation of CAFO facilities including, but not limited to: the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*; 40 C.F.R. § 122. 1 *et seq.*; the Missouri Clean Water Law, MO. REV. STAT. § 644.006 *et seq.*; MO. REV. STAT. §§ 640.700 – 640.755; MO. CODE REGS. ANN. tit. 10, §§ 20-6.010 *et seq.*; MO. CODE REGS. ANN. tit. 10, §§ 20-7.010 *et seq.*; MO. CODE REGS. ANN. tit. 10, §§ 20-8.010 *et seq.*; and MO. CODE REGS. ANN. tit. 10, §§ 20-14.010 *et seq.* The foregoing statutes and regulations provide for, among other things, the preparation and submission of a detailed application for certain permits to MDNR (which is also responsible for permitting required by the EPA), the payment of certain fees, the issuance of a construction permit, the issuance of an operating permit, set-backs for the land application of effluent, CAFO separation distances from residences or public buildings, the land area required for application of effluent, and notification of neighbors and county officials.

Two specific issues noted in the preceding paragraph are particularly important in limiting CAFO expansion, namely setbacks and manure management. Swine CAFOs generate a considerable amount of manure that must be removed from the CAFO and applied to land. Generally, application of manure is only permitted to the extent that the nutrients contained in the manure are required by growing crops. As a rule of thumb, a 2,500 head

---

[5] The example set forth above is not materially altered if one large farrow-to-finish producer (Christensen, M2P2, Hormel, or Cargill) is substituted for the seven independent producers. The larger firm must identify a group of contract producers through whom it can expand.

CFTC270

Chan Mazumdar
October 31, 2006
Page 11

finishing CAFO requires approximately 250 tillable acres for land application of manure. Thus, the seven CAFOs in our hypothetical example will require approximately 1,750 tillable acres, roughly three square miles, for manure application. Setbacks also present a significant regulatory obstacle for swine/CAFO expansion. In Missouri, for example, each of the CAFOs in our hypothetical example will need to be at least 1,000 feet from occupied residences, business, public use areas, and schools. Local regulations often increase these setbacks.[6] Again in Missouri, local ordinances increase the setbacks for CAFOs to one-half mile.[6] With setback distances of one half mile or greater, the number of available CAFO sites is dramatically reduced. In most rural counties, even those with small populations, such setbacks effectively prohibit the construction of new CAFOs. Regulation of CAFOs, including increased setbacks, increased local regulations, and increased restrictions regarding manure management, has increased in the Midwest in recent years and this trend is accelerating.

Due to transportation costs, Producer A-F's finishing sites must be constructed within a close proximity to slaughter facilities within the Western Cornbelt Region. There is, of course, a finite amount of real property within a geographic proximity to these hog slaughter facilities. Within this finite geographic area, there are also a finite number of producers who possess the land, capital, farming equipment, and wherewithal to negotiate the regulatory environment necessary to operate a CAFO.

Even if all the foregoing barriers could be overcome by a group of producers, any material supply expansion would require considerable time. Obtaining capital, coordinating with other producers, identifying sites, and applying for applicable permits takes time. In Hormel's experience, and based upon industry information, the time required for such activities is approximately 18 months. Once production facilities are properly permitted, constructed, and operational, it takes approximately 18 months for a new farrow-to-finish system to market its first hogs.[7] Thus, in our example, assuming Producers A-F and Z decide to expand on January 1 of Year 1, hogs from the facilities constructed would not reach slaughter facilities until January 1 of Year 4. Such a lengthy period for entry or expansion is not a timely response to the anticompetitive potential in Smithfield's price manipulation activities post-merger. See Horizontal Merger Guidelines at § 3.2.

The above-described hypothetical expansion by Producers A-F and Z assumes that it is legal for the producers to own swine and/or control swine production. However, this assumption is not the case for packer producers including Hormel, Tyson and Cargill. Specifically, Iowa, Minnesota, and Nebraska either have prohibited or continue to prohibit

---

[6] University of Missouri, *Permitting Animal Feeding Operations in Missouri, Local Restrictions*, available at: http://agebb.missouri.edu/commag/permit/restrictions.asp

[7] See USDA Economic Research Service, *Hogs: Background*, Available at: http://www.ers.usda.gov/Briefing/Hogs/Background.htm

CFTC271

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    HFC-PORKAT0000296677

Chan Mazumdar
October 31, 2006
Page 12

packer ownership of swine. See Minn. Stat. § 500.24; Neb. Rev. State. § 54-2604; Iowa Code § 202B.201. As a result of these prohibitions, vertical integration has not been possible in major hog-producing areas within the Western Cornbelt. Even if a Hormel or a Cargill or a Tyson could overcome the significant obstacles set forth above, which are faced by all producers, their expansion of production is still limited in many areas.[8]

In view of the legal and practical restrictions on competing packers' ability to vertically integrate, it is also questionable whether competing packers would continue to invest in expanded slaughtering capacity, even if hog production did expand. Competing packers would have to account for the cost advantage, e.g., in contracting costs, that Smithfield's high degree of post-merger integration will give it. Building more packing capacity in the face of Smithfield's cost structure, which the other packers cannot replicate, would seem unlikely.[9]

The hypothetical example set forth above assumes an expansion of just 2,500 sows. Following the merger, Smithfield will possess a domestic sow herd of at least 1,000,000 sows; more than 10 times that of its nearest packer competitor. Smithfield's farrowing and finishing facilities are already constructed and operational. In order for production to expand materially within the Western Cornbelt, producers have to overcome all of the barriers to expansion set forth above. In order for Hormel, Tyson, or Cargill to increase their production, and be better positioned with a natural hedge to adjust to Smithfield's manipulation, the companies also have to overcome state laws which restrict their ability to own swine or control swine production.

---

[8] As we noted at our October 19 meeting, in the case of Iowa, competing packers now have consent decrees permitting hog ownership; however, Smithfield gained a multi-year head start on vertical integration in Iowa by simply ignoring the state's corporate farming statute.

[9] Finally, the Department should consider the rapid expansion of the ethanol industry within the Western Cornbelt Region and its likely impact upon expansion of swine production. The Food and Agricultural Policy Research Institute (FAPRI: FAPRI-UMC Report #12-6, July 2006) estimates that ethanol production will increase from 3.4 billion gallons in 2004 to 9.2 billion gallons by 2010. In the U.S., corn is the primary input for ethanol and corn demand for ethanol is expected to grow from 1.3 billion bushels in 2004 to 3.45 billion bushels by 2010. FAPRI estimates this will increase corn prices from approximately $2.00 per bushel to $2.64/bushel. However, it is widely viewed that this price estimate is too conservative given that corn is already averaging $3 per bushel on strong ethanol demand. Regardless, the cost of feed for hog production is expected to increase as ethanol competes away corn. This will likely reduce incentives for investment in new or expanded hog production, particularly until the ethanol growth begins to peak. This presents a further barrier to entry and expansion in the swine industry in the Western Cornbelt Region.

CFTC272

Chan Mazumdar
October 31, 2006
Page 13

Contact with other producers and packers will confirm the foregoing barriers to expansion. Specifically, the Department should inquire as to expansion plans, estimated costs, timelines, and difficulties already encountered. Doing so will confirm that it is unlikely that a material expansion will occur within the Western Cornbelt Region in response to Smithfield's price manipulation activities. Simply put, packing plants in the Western Cornbelt Region are likely fixed with nominal expansion and hog production is likely fixed with nominal expansion. If the merger is consummated, Smithfield will control enough production and packing within the Western Cornbelt Region to execute a strategy of raising rivals' costs through manipulation of the WCB price, without triggering a countervailing increase in hog supply.

## IV.  SMITHFIELD'S RELATIVE COST ADVANTAGE CAN MAKE A RAISING-RIVALS-COSTS STRATEGY VIABLE EVEN IF SUPPLY EXPANDS AND PRICES FALL

Smithfield has a unique cost structure for procurement relative to other packers in the Western Cornbelt. This cost structure can provide Smithfield with a cost advantage over its rivals, which are excluded from pursuing a similar strategy simply because of past and current restrictions on corporate ownership in the Midwestern states in which they have historically operated. The cost structure advantage Smithfield has will be increased by the acquisition of PSF, the only fully vertically integrated operation available in the Western Cornbelt. Smithfield's cost advantage is hypothesized to extend from three factors:

- Economies of size related to procurement from their owned or aligned production.

- The ability to diversify hog procurement costs across 'owned-pigs' acquired at cost versus other hogs purchased at market prices.

- Smithfield's past manipulation of the Western Cornbelt price and its effect on other packers' contract-based procurement costs.

All of these factors have the potential to increase rivals' relative costs, causing them to exit from the hog slaughter business. Doing so allows Smithfield to either acquire their processing capacity and increase its share of plant capacity, or simply allow the loss of capacity to occur, thereby restricting available processing capacity and lowering hog prices to producers from packers, creating monopsony gains at the expense of hog producers.

### Numerical Illustration Of Raising Rivals' Costs

The Department should obtain comprehensive data from Smithfield and PSF on their costs of hog acquisition and packing as part of a Second Request. However, based upon the Western Cornbelt price reports over recent months, the following example demonstrates the impact that a Smithfield strategy of bidding up WCB spot market hog prices can have in

CFTC273

Chan Mazumdar
October 31, 2006
Page 14

raising rivals' costs. Another area that a Second Request should address is the prevalence of WCB-based contracts among Smithfield's formula-based contracts. If Smithfield is able to reduce its reliance on WCB-based contracts as compared to other packers, its relative cost advantage becomes even greater. There is some evidence that Smithfield is able to do so.[10]

As an illustration, assume that Smithfield acquires 17% of its capacity through hogs from affiliated entities at a price reported to AMS as $60/cwt.[11] The rest of the packers in the Western Cornbelt pay $55/cwt. for negotiated hogs on that day. Further, assume that all Western Cornbelt packers (Smithfield plus others) purchase 5% of their hogs on a negotiated basis. Finally, assume that 50% of Smithfield's and other packers' hogs are priced off a WCB negotiated price formula, and the remainder of hogs are purchased on some other formula which yields the same price for Smithfield and the other packers.

The net price Smithfield and the other packers pay can be calculated as a weighted average of purchase quantities and prices. Smithfield would weight its average of negotiated purchased hogs at a price of $60*(17/22) + $55*(5/22) = $58.86/cwt. In other words, Smithfield purchases about 77% of its total reported negotiated market hogs from affiliated entities for $60/cwt. and the remaining 23% of its negotiated hogs from other suppliers at $55/cwt. Similarly, the rest of the packers would report a negotiated price of $55/cwt. because they only purchase negotiated pigs from open market sources.

Smithfield currently has 23% of all market hogs in the WCB. Thus, approximately 5% (0.23 WCB share *0.22 share negotiated) of all hogs are negotiated by Smithfield and about 4% (0.77 WCB share*0.05 share negotiated) of all hogs are negotiated by other packers. Therefore, Smithfield's price accounts for about 55 percent of all negotiated hogs and other packers account for about 45 percent of all negotiated hogs. Using this result to create a weighted average for all negotiated price hogs in the market yields $58.86*0.55 + $55 * 0.45 = $57.12/cwt. The share assumptions used will affect this measure, but regardless of the level of shares, the purchase of affiliated hogs by Smithfield raises the negotiated price of hogs in the AMS price reports.

---

[10] When Hormel negotiated a contract to buy pigs from Smithfield to supply Hormel's Clougherty Packing plant (known by the "Farmer John" brand name) in southern California, Hormel requested a WCB-based price formula. Smithfield insisted upon a formula based on the Iowa-Minnesota reported price. While Hormel believes the Iowa-Minnesota price to be even more subject to manipulation by Smithfield than the WCB, Hormel agreed to Smithfield's demand due to a lack of alternative suppliers.

[11] This figure, 17%, is based upon historical data from 2000 regarding Prestage Stoecker and its predecessor, Murphy Farms. The figure today, including hogs from Prestage Farms, may be substantially larger.

CFTC274

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HFC-PORKAT0000296680

Chan Mazumdar
October 31, 2006
Page 15

The weighted average price of $57.12 is analogous to the weighted average price reported by AMS and becomes the price used as the hog market formula price that multiplies its effect on the market. Suppose that all packers acquire 50 percent of their hogs this way and then the remainder of all packers' hogs (28 percent of Smithfield's and 45 percent of other packers) is purchased at the equivalent of negotiated prices.

Now assume that Smithfield (as claimed by Hormel) actually has only paid the cost of production ($45) for their affiliate hogs, but still reports the $60/cwt for the hogs. Then the actual weighted net average price that Smithfield pays for its hogs is $54.39/cwt. and the average price other packers must pay is $56.10/cwt. This differential is strictly because of Smithfield's observed misreporting of WCB prices and their ability to value affiliate pigs at cost in terms of their true financial impact. (See spreadsheets attached as Exhibit D for scenarios.)

This baseline scenario can be adjusted to account for Smithfield's acquisition of PSF. In that case, Smithfield would have a 27% total market share of slaughter capacity in the Western Cornbelt, but more importantly, their total owned-pig share would increase to 29% of Smithfield's total slaughter capacity. With the same strategy in place, this growth further increases the share of hogs purchased at cost and lowers Smithfield's average cost of pigs to $53.24/cwt. compared to rivals' costs that increase slightly to $56.11/cwt. This increase in rivals' cost of pigs creates a competitive disadvantage under which marginal hog production plants in the Western Cornbelt may exit production or may be sold to others, and result in further consolidation of the market.

What if hog prices decrease or output increases in this scenario? Won't Smithfield's strategy fail? As stated above, Smithfield will obtain 29% of its slaughter hog needs in the Western Cornbelt at the cost of production. Therefore, as shown in the third spreadsheet table in Exhibit D, other packers will pay a lower net price for hogs under the scenario where negotiated prices fall below the cost of production of Smithfield's owned-pigs. Low market hog prices could occur if hog producers could expand production in response to the short-term high prices engendered by Smithfield's strategy to drive out its rival packers. However, this expanded production would only remain in production to the point where the costs of such marginal production are covered by market prices. Therefore, it is expected that Smithfield can only be harmed for short periods of time unless Smithfield's owned-pig cost of production is higher than other producers. Smithfield's vertically integrated structure also helps it withstand the low price event. Low hog prices make for a more profitable period for Smithfield's packing operations. This profitability can subsidize Smithfield's production operations and provide greater staying power relative to independent producers who have expanded and have no way to compensate for losses due to low market prices.

The key is that there is a vertical barrier to entry for other packers to replicate the position Smithfield has uniquely obtained in the Midwest. Smithfield managed to virtually replicate vertical integration with their affiliates through violating the Iowa farm laws restricting packer ownership of hogs. Though successful, Smithfield created a unique

CFTC275

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HFC-PORKAT0000296681

Chan Mazumdar
October 31, 2006
Page 16

beachhead which other packers are only now able to begin to emulate. Secondly, Smithfield is attempting to acquire the only other vertically integrated system in the Western Cornbelt, PSF. Third, this analysis does not include Smithfield's North Carolina Region operations that will be able to purchase approximately 91 percent of their hogs at cost through owned production if the merger occurs. A North Carolina monopsony provides a further financial buffer to Smithfield's use of a high price hog strategy to weaken packer rivals in the Western Cornbelt who cannot offset the higher prices through other integrated portions of their operations. Thus, focusing only on Smithfield's actions in the Western Cornbelt likely is a conservative view of how successful they may be company-wide in executing this strategy.

Further, it is unlikely that major, sustained production expansion will occur in response to Smithfield's actions due to barriers to expansion described elsewhere. Even if it does, it is likely to be at a higher cost than Smithfield's existing cost structure due to higher material costs for construction, greater permitting costs and higher costs of land (or the need for greater amounts of land to meet set-back requirements). Therefore, Smithfield's strategy is unlikely to be replicated or challenged. It is reasonably likely that post-merger Smithfield will be able to drive a rival packer to cease operations, further consolidating the market, and increasing Smithfield's eventual ability to suppress hog prices in the Western Cornbelt as it will already be able to do in North Carolina.

The theory put forward has at least two empirical aspects which must be addressed to determine the degree of harm Smithfield's acquisition of PSF will have. First, it is necessary to determine exactly what Smithfield's relationship is with its affiliates in the Western Cornbelt. Second, questions about how Smithfield reports prices must be addressed through examination of Smithfield's individual mandatory price reports. Third, it is necessary to establish Smithfield's company-wide cost of hog acquisition to evaluate its potential for executing its apparent strategy of raising rivals' costs through manipulating the Western Cornbelt price. This includes examining why observed contract prices for hogs in North Carolina ($18-$30 per pig space) are significantly lower than Midwest contract prices ($38 - $41 per pig space) as this may be evidence of oligopsony pricing power pre-merger and monopsony power post-merger, which damages the competitive operations of hog producing markets in and of itself, and can facilitate a strategy to increase rivals' costs in the Midwest.

## V.   POTENTIAL IMPACTS OF THE SMITHFIELD/PSF MERGER ON OUTPUT MARKETS FOR PORK PRODUCTS

The Department has requested Hormel's view of the potential impacts of the Smithfield/PSF merger on output markets for pork products. Hormel views output markets for pork products to be distinct product markets, under the Horizontal Merger Guidelines, from those for other proteins such as beef or poultry. Hormel also considers the market for fresh pork to be distinct from the market for processed pork products. There are identifiable submarkets within the broader categories of processed pork products and fresh pork products; between, for example, deli cuts of processed pork and canned or packaged products, and between different quality gradations of fresh pork. There can be localized

CFTC276

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    HFC-PORKAT0000296682

Chan Mazumdar
October 31, 2006
Page 17

geographic markets for pork products as well, for example, deli meat products in New York City. If this merger is consummated, Hormel sees the potential for anticompetitive impacts on output markets for pork, particularly as post-merger Smithfield abuses its monopsony position in North Carolina to the detriment of producers, and continues to seek to drive packing rivals from the market through the price manipulation strategy discussed earlier.[12]

As Smithfield attains monopsony power over hog producers, skewing competitive outcomes there, anticompetitive impacts to pork output markets can also occur, with consequent consumer harm. Smithfield will control at least 30% of slaughter capacity nationally after the merger. This figure will include of 91% of the slaughter capacity in the North Carolina region and 27% of the slaughter capacity in the Western Cornbelt region. Smithfield will also be approximately 67% vertically integrated post-merger. In the North Carolina Region, where Smithfield will have a post-merger monopsony, contract grower prices currently range between $18 and $31 per pig space compared to $38 to $41 per pig space in the Western Cornbelt region. As Smithfield controls additional capacity in the Western Cornbelt (either through acquisitions such as PSF, or the exit of rivals) it would be expected to reduce grower payments there too, enhancing its profit margin on any hogs it still procures as it depresses input costs below competitive levels.

Reducing procurement costs below competitive levels distorts the workings of the competitive market for hog production and harms producers. That fact alone should be sufficient reason to challenge this merger. But it is likely not Smithfield's only end objective. Under the theory of monopsony, a monopsonist will reduce its demand for an input such as hogs because the monopsonist recognizes that increasing demand for the input causes the input price to increase. Smithfield's long run strategy logically includes reducing input demand to lower its costs for hogs. Given that reduced inputs will reduce outputs in any normal production relationship, consumers will eventually be harmed by reduced output.

---

[12] At our October 19 meeting, Fred Gramlich inquired of Brian Stevens whether Hormel obtained prices for its processed pork products that reflected significant value added over finished pork, and Mr. Stevens replied yes. The fact that Hormel realizes significant value added on its processed pork products should not lead the Department to conclude that it can safely ignore anticompetitive impacts of the Smithfield/PSF merger on markets for hog finishing and slaughter. Hormel evaluates its finishing and slaughter operations on their own competitive merits; if those operations do not show a positive return over the medium and long term, they will be discontinued and fresh pork purchased from, in all likelihood, Smithfield. (As was discussed on October 19, Hormel has already converted one slaughter facility, in Rochelle, Illinois, to a further processing plant. Hormel also currently purchases finished hogs from Smithfield to supply the Farmer John plant in Southern California.) At that point, Hormel would be in a position of attempting to pass on to consumers increased prices for fresh pork that Smithfield could command through market power in the pork finishing and slaughter markets.

CFTC277

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

HFC-PORKAT0000296683

Chan Mazumdar
October 31, 2006
Page 18

Inelastic meat demand creates an even greater payoff to an output reduction based on Smithfield's apparent monopsony strategy. Brester and Schroeder[13] estimate the own-price elasticity of pork at -0.69 and Boetel and Liu[14] estimate it similarly to be -0.48. These elasticities would imply that if Smithfield's strategy reduces input demand, and subsequently output, that a 10% decrease in the output of pork will result in a 14.5% to 21% increase in the price of pork to consumers. This assumes that the flexibility (the change in price resulting from a change in quantity) is the theoretical inverse of the elasticity.[15] In food markets, which are typically inelastic, any reduction in output usually results in a large increase in prices. Hence, the output reducing end-game provides the long run payoff which enhances the potential to compensate for any short-term profits Smithfield foregoes by trying to remove rivals to achieve monopsony.

It may be argued that the demand effect can be mitigated by substitutes for domestic pork. The research cited above shows that by far the largest impact of changes in pork price is on pork consumption. While there are positive cross-elasticities between pork price and quantities sold of other meat proteins, the effects are weak enough that they would not impair particularly Smithfield from exercising market power to impose a price increase in pork output markets.[16]

With regard to imports preventing monopoly rents in the U.S. pork market, the U.S. imported approximately one billion pounds of pork in 2005.[17] Domestic U.S. pork

---

[13] Brester, G.W. and T.C. Schroeder. 1995. "The Impacts of Brand and Generic Advertising on Meat Demand." *American Journal of Agricultural Economics.* 77:969-979.

[14] Boetel, B.L. and D.J. Liu. 2003. "Evaluating the Effect of Generic Advertising and Food Information Within a Meat Demand System." *Agribusiness.* 19:345-354.

[15] There is a debate in the literature regarding the theoretical inverse of elasticities and their implementation in empirical studies. Some studies find inelastic demand and inflexible demand which is inconsistent. For an assessment of this issue, refer to: Eales, J. 1996. "A Further Look at Elasticities and Flexibilities: Comments." *American Journal of Agricultural Economics.* 78:1125 – 1129.

[16] Feedstuffs (Oct. 2, 2006, page 6) reported that Smithfield is ranked number one in hog, pork, turkey, and cattle production and fifth in beef production. Smithfield's announced investment in a 5,000 head per day beef packing plant (Feedstuffs, Oct. 23, 2006, page 1) in the Oklahoma panhandle region will further move it up the list of largest beef processors. Therefore, other than chicken which is also highly concentrated, any substitution among meat groups would likely benefit Smithfield's other meat portfolios. Hence, when viewed beyond the pork industry, the potential for consumer harm becomes even greater with the consolidation of broader meat protein markets by Smithfield.

[17] Source: Economic Research Service, Livestock and Meat Trade Database.

CFTC278

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   HFC-PORKAT0000296684

Chan Mazumdar
October 31, 2006
Page 19

production totaled approximately 20.6 billion pounds in 2005. Hence, total pork imports represent about 5% of total U.S. production. Canada is the largest source of U.S. pork imports accounting for 82% of all U.S. pork imports in 2005. Denmark is a distant second accounting for another 10% of U.S. pork imports. While Canada's hog production sector is viewed as competitive, the pork-processing sector is not. Hence, while the U.S. imports weaned pigs from Canada, they are raised and slaughtered in the U.S. It is unlikely Canada will offset all possible rents in a monopsony-based strategy. [18]

Although relative prices of domestic and foreign pork contribute to import quantities, a key factor is also the demand patterns for specific pork cuts by country. For example, the U.S. is a heavy consumer of pork ribs during the summer months and nearly always compared to other countries. Facing this high demand for a specific cut from an aggregate hog carcass, the alternatives from a purely domestic side of production is to either raise rib prices substantially to reduce consumption of ribs or produce more hogs to meet the demand for ribs. The problem with producing more hogs is that demand for other cuts is frequently lower in the summer so these would need to be discounted heavily to move the rest of the pork carcass. A preferred solution is to seek imports of specific cuts to fill seasonal demands. This is why the U.S. will import pork during periods of even high production -- a hog always yields basically the same cuts and even in high production periods, certain desired cuts may be in deficit. These country-specific preferences and seasonal differences account for a significant amount of pork trade, regardless of pricing. As a counter-example, the U.S. exports a large share of its offal products to countries with preferences for what the U.S. views as byproducts.

Other import barriers include sanitary restrictions on processing which restrict imports from countries not meeting U.S. standards. The U.S. has also attempted to impose Country of Origin Labeling on meat products which would create barriers to imports in the U.S. consumer's mind. Support for this legislation implies some perceived inferiority of foreign produced pork products which again would result in increased rents to restricted domestic output.

---

[18] Professor Buhr could not locate specific elasticities related to import demand by pork product type in the economic literature. However, to assess whether imports could counteract Smithfield's post-merger potential domestic U.S. market power, it would be necessary to fully consider the dynamics of U.S. pork imports, including finding or evaluating market relationships for imported pork cuts and the mix of fresh versus frozen or processed pork products and the potential for foreign countries to expand production. Smithfield also has significant swine production assets in many of potential import-source countries, further limiting true foreign competition. Analysis would have to include assessment of Smithfield's international production capabilities and the impact this might have on the potential for imported pork to mitigate Smithfield's U.S. market power.

CFTC279

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    HFC-PORKAT0000296685

Chan Mazumdar
October 31, 2006
Page 20

The potential for the Smithfield/PSF merger to threaten anticompetitive harm in pork output markets is one which deserves considered attention in a Second Request and subsequent investigation by the Department. In particular, the Department should seek to obtain data on the shares of markets for fresh and processed pork (including product submarkets and perhaps geographic submarkets) that the merging parties will enjoy, as well as any data Smithfield may have that pertains to cross-elasticities of demand with regard to other meat products, and imported pork.

## VI.   ADDITIONAL INFORMATION REGARDING HORMEL'S PLANT EXPANSION PROJECTS

Expansions in Hog Processing/Pork Fabrication at Hormel always involve lengthy fact-finding and planning. The expansion of the capacity of Hormel's Fremont, Nebraska plant from 9,000 to 10,500 head per day was a decision that followed 18 months of planning and deliberation. Hog availability, product sales, impact on plant infrastructure and systems, etc., were all reviewed in depth. This particular project was approved by upper management in February 2005 and completed in March 2006 at a cost of $6 million, for a total project timeline of approximately 31 months.

A number of incremental steps have been taken at Hormel's Austin, Minnesota plant to expand capacity at that plant from 17,000 to 19,000 hogs per day in a stepwise fashion. Beginning in early 2000, the impact of these expansion ideas was considered. As a result, Hormel management gave approval to upgrade the Austin plant's carcass chilling system in September 2003 and this project was completed in September 2004 at a cost of $4 million. Subsequently, approval was granted in August 2005 to expand office and welfare space to accommodate the growing number of employees at this plant. This project was the last step in Austin's expansion to 19,000 head/day and was completed in September 2006 at a cost of $3 million. As shown, the process of expanding the Austin plant occurred over a six year period, at a combined capital cost of $7 million.

## VII.   CONCLUSION

Thank you for considering these additional comments. Hormel continues to be concerned at the potential anticompetitive impact of the Smithfield/PSF merger, and urges the Department to act to block it.

CFTC280

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   HFC-PORKAT0000296686

Chan Mazumdar
October 31, 2006
Page 21

Please contact any of the undersigned should the Department have further questions. We can also make Professor Buhr available for further discussion. In addition, Hormel's offer of a tour of its Austin, Minnesota plant and an opportunity to meet senior management remains open, and is something the company is very interested in providing to the Department.

Sincerely,


Richard A. Duncan
Kim J Walker
Jacob D. Bylund

/lth/fb.us 1620777.03
Enclosure
cc:   Anne E. Schneider, Office of the Attorney General, State of Missouri (w/encl.) (By Overnight Mail)
      Lori J. Marco (w/encl.) (By Email and Overnight Mail)

CFTC281

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    HFC-PORKAT0000296687