# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Case No. 18-cv-1776 (JRT/JFD) |
| This Document Relates to: *All Direct Actions* | |

## DEFENDANTS' OPPOSITION TO CERTAIN DIRECT ACTION PLAINTIFFS' MOTION TO COMPEL

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 3

   I.     DEFENDANTS' PRODUCTIONS OF STRUCTURED DATA WERE
        SUBJECT TO EXTENSIVE NEGOTIATIONS. ......................................... 3

   II.    DEFENDANTS SHOULDERED A SUBSTANTIAL BURDEN TO
        TIMELY PRODUCE STRUCTURED DATA ............................................. 7

   III.   THE COURT HAS REJECTED DAPS' PREVIOUS ATTEMPT TO
        REVISIT DISCOVERY ............................................................................ 10

   IV.   MOVING DAPS HAVE NO EXCUSE FOR THEIR DELAY IN
        ATTEMPTING TO RENEGOTIATE THE SCOPE OF STRUCTURED
        DATA ....................................................................................................... 12

ARGUMENT ...................................................................................................... 16

   I.     MOVING DAPS' REQUEST SHOULD BE DENIED AS UNTIMELY. 16

   II.    THE ADDITIONAL DATA SOUGHT IS NOT PROPORTIONAL TO
        THE NEEDS OF THE CASE. ................................................................... 21

        A.     Moving DAPs Have Not Demonstrated the Additional Data Sought
              Is Relevant and Important to Their Claims. .................................... 22

        B.     Producing the Additional Data Sought Would Be Extremely
              Burdensome ..................................................................................... 25

        C.     Moving DAPs Should Rely on Their Own Purchase Data Rather
              Than Force Defendants to Produce Additional Sales Data ............. 27

   III.   MOVING DAPS' REQUESTED 30-DAY PRODUCTION DEADLINE IS
        NOT FEASIBLE. ...................................................................................... 28

CONCLUSION ................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                     **Page(s)**

*Aardwolf Indus., LLC v. Abaco Machs. USA, Inc.*,
   No. CV 16-01968-GW, 2017 WL 4769431 (C.D. Cal. July 10, 2017) ...................... 17

*In re Diisocyanates Antitrust Litig.*,
   No. 18-1001, 2020 WL 7427040 (W.D. Pa. Dec. 18, 2020) ................................. 23, 25

*Haviland v. Catholic Health Initiatives-Iowa, Corp.*,
   692 F. Supp. 2d 1040 (S.D. Iowa 2010) ............................................................... 17, 18

*Rasch v. Tyson Fresh Meats, Inc.*,
   No. 16-cv-3006-LTS, 2017 WL 3091458 (N.D. Iowa Feb. 27, 2017) ...................... 23

*Secure Energy, Inc. v. Coal Synthetics*,
   No. 4:08CV01719 JCH, 2010 WL 597388 (E.D. Mo. Feb. 17, 2010) ...................... 17

*Speed RMG Partners, LLC v. Arctic Cat Sales, Inc.*,
   No. 20-cv-609, 2020 WL 12442073 (D. Minn. Oct. 5, 2020) .................................... 21

## **Other Authorities**

Fed. R. Civ. P. 26(b)(1) ..........................................................................................21, 22, 27

8B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure
   § 2285 (3d ed. 2022) ................................................................................................ 24

## INTRODUCTION

At the tail end of fact discovery and more than a year after Defendants completed burdensome efforts to collect and produce structured data (i.e., invoice-level sales data) that spans 16 years and covers thousands of different products, a small number of Direct Action Plaintiffs ("Moving DAPs")[1] bring the present motion claiming they are entitled to even more.[2]  As this Court has acknowledged, there is "tremendous overlap" between the claims brought by the Direct Action Plaintiffs that were transferred to the District of Minnesota starting in June 2021 ("DAPs") and the claims that have been litigated since as early as June 2018 by the Direct Purchaser Plaintiffs, Commercial and Institutional Indirect Purchaser Plaintiffs, and Consumer Indirect Purchaser Plaintiffs (collectively, "Class Plaintiffs"); the Commonwealth of Puerto Rico; and DAPs Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC (collectively, "Early DAPs").  (Ex. 2 (Dec. 17, 2021 Informal Dispute Resolution ("IDR") Conference Tr., ECF No. 1082) 27:6-7.)  Given that Moving DAPs advance essentially the same claims as Class Plaintiffs and Early DAPs, the onus is on Moving DAPs to establish why they cannot prosecute their claims on the basis of

---

[1] Moving DAPs are Amory Investments LLC ("Amory"); Compass Group USA, Inc. ("Compass"); Conagra Brands, Inc. ("Conagra"); Howard B. Samuels solely as Trustee for the estate of Central Grocers, Inc. ("Central Grocers"); Nestlé Purina PetCare Company ("Nestlé Purina") and Nestlé USA, Inc. ("Nestlé USA") (collectively, "Nestlé"); and Sysco Corporation ("Sysco").  The remaining 55 DAPs are not part of the motion.  (*See* Ex. 1 (List of Current DAPs).)

[2] Moving DAPs are moving against Defendants Hormel Foods Corp. and Hormel Foods, LLC (collectively, "Hormel Foods"), JBS USA Food Company ("JBS"), Smithfield Foods, Inc. ("Smithfield"), and Tyson Foods, Inc., Tyson Prepared Foods, and Tyson Fresh Meats, Inc. (collectively, "Tyson").

Defendant documents and data produced to date, which were subject to extensive negotiations and cover everything from whole pork shoulders to pre-packaged honey ham lunch meat.  Moving DAPs cannot make that showing.

Moving DAPs all but ignore the lengthy history concerning structured data negotiations and productions that is needed to put their motion in context.  It took Class Plaintiffs, Early DAPs, and Defendants several months through the spring of 2021 to negotiate the scope of Defendants' structured data productions.  The end result of those negotiations was an agreement that reflected a series of trade-offs that both sides made (e.g., Defendants made concessions on certain issues in return for Plaintiffs conceding other issues) in order to reach a compromise and avoid motion practice.  Shortly after being transferred to this action in July and August of 2021, four Moving DAPs then in the case received a list of the product categories for which Defendants agreed to produce structured data, in August of 2021.  Defendants were then in the midst of spending several months and thousands of hours to identify, collect, and produce roughly 175 gigabytes of sales data, which those same Moving DAPs received along with all other parties then in the case in September of 2021.  With this data in their hands, DAPs agreed to a proposed case schedule providing a deadline of December 1, 2021 for Defendants to produce any additional, DAP-specific data.  But Moving DAPs' served Requests for Production ("RFPs") that did not even request the data that is the subject of their motion.  (*See* Ex. 3 (Oct. 22, 2021 MDL DAPs' First Set RFPs).)  Yet only now, with one month of fact discovery remaining, and despite this lengthy history, do Moving DAPs seek to have

Defendants produce vast amounts of additional data.  Simply put, the time for renegotiating the scope of structured data in this case is long past.

Timing aside, the marginal relevance of the products for which Moving DAPs now seek additional data cannot justify the burden and prejudice to Defendants that would result from a data do-over.  Moving DAPs seek to compel the production of data on products ranging from blood and bone meal to breakfast sandwiches and frozen burritos, products whose connection to the allegations in Moving DAPs' complaints is tenuous at best.

Finally, the considerable burdens and expenses associated with Defendants' productions of structured data outweigh any benefit that the additional structured data requested would provide.  Defendants have already expended thousands of hours on enormously burdensome data collection efforts to date, and the additional efforts required to comply with Moving DAPs' present demand would impose yet further burden.  Their motion should be denied.

## FACTUAL BACKGROUND

### I.   DEFENDANTS' PRODUCTIONS OF STRUCTURED DATA WERE SUBJECT TO EXTENSIVE NEGOTIATIONS.

In their first set of document requests served on November 1, 2018, Class Plaintiffs requested that Defendants produce extensive structured data (i.e., granular data maintained in Defendants' databases related to sales, processing costs, product information, purchases, and other business functions or transactions).  (*See* Ex. 4 (Plaintiffs' RFPs).)  For example, Request Number 37 requested "Structured Data

sufficient to show, for each U.S. Pork sale," dozens of fields of data for "the time period from January 1, 2003 through the present." (*Id.* at 20-21)  While the parties deferred action on negotiating the scope of that request until the Court's resolution of Rule 12 motions, all parties recognized the need to resolve the extent of structured data productions early in discovery.  For Defendants, the burdens involved in extracting and producing structured data made it critical to determine the scope of data productions up front, so that data productions were done correctly and done once.  Accordingly, the parties negotiated and submitted a stipulation to the Court, (ECF No. 530), which the Court granted on November 12, 2020, (ECF No. 532).  Among the key deadlines to which the parties agreed, the Court established **January 15, 2021** as the deadline for the parties to "reach agreement on production of structured data or seek relief from the court." (ECF No. 532 at 2.)  That deadline was set to facilitate compliance with the Court's **September 1, 2021** deadline for substantial completion of "Document and Structured Data Productions." (*Id.*)  All parties then in the case stipulated to the entry of that order, including Class Plaintiffs, the Commonwealth of Puerto Rico, and Early DAPs (collectively, "Plaintiffs").  (ECF No. 530.)

Following entry of that November 12, 2020 Order, the parties engaged in extensive negotiations to resolve exactly what data Defendants would produce.  With Plaintiffs demanding data dating back to 2003, a time period spanning nearly 18 years, that process included difficult negotiations about the time period that should apply to structured data productions. (*See* Ex. 5 (Mar. 9, 2021 B. Robison-S. Scarlett email

thread).)  The parties also undertook negotiations regarding the specific products at issue in the litigation that would be subject to data productions.  (*See, e.g.*, *id.*)

Dating back to the earliest discovery negotiations in the case, *Plaintiffs* underscored that it "is imperative that the parties are in agreement on what constitutes Pork for purposes of . . . this entire litigation.  For avoidance of doubt, Plaintiffs reiterate that they define Pork as 'pig or swine meat sold or purchased fresh or frozen, smoked ham, sausage, and bacon.'"  (Ex. 6 (Aug. 2, 2019 M. Looby-R. Duncan letter) at 6.)  That definition was also used in Plaintiffs' RFPs served on Defendants.  (Ex. 4 at 8.)  Determining exactly which products are defined as Pork for the litigation was an essential first step to extracting structured data from databases, and Defendants therefore agreed that the parties had to settle on a definitive list of products.  (*See* Decl. of Peter Ferrell ("Ferrell Decl.") ¶ 3.)

The process of diligently negotiating the details related to structured data productions was subject to the Court's oversight.  As negotiations progressed, the parties stipulated and the Court granted multiple extensions of the Court's original January 16, 2021 deadline, to allow continuing negotiations about the scope of structured data productions.  (*See* ECF Nos. 645, 695, 717, 729, 749.)  During this time, the parties reported to Magistrate Judge Bowbeer regarding their progress on this effort.  (*See, e.g.*, ECF Nos. 733, 737, 738.)  Those extensions reflected the extent of the parties' efforts to negotiate agreements about the boundaries for data productions.

Between January and April 2021, the parties engaged in multiple rounds of correspondence and negotiation to finalize the exact definition of Pork and to determine

5

the specific products subject to the structured data productions to be made by each Defendant.  For example, writing on behalf of all Defendants, Smithfield sought to clarify that the following products should be excluded from the litigation:  byproducts (such as offal, non-muscle cuts like feet or necks, and parts), cooked products, manufactured sausage or ham, products in which pork is an ingredient (ranging from multi-ingredient sausage to pepperoni pizzas), and hams cured by methods other than smoking.  (Ex. 5 at Mar. 9, 2021, 2:03 PM email from B. Robison.)  Plaintiffs did not accept this initial proposal, demanding, for example, that even manufactured and cooked sausage products be included to the extent they were single-protein.  (*See* Ex. 7 (Mar. 30, 2021 C. Coleman-J. Bourne letter).)  The parties continued to negotiate the categories of products that would be included and excluded from the definition of Pork, with individual Defendants corresponding with Plaintiffs to clarify exactly how agreed-upon product categories would apply to their own product offerings.  (*See, e.g.*, *id.*; Ex. 8 (Mar. 31, 2021 L. Strang-J. Bourne letter).)  That process culminated in Class Plaintiffs and the Commonwealth of Puerto Rico confirming agreement on April 5, 2021 regarding the Pork products subject to structured data collection and production.  (Ex. 9 (Apr. 5, 2021 J. Bourne-B. Robison email thread).)

On April 2, 2021, Early DAPs raised objections to the definition of Pork products negotiated by Defendants, Class Plaintiffs, and the Commonwealth of Puerto Rico.  (*See* Ex. 10 (Apr. 11, 2021 J. Taylor-P. Ahern email thread).)  For example, according to Early DAPs, Defendants should have been required to produce data related to "any multi-ingredient or further processed product with a non-trivial amount of pork."  (*Id.* at Apr. 2,

2021 email from P. Ahern).)  In response, Defendants informed Early DAPs that they intended to proceed with data collections and productions based on the agreement reached with all other Plaintiffs.  (*Id.* at Apr. 5, 2021 email from J. Taylor.)  After Defendants' position was further discussed with Early DAPs during an April 15, 2021 meet and confer, Early DAPs declined to file a motion to compel, resolving the issue and paving the way for Defendants to collect and produce relevant structured data.

## II.   DEFENDANTS SHOULDERED A SUBSTANTIAL BURDEN TO TIMELY PRODUCE STRUCTURED DATA.

With the scope of structured data collection settled, Plaintiffs pivoted to pushing for production of data in advance of the September 1, 2021 deadline for completion of document and data discovery.  (*See, e.g.*, Ex. 11 (May 17, 2021 C. Coleman-B. Hogan email thread).)  The parties had previously engaged in detailed discussions and correspondence about the many databases, data fields, and specific data each Defendant maintains relevant to the litigation.  (*See, e.g.*, *id.* at Mar. 4, 2021 email from E. Chow.)  In early May of 2021, Plaintiffs requested that Defendants "commit to producing . . . structured data by June 15."  (*Id.* at May 7, 2021 email from B. Hogan.)

Plaintiffs' request for accelerated production of structured data was addressed during the Court's June 4, 2021 status conference.  (*See* ECF No. 795.)  In response to Plaintiffs' stated need for data in advance of the September 1, 2021 deadline, Defendants committed to rolling productions of structured data throughout the summer of 2021.  (*See* Joint Update Letter, ECF No. 810, June 18, 2021.)  In the Joint Update Letter, Defendants detailed the substantial efforts they were undertaking to identify databases

and other sources of data, ascertain data fields, and prepare to extract data.  (*See generally id.* at 4-10.)  Smithfield, for example, explained its need to pull data from numerous databases maintained by various affiliates, while providing lists of data fields to Plaintiffs, responding to Plaintiff questions, and negotiating the production.  (*Id.* at 9.)  And Tyson explained its need to obtain data from the "entirely separate employees and data systems" maintained by different business divisions, its efforts to locate and revive backup tapes, and the burden the process placed on its IT professionals.  (*Id.* at 5-6.)

Notwithstanding the significant challenges involved, Defendants made extraordinary efforts to meet the Court's September 1, 2021 deadline for substantial completion of data productions.  For example, Hormel Foods' Director of Cost Accounting manually reviewed over 20,000 Stock Keeping Units ("SKUs") to identify products meeting the litigation definition of Pork, a process that consumed "many nights and weekends" just to compile the product list to allow others to run database queries. (Ferrell Decl. ¶ 4.)  Using that list, Hormel Foods' Data Engineering Team Lead spent "multiple days" running queries to generate "33 spreadsheets containing nearly 39 gigabytes of data."  (Decl. of Tyler Tweeten ("Tweeten Decl.") ¶ 3.)  The Ferrell and Tweeten declarations partially describe the efforts by just one Defendant (Hormel Foods) solely to produce sales data.  Tyson undertook a similarly burdensome process, with its Senior Manager of IT Applications managing the efforts of a team of IT employees and consultants who spent a collective 280 hours contributing to Tyson's data collection effort.  (Decl. of Kelly Joyner ("Joyner Decl.") ¶ 9; Decl. of Lindsey Strang Aberg

("Strang Aberg Decl.") ¶ 11.)  That effort was supported by an additional 420 hours of work performed by knowledgeable business people in Tyson's Prepared Foods and Hillshire Brands business divisions.  (Strang Aberg Decl. ¶ 13.)  Separately, knowledgeable business people in Tyson's Fresh Meats business division spent over 500 hours on work related to Tyson's data collection efforts in support of this litigation.  (*Id.* ¶ 15.)

 Collectively, the volume of data produced by Defendants has been overwhelming. Focusing specifically on sales data (which is just one category of structured data Defendants have produced in response to Plaintiffs' requests), responding to Plaintiffs' discovery requests required Defendants to produce data related to every sale of tens of thousands of different products over a 16-year period.  The result was the production of approximately **175 gigabytes** of sales data containing **1.4 billion observations** related to sales transactions involving more than **$150 billion** of commerce.  (*Id.* ¶ 16.)   To illustrate the complexity of the data productions made by just one Defendant, Tyson, for example, produced data from more than 12 separate data systems due to its many separate business divisions and data system migrations.  (*See* Joyner Decl. ¶¶ 4-5; Ex. 12 (chart documenting Tyson's productions of structured data from various separate data systems); Ex. 13 (Feb. 2, 2022 J. Taylor-M. Mitchell letter) (describing Tyson's data systems and productions).)

## III.   THE COURT HAS REJECTED DAPS'
##        PREVIOUS ATTEMPT TO REVISIT DISCOVERY.

As the caption of their motion indicates, only seven of the 62 DAPs now in the

litigation[3] are seeking to compel the production of additional structured data.  Moving

DAPs' filing and transfer dates are as follows:

|  | Complaint Filed | Transfer to Minnesota |
|---|---|---|
| Sysco | March 8, 2021 | June 22, 2021 |
| Amory | July 13, 2021 | July 23, 2021 |
| Nestlé Purina and Nestlé USA | July 8, 2021 | July 28, 2021 |
| Conagra | July 30, 2021 | August 19, 2021 |
| Central Grocers | November 3, 2021 | November 18, 2021 |
| Compass | June 2, 2022 | June 21, 2022 |

By an order issued on June 9, 2021, the Judicial Panel on Multidistrict Litigation

formed MDL case number 2998, and it then ordered the transfer of DAPs' cases to the

District of Minnesota.  (*See* Mem. Op. & Order Consolidating Actions, ECF No. 985,

Nov. 14, 2021.)  As this Court noted when consolidating the newly transferred cases with

the ongoing litigation, the purpose of the MDL transfer was to prevent "duplicative

pretrial proceedings," (*id.* at 3), and ensure the "just and efficient conduct" of the

litigation, (*id.* at 2).  In ordering the consolidation of the litigation, the Court recognized

the need to avoid "different scheduling orders," (*id.* at 6), to ensure efficient discovery,

(*id.* at 7), and to "decreas[e] the burdens and costs to parties," (*id.* at 10).

Immediately after the DAP cases were transferred to the District of Minnesota,

Defendants took proactive steps to ensure that DAPs would be integrated into ongoing

discovery.  In Defendants' July 8, 2021 status update to Magistrate Judge Bowbeer,

---

[3] (*See* Ex. 1 (list of current DAPs).)

Smithfield wrote on behalf of Defendants to review defense efforts to share discovery pleadings, the Court's scheduling orders, document search terms, and rulings on discovery limitations. (Defs.' Letter Regarding Coordination & Scheduling Proposal, ECF No. 820.)  Defendants stressed to the Court that, given the discovery already underway and efforts to integrate new plaintiffs, "the New DAPs should not need until the end of October to reach agreement on search terms, search, methodology, and document and data sources." (*Id.* at 3.)  For their part, the newly transferred DAPs sought a new discovery schedule that would allow them to issue new document requests and revisit search terms, document custodians, and other discovery issues that had been previously settled.  (*See* MDL DAPs' Coordination & Scheduling Proposal, No. 0:21-md-02998-JRT-HB, ECF No. 4, July 8, 2021.)  The Court repeatedly rejected DAPs' attempt at a do-over of discovery.  First, Judge Tunheim consolidated the new DAPs with the ongoing litigation and applied "all existing orders and deadlines" from the preexisting litigation to all new parties.  (Mem. Op. & Order Consolidating Actions 12, ECF No. 985, Nov. 14, 2021.)  Then, Magistrate Judge Bowbeer denied the newly transferred DAPs' efforts[4] to re-litigate search terms and upend agreed-upon discovery limits on December 17, 2021.  (Ex. 2 (IDR Conference Tr.) 26:25-30:19.)  As Magistrate Judge Bowbeer ruled:

> [W]e're not writing on a blank slate here and the defendants have already responded to discovery requests that involved tremendous overlap in the issues and have produced millions of documents. The search strategy that led to that production was negotiated over a significant period of time with highly capable class counsel who have been living with this case since 2018.

---

[4] (*See* ECF Nos. 1022, 1035.)

(*Id.* 27:4-11.)  Thus, the Court largely bound the newly transferred DAPs to existing discovery agreements and placed them on clear notice of the need to expeditiously identify any gaps remaining.  (*See id.* 28:18-30:19.)

## IV.   MOVING DAPS HAVE NO EXCUSE FOR THEIR DELAY IN ATTEMPTING TO RENEGOTIATE THE SCOPE OF STRUCTURED DATA.

As DAPs, including Moving DAPs, were aware, Defendants were required under the terms of the Pretrial Scheduling Order to substantially complete their production of documents and structured data by September 1, 2021.  (ECF No. 658.)  With the exception of Central Grocers and Compass (represented by the same counsel as other Moving DAPs), all Moving DAPs were active in the litigation prior to that deadline.  In fact, Sysco filed its lawsuit on March 8, 2021, nearly a month before Defendants, Class Plaintiffs, the Commonwealth of Puerto Rico, and Early DAPs reached agreement on the scope of structured data productions.  Consistent with the substantial completion deadline, Defendants produced structured data on a rolling basis from June until September of 2021.  Pursuant to the parties' agreement, DAPs began receiving such Defendant data productions in August 2021, and had substantially complete data productions from most Defendants as of September 1, 2021, and from each Defendant as of later that month.

Despite being actively involved in discovery discussions with Defendants throughout July and August of 2021, at no point prior to this well-known substantial completion deadline did Moving DAPs make any attempt to discuss the scope of the

ongoing Defendant data productions to determine whether the data being produced was satisfactory.  Instead, Moving DAPs elected to stay on the sidelines while Defendants expended considerable resources to collect and produce data according to product scope limitations that had been agreed to by the parties more than three months prior.  Despite their silence on the topic for many months thereafter, all DAPs were on notice by no later than August 13, 2021 that the parties had negotiated and agreed to exclude from structured sales data productions the four categories of products Moving DAPs now seek.  (*See* Ex. 14 (Aug. 13, 2021 B. Robison-M. Moonsammy letter, enclosing Mar. 30, 2021 B. Robison-J. Bourne letter describing product exclusions); Ex. 15 (Aug. 13, 2021 A. Berland-M. Moonsammy email, enclosing Apr. 3, 2021 R. Vagas-T. Schneider email thread describing product exclusions).)

On August 2, 2021, Defendants and the newly transferred DAPs, which included several of the Moving DAPs,[5] negotiated and submitted via email to the Court a Proposed Pretrial Case Management and Scheduling Order to govern DAP discovery.  (Joint Statement 2, ECF No. 1046.)  That agreed-upon proposed schedule set **December 1, 2021** as the deadline for Defendants to produce to then-Current DAPs (i.e., those whose cases had been transferred to the District of Minnesota as of August 2, 2021) data responsive to any "additional structured data" requests issued by such DAPs.[6]  (*Id.* at

---

[5] By August 2, 2021, the following Moving DAPs had filed complaints:  Amory, Conagra, Nestlé Purina, Nestlé USA, and Sysco.  All but Conagra had already had their cases transferred to the District of Minnesota.

[6] During the negotiations related to the proposed schedule, the parties discussed the possibility that DAPs may seek additional data, and Defendants indicated, both in oral

3.) After the submission of that proposed schedule, Defendants and DAPs agreed to operate under its terms absent a formal court order regarding the same. (*See id.* at 2.) Consistent with that agreement, the parties complied with the deadlines and requested ad hoc extensions to such deadlines where necessary. But both the December 1, 2021 data deadline applicable to then-Current DAPs, (*id.* at 3), and the 90-day from case commencement deadlines applicable to future DAPs under the same agreed-upon schedule, (Joint Statement Ex. A 5, ECF No. 1046-1), came and went, and Moving DAPs did not request—meaning Defendants had no reason to produce—any additional structured data. Moving DAPs also did not request an extension to the deadlines applicable to such data production, nor did they even begin to engage with Defendants on the topic of data until more than a month after the applicable deadline.[7]

---

negotiations and the subsequent court filing, that they believed their data productions were sufficient and would reserve the right to oppose any such requests. (*See* Joint Statement Ex. A 4 n.5, ECF No. 1046-1, Dec. 10, 2021 ("By agreeing to provide deadlines for proposals for new search terms and for any further structured data productions or document productions in response to new proposed search terms, Defendants do not concede that additional structured data requests . . . are proper.").)

[7] DAPs corresponded with certain Defendants about their structured data productions in early 2022, and Defendants were diligent about responding to such outreaches and forthcoming about the scope of their relevant data productions. As one example, Sysco sent Hormel Foods a detailed letter on January 4, 2022 cataloging Hormel Foods' productions of structured data and asking specific questions about purported gaps in the data. (*See* Ex. 16 (Jan. 4, 2022 M. Mitchell-C. Coleman letter).) Those issues were addressed in subsequent meet and confer discussions and correspondence. DAPs sent similar letters to other Defendants inquiring about structured data productions during that timeframe. (*See, e.g.*, Ex. 17 at 3 (Jan. 19, 2022 P. Iovieno-B. Robison letter).) Similarly, in response to a letter request from DAPs, Tyson described its structured data productions to DAPs with particularity on February 2, 2022. (*See* Ex. 12.) As to JBS, DAPs did not even reach out to discuss *any* aspect of the scope of the sales data productions or JBS's RFP responses concerning the same.

After Defendants' data productions were complete, DAPs issued and Defendants responded to DAPs' RFPs.  (*See* Ex. 3 (Oct. 22, 2021 MDL DAPs' First Set of RFPs).)  DAPs' RFPs included a definition of Pork identical to the operative definition from earlier Plaintiffs' RFPs, (Ex. 4 at 8), which guided the March 2021 negotiations between those Plaintiffs and Defendants on the definition of Pork to apply to structured data productions.  (Ex. 3 at 6 (defining Pork as "pig or swine meat sold or purchased fresh or frozen, including smoked ham, sausage, and bacon").)  As Moving DAPs acknowledge, multiple Defendants unambiguously stated in their responses to DAPs' Requests, served in November 2021, that they viewed their data productions as complete and did not intend to produce additional structured data in response to DAPs' requests.  (*See* Certain DAPs Mem. Support Mot. Compel ("Moving DAPs Mem.") 4, ECF No. 1495.)  Moving DAPs did not make any attempt to renegotiate the applicable definition of Pork.  That is, DAPs' definition of Pork in their RFP that is the subject of this dispute *does not include* the products about which they now belatedly seek data – i.e., franks that include pork and non-pork meat, multi-ingredient products like breakfast burritos, offal (e.g., fat, hearts, and other organs), renderings and by-products like blood meal and bone meal.  (*See* Ex. 3.)

Despite having had months of access to Defendant data and Defendants' RFP responses, Moving DAPs did not finally inform Defendants of their intent to substantially broaden the scope of data discovery in the case until May 31, 2022—***six months after the applicable deadline*** related to data production to DAPs.  (*See* Ex. 18 (May 31, 2022 T. Wheeler-Certain Defendants letter).)  That letter requested data related to sales of

products ranging from breakfast sandwiches and burritos to bones and blood meal.  (*Id.*)  Smithfield responded on June 13, 2022 denying Moving DAPs' request.  (Ex. 19 (June 13, 2022 B. Robison-E. Moore email thread).)  JBS similarly responded on June 16, 2022 that it "cannot accede to Mr. Wheeler's obviously burdensome request to restart data negotiations and data productions at this late stage."  (Ex. 20 (June 16, 2022 R. Vagas-S. Jones email thread).)  By June 25, 2022, Hormel Foods made its position clear by informing Moving DAPs that it is not reasonable "to re-litigate data to be produced long after the Court's deadline for production of structured data has passed."  (Ex. 21 (June 25, 2022 C. Coleman-S. Jones email thread).)  Moving DAPs now bring this motion three months later.

## ARGUMENT

### I.    MOVING DAPS' REQUEST SHOULD BE DENIED AS UNTIMELY.

Moving DAPs were transferred to this action starting in June of 2021; received Defendants' substantially complete data productions over a year ago, by September of 2021; agreed in August of 2021 that any additional structured data pursuant to requests by DAPs would be completed by December 1, 2021; and received RFP responses on November 22, 2021 stating that Defendants were resting on their prior structured data productions.  Yet, Moving DAPs waited until May 31, 2022 to first demand additional sales data and until September 20, 2022 to finally move to compel.  There is no excuse for that delay.  This late motion not only runs afoul of applicable discovery deadlines and jeopardizes the case schedule, but also prejudices Defendants by eliminating efficiencies that could have been realized by pulling and producing this data along with the data

already produced.  To make matters worse, if production is compelled at this late stage, all responding Defendants would be forced to undertake substantial additional work on data while defending multiple individual and corporate depositions, and two responding Defendants would have to undertake this work while also opposing class certification, creating further burden and prejudice.

When a party fails to comply or seek relief from applicable discovery deadlines— as Moving DAPs have done here—that party must justify their delay.  *See Secure Energy, Inc. v. Coal Synthetics*, No. 4:08CV01719 JCH, 2010 WL 597388, at *2 (E.D. Mo. Feb. 17, 2010) (denying plaintiffs' motion to compel additional ESI after the applicable deadline, noting that plaintiffs "waited two months before pursuing th[e] issue" and provided "no real basis for resting on their rights and failing to timely file their [m]otion").  Courts have considerable discretion to deny motions to compel as untimely to promote the "interests of dispatch and fairness" even when the moving parties have technically complied with applicable motion deadlines.  *Haviland v. Catholic Health Initiatives-Iowa, Corp.*, 692 F. Supp. 2d 1040, 1044 (S.D. Iowa 2010) ("Deadlines do not grant the parties carte blanche rights to demand sizable discovery requests up to the last possible minute."); *see also Aardwolf Indus., LLC v. Abaco Machs. USA, Inc.*, No. CV 16-01968-GW (JEMx), 2017 WL 4769431, at *1-2 (C.D. Cal. July 10, 2017) (denying as untimely a motion to compel filed more than a month before the discovery cutoff, noting

17

that plaintiff "did nothing for seven months" before seeking "last minute, massive

discovery relief").

Moving DAPs' deadline for seeking additional structured data is long past.  The

Moving DAPs then in the case agreed in August of 2021 that data pursuant to "additional

structured data requests" from Moving DAPs must be produced by December 1, 2021,

(Joint Statement 3, ECF No. 1046), and the deadline for later-filing DAPs was 90 days

from their transfer to this action, (Joint Statement Ex. A 5, ECF No. 1046-1).  Those

deadlines have passed for every Moving DAP except Compass, which was transferred to

this litigation in June of 2022.  *See Haviland*, 692 F. Supp. 2d at 1044 ("Plaintiffs had

fifteen months to pursue this particular line of discovery. . . . [T]he Court sees no reason

why Plaintiffs could not have . . . made this motion at a much earlier date.").  Moving

DAPs' memorandum ignores those deadlines entirely, and their statement that they

"timely" identified perceived deficiencies in Defendants' structured data production is

pure *ipse dixit*.  (Moving DAPs Mem. at 4.)

Moving DAPs also offer no justification for waiting months until after the agreed

cutoff to seek this data.  They assert that they did not identify the absence of the data they

now seek until March 2022, seven months after receiving detailed correspondence

explaining the scope of Defendants' data productions, six months after substantial

completion of data productions, and three months after the agreed deadline for providing

additional data in response to requests from DAPs.  (*See id.*)  During meet and confers

leading up to this motion, the only justification that Moving DAPs offered for that delay

is that their economic experts took that long to analyze the data.  But Moving DAPs had

18

no need to spend six months analyzing data to determine the products included in the sales data. Defendants transmitted their scope agreement with Plaintiffs to all DAPs then in the case, which included four of seven Moving DAPs, in August of 2021. (*See* Ex. 14; Ex. 15.)

Moving DAPs also could simply have asked Defendants to clarify which products were included in the sales data, but they never did. Even after Defendants stated in their November responses that they were standing on their prior production, and as the December 1, 2021 deadline came and went, Moving DAPs never asked for an extension, never stated that their experts were still reviewing whether Defendants' productions were sufficient, and never stated that they might seek additional data. Moving DAPs' claim that they could not have determined whether they needed additional data until March of 2022 does not hold water.

Moving DAPs then inexplicably waited two more months, until May 31, 2022, to raise their request for additional data with Defendants.[8] They provide no justification for that delay. Even if Moving DAPs are not held to the structured data deadlines to which they agreed, their dilatory conduct—never asking Defendants to further clarify what products were included in their structured sales data, waiting over six months after

---

[8] While Moving DAPs imply that they "began to meet and confer with Defendants regarding these four categories" of structured data between March and May of 2022, (Moving DAPs Mem. at 4), they cite no evidence to support that claim, and Defendants are not aware of any meet and confer regarding these four categories until Moving DAPs' letter dated May 31, 2022. (*See* Ex. 18.)

substantial completion to first raise their request, and waiting another four months before bringing this motion—renders their request untimely.

Moving DAPs' violation of the agreed deadlines is no mere technicality, and their delay will prejudice Defendants if the motion is granted. Producing structured data is burdensome, as discussed in further detail in the section below, in the Factual Background section above, and in the declarations accompanying this brief. Producing structured data serially compounds that burden, because it is more efficient to extract all structured data from a particular database once than it is to separately extract data for different categories of products from the same database multiple times. It was in recognition of this reality that the parties prioritized completing product scope negotiations prior to starting to collect structured data, and why there was a separate deadline for the parties to "reach agreement on production of structured data" that was eight months before the deadline to substantially complete production. (ECF No. 532 at 2.)

While Moving DAPs attempt to dismiss the agreements Defendants reached with Plaintiffs in April of 2021, the fact is that Moving DAPs chose to stand back and permit Class Plaintiffs to negotiate that discovery. As Judge Bowbeer noted previously, Class Plaintiffs were represented by able and experienced antitrust counsel, so Moving DAPs' interests were protected in that process. (*See* Ex. 2 (IDR Conference Tr.) 27:8-16 ("The search strategy that led to that production was negotiated over a significant period of time with highly capable class counsel who have been living with this case since 2018.").) All

the more so because the definition of Pork under which Class Plaintiffs negotiated the scope of structured data mirrored the definition of Pork in DAPs' RFPs.

In sum, Defendants made abundantly clear the scope of their structured data productions by August of 2021, before Defendants' deadline for substantial completion of document and data production, and DAPs agreed to a deadline of December 2021 for any additional, DAP-specific structured data production. Defendants relied on Moving DAPs' commitment to request any additional structured data before that time. Instead, Moving DAPs sat on their hands for six months, finally bringing this motion a year after receiving Defendants' structured data. There is no excuse for that delay, and Moving DAPs' motion should be denied.

## II.   THE ADDITIONAL DATA SOUGHT IS NOT PROPORTIONAL TO THE NEEDS OF THE CASE.

Moving DAPs fail in the first instance to establish the relevance of the data sought to any particularized allegation in their complaints. *See Speed RMG Partners, LLC v. Arctic Cat Sales, Inc.*, No. 20-cv-609 (NEB/LIB), 2020 WL 12442073, at *8 (D. Minn. Oct. 5, 2020) (placing the burden to show relevance on the moving party). Moreover, even if Moving DAPs had met their initial burden of showing relevance, the Court should deny Moving DAPs' motion because the discovery sought is not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The data sought is far afield from the allegations in Moving DAPs' complaints, the burden of producing the data is great, and—as Defendants noted to Moving DAPs during the meet and confer process— Moving DAPs should be able to use their own records of their own purchases rather than

shift that burden onto Defendants. *See id.* (discovery must be proportional in light of "the parties' relative access to relevant information, . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit"). This case presents an additional hurdle for Moving DAPs, as well: as Judge Bowbeer again previously noted, "we're not writing on a blank slate here." (Ex. 2 (IDR Conference Tr.) 28:15-16.) The proportionality of Moving DAPs' request therefore must not be weighed in isolation, but must instead "take into account . . . what has already been done." (*Id.* 28:16-17.)

### A. Moving DAPs Have Not Demonstrated the Additional Data Sought Is Relevant and Important to Their Claims.

Moving DAPs' complaints accuse Defendants of colluding to reduce the supply of hogs to raise the price of pork meat; they contain no allegations about products like breakfast burritos, blood, or the tens of thousands of other products for which Moving DAPs now seek structured data.[9] Instead, their complaints focused on the types of pure pork products that consumers eat. (*See, e.g.*, Sysco Am. Compl. ¶ 107 ("Pork loins, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets"), ¶ 228 ("Over the same period, prices for pork have increased substantially more for consumers over the Relevant Period."), ECF 1289.) Not only do Moving DAPs' allegations not relate to those products, the allegations in fact *exclude*

---

[9] While the definition of Pork in a footnote of certain Moving DAPs' complaints reference the products requested in their motion, the actual *allegations* relate exclusively to the products for which data has already been produced—cuts of pork meat, including minimally further processed pork meat like glazed hams.

these products from the scope of their claims. For example, the complaints allege that the relevant products at issue in this case are "virtually indistinguishable" commodities. (*E.g.*, Nestlé Second Am. Compl. ¶ 94, ECF No. 1316 (alleging that the "homogenous" nature of pork products, such as "pork loin from Tyson and Smithfield [which] is virtually indistinguishable, with similar nutritional values, branding and packaging" makes it "easier" for competing suppliers to collude on price).) Products like frozen breakfast burritos, in contrast, are highly differentiated in terms of nutritional values, ingredients, branding, packaging, and pricing. *See, e.g.*, *In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2020 WL 7427040, at *5 (W.D. Pa. Dec. 18, 2020) (declining to "stretch[] the limits of relevance" by ordering "attenuated" discovery on downstream products not mentioned in the complaints based on the theory that an overcharge "may find their way into" such downstream products).

The non-commoditized nature of some of the product categories Moving DAPs now pursue is no minor point. A foundational premise of all DAPs' claims is that there were "abnormal" average wholesale hog price movements during the alleged conspiracy period, and that those movements translated to higher pork prices due to the "commodity" nature of pork primals (*e.g.*, loins, ribs, etc.) and the significant correlation between hog and pork primal prices. (*See, e.g.*, Nestlé Second Am. Compl. ¶¶ 221-26.) Nothing in the complaints supports the contention that the price of multi-ingredient breakfast burritos is similarly correlated to live hog prices. Such products are only "tangentially related," if at all, to the allegations in the relevant complaints. *See Rasch v. Tyson Fresh Meats, Inc.*, No. 16-cv-3006-LTS, 2017 WL 3091458, at *5 (N.D. Iowa Feb.

23

27, 2017) (denying motion to compel because the information sought was only "tangentially related to the claims in [the] case").

Likely for that reason, DAPs, including Moving DAPs, requested data only for pork meat products, not pork blood or breakfast burritos.  The only set of RFPs that DAPs have served defined Pork as "pig or swine *meat* sold or purchased fresh or frozen, including smoked ham, sausage, and bacon," (Ex. 3 at 6 (emphasis added)), virtually mirroring the definition used by Class Plaintiffs that DAPs knew was the source of heavy negotiation.  Moving DAPs cannot seriously contend that bone meal—which comprises finely ground bones and other slaughterhouse waste—is "meat," nor that an egg, cheese, spinach and bacon breakfast burrito is "bacon."  The deadline for serving requests for production has now passed, so Moving DAPs cannot simply lodge additional requests without showing good cause, which they cannot do.  (*See* Pretrial Scheduling Order 5, ECF No. 658 (4.b.).)

Moving DAPs' delay in bringing this motion is further evidence that the data sought is not in fact critical to their cases.  *See, e.g.*, 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2285 (3d ed. 2022) (noting that long delays in seeking a court order may weaken or undermine the argument that the additional discovery is important).  If denying this motion "would eviscerate the claims of Nestlé Purina PetCare," (Moving DAPs Mem. at 11), a case that was transferred to this district on July 28, 2021, it should not have waited more than a year to bring this motion.[10]

---

[10] Moving DAPs cite to the Court's order requiring production of structured data from Indiana Packers Corporation ("IPC") to support their claim of relevance, but IPC

**B.**     **Producing the Additional Data**
            **Sought Would Be Extremely Burdensome.**

While the relevance of the information Moving DAPs now seek is low at best, the

burden of producing it is high.  *See In re Diisocyanates*, 2020 WL 7427040, at *5

(denying motion to compel because production would be "labor-intensive" and there was

only a weak connection between the downstream products on which documents and data

were sought and the allegations in the complaint).  And the proportionality analysis must

account not only for the work that would be required to comply with Moving DAPs'

demands, but also the efforts already expended in the litigation to comply with other

discovery requests.  As Magistrate Judge Bowbeer acknowledged in assessing a prior

dispute regarding DAPs' ability to reopen discovery negotiations:

- "[W]e can't pretend that a whole lot of work hasn't already been done in this case
  and a whole lot of documents already provided in response to requests by
  excellent experienced plaintiffs' counsel for the class plaintiffs."  (Ex. 2 (IDR
  Conference Tr.) 13:25-14:4.)

- "[W]e're not writing on a blank slate here and the defendants have already
  responded to discovery requests that involved tremendous overlap in the issues
  and have produced millions of documents."  (*Id.* 27:4-7.)

- "Proportionality requires that we look at the incremental value of the additional
  discovery sought."  (*Id.* 27:17-18.)

After spending months negotiating the scope of Defendants' structured data

production, Defendants then spent thousands of hours identifying, collecting, and

---

expressly excluded the product categories sought here from its production.  (Order IPC's
Mot. Quash 2, ECF No. 1356 (granting IPC's motion in part and ordering IPC "to
produce structured data *as previously negotiated* between it and Plaintiffs") (emphasis
added).)

producing in a usable format of approximately 175 gigabytes of structured data, containing 1.4 billion observations covering every sale of tens of thousands of products over a 16-year period.  (*See* Ferrell Decl. ¶ 4; Joyner Decl. ¶¶ 6-12; Strang Aberg Decl. ¶¶ 5-16; Tweeten Decl. ¶ 3.)  Tyson, for example, has spent more than 1,200 total hours identifying, collecting, and producing data for over 12,000 unique product SKUs sold over the course of 16 years.  (Joyner Decl. ¶ 12; Strang Aberg Decl. ¶ 10.)  Similarly, to collect the data produced to date, Hormel Foods has had to rely on business people to conduct a largely manual review to identify relevant products from its complex databases resulting in a multitude of spreadsheets containing data for over 20,000 product SKUs.  (Ferrell Decl. ¶ 4; Tweeten Decl. ¶ 3.)  These efforts have caused significant distraction from the ordinary business responsibilities of relevant employees and have required such individuals to work outside of business hours to contribute to the needs of this case.  (*See, e.g.*, Ferrell Decl. ¶ 4; Joyner Decl. ¶ 11; Strang Aberg Decl. ¶ 13.)

Moving DAPs now ask Defendants to repeat that process for tens of thousands of additional products with only tangential, if any, relevance to their allegations.  Collecting the additional data now demanded by Moving DAPs would require significant effort by Defendants to develop a methodology to identify and isolate the additional products sought and then to produce hundreds of fields across millions of transactions for each such product over a ten to 16 year time period.  Given that Defendants' products are often classified in the relevant data systems by product type (e.g., franks) as opposed to by protein content (e.g., pork), the process to identify and collect all relevant data for the products called for by Moving DAPs' expansive requests would necessarily involve

significant oversight and involvement by knowledgeable business personnel at the respective companies.  (*See, e.g.*, Ferrell Decl. ¶¶ 5-8; Joyner Decl. ¶¶ 13-14; Tweeten Decl. ¶¶ 4-6.)

The Defendants opposing this motion have diversified product portfolios and expansive product lists.  Identifying and producing data for the four broad categories of products Moving DAPs demand would be another complex and burdensome exercise.  (*See, e.g.*, Ferrell Decl. ¶¶ 5-8; Joyner Decl. ¶¶ 13-14; Tweeten Decl. ¶¶ 4-6.) By way of example, both Tyson and Hormel Foods manufacture and sell hundreds of unique varieties of sausages and franks alone, many of which contain multiple different proteins and relatively minimal amounts of pork.[11]  The burden on a multinational company with broad offerings like Tyson from identifying all "multi-ingredient products" that contain *any* pork would be enormous.

### C.   Moving DAPs Should Rely on Their Own Purchase Data Rather Than Force Defendants to Produce Additional Sales Data.

Like Defendants, Moving DAPs are large, multinational corporations; they are just as likely to have purchase records as Defendants are to have sales records.  *See* Fed. R.

---

[11] Defendant Seaboard, by contrast, which Moving DAPs claim has produced sales data on all four out-of-scope product categories, (Moving DAPs Mem. at 1-2), does not sell the disputed multi-protein or multi-ingredient products, and thus had no such data to produce.  Similarly, Clemens is differently situated in that it is a relatively small, family-owned company that sells very few non-pork products.  Accordingly, Clemens determined it would be less burdensome to produce all of its structured sales data than to attempt to exclude the relatively limited number of non-pork products it sells.  Tyson and Hormel Foods, in contrast, sell thousands of non-pork products, such that compliance with Moving DAPs' demand would necessarily require a burdensome and labor-intensive product-by-product sorting effort.

Civ. P. 26(b)(1) (courts must assess proportionality "considering . . . the parties' relative access to relevant information").  Moving DAPs in fact acknowledge in their memorandum that "Plaintiffs' purchase data reflect[s] purchases of product that Defendants refuse to produce."  (Moving DAPs Mem. at 9 n.9.)  No Moving DAP has explained why its own purchase data is not sufficient to meet its needs.  Even if Moving DAPs' own documents and data were incomplete or imperfect, they should nevertheless rely on that data given the burdens that Defendants have already borne, the burden that Moving DAPs' demands would impose, and their inexplicable delay in making this demand.  (*Cf.* Ex. 2 (IDR Conference Tr.) 27:25-28:2 ("[T]he case law, of course, is plentiful that one side isn't entitled to have the other side search for every single responsive document in any event.").)

### III.   MOVING DAPS' REQUESTED 30-DAY PRODUCTION DEADLINE IS NOT FEASIBLE.

Moving DAPs propose that Defendants be afforded only 30 calendar days to comply with an Order compelling production of additional data.  (Am. Proposed Order, ECF No. 1501.)  For the reasons described above, and given the substantial burdens to the relevant businesses to engage in a product-by-product sorting endeavor to identify relevant products to produce from multiple voluminous databases, that production timeline is not feasible.  If this Court orders production of any additional data, Defendants respectfully request that the parties be permitted to negotiate a deadline given the timing of other events in the case schedule.

## **CONCLUSION**

For the foregoing reasons, Moving DAPs' Motion to Compel the production of additional structured data should be denied.

Dated: September 29, 2022

/s/ *Tiffany Rider Rohrbaugh*
Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
Brandon Boxbaum (*pro hac vice*)
Keith Holleran (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
lstrang@axinn.com
trider@axinn.com
radcox@axinn.com
avissichelli@axinn.com
kholleran@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

Craig M. Reiser (*pro hac vice*)
Kail Jethmalani (*pro hac vice*)
Andrea N. Rivers (*pro hac vice*)
Victoria J. Lu (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
creiser@axinn.com

/s/ *Craig. S. Coleman*
Craig S. Coleman (#0325491)
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
FAEGRE DRINKER BIDDLE &
REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
craig.coleman@faegredrinker.com
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund
Stephanie A. Koltookian
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE &
REATH LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

Jonathan H. Todt
FAEGRE DRINKER BIDDLE &

kjethmalani@axinn.com
arivers@axinn.com
vlu@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

***Counsel for Tyson Foods, Inc., Tyson
Prepared Foods, Inc., and Tyson Fresh
Meats, Inc.***

/s/ Donald G. Heeman
Donald G. Heeman (#0286023)
Jessica J. Nelson (#0347358)
Randi J. Winter (#0391354)
SPENCER FANE LLP
100 South Fifth Street, Suite 1900
Minneapolis, MN 55402-4206
(612) 268-7000
dheeman@spencerfane.com
jnelson@spencerfane.com
rwinter@spencerfane.com

Stephen R. Neuwirth (*pro hac vice*)
Michael B. Carlinsky (*pro hac vice*)
Sami H. Rashid (*pro hac vice*)
Richard T. Vagas (*pro hac vice*)
David B. Adler (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com
michaelcarlinsky@quinnemanuel.com
samirashid@quinnemanuel.com

REATH LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

John S. Yi
FAEGRE DRINKER BIDDLE &
REATH LLP
One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

***Counsel for Hormel Foods Corp. and
Hormel Foods, LLC***

/s/ John A. Cotter
John A. Cotter (#0134296)
John A. Kvinge (#0392303)
LARKIN HOFFMAN DALY &
LINDGREN LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, MN 55427-1060
(952) 835-3800
jcotter@larkinhoffman.com
jkvinge@larkinhoffman.com

Richard Parker (*pro hac vice*)
Josh Lipton (*pro hac vice*)
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
rparker@gibsondunn.com
jlipton@gibsondunn.com

Brian Robison (*pro hac vice*)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
(972) 707-1809

richardvagas@quinnemanuel.com
davidadler@quinnemanuel.com

***Counsel for JBS USA Food Company***

brian@brownfoxlaw.com

***Counsel for Smithfield Foods, Inc.***