1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     In Re:  Pork Antitrust         )   File No. 18-cv-1776
4    Litigation                     )          (JRT/JFD)
                                    )
5                                   )
                                    )
6                                   )   Zoom Video Conference
                                    )   St. Paul, Minnesota
7                                   )   Wednesday, October 5, 2022
                                    )   4:03 p.m.
8                                   )
     ------------------------------------------------------------
9

10        BEFORE THE HONORABLE JOHN F. DOCHERTY
       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                    **(MOTIONS HEARING)**
11

12   APPEARANCES:

     For Direct Purchaser        PEARSON, SIMON & WARSHAW LLP CA
13   Plaintiffs:                 BY:  BOBBY POUYA
                                 15165 Ventura Boulevard, #400
14                               Sherman Oaks, California 91403

15   For Commercial and          BARRETT LAW GROUP P.A.
     Institutional Indirect      BY:  STERLING ALDRIDGE
16   Purchaser Plaintiffs:       404 Court Square North
                                 Box 927
17                               Lexington, Mississippi 39095

18                               CUNEO GILBERT & LaDUCA LLP
                                 BY:  A. BLAINE FINLEY
19                               4725 Wisconsin Avenue NW, #200
                                 Washington, D.C. 20016
20
     For Consumer Indirect       GUSTAFSON GLUEK PLLC
21   Purchaser Plaintiffs:       BY:  MICHELLE J. LOOBY
                                 120 South Sixth Street, #2600
22                               Minneapolis, Minnesota 55402

23                               HAGENS BERMAN SOBOL SHAPIRO LLP
                                 BY:  SHANA E. SCARLETT
24                               715 Hearst Avenue, #202
                                 Berkeley, California 94710
25

1    <u>APPEARANCES (Continued)</u>:

2    For Winn-Dixie            AHERN AND ASSOCIATES P.C.
     Plaintiffs:               BY:  PATRICK AHERN
3                              590 North Sheridan Road
                               Lake Forest, Illinois 60045
4
     For Commonwealth of       HAUSFELD LLP
5    Puerto Rico Plaintiffs:   BY:  KYLE G. BATES
                               600 Montgomery Street #3200
6                              San Francisco, California 94111

7    For Moving Direct         NEXSEN PRUET LLC
     Action Plaintiffs         BY:  DAVID C. EDDY
8    Nestle USA, Inc.,              DENNIS J. LYNCH
     et al:                    1230 Main Street, #700
9                              Columbia, South Carolina 29201

10   For Clemens Food Group,   KIRKLAND & ELLIS LLP
     LLC, et al.,              BY:  AMARTO BHATTACHARYYA
11   Defendants:               300 North LaSalle
                               Chicago, Illinois 60654
12
     For Hormel Foods          FAEGRE DRINKER BIDDLE & REATH
13   Corporation Defendants:   BY:  CRAIG S. COLEMAN
                                    EMILY E. CHOW
14                             90 South Seventh Street, #2200
                               Minneapolis, Minnesota 55402
15
     For Triumph Foods         HUSCH BLACKWELL LLP
16   Defendants:               BY:  CHRISTOPHER A. SMITH
                               190 Carondelet Plaza #600
17                             St. Louis, Missouri 63105

18   For JBS Defendants:       SPENCER FANE LLP
                               BY:  DONALD G. HEEMAN
19                             100 South Fifth Street, #2500
                               Minneapolis, Minnesota 55402
20
                               QUINN EMANUEL URQUHART &
21                                  SULLIVAN
                               BY:  RICHARD T. VAGAS
22                             51 Madison Avenue, 22nd Floor
                               New York, New York 10010
23
     For Seaboard Foods,       STINSON LLP
24   LLC, Defendants:          BY:  PETER J. SCHWINGLER
                               50 South Sixth Street, #2600
25                             Minneapolis, Minnesota 55402

```
 1        APPEARANCES (Continued):

 2        For Smithfield Foods,        BROWN FOX PLLC
          Inc., Defendants:           BY:  BRIAN E. ROBISON
 3                                     6303 Cowboys Way, #450
                                       Frisco, Texas 75034
 4
                                       LARKIN HOFFMAN DALY & LINDGREN
 5                                     BY:  JOHN A. COTTER
                                       8300 Norman Center Drive, #1000
 6                                     Minneapolis, Minnesota 55437

 7        For Tyson Foods, Inc.,       AXINN VELTROP & HARKRIDER LLP
          et al., Defendants:         BY:  LINDSEY STRANG ABERG
 8                                     1901 L Street NW
                                       Washington, D.C. 20036
 9
                                       AXINN VELTROP & HARKRIDER LLP
10                                     BY:  JAROD TAYLOR
                                       90 State House Square
11                                     Hartford, Connecticut 06103

12        Court Reporter:             RENEE A. ROGGE, RMR-CRR
                                       1005 United States Courthouse
13                                     300 South Fourth Street
                                       Minneapolis, Minnesota 55415
14

15          Proceedings recorded by mechanical stenography;
          transcript produced by computer.
16

17                                      *   *   *

18

19

20

21

22

23

24

25
```

1              **P R O C E E D I N G S**

2        **IN OPEN COURT VIA ZOOM VIDEO CONFERENCE**

3              THE COURT:  Good afternoon, everybody.

4              My name is John Docherty.  I am the new federal

5        magistrate judge assigned to this MDL, after Judge Bowbeer,

6        who I am sure you all got to know over time, retired.  So

7        good to meet all of you.

8              We are here today for a hearing on a discovery

9        dispute brought by direct action plaintiffs.

10             And I have read the materials.  I think I

11       understand the parameters of the argument.  I have some

12       questions for both sides, and I don't anticipate making a

13       ruling from the bench today.  I anticipate instead that I'll

14       be writing on this.

15             So why don't we begin with the moving party.  And

16       I believe that that would be -- is it Mr. Eddy?

17             And I'll just say I don't run motions hearings

18       with the rigor of an appellate argument or anything close to

19       it.  I'll hear what you have to say.

20             I would suggest, Mr. Eddy and -- will it be

21       Ms. Aberg primarily on the defense side?

22             MS. ABERG:  Yes.

23             THE COURT:  Okay.  I'd suggest 20 minutes per.

24             And, Mr. Eddy, if you want to reserve some of your

25       time for rebuttal, that's fine.  However, there's no red

1     lights, there's no yellow lights, and at times you will find

2     that I will just stop you and ask the other side to respond

3     like on the spot to something that you've just said.

4             But, Mr. Eddy, if you are ready, the floor is

5     yours.

6             MR. EDDY:  Thank you, Your Honor.  And glad to

7     make your acquaintance after Judge Bowbeer.

8             I will be arguing certain DAPs' motion to compel

9     the four defendants at issue to produce certain structured

10    sales data for four pork products that were excluded from

11    their production.

12            As I understand defendants' argument, class

13    counsel and the defendants negotiated a discovery agreement

14    in the early part of 2021 to exclude four types of products,

15    franks or hot dogs, multi-ingredient products like

16    pepperoni, pork products called offal, O-F-F-A-L, not

17    A-W-F-U-L, which are lungs, hearts, cheeks, et cetera, and

18    then the byproducts from processing called renderings, which

19    includes hog proteins, intestines, et cetera.

20            Defendants admit that they sold these products to

21    moving DAPs.  For example, Nestle Purina purchased

22    $780 million of these products from JBS, Smithfield and

23    Tyson.  Defendants admit that they have these structured

24    data for these products.  Defendants do not and cannot

25    contest clear relevance of these data to our claims.  For

1    example --

2         THE COURT:  Well, they, they rather do, though, I

3    thought at least, after reading their materials.  And I'm

4    talking, specifically, this is a case about allegations that

5    the price of pork was fixed.  A pig goes into a

6    slaughterhouse, and it comes out as pork.

7         When you're asking for data on pepperoni for --

8    and, I mean, the defendants were all over this -- breakfast

9    burritos and such, aren't you, aren't you going from a

10   commodity to a non-commodity?  Isn't your argument analogous

11   to you fix the price of steel; therefore, we want to know

12   about automobile prices because there is steel in

13   automobiles.

14        So as to some of these categories -- one of these

15   categories, particularly the third, I'm not saying that

16   there's a winning argument or a losing argument; but when

17   you say that there is no argument about relevance, I'm

18   pushing back a little bit on that.

19        MR. EDDY:  That's fine, Your Honor, and that's

20   fair.  They make a passing effort.

21        But the bottom line here is the class and the DAPs

22   allege that defendants conspired to reduce the supply of

23   hogs and to reduce the supply of pork.  This is clearly a

24   rising tide floats all boats.  And the defendants recognize

25   in the data they buy from Agri Stats and the data they get

1    from the USDA and their own materials that these products

2    are pork products.

3              And I don't know if that is sufficient to answer

4    the relevance, but similar data was requested and produced

5    in the Broiler Chicken case.  There was no fight over the

6    relevance of offal renderings or further processed products.

7    It was all produced by 20-plus defendants.  And I'll come

8    back to the Broilers case, because that has a lot of

9    relevance to what's going on here.

10             We have made clear that these data are needed by

11   our economic experts to assess the antitrust impact of

12   defendants' conduct and the antitrust damages which we

13   allege are caused by this conduct.

14             THE COURT:  When did you make that clear?  Because

15   I'm concerned that we're here with about a month to go in

16   the fact discovery deadline, or until the fact discovery

17   deadline, and that there was a November 1st of 2021 deadline

18   for DAP-specific data to be requested.  And it looks like

19   you're in negotiations with the defendants and, according to

20   them, didn't raise the possibility that you would be seeking

21   this data for quite some time.

22             MR. EDDY:  Actually, Your Honor, they are right in

23   one sense.  We used the same definition of "pork" as the

24   classes did.  But a significant issue with that is the

25   defendants negotiated exclusions from that "pork"

1   definition, recognizing that these four products were called

2   for and that the only way they could not produce them was by

3   agreement.  So we weren't surrendering these products in our

4   definition.  And the defendants knew these products were at

5   issue in our complaints, which we filed a year and a half

6   ago, and we clearly defined broad definition of "pork" in

7   those complaints.

8            THE COURT:  Well, Mr. Eddy, are you saying that

9   they should have seen that in your complaint and then

10  reached out to you and said, hey, where's your motion to

11  compel the production of this material?  I mean, surely not.

12           MR. EDDY:  Well, no.  They know that it's relevant

13  to our claims.  That's -- you can't say -- I mean, we

14  specified these pork products at issue in our complaints.

15  The problem is defendants have never answered those

16  complaints and perhaps never even read them, though they

17  should have.

18           And this issue of non-production of excluded data

19  didn't become clear to us and other DAPs until 2022.  As you

20  can see from -- pardon me -- the expert -- exhibits,

21  defendants in fact put in 16 and 17, which are January 2022

22  emails where other DAP counsel are asking about what's --

23  that there appear to be data that are missing, and

24  Exhibit 13, which is a February 2022 letter from Tyson

25  Prepared Foods to another DAP firm, in which they say Tyson

1    Prepared Foods sales data includes further processed

2    products, including pork products like lunch meat and

3    sausage.  Nowhere in that letter did they say they were

4    excluding those products.

5           Our economic consultants were given all these

6    data, which came in in bulk and in dribs and drabs,

7    depending on the defendant, and it was not until early March

8    it became clear that there were major gaps in some of the

9    productions.

10          I reached out to Clemens Food in March of 2022

11   asking if they had excluded these products.  They said no,

12   they produced them all.  Other DAPs reached out to the other

13   defendants.  And it was in May of 2022 that we wrote a

14   letter saying, okay, we now see that there's an issue here

15   and that a number of defendants have not produced these

16   data.

17          It was a confusing period because we got it wrong

18   in that letter, Your Honor.  We said that Tyson had complied

19   and produced the data.  That was a mistake on our part.  And

20   Tyson did not correct that mistake until two and a half

21   months later on August 10th.  So that began the

22   meet-and-confer process with these defendants.  Defendants

23   do not argue that we failed to meet and confer with them.

24   And we started in May, and that went through early

25   September.

1          Now, part of the defendants' argument is some sort

2     of delay and waiver by us, but we were negotiating with them

3     until September 1, when it became clear we were at a

4     complete impasse.

5          Our efforts to meet and confer also included

6     efforts to compromise.  We know that under the judge's

7     order, Judge Tunheim's order in March of 2022 approving the

8     Sysco -- excuse me -- Smithfield and JBS class settlement

9     context and claim forms the broad definition of "pork" that

10    we have in our complaints was approved by the court and that

11    notice went out and claim forms went out with that broad

12    definition of "pork."  Accordingly, the claims administrator

13    required all the data relating to those excluded products

14    and the broader definition.  So the court directed that they

15    produce all of their sales data, and defendants did so.

16         Seaboard, after we wrote our May letter, produced

17    the data it provided to the claims administrator, and that

18    we have no objection with.  It is structured data.

19         We asked JBS and Smithfield to give us a sample of

20    the data they produced and hoping that perhaps that would

21    suffice for our experts.  They gave us a sample, and we

22    provided it to our economic consultants, and it was

23    high-level summary and did not meet what -- the demands of

24    our economic consultants.

25         THE COURT:  And that gets me to the next point to

1   what I want to talk to you about most, which is

2   proportionality and undue burden, because high-level stuff

3   you've just said doesn't, doesn't meet the bill and you need

4   more detailed material.  The defendants are at pains and

5   take many pages to explain how onerous it is to produce this

6   material.

7            Let me ask you this.  You're asking for four

8   additional categories.  How many categories do you have now?

9            MR. EDDY:  That depends.  It varies by defendant.

10   For example, I understand Smithfield produced more than

11   10,000, 10,000 products, Hormel 4,000 -- I'm doing this off

12   the top of my head.

13            THE COURT:  That's fine.  I'm just trying to get a

14   ball park.  I mean --

15            MR. EDDY:  So, in other words, this is four

16   products versus many thousands, Your Honor.

17            THE COURT:  Okay.  So what's the incremental value

18   of four when you're talking about a universe of many

19   thousands?

20            MR. EDDY:  For example, Your Honor, I pointed out

21   Nestle Purina.

22            THE COURT:  Right.

23            MR. EDDY:  The almost $800 million that's bought

24   from these defendants is not in their data.  So our economic

25   consultants can't look at the pricing by weight or over time

1    for Nestle Purina.  And unless we get that data, Nestle

2    Purina is left on an island without expert support.

3            And the other clients who are involved would

4    buy -- Compass Group bought franks.  Nestle USA and Conagra

5    bought multi-protein products like pepperoni and salami.

6    And I'm not saying that the experts will find that there was

7    damages with those multi-protein products, but they need to

8    look at it.  They need to assess.

9            THE COURT:  Okay.  I take your point they need to

10   look at it.  Now, Nestle is enormous, a very sophisticated

11   multi-national corporation.  You are looking for sales data.

12   Surely, Nestle has got purchase data.  Isn't this material

13   available to your client?  And under Rule 26, since one of

14   the factors I need to look at is the parties' relative

15   access to information, what about looking in your clients'

16   own files for this material?

17           MR. EDDY:  We have done that, of course, Your

18   Honor.  Unfortunately, and it is just almost universal in

19   antitrust cases, the buyers don't have the same level of

20   detail, the same time period, the same robustness of data as

21   the defendants.  We have produced the data for Nestle USA

22   and Conagra and Nestle Purina to defendants, and they don't

23   make an argument that that data is sufficient unto our

24   purposes, because it is not.  We have given them what we

25   have.  And it's just not adequate for the kind of

1    transaction-level analysis that economists need to engage

2    in.

3              Shall I keep talking, or do you have other

4    questions?

5              THE COURT:  Well, you've used -- you've got about

6    seven minutes.  You've used about thirteen.  Give me an idea

7    how much you would like to spare for rebuttal after

8    Ms. Aberg has her say.

9              MR. EDDY:  Well, I do want to point to the

10   defendants appear to make much of Judge Bowbeer's

11   December 2021 IDR.

12             THE COURT:  But the question was, How much time do

13   you want for rebuttal?

14             MR. EDDY:  Oh.  And I have seven minutes left?

15             THE COURT:  Roughly.  I mean, as I say, this

16   isn't, this isn't ultra --

17             MR. EDDY:  Well, I would like to reserve five,

18   Your Honor.

19             THE COURT:  Sure.

20             MR. EDDY:  And I didn't realize I was taking so

21   much time.  My apologies.

22             THE COURT:  No, no, no.  That's all right.

23             So anyway, Judge Bowbeer, because -- yes, I mean,

24   she does say we're not writing on a clean slate.  You did,

25   you and your clients did join an MDL already in progress,

1   and perhaps it wasn't your wish to do so, but you are asking

2   to have rather a lot of settled expectations upended.  And

3   presumably the old DAPs knew what they were doing when they

4   negotiated this and they gave -- they got something in

5   exchange for giving up or conceding on these four categories

6   that you now want.

7           MR. EDDY:  Your Honor, class counsel are

8   competent, excellent lawyers, but they were not -- they

9   don't have the same claims as the individual DAPs, and they

10  focus on high-level products.  If you look at their expert

11  reports, they've cut down their products at issue quite a

12  lot.

13          And at that December hearing before Judge Bowbeer,

14  she found that where DAPs were asking for additional search

15  terms to be applied, they had not shown that there was

16  documents missing or that there were gaps.  Defendants here

17  admit that there are gaps.  And Judge Bowbeer said if you

18  can show me that there are gaps and things are missing,

19  that's a different analysis for us and that would shift the

20  proportionality assessment to the defendants.  There's no

21  issue here that there are gaps.  They admit to it.

22          Also, Your Honor, Judge Tunheim's November 14

23  order of consolidation recognized that there are differences

24  between the cases which may create individualized discovery,

25  and the court can accommodate these issues as necessary to

1     ensure each member case is resolved on its own legal merits.

2     And that's what we're asking for here.

3               I will reserve my time, Your Honor, since I guess

4     I'm probably down to five minutes.

5               THE COURT:  You will.

6               Is anyone else going to have something to say for,

7     for the DAP clients?

8               MR. AHERN:  Yes, Your Honor.  This is Patrick

9     Ahern --

10              THE COURT:  Hi.

11              MR. AHERN:  -- for the Winn-Dixie plaintiffs.

12              I was there when the, the purported agreement

13    binding my clients was entered into.  We did not agree to

14    the exclusion of the four categories.  I wrote an email to I

15    think Mr. Taylor -- oh, no -- actually to Ms. Strange,

16    maybe, setting forth our position, did not hear back until

17    7:30 on the, on the deadline for us to meet and confer.  We

18    then had a meet and confer a few days later and they just

19    said, well, you are too late.

20              The classes and Puerto Rico for their own reasons

21    decided that they would, they would exclude some of these

22    products in return for -- I think it was a slightly longer

23    data period.  The classes and Puerto Rico interests are not

24    aligned with either the Winn-Dixie DAPs' interest or the MDL

25    DAPs' interest.  The retail grocery store has --

1               THE COURT:  Can you elaborate on that a little?

2               MR. AHERN:  What's that?

3               THE COURT:  Can you elaborate on that a bit?

4               MR. AHERN:  Well, retail grocery stores and even

5       wholesalers are in the business of creating or carrying a

6       number of products that contain pork.  And, you know, we

7       said in our email, which I think is attached to the

8       briefing, and we said something that doesn't have an

9       insignificant amount of pork, that's an issue for the

10      experts to decide what our damages are.  If this is a

11      conspiracy that is alleged to reduce the supply of pork, but

12      also of hogs, which it is, by relating to the hog slaughter,

13      then, then Mr. Eddy is right; a rising tide does raise all

14      boats.

15              And it is not an issue of relevance in terms of --

16      at this stage.  It's an issue of whether or not the experts

17      will be able to, will be able to say that there was an

18      increase in price from, from, you know, a breakfast sausage

19      sandwich.  I mean, breakfast sausage sandwiches, frozen or

20      otherwise, are very popular.  I don't see any reason why,

21      quite frankly, that that should be excluded from the case

22      based on the, based on the conspiracy alleged.

23              THE COURT:  Well, writing on a universal level,

24      perhaps not; but in the give and take of negotiations where

25      someone said says we will give you a longer period of

1    discovery in exchange for you yielding on this, I'm not sure

2    why I wouldn't recognize that.

3              MR. AHERN:  But we didn't agree.

4              THE COURT:  Well, yes, you didn't agree.  I

5    agree -- you are right.  But, on the other hand, here we are

6    a month from fact discovery and now it's, well, our experts

7    didn't notice this and so please, you know --

8              MR. AHERN:  I would look at it, yeah, I would look

9    at it slightly differently and that is to say, number one,

10   we were the only DAP in the case.  So it was very difficult

11   for us to say let's hold up this entire agreement that's

12   happening with the classes in Puerto Rico and all the

13   defendants.  We made our position known.  They were on

14   notice.  For them to say there's undue burden now, when they

15   were on notice then, I think is not, is not something that

16   is really sustainable.  They were on notice that there was

17   this disagreement.  They met and conferred with us and all

18   they said was, oh, you are just too late, when we got their,

19   when we got their response at 7:30 p.m., 7:25 p.m. on the

20   date when we're supposed to raise the issue with the court.

21   And then we had the meet and confer a few days later.

22              So, I mean, I don't know if it's a bum's rush or

23   whatever it is, but, in any event, it was -- we made our

24   position known a week before, and they, they went ahead

25   without it, and they went ahead without resolving it, and so

1     they were on notice.  I think their claims of any kind of

2     burden or prejudice have to take into consideration that

3     fact.

4              Thank you, Your Honor.

5              THE COURT:  Thank you.

6              Anyone else for the direct action plaintiffs

7     before we go to defendants or -- yeah.

8              Okay.  Ms. Aberg, you are up.  And, first of all,

9     am I pronouncing your name correctly?

10             MS. ABERG:  Yes, Your Honor.

11             THE COURT:  Okay.  Thank you.  You have the floor.

12             MS. ABERG:  All right.  Thank you.

13             THE COURT:  So let's start off here where

14    Mr. Ahern ended, which is that your 34-page memo devotes

15    many, many pages to just a numbing recitation of burden, of

16    numbers, of fields, numbers of data points, numbers of

17    transactions, et cetera, et cetera.  Isn't that argument

18    sustained, though, drawn by the fact that you were on notice

19    that these four fields had been excluded as to parties who

20    were not members of the agreement to exclude them?

21             MS. ABERG:  So, Your Honor, I think our position

22    on that would be that Mr. Ahern was very much a party to

23    that agreement.  He was invited into those discussions.

24             I think he's saying now that he didn't have a very

25    strong bargaining position because he was outnumbered by the

1    class plaintiffs, but we as defendants definitely, you know,

2    made it a priority to bring him along for the ride.  We

3    recognized that he had an interest.  And we wanted everyone

4    on board because we did want this finality and we did want

5    certainty before we undertook the burdensome endeavor of

6    collecting the data.

7              Now, we were --

8              THE COURT:  One other question at this point.

9              MS. ABERG:  Yes.

10             THE COURT:  When was this agreement negotiated and

11   finalized?

12             MS. ABERG:  The agreement was negotiated in

13   February and March of 2021, finalized as of the beginning of

14   April of 2021.

15             THE COURT:  Now, I'm going to pause for just one

16   moment because, as I warned I might, I'm going to go to

17   Mr. Ahern.

18             Mr. Ahern, another way to look at this is that

19   you've been on notice since February and March of 2021, when

20   you were outvoted in the negotiations or whatever happened,

21   that you weren't getting these four fields of data that you

22   think you are now saying is important to your client.  Here

23   it is October of 2022, and we're finally in court trying to

24   compel that.  How does that factor into my analysis?  I

25   mean, you were there, you were in the room.

20

1          MR. AHERN:  Well, I mean, I kind of wasn't in the

2    room in the sense that they, they -- but they, no, they knew

3    from the very beginning -- and this idea of bringing us

4    along didn't happen.  They knew from the very beginning,

5    but, anyway, they knew from the very beginning what our

6    position was.  We were clearly not part of this agreement.

7    Okay.

8          THE COURT:  Okay.  Sure.

9          MR. AHERN:  But going to Your Honor's --

10          THE COURT:  Absolutely, but you were there.

11          MR. AHERN:  But going to Your Honor's point.  So,

12    once again, we're the only, we're the only DAP for a long,

13    long time, and then the MDL is created and then the MDL DAPs

14    come in.  This was the appropriate time, once they came in,

15    to raise this issue on a more global level, you know.  And

16    it has much more importance and significance -- I mean, we

17    have, you know, probably, you know, tens or hundreds of

18    millions of dollars out of our 1.6 to 2 billion in purchases

19    relating to these breakfast sandwiches and that type of

20    thing.

21          THE COURT:  Okay.

22          MR. AHERN:  But we have, but we have other DAPs

23    who have much greater --

24          THE COURT:  Mr. Ahern.

25          MR. AHERN:  Sorry.

 1            THE COURT:  Mr. Ahern.

 2            MR. AHERN:  Yes, Your Honor.

 3            THE COURT:  My narrow question.

 4            MR. AHERN:  Yes, sir.

 5            THE COURT:  On February and March of '21 you knew

 6    that these four fields were being excluded because you're,

 7    as you said it, I was -- you started your remarks by saying,

 8    I was in the room when this was negotiated.

 9            MR. AHERN:  Well, I mean, I made it known to the

10    classes and to the defendants that this is not something

11    that we were going to sign on to.  And on, and on I think it

12    was, I think it was April 2nd of 2021 really was when this

13    was, was, quote, unquote, agreed to, because I think the

14    deadline was May 5th of 2021 for us to finish meeting and

15    conferring and bringing this, and then there was a --

16    bringing this to the magistrate's attention.

17            But my, you know, my view is that, my view is

18    that, once again, we were very clear about the fact that we

19    were not on board with this agreement, that we felt -- we

20    made a proposal to the other side.  It was rejected.  And

21    the point was that, that the time for raising this was best

22    done, because I don't want to prejudice the other DAPs

23    coming in, by going and, and making a motion to compel and

24    then, and then, for whatever reason, getting that motion

25    denied --

1          THE COURT:  Okay.

2          MR. AHERN:  -- because I have, I have --

3          THE COURT:  Mr. Ahern, thank you.  I've got what I

4     need.  I appreciate it.

5          MR. AHERN:  Okay.  Sure.

6          THE COURT:  Ms. Aberg, back to you.

7          MS. ABERG:  Yeah.  Sure.

8          So just to finish up on that point, I mean, our

9     position is certainly that Mr. Ahern was on notice.  If he

10    was not happy with the agreement, that he should have moved

11    to compel the data and he should have moved quite a long

12    time ago, because he was part of those discussions, so --

13    and he did not.

14         As to his statement that the defendants told him,

15    you know, too bad, it was -- the statement was clear from

16    defendants, which was if you don't like this agreement,

17    which is reached now here in April of 2021, we are not set

18    at this time to produce the data until September.  There's

19    many months in between there where it would have been the

20    time to move and get a court order that we have to produce

21    more than we did, and he didn't.  So that's our position on

22    that.

23         THE COURT:  Okay.  So now let's talk about what

24    Judge Bowbeer said, because that has been quoted by you,

25    again, rather extensively in your memorandum.  But is it

1    correct that she said also, in addition to what you've

2    quoted, that if you show me gaps in the production, that

3    will be a different story or words to that effect?

4              MS. ABERG:  Yes, Your Honor.  And our position on

5    that -- I understood that was part of the argument that

6    Mr. Eddy made as well -- we don't agree.  We don't admit

7    that there are gaps.

8              So the relevant definition that was propounded to

9    us in the RFPs, issued not by class plaintiffs, but by DAPs,

10   defines "pork" in a manner that we contend does not include

11   these products.  It doesn't include the products that

12   they're now seeking.

13             And when we talk about the negotiations that took

14   place between defendants and the class plaintiffs and the

15   early DAPs on the product scope, it is not correct, as

16   Mr. Eddy says, that we were negotiating exclusions from the

17   definition.  That's not what we were negotiating.  We were

18   negotiating how to interpret the definition of "pork."  And

19   we agreed with the parties to the case at that time that the

20   definition in the RFPs that the class plaintiffs propounded,

21   which was identical to the definition in the DAPs' RFPs,

22   didn't include these products.

23             THE COURT:  Got it.  You can go on.

24             MS. ABERG:  Got it.

25             So the main arguments I want to cover are really

1    twofold.  We contend that the motion should be denied,

2    first, on timeliness grounds, as we started to discuss, and

3    then, second, on the grounds that the discovery sought is

4    not proportional to the needs of the case, both because it

5    is not relevant, and that's mainly because of the RFP that

6    was issued, and then also because the burden, as Your Honor

7    has alluded to, is very significant to produce this data.

8    And that's something that, you know, we all, we all know

9    very well and, as you said, we devoted a lot of space to

10   that.

11          But starting with timeliness, we contend that this

12   request is way, way too late.  And while we point out in our

13   brief that the DAPs have flouted applicable case deadlines

14   in waiting till now to file this motion, even more

15   fundamental is that their delay threatens to disrupt the

16   progression of this case.  The relevant agreement on what

17   constitutes "pork" was struck 18 months ago.  And all the

18   discovery that has occurred since then has been guided by

19   that understanding.

20          The parties recognized that it was essential to

21   agree on the products scope first, prior to data production.

22   We agreed on that nearly two years ago.  And that was

23   because we recognized that the product scope was really a

24   building block on which a ton of work was going to be

25   premised.  Data collection is burdensome, so it was crucial

1   that we agreed on the scope before we started to collect.

2   And that's what we did.

3           There were months of discussions about defendants'

4   databases, about the time frame of the data, and that was

5   hotly negotiated, and about the products scope.  And, again,

6   all of this was done because all the parties recognized that

7   this scoping exercise was a gating item.  Defendants needed

8   to understand the scope of products before we could collect

9   data, and we only wanted to do that once.

10          Now, the parties did reach an agreement on

11  products scope as of early April 2021, and it was agreed

12  that all of the products that DAPs now seek would be

13  excluded.

14          And on that point I do just want to address

15  briefly Mr. Eddy's point that this is four products out of

16  thousands.  That's not accurate.  It's four categories of

17  products.  Even within, you know, how the, how the DAPs

18  describe it in their brief, they've listed out multiple

19  products under each of these categories.  There are

20  thousands of products under these categories.  So it is not

21  four products.  It's four categories.

22          But the agreed limitations on the product scope

23  were no secret from the DAPs.  Most of the DAPs who are

24  moving now actually began participating in discovery

25  discussions before defendants even produced the data at

1    issue.  The DAPs knew that defendants were working toward a

2    September deadline to produce the data.  They also knew in

3    advance that those productions would not include that the --

4    the products they are now seeking.  They received from

5    defendants the relevant discovery correspondence summarizing

6    the product scope agreements in August of 2021, when they

7    started participating in the case.  And then DAPs waited

8    until May of 2022 to inform defendants of their refusal to

9    abide by that agreement, even though they had learned of it

10   nine months prior.  And it was through this May 2022 letter

11   that DAPs put defendants on notice of their present

12   position, that they need data on products like blood and

13   burritos.

14          Now, DAPs' inexcusable delay here really threatens

15   to disrupt the case schedule and to prejudice the

16   defendants.  Requiring defendants to go out and seek new

17   data at this late stage would be extremely prejudicial.  It

18   was a massive effort for defendants to collect and produce

19   data over a year ago.  And to do it all over again at this

20   even more active stage of the case would be even more

21   challenging.

22          THE COURT:  Well, we're not talking about doing it

23   all over again.  We're talking about adding data to the data

24   that's already been produced.

25          And while I take your point that, you know,

1      generally, your argument is they should have spoken up

2      sooner, were you really surprised when a company like

3      Nestle, which has bought hundreds of millions of dollars

4      worth of stuff in one of these categories, is put out that

5      it's not getting discovery on apparently the only purchases

6      that are keeping it in this case or have it in this case in

7      the first place?

8              MS. ABERG:  Well, Your Honor, our position on that

9      would be that it's really Nestle's job to figure out what

10     pork products it bought and make sure that it's getting data

11     on those products.  We, as defendants, we are defending --

12             THE COURT:  I can, I can even concede that.  But

13     what I'm saying is you're sort of taking a tone of we're

14     surprised, we're caught flat-footed, we can't believe

15     they're doing this.  And I'm just saying, you know, really?

16     Because you presumably know when you're selling hundreds of

17     millions of dollars worth of material to a customer, and you

18     can't be completely -- you might think it wrong of the

19     customer to do this or the plaintiff to do this, but you

20     can't really say that you are surprised when that customer

21     speaks up about the discovery in this case, can you?

22             MS. ABERG:  So I take your point on that, Your

23     Honor.  I would say that, you know, defendants are in the

24     position of defending litigation against 60-plus direct

25     action plaintiffs.  New complaints coming in all the time.

1    We, we don't necessarily have perfect visibility into which

2    types of products each bought.  Nestle, for example, brought

3    a complaint on behalf of two different entities, not just

4    Nestle PetCare, but also Nestle USA, a company that did buy

5    other products, including products for which data was

6    produced.  So it's not as if the complaint came in and we're

7    thinking, oh, these, these guys bought nothing from us that

8    is part of the case.  There are other products that Nestle

9    USA purchased from defendants.

10            Now, finally, in addition to the prejudice to

11    defendants, the DAPs have also just simply failed to comply

12    with applicable discovery deadlines.  They agreed to a

13    schedule that set a deadline to negotiate additional

14    structured data requests, and then they did nothing before

15    that deadline, and that, again, caused serious prejudice to

16    defendants.

17            Now --

18            THE COURT:  Oh, sorry.  I thought -- please

19    continue.

20            MS. ABERG:  Just moving on to the proportionality

21    analysis, which is, which is really the second prong of what

22    we're arguing here.  You know, on the firsthand we would

23    argue that offal and byproducts and multi-protein and

24    multi-ingredient products, the products the DAPs are now

25    seeking, are just not relevant to the DAPs' claims.  This

1    entire case is about pig meat, also known as "pork."  Bones

2    are not meat; blood is not meat.  And DAPs say nothing in

3    their brief about why this court should find otherwise.

4              You know, Mr. Eddy said that we haven't made any

5    arguments about relevance.  In fact, the burden is on the

6    DAPs to establish the relevance of the products that they

7    are now seeking.  And we actually have said, said plenty

8    about why the products are not relevant.  And we would be

9    interested in what the DAPs have to say about why they are,

10   beyond simply we bought them, because the fact that they

11   purchased them does not mean that they are subject to an

12   antitrust price-fixing conspiracy.

13             Now, the DAPs argue that they issued RFPs seeking

14   the data on these disputed products back in October of 2021.

15   They did not.  The definition from their RFPs defines "pork"

16   as pig or swine meat, sold or purchased, fresh or frozen,

17   including smoked ham, sausage and bacon.  We don't think

18   these products fall into that definition, and it was that

19   definition that we negotiated with the other plaintiffs in

20   the case back in the spring.

21             And so, again, we don't admit that there are gaps,

22   and we don't admit that we were negotiating exclusions from

23   the definition.  We were negotiating the interpretation of

24   the definition.

25             And Mr. Eddy also referenced a letter from Tyson

1    stating that we had produced data on certain products,

2    including lunch meat and sausage, and implying, I think,

3    that there was something incorrect about that or that caused

4    them to be confused.  But we did produce data on sausage and

5    lunch meat, single protein sausage of which there are

6    thousands of SKUs and lunch meat.  Yeah, it has been

7    produced.

8            So the idea that there's been this very narrow

9    products scope negotiated between the parties is just not

10   correct.  It's a very, very broad definition, much broader,

11   Your Honor, than, frankly, defendants would have liked.  We

12   did not agree that this case was about lunch meat or sausage

13   or anything else.  We really thought it should be limited to

14   raw commodity pork primals.  But the class plaintiffs

15   negotiated with us and demanded that they get products on

16   these -- that they get data on these further processed

17   products, and we relented.

18           THE COURT:  Well, you got something in exchange,

19   presumably.

20           MS. ABERG:  Yeah, I -- mainly we got --

21           THE COURT:  -- negotiating properly, you got

22   something in exchange.  You just didn't give it up.

23           MS. ABERG:  Yeah, I mean, we got the exclusion of

24   these other products.

25           THE COURT:  Okay.  All right.  More or --

1           MS. ABERG:  Yeah.  And now, of course, turning to

2    burden.  You know, we would contend that even if these

3    products are marginally relevant, the need for the data is

4    outweighed by the high burdens of production.  Probably not

5    too much to say about this.  We've submitted --

6           THE COURT:  No.  I think plenty has been said.

7           MS. ABERG:  Okay.

8           THE COURT:  This can be short.

9           MS. ABERG:  Yes.

10          THE COURT:  Okay.

11          MS. ABERG:  So, yeah, we submitted declarations.

12   I'm happy to provide details about any of, any of the

13   specifics that we've put in there, but, suffice it to say,

14   data production very burdensome.  It would be burdensome to

15   collect the additional data that is sought.  And,

16   accordingly, and especially given the low level of

17   relevance, we don't think that that burden is justified.

18          And just as one final point, I want to address

19   this refrain that DAPs cannot be bound by discovery

20   agreements that they weren't involved in negotiating.  We --

21   our position, first of all, is that it should not be

22   presumed that DAPs get to come in and negotiate all their

23   own discovery agreements in this case.

24          Judge Tunheim acknowledged as recently as

25   yesterday in his order that DAPs are not necessarily

1   entitled to additional requests.  In his order that he

2   issued yesterday he stated that the court would, quote, not

3   assume that additional structured data requests or new

4   proposed search terms will necessarily be deemed

5   proportional to the needs of the case.

6           And then, finally, we contend that DAPs' interests

7   were promoted and protected in the negotiated product scope

8   agreements that were reached in April of 2021 by able class

9   counsel.

10          THE COURT:  All right.  Thank you very much.

11          Mr. Eddy, let's go back to you.  And confining

12  yourself to points that Ms. Aberg made, rebuttal.

13          MR. EDDY:  Your Honor, you will not see my firm

14  listed on any of the exhibits that the defendants put

15  forward.  There was confusion in the spring of this year.

16  And once we learned of this agreement to exclude, we acted

17  promptly.  The defendants are essentially saying we waived

18  our right to these data.  That's simply untrue.  Once we

19  learned --

20          THE COURT:  Well, let's, let's break that down a

21  little bit.  I mean, after you finished on your direct

22  remarks, Mr. Ahern had some things he wanted to say; and the

23  first thing he said was, you know, contrary to what you've

24  heard, I was in the room when this was negotiated.

25  Mr. Ahern and you are both lawyers representing the direct

1    purchaser plaintiffs or direct action DAPs.  And, I mean, I

2    don't wish to sound flippant, but do you guys talk to each

3    other?  I mean, how could you have been surprised that this

4    had been negotiated?

5           MR. EDDY:  We understood we have -- we got their

6    data.  And Mr. Ahern even admitted his views were not in the

7    agreement.  When we got their data, we saw inconsistent

8    results.  Clemens Corporation produced all their data.  So

9    we had to ask our consultants, were all these data excluded

10   or were they produced?  And it varied.  And that's -- that

11   caused us to, you know, make sure we were correct in our

12   approach on this.  We didn't want to go file a motion to

13   compel on one and then another one on another company.  The

14   bottom line is even Mr. Ahern doesn't represent my clients.

15   His clients don't buy offal and rendering products.

16           And let me say --

17           THE COURT:  I'm not making that point.  What my

18   point is, is that Mr. Ahern has, in my view, put himself out

19   there as a percipient witness to this agreement, and both

20   Mr. Ahern and you are representing DAPs.  And that's, I

21   think, all I need to say and also all I can say, because I

22   think that's as far as the evidence goes.

23           MR. EDDY:  The reality is, Your Honor, we asked

24   Mr. Ahern, once we started to see gaps, what happened, what

25   was going on.  And he said, I never reached a deal.  And

1    that's all he told us.  And so that was the same time we

2    learned.  This was in February and March.  We didn't sit on

3    our hands.

4          And the cases cited by the defendants simply have

5    no bearing on this situation.  They were failure to meet and

6    confer, missing deadlines to file motions.  We haven't done

7    that.  In fact, the motion deadline was extended by the

8    defendants in covering this.

9          And as to burden, we met and conferred in good

10   faith with these defendants; and never once did Tyson say

11   there were thousands of SKUs, not once, never.  And I

12   specifically asked Mr. Taylor, please tell us the burden

13   here; we want to understand; we can't address something in

14   the abstract.  I heard nothing.  My response from him was,

15   well, show us that you bought some of these products from

16   us.  And I did.  And that was the end of it.  He never said

17   a word after that.

18         So there's a two-way street on meet and confer.

19   We did everything we could.  You can look at the

20   correspondence and see that.  The defendants just said no,

21   no, no, no.  They didn't give us anything on burden.  If

22   they had given us thousands of SKUs, we would have worked

23   with them to try and narrow it down to what was relevant,

24   but they didn't, and now we're stuck with the first time we

25   hear this is in a declaration submitted on September 29th,

1       and that's --

2               In terms of proportionality, Your Honor, the

3       Broiler Chickens case, in which Tyson and counsel in this

4       case were deeply involved, they produced data on offal, they

5       produced data on rendering to my client Nestle Purina.

6       Nestle Purina is no surprise to them in this case.  They

7       know exactly what they bought.  And, you know, they were

8       ordered by the court, put in an order of Judge Gilbert in

9       the Broilers case, there was an agreement between the

10      defendants and the class in that case to produce data

11      through 2017.  The court approved that agreement.  I mean,

12      basically, it was in writing, ordered by the court.  Two

13      years later the class changes its mind and seeks two more

14      years of all the data that had been produced from all 20

15      defendants.  The result was Judge Gilbert agreed with the

16      class that the data was relevant and recognized that while

17      there was some burden it was proportional.  You know, these

18      defendants have done that.  Tyson was in that case.  JBS

19      subsidiary Pilgrim's Pride was in that case.  And, you know,

20      unlike Broilers, we were not parties to that agreement, the

21      class was.

22              And we feel that there are other instances in this

23      year.  For example, Indiana Packers, a third party

24      processer, was ordered to produce five years of structured

25      data for 800 products.  They did it in two months.

1        Defendants themselves issued a subpoena to another

2    third party processer called Sioux-Preme.  I'll have to

3    spell that for the court reporter later.  And Sioux-Preme

4    produced 13 years of data.  This subpoena was issued in May

5    when we issued our letter to the defendants.  They issued a

6    subpoena to a third party processer, Sioux-Preme, asking for

7    13 years of structured data on more than a thousand

8    products, and that data was produced in two months.

9        So I think the defendants claim and throw out wild

10   notions of burden and lack of proportionality when they

11   themselves have obtained similar data without a hassle.  And

12   the bottom line is this data is critical to my clients.  And

13   I will leave it there, Your Honor.

14           THE COURT:  All right.  Thank you very much.

15           Mr. Ahern, do you have anything you want to add?

16           MR. AHERN:  Yes.  I mean, Your Honor, first of

17   all, when we were, when we were negotiating the case

18   management order in this case initially, I was asked to, to

19   opine on or join in a section that related to what would

20   happen to future DAPs.  And I said I can't do that.  I don't

21   represent them.  Okay?

22           Number two is I don't know if I said I was in the

23   room today or if I said I was there, but I'm not sure it

24   makes a heck of a lot of difference if, if my voice was not

25   being heard and in terms of not agreeing, and I sent emails

1    saying I'm not agreeing.

2            Third point.  They never told me to go file a

3    motion to compel if I didn't like it.  What they said was we

4    feel that this issue has been decided; the classes and the

5    defendants negotiated this deal; Winn-Dixie was part of

6    those discussions.  That is Mr. Taylor's email to me right

7    before we were supposed to meet and confer about this saying

8    it's over, it's done.  They would not consider anything

9    because at that point they said it was too late, even though

10   they sent me that email at 7:25 p.m. on May 5th.

11           So those are the points I wanted to make, Your

12   Honor.

13           THE COURT:  Okay.

14           MS. ABERG:  Your Honor, may I respond?

15           THE COURT:  Just hold.  A lot of people were

16   talking at once there.

17           Ms. Aberg, I don't know that it's necessary for

18   you to say anything.  You know, the way it works is the

19   moving parties go, the defending party goes, then there's

20   time for rebuttal.  We've done that.  The issues have been

21   thoroughly briefed.  They've been well and thoroughly argued

22   here today.  And I am going to close the record at this

23   point on this particular dispute.  Okay?

24           So thank you all very much.  The motion is under

25   advisement, and we will get out an order in due course.  All

1    right?

2           MR. EDDY:  Thank you, Your Honor.

3           MS. ABERG:  Thank you, Your Honor.

4           THE COURT:  Thank you.  Thank you all very much.

5    Have a good evening.

6           MR. AHERN:  Thank you, Your Honor.

7           (Court adjourned at 4:55 p.m., 10-05-2022.)

8                         *   *   *

9           I, Renee A. Rogge, certify that the foregoing is a

10   correct transcript from the record of proceedings in the

11   above-entitled matter.

12                   Certified by:  /s/Renee A. Rogge
                                    Renee A. Rogge, RMR-CRR
13

14

15

16

17

18

19

20

21

22

23

24

25