EXHIBIT

**A**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERSIAN GULF INC., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br>BP WEST COAST PRODUCTS LLC, et al.,<br><br>Defendants. | CASE NO. 15cv1749-JO-AGS<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| RICHARD BARTLETT, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br>BP WEST COAST PRODUCTS LLC, et al.,<br><br>Defendants. | Lead Case No. 18-cv-1374-JO-AGS (consolidated with No.18-cv-1377-JO-AGS) |

1

15cv1749-JO-AGS and 18cv1374-JO-AGS

In this putative class action for antitrust conspiracy, Defendants Chevron U.S.A. Inc. ("Chevron"), Exxon Mobil Corporation and ExxonMobil Refining & Supply Co. ("Exxon"), Phillips 66, BP West Coast Products LLC ("BP"), Tesoro Refining & Marketing Company LLC ("Tesoro"), Equilon Enterprises LLC (d/b/a Shell Oil Products US) ("Shell"), Valero Marketing and Supply Company ("Valero"), and Alon USA Energy, Inc. ("Alon") (together, "Defendants") filed motions for summary judgment. Dkts. 615, 619, 625. Defendants also filed motions to exclude the expert testimony of Plaintiffs' proffered experts: Robert McCullough, Dr. Paul Hanouna, and Dr. Michael Williams. Dkts. 613, 616. Plaintiffs have similarly filed motions to exclude the testimony of Defendants' proffered experts: Andrew Lipow, Dr. Janusz Ordover, and Dr. Richard Bergin. Dkts. 622, 626.

For the reasons stated below, the Court grants Defendants' motions for summary judgment. Dkts. 615, 619, 625. The Court also grants in part Defendants' motion to exclude the expert testimony of Dr. Williams and Dr. Hanouna on the issue of causation. Dkt. 616. The parties' remaining motions to exclude expert testimony, including Defendants' motion to exclude Dr. Williams' and Dr. Hanouna's testimony on issues outside of causation, are dismissed as moot. Dkts. 613, 622, 626.

## I. PROCEDURAL HISTORY

Plaintiff Persian Gulf Inc. ("Persian Gulf"), the operator of a retail gas station, filed its antitrust lawsuit on behalf of retail stations in California on July 7, 2015. *See* Dkt 1.[1] On June 21, 2018, individual consumers Joshua Ebright, Paul Lee, and David Rinaldi (the

---

[1] Unless otherwise noted, citations to "Dkt." refer to *Persian Gulf, Inc. v. BP West Coast Products LLC, et al.*, 15cv1749-JO-AGS.

2

"Consumer Plaintiffs") filed two separate lawsuits on behalf of consumers who purchased gasoline in California.[2]  These lawsuits alleged that eight current and former gas refiners in California—Defendants Chevron, Phillips 66, BP, Tesoro, Shell, Valero, Exxon, and Alon—conspired to fix gas prices in California from 2012 to present in violation of § 1 of the Sherman Act, Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*, and § 17200 of the Cal. Bus. & Prof. Code, commonly known as the UCL.  *See* Dkt. 76; *Bartlett*, Dkt. 44.

On July 25, 2018, the Court consolidated the two Consumer Plaintiffs' cases into one action.  *Bartlett*, Dkt. 37.  Thereafter, the Court ordered the coordination of Persian Gulf's and Consumer Plaintiffs' cases for discovery and motion briefing because the allegations were nearly identical.  *See* Dkt. 143.  Accordingly, the Court set a single briefing schedule governing both Persian Gulf's and the Consumer Plaintiffs' cases which included deadlines for motions for summary judgment and motions to exclude expert testimony.  *See* Dkt. 589.

After exhaustive discovery proceedings, Defendants Chevron, Shell, Valero, and Phillips 66 filed a joint motion for summary judgment, arguing that Plaintiffs did not have evidence to support a reasonable inference of conspiracy or causation.  *See* Dkt. 625 ("Joint MSJ").  The remaining Defendants joined the Joint MSJ, and Defendants Alon and Tesoro also filed separate motions for summary judgment.  *See* Dkts. 615, 619, 630, 632, 634, 636. In addition, the parties moved to exclude one another's expert reports under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See* Dkts. 613, 616, 622, 626. ///

---

[2] *See Bartlett et al v. BP West Coast Products LLC et al.*, 18cv1374-JO-AGS; *Rinaldi et al. v. BP West Coast Products LLC et al.*, 18-cv-1377-JO-AGS.

## II. FACTS

### A. Background Information on the Gasoline Market in California

Plaintiffs' price fixing allegations are best understood within the larger context of California's gas market and its unique supply-chain challenges. The Court, therefore, provides the following brief overview of the players in the market, how the market is supplied, and how gas is sold in the state.

In California, a small group of refiners control the entirety of gas production in the state. *See, e.g.*, Dkt. 622, Ex. 2 ("Lipow Report") ¶ 31; Dkt. 647, Ex. 1 ("McCullough Report") ¶¶ 20, 66.[3] This highly concentrated market is comprised of the eight Defendants in this case, including gas giants like Exxon and Chevron,[4] plus additional non-Defendant refiners with varying market shares.[5] Because Defendants do business in a highly concentrated market with few players, they are admittedly conscious of one another's pricing and actions in the market, as the actions of any one refiner can substantially impact the other refiners. *See, e.g.*, J. Hodgson Declaration ¶¶ 11–15, 19–20; P. Brooks

---

[3] The Court declines to rule on the admissibility of the expert opinions contained in the McCullough and Lipow reports as moot. Where there is no dispute, however, the Court has referenced these reports as sources of background information about the gas industry.

[4] For instance, evidence in the record suggests that Exxon may have accounted for 8% of California gas supply in 2015, *see* Dkt. 629-1 ("Defs. Exs.") Defs. Ex. 1 at 144:17–145:9, and Plaintiffs' expert suggests that Chevron may have accounted for 18% of California gas production during the class period. *See* McCullough Report ¶ 67.

[5] The evidence in the record also indicates that additional non-Defendant refiners may have contributed substantially to California gas production at various points during the class period. *See, e.g.*, *id.* (noting that non-Defendant PBF accounted for 12% of production and non-Defendant Marathon accounted for up to 30% of production).

4

Declaration ¶ 96; K. Archambault Declaration ¶ 59; J. Harris Declaration ¶ 6; M. O'Neal Declaration ¶ 3.[6]

The California gas market largely depends on this small group of in-state refiners because California is a "gasoline island" isolated from other sources of supply. Dkt. 629-1 ("Defs. Exs.") Defs. Ex. 2; McCullough Report ¶¶ 37–39. California suffers from a lack of direct pipeline connectivity to other major refinery centers, such as the Gulf Coast and the Pacific Northwest. *See* McCullough Report ¶¶ 37–39; Dkt. 722, Joint Statement of Undisputed Facts ("Joint Statement") ¶ 12. Thus, California can only receive imports by sea, which is costly and requires weeks of lead time. *See, e.g.*, Joint Statement ¶ 12; K. Archambault Declaration ¶¶ 22–26, 34; H. Henderlite Declaration ¶¶ 24–26; Dkt. 699 ("Opposition") at 29. Given refiners' finite production capacity and the limited options for external supply, prices in the California gas market are sensitive to events such as refinery shutdowns. *See, e.g.*, Opposition at 1; Joint Statement ¶ 15. According to the Attorney General of California, because of these factors, "California's gasoline market has been characterized by high gas and diesel prices and recurrent price spikes." *See* Defs. Ex. 2 at 1.

The California gas market also faces another unique limitation: only a specific gas formulation called CARBOB may be sold in the state. California refiners produce a variety of gas products, such as diesel, jet fuel, and different formulations of gas, including

---

[6] Unless otherwise stated, citations to declarations in this opinion refer to the declarations in Defendants' Joint Appendix (hereinafter, "J.A.") in support of their Joint Motion for Summary Judgment. Dkt. 629-2. Similarly, citations to Chevron's, Shell's, Exxon's, Phillips 66's, Valero's, and BP's exhibits (*e.g,* Chevron Ex. 1) refer to the exhibits to the declarations in the Joint Appendix at Dkt. 629-2.

5

CARBOB. Joint Statement ¶ 17. Within California, however, gas must meet the California Reformulated Gasoline Blendstock for Oxygenate Blending standard, known as CARBOB. Joint Statement ¶¶ 11, 13; 220 CCR § 2266.5. Refiners sell CARBOB directly to retail stations either (1) "at the rack," *i.e.*, distribution terminals where retailers can pick up gas; or (2) via "Dealer Tankwagon," *i.e.*, delivery by truck from the rack to the retail station. Joint Statement ¶ 18. Refiners set the wholesale prices for gas sold to retailers at the rack and by Dealer Tankwagon. *See* C. Yates Declaration ¶ 6; D. Smith Declaration ¶¶ 2–3; C. Dickson Declaration ¶ 27; J. Hodgson ¶¶ 4–5; M. O'Neal Declaration ¶ 2; P. Brooks Declaration ¶¶ 93–94; K. Archambault Declaration ¶¶ 55–56; Dkt. 621-1-2, Tesoro's Appendix ("T.A."), W. Eckard Declaration ¶ 21.

Once gas reaches retail stations, it is sold by retail stations directly to consumers at the pump. Retail stations in California are owned either by refineries or by independent third parties. Joint Statement ¶¶ 19–20. In the latter scenario, independent retail stations can enter licensing agreements with refiners that give them the right to sell gas under a refiner's brand. *Id.* ¶ 20. For example, Plaintiff Persian Gulf purchased gas from Phillips 66 via Deal Tankwagon and licensed the right to sell under the Phillips 66 brand. *Id.* Independent owners, like Plaintiff Persian Gulf, autonomously set prices at their retail stations, while refiners set prices at their corporate-owned retail stations. *See, e.g.*, C. Yates Declaration ¶ 7; P. Brooks Declaration ¶ 9.

California refiners, like many of the eight Defendants in this case, also buy and sell CARBOB and other gas products to cover their supply shortages or dispose of excess supply. Joint Statement ¶ 21; C. Yates Declaration ¶ 8; M. Perez Declaration ¶¶ 4–5; L. Lockhart Declaration ¶ 4. In order to buy and sell, as described above, refiners like the Defendants employ gas traders to trade on the "spot market," a trading market for gas on

6

the West Coast. Joint Statement ¶ 21. Gas traders perform two primary functions for their respective refineries, (1) purchasing gas to cover production shortages, and (2) selling gas to compensate for excess production. *See, e.g.*, Lipow Report ¶¶ 20, 22, 26. When executing spot-market transactions, West Coast traders either communicate directly with one another or through independent brokers on a bid-ask basis, typically negotiating within a range of the current spot-market price, reflected by pricing agencies such as the Oil Price Information Service ("OPIS"). *See* J.A. 562–76, Phillips Ex. 17; M. O'Neal Declaration ¶ 4; C. Dickson Declaration ¶ 59; L. Lockhart Declaration ¶¶ 12–13; H. Henderlite Declaration ¶ 14. West Coast traders can refer to OPIS prices when trading because OPIS publishes the daily high, low, and average West Coast spot prices based on a sampling of actual trades executed in the spot market that day. *See id.*

**B. Plaintiffs' Conspiracy Case**

*1. Plaintiffs' Initial Conspiracy Allegations*

In Plaintiffs' complaints, they initially alleged that Defendants entered a price-fixing conspiracy on or around February 2012. *See* Dkt. 76 at 64; *Bartlett*, Dkt. 44 at 46. While the complaints included allegations that Defendants manipulated supply to raise prices and entered into exchange agreements in furtherance of a conspiracy,[7] Plaintiffs' original theory of the case centered on allegations that Defendants utilized the cover of refinery maintenance to raise prices and take advantage of the reality that the California gas market is sensitive to refinery outages. *See generally id.* Plaintiffs claimed that Defendants planned and synchronized unnecessary maintenance in order to raise prices. *See id.*

---

[7] *See* Dkt. 76 at 32, 43, 67; *Bartlett*, Dkt. 44 at 26, 35–41.

Further, Plaintiffs alleged that certain of Defendants' outages were not outages at all and that emissions data demonstrated that Defendants continued to produce despite claiming to be shut down. *See id.* Based on the evidence and arguments presented to the Court on summary judgement, Plaintiffs appear to have wholly abandoned these "refinery maintenance" allegations following discovery. *See generally* Opposition.

### 2. Plaintiffs' Current Evidence of Conspiracy

Plaintiffs now argue and seek to prove that the eight Defendants conspired to fix gas prices by engaging in multiple coordinated actions designed to reduce supply and raise gas prices in California. Plaintiffs describe a conspiracy where Defendants blocked imports, increased exports, and lowered production levels to keep gas supply low in California, all while manipulating public facing gas-market prices to increase their profits. *See generally* Opposition. This conspiracy was purportedly made possible by Defendants' systemic exchanges of sensitive information and cooperation to cover each other's supply shortages. *See id.* As set forth in their discovery responses, Plaintiffs maintain that Defendants entered into, and began participating in, this illegal agreement in 2011: "Defendants, each and all, agreed, and entered into an agreement . . . by no later than August 1, 2011, to fix, maintain, or make artificial prices for gasoline sold in California." Dkt. 455, Ex. C at 12; Dkt. 455, Ex. D at 13.

In their summary judgment opposition, Plaintiffs point to the following in support of their allegations of a price fixing conspiracy: (1) Defendants entered into exchange agreements with one another throughout the class period to lend each other barrels of gas; (2) Defendants systematically exchanged confidential information with one another; (3) Defendants restricted gas supply in California, including by running their refineries below capacity, preventing gas imports, and unnecessarily exporting gas out of California;

8

(4) In 2015, Defendants cooperated with Exxon after its refinery explosion instead of leveraging the explosion to gain market share; (5) Defendants used various strategies to manipulate public facing gas prices, including through a "gentleman's agreement," wash trades, selective price reporting, and false public statements.

### III. LEGAL STANDARDS

**A. Summary Judgment Standards**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248–50.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proof at trial. *Id.* at 322–23. The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

At the summary judgment stage, the parties have the burden to support their motion and opposition with evidence and specific references to the record that they wish the Court

9

1   to consider. Fed. R. Civ. P. 56(c); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d
2   1026, 1031 (9th Cir. 2001). It is not the Court's task "to scour the record in search of a
3   genuine issue of triable fact. [The Court relies] on the nonmoving party to identify with
4   reasonable particularity the evidence that precludes summary judgment." *Keenan v.*
5   *Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996); *Schneider v. TRW, Inc.*, 938 F.2d 986, 990 n.2
6   (9th Cir. 1991) ("district court is under no obligation to mine the full record for issues of
7   triable fact"); *Asset Mktg. Sys. Ins. Servs., LLC v. McLaughlin*, 2007 WL 3232507, at *1
8   (S.D. Cal. Nov. 1, 2007) (failure to cite to evidence "is a complete failure of proof").

9         Pointing to an admissible expert opinion is one way that a party can create a triable
10  issue of material fact. Nevertheless, courts need not defer to an expert when the evidence
11  is clear and conflicts with the expert's testimony. *In re Apple Computer Sec. Litig.*, 886
12  F.2d 1109, 1116 (9th Cir. 1989); *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57
13  (9th Cir. 2019) ("[e]xpert testimony cannot create a genuine issue of material fact if it rests
14  on assumptions that are not supported by evidence"). Moreover, "an expert report cannot
15  be used to prove the existence of facts set forth therein." *In re Citric Acid Litig.*, 191 F.3d
16  1090, 1102 (9th Cir. 1999); *see also Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421,
17  1440 (9th Cir. 1995). Specifically, in the antitrust context, "[e]xpert testimony is useful as
18  a guide to interpreting market facts, but it is not a substitute for them." *Brooke Grp. Ltd.*
19  *v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *Matsushita*, 475 U.S.
20  at 594 n.19.

21  **B. Standards Governing Antitrust Cases**

22        On summary judgment in an antitrust conspiracy case, a party can move to show that
23  there is no genuine dispute of material fact on any of the essential elements of a plaintiff's
24  price fixing claim: (1) conspiracy to fix prices in violation of antitrust law; (2) injury—or

25                                    10

26                                              15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

"impact"—resulting from that violation; and (3) damages.  15 U.S.C. § 15; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665–66 (9th Cir. 2022); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101–02 (9th Cir. 1999).  Injury in the antitrust context is "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Damages are measured only after antitrust impact has been demonstrated. *Olean*, 31 F.4th at 666 (9th Cir. 2022).

On the first element, conspiracy, a genuine issue of material fact can be established either by direct evidence that Defendants agreed to fix prices or circumstantial evidence from which a reasonable factfinder could infer that Defendants entered into such an agreement.  *Citric Acid*, 191 F.3d at 1093.  When the evidence is circumstantial, the "crucial question" for the Court is "whether all the evidence considered as a whole can reasonably support the inference that [Defendants] conspired" to fix prices. *Id.* at 1097.

The Ninth Circuit applies the following two-step framework when a plaintiff's conspiracy allegations are based solely on circumstantial evidence.  At step one, "the defendant[s] can 'rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.'" *Id.* at 1094 (quoting *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987)).  Defendants may satisfy this burden by showing that the allegedly conspiratorial action "was in each defendant's independent self-interest." *Id.* at 1095.  At step two, "[t]he burden then shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior." *Id.* at 1094.  Once Defendants have met their burden at step one, Plaintiffs must "come forward with specific factual support

11

for its allegations of conspiracy" to avoid summary judgment. *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir. 1985) (citation omitted).

Plaintiffs can meet this "step two" burden by offering proof of parallel conduct among alleged conspirators alongside "plus factors"—that is, additional circumstantial evidence that when combined with parallel-conduct evidence, reasonably supports an inference of conspiracy. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193–94 (9th Cir. 2015). Conscious parallelism—parallel conduct by competitors who adopt similar policies around the same time for the same reasons—is neither "in itself unlawful" nor uncommon. *Id.* at 1193; *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1092 (9th Cir. 2015); *Brooke Grp.*, 509 U.S. at 227; *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540–41 (1954). In fact, conscious parallelism or parallel conduct is a common occurrence in concentrated, interdependent markets among players who "recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54 (2007) (quoting *Brooke Grp.*, 509 U.S. at 227). Parallel conduct alone, therefore, is not sufficient to support an inference of conspiracy, but "it is a relevant factor to be considered along with the evidence as a whole" in determining whether the facts give rise to a reasonable inference of conspiracy. *Citric Acid*, 191 F.3d at 1102.

In order to distinguish between lawful conscious parallelism and unlawful conspiracy, courts require that additional "plus factor" evidence that "tend[s] to rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 554 (citing *Matsushita*, 475 U.S. 574); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763–64 (1984). "[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly

12

1    coordinated action." *Musical Instruments*, 798 F.3d at 1194.  Plus factors may include
2    circumstantial evidence demonstrating "a common motive to conspire, evidence that shows
3    that the parallel acts were against the apparent individual economic self-interest of the
4    alleged conspirators, and evidence of a high level of inter-firm communications," among
5    other things.    *Ross v. Citigroup, Inc.*, 630 F. App'x 79, 82 (2d Cir. 2015), *as
6    corrected* (Nov. 24, 2015) (citation omitted).  Whatever form this "plus factor" evidence
7    takes, it must support the inference that the Defendants' conduct is more consistent with
8    conspiracy than with unilateral decision.    *Musical Instruments*, 798 F.3d at 1194.
9    "[C]onduct as consistent with permissible competition as with illegal conspiracy does not,
10   standing alone, support an inference of antitrust conspiracy" at the summary judgment
11   stage. *Matsushita*, 475 U.S. at 587–88.

12                       **IV.  EVIDENTIARY OBJECTIONS**

13          Before turning to the substance of the summary judgment and expert exclusion
14   motions, the Court briefly addresses the parties' evidentiary objections.  Plaintiffs made
15   over 350 objections to Defendants' declarations, while Defendants, in turn, objected to
16   over 100 of Plaintiffs' exhibits. *See* Dkt. 699-1; Dkt. 719-2.  The bulk of the objections on
17   both sides consisted of "boilerplate" objections on various grounds unsupported by
18   explanation—*e.g.*, "Hearsay," "Lack of foundation and personal knowledge regarding sale
19   of Carson refinery," and "Best Evidence Rule." *See id.*  Defendants also objected to the
20   admissibility of all three of Plaintiffs' expert reports because they were unsworn and
21   unaccompanied by a declaration. *See* Dkt. 719-2.

22          Given the high volume of boilerplate objections, the Court will only rule on the
23   objections to evidence that the Court considers in ruling on the motions currently before it.
24   *See Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009) ("it is often

                                        13

unnecessary and impractical" to rule on each evidentiary objection at summary judgment, "especially when many of the objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence"); *Pinson v. Prieto*, 2014 WL 7339203, at *4 (C.D. Cal. Dec. 19, 2014) (declining to rule on objections to evidence that was immaterial to the summary judgment decision). The Court therefore addresses below the categories of evidence relevant to its rulings.

**A. Plaintiffs' Objections to Declarations Submitted by Defendants**

Defendants submitted the declarations of over twenty company executives and traders to testify about specific actions the company took and to explain the business reasons behind those actions. *See* Dkt. 629-2. Plaintiffs objected to these declarations on grounds of hearsay, lack of personal knowledge, the best evidence rule, and improper legal conclusions. *See* Dkt. 699-1.

*1. Personal Knowledge Objections to Defendants' 30(b)(6) Declarations*

First, the Court declines to reject declarations submitted by Defendants containing Rule 30(b)(6) testimony on the grounds that the corporate witnesses lacked personal knowledge. *See* Opposition at 57–60. By definition, corporate witnesses (also called "30(b)(6) witnesses") testify regarding the company's knowledge, not the individual's personal knowledge. Fed. R. Civ. P. 30(b)(6). A 30(b)(6) witness designated to testify to matters on behalf of the company has a duty to prepare by reviewing documents, speaking with witnesses, and otherwise gathering the information available to the company on the topics the witness has been designated to testify. *See id.*; *see also Bd. of Trs. of Leland Stanford Junior Univ. v. Tyco Int'l Ltd.*, 253 F.R.D. 524, 526 (C.D. Cal. 2008) (noting that Rule 30(b)(6) explicitly requires a company to prepare designees to testify on its behalf as to all matters reasonably available to the company; personal knowledge of the deponent is

14

1  "of no consequence"). Thus, a 30(b)(6) witness's testimony is determined by the limits of

2  the company's knowledge, not the individual's personal knowledge. *See id.*; *Cooper v.*

3  *United Air Lines, Inc.*, 82 F. Supp. 3d 1084, 1096 (N.D. Cal. 2015) (overruling objections

4  based on personal knowledge with respect to 30(b)(6) declarations on summary judgment).

5  Because 30(b)(6) witnesses may testify on behalf of the company at trial, they are similarly

6  allowed to do so at summary judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th

7  Cir. 2003) (finding that evidence that can be presented in an admissible form at trial is

8  admissible on summary judgment); *see also Univ. Healthsystem Consortium v.*

9  *UnitedHealth Grp., Inc.*, 68 F. Supp. 3d 917, 921 (N.D. Ill. 2014).

10         In response to Plaintiffs' objections for lack of personal knowledge, Defendants

11  explained that the following declarations (or portions thereof) contain designated 30(b)(6)

12  corporate testimony: K. Archambault (BP), C. Yates (Chevron), C. Dickson (Exxon), R.

13  Sharum (Phillips 66), J. Harris (Shell), and P. Brooks (Valero).   *See* Dkt. 719-2.

14  Defendants have made a showing that the above corporate witnesses were designated to

15  testify on broad aspects of Defendants' businesses, including trading strategy, imports and

16  exports, maintenance, public communications, trade associations events, exchange

17  agreements, refinery production, trading, and price setting.  C. Yates Declaration ¶ 5; J.

18  Harris Declaration ¶¶ 4–5; C. Dickson Declaration ¶ 4; R. Sharum Declaration ¶ 1; P.

19  Brooks Declaration ¶ 5 & n.1; K. Archambault Declaration ¶ 5.    Plaintiffs did not argue

20  otherwise; while they raised blanket "personal knowledge" objections to these

21  declarations, they did not argue that any testimony was outside the scope of the topics for

22  these 30(b)(6) witnesses.  *See* Opposition 57–60; Dkt. 699-1.   The Court, therefore,

23  overrules Plaintiffs' personal knowledge objections: K. Archambault Declaration ¶¶ 23–

24  27, 34, 39, 66, 68–70, 72, 74; C. Yates Declaration ¶¶ 35–36, 46, 54, 56–67; C. Dickson

25

15

26

27

28

Declaration ¶¶ 13, 23; R. Sharum Declaration ¶¶ 10–17, 19, 20–21, 23, 25–28, 30–33; J. Harris Declaration ¶¶ 17, 21, 24; P. Brooks Declaration ¶¶ 22, 26, 32, 36, 38, 47–49, 54, 58–59, 72–75, 82, 85, 87–88, 90, 103, 105.

### 2. Personal Knowledge Objections to Defendants' Non-30(b)(6) Declarations

Second, the Court overrules Plaintiffs' objections to Defendants' non-30(b)(6) declarations to the extent that the declarants' personal knowledge can be inferred from the declarations themselves. Federal Rule of Civil Procedure 56(c)(4) requires declarations to be based on personal knowledge, but that requirement "imposes only a 'minimal burden.'" *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th Cir. 2013) (citation omitted). In determining whether this requirement is met, the Court can infer personal knowledge from the declaration itself, including the declarant's role in the company, the declarant's participation in certain matters, and the declarant's statements that her declaration is based on personal knowledge. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (personal knowledge of declarants can be "inferred from their positions and the nature of their participation in the matters to which they swore"); *Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 819 (9th Cir. 2002).

After a thorough review of the declarations from Defendants' corporate executives and traders, the Court concludes that the personal knowledge requirement is satisfied with regard to the following: J. Yomtoob Declaration ¶¶ 13, 17, 24–25; H. Henderlite Declaration ¶¶ 16, 24–27, 30; S. Roveda Declaration ¶¶ 10–11, 13; M. Perez Declaration ¶ 10; J. Hodgson Declaration ¶¶ 4, 9–12, 15, 20, 23, 27–28; N. Weinberg-Lynn Declaration ¶¶ 10–14, 18–21, 24–27, 31, 32; D. Smith Declaration ¶¶ 3, 10; J. Marino Declaration ¶¶ 3–4; S. Rodrick Declaration ¶¶ 9–10; L. Lockhart Declaration ¶¶ 4, 7–8, 21, 29–30, 32, 43, 47; E. Pestano Declaration ¶¶ 43–45, 50; R. Plumier Declaration ¶ 13; G. Johnson

16

1 | Declaration ¶ 7–8, 10; M. Pais Declaration ¶ 13. Each of the above non-30(b)(6) declarants
2 | was either a high-level employee for a Defendant and intimately involved with that
3 | Defendant's business practices or was a trader offering information relevant to trading. *See*
4 | Dkt. 629-2. In addition, every declarant swore that his or her declaration was based on
5 | personal knowledge and that each could competently testify with respect to the information
6 | described. *See id.* The foregoing allows the Court to infer personal knowledge from the
7 | declarations themselves, and thus, Plaintiffs' personal knowledge objections to the above
8 | testimony are overruled. *See Strong*, 724 F.3d at 1045; *Barthelemy*, 897 F.2d at 1018.

9 | *3. Objections to Non-Hearsay Testimony in Defendants' Declarations*

10 | Third, the Court overrules Plaintiffs' hearsay objections to Defendants' declarations
11 | to the extent that Plaintiffs objected to evidence that does not contain an out-of-court
12 | statement or is not being offered for its truth. Hearsay is defined in Federal Rule of
13 | Evidence 801 as an out-of-court statement offered to prove the truth of the matter asserted
14 | in the statement. Fed. R. Evid. 801(c); *United States v. Lopez*, 913 F.3d 807, 826 (9th Cir.
15 | 2019). While all declarations are technically out-of-court statements, declarations offered
16 | in support of summary judgment are not hearsay if the testimony could be presented in an
17 | admissible form at trial. *See Fraser*, 342 F.3d at 1036–37. Plaintiffs frequently objected
18 | to portions of Defendants' declarations as hearsay without explanation, but a review of
19 | those portions reveals that this testimony, if presented live at trial, would not be out-of-
20 | court statements. Rather, the testimony comprised statements of the declarant's personal
21 | knowledge of business practices, the market, annual meetings, *etc.* *See, e.g.*, K.
22 | Archambault Declaration ¶ 27; C. Yates Declaration ¶ 36. In other instances, where the
23 | testimony incorporated an out-of-court statement, the statement was not being offered for
24 | the truth of the matter asserted. *See, e.g.*, P. Brooks Declaration ¶ 48 (Homeland Security's

25 |
26 |
27 |
28 |

17

1    statement offered to show effect on Valero). Based on the foregoing, the Court overrules

2    Plaintiffs' hearsay objections to the following testimony: K. Archambault Declaration

3    ¶ 27; J. Yomtoob ¶¶ 16, 22; C. Yates Declaration ¶ 36; H. Henderlite Declaration ¶¶ 24–

4    25, 30; P. Brooks Declaration ¶¶ 48, 72, 74; R. Pluimer Decl. ¶ 6; R. Sharum Declaration

5    ¶ 10; S. Rodrick Declaration ¶ 10; L. Lockhart ¶¶ 47, 50.

6         The Court does sustain Plaintiffs' hearsay objections where the evidence takes the

7    form of out-of-court statements offered for their truth and no hearsay exception appears to

8    apply. Fed. R. Evid. 801–803. In accordance with these principles, the Court sustains the

9    following hearsay objections: J. Yomtoob Declaration ¶ 17 (the Court does not consider

10   statements to the extent they are being offered for truth rather than to demonstrate effect

11   on the listener); H. Henderlite Declaration ¶ 26 (the Court does not consider BPWCP-6 to

12   the extent it is being offered for the truth); N. Weinberg-Lynn Declaration ¶ 32 (the Court

13   does not consider PSX-4–5); R. Sharum Declaration ¶ 30 (the Court does not consider

14   PSX-12 or PSX-14).

15        *4. Objections to Defendants' Business Records as Hearsay*

16        Fourth, over Plaintiffs' objections, the Court will consider documents that meet the

17   business records exception to hearsay. The business records exception provides that a

18   writing is admissible if, (1) it is "made or transmitted by a person with knowledge at or

19   near the time of the incident recorded," and (2) "is kept in the course of regularly conducted

20   business activity." *United States v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985); Fed. R.

21   Evid. 803(6). Here, Plaintiffs objected to certain of Defendants' exhibits consisting of

22   emails, slide decks, and internal business reports as hearsay without further explanation.

23   *See* Dkt. 699-1. Defendants responded that these documents were admissible because they

24   were records kept in the ordinary course of business. *See* Dkt. 719-2. The Court agrees

25                                    18

26                                                    15cv1749-JO-AGS and 18cv1374-JO-AGS

1  that where the documents appear to have been created regularly pursuant to Defendants'

2  business activities (*e.g.*, export reports or financial presentations) and the accompanying

3  declarations indicated that they were created at or near the time of the event, the business

4  records exception applies. For the above reasons, the Court overrules Plaintiffs' hearsay

5  objections to the following exhibits because it concludes that the business records

6  exception to the hearsay rule applies: K. Archambault Declaration ¶ 68; J.A. 857–72;

7  Exhibit BPWCP-1; S. Roveda Declaration ¶¶ 10–11; J.A. 52–67, Chevron Exs. 6–7; J.A.

8  428–48, Phillips Exs. 1–3; J.A. 649–88, Phillips Ex. 24; P. Brooks Declaration ¶¶ 26, 79;

9  J.A. 806–13, Valero Ex. 15; G. Johnson Declaration ¶ 7–8, 10.

10  ### 5. Objections to Defendants' Testimony Discussing Documents

11  Fifth, the Court overrules Plaintiffs' objections to testimony discussing documents

12  to the extent those objections are based on a misapprehension that the best evidence rule

13  imposes a blanket prohibition on such testimony. That is not the case. The best evidence

14  rule provides that "[i]n proving the contents of a writing," the original is required unless

15  certain exceptions apply. Fed. R. Evid. 1002. For the most part, the declarants' references

16  to documents were not attempts to prove the contents of those documents but were

17  comments upon state of mind or beliefs about the contents. In addition, most of the

18  documents referenced are already in the record. In other cases, declarants were simply

19  testifying to their personal knowledge and do not reference documents, let alone attempt

20  to prove their contents. For these reasons, the Court overrules Plaintiffs' best evidence

21  objections to the following pieces of evidence: K. Archambault Declaration ¶¶ 35, 66, 67,

22  69–70; J. Yomtoob Declaration ¶¶ 16–17, 22, 24; C. Yates Declaration ¶¶ 25, 35, 56; H.

23  Henderlite Declaration ¶¶ 23, 25, 30; J. Hodgson Declaration ¶¶ 9, 13–14; N. Weinberg-

24  Lynn Declaration ¶¶ 10, 13–14; R. Sharum Declaration ¶¶ 11, 17, 19, 20, 23, 25–28, 30–

25  19

26  15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

33; D. Smith Declaration ¶ 3; J. Marino Declaration ¶¶ 4, 10–15; J. Harris Declaration ¶¶ 19, 21–24, 26; S. Rodrick Declaration ¶¶ 7, 9–10; P. Brooks Declaration ¶¶ 36, 88; L. Lockhart Declaration ¶¶ 42, 43–45, 47; R. Pluimer Declaration ¶¶ 6, 11; G. Johnson Declaration ¶ 7–8, 10.

### 6. *Objections to Declarations Containing Improper Legal Conclusions*

Finally, turning to Plaintiffs' objections regarding improper legal conclusions, such objections are unnecessary because the Court only considers facts contained in declarations, not legal conclusions or argumentative statements. "[S]tatements in declarations [containing] improper legal conclusions, or argumentative statements . . . will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Plaintiffs objected to Defendants' declarations containing statements such as, that a decision was "in furtherance of individual businesses interest," that a sale was in a Defendant's "economic interest," that an action was "economically rational," that a trade was "not a wash trade," or that "Plaintiffs are wrong." *See, e.g.*, K. Archambault Declaration ¶ 27; R. Sharum Declaration ¶ 12; S Rodrick Declaration ¶ 10. The Court agrees that these types of statements are not facts and therefore, the Court does not consider them. Nonetheless, where a paragraph containing an improper legal conclusion is otherwise bookended by admissible statements, as is often the case here, the Court has considered the admissible factual evidence but disregarded the improper legal conclusions and argumentative statements.

## B. Defendants' Evidentiary Objections

Plaintiffs submitted over 200 exhibits in support of their oppositions to summary judgment. *See* Dkts. 619-3–16, 689-2–4, 697-1, 781-2 ("Pltfs. Exs."). Defendants objected

20

to many of these exhibits on grounds of relevance, hearsay, and Plaintiffs' failure to identify certain documents in their interrogatory responses. *See* Dkt. 719-2. Defendants also argued that Plaintiffs' expert reports were inadmissible because they were unsworn and unaccompanied by an affidavit. *See id.*

### 1. *The Court Considers Only Relevant Evidence*

First, the Court declines to rule on Defendants' objections on the grounds of relevance because it is unnecessary to resolve the motions before the Court. Relevance is duplicative of the summary judgment standard. *Sandoval v. Cnty. of San Diego*, 985 F. 3d 657, 665 (9th Cir. 2021). "[I]f evidence submitted on summary judgement could create a genuine dispute of material fact, it is, by definition . . . relevant," and if it cannot create a genuine dispute of material fact, "there is no need for the court to separately determine whether it is relevant." *Id.* Accordingly, the Court will not further address Defendants' relevance objections.

### 2. *Defendants' Hearsay Objections to its own Statements*

Second, the Court overrules Defendants' hearsay objections to the extent that Defendants objected to evidence of their own statements, which is not hearsay. An out-of-court statement offered for its truth is not hearsay if a party's own statement or their agent's statement is being offered against them. Fed. R. Evid. 802(d)(2). A statement is admissible in this context when an employee of a defendant makes a statement in the scope of her employment. *Id.* at 802(d)(2)(D). Plaintiffs submitted evidence consisting of emails and instant messages among Defendants' employees discussing logistics, deals, and trades. *See* Pltfs. Exs. 1–198. These statements appear to have been made in the context of employment, and Defendants did not offer any basis for the Court to conclude otherwise.

1    Accordingly, the Court overrules Defendants' hearsay objections to Plaintiffs' exhibits that

2    contain communications made by Defendants or their agents.[8]

3         *3. Defendants' Objections to Admitting Professor Severin Borenstein's Blog Post*

4    Third, the Court sustains Defendants' objection to the blog post of Professor Severin

5    Borenstein on the ground that it is inadmissible hearsay. Pltfs. Ex. 2. In ruling on

6    Defendants' objection, the Court considers whether the out-of-court statements contained

7    in the blog post are being offered for their truth and, if so, whether there is an applicable

8    hearsay exception. *See* Fed. R. Evid. 801, 803. In the blog post, Professor Borenstein

9    opined on the causes of gas prices in California. *See* Pltfs. Ex. 2. In opposition to summary

10   judgment, Plaintiffs cited to Professor Borenstein's blog and stated that he "demonstrated

11   that factors internal to refiners, not externalities, caused . . . higher prices," and described

12   his conclusions to support their own claims of anticompetitive conduct. *See* Opposition at

13   1–2; Pltfs. Ex. 2. Because Plaintiffs offered Professor Borenstein's blog statements for

14   their truth to bolster their own claims, the exhibit is inadmissible hearsay unless a hearsay

15   exception applies.

16        Although Plaintiffs did not argue that any hearsay exception applied, the Court

17   confirms that there is no applicable exception. The learned treatise exception to hearsay

18   permits treatises, periodical, or pamphlets if, (1) an expert relies upon it on direct

19   examination or it is called to the expert's attention on cross-examination, and (2) the

20   publication is established as a reliable authority. *See* Fed. R. Evid. 803(18); *Diodem, LLC*

21   *v. Lumenis Inc.*, 2005 WL 6220667, at *6 (C.D. Cal. Jan. 10, 2005) (discussing the dual

---

[8] Except where the element of conspiracy is met with respect to Defendants in this opinion, the Court finds that the co-conspirator exception (allowing statements made by a party's co-conspirator during and in furtherance of the conspiracy to be admitted against the party) does not apply.

22

requirements of Fed. R. Evid. 803(18)). This exception has not been established here; therefore, the Court will not consider the blog post for its truth.

### 4. *Documents Not Identified in Interrogatory Responses*

Fourth, over Defendants' objections, the Court will consider Plaintiffs' evidence not cited in their interrogatory responses because the Court does not have the necessary information to exclude this evidence. Rule 26(e) requires a party to supplement discovery responses "in a timely manner" when it learns that the response is incomplete or incorrect and the information has not otherwise been made known to the opposing party. Fed. R. Civ. P. 26(e). Failure to comply with Rule 26(e) can result in the exclusion of evidence unless the failure to supplement was substantially justified or harmless. Fed. R. Civ. P. 37(c). Whether supplementation is timely under Rule 26(e) hinges on facts such as when the original disclosure was made, when a party discovered its response was incomplete, when the supplementation was made in relation to those events, *etc.* None of those facts are in the record, let alone facts that would aid the Court in determining whether a late disclosure was justified or harmless under Rule 37(c). Accordingly, on the present record, the Court overrules Defendants' objections to exhibits not previously disclosed in Plaintiffs' interrogatory responses.

### 5. *Objections to Plaintiffs' Expert Reports*

Lastly, the Court overrules Defendants' objections to Plaintiffs' expert reports as unverified because the reports have been sufficiently verified through deposition testimony. *Liebling v. Novartis Pharm. Corp.*, 2014 WL 12576619, at *1 (C.D. Cal. Mar. 24, 2014) (collecting cases). "[F]or an expert opinion to be considered on summary judgment, it must be accompanied by a proper affidavit or deposition testimony; courts in the Ninth Circuit have routinely held that unsworn expert reports are

23

inadmissible." *FNBN-RESCON I LLC v, Ritter*, 2014 WL 979930, at *5 (D. Nev. Mar. 12, 2014) (citation and internal quotations omitted); *King Tuna, Inc. v. Anova Food, Inc.*, 2009 WL 650732, at *1 (C.D. Cal. Mar. 10, 2009) (expert report can be verified by deposition for summary judgment purposes). While these expert reports are unaccompanied by declarations, the parties have submitted excerpted deposition testimony of Plaintiffs' experts that authenticates their reports. Defs. Exs. 3, 8, 9, 13–14, 22, 25–27. Based on the deposition testimony in the record, the verification requirement is met.

## V. CONSPIRACY TO FIX PRICES

### A. Plausibility of Allegations

As a threshold matter, the Court considers whether Plaintiffs allege a plausible theory of conspiracy that makes practical economic sense for the alleged conspirators. *Matsushita*, 475 U.S. at 596. *Matsushita* requires courts to engage in this analysis because "[t]he absence of any plausible motive [for Defendants] to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists." *Id.*; *Stanislaus*, 803 F.3d at 1090 ("[w]e first analyze whether the alleged conspirators would have had a rational motivation to conspire"). The question is not whether Defendants would have a motive to conspire generally but whether Defendants would have a motive to conspire specifically in the way alleged by Plaintiffs. *Matsushita*, 475 U.S. at 577–82 (finding no rational motive under plaintiffs' theory that 21 defendants conspired over a 20-year period to cut prices in the hopes of expanding their market share in the future—defendants had no incentive to suffer losses based on speculative future profits); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992). This plausibility inquiry does "not introduce a special burden on plaintiffs facing summary judgment in antitrust cases," but merely

24

articulates "that the nonmoving party's inferences be reasonable in order to reach the jury." *Kodak*, 504 U.S. at 468.

Here, Plaintiffs allege that the eight Defendants engaged in a wide ranging conspiracy ranging from 2011 to the present to fix prices at supracompetitive levels. *See generally* Opposition. According to Plaintiffs, Defendants orchestrated a multi-faceted conspiracy that operated as follows: Defendants agreed to reduce supply, by cutting production and imports and increasing exports, in order to raise prices. *See id.* at 26–36. Pursuant to Plaintiffs' theory of conspiracy, Defendants also engaged in deceptive acts— issued false statements about refinery maintenance and manipulated gas trades—to create a public perception of demand and further drive supracompetitive pricing in California. *See id.* at 45–49. Defendants effected this conspiracy through frequent exchanges of supply-related information concerning refinery maintenance, production, imports, and exports. *See id.* at 9–16. Defendants also cooperated to cover each other's supply shortages by trading gas on the spot market and utilizing exchange agreements to trade barrels of gas with each other, instead of purchasing elsewhere at market rates. *See id.* at 9–16, 22–24, 37–45, 49–50. Through these arrangements, Defendants consistently collaborated rather than competed with each other in times of need, such as after the Exxon refinery explosion. *See id.* at 22–24, 49–52.

The Court concludes that Defendants would have a rational economic motive to enter into the type of conspiracy alleged by Plaintiffs. Limiting supply and manipulating public facing information are economically rational ways to increase demand and, thus, prices—even more so, because Defendants themselves would remain protected by a high level of collaboration (exchange agreements, coordinated spot-market trading, and information sharing) that enabled them to anticipate market conditions, meet their own

25

supply needs, and avoid purchases at the high prices they created. In sum, Plaintiffs' theory that Defendants kept supply low and drove prices high, while implementing protections that kept their own costs and supply risks low, makes economic sense. The Court cannot, therefore, conclude that Plaintiffs' conspiracy theory is economically implausible such that it should require Plaintiffs to "come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587.

While Defendants would certainly have an economic motive to act in the manner alleged by Plaintiffs, that alone cannot establish an antitrust violation. Antitrust wrongdoing consists of concerted action pursuant to an illegal agreement, not independent, profit maximizing actions based on market conditions. *See Citric Acid*, 191 F.3d at 1105–06. Thus, the Court turns to whether the evidence supports the inference that Defendants acted pursuant to an agreement. Under *Matsushita*, unless Plaintiffs' evidence tends to exclude the possibility of independent action, it cannot raise a reasonable inference of conspiracy. 475 U.S. at 588.

## B. Plaintiffs Have Not Submitted Direct Evidence of a Price-Fixing Conspiracy

While both direct and circumstantial evidence can serve to create a triable issue on conspiracy, it appears that Plaintiffs have only submitted circumstantial evidence in their opposition. Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted," while circumstantial evidence requires one or more inferential steps to reach a conclusion of conspiracy. *Citric Acid*, 191 F.3d at 1094 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir.1999); *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001). For instance, conversations among Defendants explicitly confirming their agreement would constitute direct evidence, while ambiguous conversations among Defendants that require an inference to conclude

26

agreement would be circumstantial evidence. *Compare Markson v. CRST Int'l, Inc.*, 2022 WL 790960, at *13 (C.D. Cal. Feb. 24, 2022) ("conversations between Defendants confirming their agreements not to hire truckers" was direct evidence), *with In re Dynamic Random Access Memory Antitrust Litig.*, 2007 WL 9752971, at *6–8 (N.D. Cal. Feb. 20, 2007) (emails referencing "secret meetings" and comments regarding productions cuts required inferences to conclude agreement and thus was not direct evidence). Here, Plaintiffs do not purport to submit evidence of conversations, emails, or other documents that would directly establish that Defendants entered into an agreement with one another.[9] Instead, their briefing focuses on circumstantial evidence of parallel conduct and plus factors to establish a genuine dispute as to conspiracy. *See* Opposition at 8–9; *Toscano*, 258 F.3d at 985. As Plaintiffs have submitted no direct evidence, the Court will turn to whether the circumstantial evidence submitted by Plaintiffs is sufficient to raise an inference of conspiracy.

**C. Plaintiffs Have Raised a Genuine Dispute of Material Fact as to Conscious Parallelism**

In considering the circumstantial evidence submitted by Plaintiffs, the Court first examines whether Plaintiffs have raised a triable issue of fact that Defendants engaged in conscious parallelism, before turning to an analysis of "plus factors." Defendants argue that there is no genuine dispute of material fact as to conscious parallelism because Plaintiffs have failed to submit evidence of parallel pricing or other parallel conduct. *See*

---

[9] The only mention Plaintiffs make of the concept of direct evidence is that "[e]ven if Plaintiffs' evidence is not considered direct evidence of the conspiracy, it nevertheless tends to exclude the possibility" of independent conduct. Opposition at 9 (citation omitted).

27

Dkt. 719 ("Joint Reply") at 7–8.  As discussed above, while parallelism is not alone sufficient to show conspiracy, it is a relevant factor in addition to plus factors.

Parallelism exists when "competitors adopt[] similar policies around the same time in response to similar market conditions."  *Musical Instruments*, 798 F.3d at 1193. Plaintiffs can point to parallel prices to demonstrate conscious parallelism. *Brooke Grp.*, 509 U.S. at 227 ("[C]onscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level.").  Plaintiffs can also point to similar business behaviors to demonstrate conscious parallelism.  *Musical Instruments*, 798 F.3d at 1193 (defining parallel conduct as the adoption of "similar policies"); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 884 (9th Cir. 1982) (considering whether defendants' "account classifications, pricing structures and promotional policies" were sufficiently similar to demonstrate parallel conduct).  For instance, in *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, the Third Circuit found that, although "defendants did not use the same prices," they "acted similarly by refraining from competing" on certain accounts and retaliating against competitors that did compete on accounts. 998 F.2d 1224, 1243 (3d Cir. 1993).

Plaintiffs here point to a mix of similar pricing and other parallel business conduct to demonstrate conscious parallelism.  With respect to pricing, Plaintiffs point to a combination of evidence obtained in discovery and from publicly available documents suggesting that, (1) in 2015 and 2016, Shell based its "at the rack" prices in part on the prices of Exxon, BP, and Chevron; (2) in 2016, Phillips 66 based its Dealer Tankwagon prices in part on a brand average of the prices of Chevron, Shell, Tesoro, and non-Defendant Mobil; and (3) from January 2015 to May 2017, the Dealer Tankwagon prices

28

of Chevron, Shell, and Valero were within approximately twenty cents of one another in Richmond, California. *See* Dkt. 781-2 ("Surreply") at 2, 4–5; Pltfs. Ex. 211 at PSXPGI00089880; Pltfs. Ex. 212 at slide 25; Ex. Shell 1 at SOPUS_PGI_00002699. In addition, some of the evidence submitted by Defendants allows for an inference of follow-the-leader pricing, one common form conscious parallelism. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1195. Five of the eight Defendants admitted that they regularly monitored one another's prices through services such as OPIS and factored that information into their own pricing. *See, e.g.*, J. Hodgson Declaration ¶¶ 11–15, 19–20; P. Brooks Declaration ¶ 96; K. Archambault Declaration ¶ 59; J. Harris Declaration ¶ 6; M. O'Neal Declaration ¶ 3.

In addition to the above evidence of parallel pricing, the evidence in the record also suggests that Defendants engaged in other parallel actions. Defendants had common reactions to market events, including selling gas to Exxon following its 2015 explosion, increasing exports of gas out of California over the class period, and limiting gas inventories at their respective refineries. *See* Pltfs. Ex. 200; C. Yates Declaration ¶¶ 35–36; N. Weinberg-Lynn Declaration ¶¶ 15–16; S. Roveda Declaration ¶ 13; R. Sharum Declaration ¶¶ 30–33; C. Dickson Declaration ¶¶ 11–12; M. Perez Declaration ¶¶ 13–16; L. Lockhart Declaration ¶ 30; P. Brooks Declaration ¶¶ 38–40, 90; T.A., E. Pestano Declaration ¶ 42.

The Court finds that the foregoing evidence sufficiently raises a genuine dispute of material fact that Defendants engaged in conscious parallelism. Both conscious parallelism—where players in a concentrated market independently mirror one another's prices or take similar profit maximizing actions—and illegal conspiracy to fix prices can result in high prices, but only the latter violates antitrust law. Because conduct as consistent

29

with legal conscious parallelism as with illegal conspiracy is insufficient to support a reasonable inference of conspiracy, *Matsushita*, 475 U.S. at 587–88, the Court turns to Plaintiffs' ten categories of plus-factor evidence to determine if any evidence "tends to exclude the possibility of independent action." *Id.* at 588.

**D. Plaintiffs' Plus Factors**

After concluding that Plaintiffs have introduced circumstantial evidence of parallel conduct among the Defendants, the Court turns to an examination of the "plus factors" that Plaintiffs contend demonstrate Defendants' illegal price fixing conspiracy. In all, Plaintiffs argue that ten categories of Defendants' behavior evidence their wide-ranging, price fixing conspiracy: (1) refineries cooperated with one another through exchange agreements to cover each other's supply shortages against self-interest; (2) traders frequently exchanged confidential supply-related information against Defendants' self-interest; (3) refineries restricted production levels and maintained low inventories to reduce overall gas supply; (4) refineries prevented gas imports into California to reduce overall gas supply; (5) refineries exported gas out of California to reduce overall gas supply; (6) refineries protected Exxon after its refinery explosion in 2015 by selling it gas rather than competing for its market share; (7) refineries manipulated the market through a "gentleman's agreement" to limit trading hours; (8) traders manipulated the market by entering "wash trades" to create a false sense of market demand; (9) traders manipulated the market by selectively reporting trades to OPIS to raise public facing gas prices; and (10) refineries manipulated the market by making false public statements about refinery maintenance to create a fabricated sense of market scarcity.

The Court will examine each category of allegedly conspiratorial conduct under the Ninth Circuit's two-step framework for determining whether circumstantial evidence can

30

1   create a reasonable inference of conspiracy. *Citric Acid*, 191 F.3d at 1094. For each

2   category, where Defendants meet their Step One burden to offer plausible and justifiable

3   reasons for their conduct consistent with proper business practice, the Court will consider

4   whether Plaintiffs have pointed to any evidence at Step Two that tends to exclude the

5   possibility of independent conduct. *Id.* Finally, the Court will consider the totality of

6   Plaintiffs' evidence across all ten categories to determine whether they have successfully

7   raised an inference of conspiracy. *Id.* at 1097, 1106.

8       *1. Cooperation Through Exchange Agreements*

9       Plaintiffs contend that Defendants widely used exchange agreements to further their

10  price fixing conspiracy. *See* Opposition at 37–45. The record shows that Defendants, with

11  the exception of Alon, entered into multiple bilateral exchange agreements with one

12  another over the past twenty years or more to exchange fuel on a barrel-for-barrel basis.

13  Joint Statement ¶ 22; Pltfs. Exs. 114–28.[10] Plaintiffs explain that exchange agreements

14  allowed for geography-based exchanges of fuel, where a refinery provides fuel to another

15  in one location and receives those barrels back in different location. *See* Opposition at 38.

16  Exchange agreements also allowed a refiner to provide barrels today to have them returned

17  at a later date. *See id.* Plaintiffs argue that Defendants used exchange agreements to

---

[10] For instance, Exxon executed exchange agreements with Chevron in 2005, Phillips 66 in 2007, Tesoro in 2012, and Shell in 2013. Pltfs. Exs. 114–15, 118, 128. In addition, Chevron executed exchange agreements with Valero in 2006 and 2014, Tesoro in 2002 and 2015, and BP in 2013 (Pltfs. Exs. 116–17, 119–20, 124); Phillips 66 executed exchange agreements with Shell in 2011 and 2012, Valero in 2012, and BP in 2015 (Pltfs. Exs. 121–23, 125); Tesoro executed exchange agreements with Shell in 1999 and Valero in 2013 (Pltfs. Exs. 126–27). Many of these agreements were amended throughout the years. *See* Pltfs. Exs. 114–28.

31

transfer large amounts of product to one another with little formality and that this evidences conspiracy because such behavior is inconsistent with competition. *See id.* at 39–40.

Defendants rebut these allegations by explaining that they independently entered into exchange agreements for self-interested business reasons—because they are convenient, cost-saving, and allow for geographical competition. Defendants explain that these agreements enabled them to meet supply needs in specific geographical areas without physically transporting gas to locations where they did not have a refinery. *See, e.g.*, Joint Statement ¶ 22; C. Yates Declaration ¶ 51.[11] By enabling companies to receive gas in one location and return the gas in kind in another location, exchange agreements allowed refineries to expand the geographic reach of their operations at lower costs or in areas where they otherwise would not be able to compete. *See id.* Defendants also state that they used exchange agreements to quickly cover shortages and meet supply obligations, without having to buy barrels at market prices. *See, e.g.*, K. Archambault Declaration ¶¶ 63, 66–70; C. Yates Declaration ¶¶ 50–52.[12] They provide testimony that convenience-based exchange agreements helped them prevent supply shortages and disruptions without incurring the costs of maintaining large inventories. *See id.* According to the terms of Defendants' exchange agreements, any imbalances remaining after the parties swapped barrels back and forth were usually settled monthly in cash. *See, e.g.*, Pltfs. Exs. 114–28. By explaining that exchange agreements allowed them to save time and money transporting fuel, expand geographical reach, and cover supply shortages at lower cost and lower risk,

---

[11] *See also* J. Harris Declaration ¶¶ 21–22; R. Sharum Declaration ¶ 20; P. Brooks Declaration ¶¶ 81–83.

[12] *See also* R. Sharum Declaration ¶ 23; J. Harris Declaration ¶¶ 21–24; P. Brooks Declaration ¶¶ 82–83, 86–88; T.A. 338–342, E. Pestano Dep. at 32:13–15, 38:17–19, 39:7–14, 46:3–11.

Defendants have offered plausible, justifiable, and self-interested business reasons to enter into exchange agreements.

Plaintiffs argue that these agreements are inherently against self-interest because a refiner has no incentive to loan to competitors in times of need instead of leveraging that need to gouge them on prices.[13]  In support of this argument that exchange agreements were against self-interest, Plaintiffs highlight two instances of swaps performed at inequivalent values (*e.g.*, Phillips 66 loaned barrels when the spot market price was $1.79, and Shell returned the barrels a few days later when the spot price was $1.72).  *See* Pltfs. Exs. 147–50.  While this evidence could support the conclusion that these two transactions *in isolation* were not profit maximizing for one of the parties, *see* Pltfs. Exs. 147–50,[14] the value of any single, in-month transaction is not sufficient to raise an inference that exchange agreements, which enable dozens of transactions between two parties over a year or more, are not profitable for Defendants overall.  *See, e.g.*, Pltfs. Ex. 145.  Plaintiffs' argument would hold true only if exchange agreements went one way and benefited only one party.  The central premise of these exchange agreements, however, is that they

---

[13] Plaintiffs point to an instance of a Shell employee explaining that "[t]he whole point of the convenience exchange is to help each other out volumetrically without adverse financial impact." Pltfs. Ex. 139.  This statement, made in the context of a price negotiation to settle remaining balances, captures the mutually beneficial essence of exchange agreements. *See id.*

[14] In Exhibit 147, Shell requested product from Phillips 66 under an exchange agreement and Phillips 66 agreed to supply up to a certain amount and be paid back five days later.  Plaintiffs highlight that Shell received product on a day when gas prices were $1.79/gallon and ultimately returned product to Phillips 66 five days later when gas prices were $1.72/gallon. *See* Pltfs. Exs. 148–49.  Plaintiffs ignore the fact that Defendants entered into an agreement not knowing what the price would be five days later.  Exhibit 150 shows that Shell used an exchange agreement with Valero to cover a shortage and noted that the value of the swap was "29k." *See* Pltfs. Ex. 150.

15cv1749-JO-AGS and 18cv1374-JO-AGS

facilitate reciprocal exchanges over extended periods of time: the party giving one day will be the receiving party the next day, when its time of need arises. The Court therefore finds that Defendants have offered sufficiently plausible, legitimate, and self-interested business reasons to enter into mutually beneficial, long-term exchange agreements to reduce their risks and costs. Accordingly, Defendants meet their Step One burden.

While these types of agreements can be misused as part of an unlawful conspiracy, without more, this Court cannot conclude that exchange agreements, in and of themselves, raise a reasonable inference of conspiracy. This Court is mindful that other courts have emphasized the procompetitive features of exchange agreements. In *Aguilar v. Atl. Richfield Co.*, a consumer brought a class action alleging that gas companies had conspired to restrict the output of CARBOB and pointed to exchange agreements as a plus factor. 25 Cal. 4th 826 (2001).[15] In concluding that these agreements did "not even imply collusive, rather than independent, action," the court stated that: "exchange agreements have long been recognized as procompetitive in purpose and effect, enabling or facilitating companies to compete in product and/or geographical and/or temporal markets in which they otherwise could not or would not compete as efficiently or at all." *Id.* at 834; *see also Blue Bell Co. v. Frontier Ref. Co.*, 213 F.2d 354, 359 (10th Cir. 1954); *Thomas v. Amerada Hess Corp.*, 393 F. Supp. 58, 72 (M.D. Pa. 1975); *Indep. Iron Works, Inc. v. U.S. Steel Corp.*, 322 F.2d 656, 666–67 (9th Cir. 1963) (business transactions between competitors, without more, do not allow for an inference of conspiracy). Absent evidence of misuse, courts have uniformly rejected the argument that exchange agreements in the gas industry

---

[15] The Court in *Aguilar* addressed the plaintiff's § 1 Cartwright Act claim, which it noted "is analogous to section 1 of the Sherman Act." 25 Cal.4th at 838.

15cv1749-JO-AGS and 18cv1374-JO-AGS

are *per se* vehicles for coconspirators to exchange favors. *See, e.g.*, *Aguilar*, 25 Cal. 4th at 863–64. The Court therefore turns to whether Plaintiffs have provided evidence of such misuse.

The additional evidence that Plaintiffs offer regarding exchange agreements at Step Two does not tend to exclude the possibility of independent action. First, Plaintiffs offer no evidence to substantiate their claim that "enormous" quantities of gas changed hands pursuant to these agreements. *See* Opposition at 39. The only evidence Plaintiffs submit in support of this statement is a Phillips 66 document with three numbers on it but no indication of what the numbers signify. *See* Pltfs. Ex. 130. Moreover, Phillips 66 and Valero provide additional context explaining that their exchange volumes were less than 3% and 1% of their annual volumes, respectively. *See* R. Sharum Declaration ¶ 26; P. Brooks Declaration ¶ 82.

Second, Plaintiffs contend that the friendly and informal nature of exchange transactions, as seen in the following, raise questions about their non-competitive and collusive nature: Defendants (1) often amended agreements to accommodate different or additional product; (2) on eight occasions, settled exchange balances years after the original exchanges; and (3) referred to performance under the agreements as "help" and "favors" or "borrowing" gas, which was "appreciated." *See* Pltfs. Exs. 157–60 (referring to performance as "help" and "favors"); *see also* Pltfs. Exs. 161–64 (referring to performance as "borrowing" gas).[16] The Court agrees this evidence underscores the cooperative and

_____

[16] *See also* Ex. 133 (2011: Valero and Exxon informally add sub-octane to agreement); Ex. 134 (2014: Chevron and Tesoro amend to extend time frame); Ex. 144 (2012: BP and Phillips 66 "liquidate balances from old contracts" from prior five years); Ex. 145 (2012: BP and Valero settle exchange balances); Ex. 141 (2013: Shell and Exxon "liquidated all aged balances . . . both active and inactive"

35

interdependent nature of exchange agreements but does not find that it adds dimension that supports an inference of conspiracy. Given that the purpose of exchange agreements is to mutually benefit the parties by meeting each other's supply needs as they arise, allowing flexible contract amendments between participants could be consistent with furthering that common goal. Furthermore, the language of "help" and "favors" could simply be consistent with collegial language used in the context of the cooperative partner-supplier relationships created by these agreements.

Plaintiffs also point to evidence of eight instances where Defendants did not settle imbalances in the thousands of barrels until years after the swaps were made as evidence of collusion. In light of the evidence that Defendants commonly produced hundreds of millions to billions of barrels per year, these are *de minimis* amounts. *See, e.g.*, C. Dickson Declaration ¶¶ 6, 21 (Exxon refinery capacity was over 1 billion gallons per year); R. Sharum Declaration ¶ 28 (Phillips 66 refinery typically produced over 3 million gallons per day); *see also* Pltfs. Exs. 136–37, 139–41, 143–46. As these actions could be consistent with Defendants' self-interest in flexible administration of mutually beneficial exchange agreements or delayed bookkeeping of *de minimis* amounts, they do not tend to exclude the possibility of independent action.

---

from 2012 totaling approximately 18,000 gallons); Ex. 146 (2014: Exxon tells Tesoro it cannot deliver product to settle exchange balance and so pays); Exs. 136–37 (2014: Phillips 66 and Chevron settle "inactive outstanding balances"); Ex. 142 (2015: Chevron and Valero amend to transfer "old product . . . to the active product"); Ex. 143 (2015: Phillips 66 and Exxon "clean up inactive balances" of approximately 25,000 barrels from prior three years); Ex. 135 (2015: Valero and Shell negotiate amendment); Exs. 139–40 (2017: Chevron and Shell settle balances totaling $154,949.51 from prior three years).

36

Because the behavior that Plaintiff points to is "as consistent with permissible competition as with illegal conspiracy," it does not support an inference of antitrust conspiracy. *Matsushita*, 475 U.S. at 588. Based on the above, the Court cannot conclude that Plaintiffs' evidence concerning exchange agreements raises a reasonable inference of conspiracy.

### 2. *Exchanges of Information Among Traders*

Plaintiffs point to interfirm exchanges of information among Defendants' traders as the main driver of Defendants' alleged conspiracy. *See* Opposition at 9–16. California refineries employ traders to buy and sell gas products on the spot market to meet refinery supply needs. Joint Statement ¶ 21; McCullough Report ¶ 22 (describing trader transactions as "like a farmers' market where farmers buy and sell potatoes to each other"). These traders buy and sell with traders at other refineries and third-party trading firms on behalf of the refineries that employ them. Joint Statement ¶ 21; Lipow Report ¶¶ 20, 31; McCullough Report ¶ 22. For example, traders will buy or sell in response to their refineries' supply conditions and either buy to ensure the refinery has enough product to meet its contractual obligations (such as in the case of an outage), or sell in the market to ensure that any excess product does not slow down refinery production. *See, e.g.*, Lipow Report ¶¶ 20, 22, 26; K. Archambault Declaration ¶¶ 28–30; C. Yates Declaration ¶ 54. Neither party disputes that the California trading market is characterized by a handful of companies, and thus, traders are repeat players that are familiar with one another and buy and sell from each other on a regular basis. *See* Lipow Report ¶ 31; McCullough Report

37

¶¶ 20, 66.[17] Traders, therefore, regularly communicate with each other at trade association events, as well as by phone, email, and messaging platform in the course of performing their duties. *See* McCullough Report ¶ 50.

Although the parties agree that traders must communicate to execute transactions, Plaintiffs contend that Defendants' traders consistently and inappropriately shared confidential information regarding refinery maintenance, production, and supply in furtherance of a conspiracy. *See* Opposition at 9–16. For instance, Plaintiffs take issue with the fact that traders exchanged information like the following: In one conversation on April 17, 2012, BP's trader asked if Shell's trader had "27kb of pnw premium," explaining that he needed the product because BP's refinery was running a unit "at min rates until early may in order to build ls vgo inventory back to safety stock level." Pltfs. Ex. 43. According to Plaintiffs, rather than just simply asking for the amount of gas needed, this trader exchanged gratuitous and confidential supply information about BP's refinery against self-interest. Dkt. 809 at 42–44. Plaintiffs point to various trader exchanges like the above that occurred at trade association events and during trading communications as evidence of conspiracy. *See, e.g.*, Pltfs. Exs. 6, 8–12, 19–20, 35–44, 46–50, 52, 192–93.

In order to meet their Step One burden of producing plausible and justifiable reasons for their actions, Defendants offer evidence that traders exchanged information, while buying and selling gas products to each other, as customers and suppliers. Defendants explain that although the refineries' overall business model was premised on competition, the traders had very different roles: they acted as customers and suppliers that needed to

---

[17] *See also* C. Yates Declaration ¶ 56; R. Pluimer Declaration ¶ 6; M. Perez Declaration ¶ 10; L. Lockhart Declaration ¶¶ 4, 36–37

38

cooperate because they conducted repeat business with one another. *See, e.g.*, R. Pluimer Declaration ¶ 6; M. Perez Declaration ¶ 10.[18] Defendants assert that, in this context, traders shared information for strategic advantage—to build rapport and actively foster additional trading opportunities. *See, e.g.*, H. Henderlite Declaration ¶ 16; R. Pluimer Declaration ¶¶ 5–7.[19] Defendants also note that traders were communicating already public information about refinery maintenance and import and export schedules to explain their needs for buying or selling, rather than divulging confidential information. *See, e.g.,* P. Brooks Declaration ¶¶ 32, 36, 75; J. Yomtoob Declaration ¶¶ 15, 21 & n.4. Defendants also submit that traders attended trade association events to stay informed on the industry and explore potential business opportunities rather than for conspiratorial purposes. *See* K. Archambault Declaration ¶¶ 72, 74; J. Yomtoob Declaration ¶ 30.[20] For example, traders used these opportunities to discuss market conditions and develop business relationships with other traders. *See id.*

Based on the above, the Court is satisfied that Defendants produced plausible and justifiable business reasons for traders to share information with one another. Defendants provide evidence that traders needed to buy and sell gas from each other to meet their refineries time-sensitive supply needs, and that they did so in a concentrated market with few players, meaning that the same traders conducted repeat transactions with each other. In this context, a reasonable juror could infer that traders shared information about their

---

[18] *See also* P. Brooks Declaration ¶ 72; T.A., E. Pestano Declaration ¶¶ 48, 50–51.

[19] *See also* J. Yomtoob Declaration ¶¶ 13–15, 21, 24; C. Yates Declaration ¶ 56; R. Sharum Declaration ¶ 19; L. Lockhart Declaration ¶¶ 4, 29, 36–37, 39–45; J.A. 587–93, Phillips Exs. 21–22.

[20] *See also* H. Henderlite Declaration ¶ 19; C. Yates Declaration ¶ 57; R. Pluimer Declaration ¶ 13; L. Lockhart Declaration ¶¶ 49–50; P. Brooks Declaration ¶¶ 103, 105; C. Dickson Declaration ¶ 71; M. Perez Declaration ¶ 17.

39

respective refineries for self-interested reasons—in order to facilitate transactions, cultivate relationships, and glean information for future trading opportunities. Armed with knowledge of another trader's supply needs, that trader is arguably better positioned to sell to the other. In the same vein, disclosing one's forward looking supply needs arguably better positions a trader to identify potential sources of product coverage. The Court also agrees that incidental sharing of already public information to explain the need to buy or a sell, without more, is consistent with legitimate business conduct. Overall, Defendants' evidence of the context and purpose of traders' exchanges is consistent with what the *Citric Acid* court described as the legitimate practice of "[g]athering information about pricing and competition in the industry." 191 F.3d at 1098 (gathering information about other producers did not allow for inference of conspiracy).[21] Therefore, Defendants' explanations meet their burden at Step One.

At Step Two, Plaintiffs submit dozens of communications among traders to attempt to demonstrate that Defendants' traders regularly exchanged confidential information, and that such information was "widely dispersed" and reached the "highest echelons of management." *See* Opposition at 10–16. The Court has reviewed the communications submitted by Plaintiffs and finds that they generally fall into three categories: (1) traders from two different companies exchanged refinery information in the context of a transaction, (2) traders within one company shared information they obtained from an

---

[21] *See also Musical Instruments*, 798 F.3d at 1196 ("participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement"); *see also* Pltfs Ex. 23 ((30(b)(6) witness for trade association testifying that traders discussing pricing at informal meetings during a trade association event would not be problematic "if it's a supplier and a customer kind of a conversation").

40

1   outside trader about another refinery, and (3) only one exchange where traders ultimately

2   passed information up the chain-of-command as Plaintiffs allege.[22]   The Court summarizes

3   these categories of evidence below before considering whether Plaintiffs meet their Step

4   Two burden in light of these communications as a whole.

5          In the first category, Plaintiffs highlight communications between traders discussing

6   refinery maintenance, imports, and production that explicitly occurred in the context of

7   executing or seeking to execute a transaction.  For instance, on February 23, 2015, a Shell

8   trader asked whether Chevron could supply it in light of Shell's "ongoing structural

9   demand."  *See* Pltfs. Ex. 41.  Similarly, on December 2, 2015, BP's trader told Shell's

10  trader that he had "a fairly steady stream of barges coming in thru the month to both gatx

11  and shell carson," apparently in an effort to see if Shell had an interest in purchasing.  Pltfs

12  Ex. 11 at row 194801; *see also* Pltfs. Exs. 6, 11, 19–20, 40, 43–44, 52.  In all of the

13  foregoing, a trader from one company received information from a trader at another

14  company regarding refinery maintenance, trading, or production in the context of securing

15  a potential deal with that trader.

16         In the second category, Plaintiffs submit evidence of information exchanges between

17  traders at different refineries that do not immediately appear to have occurred in the context

18  of potential business transactions.  The majority of these documents show traders internally

19  sharing information that they obtained from a trader at a different refinery.  While it is

20  unclear whether the information was originally obtained in the context of a sale, it appears

21  that traders circulated this outside information internally to other traders, presumably to

22

23

24       [22] The Court notes that Plaintiffs also submit communications in which traders speculate regarding
     market conditions or third parties as discussed in detail at *infra* Section V.D.3.

25

26                                                                      15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

facilitate their own work of buying and selling (*i.e.*, identifying sources of supply or potential buyers). For example, in one internal conversation between Tesoro traders on March 17, 2017, a trader noted that he was "running out of options on who to buy from," after the traders discussed that they could not buy from Valero because it was still undergoing maintenance and "traders indicat[ed] [Valero was] still struggling." *See* Pltfs. Ex. 39; *see also* Pltfs. Exs. 10, 47, 192–93 (internally discussing the severity of other refineries' maintenance events).

The remaining conversations in the second category that Plaintiffs point to involve two traders from BP and Phillips 66; unlike the other trader communications submitted by Plaintiffs, these traders appear to also have exchanged potentially confidential export, import, and supply information, in addition to refinery maintenance information. For instance, on January 23, 2018, BP's trader wrote an internal market update, noting that "P66 also has a reformer TAR in Feb/March (pnc) that is unknown to the market." Pltfs. Ex. 48 at BPWC-PG-00039851; *see also* Pltfs. Exs. 8, 49–50 (discussing potentially confidential information regarding maintenance, exports, and imports). The direct exchanges between BP and Phillips 66 may suggest something more nefarious, given that the information shared was not clearly public. Where that information is then circulated internally, however, it appears to be circulated solely to other traders, presumably for the purpose of aiding buying and selling. *See, e.g.*, Pltfs. Ex. 48.

In the third and final category, Plaintiffs point to a single communication that demonstrates that the information exchanged between traders was passed up the chain-of-command to individuals responsible for production and pricing at Defendants' refineries. *See* Opposition at 16. In an email dated March 7, 2015, Tesoro's trader responded to an article that was sent to a large listserv regarding Exxon's maintenance following an

42

1  explosion at Exxon's refinery in February 2015. *See* Pltfs. Ex. 35. Tesoro's trader wrote:

2  "[g]ood news—this report is erroneous." *Id.* The email does not clearly indicate the source

3  of his knowledge.[23] Plaintiffs also submit evidence showing that the recipients of this email

4  included high-level managers at Tesoro. *See* Pltfs. Exs. 36–38. Plaintiffs argue that, based

5  on this exchange, a factfinder could reasonably infer that other information exchanges

6  among traders were similarly passed up the chain-of-command.

7      Plaintiffs argue that these communications between traders prove that Defendants

8  shared confidential information about their refinery operations and import/export decisions

9  against self-interest and in furtherance of a price fixing conspiracy. Turning to the

10  inferences that this evidence permits, the Court finds the information exchanges in the

11  record would not allow a reasonable juror to infer the wide ranging, eight-Defendant

12  conspiracy Plaintiffs seek to prove. The case law is replete with discussions on whether

13  exchanges of information are a plus factor tending to support conspiracy, and although no

14  bright-line rules or tests emerges, the Court finds the following factors are relevant to the

15  facts before it: (1) who is communicating and how frequently, *see, e.g.*, *Baby Food*, 166

16  F.3d at 121–22; (2) the proximity of the communications to pricing decisions, *see, e.g.*, *In*

17  *re Flat Glass Antitrust Litig.*, 385 F.3d 350, 368–69 (3d Cir. 2004); and (3) the context and

18  content of the communications, *see e.g.*, *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d

19  1348, 1357 (9th Cir. 1982); *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60

20  F. Supp. 3d 914, 951 (N.D. Ill. 2014), *aff'd* 801 F.3d 758 (7th Cir. 2015).

21

22

23

24

---

[23] In their opposition, Plaintiffs claim that Tesoro also wrote that the information was "confirmed via several sources including the USWC XOM crude trader," but that language is not reflected in Exhibit 35 and thus, is misquoted.

25

43

26

27

28

The Court first addresses who is exchanging information and how often those exchanges occurred. Exchanges of information among high-level executives who have pricing authority bolster an inference of conspiracy, although "there must [also] be evidence that the exchanges of information [actually] had an impact on pricing." *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 2013 WL 595122, at *12 (E.D. Cal. Feb. 15, 2013), *aff'd*, 803 F.3d 1084 (9th Cir. 2015) (quoting *Baby Food*, 166 F.3d at 125); *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012) (holding circumstantial evidence supported conspiracy where presidents of two companies with pricing authority shared intentions to increase prices before those decisions had been publicly announced). On the other hand, exchanges of information among low-level employees without pricing authority are generally not probative of conspiracy. *Baby Food*, 166 F.3d at 121–22. Nevertheless, exchanges of information between low-level employees can be probative of conspiracy where there is evidence that those employees routinely reported information up the chain-of-command. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5138859, at *6 (N.D. Cal. Dec. 10, 2010). Distinguishing *Baby Food*, the court in *SRAM* found that where exchanges between low-level employees were regularly reported to individuals with pricing authority, such conduct was more consistent with conspiracy than with unilateral conduct. *Id.* at *7.

With these factors in mind, the Court turns to the trader conversations in the record. The volume of evidence that Plaintiffs submit suggests relatively frequent communications between Defendants' traders. *See, e.g.*, Pltfs. Exs. 8, 10–11, 19–20, 35, 39, 41–44, 46–47,

44

64–65, 82, 169.[24]  However, frequency is not particularly probative of conspiracy in the context of gas traders in California. Because these traders must communicate with one another to do their jobs and because there are a limited number of traders in the California market, one would expect to see frequent communications among this small group. Moreover, the bulk of the communications took place between traders, low-level employees that did not have the authority to set rack prices or production levels. *See In re Citric Acid Litig.*, 191 F.3d at 1094. With regard to six of the Defendants—Chevron, Shell, Tesoro, Valero, Exxon, and Alon—Plaintiffs can only point to one instance[25] where information gained through trading was sent to higher-level employees and this evidence is ambiguous at best. *See* Pltfs. Ex. 35. In this instance, a Tesoro trader "replied all" to an article originally circulated to a large listerv, stating, "this report is erroneous." *See id.* Plaintiffs submit evidence to show that the recipients of this "reply all" included higher-up decisionmakers, although such decisionmakers appear to be included in the "reply all" because they were recipients of the original email circulating the article. *See id.*[26]

Plaintiffs' evidence regarding communications between BP and Phillips 66 present a different picture. The traders of these two companies appear to have repeatedly

---

[24] Some of the communications Plaintiffs submit are with unidentified third parties that may be non-Defendants, which suggest little about an agreement between Defendants in this case. *See, e.g.*, Pltfs. Ex. 9 (Valero trader and "dan_rnr"); Pltfs. Ex. 65 (Shell trader and "toddktk@YAHOO").

[25] Although the Court is not obligated to mine the record for evidence Plaintiffs do not point to in their briefing, the Court has identified an additional instance where information may have been passed up the chain-of-command. *See* Pltfs. Ex. 65 (Valero trader to Shell trader: "go tell your supply group that gas in the bay is getting tight"; no further context or reply). This single message without a reply does not indicate whether information actually was reported up the chain-of-command. *See id.*

[26] The Court also notes that Plaintiffs' Exhibit 35 is the only piece of evidence that Plaintiffs have supported by submitting additional evidence showing that the recipients of the email held particular job roles. *See* Pltfs. Exs. 36–38.

45

communicated potentially confidential information to each other and then passed that information to production decision-makers. *See, e.g.*, Pltfs. Ex. 8 (discussing imports, future projections, and production decreases); Pltfs. Ex. 48. For example, on December 18, 2017, BP's trader asked, "you guys seein run cut incentive yet in LA," and Phillips 66's trader responded, "yes indeed. Bay and LA." Pltfs. Ex. 8 at rows 5832–33. On the same day, BP's trader wrote an internal marketing update to other BP traders, stating in part that "P66 does confirm to us that they are trimming runs." Pltfs. Ex. 48 at BPWC-PG-00039857. Plaintiffs also emphasize that BP's trader testified at his deposition that he considered "run cuts" to be private information at BP. Pltfs. Ex. 74 at 228:9–229:19. These documents reflect that Phillips 66's trader disclosed the company's internal, and perhaps confidential, decision to decrease production levels (referred to as cutting or trimming "runs") with BP's trader. This evidence of confidential exchanges is coupled with declarations from BP's and Phillips 66's traders admitting that, at times, they shared such information with their respective production departments for the purpose of taking advantage of predicted market shortages.[27]

Based on the above, the evidence does not suggest the eight-Defendant conspiracy that Plaintiffs urge. Given that frequency alone is not particularly probative of conspiracy in this context, as described above, the Court focuses on whether Plaintiffs have pointed to evidence to support their argument that traders "widely dispersed" information gleaned during trading to the "highest echelons of management." Opposition at 16. Plaintiffs have

---

[27] *See* J. Yomtoob Declaration ¶ 25 (information "may sometimes be transmitted to BP's supply and refinery planning teams to determine whether there is an opportunity to supply counterparties"); L. Lockhart Declaration ¶ 47 ("on occasion, I discussed with our California refineries whether they could increase production of CARBOB" based on trader information) (emphasis omitted).

46

pointed to no evidence that Chevron, Shell, Valero, or Alon passed trading information up the chain-of-command.  Plaintiffs have pointed to one ambiguous instance involving Tesoro and Exxon where this may have occurred.  *See* Pltfs. Ex. 35.  No reasonable juror could conclude based on this scant and ambiguous evidence that traders for each of the eight Defendants regularly passed information up the chain-of-command.  Even considering BP's and Phillips 66's admissions that they occasionally shared trading information with their refineries' supply teams (evidence that Plaintiffs do not point to but that the Court has read and considered), this evidence does not implicate any of the six remaining Defendants such that a reasonable juror could infer an eight-Defendant conspiracy.

Next, the Court considers the proximity of the information exchanges to pricing decisions or other acts in furtherance of the alleged conspiracy.  Courts have consistently found that information exchanges are sufficient circumstantial evidence of conspiracy where the exchanges are closely followed in time by price increases.  *See, e.g.*, *Flat Glass*, 385 F.3d at 368–69 (holding that evidence of parallel price increases shortly following information exchanges took the exchanges "outside the realm of 'mere possession'" and allowed for an inference of conspiracy); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 778 (E.D. Pa. 2017) (holding that "the close temporal link between the transfer [of price information] and announcement of the 2001 price increases raise an inference of conspiracy"); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *13 (S.D.N.Y. Mar. 28, 2017) (information exchanges shortly followed by price drops

47

supported inference of conspiracy).[28]  Here, Plaintiffs do not point to any evidence of specific price increases, supply reductions, or other concerted activity in proximity to Defendants' exchanges of information.  Plaintiffs, therefore, have not created an inference of conspiracy by showing the proximity of information exchanges to specific collusive actions in furtherance of the conspiracy.

Lastly, the Court examines the context in which the communications occurred, and the nature of the information exchanged.  Context is particularly important given that "the mere exchange of price information, without more, is not per se illegal," *Krehl*, 664 F.2d at 1357, and information exchanges between competitors "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).  Indeed, where defendants are competitors in a market but also customers and suppliers, the range of permissible inferences to be drawn from information exchanges must be determined in part by the context in which the exchanges occur.  *See, e.g.*, *Dairy Farmers*, 60 F. Supp. 3d at 951 ("having repeated communications with a supplier, who also is a competitor in certain markets, does not a conspirator make"); *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 984–85 (N.D. Ohio 2015) (finding certain exchanges that occurred in the context of a vendor-customer relationship did not support an inference of conspiracy).

---

[28] *See also, e.g.*, *In re Domestic Drywall Antitrust Litig.*, 163 F.Supp.3d 175, 197 (E.D. Pa. 2016) ("Opportunities to conspire may be probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records."); Richard A. Posner, *Information and Antitrust: Reflections on the* Gypsum *and* Engineers *Decisions,* 67 Geo. L. J. 1187, 1199 (1979) ("[I]f the effect of the information exchange were to raise the level [of] prices, one could infer that the motive was price fixing.").

15cv1749-JO-AGS and 18cv1374-JO-AGS

Here, Defendants are competitors in the wholesale and retail gasoline markets in California, but their traders operate as customers and suppliers on the spot market where they buy and sell gasoline. *See, e.g.*, M. Perez Declaration ¶ 10; L. Lockhart Declaration ¶¶ 4, 36–37. The information exchanges in the first category of Plaintiffs' evidence discussed above confirms this market reality. *See* Pltfs. Exs. 43–45, 78. Although many of the trader chats submitted by Plaintiffs appear excerpted, leaving the reader without the context of the conversation, many of the conversations explicitly occur in the context of a current or potential transaction. *See, e.g.*, Pltfs. Ex. 43 (Shell and BP traders discussed product availability in context of potential transaction); Pltfs Ex. 44 (Tesoro internally discussed information about fire at BP and noted that "[BP] might be able to deliver us bbls"); Pltfs. Ex. 45 (Chevron discussed inventory when explaining an error in its delivery to Phillips 66); Pltfs. Ex. 78 (Shell trader told other traders that he was talking to Phillips 66 about one of their imports and the possibility of selling them a blending component).

Regarding the nature of the communications, the Court considers whether the information shared is the kind reasonably shared in the context of legitimate business interactions. *Citric Acid*, 191 F.3d at 1094; *Musical Instruments*, 798 F.3d at 1194. Here, most of the information relates to the timing and nature of refinery maintenance, although there are also some discussions regarding imports, exports, and the state of the market. *See* Pltfs. Exs. 6–12, 35, 40–50. These are the types of information that are relevant to a trader's need to buy or sell on the spot market. In fact, many of the communications submitted by Plaintiffs demonstrate that traders used the information they gained from traders at other refineries for just that purpose—to help them locate buying and selling opportunities. *See, e.g.*, Pltfs. Ex. 19 (BP noted Exxon's supply issues in context of potentially being able to sell to Exxon); Pltfs. Ex 20 (Chevron noted Tesoro's storage issues in context of potential

49

deal with Tesoro); Pltfs. Ex. 40 (Chevron internally discussed Exxon's delayed maintenance in context of timing its delivery to Exxon).

With respect to the six Defendants aside from BP and Phillips 66, the context and content of the trader communications in the record renders the exchanges as consistent with conspiracy (or less so) as with customers and suppliers exchanging useful information in the context of present and potential business transactions. *See* Pltfs. Exs. 10–11, 19–20, 35, 39, 41–44, 46–47, 65, 169. Plaintiffs emphasize that an inference of conspiracy is created by the fact that traders shared refinery information not strictly necessary to transact purchases. *See* Dkt. 809, 43:4–44:4. In this buyer-supplier context, however, the evidence supports the inference that traders had legitimate business reasons to share refinery-related information while trading. For example, a trader might share information that its refinery will be down for maintenance in order to purchase product or gain information about who might be able to sell. Traders also have a self-interested reason to share their own information so that they will receive valuable information in return—information that will help them locate either supply or parties seeking to buy. While such extensive exchanges of refinery maintenance and other supply information could have been exchanged for conspiratorial purposes, the evidence that Plaintiffs point to does not tend to rule out the possibility that Defendants shared this information for the self-interested motives set forth above.

As a whole, therefore, the exchanges of information in the record do not permit an inference of conspiracy with respect to most Defendants. Defendants' traders are low-level employees that regularly exchanged information in the course of their job duties, but there is not sufficient evidence that traders reported information up the chain-of command. *See* Pltfs. Exs. 35, 65; Opposition at 16. Moreover, these exchanges are not linked to other

50

questionable events, occurred in the context of plausibly legitimate customer-supplier relationships, and did not necessarily consist of confidential information. In light of these factors and based on a thorough analysis of the evidence in the record, the Court finds that Plaintiffs' evidence of information exchanges is not sufficient to permit a finding of conspiracy with respect to Chevron, Shell, Valero, Exxon, Tesoro, and Alon.

The Court also concludes that the above evidence of information exchanges is sufficient to permit an inference of conspiracy with respect to BP and Phillips 66. The evidence concerning BP's and Phillips 66's exchanges reflects that their traders both shared potentially confidential information and passed information up the chain-of-command to people who made production decisions. *See, e.g.*, Pltfs. Exs. 8, 64, 75, 82–84; J. Yomtoob Declaration ¶ 25; L. Lockhart Declaration ¶ 47. BP's and Phillips 66's traders testified that they shared information up the chain-of-command for the self-interested reason of enabling their refineries to better compete in the market. *See id.* From this evidence, however, a reasonable juror could infer that BP's and Phillips 66's traders shared information based on the understanding that each would use the information shared outside of trading. *See, e.g.*, Pltfs. Exs. 8, 46, 48. Accordingly, the Court finds that the nature of the communications between BP's and Phillips 66's traders, coupled with their admissions that they reported information up the chain-of-command, is more consistent with conspiracy than with independent action—or, at least, that a reasonable juror could conclude so.

*3. Supply Restrictions: Running Refineries Below Capacity*

Plaintiffs argue that Defendants colluded to keep gas supply low in California to drive supracompetitive prices and create conditions that enabled price spikes. Plaintiffs contend that Defendants restricted supply against self-interest in three main ways: by

51

15cv1749-JO-AGS and 18cv1374-JO-AGS

limiting production of CARBOB, discouraging and rerouting imports, and exporting gas when it would have been more profitable to sell in-state. *See* Opposition at 26–37.

In support of this plus factor, Plaintiffs point to Defendants' increased CARBOB production after the 2015 Exxon explosion as proof that Defendants could have produced more CARBOB prior to that point.[29] *See* Opposition at 26; Pltfs. Exs. 66–67. They do not, however, offer any proof regarding optimal CARBOB production levels nor whether any Defendant's decision to produce less than that amount was not profit maximizing, and therefore, against self-interest. Instead, Plaintiffs point to trader communications which, they claim, demonstrate that Defendants shared information for the purpose of cooperatively reducing supply. *See* Opposition at 26–34.

To meet their Step One burden, Defendants explain that each refiner independently set production levels to maximize its profit. Defendants explain that their refineries produce primarily CARBOB but also a variety of other products, such as jet fuel, diesel, and non-CARBOB gasoline. *See, e.g.*, J. Harris Declaration ¶ 7.[30] Through detailed planning processes, each Defendant decided how much of its refinery capacity to devote to producing CARBOB versus other products to maximize profit levels. *See, e.g.*, K. Archambault Declaration ¶¶ 8, 10, 15–21, 27; N. Weinberg-Lynn Declaration ¶¶ 10–14.[31] These decisions factored in considerations such as the relative demand levels for CARBOB compared to their other products and the relative costs of producing each type of product.

---

[29] Plaintiffs also point to an email by a Chevron employee stating that he expected production levels at Exxon's refinery to increase after the refiner was sold to a third party. *See* Pltfs. Ex. 69.

[30] *See also* K. Archambault Declaration ¶ 15; N. Weinberg-Lynn Declaration ¶¶ 7, 10; M. Bodziak Declaration ¶ 7; R. Sharum Declaration ¶ 5; P. Brooks Declaration ¶¶ 13–14; C. Dickson Declaration ¶ 16.

[31] *See also* M. Bodziak Declaration ¶¶ 8–10; R. Sharum Declaration ¶ 5; J. Harris Declaration ¶¶ 7–13; P. Brooks Declaration ¶¶ 13–23; C. Dickson Declaration ¶¶ 14–21.

52

1   *See, e.g.*, K. Archambault Declaration ¶¶ 8, 10, 15–21, 27; N. Weinberg-Lynn Declaration

2   ¶¶ 10–14.[32]  When prices for CARBOB rose, such as following the Exxon explosion,

3   Defendants produced more CARBOB relative to other products because it was profitable

4   to do so. *See* K. Archambault Declaration ¶ 38; H. Henderlite Declaration ¶¶ 29–32.[33]

5        Defendants further explain that their inventory decisions needed to factor in the

6   financial costs and logistical constraints of maintaining inventories. From a financial

7   standpoint, Defendants explain that they had little incentive to hold inventory in storage

8   because it was costly and gas inventories had limited life spans and declining values. *See,*

9   *e.g.*, J. Harris Declaration ¶¶ 17–19; C. Yates Declaration ¶ 35; N. Weinberg-Lynn

10   Declaration ¶¶ 15–16. From a logistical standpoint, Defendants explain that refineries

11   stored a variety of raw materials and finished products, each of which required its own

12   storage tank. The fact that refineries only had a finite number of these storage tanks

13   necessarily limited how many tanks could be dedicated to CARBOB. *See, e.g.*, N.

14   Weinberg-Lynn Declaration ¶¶ 15–16; P. Brooks Declaration ¶¶ 38–40; C. Dickson

15   Declaration ¶¶ 11–12. In light of these financial and logistical constraints, certain

16   Defendants state that they preferred to cover unexpected shortages through exchange

17   agreements or purchases on the spot market, rather than building up inventories. *See* J.

---

22
23   [32] *See also* M. Bodziak Declaration ¶¶ 8–10; R. Sharum Declaration ¶ 5; J. Harris Declaration ¶¶ 7–13; P. Brooks Declaration ¶¶ 13–23; C. Dickson Declaration ¶¶ 14–21.

24   [33] *See also* S. Roveda Declaration ¶ 11; N. Weinberg-Lynn Declaration ¶¶ 32–33, 35; M. Bodziak Declaration ¶ 21; P. Brooks Declaration ¶¶ 22, 26; J.A. 733–38, Valero Exs. 1–2.

1   Harris Declaration ¶ 19; P. Brooks Declaration ¶ 33; K. Archambault Declaration ¶¶ 45,
2   70.

3       Based on the above, the Court finds that a reasonable juror could conclude
4   Defendants made CARBOB production decisions based on their own profit maximizing
5   calculus and logistical constraints rather than pursuant to a conspiracy to reduce supply.
6   Especially because exchange agreements and spot market trades acted as insurance against
7   short-term shortages, Defendants' decisions to produce profit maximizing amounts of
8   CARBOB while maintaining low inventories to reduce costs could have been driven by
9   plausible and legitimate business objectives.   The Court therefore concludes that
10  Defendants have met their Step One burden with regard to these allegations.

11      At Step Two of its analysis, the Court examines whether Plaintiffs offer any evidence
12  that tends to exclude the possibility that Defendants acted independently and in their own
13  self-interest in setting CARBOB production levels.   Plaintiffs' raw assertion that
14  Defendants could have and, therefore, should have produced more CARBOB is not a
15  sufficient basis for the Court to conclude that Defendants acted against self-interest.
16  Antitrust law does not compel Defendants to produce the maximum amount of CARBOB
17  possible; it only requires that Defendants' production decisions be made independently for
18  legitimate business reasons.  At the least, information about the comparative costs and
19  profitability of producing more CARBOB versus other products would be necessary to
20  evaluate whether foregoing additional CARBOB production was not in Defendants'
21  financial self-interest. Plaintiffs submit no proof that any Defendant's production or

22
23
24
25                                        54
26                                                  15cv1749-JO-AGS and 18cv1374-JO-AGS
27
28

inventory decisions were not profit maximizing given demand, costs, and logistical constraints.[34] *See generally* Opposition.

Instead of offering evidence about the economics of Defendants' CARBOB supply decisions, Plaintiffs instead point to communications between Defendants' traders as circumstantial evidence that the companies colluded to depress supply and shared confidential information to implement that scheme. Opposition at 27–37. Because Plaintiffs offer largely overlapping examples of trader communications as circumstantial evidence regarding Defendants' other purported efforts to restrict supply, the Court considers all of this evidence together below.

After reviewing the communications submitted by Plaintiffs as "plus factor" evidence of an agreement to "strangle" supply, *see id.*, the Court finds that the trader communications generally fall into two categories: (1) communications in which traders from different companies generally expressed a preference for low-supply/high-price conditions while speculating about how third-party actions might impact the market; and (2) communications, which only occurred between BP and Phillips 66, constituting an actual exchange of import, export, or production information between traders from different companies. The Court examines each of these categories of communications in turn for their tendency to exclude the possibility that Defendants acted independently in making supply decisions.

The first category features emails between traders, speculating regarding competitors' actions and bemoaning actions that could bloat supply and lower prices. For

---

[34] Plaintiffs do not appear to argue that Defendants' refineries sat idle or that Defendants forewent production opportunities. Rather, Plaintiffs appear to argue that, to the extent Defendants produced other products, they should have produced CARBOB instead. *See* Opposition at 16.

55

example, one BP trader and one Phillips 66 trader made various comments of this nature to one another over the years, including that "[i]f the refineries don't cut runs it could really get bad"; "[I] think we will structurally see more exports going forward"; "hopefully some of the current PMI exports will show up in the next week stats"; and, "[d]ec could be a S_ _ _ storm if exports don't clean us up." *See* Pltfs. Ex. 8. One internal BP email among its traders noted "chatter" that "AOT" and Shell were importing CARBOB to the West Coast and stated that "everyone is becoming very cognizant that high prices will attract oil and has slowed down their buying as a result." Pltfs. Ex. 48 at BPWC-PG-00039839; *see also* Pltfs. Ex. 8 at rows 852–53 (message between BP and Phillips 66 also acknowledging that traders may slow down buying to discourage imports.) Another internal BP email among its traders noted that Valero was importing a cargo to LA and that "Noble" rerouted a cargo headed to the Pacific Northwest. *See* Pltfs. Ex. 50 at BPWC-PG-00023780; *see also* Pltfs. Ex. 8 at rows 8329–9520; Pltfs. Ex. 83 (excerpted messages lamenting supply conditions without any context or evidence of a reply).

Some of these trader messages are written in unguarded and colorful language but, similarly, do no more than show competitors scrutinizing one other's actions or expressing displeasure at high supply conditions. In one set of emails, traders referred to market conditions that attracted imports as the "bug light" being on, presumably referring to the fact that "bug lights" attract undesirable nuisances. Pltfs. Ex. 11 at row 134864; Pltfs. Ex. 48 at BPWC-PG-00039827; Pltfs. Exs. 79–82. In one of these conversations, BP and Phillips 66 traders—apparently discussing what would happen if imports arrived—stated that "everyone will poop in our back yard, kill our market and leave us the dingle berries." Pltfs. Ex. 8 at 592–95. In another email, an unidentified person asked Phillips 66's trader

56

1  if he had any alkylate needs, and Phillips 66's trader responded, "no and don't bring it the
2  west coast." Pltfs. Ex. 84.

3       The second category of communications, the ones which demonstrate an exchange
4  of potentially confidential import/export information between traders, all occurred between
5  BP and Phillips 66 and are discussed above. *See supra* Section V.D.2. Because
6  communications of this kind only occurred between these two traders at these two
7  refineries, they do not create an inference of conspiracy for all eight Defendants. They
8  may, however, create an inference of conspiracy as to BP and Phillips 66, which the Court
9  discusses separately *supra*.

10       Together, these communications and internal documents paint a picture of a small
11  group of competitors who go out of their way to obtain information about each other's
12  actions to inform their own. *See Krehl*, 664 F.2d at 1357 ("the mere exchange of price
13  information, without more, is not per se illegal"). They also portray Defendants'
14  hyperawareness of how competitors' actions impact supply and price conditions for the
15  whole market. The microcosm that these communications illustrate is consistent with
16  Plaintiffs' characterization of the California gas market as highly concentrated and
17  interdependent. *See* McCullough Report ¶¶ 20, 66; Defs. Ex. 8 at 44:15–22. Such
18  conscious parallelism in a market of this nature is not illegal, *see supra* Section V.C, and,
19  without more, does not give rise to an inference of conspiracy.

20       The Court next considers whether the fact that traders expressed preferences for
21  lower-supply and higher-price conditions constitutes the "more" that tends to exclude the
22  possibility that Defendants acted independently in making supply decisions. The Court
23  finds that these trader discussions may establish that the eight Defendants, in general, had
24  a motive to collude to maintain low-supply conditions. Motive alone, however, does not

25

26

27

28

57

permit an inference of agreement among the Defendants. *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 51 (7th Cir. 1992) (quoting 6 Phillip E. Areeda, *Antitrust Law* ¶ 1411 (1986)); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) ("[a]s one court put it, if 'a motive to achieve higher prices' were sufficient, every company in every industry could be accused of conspiracy") (quoting *Baby Food*, 166 F.3d at 133). With the exception of BP and Phillips 66, these communications do no more than illustrate that Defendants watched each other closely and desired lower supply conditions to generate higher profits.

With regard to the six Defendants not including BP and Phillips 66, the Court concludes Plaintiffs' proffered evidence does not tend to exclude the possibility of independent decision making with regard to gasoline production and supply. To summarize, Plaintiffs offer evidence that these six Defendants, (1) had the ability to increase CARBOB supply but did not, (2) shared a desire to maintain lower-supply market conditions, and (3) gathered information and closely monitored each other's market behaviors. From this, a reasonable juror could infer conspiracy but could equally infer that the six Defendants independently made profit maximizing production decisions while watching each other closely to inform those decisions. While it is illegal to act pursuant to a conspiracy, it is not illegal to act pursuant to oligopolistic self-interest. *Theatre Enterprises*, 346 U.S. at 540–41 ("this Court has never held that proof of parallel business behavior conclusively establishes agreement" without more). With regard to BP and Phillips 66, the additional evidence that their traders shared confidential information and then passed that information to their production departments tends to exclude the possibility that these two refiners made independent decisions about gasoline production. For the remaining six refiners, however, the above evidence submitted by Plaintiffs does

1    not tend to exclude the possibility of independent action and, thus, is insufficient to create

2    an inference of conspiracy.

3         *4. Supply Restrictions by Preventing Imports*

4         Plaintiffs also contend that Defendants' actions to prevent gas imports into

5    California is "plus factor" evidence of an eight-Defendant conspiracy to fix gas prices in

6    California. *See* Opposition at 28–33. In addition to the trader conversations discussed

7    above, Plaintiffs point to the following specific instances where Defendants rerouted

8    imports originally intended for the West Coast as circumstantial evidence of conspiracy:

9    (1) Chevron diverted two cargoes of unidentified product in August 2014, (Pltfs. Ex. 85);

10   (2) Valero "cancelled another 80mb barge of A1 to LA" in 2014 or 2015,[35] (Pltfs. Ex. 86

11   at VMSC_003193); (3) Shell diverted a cargo originally intended for Los Angeles to New

12   York sometime in late 2015, or early 2016,[36] (Pltfs. Ex. 87 at p. 602; Pltfs. Ex. 88 at

13   SOPUS_PGI_00223181); and (4) BP diverted a cargo originally intended for California to

14   New York in January 2016, (J.A. 915–16, BP Ex. 6).

15         To meet their Step One burden of providing plausible and justifiable reasons for their

16   actions, Defendants explain that importing gas into California is a slow and costly

17   proposition and by the time imports actually arrive, market conditions may have changed

18   such that importing is no longer profitable. In general, Defendants scheduled few imports

19   because they were often logistically and economically unfeasible. *See, e.g.*, K.

20

21

22

23       [35] Plaintiffs do not submit any evidence regarding what "A1" is or the dates of these cancellations, although the document appears to be dated in March 2014 or 2015.

24       [36] Plaintiffs do not identify the date of this diversion, although the documents appear to indicate

25   that it occurred sometime in late 2015 or early 2016.

                                  59

26                                   15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

Archambault Declaration ¶¶ 22–26, 34; H. Henderlite Declaration ¶ 23.[37]   Because California is a "gasoline island," imports could only be transported by sea. *See id.*  And due to regulatory requirements, domestic imports could only be delivered by the limited number of available Jones Act-compliant vessels (U.S.-assembled, -owned, and -crewed) that generally cost $10–20 million per vessel, per year. *See, e.g.*, K. Archambault Declaration ¶¶ 22–23. Defendants Chevron, Valero, and BP also explain that the reroutes Plaintiffs highlight were necessary because by the time the import arrived weeks later, price margins had decreased, and Defendants determined that selling elsewhere would be more profitable. *See, e.g.*, C. Yates Declaration ¶¶ 38–41; P. Brooks Declaration ¶ 47–48, 51–55, 57–59; *see also* Joint MSJ at 32; H. Henderlite Declaration ¶¶ 23–27; J.A. 915–916, BP Ex. 6.[38]   The Court notes that some of Plaintiffs' evidence supports, rather than

---

[37] *See also* C. Yates Declaration ¶¶ 38–41; J.A. 30–32, Chevron Ex. 3; R. Sharum Declaration ¶¶ 15–17; L. Lockhart Declaration ¶ 8; P. Brooks Declaration ¶¶ 47–48, 54; C. Dickson Declaration ¶¶ 52–56; M. Perez Declaration ¶¶ 6–8.

[38] BP also submitted evidence that its alleged reroute in January 2016 was in fact a complex transaction with Valero that benefitted BP. *See* Joint MSJ at 32; H. Henderlite Declaration ¶¶ 24–27; J.A. 915–916, BP Ex. 6. Valero had a cargo shipping from the United Kingdom to its Bay Area refinery but realized that it could not get its cargo into its harbor because the cargo was too heavy to get through the "Pinole Shoals," a channel that had to be crossed to reach Valero's Bay Area refinery. *See id.*  At the same time, BP had its own cargo coming to its Los Angeles refinery but realized that the cargo was unlikely to arrive in time to be used there because it was stuck in the Pacific Northwest due to weather. *See id.*  Thus, BP sold its cargo to Valero since it was not going to reach BP's Los Angeles refinery in time and because BP was already at storage capacity at its Bay Area refinery and could not use the gas there. *See id.*  BP also purchased Valero's shipment coming from the United Kingdom. *See id.*  BP ultimately determined that selling Valero's cargo into New York was more profitable than bringing it to the West Coast—at that time, Valero's shipment was near Jamaica and thus was "over 1,000 nautical miles closer to the East Coast" than to the West Coast, and East Coast prices at that time were better than what West Coast prices were predicted to be by the time Valero's cargo would have arrived at one of BP's West Coast refineries. *See id.*

undermines, Defendants' explanation that imports were rerouted because market conditions changed while shipments were en route. For example, Plaintiffs submit an internal Shell presentation to prove that Shell's reroute occurred, but the presentation itself explains that, "[w]ith the LA market weakening, STUSCO was able to divert the cargo to NYH and take $1.5mln of value on the cargo for the West Coast." *See* Pltfs. Ex. 87 at p. 602. The Court finds that based on the above, Defendants have offered plausible and legitimate explanations consistent with the limitations of a "gasoline island" where imports generally cannot arrive quickly, and gas prices are prone to shifts such that prices may be different by the time an import arrives. *See* Defs. Ex. 2; McCullough Report ¶ 37–39.

On the whole, the evidence demonstrates that Defendants did reroute imports in the four instances identified by Plaintiffs (*see* Pltfs. Exs. 85, 86–89),[39] but Plaintiffs do not demonstrate that these reroutes were common or against Defendants' self-interest. Plaintiffs argue that the fact that these reroutes occurred is sufficient to support a reasonable inference of conspiracy because it does not make economic sense to sell CARBOB in a lower-priced market than California. *See* Opposition at 32–33. Plaintiffs, however, do not point to any evidence that selling in California would have been more profitable for the handful of rerouted imports they identify.

---

[39] Defendants concede on summary judgment that BP rerouted a cargo in January 2016 as described above, *see supra* note 38, and thus, the existence of this reroute is not disputed. In opposing summary judgment, Plaintiffs point to Defendants' admission that the reroute occurred but do not point to evidence in response to Defendants' Step One explanation; instead, Plaintiffs merely state, without supporting evidence, that: "[this was] obviously against BP's self-interest" because the East Coast is a "lower priced market." Opposition at 33.

61

With regard to the six Defendants other than BP and Phillips 66, the Court concludes Plaintiffs' proffered evidence regarding import decisions does not tend to exclude the possibility of independent decision making. To summarize, Plaintiffs offer (1) four instances of rerouted imports across a seven-year period from a pool of eight Defendants; (2) no evidence that any of these reroutes were against economic interest; and (3) trader communications discussing imports and expressing a preference for low-supply conditions. As discussed above, the communications that tend to show that Defendants closely monitored each other's actions and generally preferred low-supply conditions do not, without more, support a reasonable inference of conspiracy. Considered together with the infrequent nature of rerouted imports and the lack of any evidence suggesting these reroutes were not profitable, a reasonable factfinder could infer that Defendants made independent decisions to disfavor imports in general and reroute imports when it was profitable to do so. Plaintiffs' evidence, therefore, does not tend to exclude the possibility that Defendants acted independently for self-interested reasons.

5. *Supply Restrictions Through Exports*

Plaintiffs also argue that Defendants exported gas out of California against self-interest when it would have been more profitable to sell in-state. They contend that these actions provide further "plus factor" evidence that the eight Defendants in this case conspired to fix gas prices in California. *See* Opposition at 33–37.

To support these arguments, Plaintiffs submit three categories of evidence. First, Plaintiffs contend that Defendants increased their exports over the class period even though their production capacities did not correspondingly increase. *See id.* at 34; Pltfs. Ex. 200. Second, Plaintiffs point to certain Defendants who dual certified their gas to meet both CARBOB specifications and other state requirements. *See* Pltfs. Exs. 94, 97–98; *see also*

62

1  Opposition at 34–35. Third, Plaintiffs identify two specific exports that they claim were
2  against self-interest: (1) Phillips 66 exported 5,003 gallons of CARBOB from California
3  to Nevada in 2017, (Pltfs. Ex. 96 at 183:17–25 at p. 602); and (2) Tesoro began exporting
4  gas to Mexico in 2017, (Opposition at 37).

5       To meet their burden at Step One, Defendants explain that they independently made
6  necessary, profit maximizing business decisions to export non-CARBOB and to dual
7  certify gas. With respect to exports of non-CARBOB, Defendants start by explaining that
8  manufacturing CARBOB necessarily creates byproducts that cannot be blended into
9  CARBOB and thus cannot be sold in California. *See, e.g.*, C. Yates Declaration ¶ 46.[40]
10 Defendants therefore sold all product that did not meet CARBOB specifications outside of
11 California to make a profit from it. *See id.*

12      In addition to exporting product that could not be sold in California, certain
13 Defendants also utilized their California refineries to meet supply obligations in nearby
14 geographies (*e.g.*, Arizona) that were most conveniently supplied from California. *See,*
15 *e.g.*, C. Yates Declaration ¶¶ 43–48.[41] Defendants explained that they did so to meet supply
16 obligations in nearby states like Arizona. *See* P. Brooks Declaration ¶ 24–25, 55; Pltfs. Ex.
17 94; T.A., M. Pais Declaration ¶ 13. For instance, Valero had contractual obligations to sell
18 gas in Arizona, which requires "AZRBOB." *See* P. Brooks Declaration ¶¶ 24, 55. Because
19 Arizona is connected by pipeline to both California and Texas, Valero usually supplied
20 Arizona through its Texas refinery but supplemented from their California refinery when

---

23 [40] *See also* N. Weinberg-Lynn Declaration ¶¶ 18–20; R. Sharum Declaration ¶¶ 10–12, 14; J.
Harris Declaration ¶¶ 26–27; J. Marino Declaration ¶ 3; P. Brooks Declaration ¶¶ 61–63.

24 [41] *See also* P. Brooks Declaration ¶¶ 24–25, 63; J.A. 805, Valero Ex. 11.

63

its Texas refinery could not supply enough product to meet Valero's contractual commitments in Arizona. *See id.* Dual certifying its gas as CARBOB and AZRBOB enabled this flexibility. *See id.*

Finally, with respect to specific exports, Phillips 66 submitted evidence that it exported 5,003 gallons of CARBOB to its Nevada site in 2017—"an extraordinarily unusual occurrence" likely following a supply disruption—which "constituted less than ½ of 1 percent of one day's production." R. Sharum Declaration ¶ 13. As to Tesoro, it explained that exports to Mexico in 2017 did not impact its supply commitments in California and were part of a long-term strategy to develop in a market with growing demand when California demand was forecasted to decline. *See* T.A. 348–352.

The evidence discussed above satisfies Defendants' Step One burden to show that Defendants exported gas consistent with proper business practice. For one, a reasonable juror could find that Defendants justifiably exported non-CARBOB that they could not sell in California. In addition, a reasonable juror could find that the practice of dual certification is consistent with competition. Dual certification produces a more fungible form of gas, which would have allowed BP and Valero flexibility as market needs arose. For instance, it would be reasonable for Valero to dual certify gas so that it could supply Arizona from California when its Texas refinery could not meet supply needs. Finally, based on Phillips 66's and Tesoro's explanations regarding their exports of CARBOB, a reasonable juror could find that these specific exports were justified by proper business practice. Phillips 66 explained that its one-time export was *de minimis* and justified by an unusual supply need. Tesoro explained that its 2017 exports to Mexico were performed for the purpose of establishing market presence in Mexico according to its long-term business strategy. Because Defendants meet their burden at Step One, the Court turns to

64

whether Plaintiffs meet their Step Two burden to identify evidence that tends to exclude the possibility that Defendants exported gas independently.

Plaintiffs attempt to meet their Step Two burden to show that Defendants' exports were inconsistent with unilateral conduct by first pointing to a general increase in export volumes between 2000 and 2020. Plaintiffs point to government data reflecting yearly "finished gasoline" exports from the West Coast. *See* Pltfs. Ex. 200. This aggregated data, however, does not contain any information on (1) the extent to which the state of California accounts for those exports, (2) the extent to which Defendants specifically account for those exports, or (3) how much of those exports were CARBOB versus non-CARBOB. *See id.* Plaintiffs infer from this overall trend that some of Defendants' exports were unnecessary, but this generalized evidence does not shed light on whether the eight Defendants in question engaged in unnecessary exports or whether any of their exports were against their financial self-interest. Plaintiffs also reiterate that certain Defendants dual certified gas and argue that this practice was unprofitable but offer no evidence to support that argument. *See* Opposition at 34–35.

Next, Plaintiffs highlight two specific instances of exports against self-interest by Phillips 66 and Tesoro. First, Plaintiffs point to a Phillips 66 export from California to Nevada in 2017 as evidence showing that Defendants "routinely dumped" CARBOB outside of California. *See* Opposition at 34–35. The only evidence that Plaintiffs point to regarding Phillips 66's 5,003-gallon CARBOB export to Nevada in 2017 is deposition testimony that merely confirms the existence of that export. *See* Pltfs. Ex. 96 at 183:17–25. In the face of Phillips 66's explanation that this was a one-time export of a *de minimis* amount of CARBOB, representing less than "½ of 1 percent of one day's production," the mere fact that the export occurred does not tend to exclude the possibility that Philips 66

65

independently made this export to cover its own supply shortage, rather than pursuant to a conspiracy. *See* R. Sharum Declaration ¶ 13. As to Tesoro, Plaintiffs do not specify whether those exports were CARBOB versus non-CARBOB, nor do they submit any evidence to support the argument that those exports were unprofitable.[42] Aside from the bald assertion that gas is cheaper in Mexico, Plaintiffs have submitted no evidence that Tesoro's exports were not profitable, either in the short term or long term. Instead, Plaintiffs submit two documents: (1) a Chevron document noting that certain exports to Mexico would be uneconomic in 2014; and (2) data showing that California gas prices in late 2020 and early 2021 were above $3.00. *See* Pltfs. Exs. 100, 106. Whether exports to Mexico would have been uneconomic for Chevron in 2014 has little bearing on whether such exports would be equally uneconomic for Tesoro in 2017, especially given Tesoro's long-term business plan to expand to that geographic market. *See* Pltfs. Ex. 100.[43] Similarly, Plaintiffs' data that gas was selling for $3.00 per gallon in California during 2020 and 2021 has little bearing on the overall lack of profitability for Tesoro's long-term growth plan. *See* Pltfs. Ex. 106. Without more concrete evidence, a factfinder should not second guess Tesoro's long-term business strategy "where the evidence concerning the rationality of the challenged activities might be subject to reasonable dispute." *Citric Acid*, 191 F.3d at 1101. Therefore, the Court finds that Plaintiffs have not pointed to evidence of exports that tends to exclude the possibility of independent conduct.

---

[42] Despite citing to certain exhibits, Plaintiffs fail to attach those exhibits to the record, which are marked "purposefully omitted" and thus are not considered by the Court. *See* Pltfs. Exs. 101–04.

[43] This Chevron document appears to discuss exports to Mexico being uneconomic, at the time, because of a variety of factors, including production costs, Chevron-specific refinery considerations, and other then-present market factors.

66

1

### 6. Cooperation After the 2015 Exxon Explosion

2     Plaintiffs also point to Defendants' behavior following an explosion at the Exxon
3 refinery in 2015 as indicative of improper cooperation among supposed competitors. *See*
4 Opposition at 22–24. Plaintiffs allege that instead of competing for Exxon's market share
5 when its refinery was down, as one would expect competitors to do, Defendants sold gas
6 to Exxon to help it cover its supply shortage. *See id.* at 23. Plaintiffs also argue that when
7 Defendants sold gas to Exxon, they should have done so at higher prices to take maximal
8 advantage of Exxon's crisis. *See id.* at 22–23. Plaintiffs claim that these actions were *quid*
9 *pro quo* favors in furtherance of the conspiracy. *See id.*

10     To satisfy their *Citric Acid* Step One burden, Defendants explain their responses to
11 the Exxon explosion in 2015 as follows. Defendants offer evidence showing that each
12 refinery promptly responded to the explosion by maximizing in-state supply to take
13 advantage of the overall shortage in the market and attendant price increases. *See, e.g.*, K.
14 Archambault Declaration ¶¶ 38–40; H. Henderlite Declaration ¶¶ 29–32.[44] Defendants
15 Shell, Tesoro, Chevron, Valero, and Phillips 66 also explain that they sold gas to Exxon at
16 prevailing market rates rather than trying to circumvent the long-term contracts Exxon
17 maintained station-by-station with its retailers. *See, e.g.*, C. Dickson Decl. ¶¶ 24–25; S.
18 Roveda Declaration ¶ 13; R. Sharum Declaration ¶¶ 31–33; J.A. 339–53, Exxon Ex. 1.[45]
19 Defendants explain that pursuing Exxon's retail customers would have entailed convincing
20 each local retailer to break its Exxon contract, and thus selling gas to Exxon directly at

21

22

---

23 [44] *See also* S. Roveda Declaration ¶¶ 10–12; N. Weinberg-Lynn Declaration ¶¶ 32–33; M. Bodziak
Declaration ¶ 21; P. Brooks Declaration ¶¶ 26, 46; J.A. 733–38, Valero Exs. 1–2.

24 [45] *See also* M. Perez Declaration ¶¶ 13–16; L. Lockhart Declaration ¶ 30; P. Brooks Declaration
¶ 90; E. Pestano Declaration ¶¶ 42–45.

25

26

27

28

1    market rates was the more attractive and profitable alternative. *See id.*; s*ee also* Joint MSJ

2    at 44. Because it is plausible that pursuing individual negotiations with Exxon's retail

3    stations could be costly and time consuming, the Court finds that Defendants have

4    produced a legitimate reason for preferring to sell gas to Exxon directly instead.

5    Accordingly, Defendants meet their Step One burden.

6         At Step Two, Plaintiffs respond that it nonetheless would have been better for

7    Defendants to pursue Exxon's retail market share or extract higher prices from Exxon. *See*

8    Opposition at 22–24. The bare contention that pursuing Exxon's market share was the

9    better economic course does not create a genuine dispute for the purpose of summary

10   judgment. Plaintiffs do not point to any specific evidence which would allow an inference

11   that sales were made to Exxon at below-market prices or that such sales were favors to

12   Exxon rather than profit maximizing decisions. Moreover, based on evidence that multiple

13   refiners sold gas to Exxon, the inference that no one Defendant had the leverage to extract

14   higher than market-rate prices from Exxon is as plausible as the inference that Defendants

15   conspired to help Exxon against self-interest. Plaintiffs point to one email on February 24,

16   2015, from a Chevron employee in an unidentified role, questioning why Chevron would

17   sell alkylate, a gasoline blending component, to Exxon "from a competitive standpoint."

18   *See* Pltfs. Ex. 187. But without any evidence in the record regarding the economics of this

19   sale, one employee questioning a sale cannot support an inference that this was an

20   unprofitable transaction, much less a collusive action pursuant to a conspiracy. The

21   evidence in the record concerning Defendants' reactions to the Exxon explosion therefore

22   does not suggest behavior that tends to exclude the possibility of independent conduct, and

23   thus, does not permit a reasonable inference of conspiracy.

24   ///

25                                          68

27

28

1

### 7. *Market Manipulation Through a "Gentleman's Agreement"*

2       Plaintiffs allege that a "gentleman's agreement" between West Coast traders to limit

3 trading hours provides further circumstantial evidence of collusion between Defendants.

4 *See* Opposition at 49. In an email exchange in August 2014, the West Coast trading

5 community—consisting of refiners, brokers, and large purchasers—voted and agreed to

6 change the daily trading cut-off time from 3:30 p.m. Pacific Coast Time to 2:15 p.m. Pacific

7 Coast Time, thereby aligning trading hours with OPIS[46] reporting hours. *See id.*; *see also*

8 J.A. 583–86, Phillips Ex. 20. Plaintiffs state that the 2014 agreement to "institute arbitrary

9 trading hours" was intended to increase cooperation among Defendants and deter traders

10 in other parts of the world from participating in the market. *See* Opposition at 49.

11       Defendants explain that the proposal to move up the trading cut-off to 2:15 p.m. was

12 driven by a desire to (1) better facilitate pipeline scheduling, (2) match OPIS's cut-off time

13 so that transactions were more likely to be reported, and (3) accommodate industry

14 personnel in the Central time zone. *See, e.g.,* L. Lockhart Declaration ¶¶ 31–32.

15 Defendants also submit OPIS reports from 2014 that document these reasons and show that

16 27 entities participated in the vote. *See* McCullough Report ¶¶ 297–300 ("the vote was

17 dominated by independent traders as opposed to majors who own refineries on the West

18 Coast"); *see also* J.A. 562–76, Phillips Ex. 17; J.A. 583–86, Phillips Ex. 20. A reasonable

19 factfinder could infer from this evidence that Defendants agreed to the adjusted trading

20 hours for legitimate business reasons related to convenience and transparent price

21 reporting. Defendants therefore meet their burden at Step One.

22

23

24    [46] OPIS is a price-reporting agency for the petroleum fuel supply chain, including rack, spot, and retail prices. *See* Joint MSJ at 48. In the West Coast market, OPIS collects trading data and publicly reports average pricing information. *See* J.A. 562–76, Phillips Ex. 17.

25

69

26                                    15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

In response, Plaintiffs do not point to any specific evidence tending to show that the agreement was not legitimate, self-interested behavior. Plaintiffs acknowledge that the agreement "was supposedly meant to align trading hours with . . . OPIS" but argue that "[t]his informal agreement to institute arbitrary trading hours could act as a deterrent to traders in other parts of the world that may not operate at the hours identified." Opposition at 49. The same could be said about any market's trading hours. The possibility that trading hours could be inconvenient for unspecified actors "in other parts of the world" is not evidence and does not tend to rule out the possibility of independent action. Accordingly, the Court finds that the "gentleman's agreement" does not permit a reasonable inference of conspiracy.

### 8. *Market Manipulation Through Wash Trades*

Plaintiffs further contend that Defendants engaged in deceptive "wash trades" to create a false sense of demand and raise prices in the market. Opposition at 47–49. According to Plaintiffs' expert, a "wash trade" occurs when party 1 trades a quantity of product to party 2 and, around the same time, party 2 trades a similar quantity of the same product back to party 1, at the same price. *See* McCullough Report ¶¶ 401–06. Trading activity in the form of a "wash trade" has zero net economic effects for the trading parties but creates a falsely inflated sense of demand in the market. *See id.*; *see also* McCullough Report ¶ 403. To provide circumstantial evidence of an eight-Defendant conspiracy, Plaintiffs identify a handful of what they allege are wash trades performed by Chevron, Shell, and Valero. *See* Pltfs. Exs. 170, 176–70.

At Step One, Defendants offer explanations to demonstrate that the alleged "wash trades" were, in fact, legitimate transactions. *Citric Acid*, 191 F.3d at 1094. Each Defendant accused of executing a wash trade points to evidence showing that the trade in

70

1    question does not fit Plaintiffs' definition of a wash trade—that is, parties trading similar
2    quantities of gas, at similar prices and times, and without economic benefit.  First, Chevron
3    submits evidence that its alleged wash trades did not occur on the same day (and thus are
4    not similar in time), were executed by different brokerages (and thus were not direct trades
5    with other Defendants), and closed at different prices.  *See* R. Pluimer Declaration ¶ 11;
6    J.A. 92, Chevron Ex. 9.  Chevron argues that because these trades were not similar in time
7    or price and were not direct trades with other Defendants, they do not fit Plaintiffs'
8    allegations of two trades that cancel one another out.  Second, Shell submits evidence that
9    for each alleged wash trade, more than one of the following circumstances was present: the
10   trades were (1) for different products, (2) performed at different locations in a location-
11   based swap, (3) closed at different prices, (4) separately facilitated by unrelated brokers,
12   (5) performed at different times, (6) structurally distinct (*e.g.*, different delivery times), or
13   (7) one-way transactions, not trades.  *See* J.A. 164–81, Shell Exs. 7–10; J.A. 201–20, Shell
14   Exs. 13–17; J. Marino Declaration ¶¶ 6, 9–11, 13–14; S. Rodrick Declaration ¶¶ 7, 9; R.
15   Pluimer Declaration ¶ 11; J.A. 92, Chevron Ex. 9.  Third, Valero submits evidence that its
16   alleged wash trades were beneficial to Valero, carried economic risk, and were for
17   materially different products exchanged on different dates.  *See* P. Brooks Declaration ¶ 78;
18   J.A. 804–13, Valero Exs. 14–15.  Valero argues that this evidence shows that the trades
19   could not have cancelled one another out as Plaintiffs theorize.  The Court finds that
20   Defendants meet their burden at Step One to rebut Plaintiffs' evidence of wash trades with
21   evidence that would permit a reasonable juror to conclude that the trades in question were
22   not in fact illusory "wash trades" with no other benefit than manipulating public
23   perceptions in the market.

24
25                                              71
26
27
28

1   In opposing summary judgment at Step Two, Plaintiffs discuss only one set of
2   transactions between two Defendants (Chevron and Shell) as evidence tending to exclude
3   independent action. Plaintiffs' evidence shows that in 2015, a Chevron trader suggested in
4   an internal email that he would sell Chevron's "swaps" after his coworker was "in buying
5   for a couple of days." *See* Pltfs. Ex. 176. This trader testified at his deposition that he was
6   hoping that his coworker's buying "would push the mark - he would have the market
7   impact, and the market would possibly move up" so that prices would be higher by the time
8   he sold Chevron's "swaps." *See* Pltfs. Ex. 170 at 216:9–17; *see also* Pltfs. Ex. 176. In the
9   days after this communication, his coworker did in fact execute several transactions,
10  including two with Shell on April 20–21, 2015. *See* Pltfs. Ex. 177. Plaintiffs argue that
11  this evidence permits the inference that these transactions between Chevron and Shell on
12  April 20–21, 2015, were wash trades performed pursuant to a conspiracy.

13  Plaintiffs fail to meet their burden at Step Two because Plaintiffs' evidence does not
14  suggest any concerted action between companies, as opposed to within one company. 15
15  U.S.C. § 1; *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust
16  Litig.*, 28 F.4th 42, 48 (9th Cir. 2022) ("[o]nly concerted activity is actionable under
17  Section 1" of the Sherman Act). Even if Plaintiffs' evidence at Step Two permitted the
18  inference that this trader's coworker traded in the market for the sole purpose of raising
19  market prices to benefit that trader's later "swap" sales, it remains unclear how this would
20  allow for a plausible inference that Chevron and *Shell* entered into an unlawful agreement,
21  without more. Thus, the Court concludes that Plaintiffs have not met their Step Two burden
22  to point to specific evidence that tends to exclude the possibility of independent conduct.
23  ///
24  ///

25                                          72
26                                          15cv1749-JO-AGS and 18cv1374-JO-AGS
27
28

### 9. *Market Manipulation Through Selective Price Reporting*

Plaintiffs argue that their evidence demonstrates that traders at Chevron, Shell, Tesoro, and Phillips 66 selectively reported only higher-priced trades to OPIS to manipulate market prices. *See* Opposition at 45–47. OPIS is a third-party pricing agency that publishes market information, including average daily spot prices. *See* J.A. 562–76, Phillips Ex. 17; M. O'Neal Declaration ¶ 4; C. Dickson Declaration ¶ 59. OPIS collects a sample of transactions and publishes the high, low, and average prices in the Los Angeles and San Francisco markets. *See* J.A. 562–76, Phillips Ex. 17; L. Lockhart Declaration ¶¶ 12–13. Defendants priced their gas at the rack and Dealer Tankwagon, in part, on price indices such as OPIS.[47]

Plaintiffs and Defendants dispute whether there is any evidence in the record of selective reporting. At Step One, Defendants argue that Plaintiffs have failed to point to any evidence of selective reporting, and thus that there is no genuine dispute of material fact with respect to this plus factor. *See* Dkt. 719 ("Defendants' Joint Reply") at 24–25. At Step Two, Plaintiffs point to communications where traders asked brokers to report completed trades to OPIS and where traders questioned whether trades would be reported to OPIS. *See* Opposition at 45–47; *see also* Pltfs. Exs. 11, 76–77, 169, 171, 174. Accordingly, the Court turns to whether Plaintiffs' evidence is sufficient to create a genuine dispute of material fact on whether any Defendants engaged in selective reporting.

---

[47] *See, e.g.*, K. Archambault Declaration ¶¶ 59, 61, 63; M. O'Neal Declaration ¶ 4; J. Hodgson Declaration ¶¶ 11, 13–14, 19–20, 23, 27; D. Smith Declaration ¶ 3; P. Brooks Declaration ¶¶ 10, 91, 94; C. Dickson Declaration ¶¶ 27–29; T.A. 3, W. Eckard Declaration ¶¶ 10–11.

73

Examination of Plaintiffs' evidence shows that what Plaintiffs deem "selective reporting" does not allow for an inference of conspiracy. With respect to Shell and Chevron, the evidence, at most, shows that their traders *consistently* reported all trades. *See* Pltfs. Ex. 11 at line 61501 (Shell trader: "Every deal I do needs to go to opis"); Pltfs. Ex. 77 at 87:7–14 ("Q: In other words . . . you as the trader had your own requirement that each one of your deals be reported to OPIS in some fashion? A: I wanted my deals to be reported to OPIS, yes."); Pltfs. Ex. 171 (Chevron trader: "I would like that deal reported as normal"). The evidence with respect to Phillips 66 similarly falls short. Plaintiffs point to one document where a broker asked a Phillips 66 trader whether he should "report this to OPIS . . . or keep p and c," and the Phillips 66 trader replied, "report please." Pltfs. Ex. 174. A reasonable juror could not infer from the above conversations that Defendants worked together to selectively report OPIS trades.

The Court turns to the remaining evidence consisting of testimony from Tesoro's trader that he tried to hide certain trades from being reported. This trader testified that he would typically avoid trading through a broker when he was covering an unexpected shortfall, so that the broader market would not "see a buyer looking for 500,000 barrels of gasoline." *See* Pltfs. Ex. 76 at 222. This evidence that Tesoro's trader sought to keep certain information from the market when it did not benefit Tesoro may raise an inference of inappropriate conduct by Tesoro's trader. It does not, however, create an inference that he did so pursuant to an *agreement with other Defendants* rather than pursuant to what he deemed to be in Tesoro's unilateral interest. Because evidence that is equally consistent with conspiracy and independent conduct does not tend to exclude the possibility of independent conduct, Plaintiffs' evidence of selective reporting does not permit an inference of conspiracy.

74

10. *Market Manipulation Through False Public Statements*

Plaintiffs' complaints originally contended that Defendants publicly made false or misleading statements about refinery outages as part of an agreement to manipulate California gas prices. *See* Dkt. 76 at 18–20, 28–31 (detailing Defendants' "claimed reason[s]" for maintenance and alleging these reasons were false); *Bartlett*, Dkt. 44 at 10–11, 17–20 (same). On summary judgment, however, Plaintiffs appear to be pursuing a slightly different theory. In their opposition, Plaintiffs argue that market information reported by the media was "laughably incorrect," and that Defendants had "superior information" but made no efforts to correct inaccurate media reports. *See* Opposition at 20–21. Plaintiffs point to evidence like the following: In 2012, BP internally discussed an article reporting on a fire at BP's refinery, and one employee stated that the article was "off on several facts, which is good." *See* Pltfs. Ex. 54. In addition to evidence like the foregoing, Plaintiffs argue that Defendants "exploit[ed] this [information] gap" by "present[ing] information contrary to known facts." Opposition at 21. In support of this sweeping allegation, Plaintiffs submit just one instance where Valero publicly announced its maintenance schedule but may have concluded maintenance earlier than announced. *See* Pltfs. Ex. 56.

Defendants address their Step One burden by submitting evidence tending to show that the alleged misleading statements Plaintiffs pointed to in their complaints were accurate, boilerplate, and not misunderstood by the industry. Exxon submits evidence to show that its brief response to a media inquiry regarding its October 1, 2012 power outage was factually accurate. *See* Joint MSJ at 39–40; J. Kechkian Declaration ¶ 8; J.A. 393–96, Exxon Ex. 9. Chevron and Shell similarly submit evidence that the statements each made were factually accurate. *See* Joint MSJ at 40; C. Yates Declaration ¶¶ 25–28; G. Johnson

75

Declaration ¶¶ 4–10. Valero also argues that public statements about how long a refinery unit is estimated to be offline, made soon after an incident, are based on circumstances that are subject to change and often do change. *See* P. Brooks Declaration ¶ 102. Valero contends it is widely understood in the industry that such initial estimates are usually revised as additional facts become known, and thus no one is misled when refineries give initial maintenance estimates. *See id.* Defendants' evidence would allow a reasonable juror to find that Defendants issued these statements in good faith and consistent with typical business practices. Accordingly, Defendants meet their burden at Step One to offer plausible and justifiable reasons for their conduct.

Plaintiffs' evidence is insufficient to raise a reasonable inference of conspiracy because it does not tend to exclude the possibility that Defendants acted independently and justifiably with regard to their public statements. Plaintiffs point generally to incorrect news reports, but Plaintiffs neither argue nor offer evidence that Defendants played any role in supplying or proliferating the false information contained therein.[48] Further, Plaintiffs point to only one specific instance where a Defendant made an allegedly misleading public statement: documents establish that Valero said publicly its machinery "should be at planned rates by mid-August" 2012 but by August 8, internally noted that "we're looking at late this week/early next week." *See* Pltfs. Ex. 56. This evidence may suggest that Valero intentionally misled the public about the duration of its maintenance and concealed the fact that maintenance actually concluded a few days earlier

---

[48] To the extent that Plaintiffs are arguing that Defendants had an affirmative duty to correct news articles they played no role in creating, Plaintiffs have not articulated any legal theory under which Defendants would have such a duty, and the Court declines to locate one for them.

76

than publicly announced. *See id.* Given Valero's evidence that refinery maintenance estimates are subject to change, the above evidence could also support the inference that Valero publicly announced a good faith estimate of its maintenance, but that maintenance simply took less time than originally estimated. *See* P. Brooks Declaration ¶ 102. Given that the evidence submitted by Plaintiffs supports both inferences, it does not tend to exclude the possibility that Valero made a good-faith public announcement rather than intentionally deceived the public pursuant to a conspiracy. Accordingly, this plus factor does not support a reasonable inference of conspiracy.

### 11. The Evidence as a Whole

Having addressed each of the categories of circumstantial evidence offered by Plaintiffs in support of their conspiracy claim, the Court now considers the crucial question of whether the record, viewed as a whole, supports an inference of conspiracy. *Citric Acid*, 191 F.3d at 1106 (courts must consider "whether the evidence *considered as a whole* can support an inference of conspiracy") (emphasis in original). In doing so, the Court views the evidence in the light most favorable to Plaintiffs. *Matsushita*, 475 U.S. at 587–88. If the evidence produced by Plaintiffs does not "reasonably tend[ ] to prove that [Defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective," and does not "tend[ ] to exclude the possibility that [Defendants] were acting independently," then summary judgment must be entered against them. *Monsanto*, 465 U.S. at 764 (internal quotation marks and citation omitted).

Before examining the inferences permitted by the evidence, the Court starts with a summary of the circumstantial evidence that Plaintiffs have marshaled to prove the wide ranging, eight-Defendant conspiracy that they allege. With respect to Plaintiffs' arguments that Defendants manipulated public facing gas prices, Plaintiffs were not able to create a

77

triable issue of fact that Defendants selectively reported trades or conducted wash trades, and they point to only one purportedly false public statement by Valero which misstated the duration of maintenance. The Court is therefore largely left to consider Plaintiffs' arguments that Defendants acted to "strangle" supply in the following ways: (1) produced less than the maximum amount of CARBOB;[49] (2) maintained low inventories; (3) rerouted approximately four imports between eight Defendants over seven plus years; and (4) exported gas out of the state of California. *See, e.g.*, Pltfs. Exs. 66–67, 85–86, 89, 200. The Court will consider all of the foregoing actions against the backdrop of (1) communications showing that traders desired low-supply/high-price conditions; (2) trader communications sharing refinery information while buying and selling gas from one another; (3) collaboration among Defendants to cover each other's supply needs, as exemplified by exchange agreements and the refiners' reactions to the Exxon explosion; and (4) the undisputed fact that Defendants joined an agreement to limit West Coast trading hours.

In considering the entirety of Plaintiffs' evidence, the Court finds that it does not support a reasonable inference of the eight-Defendant conspiracy alleged by Plaintiffs. Absent from Plaintiffs' evidence that Defendants acted against self-interest to "strangle" supply is any proof that Defendants' actions were not profit maximizing or that they lowered supply despite market demand. In fact, the evidence suggests that Defendants increased supply in California as demand rose. *See, e.g.*, K. Archambault Declaration

---

[49] As noted at *supra* Section V.D.3, Plaintiffs' arguments in this regard are based on the argument that Defendants had the capacity to, and therefore should have, produced more CARBOB than they did during the class period. These arguments are unsupported by any evidence suggesting that it would have been profitable for Defendants to do so.

78

1  ¶¶ 38–40; H. Henderlite Declaration ¶¶ 29–32; S. Roveda Declaration ¶¶ 10–12;[50] *see also*

2  McCullough Report ¶ 36 ("[o]ver the past twenty years, California refinery out-put has

3  always been greater than California gasoline demand."). In the absence of any evidence to

4  support Plaintiffs' theory that Defendants' supply decisions were not profit maximizing,

5  the undisputed facts that Defendants had the capabilities to produce more CARBOB,

6  maintained low inventories, rerouted a handful of imports, and exported gas out of

7  California, does not tend to exclude the possibility that Defendants made those decisions

8  independently rather than pursuant to an agreement. *Citric Acid*, 191 F.3d at 1094.

9      The trader communications expressing their preference for low-supply/high-price

10  conditions and the backdrop of general collaboration among Defendants does not change

11  this picture to one of conspiracy. Players in concentrated markets are often highly

12  conscious of their "shared economic interests" in making "output decisions" and act

13  accordingly to maximize profits. *Brooke Grp.*, 509 U.S. at 227. While it is illegal to act

14  pursuant to a conspiracy, it is not illegal to act pursuant to oligopolistic self-interest, even

15  when those actions drive supracompetitive prices. *Id.* ("[C]onscious parallelism, describes

16  the process, not in itself unlawful, by which firms in a concentrated market might in effect

17  share monopoly power, setting their prices at a profit-maximizing, supracompetitive

18  level."). The trader communications Plaintiffs highlight evidence a shared preference for

19  low-supply/high-price conditions and a mutual desire to act accordingly. *See supra*

20  Sections V.D.2–3. Aside from providing a motive (which courts have held is, alone,

21

22

23

24  [50] *See also* N. Weinberg-Lynn Declaration ¶¶ 32–33; M. Bodziak Declaration ¶ 21; P. Brooks

25  Declaration ¶¶ 26, 46; J.A. 733–38, Valero Exs. 1–2.

79

26

27

28

1    insufficient), these emails illustrate the reality that Defendants engaged in conscious
2    parallelism while operating in a highly concentrated market.

3        Plaintiffs' other evidence similarly portrays Defendants as interdependent and
4    highly responsive to what their competitors are doing: Defendants admit to being conscious
5    of one another's pricing and factoring that information into their respective pricing
6    decisions.[51] In the spot market, their traders gather as much information as possible about
7    their counterparts refinery conditions to explore opportunities for their own future
8    trading.[52] And while Plaintiffs have shown Defendants cooperate with each other in certain
9    ways, the evidence supports the inference that self-interest and interdependence drove this
10   purported collaboration. Defendants entered into mutually beneficial exchange agreements
11   to trade barrels so they could maintain low inventory levels and cover shortages without
12   having to pay high market rates. *See, e.g.*, Pltfs. Exs. 114–28.[53] By selling barrels to Exxon
13   after their 2015 refinery explosion, it could be that Defendants sought to benefit themselves
14   in the least troublesome and most profitable way, given the long-term contracts that Exxon
15   had with retailers.

16       The above evidence may support an inference that the six Defendants, aside from
17   BP and Phillips 66, engaged in conscious parallelism because each independently
18   recognized it benefitted from low-supply conditions and each sought the maximum price
19   advantage. While such oligopolistic maneuvering may be an undesirable market for

---

22   [51] *See, e.g.*, J. Hodgson Declaration ¶¶ 9–15, 19–20, 23, 27–28; P. Brooks Declaration ¶ 96; K.
23   Archambault Declaration ¶ 59; J. Harris Declaration ¶ 6; J.A. 115, Shell Ex. 1; M. O'Neal Declaration
     ¶ 3.
     [52] *See, e.g.*, Pltfs. Exs. 6, 8–12, 19–20, 35–44, 46–50, 52, 192–93.
24   [53] *See, e.g.*, Joint Statement ¶ 22; K. Archambault Declaration ¶¶ 63, 66–70; C. Yates Declaration
     ¶¶ 50–52.

80

1     consumers, such a market is not prohibited by antitrust law. Because none of the above

2     tends to exclude the possibility that each Defendant took *independent* actions to maximize

3     its profits, Plaintiffs have not created a reasonable inference of the wide ranging, eight-

4     Defendant conspiracy that they allege.

5        With regard to BP and Phillips 66, the evidence supports a reasonable inference of

6     conspiracy. In addition to the above, the traders for these Defendants exchanged supply

7     information that they admitted they considered confidential and reported information to the

8     departments responsible for setting production levels. J. Yomtoob Declaration ¶ 25

9     (information "may sometimes be transmitted to BP's supply and refinery planning teams

10     to determine whether there is an opportunity to supply counterparties"); L. Lockhart

11     Declaration ¶ 47 ("on occasion, I discussed with our California refineries whether they

12     could increase production of CARBOB" based on trader information) (emphasis omitted).

13     This evidence permits an inference that information was exchanged pursuant to an

14     agreement. Unlike other traders who exchanged information in the course of buying and

15     selling to further their own future trading opportunities, BP's and Phillips 66's traders

16     admitted to using information outside of trading to influence refinery decisions. While

17     evidence of low-level traders exchanging information to benefit their buying and selling

18     can be consistent with independent decision making in a concentrated market, evidence

19     that traders shared confidential information up the chain-of-command does tend to exclude

20     the possibility of independent conduct. Accordingly, a reasonable juror could find that BP

21     and Phillips 66 agreed to share information pursuant to a conspiracy.

22                              **VI. CAUSATION**

23        Because causal antitrust injury is an essential element of Plaintiffs' antitrust

24     conspiracy claim, the Court turns to whether a genuine dispute of material fact exists with

25                                   81

26                                    15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

1  respect to causation. In their opposition, Plaintiffs point to the opinions of their experts,

2  Dr. Williams, Dr. Hanouna, and Mr. McCullough, as evidence that the conspiracy

3  described above caused gas prices in California to be higher than they would have been

4  absent the anticompetitive conduct. *See* Opposition at 53–56. Defendants seek to exclude

5  Dr. Williams' and Dr. Hanouna's expert opinions on causation as inadmissible under

6  *Daubert* and Federal Rule of Evidence 702. *See* Dkt. 616. Defendants also argue that

7  neither Dr. Hanouna nor Mr. McCullough offer opinions on causation. *See id.*; *see also*

8  Dkt. 613.

9       In the next section, therefore, the Court first examines the admissibility of

10  Dr. Williams' and Dr. Hanouna's expert opinions with respect to causation. The Court

11  then turns to whether Mr. McCullough's expert opinions or any other facts in the record

12  create a genuine issue of material fact on the element of causation.

13  **A. *Daubert* Challenges to Dr. Williams and Dr. Hanouna on Causation**

14       Federal Rule of Evidence 702 provides that expert opinion evidence is admissible if

15  "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of

16  fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

17  on sufficient facts or data; (c) the testimony is the product of reliable principles and

18  methods; and (d) the expert has reliably applied the principles and methods to the facts of

19  the case." Fed. R. Evid. 702. Plaintiffs bear the burden of establishing that the

20  admissibility requirements are met by a preponderance of the evidence. Fed. R. Evid.

21  104(a); Advisory Committee Notes to Rule 702, 2000 Amendments (quoting *In re Paoli*

22  *R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994), and explaining that proponents

23  "only have to demonstrate by a preponderance of evidence that their opinions are reliable");

24

25  82

26  15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

*see also Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("It is the proponent of the expert who has the burden of proving admissibility.").

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. 579, 589 (1993). In its role as a gatekeeper, the trial court must ensure that an expert report is reliable and "relevant to the task at hand" before it reaches a jury. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted).  Ultimately, "[t]he objective" of the Court's gatekeeping role "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Thus, an expert's scientific conclusions must be supported by "good grounds for each step in the analysis," meaning that "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Paoli R.R. Yard*, 35 F.3d at 745 (emphasis omitted); *accord Hardeman v. Monsanto Co.*, 997 F.3d 941, 962 (9th Cir. 2021) ("expert evidence is inadmissible where the analysis is the result of a faulty methodology or theory") (citation omitted).

When evaluating the admissibility of an expert's testimony, the Court focuses on the soundness of the expert's methodology, not the correctness of the expert's conclusions. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).  Thus, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and

83

attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

### 1. Dr. Williams

Dr. Williams, Consumer Plaintiffs' causation and damages expert, used a forecasting regression methodology to determine the price overcharges resulting from the alleged conspiracy—*i.e.*, the increase in gas prices attributable to the alleged conspiracy as opposed to other market factors. *See* Opposition at 56; *see also* Dkt. 608, Ex. A ("Williams Report"). Based on his analysis, Dr. Williams opined "that Defendants' alleged conduct caused actual wholesale prices to substantially exceed but-for wholesale prices," with total damages to consumers equaling $15 billion. Williams Report ¶¶ 63, 70. For the reasons set forth below, the Court agrees with Defendants' arguments that Dr. Williams' expert opinion on causation is inadmissible under Federal Rule of Evidence 702.

While a forecasting regression analysis is a generally accepted econometric approach to determining causation and damages in the antitrust context, *see, e.g.*, *United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1042 n.11 (C.D. Cal. 2016), the Court must examine whether Dr. Williams' specific application of that methodology in this case meets Rule 702 and *Daubert* standards for reliability and relevance. Forecasting regression methodology requires an expert to first identify a benchmark period free of anticompetitive conduct and a damages period when the allegedly anticompetitive conduct occurred. *See* Halbert White, Robert Marshall & Pauline Kennedy, *The Measurement of Economic Damages in Antitrust Civil Litigation*, 6 Econ. Comm. Newsl. 17, 17–22 (2006); Williams Report ¶¶ 44–48, 50. The expert then calculates the relationship between various

84

1   factors impacting prices (*e.g.*, the cost of raw materials) and the resulting prices during the
2   benchmark, to establish a baseline for how those factors influenced prices during a "clean"
3   period without anticompetitive behavior. *See* White, *Measurement*, *supra*, at 18–20;
4   Williams Report ¶ 52. Using the data from the benchmark period, the expert then predicts
5   what prices would have been in the damages period without the defendants' allegedly
6   anticompetitive conduct. *See* White, *Measurement*, *supra*, at 20–21; Williams Report
7   ¶¶ 45–46, 56. The difference between the predicted prices in the "no conspiracy" world
8   and the actual prices in the damages period constitutes the class damages. *See* Williams
9   Report ¶ 44. By isolating and quantifying the effects of the allegedly anticompetitive
10   conduct in this way, a valid regression model can also tend to show that the price
11   differential is attributable to the alleged anticompetitive conduct and serve as evidence of
12   causation. *See generally* White, *Measurement*, *supra*.

13       The fundamental premise of a forecasting regression approach is that prices in the
14   "clean" period were influenced only by lawful economic variables (raw materials,
15   production costs, *etc.*), and prices during the conspiracy were influenced by the same
16   lawful economic variables plus the conspiracy's anticompetitive conduct. Once the
17   economist understands how conspiracy-free prices are created by lawful economic
18   variables, he can reasonably assume that higher prices in the conspiracy period were caused
19   solely by the conspiracy's anticompetitive conduct. Thus, a sound econometric approach
20   to selecting these periods is essential to the validity of the entire analysis. An expert
21   selecting a benchmark period must have a *reasonable basis* to assume that the period is
22   free of anticompetitive conduct. White, *Measurement*, *supra*, at 18 ("The [non-collusive]
23   benchmark may be a period of time, like the pre-plea period [o]r . . . where it is reasonable
24   to believe that collusion was absent"); Justin McCrary & Daniel L. Rubinfeld, *Measuring*

25

85

26

27

28

1  *Benchmark Damages in Antitrust Litigation*, 3 J. of Econ. Methods, 63–74 (2014) (noting
2  that anticompetitive conduct in the benchmark period risks producing "a biased damages
3  estimate, which is inappropriate"); David L. Faigman *et al.*, Modern Scientific Evidence:
4  The Law and Science of Expert Testimony, at § 43:35 (Dec 2021 Update) (noting that
5  regression analyses should not be used "if the allegedly unlawful behavior has always been
6  present."). Dr. Williams himself appears to agree with the foregoing, as he relied on some
7  of these same sources in his opening report. Williams Report ¶ 45 n.37 (citing White,
8  *Measurement*, *supra* and McCrary, *Measuring Benchmark Damages*, *supra*). Moreover,
9  Dr. Williams specifically criticized Defendants' regression analysis on this basis, arguing
10  that the benchmark period "should be free from the effects of the alleged conspiracy," in
11  part, because "if one measures cartel prices against cartel prices, those prices will no longer
12  appear to be the result of the cartel." Dkt. 608, Ex. G ("Williams Rebuttal Report") ¶ 58.

13  Here, Dr. Williams' methodology disregarded the basic econometric principle of
14  selecting a benchmark period that is reasonably free of misconduct so that it can serve its
15  fundamental purpose—to act as a baseline such that conclusions can be drawn about how
16  anticompetitive conduct impacted prices in the damages period. At the outset of his
17  regression analysis, Dr. Williams selected the "clean" benchmark period as January 2005
18  to January 2015, but provided no justification for this selection. Williams Report ¶ 50;
19  Dkt. 608, Ex. C ("Williams Dep.") at 224:3–4 ("I was not instructed by counsel as to the
20  definition of the benchmark period."). Dr. Williams then defined the damages period
21  where price fixing occurred as February 2015 to December 2019, "based on instruction of
22  counsel." Williams Report ¶ 50. In contrast, Consumer Plaintiffs' complaint originally
23  alleged that the price fixing conspiracy first occurred in 2012, not February 2015, and
24  Persian Gulf's complaint similarly alleged that the Defendants' price fixing conspiracy

25                                        86

27
28

began in 2012. *See Bartlett*, Dkt. 44 at 46; Dkt. 76 at 64. Based on Plaintiffs' initial allegations, Dr. Williams' benchmark period contained more than three years of anticompetitive misconduct, when it is supposed to be "clean."

Such incongruity between the pleadings and the expert's analysis would not pose a methodological problem if Dr. Williams chose a benchmark period based on post-discovery evidence instead. As the *In re Packaged Seafood Prod. Antitrust Litig.* court noted, an expert's benchmark period selection based on post-discovery evidence, rather than pleading allegations, only strengthens the relevance of an expert's analysis. 332 F.R.D. 308, 326 (S.D. Cal. 2019) (refining of conspiracy period based on the expert's "analysis of the record evidence in the case . . . bolster[ed] the reliability of the [regression] model"). Here, however, Dr. Williams' benchmark and damages periods are also inconsistent with Plaintiffs' contentions after years of gathering evidence in discovery. At the close of fact discovery, Plaintiffs asserted in binding interrogatory responses that the conspiracy—effected by information exchanges, supply restrictions, and market manipulation discussed *supra*—began no later than August 1, 2011. Dkt. 455, Ex. C at 12; Dkt. 455, Ex. D at 13. Therefore, based on Plaintiffs' *post-discovery* theory of the case, Dr. Williams' benchmark period contained more than four years of anticompetitive misconduct, when it is supposed to be "clean" of misconduct.

Dr. Williams' identification of the period from 2005 to 2015 as "clean" is also inconsistent with the evidence that Plaintiffs present to the Court on summary judgment. In their opposition to Defendants' motions, Plaintiffs ask the Court to consider a conspiracy implemented by acts beginning in at least 2011 that caused inflated prices starting in "at least 2012." *See, e.g.*, Opposition at 1, 39. For example, Plaintiffs identify exchange agreements that have been in place since 2005. *See* Pltfs. Exs. 114–128. Plaintiffs also

87

point to information exchanges, the focal point of Plaintiffs' arguments, beginning in 2012. *See, e.g.*, Pltfs. Exs. 43–44 (trader exchanges in 2012); Pltfs. Exs. 19, 46, 65 (trader exchanges in 2013); Pltfs. Exs. 11, 34, 47 (trader exchanges in 2014). Plaintiffs similarly argue that Defendants' market manipulation and supply restrictions began in 2012. *See* McCullough Report ¶¶ 404–05 (describing wash trades in 2012 and 2014); Pltfs. Ex. 56 (sole evidence of false public statements occurred in 2012); Pltfs. Ex. 85 (Chevron diverted two cargoes in August 2014); Pltfs. Ex. 100 (Chevron considering exports to Mexico in 2014); J.A. 583–86, Phillips Ex. 20 ("gentleman's agreement" on trading hours in 2014). Mr. McCullough, Plaintiffs' liability expert, also pointed to anticompetitive conduct starting in 2011 to establish liability. *See generally* McCullough Report. Nearly half of the conduct Mr. McCullough identified took place during Dr. Williams' benchmark period. *See id.* Thus, based on Plaintiffs' current evidence of conspiracy and anticompetitive acts starting in 2011, Dr. Williams' benchmark period, which is supposed to be "clean," contains more than four years of anticompetitive misconduct. Dr. Williams' 2005 to 2015 benchmark period, therefore, is not an approximation of a "clean period" under any metric—neither the allegations in Plaintiffs' complaints, their binding interrogatory responses, nor the evidence they present to the Court on summary judgment supports the selection of 2005–2015 as a period reasonably "clean" of misconduct.

Dr. Williams' methodological flaw in framing his benchmark period renders his analysis irrelevant to Plaintiffs' case. To be admissible, an expert report must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citation omitted); *Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*, 2019 WL 13045054, at *2 (C.D. Cal. Feb. 28, 2019) ("Courts reject or exclude expert testimony that fails to connect damages calculations to the theory

88

1  of liability"). Dr. Williams' analysis is based on the assumption that there was no
2  conspiratorial conduct from 2011 to 2015, whereas all of the allegations and evidence
3  before the Court suggests the opposite. Because his opinion on causation flows from this
4  inapposite assumption, it is divorced from the reality of the case that Plaintiffs are actually
5  trying to prove, and thus is not sufficiently tied to Plaintiffs' liability case to help the
6  factfinder.

7      Dr. Williams provided no methodological justification grounded in econometrics for
8  choosing a benchmark period so significantly misaligned with the case that Plaintiffs are
9  currently trying to prove. *Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp.
10 3d 385, 400 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ("[T]o be admissible,
11 a regression analysis must examine an appropriate selection of data . . . some passably
12 scientific analysis must undergird the selection of the frame of reference."). In fact, in his
13 opening expert report, Dr. Williams provided no explanation for why he selected 2005–
14 2015 as the benchmark period. Williams Report ¶ 50. At his deposition, Dr. Williams
15 stated that that he selected the benchmark period based on his "reading" of the complaint,
16 even though he apparently understood that Plaintiffs "alleg[ed] that there had been
17 anticompetitive conduct in the benchmark period." Williams Dep. at 219:24–220:5;
18 222:1–8; 228:14–229:16. In his rebuttal report, Dr. Williams argued that the evidence
19 shown to him supported the selection of 2015 as the start of the damages period, again with
20 no econometric justification of a benchmark period that is not "clean." Williams Rebuttal
21 Report ¶¶ 40–41. Dr. Williams' selective reading of the complaint is not a methodological
22 explanation grounded in econometrics that can cure his faulty selection of the benchmark
23 period. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert*
24 or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

25

                        89

26

                                15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

1    connected to existing data only by the *ipse dixit* of the expert"); *McGlinchy v. Shell Chem.*
2    *Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (upholding exclusion of conclusions in expert report
3    with only "scant basis" in the record).

4          Accordingly, Dr. Williams' selection of a benchmark period that contains four years
5    of alleged anticompetitive misconduct, based on Plaintiffs' post-discovery contentions and
6    the evidence on summary judgment, renders his analysis fundamentally flawed and
7    methodologically unsound. The Court acknowledges that perfect lines demarcating
8    benchmark periods and damages periods, such that all the misconduct falls neatly into the
9    damages period (rendering the benchmark period perfectly clean), will rarely, if ever, exist;
10   econometric principles do not require such precision to pass scientific muster. While some
11   level of inaccuracy is bound to exist, the selection of a benchmark period needs to be
12   grounded in econometric principles and bear some logical relationship to the evidence in
13   the case. Where the selection of the benchmark period is neither grounded in econometric
14   principles nor the record, all of the econometric assumptions that flow from the
15   identification of a "clean" period are rendered unsound. If the "clean" period contains
16   years of allegedly anticompetitive conduct, the idea that prices in the "clean" benchmark
17   period can be fairly traced to variables impacting price, and not the anticompetitive
18   conduct, falls apart. When the fundamental principles that a methodology is based on are
19   disregarded in this way, it is not "shaky but admissible evidence" with conclusions that
20   should be tested by cross-examination. Rather, the underlying methodology is so flawed
21   that the analysis is rendered unreliable and cannot be cured by the adversarial process at
22   trial.

23         Plaintiffs raise various arguments in opposition to Defendants' motion to exclude
24   Dr. Williams' report. First, Plaintiffs argue that the error in Dr. Williams' methodology

25                                              90

26                                                      15cv1749-JO-AGS and 18cv1374-JO-AGS

1    can be remedied by an assumption that any such error would only make the damages figure

2    more conservative. Dkt. 698 ("*Daubert* Opposition") at 19. Dr. Williams similarly

3    surmised at his deposition that a benchmark period containing some misconduct does not

4    invalidate the regression model but merely renders the damages analysis more

5    conservative. Williams Dep. at 217:6–22. This theory, however, was not tested by

6    Dr. Williams despite his acknowledgment that "[w]hether or not an alternative benchmark

7    period would increase or decrease damages is an empirical question." *Id.* at 216:24–

8    217:5.[54]

9          Plaintiffs argue that a few district courts have admitted flawed regression models

10    based on the assumption that a tainted benchmark period would only result in an

11    underestimation of damages, but the cases they point to do not stand for that proposition.

12    *Daubert* Opposition at 15, 19–20; Dkt. 809 at 18–21; *Packaged Seafood*, 332 F.R.D. 308;

13    *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 675, 683–84 (E.D. Pa. 2007). These

14    cases do not hold that benchmark periods divorced from econometric principles and record

15    evidence can be cured by an assumption that tainted benchmark periods render damages

16    figures more conservative. Rather, these cases emphasize that benchmark periods need to

17    be supported by econometric principles and record evidence to be sound under *Daubert*.

18    *Packaged Seafood*, 332 F.R.D. at 326 (selection of time periods based on "analysis of the

19

20

21    [54] The Court notes that Dr. Janus Ordover, Defendants' damages expert, submitted rebuttal

22    evidence that when 2011–2014 is moved out of the benchmark period and into the damages period, damages drop from \$15 billion to negative \$11.1 billion. Dkt. 605, Ex. C ("Ordover Report") ¶ 317; Dkt.

23    617, J. Ordover Declaration ¶ 7 & Fig. 1. The Court does not credit Dr. Ordover's opinion or analysis over Dr. Williams'. Rather, Dr. Ordover's findings merely counsel against overlooking the fundamental

24    unreliability of Dr. Williams' methodology based on an untested assumption.

25                                              91

26                                    15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

1 record evidence in the case"); *Linerboard*, 497 F. Supp. 2d at 683–84 (expert identified "a
2 more competitive period, presumably free of unlawful conduct") (citation omitted). Those
3 courts noted that some anticompetitive conduct in the benchmark periods would only make
4 the estimates more conservative, but only after finding that the experts selected reasonable
5 benchmark periods based on econometric principles and the evidence in the case. *See id.*
6 Here, as discussed above, Dr. Williams did not provide an explanation for his selection of
7 the benchmark period and acknowledged that it contradicts Plaintiffs' conspiracy case.
8 Thus, there are fundamental unreliability and irrelevance issues here that were not at issue
9 in *Packaged Seafood* and *Linerboard*. The flaws in Dr. Williams' analysis cannot be cured
10 by the assumption Plaintiffs urge.

11      Plaintiffs also argue that a conspiracy beginning in 2015 fits the facts of the case
12 because the statute of limitations precluded Plaintiffs from seeking damages prior to June
13 21, 2014. *Daubert* Opposition at 11–12. In the Court's prior order partially granting
14 Defendants' motion to dismiss, the Court ruled that Plaintiffs could not seek damages prior
15 to June 21, 2014. *See Bartlett*, Dkt. 108 at 3–7. Plaintiffs argue that Dr. Williams' damages
16 period, therefore, had to "coincide with the Court's ruling defining the damages period,"
17 and thus is consistent with their case. *Daubert* Opposition at 12. The fact that Plaintiffs
18 were foreclosed from collecting damages for the years 2011–2014 does not render those
19 years conspiracy free, especially when Plaintiffs seek to prove that Defendants operated a
20 conspiracy during those years. Accordingly, the statute of limitations may impact available
21 damages, but it does not excuse an expert from following econometric principles, and it
22 cannot erase the voluminous evidence Plaintiffs have placed before the Court to establish
23 a conspiracy beginning in 2012, at the latest.

92

1        Finally, at oral argument, Plaintiffs contended that even though the alleged
2   conspiracy was in effect starting in 2011 or 2012, the conspiracy did not impact prices until
3   2015, when the conspiracy was at its most active. *See* Dkt. 809 at 27–39. While
4   conspiracies theoretically might have delayed price impacts, the evidence before this Court
5   does not support Plaintiffs' eleventh-hour theory that the conspiracy had a four-year delay
6   in impact. First, Plaintiffs' delayed-impact theory does not appear in their opposition to
7   summary judgment and is not reflected in the opinions of their experts. Second, even
8   attempting to interpret the record evidence to fit Plaintiffs' delayed-impact theory, the
9   conspiratorial conduct Plaintiffs identify is largely identical from 2011–2014 and 2015–
10  present. As discussed in more detail at Section V.D *supra*, Plaintiffs point to particular
11  mechanisms that Defendants used to restrict supply, manipulate public facing gas prices,
12  exchange information, and protect one another from shortages. Plaintiffs' evidence
13  demonstrates that these same mechanisms were being utilized in 2011 up through the end
14  of the conspiracy period—in other words, Plaintiffs do not identify some behavioral change
15  on the part of Defendants in 2015 that would explain why the exact same market behaviors
16  would not have impacted prices in 2011 but somehow would have impacted prices in 2015.
17  Third, Plaintiffs admit that the price fixing conduct they describe had rapid price impacts,
18  ranging from hours to, *at most,* months. *See* Dkt. 809 at 34–39 (admitting that efforts to
19  restrict supply and manipulate public facing gas prices would take hours to months to
20  impact gas prices). Based on the evidence in the record, there is no reasonable basis for a
21  juror to conclude that price fixing mechanisms beginning in 2011 and occurring across the
22  class period did not impact gas prices until 2015. Accordingly, this argument does not
23  render Dr. Williams's regression model applicable to the facts of this case and his analysis
24  remains inadmissible.

93

1

*2. Dr. Hanouna*

2   Plaintiff Persian Gulf's expert on damages is Dr. Paul Hanouna, who performed

3   dummy variable and forecasting regression analyses to determine the overcharges to

4   wholesale customers at the rack.   *See* Dkt. 608, Ex. B ("Hanouna Report").   Because

5   Plaintiffs argue in their opposition to summary judgment that his damages analysis also

6   evidences causation, the Court will examine the extent to which Dr. Hanouna offers a

7   causation opinion and whether such an opinion would admissible under Federal Rule of

8   Evidence 702.

9   To begin his analysis, Dr. Hanouna identified the cost of Brent Crude Oil, one type

10  of blended oil that is refined to make gas, as the primary factor impacting gas prices from

11  January 1, 2003 to February 29, 2020.  *Id.* ¶ 6.a.  Based on the relationship between this

12  single variable—the cost of Brent Crude Oil—and gas prices, Dr. Hanouna concluded that

13  there were inflated gas prices in May and October of 2012, as well as the period of January

14  2015 to March 2020, that could not be explained by the price of Brent Crude Oil and thus

15  were caused by some other, unidentified variable.  *Id.*  ¶¶ 6.a–6.b.

16  Based on the above, Dr. Hanouna defined the damages periods as those periods

17  where he saw price spikes in May and October of 2012 and January 2015 to March 2020.

18  *Id.* ¶¶ 6.b–6.c.  He identified the benchmark period as being January 1, 2003 to February

19  29, 2020, excluding May and October of 2012 and January 2015 to March 2020.  *Id.* ¶ 25.

20  Using the benchmark period, Dr. Hanouna predicted what prices would have been in the

21  damages periods if Brent Crude Oil had continued to predict gas prices.  *Id.*  ¶¶ 6.a–6.c,

22  25.  Based on the difference between predicted and actual prices during the damages

23  periods, Dr. Hanouna determined that the total damages to wholesale purchasers of gas

24

25   94

26

27

28

1 equals $287,542,483 in May of 2012, $410,244,180 in October of 2012, and
2 $9,046,092,774 from January 1, 2015 to March 2020. *Id.* ¶ 6.c.

3     Although Plaintiffs argue on summary judgment that Dr. Hanouna's opinions
4 provide evidence of causation,[55] Dr. Hanouna expressly denied having any such opinion.
5 At his deposition, Dr. Hanouna testified more than once that he did not have any opinion
6 about the causes of inflated prices in the damages periods, and further, that the lack of
7 correlation between Brent Crude Oil and gas prices in the damages periods "[a]bsolutely"
8 did not imply collusion. *See* Dkt. 608, Ex. D ("Hanouna Dep.") at 48:23–49:1 61:14–23.
9 Dr. Hanouna also stated that he was not an expert in antitrust economics nor the gas
10 industry. Hanouna Dep. at 13:12–14:17; 36:3–8; 40:20–41:22; 95:12–24. Thus, he
11 testified that he was not offering any opinion on Plaintiffs' theory of anticompetitive
12 conduct but was solely calculating damages assuming Plaintiffs could prove the existence
13 of a conspiracy. Hanouna Dep. at 15:23–16:4; 44:9–20; 47:18–48:3; 61:14–23; Hanouna
14 Report ¶¶ 5–6.

15     As Dr. Hanouna disavows having an expert opinion on causation, the Court
16 precludes Plaintiffs from offering his regression analysis for causation purposes. *See, e.g.*,
17 *Mitchell v. Geo Grp. Inc.*, 2022 WL 874287, at *5 (D. Ariz. Mar. 24, 2022) ("when an
18 expert affirmatively repudiates or disavows an opinion expressed in the expert's report,
19 courts have not hesitated to conclude that the expert should be precluded from offering that

20
21

---

22     [55] Plaintiffs themselves have made conflicting arguments regarding whether Dr. Hanouna is being
23 offered on the issue of causation. On opposition to summary judgment, Plaintiffs point to Dr. Hanouna's
opinions as evidence of causation. Opposition at 55–56. Then, at oral argument, Plaintiffs stated that his
24 opinion was being offered solely on the issue of damages and was not being offered to show causation.
*See* Dkt. 809 at 32 (stating that the "experts aren't doing a causation analysis.").
25                             95

26
27
28

1  opinion at trial"); *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 634
2  (E.D.N.C. 2008) (finding that where an expert denied having an opinion on an issue, he
3  was not qualified under Rule 702 to offer an opinion on it); *Devito v. Smithkline Beecham*
4  *Corp.*, 2004 WL 3691343, *4 (N.D.N.Y. Nov. 29, 2004) ("if [the expert] has not formed
5  the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific
6  or otherwise, for same"). Despite Plaintiffs' arguments that Dr. Hanouna's regression
7  analysis does provide information about causation, the Court finds that the expert
8  economist himself would know best the limits of his own study and expertise. His report
9  and his testimony clearly set forth those limits: his single-variable analysis provided no
10 information as to what caused the price spikes he identified. *See* Hanouna Dep. at 15:23–
11 16:4; 44:9–20; 47:18–48:3; 48:23–49:1; 61:14–23; Hanouna Report ¶¶ 5–6. Moreover,
12 Plaintiffs—who carry the burden to demonstrate the admissibility of Dr. Hanouna's
13 opinions—have not pointed to any evidence that Dr. Hanouna has the "scientific, technical,
14 or other specialized knowledge" to offer an opinion on causation. *See* Fed. R. Civ. P. 702.
15 Therefore, the Court finds that Plaintiffs have not met their burden of establishing that
16 Dr. Hanouna is qualified to do so under Rule 702.

17     Finally, Dr. Hanouna's analysis is further inadmissible to prove what caused inflated
18 gas prices because his regression model suffers from the same flaws as Dr. Williams'
19 regression analysis. Dr. Hanouna's regression analysis also utilizes a benchmark period
20 that Plaintiffs allege contains years of anticompetitive conduct. *See supra* Section VI.A.1;
21 Hanouna Report ¶¶ 6.a–6.c, 25. Like Dr. Williams, he includes most of 2011–2015 (except
22 for two months) in the benchmark period, despite the fact that Plaintiffs seek to prove that
23 Defendants conspired during that period. *See id.* Accordingly, for the same reasons

24

25                          96

26                                   15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

1 Dr. Williams' analysis is inadmissible with respect to causation, the Court finds that
2 Dr. Hanouna's analysis is inadmissible with respect to causation.

3 **B. Whether the Remaining Evidence Creates a Genuine Dispute of Material Fact on**
4 **Causation**

5 Because the Court has excluded Dr. Williams' and Dr. Hanouna's expert opinions
6 on causation,[56] the Court turns to whether Plaintiffs have otherwise provided evidence
7 which creates a genuine dispute of material fact with respect to causation. Plaintiffs point
8 to the expert opinion of Mr. McCullough as evidence of causation and further argue that
9 causation can inferred from the facts in the record regarding the conspiracy.

10 Causal antitrust injury is "an essential element of any remedy under the Sherman
11 Act." *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986) (citation omitted).
12 While Plaintiffs need not rule out "all possible alternative sources of injury," they must
13 show that the alleged anticompetitive conduct was "a material cause" of the injury.
14 *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1509 (9th Cir. 1985)
15 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 & n.9 (1969)).
16 The trier of fact must be able to ascertain causal antitrust injury "without engaging in
17 speculation." *Id.* at 1510. Where a party fails "to proffer any evidence as to causation,
18 they fail to raise a genuine issue of material fact, and . . . summary judgment against them
19 must be granted." *In re Optical Disk Drive Antitrust Litig.*, 2017 WL 6451711, at *3 (N.D.
20 Cal. Dec. 18, 2017).

21 ///

22
23
_____

24 [56] Given the Court's ruling, it does not consider whether Dr. Williams' and Dr. Hanouna's expert
25 opinions are admissible on the issue of damages.

97

26

27
28

1

*1. Mr. McCullough's Report Does Not Create a Genuine Dispute on Causation*

2      In order to evaluate Plaintiffs' argument, the Court first examines the expert report
3   of Plaintiffs' liability expert, Robert McCullough. Mr. McCullough described his
4   assignment as offering opinions "on the structure of the California gasoline market,
5   whether it was susceptible to market manipulation, and whether and how market
6   manipulation did occur." McCullough Report ¶ 2. Mr. McCullough's report is largely
7   descriptive: he performed a review of documents produced in discovery and concluded,
8   among other things, that the California gas market is geographically isolated, highly
9   concentrated, and inelastic, which makes it "susceptible to collusive activity." *See, e.g.*,
10  *id.* ¶¶ 18–20. Mr. McCullough also reviewed Plaintiffs' alleged plus factors and agreed
11  that those plus factors, such as information exchanges, exchange agreements, and exports,
12  were highly unusual and suggestive of market manipulation. *See id.* ¶¶ 22–31. He did not,
13  however, opine on the existence of a conspiracy nor whether Defendants' anticompetitive
14  conduct identified in his report had any particular impact on prices.

15     Plaintiffs argue that a genuine dispute of material fact on causation is created by
16  Mr. McCullough's general conclusion that the record evidence suggests collusive activity
17  among Defendants, but this alone does not provide evidence of causation. *See* Opposition
18  at 55. Mr. McCullough's report, like Dr. Hanouna's, does not offer any opinions on
19  causation. *See generally* McCullough Report. While Mr. McCullough repeatedly stated
20  throughout his report and in his deposition that the gasoline market was susceptible to
21  "market manipulation," he defined that concept more broadly than illegal conspiracy under
22  antitrust laws and testified that he did not have an opinion about whether illegal price fixing
23  had occurred. Defs. Ex. 8, McCullough Dep. at 23:12–24:13; 31:13–23; 79:19–80:12;
24  92:4–21.

25

98

26

27

28

1    Further, Mr. McCullough explicitly stated that he did not have an opinion on whether

2    gasoline prices increased because of Defendants' conduct. *Id.* at 44:7–13; 83:17–84:7;

3    84:23–85:18; 196:14–21. This was, apparently, not for a lack of attempting to identify

4    causal evidence. Mr. McCullough testified that although his assignment included

5    analyzing whether Defendants' exchanges of purportedly confidential information caused

6    higher gasoline prices in California, he "did not easily find an immediate impact. Much of

7    this information, though valuable and confidential, did not lead to a specific trading

8    decision." *Id.* at 83:17–84:7. Mr. McCullough's opinions that the market was

9    "susceptible" to manipulation, that Defendants and their traders "could" have manipulated

10    prices, or that Defendants' conduct is "suspicious" and "unusual" would not permit a

11    reasonable juror to infer causation. *See* McCullough Report. Thus, his opinions do not

12    create a genuine dispute of material fact as to causation.[57]

13        *2. The Remaining Record Evidence Does Not Create a Genuine Dispute on*

14        *Causation*

15    Given that Mr. McCullough's expert report does not go to causation, the Court

16    examines whether the facts in the record regarding conspiracy support an inference of

17    causation. Because the Court has concluded above that the evidence does not support a

18    reasonable inference of the eight-Defendant conspiracy alleged by Plaintiffs, it will

19    consider only whether facts in the record create a triable issue of fact that a conspiracy

20    between BP and Phillips 66 caused Plaintiffs to suffer antitrust injury.

21

22

23

24       [57] Given the Court's rulings in this order, it does not consider whether Mr. McCullough's expert opinion is admissible on the issue of liability.

25                                  99

26                             15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

1    Plaintiffs' evidence must allow an inference, "without engaging in speculation," that

2  the alleged anticompetitive conduct was "a material cause" of the injury. *Dolphin Tours*,

3  773 F.2d at 1509–10; 2 Areeda & Hovenkamp, Antitrust Law § 338a, at 317 (2d ed. 2000)

4  (plaintiff must show that "the antitrust violation contribute[d] significantly to [its] injury")

5  (interpreting *Zenith*, 395 U.S. 100). While courts have chosen to infer causation where a

6  conspiracy had in fact occurred or where evidence made a causal link plausible, those are

7  not the facts here. *Cf. Packaged Seafood.*, 332 F.R.D. at 322 (noting defendants had

8  already entered criminal pleas admitting to the price fixing conduct).

9    The conspiracy evidence with respect to BP and Phillips 66 would not allow a

10  reasonable juror to infer that an agreement between them caused higher gas prices. *See*

11  *supra* Section V.D. There is no evidence that BP or Phillips 66 entered wash trades,

12  selectively reported trades, or issued false public statements. *See id.* The evidence with

13  respect to these two Defendants consists almost entirely of information exchanges between

14  their traders. *See, e.g.*, Pltfs. Exs. 8, 48, 74, 83–84. Nevertheless, Plaintiffs have not

15  pointed to evidence that BP's or Phillips 66's traders executed any trade based on the

16  information the traders exchanged. Defs. Ex. 8, McCullough Dep. at 83:17–84:7 ("[m]uch

17  of this information, though valuable and confidential, did not lead to a specific trading

18  decision.").[58]

19

20

21    [58] Were a jury to attempt to infer causation from the trader exchanges between BP and Phillips 66,

22  they would necessarily have to devolve into speculation. Plaintiffs would have a jury infer that these
traders did in fact enter trades based on the information exchanged and that those trades were then reported

23  to OPIS absent any evidence of same. This chain of inferences is especially tenuous given that OPIS
reports an average price taken from the high and low trades in its survey. *See* Opposition at 47; J.A. 562–

24  76, Phillips Ex. 17 (OPIS pricing methodology). Accordingly, a juror would also have to infer that the
trades executed and reported were the high or low trade at the time OPIS averaged the price information.

25

100

26                                                          15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

1    Moreover, the causal link between these traders' exchanges and any resulting supply

2    *restriction* is absent from the record. The only evidence in the record suggests that BP and

3    Phillips 66 used the information exchanged to increase supply. J. Yomtoob Declaration

4    ¶ 25 (information used to increase production); L. Lockhart Declaration ¶ 47 (same).

5    Neither do Plaintiffs submit evidence that BP's and Phillips 66's exchanges occurred in

6    proximity to a supply restriction or reduction. Accordingly, a reasonable juror could not

7    find causation based on the mere possibility that BP's Phillips 66's information exchanges

8    could have raised spot-market prices or reduced supply in the absence of any evidence

9    supporting that possibility. Even assuming that a reasonable juror could infer that the

10   foregoing could have caused higher gas prices, there is no evidence that would allow a jury

11   to determine whether BP's and Phillips 66's conduct was a material cause of Plaintiffs'

12   injury. Therefore, in the absence of causal evidence, there is no genuine dispute of material

13   fact on causation and Defendants' motions for summary judgment should be granted.

14                              **VII. STATE LAW CLAIMS**

15   Because the Court has found that Defendants are entitled to summary judgment on

16   Plaintiffs' Sherman Act conspiracy claim, they are also entitled to summary judgment on

17   Plaintiffs' remaining state law claims under California's Cartwright Act and California's

18   UCL based on the same allegations and evidence relevant to their Sherman Act claim.

19   "The analysis under California's [Cartwright Act] mirrors the analysis under federal

20   law because the Cartwright Act . . . was modeled after the Sherman Act." *Cnty. of*

21   *Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). Plaintiffs' UCL

22

23   _____

24   There is no evidence in the record of any of the foregoing, and a juror would have no evidence from which
     to determine that these exchanges had any impact on spot-market prices.

25                                      101

26                                                      15cv1749-JO-AGS and 18cv1374-JO-AGS

27

28

claim is also derivative of their antitrust claims. *See* Dkt. 86 at 20; *Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 2020 WL 6742889, at *8 (E.D. Cal. Nov. 17, 2020) ("The UCL's 'unlawful' prong 'borrows violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable.") (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."); *see also Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1350 (2009) (causation is an element of standing to bring a UCL claim). Because the Cartwright Act mirrors the Sherman Act, the claims rise and fall together. In addition, Plaintiffs' UCL claim is based entirely on the existence of a conspiracy that caused consumer losses, and Plaintiffs do not identify any other conduct as a basis for that claim. *See* Dkt. 76; *Bartlett*, Dkt. 44. Thus, the UCL claim also rises and falls with Plaintiffs' Sherman Act claim. Because the Court grants summary judgment for Defendants on Plaintiffs' Sherman Act claim, it also grants summary judgment on Plaintiffs' remaining state law claims.

## VIII.  CONCLUSION AND ORDER

For the reasons set out above, the Court GRANTS Defendants' motions for summary judgment [**Dkts. 615, 619, 625** in *Persian Gulf*, 15cv1749-JO-AGS, and **Dkts. 457, 461, 470** in *Bartlett*, 18cv1374-JO-AGS]. The Court also GRANTS IN PART Defendants' motion to exclude the expert testimony of Dr. Michael Williams and Dr. Paul Hanouna [**Dkt. 616** in *Persian Gulf*, 15cv1749-JO-AGS, and **Dkt. 458** in *Bartlett*, 18cv1374-JO-AGS] on the issue of causation. The remaining motions to exclude expert testimony [**Dkts.**

102

**613, 622, 626** in *Persian Gulf*, 15cv1749-JO-AGS, and **Dkts. 455, 464, 467** in *Bartlett*, 18cv1374-JO-AGS] are DISMISSED as moot. The Clerk of the Court is instructed to close *Persian Gulf*, 15cv1749-JO-AGS, *Bartlett*, 18cv1374-JO-AGS, and *Rinaldi*, 18cv1377-JO-AGS.

**IT IS SO ORDERED**.

Dated: September 30, 2022

Hon. Jinsook Ohta
United States District Judge

103