UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION<br><br>This Document Relates to: *All Actions* | Civil No. 18-cv-01776 (JRT/JFD)<br><br>**[REDACTED PUBLIC VERSION]** |

**TYSON'S OPPOSITION TO PLAINTIFFS' MOTION FOR**
**LETTERS OF ROGATORY FOR TYSON EMPLOYEE SUMIO MATSUMOTO**

**TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................... 1
II. ARGUMENT ..................................................................................................... 2
    A. Mr. Matsumoto's Testimony Is Duplicative and Inessential ........................ 2
    B. Plaintiffs Have Been Aware of Mr. Matsumoto for
       Several Months and Cannot Show Good Cause to
       Take His Deposition After the Close of Fact Discovery .............................. 8
III. CONCLUSION ................................................................................................ 12

I.     **INTRODUCTION**

With only a few weeks of fact discovery remaining, Plaintiffs ask the Court to issue letters rogatory so they can depose Sumio Matsumoto—a lower-level Tyson employee in Canada—several months beyond the close of fact discovery.  The Court should deny the Plaintiffs' request because the testimony sought from Mr. Matsumoto is duplicative of other discovery and not essential to the case, and because Plaintiffs cannot show good cause to amend the scheduling order.

Plaintiffs have not established that Defendants used—or even could use—Agri Stats reports to monitor each other's production levels or otherwise facilitate a supply-reduction conspiracy.  Testimony from Mr. Matsumoto will not be the key to unlocking the purported conspiracy.  Mr. Matsumoto was not a primary decision maker with respect either to Tyson's analysis and use of Agri Stats reports or to Tyson's export strategy—the two topics on which Plaintiffs premise his relevance.  The primary decision makers on those topics have already provided or committed to providing testimony in this case.

Tyson is also not to blame for Plaintiffs' failure to secure Mr. Matsumoto's testimony before the close of fact discovery.  While Plaintiffs claim they learned of Mr. Matsumoto's relevance only in June of 2022, they had access to substantially all of the documents relevant to the present motion for more than a year prior to that.  Nor do Plaintiffs explain why they waited until September to ask for Mr. Matsumoto's deposition even if they had only learned of his relevance in June.  Given their access to Tyson's document productions, Plaintiffs have long been on notice that Mr. Matsumoto is

not an officer, director, or managing agent of Tyson, and thus must be subpoenaed, rather than merely noticed. And his public work biography on the well-known website LinkedIn shows that he works in Canada and thus would not be susceptible to quick and easy service of a subpoena. Put simply, waiting carries risk. Plaintiffs' apparent assumption that Mr. Matsumoto would be made available on short notice does not amount to good cause for amending the scheduling order to take Mr. Matsumoto's deposition.

Tyson respectfully asks the Court to deny Plaintiffs' motion.

## II.   ARGUMENT

### A.   Mr. Matsumoto's Testimony Is Duplicative and Inessential

Plaintiffs allege that Defendants conspired to raise the price of pork products in the United States by agreeing to collectively reduce the supply of pork, including through increased exports. (*See, e.g.*, Compass Group USA, Inc. Am. Compl., ECF No. 1421 ("Compass Compl."), at ¶¶ 3, 122.) According to Plaintiffs, Defendants used Agri Stats in furtherance of the alleged conspiracy. (*Id.* at ¶ 4.) Agri Stats is a benchmarking service that collects certain data from its subscribers, anonymizes that data, and then publishes reports to the subscribers so that they can see, for example, how much meat they are able to harvest from a hog (i.e., their "yield") compared to others in the industry on an anonymized basis, or their "IOE" or "Index of Operation Efficiency," a metric of adjusted EBIT for each company, compared to others in the industry, again on an anonymized basis.

Plaintiffs claim that Defendants were able to "deanonymize" these reports, enabling each Defendant to monitor the other Defendants' production levels to ensure adherence to the purported conspiracy. (*E.g.*, Compass Compl. at ¶¶ 10, 304.) Specifically, they claim that Tyson's Deborah McConnell "orchestrat[ed] Tyson's regular deanonymization of the information of its competitors in Agri Stats reports." (*E.g., id.* at ¶ 304.) According to Plaintiffs, Agri Stats allowed Defendants "to monitor each other's production, and therefore control supply and price in furtherance of their anticompetitive scheme." (*E.g., id.* at ¶ 10.)

Even with discovery nearly complete, however, the record does not support Plaintiffs' allegations that Defendants used Agri Stats to monitor one another's production levels. To the contrary, only certain Defendants ever attempted to guess the identities of subscribers corresponding to specific data in Agri Stats;[1] even those Defendants were only able to *guess* at those identities and often believed they had

---

[1] Some Defendants never even guessed. (*See, e.g.*, Decl. of Lindsey Strang Aberg ("Strang Aberg Decl."), Ex. A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Strang Aberg Decl., Ex. B ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3

guessed wrongly;[2] and they went to pains to *prevent* other subscribers from being able to guess their identities.[3]

Most importantly, even if Defendants could have accurately guessed their competitors' identities in certain Agri Stats reports, those reports divulged nothing about such competitors' production volumes, meaning they could not be used to monitor supply. In sum, not only have Plaintiffs failed to support their core theory on which they now premise Mr. Matsumoto's relevance, but the documents and testimony they have obtained in fact refute that theory.

It is also not necessary to compel Mr. Matsumoto to provide testimony from Canada because the testimony he would provide overlaps with testimony provided by more knowledgeable employees. Mr. Matsumoto is employed by a Canadian subsidiary of The Hillshire Brands Company, an entity not named as a Defendant to this litigation. (Strang Aberg Decl. at ¶ 2.) During the relevant time period, he was a Director of International Pork Sales, a position responsible for ex-U.S. sales of pork products, with a focus on sales to Japanese customers. Given that Mr. Matsumoto's knowledge of both

---

[2] (*See, e.g.*, Strang Aberg Decl., Ex. C ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[3] (*See, e.g.,* Strang Aberg Decl., Ex. D (White Ex. 724) (Tyson's Noel White advising against adding one Tyson pork processing plant to Agri Stats because the plant was "too unique and easy to spot."), (*Id.*, Ex. A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4

Agri Stats and Tyson's pork export strategy is *less extensive* than that possessed by other agreed deponents in this case, his testimony should not be required.

First, with respect to Agri Stats, Plaintiffs have already secured testimony from Deborah McConnell, the Tyson employee who "spearheaded" Tyson's analyses of the pork Agri Stats reports. (Plaintiffs' Motion for Letters of Rogatory for Tyson Employee Sumio Matsumoto, ECF No. 1536 ("Mem.") at 4.)  Ms. McConnell's role as the person with "primary responsibility" for Tyson's Agri Stats analysis was disclosed on March 8, 2019, and Ms. McConnell provided sworn testimony regarding Tyson's use of Agri Stats on June 23, 2022. (*Id.*; Strang Aberg Decl. at ¶ 4, Ex. E.)  At her deposition, Ms. McConnell confirmed her role as Tyson's primary Agri Stats point person and did not suggest that Mr. Matsumoto had extensive involvement in supporting her in that effort. (*See, e.g.*, Strang Aberg Decl., Ex. F (McConnell Tr. 16:2-7; 75:7-17) (indicating Mr. Matsumoto "was just providing me some guesses [. . . ] to come up with an estimate").)

The extensive fact discovery record developed to date is at odds with Plaintiffs' contention that Mr. Matsumoto is a "critical witness" because he contributed "as a source" in support of Ms. McConnell's effort to guess the names of Tyson's competitors in the Agri Stats reports. (*See* Mem. at 4-6.)  Ms. McConnell testified that what Plaintiffs allege to reflect "reverse engineer[ing]" or "de-anonymization" of the Agri Stats reports were, to the contrary, "flat-out guesses." (Strang Aberg Decl., Ex. F (McConnell Tr. 21:3-6).)  With respect to Mr. Matsumoto's role in supporting her guessing efforts, Ms. McConnell testified that Mr. Matsumoto contributed "logic" to support her estimated company names, (*id.* (McConnell Tr. 305:9-20)), but disavowed Plaintiffs' contention

5

that Mr. Matsumoto devoted significant time or attention to collecting information to support such logic. In fact, when asked whether she "had Sumio go out and try to help identify competitor plant names," Ms. McConnell explained, "I would say Sumio spent a few minutes looking at it and just applied what he knew from being in the industry." (*Id.* (McConnell Tr. 306:8-16).) Similarly, Ms. McConnell repeatedly testified that the company names Mr. Matsumoto supplied were, like all the competitor names reflected in her Agri Stats analyses, mere "guesses." (*Id.* (McConnell Tr. 56:19-25) ("Q. And the fourth tab, which is called 'Competitors,' can you describe for us what's on this tab? A. So in the very first row, it indicates the names or estimates, I'm using Sumio's estimates, is what that appears. These names were all guesses.")); (*id.* (McConnell Tr. 58:5-6) ("He was giving his guesses so I could use them for my guesses.").) Plaintiffs have not shown that incremental testimony from Mr. Matsumoto regarding his contributions to Ms. McConnell's guesswork will shed any light on the material aspects of their claims.

And far from confirming Plaintiffs' allegation that these guesses were critical to a broader collusive scheme, Ms. McConnell testified repeatedly that she assigned estimated names to companies in Agri Stats merely because "[t]he meetings seemed to flow better when we'd say, the discussion, Hatfield or Clinton or Indiana Pack, rather than Company 5, Company 7." (*Id.* (McConnell Tr. 298:2-5; *id.* 304:23-305:7).) Documents cited by Plaintiffs in the present motion also show that Mr. Matsumoto was not unique, but instead just one of several Tyson employees who contributed input to inform Ms. McConnell's guesses. (*See* Scarlett Decl., Ex. G (McConnell Dep. Ex. 982) (reflecting Ms. McConnell's solicitation of input from four different Tyson employees).)

6

Finally, even if Plaintiffs could establish that the names assigned to anonymized competitor data in Agri Stats were accurate, other undisputed facts in the record make clear that Agri Stats could not have been used to facilitate the output-reduction conspiracy alleged. As Ms. McConnell testified, and as the reports themselves make clear, "[i]n Agri Stats, there is no volume at all, zero. I have no idea what volume harvested or processed anybody does any month." (Strang Aberg Decl., Ex. F (McConnell Tr. 90:5-7)); (*see also id.*, Ex. G (Miller Tr. 320:17-321:7).) Employees of Agri Stats have confirmed the same. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In other words, even if Tyson could reliably determine who was who—which it could not—Tyson would have no way of determining *how much pork* any given competitor was processing. And even if there could be a reasonable dispute regarding whether the names assigned to certain Agri Stats reports were guesses or whether the underlying reports contained information on volume, Plaintiffs have already had the opportunity to explore both issues with the most knowledgeable Defendant employees. Mr. Matsumoto is not a critical witness on either point.

With respect to Plaintiffs' claims regarding Tyson's export strategy, Tyson has already made available the key decision-makers—Mr. Matsumoto's supervisors. Mr. Matsumoto at all times reported to multiple levels of more senior Tyson employees,

7

including his present supervisor, Jay Krehbiel (scheduled to be deposed on November 3, 2022), and his former supervisor, Roel Andriessen (scheduled to be deposed on November 2, 2022), employees who were in turn supervised by other senior executives deposed in this litigation, including Shane Miller and Noel White.[4] Whatever information Mr. Matsumoto may have about Tyson's alleged strategy of "disappearing pork on the export markets" would be duplicative of testimony his direct and indirect supervisors, who have management responsibility for Tyson's export sales strategy, will provide. (Mem. at 6.) For example, Plaintiffs can ask Mr. Matsumoto's former supervisor, Mr. Andriessen, about the email chain involving Mr. Matsumoto, Mr. Andriessen, and a Tyson employee with responsibility for sales to China regarding rumors about Smithfield's strategy for selling pork to China. (*See* Mem. at 6, n.19.)

### B. Plaintiffs Have Been Aware of Mr. Matsumoto for Several Months and Cannot Show Good Cause to Take His Deposition After the Close of Fact Discovery

Plaintiffs, not Tyson, bear the responsibility for their own inability to secure Mr. Matsumoto's testimony within the fact discovery period. At this late stage, it is not only impossible for Plaintiffs to comply with the legal requirements to obtain Mr. Matsumoto's testimony from Canada before the October 31, 2022 cut-off for fact discovery, but probable they could miss that deadline by six months to a year. *See, e.g.*,

---

[4] Strang Aberg Decl., at ¶ 3. Plaintiffs attempt to ascribe import to the fact that Tyson has agreed to schedule Mr. Krehbiel and Mr. Andriessen's depositions two to three days after the discovery cut-off. (*See* Mem. at 2, n.4.) Tyson explicitly reserved all rights in agreeing to these modest diversions from the Scheduling Order to accommodate the schedules of these witnesses, whom Plaintiffs did not first request until mid-September. (Strang Aberg Decl., Ex. I.)

8

*Cardiovascular Systems, Inc. v. Cardio Flow, Inc.*, 2020 WL 6262378, at *3 (D. Minn. May 6, 2020) (citing Louis B. Kimmelman and Steven L. Smith, The Hague Evidence Convention, 3 Bus. & Com. Litig. Fed. Cts. § 21:89 (4th ed.)) (explaining that depending on the country, it can take six to 12 months to obtain testimony from an ex-U.S. witness pursuant to letters rogatory).

Because Plaintiffs cannot take Mr. Matsumoto's deposition in accordance with the existing case schedule, they must establish "good cause" to amend the schedule to pursue his testimony. Good cause is an "exacting" standard, requiring a demonstration "that the existing schedule cannot reasonably be met despite the diligence of the party seeking the extension." *Scheidecker v. Arvig Enterprises, Inc.*, 193 F.R.D. 630, 631-32 (D. Minn. 2000). Courts have discretion to deny motions to issue letters rogatory where, as here, the party pursuing the testimony fails to demonstrate diligence in seeking to obtain it within the applicable discovery period. *See, e.g.*, *Cardiovascular Systems, Inc.*, 2020 WL 6262378, at *2 (denying motion for letters rogatory based on determination that the plaintiff "should have started the process for deposing [the relevant witness] long ago," such that its efforts its efforts to do so were "untimely" and not excused by any showing of good cause); *Bombardier Recreational Prods., Inc. v. Arctic Cat, Inc.*, 2014 WL 10714011, at *6 (D. Minn. Dec. 5, 2014) (denying a motion for letters rogatory seeking testimony from two Canadian witnesses as untimely based on failure to pursue the relevant testimony during the scheduled fact discovery period).

Plaintiffs' offered excuses for their delay in pursuing Mr. Matsumoto's testimony are unpersuasive. Plaintiffs claim they learned of Mr. Matsumoto's relevance through

9

their preparation for the deposition of Ms. McConnell, which took place nearly four months ago, on June 23, 2022.[5] But Plaintiffs offer no excuse as to 1) why they waited more than a year after the substantial completion of her document production to take the deposition of Ms. McConnell; or 2) why they then waited an additional two and a half months from that deposition to first raise Mr. Matsumoto's name to Tyson just seven weeks before the close of fact discovery, on September 9, 2022. (*See* Strang Aberg Decl. at ¶ 5.) Moreover, Ms. McConnell's testimony did not shed any new light on Mr. Matsumoto's role, and there is no reason Plaintiffs could not have discerned the facts on which they now premise Mr. Matsumoto's purported relevance well before Ms. McConnell's deposition. Tyson substantially completed its document production for all custodians more than a year ago, on September 1, 2021. (Strang Aberg Decl. at ¶ 6.[6]) And pursuant to the parties agreement on "priority custodians," Tyson substantially completed its production of documents for Ms. McConnell even earlier than that, on April 15, 2021. (Strang Aberg Decl. at ¶ 6.) Thus, the majority of the documents on which Plaintiffs now premise their need to compel Mr. Matsumoto's testimony—i.e., all

---

[5] Plaintiffs later incorrectly state that the "depth of Mr. Matsumoto's involvement was not known to Plaintiffs until Ms. McConnell testified *in late July*." (Mem. at 8 (emphasis added).) For the sake of clarity, Ms. McConnell's deposition occurred on June 23, 2022. (Strang Aberg Decl. at ¶ 4.)

[6] Plaintiffs' attempt to rely on subsequent rolling document productions made by Tyson is unavailing. (Mem. at 8 n.26.) As Plaintiffs know, these "significant document productions" were made in response to new search terms proposed by Direct Action Plaintiffs ("DAPs") that joined the case late, and do not undermine the substantial completeness of prior productions. (*See* Scarlett Decl. at ¶ 12, Ex. D (Gingerich Tr. 13:3-12 ("As counsel knows, there are ongoing productions and will be throughout this case, pursuant to new search terms that are requested by direct action plaintiffs.")).)

the documents relating to Mr. Matsumoto's alleged involvement in Ms. McConnell's "de-anonymization" efforts—have been available to Plaintiffs for approximately eighteen months.

Tyson is also not responsible for Plaintiffs' failure to timely pursue Mr. Matsumoto's testimony. Tyson has complied with its discovery obligations and did not fail to disclose Mr. Matsumoto's name in its Rule 26 disclosures. Plaintiffs misstate the requirements of Rule 26, claiming that Tyson "had a duty to disclose the name and address of each individual likely to have discoverable information," a standard with which it would be nearly impossible for a company with approximately 120,000 employees to comply. (Mem. at 7.) Instead, Tyson was required to, and did, disclose the names of individuals "likely to have discoverable information" that Tyson "may use to support its claims or defenses[.]" FRCP 26(a)(1)(A)(i). Tyson does not intend to rely on information from Mr. Matsumoto, a lower-level Canadian employee with a focus on pork sales to Japan, to support its defense of the present litigation. It is also through no fault of Tyson's that Plaintiffs apparently did not learn until September 16, 2022 that Mr. Matsumoto resides in Canada such that obtaining his testimony would require additional time. (*See* Mem. at 7, n.20.) Tyson supplied this information to Plaintiffs promptly, just one week after Plaintiffs initially inquired about taking Mr. Matsumoto's deposition, and could have provided the information about Mr. Matsumoto's Canadian residence months (or years) earlier had it been requested by Plaintiffs.[7] (Strang Aberg Decl. at ¶ 5.) While

---

[7] Mr. Matsumoto has been living and working in Canada since June 2016. Strang Aberg Decl., at ¶ 2. His Canadian residence is also reflected on his public LinkedIn page.

11

Tyson has an obligation to cooperate in discovery—and has done so—that obligation extends only to the bounds of the applicable rules. Tyson has no obligation to threaten a lower-level employee in Canada with termination if he declines to voluntarily devote multiple days to providing sworn testimony in U.S. legal proceedings. Tyson has fulfilled its obligations while Plaintiffs have delayed, and Plaintiffs' motion should be denied.

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Letters of Rogatory for Tyson Employee Sumio Matsumoto should be denied.

Dated: October 20, 2022                    Respectfully submitted,

By: /s/ Tiffany Rider Rohrbaugh
Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Brandon Boxbaum (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
Keith Holleran (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com
lstrang@axinn.com
bboxbaum@axinn.com
avissichelli@axinn.com
kholleran@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

Kail Jethmalani (*pro hac vice*)
Craig M. Reiser (*pro hac vice*)
Andrea Rivers (*pro hac vice*)
Victoria J. Lu (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
kjethmalani@axinn.com
creiser@axinn.com
arivers@axinn.com
vlu@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center

13

90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

***Counsel for Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc.***