1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
   In Re:  Pork Antitrust           )   File No. 18-cv-1776
4    Litigation                     )          (JRT-JFD)
                                    )
5                                    )
                                    )   St. Paul, Minnesota
6                                    )   November 4, 2022
                                    )   10:00 a.m.
7                                    )
                                    )
8                                    )
   ------------------------------------------------------------
9

10        **BEFORE THE HONORABLE JOHN F. DOCHERTY**
      **UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**
11

          **(MOTION HEARING VIA ZOOM)**
12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25

```
 1     APPEARANCES VIA ZOOM:

 2          For Direct Purchaser Plaintiffs:

 3              Lockridge, Grindal, Nauen, PLLP
                BRIAN D. CLARK, ESQ.
 4              JOSEPH BRUCKNER, ESQ.
                JOSEPH C. BOURNE, ESQ.
 5              Suite 2200
                100 Washington Avenue South
 6              Minneapolis, Minnesota 55401

 7              Pearson, Simon & Warshaw, LLP
                JILL M. MANNING, ESQ.
 8              555 Montgomery Street
                Suite 1205
 9              San Francisco, California 94111

10          For the Consumer Indirect Purchaser Plaintiffs:

11              Gustafson Gluek, PLLC
                DANIEL NORDIN, ESQ.
12              Suite 2600
                120 South Sixth Street
13              Minneapolis, Minnesota 55402

14              Hagens, Berman, Sobol, Shapiro, LLP
                ABBY WOLF, ESQ.
15              1301 Second Avenue
                Suite 2000
16              Seattle, Washington 98101

17          For the Commercial and Institutional Indirect Purchaser
            Plaintiffs:
18
                Cuneo, Gilbert & LaDuca, LLP
19              A. BLAINE FINLEY, ESQ.
                Suite 2200
20              4725 Wisconsin Avenue NW
                Washington, DC 20016
21
            For the MDL Direct Action Plaintiffs:
22
                Kaplan, Fox & Kilsheimer, LLP
23              MATTHEW P. MCCAHILL, ESQ.
                850 Third Avenue
24              14th Floor
                New York, New York 10022
25
```

1      **For Defendant Tyson Foods:**

2              Axinn, Veltrop & Harkrider, LLP
               TIFFANY RIDER ROHRBAUGH, ESQ.
3              1901 L Street NW
               Washington, DC 20036
4
               Axinn, Veltrop & Harkrider, LLP
5              JAROD TAYLOR, ESQ.
               90 State House Square
6              Hartford, Connecticut 06103

7      **Court Reporter:**

8              ERIN D. DROST, RMR-CRR
               Suite 146
9              316 North Robert Street
               St. Paul, Minnesota 55101

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

**(Via Zoom)**

1

2

3

4    THE COURT:  Good morning, everyone.  My name is

5    John Docherty.  I'm the U.S. Magistrate Judge assigned to

6    this case.  This is the In Re: Pork Antitrust Litigation

7    MDL.  The case number is 18-cv-1776.

8    We are here this morning for oral argument on the

9    plaintiffs' motion that I issue letters rogatory to the

10    Court in Canada to allow the taking of the deposition of an

11    employee named Sumio Matsumoto.

12    I have read the submissions of the parties.  They

13    were informative, and I thank you for them.  I think that

14    will help us guide the argument this morning.

15    Appearances have been taken while -- before I came

16    in, and I don't think there's a need to retake them.  So why

17    don't we get started.  Mr. Bourne, you may begin.  And I

18    think what I'd appreciate hearing from you, over and above

19    your prepared remarks, would be, number one, how long is

20    this going to take, and, number two, what rejoinder you've

21    got to Tyson's statement that this should have been done

22    some time ago.

23    MR. BOURNE:  Thank you, Your Honor.  Joe Bourne

24    here for the direct purchaser plaintiffs from Lockridge

25    Grindal Nauen and also speaking on behalf of all plaintiffs.

1        We don't know exactly how long it will take.  My

2    guess would be, based on the information we've seen, it

3    could be six months.  I think it's important to note that

4    extending the fact discovery deadline to allow this

5    deposition to occur would not impact the schedule in any

6    other manner.  Class certification is set to be heard in

7    late January.  We're going to be speaking with the Court

8    in -- later this month about deadlines for merits expert

9    discovery and dispositive motion briefing.

10        We would anticipate that those would be -- we

11    haven't finished our meet and confer, but I don't expect the

12    merits expert reports to occur any less than six months from

13    now, and summary judgment, of course, would be some several

14    months after that would be my expectation.  Of course that

15    will be something we'll be discussing with the Court in a

16    couple of weeks.

17        THE COURT:  Mr. Bourne, I mean, this is your case,

18    and you know it very well, I'm sure.  But if you're going to

19    be having expert -- proceedings regarding expert witnesses

20    in the spring and this letter rogatory might take six

21    months, at least in my experience, experts like to give

22    their opinion on the basis of a fully-developed fact

23    discovery record.  Is that going to be a problem here?

24        MR. BOURNE:  Your Honor, I don't anticipate that

25    it will be a problem.  The parties haven't -- we're still

1    waiting to hear from the defendants on their view of when

2    merits expert discovery should occur or if it should occur.

3    So it's hard to say right now.  But I don't anticipate that

4    it will be a problem.  The plaintiffs, as the party with the

5    burden of persuasion, will be prepared to submit their

6    merits expert reports.

7           As to timeliness, Tyson relies heavily on two

8    cases in its papers, and those cases are both very different

9    than the circumstances here; the *Cardiovascular Systems*

10   opinion that Judge Menendez wrote, and the *Bombardier*

11   *Recreational Products* opinion from Judge Brisbois.

12          In both of those cases, fact discovery had closed

13   before the motion for a letter rogatory was filed.  In

14   *Cardiovascular Systems*, the Court noted that a significant

15   amendment of the scheduling order would be required because

16   both discovery had closed and the case was on the eve of

17   summary judgment with a hearing date already in place.

18          In *Bombardier Products*, discovery had, one,

19   closed, including multiple extensions specifically to

20   complete only identified depositions, and yet the parties

21   seeking the depositions there ignored that and waited on the

22   foreign depositions.  There, the witnesses were disclosed in

23   the initial disclosures, unlike here.  Those were also

24   breach of contract and patent cases which involved far fewer

25   documents and potential deponents than an antitrust

1    conspiracy case such as this one.

2         THE COURT:  I take your point that in the

3    *Bombardier* and the cardiac case, the parties didn't move for

4    the letters rogatory until fact discovery had closed.  You

5    did get in I think I can say under the wire without it being

6    a stretch.

7         Tell me about good cause here, though.  I mean,

8    you're going to not only be asking for letters rogatory,

9    you're also asking for an amendment to the scheduling order

10   and that does require good cause.  So what is the good cause

11   for extending the scheduling order to accommodate this

12   deposition?

13        MR. BOURNE:  Good cause focuses on the diligence

14   of the plaintiffs and also considers any prejudice to the

15   party opposing the motion.  There's no prejudice to Tyson

16   here.  I think the diligence of the plaintiffs in conducting

17   discovery is likely to be the central consideration per the

18   Court.

19        Tyson produced over a million documents.  The

20   defendants and certain third parties have produced over

21   3.8 million documents.  Tyson produced a large chunk of

22   those documents by the substantial completion deadline in

23   September 2021, although it continued to produce documents

24   until very recently on a rolling basis.  Those remaining

25   productions were smaller, but they still appeared.

1        It takes a long time to review 3.8 million

2    documents.  The plaintiffs have taken approximately 87

3    depositions.  We were allotted ten per defendant,

4    including -- and for Tyson, we're seeking Mr. Matsumoto as

5    the tenth.  It takes time to work through millions of

6    documents and dozens of depositions.

7        THE COURT:  Before you go on, let me ask you about

8    the -- about the timing -- the timing of document production

9    specifically.  I mean, you say these are rolling

10   productions.  You got some documents only just before

11   depositions.  But is it not correct that those documents

12   were produced because certain other plaintiffs had joined

13   the case; in other words, that the document production

14   requests that were specific to the plaintiffs who were in

15   the case when this came up had been completed?

16       MR. BOURNE:  The direct action plaintiffs were in

17   the case during the discovery period, Your Honor.  It is

18   true that the requests for which the most recent productions

19   occurred were responsive to requests by those direct action

20   plaintiffs, and they did enter the case later than the class

21   plaintiffs.  But, you know, they were participating in

22   discovery during that timeframe.

23       THE COURT:  So were there then document requests

24   for those direct action plaintiffs?  Let me ask it a

25   different way:  Were the documents that came in relatively

1    shortly before the depositions, were those direct action

2    plaintiff documents or were those documents for the balance

3    of the case?

4         MR. BOURNE:  Your Honor, my understanding is that

5    they were responsive to the negotiations with the direct

6    action plaintiffs; however, they weren't specific to the

7    direct action plaintiffs.  It wasn't as simple as produce

8    your e-mails with direct action plaintiff US Foods, for

9    example.  They sought substantive liability evidence that

10   was generally applicable to all plaintiffs for all of their

11   cases against the defendants, and that is part of why there

12   were substantial meet and confer efforts between the

13   defendants and the direct action plaintiffs and part of why

14   it took so long to get those additional documents.

15        THE COURT:  And I take your point.  But I think my

16   point, when you are talking about good cause, is it sounds

17   to me like on the landscape as it existed when this issue

18   came up regarding Mr. Matsumoto, Tyson had done what it was

19   required to do.  The extra documents that you place some

20   emphasis on in your motion papers were not documents that

21   you had asked for, in other words.

22        MR. BOURNE:  The direct action plaintiffs aren't

23   parties to this motion, however, I agree with the synopsis

24   that Your Honor just articulated.  And I think it's

25   important to note that the bulk of Tyson's million-plus

1    documents, yes, they were produced by September 2021.

2    That's still a million documents, that's three-plus million

3    documents from the defendants.  We can't immediately review

4    those and determine which are the people that need to be

5    deposed.  It takes time to work through that.

6              And --

7              THE COURT:  Okay.  So why then -- that's a good

8    opening.  Why then do you -- are you so eager to take the

9    deposition of Mr. Matsumoto?  I know that Ms. McConnell had

10   things to say about him.  But the defendants point out that

11   Mr. Matsumoto's supervisors are also in this case; and, in

12   fact, I think, correct me if I'm wrong, but Mr. Krehbiel

13   should have been deposed yesterday and Mr. Andriessen the

14   day before yesterday.  I believe they are both supervisors

15   of Mr. Matsumoto.  Did anything come out of those

16   depositions that changes this motion hearing this morning?

17             MR. BOURNE:  Your Honor, the -- pursuant to the

18   request of one of those witnesses, Jay Krehbiel, that

19   deposition is now going to occur on November 16th.

20             THE COURT:  Okay.

21             MR. BOURNE:  Mr. Andriessen was deposed two days

22   ago on November 2nd.  And I believe that that deposition

23   shed further light on the importance of the deposition of

24   Mr. Matsumoto.

25             THE COURT:  Could you expand on that, please?

 1              MR. BOURNE:  Yes, Your Honor.  There are two areas

 2      in which we believe that Mr. Matsumoto has important unique

 3      additional evidence based on his own personal knowledge and

 4      direct involvement.  One is identifying competitors in Agri

 5      Stats reports, the other is export sales of pork out of the

 6      United States to Japan and Asia.

 7              Mr. Andriessen -- my understanding is that

 8      Mr. Andriessen supervised Mr. Matsumoto in the export area.

 9      He was not aware of whether Mr. Matsumoto talked to

10      competitors about export sales of pork.  He testified that

11      he never asked him that.

12              That is an important issue in the case.

13      Mr. Matsumoto had information about defendant JBS visiting a

14      customer in Japan.  And Mr. Matsumoto told other employees

15      of Tyson not to mention that they knew about the visit.

16      Mr. Andriessen speculated that Mr. Matsumoto got the

17      information from the customer, but he doesn't know because

18      he didn't ask Mr. Matsumoto.  Mr. Matsumoto is the one who

19      knows.

20              I also think it's worth noting, Your Honor, that

21      on October 12th, the day before the plaintiffs filed this

22      motion, a deposition of a Seaboard witness, Duke Sand,

23      occurred in which Seaboard terminated the deposition so that

24      the witness could obtain independent counsel and consider

25      whether to invoke the Fifth Amendment for questions related

1    to communications with competitors about export sales and

2    pricing to Japan.

3              THE COURT:  Okay.  Who was that again?

4              MR. BOURNE:  Duke Sand of Seaboard.

5              THE COURT:  Okay.

6              MR. BOURNE:  And the issue there --

7              THE COURT:  Forgive me for having to ask.  Is

8    Seaboard a Tyson subsidiary?

9              MR. BOURNE:  No, Your Honor.  It's one of Tyson's

10   competitors and co-defendants in this case.

11             THE COURT:  Okay.

12             MR. BOURNE:  But the subject matter there, export

13   sales to Japan and communications with competitors in which

14   he might invoke the Fifth Amendment at the remainder of his

15   deposition, is one for which Mr. Matsumoto had authority and

16   was the person at Tyson according to the other -- the other

17   testimony of Tyson individuals.

18             THE COURT:  Okay.  And you also -- besides export

19   sales of hogs to Asia, you also want to talk with

20   Mr. Matsumoto about decoding the Agri Stats data; correct?

21   I have to observe, I see some tension between your complaint

22   and your motion papers here.  The complaint -- at least I

23   took away from it that Agri Stats was fairly transparent

24   that this was the way that the competitors communicated with

25   each other and maintained their price-fixing conspiracy.

1     But now it sounds as though decoding Agri Stats is really a

2     job for the National Security Agency and you need to go see

3     Mr. Matsumoto in Japan to figure it all out.  Is there some

4     tension there between the difficulty of Agri Stats in the

5     complaint versus the difficulty of decoding Agri Stats in

6     the papers that you submitted in support of this motion?

7         MR. BOURNE:  I don't believe there's tension

8     necessarily.  As discovery has occurred, of course we've

9     learned more about how the deanonymization process works.

10    What we believe the evidentiary record now supports is that,

11    yes, the defendants did monitor their conspiracy, in part,

12    through decoding the information in the Agri Stats reports.

13        And what we know is that the other Tyson employees

14    have, you know, said they don't know what Mr. Matsumoto

15    knew, how he knew it, or how he contributed.  Ms. McConnell

16    testified that Mr. Matsumoto provided information that was

17    important to her in that process, but she couldn't -- other

18    than saying it was based on his knowledge and his contacts

19    and his history in the industry, she couldn't specify, you

20    know, how he provided the information that she used to

21    attempt to deanonymize the Agri Stats reports, and,

22    therefore, we believe it's important to Mr. Matsumoto to

23    find out did you talk to competitors.  Where did you get the

24    information that you provided?  How did you get the

25    information you provided?

1          I also think it's really important to note,

2    Your Honor, this is a discovery motion.  The question --

3    setting aside the timeliness issue where the plaintiffs need

4    to show good cause, we only need to show that this will

5    further discovery, and then Tyson needs to show that there's

6    good cause not to take the deposition under the prevailing

7    standard.

8          What Tyson is really trying to do is to have an

9    early adjudication of summary judgment, who has the better

10   evidence on whether these Agri Stats reports were used to

11   identify competitors, whether that mattered.  And that's

12   simply inappropriate for a discovery motion in the

13   plaintiffs' view.

14          THE COURT:  Okay.  All right.  Those are all the

15   questions I have, but is there more that you think it's

16   important for me to keep in mind as I make my decision?

17          MR. BOURNE:  Your Honor, I believe that addresses

18   the key points that I was planning to discuss as well.  I

19   would request the right to respond to argument by Ms. Strang

20   Aberg.

21          THE COURT:  Yeah, I'll give you a few minutes

22   after Ms. Strang Aberg has spoken.  It will be limited, of

23   course, to the points that she makes, and I won't let you

24   introduce any new material, okay?

25          MR. BOURNE:  Thank you.

1       THE COURT:  Ms. Strang Aberg, over to you.  And

2   would you begin by helping -- how do you wish to be

3   addressed?  Is it Strang Aberg?  Is it Strang?

4       MS. STRANG ABERG:  You can just say Aberg.

5       THE COURT:  Aberg, so I'm -- not even Aberg.

6   Aberg, okay.

7       All right.  You know, looking at this, it does

8   seem that Tyson is very anxious not to have Mr. Matsumoto's

9   deposition taken, and this causes a little bit of a raised

10  eyebrow on my part.  I hear all the things you're saying

11  about timeliness, but, really, Mr. Matsumoto's deposition

12  could be taken on Monday if Tyson would tell him it's part

13  of his job to have this deposition taken.

14      MS. STRANG ABERG:  Yes, Your Honor, so here's how

15  I would respond to that.  I mean, first, this is a unique

16  situation.  Mr. Matsumoto is distinguishable from the many

17  other witnesses that Tyson has already made available for

18  deposition.  They have all been U.S. residents, and most of

19  them have been officers or directors of Tyson such that they

20  are subject to deposition by notice, whereas, Mr. Matsumoto

21  is a lower-level employee and is not.

22      Mr. Matsumoto also is not willing to testify, and,

23  put simply, Tyson is not obligated to do more than the law

24  requires to help plaintiffs sue us, essentially.  And

25  plaintiffs seem to want to imply that there's something

1    untoward about Tyson not using the threat of termination to

2    force this, but really what this comes down to is this

3    person is a lower-level employee.  We don't plan to rely on

4    his testimony, and we don't think we need it.  We don't

5    think it's essential to the case.  And we don't want to

6    force him to give up his legal rights.  They are perfectly

7    able to pursue his testimony, you know, in accordance with

8    the law, but we don't believe that we should have to

9    intervene on their behalf to force him to do something he

10   doesn't want to do.

11        THE COURT:  And I would accept all of that were it

12   not that you are also saying this will delay things for 6 to

13   12 months.  You cite a treatise on international discovery

14   for that proposition.  And, yes, you are entitled to compel

15   the plaintiffs to follow the law and get letters rogatory

16   and go to Canada and depose Mr. Matsumoto if it comes to

17   that, but I don't think that you can simultaneously say, Oh,

18   this will take a very long time, and, therefore, that's one

19   reason why it ought to be denied.

20        MS. STRANG ABERG:  Your Honor, I understand that

21   tension and that counterpoint to our argument of course.  I

22   will say also to the plaintiffs' point that there is no

23   prejudice to Tyson to making Mr. Matsumoto available, we

24   disagree with that as well.  Mr. Matsumoto is Japanese.

25   He's a non-native and non-fluent English speaker.  His

1    deposition will be considerably more time-consuming,

2    expensive, onerous, and risky frankly for Tyson as compared

3    to other deponents simply because of that language barrier.

4    He has an imperfect command of the English language which is

5    apparent on the face of the documents that have been used in

6    this case.  And, accordingly, we will definitely need an

7    interpreter both for prep and for the deposition which will

8    delay things.

9              And, in addition, you know, I think as we all know

10   as attorneys, sitting for a deposition is a really difficult

11   exercise even for native English speakers.  We have seen in

12   this case that plaintiffs' strategy in these depositions is

13   to try to get deponents to confirm plaintiffs' desired

14   interpretations and inferences from ambiguously worded

15   e-mail communications.  The type of close reading,

16   listening, and explanation that's going to be needed to

17   respond to these types of questions is difficult enough for

18   our English speakers.  It's going to be much, much more

19   difficult for a non-native English speaker.  So we're really

20   concerned about that, and that's the prejudice.

21             THE COURT:  The other question that I had

22   concerning your motion papers was it seemed to be that

23   Mr. Matsumoto's -- your argument seemed to be that

24   Mr. Matsumoto's testimony was not relevant because the

25   plaintiffs' entire theory of the case was wrong because

1    actually Agri Stats couldn't be used to communicate among

2    the members of the price-fixing conspiracy.  That, though, I

3    mean, to Mr. Bourne's point, does seem to be more summary

4    judgment and less discovery, because if you're right about

5    that, then this whole case, I mean every witness who's been

6    questioned about Agri Stats has been giving irrelevant

7    testimony.

8          But, I mean, at this point, this case has survived

9    a couple of, you know, robust motions to dismiss, and it is

10   the theory of the case that there was a price-fixing

11   conspiracy, it was operated through a communication channel

12   of Agri Stats.  So I understand you don't agree with that,

13   but if that's the theory of the case, how can

14   Mr. Matsumoto's testimony not be relevant?

15         MS. STRANG ABERG:  I think setting aside whether

16   it's plausible or not that Agri Stats could have been used

17   in the manner alleged, which I will grant that we did

18   include some argument in our briefing of course on that

19   issue, but even setting aside whether that is the case, I

20   think plaintiffs have all they need.  I think that there is

21   no dispute, and the record is very clear that Debbie

22   McConnell at Agri Stats was the Agri Stats person at Tyson.

23   I don't think that any of the testimony that's been elicited

24   in this case in any way contradicts that or suggests that

25   Mr. Matsumoto was somehow, you know, her second in command

1   or her right-hand man on that front also analyzing the

2   reports.  In fact, the only document that plaintiffs cite in

3   their brief as support for this argument that Mr. Matsumoto

4   was essential to helping Ms. McConnell in this effort is an

5   e-mail where she e-mails four different people at Tyson

6   asking all of them, including Mr. Matsumoto, for some input

7   into the -- how she's guessing who was who.  So he's just

8   one of many.

9          And I also don't agree that either Ms. McConnell,

10  Mr. Andriessen, or anyone else who was asked about

11  Mr. Matsumoto's role at deposition, you know, broadly

12  disclaimed any knowledge of what he was doing or where he

13  got his information.

14         I would definitely take issue with the

15  characterization from Mr. Bourne that at the deposition of

16  Mr. Andriessen this week, that he testified that he doesn't

17  know where Mr. Matsumoto got his information.  That's not

18  accurate.  He testified repeatedly that he understood

19  Mr. Matsumoto had a lot of connections with customers in

20  Japan and that those customers told him information about

21  his competitors, not direct competitor communication.

22         THE COURT:  Isn't this the plaintiffs' decision to

23  make?  They look at the deposition transcript, you look at

24  the deposition transcript, both of you use that deposition

25  transcript as one input into an evolving litigation

1    strategy.  And if they look at Ms. McConnell's deposition

2    and say, I think we want to go and talk to Mr. Matsumoto,

3    don't they get to make that decision?  I mean, I'm not

4    talking about this motion.  But if they, in your view, want

5    to waste one of their ten depositions on Mr. Matsumoto,

6    that's their lookout, isn't it?

7         MS. STRANG ABERG:  Your Honor, definitely.  I

8    absolutely agree with that.  The tension here though is the

9    requirement to show good cause.  They cannot get this

10   deposition done within the timeframe allotted to them, and

11   they have had a lot of time.  And as far as the document

12   productions go, I think that's been really misconstrued.

13   The documents that they rest this motion on, the documents

14   establishing that Mr. Matsumoto talked to Debbie McConnell

15   about Agri Stats and also had communications with people

16   within Tyson about exports, those have been in the discovery

17   record for 18 months or more.  They are not -- none of the

18   docs they are citing in their brief are from these recent

19   productions that they point out, and so it's just a side

20   show.  It's not relevant.

21        So they had access to these materials.  They

22   elected to wait over a year after receiving all of Debbie's

23   documents before deposing Debbie, and even then, they

24   deposed her in June and waited two and a half more months

25   before raising Mr. Matsumoto's name.  So it's just delay

1   after delay.

2           Of course they have the right -- they could have,

3   a week after Ms. McConnell's deposition, come to us and

4   said, Mr. Matsumoto is really interesting.  We want to

5   depose him.  And maybe there would have been time to do so

6   within the scheduling order at that point.  But, instead,

7   they waited until the very, very end of fact discovery.  I

8   think it's only fair for them to suffer the consequences of

9   that.

10          THE COURT:  Is it part of my decision that

11  Mr. Bourne has represented that this case can go forward as

12  scheduled, that there will be no knock-on effects or

13  collateral consequences to other deadlines if this motion is

14  granted?

15          MS. STRANG ABERG:  I don't think that's fair to

16  say.  As Mr. Bourne stated, it's still very much in flex and

17  to be determined what the schedule will be.  Direct action

18  plaintiffs, for example, I think want to get moving with

19  expert discovery and have proposed a schedule that -- or at

20  least initially proposed a schedule that would have expert

21  reports being filed certainly prior to six months from now.

22  We don't exactly know what the timing will be, but I don't

23  think it's at all a safe assumption that it will not -- that

24  this deposition being taken pursuant to the Canadian Court's

25  process will not interfere.

1          And also of course there's no commitment that it

2     takes six months.  As Your Honor knows, I'm sure full well,

3     you can't accurately predict how long something is going to

4     take in a court, in particular, in a foreign court.

5     Mr. Bourne said they estimate around six months.  It could

6     be longer than that, surely.

7          THE COURT:  Okay.  All right.  You've answered all

8     my questions, but what else do you want to tell me before I

9     make up my mind?

10          MS. STRANG ABERG:  I think I would like to just

11     address a few of the points that Mr. Bourne raised that we

12     haven't discussed yet.  I think, one, this point about

13     Seaboard and the deposition of a Seaboard CEO being cut

14     short by Seaboard's attorney because of apparent -- or based

15     on questioning on a document that showed communications

16     between Seaboard and its competitors, it was a communication

17     between Seaboard and one competitor, not Tyson.  Plaintiffs

18     have not suggested anything that would -- or put forward any

19     documents or any testimony that would suggest that

20     Mr. Matsumoto even knows Duke Sand or the other person at

21     the competitor -- non-Tyson competitor that Duke Sand was

22     allegedly talking to about this sensitive information.  And

23     so it's just got no connection whatsoever to Mr. Matsumoto

24     except for the fact that Mr. Matsumoto is Japanese and sells

25     pork to Japan.  So I don't think there's any indication

1    whatsoever that that makes the motion any stronger.

2          And then I think just also to the point that no

3    one can say but Mr. Matsumoto who Mr. Matsumoto's sources

4    were for the information he had about competitors, the

5    document that plaintiffs cite in their motion on that point,

6    it does not support any reading that he was getting this

7    information from Smithfield directly.

8          The document on its plain face references that

9    this is rumors about what Smithfield may do.  And so it's

10   just not consistent with the notion that he was getting the

11   information from Smithfield directly.  And it, I don't

12   think, supports the contention that there's -- you know,

13   that he's got sketchy competitor communications that he

14   needs to answer for.

15          THE COURT:  Okay.  All right.  Thank very much.

16          MS. STRANG ABERG:  Yeah.

17          THE COURT:  I appreciate it.

18          Mr. Bourne, is it correct that that document that

19   this motion is premised upon was in your custody for

20   18 months before this motion was made?

21          MR. BOURNE:  Your Honor, I have -- I'm not

22   certain, frankly.  I can't -- won't dispute it.  I'm sure

23   that Ms. Aberg is truthfully representing the timing of when

24   that document was produced, although, again, I think it's

25   important to note they've produced a lot of documents.  The

1    plaintiffs can't be expected to instantly know what all of

2    them say.

3            I also think it's important to note that part of

4    our strategy in determining who to depose has to be you see

5    how the depositions go.  We deposed Ms. McConnell first or

6    second among Tyson because we anticipated that she had

7    important information about identifying competitors in Agri

8    Stats reports.  We then deposed, you know, a handful of

9    other people, each time evaluating who makes sense, who do

10   we need, who can fill, not gaps necessarily, but who can

11   provide additional information we think will be important.

12   It took time to work through that process, and we eventually

13   identified Mr. Matsumoto.

14           We also --

15           THE COURT:  Well, I'll take your second point that

16   after you've taken a deposition, you need to do some

17   analysis, but I will not -- I can't accept your first point

18   about difficulty of analyzing a volume of evidence.  There

19   is a lot of material in this case, but there is a lot of

20   lawyers in this case.  Reading these papers last night, I

21   mean, half of these submissions are signature pages.  And

22   right now there's 23 attorneys participating in this hearing

23   and -- while another hearing is going on at the same time in

24   front of Judge Tunheim.  So certainly I believe that the

25   personnel are here to analyze documents, but I will accept

1       that there's some measure of needing to review a deposition

2       and then make some decisions, but I keep coming back to the

3       fact that this is -- I mean, this document where

4       Ms. McConnell says, Reach out to Mr. Matsumoto and get his

5       guesses as to who these people are on the Agri Stats

6       reports, if you've had that for 18 months, it's a concern.

7                   MR. BOURNE:  Your Honor, I do believe we've had

8       that for 18 months.

9                   The other point that I wanted to address briefly

10      that Ms. Aberg raised is the fact that Tyson's other

11      witnesses were subject to deposition by notice and not

12      Mr. Matsumoto because he's a lower-level employee.  Every --

13      Tyson's other witnesses include former employees and current

14      employees.  Every witness for every defendant in this case,

15      80 some depositions or 70 something, I think, every single

16      one has been deposed by notice without need for subpoena,

17      including former employees who theoretically would require a

18      subpoena, because that has been the parties' practice in the

19      case with one exception, Josh Edwards of Agri Stats, who

20      Agri Stats did not know how to contact.

21                  So we reasonably anticipated that Mr. Matsumoto

22      would also -- you know, we would ask Tyson to take his

23      deposition, which we did at the start of September, two

24      months before the close of fact discovery, and we

25      anticipated that they would make him available by Zoom like

1    they and all the other defendants have done throughout the

2    last year and a half of depositions.

3              THE COURT:  All right.  Thank you both.  Let's

4    take a couple of minutes for me to review some notes.  And

5    then I will come back out and, if possible, I'll give you a

6    decision.  Okay.  Stand by.

7         (Recess taken at 10:35 a.m.)

8                        *    *    *    *    *

9    (10:39 a.m.)

10                          **IN OPEN COURT**

11

12             THE COURT:  All right.  Let's resume.

13             Ms. Drost, are you ready to go?

14             THE COURT REPORTER:   (Nods head.)

15             THE COURT:  Okay.  Plaintiffs' motion for letters

16   rogatory will be granted.  I'm not planning on issuing a

17   written order on this, and so the transcript of what I'm

18   about to say will be the Court's order on this point.

19             The first question is whether Mr. Matsumoto has

20   relevant discoverable information.  He does.  The defendants

21   think that, as I understand them, were they in plaintiffs'

22   shoes, this isn't the person they would spend one of their

23   ten depositions to Tyson on, but that is the plaintiffs'

24   decision to make.  And it is clear, given the correspondence

25   between Ms. McConnell and Mr. Matsumoto and also

1    Mr. Matsumoto's involvement in the sale of hogs to Asian

2    customers, that Mr. Matsumoto does, in fact, have relevant

3    and discoverable information.

4            The more, I won't say challenging, but the piece

5    of this that takes a bit more analysis is good cause.  This

6    is a very large and very complicated case; but as I pointed

7    out during the oral argument, it's also a very well-staffed

8    case.  However, it is true, of course, that both parties are

9    constantly evaluating what their next decision in terms of

10   this litigation ought to be, and I absolutely accept

11   plaintiffs' representation that following the deposition of

12   Ms. McConnell, they made the decision to seek to depose

13   Mr. Matsumoto.

14           I believe that the plaintiffs have acted

15   diligently.  I also believe part of what factors into that

16   is Mr. Bourne's representation that this was -- the

17   requirement that Mr. Matsumoto be deposed pursuant to

18   letters rogatory was a departure from the practice of the

19   parties in this particular litigation.

20           So because Mr. Matsumoto has relevant and

21   discoverable information, because there's good cause for a

22   very limited amendment of the pretrial scheduling order, the

23   letters rogatory will issue.

24           I do want to make clear that the modification of

25   the pretrial scheduling order is just for the deposition of

1   Sumio Matsumoto pursuant to letters rogatory in Canada.  So

2   that is that.

3           I believe the next step, though, Mr. Bourne, in

4   terms of letters rogatory, is I need an actual physical

5   document that can be sealed and signed and so forth.  And

6   I'll put it on you to research all of those requirements and

7   get me what it is that I need.

8           I'm also going to ask you -- and I know you have

9   the resources -- to be very sure of Canadian law and, to the

10  extent it is relevant in a situation like this, the law of

11  the province in which Mr. Matsumoto is located.  I am

12  concerned about timing.  And I certainly don't want this to

13  be sent back by the Canadian authorities for a do-over

14  because it wasn't done right the first time.

15          So that is the ruling of the Court.  Mr. Bourne,

16  do you have any requests for clarification concerning the

17  ruling I've just made?

18          MR. BOURNE:  No, Your Honor.  We will make sure to

19  get you the materials correctly as soon as possible, and we

20  are partnering with counsel in British Columbia to make sure

21  we follow the law correctly.

22          THE COURT:  Good.  Glad to hear that.

23          Ms. Aberg, any requests for clarification

24  concerning the Court's ruling?

25          MS. STRANG ABERG:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Thank you all.  Have a

2     good weekend.  I'm sure we'll be talking again as this case

3     goes forward.  Take care.  Court is adjourned.

4          (Court adjourned at 10:44 a.m.)

5                         *     *     *

6

7

8          I, Erin D. Drost, certify that the foregoing is a

9     correct transcript from the record of proceedings in the

10    above-entitled matter to the best of my ability.

11

12              Certified by:  *s/ Erin D. Drost*

13                             Erin D. Drost, RMR-CRR

14

15

16

17

18

19

20

21

22

23

24

25