**UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF MINNESOTA**

IN RE PORK ANTITRUST
LITIGATION


This Document Relates To:

THE DIRECT PURCHASER
PLAINTIFF ACTION

Case No. 18-cv-01776 (JRT-JFD)

Honorable John R. Tunheim

Magistrate Judge John F. Docherty

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**[UNREDACTED VERSION FILED UNDER SEAL]**

984215.1

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................. 1

II.     COMMON ISSUES OF LAW AND FACT PREDOMINATE OVER
        INDIVIDUAL ISSUES ........................................................................................ 1

        A.      Common Evidence Will Be Used to Show the Class-Wide Impact of
                Defendants' Conspiracy ......................................................................... 3

                1.      Defendants' Arguments Regarding "Uninjured Class
                        Members" Are Legally and Economically Flawed ........................... 6

                2.      Defendants' Arguments Regarding "Economic Realities"
                        Cannot Support Denial of Class Certification.................................. 8

                        (a)     Defendants' attempt to minimize their control over hog
                                production is neither credible nor persuasive. ....................... 8

                        (b)     Defendants' focus on hog producer returns is
                                misplaced................................................................................ 10

                        (c)     Defendants' arguments regarding export demand do
                                not support denial of class certification. .............................. 11

        B.      Defendants' Arguments Regarding Impermissible "Averaging" Are
                Misleading and Legally Deficient .......................................................... 12

                1.      Basing the Damages Model on the Conspiracy Period Is
                        Appropriate.................................................................................... 14

                2.      The Benchmark Period Is Appropriate ........................................... 15

III.    DEFENDANTS' OTHER ARGUMENTS IN OPPOSITION TO CLASS
        CERTIFICATION ARE WITHOUT MERIT......................................................... 18

        A.      The Named Plaintiffs' Claims Are Typical............................................... 18

                1.      Plaintiffs Are Not Required to Have a Representative for
                        Different Sized Class Members ...................................................... 20

                2.      Geographical Differences in Class Representatives Are Not
                        Relevant to Typicality .................................................................... 22

                3.      DPPs' Contracting Methods Do Not Defeat Typicality.................. 23

        B.      The Named Plaintiffs Are Adequate ...................................................... 26

                1.      Named Plaintiff John Gross has No Intra-Class Conflicts.............. 26

                2.      Named Plaintiff Olean Is an Adequate Class Representative ......... 26

i

IV.    DEFENDANTS' CHARACTERIZATION OF AND ATTEMPT TO
       DISTINGUISH *BROILERS* IS INCORRECT AND OF NO
       CONSEQUENCE ................................................................................................ 28

V.     CONCLUSION ................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ................................................................................ 25

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) ...................................................................................... 18

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) .................................................................................... 15

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .............................................................................................. 2, 26

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ................................................................................................ 2, 3

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) .......................................................................................... 7

*In re Automotive Parts Antitrust Litig.*,
  No. 12-00501, 2019 WL 626143 (E.D. Mich. Jan. 7, 2019) ...................................... 25

*In re Baycol Prods. Litig.*,
  218 F.R.D. 197, 205 (D. Minn. 2003) ........................................................................ 20

*Belles v. Schweiker*,
  720 F.2d 509 (8th Cir. 1983) ............................................................................... 19, 20

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ................................................................................. 3, 13

*In re Blood Reagents Antitrust Litig.*,
  MDL No. 09–2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) .............................. 16

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) .................................................................................................... 5

*Bolanos v. Norwegian Cruise Lines Ltd.*,
  212 F.R.D. 144 (S.D.N.Y. 2002) ............................................................................... 28

*In re Broiler Chicken Antitrust Litig.*,
   No. 16 C 8637, 2018 WL 3398141, at *1 (N.D. Ill. July 12, 2018) ........................... 27

*In re Broiler Chicken Antitrust Litig.*,
   No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) .............................*passim*

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ................................................................................ 5

*In re Catfish Antitrust Litig.*,
   826 F. Supp. 1019 (N.D. Miss. 1993) .................................................... 20, 24

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................................................*passim*

*Cordoba v. DIRECTV, LLC*,
   942 F.3d 1259 (11th Cir. 2019) ................................................................ 7

*In re Domestic Air Transp. Antitrust Litig.*,
   137 F.R.D. 677 (N.D. Ga. 1991) .............................................................. 24

*Elizabeth M. v. Montenez*,
   458 F.3d 779 (8th Cir. 2006) ................................................................ 1, 2

*Fidel v. Farley*,
   No. 1:00-CV-48-M, 2004 WL 7340526 (W.D. Ky. Jan. 15, 2004) ........................... 27

*Food Lion, LLC v. Dean Foods Co.*,
   321 F.R.D. 472 (D.P.R. 2017) ................................................................ 23

*FTC v. Superior Court Trial Lawyers Ass'n.*,
   493 U.S. 411 (1990) ................................................................................ 5

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ........................................................ 21, 24

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) .............................................................................. 26

*Illinois Brick Co. v. Illinois*,
   431 U.S. 724-725 (1977) ........................................................................ 26

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   No. CV 05-485-LPS, 2014 WL 6601941 (D. Del. Aug. 6, 2014) ....................... 21, 24

*Kleen Prod. LLC v. Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ........................................................................ 5, 6

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    571 F.3d 672 (7th Cir. 2009) .......................................................................... 13

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir. 2019) ........................................................................... 7

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ............................................................ 17

*In re Linerboard Antitrust Litig*,
    305 F.3d 145 (3d Cir. 2002) ........................................................................... 19

*Manpower, Inc. v. Ins. Co. of Pennsylvania*,
    732 F.3d 796 (7th Cir. 2013) ............................................................. 5, 11, 13

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ........................................................................ 2, 7

*In re Milk Prods. Antitrust Litig.*,
    195 F.3d 430, 437 (8th Cir. 1999) ................................................................. 23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ................................................................... *passim*

*In re Optical Disk Drive Antitrust Litig.*,
    303 F.R.D. 311, 317 (N.D. Cal. 2014) ........................................................... 25

*In re Packaged Seafood Prods. Antitrust Litig.*,
    332 F.R.D. 308 (S.D. Cal. 2019) .................................................................... 17

*Paxton v. Union Nat'l Bank*,
    688 F.2d 552 (8th Cir. 1982) ......................................................................... 18

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020) ............................................................ 14

*Postawko v. Missouri Dep't of Corr.*,
    910 F.3d 1030 (8th Cir. 2018) .......................................................................... 2

*In re Potash Antitrust Litig.*,
    159 F.R.D. 682 (D. Minn. 1995) ........................................................... 1, 20, 24

*In re Pre-Filled Propane Tank Antitrust Litig.*,
No. 14-02567-MD-W-GAF, 2021 WL 5632089 (W.D. Mo. Nov. 9,
2021) ........................................................................................................ 13, 15

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
934 F.3d 619 (D.C. Cir. 2019) ................................................................ 8

*Reed Const. Data Inc. v. McGraw-Hill Cos., In*c.,
49 F. Supp. 3d 385 (S.D.N.Y. 2014)........................................................ 17

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005).............................................................. 19

*Stecyk v. Bell Helicopter Textron, Inc.*,
295 F.3d 408 (3d Cir. 2002)...................................................................... 18

*In re Sulfuric Acid Antitrust Litig.*,
743 F. Supp. 2d 827 (N.D. Ill. 2010) ...................................................... 5

*Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*,
577 F. Supp. 3d 970 (D. Minn. 2021) (Tunheim, J.) .................................. 28

*In re Terazosin Hydrochloride Antitrust Litig.*,
223 F.R.D. 666 (S.D. Fla. 2004) .............................................................. 27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010)............................................................. 13

*In re Turkey Antitrust Litig.*,
No. 1:19-cv-08318, 2021 WL 6428398 (N.D. Ill. Dec. 16, 2021) ............................. 27

*In re Urethane Antitrust Litig.*,
251 F.R.D. 629 (D. Kan. 2008)................................................................. 19

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ............................................................... 13

*In re Urethane Antitrust Litig.*,
MDL No. 1616, 2012 WL 6681783 (D. Kan. Dec. 21, 2012).................................... 16

*Westinghouse Elec. Corp. v. Gulf Oil Corp.*,
588 F.2d 221 (7th Cir. 1978) .................................................................. 5

*In re Wirebound Boxes Antitrust Litig.*,
128 F.R.D. 268 (D. Minn. 1989)............................................................... 24

*In re Workers' Compensation*,
130 F.R.D. 99 (D. Minn. 1990) .................................................................... 19

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
267 F.R.D. 549 (D. Minn. 2010) ................................................................. 18

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) ........................................................................ 8

## Other Authorities

1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3.13 at
3-79 & n.208 (3d ed. 1992) .......................................................................... 24

Fed. R. Civ. P. 34 ........................................................................................... 27

Fed. R. Civ. P. 23(a)(4) .................................................................................. 26

| INDEX OF DEFINED TERMS* | |
|---|---|
| **Defined Term** | **Meaning** |
| Class | "All persons and entities who directly purchased one or more of the following types of pork, or products derived from the following types of pork, from Defendants, or their respective subsidiaries or affiliates, for use or delivery in the United States from June 29, 2014 through June 30, 2018: fresh or frozen loins, shoulders, ribs, bellies, bacon, or hams. For this lawsuit, pork excludes any product that is marketed as organic or as no antibiotics ever (NAE); any product that is fully cooked or breaded; any product other than bacon that is marinated, flavored, cured, or smoked; and ready-to-eat bacon. Excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action." *See* ECF No. 1320, Direct Purchaser Plaintiffs' Motion for Class Certification, p. 31. |
| Class Period | June 29, 2014 through June 30, 2018, inclusive. *See* ECF No. 1320, Direct Purchaser Plaintiffs' Motion for Class Certification, p. 31. |
| Class Pork Products | The following types of Pork, or products derived from the following types of Pork, included in the Class definition: fresh or frozen loins, shoulders, ribs, bellies, bacon, or hams. For this lawsuit, Class Pork Products excludes any product that is marketed as organic or as no antibiotics ever (NAE); any product that is fully cooked or breaded; any product other than bacon that is marinated, flavored, cured, or smoked; and ready-to-eat bacon. *See* ECF No. 1320, Direct Purchaser Plaintiffs' Motion for Class Certification, p. 31. |
| Class Representatives | Plaintiffs Maplevale Farms, Inc.; John Gross and Company, Inc.; Ferraro Foods, Inc. and Ferraro Foods |

## INDEX OF DEFINED TERMS*

| | |
|---|---|
| | of North Carolina, LLC; and Olean Wholesale Grocery Cooperative, Inc. |
| Class Rep. Decls. | Collectively refers to the following declarations on behalf of each of the named Plaintiffs, filed as Exhibits to the Declaration of Bobby Pouya (ECF No. 1322): (1) Maplevale Farms, Inc. (ECF No. 1322-4); (2) John Gross and Company, Inc. (ECF No. 1322-5); (3) Ferraro Foods, Inc. and Ferraro Foods of North Carolina, LLC (ECF No. 1322-6); and (4) Olean Wholesale Grocery Cooperative, Inc. (ECF No. 1322-7). |
| Complaint or TCAC | Direct Purchaser Plaintiffs' operative Third Amended and Consolidated Class Action Complaint (ECF No. 431). |
| Conspiracy Period | January 1, 2009 through June 30, 2018, inclusive. *See* ECF No. 1320, Direct Purchaser Plaintiffs' Motion for Class Certification, p. 1 n.1. |
| Defendants | All defendants named in the Complaint, except Indiana Packers Corporation (*see* ECF No. 520, (granting Indiana Packers' motion to dismiss). Unless otherwise noted, references to each Defendant in this Motion have the same meaning as set forth in the Complaint. |
| [Name] Dep. | Refers to the excerpt of the deposition transcript for the named individual on the indicated date, attached as an Exhibit to the Reply Declaration of Bobby Pouya. |
| Direct Opposition | Defendants' Memorandum In Opposition To Direct Purchaser Plaintiffs' Motion For Class Certification, ECF No. 1445. Cited as "D.Opp." |
| DPPs or Plaintiffs | Direct Purchaser Plaintiffs. |
| Haider Report | Expert Report Of Dr. Laila Haider, ECF No. 1442-1. |
| Rule | Federal Rules of Civil Procedure. |
| Integrator Defendants | All Defendants, except for Agri Stats. |
| Joint Opposition | Defendants' Omnibus Memorandum In Opposition To All Class Plaintiffs' Motions For Class Certification, ECF No. 1155. Cited as "J.Opp." |

| INDEX OF DEFINED TERMS* | |
|---|---|
| Mangum Report | ECF No. 1330, Report of Dr. Russell Mangum filed in support of Direct Purchaser Plaintiffs' Motion for Class Certification. |
| Mangum Reply Report | Report of Dr. Russell Mangum filed concurrently herewith. |
| Mintert Report | Expert Report Of James Mintert, Ph.D., ECF No. 1442-2. |
| Motion | ECF No. 1318, Direct Purchaser Plaintiffs' Motion for Class Certification. Citations to "Mot." are to Direct Purchaser Plaintiffs' Memorandum of Law, ECF No. 1320, filed in support of the Motion. |
| Oppositions | Refers to both the Joint Opposition and Direct Opposition. |
| Pork | Porcine or swine products. "Pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry. Other related terms, such as hogs and sows, are intended to reference traditional industry meanings. *See, e.g.*, Mangum Report ¶¶ 8, 38, 39. |
| Pouya Decl. | ECF No. 1322, Declaration of Bobby Pouya filed in support of Direct Purchaser Plaintiffs' Motion for Class Certification. |
| Pouya Reply Decl. | Declaration of Bobby Pouya filed concurrently herewith. All references to "Ex." refer to exhibits to the Pouya Reply Decl. unless otherwise noted. |
| *\* All capitalized terms not defined in this Index have the same meaning as in the Complaint.* | |

## I.     <u>INTRODUCTION</u>

The proposed DPP Class meets the requirements for class certification. DPPs have set forth evidence common to the Class, in the form of documents, data, witness testimony, and expert evidence, that can be used to prove or disprove the three central elements of their claim—that Defendants violated the Sherman Act; that members of the DPP Class suffered antitrust injury; and the amount of resulting damages. Thus, common questions of law and fact will predominate at trial.

Defendants' Oppositions to class certification rely on a skewed, fictional version of the factual record. The core of Defendants' arguments is that the alleged conspiracy did not take place. Plaintiffs disagree, but regardless, these arguments based largely on evidence common to the Class cannot defeat class certification. Class certification focuses on the requirements of Rule 23, not "the merits of the parties' claims and defenses." *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006). Because the key merits questions can all be resolved on a class-wide basis, they are appropriate for class-wide adjudication. *See In re Potash Antitrust Litig.*, 159 F.R.D. 682, 689 (D. Minn. 1995) (recognizing inherent "common legal and factual questions about the existence, scope and effect of the alleged conspiracy" in price-fixing cases). Therefore, Plaintiffs respectfully request that the Court certify the Class.

## II.    <u>COMMON ISSUES OF LAW AND FACT PREDOMINATE OVER INDIVIDUAL ISSUES</u>

Predominance focuses on what the parties must prove, not whether they ultimately will prove it. Predominance requires that "*questions* common to the class predominate, not

that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under this preliminary inquiry 'involve[s] the consideration of what the parties must prove.'" *Elizabeth M.*, 458 F.3d at 786. The court's "primary task is not to determine the final disposition of a plaintiff's claims, but instead to examine whether those claims are appropriate for class resolution." *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1037 (8th Cir. 2018); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) ("in conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.").

In this case, common evidence will prove the existence and impact of the antitrust conspiracy, and Defendants' merits-based challenges have no bearing on class certification. Defendants do not challenge the fact that the central element of DPPs' claim—whether Defendants conspired—will be proven on a Class-wide basis. Their silence regarding this element of Plaintiffs' claim speaks volumes, particularly given the arguments and evidence DPPs previously set forth. Mot. 41-52; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws.").

In opposing class certification, Defendants principally assert a premature merits defense—that they did not conspire to raise Pork prices. Defendants' merits-based arguments actually *support* granting the Motion because whether Defendants conspired is a question common to the Class. Defendants' defense at trial will focus on the same facts

regardless of whether the Class is certified. *See Amgen*, 568 U.S. at 470 (holding alleged "failure of proof as to an element of the plaintiffs' cause of action." is question for summary judgment or trial, not class certification).

### A. Common Evidence Will Be Used to Show the Class-Wide Impact of Defendants' Conspiracy

At class certification, Plaintiffs' burden is not to prove antitrust impact, but only to demonstrate that it "is capable of proof at trial through evidence that is common to the class rather than individual to its members." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013). Plaintiffs must show that "damages are capable of measurement on a classwide basis," but they "need not be exact." *Comcast*, 569 U.S. at 34-35. "[P]roof of injury in a price-fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supracompetitive prices ...." *Blades v. Monsanto Co*., 400 F.3d 562, 569 (8th Cir. 2005) (quotation omitted).

Dr. Mangum presented a workable and widely-accepted methodology to calculate Class-wide damages and isolate the impact of the conspiracy based on standardized statistical analyses utilizing Defendants' transactional sales data. *See* Mangum Report §§ IV, V; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC* ("*Tuna*"), 31 F.4th 651, 676 (9th Cir. 2022) (*en banc*) (*cert. denied*, No. 22-131, U.S. Supreme Court 2022) ("[T]he district court recognized that at this stage of the proceedings, its task was to determine whether Dr. Mangum's evidence was capable of showing class-wide impact, not to reach a conclusion on the merits of the DPPs' claims."); *see also In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *19 (N.D. Ill. May 27, 2022)

("*Broiler Cert.*") (petition to appeal under Rule 23(f) denied, No. 22-8007, 7th Cir. 2022). Dr. Mangum compared Defendants' prices during the Conspiracy Period to Defendants' prices during a benchmark period presumed to be unaffected by the alleged misconduct— January 2005 through December 2008—to identify and measure the effect of Defendants' conspiracy. Mangum Report ¶ 233. The model included specific variables to account for costs, seasonal effects, the price of competing proteins, macroeconomic conditions, product and consumer characteristics, and time-specific events. Ultimately, Dr. Mangum's model estimated statistically significant overcharge coefficients for each Pork product category, thereby establishing impact to DPP Class members. Based on the calculated overcharges and relevant commerce calculations, the members of the DPP Class were overcharged for Class Pork Products by over $5 billion. *See id.* ¶¶ 236-245, 257-258.

Defendants do not dispute the fact that the multiple regression models utilized by Dr. Mangum are a valid and commonly used method of isolating the damages resulting from a conspiracy. *See id.* ¶¶ 213-218 (citing authority); Ex. 2, Haider Dep. 129:23-132:3 ("In general, regression analysis is a well-accepted tool and technique, absolutely."). Although Defendants dispute the amount and existence of damages, as well as certain explanatory variables used by Dr. Mangum, these arguments are not unique to any particular Class member. Dr. Mangum's model and opinions also can be used to establish the existence of Class-wide impact.

Defendants argue, citing *Comcast*, that Plaintiffs cannot show impact on a Class-wide basis because their damages models are somehow inconsistent with their theory of liability. J.Opp. 60. According to Defendants, even though Plaintiffs allege a conspiracy to

fix prices, *Comcast* requires Plaintiffs to specifically calculate impact based on production rather than prices. Defendants are wrong. It is axiomatic that "an *increase in price* resulting from a dampening of competitive market forces is assuredly one type of [antitrust] injury" resulting from a price-fixing conspiracy. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982) (emphasis added). As multiple courts have recognized, "constriction of supply is the essence of 'price fixing,' whether it be accomplished by agreeing upon a price, which will decrease the quantity demanded, or by agreeing upon an output, which will increase the price offered." *FTC v. Superior Court Trial Lawyers Ass'n*., 493 U.S. 411, 423 (1990); *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999); *Westinghouse Elec. Corp. v. Gulf Oil Corp*., 588 F.2d 221, 226 (7th Cir. 1978) (conspiracy to fix prices and conspiracy to restrict output are *not* distinct offenses); *In re Sulfuric Acid Antitrust Litig*., 743 F. Supp. 2d 827, 867 (N.D. Ill. 2010) (agreement to restrict production "equates to a price fixing agreement").

Consistent with this authority, multiple courts have held it is appropriate to isolate the impact of a conspiracy that includes alleged supply restraints based on a damages model that focuses on the prices paid for the products at issue. *See, e.g.*, *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016) (affirming class certification where the plaintiffs' expert modeled damages to "control for other influences on price and to isolate the impact of the conspiracy" using a "dummy variable"); *see also Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) ("the Supreme Court and this Circuit have confirmed on a number of occasions that the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of

the analysis rather than to its admissibility") (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)); *Broiler Cert.*, 2022 WL 1720468, at *19. Antitrust plaintiffs need not perform a separate production regression to prove impact (as advocated by Defendants in this case), because all that is needed is proof of "cartel pricing" on a class-wide basis. *Kleen*, 831 F.3d at 927 (rejecting the argument that antitrust plaintiffs must perform a separate production regression "of a hypothetical market free of any anticompetitive restraint"); *see also Broiler Cert.*, 2022 WL 1720468, at *19.

*Comcast* imposes a requirement to match the unlawful conduct—to the exclusion of other lawful conduct—with the damages. In other words, there must be a methodology that identifies damages that are the "result of the wrong." *Comcast*, 569 U.S. at 37. By controlling for factors affecting supply and demand relating to the price of Pork (*see* above and Mot. 52), Dr. Mangum has done exactly that. Neither *Comcast* nor the other cases cited by Defendants support a different ruling.

None of Defendants' arguments or critiques of Dr. Mangum's damages model, or his analysis of antitrust impact, supports a denial of class certification.

    1.    <u>Defendants' Arguments Regarding "Uninjured Class Members" Are Legally and Economically Flawed</u>

Defendants argue that Dr. Mangum's analyses cannot show that the number of uninjured class members is beyond a "*de minimis*" threshold (*see* J.Opp. 48). This argument has no legal or economic merit. Dr. Mangum actually found that less than 1% of the DPPs in the regression data were uninjured, *i.e.*, never paid a price during the Class Period that was higher than the predicted but-for level. Mangum Report ¶ 256. Less than

1% constitutes a *de minimis* amount under any standard. Defendants' challenges to the number of uninjured Class members therefore rely on their other attacks on Dr. Mangum's model, which are all without merit. Moreover, in arguing that Plaintiffs cannot meet the burden of establishing predominance due to what they claim is a high number of uninjured class members, Defendants seemingly adopt a *per se* rule that a class cannot be certified if it includes more than a strictly defined percentage of uninjured class members. No circuit has adopted this bright-line test, and a number of courts have rejected it.

Most recently, in *Tuna*, the Ninth Circuit explicitly rejected arguments that Rule 23(b)(3) does not allow for certification of a class that includes more than a *de minimis* number of uninjured class members. *Id.* at 669. *Tuna* specifically declined to establish a numerical threshold for a portion of uninjured class members that would necessarily defeat predominance. 31 F.4th at 669. The Ninth Circuit explained there is no such requirement in Rule 23(b)(3), which requires only that courts determine, after rigorous analysis, whether common questions predominate over any individual questions, including individualized questions about injury or entitlement to damages. *See id.*

Four other Circuits have addressed this issue, and each Circuit has held or signaled that some undefined *de minimis* number of uninjured plaintiffs can exist in a class without threatening certification. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658-59 (4th Cir. 2019); *Messner*, 669 F.3d at 825; *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019). Therefore, Defendants are incorrect in stating that courts **routinely** reject classes with more than 5% to 8% of uninjured class members. J.Opp. 48-49 (emphasis added). Even *Rail Freight*, on

which Defendants rely most heavily, concluded only that Rule 23(b)(3)'s predominance requirement is not satisfied when the need to identify uninjured class members will predominate and render an adjudication unmanageable. *See In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 934 F.3d 619 (D.C. Cir. 2019); *see also Tuna*, 31 F.4th at n.13 (discussing *Rail Freight*).

The Eighth Circuit has not adopted a *de minimis* requirement regarding uninjured class members, and there is no basis for inferring such a requirement from the current case law. *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011) (citing *Blades*, 400 F.3d at 566-67). Even if such a standard applied, it would not serve as a basis for denying certification in this case because Plaintiffs and their expert have demonstrated that all or substantially all Class members have suffered an antitrust injury. Mangum Report ¶¶ 17, 181-184; Mangum Reply Report ¶¶ 12, 96.

## 2. Defendants' Arguments Regarding "Economic Realities" Cannot Support Denial of Class Certification

### (a) *Defendants' attempt to minimize their control over hog production is neither credible nor persuasive.*

Dr. Mangum's damages model is designed to isolate the impact of the alleged conspiracy to fix the price of Pork that Defendants sold to Class members. Ignoring this central point, Defendants claim the model is unreliable because it does not analyze "the supply decisions of non-Defendant hog producers." Defendants' argument fails.

As discussed above, courts have found it appropriate for a damages model in an antitrust case (including cases involving supply restraints) to focus on prices paid for the products at issue. Plaintiffs allege a conspiracy to fix the prices of Pork. Dr. Mangum's

analysis therefore focuses on the prices paid for Pork products and the market structure and characteristics of the market for Pork products. Defendants' claim that Dr. Mangum's analysis of damages and impact should have focused on production rather than prices is legally and economically flawed. Mangum Reply Report ¶¶ 87-89. The argument is even further afield when it is applied to hog production, which is not the product or market at issue.

Further, Defendants' claim that they (multi-national, multi-billion dollar corporations) are at the mercy of local farmers with respect to the production of hogs defies logic. As Dr. Mangum has explained, Defendants exercise control over the production of Pork in several ways. First, Defendants directly control the supply of hogs because they themselves are some of the largest hog producers in the United States. As Defendants and their expert concede, the six producer Defendants are directly responsible for growing at least 30% of the hogs used for Pork production. *See* Mintert Report, Exhibit 5. These six Defendants constitute some of the top hog producers in the United States. Conversely, the vast majority (over 59,000) hog farmers in the United States are small farmers who together make up approximately 9.3% of hog supply and have very limited influence on the market. *See* Mintert Report, Exhibit 3. As Dr. Mangum points out, Defendants had the ability to sufficiently reduce supply in order to increase prices based on the hogs they grow. Mangum Reply Report ¶¶ 65, 72; *see also* Mintert Report, Exhibit 1 (showing industry supply restraints never exceeded Defendants' market share).

In addition, Defendants control approximately 90% of Pork processing and can influence the hog supply by limiting how much they buy and by controlling their Pork

production capacity. Mangum Report ¶¶ 17, 80; Mangum Reply Report ¶¶ 10, 59. Since Defendants control 90% of Pork processing and nearly all hogs are sold pursuant to contract, virtually all hog farmers make their hog-growing decisions based on their need to meet contractual obligations with Defendants; for Defendants to suggest otherwise simply is not credible. *Id*. If the non-Defendant growers choose to increase supply without an increase in Defendants' slaughter (*i.e.*, demand), that would decrease hog prices, resulting in diminished and uneconomical returns. Mangum Report ¶¶ 113-14. In other words, Defendants' status as the dominant hog purchasers in the United States allowed them to exert significant power over hog production, even if it is done by non-Defendant growers. Mangum Reply Report ¶¶ 46-47; Ex. 3, Mintert Dep. 143:6-8. ("Q. Are you aware of any other primary markets for hogs other than pork processing? A. No.").

As Dr. Mangum has pointed out, and Defendants' expert concedes, the production of Pork in the United States now occurs exclusively pursuant to contractual agreements with the Defendants. *See* Mangum Report ¶¶ 56-57; Mintert Report, Exhibit 2. In other words, these hogs are already spoken and accounted for, rather than the product of an independent decision to produce a hog that would go to the spot market. *Id.*; *see also* Mangum Reply Report ¶ 51. Furthermore, Defendants' contracts impose significant restrictions and requirements on growers that allow Defendants to exert additional control over the hog production process. *See* Mangum Reply Report ¶¶ 47-49.

(b)   *Defendants' focus on hog producer returns is misplaced.*

Consistent with Defendants' effort to recast Plaintiffs' allegations as a "hog conspiracy," Defendants criticize Dr. Mangum's model for not having a variable for hog

producer returns and other factors impacting profitability in the hog market. At best, these criticisms of the variables in Dr. Mangum's model go to its weight and credibility; they do not supply a basis to deny class certification. *Manpower*, 732 F.3d at 808. The argument is also without merit. Plaintiffs allege, and will ultimately seek to prove, a conspiracy to fix the price of Pork. Dr. Mangum's damages model adequately accounts for the supply and demand factors impacting the relevant Pork market, and there is no valid reason to include a hog producer return variable in his model. Mangum Reply Report ¶¶ 141-146. Even if such a variable were valid, incorporating it into Dr. Mangum's model would not undermine his demonstration of Class-wide damages or impact. *See id.* ¶ 146.

> (c)   *Defendants' arguments regarding export demand do not support denial of class certification.*

Defendants' claims that Dr. Mangum has failed to adequately account for exports fare no better. Exports are one means by which Defendants were able to restrict domestic supply and inflate domestic prices. Mangum Reply Report ¶ 65-67. As discussed above, the appropriate means of calculating the impact of an alleged price-fixing conspiracy, *i.e.*, the degree to which Class members paid artificially inflated prices, is by analyzing the prices paid. The domestic supply of Pork (of which exports is only one contributing factor) is relevant to the allegations, but not a necessary intermediate step that needs to be calculated in order to establish a price impact. Mangum Reply Report, Section II.B.

Nor is it true that Dr. Mangum assumes that all exports during the class period were conspiratorial. Rather, the export of Pork is one way Defendants reduced the domestic supply of Pork in furtherance of their conspiracy. Defendants provide no meaningful

rebuttal to this point, and the evidentiary record is replete with examples of Defendants acknowledging the impact that their exports had on domestic supply and prices. *See, e.g.*, Ex. 4, SMITHFIELD01144316 (early 2009 document indicates increase in exports to Russia would affect ham prices "in the lower $40s" by "boost[ing] ham prices into the lower $50s."); Pouya Decl., Exhibit 20, TF-P-000518663 (email stating "export shipments" are the "key" to "create the disappearance" necessary for domestic profitability); Pouya Decl., Exhibit 67, TF-P-000021759 (Roel Andriessen stated goal to "increase Loin, Cushion, and Picnic (through GSP) [export] sales and, subsequently, increase overall domestic disappearance."); Ex. 5, TF-P-000665127 (email discussing willingness to incur substantial air freight costs to get Pork out of domestic market); Ex. 6, SMITHFIELD00302315 (Dhamu Thamodaran email explaining domestic Pork market is inelastic and quantifying anticipated price increases from increased exports to China); Ex. 7, TF-P-000797249 (Sumio Matsumoto explaining advantage for Smithfield "to ship more meat to China to support US hog price. So, SFD should try as many as possible export to China even with loss of meat sales price by doing it."). These exports, which increased substantially during the Conspiracy Period, did not increase domestic supply of Pork. *See* Mangum Report ¶ 83; Mangum Reply Report ¶ 89, Figure 6 (showing U.S. Pork production adjusted for imports and exports).

**B.     Defendants' Arguments Regarding Impermissible "Averaging" Are Misleading and Legally Deficient**

Notwithstanding Defendants' hyperbolic discussion of a single overcharge and "averaging," they do not meaningfully dispute that Dr. Mangum's multiple regression

analysis is a common and well-accepted method to calculate damages in antitrust cases. Mangum Report ¶ 218 (citing authority); Mangum Reply Report ¶¶ 104-106; Ex. 2, Haider Dep. 129:23-132:3. Nor could they, as "Plaintiffs frequently offer expert evidence, including statistical evidence or class-wide averages, to prove that they meet the prerequisites of Rule 23(b)(3)." *Tuna*, 31 F.4th at 665; *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1260-61 (10th Cir. 2014); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010).

Dr. Mangum's reliable results are not guesswork or unconventional, and when taken as a whole provide a strong basis for proving damages. *See Tuna*, 31 F.4th at 676-77 (holding Dr. Mangum's pooled regression model capable of demonstrating antitrust impact on class-wide basis). This well-reasoned and evidence-based expert opinion, combined with Plaintiffs' substantial record evidence, provide relevant, probative evidence of the common impact resulting from the alleged conspiracy. *Id.*; *see also In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *6 (W.D. Mo. Nov. 9, 2021) (citing *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 159 (E.D. Pa. 2015)).

Defendants' actual attacks on Dr. Mangum's use of averaging are limited to the time periods Dr. Mangum used, which do not support denial of class certification or exclusion of his expert opinions. *See Manpower*, 732 F.3d at 808; *see also Blades*, 400 F.3d at 567 ("[e]xpert disputes 'concerning the factual setting of the case' should be resolved at the class certification stage only to the extent 'necessary to determine the nature of the evidence

that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class.'").

Each of these arguments is without justification.

1.     Basing the Damages Model on the Conspiracy Period Is Appropriate

Defendants criticize Dr. Mangum for basing his damages model on the Conspiracy Period of 2009 to 2018, instead of limiting it to the 2014-2018 Class Period. This criticism is economically and legally unsupported. The Conspiracy Period is based on DPPs' allegation of a conspiracy to fix, raise, or stabilize the price of Pork products in the United States that began at least as early as 2009 and continued until at least 2018. By contrast, the Class Period reflects the Court's ruling that the applicable statute of limitations limited DPPs' claims to those incurred within four years of bringing this action. Order on Motions to Dismiss, *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 775 (D. Minn. 2020). The Court's determination says nothing about when the conspiracy occurred or when its economic effects were felt, which the continuing-violation doctrine confirms. Plaintiffs' actual damages calculations are appropriately designed and limited to the Class Period, but based on an analysis of the economic effects of Defendants' alleged conduct as a whole (the Conspiracy Period). Mangum Reply Report ¶ 132; Ex. 3, Mintert Dep. 99:21-101:20 (confirming the use of 2009 as economically appropriate because it aligns with the start of the alleged conspiracy).

Dr. Mangum's multiple-regression model set forth *six* different overcharges during the Class Period. Mangum Report, Figure 75; Mangum Reply Report ¶¶ n.5, 127, Section IV. These results are well reasoned, and when taken as a whole provide a strong basis for

proving damages. Defendants rely on yet another out-of-circuit district court holding, *In re Aluminum Warehousing Antitrust Litigation*, 336 F.R.D. 5 (S.D.N.Y. 2020), in an attempt to bolster their *Comcast* challenge and to contradict Dr. Mangum's methodology. J.Opp. 9-40. Indeed, Defendants try to frame the "averaging" used by Dr. Mangum as a negative, but in reality it is quite the opposite. Here, where Dr. Mangum has calculated six overcharges (versus one in Defendants' cited cases) the overcharge model becomes *more* reliable. Mangum Reply Report ¶ 10. In *Aluminum*, the court found that the plaintiffs attempted to use an inappropriate explanatory variable in the expert's damages model. 336 F.R.D. at 56-57. The explanatory variable responsible for some of the price increases was not alleged in the complaint, and the court denied a request to amend to incorporate the explanatory variable during class certification briefing. *See id*. Here, there is nothing in the model or its explanatory variables which was not alleged in the Complaint, nor any other factors that make the model questionable or otherwise unreliable. Indeed, contrary to Defendants' claim, use of aggregate data is appropriate and widely accepted. *See Propane*, 2021 WL 5632089, at *6 (citing *Processed Egg*, 312 F.R.D. at 159); *see also Tuna*, 31 F.4th at 677 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459–60 (2016)).

### 2.    The Benchmark Period Is Appropriate

Contrary to Defendants' assertions, Dr. Mangum's Benchmark Period of January 2005 through December 2008 is supported both by evidence and well-accepted economic principles. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude the Expert Report and Testimony of Dr. Russell Mangum, filed concurrently

herewith,[1] p. 24. Dr. Mangum uses a "benchmark" model, "a standard practice in antitrust analysis." Mangum Report ¶ 229, n.497; Mangum Reply Report ¶¶ 147-154. Dr. Haider agreed the use of a benchmark model is standard practice in antitrust litigation. Haider Dep. 144:5-145:15. There is "no authority for excluding an expert's damages model" based on a challenge to the methodology used to determine the benchmark period. *In re Blood Reagents Antitrust Litig.*, MDL No. 09–2081, 2015 WL 6123211, at *12 (E.D. Pa. Oct. 19, 2015). Rather, "criticisms ... of potential benchmark years go to the weight of [expert] opinions and not their admissibility." *In re Urethane Antitrust Litig.*, MDL No. 1616, 2012 WL 6681783, at *6 (D. Kan. Dec. 21, 2012); *Broiler Cert.*, 2022 WL 1720468, at *11 (criticisms "might be relevant to the evidentiary weight of Mangum's testimony, but it is not a reason to question the reliability of his method"). Defendants' suggestion that there was nothing "normal" about 2008 is not relevant either to the Benchmark Period analysis or to determination of class certification. In econometric terms, 2008 is "normal" in this case because it is the year immediately preceding Defendants' conspiracy, or a "clean" period when Plaintiffs do not allege anticompetitive conduct. *Id.*, at *27. Thus, Defendants' argument that 2008 was not a "normal" year rests on a flawed assumption of what "normal" means for purposes of conducting a benchmark regression. Further, Dr. Mangum's model includes variables that directly control for industry- and economy-wide events that took place during 2008.[2] Mangum Reply Report ¶¶ 147-154.

---

[1] Plaintiffs incorporate by reference all arguments set forth therein.

[2] Dr. Haider's concerns about the 2008 Circovirus are similarly unwarranted. Mangum Reply Report ¶¶ 147-150.

Defendants' arguments rely on the assumption that Dr. Mangum *should have* "cherry-picked" the benchmark period and excluded 2008. J.Opp. 44-47. Courts have repeatedly rejected attempts to do just that. In *Reed Const. Data Inc. v. McGraw-Hill Cos., In*c., 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014), the court found that "[w]hen constructing a benchmark statistic, the regression analyst may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger." Similarly, in *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 299 F. Supp. 3d 430, 484 (S.D.N.Y. 2018), the court rejected the inclusion of the year 2013 in the expert's clean period where the plaintiffs' expert did not provide an affirmative justification for adding 2013 to the clean period and how it did not skew results. *Id*. Additionally, the court found that inconsistences between the plaintiffs' experts indicated a lack of reliability. *Id*. Here, including 2008 in the "clean" period makes economic sense as it is the year immediately preceding the Conspiracy Period and Dr. Mangum's explanatory variables capture the non-conspiratorial factors that Dr. Haider identifies in 2008. As such it is Dr. Haider's removal of 2008 form the model without economic justification which constitutes cherry-picking. Moreover, courts have accepted analyses based on benchmark periods that include the Great Recession. *See, e.g.*, *Broiler Cert.*, 2022 WL 1720468, at *9 (rejecting defendants' expert's opinion that "the Great Recession" was one of "the real causes for the decrease in supply" and accepting Dr. Mangum's use of a regression analysis to identify the class period); *see also In re Packaged Seafood Prods. Antitrust Litig*., 332 F.R.D. 308, 322 (S.D. Cal. 2019).

Plaintiffs allege Defendants began conspiring in 2009, the sufficiency of those allegations has been upheld (*see* Order on Motions to Dismiss, ECF No. 520), and Plaintiffs

and their expert are entitled to rely on them in this motion. In any event, to the extent an expert's benchmark determination rests on "facts and assumptions as the basis for his opinion," the opposing party "can highlight those weaknesses through effective cross–examination." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002). Here, Dr. Mangum's benchmark period is consistent with Plaintiffs' contentions after years of gathering evidence in discovery.

## III.   DEFENDANTS' OTHER ARGUMENTS IN OPPOSITION TO CLASS CERTIFICATION ARE WITHOUT MERIT

Other than the predominance challenges described above, Defendants challenge only the typicality and adequacy of the Named Plaintiffs under Rule 23(a)(3)-(4). Both challenges fail.

### A.   The Named Plaintiffs' Claims Are Typical

Typicality "is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory. The burden is fairly easily met so long as other class members have claims ***similar*** to the named plaintiff." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 559 (D. Minn. 2010), *aff'd*, 644 F.3d 604 (8th Cir. 2011) (cleaned up, emphasis added); *see also Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 562 (8th Cir. 1982) (class representatives must "have the same **or similar** grievances" as the class members (emphasis added)).

In antitrust cases, typicality is satisfied where "plaintiffs and all class members alleg[e] the same antitrust violations by defendants." *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005) (quotation marks omitted); *see also In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 640 (D. Kan. 2008). Where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, **there is a strong assumption that the claims of the representative parties will be typical**[.]" *In re Linerboard Antitrust Litig*, 305 F.3d 145, 207 (3d Cir. 2002) (quoting *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1035 (N.D. Miss. 1993)) (emphasis added); *see also In re Workers' Compensation*, 130 F.R.D. 99, 106 (D. Minn. 1990) ("An antitrust price fixing case generally will involve claims sufficiently similar to satisfy Rule 23(a)(3).").

The significant evidentiary record supporting DPPs' Motion makes clear that the Named Plaintiffs are direct purchasers of Pork products who allege they were injured by Defendants' price fixing and seek the same remedy. This evidence includes details establishing Defendants' Class-wide conduct, expert evidence establishing the other Class members who were affected by Defendants' scheme, and declarations submitted by each of the four Named Plaintiffs setting forth (1) their qualifications, (2) the fact that, like all Class Members, they purchased Pork during the Class Period, (3) their understanding of their duties as a class representative, and (4) the significant time and resources they have invested in this litigation thus far. *See* Class Rep. Decls.

Defendants' generalized argument that Plaintiffs have not met their burden to establish typicality is without merit, and the cases they rely upon are distinguishable. *Belles v. Schweiker*, 720 F.2d 509 (8th Cir. 1983), found typicality lacking because the plaintiff

failed to "identify any other person who has been subjected to the same or similar treatment as she has." *Id.* at 515. *In re Baycol Products Litigation* found that the class representatives' *personal injury* claims lacked typicality due to individual issues related to their injuries, causation, and defenses. 218 F.R.D. 197, 205 (D. Minn. 2003). Here, no such individualized issues exist; all DPPs paid inflated prices for Pork as a result of Defendants' antitrust violations. Defendants' specific challenges to typicality of the Named Plaintiffs based on size and negotiating power, geography, and contracting methods fare no better.

> 1.   Plaintiffs Are Not Required to Have a Representative for Different Sized Class Members

Defendants argue that the relative size and negotiating power of the Named Plaintiffs disqualify them from serving as representatives of the proposed Class. D.Opp. 13-15. The negotiating power of class representatives does not defeat typicality. Courts regularly find class certification warranted notwithstanding individually negotiated prices where negotiation took place from an inflated, supra-competitive starting point. *See, e.g.*, *Potash*, 159 F.R.D. at 696; *see also Catfish*, 826 F. Supp. at 1019 (finding typicality satisfied despite purchasers' varying sizes, geographical locations, and buying methods). Here, regardless of the size of the purchasers, their negotiating power, or the specific method they used to purchase Pork, all Class members paid more for Pork than they would have *but for* the existence of the conspiracy. Dr. Mangum's reports and the other record evidence establish the commodity nature of the Pork business and the industry-wide supply and demand conditions. Mangum Report ¶¶ 119-129; Mangum Reply Report ¶¶ 26, 27. These do not only apply to the Named Plaintiffs, but to ***all*** purchasers of Pork, including

large conglomerates, small purchasers, and participants in industry buying groups such as UniPro. Mangum Reply Report ¶ 126.

To support their assertion that courts "regularly" hold that differences in negotiating power defeats typicality, Defendants cite only two out-of-circuit district court decisions. Those cases were not decided based on "negotiating skill and bargaining power," but on distinct differences between segments of the class. In *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478, 489 (N.D. Cal. 2008), the named plaintiffs purchased a single retail graphics card from Defendants' website, which was atypical of the vast majority of class members who purchased cards to incorporate into electronic products. Similarly, the named plaintiffs in *In re Intel Corp. Microprocessor Antitrust Litigation*, No. CV 05-485-LPS, 2014 WL 6601941, at *11 (D. Del. Aug. 6, 2014), were consumers and small businesses who purchased computers containing price-fixed microprocessors without the ability to negotiate.

Here, the Named Plaintiffs purchased Pork products directly from Defendants for the purpose of resale. *See* Class Rep. Decls. Their line of business, experience, and claims are sufficiently co-extensive of the Class members they seek to represent in this case. *See, e.g.*, *Broilers Cert.*, 2022 WL 1720468, at *3. As Dr. Mangum noted, the characteristics of the Pork market are such that Defendants' conspiracy would have affected prices paid by all or nearly all DPP Class members. Mangum Reply Report ¶ 12. Their pricing decisions and purchases were subject to the same supply and demand conditions as the other Class members. *Id.*, Section III. Large or small, they all paid supracompetitive prices for Pork as a result of Defendants' conduct. *Id.*

2.    <u>Geographical Differences in Class Representatives Are Not Relevant to Typicality</u>

Defendants' claimed "regional differences in market forces" are not relevant to class certification. D.Opp. 19. Defendants argue that (1) the Named Plaintiffs do not conduct business nationwide and are limited to disparate geographic regions; and (2) while the demand for Pork is global, the market for Pork products is subject to regional demand and varying market forces.

Contrary to Defendants' assertions, differences in the geographic scope of the members of the proposed DPP Class are irrelevant to typicality. As discussed above, Plaintiffs allege a nationwide conspiracy, and the Named Plaintiffs, along with all other Class members, purchased Pork during the Class Period at supracompetitive prices. Geography's only relevance would be based on *Defendants' sales* of the price-fixed products, but Defendants and their experts have not presented any evidence to dispute the fact that Defendants sell Pork nationwide, including to the Named Plaintiffs. The hundreds of pages of reports submitted by Defendants' experts, Drs. Haider and Mintert, contain no support for the claim that Defendants' prices vary based on geography. Indeed, Dr. Mintert emphasized that there are *not* geographic limitations on the production of hogs and Pork in his report. Mintert Report ¶ 67. By contrast, Dr. Mangum's correlation analyses show that prices for different customers in different regions move together (*i.e.*, are correlated), and pricing patterns demonstrate that different customers are similarly affected by supply and demand factors that affect Defendants' Pork prices nationwide. Mangum Reply Report ¶¶ 99-101. Unable to support their arguments with economics, Defendants rely instead on out-

of-context deposition quotes which mostly refer to regional differences in freight costs which can be easily controlled for (D.Opp. 18).

The cases Defendants rely upon do not support their argument. In *In re Milk Products Antitrust Litigation*, the named plaintiff, a small grocery store, testified that it sought to represent only smaller stores, and not larger ones, and faced the prospect of litigating with other class members. 195 F.3d 430, 437 (8th Cir. 1999). The court held that "[a] named plaintiff who lacks the desire to 'vigorously pursue' the interests of potential class members is not a fair and adequate representative of the class." *Id.* (quotation omitted). The court further found that the plaintiff lacked standing and therefore faced unique defenses. *Id.* No such issues are present here, where each Plaintiff has evinced a strong desire to pursue the claims and faces no unique defenses. *See* Class Rep. Decls.

Defendants incorrectly cite *Food Lion* for the proposition that the court failed to find typicality due to competitive conditions faced in various geographic markets. *See* D.Opp. 19 (citing *Food Lion, LLC v. Dean Foods Co.*, 321 F.R.D. 472, 483-84 (D.P.R. 2017)). In fact, the court held the class representatives lacked typicality for the same reasons as predominance: because the class representative had formula-pricing transactions directly with the defendants and there was insufficient evidence in the record to explain how the plaintiffs were injured. *See Food Lion*, 321 F.R.D. at 496. Defendants have not shown that Plaintiffs are subject to unique pricing or market forces based on geography.

### 3.     DPPs' Contracting Methods Do Not Defeat Typicality

Contrary to Defendants' assertions, DPPs' allegedly differing purchasing mechanisms do not preclude typicality. Rule 23(a)(3) does not require that all members of

a proposed class pay the same amount or use similar purchase methods. *Potash*, 159 F.R.D. at 682; *see also Catfish*, 826 F. Supp. 1019 (class of catfish purchasers satisfied typicality despite purchasers' varying sizes, geographical locations, and buying methods because substance of price-fixing claim was the same for all class members); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 699 (N.D. Ga. 1991) (same); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 270, 272 (D. Minn. 1989) (same); *see also* 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3.13 at 3-79 & n.208 (3d ed. 1992) (explaining that "differences in the methods of purchase or kinds of products purchased among class members have been held not to bar a finding of typical claims" in price-fixing actions).

Although Defendants argue that Plaintiffs purchased products using a variety of methods, they fail to establish how such differences would defeat typicality. As Dr. Mangum has demonstrated, all the contractual mechanisms utilized in this case were subject to the same forces of supply and demand that determine the price for Pork. Mangum Reply Report ¶¶ 99-101. Conversely, Defendants' experts failed to identify any differences in Class members' prices that they attribute to any particular contracting methodology. *Id.* at n.166. Plaintiffs' injury and damages are predicated on the market prices determined from these supply and demand factors, rather than any specific method of contracting for Pork.

Defendants' cited cases are inapposite. As set forth above, *Intel* and *GPU* involved unique and distinguishable situations where the named plaintiffs were essentially consumers subject to pricing methodologies that were completely distinguishable from

substantial portions of the class. In *In re Automotive Parts Antitrust Litigation*, No. 12-00501, 2019 WL 626143, at *11 (E.D. Mich. Jan. 7, 2019), the direct purchaser plaintiffs alleged multiple means to carry out the price-fixing conspiracy, including but not limited to a coordinated price increase and bid rigging. However, the named plaintiffs there were only impacted by the price coordination, and *not* the bid rigging. *Id*. Here, there is one alleged conspiracy—to fix, raise, and stabilize the price of Pork sold in the United States—that applied to all Pork products including those purchased by the Named Plaintiffs.[3] *See* Mangum Reply Report, Section III.

In *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007), the court was concerned that not one distributor was a named plaintiff when distributors accounted for half of all sales. *Id*. Also, some of the named plaintiffs purchased the recycled version of the product and saved a substantial amount of money compared to other class members. *Id*. Here, the Named Plaintiffs are typical direct purchasers who purchased the Class Pork Products at issue for resale. Immaterial differences in their specific contracting methodology do not change their claims, theory of the case, or otherwise render them atypical of the Class members.

\* \* \*

The Named Plaintiffs' claims are typical and aligned with the proposed Class, and they will continue to diligently advance the Class's interests.

---

[3] Defendants also cite *In re Optical Disk Drive Antitrust Litigation* to support their position (D.Opp. 16 (citing 303 F.R.D. 311, 317 (N.D. Cal. 2014)), but that argument fails for the same reason: there are no bid-rigging claims in this case and there is only one alleged conspiracy that will be adjudicated using common evidence.

**B.    The Named Plaintiffs Are Adequate**

1.    Named Plaintiff John Gross has No Intra-Class Conflicts

Defendants' argument that John Gross is an inadequate representative of the proposed Class because it uses a percentage margin to determine its downstream pricing is irrelevant. Rule 23(a)(4) requires that the named plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also Amchem*, 521 U.S. at 625. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-158 (1982)). First, no such conflicts exist, and Plaintiff John Gross has (and will continue to) represent the Class with integrity and persistence. *See* Class Rep. Decls. Second, antitrust injury is complete when the direct purchaser pays an illegal overcharge, regardless of any pass-on to its customers. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 724-725 (1977). The *only* legally relevant inquiry is whether John Gross paid more for Pork products than it would have absent Defendants' anticompetitive conduct.

Because Plaintiff John Gross paid more for Pork as a result of the alleged conspiracy, its interests are aligned with all other Class members.

2.    Named Plaintiff Olean Is an Adequate Class Representative

The Court should reject Defendants' attempt to turn a claimed discovery dispute into an adequacy issue under Rule 23. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem*,

521 U.S. at 625-626 (citing *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Plaintiff Olean meets this standard.

Defendants complain that Plaintiff Olean did not produce structured sales data, even though this discovery-based argument has zero impact on class certification and creates no intra-Class issues. Olean does not possess, have custody over, or control the structured data from the years it was in business, and thus was not obligated to produce it. Fed. R. Civ. P. 34; Ex. 8, Second Amended Rule 26(a)(1) Disclosures. Defendants also complain that Olean's Rule 30(b)(6) designee was not sufficiently knowledgeable. That position ignores both the substantial testimony Olean did provide and the limitations on the information available to Olean. Ex. 1, Sept. 19, 2022 Letter from J. Bourne to S. Zimmerman.

Olean's downstream sales data is not relevant to class certification. *Broilers*, No. 16 C 8637, 2018 WL 3398141, at *1 (N.D. Ill. July 12, 2018) (striking defendants' subpoenas to DPPs seeking downstream sales information); *In re Turkey Antitrust Litig.*, No. 1:19-cv-08318, 2021 WL 6428398 (N.D. Ill. Dec. 16, 2021) (downstream discovery not relevant to class certification). Defendants have conspicuously *not* brought a motion to compel against Olean, and the deadline to do so has passed.

These circumstances are a far cry from those in Defendants' cited cases. *See In re Terazosin Hydrochloride Antitrust Litig.*, 223 F.R.D. 666, 674 (S.D. Fla. 2004) (discussing refusal to comply with subpoenas seeking "*agreed* downstream discovery" that had been *approved by the court*); *Fidel v. Farley*, No. 1:00-CV-48-M, 2004 WL 7340526, at *6 (W.D. Ky. Jan. 15, 2004) (addressing refusal to comply with a *court order granting a motion to compel*). Olean met its discovery obligations, and its alleged failure to do so does

not create an adequacy issue. *See Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 156 (S.D.N.Y. 2002) (finding adequacy despite noting dissatisfaction with certain "discovery disputes or issues"); *see also Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970, 993 (D. Minn. 2021) (Tunheim, J.) (explaining adequacy inquiry focuses on whether there are "[c]onflicts between the representatives and the class").

## IV.   **DEFENDANTS' CHARACTERIZATION OF AND ATTEMPT TO DISTINGUISH *BROILERS* IS INCORRECT AND OF NO CONSEQUENCE**

Fearing a class certification decision similar to *Broilers*, Defendants argue that differences between the pork and chicken industries somehow compel denial of class certification in this case. J.Opp. 7-8. This argument misses the mark. First, the record in this case supports certification in its own right. Second, the *Broilers* certification decision counsels in favor of a similar decision here because there are substantial similarities between the broiler and pork conspiracies, including overlapping Defendants, industry characteristics, and a similar price-fixing scheme.

In certifying classes similar to those proposed here, the *Broilers* court explained that production of broiler chicken consistently increased before 2008, then "decreased significantly" between 2008 and 2019, and then returned to the prior rate. *Broiler Cert.*, 2022 WL 1720468, at *6. The court explained that factors such as consistent demand for broiler chickens, as well as evidence of collusion in the form of communication about public and private production plans and sharing of confidential production information served as class-wide evidence of the alleged conspiracy. *Id.*

The *Broilers* court rejected the same type of merits-based arguments that Defendants make here, refusing to credit the defendants' argument that the decrease in supply was "imagined" or contrary to "reality," simply because the defendants argued that the decrease in supply was a product of natural economic factors rather than conspiracy. *Broilers Cert.*, 2022 WL 1720468 at *9. Here, Defendants also go to great lengths to identify some other cause for the supply decrease that does not implicate them (*e.g.*, high corn costs, hog market supply, the global financial crisis, and the H1N1 outbreak). J.Opp. 20-22.

This Court should apply the same thoughtful reasoning as the *Broilers* court and reject Defendants' arguments.

## V.    **CONCLUSION**

For these reasons, as well as those previously set forth in Plaintiffs' Motion for Class Certification, Plaintiffs respectfully submit that the proposed Class meets all requirements under Rule 23 and that the Court should certify the proposed Class, appoint the Named Plaintiffs as Class Representatives, and appoint Lockridge Grindal Nauen P.L.L.P. and Pearson, Simon & Warshaw, LLP as Co-Lead Class Counsel.

Date: November 18, 2022

*/s/ W. Joseph Bruckner*
W. Joseph Bruckner (MN #0147758)
Brian D. Clark (MN #0390069)
Joseph C. Bourne (MN #0389922)
Arielle S. Wagner (MN #0398332)
Stephen M. Owen (MN #0399370)
**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
T:  (612) 339-6900
F:  (612) 339-0981
*wjbruckner@locklaw.com*
*bdclark@locklaw.com*
*jcbourne@locklaw.com*
*aswagner@locklaw.com*
*smowen@locklaw.com*

Clifford H. Pearson (*Pro Hac Vice*)
Daniel Warshaw (*Pro Hac Vice*)
Bobby Pouya (*Pro Hac Vice*)
Michael H. Pearson (*Pro Hac Vice*)
**PEARSON, SIMON & WARSHAW,
LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 92403
T:  (818) 788-8300
F:  (818) 788-8104
*cpearson@pswlaw.com*
*dwarshaw@pswlaw.com*
*bpouya@pswlaw.com*
*mpearson@pswlaw.com*

Bruce L. Simon (*Pro Hac Vice*)
Benjamin E. Shiftan (*Pro Hac Vice*)
Neil Swartzberg (*Pro Hac Vice*)
Jill M. Manning (*Pro Hac Vice*)
**PEARSON, SIMON & WARSHAW,
LLP**
555 Montgomery Street, Suite 1205
San Francisco, CA 94111
T:  (415) 433-9000
F:  (415) 433-9008
*bsimon@pswlaw.com*
*bshiftan@pswlaw.com*
*nswartzberg@pswlaw.com*
*jmanning@pswlaw.com*

Melissa S. Weiner (MN #0387900)
**PEARSON, SIMON & WARSHAW,
LLP**
326 Barry Avenue South, Suite 200
Wayzata, MN 55391
T:  (612) 389-0600
F:  (612) 389-0610
*mweiner@pswlaw.com*

*Interim Co-Lead Class Counsel for the
Direct Purchaser Plaintiff Class*