# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| *IN RE PORK ANTITRUST LITIGATION* | Case No. 0:18-cv-01776-JRT-JFD |
| This Document Relates To:<br><br>ALL COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFF ACTIONS | Judge John R. Tunheim<br>Magistrate John F. Docherty<br><br>**COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. MICHAEL WILLIAMS** |

**REDACTED**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES................................................................................................ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

DISCUSSION ............................................................................................................... 9

I.    Dr. Williams Is Well-Qualified to Analyze the Effects of the Alleged Conspiracy, and the Models He Specified Here Are Reliable. ................................................... 11

    A.    Dr. Williams is Qualified to Offer His Opinions. ....................................... 11

    B.    Dr. Williams' Methods Are Reliable and Well-Accepted. ......................... 12

    C.    Dr. Williams' Analysis Is Based on Reliable Data. .................................... 13

    D.    Dr. Williams' Analysis Is Relevant and Helpful to the Trier of Fact. ........ 13

II.    Dr. Williams Appropriately Examined the Entire Conspiracy Instead of Artificially Restricting His Analysis to the Period in Which the Statute of Limitations May Limit CIIPPs' Monetary Recovery ............................................................................ 13

III.    Defendants' Methodological Criticisms of Dr. Williams' Analysis Are Without Merit and, at Most, Raise an Issue for the Jury. .................................................... 19

    A.    Dr. Williams Used an Appropriate Benchmark Period. .............................. 21

    B.    Dr. Williams Appropriately Controlled for Non-Conspiracy Factors the Affected Pork Supply. ................................................................................ 25

    C.    Dr. Williams Appropriately Controlled for Non-Conspiracy Factors that Affected Pork Exports ................................................................................ 30

    D.    Dr. Williams Performed Appropriate Econometric Tests to Confirm the Validity of His Results. ............................................................................... 33

    E.    Dr. Williams' Findings Do Not "Contradict" Each Other. ......................... 35

    F.    Dr. Williams Finds That Nearly All Class Members Were Injured............ 36

IV.    There Is No Basis for Selectively Striking Any Part of Dr. Williams' Analysis... 37

CONCLUSION ........................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Toyota Motor Corp.*, 867 F.3d 903 (8th Cir. 2017) ............................................ 34

*Bazemore v. Friday*, 478 U.S. 385 (1986) ........................................................................ 26

*Behrend v. Comcast Corp.*, 264 F.R.D. 150 (E.D. Pa. 2010) ............................................ 12

*Bertroche v. Mercy Physician Assocs., Inc.*, No. 18-CV-59 CJW-KEM, 2019 WL 7761809

    (N.D. Iowa Oct. 28, 2019) ........................................................................................... 34

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998) .............. 18

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................ 14, 16, 17, 18, 19

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) ........................ 28

*D&M Farms v. Birdsong Corp.*, No. 2:19-CV-463, 2020 WL 7074140 (E.D. Va. Dec. 2,

    2020) .............................................................................................................................. 5

*Daubert v. Merrill Dow Pharms.* Inc., 509 U.S. 579 (1993) .................................. 9, 10, 11

*In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (S.D.N.Y. 2020) ................ 19

*In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May

    27, 2022) ................................................................................................... 5, 6, 12

*In re Capacitors Antitrust Litig.*, No. 14-CV-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov.

    14, 2018) ........................................................................................................................ 5

*In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336 (M.D. Fla. 2018) .................... 12

*In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal.

    June 9, 2010) .................................................................................................................. 6

*In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004 (E.D. Mo. 2009) ............... 34

*In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478 (N.D. Cal. 2008) .................................................................................................................................. 6

*In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................................................................ 23, 24

*In re Optical Disk Drive Antitrust Litig.* ("*ODD I*"), 303 F.R.D. 311 (N.D. Cal. 2014) .... 6

*In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019) ........ 5, 12

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ......................................... 34

*In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753 (D. Minn. 2020) ............................... 3, 15

*In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/LIB), 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ........................................................................................................................ 2

*In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059 (8th Cir. 2017) ............. 15

*In re Processed Egg Products Antitrust Litigation*, 312 F.R.D. 124 (E.D. Pa. 2015) 28, 29

*In re Titanium Dioxide Antitrust Litig.*, CIV.A. RDB-10-0318, 2013 WL 1855980 (D. Md. May 1, 2013) ................................................................................................................ 18

*In re Urethane Antitrust Litig.*, No. 04-1313-JWL, 2012 WL 6681783 (D. Kan. Dec. 21, 2012) .................................................................................................................................. 19

*In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995 (8th Cir. 2019) ........... 31, 32

*In re Wholesale Grocery Prods. Antitrust Litig.*, 2018 WL 3862773 (D. Minn. 2018) ... 23, 28

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) ..................... 10

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039 (D. Minn. 2009) ................................................................................................................................ 38

*Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585 (N.D. Ill. 2015) .................................... 22

*Kruszka v. Novartis Pharms. Corp.*, 28 F. Supp. 3d 920 (D. Minn. 2014) ...................... 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ......................................... 14, 19, 21

*Mahaska Bottling Co., Inc. v. PepsiCo., Inc.*, 441 F. Supp. 3d 745 (S.D. Iowa 2019) ....... 5

*Maitland v. Univ. of Minn.*, 155 F.3d 1013 (8th Cir. 1998) ........................................ 25, 27

*Malden Transportation, Inc. v. Uber Techs., Inc.*, 404 F. Supp. 3d 404 (D. Mass. 2019) 12

*Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748 (8th Cir. 2006) .......................... 2, 10, 12

*Meridian Mfg., Inc. v. C & B Mfg., Inc.*, 340 F. Supp. 3d 808 (N.D. Iowa 2018) ............ 37

*Morgan v. United Parcel Service of America, Inc.*, 380 F.3d 459 (8th Cir. 2004) ........... 26

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) ........................................................................................................................ 6, 13

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269 (S.D. Fla. June 8, 2011) .............................................................................................................................. 4

*Persian Gulf Inc. v. BP W. Coast Prod. LLC*, No. 15CV1749-JO-AGS, 2022 WL 4830698 (S.D. Cal. Sept. 30, 2022) ............................................................................................ 12

*Platypus Wear, Inc. v. Clarke Modet & Co.*, 2008 WL 4533914 (S.D. Fla. Oct. 7, 2008). 5

*Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2:15-CV-512-WCB, 2017 WL 1319553 (E.D. Tex. Apr. 10, 2017) ............................................................................... 4

*Russell v. Whirlpool Corp.*, 702 F.3d 450 (8th Cir. 2012) ................................................ 34

*Schumacher v. Tyson Fresh Meats, Inc.*, CIV 02-1027, 2006 WL 47504 (D.S.D. Jan. 5, 2006) ...................................................................................................... 26

*Scott v. City of Sioux City, Iowa*, 68 F. Supp. 3d 1022 (N.D. Iowa 2014) ......................... 9

*Starkist Co. v. Olean Wholesale Grocery*, No. 22-131, 2022 WL 16909174 (U.S. Nov. 14, 2022) ...................................................................................................... 36

*Sys. Dev. Integration*, 886 F. Supp. 2d 873 (N.D. Ill. 2012) ................................................ 4

*Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970 (D. Minn. 2021) ...................................................................................................... 2, 10

*Thomas v. Barze*, 57 F. Supp. 3d 1040 (D. Minn. 2014) ...................................... 22, 38, 39

*United States v. Finch*, 630 F.3d 1057 (8th Cir. 2011) ........................................................ 37

*Williams v. Illinois*, 567 U.S. 50 (2012) ........................................................................... 38

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969) ................................... 35

**Other Authorities**

ABA, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES (2017) .... 4, 13, 26

Advisory Committee's Note on Proposed Fed. R. Evid. 702, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and Evidence: Request for Comment (1998) ............................................................................................. 14

**Rules**

Fed. R. Evid. 702 .............................................................................................. 13

Fed. R. Evid. 703 .............................................................................................. 37

**Treatises**

Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 58-61 (4th ed. 2005) .................................................................................................................... 31

J. McLaughlin, Weinstein's Federal Evidence (2d ed. 1998) ............................................ 14

## INTRODUCTION

Repeating arguments from their opposition to the motion for class certification of Commercial and Institutional Indirect Purchaser Plaintiffs ("CIIPPs"), ECF No. 1473, and Dr. Haider's Expert Report, ECF No. 1442, Defendants move to exclude the testimony of CIIPPs' expert economist, Dr. Michael Williams, and ask, in the alternative, that the Court, strike paragraphs 106-42, 176-77, 183, 185, and 189-96 of Dr. Williams' report.  ECF No. 1459 ("*Daubert* Mem."), at 28-31.

Like their effort to show that this case does not turn on common proof, Defendants' *Daubert* arguments fail.  Defendants do not contest Dr. Williams' expertise in the economics of industrial organization.  They instead attempt to manufacture a *Comcast* issue, raise an array of meritless methodological objections, contend that Dr. Williams should have performed additional statistical tests that undermine his findings that the alleged conspiracy inflated pork prices and impacted virtually every member of the CIIPPs' class, and object to his recitation of facts that CIIPPs will prove at trial.

In fact, Dr. Williams' analysis is tailored to CIIPPs' theory of antitrust impact and their claims for equitable and monetary relief.  Far from undermining Dr. Williams' findings, Defendants' technical objections rest on inappropriate methodological choices that are either designed to produce invalid results, confuse the issues, or inject irrelevant issues into the case.

As is clear from his reports, Dr. Williams presents a well-designed, rigorous, methodologically sound analysis of the effects of the alleged conspiracy.  At most, Defendants' assorted objections raise questions about the persuasiveness of his analysis

that are for the jury to decide. Defendants' objections involve none of the "fundamental" issues that would require the exclusion of Dr. Williams' testimony at this stage of the case. *See Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970, 985 (D. Minn. 2021) ("In a full *Daubert* analysis before a jury trial, the Court 'should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility.'" (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006))).

The Court should (1) deny the motion in full, (2) find that CIIPPs have proved the reliability of Dr. Williams' analysis by a preponderance of the evidence, and (3) find that the Dr. Williams' methods and analysis are consistent with the theory of CIIPPs' case and their theory of antitrust impact.

## BACKGROUND

After an extensive investigation, CIIPPs filed a complaint alleging a conspiracy that began on at least January 1, 2009, and continued through at least June 28, 2018 — the date the complaint was filed. ECF No. 1, at 1. Defendants moved to dismiss under Rule 12(b)(6) and the Court granted the motion, finding that the complaint did not plausibly allege parallel conduct suggestive of a conspiracy. *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/LIB), 2019 WL 3752497, at *1 (D. Minn. Aug. 8, 2019). After further research, CIIPPs filed amended and corrected complaints. *See* ECF No. 808. Defendants again moved to dismiss. ECF No. 433, 436, 440, 442, 445, 448, 450, 453, 456, 458, 460. The Court found that the operative Complaint[1] plausibly alleged parallel conduct. The Court

rejected Defendants' argument that the federal Sherman Act claims asserted by the Direct Purchaser Plaintiffs (DPPs) were barred by the statute of limitations, finding that plaintiffs plausibly pled that Defendants' conspiracy continued through June 28, 2014, "and beyond." *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 775 (D. Minn. 2020).

While the latter opinion indicates that CIIPPs may not recover damages for the period before June 2014, it does not change the complaint's core allegation that Defendants engaged in an antitrust conspiracy that began in January 2009. To this day, the operative complaint alleges a conspiracy to limit the supply and fix, raise, and maintain prices for pork products in the United States from at least 2009 through at least June 30, 2018. ECF No. 808 ("Complaint" or "Compl.") ¶ 217. The existence, and consequences, of that conspiracy are the central issues in this case. The conspiracy forms the basis of CIIPPs' claims for damages *and* their claims for injunctive relief. Because CIIPPs rely on the continuing violation doctrine, they cannot as a logical matter prove their case without offering evidence of how the conspiracy formed. In short, while the limitations period may restrict the *damages* CIIPPs ultimately recover, this case is, fundamentally, about a conspiracy that, as alleged in the Complaint, lasted from 2009 to 2018.

Contrary to Defendants' suggestion that Dr. Williams should have independently "validate[d]" that the conspiracy began in 2009, *Daubert* Mem. at 13-16, the Complaint's allegation to that effect reflects CIIPPs' detailed analysis of the U.S. pork market. Compl.

---

[1] The currently operative complaint is Commercial and Institutional Indirect Purchaser Plaintiffs' Fourth Amended and Consolidated Class Action Complaint, ECF No. 808 ("Compl.").

¶¶ 75-101. The Complaint's allegation has since been confirmed by internal communications indicative of a conspiracy that began to be implemented over the course of 2009. *See* Memorandum in Support of Commercial and Institutional Indirect Purchaser Plaintiffs' Motion for Class Certification and Appointment of Lead Counsel and Plaintiffs' Steering Committee at 7-9 ("Mem.").

CIIPPs' motion for class certification defined the proposed classes by reference to whether a class member indirectly purchased Defendants' pork products between June 28, 2014, and June 30, 2018. ECF No. 1334, at 2-3. CIIPPs' choice of those dates to define class membership reflects the legal requirement of a manageable class, Fed. R. Civ. P. 23(b)(3)(D), the limitations period, and the end of the Class Period's timeframe from the first complaint by the consumer class in this MDL. Complaint, ECF No. 1. The proposed class definition does not change the claims asserted in the Complaint, and the alleged conspiracy remains the basis of CIIPPs' claims for injunctive and monetary relief.

Following standard practice in complex antitrust matters,[2] CIIPPs asked Dr. Williams to assume that CIIPPs would prove the conspiracy the Complaint alleged and to

_____

[2] ABA, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 112 (2017); "[i]t is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion." *Sys. Dev. Integration*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012); *see Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269, at *3 (S.D. Fla. June 8, 2011) ("An expert witness … may assume liability for purposes of calculating damages [. . . .]"). "This principle has been expressed in numerous cases, and it is beyond serious challenge." *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2:15-CV-512-WCB, 2017 WL 1319553, at *5 (E.D. Tex. Apr. 10, 2017) (collecting authorities). Courts have explained that a contrary rule would be "illogical." *Sys. Dev. Integration*, 886 F. Supp. 2d at 882 (citing *Platypus Wear, Inc. v. Clarke Modet & Co.*, 2008 WL 4533914, at *6 (S.D.

analyze its effects for the period between January 1, 2009, and June 30, 2018. Williams

Rep. ¶ 218. *Cf.* Haider Rep. ¶ 8 ████████████████████████████

████████████████████████████████████████████████████████

████████████ Specifically, CIIPPs asked Dr. Williams to examine (1) whether the

conspiracy had uniform effects throughout the market for pork and (2) whether all members

of the class were affected by the conspiracy — again assuming that CIIPPs carried their

burden of proving the conspiracy took place between those dates.[3]

To answer those questions, Dr. Williams employed a standard two-step impact

analysis that courts have repeatedly found reliable and probative in complex antitrust

matters,[4] and which Defendants concede is a valid practice. *See* Opposition Mem. at 7

("Opp. Mem."). To show that Plaintiffs have evidence capable of establishing that

overcharges were experienced broadly across the members of the Class — *i.e.*, to establish

"common impact" — that analysis first considers whether common evidence is capable of

---

Fla. Oct. 7, 2008)). Unless "liability is admitted and the only issue is the amount of
damages, experts testifying to damages *must make assumptions about liability* and the
parties' legal theories in order to calculate damages." *Mahaska Bottling Co., Inc. v.
PepsiCo., Inc.*, 441 F. Supp. 3d 745, 758 (S.D. Iowa 2019) (emphasis added).

[3] In his report, Dr. Williams refers to January 1, 2009, and June 30, 2018, as the "damages
period," because this is the period in which CIIPPs suffered economic damages by reason
of the conspiracy. *Id.*

[4] *See, e.g.*, *In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 332 (S.D. Cal.
2019), *aff'd sub nom. Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F. 4th 651 (9th Cir. 2022), *cert. denied*, --- S.Ct. ----, 2022 WL 16909174 (Nov. 14,
2022); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *12-19
(N.D. Ill. May 27, 2022); *D&M Farms v. Birdsong Corp.*, No. 2:19-CV-463, 2020 WL
7074140, at *6 (E.D. Va. Dec. 2, 2020); *In re Capacitors Antitrust Litig.*, No. 14-CV-
03264-JD, 2018 WL 5980139, at *7 (N.D. Cal. Nov. 14, 2018).

showing that the alleged antitrust violation inflated prices *in general*. *See* Mem. at 34. The analysis then considers whether price inflation was limited to specific purchasers or, on the other hand, had a widespread effect across class members. *See id.* Where the alleged violation inflated prices in general and had a widespread effect across class members, this analysis permits a class "to demonstrate 'class-wide impact even when the market involves diversity in products, marketing, and prices.'" *Broiler Chicken*, 2022 WL 1720468, at *12 (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 678 (9th Cir. 2022), *cert. denied*, --- S.Ct. ----, 2022 WL 16909174 (Nov. 14, 2022)).

Dr. Williams estimated that ███████████████████████████

████████████████████████████████████████████████████████

Williams Rep. ¶ 262. Dr. Williams estimated a common overcharge of ██████[5] at the direct purchaser level. Williams Rep. ¶ 226. Finding that relevant distributors passed through approximately all of the overcharge they paid, Dr. Williams estimated that relevant distributors selling to the CIIPP class would have passed through overcharges at a rate of

---

[5] Defendants accuse Dr. Williams of using averages to mask statistical effect over Omni. Mem. at 38-40. Opp. Mem. at 2. Statistical techniques employing "averaging" have been repeatedly accepted by courts in granting class certification in antitrust matters. Mem. at 39 & n.2. Far from rejecting Dr. Williams' methodology, opinions that have denied class certification of complex antitrust matters insist upon the type of analysis and findings that Dr. Williams' report sets forth. *See In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) (expert relied on an average price trend that did not show impact on particular sales to particular customers); *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478, 494 (N.D. Cal. 2008) (expert relied on average price rather than using common model to account for sales of particular products to particular purchasers); *In re Optical Disk Drive Antitrust Litig.* ("*ODD I*"), 303 F.R.D. 311, 321-322 (N.D. Cal. 2014) (expert assumed the same overcharge for all class members and did not analyze overcharge in individual cases).

███████████████████████████████, respectively. Williams

Rep. ¶ 256. Although Dr. Haider disagrees with Dr. Williams' interpretation of his

estimates, she does not offer statistical analysis disputing their magnitude. Confirming

widespread impact could be shown at the class member level using common statistical

proof, Dr. Williams conducted regression analyses at the indirect purchaser level that

estimated the conspiracy's impact on a transaction-specific basis. Those estimates found

that ██████████████████████████████████████████████

██████ paid an overcharge on at least one purchase of a product during the lifecycle of the

conspiracy. Williams Rep. ¶ 274.

     Dr. Haider modifies production and overcharge regressions run by Dr. Williams by

████████████████████. Haider Rep., ¶¶ 89, 111. While it may seem logical

to modify the regressions in the manner that Dr. Haider proposed, her analysis was in fact

designed to produce invalid results. This is because ████████████████████

████████████████████████████████████████████████

██████████████. *See* Declaration of Blaine Finley in Support of Commercial and

Institutional Indirect Purchaser Plaintiffs' Reply In Support of Their Motion For Class

Certification, Ex. 1, Expert Reply Report of Michael A. Williams, Ph.D. ("Williams Reply

Rep."), Sections III.E.ii., IV.A.i. The appropriate economic approach to estimating impact

within the limitations period, Dr. Williams explains, is to begin by estimating damages

within different phases of the conspiracy *as reflected in actual economic conditions*.

Williams Reply Rep. ¶¶ 79-83, 102-107. Those estimates — which, again, are based on

actual economic conditions rather than the economically-irrelevant fact of when the

limitations period began to run — supply a reliable basis for estimating the conspiracy's effects in different periods of the conspiracy, including the period when CIIPPs may indisputably recover damages. *Id.* at ¶ 102-07, Table 5.

This is confirmed by Dr. Williams' response to Dr. Haider's methodological criticisms. *Daubert* Opp. Mem. at 11. In response to those criticisms, Dr. Williams supplemented his original regressions in two ways, both of which show that his model can reliably estimate impact in different periods of the conspiracy. First, Dr. Williams ██████████████████████████████████████████████████████████. Williams Reply Rep. ¶¶ 106-07. Second, he █████████████████████████████ *Id.* ¶ 107-08.

Both of Dr. Williams' modified common overcharge regressions ███████████ ████████████████████████████████████████████████████ ██████████ Williams Reply Rep., ¶ 107, Table 5. When Dr. Williams ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████. Williams Reply Rep. ¶¶ 169-70, Figures 5-6. Notably, even when Dr. Williams applies all the changes[6] urged by Dr. Haider and Dr. Mintert — many of which are methodologically inappropriate — Dr. Williams finds

─────────────────

[6] As Defendants' experts propose, Dr. Williams ███████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████



. Williams Reply Rep. ¶ 126, Table 9.

Consistent with the principle that damages should not be calculated for time-barred conduct, *see Scott v. City of Sioux City, Iowa*, 68 F. Supp. 3d 1022, 1040 (N.D. Iowa 2014); *Daubert* Mem. 11, Dr. Williams estimated the damages that class members suffered by reason of the conspiracy to be ███████. Williams Rep. ¶ 288, Table 12. Dr. Williams calculated this figure by ████████████████████████████████████

██████████████████████████████████████████████████████

████████ *Id.* When Dr. Williams ███████████████████████████████

██████████████████████████████████████████████████████

Williams Reply Rep. ¶ 107, Table 5; *see also,* Opp. Mem. at 11-12.

## DISCUSSION

Under Federal Rule of Evidence 702, expert testimony is admissible where "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *See Daubert v. Merrill Dow Pharms.* Inc., 509 U.S. 579 (1993).

As Defendants acknowledge (*Daubert* Mem. at 7), courts in this Circuit conduct "a focused *Daubert* inquiry" when the admissibility of expert testimony is challenged in connection with a motion for class certification. *See In re Zurn Pex Plumbing Prod. Liab.*

*Litig.*, 644 F.3d 604, 610 (8th Cir. 2011). This focused *Daubert* trains on whether the proponent of class certification has carried its burden of showing that Rule 23's requirements are satisfied. *See id.* The Court must resolve disputes among the experts by a preponderance of the evidence, but only to the extent those disputes are implicated by the findings Rule 23 requires the Court to make. *See* Memorandum in Support of Commercial and Institutional Indirect Purchaser Plaintiffs' Motion for Class Certification and Appointment of Lead Counsel and Plaintiffs' Steering Committee at 19-20, ECF No. 1428 (collecting authorities).

"In a full *Daubert* analysis before a jury trial, the Court 'should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility.'" *Taqueria*, 577 F. Supp. 3d at 985 (quoting *Marmo*, 457 F.3d at 758). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Only where an expert's opinion is "so fundamentally unsupported that it can offer no assistance to the jury" should it be excluded. *Kruszka v. Novartis Pharms. Corp.*, 28 F. Supp. 3d 920, 926 (D. Minn. 2014). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of resolving conflicts in otherwise admissible expert testimony. *Daubert*, 509 U.S. at 596.

Dr. Williams' analysis is admissible. Defendants do not contest Dr. Williams' qualifications, the obvious relevance of his testimony, the reliability of the data he analyzed, or the general use of multivariate regression analysis using the dummy variable

methodology to assess antitrust impact in indirect purchaser price-fixing cases. Defendants instead try to concoct a *Comcast* issue and argue that his testimony must be excluded because of a potpourri of purported technical defects identified in Dr. Haider's report.

None of Defendants' contentions have merit. The Court should accordingly find that CIIPPs have carried their burden of showing the reliability of Dr. Williams' opinions by a preponderance of the evidence, find that his analysis is consistent with CIIPPs' liability case, and deny Defendants' motion in its entirety.

I.      **Dr. Williams Is Well-Qualified to Analyze the Effects of the Alleged Conspiracy, and the Models He Specified Here Are Reliable.**

The most basic questions in a *Daubert* analysis are whether an expert is qualified, whether his methods are generally accepted in the relevant field, whether his analysis is based on reliable data, and whether it is relevant to issues in dispute. *See Daubert*, 509 U.S. at 584, 588-89. Although Defendants ignore these requirements, they are easily satisfied here.

    A.      **Dr. Williams is Qualified to Offer His Opinions.**

To begin with, Defendants do not — and could not — contest Dr. Williams' qualifications in the economics of industrial organization. Dr. William holds M.A. and Ph.D degrees from the University of Chicago in economics and has served as an economist with the U.S. Department of Justice, Antitrust Division. Dr. Williams has published dozens of studies in leading peer-reviewed venues, among them the *International Review of Law and Economics*, the *Journal of Institutional and Theoretical Economics*, and the *Oxford Handbook on International Antitrust Economics*. Courts in numerous antitrust matters have

admitted his testimony as reliable. *See* Williams Rep., App. I. Testimony or reports offered

by Dr. Williams has been accepted by numerous courts in granting class certification in the

antitrust context. *See, e.g.*, *In re Packaged Seafood*, 332 F.R.D. at 335; *In re Disposable*

*Contact Lens Antitrust*, 329 F.R.D. 336, 397 (M.D. Fla. 2018).[7]

### B.    Dr. Williams' Methods Are Reliable and Well-Accepted.

Defendants do not contest the general reliability of regression analysis, which is the

method that Dr. Williams employs in this case. "To satisfy the reliability requirement, the

proponent of the expert testimony must show by a preponderance of the evidence both that

the expert is qualified to render the opinion and that the methodology underlying his

conclusions is scientifically valid." *Marmo*, 457 F.3d at 757-58. As noted above, Dr.

Williams' methodology, which compares actual prices with those that would have been

charged in a "but for" world that was not affected by anticompetitive conduct, permits a

class "to demonstrate 'class-wide impact even when the market involves diversity in

products, marketing, and prices.'" *Broiler Chicken*, 2022 WL 1720468, at *12 (quoting

---

[7] Defendants appended *Persian Gulf Inc. v. BP W. Coast Prod. LLC*, No. 15CV1749-JO-AGS, 2022 WL 4830698 (S.D. Cal. Sept. 30, 2022) as supplemental authority. This opinion is inapposite, since in that matter the start date of the alleged conspiracy changed significantly between the filing of the initial complaint. *Persian Gulf Inc.*, 2022 WL 4830698, at *36 ("In contrast [to the damages period beginning in 2015], Consumer Plaintiffs' complaint originally alleged that the price fixing conspiracy first occurred in 2012, not February 2015, and Persian Gulf's complaint similarly alleged that the Defendants' price fixing conspiracy began in 2012."). Here, there is no similar uncertainty about the start of the conspiracy. Defendants also cite *Malden Transportation, Inc. v. Uber Techs., Inc.*, 404 F. Supp. 3d 404 (D. Mass. 2019), a bench trial ruling that dealt with Uber's effect on the value of Massachusetts taxi cab medallions, and which has marginal relevance in the antitrust context.

*Olean Wholesale Grocery*, 31 F.4th at 678, *cert. denied*, --- S.Ct. ----, 2022 WL 16909174 (Nov. 14, 2022)). *See also, e.g.*, ABA, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES at 201. Dr. Haider implicitly concedes the propriety of that methodology when she purports to improve on Dr. Williams' analysis by adjusting his model specifications and incorporating alternative variables into the analysis.

### C. Dr. Williams' Analysis Is Based on Reliable Data.

Dr. Williams' testimony is based on reliable data. In conducting his regression analysis, Dr. Williams analyzed ███████████████████████████████████

████████████████████████████████████████████████████████

Williams Rep., Appendix 2. Defendants make no argument that this data does not provide a reliable empirical basis for analyzing the conspiracy's effects.

### D. Dr. Williams' Analysis Is Relevant and Helpful to the Trier of Fact.

Finally, Dr. Williams' analysis provides reliable estimates in connection with the key economic concepts at stake in the class certification context: causal price inflation and common impact to all or nearly all the class members. The relevance of this analysis is readily apparent.

## II. Dr. Williams Appropriately Examined the Entire Conspiracy Instead of Artificially Restricting His Analysis to the Period in Which the Statute of Limitations May Limit CIIPPs' Monetary Recovery.

Implicitly conceding Rule 702's first three factors, Defendants focus on the Rule's fourth inquiry: whether "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Working from the same playbook as Dr. Haider's report and Defendants' opposition to CIIPPs' motion for class certification, the centerpiece

13

of Defendants' *Daubert* motion is an argument that Dr. Williams' analysis asks the wrong question. Instead of analyzing the *entire* alleged conspiracy, Defendants maintain that Dr. Williams should have restricted his analysis to June 2014 to July 2018 — the period when CIIPPs' damages claims are unquestionably timely. This argument misunderstands CIIPPs' claims, Dr. Williams' analysis, and the testimony he will offer at trial.

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court instructed that where a party challenges the fit between an expert's methods and the issues in dispute, courts must consider "the reasonableness of using [the expert's] approach, along with [the expert's] particular method of analyzing the data thereby obtained." *Id.* at 154. The question is "whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Id.* at 156-57 (quoting 4 J. McLaughlin, Weinstein's Federal Evidence ¶ 702.05[1], p. 702-33 (2d ed. 1998)). "[D]istrict courts must 'scrutinize' whether the 'principles and methods' employed by an expert 'have been properly applied to the facts of the case.'" *Id.* at 157 (quoting Advisory Committee's Note on Proposed Fed. R. Evid. 702, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and Evidence: Request for Comment 126 (1998)). Where an expert's analysis is challenged at class certification, the Court must further find, by a preponderance of the evidence, that the expert's analysis is consistent with the class's "theory of antitrust impact." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013).

Defendants' claim that Dr. Williams' analysis does not fit the questions at issue in this case mischaracterizes the theory of CIIPPs' case and the showing they will make at

trial. Since the filing of the initial complaint, Plaintiffs have alleged a conspiracy to limit the supply of pork that began in at least 2009 and continued through at least 2018. Compl. ¶¶ 39-165. That conspiracy forms the core of CIIPPs' claims for both equitable relief and monetary damages.

Defendants are mistaken when they assert that CIIPPS' proof will be restricted to the post-2014 period that CIIPPs have proposed to use to define class membership. *See, e.g*, Opp. Mem. at 12-13; Omni. Mem. at 40-41. This Court already recognized that CIIPPs' claims may proceed even though the conspiracy began in 2009, because CIIPPs adequately alleged a continuing violation. *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 774. To prove such a violation, CIIPPs must show: "(1) a price-fixing conspiracy; (2) that brings about a series of unlawfully high-priced sales during the class period; and (3) sale[s] to the plaintiff[s] during the class period." *Id.* at 775. The second element of the continuing-violation test requires proof "that the conspiracy *continued* into the non-time-barred class period: June 28, 2014 — that is, four years before this action was filed — and beyond." *Id.* (emphasis added). "[T]he issue is whether the amended complaint alleges that the conspiracy *continued when the sales took place*." *Id.* (emphasis added and quoting *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017)).

CIIPPs' burden, then, is to show a conspiracy that began before the Class Period and "continued" into it, as reflected in "specific instances of behavior that indicate the Defendants were still conspiring." *Id.* at 775. This is precisely what Dr. Williams' analysis does. As explained above, Dr. Williams analyzes three distinct time periods within the conspiracy alleged in the Complaint. He finds widespread, statistically significant

overcharges to all or virtually all class members within each time period. Williams Reply Rep. ¶ 107, Table 5. His findings are more than "consistent" with the class's "theory of antitrust impact," *Comcast*, 569 U.S. at 34; they are affirmative proof of it.[8]

Defendants object that, should the Court limit CIIPPs' monetary recovery to the post-2014 period, Dr. Williams cannot reliably estimate damages. But their argument misunderstands Dr. Williams' analysis. As Dr. Williams' Reply Report explains, the economic models that were described in his opening report and provided to Dr. Haider reliably calculate the damages that CIIPPs incurred in the period between June 2014 and July 2018. *See* Williams Reply Rep. ¶ 103.

Defendants repeatedly compare this case to *Comcast*, where the Supreme Court decertified a class because individualized damages calculations predominated over common issues, *see, e.g.*, *Daubert* Mem. at 12-13; Opp. Mem. at 2; Omni. Mem. at 35-38, 61-62. But ironically, the analogy between *Comcast* and this case does not fit. In *Comcast*, the plaintiff class challenged Comcast's practice of "clustering" cable television operations within the Philadelphia metro region by swapping cable systems outside that region for competitor systems within it. 569 U.S. at 29. Plaintiffs advanced four distinct, economically differentiated theories of how Comcast's clustering caused the class to suffer antitrust injury: (1) by "ma[king] it profitable for Comcast to withhold local sports

---

[8] Defendants claim that, when their counsel asked Dr. Williams to describe preliminary work product at deposition, Plaintiffs' counsel instructed him not to answer. The parties' joint stipulation concerning expert discovery excluded preliminary work product from any form of discovery. ECF No. 1016 (4)(f).

programming from its competitors;" (2) by deterring competition from "overbuilders" that built new cable systems in areas that Comcast served; (3) by eliminating "benchmark" cable systems that cable customers relied on to compare prices; and (4) by increasing Comcast's bargaining power in negotiations with content providers. *See id.* at 31. The Supreme Court held that plaintiffs had failed to show damages could be established using common evidence and reversed the lower courts' certification of a (b)(3) class. *Id.* at 38.

CIIPPs have never advanced distinct, economically differentiated theories of antitrust injury comparable to those in *Comcast*. CIIPPs allege a single conspiracy with the aim and mechanism of artificially restricting supply and increasing prices paid for pork products sold in the United States. CIIPPs allege that, in the service of effectuating this conspiracy, Defendants engaged in several types of conduct aimed at decreasing the domestic supply of pork products and increasing prices, including collusion to artificially restrict pork production, to artificially increase exports, and to monitor production, pricing, and export levels via Agri Stats. This alleged conduct is a straightforward conspiracy to reduce supply. Unlike *Comcast*, CIIPPs do not challenge integrator Defendants' withholding of a component that competitors need to participate in the domestic pork market. They do not allege that Defendants deterred new competitors from entering the pork market, for example. And while corporate consolidations have increased Defendants' market power, *see* Williams Rep. ¶ 37-39, the lawfulness of those corporate consolidations is not at issue in this proceeding.

Defendants' *Comcast* argument fails for another reason: CIIPPs' theory of antitrust injury, which is premised on a conspiracy to restrict supply and raise prices, has not

materially narrowed during the proceedings in this case. In *Comcast*, "[t]he District Court accepted the overbuilder theory of antitrust impact as capable of class-wide proof and rejected the rest," *id.* at 31, but the plaintiffs' economic model "did not isolate damages resulting from any one theory of antitrust impact." *Id.* at 32. The model, therefore, could not "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding." *Id.* at 38.

In contrast, Dr. Williams' analysis is keyed to the single conspiracy that CIIPPs allege and, as shown above, reliably estimates impact and damages for the Class Period. Dr. Williams (a) describes in detail how the market for pork was conducive to the alleged conspiracy, (b) explains how Defendants' conduct was consistent with such a conspiracy and inconsistent with Defendants' acting in their own economic self-interests absent the conspiracy, and (c) empirically measures the effects of the alleged conspiracy using his proposed multiple regression model. There is no requirement that Dr. Williams address every allegation in the Complaint for his testimony to be admissible. *See, e.g.*, *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (expert "data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury"); *In re Titanium Dioxide Antitrust Litig.*, CIV.A. RDB-10-0318, 2013 WL 1855980, at *14 (D. Md. May 1, 2013) ("while the expert's opinions must be reliable, they need not prove the Plaintiffs' entire case."). Indeed, while "Defendants may probe [Dr. Williams] at trial 'regarding the amount of the discovery record he reviewed … 'the extent to which [an expert] considered the entirety of the evidence in the case is a matter for cross-

examination,'" and "do[es] not warrant [Dr. William's] exclusion." *Id.* at *9 (quoting *In re Urethane Antitrust Litig.*, No. 04-1313-JWL, 2012 WL 6681783, at *3 (D. Kan. Dec. 21, 2012)). Defendants cite *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (S.D.N.Y. 2020), for the proposition that a valid model must allow for the possibility that the alleged conduct had different effects at different points in time. But as explained above, Dr. Williams' analysis does just that. Dr. Williams performed the analysis he was tasked with in a reliable manner consistent with Plaintiffs' allegations and the facts of the case.

This case, accordingly, is nothing like an analysis of the stock market that draws conclusions about the past four years based on the market's performance over the past nine years. *See Daubert* Mem. 10. A better analogy to Dr. Williams' work is the S&P 500 Index. Like the S&P, Dr. Williams' analysis explains what happened during the nine-year period that is critical to CIIPPs' core liability case, the four-year period that Defendants contend marks the limit of CIIPPs' ability to recover damages, and countless other issues that will be disputed at trial.

That analysis is both a reasonable means of addressing the "particular issues" in dispute in this complex antitrust matter, *Kumho*, 526 U.S. at 157, and consistent with CIIPPs' theory of antitrust injury, *Comcast*, 569 U.S. at 35. Both *Daubert* and *Comcast* are satisfied.

## III.    Defendants' Methodological Criticisms of Dr. Williams' Analysis Are Without Merit and, at Most, Raise an Issue for the Jury.

As a backup to their lead argument, Defendants raise a series of garden variety *Daubert* objections. Defendants principally claim that Dr. Williams did not identify an

appropriate "benchmark period," that his models failed to control for non-conspiratorial factors that could have impacted the pork supply, that Dr. Williams failed to account for non-conspiratorial factors that could have affected exports, that he failed to disclose or perform appropriate robustness checks, and that his models produce inconsistent results. *See Daubert* Mem., 17-24; Omni. Mem. at 28-30, 44-47, 53-59.

As Dr. Williams explains in his Reply Report, none of these contentions have merit. In fact, as courts in multiple proceedings have found, it is *Defendants'* expert, Dr. Haider, whose economic analysis fails to withstand scrutiny. Nevertheless, in an excess of caution, Dr. Williams tested and found ███████████████████████████████ ████████████████████████████████████. Williams Rep. ¶¶ 263-264, Tables 6-7. Dr. Williams's overcharge regression model is robust ███████████ ████████████████████████████████████████████ Williams Reply Rep. ¶ 126, Table 9. Defendants reference ███████████████████████ █████████ *Daubert* Mem. at 24-25. As Dr. Williams explains, however, ███████████ ████████████████████████████████████████████ ███████████████████████ Williams Reply Rep. ¶ 171. Moreover, Dr. Haider's ████████████████████████████████████████████ ███████████████████████ Williams Reply Rep. ¶¶ 174-175.

"There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456–57 (8th Cir. 2012) (quoting *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir.2005)); *see also Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we

emphasize, a flexible one."). Whether taken individually or together, Defendants' technical criticisms do nothing to undermine the reliability and relevance of Dr. Williams' analysis.

### A.    Dr. Williams Used an Appropriate Benchmark Period.

Defendants begin by attacking the "benchmark" period Dr. Williams used in his analysis — i.e., the period free of anticompetitive conduct that supplies a baseline against which to measure the effects of anticompetitive conduct. They contend that Dr. Williams should have excluded 2008 from the benchmark period because ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████  *Daubert* Mem 15-16; Omni. Mem. at 45-46.

Like their statute-of-limitations argument, Defendants' attack on Dr. Williams' benchmark analysis requires the Court to consider "the reasonableness of using [the expert's] approach, along with [the expert's] particular method of analyzing the data thereby obtained." *Kumho Tire*, 526 U.S. at 154. Contrary to Defendants' suggestion, it would have been manifestly improper to exclude the year immediately before the conspiracy allegedly began from an econometric analysis of a conspiracy that, as CIIPPs have shown, began in 2009. Dr. Williams' analysis ████████████████████ ████████████████████████████████████████████ ████████████████████████████████  As long as there are no market factors or industry conditions that support excluding 2008 from the

benchmark period, it should be included, and Dr. Williams shows ███████████

████████████████████████████████████████████████████████ [9] Williams

Reply Rep. ¶¶ 117-121. Defendants claim that ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Williams Reply Rep. ¶ 91.

Consistent with this approach, it was entirely appropriate for CIIPP to direct Dr. Williams to "assume[] the allegations in the Complaint are true" and use "well-accepted econometric methodologies and common evidence" to analyze to what extent "the economic evidence is consistent with the existence of the alleged conspiracy during the Class Period and inconsistent with each Defendant having acted in its unilateral economic self-interest absent the alleged conspiracy." Williams Rep. ¶¶ 7(c), 12. Courts have repeatedly recognized the propriety of following this approach in complex antitrust matters. *See, e.g.*, *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 602 (N.D. Ill. 2015), *aff'd sub nom. Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016); *see also*, ABA, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES at 201; *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014) ("Lego can testify to his opinion about

---

[9] Cyclical fluctuations in prices or production of pork, if any, are driven by demand and cost factors, and Dr. Williams controls for demand and cost factors. Williams Reply Rep. ¶ 114-16.

whether a certain action by Barze in a certain circumstance, assuming that those are the facts, would be consistent with police practices.").

Defendants attempt to draw an analogy between this case and an unreported *Daubert* decision in the *Wholesale Grocery* litigation. *In re Wholesale Grocery Prods. Antitrust Litig.*, 2018 WL 3862773, at *7 (D. Minn. 2018); *Daubert* Mem. at 13-16, 18, 22; Omni. Mem. at 45-47. But analysis in *Wholesale Grocery* was nothing like the analysis Dr. Williams performed for this case. Instead of the dummy variable methodology that Dr. Williams uses, the *Wholesale Grocery* expert used a "benchmark" approach that attempted to determine the overcharges a single grocer negotiated by comparing that grocer's prices to those negotiated by SuperValu, a large reseller that the expert assumed could escape the effects of the alleged antitrust conspiracy because it served as its own wholesaler. *Id.* at *5. In contrast to Dr. Williams, who controlled for every major non-conspiratorial economic explanation for the observed reduction in supply, the *Wholesale Grocery* expert failed to control for *any* non-conspiratorial factors, *id.* at *8, and conceded "that the [benchmark] data was not 'sufficient for that purpose.'" *Id.* at *7. Defendants' contention that the case involved a failure to analyze prices "before the alleged conspiracy," *Daubert* Mem. at 15; Omni. Mem. at 45-46, mischaracterizes the analysis conducted in that case and its obvious differences with the analysis here.[10]

---

[10] *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 484 (S.D.N.Y. 2018) represents a context-specific opinion driven by the appearance of cherry-picking based on the inclusion of the year of 2013 in a clean benchmark period that otherwise consisted of data from the years of 2000 through 2004. *LIBOR*, 299 F. Supp. at

Criticisms of Dr. Williams' treatment of the end of the conspiracy period are also unavailing. Defendants claim that Dr. Williams' overcharge findings disappear when analysis is limited to post-2014. Dr. Williams explained ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Williams Reply Rep. ¶¶ 102-105. Dr. Williams also showed ███████████████████████████████████████ ████████████████████████████ Williams Reply Rep. ¶¶ 106-108, 126. Defendants claim that supply increases during certain parts of the class period undermine the opinions of Dr. Williams, Omni Mem. at 30, but Defendants' argument is based on █ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Williams Reply Rep. ¶¶ 68-70. Defendants did not have evidence that pork production raised back to the but-for competitive level after 2015. Another timing-related criticism lodged by Defendants is that Dr. Williams ██████████████████████████████████ ██████████████████████████████████████ *Daubert* Mem. at 11, but Defendants' argument is again ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ Williams Reply Rep. ¶¶ 68-70.

---

474. In addition, arguments were made that 2013 was anomalous for multiple reasons, including because "the ICAP–Ask rate in 2013 exhibits data-quality problems in that it remains entirely unchanged for more than eight consecutive months." *Id.* at 483. By contrast, Dr. Williams' selection of the benchmark as the time period immediately preceding reflects common sense and is the logical and obvious choice for this case.

Defendants do not present evidence that pork production increased back to the but-for competitive level after 2013. In contrast, Dr. Williams performed 

Williams Rep., ¶¶ 143-170, Williams Reply Rep. ¶¶ 79-83.

### B.   Dr. Williams Appropriately Controlled for Non-Conspiracy Factors that May Have Affected Pork Supply.

Defendants' next complaint is that, despite incorporating an extensive list of controls into his analysis, *see* Williams Rep. ¶¶ 152-163, 222, Dr. Williams overlooked innocent explanations for the reduction in domestic pork supply that occurred during the conspiracy.  Omni. Mem. at 53-59. Defendants assert that Dr. Williams also should have



*Daubert* Mem. 19; Omni. Mem. at 55-59. Dr. Williams

Williams Reply Rep. ¶¶ 75, 118, 126. Dr. Williams also explained that

Williams Reply Rep. ¶ 114.

"[A] regression analysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented . . . ." *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1017 (8th Cir. 1998). Except in the extraordinary case where a statistical regression model fails to account for obvious,

non-conspiratorial explanations for the variable of interest, "the question of what explanatory variables should be included in a particular regression normally 'affect[s] the analysis' probativeness, not its admissibility." *Schumacher v. Tyson Fresh Meats, Inc.*, CIV 02-1027, 2006 WL 47504, at *5 (D.S.D. Jan. 5, 2006) (quoting *Morgan v. United Parcel Service of America, Inc.*, 380 F.3d 459, 468 (8th Cir. 2004), and *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)). Contrary to Defendants' arguments, the reliability of a multiple regression dummy variable model is not automatically improved by the inclusion of additional controls. Because inappropriate controls can introduce, for instance, problems of multicollinearity and endogeneity,[11] a model's choice of explanatory variables must reflect economic conditions that, in the expert's judgment, may influence the dependent variable (here, domestic pork supply) without introducing error into the analysis. *See* ABA, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES at 175-76.  "[I]t is for the

---

[11] Defendants criticize Dr. Williams for ███████████████████████████████
██████████████████████████ Omni. Mem. at 58. But as Dr. Williams explained: ████
████████████████████████████████████████████████████████
██████████████████████████████████ Williams Reply Rep. ¶ 114.
Defendants similarly criticize Dr. Williams for ███████████████████████
██████████████████ Omni. Mem. at 58. Defendants completely misinterpret Dr. Williams' testimony. All Dr. Williams stated is that ██████████████
███████████████████████████████████████████████████████
██████████████████████████ *Id.* That in no way justifies directly including the cost of acquiring hogs as a control variable in the regression models. As Dr. Williams abundantly explained, █████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████ Williams Reply Rep. ¶¶
112-116.

finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results." *Maitland*, 155 F.3d at 1017.

Here, each of the factors that Defendants contend Dr. Williams should have incorporated as a control is either captured by one of Dr. Williams' existing variables or irrelevant to the variable of interest in his analysis.

Defendants criticize Dr. Williams for not controlling for Canadian imports, circovirus, government action to reduce hog supply and stabilize pork prices, changes in non-Defendants' sow inventories, or the profitability of raising hogs. *Daubert* Mem. at 19; Omni. Mem. at 13-16, 53-59. Dr. Williams ███████████████████████████████ ███████████████████████ The factors[12] Defendants listed are already accounted for in Dr. Williams regression models. Williams Reply Rep. ¶¶ 96-126. Dr. Williams also ████████████████████████████████████████████████████████████ ███████████████████████ Williams Reply Rep. ¶ 126, Table 9.

Similarly, Defendants posit that hog producers, not processors, decide how much to make and the overall level of pork supply and that experts should have investigated and controlled for supply decisions of ████████████████████. Omni. Mem. at 4, 13, 24,

---

[12] Dr. Haider further criticizes Dr. Williams for ████████████████████████████████ ███████████████████████████████████████████ *Daubert* Mem. at 22; Haider Rep. ¶¶ 136-37, 139. However, Dr. Williams explains ██████████████ ███████████████████████████████████████████████████ Williams Reply Rep. ¶¶ 122-24. This disagreement among experts is appropriately a credibility issue for a jury.

54. But this description of the supply chain contradicts the testimony of Defendants' own expert, who explained that hog demand is a derived demand of pork demand. The effect of the alleged agreement among pork producers was to, all else equal, decrease the market demand for hogs and, thus, the quantity of hogs sold. Williams Reply Rep. ¶¶ 50-66.

Defendants again attempt to draw a comparison to *Wholesale Grocery*. *Daubert* Mem. at 13-18, 22; Omni. Mem. at 45-47. But in contrast to Dr. Williams' model, which accounts for the full range of non-conspiratorial explanations for the observed decrease in the domestic pork supply, Williams Rep. ¶¶ 143-170, the analysis in *Wholesale Grocery* contained "no control for non-conspiratorial factors" whatsoever. 2018 WL 3862773, at *8 (capitalization normalized). The *Wholesale Grocery* court thus concluded that, rather than present a battle of the experts that was appropriately resolved by the jury, the analysis failed *entirely* to "separate lawful and unlawful conduct." *Id.* That is not this case. Defendants also invoke *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), an appellate ruling rendered following a trial that included extensive evidence and witness testimony. Dr. Williams' analysis addresses the concerns of *Concord Boat* precisely because he controls for numerous competitive factors that could affect market prices in order to isolate the anticompetitive effect caused by Defendants alleged conduct.  Williams Rep. ¶¶ 152-63, 222.

Defendants' other principal authority, *In re Processed Egg Products Antitrust Litigation*, 312 F.R.D. 124 (E.D. Pa. 2015), is equally inapt. *See Daubert* Mem. 17-18; Omni. Mem. at 39, 54. Plaintiffs there alleged a conspiracy to restrict the domestic supply of eggs, as Defendants observe, but the proffered expert analysis failed to control for an

obvious non-conspiratorial explanation for the reduction in egg supply: "between 2000 and 2001, McDonald's, Burger King, and Wendy's announced their own animal welfare policies, all [of which] require[d] more cage space per hen." *Processed Egg Products*, 312 F.R.D. at 154. The court believed these policies could explain the observed reduction in supply. Expressly referencing them, it reasoned: "With respect to non-conspiring producers of eggs, Plaintiffs have not persuaded the Court to disregard the effects of the *non-conspiring purchasers* in Dr. Stiegert's [the plaintiffs' expert's] model." *Id.* (emphasis added).

Defendants and their expert nowhere suggest that the domestic pork supply was similarly affected by similar, purchaser-side policies. Apart from this obvious difference, Defendants err in complaining that Dr. Williams' supposed failure to account ███████ ████████████████████████████████████ is like the *Processed Egg* expert's treatment of non-conspiring producers. Opp. Mem. at 2; *Daubert* Mem. 18; Omni. Mem. at 53-54. Defendants describe at great length their expert's depiction of the industry and the way market participants would have behaved in the absence of an antitrust conspiracy, but that picture is divorced from the record in this case and does nothing to undermine the feasibility of the conspiracy. Omni. Mem. at 1-12. Defendants incorrectly contend that CIIPPs' case rests on the premise that processors controlled hog supply, and this undermines their case. Omni. Mem. at 4. But Dr. Williams explained clearly that ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Williams Reply Rep. ¶¶ 50-66. CIIPPs do not allege a conspiracy to restrict *hog production* but one to restrict the

domestic supply of pork products. Dr. Williams' analysis accounts for all non-conspiratorial factors with the capacity to affect pork supply. It is entirely consistent with the conspiracy for hog production to increase, decrease, or remain flat, while the supply of pork is reduced. This case, in brief, is about pork chops, not hogs.

### C. Dr. Williams Appropriately Controlled for Non-Conspiracy Factors that May Have Affected Pork Exports

In a variation of their argument that Dr. Williams should have included more controls when analyzing the conspiracy's effect on domestic supply, Defendants suggest that non-conspiratorial factors caused them to increase pork exports[13] and that Dr. Williams' failure to separately control for these factors undermines the reliability of his model. *See Daubert* Mem. 20; Omni. Mem. at 55-59. The logic of Defendants' argument is that any increases in exports necessarily would have come at the expense of domestic supply. For example, the argument assumes that, if the United States signed a trade agreement with New Zealand that eliminated tariffs between the two countries, the agreement would make it more attractive for Defendants to export to New Zealand. In Defendants' telling, this increase would come at the expense of domestic supply, because Defendants would divert supply otherwise destined for the domestic market overseas.

---

[13] Defendants contest CIIPPs' showing based on the fact that hog exports ▮▮▮▮▮▮▮▮▮▮ Omni. Mem. at 25, 29. Defendants' argument is based ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Williams Reply Rep. ¶¶ 68-70. Again, Dr. Williams' regression models ▮▮▮▮▮▮ Williams Reply Rep. ¶¶ 73-78, 126.

Thus, Defendants contend, Dr. Williams should have included separate explanatory variables in his model for, *inter alia*, "overseas pork supply, overseas demand, currency exchange rates, trade agreements, and foreign restrictions on U.S. pork." *Id.*

This argument provides no basis for excluding Dr. Williams' analysis, because it defies basic economic logic and "fail[s] to incorporate economic realities" concerning the nature of the domestic pork market. *See In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019). In a competitive market, Defendants have an incentive to increase production for both the domestic market and the international market so long as the marginal cost of production is below the price they can charge. Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 58-61 (4th ed. 2005). To continue the example, if the United States signed a new trade agreement with New Zealand, a U.S. pork producer would have an incentive to increase production for the New Zealand market, *irrespective of what happened in the United States*. This is because, compared to the status quo ante, the amount of pork that could profitably be exported to New Zealand increased, while the number of units that could profitably be sold in the domestic market would remain the same. *See id.* at 58-61.

Defendants' argument ignores this basic feature of profit-maximizing behavior in a competitive market and assumes that increased sales to New Zealand would displace domestic sales. That assumption is contrary to basic principles of economics. Rather than forego profits by decreasing domestic production in response, a profit-maximizing producer would continue to produce at the ex-ante domestic level and increase production for the international market. In doing so, the producer would maximize its profits *across*

31

the domestic and international market. Defendants' failure to advance any argument for why a producer would act in such an irrational manner shows it is their argument, not Dr. Williams' analysis, that must be disregarded in the Court's *Daubert* analysis. *See Wholesale Grocery*, 946 F.3d at 1003.

In any case, even accepting Defendants' flawed economic logic, the factors that Defendants contend Dr. Williams should have analyzed have no material effect on his findings. Dr. Williams ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ *See* Williams Reply Rep. ¶ 75. The result of this change was ██████████████████████████████████████████████████████ *See* Williams Reply Rep. ¶ 75.

While Defendants again cite *Wholesale Grocers*, they are wrong that Dr. Williams has "disregard[ed] obvious non-conspiratorial factors" that prevent his analysis from distinguishing lawful and unlawful conduct. *See Daubert* Mem. at 22; Omni. Mem. at 53. Whether one uses Dr. Williams' original, properly specified model, or the flawed version that Dr. Haider proposes, the result is the same: Dr. Williams' analysis fully accounts for changes in foreign conditions and finds inflated prices that are explained only by Defendants' unlawful conspiracy.

Defendants further criticize Dr. Williams for not controlling for the fact that the ████████████████████████████████████████████████████████

Omni. Mem. at 25, 29. Defendants provide no support for their assumption ███████████

████████████████████████████████████████████████████████

 Defendants criticize Dr. Williams for failing to control for a variety of international news events, ▮▮▮▮▮▮ Omni. Mem. at 25-26. Defendants provide no analysis of these events beyond their flawed economic argument and their own experts ▮▮▮▮▮▮ Dr. Williams' model ▮▮▮▮▮▮ Williams Rep. ¶ 160. Dr. Williams' regression models ▮▮▮▮▮▮ Reply Rep. ¶¶ 73-78, 126. Dr. Williams' regression models are ▮▮▮▮▮▮ Williams Reply Rep. ¶¶ 73-78, 126.

### D. Dr. Williams Performed Appropriate Econometric Tests to Confirm the Validity of His Results.

Pivoting from complaints about the specification of Dr. Williams' models to their findings, Defendants suggest that, had Dr. Williams run additional statistical tests, those tests would have revealed defects in his analysis. Defendants complain that Dr. Williams should have run a sensitivity test analyzing whether it was appropriate to include 2008 in the benchmark period, assert that he erred by failing to offer an opinion that his model was robust to the inclusion of control variables that Defendants erroneously assert should have been incorporated into it, and repeat their argument about his use of a single overcharge analysis, repackaging it as an argument that Dr. Williams should have performed an ▮ ▮ *Daubert* Mem. 24-25.

A district court has "great latitude" in determining whether expert testimony meets the reliability requisites of Rule 702. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456–57 (8th Cir. 2012). A methodology is reliably applied where "the expert completes the required procedure, the data used is that 'typically' relied upon, and the expert does not fail to account for relevant variables." *In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1032 (E.D. Mo. 2009). Proponents of expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct," *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994), but only that the expert reasonably applied his chosen methodology to the issues in dispute. *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 914–15 (8th Cir. 2017). "An expert should not be precluded from presenting their findings to a fact-finder simply because they used different variables to reach a different outcome than another expert. *Bertroche v. Mercy Physician Assocs., Inc.*, No. 18-CV-59 CJW-KEM, 2019 WL 7761809, at *5 (N.D. Iowa Oct. 28, 2019).

Contrary to Defendants' arguments, Dr. Williams' opening report included multiple robustness checks that were appropriately specified to test the validity of his findings. *See, e.g.*, Williams Rep. ¶¶ 263-64, 274, 278-80, Tables 6-7. The propriety of those tests is confirmed by the additional tests that Defendants assert Dr. Williams should have performed. As already explained, the additional factors and modifications that Dr. Haider claims Dr. Williams should have performed misunderstand the nature of his models and serve no purpose other than introducing error into his models. *See supra* Sections III.B & C. Nevertheless, Dr. Williams assumed *arguendo* that the arguments Defendants' experts

advance have merit and tested the effect of modifying his overcharge regression model by adopting *all* the factors and modifications they proposed. Williams Reply Rep. ¶ 126. Incorporating those factors and modifications produced ███████████████████ ██████████████████████████████████████. *Id.* ¶ 126, Table 9.

Defendants' claims about additional statistical testing are thus doubly wrong. Not only do those complaints go to persuasiveness, rather than admissibility, of Dr. Williams' analysis. Even taking them on their own terms, they have no material effect on Dr. Williams' findings.

### E.     Dr. Williams' Findings Do Not "Contradict" Each Other.

Defendants object that the results of Dr. Williams' models are inconsistent. They complain that while his opening report estimated a ██████████████████████ ██████ the backup materials for his distributor-specific regressions report ██████ ████████████████████████████████████████████████████████ ██████ Defendants assert these backup findings "contradict" Dr. Williams' main findings. *Daubert* Mem. 26-27. As an initial matter, the figures Defendants cite are ████████ Since the antitrust injury element is satisfied by *any* payment of supracompetitive prices — even a penny — the models do not differ in any manner that is material to CIIPPs' burden of proof. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 & n.9 (1969).

But Defendants' argument fails for a more fundamental reason: it is to be expected that different models analyzing different questions using different data would reach different results. Dr. Williams' overcharge analysis tests ████████████████████████

35

██████████████████████████████████████████████

Williams Reply Rep. ¶ 163. ███████████████████████████████

████████████████████████████████ To the contrary, it is consistent with some direct

purchasers paying more and other paying less (while all of them paying some overcharge).

The same holds for indirect purchasers. *Id.* ¶ 162. Thus, as Dr. Williams explains, ████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████ *Id.*

## F.     Dr. Williams Finds That Nearly All Class Members Were Injured.

Defendants' last objection gestures to the unsuccessful certiorari petition in *Olean*

*Wholesale Grocery*. Echoing the petitioners' argument there, Defendants posit that "Dr.

Williams' models are not capable of showing that nearly all putative class members paid

inflated prices on at least one transaction during the Class Period." *Daubert* Mem. 28; *see*

*also Starkist Co. v. Olean Wholesale Grocery*, No. 22-131, 2022 WL 16909174, at *1 (U.S.

Nov. 14, 2022) (Mem.). In contrast to *Olean Wholesale Grocery*, where Defendants at least

advanced an interpretation of plaintiffs' expert testimony that incorrectly asserted it

showed uninjured class members, Defendants here do not offer any independent analysis

in support of their claim. Their argument rests entirely on their theory that Dr. Williams

erred by analyzing the entire conspiracy and a conclusory assertion that unspecified aspects

of his "methodology" are not grounded in relevant literature. *See Daubert* Mem. 28.

Neither of those contentions are accurate, as CIIPPs have already explained. In any case,

Dr. Williams reports that, even when he applies all three of Dr. Haider's proposed

modifications to his overcharge regression model, there remain ███████████ ████████████████████████████████████████ Williams Reply Rep. ¶ 107, Table 5. Defendants' attempt to conjure up uninjured class members is, therefore, inconsistent with the record in this case.

## IV. There Is No Basis for Selectively Striking Any Part of Dr. Williams' Analysis.

Having failed to undermine Dr. Williams' methodology or findings, Defendants' motion closes by asking the Court to exclude portions of his testimony that Defendants incorrectly assert engage in improper factual argumentation. *See Daubert* Mem. 28 (requesting that the Court strike paragraphs 106-42, 173-97 of Dr. Williams' opening report).

Rule 703 authorizes an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Those facts and data need not be admissible if experts in the particular field would reasonably rely on them. *Id.* The Rule contains a built-in check on the improper use of expert testimony for factual argumentation, providing that where "facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.; see also Meridian Mfg., Inc. v. C & B Mfg., Inc.*, 340 F. Supp. 3d 808, 850 (N.D. Iowa 2018) ("Generally, the factual basis of an opinion goes to the credibility, not the admissibility of the testimony." (citing *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011))).

An initial problem with Defendants' argument is that it is premature. As Defendants know, there is no issue of jury prejudice at this point in the proceedings because the motions before the Court seek certification of two classes under Rules 23(b)(2) and (b)(3). Indeed, the sole case they cite, *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1045 (D. Minn. 2014), addressed a motion to exclude expert testimony at summary judgment — a motion that requires the Court to consider whether a reasonable jury could return a verdict for the non-moving party. *See, e.g.*, *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1051 (D. Minn. 2009).

In any case, Defendants misunderstand the role Dr. Williams' testimony will play in the presentation of CIIPPs case. In *Thomas*, this Court explained the respective roles of expert and non-expert evidence at trial:

> The Supreme Court has held that "an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true," *Williams v. Illinois*, 567 U.S. 50, 57 (2012), and that it then becomes the responsibility of the party calling the expert "to introduce other evidence establishing the facts assumed by the expert[.]"

57 F. Supp. at 1059.

Consistent with this division of labor, CIIPPs directed Dr. Williams to assume that they would prove the Complaint's factual core allegations (*e.g.*, the fact of the conspiracy and Defendants' ability to de-anonymize Agri Stats' reports) and to analyze whether economic evidence and methods are capable of demonstrating that, *inter alia*, "Defendants took actions against their independent self-interests but for the existence of a conspiracy" and "the alleged conspiracy caused all or virtually all Class Members to pay artificially

inflated pork prices." Williams Rep. ¶¶ 7(b), (d). In layman's terms, CIIPPs will prove real world facts; Dr. Williams will analyze their economics effects.

Defendants thus have no basis for attacking Dr. Williams' assumptions that, for instance, Hormel ████████████████████████████ (*Daubert* Mem. 29) or the

████████████████████████████████████████████████████

█████████████████ (*id.* at 30). While Defendants may attempt to advance alternative interpretations those facts at trial, Dr. Williams is entitled to assume that CIIPPs will prove them and offer expert analysis of their economic implications. *Thomas*, 57 F. Supp. at 1059. Dr. Williams' analysis is entirely appropriate and respects the proper role of expert economic testimony at trial.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion, find that CIIPPs' have carried their burden of showing the reliability of Dr. Williams' testimony by a preponderance of the evidence, and find that Dr. Williams' analysis is consistent with the theory of CIIPPs' case.

Dated: November 18, 2022          **CUNEO GILBERT & LADUCA, LLP**

By: */s/ Blaine Finley*
    Jonathan W. Cuneo (*pro hac vice*)
    Joel Davidow (*pro hac vice*)
    Blaine Finley (p*ro hac vice*)
    4725 Wisconsin Ave. NW
    Suite 200
    Washington, DC 20016
    Telephone: 202.789.3960
    Facsimile: 202.589.1813
    jonc@cuneolaw.com
    joel@cuneolaw.com
    bfinley@cuneolaw.com

By: */s/ Shawn M. Raiter*
    Shawn M. Raiter (MN#240424)
    **LARSON · KING LLP**
    30 East Seventh Street Suite
    2800 St. Paul, MN 55101
    Telephone: (651)312-6518
    sraiter@larsonking.com

    *Interim Co-Lead Counsel for Commercial
    and Institutional Indirect Purchaser
    Plaintiffs*

    Don Barrett (*pro hac vice*)
    Katherine Barrett Riley (*pro hac vice*)
    Sterling Aldridge (*pro hac vice*)
    BARRETT LAW GROUP, P.A.
    P.O. Box 927
    404 Court Square
    Lexington, MS 39095
    Telephone: (662) 834-2488
    dbarrett@barrettlawgroup.com
    kbriley@barrettlawgroup.com
    saldridge@barrettlawgroup.com

Jon Tostrud (*pro hac vice*)
Anthony Carter (*pro hac vice*)
**TOSTRUD LAW GROUP, PC**
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

David M. Cialkowski (MN#0306526)
Ian F. McFarland (MN#0392900)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
david.cialkowski@zimmreed.com
ian.mcfarland@zimmreed.com

Marcus Bozeman (*pro hac vice*)
**BOZEMAN LAW FIRM P.A.**
400 W. Capitol Avenue, Ste. 1700
Little Rock, AR 72201
mbozeman@bozemanfirm.com

*Interim Plaintiffs' Steering Committee for Commercial and Institutional Indirect Purchaser Plaintiffs*