# APPENDIX B

## II. THE SHERMAN ACT

**[3, 4]** Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a claim under § 1 "a plaintiff must demonstrate '(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a *per se* rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'" *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 703 (D. Minn. 1998)). Because § 1 "does not prohibit all unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decisions or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553, 127 S.Ct. 1955 (cleaned up).

**[5, 6]** "Certain agreements, such as horizontal price fixing . . . are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Thus, where—as here—plaintiffs allege horizontal price fixing or agreements between competing retailers to limit output in order to increase price, the only allegation that must be made at the motion-to-dismiss stage is that defendants acted collectively or with concerted action.

**[7, 8]** "[T]o satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds." *Insulate*, 797 F.3d at 543 (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1273 (8th Cir. 1983)). This may be demonstrated through the presentation of circumstantial evidence, including through a showing of parallel conduct among defendants that demonstrates that their similar behavior "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 557, n.4, 127 S.Ct. 1955 (cleaned up).

**[9]** The Eighth Circuit has adopted a rule that, in addition to parallel conduct, to survive a motion to dismiss, antitrust plaintiffs must also plead "factual enhancement," often referred to as "plus factors." *See, e.g., Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) ("An agreement is properly inferred from conscious parallelism only when certain 'plus factors' exist."). These plus factors might include (1) a shared motive to conspire; (2) action against self-interest; (3) market concentration; and (4) a substantial amount of interfirm communication in conjunction with the parallel conduct. *See, e.g., In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194–95 (9th Cir. 2015).

Thus, in order to survive a defendant's 12(b)(6) motion, plaintiffs alleging a price-fixing conspiracy must plausibly allege both parallel conduct and at least one plus factor.

### A. Parallel Conduct

Because the Court dismissed the Complaints on the ground that Plaintiffs had not adequately pleaded parallel conduct, ==the critical question== is whether the Amended Complaints sufficiently allege =="how any of the individual Defendants acted"== so that the Court can =="analyze which, how many, or when any of the individual==

Defendants may have affirmatively acted to reduce the supply of pork." *In re Pork*, 2019 WL 3752497, at *8.

The DPP Complaint contains new, specific allegations related to each Defendant at ¶¶ 124–32:

### 1. Smithfield

Plaintiffs allege that Smithfield first indicated that it was "reducing the number of pigs that come off sow farms" in 2008. (DPP Compl. ¶ 124.) In 2009, Smithfield announced that it had reduced the size of its domestic supply by "two million market hogs annually" and that it was immediately further reducing its herd by 3%. (*Id.*) Smithfield followed this with a 5% reduction in 2010, and a further (unspecified) downsize in 2011. (*Id.*) Although Plaintiffs allege that Smithfield also increased the share of its production directed to exports, they fail to provide specifics beyond the opening of a plant in China in 2015. (*Id.* ¶ 125.)

### 2. Tyson

Tyson cut its sows by over 25% between 2008 and 2009. (*Id.* ¶ 126.) Plaintiffs also allege that in 2010 and 2013 Tyson reported decreased sales volume of 3.3% and 3.6%, combined with unspecified decreases in its "capacity utilization rate." (*Id.*)

### 3. JBS

Between 2009 and 2011, JBS increased its pork export volume from 15% to 20% of its total production. (*Id.* ¶ 127.) In 2015, JBS acquired Cargill's pork business, combining the third- and fourth-largest pork producers into the second-largest producer. (*Id.* ¶¶ 85–86.) In 2016, Plaintiffs allege that JBS undertook an unspecified reduction in the number of sows it produced "despite increased consumer demand." (*Id.* ¶ 127.) JBS subsequently reported that "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions." (*Id.*)

### 4. Hormel

Plaintiffs allege that "Hormel's production statistics show that it cut its number of sows in 2008," though they do not provide specifics, and that Hormel "maintained such reduced production throughout the class period." (*Id.* ¶ 128.) They also allege that Hormel reported unspecified "tonnage reductions for its pork operations in its 2009 Annual Report." (*Id.*) The only specific reduction alleged is that "Hormel reduced its capacity at its Los Angeles plant by 500 head per day" in 2014. (*Id.*)

### 5. Seaboard

The DPP Complaint contains no specific allegations of reduced production against Seaboard, only that it "reduced supply in 2013." (*Id.* ¶ 129.) Seaboard increased its export sales in 2010 and 2011 by "23%[,] to an all-time record . . . ." (*Id.* ¶ 129 n.49.)

### 6. Triumph

A farm member of Triumph announced it was reducing its herd by 11,000 sows in September 2008. (*Id.* ¶ 130.) In 2009, Triumph further reduced its herd by 6% (24,500 sows). (*Id.*) Plaintiffs allege that "Triumph focused its production on exports" but do not provide specifics. (*Id.*)

### 7. Clemens

A Clemens subsidiary reported a decrease in production of 1000 sows in 2011. (*Id.* ¶ 131.)

### 8. Indiana Packers

Plaintiffs allege that Indiana Packers "indicated that it expected to reduce" production in 2012 but provide no specifics. (*Id.* ¶ 132.)

The most specific allegations of herd-size reductions are against Smithfield, Tyson, and Triumph. Those reductions all took place in 2008 and 2009, with Smithfield continuing alone in 2010. There are smaller specific allegations of a herd reduction in 2011 (1000 sows, by a Clemens subsidiary) and production decreases in 2014 (500 head per day, by Hormel at its

**770**                    **495 FEDERAL SUPPLEMENT, 3d SERIES**

plant in Los Angeles). There are direct allegations of herd reduction—without specifics—against Hormel (2008/2009), Smithfield (2010), Seaboard (2013), and JBS (2016); there are unspecific allegations of decreased capacity utilization against Tyson in 2010 and 2013. There are specific allegations of increased exports against JBS (5% increase, 2009–2011) and Seaboard (23% increase, 2009–2011); there are unspecified allegations of export increases against Smithfield and Triumph. There are no specific allegations against Indiana Packers.

The Court concludes that these allegations, when viewed as a whole, are sufficient to plausibly plead parallel conduct against all Defendants, except Indiana Packers. The new allegations give individualized content to what the original pleading showed: after nearly a decade of sustained growth, pork supply decreased. The initial decrease comes from three specific sources—sizeable reductions by Smithfield, Tyson, and Triumph, the first, second, and sixth largest producers. (*See* DPP Compl. ¶¶ 85–86, 88, fig.4.) This comports with the industry picture as a whole.

**Figure 7: U.S. Annual Commercial Hog Production by Weight, 2000–2017[8]**



[**Editor's Note:** The preceding image contains the reference for footnote [8]].

In the same way, the specific allegations of increased exports between 2009–2011 fit the industry as a whole.

---

8.  DPP Compl. ¶ 120, fig. 7.

IN RE PORK ANTITRUST LITIGATION 771
Cite as 495 F.Supp.3d 753 (D.Minn. 2020)

**Figure 8: U.S. Pork Exports as a Percent of Total Production, 2000–2017**[9]



[**Editor's Note:** The preceding image contains the reference for footnote [9]].

These two patterns, plausibly caused by the alleged actions of the Defendants, then allowed for a massively atypical jump in the price of pork.

**Figure 9: Average Hog Wholesale Prices in Cents per lb., 2000–2018**[10]



[**Editor's Note:** The preceding image contains the reference for footnote [10]].

[10] Given the inherent difficulty of obtaining solid information of an antitrust conspiracy—especially one involving sophisticated commercial entities—the evidence that Plaintiffs have marshalled is sufficient to survive the relatively low bar of the pleading stage.[11]

---

9. DPP Compl. ¶ 122, fig. 8.

10. DPP Compl. ¶ 165, fig. 9.

11. Indeed, even the individual-defendant allegations that lack numerical specificity are enough to overcome a 12(b)(6) motion; "Plaintiffs 'need not provide **specific facts** in support of their allegations.' Rather, they need only provide 'sufficient factual information to provide the "grounds" on which the claim rests[.]" *In re Pre-Filled Propane Tank Antitrust Litig. ("Propane I")*, 860 F.3d 1059, 1070 (8th Cir. 2017) (en banc) (quoting *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008)).