# EXHIBIT H

# PACKERS AND STOCKYARDS ACT OF 1921, AS AMENDED

APRIL 14, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. FOLEY, from the Committee on Agriculture, submitted the following

# REPORT

together with

## DISSENTING VIEWS

[To accompany H.R. 8410]

The Committee on Agriculture, to whom was referred the bill (H.R. 8410) to amend the Packers and Stockyards Act of 1921, as amended, and for other purposes having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Page 1, line 3, strike out all after the enacting clause and insert the following:

That the proviso in the paragraph designated "Packers and Stockyards Act," under the heading "MARKETING SERVICE," in the Act of July 12, 1943 (57 Stat. 422; 7 U.S.C. 204), is amended by striking out "market agency and dealer" and inserting in lieu thereof "market agency (as defined in title III of the Act), every packer (as defined in title II of the Act) in connection with its livestock purchasing operations (except that those packers whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section), and every other person operating as a dealer (as defined in title III of the Act)".

SEC. 2. Section 201 of said Packers and Stockyards Act (7 U.S.C. 191) is amended to read:

"SEC. 201. When used in this Act the term 'packer' means any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) of marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer or distributor in commerce: *Provided, however,* That nothing in this section shall affect the jurisdiction of the Federal Trade Commission with respect to retail sales of meat, meat food products, livestock products in unmanufactured form, or poultry products as provided in Section 406 of this Act.".

57-006

Sec. 3. Sections 202 and 312(a) of said Packers and Stockyards Act (7 U.S.C. 192 and 213(a)) are amended by deleting the phrase "in commerce" wherever it appears in said sections, and by deleting the commas immediately before and following the phrase "in commerce" in sections 202(b) and 312(a) of said Act (7 U.S.C. 192(b) and 213(a)).

Sec. 4. That the proviso in the paragraph designated "Packers and Stockyards Act" under the heading "MARKETING SERVICE" in the Act of July 12, 1943 (57 Stat. 422; 7 U.S.C. 204), is further amended by adding at the end thereof a new sentence as follows: "If the Secretary finds any packer is insolvent, he may after notice and hearing issue an order under the provisions of section 203 requiring such packer to cease and desist from purchasing livestock while insolvent except under such conditions as the Secretary may prescribe to effectuate the purposes of the Act.".

Sec. 5. Said Packers and Stockyards Act is further amended by redesignating section 408 as section 411 and by adding to the Act a new section 408 to read as follows:

"Sec. 408. Whenever the Secretary has reason to believe that any person subject to this Act, (a) with respect to any transactions subject to the Act, has failed to pay or is unable to pay for livestock, meats, meat food products, or livestock products in unmanufactured form, or has failed to remit to the person entitled thereto the net proceeds from the sale of any such commodity sold on a commission basis; or (b) has operated while insolvent, or otherwise in violation of the Act in a manner which may reasonably be expected to cause irreparable damage to another person; or (c) does not have the required bond, and that it would be in the public interest to enjoin such person from operating subject to this Act or enjoin him from operating subject to this Act except under such conditions as would protect vendors or consignors of such commodities or other affected persons, until complaint under this Act is issued and dismissed by the Secretary or until order to cease and desist made thereon by the Secretary has become final and effective within the meaning of this Act or is set aside on appellate review of the Secretary's order, the Secretary may notify the Attorney General, who may apply to the United States district court for the district in which such person has his principal place of business or in which he resides for a temporary injunction or restraining order. When needed to effectuate the purposes of this section, the court shall, upon a proper showing, issue a temporary injunction or restraining order, without bond. Attorneys employed by the Secretary of Agriculture may, with the approval of the Attorney General, appear in the United States district court representing the Secretary in any action seeking such a temporary restraining order or injunction.".

Sec. 6. Subsection 308(a) of said Packers and Stockyards Act (7 U.S.C. 209(a)) is amended to read:

"(a) If any person subject to this Act violates any of the provisions of the Act, or of any order of the Secretary under the Act, relating to the purchase, sale or handling of livestock, he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.".

Sec. 7. Said Packers and Stockyards Act is further amended by adding after section 408 (7 U.S.C. 229) a new section 409 to read as follows:

"Sec. 409. (a) Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized agent the full amount of the purchase price: *Provided, however,* That each packer, market agency or dealer purchasing livestock for slaughter shall, before the close of the next business day following purchase of livestock and transfer of possession thereof, actually deliver at the point of transfer of possession to the seller or his duly authorized representative a check or shall wire transfer funds to seller's accounts for the full amount of the purchase price; or, in the case of a purchase on a carcass or 'grade and yield' basis, purchaser shall make payment by check at the point of transfer or shall wire transfer funds to seller's account for the full amount of the purchase price not later than the close of the first business day following determination of purchase price.

"(b) Notwithstanding the provisions of paragraph (a) of this section and subject to such terms and conditions as the Secretary may prescribe, the parties to the purchase and sale of livestock may expressly agree in writing, before such purchase or sale, to effect payment in a manner other than that required in paragraph (a). Any such agreement shall be disclosed in the records of any

market agency or dealer selling the livestock, and in the purchaser's records and on the accounts or other documents issued by the purchaser relating to the transaction.

"(c) Any delay or attempt to delay by a market agency, dealer, or packer purchasing livestock, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment for such livestock shall be considered an 'unfair practice' in violation of the Act. Nothing in this section shall be deemed to limit the meaning of the term 'unfair practice' as used in the Act.".

SEC. 8. Said Packers and Stockyards Act, 1921, as amended (7 U.S.C. 181, *et seq.*), is hereby further amended by adding thereto after section 505 (7 U.S.C. 195) a new section 206, to read as follows:

"SEC. 206. (a) It is hereby found that a burden on and obstruction to commerce in livestock is caused by financing arrangements under which packers encumber, give lenders security interest in, or place liens on, livestock purchased by packers in cash sales, or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom, when payment is not made for the livestock and that such arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest.

"(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: *Provided, however,* That any packer whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section. Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored: *Provided, however,* That the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received within fifteen days of the final date for making a payment under section 409, or within five business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection.

"The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

"(c) For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer.".

SEC. 9. Said Packers and Stockyards Act is further amended by adding after new section 409 a new section 410 to read as follows:

"SEC. 410. No requirement of any State or territory of the United States, or any subdivision thereof, or the District of Columbia, with respect to bonding of packers or prompt payment by packers for livestock purchases may be enforced upon any packer operating in compliance with the bonding provisions under the Act of July 12, 1943 (57 Stat. 422; 7 U.S.C. 204), and prompt payment provisions of section 409 of this Act respectively.".

SEC. 10. Pending proceedings shall not be abated by reason of any provision of this Act, but shall be disposed of pursuant to the provisions of the Packers and Stockyards Act, 1921, as amended, and the Act of July 12, 1943, in effect immediately prior to the effective date of this Act.

SEC. 11. Section 407 of such Act is amended by adding a new subsection (d) to read as follows:

"(d) There is hereby authorized to be appropriated to carry out the purposes of this Act for each fiscal year beginning with the fiscal year ending September 30, 1978, such sums as may hereafter be authorized biennially by the Congress.".

## BRIEF EXPLANATION OF THE LEGISLATION

H.R. 8410, as amended, would operate to assure livestock producers they will receive payment for the animals they send to packing plants by amending the Packers and Stockyards Act, 1921, as amended.

In brief, the bill would:

(1) Require any packer with average annual purchases of over $500,000 to be bonded and to hold all livestock, meats, and proceeds

therefrom in trust until all producers who had sold livestock to the packer on a cash basis had received payment for such livestock.

(2) Clearly bring wholesale brokers, dealers, and distributors marketing meats, meat food products or livestock products under regulation as packers under title II of the Act; and bring under the jurisdiction of the Secretary of Agriculture all transactions of packers which operate in commerce—not merely those transactions which are themselves in commerce.

(3) Give the Secretary of Agriculture authority to order packers to cease and desist from operating while insolvent except under such conditions as he may prescribe. The bill also gives the Secretary specific authority to request the Attorney General to seek a temporary injunction in Federal district court, pending administrative action, to prevent irreparable injury to producers or members of the industry which would result if persons subject to the Act were permitted to operate while insolvent or otherwise in violation of the Act.

(4) Authorize the filing in court of a private cause of action seeking damages against any person subject to the Act arising out of his violation of any provision of the Act, or of any order of the Secretary under the Act, relating to purchase, sale or handling of livestock.

(5) Require packers, market agencies and dealers purchasing livestock to deliver to the seller or his agent at the point of transfer of possession of the animals by check or wire transfer of funds to the seller's account the full amount of the purchase price before the close of the next business day unless otherwise agreed in writing. Any delay or attempt to delay payment would constitute an unfair practice in violation of the Packers and Stockyards Act.

(6) Provide that the packer bonding and prompt payment provisions would preempt State laws on the same subject.

(7) Require, beginning with the fiscal year ending September 30, 1978, biennial authorization of appropriations to carry out the purposes of the Packers and Stockyards Act.

PURPOSE AND NEED FOR LEGISLATION

The Packers and Stockyards Act, 1921 (42 Stat. 159, 7 U.S.C. 181 et seq.), was enacted at a time when well over 80 percent of all livestock was sold through large terminal markets. The Act provided for close supervision by the Secretary of Agriculture of transactions involving the purchase and sale of livestock at such markets. The Act served its purpose well, and, in 1935, was amended to bring the purchase and sale of poultry at major markets within the Secretary's regulatory jurisdiction. The failure by Congress to include in the Act a provision requiring bonds of market agencies and dealers was early recognized, and discretionary authority to require such bonds was granted to the Secretary in the annual Department of Agriculture Appropriation Acts from 1924 until 1942. This authority was made permanent by the Act of July 12, 1943 (57 Stat. 422, 7 U.S.C. 204).

However, in the decades following enactment of the basic statute in 1921, and especially in the decade following World War II, the pattern of livestock marketing in the United States changed drastically. Fewer and fewer livestock moved to slaughter through the great

terminal markets. By the mid-1950's it had become clear that packers were purchasing a large percentage of their slaughter livestock through country auction markets. In 1958, Congress amended the Act to subject such markets to supervision by the Secretary (Act of September 2, 1958, 72 Stat. 1749). National livestock marketing patterns continued to change as packers continued the push to acquire slaughter livestock at its source. Today the Department of Agriculture estimates that well over 80 percent of all slaughter livestock is purchased by packers directly from producers and custom feedlots.

The consequences of these changes in livestock marketing patterns is perhaps best reflected in statistics of the Packers and Stockyards Administration which picture the results of the increased exposure of livestock producers to the risks created by certain business practices engaged in by members of the packing industry. Between 1958 and early 1975 167 packers failed, leaving livestock producers unpaid for over $43 million worth of livestock. By far the largest of such failures was that of American Beef Packers (ABP), which went bankrupt in January 1975, leaving producers in 13 states unpaid for a total of over $20 million in livestock sales. Of particular concern to the livestock producers in this instance was the fact that ABP's principal source of financing, General Electric Acceptance Corp., stood ahead of them among the bankrupt's creditors by virtue of its duly protected security interest in ABP's inventory, etc., i.e., livestock and derivative products which the producers had sold on a cash basis and for which they had not been paid.

As of July 1, 1975, 23 States had responded to the ominous trend of packer failures by enacting laws requiring bonds of packers. In the wake of the ABP bankruptcy, several States, including Kansas, Oklahoma, and Texas, have enacted laws subjecting packers to strict prompt payment requirements.

USDA figures show that in 1973 some $31 billion worth of livestock and $4 billion worth of poultry were marketed in the United States, representing approximately one-third of all farm income. Livestock is probably the single most important source of protein in the American diet. Thus, livestock producers occupy a position of unique national importance. No individual is engaged in a riskier endeavor or one more vital to the national interest than the producer. And no entrepreneur is so completely at the mercy of the marketplace. The livestock producer, if he successfully combats the vicissitudes of weather, financing, skyrocketing costs, etc., must sell when his cattle are ready irrespective of the market. His livestock may represent his entire year's output. And, if he is not paid, he faces ruin. While some may argue that business is business and that farmers must take their chances along with everyone else, this Committee must view the situation from a larger perspective. We would be derelict in our responsibilities to the American people if we failed to address the evils which have inflicted heavy losses upon the very producers upon whom the Nation depends for such an important part of its basic food supply.

## SECTION-BY-SECTION ANALYSIS

*Section 1.*—This section amends the provision contained in the Appropriation Act of July 12, 1943 (57 Stat. 422, 7 U.S.C. 204), which

empowers the Secretary of Agriculture to require reasonable bonds from market agencies and dealers, to clarify that the Secretary's authority to require such bonds extends to packers as well. However, the provision applies only to packers whose average annual purchases exceed $500,000 and such a packer could be required to be bonded only in connection with his livestock purchasing operations.

*Section 2.*—This section amends section 201 of the Packers and Stockyards Act (defining the term "packer") by deleting subsection (d) thereof and by revising subsection (c) to clarify that persons who, as wholesale brokers, dealers, or distributors, market in commerce meats, meat food products, or livestock products in unmanufactured form are encompassed within the definition. The effect is to clearly make such persons subject to regulation under title II of the Act. However, the amendment makes no change in subsections (a) and (b) of section 201.

*Section 3.*—This section deletes the phrase "in commerce" from section 202 (relating to packers) and subsection (a) of section 312 (relating to stockyard owners, market agencies, or dealers) of the Act, which prohibit unfair, unjustly discriminatory or deceptive practices, etc. The effect of this amendment is to bring within these sections all transactions of persons subject to the Secretary's jurisdiction under the Act, and not merely those transactions which occur in commerce.

*Section 4.*—This section further amends the bonding provision contained in the Act of July 12, 1943 (7 U.S.C. 204) to empower the Secretary of Agriculture, after notice and hearing, to issue an order under the provisions of section 203 of the Act requiring an insolvent packer to cease and desist entirely from purchasing livestock, or to cease and desist from purchasing livestock except under such conditions as the Secretary may prescribe to effectuate the purposes of the Act.

*Section 5.*—This section amends title IV of the Act by redesignating section 408 as section 411 and by adding to the Act a new section 408. In the event any person subject to the Act does not have the required bond, or has failed, or is unable, to pay for livestock, meats, etc., or has operated while insolvent or otherwise in violation of the Act, the new section gives the Secretary specific authority to request the Attorney General to seek from U.S. district court a temporary injunction or order restraining such person from operating subject to the Act, or from so operating except under such conditions as would protect affected persons until the Secretary could institute and complete appropriate administrative proceedings. With the approval of the Attorney General, attorneys employed by the Secretary could appear for the Secretary and the U.S. district court in which the person resides or has his principal place of business would be empowered to issue a temporary injunction or restraining order, without bond.

*Section 6.*—This section amends subsection (a) of section 308 of the Act to add packers to the categories of regulated persons against whom a private action could be brought by any person injured by a violation of the Act. However, the specific reference to violation of sections 304, 305, 306, or 307 of the Act is deleted and packers, stockyard owners, market agencies, or dealers would be liable only for violation of any provision of the Act or order of the Secretary relating to the purchase, sale or handling of livestock.

*Section 7.*—This section adds to title IV of the Packers and Stock-yards Act a new section 409 which, absent an express prior agreement in writing between the buyer and seller, requires each packer market agency, or dealer purchasing livestock before the close of the next business day following the purchase of livestock and transfer of possession thereof to wire transfer funds to the seller's account or to deliver to the seller or his duly authorized agent, at the point of transfer of possession of the livestock, a check for the full amount of the purchase price. The delivery of a draft would not satisfy this requirement. In the case of a purchase on a carcass or "grade and yield" basis the check or wire transfer of funds would be due not later than the close of the first business day following determination of purchase price. Any delay or attempt to delay by a market agency, dealer, or packer purchasing livestock, the collection of funds as provided pursuant to subsection (a) or (b) or otherwise for the purpose of or resulting in extending the normal period of payment for such livestock shall be considered an "unfair practice" in violation of the Act.

*Section 8.*—This section adds to title II of the Act a new section 206 which applies to any packer whose average annual purchases exceed $500,000. The new section requires that all livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from, meat, meat food products, or livestock products derived therefrom be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers. Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored. However an unpaid seller loses the benefit of the trust unless he gives written notice to the packer and to the Secretary (1) within 15 days of the final date for making payment under section 409, or (2) within 5 days after he has received notice that the payment instrument, promptly presently for payment, has been dishonored. A cash sale is defined as a sale in which the seller does not expressly extend credit to the buyer.

No specific identification of the livestock from which carcasses, meats, proceeds or receivables were derived is required. Instead, they are held in a pool in trust for the benefit of all unpaid cash sellers. Each such seller would be entitled to a pro rata share in settlement of his account. The trust does not extend to livestock, meats, etc., which have been purchased from the packer in good faith transactions. The provisions of this section would prevail over State law.

*Section 9.*—This section adds to title IV of the Act a new section 410 (preemption provision) which provides that no requirement of a State or territory of the United States or any subdivision thereof or the District of Columbia with respect to bonding of packers. or prompt payment by packers. for livestock purchases may be enforced upon any packer operating in compliance with the bonding provisions of the Act of July 12, 1943. as amended, and the prompt payment provisions of new section 409 of the Act.

*Section 10.*—This section provides that proceedings pending upon enactment of these amendments shall not be abated but shall be disposed of pursuant to the provisions of the Packers and Stockyards Act, 1921, as amended. and the Act of July 12, 1943, in effect immediately prior to the effective date of these amendments.

8

*Section 11.*—This section amends section 407 of the Act by adding a new subsection (d) which authorizes to be appropriated to carry out the purposes of the Packers and Stockyards Act, as amended, for each fiscal year, beginning with the fiscal year ending September 30, 1978, such sums as may hereafter be authorized biennially by the Congress. Subsection (a) of such section contains a general authorization of appropriations under which the Act, as amended, may be carried out until October 1, 1977.

<center>COMMITTEE CONSIDERATION</center>

<center>A. HEARINGS</center>

During 1975, the Subcommittee on Livestock and Grains held extensive hearings on H.R. 8410 and related bills. In addition to hearings in Washington, D.C., the Subcommittee held one day of hearings in Amarillo, Texas, and a joint one-day hearing with the Senate Committee on Agriculture and Forestry in Omaha, Nebraska. (See Amend Packers and Stockyards Act of 1921, Hearings before the Subcommittee on Livestock and Grains, Committee on Agriculture, House of Representatives, 94th Cong., 1st Sess., July 12, 23, and 24, 1975, Serial 94–CC; Livestock Marketing, Hearings before the Subcommittee on Agricultural Production, Marketing, and Stabilization of Prices of the Committee on Agriculture and Forestry, United States Senate, 94th Cong., 1st Sess., July 19 and 25, 1975.) Statements were made by Senators Clark and Culver (Iowa), Curtis and Hruska (Nebraska), and Bellmon (Oklahoma), as well as by Congressmen Poage and Hightower (Texas), Thone and McCollister (Nebraska), Grassley, Harkin, and Bedell (Iowa), Sebelius (Kansas), Litton (Missouri) and Congresswoman Virginia Smith (Nebraska). Testimony was presented by the U.S. Department of Agriculture, the U.S. Department of Justice, a number of individual livestock producers, many State and national producer and livestock feeder associations, and several packers and national packer organizations.

The Departments of Agriculture and Justice initially opposed any form of legislation on the ground that the Administration disfavored additional regulation. However, the Secretary of Agriculture recently testified before the Committee on Agriculture and indicated that the Administration would support meaningful legislation.

The principal complaints from the producer and feeder representatives were the lack of protection from packer failures and from various devices (such as use of drafts or checks drawn on distant banks) utilized by packers to delay payment for livestock purchased. The resulting "float," which amounts to enormous sums on a national aggregate basis, is used by packers to help finance their operations. This group of producer and feeder representatives overwhelmingly supported enactment of a Federal statute which requires bonding of, and prompt payment by, packers; prevents a packer from encumbering livestock for which he has not paid; gives cash sellers of livestock to packers a priority over other creditors in the event of bankruptcy, and empowers the Packers and Stockyards Administration to prevent packers from operating while insolvent either by administrative order or court injunction.

The packer representatives supported a uniform national bonding provision which would preempt the various state requirements. However, they generally opposed Federal prompt payment or financing strictures unless any requirement imposed were likewise imposed upon those to whom packers sell their products.

<div align="center">B. COMMITTEE MARKUP</div>

The Subcommittee on Livestock and Grains held a markup session on February 6, 1976. It used as a basis for markup a committee print of a bill which consisted largely of the provisions of H.R. 8410, together with a number of amendments. The committee print:

1. Required packers to provide reasonable bonds in connection with their livestock purchasing operations. (Sec. 1)

2. Redefined "packer" to include most persons operating in commerce in the meat industry; such as persons buying or otherwise acquiring in commerce livestock for slaughter, manufacturing or preparing in any manner meat or meat food products, and brokers, selling agents, distributors, food retailers purchasing or selling meats. This change would have made the remedies now available against packers who violate Section 202 (unfair trade practices) apply to these categories of persons. (Sec. 2)

3. Provided that the Act regulates all livestock and meat transactions of persons subject to the Act who are engaged in business in commerce, regardless of whether the particular transaction was in commerce. (Sec. 3)

4. Provided authority for the Secretary to order packers to cease and desist from purchasing livestock while insolvent. (Sec. 4)

5. Authorized the Secretary to request the Attorney General to seek a temporary injunction or temporary restraining order in Federal district court pending administrative action, to prevent irreparable injury to a person that results from a person subject to the Act failing to pay for livestock, meats, meat food products or from otherwise violating the Act. (Sec. 5)

6. Authorized a civil action for damages for injury sustained as a result of violation of the Act by persons subject to the Act. (Sec. 6)

7. Provided for prompt payment by requiring a packer, market agency or dealer purchasing livestock to transmit or deliver to the seller or his agent before the close of the next business day the full amount of the purchase price, unless the parties otherwise agreed. (Sec. 7)

8. Provided three alternative optional remedies for unpaid sellers of livestock (Sec. 8)—

"Option 1 made it unlawful for a packer to give a security interest on livestock purchased in a cash sale in excess of the amount owed the unpaid seller;

"Option 2 created a statutory lien for each seller of livestock to a packer in a cash sale that would extend to the

livestock, inventories and receivables, and proceeds therefrom to the extent of the amount owed; and,

"Option 3 provided that livestock purchased in a cash sales transaction, the inventories and receivables from the sale of the meat would be held in trust by the packer for the benefit of the unpaid seller."

9. Provided for preeemption of State statutes in respect to bonding and prompt payment requirements of the Act. (Sec. 9)

10. Provided for a study of the acquisition of meat, meat food products, or livestock products in unmanufactured form by packers (as broadly defined in the committee print), including the manner and timing of payment by such packers after acquisition of meats and products and for the Secretary to provide recommendations on legislation deemed necessary. (Sec. 10)

The Subcommittee discussed the various provisions of the committee print in great detail. In discussing the amendment to the definition of "packer," it was made clear by the Subcommittee that commercial feedlots, which only handle livestock that belong to others were not included within the definition of a packer. The Subcommittee also made it clear that the definition of packer exempted poultry dealers or processors, then voted to delete any reference to poultry in section 5 which authorized the Secretary to require packers to cease and desist from making purchases while insolvent, and to exclude poultry from section 6, the section that authorizes private causes of action against persons who violate provisions of the Act.

The Subcommittee members reviewed in detail section 3 and voiced agreement with the change under which packers operating in commerce would be covered under section 202 and 312(a) with respect to all their transactions—deleting the current requirement of law that each and every transaction charged as a violation must be an interstate transaction.

The Subcommittee amended the prompt payment provision (section 7) to expressly require that any agreement of the parties to provide that they be excluded from its provisions must be in writing. The issue arose as to whether the agreement between the packer and the livestock dealer must be renewed each time there is a transaction and it was indicated in the discussion that the agreement can be for a certain specified time or an unlimited time.

Committee members discussed also the provisions authorizing temporary restraining orders and temporary injunctions and expressed the view that the actions were not to be ex parte but were to be taken after notice to the opposing party.

In considering the section that provides remedies to an unpaid livestock seller in a cash sales transaction (Sec. 8), the Subcommittee voted down an amendment that would have deleted the entire section. It then voted to adopt Option 3, which provided for the livestock, inventories and accounts receivable to be held in trust by the packer for the unpaid seller. It was explained that this provision was based on the Court of Appeals decision in the case of *In Re Samuels Co., Inc.,*

483 F. 2d 557 (5th Cir. 1973), in which the Court interpreted the Packers and Stockyards Act and implementing regulations as providing for this result and that the constructive trust prevailed over provisions of state law. The Supreme Court later overruled the Circuit Court on the ground that the Packers and Stockyards Act contained no trust provision. It was made clear in the discussion that the trust applied only to livestock, meats, receivables and proceeds in the hands of the packer who purchased livestock from the unpaid seller and not to subsequent purchasers from such packer. The Subcommittee adopted perfecting amendments to provide that the trust applied not only to inventory and receivables but also to cash realized by the packer on the sale of meat, and that payment would not be considered to be made if a livestock seller received a payment instrument which was dishonored.

The Subcommittee, after discussion, deleted from the committee print section 10 which provided for the study of payment practices of packers buying meat and meat products. It agreed to consider at a later time the possibility of a section requiring prompt payment by purchasers from packers.

The Subcommittee then agreed by voice vote, in the presence of a quorum, to report to the full Committee H.R. 8410, together with the amendments adopted in the markup session.

The Committee on Agriculture met in markup session to consider the bill, H.R. 8410, as amended on February 19, March 30, and March 31, 1976. The Committee adopted a number of amendments to the bill reported by the Subcommittee. Included among the amendments was a provision to exclude from the bonding and the trust provisions packers whose average annual purchases do not exceed $500,000.

The Committee agreed to an amendment by Mr. Kelly to section 2 dealing with the definition of "packer," to reinstate subsections (a) and (b) of the present definition now contained in the Act, but to include, as well, persons marketing meats, meat food products, or livestock products in unmanufactured form while acting as wholesale brokers, dealers, or distributors in commerce. The latter provision would cover wholesalers of boxed beef.

An amendment to section 6 (private causes of action for violations of provisions of the Act), proposed by Mr. Thone, was adopted to limit the provisions of this section to violations relating to the purchase, sale or handling of livestock rather than to have it apply to any violation of the Act as provided in the bill reported by the Subcommittee.

Considerable discussion ensued on an amendment to section 7 (prompt pay) proposed by Mr. Hightower. The amendment restructures the prompt payment provision to require payment solely by delivery of a check or wire transfer of funds to the seller's account eliminating payment by mail. It also provides that in the case of a purchase on a carcass or "grade and yield" basis, payment is required not later than the close of the first business day following determination of the purchase price. It was pointed out that, if a producer made a sale to a packer and contracted for the hauling of the cattle to the

packer, the transfer of possession would occur at the packing plant, and that the packer would have the obligation to make payment to the seller or his agent at that point. If the buyer stands ready, willing, and able to tender a check at the point of transfer of possession at the time transfer takes place and for 24 hours thereafter, but no representative of the seller appeared to accept the check, the buyer would have satisfied his obligation under this provision. The buyer would, however, still have an obligation to make payment within a reasonable period of time.

The seller could pick up the check himself or constitute a commission agent or trucker as his agent to pick up the check. He could also agree in writing to other payment arrangements. The Committee agreed to an amendment to provide that such other arrangements would be subject to such terms and conditions as the Secretary might prescribe to protect either party from being forced into an arrangement to which he otherwise might not wish to agree or to cover other unforeseen circumstances. The Committee deleted from the amendment any reference to "transmittal" of payment to make clear that, absent a prior written agreement between seller and buyer, the payment requirement could not be satisfied by transmitting it by mail. The Committee then agreed to the Hightower amendment by voice vote.

An amendment was offered by Mr. Bedell which would have made poultry processors subject to those provisions of the Act which authorize cease and desist orders and preliminary injunctions pending administrative action in the event of violations. The amendment was rejected.

Mr. Foley offered an amendment to delete from the bill section 8 which provides for impressing a trust in behalf of an unpaid seller. It was argued that this provision resulted in overbalancing the bill in favor of the sellers of livestock when added to the other protections provided unpaid sellers, such as the bonding and prompt payment provisions, and the provisions for cease and desist orders, injunctions and private causes of action for damages. Also it was stated that it would adversely affect the ability of small independent packers to obtain credit and thus militate against their creditworthiness since small packers might not be able to obtain financing until the check they gave in payment cleared the bank which may be as long as a week or more after receipt of the check. The amendment lost by a vote of 8–18.

Mr. Thornton proposed an amendment to require the unpaid seller to take prompt action to perfect his trust or lose its benefit. Under his amendment, written notice would be required to be made to the packer and to the Secretary within 10 days of the final date for making payment if a payment instrument had not been received or within 5 days after the seller received notice that the payment instrument promptly presented for payment had been dishonored. The amendment was adopted by a vote of 17–14. It was later amended by the Committee at the instance of Mr. Moore to extend from 10 to 15 days the deadline for giving written notice in the event of nonpayment and to make other technical changes.

Mr. de la Garza then proposed an amendment to assure effective continual oversight by the Committee of activities under the Act. Under his amendment, an annual authorization of appropriations would be required beginning with the fiscal year ending September 30, 1978. The authorization for appropriations currently in the Act would provide authority until October 1, 1977, for funding the Packers and Stockyards Act, as amended by this bill.

This proposal was amended to require the authorization to be made every 2 years instead of on an annual basis. The amendment, as amended, was adopted by the Committee. It then adopted a few technical perfecting amendments. The Committee rejected an amendment by Mr. McHugh to require sellers of livestock to disclose the existence of liens and security interests in the livestock at the time of sale, subject to criminal penalties in the event of a violation.

Finally, the Committee voted to strike everything after the enacting clause and insert as a substitute the provisions of H.R. 8410 with the amendments agreed to in the markup session and to report the bill with such amendment to the House with a recommendation that it do pass. The action was taken in the presence of a quorum by a vote of 35–2.

### ADMINISTRATION POSITION

On July 23, 1975, at the time of the hearing on H.R. 8410 and related bills, representatives of the Administration testified in opposition to these bills, and a letter dated August 18, 1975, was received from the Department of Agriculture also opposing the bills.

On February 3, 1976, the Secretary of Agriculture appeared before the Committee on Agriculture to testify regarding the general agricultural situation. At that time, the Secretary expressed a different position in the following colloquy with Mr. Thone:

"Mr. THONE. * * * I would like to then briefly explore the Stockyards Act amendments. We have held hearings in Texas and Nebraska on this as well as here in Washington.

"We worked closely with Mr. Poage on it. Mr. Bergland and I have a bill which will be marked up Friday, H.R. 8410.

"If you remember some time ago we wanted to put some teeth in that paper tiger called the Stockyards Administration. At the eleventh hour we had the rug pulled out from under us by OMB, Justice, USDA, and I don't really know who else. One of your emissaries came up and apologized for it.

"That did not help us too much at that time.

"Is it my understanding that if we come up with a meaningful bill that will effectively do something in this area, we will have strong Administration support. Is this correct?

"Mr. BUTZ. Yes. I think the objection earlier was based on the fact that they did have budgetary implications and manpower implications, but in the meantime there are some 22 States that passed bonding requirements. We have a crazy guilt pattern in no-mans land out there. Somebody has to cooperate with across state line situations.

"There is a need for standardization."

CURRENT AND FIVE SUBSEQUENT FISCAL YEAR COST ESTIMATE

Pursuant to clause 7 of rule XIII of the Rules of the House of Representatives, the Committee submits the following cost estimates regarding costs to be incurred by the Federal Government during the current and the five subsequent fiscal years as the result of the enactment of this legislation. The Committee is of the view that program costs should approximate the estimates provided by the Congressional Budget Office. The Congressional Budget Office has estimated program costs as follows:

[In thousands of dollars]

| | |
|---|---|
| Transition quarter | 278 |
| Fiscal year: | |
| 1977 | 1,161 |
| 1978 | 1,234 |
| 1979 | 1,293 |
| 1980 | 1,366 |
| 1981 | 1,435 |

The basis for these figures is explained in the Budget Act Compliance section of this report.

The U.S. Department of Agriculture has estimated slightly higher costs. The difference between the two sets of estimates is attributable to a difference in the effect of inflation over the 5-year period.

The cost estimate received from the Department appears in full below:

DEPARTMENT OF AGRICULTURE,
OFFICE OF THE SECRETARY,
*Washington, D.C., April 9, 1976.*

Hon. THOMAS S. FOLEY,
*Chairman, Committee on Agriculture,*
*House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN: As requested the following are our estimates of the cost of H.R. 8410, approved by the House Committee on Agriculture on March 31, 1976. The present costs of implementing the bill would be approximately $1.1 million. Of this amount, $200,000 would be due to the preemption of States in section 9 of the bill.

The 5-year cost, with projected inflation, are as follows:

[In thousands of dollars]

| | |
|---|---|
| Fiscal year: | |
| 1977 | 1,152 |
| 1978 | 1,238 |
| 1979 | 1,325 |
| 1980 | 1,411 |
| 1981 | 1,491 |

RICHARD L. FELTNER, *Assistant Secretary.*

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(1)(4) of Rule XI of the Rules of the House of Representatives, the Committee estimates that enactment of H.R. 8410 will have no inflationary impact on the national economy. To the contrary, it will assist in assuring that sellers of livestock will be

paid promptly and in full on sales of livestock to packers thereby contributing to the economic viability of many small producers and to continuation of a reliable supply of meat for consumers.

BUDGET ACT COMPLIANCE (SECTION 308 AND SECTION 403)

The provisions of clause 2(1)(3)(B) of Rule XI of the Rules of the House of Representatives and section 308(a) of the Congressional Budget Act of 1974 (relating to estimates of new budget authority or new or increased tax expenditures) are not considered applicable. The estimate and comparison prepared by the Director of the Congressional Budget Office under clause 2(1)(3)(C) of Rule XI of the Rules of the House of Representatives and section 403 of the Congressional Budget Act of 1974 submitted to the Committee prior to the filing of this report are as follows:

CONGRESS OF THE UNITED STATES,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., April 7, 1976.*

Hon. THOMAS S. FOLEY,
*Chairman, Committee on Agriculture, U.S. House of Representatives,*
*Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has prepared the attached cost estimate for H.R. 8410, Amendments to the Packers and Stockyards Act of 1921.

Should the Committee so desire, we would be pleased to provide further details on the attached cost estimate.

Sincerely,

ALICE M. RIVLIN, *Director.*

CONGRESSIONAL BUDGET OFFICE

COST ESTIMATE

APRIL 7, 1976.

1. Bill Number: H.R. 8410.
2. Bill Title: Amendments to the Packers and Stockyards Act of 1921.
3. Purpose of Bill:

*General.*—This bill amends the Packers and Stockyards Act of 1921 by requiring any packer with average annual purchases of over $500,000 to be bonded. The bill would also bring brokers and other wholesalers of meat under the regulatory jurisdiction of the Secretary of Agriculture.

*Specific.*—Section 1 requires that every packer with average annual purchases of over $500,000 must be bonded.

Section 5 gives the Secretary of Agriculture authority to order packers to stop operating while insolvent, except under certain conditions which he may prescribe.

Section 7 requires packers, market agencies and dealers purchasing livestock to deliver to the seller or his agent, at the point of transfer

of the animals, a check or wire transfer for the full amount of the purchase before the close of the next business day unless otherwise agreed in writing.

Section 9 provides that the provisions of this bill preempt state laws which cover the same subject.

4. Cost Estimate:

[In thousands of dollars]

| | |
|---|---|
| Transition quarter | 278 |
| Fiscal year: | |
| 1977 | 1,161 |
| 1978 | 1,234 |
| 1979 | 1,293 |
| 1980 | 1,366 |
| 1981 | 1,435 |

5. Basis for Estimate: Presently the Packers and Stockyards Administration within the Department of Agriculture, supervises market agencies and dealers purchasing livestock. This bill expands the USDA responsibility to packers, and therefore there will be a need for additional personnel. The administration now has 198 people, 134 in thirteen regional offices and 64 in Washington. The present mix of personnel is 2.5 professionals to 1 clerical. The people in the regional office perform many duties and the additional personnel would have to work within this system. This bill would require the USDA personnel to monitor bonding, check on the packer's solvency, bring injunctions against violators of the Act, and investigate complaints. In addition, extra personnel would be needed to take over functions now being done by some states, as authorized by Section 9 of the bill. To perform these duties, it is estimated that each of the thirteen regional offices would need 3 additional professionals and 1 clerical. The Washington office would only need 5 additional staff members and the General Counsel's Office would need an additional 2 lawyers to handle the increased legal functions. The clerical rate of a GS-7, step 5 ($12,518), multiplied by 15 clericals equals $187,770. The professional rate of a GS-11, step 1 ($16,255), multiplied by 44 equals $715,220, which gives a total personnel cost of $902,990. Overhead costs of 18 percent are applied to this number to get $162,538, this figure includes the costs for training, equipment, travel and rent. The total FY 1976 cost of this bill would be $1,065,528. Manpower costs were based on FY 1976 figures and have to be adjusted for inflation for 1978 through 1981. The 1978 cost would then be $1,234,308.

6. Estimate Comparison: None.
7. Previous CBO Estimate: None.
8. Estimate Prepared By: Jack Garrity (225–5275)
9. Estimate Approved By: —— ——.

JAMES L. BLUM,
*Assistant Director for Budget Analysis.*

OVERSIGHT STATEMENT

No summary of oversight findings and recommendations made by the Committee on Government Operations under clause 2(b)(2) of Rule X of the Rules of the House of Representatives was available to the Committee with reference to the subject matter specifically addressed by H.R. 8410, as amended.

No specific oversight activities, other than the hearings accompanying the Committee's consideration of H.R. 8410, as amended, and related bills were made by the Committee, within the definition of clause 2(b) (1) of Rule X of the House.

CHANGES IN EXISTING LAW

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

## PACKERS AND STOCKYARDS ACT, 1921, AS AMENDED

An Act To regulate interstate and foreign commerce in live stock, live-stock products, dairy products, poultry, poultry products, and eggs, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## TITLE I—DEFINITIONS

This Act may be cited as the "Packers and Stockyards Act, 1921."

SEC. 2. (*a*) When used in this Act—

(1) The term "person" includes individuals, partnerships, corporations, and associations;

(2) The term "Secretary" means the Secretary of Agriculture;

(3) The term "meat food products" means all products and by-products of the slaughtering and meat-packing industry—if edible;

(4) The term "live stock" means cattle, sheep, swine, horses, mules, or goats—whether live or dead;

(5) The term "live-stock products" means all products and by-products (other than meats and meat food products) of the slaughtering and meat-packing industry derived in whole or in part from live stock; and

(6) The term "commerce" means commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through any place outside thereof; or within any Territory or possession, or the District of Columbia.

(*b*) For the purpose of this Act (but not in anywise limiting the foregoing definition) a transaction in respect to any article shall be considered to be in commerce if such article is part of that current whereby livestock, meats, meat food products, live-stock products, dairy products, poultry, poultry products, or eggs, are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State, or for slaughter of live stock within the State and the shipment outside the State of the products resulting from such slaughter. Articles normally in such current of

commerce shall not be considered out of such current through resort being had to any means or device intended to remove transactions in respect thereto from the provisions of this Act. For the purpose of this paragraph the word "State" includes Territory, the District of Columbia, possession of the United States, and foreign nation.

## TITLE II—PACKERS

[Sec. 201. When used in this Act—

[The term "packer" means any person engaged in the business (*a*) of buying live stock in commerce for purposes of slaughter, or (*b*) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (*c*) of manufacturing or preparing live-stock products for sale or shipment in commerce, or (*d*) of marketing meats, meat food products, live-stock products, dairy products, poultry, poultry products, or eggs, in commerce; but no person engaged in such business of manufacturing or preparing live-stock products or in such marketing business shall be considered a packer unless—

[(1) Such person is also engaged in any business referred to in clause (*a*) or (*b*) above, or unless

[(2) Such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, by himself or through his agents, servants, or employees, any interest in any business referred to in clause (*a*) or (*b*) above, or unless

[(3) Any interest in such business of manufacturing or preparing live-stock products, or in such marketing business is owned or controlled, directly or indirectly, through stock ownership or control or otherwise, by himself or through his agents, servants, or employees, by any person engaged in any business referred to in clause (*a*) or (*b*) above, or unless

[(4) Any person or persons jointly or severally, directly or indirectly, through stock ownership or control or otherwise, by themselves or through their agents, servants, or employees, own or control in the aggregate 20 per centum or more of the voting power or control in such business of manufacturing or preparing live-stock products or in such marketing business and also 20 per centum or more of such power or control in any business referred to in clause (*a*) or (*b*) above.]

*Sec. 201. When used in this Act the term "packer" means any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) of marketing meats, meat food products, or livestock products in an unmanufacturerd form acting as a wholesale broker, dealer or distributor in commerce: Provided, however, That nothing in this section shall affect the jurisdiction of the Federal Trade Commission with respect to retail sales of meat, meat food products, livestock products in unmanufactured form, or poultry products as provided in Section 406 of this Act.*

Sec. 202. It shall be unlawful with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry,

or poultry products for any packer or any live poultry dealer or handler to:

(*a*) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device [in commerce]; or

(*b*) Make or give [in commerce,] any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject [in commerce,] any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; or

(*c*) Sell or otherwise transfer to or for any other packer or any live poultry dealer or handler, or buy or otherwise receive from or for any other packer or any live poultry dealer or handler, any article for the purpose or with the effect of apportioning the supply [in commerce] between any such packers, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly [in commerce], or

(*d*) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices [in commerce], or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article [in commerce], or of restraining commerce; or

(*e*) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices [in commerce], or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article [in commerce], or of restraining commerce; or

(*f*) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business [in commerce], or (2) to apportion purchases or sales of any article [in commerce], or (3) to manipulate or control prices [in commerce]; or

(*g*) Conspire, combine, agree or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivision (*a*), (*b*), (*c*), (*d*), or (*e*).

SEC. 203. (*a*) Whenever the Secretary has reason to believe that any packer has violated or is violating any provision of this title, he shall cause a complaint in writing to be served upon the packer, stating his charges in that respect, and requiring the packer to attend and testify at a hearing at a time and place designated therein, at least thirty days after the service of such complaint; and at such time and place there shall be afforded the packer a reasonable opportunity to be informed as to the evidence introduced against him (including the right of cross-examination), and to be heard in person or by counsel and through witnesses, under such regulations as the Secretary may prescribe. Any person for good cause shown may on application be allowed by the Secretary to intervene in such proceeding, and appear in person or by counsel. At any time prior to the close of the hearing the Secretary may amend the complaint; but in case of any amendment adding new charges the hearing shall, on the request of the packer, be adjourned for a period not exceeding fifteen days.

(*b*) If, after such hearing, the Secretary finds that the packer has violated or is violating any provisions of this title covered by

# 20

the charges, he shall make a report in writing in which he shall state his findings as to the facts, and shall issue and cause to be served on the packer an order requiring such packer to cease and desist from continuing such violation. The testimony taken at the hearing shall be reduced to writing and filed in the records of the Department of Agriculture.

(c) Until the record in such hearing has been filed in a court of appeals of the United States, as provided in section 204, the Secretary at any time, upon such notice and in such manner as he deems proper, but only after reasonable opportunity to the packer to be heard, may amend or set aside the report or order, in whole or in part.

(d) Complaints, orders, and other processes of the Secretary under this section may be served in the same manner as provided in section 5 of the Act entitled "An Act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," approved September 26, 1914.

SEC. 204. (a) An order made under section 203 shall be final and conclusive unless within thirty days after the service the packer appeals to the court of appeals for the circuit in which he has his principal place of business, by filing with the clerk of such court a written petition praying that the Secretary's order be set aside or modified in the manner stated in the petition, together with a bond in such sum as the court may determine, conditioned that such packer will pay the costs of the proceedings if the court so directs.

(b) The clerk of the court shall immediately cause a copy of the petition to be delivered to the Secretary, and the Secretary shall thereupon file in the court the record in such proceedings, as provided in section 2112 of title 28, United States Code. If before such record is filed the Secretary amends or sets aside his report or order, in whole or part, the petitioner may amend the petition within such time as the court may determine, on notice to the Secretary.

(c) At any time after such petition is filed, the court, on application of the Secretary, may issue a temporary injunction, restraining, to the extent it deems proper, the packer and his officers, directors, agents, and employees, from violating any of the provisions of the order pending the final determination of the appeal.

(d) The evidence so taken or admitted, and filed as aforesaid as a part of the record, shall be considered by the court as the evidence in the case. The proceedings in such cases in the court of appeals shall be made a preferred case and shall be expedited in every way.

(e) The court may affirm, modify, or set aside the order of the Secretary.

(f) If the court determines that the just and proper disposition of the case requires the taking of additional evidence, the court shall order the hearing to be reopened for the taking of such evidence, in such manner and upon such terms and conditions as the court may deem proper. The Secretary may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken, and he shall file such modified or new findings and his recommendations, if any, for the modification or setting aside of his order, with the return of such additional evidence.

(*g*) If the court of appeals affirms or modifies the order of the Secretary, its decree shall operate as an injunction to restrain the packer, and his officers, directors, agents, and employess from violating the provisions of such order or such order as modified.

(*h*) The court of appeals shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to review, and to affirm, set aside, or modify, such orders of the Secretary, and the decree of such court shall be final except that it shall be subject to review by the Supreme Court of the United States upon certiorari, as provided in section 1254 of title 28, if such writ is duly applied for within sixty days after entry of the decree. The issue of such writ shall not operate as a stay of the decree of the court of appeals, insofar as such decree operates as an injunction, unless so ordered by the Supreme Court.

(*i*) For the purposes of this title the term "circuit court of appeals," in case the principal place of business of the packer is in the District of Columbia, means the Court of Appeals of the District of Columbia.

SEC. 205. Any packer, or any officer, director, agent, or employee of a packer, who fails to obey any order of the Secretary issued under the provisions of section 203, or such order as modified—

(1) After the expiration of the time allowed for filing a petition in the court of appeals to set aside or modify such order, if no such petition has been filed within such time; or

(2) After the expiration of the time allowed for applying for a writ of certiorari, if such order, or such order as modified, has been sustained by the court of appeals and no such writ has been applied for within such time; or

(3) After such order, or such order as modified, has been sustained by the courts as provided in section 204: shall on conviction be fined not less than $500 nor more than $10,000, or imprisoned for not less than six months nor more than five years, or both. Each day during which such failure continues shall be deemed a separate offense.

*SEC. 206. (a) It is hereby found that a burden on and obstruction to commerce in livestock is caused by financing arrangements under which packers encumber, give lenders security interest in, or place liens on, livestock purchased by packers in cash sales, or on inventories of or receivables or proceeds from meat, meat food products, or livestock products therefrom, when payment is not made for the livestock and that such arrangements are contrary to the public interest. This section is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest.*

*(b) All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers: Provided, however, That any packer whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section. Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored: Provided, however, That the*

*unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within fifteen days of the final date for making a payment under section 409, or within five business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection.*

*The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.*

(c) *For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer.*

## TITLE III—STOCKYARDS

SEC. 301. When used in this Act—

(a) The term "stockyard owner" means any person engaged in the business of conducting or operating a stockyard;

(b) The term "stockyard services" means services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce, of live stock;

(c) The term "market agency" means any person engaged in the business of (1) buying or selling in commerce live stock on a commission basis or (2) furnishing stockyard services; and

(d) The term "dealer" means any person, not a market agency, engaged in the business of buying or selling in commerce live stock, either on his own account or as the employee or agent of the vendor or purchaser.

SEC. 302. (a) When used in this title the term "stockyard" means any place, establishment, or facility commonly known as stockyards, conducted, operated, or managed for profit or nonprofit as a public market for livestock producers, feeders, market agencies, and buyers, consisting of pens, or other inclosures, and their appurtenances, in which live cattle, sheep, swine, horses, mules, or goats are received, held, or kept for sale or shipment in commerce.

(b) The Secretary shall from time to time ascertain, after such inquiry as he deems necessary, the stockyards which come within the foregoing definition, and shall give notice thereof to the stockyard owners concerned, and give public notice thereof by posting copies of such notice in the stockyard, and in such other manner as he may determine. After the giving of such notice to the stockyard owner and to the public, the stockyard shall remain subject to the provisions of this title until like notice is given by the Secretary that such stockyard no longer comes within the foregoing definition.

SEC. 303. After the expiration of thirty days after the Secretary has given public notice that any stockyard is within the definition of section 302, by posting copies of such notice in the stockyard, no person shall carry on the business of a market agency or dealer at such stockyard unless (1) the stockyard owner has determined that his services will be beneficial to the business and welfare of said stockyard, its patrons, and customers, which determination shall be made on a basis which is not unreasonable or unjustly discriminatory, and has given

written authorization to such person, and (2) he has registered with the Secretary, under such rules and regulations as the Secretary may prescribe, his name and address, the character of business in which he is engaged, and the kinds of stockyards services, if any, which he furnishes at such stockyard. Every other person operating as a market agency or dealer as defined in section 301 of the Act may be required to register in such manner as the Secretary may prescribe. Whoever violates the provisions of this section shall be liable to a penalty of not more than $500 for each such offense and not more than $25 for each day it continues, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

SEC. 304. All stockyard services furnished pursuant to reasonable request made to a stockyard owner or market agency at such stockyard shall be reasonable and nondiscriminatory and stockyard services which are furnished shall not be refused on any basis that is unreasonable or unjustly discriminatory: *Provided*, That in any State where the weighing of livestock at a stockyard is conducted by a duly authorized department or agency of the State, the Secretary, upon application of such department or agency, may register it as a market agency for the weighing of livestock received in such stockyard, and upon such registration such department or agency and the members thereof shall be amenable to all the requirements of this Act, and upon failure of such department or agency or the members thereof to comply with the orders of the Secretary under this Act he is authorized to revoke the registration of such department or agency and to enforce such revocation as provided in section 315 of this Act.

SEC. 305. All rates or charges made for any stockyard services furnished at a stockyard by a stockyard owner or market agency shall be just, reasonable, and nondiscriminatory, and any unjust, unreasonable, or discriminatory rate or charge is prohibited and declared to be unlawful.

SEC. 306. (a) Within sixty days after the Secretary has given public notice that a stockyard is within the definition of section 302 by posting copies of such notice in the stockyard, the stockyard owner and every market agency at such stockyard shall file with the Secretary, and print and keep open to public inspection at the stockyard, schedules showing all rates and charges for the stockyard services furnished by such person at such stockyard. If a market agency commences business at the stockyard after the expiration of such sixty days such schedules must be filed before any stockyard services are furnished.

(b) Such schedules shall plainly state all such rates and charges in such detail as the Secretary may require, and shall also state any rules or regulations which in any manner change, affect, or determine any part of the aggregate of such rates or charges, or the value of the stockyard services furnished. The Secretary may determine and prescribe the form and manner in which such schedules shall be prepared, arranged, and posted, and may from time to time make such changes in respect thereto as may be found expedient.

(c) No changes shall be made in the rates or charges so filed and published, except after ten days' notice to the Secretary and to the public filed and published as aforesaid, which shall plainly state the changes proposed to be made and the time such changes will go into

effect; but the Secretary may, for good cause shown, allow changes on less than ten days' notice, or modify the requirements of this section in respect to publishing, posting, and filing of schedules, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions.

(*d*) The Secretary may reject and refuse to file any schedule tendered for filing which does not provide and give lawful notice of its effective date, and any schedule so rejected by the Secretary shall be void and its use shall be unlawful.

(*e*) Whenever there is filed with the Secretary any schedule, stating a new rate or charge, or a new regulation or practice affecting any rate or charge, the Secretary may either upon complaint or upon his own initiative without complaint, at once, and if he so orders without answer or other formal pleading by the person filing such schedule, but upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, charge, regulation, or practice, and pending such hearing and decision thereon the Secretary, upon filing with such schedule and delivering to the person filing it a statement in writing of his reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, regulation, or practice, but not for a longer period than thirty days beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, charge, regulation, or practice goes into effect, the Secretary may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If any such hearing can not be concluded within the period of suspension, the Secretary may extend the time of suspension for a further period not exceeding thirty days, and if the proceeding has not been concluded and an order made at the expiration of such thirty days, the proposed change of rate, charge, regulation, or practice shall go into effect at the end of such period.

(*f*) After the expiration of the sixty days referred to in subdivision (*a*) no person shall carry on the business of a stockyard owner or market agency unless the rates and charges for the stockyard services furnished at the stockyard have been filed and published in accordance with this section and the orders of the Secretary made thereunder; nor charge, demand, or collect a greater or less or different compensation for such services than the rates and charges specified in the schedules filed and in effect at the time; nor refund or remit in any manner any portion of the rates or charges so specified (but this shall not prohibit a cooperative association of producers from bona fide returning to its members, on a patronage basis, its excess earnings on their livestock, subject to such regulations as the Secretary may prescribe) ; nor extend to any person at such stockyard any stockyard services except such as are specified in such schedules.

(*g*) Whoever fails to comply with the provisions of this section or of any regulation or order of the Secretary made thereunder shall be liable to a penalty of not more than $500 for each such offense, and not more than $25 for each day it continues, which shall accrue to the United States and may be recovered in a civil action brought by the United States.

(*h*) Whoever willfully fails to comply with the provisions of this section or of any regulation or order of the Secretary made thereunder shall on conviction be fined not more than $1,000, or imprisoned not more than one year, or both.

Sec. 307. (*a*) It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful.

(*b*) It shall be the responsibility and right of every stockyard owner to manage and regulate his stockyard in a just, reasonable, and nondiscriminatory manner, to prescribe rules and regulations and to require those persons engaging in or attempting to engage in the purchase, sale, or solicitation of livestock at such stockyard to conduct their operations in a manner which will foster, preserve, or insure an efficient, competitive public market. Such rules and regulations shall not prevent a registered market agency or dealer from rendering service on other markets or in occasional and incidental off-market transactions.

Sec. 308. 〚(*a*) If any stockyard owner, market agency, or dealer, violates any of the provisions of sections 304, 305, 306, or 307, or of any order of the Secretary made under this title, he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.〛

(*a*) *If any person subject to this Act violates any of the provisions of the Act, or of any order of the Secretary under the Act, relating to the purchase, sale or handling of livestock, he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.*

(*b*) Such liability may be enforced either (1) by complaint to the Secretary as provided in section 309, or (2) by suit in any district court of the United States of competent jurisdiction; but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies.

Sec. 309. (*a*) Any person complaining of anything done or omitted to be done by any stockyard owner, market agency, or dealer (hereinafter in this section referred to as the "defendant") in violation of the provisions of sections 304, 305, 306, or 307, or of an order of the Secretary made under this title, may, at any time within ninety days after the cause of action accrues, apply to the Secretary by petition which shall briefly state the facts, whereupon the complaint thus made shall be forwarded by the Secretary to the defendant, who shall be called upon to satisfy the complaint, or to answer it in writing, within a reasonable time to be specified by the Secretary. If the defendant within the time specified makes reparation for the injury alleged to be done he shall be relieved of liability to the complainant only for the particular violation thus complained of. If the defendant does not satisfy the complaint within the time specified, or there appears to be any reasonable ground for investigating the complaint, it

shall be the duty of the Secretary to investigate the matters complained of in such manner and by such means as he deems proper.

(*b*) The Secretary, at the request of the livestock commissioner, Board of Agriculture, or other agency of a State or Territory, having jurisdiction over stockyards in such State or Territory, shall investigate any complaint forwarded by such agency in like manner and with the same authority and powers as in the case of a complaint made under subdivision (*a*).

(*c*) The Secretary may at any time institute an inquiry on his own motion, in any case and as to any matter or thing concerning which a complaint is authorized to be made to or before the Secretary, by any provision of this title, or concerning which any question may arise under any of the provisions of this title, or relating to the enforcement of any of the provisions of this title. The Secretary shall have the same power and authority to proceed with any inquiry instituted upon his own motion as though he had been appealed to by petition, including the power to make and enforce any order or orders in the case or relating to the matter or thing concerning which the inquiry is had, except orders for the payment of money.

(*d*) No complaint shall at any time be dismissed because of the absence of direct damage to the complainant.

(*e*) If after hearing on a complaint the Secretary determines that the complainant is entitled to an award of damages, the Secretary shall make an order directing the defendant to pay to the complainant the sum to which he is entitled on or before a day named.

(*f*) If the defendant does not comply with an order for the payment of money within the time limit in such order, the complainant, or any person for whose benefit such order was made, may within one year of the date of the order file in the district court of the United States for the district in which he resides or in which is located the principal place of business of the defendant or in any State court having general jurisdiction of the parties, a petition setting forth briefly the causes for which he claims damages and the order of the Secretary in the premises. Such suit in the district court shall proceed in all respects like other civil suits for damages except that the findings and orders of the Secretary shall be prima facie evidence of the facts therein stated, and the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they accrue upon his appeal. If the petitioner finally prevails, he shall be allowed a reasonable attorney's fee to be taxed and collected as a part of the costs of the suit.

SEC. 310. Whenever after full hearing upon a complaint made as provided in section 309, or after full hearing under an order for investigation and hearing made by the Secretary on his own initiative, either in extension of any pending complaint or without any complaint whatever, the Secretary is of the opinion that any rate, charge, regulation, or practice of a stockyard owner or market agency, for or in connection with the furnishing of stockyard services, is or will be unjust, unreasonable, or discriminatory, the Secretary—

(a) May determine and prescribe what will be the just and rea-sonable rate or charge, or rates or charges, to be thereafter in such case observed as both the maximum and minimum to be charged, and what regulation or practice is or will be just, reasonable, and nondiscriminatory to be thereafter followed; and

(b) May make an order that such owner or operator (1) shall cease and desist from such violation to the extent to which the Secretary finds that it does or will exist: (2) shall not thereafter publish, demand, or collect any rate or charge for the furnishing of stockyard services more or less than the rate or charge so pre-scribed; and (3) shall conform to and observe the regulations or practice so prescribed.

SEC. 311. Whenever in any investigation under the provisions of this title, or in any investigation instituted by petition of the stockyard owner, market agency, or dealer concerned, which peti-tion is hereby authorized to be filed, the Secretary after full hearing finds that any rate, charge, regulation, or practice of any stockyard owner, market agency, or dealer for or in connection with the buy-ing or selling on a commission basis or otherwise, receiving, mar-keting, feeding, holding, delivery, shipment, weighing, or handling, not in commerce, of live stock, causes any undue or unreasonable advantage, prejudice, or preference as between persons or localities in intrastate commerce in live stock on the one hand and interstate on foreign commerce in live stock on the other hand, or any undue, unjust, or unreasonable discrimination against interstate or for-eign commerce in live stock, which is hereby forbidden and de-clared to be unlawful, the Secretary shall prescribe the rate, charge, regulation, or practice thereafter to be observed, in such manner as, in his judgment, will remove such advantage, preference, or discrimination. Such rates, charges, regulations, or practices shall be observed while in effect by the stockyard owners, market agen-cies, or dealers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding.

SEC. 312. (a) It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discrimina-tory, or deceptive practice or device in connection with determining whether persons should be authorized to operate at the stockyards, or with the receiving, marketing, buying or selling on a commission basis or otherwise. feeding, watering, holding, delivery, shipment, weigh-ing or handling [in commerce.] of live stock.

(b) Whenever complaint is made to the Secretary by any person, or whenever the Secretary has reason to believe, that any stockyard owner. market agency, or dealer is violating the provisions of subdivi-sion (a), the Secretary after notice and full hearing may make an order that he shall cease and desist from continuing such violation to the extent that the Secretary finds that it does or will exist.

SEC. 313. Except as otherwise provided in this Act, all orders of the Secretary under this title, other than orders for the payment of money, shall take effect within such reasonable time, not less than five days, as is prescribed in the order, and shall continue in force

until his further order, or for a specified period of time, according as is prescribed in the order, unless such order is suspended or modified or set aside by the Secretary or is suspended or set aside by a court of competent jurisdiction.

Sec. 314. (a) Any stockyard owner, market agency, or dealer who knowingly fails to obey any order made under the provisions of sections 310, 311, or 312 shall forfeit to the United States the sum of $500 for each offense. Each distinct violation shall be a separate offense, and in case of a continuing violation each day shall be deemed a separate offense. Such forfeiture shall be recoverable in a civil suit in the name of the United States.

(b) It shall be the duty of the various United States attorneys, under the direction of the Attorney General, to prosecute for the recovery of forfeitures. The costs and expense of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States.

Sec. 315. If any stockyard owner, market agency, or dealer fails to obey any order of the Secretary other than for the payment of money while the same is in effect, the Secretary, or any party injured thereby, or the United States by its Attorney General, may apply to the district court for the district in which such person has his principal place of business for the enforcement of such order. If after hearing the court determines that the order was lawfully made and duly served and that such person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person, his officers, agents, or representatives from further disobedience of such order or to enjoin upon him or them obedience to the same.

Sec. 316. For the purposes of this title, the provisions of all laws relating to the suspending or restraining the enforcement, operation, or execution of, or the setting aside in whole or in part the orders of the Interstate Commerce Commission, are made applicable to the jurisdiction, powers, and duties of the Secretary in enforcing the provisions of this title, and to any person subject to the provisions of this title.

Sec. 317. (a) The Secretary may, upon written application made to him, and if he deems it necessary, authorize the charging and collection, at any stockyard subject to the provisions of this Act, by any department or agency of any State in which branding or marking or both branding and marking livestock as a means of establishing ownership prevails by custom or statute, or by a duly organized livestock association of any such State, of a reasonable and nondiscriminatory fee for the inspection of brands, marks, and other identifying characteristics of livestock originating in or shipped from such State, for the purpose of determining the ownership of such livestock. No charge shall be made under any such authorization until the authorized department, agency, or association has registered as a market agency. No more than one such authorization shall be issued with respect to such inspection of livestock originating in or shipped from any one State. If more than one such application is filed with respect to such inspection of livestock originating in or

shipped from any one State, the Secretary shall issue such authorization to the applicant deemed by him best qualified to perform the proposed service, on the basis of (1) experience, (2) financial responsibility, (3) extent and efficiency of organization, (4) possession of necessary records, and (5) any other factor relating to the ability of the applicant to perform the proposed service. The Secretary may receive and consider the recommendations of the commissioner, secretary, or director of agriculture, or other appropriate officer or agency of a State as to the qualifications of any applicant in such State. The decision of the Secretary as to the applicant best qualified shall be final.

(*b*) The provisions of this title relating to the filing, publication, approval, modification, and suspension of any rate or charge for any stockyard service shall apply with respect to charges authorized to be made under this section.

(*c*) Charles authorized to be made under this section shall be collected by the market agency or other person receiving and disbursing the funds received from the sale of livestock with respect to the inspection of which such charge is made, and paid by it to the department, agency, or association performing such service.

(*d*) The Secretary may, if he deems it to be in the public interest, suspend, and after hearing, revoke any authorization and registration issued under the provisions of this section or any similar authorization and registration issued under any other provision of law. The order of the Secretary suspending or revoking any such authorization and registration shall not be subject to review.

## TITLE IV—GENERAL PROVISIONS

Sec. 401. Every packer or any live poultry dealer or handler, stockyard owner, market agency, and dealer shall keep such accounts, records, and memoranda as fully and correctly disclose all transactions invloved in his business, including the true ownership of such business by stockholding or otherwise. Whenever the Secretary finds that the accounts, records, and memoranda of any such person do not fully and correctly disclose all transactions involved in his business, the Secretary may prescribe the manner and form in which such accounts, records, and memoranda shall be kept, and thereafter any such person who fails to keep such accounts, records, and memoranda in the manner and form prescribed or approved by the Secretary shall upon conviction be fined not more than $5,000, or imprisoned not more than three years, or both.

Sec. 402. For the efficient execution of the provisions of this Act, and in order to provide information for the use of Congress, the provisions( including penalties) of sections 6, 8, 9, and 10 of the Act entitled "An Act to create a Federal Trade Commission, to define its powers and duties, and for other purposes," approved September 26, 1914, are made applicable to the jurisdiction, powers, and duties of the Secretary in enforcing the provisions of this Act and to any person subject to the provisions of this Act, whether or not a corporation. The Secretary, in person or by such agents as he may designate, may prosecute any inquiry necessary to his duties under this Act in any part of the United States.

SEC. 403. When construing and enforcing the provisions of this Act, the act, omission, or failure of any agent, officer, or other person acting for or employed by any packer or any live poultry dealer or handler, stockyard owner, market agency, or dealer, within the scope of his employment or office, shall in every case also be deemed the act, omission, or failure of such packer or any live poultry dealer handler, stockyard owner, market agency, or dealer, as well as that of such agent, officer, or other person.

SEC. 404. The Secretary may report any violation of this Act to the Attorney General of the United States, who shall cause appropriate proceedings to be commenced and prosecuted in the proper courts of the United States without delay.

SEC. 405. Nothing contained in this Act, except as otherwise provided herein, shall be construed—

(a) To prevent or interfere with the enforcement of, or the procedure under, the provisions of the Act entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890, the Act entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes," approved October 15, 1914, the Interstate Commerce Act as amended, the Act entitled "An Act to promote export trade, and for other purposes," approved April 10, 1918, or sections 73 to 77, inclusive, of the Act of August 27, 1894, entitled "An Act to reduce taxation, to provide revenue for the Government, and for other purposes," as amended by the Act entitled "An Act to amend sections seventy-three and seventy-six of the Act of August twenty-seventh, eighteen hundred and ninety-four, entitled 'An Act to reduce taxation, to provide revenue for the Government, and for other purposes,' " approved February 12, 1913, or

(b) To alter, modify, or repeal such Acts or any part or parts thereof, or

(c) To prevent or interfere with any investigation, proceeding, or prosecution begun and pending at the time this Act becomes effective.

SEC. 406. (a) Nothing in this Act shall affect the power or jurisdiction of the Interstate Commerce Commission, nor confer upon the Secretary concurrent power or jurisdiction over any matter within the power or jurisdiction of such Commission.

(b) The Federal Trade Commission shall have power and jurisdiction over any matter involving meat, meat food products, livestock products in unmanufactured form, or poultry products, which by this Act is made subject to the power or jurisdiction of the Secretary, as follows:

(1) When the Secretary in the exercise of his duties requests of the Commission that it make investigations and reports in any case.

(2) In any investigation of, or proceeding for the prevention of, an alleged violation of any Act administered by the Commission, arising out of acts or transactions involving meat, meat food products, livestock products in unmanufactured form, or poultry products, if the Commission determines that effective exercise of its power or jurisdiction with respect to retail sales of any such commodities is or will be impaired by the absence of power or jurisdiction over all acts or transactions involving such commodities in such investigation or pro-

ceeding. In order to avoid unnecessary duplication of effort by the Government and burdens upon the industry, the Commissioner shall notify the Secretary of such determination, the reasons therefor. and the acts or transactions involved, and shall not exercise power or jurisdiction with regard to acts or transactions (other than retail sales) involving such commodities if the Secretary within 10 days from the date of receipt of the notice notifies the Commission that there is pending in his Department an investigation of, or proceeding for the prevention of, an alleged violation of this Act involving the same subject matter.

(3) Over all transactions in commerce in margarine or oleomargarine and over retail sales of meat. meat food products, livestock products in unmanufactured form. and poultry products.

(c) The Federal Trade Commission shall have no power or jurisdiction over any matter which by this Act is made subject to the jurisdiction of the Secretary, except as provided in subsection (b) of this section.

(d) The Secretary of Agriculture shall exercise power or jurisdiction over oleomargarine or retail sales of meat, meat food products. livestock products in unmanufactured form, or poultry products only when he determines, in any investigation of. or any proceeding for the prevention of, an alleged violation of this Act. that such action is necessary to avoid impairment of his power or jurisdiction over acts or transactions involving livestock, meat, meat food products. livestock products in unmanufactured form, poultry or poultry products. other than retail sales thereof. In order to avoid unnecessary duplication of effort by the Government and burdens upon the industry, the Secretary shall notify the Federal Trade Commission of such determination. the reasons therefor. and the acts or transactions involved. and shall not exercise power or jurisdiction with respect to acts or transactions involving oleomargarine or retail sales of meat, meat food products, livestock products in unmanufactured form, or poultry products if the Commission within 10 days from the date of receipt of such notice notifies the Secretary that there is pending in the Commission an investigation of, or proceeding for the prevention of, an alleged violation of any Act administered by the Commission involving the same subject matter.

(e) The Secretary of Agriculture and the Federal Trade Commission shall include in their respective annual reports information with respect to the administration of subsections (b) and (d) of this section.

SEC. 407. (a) The Secretary may make such rules. regulations and orders as may be necessary to carry out the provisions of this Act and may cooperate with any department or agency of the Government. any State. Territory, District. or possession. or department, agency or political subdivision thereof. or any person; and shall have the power to appoint, remove, and fix the compensation of such officers and employees, not in conflict with existing law, and make such expenditures for rent outside the District of Columbia. printing, telegrams. telephones. law books, books of reference, periodicals. furniture. stationery, office equipment, travel. and other supplies and expenses as shall be necessary to the administration of this Act in the

District of Columbia and elsewhere, and as may be appropriated for by Congress, and there is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such sums as may be necessary for such purpose.

(b) The Secretary shall maintain within the Department of Agriculture a separate enforcement unit to administer and enforce title II of this Act.

(c) Notwithstanding any other provision of law, the authority of the Secretary under this Act shall not apply to deductions made from sales proceeds for the purpose of financing promotion and research activities, including educational activities relating to livestock, meat, and other products covered by the Act.

*(d) There is hereby authorized to be appropriated to carry out the purposes of this Act for each fiscal year beginning with the fiscal year ending September 30, 1978, such sums as may hereafter be authorized biennially by the Congress.*

*SEC. 408. Whenever the Secretary has reason to believe that any person subject to this Act, (a) with respect to any transactions subject to the Act, has failed to pay or is unable to pay for livestock, meats, meat food products, or livestock products in unmanufactured form, or has failed to remit to the person entitled thereto the net proceeds from the sale of any such commodity sold on a commission basis; or (b) has operated while insolvent, or otherwise in violation of the Act in a manner which may reasonably be expected to cause irreparable damage to another person; or (c) does not have the required bond, and that it would be in the public interest to enjoin such person from operating subject to this Act or enjoin him from operating subject to this Act except under such conditions as would protect vendors or consignors of such commodities or other affected persons, until complaint under this Act is issued and dismissed by the Secretary or until order to cease and desist made thereon by the Secretary has become final and effective within the meaning of this Act or is set aside on appellate review of the Secretary's order, the Secretary may notify the Attorney General, who may apply to the United States district court for the district in which such person has his principal place of business or in which he resides for a temporary injunction or restraining order. When needed to effectuate the purposes of this section, the court shall, upon a proper showing, issue a temporary injunction or restraining order, without bond. Attorneys employed by the Secretary of Agriculture may, with the approval of the Attorney General, appear in the United States district court representing the Secretary in any action seeking such a temporary restraining order or injunction.*

*SEC. 409. (a) Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized agent the full amount of the purchase price: Provided, however, That each packer, market agency or dealer purchasing livestock for slaughter shall, before the close of the next business day following purchase of livestock and transfer of possession thereof, actually deliver at the point of transfer of possession to the seller or his duly authorized representative a check or shall wire transfer funds to seller's account for the full amount of the purchase price;*

*or, in the case of a purchase on a carcass or "grade and yield" basis, purchaser shall make payment by check at the point of transfer or shall wire transfer funds to seller's account for the full amount of the purchase price not later than the close of the first business day following determination of purchase price.*

*(b) Notwithstanding the provisions of paragraph (a) of this section and subject to such terms and conditions as the Secretary may prescribe, the parties to the purchase and sale of livestock may expressly agree in writing, before such purchase or sale, to effect payment in a manner other than that required in paragraph (a). Any such agreement shall be disclosed in the records of any market agency or dealer selling the livestock, and in the purchaser's records and on the accounts or other documents issued by the purchaser relating to the transaction.*

*(c) Any delay or attempt to delay by a market agency, dealer, or packer purchasing livestock, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment for such livestock shall be considered an "unfair practice" in violation of the Act. Nothing in this section shall be deemed to limit the meaning of the term "unfair practice" as used in the Act.*

*Sec. 410. No requirement of any State or territory of the United States, or any subdivision thereof, or the District of Columbia, with respect to bonding of packers or prompt payment by packers for livestock purchases may be enforced upon any packer operating in compliance with the bonding provisions under the Act of July 12, 1943 (57 Stat. 422; 7 U.S.C. 204), and prompt payment provisions of section 409 of this Act respectively.*

Sec. [408.] 411. If any provision of this Act or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby.

## TITLE V—LIVE POULTRY DEALERS AND HANDLERS

Sec. 501. The handling of the great volume of live poultry required as an article of food for the inhabitants of large centers of population is attendant with various unfair, deceptive, and fraudulent practices and devices, resulting in the producers sustaining sundry losses and receiving prices far below the reasonable value of their live poultry in comparison with prices of other commodities and in unduly and arbitrarily enhancing the cost to the consumers. Such practices and devices are an undue restraint and unjust burden upon interstate commerce and are a matter of such grave concern to the industry and to the public as to make it imperative that steps be taken to free such commerce from such burden and restraint and to protect producers and consumers against such practices and devices.

Sec. 502. (a) The Secretary of Agriculture is authorized and directed to ascertain from time to time and to designate the cities where such practices and devices exist to the extent stated in the preceding section and the markets and places in or near such cities where live poultry is received, sold, and handled in sufficient quantity to con-

stitute an important influence on the supply and price of live poultry and poultry products. On and after the effecive date of such designation, which shall be publicly announced by the Secretary in publication in one or more trade journals or in the daily press or in such other manner as he may determine to be adequate for the purpose approximately thirty days prior to such date, no person other than packers as defined in title II of said Act and railroads shall engage in, furnish, or conduct any service or facility in any such designated city, place, or market in connection with the receiving, buying, or selling, on a commission basis or otherwise, marketing, feeding, watering, holding, delivering, shipping, weighing, unloading, loading on trucks, trucking, or handling in commerce of live poultry without a license from the Secretary of Agriculture as herein authorized valid and effective at such time. Any person who violates any provision of this subsection shall be subject to a fine of not more than $500 or imprisonment of not more than six months, or both.

(b) Any person desiring a license shall make application to the Secretary, who may be regulation prescribe the information to be contained in such application. The Secretary shall issue a license to any applicant furnishing the required information unless he finds after opportunity for a hearing that such applicant is unfit to engage in the activity for which he has made application by reason of his having at any time within two years prior to his application engaged in any practice of the character prohibited by this Act or because he is financially unable to fulfill the obligations that he would incur as a licensee.

SEC. 503. Section 202, 401, 402, 403, and 404 of said Act are amended by addition of the words "or any live poultry dealer or handler" after the word "packer" wherever it occurs in said sections. The term "live poultry dealer" means any person engaged in the business of buying or selling live poultry in commerce for purposes of slaughter either on his own account or as the employee or agent of the vendor or purchaser.

SEC. 504. The provisions of sections 305 to 316, both inclusive, 401, 402, 403, and 404 of said Act shall be applicable to licensees with respect to services and facilities covered by this title and the rates, charges, charges, and rentals therefor except that the schedules of rates, charges, and rentals shall be posted in the place of business of the licensee as prescribed in regulations made by the Secretary.

SEC. 505. Whenever the Secretary determines, after opportunity for a hearing, that any licensee has violated or is violating any of the provisions of this title, he may publish the facts and circumstances of such violation and by order suspend the license of such offender for a period not to exceed ninety days and if the violation is flagrant or repeated he may by order revoke the license of the offender.

  *   *   *   *   *   *   *

## ACT OF JULY 12, 1943

An act of Congress, approved July 12, 1943 (Public No. 129, 78th Congress), entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," contains the following provisions:

Packers and Stockyards Act: For carrying out the provisions of the Packers and Stockyards Act, approved August 15, 1921, as amended by the Act of August 14, 1935 (7 U.S.C. 181–229), $364,070: *Provided*, That hereafter the Secretary may require reasonable bonds from every [market agency and dealer] *market agency (as defined in title III of the Act), every packer (as defined in title II of the Act) in connection with its livestock purchasing operations (except that those packers whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section), and every other person operating as a dealer (as defined in title III of the Act),* under such rules and regulations as he may prescribe, to secure the performance of their obligations, and whenever, after due notice and hearing, the Secretary finds any registrant is insolvent or has violated any provisions of said Act he may issue an order suspending such registrant for a reasonable specified period. Such order of suspension shall take effect within not less than five days, unless suspended or modified or set aside by the Secretary or a court of competent jurisdiction. *If the Secretary finds any packer is insolvent, he may after notice and hearing issue an order under the provisions of section 203 requiring such packer to cease and desist from purchasing livestock while insolvent, or while insolvent except under such conditions as the Secretary may prescribe to effectuate the purposes of the Act.*



# DISSENTING VIEWS OF HON. FRED RICHMOND

APRIL 7, 1976.

A practical remedy which restores producer confidence in meat packing and processing operations is important to the livestock industry and to American consumers. Producers need to be assured of prompt, reliable payment for their product, while consumers need a livestock marketing system which provides fresh products at the lowest possible cost.

I voted against H.R. 8410 as reported by the Committee because it contains one provision which I believe is contrary to this important goal.

Section 8 of the bill permits producers to retain beneficial title to their livestock until payment from the packer has cleared the bank. We know it may take 7 to 10 days for a check to clear. Meanwhile, the packer, without clear title to his livestock, cannot obtain necessary capital to finance new purchases. In effect, he is not allowed to own his inventory, unlike other businesses. In normal business practice, manufacturers purchase inventory with clear title to it. Using inventory as collateral, they are then able to obtain bank credit for normal business operations.

In the meat packing business, inventory turns over rapidly; carcasses are processed and move along the food chain in a day or two. Packers need this liquid inventory to obtain loans to buy more livestock.

Without clear title to their inventory, many smaller packers would be forced out of business. They have too little capital to finance their operation without bank loans. The entire livestock processing chain would become bogged down; there would be less competition and higher prices as small packers are forced to shut down. The industry itself admits that up to 300 independent packers may be threatened.

The purpose of packer-bonding legislation is to protect livestock producers by requiring bonding of all packers. Thus, producers have some assurance that packers are in a stable and solvent financial condition.

Obviously, no bonding company would risk its money on a financially unstable packer.

The requirement that producers retain beneficial title to their livestock for an unreasonable period after they have been paid is an onerous and unnecessary provision. If a producer has any doubts about whether his packer has sufficient funds to cover his check, he can request an immediate wire transfer of funds from the packer's bank.

(37)

Immediate transfer of clear title upon receipt of payment is standard business procedure. Amply protected by the bonding provisions of this bill, producers require no extraordinary exceptions. Indeed, if H.R. 8410 had been in effect last year without Section 8, American Beef Packers would never have gone bankrupt. Simple bonding would have saved producers millions of hard-earned dollars.

I will therefore be offering an amendment on the House floor to strike Section 8 and allow packers to maintain sufficient inventory to finance additional purchases. With this protection for consumers and independent packers, and bonding protection for producers, this legislation is a positive step forward in solving a difficult agricultural problem.

FRED RICHMOND.

○