# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **In re Pork Antitrust Litigation** | |
| This Document Relates To: | Case No. 18-cv-01776-JRT-HB |
| Consumer Indirect Purchaser Plaintiff Actions | **[FILED UNDER SEAL]** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DR. HAL SINGER

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

SUMMARY OF ARGUMENT ............................................................................. 2

LEGAL STANDARD ........................................................................................... 7

ARGUMENT ......................................................................................................... 7

I.    DR. SINGER'S FUNDAMENTAL FACTUAL ERRORS
REQUIRE EXCLUDING HIS OPINIONS................................................. 7

    A.    Dr. Singer's False Assumption of Vertical Integration Fatally
Undermines His Analysis................................................. 8

    B.    Dr. Singer's Assumption that Agri Stats Performed the "Work
of a Cartel" Is Unsupported. ........................................... 12

II.    DR. SINGER'S MODEL FAILS TO SEPARATE LAWFUL FROM
UNLAWFUL CONDUCT. ....................................................................... 15

    A.    Liquidation. ..................................................................... 19

    B.    Harvest Reduction........................................................... 21

    D.    Exports............................................................................. 24

III.    DR. SINGER'S ECONOMETRIC MODEL IS UNRELIABLE.............. 27

    A.    Dr. Singer's Overcharge Model Relies on an Inaccurate
Benchmark Period............................................................ 28

    B.    Dr. Singer's Model is Flawed Because the Average
"Overcharge" Disappears from 2014-2018. ................... 29

CONCLUSION ...................................................................................................... 31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Apotex, Inc. v. Cephalon, Inc.*,
  321 F.R.D. 220 (E.D. Pa. 2017) ............................................................................ 16, 17

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ...................................................................................... 16

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) ................................................................................ 15, 16

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ...................................................................................................... 7

*Cole v. Homier Distrib. Co.*,
  599 F.3d 856 (8th Cir. 2010) ........................................................................................ 7

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ........................................................................... 7, 15, 16

*Conrad v. Jimmy John's Franchise, LLC*,
  No. 18-CV-00133-NJR, 2021 WL 718320 (S.D. Ill. Feb. 24, 2021) ......................... 16

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) ................................................................................... 29

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................................. passim

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
  442 F. Supp. 3d 1329 (D. Or. 2020) ........................................................................... 28

*In re Capacitors Antitrust Litig.*,
  No. 14-CV-03264-JD, 2020 WL 870927 (N.D. Cal. Feb. 21, 2020) ......................... 16

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ........................................................................ 16

*In re Macbook Keyboard Litig.*,
  2021 WL 1250378 (N.D. Cal. Apr. 5, 2021) ............................................................... 16

*In re Pork Antitrust Litig.*,
  495 F. Supp. 3d 753 (D. Minn. 2020) ........................................................................... 3

*In re Pork Antitrust Litig.*,
   No. CV 18-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ..................................... 3

*In re Wholesale Grocery Prod. Antitrust Litig.*,
   946 F.3d 995 (8th Cir. 2019) ....................................................................... 28

*In re Wholesale Grocery Prod. Antitrust Litig.*,
   No. 09-MD-2090, 2018 WL 3862773 (D. Minn. Aug. 14, 2018) .................. 15, 16, 28

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
   644 F.3d 604 (8th Cir. 2011) ....................................................................... 27

*Marmo v. Tyson Fresh Meats, Inc.*,
   457 F.3d 748 (8th Cir. 2006) ......................................................................... 7

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) ..................................................................... 17

**RULES**

Fedral Rule of Evidence 702 ........................................................................... 7, 27

# INTRODUCTION

In support of class certification, the Consumer Indirect Purchaser Plaintiffs ("Consumer IPPs") offer the testimony of economist Dr. Hal Singer to show class-wide antitrust impact and damages. Consumer IPPs point to Dr. Singer's report as evidence that the alleged conspiracy raised the price of every single retail purchase of class products, during the more-than-four-year class period from June 28, 2014 to June 30, 2018 ("Class Period"), across 22 states and the District of Columbia. According to Consumer IPPs, Dr. Singer has built a single econometric model that shows artificially high prices for everything from bacon bought in a local Maine market in 2014, to frozen pork ribs bought at a Costco in Maui in 2018, to anything in between. Dr. Singer's testimony has been excluded under *Daubert* by four previous courts. In this case too, his analysis fails the *Daubert* test and must be excluded.

Dr. Singer's model is based upon assumptions about the structure of the pork market that are unsupported by any evidence and are entirely false. Most importantly, Dr. Singer assumes that Defendants are "vertically integrated"—that they both raise pigs and process them into pork—when that is almost uniformly incorrect. His assumptions are also premised on fundamental misunderstandings about how Agri Stats operates and the Defendants' participation in Agri Stats. Dr. Singer is modeling an imaginary world that departs dramatically from reality, and as a result his analysis is incapable of yielding reliable results.

Dr. Singer's analysis also runs contrary to blackletter Eighth Circuit law, because it fails to distinguish lawful from unlawful activity. His model does nothing to directly

1

measure or analyze the effects of the alleged anticompetitive activity; indeed, he does not even know precisely what the alleged anticompetitive activity was. Instead, he simply controls for a handful of factors and then simply assumes that *everything else* that affected pork prices during the relevant time period must have been attributable to an illegal conspiracy, so his model sweeps in lawful conduct along with the allegedly unlawful conduct. Eighth Circuit law requires much more than that.

Finally, Dr. Singer's methodology is unreliable because it is riddled with errors and improper comparisons. He concludes that prices during the "conduct period" (January 1, 2009 to June 30, 2018) ("Alleged Conspiracy Period") were artificially high by comparing them to a "benchmark period" in 2008, but he does nothing to test whether that benchmark period is representative or appropriate. Moreover, Dr. Singer has not actually measured the alleged conspiracy price impact during the Class Period; he has merely measured the *average* price impact over the Alleged Conspiracy Period that is nearly twice as long as the Class Period. A closer look at his data shows that essentially all the price increases he calculates occurred *before* the Class Period and are not even an issue in this lawsuit.

Because Dr. Singer's analysis is unreliable and unhelpful, it must be excluded.

## SUMMARY OF ARGUMENT

Dr. Singer begins his analysis by assuming liability is established and that an antitrust conspiracy exists. Ex. A, Expert Report of Dr. Hal Singer ("Singer Report") ¶ 6. From this flawed premise flows conclusions predicated on Plaintiffs' allegations about the structure and economic realities of the pork industry—allegations that have never been true, and that the record now proves are false. When these errors are accounted for, Dr.

Singer's theories and economic model collapse. Dr. Singer's opinions and testimony must be excluded for three reasons.

First, the Court will recall that Consumer IPPs' complaint alleged that Defendants' vertical control over hog production facilitated a conspiracy to restrict the production of hogs—and that Consumer IPPs doubled down on that theory to survive a second motion to dismiss.[1] Dr. Singer's analysis follows that theory by assuming Defendants own and raise hogs before harvesting and processing them into pork. But the record establishes that the pork industry is characterized by *a lack* of vertical integration. Defendants are pork *processors* who, for the most part, buy live pigs from independent farmers. If the *Daubert* standard means anything, an economist cannot start his analysis by assuming into existence an industry that does not exist in reality.

Dr. Singer also uncritically accepts Plaintiffs' allegations about the operations of Agri Stats. Based on those allegations, Dr. Singer claims that Agri Stats did the work of a "cartel." But Plaintiffs' allegations are demonstrably wrong. The realities of how Agri Stats operated (for instance, it never reported quantities of pork sold), and how Defendants participated in it (many of them never received supposedly-crucial reports), make Dr. Singer's conclusions impossible. Dr. Singer states that "it is important to establish that

---

[1] *Compare In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/LIB), 2019 WL 3752497, at *7 (D. Minn. Aug. 8, 2019) (dismissing Plaintiffs' first complaint after finding the allegations to be "spare and conclusory") *with In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 770-72 (D. Minn. 2020) (denying second motion to dismiss because Plaintiffs adequately alleged that defendants reduced the pork supply via production and increasing exports).

Defendants could deanonymize" Agri Stats reports (Singer Report ¶ 97), because it is central to his opinion that Agri Stats served as a monitoring mechanism for a cartel. Singer Report ¶ 91. Yet he cannot point to any communication by Agri Stats facilitating such deanonymization, any decoding mechanism communicated among the supposed cartel, or any effort to deanonymize reports by multiple Defendants. Ex. B, Transcript of the Deposition of Dr. Hal Singer ("Singer Tr.") 309:18-310:6, 310:7-21, 311:12-312:1. Plaintiffs' theory that Defendants conspired to restrict hog supply was never capable of surviving real-world proof, and Dr. Singer's model is the first casualty.

Second, Dr. Singer violates a cardinal rule of this Court and the Eighth Circuit: expert analysis claiming to quantify antitrust misconduct must distinguish lawful from unlawful conduct. Rather than doing so, Dr. Singer accuses Defendants of participating in a cartel through a grab-bag of conduct while freely admitting that any or all of that conduct may have been economically rational and lawful. Not only does he fail to identify a single export, plant closure, or sow reduction that was illegitimate, unlawful, or even suspect, but he admits he has no idea how much of this conduct would have occurred absent the purported conspiracy.

Since Dr. Singer does not know what the precise anticompetitive conduct was, and cannot measure its effects directly, the reliability of his before-and-after model depends on his ability to identify and accurately control for *all other factors* that might have affected the supply of hogs and demand for pork between 2008-2009 and 2009-2018. Only by identifying and excluding the influence of all non-conspiratorial factors could Dr. Singer isolate the supposed effects of the unidentified conspiratorial conduct. Doing that would

4

have required Dr. Singer to control for all variables in a complex industry marked by the vagaries of biology, shifting consumer demands, and varying economic forces, which he admittedly does not. Singer Tr. 23:20-28:16; 162:4-163:6; 203:12-226:18; 291:5-295:8.

Third, Dr. Singer's analysis is riddled with internal flaws that make it unreliable and incapable of assisting the trier of fact. Dr. Singer used 2004-2008 as a "benchmark" period for measuring supposedly "normal," conspiracy-free pork prices, but he did nothing to test or assess whether this was an appropriate benchmark period. The facts show that it was not: 2008 was an historic outlier year, reflecting the end of the hog cycle, increased hog supply due to the circovirus vaccine, and other critical supply and demand factors that differ from "normal" years. The inclusion of 2008 as a "benchmark" badly biases Dr. Singer's overcharge estimate. Notwithstanding the absence of any rationale for the selection of 2004-2008 as a control period (other than the data that happened to be available), Dr. Singer's opinion that Defendants are "conservatively" responsible for $1.37 billion of supposed damages to the Consumer Class hinges entirely on the validity of comparing the 2004-2008 benchmark to the Alleged Conspiracy Period.

Moreover, Dr. Singer selects the start of the Alleged Conspiracy Period solely based on claimed facts about Agri Stats. Singer Report ¶¶ 33-34, 95; Singer Tr. 69:2-8. His model does not consider when during that period the instances of alleged anticompetitive conduct—such as herd reductions, export increases, or plant slowdowns—actually occurred. Indeed, even Plaintiffs' evidence on that timing shows no sustained or continuous course of conduct, but a mere hodgepodge of disparate actions at different times: ████

███████████████████████████[2], ████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████. *See,*
*e.g.*, Singer Report ¶¶ 212, 213, 217-19, 221. On top of that, Dr. Singer conceded that
industry capacity dramatically expanded between 2014 and 2018, as the industry (including
Defendants) added multiple new packing plants. Singer Tr. 252:11-19, 245:4-8, 256:9-19,
257:4-11; Haider Rep. ¶ 83-85, Ex. 9, Ex. 10; Ex. C Steven Meyer, *Production-Packer
Match Point*, National Hog Farmer (May 2006). Despite his and Consumer IPPs' sweeping
claims of a nearly decade-long cartel agreement, Dr. Singer cannot explain exactly what
the cartel agreed to do—he can only offer vague assertions that it existed to reduce "pork
supply." Singer Tr. 35:30-44:11; 52:6-59:21.

Nor does Dr. Singer actually measure any overcharge rate for the four-year Class
Period—instead, he estimates a single overcharge for the entire Alleged Conspiracy Period
of nine-and-a-half years and applies that without allowing any variation in the alleged
conduct or its alleged effects. When Dr. Singer's model is altered to analyze just the Class
Period, and the effects of the conduct is allowed to differ over time, the overcharge
disappears almost completely.

For these reasons, this Court—like four courts before it—should exclude Dr.
Singer's opinions and testimony.

---

[2] Counsel for Consumer IPPs have since retracted mistaken claims concerning alleged sow
liquidations by Seaboard. Ex. D, 2022-05-31 Letter from Plaintiffs' Counsel re Seaboard
Correction.

## LEGAL STANDARD

Defendants have stated the *Daubert* standard in their briefs regarding the pork plaintiffs' other experts (Dr. Mangum and Dr. Williams) ("Class Experts"). In the interest of economy and readability, we will not repeat it here. Defendants incorporate by reference those briefs' statement of the legal standard. See, e.g., Dfts.' Mem. to Exclude Dr. Russell Mangum, ECF No. 1450, at 6-7.

## ARGUMENT

## I.   DR. SINGER'S FUNDAMENTAL FACTUAL ERRORS REQUIRE EXCLUDING HIS OPINIONS.

Dr. Singer's opinion fails to meet a threshold requirement for admissibility under Rule 702: it does not rest on sufficient facts, consistent with reality. *See, e.g.*, *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865 (8th Cir. 2010) (holding expert opinion properly excluded where testimony was "factually flawed, rendering it of little to no assistance to the jury"). Dr. Singer's opinion is detached from reality and will not assist the trier of fact in determining or understanding any issue in this case, so it must be excluded. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006) (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056–57 (8th Cir. 2000)) ("Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."). Each of Dr. Singer's assumptions alone require exclusion. *Concord Boat*, 207 F.3d at 1057 ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.") (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

**A.    Dr. Singer's False Assumption of Vertical Integration Fatally Undermines His Analysis.**

Dr. Singer's opinions are premised on the faulty assumption that Defendants are vertically integrated—that, in addition to processing pigs into pork, Defendants own and raise the animals themselves. This fundamental misunderstanding renders his theory that "Defendants collectively wield market power over pork, which would allow them to profitably inflate prices over the competitive level" unreliable and unhelpful. Singer Report ¶ 67.

Dr. Singer recognizes that vertical integration involves "a single owner" of both hog processing and hog production operations.[3] Singer Report ¶ 77; Decl. of Lindsay Strang Aberg Ex. 2 ("Mintert Report") ¶ 39, ECF No. 1442-2. Dr. Singer theorizes that Defendants maintain their dominant share of hog-processing capacity by leveraging their vertical integration to create high barriers to entry, preventing outside competition.[4] Singer Report § II(A)(5). But the evidence shows the opposite: there is limited vertical integration in Defendants' operations. For example, ███████████████████████████████

███████████████████████████████████████████████████████████

---

[3] *See* J. MacDonald & P. Korb, *Agricultural Contracting Update: Contracts in 2008*, ERS, USDA pp. 16-17, https://www.ers.usda.gov/webdocs/publications/44524/5874_eib72.pdf (contrasting the pork industry with the broilers industry, which "has a high degree of vertical integration).

[4] In support of his claim, Dr. Singer cites to general comments by Defendants that vertical integration can make it more difficult for competition to enter the supply chain. Singer Report ¶ 77. However, as his quote makes clear, vertically integrated firms in this industry are the exception, not the rule. *Id.* (citing Ex. E, ██████████████████████████████ ████████████████████████████████████████████ (internal citations omitted) (emphasis added).



▮▮▮▮▮▮▮▮▮▮. Decl. of Lindsay Strang Aberg Ex. 1 ("Haider Report") ¶ 60, ECF No. 1442-1. ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*

Dr. Singer conceded he could have ascertained through publicly available USDA reports how many hogs were produced by independent producers, as opposed to vertically integrated packers, but did not do so. Singer Tr. 117:2-12; 120:5-19. In fact, Dr. Singer admitted that USDA reports show that 70% of hogs slaughtered and reported to the USDA were raised by independent producers. Singer Tr. 125:9-126:9. The reality of the industry is that herd size is controlled by the hog-production decisions of independent growers: non-Defendant hog producers. If Defendants do not control the sow supply, Dr. Singer's theory that Defendants reduced sow herds through liquidation to reduce hog output and raise prices makes no economic sense.

This misunderstanding is fatal to Dr. Singer's model. Dr. Singer builds on Plaintiffs' allegation that Defendants conspired to reduce the number of hogs raised in the United States—but because Defendants mostly *buy* hogs rather than raise them, Dr. Singer assumes the existence of a cartel that conspires to increase its own costs. Dr. Singer claims that "if there were a conspiracy, that the objective would be to artificially inflate the prices of processed pigs that [Defendants] sold." Singer Tr. 130:14-22. The fundamental problem for Dr. Singer is that Defendants *buy* pigs and *sell* finished pork products.

---

[5] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮. Haider Report ¶ 60.

Dr. Singer's false assumption about vertical integration drives key errors in his analysis. One key determinant of pork prices is the cost to produce the pork. Because Dr. Singer assumes that Defendants raised the hogs themselves, he tries to control for the cost of production by including a variable in his model for hog cost data—what he describes as "the average cost of producing a 270-pound finished pig." Singer Report ¶¶ 15, 153. But, because Dr. Singer falsely assumes vertical integration, he misses the fact that Defendants did not pay those costs—rather, they simply bought the hogs from farmers. Singer Tr. 85:1-16. The USDA mandates that purchase prices for finished hogs be reported, so this data is publicly available. Ex. F, Singer Dep. Ex. 6, Pork Checkoff, *Quick Facts*, p. 81; Singer Tr. 85:24–87:16; Singer Report ¶ 153. Moreover, Dr. Singer had data from Defendants showing their actual purchase prices for market hogs. Singer Tr. 84:20-85:16. Dr. Singer could and should have used the cost of *buying* a hog in his model. But because he wrongfully assumed vertical integration, he didn't.

Because Dr. Singer is oblivious to the prevalence of independent hog farmers, his model also ignores the fact that the supply of hogs changes along with variation in the *profits* that those farmers earn on each hog they raise.[6] *See* Singer Tr. 90:24–91:12 (admitting the "[profitability of hog production] was not explicitly controlled for in my econometric model"). In order to control for decisions by independent producers, it is

---

[6] In fact, all Class Experts' models fail to control for the impact of low hog prices on hog supply. *See, e.g.*, Williams Tr. 159:14–160:25 (testifying that his report does not offer an opinion on hog producer margins, hog producer profitability, or the effect of corn prices on hog prices); Singer Tr. 90:24–91:2 (admitting he did not control for hog producer profitability); Mangum Tr. 288:20–22 (testifying regarding government reports reflecting $2.5 billion in producer losses that, "I don't know what this means.").

necessary to know their profits (or if business is bad, losses) on the sale of hogs. Dr. Singer's model lacks this control and fails to account for economically reasonable upstream reductions by producers due to market factors.

Dr. Singer confirmed this, admitting that he has "not offered an opinion on the profitability," nor on whether there were any time periods during the Alleged Conspiracy Period in which it was economically sensible for independent producers to cut back on hog production. Singer Tr. 95:4–96:21. Dr. Singer speculated that Defendants could have conspired "regardless of what is going on upstream" (Singer Tr. 133:7-15), but that speculation cannot fix the flaw in the analysis he actually performed: Dr. Singer falsely attributed "upstream" conduct—hog production—to Defendants by pretending they are vertically integrated.

In the real world, 2008 and 2009 were catastrophic for hog producers. Fears about swine flu decreased consumers' demand for pork. Mintert Report ¶ 125 ("The USDA projected that H1N1 fears would lead to lower hog prices."). At the same time, farmers had a glut of hogs because they had boosted inventories in response to record profits in previous years, and because the introduction of the circovirus vaccine meant that an unexpectedly high percentage of those hogs survived to a harvestable age. Mintert Report ¶ 124, 132. On top of that, the cost of raising hogs skyrocketed, as corn costs soared. Mintert Report ¶ 107-110. This resulted in hog farmers losing money on every animal they raised and sold, as low prices did not cover their increasing costs. Farmers responded to those circumstances by raising fewer hogs. Not only was this conduct not an antitrust violation, it was not attributable to Defendants at all. Dr. Singer's failure to control for something as basic as

11

the profitability of hog production renders him incapable of explaining whether any reduction in hog supply was irrational, illegitimate, or unlawful.

In sum, Dr. Singer's false presumption that Defendants are vertically integrated, based solely on Plaintiffs' allegations and roundly contradicted by the record, renders his analysis unreliable and unhelpful to the factfinder. His opinions should be excluded.

### B. Dr. Singer's Assumption that Agri Stats Performed the "Work of a Cartel" Is Unsupported.

Dr. Singer's opinion that Defendants used "Agri Stats data to effectuate an agreement to stabilize the price of pork" is similarly founded on factual assumptions that are contradicted by the record. Singer Report ¶ 2. There is a wide gulf between Dr. Singer's opinion that Agri Stats performed "the work of a cartel" and the evidence in the record.

First, there is zero record support for Dr. Singer's claim that Agri Stats was not a legitimate benchmarking service, but instead was the monitoring mechanism of a cartel. Singer Report ¶¶ 104-128; Singer Tr. 300:3-303:6. Remarkably, although the cartel purportedly operated for more than nine years, there is not a single document in which Agri Stats refers to any such role, which Dr. Singer admits. Singer Tr. 305:2-13. Nor is there a single document in which any Defendant referenced another Defendant violating the supposed agreement, or any document referencing or showing enforcement of the cartel agreement against a Defendant. In other words, Dr. Singer assumed the narrative in Plaintiffs' complaint to be true, and he invented a role for Agri Stats to fit that narrative— but that invention is not supported by any actual facts.

Second, Defendants' own actions were inconsistent with Dr. Singer's assumption that Agri Stats was the hub of the supposed conspiracy. Dr. Singer recognizes that, if Agri Stats had been the monitoring mechanism for a cartel, it would have made no sense for participants to do anything other than consistently subscribe to all of its reports. Indeed, he characterizes Agri Stats sales reports as an "inducement" to participate in the purported cartel. Singer Report ¶ 93. But Defendants did not act that way. Hormel Foods cancelled its subscription to the processing report in 2010—at the very outset of the purported conspiracy—and later subscribed only from late 2014-2017. Singer Report, App. 3, tbl. 1; It *never* subscribed to the sales report. Ex. G, Deposition of Paul Peil 231:20-23; Ex. H, Deposition of Jeffrey Nuytten 203:14-17, 204:15, 206:21-25; Ex. I, AGSTAT-0003431573, Peil Dep. Ex. 1030 at 2. ████████████████████████ ████████████████████████. Singer Report, App. 1. The actual history of Defendants' behavior disproves Dr. Singer's assertion that "Defendant Pork Processors used Agri Stats as a means to communicate competitively sensitive information concerning firm-specific, plant level pricing and output among themselves." Singer Report ¶ 95.

Third, even when some Defendants subscribed to Agri Stats, the record does not support an inference that they used it as a monitoring mechanism for a cartel. In order to do that, all participants would have had to be able to consistently use the reports to identify and penalize participants cheating on the cartel agreement. Singer Report ¶ 96. But the record shows nothing like that—████████████████████████ ████████████████████████. *See, e.g.*, Singer Report ¶¶ 101-102.

13

Dr. Singer alleges that "[t]he evidence shows that Producer Defendants used [the] participant list, in conjunction with their industry experience of each plant's individual characteristics, to deanonymize the Agri Stats Reports." Singer Report ¶ 101. But he offers almost no support for this claim: he merely ███████████████████████████ ███████████████████████████████████████████████████ ██████████████████████. Singer Report at Figure 16. Dr. Singer also references similar internal documents involving Smithfield and Tyson. Singer Report at Figure 17, Figure 18, ¶ 102. But none of the documents reference or reflect any collective effort, methodology, or instructions for deanonymizing. Even these scraps of evidence relate to only a minority of the Defendants—Dr. Singer has no evidence of deanonymization efforts by Defendants Seaboard, Clemens, Cargill, JBS, or Hormel. When asked whether he made any effort to determine whether all defendants attempted to deanonymize Agri Stats Reports, Dr. Singer admitted:

> I put forward the evidence I thought was most consistent with the claim. Whether or not I was able to show it for all defendants is another question. I don't know if I did. But that was certainly—you know, we sought to get as much data on the question as we could.

Singer Tr. 311:12-312:1. With no evidence Defendants did (or even could) deanonymize the Agri Stats Reports, Dr. Singer presumes that all were engaged in this conduct. He has no other option, for if he cannot establish that all Defendants were deanonymizing the Agri Stats Reports in concert, then he has established none of the factors that he says indicate a

cartel,[7] and Dr. Singer's analysis fails. His theory is even more unsound when coupled with the fact that not all Defendants even *contributed* to the Sales Reports.

Because Dr. Singer's opinions dramatically depart from the facts in the record his opinions should be excluded.

## II. DR. SINGER'S MODEL FAILS TO SEPARATE LAWFUL FROM UNLAWFUL CONDUCT.

Even if Dr. Singer's econometric model was based upon adequate facts, it still must be excluded as a matter of law because it fails to distinguish lawful from unlawful conduct.

An antitrust expert's opinion must be excluded if it fails to provide a basis to "separate lawful from unlawful conduct." *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018) (excluding expert opinion that failed to "incorporate all aspects of the economic reality of the [relevant] market and . . . separate lawful from unlawful conduct") (citation omitted), *aff'd*, 946 F.3d 995 (8th Cir. 2019) (affirming exclusion of expert opinion that failed to account for nonconspiratorial reasons for price changes); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (excluding opinion where model did not account for market events that were not anticompetitive). That is because "[s]tatistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." *Blue Cross & Blue Shield United of Wis. v. Marshfield*

---

[7] Dr. Singer argues these factors are (1) monitoring output or prices; (2) developing organizations to effectuate cartel policies; and (3) developing inducements to support collusion. Singer Report ¶¶ 89-94.

*Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (citations omitted); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 487 (S.D.N.Y. 2018) (holding model which did not control for "economic events and business developments" did not withstand scrutiny at class certification). Dr. Singer's opinion and testimony flunks this legal standard.

In order to separate lawful from unlawful conduct, an expert in an antitrust overcharge case "is required to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive." *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005) (internal quotation omitted). While using a benchmark can satisfy this requirement, the methodology must correct for "any nonconspiratorial factors that might have caused the prices that are being compared to be different from each other." *Blue Cross*, 152 F.3d at 592; *see also Concord Boat*, 207 F.3d at 1057. The expert cannot attribute conspiratorial price increases, in whole or in part, to lawful conduct, and any failure to comply with this requirement is an independent basis for exclusion. *In re Wholesale Grocery*, 2018 WL 3862773, at *7.

Dr. Singer's opinions have previously been excluded for precisely this failing.[8] In *Apotex*, the court excluded two of Dr. Singer's damages models which "assume[d] a but-

---

[8] *See Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 235 (E.D. Pa. 2017) ("As antitrust lost profits damages scenarios must presume the existence of rational economic behavior in the hypothetical free market, this lack of factual basis renders [Dr. Singer's] Calculation 3 inadmissible."); *Conrad v. Jimmy John's Franchise, LLC*, No. 18-CV-00133-NJR, 2021 WL 718320, at *18 (S.D. Ill. Feb. 24, 2021), *reconsideration denied*, No. 18-CV-00133-NJR, 2021 WL 1736887 (S.D. Ill. May 3, 2021); *In re Capacitors Antitrust Litig.*, No. 14-CV-03264-JD, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020); *In re Macbook Keyboard*

(footnote continued)

for world for which there is no factual support, which require[d] assuming away rational economic behavior by competitors, and [which] measure[d] damages in excess of [Plaintiff's] lost profits . . . ." 321 F.R.D. at 237. Dr. Singer's models failed to account for lawful competitive behavior occurring simultaneously with the alleged anticompetitive conduct, and "[t]his the law does not allow." *Id.* at 236 (citing *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("If a plaintiff has suffered financial loss from the lawful activities of a competitor, then no damages may be recovered under the antitrust laws.")).

Dr. Singer's damages model here suffers from the same flaws. Singer Tr. 21:1-15. Dr. Singer purports to measure a price increase but fails to determine whether the increase really resulted from the alleged anticompetitive conduct—or whether the alleged anticompetitive conduct really occurred at all. Parroting Consumer IPPs' allegations, Dr. Singer identifies three "levers" that Defendants allegedly used to reduce the domestic pork supply: reduction of the sow herd (referred to as "liquidation"), reduction of slaughter operations ("harvest reduction"), and export increases. Singer Report ¶ 208. Although these levers are purportedly critical to effectuating the alleged conspiracy, Dr. Singer did not measure the effects of any of these levers in his econometric model. *See, e.g.*, Singer Tr. 56:15-18 ("I don't see liquidation, for example, or exporting to be a separate and standalone

---

*Litig.*, 2021 WL 1250378, at *4 (N.D. Cal. Apr. 5, 2021) ("Because Dr. Singer's regression analysis relies on the untenable assumptions that the keyboard defect inevitably . . . leads to a complete loss of mobility, the Court does not find this theory relevant to the ability to calculate class-wide damages.").

restraint that I need to remove in the but-for world."). No term or variable in his model measures or tracks the size of the sow herd, the number of sows liquidated, the number or dollar value of pork exports, or the rate of slaughter operations or any change in that rate. Singer Tr. 64:13-65:5 ("[The model] does not provide a decomposition of that output effect into the three . . . mechanisms that were used by defendants to reduce domestic supply."). More seriously, Dr. Singer knows that there are legitimate reasons to export pork (Singer Report ¶ 43), reduce sow herds (Singer Tr. 243:10-11, 243:23-244:5), or reduce harvest (Singer Tr. 262:23-263:14), yet he cannot explain or quantify whether any Defendant took any specific action for legitimate, competitive reasons. Instead, he regards all purported levers as unlawful, anticompetitive conduct.

During his deposition, Dr. Singer admitted all three actions—sow liquidations, exports, and temporary processing slowdowns—would have existed and continued in the but-for world (absent the conspiracy). Despite this, Dr. Singer did not measure the amount (if any) by which the alleged conspiracy *increased* these liquidations or exports or processing slowdowns—let alone how any such increase affected the supply and price of domestic pork (if at all). For example, he admits that exports surely would have occurred even without the conspiracy, but he has no idea how many. Singer Tr. 41:21-42:4, 192:19-194:2. Likewise, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. Singer Tr. 236:14–237:20. As a result, Dr. Singer has no way to determine whether the price increase he calculated was the result of the alleged conspiracy or resulted from lawful activity. This is a clear violation of this Court's and the Eighth Circuit's requirements.

18

This concern is not theoretical: the record is full of examples of Defendants using the alleged "levers of conspiracy" in ways that were perfectly lawful. We describe those examples—and Dr. Singer's admissions about them—in the following subsections.

### A. Liquidation.

Dr. Singer claims that one lever Defendants used to reduce the domestic supply of pork was "liquidation of the sow herd," but admits that "there will be some liquidation in the but-for world," and there "could be good justification for a particular liquidation." Singer Tr. 60:17-19, 242:23-243:11. Yet Dr. Singer did nothing to isolate or distinguish the alleged unlawful liquidation from the lawful liquidation that would have existed absent the alleged conspiracy. Singer Tr. 64:16-65:5. There is nothing inherently illegal about liquidation, especially against the backdrop of circumstances affecting the pork industry in 2008 and 2009. But Dr. Singer's model assumes *all* liquidation is unlawful and anticompetitive; it does nothing to control for or isolate lawful conduct.

This failure is especially egregious because the record reveals good reasons for liquidations during the period Dr. Singer was testing. As Dr. Singer acknowledges, 2008 and 2009 "were really bad" and "extremely unprofitable for the [pork] industry." Singer Report ¶ 210 (citing Dep. of Daniel Groff at 341:2-4, 341:14-16). In fact, 2008 and 2009 were historic years in the pork industry due to increased pig supply (as a result of the circovirus vaccine increasing survival rates) and decreased demand (due to fears of Swine

Flu and the Great Recession),[9] together with historically high feed costs, rendering pig rearing wildly unprofitable. This meant that pig farmers—mostly independent producers, but also including those few Defendants that actually owned some pigs—faced losses totaling nearly $6 billion during 2008 and 2009. Ex. F, Quick Facts, pp. 45, 81. Since the price of hogs was not enough to cover the cost of feeding and raising them, some producers made rational, justified, and independent decisions to liquidate parts of their herds. Considered in their historical context, there is absolutely nothing suspect about those decisions. Dr. Singer acknowledges that a reduction in the sow herd and hog supply would be reasonable when faced with massive losses. Singer Tr. 160:20-161:6. Economically rational and lawful activity cannot be treated as unlawful. *See* Singer Tr. 197:1-6 (Q. You would agree that it's important to take care that actions consistent with rational self interest are not treated as evidence of antitrust conspiracy, right? A. I think that's fair, yes.).

When faced with other examples of lawful reasons for liquidation, Dr. Singer agreed "there could be good justification for a particular liquidation." Singer Tr. 242:23-243:11. Specifically, genetic enhancements coincided with liquidations during the Alleged Conspiracy Period: in 2011 "producers were able to replace the older sows with younger and fresher genetics while receiving top value for the culls." Ex. J, *December Hog and Pork Update*, Informa Economics (Dec. 29, 2011), SBF0294998, at -5001. When asked

---

[9] Prepared Statement of Michael T. Scuse at 9-10, Deputy Under Secretary, USDA (Oct. 22, 2009), *available at* https://www.govinfo.gov/content/pkg/CHRG-111hhrg54577/html/CHRG-111hhrg 54577.htm.

whether this was a procompetitive reason for justification, Dr. Singer testified: "I don't think that motivation . . . has any kind of anticompetitive tint to it." Singer Tr. 244:3-5.

Dr. Singer admits that he did not distinguish between lawful and unlawful liquidations. Dr. Singer testified: "I'm not removing liquidation in the but-for world. . . . [t]here will be some liquidation in the but-for world. It's not a restraint to be eliminated in the but-for world when I s[et] about modeling the but-for world and the challenged conduct." Singer Tr. 60:17-23. Though Dr. Singer admits that some liquidations would occur in the but-for world, he fails to explain how liquidations increased or decreased as a result of the alleged conspiracy. As a result, his estimation of the alleged overcharge is fundamentally flawed: it includes price increases attributable to both allegedly conspiratorial conduct and increases that could result from lawful and economically rational sow liquidations. This failure places Dr. Singer's model well below the standards required by the law.

### B. Harvest Reduction.

Dr. Singer acknowledges that his but-for world would include some "harvest reduction" (reduction of slaughter capacity) but fails to distinguish lawful harvest reduction from the allegedly unlawful conduct. This is, again, well below the standard imposed by the law.

As a primary example, Dr. Singer cites to isolated incidents of slaughter facilities closing on Saturdays and to discussions amongst Defendants, concluding "[t]hese reductions affected market prices." Singer Report ¶¶ 213-15. But he has no way of determining whether these supposed slowdowns were actually anticompetitive, or whether

they really slowed down production. 

. Singer Tr. 262:4-12; 262:20-22. Moreover, although Dr. Singer recognized in theory that plant closures can be warranted for lawful reasons, his model has no way to distinguish between this and illegal conduct, nor to determine how often or for how long plants would have been shut down in the "but for" world:



Singer Tr. 263:16-264:4 (emphasis added). Despite that, Dr. Singer's model assumes that all plant slowdowns are anticompetitive, regardless of the stated reason. *See* Singer Tr. 262:23-263:3.

Moreover, Dr. Singer admits he did not account for the fact that several Defendants built *new processing facilities* and *expanded their production capability* during the relevant time period. *See* Singer Report ¶ 78 (

) (citing Ex. K, CLMNS-0000083482). When asked about the increase in the number of processing plants, Dr. Singer dismissed new processing plants as providing any information about the effect of the conduct on capacity for slaughter; yet did nothing to

22

model the purported difference in slaughter capacity in the but-for world. Singer Tr. 252:11-19; 256:9-257:11.

On top of this, Dr. Singer gives no clear explanation of how plant slowdowns could have reduced the supply of pork. Closing a pork plant for a day does not, by itself, reduce the number of slaughter hogs that exist in the world. A temporary closure would just mean that some hogs gain weight while waiting until the plant can catch up. In order to actually reduce the supply of pork, a plant closure would have to result in hogs being killed and then *not* processed into pork. Dr. Singer has not identified any instance where that happened. Singer Tr. 74:23-76:23; 80:4–81:18; 82:23-84:7.[10]

Dr. Singer attempts to show an overcharge as a result of an alleged conspiracy accomplished through "harvest reductions," but he cannot explain (a) the amount by which hog harvest decreased as a result of the alleged conspiracy, or (b) whether and to what extent any such reduction affected the supply or the price of pork. Rather, Dr. Singer assumes that harvest reduction occurred, that it was necessarily part of the alleged conspiracy, and that it was necessarily entirely unlawful. Dr. Singer assumes that lawful conduct is unlawful conduct and anticompetitive and this requires exclusion of his opinion and testimony.

---

[10] The "liquidations" Dr. Singer points to elsewhere in his report were of *sows*, which were kept for breeding purposes and were never going to be slaughtered for human consumption. *Compare* Singer Report ¶ 209 ("Liquidation reduces herd size . . . by taking *sows (female breeders)* out of production.") (emphasis added), *with* Singer Report ¶ 213 ("Harvest reduction occurs when Defendants . . . suspend operations so that fewer hogs would be slaughtered . . . .") (emphasis added).

### D. Exports.

Finally, Dr. Singer alleges that Defendants unlawfully increased pork exports, which (he says) correspondingly reduced the amount of meat for sale in the United States, thereby raising its price. However, Dr. Singer fails to distinguish between lawful and unlawful exports. He admits that pork exports would have occurred even without the alleged conspiracy, he completely ignores key political developments driving exports generally and pork exports specifically, and he does nothing to separate these admittedly lawful exports from exports allegedly due to anticompetitive conduct.

Dr. Singer admits that exporting pork can be "perfectly rational in a competitive environment." Singer Report ¶ 43. That is true where a processor can make more money by exporting products than by selling them domestically. Dr. Singer's report is rife with citations to documents showing Defendants' individual efforts to export products with weak domestic demand. *See, e.g.*, Singer Report ¶ 89 (citing ████████████████ ); Singer Report ¶ 45 (citing █████████████ ); Singer Report ¶ 113 (citing █████ █████████████████ ).

Despite this, Dr. Singer does nothing to determine how much of Defendants' exports were lawful, and so would have occurred even in his "but-for" world. Instead, he assumes that *all* pork exports are suspect. Dr. Singer ██████████████████████████ ████████████████████████████████████ ███████████████. *See, e.g.*, Singer Report ¶¶ 217-19. But none of these documents show any concerted or coordinated action amongst Defendants. Despite Dr. Singer's testimony that "there were, in fact, in the record episodes of coordination on the decision

of how much to export," his report cites only a single external communication in support of that claim. *See* Singer Tr. 196:5-19; Singer Report ¶ 219 (citing Ex. O,



Singer Report ¶ 219; Singer Tr. 196:6-25. Dr. Singer's understanding of the timing is far wide of the mark. The cited email is from 2018. At that time, Mr. Brenneman had not worked for Seaboard for *6 years*, and in fact was serving on the board of the Clemens Family Corporation.[11] Dr. Singer admitted that he could not think of any other instance of Defendant-to-Defendant communications about exports, other than this one he invented. Singer Tr. 196:13-19.

Nor does any other record evidence cited by Dr. Singer suggest that exports were unlawful. Although Dr. Singer points to "[i]ndustry analysts" who assessed exports as "the strength" of the hog and pork industry in 2011 (Singer Report ¶ 217 (citing Ex. J, SBF0294998 at -5007; Ex. P, TF-P-001573662)), he omits the analysts' explanation of perfectly lawful reasons why:



*See* ⬛⬛⬛⬛⬛⬛⬛. Those same analysts further observed:

---

[11] *See* Bio Details: Rod Brenneman, Chairman of the Board, *available at* https://investors.crossfirstbankshares.com/board-member/rod-brenneman.



*See* Ex. P at TF-P-001573662 at 663 ("US Pork Exports Explode"). Similarly, Dr. Singer

. Singer Report ¶ 219 (citing Ex. Q, ).

There are other obviously lawful drivers of pork exports. In fact, the U.S. Department of Agriculture has actively promoted the export of pork and encouraged the expansion of commercial export markets for American agricultural products.[12]

Dr. Singer agreed that exports have increased year-over-year for decades. Singer Tr. 41:12-19. He further opined that "exports would have been smaller in the but-for world. But if you drew them on a graph, they would be increasing over time, no doubt, even in the but-for world." Singer Tr. 41:21-42:4. But his model does nothing to determine *how many* exports were lawful and would have occurred even in a but-for world. Singer Tr. 42:16–43:20. Objective evidence demonstrates that various political and economic trends significantly increased the demand for export of U.S. pork products during the alleged

---

[12] *See, e.g.*, *USDA Helps Open and Expand Export Markets for U.S. Agriculture through 2014 Farm Bill Programs*, USDA (April 16, 2014), https://www.fas.usda.gov/newsroom/usda-helps-open-and-expand-export-markets-us-agriculture-through-2014-farm-bill-programs.

conspiracy period, and Dr. Singer wholly fails to account for Defendants' lawful commercial conduct in response to these changing trends.

Dr. Singer recognized that "as an economist," his objective is to "isolate the effect of the anticompetitive conduct when estimating damages, and I want to control for all the other factors that could be affecting prices . . . ." Singer Tr. 23:20-24:8. But he failed to do that. Instead, he conflates lawful, competitive conduct with allegedly unlawful, anticompetitive conduct. His benchmark analysis does not control for essential supply and demand variables and treats the "levers" of the alleged conspiracy as wholly unlawful, despite rational, procompetitive explanations. Although he repeatedly acknowledges that some of the conduct at issue "would have occurred in the but-for world," he does not even attempt to quantify the amount by which the alleged conspiracy altered the domestic pork supply. His impact-and-damages model therefore fails to distinguish lawful from unlawful conduct and must be excluded.

## III. DR. SINGER'S ECONOMETRIC MODEL IS UNRELIABLE.

Even if Dr. Singer's opinions were founded upon adequate facts, and even if they purported to distinguish lawful from unlawful activity, they must still be excluded because the methodology is riddled with errors that render it fundamentally unreliable. Fed. R. Evid. 702 (including reliability as a requirement for admissibly); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011) (assessing reliability is appropriate in context of class certification).

"Under *Daubert*, any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019). Dr. Singer's opinion is not reliable because when his missteps are reversed, the estimated overcharge disappears. Haider Report ¶ 112, Exhibit 14. Specifically, Dr. Singer falls short of a minimum showing of reliability for the following reasons: (a) he uses a faulty benchmark period to estimate the alleged overcharge, which disappears if the unusual characteristics of the outlier year (2008) is controlled for; (b) he bases his overcharge analysis on the entire Alleged Conspiracy Period (January 2009 to June 2018), determines an average overcharge for the entire period, and applies it uniformly to much shorter Class Period, from 2014 to 2018; and (c) he commits other glaring errors that create drastic swings in his results.

Each one of these errors independently renders Dr. Singer's opinion unreliable. Together, they add up to overwhelming flaws.

## A. Dr. Singer's Overcharge Model Relies on an Inaccurate Benchmark Period.

An antitrust regression model must be based upon reliable principles, including the use of a suitable benchmark. *See In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018) (excluding expert's opinion for failure to validate reliable benchmark), *aff'd*, 946 F.3d 995 (8th Cir. 2019). An invalid benchmark renders the regression unreliable. *See, e.g.*, *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 442 F. Supp. 3d 1329, 1360 (D. Or. 2020) ("A

'poor benchmark cannot supply sufficient evidence' in a 'but for" damage analysis.'" (citing *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1359 (Fed. Cir. 2001))). Dr. Singer himself recognizes the critical need for a reliable benchmark period: "The inclusion of data prior to January 2009 is essential for the regression analysis to have a 'clean' or benchmark period with which to compare prices during the Conduct Period." Singer Report ¶ 147.

But Dr. Singer used an inappropriate benchmark. He chose the year 2008 as his benchmark for "neutral" pork prices but did not assess whether that choice was appropriate. He used 2008 simply because data for that year was available, even though 2008 is a clear example of an outlier as a result of historic conditions affecting the hog industry during that time. *See supra* Section I.A, at 11; Section II.A at 19-20. Dr. Singer does nothing to correct for these significant and anomalous effects.

This flaw is not merely academic. When the effects of the outlier year are removed, by adding a control for the effects of the anomalous events of 2008, the benchmark price increases so much that Dr. Singer's (as well the other Class Experts') estimated overcharge disappears. Haider Report ¶¶ 126-128, 131, 134, Exhibit 25, Exhibit 28. As such, Dr. Singer's econometric model is fundamentally unreliable and should be excluded.

### B.     Dr. Singer's Model is Flawed Because the Average "Overcharge" Disappears from 2014-2018.

Dr. Singer's model is also unreliable because it estimates a single, average overcharge across the entire Alleged Conspiracy Period, and compares that average to prices during the benchmark period. This methodology is flawed because it covers the

Alleged Conspiracy Period rather than the much shorter Class Period, which is the only relevant time period for determining antitrust impact and damages.

Dr. Singer does nothing to estimate the overcharge for the Class Period. Rather, his overcharge estimation is based upon a comparison of average prices paid during the benchmark period, with average prices paid during the entire nine-and-a-half-year Alleged Conspiracy Period. Singer Report ¶ 146; Haider Report ¶ 108. His model uses only one variable to account for changes in the challenged conduct: for the "pre-conspiracy" period (the benchmark), he sets an indicator variable value to "zero," and for the entire Alleged Conspiracy Period, and he sets the same variable to "one." Singer Report ¶ 151. In other words, Dr. Singer simply assumes (without analysis) that there was no variation in the challenged conduct over the course of the alleged conspiracy—and, critically, no variation in the price effects of the alleged conspiracy over its entire course. The resulting conduct coefficient is a single uniform overcharge, averaged across the entire Alleged Conspiracy Period. This means that Dr. Singer's calculation reflects, in significant part, alleged overcharges that occurred from 2009 to 2014[13]—a time period not at issue in this case, and for which Plaintiffs could not recover. Even Dr. Singer and Consumer IPPs seem to claim that there was variation in the alleged conspiratorial conduct and the effects throughout the Alleged Conspiracy Period. Singer Report ¶¶ 211-212 (███████████████████

---

[13] It is not clear what the precise sales volume was for those years compared to the 2014–2018 Class Period, but we note that this irrelevant portion of the Alleged Conduct Period is actually longer in time than the proposed Class Period—5 years versus 4 years. Thus, it is quite possible, if not likely, that *most* of the sales that Dr. Singer used to calculate his average overcharge are ones that are *not* at issue in this case.

▇▇▇▇▇▇▇ ), 213-214 ( ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇ ); Singer Report § VIII(c)(1)(a)(iii) ( ▇▇▇▇▇▇▇▇▇▇▇ ).

This error is a critical one. Suppose that Dr. Singer had used his same 2008 benchmark year but compared it just to prices from the actual Class Period. What (if any) overcharge would he have calculated then? Dr. Singer does not say—but when Defendants' expert, Dr. Haider, performed that analysis, she found that it reduced the estimated overcharge almost to zero. Haider Report ¶ 134. Breaking down the analysis by particular cut yields similar results: the alleged overcharge for the actual Class Period is always either "negligible" or completely nonexistent. Haider Report ¶ 179, App. D. These changes to Dr. Singer's model fundamentally alter the outcome of his analysis: when his models are amended to account for the necessary variation, the estimated overcharge dwindles to almost nothing, and frequently disappears completely or even decreases to a negative value. And of course, with no overcharge to direct purchasers, there can be no passthrough to Consumer IPPs.

As such, Dr. Singer's model is unreliable and should be excluded as well below the standard required by *Daubert*.

## CONCLUSION

For the foregoing reasons, the Court should exclude the opinion and testimony of Dr. Hal Singer.

Dated: August 24, 2022

Respectfully submitted,

/s/ *Tiffany Rider Rohrbaugh*

Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com
lstrang@axinn.com
avissichelli@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

Craig M. Reiser (*pro hac vice*)
Kail Jethmalani (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
creiser@axinn.com
kjethmalani@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

**Counsel for Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc.**

/s/ *Craig. S. Coleman*

Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund (*pro hac vice*)
Stephanie A. Koltookian (*pro hac vice*)
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

Jonathan H. Todt (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

John S. Yi (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP

/s/ Christopher A. Smith
Aaron Chapin (#0386606)
Christopher A. Smith (*pro hac vice*)
Tessa K. Jacob (*pro hac vice*)
A. James Spung (*pro hac vice*)
Jason Husgen (*pro hac vice*)
Sarah L. Zimmerman (*pro hac vice filed*)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Ste 600
St. Louis, MO 63105
Telephone: (314) 480-1500
aaron.chapin@huschblackwell.com
chris.smith@huschblackwell.com
tessa.jacob@huschblackwell.com
james.spung@huschblackwell.com
jason.husgen@huschblackwell.com
sarah.zimmerman@huschblackwell.com
kate.ledden@huschblackwell.com
tanner.cook@huschblackwell.com

**Counsel for Triumph Foods, LLC**

/s/ Peter H. Walsh
Peter H. Walsh (#0388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
(612) 402-3000
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

**Counsel for Agri Stats, Inc.**

One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

**Counsel for Hormel Foods Corporation**

/s/ Mark L. Johnson
Mark L. Johnson (#0345520)
Davida S. McGhee (#0400175)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
dwilliams@greeneespel.com

Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com

**Counsel for Clemens Food Group, LLC and The Clemens Family Corporation**

/s/ William L. Greene
William L. Greene (#0198730)
Peter J. Schwingler (#0388909)
William D. Thomson (#0396743)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com

33

peter.schwingler@stinson.com
william.thomson@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

***Counsel for Seaboard Foods LLC and
Seaboard Corporation***