# EXHIBIT G

# Exhibit D

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

SYSCO CORPORATION,           )
                                 ) CASE NUMBER:
           PETITIONER,      )
                                 ) JUDGE:
          v.                 )
                                 ) MAGISTRATE JUDGE:
GLAZ LLC, POSEN INVESTMENTS LP, )
and KENOSHA INVESTMENTS LP,     )
                                 )
           RESPONDENTS.     )

## EXPERT REPORT OF PROFESSOR MAYA STEINITZ IN SUPPORT OF SYSCO CORPORATION'S PETITION TO VACATE ARBITRATION AWARD

———————————————————

Professor Maya Steinitz
476 Boyd Law Building
Melrose & Byington
Iowa City, IA 52242
maya-steinitz@uiowa.edu

## EXPERT REPORT OF PROFESSOR MAYA STEINITZ

_____

## I.  INTRODUCTION

### 1.  Qualifications

1.  I am the Charles E. Floete Distinguished Professor of Law at the University of Iowa College of Law where I teach or have taught civil procedure, complex litigation, international arbitration and corporations.  My research and practice are at the intersection of civil litigation, corporations and international law.  I have been retained by counsel for Petitioner Sysco Corporation ("Sysco" or "Petitioner") to opine on certain issues, set forth below, related to the TRO Award dated December 14, 2022 entered by the Tribunal[1] in the dispute concerning the litigation funding agreement in _Glaz LLC, Posen Investments LP, and Kenosha Investments LP v. Sysco Corporation_ (LCIA No. 225609).  My qualifications to undertake this assignment include the following:

2.  I have conducted substantial academic research into litigation finance.  Over the past decade I have published many articles on litigation finance in leading legal journals including _The Partnership Mystique: Law Firm Finance and Governance in the 21st Century_, 63 William & Mary L. Rev. 939 (2022); _Third-Party Litigation Funding of International Investment Arbitration_, Max Planck Encyclopedia of International Procedural Law (2021); _Follow the Money? A Proposal for the Regulation of Disclosure of Litigation Finance_, 53 U.C. Davis L. Rev. 1073 (2019); _Incorporating Legal Claims_, 90 Notre Dame L. Rev. 1155 (2015); _A Model Litigation Finance Contract_, 99 Iowa Law Review 711 (2014) (with A.C. Field); _How Much is that Lawsuit in the Window? Pricing Legal Claims_, 66 Vanderbilt L. Rev. 1889 (2013); _The Litigation Finance Contract_, 54 William & Mary L. Rev. 455 (2012); _Whose Claim is This Anyway? Third-Party Litigation Funding_, 95 Minnesota L. Rev. 1268 (2011); _Third Party Funding, Contingent Fees, Cost Allocation and Collection against Sovereigns_, Transnational Dispute Management (2011) (with J. Matthews).  My book, _Litigation Funding, Law Firm Finance, And the Future of the Legal Profession_ has been accepted for publication by Cambridge University Press and is forthcoming

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning given to them in Sysco's Petition to Vacate.

in 2024. My articles are among the most cited in the field. My scholarship on litigation finance often analyzes legal ethics in depth.

3.     In 2018, I served as a Visiting Professor of Law at Harvard Law School where I taught an advanced seminar on the subject of litigation finance. I have also, over the past decade, been invited to lecture on litigation finance by law schools including, among many others, Stanford, Columbia, New York University, University of Pennsylvania, Berkeley, Duke University, and UCLA; and by organizations such as the American Bar Association, the Western States Bar Association, the California Bar Association, and the New York City Bar Association. The Wall Street Journal, the New York Times, National Public Radio, NBC, 60 Minutes, and The American Lawyer, among other media, have sought out and published my views on the topic. I have also provided legislative and policy advice, testifying before the New York State Senate Committee on Consumer Protection, and advising the United States Senate's Judiciary Committee, the U.S. Government Accountability Office, the New York City Bar Association Task Force on Litigation Finance, and the International Council for Commercial Arbitration-Queen Mary Task Force on litigation finance in international arbitration.

4.     I have also handled more than thirty litigation finance matters as counsel, consultant, and expert witness. I am routinely retained by litigation finance firms, corporate clients seeking or negotiating litigation funding agreements, law firms, and institutional investors contemplating or investing in litigation finance.

5.     I regularly teach the basic civil procedure course as well as advanced complex litigation (class and mass action) at the University of Iowa College of Law and have also taught these courses at Boston University Law School and Harvard Law School. My book on mass tort litigation, *The Case for an International Court for Civil Justice* (2019), was published by Cambridge University Press. I have worked on several class and mass actions, including in the area of antitrust, as a litigator at Latham & Watkins LLP (2003-2009). And I have served as an expert witness opining on class action procedure.

6.     Prior to joining academia and starting my independent arbitration and consulting practice in 2009, I was a commercial litigator at Latham & Watkins LLP (2003-2009) and at Flemming, Zulack, and Williamson LLP in New York (2001-2002). I began my law career as a law clerk to the Hon. Esther Hayut, the current Chief Justice of the Supreme Court of Israel (1998). A copy of

my CV is attached as <u>Exhibit A</u>.   A list of all other cases in which, during the previous four years, I testified as an expert at trial or by deposition is attached as <u>Exhibit C</u>.

### 2. Assignment

7.     My instructions are to prepare a report analyzing whether judicial enforcement of the TRO Award would contravene clearly established relevant laws and public policy.

8.     For purposes of the factual background, I refer to the facts section of Sysco's Petition to Vacate, and do not set out a separate facts section herein.

9.     I am compensated at the rate of $1,400 per hour for my time.   My compensation is not contingent upon my findings, the testimony I may give, or the outcome of this litigation.

### 3. Materials Consulted

10.     In preparing this report, I reviewed the materials submitted by Burford and Sysco to the underlying arbitration proceedings and various documents exchanged between the parties in the underlying arbitration proceedings.  In addition, I reviewed secondary materials on litigation finance, champerty law, professional conduct rules, and business law.  (See <u>Exhibit B</u> attached hereto.)

## II.     SUMMARY

11.     I was asked to address whether the judicial enforcement of the TRO Award would contravene relevant laws and public policy.

12.     In my opinion, the TRO Award gives effect to an interpretation of the funding agreement that violates the prohibition on champerty and/or is unconscionable in several states with a connection to this matter—Illinois, New York and Minnesota—and also contravenes important federal and state policies encouraging the settlement of civil suits, and reserving control over settlement for the client.

13.     In connection with the underlying arbitration, I submitted two expert reports addressing the champerty and public policy-related implications of Burford's interpretation of the CPA, as well as the impact of litigation funding agreements on lawyers' duties of loyalty, zeal, lack of conflicts, confidentiality, and independent judgment.  I do not directly address all of these matters to the

4

same extent in this expert report, in which I have sought to focus on the points most directly relevant to the TRO Award.

## III.   THE TRO AWARD IS CONTRARY TO LAW AND PUBLIC POLICY

14.     Below, I analyze whether the TRO Award sanctions champerty, and violates various public policies that have influenced the prohibition on champerty.  From a historical perspective, I trace the origins and animating principles of the champerty doctrine and provide an overview of its lasting significance today.  I then proceed with an examination of the state and federal policy of encouraging the settlement of civil lawsuits, and the related public policy reserving control over settlement for the client, which is reflected in, among other places, professional conduct rules. Here, the TRO Award forces Sysco to decline settlements it wishes to accept and to continue litigating, which involves taking affirmative, adversarial action against its suppliers and business counterparties, all in the interest of the nonparty litigation funder.  As such, this award is contrary to the fundamental principles of public policy and the law of several states.[2]

### A. FUNDERS CONTROLLING (VETOING) SETTLEMENT DECISIONS WOULD VIOLATE CHAMPERTY LAW AND THE PUBLIC POLICIES IT PROTECTS.

15.     As set forth below, the TRO Award is contrary to public policy, because it gives effect to an interpretation of the CPA that permits Burford to exercise control over Sysco's decision to settle which renders the CPA champertous. The TRO Award improperly sanctions champerty under the law of Illinois, where Sysco is currently blocked from executing a settlement, and would be unconscionable in Minnesota, another jurisdiction where Sysco is currently blocked from settling federal litigation.  Although there remains some uncertainty in certain jurisdictions around what might render an agreement champertous, a fundamental animating principle—and one which has been unchanged despite evolutions in applicable law—is that the plaintiff controls its claim and in

---

[2]     I note that Section 29(k) of the CPA purports to restrict the parties from challenging any portion of the agreement as, among other things, champertous or against public policy.  My understanding is that Sysco does not contend that the Court needs to address the issue of whether the agreement as properly construed is either of those but rather that the interpretation of that agreement proffered by Burford that necessarily was adopted by the TRO Award (otherwise there could not have been a TRO in the first place) is champertous and against public policy.

particular the decision to settle. The TRO Award, which provides Burford with control over settlement decisions, is thus contrary to public policy protected by champerty law.

### 1. What is champerty?

16.    'Champerty' is 'maintenance' for a profit. As the United States Supreme Court explained, "[p]ut simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome."[3] Consistently, champerty has been defined as "[a]n agreement between an officious intermeddler in a lawsuit and a litigant by which the intermeddler helps pursue the litigant's claim as consideration for receiving part of any judgment proceeds."[4] A maintainer, or champertor, "intermeddl[es] in a suit of a stranger or [is] one not having any privity or concern in the subject matter, or standing in no relation of duty to the suitor."[5] The American Bar Association explained that 'officious intermeddling' means "offering unnecessary and unwanted advice or services; meddlesome, esp[ecially] in a highhanded or overbearing way"[6] and went on to note that in states which allow it, "champerty is generally permissible as long as the supplier is not… 'intermeddling' with the conduct of the litigation (e.g. determining trial strategy or controlling settlement)."[7]

17.    The transfer of control over a litigation generally, and over a settlement decision in particular, is a clear indication that an agreement is champertous. The converse is also true: some courts have reasoned, including in the antitrust context, that the absence of control over settlement decision is prima facie evidence that a contract does not permit the funder to "intermeddle."[8] For example, in a recent case, the Superior Court of Delaware held that a litigation finance agreement was not champertous under Delaware law (the state in which all four of the parties here are

---

[3]    *In re Primus*, 436 U.S. 412, 424 n.15 (1978).

[4]    Champerty, *Black's Law Dictionary* (9th ed. 2009).

[5]    14 Am.Jur. 2d Champerty, Maintenance, and Barratry § 1 (2022).

[6]    ABA COMM'N ON ETHICS 20/20 INFORMATIONAL REPORT TO THE HOUSE OF DELEGATES 11 n.40 (2011), https://lowellmilkeninstitute.law.ucla.edu/wp-content/uploads/2019/02/ABA-White-Paper-on-Litigation-Finance.pdf (quoting *Kraft v. Mason*, 668 So. 2d 679, 682 (Fla. Dist. Ct. App. 1996)).

[7]    *Id*. at 11.

[8]    *See, e.g., Kraft*, 668 So. 2d at 683 ("[The funder did not] concern herself with the antitrust litigation or impose her views upon the attorneys or the litigants once she provided the loan.").

incorporated) *because* the funder was not "controlling or forcing [the plaintiff] to pursue litigation, or is controlling the litigation for the purpose of continuing a frivolous *or unwanted lawsuit*."[9]

18.     Where champerty is prohibited, champertous agreements are void.[10]

### 2. Champerty's history and rationales.

19.     The champerty prohibition dates back to Greek and Roman times and until the mid to late twentieth century was both a crime and a tort and remains an ethical violation in many states. According to legal historians, in Greek and Roman civilizations, advocates who wished to speak on behalf of a litigant (they were not, at the time, lawyers) had to have some personal connection to them. Even in those times, such advocates who used their power (and proximity thereto) and the legal process to bully, harass, and intimidate were held in low regard. They were called "'sycophants' in ancient Greece, 'calumniators' in ancient Rome, and 'maintainers' in medieval England."[11]

20.     As Professor Anthony Sebok has explained, champerty was historically prohibited because allowing it would facilitate 'inauthentic claims': "[The reason that champerty and assignment of claims] were treated as a unique threat to the common law, was precisely because both permitted someone who had not suffered a wrong to exercise some degree of control over a claim for redress for a private wrong suffered by a stranger."[12] As noted below, the question of who suffered an injury is particularly pivotal in analyzing the availability of remedies in the antitrust context.

21.     The line between an 'authentic' and 'inauthentic' claim has been drawn by control:

> More common are limitations based on *how* the maintenance is performed. The most common way states control the *how* question in champerty is by limiting

---

[9]     *Charge Injection Techs. v. E.I. Dupont De Nemours & Co.*, No. N07C-12-134-JRJ, 2016 Del. Super. LEXIS 118 at *13 (Del. Super. Ct. Mar. 9, 2016) (emphasis added).

[10]     14 C.J.S. Champerty and Maintenance §17 (2022); 14 Am.Jur.2d Champerty and Maintenance § 5 (2022).

[11]     *Osprey, Inc. v. Cabana Ltd. P'ship*, 532 S.E.2d 269, 273 n.2 (S.C. 2000).

[12]     Anthony J. Sebok, *The Inauthentic Claim*, 64 Vand. L. Rev. 61, 94 (2011); *see also Am. Optical Co. v. Curtiss*, 56 F.R.D. 26, 31 (S.D.N.Y. 1971) ("[funder-assignee] had nothing to do with the relationships between the individual defendants and the [original claimholder], which form the basis for the instant complaint. The assignment was merely a means to enable [the funder-assignee] to sue on behalf of the [original claimholder] and, as such, it contravenes [Section 489] and the public policy of New York. Accordingly… courts of New York would not enforce it as being contrary to the public policy of New York.").

> how much *control* the investor has over the conduct of the litigation into which she has put her money. We can say, therefore, that states sometimes limit *intermeddling profit maintenance*: where a contract allows the third party to take too much control over the conduct of what otherwise would be a meritorious suit by another, the maintenance will be prohibited.[13]

22.     In other words, the more control a funder exerts over the conduct of the litigation, the more potentially champertous its involvement becomes. The power to veto settlement decisions is the highest degree of control envisioned in the ongoing debates about whether third-party funding should be a new exception to champerty. Accordingly, any arbitral award purporting to enforce an alleged right of a litigation funder to veto the settlement decisions of the party would violate public policy.

23.     In the late nineteenth century and early twentieth century, two exceptions to the champerty doctrine developed. One was the development of contingency fees by which lawyers, who are fiduciaries of the financed parties and subject to rules of ethics, are allowed to fund litigation; second, for insurers, who are also considered fiduciaries or quasi-fiduciaries of the insureds, and are also subject to regulation aimed at protecting their insureds and society as a whole. In other words, champerty is allowed in two contexts where fiduciary duties and other regulation promises to protect the funded party (plaintiffs, in the contingency fee case, and defendants, in the case of insurance), the courts, and the public.

24.     The champerty prohibition was historically, and remains currently, motivated by a number of rationales, which are fundamental to the functioning of the justice system. One is a desire to limit the level of litigation in courts and a preference for private dispute resolution outside the courts (the same rationale which, as discussed below, underlies the policy of encouraging settlements). Another is a desire to prevent the prolonging of litigation generally and especially by "a 'stranger' to the lawsuit with no legitimate interest in it,"[14] as well as the protection of parties' autonomy and control over their cases. An additional motivation is a desire to prevent speculation in lawsuits and extortion of defendants (all rationales discussed below in connection to the question of who is entitled to pursue the private enforcement of antitrust law). Champerty also seeks to

---

[13]     Sebok, *supra* n.12 at 109 (emphasis in original).

[14]     *Osprey*, 340 S.C. 367 at 379.

prevent "financial overreaching by a party of superior bargaining position,"[15] 'great men' (i.e. powerful players) overrunning the courts and, generally, usage of the courts for a purpose other than the pursuit of justice. In sum, champerty protects a multitude of interests of the courts (and therefore the public at large), of plaintiffs, of potential defendants, and of actual defendants.

### 3. The advent of the litigation funding industry.

25. Hundreds of years after the champerty doctrine's origins, the litigation funding industry began to develop.

26. Third-party funders who fall into neither of the two twentieth century exceptions to champerty (contingency fee and insurance) have begun to develop a new market. They have done so, in part, by reassuring legislators, the courts, the bar, and the public that the attorney-client relationship will not be compromised by their involvement; that third-party funding will not promote non-meritorious litigation nor protract cases which then further clog the already-burdened court system; and that plaintiffs will remain in control of their cases, especially over the decision to settle.

27. For example, an early reassurance by Burford, which was founded in 2009, at a time when the industry was still nascent,[16] to the American Bar Association of non-interference in settlements stated: "Burford does not hire or fire the lawyers, direct strategy or make settlement decisions. Burford is a purely passive provider of non-recourse financing to a corporate party."[17] Juridica Capital, which launched and went public around the same time, similarly reassured the American Bar Association that "[w]e do not seek to control any of the decisions regarding the conduct of any

---

[15] *Id.* at 381.

[16] *See How We Work With Companies*, Burford Capital, https://www.burfordcapital.com/how-we-work/with-companies/ (last accessed March 3, 2023) ("Our track record and expertise in providing legal finance capital to companies lead the industry. Founded in 2009, we created the first known portfolio for a company, a $45 million portfolio for a FTSE 20 company to finance commercial litigation.").

[17] *ABA Comm'n on Ethics 20/20 Informational Report to the House of Delegates* 23 n. 82 (2011) (quoting *Comments of Burford Group, LLC to the Am. Bar Ass'n Working Group on Alternative Litig. Fin.* 5 (Feb. 15, 2011)).

litigation that we finance, nor are we aware of any other supplier in this market segment who does."[18]

### 4. The trajectory of the champerty prohibition: reports of its demise have been greatly exaggerated.

28.     While at first blush it might seem like champerty is on the decline in parts of the United States, a closer look reveals a much more nuanced picture: while the champerty prohibition is being rolled back in certain states in order to make way for third-party funding—in the hopes that this will help increase access to justice—its underlying rationales remain protected.

29.     Importantly, officious intermeddling, with an emphasis on any limitation in the client's complete autonomy over settlement decisions, remains unlawful via doctrines such as unconscionability and equity or simply by reference to the general public policy against officious intermeddling and the unquestioned principle of plaintiffs' autonomy over their cases.  As the ABA correctly observed, in states which allow it, "champerty is generally permissible as long as the supplier is not… 'intermeddling' with the conduct of the litigation (e.g. determining trial strategy or controlling settlement)."[19]

30.     For example, in *Maslowski v. Prospect Funding*,[20] the Minnesota Supreme Court abolished the common law doctrine of champerty but noted that "[o]ur abolition of champerty as a defense

---

[18]     *ABA Comm'n on Ethics 20/20 Informational Report to the House of Delegates* 23 n. 82 (2011) quoting *Comments of Juridica Capital Mgmt. Ltd. to the Am. Bar Ass'n Working Group on Alternative Litig. Fin.* 6 (Feb. 17, 2011)).  For a more recent example of a similar reassurance made to members of the state and federal judiciaries *see* Panel on The Evolution of Third Party Litigation Finance, *Sixth Annual Judicial Symposium on Civil Justice Issues*, https://masonlec.org/events/sixteenth-annual-judicial-symposium-on-civil-justice-issues/ (Oct. 10, 2022) (repeated representations that Burford does not control settlements).  The same reassurance was made to the public by Burford's CEO in an interview on 60 Minutes in December 2022, just six days after it filed its application that gave rise to the TRO Award.  Lesley Stahl, *Litigation Funding: A multibillion-dollar industry for investments in lawsuits with little oversight*, CBS NEWS (Dec. 18, 2022), https://www.cbsnews.com/news/litigation-funding-60-minutes-2022-12-18/.  Omni Bridgeway has explained that "[t]ypically… litigation funders take a 'light touch' approach to case management. Litigation funders are not permitted to exercise control over the lawyers' strategy decisions and generally are afforded limited rights in this regard under the LFA.  The right to be informed, including of settlement offers and major case developments, is a fairly common one."  *Litigation Finance*, OMNI BRIDGEWAY, https://omnibridgeway.com/litigation-finance (last accessed March 3, 2023).

[19]     *ABA Comm'n on Ethics 20/20 Informational Report to the House of Delegates* 11 (2011).

[20]     *Maslowski v. Prospect Funding Partners* LLC, 944 N.W.2d 235, 238 (Minn. 2020).

does not mean that all such agreements are enforceable as written"[21] and that "[p]arties like Maslowski retain the common law defense of unconscionability."[22] The court went on to "note that district courts may still scrutinize litigation financing agreements to determine whether equity allows their enforcement" and specifically directed "[c]ourts and attorneys [to] likewise be careful to ensure that litigation financiers do not attempt to control the course of the underlying litigation *similar to the 'intermeddling' that we described in our early champerty precedent*."[23] The court concluded by quoting that precedent: "it is difficult to conceive of any stipulation more against public policy than a contract term requiring the litigation financier's permission to settle the underlying litigation[]."[24]

31.     Following the Supreme Court's direction, on remand, the Minnesota trial and appellate courts found that part of the funding contract was, in fact, unconscionable because the

> agreement unconscionably interfered with Maslowski's decisions as to her legal claim… Restricting Maslowski's freedom to enter into settlements and imposing a fixed penalty on her if she fails to 'use reasonable efforts' to protect [the funder's] interests offends the [] principle [that] an outside party may not influence a litigant's efforts to settle a legal claim.[25]

32.     Similarly, in *Osprey v. Cabana*, the Supreme Court of South Carolina explained that "[o]ur abolition of champerty as a defense does not mean that all such agreements are enforceable as written."[26] The Court then listed several factors that could make a funding agreement unenforceable, including "whether the financier engaged in officious intermeddling," noting that "[a] financier becomes an officious intermeddler when he or she offers unwanted advice or otherwise attempts to control the litigation for the purpose of stirring up strife or continuing a frivolous lawsuit."[27]

---

[21]     *Id.* at 241 (internal quotation marks omitted) (quoting in agreement *Osprey,* 340 S.C. at 532).

[22]     *Id.*

[23]     *Id.* (emphasis added).

[24]     *Id.* at 238 (internal quotation marks omitted) (citing and quoting *Huber v. Johnson*, 70 N.W. 806, 808 (Minn. 1897)).

[25]     *Maslowski v. Prospect Funding Partners LLC*, 978 N.W.2d 447, 456, 457 (Minn. Ct. App. 2022).

[26]     *Osprey*, 340 S.C. at 382.

[27]     *Id.* at 383.

33.     Again, we see a court stepping back from champerty not out of lack of concern for the public policies underlying the doctrine, but rather out of the belief that "other well-developed principles of law can more effectively accomplish the goals of preventing speculation in groundless lawsuits and the filing of frivolous suits."[28]

34.     In *Miller v. Caterpillar*, the U.S. District Court for the Northern District of Illinois addressed whether Illinois' statute criminalizing maintenance applied to Miller's agreement with a third-party litigation financier in the context of a discovery dispute.  The statute reads as follows: "if a person officiously intermeddles in an action that in no way belongs to or concerns that person, by maintaining or assisting either party, with money or otherwise, to prosecute or defend the action, with a view to promoting litigation, he or she is guilty of maintenance and upon conviction shall be fined and punished as in cases of common barratry."[29] The court focused on the definition of 'officious intermeddler' and concluded that it is someone who caused litigation to be brought that otherwise would not have been, which is similar to prolonging a litigation that would otherwise settle, or meritless litigation, or litigation for the purposes of harassment.  The court ultimately denied discovery of the funding agreement at issue, for reasons that included the court's conclusion that the litigation funder had not engaged in officious intermeddling, but *Miller* shows that the doctrines of champerty and maintenance are still very much alive in Illinois.

35.     In another recent case, *Boling v. Prospect Funding*, a litigation funder argued that Kentucky's champerty law does not have a 'clear policy' prohibiting litigation funding agreements, and the Sixth Circuit, sitting in diversity, was called to interpreted Kentucky's champerty law based on Kentucky's public policy. The Circuit Court affirmed the District Court's judgment finding the agreement champertous because "the terms of the Agreements effectively give [the Funder] substantial control over the litigation […] [impose] conditions [which] raise quite reasonable concerns about whether a plaintiff can truly operate independently in a litigation […] [and] that agreements like this may interfere with or discourage settlement."[30]

---

[28]     *Id*. at 381.

[29]     *Miller UK Ltd. v. Caterpillar, Inc*., 17 F. Supp. 3d 711, 725 (N.D. Ill. 2014) (emphasis omitted) (quoting 720 ILCS 5/32-12).

[30]     *Boling v. Prospect Funding Holdings LLC,* 771 Fed. Appx. 562, 579-80 (6th Cir. 2019).

36.     This review shows that over many different time periods, and across many different jurisdictions, courts have repeatedly expressed the same animating concerns.

37.     In sum, in my opinion, the observation that "recent state and federal court decisions in the [third party litigation funding] arena belie the notion that champerty and maintenance principles are moribund," is therefore correct.[31] While some states have taken steps to roll back champerty in order to allow litigation funding for the purpose of increasing access to justice, they have done so while being careful to clarify and caution that officious intermeddling remains impermissible and that third-party funding should not interfere with parties' decision-making and lawyers' independent judgment or other ethical obligations.

### 5.  The modern era regulation of third-party funders.

38.     Further, while those in the litigation funding industry and those who support it understandably focus on court decisions and other legal developments that have gradually legalized certain forms of third-party funding, in those quarters there is a tendency to underplay not only the limitations that remain on the practice but also the controversy that continues to surround it.  Recently, fourteen states attorneys general called on the U.S. Attorney General to implement a strategy to protect the American court system from certain types of third-party funding.[32] So has a U.S. Senator.[33] Longstanding opposition to third-party funding by such groups as the U.S. Chamber of Commerce thus appears to be gaining momentum and visibility.

39.     Given these developments, a national trend towards requiring some measure of disclosure of litigation funding in some cases, courts' and judges' growing inclination to regulate funding via courts' and chambers' orders, and a growing movement to limit third-party funding of law firms,[34]

---

[31]     U.S. Chamber of Com. Inst. for Legal Reform, SELLING MORE LAWSUITS, BUYING MORE TROUBLE: THIRD PARTY LITIG. FUNDING A DECADE LATER 19 (Jan. 2020), https://instituteforlegalreform.com/wp-content/uploads/2020/10/Still_Selling_Lawsuits_-_Third_Party_Funding_A_Decade_Later.pdf.

[32]     Letter from Christopher M. Carr et al. to the Hon. Merrick B. Garland et al., (Dec. 22, 2022), available                                                                              at https://fingfx.thomsonreuters.com/gfx/legaldocs/movakkoybva/12.22.22%20TPLF%20Letter.pdf.

[33]     Letter from the Hon. Sen. Kennedy to the Hon. Merrick B. Garland et al., (Jan. 6, 2023).

[34]     In June 2021, the U.S. District Court for the District of New Jersey amended its local rules requiring that parties disclose "the following information regarding any person or entity that is not a party and is providing funding . . . *Whether the funder's approval is necessary for litigation decisions or settlement*

in my opinion, we have entered an era of more, not less, restriction on third-party funding. As the new industry grows and gains visibility, the public and regulators are—slowly but surely—catching up and seeking to curtail such undesirable affects as parties losing control over their cases and litigation being prolonged for the purpose of non-parties' financial gain.

40.     It is my opinion that the TRO Award that forces Sysco to continue litigating against its wishes is contrary to interests that remain protected even where champerty as such is being rolled back—namely the desire to limit the level of litigation in courts; the preference for private dispute resolution outside the courts; the desire to curtail the prolonging of litigation, especially by a 'stranger' to the lawsuit; the protection of parties' autonomy and control over their cases; the imperative to prevent speculation in lawsuits and to prevent 'extortion' of defendants; and, generally, usage of the courts for a purpose other than the pursuit of justice.

### 6.     The TRO Award gives effect to an interpretation of the CPA that is champertous and/or violates public policy under Illinois law and New York law, and is unconscionable under Minnesota law.

41.     Illinois, New York and Minnesota courts have not considered the precise question being raised here; that is, whether a litigation funder may exercise veto control over the plaintiff's decision to settle, thereby forcing the plaintiff to continue litigating against its will. At least in part, this issue has not been considered because litigation funders keep their practices largely out of judicial and public view by requiring that disputes be arbitrated rather than litigated (as well as

---

decisions in the action and if the answer is in the affirmative, the nature of the terms and conditions relating to that approval." Order, *In Re: Amendment of Loc. Civ. Rules*, (D.N.J. June 21, 2021) (emphasis added), https://www.njd.uscourts.gov/sites/njd/files/Order7.1.1%28signed%29.pdf.     *See also*, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 510 F. Supp. 3d 1234, 1237 (S.D. Fla. 2020) (directing counsel had to disclose, among other things, whether the litigation funder had control—direct or indirect, actual or apparent or implied—over the decision to file or the content of any motions or briefs, or any input into the decision to accept a settlement offer; and whether the financing created a conflict of interest for counsel, undermined counsels' obligation of vigorous advocacy, affected counsel's independent judgment, gave to the lender control over litigation strategy or settlement decisions, or affects party control of settlement); *In re Nat'l Prescription Opiate Litig.*, NO. 1:17-MD-2804, 2018 WL 2127807, at * 1 (N.D. Ohio May 7, 2018) (ordering counsel to submit sworn affidavits from counsel and any third-party litigation funders attesting that the financing does not "(1) create any conflict of interest for counsel, (2) undermine counsel's obligation of vigorous advocacy, (3) affect counsel's independent professional judgment, (4) give to the lender any control over litigation strategy or settlement decisions, or (5) affect party control of settlement"); ABA RESOL. 402 (adopted Aug. 2022), https://www.americanbar.org/news/reporter_resources/annual-meeting-2022/house-of-delegates-resolutions/402/ ("[S]haring legal fees with non-lawyers and the ownership and control of the practice of law by non-lawyers are inconsistent with the core values of the legal profession.").

by including confidentiality clauses in funding agreements).  Because litigation funders, as a matter of business practice, draft their agreements to avoid court intervention, the specific scenario at bar has simply not been litigated.  (The other reason this scenario has not come up in the courts is because to my knowledge, funders have never asserted to a court that they have a veto over settlement decisions).

42.     Thus, while there remains uncertainty on what the proper standard is to determine whether a funding agreement violates Illinois or New York champerty law, or is unconscionable under Minnesota law, based on my understanding of what the prohibition on champerty is designed to accomplish, Burford's interpretation of the CPA renders it champertous (in Illinois and New York) and unconscionable (in Minnesota), and the TRO Award giving it effect is therefore contrary to public policy in all three jurisdictions.  The animating principles of the doctrine are clear: the more control a funder exerts over the conduct of the litigation, the more problematic (and likely champertous) its involvement becomes.  And purporting to have the power to veto settlement decisions is the highest degree of control envisioned in the debates about whether third-party funding should be the third exception to champerty.  Here, the injured party, Sysco, is satisfied with the resolution of its claim and seeks to settle.  But it cannot do so due to the TRO Award, and because it is now forced to litigate, an inauthentic claim is proceeding.  This case exemplifies the concerns underlying champerty.

43.     In Illinois specifically, champerty is a viable common law doctrine and maintenance is prohibited by statute.  Champerty at common law is defined as follows: "The law . . . does not permit a person having no interest in the subject-matter of a suit to become interested in it, and concerned in its prosecution; and an agreement by which such person, although an attorney, agrees to bear expense and costs of litigation, falls within the definition of champerty, and will not be enforced, either at law or in equity."[35]  To the extent that courts have been moving away from a strict definition at common law, they have been moving *towards* an approach which seeks to protect the public policies underlying the prohibition of champerty:  "While the common-law crime of champerty has not been abolished by statute in this State, the tendency of decisions is to

---

[35]     *Geer v. Frank*, 179 Ill. 570, 575 (1899) (emphasis added).  *See also In re Reed*, 532 B.R. 82, 93 (Bankr. N.D. Ill. 2015) (citing *Miller*, 17 F.Supp.3d at 729-30); Michael J. Howlett, *Consumer Litig. Fin. in Ill.*, 26 LOY. CONSUMER L. REV. 140, 158 (2013) (stating that the prohibition on champerty in Illinois "surviv[es] in common law").

depart from the severity of the old law and at the same time to preserve the principle which tends to defeat the mischief to which the old law was directed, namely, 'the traffic of merchandizing in quarrels, of huckstering in litigious discord.'"[36]

44.      As discussed above, in interpreting Illinois' maintenance statute, courts have focused on the definition of 'officious intermeddler' and concluded that it is someone who caused litigation to be brought that otherwise would not have been, which is similar to prolonging a litigation that would otherwise settle, or meritless litigation, or litigation for the purposes of harassment.[37]   In Illinois, it is prohibited by the maintenance statute for an individual to "officiously intermeddle[] in an action that in no way belongs to or concerns that person, by maintaining or assisting either party, with money or otherwise, to prosecute or defend the action, with a view to promote litigation."[38]

45.      Whether a litigation funder's total control over a plaintiff's right to settle a case constitutes common-law champerty and/or statutory maintenance would be a question of first impression in Illinois.[39]   In my view, based on both the case law and the well-established public policies

---

[36]      *Berlin v. Nathan*, 64 Ill. App. 3d 940, 956 (1st Dist. 1978) (quoting *Milk Dealers Bottle Exch. v. Schaffer*, 224 Ill. App. 411, 415 (1st Dist. 1922)).

[37]      *Miller*, 17 F. Supp. 3d at 725 (quoting 720 ILCS 5/32-12).

[38]      *See* 720 Ill. Comp. Stat. Ann. 5/32-12 (West 2023).  While the case law in Illinois discussing statutory maintenance or common law champerty in the context of litigation funding is still quite limited, Illinois has made clear that assignments of claims may constitute champerty.  In *Todd v. Franklin*, for example, the Court found that Todd's assignment of legal claims violated Illinois' public policy protected by champerty.  Indeed, the court voided the assignments directly based on public policy without making a direct finding on champerty.  *Todd v. Franklin Collection Serv., Inc.*, No. 11 C 6128, 2011 WL 6140863, at *4 (N.D. Ill. Dec. 9, 2011), *aff'd*, 694 F.3d 849 (7th Cir. 2012) (emphasis added) (Although the assignee's actions did not meet the technical definitions of the champerty, his "actions are *close enough* to champerty and barratry to bolster [the] argument that the assignment of [the] claims in this case violates Illinois *public policy*.").  And Black's Law Dictionary's definition, referred to in some decisions, discusses "[a] bargain by a stranger . . . in consideration of receiving, if successful, a part of the proceeds or subject sought to be recovered."  *See, e.g.*, *Miller*, 17 F.Supp.3d at 724 (quoting Black's Law Dictionary).

[39]      However, there is case law indicating that such as result would be disfavored.  In a case involving a contract where an injured plaintiff contracted to only settle with the permission of his attorney, the 1st District Court of Appeal held that "Whether a cause of action exists, and if so, its nature and amount, are facts always involved in uncertainty, and a defendant has a right to buy his peace.  The plaintiff has a right to compromise, and avoid the anxiety resulting from a cause pending to which he is a party.  Any contract whereby a client is prevented from settling or discontinuing his suit is void, as such agreement would foster and encourage litigation."  *Filipiak v. Zintak*, 264 Ill. App. 392, 396 (1st Dist. 1932).

underlying the common law prohibition of champerty and the statutory prohibition of maintenance, Burford's interpretation of the CPA, as given effect by the TRO Award, constitutes champerty and/or maintenance under Illinois law. This is particularly true in circumstances where, as here, Burford not only seeks to have a say in relation to settlement, but to affirmatively block Sysco from settling, thereby implicating the key dangers the prohibition on champerty is meant to guard against (including needlessly prolonging litigation and contributing to the overburdening of the courts) .

46. Under New York law, which governs the CPA, champerty is prohibited by Section 489 of the Judiciary Act.[40] By its text, the statute prohibits individuals and companies from purchasing or taking an assignment of notes, other securities, "or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon."[41] This statutory prohibition has been in place for over a century; the Court of Appeals recently traced Section 489 to a predecessor statute dated to 1829.[42]

47. Today, New York's champerty prohibition remains very much in force in the state.[43] The statute itself, however, is considered by many to be outdated, and the recent, limited case law applying that statute has generated ambiguity and uncertainty. The statute was drafted, and subsequently amended, prior to the advent of the modern litigation funding industry, and New York courts have not considered whether an agreement purporting to provide a funder with the right to veto a party's settlement decisions would violate Section 489.

---

[40]    N.Y. Jud. Law § 489(1) (McKinney 2004) ("No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon; provided however, that bills receivable, notes receivable, bills of exchange, judgments or other things in action may be solicited, bought, or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors, trustee or receiver in bankruptcy, or any other person or persons in charge of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise.").

[41]    *Id.*

[42]    *Justinian Cap. SPC v. WestLB AG*, 28 N.Y.3d 160, 166 n.2 (2016).

[43]    *Phoenix Light SF DAC v. U.S. Bank Nat'l Ass'n*, No. 20-1312-cv, 2021 WL 4515256, at *1 (2d Cir. Oct. 4, 2021); *Justinian Cap. SPC*, 28 N.Y.3d at 163-64; *Echeverria v. Est. of Lindner*, 7 Misc. 3d 1019(A), at *5-8 (Sup. Ct. Nassau Cnty. 2005).

48.    New York's champerty statute takes into account three factors when defining champerty: (i) the type of interest taken; (ii) the thing in which the interest is taken; and (iii) the purpose for which the interest is taken.  A New York court would likely conclude that the CPA, as interpreted by Burford and given effect by the TRO Award, violates the statute.

49.    *First*, among the types of interests the statute prohibits are soliciting, buying, or taking an assignment.  According to the plain language of the statute this includes *indirect assignments*.[44] The question of what it means to "indirectly . . . take an assignment"[45] in this context would be a matter of first impression under New York law.  In addressing that question, a New York court would thus likely refer to the public policies underlying the prohibition on champerty, including the extent to which courts disfavor efforts to control a claimholder's choices regarding the conduct of its litigation.  The interpretation of the CPA given effect by the Tribunal in the TRO Award is that Burford has a contractual right to prevent Sysco from settling and can force Sysco to continue litigating and, indeed, Sysco has been compelled  by the TRO Award to do so against its will for most of the last three months; it is my opinion that a New York court would likely view that arrangement as an indirect assignment, not as a purchase of proceeds, given the level of control afforded to Burford over Sysco's claims.[46]

50.    *Second*, the thing in which the interest is taken (or the subject of the agreement) is "claims."[47]

51.    *Third*, to be champertous, an agreement to take a direct or indirect assignment in a claim must have been undertaken "with the intent and for the purpose of bringing an action or proceeding

---

[44]    N.Y. Jud. Law § 489(1) (McKinney 2004).

[45]    *Id.*

[46]    Similarly, a court found funders to be a real "party" in a litigation because they entered into an agreement pursuant to which they paid litigation costs, approved counsel, had veto power over the filing and manner of prosecution of the lawsuit, "[had] the final say over any settlement agreements," and were entitled to 18.33% of any amount awarded to the nominal plaintiffs.  *Abu-Ghazaleh v. Chaul*, 36 So.3d 691, 693-94 (Fla. Dist. Ct. App. 2009).

[47]    N.Y. Jud. Law § 489(1) (McKinney 2004).

thereon."[48] Here, the TRO Award sought and obtained by Burford gives effect to an interpretation of the CPA that allows Burford not just to seek damages based on a purported breach of their consent rights, but to block Sysco from settling and *force the litigation of claims that would not otherwise be before the court*.[49] In my view, this brings the interpretation of the CPA to which the TRO Award gives effect within the statutory definition of champerty in New York.

52.     In addition to violating champerty law and/or its underlying policies in Illinois and New York, the TRO Award is also unconscionable under the law of Minnesota, where Sysco is also blocked by the TRO Award from settling pending litigation. As explained above, the Minnesota Supreme Court has abolished the doctrine of champerty, but directed courts to continue to consider whether litigation funding contracts are unconscionable, and in this context, has clearly recognized that "it is difficult to conceive of any stipulation more against public policy than a contract term requiring the litigation financier's permission to settle the underlying litigation."[50] That is exactly the case here, a concern magnified by Burford's successful attempt to affirmatively block settlement when permission was (and continues to be) withheld.

### B. FORCING A PLAINTIFF TO LITIGATE AGAINST ITS WILL VIOLATES FEDERAL AND STATE PUBLIC POLICIES ENCOURAGING SETTLEMENT OF CIVIL SUITS AND RESERVING CONTROL OVER SETTLEMENT FOR THE PARTIES.

---

[48]     *Id.* This is the reason that the industry practice is to structure commercial litigation deals as the acquisition of rights in proceeds and not an assignment of the underlying claim; by doing so, third-party funders seek to avoid the thorny questions that New York's champerty statute gives rise to.

[49]     Although the New York statute contains a "safe-harbor" provision, it does not apply here. That provision provides, in relevant part, that: "the [prohibition on champerty] shall not apply to any assignment . . . of . . . any claims . . . if such assignment . . . included *bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor* . . . having an aggregate purchase price of at least five hundred thousand dollars . . . ." N.Y. Jud. Law § 489(2) (McKinney 2004) (emphasis added). The New York Court of Appeals considered the legislative history of this provision in *Justinian Cap. SPC* and confirmed that it applies to assignments of debt instruments ("notes or other securities") and not just any given financial transaction: "The safe harbor was enacted to exempt large-scale commercial transactions *in New York's debt-trading markets* from the champerty statute in order to facilitate the fluidity of transactions in these markets." *Justinian Cap. SPC*, 28 N.Y.3d at 169 (emphasis added) (citing Assembly Mem. in Support, Bill Jacket, L 2004, ch 394 at 4, 2004 N.Y. Legis. Ann. at 282-83). The transaction between Burford and Sysco did not "include[] bonds, promissory notes, bills of exchange and/or book debts" as contemplated by the statute, N.Y. Jud. Law § 489(2) (McKinney 2004), and was not undertaken in New York's debt-trading markets.

[50]     *Maslowski*, 944 N.W.2d at 238 (Minn. 2020) (internal quotation marks omitted) (citing and quoting *Huber*, 70 N.W. at 808).

53.     In the United States, both state and federal law promote a public policy of encouraging settlements.  The U.S. Supreme Court has long ago held that "[c]ompromises of disputed claims are favored by the courts."[51] Covering New York, the Second Circuit has endorsed this public policy.[52]  The Seventh and the Eighth Circuits, the seats of the underlying antitrust claims, have similarly endorsed the federal policy of encouraging settlements.[53]   Contravening this defined policy, the TRO Award, which forces Sysco to litigate against its will, chills settlement and discourages (indeed prevents) the amicable resolution of litigation.

54.     The federal public policy, relevant to the antitrust proceedings in federal courts, is reflected in federal rules of procedure and evidence such as Rule 16(a) (5) of the Federal Rules of Civil Procedure, which encourages pre-trial conferences that have as one of their goals "facilitating settlement," and Rule 408 of the Federal Rules of Evidence, which creates a privilege that bars the introduction of settlement offers or statements made in settlement negotiations to prove liability. "The primary policy reason for excluding settlement communications is that the law favors out-of-court settlements, and allowing offers of compromise to be used as admissions of liability might chill voluntary efforts at dispute resolution."[54]  Local Rules of the United States District Court for the Northern District of Illinois similarly encourage settlement, for example, by requiring counsel

---

[51]     *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) (citing *Hennessy v. Bacon*, 137 U. S. 78, 34 (1890)).

[52]     *See, e.g.*, *Gupta v. Headstrong, Inc.*, No. 17-CV-5286 (RA), 2018 WL 1634870, at *3 (S.D.N.Y. Mar. 30, 2018) (citation omitted) ("Federal courts likewise have 'articulated a strong policy in favor of enforcing settlement agreements and releases.'"); *In re Sony Corp. SXRD*, 448 F. App'x. 85, 87 (2d Cir. 2011) (citations omitted) ("Public policy favors settlement."); *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) (collecting federal cases) ("[I]t is axiomatic that the law encourages settlement of disputes."); *Snyder v. Wells Fargo Bank, N.A.*, No. 11 Civ. 4496(SAS), 2011 WL 6382707, at *5 (S.D.N.Y. Dec. 19, 2011) (footnote omitted) ("[J]ust as there is a federal policy in favor of arbitration, there is always a strong federal policy in favor of early and amicable settlement."); *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 461 (2d Cir.1982) (noting "the paramount policy of encouraging settlements").

[53]     *See, e.g.*, *Howell v. Motorola, Inc.*, 633 F.3d 552, 561 (7th Cir. 2011) (citation omitted) (recognizing that the Seventh Circuit previously noted "the importance of the federal policy in favor of voluntary settlement of claims"); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999) ("[A] strong public policy favors agreements, and courts should approach them with a presumption in their favor.") (quoting *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1388 (8th Cir.1990)).

[54]     *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005).

and the parties in civil cases "to undertake a good faith effort to settle that includes a thorough exploration of the prospects of settlement" in advance of trial.[55]

55.     New York law, which governs the CPA, similarly promotes this public policy.    For example, New York law prohibits a non-settling defendant from seeking contribution against a defendant that has settled[56] and requires parties to engage in settlement negotiations during the pendency of a litigation.[57]  New York law similarly provides an evidentiary privilege for settlement communications.[58]

56.     Courts in Illinois likewise recognize that public policy favors settlement, acknowledging, in numerous cases, the "importance of the federal policy in favor of voluntary settlement of claims."[59]

57.     Many commentators have also pointed out the prevalence of and public policy encouraging settlements.    The settlement of civil suits is in the public interest because it eases docket congestion; avoids the significant cost of trial thus conserving judicial resources, for which taxpayers pay; and conserves the private resources of the litigants.    Further, settlement leads to higher levels of satisfaction of the litigants who are able to determine their own solution to their

---

[55]     LOCAL RULES OF THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILL., Rule 16.1.5, available at https://www.ilnd.uscourts.gov/_assets/_documents/_rules/LRRULES.pdf.

[56]     N.Y. GEN. OBLIG. LAW § 15-108(b) (McKinney 2007).

[57]     N.Y. UNIFORM RULES FOR N.Y. STATE TRIAL CTS. §§ 202.12-a(c)(1)-(4), § 202.26(a), https://ww2.nycourts.gov/rules/trialcourts/202.shtml.

[58]     *See, e.g.*, *In re Gordon v. Vill. of Bronxville*, 5 Misc. 3d 1030(A), 4 (Sup. Ct. Westchester Cnty. 2004) (citations omitted) (noting the well-settled law in New York that "'[a]dmissions of fact explicitly or implicitly made "without prejudice" during settlement negotiations are protected from discovery pursuant to the public policy of encouraging and facilitating settlement'"); *Baghoomian v. Basquiat*, 167 A.D.2d 124, 125 (1st Dep't 1990) (citation omitted) ("Public policy encourages the settlement of lawsuits and directs that Judges and their law assistants take part in settlement conferences without fear that they may be called to testify about materials or information obtained during these private conferences.").

[59]     *Howell*, 633 F.3d at 561 (citation omitted); *see also Canon v. Burge*, 752 F.3d 1079, 1104 (7th Cir. 2014) (citation omitted) (affirming that "'[p]ublic policy in Illinois favors settlements'"); *Miksis v. Evanston Twp. High Sch. Dist. #202*, 235 F. Supp. 3d 960, 987 (N.D. Ill. 2017) (Durkin, J.) (acknowledging "the strong federal policy favoring the voluntary resolution of disputes").

disputes.[60] For these reasons, "it is axiomatic that the law encourages settlement of disputes," as the Second Circuit has recognized.[61]

58. The benefits of settlements have been specifically noted in the leading antitrust treatise as they relate to disputes in this area. "Repose is especially valuable in antitrust, where tests of legality are often rather vague, where many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations."[62] Further, "[a]lthough there is an unquestioned public interest in the 'vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action,' this public interest does not prevent the injured party from releasing his claim and foregoing the burden of litigation."[63]

59. The TRO Award, by blocking settlement, cannot be reconciled with, and in my view violates, these policies.

60. The TRO Award also contravenes widespread public policy protecting clients' control over their lawsuits, in particular in relation to settlement. The decision to settle is fundamental and dispositive, and is consequently afforded the highest degree of protection in the legal system.

61. This is reflected in the rules of professional conduct. In New York, the laws of which govern the underlying arbitration, "*[t]he touchstone* of the client-lawyer relationship is the lawyer's obligation to assert *the client's position* under the rules of the adversary system."[64] Specifically, in any given case the client has the right to accept or reject a settlement proposal[65] and a lawyer must "abide by a client's decisions concerning the objectives of representation," including and especially a client's decision whether to settle a matter.[66] An identical rule applies

---

[60]    *Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993); *In re Franklin Nat'l Bank Sec. Litig.*, 92 F.R.D. 468, 472 (E.D.N.Y. 1981), *aff'd sub nom. F.D.I.C. v. Ernst & Ernst*, 677 F.2d 230 (2d Cir. 1982); *In re N.Y. Cnty Data Entry Worker Prod. Liab. Litig.*, 162 Misc. 2d 263, 267 (Sup. Ct. N.Y. Cnty. 1994), *aff'd*, 222 A.D.2d 381, 381 (1st Dep't 1995).

[61]    *Bano*, 273 F.3d at 129 (collecting federal cases).

[62]    Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 320a (5th ed. 2020).

[63]    *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 891-92 (3d Cir. 1975) (citation omitted).

[64]    Rules of Professional Conduct [22 NYCRR 1200.0], Preamble ¶ 2 (emphasis added).

[65]    *Id.* Rule 1.16 cmt 7A.

[66]    *Id.* Rule 1.2(a).

in Illinois,[67] and if a funding agreement compromises the attorney's independent judgment on this, or any other, point the lawyer must withdraw.[68]

62.    The decision as to whether and under what terms to settle a case is protected to the same degree other fundamental legal decisions—such as a client's decision to write a new will or a decision whether to plead guilty to a crime—are protected.[69]

63.    Litigation "concerns a client's affairs and is *intended to advance the client's lawful objectives as the client defines them* . . . . Some decisions are so vital to a client that a reasonable client would not agree to abandon irrevocably the right to make the decisions."[70]  Further, the decision to settle is reserved to the client "because a settlement definitively disposes of client rights."[71]

64.    In other words, just as a lawyer cannot decide that a client must write a new will or must plead guilty to a crime, a lawyer cannot decide a client must continue litigating a civil case.  The right to settle a civil case is reserved to the client alone and a client may always choose to make this decision "[r]egardless of any contrary contract with a lawyer."[72] If a client enters into a contract to the contrary, i.e. allowing its lawyer to make a settlement decision, the client may revoke a lawyer's authority to do so.   Further,"[b]ecause the client retains the nondelegable right to revoke, doing so does not constitute repugnant or imprudent conduct, breach of obligation to

---

[67]    Illinois Supreme Court Rules, Article VIII, r. 1.2(a) (amended Oct. 15, 2015, eff. Jan. 1, 2016) ("[A] lawyer shall abide by a client's decision whether to settle a matter.").

[68]    *See, e.g.*, *id.* r. 5.4(c) (eff. Jan. 1, 2010) ("A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."); *id*. r. 1.8(f) (eff. Jan. 1, 2010) ("A lawyer shall not accept compensation for representing a client from one other than the client unless . . . there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship"); *see also* Anthony J. Sebok, *The Rules of Professional Responsibility and Legal Finance: A Status Update*, Cardozo Law Jacob Burns Inst. For Advanced Legal Studies, Faculty Research Paper No. 671, at 11 n.41 (2022) ("[A] lawyer should counsel a client to refuse any funding agreement that allows a funder to take control of settlement, which would be seen as against public policy in every state, or withdraw from representation if the client persists in granting the funder control.").

[69]    Restatement (Third) of the Law Governing Lawyers § 22(1) (2000).

[70]    *Id*. § 22 cmt. b.

[71]    *Id*. § 22 cmt. d.

[72]    *Id*. § 22(3).

the lawyer, or conduct rendering the representation unreasonably difficult."[73] A lawyer who settles without the client's authorization may be liable to the client and subject to discipline. [74]

65.     The rules of professional conduct do not apply directly to funders but serve to illustrate that there is a universally recognized public policy *in favor of* client control over settlement, and *against* any interference with that control.  Forcing Sysco to litigate against its will rather than allowing Sysco to accept a settlement offer it wishes to accept is contrary to these policies.[75]

---

[73]     *Id.* § 22 cmt. c.

[74]     The Reporter's Note supporting this restatement of the law, in *id.* § 22 comment c, provides the following:

> On reservation of ultimate settlement authority to the client, see ABA Model Rules of Professional Conduct, Rule 1.2(a) (1983) ("A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter"); ABA Model Code of Professional Responsibility, EC 7-7 (1969); *Hayes v. Eagle-Picher Indus., Inc.*, 513 F.2d 892 (10th Cir.1975) (contract that lawyer could settle case if majority of plaintiffs approved does not bar dissenters from rejecting settlement); *Lockette v. Greyhound Lines, Inc.*, 817 F.2d 1182 (5th Cir.1987) (client effectively revoked settlement authority); *In re Lewis*, 463 S.E.2d 862 (Ga. 1995) (contingent-fee contract purporting to give lawyer full authority to settle is invalid); *Lieberman v. Employers Ins. of Wausau*, 419 A.2d 417 (N.J. 1980) (lawyer liable to client for settling after client revoked settlement authority) . . . . On the invalidity of a client-lawyer contract requiring the lawyer to consent to any settlement, see *Mattioni, Mattioni & Mattioni, Ltd. v. Ecological Shipping Corp.*, 530 F. Supp. 910 (E.D. Pa. 1981); *Cummings v. Patterson*, 442 S.W.2d 640 (Tenn. Ct. App. 1968); 1 S. Speiser, Attorneys' Fees 203 (1973); *cf. Jones v. Feiger, Collison & Killmer*, 903 P.2d 27 (Colo. Ct. App. 1994) (invalidating contract authorizing lawyer to withdraw if client unreasonably refused to settle).  On the sanctions imposed on a lawyer for settling without authority, see *Lieberman v. Employers Ins. of Wausau*, supra (damage liability); *In re Miller*, 625 P.2d 701 (Wash. 1981) (discipline); Annot., 92 A.L.R. 3d 288 (1979) (discipline).

[75]     Forcing Sysco to litigate against its will—at the behest of a funder—rather than allowing it to accept a settlement offer it wishes to accept is also contrary to one of the public policies underlying the real party in interest rule.  Under the Federal Rules of Civil Procedure, a lawsuit "must be prosecuted in the name of the real party in interest."  Fed. R. Civ. P. 17(a)(1).  The rule is rooted in, among other things, the due process notion that a litigating party should be able to identify its adversary and confront that adversary in court.  In circumstances where, as here, the litigating party's adversary wants to settle, but is prevented from doing so by a non-party to the litigation, operating behind the scenes, the litigating party's due process rights may be imperilled.  *Cf. Gray v. Dummitt*, No. CV 06-0322(ERK)(JO), 2007 WL 6925690, at *3 (E.D.N.Y. Dec. 21, 2007) (holding that defendants have standing to challenge a retainer agreement between plaintiff and her counsel which arguably provides counsel with the right to reject proposed settlements without informing plaintiff, on the basis that defendants "seek to avoid the burden of protracted litigation that they believe the [r]etainer improperly causes them to bear"), *overruled on other grounds*, No. CV 06–CV–0322 (ERK)(JO), 2009 WL 210865 (E.D.N.Y. Jan. 9, 2009).

66.     This is particularly problematic in the antitrust context.  The Tribunal has issued an award that may dictate the trajectory of several antitrust suits pertaining to the entire American protein market (chicken, beef, pork, and turkey).   Antitrust law has strong public interest dimensions: Congress provided treble damages in antitrust cases, in favor of those who have been injured, to advance "not only the redress of private wrong but also the protection of the public interest."[76]  For that reason, Congress set up an enforcement regime, known as 'private enforcement of the law,' by the private plaintiffs' bar conceived of "as 'private attorneys general.'"[77]  These "private attorneys general" are, of course, subject to the rules of ethics.  As officers of the court, the hope is that, among other things, they will serve as a bulwark against the main downside of treble damages which is that such punitive damages can incentivize overzealous prosecution of antitrust claims which would force defendants to overpay beyond what the merits of the case warrant.[78]

67.     As for the private right of action Congress created, the courts have clarified that claims are to be brought on behalf of parties that have actually been harmed by anticompetitive behavior.[79] Specifically, Congress sought to incentivize litigation by persons "were injured in their business or property," with "business or property," interpreted to mean "commercial interests or

---

[76]     *United States v. Standard Ultramarine & Color Co.*, 137 F. Supp. 167, 171 (S.D.N.Y. 1955) (footnote omitted).  *See also Haw. v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972) ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress.").

[77]     *Haw. v. Standard Oil Co.*, 405 U.S. at 262 ("By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as 'private attorneys general.'").

[78]     Robert H. Lande & Joshua P. Davis, *Benefits From Priv. Antitrust Enf't: An Analysis Of Forty Cases*, 42 U.S.F. L. REV. 879, 885 (2008) (footnote omitted) ("[O]ne common criticism of private actions . . . is that they are a form of blackmail or extortion, one in which plaintiffs' attorneys, with little risk to themselves, coerce defendants into settlements based not on meritorious claims, but rather on the cost of litigation or fear of an erroneous and catastrophic judgment.").

[79]     15 U.S.C. § 15(a), titled *Suits by persons injured: Amount of recovery; prejudgment interest*, states ". . . *any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue* therefor[e] in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  (Emphasis added).  *See also*, Robert H. Lande & Joshua P. Davis, *Benefits from Priv. Antitrust Enf't: An Analysis of Forty Cases*, 42 U.S.F. L. REV. 879, 881-82 (2008) (footnotes omitted) ("The legislative history and case law interpreting the federal antitrust laws indicate that one important goal of the laws is to compensate victims of illegal behavior.").  *Id.* at 882 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n.10 (1977) ("'Treble-damages antitrust actions ... [were] conceived of primarily as a remedy for [t]he people of the United States as individuals, especially consumers . . . .'").

enterprises."[80]  This was explained in *Hawaii v. Standard Oil Co*., in which the United States Supreme Court denied the State of Hawaii's claim for antitrust treble damages because the state, unlike its citizens, did not sustain an injury to 'its business or property.' Here, the TRO Award empowers a third-party funder to enforce antitrust law absent any injury to *its* 'business or property' through anticompetitive behavior—circumstances under which even a sovereign state was held not to have a sufficient interest to pursue similar claims.

68.    "In enacting [antitrust legislation], Congress had many means at its disposal to penalize violators.  It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations . . . . Instead, Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation."[81]  The TRO Award—which compels litigation by a plaintiff who wishes to accept a settlement it believes to be fair and reflective of the current value of its claims at the behest of a nonparty financier seeking to maximize its profits—is in diametric opposition to the goals of treble damages and joint-and-several liability as they currently stand.  Giving effect to the TRO Award would thus appear to run contrary to the private attorneys general model Congress has created in antitrust law via the incentive structure—treble damages and joint-and-several liability—from which Burford seeks to profit.

## IV.    CONCLUSION

69.    To my knowledge, there is wall-to-wall consensus—among courts across the nation that had the occasion to rule on the matter; bar associations; scholars; and funders as far as we know from their public representations and standard no-control clauses—that ceding control over settlement decisions to a third-party funder is impermissible under current law and regarded as against public policy in the United States.

70.    In my opinion as a litigation funding expert as well as an expert on civil procedure and international arbitration, an arbitration award that forces a plaintiff to litigate an antitrust case against its will—including, specifically, the TRO Award—is contrary to public policy.  Any court

---

[80]    *Haw. v. Standard Oil Co*., 405 U.S. at 262, 264.

[81]    *Id.* at 262 (first citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130-31 (1969); and then citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 147 (1968)).

decision to the contrary, would send shock waves throughout the legal profession as well as the business community, which already regards third-party funding as a "clear and present danger to the impartial and efficient administration of civil justice in the United States." [82]

71.     I hereby affirm my genuine belief in the views and opinions expressed in this report.

_____          March 8, 2023_____

Prof. Maya Steinitz                              Date

Iowa City, IA USA

---

[82]     U.S. Chamber of Com. Inst. for Legal Reform, STOPPING THE SALE ON LAWSUITS: A PROPOSAL TO REGULATE THIRD-PARTY INVS. IN LITIG. 1 (2012), https://instituteforlegalreform.com/research/stopping-the-sale-on-lawsuits-a-proposal-to-regulate-third-party-investments-in-litigation/.

**EXHIBIT A**

**PROF. MAYA STEINITZ**
Charles E. Floete Distinguished Professor of Law
University of Iowa College of Law

## ACADEMIC APPOINTMENTS (SELECTED)

**BOSTON UNIVERSITY LAW SCHOOL**, Boston, Mass.          (expected start date July 2023).

*Professor of Law and R. Butler Gordon Scholar in International Law*. Teach civil procedure, international arbitration, and international business transactions.

**HARVARD LAW SCHOOL**, Cambridge, Mass.                                   2018

*Visiting Professor of Law*. Taught civil procedure, international business transactions, cross-border tort litigation, and litigation and law firm finance and the legal profession.

**UNIVERSITY OF IOWA COLLEGE OF LAW**, Iowa City, Iowa          2011–Present

*Charles E. Floete Distinguished Professor of Law (tenured since 2015).*

*Teaching*: Teach civil procedure, complex litigation, international business transactions, business associations (corporations), international arbitration, and negotiation and mediation.

*Additional teaching interests*: contracts, torts, professional responsibility, trusts & estates.

*Research*: Current research focuses on litigation finance, law firm ownership, and the future of the legal profession; transnational litigation, international adjudication, and international dispute resolution; class actions, mass torts and complex claims administration. My doctoral work focused on the social psychology of law, and since then I have mostly drawn on comparative law and law and economics.

**COLUMBIA LAW SCHOOL**, New York, N.Y.                          2006; 2009–2011

*Associate-in-Law*. Taught LLM course "Comparative Introduction to American Law" (with Prof. G. Fletcher). Designed and organized, in association with the Columbia Center on International Investment, a conference on "State and State-Controlled Entities in International Investment Arbitration."

*Lecturer*. Appointed to co-teach "The Legal Aspects of the Israeli-Palestinian Conflict."

## ACADEMIC PUBLICATIONS

### Books

- *Litigation Finance, Law Firm Ownership & The Future of the Legal Profession* (accepted for publication by CAMBRIDGE UNIVERSITY PRESS; expected publication 2024).

  This volume will collect, streamline, and update my works on litigation funding in monograph form. As such, it will be an in-depth study of the law, economics, policy implications, and the emerging and desirable practices in the interlocking areas of litigation and law firm finance. Critically, while earlier versions of most of the chapters were initially published separately, they developed as a single study of the major themes of these twin phenomena: What exactly is litigation funding? How do you price legal claims? Is litigation funding good or bad for different constituencies? What do and should litigation funding deals look like? How should individual deals and the industry as a whole be regulated? Cui bono – who wins and who loses from different forms of litigation funding? What is the relationship between funding a single case, a portfolio of cases, and a whole law firm? What are the likely implications of the undoing of lawyers' monopoly over the practice of law for lawyers, law firm, and society writ large? What will happen when lawyers have equal but competing fiduciary duties to clients and to those holding the purse strings (otherwise stated: is the future of law like the present of medicine)?

- *The Case for an International Court of Civil Justice* (CAMBRIDGE UNIVERSITY PRESS 2019).
  The book argues that we live in a world in which the victims of cross-border mass torts *de facto* lack a court to turn to in order to pursue legal action against multinational corporations responsible for disasters, atrocities and other harms. And even though tort victims ultimately receive no redress, corporations must nonetheless spend large sums to defend against sprawling, parallel litigations. The best way to provide a fair, legitimate, and efficient process for both victims and corporations is to create an International Court of Civil Justice (ICCJ). The book presents both justice-based and economics-based arguments in favor of an ICCJ. Closely associated with the economic arguments is a broader explanation for why the proposal is not only timely but also, perhaps counterintuitively, politically viable. The book also provides a procedural and institutional design for such a court, addressing such issues as personal and subject-matter jurisdiction, remedies, appeal, preclusion, and judicial independence.

- *Rules and Laws for Civil Actions* (with J. Rantanen, et. al) (2022) (open source, funded by an OpenHawks grant).

  Rules and Laws for Civil Actions is an open-access resource for law students containing the U.S. Constitution, Federal Rules of Civil Procedure, Federal Rules of Evidence, Federal Rules of Appellate Procedure, and selected federal and state statutes. In addition to containing the official text, each legal source found in Rules and Laws for Civil Actions is accompanied by an introductory section written by an Iowa Law professor explaining its significance and background. The book was created, with the support of an OpenHawks grant, to supplement the study of Civil Procedure, Evidence, Constitutional Law, and other law school courses and to address multiple barriers to student access to these resources, including cost, multi-platform use, disability, and readability.

- *Civil Procedure: Cases and Materials* (open source coursebook, forthcoming 2024).
  A Coursebook for the first-year civil procedure course, containing edited court opinions, scholarly excerpts, and introductory essays by the author. Aimed in part to address multiple barriers to student access to learning materials including cost, multi-platform use, disability, and readability.

- *Trust: The Unlikely Story of The Temple Mount/Al-Haram Al-Sharif Waqf* (in progress).

  The Jerusalem Waqf Administration is a trust arrangement under Islamic law which governs sites holy to both Jews and Muslims: Al-Haram al-Sharif and Temple Mount. *Trust* explores the puzzle of why, in a region where no dispute resolution mechanism seems to work, the compromise of having a waqf govern the holiest sites in Jerusalem does work. In so doing, it contributes to the study of dispute resolution the idea that trusts—those that developed in religious traditions such as Shari'a, Halachic (Jewish) law, and Cannon law as well as those used in the Common Law world and semi-equivalents in Civil Law systems—should be added to the dispute management and resolution toolbox into which negotiators reach in devising interim and final peace agreements and in international dispute resolution more broadly.

- *Law and the Self: An Imaginary Exchange of Letters between H.L.A. Hart and G.H. Mead* (in progress).
  In this re-working of my doctoral thesis, I present a fictional debate between two titans of the 20th century—the social philosopher Herbert Mead and the legal philosopher Herbert Hart. Using this heuristic/artistic device, I present my own argument that (i) phenomenologically, whatever else the law is it is patterned interactions between society's Generalized Other (as defined by Mead), performed by legal institutions, and the Self; (ii) that the concept of law co-emerges with the phenomenon of law; and (iii) that important implications follow from the co-emergence of law and its concept for both substantive and methodological legal positivism.

## Law Review Articles

- *An End to Class Actions?* (in progress).

  This article explores the ways both plaintiffs and defendants have devised in recent years to circumvent the class action device and offers another novel way to aggregate cases without the need to go through the increasingly-difficult class certification process.

- *The Partnership Mystique: Law Firm Finance and Governance in the 21st Century*, 63 WM & MARY L. REV., 939 (2022).

  The article identifies and analyzes the de facto and de jure end of lawyers' exclusivity over the practice of law in the U.S.. First, the article argues that various financial products that have recently flooded the legal market are functionally equivalent to investing in and owning law firm and create all the same governance challenges as does allowing nonlawyers to directly own stock in law firms. Second, the article analyzes Arizona's groundbreaking legalization of nonlawyer participation in law firms and the effects it will have nationally. Third, the article explains that the drawbacks of liberalizing the practice of law are rooted in the conception of shareholder primacy. This principle would encourage lawyers to prioritize profit-maximization for the benefit of their investors over the interests of clients and the courts. Fourth, despite the apparent dangers there are reasons to celebrate the end of the era of the legal practice as the exclusive purview of lawyers. Lawyers' monopoly hinders inclusion and diversity and,

counterintuitively, undermines practitioners' dignity and wellbeing. Fifth, the apparent dangers of liberalization can be avoided if states follow Arizona in allowing nonlawyer participation in the practice of law but condition it on organization as 'legal benefit entity' which will be required to privilege the interests of clients and the courts over those of investors.

- *Follow the Money? A Proposed Approach for Disclosure of Litigation Finance Agreements*, 53 U.C. DAVIS L. REV. 1073 (2019).

  Congress, state legislatures, state and federal courts, bar associations, and others are proceeding along dozens of parallel tracks, engaging in fierce debates about how best to regulate the disclosure of litigation finance. This essay aims to turn those debates inside out. The thrust of the argument is that the quest for a bright-line rule by which to regulate disclosure of litigation funding is fundamentally misguided because it fails to account for the near-infinite variability of funding scenarios—scenarios that implicate widely different interests, pose different risks, and affect different constituencies to varying degrees. Instead of a bright line rule, this Essay proposes a shift to a standard-based approach and, specifically, a balancing test. After explaining the stakes, and laying out the reasons why finding a uniform approach has proved so controversial and elusive, the Essay culminates with a suggestion for a specific balancing test, including factors and interests to be weighed by courts on an ad hoc basis.

    - Republished, in edited form, in Harvard's *The Practice* (September-October 2019).
    - Republished in David Siffret et. al (eds.), Mandatory Disclosure Rules in Dispute Financing (forthcoming 2020).

- *Transnational Litigation as Prisoners Dilemma* (with P. Gowder) 94 NORTH CAROLINA L. REV. 751 (2016).
  In this article we use game theory to argue that perceptions of widespread corruption in the judicial processes in developing countries create *ex ante* incentives to act corruptly. Therefore, contrary to judicial narratives in individual cases—such as the (in)famous Chevron-Ecuador dispute used as illustration—the problem of corruption in transnational litigation is structural and as such calls for structural solutions. The article offers one such solution: the establishment of an international court of civil justice.

- *Back to Basics: Public Adjudication of Corporate Atrocities Mass Torts,* HARVARD JOURNAL OF INTERNATIONAL LAW (2016) (invited symposium essay).
  Arguing that the international tort cases arising out of corporate atrocity crimes should be adjudicated in an international court, not in international arbitration.

- *Incorporating Legal Claims,* 90 NOTRE DAME L. REV. 1155 (2015).
  This article proposes a new paradigm which would replace litigation-finance-as-champerty (the 'legal ethics paradigm') as the organizing idea in the literature and jurisprudence of litigation finance with litigation-finance-as-finance (the 'incorporation paradigm'). It first argues that the problems created by litigation finance are all facets of the classic problem of the separation of ownership and control. It then suggests incorporating legal claims: conceiving of a claim as an asset with an existence separate from the plaintiff by issuing securities tied to litigation proceed rights. Such securities can be issued with or without the use of various business entities. The incorporation paradigm also opens up the possibility of applying practices of corporate governance to litigation governance. The theoretical argument is

buttressed by an analysis of previously-overlooked deals that used securities tied to litigation proceed as well as corporate governance mechanisms.

- *The Case for an International Court of Civil Justice*, 67 STAN. L. REV. 74 (2014).
  An essay in which the main argument in the book by the same name (above) was presented.

- *A Model Litigation Finance Contract,* (with A. C. Field) 99 IOWA L. REV. 711 (2014).
  This article steps into the gap created by the absence of information about or discussion of litigation finance contracting by providing an annotated model contract. We (i) set out the efficiency and justice case for a model contract; (ii) build on previous work to make the case for using venture capital contracts as analog; (iii) describe the ethical and economic challenges constraining parties to litigation finance contracts and narratively explain the contractual solutions we have devised; (iv) provide a model contract; and (v) conclude by mapping a research agenda for the new field of litigation finance contracting.

  - See also *online research project*: litigationfinancecontract.com
    In this first-ever instance of 'crowd-sourced' legal research I offered a model litigation finance contract, provision by provision, for discussion and debate. I linked our provisions to background essays we authored and hosted and edited guest commentary, which served as original research in their own right. Where persuaded by the commentary we revised our draft model. The final model contract was published as a section in the *A Model Litigation Contract*.

- *How Much is that Lawsuit in the Window? Pricing Legal Claims* 67 VANDERBILT L. REV. 1889 (2013).
  How should parties to litigation finance and contingency fee agreements deal with the inherent difficulty in pricing legal claims? The answer lies in "staged funding" which allows all of the claim owners to minimize the effects of uncertainty, optimize the distribution of the proceeds, and increase the value of the option to settle—described here as a compound call option—by accounting for real options i.e., lawyers' and funders' option of adjusting their investments in response to new information. The article concludes with practical suggestions on how to adapt staged funding, common in other areas of finance, to third party litigation funding.

- *The Litigation Finance Contract*, 54 WM & MARY L. REV. 455 (2012).
  Whereas the literature and case-law on litigation funding ("LF") is based on an analogy between LF and contingency fees this article breaks away from that tradition and instead posits an analogy to venture capital ("VC"). The article explains the resemblance between the economics of LF and the well-understood economics of VC, both of which are characterized by extreme (1) uncertainty, (2) information asymmetry, and (3) agency costs. It discusses which contractual arrangements developed in VC directly apply to LF, which need adaptation, and how to adapt. The analogy turns most of the conventional wisdom on its head arguing that funders should be viewed as real parties in interest and should be allowed to purchase control over the litigation. Various policy implications of the conceptual shift are explored.

- *Whose Claim is This Anyway? Third-Party Litigation Funding*, 95 MINNESOTA L. REV. 1268 (2011).
  The article identifies and describes the emerging secondary market in legal claims and the prospect of securitization of legal claims. It applies a bargaining analysis to understanding the systemic effects of the litigation finance industry and offers a three-step argument for a move

away from a prohibition of litigation funding towards nuanced regulation of the industry. The article concludes with a five-pronged framework for the suggested regulatory regime.

- ▪ Republished in *Transnational Dispute Management Journal* (2012).

- ▪ *Internationalized Pro Bono and a New Global Role for Lawyers in the 21st Century: Lessons from Nation Building in Southern Sudan*, YALE HRDL JOURNAL (Spring 2009).
  This Note From the Field draws on the author's experience leading a team of fifty attorneys in representing the Sudanese Peoples Liberation Movement in drafting and negotiating the National Interim Constitution of Sudan, the Interim Constitution of Southern Sudan, and the Constitutions of two "transitional" states. It provides some counter-intuitive observations on the role *pro bono* private practitioners play, in contrast with public sector attorneys and foreign aid providers, as they enter the 'market' of global affairs.

- ▪ *The International Criminal Tribunal for Rwanda as Theater: The Social Negotiation of the Moral Authority of International Law*, 5 U. PENN. JILP 1 (2006).
  This article explores the philosophical notion advanced by some positivists that law *qua* law claims legitimate and supreme authority through ethnographic research conducted at the international criminal tribunal for Rwanda (ICTR). It examines the means through which moral authority is constructed and communicated by the ICTR and by extension by the International Criminal Courts (ICCs). It advances the argument that the ICCs seek to personify the Generalized Other (as the term is used in social-psychology) and demonstrates how they claim to embody the universal authority and morality of the international community.

- ▪ *'The Milosevic Trial - Live!': An Iconic Analysis of International Law's Claim of Legitimate Authority,* 3 OXFORD J. OF INT'L. CRIM. J. 103 (2005) (peer-reviewed).
  It has been argued that in order for a normative system to qualify as law it must claim to possess legitimate authority and to be supreme to other normative systems. This article examines criminal war trials from an ethnographic perspective, trying to discern whether and how international law claims legitimate authority and supremacy. Specifically, it focuses on the deeply symbolic example of the Milosevic trial. It offers a sociological reading of the symbolism of the interpersonal dynamics at the trial to show how a claim of supreme, legitimate authority is socially constructed and explores the sub-textual claims of the trial.

- ▪ *The Ad Hoc International Criminal Tribunals and a Jurisprudence of the Deviant*, 7 INT'L LAW FORUM DU DROIT 129 (2005) (invited, peer-reviewed).
  This short article is a synopsis of a doctoral thesis entitled "Law as Communication: A Concept of International Law," described below.

- ▪ *Law as Communication: A Concept of International Law*, J.S.D. DOCTORAL THESIS (NYU 2005).
  The thesis seeks to defend Razian positivism, specifically the claim that "whatever else the law is, it either claims legitimate authority, is held to possess it, or both" in two ways. One, is by using concepts from the social philosophy of G. H. Mead and his intellectual disciples (principally Erving Goffman) to explain the emergence of law and the co-emergence of the concept of law. The other, is a dramaturgical ethnography of the international criminal courts. The ethnography is used as an illustration of how one normative system claiming to be 'law'— the international legal system—is claiming legitimate, supreme, authority.

**Edited Volumes**

- *Third-Party Litigation Funding of International Investment Arbitration* in the MAX PLANK INSTITUTION ENCYCLOPEDIA OF CIVIL PROCEDURE (OXFORD UNIVERSITY) (2021).

- *Follow the Money? A Proposal for the Regulation of Disclosure of Litigation Finance* in MANDATORY DISCLOSURE RULES IN DISPUTE FINANCING (David Siffret et. al, eds.) (2020 NYU PRESS).

  - *Transnational Litigation Process Theories* in THE INTERNATIONAL ADJUDICATION HANDBOOK (C. Romano et. al, eds.) (OXFORD UNIVERSITY PRESS 2014).

  - *Foreign Direct Investment by State-Controlled Entities—Do the Rules Need Changing?* in FDI BY STATE-CONTROLLED ENTITIES (Karl P. Sauvant and Lisa Sachs, eds.) (OXFORD UNIVERSITY PRESS 2012).

  - Contributor, RESTATEMENT ON INTERNATIONAL COMMERCIAL ARBITRATION (George A. Bermann et. al, eds.).

**Edited Journal Issues**

- "Contingent Fees and Third-Party Funding in Investment Arbitration Disputes," TRANSNATIONAL DISPUTE MANAGEMENT (2011) (with J. Matthews).

- "International Round Table on Law and Semiotics," INT'L J. LAW AND SEMIOTICS (Spring 2007) (with J. Brigham and A. Patakchi).

**Unpublished Works in Circulation**

- *Written testimony on lawsuit lending before the New York State Senate Standing Committee on Consumer Protection*, May 2018, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3178963.

- *Letter to the Hon. Sen. Orrt (NYS Senate) Regarding Lawsuit Lending*, May 2018, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3238148 (a follow-up research memorandum provided the New York State Senate Standing Committee on Consumer Protection at its request following up on the testimony).

- *Experiential Teaching in Theory and Practice: An Annotated International Business Transaction Syllabus*, U. IOWA LEGAL STUDIES RESEARCH PAPER NO. 15–22 (with O. Shalomson and N. Steinitz – Edelman).

**OpEds and Short Pieces**

- *To Heal the Nation, Hold Even the Politically Powerful Accountable*, Washington Post (October 2022).

- *The Sanctions Against Russia – A Game Changer for Israel*, Haaretz (April 2022) (Hebrew).

- *Pissarro Goes to Washington: Nazi-looted art litigation in the U.S. Supreme Court*, Haaretz (January 2022) (Hebrew).

- *The Abraham Accords Honeymoon May lead to Arbitration Impasses*, Globes (October 2021)

(Hebrew).

- *The Identity Crisis of American Identity Politics*, Haaretz (August 2021) (Hebrew).

- *The Significance of Bill Cosby's Release*, Haaretz (July 2021) (Hebrew).

- *The Unholy Status Quo*, Haaretz (June 2021) (Hebrew).

- *Israel Can Learn from Police Reform in America*, Globes (May 2021) (Hebrew).

- *The Party Is Over*, Haaretz (April 2021) (Hebrew).

- *How to Accomplish Compensation for the Victims of the Mediterranean Tar Spill*, Haaretz (March 2021) (Hebrew).

- *Tar Disaster: Domestic Courts will Struggle to Provide Redress*, Globes (March 2021) (Hebrew).

- *Profits May Tip Scales of Justice,* Arizona Republic (Feb. 2021) (with V. Sahani).

- *New Ariz. Law Practice Rules May Jump-Start National Reform*, Law360 (January 2021) (with V. Sahani).

## Scholarly Blog Posts

- *Navigating the Sea Change in Law Firm Finance and Ownership in the U.S.*, Kluwer Arbitration Blog (November 2021) (with V. Sahani).

- *The Model Contract Project Overview*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Jan. 14, 2013).

- *The Case for Staged Funding of Litigation*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Jan. 14, 2013).

- *Litigation Proceed Rights*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Jan. 16, 2013).

- *Sale and Purchase of Litigation Proceed Rights*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Jan. 18, 2013).

- *Pricing Litigation Proceed Rights: Initial Claim Value and Risk Discount Factors*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Jan. 21, 2013).

- *Milestones Generally and in the Model Contract*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Jan. 25, 2013).

- *Introducing Conflicts of Interest*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Jan. 28, 2013).

- *Funding Through to Milestones: Accelerated and Supplemental Investments*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Jan. 30, 2013).

- Maya Steinitz, *Re-Pricing Litigation Proceed Rights*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Feb. 1, 2013).

- *Champerty*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Feb. 6, 2013).

- *Discoverability of Funding Contracts*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Feb. 8, 2013).

- *Final Funding Provisions*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Feb. 13, 2013).

- *Attorney Waste*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Feb. 15, 2013).

- *Using Securities as the Financing Instrument*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Feb. 21, 2013).

- *The Need for Independent Counsel*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Feb. 27, 2013).

- *Disclosing Conflicts of Interest*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 1, 2013).

- *Funder Influence, Not Control: Settlement Decisions in the Model Contract*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 6, 2013).

- *Funder Influence, Not Control: Choosing Litigation Counsel*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 8, 2013).

- *Funders as Lawyers*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 13, 2013).

- *The Duty to Cooperate*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 15, 2013).

- *Funder as Fiduciaries*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 20, 2013).

- *Defining the Award*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 22, 2013).

- *Confidential Information*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 27, 2013).

- *Dealing with Investigations*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Mar. 29, 2013).

- *Attorney-Client Privilege and Litigation Funding in New York*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Apr. 3, 2013).

- *Attorney-Client Privilege and the Model Contract Part 1: Common Legal Interest*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Apr. 5, 2013).

- *Privilege II: Securities Fraud and Information Shared as of Contract Execution*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Apr. 10, 2013).

- *Privilege III: Information Sharing During the Funding of the Suit*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Apr. 12, 2013).

- *Securitizing Claims*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Apr. 17, 2013).

- *Securitization and Secondary Financing Under the Model Contract*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Apr. 19, 2013).

- *Choosing a Forum for Dispute Resolution*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Apr. 26, 2013).

- *Funding Terms, Conflicts and the Model Contract, a Response*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 1, 2013).

- *Terminating Funding Contracts*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 3, 2013).

- *Rights of Funder to Terminate for Cause*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 6, 2013).

- *Termination for Cause by Plaintiff*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 8, 2013).

- *Consequences of Termination for Cause*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 10, 2013).

- *Executed Litigation Finance Contract from Canada*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 15, 2013).

- *Comparing the Financial Terms in the Dugal Contract to the Model*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 17, 2013).

- *Information Sharing in the Dugal Contract V. The Model*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 20, 2013).

- *Conflicts and Buyer's Remorse in the Dugal Contract V. The Model*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 22, 2013).

- *Termination and Control in the Dugal Contract and the Model*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 24, 2013).

- *Incorporating the Claim*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (May 31, 2013).

- *Dugal Versus the Model; Final Odds and Ends*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 3, 2013).

- *Securities Interest in the Model Contact*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 5, 2013).

- *Protecting the Claim from Impairment*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 7, 2013).

- *Proceeds and Costs*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 10, 2013).

- *Proceeds and Taxes*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 12, 2013).

- *The Role of Representations, Warranties and Covenants*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 14, 2013).

- *Capping Funder's Investment and Contractual Fiduciary Duties: A Response To Professors Sebok And Wendel*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 20, 2013).

- *Contracting for Funding in "Access to Justice Cases" Versus "Corporate Finance Cases"*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 24, 2013).

- *Good Faith Duty as Alternative to Fiduciary Duty*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (June 27, 2013).

- *The Third Wave of Litigation Finance: Litigation Finance as Corporate Finance*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (July 1, 2013).
- *The Need for and the Potential Role of Reputation Markets in Litigation Finance*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (July 4, 2013).
- *Aligning Incentives by Requiring Plaintiff to Shoulder Part of the Costs*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (July 11, 2013).
- *The Model and the Securities Laws, Coda*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (July 29, 2013).
- *Litigation Finance Brokers*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (August 1, 2013).
- *Some Thoughts About Plaintiff's Due Diligence*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (August 5, 2013).
- *Pricing Legal Claims Part I: The Valuation Challenge*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Aug. 15, 2013).
- *Pricing Legal Claims Part II – Valuation Biases and Heuristics*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Aug. 19, 2013).
- *Pricing Legal Claims III-Staged Funding and the Link to Options Analysis*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Aug. 21, 2013).
- *Pricing Legal Claims IV: Staged Funding Addresses the Nonmonotonic Trajectory of Claim Value*, Model Litig. Fin. Cont.: Litig. Funding Theory Prac. (Aug. 29, 2013).

**Refereeing** *(selected)*
- European Journal of International Law
- Oxford University Press (multiple)
- Oxford University Press Yearbook on International Investment Law
- Oxford Journal of International Criminal Justice
- Dutch Research Council
- Israel Science Foundation
- Aspen Publication

## LEGAL EXPERIENCE

### JUDICIAL CLERKSHIPS

**INTERNATIONAL CRIMINAL TRIBUNAL FOR RWANDA**, Rwanda & Tanzania    2003
*Judicial Intern*. Assisted judges in Trial Chamber with all aspects of judicial duties.

**HON. E. HAYUT, TEL AVIV APPELLATE COURT,** presently **CHIEF JUSTICE OF THE SUPREME COURT OF ISRAEL**                    1998–1999

*Judicial Clerk*. Served on one of five penultimate national courts of appeal, considered second in importance only to the Supreme Court of Israel. Assisted in all aspects of judicial duties of the Hon. E. Hayut. Also assisted panel chaired by the Hon. A. Grunis, former Chief Justice of the Supreme Court of Israel, in all judicial tasks.

## LITIGATION

**LATHAM & WATKINS, LLP**, New York, NY                    2003–2009

*Associate*. Originated and led representation of the Government of Southern Sudan in the negotiation and drafting of peace agreements and post-conflict constitutions following more than 20 years of civil war. Represented companies and governments in all aspects of pre-claim, pre-hearing, and arbitral proceedings in arbitrations under the rules of the ICC, LCIA and UNCLOS, in enforcement actions in New York courts and in securities and antitrust investigations and litigation. Litigated multi-billion dollar post-merger and cross-border finance disputes on behalf of Fortune 100 and Fortune Global 500 companies.

**FLEMMING, ZULACK & WILLIAMSON, LLP**, New York, NY                    2001–2002

*Law Clerk*. Participated in every aspect of sophisticated commercial trial practice for this Wall Street boutique law firm. Researched and wrote memoranda on issues including insurance, product liability, construction and contract law.

## ARBITRATION AND ADJUDICATION

***Court Member & Arbitrator***                    2009–Present

Served as chair, sole arbitrator, and co-arbitrator in dozens of international and domestic arbitrations. Authored dozens of arbitration decisions and awards (judgements) on topics of public and private international law, securities law, contracts, and torts. Selected to serve as one of nine Members of the inaugural bench of the ICC's Jerusalem Arbitration Center, a joint venture of the Israeli and Palestinian chambers of commerce, which resolves commercial disputes between Israelis and Palestinians. Member of the rosters of arbitrators of the ICC Court of Arbitration (ICC), the International Centre for Dispute Resolution (ICDR), the United Nations World Intellectual Property Organization (WIPO), the Singapore International Arbitration Center (SIAC), and the Financial Industry Regulatory Authority (FINRA). Serve as a Member of the ICC Commission on Arbitration and the Academic Council of the Institute for Transnational Arbitration.

**ISRAEL DEFENSE FORCES**, Israel                    1992–1995

*Lieutenant*. Served as an adjudication officer, adjudicating hundreds of cases including cases that carried a penalty of jail time; platoon commander on the Israeli - Jordanian border during handover of the Jericho military post to the Palestinian Authority in implementation of the Oslo Accords. Prior to becoming an officer, served as media relations coordinator for the IDF spokesman.

## EDUCATION

**NEW YORK UNIVERSITY SCHOOL OF LAW**, LL.M., 2000; J.S.D. 2005.

*Honors*: Emile Noel Fellow, Jean Monnet Center for and Regional Economic Law and Justice; Dean's merit scholarships (multiple); Slavitt Postgraduate Fellowships; AVI foundation scholarship; Advanced Doctoral Research Fellowship, University College, Oxford.

**HEBREW UNIVERSITY FACULTY OF LAW,** Jerusalem, Israel, LL.B. 1999.

*Honors*: Minerva Human Rights Inaugural Fellowship. *Teaching Assistant:* Introduction to Israeli Law; Introduction to Common Law.

*Lecturer*: Introduction to Legal Philosophy, 1998–1999.

## BAR ADMISSIONS

Admitted to the New York State Bar (2004); Southern District of NY; Eastern District of NY.

## PRESS APPEARANCES

Interviewed and cited by scores of leading news outlets globally, including the New York Times, the Washington Post, the Wall Street Journal, NBC, NPR, CBS 60 Minutes, The Atlantic, The Chicago Tribune, Reuters, Bloomberg, and the American Lawyer.

## LECTURES AND PRESENTATIONS

- Commentator, *Recent Developments in Litigation Finance*, Tel Aviv University (June 2023).
- Co-organizer and Presenter, *Frontiers in Law Firm Ownership*, NYU Law School Center for Civil Justice (February 2023).
- Co-organizer and Presenter, *Recent Developments in Arbitration*, NYU Law School Center for Civil Justice (November 2022).
- Presenter, *Sixteenth Annual Judicial Symposium on Civil Justice Issues*, George Mason's Law and Economics Center (October 2022).
- Presenter, *Complex Litigation Ethics*, Hastings Law School (October 2022).
- Participant, expert roundtable held by the U.S. Government Accountability Office (GAO) on the topic of addressing data/information gaps in in the U.S. third-party litigation finance market (September 2022).
- Presenter, *Alternative Business Structures: Accessing Justice Through a different Model*, Baylor Law School (September 2022).
- Invited Speaker, *The Abraham Accords - Discussion with Prof. Maya Steinitz*, Freshfields (July 2022).
- Organizer and moderator, *Practical Insights into Commercial Arbitration in the Abraham Accords Economy*, Tel Aviv/Dubai/London (virtual) (June 2022).

- Panelist, *Litigation Funding Disclosure*, Baylor Law School (May 2022).

- Investiture Lecture, *The Great Transformation of the American Courtroom and Two Possible Futures of the Legal Profession*, University of Iowa School of Law (April 2022).

- Moderator, *Recent Developments in International Arbitration Finance*, NYU Law School (February 2022).

- Presenter, *Third Party Litigation Funding - A Necessity or Deterrence of Justice?*, the European Law Institute, Vienna, Austria (virtual) (December 2021).

- Presenter, *The Role of Third-Party Financing in the Litigation Ecosystem*, Fifteenth Annual Judicial Symposium on Civil Justice, George Mason's Law and Economics Center (November 2021).

- Presenter, *New Issues in Litigation Funding*, Berkeley Law School (October 2021).

- Discussant, *The Mysterious Market for Post-Settlement Litigant Finance*, Berkley Law School (March 2021).

- Presenter, *Israeli-Arab Commercial Arbitration in the Wake of the Abraham Accord*, Boston University Law School (March 2021).

- Keynote speaker, *Harnessing the law to protect the planet: The case for an International Court for the Environment*, International Bar Association's Human Rights Institute, London (virtual) (February 2021).

- Panelist, *Careers in International Law*, University of Iowa College of Law (February 2021).

- Panelist, *Careers in International Law*, Boston University School of Law (February 2021).

- Presenter, *The Partnership Mystique: Law Firm Finance and Governance in the 21st Century*, Boston University Law School (January 2021).

- Presenter, *The Growth of Third-Party Litigation Finance: Promise or Peril?* Association of American Law Schools (AALS) (January 2021).

- Presenter, *Arizona's Pioneering World of Non-Lawyer Investment in Law*, Cardozo Law School (December 2020).

- Presenter, *The Case for an International Court of Civil Justice*, Northwestern Law School's Sixth Annual Civil Procedure Workshop (October 2020).

- Discussant, *Avraham et al.'s "The Mysterious Market for Post-Settlement Litigant Finance,"* Northwestern Law School's Sixth Annual Civil Procedure Workshop (October 2020).

- Discussant, *Professor Mark Osiel's 'The Right to Do Wrong,"* Iowa Law (October 2020).

- Presenter, *Funding International Collective Proceedings*, Global Class Actions Symposium, London (virtual) (September 2020).

- Moderator, *The Future of Dispute Financing*, NYU Center for Civil Justice (June 2020).

- Presenter, *The Case for an International Court of Civil Justice*, Boston University Law School (May 2020).

- Presenter, *The Case for an International Court of Civil Justice*, Stanford Law School (March 2020).

- Panelist, *Litigation Finance Ethics,* Berkeley Law School (September 2019).

- Moderator*, E-discovery and Civil Procedure,* Harvard Law School (September 2019).

- Panelist*, The Future of Dispute Finance: Pricing, Profits, and Policy*, NYU Law School (October 2019).

- Panelist, *Follow the Money? A Proposed Approach for Disclosure of Litigation Finance Agreements*, Hebrew University of Jerusalem (November 2019).

- Panelist, "*The Erosion of the Rule of Law in Nazi Germany and How It Informs Challenges of Today*," Latham & Watkins, New York (June 2019).

- Panelist, "*The Past, Present and Future of Litigation and Law Firm Finance*," Western Bar Associations Annual Meeting, Hawaii (March 2019).

- Panelist, "*Disclosure of Litigation Finance, Pool Financing, and Fee Sharing*," New York City Bar Association Task Force on Litigation Finance (March 2019).

- Panelist, *"The Case for an International Court of Civil Justice,"* International Institute on Sustainable Development Geneva (February 2019).

- Panelist, *"The Case for an International Court of Civil Justice,"* British Institute of International and Comparative Law (February 2019).

- Panelist, *"The Case for an International Court of Civil Justice,"* Max Planck Institute Luxembourg for Procedural Law (January 2019).

- Panelist, *"The Case for an International Court of Civil Justice,"* Paris Institute of Political Studies (Sciences Po) (January 2019).

- Panelist, *"The Case for an International Court of Civil Justice,"* Amsterdam University School of Law (January 2019).

- Panelist, *"The Case for an International Court of Civil Justice,"* The Hague Academy of International Law (January 2019).

- Panelist, "*Alternative Litigation Funding in the Federal Courts*," George Washington Law School (November 2018).

- Moderator, "*Litigation or Arbitration?*" Harvard Law School (October 2018).

- Panelist, *"The Case for an International Court of Civil Justice,"* Harvard Law School (September 2018).

- Panelist, *"Law Firm Finance and Governance in the 21st Century,"* Harvard Law School (April 2018).

- Panelist, *"The Case for an International Court of Civil Justice,"* Harvard Law School (March 2018).

- Moderator, "*Women in Arbitration and Gender Issues*," Harvard Law School (February 2018).

- Panelist, "*Facing the Future in International Arbitration: Evolving Issues, Practices and Solutions*" Fordham Law School (November 2017).

- Panelist, "*Third-Party Funding in Investor-State Dispute Settlement*," Columbia Law School (October 2017).

- Panelist, *"The Case for an International Court of Civil Justice,"* Haifa University, Israel (October 2017)

- Panelist, *"The Case for an International Court of Civil Justice,"* College of Law and Management, Israel (October 2017)

- Panelist, "*International Arbitration finance*," Three Crowns, London (July 2017).

- Panelist, *"The Case for an International Court of Civil Justice,"* Northwestern Colloquium on law and global capitalism (May 2017).

- Commentator, comment on *"Do Courts Matter for Firm Value? Evidence from the U.S. Court System,"* American Law and Economic Association, Harvard Law School (May 2016).

- Panelist, *Litigation Finance,* Hebrew University of Jerusalem (June 2016).

- Panelist, *"The Case for an International Court of Civil Justice,"* Hebrew University of Jerusalem (May 2016).

- Panelist, *Back to Basics: Public Adjudication of Corporate Atrocities Mass Torts*, Harvard Law School (April 2016).

- Moderator, *Litigation funding*, NYU School of Law Center on Civil Justice (November 2015).

- Panelist, *"Lex arbitri Israel and Palestine: Current Status and Recent Developments,"* ICC International Court of Arbitration, Paris, France (October 2015).

- Panelist, *"The Jerusalem Arbitration Center,"* multiple presentations in Tel Aviv and Ramallah (June 2015).

- Panelist, *"The Case for an International Court of Civil Justice,"* NYU School of Law (July 2015).

- Panelist and Commentator, *"The Case For an International Court of Civil Justice,"* Midwest Regional Colloquium on International Law/International Organization, Northwestern Law School/American Bar Foundation (May 2015).

- Panelist, *"The Color of Money: Ethical Issues in Alternative Litigation Funding,"* California Bar Association Annual Ethics Symposium, San Diego, CA (April 2015).

- Panelist, *"Transnational Litigation as Prisoner's Dilemma,"* Washington & Lee School of Law Faculty Seminar (March 2015).

- Panelist, "*Litigation Finance*," 66th Annual Oil & Gas Law Conference of the Institute for Energy Law, Houston, Texas (February 2015).

- Panelist, *"Corruption and the Transnational Litigation Prisoner's Dilemma,"* Florida International University Law School (November 2014).

- Moderator, *"Rethinking Litigation,"* Centennial Symposium Honoring the Work of Professor Hovenkamp, Iowa City, Iowa (October 2014).

- Panelist and Commentator, *"Corruption and the Transnational Litigation Prisoner's Dilemma*," Midwest Regional Colloquium on International Law/International Organization, Northwestern Law School/American Bar Foundation (May 2014).

- Panelist, *"Litigation Finance: Contracts and Ethics,"* American Bar Association, 2014 National Conference on Professional Responsibility (May 2014).

- Panelist, *Fraud in Transnational Litigation*, Stanford Law School (May 2014).

- Panelist, *Litigation Finance: Contracts and Ethics*, American Bar Association, 2014 National Conference on Professional Responsibility (May 2014).

- Panelist and Commentator, *Corruption and the Transnational Litigation Prisoner's Dilemma*, Midwest Regional Colloquium on International Law/International Organization, Northwestern Law School/American Bar Foundation (May 2014).

- Selected Paper Presentation, *A Model Litigation Finance Contract*, Legal Scholarship 4.0 Conference, Northeastern University School of Law, Boston (March 2014) (Paper selected based on national competition).

- Panelist, *Financing International Arbitration*, Columbia Law School, NY (February 2014).

- Moderator, *Crowdsourcing Litigation Finance*, SFU School of Law, SF (January 2014)

- Moderator, *The Jerusalem Arbitration Center*, NYU Law School, NY (November 2013).

- Panelist, Roundtable on Third Party Funding of Litigation and Arbitration, Washington & Lee School of Law (November 2013).

- Panelist, *Alternative Finance of Securities Litigation*? Annual Institute for Investor Protection Conference, Chicago (October 2013).

- Panelist, *Financing International Arbitration*, Columbia Law School, NY (September 2013).

- "Incorporating Legal Claims," University of Pennsylvania (Fall 2013).

- Panelist, *The Litigation Finance Contract*, Windsor Law, Windsor, Ontario, Canada (July 2013).

- Panelist, *The Jerusalem Arbitration Center: The Promise and the Challenges*, Center for Law and Business, Tel Aviv (June 2013).

- Panelist, *Rights and Obligations in Litigation Finance*, Institute for Law & Economic Policy, Naples, Fl. (April 2013).

- Panelist, *Litigation finance*, the ABA Litigation Section Annual Meeting, Chicago, IL (April 2013).

- Panelist, *Financing the Chevron / Ecuador Litigation*, Stanford Law School, Stanford, CA (February 2013).

- Panelist, *The Jerusalem Arbitration Center in a Comparative Perspective*, Israel Social Avenues Conference, Sapir College, Sderot, Israel (December 2012).

- Panelist, *International Arbitration*, Herzog, Fox & Ne'eman, Tel Aviv (July 2012).

- Trainer, *International Arbitration*, co-teach 4-day training program for lawyers, arbitrators and judges, Palestine Chamber of Commerce, Ramallah (July 2012).

- Trainer, *International Arbitration*, teach 2-day training program for lawyers, arbitrators and judges, Israel Chamber of Commerce, Tel Aviv (June 2012).

- Speaker, *The Litigation Finance Contract*, University of Wisconsin School of Law, Madison (March 2012).

- Panelist, *Third Party Funding of International Arbitration,* Third Annual ICC Asia Pacific Conference, San Francisco (March 2012).

- Moderator and Panelist, *Third Party Funding of International Arbitration,* 10th Annual International and Arbitration Conference, Miami (February 2012).

- Panelist, *Women in Public Service,* 2nd Annual Duke University School of Law Women in the Law Conference Durham (January 2012).

- Panelist, *Third Party Funding of International Arbitration Claims,* Fordham University School of Law (June 2011).

- Panelist, *Ethics in International Arbitration,* Israel Bar Association/American Bar Association, Israel (May 2011).

- Panelist, *Nuts and Bolts of Academic Publishing*, New York University School of Law (April 2011).

- Moderator, *Law, Religion and Politics Unbounded: Contemporary Perspectives on the Recent Developments in the Middle East and North Africa,* Columbia University School of Law (March 2011).

- Panelist, *Newbies Speak: What I Wished I Had Known or Thought Harder About Before I Went on the Market,* Columbia University School of Law (March 2011).

- Panelist, *Financing International Arbitration: Contingency Fees and Third-Party Funding,* Northern Kentucky University Symposium (February 2011).

- Panelist, *Whose Claim Is It Anyway? Third Party Litigation Funding,* UCLA School of Law (December 2010).

- Panelist, *Comparative Conflict Studies: A New Approach to International Conflict Resolution,* Conference on Law in the Service of Peace: A New Method for Teaching the Legal Dimensions of the Israeli-Palestinian conflict, Columbia Law School (October 2010).

- Organizer and Panelist, *Forum Selection and Parallel Proceedings Involving States and State Controlled Entities in International Investment Arbitration,* Columbia Law School & Earth Institute (March 2010).

- Rapporteur, *FDI, the Global Crisis and Sustainable Recovery,* Columbia Law School & Earth Institute (November 2009).

- Panelist, *Foreign Direct Investment by State-Controlled Entities—Do the Rules Need Changing?* Eight World Free Zone Convention, Charleston, South Carolina (December 2008).

- Panelist, *Foreign Direct Investment by State-Controlled Entities—Do the Rules Need Changing?* Columbia Law School & Earth Institute (October 2008).

- Panelist, *The Legacy of the Eichmann Trial,* Hebrew University Faculty of Law, Jerusalem (January 2008).

- Panelist, *Internationalized Pro-Bono and the Attorney-Client Relationship: Lessons from Nation Building in Southern Sudan,* International Law Committee of the New York City Bar Association (March 2007).

- Panelist, *Internationalized Pro-Bono and the Attorney-Client Relationship: Lessons from Nation Building in Southern Sudan,* Duke Law School (February 2007).

- Panelist, *An International 'Generalized Other'"? The Social Negotiation of the Moral Authority at the International Criminal Tribunal for Rwanda,* American Sociological Association Annual Meeting, Montreal, Canada (June 2006).

- Panelist, *An International 'Generalized Other'"? The Social Negotiation of the Moral Authority at the International Criminal Tribunal for Rwanda,* International Round Table for the Semiotics of Law, Université du Littoral Côte d'Opale, France (May 2006).

- Panelist, *International Law and the Israeli-Palestinian conflict,* Carnegie Mellon University Middle East Peace Forum (January 2006).

- Panelist, *The Milosevic Trial - Live!,* NYU School of Law (January 2004).

**EXHIBIT B**

## Materials Considered

Arbitration Materials
- I considered various materials from the arbitration, a list of which can be furnished upon request.

Court Materials
- Sysco's Petition to Vacate, dated 8 March 2023
- Sysco's Memorandum of Law, dated 8 March 2023

Other Materials
- Amendment No. 1 to Second Amended and Restated Capital Provision Agreement, dated April 1, 2022 ("Amendment")
- *In re Primus*, 436 U.S. 412 (1978)
- Champerty, *Black's Law Dictionary* (9th ed. 2009)
- 14 Am.Jur. 2d Champerty, Maintenance, and Barratry § 1 (2022)
- ABA Comm'n on Ethics 20/20 Informational Report to the House of Delegates (2011), *available at https://lowellmilkeninstitute.law.ucla.edu/wp-content/uploads/2019/02/ABA-White-Paper-on-Litigation-Finance.pdf*
- *Kraft v. Mason*, 668 So. 2d 679 (1996)
- *Charge Injection Techs. v. E.I. Dupont De Nemours & Co.*, No. N07C-12-134-JRJ, 2016 Del. Super. LEXIS 118 (2016)
- 14 C.J.S. Champerty and Maintenance § 17 (2022)
- 14 Am.Jur.2d Champerty and Maintenance § 7 (2022)
- *Osprey, Inc. v. Cabana Ltd. P'ship*, 340 S.C. 367 (S.C. 2000)
- Anthony J. Sebok, *The Inauthentic Claim*, 64 Vand. L. Rev. 61 (2011)
- *Am. Optical Co. v. Curtiss*, 56 F.R.D. 26 (S.D.N.Y. 1971)
- *How We Work With Companies*, Burford Capital, *available at* https://www.burfordcapital.com/how-we-work/with-companies/
- Panel on The Evolution of Third Party Litigation Finance, Sixth Annual Judicial Symposium on Civil Justice Issues, *available at* https://masonlec.org/events/sixteenth-annual-judicial-symposium-on-civil-justice-issues/ (October 10, 2022)
- Report by Lesley Stahl, *Litigation Funding: A multibillion-dollar industry for investments in lawsuits with little oversight* (Dec. 18, 2022), *available at* https://www.cbsnews.com/news/litigation-funding-60-minutes-2022-12-18/.
- *Maslowski v. Prospect Funding Partners LLC*, 944 N.W.2d 235 (Minn. 2020).
- *Maslowski v. Prospect Funding Partners LLC*, 978 N.W.2d 447 (Minn. Ct. App. 2022)
- *Boling v. Prospect Funding Holdings LLC*, 771 Fed. Appx. 562 (6th Cir. 2019).
- *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711 (N.D. Ill. 2014)
- U.S. Chamber of Commerce Institute for Legal Reform, *Selling More Lawsuits, Buying More Trouble: Third Party Litigation Funding A Decade Later* (January 2020) *available at* https://instituteforlegalreform.com/wp-content/uploads/2020/10/Still_Selling_Lawsuits_-_Third_Party_Litigation_Funding_A_Decade_Later.pdf

- Letter from Christopher M. Carr et al., to the Hon. Merrick B. Garland et al., (Dec. 22, 2022), available https://fingfx.thomsonreuters.com/gfx/legaldocs/movakkoybva/12.22.22%20TPLF%20Letter.pdf
- Letter from the Hon. Sen. Kennedy to the Hon. Merrick B. Garland et al., (January 6, 2023)
- ABA Resolution 402, adopted last August at the ABA Annual Meeting, *available at* https://www.americanbar.org/news/reporter_resources/annual-meeting-2022/house-of-delegates-resolutions/402/
- *Geer v. Frank*, 179 Ill. 570 (1899)
- *In re Reed*, 532 B.R. 82 (Bankr. N.D. Ill. 2015)
- Michael J. Howlett, *Consumer Litig. Fin. in Ill.*, 26 LOY. CONSUMER L. REV. 140 (2013)
- *Berlin v. Nathan*, 64 Ill. App. 3d 940 (1st Dist. 1978)
- 720 Ill. Comp. Stat. Ann. 5/32-12 (West 2023)
- *Todd v. Franklin Collection Serv., Inc.*, No. 11 C 6128, 2011 WL 6140863 (N.D. Ill. Dec. 9, 2011)
- *Filipiak v. Zintak*, 264 Ill. App. 392 (1st Dist. 1932)
- N.Y. Jud. Law § 489
- *Justinian Cap. SPC v. WestLB AG*, 28 N.Y.3d 160 (2016)
- *Phoenix Light SF DAC v. U.S. Bank Nat'l Ass'n*, No. 20-1312-cv, 2021 WL 4515256 (2d Cir. Oct. 4, 2021)
- *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910)
- Restatement (Third) of the Law Governing Lawyers § 1 cmt. b (2000)
- NY ST RPC Rule 1.2(a) (McKinney)
- NY ST RPC Rule 1.6 (McKinney)
- NY ST RPC Rule 1.7 cmt. 13 (McKinney)
- NY ST RPC Refs & Annos (Preamble) (McKinney)
- Report on the Ethical Implications of Third-Party Litigation Funding, N.Y. State Bar Ass'n (Apr. 16, 2013)
- Second Amended and Restated Capital Provision Agreement, dated December 22, 2020
- Anthony J. Sebok, *The Rules of Professional Responsibility and Legal Finance: A Status Update, Cardozo Legal Studies Research Paper No. 671*, 1 (2022)
- Victoria Shannon, *Harmonizing Third-Party Litigation Funding Regulation*, 36 Cardozo L. Rev. 861 (2015)
- Maya Steinitz, *The Partnership Mystique: Law Firm Finance and Governance in the 21st Century*, 63 William & Mary L. Rev. 939 (2022)
- Court Order, *In Re: Amendment of Local Civil Rules*, (D.N.J. 2021), *accessible at* https://www.njd.uscourts.gov/sites/njd/files/Order7.1.1%28signed%29.pdf
- *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 510 F. Supp. 3d 1234 (S.D. Fla. 2020)
- *In re Nat'l Prescription Opiate Litig.*, 2018 WL2127807 (N.D. Ohio May 7, 2018)
- Rule 1.17 cmt 7 (McKinney)
- Model Rules of Pro. Conduct, Am. Bar Ass'n (2020)
- NY ST RPC Rule 1.16 (McKinney)
- Am. Bar Ass'n Best Practices For Third-Party Litigation Funding (2020), *available at* https://www.americanbar.org/content/dam/aba/directories/policy/annual-2020/111a-annual-2020.pdf

- Zeqing Zheng, *The Paper Chase: Fee-Splitting vs. Independent Judgment in Portfolio Litigation Financing of Commercial Litigation on Investors' ESG Demands*, 34 Geo. J. Legal Ethics 1383 (2021)
- NY ST RPC Rule 5.4 (McKinney)
- U.S. Chamber of Commerce Institute for Legal Reform, A *New Threat: The National Security Risk of Third Party Litigation Funding 9* (2022), *available at* https://instituteforlegalreform.com/wp-content/uploads/2022/11/TPLF-Briefly-Oct-2022-RBG-FINAL-1.pdf
- *Miller v. Counsel Fin. Servs., LLC (In re Girardi Keese)*, No. 2:20-bk-21022-BR, ECF No. 1333 (Bankr. C.D. Cal. Aug. 31, 2022).
- IBA Guidelines on Conflicts of Interest in International Arbitration (2014)
- *Applied Energetics, Inc. v. Gusrae Kaplan Nusbaum PLLC*, No. 21CV382 (DF), 2022 WL 956119 (S.D.N.Y. Mar. 30, 2022)
- Letter from Burford's Counsel to Sysco's Counsel, dated Dec. 6, 2022
- Fed. R. Civ. P. 17(a)(1)
- *Gray v. Dummitt*, No. CV 06-0322(ERK)(JO), 2007 WL 6925690 (E.D.N.Y. Dec. 21, 2007)
- *Guerrilla Girls, Inc. v. Kaz*, 224 F.R.D. 571 (S.D.N.Y. 2004)
- *Abu-Ghazaleh v. Chaul*, 36 So. 3d 691 (Fla. Dist. Ct. App. 2009)
- *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458 (1980)
- *Nat'l Credit Union Admin. Bd. v. HSBC Bank US, Nat'l Ass'n*, 331 F.R.D. 63 (S.D.N.Y. 2019)
- *Stan Lee Media, Inc. v. Walt Disney Co.*, No. 12-cv-02663-WJM-KMT, 2015 WL 5210655 (D. Colo. Sept. 8, 2015)
- New Appleman New York Insurance Law §3.05 (2d ed. 2022).
- Michelle Boardman, *Insurers Defend and Third Parties Fund: A Comparison of Litigation Participation*, 8 J.L. Econ. & Pol'y 673, 697 (2011-2012)
- Judith Resnik, *Courts: In and Out of Sight, Site, and Cite – The Norman Shachoy Lecture*, 53 Vill. L. Rev. 771 (2008)
- *United States v. Standard Ultramarine & Color Co.*, 137 F. Supp. 167 (S.D.N.Y. 1955)
- *Haw. v. Standard Oil Co. of Cal.*, 405 U.S. 251 (1972)
- Robert H. Lande & Joshua P. Davis, *Benefits From Private Antitrust Enforcement: An Analysis Of Forty Cases*, 42 U.S.F. L. Rev. 879 (2008)
- 15 U.S.C. § 15(a)
- *Gupta v. Headstrong, Inc.*, No. 17-CV-5286 (RA), 2018 WL 1634870 (S.D.N.Y. Mar. 30, 2018)
- *In re Sony Corp. SXRD*, 448 F. App'x. 85 (2d Cir. 2011)
- *Bano v. Union Carbide Corp.*, 273 F.3d 120 (2d Cir. 2001)
- *Snyder v. Wells Fargo Bank, N.A.*, No. 11 Civ. 4496(SAS), 2011 WL 6382707 (S.D.N.Y. Dec. 19, 2011)
- *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456 (2d Cir.1982)
- *Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011)
- *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999)
- *Zurich Am. Ins. Co. v. Watts Indus.*, Inc., 417 F.3d 682 (7th Cir. 2005)

- Local Rules of the United States District Court Northern District of Ill., available at https://www.ilnd.uscourts.gov/_assets/_documents/_rules/LRRULES.pdf.
- Bds. of Judges of the S. & E. Dists. of N.Y., Local Rules of the United States District Courts for the Southern and Eastern Districts of New York Rules 47.1 and 83.8 (Oct. 15, 2021), https://nysd.uscourts.gov/sites/default/files/local_rules/2021-10-15%20Joint%20Local%20Rules.pdf.
- N.Y. Gen. Oblig. Law § 15-108(b) (McKinney 2007)
- N.Y. Uniform Rules for N.Y. State Trial Cts. §§ 202.12(c)(5), § 202.26, https://ww2.nycourts.gov/rules/trialcourts/202.shtml
- *In re Gordon v. Vill. of Bronxville*, 5 Misc. 3d 1030(A) (Sup. Ct. Westchester Cnty. 2004)
- *Baghoomian v. Basquiat*, 167 A.D.2d 124, 1125 (1st Dep't 1990)
- *Canon v. Burge*, 752 F.3d 1079 (7th Cir. 2014)
- *Miksis v. Evanston Twp. High Sch. Dist. #202*, 235 F. Supp. 3d 960 (N.D. Ill. 2017)
- *Kalinauskas v. Wong*, 151 F.R.D. 363 (D. Nev. 1993)
- *Ernst & Ernst*, 677 F.2d 230 (2d Cir. 1982)
- *In re N.Y. Cnty Data Entry Worker Prod. Liab. Litig.*, 162 Misc. 2d 263 (Sup. Ct. N.Y. Cnty. 1994)
- Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 320a (5th ed. 2020)
- *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885 (3rd Cir. 1975)
- Rules of Professional Conduct [22 NYCRR 1200.0]
- Illinois Supreme Court Rules, Article VIII (amended Oct. 15, 2015, eff. Jan. 1, 2016)
- Herbert M. Kritzer, *Risks, Reputations, And Rewards: Contingency Fee Legal Practice in the United States* 10–16 (2004)
- Maya Steinitz, *How Much is that Lawsuit in the Window? Pricing Legal Claims*, 66 Vand. L. Rev. 1889 (2013)
- Maya Steinitz, *The Litigation Finance Contract*, 54 W&M L. Rev. 455 (2012)
- Maya Steinitz, *A Model Litigation Finance Contract*, 99 Iowa L. Rev. 711 (2014) (2014) (with A.C. Field).
- Bradford Cornell, *The Incentive to Sue: An Options-Pricing Approach*, 19 J. Legal Stud. 173 (1990)
- Joseph A. Grundfest & Peter H. Huang, *The Unexpected Value of Litigation: A Real Options Perspective*, 58 Stan. L. Rev. 1267 (2006)
- Robert J. Rhee, *The Effect of Risk on Legal Valuation*, 78 U. Colo. L. Rev. 193 (2007)
- Oren Bar-Gill, *Pricing Legal Options: A Behavioral Perspective*, 1 Rev. L. & Econ. 203 (2005)
- Maya Steinitz, *Whose Claim is This Anyway? Third-Party Litigation Funding*, 95 Minn. L. Rev. 1268 (2011)
- Burford Capital, Burford Capital 2021 Annual Report, *available at* https://www.burfordcapital.com/media/2679/fy-2021-report.pdf
- U.S. Chamber of Commerce Institute for Legal Reform, Stopping the Sale on Lawsuits: A Proposal to Regulate Third-Party Funding in Litigation 1 (2012), *available at* https://instituteforlegalreform.com/research/stopping-the-sale-on-lawsuits-a-proposal-to-regulate-third-party-investments-in-litigation/

- *Litigation Finance*, Omni Bridgeway, *available at* https://omnibridgeway.com/litigation-finance
- *Moses v McDivitt*, 88 NY 62 (1882)
- *In Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v Love Funding Corp.*, 13 NY3d 190 (2009)
- *Bluebird Partners v First Fid. Bank*, 94 NY2d 726 (2000)
- *Ehrlich v. Rebco Ins. Exch.*, 225 A.D.2d 75 (1st Dep't 1996)
- *Richbell Info. Servs., Inc. v. Jupiter Partners L.P.*, 280 A.D.2d 208 (1st Dep't 2001)
- *Melcher v Greenberg Traurig LLP*, 44 Misc. 3d 1224(A) (Sup. Ct. N.Y. Cnty. 2014)
- Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. V, 21 U.S.T. 2517 (1958)
- *In re Franklin Nat. Bank Sec. Litig.*, 92 F.R.D. 468 (E.D.N.Y. 1981), *aff'd sub nom. F.D.I.C. v. Ernst & Ernst*, 677 F.2d 230 (2d Cir. 1982)
- Henry Hansmann & Reiner Kraakman, *The End of History for Corporate Law*, 89 GEO. L.J. 439, 440–41 (2001)
- Mark J. Roe, *The Shareholder Wealth Maximization Norm and Industrial Organization*, 149 U. PENN. L. REV. 2063 (2001)
- Maya Steinitz, *The Case for an International Court of Civil Justice*, 108 – 134 (2019)
- *Echeverria v. Estate of Lindner*, 801 N.Y.S. 2d 233, 2005 WL 1083704 (N.Y. Sup. Ct. 2005)
- NY ST RPC Rule 1.8 (McKinney)
- The Restatement (Third) of the Law Governing Lawyers § 22 cmt. b-c (2000)
- *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325 (1971)
- *IKB Int'l S.A. in Liquidation v. Morgan Stanley*, 45 Misc. 3d 1212(A) (Sup. Ct. N.Y. Cnty. 2014)
- *Sprung v. Jaffe*, 3 N.Y.2d 539 (1957)
- W. Bradley Wendel, *Paying the Piper But Not Calling the Tune: Litigation Financing and Professional Independence*, 52 AKRON L. REV. 1 (2018)
- *Charge Injection Techs., Inc. v. E.I. Dupont De Nemours & Co.*, 2016 WL 937400 (Del. Mar. 6, 2016)
- *Del Webb Cmtys., Inc. v. Partington*, 652 F.3d 1145 (9th Cir. 2011)
- *Odell v. Legal Bucks LLC*, 192 N.C. App. 298 (N.C. Ct. App. 2008)
- *Charlotte-Mecklenburg Hosp. Auth. v. First of Ga. Ins. Co.*, 455 S.E.2d 655 (N.C. 1995)
- *Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87 (Tex. App. 2006)
- W. Bradley Wendel and Joshu. P. Davis, *Complex Litigation Funding: Ethical Problem or Ethical Solution?* _ (forthcoming 2023) (on file with authors)
- Maya Steinitz, *Incorporating Legal Claims*, 90 Notre Dame L. Rev. 1155 (2015)
- 22 N.Y. Jur. 2d Contracts § 214 (2022)
- Restatement (Second) of Contracts § 203(a) (1981)
- Stephen N. Subrin, *Civil Procedure: Doctrine, Practice, and Context* , 336-37 (5th ed. 2016)
- *Antonicelli v. Rodriguez* , 104 N.E.3d 1211 (Ill. 2018)
- *Cook v. Connolly*, 366 N.W.2d 287 (Minn. 1985)
- *Bonnette v. Long Island College Hosp.*, 3 N.Y.3d 281 (2004)

- *Booth v. 3669 Del., Inc.*, 92 N.Y. 2d 934 (1998)
- *In re Feinerman*, 48 N.Y. 2d 491 (1979)
- *Mahoney v. Turner Constr. Co.*, 61 A.D.3d 101 (N.Y. App. Div. 1st Dep't 2009)
- *In re E. 51st St. Crane Collapse Litig.*, 31 Misc. 3d 406 (Sup. Ct. N.Y. Cnty. 2011)
- Owen M. Fiss, *Against Settlement*, 93 Yale L. J. 1073 (1984)
- *Freeman Lewis LLP v Financiera De Desarrollo Indus. y Com. S.A.*, 172 A.D.3d 574 (N.Y. App. Div. 1st Dep't 2019)
- *In re Snyder*, 190 N.Y. 66 (1907).
- *Anderson v. Itasca Lumber Co.*, 91 N.W. 12 (Minn. 1902)
- *Harris v. Standard Accident & Ins. Co.*, 191 F. Supp. 538 (S.D.N.Y. 1961)
- *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*, 38 N.Y.3d 169 (2022)

**EXHIBIT C**

**Expert Witness Engagement in the Past Four Years**

*Litigation in the Supreme Court of the State of New York 2019 - 2021*

Submitted expert report, rebuttal report, and supplemental report regarding litigation finance ethical requirements, compliance with New York champerty law, economic analysis of litigation funding agreements, and litigation funding industry practices.

*Confidential Arbitration 2021*

Submitted expert report and testified in an arbitral hearing regarding the certification of class arbitration.

*Confidential Arbitration 2021 – 2022*

Submitted expert report and rebuttal report regarding litigation funding industry practices and quantum of damages.