# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: PORK ANTITRUST LITIGATION | Case No. 0:18-cv-01776-JRT-JFD |
| This Document Relates To:<br><br>ALL COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS ACTIONS | **MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF DR. MICHAEL WILLIAMS**<br><br>**[REDACTED]** |

## Table of Contents

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

LEGAL STANDARD ........................................................................................ 7

ARGUMENT...................................................................................................... 8

I.   Dr. Williams' models do not answer relevant questions or fit Plaintiffs' theory of liability............................................................................................................ 9

    A.   Dr. Williams' statistical models do not answer the relevant question. .............. 9

    B.   Dr. Williams' models do not fit Plaintiffs' theory of liability........................... 12

II.   Dr. Williams' regression models are unreliable. ........................................ 13

    A.   Dr. Williams failed to validate his benchmark period, which improperly includes an outlier year.................................................................................. 13

    B.   Dr. Williams' models cannot isolate the effects of the alleged conspiracy. ..... 17

    C.   Dr. Williams' models fail routine statistical tests. ............................................ 23

    D.   Dr. Williams' models contradict each other...................................................... 25

    E.   Dr. Williams' models do not show that nearly all class members paid at least one overcharge. .......................................................................................... 28

III.  Dr. Williams' anecdotal opinions are divorced from the facts of the case. ............. 28

CONCLUSION ................................................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ........................................................................ 11

*Anderson v. Raymond Corp.*,
    340 F.3d 520 (8th Cir. 2003) .......................................................................... 7

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
    582 F.3d 1227 (11th Cir. 2009) .................................................................... 11

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ............................................................... 2, 8, 22

*Daubert v. Merrell Dow Pharms. Inc.*,
    43 F.3d 1311 (9th Cir. 1995) .......................................................................... 8

*Daubert v. Merrill Dow Pharms. Inc.*,
    509 U.S. 579 (1993) .......................................... 2, 3, 7, 8, 9, 11, 12, 17, 18, 23, 28, 31

*In re Domestic Drywall Antitrust Litig.*,
    322 F.R.D. 188 (E.D. Pa. 2017) ................................................................. 5, 13

*Jones v. U.S.*,
    933 F. Supp. 894 (N.D. Cal. 1996) ................................................................ 8

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................ 15, 16, 23, 27

*Malden Transportation, Inc. v. Uber Techs., Inc.*,
    404 F. Supp. 3d 404 (D. Mass. 2019) ........................................................... 22

*McMahon v. Robert Bosch Tool Corp.*,
    5 F.4th 900 (8th Cir. 2021) ............................................................................ 6

*Polski v. Quigley Corp.*,
    538 F.3d 836 (8th Cir. 2008) .......................................................................... 7

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020) ............................................................ 4

*In re Pork Antitrust Litig.*,
 No. 18-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ........................................... 3

*In re Processed Egg Prod. Antitrust Litig.*,
 312 F.R.D. 124 (E.D. Pa. 2015) ........................................................................... 17, 18

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
 49 F. Supp. 3d 385 (S.D.N.Y. 2014) ........................................................................ 24

*Scott v. City of Sioux City, Iowa*,
 68 F. Supp. 3d 1022 (N.D. Iowa 2014) ...................................................................... 11

*Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*,
 No. 19-cv-3071, 2021 WL 6127880 (D. Minn. Dec. 28, 2021) ................................... 7

*Thomas v. Barze*,
 57 F. Supp.3d 1040 (D. Minn. 2014) ........................................................................ 30

*In re Wholesale Grocery Prods. Antitrust Litig.*,
 No. 09-md-2090, 2018 WL 3862773 (D. Minn. Aug. 14, 2018) .. 13, 14, 15, 16, 18, 22

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
 644 F.3d 604 (8th Cir. 2011) .................................................................................... 7

**Other Authorities**

ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and
 Economic Issues* (3d ed. 2017) ................................................................................ 16

ABA Section of Antitrust Law, *Econometrics* (2d ed. 2014) ................................... 23, 24

Changhee Lee, *Porcine epidemic diarrhea virus: An emerging and re-
 emerging epizootic swine virus*, 12 VIROLOGY J. 193 (2015) ................................... 20

Daniel Rubinfeld, *Modern Methods for Measuring Antitrust Damages*,
 RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (2009) ............. 13, 16

Daniel Rubinfeld, *Reference Guide on Multiple Regression*, REFERENCE
 MANUAL ON SCIENTIFIC EVIDENCE 195 (3d ed. 2011) ................................................ 23

The undersigned Defendants respectfully submit this memorandum in support of their motion to exclude the testimony of Dr. Michael Williams.

## **INTRODUCTION**

The Commercial and Institutional Indirect Purchaser Plaintiffs ("CIIPPs") seek to show predominance through the testimony of Dr. Williams. As Defendants explain in their main class-certification opposition brief and CIIPP supplement, Dr. Williams' models are incapable of proving antitrust injury (or "impact") on a classwide basis. Like the other class experts, Dr. Williams fails to analyze impact during the Class Period of June 2014 through June 2018. And, like the other class experts, Dr. Williams: (i) ignores the role of non-Defendant hog producers, who account for roughly 70% of all hog production; (ii) makes no effort to differentiate lawful exports from those resulting from the alleged conspiracy; and (iii) fails to control for key factors impacting pork prices, including pig disease, hog producer margins, overseas supply and demand, and Defendants' true cost of acquiring hogs.

These flaws are critical. Defendants' expert, Dr. Laila Haider, shows that correcting them flips the results. To give one example, Dr. Haider made one minor tweak to Dr. Williams' main overcharge model: she allowed the effects of the alleged conspiracy to vary between the early years (when Plaintiffs' claims are time-barred) and the Class Period. This single change caused the overcharge to disappear. In other words, when run over the only period that matters—the Class Period—Dr. Williams' model shows *no injury at all*. And this is but one example; as Dr. Haider shows, Dr. Williams' models are sensitive to a number of flawed choices. They also fail routine tests that Dr. Williams should have

performed, but did not.  Individually and collectively, these flaws render Dr. Williams'
models unable to "separate lawful from unlawful conduct."  *Concord Boat Corp. v.
Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (reversing denial of *Daubert*
motion).

The problems with Dr. Williams' testimony do not end there.  His opinions
generally, and his models in particular, bear no relation to CIIPPs' theory of liability.
CIIPPs allege Defendants conspired to restrict hog supply and increase export sales, yet
Dr. Williams offers *no opinion* on whether Defendants' alleged conduct affected hog
supply or exports.  CIIPPs claim that Defendants used Agri Stats to monitor and enforce
the alleged conspiracy, but Dr. Williams offers no opinion on that, either.  In fact, he offers
no opinion on whether Agri Stats "facilitated collusion" in any fashion whatsoever.  Ex. 1
(Williams Dep.) at 289:13-290:5.[1]  Thus, whatever Dr. Williams was purporting to measure
through his regression models, it was not the impact of the alleged conspiracy.

Dr. Williams also ignores basic industry facts.  For example, the USDA has long
recognized that pork supply is a function of *hog* production.  And hog producers act like
every other business.  When times are good and margins are high, they expand; when times
are bad and they are losing money, they contract.  Dr. Williams gives lip service to
independent producers—who account for 70% of all hog production—but offers *no
opinion* on whether Defendants prevented those third parties from raising more hogs during
the alleged conspiracy.  And because his models do nothing to control for hog producer

---

[1] All exhibits are to the Declaration of William D. Thomson unless otherwise noted.

returns, they fail to account for a critical factor necessary to isolate the effect of Defendants' alleged conduct.

Lastly, to the extent Dr. Williams engages with the record, he serves as nothing but a conduit for CIIPPs' interpretation of documents and testimony. Rather than sticking to objective facts, or even facts that are arguably true, his report contains numerous false and unsupported statements. His anecdotal opinions are as divorced from reality as his empirical work.

For these reasons, Dr. Williams' opinions are irrelevant and unreliable. The Court should exclude them under Rule 702 and *Daubert v. Merrill Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).

## **BACKGROUND**

In June 2018, CIIPPs sued the nation's largest pork processors. CIIPPs' central allegation was that Defendants conspired to "limit the supply of pork in order to fix prices." *In re Pork Antitrust Litig.*, No. 18-1776, 2019 WL 3752497, at *1 (D. Minn. Aug. 8, 2019). The original pleadings identified two principal means by which Defendants supposedly restricted pork supply:  decreasing the production of pork, and exporting a "greater percentage" of pork. *Id.* at *7. Noting that CIIPPs failed to allege production cuts or increased exports by each Defendant, the Court granted Defendants' initial motion to dismiss. *Id.* at *8-9.

CIIPPs filed an amended pleading with allegations the Court found sufficient as to most Defendants. The amended complaint included two charts showing that (i) total U.S. hog production decreased in 2009, 2010, and 2013, and (ii) exports as a percentage of

production increased between 2009 and 2011.  CIIPP 2d Am. Compl. ¶¶ 124, 126, ECF
No. 399.  But Plaintiffs omitted key industry facts that undermine their claims.  These
omitted (but now undisputed) facts include that *non-Defendants* account for ***70%*** of all hog
production; that hog producers lost billions of dollars in 2008 and early 2009, leading major
non-Defendant producers to cut back or leave the business entirely; and that the USDA
actively promoted pork exports throughout the alleged conspiracy.  Decl. of Lindsay Strang
Aberg Ex. 2 ("Mintert Rep.") ¶ 57, ECF No. 1442; Ex. 2 (Prepared Statement of Michael
T. Scuse, Deputy Under Secretary, USDA (Oct. 22, 2009)) ("USDA Statement") at 1-3, 5-
8.

    In May 2022, CIIPPs filed their motion for class certification.  Recognizing that
damages are unavailable for purchases before June 28, 2014, CIIPPs ask the Court to
certify a class of commercial end-users who bought pork between June 2014 and June
2018.  Proposed Order at 2 n.1, ECF No. 1346;[2] *see also In re Pork Antitrust Litig.*, 495 F.
Supp. 3d 753, 774 (D. Minn. 2020) (holding that Plaintiffs fail to allege fraudulent
concealment).

    As "common proof" that Defendants' alleged conspiracy injured all or nearly all
commercial end-users, CIIPPs offer the testimony of Dr. Michael Williams.  Dr. Williams
purports to show common impact through a series of regression models:  first, a direct
purchaser regression intended to show a "common" overcharge of 10.3%; and second, a

---

[2] For five jurisdictions, Plaintiffs define a Class Period of June 28, 2015, through June 30,
2018.  *Id.*  For ease of reference, Defendants refer to the longer of the two periods—June
2014 through June 2018—as the "Class Period" throughout this brief.

series of models intended to show that direct purchasers passed through roughly 100% of that "common" overcharge.   Corrected Expert Rep. of Dr. Williams, ECF No. 1429 ("Williams Rep.") ¶¶ 203, 205-273.   Dr. Williams also offers a so-called production regression, which analyzes pork production less net exports.  *Id.* ¶¶ 146-70.

For each regression, Dr. Williams uses a "benchmark period" of 2005-2008.  *Id.* ¶ 218.   A benchmark is supposed to be a "normal" period "against which an antitrust plaintiff compares alleged 'conspiracy years' to show the impact of the conspiracy."  *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 224 (E.D. Pa. 2017).   But Dr. Williams does not offer any opinion that 2008 was a "normal" year in the pork industry.   Indeed, he offers no economic justification for including 2008 in his benchmark.   Nor could he:  it is undisputed that, due to factors outside Defendants' control, hog production was at historically *high* levels in 2008 even as hog producers suffered major losses.   Mintert Rep. ¶¶ 107-15, 124.   It is also undisputed that hog production is cyclical, with periods of profitability leading to expansion, periods of expansion leading to losses, and periods of losses leading to contraction.  *Id.* ¶¶ 26-28.   Dr. Williams' benchmark period coincides with the peak of a hog cycle, just before the inevitable contraction, and includes no "down" years. *Id.* ¶ 28 & Ex. 1.   As a result, the critical benchmark period does not reflect historical production trends—a fact even Dr. Williams does not dispute.  *See* Ex. 1 (Williams Dep.) at 142:13-143:23 (admitting he does not identify any market factors or industry conditions supporting inclusion of 2008 in benchmark period).

Remarkably, although CIIPPs propose a Class Period of June 2014 to June 2018, Dr. Williams does not use that period for *any* of his common impact models.   Instead, at

the instruction of counsel, he uses a "damages period" of January 2009 through June 2018. Williams Rep. ¶ 218.  Thus, as he admitted in his deposition, he does not offer any model capable of showing that Defendants' alleged conspiracy had any impact on pork supply or prices *during the Class Period*.[3]

The gulf between CIIPPs' liability case and Dr. Williams' opinions expands from there.  Although CIIPPs allege two primary mechanisms by which Defendants supposedly restricted supply—reduced hog production and increased exports—Dr. Williams offers *no opinion* on whether the alleged conspiracy caused hog production to go down or exports to go up.  As he confirmed in his deposition, he offers no model of "but-for" hog supply or "but-for" export sales.  Ex. 1 (Williams Dep.) at 71:3-10, 148:7-13.  Dr. Williams also offers *no opinion* that Defendants prevented non-Defendant hog producers from raising more hogs.  *Id.* at 49:1-50:7, 54:16-55:8, 62:9-20.  In fact, Dr. Williams offers no analysis whatsoever of the production decisions by non-Defendant producers.  And lastly, despite the central importance of Agri Stats to CIIPPs' theory of liability, Dr. Williams offers *no opinion* that Agri Stats "facilitated collusion" in any way.  *Id.* at 289:13-290:5.

---

[3] *See* Ex. 1 (Williams Dep.) at 29:18-30:4 ("A: My report does not offer different overcharge estimates for different years within the damages period.  Q: It's also true your report doesn't offer an overcharge estimate for the period June of 2014 through June of 2018.  Correct? . . .  A: It does not offer a separate estimate of any alleged—of any possible overcharge, assuming any existed.  It doesn't offer a specific estimate of an overcharge in that time period.  That is correct.").

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 904 (8th Cir. 2021). An expert's opinion is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. P. 702. "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court . . . ." *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003) (quotation omitted). Under Rule 702, "the trial judge acts as a 'gatekeeper' screening evidence for relevance and reliability." *Polski v. Quigley Corp.*, 538 F.3d 836, 838 (8th Cir. 2008) (quotation omitted).

At the class certification stage, the Court conducts "a focused *Daubert* inquiry" to assess whether the opinions of the proposed experts "should be considered in deciding the issues relating to class certification." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 610 (8th Cir. 2011). "Although the Court may engage in a tailored, focused *Daubert* analysis at this stage, *Daubert* and its progeny are still relevant to the Court's inquiry." *Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, No. 19-cv-3071, 2021 WL 6127880, at *7 (D. Minn. Dec. 28, 2021) (Tunheim, C.J.). Plaintiffs have the burden of proving that their expert testimony satisfies Rule 702. *Id.*

## **ARGUMENT**

Dr. Williams' opinions fall well short of the *Daubert* standard. His statistical models are, by design, unable to answer the core question in CIIPPs' motion: whether Defendants' alleged conspiracy caused all or nearly all class members to pay inflated prices for pork during the Class Period. These models are also divorced from CIIPPs' theory of liability, which posits that Defendants conspired to restrict hog supply and increase exports. These foundational issues alone warrant excluding Dr. Williams' models.

The problems, however, continue. Dr. Williams violated a fundamental rule of econometrics: he did not test whether his benchmark period was appropriate. As a result, he included a year (2008) where the expected relationships between pork supply, on one hand, and his control variables, on the other, were upside down. Were that not enough, he then failed to account for key supply and demand factors that impact pork prices. Unsurprisingly, Dr. Williams' models fail routine statistical tests for reliability and generate contradictory results. They are fundamentally unreliable and cannot "separate lawful from unlawful conduct." *Concord Boat*, 207 F.3d at 1057.

Lastly, Dr. Williams overreaches in his analysis of documents and testimony. His lengthy recitation of anecdotal evidence not only infringes on the role of counsel, but he repeatedly offers factual arguments that find no support in—or are flatly contradicted by—the evidence he cites.

I.   **Dr. Williams' models do not answer relevant questions or fit Plaintiffs' theory of liability.**

Opinion testimony is admissible only if it is "relevant to the task at hand." *Daubert*, 509 U.S. at 597.  This means the testimony must "fit" the facts and "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms. Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995).  This rule is more stringent than the general relevancy standard of Rule 402, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal. 1996).  Thus, under *Daubert*, a court must exclude expert testimony unless the evidence "speaks clearly and directly to an issue in dispute in the case." *Id.*

Dr. Williams' opinions fail this basic requirement for at least two reasons.  First, his regression models do not analyze impact during the Class Period.  Thus, they cannot assist the factfinder in deciding whether Defendants' alleged conspiracy injured members of the putative class.  And second, his models are not tied to CIIPPs' theory of liability.  They would show the same purportedly common "overcharge" regardless of whether Defendants conspired to restrict supply in the manner CIIPPs allege.

A.   **Dr. Williams' statistical models do not answer the relevant question.**

Dr. Williams' regression models fail *Daubert*'s "fit" requirement for a simple reason:  the models do not (and cannot) show antitrust impact during the Class Period.

As CIIPPs concede, the Class Period begins no earlier than June 28, 2014, four years before these lawsuits commenced.  Yet Dr. Williams did not design his models to analyze whether the alleged conspiracy affected pork supply or prices between June 2014 and June

2018.  Instead, his models analyze production (less net exports) and prices across a much longer period:  January 2009 through June 2018.  Critically, Dr. Williams does not allow the results to vary over time.  As Dr. Williams admits, this means his models show a single overcharge for 2009 to 2018, but no overcharge specific to the Class Period.  *See* Ex. 1 (Williams Dep.) at 29:18-30:4 ("It doesn't offer a specific estimate of an overcharge in that time period [June 2014 to June 2018].").

This renders his models useless.  Put simply, Dr. Williams can tell us nothing about whether, or to what extent, an overcharge existed during the *relevant* time period, 2014 to 2018, by suggesting one existed over a much longer period.  To use an analogy, knowing the stock market increased by an average of 10% over the last nine years does not tell us what happened in the last four—the market could have increased, decreased, or stayed flat.  The same is true of Dr. Williams' model.  He opines there was an average 10.3% overcharge over a nine-year period, but admits he has no idea what happened during the last four.  *Id.*  29:21-30:4 ("Q: It's also true your report doesn't offer an overcharge estimate for the period June of 2014 through June of 2018.  Correct?  A: It does not offer a separate estimate of any alleged—of any possible overcharge, assuming any existed.  It doesn't offer a specific estimate of an overcharge in that time period.  That is correct." (objection omitted)).

This is crucial.  As Dr. Williams is surely aware, his failure to ask the relevant question is outcome-determinative.  When the effects of the alleged conspiracy are allowed to vary between the pre-Class Period and the Class Period—that is, when his models are appropriately focused on the relevant period—his production model shows *no reduction* in

"production" relative to the benchmark period.  Decl. of Lindsay Strang Aberg Ex. 1 ("Haider Rep.") ¶ 89.  The same is true for his overcharge regression:  when the effects are allowed to vary over time, the model shows *no overcharge whatsoever* during the Class Period.  *Id.* ¶ 111.  In other words, Dr. Williams' purported evidence of antitrust impact in the disappears.

Dr. Williams' failure to analyze impact during the Class Period is inexcusable given the factual setting of the case.  Although CIIPPs allege that the "pork industry" cut production in 2009, 2010, and 2013, CIIPP 4th Am. Compl. ¶ 124, they offer no theory that would explain any material impact in more recent years.  CIIPPs also do not dispute that production grew rapidly during the Class Period, *id.* ¶ 124 & Fig. 7, and that exports *decreased* relative to production in 2013 and 2015, *id.* ¶ 126 & Fig. 8.  Under these circumstances, a valid model must allow for the possibility that the alleged conduct had different effects at different points in time.  *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 57 (S.D.N.Y. 2020).  Yet here, Dr. Williams designed his models to mask variation over time.

Had Dr. Williams asked whether buyers of pork paid inflated prices between June 2014 and June 2018, the answer would have ended CIIPPs' case.  Dr. Williams' solution to this problem—designing his models to avoid the question entirely—renders them irrelevant and unhelpful.  They should be excluded on this basis alone.  *See Scott v. City of Sioux City, Iowa*, 68 F. Supp. 3d 1022, 1040, 1042 (N.D. Iowa 2014) (excluding expert report that purported to calculate damages by assessing time period that included both time-barred and non-time-barred conduct).

B.       **Dr. Williams' models do not fit Plaintiffs' theory of liability.**

Dr. Williams' models also fail *Daubert*'s relevancy prong because they do not fit CIIPPs' theory of liability.  *Comcast*, 569 U.S. at 35; *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232-33 (11th Cir. 2009).

Like the other plaintiff groups, CIIPPs alleged two primary mechanisms for restricting supply:  sow liquidations, which CIIPPs blame for lower hog production; and increased exports.  CIIPP 4th Am. Compl. ¶¶ 123-27.  CIIPPs also allege that Defendants had the ability to control supply through "capacity reductions" and "controlling slaughter rates."  *Id.* ¶ 85.  Yet like the other class experts, Dr. Williams does not analyze whether sow inventories, hog production, plant capacities, or slaughter rates were lower as a result of the alleged conspiracy.  Ex. 1 (Williams Dep.) at 50:24-51:14 (sow inventories),[4] 125:13-126:6 (slaughter levels), 148:7-13 (hog production), 295:11-20 (slaughter capacity).  And like the other class experts, Dr. Williams does not analyze whether export levels were higher as a result of the alleged conspiracy.  *Id.* 88:20-91:1; *see also id.* 78:4-11 (no opinion that exports caused class members to pay higher prices for pork).  In short, he offers *no opinion* that Defendants' supposed conspiracy impacted hog production, capacities, slaughter levels, or exports in the manner CIIPPs allege.

The result is that Dr. Williams' models are divorced from CIIPPs' theory of liability. These regressions calculate the same purported "impact"—be it lower production (less net

---

[4] Dr. Williams was unable to answer whether Defendants controlled the number of sows in production other than by referring to paragraphs in his report that have nothing to do with that issue. Ex. 1 (Williams Dep.) at 50:24-51:14 (citing paragraphs 37-55 of report).

exports) or higher prices—regardless of whether Defendants actually restricted hog production, coordinated slaughter rates, reduced capacity, or colluded to increase exports. They also calculate the same purported "impact" regardless of whether, as CIIPPs allege, Agri Stats "facilitated collusion between defendants."  Ex. 1 (Williams Dep.) at 289:13-290:5.  Accordingly, Dr. Williams' models do not "measure only those damages attributed" to Defendants' alleged conduct.  *Comcast*, 569 U.S. at 35.  Nor do they translate "the *legal theory of the harmful event*"—here, an alleged conspiracy to restrict pork supply through the mechanisms noted above—"into an analysis of the economic impact *of that event*."  *Id.* at 38 (emphasis in original).  The models do not fit CIIPPs' theory of liability and must be excluded under *Daubert*.

## II.   Dr. Williams' regression models are unreliable.

Dr. Williams' regression models are also unreliable for at least four reasons:  (1) he includes an outlier year in his benchmark period; (2) he fails to control for key supply and demand factors; (3) his models fail routine tests for reliability; and (4) his models are internally inconsistent.  Beyond that, his claim that the models show that nearly 100% of all class members paid at least one overcharge is based on a methodology that is not peer-reviewed and generates many false positives.

### A.   Dr. Williams failed to validate his benchmark period, which improperly includes an outlier year.

Dr. Williams uses a "dummy variable" regression to analyze pork supply and prices. This type of model compares a variable of interest (say, pork prices) between two periods of time:  the "impact period" and the "non-impact," or benchmark, period.   Daniel

Rubinfeld, *Modern Methods for Measuring Antitrust Damages*, RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW ch. 14, § II.B (2009) ("Rubinfeld 2009"); Williams Rep. ¶¶ 146, 206.  Because the benchmark period is the baseline for measuring the effects of the alleged conspiracy, the model is reliable only if the competitive benchmark is a "reliable predictor" of but-for prices.  *In re Wholesale Grocery Prods. Antitrust Litig.*, No. 09-md-2090, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018); *see also Domestic Drywall*, 322 F.R.D. at 224 (defining benchmark as period when prices were "normal" to allow model to "isolate the impact of a price-fixing agreement").  The Court should exclude Dr. Williams' regression models because his benchmark period includes an outlier year (2008), and he fails to justify this decision.

For each regression in his report, Dr. Williams uses 2005-2008 as the benchmark period.  In other words, his overcharge regression compares pork prices during his "damages period" (January 2009 through mid-2018) to pork prices between 2005 and 2008. Ex. 1 (Williams Dep.) at 185:13-19, 190:5-16.  And his "production regression" compares pork production minus net exports between those same two periods.  Williams Rep. ¶¶ 147, 165.  Yet Dr. Williams did not test whether pricing and supply from 2005 to 2008 are "reliable predictor[s]" of what pricing and supply would have been but-for the alleged conspiracy.  *Wholesale Grocers*, 2018 WL 3862773, at *7.  Instead, as he confirmed in his deposition, he selected 2005-2008 as the benchmark solely because 2008 "precedes the damages period" and he had data going back to 2005.  Ex. 1 (Williams Dep.) at 137:13-15, 137:16-138:9.  Critically, other than the fact that 2008 is before 2009, Dr. Williams could

not identify any market factors or industry conditions that would justify including 2008 in the benchmark period.  *Id.* at 142:13-143:23.

As in *Wholesale Grocers*, this renders Dr. Williams' models unreliable.  *Wholesale Grocers* involved allegations that two grocery wholesalers conspired to allocate territories. 2018 WL 3862773, at *1.  The plaintiff, a retail grocer in Massachusetts, retained an expert economist to show that it and "similarly situated grocers in Massachusetts and Rhode Island" paid "higher prices for delivery of groceries than they would have paid" but for the challenged agreement.  *Id.* at *4.  To predict how prices would have changed but for the alleged conspiracy, the expert compared the actual prices charged to the plaintiff (and other "similarly situated" retailers) to those charged to Stop & Shop, a large chain that was not injured by the defendant's conduct.  *Id.* at *4-5.  The expert did not, however, analyze whether the "prices paid by independent grocers and Stop & Shop were correlated in any way" before the alleged conspiracy.  *Id.* at *7.  Because the expert "failed to validate the foundational premise of his benchmarking model"—that "Stop & Shop's prices are a reliable predictor of the independent grocers' but-for prices"—there was "no basis to conclude that divergence in those prices demonstrates antitrust injury or impact."  *Id.* Judge Montgomery thus excluded the model as unreliable.  *Id.*; *see also, e.g.*, *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 484 (S.D.N.Y. 2018) (excluding model where expert included outlier year in benchmark period without justification).

Dr. Williams' failure to validate his benchmark period is even more problematic given the facts of this case.  As he surely knew, 2008 was an outlier year in the pork

industry.  Even though feed costs were through the roof and demand was down, hog production went up.  Mintert Rep. ¶¶ 107-15, 124-25; Ex. 2 (USDA Statement) at 3.  The result was a year with historically high production even though producers were losing money hand over fist.  *See* Ex. 2 (USDA Statement) at 1 (noting that producers lost an average of $20/head between October 2007 and September 2009, "with losses as high as $40-$46 per head in November and December 2008").  Simply put, the expected relationship between hog production, on one hand, and supply and demand factors (like feed costs and GDP), on the other, was upside down for the entire year.

Unsurprisingly, Dr. Williams' decision to include 2008 in his benchmark has a profound effect on the results.  If one controls for the unique circumstances in 2008, but leaves the rest of the models unchanged, the overcharge model predicts a much smaller effect during the improper nine-year "damages period" and *no effect* during the Class Period.  Haider Rep. ¶¶ 128, 130, 133; *see also id.* (explaining that multiple sensitivity tests confirm including 2008 in benchmark is outcome-determinative).

Dr. Williams' failure to validate his benchmark is inexcusable.  The basic standards of his profession require an economist to *test* whether his benchmark period includes a year, such as 2008, when the normal relationships between the dependent variable (*e.g.*, pork prices) and the explanatory variables (*e.g.*, feed costs, GDP) do not hold.  *E.g.*, Rubinfeld 2009 ch. 14, § II.B ("[I]t is essential that the non-impact period be as similar as possible to the impact period."); ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 181 (3d ed. 2017) ("[I]t is important to test whether prices react differently to the supply and demand factors in the conspiracy period than they

16

did in the non-conspiracy period.").  Had he done so, he would have learned that his models are sensitive to including 2008 in the benchmark.  As things stand, his failure to justify including this outlier year, and the fact that doing so "is a significant driver of his results," render his models unreliable.  *LIBOR*, 299 F. Supp. 3d at 484; *Wholesale Grocers*, 2018 WL 3862773, at *7.

**B.    Dr. Williams' models cannot isolate the effects of the alleged conspiracy.**

Like the expert in *Wholesale Grocery*, Dr. Williams also fails to control for "non-conspiratorial factors."  2018 WL 3862773, at *8.  His inability to "separate lawful and unlawful conduct" is an independent reason to exclude his testimony.  *Id.* (quotation omitted).

As Defendants explain in their main brief, a regression model cannot show common impact unless it controls for non-conspiratorial supply and demand factors.  Omnibus Mem. at 53-60, ECF No. 1441.  This means it must be capable of isolating the effects of Defendants' alleged conspiracy from the effects of lawful conduct, including conduct by third parties.  *Id.*

The analysis in *In re Processed Egg Products Antitrust Litigation*, 312 F.R.D. 124 (E.D. Pa. 2015), is instructive.  Like the present case, *Egg Products* involved an alleged conspiracy to restrict supply.  Also like the present case, the indirect purchasers' expert offered a regression to estimate supply in the "but-for" world.  *Id.* at 153.  The expert did not, however, investigate whether "non-conspiring producers contributed to, or were responsible for," the observed drop in production.  *Id.*  Finding that "the failure to account

for non-conspiring producers" was a "flaw[] undermining the reliability of [the expert's] model," the court denied the indirect purchasers' motion for class certification. *Id.* at 153, 163.[5]

The regression model in *Wholesale Grocers* had a similar flaw. There, the expert's regression model did not account for several factors "unrelated to . . . the alleged conspiracy" that impacted plaintiffs' prices, including "contract-driven price reduction[s]" and inflation. 2018 WL 3862773, at *8-9. As a result, Judge Montgomery excluded the model under *Daubert*. *Id.*

The same outcome is warranted here. Under CIIPPs' theory of the case, there are two main drivers of domestic pork supply:  hog production and exports. *See* CIIPP 4th Am. Compl. ¶¶ 75, 123-26.  Taking CIIPPs' case at face value, their expert must control for independent factors that affected hog supply and exports.  Dr. Williams does neither.

As for hog supply, Dr. Williams makes two fundamental errors.  First, like the expert in *Egg Products*, he ignores the role of non-Defendant producers.  It is undisputed that third parties accounted for roughly *70%* of all hog production during the alleged conspiracy. Yet Dr. Williams offers no analysis of the production decisions by those third parties.  Not only that, but Dr. Williams has disavowed any opinion that Defendants controlled the sow inventories or hog quantities of non-Defendant producers.  Ex. 1 (Williams Dep.) at 54:16-

---

[5] Because the expert's testimony, "even if admissible under *Daubert*," was insufficient to carry plaintiffs' burden under Rule 23, the court did not resolve the defendants' motion to exclude the expert. *Id.* at 151.  The court did, however, make clear that the expert's failure to account for non-defendant producers undermined "the reliability of [his] model." *Id.* at 153.

55:8 (no opinion that any Defendant, by virtue of its marketing contracts, was able to control "how many sows that producer maintained in its sow farms" or "how many hogs that independent producer raised"); *see also id.* 60:4-18 (agreeing that, by "significant degree of control" over hog production, he does not mean control "over nondefendants' decisions about how many sows to have on their sow farms" or "how many hogs to raise"). Indeed, he offers no opinion about whether the alleged conspiracy impacted hog production in any way. *Id.* 148:7-13.

Dr. Williams' second fundamental error is that he fails to control for non-conspiratorial changes to hog supply. Specifically, Dr. Williams fails to control for:

- Pig imports from Canada, which accounted for nearly 10% of all hogs slaughtered in the U.S. during Dr. Williams' benchmark period, but fell dramatically during the early years of the alleged conspiracy;

- The circovirus vaccine;

- Government action designed to reduce hog supply and stabilize pork prices;[6]

- Changes in non-Defendants' sow inventories; or

- The profitability of raising hogs, which the USDA identifies as a fundamental driver of hog production.

Williams Rep. ¶ 222; Ex. 1 (Williams Dep.) at 154:13-16 (sow inventory), 154:22-25 (pig imports), 161:1-10 (producer returns), 299:9-22 (USDA actions); Haider Rep. ¶ 114 (circovirus). These factors plainly impact the supply and price of pork. Haider Rep. ¶¶ 75

---

[6] Ex. 3 (*USDA Announces Plans to Buy Pork Products*, National Hog Farmer (April 1, 2009)).

n.117, 114-40; *see also* Mintert Rep. ¶¶ 22-24 (discussing importance of producer returns to understanding hog and pork supply); Ex. 2 (USDA Statement) at 2-3 (discussing hog profitability and hog imports from Canada); Ex. 4 (USDA Economic Research Service, *Structure of the USDA Livestock & Poultry Baseline Model* (Feb. 2022)) at 14 (concluding that "the number of sows will expand if hog production is profitable; alternatively, in years when hog production is unprofitable, the number of sows declines"). And none of these factors, which Dr. Williams ignores, has anything to do with the alleged conspiracy.

Dr. Williams also fails to control for the PEDv virus. This disease was first observed in the United States in May 2013. Ex. 5 (APHIS Factsheet (Apr. 2014)). It causes significant piglet mortality during the first three weeks after birth. Haider Rep. ¶ 172.[7] Because a typical weaned pig takes another 22-25 weeks to grow to market weight,[8] it takes about six months for an outbreak to have a significant impact on pork production. Dr. Williams recognizes the need to control for PEDv—in his words, a "supply-decreasing disease"—but fails to account for the six-month lag. Williams Rep. ¶ 161. As a result, his "piglet loss" variable does not control for the effects of PEDv.

As for exports, Dr. Williams fails to control for overseas pork supply, overseas demand, currency exchange rates, trade agreements, and foreign restrictions on U.S. pork. Williams Rep. ¶ 222; Ex. 1 (Williams Dep.) at 155:6-20 (overseas supply and demand),

---

[7] *See also* Changhee Lee, *Porcine epidemic diarrhea virus: An emerging and re-emerging epizootic swine virus*, 12 VIROLOGY J. 193 (2015), *available at* https://virologyj.biomedcentral.com/articles/10.1186/s12985-015-0421-2 ("Mortality rate averages 50%, often approach 100% in 1- to 3-day-old piglets, and decreases to 10% thereafter.").

[8] Ex. 7 (*Life Cycle of a Market Pig*, Pork Checkoff (last visited August 19, 2022)).

156:3-6 (exchange rates), 156:25-157:3 (foreign restrictions on U.S. pork). All of these factors impact export levels, and none are related to the alleged conspiracy. Haider Rep. ¶¶ 97-100; Mintert Rep. ¶¶ 152-61; *see* Williams Rep. ¶¶ 65-66 (citing evidence that strength of dollar and changes in overseas pork production would impact export levels); Ex. 6 (USDA Agricultural Projections to 2016 (Feb. 2007)) at 2-3 (noting that USDA considers global GDP, currency values, and trade agreements when projecting pork supply); Ex. 2 (USDA Statement) at 3, 5-6 (discussing currency values, USDA efforts to eliminate restrictions on U.S. pork, and USDA efforts to promote U.S. pork in other countries).

To be sure, not all omitted variables render a model unreliable. To determine whether Dr. Williams' omitted variables matter, Dr. Haider performed three sensitivity tests. She first added a control variable to account for the unprecedented industry events in 2008, including the increase in sow productivity caused by the circovirus vaccine. Haider Rep. ¶ 130. After Dr. Haider added this variable, but otherwise left the model unchanged, Dr. Williams' models found *no overcharge* during the Class Period and a much smaller overcharge during the alleged conspiracy period. *Id.*

Separately, Dr. Haider replaced Dr. Williams' hog cost variable—which captures changes in feed prices—with a variable that accounts for changes in hog prices for three Defendants who purchase most of their hogs. Haider Rep. ¶¶ 115-20. To the extent changes in hog imports, hog profitability, sow inventory, or sow productivity impacted hog supply, that impact would be reflected in the prices Defendants paid for hogs. *Id.* Moreover, the cost of acquiring hogs is the most significant cost of producing pork.

Williams Rep. ¶ 25.    As Dr. Williams concedes, for the vast majority of the hogs slaughtered at Defendants' plants, the processor's acquisition cost is the price of the hog, not the cost of raising it.  Ex. 1 (Williams Dep.) at 153:25-154:5.  A variable capturing hog prices thus better reflects Defendants' actual cost of acquiring hogs.  Haider Rep. ¶¶ 115-20.  Here again, after Dr. Haider changed a single variable but otherwise left Dr. Williams' model unchanged, the model showed *no overcharge* during the alleged conspiracy period. *Id.* ¶ 120.

Lastly, Dr. Haider replaced Dr. Williams' piglet loss variable with Dr. Singer's lagged piglet loss variable.  *Id.* ¶ 139.  Once again, a single adjustment flipped the result. After Dr. Haider replaced the variable with Dr. Singer's lagged equivalent, but otherwise left the model unchanged, the model predicted a lower overcharge during the alleged conspiracy period and *no overcharge* during the Class Period.  *Id.*[9]

Dr. Williams' failure to control for non-conspiratorial changes in hog supply and exports is not a mere technicality.  Nor is it a fact issue for the jury.  Like the model in *Wholesale Grocers*, Dr. Williams' disregard for obvious non-conspiratorial factors renders his model incapable of separating "lawful from unlawful conduct."  2018 WL 3862773 at *7-8 (citing *Concord Boat*, 207 F.3d at 1055).  In short, as the District of Massachusetts held in a similar case, "Dr. Williams' omission of [important] variables amounts to a cherry-picking of data that renders his regression models unreliable."  *Malden*

---

[9] Dr. Haider ran the same sensitivity tests on Dr. William's "production" regression.  The results were similar:  in each instance, the model predicted a lower reduction in supply or no reduction at all.  Haider Rep. ¶¶ 91-93.

*Transportation, Inc. v. Uber Techs., Inc.*, 404 F. Supp. 3d 404, 423 (D. Mass. 2019) (excluding Dr. Williams' testimony).

### C.   Dr. Williams' models fail routine statistical tests.

Dr. Williams' models are unreliable for an additional, independent reason: they fail basic tests that ask whether the models are sensitive to small changes, and whether the use of a single overcharge is appropriate.

First, Dr. Williams' models are not robust: they do not hold up to even small changes in assumptions. Common sense tells us this is important. If small changes lead to very different results, the model is not a reliable way to analyze cause and effect. But this is not just common sense, it is ingrained in the basic standards of the economics profession. As Dr. Williams' own authorities make clear, the "issue of robustness" is "of vital importance" when interpreting a regression. Daniel Rubinfeld, *Reference Guide on Multiple Regression*," REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 195 (3d ed. 2011); *see also* ABA Section of Antitrust Law, *Econometrics* § 6.C (2d ed. 2014) ("ABA *Econometrics*") ("Once the econometric model has been specified and estimated, a series of statistical tests can be run to evaluate the reliability and robustness of the estimates.").

Courts agree. In the *LIBOR* matter, for example, the court held that "robustness and sensitivity testing relates directly to two of the *Daubert* factors articulated by the Supreme Court: whether the methodology 'can be (and has been) tested' and the methodology's 'known or potential rate of error.'" *LIBOR*, 299 F. Supp. 3d at 467. "Robustness testing and sensitivity testing that produces contradictory or otherwise implausible results strongly

suggest that a methodology has been insufficiently tested and that the methodology has a high potential rate of error." *Id.* at 468.

Dr. Williams does not dispute this fundamental principle. Ex. 1 (Williams Dep.) at 201:15-25 ("it sounds plausible to me"); *see also* Williams Rep. at 149 (listing Rubinfeld treatise among materials relied upon). He does not, however, disclose the results of any sensitivity tests. Nor does he offer any opinion that his models are robust. Ex. 1 (Williams Dep.) at 145:20-146:6 ("Q. Dr. Williams, is your production regression sensitive to including 2008 in the benchmark period? . . . A. My report doesn't offer an opinion on that." (objection omitted)); *id.* at 146:21-147:2 ("Is your opinion that this model is appropriate, does that rely on a sensitivity check that you performed but did not disclose in the report? . . . A. No. My report shows all the work on which I'm relying." (objection omitted)).

Dr. Haider conducted the sensitivity checks Dr. Williams did not perform (or elected not to disclose). Unsurprisingly, Dr. Williams' models are sensitive in multiple respects. As discussed above, his models predict very different results—and often fail to show *any* overcharge—when certain of his control variables are modified to reflect industry reality. Haider Rep. ¶¶ 120, 130, 133, 139.

Dr. Williams' models also fail a routine test that asks whether a single overcharge is appropriate. *See* ABA *Econometrics* § 6.B.1 ("An F-test is the standard approach for testing general forms of multiple linear restrictions on the parameters of a regression model."). Dr. Haider performed this test on Dr. Williams' direct purchaser overcharge model. The results of the test reject Dr. Williams' assumption of a single overcharge across

direct purchasers.  Haider Rep. ¶ 144 & n.261.  Based on these results, Dr. Haider then took Dr. Williams' model and allowed the alleged overcharge to vary among top direct purchasers.  This revealed that, even setting aside the flaws with Dr. Williams' model, 140 of the 803 top direct purchasers sustained no overcharge during Dr. Williams' "damages period."  *Id.* ¶ 145 & n.268.  The upshot—that direct purchasers cannot be pooled in a singled regression model—is fatal to Dr. Williams' methodology.

Given the myriad flaws in Dr. Williams' approach, it is hardly surprising that his models fail routine statistical tests.  This is yet another, independent basis for excluding his opinions.  *E.g.*, *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014) (excluding model as "insufficiently robust" because "very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions").

### D.    Dr. Williams' models contradict each other.

In addition to his main overcharge regression, Dr. Williams presents several regressions that he claims are capable of showing pass-through.  He first presents a model intended to show that certain direct purchasers—namely, foodservice distributors and multi-channel distributors—passed on roughly 100% of the "common" overcharge to members of the CIIPP class.  Williams Rep. ¶¶ 256-257.  Then, he purports to corroborate this approach by presenting so-called "common impact" regressions for three distributors.  But these distributor regressions generate remarkably different results than his main overcharge regression.  They merely undermine his opinion that common impact can be proven on a classwide basis by applying pass-through rates of around 100% to 10.3% "common" overcharge.

Dr. Williams' first pass-through model, presented at Table 5 in his report, estimates pass-through rates for twenty-five distributors. *Id.* ¶ 256 & Tbl. 5. These pass-through rates range from ███████████, with a weighted average near 100%. *Id.* Dr. Williams estimates overcharges for CIIPPs by applying the weighted average pass-through rates to the 10.3% "common" overcharge from the main regression. *Id.* ¶ 288 & Tbl. 12.[10]

Dr. Williams then purports to "test whether all or virtually all CIIPP Class Members paid higher prices for pork products during the damages period [January 2009 through June 2018] than they would have paid but for Defendants' alleged conspiracy." *Id.* ¶ 269. He does this by applying his overcharge regression to three distributors—███████ ███████████████—with "sufficient sales data to estimate overcharges." *Id.* Based on these regressions, he claims that ███% of ███████████ customers, ███% of ██████ customers, and ███% of ████████ customers had at least one "overcharge observation" between January 2009 and June 2018. *Id.* ¶¶ 271-73.

Tellingly, although Dr. Williams relies on his three distributor-specific regressions, his report does not disclose the overcharges predicted by each model. In fact, all three of the regressions predict overcharges below 10.3%. Dr. Williams' backup materials reveal that his models predict overcharges of ███% for customers who purchased from ██████

---

[10] Dr. Williams also presents two alternative versions of his main overcharge regression: one where he allows the effects to vary by Defendant (except Clemens, for which he has insufficient data); and one where he allows the effects to vary by product category. *Id.* ¶¶ 263-64 & Tbls. 6-7. Dr. Williams does not rely on these versions, however, in estimating classwide damages.

████ ██ % for customers who purchased from █████, and a paltry ██ % for customers who purchased from ████. Haider Rep. ¶ 191.

These results contradict Dr. Williams' conclusion that his main overcharge regression (plus his pass-through rates) can show impact "common" to nearly all commercial end-users. With respect to ████, for example, Dr. Williams calculates a pass-through rate of ████ %. Williams Rep. ¶ 256 & Tbl. 5. As he admitted during his deposition, with a "common" overcharge of ███ % and a pass-through rate just above ███ %, one would "expect to see an overcharge for █████ customers in the neighborhood of █ percent." Ex. 1 (Williams Dep.) at 254:6-25. Yet Dr. Williams' █████-specific model predicts an overcharge of ████████. Thus, Dr. Williams' pass-through methodology—which multiplies the "common" overcharge of ███ % times ████████ % pass-through rate—generates an overcharge over *ten times higher* than that predicted by his █████-specific regression. This means either (i) █████ paid nowhere close to a 10.3% overcharge, or (ii) █████ true pass-through rate is nowhere close to ████.

Dr. Williams' three distributor regressions imply substantial differences in overcharges paid by distributors, substantial differences in pass-through rates, or both. Haider Rep. ¶ 191. These models cannot be reconciled with his claim that his pass-through methodology generates "common" overcharges and pass-through rates. This inconsistency across alternative models is yet another basis for excluding his testimony. *E.g.*, *LIBOR*,

27

299 F. Supp. 3d at 478 (holding that "inconsistencies *across* an expert's multiple methodologies" go to admissibility, not weight (emphasis in original)).[11]

> **E.   Dr. Williams' models do not show that nearly all class members paid at least one overcharge.**

Lastly, as explained in Defendants' main class certification brief, Omnibus Mem. at 49-51, Dr. Williams' models are not capable of showing that nearly all putative class members paid inflated prices on at least one transaction during the Class Period. His claim that 99.6% of all direct purchasers "had at least one overcharge observation" relates to the "damages period" of January 2009 through June 2018. Williams Rep. ¶ 262. The same is true for his claims about customers who bought from ███████████████████. *Id.* ¶¶ 271-73. He thus offers no opinion to that effect for the Class Period. Regardless, his methodology is deeply flawed and finds no support in peer-reviewed literature. Omnibus Mem. at 49-51. His opinion that nearly all class members paid at least one overcharge falls well short of the *Daubert* standard. *Id.*

## III.   Dr. Williams' anecdotal opinions are divorced from the facts of the case.

In addition to his regression models, Dr. Williams claims to apply his "expertise" to the anecdotal record, offering page after page of factual argument. Williams Rep. ¶¶ 106-42, 173-97. Playing lawyer, he quotes documents out of context, argues inferences about

---

[11] Although Dr. Williams' distributor-specific regressions generate markedly different results than his main overcharge model, these additional models are constructed in substantially the same way as the main regression. Accordingly, they share the same methodological flaws discussed above. *See* Haider Rep. ¶¶ 192-203.

Defendants' motives, and ignores reams of evidence that contradict his claims.  These sections of his report bear no resemblance to the work of an economist.

For example, consider Dr. Williams' treatment of ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ Apart from the obvious logical flaw,[12] Dr. Williams' opinion finds no support in the record.  ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

Dr. Williams' treatment of purported "direct communications between competitors" about "commercially sensitive information" fares no better.  Williams Rep. ¶¶ 189-96. ██

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ ██████████████████████████

---

[12] Dr. Williams concludes that ████████ decision was against its self-interest for a single reason:  his claim that "under competition, a reduction in one Defendant's supply should have incentivized its rivals to expand output."  Williams Rep. ¶ 142.  This conclusion holds only if *every time* any company reduces output for *any reason*, it is *always* in its rivals' independent self-interest to expand output in response.  That is plainly not true.
[13] *See e.g.*, Ex. 9 (Rita Jane Gabbett, *Tyson Reducing Sow Heard Over the Next 10 Weeks*,

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

Dr. Williams' most significant offense relates to Agri Stats. He makes a series of bold statements: that "ample evidence demonstrates that pork integrator Defendants understood how to de-anonymize Agri Stats reports and did, in fact, de-anonymize reports they received from Agri Stats," Williams Rep. ¶ 120; that "Defendants exchanged disaggregated, non-anonymous Agri Stats' data that could facilitate collusion," *id.* ¶ 176; and that "Agri Stats was not only aware that Defendants tried to identify competitors in the reports, but *actively assisted* Defendants in doing so," *id.* ¶ 183 (emphasis added). But he presents no evidence backing up these claims.

Instead, Dr. Williams' analysis is largely theoretical. He claims Agri Stats reports "can" be de-anonymized, *id.* ¶ 177, and that Agri Stats reports "can" facilitate collusion, *id.* ¶ 185. He suggests Agri Stats data "can" facilitate monitoring and enforcement, *id.* ¶ 186, and that if cartel members detect cheating, there "could" be punishment, *id.* ¶ 187. But he disavows any opinion that these things ever happened. ████████████████ 289:13-290:5.

---

American Association Swine Veterinarians (July 15, 2009)).

Even where Dr. Williams delves into the record, he is unable to support his claims about Agri Stats.  For example, although Dr. Williams claims all Defendants could de-anonymize Agri Stats reports, Williams Rep. ¶ 120, he cites no evidence that most Defendants even tried to do so.  And though he claims Agri Stats "actively assisted" Defendants in identifying competitors, his only example is off point.  It merely shows Agri Stats identifying a company that was *not* in a report.  *See id.* ¶ 183 ████

████████████████████████████████████████████████████████████████████

████████████

Expert testimony that endorses one side of a disputed fact is improper.  *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014).  Here, Dr. Williams applies no economic expertise; he simply acts as a conduit for CIIPPs' fanciful interpretation of the record.  This testimony should be excluded.

## CONCLUSION

For the reasons set forth above, Dr. Williams' opinion testimony fails to meet the requirements of Rule 702 and *Daubert*.  The Court should exclude Dr. Williams' testimony from the class certification record.

Dated: August 24, 2022                         Respectfully submitted,

*By: /s/ Peter J. Schwingler*
Peter J. Schwingler (#0388909)
William L. Greene (#0198730)
William D. Thomson (#0396743)
Jon W. Ripa (#0402069)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500

william.greene@stinson.com
peter.schwingler@stinson.com
william.thomson@stinson.com
jon.ripa@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

**Counsel for Seaboard Foods LLC and Seaboard Corporation**

/s/ Mark L. Johnson
Mark L. Johnson (#0345520)
Davida S. McGhee (#0400175)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
dwilliams@greeneespel.com

Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com

**Counsel for Clemens Food Group, LLC and The Clemens Family Corporation**

/s/ Craig. S. Coleman
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund (*pro hac vice*)
Stephanie A. Koltookian (*pro hac vice*)
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com

32

stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

Jonathan H. Todt (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

John S. Yi (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

***Counsel for Hormel Foods Corporation***

/s/ *Peter H. Walsh*

Peter H. Walsh (#0388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
(612) 402-3000
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

**Counsel for Agri Stats, Inc.**

/s/ *Tiffany Rider Rohrbaugh*

Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com
lstrang@axinn.com
avissichelli@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

/s/ *Christopher A. Smith*

Aaron Chapin (#0386606)
Christopher A. Smith (*pro hac vice*)
Tessa K. Jacob (*pro hac vice*)
A. James Spung (*pro hac vice*)
Jason Husgen (*pro hac vice*)
Sarah L. Zimmerman (*pro hac vice filed*)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Ste 600
St. Louis, MO 63105
Telephone: (314) 480-1500
aaron.chapin@huschblackwell.com
chris.smith@huschblackwell.com
tessa.jacob@huschblackwell.com
james.spung@huschblackwell.com
jason.husgen@huschblackwell.com
sarah.zimmerman@huschblackwell.com

**Counsel for Triumph Foods, LLC**

Craig M. Reiser (*pro hac vice*)
Kail Jethmalani (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
creiser@axinn.com
kjethmalani@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

***Counsel for Tyson Foods, Inc., Tyson
Prepared Foods, Inc. and Tyson Fresh
Meats, Inc.***