# EXHIBIT 1

## FILED UNDER SEAL

**In the Matter Of:**

*In Re: Pork Antitrust Litigation*

*MICHAEL WILLIAMS, PH.D.*

*June 21, 2022*



1

1                                                      VOLUME 1
                                          PAGES:  1-303
2                                         EXHIBITS:  See Index

3

                              UNITED STATES DISTRICT COURT
4                           FOR THE DISTRICT OF MINNESOTA

5

      _____ )
6                                           )
      IN RE:                                ) No. 0:18-cv-01776-JRT-HB
7                                           )
      PORK ANTITRUST LITIGATION )
8                                           )
      _____)
9

10

11

12

13                      VIDEOTAPED DEPOSITION of

14                   MICHAEL A. WILLIAMS, PH.D.

15              - CONDUCTED BY VIDEOCONFERENCE -

16                    Tuesday, June 21, 2022

17                8:01 a.m. Pacific Daylight Time

18

19

20

21

22               Michelle Keegan, RMR, CRR

23                          Lexitas

24           508-478-9795 ~ 508-478.0595 (Fax)

25                    www.LexitasLegal.com

1    I'm getting at.  Are you assuming that the

2    defendants used each of the alleged mechanisms in

3    each year of the alleged conspiracy?

4         MR. FINLEY:  Objection, form, and on the

5    basis of expert stipulation.

6        A. Well, again, just coming back to the first

7    sentence in Paragraph 12, I have assumed that "For

8    the purpose of estimating overpayments, if any,

9    caused by the Defendants' alleged conspiracy," I

10   have assumed, as any damage expert must, that the

11   allegations in the complaint are true.

12        So obviously the complaint speaks for

13   itself about what the allegations are.  My report

14   doesn't contain a specific statement about the

15   question you just raised.

16        But if it would be considered as part of

17   the allegations in the complaint pertaining to the

18   alleged conspiracy, then again, I have, as any

19   damage expert must, assumed for purposes of

20   calculating overpayments that those allegations

21   are correct.

22      Q. For purposes of calculating overpayments

23   in 2016, what conduct did you assume defendants

24   engaged in that impacted prices that year?

25        MR. FINLEY:  Objection, lack of

29

1   foundation.

2      A. Yeah.  So my overcharge regression doesn't

3   have a specific overcharge for 2016.

4          It has -- as you mentioned earlier, it has

5   a dummy variable that answers the question of

6   whether or not there is or is not a statistically

7   significant difference between actual prices and

8   but-for prices over the period January 2009 to

9   June 2018.

10          So my report doesn't offer a specific

11  opinion on the subject of your question.

12     Q. Your report doesn't offer a specific

13  opinion on whether there was an overcharge in 2015

14  either.  Correct?

15     A. Yeah.

16          MR. FINLEY:  Hold on.  Objection, you may

17  have mischaracterized prior testimony.

18     A. My report does not offer different

19  overcharge estimates for different years within

20  the damages period.

21     Q. It's also true your report doesn't offer

22  an overcharge estimate for the period June of 2014

23  through June of 2018.  Correct?

24          MR. FINLEY:  Same objection.

25     A. It does not offer a separate estimate of

1    any alleged -- of any possible overcharge,

2    assuming any existed.  It doesn't offer a specific

3    estimate of an overcharge in that time period.

4    That is correct.

5         Q. And you're not making any assumptions

6    about defendants' actual conduct between June

7    of 2014 and June of 2018 other than what's

8    specifically stated in the complaint.  Correct?

9         MR. FINLEY:  Objection, form.

10        A. Your question was a little vague.

11             But again, I'll just come back again to

12    the first sentence in Paragraph 12.  "For the

13    purpose of estimating overpayment, if any, caused

14    by the Defendants' alleged conspiracy."

15             And that conspiracy is alleged to have

16    existed between -- at least the damages, between

17    January 2009 and June 2018.

18             And I have -- as I've said several times

19    now, I have assumed, as any damage expert must,

20    that the allegations in the complaint are true.

21        Q. Yeah.  And so that's what I'm trying to

22    get at.  So for 2016, just to pick a year, what

23    are you assuming the defendants did that then led

24    to the overcharge you purport to measure?

25             MR. FINLEY:  Objection, asked and

CASE 0:18-cv-01776-JRT-JFD Doc. 1458-1 Filed 08/24/22 Page 7 of 83
In Re: Pork Antitrust Litigation
Michael Williams, Ph.D.
June 21, 2022

31

1   answered, lack of foundation.

2       A. Yeah.  I'm assuming that in 2016 the

3   defendants engaged in the conduct that's alleged

4   in the complaint as it relates to conduct that

5   allegedly supported the claimed conspiracy.

6       Q. Are you assuming that all decreases in sow

7   inventory between January of 2009 and June of 2018

8   were a result of the alleged conspiracy?

9           MR. FINLEY:  Hold on.  And objection,

10  form, also on the basis of expert stipulation.

11  This is something possibly considered, not

12  necessarily relied on.

13      A. My report doesn't offer such an opinion.

14  My report doesn't make such.  It doesn't have a

15  statement about that.

16      Q. Are you assuming that all decreases in hog

17  production between January of 2009 and June

18  of 2018 were a result of the conspiracy?

19          MR. FINLEY:  Same objection.

20      A. Again, the -- I mean, the complaint speaks

21  for itself.  So I'm assuming that the allegations

22  in the complaint are true as it pertains to those

23  allegations that are relevant to the alleged

24  conspiracy.

25          I don't specifically recall right now if

1  Paragraphs 70 through 76.  But in particular, to

2  Table 2 on page 37, which reports the "U.S. Daily

3  Hog Slaughter Capacity, 2009-2020, by Company,"

4  and separates the defendants from others and

5  reports defendants' market share in the last row

6  of the table.

7      Q. As measured by hog slaughter capacity.

8  Correct?

9      A. That is correct.

10     Q. What were defendants' market shares for

11 hog production during these years?

12     A. I don't believe that's contained in my

13 report.  And the reason would be, if you look at

14 Paragraph 71 and in particular the article by my

15 former colleague Greg Werden, I believe that the

16 capacity provides -- for antitrust purposes

17 provides a better estimate of market

18 concentration.

19     Q. I get that.  I'll sort of take that point

20 for now as it relates to pork processing.

21        My question is upstream for hog

22 production.  Your report contains no analysis of

23 defendants' market shares in the upstream market

24 for hog production.  Correct?

25     A. I don't recall that.

49

```
1      Q. Back to the phrase "upstream vertical
2    control" as you use it in your report.  Does that
3    mean control about -- control over decisions about
4    sow inventories?
5          MR. FINLEY:  Objection, form.
6      A. Well, it means what I've stated in
7    Paragraphs 37 through 55.  So that's -- you asked
8    me earlier where have I discussed issues that
9    relate to upstream vertical control.  And the
10   answer is in Paragraphs 37 through 55.
11     Q. And those paragraphs don't say anything
12   about control over sow inventory.
13         So is it fair to say you are not opining
14   that defendants exercised control over
15   nondefendants' decisions about sow inventories?
16         MR. FINLEY:  Objection, form.
17     A. I'm not going to take the time right now
18   to read everything in 37 through 55.
19         I don't recall those paragraphs
20   specifically talking about the issue you're
21   discussing right now.  So I'd say -- assuming
22   that's correct, I would say my report doesn't
23   offer an opinion.
24     Q. And then same question about how many hogs
25   to produce.
```

50

```
1          Is it fair to say your report contains no

2    opinion that defendants controlled nondefendant

3    companies' decisions about how many hogs to

4    produce?

5          MR. FINLEY:  Objection, form.

6       A. I don't recall my report offering an

7    opinion on that.

8       Q. Is it fair to say that none of your

9    opinions turn on whether the defendants actually

10   controlled a majority of U.S. hog production

11   between 2009 and June of 2018?

12      A. Well, the -- you asked me earlier where

13   was the discussion of upstream vertical control,

14   and my answer was Paragraphs 37 through 55.

15          So those paragraphs discuss facts related

16   to, for example, the changing vertical nature of

17   the industry over time.  So I would say that

18   unless -- these are just factual statements that

19   I've made about the industry background.  I'm not

20   aware of any errors in them right now.  If there

21   were, I'd want to correct them.

22      Q. I guess what I'm trying to get at is what

23   you're assuming and what you're opining on.

24          Do your opinions turn on whether or to

25   what extent defendants controlled the number of
```

In Re: Pork Antitrust Litigation                    Michael Williams, Ph.D.
                                                    June 21, 2022

51

1    sows in production at any point in time between

2    2009 and June 2018?

3        A. Well, the opinions that are expressed in

4    Paragraphs 37 through 55, to the extent that they

5    cover that, again, these are my opinions based on

6    my understanding of the facts of the industry as

7    it pertains to the consolidation and

8    specialization of farming operations and as it

9    pertains to hog farming and the fact that hog

10   farming and hog packing have become increasingly

11   vertically integrated.

12       As I said, these -- I'm not aware of any

13   errors in these paragraphs on industry background.

14   If there were, I'd certainly want to correct them.

15       Q. Let's just take a look at maybe a few

16   examples.  Before we get into the paragraphs you

17   were discussing, if you could just turn back to

18   Paragraph 24, which is on page 12.

19       You can read the whole paragraph, if you

20   want.  I'm just going to ask you about the last

21   sentence.

22       A. Sure.  If you could just give me a moment.

23       Q. Absolutely.

24       A. Yes.  I've read the paragraph.

25       Q. In the last sentence you say, "Because of

52

1    their high degree of vertical integration (either

2    by ownership or by contract), pork packing and

3    processing firms are also referred to as pork

4    integrators."

5        Did I read that correctly?

6        A. I believe so.

7        Q. What do you mean by "vertical

8    integration"?

9        A. Well, it's described right above.  In the

10   sentence kind of halfway down the paragraph, it

11   starts, "First, due to vertical integration, many

12   packers now own the hog farms that supply their

13   packing operations.  Second, independently owned

14   hog farms now primarily operate under long-term

15   contracts with packers to which they supply

16   finished hogs directly."

17       So those would be two examples of vertical

18   integration.

19       Q. So my client, Seaboard, over the years has

20   had contracts to buy hogs from Prestage, which is

21   one of the companies I asked you about before.

22       Assuming that that's true, assuming my

23   representation is true, in your view, does that

24   mean Seaboard is vertically integrated with

25   Prestage?

53

```
 1        MR. FINLEY:  And objection, scope.

 2     A. If I understand your representation,

 3  Seaboard doesn't own Prestage.  So I would say

 4  they're not vertically integrated in the sense

 5  that's described in the sentence that I read a

 6  moment ago that begins, "First, due to vertical

 7  integration, many packers now own the hog farms

 8  that supply their packing operations."

 9        But it sounds like, if I understand your

10  representation, you're saying that there is a

11  contract -- I don't know if it's short-term,

12  long-term, but you're saying there is a contract

13  or contracts between Seaboard and Prestage.

14        And so that's a kind of vertical

15  integration.  It's a contractual vertical

16  integration.  It's not an ownership vertical

17  integration.

18     Q. I suppose to understand the rights and

19  obligations Seaboard and Prestage would have

20  relative to each other, you'd have to read the

21  contract.  Right?

22        MR. FINLEY:  Objection, calls for a legal

23  conclusion, calls for speculation.

24     A. Yeah.  I haven't -- I'm not an attorney.

25  I'm not -- my report doesn't offer any opinions
```

54

1    about the contractual relationship between

2    Seaboard and Prestage.

3         Q. You're not opining that by virtue of that

4    contractual relationship Seaboard was able to

5    control how many sows Prestage maintained in its

6    sow farms.  Correct?

7         MR. FINLEY:  Objection to form.

8         A. My report does not offer such an opinion.

9         Q. And your report doesn't offer an opinion

10   that, to stick with this example, Seaboard by

11   virtue of its contract with Prestage was able to

12   control how many hogs Prestage produced at any

13   point in time.  Correct?

14        MR. FINLEY:  Objection to form.

15        A. My report doesn't offer such an opinion.

16        Q. Stepping outside of that example, it's

17   also true your report doesn't offer any opinion

18   that any defendant by virtue of a contract with an

19   independent producer was able to control how many

20   sows that producer maintained in its sow farms.

21   Correct?

22        MR. FINLEY:  Objection, vague, ambiguous.

23        A. I don't recall my report offering such an

24   opinion.

25        Q. And your report also doesn't offer an

55

1    opinion that any defendant by virtue of a contract

2    with an independent producer was able to control

3    how many hogs that independent producer raised.

4    Correct?

5          MR. FINLEY:  Objection, form, vague,

6    ambiguous.

7      A. Yeah.  I don't recall my report offering

8    such an opinion.

9      Q. Would you turn to Paragraph 42 of your

10   report.  That's on page 19.

11     A. Yes, sir.  I'm there.

12     Q. It says in 2009, in the last sentence,

13   "130 farms that had 50,000 or more pigs accounted

14   for 56.7% of the nationwide inventory."

15         Did I read that right?

16     A. Well, you started in the middle of the

17   sentence.

18     Q. Yeah.  Let me break it up.

19         So this paragraph refers to information

20   about 2009.  Correct?

21     A. Yes, sir.

22     Q. And the last sentence reads, "On the other

23   hand, 130 farms that had 50,000 or more pigs

24   accounted for 56.7% of the nationwide inventory."

25         Did I read that correctly?

1    A. You did.

2    Q. Do you know about how many of these 130

3    farms were owned by defendants?

4        MR. FINLEY:  Objection, form.

5    A. I don't -- my report doesn't offer that

6    opinion.  I don't recall it right now.

7    Q. Do you have just a ballpark?  Do you know

8    if it was 10 farms versus 120 farms?

9        MR. FINLEY:  Well, objection on the basis

10   of the expert stipulation, asking him about

11   knowledge, preliminary work product, these kinds

12   of things here.

13   A. I don't recall.

14   Q. If you'd turn to Paragraph 47.  It's on

15   page 21.  And then Figure 4, which is on the next

16   page.

17       Paragraph 47 reads, "According to the

18   USDA's Agricultural Resource Management Survey

19   (ARMS), by 2020 the share of hog production

20   operating under contract increased to nearly 70%

21   as shown in Figure 4 below."

22       Did I read that correctly?

23   A. I believe so.

24   Q. And the paragraph above, in Paragraph 46

25   there's a reference to two different types of

1    given Defendants a significant degree of control

2    over hog farming production."

3          Did I read that right?

4      A. I believe so.

5      Q. And what do you mean by "significant

6    degree of control"?

7      A. Well, it would be the -- again, this would

8    be the discussion generally in 37 through 55,

9    particularly in 44 through 55.

10          But that the graph shows a substantial

11   increase in U.S. hog production operating under

12   contract.  And so that's the graph that I was

13   referring to when I wrote the sentence that

14   appears -- the first sentence in 48.

15     Q. And just to be clear, sitting here today,

16   you don't know whether the graph in Figure 4 is

17   measuring contracts between defendants and third

18   parties exclusively or if it also includes

19   contracts between nondefendant hog producers and

20   the hog farmers?

21          MR. FINLEY:  Objection, form, compound.

22     A. Yeah.  I would have to go back and

23   double-check the source.

24     Q. And when you say "significant degree of

25   control over hog" . . . "production," just to make

60

1    sure I understand this correctly, you're not -- by

2    "significant degree of" -- let me withdraw that

3    and start over.

4         By "significant degree of control over hog

5    farming production," you do not mean control over

6    nondefendants' decisions about how many sows to

7    have on their sow farms.  Correct?

8         MR. FINLEY:  Objection, form.

9     A. I don't recall my report offering an

10   opinion about that.

11    Q. And it's also the case that "significant

12   degree of control over hog farming production"

13   does not mean defendants have control over

14   nondefendants' decisions about how many hogs to

15   raise.  Correct?

16        MR. FINLEY:  Objection, form.

17    A. Yeah.  Again, I don't specifically recall

18   my report offering an opinion about that.

19    Q. Let's take Tyson as an example, if you

20   could turn to Paragraph 52.

21        Paragraph 52 reads, "In 2017, Tyson

22   reported that the 'majority of our live hog supply

23   is obtained through various procurement

24   relationships with independent producers.'"

25        Did I read that right?

61

1      A. I believe so.

2      Q. Did you, for purposes of forming your

3   opinions in this case, rely on any of Tyson's

4   contracts with outside hog producers?  Sorry.  Let

5   me strike that.

6      Did you, for purposes of your opinions in

7   this case, rely on any of Tyson's contracts with

8   independent producers?

9      MR. FINLEY:  Objection, form.

10     A. I'm not sure if I understand the question.

11     I mean, the sentence that you read in

12  Paragraph 52 is a statement about -- well, it's a

13  quote from Tyson about their contractual

14  relationships with independent producers.

15     Q. Okay.  I'm asking -- well, let me ask a

16  simpler question.

17     Did you review any of Tyson's contracts

18  with independent producers?

19     MR. FINLEY:  And objection based on the

20  expert stip to the extent this is considered but

21  not relied upon.

22     So you may answer about whether rely upon,

23  not whether just considered.

24     A. My report doesn't rely on any such

25  contracts.

62

1      Q. Are you aware of any instance in which

2   Tyson instructed an independent producer to grow

3   fewer hogs?

4          MR. FINLEY:  Same objection.

5      A. I don't believe my report contains --

6   offers such an opinion.

7      Q. For any defendants, does your report offer

8   an opinion -- well, let me restart.

9          Does your report offer an opinion that any

10  defendants instructed an independent producer to

11  grow fewer hogs?

12         MR. FINLEY:  Objection, form.

13     A. I don't recall that opinion being in my

14  report.

15     Q. Does your report offer an opinion that any

16  defendant instructed an independent producer to

17  forgo a contemplated expansion?

18         MR. FINLEY:  Objection, form.

19     A. I don't recall my report offering such an

20  opinion.

21     Q. Are you relying on any of the marketing

22  contracts between any defendant and any

23  independent, let me say, nondefendant hog producer

24  for your opinions in this case?

25         MR. FINLEY:  Objection, form.

63

1       A. I don't recall that.

2           You know, the -- as I'm sure you're aware,

3    the documents I have relied on are listed in

4    Appendix II.  But I don't specifically recall such

5    a contract being in Appendix II.

6       Q. Can you identify any instance between 2009

7    and June of 2018 where a defendant prevented an

8    independent hog producer from growing more hogs?

9           MR. FINLEY:  And objection on the basis of

10   the expert stip to the extent this is asking for

11   materials considered but not relied upon.

12          And so you can answer to the extent you

13   relied on these materials.

14      A. Yeah.  I don't believe my report relies on

15   such materials.  I don't recall that.

16      Q. And you're not willing to testify whether

17   you're aware of any such instance?

18          MR. FINLEY:  Same objection, same

19   instruction.

20      A. Yeah.  I'll answer the same way.  My

21   reports doesn't rely on any such evidence.

22      Q. And so is it fair to say that none of your

23   opinions turn on whether any defendant ever

24   instructed any nondefendant hog producer to grow

25   fewer hogs?

1      A. Well, as we've talked about on several

2    occasions now, the first sentence of Paragraph 12

3    says, "For the purposes of estimating

4    overpayments, if any, caused by Defendants'

5    alleged conspiracy, I have assumed the allegations

6    in the Complaint are true."

7          Again, that's what any damage expert is

8    obligated to do.

9          And then there are two regressions in my

10   report:  One is an overcharge regression, and one

11   is a production regression.

12         And those regressions ask whether or not

13   given the, as you said, nonconspiratorial factors,

14   in particular supply and demand factors, whether

15   or not in the output regression whether or not

16   actual output is lower than but-for output, and

17   then in the overcharge regression, whether or not

18   actual prices exceed but-for prices.

19         Again, there's no assumption that there's

20   any difference between actual output and but-for

21   output, and there's no assumption that there's any

22   difference between actual prices and but-for

23   prices.

24         It's an empirical question, which is

25   investigated in the regression -- in the

1   production regression in Table 3 and the

2   overcharge regression in Table 4.

3       Q. And none of your regressions estimates

4   what the volumes of export sales would have been

5   but for the alleged conspiracy.  Correct?

6       MR. FINLEY:  Objection, form.

7       A. That is correct.  There is no -- as I said

8   earlier, there's no export variable in the

9   overcharge regression; neither is there an export

10  variable in the production regression.

11      Q. Let's take a look at page 29 of your

12  report, Figure 6.  This figure is titled "Total

13  U.S." . . . "Net Exports and Net Exports as a

14  Share of Production, 2000-2020 (by Weight)."

15      Did I get that right?

16      A. No.  You actually left out the most

17  important word.  You left out the word "Pork."

18  But otherwise, you got it right.

19      Q. Okay.  I'll own that one.

20      This figure portrays "Total U.S. Pork Net

21  Exports and Net Exports as a Share of Production,

22  2000-2020 (by Weight)."  Correct?

23      A. I believe that is correct.

24      Q. For purposes of this figure, how did you

25  calculate net exports?

72

1      A. Well, I would -- I'd want to double-check

2  the source.  And as I'm sure you're aware, we gave

3  you all of the backup for our report.  So I would

4  just want to double-check those things.

5         But my recollection is it would be exports

6  minus imports.

7      Q. And the exports and imports you're

8  referring to would be of all pork products.

9  Correct?

10      A. Again, the answer is an empirical one.  It

11  would be contained in that source.  That's what

12  the title to the table says.  That would be --

13      Q. Do you recall -- I'm sorry.  Go ahead and

14  finish.

15      A. I'm sorry.  I was just saying that's what

16  the title -- the title to the table says "Pork."

17  It doesn't specify any particular pork products.

18  But again, the source would answer the question.

19      Q. Do you know, sitting here today, whether

20  this figure -- whether the net exports depicted in

21  this figure include exports of products that fall

22  outside of the class definition?

23      A. I don't recall that right now.  I would

24  have to double-check the source.

25      Q. So sitting here today, you don't know

1    Illinois Brick states, and then using the

2    pass-through information and other information

3    that's discussed in Sections IV and V to come up

4    with the estimate of damages, which is in

5    Table 12.

6         But those discussions don't specifically

7    rely on Figure 6.

8       Q. You're not opining that the members of the

9    commercial and institutional indirect purchaser

10   class paid higher prices for pork as a result of

11   increases in exports?

12        MR. FINLEY:  And objection, vague,

13   ambiguous, calls for speculation, calls for a

14   legal conclusion.

15      A. Yeah.  We talked earlier about the

16   overcharge regression, which is in a sense the

17   beginning of the damage calculation.

18        And there is no variable in that

19   overcharge regression which appears in Table 4,

20   there is no variable in there for exports, so

21   there's not -- certainly no direct connection

22   between Figure 6 and the estimated overcharge.

23        And then as I mentioned a moment ago, the

24   actual calculation of damages, which of course

25   goes through a number of steps to get to the

78

1   relevant volume of commerce, is in a sense

2   affected by exports, but it's really looking at

3   the domestic sales of the relevant pork products.

4       Q. Are you offering an opinion that increases

5   in exports resulted in higher prices for members

6   of the class during the period 2009 to June 2018?

7       MR. FINLEY:  Objection to form, vague,

8   ambiguous.

9       A. No.  I don't believe my report says that.

10  Again, as we've talked about, Table 4 does not

11  have a variable for exports.

12      Q. Let's take a look at Paragraph 62 of your

13  report, which is on page 31.

14      A. Yes.  I'm here.

15      Q. And this paragraph -- well, the header

16  above this paragraph is "Events affecting pork

17  exports."  Correct?

18      A. That is correct.

19      Q. And then in Paragraph 62 you wrote, "Net

20  U.S. pork exports increased during 2000 through

21  2020, this increase was not uniform."

22      Did I read that right?

23      A. You did.

24      Q. And then you say, "As Figure 6 above

25  shows, net exports fell in some years (2009 and

1    2013-2015) before rebounding later."

2         Did I read that right?

3      A. You did.

4      Q. And then you wrote, "These temporary

5    decreases in exports are often due to factors and

6    events outside of the control of U.S. pork

7    producers and pork processors."

8         Did I read that correctly?

9      A. Yes, you did.

10     Q. And it's in your report.  I take it you

11   agree with that statement?

12     A. Yes, I agree.

13     Q. And then you quote from the USDA.  You

14   say, "For example, in April 2009, the USDA

15   reported:

16         "'Deterioration in the global economic

17   situation, restrictive trade policies, the

18   stronger U.S. dollar and changing market

19   conditions, are among the reasons for falling

20   demand in some major importing countries.'"

21         Did I read that right?

22     A. You did.

23     Q. And then you say, "This decline was

24   transitory, and international meat trade rebounded

25   in 2010, benefitting U.S." . . . "exporters."

87

1    opinion.

2         Q. Dr. Singer submitted a report in this

3    matter.  And he wrote -- this is a quote from his

4    report.  I'd like your reaction.  He wrote, "A

5    firm's decision to export is not itself evidence

6    of a conspiracy."

7              Do you agree with that statement?

8              MR. FINLEY:  Hold on.  Objection.  Is this

9    document before the witness?

10             MR. SCHWINGLER:  It is not.

11             MR. FINLEY:  Okay.

12        A. I've never read Dr. Singer's report.  I

13   don't know what's in it.  I don't have any

14   particular reason to agree or disagree with that

15   sentence.  I've never seen it before.

16        Q. All right.  So let's forget about

17   Dr. Singer for a moment.  I'm just going to ask

18   for your reaction to the following statement,

19   whether you disagree or agree.

20             The statement is, "A firm's decision to

21   export is not itself evidence of a conspiracy."

22             Do you agree?

23             MR. FINLEY:  Objection, form, calls for

24   speculation.

25        A. Well, my report doesn't offer a specific

88

1    opinion along those lines.

2         But if the question was, would a firm's

3    decision to export some specific quantity of

4    widgets by itself be evidence of collusion, I

5    think in the abstract I would say no.

6         There's obviously -- there's a lot -- the

7    context would certainly matter.  If that's the

8    only thing I knew about the widget industry, that

9    some firm had made a decision about how much to

10   export and I didn't know anything else, I would

11   say that -- I wouldn't particularly regard that as

12   evidence of collusion.

13       Q. I'll give you another statement and you

14   can agree or disagree.

15       The statement is, "A firm's individual

16   decision to sell into foreign markets could be

17   perfectly rational in a competitive environment."

18       Do you agree with that?

19       MR. FINLEY:  Same objection.  Is this

20   referencing the Singer report?

21       MR. SCHWINGLER:  It is a quote from the

22   Singer report, but my question is not about the

23   Singer report.  It's whether the witness agrees

24   with that statement.

25       MR. FINLEY:  Then objection on the basis

89

1    of scope and expert stip to the extent that this

2    may have been considered but not relied upon.

3         A. Well, I'll just say again, I've never read

4    Dr. Singer's report.  I don't know what's in it.

5    I don't know anything about the context of any

6    particular sentence that's in it.

7         But if -- just that sentence by itself and

8    just thinking about some abstract widget industry,

9    if that's the only thing I knew about the widget

10   industry in the absence of any other facts about

11   the structure of conduct about that industry, I

12   wouldn't think that that would be particularly

13   indicative of collusion.

14        Q. To analyze whether an export was

15   indicative of collusion, you'd need to analyze the

16   context behind that decision.  Correct?

17        A. My report doesn't offer any opinions about

18   exports in collusion.  It's just not something --

19   it's not an opinion I'm offering in my report.

20        Q. And you may have just answered my

21   question, but if you'll bear with me.  If you

22   could turn to Paragraph 7.  In 7 and 8 --

23   actually, I'll just have you look at Paragraph 8,

24   8 through 13, which summarizes your opinions.

25        A. If I could have just a moment to refresh

90

1    my recollection.

2        Q. Absolutely.

3        A. Okay.  I've reread those paragraphs.

4        Q. And so first of all, am I correct that

5    Paragraphs 8 through 13 summarize the opinions

6    you're offering in this case?

7        A. Well, yes, subject to -- I'm sure you read

8    it, but the second sentence in Paragraph 8

9    specifically says, "The following summary does not

10   reflect all of my findings and conclusions or all

11   of the bases for those findings and conclusions."

12       Subject to that statement, then yes, this

13   was described in my report in Subsection C as an

14   overview of my opinions.

15       Q. And none of the items in Paragraphs 8

16   through 13 refer to exports.  Correct?

17       A. I believe that's correct.  The word

18   "exports" does not appear in Paragraphs 8 through

19   13.

20       Q. And more generally, your report does not

21   contain an analysis of whether economic evidence

22   supports an inference that defendants increased

23   their exports as part of the alleged conspiracy.

24   Correct?

25       A. My report does not contain such an

91

```
1    opinion.

2         Q. If you look at Subsection III.B., which

3    starts on page 66 of your report -- I believe

4    that's III.B.  Let me confirm.  Yes.

5         Subsection III.B. on page 66.  The header

6    reads, "Defendants took actions that were against

7    their independent self-interests but for the

8    existence of a conspiracy."  Correct?

9         A. Yes.  That's what the heading says.

10        Q. And the section that follows identifies

11   what you describe as actions against defendants'

12   unilateral self-interest.  Correct?

13        A. No, I wouldn't state it that way.

14        Q. How would you state it?

15        A. I would state it that it describes actions

16   that the defendants took that were against their

17   independent self-interests but for the existence

18   of a conspiracy.

19        Q. And that section doesn't address export

20   activity.  Correct?

21        A. If I could have just a moment to refresh

22   my recollection.

23        So I have quickly scanned Paragraphs 128

24   to 201, which constitute the Subsection B, and I

25   don't see any discussion of exports.
```

92

1      Q. So you don't in your report identify any

2   export sale that you believe was against the

3   seller's unilateral self-interest absent a

4   conspiracy.  Correct?

5          MR. FINLEY:  Objection, form, calls for a

6   legal conclusion.

7      A. Well, I don't see a discussion of that in

8   Paragraphs 128 to 201.

9      Q. I know it's a lengthy document.  But you

10  don't recall any examples elsewhere in your

11  report, sitting here today.  Is that fair?

12     A. That is fair.

13     Q. And your report doesn't contain an

14  estimate of the total volume of exports that were

15  against the seller's unilateral self-interest

16  absent a conspiracy.  Correct?

17     A. I don't believe it does.

18     Q. And your opinions about class

19  certification do not rely on any assumption or

20  opinion about whether defendants actually exported

21  pork against their unilateral self-interest absent

22  a conspiracy.  Correct?

23          MR. FINLEY:  Objection to form, calls for

24  a legal conclusion.

25     A. Yeah.  I was going to say, it seems to be

124

1      Q. So, Dr. Williams, I'd like to spend some

2   time on the production regression in your report.

3          And if you could turn to page -- so

4   Exhibit 1, Paragraph 144, which is on page 72.

5   And so I'd like to talk about -- well, let's just

6   go sentence by sentence.

7          So first you write, "Defendant production

8   can be influenced by non-collusive market

9   conditions in addition to the alleged conspiracy."

10  Is that right?

11     A. Yes.  You read that correctly.

12     Q. And then you wrote, "For example,

13  increasing consumer demand for pork over time

14  could incentivize greater pork production."

15         Did I read that right?

16     A. Yes, you did.

17     Q. And then you say, "Consequently, an

18  increase in industry-wide pork production does not

19  constitute evidence inconsistent with the

20  existence of the alleged conspiracy."

21         Did I read that correctly?

22     A. Yes, you did.

23     Q. And then you say, "The relevant question

24  in this regard is whether or not actual pork

25  production was lower than it would have been but

125

1   for the alleged conspiracy."

2        Did I read that correctly?

3      A. Yes, you did.

4      Q. Does your regression model answer that

5   question?

6      A. Yes, it does.  It answers other questions

7   as well, but it answers that question.

8      Q. My understanding of your regression model

9   is that the dependent variable is quarterly pork

10  production net of net exports.  Is that right?

11     A. Yes.  I believe you're looking at

12  Paragraph 151.

13     Q. Yes.  So you're not -- your model is not

14  analyzing slaughter levels.  It's analyzing pork

15  production net of net exports.  Correct?

16     A. That is correct.

17     Q. So I'll ask the question again.

18        You wrote in your report, "The relevant

19  question in this regard is whether or not actual

20  pork production was lower than it would have been

21  but for the alleged conspiracy."

22        Does your regression model measure actual

23  pork production?

24     A. It measures exactly what's in

25  Paragraph 151.

126

1    Q. Which is pork production net of net

2  exports.  Correct?

3    A. Correct.

4    Q. So in order to know whether actual pork

5  production changed, you would first have to add

6  the net exports back in.  Correct?

7        MR. FINLEY:  Objection, form, calls for

8  speculation.

9    A. Well, I suppose one could do that.  That's

10 not what I've measured -- that's not what I've

11 utilized as the dependent variable in the

12 production regression.

13   Q. Is a better term for what you're using

14 "domestic pork supply" as opposed to "actual pork

15 production"?

16       MR. FINLEY:  Objection to form.

17   A. I didn't use that phrase.  I'm comfortable

18 with the language that's in Paragraph 151.

19   Q. I'm asking -- sorry -- a different

20 question.

21       When you say "The relevant question" -- in

22 Paragraph 144, when you say, "The relevant

23 question in this regard is whether or not actual

24 pork production was lower than it would have been

25 but for the alleged conspiracy," would it be more

1  consistent with your opinions and your work in

2  this case to replace the phrase "actual pork

3  production" with another phrase, whether it's

4  "pork production net of net exports" or "domestic

5  pork supply"?

6       I'm just trying to make sure I understand

7  what you're really saying in Paragraph 144.

8       MR. FINLEY:  Objection to form.

9    A. I don't have any reason to change the

10 language in 144.  As I said, I think the right

11 dependent variable is the dependent variable

12 specified in Paragraph 151.

13   Q. Okay.  We'll get to that.

14       So you're, I guess, standing by the

15 opinion that the relevant question is whether or

16 not actual pork production was lower than it would

17 have been but for the alleged conspiracy --

18       MR. FINLEY:  Objection.

19   Q. -- if I'm understanding you correctly?

20   A. I don't have any particular reason right

21 now to change what I stated in Paragraph 144.

22       And then, as I said, I believe that the

23 relevant dependent variable for analyzing that is

24 the dependent variable specified in Paragraph 151.

25   Q. The last sentence in Paragraph 144 says,

1    the expert stip to the extent this is calling for

2    factors considered as opposed to information

3    material to rely upon.

4        A. Well, if we go back for a moment to

5    Paragraph 218 -- and I won't repeat the long

6    answers I've just given you about the damages

7    period.

8            But the benchmark period is going to be

9    before the damages period.  So it's going to be

10   before January 1st, 2009.

11           And as I say in Paragraph 218 -- I'll just

12   read here -- "For the benchmark period, I use all

13   the available data for the period before

14   January 2009.  Specifically, data in the benchmark

15   period used for my regression analysis covers the

16   period January 2005 through December 2008."

17       Q. My question -- I understand the benchmarks

18   are the same I believe for the two models.

19           But why did you only go back to 2005 for

20   the production regression?

21           MR. FINLEY:  Objection on the basis of the

22   expert stip.

23           MR. SCHWINGLER:  I'm asking him why he

24   limited his benchmark to 2005.  I think that's a

25   fair question.

137

1          MR. FINLEY:  Same objection.

2      A. So in Paragraph 218, again, it says, "For

3  the benchmark period, I use all the available data

4  for the period before January 2009.  Specifically,

5  data in the benchmark period used for my

6  regression analysis covers the period January 2005

7  through December 2008."

8          The variables in the regression -- in the

9  production regression are the same as the

10  variables in the overcharge regression, with the

11  exception that the overcharge regression does add

12  one variable, the Consumer Price Index.

13          My recollection is that that's as far back

14  as I felt like the reliable available data were

15  available.

16      Q. Why did you include 2008 in your benchmark

17  period?

18      A. Well, let's --

19          MR. FINLEY:  Same objection.

20      A. Paragraph 218, remember that I was -- I'll

21  read it again.

22          "I was instructed by counsel to use the

23  period January 1, 2009 through June 30, 2018, as

24  the damages period."

25          And I'm not going to repeat -- I gave it

1    twice, roughly -- those long answers about why I

2    thought there was both econometric support and

3    evidentiary support for why I think that period

4    makes economic sense to me.

5         But your question now is why would I

6    include 2008 in the benchmark period.  And the

7    answer is, it precedes the damages period.  So I

8    consider it as likely untainted by anticompetitive

9    conduct.

10    Q. Did hog producers on average make money in

11   2008?

12        MR. FINLEY:  Objection to form.  Also

13   objection on the basis of expert stip.  And

14   objection on the basis of scope.

15    A. Your question is really vague.  Did they

16   make money?  Yes, they certainly had revenues.

17   I'm not sure what you mean by "make money."

18    Q. Did the hog producers -- did the prices

19   hog producers realized selling hogs in 2008 exceed

20   their cost of producing hogs in that year?

21        MR. FINLEY:  Objection on the basis of the

22   expert stip.

23    A. My report doesn't offer an opinion about

24   that.

25    Q. None of your opinions turn on whether hog

139

1    production was profitable in 2008.  Correct?

2         MR. FINLEY:  Objection, vague and

3    ambiguous.  Also object on the basis of expert

4    stip.

5      A. My report doesn't offer an opinion about

6    that.  And one would also have to distinguish

7    short-run profits, long-run profits, accounting

8    profits, economic profits.

9         But at any rate, my report does not offer

10   an opinion about the defendants' profits from the

11   sale of pork products in 2008.

12     Q. Is the only reason you included 2008 in

13   your benchmark period because it was the year

14   before the alleged conspiracy began?

15        MR. FINLEY:  Same objection.

16     A. So we'll go back to Paragraph 218.  I'll

17   read it again.

18        "I was instructed by counsel to use the

19   period January 1, 2009 through June 30, 2018, as

20   the damages period.  For the benchmark period, I

21   used all the available data for the period before

22   January of 2009.  Specifically, data in the

23   benchmark period used for my regression analysis

24   covers the period January 2005 through

25   December 2008."

141

1        So as I said, the goal would be to

2    identify a period of time for the benchmark that

3    was unaffected by the disputed conduct.

4        And I believe that the econometric

5    evidence and the production regression, the other

6    evidence in the paragraphs I cited earlier, as

7    well as the evidence in the complaint, supports

8    the instruction I received about what period I

9    should use as the damages period.

10       And then I believe it's appropriate to use

11   as the benchmark period the period of time that

12   just precedes the onset of the damages period and

13   then working back from there.

14   Q. Other than the fact that 2008 just

15   precedes the alleged damages period, you're not

16   relying on any analysis of industry factors for

17   market conditions in 2008 that, in your opinion,

18   support using it as a benchmark for analyzing the

19   production that came in the years to follow.  Is

20   that fair?

21       MR. FINLEY:  Objection, asked and

22   answered.

23   A. I don't think I'd agree with quite the way

24   you're saying it.

25       What I testified earlier to was my report,

142

```
 1   for example, does not contain an opinion that

 2   there was -- obviously I'm not going to repeat

 3   everything that's in Subsection III.B., which

 4   relates to actions against the defendants'

 5   unilateral self-interest in the absence of an

 6   agreement.

 7        But my report -- maybe I'll state it in

 8   the alternative.

 9        My report does not offer an opinion that

10   2008 is contaminated by the disputed conduct.  So

11   I believe that 2008 is an appropriate year to

12   include in the benchmark.

13      Q. And I'm not asking whether you think '08

14   is contaminated by the disputed conduct.  I'm just

15   trying to understand what you're relying on in

16   selecting your benchmark period.

17        So I understand it's a year before the

18   alleged conspiracy started.  I understand you have

19   data available for that year.

20        Other than those two things, is there

21   anything else about 2008 that you're relying on

22   when you select it as part of your benchmark?

23        MR. FINLEY:  Same objection.

24      A. Well, again, I'm not going to repeat the

25   long answers that I've given in the last couple of
```

1    minutes.

2         But the -- I believe it's appropriate to

3    include 2008 in the benchmark because it's not in

4    the damages period.  It precedes the damages

5    period, precedes the period used, for example, in

6    the production regression.

7         I won't go through all of them, obviously,

8    but the two different sets of paragraphs I cited

9    earlier about evidence about communications, the

10   information that's in the complaint.

11        As I said, so far as I'm aware, it is

12   appropriate in the context of the production

13   regression and the overcharge regression to use --

14   to consider 2008 as part of the benchmark period.

15        And as I said earlier, the goal would

16   be -- is always in identifying a benchmark period

17   to identify a period of time in which the disputed

18   conduct was not present.

19        And so far as I know, the disputed conduct

20   was either not present or certainly less present.

21   Again, it's preferable from an econometric

22   perspective if there's no disputed conduct in the

23   benchmark period.

24      Q. Is your production regression sensitive to

25   including 2008 in the benchmark period?

144

1      MR. FINLEY:  Objection.  And I'm

2   definitely going to object on the basis of the

3   expert stip here since this does seem to ask for

4   preliminary work product or alternate calculations

5   if they were made.

6      MR. SCHWINGLER:  I'm going to be very

7   clear about what I'm asking for.  I'm not asking

8   for preliminary models.  I'm asking whether the

9   model that he is offering is sensitive to

10  inclusion of 2008 in the benchmark period.  This

11  is his opportunity to answer that question.

12      If you're going to instruct him not to

13  answer, you can do that.  But my question is not

14  about preliminary work.  It's about whether his --

15  the work he is relying on is sensitive to that

16  variable.

17      MR. FINLEY:  And perhaps there are other

18  ways he could answer this without reference to

19  preliminary work.  But it seems like one thing

20  this -- the one salient thing this might call for

21  is preliminary work.

22      Sorry.  In other words, are you defining

23  "sensitivity" in a way that doesn't include

24  preliminary work, reference to preliminary work?

25      MR. SCHWINGLER:  I want to know if he's

145

1  done a sensitivity check to see if including 2008

2  in his benchmark period impacts the results in a

3  way that is meaningful to the case.

4        MR. FINLEY:  Are you asking him whether

5  the sensitivity check is part of the report or

6  whether -- just whether he's done it?

7        MR. SCHWINGLER:  Quite obviously he

8  doesn't disclose a sensitivity check.  So if you

9  want to instruct him not to give any information

10  that isn't in his report, that's your

11  interpretation of the expert protocol, and we will

12  reserve our rights.

13        This is his opportunity to defend his

14  work.  I'm asking him if his model is sensitive to

15  including 2008 in the benchmark.

16        Obviously I can't force you to allow him

17  to answer.  But my -- I'll restart with the

18  question.  I'll let you handle it as you see fit.

19  BY MR. SCHWINGLER:

20     Q.  Dr. Williams, is your production

21  regression sensitive to including 2008 in the

22  benchmark period?

23        MR. FINLEY:  And I will object based on

24  the expert stip since this question seems to be in

25  reference to preliminary work product and possible

146

1   preliminary calculations.

2       A. My --

3           MR. FINLEY:  The witness may answer to the

4   extent he has a view independent of that.

5       A. My report doesn't offer an opinion on

6   that.

7       Q. So your opinions -- your opinion that the

8   production regression you disclose in your report

9   is an appropriate method for analyzing the impact,

10  if any, of the conspiracy on pork production net

11  of net exports does not rely on any sensitivity

12  check related to including 2008 in the benchmark

13  period.  Is that correct?

14          MR. FINLEY:  Objection.

15      A. I didn't say that.  I said my report

16  doesn't offer an opinion on that.

17      Q. Well, if your opinion that this is an

18  appropriate model relies on a sensitivity check,

19  we're entitled to know that.  So that's my

20  question.

21          Is your opinion that this model is

22  appropriate, does that rely on a sensitivity check

23  that you performed but did not disclose in the

24  report?

25          MR. FINLEY:  Objection, form, vague,

1    ambiguous.

2        A. No.  My report shows all the work on which

3    I'm relying.

4        Q. If defendants hadn't conspired to restrict

5    pork production starting in 2009, what would have

6    happened to hog prices during your damages period,

7    as you define it?

8            MR. FINLEY:  Objection, calls for

9    speculation.

10       A. My report doesn't offer an opinion on

11   that.

12       Q. Your report doesn't analyze but-for hog

13   prices.  Correct?

14           MR. FINLEY:  Objection, may

15   mischaracterize prior testimony.

16       A. That's not what I said.

17       Q. I'm not trying to characterize what you

18   said.  I'm asking you a question.

19           Does your report analyze what hog prices

20   would have been but for the alleged conspiracy?

21           MR. FINLEY:  Objection, vague, ambiguous.

22       A. Yes.  If you're referring to the

23   overcharge regression, that regression does

24   produce results that bear on but-for prices of

25   pork products.

148

1    Q. Pork products.  My question is about hog

2    prices.  Does your report analyze what hog prices

3    would have been but for the alleged conspiracy?

4         MR. FINLEY:  Objection, vague, ambiguous.

5    A. I don't believe my report offers any

6    opinions on that.

7    Q. And your report also doesn't offer any

8    opinion on what hog production would have been but

9    for the alleged conspiracy.  Correct?

10        MR. FINLEY:  Objection, form.

11   A. I believe that is correct.  The production

12   regression looks at what production would have

13   been in the but-for world.

14   Q. Pork production, not hog production.

15   Correct?

16   A. That's what's specified in Paragraph 151.

17   Q. And specifically pork production net of

18   net exports.  Correct?

19   A. That is correct.  That is the dependent

20   variable in the production regression that appears

21   in Table 3.

22   Q. Let's take a look at Paragraph 147 of your

23   report.  So the last sentence of Paragraph 147

24   says, "The empirical quantification of impact, if

25   any, attributable to the alleged conspiracy

1    involves a comparison of actual quantities during

2    the alleged conspiracy period with estimated,

3    but-for quantities in the absence of the alleged

4    conspiracy in that period."

5         Did I read that right?

6         A. Yes, sir.

7         Q. And by "actual quantities," are you

8    referring to pork production net of net exports?

9         A. That is correct, since that is the

10   dependent variable.

11        Q. In Paragraph 147, in the first sentence --

12   sorry.  Not in the first sentence.  In the

13   sentence immediately above -- I apologize for

14   working backwards.

15        So you write, "The dummy variable."  Do

16   you see that sentence?

17        A. Yes, sir.

18        Q. "The dummy variable multiple regression

19   methodology implements the comparison described

20   above, in that it relies on comparing

21   '[quantities] in the impact period to available

22   [quantities] before and/or after the alleged

23   period of impact,' while controlling for other

24   factors that affect quantities, e.g., hog costs or

25   adverse economic conditions."

152

1      A. My report doesn't offer an opinion about

2  that.

3      Q. You would agree that in order to make

4  pork, you have to have a hog.  Correct?

5      A. That would be my understanding.

6      Q. So do you dispute that hog supply impacts

7  the quantity of pork produced in the United

8  States?

9          MR. FINLEY:  Objection, form.

10     A. I don't have a specific reason to dispute

11  that.  I'm just correctly noting that my report

12  doesn't offer an opinion.

13     Q. And your production regression does not

14  control for changes in hog supply, does it?

15          MR. FINLEY:  Objection, form.

16     A. Well, it controls for a number of factors

17  that affect -- related to that.

18          It controls for hog costs.  It controls

19  for the plant costs of pork processing.  It

20  controls for the piglet loss rate.  It controls

21  for swine flu.

22          So it controls for a number of factors,

23  all the factors that are listed in Table 3.  It

24  doesn't have a specific variable called "supply of

25  hogs."

153

1    Q. You don't use USDA data on how many hogs

2    were actually produced between 2005 and whatever

3    the year was, 2020, as an input into your

4    production regression, do you?

5    A. That is correct.  There's no independent

6    variable of what -- of the type that you're

7    describing now.

8    Q. There's also no independent variable that

9    accounts for changes in hog prices.  Correct?

10    MR. FINLEY:  Objection, form.

11    A. Yes.  There's a variable -- there are

12    related variables, but there's not a variable

13    that's specifically called "hog prices."

14    Q. And Paragraph 25 of your report -- sorry

15    to jump around.  It's on this topic.

16    MR. SCHWINGLER:  It's on page 12, Caylob.

17    Q. So in Paragraph 25 you write, "The cost of

18    acquiring live hogs -- be it from a packer-owned

19    farm, a contract farm, or the public market -- is

20    the most significant part of packing and

21    processing operations, accounting for

22    approximately 70% of the total cost."

23    Did I read that correctly?

24    A. Yes, sir.

25    Q. And you would agree with me that in

154

1     circumstances where a packer buys a hog from a

2     third-party producer, its cost of acquiring that

3     hog would be the price it paid for the hog.

4     Correct?

5       A. That sounds right.

6       Q. Does the total U.S. sow inventory affect

7     the quantity of pork produced in the United

8     States?

9        MR. FINLEY: Objection, calls for

10    speculation.

11       A. My report doesn't offer an opinion on

12    that.

13       Q. And your production regression does not

14    include a control variable for sow inventory.

15    Correct?

16       A. That is correct.

17       Q. Does the number of pigs imported from

18    Canada affect the quantity of pork produced in the

19    United States?

20       A. My report does not offer an opinion on

21    that.

22       Q. And your production regression does not

23    include a control variable to address changes in

24    pigs imported from Canada. Correct?

25       A. That is correct.

155

1    Q. Does overseas demand for U.S. pork affect

2    the quantity of pork produced in the United States

3    net of net exports?

4    A. My report does not offer an opinion on

5    that.  No.

6    Q. Your production regression does not

7    include a control variable that addresses changes

8    in overseas demand for U.S. pork.  Correct?

9    A. That is correct.

10    Q. Do changes in pork supply overseas, such

11   as a disease outbreak in China, impact the

12   quantity of pork exported out of the United States

13   to other countries?

14        MR. FINLEY:  Objection, form.

15    A. My report does not offer an opinion on

16   that.

17    Q. And your report does not include a control

18   variable to address changes in overseas pork

19   supply.  Correct?

20    A. That is correct.

21        MR. FINLEY:  Objection.

22    Q. Do changes in currency exchange rates

23   impact or affect the quantity of pork exported to

24   other countries?

25        MR. FINLEY:  Same objection.

156

1       A. My report does not offer an opinion on

2    that.

3       Q. And your production regression does not

4    include a control variable to address changes in

5    exchange rates.  Correct?

6       A. That is correct.

7       Q. Do changes in trade agreements between the

8    United States and other countries affect the

9    quantity of pork exported to other countries?

10          MR. FINLEY:  Objection, form.

11      A. My report does not offer an opinion on

12   that.

13      Q. Your production regression does not

14   include a control variable to address changes in

15   trade agreements over time.  Correct?

16      A. That is correct.

17      Q. If another country such as Russia lifted a

18   ban on pork imported from the United States, would

19   that impact -- sorry -- would that affect the

20   quantity of pork exported to that country?

21          MR. FINLEY:  Objection, calls for

22   speculation.

23      A. My report doesn't offer an opinion on

24   that.

25      Q. And your production regression doesn't

1   include a control variable for changes to foreign

2   restrictions on pork imported from the U.S.

3   Correct?

4        MR. FINLEY:  Objection.

5     A. That is correct.

6     Q. I'm happy to go through each of them

7   again, if that would be helpful.

8        But am I correct that each of the items

9   that I've gone through and listed --

10       And I'll just list them:  hog supply, hog

11  prices, sow inventory, pigs imported from Canada,

12  overseas demand for U.S. pork, currency exchange

13  rates, changes in trade agreements, and import

14  bans.

15       -- is it fair to say that you don't

16  include control variables for those factors in

17  your overcharge regression either?

18       MR. FINLEY:  Objection, form.

19     A. That is correct.

20     Q. Let's talk about hog costs for a minute.

21  And if you want to turn back to Paragraph 153.  I

22  don't know if I'll have questions on that

23  paragraph, but I know that's where we were.

24       What did you use as a -- as a proxy for

25  the cost of raising a hog, for purposes of your

158

1    regressions in this case?

2        A. I'll read the second sentence in

3    Paragraph 153.

4            "I obtained monthly data on estimated

5    costs of producing hogs from farrow to finish

6    (birth to 270 lbs) from Iowa State University

7    (ISU) for the period from January 2004 to

8    September 2021."

9            So the data came from Iowa State.  And as

10   it's described in the rest of the paragraph, "The

11   total costs of production include feed and

12   non-feed costs.  Feed costs cover the costs of

13   corn, soybean meal, dried distiller grain,

14   complete feeds and other ingredients, and feed

15   processing.  Nonfeed costs are mainly on variable

16   costs, fixed costs, and operating interests."

17       Q. You used this variable in your overcharge

18   regression as well?

19       A. Yes, sir.

20       Q. In both the production regression and the

21   overcharge regression, did you use a three-month

22   moving average for that Iowa State data?

23       A. I believe that's correct.

24       Q. Would you agree with me that changes in

25   corn prices impact hog prices?

160

```
1        MR. FINLEY:  Objection, form.

2     A. There's no specific study of the

3  relationship between corn prices and hog prices in

4  my report.

5     Q. Does the profitability of raising hogs

6  impact hog supply?

7        MR. FINLEY:  Objection, form.

8     A. My report doesn't offer an opinion on

9  that.

10     Q. Your report contains no analysis of hog

11  producer margins between 2009 and 2018.  Correct?

12     A. That is correct.

13     Q. And it also doesn't analyze hog producer

14  margins before 2009 either.  Correct?

15     A. That is correct.

16     Q. And your report contains no analysis of

17  whether hog producer margins affected hog supply.

18  Correct?

19     A. That is correct.  My report does not offer

20  an opinion on that.

21     Q. Your report offers no opinion on whether

22  hog producer margins affected pork prices either.

23  Correct?

24     A. That is correct.  My report does not offer

25  such an opinion.
```

161

1    Q. And I should add that the list of

2    variables, there's no control variable in either

3    your production regression or your overcharge

4    regression that accounts for changes in producer

5    returns or margins for hog production.  Correct?

6         MR. FINLEY:  I object to form.

7    A. I believe that's correct.  I think

8    "producer returns" is a little vague.  But there's

9    no variable that's looking at hog producers'

10   profits in those two regressions.

11   Q. Let's go to Paragraph 151.  I know you've

12   touched on this before.  But just to level set the

13   four-year production regression, the dependent

14   variable is quarterly pork production net of net

15   exports.  Correct?

16   A. That is correct.

17   Q. And is it fair to say if exports go up,

18   all else equal, pork production net of net exports

19   will go down?

20   A. That sounds right.  Obviously the

21   important thing is the "all else equal."

22   Q. Just basically getting at, for a given

23   level of slaughter, if exports go up the dependent

24   variable in your regression will go down, assuming

25   everything else stays constant?

162

```
 1        A. I believe that's correct.

 2        Q. And that's true regardless of which

 3   product is being exported.  Correct?

 4           MR. FINLEY:  Objection, form.

 5        A. Yes.  Because the USDA is looking at all

 6   pork products.

 7        Q. The fact that your production net of net

 8   exports will go down, all else equal, if exports

 9   go up is also true regardless of the reason why

10   exports increased.  Correct?

11           MR. FINLEY:  Same objection.

12        A. I think what you're describing is just a

13   reference here.

14        Q. Are you offering an opinion that export

15   sales are made from pork produced exclusively for

16   overseas customers?

17           MR. FINLEY:  Objection, calls for

18   speculation.

19        A. My report doesn't offer such an opinion.

20        Q. Suppose Smithfield breeds a sow tomorrow.

21   Are you offering an opinion of whether that sow is

22   being bred to produce hogs to make pork for

23   domestic production or exports or either?

24           MR. FINLEY:  Same objection.

25        A. My report doesn't offer any opinions about
```

184

```
 1    remember exactly what kind of regression model we
 2    used.  I don't see anything in the paragraph you
 3    just read that would seem to conflict with my
 4    report in this case.
 5        Q. And the sentence I want to focus on begins
 6    with, "The difference."
 7            "The difference between prices in the
 8    damages period and the benchmark period is
 9    commonly referred to as the overcharge."
10            And is that consistent with the approach
11    you've taken in this case?
12        A. Well, it's not really -- I'm not trying to
13    quibble.  You used the word "approach."  It's
14    really just a word you're talking about.  It is
15    commonly referred to as "the overcharge."
16            I mean, I did title Table 4 in my report.
17    I didn't -- I gave the title of it as "Overcharge
18    Regression Results."  I think it's consistent with
19    that.
20        Q. Yes.  So when we look at Table 4 of your
21    report, the overcharge that you're reporting is
22    the difference between prices in the damages
23    period -- it's a comparison of prices in the
24    damages period to prices in the benchmark period,
25    obviously with some controls baked in.  Correct?
```

185

```
 1      A. No.  That's not really the right way to
 2   say it.
 3          It's looking at data in the benchmark
 4   period and the damages period and then it's using
 5   a dummy variable to indicate the alleged damages.
 6   And then the regression is calculated -- I'm
 7   sorry.  I'm hearing an echo.
 8      Q. So am I.
 9          MR. SCHWINGLER:  If there's anybody who
10   needs to go on mute, please do.
11      A. Perhaps you could restate the question?
12   Sorry.  I have got distracted by the echo.
13      Q. My question is, when you refer to an
14   overcharge in your overcharge regression, at a
15   high level, is that a comparison between the
16   prices in the damages period and the prices in the
17   benchmark period?
18      A. You know, that's a -- it's not wrong to
19   say that.  It's a little confusing because the
20   overcharge regression uses data from both periods.
21          And in particular, it uses the observed
22   values of the independent variables in both the
23   benchmark period and the damages period, but then
24   it -- and again, this is all very standard.  It
25   uses the -- in the regression I've used, just a
```

1    dummy variable regression, it used a single dummy

2    variable to ask, you know, is there, in fact, a

3    statistically significant difference between

4    actual prices and but-for prices.

5          But it's a little -- if somebody just

6    said, well, can you measure the overcharge by

7    simply comparing prices in the benchmark period to

8    prices in the damages period, that's a little too

9    simplistic.

10     Q. I'm not trying to overly simplify.  I'm

11   just trying to understand, when you run an

12   overcharge regression like this, what your results

13   tell you is, as this article states, "The

14   difference between prices during the damages

15   period and the bench period is commonly referred

16   to as the overcharge."

17         It's the difference in price between those

18   two periods after controlling for the other

19   variables.

20     MR. FINLEY:  Objection to form.

21     Q. Is that correct?

22     A. I think that's overly -- look, we were

23   writing this article for a law review.  It's not

24   the way I would write it in an economics journal.

25         It's naive to say that the overcharge can

189

1          It uses data from both periods, utilizing

2     in particular the methodology that's described in

3     the sources I list in Footnotes 214 and 215.

4          So that would be the "ABA Section of

5     Antitrust Law," "Proving Antitrust Damages: Legal

6     and Economic Issues, Chapter 6," as well as the

7     article as I mentioned earlier by Professors

8     McCrary and Rubinfeld called "Measuring Benchmark

9     Damages in Antitrust Litigation."  That was

10    published in the "Journal of Econometric Methods."

11         It's also -- the same dummy variable

12    methodology is discussed in the ABA Section of

13    Antitrust Law in a book called "Econometrics:

14    Legal, Practical, and Technical Issues."

15         So this is a very standard dummy variable

16    model that is utilizing data from both the

17    benchmark period and the damages period and asking

18    the question, is there a statistically significant

19    difference between actual and but-for prices in

20    that period, namely January 2009 through

21    June 2018, controlling for all of the variables

22    that appear in Table 4?

23         That's what the regression is testing.

24    And the answer is, in the regression as reported

25    in Table 4, yes, there is a statistically

190

1    significant difference between those actual and

2    but-for prices in the period January 2009 through

3    June 2018.  And in percentage terms, the common

4    overcharge is 10.3 percent.

5         Q. Do you disagree with the statement that a

6    dummy variable regression methodology relies on

7    comparing prices in the impact period to available

8    prices before and/or after the alleged period of

9    impact?

10        MR. FINLEY:  Objection, form.

11        A. No.  It's a little oversimplified.  But

12   certainly that's part of it.  It's using data from

13   both a benchmark period -- and there may be more

14   than one benchmark period.  There's some times

15   people use an after period as well.  Mine uses a

16   before, during model.

17        Q. And I would hope you wouldn't disagree

18   with that because that's a direct quote from your

19   report in Paragraph 206.

20        All I'm trying to establish is that the

21   regression, at a high level, is a comparison of

22   prices in one period to prices in another while

23   controlling for other factors that affect prices

24   other than the conspiracy.

25        Do we have a disagreement on that basic

1  concept?

2       MR. FINLEY:  Objection, form.

3     A. Yeah.  I mean, I've answered this three

4  times now.

5       But as I've said, I don't specifically

6  disagree with the way you're phrasing it.  It

7  would be naive and incorrect to simply say that

8  the overcharge can be measured directly by

9  comparing prices in the before period to prices in

10  the during period.  That would not be correct.

11      But it certainly is correct that the

12  regression utilizes data from both a benchmark

13  period and a damages period, in the context of

14  this multivariate regression, with a dummy

15  variable for the alleged damages period.

16      And it's absolutely correct that it

17  utilizes data and relies on data from both the

18  benchmark period and the damages period.

19    Q. You stand by the statement in

20  Paragraph 206 of your report.  Correct?

21      MR. FINLEY:  Objection, form.

22    A. Could you -- I believe so.  But could you

23  just show me the sentence you're talking about?

24    Q. It's page 99.  Let's go to Exhibit 1,

25  page 99, Paragraph 206.

200

1    pork production at different periods of time

2    within the years 2009 to June 2018?

3         MR. FINLEY:  Objection, form, vague,

4    ambiguous.

5      A. My report doesn't offer any opinion on

6    that.

7      Q. So you have no opinion one way or the

8    other on whether the conspiracy could have had

9    different impacts at different times within the

10   damages period?

11        MR. FINLEY:  Hold on.  Objection, form,

12   vague, ambiguous, may mischaracterize prior

13   testimony.

14     A. My report doesn't offer any opinions on

15   that.

16     Q. So your interpretation of your overcharge

17   regression I take it does not rely on any

18   assumptions or opinions about whether defendants'

19   conduct had different impacts at different points

20   in time in the alleged conspiracy.  Correct?

21        MR. FINLEY:  Same objection.

22     A. Yes.  I think that's correct.  My -- the

23   overcharge regression, as it says in Paragraph 12,

24   assumes that the allegations in the complaint are

25   true.

201

1          And then it asks the question as to

2    whether or not there is a difference between the

3    actual prices and the but-for prices in the

4    alleged damages period January 2009 through

5    June 2018.

6          And I've concluded that the answer to that

7    question is yes.

8      Q. If you look at page 149 in your report,

9    this is in your appendix of documents relied upon.

10         There is an article about halfway down the

11   page from Dr. Rubinfeld, contained within the

12   "Reference Manual on Scientific Evidence."  Do you

13   see that?

14     A. Yes, I see that.

15     Q. Page 322 of that chapter, Dr. Rubinfeld

16   wrote, "The issue of robustness, whether

17   regression results are sensitive to slight

18   modifications and assumptions, e.g., that the data

19   are measured accurately, is of vital importance."

20         Do you agree with that statement?

21         MR. FINLEY:  Objection.

22     A. I don't have his article in front of me

23   and I don't know the exact context in which he's

24   writing that.  It doesn't sound -- it sounds

25   plausible to me.

202

1    Q. And I can't remember.  I know I asked you

2   these questions about your production regression.

3   I'm drawing a blank on whether I asked as to the

4   overcharge.  So apologies if we're double-dipping

5   here.

6        Did you run any sensitivity checks on the

7   overcharge regression that you report -- that you

8   disclose in your report?

9        MR. FINLEY:  Sure.  And so the question

10  has changed.  I'll object on the basis of expert

11  stip to the extent this is calling for calculation

12  that is not shown in the report or relied upon.

13   A. So the only overcharge regression that I'm

14  showing in my report is the one shown in Table 4.

15   Q. And you're not defending this overcharge

16  report -- the overcharge regression that you

17  disclose in your report on the basis that it is

18  not sensitive to slight modifications and

19  assumptions.  Is that fair?

20       MR. FINLEY:  Objection, form.

21   A. I would say that what I'm relying on are

22  the analyses that I've undertaken to perform the

23  overcharge regression results.  And that's -- and

24  all of the bases for that, all of the facts, all

25  of the data, all the modeling, that is all

253

1          So the pass-through elasticity -- do you

2    see that in Table 5?  For example, for [REDACTED], do

3    you see the [REDACTED]?

4          Q. Yes.

5          A. So that's the number that comes out of the

6    regression.  So remember, we're regressing -- it

7    is a log-log regression.  So it's an elasticity.

8          So the regression is giving us back that

9    [REDACTED]number.  We then multiply -- to get the

10   pass-through rate, we multiply the pass-through

11   elasticity by that variable called the price-cost

12   ratio.

13         So as I said earlier, if we take the

14   pass-through elasticity for [REDACTED] of [REDACTED],

15   multiply it by the cost-price ratio of

16   [REDACTED]percent, that's what gives us the pass-through

17   rate of [REDACTED] percent.

18         Q. So let's just stay with Sysco for a

19   minute.  If the average direct -- sorry.

20         If the direct purchaser overcharge from

21   your overcharge regression is [REDACTED]percent and

22   Sysco has a pass-through elasticity of [REDACTED]and a

23   pass-through rate of [REDACTED] percent, would you

24   expect to see overcharges of close to [REDACTED]percent

25   for [REDACTED]customers?

1          MR. FINLEY:  Objection, form.

2          MS. JONES:  Objection.

3       A. I apologize.  I got a little bit lost in

4    your question.

5          Could you read it back, please?

6       Q. If the direct purchaser overcharge from

7    your overcharge regression is ▮REDACTED▮percent,

8    ▮REDACTED▮pass-through elasticity is just under ▮REDA▮,

9    pass-through rate is just over ▮REDACTED▮percent, would

10   you expect to see an overcharge for ▮REDACTED▮

11   customers of in the neighborhood of ▮REDACTE▮ percent?

12          MR. FINLEY:  Objection, form.

13          COUNSEL:  Objection to form.

14       A. I think the short answer is yes.  That is

15   the estimated pass-through rate.

16          Again, if we look at the last sentence in

17   Paragraph 256, the "estimated pass-through rates

18   can be multiplied by the estimated overcharge

19   percentages" -- I see I put an S on that.  It

20   really just should have been singular.  You were

21   correct.  I was referring to the ▮REDACTED▮ "discussed

22   above to determine the overcharge percentages for

23   CIIPP Class Members."

24          So that's the implication of the

25   pass-through rate for ▮REDACTED▮

255

1      Q. There were three distributors where you

2    applied your overcharge regression model to the

3    data for those specific distributors.  Correct?

4          MR. FINLEY:  Objection, form.

5      A. Yeah.  I believe you're referring to --

6    we're now on page 122, in Romanette iii, which

7    says, "Common impact regressions."

8          And so I believe you're referring to the

9    regressions that are in Paragraphs 271, 272, and

10   273.

11     Q. That's correct.  I may have been able to

12   frame it more artfully.

13         But what you say in Paragraph 269, "To

14   test whether all or virtually all CIIPP Class

15   Members paid higher prices for pork products

16   during the damages period than they would have

17   paid but for Defendants' alleged conspiracy, I

18   apply my overcharge regression model described in

19   Section IV.A to distributors with sufficient sales

20   data to estimate overcharges.  These distributors

21   are REDACTED, REDACTED, and REDACTED."  Is

22   that right?

23     A. Yes.  You read that correctly.

24     Q. When you say "I apply my overcharge

25   regression model to those three distributors,"

1    what does that mean?

2        A. Well, I mean, I think the words are pretty

3    clear.  I don't know how else to say it.  I

4    applied the overcharge regression model that we

5    looked at in Table 4 to the individual

6    distributors, one at a time: REDACTED,

7    REDACTED and was REDACTED.

8            Those distributors had information that

9    allowed me to look at the sales to individual

10   customers.  And so that's part of my analysis that

11   appears in Section IV.C that is common impact

12   analysis.  So that's what I mean by applying the

13   overcharge regression model in Section IV.A.

14           And of course, as you are aware, we

15   provided you with all of our data and stated code.

16   So I would hope there would be no confusion about

17   what exactly these regressions are.

18       Q. No confusion.  I'm just trying to make

19   sure we're on the same page for some questions.

20           Just so I understand, when you apply your

21   regression model to REDACTED, for example,

22   does that mean the prices REDACTED customers

23   paid are the -- is the dependent variable as

24   opposed to all prices by all customers?

25       A. I think I understand your question.  I

288

1        And their quote out of their Michigan Law

2    Review article was, "modern cartels are more

3    focused on monitoring, communication, and

4    redistribution so as to prevent cartels" -- I'm

5    sorry -- "so as to prevent breakdowns in cartel

6    discipline than on some punishment."

7        Q. In order to successfully monitor and

8    punish noncompliance with a cartel, does the

9    information the members of the cartel use for

10   monitoring have to be accurate?

11       MR. FINLEY:  Objection, form, lack of

12   foundation, calls for speculation.

13       A. My report doesn't offer a specific opinion

14   about that.

15       Remember that the point to this whole

16   discussion is that -- remember we're in section --

17   that we're in Subsection III.B. of the report,

18   which asks the question, did the defendants take

19   actions that were against their unilateral or

20   independent self-interest but for the existence of

21   a conspiracy.

22       So the analysis that's in these paragraphs

23   is about that.  It's about did the firms in fact

24   engage in conduct that will be against their

25   unilateral self-interest but for the existence of

1    a conspiracy.

2          The analysis in these paragraphs is not

3    about the optimal way to run a cartel.  And my

4    report doesn't have any specific opinions about

5    the optimal mechanisms firms use to run cartels

6    other than, as I said, it generally -- this

7    discussion that we're looking at right now in

8    Paragraph 186 about generally what do cartels

9    attempt to do.

10         And again, with the important contribution

11   from Professor Kovacic, et al., about what modern

12   cartels attempt to do.

13       Q. You're not offering an opinion that

14   Agri Stats in fact facilitated monitoring and

15   enforcement by the defendants in this case.  Is

16   that fair?

17         MR. FINLEY:  Objection, form, may

18   mischaracterize prior testimony.

19       A. I don't believe my report offers an

20   opinion that says that.  The discussion of

21   Agri Stats really is in the vein I just described

22   earlier.  It's about whether or not there's

23   evidence that the firms took actions that were

24   against their unilateral self-interest in the

25   absence of an agreement.

290

1      Q. Is it your opinion that Agri Stats

2  facilitated collusion between defendants?

3          MR. FINLEY:  Objection, form, scope.

4      A. My report doesn't offer a specific opinion

5  that says that.

6          Again, we talked about Paragraph 183.  So

7  whether or not someone would regard 183 as

8  evidence that Agri Stats facilitated an alleged

9  agreement, I suppose that would be up to the

10 person reading Paragraph 183.  I certainly stand

11 by what's in Paragraph 183.

12     Q. You say in Paragraph 185, you refer to

13 "information sharing through Agri Stats."

14         And then the second sentence says, "Such

15 information sharing can facilitate collusion

16 because the detailed knowledge that Defendants

17 gained regarding their competitors' pricing and

18 production decisions is the type of information

19 that would be useful for coordinating price

20 increases and/or production decisions, including

21 production cuts, among firms."

22         Did I read that correctly?

23     A. I believe so.

24     Q. So can you give me an example in this case

25 where two or more defendants used information from

291

1    Agri Stats to coordinate their production of pork?

2        A. I don't believe --

3            MR. FINLEY:  Objection, form.

4        A. I don't believe my report offers such an

5    opinion.  Again, the point to these paragraphs is

6    to ask the question did -- particularly in the

7    context of information exchanges related to

8    Agri Stats, did the firms engage in conduct that

9    was against their unilateral self-interest in the

10   absence of an agreement.  That's what's being

11   discussed here.

12           My report doesn't offer a specific opinion

13   about the -- about your specific question.

14       Q. So when your report says Agri Stats would

15   be useful for coordinating production decisions,

16   you're not -- that's a sort of hypothetical

17   observation?  You're not opining that in fact

18   defendants used Agri Stats to coordinate

19   production?

20           MR. FINLEY:  Objection, form.

21       A. I don't know that I'd agree with the way

22   you're stating that.

23           The whole discussion of Agri Stats is, in

24   my opinion, demonstrating that the firms --

25   including Agri Stats itself, as discussed in

294

```
 1    double-check the IBISWorld report to see what the
 2    first date is, what the first year is in their
 3    data.
 4         Q. I'd like you to turn to -- let's set aside
 5    Exhibit 1 and take a look at Exhibit 2, which is
 6    the complaint.  And I'd ask you to look at
 7    Paragraph 85.
 8              Paragraph 85, which is on page 31, reads,
 9    "Each of the Defendants further controls the
10    manner in which pork is processed and has the
11    ability to restrict and reduce supply through a
12    number of means including capacity reductions,
13    controlling slaughter rates, and exports."
14         Did I read that right?
15         A. Yes, you did.
16         Q. Are you assuming that allegation to be
17    true?
18         MR. FINLEY:  Objection, form.
19         A. Yeah.  I don't have a specific reason for
20    disagreeing with it.
21         Q. Do you have an understanding of what the
22    term "controlling slaughter rates" refers to?
23         A. I'm not sure other than number of hogs
24    slaughtered per day, for example.  I'm not sure
25    what else it would be referring to, the rate at
```

295

1    which hogs are being slaughtered over time.

2        Q. Paragraph 85 also refers to "capacity

3    reductions."  What does it mean for a defendant to

4    reduce capacity?

5        MR. FINLEY:  Objection, form.

6        A. My report doesn't talk about capacity

7    reductions.  I'm not sure exactly what it would

8    mean here to reduce capacity.  I mean, it could be

9    mothballing a plant would be a capacity reduction.

10   As I said, my report doesn't talk about that.

11       Q. Your report contains no analysis of what

12   slaughter capacity would have been but for the

13   alleged conspiracy.  Is that correct?

14       MR. FINLEY:  Objection to form.

15       A. Yeah.  If we look at Table 2 in my report

16   on page 37, that has the "U.S. Daily Hog

17   Slaughter, Capacity 2009-2020, by Company."

18       There's no -- there's not another table in

19   my report that has different but-for values for

20   hog slaughter capacity.

21       Q. For purposes of analyzing the impact of

22   the alleged conspiracy on pork prices, are you

23   assuming that but for the conspiracy, defendants

24   would have increased their slaughter capacity more

25   than they did?

1          MR. FINLEY:  Objection, form, vague,

2     ambiguous, calls for a legal conclusion, calls for

3     speculation.

4          A. Well, I'll just come back again to the

5     first sentence in Paragraph 12.  "For the purpose

6     of estimating overpayments, if any, caused by

7     Defendants' alleged conspiracy, I have assumed

8     that the allegations in the Complaint are true."

9          And then, of course, that leads to the

10    analysis that we've talked about at length today

11    in Paragraphs 205 through 226 and the overcharge

12    regression in Table 4.

13          So that, again, as any damage expert must,

14    I'm assuming that the plaintiffs' claims are

15    correct as they pertain to the alleged conspiracy.

16          So there's no -- there's no -- for

17    example, there's no capacity variable in the

18    overcharge regression.

19          But again, I do agree that I am assuming,

20    as I said, as any damage expert must, that the

21    plaintiffs' claims as they pertain to the alleged

22    conspiracy are true.

23          Q. Are you assuming that defendants

24    restricted slaughter capacity as part of the

25    conspiracy?

298

1  to purchase $50 million of pork products derived

2  from sows as a means of reducing the national herd

3  and stabilizing pork prices?

4      MR. FINLEY:  Objection to form.  Also

5  objection on the basis of the expert stipulation.

6     A. I don't specifically remember that right

7  now.  It's certainly not something I'm relying on.

8     Q. Do you view actions by the USDA to be part

9  of a conspiracy?  Let me ask it differently.

10      Are you -- do you understand -- are you

11  assuming for purposes of your analysis that

12  actions by the USDA are part of a conspiracy?

13      MR. FINLEY:  Objection, form, calls for a

14  legal conclusion, calls for speculation, lack of

15  foundation.

16     A. I don't recall the complaint alleging that

17  the USDA was part of the alleged conspiracy.  So

18  unless I'm misremembering it, I think the answer

19  to your question would be no.

20     Q. Your report contains no analysis of

21  whether actions by the USDA to reduce sow

22  inventories had any impact on pork prices during

23  the damages period.  Correct?

24      MR. FINLEY:  Objection, form, lack of

25  foundation, vague, ambiguous, may call for a legal

CASE 0:18-cv-01776-JRT-JFD   Doc. 1468-1   Filed 08/24/22   Page 82 of 83
In Re: Pork Antitrust Litigation                                      Michael Williams, Ph.D.
                                                                      June 21, 2022

299

1   conclusion.

2         MR. SCHWINGLER:  Let's take those one at a

3   time.  What's vague about my question?

4         MR. FINLEY:  It's unclear what actions

5   we're talking about, supposed actions by the USDA.

6         MR. SCHWINGLER:  I'm asking whether his

7   report contains analysis of any actions by the

8   USDA.  Let me ask it in a nonleading way.

9     Q. Dr. Williams, does your report contain any

10  analysis of actions by the USDA related to sow

11  inventories or pork prices?

12    A. I don't specifically recall that.  If

13  there were actions taken by the USDA that

14  affected, for example, pork production, the

15  dependent variable would pick that up in the

16  production regression.

17        But I don't -- and I don't have time to

18  reread the whole report right now.  But I don't

19  recall anything in the report about a specific

20  USDA policy, for example, that's analyzed in my

21  report as pertains to hog production.  I don't

22  recall them.

23    Q. What's the --

24        MR. FINLEY:  If I may ask, what's the time

25  on the record?  I think we're pretty close to the

300

1    end.

2            THE VIDEOGRAPHER:  1 hour and 18 minutes

3    on this session.

4            MR. FINLEY:  What's the total, if I may

5    ask?

6            THE VIDEOGRAPHER:  Two more minutes for

7    seven hours on the record.

8            MR. SCHWINGLER:  Two more minutes for

9    seven?

10           MR. FINLEY:  Uh-hmm.

11           THE VIDEOGRAPHER:  Sorry.  It's one,

12   eighteen.  So it's been seven hours on the record.

13           MR. SCHWINGLER:  Let's just go off the

14   record for a second.  I want to make sure we're

15   straight on this.

16           THE VIDEOGRAPHER:  The time is -- sorry.

17   The time is 4:09.  We're going off the record.

18           (Off the record 4:09 p.m. to 4:10 p.m.)

19           THE VIDEOGRAPHER:  The time is 4:10, and

20   we are back on the record.

21           MR. SCHWINGLER:  So we've reached our

22   seven hours, Dr. Williams.  I'm not going to have

23   any other questions for you.

24           I am going to note for the record

25   defendants reserve their rights as to plaintiffs'