# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-1776 (JRT/HB) |
| | **CONSUMER INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| This Document Relates to: | |
| All Consumer Indirect Purchaser Actions | |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   CLASS DEFINITION ................................................................................... 4

III.  PROFFER OF FACTS COMMON TO THE CLASS ............................................ 5

      A.   Defendants' agreement to stabilize supply begins in 2009 to 2012
           with unprecedent cuts. ...................................................................... 5

      B.   Accompanying the liquidation of sows, in 2009, Agri Stats and
           Tyson seek to unite the Pork industry through Agri Stats reports. .............. 6

      C.   Agri Stats develops the data miner sales tool and ensures the
           industry receives ever more detailed and current data. ................................ 8

      D.   In 2013 to 2014, defendants create an Agri Stats export report to
           track and monitor the "disappearance" of pork from the U.S.
           market. ............................................................................................. 10

      E.   Processor defendants exchanged competitively sensitive output
           and pricing data that normally would be kept confidential from
           competitors. ...................................................................................... 15

      F.   Processor defendants deanonymized the Agri Stats reports. ..................... 16

      G.   Processor defendants considered Agri Stats data critical to their
           decision-making. .............................................................................. 18

      H.   Processor defendants in fact relied on common benchmark data
           from Agri Stats to increase the price of pork. ........................................ 20

IV.   LEGAL STANDARD ................................................................................. 23

V.    ARGUMENT ........................................................................................... 24

      A.   The implicit requirements of Rule 23 are satisfied here. ......................... 24

      B.   The elements of Rule 23(a) support certification. ................................... 26

           1.   The class is sufficiently numerous. .............................................. 26

           2.   Common questions of fact and law exist. ...................................... 26

3.      The claims of the named plaintiffs are typical of the
        class claims...................................................................... 27

4.      The named plaintiffs will adequately represent the
        class. .............................................................................. 28

C.      The class satisfies Rule 23(b)(3). ................................................ 29

1.      Questions of law and fact predominate over any
        individual questions.......................................................... 29

        a.      Common questions about defendants' violations of
                the antitrust laws predominate. ............................... 31

        b.      Antitrust impact will be proven through evidence
                that is common to the class. .................................... 32

                (1)     Market structure evidence supports a finding
                        of common impact. ...................................... 33

                (2)     Common evidence demonstrates Agri Stats
                        acted as a conspiracy benchmark for pork
                        sales............................................................. 38

                (3)     Econometric analysis shows common
                        impact in the form of higher pork prices. ................. 39

                (4)     Common econometric evidence
                        demonstrates that all or nearly all direct
                        purchasers suffered impact. ........................ 42

                (5)     Common record evidence demonstrates
                        overcharges were passed through from
                        direct purchasers to class members........................... 43

                (6)     CIPPs measure pass-through based on
                        millions of observations from market
                        participants. ............................................... 46

2.      Damages to class members need not be measured with
        precision, but can be measured using a common
        methodology....................................................................... 49

3.      A class action is superior to any other alternative........................... 50

        a.      Class members cannot proceed individually......................... 50

        b.     Litigating the claims of the class members from different States in this Court is manageable..........................51

   D.     Class Counsel are adequate under Rule 23(g).............................................52

VI.   CONCLUSION ....................................................................................................52

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MD-1775 JG VVP, 2014 WL 7882100
(E.D.N.Y. Oct. 15, 2014) ...................................................................... 43

*In re Blood Reagents Antitrust Litig.*,
No. 09-2081, 2015 WL 6123211
(E.D. Pa. Oct. 19, 2015) ........................................................................ 40

*In re Capacitors Antitrust Litig. (No. III)*,
No. 14-CV-03264-JD, 2018 WL 5980139
(N.D. Cal. Nov. 14, 2018) ............................................................ 33, 36, 43

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ................................................................. 52

*In re Catfish Antitrust Litig.*,
826 F. Supp. 1019 (N.D. Miss. 1993) ..................................................... 41

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ................................................................................. 51

*Custom Hair Designs by Sandy v. Cent.*
*Payment Co., LLC*,
984 F.3d 595 (8th Cir. 2020) ...................................... 24, 25, 28, 30, 50, 52

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
No. 16-02709-MD-W-GAF, 2019 WL 1418292
(W.D. Mo. Mar. 21, 2019) ................................................................ 15, 26

*Flegel v. Christian Hosp., Ne.-Nw.*,
4 F.3d 682 (8th Cir. 1993) .................................................................... 31

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*,
No. 09-cv-00852, 2012 WL 3841397
(E.D. Wis. Sept. 5, 2012) ...................................................................... 44

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
No. 09-cv-00852, 2017 WL 4457515
(E.D. Wis. Aug. 8, 2017) ....................................................................... 44

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,*
   744 F.2d 588 (7th Cir. 1984) ..................................................................... 34

*Gordon v. Microsoft Corp.,*
   No. 00-5994, 2001 WL 366432 (D. Minn. Mar. 30, 2001) ......................................... 44

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977).............................................................................. 5

*Kleen Prods. LLC v. Int'l Paper* (*Kleen Prods. I*),
   306 F.R.D. 585 (N.D. Ill. 2015)............................................................ 33, 50

*Kleen Prods. LLC v. Int'l Paper Co.* (*Kleen Prods. II*),
   831 F.3d 919 (7th Cir. 2016) ................................................... 35, 36, 37, 38, 39

*In re Korean Ramen Antitrust Litig.,*
   No. 13-cv-04115-WHO, 2017 WL 235052
   (N.D. Cal. Jan. 19, 2017) ...................................................................... 44

*Lafollette v. Liberty Mut. Fire Ins. Co.,*
   No. 2:14-CV-04147-NKL, 2016 WL 4083478
   (W.D. Mo. Aug. 1, 2016) ....................................................................... 25

*In re Linerboard Antitrust Litig.,*
   305 F.3d 145 (3d Cir. 2002)..................................................................... 34

*McKeage v. TMBC, LLC,*
   847 F.3d 992 (8th Cir. 2017), .............................................................. 25, 26

*Messner v. Northshore Univ. Healthsystem,*
   669 F.3d 802 (7th Cir. 2012) ............................................................... 38, 40

*Midwestern Mach. v. Nw. Airlines, Inc.,*
   211 F.R.D. 562 (D. Minn. 2001).................................................................. 42

*Mullins v. Direct Digital, LLC,*
   795 F.3d 654 (7th Cir. 2015) .................................................................... 51

*In re Mushroom Direct Purchaser Antitrust Litig.,*
   319 F.R.D. 158 (E.D. Pa. 2016).................................................................. 40

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   259 F.3d 154 (3d Cir. 2001)..................................................................... 50

*Olean Wholesale Grocery Cooperative, Inc. v.*
   *Bumble Bee Foods LLC*,
   No. 19-56514, --- F.4th ----, 2022 WL 1053459
   (9th Cir. Apr. 8, 2022)...................................................................... 35, 39, 40, 41, 43, 44

*In re Polyurethane Foam Antitrust Litig.*,
   No. 1:10 MD 2196, 2014 WL 6461355
   (N.D. Ohio Nov. 17, 2014) ........................................................................... 34

*In re Pork Antitrust Litig.*,
   No. CV 18-1776 (JRT), 2019 WL 3752497
   (D. Minn. Aug. 8, 2019)................................................................................ 31

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995).................................................. 31, 32, 33, 40, 41, 50

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
   821 F.3d 992 (8th Cir. 2016) ................................................................... 25, 26

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ........................................................................ 32

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009).................................................................... 53

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004).................................................................... 53

*United States v. Apple Inc.*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013)............................................................. 52

*In re Urethane Antitrust Litig.* (*Urethane I*),
   768 F.3d 1245 (10th Cir. 2014) .................................................................... 32

*In re Urethane Antitrust Litig.* (*Urethane III*),
   237 F.R.D. 440 (D. Kan. 2006)...................................................................... 38

*Vogt v. State Farm Life Ins. Co.*,
   963 F.3d 753 (8th Cir. 2020) ........................................................................ 29

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)................................................................................. 25, 27

*In re Wholesale Grocery Prod. Antitrust Litig.*,
   No. 09-MD-2090 ADM, 2016 WL 4697338
   (D. Minn. Sept. 7, 2016) ....................................................24, 25, 26, 27, 29, 31, 32, 50

*In re Wirebound Boxes Antitrust Litig.*,
   128 F.R.D. 268 (D. Minn. 1989)...........................................................................31, 33

*In re Workers' Comp.*,
   130 F.R.D. 99 (D. Minn. 1990)..........................................................24, 25, 28, 31, 41

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
   644 F.3d 604 (8th Cir. 2011) ....................................................................................25, 30

**Rules & Statutes**

Sherman Act ....................................................................................................30, 31, 32, 52

Fed. R. Civ. P. 23...............................................3, 24, 25, 26, 27, 28, 29, 30, 50, 51, 52, 53

**Other Authorities**

7 C. Wright, A. Miller, & M. Kane, Federal Practice
   & Procedure § 1781 (3d ed. 2020)..................................................................................32

6 Newberg on Class Actions § 20:23 (5th ed. 2020)........................................................32

**TABLE OF ABBREVIATIONS**

| Short Cite | Long Cite |
|---|---|
| Compl. | Consumer Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Class Action Complaint, ECF No. 1111 (Jan. 12, 2022) |
| Ex. | All exhibit references are to the Declaration of Shana E. Scarlett in Support of Consumer Indirect Purchaser Plaintiffs' Motion for Class Certification, unless stated otherwise in the brief |
| Schachter Decl. | Declaration of Eric Schachter in Support of Consumer Indirect Purchaser Plaintiffs' Motion for Class Certification |
| Singer Decl. | Declaration of Dr. Hal Singer in Support of Consumer Indirect Purchaser Plaintiffs' Motion for Class Certification |
| **PARTIES** | |
| Agri Stats | Defendant Agri Stats, Inc. |
| Clemens | Defendants Clemens Food Group, LLC, the Clemens Family Corporation, Hatfield Quality Meats |
| CIPP | Consumer Indirect Purchaser Plaintiffs |
| Hormel | Defendant Hormel Foods Corporation |
| JBS | Defendant JBS USA Food Company |
| Seaboard | Defendant Seaboard Foods LLC |
| Smithfield | Defendant Smithfield Foods, Inc. |
| Triumph | Defendant Triumph Foods, LLC |
| Tyson | Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. |

# I.   INTRODUCTION

Consumer Indirect Purchaser Plaintiffs (Consumer IPPs or CIPPs)[1] seek certification of a class of consumers who purchased certain cuts of raw pork (bellies, loins, should cuts, ribs, pork chops or bacon) for personal consumption from grocery or club stores during the period June 2014 to June 2018. Consumer IPPs allege that they overpaid for this pork due to Defendants' conspiracy to restrict supply and stabilize prices in the market for pork (the *per se* claim) and to participate in an anticompetitive information exchange (the rule of reason claim). This motion is brought against Smithfield, Tyson, Hormel, Seaboard, Triumph, and Clemens (processor defendants), and Agri Stats (collectively, defendants).[2]

Evidence common to the class demonstrates that in the 2009 to 2012 time period processor defendants engaged in a series of unprecedented cuts in the supply of pork. In that same period, Tyson and Agri Stats sought to join the pork processors together through Agri Stats reports. Agri Stats is a subscription service for which processor defendants paid millions of dollars and to which they could gain access only by submitting their own contemporaneous and competitively sensitive pricing and output

---

[1] The named representatives bringing this motion on behalf of the class are: Michael Anderson, Sandra Steffen, Michael Pickett, David Look, Joseph Realdine, Ryan Kutil, Kory Bird, Duncan Birch, Robert Eccles, Jennifer Sullivan, Kenneth King, Sarah Isola, Wanda Duryea, Edwin Blakey, Michael Reilly, Jeffrey Allison, Kenneth Neal, Chad Nodland, Chris Deery, Laura Wheeler, Christina Hall, Donya Collins, Thomas Cosgrove, Charles "Rich" Dye, Eric Schaub, Kate Smith, Stacey Troupe, James Eaton, and Isabelle Bell.

[2] The Consumer IPPs have settled with the JBS defendants and do not move to certify a class as to those entities, given that the Court has already certified a settlement class.

data. Indeed, processor defendants worked with Agri Stats to gather more and better data by developing a "███████" tool in 2009-2010, which allowed the pork processors instantaneous access to sales information; a "███████" in 2011, which provided more detailed information regarding the sales of bacon; and an "███████" in 2013, which provided defendants' heightened transparency into their efforts to export pork and ensure the stabilization of U.S. prices. *See* Proffer sections III.A-D.

Though the information in the Agri Stats reports was anonymized, common evidence demonstrates that processor defendants were able to—and did in fact—deanonymize these reports. Defendants provided this confidential and sensitive business information to Agri Stats, and therefore each other, because Agri Stats reports were considered critical benchmarks for decision-making, with Tyson referring to them as "the bible." *See* Proffer sections III.E-G.

Evidence, common to the class, demonstrates that these actions had impact. Processor defendants used Agri Stats reports to identify opportunities to increase the price of pork compared to their competitors. For example, Seaboard concluded that ████████████████████████████████████████ And, in response to a ████████████████████████ a Smithfield document internally advises: ████████████████ Absent collusion, a rise in one processor's prices would be undercut by a competing processor, keeping prices competitive and profits in check. Here, processor defendants' agreement to refrain from undercutting each other kept everyone's profits (and prices) artificially high to the detriment of consumers. *See* Proffer section III.H.

Consumer IPPs satisfy the four elements of Federal Rule of Civil Procedure 23(a). The class is undoubtedly numerous. There are many common questions of law and fact, such as whether defendants conspired to exchange competitive information and stabilize the supply and price of pork, and whether this violates antitrust laws. The named plaintiffs have each suffered losses that make them typical of absent class members and are sufficiently committed to this litigation that they will adequately represent the class. And the implicit requirements of Rule 23 are also satisfied because class members may be identified by reference to objective criteria and the class representatives fall within the proposed classes. *See* sections V.A.-B.4.

CIPPs also meet the requirements of Rule 23(b)(3). Common questions of fact and law predominate in this action. CIPPs present robust evidence, common to the class, of the defendants' agreement to stabilize the price and supply of pork. And the existence of a relevant antitrust market for pork, as well as processor defendants' market power, which are pertinent to the rule of reason claim, are supported by common evidence too, in the form of expert analysis by Dr. Hal Singer. *See* section V.C.1.a.

Common evidence also proves antitrust impact. First, certain characteristics of the pork industry—its high level of concentration, barriers to entry, absence of competition from imports, lack of substitutes, and commodity nature of the products—render it particularly susceptible to cartelization. Second, defendants admit using Agri Stats data to benchmark prices and systematically identify opportunities to raise them throughout the class period. Third, Dr. Singer's regression models demonstrate the higher prices caused by this conspiracy and the pass through of those higher prices to class members.

Economic theory, as well as documentary and testimonial evidence, confirms that such pass through is expected in this market. *See* sections V.C.1.b.(1)-(6). Dr. Singer also employs a common methodology to measure damages to class members. *See* section V.C.2.

Finally, a class action is superior to proceeding by individual claims. Each class member has suffered harm, but not enough to individually justify an expensive lawsuit. Yet, combined, the damages to CIPPs are estimated to be over $1.3 billion. Without the existence of a class action, there will be no action at all. *See* section V.C.3.

For all these reasons, CIPPs respectfully request the Court to grant their motion.

## II.   CLASS DEFINITION

The proposed class definition for the Consumer IPP class is:

> All persons and entities who indirectly purchased raw pork bacon, or one or more of the following types of raw pork, whether fresh or frozen: bellies, loins, shoulder, ribs or pork chops from defendants or co-conspirators for personal consumption in the Repealer Jurisdictions from June 28, 2014 to June 30, 2018. For this lawsuit, pork excludes any product that is marketed as organic, no-antibiotics ever (NAE) and any product other than bacon that is marinated, seasoned, flavored, or breaded.

The Repealer Jurisdictions are those states which have "repealed" the Supreme Court's holding in *Illinois Brick Co. v. Illinois*[3] and provide standing to indirect purchasers.[4]

---

[3] 431 U.S. 720 (1977). Internal citations and quotations omitted, and emphasis added throughout, unless otherwise indicated

[4] For purposes of this class certification motion, those jurisdictions are: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New

Defendants have engaged in an ongoing conspiracy from 2009 to 2018, but given the

Court's ruling at the motion to dismiss stage, the damages period is limited from June 28,

2014, to June 30, 2018 (the filing of the *Duryea* complaint).

### III.   PROFFER OF FACTS COMMON TO THE CLASS

**A.   Defendants' agreement to stabilize supply begins in 2009 to 2012 with unprecedent cuts.**

Facing an excess of supply in 2008 to 2009, processor defendants joined together

to cut supply and stabilize the price of pork sold in the U.S. During this time, the industry

saw unprecedented liquidation of sows (female breeders)—which are not easily reversed

given the 19-month gestation period of hogs. In April of 2008, at the 21st Century

Meeting of the National Pork Industry Conference, attended by processor defendants,



[5] Following this call to action, in 2009,

[6] Tyson          [7] and Seaboard          .[8] In

---

York, North Carolina, North Dakota, Rhode Island, South Carolina, Tennessee, Utah, and
West Virginia. The class period for Kansas, Tennessee, and South Carolina class
members is proposed to begin June 28, 2015.

Excluded from the class are defendants, the officers, directors or employees of any
Defendant; any entity in which any Defendant has a controlling interest; and any affiliate,
legal representative, heir or assign of any Defendant; any federal, state, or local
governmental entities, any judicial officer presiding over this action and the members of
his/her immediate family and judicial staff, any juror assigned to this action; and any co-
conspirator identified in this action.

[5] Ex. 1, CLMNS-0000030331.

[6] Ex. 2 TF-P-000159370, at 372.

[7] Ex. 3, TF-P-000179765.

[8] *Id.*; *see also* Ex. 4, SBF0184924

2012, producers ███████████████████████████████████████████████████ [9]

Sow liquidations in this early period had long lasting effects on producer herd size and

started the beginning of a period where the defendant pork producers worked together to

stabilize supply. Singer Decl., ¶¶ 211-12.

**B.    Accompanying the liquidation of sows, in 2009, Agri Stats and Tyson seek to unite the Pork industry through Agri Stats reports.**

To cement the gains made through their cuts to supply, defendants introduced a

new tool to monitor and stabilize the market. Beginning in 2009, Agri Stats

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ .[10] The dominant pork processors, Tyson, JBS,

Smithfield, and Triumph, all joined the Sales Report program in 2009.[11]

Tyson aggressively sought to have other pork processors added to the Agri Stats

reports. In 2012 Deborah McConnel of Tyson told Josh Edwards of Agri Stats to ████████

---

[9] Ex. 5, HFC-PORKAT0000045312; *see also* Ex. 6, TF-P-000642082, at 82, 83

████████████████████████████████████████████████████ ; Ex. 7,

CLMNS-0000646890, at 91 █████████████████

██████████████████████████████████████████

[10] Ex. 8, AGSTAT-P-0000019809 █████████████

████████████████████████████████████████████████████████

██████████████████ ); Ex. 9, AGSTAT-P-000001 ██████████████████

████████████████████████████████████████████████████

[11] Singer Decl., Appx. T.1.

████████████████████████████████████████████████ [12] In June 2012, Jerry

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ [13] In January 2013, Tyson executives Jerry

Pfeifer and Deb McConnell asked Agri Stats to '████████████████████████████████

███████████████████████████████████████████████████ [14] Agri

██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████ [15]

Documents make clear that Tyson's participation in the reports was conditioned

on its competitors joining the reports. A 2015 email from Tyson to Agri Stats

complained: ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████ [16] Agri Stats internally commented that ██████

██████████████████████████ [17] While it is rational to expect Agri Stats to seek

_____

[12] Ex. 10, TF-P-000318770; Ex. 11, TF-P-000466138.

[13] Ex. 12, TF-P-000105985.

[14] Ex. 13, TF-P-000529625.

[15] *Id.*

[16] Ex. 14, AGSTAT-P-0003426785.

[17] *Id. See also* Ex. 15, AGSTAT-P-0003415484 ███████████████████████████

████████████████████████████████████████████████████████

expansion for its own revenue, the fact that *member processors* sought expansion shows

that *they* expected to profit from expanding the program—a clear indicator of a cartel.

Singer Decl., ¶ 137. Ultimately, ██████████████████████████████████████████

██████████████████████████.[18]

**C.     Agri Stats develops the ███████████████, a "███████████" and ensures
       the industry receives ever more detailed and current data.**

Beyond ensuring industry participation in the reports, defendants pushed for Agri

Stats to provide them with increasingly detailed and contemporaneous information about

their competitors. Agri Stats developed a "███████ tool, which made sales prices

almost immediately available. Tyson once again was the instigator, pushing Agri Stats to

make the information available in this online tool more detaile██████████████████

████████████████, and making it ███████████████████████████[19] By

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████[20] Tyson acknowledged internally that the data

miner tool benefited the industry as a whole: █████████████████████████

—————————————————

██████████████████████████████████████████████████████████
████████████████████████

[18] Ex. 16, Edwards Depo. at 33:21-23; Singer Decl., Appx. T.1.

[19] Ex. 17, TF-P-000047827.

[20] Ex. 18, TF-P-000304468; *see also* Ex. 19, AGSTAT-P-0000019993, at native 39.

██████████████████████████████████████████████████████████
█████████████████████. Ex. 16, Edwards Depo. at 47:10-48:12; *see also* Ex. 20,
Rennells Depo. at 225:17-24
██████████████████; Ex. 21, SMITHFIELD00548308
██████████████████████████████████████████.

████████████████████████████████████████████████████████████

████████████████████████████████ [21]

 Processor defendants pushed for ever more detailed information on a shorter timeline. In 2011, Agri Stats introduced a ████████████ which contained ████████████ ████████████████████████████████ [22] ████████████████████████████ ████████████████████████████████████████ ████████████████ . [23] No later than 2015, ████████████████████████████████████████ ████████████████████████ . [24]

 When defendants complained that Agri Stats data was not current enough, Agri Stats pledged to ████████████████████████████████████████████████ . [25] The scope and detail of the reports ensured that competitors could monitor in near-real time the prices and supply of their competitors.

---

[21] Ex. 22, TF-P-000515626, at 626-27.

[22] Ex. 23, AGSTAT-P-0003415121.

[23] Ex. 24, AGSTAT-P-0002613526.

[24] Ex. 25, AGSTAT-P-0003472186; Ex. 26, AGSTAT-P-0002620972████████████ ████████████████████████████

[25] *Id. See also* Ex. 27, AGSTAT-P-0002861140 ████████████████████ ████████████████████████████████████████████ ); Ex. 28, SBF0088112 ████████████████████████████████████████████████████ ; Ex. 29, Ginther Depo. at 247:17-21 ( ████████████████████████████████

**D.** ████████████████████████████████████████████

In 2013, Agri Stats (at the behest of Smithfield) introduced an additional sales book to track exports by processor defendants. ████████████████ became known as the ████████.[26] In April 2013 Josh Edwards of Agri Stats agreed that Smithfield "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[28] And, in 2014, Agri Stats raised internally the possibility of "████████████████████████████████████████████████████.[29] As Clemens put it, "████████████████████████████████████████████████████[30] ████████████████████████████████████████████.[31]



---

[26] Ex. 30, Copa Depo. at 20:15-21:3.

[27] Ex. 31, SMITHFIELD00663101.

[28] Ex. 32, HFC-PORKAT0000019130.  Farmland is a Smithfield affiliate.

[29] Ex. 33, AGSTAT-P-0002620767.

[30] Ex. 34, CLMNS-0000529020, at native 22.

[31] Ex. 31, SMITHFIELD00663101 ████████████████████████████████████████

The disappearance of pork from the U.S. market was a deliberate and concerted piece of processor defendants' conspiracy to restrain supply and stabilize prices in the U.S. As one Smithfield executive put it, ███████████████████████████ ████████████████████████████████████████[32] And the Agri Stats reports were a critical piece. A senior vice president at Tyson wrote in an internal June 2012 email that █████████████████████████████ █████████████████████████████████████"[33] Similarly, when Agri Stats proposed making a change to the Agri Stats export report (which may have censored some information), Cargill's Global Pork Director commented that ████ ██████████████████████████████████████████ ████████████████████████████████ ██████████████████████████[34] ███████████████ ██████████████████████[35]

Tyson in particular paid close attention to the domestic availability of Pork products as it had a direct impact on price and profitability. Tyson maintained a ████

---

[32] Ex. 35 SMITHFIELD01071523, at 538-539.

[33] Ex. 36, TF-P-000527381.

[34] Ex. 37, AGSTAT-P-0002621454, at 454, 455.

[35] Ex. 38, TF-P-000210990 & Ex. 39, TF-P-000210991, at native 3, 6 ████████

███████████████████████████████████████████

███████████████████████████████████████████████

███ .[36] In an April 2015 email, one Tyson employee wrote that the ███████

██████████████████████████████████████████████ [37]

Smithfield also understood that reducing domestic supply would inflate prices. A

2015 internal presentation from Smithfield's Chief Strategy Officer stated that ███

█████████████████████████████████████████████

██████████████████████████ [38] A similar 2016 internal email from

Smithfield's Chief Strategy Officer estimated ███████████████████████████

████████████████████ [39] Later that year, Smithfield proposed an

aggressive export budget and target for China. One Smithfield employee commented that

████████████████████████████████████████████

█████████████████████ [40]

Other defendants reached the same conclusion. A 2015 industry overview

document circulated among Clemens's employees noted that ████████████████

██████████████████████████████████████████

---

[36] Ex. 40, TF-P-001063041 & Ex. 41, TF-P-001063042.

[37] Ex. 42, TF-P-001007930; *see also id* ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[38] Ex. 43, SMITHFIELD01095551, at 552.

[39] Ex. 44, SMITHFIELD01286583.

[40] Ex. 45, SMITHFIELD00705612.

████████████████████████████[41] The document further noted that ████████

████████████████████████████████████████████████████████

████████████████████████████[42] A 2016

"████████████████████████" report prepared by a consulting group for Hormel

similarly noted: ████████████████████████████████████

████████████████████████████████████████████████

████████████████[43] In other words, processor defendants reduced domestic supply and

increased domestic prices—just as economic theory predicts a monopolist or cartel

member would do—by shipping pork in excess of the monopoly output level into foreign

markets. Singer Decl., ¶ 40.

Dr. Singer, using data from the USDA, shows the "disappearance" of pork from

the U.S. market deviated from its historical trend during the 2009 to 2018 period, while

exports surged. The difference between the pre-2009 trendline and the actual amount of

Pork during the Conduct Period is over 10,000 million pounds of Pork, or about 6 months

of total U.S. pork processing output.

---

[41] Ex. 46, CLMNS-0000298048 ████████████████████████
████████████████████████████████████████

[42] *Id.*

[43] Ex. 47, HFC-PORKAT0000115867, at 869 ████████████████████
████████████



Although a firm's unilateral decision to export may be competitively rational, multiple industry participants all engaging in such conduct *and* exporting at prices below cost or selling in a foreign market for a price lower than what could be achieved domestically is against self-interest and indicative of a conspiracy. The only reason a firm would unprofitably shift product into a foreign market, leading to a product shortfall in the domestic market, is if that firm believes that its rivals will follow suit or at least not (competitively) sell extra product into the created domestic shortfall. Singer Decl., ¶ 43.

**E.     Processor defendants exchanged competitively sensitive output and pricing data that normally would be kept confidential from competitors.**

Agri Stats reports contained detailed output and pricing data that processor defendants shared with Agri Stats. Singer Decl., at ¶¶ 108-122. Absent collusion, this information is not normally shared with competitors. Indeed, the "Antitrust Guidelines" for an industry leadership summit advised participants, ████████████████████ ████████████████████████████████████████████ ████████████[44] Processor defendants routinely violated these guidelines by their participation in Agri Stats. Seaboard plainly acknowledges that ████████████ ████████████████████████[45] Triumph likewise states that ██████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████

---

[44] Ex. 48, TF-P-000746325.

[45] Ex. 49, SBF0375666, at 67.

[46] Ex. 50, Grannas Depo. at 120:9-23, 124:8-25.

[47] Ex. 16, Edwards Depo. at 23:10-14.

[48] Ex. 51 Bollum Depo. at 300:11-21 (████████████████████████████ ████████████████████████████████████████; *see also* Ex. 52, HFC-PORKAT0000356426 ████████████████████████████ ████████████████████████

[49] Ex. 53, AGSTAT-P-0002819700.

███████████████████████████████████████████████████████

████████ [50]

**F.    Processor defendants were able to and did in fact deanonymize the Agri Stats reports.**

The first pages of any Agri Stats report list the participants who have contributed

███████████████████████████████████████████████████

█████████████████████ As early as 2009, *Tyson*, for example, created ███████████

██████████████████"[52] Tyson employees would work together to get the ██████

█████████████████"[53] Deborah McConnell cautioned her colleagues that ██████████

---

[50] Ex. 54, TF-P-000173720, at 721. To the extent defendants suggest that Agri Stats reports were pro-competitive, this is a question common to the class—although it would be a novel defense that the agreement to exchange cost information (partially for the purpose of exercising monopsony power to suppress wages) is a defense to a claim of separately sharing production and pricing information for the purpose of increasing the prices paid by consumers. *See, e.g.,* Ex. 55, SMITHFIELD00703508, at native 69 ████████████████████████████████████████████████████████████;
Ex. 56, JBS-PORK-00645017, at 16 █████████████████████████████████

███████ ); Ex. 57, SMITHFIELD01357914, at 44 (██████████████████████████
██████████████████████████ ; Ex. 23, AGSTAT-P-
0003415121 ██████████████████████████████████████████
████ .

[51] Ex. 30, Copa Depo. at 24:24-25:9; *see also* Ex. 58, TF-P-000314709 ██████████
██████████████ ). *See also* ██████████████████████████████████████

[52] Ex. 59, TF-P-000100077.

[53] Ex. 60, TF-P-000257671; *see also* Ex. 61, TF-P-000316394 ████████████
████████ ); Ex. 62, TF-P-000538548 ████████████████████████████

███████████████████ because it ███████████████████████████

███████████████ [54] On another occasion she likewise warned █████████

██████████████████████████████████████████████

███████████ [55] Later McConnell directed a colleague: ████████████████

██████████████████████████████████████████████

████████████████████████ [56] Tyson's VP of Fresh Meats, Jerry Pfeifer, summed it

up best: ███████████████████████████████████████

████████████████████████████████████████ [57]

Similarly, **Smithfield**'s CEO Larry Pope acknowledged, ███████████████

██████████████████████████████████████████████

███████████████████████████████████ [58] Analysis by

**Seaboard** showed ████████████████████████████████ [59] and

**Triumph** ███████████████████████████████████████████

████████████████ .[60] In addition, Triumph discussed internally that it had ██████████

_____

[54] Ex. 63, TF-P-000212871.

[55] Ex. 64, TF-P-000213274.

[56] Ex. 65, TF-P-000304473.

[57] Ex. 22, TF-P-000515626; *see also* Ex. 66, TF-P-000051236 ████████████

████████████████████████████████████████

[58] Ex. 67, TF-P-1718780, at 790.

[59] Ex. 68, SBF0459030, at 31.

[60] Ex. 69, TRI0000049900, at 901; *see also* Ex. 29, Ginther Depo. at Ex. 61 ██████████

████████████████████████████████████



[61] *Clemens* likewise referenced deanonymized Agri Stats: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[62]

And *JBS* acknowledged that it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ [63] and on another occasion reported ▮▮▮▮▮▮▮▮▮▮ [64]

**G.  Processor defendants considered Agri Stats data critical to their decision-making.**

As a *Tyson* VP of Pork Procurement stated, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ [65] According to Ms. McConnell, as of early 2010, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ [66] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [67].

For example, in June 2010, McConnell wrote: ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ [68] Shane Miller, VP of Pork Pricing, commented ▮▮▮▮

---

[61] Ex. 70, TRI0000433907, at 908.

[62] Ex. 71, CLMNS-0000670325.

[63] Ex. 72, JBS-PORK-01389262.

[64] Ex. 73, JBS-PORK-00734271.

[65] Ex. 74, TF-P-000986521.

[66] Ex. 38, TF-P-000210990; *see also* Ex. 75, TF-P-000329939 (Sept. 2012); Ex. 76, TF-P-000368308 (June 2013); Ex. 77, TF-P-000408067 (April 2014); Ex. 78, TF-P-000445553 (June 2015); Ex. 79, TF-P-000475538 (June 2016); Ex. 80, TF-P-000231541 (May 2017); Ex. 81, TF-P-000231539 (April 2018).

[67] Ex. 82, TF-P-000220755 (June 2010); Ex. 83, TF-P-000205959 ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮); Ex. 84, TF-P-000102225
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[68] Ex. 85, TF-P-000218761, at 762.

██████████████████████████████████████████████

██████ [69]

**Clemens**'s ████████████████████████████████████████████

███████████████████████████████ [70] **Hormel** Director of Pork Operations

Cory Bollum asked Agri Stats to ██████████████████████████████████

███████████████████████████ and Agri Stats responded that ████████

████████████████████████████████████████████████ [71] And

**Seaboard,** ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ [72]

**Cargill** likewise ██████████████████████████████████

█████████████ [73] ███████████████████████████ [74] **JBS**

████████████████████████████████████████████

████████████████████████████ [75] And **Triumph**

---

[69] Ex. 86, TF-P-000275993; *see also* Ex. 87, TF-P-000642134 ███████████
██████████████

[70] Ex. 88, CLMNS-0000036566, at 567.

[71] Ex. 89, HFC-PORKAT0000013693.

[72] Ex. 90, SBF0371672; Ex. 91, SBF0428074 ████████████████████
██████████████

[73] Ex. 92, AGSTAT-P-0002819815.

[74] Ex. 37, AGSTAT-P-0002621454.

[75] Ex. 93, JBS-PORK-00010573.

considered ███████████████████████████████████████████

██████████████████ [76] For example, CEO Mark Campbell stated ████████████

████████████████████████████████████████████████████████████

██████████████████████████ [77] In short, processor defendants considered Agri Stats

data critical to their decision-making. ████████████████████████████████

████████████████████████████████████ [78]___ ████████████████████

██████████████████████ [79]

**H.    Processor defendants in fact relied on common benchmark data from Agri Stats to increase the price of pork.**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Singer Decl., at ¶ 108. And Agri

████████████████████████████████████████████████████████████

████████████████████████████████████████ " *Id.* at ¶ 111. And

such analyses continue into "greater and greater levels of product detail" with Agri Stats

---

[76] Ex. 94, TRI0000037014, at native 12.

[77] Ex. 95, TRI0000045857. *See also* Singer Decl., at ¶ 141 ██████████████

████████████████████████████████████

██████████

[78] Ex. 96, AGSTAT-P-0002793502; Ex. 97, AGSTAT-P-0002802244. ██████████

████████████████████████████████████████████████████████

██████ *E.g.*, Ex. 98, Peil Depo. at 171:2-172:25; *see also* Ex. 55,
SMITHFIELD00703508, at native 45 ████████████████████████████████

████████████████████████████████

[79] Ex. 99, AGSTAT-P-0002802467, at 467, 483 ████████████████████████

████████████████████ ; *id.* at 476

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ *Id*. at ¶ 112 & T.7. Each processor defendant used these

Agri Stats rankings and economic impact analyses to identify opportunities to increase

the price of pork compared to its competitors.

   ***Tyson***, for example, stated in 2009 that ████████████████████████.

████████████████████████████████████"[80] A 2010 monthly report

included ████████████████████████████████████████████

█████ [81] A 2011 email asked that an upcoming meeting ███████████████

████████████████████████████ [82] And a 2012 spreadsheet

analyzed ████████████████████████████████████████████

██████ . [83]

   ***Clemens*** was also █████████████████████████████████

████████████████████████ "[84] At monthly meetings, it held █████████████

███████████████████████████████████████████████████

████████ [85] In 2011, it observed that ██████████████████████████

████████████████████████████████████████████ which

_____

[80] Ex. 100, TF-P-000096312.

[81] Ex. 101, TF-P-000205960, at native 23.

[82] Ex. 102, TF-P-000054715.

[83] Ex. 103, TF-P-000172958.

[84] Ex. 88, CLMNS-0000036566, at 567.

[85] Ex. 104, CLMNS-0000579006, at native 4.



presented ███████████████████████ [86] In 2014, Clemens celebrated ██████████

████████████████████████████████████████████████████

███████████████████ [87] And this from a company whose competition policy explicitly

forbids ███████████████████████████ [88]

   *Triumph* likewise stated in 2008 that ████████████████████████████████

████████████████████████████████████████████ which were ████████████████████

███████████████████████████████████████ [89] And in 2015 it

continued ████████████████████████████████████████████████████

██████████████████████████████████████ [90] [91] *Hormel* engaged in a

similar ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ [92]

   Finally, in 2012, *Seaboard* worried that the company ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

_____

[86] Ex. 105, CLMNS-0000036455.

[87] Ex. 106, CLMNS-0000669589.

[88] Ex. 107, CLMNS-0000119051.

[89] Ex. 108, SBF0149705.

[90] Ex. 94, TRI0000037014, at native 3.

[91] *Id.* at native 37.

[92] Ex. 109, HFC-PORKAT0000272375, at 381; *see also* Ex. 110, AGSTAT-P-
0002818528 ████████████████████████████████████████████████

████████████████████████████████████████████████

 [93] Indeed, Seaboard would focus on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [94] ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ [95] And Seaboard would identify certain customers with the ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ [96] Bigger picture, Seaboard concluded that ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [97]

The inescapable agreement underlying all this is that if processor defendants raised prices on each of their products to meet or exceed the industry average, their competitors would not undercut them on price, and they would all make more money.

## IV.   LEGAL STANDARD

A party seeking to certify a class action must show that the proposed class satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation, and one of the subsections of Rule 23(b).[98] Rule 23(b)(3) in turn requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

---

[93] Ex. 111, SBF0312990.

[94] Ex. 112, SBF0351271.

[95] Ex. 113, SBF0125785, at native 16.

[96] Ex. 29, Ginther Depo. at Ex. 61.

[97] *Id.* at 251:6-15.

[98] *In re Workers' Comp.*, 130 F.R.D. 99, 103 (D. Minn. 1990).

adjudicating the controversy."[99] Finally, Rule 23 "implicitly requires that a defined class exists and that the class representatives fall within the class."[100]

"District courts have broad discretion to determine whether certification is appropriate."[101] A court "may only certify the class if it is satisfied after a rigorous analysis that all of the prerequisites are met."[102] When determining "whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class."[103] Merits questions may be considered "only to the extent" that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[104]

## V.   ARGUMENT

### A.   The implicit requirements of Rule 23 are satisfied here.

The "implicit criterion, subsumed within Rule 23, is the existence of a defined

---

[99] *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 601 (8th Cir. 2020), *cert. denied*, 142 S. Ct. 426 (2021).

[100] *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM, 2016 WL 4697338, at *4 (D. Minn. Sept. 7, 2016).

[101] *Custom Hair*, 984 F.3d at 599; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011) (stating that "most issues arising under Rule 23" are "committed in the first instance to the discretion of the district court").

[102] *Workers' Comp.*, 130 F.R.D. at 103; *Wholesale Grocery*, 2016 WL 4697338, at *5.

[103] *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011).

[104] *Custom Hair*, 984 F.3d at 600.

class of which the named representatives are a part."[105] A class must be defined so that "its members may be identified by reference to objective criteria."[106] The "precise contours of the class need not be ascertained before certification so long as the class members can be identified at some stage of the proceeding."[107] Moreover, self-identification may be used "to adequately ascertain potential class members," as "[s]elf-identification affidavits are appropriate in consumer class actions concerning low-cost products where class members are unlikely to retain purchasing records and financial incentives to falsify are low."[108] Here, the proposed class definitions—those purchasing pork for personal consumption in the class jurisdictions during the class period[109]— "allow for class members to be identified using objective criteria during the litigation."[110] And the class representatives fall within these classes.[111] So the implicit requirements of Rule 23(a) are satisfied.

---

[105] *Workers' Comp.*, 130 F.R.D. at 104; *see also Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) ("this court has not addressed ascertainability as a separate, preliminary requirement").

[106] *McKeage v. TMBC, LLC*, 847 F.3d 992, 998-99 (8th Cir. 2017), *reh'g denied* (Oct. 4, 2017), *cert. denied*, 138 S. Ct. 2026 (2018); *see also Lafollette v. Liberty Mut. Fire Ins. Co.*, No. 2:14-CV-04147-NKL, 2016 WL 4083478, at *5 (W.D. Mo. Aug. 1, 2016) ("The *Sandusky* court . . . examine[d] whether the class proposed there was ascertainable according to objective criteria, and concluded it was. It did not apply any heightened ascertainability standard as advocated by the defendant there.").

[107] *Wholesale Grocery*, 2016 WL 4697338, at *5; *McKeage*, 847 F.3d at 998-99.

[108] *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292, at *16 (W.D. Mo. Mar. 21, 2019).

[109] Compl., ¶ 241.

[110] *Wholesale Grocery*, 2016 WL 4697338, at *5.

[111] Compl., ¶¶ 199-229.

Besides defining the class in a manner permitting self-identification by members, CIPPs have also identified a series of groceries stores that maintain identification for persons who have purchased pork.[112] As already demonstrated in the settlement context, class members may be contacted using email addresses and submit claims using an online process.[113] Ascertainability is more than met here.

## B.   The elements of Rule 23(a) support certification.

### 1.   The class is sufficiently numerous.

Rule 23(a)(1) requires a class so numerous that joinder of all members individually is "impracticable."[114] "Courts generally recognize that the existence of 40 or more class members raises a presumption that joinder is impracticable."[115] And the "Eighth Circuit has affirmed the certification of classes with as few as 20 members."[116] The class here is estimated in the tens of millions. Singer Decl., ¶ 196. The proposed class plainly satisfies numerosity.[117]

### 2.   Common questions of fact and law exist.

Commonality is satisfied if "there are questions of law or fact common to the class."[118] A common question "must be of such a nature that it is capable of classwide

---

[112] Schachter Decl. ¶¶ 8-11.

[113] *Id*. at ¶ 7, 11.

[114] *Wholesale Grocery*, 2016 WL 4697338, at *7.

[115] *Id*.

[116] *Id*.

[117] Compl., ¶ 244.

[118] Fed. R. Civ. P. 23(a)(2).

resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[119] According to the Supreme Court, "even a single common question will do."[120] Here there are many.[121] For example, whether defendants conspired to exchange competitive information and to stabilize the supply and price of pork—and whether this conduct violates antitrust law—are class-wide questions that will yield class-wide answers based on common evidence.[122] Commonality is satisfied.

### 3.   The claims of the named plaintiffs are typical of the class claims.

Under Rule 23(a)(3), typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."[123] According to the Eighth Circuit, typicality is "fairly easily met so long as other class members have claims similar to the named plaintiff."[124] Indeed, "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory."[125]

---

[119] *Dukes*, 564 U.S. at 350.

[120] *Wholesale Grocery*, 2016 WL 4697338, at *7 (quoting *Dukes*, 564 U.S. at 359).

[121] Compl., ¶ 246.

[122] *See*, *e.g.*, Proffer, section III, above.

[123] Fed. R. Civ. P. 23(a)(3).

[124] *Custom Hair*, 984 F.3d at 604.

[125] *Id*.

An "antitrust price fixing case generally will involve claims sufficiently similar to satisfy Rule 23(a)(3)."[126] If the representatives must prove "a conspiracy, its effectuation, and damages therefrom—precisely what the absentees must prove to recover—the representative claims can hardly be considered atypical."[127] So too here. Each of the named plaintiffs purchased pork for their own consumption during the class period.[128] And defendants' conspiracy to restrict the supply and stabilize the price of pork gives rise to their antitrust claims for damages—just as it does for class members. Typicality is satisfied.

### 4. The named plaintiffs will adequately represent the class.

"Rule 23(a)(4) focuses on whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interest of the class through qualified counsel."[129] "But perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable."[130] Here, the named plaintiffs have no material conflict with other class members. And each named plaintiff is aligned with the class in establishing defendants' liability and maximizing class-wide damages. "Additionally, the proposed representatives have demonstrated their commitment to

---

[126] *Workers' Comp.*, 130 F.R.D. at 106.

[127] *Id.*

[128] Compl., ¶¶ 199-229.

[129] *Wholesale Grocery*, 2016 WL 4697338, at *8.

[130] *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 767 (8th Cir. 2020), *cert. denied,* 141 S. Ct. 2551 (2021).

vigorously prosecute the interests of the classes by responding to interrogatories, producing documents, and being deposed."[131] Adequacy is satisfied.

## C.      The class satisfies Rule 23(b)(3).

To satisfy Rule 23(b)(3), CIPPs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy."[132] Each of these prongs is satisfied here.

### 1.      Questions of law and fact predominate over any individual questions.

Predominance gauges "whether questions of law or fact capable of resolution through common evidence predominate over individual questions."[133] The district court begins by "considering the nature of plaintiffs' claim to determine whether it is suitable for class certification."[134] The district court does "not need to conclude whether the theory of liability is viable."[135] Instead, the court denies certification "only if the theory of liability is a highly individualized question that does not allow class certification."[136]

---

[131] *Wholesale Grocery*, 2016 WL 4697338, at *8; *see also* Decl. of Shana E. Scarlett ISO CIPPs' Mot. for an Award of Attorneys' Fees & Expenses, ECF No. 952 (Oct. 6, 2021), at Ex. D, ¶¶ 4-6.

[132] Fed. R. Civ. P. 23(b)(3).

[133] *Zurn Pex Plumbing*, 644 F.3d at 619.

[134] *Custom Hair*, 984 F.3d at 601.

[135] *Id.*

[136] *Id.*

Certification for class treatment "may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages."[137]

The essential elements of CIPPs' *per se* cause of action arising under § 1 of the Sherman Act, and the harmonized state laws, are "(1) Defendants violated federal antitrust laws, (2) Plaintiffs suffered some resulting injury, and (3) a measure of damages."[138] CIPPs' rule of reason claim for information exchange contains the same three elements, with a few additional requirements for establishing the first element, namely the existence of a relevant antitrust market and processor defendants' market power.[139] Each of these elements presents class-wide questions. Indeed, "as a general rule in antitrust price-fixing cases, questions common to the members of the class will predominate over questions affecting only individual members."[140] Where CIPPs' theory of liability rests on "a nationwide horizontal price-fixing conspiracy in violation of section 1 of the Sherman Act . . . [p]roof of such an antitrust violation involves primarily common issues of fact and law."[141] And to prove injury "plaintiffs need only demonstrate they have suffered some damage from the unlawful conspiracy," which "showing may be

---

[137] *Id*.

[138] *Wholesale Grocery*, 2016 WL 4697338, at *9. *See also* Compl., ¶¶ 260-265.

[139] *See, e.g., Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993). *See* Compl., ¶¶ 260-265. CIPPs' operative complaint asserts the information exchange claim under the rule of reason, *see id.*, rather than solely "centered on a per se violation," as earlier described in the Court's original order on motion to dismiss. *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT), 2019 WL 3752497, at *7 n.7 (D. Minn. Aug. 8, 2019).

[140] *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995).

[141] *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 271 (D. Minn. 1989).

made on a class basis if the evidence demonstrates that the conspiracy succeeded in increasing prices above the competitive level."[142] Predominance is satisfied here.

> **a.      Common questions about defendants' violations of the antitrust laws predominate.**

Defendants' violations of the antitrust laws present the prototypical common question in a class action. As leading treatises have recognized, "whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)."[143] Case law agrees.[144] Because the question of antitrust violation (or liability) will focus exclusively on the actions of defendants, CIPPs will rely on evidence common to the entire class to make their case. *See* Proffer, section III, above.

Likewise, CIPPs have retained Dr. Singer to provide economic analysis and testimony common to the class. He explains why processor defendants' actions were consistent with collusion and had anticompetitive effects. Singer ¶¶ 88-143. Dr. Singer also provides economic evidence that processor defendants occupy a relevant antitrust

---

[142] *Workers' Comp.*, 130 F.R.D. at 108-09.

[143] 7 C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 1781 (3d ed. 2020); *accord* 6 Newberg on Class Actions § 20:23 (5th ed. 2020) ("Price fixing cases are generally well-suited for class action adjudication" in part because "[t]he legal violation is established *per se*").

[144] *Wholesale Grocery*, 2016 WL 4697338, at *9 (proof of an antitrust conspiracy in violation of Section 1 of the Sherman Act involves primarily common issues of fact and law."); *Potash*, 159 F.R.D. at 694 ("Whether Defendants agreed to fix the price of potash . . . clearly involves questions common to the entire class. This element relates solely to Defendants' conduct, and as such proof for these issues will not vary among class members.").

market and collectively wielded power in that market. Singer ¶¶ 46-87. The common

documentary evidence produced in this litigation supports these opinions. Thus, these

dispositive liability questions predominate over any individual questions.[145]

> **b.    Antitrust impact will be proven through evidence that is common to the class.**

The second element of CIPPs' claim is antitrust impact, or the "fact of injury" (as

opposed to damages, or the amount of injury).[146] Because the "gravamen of a price-fixing

claim is that the price in a given market is artificially high, there is a presumption that an

illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a

conspiratorially affected market."[147] CIPPs do not, however, rely on a mere presumption

of impact. Rather, CIPPs offer common proof of *marketwide overcharges* based on

(1) economic theory and evidence of the structure of the pork market; (2) defendants'

---

[145] *Wholesale Grocery*, 2016 WL 4697338, at *14 (analysis of relevant product and geographic markets "largely involves common evidence" such that "individual issues do not predominate"); *accord In re Urethane Antitrust Litig.* (*Urethane I*), 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices."); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("proof of the conspiracy is a common question that is thought to predominate over the other issues of the case"); *In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-03264-JD, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14, 2018) ("the claim of a conspiracy to fix prices inherently lends itself to a finding of commonality and predominance, even when the market involves different products and prices.").

[146] *Wirebound Boxes*, 128 F.R.D. 268 at 272.

[147] *Potash*, 159 F.R.D. at 695; *see also Wirebound Boxes*, 128 F.R.D. at 272 ("Proof of impact typically follows from proof of a price-fixing conspiracy where the defendants are shown to have sufficient market power."); *accord Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 600 (N.D. Ill. 2015) (*Kleen Prods. I*) ("price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated").

documentary and testimonial admissions; (3) regression models measuring impact on the class using defendants' data and USDA data, as well as robustness checks regarding the impact by defendant, by customer group, and by product type; and (4) a measurement of impact by customer through a comparison of the prices actually paid against the prices predicted by the regression model, which demonstrates impact on all or nearly all class members. CIPPs also offer common proof of *marketwide pass through* of these overcharges based on (5) record evidence; and (6) empirical regression analysis.

### (1)   Market structure evidence supports a finding of common impact.

In a case alleging a supply restriction conspiracy, the basic law of supply and demand makes causation a common issue. As one court has recognized, "the more closely [given] products resemble a prototypical commodity . . . the more cohesive an industry cartel will be and the more widespread the price effects."[148] Defendants' statements and documents confirm the operation of this basic economic theory in the pork industry. As Daniel Groff of Clemens put it, when ███████████████████████

███████████████████[149] Paul Peil of Hormel agreed that ███████████████

████████████████████████████████████████████████

---

[148] *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *19 (N.D. Ohio Nov. 17, 2014).

[149] Ex. 115, Groff Depo. at 344:5-7. *See also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002) ("A reduction in supply will cause prices to rise."); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) (when "firms restrict output directly, price will as mentioned rise").



[150] Smithfield's Dhamu Thamodaran stated to his colleagues that ███████████████████████████ [151] At his deposition, he explained that it was ███████ ███████████████████████████████ [152] A Hormel presentation states that ███████████████████████ [153] Robert Manly, an EVP at Smithfield, stated that ███████████████████████████ ███████████████████████████████ ███████████████████████ [154]

Dr. Singer opines that the structure of the pork industry ensured that any collusion would impact prices throughout the pork market. Singer Decl., at ¶¶ 62-86, 233-235. Courts have recognized that to establish predominance CIPPs may rely on evidence that "the structure of the [relevant] market was conducive to successful collusion" as

---

[150] Ex. 98, Peil Depo. at 51:19-24; *see also id*. at 131:2-6 ███████████████ ███████████████████████ ; *id.* at 136:13-15 ████████████

[151] Ex. 116, SMITHFIELD00832270; *see also* Ex. 44, SMITHFIELD01286583.

[152] Ex. 117, Thamodaran Depo. at 237:18-238:7; *see also* Ex. 118, SMITHFIELD00321244, at 260.

[153] Ex. 119, HFC-PORKAT0000202139, at native 14.

[154] Ex. 120, TF-P-000070892, at 904, 906.

"common proof that will establish antitrust injury . . . on a classwide basis."[155] Such

market characteristics are present here: a concentrated market; barriers to entry; vertical

integration; no competition from foreign imports; lack of substitutes; and a commodity

product.[156]

     **Concentration**: The market for pork is highly concentrated. Processor defendants

controlled over 80 percent of slaughter capacity. Singer Decl., at ¶¶ 68-75. Defendants'

documents confirm this. One internal Tyson document shows ███████████████████

███████████████████████████████████████████████████ [157] This level of

concentration makes the market for pork ripe for collusion.[158]

     **Barriers to Entry/Vertical Integration**: Industry analysts and processor

defendants themselves repeatedly recognized substantial barriers to entry because of

vertical integration and high, fixed capital costs. For example, in a 2013 investor

presentation addressing its vertical integration, Smithfield explained that ██████████

████████████████████████████████████████████████

---

    [155] *Kleen Prods. LLC v. Int'l Paper Co.* (*Kleen Prods. II*), 831 F.3d 919, 924, 927 (7th Cir. 2016); *see also Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC,* No. 19-56514, --- F.4th ----, 2022 WL 1053459, at *11, *12, *14 (9th Cir. Apr. 8, 2022) (*en banc*).

    [156] *Kleen Prods. II*, 831 F.3d at 924, 927.

    [157] Ex. 121, TF-P-000817306, at 313.

    [158] *See Kleen Prods. II*, 831 F.3d at 924, 927 (describing market as concentrated when defendants were responsible for 74% of production); *Capacitors*, 2018 WL 5980139, at *8 (certifying class and noting that plaintiffs' expert "provided considerable material about how the structure of the market for capacitors was conducive to price fixing, including evidence about the concentration of manufacturers").

███████████ [159] Tyson has explained that the ████████████████

████████████████████████████████████████████

███████ [160] Such high barriers to entry make the market for pork even more

susceptible to collusion, given that a ████████████████████████

████████████████████████████████████████████

███████████████████ [161]

**No Competition from Imports**: Nor are foreign producers likely to threaten

defendants' control of the market.[162] Pork imports "account for only three percent of

domestic production," and "the United States exports seven times the amount of pork it

imports." Singer Decl., at ¶ 51. Defendants' documents confirm this. Tyson, for example,

has stated that ███████████████████████████ [163]

**Lack of Substitutes**: Markets with "no good substitutes" and a "low elasticity of

demand" are "accepted characteristics of a market that is subject to cartelization."[164] Both

apply to pork. Smithfield acknowledges that the ███████████████ [165] and Tyson

explains why: ████████████████████████████████████████

---

[159] Ex. 122, SMITHFIELD00898940, at 957; *see also* Singer Decl., at ¶¶ 76-86.

[160] Ex. 123, TF-P-000128650, at native 19; *see also* Ex. 124, TF-P-000036749, at 750.

[161] *Kleen Prods. II*, 831 F.3d at 927.

[162] *See id.* (identifying "weak competition from import[s]" as characteristic of market conducive to collusion).

[163] Ex. 125, TF-P-000641160.

[164] *Kleen Prods. II*, 831 F.3d at 927.

[165] Ex. 116, SMITHFIELD00832270.

[REDACTED]

[REDACTED] [166] The USDA confirms pork has low cross-price

elasticity with beef and chicken.[167]

**Commodity Product**: The market for pork also satisfies the final "characteristics

of a market that is subject to cartelization," because pork is "a standardized, commodity

product."[168] Processor defendants acknowledge that pork is a commodity. Triumph states

that it is [REDACTED] [169] Tyson refers to its pork [REDACTED]

[REDACTED] [170] Daniel Groff from Clemens testified that fresh pork is a

[REDACTED] [171] As Senior Pricing Manager Robert Moore of Smithfield put

it, [REDACTED] because

[REDACTED] [1]72 Antitrust impact is routinely found to be a common issue in cases

involving commodity goods.[173]

---

[166] Ex. 124, TF-P-000198549, at native 23.

[167] Singer Decl., at ¶ 62 ("the USDA estimates that the cross-price elasticity of pork with respect to the price of beef is 0.48, while the cross-price elasticity of pork with respect to the price of poultry is 0.28, indicating that these products are weak substitutes for pork").

[168] *Kleen Prods. II*, 831 F.3d at 927. *See also* Singer Decl., at ¶ 25.

[169] Ex. 94, TRI0000037014, at native 8.

[170] Ex. 127, TF-P-000681324, at 414.

[171] Ex. 115, Groff Depo. at 38:11-13; *see also* Ex. 128, Taphorn Depo. at 183:19-22 [REDACTED].

[172] Ex. 129, Moore Depo. at 20:24-21:15.

[173] *See, e.g.*, *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 816 (7th Cir. 2012) (establishing common impact is "relatively simple" in cases involving "a market for a generic, undifferentiated commodity" and "simple supply and demand curves"); *In*

In sum, CIPPs' evidence—including Dr. Singer's report—demonstrates that "the structure of the [relevant] market was conducive to successful collusion" and offers common proof that will establish antitrust injury on a class-wide basis.[174]

### (2)  Common evidence demonstrates Agri Stats acted as a conspiracy benchmark for pork sales.

Processor defendants regularly used Agri Stats to benchmark prices to each other and to the market by systematically identifying opportunities where they were low in the Agri Stats rankings or priced lower than average compared to their competitors.[175] Both Smithfield and Tyson explicitly referred to Agri Stats as providing a benchmark,[176] with Clemens using Agri Stats to ██████████████████████████████████████████[177] and Triumph ████████████████████████████████████████████ ████████████████████████████████████[178] In this manner, processor defendants systematically ratcheted prices up.

Moreover, defendants internally confirmed the marketwide impact on pork price. For example, a Hormel presentation from 2011 stated that ████████████████████████

---

re Urethane Antitrust Litig. (*Urethane III*), 237 F.R.D. 440, 450-51 (D. Kan. 2006) (certifying class where expert opined that "the products are fungible commodity products").

[174] *Kleen Prods. II*, 831 F.3d at 927; *see also Olean Wholesale Grocery,* 2022 WL 1053459, at *11, *12, *14.

[175] *See* section III.H., above. *See also* Singer Decl., at ¶¶ 123-128.

[176] Ex. 30, Copa Depo. at 24:13-18; Ex. 130, TF-P-000172956.

[177] Ex. 88, CLMNS-0000036566, at 567.

[178] Ex. 94, TRI0000037014, at native 3.



█████████████████ [179] And an industry analyst at Urner Barry reported to Tyson, JBS, and Hormel in 2014 that ███████████████████████ [180] Indeed, use of price lists by Smithfield, for example, ████████████████ [181] and ████████████████████ [182] And Seaboard also used ██████████████████████████ [183]

Such record evidence is "probative of whether common issues will predominate with respect to antitrust impact, as it is probative of whether the conspiracy occurred and was anticompetitive."[184]

### (3)   Econometric analysis shows common impact in the form of higher pork prices.

At the class certification stage, CIPPs need "only [] demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class."[185] For example, in *Potash*, the plaintiffs provided expert analysis to show that "the

---

[179] Ex. 119, HFC-PORKAT0000202139, at native 14.

[180] Ex. 131, TF-P-002121994; Ex. 132, HFC-PORKAT0000032620; Ex. 133, JBS-PORK-00259786.

[181] Ex. 129, Moore Depo. at 33:21-34:15, 37:4-38:7.

[182] *Id*. at 43:19-44:15.

[183] Ex. 134, Davis Depo. at 211:24-212:6; *see also* Ex. 135, TRI0000313243

█████████████████████

[184] *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 200 (E.D. Pa. 2016); *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *33 (E.D. Pa. Oct. 19, 2015) (finding that although the defendants' internal "documents, standing alone, would not suffice to prove impact," they "lend support to a finding of predominance").

[185] *Messner*, 669 F.3d at 818-19 (emphasis in original); *see also id.* at 819 ("common evidence and common methodology to prove a class's claims is sufficient to support a

conspiracy succeeded in increasing prices above the competitive level," which the court explained was evidence "not unique to each class member, but [] common to the class and susceptible to class-wide proof."[186] The defendants meanwhile "proffered an analysis of their own economics expert," which they claimed "did not support a finding of common impact."[187] The district court found that this "present[ed] the familiar 'battle of the experts.'"[188] But the court explained that the "certification stage of this litigation is not [] the proper forum in which to resolve this battle."[189] The court in *Potash* concluded that "[w]ithout trenching on the merits, in considering a class certification motion, a court must consider only whether plaintiffs have made a threshold showing that what proof they will offer will be sufficiently generalized in nature."[190]

Dr. Singer offers common evidence in the form of a multiple regression analysis that *proves empirically* that defendants' collusion caused higher prices. Singer Decl., at ¶¶ 144-165. The type of regression analysis performed by Dr. Singer is well established

---

finding of predominance on the issue of antitrust impact"); *Olean Wholesale Grocery*, 2022 WL 1053459, at *7 ("In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial.") (emphasis in original); *see also id*. at *18-19.

[186] 159 F.R.D. at 696.

[187] *Id*.

[188] *Id*. at 697.

[189] *Id*. (citing *In re Catfish Antitrust Litig*., 826 F. Supp. 1019, 1039 (N.D. Miss. 1993)); *see also Workers' Comp.*, 130 F.R.D. at 110 ("Common proof of impact is possible even though prices are individually negotiated.").

[190] 159 F.R.D. at 697.

as an appropriate tool for proving antitrust impact and estimating damages on a class-wide basis.[191] Using 3.9 million observations, Dr. Singer's econometric model isolates the impact of defendants' conduct by comparing the prices paid by direct purchasers during the class period to a benchmark period prior to the conspiracy. Singer Decl., ¶¶ 144 & T.12. Controlling for other factors that might influence the price, Dr. Singer's analysis decisively rejects the "null hypothesis"—that processor defendants' conspiracy did not inflate prices. *Id.*, ¶ 144. Using the multivariate regression model, Dr. Singer estimates defendants' conspiracy inflated the price of pork products sold to class members by 12.8 to 15.3 percent. *Id.*, ¶¶ 160-161.

Dr. Singer tests the same regression model on national pork wholesale prices from the USDA to ensure the results are not due to the particularities of processor defendants' data. *Id.*, ¶¶ 163-165. The results of the regression are remarkably similar to those from defendants' sales data, showing an overcharge of 12.9 to 16.5 percent. As Dr. Singer explains, the validity of the regression model is evidenced by the fact it yields consistent results when employed on two entirely different data sets. *Id.*, ¶ 165.

Dr. Singer also performs several robustness checks to ensure that there is no pocket of the market unimpacted by the conspiracy. Using his basic multivariate

---

[191] *See, e.g.*, *Olean Wholesale Grocery*, 2022 WL 1053459, at *15 ("In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members."); *Midwestern Mach. v. Nw. Airlines, Inc.*, 211 F.R.D. 562, 567 (D. Minn. 2001) (expert's "proposed methodology, namely regression analysis, and antitrust principles are widely recognized within the field of economics and have been accepted by courts").

regression model, Dr. Singer measures whether there is econometric evidence of price inflation by *product* (measuring the overcharge on bacon, bellies, loins, ribs and shoulders separately), by *defendant*, and by *customer type* (breaking the direct purchaser class into distributors, further processors, retailers, and trader brokers. Singer Decl., ¶¶ 190-194. Each of these measurements, using evidence common to the class, points in the same direction—that defendants' conduct resulted in higher prices being paid by all class members.

### (4) Common econometric evidence demonstrates that all or nearly all direct purchasers suffered impact.

Dr. Singer also performs another standard method of measuring common impact using an in-sample prediction that compares the price that each direct purchaser actually paid to the price they would have paid absent the conspiracy. Singer Decl., ¶¶ 169-170. Numerous courts have accepted that that this type of evidence demonstrates common impact to class members.[192] Dr. Singer employs this econometric model to make two separate measurements: a raw count of the impacted purchasers and a measurement of the weighted amount of pork product purchased in dollars. Using the same regression model employed to measure the overcharge, Dr. Singer estimates that over 99.99 percent of all

---

[192] *See, e.g., Olean Wholesale Grocery,* 2022 WL 1053459; *Capacitors*, 2018 WL 5980139; *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1775 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014).

direct purchasers suffered injury when weighted by volume of commerce, and 99.79

percent of all direct purchasers suffered impact even when unweighted. *Id.,* ¶ 170.[193]

> **(5)** **Common record evidence demonstrates overcharges were passed through from direct purchasers to class members.**

Beyond demonstrating the overcharge due to the conspiracy, CIPPs also

demonstrate that the overcharges were passed through from direct purchasers through the

distribution chain to the class members. Singer Decl., at ¶¶ 171-189. When, as here, the

products purchased by class members are the complete products unchanged from how

processor defendants sold them to direct purchasers, courts recognize that "the price

charged by the manufacturer will largely determine the [price] paid by the end user."[194]

Courts have repeatedly certified classes of indirect purchasers based on pass through

analysis that shows common impact and injury.[195] This accords with basic economic

---

[193] The difference between these two numbers is due to a long tail of direct purchasers with only a handful of purchases. Singer Decl., ¶ 170.

[194] *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09-cv-00852, 2012 WL 3841397, at *3 (E.D. Wis. Sept. 5, 2012); *see also Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.,* No. 09-cv-00852, 2017 WL 4457515 (E.D. Wis. Aug. 8, 2017) (certifying statewide classes of indirect purchasers who purchased aftermarket sheet metal auto parts that traveled down the distribution chain substantially unchanged).

[195] *See, e.g.*, *Gordon v. Microsoft Corp*., No. 00-5994, 2001 WL 366432, at *10-12 (D. Minn. Mar. 30, 2001) (where Microsoft OS was "unchanged as it passes through distribution" granting class certification "based on Plaintiffs' proposed methods of determining an overcharge to direct purchasers and a percentage pass through to individual consumers"); *accord Olean Wholesale Grocery,* 2022 WL 1053459, at *20 (affirming district court determination that expert's pass-through analysis was "capable of showing class-wide impact"); *In re Korean Ramen Antitrust Litig*., No. 13-cv-04115-WHO, 2017 WL 235052, at *19 n.38 (N.D. Cal. Jan. 19, 2017) (accepting pass-through analysis because "[t]he ramen market does not present the same sort of complexities" as actions involving component parts).

theory, which uniformly predicts that in a competitive market, firms will consistently pass through cost changes. Singer Decl., at ¶ 177.

Here, the two largest distributors acknowledge that a significant portion of their sales are ██████████████████████████████████████████████████████████

██████ [196] In fact, industry expert Dr. Steven Meyer testified that ███████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ [197] Likewise, large retailers have also publicly confirmed their strategy of passing along cost increases. Kroger's CEO stated that "as we have cost increases to us, whether it is list cost or . . . reduction in promotional spending, we are passing that through to our customers, as the vendors give it to us." [198] Indeed, Cleveland Research Company (CRC), a third party research analyst, conducted an extensive survey of grocery retailers in 2011, and reported that ████████████████████████████████████████████████████████████████

█████ ████████████████████████████████████████████████████████

████████████████████████████████████ [199]

---

[196] Ex. 136, at 10 (US Foods 10-K); Ex. 137, at 7 (Sysco 10-K).

[197] Ex. 138, Meyer Depo. at 105:16-25; *see also* Ex. 139, KERNS00250162, at 166 ████████████████████████████████████████████

[198] Ex. 140, at 22 (Kroger Earnings Call Tr.). *See also* Ex. 141, at 16 (Supervalu July 26, 2011 Earnings Call) ("in no case did we *not* pass through inflation. I want to be very clear about that").

[199] Ex. 142, at CLMNS-0000081357, at 358, 379. *See also* Ex. 143, TF-P-000655793, at 797 (2014 CRC report: ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

In addition, processor defendants themselves repeatedly acknowledged that direct purchasers passed through cost changes. Director of Fresh Meat Sales at Hormel, Paul Peil, testified that ███████████████████████████████████████████████████████████ ███████████████████████████████████████████ [200] ██████████████████████ ████████████████████████████████████████████████████ [201] Brian Taphorn of Seaboard explained that ██████████████████████████████████████████████ ████████████████████ [202] ███████████████████████████████████████████████ ██████ [203] Smithfield stated that as ████████████████████████████████████████ ████████ and ██████████████████████████████████████ ████████████ [204] Hormel also acknowledged that ███████████████████████████ ██████████████████████ [205] Clemens explained that ████████████████████████ ██████████████████████████████████████████████████████

---

██████████████████████████): Ex. 144, SMITHFIELD00903091, at 092 (July 20, 2012: CRC report re pork industry: ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ Ex. 145, TF-P-001303751 (June 18, 2012 CRC report re Smithfield: ██████████████████████ ████████████████████████████████████████████████████████

[200] Ex. 98, Peil Depo. at 162:16-25.

[201] *Id.*

[202] Ex. 128, Taphorn Depo. at 125:9-15.

[203] *Id.* at 183:3-18.

[204] Ex. 107, SMITHFIELD02229051, at 056.

[205] Ex. 147, HFC-PORKAT0000372974.

██████████████████████████████████████████[206] Tyson summed it up: ████████

████████████████████████████████████████████████████████

████████████████████████████[207]

### (6)   CIPPs measure pass-through based on millions of observations from market participants.

CIPPs have also subpoenaed and measured pass-through of cost changes from thirty-nine industry participants with usable data, including over 1.6 million observations. Singer Decl., at ¶ 181. Dr. Singer explains that "pass-through can be empirically measured if structured data for a reseller's costs and prices over time are available." *Id.*, at ¶¶ 180. And he then performs regression pass-through analysis using such procurement (cost) and sales (price) data. *Id.*, at ¶ 181.

Dr. Singer identifies two levels of the distribution channel and runs the same pass-through regressions on each. Dr. Singer first measures pass-through for twenty-three distributors (entities that largely purchase from defendants), generally finding pass-through rates in excess of ██ percent:[208]

---

[206] Ex. 148, CLMNS-0000051029.

[207] Ex. 149, TF-P-001131638; *see also id.* at 653 ████████████████████
████████████████

[208] Pass-through rates above ██ percent are common and expected in a commodity market such as this, when distributors and retailers use cost-plus pricing strategies to keep their markups constant when the cost of a good increases. For the purposes of damages, all pass-through numbers are conservatively limited to 100 percent. Singer Decl., ¶¶ 177, 197.

TABLE 22: PASS-THROUGH ANALYSIS
DISTRIBUTORS

| Entity | Linear-Levels Model | | Linear-Log Model | | | | Share of Defendant Distributor Sales (2018) | Weighting (2018 Own-Data Sales) |
|---|---|---|---|---|---|---|---|---|
| | Pass-Through | R-Squared | Pass-Through | Price / Cost Ratio | Elasticity | R-Squared | | |

Singer Decl., ¶ 183. Then Dr. Singer measures pass-through on sixteen different entities

at the retail level, finding pass-through ranging from █ to over █ percent:

- 47 -

TABLE 21: PASS-THROUGH ANALYSIS
RETAIL STORES

| Entity | Linear-Levels Model | | Linear-Log Model | | | | Share of Defendant Retail Sales (2018) | Weighting (2018 Own-Data Sales) |
| | Pass-Through | R-Squared | Pass-Through | Price / Cost Ratio | Elasticity | R-Squared | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

Singer Decl., ¶ 183.

Consistent with the documentary evidence, Dr. Singer finds consistently high, positive rates of past-through *independently* for each and every market participant whose data he was able to obtain to analyze. *Id.* & TT. 21-22. His results also demonstrate that the average pass-through rate is ▮▮▮▮ for distributors and ▮▮▮▮ for retail stores. *Id.* In short, he finds positives rates of pass through across all participants. This empirical analysis is common evidence of impact on class members, because it shows that supra-competitive prices that resulted from defendants' anticompetitive conduct were passed through the distribution chain resulting in higher prices that consumer class members paid for pork products.

- 48 -

**2.      Damages to class members need not be measured with precision, but can be measured using a common methodology.**

In antitrust cases, a lesser level of proof is needed to support the amount of damages than the fact of antitrust injury. "Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)."[209] Indeed, the "distinction between impact and damages is crucial in a case like this, where Plaintiffs have presented (1) record and expert evidence independently showing impact and (2) an econometric model that attempts to prove both damages and therefore impact."[210] Once common evidence of an antitrust violation and its impact is established, certification for class treatment "may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages."[211] At the class certification stage, plaintiffs need only demonstrate they have a valid method for calculating damages.[212]

Here, CIPPs propose a valid methodology to calculate aggregate damages to the class. Singer Decl., at ¶¶ 195-99. Dr. Singer calculates the total volume of purchases by

---

[209] *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001).

[210] *Kleen Prods. I*, 306 F.R.D. at 595.

[211] *Custom Hair*, 984 F.3d at 599.

[212] *See Wholesale Grocery*, 2016 WL 4697338, at *13 ("Dr. Leitzinger offers a generalized mathematical formula that can be applied to all class members to calculate a reasonable estimation of their damages."); *Potash*, 159 F.R.D. at 697 ("Plaintiffs have proffered several reasonable damage methodologies."); *accord Kleen Prods. I*, 306 F.R.D. at 605 ("[I]n a complicated antitrust case such as this, where the theory of harm is that the entire market price of a product was inflated as a result of a conspiracy, plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages.").

class members of products included in class. He then multiplies the total volume of
purchases by the applicable overcharge rate derived from his overcharge regression.
Finally, Dr. Singer multiplies the overcharge by the applicable pass-through rate to
calculate the amount of the overcharge passed on to CIPPs. The resulting damages
exceed $1.3 billion before trebling. *Id.*, at ¶ ¶¶ 198-99.  And this method satisfies
*Comcast* because it "measure[s] damages resulting from the particular antitrust injury on
which [] liability in this action is premised."[213]

### 3.      A class action is superior to any other alternative.

"Rule 23(b)(3)'s superiority requirement . . . is comparative: the court must assess
efficiency [of a class action] with an eye toward 'other available methods.'"[214] Rule 23
instructs that the matters pertinent to this inquiry include: (A) class members' interests in
individually controlling the prosecution of separate actions; (B) whether other litigation
exists concerning this controversy; (C) the desirability of concentrating the litigation in
this forum; and (D) any difficulties in managing a class action.[215] Each of these factors
supports certification.

#### a.      Class members cannot proceed individually.

Where the harm caused to any one individual class member is small, but the
collective harm is great, the first three factors of Rule 23(b)(3) weigh heavily in favor of
certification. The Eighth Circuit has recognized that when "individual claims are for tens

---

[213] *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013).

[214] *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015).

[215] Fed. R. Civ. P. 23(b)(3).

or hundreds of dollars . . . . no plaintiff is likely to pursue their claim individually."[216] So
a "class action is the superior mechanism to try the case."[217]

> ### b.  Litigating the claims of the class members from different States in this Court is manageable.

CIPPs bring claims under the laws of twenty-four jurisdictions, each of which has
an antitrust or consumer statute that permits indirect purchaser suits and harmonizes with
the federal Sherman Act, ensuring that the core questions of liability will be the same.[218]
CIPPs outline the statutory bases of the claims in Appendices A and B. The similarity of
these statutes demonstrates the manageability of the common legal issues under Rule
23(b)(3). Thus, "courts frequently certify classes under the laws of multiple
jurisdictions."[219]

---

[216] *Custom Hair*, 984 F.3d at 605; *see also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."), *cert. denied*, 543 U.S. 1051 (2005).

[217] *Custom Hair*, 984 F.3d at 605.

[218] *See* Appendices A & B. In the *Apple eBooks* antitrust litigation, the Attorney Generals of thirty-three states asserted that their antitrust laws prohibiting price fixing were so similar that they could be tried jointly with each other and the DOJ's Sherman Act claims. Following that trial, the district court ruled that the defendant had "conspired to restrain trade in violation of Section 1 of the Sherman Act and relevant state statutes to the extent those laws are congruent with Section 1." *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 645, 687 (S.D.N.Y. 2013), *aff'd,* 791 F.3d 290 (2d Cir. 2015).

[219] *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 615 (N.D. Cal. 2009) (certifying 27 state subclasses); *see also In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 700-01 & n.45 (S.D. Fla. 2004) (certifying 17 state classes of indirect purchasers under state laws, which did "not pose a manageability problem because the applicable substantive laws are virtually identical in their required elements").

**D.** **Class Counsel are adequate under Rule 23(g).**

The CIPP class respectfully request that Hagens Berman Sobol Shapiro LLP and Gustafson Gluek PLLC be appointed as co-lead class counsel under Rule 23(g) for the CIPP class. These two firms have litigated this case on behalf of CIPPs for nearly four years. Each firm has devoted considerable time and resources to prosecute this action since its inception, and each is committed to continuing to do so. The firms have overseen the litigation strategy, the briefing and argument of motions, the coordination and review of millions of documents from defendants and third parties, the taking and defending of dozens of depositions, and the retention of experts. Moreover, both firms have extensive knowledge of the relevant law and vast experience litigating similar antitrust actions to a successful end.[220]

## VI.   CONCLUSION

For all of these reasons, CIPPs respectfully request that the class be certified.

DATED: May 2, 2022                    Respectfully submitted,

                                      HAGENS BERMAN SOBOL SHAPIRO LLP

                                      By:   */s/ Shana E. Scarlett*
                                      SHANA E. SCARLETT
                                      Rio Pierce
                                      715 Hearst Avenue, Suite 202
                                      Berkeley, California 94710
                                      Telephone: (510) 725-3000
                                      Facsimile: (510) 725-3001
                                      shanas@hbsslaw.com
                                      riop@hbsslaw.om

---

[220] *See* Ex. 150 (firm resume for Hagens Berman) & Ex. 151 (firm resume for Gustafson Gluek).

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

*Proposed Co-Lead Counsel for Consumer
Indirect Purchaser Class*

**APPENDIX A**

| ANTITRUST STATUTES | | | | |
|---|---|---|---|---|
| **STATE** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** |
| Arizona | The Arizona Uniform Antitrust Act states that "[a] contract, combination or conspiracy between two or more persons in restraint of . . . trade or commerce, any part of which is within this state, is unlawful." *See* Ariz. Rev. Stat. § 44-1402. | Yes. *See* Ariz. Rev. Stat. § 44-1412 ("It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes."); *Wedgewood Inv. Corp. v. Int'l Harvester Co.*, 613 P.2d 620, 622-23 (Ariz. Ct. App. 1979) ("The Arizona legislature clearly intended to strive for uniformity between federal and state antitrust laws."); *Brooks Fiber Comm'ns of Tucson, Inc. v. GST Lightwave, Inc.*, 992 F. Supp. 1124, 1130 (D. Ariz. 1997) ("The Arizona Antitrust Act, A.R.S. §§ 44-1401 *et seq.*, mirrors federal antitrust law. Because summary judgment is inappropriate on the federal claims under the Sherman Act, it is also inappropriate on the state law claims."). | Yes.  Indirect purchasers have standing to pursue damages, costs, and attorneys' fees.  *See* Ariz. Rev. Stat. § 44-1408; *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) ("by defining the term 'person' to include an 'individual,' the legislature signaled its intent to allow indirect purchasers to sue, because individuals are rarely direct purchasers"). | 4 years.  Ariz. Rev. Stat. § 44-1410(B). |
| California | California's antitrust law, the Cartwright Act, prohibits combinations between two or more persons "[t]o create or carry out restrictions in trade or commerce" or "[t]o limit or reduce the production, or increase the price of merchandise or of any commodity." *See* Cal. Bus. & Prof. Code § 16720(a) & (b). | Yes. *See Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, was modeled after the Sherman Act."). | Yes.  Indirect purchasers have standing to pursue damages, costs, and attorneys' fees.  *See* Cal Bus. & Prof. Code § 16750(a) ("This action may be brought by any person who is injured . . . regardless of whether such injured person dealt directly or indirectly with the defendant."). | 4 years.  *See* Cal. Bus. & Prof. Code § 16750.1. |
| District of Columbia | The District of Columbia Antitrust Act provides that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce all or any part of which is within the District of Columbia is declared to be illegal." *See* D.C. Code § 28-4502. | Yes. *See* D.C. Code § 28-4515 ("[A] court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."); *In re Tobacco/Gov'tal Health Care Costs Litig.*, 83 F. Supp. 2d 125, 134 n.7 (D.D.C. 1999) (liability under D.C. Code § 28-4502 is "governed by the | Yes.  Indirect purchasers have standing to pursue damages, costs, and attorneys' fees.  *See* D.C. Code §§ 28-4508(a), 28-4509(a) ("any indirect purchaser in the chain of manufacture, production, or distribution of goods or services, upon proof of payment of all or any part of any overcharge for such | 4 years.  *See* D.C. Code § 28-4511(b). |

| ANTITRUST STATUTES | | | | |
|---|---|---|---|---|
| STATE | ANTITRUST STATUTE | HARMONIZATION WITH FEDERAL LAW | INDIRECT PURCHASER STANDING | STATUTE OF LIMITATIONS |
| | | same principles" as liability under §1 of the Sherman Act). | goods or services, shall be deemed to be injured within the meaning of this chapter."). | |
| Illinois | The Illinois antitrust act prohibits "any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person . . . for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or bought by the parties thereto." *See* 740 Ill. Comp. Stat. 10/3(1). | Yes. *See* 740 Ill. Comp. Stat. 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* 740 Ill. Comp. Stat 10/7(2) ("No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages."). | 4 years. *See* 740 Ill. Comp. Stat. 10/7. |
| Iowa | The Iowa antitrust act states that a "contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." *See* Iowa Code § 553.4. | Yes. *See* Iowa Code § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter."). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* Iowa Code § 553.12; *Comes v. Microsoft*, 646 N.W.2d 440, 445 (Iowa 2002) (§ 553.12 "does not restrict the class of persons who may bring suit under the Iowa Competition Law. Nothing in the statute says in order to seek redress for antitrust violations a purchaser must be directly injured."). | 4 years. *See* Iowa Code § 553.16(2). |
| Kansas | The Kansas Restraint of Trade Act prohibits "arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition." *See* Kan. Stat. § 50-112. | Yes. *See Bergstrom v. Noah*, 974 P.2d 520, 531 (Kan. 1999) (Federal Sherman Act cases "may be persuasive authority for any state court interpreting its antitrust laws"). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* Kan. Stat. § 50-161(b) ("action may be brought by any person who is injured . . . regardless of whether such injured person dealt directly or indirectly with the defendant"). | 3 years. *See* Kan. Stat. § 60-512; *Four B Corp. v. Daicel Chem. Indus.*, 253 F. Supp. 2d 1147, 1155 (D. Kan. 2003). |
| Maine | Maine's antitrust act states that "[e]very contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or | Yes. *See Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1081 (1st Cir. 1993) ("The Maine antitrust statutes parallel the Sherman Act."). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* Maine Rev. Stat. tit. 10, § 1104(1) ("Any person . . . injured | 6 years. *See* Maine Rev. Stat. tit. 14, § 752. |

| ANTITRUST STATUTES | | | | |
|---|---|---|---|---|
| **STATE** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** |
| | commerce in this State is declared to be illegal." *See* Me. Rev. Stat. tit. 10, § 1101. | | directly or indirectly . . . may sue for the injury in a civil action."). | |
| Michigan | Michigan's Antitrust Reform Act prohibits "[a] contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce." *See* Mich. Comp. Laws § 445.772. | Yes. *See* Mich. Comp. Laws § 445.784 ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes"); *ETT Ambulance Service, Inc., v. Rockford Ambulance*, 516 N.W.2d 498, 500 (Mich. Ct. App. 1994) ("The Michigan antitrust laws were patterned after the Sherman Anti-Trust Act, 15 U.S.C. § 1 *et seq.*"). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* Mich. Comp. Laws § 445.778(2). ("Any other person threatened with injury or injured directly or indirectly . . . may bring an action"). | 4 years. *See* Mich. Comp. Laws § 445.781(2). |
| Minnesota | Minnesota's antitrust act prohibits: "(1) A contract, combination, or conspiracy between two or more persons in competition: (a) for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price, rate, or fee of any commodity or service." *See* Minn. Stat. § 325D.53. | Yes. *See Minnesota Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn. 1999) ("Minnesota's antitrust laws are generally interpreted consistently with federal courts' construction of federal antitrust laws."). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* Minn. Stat. § 325D.57 ("Any person . . . injured directly or indirectly by a violation of sections 325D.49 to 325D.66, shall recover . . . ."). | 4 years. *See* Minn. Stat. § 325D.64. |
| Missouri | The Missouri Merchandising Practices Act prohibits "any practice which . . . offends any public policy as it has been established by . . . the Federal Trade Commission." *See* Mo. Code Regs. tit.15, § 60-8.020(1). | Yes. *See* Mo. Code Regs. tit. 15, § 60-8.020(1) (prohibiting "any practice which . . . offends any public policy as it has been established by . . . the Federal Trade Commission."); *Federal Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 694 (1948) ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). | Yes. Indirect purchasers have standing to pursue damages and attorneys' fees. *See Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669-70 (Mo. 2007) (rejecting privity requirement); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 415 (E.D. Pa. 2010) (permitting suit by indirect purchasers based on *Gibbons*). | 5 years. *See* Mo. Stat. § 516.120. |
| Nebraska | Nebraska's antitrust statute, the Junkin Act, prohibits any "contract, combination in the form of trust or otherwise, or | Yes. *See* Neb. Rev. Stat. § 59-829 ("When any provision of sections 59-801 to 59-831 . . . is the same as or similar to the language of the federal antitrust | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* Neb. Rev. Stat. § 59-821 ("Any | 4 years. *See* Neb. Rev. Stat. § 59-1612. |

| ANTITRUST STATUTES | | | | |
|---|---|---|---|---|
| STATE | ANTITRUST STATUTE | HARMONIZATION WITH FEDERAL LAW | INDIRECT PURCHASER STANDING | STATUTE OF LIMITATIONS |
| | conspiracy in restraint of trade or commerce." *See* Neb. Rev. Stat. § 59-801. | law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts."). | person who is injured . . . whether such injured person dealt directly or indirectly with the defendant, may bring a civil action"). | |
| Nevada | Nevada's Unfair Trade Practice Act prohibits "a contract, combination, or conspiracy in restraint of trade," including a specific prohibitions against agreements to restrict volumes of production and price-fixing conspiracies. *See* Nev. Rev. Stat. § 598A.060. | Yes. *See* Nev. Rev. Stat. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."). | Yes.  Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* Nev Rev. Stat. § 598A.210(2) ("Any person injured or damaged directly or indirectly . . . may institute a civil action"). | 4 years. *See* Nev. Rev. Stat. § 598A.220(2)(a). |
| New Hampshire | New Hampshire's antitrust act prohibits "[e]very contract, combination, or conspiracy in restraint of trade." *See* N.H. Rev. Stat. § 356:2. | Yes. *See Minuteman v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002) ("While judicial review of our antitrust law is sparse, both we and the United States District Court for the District of New Hampshire have looked to federal law when construing RSA chapter 356."). | Yes.  Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* N.H. Rev. Stat. § 356:11(II) ("Any person injured . . . may recover . . . regardless of whether that person dealt directly or indirectly with the defendant."). | 4 years. *See* N.H. Rev. Stat. § 356:12. |
| New Mexico | The New Mexico antitrust act states that "[e]very contract, agree-ment, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful." *See* N.M. Stat. § 57-1-1. | Yes. *See* N.M. Stat. § 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices."). | Yes.  Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* N.M. Stat. § 57-1-3(A) ("any person threatened with injury or injured in his business or property, directly or indirectly . . . may bring an action"). | 4 years. *See* N.M. Stat. § 57-1-12(B). |
| New York | New York's antitrust law, the Donnelly Act, prohibits "[e]very contract, agreement, arrangement or combination whereby . . . Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service | Yes. *See Agency Dev., Inc. v. MedAmerica Ins. Co.*, 310 F. Supp. 2d 538, 543 n.6 (W.D.N.Y. 2004) ("A Donnelly Act claim generally is construed in accordance with the Sherman Act.  Therefore, the analysis . . . applies equally to plaintiff's state and federal antitrust claims."). | Yes.  Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* N.Y. Gen. Bus. Law § 340(6) ("the fact that . . . any person who has sustained damages by reason of violation of this section has not dealt directly with the defendant shall not bar or otherwise limit recovery"). | 4 years. *See* N.Y. Gen. Bus. Law § 340(5). |

| ANTITRUST STATUTES | | | | |
|---|---|---|---|---|
| **STATE** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** |
| | in this state is or may be restrained." *See* N.Y. Gen. Bus. Law § 340(1). | | | |
| North Carolina | North Carolina's antitrust law states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal." *See* N.C. Gen. Stat. § 75-1. | Yes. *See Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973) ("[T]he body of law applying the Sherman Act, although not binding upon this Court in applying G.S. § 75-1, is nonetheless instructive in determining the full reach of that statute."). | Yes. Indirect purchasers have standing to pursue damages. *See* N.C. Gen. Stat. § 75-16; *Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 688 (N.C. App. 1996) (holding "that indirect purchasers have standing under N.C.G.S. § 75-16 to sue for Chapter 75 violations."). | 4 years. *See* N.C. Gen. Stat. § 75-16.2. |
| North Dakota | North Dakota's antitrust law states that a "contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." *See* N.D. Cent. Code § 51-08.1-02. | Yes. *See Ag Acceptance Corp. v. Glinz*, 684 N.W.2d 632, 639-41 (N.D. 2004) (following federal case in construing claim under state antitrust act); *Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144, at *2 (N.D. Dist. Ct. Aug. 23, 2004) ("the Court assumes that a 'tying' arrangement illegal under the Clayton and Sherman Acts is also illegal under State law"). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* N.D. Cent. Code § 51-08.1-08(4) ("the fact that the . . . person threatened with injury or injured . . . has not dealt directly with the defendant does not bar recovery"). | 4 years. *See* N.D. Cent. Code § 51-08.1-10(2). |
| Rhode Island | Rhode Island's antitrust act states that "[e]very contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce is unlawful." *See* R.I. Gen. Laws § 6-36-4. | Yes. *See* R.I. Gen. Laws § 6-36-2(b) ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* R.I. Gen. Laws § 6-36-11(a) ("the fact that a person . . . has not dealt directly with the defendant shall not bar or otherwise limit recovery"). | 4 years. *See* R.I. Gen. Laws § 6-36-23. |
| Tennessee | The Tennessee Unfair Trade Practices Act declares unlawful and void "[a]ll arrangements, contracts, agreements, trusts or combinations between persons or corporations designed, or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article." *See* Tenn. Code § 47-25-101. | Yes. *See State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Sept. 25, 1980) ("The State anti-trust statute passed in 1891 is quite similar to the Sherman Anti-Trust Act passed by Congress in 1890. 15 U. S. C. § 1. Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive."). | Yes. Indirect purchasers have standing to pursue damages. *See* Tenn. Code § 47-25-106; *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9CV, 2003 WL 21780975, at *29 (Tenn. Ct. App. July 31, 2003) (holding that "indirect purchasers are 'persons' who may bring an action for an injury caused by violation of the TTPA"). | 3 years. *See* Tenn. Code § 28-3-105; *Levi Strauss & Co.*, 1980 WL 4696, at *1 (holding state antitrust claims subject to § 28-3-105). |

| ANTITRUST STATUTES | | | | |
|---|---|---|---|---|
| **STATE** | **ANTITRUST STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** |
| Utah | Utah's antitrust act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal." *See* Utah Code § 76-10-3104. | Yes. *See* Utah Code § 76-10-3118 ("The Legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* Utah Code § 76-10-3109 (a)(1) ("A person . . . who is injured . . . may bring an action . . . regardless of whether the person dealt directly or indirectly with the defendant"). | 4 years. *See* Utah Code § 76-10-3117. |
| West Virginia | The West Virginia Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in this State shall be unlawful." *See* W.Va. Code § 47-18-3. | Yes. *See* W.VA. Code § 47-18-16 ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); *Gray v. Marshall Cty. Bd. of Educ.*, 367 S.E.2d 751, 755 (W. Va. 1988) ("we are directed by the legislature to apply the federal decisional law interpreting the Sherman Act to our own parallel anti-trust statute"). | Yes. Indirect purchasers have standing to pursue damages, costs, and attorneys' fees. *See* W.VA. Code § 47-18-9; W. Va. Code St. R. § 142-9-2 ("any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq.*, may bring an action for damages"). | 4 years. *See* W.VA. Code § 47-18-11. |

**APPENDIX B**

| CONSUMER PROTECTION STATUTES | | | | |
|---|---|---|---|---|
| **JURISDICTION** | **CONSUMER PROTECTION STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** |
| California | California's Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice". *See* Cal. Bus. & Prof. Code § 17200. | Yes. *See Rubio v. Cap. One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010) (by alleging violation of a federal statute a plaintiff "also alleged a UCL violation under the prong of the UCL that prohibits 'unlawful' business acts or practices"). | Yes. *See In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1105 (N.D. Cal. 2007) ("[A]s long as Indirect Purchaser Plaintiffs are ultimately able to prove traceability, California law authorizes this Court to award them restitution under the UCL."). | 4 years. *See* Cal. Bus. & Prof. Code § 17208. |
| District of Columbia | D.C.'s Consumer Protection Procedures Act states that it "shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice." *See* D.C. Code § 28-3904. | Yes. *See* D.C. Code § 28-3901(d) ("In construing the term 'unfair or deceptive trade practice' due consideration and weight shall be given to the interpretation by the Federal Trade Commission"); *Federal Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 694 (1948) ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). | Yes. *See In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 584 (M.D. Pa. 2009) ("the DCCPPA subsumes a Sherman Act claim and creates an indirect purchaser cause of action for conspiratorial price fixing"). | 3 years. *See* D.C. Code § 12-301(8) (residual three-year statute of limitations); *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 323 (D.C. 2008) (applying § 12-301(8) to DCCPPA). |
| Florida | The Florida Deceptive and Unfair Trade Practices Act states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *See* Fla. Stat. § 501.204. | Yes. *See* Fla. Stat. § 501.204(2) ("[D]ue consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1)."); *Cement Inst.*, 333 U.S. at 694 ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). | Yes. *See Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 108 (Fla. Dist. Ct. App. 1996) ("[W]e read subsections 501.202(2), 501.211(2) and 501.204(1) of the Florida DTPA as a clear statement of legislative policy to protect consumers through the authorization of such indirect purchaser actions."). | 4 years. *See* Fla. Stat. § 95.11(3)(f); *S. Motor Co. of Dade Cnty. V. Doktorczyk*, 957 So. 2d 1215, 1216-17 (Fla. Dist. Ct. App. 2007) (holding that § 95.11(3)(f) applies to FDUTPA claims). |
| Hawaii | Hawaii's act states that "[e]very contract, combination in | Yes. *See* Haw. Rev. Stat. § 480-3 ("This chapter shall be construed in accordance with judicial interpretations | Yes. *See* Haw. Rev. Stat. § 480-3 ("lawsuits by indirect purchasers may be brought as provided in this | 4 years. *See* Haw. Rev. Stat. § 480-24. |

1

| CONSUMER PROTECTION STATUTES | | | | |
|---|---|---|---|---|
| **JURISDICTION** | **CONSUMER PROTECTION STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** |
| | the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal." *See* Haw. Rev. Stat. § 480-4(a). | of similar federal antitrust statutes . . . ."). | chapter"). | |
| Illinois | Illinois's Consumer Fraud and Deceptive Business Practices Act states that "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful." *See* 815 Ill. Comp. Stat. 505/2. | Yes. *See* 815 Ill. Comp. Stat. 505/2 ("In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act"); *Cement Inst.*, 333 U.S. at 694 ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). | *Yes. See In re Zetia (Ezetimibe) Antitrust Litig.*, 400 F. Supp. 3d 418, 436 (E.D. Va. 2019) (holding that end payor plaintiffs "can bring an indirect purchaser action under the consumer protection statutes of Illinois"). | 3 years. *See* 815 Ill. Comp. Stat. 505/10a(e). |
| Nebraska | Nebraska's Consumer Protection Act states that any "contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful." *See* Neb. Rev. Stat. § 59-1603. | Yes. *See State ex rel. Douglas v. Associated Grocers of Neb. Co-op., Inc.*, 332 N.W.2d 690, 693 (Neb. 1983) (relying on cases interpreting the Sherman Act when interpreting Nebraska's consumer protection statute for claims sounding in antitrust). | Yes. *See Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 35 (Neb. 2004) ("[W]e conclude that § 59-1609, as it relates to a cause of action for any person injured in violation of § 59-1604, contemplates an action by indirect purchasers."). | 4 years. *See* Neb. Rev. Stat. § 59-1612. |
| Nevada | Nevada's Deceptive Trade Practices Act states that a person engages in a deceptive trade practice by "[v]iolat[ing] a | Yes. *See* Nev. Rev. Stat. § 598.0923(1)(c) (person violates NDTPA by "[v]iolat[ing] a state or federal statute or regulation relating to the sale or lease of goods or services"). | Yes. *See In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1080-81 (S.D. Cal. 2017) (allowing end purchaser plaintiffs claims under the NDTPA)*; In re DDAVP Indirect Purchaser* | 3 years. *See* Nev. Rev. Stat. § 11.190(3)(a). |

010736-11/1884609 V1

| CONSUMER PROTECTION STATUTES | | | | |
|---|---|---|---|---|
| **JURISDICTION** | **CONSUMER PROTECTION STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** |
| | state or federal statute or regulation relating to the sale or lease of goods or services"). *See* Nev. Rev. Stat. § 598.0923(1)(c). | | *Antitrust Litig.*, 903 F. Supp. 2d 198, 227 (S.D.N.Y. 2012) (permitting indirect purchaser claims under the NDTPA). | |
| New Mexico | New Mexico's Unfair Practices Act states that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." *See* N.M. Stat. § 57-12-3. | Yes. *See* N.M. Stat. § 57-12-4 ("It is the intent of the legislature that in construing Section 3 of the Unfair Practices Act the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts."); *Cement Inst.*, 333 U.S. at 694 ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). | Yes. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 196 (D. Me. 2004) (rejecting the defendants' argument that the "plaintiffs' indirect purchaser status prevents them from pursuing an NMUPA claim"). | 4 years. *See* N.M. Stat. § 37-1-4; *Nance v. L.J. Dolloff Assocs., Inc.*, 126 P.3d 1215, 1220 (N.M. Ct. App. 2005). |
| North Carolina | North Carolina's Unfair and Deceptive Trade Practices Act states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." *See* N.C. Gen. Stat. § 75-1.1. | Yes. *See Henderson v. U.S. Fid. & Guar. Co.*, 488 S.E.2d 234, 239 (N.C. 1997) ("Our statute is patterned after section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and we look to federal case law for guidance in interpreting the statute."); *Cement Inst.*, 333 U.S. at 694 ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). | Yes. *See In re Processed Egg Prod. Antitrust Litig.*, 851 F. Supp. 2d 867, 909-11 (E.D. Pa. 2012) (allowing indirect purchasers' claims to proceed under North Carolina's Unfair and Deceptive Trade Practices Act). | 4 years. *See* N.C. Gen. Stat. § 75-16.2. |
| Rhode Island | Rhode Island's Unfair Trade Practice and Consumer Protection Act states that "[u]nfair methods of | Yes. *See* R.I. Gen. Laws § 6-13.1-3 ("It is the intent of the legislature that in construing §§ 6-13.1-1 and 6-13.1-2 due consideration and great weight shall be given to the interpretations of the Federal Trade | Yes. *See In re Zetia*, 400 F. Supp. 3d at 437 (permitting end payor plaintiffs' claim "premised on anticompetitive conduct [to] proceed under Rhode Island's consumer protection statute). | 4 years. *See Paul v. City of Woonsocket*, 745 A.2d 169 (R.I. 2000) (holding that courts must look to the limitations |

010736-11/1884609 V1

| CONSUMER PROTECTION STATUTES | | | | |
|---|---|---|---|---|
| **JURISDICTION** | **CONSUMER PROTECTION STATUTE** | **HARMONIZATION WITH FEDERAL LAW** | **INDIRECT PURCHASER STANDING** | **STATUTE OF LIMITATIONS** |
| | competition . . . in the conduct of any trade or commerce are declared unlawful." *See* R.I. Gen. Laws § 6-13.1-2. | Commission and the federal courts relating to § 5(a) of the Federal Trade Commission Act"); *Cement Inst.*, 333 U.S. at 694 ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). | | period of the state's most analogous cause of action); R.I. Gen. Laws § 6-36-23. |
| South Carolina | South Carolina's Unfair Trade Practices Act states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *See* S.C. Code § 39-5-20(a). | Yes. *See* S.C. Code § 39-5-20(b) ("[C]ourts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to § 5(a) (1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1))."); *Cement Inst.*, 333 U.S. at 694 ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act"). | Yes. *See In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 840, 841 (E.D. Pa. 2019) (allowing indirect purchasers' claims to proceed under South Carolina's Unfair Trade Practices Act). | 3 years. *See* S.C. Code § 39-5-150. |

4

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE PORK ANTITRUST
LITIGATION

_This Document Relates to_:

All Consumer Indirect Purchaser Plaintiff
Actions

Civil No. 18-1776 (JRT/HB)

**CERTIFICATE OF COMPLIANCE
ON MEMORANDUM IN SUPPORT
OF CONSUMER INDIRECT
PURCHASER PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION**

I, SHANA E. SCARLETT, certify that this brief complies with the type-volume limitation of D. Minn. L.R. 7.1(f)(1), is consistent with the agreement of the parties and Order of this Court (ECF No. 1274) expanding the word limit to 24,000 words for both this Memorandum and the anticipated Reply in support of this Motion, and with the type-size limit of D. Minn. L.R. 7.1(h)(1).

The brief has 13,628 words of type, font size 13 and was prepared using Microsoft Word, which includes all text, including headings, footnotes, and quotations in the word count. The anticipated Reply Memorandum in support of this Motion shall not exceed 10,372 words.

DATED: May 2, 2022                    Respectfully submitted,

                                      HAGENS BERMAN SOBOL SHAPIRO LLP

                                      By:     */s/ Shana E. Scarlett*
                                           SHANA E. SCARLETT
                                      Rio Pierce
                                      715 Hearst Avenue, Suite 202
                                      Berkeley, California 94710
                                      Telephone: (510) 725-3000
                                      Facsimile: (510) 725-3001
                                      shanas@hbsslaw.com
                                      riop@hbsslaw.com

                                      Steve W. Berman
                                      Breanna Van Engelen
                                      HAGENS BERMAN SOBOL SHAPIRO LLP
                                      1301 Second Avenue, Suite 2000
                                      Seattle, Washington 98101
                                      Telephone: (206) 623-7292
                                      Facsimile: (206) 623-0594
                                      steve@hbsslaw.com
                                      breannav@hbsslaw.com

- 1 -

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

*Interim Co-Lead Counsel for Consumer
Indirect Purchaser Plaintiffs*

- 2 -