# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-1776 (JRT/JFD) |
| | **[FILED UNDER SEAL]** |
| This Document Relates to: | **CONSUMER INDIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| *All Consumer Indirect Purchaser Actions* | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

COMMON EVIDENCE IN REPLY ...................................................................... 2

I.    The "⬛⬛⬛⬛⬛⬛" via their purchasing decisions allowed
       processor defendants to influence hog supply and prices. ........................... 2

II.   Common evidence demonstrates that processor defendants
       restrained pork supply throughout the conduct period.............................. 11

      A.    A majority of processor defendants engaged in herd
             liquidations, which had long lasting effects on
             supply—and the evidence belies that these were
             compelled by market conditions. ...................................................... 11

      B.    Processor defendants failed to maintain per capita
             processing capacity throughout the conduct period—
             and the new plants late in the conduct period were
             meant to supply the export market. ................................................... 14

      C.    Processor defendants underutilized available capacity
             throughout the conduct period with ongoing harvest
             reductions—and took advantage of PEDv as a pretext
             for doing so........................................................................................ 15

      D.    Processor defendants restrained supply by sending
             product overseas throughout the conduct period for the
             purpose of driving up prices in the U.S............................................ 21

III.  Processor defendants routinely deanonymized Agri Stats data as
       part of their ongoing effort to effectuate and monitor the cartel's
       output and pricing decisions...................................................................... 26

ARGUMENT......................................................................................................... 28

I.    CIPPs meet the implicit requirements of Rule 23(a), because
       class members can self-identify as purchasers of pork products. .............. 28

II.   CIPPs also satisfy the explicit requirements of rule 23(a). ....................... 30

III.  Common questions regarding defendants' violations of the
       antitrust laws predominate under rule 23(b). ............................................ 30

IV.  Common evidence demonstrates antitrust impact across the class
     and predominance under rule 23(b). ......................................................... 34

     A.  Defendants do not meaningfully dispute that pork
         market characteristics subject it to cartelization. ............................ 34

     B.  By controlling for supply and demand factors,
         Dr. Singer uses hornbook regression analysis to
         demonstrate the artificially inflated price caused by
         defendants' anticompetitive conduct................................................. 35

     C.  There is no requirement that Dr. Singer separately
         model artificially deflated output. .................................................... 38

     D.  The aggregate results of regression analyses using
         pooled data are widely accepted by courts as evidence
         capable of showing common impact................................................. 40

     E.  Further testing confirms that Dr. Singer's model
         establishes broad impact across all class members .......................... 46

     F.  Dr. Singer's calculation of pass-through is grounded in
         sound econometrics—as opposed to Dr. Haider's
         disfavored Chow tests and "unpooling" of data, which
         decreases statistical power. .............................................................. 52

     G.  Economic theory and record evidence comport with
         pass-through rates approximating 100%—and are not
         undercut by speculation regarding focal point and
         high-low pricing. .............................................................................. 55

CONCLUSION ............................................................................................. 59

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
   336 F.R.D. 5 (S.D.N.Y. 2020) ..................................................................... 45

*AU New Haven, LLC v. YKK Corp.*,
   No. 15-CV-3411 (GHW)(SN), 2019 WL 1254763
   (S.D.N.Y. Mar. 19, 2019) ........................................................................... 53

*Bazemore v. Friday*,
   478 U.S. 385 (1986) ................................................................................... 37

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ..................................................................... 45

*In re Broiler Chicken Antitrust Litig.*,
   No. 16-cv-8637, 2022 WL 1720468
   (N.D. Ill. May 27, 2022) (*Broilers*) ...............30, 31, 35, 39, 40, 41, 42, 53, 54, 55, 56

*Brown Shoe Co. v. U.S.*,
   370 U.S. 294 (1962) ................................................................................... 33

*CellTrust Corp. v. ionLake, LLC*,
   No. 19-CV-2855, 2022 WL 4018042
   (D. Minn. Sept. 2, 2022) ............................................................................ 37

*Chen-Oster v. Goldman, Sachs & Co.*
   114 F. Supp. 3d 110, 122 (S.D.N.Y. 2015), ...................................... 49, 55

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .............................................................................. 38, 39

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ................................................................... 39

*Day v. Celadon Trucking Servs., Inc.*,
   827 F.3d 817 (8th Cir. 2016) ..................................................................... 38

*DeSlandes v. McDonald's USA*,
   No. 17 C 4857, 2021 WL 3187668
   (N.D. Ill. July 28, 2021) ............................................................................ 31

*Infogroup, Inc. v. DatabaseLLC,*
  956 F.3d 1063 (8th Cir. 2020) ....................................................................... 39

*Infogroup, Inc. v. DatabaseUSA.com LLC,*
  No. 8:14-CV-49, 2018 WL 6624217
  (D. Neb. Dec. 18, 2018) ................................................................................. 39

*Jein v. Perdue Farms, Inc.*,
  No. 19-cv-02521-SAG, 2020 WL 5544183
  (D. Md. Sep. 16, 2022) .............................................................................. 32, 33

*Kleen Prods. LLC v. Int'l Paper Co.*,
  831 F.3d 919 (7th Cir. 2016) ............................................. 30, 34, 35, 38, 39, 40, 41, 45

*Morgan v. United Parcel Serv. of Am., Inc*.,
  380 F.3d 459 (8th Cir. 2004) .......................................................................... 37

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  No. 06-0620, 2015 WL 5767415
  (E.D. Pa. July 29, 2015) ................................................................................. 33

*Olean Wholesale Grocery Coop., Inc. v.*
  *Bumble Bee Foods LLC,*
  31 F.4th 651 (9th Cir. 2022) (*Tuna*)
  ...................................................................... 34, 40, 41, 43, 46, 49, 52, 55, 59

*In re Pharmacy Benefit Managers Antitrust Litig*.,
  No. CV 03-4730, 2017 WL 275398
  (E.D. Pa. Jan. 18, 2017) ................................................................................. 31

*In re Potash Antitrust Litig.*,
  159 F.R.D. 682 (D. Minn. 1995) ...................................................................... 29

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  No. 14-02567-MD-W-GAF, 2021 WL 5632089
  (W.D. Mo. Nov. 9, 2021) ............................................................................... 45

*In re Qualcomm Antitrust Litig.*
  328 F.R.D. 280, 308-09 (N.D. Cal. 2018) ......................................................... 57

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) .......................................................................... 33

*Todd v. Exxon Corp.*,
  275 F.3d (2d Cir. 2001) .................................................................................. 32

*Tyson Foods, Inc. v. Bouaphakeo*
    577 U.S. 442, 459 (2016) ................................................................ 37, 42, 43

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ................................................................ 30

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019) ................................................................ 48

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    No. 09-MD-2090 ADM, 2016 WL 4697338
    (D. Minn. Sept. 7, 2016) ................................................................ 29, 48

**Other Authorities**

2 Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law §395 (4th ed.
    2021) ................................................................ 39

Martin A. Asher, Gregory K. Arenson, Russell L. Lamb, Losing the Forest
    for the Trees: On the Loss of Economic Efficiency and Equity in
    Federal Price-Fixing Class Actions, 16 Va. L. & Bus. Rev. 293, 324
    (2022) ................................................................ 45, 49

## TABLE OF ABBREVIATIONS

| Short Cite | Long Cite |
|---|---|
| Compl. | Consumer Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Class Action Complaint, ECF No. 1111 (Jan. 12, 2022) |
| Consumer Mot. | Consumer Indirect Purchaser Plaintiffs' Motion for Class Certification, ECF No. 1343 (May 2, 2022) |
| Singer Decl. | Declaration of Dr. Hal Singer in Support of CIPPs' Motion for Class Certification, ECF No. 1347 (May 2, 2022) |
| Omnibus Opp. | Defendants' Omnibus Memorandum in Opposition to All Class Plaintiffs' Motions for Class Certification, ECF No. 1441 (Aug. 24, 2022) |
| Consumer Opp. | Memorandum of Law in Opposition to CIPPs' Motion for Class Certification, ECF No. 1460 (Aug. 24, 2022) |
| Haider Report | Expert Report of Dr. Laila Haider, ECF No. 1442-1 (Aug. 24, 2022) |
| *Daubert* Mot. | Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Expert Report and Testimony of Dr. Hal Singer |
| Singer Reply | Reply Declaration of Dr. Hal Singer in Support of CIPPs' Motion for Class Certification (Nov. 18, 2022) |
| Ex. | All exhibit references are to the Further Declaration of Shana E. Scarlett in Support of CIPP's Reply in Support Class Certification and CIPP's Opposition to Defendants' Motion to Exclude the Testimony of Dr. Hal Singer (Nov. 18, 2022), unless stated otherwise |
| *Broilers* 23(f) Denial | Order Denying Petition for Permission to Take an Interlocutory Appeal, No. 22-8007, Doc. No. 00714036758 (7th Cir. July 18, 2022) |
| **PARTIES** | |
| Agri Stats | Defendant Agri Stats, Inc. |
| Clemens | Defendants Clemens Food Group, LLC, the Clemens Family Corporation, Hatfield Quality Meats |
| CIPP | Consumer Indirect Purchaser Plaintiffs |

| Hormel | Defendant Hormel Foods Corporation |
|---|---|
| JBS | Defendant JBS USA Food Company |
| Seaboard | Defendant Seaboard Foods LLC |
| Smithfield | Defendant Smithfield Foods, Inc. |
| Triumph | Defendant Triumph Foods, LLC |
| Tyson | Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. |

**INTRODUCTION**

Consumer indirect purchaser plaintiffs (CIPPs) have provided extensive record evidence of common facts showing antitrust impact on a class-wide basis: (1) processor defendants control the market *for pork* in the United States (and also influence hog supply and prices, without conceding that matters at all); (2) defendants conspired to restrict the supply and stabilize the price of pork—with herd liquidations, harvest reductions, increasing exports, and the benchmarking of competitively sensitive information via Agri Stats—throughout the conduct period; (3) the market structure of pork (commodity product, significant barriers to entry, and little competition from foreign imports) meant that this conspiracy would effectively raise pork prices on a class-wide basis; and (4) direct purchasers passed through increased pork costs in the form of higher prices for consumers—on products that a typical consumer purchases half a dozen times a year, such that avoiding pass-through is virtually impossible. Plaintiffs have also provided a common methodology, in the form of regression equations from Dr. Hal Singer, to measure both overcharges to direct purchasers and pass-through to end-user consumers on a class-wide basis.

Dr. Singer's regression and other analyses are reliable and well-accepted—and plainly common evidence—rendering Defendants' criticisms of them a battle of experts appropriate only for the fact finder. The Ninth Circuit in *Tuna*, as to which the Supreme Court recently denied certiorari, and Judge Durkin in *Broilers*, as to which the Seventh Circuit denied 23(f) review, certified similar classes recognizing that the aggregate results of regression analyses using pooled data are widely accepted by courts as evidence

- 1 -

capable of showing common impact. So too here. Indeed, critically important is that, even taking defense expert Dr. Laura Haider's criticisms of Dr. Singer's work at face value, her *variant overcharge model* yields a different, but still statistically significant overcharge of 2.9%—and her *variant pass-through model* yields different, but still statistically significant pass-through for every distributor and retailer. In short, all class members have suffered impact, and the consumer class should be certified.

## COMMON EVIDENCE IN REPLY

**I.    The "power of the packer" via their purchasing decisions allowed processor defendants to influence hog supply and prices.**

Defendants largely oppose class certification by reframing the conspiracy as one to reduce the supply of hogs and then arguing that processor defendants were not in control of the supply of those hogs.[1] To the first issue, no case law exists allowing a defendant to simply reframe the allegations against it. CIPPs clearly allege a conspiracy to restrain the price and supply of pork.[2] On the second issue, this is clearly a question of fact, common to the class and which relates to the merits of the case. Defendants' arguments that the lawsuit fails due to insufficient vertical integration actually support the granting of class certification, because they indisputably rely on evidence common to the class.[3]

---

[1] Omnibus Opp. at 28.

[2] ECF No. 1111 at ¶¶ 124-167.

[3] Omnibus Opp. at 4, 8-9, 11-12, 13-14, 31-33, 53-54.

In any event, it is also a classic strawman argument. CIPPs did not argue that vertical integration was essential to the success of this conspiracy.[4] And Dr. Singer likewise confirms that "none of [his] analyses" turn on Defendant's vertical integration.[5] As a matter of economics, control of the hog market is not necessary for a cartel to function in the pork market.[6] So in Dr. Singer's view opinions regarding defendants' lack of control over the supply of hogs are "a distraction and not relevant to the case."[7]

The argument is also wrong. As the common evidence demonstrates, processor defendants influence hog supply and prices by virtue of their hog purchasing decisions.[8]

First, as a preliminary matter, there is vertical integration in the pork industry, which is one aspect of processor defendants' influence over the hog supply—though not the *sine qua non* that Defendants pretend. For example, ███████████████████ ████████████████[9] **Triumph** ███████████████████████████████████████ ███████████████████[10] ███████████████████████████████████████████ ██████████████[11] ████████████████████████████████████████████

---

[4] *See* Consumer Mot. at 35-36.

[5] Singer Reply, ¶12.

[6] *Id*., ¶33.

[7] *Id*.

[8] Singer Reply, ¶¶36-38.

[9] Ex. 152, SMITHFIELD01061844, at 845. ████████████████████████ ████████████████████████████████████

[10] Ex. 153, Lehenbauer Depo. (Triumph) at 50:18-23.

[11] *Id*. at 48:2-5.

[REDACTED].[12] **Clemens** [REDACTED]

[REDACTED]

[REDACTED].[13]  Similarly,

**JBS** reports that the "majority of [its] live hog supply is purchased from third parties

through long-term supply contracts" that are "typically four to five years in duration."[14]

Another document defines this [REDACTED][15]  Likewise, [REDACTED]

[REDACTED]

[REDACTED],[16] [REDACTED]

[REDACTED][17] as summarized here:[18]

[REDACTED]

Indeed, one of USDA's leading economists responsible for analyzing the pork industry

testified that he considered such " [REDACTED]

---

[12] Ex. 154, Brenneman Depo. at 66:12-17.

[13] Ex. 155, D. Clemens Depo. at 28:16-22.

[14] Ex. 156, JBS Foods International B.V. Form F-1 (2017), p. 117, available at
https://www.sec.gov/Archives/edgar/data/1691004/000119312516785274/d304020df1.ht
m.

[15] Ex. 157, JBS-PORK-00143705, native 1.

[16] Ex. 158, TF-P-002024677, native 1.

[17] Ex. 159, TF-P-000743209.

[18] Ex. 158, TF-P-002024677, native 1.

 ."[19] Dr. Mintert, defendants' expert,

.[20]

Thus, the majority of hog sales are under contract, such that the number of hogs purchased by processor defendants is planned well in advance to match their capacity. And this in turn guides farmer behavior.  As Jason Kurtz of Keystone Mills testified,

[21] In fact,

.[22]

Even in the small percentage of sales on the spot market, it is the hog farmers who are at the mercy of the processors—not the other way around.  As Dr. Singer explains, "Defendants 'control' hogs via their willingness to purchase them."[23]  For example, in

---

[19] Ex. 160, Shagam Depo. at 310:17-21; *see also id.* at 305:10-310:15.

[20] Ex. 161, Mintert Depo. at 152:22-154:16; *see also* Ex. 153, Lehenbauer Depo. at 148:23-149:6     ; Ex. 162, TF-P-001864370, 384     ; Ex. 163, AGSTAT-P-0003406624, native 4-7     .

[21] Ex. 164, Kurtz Depo. at 25:14-20; *see also* Ex. 153, Lehenbauer Depo. (Triumph) at 70:6-10

[22] *See* Ex. 153, Lehenbauer Depo. (Triumph) at 111:7-11.

[23] Singer Reply, ¶38.

2010, ███████████████████████████████████████████████

█████████████████████████████████████[24]

　　　Documents reveal processor defendants' ability to create leverage for themselves by reducing their planned harvests.  As one farmer complained in 2015:



[25]

Industry analysts at Kerns likewise commented in 2016 ███████████████

█████████████████████████████████████████████████████

███████████████ [26]  In 2017 Kerns forwarded a similar acknowledgement ████████

█████████████████████████ [27]  That same year Tyson also described itself

████████████████████████████████████ "[28]  And Hormel likewise

---

[24] Ex. 165, JBS-PORK-02096990, at 993.

[25] Ex. 293, AGSTAT-P-0003392076, at 76-77 █████████████████████████
██████████████████████████████████████████████████████████████

[26] Ex. 166, KERNS00181720, at 721 ███████████████████████████████

[27] Ex. 167, KERNS00042249, at 250 ███████████████████████████████
██████████████████████

[28] Ex. 168, TF-P-001563315.

████████████████████████████████████████████████████

████████████████████████.[29]  Farmers felt powerless as a result.

Indeed, during the class period, one independent hog producer, Prestage Farms, made the decision to open its own slaughter facility.  Announced in the heart of the damages period for this case, on March 28, 2016, Prestage announced it had:



Despite being announced in 2016, the Prestage plant did not open until March 2019 (after the class period), demonstrating the enormous barriers to entry that exist in this market.[31]

The processors' clout in underutilizing capacity and in pricing vis-à-vis producers led to widening margins between them, with Prestage, for example, saying that ██████████ ████████████████████████████████[32]  Dr. Singer examined the price increase that occurs at the processor stage, known as the farm-wholesale spread, to see "the difference between what the farmer receives and what the processors captures in

---

[29] Ex. 169, HFC-PORKAT0000261842, at 865.

[30] Ex. 170, KERNS00028102.  *See also* ████████████████████████████████
████████████████████

[31] Ex. 171, https://www.prestagefoods.com/about/ (public statement from Prestage Farms on the opening of the Iowa pork processing plant in March 2019).

[32] Ex. 172, SMITHFIELD00433644, at 645.

the sale."[33]  He found that the average spread for pork processors increased by 17.3 percent from 2009 to 2020 relative to the average spread from 2000 to 2008:[34]



And common evidence supports Dr. Singer's analysis.  For example, in 2010, a farmer complaint to Tyson about ████████████████████████████████████ ████████████████[35]  JBS's Dale DeGroot testified ████████████████ ██████████████████████████████████████████████████████████ ████████████████████████[36]  An internal Smithfield email from 2012 stated, ██████████████████████████████████████████████████████████ ███████████████████████████████[37]  A September 2016 Kerns email blast to farmers lamented that ████████████████████████████████ ████████████████

---

[33] *See* Singer Decl., ¶31.

[34] *Id.* & Fig. 5.

[35] Ex. 173, TF-P-002246725 ████████████████████████████████

[36] Ex. 174, DeGroot Depo. at 117:7-119:21.

[37] Ex. 175, SMITHFIELD00828142 ████████████████████████████ ████████████████

██████████████████████████████████████████████[38]  A contempor-

aneous article explains, ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████[39]  As Kerns explained, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████[40]  Indeed, this

was the packer ████████████████████████████████████████[41]

Moreover, this processor power over the farmer was evident both in the contract

market and in the spot market.  As one supplier of negotiated pigs put it,



[38] Ex. 176, KERNS00188623, at 624.

[39] Ex. 177, KERNS00193870, at 874 ████████████████████████████████

████████

[40] Ex. 178, KERNS00195812 ████████████████████████████████

[41] Ex. 179, KERNS00215077, at 79 ████████████████████████████

[42] Ex. 180, KERNS00195683, at 684 ████████████████████████████

And during multi-year contract negotiation with Hormel, a farmer referred ███████

████████████████████████████████████████████████████████████

████████ [43]

     Of course, farmers had to put up with this because pork meat cannot be sold in the

U.S., except through the USDA-certified processing plants—most of which are owned by

processor defendants.  Hence, as Tyson's Roel Andriessen wrote to JBS's Mark

Gustafson: ████████████████████████████████████████

████████████████████████ [44]  In short, the processors dictated hog

supply and prices—and hog farmers were cautioned against ████████████████

████████████ [45]

     Finally, vertical integration does not matter for the further reason that, besides

influencing hog supply and prices, processor defendants just raise the price of pork if hog

prices are higher.  As Smithfield has explained, when ████████████████

████████████████████████████████████████████████████

████████████████ [46]  As Steve Meyer—"████████████████████████

████"[47]—has testified, ████████████████████████████████████

_____

[43] Ex. 181, HFC-PORKAT0000060138 ████████████████████████

[44] Ex. 182, TF-P-002388199.

[45] Ex. 183, KERNS00200709, at 710 ████████████████████

[46] Ex. 184, SMITHFIELD02229051, at 056; *see also* Ex. 185,
SMITHFIELD01064551 ████████████████████████████████████
████████████████████████████

[47] Ex. 186, Groff Depo. at 282:17-24; Ex. 187, SMITHFIELD00874019.

███████████████████████████████[48]  Indeed, Hormel has acknowledged that

████████████████████████████████████████████████████████████

███████████████████████[49]

Thus, processor defendants did not desire more hogs as they argue (again, on the merits, using common evidence),[50] because the packers could pass on these costs—and a low supply of hogs would enable them to command even higher pork prices from wholesalers and retailers.  For example, an internal JBS email from Tim Hiller states that

████████████████████████████████████████████████████████████

███████[51]  Likewise Rodney Brenneman of Seaboard agreed that ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████[52]

## II. Common evidence demonstrates that processor defendants restrained pork supply throughout the conduct period.

### A. A majority of processor defendants engaged in herd liquidations, which had long lasting effects on supply—and the evidence belies that these were compelled by market conditions.

Processor defendants claim that few of them were involved in sow liquidation, but common evidence establishes that almost all of them participated in these long-lasting

---

[48] Ex. 188, Steve Meyer Depo. at 105:16-25.

[49] Ex. 189, HFC-PORKAT0000258382, at native 3.

[50] Omnibus Opp. at 5, 16-18; *Daubert* Mot. at 9.

[51] Ex. 190, JBS-PORK-02476820.

[52] Ex. 154, Brenneman Depo. at 137:23-140:13.



cuts.[53]  Specifically, in 2009 **Smithfield** ████████████,[54] **Tyson** ██████ ████,[55] and **Triumph** ████████████████.[56]  In 2011, **Clemens** ████████████████████████████.[57]  And in 2012 producers ████████████████████████,[58] with **JBS** ████████████████████.[59]  Retraction of the breeding herd had substantial and long lasting effects.  According to Jim Long's Pork Commentary in August 2015, the ████████████████████ ████████████████████████ ████████████.[60]

Defendants then pivot to arguing that such cuts were the inevitable result of market conditions at the time.[61]  First, this is, again, their position on the merits—and a position that they argue relying on common evidence.[62]  So it has no bearing on class certification.  In any event, if it were true that sow liquidation was the inevitable choice given market conditions, then Smithfield would not have had to spend so much time

---

[53] Omnibus Opp. at 18-20.

[54] ECF No. 1345-1, Ex. 2 TF-P-000159370, at 372.

[55] ECF No. 1345-1, Ex. 3, TF-P-000179765.

[56] Ex. 191, SBF0184924.

[57] Ex. 192, AGSTAT-P-0003014046.

[58] ECF No. 1345-1, Ex. 5, HFC-PORKAT0000045312.

[59] Ex. 193, JBS-PORK-00729359, at 360.

[60] Ex. 194, SMITHFIELD01091105, at 106.

[61] Omnibus Opp. at 15, 20-22; *Daubert* Mot. at 11, 19-20.

[62] *Id.*

convincing other producers to do so.  For example, a November 2008 internal Smithfield email from Joe Luter IV to Larry Pope complains that Smithfield ██████████████

████████████████████████████████████████████████[63]  And Luter tells

Pope, ██████████████████████████████████████████████████████████

████████████████[64]  Pope responds, ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████[65]  These behind-the-scenes efforts to

get other producers to liquidate sows undermines the notion that it was the predestined

activity in each's self-interest that defendants pretend it was.

In fact, the market conditions in 2008 were not actually the outlier defendants contend.  According to Howard Hill from Iowa Select Farms, the two worst times in the pork market were in 1998 and during the Covid pandemic; he acknowledged that the 2008-09 period was difficult but not to the same degree.[66]  And he testified that high corn costs do not affect the hog production of large producers due to contracts in place requiring the delivery of hogs.[67]  In any event, Dr. Singer controlled for all of the market factors relating to this time period—including "record-high corn costs," pig mortality

---

[63] Ex. 195, SMITHFIELD00837722.

[64] *Id*.

[65] *Id*.

[66] Ex. 196, Hill Depo. at 169:8-170:6.

[67] *Id*. at 68:11-69:15.

reduction caused by circovirus vaccine, global financial crisis, and swine flu—in his

pricing regression.[68]

**B. Processor defendants failed to maintain per capita processing capacity throughout the conduct period—and the new plants late in the conduct period were meant to supply the export market.**

Defendants next argue that processing capacity actually increased throughout the

class period, focusing on two new processing plants opened by Clemens and Seaboard

Triumph Foods.[69]  But these were meant to supply the export market.  Clemens acknow-

ledged that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████[70]  Seaboard Triumph Foods likewise

stated that ████████████████████████████████████████████████████████████

████████████████████████████████████████[71]   And other deponents have

acknowledged the obvious fact that increased domestic production ████████████████

████████████████████████████████████████████████████████████[72]

Moreover, these new plants opened in the Fall of 2017,[73] ████████████████████████

---

[68] Singer Reply, ¶63 & T.7.

[69] Omnibus Opp. at 23-24, 30; *Daubert* Mot. at 6, 22.

[70] Ex. 155, D. Clemens Depo. at 271:16-272:14.

[71] Ex. 197, TRI0000052167.

[72] Ex. 198, Temperley Depo. at 80:24-81:6.

[73] Ex. 199, Taphorn Depo. at 304:22-25 (Seaboard Triumph Foods plant in Sioux City); Ex. 186, Groff Depo. 428:24-429:5 (Coldwater plant).

██████████████████████████ [74] And Seaboard and Triumph had a

████████████████████████████████████████████

███████ [75]

In addition, defendants ignore what capacity increases may have occurred in the

absence of conspiracy.  For example, a Tyson presentation shows that ████████

.[76]

**C. Processor defendants underutilized available capacity throughout the conduct period with ongoing harvest reductions—and took advantage of PEDv as a pretext for doing so.**

In addition to lower available capacity than one would expect during the conduct

period, *utilization* of available processing capacity shrank as well.  Defendants falsely

claim that their harvest reductions were sporadic and needed for maintenance or the

---

[74] Ex. 200, SMITHFIELD02021865 ██████████████████████████
████████████████████████

[75] Ex. 201, TF-P-002153432.

[76] Ex. 203, TF-P-000134683, native 19.

like.[77]  But defendants ███████████████████████████████.[78]  And in response to

Smithfield supposedly shutting down a plant for "maintenance," Hormel said it was

███████████████████████████████████████████████.[79]  But

this is just the tip of the iceberg regarding such evidence.  Big picture, an internal Tyson

document ████████████████████████████████████████████████████

████.[80]  Indeed, Dr. Singer confirms the drop with defense expert Dr. Mintert's own

exhibit 24 showing capacity utilization was nearly two percentage points *lower* during the

conduct period.[81]



---

[77] *Daubert* Mot. at 6, 22-23.

[78] Ex. 204, SMITHFIELD04914384 ████████████████████████████
████████████████.

[79] Ex. 205, HFC-PORKAT0000153244.  *See also* Singer Decl., ¶¶230-232.

[80] Ex. 206, TF-P-000128976, native 45.

[81] Singer Reply, ¶190.

Such aggregate numbers are not surprising as the kill cutbacks were part of an ongoing effort that processor defendants constantly monitored—doing what was necessary behind the scenes to ████████████████████████ [82]

For example, in 2009, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ [83]  Likewise, Tyson reported internally in 2012 that

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ [84]  Indeed, the industry plan ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ [85]  And this was plainly

acknowledged as an industry commitment: ████████████████████████

████████████████████████████████████████████████

████████████████████ [86]

---

[82] Ex. 207, SMITHFIELD00460210, at 211.

[83] Ex. 208, TF-P-000219855.

[84] Ex. 209, TF-P-000642134.

[85] Ex. 210, SBF0311731.

[86] Ex. 211, Sand Depo. at Ex. 1648; *see also* Ex. 212, JBS-PORK-01141336 ████; Ex. 199, Taphorn Depo. at Ex. 326 ████████████████████████████████ Ex. 213, SBF0314725 (████████████████████████████████

To this end, Smithfield continued to keep tabs on industry-wide kill numbers in

2014: "█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████[87]  Hormel, in turn, kept tabs on Smithfield's production restraints: an

email from 2014, for example, discussed ███████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████[88]  Likewise, in 2018, Hormel analyzed the effect of Tyson production

restraints, including dark Mondays and limited hours and shifts on Fridays, which

amounted to a "█████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████[90] and that ███████████████████████████████████████

████████████████████████[91]

_____

███████████████████████████████████████████████

█████████████████████████████████ ; Ex. 214, SBF0971082 █████████

███████████████).

[87] Ex. 215, SMITHFIELD04912814.

[88] Ex. 216, HFC-PORKAT0000068283.

[89] Ex. 217, HFC-PORKAT0000064704.

[90] Ex. 218, VG-P-0000005281.

[91] Ex. 219, VG-P-0000005312.  *See also* Ex. 220, SMITHFIELD01167346 ███████

█████████████████████████████████████████████████████████████

████████████████████

Indeed, processor defendants acknowledged that their kill cuts caused pork

shortages.  For example, in 2013 Tyson's Shane Miller relayed to a customer that it had

███████████████████████████████████████████[92]  Smithfield

similarly reported in 2013 that ███████████████████████████████

█████████████████████████████████████████

████████████████████████[93]  JBS likewise stated in 2016 that ██

███████████████████████████████████[94]  And in 2017

JBS relayed *to Seaboard* that ███████████████████████████████

███████████████████████████[95]

Further, as Seaboard discussed internally, ████████████████████

█████████████████████.[96]  JBS concurred that ██████████████████

████████████████████"[97]  And, as Hormel put it in reference to Smithfield, ████

███████████████████████████████████████████████

---

[92] Ex. 221, TF-P-001996515.

[93] Ex. 222, SMITHFIELD04803907; Ex. 223, TF-P-002001290 ████████████
█████████████████████████████████████████

[94] Ex. 224, JBS-PORK-02481149.

[95] Ex. 225, JBS-PORK-02479335; *see also* Ex. 226, JBS-PORK-02444744 ████
█████████████████████████████████

[96] Ex. 227, SBF0080489, at 493.

[97] Ex. 228, JBS-PORK-02477717 ██████████████████████████████
████████████████████████

███████████████████████[98]  Indeed, Hormel pegged its own prices to be ██████████

██████ Smithfield.[99]  And analysts reported that Tyson's pork margins ████████████

████████████████████████[100]

In fact, even PEDv—another factor for which Dr. Singer controls[101]—did not have

the effect defendants contend on the hog supply,[102] and in large part was another

contrived excuse by processor defendants to cut kill and sell the market higher.  An

internal JBS email from March of 2014 stated that ████████████████████████

████████████████████████████████████████████[103]

And internal Smithfield emails from the same time recognize that ████████████

████████[104] and ████████████████████████████████████████

████████████████████████[105]  But later in the year Seaboard acknowledged that

██████████████████████████████████████████████

---

[98] Ex. 229, HFC-PORKAT0000095315.

[99] Ex. 230, Schweitzer Depo. at 49:4-7.

[100] Ex. 231, TF-P-000036196, at 201.

[101] Singer Decl., ¶153.

[102] Omnibus Opp. at 23-24; *Daubert* Mot. at 6.

[103] Ex. 232, JBS-PORK-01983967; *see also* Ex. 233, JBS-PORK-00570261 ████████████
████████████████████████████.

[104] Ex. 234, SMITHFIELD00302238 ████████████████████████████
██████████.

[105] Ex. 235, SMITHFIELD04831155.

██████████████████████████████████████████████████████████████

████████████████████ [106]

**D. Processor defendants restrained supply by sending product overseas throughout the conduct period for the purpose of driving up prices in the U.S.**

As discussed in opening, defendants themselves acknowledge that they increased pork exports for the purpose of decreasing domestic availability and increasing U.S. pork prices.[107]  Processor defendants exported to foreign markets *even if it meant shortages in the U.S.*  As Martin Dooley at JBS pointed out, Smithfield ██████████████████████ ███████████████████████████████████████████████ [108]  Likewise, an internal Seaboard email stated that ███████████████████████████████████████████ ██████████████████████████████████████████ [109]  And an internal Triumph email explains that ███████████████████████████████████████ ████████████████████████ [110]  As one analyst put it, the ███████████████ ███████████████████████████████████████ [111]

Indeed, contrary to defendants' argument, products sold abroad included choice cuts consumed domestically.[112]  As stated in an internal Clemens email, the ████████████

---

[106] Ex. 236, SBF0437621.

[107] Consumer Mot. at 11-14; Singer Decl., ¶¶42-45, 129-133, 216-222.

[108] Ex. 237, JBS-PORK-01215771, at 772.

[109] Ex. 238, TRI0000313900, at 902.

[110] Ex. 239, TRI0000313664, at 65.

[111] Ex. 240, CLMNS-0000333998.

[112] *See* Omnibus Opp. at 34 & n.12.



[113]  As JBS put it, [114]

Seaboard similarly reported that due to its

.[115]  Triumph's Grannas testified that [116]

Tyson too sold loins to foreign markets, commenting that it needed to

[117]  And

an internal Smithfield email comments that

[118]  Indeed, Smithfield's Chief Supply Officer

acknowledged that

[119]  And Agri Stats, for its part, testified that

[120]

---

[113] Ex. 241, CLMNS-0000655538; *see also* Ex. 242, HFC-PORKAT0000209857, at 858

[114] Ex. 243, JBS-PORK-01993559.

[115] Ex. 244, SBF0149705.

[116] Ex. 245, Grannas Depo. at 56:8-13.

[117] Ex. 246, TF-P-000218497.

[118] Ex. 247, SMITHFIELD00882452.

[119] Ex. 248, Saunders Depo. at 97:3-4, 17-21.

[120] Ex. 249, Stegall Depo. at 150:19-22.

Moreover, CIPPs did not ignore facts critical to analyzing export levels, as defendants assert.[121]  For example, defendants contend that the "2014 Farm Bill" awarded funding to help expand export markets.[122]  But they neglect to mention that the U.S. Meat Export Federation received similar allocations in prior years as well.[123]  There was nothing special about 2014 in this regard.  Moreover, defendants vaguely refer to "multiple large foreign markets" lifting swine flu related bans on U.S. pork in 2010.[124]  But Japan was by far the U.S.'s largest trading partner and it did not implement a ban in the first place—and neither did Mexico, Canada, or Australia.[125]  And China lifted its ban in May 2010,[126] ███████████████████████████████████████.[127]  Likewise, defendant assert that "in 2012, South Korea lifted its trade barriers," causing U.S. pork exports to that country to increase 74%.[128] ████████████████████

---

[121] Omnibus Opp. at 24-26, 59-60.

[122] *Id*. at 25.

[123] *See* Singer Reply, ¶185 & Fig. 6.

[124] Omnibus Opp. at 25.

[125] Ex. 250, https://www.wto.org/english/news_e/news09_e/sps_25jun09_e.htm ("Canada, Mexico, Japan, the US, New Zealand, the EU, Brazil, Paraguay, Australia and the Dominican Republic were the countries arguing that import bans on live pigs and pork products are unjustified for dealing with H1N1 influenza.").  *See also* Ex. 251, Seth Meyer Depo. at Ex. 8.

[126] Ex. 252, https://www.farmanddairy.com/news/china-reopens-market-to-us-pork/14922.html.

[127] Ex. 251, Seth Meyer Depo. at Ex. 8.

[128] Omnibus Opp. at 25.

███████████████████████████████████████[129]   So these were not the "seismic trade

policy changes" that defendants contend.[130]

Table 15  U.S. exports of fresh and frozen pork by country, 2008–13

| Destination | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| | | | Metric tons | | | |
| Japan | 419.1 | 391.8 | 391.0 | 464.6 | 421.6 | 402.3 |
| Mexico | 228.4 | 274.2 | 283.1 | 285.8 | 409.8 | 427.7 |
| Canada | 125.1 | 112.8 | 112.6 | 122.6 | 130.8 | 111.9 |
| China/Hong Kong | 263.2 | 112.3 | 106.5 | 256.0 | 237.8 | 199.5 |
| Korea | 94.9 | 83.9 | 69.5 | 148.6 | 132.5 | 87.2 |
| Australia | 30.7 | 38.5 | 44.5 | 56.0 | 59.6 | 48.6 |
| Russia | 134.0 | 89.7 | 53.7 | 63.4 | 89.4 | 5.4 |
| All other | 171.7 | 150.4 | 178.7 | 150.5 | 164.5 | 205.7 |
| Total | 1,467.1 | 1,253.7 | 1,239.7 | 1,547.5 | 1,645.1 | 1,488.4 |
| | | | Thousand metric tons | | | |
| Japan | 1,470.7 | 1,464.1 | 1,551.9 | 1,884.0 | 1,875.5 | 1,810.2 |
| Mexico | 411.8 | 423.8 | 559.1 | 598.5 | 777.7 | 853.6 |
| Canada | 410.4 | 357.6 | 419.5 | 468.3 | 492.5 | 432.3 |
| China/Hong Kong | 480.3 | 194.0 | 174.8 | 550.9 | 482.3 | 430.2 |
| Korea | 229.3 | 182.8 | 160.9 | 433.3 | 371.9 | 234.1 |
| Australia | 79.4 | 85.7 | 122.6 | 178.9 | 181.4 | 149.1 |
| Russia | 315.4 | 179.9 | 154.9 | 198.3 | 255.8 | 16.1 |
| All other | 390.7 | 291.0 | 385.2 | 372.8 | 404.7 | 503.3 |
| Total | 3,788.0 | 3,178.9 | 3,528.9 | 4,685.0 | 4,839.8 | 4,428.8 |

Source: USITC DataWeb/USDOC, accessed February 28, 2014.

And contrary to Dr. Mintert's irrelevant analysis of absolute figures, exports—as a share

of domestic production—actually accelerated during the conduct period.[131]   Indeed,

Tyson acknowledged that ██████████████████████████████████████[132]

And, of course, that makes sense as processor defendants' stated goal was to decrease

---

[129] Ex. 251, Seth Meyer Depo. at Ex. 8.

[130] Omnibus Opp. at 25.

[131] *See* Singer Reply, ¶187.  Ex. 253, TF-P-002349999, native 64.  Omnibus Opp. at 24.

[132] Ex. 253, TF-P-002349999, native 64.

domestic availability by increasing exports,[133] which has a ███████████████

████████ [134] ████████████ ·[135]



And it was clear the intent of these increased exports was to keep the domestic

prices high.  An internal Tyson email looked at the ████████████████████████

████████████████████████████████████ [136]  If the export

volume were to return to the domestic market, it ████████████████████████████

████████████████ [137]

In sum, defendants' concerted efforts successfully restrained output, as Dr. Singer

established in his opening report.[138]  Moreover, in his reply report Dr. Singer finds this

---

[133] Consumer Mot. at 11-14; Singer Decl., ¶¶42-45, 216-222.

[134] Ex. 254, SBF0276226 ████████████████████████████████
████████████████████████████

[135] Ex. 255, SMITHFIELD02239928;
████████████████████████████████████
████████████████████████

[136] Ex. 256, TF-P-000076737.

[137] *Id.*

[138] Singer Decl., ¶¶166-176 & T.15.

artificially reduced output for *each year* of the conduct period.[139]  This aggregate analysis comports with the common evidence establishing that the conduct was ongoing, including (1) liquidations with long-lasting effect on the national herd; (2) available processing capacity on a per capita basis remaining restrained throughout the conduct period; (3) capacity utilization remaining below historical levels during the conduct period; and (4) exports surging as a percentage of production, as defendants targeted foreign markets to prop up domestic prices.

## III.   Processor defendants routinely deanonymized Agri Stats data as part of their ongoing effort to effectuate and monitor the cartel's output and pricing decisions.

Ignoring the vast majority of facts regarding Agri Stats both in CIPP's motion and Dr. Singer's declaration,[140] defendants make certain false assertions, once again as to merits issues, that are completely at odds with the common evidence.[141]  First, defendants claim that Agri Stats "offered no insight into participating processors' production levels."[142]



[143]  And email correspondence from Matt McNeil of Agri Stats

---

[139] Singer Reply, ¶26 TT.5-6.  And this is contrary to defendants' false assertion that he did not opine on hog supply.  *See* Omnibus Opp. at 28.

[140] Consumer Mot. at 6-23; Singer Decl., ¶¶95-142.

[141] Omnibus Opp. at 26-27.

[142] *Id.*

[143] Ex. 257, SBF0459029, at 31.

████████████████ [144] Indeed, Tyson was also keeping track of its competitors'

slaughter: ████████████████████████████████████████████████

████████████████████████████████████████████████ [145]

Moreover, defendants ignore troves of evidence demonstrating that processor

defendants relied on common benchmark pricing data from Agri Stats, enabling them to

see "opportunities" to *increase* the price of pork relative to their competitors.[146]  And the

common evidence further demonstrates that defendants used the Agri Stats data for

purposes of monitoring their cartel.  A prime example is an internal email from Tim

Hiller, Head of Processor Sales at JBS: ████████████████████████████

████████████████████████████ [147]

Lastly, defendants again ignore CIPPs' evidence[148] and rely on their own common

evidence to argue that defendants did not routinely deanonymize the Agri Stats data.

This is incorrect.  For example, Tyson's Deborah McConnell directed a colleague: ████

████████████████████████████████████████████████

████████████████████████████ [149]—and on another occasion stated

that ████████████████████████████████████████████

---

[144] Ex. 258, SMITHFIELD04934968.

[145] Ex. 259, TF-P-001572423. ████████████████████████████

████████████████████████████.

[146] *See*, *e.g.*, Consumer Mot. at 20-23, Singer Decl., ¶¶123-128.

[147] Ex. 260, JBS-PORK-00754219, at 222.

[148] Consumer Mot. at 16-18, Singer Decl., ¶¶97-103.

[149] Ex. 261, TF-P-000304473.

 [150] And Tyson's VP of Fresh Meats Jerry Pfeifer acknowledges

that ██████████████████████████████████████████████████

██████████████████████████████████████ [151] Similarly,

Triumph shared with Seaboard deanonymized Agri Stats data with ████████

████████████████████████████████████████████████████

██████████████████████████ [152] And contemporaneous correspondence refers to

████████████████████████████████ [153] So defendants did in fact routinely

deanonymize Agri Stats data in effectuating and monitoring the cartel.

## ARGUMENT

**I.    CIPPs meet the implicit requirements of Rule 23(a), because class members can self-identify as purchasers of pork products.**

Defendants argue it will be impossible to determine which class members

purchased their pork products, because 20% were processed by non-defendants.[154]  This

is wrong in terms of both premise and conclusion.  Processor defendants are responsible

for closer to 84% of pork slaughter capacity if co-conspirators are included.[155]  And by

"eliminat[ing] companies that do not produce in-class products" Dr. Singer demonstrates

that processor defendants processed approximately 85% of class products.[156]

---

[150] Ex. 262, TF-P-000538548.

[151] Ex. 263, TF-P-000515626.

[152] Ex. 264, SBF0459029, at 29, 31; *see also* Ex. 265, TRI0000089336.

[153] Ex. 266, SBF0490482 (attaching SBF0490487); *see also* Ex. 267, SBF0538947.

[154] Consumer Opp. at 8-11.

[155] Singer Decl., ¶70.

[156] Singer Reply, ¶17.

Moreover, *even if* processor defendants processed only 80% of class products, it would not follow that it is impossible to know which class members purchased from defendants, due to the repeat nature of pork purchases.  The purchasing history of the class representatives demonstrates that they purchased multiple pork products routinely.[157]  Indeed, Nielsen data establishes that ██████████████████████ ██████████████████[158]  So Dr. Singer explains that there is less than a 0.02% chance in a single year that a class member did not purchase a pork product from a processor defendant—and virtually zero chance over the class period.[159]  All class members purchased from processor defendants.

Further, Dr. Singer calculates aggregate damages based on processor defendants' actual sales,[160] so each class member self-identifying as a purchaser of class products can be allocated a *pro rata* share of any recovery based on their volume of purchases.  This is precisely what this Court approved to allocate defendant Smithfield's $75 million in settlement funds[161]—and what Judge Durkin approved in *Broilers*.[162]  Indeed, in granting

---

[157] *See* App'x A.  And nearly every class representative also testified to purchasing a pork product with a processor defendant name brand.  *See* Ex. 268.

[158] Ex. 269, SMITHFIELD04739834, 838; *see also* Ex. 270, AGSTAT-P-0003410325 ████████████████████████; Ex. 271, 21CForum-0000008944, at 945 ████████████████ Ex. 272, HFC-PORKAT0000200877, native 5 ████████████.

[159] Singer Reply, ¶¶18-19 & T.3.

[160] Singer Decl., ¶¶195-198.

[161] No. 16-cv-8637, ECF Nos. 1515 at 25-27; 1517-6, Ex. F; 1588.

[162] No. 16-cv-8637, ECF Nos. 4938 & 4921-2, at Ex. F.  While ignoring this case and other antitrust cases that CIPPs cite from within this judicial district, *see* Mot. at 24 & 49

class certification, the court recognized that it had "considered and approved methods for apportioning class settlements that should also be effective at apportioning any damages awarded by a verdict."[163]  So defendants' handwringing over the purported impossibility of allocating damages to class members is misplaced.[164]  And, in any event, defendants have "no interest in the method of distributing the aggregate damages award among the class members."[165]

## II.   CIPPs also satisfy the explicit requirements of rule 23(a).

Defendants do not contest that CIPPs satisfy numerosity, commonality, typicality, and adequacy.

## III.   Common questions regarding defendants' violations of the antitrust laws predominate under rule 23(b).[166]

As in *Broilers*, with respect to the first question regarding *per se* liability, defendants do not challenge CIPPs' contention that "this question predominates over any

---

(citing *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM, 2016 WL 4697338 (D. Minn. Sept. 7, 2016), and *In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995)), defendants instead cite to non-antitrust cases and/or cases from outside this district.  Consumer Opp. at 45-46.

[163] *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, 2022 WL 1720468, at *19 (N.D. Ill. May 27, 2022) (*Broilers*).

[164] Consumer Opp. at 29, 30 n.12, 45-48.  In the interest of space, CIPPs address this related argument here.

[165] *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1269 (10th Cir. 2014); *see also Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016) ("The determination of the aggregate classwide damages is something that can be handled most efficiently as a class action, and the allocation of that total sum among the class members can be managed individually, should the case ever reach that point.").

[166] CIPPs object to defendants' attempt to incorporate by reference argument they make solely in opposing CIIPPs' motion.  *See* Consumer Opp. at 5 (cross-referencing

individual issues."[167]   As Judge Durkin stated, "this type of alleged conspiracy" is the

"prototypical example" of predominance, "because it is much more efficient to have a

single trial on the alleged conspiracy rather than thousands of identical trials all alleging

identical conspiracies based on identical evidence."[168]

Common questions also predominate with respect to liability on CIPPs' rule of

reason claim.  Contrary to defendants' false assertion that CIPPs "provide virtually no

analysis" as to the relevant product and geographic markets,[169] Dr. Singer dedicates *30*

*pages* of his expert declaration to these issues,[170] which defendants simply ignore.[171]

First, Dr. Singer performs a variation of the SSNIP test—which the DOJ and FTC

use to define relevant product markets—to confirm that the cartel could profitably impose

a Small but Significant and Non-transitory Increase in Price (a SSNIP) over the

competitive price level for pork products.[172]  In addition to this quantitative evaluation,

---

argument addressing purported variations in state law).  If the Court were inclined to
deny class certification on this ground, CIPPs request additional briefing in order to have
opportunity to address it.

[167] *Broilers*, 2022 WL 1720468, at *6.

[168] *Id.* at *7.

[169] Consumer Opp. at 48, 52.

[170] Mot. at 31-32 (citing Singer Decl., ¶¶46-87).  And this distinguishes *DeSlandes v. McDonald's USA*, No. 17 C 4857, 2021 WL 3187668, at *12 (N.D. Ill. July 28, 2021) ("Plaintiffs have made no attempt to identify a relevant market"), and *In re Pharmacy Benefit Managers Antitrust Litig.*, No. CV 03-4730, 2017 WL 275398, at *31 (E.D. Pa. Jan. 18, 2017) ("[Plaintiffs] have offered no evidence to establish the geographic market or Defendants' market power.").

[171] And they ignore CIPPs' supporting cases as well.  Mot. at 32 n.145.

[172] Singer Decl., ¶¶52-60.

Dr. Singer also reviews qualitative evidence supporting pork as the relevant product market, including evidence establishing that pork has no close demand substitutes,[173] that industry participants consider it a unique market, including Agri Stats reports specific to the pork industry,[174] and that pork supply has unique production facilities.[175]  Likewise, Dr. Singer also reviews qualitative evidence that the relevant geographic market is the United States, because pork processors face little competition from foreign imports.[176]  Importantly, here again, defendants themselves considered the market nationwide in scope with Agri Stats reporting prices for individual pork products against national average, as opposed to regional average, prices.  And "[i]ndustry recognition is well established as a factor that courts consider in defining a market," because "we assume that the economic actors usually have accurate perceptions of economic realities."[177]

Finally, both this quantitative and qualitative evidence of the relevant market is, of course, common to all class members—as are defendants' arguments that the relevant markets are poorly defined.  For example, defendants argue that a nationwide geographic market is too broad, an argument that can be answered once for all class members.[178]  And it is, in any event, incorrect.  As the district court in *Jein* explained, "Plaintiffs must

---

[173] *Id.*, ¶62.

[174] *Id.*, ¶¶ 63-65.

[175] *Id.*, ¶66 & Fig. 7.

[176] *Id.*, ¶51.

[177] *Todd v. Exxon Corp.*, 275 F.3d at 205-6 (2d Cir. 2001) (holding that the scope of defendants' salary exchange was probative of market definition).

[178] Consumer Opp. at 54-55.

outline a relevant market so that they can then allege that Defendants have sufficient market power within the market for their information sharing to restrain competition."[179] So it is "problematic to allege too *narrow* a geographic market, because it could create the illusion of market power where no market power exists."[180]  But if the "geographic [m]arket definition is too large, that would only understate market power in the relevant market."[181]

Defendants' arguments as to the proposed product market are equally common (and incorrect).  On the one hand, they say it is too broad, because "a rack of ribs is no clear substitute for breakfast bacon."[182]  But this overlooks that a "cluster of products can comprise a relevant product market."[183]  And, on the other, defendants argue that the alleged market is too narrow, because "pork ribs . . . may very well compete against other proteins."[184]  But, as the Supreme Court recognized in *Brown Shoe,* "within [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."[185]  Here, defendants themselves clearly recognize such a

---

[179] *Jein v. Perdue Farms, Inc.*, No. 19-cv-02521-SAG, 2020 WL 5544183, at *10 (D. Md. Sep. 16, 2022).

[180] *Id.* (emphasis in original).

[181] *Id.* (citing *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *19 (E.D. Pa. July 29, 2015)).

[182] Consumer Opp. at 52.

[183] Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC, 950 F.3d 911, 918 (7th Cir. 2020).

[184] Consumer Opp. at 52.

[185] *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962).

market by exchanging contemporaneous and competitive data on a regular basis to monitor—and ratchet up—nationwide pricing for pork products (not regional pricing for all protein products).[186]  In short, class members plainly participated in the relevant market as defined, and defendants' arguments that the market is poorly defined can be addressed "in one fell swoop" for all of them.

**IV.    Common evidence demonstrates antitrust impact across the class and predominance under rule 23(b).**

**A. Defendants do not meaningfully dispute that pork market characteristics subject it to cartelization.**

Defendants ignore—and so concede—CIPPs' common impact evidence that the "structure of the [relevant] market was conducive to successful collusion."[187]  Defendants instead pretend that market structure evidence means a price index or its equivalent.[188]  Of course, Agri Stats performed that function here,[189] as did USDA pricing.[190]

But putting that aside, a "commodity market with a structure conducive to collusion" was a distinct category of evidence supporting predominance—separate from the "common use of the PPW index" in *Kleen*.[191]  In addition to market concentration,

---

[186] *See* Consumer Opp. at 55.

[187] *Kleen*, 831 F.3d at 927; *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 675 (9th Cir. 2022), *cert. denied* (*Tuna*) ("other evidence in the record, including [] market characteristics, showed that class members suffered a common impact").

[188] Consumer Opp. at 36 (discussing *Kleen*).

[189] Consumer Mot. at 38-39.

[190] *E.g.*, Ex. 273, Hiller Depo. at 36:19-25.

[191] 831 F.3d at 925.

such structure factors include a "capital-intensive manufacturing process (which affected the pace and likelihood of new entry); weak competition from imported [products]; no good substitutes for the product; a low elasticity of demand; and a standardized, commodity product."[192]  Defendants inexplicably claim that CIPPs assert such market characteristics "without analysis."[193]  In so doing, they fail to accurately acknowledge the law and meaningfully address CIPPs' copious evidence on these "well accepted characteristics of a market that is subject to cartelization."[194]

### B.  By controlling for supply and demand factors, Dr. Singer uses hornbook regression analysis to demonstrate the artificially inflated price caused by defendants' anticompetitive conduct.

Just as in *Broilers*, Dr. Singer (like Drs. Williams and Mangum for DPPs and CIIPs) performed a "regression analysis to determine whether factors other than a conspiracy could have caused the supply decrease by analyzing what [pork] prices would have been 'but for' the conspiracy."[195]  As Judge Durkin explained: "Plugging in known prices and market factor data from the class period and running the regression equation to solve for the dummy variable allows the experts to calculate the portion of price not accounted for by the market factors."[196]  And each expert here—as there—did just that.

---

[192] *Id.* at 927.

[193] Consumer Opp. at 39.

[194] *See* Consumer Mot. at 34-38; Singer Decl., ¶¶62-86, 233-235.

[195] 2022 WL 1720468, at *7.

[196] *Id*.

Defendants, however, wrongly contend that Dr. Singer failed to account for certain market factors, including hog producer returns, the cost of acquiring hogs, and events affecting export levels, such as changes in trade agreements, currency fluctuations, and overseas demand.[197]  This is incorrect.  Defendants claim that hog producer returns were driven by higher feed costs, an expanding hog supply due to the success of the circovirus vaccine, and the economic effects of the Great Recession.  And Dr. Singer controlled for each of these in turn with his total cost variable, piglet mortality variable, and general economic indicator.[198]  Indeed, including an indicator variable for 2008, as Dr. Haider did, is a crude tool for controlling for these events that did not begin and end precisely on the calendar year.[199]  Moreover, Dr. Singer chose to use a "hog cost" variable reflecting the cost of raising hogs rather than purchasing them, because the price of hogs "is itself determined, in large part, by the price of Pork products."[200]  So using hog purchase data introduces a form of endogeneity termed "simultaneity bias" into the model, which Dr. Singer's variable selection avoids.[201]

---

[197] Omnibus Opp. at 55-60.  Defendants also contend that Dr. Singer should have analyzed the supply decisions of individual producers, *see* Omnibus Opp. at 53-54, but, as discussed above in Common Evidence section I, processor defendants exerted influence over hog supply and pricing via ownership, long-term contracts, and packer discipline vis-à-vis the farmers.

[198] Singer Reply, ¶63 & T.7.

[199] *Id*., ¶94.

[200] Singer Reply, ¶91.

[201] *Id*., ¶89.

Dr. Singer likewise did not ignore variables critical to analyzing export levels. As discussed above,[202] annual farm bills and changes in trade bans and barriers were not the "seismic trade policy changes" that defendants contend.[203] And Dr. Singer did control for increasing global demand using a linear time trend.[204] While he did not previously control for currency fluctuations, "[w]hen a defendant attacks a plaintiff's regression, he must typically do more than point out the flaws in his opponent's analysis" and instead "must show that the omission had an impact on the result."[205] Dr. Haider failed to do this. And, in any event, Dr. Singer tested all such allegedly "omitted variables" relating to exports and found the overcharge "virtually unchanged at 12 percent."[206]

Thus, Dr. Singer has controlled for all the variables that defendants contend he should have and, even if he had not, a regression's "failure to include variables will affect the analysis's probativeness, not its admissibility.'"[207] And, of course, its probativeness is a question for the trier of fact, with the Supreme Court in *Tyson Foods, Inc. v.*

---

[202] *See* Common Evidence section II.D.

[203] Omnibus Opp. at 25.

[204] Singer Reply, ¶57.

[205] *Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 468-69 (8th Cir. 2004).

[206] Singer Reply, ¶58.

[207] *CellTrust Corp. v. ionLake, LLC*, No. 19-CV-2855 (WMW/TNL), 2022 WL 4018042, at *28 (D. Minn. Sept. 2, 2022) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

*Bouaphakeo* stating that the resolution of the persuasiveness of such common evidence is the "near-exclusive province of the jury."[208]

### C. There is no requirement that Dr. Singer separately model artificially deflated output.

Besides contending that Dr. Singer did not account for all variables in his pricing regression, defendants also argue that he should have created a separate model to measure artificially deflated output caused by each lever of the conspiracy.[209]  But there is no such requirement.  Contrary to defendants' contention, *Comcast* requires only that damages be "capable of measurement on a classwide basis"[210] and "consistent with the [plaintiff]'s liability case."[211]

In *Kleen*, for example, the Seventh Circuit explained that the "plaintiffs' damages expert in *Comcast* had estimated harm based on the assumption that all four theories of liability that plaintiffs offered had been established," while the class as certified by the district court "was limited to only one of those theories," such that the plaintiffs were "without a theory of loss that matched the theory of liability."[212]  *Kleen* went on to affirm class certification where the plaintiffs' expert modeled damages to "control for other influences on price and to isolate the impact of the conspiracy" using a "dummy

---

[208] 577 U.S. 442, 459 (2016) ("Reasonable minds may differ as to whether the average time [the expert] calculated is probative as to the time actually worked by each employee.").

[209] Omnibus Opp. at 27-28, 60-63.

[210] *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

[211] *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 833 (8th Cir. 2016).

[212] 831 F.3d at 926.

variable."[213]   And *Kleen* specifically rejected the argument that antitrust plaintiffs must

perform a separate production regression "of a hypothetical market free of any anti-

competitive restraint," because "what is essential is" common proof of "cartel pricing."[214]

Thus, defendants distort *Comcast* when they assert it requires separate modeling of

the conduct.   Instead, a methodology that matches the unlawful conduct—to the

exclusion of other lawful conduct—with the damages ensures that they are the "result of

the wrong."[215]   That is exactly what Dr. Singer did here.   By "[p]lugging in known prices

and market factor data from the class period and running the regression equation to solve

for the dummy variable," Dr. Singer "calculate[d] the portion of price not accounted for

by the market factors."[216]   As a leading treatise likewise puts it, the "coefficient on the

dummy variable" is "an estimate of the collusive overcharge—that is, the increase in

---

[213] *Id.* at 929.

[214] *Id.* at 927.

[215] *Comcast*, 569 U.S. at 37; *see also Broilers*, 2022 WL 1720468, at *10 (N.D. Ill. May 27, 2022) (rejecting *Comcast* argument); *Infogroup, Inc. v. DatabaseUSA.com LLC*, No. 8:14-CV-49, 2018 WL 6624217, at *3 (D. Neb. Dec. 18, 2018) (explaining that the "problem" in *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), was "not, as [defendant] suggests, that the jury was unable to parse out the amount of damage associated with each allegation of unlawful conduct. Rather, the problem is that there was *no* evidence on the *amount* of damages attributable only to the unlawful conduct") (emphasis in original), *aff'd sub nom. Infogroup, Inc. v. DatabaseLLC*, 956 F.3d 1063 (8th Cir. 2020).   *See* Omnibus Opp. at 53.

[216] *Broilers*, 2022 WL 1720468, at *12.   *See also* Singer Decl., ¶¶144 & n.289, 146 & n.296.

price *due solely to the anticompetitive behavior*."[217]  Thus, the Seventh Circuit denied

the *Broilers* defendants' 23(f) petition premised on this same ground.[218]

**D.  The aggregate results of regression analyses using pooled data are widely accepted by courts as evidence capable of showing common impact.**

In *Tuna*, the Ninth Circuit sitting *en banc* issued a 9-2 decision rejecting the

argument that "pooled regression models involve improper 'averaging assumptions' and

therefore are inherently unreliable when used to analyze complex markets."[219]  Instead,

the Ninth Circuit recognized that "[i]n antitrust cases, regression models have been

widely accepted as a generally reliable econometric technique to control for the effects of

the differences among class members and isolate the impact of the alleged antitrust

violations on the prices paid by class members."[220]  And the court affirmed class

certification with common impact measured as a 10.2% average overcharge.  Likewise,

in *Kleen*, the Seventh Circuit Court faced the question "whether the common evidence

could show the fact of injury on a classwide basis" and stated that, "[a]t base, Defendants

argue that it is not enough for Purchasers to prove aggregate injury and one aggregate

overcharge."[221]  *Kleen* rejected this argument and affirmed class certification with the

plaintiffs' expert "calculate[ing] an average overcharge of 2.92%."[222]  And in recently

---

[217] 2 Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law §395 (4th ed. 2021).

[218] *Broilers* 23(f) Denial.

[219] 31 F.4th at 677.  *See* Consumer Opp. at 22-25.

[220] *Id.* at 677.

[221] 831 F.3d at 927.

[222] *Id.* at 929.

granting class certification in *Broilers*, Judge Durkin stated that "[c]ourts have held that a pooled regression analysis can be an appropriate tool to demonstrate class-wide impact even when the market involves diversity in products, marketing, and prices."[223]

Moreover, as Judge Durkin explained in *Broilers*, the "experts' opinions in this case [] are not merely based on 'averages' of individually negotiated sales."[224]  Rather, individual negotiations "take place in the context of a 'market price,'" which is the "starting point" for negotiations.[225]  As the Seventh Circuit stated in *Kleen*, "[e]ven for transactions where prices were negotiated individually," classwide impact follows where the "starting point for those negotiations would be higher if the market price for the product was artificially inflated."[226]  The evidence shows that here.  For example, an internal Hormel email from 2015 states: ██████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████[227]  And a similar email from 2017 says: ████████████████████████
████████████████████████████████████████████████████

---

[223] 2022 WL 1720468, at *12.

[224] *Id.* at *15.

[225] *Id*.

[226] 831 F.3d at 928-29; *see also Tuna*, 31 F.4th at 678 ("district court could reasonably conclude that price-fixing would have affected the entire market, raising the baseline prices for all buyers").  *See* Consumer Opp. at 7, 36-38.

[227] Ex. 274, HFC-PORKAT0000192472, at 474-75.

███████████████████████████████████[228]   Moreover, despite defendants'
claim that CIPPs nowhere identify "anything at all that would have spread an average
price impact across all direct purchasers,"[229] Agri Stats is a big something that provided a
mechanism by which defendants regularly benchmarked prices to each other and to the
market—and ratcheted them up when lower compared to their competitors.[230]

Thus, in *Broilers* Judge Durkin weighed conflicting expert testimony and
concluded that Dr. Johnson's "unpooled" subregressions "should not serve as a basis to
conclude that Plaintiffs' experts' opinions are insufficient evidence to demonstrate class-
wide impact and support class certification."[231]   But Judge Durkin did not go so far as to
decide that either side was more persuasive on the merits.[232]   Indeed, the district court's
analysis was consistent with the Supreme Court's directive in *Tyson* that resolving the
persuasiveness of such common evidence is the "near-exclusive province of the jury."[233]

---

[228] Ex. 275, HFC-PORKAT0000197300, at 301; *see also* Ex. 273, Hiller Depo. at
36:19-25 (JBS sets prices based on a USDA base market price with adjustments).

[229] Consumer Opp. at 38.

[230] Consumer Mot. at 38-39; *see also* Ex. 273, Hiller Depo. at 36:19-25 ██████████
██████████████████████████████████████.

[231] 2022 WL 1720468, at *16.

[232] 2022 WL 1720468, at *18 ("to the extent Johnson has created alternative economic
models showing that the price increase was not caused by a conspiracy, the choice to
accept Plaintiffs' experts' or Johnson's models of alternatives is a question better suited
to summary judgment or trial").

[233] *Tyson*, 577 U.S. at 459.

And the Seventh Circuit presumably agreed, because it denied the *Broilers* defendants'
23(f) petition premised on this same ground.[234]

In *Tuna*, relying on *Tyson*, the Ninth Circuit likewise affirmed the district court's
finding that the plaintiffs' expert's "pooled regression model was *capable* of showing that
[] class members suffered antitrust impact on a class-wide basis, *notwithstanding* Dr.
Johnson's critique"—while reserving further inquiry for the fact finder.[235]  The Court
explained: "Neither Dr. Mangum's pooled regression model nor Dr. Johnson's critique
required individualized inquiries into the class members' injuries.  If the jury found that
Dr. Mangum's model was reliable, then the DPPs would have succeeded in showing
antitrust impact on a class-wide basis. . . .  On the other hand, if the jury were persuaded
by Dr. Johnson's critique, the jury could conclude that the DPPs had failed to prove
antitrust impact on a class-wide basis."[236]  So too here.

Realizing that the most on-point and current cases do not go their way, defendants
resort to misrepresenting Dr. Singer's scholarship on the matter.[237]  They claim that he
co-authored a book chapter stating that "[e]conometric methods estimat[ing] the average
effect of the challenged conduct . . . do not inform impact for individual class

---

[234] *Broilers* 23(f) Denial.

[235] *Tuna*, 31 F.4th at 680-681 (emphasis in original).

[236] *Id.* at 681; *see also Tyson*, 577 U.S. at 457, 478 (explaining that the question
whether the expert's "study was unrepresentative or inaccurate" was "itself common to
the claims made by all class members").

[237] Omnibus Opp. at 39-40; Consumer Opp. at 15-21, 40-44.

members."[238]  But defendants elide language indicating that this statement was with

respect to methods applied by others.[239]  Indeed, the very point of Dr. Singer's chapter

was to "present classwide econometric methods and statistical tests for detecting the

existence (or lack thereof) of common impact and determining what proportion (if any)

of the proposed class suffered injury in many class actions."[240]  And in his reply report

Dr. Singer confirms that he employed such tests in his original report.[241]  Moreover,

while defendants claim that language describing Dr. Singer's results on common impact

is "tepid" and "vague,"[242] Dr. Singer's conclusion is actually unequivocal: "Artificial

price inflation due to the Challenged Conduct impacted **all** Direct Purchasers and passed

through to impact **all** Class Members."[243]

      As to other articles purportedly supporting their position, defendants misrepresent

these as well—and fail to mention that one was authored by Dr. Haider herself.[244]  Other

articles, not written by their own expert, of course support exactly the approach CIPPs

take here, explaining that "[i]mpact may be demonstrated by the use of case-specific facts

---

[238] Consumer Opp. at 20 (quoting abstract).

[239] Likewise, at the outset of Dr. Singer's article he reviews the opinions of others—which is typically done in academic writing—but defendants attribute these opinions to Dr. Singer while omitting the quotations and citations that clearly mark them as the opinions of others.  Omnibus Opp. at 40, Consumer Opp. at 21.  *See also* Singer Reply, ¶11.

[240] Singer Reply, ¶10.

[241] *Id.*

[242] Consumer Opp. at 15-16.

[243] Singer Decl., ¶7.

[244] Consumer Opp. at 19-20.  Singer Reply, ¶103.

and economic theory and analysis (*e.g.*, large market share, fungible class products, no close non-class substitutes, barriers to entry)" and "confirming or supporting statistical analysis through a multiple regression model using pooled data," which allows a court to "conclude that it would be difficult for purchasers to have escaped *every* price increase for *every* product *cumulatively over the entire period of the conspiracy--i.e.*, impact is widespread or class-wide in effect."[245]

Moreover, evidence of impact based on market analysis combined with robust regression results is what distinguishes *Tuna*, *Kleen*, and *Broilers* from cases like *Blades, Propane Tank,* and *Aluminum Warehousing*.[246]  In *Blades*, list prices showed zero or negligible premiums and the plaintiffs' expert "did not show that other common evidence could fill the gap in proof of classwide injury."[247]  In *Aluminum Warehousing*, the plaintiffs' "allegations, styled as price-fixing, [we]re far afield from the paradigm in which competitors gather and secretly set a price (or price floor)."[248]  Likewise, in *Propane Tank* the plaintiffs did "not proffer any evidence or mechanism for how pricing

---

[245] Martin A. Asher, Gregory K. Arenson, Russell L. Lamb, *Losing the Forest for the Trees: On the Loss of Economic Efficiency and Equity in Federal Price-Fixing Class Actions*, 16 Va. L. & Bus. Rev. 293, 324 (2022) ("Asher, Arenson & Lamb") (emphasis in original); *see also id.* at 325 ("Aggregate damages can be computed using a multiple regression--i.e., a reduced-form price equation--which is estimated over the purchases of all potential class members and includes controls for demand, supply, and individual factors, and an indicator variable for the period of the conspiracy. Such a model may also support a conclusion of class-wide impact.").

[246] Omnibus Opp. at 38-39; Consumer Opp. at 17-19, 34-35.

[247] *Blades v. Monsanto Co.*, 400 F.3d 562, 573, 574 (8th Cir. 2005).

[248] In re Aluminum Warehousing Antitrust Litig., 336 F.R.D. 5, 45 (S.D.N.Y. 2020).

throughout the entire class period was subject to ongoing collusion."[249]  Here, of course, Agri Stats provided that mechanism for a pricing floor in a market with characteristics conducive to widespread effects of collusion, the broad impact of which Dr. Singer's analysis confirms.

### E.  Further testing confirms that Dr. Singer's model establishes broad impact across all class members

As in *Tuna*, Dr. Singer performed several robustness checks "to confirm that his regression model was an appropriate tool to be used by the entire DPP class to show common impact."[250]  Specifically, and just as in *Tuna*, Dr. Singer altered his econometric model "to specifically show the effect of the Challenged Conduct on individual subgroups" and, in fact, it showed that "prices were artificially inflated for all five of the major pork product categories, for each of the seven Defendants, and for all types of Direct Purchasers," including distributors, further processors, retailers, and trader brokers.[251]  In addition, again as in *Tuna*, Dr. Singer also performed an in-sample prediction comparing the price that each direct purchaser actually paid to the but-for price they would have paid absent the conspiracy.[252]  And he estimated that over 99% of all direct purchasers suffered injury.[253]

---

[249] *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *7 (W.D. Mo. Nov. 9, 2021).

[250] 31 F.4th at 672.

[251] Singer Decl., ¶¶190-194.

[252] *Id.*, ¶¶169-170.

[253] *Id.*, ¶170.

Dr. Haider, in turn, performs her own modifications and tests, but these fail to undermine Dr. Singer's results. <u>First</u>, Dr. Haider breaks up the conduct period into two separate periods—as though the legal statute of limitations period running backwards from the complaint filing (and forming the class period) has anything to do with the factual basis for the conspiracy.[254] It does not. Instead, the conspiracy begins in 2009 because this was a time of significant sow liquidations,[255] as well as when Agri Stats

██████████████████████████████████████████████████

████████████████████████████████████

Moreover, as discussed above, the common evidence demonstrates that defendants' conduct was ongoing throughout the entire conduct period, including (1) the exchange of competitively sensitive information via Agri Stats and benchmarking of prices; (2) liquidations with long-lasting effect on the national herd; (3) available processing capacity on a per capita basis remaining restrained throughout the conduct period; (4) capacity utilization remaining below historical levels during the conduct period; and (5) exports surging as a percentage of production as defendants targeted foreign markets to prop up domestic prices.[257] Indeed, in his reply report Dr. Singer finds

---

[254] *See* Omnibus Opp. at 40-44; Consumer Opp. at 26-27. Singer Reply, ¶74 (discussing American Statistical Association's warning against such p-hacking).

[255] *See* Common Evidence section II.A., above. *See also* Omnibus Opp. at 29.

[256] Singer Reply, ¶75; *see also* Ex. 276, ███████████████████████████████
███████████████████████████████████████

[257] *See* Common Evidence sections II-III.

this artificially restrained output for *each year* of the conduct period.[258]  So there is no credible basis for the structural break Dr. Haider introduces into the model.  And, in any event, even her modifications **still show statistically significant price overcharges**, albeit lower than what Dr. Singer calculates, of 2.9%.[259]  So Dr. Haider's analysis actually supports class certification.

Second, defendants contend that Dr. Singer should not have included 2008 as part of the benchmark period because it was such an outlier.[260]  But market participants did not view 2008 as the outlier that defendants contend.  For example, ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████[261]  In any event, Dr. Singer controlled for all of the market factors that supposedly made 2008 such an outlier—including "record-high corn costs," pig mortality reduction caused by circovirus vaccine, global financial crisis, and swine flu.[262]  So there was no need to also include an indicator variable for that year—which again is a crude tool to control for events not beginning and ending right on the calendar year.[263]

---

[258] Singer Reply, ¶26 TT.5-6.

[259] Singer Reply, ¶¶5-7 & T.1, ¶68; *see also id*., ¶76 ("if I 'interact' the conduct by each calendar year, the regression shows positive and economically significant price overcharges in every year except for 2009").  *See* Consumer Opp. at 24.

[260] Omnibus Opp. at 44-47.

[261] Ex. 196, Hill Depo. at 169:8-170:6.

[262] Singer Reply, ¶63 & T.7.

[263] Singer Reply, ¶94.  And *Wholesale Grocery* is inapposite on this point, because it involved not a dispute about the inclusion of certain benchmark years, but an entirely

Third, Dr. Haider performs a Chow test to claim that Dr. Singer should not have pooled data across direct purchasers.[264]  But Chow tests should only be performed to check a known structural break—not used repeatedly to try to manufacture one, as Dr. Haider did.[265]  Indeed, academic literature describes the "misuse of 'structural break' or Chow tests" to "creat[e] 'individualized' statistical effects even when there are no meaningful *economic* differences."[266]  As the district court explains in *Chen-Oster v. Goldman, Sachs & Co.*, in effect "the Chow test measures whether the coefficients of all variables in separate regressions are the same."[267]  So "an analysis could fail the Chow test even if the coefficient for the variable of interest was identical in each regression on disaggregated data, if the coefficients for other variables were dissimilar."[268]  And, "[m]ore importantly, an analysis could fail the Chow test where the coefficient for the variable of interest varies in magnitude but not in the direction of impact."[269]  Thus, *Tuna* stated that "the failure of the Chow test d[oes] not require the court to reject the model."[270]

---

different type of construct with the plaintiffs' expert opining that the largest retail grocery chain in New England, "although not an independent grocer and much larger than the class plaintiffs, served as a reliable and relevant benchmark."  *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 999 (8th Cir. 2019).  *See* Omnibus Opp. at 46.

[264] Consumer Opp. at 26.

[265] Singer Reply, ¶101.

[266] Asher, Arenson & Lamb, at 315-16 (emphasis in original).

[267] 114 F. Supp. 3d 110, 122 (S.D.N.Y. 2015), *objections overruled,* 325 F.R.D. 55 (S.D.N.Y. 2018).

[268] *Id*.

[269] *Id*.

[270] 31 F.4th at 676; *see also Chen-Oster*, 114 F. Supp. 3d at 122.

Fourth, Dr. Haider asserts that 24 of the top 635 direct purchasers did not pay overcharges.[271]  But even taking her conclusion at face value, Dr. Haider's own analysis shows that ███████████████████████████████████████████████████

███████████████████████████████.[272]  This is strong additional evidence in support of class certification.[273]  And when expressed in terms of dollar sales of pork products, this rises to 99.2 percent of all pork transaction analyzed.[274]

Fifth, ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████.[275]  But given the repeat nature of pork purchases, as discussed above, it remains virtually impossible for consumers in these circumstance to escape overcharge.[276]  Moreover, as Dr. Singer explains, "[i]f Dr. Haider believes that individual Direct Purchasers may have escaped injury," that is easily tested—and refuted—by looking at "each Direct Purchasers' transactions on net."[277]  And the result of this analysis demonstrates that "████████████████████████████

---

[271] Consumer Opp. at 27.

[272] Singer Reply, ¶98 & T.12.

[273] *Id*., ¶108.

[274] *Id*., ¶98.

[275] Consumer Opp. at 28-29; *see also* Omnibus Opp. at 48-53.

[276] *See* Argument section I, above.

[277] Singer Reply, ¶121.

████████████████████████████████████████████████████████

████████████████████████████████.",278

Indeed, Dr. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████    ████████████████████

████████████████████████████████████████████████████████

████████████    ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████    That is the point of the test.  Indeed, "[i]f Dr. Haider is correct, and the in-sample prediction method is just generating statistical noise and false positives, then we should expect that the *net volume of commerce impacted under the in-sample prediction method to be approximately zero*."[282]  But if Dr. Singer instead "add[s] up the differences between the actual price and the 'but-for' price across all transactions, the difference in value between the actual and 'but-for' volume of commerce is ██ percent—remarkably close to the coefficient from [his] overcharge regression."[283]  Thus, the in-sample prediction method demonstrates that "approximately

---

[278] *Id.*

[279] *Id.*, ¶117.

[280] *Id.*, ¶122.

[281] *Id.*

[282] *Id.*, ¶123.

[283] *Id.*

███ *percent of Direct Purchasers were overcharged*."[284]  And defendants' argument that there are more than a *de minimis* number of uninjured class members has no merit.[285]

### F. Dr. Singer's calculation of pass-through is grounded in sound econometrics—as opposed to Dr. Haider's disfavored Chow tests and "unpooling" of data, which decreases statistical power.

As part of his empirical pass-through analysis, Dr. Singer reviewed the sales and procurement data for 39 third-party resellers, including 16 retailers and 23 distributors or wholesalers.[286]  Contrary to defendants' mistaken view that this data amounted to a "sliver of data from one year,"[287] this 686 gigabytes of data covered almost two decades, ranging from 2003 to 2022 and containing 1,615,130 observations in total.[288]  It is only for purposes of weighting the relative sales of processor defendants that Dr. Singer relied solely on data from 2018, because "nearly all entities produced usable pass-through data for the year 2018."[289]  And that allowed Dr. Singer to conclude that the "third-party firms that provided pass-through data collectively account for approximately 28 percent of Defendants' Direct Purchaser pork sales in 2018."[290]

---

[284] *Id.*, ¶124.

[285] *Tuna* rejects the "argument that Rule 23 does not permit the certification of a class that potentially includes more than a *de minimis* number of uninjured class members." 31 F.4th at 669; *see also id.* at n.13 (distinguishing *Rail Freight II*).  But the Court need not reach that issue here because there are no more than *de minimis* uninjured here.

[286] Singer Decl., ¶181.

[287] Consumer Opp. at 30; *see also id.* at 33.

[288] Singer Decl., ¶181.

[289] *Id.*

[290] *Id.*, ¶182.  And contrary to defendants' flawed contention, *see* Consumer Opp. at 30 n.12, it is not actually 13%.  *See* Singer Reply, ¶¶57-58 & n.260.

Defendants then speculate that this 28% is a "non-representative" sample.[291] While "subpoenaed third-party data is *not* a random sample," of course, "for a variety of legal and practical reasons," when census data does not include every unit in a whole population "one must ask whether the missing data are likely to differ in some systematic way from the data that are collected."[292]  There is no reason to think that here.[293]

████████████████████████████████████████████ that is consistent with previous pass-through results and brings defendants' share of 2018 pork sales to 50.3%.[294]  Thus, this case is again like *Broilers* where Judge Durkin rejected the defense expert's criticism of the plaintiffs' expert "for analyzing only 22 of 540 direct purchasers," because "those 22 direct purchasers account[ed] for 65% of sales."[295]

Relying on his 1.6 million observations, Dr. Singer found a pass-through rate of between 106.8 and 113.8 percent,[296] with pass-through of between 105.4 to 111.0 percent for distributors and between 113.6 to 126.8 percent for retailers.[297]  Defendants once

---

[291] Consumer Opp. at 30; *see also id.* at 33.

[292] Singer Reply, ¶159.

[293] *Id*. *See also AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW)(SN), 2019 WL 1254763, at *25-26 (S.D.N.Y. Mar. 19, 2019) (denying motion to exclude expert's "estimate of water-resistant zippers sold by YKK into the high end outerwear market" based on discovery that the plaintiffs were able to obtain for twelve customers "who accounted for roughly 30% of YKK's water-resistant zipper sales," because "[u]nless the movant can show a reason that the assumption of representativeness is unsound, courts routinely allow experts to extrapolate from a nonrandom sample").

[294] Singer Reply, ¶152.

[295] 2022 WL 1720468, at *19.

[296] Singer Decl., ¶182.

[297] *Id.*, ¶183.

again take issue with Dr. Singer's calculation of an average pass-through rate for each re-seller and speculate that it may not have been as high for all transactions.[298]  But any positive pass-through establishes the fact of injury.[299]  And Dr. Haider's own variant of Dr. Singer's pass-through model ***still finds pass through for all distributors and retailers***.[300]

So defendants then point to four retailers as to which Dr. Haider says another Chow test precludes pooling, such that pass through disappears when the data is "unpooled" for each retailer's products to be analyzed individually.[301]  But there is no economic reason to suspect a structural break with respect to these products: economic theory predicting 100% pass-through applies equally to them.[302]  And by running Dr. Singer's regression for each retailer individually she creates sample sizes too small to detect pass through.  In *Chen-Oster* for example, the court held that aggregation of data was reasonable "in light of the statistical pitfalls of disaggregation," which "tends to mask common mechanisms," because "statistical power increases with sample size."[303]

---

[298] Consumer Opp. at 31.

[299] Singer Decl., ¶175.  *See also Broilers*, 2022 WL 1720468, at *19 ("unpooling" of pass-through regression showing "much lower" pass-through rate of 57% "is still sufficiently significant to demonstrate damages").

[300] Singer Reply, ¶¶133-137, 141 & TT.17-18.

[301] Consumer Opp. at 33; Haider Report, ¶¶214 n.242, 215-216.

[302] Singer Reply, ¶144.  *See also* Argument section IV.E (describing the significant limitation of the disfavored Chow test).

[303] 114 F. Supp. 3d at 120-121; *see also Tuna*, 31 F.4th at 673 n.21 ("some purchasers had no or too few transactions during the pre-collusion benchmark period to generate statistically significant results").

Likewise, Judge Durkin rejected the defendants' argument that the class "sweeps in a great many class members that were demonstrably unharmed," because their expert's "unpooling analysis does not appear to produce an accurate picture of the market."[304]

As Dr. Singer explains in reply, "[u]sing Dr. Haider's own sample size rule," more than half of the products that Dr. Haider highlights from Amazon Fresh, Meijer, and Target "have too few observations to be estimated."[305]   Thus, the lack of pass-through predicted by Dr. Haider's "unpooled" regressions is simply a result of her flawed method, which is why it contradicts economic theory, defendants' admissions, and similar results found in *Broilers*, which are all consistent with the results Dr. Singer finds here.

### G. Economic theory and record evidence comport with pass-through rates approximating 100%—and are not undercut by speculation regarding focal point and high-low pricing.

Defendants ignore documentary and testimonial evidence of pass-through— including defendants' own admissions[306]—which permitted Dr. Singer to conclude that his pass-through finding "comports with the record evidence that industry expects pass-through rates of 100 percent, and with economic theory."[307]   After all, as Judge Durkin put it in *Broilers*, the "products purchased by the Indirects from the Directs are the same products the Directs purchase from Defendants," and the "Directs profit by adding a

---

[304] *Broilers*, 2022 WL 1720468, at *16 n.12.

[305] Singer Reply, ¶146; *see also id.,* ¶¶147-149 (discussing Trader Joe's).

[306] Consumer Mot. at 43-46; Singer Decl., ¶¶177, 185-189.

[307] Singer Decl., ¶179.

mark-up to the price they pay Defendants," so "[i]f the Directs did not pass on any price increase imposed by Defendants, the Directs would quickly become unprofitable."[308]

Here, distributors have testified that there would never be an instance where they would ██████████████████████ rather than passing the increase on to customers.[309] And the same logic holds for the retailers, which they themselves have confirmed.[310] Indeed, Paul Peil of Hormel testified that "██████████████████████ ███████████████████████████████████████

██████ [311]

Ignoring record evidence demonstrating that retailers here seek to maintain a gross margin of 30 or 40%,[312] defendants speculate that focal point or high-low pricing precludes pass-through.[313] They are wrong on both counts. While defendants claim that "[m]any general economic studies" have shown that retailers favor "prices ending in the digit 9,"[314] pricing studies done *on pork sales* found that ███████████████████

_____

[308] 2022 WL 1720468, at *18.  *E.g.,* Ex. 277, Barthelme Depo. at 292:15-293:6; Ex. 278, The Golub Corp. Depo. at 19:20-25, 21:23-22:6.

[309] Ex. 279, Schneider Depo. (United Retail Merchants) at 25:1-7.

[310] Consumer Mot. at 44.

[311] Ex. 280, Peil Depo. at 162:16-25.

[312] Singer Decl., ¶177; Ex. 281, SBF0143013 (making price recommendations to Publix to "maintain the 40% gross margin they want"); Ex. 282, SBF0175459, at 460 (making price recommendations to Roche Bros. Supermarkets "for a 40% gross margin").

[313] Consumer Opp. at 31-33.

[314] *Id.* at 31.

███████████████████████████████████████[315]  As Dr. Singer

explains, "[e]ven if retailers *only* price products ending in a '9,' they are more than able

to pass through small cost changes to consumers," given the relatively low product prices

at issue here.[316]

Indeed, focal point pricing is an issue in cases, unlike this one, where the amount

passed through is smaller than the distance between focal price points.  For example, in

*In re Qualcomm Antitrust Litig.*, most devices containing the modem chips at issue were

sold at prices ending in $49.99 and $99.99.[317]  So a small change in cost might not be

enough to move the price to the next focal point.  Here, on the other hand, the 12%

overcharge that Dr. Singer predicts is greater than the 10 cent distance between focal

points ending in .9.[318]  And even in Dr. Haider's cherrypicked examples of certain

retailers with patterns of .49 and .99 pricing for certain products, a movement from $4.49

to $4.99 amounts to an increase of 11%—still under Dr. Singer's predicted overcharge of

12%.[319]  Moreover, even for an item costing less, a move from say $3.49 to $3.99

amounts to an increase of 14%, which would overshoot the predicted overcharge by so

little that it provides explanation for pass-through in excess of 100%, as Dr. Singer in fact

---

[315] Ex. 283, HFC-PORKAT0000196923, native at 3.

[316] Singer Reply, ¶161.

[317] 328 F.R.D. 280, 308-09 (N.D. Cal. 2018), *vacated on other grounds.*

[318] Singer Reply, ¶162 & T.20.

[319] *Id.*, ¶163.

finds here.[320]  Further, there can be no real debate that, over a period of years, 100% of

costs are passed on, because ███████████████████████████████████ [321]

As for high-low pricing, defendants again speculate—without citation to record

evidence—that retailers would not have to pass along any price increase to "most of its

retail transactions," because they could just raise either the high everyday price or the

periodic discount price.[322]  But by defendants' own description, raising the everyday

price would still ensure pass-through for most retail transactions and if they tried to

recoup cost increases all on the discounted items they would no longer have any.  So their

argument does not make sense.  And it is inconsistent with record evidence.  Indeed,

defendants mischaracterize CIPPs' evidence as a statement of "one retailer" when it was

actually the conclusion of Cleveland Research Group that the ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ [323]

In any event, as Dr. Singer explains, his "pass-through regression used *actual*

*costs* and *actual prices* (after discounts) sold to consumers."[324]  In *Tuna*, where Dr.

Haider claimed, as here, that the plaintiffs' expert failed to control for possible pricing

---

[320] *Id.*

[321] ECF No. 1345-14, Ex. 138, Meyer Depo. at 105:16-25.

[322] Consumer Opp. at 32.

[323] ECF No. 1345-15, Ex. 143, TF-P-000655793, at 797.  *See* Consumer Opp. at 39
(citing Consumer Mot. at 44-45 n.199).

[324] Singer Reply, ¶165.

strategies of the defendants, the Ninth Circuit affirmed the district court's determination that "Dr. Haider's additional critiques were based either on a misreading of Dr. Sunding's report, or her own miscalculations," such that his model was "capable of proving antitrust impact on a classwide basis."[325]  The Court should find the same here as to Dr. Singer.

## CONCLUSION

For all of these reasons, CIPPs respectfully request that the class be certified.

DATED: November 18, 2022           Respectfully submitted,

                                   HAGENS BERMAN SOBOL SHAPIRO LLP

                                   By:   /s/ Shana E. Scarlett
                                   SHANA E. SCARLETT
                                   Rio Pierce
                                   715 Hearst Avenue, Suite 202
                                   Berkeley, California 94710
                                   (510) 725-3000
                                   shanas@hbsslaw.com
                                   riop@hbsslaw.om

                                   Steve W. Berman
                                   Breanna Van Engelen
                                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                   1301 Second Avenue, Suite 2000
                                   Seattle, Washington 98101
                                   (206) 623-7292
                                   steve@hbsslaw.com
                                   breannav@hbsslaw.com

                                   Elaine T. Byszewski
                                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                   301 North Lake Avenue, Suite 920
                                   Pasadena, CA 91101
                                   (213) 330-7150
                                   elaine@hbsslaw.com

---

[325] 31 F.4th at 684.

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

*Co-Lead Counsel for Consumer Indirect
Purchaser Class*

**APPENDIX A**

| Consumer | Pork Product | Defendant Branded Purchases | Frequency of Purchases |
|---|---|---|---|
| Jeffrey Allison | baby back ribs, bacon, black forest ham, boneless pork chops, ground pork, pork butt, pork chops, pork ribs, pork shoulder, | Smithfield (Tr. 44:15-20) | Purchased pork products once per month (Tr. 59:14-15) |
| Michael Anderson | pork butt, pork loins, pork shoulder | Hormel (Tr. 32:4) | Purchases pork products monthly (Tr. 21:19-24) |
| Isabelle Bell | pork roasts, pork chops, bacon, pork roasts, hams | Smithfield (Tr. 36:9-14) | Purchased pork products once per week (Tr. 80:17-21). |
| Duncan Birch | bacon, ham, pork butt, pork chops, pork ribs | Smithfield (Tr. 44:16); Hormel (Tr. 53:12-14) | Purchased pork products on weekend trips to the grocery store (Tr. 84:14-16) |
| Kory Bird | ground pork, pork butts, pork chops, pork ribs | Hormel (Tr. 35:21-23) | Purchased pork products at Fareway's twice per month (Tr. 36:2); Purchases pork at Sam's Club once per month (Tr. 39:2-4) |
| Edwin Blakey | bacon, ham, pork butt, pork chops, pork loin, pork ribs, pork shoulder | Hormel (Tr. 83:12); Smithfield (83:17) | Purchased pork products once a month (CIPP Responses to Def. Interrog. Ex. A) |
| Donya Collins | bacon, ham, ground pork, pork chops, pork loins | Tyson (Tr. 85:4); Hormel (Tr. 85:5) | From 2013 to 2020, purchased pork products once per week (Tr. 82:1) |

1

| Consumer | Pork Product | Defendant Branded Purchases | Frequency of Purchases |
|---|---|---|---|
| Thomas Cosgrove | bacon, salt pork, pork chops | Smithfield (Tr. 54:4-7); Hormel (Tr. 54:2-3) | Purchased pork products Three to four times each month.  (Tr. 37:2-4) |
| Chris Deery | bacon, pork belly, pork links, pork butt, pork tenderloin, ham, pork loin | Smithfield (Tr. 72:7-8); Hormel (Tr. 73:7) | Purchased pork products once a month from at least May 2017 to current (CIPP Responses to Def. Interrog. Ex. A) |
| Wanda Duryea | Ham, Pork loin, bacon, pulled pork, pork chops, pork roasts | Hormel (Tr. 35:23), Smithfield (Tr. 35:22) | Purchased pork products from Sam's Club every 2-3 months (Tr. 57:18-20) |
| Charles Dye | Pork steak, ham, Pork loin, bacon, pulled ribs, pork chops, pork roasts, pork shoulders | Hormel (Tr. 28:14-16); Smithfield (Tr. 31:7-10; 54:25) | Purchased pork products Ocne per month and twice per year (CIPP Response to Def's Interrog., Ex. A.) |
| James Eaton | ham, bacon | Smithfield (Tr. 36:9-14); Hormel (Tr. 83:14) | Purchased pork products once per week (Tr. 80:17-21). |
| Bob Eccles | bacon | | Purchased bacon one to two times a month (Tr. 42:23) |
| Christina Hall | bacon, pork chops, pork loin; ground pork, pork butt, sliced ham | Hormel (Tr. 81:18), Smithfield (Tr. 81:18-19), Tyson (Tr. 35:18-25; 36:1-7 | Purchased pork products once or twice per month (Tr. 52:9-10) |
| Sarah Isola | bacon, pork ribs, ham | | Purchases pork products on a monthly basis (Tr. 37:22-25; 38:1) |

| Consumer | Pork Product | Defendant Branded Purchases | Frequency of Purchases |
|---|---|---|---|
| Kenneth King | bacon, pork chops, pork tenderloins | Tyson (Tr. 96:2-6) | Purchased pork products once to twice per month (Tr. 72:1-7) |
| Ryan Kutil | pork sausages, pork tenderloins, pork ribs, pork chops, bacon, pork butt, pork roast | Smithfield (Tr. 102:20); Hormel (Tr. 102:20) | Purchases pork loins a couple times per month. (Tr. 75:23-25; 76:1-3) |
| David Look | bacon, ham | Hormel (Tr. 81:16); Tyson (Tr. 81:17) | Purchased pork products 2008 to the present (CIPP Response to Def' Inerrog., Ex. A) |
| Kenneth Neal | baon, ham, pork ribs, pork shoulder | Hormel (Tr. 56:16); Tyson (Tr. 56:17); Smithfield (Tr. 56:17) | Purchased pork products one to two times per week (Tr. 69:8-16). |
| Chad Nodland | bacon, pork butts | Smithfield (Tr. 91:23-24) | Purchased pork butts in the summer (Tr. 132:7-8); often purchased bacon to prepare "hot breakfast" for his kids each day and would rotate bacon in and out of that hot breakfast (See Tr. 126:6-13) |
| Michael Pickett | bacon, ham, pork chops | Tyson (Tr. 72:18); Smithfield (Tr. 72:23) | Purchased pork products once per month (CIPP Response to Def' Inerrog., Ex. A). |
| Joseph Realdine | pork loin, spare ribs, pork chops, | Hormel (Tr. 85:16) | Purchased pork products every month (Tr. 64:23-25) |

| Consumer | Pork Product | Defendant Branded Purchases | Frequency of Purchases |
|---|---|---|---|
| Michael Reilly | bacon, ham, pork loin | Hormel (Tr. 31:22-32:3) | Purchased pork products twice a month (Tr. 35:12-17) |
| Eric Schaub | bacon, ribs, pork bellow, pork chops, pork shoulder | Tyson (Tr. 30:16-19), Smithfield (Tr. 28:13-6); Hormel (Tr. 24:17-19) | Purchased pork products from costco monthly (Tr. 40:17-18); two times each month from Publix (Tr. 50:16) |
| Kate Smith | bacon, pork loin, pork shoulders, pork chops, ham steak | Smithfield (Tr. 45:25), Tyson (Tr. 46:2), and Hormel (Tr. 46:2) | Purchased pork products at least once a week, at times twice a week (Tr. 30:12-15). |
| Sandra Steffen | bacon, ham, pork roast, pork chops, ham steaks | "Looks for" Hormel and Tyson when going to the grocery store (Tr. 20:9-13) | Purchased bacon from Costco that lasts two to three months (Tr. 40:11-13) |
| Jennifer Sullivan | pork chops, ham, bacon, pork roasts | Hormel (Tr. 46:22); Smithfield (Tr. 46:22); Tyson (Tr. 46:22) | Purchased pork shoulders once per month (Tr. 62:13-15); |
| Stacy Troupe | bacon, ham shank, pork chops, pork roasts | Smithfield (Tr. 51:4-6), Tyson (Tr. 53:4-6), Hormel (Tr. 35:12-14), | Varied, but often once or twice per week(Tr. 62:10-11) |
| Laura Wheeler | pork ribs, bacon, pork roasts | Smithfield, Hormel (Tr. 51:20-25) | Purchased pork every other week from 2015 to 2018 (Tr. 49:4-7) |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE PORK ANTITRUST
LITIGATION

_This Document Relates to_:

All Consumer Indirect Purchaser Plaintiff
Actions

Civil No. 0:18-1776 (JRT-JFD)

**CERTIFICATE OF COMPLIANCE
ON REPLY MEMORANDUM IN
SUPPORT OF CONSUMER
INDIRECT PURCHASER
PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

010736-11/2072371 V1

I, SHANA E. SCARLETT, certify that this brief complies with the type-volume limitation of D. Minn. L.R. 7.1(f)(1), consistent with the agreement of the parties (ECF No. 1274) and Order of this Court (ECF No. 1592) expanding the word limit 4,000 words in addition to the remaining 10,372 words for a total of 14,372 words, and with the type-size limit of D. Minn. L.R. 7.1(h)(1).

The reply brief has 14,282 words of type, font size 13 and was prepared using Microsoft Word, which includes all text, including headings, footnotes, and quotations in the word count.

DATED: November 18, 2022                   Respectfully submitted,

                                           HAGENS BERMAN SOBOL SHAPIRO LLP

                                           By:___/s/ Shana E. Scarlett_____
                                               SHANA E. SCARLETT
                                           Rio Pierce
                                           715 Hearst Avenue, Suite 202
                                           Berkeley, California 94710
                                           Telephone: (510) 725-3000
                                           Facsimile: (510) 725-3001
                                           shanas@hbsslaw.com
                                           riop@hbsslaw.om

                                           Steve W. Berman
                                           Breanna Van Engelen
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           1301 Second Avenue, Suite 2000
                                           Seattle, Washington 98101
                                           Telephone: (206) 623-7292
                                           Facsimile: (206) 623-0594
                                           steve@hbsslaw.com
                                           breannav@hbsslaw.com

                                           Elaine T. Byszewski
                                           HAGENS BERMAN SOBOL SHAPIRO LLP

301 North Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150
elaine@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

*Interim Co-Lead Counsel for Consumer
Indirect Purchaser Plaintiffs*

- 2 -