**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Civil No. 18-cv-01776 (JRT/JFD) |
| This Document Relates to: *Direct Purchaser Class Action* | **[PUBLIC REDACTED VERSION]** |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO DIRECT**
**PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND ............................................................................................. 2

I.     THE PROPOSED DPP CLASS MEMBERS INCLUDE LARGE
       AND NATIONAL BUSINESSES, WHILE THE DPP CLASS
       REPRESENTATIVES ARE UNIFORMLY SMALL AND REGIONAL ... 3

II.    DPPS USED SEVERAL CONTRACTING METHODS,
       NONE OF WHICH ARE TYPICAL OF THE PROPOSED CLASS .......... 6

III.   NAMED DPPS OPERATE IN A
       LIMITED GEOGRAPHIC MARKET ........................................................ 9

ARGUMENT .................................................................................................. 10

I.     DPPS FAIL TO DEMONSTRATE
       PREDOMINANCE UNDER RULE 23(b) ................................................ 10

II.    DPPS CANNOT MEET THE TYPICALITY
       REQUIREMENT OF RULE 23(a)(3) ..................................................... 12

       A.   The DPPs' Differing Abilities to Negotiate
           Pork Prices Preclude The DPPs from Meeting Their
           Burden of Showing Typicality ........................................................... 13

       B.   The DPPs' Differing Purchasing Mechanisms Preclude
           The DPPs from Meeting Their Burden of Showing Typicality ....... 15

       C.   The Differences In Geographic Reach of The DPPs Preclude
           Them from Meeting Their Burden of Showing Typicality .............. 17

III.   DPPS FAIL TO SATISFY THE ADEQUACY
       REQUIREMENT OF RULE 23(a)(4) ..................................................... 20

       A.   Intra-Class Conflicts Prevent Named DPPs from
           Meeting Their Burden of Showing Adequacy ................................. 20

       B.   Olean's Failures to Meet Its Discovery Obligations
           Preclude It from Meeting Its Burden to Show Adequacy ............... 21

CONCLUSION ............................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................ 15, 19

*In re Auto. Parts Antitrust Litig.*,
    No. 12-md-02311, 2019 WL 626143 (E.D. Mich. Jan. 7, 2019) .......................... 13, 15

*In re Baycol Prods. Litig.*,
    218 F.R.D. 197 (D. Minn. 2003).......................................................................... 12, 19

*Belles v. Schweiker*,
    720 F.2d 509 (8th Cir. 1983) ..................................................................................... 12

*Bieneman v. City of Chicago*,
    864 F.2d 463 (7th Cir. 1988) ..................................................................................... 21

*Fidel v. Farley*,
    No. 1:00-CV-48-M, 2004 WL 7340526 (W.D. Ky. Jan. 15, 2004).............................. 23

*Food Lion, LLC v. Dean Foods Co.*,
    321 F.R.D. 472 (D.P.R. 2017) ................................................................................... 19

*Gen. Tel. Co. Sw. v. Falcon*,
    457 U.S. 147 (1982)................................................................................................... 12

*In re Graphics Processing Units*,
    253 F.R.D. 478 (N.D. Cal. 2008)............................................................. 13, 14, 15, 17

*Hoekman v. Educ. Minn.*,
    335 F.R.D. 219 (D. Minn. 2020)................................................................................ 21

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    MDL Docket No. 05–1717–LPS, 2014 WL 6601941 (D. Del. Aug. 6,
    2014) ......................................................................................................................... 13

*Lang v. Kansas City Power & Light Co.*,
    199 F.R.D. 640 (W.D. Mo. 2001) .............................................................................. 20

ii

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

*In re Milk Prods. Antitrust Litig.*,
   195 F.3d 430 (8th Cir. 1999) .......................................................... 17, 19, 20

*In re Optical Disk Drive*,
   303 F.R.D. 311 (N.D. Cal. 2014) .......................................................... 16, 17

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ................................................................ 21

*Rattray v. Woodbury Cnty.*,
   253 F.R.D. 444 (N.D. Iowa 2008), *aff'd*, 614 F.3d 831 (8th Cir. 2010)..................... 23

*Sample v. Monsanto Co.*,
   218 F.R.D. 644 (E.D. Mo. 2003), *aff'd sub nom.*
   *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) ............................................. 11

*In re Terazosin Hydrochloride Antitrust Litig.*,
   223 F.R.D. 666 (S.D. Fla. 2004) .......................................................... 21, 22

*Thomas v. City of Chicago*,
   No. 83 C 5601, 1984 WL 946 (N.D. Ill. Aug. 30, 1984) ............................................ 22

*In re Urethane Antitrust Litig.*,
   No. 04–MD–1616–JWL, 2010 WL 10876331 (D. Kan. Jan. 20, 2010)..................... 19

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ................................................................ 21

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   946 F.3d 995 (8th Cir. 2019) ................................................................ 11

## Other Authorities

Fed. R. Civ. P. 23.......................................................................*passim*

## PRELIMINARY STATEMENT

The Direct Purchaser Plaintiffs (the "DPPs") ask this Court to certify a class of disparate direct purchasers who purchased different pork products, experienced different costs and savings, purchased through different means and contractual arrangements, based on different pricing calculations, and possessed different levels of bargaining power.  In their Omnibus Brief,[1] Defendants demonstrate how Plaintiffs, including DPPs, fail to satisfy the demanding predominance requirement of Federal Rule of Civil Procedure 23(b)(3) by attempting to meet their burden of showing predominance through expert evidence incapable of establishing common antitrust impact.  The DPPs' failures, however, do not end there:  the DPPs also fail to meet their burden of showing they meet the typicality and adequacy requirements of Rule 23(a).  Accordingly, even if the DPPs could establish predominance, which they cannot, the Court should still deny their motion for class certification for the independent reasons described herein.

***Typicality.***  The DPPs fail to satisfy the typicality requirement because the named DPPs operate in a different market environment than the typical proposed class members.  First, the named DPPs are smaller distributors and wholesalers who represent only a small segment of the proposed class that also includes large, billion-dollar corporations like Wal-Mart and Costco.  Second, the named DPPs purchased pork using a variety of

---

[1] Defs.' Omnibus Mem. in Opp'n to All Class Pls.' Mots. for Class Certification, Aug. 24, 2022 (the "Omnibus Brief").  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Omnibus Brief.

different contracting methods, none of which are typical of the contracting methods of the proposed class they seek to represent.  And third, the named DPPs all operate on the East Coast of the United States, meaning their pork purchases differ from other proposed class members due to differences in and demand of other U.S. geographic markets.  The DPPs do nothing to confront these disparities among their proposed class members.  Instead, they claim to meet their burden of establishing typicality with a mere conclusory statement that Defendants entered into a conspiracy and that the named DPPs will prove the same elements that other proposed class members would need to prove.  DPPs' Mem. Supp. Class Certification 35, ECF No. 1320 (hereinafter, "DPP Br.").

 *Adequacy.*  For the same reasons DPPs cannot establish typicality, they also cannot not meet their burden of showing they are adequate representatives of the proposed class.  Furthermore, certain named DPPs utilize pricing structures through which they could only benefit from the alleged conspiracy and therefore cannot adequately represent the interests of the proposed class.  Finally, named DPP Olean Wholesale Grocery Cooperative, Inc. ("Olean") is not an adequate class representative because it has fallen far short of its discovery obligations under the Federal Rules of Civil Procedure.

## **BACKGROUND**

 The DPPs seek to certify a broad class of every company that purchased any amount of any pork loins, shoulders, ribs, bellies, bacon, and hams directly from Defendants at any time during the period from June 29, 2014 to June 30, 2018 (the "Class

Period"). DPP Br. 31. Proposed class members range from small, regional restaurants to nationwide mega-retailers with billions of dollars in revenue.

## I. THE PROPOSED DPP CLASS MEMBERS INCLUDE LARGE AND NATIONAL BUSINESSES, WHILE THE DPP CLASS REPRESENTATIVES ARE UNIFORMLY SMALL AND REGIONAL

The proposed DPP class includes well-known, nationwide retailers (e.g., Wal-Mart), restaurant chains (e.g., Famous Dave's Bar-B-Que), and manufacturers of further processed pork products (e.g., Oscar Mayer) as well as much smaller-scale operations such as local grocers, restaurants, and regional distributors. The largest direct purchaser of pork spent almost $5 billion on pork products from all Defendants throughout the Class Period; 20 spent over $200 million during that period. Strang Aberg Decl. Ex. 1, Dr. Laila Haider Expert Report ("Haider Rep.") App. D-35.[2] In contrast, three of the four named DPPs each purchased less than $5 million worth of pork from all Defendants during the Class Period, and no named DPP purchased more than $20 million worth of pork from Defendants during the Class Period. *Id.* On the other end of the spectrum, other direct purchasers spent no more than $2,000 on pork products from all Defendants over the Class Period. *Id.*

These differences in size and scope among proposed DPP class members yield significant differences in bargaining power. Large direct purchasers use their leverage

---

[2] Unless otherwise noted, exhibit references are to the documents attached to the Declaration of Allison M. Vissichelli, dated August 24, 2022, that is filed concurrently herewith. References to the "Strang Aberg Decl." refer to the Declaration of Lindsey Strang Aberg, dated August 24, 2022, which was filed concurrently with the Omnibus Brief.

and sophistication to negotiate for lower pork prices.  They can demand lower pork prices

by threatening to buy large volumes of pork elsewhere, leaving a pork supplier in the

position of having too much pork and no one to sell it to.  *See* ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████; Ex. 2, Ferraro Foods Dep. 134:2-135:9

(Ferraro Foods confirming that purchasers may obtain "leverage in . . . negotiations" by

purchasing for a private-label product where they can "threaten to move [their business]

if the[] [suppliers] don't give [them] the discount [they] want").  While it may be feasible

for a pork supplier to find an alternative purchaser for a few hundred pounds of pork in

response to one small purchaser's refusal to accept a price increase, finding a new home

for a million pounds of pork is a much taller order.  *See, e.g.*, Ex. 3, TF-P-000134563

("[I]f [Wal-mart] cuts our volume back substantially . . . this could really cripple our

plants ability to operate, (especially this fall/winter) as we work through record hog

numbers.").  And the threat of immediate lost volume is not the only leverage that large

purchasers have.  The ability to offer stable business for millions of pounds of pork

products also gives larger purchasers leverage that smaller purchasers lack.  Strang Aberg

Decl. Ex. 2, Dr. James Mintert Expert Report ("Mintert Rep.") III.D.1.c; *see also, e.g.*,

Ex. 4, CLMNS-0000633743 (internal Clemens discussion demonstrating Clemens's

willingness to make special allowances to "build and strength[en] the relationship" with a

large restaurant chain (Darden)).

4

In addition to leveraging their purchase volumes to demand lower prices, large direct purchasers can impose non-price-related concessions that drive up pork suppliers' costs.  For example, many large direct purchasers scrutinize their pork suppliers' production practices to ensure conformity with evolving animal welfare and nutritional standards.  *See, e.g.*, ███████████████████████████████

████████████████████████████████████████

██████████████████████████████.  Smaller companies do not have the same negotiating power to demand comparable visibility into supplier operations.

Differences in size are not the only material distinction among proposed class members.  The type of business a direct purchaser operates affects its negotiating power as well, and members of the proposed DPP class run numerous different types of businesses.  As just one example, wholesalers and distributors would have to consider their contracts with and requests from downstream purchasers before substituting away from a particular pork product in response to a price increase, whereas restaurants may simply elect to change their menu offerings in order to make such a substitution.  *See, e.g.*, Ex. 2, Ferraro Foods Dep. 148:20-149:7 (testifying that Ferraro Foods' customers demand specific products sold by specific processors); Ex. 6, Olean Dep. 173:14-175:4 (testifying that customer preferences impact which products Olean purchases).

Although the proposed class of DPPs broadly includes this range of purchasers from small, regional restaurants to nationwide mega-retailers with billions of dollars in revenue, the proposed class representatives consist of only small distributors and

wholesalers.[3]  Together, the named DPPs represent a tiny sliver of the proposed class and capture none of its significant variability.[4]  Remarkably, the proposed class representatives include no restaurants, no large distributors or wholesalers, and no nationwide entities of any sort.

## II.   DPPS USED SEVERAL CONTRACTING METHODS, NONE OF WHICH ARE TYPICAL OF THE PROPOSED CLASS

Members of the proposed DPP class also used a wide variety of contracting methods during the Class Period.  Contrary to the DPPs' claim that the USDA cut-out values are the basis for all DPPs' pork pricing,[5] the reality is that direct purchasers bought pork using a range of contracting and pricing methods.  *See, e.g.*, Ex. 10, White Dep. 229:24-230:4 ("Each [Tyson customer] was different.  So some customers preferred to negotiate each and every order . . . In other cases, we sold to them on what is referred to

---

[3] *See* Ex. 2, Ferraro Foods Dep. 14:14-16 ("Ferraro Foods is a distributor mainly to pizzerias, Italian restaurants, delis."); Ex. 7, John Gross Dep. 17:23-25 (describing John Gross as a "food service distributor"); Ex. 8, Maplevale (Dunderdale) Dep. 22:11-12 ("Maplevale is a broadline food service distributor."); Ex. 9, C&S Wholesale Grocers, *C&S Wholesale Grocers to Acquire Olean Wholesale Grocery Cooperative* (Dec. 6, 2018), https://www.cswg.com/news/cs-wholesale-grocers-acquire-olean-wholesale-grocery-cooperative-inc-premier-full-service-food/ (describing Olean as a "full-service grocery wholesaler").

[4] *See* Ex. 2, Ferraro Foods Dep. 80:10-12 ("[Ferraro Foods is] represented from Upstate New York all the way down to Georgia."); Ex. 7, John Gross Dep. 29:18-24 ("[John Gross's] distribution area is roughly 150 to 200 miles from Mechanicsburg, Pennsylvania."); Ex. 8, Maplevale (Dunderdale) Dep. 126:6-14 ("[Maplevale] distribute[s] in New York, a little in Ohio and in Pennsylvania as well."); *see also* Strang Aberg Decl. Ex. 1, Haider Rep. App. D-35 (showing that the named DPPs purchased a fraction of the amount of pork products that the larger direct purchasers did).

[5] Dr. Russell Mangum Expert Report Supp. DPPs' Class Certification ¶¶ 189-93, ECF No. 1330 ("Mangum Rep.").

as a formula basis.").  For example, unlike many proposed class members, neither named

DPPs Maplevale nor John Gross purchased pork via long-term contracts that locked in

their pricing or even their pricing formulas.  *See* Ex. 7, John Gross Dep. 44:4-18; Ex. 8,

Maplevale (Dunderdale) Dep. 60:19-61:8.  Both instead purchased pork using pricing

reflected on short-term price lists circulated by pork suppliers.  *See* Ex. 7, John Gross

Dep. 44:4-18 (stating that John Gross receives price lists from suppliers with set prices

that are valid for a few days); Ex. 8, Maplevale (Dunderdale) Dep. 53:16-22 (stating that

Maplevale learned of product prices from weekly, bi-weekly, or monthly price lists

received from suppliers).

Even as to customers who purchased pork on the basis of short term price lists,

there is significant variability as to actual prices paid.  John Gross, for example, indicated

that supplier price lists were just a starting point for negotiations, and it would often

negotiate for prices lower than the prices reflected on the list, particularly where it was

purchasing significant volumes of a given pork product.  Ex. 7, John Gross Dep. 56:20-23

("Q. The company will negotiate with a supplier to try to get a better price than what's

listed on the price list?  A. Based on the volume, yes.").  Maplevale, on the other hand,

did not actively negotiate with suppliers—believing that "their best offer was their first

offer"—and only negotiated with suppliers around "once a year maybe" when purchasing

higher volumes of product due to seasonal demands.  Ex. 8, Maplevale (Dunderdale)

Dep. 55:6-58:18.  Thus, customer-specific negotiations and purchase volumes could

impact pork prices even in instances where customers used the same pricing methodology, such as price lists, as a starting point.[6]

Moreover, while certain contracts of the proposed class representatives did refer directly to a USDA index for prices, *see, e.g.*, Ex. 2, Ferraro Foods Dep. 110:12-112:13 (explaining that Ferraro Foods purchases pork pursuant to formulas tied to public indexes, including USDA, that are memorialized by contract),[7] Defendants also sold pork to direct purchasers using fixed or set short-term prices or through direct negotiations for one-off, short-term purchases, *see, e.g.*, ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ Ex. 13, TF-P-001377323 at pp. 3-4 (demonstrating Tyson's use of the following five methods for pricing pork:  formula (price based on reported market, like (though not exclusively) the USDA), negotiated (fixed price or volume to be delivered within ten days of negotiating),

---

[6] The representative for named DPP Olean was unprepared to provide evidence as to its contracting methods regarding its purchase of pork despite having been noticed on this topic.  Ex. 6, Olean Dep. 131:7-132:13; Ex. 11, Schedule A 30(b)(6) Dep. Notice Olean Wholesale Grocery Coop., Inc., Subject Matter Area 6.

[7] Even Ferraro Foods' contracts varied in (1) length (its contracts with Tyson, for example, are three months, while its standard contracts were a year, Ex. 2, Ferraro Foods Dep. 113:12-20); (2) volume discounts and rebates (*id.* 115:8-19, 118:17-22, 119:18-21); and (3) structure (its contracts with Smithfield, for example, are based around "weekly pricing," *id.* 117:20-118:11, while its contracts with Hormel have "geographic pricing," *id.* 120:17-121:6).

forward (fixed price or volume to be delivered beyond ten days of negotiating), hedge (hedging decision combined with fixed price or volume to be delivered beyond ten days of negotiating), and MSP (agreed upon ceiling price, with purchaser receiving formula price if cheaper than agreed upon ceiling price)).

## III.   NAMED DPPS OPERATE IN A LIMITED GEOGRAPHIC MARKET

While the DPPs seek to certify a class comprised of "[a]ll persons and entities who directly purchased" pork "for use or delivery in the United States," Mangum Rep. ¶ 10, supplier competition, prices paid by direct purchasers, demand for pork products, and the input costs of hogs and pork all vary based on geographic markets.  *See, e.g.*, Mangum Rep. 115 n.459 (conceding that "if there are meaningful differences in price across regions that are not explained by shipping costs, opportunistic customers (including those with multiple locations) could potentially earn an arbitrage by purchasing (relatively) cheap pork from one region and re-selling it in a (relatively) expensive part of the country"); Ex. 2, Ferraro Foods Dep. 120:23-25 ("Ferraro Foods of New Jersey will get a better price on pepperoni than North Carolina will."); Ex. 14, USDA (Cox) Dep. 33:1-36:18, 158:7-160:25 (explaining the USDA publishes hog producer contracts and 102 weekly swine reports *by region*, in order to provide hog producers better "market transparency" into regional swine markets); Ex. 15, USDA (Cox) Dep. Ex. 1.

The proposed class representatives, however, operate only in a limited geographic market concentrated on the East Coast of the United States.  Food service distributor John Gross operates primarily in Pennsylvania, broadline food distributor Maplevale and

grocery wholesaler Olean each operate within a few states in the Northeast, and distributor Ferraro Foods operates along the East Coast.[8]  In fact, none of the proposed class representatives operates west of Ohio.  The proposed class representatives are accordingly differently situated from direct purchasers based in the Midwest or West Coast, for example, who face different market dynamics in purchasing pork products. *See* Ex. 8, Maplevale (Dunderdale) Dep. 46:11-20 (explaining that different manufacturers produce hams with tastes that may be "too smoky for the northeast or maybe not [smoky] enough for the southwest").

## ARGUMENT

## I.     DPPS FAIL TO DEMONSTRATE PREDOMINANCE UNDER RULE 23(b)

The DPPs' failure to demonstrate that common questions predominate over questions only affecting individual members is fatal to their bid for class certification.[9] DPPs rely only on the testimony of their expert, Dr. Mangum, to show predominance. *See* Omnibus Brief at Argument I.A.  But, for the reasons described in Defendants' Memorandum in Support of Their Motion to Exclude Dr. Russell Mangum Expert Report and Testimony, filed concurrently herewith, Dr. Mangum fails to provide a reliable or

---

[8] *See* Ex. 2, Ferraro Foods Dep. 80:10-12; Ex. 7, John Gross Dep. 29:18-30:4; Ex. 8, Maplevale (Dunderdale) Dep. 126:6-14; Ex. 9, *C&S Wholesale Grocers to Acquire Olean Wholesale Grocery Cooperative* (Dec. 6, 2018) (noting "[t]he company services over 270 independent food retail and convenient stores throughout New York, Pennsylvania, and Northeast Ohio").

[9] The failure of the DPPs, and the other Plaintiffs, to meet demanding predominance requirement of Fed. R. Civ. P. 23(b) is further detailed in the Omnibus Brief.

persuasive means of proving common impact.  Accordingly, DPPs cannot meet their

burden of demonstrating predominance as required by Rule 23(b)(3).[10]

Moreover, as detailed in the Omnibus Brief, Dr. Mangum:

- Offered no evidence of impact during the actual Class Period, instead only opining on the *average* effects of the Alleged Conspiracy Period.  Omnibus Brief at Argument I.B.1.a.

- Admitted that his model does not identify potential differences in damages sustained during the Class Period, specifically as compared to the 2009 to 2014 timeframe preceding it.  *See* Ex. 16, Mangum Dep. 493:6-494:8.

- Selected an unreliable benchmark period for analyzing pork prices by including 2008.  Omnibus Brief at Argument I.B.1.b.  2008 was an outlier year for hog supply, as production was at historically high levels.  When Defendants' expert, Dr. Haider, reran Dr. Mangum's model but controlled for 2008, Dr. Mangum's estimated overcharge became negative for most cuts of pork.  *Id.*

- Masked uninjured class members in his average overcharge model by failing to actually analyze whether individual class members were overcharged.  *Id.* at Argument I.B.2.b.  Without making any changes to Dr. Mangum's model, Dr. Haider calculated overcharges for the top direct purchasers during the Alleged Conspiracy Period and found that over 25% sustained no positive and statistically significant overcharge.  Strang Aberg Decl. Ex. 1, Haider Rep. ¶ 145.

- Ignored the economic reality of the pork industry and failed to isolate lawful and unlawful conduct.  Omnibus Brief at Argument I.B.3.

---

[10] *See, e.g.*, *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1003-04 (8th Cir. 2019) (holding that the district court did not err in denying a motion to reconsider denial of class certification where the expert supporting class certification could not withstand the *Daubert* test); *Sample v. Monsanto Co.*, 218 F.R.D. 644, 650 (E.D. Mo. 2003) (concluding that plaintiffs failed to satisfy their burden of establishing predominance where, after weighing the expert testimony, the court determined that improper assumptions and flawed methodology on the part of plaintiff's expert did not support the conclusion that class-wide impact and damages could be established with common proof), *aff'd sub nom. Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005).

As a result of all of these failures, the DPPs—like all Plaintiffs—cannot establish class-wide impact and their motion for class certification fails.

## II.   DPPS CANNOT MEET THE
## TYPICALITY REQUIREMENT OF RULE 23(a)(3)

The DPPs also fail to meet their burden of showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23. To establish typicality, the DPPs have the burden of providing evidence that the class representatives' interests are aligned with those of the rest of the class *and* that the class representatives will advance the interests of the class members. *Gen. Tel. Co. Sw. v. Falcon*, 457 U.S. 147, 156, 158 n.13 (1982); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 205 (D. Minn. 2003). The DPPs provide no such evidence.

Instead, the DPPs devote a mere two sentences of their certification brief to their attempt to establish typicality, repeating only their broad and conclusory allegation that Defendants illegally conspired to fix pork prices and that they "will prove the same elements that other proposed Class members would need to prove." DPP Br. 35. Rule 23(a)'s typicality requirement cannot be satisfied by speculative, conclusory allegations alone. *See Belles v. Schweiker*, 720 F.2d 509, 515 (8th Cir. 1983) (affirming denial of class certification and determining typicality requirement not met where allegations were speculative and conclusory). But that is all the DPPs have put forth.

The DPPs' failure to adduce any evidence in support of their typicality claim is unsurprising, given that all the evidence points to "overwhelming disparities in the circumstances surrounding the proposed class representatives' purchases versus the

defendants' sales to absent class members." *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2019 WL 626143, at *9-11 (E.D. Mich. Jan. 7, 2019) (internal citations omitted).  Overwhelming disparities in the sizes and purchasing volumes, contracting methods, and geographic scope of the proposed DPP class belie the DPPs' *ipse dixit* that the individual claims of their proposed class representatives against Defendants are probative of those of the very differently situated class members they seek to represent.

A.   **The DPPs' Differing Abilities to Negotiate Pork Prices Preclude The DPPs from Meeting Their Burden of Showing Typicality**

Courts regularly hold that differing negotiation skill and bargaining power among proposed class members defeats typicality.  *See, e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig.*, MDL Docket No. 05–1717–LPS, 2014 WL 6601941, at *11-12 (D. Del. Aug. 6, 2014) (denying certification for lack of typicality where ability to negotiate was typical for some class members and not represented by the current class representatives).  Here, disparities in the size and purchasing volumes of the named DPPs and the absent class members result in such differences.

In *In re Graphics Processing Units Antitrust Litigation*, for example, the named plaintiffs of the proposed class made only small, individual purchases off of defendants' list prices on non-negotiable terms, while the proposed class also included "wholesale conglomerates, such as Dell, Microsoft, Hewlett–Packard, Apple, Motorola, and Best Buy," who purchased a variety of products on individually negotiated terms.  253 F.R.D. 478, 489-90 (N.D. Cal. 2008).  Pointing to this reality, the court denied certification on typicality grounds.  *Id.*  As the court explained, the named plaintiffs did not have "the

appropriate incentive to establish antitrust violations with respect to all of the absent class members" due to these differences.  *Id.* at 490.

Here, as in *In re Graphics Processing Units*, the proposed DPP class includes a wide range of purchasers, from nationwide retailers like Wal-Mart and Costco to small operations like local grocers, restaurants, and regional distributors, yet the named DPPs are a relatively homogenous group of small distributors and wholesalers.  These differences in size and scope of operations among direct purchasers result in varying levels of opportunity and ability to negotiate, with the negotiating power and opportunity afforded to small, regional distributors and wholesalers like the named DPPs being distinct from that of massive nationwide retailers and small local restaurants.  *See supra* Background I.

These distinctions are further compounded for named DPPs Maplevale, John Gross, and Ferraro Foods, each of which has outsourced some or all of its pork purchases to a "buying group" called UniPro, Ex. 2, Ferraro Foods Dep. 214:10-12, which is "owned by food service distributors."  Ex. 7, John Gross Dep. 41:19-23, 42:8-12; *see also* Ex. 8, Maplevale (Dunderdale) Dep. 32:17-22.[11]  As Douglas Neckers, President and CEO of Maplevale testified, UniPro provides its members with a "stronger voice since they're speaking on behalf of 400 distributors," Ex. 17, Maplevale (Neckers) Dep. 80:4-21, putting its members in a unique negotiation position with suppliers as compared to

_____

[11] UniPro has also individually brought direct claims in this action.  Unipro Am. Compl., ECF No. 1294.

purchasers who are not members, Ex. 8, Maplevale (Dunderdale) Dep. 70:25-71:21 (agreeing that certain savings were only offered through UniPro). Accordingly, as members of a cooperative purchasing organization that maintains a unique negotiating position for its members, three of the four named DPPs maintain negotiating opportunity and ability that is atypical of the thousands of small retailers, distributors, and wholesalers who lack the same aggregate power, as well as the nationwide retailers who negotiate individually on their own behalf. Because the proposed class members "[come] to the negotiating table in a fundamentally different position" than the named DPPs, the DPPs cannot establish typicality pursuant to Rule 23(a)(3). *In re Graphics Processing Units*, 253 F.R.D. at 489.

### B. The DPPs' Differing Purchasing Mechanisms Preclude The DPPs from Meeting Their Burden of Showing Typicality

There is also no proposed class member with claims that are typical of others because direct purchasers purchased pork products from Defendants in myriad ways. This disparity in how the named DPPs and other members of the proposed class purchased pork products from Defendants destroys typicality, as proof that any of the named DPPs suffered antitrust impact as a result of Defendants' alleged conspiracy would not be probative of whether other proposed class members were impacted by Defendants' alleged conduct. *In re Auto. Parts*, 2019 WL 626143, at *11; *see also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007) (concluding that differences between the named plaintiffs and absent class

members with respect to contract terms, purchasing volumes, and preferred products made it "far from evident" that their claims were typical of the full class).

For example, in *In re Optical Disk Drive Antitrust Litigation*, the named plaintiffs all purchased optical disk drives through subsidiaries or the retailers' websites, while other members of the class negotiated purchase prices directly or ran bidding processes. 303 F.R.D. 311, 317 (N.D. Cal. 2014). The court concluded that typicality was not present because the proposed class included "a myriad of other [] purchasers whose . . . means of [] purchases do not compare" to those of the named plaintiffs. *Id.* As a result, the court concluded that the named plaintiffs did not have the "appropriate incentive" to establish antitrust violations. *Id.* at 318 (citing *In re Graphics Processing Units*, 253 F.R.D. at 489-90).

Similarly here, the diversity of the contracting methods used by direct purchasers means that there was no typical mechanism direct purchasers used to purchase pork products from Defendants. *See, e.g.,* ██████████████████████ ████████████████████████ Ex. 13, TF-P-001377323 at 3-4 (demonstrating that Tyson used five different pricing methods for pork). There is significant variation among the named DPPs themselves. Maplevale and John Gross both purchased pork on a short-term basis and did not use any long-term contracts. Ex. 7, John Gross Dep. 44:4-11; Ex. 8, Maplevale (Dunderdale) Dep. 51:5-20, 61:2-8, 61:24-62:6. Ferraro Foods purchased pork using long-term contracts with indexed pricing based on USDA data. Ex. 2, Ferraro Foods Dep. 110:12-112:13. Accordingly, like the

proposed class representatives in *In re Optical Disk Drive*, the named DPPs here do not

have appropriate incentives or ability to establish liability or overcharge for the

purchasing methods that they did not use.  Maplevale's and John Gross's only incentive

is to prove that their non-contract purchases were impacted by the alleged conspiracy,

and Ferraro Foods will attempt to prove that its index-based purchases were impacted.

These differences defeat typicality.  *In re Optical Disk Drive*, 303 F.R.D. at 318 (citing *In

re Graphics Processing Units*, 253 F.R.D. at 489-90); *see also, e.g.*, *In re Milk Prods.

Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) (holding that the claims of named

plaintiffs buying at list prices may be atypical of class members whose prices are not tied

to price lists).

### C.    The Differences In Geographic Reach of The DPPs Preclude Them from Meeting Their Burden of Showing Typicality

Separately, the differences in the geographic scope of the members of the

proposed nationwide DPP class means that the named DPPs do not typify the claims and

defenses of other class members.  The named DPPs do not conduct business nationwide;

rather, they are limited to disparate geographic regions.  *See, e.g.*, Ex. 2, Ferraro Foods

Dep. 80:10-12 (describing DPP Ferraro Foods's geographic reach as covering "Upstate

New York all the way down to Georgia"); Ex. 7, John Gross Dep. 29:18-24 (describing

DPP John Gross's regional footprint as "roughly 150 to 200 miles from Mechanicsburg,

Pennsylvania"); Ex. 8, Maplevale (Dunderdale) Dep. 126:9-14 (describing DPP

Maplevale's geographic reach as "New York, a little in Ohio and in Pennsylvania as

well").

While the demand for pork is global, the market for pork products is subject to regional demand and varying market forces. For example, Ferraro Foods receives different prices based on its location along the East Coast. Ex. 2, Ferraro Foods Dep. 120:21-25 ("Ferraro Foods of New Jersey will get a better price on pepperoni than North Carolina will."). There are more suppliers in the New Jersey region than in North Carolina, and so Ferraro Foods of New Jersey is able to negotiate lower pricing in that region. *Id.* 121:14-25. And as the direct purchasers typically pay the freight cost to get the pork delivered to them, the price inevitably varies based on where the direct purchaser is located. *Id.* 82:16-83:5 ("[M]ost pork's coming out of the Midwest. So if someone is farther out than someone else, you will pay more to freight it in."); Ex. 8, Maplevale (Dunderdale) Dep. 59:8-13 ("[W]e pay the freight to the suppliers and whatever their cost to get it deliver to us is."); Ex. 18, Freed Dep. 92:23-93:13 (testifying that Clemens has a "geographic advantage" compared to other Defendants because it had "less freight cost" to ship to "the largest population concentration in country"). Additionally, product preference and demand varies by geographic region. *See, e.g.*, Ex. 8, Maplevale (Dunderdale) Dep. 46:11-20 (explaining that different manufacturers produce hams with tastes that may be "too smoky for the northeast or maybe not [smoky] enough for the southwest"); *see also* Ex. 2, Ferraro Foods Dep. 120:21-121:6 (explaining that Ferarro Foods can get different prices for different pork products in different regions because "the demographics of [Ferraro's] location determine that price, and they just do a big deviation based on the geographic area").

These regional differences in market forces are more than substantial factual differences. *In re Baycol Prod. Litig.*, 218 F.R.D. at 205. To prove their claims, the DPPs will have to grapple with evidence showing ample non-conspiratorial reasons for the pork-price levels they claim were supracompetitive. *See In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2010 WL 10876331, at *4 (D. Kan. Jan. 20, 2010). And the evidence relevant to those non-collusive explanations will vary by geography because certain of the named DPPs experience different market forces from other named DPPs and the proposed class members they seek to represent—most notably, large, nationwide pork purchasers. *See In re Milk Prods.*, 195 F.3d at 436-37 (affirming district court's holding that typicality was not met in part due to geographic differences of the proposed class and that "any evidence regarding an alleged conspiracy in [the named representative's] area would not necessarily translate into evidence of a conspiracy in other regions"); *Food Lion, LLC v. Dean Foods Co.*, 321 F.R.D. 472, 483-84 (D.P.R. 2017) (determining that plaintiffs failed to meet the typicality standard due to the different competitive conditions the class members faced in various geographic markets); *Allied Orthopedic Appliances*, 247 F.R.D. at 178 (holding that named plaintiffs' claims were not typical because, in part, differences in preferred products by proposed class members). Because each named DPPs' claim will not be typical of other unnamed class members, the DPPs do not meet the typicality requirement of Rule 23(a)(3).

III.    **DPPS FAIL TO SATISFY THE
        ADEQUACY REQUIREMENT OF RULE 23(a)(4)**

The DPPs' failure to satisfy the typicality requirement of Rule 23(a) likewise

results in a failure to meet the adequacy standard of Rule 23(a)(4).  *See, e.g.*, *In re Milk

Prods.*, 195 F.3d at 433-34, 437 (affirming district court's denial of class certification

where the court concluded that the class representative was not an adequate or typical

class representative because, as a small convenience store located in one part of the state,

its claim was not typical of large purchasers (such as supermarkets, restaurants, and

distributors) located elsewhere in the state); *Lang v. Kansas City Power & Light Co.*, 199

F.R.D. 640, 658 (W.D. Mo. 2001) ("[T]he lack of typicality precludes a finding that the

class representatives can adequately represent the class members' interests.").

In addition, the named DPPs cannot establish that they will adequately represent

the interests of the putative class as certain named DPPs benefitted from the alleged

conduct.  Finally, named DPP Olean is not an adequate representative due to its failure to

meet its discovery obligations.

A.    **Intra-Class Conflicts Prevent Named DPPs
      from Meeting Their Burden of Showing Adequacy**

Intra-class conflicts prevent the DPPs from establishing that they will adequately

represent the interests of the putative class.  For instance, named DPP John Gross

admitted that, in determining the price at which it sells pork, John Gross adds a

percentage margin to its purchase price.  Ex. 7, John Gross Dep. 28:6-25.  Accordingly,

when the price of pork increases, John Gross earns a higher profit.  This means that an

alleged conspiracy to raise or fix prices could only have resulted in higher profits for

20

DPPs like John Gross that use percentage margins to determine their sales price. Intra-class conflicts precluding certification exist where "some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 243 (D. Minn. 2020); *see also Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) ("To our knowledge, no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class."); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (reversing the district court's order to certify the class because the proposed class lacks an adequate class representative and "[i]ncludes those who claim harm from the very same acts from which other members of the class have benefitted"); *Bieneman v. City of Chicago*, 864 F.2d 463, 465-66 (7th Cir. 1988) (affirming denial of class certification and noting that some class members "undoubtedly derive great benefit" from challenged conduct). Because DPPs like John Gross obtained direct economic benefits from any price increases, DPPs fail to meet the adequacy standard of Rule 23(a)(4).

### B. Olean's Failures to Meet Its Discovery Obligations Preclude It from Meeting Its Burden to Show Adequacy

Named DPP Olean also separately fails to show its adequacy as a class representative here because it has fallen far short of its discovery obligations as required by the Federal Rules. Courts have held that the adequacy requirement is not met where the plaintiffs failed to adequately respond to discovery requests. *E.g.*, *In re Terazosin*

*Hydrochloride Antitrust Litig.*, 223 F.R.D. 666, 674-75 (S.D. Fla. 2004). "A person who for whatever reason is unable to give or obtain full discovery should not be appointed to represent the interests of a large class. Principles of typicality and adequacy of representation prevent such an appointment." *Thomas v. City of Chicago*, No. 83 C 5601, 1984 WL 946, at *9 (N.D. Ill. Aug. 30, 1984).

*In re Terazosin Hydrochloride* highlights Olean's failures as to adequacy. 223 F.R.D at 668. In *In re Terazosin Hydrochloride*, the Eleventh Circuit permitted downstream discovery of the direct purchasers to allow the court to determine if the proposed class representatives would adequately represent the rest of the class. *Id.* at 670. After the class plaintiffs failed to comply with the subpoena, either due to an inability to comply or a refusal to cooperate, the court held that this failure left the court with no other choice but to deny the motion for class certification, because the adequacy requirement was not met. *Id.* at 674-75.

Here, named DPP Olean also failed to produce sufficient evidence to meet its discovery obligations. Not only did it fail to produce any structured sales data, Ex. 6, Olean Dep. 85:19-89:15 (stating that it is unable to access or produce any structured data for any part of the entire nine-year Alleged Conspiracy Period), but its corporate representative was unprepared to testify on topics related to Olean's pork purchases and was largely unaware of Olean's interactions with certain suppliers or the purported harm it had suffered. *See, e.g.*, *id.* 83:9-14 (stating Olean does not have any independent basis outside of information from counsel that it's been harmed), 122:5-8 ("Q. Are you

prepared to testify about Olean's purchases of pork from Mancuso?  A. I am not.  I don't know Mancuso other than he's a supplier for us.").

Those failures render Olean, the only proposed non-distributor named DPP, incapable of establishing that it maintains the same interests and circumstances of the other proposed class members or sufficient motivation to prosecute claims on the other proposed class members' behalf.  *See Rattray v. Woodbury Cnty.*, 253 F.R.D. 444, 455 (N.D. Iowa 2008) (stating that in determining adequacy of representation, the Eighth Circuit has looked at both the similarity of the proposed representative's claims and circumstances to other class members and at the proposed representative's motivation to represent the entire class), *aff'd*, 614 F.3d 831 (8th Cir. 2010).  A class representative who, like Olean, "will not comply wholeheartedly and fully with the discovery requirements of modern federal practice, is not to be regarded by this Court as one to whom the important fiduciary obligation of acting as a class representative should be entrusted."  *Fidel v. Farley*, No. 1:00-CV-48-M, 2004 WL 7340526, at *6 (W.D. Ky. Jan. 15, 2004).  Olean thus fails to meet the adequacy requirement of Rule 23(a)(4).

## **CONCLUSION**

In addition to failing to establish predominance under Rule 23(b)(3), DPPs fail the typicality and adequacy requirements of Rule 23(a)(3) and (a)(4), respectively. Defendants respectfully request that the Court deny DPPs' motion for class certification.

Dated: August 24, 2022

Respectfully submitted,

By: */s/* Tiffany Rider Rohrbaugh

Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com
lstrang@axinn.com
avissichelli@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

Craig M. Reiser (*pro hac vice*)
Kail Jethmalani (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
creiser@axinn.com
kjethmalani@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

24

*Counsel for Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc.*

/s/ Mark L. Johnson

Mark L. Johnson (#0345520)
Davida S. McGhee (#0400175)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
dwilliams@greeneespel.com

Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
Jenna Stupar (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
jenna.stupar@kirkland.com

**Counsel for Clemens Food Group, LLC and The Clemens Family Corporation**

/s/ Craig. S. Coleman

Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund (*pro hac vice*)
Stephanie A. Koltookian (*pro hac vice*)
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

Jonathan H. Todt (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

25

John S. Yi (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

***Counsel for Hormel Foods Corporation***


/s/ *Peter H. Walsh*
Peter H. Walsh (#0388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
(612) 402-3000
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

***Counsel for Agri Stats, Inc.***


/s/ *Christopher A. Smith*
Aaron Chapin (#0386606)
Christopher A. Smith (*pro hac vice*)
Tessa K. Jacob (*pro hac vice*)
A. James Spung (*pro hac vice*)
Jason Husgen (*pro hac vice*)
Sarah L. Zimmerman (MDL registered)
Kate Ledden (MDL registered)
Tanner Cook (MDL registered)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Ste 600
St. Louis, MO 63105
Telephone: (314) 480-1500
aaron.chapin@huschblackwell.com
chris.smith@huschblackwell.com
tessa.jacob@huschblackwell.com
james.spung@huschblackwell.com
jason.husgen@huschblackwell.com
sarah.zimmerman@huschblackwell.com
kate.ledden@huschblackwell.com
tanner.cook@huschblackwell.com

***Counsel for Triumph Foods, LLC***


26

*/s/ Peter J. Schwingler*

Peter J. Schwingler (#0388909)
William L. Greene (#0198730)
William D. Thomson (#0396743)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
william.thomson@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

***Counsel for Seaboard Foods LLC and
Seaboard Corporation***