# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: PORK ANTITRUST LITIGATION | Case No. 18-cv-1776 (JRT/JFD) |
| IN RE: CATTLE AND BEEF ANTITRUST LITIGATION | Case No. 22-md-3031 (JRT/JFD) |
| This Document Relates To: *Sysco Corp. v. Agri Stats, Inc.*, Case No. 21-cv-1374 (D. Minn.), and *Sysco Corp. v. Cargill Inc.*, Case No. 22-cv-1750 (D. Minn.) | **ORDER** |

This Order decides Sysco Corporation and Carina Ventures LLC's Joint Motions for Substitution of Plaintiff, which have been filed in the *In re: Pork Antitrust Litigation*, Case No. 18-cv-1776, at Docket No. 1940, and in the *In re: Cattle and Beef Antitrust Litigation*, Case No. 22-md-3031, at Docket No. 277. If any portions of this Order apply to only one case, the Court will indicate that at the appropriate part of the Order. The motions for substitution are denied.

## I.      INTRODUCTION

When a party to a lawsuit transfers an "interest," a federal court has the discretion to choose one of three options: allow the action to proceed as though there had been no transfer, join the interest's new owner as a party along with the former owner, or dismiss the former owner and substitute the new owner as a party to the lawsuit. Fed. R. Civ. P. 25(c). Sysco Corporation, a large food distributor and a direct-action plaintiff in these cases, financed its litigation expenses through Burford Capital, which holds itself out as

"the world's largest provider of commercial legal finance." *See* burfordcapital.com/about-us/ (last visited Feb. 8, 2024). The litigation finance contract between Sysco and Burford gave Burford the authority to approve or disapprove of settlements. After Sysco attempted to settle with some defendants in these cases on terms Burford did not favor, Burford refused to permit the settlements. Sysco then fired its legal counsel, Boies Schiller Flexner LLP, accusing them of disloyalty because Sysco's lawyers were also (for purposes other than this lawsuit) Burford's lawyers, and Sysco alleged that its lawyers provided legal advice to Burford that was contrary to Sysco's interests during the dispute between Sysco and Burford over settlement authority. This Court allowed Sysco's counsel to withdraw, but then had to partially stay both the *In re: Pork* MDL and the *In re: Cattle* MDL while Sysco hired new lawyers. The dispute between Sysco and Burford over settlement authority also generated an arbitration proceeding in New York, a New York state court action (later removed to the U.S. District Court for the Southern District of New York) to enforce the arbitration award, an action in the U.S. District Court for the Northern District of Illinois to stay the arbitration award, and a substitution motion in each of the Minnesota MDLs, plus a substitution motion in *In re Broiler Chicken Antitrust Litigation*, Case No. 16-cv-08637 (N.D. Ill.).

Sysco and Burford resolved their differences by engineering an assignment of Sysco's antitrust claims in the two Minnesota cases and the Illinois case to a "special purpose vehicle" established by Burford. This special purpose vehicle is a limited liability company named Carina Ventures LLC, which was formed in June of 2023 and apparently

has no assets except its ownership of Sysco's federal antitrust claims in these three lawsuits. Sysco's discharged former counsel, Boies Schiller, now represents Carina.

In the motions to substitute, Sysco and Carina ask the Court to substitute Carina for Sysco in these cases. The Court will not do so, because the transfer does violence to the Federal Rules of Civil Procedure's meaning of transferring an "interest," has caused serious practical problems in this litigation, and will allow a financer with no interest in the litigation beyond maximizing profit on its investment to override decisions made by the party that actually brought suit.[1] The Court exercises its discretion by choosing the first option under Rule 25(c)—allowing this case to proceed by the original party. The two substitution motions are therefore denied.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 25(c) governs transfers of interests after a lawsuit has begun and states, in relevant part: "If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." "Whether to grant a motion to substitute parties under Rule 25(c) is within the discretion of the district court." *Jackson Nat'l Life Ins. Co. v. Bohnert*, No. 15-cv-3044 (WMW/DTS), 2020 WL 3077352 (D. Minn.

---

[1] During the first week of August 2023, the attorney who orally argued the substitution motion for Carina entered appearances in these matters identifying himself as "counsel of record for *Plaintiff* Carina Ventures LLC." (*See* Dkt. No. 1985, Case No. 18-cv-1776; Dkt. No. 309, Case No. 22-md-3031) (emphasis added). Carina also appeared on the docket of the *In re: Pork* MDL as a "Plaintiff." Carina is not a plaintiff in these cases, having appeared only to brief and argue the substitution motions. The Court directs the Clerk of Court to correct the docket of the *In re: Pork* MDL by assigning Carina the status of "movant."

June 10, 2020) (citing *Froning's, Inc. v. Johnston Feed Serv., Inc.*, 568 F.2d 108, 110 n.4 (8th Cir. 1978)). "The decision whether to substitute parties lies within the discretion of the trial judge and he may refuse to substitute parties in an action even if one of the parties so moves." *Froning's, Inc.*, 568 F.2d at 110 n.4; *see Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 16 (7th Cir. 1977) ("The very nature of Rule 25(c) vests a great deal of discretion in the hands of the court. It is not mandatory that a substitution be made in every case of a transfer of interest.").

"The most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred. The action may be continued by or against the original party, and the judgment will be binding on the successor in interest even though the successor is not named." 7C Charles A. Wright et al., *Federal Practice & Procedure* § 1958 (3d ed). "Since the matter is discretionary, the court . . . may refuse substitution if this seems the wisest course." *Id.*

## III.   FACTUAL AND PROCEDURAL CONTEXT

Although Carina and Sysco argue that the factual and procedural background of Sysco's lawsuits and Sysco's dispute with Burford are irrelevant, the Court strongly disagrees. This context is quite relevant to the Court's exercise of discretion under Rule 25(c).

### A.   Background of Sysco's Lawsuits

#### 1.   *In re: Pork*

In March of 2021, Sysco filed suit in the Southern District of Texas against Defendants Agri Stats, Inc.; Clemens Food Group, LLC; Clemens Family Corporation;

Hormel Foods Corporation; JBS USA Food Company; Seaboard Foods, LLC; Smithfield Foods, Inc.; Triumph Foods, LLC; Tyson Foods, Inc.; Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. *See* Complaint, *Sysco Corp. v. Agri Stats, Inc.*, No. 21-cv-1374 (D. Minn. filed Mar. 8, 2021) (Dkt. No. 1). Sysco's Complaint alleged a conspiracy among all the Defendants "to fix, raise, maintain, and stabilize the price of pork" in violation of Section One of the Sherman Act. *Id.* ¶¶ 4, 228. Sysco sought treble monetary damages under Section Four of the Clayton Act, *id.* ¶¶ 11, 239, and an injunction against further anticompetitive behavior under Section 16 of the Clayton Act, *id.* ¶¶ 11, 240.

On March 22, 2021, Sysco moved to transfer the action to the District of Minnesota for coordination with this MDL. Notice of Motion for Transfer filed with the J.P.M.L., *Sysco Corp. v. Agri Stats, Inc.*, No. 21-cv-1374 (D. Minn. filed Mar. 22, 2021) (Dkt. No. 18). The J.P.M.L. transferred the case, and it was consolidated into the MDL on November 14, 2021. *Sysco Corp. v. Agri Stats, Inc.*, No. 21-cv-1374, slip op. at 11 (D. Minn. filed Mar. 22, 2021) (Dkt. No. 34). The operative Complaint is a consolidated complaint filed by the direct action plaintiffs, including Sysco, in the *In re: Pork* MDL at Docket No. 1659.

### 2.  *In re: Cattle*

In June of 2022, Sysco filed suit in the Southern District of Texas against Defendants Cargill, Inc.; Cargill Meat Solutions Corporation; JBS S.A; JBS USA Food Company; Swift Beef Company; JBS Packerland, Inc.; National Beef Packing Company; Tyson Foods, Inc.; and Tyson Fresh Meats, Inc. *See* Complaint, *Sysco Corp. v. Cargill, Inc.*, No. 22-cv-1750 (D. Minn. filed June 24, 2022) (Dkt. No. 1). Sysco's Complaint alleged a conspiracy among all the Defendants "to limit the supply, and fix the prices, of

beef sold to Plaintiff in the U.S. wholesale market" in violation of Section One of the Sherman Act. *Id.* ¶¶ 2, 346. Sysco sought treble monetary damages under Section Four of the Clayton Act, *id.* ¶¶ 25, 357, and an injunction against further anticompetitive behavior under Section 16 of the Clayton Act, *id.* ¶¶ 25, 358–59. The case was transferred to the District of Minnesota on July 12, 2022, and consolidated into the *In re: Cattle* MDL on October 12, 2022. *Sysco Corp. v. Cargill, Inc.*, No. 22-cv-1750, slip op. at 4 (D. Minn. Oct. 12, 2022) (Dkt. No. 17). The operative Complaint is a consolidated complaint filed by the direct action plaintiffs, including Sysco, in the *In re: Cattle* MDL at Docket No. 132.

**B.    Background of the Substitution Motions**

The Court first learned of the dispute that led to the substitution motions on March 10, 2023, when Sysco filed "stipulations" for the withdrawal of its counsel, Boies Schiller, accompanied by motions asking for a limited stay to allow Sysco to find new counsel. (*See* Dkt. Nos. 1841, 1843, Case No. 18-cv-1776; Dkt. Nos. 162, 164, Case No. 22-md-3031.) The Court denied the stipulations because they did not comply with District of Minnesota Local Rule 83.7. (Dkt. No. 1872, Case No. 18-cv-1776; Dkt. No. 180, Case No. 22-md-3031.) The Court eventually learned that the dispute between Sysco, Boies Schiller, and Burford had already been going on for some months.

Starting in 2019, Sysco financed its litigation in these matters with approximately $140 million of litigation financing provided by Burford. (Carina's Mem. Supp. Joint Mot. Substitution, Dkt. No. 1952, Case No. 18-cv-1776); Pet. Confirm Arbitration Award ¶ 8, *Glaz LLC v. Sysco Corp.*, No. 1:23-cv-02489 (S.D.N.Y. filed Mar. 23, 2023) (Dkt. No. 1-

1).[2] Sysco is required, under Amendment No. 1 to the Second Amended and Restated Capital Provision Agreement between Burford and Sysco, to immediately email to Burford any settlement offers it receives "and shall not accept a settlement without the Capital Providers' prior written consent, which shall not be unreasonably withheld." Swiber Decl. Ex. B at 5, *Glaz LLC v. Sysco Corp.*, No. 1:23-cv-02489 (S.D.N.Y. filed May 3, 2023) (Dkt. No. 21-2). Matters came to a head in 2022 when Sysco negotiated settlements with some defendants, and Burford, thinking the settlement amounts too low, withheld its approval. *See* Pet. Vacate Arbitration Award ¶¶ 16, 27–34, *Glaz LLC v. Sysco Corp.*, No. 1:23-cv-02489 (S.D.N.Y. filed May 3, 2023) (Dkt. No. 21-3). More concerningly to Sysco, the law firm that represented Sysco in the Minnesota antitrust cases, Boies Schiller, also represented Burford on other matters. When Sysco heard allegations that Boies Schiller had allegedly played a role in counseling its client Burford to veto its other client Sysco's antitrust settlements, Sysco fired Boies Schiller, and accompanied the firing with angry, public accusations of serious professional misconduct, even including disloyalty to a client. *See* Sysco's Opp'n Pet. Confirm Arbitration Award at 6, *Glaz LLC v. Sysco Corp.*, No. 1:23-cv-02489 (S.D.N.Y. filed May 3, 2023) (Dkt. No. 18) (Burford "induced [Boies Schiller] to violate its fiduciary duties to Sysco" and "sought to use the courts for a purpose other than the pursuit of justice.").

---

[2] Citations to documents in the New York state court action or the arbitration proceedings are to the versions of those documents that were filed as exhibits to filings made in the federal action in the U.S. District Court for the Southern District of New York. *See* footnote 3, *infra*.

In December of 2022, Burford applied for and was granted a temporary restraining order by an arbitration panel in New York, to prevent Sysco from finalizing the negotiated settlements. Three months later, in March of 2023, Sysco filed an action in U.S. District Court for the Northern District of Illinois to vacate the arbitration award. *Sysco Corp. v. Glaz LLC*, No. 1:23-cv-01451 (N.D. Ill.) Burford responded within a week by filing in New York state court a Petition to Confirm Arbitration Award, which Sysco removed to the U.S. District Court for the Southern District of New York, thereby commencing the *Glaz LLC v. Sysco Corp.* case.[3]

There was yet more litigation over Burford's efforts to bar Sysco from settling its claims. After discharging Boies Schiller, Sysco filed motions asking this Court for 60-day, partial stays of both these cases.[4] (Dkt. No. 1843, Case No. 18-cv-1776; Dkt. No. 164, Case No. 22-md-3031.) Sysco argued that it needed this much time both because it claimed Burford was illicitly seeking to obstruct Sysco's ability to retain new counsel and because some law firms were reluctant to represent a client whose freedom of action to settle a case was limited.

---

[3] The complete records of the arbitration proceeding do not seem to be publicly available. However, some of the key documents were appended as exhibits to Burford's Petition to Confirm Arbitration Award that it filed in New York state court. When Sysco removed that action to federal court, the state court exhibits became part of the federal court record. Notice of Removal Ex. C, *Glaz LLC v. Sysco Corp.*, No. 1:23-cv-02489-PGG (S.D.N.Y. filed Mar. 23, 2023) (Dkt. No. 1). This Court has used the Southern District of New York's docket as its source of information about the arbitration. The documents available to this Court through PACER are the redacted, public versions, not the sealed versions.

[4] The cases were stayed only as to Sysco. The balance of the cases went forward, to the extent possible, during the stay.

Peace of a sort was restored, but it was achieved in a manner that, as explained below, this Court will not countenance. On June 28, 2023, Sysco, now represented by new lawyers, assigned its interest in the *In re: Pork* and *In re: Cattle* MDLs and its interest in the *In re Broiler Chicken* case, to Carina. Carina was created by Burford in late June of 2023, and its only reason for existence is to accept Sysco's assigned claims and litigate them, one assumes in the way Burford wants the cases litigated.

Carina and Sysco filed a "Joint Motion" to substitute Carina for Sysco in both *In re: Pork* and *In re: Cattle* on June 29, 2023, one day after the assignment was executed. The motions did not comply with District of Minnesota Local Rule 7.1(b) in several respects, and the Meet and Confer Statement (and the *In re: Pork* Defendants' responses to that Statement) reflected that Carina and Sysco had not met and conferred meaningfully and in good faith with Defendants before filing the motions. (*See* Dkt. Nos. 1940, 1941, 1945, 1946, Case No. 18-cv-1776; Dkt. Nos. 277, 278, Case No. 22-md-3031.) As it turns out, Defendants object strongly to the substitution. If the substitution motions are granted, Sysco will no longer be a party to these cases, and Carina will step into its place.

The litigation burden caused by Burford's efforts to maximize return on investment has been enormous. A state court in New York and two federal district courts, the Southern District of New York and the Northern District of Illinois, have been involved in litigation over enforcement of the arbitration award Burford obtained. This Court has ruled on Boies Schiller's motion to withdraw as counsel for Sysco and then had to partially stay two of the largest cases on its docket for 60 days each while Sysco obtained new counsel. In this Order, this Court is dealing with two substitution motions that Burford and Sysco want to

have granted as an endorsement of their transfer of the antitrust claims to Carina. A Rule 25(c) motion to substitute Carina for Sysco is also pending in the *In re Broiler Chicken* litigation in the Northern District of Illinois. Joint Mot. Substitution, *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637 (N.D. Ill. filed June 28, 2023) (Dkt. No. 6630).

## IV.   ANALYSIS

### A.   Preliminary Matters

Before turning to the substance of the substitution motions, the Court must address two preliminary matters, standing and the rule of decision, because the Court's resolution of those questions is essential context for the balance of the discussion.

#### 1.   Standing

At oral argument on these motions, Carina and Sysco intimated that they had presented the Court with a *fait accompli* because the transfer of Sysco's interests in these cases deprived Sysco of Article III standing. (Mot. Hr'g Tr. at 86, Dkt. No. 2013, Case No. 18-cv-1776; Dkt. No. 337, Case No. 22-md-3031.) They are mistaken, because Article III standing is evaluated at the time a lawsuit is filed and in neither the briefing nor the oral argument on this motion was there so much as a hint of an argument that Sysco lacked standing at the time it filed its complaint. Carina and Sysco's Article III standing argument is unavailing.

   a. **Sysco Has Article III Standing in This Case Notwithstanding Its Transfer of Its Antitrust Claim to Carina, Because Article III Standing Is Evaluated When a Case Is Filed.**

Because the judicial power of the United States is limited to "Cases" and "Controversies," U.S. Const., Art. III, federal courts will hear only cases brought by plaintiffs who can establish standing. Under the well-known rule of *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), to show Article III standing, "the plaintiff must have suffered an 'injury in fact,'" must establish a causal relationship between the contested conduct and the alleged injury, and must show that a favorable decision from the court will redress its injury. *Id.* at 560–61.

For Article III standing to exist, "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (cleaned up). No party involved in these motions claims Sysco did not have Article III standing at the time Sysco filed suit. Nor could they. Taking the allegations in Sysco's Complaints as true for purposes of this discussion, Sysco alleges what is immediately recognizable to a reader as price-fixing conspiracies that Sysco claims caused it to pay more for pork and beef. Sysco's injury can be redressed by the relief it is asking for—a monetary damages award and an injunction against further anticompetitive behavior.

Sysco did not lose Article III standing by transferring its interest in this lawsuit to Carina. *See Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (stating that "one who sells his interest in a cause of action is not deprived of Article III standing").

*Cranpark* is not directly on point because the assignment occurred before the case was filed, but the Court finds its reasoning persuasive nonetheless. With respect to any argument concerning redressability,[5] the proper focus of that inquiry is "the causal connection between the alleged injury and the judicial relief requested," *id.* (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)), not "that the plaintiff actually be entitled to the relief sought," *id.* (quoting 15 James W. Moore et al., *Moore's Federal Practice* § 101.42 (3d ed. 2015)). "Stated differently, the question is not whether plaintiff is absolutely, personally entitled to possess the remedy for its injury, but whether the injury plaintiff suffered is redressable by the requested relief, regardless of who ultimately gets that relief." *NextEngine Inc. v. NextEngine, Inc.*, No. CV 19-00249-AB (MAAx), 2021 WL 926104, at *5 (C.D. Cal. Jan. 15, 2021). Thus, Sysco continues to meet the redressability requirement, despite the assignment. *See id.* (relying on *Cranpark* in finding that the plaintiff did not lose Article III standing by assigning rights mid-suit).

The Court finds that Sysco had Article III standing in this case at the time it filed its complaint and still has Article III standing today.[6]

---

[5] "An assignment has no bearing on the first two elements" of Article III standing. *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 381 (2d Cir. 2021). "After all, an assignment does not erase an injury – it is simply an exchange of legal entitlement about who can seek to rectify that injury in court." *Id.* (citing *Cranpark*, 821 F.3d at 730–31). Nor can an assignment sever a pre-existing causal link between that injury and the defendant. *Id.*

[6] The *Cranpark* court also noted the potential presence of a real party in interest argument. That concern is not present in this case, because such an argument applies only when a litigation claim is assigned before the filing of a complaint. In this case, of course, the assignments came mid-litigation.

      **b.**     **Carina Has Article III Standing Only Through the Assignment from Sysco; Carina Does Not Have Standing as an Affiliate of a Litigation Funder.**

Carina has Article III standing in this case only through the assignment to it of Sysco's antitrust claims. Were Carina to try and bring this case on its own, as a special purpose vehicle of a litigation financer rather than as an assignee, Carina would not have standing. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Supreme Court held that while a *qui tam* relator had an interest in the outcome of a lawsuit—the relator's financial share of any recovery—that type of interest was insufficient to confer standing. *Id.* at 772–73. The *qui tam* relator had standing only through the assignment to the relator, by operation of the False Claims Act, of the interest of the United States. The purely financial interest of a *qui tam* relator, as opposed to the relator's assignment interest, was no more than that "of someone who has placed a wager upon the outcome." *Id.* at 772. A wager on a lawsuit would not confer standing because any interest a wager yields is no more than a "byproduct of the suit itself," indistinguishable from trying to "achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit." *Id.* at 773 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)). "An interest unrelated to injury in fact is insufficient to give a plaintiff standing." *Id.* at 772 (citing *Valley Forge Christian Coll. v. Ams. United for Separation of*

*Church & State, Inc.*, 454 U.S. 464, 486 (1982); *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)).[7]

Carina has Article III standing through the assignment from Sysco. Despite this, as we will see, prudential considerations do not allow Carina to be substituted for Sysco in these cases.

### 2. Federal Law, Specifically Federal Rule of Civil Procedure 25(c), Provides the Rule of Decision for the Motions to Substitute.

Because the parties disagree whether the Court should focus on the assignment or on the substitution, the parties also disagree over which body of law provides the rule of decision for these motions. The moving parties concentrate on the substitution and Federal Rule 25(c), while the opposing parties concentrate on the assignment, the legality of which they evaluate under state law. Because these motions ask the Court to allow Carina to be substituted for Sysco in a federal antitrust case, the Court decides the motions by analyzing the substitution, and so looks to federal law, not state law, for the rule of decision.

Defendants ask the Court to find the assignment of Sysco's federal antitrust claims to Carina illegitimate because it violates the rule against champerty,[8] then, in a second step,

---

[7] *Vermont Agency* was eventually decided against the relator, but not on standing grounds. The Supreme Court held that the term "person" in the False Claims Act did not include a state or one of its agencies. *Vermont Agency*, 529 U.S. at 787.

[8] Champerty was a form of medieval land tenancy that eventually gave its name to the vice of vexatiously stirring up other people to litigate. Together with barratry, champerty is a form of maintenance. "Put simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty." *In re Primus*, 436 U.S. 412, 424, n.15 (1978). As explained below, the policy concerns behind the doctrine of champerty are still alive, even though most courts to consider the doctrine itself have found it to be

to disallow the substitution of Carina for Sysco. There is no need for the first step, and

therefore no need for reference to state contract law, because the Court need not decide the

validity of the assignment of Sysco's claims to Carina. The question of the assignment's

validity is analytically distinct from the question of whether the Court should exercise its

discretion to allow the substitution under Rule 25(c).

In these cases, federal subject-matter jurisdiction is premised on the existence of a

federal question, namely whether Defendants conspired to fix prices in violation of Section

One of the Sherman Act. Because a federal statute is involved, this Court will analyze the

substitution under federal law. Only if the Court were to analyze the assignment would

state law become relevant. *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 435–36 (8th

Cir. 1999) (describing the sale of an antitrust claim as a matter of contract law and stating

that "we see little need for federal common law to govern this issue of contract law").

While another magistrate judge in this District, in *Fischer Bros. Aviation, Inc. v. NWA*,

*Inc.*, 117 F.R.D. 144, 146 (D. Minn. Aug. 11, 1987) first analyzed the underlying

assignment before permitting a Rule 25(c) substitution, too much should not be read into

that holding. The full holding was that "[a]s a matter of federal law, *assuming a valid*

*assignment*, an antitrust claim may be assigned." *Id.* (emphasis added) All that *Fischer*

---

archaic. *See, e.g., Maslowski v. Prospect Funding Partners, LLC*, 994 N.W.2d 235, 241
(Minn. 2020); *Osprey, Inc. v. Cabana Ltd. Partnership*, 532 S.E. 2d 269, 277 (S.C. 2000)
("we abolish champerty as a defense"). For a thorough history of champerty, *see* Max
Radin, *Maintenance by Champerty*, 24 Cal. L. Rev. 48 (1935), although the undersigned
hopes that this order can be understood without needing to read that "[f]requent reference
is made to the 'assache after the custom of Wales' in which the compurgators numbered
three hundred," and its accompanying citation to Ellis's treatise, *Welsh Tribal Law* (1926).
Radin, at 48 n.1.

*Bros.* held was that federal law allows antitrust claims to be assigned. The validity of the assignment is a matter of state law. *Fischer Bros.*, 117 F.R.D at 146 (applying Ohio and Minnesota state law to assess the validity of the antitrust claim's assignment).

What is before the Court is whether to exercise its discretion and allow substitution under Federal Rule of Civil Procedure 25(c). That analysis is the central portion of this Order and is set forth below.

### B.   The Proper Exercise of the Court's Discretion Is to Find the Substitution Contrary to Public Policy and Decline to Allow It.

"[I]t is difficult to conceive of any stipulation more against public policy than a contract term requiring the litigation financier's permission to settle the underlying litigation." *Maslowski v. Prospect Funding Partners LLC*, 944 N.W.2d 235, 241 (Minn. 2020) (quoting *Huber v. Johnson*, 70 N.W. 806, 808 (Minn. 1897), *abrogated on other grounds by Maslowski*). "Courts and attorneys should . . . be careful to ensure that litigation financiers do not attempt to control the course of the underlying litigation . . . ." *Id.*

"[A] lawyer should counsel a client to refuse any funding agreement that allows a funder to take control of settlement, which would be seen as against public policy in every state, or withdraw from representation if the client persists in granting the funder control." Anthony J. Sebok, *The Rules of Professional Responsibility and Legal Finance: A Status Update*, Cardozo Law Jacob Burns Inst. for Advanced Legal Studies, Faculty Research Paper No. 671, at 11 n.41 (2022), quoted in Expert Report of Professor Maya Steinitz at 23 n.68, *Glaz LLC v. Sysco Corp.*, No. 1:23-cv-02489 (S.D.N.Y. filed May 3, 2023) (Dkt. No. 21-4). Professor Sebok is ethics advisor to Burford Capital. Burford Capital,

https://www.burfordcapital.com/about-us/our-team/anthony-sebok/ (last visited Feb. 8, 2024).

As these quotations show, there is a strong public policy in favor of the parties to a lawsuit controlling the litigation, and particularly settlement, giving voice to the community's sense that "[l]egal justice consists in the right determination by a judge of a controversy between two litigants." Max Radin, *Maintenance by Champerty*, 24 Cal. L. Rev. 48, 49 (1935).

The largest harm that condoning Burford's efforts to maximize its return on investment would cause is the harm of forcing litigation to continue that should have settled. Burford wants the litigation to continue so it can realize two sorts of benefit. First, Burford apparently hopes to extract larger settlement payments from the parties with whom Sysco negotiated settlements or was in the process of negotiating settlements and thereby realize a larger return on its investment in this case. Second, as a dissenting member of the arbitration panel astutely pointed out, Burford is trying to prevent these settlements because the Sysco settlements, if they go through, will set benchmarks for other settlements with other defendants. Burford apparently hopes that if those benchmarks can be set at high enough levels, Burford will realize a financial gain on not just its financing contract with Sysco but with other, as-yet-undisclosed financing agreements that seem to be in place in these cases. *See* Dissent of John J. Kerr, Jr., Co-Arbitrator, Notice of Removal Ex. C at 123, *Glaz LLC v. Sysco Corp.*, No. 1:23-cv-02489 (S.D.N.Y. filed Mar. 23, 2023) (Dkt. No. 1-3) ("[I]f the Proposed Settlements are too low, they will have a ripple effect decreasing future settlements in cases where Burford is a litigation funder.") These private

interests of Burford's, however, cannot overcome the strong public policy in favor of

settling lawsuits[9] or the public policy in favor of allowing litigants to control their own

cases. The public policy limiting the plaintiffs who can launch large, expensive federal

antitrust cases, judicially expressed in the doctrine of antitrust standing, while not precisely

on point, is also relevant to the Court's exercise of its discretion under Rule 25(c).

### 1.    Public Policy Disfavors Allowing Carina to be Substituted for Sysco.

The Court finds that allowing the substitution would contravene the important

public policy granting control of litigation to the parties who claim to have actually suffered

injury and their counter-parties. Most important for this Order is the specific control that

the parties should have over the decision to settle a lawsuit and on what terms. The Court

further finds that while the medieval doctrine of "maintenance by champerty" relied upon

by those parties opposing the substitution is no longer an automatic route to dismissal, the

reasons behind the champerty doctrine are significant factors to the Court's discretion.

Sysco and Carina correctly point out that there is also a strong public policy in favor of

---

[9] Sysco points out in its motion papers that there have been "numerous assignments in this very matter and the related protein cases—including by Sysco itself." (Sysco's Reply at 6, Dkt. No. 1992, Case No. 18-cv-1776.) The assignments are collected at footnote 2 of Sysco's Reply. The Court has reviewed the materials cited in this footnote, and notes that all these assignments are assignments from direct purchasers to indirect purchasers pursuant to *Illinois v. Illinois Brick*, 431 U.S. 720 (1977). None of these assignments was to an entity that did not actually buy the product whose price is alleged to have been inflated by conduct that violated the antitrust laws; none of these assignments was to a litigation financer; and none of these assignments was undertaken with the specific intent of scuppering settlements. Most significantly, none of these assignments occurred mid-suit, nor did they require a Rule 25(c) motion for substitution. These significant differences mean the assignments collected at footnote 2 and the history of assignments in these cases have no persuasive value.

vigorous antitrust enforcement, but that policy, properly understood, only weakly supports substitution (if it supports it at all). On balance, the Court finds that public policy disfavors allowing substitution.

> ### 2. Substituting Carina for Sysco Would Contravene the Strong Public Policy in Favor of Settling Lawsuits.

Sysco and Carina frankly admit that their motive to substitute Carina for Sysco is that Sysco was planning to settle these antitrust claims for lower amounts than Burford wanted. Put more starkly, a non-party has interfered with the decision of a party to settle that party's claims, because of reasons specific to the non-party.

The Eighth Circuit and the District of Minnesota have frequently recognized that public policy favors settlement of lawsuits. *Associated Elec. Co-op, Inc. v. Mid-Am. Transp. Co.,* 931 F.2d 1266, 1272 (8th Cir. 1991) (recognizing a "public policy in favor of encouraging settlements"); *Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 967 (8th Cir. 2011) (holding that a district court clearly abused its discretion in admitting settlement evidence because doing so militated "against the public policy considerations which favor settlement negotiations") (quoting *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 510 (2d Cir. 1989) ("explaining that a party's letter offering to settle a contract dispute was inadmissible to prove compliance with the statute of frauds because . . . 'admission of the documents . . . would . . . militate against the public policy considerations which favor settlement negotiations'")); *Red Wing Shoe Co., Inc. v. B-Jays USA, Inc.*, No. 02-cv-257 (DWF/AJB), 2002 WL 724237, at *3 (D. Minn. Apr. 19, 2002) (concluding that contacts with the forum state resulting from efforts to settle a case would not be considered

"minimum substantial contacts" supporting the exercise of personal jurisdiction because doing so "would undermine the public policy in favor of settlement of disputes") (following the holding of *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE) Ltd.*, 89 F.3d 519, 524-25 (8th Cir. 1996) (stating that "courts have hesitated to use unsuccessful settlement discussions as 'contacts' for jurisdictional purposes" because "[g]iving jurisdictional significance to such activities may work against public policy by hindering the settlement of claims")).

The District of Minnesota has held specifically that overturning a negotiated settlement is antithetical to public policy. *Smith v. Questar Capital Corp.*, No. 12-cv-02669 (SRN/TNL), 2015 WL 1963019, at *12 (D. Minn. Apr. 30, 2015) ("There is a public policy which favors the settlement of disputes, and *preserving the integrity of a negotiated settlement is important* in promoting the private settlements of class action disputes") (emphasis added).

Sysco and Carina do not dispute the existence of this public policy. Instead, they try to avail themselves of the policy because, they point out, the assignment of claims from Sysco to Carina was part of the settlement of the dispute between Sysco and Burford. (Mot. Hr'g Tr. at 8.) Therefore, they say, the Court should uphold the assignment because doing so furthers the public policy in favor of settlement. (*Id.*)

The Court is unconvinced, because this argument tells only half, and not the most important half, of the effect of the assignment from Sysco to Carina. The argument that the Sysco-Carina assignment is pro-settlement falls apart when rewritten to include both halves of the Sysco-Burford settlement. The complete picture is that Burford and Sysco came to

20

loggerheads when Burford attempted to *prevent Sysco from settling litigation*. Moreover, Sysco and Carina have forthrightly said that the assignment was intended to allow Carina to stymie settlements with Defendants. The Sysco-Burford settlement, put plainly, is a settlement that was meant to prevent other settlements. Consequently, the Court finds the Sysco-Burford settlement—even notwithstanding that it *is* a settlement—antithetical to the public policy in favor of settling litigation.

The public policy in favor of settlement of lawsuits does not favor allowing the substitution of Carina for Sysco.

### 3. The Rationale Behind the Doctrine of Antitrust Standing Weighs Against Substitution.

Both the general public policy favoring leaving litigation decisions in the hands of the litigants, and the special importance within that general policy of the specific decision whether to settle a case and, if so, on what terms, become particularly important in large, expensive antitrust cases like these. Federal courts recognize that antitrust litigation is expensive for the parties and burdensome for both the parties and the courts. For example, in the context of specificity of pleading, the Supreme Court has reminded lower courts not "to forget that proceeding to antitrust discovery can be expensive." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007); *see Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-cv-3183 (ADM/LIB), 2016 WL 7042117, at *5 (D. Minn. July 25, 2026) (citing *Twombly* as standing for "a need to cabin the trend towards expensive and burdensome antitrust discovery"). The Seventh Circuit has also recognized the uniquely far-reaching nature of antitrust discovery. *In re Text Messaging Antitrust Litig.*, 630 F.3d

21

622, 625–26 (7th Cir. 2010) ("When a district court by misapplying the *Twombly* standard allows a complex case of extremely dubious merit to proceed, it bids fair to immerse the parties in the discovery swamp . . . and by doing so create irrevocable as well as unjustifiable harm to the defendant . . . ."). Courts have responded to this burden and expense by limiting antitrust litigation in several ways, including by creating a prudential doctrine, "antitrust standing," that limits the pool of potential antitrust plaintiffs. "Constitutional and prudential standing are about, respectively, the constitutional power of a federal court to resolve a dispute and the wisdom of so doing." *United States v. The Cameron-Ehlen Grp., Inc.*, No. 13-cv-3003 (WMW/DTS), 2020 WL 4476427, at *3 (D. Minn. Aug. 8, 2020) (quoting *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012)) (internal quotation marks omitted).

The question of antitrust standing is "whether the plaintiff, even if injured, is a proper party to bring the action." *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 449 (8th Cir. 1985). Antitrust standing is analyzed only after Article III standing has been found, and differs from Article III standing in being a court-made doctrine, not a constitutional limitation on the power of federal courts.

To demonstrate antitrust standing, a plaintiff must show more than the requirements of Article III standing. *Id.* ("[A]ntitrust standing requirements go beyond injury in fact."). To show antitrust standing, a plaintiff must show not just injury but antitrust injury, which is "a loss that Congress intended to prevent with the antitrust laws and that flows from the unlawfulness of the defendant's acts." *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 520 (8th

Cir. 1992) (noting that cases "routinely deny[] antitrust standing to a corporation's sole shareholders, officers, employees, lessors, guarantors, *and creditors*") (emphasis added).

Six factors inform the antitrust standing analysis:

(1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; and (6) the risk of duplicate recoveries or complex damage apportionment.

*Id.* (quoting *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983)) (cleaned up). While some sort of prudential standing limits apply in many types of federal cases, those limits are quite rigorously enforced in antitrust cases. *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) (en banc) ("[A]ntitrust standing [is] more rigorous than Article III standing," and "courts 'must[ ] reject claims under [Rule] 12(b)(6) when antitrust standing is missing.'")). Federal courts are aggressive about weeding out antitrust cases for lack of antitrust standing for numerous reasons, including the size and complexity of antitrust litigation, and the existence of treble damages as a remedy in antitrust cases. *Blue Shield v. McCready*, 457 U.S. 465, 476–77 (1982) ("An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but . . . [i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.").

Most courts that justify the existence of the antitrust standing doctrine do so on the grounds that only plaintiffs whose suit vindicates an interest protected by the antitrust laws,

such as harm to competition, should bring suit. Carina, an "affiliate" of Burford created by Burford, sues to maximize its return on investment, which is not an interest Congress protected in the Sherman Act, the Clayton Act, or any other antitrust statute. Absent assignment, Carina's suit would be dismissed for failure to establish antitrust standing.

While protecting litigants and the courts from the expense of antitrust litigation is implicit in the antitrust standing doctrine, at least one court has made that underpinning of the antitrust standing doctrine explicit. The Fifth Circuit in *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 546–47 (5th Cir. 1980), held that potential plaintiff Pan-Islamic did not have antitrust standing. While *Pan-Islamic*'s holding on antitrust standing was abrogated on other grounds by *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537 (1983), the Fifth Circuit's approving observation that "[t]he trial court also concluded that the defendants would be subjected to hardship and prejudice if the filing of the amended complaint were allowed and if Pan-Islamic were permitted to pursue massive discovery into every phase of the defendants' worldwide oil operations," *id*. at 545, was left intact by the Supreme Court.

Carina will object that antitrust standing, like Article III standing, can be obtained via an assignment, *see, e.g., Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 430–32 (3d Cir. 1993), and that is correct, but the rationale behind the doctrine—that antitrust cases and their attendant burdens should be launched only by plaintiffs who have suffered antitrust injury—counsels against this Court exercising its discretion to allow a special purpose vehicle created by a litigation funder whose Article

III and antitrust standing comes only from assignment—Carina—to be substituted for a party who had both types of standing *ab initio*—Sysco.

### 4.    Carina and Sysco Cite No Authority for the Proposition that a Litigation Funder Should be Substituted as a Party under Rule 25(c).

In support of substitution, Sysco and Carina lean heavily on the public policy favoring energetic antitrust enforcement. It is beyond doubt that vigorous antitrust enforcement is the public policy of the United States. "[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." *Perma-Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1981), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

However, a policy of strict enforcement is not the same as a policy that allows anyone at all to go to federal court to wage unrestricted warfare on alleged monopolists and price-fixers. Again, the doctrine of antitrust standing imposes court-created, prudential limits on private antitrust enforcement.

Sysco and Carina's protest that assignments are common in antitrust cases, including this one, is unpersuasive, as the Court explains above at footnote 9. Based on the cases cited by the parties and the Court's independent research, no court has ever before been asked to ratify a substitution under Rule 25(c) of a party with undoubted Article III and antitrust standing with a newly formed shell company created mid-suit for the sole purpose of litigating assigned claims on behalf of a litigation funder, which has no stake in the litigation other than maximizing its return on an investment it made in the outcome of

the litigation. If such a case exists, neither the parties favoring substitution nor the parties opposed to substitution have directed the Court's attention to it.

It may be objected that the cases the Court cites at the outset of this analysis section and their dire remarks about the expense and burden of antitrust discovery are not cases dealing with a substitution motion under Rule 25(c) and that the doctrine of antitrust standing was developed to make sure a plaintiff has suffered the type of injury the antitrust laws are meant to address, not to guard parties and courts against the expense and burden of antitrust discovery. Both criticisms have a point, up to a point, but both also miss the point. The fact is that both *Twombly*'s requirement that pleadings allege a "fair probability" and the doctrine of antitrust standing have their roots in a recognition that antitrust cases are uniquely large and uniquely burdensome, and therefore plaintiffs in such cases should be limited to those who can allege a "fair probability" of the specific type of injury denominated "antitrust injury." Carina cannot do that.

As to finding cases that combine the recognition of the uniqueness of antitrust law with an abuse-of-discretion analysis of a Rule 25(c) substitution motion, no party or nonparty has cited a case in which a court either allowed or disallowed a litigation funder to take control of litigation in order to maximize settlement value. The briefs for and against substitution at times read like a duel of maxims: Carina and Sysco announce that "nothing in Rule 25 entitles Defendants to litigate against their preferred plaintiff" (Carina's Reply Mem. Supp. Joint Mot. Substitution at 2, Dkt. No. 1991, Case No. 18-cv-1777), which is countered with "Sysco's assignment to Burford turns its litigation claim into an instrument

26

of financial speculation for a litigation funder with no connection to the underlying claim"
(Defs.' Mem. Opp'n at 4, Dkt. No. 1971, Case No. 18-cv-1776.)

While both those in favor of substitution and those opposed to it have cited
numerous cases, nowhere among them is there a case that so much as approaches the facts
of this case—an attempt by a litigation funder to step into the shoes of the party it was
funding, once litigation was well underway and settlements purportedly negotiated, and
conduct the litigation for itself, in search of a larger payoff. In all the cases cited, on both
sides, there is some pre-existing nexus between the party accepting the assignment and the
litigation. For example, *Fischer Bros. Aviation*, cited by both sides, involved an assignment
by a corporation that was about to be sold of its antitrust claims to its four shareholders, a
group that Magistrate Judge Symchych described in her order as having "a very real interest
in the case as shareholders" who "cannot fairly be referred to as strangers to the events
involved in this litigation." 117 F.R.D. at 147. As Magistrate Judge Symchych noted, the
shareholder/plaintiffs were not trying to base standing on "an investment gambit by a
disinterested party trying to collect a windfall." *Id.*

The Court takes the absence of Rule 25-specific precedent as evidence that what
Sysco and Carina ask in this case is something that has not been asked of a court before.
Of course, that this might be the first time a litigation funder has asked for what Burford is
asking for here is not a reason, standing alone, to decline to grant the substitution. But in
combination with the other reasons not to allow the substitution that are set out in this
Order, the extraordinary nature of Sysco and Carina's request—the fact that no other
litigation funder has apparently ever before asked to be substituted for its client under Rule

27

25(c)—leads the Court to be particularly chary of granting the substitution, as the Court must consider that allowing this substitution will lead to other such requests being made, with this Order adduced as support, in scenarios far removed from the one in this case – perhaps frequent (monthly or weekly) assignments and reassignments, presenting courts with significant challenges in addressing numerous mid-suit motions for substitution.

## V.   CONCLUSION

The parties have briefed and argued, exceptionally well, issues of governing law, the state law of contracts, the history of the champerty doctrine, and whether the Court ought to order at least some discovery into Sysco's assignment of its claims to Carina. In the end, though, these issues are peripheral. The central question is whether this Court will allow a mid-litigation Rule 25(c) substitution that will let a litigation funder be substituted for its client in order to try and negotiate larger settlements. The answer to that central question is no.

This Court does not doubt that antitrust claims are freely assignable and that aggressive antitrust enforcement is an important public policy. But the substitution sought here is different from any other case to which the Court's attention has been directed by the parties, because this substitution would have a litigation funder, in order to prevent settlement of litigation, step into the shoes of the party to whom it was providing financing, after litigation was well underway. Therefore, the Court will exercise its discretion and deny substitution pursuant to Rule 25(c). As expressly allowed by the Rule, "the action may be continued by the original party," that is, Sysco.

For the reasons set out above, **IT IS HEREBY ORDERED** that Sysco Corporation and Carina Ventures LLC's Joint Motions for Substitution of Plaintiff (Dkt. No. 1940, Case No. 18-cv-1776; Dkt. No. 277, Case No. 22-md-3031) are **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk's Office shall correct the docket of Case No. 18-cv-1776 by designating Carina Ventures LLC as a "Movant" rather than a "Plaintiff."

Date:  February 9, 2024          _s/ John F. Docherty_
                                 JOHN F. DOCHERTY
                                 United States Magistrate Judge