## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | No. 0:18-cv-01776-JRT-JFD |
| *This Document Relates to:* | Honorable John R. Tunheim |
| *All Actions* | |

## STATEMENT OF INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Department of Justice "to attend to the interests of the United States" in any case pending in federal court.  The Antitrust Division of the U.S. Department of Justice enforces the federal antitrust laws, including the Sherman Act, 15 U.S.C. §§ 1 et seq., and has a strong interest in their correct application.

As the Supreme Court recognized over a century ago, agreements to exchange competitively sensitive information can be "inconsistent with that free and unrestricted trade which the [Sherman Act] contemplates shall be maintained." *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 409 (1921).  Information sharing among competitors can therefore run afoul of the antitrust laws in various ways.  The prohibition on information sharing applies not only where information exchange facilitates price- or output-fixing agreements, but also where the information exchange tends to harm competition.  That is, free-standing information exchange among competitors is within the reach of the Sherman Act because it is *itself* concerted action—and it is unlawful whenever

1

it tends to lead to anticompetitive effects, including by chilling the vigor of competition or corrupting the competitive process.  Modern advances have also enabled information sharing to take a more dangerous form than in the past, as greater amounts of information are exchanged more quickly, more frequently, and with increasing granularity.

Critically, the legality of information exchange depends on whether it tends to suppress competition—and not on the format of the reported data.  Whether the shared information is aggregated is thus not a safe harbor from liability.  Indeed, courts have found information sharing to be illegal even where a defendant reported mean, median, and mode prices without identifying each competitor.  *N. Texas Specialty Physicians v. FTC*, 528 F.3d 346 (5th Cir. 2008).  Courts also have condemned the reporting of aggregated results of a few competitors.  *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.).

Because of the dangers of information exchange, the United States has a strong interest in the application of the antitrust laws to information-sharing claims.  The Department of Justice is currently litigating two civil cases challenging information-sharing agreements: the action against Agri Stats pending before this court, *United States v. Agri Stats, Inc.*, No. 0:23-cv-3009-JRT-JFD (D. Minn. filed Sept. 28, 2023), and an action against RealPage, Inc., alleging, *inter alia*, an agreement among competing landlords and RealPage to share competitively sensitive information through joint use of RealPage's rental pricing software, *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. filed Aug. 23, 2024).

\*     \*     \*

In this case, various private plaintiffs allege a per se illegal conspiracy to restrict supply and stabilize prices based on competing pork producers' sharing information with Agri Stats.[1]  A subset of plaintiffs also allege facts supporting a "standalone" information-sharing claim (i.e., where evidence of information exchange is not used to infer a price-fixing claim) assessed under the rule of reason, *see, e.g.*, Consumer Indirect Purchaser Plaintiffs Fourth Am. Consolidated Class Action Compl., ECF 1110 (CIPP Compl.), ¶¶ 168-94.[2]  The parties filed motions for summary judgment on June 7, 2024.[3]

The United States takes no position on the resolution of these motions, but files this Statement to make clear that **(1)** information sharing alone can violate Section 1, even without proof of an agreement to fix prices; and **(2)** information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors.  Ultimately, the antitrust laws prohibit information sharing among competitors whenever such exchanges tend to harm competition.  Despite defendants' suggestions to the contrary, courts do not apply bright-line rules in making this inquiry; they look to the full circumstances to gauge anticompetitive potential.

---

[1] *See, e.g.*, All Pls.' Opp'n to Agri Stats' Mot. for Summ. J. and Defs.' Rule of Reason Args. in the Joint Mot. for Summ. J., ECF 2535 (Pls.' Joint Opp'n), at 61; CIPPs' Fourth Am. Consolidated Class Action Compl., ECF 1110 (CIPP Compl.), ¶¶ 260-65; DAPs' Consolidated Compl., ECF 1666 (DAP Compl.), ¶¶ 451-59.

[2] The parties appear to dispute whether some or all plaintiffs have asserted a standalone information-sharing claim.  *Compare* RoR MSJ at 3 *with* Pls.' Joint Opp'n at 1 n.2.  The United States does not take a position on which plaintiffs have done so.

[3] *See, e.g.*, Defs.' Joint Mot. for Summ. J. on Per Se Claims, ECF No. 2245 (Defs.' Per Se MSJ); Mem. of Law in Supp. of Defs.' Joint Mot. for Summ. J. on Remaining Claims, ECF No. 2269 (Defs.' RoR MSJ); Mem. of Law in Supp. of Agri Stats' Mot. for Summ. J., ECF No. 2309 (Agri Stats MSJ); Mem. in Supp. of CIPPs' Mot. for Partial Summ. J., ECF No. 2403 (CIPP MSJ).

## ARGUMENT

There are two central elements of a Section 1 violation: (1) concerted action—i.e., a "contract, combination, or conspiracy," 15 U.S.C. § 1; and (2) unreasonableness—i.e., that the concerted action "unreasonably restrains trade." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186, 195 (2010).[4]  This Statement addresses each in turn.

## I.    Information Exchange Is Itself Concerted Action Under Section 1.

The Supreme Court has long held that information exchange among competitors satisfies the concerted-action element of Section 1.  This includes any information-sharing arrangements run by a third-party reporting service (such as Agri Stats), in which participants agree to share their information with the third party.  Evidence of information exchange may also be used to infer other types of concerted action, such as an agreement to fix prices or to restrict output.

**1.**  Because "[c]oncerted activity inherently is fraught with anticompetitive risk," *Am. Needle*, 560 U.S. at 190, Congress has defined concerted action broadly to encompass different types of arrangements, including contracts, combinations, and conspiracies, *id*. at 195 (citation omitted).  The key to whether concerted action exists is whether the alleged arrangement "joins together separate decisionmakers" and thus "deprives the marketplace of independent centers of decisionmaking." *Id.* at 195 (citations omitted).  The expansive

---

[4] Plaintiffs also must show that the alleged restraint of trade substantially affected, or occurred in the flow of, interstate or foreign commerce. *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 241 (1980).  We do not address this element in this Statement of Interest.  Nor do we address the requirement in private suits for plaintiffs to establish antitrust standing and injury.

4

definition of concerted action can be traced to common law, which prohibited separate economic actors from joining together in a way that denied the public "the wholesome influence of [their] rivalry and competition." *Stanton v. Allen*, 5 Denio 434, 439-40 (N.Y. Sup. Ct. 1848). Concerted action is therefore not limited to certain categories, such as price-fixing or market-allocation agreements; many types of joint conduct qualify.

**2.** As relevant here, competitors' exchange of competitively sensitive information is itself a form of concerted action that can violate the antitrust laws. As the Supreme Court explained in *United States v. Container Corp.*, reciprocal information exchange among competitors is "concerted action [that] is *of course sufficient* to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act." 393 U.S. 333, 335 (1969) (emphasis added).[5] This is so even when the participants have the "freedom to withdraw from the agreement" and when the exchanges are "infrequen[t] and irregular[]." *Id.*; *see, e.g.*, *Todd*, 275 F.3d at 198 (recognizing that an "information exchange itself" can form a claim under Section 1).

**3.** Information exchanges can be relevant to concerted action in a second way: An information exchange among competitors can support an inference that a price-fixing or output-restriction agreement exists. Plaintiffs therefore regularly rely on information exchanges as evidence of a conspiracy to fix prices or restrict output. *See Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc) (recognizing that information exchanges can serve as a "plus factor" suggestive of a

---

[5] Defendants do not appear to dispute that information sharing can be itself a violation of Section 1. Defs.' RoR MSJ 3.

5

price-fixing conspiracy); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1151 (8th Cir. 1979); *Todd*, 275 F.3d at 198; *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

But this use of information-exchange evidence is not to be confused with allegations of standalone information sharing. As the Second Circuit explained in *Todd*, a claim that uses information exchange as circumstantial evidence of a price-fixing agreement is "analytically distinct" from a claim where "the violation lies in the information exchange itself." 275 F.3d at 198. In the latter circumstance, the information exchange can corrupt the competitive process or lead to anticompetitive effects, even without an agreement to fix prices.[6] *See also Container Corp.*, 393 U.S. at 334, 337.

Accordingly, where plaintiffs rely on information-sharing evidence, the concerted-action element of Section 1 can be satisfied by showing, *inter alia*, (1) an agreement to fix prices or restrict output, where information sharing is used to infer such an agreement; *or* (2) an agreement to share information, such as the claim brought by the United States in *Agri Stats*, No. 0:23cv3009. As described below, the level of scrutiny courts apply to each differs.

---

[6] Even where information exchange is not used to support an inference of price fixing, the anticompetitive effects from an information-sharing agreement can include the "added potential for the development of concerted price-fixing arrangements." *United States v. Gypsum Co.*, 438 U.S. 422, 457 (1978).

6

II.     **Information Sharing Is "Unreasonable" Under Section 1 If It Tends to Harm Competition.**

The second central element of a Section 1 violation is "unreasonableness"—i.e., whether the concerted action unreasonably restrains trade.   Whereas price-fixing agreements (including those inferred from information-sharing evidence) are unreasonable per se, standalone information-sharing claims are subject to a flexible rule-of-reason analysis, which requires a fact-specific inquiry in each case.   Defendants are therefore wrong to the extent they seek a categorical rule that information exchanges can violate Section 1 only where the information exchanged is linked to specific competitors.

A.  **Information-Sharing Arrangements Can Be Condemned as Anticompetitive Even Where They Are Not Part of a Price-Fixing Agreement.**

**1.** A restraint can be unreasonable in either of two ways.  First, some types of restraints are unreasonable per se. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (*Amex*).  Such restraints violate Section 1 by virtue of "the nature and character of the contract or agreement," *Standard Oil v. United States*, 221 U.S. 1, 64 (1911), and are deemed unlawful without elaborate inquiry into competitive effects.   Price-fixing agreements—including those inferred from evidence of information sharing, *see Am. Column*, 257 U.S. at 411-12; *In re Flat Glass*, 385 F.3d at 369—fall into this category.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (referring to collusion as one of the "supreme evil[s]" of antitrust).

Second, a restraint is unreasonable if it violates a fact-specific standard known as the rule of reason.  *See Amex*, 585 U.S. at 540.  A court applying the rule of reason must

evaluate "the surrounding circumstances" to determine whether the restraint tends to harm competition. *Standard Oil*, 221 U.S. at 58; *Amex*, 585 U.S. at 540. Standalone information-sharing claims are evaluated under the rule of reason. *Todd*, 275 F.3d at 213-14; *Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521-SAG, 2022 WL 2818950, at *15 (D. Md. July 19, 2022). If information sharing tends to harm competition based on the full factual circumstances, "liability follow[s]." *United States v. Gypsum Co.*, 438 U.S. 422, 446-47 n.22 (1978) (confirming that "proof of a purpose to restrain trade or competition" is not required for Section 1 liability if there is proof of anticompetitive effects) (citation omitted).

**2.** The rule of reason is a highly "fact-specific assessment," *Amex*, 585 U.S. at 541, through which the fact finder considers "facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable," and more. *Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918); *Am. Needle*, 560 U.S. at 203 n.10 (describing this as the "classic" formulation of the rule of reason). The "true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Bd. of Trade of Chi.*, 246 U.S. at 238; *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021).

For standalone information-sharing claims, as with any other, the rule of reason is intended to be flexible—entailing an "enquiry meet for the case." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999). The "quality of proof required [in applying the rule of reason] should vary with the circumstances." *Id.* at 780 (internal quotations omitted).

8

Indeed, the analysis can be highly abbreviated—sometimes referred to as quick-look review—if "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect." *Id.* at 770; *cf. Gypsum*, 438 U.S. at 441 n.16 (observing that some information exchanges, although not per se unlawful, "have the greatest potential for generating anticompetitive effects" and therefore "have consistently been held to violate the Sherman Act"); *Cal. Dental*, 526 U.S. at 779.

**3.**  To provide structure to the rule-of-reason inquiry, courts often use a flexible, burden-shifting framework. *Alston*, 594 U.S. at 96; *Amex*, 585 U.S. at 541-42; *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983-94 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc).  First, the plaintiff must show that the challenged conduct has an "anticompetitive effect"—that it "harm[s] the competitive process and thereby harm[s] consumers." *Id.*; *Epic Games*, 67 F.4th at 983.  If the plaintiff does so, the burden shifts to the defendant to provide a sufficient "procompetitive justification" for its conduct. *Microsoft*, 253 F.3d at 59; *Epic Games*, 67 F.4th at 985-87.  If that is established, the plaintiff has the burden "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Alston*, 594 U.S. at 97 (quoting *Amex*, 585 U.S. at 542); *Epic Games*, 67 F.4th at 990.  Alternatively, the plaintiff can show that the anticompetitive harm outweighs the procompetitive benefit. *Epic Games*, 67 F.4th at 993; *Microsoft*, 253 F.3d at 59.

To make the prima facie case under the first step, plaintiffs can rely on either direct evidence or indirect evidence. *Amex*, 585 U.S. at 542. Direct evidence is proof of "actual detrimental effects" on competition.[7] Indirect evidence is "proof of market power plus some evidence" that the challenged restraint is likely to lead to anticompetitive effects, *id.* at 542; *see Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 53 (1st Cir. 1998) ("a sufficiently high *risk* of an anticompetitive effect" meets plaintiff's burden); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 825 (6th Cir. 2011) (similar); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998) (similar).

## B. Defendants Impermissibly Seek to Narrow What Types of Information Sharing is Anticompetitive Under the Rule of Reason.

Defendants claim the pork producers' alleged information sharing through Agri Stats is lawful, because Agri Stats' reports contain no individual competitor production or price information. *See* Mem. of Law in Supp. of Defs.' Joint Mot. for Summ. J. on Remaining Claims, ECF No. 2269 (Defs.' RoR MSJ) at 3-13. In their view, without this information, Agri Stats' reports cannot produce the anticompetitive effects alleged. *See id.* at 8-9. In seemingly pushing for a categorical rule, however, defendants misapprehend the law.[8]

---

[7] Actual effects can include evidence of higher prices or reduced output, *Ohio v. Am. Express Co.*, 585 U.S. 529, 542, 549-52 (2018) (*Amex*); decreased quality, *id.* at 542; less consumer choice, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986); *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 340 (3d Cir. 2018); or the elimination of significant head-to-head competition, *United States v. First Nat'l Bank & Trust Co. of Lexington*, 376 U.S. 665, 671-72 (1964); *Amex*, 585 U.S. at 550.

[8] Defendants' heavy reliance on the district court's decision in *In re Broiler Chicken Antitrust Litig.*, 2023 WL 7220170, at *27-28 (N.D. Ill. Nov. 2, 2023) is misplaced. Defs.'

CASE 0:18-cv-01776-JRT-JFD   Doc. 2616   Filed 10/01/24   Page 11 of 19

**1.** Courts have long recognized that information sharing can, by itself, corrupt the competitive process. Competition is premised on a system of "separate economic actors pursuing separate economic interests." *Am. Needle*, 560 U.S. at 195 (quotation omitted). The antitrust laws therefore envision a process of rivalry by which firms compete vigorously with one another on their offerings—whether by lowering prices, improving quality, pursuing more innovation, or other means. Accordingly, when rivals come together to share competitively sensitive information instead of closely safeguarding that information, courts are concerned that the rivals are undermining the competitive process. As the Supreme Court put it, information exchange among competitors is prohibited whenever "the necessary tendency is to destroy the kind of competition to which the public has long looked for protection." *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 390 (1923); *see also Container Corp.*, 393 U.S. at 337 (condemning information exchange where it "chill[s] the vigor of price competition").

The Supreme Court's decision in *Linseed Oil*, 262 U.S. 371, is one of the earliest to condemn standalone information sharing—recognizing that competitors' information sharing can undermine the competitive process; increase coordination among rivals; and cause an asymmetry of power in the market. As the Supreme Court explained, the firms

---

RoR MSJ at 4, 13-15. There, based on the evidence and representations presented at summary judgment, a district court granted summary judgment on an information-sharing claim, relying on the plaintiffs' expert's concession that the exchange was only "high-level" and without considering the participants' market power. Defendants' overreading of the decision contradicts *Todd* and Supreme Court precedent. *See Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001) (Sotomayor, J.) (reversing dismissal of information-exchange claim where data was aggregated to include at least three firms); *Alston*, 594 U.S. at 96-98 (rule of reason not intended to be a "rote checklist").

in *Linseed Oil* started out as "active, unrestrained competitors" "conducting *independent* enterprises along customary lines." *Id.* at 380, 389 (emphasis added).  But these rivals soon subscribed to an information exchange that, in the Supreme Court's words, "took away their freedom of action by requiring each to reveal to all the intimate details of its affairs." *Id.* at 389.  Having mutually agreed to these restrictions, the firms were no longer "bona fide competitors" and did not act in a way "compatible with fair dealing."  *Id*. at 390.  The "obvious policy" of the arrangement was to "submerge the competition" among rivals, substituting open competition with coordination.  *Id*. at 388.  This harmed consumers as competitors' knowledge of their rivals' business allowed the rivals to "deal with widely separated and unorganized customers necessarily ignorant of the true conditions."  *Id.* at 390.  The Court's holding did not depend on whether the competitors also agreed to set the same price or output.

2.  To determine whether information exchanges among competitors tend to harm competition, courts look to factual circumstances such as the structure of the industry, the nature of the information exchanged, and the manner of exchange.  Courts have therefore identified a number of factors that indicate whether an information-sharing scheme is likely to harm competition.[9]  *See Gypsum*, 438 U.S. at 441 n.16, 446-47 n.22; *Todd*, 275 F.3d at 211-12.

---

[9] As described above, plaintiffs can make out a prima facie case under the rule of reason through indirect evidence, which requires "proof of market power plus some evidence" that the challenged restraint is likely to lead to anticompetitive effects.  *Amex*, 585 U.S. at 542.  These factors provide "evidence that the challenged restraint harms competition" under the indirect approach.  *Id.*

But no factor is dispositive.  Instead, courts look to the particular facts of each information-sharing case, conducting a flexible inquiry to give due consideration to whether the "principal tendency" of the restraints at issue is to harm competition.  *Cal. Dental*, 526 U.S. at 781; *see also Todd*, 275 F.3d at 195 (assessing whether the alleged data exchange had "anticompetitive potential"); *Container Corp.*, 393 U.S. at 337 (explaining the "inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry").

**i. *Sensitivity of information exchanged.*** The Supreme Court has cautioned that the exchange of competitively sensitive information poses anticompetitive risk; the more sensitive the information, the more it can be used to restrain competition.  In particular, "[p]rice is too critical, too sensitive a control to allow it to be used even in an informal manner to restrain competition." *Container Corp.*, 393 U.S. at 338.  Exchanges of price, output, or cost information can "stabilize prices" by encouraging or enabling competitors to match prices or to use each other as a benchmark in pricing.  *Id.* at 336-37.  Courts have therefore been especially suspicious when competitors exchange recent, current, or future price or output.  *Gypsum*, 438 U.S. at 441 n.16; *id.* at 446-47 n.22; *Container Corp.*, 393 U.S. at 334-37; *Am. Column*, 257 U.S. at 410; *Todd*, 275 F.3d at 211-12.

Here, plaintiffs, including Consumer Indirect Purchaser Plaintiffs (CIPP), argue the data exchanged through Agri Stats included price and output metrics, *see, e.g.*, Mem. in Supp. of CIPPs' Mot. for Partial Summ. J., ECF No. 2403 (CIPP MSJ) at 23-24; and that

Agri Stats' reports include data providing insight into processors' future business plans, *id.* at 25.[10]

But not every case requires a direct exchange of price or cost. Courts have condemned information sharing even where no prices or quantity are exchanged at all—recognizing that the plaintiffs' burden is to show that the facts, taken as a whole, indicate a tendency for anticompetitive harm. *See, e.g.*, *SourceOne Dental, Inc. v. Patterson Cos.*, 310 F. Supp. 3d 346, 364-65 (E.D.N.Y. 2018) (holding that exchanging information about attendance at dental conventions could support a rule-of-reason claim without any exchange of price, cost, or wage information, because it represented "material and competitively sensitive" information facilitating exclusionary anticompetitive conduct).

**ii. *Granularity of information exchanged.*** Courts have also recognized that information-sharing arrangements are more likely to harm competition when the information shared is detailed or non-aggregated. *Am. Column*, 257 U.S. at 410; *Todd*, 275 F.3d at 212. As the Supreme Court noted in *Linseed Oil*, committing to expose intimate details of a firm's competitive affairs to a rival gravely interferes with the freedom underlying the competitive process. 262 U.S. at 389.

Here, plaintiffs claim the Agri Stats reports disaggregate or enabled disaggregation of data at the product and firm level. *See, e.g.*, CIPP MSJ at 27; All Pls.' Opp'n to Agri Stats' Mot. for Summ. J. and Defs.' Rule of Reason Args. in the Joint Mot. for Summ. J.,

---

[10] Plaintiffs argue that Agri Stats' reports provided pricing and output information sufficient to calculate individual plants' output. *See* Pls.' Joint Opp'n at 47. The United States takes no position on this factual dispute, particularly in light of the highly redacted evidentiary record in this case.

14

ECF 2535 (Pls.' Joint Opp'n) at 52-54, 56-57.  Plaintiffs also claim that Agri Stats did

nothing to stop processor defendants from deanonymizing its reports.  *See, e.g.*, CIPP MSJ

13.

But, once again, there is no categorical rule:  Courts do not require detailed or non-

aggregated information if other circumstances indicate a tendency for anticompetitive

harm.[11]  For example, in *Todd*, the Second Circuit concluded that aggregated information

was problematic when recipients could obtain subsets of data comprising as few as three

firms.  275 F.3d at 212.  Even though the data was aggregated and anonymized, the

narrowness of the subsets of data and the periodic updates to them enabled the firms to

glean information about their competitors' budget plans and to coordinate their salaries in

response.  *Id.*  In *North Texas Specialty Physicians*, an organization of independent

physicians polled its members regarding the minimum rates they would accept from payors

and reported back to the group only the mean, median, and mode.  528 F.3d. at 363.  The

Fifth Circuit upheld the FTC's conclusion that even this high-level reporting was

anticompetitive, because it helped the organization encourage members on the low end of

the range to raise their minimum rates in line with their peers.  *Id.* at 365.  *See also In re

RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 544, 549-50 (M.D.

---

[11] Exchange of disaggregated data can harm competition even if the individual firms are not explicitly identified, and the United States has obtained consent decrees in recent years with firms that shared disaggregated information without directly identifying individual competitors.  *See United States v. Cargill Meat Sols. Corp.*, No. 1:22-cv-01821, ECF Nos. 1, 2-1 (D. Md. filed July 25, 2022) (court accepted consent decree after United States alleged in its complaint that information-sharing agreement violated Section 1 when competitors shared detailed wage data, some of which did not explicitly identify individual competitors).

15

Tenn. 2023) (holding plaintiffs plausibly pleaded a Section 1 claim even where each competitor was not directly linked to the information shared, due in part to other evidence of anticompetitive harm, such as a centralized algorithm's recommending prices based on "granularly-focused data").

      **iii. *Public availability of information exchanged*.** Another factor courts consider is whether the information shared is publicly available or disseminated only among the parties to the information exchange. *See Todd*, 275 F.3d at 213. Courts have condemned information sharing where the information was unavailable to the public. *Sugar Inst., Inc. v. United States,* 297 U.S. 553 at 604-05 (1936); *Am. Column*, 257 U.S. at 411; *Todd*, 275 F.3d at 213 (explaining that, without public dissemination, information exchange loses much of its "procompetitive potential"). Such condemnation is consistent with the strict treatment of concerted action in Section 1 of the Sherman Act, which reflects Congress' recognition that joint activity "not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984).

      When competitors agree to exchange competitively sensitive information only among each other, it suggests that the information sharing will benefit only the competitors at the expense of consumers, workers, or other market participants. This asymmetry in dealing animated, in large part, the Supreme Court's finding of anticompetitive harm in *Linseed Oil*. *See* 262 U.S. at 389-90 (information exchange harmed consumers as manufacturers were able to "deal with widely separated and unorganized customers necessarily ignorant of the true conditions."); *cf. Am. Column*, 257 U.S. at 411

(distinguishing exchange of information in "newspaper and government publications" that "go to both seller and buyer" without a "skilled interpreter of the published reports," with reports that "go to the seller only," accompanied with recommendations urging "harmony of action").

There is no dispute that Agri Stats' reports were not publicly available.  *See* CIPP MSJ at 28 (confidential data); Pls.' Joint Opp'n at 68 (confidential data); Defs.' RoR MSJ at 7-8 (not contesting that Agri Stats' data is confidential although arguing that other, non-Agri Stats-analyses were based on public data and available to plaintiffs).

**iv.** ***Contemporariness of information exchanged***.  The temporal nature of the data—i.e., whether it reflects past, present, or planned future conditions—carries significant weight in courts' analysis of information exchanges as well.  As courts have recognized, exchanges of recent or future information carry far greater potential for anticompetitive effects than historical data.  *Am. Column,* 257 U.S. at 398-99; *Container Corp.*, 393 U.S. at 336; *Todd*, 275 F.3d at 211-12.  Knowledge of competitors' current or future prices and plans enables firms to converge rather than to pursue their "separate economic interests," *Am. Needle*, 560 U.S. at 195.  In *Container Corp.*, the Court noted that the exchange of current information stabilized prices because "[k]nowledge of a competitor's price usually meant matching that price."  393 U.S. at 336-37.  Information sharing is more likely to enable this sort of anticompetitive behavior where the parties are sharing current data (price, output, or other information) or planned future changes.

As with the other factors, the plaintiffs and defendants disagree over how current Agri Stats' reports were.  *Compare* CIPP MSJ at 7, 25-26, *and* Pls.' Joint Opp'n at 48 *with*

Mem. of Law in Supp. of Agri Stats' Mot. for Summ. J., ECF No. 2309 (Agri Stats MSJ) at 13.  And, as with the other factors, courts must evaluate this factor as part of the holistic rule-of-reason analysis.[12]

*      *      *

The precedents above make clear that the rule of reason is intended to be a flexible inquiry—one not conducive to rigid and arbitrary rules.  Defendants are thus wrong to the extent they suggest that plaintiffs can succeed only by showing that Agri Stats' reports contain individual competitor production or price information.  Such an approach impermissibly narrows the scope of liability in Section 1 cases, replacing a flexible determination with a box-checking exercise.

---

[12] In assessing whether information sharing is anticompetitive, courts also often consider the "structure of the industry involved" and whether it is highly concentrated. *Gypsum*, 438 U.S. at 441 n.16, 457; *Todd*, 275 F.3d at 207-08.  But, once again, not every case must involve only a handful of competitors.  Information sharing has been condemned as anticompetitive even where eighteen firms controlled 90% of the market.  *See United States v. Container Corp.*, 393 U.S. 333, 336 (1969); *id*. at 342 (Marshall, J., dissenting); *cf. Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921) (condemning information sharing used to fix prices among "365 natural competitors" comprising one-third of the market).

18

Dated: October 1, 2024

Respectfully submitted,

**FOR UNITED STATES OF AMERICA:**

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

MICHAEL KADES
JOHN ELIAS
HETAL DOSHI
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
*Policy Director*

MARKUS A. BRAZILL
*Counsel to the Assistant Attorney General*

*/s/ Yixi (Cecilia) Cheng*
YIXI (CECILIA) CHENG
*Counsel to the Assistant Attorney General*
JOHN SULLIVAN (*MDL Registration Forthcoming*)
*Trial Attorney*
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Ave NW, #3224
Washington, DC 20530
Telephone: 202-705-8342
Email: yixi.cheng@usdoj.gov

*/s/ Lisa D. Kirkpatrick*
LISA D. KIRKPATRICK
First Assistant United States Attorney
Attorney for the United States Acting Under Authority Conferred by
28 U.S.C. § 515

*/s/ Liles H. Repp*
LILES H. REPP
Attorney ID No. 0400692
Assistant United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone: (612) 664-5600
Fax: (612) 664-5788
Email: Liles.Repp@usdoj.gov

*Attorneys for United States of America*