# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

IN RE PORK ANTITRUST LITIGATION

This Document Relates To:

ALL ACTIONS

Civil No. 18-1776 (JRT/JFD)

MDL No. 21-2998

**AMENDED MEMORANDUM OPINION
AND ORDER ON MOTIONS FOR
SUMMARY JUDGMENT**

---

Brian D. Clark, W. Joseph Bruckner, and Arielle S. Wagner, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; Bobby Pouya and Michael H. Pearson, **PEARSON WARSHAW, LLP**, 15165 Ventura Boulevard, Suite 400, Sherman Oaks, CA 91403, for the Direct Purchaser Plaintiffs.

Shana E. Scarlett, **HAGENS BERMAN SOBOL SHAPIRO LLP**, 715 Hearst Avenue, Suite 202, Berkeley, CA 94710; Breanna Van Engelen, **HAGENS BERMAN SOBOL SHAPIRO LLP**, 1301 Second Avenue, Suite 2000, Seattle, WA 98101; Abigail D. Pershing, **HAGENS BERMAN SOBOL SHAPIRO LLP**, 301 North Lake Avenue, Suite 920, Pasadena, CA 91101; Joshua J. Rissman, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for the Consumer Indirect Purchaser Plaintiffs.

Shawn M. Raiter, **LARSON KING, LLP**, 30 East Seventh Street, Suite 2800, St. Paul, MN 55101; Michael J. Flannery, **CUNEO GILBERT & LADUCA, LLP**, 2 City Place Drive, Second Floor, St. Louis, MO 63141, for the Commercial and Institutional Indirect Purchaser Plaintiffs.

Samuel Jarashow Randall and William J. Blechman, **KENNY NACHWALTER, PA**, 1441 Brickell Avenue, Suite 1100, Miami, FL 33131, for Direct Action Plaintiffs The Kroger Co.; Albertsons Companies, Inc.; Hy-Vee, Inc.; Save Mart Supermarkets; and US Foods, Inc.

Derek T. Ho, Kathleen W. Hickey, and Collin R. White, **KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC**, 1615 M Street Northwest, Suite 400, Washington, D.C. 20036, for Direct Action Plaintiff Amory Investments LLC.

Mark A. Singer, **CADWALADER, WICKERSHAM & TAFT LLP**, 200 Liberty Street, New York, NY 10281, for Direct Action Plaintiffs McDonald's Corporation; PJ Food Service, Inc.; Aramark Food and Support Services Group, Inc.; Target Corporation; Gordon Food Service, Inc.; Glazier Foods Company; Quality Supply Chain Co-Op, Inc.; Sherwood Food Distributors, L.L.C.; Harvest Meat Company, Inc.; Western Boxed Meat Distributors, Inc.; Hamilton Meat, LLC; Jetro Holdings, LLC; Maximum Quality Foods, Inc. and BJ's Wholesale Club, Inc.; Kraft Heinz Foods Company; Winn-Dixie Stores, Inc.; and Bi-Lo Holdings, LLC.

Brian C. Hill, **MARCUS & SHAPIRA LLP**, One Oxford Centre, Thirty-Fifth Floor, Pittsburgh, Pennsylvania 15219, for Direct Action Plaintiffs Action Meat Distributors, Inc.; Topco Associates, LLC; Alex Lee, Inc./Merchants Distributors, LLC; Associated Food Stores, Inc.; Brookshire Grocery Company; Colorado Boxed Beef Co.; Certco, Inc.; The Golub Corporation; Nicholas & Co.; PFD Enterprises, Inc.; SpartanNash Company; Springfield Grocer Company; The Distribution Group d/b/a Van Eerden Foodservice Co.; URM Stores, Inc.; Giant Eagle, Inc.; and UniPro Foodservice, Inc.

James J. McGuire, **GREENSPOON MARDER LLP**, 1345 Avenue of the Americas, Suite 2200, New York, NY, 10105, for Direct Action Plaintiff Sysco Corporation.

Jason H. Kim, **SCHNEIDER WALLACE COTTRELL KONECKY LLP**, 300 South Grand Avenue, Suite 2700, Los Angeles, CA 90071, for the Commonwealth of Puerto Rico.

Justin W. Bernick, **HOGAN LOVELLS US LLP**, 555 Thirteenth Street, Northwest, Washington, D.C. 20004, for Defendant Agri Stats, Inc.

Christa C. Cottrell, Daniel Laytin, Amarto Bhattacharyya, and Nicholas M. Ruge, **KIRKLAND & ELLIS LLP**, 333 West Wolf Point Plaza, Chicago, IL 60654, for Defendants Clemens Food Group, LLC and The Clemens Family Corporation.

Emily E. Chow and Craig S. Coleman, **FAEGRE DRINKER BIDDLE & REATH LLP**, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, for Defendants Hormel Foods Corporation and Hormel Foods, LLC.

Sami H. Rashid, **QUINN EMANUEL URQUHART & SULLIVAN LLP**, 51 Madison Avenue, Twenty-Second Floor, New York, NY 10010; Donald G. Heeman and Jessica J. Nelson, **SPENCER FANE LLP**, 150 South Fifth Street, Suite 1900, Minneapolis, MN 55402, for Defendant JBS USA Food Company.

Peter J. Schwingler, **JONES DAY**, 90 South Seventh Street, Suite 4950, Minneapolis, MN 55402, for Defendant Seaboard Foods LLC.

Joshua Lipton, **GIBSON, DUNN & CRUTCHER LLP**, 1050 Connecticut Avenue, Northwest, Washington, D.C. 20036; Brian Robison, **BROWN FOX PLLC**, 6303 Cowboys Way, Suite 450, Frisco, TX 75034, for Defendant Smithfield Foods, Inc.

Christopher A. Smith, **HUSCH BLACKWELL LLP**, 8001 Forsyth Boulevard, Suite 1500, St. Louis, MO 63105; A. James Sprung, **HUSCH BLACKWELL LLP**, 1801 Wewatta Street, Suite 1000, Denver, CO 80202, for Defendant Triumph Foods, LLC.

Tiffany Rider Rohrbaugh and Lindsey Strang Aberg, **AXINN, VELTROP & HARKRIDER LLP**, 1901 L Street Northwest, Washington, D.C. 20036; Denise L. Plunkett, **AXINN, VELTROP & HARKRIDER LLP**, 114 West Forty-Seventh Street, New York, NY 10036; Scott M. Rusert, **TAFT LAW**, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc.

In this sprawling multidistrict litigation, three classes and dozens of direct action plaintiffs allege that Defendants, one benchmarking company and seven of the nation's leading pork producers and integrators, conspired to limit the supply of pork and fix prices in violation of state and federal antitrust laws. The Parties now move for summary judgment, totaling eleven separately briefed motions. After a comprehensive examination of the 55,000-page summary judgment record, the nearly forty filings

outlining the Parties' positions, and two days of oral argument, the Court will grant the

motions in part and deny the motions in part.

## BACKGROUND

### I.    FACTS

#### A.    Overview of Claims

This action represents the consolidation of many separately filed actions alleging

price fixing in the pork industry by Defendants, which include seven of America's leading

pork producers and integrators (collectively the "Processor Defendants") and a

benchmarking company.[1]  There are three certified classes of Plaintiffs (collectively the

"Class Plaintiffs"): the Direct Purchaser Plaintiffs ("DPPs"), Consumer Indirect Purchaser

Plaintiffs ("Consumer IPPs"), and Commercial and Institutional Indirect Purchaser

Plaintiffs ("Commercial IIPPs").  Each group consists of individuals or companies who

directly or indirectly purchased pork products from one of the Processor Defendants.[2]  In

addition, dozens of Direct Action Plaintiffs ("DAPs") also bring actions against Defendants.

All Plaintiffs allege that Defendants engaged in a price-fixing conspiracy to

artificially constrict the supply of pork products in the domestic market of the United

---

[1] Defendants are Agri Stats, Inc. ("Agri Stats"); Clemens Food Group, LLC, and The Clemens Family Corporation (collectively "Clemens"); Hormel Foods Corporation and Hormel Foods, LLC (collectively "Hormel"); JBS USA Food Company ("JBS"); Seaboard Foods LLC ("Seaboard"); Smithfield Foods, Inc. ("Smithfield"); Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. (collectively "Tyson").

[2] The only Defendant excluded from the Processor Defendants is Agri Stats.

States, a per se violation of § 1 of the Sherman Act, 15 U.S.C. § 1. (*See, e.g.*, DPPs' 3d Am. & Consol. Class Action Compl. ("DPP Compl.") ¶¶ 205–15, Jan. 15, 2020, Docket No. 431.)[3] Additionally, Consumer IPPs allege that the exchange of information through Agri Stats reports unreasonably restrained competition in the U.S. pork industry in violation of the rule of reason under § 1 of the Sherman Act. (Consumer IPPs' 4th Am. Consol. Class Action Compl. ("Consumer IPP Compl.") ¶¶ 266–79, Jan. 12, 2022, Docket No. 1111.)

In addition to the Sherman Act claims, Plaintiffs bring claims under various state laws and the Packers and Stockyard Act ("PSA"). Specifically, Commercial IIPPs bring claims for damages under the antitrust laws of 23 jurisdictions,[4] the consumer-protection laws of 9 jurisdictions,[5] and the unjust enrichment laws of 27 jurisdictions.[6] (Commercial IIPPs' 4th Am. & Consol. Class Action Compl. ("Commercial IIPP Compl.") ¶¶ 219–81, June 15, 2021, Docket No. 808.) Similarly, Consumer IPPs bring claims for damages under the

---

[3] All record citations to document entries can be found in ECF No. 18-1776 unless otherwise indicated. When citing page numbers, the Court references the ECF page numbers as opposed to document page numbers.

[4] Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

[5] Arkansas, California, Florida, Nebraska, New Mexico, North Carolina, South Carolina, Vermont, and West Virginia.

[6] Arizona, Arkansas, California, District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

antitrust laws of 21 jurisdictions,[7] the consumer protection laws of 11 jurisdictions,[8] and the unjust enrichment laws of 18 jurisdictions.[9] (Consumer IPP Compl. ¶¶ 280–536.) The DAPs bring claims for damages under the PSA, 7 U.S.C. § 192. (DAPs' Consol. Compl. ("DAP Compl.") ¶¶ 460–71, Dec. 5, 2022, Docket No. 1659.)

Finally, the Commonwealth of Puerto Rico brings claims for relief on behalf of itself and in its *parens patriae* capacity under § 1 of the Sherman Act, as well as Puerto Rico's antitrust and unjust enrichment laws. (3d Am. Coml. ¶¶ 178–99, Jan. 22, 2020, Docket No. 103 in ECF No. 19-2723.)

### B.    The U.S. Pork Market

The United States is the third-largest producer and one of the largest exporters of pork in the world. (Decl. of Robert C. Gallup, Sealed Defs.' Joint Ex. 25 at 14, June 7, 2024, Docket No. 2248.)[10] The U.S. pork market includes farming operations that raise hogs, harvesting plants that process hogs into pork, and value-added operations that further process pork into cuts for sale in the retail and foodservice sectors. (*Id.* at 16.)

---

[7] Arizona, California, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, Tennessee, Utah, and West Virginia.

[8] California, District of Columbia, Florida, Hawaii, Illinois, Nebraska, Nevada, New Mexico, North Carolina, Rhode Island, and South Carolina.

[9] California, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Mexico, North Carolina, Rhode Island, South Carolina, Tennessee, and West Virginia.

[10] The Court references all the exhibits introduced at Docket No. 2248 as "Defs.' Joint Ex. X," with X representing the number of the exhibit.

The pork process begins with hogs,[11] which are farmed, slaughtered, and then processed into pork.  (*Id.* at 14.)  Some of the Processor Defendants own and raise a sizeable portion of the hogs that they process; others rely entirely or almost entirely on independent hog producers for their hog supply.  (Sealed Defs.' Joint Ex. 5 ("Stiroh") ¶ 61, Fig. 8 (depicting the share of each Processor Defendants' pork processing that is supplied through external hog purchases).)[12]

Hog production is generally cyclical, with the number of hogs raised rising and falling about every four years due to various supply and demand factors.  (Sealed Defs.' Joint Ex. 25 at 19–20.)  This phenomenon is known as the "hog cycle."  (*Id.* at 19.)  To put the economics of the hog cycle simply, when hog producers enter the market or increase supply due to improved market conditions, the cost of hogs decreases, which prompts producers to exit the market or decrease production through liquidation.  (*Id.* at 17; *see also* Defs.' Joint Ex. 15 at 116:10–21 ("[P]roducers will expand production until prices reach a certain level, usually lower, . . . at which point the producers will begin to liquidate, reduce the number of animals in response to the fact that their costs have been squeezed . . . at which point hog prices increase, and with the increase in hog prices, . . .

---

[11] "Sows" refer to female breeding pigs; "pigs" refer to the offspring of sows before they reach market weight; and "hogs" refer to pigs that have reached market weight.  (Sealed Defs.' Joint Ex. 3 ¶¶ 33–34, Fig. 1.)

[12] Processor Defendants purchase the following approximate percentages of hogs from independent hog producers: Triumph: 100%, Hormel: 99.6%, Tyson: 94.6%, JBS: 85.2%, Clemens: 74.8%, Smithfield: 53.6%, and Seaboard: 10.5%.  (Stiroh ¶ 61, Fig. 8.)

producers begin to expand again.").)  The following chart illustrates the hog cycle over the last 50 years.



(Sealed Defs.' Joint Ex. 27 at Ex. 8.)  The data demonstrates how hog producers earned profits (green) or lost money (red) over time, with yellow depicting year-over-year change.  As can be seen by the sharp upward and downward trends, the market "respond[s] very quickly by adjusting supply of pigs to counteract downturns in prices." (Sealed Defs.' Joint Ex. 8 at 93:2–4.)  The fluctuation of hog production necessarily impacts pork production, as pork processors cannot process hogs that are not ready for slaughter.

### C.     Key Events in the U.S. Pork Market During the Relevant Period

Plaintiffs allege that the Defendants' conspiracy began at least as early as 2009 and continued to 2018 (the "Relevant Period").

Every year, economists from the United States Department of Agriculture ("USDA") prepare reports with ten-year projections on commodities, trade, and aggregate indicators for the agricultural sector. (*See, e.g.*, Defs.' Joint Ex. 29.) As demonstrated in the graph below, in 2008 the USDA predicted that pork production, like production of other meats, would decline for a few years before increasing again because of anticipated increases in feed costs, which were expected to increase due to the expansion of corn-based ethanol production. (*Id.* at 47.)

**U.S. red meat and poultry production**

Billion pounds



(*Id.*) Feed, which primarily consists of corn and soybeans, is the largest contributor of costs to hog producers. (Sealed Defs.' Joint Ex. 25 at 17.) USDA economists predicted that pork production would decline between 2009 and 2011 given hogs' mostly-corn diet

but then grow again "as higher hog prices improve returns." (Defs.' Joint Ex. 29.) Researchers from the Food and Agricultural Policy Research Institute at the University of Missouri reached similar conclusions in 2009, predicting higher hog prices due to significant reductions in the sow herd in 2009 and 2010. (Defs.' Joint Ex. 30 at 292.)

As predicted, 2008 was a tumultuous year for the pork industry. To start, feed prices spiked as anticipated. (Defs.' Joint Ex. 32.) In addition, the 2008 Great Recession decreased pork demand, and a new circovirus vaccine lowered hog mortality in 2008, resulting in an unanticipated surplus of hogs. (Defs.' Joint Ex. 15 at 69:17–70:14, 102; Defs.' Joint Ex. 7 at 383:25–385:14; Sealed Defs.' Joint Ex. 34 at 4.) Together, these conditions eviscerated hog production profits and created a financial "crisis" in the pork industry. (*See, e.g.*, Sealed Defs.' Joint Ex. 76 at 3; Defs.' Joint Ex. 28 at 4.) Many hog producers, including some Processor Defendants, reduced their sow herd during this time. (*E.g.*, Sealed Defs.' Joint Ex. 36 ¶ 176; Defs.' Joint Ex. 37.)

Meanwhile, fewer hogs were being imported from Canada for U.S. pork production. This was due in part to the imposition of certain U.S. regulatory changes in the pork industry. (Defs.' Joint Ex. 28 at 8; Sealed Defs.' Joint Ex. 10 at 150:18–21.) The decrease in live hog imports into the U.S. encouraged the Canadian government to pay Canadian hog producers to reduce sows or temporarily close their farms. (*See* Sealed Defs.' Joint Ex. 50 at 6; Sealed Defs.' Joint Ex. 51 at 14–15.) Together, the U.S. regulatory changes and Canadian government-sponsored sow liquidations meant fewer hogs were

imported into the U.S., with live hog imports from Canada dropping from 9.35 million hogs in 2008 to 6.3 million in 2009 and remaining under 6 million hogs per year for the remainder of the Relevant Period.  (Stiroh ¶ 145 & Fig. 17.)

In 2011, hog producers began to profit again, as predicted by USDA economists, which in turn increased hog and pork production.  (*See* Defs.' Joint Ex. 29 at 185.)

Then, from the second half of 2012 and into early 2013, a significant drought decreased the corn crop, which led to higher feed costs.  (Defs.' Joint Ex. 57 at 53:4–54:5; Sealed Defs.' Joint Ex. 3 ("Mintert") ¶ 189 & Ex. 24B.)  In addition, an outbreak of the porcine epidemic diarrhea virus ("PEDv") in late 2013 killed approximately 10% of U.S. hogs.  (Sealed Defs.' Joint Ex. 4 at 3; Joint Ex. 58 at 412–13.)  Together, the drought and PEDv reduced the supply of hogs in the U.S. pork industry.

Between 2015 and 2019, pork production increased again.  In fact, pork production reached record levels through 2019.  (*E.g.*, Defs.' Joint Ex. 53 at 385–86, Fig. 2.)

### D.    The Alleged Conspiracy

Plaintiffs allege that, beginning in at least 2009 and continuing to 2018, Defendants conspired to "fix, raise, maintain, and stabilize the price of pork."  (DPP Compl. ¶ 2.)  This was principally done "by coordinating input and limiting production with the intent and expected result of increasing pork prices in the United States."  (*Id.*)  In other words, Plaintiffs accuse Defendants of entering a supply-reduction agreement to raise the price of pork and increase their profits.

Plaintiffs claim that Defendants have sufficient market power to manipulate the pork industry, and that Defendants used their market power to pull several "levers" in furtherance of the conspiracy.  The three alleged "levers" include (1) decreasing hog supply by liquidating sows and procuring fewer hogs, (2) restricting pork production and expansion below competitive levels, and (3) exporting a greater proportion of pork products to international markets to keep demand for pork high in the United States. Together, Plaintiffs argue, these actions resulted in an artificial constriction of pork supply and higher prices for pork in the domestic market.  According to Plaintiffs, Defendants maintained the conspiracy by communicating with each other publicly and directly and by exchanging competitively sensitive, non-public information through Agri Stats.

### E.    Agri Stats Reports

Agri Stats is a benchmarking company headquartered in Fort Wayne, Indiana, that has approximately 70 employees.  (Decl. of Justin W. Bernick, Sealed AS Ex. 1 ¶¶ 6, 9, June 7, 2024, Docket No. 2311; Sealed AS Ex. 2 at 41:11–13.)[13]

The company collects data and provides reports and accompanying services to protein producers, including those in the U.S. pork and broiler chicken industries.  (Sealed AS Ex. 1 ¶¶ 9–10, 16, 18.)  Agri Stats began offering reports related to the farming of live hogs in 2004, and the company expanded its reports to include pork production in 2006.

---

[13] The Court references the Agri Stats exhibits, which are introduced at Docket No. 2311, as "AS Ex. X," with X representing the number of the exhibit.

(Sealed AS Ex. 23 at 8; Sealed AS Ex. 2 at 49:17–50:4.)  In addition to providing reports, Agri Stats provides "on-site live review presentations" every quarter where it "facilitate[s] discussions and actions on key opportunities without making recommendations or providing consulting."  (Sealed AS Ex. 22 at 16; Sealed AS Ex. 21 at 6.)  Agri Stats charges its subscribers a flat fee for its reports and services.  (Sealed AS Ex. 1 ¶ 44.)

Processor Defendants participated in a variety of Agri Stats reports at some point during the Relevant Period, as demonstrated by the following table.  (Decl. of Shana E. Scarlett, Sealed Pls.' Ex. 9 ("Singer") at 201, App. 3 T.1, Aug. 25, 2024, Docket No. 2462 (reproduced below).)[14]

---

[14] The Court references all Plaintiffs' exhibits as "Pls.' Ex. X," with X representing the number of the exhibit.  Plaintiffs' exhibits are filed in the following docket entries in ECF No. 18-1776: Docket No. 2462 (exhibits 1-417); Docket No. 2536 (exhibits 700-773); Docket No. 2497 (exhibits 800-873); Docket No. 2511 (exhibits 900-957); Docket No. 2524 (exhibits 1000-1050); Docket No. 2483 (exhibits 1100-1184); Docket No. 2504 (exhibits 1300-1334); Docket No. 2520 (exhibits 1400-1470); Docket No. 2530 (exhibits 1600-1628); Docket No. 2492 (exhibits 1900-1939); and Docket No. 2542 (exhibits 2000-2100).

APPENDIX TABLE 1: DEFENDANTS AGRI STATS PARTICIPATION 2008-2018

| Year | Clemens (Hatfield) | | | Hormel (PFFJ until March 2017) | | | JBS (Cargill, Pilgrim, Swift) | | | Seaboard (Seaboard Triumph Foods) | | | Smithfield (Farmland, John Morrell, Murphy-Brown, PFFJ from March 2017) | | | Triumph (Christensen Farms) | | | Tyson | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Live | Plant | Sales | Live | Plant | Sales | Live | Plant | Sales | Live | Plant | Sales | Live | Plant | Sales | Live | Plant | Sales | Live | Plant | Sales |
| 2008 | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | N | Y | Y | Y |
| 2009 | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 2010 | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 2011 | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 2012 | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 2013 | N | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 2014 | N | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 2015 | N | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 2016 | N | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 2017 | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y |
| 2018 | N | Y | Y | N | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | Y | Y | Y |

Though Agri Stats separates different aspects of the pork industry into distinct reports, the compilation and distribution of the data follow the same basic procedure. Agri Stats reports are compiled from data submitted by participating pork processors, who submit data separately for each of their production complexes. (Sealed AS Ex. 1 ¶ 20.) After receiving the data, Agri Stats audits and anonymizes the information and curates the reports, which compare the data from a report recipient's complexes with that of anonymized competitors' complexes on a variety of operational metrics related to pork production, including sales, processing, operations, hog production, and exports. (*Id.* ¶¶ 19–23, 27–30; Sealed AS Ex. 22 at 17 ("Confidential – *cannot be identified*"); Sealed AS Ex. 4 at 28:17–23.) The data eventually provided to the subscribers in the reports is,

on average, 45 days old.  (Sealed AS Ex. 1 ¶ 15.)  Notably, however, some of the sales reports are produced weekly.  (*Id.* ¶ 25; Sealed AS Ex. 2 at 24:2–5.)

The data pages of the reports are anonymized, in that they do not match the name of any competitor's production complex to the data.  (Sealed AS Ex. 4 at 43:23–44:6.) Instead, Agri Stats assigns each participating production complex a unique identifier number that is only provided to the subscribing company that operates the production complex.  (Sealed AS Ex. 1 ¶ 21.)  Subscribers who receive Agri Stats reports are thus able to identify their own production complexes with the unique identifier numbers, while the remaining rows of data for competitors' production complexes bear no identifier number. (*Id.* ¶ 22.)  However, each report includes a page at the beginning that lists the participating production complexes whose data are included inside, so recipients are aware of which competitors participated in each report.  (Sealed AS Ex. 4 at 43:16–23.) Every month, the Agri Stats's audit team looks for potential outliers in the data that may make an unnamed processor more identifiable.  (Sealed AS Ex. 5 at 232:7–17.)

Agri Stats provided its various reports in several "books" to participating pork processors during the Relevant Period, including a sales analysis book, a processing analysis book, and an export sales book.  (Sealed AS Ex. 1 ¶ 19; Sealed AS Ex. 3 at 40:25–41:10.)

The reports in the sales analysis book provide anonymized price analyses that compare a recipient's sales by product against averages for bundles of similar products.

(Sealed AS Ex. 1 ¶ 23.)  Agri Stats groups together bundles of similar products for as near apples-to-apples comparison to the recipient's products as possible.  (*Id.*)  The sales analysis book provides company-by-company-level analysis in its Ranking Reports, which Agri Stats began offering in 2009.  (*Id.* ¶ 24; Sealed Pls.' Ex. 49 at 2.)

The Ranking Reports compare a report recipient's price by product against (1) a "national net" price for similar, bundled products that is calculated from the companies participating in any given report, and (2) a "national top 25 percent" price for similar, bundled products that is calculated from the top 25% of the pounds being sold for similar products.  (Sealed AS Ex. 1 ¶ 23; *see also* Tr. of Mots. Hr'g – A.M. Session at 135:4–16, 135:24–136:2, Dec. 17, 2024, Docket No. 2803; Sealed AS Ex. 9 at 37:10–38:4.)  Notably, the reports do not identify which products are included in the competitors' "mix," or bundle, of products at any complex, and the data for the competitors' mix is "adjusted to account for the report recipient's own product mix."  (Sealed AS Ex. 1 ¶ 24.)

The sales analysis book data is also available in an electronic format called Data Miner, which provides more timely sales information.  (*Id.* ¶ 26; *see also* Sealed Pls.' Ex. 27 at 47:10–48:12 (testifying about Data Miner tool).)  There is evidence that at least Clemens, JBS, Smithfield, Triumph, and Tyson used Data Miner.  (Sealed Pls.' Ex. 73 (Clemens); Sealed Pls.' Ex. 1913 (JBS); Sealed Pls.' Ex. 1914 (Smithfield); Sealed Pls.' Ex. 51 (Triumph); Sealed Pls.' Ex. 1912 (Tyson).)

The processing analysis book is an additional book of reports that Agri Stats provides to subscribers.  The reports in this book compare the processing costs of a recipient against those of competitors.  (Sealed AS Ex. 1 ¶ 27.)  One of the reports in the processing analysis book, Report 2.2, ranks participating production complexes based on slaughtering costs.  (*Id.* ¶ 36.)  Report 2.2 does not identify the total number of head or pounds produced by any competitor, but starting in 2011 the report provided columns identifying the weekly run time for each participating complex, the number of plant shifts for each complex, the average number of days worked in a week for each complex, the number of hogs slaughtered per operating hour at each complex, and the number of lines run by each complex.  (*Id.* ¶¶ 37–38.)  An underline identifies the data for each report recipient's complex.  (*Id.* ¶ 38.)  However, Report 2.2 only identifies the number of lines operated by the report recipient's complex(es) and removes such data for every competitor-run complex in the report.  (*Id.* ¶ 39.)

Finally, the export sales book, which was added to Agri Stats's pork benchmarking program in 2010, provides anonymized data on the export sales of pork products to international markets.  (*Id.* ¶ 30.)

Agri Stats stopped its sales, processing, and export reports in 2019.  (Sealed AS Ex. 2 at 191:11–15.)

## F.    Other Reports and Services

Notably, the USDA tracks and reports production volume of swine every day, week, and month in publicly available reports.  (Sealed AS Ex. 1 ¶ 41.)  In addition, the USDA

publishes current and historic breeding herd data for hog production every quarter and publishes data for the volume of pork products sold by product category with the average price for each category twice daily.  (*Id.* ¶¶ 42–43.)

Express Markets, Inc. ("EMI"), a wholly owned subsidiary of Agri Stats, provides services related to those provided by Agri Stats.  (*Id.* ¶ 45; Sealed AS Ex. 8 at 31:7–9.)  In particular, EMI provides market analysis services to protein producers and protein purchasers by identifying current economic conditions in protein businesses and projecting future ones based on current and past trends.  (Sealed AS Ex. 1 ¶ 47.)  In the pork industry, EMI offers Analytics Services, through which EMI provides forecasting, market analysis, and commentary from economists in the pork industry based on data from public sources, primarily the USDA.  (*Id.* ¶¶ 49–51.)

## II.   PROCEDURAL HISTORY

Beginning in 2018, a series of class actions and individual actions were filed against Defendants, alleging that Defendants had entered a price-fixing conspiracy in violation of federal and state antitrust laws.  (*See, e.g.*, Compl., June 28, 2018, Docket No. 1.)

Thirteen putative classes were subsequently organized into three classes.  The DPPs are a class "consisting of all persons and entities who purchased pork directly from a Defendant or co-conspirator."  (DPP Compl. at 4.)  The Consumer IPPs are a class of "consumers who have purchased pork as the end-consumers in the food distribution chain" and thus "purchased pork indirectly from a defendant or co-conspirator for personal use."  (Consumer IPP Compl. ¶ 14.)  The Commercial IIPPs are a class "consisting

-18-

of all commercial and institutional indirect purchasers of pork from a Defendant or co-conspirator."  (Commercial IIPP Compl. at 4.)

Once categorized, the Class Plaintiffs filed separate consolidated complaints on August 17, 2018.[15]  Defendants moved to dismiss the complaints, which the Court granted without prejudice because Plaintiffs had not adequately alleged parallel conduct.  *In re Pork Antitrust Litig.*, No. 18-1776, 2019 WL 3752497, at *10 (D. Minn. Aug. 8, 2019).

After the classes filed amended complaints,[16] Defendants moved to dismiss again, which the Court granted in part.  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 802 (D. Minn. 2020).  The Court dismissed certain state law claims but allowed the federal law claims and most state law claims to go forward because this time Plaintiffs' amended complaints adequately pled parallel conduct, and the claims were not time-barred.  *Id.* The Court dismissed Indiana Packers as a defendant.  *Id.* at 802–03.

The Court certified the three classes on March 29, 2023.  *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 981 (D. Minn. 2023), *as amended by* No. 18-1776, 2024 WL 2060386 (D. Minn. May 8, 2024).

---

[15] The DPPs' consolidated complaint can be found in ECF No. 18-1803, Docket No. 83; the Consumer IPPs' consolidated complaint can be found in ECF No. 18-1776, Docket No. 74; the Commercial IIPPs' complaint can be found in ECF No. 18-1891, Docket No. 63.

[16] The DPPs' amended complaint can be found at Docket No. 431; the Consumer IPPs' amended complaint can be found at Docket No. 392; the Commercial IIPPs' amended complaint can be found at Docket No. 432.

Additional cases brought by plaintiffs who opted out of the classes, called Direct Action Plaintiffs ("DAPs"), were filed in various federal district courts. *In re Pork Direct & Indirect Purchaser Antitrust Litig.*, No. 2998, 2021 WL 2369199, at *1 (J.P.M.L. June 9, 2021). Pursuant to 28 U.S.C. § 1407(a), the Judicial Panel on Multidistrict Litigation formed MDL No. 2998 and began transferring such cases to this Court. (*E.g.*, ECF No. 21-2998, Conditional Transfer Order, July 15, 2021, Docket No. 8.) The Court consolidated the individual actions brought by the DAPs with the class actions into a single, multidistrict litigation. *In re Pork Antitrust Litig.*, No. 18-1776, 2021 WL 5310590, at *5 (D. Minn. Nov. 14, 2021).

The DAPs filed a consolidated complaint on December 5, 2022. (*See generally* DAP Compl.) Defendants moved to dismiss the DAP complaint, but the Court denied the motion. *In re Pork Antitrust Litig.*, No. 18-1776, 2023 WL 6278354, at *11 (D. Minn. Sept. 26, 2023).

The action proceeded to discovery. Then, on June 7, 2024, Defendants and the Consumer IPPs filed the present eleven motions for summary judgment:[17] two consolidated motions joined by all defendants, eight separate motions filed by each defendant individually, and one motion for partial summary judgment filed by the

---

[17] The Parties also filed *Daubert* motions, which the Court addresses in a separate memorandum opinion and order.

Consumer IPPs.[18]   In addition, the United States submitted a Statement of Interest

regarding the correct application of the antitrust laws to information-sharing claims.

(Statement of Interest of the U.S., Oct. 1, 2024, Docket No. 2616.)

    The Court heard nearly eight hours of oral argument on the summary judgment

motions over two days.  (Min. Entry, Dec. 12, 2024, Docket No. 2796; Min. Entry, Dec. 13,

2024, Docket No. 2797.)

## DISCUSSION

## I.    STANDARD OF REVIEW

    Summary judgment is appropriate when there are no genuine issues of material

fact, and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case, and

a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a

verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court considering a motion for summary judgment must view the facts in the light most

favorable to the nonmoving party and give that party the benefit of all reasonable

inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or

---

[18] The motions for summary judgment can be found at Docket Nos. 2245 (Defendants' Joint Per Se), 2266 (Defendants' Joint All Remaining Claims), 2271 (Tyson), 2273 (Hormel), 2275 (Seaboard), 2284 (Triumph), 2323 (Clemens), 2338 (JBS), 2344 (Smithfield), 2379 (Agri Stats), and 2350 (Consumer IPPs).

denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.[19]  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  Still, as noted below, the standard for summary judgment is higher for inferring a conspiracy under § 1 Sherman Act claims.

## II.    PER SE SHERMAN ACT VIOLATIONS

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  Though not in the text of the statute itself, courts have long read the Act as only outlawing "*unreasonable* restraints" of trade.  *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) ("*Amex*") (quoting *State Oil Co v. Khan*, 522 U.S. 3, 10 (1997)).

---

[19] Defendants challenge the admissibility of certain of Plaintiffs' exhibits, primarily on hearsay, lack of foundation, and relevance grounds.  (*See* Letter to District Judge, Oct. 25, 2024, Docket No. 2702; Letter to District Judge, Nov. 8, 2024, Docket No. 2724; Letter to District Judge, Nov. 12, 2024, Docket No. 2725.)  The Court has independently reviewed each of the exhibits and the Parties' respective positions regarding their admissibility.  The standard for admissibility of exhibits at summary judgment is whether the evidence could be presented in an admissible form at trial.  *Am. Home Assurance Co. v. Greater Omaha Packing Co.*, 819 F.3d 417, 429 (8th Cir. 2016).  Because the Court finds that each of the challenged exhibits relied upon in this Memorandum Opinion and Order could conceivably be presented in an admissible form at trial, whether as non-hearsay, exceptions to the rule against hearsay, and the like, the Court will consider them for the limited purpose of summary judgment but reserve ruling on their final admissibility until trial, perhaps with a separate evidentiary hearing.

To establish a claim under § 1, "a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (quotation omitted).

In general, allegations of information exchanges can move an antitrust case forward in two ways. First, plaintiffs may use allegations of information exchange as evidence of a conspiracy to prove a per se claim. Second, if no price-fixing agreement can be proven, the information exchange can itself be an agreement, but its restraint on the market must be evaluated under the rule of reason. The Court will begin with Plaintiffs' per se claims and address the rule of reason later in its analysis.

On the per se claims, courts have long held that price-fixing conspiracies "are thought so inherently anticompetitive that [they are] illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). Here, there is no real dispute that, if proven, the alleged restraint would affect interstate commerce. Therefore, the only question remaining as to Plaintiffs' per se allegations is whether Defendants engaged in concerted action.

A plaintiff's burden on summary judgment to show evidence of concerted action under § 1 is high. The Supreme Court has recognized that the type of ambiguous conduct commonly identified by plaintiffs as evidence of collusive activity often actually reflects

pro-competitive, unilateral conduct. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Matsushita*, 475 U.S. at 588. To avoid chilling businesspersons from engaging in lawful activities, "antitrust law limits the range of permissible inferences from ambiguous evidence in a Section 1 case." *Matsushita*, 475 U.S. at 588. Therefore, to avoid summary judgment, plaintiffs must present evidence that "tends to exclude the possibility of independent action" by defendants. *Monsanto*, 465 U.S. at 768. In other words, conduct that is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588.

The Eighth Circuit strictly applies the *Monsanto/Matsushita* standard in both horizontal and vertical price-fixing antitrust cases. *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 203 F.3d 1028, 1032 (8th Cir. 2000) (en banc); *see also Corner Pocket of Sioux Falls, Inc. v. Video Lottery Tech., Inc.*, 123 F.3d 1107, 1109 (8th Cir. 1997); *St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 861 (8th Cir. 1998).

## A. Plausibility of Conspiracy

As a threshold matter, Defendants argue that Plaintiffs' theory of a conspiracy is economically implausible. The Supreme Court is clear that "courts should not permit factfinders to infer conspiracies when such inferences are implausible." *Matsushita*, 475 U.S. at 593. Defendants raise three main points in support of their argument.

First, Defendants argue that the Plaintiffs' conspiracy theory ignores the role of thousands of independent hog producers, who accounted for 70% of U.S. hog production during the Relevant Period. (*See* Mintert ¶ 23b.) Defendants contend that any meaningful efforts to reduce hog production levels would require the participation of independent hog producers and could not be orchestrated by Defendants alone.

However, the Court finds that Plaintiffs have produced enough evidence from which a reasonable jury could find that Defendants were in a position to control hog supply in a meaningful way, despite the role that independent hog producers play in the industry. In particular, there is evidence that some of the Processor Defendants' vertical integration—their control of the entire life cycle of a hog, from hog production to harvest—enabled them to directly control hog supply by restricting their own hog production and by using "vertical restraints" to restrict independent hog farmers' production under contract. (Singer ¶ 102; *see also* Sealed Pls.' Ex. 33 at 25:14–20 (testifying that although packers "do not dictate [how many hogs producers grow] per se, . . . [producers] are very cautious and slow not to add production until we know for sure there's a marketplace for those market hogs").)

In addition, there is evidence that Defendants' market share enabled them to indirectly control hog supply through the "price mechanism" by manipulating the supply and demand of pork. (Singer ¶¶ 102–09.) In other words, the Processor Defendants' dominance in the pork industry meant that they could control hog supply by processing

less pork.  (*See, e.g.*, Sealed Pls.' Ex. 317 (JBS email stating that packers/integrators "habitually manipulate the hog market today"); Sealed Pls.' Ex. 101 (JBS email stating that "[t]he hog farmers are dictating the price of live hogs and the packers are resisting by lowering the kills."); Sealed Pls.' Ex. 321 (Tyson email reporting harvest shift cuts "to try to stop the continued rise in the hog market").)[20]  This evidence of Defendants' indirect control over hog supply, in combination with Plaintiffs' evidence that Defendants could also directly control hog supply, leads the Court to conclude that Plaintiffs' theory of conspiracy is not implausible just because of the large number of independent hog producers in the U.S. pork industry.

Second, Defendants argue that they had no logical motive to reduce hog supply, a "lever" that Plaintiffs allege Defendants pulled in furtherance of the conspiracy, because it is in Defendants' best economic interest to have abundant hogs.  "Lack of motive bears

---

[20] There is additional contested evidence indicating that pork processors can control the quantity of hogs by processing less pork.  (*See, e.g.*, Sealed Pls.' Ex. 320 ("Long Pork Commentary" email blast reporting that the "loss of slaughter days gives packers leverage"); Sealed Pls.' Ex. 323 ("Long Pork Commentary" email blast reporting that independent hog producer opened its own slaughter facility in response to "the consolidation of the pork packing industry," which "had decreased competition for live hogs and helped depress prices to hog producers").)  Defendants challenge these exhibits as inadmissible hearsay.  The standard for admissibility of exhibits at summary judgment is whether the evidence could be presented in an admissible form at trial. *Am. Home Assurance Co.*, 819 F.3d at 429.  Plaintiffs argue the exhibits are admissible as business records, as Jim Long's Pork Commentary is a series of regular email blasts about the pork industry. Fed. R. Evid. 803(6).  It is unclear at this juncture whether third-party commentary on market conditions meets the traditional definition of a business record for purposes of the hearsay exception, but if Plaintiffs present testimony by a qualified person who can explain how the records were created and their reliability, the exhibits could conceivably be admissible at trial. Thus, the Court will reserve the final admissibility of these exhibits for trial.

on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita*, 475 U.S. at 597; *see also TRI, Inc. v. Boise Cascade Off. Prods., Inc.*, 315 F.3d 915, 918 (8th Cir. 2003) (affirming summary judgment where there was "no rational economic motive"); *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 660 (8th Cir. 2008) (affirming summary judgment where there was "no logical motive to conspire"). Because all Defendants purchase some—if not most— of their hog supply from independent hog producers, Defendants argue it would make little sense for them to conspire to restrict hog supply, as doing so would effectively raise hog prices for themselves. (*E.g.*, Sealed Defs.' Joint Ex. 114 at 310:3–9 (testifying that it was in Tyson's best interest to have an "abundant supply of hogs"); Mintert ¶¶ 127–33, Ex. 12A (opining that Defendants are more profitable when hog supply is higher).)

Nevertheless, Plaintiffs have presented evidence that Defendants were able to make up higher costs from elevated hog prices by inflating pork prices. In particular, Plaintiffs' expert Dr. Singer concluded that the margins between hog prices and pork prices widened during the Relevant Period, indicating that there were stronger pork margins during this time, such that Defendants "captured more value in the supply chain." (Singer ¶ 33.) In addition, some evidence demonstrates that higher hog prices are eventually passed on to consumers, suggesting that consumers, not Defendants, would

feel most of the brunt of elevated hog prices.  (*See* Sealed Pls.' Ex. 149 at 8 (Smithfield

explaining to its shareholders that "[a]s production is reduced and costs rise, meat prices

will increase" and "[u]nfortunately, these cost increases eventually will be passed through

to the American consumer"); Sealed Pls.' Ex. 36 at 105:16–25 (testifying that packers pass

on any increase in the price of hogs to consumers).)   This evidence cuts against

Defendants' argument that they had no logical motive to reduce hog supply because

doing so would raise hog prices.

In fact, additional evidence indicates that Defendants recognized that decreased

hog supply would benefit them.  For example, an internal JBS email remarked that, "All

the hog producers ran out of hogs now. Lol. Marty will like that and expect product to go

up[.]"  (Sealed Pls.' Ex. 104 at 2.)  Similarly, a Seaboard employee agreed that it was

plausible to understand that the liquidation of sows would "indirectly benefit us as it will

be a reduction in the market of hogs for the industry, which should help reduce supply

long term" and lead to "higher prices for processed pork products."  (Sealed Pls.' Ex. 20

at 137:23–140:13.)  There is also contested evidence of hog farmers lamenting about pork

processors profiting from decreased hog supply.  (*See, e.g.*, Sealed Pls.' Ex. 325

(complaining that "the packers have such extreme, ridiculous, and 'producer killing'

margins"); Sealed Pls.' Ex. 326 ("Packers continue to have their way with the hog producer

with margins now at their widest point since last Christmas.").)[21]  All the above evidence, combined with Dr. Singer's findings, lends plausibility to the alleged conspiracy, as Defendants may have been willing to make smaller sacrifices, i.e., pay more for hogs due to decreased hog supply, in order to achieve bigger returns from inflated pork prices in furtherance of the alleged conspiracy.  Thus, Plaintiffs' theory of the conspiracy is not implausible just because reducing hog supply would have caused hog prices to increase.

Third, and finally, Defendants argue that variations in their business models makes Plaintiffs' theory of conspiracy implausible.  *See Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1306 (N.D. Ga. 2002) (finding that companies' different market positions and motivations undercut the plaintiffs' theory that there was a common industry-wide motive to conspire).  Because of the way that market conditions impact their businesses in different ways due to their divergent business structures, Defendants argue that they had no industry-wide motive to conspire.  For example, Hormel purchases nearly 100% of its hogs from independent hog producers, while

---

[21] Defendants challenge the admissibility of these exhibits as inadmissible hearsay. Plaintiffs argue Exhibit 325 is admissible as an excited utterance or as evidence offered for a purpose other than the truth of the matter asserted.  Fed. R. Evid. 803(2); 801(c).  If testimony is presented to establish that the hog farmer made the statement at issue in response to a startling event or condition while still under the stress of excitement that it caused, then the exhibit could conceivably be presented in an admissible form at trial.  *Am. Home Assurance Co.*, 819 F.3d at 429.  Plaintiffs do not explain Exhibit 326, though it appears to be third-party market commentary on the pork industry that may be admissible as a business record.  Fed. R. Evid. 803(6).  Because Plaintiffs could conceivably present these exhibits in an admissible form at trial, the Court will reserve their final admissibility.

Seaboard purchases only about 10%.  (*See* Stiroh ¶ 61, Fig. 8.)  So, any conspiracy that would result in fewer hogs would impact these Defendants differently and require complex methods to monitor compliance with the conspiracy and to redistribute gains and losses.

But Plaintiffs offer ample counter evidence that Defendants still had much to gain from participating in the alleged conspiracy, despite their divergent business models.  Even if their business structures meant that Defendants would have participated in the conspiracy in different ways, the Supreme Court noted more than 80 years ago that "simultaneous action is not a requirement to demonstrate parallel conduct."  *In re Broiler Chicken* ("*Broilers I*"), 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (citing *Interstate Cir., Inc. v. United States*, 306 U.S. 208, 227 (1939)).  Thus, Plaintiffs' theory of conspiracy is not implausible just because Defendants have different business models that would have influenced their motivations and participation in the alleged conspiracy.

Furthermore, Plaintiffs have presented several opinions from expert economists in support of their claims.[22]  Plaintiffs' experts believe that common economic evidence supports the existence of a conspiracy in this case.

---

[22] More details on the Parties' dueling expert reports can be found in the Court's separate memorandum opinion and order on the *Daubert* motions.  Throughout their summary judgment briefs, the Parties quibble with the methodologies used and conclusions drawn by either side's experts.  While the Parties have raised compelling arguments in support of their positions, their voiced disagreements are best suited for cross examination.  For the reasons stated in the Court's separate memorandum opinion and order on the *Daubert* motions, the Court will not deny a jury the opportunity to review all of the expert reports presented in this case.

According to the experts, the U.S. pork market is conducive to cartel behavior based on certain market structure characteristics. First, the pork packing and processing market is highly concentrated, meaning that a small number of companies have a collectively large market share. (Sealed Pls.' Ex. 3 ("Williams") ¶¶ 54, 95–96; Singer ¶ 74; Sealed Pls.' Ex. 11 ("Lamb") ¶¶ 78, 92–93, 95; Sealed Pls.' Ex. 2 ("Mangum") ¶¶ 50, 95.) Plaintiffs' experts figure that the Processor Defendants together accounted for 80 to 85% of the market-wide daily hog slaughter capacity for each year of the Relevant Period. (Williams ¶ 93 & T.2; Singer ¶ 74; Mangum ¶ 104.) In the experts' view, then, the Processor Defendants were in a position to exercise their market power as a single, profit-maximizing entity to achieve anticompetitive gains. (*See* Singer ¶ 75; Lamb ¶¶ 95–97.) Second, the experts opine that pork products are commodity-like, and markets with standardized commodity-like products are more susceptible to price-fixing agreements than markets with highly differentiated products. (Williams ¶¶ 102–13; Singer ¶ 26; Lamb ¶¶ 78, 108–15; Mangum ¶¶ 126–34.) Third, the fact that pork has no close demand substitutes and thus generally has inelastic demand makes it more likely that sellers are able to successfully collude. (Williams ¶¶ 114, 119; Singer ¶ 68; Lamb ¶ 116.) Fourth, the significant barriers to entry in the pork packing industry, including the substantial costs and time required to create processing complexes, make the market more conducive to collusion. (Williams ¶¶ 124–25; Singer ¶ 86; Lamb ¶ 98; Mangum ¶¶ 148–51.) Finally, Plaintiffs' experts believe that the U.S. pork industry provides ample

opportunities for packers to collude, including through industry trade associations, interfirm communications, and Agri Stats reports. (Williams ¶¶ 133, 144; Singer ¶¶ 333–35; Lamb ¶¶ 128–30; Mangum ¶ 159.)

In conjunction with their belief that the pork industry's characteristics make it conducive to collusion, Plaintiffs' experts opine that the economic evidence of this case is consistent with the existence of the alleged conspiracy and inconsistent with each Defendant having acted in its unilateral economic self-interest. In reaching their conclusions, the experts considered Defendants' reductions in hog supply, production levels, increase in exports, and deanonymization and use of Agri Stats reports during the Relevant Period. The experts conducted regression analyses accounting for supply and demand factors, such as hog costs, swine flu, and the PEDv outbreak, and compared pork production during the Relevant Period to a benchmark period right before it. (*E.g.*, Williams ¶¶ 348–58.) Ultimately, the experts concluded that the reduction in pork supply and increase in pork prices during the Relevant Period cannot be explained by market factors alone. (*E.g.*, Singer ¶¶ 182, 187–213; *see also* Williams ¶ 365; Lamb ¶¶ 267–68; Mangum ¶ 220.) In other words, pork production was lower and pork prices were higher than what would have been expected in a competitive market.

In sum, there is ample evidence supporting the plausibility of Plaintiffs' theory of conspiracy.

B.    **Existence of Conspiracy**

The primary issue is whether Plaintiffs have presented sufficient evidence from which a reasonable jury could find that the Defendants entered a conspiracy which tends to exclude the possibility of independent action.

"[T]o satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1273 (8th Cir. 1983) (internal quotation marks omitted)).  Unilateral conduct by one defendant is insufficient to give rise to antitrust liability.  *Willman v. Heartland Hosp. E.*, 34 F.3d 605, 610 (8th Cir. 1994).

Concerted action may be demonstrated through the presentation of direct evidence or circumstantial evidence.  *Monsanto*, 465 U.S. at 764.  Absent direct evidence, plaintiffs can show concerted action through circumstantial evidence of parallel conduct that demonstrates that defendants' similar behavior "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007) (quotation omitted).  However, a showing of parallel conduct on its own is insufficient to demonstrate concerted action.  Instead, the Eighth Circuit has adopted the rule that, in addition to parallel conduct, antitrust plaintiffs must also plead "plus factors," or circumstances accompanying parallel conduct

that suggest concerted action. *Blomkest*, 203 F.3d at 1033. Plus factors may include both economic evidence, such as economic analyses depicting that the industry is susceptible to collusion or that the alleged conspirators share a common motive to conspire, and non-economic evidence, such as actions against self-interest or frequent meetings and communications among competitors regarding competitively sensitive information. *Id.*; *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655–58 (7th Cir. 2002); *Matsushita*, 475 U.S. at 587 ("Economic factors strongly suggested that the defendant had no motive to join the alleged conspiracy."); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) ("[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.").

In this case, Plaintiffs have not produced sufficient direct evidence to definitively show that Defendants formed a conspiracy to limit the supply of pork and fix prices. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) ("Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."). Instead, Plaintiffs primarily rely on circumstantial evidence to support their § 1 case.

As an initial matter, the Parties dispute what Plaintiffs must show to support their case with circumstantial evidence. Plaintiffs argue they need not show parallel conduct and instead can rely on other kinds of circumstantial evidence to support an inference of

an agreement.   Defendants disagree, arguing that Plaintiffs must establish their circumstantial-evidence case with evidence of parallel conduct and plus factors.

The Court is willing to entertain the theory that "[i]t is possible to prove a conspiracy without evidence of parallel noncompetitive conduct," *In re Broiler Chicken Antitrust Litig.* ("*Broilers II*"), 702 F. Supp. 3d 635, 658 (N.D. Ill. 2023), especially as more courts have come to find that parallel conduct merely "provides one means by which a plaintiff in a § 1 case may make a circumstantial showing of concerted activity." *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 627–28 (E.D. Mich. 2012); *see also Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 158–59 (N.D.N.Y. 2010) (finding parallel pricing to be just one form of circumstantial evidence that Plaintiffs can rely on to support § 1 claim).   Nevertheless, while parallel conduct may not be explicitly required, Plaintiffs should know they navigate largely uncharted waters, and the burden is on them to clearly articulate an alternative theory that will survive judicial scrutiny.

With that challenge in mind, Plaintiffs raise two distinct theories of concerted action.   First, a certain group of DAPs argue that there is sufficient evidence that Defendants formed a hub-and-spoke conspiracy, with Agri Stats as the hub facilitator of an unlawful information exchange.   Second, all Plaintiffs take the more traditional path of arguing that there is sufficient evidence of parallel conduct and plus factors to demonstrate an agreement among Defendants to form a supply-reduction conspiracy. The Court will evaluate each theory of concerted action in turn.

### 1.      Hub-and-Spoke Agreement

Certain DAPs argue that a reasonable jury could conclude that the Defendants consciously committed to a hub-and-spoke agreement to trade highly confidential information through Agri Stats to artificially limit the supply of and increase the price of pork in the U.S.[23]  Specifically, the DAPs argue that Agri Stats served as the central hub through which the Processor Defendants traded confidential information against their self-interest to coordinate price increases and output restrictions, all the while hiding their unlawful scheme behind supposedly legitimate benchmarking services.

The threshold issue is whether evidence of an agreement among Defendants to use Agri Stats to facilitate a supply-reduction agreement can serve as a standalone pathway to per se liability under § 1.[24]

DAPs rely primarily on *Interstate Circuit* to support their theory.  In *Interstate Circuit*, a motion picture theatre operator who had a monopoly of first-run movie theatres in certain Texan cities had sent a letter to distributors of motion picture films, asking them

---

[23] These DAPs include Conagra Brands, Inc.; Nestlé USA, Inc.; Nestlé Purina PetCare Co.; Compass Group USA, Inc.; Howard B. Samuels, solely as Chapter 7 Trustee of the estate of Central Grocers, Inc.; Amory Investments LLC; ALDI Inc.; Sodexo Inc.; Sodexo Operations, LLC; Sysco Corporation; Cheney Brothers, Inc.; Subway Protein Litigation Corp., as Litigation Trustee of the Subway®; Protein Litigation Trust; Buffalo Wild Wings, Inc.; Jimmy John's Buying Group SPV, LLC; Sonic Industries Services Inc.; CKE Restaurants Holdings, Inc.; Wawa, Inc.; Restaurant Services, Inc.; and McLane Company, Inc. et al.

[24] The Parties dispute whether the DAPs properly raised their hub-and-spoke theory in their pleadings, with Defendants arguing that the DAPs are improperly trying to introduce a new legal claim too late in the litigation.  The Court is concerned about the late notice but will nonetheless resolve the DAPs' hub-and-spoke argument on the merits.

to comply with certain price demands.  *Interstate Cir.*, 306 U.S. at 214–16.  The letter named all of the recipients as addressees, and the price demands included requests that the distributors not sell their films to first-run theatres unless the theatres charged admission prices that were higher than the average price customarily charged in the Texan cities.  *Id.* at 217.  After a series of conferences discussing the demands, each of the distributors eventually agreed to implement the requested price demands.  *Id.* at 218–19. The Supreme Court held that the trial court rightly drew an inference of agreement from the evidence based on, for example, "the nature of the proposals," "the manner in which they were made," and "the substantial unanimity of action taken upon them by the distributors."  *Id.* at 218–221.  Each of the distributors was aware that they had received the same letter and were considering the same demands, and there was risk of losing business if all of them failed to comply.  *Id.* at 222.  Thus, the Supreme Court concluded that "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."  *Id.* at 227.  Indeed,

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.  Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan.  They knew that the plan, if carried out, would result in a restraint of commerce, which, we will presently point out, was unreasonable within the

meaning of the Sherman Act, and knowing it, all participated
in the plan.

*Id.* at 226–27.

All parties agree that a § 1 violation can be shown with (1) direct evidence of a

conspiracy or circumstantial evidence of parallel conduct and plus factors, or (2) evidence

of an information exchange evaluated under the rule of reason.  But the DAPs read

*Interstate Circuit* as giving them a third pathway: showing evidence of a conscious

commitment among competitors to restrain competition without parallel price or output

changes, based on an invitation and acceptance of an anticompetitive plan.  (*See* Tr. of

Mots. Hr'g at 81:7–82:4, Dec. 17, 2024, Docket No. 2802.)  The first two theories are well-

established in the caselaw and are analyzed separately below.  It is the third theory that

warrants closer scrutiny, as it veers off the familiar paths of antitrust cases of yore.

Under the DAPs' theory, synchronization or parallel conduct is not required to

establish an agreement under the invitation and acceptance test in *Interstate Circuit*

because all cartel members gain from the output reductions and price increases of each

firm, regardless of whether all members are doing the same thing.  *See In re Foreign Exch.*

*Benchmark Rates Antitrust Litig.*, No. 13-7789, 2022 WL 294118, at *11 (S.D.N.Y. Feb. 1,

2022) (finding sufficient evidence of conspiracy among banks to fix spreads in the foreign

exchange market that used chat rooms for communication); *In re Static Random Access*

*Memory (SRAM) Antitrust Litig.*, No. 07-1819, 2010 WL 5138859, at *8–9 (N.D. Cal. Dec.

10, 2010) (finding exchange of forecast information among competitors tended to exclude the possibility that defendants acted independently).

The DAPs argue that, as in *Interstate Circuit*, here the evidence demonstrates that Defendants formed an agreement in per se violation of § 1 based on the Processor Defendants' acceptance of Agri Stats's invitation to participate in reports that targeted higher prices and lower output which would unreasonably restrain trade. *See Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921). Because each Agri Stats report includes a page at the beginning that lists which competitors participated in the report, the Processor Defendants knew who else was participating in the alleged scheme, just as the distributors did in *Interstate Circuit*.

The Eighth Circuit seems to have given some credence to this alternative path by borrowing a test for establishing a hub-and-spoke agreement from the Sixth Circuit:

> (1) that there is an *overall*-unlawful plan or "common design" in existence; (2) that knowledge that others must be involved is inferable to each member because of his knowledge of the unlawful nature of the subject of the conspiracy but knowledge on the part of each member of the exact scope of the operation or the number of people involved is not required, and (3) there must be a showing of each alleged member's participation.

*Impro Prods.*, 715 F.2d at 1279 (quoting *Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 146–147 (6th Cir. 1972)). Under this test, there must be a showing not only of an agreement between the "hub" and each of the "spokes," but also of an agreement between all of the "spokes." *See Target Corp. v. LCH Pavement*

-39-

*Consultants, LLC*, No. 12-1912, 2013 WL 2470148, at *6 (D. Minn. June 7, 2013) ("'The critical issue for establishing a per se violation with the hub and spoke system is how the spokes are connected to each other'; in other words, there must be a rim—a horizontal agreement—that connects the spokes.") (quoting *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008)).

Developing caselaw also supports the DAPs' argument. A court in the Western District of Washington recently denied a motion to dismiss a class action complaint brought by tenants alleging that the defendants, owners or operators of multifamily residential units and a property management software company, conspired to exchange competitively sensitive business information to establish supracompetitive rental rates in the multifamily housing market. *Duffy v. Yardi Sys., Inc.*, No. 23-1391, 2024 WL 4980771, at *1 (W.D. Wash. Dec. 4, 2024). The plaintiffs alleged that the property management software company, Yardi, agreed that the lessor defendants could use its revenue management software; that the lessor defendants agreed between and among themselves to provide their rental information to Yardi, to use Yardi's revenue management software, and to implement the recommendations generated by the software; and that there was a shared understanding that Yardi would recommend rental rates above procompetitive levels. *Id.* Relying on *Interstate Circuit*, the *Yardi* court recognized that concerted action can be demonstrated through a showing of an "acceptance of an invitation to participate in a common scheme that restrains trade," and

the plaintiffs had plausibly alleged such concerted action.  *Id.* at *3–4.  Other courts have also seemingly recognized this alternative pathway to § 1 liability.  *E.g.*, *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 507–08 (M.D. Tenn. 2023).

The problem the DAPs face is that virtually all of the caselaw that seems to give legitimacy to a standalone § 1 claim under a hub-and-spoke test also relies on the support of allegations of parallel conduct and plus factors.  Though the DAPS argue that *Yardi* "made clear" that evidence of parallel conduct and plus factors "is not the only way to prove concerted action," (Certain DAPs' Not. Suppl. Authority at 1, Dec. 10, 2024, Docket No. 2781,) the *Yardi* court ultimately denied the motion to dismiss based on a finding that the plaintiffs not only had plausibly alleged an agreement under the invitation and acceptance test but also had plausibly alleged an agreement under the parallel conduct and plus factors test.  *Yardi*, 2024 WL 4980771, at *4.  It is therefore unclear whether *Yardi*—which is notably not binding on the Court—held that evidence of an invitation and acceptance alone, without corresponding evidence of parallel conduct and plus factors, would be sufficient to survive summary judgment in a § 1 case based on circumstantial evidence.  What's more, even the *RealPage* court still credited evidence of parallel conduct in denying the motion to dismiss in that case.  *In re RealPage*, 709 F. Supp. 3d at 507–08.  Above all, *Interstate Circuit* was decided nearly a century ago, and since then

caselaw has developed in such a way as to indicate that parallel conduct and plus factors are typically important to support a per se violation of § 1.

Furthermore, after cutting away the fat, the hub-and-spoke agreement advocated by the DAPs is in many ways a basic information exchange. And the Supreme Court is clear that information exchanges are not per se unlawful. *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975) ("[T]he dissemination of price information is not itself a per se violation of the Sherman Act."); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects."). Rather, information exchanges are evaluated under the rule of reason. *Todd v. Exxon Corp.*, 275 F.3d 191, 198–99, 207 (2d Cir. 2001) (differentiating between per se and rule of reason claims). This Court dismissed a similar argument at the first round of motions to dismiss in this case. *In re Pork*, 2019 WL 3752497, at 7 n.7 ("To the extent that Plaintiffs are asserting that the use of Agri Stats alone is sufficient to allege a conspiracy, the Court disagrees. *Todd* itself explained that information sharing 'is not illegal per se, but can be found unlawful under a rule of reason analysis.'"). Indeed, "absent some agreement between competitors to restrain price, the exchange of price and other market information is generally benign conduct that facilitates efficient economic activity." *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1052–53 (D. Minn. 1992). Even the United States in its Statement of Interest acknowledges that "standalone information-sharing claims are

subject to a flexible rule-of-reason analysis, which requires a fact-specific inquiry in each case." (Statement of Interest of the U.S. at 7.) And other courts have refused to evaluate similar hub-and-spoke conspiracies as per se violations of § 1. *E.g.*, *In re RealPage*, 709 F. Supp. 3d at 519–21.

Accordingly, though the DAPs put forth ample evidence of a hub-and-spoke agreement, the Court finds that such evidence is insufficient—on its own without corresponding evidence of parallel conduct—to establish a per se violation of § 1. Instead, the evidence of Agri Stats's invitation and the Processor Defendants' acceptance to participate in a common plan that restrained trade is better suited as a plus factor buttressing the evidence of parallel conduct, and not a standalone pathway to liability for a § 1 per se violation.

To the extent that the DAPs also argue that the evidence shows that the Defendants entered an information exchange that violates the rule of reason, the Court finds that the DAPs neglected to develop an appropriate rule of reason record sufficient for such a claim to survive summary judgment. Unlike the Consumer IPPs, who have provided expert evidence to support their rule of reason analysis, the DAPs have not provided similar evidence sufficient to recover on this alternative basis at trial.

## 2.    Parallel Conduct and Plus Factors

The Parties' primary dispute is whether there is sufficient circumstantial evidence tending to exclude the possibility of independent action from which a reasonable jury could infer an agreement to fix prices based on parallel conduct and plus factors.

-43-

### a.    Parallel Conduct

Plaintiffs point to various forms of parallel conduct that they claim support an inference of a conspiracy.  Specifically, Plaintiffs allege Defendants engaged in parallel conduct with respect to (1) liquidating more sows and procuring fewer hogs than Defendants would have absent conspiracy; (2) restraining pork production and expansion below competitive levels; (3) increasing the share of production that is exported to other countries than they would have but for a conspiracy; (4) using Agri Stats to target higher prices at or above the industry average; and (5) raising prices above competitive levels.[25] The Court will take each form of parallel conduct in turn.

### i.    Hog Reductions

Plaintiffs first argue that Defendants liquidated sows and procured fewer hogs than they would have but for a conspiracy, thus putting artificial pressure on the U.S. pork market by reducing hog supply.

The most suggestive evidence of parallel hog reductions is evidence that Smithfield, Tyson, and Triumph liquidated sows at the beginning of the Relevant Period. Smithfield liquidated 130,000 sows in 2009, which represented approximately 13% of its sow herd.  (Sealed Pls.' Ex. 354 at 3.)  That same year, Tyson liquidated 20,000 sows, which

---

[25] The Parties dispute whether Plaintiffs appropriately referenced these forms of parallel conduct in their opening expert reports.  But the Court finds that Plaintiffs' expert Dr. Williams discussed each of these forms of parallel conduct in his opening report, thus mooting this argument.  (*See* Williams ¶¶ 158, 373, 382, 587.)

represented nearly 30% of its herd.  (Sealed Pls.' Ex. 160 at 3; Sealed Defs.' Joint Ex. 46 at

2.)   In addition, there is evidence indicating that Triumph's LLC members cut sow

production by 6% in 2009 as well.[26]  (Sealed Pls.' Ex. 194 (depicting reduction of sow herds

from a total of 396,000 sows in 2008 to 371,500 sows in 2009);[27] Sealed Pls.' Ex. 355 at 2

(reporting that Triumph reduced sow numbers in 2009); *see also* Mangum ¶¶ 49–50

(opining that Triumph has sufficient control over its LLC members' hog production).)

       There is evidence of hog reductions by other Defendants later in the Relevant

Period, as well.  In 2011, for example, Clemens produced 900 fewer sows through its

subsidiary, Hatfield Quality Meats.  (Sealed Pls.' Ex. 59 at 3.)  Moreover, between 2012

and 2013, JBS liquidated 6,600 sows, which represented over 70% of its sows that were

company-owned and approximately 34% of the company's total sows from which it

produces market hogs, as the company produces hogs from sows that are company-

owned and from sows under contract.  (Sealed Pls.' Ex. 94 at 3.)

---

[26] The Parties dispute whether Triumph's LLC members' hog reductions are attributable to Triumph, which the Court will address later in the analysis.

[27] Triumph challenges the admissibility of this exhibit as inadmissible multiple hearsay. The exhibit includes an excel spreadsheet that appears to have been created by Successful Farming as part of its Pork Powerhouse content.  (*See* Pls.' Letter to District Judge, Ex. 1 at 3, Oct. 25, 2024, Docket No. 2702.)   Because the evidence could conceivably be presented in an admissible form at trial if Plaintiffs demonstrate that Successful Farmer compiled the data and created the spreadsheet in the regular course of its business under the business records exception, the Court will reserve this exhibit's final admissibility.  Fed. R. Evid. 803(6); *Am. Home Assurance Co.*, 819 F.3d at 429; *see also Grogg v. Mo. Pac. R.R. Co.*, 841 F.2d 210, 213 (8th Cir. 1998) ("If both the source and recorder of the information contained in [the entity's] document were acting in the regular course of [the entity's] business, the multiple hearsay is excused by rule 803(6).").

Moreover, Plaintiffs' expert Dr. Singer constructed a hog procurement regression to test whether Defendants decreased hog procurement during the Relevant Period, holding other factors constant. (Singer ¶¶ 234–35.) Dr. Singer's model shows that Clemens, Hormel, Seaboard, Smithfield, and Tyson each procured fewer hogs during the Relevant Period than can be explained by competitive factors alone. (*Id.* ¶ 238.) Only Triumph appears to have procured more hogs during the Relevant Period than can be explained by competitive factors alone. (*Id.*)

Defendants push back with evidence from one of their own experts, Dr. Mintert, who found that Defendants' year-over-year growth in weaned pigs was "consistent with unilateral and self-interested conduct." (Mintert ¶ 170.) Yet, it is not the role of the Court to weigh conflicting evidence or make credibility determinations on summary judgment; rather, resolving factual disputes is the job of the jury. *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 735 (8th Cir. 2014).

There is also additional evidence of communications between Defendants suggesting that Smithfield was urging the other hog producers, including Processor Defendants, to cut sows collectively. (*E.g.*, Sealed Pls.' Ex. 141 (depicting internal email exchange where Smithfield was concerned about being "the only one cutting back" and was trying to convince independent hog farmers to also reduce sows).) For example, an internal Seaboard email reports that Smithfield "has called and tried to convince us and other big producers to cut back which would help them so they are even trying to

embarrass us in the media to do it." (Sealed Pls.' Ex. 112.) Notably, however, the beginning of the email indicates that "Seaboard has no intention of liquidating sows as we can not [sic] afford to have those farrowing assets empty." (*Id.*) Defendants thus argue that even if such evidence suggests that Smithfield was trying to orchestrate herd reductions in furtherance of a conspiracy, it is less clear that any Defendants actually followed suit based on Smithfield's communications. Nevertheless, this evidence, in combination with the other evidence discussed above, is sufficient to support a finding that the Defendants purposely reduced hog supply in parallel.

Defendants also argue there are alternative explanations for the hog reductions. In particular, they claim the sow liquidations and reduced hog procurement were justified by independent business reasons or came about from unavoidable market conditions, including the 2008 financial crisis in the U.S. pork industry, higher feed costs, and the 2013 PEDv outbreak.

For example, Smithfield contends that, after losing over a billion dollars between 2007 and 2010, the company liquidated the least-productive sows and closed down the most inefficient sow farms to try to financially recover. (*E.g.*, Defs.' Joint Ex. 31 at 315:6–317:24 (testifying about Smithfield's losses between 2008–2010), 341:4–342:15 (testifying that Smithfield's liquidation of the least-productive sows improved the efficiency of the rest of the sows); Sealed Defs.' Joint Ex. 44 (2008 announcement quoting

Smithfield's CEO as saying, "Given the economics for raising hogs today, we cannot continue on the current path; something has to change").)

Similarly, Tyson explains that its sow liquidations were motivated by a desire to shut down underperforming sow farms and increase efficiency, which Tyson claims has been a stated company goal since at least 2002. (*E.g.*, Sealed Defs.' Joint Ex. 46 (2009 press release announcing Tyson would sell hog farms and liquidate sows "due to ongoing hardships in the pork industry"); Sealed Defs.' Joint Ex. 47 at 2–4 (2002 press release reporting that Tyson was restructuring its live hog operation, which it had "been running . . . at an operating loss").)

Defendants have presented independent business justifications for the hog reductions. *Corner Pocket*, 123 F.3d at 1112 (noting that courts "may not lightly disregard" a defendant's "legitimate business reasons" for its conduct). That said, while Defendants' alternative explanations appear to be compelling, "parallel conduct always has an alternative explanation." *Broilers II*, 702 F. Supp. 3d at 659 (cleaned up). And, though the Court will ultimately determine based on the totality of the evidence whether there is sufficient evidence tending to exclude the possibility of independent action, it is not the Court's role to weigh conflicting evidence on each individual issue on summary judgment. *In re Wholesale Grocery Prods.*, 752 F.3d at 735; s*ee also In re High Fructose Corn Syrup*, 295 F.3d at 655 (cautioning courts not to fall into the "trap" of thinking that

"if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment").

Still, weighing all the evidence of parallel conduct in this case, the Court notes that the evidence of parallel hog reductions is probably the weakest. While three of the five alleged sow reductions occurred within the same year, the other two reductions, those by Clemens and JBS, were separated by years. *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir. 2018) (finding insufficient evidence of parallel conduct where conduct separated by six months "lack[ed] temporal proximity" and was executed under dissimilar circumstances); *see also Broilers II*, 702 F. Supp. 3d at 658–69 (considering evidence that all eighteen defendants cut production in the key years in question). And Defendants have presented independent business justifications for their hog supply decisions, which the Court "may not lightly disregard." *Corner Pocket*, 123 F.3d at 1112.

Nevertheless, while the hog reduction evidence may have been insufficient on its own to show parallel conduct, Plaintiffs have provided other evidence of parallel conduct as well. At the very least, the hog reduction evidence supports an inference that reducing hog supply was one lever that Defendants pulled to restrain production. The mere fact that some of the Defendants' hog reductions are separated temporally from the rest does not mean such conduct cannot constitute parallel conduct. *See Park Irmat Drug Corp.*, 911 F.3d at 517 ("We do not hold that actions taken within six months of each other can

-49-

never constitute parallel conduct, but only that the terminations here, executed under dissimilar circumstances and separated by six months, did not constitute parallel conduct."). Plus, there is no requirement that Defendants engaged in simultaneous action to demonstrate parallel conduct. *See Broilers I*, 290 F. Supp. 3d at 791; *see also Interstate Cir.*, 306 U.S. at 227. Finally, Dr. Singer's regression model demonstrates that most of the Processor Defendants procured fewer hogs during the Relevant Period than can be explained by competitive factors alone.

While this evidence of parallel conduct is the weakest of such presented by Plaintiffs, it is enough to support a reasonable inference that hog reductions was one method in which Defendants agreed to restrain production in parallel.

### ii.   Production Restraint

Plaintiffs next argue that Defendants restrained pork production and expansion below competitive levels in parallel, which artificially decreased the supply of pork in the U.S. and subsequently raised the price of pork. Specifically, Plaintiffs claim that Defendants underutilized available production capacity[28] by cutting back harvest shifts and limiting capacity expansion below competitive levels.

Plaintiffs' experts concluded that pork production would have been higher during the Relevant Period but for a conspiracy. Indeed, Dr. Singer found that "[t]he *rate* of Pork

---

[28] "Capacity" refers to a pork packer's theoretical ability to slaughter hogs. (Singer ¶ 42 n.91.)

production (as measured by slaughter) was slower during the Conduct Period than in the

benchmark period before it, even if the absolute amount of production is larger." (Sealed

Pls.' Ex. 10 ("Singer Reply") ¶ 97 & Fig. 6 (reproduced below).)



As depicted in the figure above, Dr. Singer determined that, absent a conspiracy, pork

production would have increased in accordance with the rate depicted by the red-dotted

line, as opposed to the lower, actual rate depicted by the green-dotted line. In this way,

Dr. Singer concluded that "hog slaughter stalled during the [Relevant Period], even

though it increased in absolute terms." (*Id.* ¶ 97.)

Defendants contend that the fact that pork production increased during the Relevant Period undermines any argument that they conspired to restrict pork production.  However, Plaintiffs have presented sufficient counter evidence suggesting that production could have increased more but for the Defendants' alleged collusion.

Defendants also insist that they did not uniformly restrain pork production during the Relevant Period.  Defendants' expert Dr. Mintert concluded that there was no pattern or consistently coordinated and depressed capacity utilization across Defendants during the Relevant Period.  (*See* Mintert ¶ 168 & Ex. 18.)  Yet Plaintiffs have presented counter opinion evidence that supports a different conclusion.  And, at any rate, "simultaneous action is not a requirement to demonstrate parallel conduct."  *Broilers I*, 290 F. Supp. 3d at 791 (citing *Interstate Cir.*, 306 U.S. at 227).  The evidence that pork production slowed during the Relevant Period for reasons that cannot be explained by non-conspiratorial factors, according to Plaintiffs' experts, is sufficient for a jury to consider as parallel conduct, especially when combined with other evidence of Defendants' market power.

Non-opinion evidence also supports Plaintiffs' allegation that Defendants were purposely restraining production during the Relevant Period.  In particular, there is evidence that Defendants were reducing hours and harvest shifts at their processing plants, and that those reductions caused pork shortages in the domestic market.  (*E.g.*, Lamb ¶¶ 180–93; Sealed Pls.' Ex. 12 ("Lamb Reply") ¶ 301.)  For example, in 2013 Tyson told a customer that it had "been 7-10 loads short per week for the past 3 weeks due to

kill cutbacks." (Sealed Pls.' Ex. 366.) Smithfield similarly reported that same year that

production would be "tight" "primarily due to the cutback in kill levels," and that

"[t]ightness [for hams] is strictly due to kill cutbacks and not additional demand." (Sealed

Pls.' Ex. 367.) In another example, JBS reported in 2016 that there would be "[n]o

seaboard or triumph kill this [Saturday]," which "could shorten things up a little more."

(Sealed Pls.' Ex. 107.)[29]

There is also evidence suggesting that the reduced hog slaughter numbers were

beneficial to Defendants, and that Defendants were restraining production to achieve

those benefits. For example, in 2017 JBS communicated to Seaboard that "[w]e'll only kill

2160 next week so that hopefully will keep these guys a little short and hungry for hams."

(Sealed Pls.' Ex. 106 at 2.) There is additional evidence of JBS recognizing that it "[a]lways

seems impossible to get there in the spring, but every summer its amazing what a little

less kill does to the prices." (Sealed Pls.' Ex. 105 at 2.) In addition, in 2017 Clemens

internally mused whether it should "cancel[] the Saturday harvest" because "nobody is

screaming for meat." (Sealed Pls.' Ex. 370 at 2–3.) Seaboard similarly explained that

---

[29] Defendants challenge this exhibit on relevance and hearsay grounds. The exhibit
depicts an internal JBS email exchange regarding the anticipated harvest schedules of Seaboard
and Triumph. Evidence that JBS was aware of Seaboard and Triumph's harvest schedules is
relevant under the liberal policy of relevancy. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579,
587 (1993). Plaintiffs allege that Defendants were sharing competitively sensitive business
information—like their kill schedules—as part of the conspiracy, so this exhibit is relevant.
Because the exhibit could conceivably be presented in an admissible form at trial as statements
by a party's co-conspirators, the Court will reserve the final admissibility of this exhibit. Fed. R.
Evid. 801(d)(2)(E).

reduced hog slaughters, "along with good domestic and strong export demand, are very supportive to the cutout and product values."  (Sealed Pls.' Ex. 371 at 3.)  Moreover, Hormel remarked that, "when the largest producer [is] only harvesting/working 4 days per week . . . . [w]e must start selling the market higher."  (Sealed Pls.' Ex. 85 at 2.)

In addition, there is evidence suggesting that Defendants were communicating with one another about their harvest schedules and putting pressure on one another to reduce slaughter capacity.  For example, in a January 2009 email exchange, a futures commission merchant reported to Tyson,

> It appears to me that Smithfield is going to run Morr and Farm wide open until the rest of the industry significantly reduces their kills.  They are already barking about killing full next Saturday and very interested in what the industry plans to do . . . . You didn't hear any of this from me.

(Sealed Pls.' Ex. 358 at 2.)  In another example, Tyson reported that Seaboard and Triumph's scheduled kills for an upcoming weekend was "[t]oo many," such that the "[i]ndustry needs to reevaluate slaughter schedule going forward."  (Sealed Pls.' Ex. 359 at 2.)

Other communications suggest that Defendants were trying to keep slaughter capacity at a certain level.  For example, a series of internal emails by Seaboard employees suggests that the defendant was trying to keep its hog slaughter levels below a certain amount.  One such communication remarked, "Again we have seen that if the weekly slaughter total is 2 million or less we seem to have enough demand to keep product

moving but going too far beyond that level and prices come under extreme pressure."
(Sealed Pls.' Ex. 123 at 2.)  Another Seaboard communication reported that "next week
could get our total kill down to 2,080K; and below the psychological 2.1 MM head number
the industry has been trying to break for the last 2 weeks."  (Sealed Pls.' Ex. 360 at 2; *see
also* Sealed Pls.' Ex. 124 ("Lot of talk about the fact that the industry needs to maintain a
1,950 weekly kill going forward to get real support and upward price pressure in the
product."); Sealed Pls.' Ex. 362 ("Even though we will exceed the 2 million kill level we
have repeatedly commented on this year, product held fairly well."); Sealed Pls.' Ex. 363
("I have capped the weekly kill amount at 39,231. This represents our 2,000,000 head
commitment.").)  There is also evidence that Defendants were monitoring the industry's
reduced harvest levels.  (*E.g.*, Sealed Pls.' Ex. 364 ("The Saturday kill was 134K this year
vs. 225K head last year for a YoY change of -47.5%.  For the week, kill was 1,780,000 this
year vs. 1,984,000 last year for a YoY change of -10.3%.").)

Defendants argue that because they invested in significant capacity expansions
throughout the Relevant Period, they took actions at odds with the goal of the alleged
conspiracy, which undermines any argument that they conspired.  For example, there is
evidence that Clemens, JBS, Seaboard, Smithfield, Triumph, and Tyson expanded their
processing plants during the Relevant Period.  (*See* Mintert ¶ 177 & Ex. 22.)  Most tellingly,
Clemens opened a new slaughter plant in Coldwater, Michigan in 2017, and Seaboard and

Triumph opened a joint processing plant in Sioux City, Iowa that same year. (*Id.* ¶ 177 & Ex. 21.)

Antitrust law does not require Defendants to produce the maximum amount possible. *In re Citric Acid Litig.*, 191 F.3d 1090, 1100–01 (9th Cir. 1999) (rejecting argument that a company's decision to expand capacity by 50% rather than 100% was circumstantial evidence of conspiracy and warning against courts second-guessing strategic business decisions regarding capacity expansions); *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018) (rejecting argument that a company's underutilization of its machines supported an inference of conspiracy because the company provided a valid reason for underutilizing its machines, e.g., only running them enough to fill orders without creating excess inventory). But Plaintiffs are not arguing that Defendants should have produced at maximum capacity; rather, Plaintiffs are arguing that pork production increased at a slower rate that cannot be explained by other controlling factors of the time.

Plaintiffs have presented sufficient counter evidence that, despite the cited examples of expansion, no material expansion occurred during the Relevant Period, as would have been expected but for a conspiracy. Dr. Mangum, for example, found that the processing plants that opened in 2017 were unremarkable in the sense that the full impact of those expansions were not felt until the tail end of the Relevant Period. (Sealed Pls.' Ex. 2 ("Mangum Reply") ¶ 171.) In addition, Plaintiffs have presented evidence

suggesting that Seaboard and Triumph intended to limit the growth that their joint

processing plant could bring to the industry.  Specifically, notes summarizing a March

2016 meeting between a member of Triumph's Board of Managers, Brad Freking, and a

senior Tyson executive, Todd Neff, suggest that Seaboard and Triumph's partners had "a

gentlemen agreement to start the first shift without adding new sows to the industry."

(Sealed Pls.' Ex. 180.)[30]    Furthermore, there is evidence suggesting that the 2017

expansions were primarily meant to supply the export, not domestic, market.  (*See, e.g.*,

Sealed Pls.' Ex. 22 at 271:16–272:14 (testifying that supplying exports in foreign markets

was "certainly part of the reason why" the Coldwater plant was built); Sealed Pls.' Ex. 197

(reporting that "substantial amounts of product produce[d]" from the Sioux City plant

"will represent incremental export sales for the industry").  Thus, the fact that Defendants

_____

[30] Defendants challenge the admissibility of this exhibit as inadmissible multiple hearsay. The exhibit is an email that Todd Neff of Tyson sent to other Tyson executives wherein he attached a summary of a New Fashion Pork Meeting.  To the extent that the summary contains statements by Triumph through Brad Freking, such statements are admissible as co-conspirator statements made during and in furtherance of the conspiracy.  Fed. R. Evid. 801(d)(2)(E). Freking's statements are attributable to Triumph because he is as an agent of Triumph given his status as an officer of the company, and because it appears he was speaking on behalf of Triumph during the meeting with Tyson.  Further, evidence indicates the meeting summary was prepared by an attendee of the meeting with Freking and then circulated to others at Tyson "in the regular course of business at Tyson" within six days of the meeting.  (Sealed Pls.' Ex. 40 at 161:1–21 (Neff testifying about document).); *e.g.*, *Chism v. Ethicon Endo-Surgery, Inc.*, No. 08-00341, 2009 WL 3066679, at *2 (E.D. Ark. Sept. 23, 2009) (report prepared "within ten working days of the event" was prepared timely under Rule 803(6)).  Neff confirmed that the summary was accurate.  (Sealed Pls.' Ex. 40 at 161:22–162:3.)  Because the summary of the meeting and the email may be presented in an admissible form at trial as business records, the Court will reserve the final admissibility of this exhibit.  *See* Fed. R. Evid. 803(6); *Am. Home Assurance Co.*, 819 F.3d at 429.

expanded at all during the Relevant Period does not negate Plaintiffs' evidence that Defendants still restricted their capacity.

Defendants also argue that they competed with each other for business during the Relevant Period, which undermines any argument that they conspired. In particular, Defendants point to evidence indicating that they stole market share from one another and competed for customers during the Relevant Period. For example, Seaboard and Triumph increased market share through their joint-venture Sioux City plant; and Clemens nearly doubled its market share from 2.6% to 4.9% with the opening of its Coldwater plant. (Mangum ¶ 102 & Fig. 20 (reproduced below).)



**Figure 20. Slaughter Capacity by Year[199]**

In addition, there is evidence that Defendants bid against one another for customers or sought to steal business, (*see, e.g.*, Sealed Defs.' Joint Exs. 118–21,) sometimes by offering lower prices, (*see, e.g.*, Sealed Defs.' Joint Exs. 106–07, 122–31.) This evidence, according to Defendants, cuts against any inference of a conspiracy. *City of Moundridge v. Exxon Mobile Corp.*, No. 04-940, 2009 WL 5385975, at *7 (D.D.C. Sept. 30, 2009), *aff'd* 409 F. App'x 363 (D.C. Cir. 2011) (finding evidence that two defendants increased production levels in a given year while two other defendants' levels decreased undercut an inference that a conspiracy occurred); *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1321 (11th Cir. 2003) (noting it would "make[] little sense to posit that [defendants] would continue to participate in a conspiracy that cut their market shares so dramatically" in a case where the defendants' market shares fell approximately 25% and 19%); *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 196 (3d Cir. 2017) ("[A]ggressive and common price competition between firms is inconsistent with the idea that those same firms have conspired not to compete on price.").

Despite this argument, however, there is strong counter evidence that even with variances in market shares and examples of competition, Defendants were still manipulating pork production to increase the price of pork. For example, Dr. Mangum found that even though Defendants stole market share from one another during the Relevant Period, such variances were "in large part due to acquisitions by and among Defendants," indicating merely a shift in ownership of production. (Mangum ¶ 102.) In

other words, Defendants' collective market share did not vary meaningfully. (*Id.* ¶ 104.)

In addition, Dr. Singer determined that "Defendants' market shares (individually and

collectively) were stable throughout the Conduct Period, which is a hallmark of a

functional cartel." (Singer Reply ¶ 128.) And, as Plaintiffs contend, while Clemens's

market share doubled during the Relevant Period, this statistic is due to the company's

relatively small starting share of 2.6%.

Finally, Defendants argue that because their production in large part depends on

the current hog supply, which dropped on multiple occasions during the Relevant Period

for reasons unattributable to Defendants, any restrained production was the result of

adverse economic conditions, not collusion. According to Defendants, multiple

independent forces were at play which impacted the market, and, in turn, Defendants'

conduct during the Relevant Period. Defendants claim Plaintiffs have failed to "come

forward with more persuasive evidence to support their claim than would otherwise be

necessary" as required given their argument that Plaintiffs' theory of conspiracy is

implausible. *Matsushita*, 475 U.S. at 587.

However, Plaintiffs' experts accounted for such factors in their regression analyses

and still found that production levels were lower than they would have been in the

absence of a conspiracy. Moreover, there is non-opinion evidence indicating that the

PEDv outbreak did not have the effect on hog supply that Defendants contend it did, e.g.,

that the PEDv outbreak "artificially shortened the supply," created a price "bubble," or

was merely a "scare" such that "the anticipated shortage was never realized." (*See* Sealed Pls.' Exs. 372, 374, 376.)

On balance, while Defendants have raised counter arguments to explain slowed production levels during the Relevant Period, the Court finds that Plaintiffs have presented sufficient evidence that restraining production was one lever that Defendants pulled to artificially decrease the supply of pork in the domestic market and thereby fix pork prices above competitive levels.

### iii.    Increased Exports

Next, Plaintiffs argue that Defendants collectively exported a greater proportion of pork products to international markets than they would have absent a conspiracy.

It is undisputed that export sales increased during the Relevant Period. In fact, Dr. Lamb found that exports increased from approximately 12% of pork production to over 21% of pork production during the Relevant Period. (Lamb ¶ 194.) That said, Defendants' expert Dr. Mintert opined that export sales increased at a slower rate during the Relevant Period than they had in the benchmark period before it. (Mintert ¶ 27 & Fig. 2.) Specifically, Dr. Mintert calculated that between 1999 and 2008, exports increased at a rate of 13%, whereas between 2009 and 2018 exports increased at a rate of 3%. (*See id.*) Nevertheless, Plaintiffs' experts concluded that Defendants increased their exports during the Relevant Period and that their export activity was consistent with a conspiracy. (Singer ¶¶ 242–51; Lamb ¶¶ 156, 194, 196–202, 210.) Furthermore, Dr. Williams found evidence that Defendants' export activity moved in parallel during the Relevant Period.

(Williams ¶ 158; Sealed Pls.' Ex. 4 ("Williams Reply") ¶¶ 116–17.)  So, while there is evidence that export activity slowed somewhat during the Relevant Period, there is also opinion evidence suggesting that Defendants nevertheless were exporting against their unilateral interests in furtherance of a conspiracy.

Defendants challenge Plaintiffs' export evidence, arguing that Plaintiffs' experts based their regression analyses on industry-wide data, which does not reflect how any of the individual Defendants acted.  However, Dr. Singer took Defendants' criticism that his analysis used national prices rather than company-specific prices and, in his reply report, recreated his export tables using Defendant-specific export prices.  (*See* Singer Reply ¶ 137.)  Even in his new analysis, Dr. Singer concluded that Defendants exported below domestic prices.  (*Id.*)

In addition, there is non-opinion evidence suggesting that Defendants exported more than they would have absent a conspiracy during the Relevant Period.  This is primarily demonstrated by evidence indicating that Defendants acted against their self-interest through exports.  Specifically, there is evidence that Defendants exported products even if it meant shortages in the domestic market.  (*E.g.*, Sealed Pls.' Ex. 385 at 2–3 (remarking that Smithfield "sold carcass hogs to China, shorted domestic customers and ran all of the markets higher"); Sealed Pls.' Ex. 386 at 3 (explaining that domestic short rib orders that had been "taken before the export SRB's orders" could not be filled because of exports to Korea); Sealed Pls.' Ex. 200 at 3 (explaining that "skinned tenders

for export . . . shortens the domestic supply" and "drives up those margins").)  There is also evidence that Defendants exported products even if doing so meant shouldering greater costs.  (*E.g.*, Sealed Pls.' Ex. 156 (explaining that paying part of the incremental air freight to export products should be "viewed as keeping this product out of the domestic market"); Sealed Pls.' Ex. 143 at 2–3 (justifying exports at a loss to China because "more exports translate to higher meat value").)  Moreover, there is evidence that Defendants exported products even if doing so meant taking a loss on sales.  (*E.g.*, Sealed Pls.' Ex. 389 (discussing how "frozen cushions" were "at a pretty heavy discount to regular cushions" because they were exported).)  In fact, Dr. Mangum and Dr. Singer found that Defendants were consistently exporting products to certain international markets below domestic prices.  (Mangum Reply ¶ 98 & Fig. 13; Singer ¶¶ 316–19; Singer Reply ¶¶ 136–38, Fig. 12 & n.270.)

In addition, there is evidence suggesting that Defendants recognized the value exports presented to their businesses, in that exports could allow Defendants to keep excess product out of the domestic market and subsequently raise domestic prices.  For example, Tyson remarked after an Agri Stats meeting that "EXPORT is the low hanging fruit in this !!!!!"  (Sealed Pls.' Ex. 161 at 2.)  There are additional communications indicating that Defendants aimed to "continue to chase all the export opportunities we can find to keep excess product off the US market," desired to "utilize export markets for margin expansion," and recognized that increasing pork exports by certain percentages

would "lift US hog prices by 10%." (Sealed Pls.' Ex. 110 at 6; Sealed Pls.' Ex. 159 at 4; Sealed Pls.' Ex. 382 at 3.)

Defendants argue that Plaintiffs' comparison of export prices to domestic prices shows nothing about the market conditions, relative size of the orders, pricing mechanisms used, or non-price reasons why Defendants pursued export sales. Defendants also contend that their export activities were pursued independently to maximize their own profit. For example, there is evidence that international demand for exported pork increased and that there was federal funding encouraging pork exports during the Relevant Period. (*See, e.g.*, Sealed Defs.' Ex. Joint Ex. 79 at 108:9–109:21 (noting that "ninety-five percent of the growth in demand globally [for pork] is outside the United States," which is a "low-cost, high quality producer of pork"); Mintert ¶ 158; Defs.' Joint Ex. 28 at 11 (discussing USDA actions and programs to assist the pork industry in 2009 at congressional subcommittee hearing).) In addition, Defendants argue that increased exports enabled processors to sell all parts of the hog carcass, as international markets tend to have higher demand for certain parts of the processed hog that are less popular in the U.S., e.g., organs, snout, and feet. (*See* Sealed Defs.' Joint Ex. 10 at 35:20–36:7, 36:22–37:12; Defs.' Joint Ex. 78 at 23:5–25:8.) Moreover, Defendants explain that international customers often pay premiums for pork. (*See* Sealed Defs.' Joint Ex 25 at 38; Sealed Defs.' Joint Ex. 10 at 35:20-36:7.) In this way, exports can help processors achieve higher sales and margins, not to mention diversify customer base and achieve an

optimal mix of forward and spot sales.  Defendants thus argue that such independent justifications for their export activities during the Relevant Period are "legitimate business decisions" that the Court "may not lightly disregard."  *Corner Pocket*, 123 F.3d at 1112.

Nonetheless, Plaintiffs have presented sufficient alternative evidence that Defendants were exporting in parallel.  Indeed, Plaintiffs' experts concluded that Defendants exported a greater share of pork production relative to the benchmark period after accounting for economic factors that affect exports.  (*E.g.*, Singer ¶¶ 243, 248.)  The experts also determined that increasing international demand for pork could not explain the Defendants' export activity, because if international demand did increase, one would have expected export prices to increase as well.  (*See* Williams ¶ 160 & Fig. 17.)  But in fact, the gap between domestic and export prices widened in the Relevant Period.  (*Id.*)  Plus, Plaintiffs' expert Dr. Zona found that approximately 80% of pork exported during the Relevant Period consisted of high-value, non-offal products, suggesting that Defendants' argument that exports were a primary way to get rid of less desirable parts of the hog does not have much of a leg to stand on.  (Sealed Pls.' Ex. 16 ("Zona Reply") ¶ 52.)

In sum, Defendants have provided non-conspiratorial alternatives to explain their export activities during the Relevant Period.  Yet the Court still finds that Plaintiffs have presented enough counter evidence to support a reasonable inference that increasing exports was one way in which Defendants artificially restrained pork supply to increase the price of pork.

### iv.    Price Targeting Through Agri Stats

Plaintiffs next argue that Defendants collectively provided competitively sensitive sales data to Agri Stats and then used Agri Stats reports to target prices at or above the industry average.

Here, the central dispute is whether the sales reports contain price information that the Defendants could use to increase prices in furtherance of a conspiracy. Defendants' primary argument is that they could not have used the information in the sales reports to target higher prices in parallel because the reports do not contain actual current or future pricing information about any competitor.  Plaintiffs disagree.

The Court agrees with Defendants that the evidence does not establish that the sales reports contain individual sales and pricing information broken out by product for competitors.  The Ranking Report shows the recipient its own sales, broken out by product, compared against averages for a curated mix of "like" products that Agri Stats grouped together for analysis purposes.  (*See* Sealed AS Ex. 20 at 10.)  The report does not compare the recipient's sales and prices against any individual competitor sales and prices.  The Ranking Report also does not identify the composition of mixed product that Agri Stats creates for apples-to-apples comparison purposes.  Nor does it identify which competitors manufactured the products in the product mix.

Without all the information discussed above, Defendants contend there is no way for recipients of the Agri Stats sales book to use the reports to target higher prices. Defendants urge the Court to reach the same conclusion as that reached in the *Broilers*

antitrust case.  *Broilers II*, 702 F. Supp. 3d at 678–79 (determining that Agri Stats's broiler chicken reports, which are similar to the pork reports, did not provide pricing data of competitors).

The Court respectfully disagrees.  The lack of individual competitor price per product information does not mean that the reports do not contain sufficient price information for recipients to use to target higher prices.  The Court is satisfied that comparing a recipient's sales information by product against averages for similar, bundled products sold by competitors could be used by subscribers to aim for higher price targets. To illustrate, a recipient who identifies that its price for a certain product is below the price averages included in the reports—which are calculated from the subscribers participating in the report and from the top 25% of the pounds being sold for similar products—could be motivated to raise its price to meet or exceed that average.  A recipient may not know the individual price information by product of its competitors, but it would know which competitors are participating in each report, and thus whose data its prices are being compared to.  A recipient also may not know which competitors' products exactly are being compared against its own products, but it would know that the product mixes are adjusted to account for its own products for apples-to-apples comparisons, which could prove more valuable than individual pricing information on competitors' different products, anyway.  In effect, if all subscribers use the reports to meet or exceed the price averages included in the reports, then collectively the new

average price will become higher, and could continue to increase. (*See* Sealed Pls.' Ex. 6 ("Cabral") ¶ 50 (explaining this phenomenon).) Therefore, there is strong evidence indicating that the sales reports could be used to target prices.

The next question, then, is whether there is enough evidence on summary judgment that Defendants agreed to use the sales reports to target higher prices. The Court finds that the evidence answers this question in the affirmative.

To start, there is certainly evidence that each of the Processor Defendants participated in the Agri Stats sales analysis program and knew which competitors were also participating. At least by 2009, Clemens, JBS, Seaboard, Smithfield, Triumph, and Tyson each joined the program, wherein they agreed to submit their sales data for Agri Stats to put into the sales reports. (Singer at 201, App. 3 T.1.) Hormel is the only Processor Defendant who did not formally subscribe to the sales analysis program, aside from accepting free samples in 2017. (*See* Sealed Pls.' Ex. 19 at 300:11-21 (testifying that Hormel "never wanted to share or show what our sales data was. So we never did").) Because the Agri Stats reports list which production complexes are included in each report, the Processor Defendants knew which competitors' data was being compared to their own. The fact that some Defendants conditioned their participation in Agri Stats on competitors' participation is telling. (*See, e.g.*, Sealed Pls.' Ex. 1155 at 3 (Tyson conditioning its complete participation in Agri Stats on JBS and Hormel's commitment)).

There is also evidence that the Processor Defendants used the Agri Stats reports to identify pricing opportunities.  For example, in 2009 Tyson remarked that it "will very easily be able to determine our carcass return opportunities related to pricing" based on the data in Agri Stats.  (Sealed Pls.' Ex. 340 at 2.)  In 2013, Smithfield used Agri Stats to identify its "biggest opportunity" which were "both sales related . . . product mix and sales price" and planned a monthly review "to review results, challenge the pricing decisions and move these numbers up the line."  (Sealed Pls.' Ex. 345 at 2.)  In fact, a 2016 Smithfield presentation advised Smithfield's rib team to "Just raise your price."  (Sealed Pls.' Ex. 145 at 3.)  In addition, in 2010 JBS used Agri Stats to identify "several SKU's" that were "show[ing] up weekly that are LOW relative to the industry" and instructed employees to "identify those weekly offenders and get a plan in place with Sales to improve results."  (Sealed Pls.' Ex. 92 at 3.)  There is also additional evidence suggesting that Clemens, Seaboard, and Triumph similarly used Agri Stats to identify opportunities to improve sales price.  (*See, e.g.*, Sealed Pls.' Ex. 76 (Clemens); Sealed Pls.' Ex. 350 (Seaboard); Sealed Pls.' Ex. 111 (Triumph).)  Even Hormel—who did not subscribe to the Agri Stats sales reports but did accept free samples in 2017—reviewed pricing opportunities that had been identified by Agri Stats.  (Sealed Pls.' Ex. 55 at 2.)

Defendants argue that under the rules of basic economics, they cannot simply "target" a price and raise it in a vacuum.  In particular,  Defendants explain that prices are the result of individualized negotiations and often involve prices set in long-term

contracts.  However, Plaintiffs have presented enough counter evidence that Defendants'
collective market power enabled them to negotiate higher prices or, over the course of
the nearly decade-long alleged conspiracy period, modify long-term contracts with higher
prices in furtherance of a conspiracy.

Defendants also argue that their use of Agri Stats to identify opportunities was
consistent with independent action, as it allowed them to identify opportunities to reduce
costs, change product mix, and identify opportunities for operational investments.  But
Plaintiffs have presented counter evidence that Defendants acted against their unilateral
self-interest by using Agri Stats to target prices at or above the industry average—rather
than prices below the industry average.  In a competitive market, a firm that unilaterally
raises prices faces a risk of losing business to rivals.  Thus, evidence that the Defendants
were using Agri Stats to identify higher price targets instead of lower price targets could
support an inference that they were doing so in furtherance of a conspiracy to increase
prices.  (Singer ¶ 296.)

In sum, while the sales reports may not contain individual sales and pricing
information broken out by product for competitors, the Court finds there is enough
evidence indicating that the sales reports could still be used to target higher prices at or
above the industry average.  And even though Defendants have raised somewhat
plausible reasons why they were using Agri Stats to identify pricing opportunities,
Plaintiffs have presented enough evidence suggesting that targeting higher prices

through Agri Stats reports was one way in which Defendants agreed to increase prices in parallel.

### v.    Higher Prices

Finally, Plaintiffs argue that Defendants increased prices in parallel during the Relevant Period.

There is evidence indicating that Defendants raised prices to levels higher than they would have been but for a conspiracy.  Plaintiffs' experts constructed pricing regressions that were "designed to isolate price effects (overcharge), if any, owing to the Challenged Conduct, holding constant other key supply and demand factors that could influence price."  (Singer ¶ 182; *see also id.* ¶¶ 187–208; Mangum ¶¶ 331–54; Williams ¶¶ 502–23; Lamb ¶¶ 308–12.)  The experts concluded that the Plaintiffs were overcharged during the Relevant Period, in some cases by 10 to 11%.  (*See* Williams ¶ 523; Lamb ¶¶ 275–76, 310; Mangum ¶ 354.)

In addition, Dr. Singer concluded that every Defendant—except for Clemens, who was not included in the analysis for lack of pre-conduct sales data—raised prices during the Relevant Period.  (Singer ¶ 212 & T.17.)  He further examined pork prices "for each Defendant by primal cut" and concluded that the prices moved together, indicating that "Defendants mirrored each other's price changes—exactly what one would expect from a conspiracy to inflate Pork prices."  (Singer Reply ¶ 106 & Figs. 7–11.)

Defendants argue that Plaintiffs have failed to demonstrate that their pricing ever in fact converged around an industry average or moved in any other parallel way.  On this

point, Defendants argue that even if prices increased over a decade, "the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993). Indeed, given the competitive nature of the pork market, one would expect competitors' prices to generally move in parallel. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 410 (3d Cir. 2015) ("Historically, parallel pricing in the U.S. chocolate market has not been at all uncommon.").

However, Plaintiffs have presented sufficient evidence that Defendants did engage in parallel pricing to survive summary judgment, so this issue will ultimately be resolved by a jury. While raised prices alone may lack significant probative value given that pork is a fungible commodity, this evidence, when viewed in tandem with the evidence of other parallel conduct and plus factors, tends to show that Defendants formed an agreement.

**b.    Plus Factors**

Plaintiffs have presented enough evidence of various forms of parallel conduct that, when viewed together, suggest an agreement among Defendants to fix the price of pork. However, evidence of parallel conduct alone is insufficient to survive summary judgment. In addition to parallel conduct, Plaintiffs must provide sufficient evidence of "plus factors," or factual enhancements, to support an inference of concerted action. *Blomkest*, 203 F.3d at 1033. There is "no finite set of such criteria" or "exhaustive list" of plus factors sufficient to defeat summary judgment. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). What matters is that even with evidence of plus factors, "the

plaintiff's evidence tends to exclude the possibility of independent action." *Blomkest*, 203 F.3d at 1033. While many of these individual plus factors are close calls examined in isolation, the Court will heed Judge Richard Posner's advice to courts that "if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole [can still] defeat summary judgment." *In re High Fructose Corn Syrup*, 295 F.3d at 655.

Plaintiffs assert that they have established the existence of ten plus factors that tend to the exclude the possibility that Defendants acted independently. These include (1) the type of competitively sensitive data shared through Agri Stats, (2) Defendants' acceptance of Agri Stats's invitation to use Agri Stats reports to target higher prices, (3) Defendants' shared motive to restrict production and raise pork prices, (4) certain characteristics of the U.S. pork industry that make it favorable to collusion, (5) Defendants' public signaling of sensitive business plans, (6) a high level of interfirm communications among Defendants, (7) actions taken against Defendants' self-interests, (8) Defendants' departure from historical conduct, (9) evidence of monitoring and discipline, and (10) similar practices in the broiler chicken industry. To the extent that the Court has not already discussed them, the Court will analyze each plus factor in turn.

### i.    Type of Data Shared

Plaintiffs first argue that the type of current and sensitive data shared through Agri Stats is a plus factor indicative of agreement. In particular, Plaintiffs claim that Agri Stats reports contain current, granular, disaggregated, and non-public competitively sensitive

information regarding prices and production output.  Absent collusion, Plaintiffs contend that competitors do not usually share such information.

The sharing of confidential information with competitors, especially pricing information, can support an inference of agreement.  *Gypsum*, 438 U.S. at 441 n.16 ("Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects and although not *per se* unlawful have consistently been held to violate the Sherman Act.").  The Supreme Court has recognized that "[g]enuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals."  *Am. Column*, 257 U.S. at 410.

Plaintiffs have presented evidence that the Processor Defendants shared confidential information regarding their sales and production with Agri Stats, which was then transformed into anonymized reports that were shared with competitors.  (*See* Singer at 201, App. 3 T.1 (depicting Processor Defendants' participation in Agri Stats reports during the Relevant Period).)

The Court has already reviewed evidence suggesting that the sales reports contain confidential pricing information that recipients could use to target higher prices, and that Defendants used the reports for such purposes.  Defendants argue that the sales reports merely provide historical, aggregated averages and hypothetical product mix comparisons.  But, as discussed above, the Court concludes that a reasonable jury could find that comparing a recipient's sales information by product against averages for

similar, bundled products sold by competitors could be used by subscribers to collectively target higher prices than they otherwise would have. The fact that the Processor Defendants willingly shared their confidential pricing information—especially with the understanding that competitors could use that information to undercut each other on price and thereby steal business—supports an inference that the Defendants formed an agreement. *See S&S Forage & Equip. Co., Inc. v. UP N. Plastics, Inc.*, No. 98-565, 2002 WL 505919, at *6 (D. Minn. Mar. 31, 2002) (denying summary judgment given the "evidence that the defendants exchanged pricing information before prices went out to customers" and that the "price verifications did in fact have an impact on pricing").

In addition to sharing price information, the Parties dispute whether the processing analysis books contain confidential production output information. Plaintiffs argue that the processing analysis book contains enough detailed information for Defendants to use "simple arithmetic" to calculate the actual values for the total output of competitors' complexes. With such information, Defendants allegedly were able to monitor each other's production output and thereby ensure that each conspiracy member was continuing to restrain production to achieve the overall effect of increased pork prices. Defendants disagree, arguing that the only total output information included in Agri Stats reports is that of the report recipient, not any competitor. What's more, Defendants contend that the metrics related to production were insufficient for recipients to actually calculate competitors' current or future production volumes, as

evidenced by the lack of evidence of any Processor Defendant using the theoretical formula to calculate competitor output.

Based on the evidence presented, the processing analysis reports did not explicitly provide production output information for any competitor.  As the Court understands it, a recipient could theoretically identify an estimate of its own production using Report 2.2 in the processing analysis book by multiplying the pigs slaughtered per operating hour by the plant operating hours and the number of lines run at each plant.  (*See* Cabral ¶ 93 & Fig. 8.)  But to calculate production output for competitors, a subscriber would need information on the number of lines run at each competitor plant.  And Agri Stats redacts the number of lines run by competitors in the reports, so that key part of the theoretical arithmetic formula is missing for competitors.  (Sealed AS Ex. 1 ¶ 39.)  Moreover, Defendants contend that the metrics necessary for the theoretical arithmetic formula were not added to the reports until April 2011, so subscribers could not have used the formula until mid-way into the Relevant Period.  (*See* Sealed AS Ex. 28.)

Nevertheless, the processing analysis books provided confidential production metrics that ordinarily would not be shared with competitors.  Despite Defendants' arguments, Plaintiffs have presented opinion evidence indicating that the information in the processing reports enabled subscribers to calculate production output from competitors with 75% accuracy.  (*See* Cabral App. C ¶ 61.)  Thus, evidence that the Defendants willingly provided confidential production metrics information to their

competitors, with the possibility that those competitors could use that data to steal business and market share, supports an inference of a conspiracy.

Overall, the data shared through the Agri Stats reports was only available to subscribers, and the fact that Agri Stats went through the trouble of anonymizing the data speaks to its sensitivity. As in *American Column*, where the Supreme Court found that an exchange of information on competitors' sales, shipping, production, and price data unreasonably restrained trade, so too here the Court finds that there is sufficient evidence suggesting that Defendants shared similar minute details regarding their price and production information to support an inference of a conspiracy. Indeed, even a JBS employee recognized the bizarre nature of Defendants' information exchange through Agri Stats, remarking that "I'm still amazed at how quick this industry is to share information with the competition, customers, etc. . . . I'll bet you a hundred bucks that Coca-Cola, GM, Sony, and the like don't share pricing and production cost information like this industry does." (Sealed Pls.' Ex. 93 at 2.) On balance, the Court finds that the type of information shared through Agri Stats supports an inference of a conspiracy.

### ii.    Acceptance of Invitation to Create Higher Price Targets

Plaintiffs next argue that the Processor Defendants' acceptance of Agri Stats's invitation to share their data to create higher price targets is another plus factor indicative of an agreement. In particular, Plaintiffs claim that Defendants agreed to subscribe to Agri Stats's sales reports knowing that the purpose was to identify prices that could be raised above the industry average, which is the sort of acceptance of agreement that the

Supreme Court has found sufficient to establish an unlawful conspiracy under § 1. *Interstate Cir.*, 306 U.S. at 227.

As recognized by the Supreme Court, "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *Id.* Courts have since recognized that the existence of a common invitation contemplating concerted action can support an inference of conspiracy. *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1372 (N.D. Ga. 2017) (listing cases).

The Court has already determined that the invitation and acceptance to participate in Agri Stats reports supports an inference of a conspiracy. Processor Defendants agreed to provide confidential price and output information to Agri Stats for the purpose of formulating that data into anonymized reports that would be distributed to competitors. Agri Stats reports include a page at the beginning that lists the participating production complexes whose data are included in the report. (*See* Sealed AS Ex. 4 at 43:16–23.) In this way, the Processor Defendants knew whose data theirs was being compared against in each book. And the information exchanged between the Processor Defendants was competitively sensitive pricing and production information. Moreover, there is evidence that some Defendants conditioned their participation in Agri Stats on their competitor's participation, which suggests all the more that the Defendants were aware of the

potential for concerted action from collective participation in Agri Stats reports.  For example, there is evidence that Tyson conditioned its complete participation in Agri Stats on other major producers, particularly co-Defendants, also participating.  (*See, e.g.,* Sealed Pls.' Ex. 62 ("When I agreed to add the balance of our plants, you made the commitment to get JBS and Hormel completely onboard as well.  How do we resolve?"); Sealed Pls.' Ex. 171 ("Talk to me 'after' you get the Seaboard and Triumph commitments . . . Did you get Hormel to join Agristats yet??").)

Defendants argue that Plaintiffs have failed to cite any evidence in support of their claim that the Defendants subscribed to Agri Stats knowing that the purpose was to identify prices to raise above the industry average, rather than steal market share, and thus dismiss Plaintiffs' claims as merely speculative.  However, Plaintiffs have presented sufficient evidence suggesting otherwise.  Furthermore, the Parties have cited no evidence in the record that the Defendants ever used Agri Stats reports to decrease their prices.  Indeed, the mountain of evidence indicates the opposite: that Processor Defendants were much more interested in using the reports to increase their prices, which certainly raises suspicion in a competitive market.

In sum, there is sufficient evidence indicating that the Processor Defendants accepted Agri Stats's invitation to participate in Agri Stats reports to target higher prices. This plus factor thus supports an inference of a conspiracy.

### iii.    Shared Motive to Conspire

Plaintiffs argue that Defendants shared a motive to restrain supply and stabilize prices given the economic conditions of 2008, which is also indicative of a conspiracy. Specifically, Plaintiffs claim that the economic conditions of 2008, namely the spike in corn prices, Great Recession, and new circovirus vaccine, together created a chain of events that motivated the Defendants to work together to artificially constrict pork supply to increase pork prices.

A shared motive to conspire can support an inference of a conspiracy. *E.g.*, *In re Flat Glass*, 385 F.3d at 360–61 (recognizing that "evidence that the defendant had a motive to enter into a price-fixing conspiracy" can be a plus factor); *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1013 (E.D. Mo. 2018) ("[P]lus factors may include a shared motive to conspire.") (cleaned up).  Notably, however, courts have been cautious to recognize a common motive among competitors to increase profits as factual enhancement evidence sufficient to support an inference of a conspiracy on its own.  Indeed, because "[p]rofit is a legitimate motive in pricing decisions," courts have required "something more . . . before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act."  *In re Baby Food*, 166 F.3d at 134–35.

As discussed above, Plaintiffs have produced evidence that Defendants had a logical motive to conspire to raise pork prices given the economic conditions that disrupted the U.S. pork industry starting in 2008.  While such evidence alone may be

insufficient to support an inference of a conspiracy, it is stronger when coupled with "evidence that the structure of the market was such as to make secret price fixing feasible." *In re Flat Glass*, 385 F.3d at 360 (quoting *In re High Fructose Corn Syrup*, 295 F.3d at 655).  As discussed, there is evidence from Plaintiffs' experts that the characteristics of the pork industry make it susceptible to collusion, especially its concentration, the commodity-like nature and general inelastic demand of pork, and the significant barriers to entry in the pork packing industry.  (*E.g.*, Williams ¶¶ 54, 95–96, 102–14, 119, 124–25.)  Furthermore, the economic market conditions during parts of the Relevant Period caused the demand for pork to decrease and Defendants to have excess hog supply and higher costs.  All of this evidence together supports an inference that Defendants were motivated to enter into a price-fixing conspiracy.  *See In re Flat Glass*, 385 F.3d at 361 (finding concentration of the flat glass market, the standardized nature of flat glass, declining demand for flat glass during the period at issue, and the competitors' excess capacity tended to show that defendant had a motive to enter into a price-fixing conspiracy).

### iv.    Market Concentration and Structure

Related to the previous plus factor, Plaintiffs next point to the characteristics of the U.S. pork industry—in particular its market concentration and structure—as additional factual enhancements tending to exclude the possibility that Defendants acted independently.

Market concentration and structure can be probative of a conspiracy. Courts have noted that a price-fixing conspiracy is more attractive to competitors and feasible in markets that are highly concentrated and have fungible products that are subject to inelastic demand, especially when the conditions are such that the primary sellers of the product have excess capacity. *See In re High Fructose Corn Syrup*, 295 F.3d at 656–57 (discussing how the structure of the high fructose corn syrup market is favorable to secret price fixing); *Todd*, 275 F.3d at 207–11 (same in oil and petrochemical industry). *But see Williamson Oil*, 346 F.3d at 1317–18 (rejecting argument that structure of the tobacco industry is conductive to price-fixing conspiracies because oligopolies are "perfectly legal").

As mentioned, there is substantial evidence that the U.S. pork industry is conducive to cartel behavior based on certain market structure characteristics, including its concentration, the commodity-like nature of pork, pork's generally inelastic demand, the significant barriers to entry in the pork packing industry, and various opportunities to collude, including through industry trade associations. Defendants do not dispute that the U.S. pork market's concentration and structure are favorable to secret price fixing. The Court is satisfied that the evidence of the pork market's susceptibility to collusion supports an inference of an agreement in this case.

### v.   Public Signaling

Next, Plaintiffs argue that Processor Defendants publicly signaled competitively sensitive business plans, especially planned production cuts and increased exports, which constitutes another plus factor indicative of an agreement.

Courts have found that public signaling, especially those that involve sensitive business plans, can support an inference of an agreement. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 215–19 (D.D.C. 2023) (denying summary judgment where the plaintiffs alleged that airline defendants conspired to increase airfares by decreasing capacity growth, which involved public statements about capacity); *In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 690–91 (D. Minn. 1995) (denying summary judgment where the plaintiffs alleged that airline defendants conspired to cut travel agent commissions, which involved public speeches, subtle press releases, and official and unofficial corporate utterances).

The strongest evidence in support of Plaintiffs' allegation is evidence that Smithfield publicly signaled hog production cuts at the beginning of the Relevant Period. For example, in July 2008, Smithfield reported that it "led the industry in announcing plans to reduce its U.S. sow herd by 4 to 5 percent, or 40,000 to 50,000 sows," which "ultimately will result in production of 800,000 to 1 million fewer market hogs annually." (Sealed Pls.' Ex. 149 at 8.)  When other producers did not immediately follow through, the company stated on a March 2009 earnings call that "We absolutely need to have some further reduction in the supply.  We've taken the lead. . . . We need more supply contraction, and

even with these big losses it does not seem the producers out there have heard this message." (Sealed Pls.' Ex. 157 at 2.) Tyson internally commented that "[t]he way this reads, Smithfield is the lone ranger." (*Id.*)

Later that year, on a June 2009 earnings call, Smithfield reiterated that "[s]omebody else has got to do something," because "we solidly need a 10% cutback" as "that would make the industry very profitable." (Sealed Pls.' Ex. 179 at 12.) Reviewing the transcript from the call, Tyson internally commented that Smithfield was "very aggressive, almost careless, in discussing the rest of the industry." (Sealed Pls.' Ex. 151 at 3.) In a press release issued the same day as the earnings call, Smithfield reported that "liquidation is now a recognized reality by all in the industry" and that it planned to reduce more of its sow herd, which, "combined with the additional cuts by our fellow producers should shrink supply to a point where the industry can return to profitability." (Sealed Pls.' Ex. 146 at 5.) One month later, Tyson announced that it would reduce its sow herd by roughly 29%. (Sealed Pls.' Ex. 160 at 3.)

Furthermore, on a September 2009 earnings call, Smithfield's CEO Larry Pope reiterated that "Smithfield cannot solve this problem alone" and stated that he "had conversations with several . . . very large producers, and I would tell you they are doing some liquidation. . . . I think this industry has got to solve it collectively. I do believe everyone is now looking." (Sealed Pls.' Ex. 153 at 14.)

Additional evidence from later in the Relevant Period also supports Plaintiffs' argument. For example, in 2010, Pope stated that he anticipated that 8% of Smithfield's hog supply "will be down" in the next fiscal year. (Pls.' Ex. 406 at 3.) And in response to a forwarded email with an April 2010 announcement from Smithfield that "some costs will rise," Tyson internally responded with "Sure helps when Smithfield signals" and that Smithfield's announcement likely meant the company "is experiencing the impact and pain of the rising pork markets just like [Tyson], and, this means they will have to be aggressive with price increases as well." (Sealed Pls.' Ex. 407 at 2.)

JBS similarly stated on a November 2011 earnings call that "we don't see any new capacity coming to the market in 2012. In our plans we are already running pretty full and we are not planning any increase in capacity in our pork business." (Sealed Pls.' Ex. 175 at 12.)

Moreover, in December 2013, a Smithfield executive stated that, "you really need to look at the overall industry balance of supply and demand to be able to determine can the industry move prices up collectively as a group. We've got limited ability to do it ourselves if the rest of the industry doesn't follow. But the consumer tends to be willing to pay proportionally higher values for their pork meat when small increments of supply are withdrawn from the marketplace." (Sealed Pls.' Ex. 155 at 68.)

Finally, as to exports, Plaintiffs cite evidence from a 2015 conference call where Smithfield explained that "[t]he fact is the more US pork that gets out of the country, the

better for the values of the meat that remains in the United States."  (Sealed Pls.' Ex. 408 at 3.)

The evidence is certainly suggestive that Smithfield was encouraging its fellow producers, including Defendants, to cut hog production to help the industry become more profitable.  And the fact that Tyson announced its sow liquidation plans shortly after Smithfield encouraged other producers to follow its lead is also suggestive.  *See In re Domestic Airline Travel*, 691 F. Supp. 3d at 214 ("[T]he timing of the statements with the alleged concerted action provides some of the requisite 'factual heft' in support of Plaintiffs' allegations of parallel conduct.") (cleaned up).  Furthermore, the evidence also supports an inference that some of the Defendants were publicly signaling price increases and export plans to further the alleged conspiracy.

In their defense, Defendants explain that there are independent business justifications for their public statements, such as the fact that public companies must report major business changes to investors, who Defendants must keep apprised of their business prospects.  *See* 17 C.F.R. § 229.303 (requiring corporations to discuss their financial condition, changes in financial condition, and results of operations); *see also In re Domestic Airline Travel*, 691 F. Supp. 3d at 214 (recognizing that investors are interested in companies' forward-looking plans).  Moreover, Defendants contend that certain Defendants, including Smithfield and Tyson, made similar announcements prior to the alleged conspiracy period, and a "continuation of a historic pattern—including of

parallel price increase announcements—does not plausibly allow one to infer the existence of a cartel." *Kleen*, 910 F.3d at 937.

Though the Court does not completely discount Defendants' legitimate business reasons for some of their public statements, the Court nevertheless finds that as a whole Defendants' public statements support an inference of a conspiracy. Given the changed marked conditions that severely impacted the U.S. pork industry during the Relevant Period and Defendants' obligations to report their financial conditions and operations to investors, it seems reasonable that Defendants were reporting some of their conduct publicly. Conveying such information can theoretically be non-conspiratorial and lawful.

Nevertheless, encouraging competitors to engage in similar behaviors is distinct from mandated public reporting. It is difficult for the Court to rationalize the need for Defendants, particularly Smithfield, to so obviously encourage its fellow producers to follow its lead in cutting hog production, raising prices, and exporting. "[A]nnouncements about forward-looking capacity plans and the Defendants' alleged need for and their commitment to capacity discipline" can support an inference of a conspiracy. *In re Domestic Airline Travel*, 691 F. Supp. 3d at 216. Here, Smithfield did not just announce its own forward-looking plans to the industry; Smithfield also effectively begged its fellow producers to act in lockstep for the purpose of profiting the industry, which in the Court's view could have "crossed the line." *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 840 (N.D. Ill. 2017) ("[I]f Defendants had crossed the line into encouraging their

competitors to exercise discipline, then their talk would become actionable conduct (or at least indicate that a conspiracy was afoot)."); *see also Broilers II*, 702 F. Supp. 3d at 663 (finding defendant's public statements encouraging its competitors to take collective action sufficient to support a reasonable inference that the defendant conspired).

Ultimately, whether Defendants' public announcements and communications can be explained by Defendants' proffered, independent business justifications is a fact question best left for a jury. *In re Wholesale Grocery Prods.*, 752 F.3d at 735. But for now, the Court finds that this plus factor supports the inference of a conspiracy and, together with other factors, tends to exclude the possibility of independent action in the alleged conspiracy.

### vi.    Interfirm Communications

In addition to the public signaling and the routine data sharing through Agri Stats discussed above, Plaintiffs argue there is additional evidence of interfirm communications among Defendants which, when viewed with the other evidence, tends to exclude the possibility that Defendants acted independently during the Relevant Period.

"[A] high level of communications among competitors can constitute a plus factor which, when combined with parallel behavior, supports an inference of conspiracy." *Blomkest*, 203 F.3d at 1033 (citing *In re Plywood Antitrust Litig.*, 655 F.2d 627, 633–34 (5th Cir. 1981)). Notably, however, the Eighth Circuit has warned that evidence of interfirm communications among competitors does not tend to exclude the possibility of independent conduct where "other significant events strongly suggest independent

-88-

behavior," including market conditions of the relevant time period and interdependence in oligopolistic markets. *Id.* at 1033–34.

In support of their allegation that Defendants shared suspicious salutations, Plaintiffs first point to evidence that Defendants shared herd liquidation plans at trade association meetings. For example, at a January 2008 American Meat Institute executive committee meeting attended by executives from Smithfield, Seaboard, Tyson, and Clemens, Smithfield shared that it would be reducing its sow herd. (Sealed Pls.' Ex. 71 at 2.) Later that year, at an April 21st Century Pork Club meeting, Clemens conducted an "'informal' late night poll" that revealed that "a little over 50% of us" were "reducing production through euthanasia, or the likes." (Sealed Pls.' Ex. 67 at 4.)

Plaintiffs contend this evidence demonstrates that Defendants were colluding with one another to collectively reduce hog supply in furtherance of the alleged conspiracy. The Eighth Circuit has declined to find a high level of interfirm communications sufficient to support an inference of agreement where the information that was shared concerned past, not future, plans. *Blomkest*, 203 F.3d at 1033–35 (finding no inference of conspiracy where defendants shared price verifications on completed sales, not future market prices). Here, however, there is evidence that Defendants shared future business plans with one another.

Still, Defendants explain that these statements were made at trade association meetings where hog producers and pork customers, including Plaintiffs, were present,

weighing against a finding that the statements support an inference of agreement. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015) (noting that attendance of non-defendants at trade association meetings where defendants allegedly met and conspired to raise prices made "the probability of collusion . . . go away"); *Broilers II*, 702 F. Supp. 3d at 686 ("The presence of a non-conspirator at the meeting where Defendants are alleged to have hatched their conspiracy strongly weighs against finding that the meeting is evidence of a conspiracy."). Plus, Clemens argues that its "'informal' late night poll" was directed to hog producers, not just Defendants, and that the purpose of the poll was to soothe Clemens's concerns regarding reduced hog supply, as Clemens relies on independent hog producers for approximately two-thirds of its hog supply.

What's more, the fact that Defendants attended industry trade association meetings with one another does not by itself support an inference of a conspiracy. The law is clear that membership in industry trade associations alone does not permit an inference of a price-fixing agreement. *Twombly*, 550 U.S. at 557 n.12 (suggesting that membership in various trade associations is insufficient to suggest conspiracy); *In re Chocolate*, 801 F.3d at 409 ("[E]vidence of mere opportunities to conspire . . . cannot alone support an inference of a conspiracy."); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991) ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy."); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910–11 (6th Cir. 2009) (noting that gathering

at industry trade association meetings "should not weigh heavily in favor of suspecting collusion" because such presence "is more likely explained by . . . lawful, free-market behavior").

However, additional evidence, when coupled with evidence that competitors had opportunities to collude at industry trade association meetings, could support an inference of an agreement. For example, evidence that competitors simultaneously or near-simultaneously increased prices immediately after an industry trade association meeting would make an inference of an agreement more compelling. *In re Text Messaging*, 782 F.3d at 878. Here, there is evidence that, after Smithfield announced its plans to reduce its sow herd, shortly thereafter Tyson too announced that it would be reducing its sow herd. But without more "simultaneous or near-simultaneous" action by more Defendants, the Court is skeptical of whether such evidence demonstrates that Defendants were using trade association meetings to collude.

Nevertheless, Plaintiffs have provided additional evidence of communications between Defendants that makes their argument that Defendants' high level of communications supports an inference of an agreement more compelling. In particular, Plaintiffs highlight a series of communications between different pairs of Defendants regarding hog supply. For example, in June 2009 a Seaboard employee internally reported that "[Smithfield] has called and tried to convince us and other big producers to cut back which would help them so they are even trying to embarrass us in the media to

do it." (Sealed Pls.' Ex. 112 at 2.)  Seven days later, Seaboard emailed Smithfield representatives saying, "We appreciated the 'heads up' given by [Smithfield] to [Seaboard] regarding the sow liquidation." (Sealed Pls.' Ex. 302.)

In addition, in July 2009 Seaboard questioned Tyson: "With regards to the sow reduction at Tyson are you selling the sows to someone else who will continue to produce with those sows or are the sows being liquidated?"  (Sealed Pls.' Ex. 113 at 2.)  Tyson replied, "The sows are being liquidated and the sow units are being taken out of production." (*Id.*)  Then Seaboard forwarded that email internally, stating, "Just checked with Tyson. The 20,000 sow reduction they have announced will result in 20,000 sows being liquidated." (*Id.*)

There are additional communications between Defendants regarding harvest schedules.  For example, in June 2012 Hormel emailed JBS inquiring, "Still sitting tight with reduced harvest numbers. . . . You guys are in the same boat it appears?" (Sealed Pls.' Ex. 103 at 2.)  JBS responded with, "Yeah we are, kills cut way back 'cause producers are asking stupid $ for pigs." (*Id.*)  And in August 2017, JBS emailed Seaboard to provide the number of hogs they planned to harvest for the next week, stating: "We'll only kill 2160 next week so that hopefully will keep these guys a little short and hungry for hams." (Sealed Pls.' Ex. 106 at 2.)

Further, in 2017 Clemens internally commented that  "[t]here are lawsuits all over the place on price fixing, and people are scared to communicate . . . we have to find a way

to avoid this with pork" "[s]tay united."  (Sealed Pls.' Ex. 31 at 303:23–304:12.)  There is also evidence that a Tyson employee was in the "habit" of instructing employees to "read and delete" emails, though he could not recall whether he had done so with respect to emails with "competitors' prices" or their "plans on supply."  (Sealed Pls.' Ex. 32 at 65:4–66:15.)

At first blush, these communications are alarming.  The fact that competitors were communicating so casually with one another about competitively sensitive business information like hog reduction plans and harvest schedules definitely raises a red flag. However, Defendants reassure the Court that Plaintiffs have taken these communications "wildly out of context" because these communications concern legitimate business transactions between Defendants.  (Defs.' Joint Mem. at 64, June 7, 2024, Docket No. 2247.)  Several Defendants, for example, have customer-supplier relationships among themselves which require them to communicate about hog availability or transaction-specific pricing.  (*E.g.*, Sealed Defs.' Joint Ex. 157 (Smithfield communicating to Seaboard regarding delayed delivery of product).)

Considering the buy-sell relationships that Defendants have with one another, the Court is hesitant to find that such communications support an inference of a conspiracy. Indeed, "[e]specially when companies have legitimate business reasons for their contacts, plaintiffs must offer some evidence that moves beyond speculation about the content of what was conveyed."  *Kleen*, 910 F.3d at 938; *see also In re Dairy Farmers of Am., Inc.*

-93-

*Cheese Antitrust Litig.*, 801 F.3d 758, 763 (7ᵗʰ Cir. 2015) (affirming summary judgment where defendants had "a number of legitimate reasons to communicate with each other" as part of customer relationship and plaintiffs failed to "point[] to a single communication that suggests a meeting of the minds to fix prices").

Nevertheless, Plaintiffs dispute whether all of the communications cited relate to legitimate business transactions.  And the fact that a Tyson employee habitually instructed employees to "read and delete" emails is suspicious and signifies that there was something to hide.  Furthermore, the evidence of public signaling and data sharing through Agri Stats constitutes additional communications evidence among Defendants. On balance, therefore, the Court declines to rule out the possibility that Defendants' direct communications are indicative of a conspiracy and will allow a jury to consider such evidence in evaluating whether Defendants formed an agreement to fix prices.  On summary judgment, this plus factor tips the scale slightly towards an inference of a conspiracy.

### vii.    Actions Against Self-Interest

Next, Plaintiffs argue that Defendants took actions that would have been irrational and against their independent self-interests in a competitive market.

Conduct against independent self-interest can be a plus factor.  *Blomkest*, 203 F.3d at 1037; *see also Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1243–45 (3d Cir. 1993) (finding evidence that defendants refused to bid on each other's accounts to steal business even when they knew they could undercut one another

on price supported an inference of conspiracy at summary judgment); *In re High Fructose Corn Syrup*, 295 F.3d at 659 (finding evidence that competitors purchased product from one another to sell to customers even though the purchasing competitor could have supplied the product at a lower cost supported an inference of conspiracy at summary judgment). For evidence that a competitor acted contrary to its independent self-interest to support an inference of a conspiracy, it must have been "irrational" for the defendant to have acted in that way, "assuming that defendant operated in a competitive market." *In re Flat Glass*, 385 F.3d at 361. Nevertheless, "where there is an independent business justification for the defendants's [sic] behavior, no inference of conspiracy can be drawn." *Blomkest*, 203 F.3d at 1037 (citing *Todorov*, 921 F.2d at 1456–57); *see also In re Baby Food*, 166 F.3d at 127 (noting an unwillingness to question a defendant's "business judgment" as to "whether and when to pursue particular business opportunities"). Furthermore, conduct that may ordinarily be against a competitor's independent self-interest may not be against such interest in an oligopolistic market, such as the U.S. pork industry, where competitors' actions can be driven by interdependence. *See In re Flat Glass*, 385 F.3d at 360–61. Indeed, "[i]n an oligopolistic market, . . . a firm might refrain from cutting prices to gain market share, because it reasonably anticipates that its few large competitors would be able to match the price cut and thus no additional market share would be gained." ABA Section of Antitrust Law, Proof of Conspiracy Under Federal Antitrust Laws 73 (2010). In this way, evidence that competitors in an oligopolistic market took actions

seemingly at odds with their independent self-interests may not, on its own, be sufficient to defeat summary judgment alongside evidence of parallel conduct. *See In re Flat Glass*, 385 F.3d at 361 & n.12. However, when evidence of conduct against self-interest is coupled with evidence that competitors shared confidential price information, such evidence "cannot simply be explained as a result of oligopolistic interdependence." *Id.*

In support of their allegation, Plaintiffs first argue that Defendants' public announcements and direct communications regarding supply reductions were against their independent self-interests. Dr. Williams opined that it is generally against one's self-interest to tip off competitors about such plans, as doing so would incentivize competitors to expand output to win business. (Williams ¶ 321; *see also* Singer ¶ 299; Lamb ¶¶ 216–18.) Defendants counter that their public announcements and direct communications arose out of necessary business disclosures or legitimate business relationships. Nevertheless, as the Court already noted, whether Defendants' public announcements and communications can be explained by Defendants' proffered, independent business justifications is a fact question best left for a jury.

Plaintiffs next argue that the Defendants' various methods of output restraint were against their self-interest because (1) sow liquidations are not easily reversible and would impact Defendants' herd sizes for years to come, (2) absent harvest reductions, Defendants could have otherwise processed more pork and taken market share from one another, and (3) exporting when faced with domestic shortage or lower-than-domestic

prices risked loss of domestic market share.  (Singer ¶¶ 300–04; Lamb ¶ 170.)  Defendants

repeat their earlier arguments that they had independent reasons why they liquidated

sows, cut back on pork production, and exported more during the Relevant Period.

It is true that the Defendants' sow reductions were not easily reversible given the

life cycle of hogs.  Acting without the ability to stave off potential losses, or "perilous

leading," makes "little economic sense" absent conspiracy.  *Kleen*, 910 F.3d at 937–38.

However, given the rather catastrophic economic conditions of the U.S. pork industry

during various parts of the Relevant Period, including the spikes in corn prices, Great

Recession, circovirus vaccine, and PEDv outbreak, Defendants have provided rational

justifications for some of their conduct.  It is difficult to conclude that Plaintiffs have

provided sufficient evidence tending to "rule out the hypothesis that the defendants were

engaged in self-interested but lawful oligopolistic behavior."  *Id.* at 934–35.

Even still, the fact that Defendants seemingly used Agri Stats reports to raise prices,

which, according to Plaintiffs' experts, effectively heightened the market average above

competitive levels, tips this plus factor slightly in Plaintiffs' favor.  In a competitive market,

one would expect competitors to use benchmarking reports, like Agri Stats reports, to

fiercely compete with one another, most obviously by using the reports to undercut one

another on price to steal business and gain market share.  However, to the Court's

knowledge, there is no evidence suggesting that Defendants ever used Agri Stats reports

to decrease prices.  The Court recognizes the interdependent nature of the U.S. pork

market.  But the Court also notes that a firm that raises prices in a competitive market faces a risk of losing business to rivals.  Here, the evidence strongly suggests that Defendants raised prices collectively without fear of losing market share because they entered into an agreement to keep prices high.

While the other cited evidence regarding Defendants' conduct against their independent self-interests is somewhat suspicious, the Court finds the lack of any evidence of any Defendant using Agri Stats to undercut competitors on price over a nearly decade-long period most telling.  These alleged actions against self-interest, if proven, help bolster the inference of a conspiracy and suggest Defendants were not acting independently.

### viii.    Historical Conduct

Plaintiffs next argue that Defendants' departure from historical trends during the Relevant Period tends to exclude the possibility that they acted independently.  As evidence, Plaintiffs point to (1) the widening margins between what hog farmers received and what Processor Defendants ultimately captured in the sale, (2) the slower growth rate of pork production, and (3) the growing gap between higher domestic prices and lower export prices.

"A continuation of a historic pattern . . . does not plausibly allow one to infer the existence of a cartel."  *Kleen*, 910 F.3d at 937.  For evidence of a departure from historical conduct to create an inference of a conspiracy, "the shift in behavior must be a 'radical' or 'abrupt' change from the industry's business practices."  *In re Chocolate*, 801 F.3d at

410 (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)).  In other words, the change must generally be "more than just an uptick in frequency of a pre-established industry practice."  *Valspar*, 873 F.3d at 196.

Defendants argue that the cited trends occurred over ten or more years and were not isolated to Defendants.  In their view, the trends thus fail to demonstrate any radical or abrupt change of the type courts credit as a plus factor.  Furthermore, Defendants claim that reduced hog supply during the Relevant Period merely reflected the cyclical nature of the hog cycle, and that while exports increased during the Relevant Period, they did so at a slower rate during the Relevant Period than the benchmark period before it.

The Court is skeptical of whether the alleged departures from historical conduct tend to exclude the possibility that Defendants acted independently.  The increased spreads between what hog farmers received and what Processors ultimately captured in the sale are certainly suspicious.  But the fact that Defendants profitably overcame some of the crises during the Relevant Period does not by itself create a reasonable inference of a conspiracy.  Nor do the slowed pork production rates, which could be explained by external factors.  Defendants have provided explanations for their slower processing growth during the Relevant Period, such as the 2008 financial crisis and the 2013 PEDv outbreak, and "changed market conditions" are insufficient to allow one to plausibly infer the existence of an agreement.  *Kleen*, 910 F.3d at 936–37.  Finally, the growing gap between higher domestic prices and lower export prices could also be explained by

external factors.  But the suspect nature of the trend does not rule out the possibility of a conspiracy.

Therefore, this plus factor does little to help infer a conspiracy.  Nevertheless, because it may be helpful context in conjunction with other factors, the Court will still permit a jury to consider such evidence in evaluating whether Defendants formed an agreement to fix prices.

### ix.    Monitoring and Discipline

Next, Plaintiffs argue that evidence that Defendants monitored and disciplined one another for straying from the goals of the cartel is a plus factor.

Evidence of monitoring and enforcement mechanisms can support an inference of an agreement.  *Kleen*, 910 F.3d at 937.  In fact, courts have held that "a cartel cannot survive absent some enforcement mechanism."  *Petruzzi's*, 998 F.2d at 1233.  A lack of evidence of enforcement mechanisms is generally insufficient to "dissipate the inference of independent behavior."  *Kleen*, 910 F.3d at 937.

Plaintiffs' experts believe that Defendants used Agri Stats to monitor output and pricing and to enforce the alleged cartel.  (*E.g.*, Singer ¶¶139–57; Singer Reply ¶¶ 108–16; Mangum ¶¶ 178–83; Mangum Reply ¶¶ 329–34; Williams Reply ¶¶ 249–52; Cabral ¶¶ 93–95; Lamb ¶¶ 233–40; Lamb Reply ¶¶ 363–75.)  For example, Plaintiffs argue that the Processing Report allowed Defendants to calculate their competitors' output levels on a plant-by-plant basis or at least allowed Defendants to ensure that their competitors were abiding by a low volume/high margin strategy.  Further, Plaintiffs claim that

Defendants' deanonymization of Agri Stats reports enhanced their ability to monitor one another because the threat that one's competitors could deanonymize the data was a deterrent to chasing market share, even if the deanonymization was not correct in all instances.  Moreover, Section CR-1 of the processing reports contained an "Index of Operating Efficiency," which provided information about competitors' profit margins on a plant-by-plant basis.  (Sealed Pls.' Ex. 202 at 156.)  Participants could have used this information to determine whether their co-conspirators were continuing to comply with the conspiracy's targeted supply restrictions, as that would have been evident by abnormally high margins.

Defendants argue there is no reason to assume that any monitoring Defendants did of each other's activities is more indicative of a conspiracy than competition, as "gathering the price information of competitors can be just as consistent with lawful interdependence as with a price-fixing conspiracy."  *In re Chocolate*, 801 F.3d at 409.  Indeed, "[i]n a highly competitive industry . . . intensely dependent on marketing strategy, it makes common sense to obtain as much information as possible of the pricing policies and marketing strategy of one's competitors."  *In re Baby Food*, 166 F.3d at 126.  Furthermore, Defendants contend that Plaintiffs have provided no evidence of any Defendant ever disciplining another for a failure to heed to the conspiracy.

Nevertheless, there is evidence suggesting that Agri Stats reports themselves supplied a mechanism for enforcing the alleged conspiracy.  As Plaintiffs' expert Dr. Singer

opined, the "very structure of the Agri Stats program was its main enforcement mechanism," as a "participating member could only receive the competitively sensitive price and quantity information if they first provided their own data as a precondition." (Singer Reply ¶ 115.) In other words, "Agri Stats functioned as a broker and clearing house for the information exchange, affirming participants' agreement to the conspiracy as a precondition for access to the data that would enable cheating in the first place." (*Id.*)

The Parties dispute whether or not the Agri Stats reports could be successfully deanonymized, such that they could be used to monitor or enforce the alleged conspiracy. Plaintiffs claim that one plant, Smithfield's Tarheel plant, which is the only plant that runs two lines in the domestic market, was theoretically identifiable using a second report in conjunction with Report 2.2 despite the redacted information. (*See, e.g.*, Sealed Pls.' Ex. 763 at 3 (depicting how Tarheel is the only plant with a double line).) But the main evidence supporting Plaintiffs' allegation that Defendants identified the Tarheel plant is that a Triumph employee noted in an email that Tarheel ran two lines. (*See* Cabral ¶ 94.) However, it is not clear that the employee was reviewing Report 2.2 when mentioning Tarheel, and Defendants' expert Dr. Stiroh determined that the identification in any event was incorrect. (Stiroh ¶ 249 & Fig. 28.) What's more, even if Tarheel was deanonymized, it is not clear whether the remaining competitor plants would be identifiable. Nevertheless, Plaintiffs claim that the information in the Processing Report enables Processor Defendants to calculate total output from all Processor Defendants with 95%

accuracy.  (Stiroh Fig. 25, Column C.)  Plaintiffs also point to evidence that Tyson in particular went to great lengths to deanonymize Agri Stats reports, which Plaintiffs' expert Dr. Cabral figures was accurate 60% of the time.  (Cabral ¶ 63.)

Defendants contend that not every Defendant attempted to deanonymize Agri Stats reports, and that even the deanonymization efforts that are included in the record were not accurate or conclusive enough to actually be useful for monitoring or enforcing the alleged cartel.

While deanonymization is certainly relevant here, the reports could still be useful even without complete or accurate deanonymization.  Indeed, as already discussed, the Court believes the reports contained sufficient information for recipients to use to target higher prices or maintain production restraint.  Plus, Plaintiffs have provided significant evidence suggesting that Defendants did successfully deanonymize the reports to some extent.  Even if the deanonymization was not 100% accurate, the fact that any of it could be accurate suggests the reports' usefulness for monitoring the alleged conspiracy.

Plaintiffs also accuse the Defendants of using an industry analyst, Kerns & Associates, as a channel for information that helped them monitor the success of the alleged cartel.  As an example, Plaintiffs cite to an email Kerns sent in 2015 that passed along an imminent sow herd reduction "from The Big Gun," as well as an email Kerns sent in 2017 to Smithfield passing along Triumph's harvest shifts in return for Smithfield's kill numbers.  (Sealed Pls.' Ex. 412 at 2; Sealed Pls.' Ex. 413 at 2.)

Moreover, Plaintiffs argue that Defendants' various references to getting their "fair share" implies that each defendant was responsible for playing "a role in a larger agreement." *Kleen*, 910 F.3d at 940. For instance, a Tyson executive wrote in 2011 that "we have earned the right to get our fair share of [slaughter] since we are performing well vs. industry. i.e. - make the other guys cut back! I trust you'll read and delete and not repeat this." (Sealed Pls.' Ex. 183 at 2.) And, in 2015, a JBS executive stated, "[w]e need to make sure we're getting our fair share of volume." (Sealed Pls.' Ex. 414 at 2.)

The Court reiterates that Defendants' monitoring of each other's operations is not by itself suggestive of a conspiracy. However, the value that Agri Stats reports presented to participants and the evidence of deanonymization efforts creates suspicion regarding whether Defendants were, in fact, lawfully monitoring one another's activities. Accordingly, the Court finds this plus factor pushes the needle ever closer toward inferring a conspiracy and will allow a jury to consider such evidence in combination with all the other evidence in this case in determining whether Defendants formed an agreement to fix prices.

### x.   Involvement in Similar Practices

Finally, Plaintiffs argue that the fact that some Defendants engaged in similar practices in the broiler chicken industry supports an inference that they conspired in the pork industry. More specifically, Plaintiffs claim that Defendants modeled the alleged conspiracy in the pork market after a similar price-fixing scheme in the broiler chicken market.

Courts have found that evidence of an entity's involvement in a prior conspiracy may be relevant to supporting an inference of a current conspiracy in an overlapping market.  *E.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1149–50 (N.D. Cal. 2009); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1009 (E.D. Mich. 2010).  Indeed, if there is "a significant overlap in identify of interest of the alleged co-conspirators in both markets" and the claims are "based upon the same anticompetitive conduct," then the "'if there, then here' argument certainly can have merit."  *In re Packaged Ice*, 723 F. Supp. 2d at 1011.

In addition to this case, Agri Stats and Tyson are named as defendants in the *Broilers* antitrust case in the Northern District of Illinois.  *See generally Broilers II*, 702 F. Supp. 3d at 635.  In an attempt to connect the *Broilers* case to this one, Plaintiffs point to a guilty plea to antitrust violations entered by Pilgrim's, which is owned by JBS, and Tyson's antitrust leniency arrangement with the Department of Justice.  (*See* Singer ¶¶ 337–38.)  Plaintiffs claim that from this evidence it is reasonable to infer that JBS and Tyson's involvement in the broiler chicken conspiracy is connected to the alleged pork conspiracy.

Defendants argue that *Broilers* involved almost none of the same Defendants, and that all *Broilers*-related cases that have gone to trial have rejected the conspiracy claim.  Defendants thus urge the Court to reject this plus factor because Plaintiffs have failed to

"adequately link[]" the *Broilers* conspiracy with the purported conspiracy before it.  *In re Chocolate*, 801 F.3d at 403.

The Court concludes that Plaintiffs have not adequately linked the *Broilers* conspiracy to this alleged conspiracy to make it reasonable to infer that involvement in the broiler chicken conspiracy is connected to the alleged pork conspiracy.  Plaintiffs only attempt to connect two of the defendants between the conspiracies, JBS and Tyson, and they do not present sufficient evidence suggesting a "significant overlap in identify of interest of the alleged co-conspirators in both markets."  *In re Packaged Ice*, 723 F. Supp. 2d at 1011.  For example, Plaintiffs point to no evidence indicating that the same executives in the broiler chicken industry and the pork industry were responsible for production or sales in both markets or that JBS and Tyson had the most market power among all defendants in both markets.  *See In re Chocolate*, 801 F.3d at 403; *In re Flash Memory*, 643 F. Supp. 2d at 1149.  While the conspiracies allege similar anticompetitive conduct, the Court declines to find that involvement by some Defendants in the broiler chicken conspiracy supports an inference that they were involved in the alleged conspiracy in the pork market.

* * *

Some of Plaintiffs' evidence—on both parallel conduct and plus factors—is quite strong.  Other evidence does little to persuade the Court that it would be reasonable to infer a conspiracy, especially in the face of Defendants' legitimate business justifications

for such conduct.  But at summary judgment in an antitrust case, the Court's job is not to separate wheat from chaff on every single plus factor and allegation of parallel conduct in isolation.  The Court must instead evaluate the evidence in its totality and determine once and for all whether the evidence tends to exclude the possibility of independent action.

After spending several months wading through the voluminous record and reviewing holistically the evidence of parallel conduct and plus factors, the Court finds that there is sufficient evidence for a reasonable jury to find that Defendants formed an agreement to fix prices in per se violation of the Sherman Act.  The Court is satisfied that the number of plus factors in combination with the evidence of parallel conduct tends to exclude the possibility of independent action.  Though the Court recognizes the high standard of proof that applies at summary judgment in antitrust cases and that a "tie" would go to the movants, in the Court's view the evidence regarding Agri Stats's role in the alleged conspiracy in particular tips the scale in favor of Plaintiffs.  The fact that competitors willingly decided to share competitively sensitive business information with a third-party, who in turn distributed that information—albeit in a different, anonymized format but that could be used to decipher competitors' business plans—is highly suspicious.  As even Defendants realize, such information-sharing among competitors is uncommon and very risky given the likely possibility that competitors with access to such information could steal business and market share.  Only if all the participants were

committed to the goals of the cartel could such a scheme be successful. And the Court is loath to preclude a jury from considering whether Defendants, who are sophisticated entities no doubt capable of masking a price-fixing conspiracy behind a so-called legitimate benchmarking program, actually entered an agreement in violation of the antitrust laws.

For all the foregoing reasons, the Court finds that there are genuine issues of material fact regarding whether Defendants formed an agreement to fix prices that a jury should decide because the evidence tends to exclude the possibility of independent action. Defendants' Motion for Summary Judgment on Plaintiffs' per se claims is thus denied.

### C.    Membership in Conspiracy

The Court must next determine whether there is sufficient evidence connecting each of the Defendants to the alleged conspiracy. The eight Defendants filed individual motions for summary judgment in which they argue that, even if the evidence would support a conspiracy, none of them ever joined it.

As a threshold matter, the Parties dispute the appropriate standard that is required to connect a defendant to a conspiracy at summary judgment. Plaintiffs argue that "[o]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it." *In re Bulk Popcorn Antitrust Litig.*, 783 F. Supp. 1194, 1197 (D. Minn. 1991) (denying summary judgment after finding plaintiffs presented more than slight evidence that defendant may have been a player in conspiracy to fix popcorn prices). Defendants

disagree, arguing that the "slight evidence" rule has since been rejected by the Eighth Circuit.

The Eighth Circuit has rejected the "slight evidence" rule for minor conspiracy roles in the criminal context, holding that "[a]lthough we have in the past sometimes said that 'slight evidence' is all that is necessary to connect an individual to a conspiracy, we hold that while a defendant's role in a conspiracy may be minor, the government must offer enough evidence to prove a defendant's connection to a conspiracy beyond a reasonable doubt before a conspiracy conviction can be upheld."  *United States v. Lopez*, 443 F.3d 1026, 1028 (8th Cir. 2006) (en banc); *see also United States v. Cannon*, 475 F.3d 1013, 1020 (8th Cir. 2007) (citing *Lopez*).  *But see United States v. Bailey*, 54 F.4th 1037, 1039–40 (8th Cir. 2022) ("Once the government establishes the existence of a drug conspiracy, only slight evidence linking the defendant to the conspiracy is required to prove the defendant's involvement and support the conviction.").

While some courts have rejected the "slight evidence" rule in the civil context as well, others have not.  *Compare In re Citric Acid Litig.*, 996 F. Supp. 951, 955 (N.D. Cal. 1998) , *aff'd* 191 F.3d 1090 (9th Cir. 1999) ("The 'slight evidence' rule . . . is a rule of criminal appellate procedure not properly applied to a motion for summary judgment."), *and In re Lithium Ion Batteries Antitrust Litig.*, No. 13-2420, 2014 WL 309192, at *13 n.13 (N.D. Cal. Jan. 21, 2014) ("[T]he proffered 'slight connection' or 'slight evidence' rule has been disapproved as a standard for determining whether a defendant has joined a conspiracy

in the first instance, and indeed as a standard applicable in district courts at all."), *with In re Polyurethane Foam Antitrust Litig.*, 86 F. Supp. 3d 769, 786 (N.D. Ohio 2015) (applying "slight evidence" rule on summary judgment motion).

While a court in this District did apply the "slight evidence" rule to a motion for summary judgment in a civil antitrust case, that decision is not binding on the Court. *See In re Bulk Popcorn*, 783 F. Supp. at 1197. Moreover, that decision was issued years prior to the Eighth Circuit's rejection of the "slight evidence" rule in the criminal context. Given the higher burden of proof at the summary judgment stage in antitrust cases, the Court declines to apply the "slight evidence" rule to the present motions. Instead, there must be more than "slight evidence": evidence for a reasonable jury to find by a preponderance of the evidence that each of the individual Defendants agreed to the alleged supply-reduction agreement. *See Broilers II*, 702 F. Supp. 3d at 661 (applying such a standard).

After reviewing the record, the Court concludes there is sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence that the following Defendants knowingly entered an agreement to artificially constrict the supply of pork and fix prices in violation of the antitrust laws: Agri Stats, Clemens, JBS, Seaboard, Smithfield, Triumph, and Tyson. The Court cannot say the same for Hormel, however. The following analysis does not discuss every piece of evidence offered by the Parties in support of their positions; rather, the Court addresses only the evidence sufficient to decide the pending motions.

### 1.    Agri Stats

Agri Stats is unique among Defendants in that, as a benchmarking company, there is no evidence that Agri Stats engaged in the types of parallel conduct associated with the Processor Defendants, such as hog reductions, production restraint, increased exports, or price targeting.    Instead, Plaintiffs allege that the primary way in which Agri Stats participated in the alleged conspiracy was as the facilitator of an information exchange through which the Processor Defendants coordinated their sales and production in unreasonable restraint of trade.

The main issue is whether participants of Agri Stats reports could have used the reports to facilitate a supply-reduction agreement.    If not, then Agri Stats contends there was virtually no way in which it could have facilitated any conspiracy.

Agri Stats claims that its reports could not have been used in such a way because the reports do not contain any competitor price or output information.[31]    However, the

---

[31] Agri Stats invokes stare decisis and issue preclusion, arguing that the Classes are barred from relitigating whether Agri Stats reports contain pricing and production information that could be used to facilitate an agreement because the *Broilers* decision decided that question in the negative.    But *Broilers* is not binding on this Court.    *Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC*, 588 F.3d 963, 967 (8th Cir. 2009).    And issue preclusion does not apply. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."    *Doe Run Res. Corp. v. St. Paul Fire & Marine Ins. Co.*, 48 F.4th 574, 579 (8th Cir. 2022) (quoting *Turner v. U.S. Dep't of Just.*, 815 F.3d 1108, 1111 (8th Cir. 2016)).    However, issue preclusion does not apply where there are new or distinct issues in the second proceeding that were not decided in the first.    *See id.* at 579–80.    This case presents, among others, the distinct issues of Agri Stats adding the export sales report during the Relevant Period and evidence that Agri Stats advised

Court has already determined that Agri Stats reports contain sufficient pricing and production data that participants could use to target higher prices and to infer competitors' production information.  The data provided in the reports was confidential, not accessible to the public, more trustworthy than interfirm sources, and clearly valuable, otherwise the participants would have used free, publicly available USDA data or the like instead.  Furthermore, according to Plaintiffs' experts, the evidence shows that Processor Defendants used Agri Stats reports to identify opportunities where they could raise prices to meet the industry average, and that prices were higher and output was restrained by reasons that cannot be explained absent a conspiracy.  The Court is thus satisfied that enough competitively sensitive information could be gleaned from the reports by the Processor Defendants to aim for collective focal points, e.g., higher prices and restrained output.  *Contra Broilers II*, 702 F. Supp. 3d at 675–76.

The next issue is whether Agri Stats knowingly joined the conspiracy by providing a means through which the Processor Defendants could coordinate their concerted action.  After all, Agri Stats anonymized the data to try to preserve confidentiality, and the fact that Agri Stats provided benchmarking services to the U.S. pork industry is not inherently unlawful under the antitrust laws.  *See id.* 676–78 (finding that just because

---

subscribers to increase prices.  Further, the *Broilers* court emphasized that it "can only decide the case on the facts before it," indicating that the court defined its findings "narrowly in terms of the evidence or arguments actually considered by the court."  *Broilers II*, 702 F. Supp. 3d at 675; *Doe Run Res. Corp*, 48 F.4th at 580.  Thus, Plaintiffs are not barred from litigating whether Agri Stats reports contain pricing and production information.

defendants traded information through Agri Stats did not mean Agri Stats joined the conspiracy). Indeed, benchmarking reports and services can be pro-competitive.

Nevertheless, alternative evidence tends to exclude the possibility that Agri Stats acted independently. A reasonable jury could find that Agri Stats knowingly played a central role in the alleged conspiracy. The company modified its pork reports at the start of the Relevant Period to provide a new weekly and monthly sales report, which was seen as a "dramatic improvement" to the way in which Agri Stats had previously evaluated sales. (Sealed Pls.' Ex. 108; *see also* Sealed Pls.' Ex. 43 at 76:19–25.) Agri Stats also advertised its ability to help processors "MAXIMIZE PROFIT" by expanding focus from production measurements to "measurements of cost and/or financial performance." (Pls.' Ex. 1939 at 2, 4.) Merely focusing on production measurements, in Agri Stats's view, could "create a level of 'paradigm blindness,'" but this could be counteracted by also focusing on "measurements of cost and/or financial performance," which Agri Stats's reports did. (*Id.* at 4.) Indeed, Agri Stats stated that "the ultimate goal is increasing profitability—not simply increasing level of production," and that "you cannot produce your way to the top of the page." (*Id.*) However, as the Plaintiffs point out, in a competitive market one would traditionally expect competitors to try to produce their way to the top of the market by whittling prices down to attract customers, not by increasing prices. *See A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401 (7th Cir. 1989) ("Rivalry is harsh, and consumers gain the most when firms slash costs

to the bone and pare price down to cost, all in pursuit of more business."); *see also In re Flat Glass*, 385 F.3d at 360 ("In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs.").  Such evidence indicates that Agri Stats was encouraging participants of its programs to maximize profit by paying more attention to cost and sales as opposed to production measurements—primarily by comparing costs and sales to competitors' performances.  (Pls.' Ex. 1939 at 4.)

In addition, Agri Stats described its "paradigm" as requiring "each step," including that participants provide accurate information to "help increase profitability of all participants," in order "to be effective" and "to survive."  (Sealed Pls.' Ex. 1902 at 34.) What's more, Agri Stats's sales reports ranked the highest-price firm as the "best" and the lower-priced firms "poorest."  (*See* Sealed Pls.' Ex. 1905 at 8 (explaining Agri Stats's rating system); Sealed Pls.' Ex. 1903 at 7–8 (Agri Stats sales report for Tyson depicting how much money Tyson could make by raising its own price for a particular product to the top 25th percentile price).)  The Plaintiffs argue that sharing their information would only make sense if competitors understood that the price increases would not be undercut by competition, thus indicating that the goal was not to encourage procompetitive pricing among competitors but rather to facilitate price fixing above competitive levels.  Notably, the reports do not appear to show recipients how they could capitalize on their lower

prices to lure customers away from competitors selling the same or similar product for a higher price, which is what one would expect procompetitive benchmarking to do.

There is also evidence suggesting that Agri Stats was the ideal intermediary for facilitating the conspiracy given certain characteristics. In particular, Agri Stats presented itself as a more credible source than direct, interfirm communications among competitors. (*E.g.*, Sealed Pls.' Ex. 1902 at 21 (advertising Agri Stats's reliability).) Instead of blindly trusting avid competitors to provide timely, accurate information on pricing and production, participants could rest easy knowing that Agri Stats, a third-party, was more motivated to churn out timely, accurate information to its participants than any competitor would be. Not to mention, using a third-party to facilitate such an information exchange would avoid any blatant violations of the antitrust laws through direct, interfirm communications. Moreover, Agri Stats grouped the data received by participants to facilitate "apples-to-apples" comparisons between products which made it easier for participants to find opportunities to safely raise prices and lower output without fear of losing business. (*See* Sealed Pls.' Ex. 34 at 188:9–189:3 (testifying about "apples-to-apples" comparisons); Sealed Pls.' Ex. 35 at 126:20–127:9 (same).) The introduction of the Index of Operating Efficiency and export sales report—per Smithfield's request—mid-way through the Relevant Period provided other useful competitor information. (Sealed Pls.' Ex. 1049.) And it goes without saying that Agri Stats's business model involved the

identification of "opportunities," including primarily opportunities to raise prices, for the Processor Defendants.  (*See* Sealed Pls.' Ex. 48 at 9.)

In addition, Agri Stats appears to have aggressively worked to win the business of major pork processors, because its paradigm could only "survive" if the major players worked together.  (Sealed Pls.' Ex. 1902; *see also* Sealed Pls.' Ex. 1936 at 3("I will let you know that [Hormel] will be published in the April reports.  It took a long time for a number of reasons to get them on the report, but they are setup and committed."); Sealed Pls.' Ex. 27 at 108:11–25, 111:11–113:2, 113:2–117:15, 145:14–146:6 (testifying about how Agri Stats offered discounts, sometimes up to 40 to 60%, to win participants' business); Sealed Pls.' Ex. 43 at 104:7–21 (same).)

What's more, in the face of evidence that participants were attempting to deanonymize the reports, Agri Stats did nothing.  Agri Stats has provided its own explanations for this behavior, but the Court finds that a reasonable jury could find that Agri Stats knowingly entered a supply-reduction agreement based on the above evidence.

Agri Stats's last Hail Mary is that it had no incentive to enter a supply-reduction agreement with the Processor Defendants because it had nothing to gain from such a conspiracy.  As a benchmarking company, Agri Stats would not directly benefit from decreased supply and increased price of pork.  The Court recognizes that Agri Stats's motivation to participate in a supply-reduction agreement would likely differ from that of pork processors.  Nonetheless, co-conspirators need not share the same motive.

*Petruzzi's*, 998 F.2d at 1243.  Agri Stats knew the value it presented to participants as a trustworthy, third-party facilitator of an information exchange.  (*E.g.*, Sealed Pls.' Ex. 60 at 19.)  And it certainly stood to profit from the success of the conspiracy; the more competitively sensitive business information that Agri Stats could share with conspiring participants, the more likely participants would remain subscribers.

In the Court's view, all this evidence together is sufficient for a reasonable jury to find by a preponderance of the evidence that Agri Stats knowingly joined the conspiracy. The Court will therefore deny Agri Stats's Motion for Summary Judgment.

### 2.    Clemens

Clemens is a family-owned company that sells pork products across the U.S.  (Decl. of Daniel Laytin, Sealed CLMNS Ex. 6 ¶ 22, June 7, 2024, Docket No. 2329.)[32]  Clemens's operations include "the entire production chain," from farming hogs to processing and selling fresh and value-added pork products.  (*Id.*; CLMNS Ex. 10 at 27:11–18.)

The primary issue concerning Clemens's participation is the company's extensive growth during the Relevant Period, which contradicts the allegations that Clemens agreed to a supply-reduction conspiracy.  During the Relevant Period, Clemens doubled its size, processing capacity and output, and market share.  Much of this growth is attributable to the opening of a new, multimillion dollar slaughter plant in Coldwater, Michigan, in 2017.

---

[32] The Court references all Clemens exhibits, which are introduced at Docket No. 2329, as "CLMNS Ex. X," with X representing the number of the exhibit.

(CLMNS Ex. 7 at 294:6–17; CLMNS Ex. 14 at 359:19–23; CLMNS Ex. 11 at 295:2–10.) Given that the company only raises approximately one-third of its hog supply itself, Clemens needed to purchase more hogs from independent hog producers to meet the Coldwater plant's supply needs. (CLMNS Ex. 14 at 388:10–20; *see also* CLMNS Ex. 5 at 321:16–24 (lining up hog producer contracts for Coldwater plant in 2011).) In 2009, for example, Clemens purchased 1.5 million hogs from independent hog producers; by 2018, however, Clemens purchased 3.7 million. (Sealed CLMNS Ex. 18 ("Babcock") at 41–42.) It is undisputed that the Coldwater plant significantly expanded Clemens's pork production. In 2009, Clemens processed approximately 2.2 million hogs; in 2018, Clemens processed more than 5 million. (*Id.*, Fig. 7.) By 2018, Clemens had doubled its market share to from 2.6% to 4.9%, at the main expense of competitors Hormel and Tyson. (Mangum ¶ 102; Williams ¶ 93 & T.2; Sealed Pls.' Ex. 15 ("Zona") ¶ 30, Ex. 9; Sealed CLMNS Ex. 25 ("[T]he new plant in Coldwater MI WILL put significant pressure on [Tyson's] ability to keep Logansport IN plant supplied - it will cause economic harm."); Sealed CLMNS Ex. 28 (Smithfield listing Coldwater plant as risk in 2017).)

Clemens argues it would make little sense for a company that spent years and millions of dollars planning and building a new processing plant to agree to a supply-reduction conspiracy. The fact that Clemens experienced so much growth during the Relevant Period certainly cuts against Plaintiffs' argument that Clemens knowingly joined the alleged conspiracy. However, much of Clemens's growth is attributable to the

Coldwater plant, which did not open until 2017, very late in the Relevant Period. *In re High Fructose Corn Syrup*, 295 F.3d at 657 (a conspirator's addition to capacity at end of conspiracy period does not disprove existence of conspiracy). And there is additional evidence suggesting that despite its growth, Clemens nevertheless restricted its pork output by reducing hog supply, restraining production, and increasing exports in tandem with its co-Defendants. Such evidence tends to show that Clemens was not acting independently.

Starting with hog production, in 2011 Clemens decreased its sow herd by 900 sows. (Babcock, Figs. 13 & 16.) Though this decrease only constituted approximately 1.9% of Clemens's then-existent herd, Dr. Singer found that Clemens suppressed the procurement of hogs by about 14.7% during the Relevant Period. (Singer T.31.) Plus, internal documentation shows that Clemens planned to implement "[r]eduction in wean pig throughput by 3%," "[r]eduction of sow inventory" at certain farms, "[i]ncrease in sow cull rate," and "decrease in overtime" at certain farms. (Sealed Pls.' Ex. 830.) That said, Clemens was the only Defendant to grow its sow supply in 2009, when the conspiracy allegedly began. (Lamb ¶ 174.) And Clemens has produced alternative opinion evidence that its hog production increased at a higher rate than other hog producers during the Relevant Period. (Babcock, Figs. 15, 16.)

Nevertheless, the Court is satisfied that alternative evidence regarding Clemens's pork production and exports tends to exclude the possibility that Clemens was acting

independently.  Dr. Lamb found that between 2010 and 2017, Clemens held its production levels constant and maintained its production at or below 3% of pork produced by Defendants.  (Lamb ¶ 86, T.7.)  In other words, for the first six years of the alleged conspiracy, Clemens was producing less pork than in the benchmark period before, after adjusting for population growth.  (Lamb Reply ¶ 286 & Fig. 23.)  In addition, there is evidence that Clemens significantly increased exports during the Relevant Period with the understanding that doing so would shorten domestic supply and profit U.S. pork producers.  Before 2017, Clemens only exported around 5% of its pork production. (Sealed CLMNS Ex. 1 ¶ 201.)  After opening its Coldwater plant, Clemens intended to increase its exports to 10%.  (*Id.*)  In addition, in 2018 a board member stated that Clemens was "working on some higher value export opportunities in Japan/Korea [that would] help take some of the pressure off of domestic sales with the volumes increasing so fast as well as provide some nice margins."  (Sealed Pls.' Ex. 68.)

Clemens of course provides its own explanations for its production and export behaviors.  It argues that its production decreased at times during the Relevant Period because independent hog producers sold fewer hogs to Clemens due to external market forces, including higher feed costs.  (Babcock at 42–43; CLMNS Ex. 17; CLMNS Ex. 14 at 333:18–334:2; *see also* CLMNS Ex. 14 at 401:4–403:20 (explaining the graphs in CLMNS Ex. 17).)  And Clemens attributes its increase in exports to its capitalization on export opportunities in China given the 2018 outbreak of African Swine Flu.  (*See* CLMNS Ex. 10

at 44:21–45:15; CLMNS Ex. 48 ("The 2018 spread of African swine fever . . . to China had reverberations in the global pork market . . . caus[ing] an estimated loss of 27.9 metric tons of China's pork output from late 2018 to early 2021.").)  But Plaintiffs' experts accounted for external market factors when configuring their regression analyses and still determined that pork production levels during the Relevant Period could not be explained absent a conspiracy.  Whether and how much to weigh this evidence is for a jury, not the Court, to decide.  *In re Wholesale Grocery Prods.*, 752 F.3d at 735.

Furthermore, additional evidence shows that Clemens generally supported the conspiracy's objectives.  In particular, Clemens attended meetings in 2008 with other processors wherein the discussion focused on the "trouble in the industry" regarding the surplus of hogs and Smithfield's plans to immediately reduce its sow herd.  (Sealed Pls.' Ex. 71; *see also* Sealed Pls.' Ex. 67; Sealed Pls.' Ex. 846.)  Notably, at a 2009 21st Century Pork Club meeting, Phil Clemens announced, "We continue to produce too much pork for the amount that is being consumed.  In the last few weeks we have started to see reduction in the sow herd – but still not even close to what really has to happen." (Sealed Pls.' Ex. 77 at 8.)  He also emphasized that processors had to "work together wherever and whenever possible.  As an industry we must be willing to speak with one voice in a very compelling manner." (*Id.* at 25.)  Later that year, Phil Clemens circulated a memorandum which noted Tyson's announcement that it would reduce its sows, and

reminded that "Remember, we believe the sow herds need to come down by about 600,000 to bring hogs back to real profitability." (Sealed Pls.' Ex. 845.)

In addition, there is ample evidence suggesting that Clemens routinely communicated with co-Defendants regarding competitively sensitive business information, including kill cutbacks, future pricing, and plant downtime with competitors. (*E.g.*, Sealed Pls.' Ex. 853 (Clemens email about Smithfield cutting back kills labeled "For your eyes only"); Sealed Pls.' Ex. 854 at 5 (Clemens email sharing future Smithfield pricing); Sealed Pls.' Ex. 841 (Clemens email regarding Smithfield plant downtime).) And, when it came to participation in industry trade association meetings, Clemens appears to have been eager to learn competitors' secrets in private, backdoor conversations. In fact, Clemens's Dan Groff joked with a colleague who would attend a Pork Leadership Institute to "[b]ring back lots of good ideas and trade secrets from other companies!" (Sealed Pls.' Ex. 855.) Groff noted that "[a]s always, most of the interesting stuff comes out in the hallways and at dinner rather than the actual meetings." (Sealed Pls.' Ex. 863.) Defendants undoubtedly have legitimate business relationships necessitating some sharing of competitively sensitive information. But the significant detail in the confidential information that was shared does not square with much of Plaintiffs' economic evidence, which suggests that conspiratorial activity was afoot.

Finally, the Court finds that Clemens's active participation in Agri Stats supports a reasonable inference that Clemens agreed to a supply-reduction conspiracy. Clemens

subscribed to Agri Stats reports during the entire Relevant Period.  (*E.g.*, Singer at 201 App. 3 T.1.)  The company initially joined Agri Stats on the hog production side of its business after "vett[ing] it very, very closely to make sure that the confidentiality and the anonymity of . . . production facilities was up their standards."  (CLMNS Ex. 5 at 270:5–271:23.)  Yet several years later, Clemens subscribed to Agri Stats on the pork processing side of its business.  (*Id.* at 271:15–16.)  Clemens claims it relied on publicly available USDA data as well Agri Stats's benchmarking services to inform its business decisions.  (*See* CLMNS Ex. 14 at 436:11–20 ("[W]e relied on [the USDA information] constantly minute to minute day-to-day"); CLMNS Ex. 5 at 270:19–271:23.)   But there is nonetheless substantial evidence that Clemens used Agri Stats data to identify pricing opportunities and to raise prices.  (*See, e.g.*, Sealed Pls.' Ex. 823 (spreadsheet depicting sales and pricing data from Agri Stats and internal comments); Sealed Pls.' Ex. 844 at 217:7-14 (testifying that Clemens "absolutely" "considered" Agri Stats data in making pricing decisions); Sealed Pls.' Ex. 821 at 10 (noting improvements based on information from Agri Stats); Sealed Pls.' Ex. 858 (using Agri Stats data to target higher prices).)  And, notably, Dr. Singer calculated that Clemens overcharged pork products by about 15.6 percent.  (Singer Reply ¶ 246.)

The Court finds there is sufficient evidence for a reasonable jury to find by a preponderance of the evidence that Clemens knowingly joined the conspiracy.  The Court will therefore deny Clemens's Motion for Summary Judgment.

### 3.    Hormel[33]

Hormel is a Minnesota-based Fortune 500 company that manufactures and sells branded food and meat products around the world.  *See* Hormel, Our History, https://www.hormelfoods.com/about/our-history [https://perma.cc/Q42R-XQ2D] (last visited Mar. 10, 2025).[34]  Hormel started as a meat packing company with hog production units but has evolved into a branded value-added food company over the years.  (Decl. of Emily E. Chow, Sealed HRL Ex. 3 at 82:21–83:8, June 7, 2024, Docket No. 2286; Sealed HRL Ex. 4 at 9 (explaining that in FY 2017 the value-added products accounted for approximately 82% of Hormel's sales).)[35]

Until 2016, Hormel operated three harvesting plants.  (Sealed Decl. of Jose Rojas ("Rojas Decl.") ¶ 2a, June 7, 2024, Docket No. 2281.)  Hormel divested most of its hog production farms and two of its three harvest plants during the Relevant Period.[36]  Before that divestment, Hormel harvested approximately 9 million hogs annually, accounting for

---

[33] Because Hormel has settled with all of the Class Plaintiffs, the only claims remaining against Hormel belong to certain DAPs.

[34] For any internet sites referenced in this Memorandum Opinion and Order, the Court accepts no responsibility for, and does not endorse, any product, organization, or content at any captured site, or at any site to which that site might be linked.

[35] The Court references all Hormel exhibits, which are introduced at Docket No. 2286, as "HRL Ex. X," with X representing the number of the exhibit.

[36] *See* Press Release, Hormel Announces the Sale of Farmer John (Nov. 21, 2016), *available at* https://www.hormelfoods.com/newsroom/press-releases/hormel-foods-corporation-announces-the-sale-of-farmer-john-saags-specialty-meats-and-three-farm-operations [https://perma.cc/3SLD-CPJP]; Press Release, Hormel and Wholestone Farms Announce the Sale of Fremont (Aug. 16, 2018), *available at* https://www.hormelfoods.com/newsroom/press-releases/hormel-foods-corporation-and-wholestone-farms-announce-the-sale-of-fremont-neb-processing-facility-to-wholestone-farms-llc [https://perma.cc/P6R3-2H8H].

8.33% of the industry's daily harvest.  (Sealed HRL Ex. 8 at 15.)  After the divestments,

Hormel harvested approximately 7.7 million hogs annually, accounting for about 6.7% of

the industry's daily harvest.  (Sealed HRL Ex. 9 at 3–4; Sealed HRL Ex. 10 at 30:18–21.)

One of Hormel's primary arguments is that it had no rational, economic motive to

participate in the alleged conspiracy, as the company sourced between 95 to 99.5% of the

hogs it harvested from independent hog farmers during the Relevant Period and

benefited from higher domestic pork supply because its business strategy focused on

further-processing and marketing of value-added products.  (Sealed HRL Ex. 14; Sealed

HRL Ex. 16 at 5; Sealed HRL Ex. 18 at 342:18–343:13, 343:20–344:14.)  However, the DAPs

contend that Hormel mimicked vertical integration as a "vertical coordinator" through

the manipulation of hog contracts, which gave Hormel virtually total control over the hog

production process of independent producers.  (Sealed Pls.' Ex. 1456 at 13 (document

describing Hormel's procurement contracts as "vertically coordinated"); Sealed HRL Ex.

11 at 16 (describing Farmer John's operations as "vertically integrated").)  And the Court

is unconvinced that Hormel would have been unmotivated to participate in a supply-

reduction conspiracy that, if successful, could make up for losses on the hog production

side of the industry.   Nonetheless, the Court recognizes Hormel's slightly different

business model from its co-Defendants.

Similar to its co-Defendants, the evidence suggests that Hormel participated in

some, if not all, of the alleged levers that the Defendants pulled in furtherance of the

conspiracy, though Hormel's conduct is not as suggestive or suspicious as that of the other

Defendants.  In 2008, for example, Hormel liquidated 9,000 sows, representing over 14%

of its sow herd, but that liquidation occurred before the Relevant Period.  (Williams ¶ 222;

*see also* Sealed HRL Ex. 55 (announcing Hormel's liquidation); Sealed Pls.' Ex. 194

(depicting change in Hormel's number of sows between 2007 and 2008).)   Additional

evidence indicates that Hormel's pork production levels remained relatively constant

during the Relevant Period.  (Sealed HRL Ex. 15.)  In fact, Plaintiffs' expert, Dr. Zona, found

that Hormel held its processing capacity virtually constant between 2009 and 2015, and

then decreased its overall processing capacity by selling its third harvesting facility to

Smithfield in 2016.  (Sealed Pls.' Ex. 15 ("Zona") ¶ 62.)  Hormel insists that any immaterial

and intermittent changes in its conduct were caused by circumstances outside of its

control.

       As for exports, Hormel claims its exports amounted to less than 5% of its pork

production each year, and that exports actually decreased during the early years of the

Relevant Period, before marginally varying year-to-year.  (Sealed Decl. of Feng Walkup ¶¶

3, 6, Ex. A, June 7, 2024, Docket No. 2280.)[37]  However, the DAPs contend that Hormel

---

[37] The DAPs challenge the reliability of the exhibits that Walkup reviews in her declaration because Walkup admitted during her deposition that she did not prepare those exhibits, did not know who prepared them, and had never seen the document her declaration cites as the source for the exhibits.  (*See* Sealed Pls.' Ex. 1464 at 73:6–20, 75:10–76:21, 77:3–78:3, 87:21–88:13, 104:5–19, 105:8–25.)   Hormel explains that it produced the data from databases that are reliability maintained.  (*See id.* at 73:18–74:7, 87:6–16, 91:4–9, 97:21–98:2.)  The Court reserves the final admissibility of this evidence for trial.

increased exports by more than 10 million pounds between 2010 and 2011, and that its export numbers remained above 2010 levels for the remainder of the Relevant Period. (*See id.*)  Furthermore, the DAPs presented evidence that Hormel exported at a loss, and that the company lauded other Processor Defendants' efforts to increase exports.  (*E.g.*, Sealed Pls.' Ex. 1442; Sealed Pls.' Ex. 1405.)

Also similar to co-Defendants, there are communications wherein Hormel exchanged confidential information with competitors.  (*See, e.g.*, Sealed Pls.' Ex. 1415 ("Call with David Delany: Smithfield is killing hogs just because they need the belly's, very short on"); Sealed Pls.' Ex. 144 (Smithfield reporting that "[Hormel] [has] decided to run 6k hd this Saturday.  This will ease the Sat kill up close to 130k."); Sealed Pls.' Ex. 1417 ("Smithfield has cut all Saturday harvest for the next month."); Sealed Pls.' Ex. 82 ("Looks like JBS is reducing their harvest numbers the next couple weeks.").)  Some of the communications reflect a desire to "Keep this confidential as we shouldn't have this document."  (Sealed Pls.' Ex. 1419; *see also* Pls.' Ex. 83 at 4 ("Use this to your benefit! This shows major harvest changes at Tyson! Please keep very close to your chest! Highly confidential!").)  There are also communications suggesting that Hormel was publicly signaling its commitment to industry-wide output restrictions, as reflected by various statements made during earnings calls about planned production cuts.  (*See, e.g.*, Pls.' Ex. 90 at 10–11; Sealed Pls.' Ex. 1409 at 6.)  Furthermore, the DAPs present evidence that Hormel participated in the so-called "pig mafia rumor mill," wherein processors allegedly

spread sensitive information.  (*See, e.g.*, Sealed Pls.' Ex. 1422 at Ex. 14; Sealed Pls.' Ex.

1424.)  Hormel defends its communications and public statements as commonplace

business communications or reactions to market conditions.

The primary difference between Hormel and its alleged co-conspirators, in the

Court's view, is the fact that the company was reluctant—and in some ways, refused—to

participate in Agri Stats reports.  Hormel subscribed to Agri Stats's Live Production Report

from at least 2010 onwards.  (Lamb T.3.)  Yet Hormel was clearly concerned about sharing

its data with competitors through Agri Stats reports.  (*See, e.g.*, Sealed Pls.' Ex. 1423 at

207:20–23 ("Q. Did you have any concern that if Hormel participated in the Agri Stats

sales reports, that its data will be exposed to Hormel's competitors? A. Yeah. We had --

yes.").)  Other Processors urged Agri Stats to get Hormel on board with the other reports.

(*See, e.g.*, Sealed Pls.' Ex. 171 ("Did you get Hormel to join Agristats yet??").)  In 2015,

Hormel joined the Processing Report, but the company never subscribed to the sales

report.  (Sealed Pls.' Ex. 1430 (reporting that Hormel joined processing report).)  When

asked, Hormel explained that "we chose not to participate in that sales report" because

> Our sales team felt that they were already getting a premium
> and that it would -- it would serve no purpose for them to
> participate in -- in that report because they didn't believe that
> they could do better and they didn't want to share with
> anybody what we were doing and how we were doing it.

(Sealed Pls.' Ex. 1412 at 237:24–238:8.)  Nevertheless, Agri Stats gave Hormel a free trial

subscription to the sales report from August through November in 2017.  (Sealed Pls.' Ex.

1434 at 2; Sealed Pls.' Ex. 1435.)  Hormel considered some pricing opportunities using the Agri Stats sales report data.  (*E.g.*, Sealed Pls.' Ex. 1438.)

Everything considered, the Court finds that the evidence could support a finding either way: that Hormel knowingly joined the conspiracy, or alternatively did not.  To survive summary judgment, however, there must be evidence to tip the scale slightly in the DAPs' favor in suggesting that it was more likely that Hormel knowingly joined the alleged conspiracy.  Hormel's apprehension about and refusal to subscribe to the Agri Stats's sales reports, the most suspicious and suggestive element in this case, undermines an inference that Hormel knowingly joined the conspiracy.  The Court is unsatisfied that the evidence tends to exclude the possibility that Hormel acted independently.  Therefore, the Court will grant Hormel's Motion for Summary Judgment.

As noted below, only the Consumer IPPs have brought a claim under the rule of reason, and Consumer IPPs have already settled their claims against Hormel.  The remaining claims under the PSA and various state law claims largely depend on a finding of a conspiracy to price-fix, and the Court has found that Plaintiffs have not put forth enough evidence to link Hormel to that conspiracy.  Accordingly, the Court will fully dismiss Hormel as a Defendant in this litigation.

4.    JBS[38]

JBS is the second-largest pork producer in the world. *See* JBS Foods Group, Our

Business, https://jbsfoodsgroup.com/our-business [https://perma.cc/9ECZ-BRKV] (last

visited Mar. 10, 2025). Prior to its acquisition of Cargill's pork processing business in 2015,

JBS slaughtered approximately 12 million hogs annually, and raised up to 3.3% of those

hogs itself. (Decl. of Jessica J. Nelson, Sealed JBS Ex. 5 at 32:22–33:16, June 7, 2024,

Docket No. 2341.)[39] Since the acquisition, JBS harvests 20 to 25 million hogs annually,

and raises about 14% of those hogs itself. (*Id.* at 35:7–22.) JBS sources the remainder of

the hogs it harvests from independent hog farmers. (*Id.* at 34:18–35:5; Sealed JBS Ex. 62

(depicting that hog purchases accounted for 70.7–77.5% of JBS's annual pork production

costs).)

Similar to other co-Defendants, JBS argues that it had no rational economic motive

to conspire because it purchases most of the hogs it slaughters from independent hog

farmers. (*E.g.*, Sealed JBS Ex. 18 (email chain depicting how JBS was shorted 20,000 hogs

in 2017); Sealed JBS Ex. 12 at 268:11–20 (testifying about same shortage).) Nonetheless,

other evidence indicates that JBS understood that more hog liquidation would mean

stronger price margins on the pork processing side. (Pls.' Ex. 900 at 19 (discussing impact

---

[38] Because JBS has settled with all of the Class Plaintiffs, the only claims remaining against
JBS belong to certain DAPs.
[39] The Court references all JBS exhibits, which are introduced at Docket No. 2341, as "JBS
Ex. X," with X representing the number of the exhibit.

of liquidation on processing margins); Pls.' Ex. 901 at 18–19; Sealed Pls.' Ex. 902 at 82 (same); Sealed Pls.' Ex. 903 at 46 ("Able to increase price to offset supply restriction[.]"); Sealed Pls.' Ex. 904 ("Pork industry is unique, a small change in supply will have big changes in prices.").) Even more evidence indicates that JBS recognized the benefits of restricting production to cause an artificial supply shortage, as evidenced by communications between JBS and co-Defendants regarding plans to "cut" kills "way back" to keep the market "a little short and hungry for hams." (Sealed Pls.' Ex. 103; Sealed Pls.' Ex. 106.) Indeed, a JBS officer acknowledged that "its amazing what a little less kill does to the prices." (Sealed Pls.' Ex. 105.) Furthermore, JBS stated that increased exports "created a shortage of supplies and cleaned out pipelines of pork," "which in turn . . . kept prices at lofty levels" in the domestic market. (Sealed Pls.' Ex. 907.) The Court is thus unconvinced that JBS was unmotivated to join a supply-reduction conspiracy.

JBS relies heavily on its push for increased oversight to downplay its participation, but JBS's calls for investigation into the industry are of questionable relevance. To be sure, JBS asked government agencies to investigate Triumph and possibly others who JBS feared were manipulating the hog market under the USDA's new mandatory price reporting regime. (*See, e.g.*, Sealed JBS Ex. 4 at 120:17–121:1 (testifying about JBS's invitation of government regulatory scrutiny); Sealed JBS Ex. 9 ("We cannot allow this market to be manipulated the way it is."); Sealed JBS Ex. 10 ("We are becoming increasingly convinced that this CME Lean Hog futures contract is being manipulated from

the cash side of the market.").)  JBS also warned its customers directly about such concerns.  (Sealed JBS Ex. 1 ("[W]e need to get the word out to these retailers about what Triumph is doing to them by holding this phony top on this hog market.  It is ultimately translating into higher prices for the retailer."); Sealed JBS Ex. 13 (Costco call talking points included warnings about hog market manipulation).)  JBS raises a good point that if it was participating in the alleged conspiracy, inviting such regulatory scrutiny would have been against its self-interest.  But JBS's calls for scrutiny may have only been in relation to the hog futures market, which DAPs contend "has nothing to do with the alleged conspiracy and is, at best, tangentially related to the pork market in general."  (Sealed JBS Ex. 9; Sealed JBS Ex. 10; Tr. of Mots. Hr'g – P.M. Session at 247:2–10, Dec. 17, 2024, Docket No. 2795.)  Perhaps at trial the Parties will be able to shed better light on this evidence, but for now the Court declines to find that JBS had no logical motive to conspire on this ground.

Evidence that JBS was motivated to join a supply-reduction agreement alone is insufficient, there must also be sufficient evidence that JBS in fact agreed to join.  Between 2012 and 2013, JBS decreased its sow herd by 6,600 sows, which represented approximately 34% of the company's total sows from which it produces market hogs.  (Sealed Pls.' Ex. 94.)  This decrease, though separated in time by co-Defendants' liquidations in 2009, is noteworthy given its substantial size.  Plus, JBS terminated a contract with a hog producer who had supplied the company with hogs around this time.

(*Id.*)  JBS explains that its decision to sell its sow operation in 2012 was motivated by profitability concerns given the worsening market conditions of high feed prices and the PEDv outbreak.  (*E.g.*, Sealed JBS Ex. 26 (estimating cost of conversion of group sow gestation housing at JBS sow farms); Sealed JBS Ex. 27 (reporting that 2013 was "a very difficult year" for JBS's hog production unit "with record high corn and soybean meal prices" and "an increase in health challenges")).  And, despite selling its sow operation, JBS claims it did its best "to keep the plants full" by contracting with third-party hog producers.  (Sealed JBS Ex. 27.)

Nonetheless, additional evidence raises doubts about JBS's proclamations of purely legal conduct.  On the production side, for example, even though JBS increased its pork production between 2008 and 2009, opinion evidence indicates that the increase was at a slower rate than before.  (Lamb T.10A; Sealed JBS Ex. 24 at 9.)  What's more, Dr. Zona determined that JBS had over 10% excess processing capacity and that its market share remained relatively steady during the Relevant Period until it acquired Cargill's pork business in 2015.  (Zona Reply Exs. 2, 9; Sealed Pls.' Ex. 45.)

JBS insists that it acted independently.  Instead of, for example, explicitly restraining production in 2009 as would be consistent with Plaintiffs' theory of the conspiracy, JBS exceeded its planned slaughter amount that year.  (Sealed JBS Ex. 23 (depicting targeted and actual slaughter numbers); Sealed JBS Ex. 16 at 230:10–15 (explaining data depicted in JBS Ex. 23).)  Moreover, the company doubled the amount of

pork it slaughtered between 2008 and 2018.  (Sealed JBS Ex. 23 (depicting slaughter numbers between 2008 and 2018).)  Much of that growth can be attributed to the fact that the company spent $1.45 billion in 2015 to acquire two pork processing plants from Cargill.  (Sealed JBS Ex. 35; Sealed JBS Ex. 37 at 49:18–53:3.)  Notably, Smithfield and Tyson viewed the acquisition as a competitive threat.  (Sealed JBS Ex. 38 ("JBS will be in position to supply more Depots if the Cargill acquisition goes through which could threaten our business[.]"); Sealed JBS Ex. 39 (Tyson being "concerned from a competitive standpoint" about the acquisition and that "JBS will make them better, no doubt.").)  However, as the DAPs contend, JBS's acquisition of Cargill's pork business did not in fact change market-wide processing capacity, but rather increased the processing capacity within JBS's control, which does not necessarily demonstrate competitive conduct.

JBS also increased its exports during the Relevant Period, from 14% in 2009 to nearly 20% in 2017, an increase of approximately 620 million pounds.  (Sealed Pls.' Ex. 951.)  JBS contends that it increased exports to meet growing global demand, pointing to evidence demonstrating that China grew as an export market during Relevant Period because its "wealth was advancing" and "people moving [out of] poverty . . . improved consumption of protein."  (Sealed JBS Ex. 12 at 264:14–265:9.)  Still, there is evidence contradicting JBS's argument that it increased exports to sell less desirable products to international markets, because the export market is "normally . . . in the loins," which are desirable in the domestic market.  (Sealed Pls.' Ex. 957 at 2.)

In addition, various documents reflect communications wherein JBS shared confidential information regarding production plans and pricing with co-Defendants. (*See, e.g.*, Sealed Pls.' Ex. 909 (Seaboard); Sealed Pls.' Ex. 910 (Hormel); Sealed Pls.' Ex. 911 (Hormel); Sealed Pls.' Ex. 97 (Seaboard); Sealed Pls.' Ex. 912 (Tyson); Sealed Pls.' Ex. 106 (Seaboard); Sealed Pls.' Ex. 914 (Smithfield).)  The most suspicious communications are those between brothers Brad Lorenger of JBS and Doug Lorenger of alleged co-conspirator Indiana Packers,[40] who shared extensive communications regarding kill levels and pricing which they then passed on to their supervisors.  For example, in 2010 Doug asked Brad, "Are you killing on Saturday ?" to which Brad confirmed, "Yes—we are estimating Sat industry kill at 240-245."  (Sealed Pls.' Ex. 918.)  In 2011, Doug asked Brad "Have you heard that they have sold boxed frozen in the 130s fob through Feb ? I heard both Tyson @ Seaboard[.]"  (Sealed Pls.' Ex. 919.)  And in 2012, Doug asked Brad, "Are you all reducing any numbers next week, I am hearing we are[.]"  (Sealed Pls.' Ex. 920.)  To which Brad replied, "Yes.  The product needs to go higher."  (*Id.*)  The fact that brothers working at competing companies were sharing such information in such a nonchalant manner definitely raises red flags regarding JBS's participation in the conspiracy.  Moreover, JBS was a member of the 21st Century Pork Club, which had meetings during which Plaintiffs claim co-Defendants encouraged industry-wide hog reductions.  (*See*

---

[40] The Court dismissed Indiana Packers at the pleading stage.  *In re Pork*, 495 F. Supp. 3d at 802–03.

Sealed Pls.' Ex. 922.)  JBS insists that none of the direct communications identified by Plaintiffs demonstrate an agreement or correspond to an alleged supply reduction. Rather, JBS claims they merely reflect market rumors, legitimate buy-sell discussions, or idle chatter between JBS employees and their family/friends in the industry.  Yet there is sufficient alternative evidence from which a reasonable jury could find otherwise.

Finally, ample evidence indicates that JBS actively used Agri Stats to seek opportunities to raise prices.  JBS clearly recognized the unique value that Agri Stats reports offer to the industry, with an officer remarking that "I'm still amazed at how quick this industry is to share information with the competition . . . I'll bet you a hundred bucks that Coca-Cola, GM, Sony and the like don't share pricing and production cost information like this industry does."  (Sealed Pls.' Ex. 93.)  Moreover, evidence shows JBS used Agri Stats to "bring JBS more in line with the competition," which included raising prices. (Sealed Pls.' Ex. 925; *see also* Sealed Pls.' Ex. 927 (Part 1) at 2 (identifying opportunities to raise prices based on Agri Stats report); Sealed Pls.' Ex. 92 ("Marty is seeing several SKU's show up weekly that are LOW relative to the industry.  He and I expect each of you will identify those weekly offenders and get a plan in place with Sales to improve results[.]"); Sealed Pls.' Ex. 933 ("Agristats would tell us to go after an additional 3-5 cents to bring us more towards industry avg.").)  JBS also attempted to deanonymize Agri Stats reports, sometimes relying on employees who had previously worked for competitors to help deanonymize the data.  (Sealed Pls.' Ex. 927 ("[W]e know this is Sara Lee."); Sealed Pls.'

Ex. 946 (trying to calculate Tyson's production costs based on data); Sealed Pls.' Ex. 947

(trying to "crack" Agri Stats report); Sealed Pls.' Ex. 950 (indicating that JBS reviews Agri

Stats data "with the people we know who have insider information").)

JBS maintains that it used Agri Stats reports to better compete and to identify

opportunities to improve its business. (*See, e.g.*, Sealed JBS Ex. 42 (using Agri Stats to

broadcast "larger goal of beating our competition"); Sealed JBS Ex. 44 (listing

"improvements to beat Tyson"); Sealed JBS Ex. 11 at 191:5–12, 202:7–14; Sealed JBS Ex.

12 at 226:7–227:3; Sealed JBS Ex. 45 (identifying operating efficiency and cost

opportunities).) JBS also insists that any deanonymization guesses were never confirmed

by anyone, were only shared with a select few employees at JBS, and were never used to

make business decisions. (Sealed JBS Ex. 11 at 242:17–243:21, 243:22–24; Sealed JBS Ex.

12 at 239:3–15.) In fact, when worried about competitors' deanonymization efforts, JBS

says it raised such concerns to Agri Stats and received reassurances that it would not

happen. (*See, e.g.*, Sealed JBS Ex. 48.) JBS also took measures to avoid JBS's Agri Stats

reports being passed on to competitors through employees changing firms. (*E.g.*, Sealed

JBS Ex. 49 (expressing concerns about "books floating around Wichita anymore"); Sealed

JBS Ex. 50 at 131:4–22 (explaining that employees at Wichita facility were leaving JBS).)

In a last push to clear its name, JBS points to evidence indicating that it fiercely

competed with its competitors during the Relevant Period. For example, the company

tied salary bonuses to beating competitors like Tyson and Smithfield. (Sealed JBS Ex. 37

at 69:7–16, 78:15–79:15.)  The company celebrated wins when it "beat" competitors, including co-Defendants.  (*E.g.*, Sealed JBS Ex. 55 (beating Tyson).)  And JBS stole a significant source of business away from Smithfield when Costco awarded JBS 100% of its U.S. fresh pork business in 2016.  (Sealed JBS Ex. 59 at 17; Sealed JBS Ex. 60.)

Nonetheless, there is sufficient alternative evidence from which a reasonable jury could conclude by a preponderance of the evidence that JBS joined the conspiracy with its competitors to reduce supply and increase the price of pork.  The evidence tends to exclude the possibility that JBS acted independently, with the evidence of communications between the Lorenger brothers and JBS's use of Agri Stats being especially suspicious.  Accordingly, the Court will deny JBS's Motion for Summary Judgment.

### 5.    Seaboard

Seaboard "effectively control[s] pork production across the entire lifecycle of the hog," as it operates hog production and harvesting units.  (Decl. of Peter J. Schwingler, SBF Ex. 2 at 270:6–19, June 7, 2024, Docket No. 2303.)[41]  The company owns a pork processing plant in Guymon, Oklahoma, for which it produces approximately 75% of the hogs it harvests itself.  (SBF Ex. 1 at 339:1–7; SBF Ex. 2 at 271:21–272:5.)  Seaboard supplies the rest of its hogs from independent hog producers.  (Stiroh ¶ 61, Fig. 8.)

---

[41] The Court references all Seaboard exhibits, which are introduced at Docket No. 2303, as "SBF Ex. X," with X representing the number of the exhibit.

The Court first recognizes that Seaboard has a relatively unique operations model compared to its co-Defendants. In addition to selling pork products from its own plant, Seaboard also sells pork products from two other plants: (1) a plant in St. Joseph, Missouri operated by Triumph, and (2) a plant in Sioux City, Iowa that is co-owned by Seaboard and Triumph. (SBF Ex. 2 at 57:10–22, 427:17–22, 430:13–431:12.) Seaboard markets and sells pork products processed at Triumph's St. Joseph plant pursuant to a marketing agreement the co-Defendants entered in 2004. (SBF Ex. 8 at 26 (terms regarding marketing and sale rights of St. Joseph plant), 30–31 (terms regarding plant's construction and operation).) The St. Joseph plant opened in 2006 and has been expanded multiple times. (SBF Ex. 1 at 341:21–342:3; SBF Ex. 9 at 276:8–22 (discussing Triumph's expansions).) In addition, Seaboard sells pork processed at the Sioux City plant it co-owns with Triumph. In 2015, Seaboard and Triumph entered a joint 50-50 venture, called Seaboard Triumph Foods, to open a new multimillion-dollar processing plant in Sioux City, Iowa. (SBF Ex. 11 at 30:13–19; SBF Ex. 12 at 309:14–310:21.) The Sioux City plant opened in September 2017 and added a second shift in October 2018. (SBF Ex. 2 at 397:7–16; SBF Ex. 5 ¶ 42.) Seaboard produces approximately one-third of the Sioux City plant's hog supply, which it made possible through hog facility expansions. (SBF Ex. 2 at 272:7–15, 454:2–457:10.)

Plaintiffs' primary argument is that Seaboard stunted its growth during the Relevant Period and spearheaded the alleged conspiracy's efforts to increase exports to

decrease domestic supply.  Plaintiffs insist that Seaboard's sow herd levels and pork production remained largely constant during the Relevant Period, even though Seaboard was capable of much more.  (Lamb ¶ 175 & Fig. 21, T.10B, T.11.)  Moreover, Dr. Zona determined that Seaboard's capacity utilization was 89.7%, the third lowest among Defendants, and that Seaboard's market share effectively flatlined.  (Zona Reply Ex. 2; Zona ¶ 55, Ex. 6.)

Seaboard provides alternative explanations for its conduct.  For example, Seaboard blames the PEDv outbreak for the only year where Seaboard contends it did not meet its targeted hog production numbers.  (SBF Ex. 6 ¶¶ 57–59 & Fig. 6, T.2.)  The company also blames any stunted pork production on external factors outside of its control, such as labor constraints, the need to repair equipment, and the number of animals available for slaughter.  (*See* SBF Ex. 1 at 365:7–16; SBF Ex. 11 at 177:19–179:9; SBF Ex. 6 ¶¶ 60–68; SBF Ex. 4 ¶ 26.)  In addition, Seaboard points to efforts to expand production during the Relevant Period, like the company's expansions of the Guymon plant's capacity.  (SBF Ex. 3 ¶ 7; SBF Ex. 4 ¶¶ 32–37; SBF Ex. 6 ¶ 53, Fig. 4; SBF Ex. 7 at 4.)  Seaboard insists that its investments in the Sioux City plant and involvement with Triumph's St. Joseph plant contradicts Plaintiffs' theory that Seaboard agreed to a supply-reduction conspiracy.

Nonetheless, any growth that Seaboard did experience, according to Plaintiffs, was due to its efforts to expand its presence in international markets, not the domestic one.  (Lamb ¶ 196, T.10A.)  There is no doubt that Seaboard's exports surged during the

Relevant Period.  Between 2008 and 2015, Seaboard increased its exports from 425 million pounds to 780.8 million pounds—an 84% increase.  (*Id.* ¶ 196.)  Yet, Seaboard was sometimes exporting at a loss, as some evidence shows that Seaboard's export prices for certain products were consistently lower than what Seaboard would have been able to obtain domestically.  (Lamb Reply ¶ 329.)  Moreover, Seaboard regularly stated its intent to increase exports to get products off the domestic market.  In particular, the company was "actively pushing product into the export markets and digging out every opportunity in order to put some support to the domestic side."  (Sealed Pls.' Ex. 121 at 2; *see also* Sealed Pls.' Ex. 122 ("[W]e have been very aggressive in the export markets to get as many loins, hams and butts off the domestic market to prevent product from getting any softer."); Sealed Pls.' Ex. 123 ("[W]e continue to chase all the export opportunities we can find to keep excess product off the US market."); Sealed Pls.' Ex. 1613 ("[A]ny move another pork company can make to secure the ability to export more pork will be beneficial to Seaboard. The more pork that moves out of the U.S., the better the domestic prices will be.").)  In addition, Seaboard communicated its export sales information with other Defendants, including Smithfield.  (*See, e.g.*, Sealed Pls.' Ex. 1611 at 327:8–329:8 (testifying that Seaboard would discuss initial price offering to Japanese customers for chilled pork with Smithfield).)

Seaboard explains that its goals to increase export sales date back long before the start of the alleged conspiracy and were motivated by profit anyhow.  (SBF Ex. 1 at

343:17–344:14; *see also* SBF Ex. 16 (1998 article regarding Seaboard's export business); SBF Ex. 4 ¶¶ 12–13 (explaining that Seaboard's export sales generally involved "products with little demand in the United States" or "high-quality products that commanded a premium in certain overseas markets, notably Japan").)  Indeed, Seaboard contends its export sales were made to sell parts of the hog that are less desirable in the U.S., diversify customer base, or book an optimal mix of forward and spot sales.  (*E.g.*, SBF Ex. 1 at 348:2–19 (testifying about exporting offal products to China); SBF Ex. 12 at 308:1–11, 308:20–24 ("[B]y being able to sell into the export markets, we get a better margin than what we would get in the domestic markets"); SBF Ex. 5 ¶ 18–21 (explaining export strategy); SBF Ex. 1 at 346:22–349:16 (testifying about profitability of export sales to markets of higher demand); SBF Ex. 4 ¶¶ 12–16; SBF Ex. 6 ¶¶ 82–85 (opining why export sales can be beneficial to processors).)  Seaboard also clarifies that export sales were not always necessarily higher than domestic prices for the same product, but that in general export sales aimed to maximize returns based on information at the time of the sale.

Nonetheless, there are ample documents and communications that on the whole suggest that Seaboard was involved in the conspiracy.  For starters, a series of documents and communications suggests that Seaboard agreed with the conspiracy's plan to reduce hog supply as part of its primary objectives.  For example, in 2008 Rodney Brenneman of Seaboard attended an American Meat Institute meeting with Larry Pope of Smithfield, where Pope announced that Smithfield "will begin reducing their herd immediately."

(Sealed Pls.' Ex. 71.)  Later that month, Brenneman discussed the incoming "sea change" to the U.S. pork industry with other Seaboard officers, anticipating "some pretty decent sow liquidation starting to occur" and understanding that "this year will be a tough one until we get the liquidation that we need."  (Sealed Pls.' Ex. 1600.)  Further, a Clemens document concerning "hog strategy" indicates that "[Phil Clemens] will talk to Rod Brenneman (Seaboard) to see if he will share information with us about their strategies." (Sealed Pls.' Ex. 1601.)

In May 2009, Brenneman told Pope of Smithfield that he "wanted to talk to [Pope] about that other program we discussed last week and see if you are still planning to participate??"  (Sealed Pls.' Ex. 1602.)  About a month later, Brenneman emailed Steve Weiss, a third-party consultant, saying, "I saw the announcement of the sow liquidation program last week.  Congratulations.  Did Smithfield decide to come along? Any details that you feel okay sharing with me? (size, etc.)"  (Sealed Pls.' Ex. 1603 at 2–3.)  That same day, Darwin "Duke" Sand of Seaboard reported internally that "[Smithfield] has called and tried to convince us and other big producers to cut back."  (Sealed Pls.' Ex. 112 at 2.)  Days later, Weiss emailed Brenneman with another announcement that Smithfield was liquidating more sows.  (Sealed Pls.' Ex. 1604.)  And at a September 2009 luncheon, Brenneman encouraged the industry to implement a 10% liquidation in order to "right-size the industry" as evidenced by companies, like Smithfield and Tyson, cutting swine herds by 5% or more.  (Sealed Pls.' Ex. 1605.)

There are also ample communications between Seaboard and co-Defendants that support an inference that Seaboard knowingly joined the alleged conspiracy. For example, in July 2009 Seaboard questioned Tyson, "With regards to the sow reduction at Tyson are you selling the sows to someone else who will continue to produce with those sows or are the sows being liquidated?" (Sealed Pls.' Ex. 113 at 2.) To which Tyson replied, "The sows are being liquidated and the sow units are being taken out of production." (*Id.*) Seaboard forwarded that email internally, stating, "Just checked with Tyson. The 20,000 sow reduction they have announced will result in 20,000 sows being liquidated." (*Id.*) In addition, Duke Sand of Seaboard and Eldon Weber of Smithfield/Farmland apparently communicated quite extensively about export sales, in one instance even "agree[ing] prices should be higher so we thought [Smithfield] should push hard for their 10 cent increase." (Sealed Pls.' Ex. 114; *see also* Sealed Pls.' Ex. 1611 at 327:8–329:8, 330:11–25.) There are also additional communications suggesting that Seaboard discussed pricing and processing information with competitors. (*See, e.g.*, Sealed Pls.' Ex. 117 (Smithfield); Sealed Pls.' Ex. 118 (Smithfield); Sealed Pls.' Ex. 96 (JBS); Sealed Pls.' Ex. 1608 at 6 (circulating future pork processing supply reductions being taken by Tyson, JBS, Indiana Packers, and Triumph and noting "we will get help with the shortening of hog numbers the next few weeks").) In addition to written communications, Smithfield and Tyson placed the second greatest number of calls to Seaboard. (Zona Reply ¶ 135, Ex. 19.)

Additional evidence suggests that Seaboard was committed to the conspiracy throughout the Relevant Period.  For example, in 2016 a Tyson employee summarized a New Fashion Pork Meeting between a member of Triumph's Board of Managers, Brad Freking, and a senior Tyson executive, Todd Neff.  The notes stated that "Seaboard and the Triumph partners have each committed to 1M hogs for the first shift.  They will buy another 1M hogs from outside sources.  The partners have a gentlemen agreement to start the first shift without adding new sows to the industry." (Sealed Pls.' Ex. 301.)[42]  This evidence of a "gentlemen's agreement" to restrict sow supply certainly casts doubt on Seaboard's claim that it acted independently during the Relevant Period.  That same year, a sales team officer instructed his team to "keep establishing more and better industry informational channels to help us make better decisions and to anticipate market moves.  If you think this sounds like a mission statement, you are right.  LIVE IT." (Sealed Pls.' Ex. 1606.)

Furthermore, Seaboard used Agri Stats reports on a "regular basis" to identify products priced lower than competitors.  (Sealed Pls.' Ex. 1624; Sealed Pls.' Ex. 1625; Sealed Pls.' Ex. 1626.)  As the Court has already explained for other co-Defendants, the use of Agri Stats reports—given the content contained within them—certainly raises suspicion that an agreement was afoot, and that Seaboard had joined.

---

[42] Defendants challenge the admissibility of this exhibit as inadmissible multiple hearsay.  The exhibit is the same as Sealed Pls.' Ex. 180, but without the cover email attaching the New Fashion Pork Meeting summary.  *See supra* note 30.

Seaboard contends that all of these communications and its use of Agri Stats were legitimately motivated by business relationships and were consistent with Seaboard's unilateral self-interest. However, there is sufficient alternative evidence from which a reasonable jury could conclude otherwise.

The evidence tends to exclude the possibility that Seaboard acted independently during the Relevant Period. A reasonable jury could find by a preponderance of the evidence that Seaboard knowingly entered a supply-reduction agreement. Therefore, the Court will deny Seaboard's Motion for Summary Judgment.

### 6. Smithfield[43]

Smithfield started as a pork processing business and is now a leading producer of hogs and pork in the world. (Decl. of Joshua Lipton, SF Ex. 18 at 3, 6–7, June 7, 2024, Docket No. 2356.)[44] In fact, Smithfield is the largest hog producer in the U.S., with a market share between 12 to 15%. (*Id.* at 44:16–22 ("There are sixty thousand hog producers in the U.S. . . . Smithfield is the largest in this magnitude."); *see also* SF Ex. 6 at 95:6–10 (testifying about Smithfield's market share).) Smithfield also holds just over a quarter of the market share on the pork processing side of the industry. (SF Ex. 33 at 9 (depicting Smithfield's share).) Smithfield's U.S. business includes hog production

---

[43] Because Smithfield has settled with all of the Class Plaintiffs, the only claims remaining against Smithfield belong to certain DAPs.

[44] The Court references all Smithfield exhibits, which are introduced at Docket No. 2412, as "SF Ex. X," with X representing the number of the exhibit.

operations, pork processing operations, and packaged meet operations, meaning that Smithfield is vertically integrated.  (SF Ex. 3 at 303:21–304:7, 26:6–16.)

At the outset, it is important to recognize Smithfield's size and business model. Smithfield's hog production division is comprised of thousands of company-owned, contract, and leased farms that collectively produced approximately 18 to 20 million hogs every year of the Relevant Period.  (SF Ex. 22 at 2; SF Ex. 58 at 4 ("Over 2,800 company and contract farms.").)  Most of Smithfield's hogs are processed at its own pork processing division; the remaining 15 to 20% are sold to other pork processors, including Clemens, Hormel, Seaboard, and Triumph.  (SF Ex. 17 at 21; SF Ex. 6 at 51:17–53:21.)  Smithfield's pork processing division is comprised of nine packing plants, which collectively processed 27 to 32 million hogs every year during the Relevant Period.  (SF Ex. 18 at 6 (nine plants); SF Ex. 19 (depicting Smithfield as having eleven plants, two of which were closed in 2005 and 2010); SF Ex. 20 (depicting Smithfield slaughtered between 26.6 to 32.9 million hogs during the Relevant Period); SF Ex. 5 at 219:24–220:5 (testifying that Smithfield roughly slaughters 32 million hogs in the U.S. each year).)  Smithfield supplies about half of the hogs for its pork processing operations with its own hog supply and purchases the remaining half from independent hog producers and other Defendants, like Tyson.  (SF Ex. 20 (depicting percentage of non-company-owned slaughtered hogs during the Relevant Period); SF Ex. 5 at 220:7–221:2 (explaining Smithfield purchases about half of

its hogs from independent hog suppliers); SF Ex. 6 at 54:15–20 (same), 53:22–54:2 (explaining Smithfield purchased hogs from Tyson).)

After Smithfield's pork production process, a "substantial portion" of the fresh pork is transferred to Smithfield's packaged meat operations, while the rest is sold to domestic customers, including Clemens, Hormel, JBS, Seaboard, and Tyson, as well as international customers.  (SF Ex. 18 at 6, 9; Seaboard Ex. 25 at 2–3 (depicting Defendants who purchased fresh and processed pork products from Smithfield between 2009 and 2020); SF Ex. 26 at 2–3 (same).)  Approximately 25% of Smithfield's pork is exported.  (SF Ex. 18 at 7 ("In 2014, export sales comprised approximately 23% of the Fresh Pork segment's volumes."); SF Ex. 33 at 37 (showing exports accounted for 26% of Smithfield's fresh pork volumes in 2013).)

Smithfield's packaged meat division is comprised of approximately 33 processing plants, which further process fresh pork into packaged meat products like smoked and boiled hams, bacon, sausage, hot dogs, deli and luncheon meats, and more.  (SF Ex. 18 at 7.)  The packaged meat segment processes pork from Smithfield's own processing plants as well as other pork processors like Clemens, Hormel, JBS, Seaboard, and Tyson.  (*Id.* at 9; SF Ex. 24 (depicting primal purchases by Defendants during Relevant Period).)

Smithfield asks the Court to grant its Motion for Summary Judgment in full or, alternatively, in part with respect to any time period after 2010.  In its view, the DAPs have failed to demonstrate Smithfield's membership in any conspiracy after 2010, if at

all.  However, given that a substantial portion of the evidence suggesting that a price-fixing agreement was afoot relates to Smithfield, the Court will deny Smithfield's requests.

Primarily, there is significant evidence suggesting that Smithfield kickstarted the conspiracy by leading the Defendants in sow liquidations.  At the beginning of the Relevant Period, Smithfield liquidated 130,000 sows, which represented approximately 13% of its sow herd.  (Sealed Pls.' Ex. 354 at 3.)  In addition to Smithfield's own liquidations, there is also evidence suggesting that the company was publicly signaling and urging other producers in the industry to similarly follow suit in order to help the industry back to profit.  For example, in December 2008, Bo Manly of Smithfield explained that Smithfield "took a leadership role in herd reduction in the US last winter," and that "[f]rankly, we are disappointed that more of our competitors in live production in the US have not been equally as aggressive."  (Sealed Pls.' Ex. 1010 at 8.)  When other producers did not immediately follow suit with such calls for more aggressive hog reductions, in early 2009 Smithfield apparently threatened to "run Morr and Farm wide open until the rest of the industry significantly reduces their kills" and were "barking about killing full next Saturday and very interested in what the industry plans to do."  (Sealed Pls.' Ex.

185.)[45]  In March, Larry Pope of Smithfield continued to emphasize to the industry that "we need more supply contraction" and to express disappointment that "it does not seem that the producers out there have heard this message or at least adhering to it at all." (Sealed Pls.' Ex. 1012 at 14.)

Then, in Summer 2009, Pope noted that Smithfield was "doing [its] part in this industry to right-size the business from a production standpoint" and that it would "try to lead this industry . . . back to profitability."  (Pls.' Ex. 1013 at 4, 10.)  And documents indicate that the company continued to be "bothered by the fact that the rest of the industry has not cut back" but that it was "encouraged" that there was a "commitment to cutback" at that year's Pork Expo.  (Sealed Pls.' Ex. 1006 at 3.)  By September of that year, Pope announced that "Smithfield cannot solve this problem alone" and that he "had conversations with several . . . very large producers, and I would tell you they are doing some liquidation. . . . I think this industry has got to solve it collectively.  I do believe everyone is now looking."  (Sealed Pls.' Ex. 153 at 14.)

_____

[45] Defendants challenge this exhibit on hearsay grounds.  The exhibit is an email wherein Dow McVean, a third-party industry analyst for McVean Trading, shares that Smithfield may be planning to increase production until the rest of the industry significantly cuts back their kills. Plaintiffs argue the exhibit is admissible as a present sense impression and as evidence offered for a purpose other than the truth of the matter asserted, i.e., showing the state of Tyson's mind and the effect of Smithfield's threat on Tyson.  Plaintiffs have not offered a thorough explanation for how the exhibit constitutes a present sense impression, but the exhibit could conceivably be presented in an admissible form at trial as evidence offered not for its truth but for a non-hearsay purpose: to show that Tyson was monitoring competitors' activities.  Thus, the Court will reserve final admissibility of this exhibit for trial.

As mentioned, public statements can support an inference of a conspiracy.  *See, e.g.*, *In re Domestic Airline Travel*, 691 F. Supp. 3d at 215.  Smithfield contends that it only disclosed its sow liquidation plans publicly because it was required to disclose material developments that may impact its business as a publicly traded company.  *See, e.g.*, 17 C.F.R. § 229.303(a)(3)(ii) (2018).  Plus, the USDA and other institutions and publications have reported on hog producers' sow herds, including actual and anticipated changes thereto, for decades.  (*See, e.g.*, SF Ex. 77 (1994 Pork Powerhouses publication reporting on sow herd numbers and changes)).  That may be so.  But the Court nevertheless finds there is enough counter evidence that Smithfield went beyond what was necessary for lawful, mandatory reporting.  Indeed, the company not only "made public statements about their own commitment to capacity discipline" but also publicly emphasized the need for other producers to also cut back, which "involves more than a mere announcement of [Smithfield's] own planned course of conduct."  *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 62–63 (D.D.C. 2016); *see also In re Travel Agency Comm'n*, 898 F. Supp. at 691 (denying summary judgment where plaintiffs presented sufficient evidence that airline defendant effectively announced it would take the lead in cutting airline travel agent commissions and that other airlines should do the same to profit them all).  Indeed, Smithfield combined its announcement of its own anticipated course of conduct with pleadings for other producers to follow suit for the good of the industry as a whole.  *See Kleen Prods.*, 276 F. Supp. 3d at 840.  Plus, soon after Smithfield's

public announcements and pleas for liquidations, at least two other Defendants—Tyson and Triumph—followed suit. (Sealed Pls.' Ex. 160 (Tyson's announcement); Zona Reply ¶ 72 (Triumph's cuts).) Further, other Defendants heard or repeated Smithfield's message. (Pls.' Ex. 1029 at 3 (Seaboard CEO repeating the "need to right-size the industry" with a "10-percent liquidation"); Sealed Pls.' Ex. 1030 at 8 (Clemens reporting that "[w]e continue to produce too much pork for the amount that is being consumed" but that "we have started to see a reduction in the sow herd – but still not even close to what really has to happen"); Pls.' Ex. 1031 at 19 (JBS explaining that "we are seeing some more liquidation" and anticipating that "we will continue to see the margin in the processing side strong this whole year").)

Smithfield argues that its sow liquidations were motivated by independent business reasons—primarily to avoid bankruptcy. Specifically, the company claims it was necessary to eliminate the least productive sows and high-cost facilities to become more efficient given the unprecedented financial crisis facing the pork industry during that time, which cost Smithfield billions of dollars. (*See, e.g.*, SF Ex. 3 at 337:5–338:9; 341:2–342:15; SF Ex. 43 at 2; SF Ex. 1 at 26:20–27:7; SF Ex. 6 at 115:2–116:8.) In fact, Smithfield lost approximately $50 to $65 per hog between 2008 and 2010. (SF Ex. 3 at 316:13–317:24, 337:5–20, 341:2–3; *see also* SF Exs. 41, 42, 43 (depicting losses in the millions of dollars between November 2007 and May 2010).) Smithfield thereafter increased its sow herd annually, with a recorded decrease between 2013 and 2014, when Smithfield lost

approximately 2 million hogs from PEDv.  (SF Ex. 3 at 344:19–345:21 (testifying that Smithfield expanded by 60,000 sows); SF Ex. 23 (graph depicting Smithfield's sow inventory during Relevant Period); SF Ex. 22 at 2; SF Ex. 6 at 114:8–21.)   Despite Smithfield's increasing sow herd, Dr. Zona calculated that Smithfield's sow herd never recovered to 2008 levels during the Relevant Period.  (Zona Reply ¶ 72.)  And an increasing sow herd does not explain the public and private pleas for competitors to join its efforts to "right-size" the industry.  A reasonable jury could thus conclude that Smithfield led the alleged conspiracy in parallel hog reductions.

In addition, there is evidence indicating that Smithfield constricted its pork output in ways that could not be explained absent a conspiracy.  Smithfield's processing of pork mostly increased every year during the Relevant Period, though the company's market share remained relatively constant.  (*See, e.g.*, SF Ex. 19 (depicting annual slaughter weights); SF Ex. 27 at 3 (showing annual sales volume by meat type); Stiroh Ex. 3 (depicting total pounds slaughtered by Smithfield), ¶ 36 & Exs. 4–6 (showing slaughter capacity shares among Defendants).)  And Dr. Zona calculated that Smithfield's average capacity utilization was more than 17% below its total capacity, and that its market share "did not fluctuate significantly."  (Zona Reply Exs. 2, 9, 11; Zona Exs. 6, 16.)  The DAPs insist that Smithfield's size enabled it to meaningfully manipulate domestic hog and pork production.  What's more, there is evidence of various communications between Smithfield and its competitors suggesting that Smithfield coordinated its activity.  For

example, in March 2016 Smithfield's Steve Davis reported that "JBS just told they are cutting production at their Worthington, MN plant next week." (Sealed Pls.' Ex. 1000 at 2.) In November 2017, Smithfield's Kirk Zittlau emailed, "This is what Seaboard told me.--- Kirk, they are cutting in the neighborhood of 5500 per day- Actually, this week they should be killing 6k per day!!" (Sealed Pls.' Ex. 1001; *see also* Sealed Pls.' Ex. 142 (Smithfield email chain discussing competitors' slaughter plans and suggesting that Smithfield was communicating with those competitors about such plans)[46].) Smithfield provides its own explanations for its pork output levels and related communications with competitors, but there is enough here for a jury to consider what the right story is.

As for exports, Smithfield's exports increased from less than 1 billion pounds to approximately 1.7 billion pounds during the Relevant, a percentage from about 14 to 24%. (Lamb T.10A; Sealed Pls.' Ex. 1022 (demonstrating Smithfield's export activity); Sealed Pls.' Ex. 1023 (same).) Moreover, there is supplemental evidence suggesting that

---

[46] Defendants challenge this exhibit on relevance and hearsay grounds. The exhibit is an email chain between Smithfield representatives wherein they discuss competitors' anticipated harvest schedules on a particular Saturday. Defendants argue that whether a processor was harvesting on a given Saturday is irrelevant to any claim or defense. However, Plaintiffs allege that Defendants were coordinating a restraint on their production levels in furtherance of the alleged conspiracy, so evidence suggesting that Defendants were tracking and/or communicating competitors' harvest schedules is relevant. Fed. R. Evid. 401. Regarding the hearsay objection, the exhibit could be presented in an admissible form at trial as opposing party statements against defendants other than Smithfield. Fed. R. Evid. 801(d)(2). In addition, the exhibit could be admissible as co-conspirator statements against the other defendants if the preponderance of the evidence establishes the existence of a conspiracy and that the defendants were connected to it at trial. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987). The Court will thus reserve final admissibility of this exhibit for trial.

Smithfield recognized that exporting more would reduce domestic supply, that the company sometimes exported at a loss to achieve higher meat value in the domestic market, and that Smithfield communicated the value of exports to help the domestic market with competitors.   (*See, e.g.,* Sealed Pls.' Ex. 1041 at 34 (listing "synergy opportunities for Smithfield," including to "[r]educe domestic supply to improve and stabilize profitability"); Sealed Pls.' Ex. 143 ("Very simple: More exports translate to higher meat value."); Sealed Pls.' Ex. 1024 ("[W]e need pork cut out to improve.  Exports, Exports!!").)  Smithfield argues its exports had been increasing before the Relevant Period and that the company had independent business justifications for that increase, like increasing sales and optimizing total carcass utilization. (*See* SF Ex. 3 at 76:2–77:11 (testifying about Smithfield's long-term goal to increase exports); SF Ex. 57 (comparing Smithfield's domestic and export history between 2005 and 2017); SF Ex. 10 at 31:10– 40:12, 147:18–148:7; SF Ex. 3 at 77:12–78:13 (testifying Smithfield exported large amounts of offal, which is not as high in demand in the United States).)  However, in light of all the other evidence of parallel conduct and plus factors in the record, a reasonable jury could find otherwise.

Finally, Smithfield's involvement in Agri Stats raises suspicion regarding whether the defendant agreed to a supply-reduction conspiracy.  Smithfield subscribed to Agri Stats's processing and sales reports throughout the Relevant Period.  (*See, e.g.*, SF Ex. 4 at 92:13–93:2, 130:22–131:15.)  And there is evidence showing that Smithfield used Agri

Stats reports to increase prices. (*See, e.g.*, Sealed Pls.' Ex. 23 at 104:15–20; Sealed Pls.' Ex. 1048 (identifying opportunities for price based on Agri Stats Sales Report).) Indeed, Smithfield's takeaway from Agri Stats's reports was to "[j]ust raise your price." (Sealed Pls.' Ex. 145.) What's more, Smithfield took the lead in bringing the need for an export report to Agri Stats's attention and thus played a critical role in Agri Stats's adding the Export Report to its pork program. (Sealed Pls.' Ex. 1049.) Smithfield argues it used Agri Stats to improve its efficiency, not to collude, and that at any rate it gathered most of its market information from the USDA. (*See, e.g.*, SF Ex. 5 at 229:14–230:9 ("The market data that I use on a daily basis is USDA market data.").)

Yet, there is sufficient alternative evidence from which a reasonable jury could conclude by a preponderance of the evidence that Smithfield joined the conspiracy with its competitors to reduce supply and increase the price of pork. The evidence tends to exclude the possibility that Smithfield acted independently, with Smithfield's public signaling for industry-wide liquidations being very suspicious, especially when coupled with an understanding of Smithfield's sheer size and ability to manipulate the hog and pork production side of the market. Accordingly, the Court will deny Smithfield's Motion for Summary Judgment.

### 7.    Triumph

Triumph is a pork processing company located in St. Joseph, Missouri.  (Decl. of Christopher A. Smith, TRI Ex. 1 at 221:9–12, June 7, 2024, Docket No. 2295.)[47]  Triumph maintains that it only occupies the middle supply-chain space between hog production and sales—pork processing—though this fact is fiercely disputed by the Plaintiffs.

Notably, Triumph has some structural characteristics that differentiate it from its co-Defendants.  Triumph was created in early 2003 by five independently owned hog producers, including some of the "most recognized and successful hog producers in the nation."  (Sealed Pls.' Ex. 1311 at 11; *see also* Sealed Pls.' Ex. 1310 at 33 ("Triumph is owned by five pork producers with Christensen being the largest investor.")[48].)  In the aggregate, Triumph's five LLC members represent the second-largest hog producer in the U.S.  (Sealed Pls.' Ex. 1311 at 11.)  In 2009, the LLC members reduced their sow herds by 6%, from a total of 396,000 sows in 2008 to 371,500 sows in 2009.  (Sealed Pls.' Ex. 194.)

---

[47] The Court references all of Triumph's Exhibits, which are introduced at Docket No. 2295, as "TRI Ex. X," with X representing the number of the exhibit.

[48] Triumph challenges the admissibility of this exhibit as inadmissible hearsay and for lack of foundation.  The exhibit is a presentation from Christensen Farms that appears to have been produced by JBS but authored by Christensen Farms.  It is conceivable that the exhibit could be presented in an admissible form at trial under the business records exception if a custodian or other qualified person can authenticate the presentation and explain how it was created.  Fed. R. Evid. 803(6); *Am. Home Assurance Co.*, 819 F.3d at 429; *see also United States v. Taylor*, 189 F.3d 712, 720 (8th Cir. 1999) (noting that "even if the witness 'was not the keeper of the records and did not prepare them, . . . [that] would not impede her ability to testify that the records were authentic.'").  The Court will thus reserve final admissibility.

One of the primary factual disputes concerns Triumph's connection to its members' sow liquidations. Triumph claims that it does not directly raise any of the hogs it processes or own any sow farms. (*See, e.g.*, TRI Ex. 1 at 221:18–222:16 ("Q. Does Triumph have sow farm operations? . . . THE WITNESS: No."); TRI Ex. 2 at 298:14–20 ("Triumph is pretty unique. . . . we're just focused so specifically on operations. We don't own pigs, we don't produce pigs. We just process pigs and turn them into pork."); TRI Ex. 3 at 195:2–196:7 (testifying that Triumph does not own sows, operate sow farm operations or own hogs before purchasing them for processing into pork).) Rather, Triumph claims it purchases 100% of the hogs it harvests. (*See, e.g.*, TRI Ex. 1 at 222:24–224:6.) Most of Triumph's hogs—between 80 to 90%—are supplied through contractual agreements with Triumph's five LLC members. (*Id.* at 50:15–23.) The members do not produce hogs exclusively for Triumph; they also produce hogs for other processors. (TRI Ex. 3 at 202:21–203:11.) Triumph claims to have no control over its members' hog production levels, decisions, operations, or sales. (*See, e.g.*, TRI Ex. 2 at 246:6–9 ("We don't have a sow herd to reduce. And we don't have the ability to make that decision. We've never made that decision."), 250:19–23 (no control over members' sow herds), 270:4–13 (no control over Christensen Farms' operations), 270:19–271:2 (no control over member New Fashion Pork facilities).) Because it does not own or raise hogs or control its members' sow operations, Triumph insists that it could not have reduced a sow herd as part of the conspiracy.

Despite Triumph's coloring of the facts, however, Plaintiffs have presented evidence indicating otherwise. Because Triumph was created by hog producers who, in the aggregate, represent the second-largest hog producer in the country, the evidence suggests that Triumph was created to consolidate control over the members' sow herds into a single organization and to coordinate their downstream sales and marketing efforts. In addition, some documentation shows that Triumph represented itself to others and regarded itself internally as vertically integrated. For example, a draft of a credit application for private lenders claimed that Triumph "by virtue of its Member owners, has 371,000 sows, ranking it as the second largest sow owner in the US," that it had "control over all aspects of hog production," and was "vertically integrated." (*See* Sealed Pls.' Ex. 1308 at 11, 17, 30.)[49] Though, notably, the final draft removed or else downplayed the control that Triumph purported to have over its members' sow operations, instead attributing Triumph's members, not Triumph itself, as "the second largest sow owner in the U.S." (Sealed Pls.' Ex. 1311 at 26; *also compare* Sealed Pls.' Ex. 1308 at 17 ("[Triumph] was organized . . . to create a low-cost, highly efficient pork processing operation to

---

[49] Triumph challenges the admissibility of this exhibit as inadmissible hearsay and for lack of foundation. The exhibit is a preliminary draft of a credit application that appears to have been prepared for Triumph by Merrill Lynch and AgStar Financial Services; the final draft is also included in the record. (*See* Sealed Pls.' Ex. 1311.) Deposition testimony from Matt England of Triumph suggests that Triumph somewhat regularly sought credit, that the date on the application was accurate, that this document would have been edited by someone familiar with Triumph's business, and that he himself was familiar with the business, indicating the exhibit could be admissible under the business records exception. (Sealed Pls.' Ex. 28 at 51:6–20, 52:20–22, 53:17–20, 54:13–17.) The Court thus reserves the final admissibility of the exhibit.

capture the benefits of an integrated business strategy intended to leverage: . . . [c]ontrol over all aspects of hog production . . . ."), *with* Sealed Pls.' Ex. 1311 at 16 ("The producer-owned structure provides the Company with a number of advantages, including: . . . [c]ontrol over key aspects of hog production . . . .").)  Still, a 2013 presentation lists one of the company's "Core Strategies" as "Optimization of Plant Operations through Vertical Integration."  (Sealed Pls.' Ex. 1315 at 24.)  Moreover, the industry appears to have regarded Triumph as vertically integrated, too.  For example, Pork Powerhouses reported that Triumph was one of the firms that reduced sow numbers in 2009.  (Sealed Pls.' Ex. 1303 at 2.)[50]  And even JBS appeared to think Triumph had control over its members' sow herds.  (Sealed Pls.' Ex. 38 at 120:17–121:1 (JBS repeatedly "invit[ed] government regulatory scrutiny into the pork industry" due to concerns that Triumph and possible other market actors were manipulating hog prices higher, to the detriment of JBS, which had to buy hogs in the open market).)

At a minimum, Plaintiffs argue that the "collective conduct" of Triumph and its members demonstrates Triumph's involvement in sow reductions, as the Court has previously recognized is possible.  *See In re Cattle Antitrust Litig.*, No. 19-1129, 2021 WL

---

[50] Triumph challenges the admissibility of this exhibit as inadmissible hearsay and for lack of foundation.  The exhibit is a Pork Powerhouses article written by Betsy Freese.  Newspaper articles are hearsay.  *Nooner v. Norris*, 594 F.3d 592, 603 (8th Cir. 2010).  But commercial publications "that are generally relied on by the public or by persons in particular occupations" are excepted from the hearsay rule.  Fed. R. Evid. 803(17).  Because the article appears to reflect objective facts, not subjective opinions, the Court reserves the final admissibility of this evidence.  *White Indus., Inc. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1069 (W.D. Mo. 1985).

7757881, at *17 (D. Minn. Sept. 14, 2021) ("[I]n a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the enterprise they jointly compose—that matters; it is the enterprise which must be shown to satisfy the elements of a [Sherman Act] claim.") (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631 (9th Cir. 2018)).

Triumph, of course, has its own version of the story. But the Court concludes there is enough evidence here to support a finding that Triumph is sufficiently intertwined with its LLC members' sow operations for liability purposes. Five hog producers who, in the aggregate, constitute the second-largest hog producer in the country own Triumph. It is difficult to fathom that the members' decisions regarding their sow operations operate completely independently of their operations of Triumph. Plus, additional evidence suggests that the members were communicating with Triumph's co-Defendants about hog reductions during the Relevant Period. For example, in late 2008 Bob Christensen of Christensen Farms, one of Triumph's member-owners, appears to have communicated with Larry Pope of Smithfield that he was cutting sows by 10% and finished hogs by 1% "due to productivity gains." (Sealed Pls.' Ex. 141.) And in 2009, Christensen explained that reducing 6.5% of sows was necessary "to see a real decrease in pigs produced." (Sealed Pls.' Ex. 1303.) The company also represented the sows produced by its members collectively as Triumph's production. (*See* Sealed Pls.' Ex. 1304 (reporting "Triumph sow numbers" as "381,500 sows," which included numbers from Triumph's five members);

Sealed Pls.' Ex. 1305 at 3 ("I think the appropriate and transparent . . . method of presenting the Triumph group remains on a consolidated basis . . . . While I understand that the industry may look at the TF members as individual companies, the members do operate – as it relates to the hogs sent to Triumph – largely as one company . . . ."); Sealed Pls.' Ex. 1306 (discussing reporting Triumph Foods' consolidated sow numbers as opposed to individual members' numbers).)    Furthermore, Plaintiffs claim that Triumph's marketing and organizational agreements require the members to allocate the hogs they grew to Triumph in proportion to their ownership interest over Triumph, and that Triumph may have restricted the number of hogs it purchased through these contracts. (*See* Sealed Pls.' Ex. 1314 at 7660, 7679–7680.)    Triumph contends that Plaintiffs misrepresent the Triumph-member agreements, which set mandatory minimum-delivery requirements to Triumph, not production caps. (*See* TRI Ex. 1 at 243:2–245:14.)  But the Court finds there is sufficient alternative evidence for a jury to consider whether Triumph joined the conspiracy through hog reductions.

In addition, there is also evidence that Triumph purposely constrained its pork production below the competitive level.  One of the most striking pieces of evidence is the March 2016 communication indicating that Seaboard and Triumph had a "gentlemen's agreement" to start the first shift of their anticipated joint Sioux City plant "without adding new sows to the industry." (Sealed Pls.' Ex. 180.)  Such evidence suggests that the co-Defendants agreed to restrain production at their new facility before it had

even opened.  In addition, other evidence demonstrates that Triumph operated its plants below capacity.  In fact, Dr. Zona calculated that Triumph utilized, on average, 84.5% of its total capacity, with its utilization rate staying between 83.1% and 85.9% for the entirety of the Relevant Period.  (Zona Reply ¶ 14, Ex. 2; *see also* Sealed Pls.' Ex. 202 at 47 (October 2016 report showed that Seaboard/Triumph plants killed 1,079 and 1,083 hogs per hour, respectively, but competitor plants were killing up to 1,524).)

Like its co-Defendants, Triumph tenders its own explanations for its production, including its emphasis on the fact that it increased its annual pork output during the Relevant Period.  (*See* TRI Ex. 5 (Triumph production summary); TRI Ex. 1 at 253:4–13 (explaining that Triumph operated two shifts at its harvest facility, which is not as common in the U.S. pork industry); TRI Ex. 2 at 261:20–265:8, 341:1–24 (testifying that Triumph operated on more than 30 weekends during the Relevant Period).  True, Triumph entered the joint capital venture with Seaboard to open the multi-million-dollar Seaboard Triumph Foods processing plant in Sioux City, Iowa in 2017.  (TRI Ex. 3 at 230:13–231:21 (discussing investments and Sioux City plant); TRI Ex. 2 at 276:8–277:14 (discussing investments to improve production capacity); TRI Ex. 5 (depicting impact of Sioux City plant on Triumph's production).)  But Triumph's alternative explanations do not negate the possibility that Triumph nevertheless could have produced even more in the absence of the conspiracy.

Another primary dispute concerns whether Triumph is responsible for the sales of its processed pork, whether domestically or internationally. Triumph claims that, after processing pork, it is not responsible for selling its pork, setting prices, or deciding whether its pork will be exported or sold domestically. In 2004, Triumph "contracted that out" to Seaboard, who markets Triumph's pork products domestically and internationally on Triumph's behalf. (TRI Ex. 2 at 39:18–23, 298:13–299:4, 303:24–304:9.) Under the marketing agreement, Triumph is precluded from selling or making any marketing efforts directly or indirectly for the pork it processes. (*Id.* at 78:7–20.)

The Court finds there is enough evidence indicating that Triumph was sufficiently intertwined with these sales. Before the Relevant Period, Seaboard and Triumph collectively exported approximately 425,000,000 pounds of pork; by 2015, they increased this by almost 84% to 781,000,000 pounds. (Sealed Pls.' Exs. 1321–24.) Triumph consistently tracked and reported on such sales. (Sealed Pls.' Ex. 1321 at 127 ("Export rising again, decreasing available domestic supplies and supporting hog and pork prices. Over 20% of production to be exported this year."); Sealed Pls.' Ex. 1322 at 20–23 (reporting on export sales); Sealed Pls.' Exs. 1323–24 (same).) In addition, some communications suggest that Smithfield colluded with Triumph and Seaboard to fix prices on pork exports. For example, in 2009, Duke Sand of Seaboard reported that he had spoken with Eldon Weber of Smithfield about "chilled," and that Weber said "he was going to try and push prices up about 10 cents so I told him we were trying to for loins

and bellies up 5 and tenders up 8." (Sealed Pls.' Ex. 114.) Sand told Weber that "we were trying to for loins ands [sic] bellies up 5 and tenders up 8," and that "worst case we may trade back to steady on one or two of these items but we agreed prices should be higher so we thought he [Farmland/Smithfield] should push hard for their 10 cent increase." (*Id.*; *see also* Sealed Pls.' Exs. 116–19 (depicting various communications) about price).)

Furthermore, additional evidence suggests that Triumph is liable for Seaboard's conduct under agency theory. Defendants may be held liable for Sherman Act violations under an agency theory of liability. *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 577 (1982). "[U]nder general rules of agency law, principals are liable when their agents act with apparent authority and commit torts analogous to . . . antitrust violation[s]." *Id.* at 565–66. Here, Plaintiffs cite to the marketing agreement that establishes Seaboard's responsibility for operating the marketing and sales of Triumph's pork products on Triumph's behalf. (*See, e.g.*, Sealed Pls.' Ex. 1325.) In fact, the marketing agreement may have provided Seaboard with actual authority and broad discretion to market and sell pork on Triumph's behalf. (*See* Sealed Pls.' Ex. 1313 § 6.01(a).)

In addition to the marketing agreement, other evidence also suggests an agency relationship. For example, documentation represents that in lieu of purchasing pork from Triumph, Seaboard is merely compensated for its marketing and sales of Triumph's products; in other words, Seaboard serves as the negotiator between Triumph and a buyer, but Seaboard itself never takes ownership of the pork. (*See id.*) All of this

evidence, in combination with the above evidence suggesting that Triumph was actually intertwined with the sale of its own products, is sufficient for a jury to impose liability on Triumph for its domestic and export sales.

Finally, like its co-Defendants, Triumph's participation in Agri Stats's production and sales program throughout the Relevant Period is suspicious.  Through these programs, Triumph shared competitively sensitive business information with competitors.  (Sealed Pls.' Ex. 30 at 124:13–25.)[51]  And in turn, the company considered Agri Stats's data in making business decisions.  (*E.g.*, Sealed Pls.' Ex. 195 (a detailed presentation titled "Agristats and Related Plant and Sales Analyses: Q1–2015" that reviews Triumph's and Seaboard's pricing and mix analyses, as well as plant performance); *see also* Sealed Pls.' Ex. 1327 (email discussion regarding the presentation).)  In fact, some evidence refutes Triumph's argument that it was not involved in the sale of its pork products, as it indicates Triumph considered sales opportunities from the data and discussed such opportunities with Seaboard.  (*See, e.g.,*

---

[51] Defendants object to this testimony for lack of foundation.  The exhibit is a deposition transcript wherein Kenneth Grannas of Triumph testified about Triumph sending confidential production information to Agri Stats.  Defendants argue that Grannas's testimony cannot support Plaintiffs' contention that Triumph provided proprietary revenue and pricing information to Agri Stats because his personal knowledge of such information sharing was limited to production information.  (*See* Sealed Pls.' Ex. 30 at 81:1–19, 85:1–9.)  Because segments of this exhibit could conceivably be presented in an admissible form at trial if Plaintiffs lay the foundation for Grannas's personal knowledge of Triumph's sharing of proprietary and confidential production information with Agri Stats, the Court will reserve final admissibility of the exhibit.  *Am. Home Assurance Co.*, 819 F.3d at 429.

Sealed Pls.' Ex. 111; Sealed Pls.' Ex. 1329.)  Further, Triumph exerted rather extensive efforts to deanonymize Agri Stats reports, as detailed spreadsheets demonstrate the company attempted to connect its competitors' to Agri Stats data.  (*See, e.g.*, Sealed Pls.' Ex. 203; Sealed Pls.' Ex. 1330 at 315; Sealed Pls.' Ex. 1334; Sealed Pls.' Ex. 1307.)  Triumph maintains that it could not have used Agri Stats to make pricing decisions because it has no control over sales.  But Plaintiffs have presented sufficient alternative evidence to create a genuine dispute of this material fact.

Weighing all the evidence, the Court finds there is enough in the record for a reasonable jury to find by a preponderance of the evidence that Triumph knowingly joined the conspiracy.  The evidence tends to exclude the possibility that Triumph acted independently.  The Court will therefore deny Triumph's Motion for Summary Judgment.

### 8.   Tyson

Tyson owns and operates six pork processing plants in the midwestern and western parts of the U.S.  (Decl. of Lindsey Strang Aberg, Sealed TYS Ex. 27 at 6–7, June 7, 2024, Docket No. 1182.)[52]  The company has hog production and pork processing units; it supplies a small percentage of the hogs it harvests itself through its live hog division, The

---

[52] The Court references all of Tyson's Exhibits, which are introduced at Docket No. 2282, as "TYS Ex. X," with X representing the number of the exhibit.

Pork Group ("TPG"), which historically had operations in four states and the Philippine Islands. (TYS Ex. 15 ¶ 10;[53] Sealed TYS Ex. 13 at 2.)

Similar to its co-Defendants, Tyson argues it would be implausible to infer that the company entered a supply-reduction agreement because it has no meaningful ability to restrict hog supply and because it lacked an incentive to do so. Tyson purchased between 92 to 99% of the hogs it harvested from independent hog producers during the Relevant Period, so the company claims it had no incentive to restrict hog supply. (Sealed TYS Ex. 2 ("Wu") ¶ 49 & Ex. 3.) In fact, Tyson argues it went into "crisis mode" when hog supply was threatened in 2009, fearing its plants could not "remain viable" without enough hogs to process. (*See, e.g.*, Sealed TYS Ex. 62 at 5, 15.) Tyson also claims it did not constrict hog supply through procurement contracts, as Tyson considered it "good" when a supplier delivered more hogs than were contractually required. (*See* Sealed TYS Ex. 7 at 2 (2012 email remarking, "[W]e know they've been sending more [hogs] to us than what's contracted (which is good).").) However, Tyson's argument is a nonstarter. As already explained, there is counter evidence indicating that processors like Tyson were in a position to control hog supply in a meaningful way despite independent hog producers.

_____

[53] The Parties dispute the probative value of Noel White's declaration, which is TYS Ex. 15. Plaintiffs argue that the declaration has been undermined by concessions and contradictions at White's 2022 deposition, which is TYS Ex. 21, particularly regarding his explanation for why Tyson closed its Arkansas farms in 2009. Tyson argues that Plaintiffs mischaracterize White's declaration and that, at any rate, other evidence supports Tyson's independent business rationale to close the farms. The Court finds the exhibit carries sufficient probative value and will allow a jury to weigh the credibility of White's declaration against his deposition.

Processors were able to do this by virtue of their direct control of hog supply through their vertically integrated business models and the use of vertical restraints, as well as their indirect control of hog supply through the price mechanism. Furthermore, additional evidence supports Plaintiffs' theory that Defendants were able to make up losses from elevated hog prices due to reduced hog supply through elevated pork prices and that they recognized how decreased hog supply could benefit them. Thus, the Court declines to find that Tyson had no ability or motive to conspire in this case.

In any event, there is significant evidence that Tyson knowingly joined the conspiracy. To start, Tyson was one of the primary processors who liquidated sows at the beginning of the Relevant Period. In particular, Tyson closed some of its sow farms in Arkansas, which resulted in a decrease of 18,802 sows, or 26.5% of Tyson's then-current sow herd. (Wu ¶ 66 n.123.) Plaintiffs contend that Tyson took direction for doing so from Smithfield, who put pressure on other hog producers to reduce their sow herds to bring back profitability to the pork industry. Additional communications also indicate that Tyson was communicating with processors about sow liquidations. For example, in July 2009 Mel Davis of Seaboard remarked that he "Just checked with Tyson. The 20,000 sow reduction they have announced will result in 20,000 sows being liquidated." (Sealed Pls.' Ex. 113.) Later that year, Todd Neff of Tyson emailed a Smithfield earnings summary internally with the message "Fyi – read and delete." (Sealed Pls.' Ex. 1107 at 2.) The summary reported that "Smithfield has completed its sow liquidation and has done more

than their 'fair share' of liquidating[.]  Need continued liquidation of 3-5% over the next year."  (*Id.* at 5.)

Tyson explains that its farm closures and sow liquidations were made pursuant to independent business reasons that predated the Relevant Period.  In particular, the company had a goal since 1999 to restructure the company's live swine operations by closing or decreasing the company's sow farms in Alabama, Arkansas, and North Carolina and focusing more attention on its Oklahoma-based herd.  (Sealed TYS Ex. 13 (depicting TPG's historical business model); Sealed TYS Ex. 14 (announcing Tyson's plans to restructure live swine operation); TYS Ex. 15 ¶ 15 (explaining closure of Arkansas sow farms).)  Moreover, the Arkansas farms were underperforming and disadvantageously located.  (Wu ¶ 94 & Ex. 11 (comparing TPG costs per head in Arkansas farms versus cost and sale price estimates in Iowa); Sealed TYS Ex. 20 ("[W]e did significant analysis, and determined it to be the best decision to reduce the sow herd by 20,000 sows."); Sealed TYS Ex. 14 at 3 (transportation costs); TYS Ex. 22 ¶¶ 10 (farm inefficiencies), 13c (location); Sealed TYS Ex. 21 at 256:20–258:12 (general motivations).)  Tyson also points out that it expanded its hog operations and regrew its sow herd to make up for sows liquidated in 2009.  (TYS Ex. 22 ¶¶ 23–25; *see also* Sealed TYS Ex. 23 at 2 (April 2009 email stating Tyson "intend[ed] ultimately to own 70,000 sows in Oklahoma"); TYS Ex. 22 ¶ 17 ("[W]e did anticipate that TPG would build its Oklahoma sow herd over time, and we did so starting

in 2013."); Sealed TYS Ex. 24 (October 2015 email announcing that TPG was entering its "next growing phase" by putting more sows in Oklahoma).)

Despite Tyson's version of the evidence, sufficient counter evidence supports Plaintiffs' version. For example, evidence from 2010 suggests that Tyson started scheming with co-Defendants to restrain production, with some communications indicating that the company wanted to make sure it got it's "fair share" of the conspiracy's benefits and was hearing "strong rumors of alleged slaughter cutbacks." (Sealed Pls.' Ex. 1108; Sealed Pls.' Ex. 1110.) That year, Tyson decreased its pork sales volume and increased its exports. (*See* Sealed Pls.' Ex. 1111 at 3–6.)

In addition, Tyson appears to have openly supported the conspiracy's objective to restrain supply. For example, a 2012 report from Seaboard explains that it "[b]elieve[s] we will get help with the shortening of hog numbers the next few weeks," that "[Indiana Packers] has acknowledged the higher hog prices and will be cutting their kill by 1500 head per day next week," and that "Tyson believes hog numbers will continually tighten through the 1st part of June." (Sealed Pls.' Ex. 1113.) In 2013, an internal Seaboard email reported that "Tyson has said to cancel all kill plans for weekend of 2/9; . . . We believe it would take significant cutbacks to make a real supportive move in the markets." (Sealed Pls.' Ex. 1114.) In addition, an internal Smithfield email remarked that "[o]verall general trend is it sounds like there are going to be some cutbacks; however, some plants are going to be dark one day and then run more hours for the other 4 days and as a result

have limited impact on their kill." (Sealed Pls.' Ex. 147.)  The email went on to explain that "potential cutbacks" from four packers, including JBS, Hormel, and Tyson, "would total approx. 30k – 40k hd." (*Id.*)  Other evidence reflects similar sharing of kill plans. (*E.g.*, Sealed Pls.' Ex. 126.)

Even more evidence demonstrates that Tyson recognized the value that working collectively to restrict supply would have so long as each Processor Defendant contributed.  In a 2011 email, Todd Neff of Tyson stated that he "HATE[S] selling hogs this time of the year (high margins) – I think it makes more sense to do that when margins are tight and/or product feels very heavy. . . . we have earned the right to get our fair share of [slaughter] since we are performing well, versus industry i.e., make the other guys cut back." (Sealed Pls.' Ex. 183.)  Neff instructed readers to "read and delete and not repeat this." (*Id.*)

Tyson's export activities raise additional suspicion.  Tyson's export sales increased during the Relevant Period to a degree that, in Plaintiffs' view, went beyond the competitive level.  Indeed, in March 2009 Neff explained that his takeaway from Agri Stats is that "EXPORT is the low hanging fruit in this!!!!!" (Sealed Pls.' Ex. 1121.)  In general, the company consistently recognized the value that export sales present in creating "disappearance" in the domestic market to generate more profit. (*See, e.g.*, Sealed Pls.' Ex. 1123 ("Very aggressive exports creating double digit negative disappearance and very

unseasonable prices!!!!!"); Sealed Pls.' Ex. 1122 ("We need to increase export mix percent

on boneless loins – currently 15.7% versus west average at 21.7%.").)[54]

 In its defense, Tyson argues that it increased pork production during the Relevant

Period, and that any perceived lack of possible growth cannot be squared by the various

market factors that cause processing volumes to fluctuate year-over-year.  (*See, e.g.*,

Sealed TYS Ex. 35 (hog shortages); Sealed TYS Ex. 37 at 6–8 (considering Tyson's options

to maintain its hog supply by supporting independent producers).)  Furthermore, the

company invested millions of dollars to increase the capacity of its processing plants.

(*See, e.g.*, Sealed TYS Ex. 29 (Perry plant); Sealed TYS Ex. 30 (Storm Lake plant).)  As for

exports, the company contends its export sales were consistent with long-term business

plans and independently profit-motivated.  (Sealed TYS Ex. 21 at 109:3–21.)  For example,

Tyson insists that it generally only exported pork products when it was "able to sell them

at higher prices by exporting them," but that when the company did export at a loss, it

did so to prioritize customer relationships with export businesses for long-term

optimization.  (Sealed TYS Ex. 42 at 125:18–126:8; Sealed TYS Ex. 21 at 98:15–99:1

("[S]elling product internationally was to optimize profit."); Sealed TYS Ex. 41 at 49

("Emphasize relationship based export business that contributes positively long term.");

Sealed TYS Ex. 42 at 128:3–129:2 ("[I]f it is a[n] [export] customer that purchases from us

---

[54] "Disappearance" refers to the availability of agricultural products, net imports and exports. (*See, e.g.*, Sealed TYS Ex. 43 at 50 ("Export Disappearance – Export market share at more revenue than domestic revenue[.]").)

on a regular basis, then [our pricing managers] will allow us to sell to that customer in that month, even if we are to fall a little short of the premium.").)

Nonetheless, there is a significant amount of evidence suggesting that Tyson joined the conspiracy, as seen through the extensive communications and exchanges of information that the company had with co-Defendants, whether directly or through Agri Stats. Tyson routinely exchanged information with other pork processors, with whom the company was in continuous communication. (*E.g.*, Sealed Pls.' Ex. 1154 (phone records); Sealed Pls.' Ex. 113 (Seaboard email chain indicating that Tyson had communicated its sow reduction plans).) Tyson received price lists with competitors' data, including JBS, Cargill, and Seaboard. (Sealed Pls.' Ex. 21 at 40:15–17, 46:16–53:14; Sealed Pls.' Ex. 32 at 51:14–16, 72:19–74:2, 176:4–177:15.) The Parties dispute whether these price lists were sent to Tyson from customers or competitors, but Plaintiffs contend that at least some of the price lists came from direct communications from competitors. (Sealed Pls.' Ex. 21 at 63:7–10 (testifying that Tyson employee received price list from competitor).)

When sharing sensitive competitor data, Tyson repeatedly instructed its employees to destroy such communications. For example, a 2011 all-hands meeting presentation warned employees to "[t]hink before you type" when sending "[e]mails about the competition." (Sealed Pls.' Ex. 1100 at 5, 9–10.) In addition, a March 2011 email that Jerry Holbrook forwarded from Tyson's General Counsel to the sales team regarding "ANTI-TRUST" instructed employees to "[a]t the very least, be mindful of the

content of any emails that you write." (Sealed Pls.' Ex. 1101; *see also* Sealed Pls.' Ex. 1102 at 66:15–72:15.) Tyson disputes Plaintiffs; interpretation of such instructions, but those rationalizations are best reserved for a jury.

Finally, Tyson's use and comprehensive deanonymization of Agri Stats reports is highly suspicious. Tyson participated in Agri Stats before and during the Relevant Period. (*See* Sealed TYS Ex. 46 (referencing Tyson's participation in Agrimetrics before 2006).) The company conditioned its complete participation in Agri Stats on other major producers also participating. (*See, e.g.*, Sealed Pls.' Ex. 62 ("When I agreed to add the balance of our plants, you made the commitment to get JBS and Hormel completely onboard as well. How do we resolve?"); Sealed Pls.' Ex. 171 ("Talk to me 'after' you get the Seaboard and Triumph commitments . . . Did you get Hormel to join Agristats yet??").) And the company used Agri Stats reports to identify opportunities to raise prices. (*E.g.*, Sealed Pls.' Ex. 1183.)

A Tyson accountant, Deborah McConnell, managed Tyson's participation in Agri Stats. (Sealed TYS Ex. 45 at 26:21–27:15.) McConnell reviewed and prepared Excel summaries of the Agri Stats reports, which were reviewed in benchmarking meetings. (*Id.* at 29:14–31:7; *see also* Sealed TYS Exs. 47–50 (example summaries).) McConnell's spreadsheets show, on a competitor-plant-company basis, detailed information regarding yields, prices, and costs for each month. (Sealed Pls.' Ex. 165.) Plaintiffs contend that McConnell used plant capacity data and the cut-out section of Agri Stats processing

reports to deanonymize competitors' plants.  (Sealed Pls.' Ex. 34 at 251:3–253:7.)  She assigned potential plant names to Agri Stats participants in the reports, which she characterized as "guesses" that she would "frequently" change.  (Sealed TYS Ex. 45 at 16:24–18:24; *see also* Sealed TYS Ex. 51 ("Each non-Tyson participant on this file with a 'name' is a best guess.").)  One document tracked deanonymized competitors' price and rank for every month over a two-year period.  (Sealed Pls.' Ex. 176.)  Notably, Dr. Cabral found that McConnell's guesses were correct about 60% of the time.  (Cabral ¶ 63.)

Tyson argues it used Agri Stats to improve its operations, not to collude.  (*See, e.g.*, Sealed TYS Ex. 21 at 247:9–17 ("[W]e had the monthly [Agri Stats] meetings in particular, to look for those opportunities to maximize value."); Sealed TYS Ex. 45 at 33:19–34:5 ("[A]s I recall, it -- the intent was benchmarking, you know, where could we compete better[.]"); Sealed TYS Ex. 15 ¶ 20 ("I found Agri Stats to be directionally helpful in identifying cost-saving or efficiency opportunities to improve our plant operations.").)  In particular, Tyson claims it used Agri Stats to identify opportunities to improve its freight costs, hog production costs, hog procurement costs, line speed, labor efficiency, carcass yield, and belly yields.  (*See, e.g.*, Sealed TYS Ex. 53 (freight costs, hog production costs); Sealed TYS Ex. 54 (hog procurement costs); Sealed TYS Ex. 55 (line speed, labor efficiency); Sealed TYS Ex. 56 (carcass yield); Sealed TYS Ex-57 (belly yields); Sealed TYS Ex. 58 (same).)  Despite the potential lawful uses of the Agri Stats reports, the Court cannot ignore the suspiciousness of Tyson's conduct.  Indeed, the company referred to Agri Stats as "the

bible." (Sealed Pls.' Ex. 178.)  Enough evidence supports a reasonable inference that Tyson used Agri Stats reports to monitor the conspiracy and keep domestic prices high.

Everything considered, the Court concludes there is enough for a reasonable jury to conclude by a preponderance of the evidence that Tyson knowingly joined the conspiracy.  The volume of communications between Tyson and its competitors and its use of Agri Stats especially satisfy the Court that the evidence tends to exclude the possibility that Tyson acted independently.  Therefore, Tyson's Motion for Summary Judgment will be denied.

### D.    Statute of Limitations

In addition to attacking Plaintiffs' claims on the merits, Defendants also argue that Plaintiffs' claims are time-barred by the statute of limitations.

Whether a claim is time-barred is a question of law that the Court may properly resolve at the summary judgment stage, so long as there are no genuine issues of material fact in dispute.  *In re Minn. Mut. Life In. Co. Sales Pracs. Litig.*, 346 F.3d 830, 835 (8th Cir. 2003).  The limitations period for any claims for damages under the Sherman Act and the PSA is four years.  15 U.S.C. § 15b; *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1460 (8th Cir. 1995).[55]  The statute of limitations period begins to run when a defendant commits the injurious act.  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).

---

[55] In addition, Defendants claim that the limitations period for many of Plaintiffs' state law claims is four years or fewer.  (*See* Ex. Index to Defs.' Joint Mot. Dismiss State Law Claims, Ex. 1, Jan. 15, 2020, Docket No. 438.)

Plaintiffs bear the burden of demonstrating that an issue of material fact remains as to whether an exception applies. *Nitro Distrib., Inc., v. Alticor, Inc.*, 565 F.3d 417, 427 (8th Cir. 2009).

The first class complaint was filed in June 2018, and the first DAP complaint was filed in 2019. The statute of limitations therefore limits Class Plaintiffs from recovering for any claims arising prior to June 2014, and the DAPs from recovering for any claims arising prior to 2015, unless an exception applies. Plaintiffs argue that the statute of limitations is tolled under two doctrines: (1) continuing violation and (2) fraudulent concealment. The Court will consider each in turn.

### 1. Continuing Violation

The statute of limitations for conduct before June 2014 may have been tolled if the Defendants engaged in ongoing conduct consistent with the alleged conspiracy.

A continuing violation restarts the statute of limitations period each time the defendant commits a new and independent act that inflicts new and accumulating injury on the plaintiff. *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc). "An overt act has two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act, and (2) it must inflict new and accumulating injury on the plaintiff." *Id.* "In the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years . . . each sale to the plaintiff . . . starts the statutory period running again,

regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Id.* at 1064 (internal quotation marks omitted).

Defendants argue that the previous allegations on which the Court sustained Plaintiffs' claims at the pleading stage no longer save Plaintiffs' claims from the statute of limitations. The Court found that Plaintiffs had plausibly alleged a continuing violation into the non-time-barred period based on Defendants' continued use of Agri Stats and three alleged overt acts: (1) Clemens' alleged failure to take advantage of the 2014 PEDv epidemic by increasing market share, even though its hogs were largely unaffected by the epidemic, (2) JBS's alleged decrease in supply after it acquired Cargill's pork enterprise in 2015 despite increased consumer demand, and (3) Seaboard and Triumph's alleged decision to postpone an expansion of facilities in 2017, even though it was publicly acknowledged that growing demand and growth in the industry would have supported expansion. *In re Pork*, 495 F. Supp. 3d at 775. The Court also noted Plaintiffs' allegations that each of the plus factors were still present beyond 2013. *Id.*

Now, Defendants argue, those previously alleged overt acts no longer pass muster at the summary judgment stage to toll the statute of limitations. In 2014 for example, Clemens increased, not decreased, its sows at a higher rate than the rest of the industry and increased the number of hogs it slaughtered, all the while investing in and building a new slaughter plant. (Babcock Figs. 7, 14, 15.) Defendants also argue that the other alleged overt acts fail too because the evidence shows that JBS invested millions of dollars

in expansions after acquiring Cargill's pork business, and Plaintiffs are no longer arguing that Seaboard and Triumph postponed an expansion at their new plant in furtherance of the conspiracy.

Despite Defendants' well-taken claims, the Court finds that Plaintiffs have established a genuine issue regarding whether Defendants continued to violate the antitrust laws beyond June 2014.  Clemens's expanded hog and pork production post-2014 and JBS's significant investment in expansions after 2015 do not necessarily mean that those Defendants were not also restraining their expansion in furtherance of the conspiracy.  Plaintiffs have presented evidence that the Processor Defendants caused the pork supply level to be lower than it would have been in the absence of the alleged conspiracy throughout the Relevant Period.  (Mangum Reply ¶ 168; Singer Reply ¶ 96; Lamb ¶¶ 155–56; Lamb Reply ¶ 266.)  And Plaintiffs' experts found that the prices of pork remained at supracompetitive levels until at least June 2018.  (Sealed Pls.' Ex. 13 ("McClave") § 4.0 (indicating "prices were elevated by 13.0% above competitive levels" between January 2009 and June 2018); Lamb ¶¶ 275–76, 310 (finding "an adjusted overcharge of 11.5 percent" for all Defendants).)  Furthermore, the evidence of parallel conduct is supplemented by more than one plus factor beyond 2014, including the Defendants' participation in Agri Stats and various interfirm communications.  Indeed, all the Processor Defendants exchanged information through Agri Stats post-2014.  (*See, e.g.*, Sealed Pls.' Ex. 736 (Clemens email correspondence analyzing Agri Stats data in

November 2016); Sealed Pls.' Ex. 741 (JBS email correspondence analyzing Agri Stats data in January 2016).)  Furthermore, communications from one of the most hotly contested pieces of evidence in this case, the alleged "gentlemen's agreement" between Seaboard and Triumph's LLC members, occurred in March 2016.  (Sealed Pls.' Ex. 180.)  There is therefore sufficient evidence from which a reasonable jury could conclude that Defendants conspired in continuing violation of the antitrust laws beyond June 2014, such that the limitations periods for the Plaintiffs' claims are equitably tolled.

### 2.    Fraudulent Concealment

The DAPs also allege that the statute of limitations should be equitably tolled for their claims due to the Defendants' fraudulent concealment of the conspiracy.[56]  To invoke fraudulent concealment, the DAPs must offer evidence showing that (1) Defendants concealed Plaintiffs' cause of action, (2) Plaintiffs failed to discover the existence of their cause of action, and (3) Plaintiffs exercised due diligence in attempting to discover their cause of action.  *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999).  For concealment, the Eighth Circuit requires "an act of affirmative misrepresentation over and above the acts creating the alleged cause of action."  *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442–43 (8th Cir. 1990).  "Simply denying the existence of an antitrust violation does not constitute

---

[56] At the pleading stage, the Court rejected the Class Plaintiffs' fraudulent-concealment theory.  *In re Pork*, 495 F. Supp. 3d at 773–74.

fraudulent concealment, and to hold otherwise 'would effectively nullify the statute of limitations in these cases.'"  *In re Milk*, 84 F. Supp. 2d at 1023 (quoting *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–19 (4th Cir. 1987)). "[N]ormally in a statute of limitations context fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment."  *Hines v. A.O. Smith Harvestore Prods., Inc.*, 880 F.2d 995, 999 (8th Cir. 1989).

### a.    Concealment

The first element for fraudulent concealment requires a showing that the defendants concealed the cause of action from the plaintiffs.  *In re Milk*, 84 F. Supp. 2d at 1022.  Defendants argue that, far from attempting to conceal relevant facts from the DAPs, Defendants openly and publicly discussed what the DAPs claim was a secret conspiracy.

Despite Defendants' public discussion about the alleged conspiracy, evidence also demonstrates active concealment.  For example, there are private emails between the alleged co-conspirators that discuss competitively sensitive information, internal slide decks on price increases that are marked "CONFIDENTIAL – DO NOT SHARE WITH YOUR CUSTOMER," and internal correspondence discussing competitors' pricing and production information or future plans instructing recipients to "read and delete" or to "keep very confidential."  (*E.g.*, Sealed Pls.' Exs. 2074, 2076, 2079, 2081, 2084.)  In addition, there are internal communications suggesting that Tyson in particular wanted to keep its efforts to deanonymize Agri Stats reports "confidential."  (*E.g.*, Sealed Pls.' Exs.

2082, 2083.)  The DAPs also note that 21st Century Pork Club meeting rules prohibited meeting attendees from attributing comments to specific speakers afterwards and that the Pork Club started meetings for only pork producers starting in 2012.  (Sealed Pls.' Exs. 2086, 2088.)   Furthermore, there is evidence suggesting that Defendants limited themselves to communication by telephone to avoid a paper trail.  (Sealed Pls.' Exs. 2090, 2091, 2092.)   What's more, the DAPs contend there is evidence that Defendants knowingly made allegedly false representations to customers and the public about the reasons for supply shortages and price increases.  (*See* Sealed Pls.' Exs. 2097, 2098, 2099.)

However, the above alleged affirmative acts only suggest fraudulent concealment if they are "separate and apart" from the alleged conspiracy and not part of the alleged conspiracy itself.  As they did at the pleading stage, Defendants ask the Court to rely on an unpublished Sixth Circuit decision to find that the DAPs' allegations that Defendants communicated in secret do not support fraudulent concealment because concealing internal communications "does not constitute an affirmative act of concealment." *Premium Props. Unlimited, LLC v. Mercantile Bank Mortg. Co.*, 732 F. App'x 414, 417–18 (6th Cir. 2018).  However, the Court already dismissed this argument at the pleading stage, finding this case more akin to *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 262, 266–27 (D. Minn. 1989) (finding allegations that defendants used "various secretive means of communication in establishing and maintaining their unlawful activity" and used trade association meetings as a pretext for their secret meetings sufficient).  Moreover, the

DAPs have provided evidence suggesting that Defendants encouraged communications by phone so as not to leave a "paper trail" and knowingly made allegedly false representations to customers and the public about the reasons for supply shortages and price increases. *In re Monosodium Glutamate Antitrust Litig.*, No. 00-1328, 2003 WL 297287, at *2–3 (D. Minn. Feb. 6, 2003).

Defendants argue that attributing the change in price or supply to factors other than an illegal conspiracy is not fraudulent concealment, citing to *In re Milk*, 84 F. Supp. 2d at 1023. However, in *In re Milk* the plaintiffs alleged that instead of admitting to conspiracy amidst price-fixing allegations, defendants publicly denied a price-fixing conspiracy. The court held that "[s]imply denying the existence of an antitrust violation does not constitute fraudulent concealment," as "to hold otherwise 'would effectively nullify the statute of limitations in these cases.'" *Id.* (citing *Pocahontas Supreme Coal Co.*, 828 F.2d at 218–19). This case is distinguishable, in that Defendants' alleged misrepresentations were not made in response to price-fixing allegations but rather separate and apart from the alleged conspiracy in an effort to conceal it.

The Court finds that the DAPs have created a genuine issue of material fact whether Defendants took affirmative acts solely to conceal their alleged conspiracy, including by encouraging communications by phone to avoid a paper trail, making false representations about the reasons for supply shortages and price increases, and instructing recipients of emails to "read and delete" and keep certain shared information

"confidential."  Whether or not Defendants in fact fraudulently concealed their allege conspiracy is a matter best left for a jury.  *Hines*, 880 F.2d at 999.

### b.    Failure to Discover

The second element for fraudulent concealment requires a demonstration that the plaintiffs failed to discover the existence of their cause of action.  *In re Milk*, 84 F. Supp. 2d at 1022.

Defendants argue that the DAPs were on constructive notice of their claims from Defendants' public statements, which Plaintiffs claim were used to maintain the conspiracy, and from public information regarding the pork industry, such as sow herd reductions, exports, and pricing.  In fact, some DAPs internally tracked and forecasted pork pricing and production based on publicly available data.  (*See, e.g.*, Misc. Ex. 37 (Topco) at 22:11–25:11, June 7, 2024, Docket No. 2287;[57] Misc. Ex. 31 (Colorado Boxed Beef) at 181:14–182:9; Misc. Ex. 36 (US Foods) at 243:11–248:24.)  Thus, Defendants insist that because the DAPs "had access to the facts that would make out [their] cause of action" more than four years before their complaints were filed, the doctrine of fraudulent concealment cannot toll their claims.  *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873 (8th Cir. 2000).

---

[57] The Court references the exhibits introduced at Docket No. 2270 as "Misc. Ex. X," with X representing the number of the exhibit.

However, it is not clear from the record that the DAPs were aware of the Defendants' alleged conspiracy prior to filing their complaint. The moving party at summary judgment bears the burden of pointing to facts entitling it to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Yet Defendants have not pointed to undisputed evidence indicating that the DAPs were on notice of the alleged conspiracy. As one circuit court has held,

> [T]o be entitled to judgment as a matter of law on these issues, . . . the [defendants] have the burden, as the moving parties, to point to undisputed facts in the record which demonstrate conclusively that plaintiffs had notice of their claims, . . . It is not enough for summary judgment to point to facts which might have caused a plaintiff to inquire, or could have led to evidence supporting his claim. A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment.

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999). Indeed, as the Court previously explained in this case, although public statements made by Defendants could have tipped off a savvy consumer to the conspiracy, that does not mean that a reasonable person would have discovered the conspiracy through the statements. *In re Pork*, 495 F. Supp. 3d at 774. Given that the DAPs represented in their Complaint that they were unaware of the conspiracy, the lack of conclusive evidence otherwise, and that Defendants' constructive notice argument fails to consider the significant burden of establishing a plausible claim for antitrust conspiracy without discovery, the Court

declines to rule as a matter of law that the DAPs failed to discover the conspiracy. (DAP Compl. ¶ 445.)

### c.    Due Diligence

Finally, the last element for fraudulent concealment requires a showing that the plaintiffs exercised due diligence in attempting to discover their cause of action. *In re Milk*, 84 F. Supp. 2d at 1022. The due diligence inquiry employs a reasonableness standard. *See Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 897 (8th Cir. 1997) ("A victim must be aware of some suspicious circumstances, some 'storm warnings,' to trigger the duty to investigate.") (quoting *Davidson v. Wilson*, 973 F.2d 1391, 1402 (8th Cir. 1992)).

Defendants argue that the DAPs cannot establish a triable issue of fact that they exercised proper diligence in investigating their claims once they were on constructive notice of them. Defendants cite to evidence indicating that several DAPs confirmed they did little to investigate their claims before retaining counsel in this case. (*See, e.g.*, Misc. Ex. 38 (Topco) at 34:9–20; Misc. Ex. 39 (SpartanNash) at 21:24–23:7; Misc. Ex. 40 (Springfield Grocer) at 17:24–18:5.)

However, the DAPs attached a rather detailed Appendix to their brief in which they provide specific examples of the ways in which they exercised due diligence in investigating their cause of action. (*See* Certain Pls.' Joint Opp'n Br., App. 1, Aug. 26, 2024, Docket No. 2539.) In particular, the DAPs explain that they exercised due diligence by (1) seeking price quotes from suppliers or submitting requests for proposals to supply pork;

(2) conducting auctions or establishing sophisticated processes to negotiate for lower pork prices; (3) monitoring pricing indices for pork, confirming statements by Defendants on market dynamics, and requiring Defendants to submit objective market data to justify pricing; (4) moving businesses away from companies that raised prices or pushed back on proposed price increases; and (5) attending training sessions with economists to understand the market dynamics affecting pork prices. (*See id.*) Defendants contend that the DAPs' purported efforts to exercise due diligence are nothing more than actions taken in the ordinary course of business, such as seeking price quotes. Defendants would have the Court require the DAPs to have done something more, but enough evidence would support a finding that the DAPs exercised due diligence here. Indeed, the DAPs engaged with economists to better understand what market dynamics impact pork prices and, in some cases, pushed back against Defendants' pricing by requiring them to submit market data to justify it. There is thus sufficient evidence from which a reasonable jury could find that the DAPs exercised due diligence in attempting to discover their cause of action. *Hines*, 880 F.2d at 999 (noting that a plaintiff's due diligence is generally a question of fact unsuited for summary judgment).

In sum, there is sufficient evidence creating a triable issue regarding whether Defendants fraudulently concealed the conspiracy from the DAPs, whether the DAPs failed to discover their claims, and whether the DAPs exercised due diligence in

investigating their claims.  Whether the fraudulent concealment doctrine equitably tolls the statute of limitations as to the DAPs' claims is a matter best left for a jury.

*    *    *

In sum, the Court will allow Plaintiffs' per se claims under § 1 of the Sherman Act to move forward almost in their entirety, except that it will dismiss Hormel as a Defendant.  The Court is satisfied, based upon the totality of the evidence, that the evidence supports a reasonable inference of a price-fixing conspiracy and tends to exclude the possibility of mere independent action among co-Defendants.  Separately, there is also sufficient evidence linking each Defendant, other than Hormel, to the price-fixing conspiracy.

The allegations falling under the rule of reason warrant a separate discussion.

### III.    RULE OF REASON SHERMAN ACT VIOLATIONS

In addition to their theory that Defendants agreed to fix prices as a per se violation of the Sherman Act, the Consumer IPPs also allege that the Defendants' exchange of information through Agri Stats violates the rule of reason under § 1 of the Sherman Act.  Defendants and the Consumer IPPs cross-move for summary judgment on this theory of conspiracy.

A standalone information exchange itself can constitute a § 1 violation, even without proof of an agreement to fix prices, if it tends to lead to anticompetitive effects.  *United States v. Container Corp.*, 393 U.S. 333, 334 (1969).  Though, such an exchange is not itself a per se violation of the Sherman Act.  *Citizens & S. Nat'l Bank*, 422 U.S. at 113.

Rather, such an exchange will be evaluated under the rule of reason. *Gypsum*, 438 U.S. at 441 n.16.

Here, Defendants agreed to reciprocally exchange confidential information with competitors through Agri Stats, albeit in a different, anonymized format. It is uncontested that Clemens, Seaboard, Triumph, and Tyson[58] all subscribed to and shared confidential information with Agri Stats during the Relevant Period, that Agri Stats took that information and formulated reports that were shared with competitors, and that Defendants knew which competitors were participating in each of the reports. Thus, though Defendants do not necessarily contest it, the Court finds that the Consumer IPPs have established concerted action for purposes of their information exchange theory of conspiracy. *Insignia Sys., Inc.*, 661 F. Supp. 2d at 1062.

Still, to succeed on a § 1 Sherman Act claim, Plaintiffs must also show that the concerted action unreasonably restrains trade. Unreasonable restraint of trade can be established with evidence demonstrating that "(1) the conspiracy was of a type that the law finds to be inherently unreasonable (a per se violation), or (2) that the conspiracy had an anticompetitive motive or effect (a rule of reason violation)." *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 556 (8th Cir. 1991). Under the rule of reason, courts "conduct a fact-specific assessment of market power and market structure . . . to assess the

---

[58] As the Consumer IPPs have settled with Hormel, JBS, Seaboard, and Smithfield, the relevant Defendants for the rule of reason claim are Agri Stats, Clemens, Triumph, and Tyson.

restraint's actual effect on competition," with the goal being "to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Amex*, 585 U.S. at 541 (cleaned up).

Courts apply a three-step, burden-shifting framework under the rule of reason.  At the first step, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.*  If the plaintiff meets its burden, "the burden shifts to the defendant to show a procompetitive rationale for the restraint."  *Id.*  Finally, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Id.* at 542.  Ultimately, the Court "weighs the harms and benefits to determine if the behavior is reasonable on balance."  *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993).

### A.    Substantial Anticompetitive Effect

Consumer IPPs bear the initial burden of proving that the Defendants' exchange of information through Agri Stats reports had a "substantial anticompetitive effect" that harmed them in the relevant market.  *Amex*, 585 U.S. at 541.  This burden can be satisfied with a showing of direct or indirect evidence.  "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market."  *Id.* at 542 (cleaned up). "Indirect evidence would be proof of market power plus some evidence that the

challenged restraint harms competition." *Id.* Here, Consumer IPPs rely on direct and indirect evidence to support their argument that Agri Stats reports have substantial anticompetitive effects.

For direct evidence, Consumer IPPs point to opinion evidence from experts that the Processor Defendants reduced output and increased prices in ways that would not have been expected in a competitive market. (*E.g.*, Cabral ¶¶ 11–12; Singer ¶ 8.)

As for indirect evidence, it is uncontested that Defendants had market power in the relevant market. The Parties do not appear to dispute that the market for wholesale pork in the United States is the properly defined relevant market. And there is opinion evidence that Processor Defendants collectively accounted for over 80% of the pork industry's market share, which Dr. Singer opined is sufficient market power to affect output and prices in the U.S. pork market. (Singer ¶¶ 11, 51–121.)

The issue instead is whether there is sufficient evidence that Agri Stats reports harm competition in the U.S. pork industry.[59] Consumer IPPs argue that Agri Stats reports harm competition based on the information that is exchanged, how that information can

---

[59] Defendants urge the Court to follow *Broilers*, where the court entered summary judgment on the plaintiffs' rule of reason claim because of "scant evidence" that the Agri Stats reports in the broiler chicken industry were used in a manner that had anticompetitive effects. *Broilers II*, 702 F. Supp. 3d at 678–79. Nevertheless, as mentioned, *Broilers* is not binding on this Court. *Se. Stud & Components, Inc.*, 588 F.3d at 967. The *Broilers* court rendered its summary judgment order on the specific evidence and arguments in front of it. While that opinion is certainly helpful to the Court's own analyses, and maybe even persuasive, the Court must render its decision based on the evidence and arguments before it.

be used, and the fact that Plaintiffs' experts found that pork production was lower and pork prices higher than what would have been expected in a competitive market. In particular, Consumer IPPs claim that Agri Stats reports are likely to lead to anticompetitive effects because they share current, aggregated, and future information on competitors' prices and output that is not otherwise available to the public. Given the sensitivity of the information exchanged and the ability to deanonymize the data to monitor each other's activity, the Class contends that Processor Defendants used Agri Stats reports to coordinate their prices and output in unreasonable restraint of trade.

Courts have recognized that information exchanges with certain features have the potential to generate anticompetitive effects. Such features include the sensitivity of the data, its granularity, whether the data is publicly available, and the contemporariness of the information that is exchanged. *See Am. Column*, 257 U.S. at 377; *Container Corp.*, 393 U.S. at 338; *Gypsum*, 438 U.S. at 441 n.16.

Here, the data exchanged in Agri Stats reports was competitively sensitive and posed a threat to competition for a myriad of reasons. To start, the data provided in the reports was rather current. Even if the data included in the reports was on average 45 days old, some data was more current. To put it simply, the monthly reports provided data that was collected from the immediately preceding month, so reports that were provided mid-month shared data that was only two weeks old. (Sealed Pls.' Ex. 64 ("Companies submit financial and production data electronically each month."); Sealed

Pls.' Ex. 394 ("Agri Stats provides 'selling price analysis' both weekly and monthly.");

Sealed Pls.' Ex. 58 (announcing publication of April sales report in mid-May); *see also*

Cabral. App. 6 ¶ 14 ("Agri Stats also prepares weekly sales reports.").)    The U.S.

Department of Justice has suggested that data less than three months old is current.

*Justice Department Withdraws Outdated Enforcement Policy Statement*, Office of Public

Affairs,    U.S.    Department    of    Justice    (Feb.    3,    2023),

https://www.justice.gov/opa/pr/justice-department-withdraws-outdated-enforcement-

policy-statements [https://perma.cc/LC5X-NGVM].    Plus, the Data Miner tool, which

provides the same data as that included in the sales reports but in an electronic format,

allowed participants to input their sales data and immediately compare it to competitors'

data before the hard-copy reports were issued.    (*See* Tr. of Mots. Hr'g – A.M. Session at

159:15–160:7, 138:11–18.)    This indicates that the Data Miner tool was more up-to-date

than the data supplied in the hard-copy reports.    It is evident that Clemens, JBS, Seaboard,

Smithfield, and Tyson used Data Miner, with Tyson even describing it as "a weekly and

more timely pricing (price only) report from Agristats with a different and larger

enrollment of companies, which is used extensively by [Tyson's] pricing desk."    (Sealed

Pls.' Ex. 168; *see also* Sealed Pls.' Ex. 44 at 107:1–108:23, 109:21–110:10; Sealed Pls.' Ex.

397.)

    The reports also provided some insight into competitors' future business plans,

another potentially anticompetitive feature.    For example, Plaintiffs argue the live

production reports enabled participants to measure future hog supply by multiplying the number of pigs weaned by the total number of sows.  Even if such metrics are reported by the USDA every quarter, Agri Stats's frequent report distributions could have provided more up-to-date information on such plans.  (Sealed AS Ex. 1 ¶ 42 (describing USDA swine production report));  *see also* USDA, *Hogs and Pigs Report*, https://usda.library.cornell.edu/concern/publications/rj430453j [https://perma.cc/G9VC-WC2S].  Having access to rather current, competitively sensitive information from competitors that provided insight into future business plans is suggestive of anticompetitive effects.

Furthermore, the exclusivity of the reports speaks to their sensitivity and potential threat to competition.  Indeed, Agri Stats's reports and services were not freely accessible to the public.  (Sealed CIPP Ex. 9 at 53:7–13; Sealed CIPP Ex. 10 at 51:3–12.)[60]  Only subscribers had such access, and Agri Stats for the most part limited subscribers to pork packers like the Processor Defendants.  (Sealed CIPP Ex. 9 at 52:2–13; Sealed CIPP Ex. 17 at 64:15–23.)  If the USDA published similar information on price and production, the Court finds it difficult to understand why the Processor Defendants would pay large amounts of money to gain access to data that they could have otherwise accessed publicly for free.

---

[60] The Court references all the Consumer IPPs Exhibits offered in support of their motion, which are introduced at Docket No. 2359, as "CIPP Ex. X," with X representing the number of the exhibit.

Even though Agri Stats anonymized the data, there is evidence that Defendants, especially Tyson, attempted to deanonymize the reports, with an estimated 60% success rate. (Cabral ¶ 63.) To be sure, the Court recognizes that Defendants' deanonymization efforts do not necessarily mean they were using the information to restrain trade; indeed, it would make smart business sense to try to guess which data belonged to which competitor in the Agri Stats reports. *In re Chocolate*, 801 F.3d at 409; *In re Baby Food*, 166 F.3d at 126. However, the fact that Agri Stats took no action to stop such conduct raises some suspicion. (*See* Sealed CIPP Ex. 17 at 223:19–23; CIPP Ex. 40 at 195:6–7, 191:6–192:12.) And a reasonable jury could nevertheless determine that the ability to deanonymize the reports enabled participants to better track their rivals' decisions.

Finally, and most importantly, the Court has already determined that there is enough evidence to support a reasonable finding that the reports contain competitor pricing and output data that participants could use to target higher prices and infer competitors' production in restraint of trade. What made this data so meaningful was the fact that it allowed participants to create "focal points" for industry action, or collective goals to work toward to keep prices higher and output lower than they otherwise would be. In fact, Dr. Cabral opined that Agri Stats "provides more than a simple industry average." (Cabral ¶ 50.) Because Processor Defendants have different production portfolios, Dr. Cabral explained, Agri Stats creates valuable price indexes with hypothetical product mixes "so as to compare 'apples to apples'—in other words, so that

a firm's price can be compared to the relevant industry average." (*Id.*) Products priced below the industry average for like products were deemed "economic opportunities" where prices should be raised, which, when applied, could have a ratchet effect on prices, "as the lowest-priced sales move to the average, the new average price will be higher." (*Id.*)

Defendants argue that any opportunity to increase prices that were below the national average cannot establish anticompetitive effects because prices are the result of individualized negotiations and often involve prices set in long-term contracts. In other words, prices do not simply increase in a vacuum. Nonetheless, there is sufficient alternative evidence suggesting that Agri Stats reports could generate anticompetitive effects because of the type of information exchanged and the way that information could be used to restrain trade, especially in a market with characteristics like the U.S. pork industry.

The Parties also dispute the level of aggregation/disaggregation of the data in the Agri Stats reports. Regardless of whether the data was aggregated or disaggregated, information exchanges that provide only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors. There is no requirement that the reports contain individual competitor price or production information to generate anticompetitive effects. Rather, the legality of information exchanges that report only aggregated data depends on whether the information exchange tends to

suppress competition, not on the format of the reported data. *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 390 (1923) (holding that concerted action "is forbidden when the necessary tendency is to destroy the kind of competition to which the public has long looked for protection"); *see also Container Corp.*, 393 U.S. at 337. Therefore, even without individual competitor price or production information, Defendants' information exchange could still violate § 1. *Todd*, 275 F.3d at 212 (concluding that anonymized, aggregated information was problematic because it enabled firms to glean information on competitors' budget plans and coordinate salaries in response); *N. Tex. Specialty Physicians*, 528 F.3d 346, 363 (5th Cir. 2008) (upholding conclusion that reports of mean, median, and mode of competitors was anticompetitive because it helped the organization encourage members on the low end of the range to raise their minimum rates in line with their peers). Thus, certain features of the information exchanged in the Agri Stats reports could generate anticompetitive effects, even if the data was aggregated.

Considering all of the above, the Court finds that the features of Agri Stats reports pose a threat to competition. And this threat is bolstered with evidence suggesting that the reports were in fact used to unreasonably restrain trade. Consumer IPPs point to opinion evidence that the Processor Defendants' information exchanges through Agri Stats had anticompetitive effects. In particular, Dr. Cabral concluded based on his qualitative analysis that the information exchange had "problematic features that are

associated with anticompetitive effects, and that pork processors exploited those features to reduce pork output and raise prices." (Cabral ¶ 12.)  In his view, evidence that Defendants relied on Agri Stats to identify and execute opportunities to raise prices shows "direct evidence of anticompetitive effects." (*Id.* ¶ 13.)  For example, Dr. Cabral discussed evidence of a Smithfield presentation detailing "price opportunities" "based on agri-stats data," as well as Clemens emails indicating that an employee "increased the pricing significantly" "[c]oming out of the Agristats review." (*Id.*)  In addition, Dr. Singer constructed a regression analysis and determined based on his quantitative analysis that the Consumer IPPs paid artificially high prices due to the Defendants' challenged conduct, and that those damages are quantifiable. (Singer ¶ 8.)

Defendants contend that Consumer IPPs cannot show that Agri Stats reports harm competition without damages analyses that consider the impact of Agri Stats separate from the rest of the Defendants' challenged conduct.  In other words, Defendants insist that damages to the Consumer IPPs based on the conduct analyzed under the § 1 per se violation must be analyzed separately from those based on the information exchange through Agri Stats.

Defendants assume that because the Consumer IPPs' experts did not quantify the harm to the Class specifically caused by Agri Stats, they lack antitrust standing.  *Fischer v. NWA, Inc.*, 883 F.2d 594, 597 (8th Cir. 1989) ("[A]ntitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws.").  Yet

the conduct underlying the per se and rule of reason theories is the same and, accordingly, do not require different damages models. *See In re Turkey Antitrust Litig.*, No. 19-8318, 2025 WL 264021, at *27 (N.D. Ill. Jan. 22, 2025) ("*[P]er se* and rule-of-reason claims do not involve different damages theories which require separate damages models."). Indeed, as the Court has previously noted in this litigation, per se and rule of reason are not separate claims; instead, they present different ways to analyze an antitrust claim, even though they are often dubbed "claims" by courts. *In re Pork*, 665 F. Supp. 3d at 996 n.14. Agri Stats reports played a central role in the antitrust violations alleged under the per se and rule of reason theories. There is significant evidence suggesting that the reports provided the primary form of communication whereby the Processor Defendants could coordinate their conduct in restraint of trade. Importantly, "the character and effect of the conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Agri Stats reports are bound up in the whole scheme, and Dr. Singer isolated the effect of the entire scheme on the Class. In fact, he calculated that the Class was overcharged by 12%, or roughly $3 billion, during the Relevant Period. (Singer ¶ 288.) The Court finds this sufficient to establish that the Consumer IPP class was harmed by Defendants' conduct for antitrust standing.

Everything considered, there is a genuine issue of material fact regarding whether Agri Stats reports have anticompetitive effects. Whether and to what extent Agri Stats reports generated anticompetitive effects is for a jury to decide.

### B.    Procompetitive Rationale

In the second step in the rule of reason analysis, the burden shifts to the defendants to show that a procompetitive rationale justifies the restraint. *Amex*, 585 U.S. at 541.

Defendants argue Agri Stats reports are procompetitive for many reasons. In particular, they claim the reports allow participants to improve efficiency of processing operations to lower costs for pork production; increase production of pork; calibrate product mixes to suit customer tastes; and, for firms with newer processing plants, measure how they were performing in the initial stages relative to the industry as a whole.

Courts have recognized the procompetitive benefits that benchmarking services offer. *Gypsum*, 438 U.S. at 441 n.16; *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 582-83 (1925) ("[T]he public interest is served by the gathering and dissemination, in the widest possible manner, of information with respect to the production and distribution, cost and prices in actual sales, of market commodities."); *Five Smiths*, 788 F. Supp. at 1053 ("[T]he exchange of price and other market information is generally benign conduct that facilitates efficient economic activity."). And here, there is evidence of Defendants using the Agri Stats reports for procompetitive purposes. For example, some Defendants used Agri Stats to identify opportunities to increase efficiency. (*See, e.g.*, Joint

Ex. 84 at 278:14–279:15, 281:11–20 (Clemens); Joint Ex. 68 at 57:13–23 (Triumph); Joint

Ex. 89 (Seaboard); Joint Ex. 90 ¶ 17 (Hormel).)  Others used the reports to invest in new

plant equipment or storage and to improve products.  (See, e.g., Joint Ex. 85 (Tyson); Joint

Ex. 86 (Smithfield); Joint Ex. 72 at 226:5–227:6 (JBS).)  Even some Plaintiffs subscribed to

Agri Stats and EMI during the Relevant Period.  (See, e.g., Joint Ex. 91 at 229:3–6, 231:8–

15, 232:5–18 (Plaintiff Kraft Heinz using Agri Stats's bacon reports to benchmarking

processing and plant operations); Joint Ex. 92 at 7 (Kraft subscribed from 2014 to 2017).)

The Consumer IPPs' primary argument is that, assuming the main procompetitive

justification is that the Agri Stats reports help lower costs, any lowered costs come at the

expense of wage suppression in the meat packing labor market, as up to 70% of

Defendants' costs are attributable to labor.  (CIPP Ex. 35 at 131:4–16.)  In other words,

any cost cuts based on Agri Stats opportunities inevitably mean that wages are being

suppressed in the meat packing labor market.  In support, Consumer IPPs direct the Court

to a case in the District of Colorado where the issue of wage suppression in the meat

packing labor market is currently being litigated.  Brown v. JBS, No. 22-2946 (D. Colo.); see

also Jien et al v. Perdue Farms, Inc. et al, No. 19-2521 (D. Md.).  In Brown, plaintiffs are

pork and beef meat packing workers alleging that processors, including some Defendants

in this case,[61] used Agri Stats to suppress their wages.  See Compl. ¶¶ 1, 16, 26–28, Brown

---

[61] Agri Stats, Hormel, JBS, Seaboard, Smithfield, Triumph, and Tyson are defendants in the
District of Colorado case.  See Compl., Brown v. JBS, No. 22-2946 (D. Colo.), Docket No. 1.

*v. JBS*, No. 22-2946 (D. Colo.), Docket No. 1. The court denied the defendants' motion to dismiss, finding the claims plausible. *See* Order, *Brown*, No. 22-2946, Docket No. 219. Tyson and JBS have since settled with the plaintiffs in that case. *See* Pls.' Mot. Prelim. Approval of Settlement, *Brown*, No. 22-2946, Docket No. 322. Because of *Brown* and similar cases, Consumer IPPs ask the Court to engage in cross-market balancing to consider whether actions that have procompetitive effects in one market but anticompetitive effects in another are justified. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 88 (1984) (considering whether preserving demand for tickets to live college football games could justify anticompetitive restraints in the market for live college football television); *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756 (1999) (weighing anticompetitive restrictions in the advertising market with procompetitive goals in the product market).

While the wage suppression argument is compelling, Consumer IPPs have cited no evidence in this record suggesting that the Processor Defendants engaged in wage suppression using Agri Stats reports, and thus ask the Court to make multiple logical leaps in support of their argument. In short, Consumer IPPs ask the Court to infer, from a partially-developed record in another case, that the Processor Defendants used the Agri Stats reports at issue in this case to suppress wages and that, because Defendants' alleged wage suppression harmed the pork packing labor market, Agri Stats reports have no procompetitive benefits in the pork processing market. Though the Court has considered

the alleged harm in the pork packing labor market as evidence undercutting Defendants' arguments that Agri Stats reports have procompetitive benefits, there is a genuine issue of material fact regarding whether Agri Stats reports have procompetitive benefits.

In the alternative, Consumer IPPs move for partial summary judgment on the procompetitive benefits of Agri Stats regarding the wage suppression issue. Though the Court is sympathetic to the possibility that Agri Stats reports are being used to suppress wages, the Consumer IPPs ask too much here. Even if 70% of Defendants' labor costs are attributable to labor, the Court is hesitant to find that the Agri Stats reports at issue here contain no procompetitive benefits as a matter of law just because other records in other cases suggest that some of the Defendants here used Agri Stats reports to suppress wages. While the Court recognizes the wage suppression element as an additional anticompetitive factor, it declines to rule on the procompetitive benefits of Agri Stats as a matter of law based on this theory. The Court will therefore deny the Consumer IPPs' alternative Motion for Partial Summary Judgment.

## C.   Substantially Less Restrictive Alternative Means

In the third step of the rule of reason framework, the burden shifts back to the plaintiffs to show that "the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Amex*, 585 U.S. at 542. Notably, Defendants are not required to use the "least restrictive means" of achieving legitimate business purposes. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 98 (2021). Rather, plaintiffs can satisfy the third prong if they demonstrate that "substantially less restrictive

alternative [means] existed to achieve the same procompetitive benefits the [Defendants] had proved at the second step." *Id.* at 100.  The Supreme Court encourages courts to "resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives" due to the courts' "limitations— as generalists, as lawyers, and as outsiders trying to understand intricate business relationships." *Id.* at 106.

Consumer IPPs insist that any plausible procompetitive effects that Agri Stats reports may produce can be achieved through other, less anticompetitive, means.  In particular, Dr. Cabral identified six modifications to Agri Stats reports that he claims would achieve any procompetitive benefits through less restrictive means: (1) eliminate the participant list in Agri Stats reports; (2) stop reporting granular results at the level of the company; (3) make Agri Stats available to all market participants, including pork purchasers, (4) aggregate the information in the export reports; (5) enact electronic security improvements to prevent access to records as employees change firms; and (6) implement longer delays in the publication of data.  (Cabral ¶ 123.)  Defendants argue that Dr. Cabral's proposed modifications are based on economic theory, not evidence.  Yet the Court finds that there is enough evidence here for a jury to consider in determining whether such modifications would eliminate the anticompetitive features of Agri Stats reports in their current state.

*    *    *

Because there are genuine issues of material fact regarding whether Agri Stats reports harm competition, whether the reports have procompetitive benefits, and whether there are less restrictive means to accomplish any procompetitive benefits, the Court will deny the Defendants' and Consumer IPPs' Motions for Summary Judgment under the rule of reason.

## IV.    REMAINING CLAIMS

Defendants challenge all of the remaining claims, including claims under the PSA, claims brought by the Commonwealth of Puerto Rico, claims brought by certain DAPs, and all of the claims arising under the laws of various states and the Commonwealth of Puerto Rico.

### A.    Packers and Stockyards Act

Defendants argue that certain DAPs' claims under the PSA, 7 U.S.C. § 192, fail at summary judgment for the same reasons that the Sherman Act claims fail.[62]

Section 202 of the PSA enumerates several unlawful practices for meat packers "with respect to livestock, meats, meat food products, or livestock products."  7 U.S.C. § 192.  One such unlawful practice is conspiring to "manipulate or control prices."  *Id.* § 192(f).  Defendants primarily argue that the PSA claims fail because they are based on the same alleged conspiracy underlying the Sherman Act claims, and the record

---

[62] Action Meat DAPs, Kroger DAPs, and Publix DAPs alleged PSA Claims.  (*See* DAP Compl. at 5–9, 15–20.)

demonstrates that Defendants acted independently.  However, the Court has determined that there is a genuine issue of material fact regarding whether the Defendants conspired to fix pork prices in violation of the Sherman Act.  And the Eighth Circuit has recognized that "[w]hile § 202 of the Packers and Stockyards Act may have been made broader than antecedent antitrust legislation in order to achieve its remedial purpose, it nonetheless incorporates the basic antitrust blueprint of the Sherman Act and other pre-existing antitrust legislation . . . ."  *Jackson*, 53 F.3d at 1458 (quoting *De Jong Packing Co. v. U.S. Dep't of Agric.*, 618 F.2d 1329, 1335 (9th Cir. 1980)).  Thus, the Court similarly finds there is a genuine issue of material fact as to whether the Defendants conspired to manipulate or control pork prices in violation of § 202(f) of the PSA.

Alternatively, additional unlawful practices enumerated by § 202 of the PSA include engaging in unfair, discriminatory, or deceptive practices and transferring or receiving articles from other entities or engaging in any business practice "for the purpose or with the effect of manipulating or controlling prices."  7 U.S.C. § 192(a), (d), (e).  The DAPs argue that, even if there is insufficient evidence that Defendants conspired to manipulate or control pork prices, their PSA claim can still survive under alternative provisions of the statute.  *See In re Cattle Antitrust Litig.*, Nos. 19-1222 & 19-1129, 2020 WL 5884676, at *7 (D. Minn. Sept. 29, 2020) (noting that failure to allege conspiracy under the Sherman Act is "not necessarily fatal" to a claim under § 202(a) of the PSA given the statute's intended broad, remedial scope).  In particular, the DAPs claim Defendants

violated the PSA by sending and receiving competitively sensitively information through Agri Stats reports and other forms of communication for the purpose or with the effect of manipulating or controlling prices.  In administering the PSA, the Code of Federal Regulations states that meat packers are prohibited from furnishing competitors with information concerning "proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid," as well as "any other buying information to competitor buyers."  9 C.F.R. § 201.69.

Defendants contend there is no evidence that they took any action for the purpose or with the effect of manipulating or controlling prices.  Further, they argue that the DAPs' experts analyzed the price impact of the alleged conspiracy as a whole, not specific actions by specific Defendants in the absence of any conspiracy.

Nonetheless, there is significant evidence in the record suggesting that Defendants exchanged competitively sensitive information to coordinate their conduct for the purpose of raising pork prices, which Plaintiffs' experts found reduced competition and caused supracompetitive pricing.  (*E.g.*, Zona ¶¶ 56–58; McClave §§ 2.0, 4.0.)  In the event a jury finds there was no conspiracy to fix prices, the Court finds sufficient evidence to allow a jury to alternatively decide whether Defendants exchanged articles or intentionally engaged in practices for the purpose or with the effect of manipulating or controlling prices.  *See Schumacher v. Cargill Meat Sols. Corp.*, 515 F.3d 867, 872 (8th Cir.

2008) (requiring that unlawful actions under § 202(e) be supported by evidence that the packer intentionally committed the unlawful conduct).

Because there are genuine fact questions regarding whether Defendants violated the PSA, the DAPs' PSA claims may continue to trial. Defendants' Motion as to these claims is thus denied.

### B.    Commonwealth of Puerto Rico

Defendants argue that the Commonwealth of Puerto Rico's parens patriae claims for direct purchases for violation of the Puerto Rico Antitrust Act are improperly pled.

In its Amended Complaint, Puerto Rico stated that it brought its action "on behalf of itself [that is, an allegedly direct and indirect purchaser] and as parens patriae on behalf of the population of Puerto Rico." (P.R. Compl. at 1, Jan. 22, 2020, Docket No. 103.) At the second round of motions to dismiss, the Court held that because Puerto Rico failed to plead—even with a simple conclusory sentence—that any of its residents are, in fact, direct purchasers, the Court would consider Puerto Rico's claims on its own behalf as both direct and indirect claims but would consider its parens patriae claims as only being indirect. *In re Pork*, 495 F. Supp. 3d at 800 n.26.

Puerto Rico never corrected this pleading deficiency, but its experts offer damages estimates that purport to include direct purchases made by Puerto Rico's consumers and businesses. (*See* Williams ¶¶ 604, 611 (calculating Puerto Rico's "total volume of commerce," including "purchases of Defendants' Relevant Products by Puerto Rico or consumers and businesses in Puerto Rico, directly or indirectly, in the Damages Period").)

Defendants now seek summary judgment on the claims for direct purchases by Puerto Rico's consumers and businesses and to exclude any damages for direct purchases from Puerto Rico's estimated damages. *Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1010 (8th Cir. 1993) ("It is axiomatic that a plaintiff is not entitled to damages if a plaintiff has failed to state a cognizable claim.").

Puerto Rico insists that it need not have pled that its residents are direct purchasers for Puerto Rico to assert claims for direct purchases in its parens patriae capacity. In the alternative, Puerto Rico requests leave to amend its pleadings pursuant to Federal Rule of Civil Procedure 15(b)(2) to clarify that its consumers and businesses include both direct and indirect purchasers.

The Court sees no reason to depart from its earlier decision that it would consider Puerto Rico's claims on its own behalf as both direct and indirect claims but its parens patriae claims as only being indirect due to pleading deficiencies. *In re Pork*, 495 F. Supp. 3d at 800 n.26. Puerto Rico could have sought leave to amend its complaint after the Court's order on the second round of motions to dismiss, but it failed to do so. *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050 (8th Cir. 2004) (noting "[c]ourts regularly deny motions to amend on "the eve of summary judgment"). Accordingly, the Court will deny Puerto Rico's request for leave to amend and grant Defendants' Motion in part as to Puerto Rico's parens patriae claims for direct purchases. To the extent that Puerto Rico

seeks damages for its consumers' and businesses' purchases in its parens patriae capacity, such damages for direct purchases must be excluded.

### C.    Amory

Defendants argue that the Direct Action Plaintiff Amory Investments LLC's ("Amory") Sherman Act claim fails not only on the merits but also because Amory's assignment is champertous and void.

Amory purchased the claims at issue from the bankruptcy estate of Maines Paper & Food Services. *See* Pet., *In re Maines Paper & Food Serv., Inc.*, No. 20-11502 (Bankr. D. Del. June 10, 2020), ECF No. 1; Ex. 2071.

Defendants argue Amory's assignment is void as champertous under the laws of Delaware or Illinois, which they contend govern the validity of Amory's assignment. Champerty refers to an agreement under which a third-party, an intermeddler, maintains or supports an individual's lawsuit in exchange for a portion of the proceeds.  14 Am. Jur. 2d Champerty, Maintenance, Etc. § 1 (2020).  In Defendants' view, Amory was created to house, prosecute, and profit from another entity's claims, such that it has only a financial interest in this action such that its assignment is void as champertous.  *See Hall v. State*, 655 A.2d 827, 829–30 (De. Super. Ct. 1994) (forbidding assignments "where the assignee had no interest in the cause of action prior to the assignment"); *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 238 A.3d 194, 203–04 (De. Super. Ct. 2020) ("Delaware continues to recognize a policy against sale of a lawsuit."); *Birner v. Gen. Motors Corp.*, No. 06-1148, 2007 WL 269847, at *3 (C.D. Ill. Jan. 26, 2007) (rejecting litigation assignment as "thinly

veiled champerty" where the assignee "had no involvement prior to the assignment and, absent the assignment, would have no interest at all in the subject matter of [the] case").

Resolving this issue requires a determination of whether state or federal law governs the validity of Amory's assignment. On the one hand, Defendants claim that state law governs, as Magistrate Judge John F. Docherty briefly noted that "[t]he validity of [an] assignment is a matter of state law" when ruling on Sysco's motion for substitution. *In re Pork Antitrust Litig.*, No. 18-1776, 2024 WL 511890, at *7 (D. Minn. Feb. 9, 2024). On the other hand, Plaintiffs claim that federal law governs, and federal antitrust policy permits the free assignment of claims.

Courts disagree on whether state or federal law should govern the validity of antitrust assignments. *Compare Martin v. Morgan Drive Away, Inc.*, 665 F.2d 598, 604 (5th Cir. 1982) (holding federal courts should look to state law when determining the validity of an assignment of federal antitrust claims), *with Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993) ("[T]he validity of the assignment of an antitrust claim is a matter of federal common law."). To the Court's knowledge, the Eighth Circuit has not explicitly spoken on this issue. Defendants contend otherwise, arguing that the Eighth Circuit held that selling an antitrust claim is a matter of contract law in *In re Milk Products Antitrust Litigation*, 195 F.3d 430, 435–36 (8th Cir. 1999). However, the question in *In re Milk* was whether the parties intended to include an antitrust claim in a sale of assets. The particular issue of the parties' intent depended on

contract interpretation, so the Eighth Circuit saw "little need for federal common law to govern[.]" *Id.* at 436. Here, though, the question concerns whether Amory's assignment is void as champertous, not the intent of the parties as to what rights were assigned. *In re Milk* therefore provides little guidance here.

Nevertheless, the Court finds persuasive authority from a parallel antitrust case in the turkey industry pending in the Northern District of Illinois, *In re Turkey Antitrust Litigation*, to be compelling. In that case, the court explicitly rejected the defendants' similar arguments and found Amory's assignment to be valid under federal law. *In re Turkey Antitrust Litig.*, 727 F. Supp. 3d 756, 759–62 (N.D. Ill. 2024); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289–92 (2008) (applying federal law to assignment of federal claims). Even though assignment agreements are contracts, which are typically governed by state law, applying federal law here comports not only with federalism principles dictating that states lack power to determine the transferability of federal interests, but also with antitrust principles encouraging the private enforcement of antitrust laws. *See In re Turkey*, 727 F. Supp. 3d at 759–62. That the assignment arose as part of a federal bankruptcy proceeding pushes the Court even more toward an implication that it arose under federal law. Therefore, the Court will apply federal law. And federal antitrust policy permits the free assignment of claims. *See id.* at 762–67 (discussing in depth the principles and case law supporting the conclusion that

federal common law does not recognize the champerty doctrine). Accordingly, Amory's assignment is not void as champertous. Amory may thus continue to litigate its claim.

###    D.    Sysco

Defendants challenge Sysco Corporation's ("Sysco") Sherman Act claims on two grounds.

First, Defendants argue Sysco's claims are unlawfully tainted by Burford Capital LLC's ("Burford") involvement. The Court previously affirmed the Magistrate Judge's order denying Sysco's request to substitute a Burford-created, special-purpose vehicle called Carina Ventures LLC ("Carina"), to whom Sysco had assigned its claims, in its place. *In re Pork Antitrust Litig.*, No. 18-1776, 2024 WL 2819438 (D. Minn. June 3, 2024). The Court was especially concerned that permitting a litigation funder to step into the shoes of its client via substitution would contravene antitrust and standing principles by condoning third parties with only investment interests to take over and litigate antitrust claims. *Id.* at *4.

Defendants now argue that because Burford effectively controls Sysco's litigation decisions and previously vetoed Sysco's negotiated settlements, the Court should dismiss Sysco's claims as contrary to public policy. However, the Court declines to do so. Sysco still has standing for its own claims in this case, and the Court will not prevent Sysco from continuing to litigate such claims. *See In re Pork*, 2024 WL 511890, at *5.

Second, Defendants argue that Sysco lacks standing to bring Sherman Act claims on behalf of its subsidiaries. Sysco disclosed 160 subsidiaries or affiliates and confirmed

that it has approximately 74 operating companies that purchase pork; sometimes those purchases involve Sysco, and sometimes those purchases bypass Sysco entirely.  (Misc. Ex. 46 at 31:13–32:9, 32:22–33:1; Proposed Order, Ex. 1 at 3–5, July 21, 2021, Docket No. 836-1 (identifying 160 Sysco subsidiaries or affiliates).)  In other words, evidence suggests that some of the purchases for which Sysco seeks damages were made directly by its subsidiaries without Sysco's involvement.

Sysco does not appear to have explicitly asserted claims on behalf of its subsidiaries' direct purchases in the DAP Complaint.  (*See generally* DAP Compl.)  Though, Sysco argues that it has been clear that it was pursuing claims on behalf of its subsidiaries based on the fact that Sysco and its subsidiaries opted out of settlements with some of the Defendants and opted out of the certified DPP class earlier in the litigation.

However, Defendants contend that Sysco has not established, by assignment or otherwise, that it has standing to bring claims for purchases made by its subsidiaries.  *In re Domestic Drywall Antitrust Litig.*, No. 15-1712, 2019 WL 3098913, at *5–6 (E.D. Pa. July 15, 2019) (finding parent company lacked Article III standing to "cover separately-organized subsidiaries and related legal entities simply because they engage in the same line of business and because some of them use the same brand name as their corporate parents").  Without standing for its subsidiaries' direct purchases, Sysco could not assert claims on their behalf.  *Young Am.'s Found. v. Kaler*, 14 F.4th 879, 887–88 (8th Cir. 2021)

(Article III standing); *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 450 (8th Cir.

1985) (antitrust standing).

Article III standing can be obtained through an assignment. *E.g.*, *Gulfstream III Assocs., Inc.*, 995 F.2d at 430–32. Sysco's subsidiaries have assigned their interests in this case to Sysco, but they did so on August 23, 2024, which was over two months after the Parties filed summary judgment motions and well after the close of discovery. (*See* Pls.' Ex. 2072.) The Court is reluctant to give much weight to this late assignment, which was presumably made to button up Sysco's apparent standing problem, especially given the lack of clarity regarding whether Defendants were given the opportunity to discover Sysco's subsidiaries and their purchases. *See Lopez Ent. Grp. v. Telemundo Commc'ns Grp.*, No. 13-5222, 2013 WL 12614474, at *3 (C.D. Cal. Oct. 14, 2024).

In addition to assignment, a parent company can obtain Article III standing through a showing that the parent and its subsidiaries are a "single entity." Under the single entity theory, a court could assume that a parent company is automatically injured for standing purposes by its subsidiary's purchase of a product at an illegally inflated cost. *See Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 500 (S.D.N.Y. 2005) (finding that parent company had standing based on evidence that parent company and affiliates were "acting as a single enterprise and shared a complete unity of interests"); *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 755852, at *3 n.4 (D.D.C. June 7, 2001) (finding that parent companies had standing based on evidence "contain[ing] numerous exhibits and

affidavits detailing the coordination between the parent companies and their subsidiaries"); *Farmland Dairies, Inc. v. N.Y. Farm Bureau, Inc.*, Nos. 87-1622 & 89-567, 1996 WL 191971, at *4 (N.D.N.Y. Apr. 5, 1996) (finding that parent company and its subsidiary were the "same entity" because "their interests are identical").

Here, however, Sysco has failed to produce sufficient evidence suggesting that Sysco and its subsidiaries have a complete unity of interests.  In fact, Sysco appears to assume that, because of the wholly owned subsidiary-parent relationship, the Court will just assume that Sysco and its operating companies' activities are coordinated to such a degree that any harm experienced by an operating company through inflated pork prices simultaneously caused harm to Sysco.  But the record lacks enough evidence to make that assumption.  Sysco merely points the Court to its Annual Form 10-K Reports, in which Sysco publicly discloses its subsidiaries on an annual basis, but such documentation alone does little to reassure the Court that Sysco and its subsidiaries act as a single enterprise. (*See* Letter to District Judge, Dec. 15, 2024, Docket No. 2787.)

Given the Court's concerns about the timeliness of the subsidiaries' assignment and the lack of record evidence to support Sysco's contention that it and its subsidiaries share a unity of interests, the Court will grant Defendants' Motion in part as to the claims that Sysco brings on behalf of its subsidiaries.

### E.    State and Commonwealth Claims

Defendants seeks summary judgment on the antitrust, consumer protection, and unjust enrichment claims that the Indirect Plaintiffs bring under the laws of various states and the Commonwealth of Puerto Rico.

### 1.    Antitrust Claims

Defendants' primary argument is that each of the antitrust claims arising under the laws of various states and Puerto Rico requires the Indirect Plaintiffs to establish a conspiracy to limit the supply of pork and that, because the Indirect Plaintiffs fail to do so, all such claims fall with their Sherman Act claims. Yet because the Court finds the Indirect Plaintiffs have presented sufficient evidence of a conspiracy to survive summary judgment for their Sherman Act claims, the Court will deny Defendants' Motion as to the antitrust claims arising under the laws of various states and Puerto Rico.

### 2.    Consumer Protection Claims

Defendants urge the Court to grant summary judgment on certain consumer protection claims for state-specific reasons, primarily arguing the claims are not actionable based on a price-fixing conspiracy or that they require a showing of reliance or causation.[63]

---

[63] Because the Indirect Plaintiffs are no longer pursuing their claims arising under North Dakota and Wisconsin's consumer protection statutes, the Court will grant Defendants' Motion as to the North Dakota and Wisconsin consumer protection claims.

### a.    Arkansas

The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code § 4-88-107(a)(10).  "[U]nconscionable acts" under the ADTPA include behavior which violates "public policy or statute." *Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark. 2006).  Defendants argue that claims under the ADTPA cannot be based on an alleged conspiracy to fix or stabilize prices.  But, as the Court previously noted at the pleading stage, unconscionable acts under the ADTPA include anticompetitive behavior like price-fixing schemes.  *See* Ark. Code § 4-75-302 ("A monopoly . . . is declared to be unlawful and against public policy[.]"), § 4-75-309 (banning price fixing).  The Court will therefore deny Defendants' Motion as to this claim.

### b.    District of Columbia

The District of Columbia Consumer Protection Procedures Act ("DCCPPA") prohibits "unfair or deceptive trade practice[s]."  D.C. Code § 28-3904.  Defendants argue that a claim under the DCCPPA cannot be based on an alleged price-fixing conspiracy.  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007) (dismissing claims under DCCPPA after determining that "pleading unconscionability requires something more than merely alleging that the price of a product was unfairly high" under the statute).  However, courts have broadly interpreted the DCCPPA to be "a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers."  *Atwater v. D.C.*

*Dep't of Consumer & Regul. Affs.*, 566 A.2d 462, 465 (D.C. 1989).  Though the statute enumerates a list of "unfair or deceptive trade practice[s]" prohibited under the statute, that list is not meant to be exclusive.  D.C. Code § 28-3904; *see also Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003) ("While the CPPA enumerates a number of specific unlawful trade practices, *see* D.C.Code § 28–3904, the enumeration is not exclusive.").  Thus, courts have recognized claims under the DCCPPA based on price-fixing conspiracies.  *E.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1126 (N.D. Cal. 2008); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 379 (D.R.I. 2019); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 182–83 (D. Me. 2004).  Given the expansive interpretation that courts have applied to the DCCPPA, the Court will deny Defendants' Motion as to this claim.

### c.    Hawaii

Hawaii's antitrust provisions prohibit "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Haw. Rev. Stat. § 480-2(a).  Causes of action alleging "unfair methods of competition" are recognizably distinct from causes of action for "unfair or deceptive acts or practices."  *Sakugawa v. Countrywide Bank F.S.B.*, 769 F. Supp. 2d 1211, 1222 (D. Haw. 2011).  As Defendants contend, there must be a showing of causation to bring a consumer protection claim under Hawaii law.  *Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 325–26 (Haw. 2010); *see also Sakugawa*, 769 F. Supp. 2d at 1222.  But to the extent that Defendants would require the Indirect Plaintiffs to show reliance or deception to establish causation, Hawaii

law does not require such a showing for claims based on unfair methods of competition. *Sakugawa*, 769 F. Supp. 2d at 1222 n.10 ("In an unfair method of competition claim, the second element is injury to the plaintiff's business or property resulting from the section 480–2 violation."); *Field v. Nat'l Collegiate Athletic Ass'n*, 431 P.3d 735, 747 (Haw. 2018) ("[T]he injury in fact must flow from the anticompetitive conduct.").  Therefore, the Court will deny Defendants' Motion as to this claim.

### d.    Nevada

The Nevada Deceptive Trade Practices Act ("NDTPA") provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . [v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services."   Nev. Rev. Stat. § 598.0923(3). Defendants argue that the Indirect Plaintiffs must show reliance to maintain their claim under the NDTPA.  *See Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 657–58 (D. Nev. 2009) (dismissing NDTPA claim based on misrepresentation for lack of reliance). However, courts have found that reliance is not required for NDTPA claims premised on price fixing or anticompetitive conduct.  *In re Loestrin*, 410 F. Supp. 3d at 378 ("The Court joins the majority of courts in holding that the Nevada Deceptive Trade Practices Act does not require . . . consumer reliance."); *In re Effexor Antitrust Litig.*, 337 F. Supp. 3d 435, 464–65 (D.N.J. 2018) (explaining the NDTPA does not require reliance and denying defendants' motion for judgment on the pleadings in case alleging anticompetitive scheme).

In the alternative, Defendants contend that the prices paid for the pork and the value received does not amount to a "gross disparity" sufficient to establish a violation of the NDTPA based on price-fixing. Nev. Rev. Stat. § 598.0923(2)(b)(2) ("'Unconscionable practice' means an act or practice which, to the detriment of a consumer . . . [r]esults in a gross disparity between the value received and the consideration paid, in a transaction involving transfer of consideration."). Yet the Court finds that the Indirect Plaintiffs have presented evidence that the price they paid for pork and the value they received were significantly disproportionate. *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 538, 586 (M.D. Pa. 2009). The Court finds this sufficient to deny Defendants' Motion as to this claim.

### e.    New Mexico

The New Mexico Unfair Practices Act ("NMUP") prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce[.]" N.M. Stat. § 57-12-3. Defendants argue that a claim under the NMUP cannot be premised on a price-fixing conspiracy. *See In re Graphics Processing Units*, 527 F. Supp. 2d at 1029–30. The NMUP defines an "unconscionable trade practice" as "an act or practice in connection with the sale, . . . of any goods or services, . . . that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." N.M. Stat. § 57-12-2(E). Courts have allowed claims under the NMUP based on price-fixing conspiracies to continue, so long as the

plaintiff alleges a "gross disparity" between the price paid and the value received.  *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 906–07 (E.D. Pa. 2012) (collecting cases); *see also In re Cast Iron Soil Pipe & Fittings*, No. 14-2508, 2015 WL 5166014, at *28 (E.D. Tenn. June 24, 2015); *In re Aftermarket Filters Antitrust Litig.*, No. 08-4883, 2009 WL 3754041, at *9 (N.D. Ill. Nov. 5, 2009).

Defendants also contend that the price paid for pork products and the value received does not amount to a "gross disparity" sufficient to establish a violation of the NMUP based on price fixing.  Yet courts have recognized that the payment of supracompetitive prices for a product, which the Indirect Plaintiffs have provided evidence of here, can constitute a "gross disparity" under the NMUP.  *In re Chocolate Confectionary*, 602 F. Supp. at 585–86.  Because the Indirect Plaintiffs have provided evidence that they paid artificially inflated prices for pork and that Defendants stabilized prices at supracompetitive levels, the Court will deny Defendants' Motion as to this claim.

### f.    North Carolina

Defendants argue that the Indirect Plaintiffs must demonstrate reliance to maintain their claims under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA").  *See McLamb v. T.P. Inc.*, 619 S.E.2d 577, 582 (N.C. Ct. App. 2005) ("[R]ecovery [under North Carolina's consumer protection statute] is limited to those situations when a plaintiff can show that plaintiff detrimentally relied upon a statement or misrepresentation."); *Bledsoe v. FCA US LLC*, 663 F. Supp. 3d 753, 803–05 (E.D. Mich. 2023) (applying North Carolina Law) (granting summary judgment on NCUDTPA claim in

putative class action false advertising case for failure to prove reliance). However, courts do not require a showing of reliance for all NCUDTP claims, just those predicated on an alleged misrepresentation. *Stester v. TAP Pharm. Prods., Inc.*, 598 S.E.2d 570, 584 (N.C. App. 2004) ("North Carolina's law does not require reliance by the plaintiff in order to successfully pursue a claim under G.S. § 75-1.1 . . ."); *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226–27 (N.C. 2013) (holding NCUDTP claims stemming from an alleged misrepresentation require reliance). Here, the Indirect Plaintiffs' claim under the NCUDTPA is not based on an alleged misrepresentation, but rather unfair methods of competition. Therefore, the Court will deny Defendants' Motion as to this claim.

### g.    South Carolina

South Carolina's Unfair Trade Practices Act ("SCUTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices" and is intended to be interpreted in harmony with the Federal Trade Commission Act. S.C. Code § 39-5-20. Defendants claim that the Indirect Plaintiffs must show reliance and causation to maintain their claim under the SCUTPA. *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d 176, 189 (S.C. 2015) (explaining that a private litigant bringing a SCUTPA claim must show a "causal connection" between the actual injury and the unfair or deceptive acts or practices); *Doe 9 v. Varsity Brands, LLC*, No. 22-3509, 2023 WL 4113198, at *11 (D.S.C. June 21, 2023) (dismissing SCUTPA claim for failure to show reliance as required for the "causal nexus" and stating "[e]stablishing this causal connection in a misrepresentation case necessarily requires proof that the plaintiff detrimentally relied on the defendant's

deceptive conduct."). However, there is no explicit requirement that SCUPTA claims predicated on unfair methods of competition, as opposed to deceptive acts or practices, be accompanied with a showing of reliance. Indeed, the statute requires private plaintiffs to merely demonstrate "a causal connection between the injury-in-fact and the complained of unfair or deceptive acts or practices." *State ex rel. Wilson*, 777 S.E.2d at 189.

In the alternative, Defendants argue that the alleged conduct did not adversely impact the public as required to prevail under the SCUTPA. *Omni Outdoor Advert. Inc. v. Columbia Outdoor Advert. Inc.*, 974 F.2d 502, 507–08 (4th Cir. 1992). "An impact on the public interest may be shown if the acts or practices have the potential for repetition," which can be demonstrated by "(1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the company's procedures created a potential for repetition of the unfair and deceptive acts." *Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461, 466 (S.C. 2004). Here, there is evidence that Defendants conspired to artificially inflate prices in the past that makes it likely they will continue to do so absent deterrence. This is sufficient to deny Defendants' Motion as to this claim. *See also In re Pork*, 665 F. Supp. 3d at 1003–05 (analyzing impact of Defendants' alleged conspiracy on the Classes).

### h.    West Virginia

The West Virginia Consumer Credit and Protection Act ("WVCCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce[.]"  W. Va. Code § 46A-6-104.  Defendants again point to *In re Graphics Processing Units* in arguing that a claim under the WVCCPA cannot be based on a price-fixing conspiracy.  527 F. Supp. 2d at 1029–30.  To be sure, courts have found that price fixing is not within the scope of the WVCCPA.  *See In re Flash Memory*, 643 F. Supp. 2d at 1162; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007); *TFT-LCD*, 586 F. Supp. 2d at 1130–31.  Nonetheless, since the West Virginia Legislature's 2015 amendment to the WVCCPA, in which it stated an intent for courts to "be guided by the policies of the Federal Trade Commission and interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act[,]" at least one court has found that a claim under the WVCCPPA can be premised on a price-fixing conspiracy.  W. Va. Code § 46A–6–101; *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1087-88 (S.D. Cal. 2017).  The Court is thus satisfied that the WVCCPPA was intended to be interpreted broadly in its mission to prohibit unfair and deceptive trade practices, including price-fixing schemes.

Defendants also contend that, to maintain a claim under the WVCCPPA, the Indirect Plaintiffs must present evidence that they relied on the deceptive conduct or that the deceptive conduct was the cause of the harm.  Yet the Supreme Court of West Virginia has analyzed this precise issue and determined that when a plaintiff alleges concealment or omission, the plaintiff can show proximate cause without a showing of reliance.  *White*

*v. Wyeth*, 705 S.E.2d 828, 837 (W. Va. 2010); *see also In re Ranbaxy Generic Drug Application Antitrust Litig.*, No. 19-2878, 2019 WL 6341298, at *9 (D. Mass. Nov. 27, 2019) ("Where an omission is the alleged violative conduct, a plaintiff may show proximate cause in the absence of any proof of reliance."). Here, the Indirect Plaintiffs have presented evidence that production was lower than it would have been but-for the alleged conspiracy, that Defendants raised pork prices, and that the Indirect Plaintiffs paid artificially inflated prices for pork. The Court finds this sufficient to deny Defendants' Motion as to this claim.

### 3. Unjust Enrichment Claims

Defendants ask the Court to grant summary judgment on the Indirect Plaintiffs' unjust enrichment claims on the basis that such claims are predicated on the same deficient proof of an alleged conspiracy to restrict pork supply as the Sherman Act claims. In general, unjust enrichment claims require a showing that the defendant received benefit at the plaintiff's expense "under circumstances that would make it unjust for [the] defendant to retain benefit without paying for it." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (citing Restatement of Restitution § 1 (1937)). Defendants primarily argue there is insufficient evidence that they retained a benefit, e.g., that prices materially increased during the Relevant Period, such that the Indirect Plaintiffs suffered any inequitable harm. However, the Court finds there is sufficient evidence for a jury to determine that Defendants formed a conspiracy that benefitted them and harmed the Indirect Plaintiffs.

Defendants also challenge the unjust enrichment claims under the laws of fourteen jurisdictions[64] on the ground that such jurisdictions only permit equitable remedies where no adequate remedy at law exists. The unjust enrichment claims are premised on the same conduct as that underlying the federal and state antitrust and consumer protection laws. Because the other causes of actions "would provide adequate relief if Plaintiffs succeeded in proving up their claims," Defendants claim the Indirect Plaintiffs should not be permitted to simultaneously pursue equitable remedies. *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 969 (D. Minn. 2009).

Because it is still unclear whether the Indirect Plaintiffs' claims will prevail, the Court will allow the unjust enrichment claims to continue. *In re Pork*, 495 F. Supp. 3d at 798–99. The Federal Rules of Civil Procedure generally allow plaintiffs to plead alternative theories of recovery. Fed. R. Civ. P. 8(d)(2), (3). And courts have permitted unjust enrichment claims to proceed in the alternative in the challenged jurisdictions, even at the summary judgment stage. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2011 WL 4501223, at *13–14 (N.D. Cal. Sept. 28, 2011); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 544–46; *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 237–43 (M.D. Pa. 2010); *In re Processed Egg Prods.*, 851 F. Supp. 2d at 916–18 & n.50; *In*

---

[64] Hawaii, Kansas, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, Oregon, South Carolina, South Dakota, Tennessee, West Virginia, and Puerto Rico. Because the Indirect Plaintiffs are no longer pursuing their unjust enrichment claim under New Hampshire law, the Court will grant Defendants' Motion as to the New Hampshire unjust enrichment claim.

*re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 851 (E.D. Pa. 2019). Therefore, the Court will deny Defendants' Motion as to the unjust enrichment claims arising under the laws of Hawaii, Kansas, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, Oregon, South Carolina, South Dakota, Tennessee, West Virginia, and Puerto Rico.  It is the Court's understanding that the unjust enrichment claims are pled in the alternative.  While the Court will allow Plaintiffs to proceed on unjust enrichment in the alternative, Plaintiffs may not recover under both theories at trial.

## CONCLUSION

The Court will grant in part and deny in part the pending motions for summary judgment.  Because the Court finds there are genuine issues of material fact regarding whether Defendants formed an agreement to fix prices and the evidence tends to exclude the possibility of independent action by Defendants, the Court will deny Defendants' Motion for Summary Judgment on Plaintiffs' per se claims under the Sherman Act. Because the Court finds there are genuine disputes regarding whether Agri Stats, Clemens, JBS, Seaboard, Smithfield, Triumph, and Tyson knowingly joined a price-fixing conspiracy, the Court will deny those Defendants' Motions for Summary Judgment.  The Court will grant Hormel's Motion for Summary Judgment.  Because the Court finds there are genuine issues of material fact regarding whether Agri Stats reports violate the rule of reason, the Court will deny Defendants' and Consumer Indirect Purchaser Plaintiffs' cross Motions for Summary Judgment on the information exchange through Agri Stats reports.  There are also genuine issues of material fact regarding whether the statute of

limitations for the Sherman Act claims is tolled under the continuing violation or fraudulent concealment doctrines. The Court will grant in part and deny in part Defendants' Motion for Summary Judgment as to the remaining claims as consistent with this Memorandum Opinion and Order.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Joint Motion for Summary Judgment on Plaintiffs' Alleged Per Se Claims Under the Sherman Act [Docket No. 2245] is **DENIED**;

2. Defendants' Joint Motion for Summary Judgment on all Remaining Claims Against Defendants [Docket No. 2266] is **GRANTED in part and DENIED in part** as follows:

   a. The Motion is **GRANTED** as to:

      i. The Commonwealth of Puerto Rico's direct purchase claims in its parens patriae capacity;

      ii. Plaintiff Sysco Corporation's claims on behalf of its subsidiaries and affiliates;

      iii. Plaintiffs' claims arising under North Dakota and Wisconsin's consumer protection statutes;

      iv. Plaintiffs' claim for unjust enrichment under the laws of New Hampshire;

b. The Motion is **DENIED** as to the remaining claims;

3. Defendant Agri Stats, Inc.'s Motion for Summary Judgment [Docket No. 2379] is **DENIED**;

4. Defendants Clemens Food Group, LLC and the Clemens Family Corporation's Motion for Summary Judgment [Docket No. 2323] is **DENIED**;

5. Defendants Hormel Foods Corporation and Hormel Foods, LLC's Motion for Summary Judgment [Docket No. 2273] is **GRANTED**;

6. Defendant JBS USA Food Company's Motion for Summary Judgment [Docket No. 2338] is **DENIED**;

7. Defendant Seaboard Foods LLC's Motion for Summary Judgment [Docket No. 2275] is **DENIED**;

8. Defendant Smithfield Foods, Inc.'s Motion for Summary Judgment [Docket No. 2344] is **DENIED**;

9. Defendant Triumph Foods, LLC's Motion for Summary Judgment [Docket No. 2284] is **DENIED**;

10. Tyson Defendants' Motion for Summary Judgment on All Claims Against Tyson [Docket No. 2271] is **DENIED**; and

11. Consumer Indirect Purchaser Plaintiffs' Motion for Partial Summary Judgment as to Defendants' Liability Under Consumer Indirect Purchaser Plaintiffs' Rule of Reason Claim, or in the Alternative for Partial Summary

Judgment on the Procompetitive Benefits of Agri Stats [Docket No. 2350] is

**DENIED**.


DATED:  April 28, 2025                                    _John R. Tunheim_
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                    United States District Judge