# CADWALADER

Cadwalader, Wickersham & Taft LLP
200 Liberty Street, New York, NY 10281
Tel +1 212 504 6000  Fax +1 212 504 6666
www.cadwalader.com

May 9, 2025

Re: *In re Pork Antitrust Litig.*, No. 18-cv-1776 (JRT/JFD)

Dear Judge Tunheim:

We write on behalf of DAPs with claims against Seaboard Foods LLC ("**Seaboard**") (*see* ECF 2989) in opposition to its request for permission to file a motion for reconsideration (ECF 2976) (the "**Request**"). Seaboard's Request should be denied for three independent reasons. *First*, Seaboard fails to identify anything close to the "compelling circumstances" necessary for the Court to take the extraordinary step of reconsideration. Rather, the Request re-hashes three arguments already carefully considered and rejected by the Court and thus seeks "nothing more than 'a second bite at the apple,' something the rules prohibit." *Edina Realty, Inc. v. TheMSLOnline.com*, 2006 WL 1314303, at *1 (D. Minn. May 11, 2006) (Tunheim, J.) (quoting *Dale & Selby Superette & Deli v. U.S. Dep't of Agric.*, 838 F. Supp. 1346, 1348 (D. Minn. 1993)). *Second*, as explained below, the arguments Seaboard has raised again should be rejected again for all the reasons clearly explained in the Court's comprehensive summary judgment order. *Third*, the Request should be denied for the additional reason that it ignores the "ample documents and communications that on the whole suggest that Seaboard was involved in the conspiracy" (ECF 2955 at 142), including evidence that its CEO "encouraged the industry to implement a 10% liquidation in order to 'right-size the industry' . . . like Smithfield and Tyson" (*id.* at 143), "ample communications between Seaboard and co-Defendants that support an inference that Seaboard knowingly joined the alleged conspiracy" (*id.* at 144), and economic evidence that Seaboard underutilized its capacity and its "market share effectively flatlined" during the conspiracy (*id.* at 140). *See Cenveo Corp. v. S. Graphic Sys., Inc.*, 2011 WL 1672034, at *2 (D. Minn. May 4, 2011) (Tunheim, J.) (denying request for leave for reconsideration where defendants "argu[ed] that three facts utilized by the Court are not supported by the record," in part because "the record is replete with other evidence" that sufficiently supported the Court's findings "for the purposes of denying summary judgment").

**I. There Is Ample Evidence Seaboard Participated in Agri Stats to Further the Conspiracy.**

The Court correctly found that "the invitation and acceptance to participate in Agri Stats reports" by Seaboard and its co-Defendants "supports an inference of a conspiracy." (ECF 2955 at 78.) In its Request, Seaboard attempts to equate itself with Hormel by arguing, counterfactually, that there is no evidence it used Agri Stats reports when setting prices. That assertion ignores that what was "highly suspicious" about Agri Stats was the fact that Seaboard and its co-Defendants "willingly decided to share competitively sensitive business information with a third-party, who in turn distributed that information" to them. (*Id.* at 107.) By contrast, what distinguished Hormel was the fact that it was "the only Processor Defendant who did not formally subscribe to the sales

CADWALADER

analysis program." (*Id.* at 68).[1]  In any event, the Court correctly found there is sufficient evidence that "Seaboard used Agri Stats reports on a 'regular basis' to identify products priced lower than competitors" (*id.* at 145) and "identify opportunities to improve sales price" (*id.* at 69).  (*See, e.g.*, PX-350 ("Once I brought in actual data from Agri Stats, [Seaboard's Director of Sales] Brian is finally changing his pricing structure . . . it looks like Sales may finally be doing something about pricing them higher.").)

**II.  There Is Ample Evidence Seaboard and Triumph Reached a "Gentlemen Agreement."**

The Court also carefully considered and rejected all of Seaboard's arguments regarding the "gentlemen agreement to start the first shift" of the joint Seaboard-Triumph plant "without adding new sows to the industry." (PX-180.)  Indeed, the Court referenced that document numerous times throughout its decision (*see* ECF 2955 at 57, 145, 162, 181) and described it as "one of the most hotly contested pieces of evidence in this case" (*id.* at 181).  Seaboard nonetheless again attempts to distort the plain meaning of that document by arguing that "partners" refers only to the members of Triumph, rather than both Seaboard and Triumph—the entities which partnered together to "enter[] a joint 50-50 venture" in connection with their new plant.  (*Id.* at 139.)  The Court was correct to reject Seaboard's interpretation because it would rewrite the document and require the Court to view a disputed fact in the light most favorable to the *moving* party.[2]  In addition, DAPs' reading of the plain language of the document is consistent with the economic evidence, which shows that the vast majority of "Seaboard's sow herd inventory increases" at the end of the conspiracy "came via acquisition of existing sow herds" and thus "would not have increased market-wide sow herd supply." (ECF 2528 at 20-21 (citing Dr. Lamb Report ¶ 175).)

**III.  There Is Ample Evidence Seaboard's Export Activity Furthered the Conspiracy.**

Finally, Seaboard again contends there is insufficient evidence that "Seaboard's export prices for certain products were consistently lower than what Seaboard would have been able to obtain domestically."  (ECF 2955 at 141).  For purposes of its Request, Seaboard does not, however, dispute the Court's findings that there is sufficient evidence Seaboard "was sometimes exporting at a loss;" "Seaboard regularly stated its intent to increase exports to get products off the domestic market;" and "Seaboard communicated its export sales information with other Defendants, including Smithfield."  (*Id.*)  Rather, Seaboard's Request is limited to arguing about what Dr. Lamb, one of the DAP experts, opined.  Dr. Lamb's opinion is clear: based on his review of the available data, he found "Seaboard sold pork products abroad at lower prices than in the U.S." on average repeatedly *over the course of a six-year period*, and "Seaboard's export conduct cannot only be explained by its unilateral economic self-interest in the absence of the alleged conspiracy." (ECF 2528-12, Dr. Lamb Reply Report ¶¶ 329, 331.)  All this evidence taken together was more than sufficient to support the Court's conclusion.

---

[1] In fact, the Court found Hormel "reviewed pricing opportunities . . . identified by Agri Stats." (*Id.* at 69).

[2] Seaboard's attempt to sweep PX-1606 and other, unspecified documents under the rug as innocent market intelligence fails for the same reasons.

CADWALADER

                              Respectfully submitted,

                              */s/ Philip J. Iovieno*
                              Philip J. Iovieno