# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Case No.: 0:18-cv-01776 (JRT-JFD) |
| This Document Relates To: | |
| THE DIRECT PURCHASER PLAINTIFF CLASS ACTION | |

## DECLARATION OF BRIAN DEVERY IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR SECOND <u>DISTRIBUTION OF NET SETTLEMENT PROCEEDS</u>

I, Brian Devery, declare as follows:

1.    I am a Director of Client Services with A.B. Data, Ltd. ("A.B. Data"). I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.    A.B. Data was appointed by the Court to act as the Notice, Claims, and Settlement Administrator in the above-captioned action (the "Action"). In these roles, A.B. Data, provided notice to inform Class Members about the settlements with JBS USA Food Company Holdings ("JBS") and Smithfield Foods, Inc. ("Smithfield"); claims process for the settlements with JBS and Smithfield; class certification and settlement with Seaboard Foods LLC ("Seaboard"); settlement with Hormel Foods Corporation ("Hormel Foods"); and recent settlements with Clemens Food Group, LLC and The Clemens Family Corporation ("Clemens"); Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson") and claims process. A.B. Data completed the first distribution of the Net Settlement Fund from the JBS and Smithfield settlements. A.B. Data's duties also include, among other things, establishing and maintaining a toll-free telephone helpline and website dedicated to this Action and received and processed Claim Forms and Direct Purchaser Antitrust Purchase Audit Request Forms ("Audit Forms") along with supporting documentation.

3.    The Court granted final approval of the settlement with Seaboard in its *Order Granting Direct Purchaser Plaintiffs' Motion for Final Approval of the Class Action Settlement with Seaboard Foods LLC. and Entry of Final Judgment* on March 5, 2025 (ECF No. 2137), settlement with Hormel Foods in its *Order Granting Direct Purchaser*

*Plaintiffs' Motion for Final Approval of the Class Action Settlement with Hormel Foods Corporation and Entry of Final Judgment* on October 3, 2025 (ECF No. 2618), and settlements with Clemens, Triumph, and Tyson in its *Order Granting Motion for Final Approval of the Class Action Settlements Between Direct Purchaser Plaintiffs and the Tyson, Clemens, and Triumph Defendants* on August 13, 2025 (ECF No. 3129).

4. A.B. Data has completed processing all claims received. This declaration provides A.B. Data's administrative determinations accepting and rejecting the Claim Forms in support of *Direct Purchaser Plaintiffs' Memorandum in Support of Motion for Second Distribution of Net Settlement Proceeds*.

## CLASS MEMBER DATA

5. As described in A.B. Data's prior declarations, A.B. Data worked closely with Co-Lead Class Counsel[1] and their data team to develop a list of Class Members that would receive notice. The list of unique potential Class Members ("Class List") now contains 42,778 entries.

6. The Class List also contains data showing Class Members' purchases of affected qualifying types of pork during the Class Period from producer Defendants or collected during the previous notice and/or claims process.

7. A.B. Data prepopulated the Claim Forms for each Class Member using the purchase data in its records. The Claim Forms contain a unique ID that could be utilized to file claims online through the Settlement Website. Class Members were permitted to

---

[1]All capitalized terms not defined herein have the meanings given to them in the Final Approval Declaration.

challenge the prepopulated amounts by submitting a Direct Purchaser Antitrust Purchase Audit Request Form, along with supporting documentation.

8.    Class Members for whom purchase data was not available were able to complete and submit a Purchase Audit Request Form along with supporting documentation.

9.    Class Members who filed a claim in earlier settlements with JBS and Smithfield or received a payment from the first distribution of the Net Settlement Fund, were not required to submit another Claim Form to be eligible to participate.

## MAY 2025 NOTICE CAMPAIGN

10.    The *Declaration of Tracy Hanson Regarding: (a) Mailing of the Notice Packet and (b) Publication of the Summary Notice Regarding the Tyson, Clemens, and Triumph Defendants Settlements* (ECF No. 3118) ("Hanson Declaration") described the implementation of the recent Notice Plan to provide notice to Class Members about the settlements with Tyson, Clemens, and Triumph and the claims process. Similar to previous notice plans implemented in this Action, this Notice Plan featured a combination of: direct notice by electronic mail ("email") or mail to potential Class Members, print advertising in *Supermarket News* and *Nation's Restaurant News*, digital advertising for 30 days on www.supermarketnews.com and www.nrn.com, and a toll-free telephone number and case-specific website to address Class Member inquiries.

11.    As described in the Hanson Declaration, on May 12, 2025, A.B. Data mailed the Court-approved Long-Form Notice and either a prepopulated Claim Form (for Class Members for purchase information was available) or a blank Purchase Audit Request Form

(for Class Members for whom purchase information was not available) (collectively, the "Notice Packet") via U.S. First Class mail to 42,778 Class Members (known direct purchasers) identified during the previous notice plans in this litigation. Of these Notice Packets 51 were returned as undeliverable.

12.     On the same day, the Email Notice, that included a unique ID for online claims filing, was sent to 1,399 email addresses associated with potential Class Members, 982 of which were successfully delivered. A.B. Data also caused the Publication Notice to be published in industry publications and placed banner display advertisements on industry websites.

## **CLAIM FORM REVIEW**

13.     Class Members could submit a Claim Form online at the Settlement Website or through the mail ("paper"). If Class Members filed a claim in the earlier settlements with JBS and Smithfield (or received a payment from the previous distribution), they were not required to file another claim. Class Members had to submit their Claim Forms by June 11, 2025.

14.     A.B. Data's database contains a total of 1,796 claims including 1,461 claims that were previously paid and 335 "new" claim forms received during this claims period. Of the new Claim Forms received, 53 were submitted by mail and 282 were submitted online.

15.     Of the 335 new claim forms received, 197 claim forms were submitted by class members that already received a prior payment and changes were reflected, leaving a total of 138 newly submitted claims that were not previously paid in prior settlements.

16.     Of the new forms received, 328 Claim Forms were timely submitted, and 7

Claim Forms were submitted after the claims deadline.

## PURCHASE AUDIT REQUEST FORM REVIEW

17.   Class Members also had the option to submit a Purchase Audit Request Form online or via mail to supplement or correct their known purchase information or if they were self-identified or no purchase information was available for them. The Purchase Audit Request Form had to be submitted with documents that supported the purchase amounts the claimant reported in the form. Class Members had to submit their Purchase Audit Request Forms by June 11, 2025.

18.   As of December 1, 2025, A.B. Data has received and fully processed 419 Purchase Audit Request Forms submitted during this claims period. Of these Purchase Audit Request Forms, 76 were submitted by mail and 343 were submitted online.

19.   Of the Purchase Audit Request Forms, 306 were submitted by prior claimants (from the JBS and Smithfield settlements) who wanted their prepopulated purchase amounts to be audited or updated.

20.   Also, of the Purchase Audit Request Forms, 23 were submitted by new claimants who wanted their prepopulated purchase amounts to be audited or updated and 90 were submitted by new claimants for whom prepopulated data was not available.

21.   Of the new forms received, 418 Purchase Audit Request Forms were timely submitted, and 1 Purchase Audit Request Form was submitted after the deadline.

## PURCHASE AUDIT REQUEST FORM PROCESSING

22.   Information from each Purchase Audit Request Form, including the claimant's contact information and listed purchase information, was entered into the case-specific

database and matched to known Class Members, if applicable. Purchase data provided by the claimant to support their Purchase Audit Request Form was further reviewed as described below.

23.    For Purchase Audit Request Forms that were submitted by claimants who self-identified and for whom no prepopulated data was available, A.B. Data compared the information provided against the purchase data to determine if data for that claimant was available. Whether A.B. Data located a match or similar entity, or could not locate a match, A.B. Data escalated these claims to Class Counsel and their data team for confirmation. When a match was confirmed, the claimant's record was updated accordingly in the case-specific database.

## THE DEFICIENCY PROCESS

24.    A.B. Data reviewed all Claim Forms, and Purchase Audit Request Forms, and supporting documents.

25.    A.B. Data utilized internal codes ("flags") to identify and classify claims with deficiency or ineligibility conditions. For example, if a claimant did not properly sign a form, the applicable flag was applied to denote the deficiency. A.B. Data used flags to document missing form information (or facial deficiencies), duplicate claims, Purchase Audit Request Forms with missing documentation, ineligible products, indirect purchases, among other conditions. Appropriate flags were assigned to these claims and checked several times as they were processed. Also, A.B. Data worked closely with Class Counsel to review deficient and ineligible claims and supporting documentation.

26.    Claimants with claims that were determined to have defects were given the

opportunity to cure their claims and have the flags removed. The deficiency process involved contacting claimants and responding to communications from these claimants by email and/or telephone. This process was intended to help claimants properly complete their otherwise deficient submissions, so they could be eligible to participate in the settlements.

27. If the claims were not cured, the claim was determined to be ineligible for payment from the Net Settlement Fund.

28. Of the total Claim and Audit request forms received, A.B. Data initially determined there were 223 claims and requests were deficient because:

(a) Did not list the amount purchased of qualifying pork types on the Purchase Audit Request Form;

(b) Did not provide an authorization letter (if filing as a third-party payor or counsel on behalf of a Class Member);

(c) Did not provide individualized qualifying types of pork purchases on the Purchase Audit Request Form;

(d) Did not submit any, adequate, or complete supporting documents with their Purchase Audit Request Form; and/or

(e) Was a duplicate of another claim.

29. A.B. Data sent emails with deficient (or otherwise inadequate) claims (the "deficiency notices"). The deficiency notices provided the reason(s) the claim was deficient, instructions on how the claimant could cure the deficiencies and the deadline to do so. These emails advised claimants that they needed to submit appropriate information and/or documentary evidence to complete their claim or it would be recommended for rejection to

the extent that they did not cure the deficiency condition.

30.    As of November 4, 2025, A.B. Data received 52 submissions from claimants that attempted to cure their deficiencies. A.B. Data carefully reviewed each submission, to determine whether it cured the deficiency and validated the record. Sometimes claimants submitted several rounds of documentation to support their claim. When appropriate, A.B. Data conferred with Class Counsel and its data team to determine whether the additional submissions were sufficient to support a given claim. Of the 52 responses, 45 cured their deficiency in whole or in part and 178 deficiencies were not cured or curable.[2]

31.    In addition, A.B. Data initially determined that there were 104 claims that were ineligible because the claim was duplicative of a previously-filed claim, did not include direct purchases, included purchases solely for use or delivery outside the United States, only included non-qualifying types of pork, only included purchases not made from Defendants (or their respective subsidiaries or affiliates), did not include purchases during the class period (June 29, 2014 through June 30, 2018), was submitted by an excluded Class Member, or was withdrawn by the filer.

32.    Duplicate claims were initially reviewed and researched before they were determined to be ineligible. When an exact duplicate was identified (for example, where a claim was submitted online to A.B. Data and the original hard-copy was sent by mail and received at a later date), it was flagged for rejection. When claims were filed by the same claimant with a standardized name, A.B. Data evaluated the contact information provided

---

[2] 74 claims or audits that were not cured in entirety but where defendant data or where a prior payment was made, reverted to the original data.

by the claimant to determine whether the claims were filed by the same entity. If these claimants' addresses were different, A.B. Data reached out to the claimant(s) to determine which claim should "survive" and which should be consolidated and rejected.

33.    A.B. Data sent letters via First-Class Mail to claimants and emails (to third-party filers) whose claims were determined to be ineligible (the "ineligibility notices"). The ineligibility notices provided the reasons a claim was determined to be ineligible, instructions on how the claimant could respond, and the deadline to do so.

34.    Claimants' responses to deficiency and ineligibility notices were scanned into the case-specific database and associated with the corresponding claims.

## SUPPORTING DOCUMENTS REVIEW/AUDIT

35.    A.B. Data reviewed and/or audited all supporting documents submitted with Purchase Audit Request Forms, such as invoices and structured transactional data. Both programmatic and manual reviews were utilized.

36.    Specifically, A.B. Data reviewed the supporting purchase information included with each claim to verify the amount claimed was made for qualifying types of pork, from Defendants (or their respective subsidiaries or affiliates), for use or delivery in the United States, from June 29, 2014 through June 30, 2018. A.B. Data methodically reviewed each submission during several rounds and tabulated the purchase data to verify the claimed purchase amounts and verify eligible purchases. After A.B. Data's processing team completed their initial review, claims were again reviewed by a member of A.B. Data's operations team responsible for administration of this matter, and the claims were finally reviewed by A.B. Data's quality assurance team.

37.    Claims with documents where qualifying purchases were able to be verified were updated in the case-specific database. When claim submissions showed assignment agreements, assigned purchases were credited to the assignee's claim and debited from the assignor's claim, as appropriate.

38.    Claims could be marked as deficient in whole or in part if the supporting documents included purchases for non-qualifying types of pork, from a distributor or entity that was not a Defendant (or one of its respective subsidiaries or affiliates), purchases were not made for use or delivery in the United States, and/or purchases were not made from June 29, 2014 through June 30, 2018.

39.    Also, A.B. Data worked closely with Co-Lead Class Counsel to resolve questions about specific purchase data, including whether certain products were eligible, for example, if product descriptions in the claimant's data were unclear. When Co-Lead Class Counsel determined that a claimant had verified purchases, A.B. Data recorded the approved amount in the case-specific database.  When Co-Lead Class Counsel determined that the claimed amounts were not proven, the claim was marked as deficient.

40.    As noted above, deficiency notices were sent to all claimants whose claims were determined to be deficient.

## CLAIM DETERMINATIONS

41.    A.B. Data tabulated qualifying purchases for the class periods, excluding Class Members that opted out of the JBS and/or Smithfield settlements and/or certified class

accordingly.[3]

42.    Through the multi-layered review process described above, A.B. Data has made the following claim determinations. As of the filing of this Motion there are no outstanding disputes or issues.

**Timely Submitted and Valid Claims**

43.    A.B. Data validated 1,614 claims, in whole or in part, totaling $50,666,928,578.02 in purchases.

44.    There are 1,154 valid claims from the earlier settlements who did not submit a new Purchase Audit Request totaling $31,759,885,797.16 in purchases.

45.    There are 304 claimants who submitted validated Purchase Audit Request Forms with approved purchase amounts that differed from their previous claim or prepopulated Claim Form totaling $14,609,189,449.28 in purchases.

46.    There are 156 claimants who submitted validated new claim forms that did not have a previously paid claim or a prepopulated claim form totaling $4,297,853,331.58 in purchases.

47.    A.B. Data recommends that the above timely submitted and validated claims be approved by the Court.

**Late But Otherwise Eligible Claims**

48.    A total of 7 claims were received or postmarked after June 11, 2025, the claim

---

[3] As stated in previous A.B. Data declarations, 85 Class Members opted out of the JBS settlement, 94 Class Members opted out of the Smithfield settlement, and 77 Class Members opted out of the certified class (and would not be eligible for payments from the Seaboard, Hormel Foods, Clemens, Triumph, and Tyson settlements).

filing deadline. Of these 3 were received within two weeks of the claim filing deadline, June 11, 2025, and all 4 were received on or before July 12, 2025.

49.     Of the late claims, A.B. Data validated 4 new claims, in whole or in part, totaling $23,458,678.83 in purchases. The remaining 3 late claims were deficient and should be rejected for reasons in addition to tardiness.

50.     Of the late but otherwise valid claims, 3 are valid claims not previously paid who did not submit a new Purchase Audit Request totaling $177,382.83 in purchases.

51.     Of the late but otherwise valid claims, 1 claimant submitted validated Purchase Audit Request Forms with approved purchase amounts that differed from their previous claim or prepopulated Claim Form totaling $23,281,296.00.

52.     These late claims did not delay the claim review process, and A.B. Data recommends that the 4 late and validated claims be approved by the Court.

**Total Claims**

53.     There are a total of 1,618 valid and payable claims, including the late claims referenced above totaling $50,690,387,256.85[4]. A list of Claimant Numbers for claimants with validated claims, and the purchase amounts validated for each claimant and each claim's status as previously paid, newly submitted or updated,[5] is attached as **Exhibit A**.

---

[4] A.B. Data continues to review claims received and perform advanced quality assurance auditing; therefore, this amount is subject to change.

[5] Previously paid claims are those where the claimant received a payment in the initial distribution from the JBS and Smithfield settlements. Newly submitted claims are those where the claimant did not file a claim or receive a payment in the initial distribution and filed a claim now. Updated claims are those where the claimant received a payment in the initial distribution or filed a claim in the previous JBS and Smithfield settlements and requested that A.B. Data update or audit their claim.

**Rejected Claims**

54.     After the responses to deficiency and ineligibility notices were processed and the review and audit process completed, a total of 104 claims remain recommended for rejection by the Court for the following reasons:

- 96 Duplicate Claims;

- 2 Withdrawn Claims;

- 4 Claims with only exported products;

- 1 Claim submitted by excluded entities; and

- 1 Claim with no direct purchases.

## DISTRIBUTION PREPARATION

55.     A.B. Data will issue payments to claimants with approved claims promptly after Court approval.

56.     A.B. Data recommends that the checks sent to qualified claimants state that they are "Non-Negotiable After 90 Days" and no check be negotiable more than 120 days after the date of the check. The additional 30 days will allow for bank processing and a small period of time for individuals who present their checks to the bank after 90 days but the bank continues to accept the check for payment.

## FEES AND EXPENSES

57.     Class Counsel has received invoices detailing the work A.B. Data performed to provide notice, settlement, and claims administration in this Action. A.B. Data has been paid fees and expenses in the amount of $493,193.82 through October 31, 2025. To date,

A.B. Data has incurred $34,348.34 in costs in connection with the claims process and distribution, which have not yet been paid. A.B. Data's estimated fees and expenses, including the anticipated cost of completing this distribution, are $49,719.55.

## CONCLUSION

58.     A.B. Data respectfully requests that the Court approves its administrative determinations, accepting and rejecting the submitted claims and the proposed distribution plan.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of December 2025, in Oakdale, New York.

By: _____
Brian Devery