UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN RE PORK ANTITRUST LITIGATION

Case No. 18-1776 (JRT/JFD)

MDL No. 21-2998

This Document Relates To:

COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFF ACTIONS

**DECLARATION OF CAMERON R. AZARI, ESQ. REGARDING NOTICE PROGRAM**

I, Cameron Azari, declare as follows:

1. My name is Cameron R. Azari, Esq. I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

2. I am a nationally recognized expert in the field of legal notice, and I have served as an expert in hundreds of federal and state cases involving class action notice plans.

3. I am a Senior Vice President of Epiq Class Action & Claims Solutions, Inc. ("Epiq") and the Managing Director of Epiq Legal Noticing (aka Hilsoft Notifications), a business unit of Epiq that specializes in designing, developing, analyzing, and implementing large-scale, un-biased, legal notification plans. Epiq recently rebranded as Epiq Legal Noticing. I previously filed declarations in this matter related to Epiq's administration of the settlements with the JBS, Smithfield Foods, Seaboard, Hormel, and Clemens Defendants.

4. Epiq is an industry leader in class action administration, having implemented more than a thousand successful class action notice and settlement administration matters. Epiq has been involved with some of the most complex and significant notice programs in recent history, examples of which are discussed below. My team and I have experience with legal noticing in more than 700 cases, including more than 75 multidistrict litigation settlements, and have prepared notices that have appeared in 53 languages and been distributed in almost every country, territory, and dependency in the world. Courts have recognized and approved numerous notice plans developed by Epiq, and those decisions have invariably withstood appellate review.

## EXPERIENCE RELEVANT TO THIS CASE

5.  I have served as a notice expert and have been recognized and appointed by courts to design and provide notice in many large and significant cases, including:

a)  *In Re Pork Antitrust Litigation (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (Clemens), 18-cv-01776 (D. Minn.), involved a $7.75 million settlement with Defendants Clemens Food Group, LLC and The Clemens Family Corporation. The Notice Program (individual notice and supplemental media - nationally distributed digital and social media) reached 76% of the settlement classes, with an average frequency of 2.0 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

b)  *In Re Pork Antitrust Litigation (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (Hormel), 18-cv-01776 (D. Minn.), involved a $2.4 million settlement with Defendant Hormel Foods Corporation and Hormel Foods, LLC. The Notice Program (individual notice and supplemental media - nationally distributed digital and social media) reached 77% of the settlement classes, with an average frequency of 2.6 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

c)  *In Re Pork Antitrust Litigation (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (Seaboard), 18-cv-01776 (D. Minn.), involved a $4.9 million settlement with Defendant Seaboard Foods LLC. The Notice Program (individual notice and supplemental media - nationally distributed digital and social media) reached 77% of the settlement classes, with an average frequency of 2.6 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

d)  *In Re Pork Antitrust Litigation (Commercial and Institutional Indirect Purchaser Plaintiff Action)*, 18-cv-01776 (D. Minn.), involved class certification notice for non-settling Defendants. The Notice Program (individual notice and supplemental media - nationally distributed digital and social media) reached 77% of the classes, with an average frequency of 2.6 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

e) *In Re Pork Antitrust Litigation (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (Smithfield), 18-cv-01776 (D. Minn.), involved a $42 million settlement with Defendant Smithfield Foods, Inc. The Notice Program (individual notice and supplemental media - nationally distributed digital and social media) reached 72% of the settlement classes, with an average frequency of 2.25 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

f) *In Re Pork Antitrust Litigation (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (JBS), 18-cv-01776 (D. Minn.), involved a $12.75 million settlement with Defendants JBS USA Food Company, JBS USA Food Company Holdings, Swift Pork Company, and related or affiliated entities. The Notice Program (individual notice and supplemental media - nationally distributed digital and social media) reached 71% of the settlement classes, with an average frequency of 2.6 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

g) *In Re Turkey Antitrust Litigation* 1:19-cv-08318 (N.D. Ill.) - *Sandee's Catering et al. v. Agri Stats, Inc. et al., (Commercial and Institutional Indirect Purchaser Plaintiff Action)* (Tyson), No. 1:20-cv-02295 (N.D. Ill.), involved a $1.75 million settlement with Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Tyson Prepared Foods, Inc., and the Hillshire Brands Company. The Notice Program (individual notice and supplemental media – nationally distributed digital and social media) reached 73% of the settlement classes, with an average frequency of 2.7 times each. The reach was further enhanced by internet sponsored search listings, an informational release, and a settlement website.

h) *In re Juul Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation*, 19-md-02913 (N.D. Cal.), involved two settlements totaling $300 million for JUUL Labs, Inc. and Altria, which alleged consumers were misled about JUUL products' addictiveness and safety, causing them to pay more, and that JUUL products were unlawfully marketed to minors. Two companion notice programs were implemented with more than 10.7 million email notices and nearly 500,000 postcard notices sent to potential class members and comprehensive

media efforts (over 936 million impressions delivered). The notice programs each reached approximately 80% of the class nationwide.

    i) *In re Takata Airbag Products Liability Litigation*, MDL No. 2599, 1:15-md-02599 (S.D. Fla.), involved $1.91 billion in settlements with BMW, Mazda, Subaru, Toyota, Honda, Nissan, Ford, and Volkswagen regarding Takata airbags. The notice programs included individual mailed notice to more than 61.8 million potential class members and extensive nationwide media via consumer publications, U.S. Territory newspapers, radio, digital notices, mobile digital notices, and behaviorally targeted digital media. Combined, the notice programs reached more than 95% of adults aged 18+ in the U.S. who owned or leased a subject vehicle, with a frequency of 4.0 times each.

    j) *In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.). Second Circuit affirmed. *See Fikes Wholesale, Inc. v. Visa U.S.A., Inc.* 62 F.4th 704 (2d Cir. 2023). The case involved a $5.5 billion settlement reached by Visa and MasterCard. An intensive initial notice program included more than 19.8 million direct mail notices sent to potential class members, together with insertions in over 1,500 newspapers, consumer magazines, national business publications, trade and specialty publications, with notices in multiple languages, and a digital notice campaign (delivering more than 770 million adult impressions). Sponsored search listings and a settlement website in eight languages expanded the notice program. For the subsequent settlement reached by Visa and MasterCard, an extensive notice program was implemented, which included over 16.3 million direct mail notices to class members together with more than 354 print publication insertions and digital notices (delivering more than 689 million adult impressions).

    k) *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 (E.D. La.), involved landmark settlement notice programs to distinct "Economic and Property Damages" and "Medical Benefits" settlement classes for BP's $7.8 billion settlement related to the Deepwater Horizon oil spill. Notice efforts included more than 7,900 television spots, 5,200 radio spots, and 5,400 print insertions and reached over 95% of Gulf Coast residents.

6. Courts have recognized my testimony regarding which method of notification is appropriate for a given case, and I have testified on numerous occasions on whether a certain method of notice represents the best notice practicable under the circumstances. Numerous court opinions and comments regarding my testimony, and the adequacy of our notice efforts, are included in our *curriculum vitae* included as **Attachment 1**.

7. In forming expert opinions, my team and I draw from our in-depth class action case experience, as well as our educational and related work experiences. I am an active member of the Oregon State Bar, having received my Bachelor of Science from Willamette University and my Juris Doctor from Northwestern School of Law at Lewis and Clark College. I have served as the Director of Legal Notice for Epiq since 2008 and have overseen the detailed planning of virtually all of our court-approved notice programs during that time. Overall, I have more than 25 years of experience in the design and implementation of legal notification and claims administration programs, having been personally involved in hundreds of successful notice programs.

8. The facts in this declaration are based on my personal knowledge, as well as information provided to me by my colleagues in the ordinary course of my business at Epiq and Epiq Legal Noticing (hereinafter "Epiq").

## OVERVIEW

9. This declaration will describe the Notice Program for the Commercial and Institutional Indirect Purchaser Plaintiffs ("Notice Program" or "Notice Plan") and notice (the "Notice" or "Notices") proposed here for *In re Pork Antitrust Litigation*, Case No. 18-1776 (JRT/JFD) for Settling Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc. ("Tyson"). Epiq developed the Notice Program based on our prior experience and research into the notice issues in this case. We have analyzed and propose the most effective method practicable of notice for the Settlement Classes.

10. In my opinion, the Notice Program is designed to reach the greatest practicable number of Settlement Class members through the use of individual notice and targeted media notice.

## NOTICE PROGRAM METHODOLOGY

11. Federal Rule of Civil Procedure 23 directs that notice must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."[1] The Notice Program will satisfy this requirement. Notice will include an individual notice effort and will be supplemented by a targeted media campaign.

12. Data sources and tools that are commonly employed by experts in this field were used to analyze and develop the media portion of this Notice Program. These include MRI-Simmons data,[2] which provides statistically significant readership and product usage data, Comscore,[3] and Alliance for Audited Media ("AAM")[4] statements, which certify how many readers buy or obtain copies of publications. These tools, along with demographic breakdowns indicating how many people use each media vehicle, as well as computer software that take the

---

[1] Fed. R. Civ. P. 23(c)(2)(B).

[2] MRI-Simmons is a leading source of publication readership and product usage data for the communications industry. MRI-Simmons is the new name for the joint venture of GfK Mediamark Research & Intelligence, LLC ("MRI") and Simmons Market Research. MRI-Simmons offers comprehensive demographic, lifestyle, product usage and exposure to all forms of advertising media collected from a single sample. As the leading U.S. supplier of multimedia audience research, the company provides information to magazines, televisions, radio, Internet, and other media, leading national advertisers, and over 450 advertising agencies—including 90 of the top 100 in the United States. MRI-Simmons's national syndicated data is widely used by companies as the basis for the majority of the media and marketing plans that are written for advertised brands in the United States.

[3] Comscore is a global internet information provider for planning, transacting and evaluating media across platforms. With a data footprint that combined digital, linear TV, OTT and theatrical viewership intelligence with advanced audience insights, Comscore allows media buyers and sellers to quantify their multiscreen behavior. A leader in measuring digital and TV audiences and advertising at scale, Comscore is the industry's emerging, third-party source for reliable and comprehensive cross-platform measurement.

[4] Established in 1914 as the Audit Bureau of Circulations ("ABC") and rebranded as Alliance for Audited Media ("AAM") in 2012, AAM is a non-profit cooperative formed by media, advertisers, and advertising agencies to audit the paid circulation statements of magazines and newspapers. AAM is the leading third-party auditing organization in the U.S. It is the industry's leading, neutral source for documentation on the actual distribution of newspapers, magazines, and other publications. Widely accepted throughout the industry, it certifies thousands of printed publications as well as emerging digital editions read via tablet subscriptions. Its publication audits are conducted in accordance with rules established by its Board of Directors. These rules govern not only how audits are conducted, but also how publishers report their circulation figures. AAM's Board of Directors is comprised of representatives from the publishing and advertising communities.

underlying data and factor out the duplication among audiences of various media vehicles, allow us to determine the net (unduplicated) reach of a particular mailing and media schedule. We combine the results of this analysis to help determine notice plan sufficiency and effectiveness.

13. ***Tools and data trusted by the communications industry and courts.*** Virtually all of the nation's largest advertising agency media departments utilize, scrutinize, and rely upon such independent, time-tested data and tools, including net reach and de-duplication analysis methodologies, to guide the billions of dollars of advertising placements that we see today, providing assurance that these figures are not overstated. These analyses and similar planning tools have become standard analytical tools for evaluations of notice programs and have been regularly accepted by courts.

14. In fact, advertising and media planning firms around the world have long relied on audience data and techniques: AAM data has been relied on since 1914; 90 to 100% of media directors use reach and frequency planning;[5] all of the leading advertising and communications textbooks cite the need to use reach and frequency planning.[6] According to MRI-Simmons data, 90 of the top 100 media firms use MRI-Simmons data. According to Comscore more than 3,200 companies worldwide including mainstream, prominent brands use Comscore. And at least 25,000 media professionals in 100 different countries use media planning software.[7]

---

[5] *See generally* Peter B. Turk, Effective Frequency Report: Its Use And Evaluation By Major Agency Media Department Executives, 28 J. ADVERTISING RES. 56 (1988); Peggy J. Kreshel et al., How Leading Advertising Agencies Perceive Effective Reach and Frequency, 14 J.ADVERTISING 32 (1985).

[6] Textbook sources that have identified the need for reach and frequency for years include: JACK S. SISSORS & JIM SURMANEK, ADVERTISING MEDIA PLANNING, 57-72 (2d ed. 1982); KENT M. LANCASTER & HELEN E. KATZ, STRATEGIC MEDIA PLANNING 120-156 (1989); DONALD W. JUGENHEIMER & PETER B. TURK, ADVERTISING MEDIA 123-126 (1980); JACK Z. SISSORS & LINCOLN BUMBA, ADVERTISING MEDIA PLANNING 93 122 (4th ed. 1993); JIM SURMANEK, INTRODUCTION TO ADVERTISING MEDIA: RESEARCH, PLANNING, AND BUYING 106-187 (1993).

[7] For example, Telmar, founded in 1968, provides strategic targeting and media planning solutions to advertisers, agencies, data suppliers and media sales houses. Over 25,000 media professionals in 100 countries use Telmar systems for media and marketing planning tools including reach and frequency planning functions.

## NOTICE PROGRAM DETAIL

15. The *Long-Form Settlement Agreement Between Commercial and Institutional Indirect Purchaser Class Plaintiffs and Tyson Foods, Inc., Tyson Fresh Meats, Inc., and Tyson Prepared Foods, Inc.* ("Settlement Agreement") defines the Settlement Classes as:

### Commercial and Institutional Indirect Purchaser Plaintiffs

**Injunctive Class:** All entities that indirectly purchased uncooked pork bacon, or one or more of the following types of raw pork, whether fresh or frozen: loins, shoulder, ribs, hams, or pork chops from defendants or co-conspirators for their own use in commercial food preparation in the United States from June 28, 2014 to June 30, 2018. For this lawsuit, pork excludes any product that is marketed as organic and/or no antibiotics ever and any product other than bacon that is marinated, seasoned, flavored, or breaded, but it includes uncooked and cooked ham water added products.

**Damages Class:** All entities that indirectly purchased uncooked pork bacon, or one or more of the following types of raw pork, whether fresh or frozen: bellies, loins, shoulder, ribs, hams, or pork chops from defendants or co-conspirators for their own use in commercial food preparation in the Repealer Jurisdictions[8] from June 28, 2014 to June 30, 2018. For this lawsuit, pork excludes any product that is marketed as organic, no antibiotics and/or no antibiotics ever (NAE) and any product other than bacon that is marinated, seasoned, flavored, or breaded, but it includes uncooked and cooked ham water added products.[9]

16. Given our experience with similar notice efforts, including the Notice Programs

---

[8] "Repealer Jurisdictions" are those states that have "repealed" the Supreme Court's holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and provide standing to indirect purchasers. Commercial IIPPs assert damages claims in: Arkansas, Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. The class period for Kansas, Massachusetts, Mississippi, South Carolina, and Tennessee class members begins June 28, 2015.

[9] Excluded from the Settlement Classes are: natural persons who purchased pork for their personal use and not for commercial food preparation (End-User Consumers); purchasers of pork directly from Defendants; purchasers of pork for resale in unaltered form; purchasers of pork from an intermediary who has further processed the pork; the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant; any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action; and any coconspirator identified in this action.

that we implemented for the settlements with Defendants JBS, Smithfield Foods, Seaboard, Hormel, and Clemens we expect the Notice Program with individual notice and supplemental media - nationally distributed digital and social media notice will reach approximately 70% of the Settlement Classes, with an average frequency of 2.0 times each. "Reach" refers to the estimated percentage of the unduplicated audience exposed to the notice. Notice exposure is defined as the opportunity to see a notice. "Frequency" of notice exposure is the average number of times that those reached by a notice would be exposed to the notice. The reach will be further enhanced by internet sponsored search listings, an informational release, and a settlement website, which are not included in the estimated reach calculation. In my experience, the projected reach of the Notice Program is consistent with other court approved notice programs, is the best notice practicable under the circumstances of this case and has been designed to satisfy the requirements of due process, including its "desire to actually inform" requirement.[10]

## INDIVIDUAL NOTICE

### *Email Notice – Direct Mail*

17.   Epiq will acquire an email list of restaurants nationwide ("Class List"). This data will be used to provide individual notice to the Settlement Classes. Epiq will use the potential Class List to send an Email Notice to valid email addresses contained in the Class List.

18.   Industry standard best practices will be followed for the Email Notice effort. The Email Notice will be created using an embedded html text format. This format will provide easy-to-read text without graphics, tables, images and other elements that in our experience would increase the likelihood that the message could be blocked by Internet Service Providers (ISPs) and/or SPAM filters for this type of email communication. Each Email Notice will be transmitted with a unique message identifier. The Email Notice will include an embedded link to the settlement website. By clicking the link, recipients will be able access the Long Form

---

[10] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . .").

9
DECLARATION OF CAMERON R. AZARI, ESQ. REGARDING NOTICE PROGRAM

Notice and other information about the settlement. The proposed Email Notice is included as **Attachment 2**. The proposed Long Form Notice is included as **Attachment 3**.

19. If the receiving email server cannot deliver the message, a "bounce code" will be returned along with the unique message identifier. For any Email Notice for which a bounce code is received indicating that the message was undeliverable for reasons such as an inactive or disabled account, the recipient's mailbox was full, technical auto-replies, etc., at least two additional attempts will be made to deliver the Notice by email.

### *Media Plan*

#### ***Targeted Internet Digital Advertising***

20. Internet advertising has become a standard component in legal notice programs. The internet has proven to be an efficient and cost-effective method to target class members as part of providing notice of class certification and/or a settlement for a class action case. According to MRI-Simmons data, 97% of all adults are online and 85% of all adults use social media.[11]

21. The Notice Program includes targeted digital advertising on selected advertising networks, which will be targeted to Settlement Class members. The internet Digital Notices will link directly to the settlement website, thereby allowing visitors easy access to relevant information and documents.

22. The internet Digital Notices use language from the Long Form Notice, which will allow users to identify themselves as potential Settlement Class members. As an additional way to draw the interest of Settlement Class members, and to be consistent with Federal Judicial Center's ("FJC") recommendations that a picture or graphic may help class members self-identify, the internet Digital Notices will prominently feature a high-resolution graphic of a diagram of the pork butcher cuts identified on a pig. Examples of the proposed Digital Notices are included as **Attachment 4**.

23. The Notice Program includes internet Digital Notices in various sizes, which will be placed on the advertising networks, *Google Display Network* and *Yahoo Audience Network*.

---

[11] MRI-Simmons 2024 Survey of the American Consumer®.

Combined, these ad networks cover 90% of the United States' population that is online. All internet Digital Notices will run on desktop, mobile and tablet devices and will be distributed to the selected targeted audiences nationwide as described below. Digital Notices will also be targeted (remarketed) to people who visit the website after clicking on a Digital Notice.

24. The Notice Program also includes advertising on social media, which will consist of internet Digital Notices on *Facebook* and *LinkedIn* in multiple sizes. *Facebook* is the leading social networking site in the United States with more than 196.9 million users[12] in the United States and *LinkedIn* is the world's largest professional network on the internet with 250 million members in the United States.[13]

25. More details regarding the target audiences, distribution, and specific ad sizes of the internet Digital Notices, are included in the following table.

| Network/Property | Target | Distribution | Ad Sizes | Planned Impressions |
|---|---|---|---|---|
| Google Display Network | Adults 18+ | National | 728x90, 300x250, 300x600, 970x250 | 19,000,000 |
| Google Display Network | Custom Affinity Audience:[14] Business Owner | National | 728x90, 300x250, 300x600, 970x250 | 27,000,000 |
| Google Display Network | Custom Intent Audience:[15] Food Service | National | 728x90, 300x250, 300x600, 970x250 | 27,000,000 |
| Google Display Network | Custom Affinity Audience: Food Service | National | 728x90, 300x250, 300x600, 970x250 | 27,000,000 |
| Yahoo Audience Network | Finance/Business Channels | National | 728x90, 300x250, 300x600, 970x250 | 23,500,000 |
| Facebook | Adults 18+ | National | Newsfeed & Right Hand Column | 5,000,000 |

---

[12] Statista Digital 2025: Global Overview Report. Statista, founded in 2007, is a leading provider of worldwide market and consumer data and is trusted by thousands of companies around the world for data. Statista.com consolidates statistical data on over 80,000 topics from more than 22,500 sources and makes it available in German, English, French and Spanish.

[13] Statista Digital 2025: Global Overview Report.

[14] "Custom Affinity Audience" means Digital Notices will be targeted to specific website content, here meaning websites, blogs, etc. that focus on business owners, small business, business and industrial, business news, business opportunities, and business formation.

[15] "Custom Intent Audience" means Digital Notices will be targeted to individuals who have searched for the targeted topic, here meaning the food service, restaurant supply, business and industrial, good distribution, and hospitality industry.

| Network/Property | Target | Distribution | Ad Sizes | Planned Impressions |
|---|---|---|---|---|
| *Facebook* | Interests include Business Ownership | National | Newsfeed & Right Hand Column | 15,000,000 |
| *Facebook* | Interests include Food Service | National | Newsfeed & Right Hand Column | 15,000,000 |
| *Facebook* | Demographics Targeting: Food and Restaurants | National | Newsfeed & Right Hand Column | 15,000,000 |
| *LinkedIn* | Jobs in the Food Service Industry | National | LinkedIn Ads | 8,500,000 |
| **TOTAL** | | | | **182,000,000** |

26. Combined, approximately 182 million targeted impressions will be generated by the internet Digital Notices, which will run for approximately 31 days nationwide.[16] Clicking on the Digital Notices will link the reader to the settlement website, where they can easily obtain detailed information about the settlement.

27. Throughout the implementation of the Notice Program, Epiq will continuously monitor the effectiveness of the Notice Program to ensure impression goals are met to satisfy a combined reach of approximately 70%.

### *Sponsored Search Listings*

28. The Notice Program includes purchasing sponsored search listings to facilitate locating the settlement website. Sponsored search listings will be acquired on the three most highly visited internet search engines: *Google*, *Yahoo!*, and *Bing*. When search engine visitors search on selected common keyword combinations related to the settlement, the sponsored search listing will be generally displayed at the top of the page prior to the search results or in the upper right-hand column. Representative search terms will include word and phrase variations related to the settlement. The sponsored search listings will be displayed nationwide. All sponsored search listing ads will link directly to the settlement website.

---

[16] The third-party ad management platform, ClickCease will be used to audit the Digital Notice ad placements. This type of platform tracks all Digital Notice ad clicks to provide real-time ad monitoring, fraud traffic analysis, blocks clicks from fraudulent sources, and quarantines dangerous IP addresses. This helps reduce wasted, fraudulent, or otherwise invalid traffic (*e.g.*, ads being seen by 'bots' or non-humans, ads not being viewable, etc.).

*Informational Release*

29. To build additional reach and extend exposures, a party-neutral Informational Release will be issued broadly over PR Newswire to approximately 13,000 general media (print and broadcast) outlets, including local and national newspapers, magazines, national wire services, television and radio broadcast media across the United States as well as approximately 4,000 websites, online databases, internet networks and social networking media. The informational release will also be distributed to more than 640 journalists that report specifically on restaurants and the food industry.

30. The Informational Release will include the address of the settlement website and the toll-free telephone number. Although there is no guarantee that any news stories will result, the Informational Release will serve a valuable role by providing additional notice exposures beyond that which was provided by the paid media.

*Case Website, Toll-free Telephone Number, and Postal Mailing Address*

31. The existing settlement website (www.PorkCommercialCase.com) established for the previous settlements with Defendants JBS, Smithfield Foods, Seaboard, Hormel, and Clemens will be updated with information regarding the Tyson Settlement. The settlement website will allow Settlement Class members to obtain detailed information about the settlement and review key documents, including the Complaints, Long Form Notice, and the Settlement Agreement, as well as answers to frequently asked questions ("FAQs"), instructions for how Settlement Class members may object to the Tyson Settlement, contact information for the Settlement Administrator, and how to obtain other case-related information. The settlement website address will be displayed prominently on all Notice documents.

32. The existing toll-free telephone number (1-855-867-0738) established for the previous settlements with Defendants JBS, Smithfield Foods, Seaboard, Hormel, and Clemens will be updated with information regarding the Tyson Settlement. Settlement Class members will be able to call for additional information, listen to answers to FAQs, and request that a Long Form Notice be mailed to them. The toll-free telephone number will be prominently displayed in the

Notice documents as well. The automated phone system will be available 24 hours per day, 7 days per week.

33. A post office box and an email address for correspondence about the settlement will also be established and maintained, allowing Settlement Class members to contact the Settlement Administrator by mail with any specific requests or questions.

## PLAIN LANGUAGE NOTICE DESIGN

34. The proposed Notices are designed to be "noticed" and reviewed by Settlement Class members and are written in plain language so the Notices will be understood by Settlement Class members. The design of the Notices follows the principles embodied in the FJC's illustrative "model" notices posted at www.fjc.gov. Many courts, and as previously cited, the FJC itself, have approved notices written by our notice experts and designed in a similar fashion. The Notices contain substantial, albeit easy-to-read, summaries of all of the key information about Settlement Class members' rights and options. Consistent with our normal practice, all notice documents will undergo a final edit for grammatical errors and accuracy.

35. The Notices are designed to increase noticeability and comprehension. Once people "notice" the Notices, it is critical that they can understand them. As such, the Notices, as written, are clearly worded with an emphasis on simple, plain language to encourage readership and comprehension.

36. The Notices feature a prominent headline in bold text. These design elements will alert recipients and readers that the Notice is an important document authorized by a court and that the content may affect them, thereby supplying reasons to read the Notice.

37. The proposed Long Form Notice provides substantial information to Settlement Class members. It begins with a summary page, which provided a concise overview of the important information and a table, which highlights key options available to Settlement Class members. The Notice is categorized into logical sections, which helps to organize the information, while a question and answer format makes it easy to find answers to common questions by breaking the information into simple headings.

DECLARATION OF CAMERON R. AZARI, ESQ. REGARDING NOTICE PROGRAM

## CONCLUSION

38. In class action notice planning, execution, and analysis, we are guided by due process considerations under the United States Constitution, by federal and local rules and statutes, and further by case law pertaining to notice. This framework directs that the notice program be designed to reach the greatest number of potential class members and, the notice or notice program itself provide class members with easy access to the details of how the class action may impact their rights. All of these requirements will be met in this case.

39. The Notice Program includes individual notice to potential identified Settlement Class members and supplemental media. I reasonably expect the Notice Program (individual notice and supplemental media - nationally distributed digital and social media notice) will reach approximately 70% of the Settlement Classes. The reach will be further enhanced by internet sponsored search listings, an informational release, and a settlement website. The FJC's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, which is relied upon for federal cases, states that, "the lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%."[17] Here, we have developed a Notice Program that will readily achieve a reach within that standard.

40. The Notice Program follows the guidance for how to satisfy due process obligations that a notice expert gleans from the United States Supreme Court's seminal decisions, which are: a) to endeavor to actually inform the class, and b) to demonstrate that notice is reasonably calculated to do so:

> A. "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," *Mullane v. Central Hanover Trust*, 339 U.S. 306, 315 (1950).
>
> B. "[N]otice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them

---

[17] Fed. Judicial Ctr, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide 3 (2010), available at https://www.fjc.gov/content/judges-class-action-notice-and-claims-process-checklist-and-plain-language-guide-0.

an opportunity to present their objections," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) citing *Mullane* at 314.

41. The Notice Program will provide for the best notice practicable under the circumstances of this case, conform to all aspects of Federal Rules of Civil Procedure, Rule 23 regarding notice, comport with the guidance for effective notice articulated in the Manual for Complex Litigation, Fourth and applicable FJC materials, and satisfy the requirements of due process, including its "desire to actually inform" requirement.

42. The Notice Program schedule will afford enough time to provide full and proper notice to the Settlement Class members before the exclusion request and objection deadlines.

43. After the Notice Program has been carried out, I will provide a declaration verifying the effective implementation of the Notice Program.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on January 27, 2026, at Beaverton, Oregon.

*/s/ C.A.*
_____
Cameron R. Azari