# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFF ACTIONS | Case No. 18-cv-1776 (JRT/JFD)<br><br>**Memorandum in Support of Motion for Preliminary Approval of Class Action Settlements Between Commercial and Institutional Indirect Purchaser Plaintiffs and Triumph Foods and Agri Stats and for Leave to Disseminate Notice** |

**Table of Contents**

I.    Introduction.................................................................................................................1

II.   Background and Settlement Terms ...........................................................................2

      A.    The Triumph Settlement Agreement....................................................................3

      B.    The Agri Stats Settlement Agreement ...................................................................6

III.  Preliminary Approval Should be Granted...............................................................11

      A.    The Proposed Settlements Are the Result of Arm's-Length Negotiations......12

      B.    The Settlements Achieve Excellent Result for the Certified Classes,
            Particularly Given the Expense, Duration, and Uncertainty of Continued
            Litigation...........................................................................................................13

IV.   The Court Should Certify the Classes Defined in the Settlement Agreements............16

V.    The Court Should Approve the Form and Manner of Notice to the Settlement Class
      Members.............................................................................................................17

      A.    The Proposed Notice Satisfies the Requirements of Federal Rule of Civil
            Procedure 23(e) and Due Process.......................................................................18

      B.    The Proposed Notice Satisfies the Requirements of Federal Rule of Civil
            Procedure 23(c).................................................................................................21

      C.    The Proposed Notice Provides Class Members with Sufficient Information
            About the Details of the Settlements .................................................................23

            1.    Plan of Allocation ...................................................................................23

            2.    Costs, Attorneys' Fees, and Service Awards ...........................................24

      D.    The Court Should Enter the Proposed Order, Which Schedules the Final
            Approval Hearing and Establishes Other Deadlines..........................................24

VI.   Conclusion.......................................................................................................25

i

## Table of Authorities

**Cases**

*Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696 (1974)...............................................................24

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 2008) ...............................................................24

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114(8th Cir. 1975)...........................................................12

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ...............................................................3

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) ........................... 13, 14, 15

*In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822 (W.D. Pa. 1995) ...............................................................14

*In re Corrugated Container Antitrust Litig.*, 1981 WL 2093 (S.D. Tex. Jan. 27, 1981)....................16

*In re Endotronics, Inc.*, Civ. No. 4-87-130, 1989 WL 6746 (D. Minn. Jan. 30, 1989) .................24

*In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litig.*,
481 F.3d 1119 (9th Cir. 2007)...............................................................14

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003).................................. 13, 16

*In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 1:15-md-2627, 2022 WL 2128630 (E.D. Va. 2022)....................................................22

*In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-01952,
2011 U.S. Dist. LEXIS 17255 (E.D. Mich. Feb. 22, 2011).........................................................14

*In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-01952,
2011 U.S. Dist. LEXIS 150427 (E.D. Mich. Dec. 13, 2011).........................................................13

*In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758 (D. Minn. 2025)....................................................15

*In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491 (W.D. Pa. 2003) ...............................................................15

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)...............................................15

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922 (8th Cir. 2005)...............................11

*In re Zurn Pex Plumbing Prods. Liab. Litig.*, 08-MDL-1958 (ADM/AJB),
2013 WL 716088 (D. Minn. Feb. 27, 2013).........................................................13, 19, 22

*Jones v. Flowers*, 547 U.S. 220 (2006) ............................................................................19

*Larson v. Sprint Nextel Corp.*, No. 07-5325 (JLL),
2009 WL 1228443 (D. N.J. Apr. 30, 2009) ................................................................21

*Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013) ...................................... 11, 12, 13

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............................. 18, 19

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ..............................................18

*Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) ......................................14

*U.S. v. Agri Stats, Inc.*, Civ. No. 23-cv-03009 ............................................................16

*Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1988) .....................................................11

*White v. Nat'l Football League*, 822 F. Supp. 1389 (D. Minn. 1993) ......................... 11, 12

**Statutes & Rules**

Fed. R. Civ. P. 23 ...........................................................................................................23

Fed. R. Civ. P. 23(3)(1)(B) ...........................................................................................17

Fed. R. Civ. P. 23(b)(3) ................................................................................................17

Fed. R. Civ. P. 23(c) .....................................................................................................21

Fed. R. Civ. P. 23(c)(2)(B) ...................................................................................18, 19, 22

Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii) ...............................................................................22

Fed. R. Civ. P. 23(c)(3) ........................................................................................... 17, 22

Fed. R. Civ. P. 23(e) .....................................................................................................18

Fed. R. Civ. P. 23(e)(1) .................................................................................................16

Fed. R. Civ. P. 23(e)(2) .................................................................................................11

Fed. R. Civ. P. 23(e)(2)(C) ...........................................................................................16

Fed. R. Civ. P. 23(h)........................................................................................................24

**Other Authorities**

2 MCLAUGHLIN ON CLASS ACTIONS, § 6:21 (19th ed.)..............................................22

4 NEWBERG ON CLASS ACTIONS § 13.10 (6th ed.) .......................................................12

4 NEWBERG ON CLASS ACTIONS § 13.14 (6th ed.).......................................................12

740 ILL COMP. STAT. § 10/7........................................................................................17

Class Action Fairness Act of 2005, 28 U.S.C. § 1715.............................................5, 11

MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41  ...........................................12

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.611 .......................................22

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.312 .......................................23

## I.    Introduction.

The Commercial and Institutional Indirect Purchaser Plaintiffs ("CIIPPs") respectfully request the Court's preliminary approval of the settlements of their claims against Triumph Foods, LLC ("Triumph") and Agri Stats, Inc. ("Agri Stats") (collectively, "Settling Defendants"). CIIPPs further seek approval of the form and manner of notice related to these settlements and leave to disseminate notice. The proposed settlements include monetary relief of $700,000.00 and substantial non-monetary relief. The Court should grant preliminary approval of the proposed settlements because they are well within the range of possible approval and are in the best interest of the CIIPPs class members. As the Settling Defendants are the final Defendants in the CIIPPs' litigation, if the Court grants preliminary and, subsequently, final approval, the CIIPPs' involvement in this MDL will conclude.

The Court should also grant CIIPPs leave to disseminate notice to the class members according to the proposed notice plan, which provides the best notice practicable under the circumstances. CIIPPs also request that the Court should schedule a final fairness hearing, at which Co-Lead Class Counsel will seek entry of a final order and judgment dismissing Triumph and Agri Stats and retaining jurisdiction for implementation and enforcement of the Settlement Agreements.[1]

---

[1] Unless otherwise set forth herein, capitalized terms in this memorandum that are defined in the Settlement Agreement between CIIPPs and Triumph and the Settlement Agreement between CIIPPs and Agri Stats (collectively, the "Settlement Agreements") shall have the same meaning as ascribed to them in the Settlement Agreements. (*See* Exhibits A & B to the Declaration of Shawn Raiter in Support of Motion for Preliminary Approval of Class Action Settlements Between Commercial and Institutional Indirect Purchaser Plaintiffs and Triumph and Agri Stats and for Leave to Disseminate Notice ("Raiter Decl.")).

## II.    Background and Settlement Terms.

This MDL involves the consolidation of separately filed putative class actions alleging that Defendants engaged in a conspiracy to artificially constrict the supply of Pork in the domestic market of the United States. The CIIPPs allege that the Defendants conspired to constrain the supply and fix the price of Pork from at least 2009 through the commencement of this action. (*See* Dkt. 808 (CIIPPs' Fourth Consolidated and Amended Complaint)). CIIPPs allege that Defendants, through Agri Stats, exchanged detailed, competitively sensitive, and closely guarded non-public information about price, capacity, sales volume, and demand. (*Id.* ¶ 2). CIIPPs allege that Agri Stats provided highly sensitive "benchmarking" reports to most Pork integrators, thereby allowing competitors to compare their profits or performance against that of other companies. (*Id.* ¶ 3). The effect of this anti-competitive exchange of non-public information allegedly allowed Pork integrators to control the supply and price of Pork. (*Id.*) The named CIIPPs allege that they and the class members paid artificially inflated prices for Pork during the Class Period. (*Id.* ¶ 7).

Unlike many civil antirust actions, these cases were started without a formal antitrust investigation by the United States Department of Justice and without the assistance of a leniency applicant under the Department of Justice's Corporate Leniency Program. Since filing the first complaint, the CIIPPs have coordinated with the other plaintiff groups to investigate and develop their case, pursue discovery, and advance this litigation toward trial.

The terms of these settlements were negotiated following years of substantial adversarial litigation as the case was nearing trial. CIIPPs' counsel was well-informed, and the Settlement Agreements arose from arm's-length and good-faith negotiations. (*See* Raiter Decl.

¶¶ 4-7). These are the seventh and eighth settlements the CIIPPs have secured in the Pork litigation. In combination with the CIIPPs' earlier settlements with Defendants JBS, Smithfield, Seaboard, Hormel, Clemens, and Tyson, these settlements would bring CIIPPs' total monetary relief to more than $118 million. (*See* Dkts. 1007, 1548, 2807, 2809, 3254, & 3366).

### A. The Triumph Settlement Agreement

Certified Classes: The Triumph Settlement Agreement defines the "Certified Classes" as follows:

> Injunctive Class: All entities that indirectly purchased uncooked pork bacon, or one or more of the following types of raw pork, whether fresh or frozen: loins, shoulder, ribs, hams, or pork chops from defendants or co-conspirators for their own use in commercial food preparation in the United States from June 28, 2014 to June 30, 2018. For this lawsuit, pork excludes any product that is marketed as organic and/or no antibiotics ever and any product other than bacon that is marinated, seasoned, flavored, or breaded, but it includes uncooked and cooked ham water added products.

> Damages Class: All entities that indirectly purchased uncooked pork bacon, or one or more of the following types of raw pork, whether fresh or frozen: loins, shoulder, ribs, hams, or pork chops from defendants or co-conspirators for their own use in commercial food preparation in the Repealer Jurisdictions[2] from June 28, 2014 to June 30, 2018. For this lawsuit, pork excludes any product that is marketed as organic and/or no antibiotics ever (NAE) and any product other

---

[2] "Repealer Jurisdictions" are states that have "repealed" the Supreme Court's holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and provide standing to indirect purchasers. Commercial and Institutional Indirect Purchaser Plaintiffs assert damages claims in: Arkansas, Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. The class period for Kansas, Massachusetts, Mississippi, South Carolina, and Tennessee class members begins June 28, 2015. (Triumph Settlement Agreement ¶ 5 n.2).

than bacon that is marinated, seasoned, flavored, or breaded, but it includes uncooked and cooked ham water added products.[3]

(Triumph Settlement Agreement ¶ 5). The definitions of the Certified Classes in the Triumph Settlement Agreement are the same as the litigation classes certified in the Court's March 29, 2023 Order (Dkt. 1887), as amended on May 8, 2024 (Dkt. 2225), except for the agreed revision of the "Damages Class" to add Illinois as a Repealer Jurisdiction. (*See* Dkts. 1887, 2225; Triumph Settlement Agreement ¶ 5; Raiter Decl. ¶¶ 9-10).

Settlement Fund: Triumph will pay $700,000.00 to the CIIPPs by paying, or causing to be paid, such sum into an interest-bearing Escrow Account maintained by an escrow agent on behalf of the Certified Classes. (Triumph Settlement Agreement ¶¶ 1h, 1i, 1s, 9, 10).

Other Terms: Triumph agreed to assist with the authentication of Triumph documents that CIIPPs may use at trial. (*Id.* ¶ 3a). When the Triumph settlement was being negotiated, CIIPPs were preparing for trial; this agreement was valuable consideration for the Certified Classes.

Released Claims: In consideration for the $700,000.00 payment and other terms described above, the CIIPPs agree, upon Final Judgment, to release the Triumph Released Parties from:

---

[3] Excluded from the classes are: Natural persons who purchased pork for their personal use and not for commercial food preparation (End-User Consumers); purchases of pork directly from Defendants; purchases of pork for resale in unaltered form; purchases of pork from an intermediary who has further processed the pork; the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant; any federal, state governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action; and any coconspirator identified in this action. (Triumph Settlement Agreement ¶ 5 n.3).

4

all claims, demands, actions, suits, and causes of action, whether statutory, administrative, or common-law, whether at law or in equity, whether seeking injunctive relief or money damages, whether class, individual, or otherwise in nature (whether or not any member of the Certified Class has objected to the Settlement Agreement or makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively or in any other capacity) that the Releasing Parties ever had, now have, or hereafter can, shall, or may ever have, that exist as of the date of the order granting Preliminary Approval, on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected, actual or contingent, liquidated or unliquidated claims, injuries, losses, damages, and the consequences thereof that have been asserted, or could have been asserted, under federal or state law in any way arising out of or relating in any way to the indirect purchase of Pork produced, processed or sold by the Triumph Released Parties or any of the Defendants or their co-conspirators, and purchased indirectly by the Releasing Parties (the "Released Claims").

(*Id.* pp. 17-18).

Termination: The Triumph Settlement Agreement provides either Party the right to rescind the Triumph Settlement Agreement upon the occurrence of specified conditions, including if the Court does not approve the Settlement Agreement, declines to enter a Preliminary Approval order, does not enter an order of Final Approval and a Final Judgment, approves the Settlement Agreement in a materially modified form, or does enter a Final Approval order and Final Judgment but such order and judgment is reversed on appeal. (*Id.* ¶ 18).

Notice: The Triumph Settlement Agreement also requires Triumph—within 10 business days of filing the Settlement Agreement with the Court in connection with CIIPPs' motion for preliminary approval—to submit all materials required to be sent to appropriate Federal and State officials pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715. (*Id.* ¶ 22).

**B. The Agri Stats Settlement Agreement.**

Certified Classes: The Agri Stats Settlement Agreement defines the "Certified Class" as follows:

> All entities that indirectly purchased raw pork, bacon, or one or more of the following types of raw pork, whether fresh or frozen: loins, shoulder, ribs, hams, or pork chops from defendants or co-conspirators for their own use in commercial food preparation in the Repealer Jurisdictions[4] from June 28, 2014 to June 30, 2018. For this lawsuit, pork excludes any product that is marketed as organic, no-antibiotics ever (NAE) and any product other than bacon that is marinated, seasoned, flavored, or breaded, but it includes uncooked and cooked ham water added products.[5]

(Agri Stats Settlement Agreement ¶ 5). The definition of the Certified Class in the Agri Stats Settlement Agreement is the same as the litigation class certified in the Court's March 29, 2023 Order. (*See* Dkt. 1887; Agri Stats Settlement Agreement ¶ 5; Raiter Decl. ¶¶ 9-10).

Settlement Consideration and Conduct Reform: The Agri Stats Settlement Agreements provides for significant conduct reform to address the concerns that motivated this lawsuit. As of the date of the Agri Stats Settlement Agreement, Agri Stats no longer publishes Pork processing reports and does not plan to resume publication of such reports. (Agri Stats

---

[4] "Repealer Jurisdictions" are Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, Tennessee, Utah, and West Virginia. The class period for Kansas, Tennessee, and South Carolina class members is proposed to begin June 28, 2015. (Agri Stats Settlement Agreement ¶ 5 n.2).

[5] Excluded from the class are defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant; any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action; and any coconspirator identified in this. (*Id.* ¶ 5 n.3).

6

Settlement Agreement ¶ 9). In the event that Agri Stats resumes publication of such reports in the future, Agri Stats has agreed to conduct numerous reforms, including that it would:

a. Retain an experienced outside attorney with responsibility for antitrust compliance.

b. Conduct annual employee antitrust compliance training;

c. Implement a written antitrust compliance policy and training:

    i. Prohibiting Agri Stats and its employees from disclosing to a competitor of a pork subscriber, orally or in writing (including through custom reports), any non-public information collected from a pork subscriber other than the anonymized information disclosed in Agri Stats' reports;

    ii. Prohibiting any Agri Stats pork report from containing actual competitor- or plant-level price or production volume data.

    iii. Implementing data security measures to prevent pork customer employees who transition from firm A to firm B from accessing firm A data.

    iv. Implementing data security measures to prevent Agri Stats employees who transition to a customer firm from accessing non-public or non-anonymized Agri Stats data.

    v. Prohibiting Agri Stats and its employees from assisting with identifying and/or de-anonymizing pork subscriber data in Agri Stats' reports;

    vi. Ensuring that all data values within all data fields in Agri Stats pork reports consist of data from at least three entities4 with no entity representing more than 70% of the data, except for quartile data fields and plant-level data fields (that are not removed as set forth in Exhibit A, as discussed below);

    vii. Agri Stats will suppress any fields that have categorical values (for example a field that takes on values of YES and NO, or a plant shift field which lists the shifts a plant operates, or the breed processed at a particular plant) if any given value of that category has fewer than three firms. If, at any time, the number of plants increases or the number of firms that take on a particular value increases, the field no longer needs to be

7

suppressed. Conversely if the number of plants decreases or the number of firms that take on a particular value decreases such that fewer than three firms take on a particular value, the field will be suppressed even if it had not been in the past;

viii. Requiring that, other than data available for anyone to purchase as set forth below, every data field in Agri Stats pork reports shall be composed of data that is at least 45 days old on average;

d. Implement provisions protecting confidentiality of competitor data in Agri Stats pork customer contracts.

e. Remove all participant lists in pork reports.

f. Remove all flags in pork reports.

g. Remove in the pork reports made available to a report recipient all plant-level production-related data fields identified in Exhibit A for pork subscribers other than the report recipient. Notwithstanding the foregoing, Agri Stats may provide to a subscriber a subscriber's rank and percentile for these data fields.

h. Modify the pork reports as necessary to (1) delete variance fields and/or (2) suppress "linking" of data fields across reports that would otherwise disclose the plant-level data field identified in Exhibit A.

i. Nothing in this Settlement Agreement prohibits or limits EMI's ability to provide nationwide average price data by product category for anyone (including consumers) to purchase. Agri Stats also shall publish a pork performance report containing the production-related data fields identified in Exhibit B for anyone (including consumers) to purchase. Neither Agri Stats nor EMI may refuse a purchase of such reports on the basis that the purchaser is not a protein producer unless the persons or entities have unresolved claims pending against Agri Stats. The prices for such reports shall be no more than the average price being charged to Agri Stats' or EMI's regular customers as of the date of purchase. Except as set forth in this paragraph, nothing in this Settlement Agreement shall prohibit Agri Stats or EMI from adjusting or altering prices to any customer or adjusting other terms and conditions of purchase from time to time in its sole discretion. Such reports shall be made available without requiring the submission of data from subscribers, except that Agri Stats and EMI may continue to require processors to submit data.

8

j.  Agri Stats will not introduce any averages in any pork reports or subsections that do not comply with the 3 entity / 70% rule set forth above.

k.  Agri Stats will give class counsel two weeks' notice in the unforeseen event that pork reports resume.

l.  No non-public export data collected from a subscriber will be provided to any competitor other than the information disclosed in Agri Stats' regular pork reports.

m.  Agri Stats will provide no forward-looking industry forecasts to pork processors, including regarding how future industry production decisions might impact future prices or profitability. For the avoidance of doubt, nothing in the Settlement Agreement prohibits or limits EMI's ability to provide forward-looking industry forecasts based on publicly available data for anyone (including consumers) to purchase and EMI may not refuse such a purchase on the basis that the purchaser is not a protein producer unless the persons or entities have unresolved claims pending against Agri Stats.

n.  In the unforeseen event that Agri Stats resumes publication of pork processing reports in the future, Agri Stats agrees that it will not readd the plant-level data fields set forth in Exhibit A for subscribers other than the report recipient under a different numbering system, report, or mechanism for delivery to a report recipient. For the avoidance of doubt, nothing in the Settlement Agreement prohibits or limits 1) subscriber disclosure of data to Agri Stats or Agri Stats' addition of new reports or services, so long as such reports or services incorporate corresponding restrictions to those set forth herein; or 2) the renumbering and reordering of reports or data fields.

o.  Agri Stats will not disclose any non-public data collected from a pork subscriber to any competitor of the subscriber other than the anonymized information disclosed in Agri Stats' regular reports, including through electronic tools like the sales data miner, web application programming interfaces ["API"] services, or other web services provided by Agri Stats and/or its parents, subsidiaries, owners, or contractors. For the avoidance of doubt, nothing in the Settlement Agreement prohibits Agri Stats from providing pork reports to subscribers in different electronic formats, so long as the format complies with the other provisions of this Settlement Agreement.

9

p.      Agri Stats shall cease, and will not resume in the future, publication of any and all sales reports. Agri Stats shall cease, and will not resume in the future, publication of any and all price data for product categories that are not otherwise made available to the public from EMI pursuant to Paragraph 9(i).

q.      With the exception of paragraph 9(p), this conduct relief shall remain in effect for five years, starting from the unforeseen date that Agri Stats resumes the pork reports.

r.      Nothing in this Settlement Agreement shall be construed to prohibit Agri Stats from petitioning the Court for modification of the Conduct Relief for good cause shown.

s.      This Section sets out the total scope of Agri Stats' Conduct Relief agreed upon by the parties, and Agri Stats shall have no further obligations other than or beyond those set forth in this Section.

(Agri Stats Settlement Agreement ¶ 9).

Released Claims: In consideration for the conduct reform described above, the CIIPPs

agree, upon Final Judgment, to release the Agri Stats Released Parties from:

> any and all claims, demands, actions, suits, and causes of action, whether class, individual, or otherwise in nature (whether or not any member of the Certified Class has objected to the Settlement Agreement, whether directly, representatively, derivatively or in any other capacity) that the Releasing Parties ever had, now have, or hereafter can, shall, or may ever have, that exist as of the date of the order granting Preliminary Approval on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected, actual or contingent, liquidated or unliquidated claims, injuries, losses, damages, and the consequences thereof that have been asserted in the Action, or could have been asserted, under federal or state law in any way arising out of or relating in any way to the indirect purchase of Pork produced, processed or sold by subscribers of the Agri Stats Released Parties or any of the Defendants or their Co-Conspirators, and purchased by the Releasing Parties (the "Released Claims").

(*Id.* ¶ 11).

Termination: The Agri Stats Settlement Agreement provides either Party the right to

rescind the Agri Stats Settlement Agreement upon the occurrence of specified conditions,

10

including if the Court does not approve the Settlement Agreement, declines to enter a Preliminary Approval order, does not enter an order of Final Approval and a Final Judgment, approves the Agri Stats Settlement Agreement in a materially modified form, or does enter a Final Approval order and Final Judgment but such order and judgment is reversed on appeal. (*Id.* ¶ 16).

Notice: The Agri Stats Settlement Agreement also requires Agri Stats—within 10 business days of filing the Settlement Agreement with the Court in connection with CIIPPs' motion for preliminary approval—to submit all materials required to be sent to appropriate Federal and State officials pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715. (*Id.* ¶ 20).

## III.   Preliminary Approval Should be Granted.

When parties propose to settle a class action, the Court must review the settlement to ensure that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A district court has broad discretion in evaluating a class-action settlement. *Van Horn v. Trickey*, 840 F.2d 604, 606–07 (8th Cir. 1988). Review of a proposed class action settlement typically proceeds in two stages. *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 383 (D. Minn. 2013). At the preliminary approval stage, the court determines whether the settlement is within the range of possible approval and whether class members should be notified of the terms of the proposed settlement.[6] *White*

---

[6] In making a final determination of settlement approval, the district court ultimately is required to consider four factors: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 931 (8th Cir. 2005). But, at the preliminary approval stage, "the fair, reasonable and adequate standard is lowered, with emphasis only on whether

11

*v. Nat'l Football League*, 822 F. Supp. 1389, 1416 (D. Minn. 1993). A court's preliminary evaluation of proposed settlements is simply to determine whether it is within the range of possible approval and, thus, whether notice to the class of the terms and conditions of the settlement, and scheduling a formal fairness hearing, are worthwhile. 4 NEWBERG ON CLASS ACTIONS § 13.10 (6th ed.).

A proposed settlement agreement should be preliminarily approved if "the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies … and [the settlement] appears to fall within the range of possible approval." MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41. "The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context." *White*, 822 F. Supp. 2d at 1416. The proposed settlements between the CIIPPs and Triumph and Agri Stats should be granted preliminary approval because the settlements are well within the range of reasonableness and possible approval. (*See* Raiter Decl. ¶¶ 4-8).

### A.     The Proposed Settlements are the Result of Arm's-Length Negotiations.

Courts determining preliminary approval consider "whether the agreement arose out of arm's-length, non-collusive negotiations." 4 NEWBERG ON CLASS ACTIONS § 13.14 (6th ed.); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975). The preliminary determination establishes a presumption of fairness when a settlement "has been negotiated at arm's length, discovery is sufficient, [and] the settlement proponents are experienced in

---

the settlement is within the *range* of possible approval due to an absence of any glaring substantive or procedural deficiencies." *Martin*, 295 F.R.D. at 383 (quotation omitted).

similar matters." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 08-MDL-1958 (ADM/AJB), 2013 WL 716088, at *6 (D. Minn. Feb. 27, 2013). The court gives "great weight" to and may rely on the judgment of experienced counsel in its evaluation of a proposed settlement. *Id.*

At the preliminary approval stage, "the fair, reasonable and adequate standard is lowered, with emphasis only on whether the settlement is within the range of possible approval due to an absence of any glaring substantive or procedural deficiencies." *Martin*, 295 F.R.D. at 383 (quotation omitted). The Settlement Agreements here are within the range of possible approval because there are no glaring substantive or procedural deficiencies. The Settlement Agreements are the product of extensive litigation and arm's-length negotiations following the Court's class certification, *Daubert*, and summary judgment rulings and during preparation for trial. (*See* Raiter Decl. ¶¶ 4-8). By the time the settlements were reached, the CIIPPs had developed and assessed both their claims and the Settling Defendants' defenses after years of litigation. (*Id.*).

> **B.    The Settlement Agreements Achieve an Excellent Result for the Certified Classes, Particularly Given the Expense, Duration, and Uncertainty of Continued Litigation.**

Antitrust class actions are "arguably the most complex action[s] to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome." *In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-01952, 2011 U.S. Dist. LEXIS 150427, at *76 (E.D. Mich. Dec. 13, 2011) (quoting *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003)); *see also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003) ("Moreover, the complexity of this case cannot be overstated. Antitrust class actions are

13

inherently complex."). Motions have been vigorously contested, and the discovery process has been complex.

The Settling Defendants have asserted numerous defenses, and a jury trial might well turn on close questions of proof, many of which would be the subject of complicated expert testimony, particularly regarding damages, making the outcome of such trial uncertain for both parties. *See, e.g., Cardizem*, 218 F.R.D. at 523 (in approving settlement, noting that "the prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery and that "no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation"); *Packaged Ice*, 2011 U.S. Dist. LEXIS 17255, at *53-54 (noting the "undeniable inherent risks" in antitrust class action litigation including "whether the class will be certified and upheld on appeal, whether the conspiracies as alleged in the Complaint can be established, whether Plaintiffs will be able to demonstrate class wide antitrust impact and ultimately whether Plaintiffs will be able to prove damages"). Given this uncertainty, "[a] very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

Moreover, given the stakes involved, an appeal would be nearly certain to follow regardless of the outcome at trial. This creates additional risk, as judgments following trial may be overturned on appeal. *See, e.g.*, *In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119 (9th Cir. 2007) ($52.5 million class action judgment following trial reversed on appeal); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs reversed and judgment entered for defendant). And even if class

members were willing to assume all the litigation risks, the passage of time would introduce still more risks in terms of appeals and possible changes in the law that would, considering the time value of money, make future recoveries less valuable than recovery today. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004) ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class."); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 501 (W.D. Pa. 2003) ("[A] future recovery, even one in excess of the proposed Settlement, may ultimately prove less valuable to the Classes than receiving the benefits of the proposed Settlement at this time"). Hence, "the certain and immediate benefits to the Class represented by the Settlement outweigh the possibility of obtaining a better result at trial, particularly when factoring in the additional expense and long delay inherent in prosecuting this complex litigation through trial and appeal." *Cardizem*, 218 F.R.D. at 525.

Against this background, the settlements providing the substantial benefits afforded here represent an excellent result for the members of the Certified Classes. (*See* Raiter Decl. ¶¶ 4-8). Triumph's $700,000.00 payment provides compensation that will be available earlier than if litigation against Triumph continued through trial and appeal. Triumph will pay the Settlement Fund into the Escrow Account within 30 calendar days of the Court's preliminary approval. (Triumph Settlement Agreement ¶ 10). The Settlement Fund will be used to compensate the eligible members of the Certified Classes for damages suffered and expenses incurred. And Agri Stats's conduct reform puts an end to the reports that this Court concluded were "the most suspicious" of Agri Stats's products. *See In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 839 (D. Minn. 2025). These reforms—including public access to the reports,

15

anticompetitive features, eliminating plant-specific pricing and production volume data, and ending the publication of sales reports altogether—represent meaningful change to the industry and provide a class-wide benefit. Settlements of this type create value beyond their direct pecuniary benefit to the class.[7] *See Linerboard*, 292 F. Supp. 2d at 643; *In re Corrugated Container Antitrust Litig.*, 1981 WL 2093, *16 (S.D. Tex. Jan. 27, 1981). The Settlement Agreements provide significant relief to the Certified Classes, far greater than the threshold "adequate" relief required by Fed. R. Civ. P. 23(e)(2)(C). (*See* Raiter Decl. ¶¶ 4-8). The Court should therefore grant preliminary approval of the settlement.

**IV.    The Court Should Certify the Classes Defined in the Settlement Agreements.**

The Court previously granted the CIIPPs' motion for class certification and certified a damages class and an injunctive relief class. (Dkt. 1887; Dkt. 2225). In cases certified before settlement—as happened here—the Federal Rules of Civil Procedure's Advisory Committee notes state that the only class certification issues at the settlement stage concern "whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted." Fed. R. Civ. P. 23(e)(1) Advisory Committee Note to 2018 Amendment.

The Court certified almost identical classes before settlement, which allows it to incorporate its findings from the March 29, 2023 Order, as amended on May 8, 2024, and address only the addition of Illinois as a Repealer Jurisdiction. *See* Fed. R. Civ. P. 23(e)(1) Advisory Committee Note to 2018 Amendment). In this litigation, the Court previously

---

[7] The Agri Stats Settlement Agreement imposes even broader and more stringent prohibitions on Agri Stats's conduct than the recent Proposed Final Judgment in *U.S. v. Agri Stats, Inc.* (*See* Dkt. 742-2, Civ. No. 23-cv-03009 (JRT/JFD)).

16

approved an indirect purchaser class that included Illinois as a Repealer Jurisdiction. (*See* Dkt.

1887 at 8 n.10).  Earlier in the litigation, an attorney from the Illinois Attorney General's Office

contacted Class Counsel for the CIIPPs and indicated that their office viewed Illinois as a

Repealer Jurisdiction and further indicated that their office would appear in this MDL to

advocate, if necessary, for the inclusion of Illinois class members in settlements. (*See* Raiter

Decl. ¶¶ 9-10; *see also* § 740 ILL COMP. STAT. § 10/7). The CIIPPs therefore sought inclusion

of Illinois as a Repealer Jurisdiction in these settlements with Triumph and Agri Stats.

Accordingly, CIIPPs request that the Court incorporate its findings from its March 29,

2023 Order, as amended on May 8, 2024, approve the inclusion of Illinois as a Repealer

Jurisdiction for this Settlement, and preliminarily certify—for purposes of these settlements—

the "Certified Classes" as defined in the Settlement Agreements. (*See* Triumph Settlement

Agreement ¶ 5; Agri Stats Settlement Agreement ¶ 5).

**V.     The Court Should Approve the Form and Manner of Notice to the Settlement
         Class Members.**

After preliminary approval of a settlement agreement, class members must be notified

of the settlement. Fed. R. Civ. P. 23(3)(1)(B). For a class certified under Rule 23(b)(3), whether

litigated or by settlement, the notice must:

> clearly and concisely state in plain, easily understood language: (i) the nature of
> the action; (ii) the definition of the class certified; (iii) the class claims, issues, or
> defenses; (iv) that a class member may enter an appearance through an attorney
> if the member so desires; (v) that the court will exclude from the class any
> member who requests exclusion; (vi) the time and manner for requesting
> exclusion; and (vii) the binding effect of a class judgment on members under
> Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). The Court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Id.*

To design and implement the proposed notice plan, Class Counsel has retained Epiq Class Action & Claims Solutions, Inc., an industry leader in class action administration, and Epiq Legal Noticing aka Hilsoft Notifications, a business unit of Epiq Class Action & Claims Solutions, Inc. that specializes in designing, developing, analyzing, and implementing large-scale, un-biased, legal notification plans (collectively, "Epiq"). (*See* Declaration of Cameron Azari, filed herewith ("Azari Decl.") ¶¶ 3, 4). Epiq has been involved with legal noticing in more than 700 cases, including more than 75 multi-district litigation settlements. (*Id.* ¶ 4). Cameron Azari, a nationally recognized expert in the field of legal notice, is a Senior Vice President of Epiq Class Action & Claims Solutions, Inc. and the Managing Director of Epiq Legal Noticing. (*Id.* ¶ 3). As with the notice plans approved by this Court for the CIIPPs' settlements with Defendants JBS, Smithfield, Seaboard, Hormel, Clemens, and Tyson, Co-Lead Class Counsel has worked with Mr. Azari and his team to develop both the proposed form of class notice and the plan for dissemination of the notice. (*See id.* ¶¶ 3, 5).

> **A.      The Proposed Notice Satisfies the Requirements of Federal Rule of Civil Procedure 23(e) and Due Process.**

The notice of a class action settlement need only satisfy the broad "reasonableness" standards imposed by due process. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999). A notice is adequate if "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314

18

(1950)). To satisfy due process, the notice must reflect a desire to inform. *Mullane*, 339 U.S. at 315. The notice plan should take reasonable steps to update addresses before mailing and provide for re-mailing of notices to better addresses when returned as undeliverable. *Jones v. Flowers*, 547 U.S. 220, 226-27 (2006). The "best notice practicable" does not mean actual notice, nor does it require individual mailed notice where there are no readily available records of class members' individual addresses or where it is otherwise impracticable. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2012 WL 5055810, at *8. In addition to United States mail, notice may be by electronic means, or other appropriate means. Fed. R. Civ. P. 23(c)(2)(B).

CIIPPs propose providing notice through several different channels. Individual notice (the "Email Notice") will be emailed to a nationwide list of restaurants identified as potential members of the class. (*See* Azari Decl. ¶¶ 17-19, Attachment 2). The Email Notice will be drafted in such a way that the subject line, the sender, and the body of the message overcome spam filters and ensure readership to the fullest extent practicable. (*Id.*). The Email Notice will provide an embedded link to the settlement website where recipients may obtain additional information about the Settlement with Triumph and Agri Stats. (*Id.*).

The current settlement website will be updated to allow class members to obtain detailed information about the case and review key documents, including: Complaints, Long Form Notice, Settlement Agreement, Preliminary Approval, Motions for Attorneys' Fees and Expenses, Final Approval Order, as well as answers to Frequently Asked Questions (FAQs), instructions for how class members may object to the settlements, contact information for the Settlement Administrator, and how to obtain other case-related information. (*Id.* ¶ 31). The website address will be displayed prominently on all notice documents. (*Id.*). The proposed

19

notice plan also provides a toll-free telephone number for class members to call for additional information, listen to answers to FAQs, and request that a Long Form Notice be mailed to them. (*Id.* ¶ 32). The toll-free number will also be prominently displayed on all notices, and the automated phone system will be available 24 hours per day, 7 days per week. (*Id.*). Finally, the proposed notice plan establishes a post office box and email address for correspondence about the case, allowing class members to contact the Settlement Administrator with any specific requests or questions. (*Id.* ¶ 33).

To supplement direct Email Notice, the proposed notice includes a comprehensive media plan. The notice plan includes Digital Notices on selected advertising networks, which will be targeted to class members. (*Id.* ¶¶ 20-22). The internet Digital Notices will link directly to the settlement website, thereby allowing visitors easy access to relevant information and documents. (*Id.*). The internet Digital Notices (*see id.*, Attachment 4) will be placed on the advertising networks *Google Display Network* and *Yahoo Audience Network*, which together cover 90% of the United States' population that is online.[8] (*Id.* ¶ 23). The proposed notice plan also includes Digital Notice advertising on social media websites *Facebook* and *LinkedIn*, which have more than 197 million and 270 million members, respectively, in the United States. (*Id.* ¶ 24). In total, the proposed comprehensive media plan is expected to generate over 182 million targeted impressions nationwide over the course of approximately 31 days. (*Id.* ¶¶ 25-27). On top of these impressions, the proposed notice plan includes sponsored search listings on the three most highly visited search engines: *Google*, *Yahoo!*, and *Bing*. (*Id.* ¶ 28).

---

[8] According to MRI-Simmons syndicated research, 97% of all adults are online and 85% of all adults use social media. (Azari Decl. ¶ 20).

To further supplement the direct Email Notice and comprehensive Digital Notice advertising, the proposed notice plan includes an Informational Release to be issued broadly over PR newswire to approximately 13,000 general media (print and broadcast) outlets, including local and national newspapers, magazines, national wire services, television and radio broadcast media across the United States, as well as approximately 4,000 websites, online databases, internet networks, and social networking media. (*Id.* ¶¶ 29-30). This Informational Release also will be distributed to more than 640 journalists that report specifically on restaurants and the food industry. (*Id.*).

This plan is nearly the same as plans the Court approved for prior CIIPP settlements in this MDL, and the methods of notice proposed here are the best available under the circumstances. The proposed methods are well-designed to reach class members and to comply with due process. The proposed notice program is expected to reach at least 70% of class members, with an average frequency of 2.0 times each. (*Id.* ¶¶ 16, 39). Additionally, as this will be the seventh notice for a CIIPP settlement, numerous class members will have already received notice about the prior settlements. The "reach" for class members easily exceeds due process requirements and the notice reach approved in other cases. *See, e.g.*, *Larson v. Sprint Nextel Corp.*, No. 07-5325 (JLL), 2009 WL 1228443, at *11 (D. N.J. Apr. 30, 2009) ("No case stands for the proposition that a publication notice reach of 49-53 percent is disallowed.").

**B.   The Proposed Notice Satisfies the Requirements of Federal Rule of Civil Procedure 23(c).**

Notice must "clearly and concisely state in plain, easily understood language" seven types of information: "(i) the nature of the action; (ii) the definition of the class certified; (iii)

21

the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).

Both the Email Notice and Long Form Notice satisfy the requirements under Federal Rule of Civil Procedure 23(c)(2)(B). The proposed notices state in clear and concise plain language the nature of the action, the definition of the class certified, and the class claims, issues, and defenses. (*See* Azari Decl., Attachment 3 (Long Form Notice)). Mr. Azari has attested that the proposed notices are designed to be "noticed" and reviewed by class members, and are written in plain language so the notices will be understood by class members. (*Id.* ¶¶ 34-35). The proposed notices follow the principles embodied in the Federal Judicial Center's illustrative "model" notices posted at www.fjc.gov and are written in simple, plain language to encourage readership and comprehension.[9] (*Id.* ¶¶ 34-37). The proposed notice plan informs class members that they may request to be heard at the final fairness hearing by following certain procedures, and it clearly identifies class members' right to object to the settlement terms. (*Id.*, Attachments 2 & 3).[10]

---

[9] *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2013 WL 716088, at *8 (D. Minn. Feb. 27, 2013) (approving notices with form and content that is consistent with the principles articulated by the Federal Judicial Center).

[10] Because notice was given of the certification of the litigation classes and the time for exclusion from those classes has passed, no additional opportunity to opt-out of the Settlement Class is needed. *See* 2 MCLAUGHLIN ON CLASS ACTIONS, § 6:21 (19th ed.) (quoting and citing MANUAL FOR COMPLEX LITIGATION (4th), § 22.611 at 313); *In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 1:15-md-2627, 2022 WL 2128630, at *6 n.9 (E.D. Va. 2022)).

The Court should approve the proposed notice plan because it satisfies the requirements under Federal Rule of Civil Procedure 23 and comports with due process. (*Id.* ¶¶ 40-41). At final approval, the CIIPPs will show that the form and content of the notices, together with the manners of dissemination, were reasonably calculated to reach the members of the class and were the best form of notice available under the circumstances, in satisfaction of federal law and due process.

### C.  The Proposed Notice Provides Class Members with Sufficient Information About the Details of the Settlements.

The notice plan provides class members with information about the benefits available under the settlements, their options, and that attorneys' fees, costs, and service awards will be requested at a later date. The notice also advises that a proposed plan of allocation will be submitted for consideration by the Court.

### 1.  Plan of Allocation.

The notice plan will advise class members that information about a plan of allocation will be published on the settlement website when sufficient information is available to issue such a plan. (*See* Azari Decl., Attachment 3). In this motion, the CIIPPs do not ask the Court to approve a plan of allocation, but the Court may grant final approval before approving a plan of allocation. *See, e.g.*, MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.312 ("Often … the details of allocation and distribution are not established until after the settlement is approved."). Information about how the Settlement Fund will be allocated through one or more plans of allocation will be published after the CIIPPs and any allocation consultants have determined how settlement proceeds should be allocated and the Court has approved the plan.

### 2.    Costs, Attorneys' Fees, and Service Awards.

Class Counsel will seek reimbursement of certain litigation expenses already incurred during this litigation. *See, e.g.*, Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorneys' fees and untaxable costs that are authorized by law or by the parties' agreement."); *In re Endotronics, Inc.*, Civ. No. 4-87-130, 1989 WL 6746, at *1 (D. Minn. Jan. 30, 1989) (citing *Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 723 (1974)).

The notice plan advises class members that Class Counsel will request a portion of the Settlement Fund be used for a service award for businesses that served as class representatives. *See Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 2008) (Class representatives are "an essential ingredient of any class action" and incentive awards are appropriate to induce a business or consumer to participate in worthy class action lawsuits). The CIIPP representative plaintiffs have shouldered a substantial discovery burden and devoted years' of attention to this litigation. Considering the substantial benefits provided to the Settlement Classes, an award from the Court recognizing class representatives' efforts is appropriate.

### D.    The Court Should Enter the Proposed Order, Which Schedules the Final Approval Hearing and Establishes Other Deadlines.

The CIIPPs respectfully request that the Court hold a Final Approval hearing in connection with the settlements. At the hearing, the Court should consider: whether the settlements are fair, reasonable, and adequate; whether to approve a request for attorneys' fees and reimbursement of litigation expenses; and whether to approve a request for service awards for the named class representatives. At the final fairness hearing, Class Counsel will offer argument in support of approval, and class members may be heard regarding the proposed settlements and objections if they choose.

24

The CIIPPs propose the following schedule of events for disseminating notice to class members and setting the final fairness hearing:

| DATE | EVENT |
|---|---|
| Within 21 days from order directing notice | Settlement Administrator shall provide direct mail and email notice, and commence implementation of the publication notice plan |
| 60 days after the commencement of notice | Last day for class members to object to the settlements, and for class members to file notices to appear at the final fairness hearing |
| 14 days before the final fairness hearing | Class Counsel shall file a motion for final approval of the settlements and all supporting papers, and Class Counsel and Settling Defendants may respond to any objections to the proposed settlements |

## VI.    Conclusion.

For the foregoing reasons, the CIIPPs respectfully request that the Court preliminarily approve the Triumph Settlement Agreement and Agri Stats Settlement Agreement and authorize Co-Lead Class Counsel to disseminate notice of the settlements according to the proposed notice plan.

Dated: May 29, 2026

By ___*s/ Shawn M. Raiter*___
Shawn M. Raiter (240424)
**Larson · King, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
(651) 312-6500
sraiter@larsonking.com

25

Michael Flannery (*pro hac vice*)
**Cuneo Gilbert Flannery & LaDuca, LLP**
Two CityPlace Drive
Second Floor
St. Louis, MO 63141
(314) 226-1015
mflannery@cuneolaw.com

**Class Counsel for the Commercial and Institutional Indirect Purchaser Plaintiffs**

26